Robert B. McCaw
Lori A. Martin
John V. H. Pierce
Dawn M. Wilson
Michael L. Feinberg

**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
399 Park Avenue
New York, New York 10022
(212) 230-8800

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| : | **MDL-1902** |
| **In re REFCO, INC. SECURITIES** : | **05 Civ. 8626 (GEL)** |
| **LITIGATION** : | |
| : | |
| : | |

- - - - - - - - - - - - - - - - - - - - - - - - - -x

## DECLARATION OF DAWN M. WILSON IN SUPPORT OF THE 144A DEFENDANTS' MOTION TO DISMISS COUNT THREE OF THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

I, Dawn M. Wilson, hereby declare under penalty of perjury as follows:

1.      I am counsel at the firm of Wilmer Cutler Pickering Hale and Dorr LLP,

counsel for Defendants Credit Suisse Securities (USA) LLC, Banc of America Securities

LLC, and Deutsche Bank Securities Inc. (the "144A Defendants") in the above-captioned

action.  I respectfully submit this Declaration in further support of the 144A Defendants'

Motion to Dismiss Count Three of the Second Amended Consolidated Class Action

Complaint.

2.      Attached hereto as Exhibit A is a true and correct copy of the Second

Amended Consolidated Class Action Complaint in *In re Refco, Inc. Securities Litigation*,

05 Civ. 8626 (S.D.N.Y. Dec. 3, 2007).

3.    Attached hereto as Exhibit B is a true and correct copy of the letter from

Megan McIntyre, counsel to Lead Plaintiffs, to Greg A. Danilow, dated January 25, 2008.

4.    Attached hereto as Exhibit C is a true and correct copy of Refco Group Ltd.,

LLC Form S-4 Registration Statement (Oct. 12, 2004).

5.    I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       February 1, 2008

WILMER CUTLER PICKERING
HALE AND DORR LLP

By: _____

Dawn M. Wilson

399 Park Avenue
New York, New York 10022
Tel.: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Defendants Credit Suisse
Securities (USA) LLC, Banc of America
Securities LLC, and Deutsche Bank
Securities Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CONFIDENTIAL—PORTIONS OF
THIS DOCUMENT HAVE BEEN
REDACTED**

In re REFCO, INC. SECURITIES
LITIGATION

MASTER FILE NO.
05 Civ. 8626 (GEL)

JURY TRIAL DEMANDED

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
John P. Coffey  (JC-3832)
Salvatore J. Graziano (SG-6854)
John C. Browne (JB-0391)
Jeremy P. Robinson
David Webber (DW-3876)
1285 Avenue of the Americas
New York, NY 10019
Telephone:     (212) 554-1400
Facsimile:     (212) 554-1444

**GRANT & EISENHOFER  P.A.**
Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
Jonathan D. Margolis (JM-1128)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:     (646) 722-8500
Facsimile:     (646) 722-8501

- and -

Megan D. McIntyre
Jeff A. Almeida
Peter B. Andrews
Christine M. Mackintosh
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone:     (302) 622-7000
Facsimile:     (302) 622-7100

*Attorneys for Lead Plaintiffs RH Capital Associates LLC and Pacific
Investment Management Company LLC and Co-Lead Counsel for the Putative Class*

**TABLE OF CONTENTS**

Page

I.    NATURE OF THE ACTION ............................................................................. 1

II.   JURISDICTION AND VENUE ....................................................................... 7

III.  PARTIES AND RELEVANT NON-PARTIES ............................................... 8

    A.    Plaintiffs ................................................................................................ 8

    B.    The Company ........................................................................................ 9

    C.    The Defendants ................................................................................... 13

        1.    The Bennett Shell-Entity Defendants ....................................... 13

        2.    The Officer Defendants.............................................................. 14

        3.    Defendant Trosten...................................................................... 18

        4.    Defendant Grant......................................................................... 18

        5.    The Audit Committee Defendants ............................................. 19

        6.    The Defendants Affiliated with Thomas H. Lee Partners.......... 20

        7.    Defendant Grant Thornton ........................................................ 23

        8.    The Underwriter Defendants...................................................... 24

        9.    The Mayer Brown Defendants................................................... 31

IV.   CLASS ALLEGATIONS .............................................................................. 33

V.    FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF
     UNDER THE SECURITIES ACT ................................................................. 36

    A.    Historical Background Regarding the Company .................................. 36

    B.    Early Efforts to Sell the Company ...................................................... 40

    C.    The THL Partner Defendants' Investment and the 2004 Recapitalization ........... 41

    D.    The Bond Offering............................................................................... 43

        1.    The Offering Memorandum........................................................ 45

(a)     The Financial Statements in the Offering Memorandum Contained Untrue Statements of Material Facts ........................... 48

(b)     The Description of Customer Receivables and Related-Party Transactions in the Offering Memorandum Contained Untrue Statements and Omissions of Material Fact .................................. 57

(c)     The Offering Memorandum Misrepresented the Reasons for the Company's Purported Success .................................................. 59

(d)     The Offering Memorandum Misrepresented the Company's Ability to Access the Cash It Needed to Service Its Debt ............ 60

(e)     The Offering Memorandum Misrepresented That the Company Had Taken Adequate Steps to Protect Itself From the Risk of Customer Defaults ...................................................................... 62

(f)     The Offering Memorandum Misrepresented That the Company Maintained Excess Regulatory Capital ......................................... 64

(g)     The Offering Memorandum Failed to Disclose BAWAG's Full Ownership Interest in Refco Group ............................................. 65

2.     Presentations to Ratings Agencies ........................................................... 65

3.     The Bond Road Show ............................................................................. 67

4.     The Bond Registration Statement ............................................................ 69

E.     The August 2005 Initial Public Offering ............................................................. 80

1.     The IPO Registration Statement ............................................................. 82

(a)     The Financial Statements in the IPO Registration Statement Contained Untrue Statements of Material Facts ........................... 83

(b)     The Description of Customer Receivables and Related-Party Transactions in the IPO Registration Statement Contained Untrue Statements and Omissions of Material Fact .................................. 92

(c)     The IPO Registration Statement Misrepresented That the Company Had Taken Adequate Steps to Protect Itself From the Risk of Customer Defaults ........................................................... 95

(d)     The IPO Registration Statement Misrepresented That The Company Maintained Excess Regulatory Capital ....................... 96

(e)     The IPO Registration Statement Failed to Disclose BAWAG's Full Ownership Interest in Refco Group ....................................... 97

F.      The Truth Begins to Emerge and the Company Collapses .................................... 98

VI.     THE COMPANY'S VIOLATIONS OF GAAP ............................................................... 103

VII.    GRANT THORNTON'S VIOLATIONS OF AUDITING STANDARDS ................... 108

        A.      Violations of General Standards .......................................................................... 109

        B.      Violations of Standards of Fieldwork ................................................................. 110

                1.      Standard of Fieldwork No. 1 – Audit Planning ...................................... 110

                2.      Standard of Fieldwork No. 2 – Evaluation of Internal Controls ............ 114

                3.      Standard of Fieldwork No. 3 – Obtaining Evidential Matter .................. 115

        C.      Violations of Reporting Standards ....................................................................... 119

        D.      Violations of CFTC Rules and Regulations ........................................................ 121

VIII.   DEFENDANTS' NEGLIGENCE .................................................................................. 122

        A.      The Offering Memorandum and the Bond Registration Statement ..................... 122

        B.      The IPO Registration Statement .......................................................................... 125

IX.     ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY ................... 127

        A.      The Officer Defendants ........................................................................................ 127

        B.      RGHI and the Bennett Trust ................................................................................ 131

        C.      Robert C. Trosten ................................................................................................ 132

        D.      The THL Partner Defendants ............................................................................... 133

        E.      The THL Individual Defendants .......................................................................... 135

        F.      The Audit Committee Defendants ....................................................................... 137

X.      CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 139

        COUNT ONE ................................................................................................................... 139

        COUNT TWO ................................................................................................................... 143

        COUNT THREE ............................................................................................................... 146

COUNT FOUR ............................................................................................. 149

COUNT FIVE ............................................................................................. 152

COUNT SIX ............................................................................................... 154

COUNT SEVEN .......................................................................................... 157

COUNT EIGHT ........................................................................................... 159

XI.    DEFENDANTS' FRAUDULENT SCHEME ................................................. 161

    A.    Refco and Its Customers Suffer Hundreds of Millions of Dollars in Trading Losses.......................................................................................................... 162

    B.    Bennett Becomes CEO and, With the Aid of Collins, Mayer Brown and Maggio, Transfers Uncollectible Receivables Off Refco's Books ..................... 165

    C.    Refco Conceals the Uncollectible Receivable Through a Series of Fraudulent "Round Trip" Loan Transactions ...................................................................... 171

        1.    The Fraudulent Transactions With Customer X ....................................... 173

            (i)    The February 2002 Transaction .................................................. 173

            (ii)    The February 2003 Transaction .................................................. 173

            (iii)    The February 2004 Transaction ................................................. 1739

            (iv)    The May 2004 Transaction ......................................................... 173

            (v)    The August 2004 Transaction ..................................................... 173

            (vi)    The November 2004 Transaction................................................. 173

            (vii)    The December 2004 Transaction ................................................ 173

            (viii)    The May 2005 Transaction ......................................................... 173

            (ix)    The August 2005 Transaction ..................................................... 173

        2.    The Fraudulent Transactions With BAWAG ........................................... 188

            (i)    The February 2000 Transaction .................................................. 173

            (ii)    The February 2001 Transaction .................................................. 173

            (iii)    The February 2002 Transaction ................................................. 173

|  |  | (iv) | The February 2003 Transaction | 173 |
|  |  | (v) | The February 2004 Transaction | 173 |
|  |  | (vi) | The February 2005 Transaction | 173 |
|  | 3. | | The Fraudulent Transactions With CIM Ventures | 197 |
|  |  | (i) | The February 2000 Transaction | 173 |
|  |  | (ii) | The February 2001 Transaction | 200 |
|  |  | (iii) | The Aborted February 2002 Transaction | 20173 |
|  | 4. | | The Fraudulent Transactions With EMF and Delta Flyer | 202 |
|  |  | (i) | The February 2000 Transaction | 202 |
|  |  | (ii) | The February 2001 Transaction | 203 |
|  |  | (iii) | The February 2002 Transaction | 204 |
|  |  | (iv) | The February 2003 Transaction | 204 |
|  | 5. | | The Fraudulent Transaction With Beckenham | 205 |
|  | 6. | | The Fraudulent Transaction With CS Land | 205 |
| D. | | | Summary and Form of Transactions | 206 |
| E. | | | Material Impact on Financial Statements | 209 |
| XII. | | | FALSE AND MISLEADING STATEMENTS | 213 |
| A. | | | The May 2005 Press Release and May 2005 8-K | 213 |
| B. | | | The Year End 2005 Press Release and 2005 10-K | 215 |
| C. | | | The First Quarter 2006 Press Release, July 2005 8-K, and First Quarter 2006 10-Q | 218 |
| XIII. | | | ADDITIONAL ALLEGATIONS OF SCIENTER | 221 |
| A. | | | Circumstantial Evidence of Scienter | 222 |
| B. | | | Motive and Opportunity | 244 |
| C. | | | Additional Allegations of Scienter As to the Audit Committee | 255 |

|   | D. | Additional Allegations of Scienter Against the THL Defendants ...................... 261 |
|---|----|-----|
|   | E. | Additional Allegations of Scienter Against Mayer Brown and Collins ............. 271 |
|   |    | 1.  Motive and opportunity........................................................... 271 |
|   |    | 2.  Knowledge and/or reckless disregard of the fraud ................................. 274 |

XIV.  LOSS CAUSATION.................................................................................. 277

XV.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................................. 279

XVI.  PRESUMPTION OF RELIANCE.................................................................. 280

    A.  Reliance Should Be Presumed With Respect to Defendants' Omissions........... 280

    B.  Reliance Upon the Offering Memorandum and Road Show Should Be Presumed For All Purchasers of 144A Bonds in the Initial Offering................................... 280

    C.  Reliance Should Be Presumed Because Fraud Created the Market for the Company's Securities ........................................................................... 281

    D.  Reliance Should Be Presumed Under the Fraud-on-the-Market Doctrine ......... 283

XVII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.......................................... 287

    COUNT NINE ........................................................................................ 287

    COUNT TEN .......................................................................................... 290

    COUNT ELEVEN .................................................................................... 290

    COUNT TWELVE .................................................................................... 294

    COUNT THIRTEEN ................................................................................. 297

    COUNT FOURTEEN ................................................................................ 302

    COUNT FIFTEEN.................................................................................... 305

    COUNT SIXTEEN ................................................................................... 308

JURY DEMAND ........................................................................................ 309

PRAYER FOR RELIEF ................................................................................. 309

RH Capital Associates LLC, Pacific Investment Management Company LLC and

PIMCO Funds: Pacific Investment Management Series – PIMCO High Yield Fund bring this

federal securities law class action on behalf of themselves and all other persons and entities,

other than Defendants and their affiliates as specified in ¶ 81 below, who purchased or acquired

publicly traded shares, bonds or notes of Refco Inc., its predecessors and affiliates (including, but

not limited to, Refco Group Ltd., LLC, Refco Finance Holdings LLC, and Refco Finance Inc.)

(collectively, with Refco Inc., the "Company" or "Refco") between July 1, 2004 and October 17,

2005 (the "Class Period"), and based on conduct asserted herein, were injured thereby.[1]

## I.    NATURE OF THE ACTION

1.    This is a case about a company that suffered one of the most precipitous corporate

meltdowns in U.S. history, and the well-compensated professional gatekeepers who utterly failed

in their responsibilities to the investing public.  That company is Refco, and the gatekeepers who

failed to do their jobs include one of this country's largest auditing firms, fifteen Wall Street

investment banks, a large and well-known law firm and one of its partners, an audit committee, a

board of directors and corporate officers more intent on lining their own pockets than with

ensuring that the company they ran reported accurate information to investors.  As explained

below, a little more than two months after completing a highly lucrative initial public offering,

Refco admitted that its financial statements "should no longer be relied upon" because the

Company had concealed hundreds of millions of dollars of uncollectible receivables owed to the

Company by an off-balance sheet entity owned by its Chief Executive Officer ("CEO").  While

this admission only partially revealed the true extent of the problems at the Company, it set into

---

[1]    For the convenience of the reader, Lead Plaintiffs attach hereto a glossary of definitions
(Exhibit 1) and a table of Defendants and claims (Exhibit 2).

motion a chain of events and subsequent disclosures that – over the span of just a few days – led to Refco's abrupt collapse into bankruptcy.

2.    Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency and futures markets. An integral component of Refco's business model was to extend credit to its customers so that they could trade on "margin" and leverage their capital into larger trades. These larger trades, in turn, generated larger commissions, revenues and profits for Refco. Unknown to investors, however, Refco regularly extended credit to its customers based on little or no assessment of the customers' credit-worthiness. These "no questions asked" loans exposed the Company to the very same trading risks undertaken by its customers, some of whom were willing to make large and speculative wagers with Refco's money. Thus, Refco had, unbeknownst to the public, adopted a business model that sought to increase the Company's fees by gambling its very survival on the ability of its customers to make successful trades in the volatile currency, commodities and derivatives markets around the world.

3.    As described in more detail below, the inherent dangers posed by this business model materialized – though were not revealed to the public – in the late 1990s, when a number of Refco's most significant customers suffered massive trading losses and were unable or unwilling to repay hundreds of millions of dollars of margin loans extended to them by Refco. Rather than properly account for these uncollectible receivables on Refco's books, Refco and its CEO, Phillip Bennett ("Bennett")—with the direct and active participation of Refco's outside lawyers at Mayer Brown LLP ("Mayer Brown"), including Mayer Brown partner Joseph P. Collins ("Collins")—hid them from public view by transferring these "IOUs" to Refco Group Holdings, Inc. ("RGHI"), an entity controlled by Bennett. RGHI had no operational functions,

but simply served as an empty vessel for Bennett and another former CEO of Refco to stash their large personal holdings of Refco stock.

4.     Once these uncollectible debts were transferred off of Refco's balance sheet, Refco was left with a multi-hundred million dollar receivable owed to it by RGHI, a non-operating company with no conceivable means of repaying the receivable. Moreover, because RGHI was a "related-party" to Refco, the mere existence of the receivable would have raised numerous red flags to any potential investor or candid professional who was aware of it. To conceal the true nature of this receivable, Bennett and others, including Mayer Brown and Collins, devised a series of transactions whereby the receivable was shifted from RGHI to unrelated third parties just before the end of Refco's financial reporting periods, thus creating the illusion that they were legitimate (and collectible) third party receivables.

5.     As was ultimately revealed, this scheme was simple to perpetrate and even easier to detect, had the gatekeepers for the investing public not averted their eyes. As described in more detail below, the scheme involved the manipulation of huge sums of money – as much as 75% of Refco's annual revenue and 900% of its reported annual net income – yearly and sometimes quarterly for at least five years. Like clock-work, a few days before Refco closed its books for the pertinent period, from at least 1999 until the scheme was discovered in October 2005, the Company loaned huge sums of money  –  as much as $970 million on one occasion  – from one of its subsidiaries to one of its members and to certain third parties, which simultaneously loaned the same amount to RGHI. RGHI, in turn, used the proceeds from the member and third-party loans to pay down temporarily the uncollectible receivable it owed to Refco, while neither the uncollectible receivable nor the related-party transactions were disclosed to investors. Promptly after the close of each financial period, the circular transactions were

3

"unwound," the loans were repaid, and the uncollectible receivable from RGHI was returned to Refco's books, where it was apparent to anyone who had bothered or wanted to look.

6.     The scheme allowed Refco to project the appearance of growth and success, which inflated the price of Refco's securities and enabled the Company's insiders to enrich themselves by hundreds of millions of dollars at investors' expense. For instance, in June 2004, Refco engaged in a Leveraged Buyout ("LBO") with the THL Partner Defendants (defined below). In conjunction with the LBO, Refco – with the direct assistance of some of Wall Street's most powerful investment banks – issued and sold $600 million worth of bonds to public investors. Although Refco's senior officers received tens of millions of dollars in cash payouts from the LBO and the bond offering, this was just the beginning of a feeding frenzy designed to further enrich the Company's insiders. Following the LBO, Refco issued tens of millions of dollars' worth of stock options to Refco's officers, audit committee members, and directors. Thus, Refco's insiders were perfectly positioned for the ultimate prize:  taking their fraud-ridden company public through a lucrative initial public offering.

7.     There was no shortage of professionals eager to help Refco sell itself to the public. On August 10, 2005, with the aid of fifteen Wall Street investment banks acting as underwriters, Refco conducted a $670 million initial public offering (the "IPO"). Defendant Bennett made over $118 million by selling a portion of his Refco holdings in the IPO; the THL Partner Defendants and their passive co-investors made nearly $170 million; and, through the exercise of a "green shoe" option built into the IPO, an additional $82,203,000 "special dividend" was paid to Refco's shareholders of record before the IPO (including Defendant Bennett and the THL Partner Defendants).

4

8.    Bolstered by Refco's false financial statements, the IPO was an unqualified success for Refco's insiders. Indeed, on September 9, 2005, Bennett – a newly minted billionaire – was invited to ring the opening bell on the New York Stock Exchange ("NYSE"). With the Company's supposed gatekeepers ignoring their responsibilities, the price of Refco's common stock, issued at $22 per share, quickly rose above $28 per share, further enriching the Company's insiders. Just a short time later, however, the scheme unraveled when the huge related-party receivable was brought to light – not by the professional gatekeepers who had been associated with the Company for years, but rather by an employee who had been working at Refco for only two months.

9.    On October 10, 2005 – a mere forty-two trading days after Refco's IPO – Refco publicly disclosed the existence of a multi-hundred million dollar uncollectible receivable that had previously been concealed, and admitted that its financial statements for the years ended February 28, 2002 ("fiscal year 2002"), February 28, 2003 ("fiscal year 2003"), February 29, 2004 ("fiscal year 2004"), February 28, 2005 ("fiscal year 2005"), and the quarter ended May 31, 2005 – all of which were integral to the IPO offering documents blessed by the underwriters, auditors, officers and directors just weeks earlier – should no longer be relied upon. This announcement set into motion a series of events and subsequent disclosures that culminated in Refco filing for bankruptcy just one week later.

10.    In the days following the October 10, 2005 disclosure, the market learned that the problems at Refco were even more severe than those disclosed in that initial announcement, as Bennett was arrested and charged with securities fraud; Refco disclosed that its "liquidity . . . [was] no longer sufficient to continue operations;" the NYSE suspended trading in Refco shares; and Refco filed for bankruptcy in this District. These disclosures caused the prices of Refco's

publicly traded securities to collapse. Refco's bonds declined at least 80% in a single week,

from 108.625% of par on October 7, 2005 to approximately 16% of par on October 14, 2005.

Refco's publicly-traded stock declined from a closing price of $28.56 on October 7, 2005 to 65

cents on October 18, 2005 – a stunning drop of nearly 98% in little more than a week. Thus, in

virtually the blink of an eye, unsuspecting investors who had relied on the truth and accuracy of

the statements made by Refco and others in purchasing the Company's publicly-traded stock and

bonds suffered hundreds of millions of dollars of damages.

11.    On July 11, 2007, the examiner appointed in Refco's bankruptcy proceedings (the

"Examiner") issued a lengthy report (the "Examiner's Report") describing in detail the Refco

debacle, and the roles of certain of Refco's professional advisors therein. After reviewing a

substantial volume of documents and interviewing numerous witnesses, the Examiner concluded,

among other things, that there was evidence that Mayer Brown and Refco's outside auditor,

Grant Thornton LLP, had knowledge of improprieties at Refco prior to the Bond Offering and

the IPO. The Examiner did not evaluate the potential culpability of the other defendants named

herein.

12.    In this complaint, Plaintiffs assert two different sets of claims. The first set of

claims (Counts One through Eight) asserts a series of strict liability and negligence claims based

on the Securities Act of 1933 ("Securities Act"); these claims are asserted against the Defendants

who are statutorily responsible for the untrue statements in the prospectuses and registration

statements pursuant to which Refco issued securities to the public. Plaintiffs specifically

disclaim any allegations of fraud in these non-fraud claims. In the second set of claims (Counts

Nine through Sixteen), Plaintiffs assert a number of fraud-based claims under the Securities

Exchange Act of 1934 ("Exchange Act") against those Defendants who directly participated in

the fraudulent scheme and those who knew about or were reckless with respect to discovering

the fraud. In an opinion dated April 30, 2007, this Court denied the Defendants' motions to

dismiss most of the claims asserted herein.[2]

## II.    JURISDICTION AND VENUE

13.    Certain non-fraud claims asserted herein arise under Sections 11, 12(a)(2) and 15

of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. Certain other claims asserted herein

arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and

78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17

C.F.R. § 240.10b-5 ("Rule 10b-5").

14.    This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, Section 22 of the Securities Act, 15 U.S.C.

§§ 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United

States.

15.    Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15

U.S.C. §§ 78aa and Section 22 of the Securities Act, 15 U.S.C. §§ 77v. Many of the acts and

transactions that constitute the violations of law complained of herein, including the

dissemination to the public of untrue statements of material facts, occurred in this District.

16.    In connection with the acts alleged in the Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

---

[2] The claims that the Court sustained are not being amended in any way that would alter the Court's denial of the motions to dismiss those claims. Rather, this Second Amended Complaint (a) adds Mayer Brown and Collins as defendants and incorporates the allegations that Lead Plaintiffs had made against those defendants in a separate complaint filed in this Court on October 1, 2007 under the caption *RH Capital Associates LLC, et al. v. Mayer Brown LLP, et al.*; (b) asserts additional claims against certain previously-named defendants (namely, a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against the THL Defendants (defined below)); and (c) adds allegations and factual details to replead certain claims that the Court dismissed in its April 30, 2007 opinion (namely, claims against defendant Robert Trosten pursuant to Sections 10(b) and 20(a) of the Exchange Act and claims against the Bond Underwriter Defendants pursuant to Section 11 of the Securities Act).

limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## III.  PARTIES AND RELEVANT NON-PARTIES

### A.  Plaintiffs

17.     RH Capital Associates LLC ("RH Capital") is a Delaware limited liability company with its principal office and place of business located at 139 W. Saddle River Road, Saddle River, New Jersey.  Founded in 1983, RH Capital is an investment firm that manages in excess of $600 million in assets.  RH Capital is the attorney-in-fact for its investment clients and is vested with the authority to initiate legal action on their behalf.  In addition, during the Class Period, RH Capital had full investment discretion on behalf of its clients and was solely responsible for making all investment decisions with respect to transactions in Refco securities. During the Class Period, RH Capital purchased or acquired Refco securities in and/or traceable to the IPO, and suffered millions of dollars in damages as a result of the violations of the federal securities laws alleged herein.  On February 3, 2006, the Honorable Gerard E. Lynch appointed RH Capital as Co-Lead Plaintiff for this consolidated litigation.

18.     Pacific Investment Management Company LLC ("PIMCO") is an investment manager and advisor for numerous institutional and individual clients worldwide, with its headquarters in Newport Beach, California.  Founded in 1971, PIMCO has grown to become one of the world's leading fixed-income institutional money managers, currently managing over $600 billion in assets and overseeing numerous funds and accounts invested in such financial instruments as corporate bonds, emerging markets debt, municipal bonds, mortgage-backed securities, and other fixed income securities.  During the Class Period, PIMCO had full investment discretion on behalf of its clients and was solely responsible for making all investment decisions with respect to transactions in the Company's securities.  PIMCO

8

purchased $87,245,000 par amount of the Company's 9% Senior Subordinated Notes due 2012 during the Class Period. These purchases included $49,300,000 par amount of 144A Bonds (defined below) in the initial offering, $22,165,000 par amount of 144A Bonds in the secondary market, and $15,780,000 par amount of Registered Bonds (defined below). As a result of these purchases of Refco securities and the violations of the federal securities laws alleged herein, PIMCO suffered millions of dollars in damages. On February 3, 2006, the Honorable Gerard E. Lynch appointed PIMCO as Co-Lead Plaintiff for this consolidated litigation.

19.    Plaintiff PIMCO Funds: Pacific Investment Management Series - PIMCO High Yield Fund (the "PIMCO High Yield Fund") is an investment fund that invests in a diversified portfolio of high yield securities. The PIMCO High Yield Fund is one of the numerous investment funds and accounts managed by PIMCO, and for which PIMCO has sole discretion to make investment decisions. PIMCO purchased $28,720,000 par amount of Bonds on behalf of the PIMCO High Yield Fund during the Class Period, including $20,000,000 par amount of 144A Bonds in the initial offering, $4,320,000 par amount of 144A Bonds in the secondary market, and $4,400,000 million par amount of Registered Bonds. As a result of these purchases of Refco securities and the violations of the federal securities laws alleged herein, PIMCO High Yield Fund suffered millions of dollars in damages. PIMCO High Yield Fund, which is not a Lead Plaintiff, has joined in this action as a Named Plaintiff and proposed Class Representative.

20.    RH Capital, PIMCO, and the PIMCO High Yield Fund are collectively referred to herein as "Plaintiffs."

## B.    **The Company**

21.    Refco Inc. is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Prior to its bankruptcy filing, Refco Inc. was a publicly traded holding company that, through its

subsidiaries, was in the business of providing execution and clearing services for exchange-trade derivatives, and providing prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with the IPO, and was the issuer of the stock sold pursuant to the IPO. At all relevant times after the IPO, 44% of Refco Inc.'s stock was owned by the THL Partner Defendants and their passive co-investors, 36.4% was owned by Defendant Bennett, and 19.6% was owned by public investors. Refco Inc. was a Delaware corporation with its principal offices located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. At all relevant times, the financial results of Refco Inc.'s operating subsidiaries – Refco Securities, LLC; Refco, LLC; and Refco Capital Markets Ltd. – were consolidated on Refco Inc.'s financial statements for financial reporting purposes.

22.     Refco Group Ltd., LLC ("Refco Group") is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Refco Group, which was formed in 1999, is a Delaware limited liability company with its principal offices at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. Prior to the formation of Refco Inc., the Company's business was conducted through Refco Group as the parent company. Refco Group was the co-issuer of the Company's Registered Bonds (defined below) and was a signatory to the Company's Bond Registration Statement (defined below). Refco Group filed a Form 10-K Annual Report and a Form 10-K/A Annual Report with the SEC in July 2005. At all relevant times, the financial results of Refco Group's operating subsidiaries – Refco Securities, LLC; Refco, LLC; and Refco Capital Markets Ltd. – were consolidated on Refco Group's financial statements for financial reporting purposes.

23.     New Refco Group Ltd., LLC ("New Refco") is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.  Upon completion of the Bond Offering (defined below), New Refco became the parent of, and owned all of the outstanding membership interests in, Refco Group.  At that time, the THL Partner Defendants and Defendant RGHI owned approximately 57% and 43%, respectively, of New Refco.  Upon completion of the IPO, Refco became the public company parent of New Refco.

24.     Refco Finance Holdings LLC ("Refco Finance Holdings") is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.  Refco Finance Holdings was a co-issuer of the Company's 144A Bonds (defined below).  On the date of the issuance of those bonds, August 5, 2004, Refco Finance Holdings merged with and into Refco Group.

25.     Refco Finance Inc. ("Refco Finance") is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.  Refco Finance was a co-issuer of the 144A Bonds (defined below) and, at the time those bonds were issued, was a wholly-owned subsidiary of Refco Finance Holdings.  Upon completion of the Bond Offering (defined below), Refco Finance became a wholly-owned subsidiary of Refco Group.  Refco Finance was also a co-issuer of the Company's Registered Bonds and was a signatory to the Company's Bond Registration Statement.  Refco Finance, together with Refco Group, filed a Form 10-K Annual Report and a Form 10-K/A Annual Report with the SEC in July 2005.

26.     Refco Capital Markets Ltd. ("Refco Capital") is a non-party that is not named as a defendant in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the

Bankruptcy Code on October 17, 2005. Refco Capital, a Bermuda-based Refco subsidiary, was an offshore securities and foreign exchange broker that traded over-the-counter derivatives contracts in a largely unregulated market. Refco Capital was one of the Company's three principal operating subsidiaries, and its financial results were consolidated on the Company's consolidated financial statements at all relevant times. Refco's senior executives were directly involved in the management and oversight of the business of Refco's subsidiaries, including Refco Capital. In a criminal complaint against Bennett filed by the United States Attorney for this District on October 12, 2005, Refco Capital was named as one of the entities utilized by Bennett to help hide the Company's uncollectible receivables.

27.    Refco Managed Futures LLC ("Refco Futures") is an entity that was named as a defendant in Plaintiffs' Amended Complaint, but is not named as a defendant in this Second Amended Complaint due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on June 5, 2006. Refco Futures, a Delaware limited liability company, was a subsidiary of Refco with its principal offices located at the Company's headquarters in New York. Refco Futures was a guarantor and co-registrant of the Registered Bonds. At all relevant times, Bennett was a Manager of Refco Futures, Joseph J. Murphy was President and Principal Executive, Financial, and Accounting Officer of Refco Futures, and Philip Silverman was the company Secretary.

28.    Westminster-Refco Management LLC ("Westminster-Refco") is an entity that was named as a defendant in Plaintiffs' Amended Complaint, but is not named as a defendant in this Second Amended Complaint due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on June 5, 2006. Westminster-Refco, a Delaware limited liability company, was a subsidiary of Refco with its principal offices located at the Company's

headquarters in New York. Westminster-Refco was a guarantor and co-registrant of the Registered Bonds. At all relevant times, Bennett was a Manager of Westminster-Refco, Joseph J. Murphy was its President and Principal Executive, Financial, and Accounting Officer, and Philip Silverman was the company Secretary.

29.     Lind-Waldock Securities LLC ("Lind-Waldock") is an entity that was named as a defendant in Plaintiffs' Amended Complaint, but is not named as a defendant in this Second Amended Complaint due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on June 5, 2006. Lind-Waldock, a Delaware limited liability company, is an online retail derivatives brokerage primarily serving individual traders. At all relevant times, Lind-Waldock was a subsidiary of Refco Group, with its principal offices located at the Company's headquarters in New York. Bennett was President, Manager, and Principal Executive, Financial, and Accounting Officer of Lind-Waldock, and Silverman was its corporate Secretary. Lind-Waldock was a guarantor and co-registrant of the Registered Bonds.

## C.     The Defendants

30.     The term "Defendants" as used herein shall refer to RGHI, The Phillip R. Bennett Three Year Annuity Trust, the Officer Defendants (as defined below), Robert C. Trosten, Tone N. Grant, the Audit Committee Defendants (as defined below), the THL Defendants (as defined below), Grant Thornton LLP, the Underwriter Defendants (as defined below), Mayer Brown and Collins.

### 1.     The Bennett Shell-Entity Defendants

31.     Defendant Refco Group Holdings, Inc. ("RGHI") is a Delaware corporation that was wholly owned and controlled by Refco's CEO, Bennett, at all relevant times after August 5, 2004. Prior to that date, RGHI was owned 50% by Bennett and 50% by Refco's former CEO, Defendant Tone Grant. RGHI lacked any business or operational function other than to serve as

13

a "parking" vehicle for Bennett (and, before the LBO, Tone Grant) to hold their personal

holdings of Refco stock. RGHI was involved in the related-party transactions that concealed as

much as $970 million worth of uncollectible debts owed to Refco, as alleged herein.

32.    Defendant The Phillip R. Bennett Three Year Annuity Trust (the "Bennett Trust")

is a U.S. domestic trust organized and existing under the laws of the State of Delaware. At all

relevant times, Defendant Bennett was both trustee and beneficiary of the Bennett Trust. The

Bennett Trust was another vehicle through which Bennett held his Refco stock.

### 2.    The Officer Defendants

33.    Defendant Phillip R. Bennett was the President, Chief Executive Officer ("CEO")

and Chairman of Refco Group from September 1998 until he was forced to resign in October

2005. He also served as President, CEO, and Chairman of Refco, and as President and CEO of

New Refco, at all relevant times. Prior to becoming CEO of Refco Group, Bennett held the

position of Chief Financial Officer ("CFO") since 1983. Bennett joined Refco Group in 1981

from Chase Manhattan Bank, where he had held various positions involving credit and

commercial lending since 1970. Bennett prepared and approved the Offering Memorandum

(defined below) for the 144A Bonds. Bennett also prepared, approved and signed the

Company's October 12, 2004 Bond Registration Statement (including subsequent amendments),

the Company's IPO Registration Statement, and the Company's Forms 10-K and 10-K/A for

fiscal year 2005. In October 2005, Bennett was asked by the Board of Directors to take a leave

of absence. He did so, then subsequently resigned from all posts at the Company on January 12,

2006. On November 10, 2005, a grand jury sitting in this District indicted Bennett, charging him

with a massive securities fraud scheme as a result of the acts alleged herein.

34.    Defendant Gerald M. Sherer ("Sherer") joined Refco Group as its Executive Vice

President and CFO in January 2005. From 1997 through 2004, Sherer held various positions at

14

Deutsche Bank, including Deputy Global Head of Controlling, CFO of the Investment Bank, CFO of the Americas, and the Global Head of Internal Controls. From 1995 to 1997, Sherer was CFO of CIBC Woody Gundy's U.S. operations. Sherer also served as Senior Vice President of the Finance Division for Goldman Sachs from 1982 to 1995. Sherer prepared, approved and signed the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Refco recently requested permission of the Bankruptcy Court to terminate and reject its employment agreement with Sherer.

35.    Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer ("COO") of Refco Group beginning in August 2004 and was responsible for information technology, operations, accounting and finance, credit, margins, and risk control for Refco's futures businesses. As COO of Refco Group, Sexton was responsible for overseeing these functions with respect to each of the Company's operating subsidiaries, including Refco Capital, at all relevant times. He joined Refco Group in April 1999 and served as Executive Vice President and COO of Refco, LLC, a Refco Group subsidiary, from July 2001 until August 2004. After Bennett was forced to resign by the Board of Directors, Sexton served as CEO of Refco for a brief period of time before he resigned on November 11, 2005. From 1991 to 1997, Sexton served in various capacities for Chase Manhattan Bank, including financial controller for the U.S. Foreign Currency Markets, institutional sales for marketing derivatives, and for exchange and treasury products. Sexton prepared and approved the Company's Offering Memorandum for the Bonds, the Company's IPO Registration Statement, and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Sexton also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).

36.    Defendant Santo C. Maggio ("Maggio"), also known as "Sandy" Maggio, joined the Company in 1985, and was Executive Vice President of Refco Group and President and CEO of Refco Securities, LLC, the Company's NASD broker-dealer subsidiary, since 1991. Maggio was also President of the Refco Capital subsidiary, since 2001. Maggio prepared and approved the Offering Memorandum for the Bonds, the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Maggio also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments). Like Bennett, Maggio was asked by Refco's Board of Directors to take a leave of absence in October 2005. He did so, then subsequently resigned from the Board.

37.    Defendant Joseph J. Murphy ("Murphy") was Executive Vice President of Refco Group and responsible for global marketing since 1999. Murphy was also President of various Refco subsidiaries, including Refco Futures and Westminster Refco during the same period. From 1994 to 1999, Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation of New York and held management positions in the Treasury Department of the Chase Manhattan Bank. Murphy prepared and approved the Offering Memorandum for the Bonds, the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Murphy also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).

38.    Defendant Phillip Silverman ("Silverman") began serving as Secretary of the Company in at least 1999, and held numerous high-level executive positions within Refco and its subsidiaries, including Controller of Refco Group and, beginning in 2005, Director of Internal

Audit at Refco. Silverman was also Secretary of RGHI and of numerous Refco subsidiaries. Silverman has been a certified public accountant ("CPA") since 1982, was a close confidant of Bennett, and, on information and belief, was Bennett's personal accountant. Silverman prepared and approved the Offering Memorandum for the Bonds, the Company's IPO Registration Statement and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Silverman also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments). Silverman was asked by the Board of Directors to resign, and did resign, at or about the same time as Bennett and Maggio.

39.     Defendant Dennis A. Klejna ("Klejna") began serving as Executive Vice President and General Counsel of Refco Group in 1999. Prior to joining Refco Group, Klejna was in private law practice in the Washington, D.C. firm of Vinson & Elkins, L.L.P. from 1996 to 1998, where his practice focused on derivatives trading regulations. Klejna was Director of the Division of Enforcement of the Commodity Futures Trading Commission ("CFTC") from 1983 to 1995. Klejna prepared and approved the Offering Memorandum for the Bonds, and the Company's fiscal year 2005 Forms 10-K and 10-K/A. Klejna also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments), and he prepared and approved the Company's IPO Registration Statement. As General Counsel of Refco Group, his duties included supervising the Company's outside legal counsel on all significant legal matters, and reviewing and approving bills received from outside counsel.

40.     Defendants Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, and Klejna shall be collectively referred to herein as the "Officer Defendants."

17

### 3.    Defendant Trosten

41.    Defendant Robert C. Trosten ("Trosten") was Executive Vice President and CFO of Refco Group from 2001 until October 2004, when he abruptly resigned.  Prior to becoming CFO, Trosten was a member of the Company's corporate finance team from 1997 until 2001. He is a CPA, and before joining the Company he served as Vice President of Corporate and Regulatory Accounting at Lehman Brothers Inc.  As CFO of the Company, Trosten's responsibilities included global accounting and budgeting, regulatory reporting, establishment of accounting policies, and the development and execution of key strategic initiatives at the corporate level.  In the years leading up to his departure, Trosten received salary and bonuses totaling $2.2 million in fiscal year 2005, $3.1 million in fiscal year 2004, $2.8 million in fiscal year 2003, and $2.2 million in fiscal year 2002.  According to his sworn testimony in an unrelated case, Trosten received a $45 million severance payment when he left the Company, after serving only three years as CFO.  The Company did not publicly disclose to its investors this huge payment to Trosten, but instead simply announced that he had resigned in order to "pursue other financial interests."  Trosten prepared and approved the Offering Memorandum for the Bonds and, along with Bennett and others, participated in the nationwide road show to market the Bonds to institutional investors.  On October 24, 2006, Trosten was indicted by a grand jury sitting in this District on charges that include securities fraud and conspiracy to commit securities fraud in connection with the collapse of Refco.

### 4.    Defendant Grant

42.    Defendant Tone N. Grant ("Grant") was the CEO of Refco Group prior to Bennett's promotion to that position in September 1998.  Upon information and belief, Grant continued to have direct involvement in the management of the Company even after stepping down as CEO.  Indeed, prior to the LBO and Bond Offering (defined below), Grant owned 50%

18

of RGHI, which in turn owned approximately 43% of Refco Group. Grant was cashed out of his interest in RGHI effective as of the date of the Bond Offering, leaving Bennett as the sole owner of RGHI. On January 16, 2007, Grant was indicted by a grand jury sitting in this District on charges that include securities fraud and conspiracy to commit securities fraud in connection with the collapse of Refco.

### 5.    The Audit Committee Defendants

43.    Defendant Ronald L. O'Kelley ("O'Kelley") was at all relevant times a director of the Company and a member of the Company's audit committee. O'Kelley has been Chairman and CEO of Atlantic Coast Venture Investments, Inc., a private investment company, since 2002. O'Kelley previously served as Executive Vice President, CFO and Treasurer of State Street Corporation from 1995 to 2002, as CFO of Douglas Aircraft Company from 1991 to 1995, and as CFO of Rolls Royce, Inc. from 1983 to 1991. Prior to his tenure at Rolls-Royce, O'Kelley held several senior financial positions at Citigroup from 1975 to 1983, and at Texas Instruments, Inc. from 1969 to 1975. O'Kelley approved and signed the Company's IPO Registration Statement. O'Kelley also approved the Company's financial statements for all relevant periods, the October 12, 2004 Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

44.    Defendant Leo R. Breitman ("Breitman") was at all relevant times a director of the Company and a member of its audit committee. Breitman was Chairman and CEO of Fleet Bank, Massachusetts, from 1991 through March 2004, and also served as Senior Lending Officer of FleetBoston Financial Corporation from 2002 through March 2004. From 1996 to 2002, Breitman was Managing Director of the Commercial Banking Division of FleetBoston Financial Corporation. Breitman approved and signed the Company's IPO Registration Statement. Breitman also approved the Company's financial statements for all relevant periods, the October

12, 2004 Bond Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

45.    Defendant Nathan Gantcher ("Gantcher") was at all relevant times a director of the Company and a member of its audit committee.  Gantcher was Co-Chairman, President and CEO of Alpha Investment Management L.L.C. from 2002 until August 2004.  Prior to joining Alpha, Gantcher was a private investor from 1999 to 2001.  Gantcher served as Vice Chairman of CIBC Oppenheimer Corp. from 1997 to 1999, and prior to that served as Co-CEO of Oppenheimer & Co., Inc.  Gantcher approved and signed the Company's IPO Registration Statement.  Gantcher also approved the Company's financial statements for all relevant periods, the October 12, 2004 Bond Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

46.    Defendants O'Kelley, Breitman and Gantcher are collectively referred to herein as the "Audit Committee Defendants."  Prior to the August 2005 IPO, the Audit Committee Defendants comprised the audit committee of New Refco, which performed the functions of an audit committee of Refco Group.  After the IPO, the Audit Committee Defendants comprised the audit committee of Refco Inc.  At all times (and as described more fully below), the Audit Committee Defendants were responsible for overseeing, among other things,  the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the engagement, independence and qualifications of the outside auditor; and the performance of the outside auditor.

### 6.    The Defendants Affiliated with Thomas H. Lee Partners

47.    Defendant Thomas H. Lee Partners, L.P. ("Thomas H. Lee Partners") is a private equity investment fund headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management, which focuses on the acquisition of substantial equity stakes in

mid- to large-capitalization companies. In June 2004, as part of the LBO, Thomas H. Lee

Partners and its affiliates and other related parties purchased a 57% equity stake in the Company

for approximately $507 million. These affiliates and other related parties, whose interests in the

Company were at all times beneficially owned by Thomas H. Lee Partners, include:

      a.    THL Refco Acquisition Partners, THL Refco Acquisition Partners II, and

THL Refco Acquisition Partners III, each of which was, until its dissolution at or about the time

of the IPO, a Delaware general partnership indirectly owned by Defendants Thomas H. Lee

Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman)

Fund V, L.P., which in turn are Delaware limited partnerships whose general partner is

Defendant THL Equity Advisors V, LLC. Thomas H. Lee Partners is the sole member of THL

Equity Advisors V, LLC, and thus controlled THL Refco Acquisition Partners, THL Refco

Acquisition Partners II, and THL Refco Acquisition Partners III;

      b.    Defendant Thomas H. Lee Investors Limited Partnership, a Massachusetts

limited partnership controlled by Defendant Thomas H. Lee; and

      c.    Defendant The 1997 Thomas H. Lee Nominee Trust, a trust over which

Defendant Thomas H. Lee has voting and investment control.

    48.    Defendants Thomas H. Lee Partners, Thomas H. Lee Equity Fund V, L.P.,

Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas

H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are

collectively referred to herein as the "THL Partner Defendants."

    49.    At all relevant times, the THL Partner Defendants managed and controlled the

Company. One year after the LBO, the THL Partner Defendants brought Refco public in the

IPO. The THL Partner Defendants and their co-investors were paid $210 million in the deal, while still maintaining a controlling ownership stake of 38% of the Company's stock.

50.    Defendant Thomas H. Lee ("Lee") was at all relevant times a director of the Company. Lee founded the Thomas H. Lee Company, the predecessor of Thomas H. Lee Partners, in 1974 and served as its Chairman and CEO from its inception until reportedly leaving that entity after the events giving rise to this litigation. Lee approved and signed the Company's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Lee also approved. Lee also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

51.    Defendant David V. Harkins ("Harkins") was at all relevant times a director of the Company. Harkins is Vice Chairman and Managing Director of Private Equity Funds of Thomas H. Lee Partners, and has also served as President of Thomas H. Lee Partners. Harkins approved and signed the Company's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Harkins also approved. Harkins also prepared and approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

52.    Defendant Scott L. Jaeckel ("Jaeckel") was at all relevant times a director of the Company. Jaeckel is a Managing Director of Thomas H. Lee Partners. Jaeckel previously served as Vice President of Thomas H. Lee Partners from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Prior to his affiliation with Thomas H. Lee Partners, Jaeckel worked at Morgan Stanley in the Corporate Finance Department from 1992 to

22

1994. Jaeckel approved and signed Refco's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Jaeckel also approved. Along with Bennett and others, Jaeckel participated in the nationwide road show to market the Company's bonds to institutional investors. Jaeckel also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

53.     Defendant Scott A. Schoen ("Schoen") was at all relevant times a director of the Company. Schoen joined Thomas H. Lee Partners in 1986 and currently serves as its Co-President. He previously served as a Managing Director of Thomas H. Lee Partners from 1992 to 2004 and Vice President from 1988 to 1992. Prior to joining Thomas H. Lee Partners, Schoen was in the Private Finance Department of Goldman Sachs. Schoen approved and signed Refco's IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Schoen also approved. Schoen also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Forms 10-K and 10-K/A.

54.     Defendants Lee, Harkins, Jaeckel and Schoen are collectively referred to herein as the "THL Individual Defendants," and, together with the THL Partner Defendants, are collectively referred to herein as the "THL Defendants."

### 7.     **Defendant Grant Thornton**

55.     Defendant Grant Thornton LLP ("Grant Thornton") is the Chicago-based U.S. member firm of Grant Thornton International, one of six global accounting, tax and business advisory organizations with member firms in 111 countries. Grant Thornton is one of the largest U.S. accounting concerns outside of the "Big Four." Grant Thornton served as the Company's purportedly independent auditor at all relevant times since 2002, when it replaced Arthur

Andersen LLP ("Andersen") in that role. In addition to auditing the Company's consolidated financial statements for fiscal 2003, 2004 and 2005 and issuing clean and unqualified audit opinion letters thereon, Grant Thornton materially assisted in the preparation of those financial statements.

56.     Grant Thornton also provided auditing and accounting services to the Company prior to and in connection with the LBO, the Bond Offering and the IPO. For the LBO and Bond Offering, these services included advice regarding the structure of the LBO, a review and/or re-audit of Refco's financial statements for the fiscal year ended February 28, 2002, and reviews of Refco's financial statements for the quarters ended May 31, 2003 and May 31, 2004. For the IPO, these services included reviews of Refco's financial statements for the quarters ended August 31, 2003, November 30, 2003, August 31, 2004, and November 30, 2004.

57.     After the LBO, Grant Thornton conducted quarterly reviews of the Company's financial statements and, upon information and belief, also participated in the preparation of those financial statements.

58.     In addition to serving as the auditor for Refco, Grant Thornton performed personal tax accounting services for Bennett.

## 8.     The Underwriter Defendants

59.     Defendant Credit Suisse Securities (USA) LLC (known at the time of the IPO as Credit Suisse First Boston LLC) ("Credit Suisse"), a subsidiary of Credit Suisse Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services. Its headquarters are located at 11 Madison Avenue, New York, New York. Credit Suisse was a lead placement agent, underwriter, and initial purchaser for the Company's Bond Offering, and a joint bookrunning manager of Refco's IPO of 26,500,000 shares of common stock. It sold and distributed Bonds to investors in the

Bond Offering, and it sold and distributed Refco common stock to the investing public pursuant

to the registration statement and prospectus filed with the SEC in connection with the IPO

(together, the "IPO Offering Materials"). As part of its duties as an underwriter, Credit Suisse

was required to conduct, prior to the offerings of the Company's securities, a reasonable

investigation of the Company to ensure that the statements contained in the Offering

Memorandum for the Bonds and the IPO Offering Materials contained no misstatement or

omission of material fact. Credit Suisse purchased and agreed to sell to the investing public at

least $150,822,100 in common stock in connection with the IPO.

60.     Defendant Banc of America Securities LLC ("BAS"), a subsidiary of Bank of

America Corporation, is an investment banking firm that provides securities underwriting,

financial advisory, capital raising, sales and trading, and financial products and services. Its

headquarters are located at 9 W. 57th Street, New York, New York. BAS was a lead placement

agent, underwriter, and initial purchaser for the Company's Bond Offering, and a joint

bookrunning manager of the IPO. It sold and distributed Bonds to investors in the Bond

Offering, and it sold and distributed Refco common stock to the investing public pursuant to the

IPO Offering Materials. As part of its duties as an underwriter, BAS was required to conduct,

prior to the offerings, a reasonable investigation of the Company to ensure that the statements

contained in the Offering Memorandum for the Bonds and in the IPO Offering Materials

contained no misstatement or omission of material fact. BAS purchased and agreed to sell to the

investing public at least $118,640,500 in common stock in connection with the IPO.

61.     Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank"), a subsidiary of

Deutsche Bank AG, is an investment banking firm that provides securities underwriting,

financial advisory, capital raising, sales and trading, and financial products and services. Its

headquarters are located at 60 Wall Street, New York, New York. Deutsche Bank was a lead placement agent, underwriter, and initial purchaser for the Company's Bond Offering, and a co-manager of the IPO. It sold and distributed Bonds to investors in the Bond Offering, and it sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Deutsche Bank was required to conduct, prior to the offerings, a reasonable investigation of the Company to ensure that the statements contained in the Offering Memorandum for the Bonds and in the IPO Offering Materials contained no misstatement or omission of material fact. Deutsche Bank purchased and agreed to sell to the investing public at least $37,778,400 in common stock in connection with the IPO.

62.     Defendant Goldman, Sachs & Co. ("Goldman Sachs"), a subsidiary of The Goldman Sachs Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its global headquarters are located at 85 Broad Street, New York, New York. Goldman Sachs was a joint bookrunning manager of the IPO. It sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Goldman Sachs was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Goldman Sachs purchased and agreed to sell to the investing public at least $124,062,400 in common stock in connection with the IPO.

63.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 4 World Financial Center, New York, New York. Merrill Lynch was a co-manager of the IPO. It sold

and distributed Refco common stock to the investing public pursuant to the IPO Offering

Materials. As part of its duties as an underwriter, Merrill Lynch was required to conduct, prior to

the offering, a reasonable investigation of the Company to ensure that the statements contained

in the IPO Offering Materials contained no misstatement or omission of material fact. Merrill

Lynch purchased and agreed to sell to the investing public at least $53,927,500 in common stock

in connection with the IPO.

      64.     Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan"), a subsidiary of J.P.

Morgan Chase & Co., is an investment banking firm that provides securities underwriting,

financial advisory, capital raising, sales and trading, and financial products. Its headquarters are

located at 270 Park Avenue, New York, New York. J.P. Morgan was a co-manager of the IPO.

It sold and distributed Refco common stock to the investing public pursuant to the IPO Offering

Materials. As part of its duties as an underwriter, J.P. Morgan was required to conduct, prior to

the offering, a reasonable investigation of the Company to ensure that the statements contained

in the IPO Offering Materials contained no misstatement or omission of material fact. J.P.

Morgan purchased and agreed to sell to the investing public at least $37,778,400 in common

stock in connection with the IPO.

      65.     Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill") is an investment

banking firm that provides securities underwriting, financial advisory, capital raising, sales and

trading, and financial products. Its headquarters are located at 919 Third Avenue, New York,

New York. Sandler O'Neill was a co-manager of the IPO. It sold and distributed Refco

common stock to the investing public pursuant to the IPO Offering Materials. As part of its

duties as an underwriter, Sandler O'Neill was required to conduct, prior to the offering, a

reasonable investigation of the Company to ensure that the statements contained in the IPO

Offering Materials contained no misstatement or omission of material fact. Sandler O'Neill purchased and agreed to sell to the investing public at least $16,207,400 in common stock in connection with the IPO.

66.    Defendant HSBC Securities (USA) Inc. ("HSBC"), a subsidiary of The HSBC Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 2700 Sanders Road, Prospect Heights, Illinois. HSBC was a co-manager of the IPO. It sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, HSBC was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. HSBC purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the IPO.

67.    Defendant William Blair & Company, L.L.C. ("William Blair") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 222 West Adams Street, Chicago, Illinois. William Blair sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, William Blair was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. William Blair purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the IPO.

68.    Defendant Harris Nesbitt Corp. ("Harris Nesbitt"), a subsidiary of the Bank of Montreal, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 111 West Monroe St., Chicago, Illinois. Harris Nesbitt sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Harris Nesbitt was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Harris Nesbitt purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the IPO.

69.    Defendant CMG Institutional Trading LLC ("CMG") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 123 North Wacker Drive, Chicago, Illinois. CMG sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, CMG was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. CMG purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

70.    Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez & Co.") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 61 Broadway, Suite 2924, New York, New York. Ramirez & Co. sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter,

Ramirez & Co. was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Ramirez & Co. purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

71.    Defendant Muriel Siebert & Co. Inc. ("Seibert & Co.") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 885 Third Avenue, New York, New York. Seibert & Co. sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Seibert & Co. was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Seibert & Co. purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

72.    Defendant The Williams Capital Group, L.P. ("Williams Capital") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 650 Fifth Avenue, 10th Floor, New York, New York. Williams Capital sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Williams Capital was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Williams Capital purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

73.     Defendant Utendahl Capital Partners, L.P. ("Utendahl") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 30 Broad Street, New York, New York. Utendahl sold and distributed Refco common stock to the investing public pursuant to the IPO Offering Materials. As part of its duties as an underwriter, Utendahl was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the IPO Offering Materials contained no misstatement or omission of material fact. Utendahl purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the IPO.

74.     References herein to the "Bond Underwriter Defendants" refer collectively to Defendants Credit Suisse, BAS, and Deutsche Bank.

75.     References herein to the "Stock Underwriter Defendants," refer collectively to Defendants Credit Suisse, BAS, Deutsche Bank, Goldman Sachs, Merrill Lynch, J.P. Morgan, Sandler O'Neill, HSBC, William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl.

### 9.     The Mayer Brown Defendants

76.     Defendant Mayer Brown LLP ("Mayer Brown"), an Illinois limited liability partnership, is a large, sophisticated law firm. Along with its affiliate Mayer Brown International LLP, Mayer Brown employs more than 1,500 lawyers and has offices in more than a dozen major cities worldwide, including New York. From 1994 until the Company's collapse, Mayer Brown and/or its predecessor firms were Refco's primary outside legal counsel.

77.     Defendant Joseph P. Collins ("Collins") is a partner of Mayer Brown who works out of Mayer Brown's New York and Chicago offices. According to his profile on "Chambers and Partners," Collins has multiple years of experience representing "brokerage firms,

31

investment management clients, trading and investment advisors, hedge fund operators, investment companies, banks and pension plans" and regularly practices in areas such as "securities, futures, forwards, swaps, options and hybrid securities." From 1994 through the end of the Class Period, Collins was the primary contact between Mayer Brown and Refco and the billing partner in charge of the Refco account at Mayer Brown. Collins' relationship with Refco goes back nearly twenty years and began while Collins was an attorney at another law firm, Schiff Hardin & Waite ("SH&W"). At SH&W, Collins formed a close working relationship with Refco's former CEO, Thomas Dittmar. When Collins moved to Mayer Brown in 1994, he brought Refco to Mayer Brown as a client. Collins has been described in press reports as the "go-to-guy at Refco," and the vast majority of important transactions and deals at Refco were cleared through Collins or Mayer Brown attorneys who worked under the direct supervision of Collins.

78.    From 1994 forward, Refco was an extremely lucrative client for Mayer Brown and Collins' largest personal client. Mayer Brown attorneys, with Collins as the primary contact and billing partner, provided a broad range of legal services to Refco, and Mayer Brown collected approximately $5 million in legal fees annually from Refco, which constituted nearly half the total billings for which Collins was responsible at Mayer Brown. As set forth in the Examiner's Report, as the billing partner on the Mayer Brown account, Collins reviewed Refco bills on a monthly basis and was therefore aware of the work that everyone at Mayer Brown performed for Refco.

79.    As described in more detail below, Mayer Brown was intimately familiar with Refco's operations and finances and played a significant and direct role in designing, implementing and effecting the transactions by which Refco's uncollectible receivables were

concealed from the investing public, and they also prepared and edited Refco's misleading

financial statements and other public disclosures including the Offering Memorandum for the

Bonds and the IPO Registration Statement, which specifically identified Mayer Brown as

counsel for Refco.

80.    Other Mayer Brown attorneys referenced herein who played a significant role in

Mayer Brown's representation of Refco include:

(a)    Paul K. Koury. Paul K. Koury ("Koury") is a former Mayer Brown

associate who worked out of Mayer Brown's New York office. Koury worked extensively for

Collins and performed substantial work on the Refco account prior to his departure from Mayer

Brown in May 2005.

(b)    Robert Monk. Robert Monk ("Monk") is a former Mayer Brown associate

who worked out of Mayer Brown's Chicago office. Monk worked extensively for Collins and

performed substantial work on the Refco account prior to his departure from Mayer Brown in

February 2001.

## IV.    CLASS ALLEGATIONS

81.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant

to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the

"Class") consisting of all persons and entities who purchased or otherwise acquired Refco

Finance Holdings 9% Senior Subordinated Notes due 2012 (CUSIP numbers 75866HAA5 and

75866HAC1) (the "Bonds") and/or Refco common stock during the Class Period, either in the

respective initial offering, pursuant to a registration statement, or in the secondary market, and

who, upon disclosure of certain facts alleged herein, were injured thereby. Excluded from the

Class are: (a) Refco, BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische

Postsparkasse Aktiengesellschaft ("BAWAG"),[3] and their subsidiaries and affiliates; (b) the Defendants; (c) members of the families of the individual Defendants; (d) the subsidiaries and affiliates of the Defendants; (e) any person or entity who is a partner, officer, director, employee, or controlling person of Refco or BAWAG (including any of their subsidiaries or affiliates) or of any Defendant; (f) any entity in which BAWAG or any Defendant has a controlling interest; (g) the directors' and officers' liability insurance carriers for Refco or any Defendant, and any affiliates or subsidiaries thereof; and (h) the legal representatives, heirs, successors and assigns of any such excluded party.

82.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, the Company issued $600 million par amount of debt securities and consummated an initial public offering of over 30 million shares of common stock. While Plaintiffs do not know the exact number of purchasers of those securities, Plaintiffs believe that Class members number in the thousands.

83.     Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and the other members of the Class acquired Bonds and/or Refco common stock in the initial offerings, pursuant to a registration statement, and/or in the secondary market, and sustained damages as a result of Defendants' wrongful conduct complained of herein.

84.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

85.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the

---

[3]  BAWAG was formerly a defendant in this action, but all claims against it have been settled with the approval of the Court.

Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

86.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

(b)    Whether the registration statements and prospectuses for the Company's securities contained material misstatements or omitted to state material information;

(c)    Whether the S.E.C. filings, press releases, reports, and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

(d)    Whether and to what extent the Company's financial statements failed to comply with generally accepted accounting principles ("GAAP") during the Class Period;

(e)    Whether Grant Thornton's audits of the Company's financial statements during the Class Period were conducted in accordance with generally accepted auditing standards ("GAAS");

(f)    Whether and to what extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

(g)    With respect to Plaintiffs' claims under the Section 10(b) of the Exchange Act, whether the Defendants named in those claims acted with scienter;

(h)    With respect to Plaintiffs' claims under the Securities Act, whether the Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

(i)    With respect to Plaintiffs' claims pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company;

(j)  Whether reliance may be presumed pursuant to the fraud-on-the-market rule and/or the fraud-created-the-market rule; and

(k)  Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, the proper measure thereof.

87.  In addition to the common questions of law and fact, there are certain undisputed material facts that are common to the claims of all Class members. These undisputed facts, which Refco has publicly admitted or which are directly derived from Refco's public admissions, include that:

(a)  Certain related-party receivables involving hundreds of millions of dollars had been omitted from the Company's financial statements prior to October 10, 2005;

(b)  The Company's financial statements for the fiscal years 2002, 2003, 2004 and 2005, and for the quarter ended May 31, 2005, taken as a whole, should no longer be relied upon; and

(c)  With respect to Plaintiffs' claims under the Securities Act, the offering materials for the Bond Offering and IPO contained material misstatements and omissions.

88.  The names and addresses of those persons and entities who purchased securities in the Bond Offering and the IPO, and/or of the record owners of the Company's securities, are available from the Company's transfer agent(s) and/or from the Underwriter Defendants. Notice may be provided to such purchasers and/or record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## V.  FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### A.  Historical Background Regarding the Company

89.  Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency and futures markets. Essentially,

Refco provided financial services by executing trades on behalf of its customers and then recording and "clearing" those trades. Refco offered these services to a wide variety of customers – ranging from individuals to corporations, hedge funds, financial institutions, retail clients and professional traders – on a broad spectrum of derivatives exchanges and over-the-counter, cash and securities markets.

90.    Refco's revenues were primarily comprised of (i) transaction fees earned from executing and clearing customer orders; and (ii) interest income earned on cash balances in its customers' trading accounts and from providing financing through repurchase transactions. The latter element of Refco's business model took on greater significance towards the end of the 1990s because it allowed Refco's customers to trade on "margin" and leverage their capital into larger trades, which generated larger commissions, revenues and profits for Refco.

91.    By 2004, the Company had secured a dominant position in the burgeoning derivatives market. In fact, in that year it processed 461 million derivatives contacts, a volume comparable to that processed by the Chicago Board of Trade and greater than that processed by both the Chicago Board Options Exchange and the New York Mercantile Exchange that year.

92.    However, the very practice that fueled Refco's success – extending margin loans to its trading customers – would prove to be disastrous when, on information and belief, a number of its customers defaulted in the wake of international financial crises that occurred in late 1997 and 1998. The Asian financial crisis began on July 2, 1997, when the Thai government was forced to devalue the Thai baht following months of speculative attacks on the currency. The collapse of the baht sparked economic decline in several Asian nations and led to similar devaluations of the Philippine peso, the Malaysian ringgit, the Indonesian rupiah and the Singaporean dollar. The Hong Kong stock market crashed in the wake of these currency

devaluations, suffering a staggering 40% loss in October 1997. The aftershocks of this collapse were felt far and wide, causing declines in markets in Brazil, Argentina and Mexico.

93.    The Asian financial crisis hit the United States on October 27, 1997. The Dow Jones Industrial Average suffered the third largest point loss in its 109-year history that day, dropping by 7%. This "mini-crash" was so severe that it halted trading on the New York Stock Exchange for the first time ever.

94.    A number of the Company's customers suffered extensive trading losses in the crisis and were unable to repay the credit the Company had extended to them. For example, Victor Niederhoffer ("Niederhoffer") lost nearly $100 million on investments made in part with improperly collateralized "margin" loans from Refco, and was unable or unwilling to repay over $70 million of the debt. According to media reports, these customers may have also included Ross Capital; Devonshire Strategic Holdings; RGF Ltd.; Kipler Investments; Hazelhurst Investments; Helford Resources; East Client Services Ltd.; Luhur; and/or several other entities. In particular, based on Lead Plaintiffs' investigation to date, and on information and belief, it appears that Ross Capital, the hedge fund run by Wolfgang Flottl, incurred considerable losses.

95.    Not only did Refco's customers sustain trading losses during the late 1990s, but Refco itself sustained more than $40 million in losses on proprietary trades (trades carried out on its own behalf) during that period.

96.    Faced with the unwelcome prospect of having to write off these extensive customer and proprietary trading losses, Defendant Bennett and others formulated a way to hide these bad debts from consumers of Refco's financial statements. First, the receivables were consolidated and transferred from the Company to RGHI, an entity controlled by Bennett. The Company's books then reflected a large receivable from RGHI. Knowing that RGHI lacked the

ability to pay that receivable, and concluding that such a large receivable would be less likely to draw attention if its character as a debt from a related-party were obscured, Bennett and others orchestrated a series of transactions whereby the RGHI receivable was temporarily paid off at the end of each of the Company's financial reporting periods and replaced on the books with receivables from unrelated entities, including BAWAG. These transactions – which were repeated yearly from 2000 and at the end of every quarter from at least 2004 until August 2005 – enabled the Company to hide from the investing public the existence of uncollectible debts and losses.

97.     According to a complaint filed by counsel for Refco's Litigation Trustee on October 9, 2007, in a case captioned *VR Global Partners, L.P., et al. v. Bennett, et al.*, 07-CIV-8686 (S.D.N.Y.) (the "VR Complaint"), Bennett used RGHI as a means to manipulate Refco's financial statements in other ways as well, including:

(a)     having Refco Capital and RGHI engage in fifty U.S. Treasury Note transactions on November 17, 2004, with RGHI losing $7.8 million on the transactions and Refco Capital gaining the same amount;

(b)     shifting over $100 million in expenses from Refco to RGHI, including approximately $46.3 million in computer expenses between fiscal 2000 and fiscal 2006, thereby increasing Refco's net income and increasing the amount of the RGHI receivable by the same amount;

(c)     causing Refco to accrue bogus interest income on the RGHI receivable – *i.e.*, interest that was purportedly received from RGHI on the amount of the receivable, but that was never actually paid – in the amounts of $62.75 million on January 28, 2004 and $12 million on or about February 11, 2005;

(d)    causing Refco and RGHI to engage in certain so-called "transactions" that served no economic purpose and were merely designed to artificially inflate Refco's net income, including two "Transfers" totaling $13 million on January 28, 2004; fifty transactions in United States Treasury Notes on November 17, 2004 that resulted in gains to Refco and losses to RGHI of approximately $7.8 million; and over thirty fictitious foreign currency exchange transactions whereby RGHI lost $5 million (which was added to the RGHI receivable) and Refco recognized $5 million in revenue.

### B.    Early Efforts to Sell the Company

98.    The above-described manipulations of Refco's financial results were designed to allow RGHI – owned by Bennett and Grant – to sell its interests in the Company at artificially inflated prices.  Mayer Brown and Collins were closely involved in the efforts of the Company's insiders to sell Refco.

99.    The Examiner concluded that by no later than February 6, 2002, Mayer Brown knew that the ultimate goal of Bennett and Grant was to sell the entire Company and monetize their ownership interests.  A purchase agreement drafted by Mayer Brown on or about February 6, 2002 stated that the parties to the agreement (Refco, RGHI and an unnamed purchaser) agreed that the "Company's board of managers shall endeavor to sell ownership of the Company or its assets."  Collins had discussed the terms of the purchase with Bennett and others and had personally revised prior drafts of the agreement.  The Examiner also noted that, based on a review of Mayer Brown's time records, Collins may have been aware of the plan to sell the Company as early as May 1999.  Indeed, Mayer Brown had represented Refco in the transaction whereby BAWAG purchased its interest in the Company in 1999.

C.    **The THL Partner Defendants' Investment and the 2004 Recapitalization**

100.    In November 2003, after numerous aborted efforts to sell all or parts of the Company, including unsuccessful efforts led by Credit Suisse to launch an IPO and/or locate a commercial bank interested in buying Refco, Bennett and others at Refco began to negotiate with the THL Defendants to enter a leveraged buyout transaction whereby a large portion of the Company would be sold to public investors.

101.    On June 8, 2004, the THL Partner Defendants and their passive co-investors entered into an equity purchase and merger agreement (the "Merger Agreement") with Refco Group and RGHI. Pursuant to the Merger Agreement, as amended on July 9, 2004, New Refco would become the parent company of Refco Group, and the THL Partner Defendants and their co-investors would acquire a 57% equity stake in New Refco. The remaining 43% of New Refco was to be held by RGHI, which would then be wholly-owned by Bennett. Grant and BAWAG were to be cashed out of their respective ownership interests in Refco Group. Mayer Brown negotiated, drafted and reviewed the Merger Agreement on behalf of both Refco and RGHI. As the Examiner concluded, "Mayer Brown represented Refco and RGHI in connection with the LBO and was deeply involved in the LBO." The Merger Agreement took effect on August 5, 2004.

102.    The THL Partner Defendants and their passive co-investors paid $507 million in cash for their share of New Refco while Bennett (through RGHI) rolled over $382.5 million of his Refco Group stock to pay for his share. To raise the remaining funds needed to cash-out the existing equity holders (approximately $1.4 billion) and repay existing debt (including debt owed to RGHI), the Company took out $800 million in term loans pursuant to a senior credit facility, opened a $75 million revolving line of credit, and issued $600 million of 9% Senior Subordinated Notes due in 2012 (the "144A Bonds").

103.    On August 5, 2004, as part of the recapitalization of Refco, Refco Group and Refco Finance transferred more than $1.325 billion and an asset management business, Forstmann-Leff International Associates, LLC (valued at approximately $231 million), to RGHI. On the same date, RGHI transferred $1.342 billion to BAWAG through a series of transactions which extinguished BAWAG's ownership interest in the Company.

104.    Defendants BAS, Credit Suisse and Deutsche Bank acted as co-lead arrangers and joint book running managers for the senior credit facility, and as lead underwriters and placement agents, joint book-running managers, and initial purchasers for the offering of 144A Bonds (the "Bond Offering"). Defendants Credit Suisse and Deutsche Bank also acted as syndication agent and documentation agent for the senior credit facility, respectively, while Bank of America, N.A., an affiliate of Defendant BAS, acted as administrative agent, swingline lender and letter of credit issuer.

105.    Refco Finance Holdings and Refco Finance were co-issuers of the 144A Bonds. Upon completion of the Bond Offering, Refco Finance Holdings merged into Refco Group. Refco Finance, which was a wholly-owned subsidiary of Refco Finance Holdings at the time of the Bond Offering, thus became a subsidiary of Refco Group.

106.    The chart below (taken from the Bond Registration Statement and the IPO Registration Statement) summarizes the structure of the Company upon completion of the LBO and the Bond Offering:



### D.    The Bond Offering

107.    The 144A Bonds were issued in the same manner as much high yield debt.  The issuance involved two steps, constituting a single plan of financing.  The general purpose of the plan was to obtain rapid access to the public capital markets in order to obtain funds at a cost of capital corresponding to registered, freely tradable securities.  The first step, pursuant to which the issuers actually obtained the funds, was to issue the 144A Bonds through underwriters pursuant to an offering memorandum (the "Offering Memorandum").  The second step, mandated by the Offering Memorandum and the underwriting contracts, was for the issuers of the 144A Bonds to offer to exchange the bonds issued in the first step for identical bonds issued pursuant to a registration statement (the "Registered Bonds") (together with the 144A Bonds, the "Bonds").  The second step was merely an exchange of bonds issued without prior registration

for identical bonds issued pursuant to a registration statement and for which the issuers had already received funds in the first step (the "Exchange Offer"). Accordingly, no new funds flowed to the issuer in the second step. The entire two-step process constituted a public offering of the Bonds.

108.    This two-step procedure is known in the investment banking industry as a "Rule 144A/Exxon Capital Exchange Offer." The reference to "Rule 144A" relates to the first step of the transaction, by which the initial purchasers (the Bond Underwriter Defendants) purchase the securities from the issuers and resell them pursuant to an SEC regulation providing a safe harbor for resales of unregistered securities to "Qualified Institutional Buyers." The second step, the "Exxon Capital Exchange Offer," is the means by which the 144A bonds are converted into registered, freely tradable securities. In practice, the Rule 144A/Exxon Capital framework does not differ from registration. High yield issuers and their underwriters prepare the offering memoranda for Rule 144A offerings in contemplation of the Exxon Capital Exchange Offer and, accordingly, prepare such documents to conform in all material respects with the requirements for a prospectus included in a registration statement on SEC Form S-1.

109.    The Bond Underwriter Defendants purchased the 144A Bonds from the issuers and resold them to investors with the understanding and expectation that the 144A Bonds would later be exchanged for freely tradeable Registered Bonds in the second step Exchange Offer. The Bond Underwriter Defendants were compensated for their underwriting services by a discount between the price at which they initially purchased the 144A Bonds from the issuers and the offering price. Further, the Bond Underwriter Defendants obtained from the issuers a purported obligation to indemnify them from certain liabilities, including liabilities under the Securities Act.

110.    As is the case with all high yield debt issued in such two-step offerings, the 144A Bonds were priced from the outset as registered, freely tradable securities. Because the co-issuers undertook to use their best efforts to offer the Registered Bonds in exchange for the 144A Bonds within 450 days after the Bond Offering, the market accepted such pricing and did not demand the substantially higher yield that would otherwise be expected in the purchase of unregistered securities. Indeed, the Exchange Offer was consummated in April 2005, only eight months after the 144A Bonds were issued.

111.    Upon the occurrence of certain events, including failure of the issuers to have the Bond Registration Statement declared effective within 450 days after the issuance of the 144A Bonds, or failure to consummate the Exchange Offer within 40 days after the Bond Registration Statement became effective, the issuers would be obligated to increase the interest payments due to the holders of 144A Bond by 0.25% *per annum* for the first 90-day period following such failure, plus an additional 0.25% *per annum* for each subsequent 90-day period in which the failure was not cured, up to a maximum additional interest rate of 1.0% *per annum*.

112.    PIMCO, the PIMCO High Yield Fund, and other members of the Class would not have purchased the 144A Bonds without the understanding that they would have an opportunity to exchange them for Registered Bonds. Indeed, the funds and accounts for which PIMCO and many other class members purchased the 144A Bonds were subject to restrictions on the amount of unregistered securities they could hold, since, among other reasons, they required flexibility and liquidity to respond to investors' redemption requests.

### 1.    The Offering Memorandum

113.    The 144A Bonds were marketed to PIMCO, other Qualified Institutional Buyers and other members of the Class pursuant to the Offering Memorandum, which was first disseminated on or about July 12, 2004. The Offering Memorandum described the terms of the

45

Bonds, provided information concerning the Company's operations and finances, and contained

the Company's audited financial statements for the fiscal years ended February 28, 2004 and

February 28, 2003. The Offering Memorandum contained all the information required to be set

forth in a prospectus included in a registration statement filed with the SEC.

114.    The Offering Memorandum, which described and provided for the entire two-step

process by which the Bonds were transmitted into the market, constituted a prospectus for the

Bonds, and was used by the Bond Underwriter Defendants, Bennett, Trosten, Jaeckel, and the

THL Partner Defendants to solicit PIMCO, the PIMCO High Yield Fund, and other members of

the Class not only to participate in the first step of the offering, but also to participate in the

second step exchange by which the 144A Bonds achieved their status as registered, freely

tradable securities. The two steps of the offering were inseparable, and each and every

communication soliciting the participation of any person in the first step necessarily also

solicited participation in the second step.

115.    The Offering Memorandum was created by, among others, Defendants Credit

Suisse, BAS, Deutsche Bank, Bennett, Trosten, Jaeckel, the THL Partner Defendants, Mayer

Brown, and Collins. Defendant Grant Thornton reviewed the Offering Memorandum prior to its

issuance, helped prepare the financial statements and other financial data contained therein, and

consented to the inclusion of its audit opinion therein. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████    ████████████████████████



116.    The Offering Memorandum states that Mayer Brown represented Refco Group in connection with the Bond Offering.  In that role, Mayer Brown was heavily involved in the process of issuing the 144A Bonds and preparing and disseminating the Offering Memorandum to investors.  According to the Examiner's Report, Collins participated in numerous conferences with Bennett and others and "reviewed, revised and reviewed revisions to the offering circular to be submitted in connection with the exchange of the privately purchased notes for publicly traded notes."  Other Mayer Brown attorneys, including partners Angela Lang ("Lang") and Edward Best ("Best"), attended numerous drafting sessions where the content of the Offering Memorandum was discussed, drafted and revised, and successive drafts of the Offering Memorandum were routinely circulated to and reviewed and revised by Collins and other Mayer Brown attorneys.  Additionally, Collins and other Mayer Brown attorneys personally drafted certain sections of the Offering Memorandum, including the Management Discussion & Analysis ("MD&A") section which was drafted by Best and reviewed by Collins. ████████████

████████████████████████████████████

███████████ As described below, the MD&A section of the Offering Memorandum contained a number of material untrue statements and omitted to state facts that were needed to make it not misleading.

117. As noted by the Examiner, in the midst of these efforts to sell a large portion of Refco to public investors, Collins also sent Refco a billing statement on behalf of Mayer Brown which described time charged to "revision to [Customer X] loan documents." Thus, at the same time Mayer Brown was drafting and reviewing an Offering Memorandum containing representations regarding Refco's financial condition that Mayer Brown knew would be relied upon by potential investors, Mayer Brown was collecting legal fees for its substantial role in transactions that rendered those representations materially false and misleading.

118. As set forth below, the Offering Memorandum pursuant to which PIMCO, the PIMCO High Yield Fund, and other members of the Class were induced to purchase the Bonds contained a number of untrue statements of material facts and omitted to state material facts needed to make it not misleading.

(a)    **The Financial Statements in the Offering Memorandum**
       **Contained Untrue Statements of Material Facts**

119. The Offering Memorandum contained financial statements and other statements regarding the Company's financial performance that purported to demonstrate the Company's soundness, but which in reality contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. These statements were made in several contexts, including (1) in the audited financial statements included in the Offering Memorandum; (2) in the discussion of certain historical consolidated financial data derived from the Company's audited consolidated financial statements; (3) in the unaudited financial statements included in the Offering Memorandum; (4) in the discussion of

certain historical consolidated financial data derived from the Company's unaudited consolidated

financial statements; and (5) in statements made in the Management Discussion & Analysis

("MD&A") and other textual portions of the Offering Memorandum.

120.   Refco Group's Consolidated Balance Sheets, as audited and certified by Grant

Thornton and as included in the Offering Memorandum, stated that Refco Group and its

subsidiaries had receivables from customers in the amounts of $1,827,190,000 and

$1,795,445,000 for fiscal years 2004 and 2003, respectively; total assets of $33,332,172,000 and

$19,215,429,000 for fiscal years 2004 and 2003, respectively; and members' equity of

$616,084,000 and $566,361,000 for fiscal years 2004 and 2003, respectively.

121.   Further, Refco Group's Consolidated Statements of Income, as audited and

certified by Grant Thornton and as included in the Offering Memorandum, stated that Refco

Group and its subsidiaries incurred general, administrative and other expenses in the amounts of

$200,902,000 and $167,464,000 for fiscal years 2004 and 2003, respectively; and earned net

income of $187,156,000 and $140,119,000 for fiscal years 2004 and 2003, respectively.

122.   Grant Thornton gave its written consent to the inclusion of its audit opinion on the

Company's fiscal years 2003 and 2004 financial statements in the Offering Memorandum.  In the

audit opinion, Grant Thornton certified that those financial statements had been prepared in

accordance with GAAP.  Grant Thornton's report stated:

### REPORT OF INDEPENDENT REGISTERED
### PUBLIC ACCOUNTING FIRM

To the Members of
**Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheets of
Refco Group Ltd., LLC (the "Company") (a Delaware limited liability
company) and subsidiaries (the "Group") as of February 29, 2004 and
February 28, 2003, and the related consolidated statements of income,

changes in members' equity and cash flows for each of the two years then ended....

We conducted our audits in accordance with the auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the two years then ended in conformity with accounting principles generally accepted in the United States of America.

Grant Thornton LLP
New York, New York
April 27, 2004

123.    In addition to the financial statements audited by Grant Thornton, the Offering Memorandum presented certain historical consolidated financial data derived from the Company's consolidated financial statements. Based on the audited financial statements for fiscal years 2003 and 2004, respectively, the Offering Memorandum reflected EBITDA (that is, earnings before interest, income tax, depreciation and amortization) for those years of $211 million and $258 million, respectively. Based on the Company's unaudited consolidated financial statements for fiscal years 2000, 2001 and 2002, the Offering Memorandum reported:

(a)    general, administrative and other expenses in the amounts of $104 million, $174 million and $172 million for the fiscal years ended February 29, 2000 ("fiscal year 2000"), February 28, 2001 ("fiscal year 2001"), and fiscal year 2002, respectively;

(b)  net income of $45 million, $72 million and $93 million for fiscal years 2000, 2001, and 2002, respectively;

(c)  EBITDA of $92 million, $140 million, and $179 million for fiscal years 2000, 2001, and 2002, respectively;

(d)  total assets of $17.7 billion, $18.2 billion and $22.6 billion for fiscal years 2000, 2001, and 2002, respectively; and

(e)  members' equity of $441 million, $500 million and $522 million for fiscal years 2000, 2001, and 2002, respectively.

124.  The Offering Memorandum also included unaudited financial results for the three month period ended May 31, 2004, which was the first quarter of the Company's fiscal year 2005. For that quarter, the Offering Memorandum reported general, administrative and other expenses in the amount of $57,502,000; net income of $59,270,000; EBITDA of $78 million; total assets of $55,229,109,000; receivables from customers of $2,290,621,000; and members' equity of $671,100,000.

125.  Further, the Offering Memorandum included Unaudited Pro Forma Consolidated Statements of Operations for fiscal year 2004; the twelve months ended May 31, 2004; and the three months ended May 31, 2004. The Unaudited Pro Forma Consolidated Statements of Operations treated the Bond Offering and related transactions as if they had occurred on March 1, 2003. For fiscal year 2004, the Offering Memorandum reflected, on a pro forma basis, general, administrative and other expenses of $188 million and net income of $108 million. For the twelve months ended May 31, 2004, the Offering Memorandum reflected, on a pro forma basis, general, administrative and other expenses of $199 million and net income of $116 million. For the three months ended May 31, 2004, the Offering Memorandum reflected, on a

pro forma basis, general, administrative and other expenses of $52 million and net income of $35 million.

126.    In addition, the Offering Memorandum included an Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2004, which treated the Bond Offering and related transactions as if they had occurred on May 31, 2004.  As of May 31, 2004, the Offering Memorandum reflected, on a pro forma basis, members' equity of $76 million; receivables from customers of $2.26 billion; and total assets of $55.6 billion.

127.    The textual portions of the Offering Memorandum also included a significant amount of financial information.  For example, the MD&A section—which Mayer Brown drafted—contains the following statements:

(a)    "General, administrative and other expenses on a consolidated basis for the three months ended May 31, 2004 increased $14.8 million, or 34.7%, to $57.5 million from $42.7 million for the three months ended May 31, 2003."

(b)    "General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $33.5 million, or 20.0%, to $200.9 million from $167.4 million for the year ended February 28, 2003."

(c)    "Operating profit on a consolidated basis for the three months ended May 31, 2004 increased $21.2 million, or 44.9%, to $68.4 million from $47.2 million for the three months ended May 31, 2003."

(d)    "Operating profit on a consolidated basis for the year ended February 29, 2004 increased $42.9 million, or 27.2%, to $200.6 million from $157.7 million for the year ended February 28, 2003."

(e)    "We currently have no off balance sheet arrangements."

(f)    "We generated significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period."

(g)    "[O]ur management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x."

128.    The statements set forth above were materially untrue because Refco failed to disclose the existence of hundreds of millions of dollars of uncollectible receivables, proprietary trading losses, related-party transactions, and guarantees. Additionally, Refco had inappropriately shifted expenses from Refco to RGHI and recorded income on Refco's books that Refco had neither received nor earned, and/or that was the result of "transactions" with RGHI that lacked economic substance and were solely for the purpose of inflating Refco's net income. Among other things, the reported results for receivables from customers, net assets, members' equity, net income and EBITDA discussed above were materially overstated, and the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated. Further, the pro forma financial statements were based on the Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts.

129.    The Company and the THL Partner Defendants have publicly admitted that Refco's reported financial information for fiscal years 2002, 2003 and 2004, as contained in the Offering Memorandum, was untrue and should not be relied upon. Specifically, on October 10, 2005, Refco announced that the Company's financial statements for fiscal years 2002, 2003, and 2004, among other periods – taken as a whole – could no longer be relied upon. The THL Partner Defendants have also conceded, in a complaint filed in this District on November 14, 2005, and styled Thomas H. Lee Equity Fund V., L.P., et al. v. Phillip R. Bennett, et al., No. 05 Civ. 9608 (S.D.N.Y.) (the "THL Complaint"), that the Company's financial statements for these periods (and others) contained untrue statements of material facts.

130.    In addition to the foregoing admissions of Refco and the THL Partner Defendants, Lead Plaintiffs have, in the course of their ongoing investigation, gathered substantial evidence concerning the scope of the untrue statements in the financial statements contained in the Offering Memorandum. Lead Plaintiffs have reviewed documents and conducted witness interviews pertaining to several sets of transactions between Refco and third party customers of Refco which show, among other things, that the financial statements and description of the Company's historical performance contained in the Offering Memorandum contained material statements and omissions of material fact because:

(a)    For a twelve-day period bracketing February 28, 2000, the final day of Refco's fiscal year 2000, a receivable from RGHI to Refco in the amount of $610,000,000 was temporarily replaced with (1) a receivable in the amount of $300,000,000 from BAWAG, (2) a receivable in the amount of $150,000,000 from an entity called CIM Ventures, Inc. ("CIM Ventures"), which was a subsidiary of Ingram Micro, Inc. ("Ingram"), (3) a receivable in the amount of $110,000,000 from an entity

called CS Land Management LLC ("CS Land"), and (4) a receivable in the amount of $50,000,000 from EMF Core Fund Limited ("EMF"), an affiliate of hedge fund manager EMF Financial Products, LLC;

      (b)    For a twelve-day period bracketing February 28, 2001, the final day of Refco's fiscal year 2001, a receivable from RGHI to Refco in the amount of $750,000,000 was temporarily replaced with (1) a receivable in the amount of $250,000,000 from CIM Ventures, (2) a receivable in the amount of $300,000,000 from BAWAG, and (3) a receivable in the amount of $200,000,000 from a subsidiary of EMF Financial Products, LLC called Delta Flyer Fund, LLC ("Delta Flyer");

      (c)    For a twelve-day period bracketing February 28, 2002, the final day of Refco's fiscal year 2002, a receivable from RGHI to Refco in the amount of $925,000,000 was temporarily replaced with (1) a receivable in the amount of $325,000,000 from a third-party customer of Refco ("Customer X"), (2) a receivable in the amount of $300,000,000 from BAWAG, (3) a receivable in the amount of $175,000,000 from Delta Flyer, and (4) a receivable in the amount of $125,000,000 from Beckenham Trading Company, Inc. ("Beckenham");

      (d)    For a sixteen-day period bracketing February 28, 2003, the final day of Refco's fiscal year 2003, a receivable from RGHI to Refco in the amount of $900,000,000 was temporarily replaced with (1) a receivable in the amount of $500,000,000 from Customer X, (2) a receivable in the amount of $250,000,000 from BAWAG, and (3) a receivable in the amount of $150,000,000 from Delta Flyer;

      (e)    For a seventeen-day period bracketing February 29, 2004, the final day of Refco's fiscal year 2004, a receivable from RGHI to Refco in the amount of

$970,000,000 was temporarily replaced with (1) a receivable in the amount of $720,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from BAWAG; and

(f)    For a twelve-day period bracketing May 31, 2004, the final day of Refco's first quarter for fiscal year 2005, a receivable from RGHI to Refco in the amount of $700,000,000 was temporarily replaced with a receivable in the amount of $700,000,000 from Customer X.

131.    The Offering Memorandum also contained materially untrue statements by the Company's outside auditor, Defendant Grant Thornton, in addition to those contained within the financial statements that Grant Thornton helped prepare. Grant Thornton's statements that it had "conducted [its] audits in accordance with the auditing standards generally accepted in the United States of America" and that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and its subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the two years then ended in conformity with accounting principles generally accepted in the United States of America" constituted untrue statements of material facts. Grant Thornton, as set forth more fully below, had not conducted its audits in accordance with GAAS. Further, the Company's financial statements as of February 29, 2004 and February 28, 2003 and the results of its operations and cash flows for each of the two years then ended did not present fairly, in all material respects, the Company's financial position in accordance with GAAP.

56

(b)    **The Description of Customer Receivables and
Related-Party Transactions in the
Offering Memorandum Contained Untrue
Statements and Omissions of Material Fact**

132.    To assure investors that the Bonds were a sound investment, the Offering

Memorandum stressed that the Company had adequately accounted for doubtful accounts and

related-party transactions.  With respect to receivables from and payable to customers, the Notes

To Consolidated Financial Statements stated:

> **Receivables from and payable to customers**
>
> These balances primarily pertain to margin and open contractual
> commitments related to customer futures, foreign currencies and securities
> transactions. ...  For certain receivables that are not fully secured and
> where the Group deems appropriate, the Group pursues collection of these
> receivables through various means, including legal action, and provides
> reserves when, in the opinion of management, such reserves are
> appropriate.  Reserves of $65.2 million and $42.7 million have been
> provided against receivables from customers as of February 29, 2004 and
> February 28, 2003, respectively.

133.    Similarly, the MD&A section of the Offering Memorandum stated:

> **Receivables from customers-provisions for doubtful accounts**.  Our
> receivables are generally collateralized with marketable securities.  For
> certain customer receivables that are not fully secured, we establish
> reserves when, in the opinion of management, such reserves are
> appropriate.  Reserves of $65.2 million and $42.7 million have been
> provided against receivables from customers as of February 29, 2004 and
> February 28, 2003, respectively.

134.    Further, the Offering Memorandum stated the following regarding related-party

transactions:

> The Group may loan money to and may borrow money from its affiliates,
> members, affiliated companies and other related parties.  Interest is
> generally charged at prevailing market rates.  The $105 million due from
> Refco Group Holdings, Inc., included in receivables from customers at
> February 28, 2003, was received by February 29, 2004.
>
> As of February 29, 2004 and February 28, 2003, the Group had a deposit
> with BAWAG Overseas, Inc., a third party financial institution who is a

member, of $210 million and $175 million, respectively. These balances
were included in "Receivables from customers" and liquidated shortly
after each year-end.

135.    These statements contained untrue statements and omissions of material facts

because they failed to account for the existence of material related-party transactions and related-

party indebtedness between the Company, RGHI and BAWAG, or that the reserves provided

against receivables from customers as of February 29, 2004 and February 28, 2003 were grossly

insufficient, given the hundreds of millions of dollars in uncollectible receivables that the

Company was carrying on its books. As of February 29, 2004 and February 28, 2003, the

Company had $970 million and $900 million in undisclosed uncollectible receivables,

respectively, of which $720 million and $650 million, respectively, were concealed through loan

transactions involving Collins and Mayer Brown.

136.    Further, the Offering Memorandum stated that RGHI owed $105 million to Refco

Group as of February 28, 2003, when in fact that figure would have been much larger were it not

for the temporary shifting of certain RGHI debts to third parties through round trip transactions

arranged by Collins and Mayer Brown just prior to the end of Refco Group's fiscal year. The

Offering Memorandum also failed to disclose that the receivable from RGHI was "paid" by

February 29, 2004 only because the Company had loaned RGHI several hundred million dollars

through BAWAG and Customer X to facilitate that "payment." Moreover, as the SEC would

later remark when reviewing a draft of the Bond Registration Statement containing a similar

characterization (*see* ¶ 185 below), the inclusion of amounts due from RGHI in "receivables

from customers" was inappropriate. Collins and Mayer Brown participated in the drafting and

review of the Offering Memorandum and were well aware, given their representation of Refco

Group and RGHI and their direct involvement in transactions to conceal the RGHI receivable,

that the descriptions of Refco Group's related party transactions and "receivables from customers" were not accurate.

137.    The Offering Memorandum also mischaracterized and failed to disclose the full extent of the related-party transactions between Refco and BAWAG, by stating that the Company had "deposits" with BAWAG Overseas, Inc. (a wholly-owned BAWAG affiliate) of $210 million and $175 million as of February 29, 2004 and February 28, 2003, respectively, without disclosing any of the loan transactions referenced above.

<div align="center">

**(c)    The Offering Memorandum Misrepresented the
Reasons for the Company's Purported Success**

</div>

138.    The Offering Memorandum portrayed the Company as a rising star in the derivatives market led by a team of dedicated and talented executives.  For example, the Offering Memorandum stated:

> From fiscal year 2000 through fiscal year 2004, our net revenues and EBITDA . . . have increased at a compound annual growth rate of 20.6% and 29.4%, respectively, as a result of organic growth and acquisitions. For the twelve months ended May 31, 2004 ("LTM") on a pro forma basis after giving effect to the Transactions, we generated $1,008.0 million and $269.0 million of net revenues and EBITDA, respectively.

139.    The Company attributed these remarkable results to its "proven and committed management team," stating:

> We are led by a senior management team that has an average of 22 years of industry experience.  Phillip Bennett, who has been with us for 23 years, became our President and CEO in 1998 and formed a new senior management team comprised of well respected industry professionals. Under the leadership of our senior management team, net revenues and EBITDA have grown at a compound annual growth rate of 20.6% and 29.4%, respectively, from fiscal year 2000 through fiscal year 2004.

140.    These statements contained untrue statements of material facts because the Company's financial statements for fiscal years 2002, 2003 and 2004 materially overstated the Company's EBITDA.  Thus, the Company's purported financial results in fiscal years 2000

<div align="center">59</div>

through 2004 were not due to the "leadership" of its "proven and committed management team," but rather were the result of the failure to disclose uncollectible receivables and related-party transactions, which rendered the Company's financial results for fiscal years 2000 through 2005 materially untrue.

> **(d)** **The Offering Memorandum Misrepresented the Company's Ability to Access the Cash It Needed to Service Its Debt**

141.    As discussed above, the Company incurred significant debt in connection with the 2004 recapitalization. As a result, its operations were highly leveraged. The Offering Memorandum emphasized that ready access to cash was critical to the Company's ability to service this debt:

> **To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.**
>
> Our ability to make payments on and to refinance our indebtedness, including the notes and amounts borrowed under our senior credit facilities, and to fund our operations, will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors beyond our control.

(Emphasis in original.)

142.    Because ready access to cash was essential to its business, the Company had an interest in maintaining its high credit rating. The Offering Memorandum disclosed that a reduction in the Company's credit rating could cause a host of unwelcome problems:

> **Liquidity Risk**
>
> Ready access to cash is essential to our business. … Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties

> could terminate contracts with us or require us to post additional collateral.
> Termination of our trading and collateralized financing contracts could
> cause us to sustain losses and impair our liquidity by requiring us to find
> other sources of financing or to make significant cash payments or
> securities movements.

(Emphasis in original.)

143.    The Company's ability to access cash to service its debt was of crucial importance
to potential Bond investors, because the Bonds were subordinated to the Company's senior
indebtedness, including $800 million in term loans and up to $75 million in borrowings that
could be incurred under the revolving credit facility.

144.    Because PIMCO, the PIMCO High Yield Fund, and other members of the Class
understood when they purchased the Bonds that the Company's ability to make required
payments on the Bonds was subject to its ability to generate sufficient cash, any facts that could
affect the Company's ability to access the cash it needed to service its senior debt were of special
significance to PIMCO, the PIMCO High Yield Fund, and other members the Class.

145.    Accordingly, the Company and those Defendants who prepared the Offering
Memorandum, including Mayer Brown and the Underwriter Defendants, took steps to assure
PIMCO, the PIMCO High Yield Fund, and other members of the Class that the Company was
generating sufficient cash to service its debt and, thus, would be in a position to make required
payments on the Bonds.  For example, the Offering Memorandum stated:

> We generate significant free cash flow afforded by high margins and a
> business model that allows us to grow without significant capital
> expenditures.  For our fiscal year 2004, we generated EBITDA of $258.0
> million with capital expenditures of $11.2 million.  While our EBITDA
> has increased from $92.0 million to $258.0 million from fiscal year 2000
> to 2004, our average capital expenditures were $16.0 million for the same
> period.  In addition, our management has demonstrated its ability to
> operate in a leveraged capital structure by improving our leverage ratio,
> which we define as the ratio of long-term debt and preferred securities
> issued by subsidiaries to EBITDA.  From fiscal year 2000 to fiscal year
> 2004, our total leverage ratio decreased from 4.0x to 1.5x.

146.   The statements identified above contained untrue statements and omissions of material facts.  The Company had severely jeopardized its credit rating and had overstated its ability to generate the cash that it needed to service its debt (and, accordingly, its ability to make the payments that would come due on the Bonds) by including untrue material statements of fact in its financial statements, and by failing to disclose the existence of hundreds of millions of dollars in uncollectible receivables and the guarantees Refco Group had given to third parties in connection with the round-trip loans.  If the truth had been disclosed, it would have shown that Refco failed to comply with its minimum capital requirements and thus impaired its ability to conduct its business.  In addition, the EBITDA results and leverage ratios discussed above were materially overstated because they were based on the untrue financial statements.

### (e)   The Offering Memorandum Misrepresented That the Company Had Taken Adequate Steps to Protect Itself From the Risk of Customer Defaults

147.   The Company's exposure to customer defaults further compounded the risks associated with its high degree of leverage.  As the Offering Memorandum explained:

> We act on behalf of our customers for all trades consummated both on exchanges and in OTC markets.  Accordingly, we are responsible for our customers' obligations with respect to these transactions, which exposes us to significant credit risk.  Our customers may default on their obligations due to bankruptcy, lack of liquidity, operational failure or other reasons.  A substantial part of our working capital is at risk if customers default on their obligations to us and their margin and security deposits are insufficient to meet all of their obligations.  We cannot assure you that we will not be materially and adversely affected in the event of a significant default by our customers.

148.   To allay potential investors' fears that these credit risks would prevent the Company from making required payments on the Bonds, the Company touted the steps it had taken to minimize the risk of customer default.  In fact, the Company named its "Attractive Risk Profile" as a "Competitive Strength," stating:

We have built a comprehensive risk management system throughout our operations to limit and monitor our exposure to customer and counterparty risk. We only undertake transactions on behalf of our customers and consequently are not exposed to market risk as a result of proprietary trading. In order to mitigate customer and counterparty risk, we implement margin technologies, mark-to-market risk management tools, internal review and executive approval procedures and rigorous risk monitoring. As a result of our risk management techniques, we have had limited credit losses resulting from our customer or counterparty defaults since fiscal year 2000, even through such recent volatile events as the terrorist attacks on September 11, 2001.

149.    Further, the MD&A Section of the Offering Memorandum stated:

As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. ... Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's ability to pay margin. We perform frequent stress tests to our customers' positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

150.    These statements contained untrue statements and omissions of material facts because, contrary to the statement that Refco was "not exposed to market risk as a result of proprietary trading," Refco had suffered significant proprietary trading losses. Additionally, contrary to the Company's espoused commitment to safeguarding itself against customer defaults, the Company had experienced significant customer defaults that were not disclosed to the investing public, and that materially impaired the Company's working capital. Further, the Company's financial statements contained untrue material statements and material omissions concerning its hundreds of millions of dollars in uncollectible debt, which was inaccurately reflected on the Company's books as a "customer receivable." This uncollectible debt, if properly disclosed, would have jeopardized the Company's credit rating and its ability to pay

down the senior indebtedness described above, and been a material fact weighed in the

investment decisions of PIMCO, the PIMCO High Yield Fund, and other members of the Class.

### (f)    The Offering Memorandum Misrepresented That the Company Maintained Excess Regulatory Capital

151.    The Company operated in a heavily regulated environment that imposed unique

requirements on its business operations.  Among other things, the Company was required to

carry a certain amount of regulatory capital on its books as a condition of its continued operation.

In fact, the Offering Memorandum acknowledged that the Company's failure to maintain

adequate capital levels could be fatal to its continued existence:

> The SEC, NASD, CFTC and various other regulatory agencies have
> stringent rules with respect to the maintenance of specific levels of net
> capital by securities broker-dealers and FCMs.  Our failure to maintain the
> required net capital could result in suspension or revocation of our
> registration by the SEC and our suspension or expulsion by the NASD,
> and could ultimately lead to our liquidation.

152.    To assure potential Bond purchasers that the Company's operations were not at

risk of being shut down due to failure to comply with regulatory capital requirements, the

Offering Memorandum reported that the Company "maintain[ed] excess regulatory capital to

provide liquidity during periods of unusual market volatility."  Specifically, the Offering

Memorandum stated that the Company's regulated subsidiaries, Refco LLC and Refco

Securities, LLC, exceeded their minimum regulatory capital requirements by $95.6 million and

$61.9 million, respectively.

153.    These statements contained untrue statements of material facts because the

Company's reported regulatory capital was overstated and the Company failed to disclose that

Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco

Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason.

Upon information and belief, the Company would not have satisfied its regulatory capital

requirements during the Class Period if the true facts were disclosed regarding its hundreds of millions of dollars of uncollectible receivables. To the extent the Company did maintain excess regulatory capital, the excess amounts were materially less than the figures reported in the Offering Memorandum and were not sufficient to "provide liquidity during periods of unusual market volatility," as represented in the Offering Memorandum.

### (g)    The Offering Memorandum Failed to Disclose BAWAG's Full Ownership Interest in Refco Group

154.    In describing the Company's ownership, the notes to the financial statements contained in the Offering Memorandum stated that the Company was 90% owned by RGHI, and 10% owned by "BAWAG Overseas, Inc., a third party financial institution." This statement was materially incomplete and misleading, because the Offering Memorandum failed to disclose that BAWAG – the parent entity of BAWAG Overseas – also held a security interest in another 27% of the Company's equity by virtue of various loans by BAWAG to DF Capital and other Bennett-controlled entities.

155.    As a result, investors were led to believe that BAWAG's interest in Refco was limited to 10%, when in fact it held interests in approximately 37% of the Company's equity and therefore was in a position to exercise significant influence and control over the Company. In addition, the description of BAWAG Overseas as a "third-party financial institution" was materially misleading because it failed to disclose the true extent of the business dealings and interlocking relationships between BAWAG, Refco, Bennett, RGHI and other Defendants throughout the Class Period.

### 2.    Presentations to Ratings Agencies

156.    At the same time they were preparing materials to disseminate to potential Bond investors, the Bond Underwriter Defendants, Refco, and the THL Partner Defendants were

working on presentations to Standard & Poor's ("S&P") and Moody's in an effort to achieve the best possible ratings for the 144A Bonds, and thereby to make the Bonds more attractive to investors. The Bond Underwriter Defendants – led by Credit Suisse – drafted the ratings agency presentations and played a central role in communicating with those agencies. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

157.    On July 12, 2004, S&P issued a "B" rating on the 144A Bonds, stating that the rating was "based on Refco's strong and well-established franchise" and its "strong and well-seasoned management team and … good earnings track record." A week later, on July 19, 2004, Moody's assigned a "B3" rating to the 144A Bonds, stating that the rating "reflect[ed] Refco's business franchise and its operating risks" and the fact that – at least as represented by Refco – "[t]he firm takes very limited market risks and almost no unsecured credit risk." These ratings were based in significant part upon the information provided to the ratings agencies by the Bond Underwriter Defendants, Refco, and the THL Defendants.

### 3.    **The Bond Road Show**

158.    Defendants Bennett, Trosten and Jaeckel, together with representatives of the Bond Underwriter Defendants, led a nationwide road show in July 2004 in an effort to convince investors to purchase the Bonds (the "Bond Road Show"). The Bond Road Show was organized by the Bond Underwriter Defendants, who identified and contacted potential investors and invited them to attend. Representatives of the Bond Underwriter Defendants attended each Road Show meeting and introduced Refco's management team to investors. Those representatives varied from meeting to meeting, but included Credit Suisse representatives Joseph Molluso, Laurence Goldberg, Paul Kromwyk, Lori Finkel, Diron Jebejian and Tiffany Gallo. The Bond Road Show made stops in various cities across the United States and visited numerous institutional investors, including a visit to PIMCO's Newport Beach, California office on July 16, 2004.

159.    During the Bond Road Show, Defendants Bennett, Trosten, Jaeckel and representatives of the Bond Underwriter Defendants made numerous standardized oral statements relating to the Offering Memorandum and to the Company's financial condition and results, including liberal use of the financial statements contained in the Offering Memorandum, which, as explained above, contained untrue statements of material facts.

160.    Among other things, Defendants Bennett and Trosten told investors during the Bond Road Show that the Company had experienced only about $1 million in customer credit losses in the preceding five years (1999-2003), and had suffered no such losses in 1998. These statements were materially untrue and omitted to state material facts because they did not disclose the hundreds of millions of dollars in customer credit losses that the Company had suffered in 1997 and 1998, which had been hidden from the Company's books.

161.    Investors were also presented with slide and/or written presentations at the Bond Road Show which, upon information and belief, were prepared by Defendants Bennett, Trosten, Jaeckel, and the Bond Underwriter Defendants ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

162.    ████████████████████████████████████████████

████████████████████████████████████ The slides also incorrectly stated that the Company had achieved EBITDA of $208 million and $256 million for fiscal years 2003 and 2004, respectively, and $269 million for the twelve months ending May 31, 2004. These figures were materially untrue because of Defendants' failure to write off hundreds of millions of dollars in losses and uncollectible receivables, inappropriate shifting of expenses from Refco to RGHI, recording of bogus income on Refco's books, and failure to disclose that Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason. The Bond Road Show slides similarly contained statements regarding the Company's revenues, pre-tax operating income, and leverage that were untrue for the same reasons they were untrue in the Offering Memorandum.

163.    Based on feedback received at the Bond Road Show, as well as the ratings given to the 144A Bonds by Moody's and S&P, the Bond Underwriter Defendants – together with Refco management and representatives of the THL Partner Defendants – determined the pricing of the 144A Bonds. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

164.    In reliance on the information received during the Bond Road Show, the information contained in the Offering Memorandum (including the untrue financial statements contained therein, which, as set forth above, contained untrue statements of material fact), and the Company's commitment to complete the Exchange Offer, PIMCO, the PIMCO High Yield Fund, and numerous other institutional investors purchased the 144A Bonds.

### 4.    The Bond Registration Statement

165.    Pursuant to the Registration Rights Agreement, the Company filed a Form S-4 Registration Statement with the SEC on October 12, 2004, which was subsequently amended through Form S-4/A filings dated December 10, 2004; January 12, 2005; February 23, 2005; March 11, 2005; April 5, 2005; and April 6, 2005 (collectively, the "Bond Registration Statement"). The filing of the Bond Registration Statement allowed for the exchange of the 144A Bonds for Registered Bonds, as originally contemplated in the Offering Memorandum.

166.    The Bond Registration Statement became effective, and Registered Bonds were issued pursuant thereto, on or about April 13, 2005. The Exchange Offer remained open until May 10, 2005, at which time PIMCO and the PIMCO High Yield Fund exchanged their 144A Bonds for Registered Bonds.

167.    The co-issuers of the Registered Bonds were Refco Group and its wholly-owned subsidiary, Refco Finance. Additionally, there were a number of co-registrants for the Registered Bonds, including, among others, Lind-Waldock, Refco Futures, and Westminster-Refco.

69

168.    Defendant Bennett signed the Bond Registration Statement on behalf of Refco Group.  In addition, Defendants Sherer, Murphy, Sexton, Maggio, Silverman and Klejna (through their attorney-in-fact Defendant Bennett) signed the Bond Registration Statement on behalf of Refco Group.  Other signatories on the Bond Registration Statement included Refco Finance (through Bennett and Silverman), Lind-Waldock (through Bennett and Silverman), Refco Futures (through Bennett, Silverman and Murphy), and Westminster-Refco (through Bennett, Silverman and Murphy).

169.    The Offering Memorandum was used as the foundation for preparing the Bond Registration Statement, and, therefore, the two documents were substantially similar in content.  This fact was understood and expected by the parties that prepared the Offering Memorandum, including Mayer Brown and the Bond Underwriter Defendants, and thus those parties knew when they were preparing the Offering Memorandum that they were also preparing statements which would be repeated in the Bond Registration Statement.

170.    The Bond Underwriter Defendants, Collins, and Mayer Brown also participated in the preparation of the Bond Registration Statement itself.  The drafting of the Bond Registration Statement was an iterative process, involving several rounds of comments from the SEC staff and responsive changes by Refco.  It was only after six amendments to the Bond Registration Statement that the SEC was satisfied with the disclosures and the Bond Registration Statement became effective.  The Bond Underwriter Defendants and Mayer Brown received and reviewed the SEC comment letters and the amendments of the Bond Registration Statement that addressed those comments, and participated in drafting sessions for amendments of the Bond Registration Statement.  Moreover, the amendment of the Bond Registration Statement occurred hand-in-hand with the preparation of the IPO Registration Statement, and Mayer Brown (which

represented Refco in connection with the IPO) and the Bond Underwriter Defendants (which were also underwriters and joint bookrunners of the IPO) participated in both processes simultaneously.

171.  

172.  Drafts of Refco's response to the SEC's November 10 comment letter and of Amendment No. 1 to the Bond Registration Statement were circulated to the Bond Underwriter Defendants in early December 2004.



173.

Among other comments, Cravath suggested that the description of Refco's credit risk be supplemented with examples of events that had given rise to the Company's reserves against receivables from customers, such as the Asian economic crisis. Cravath's comments on the Bond Registration Statement also make reference to Cravath's having participated in an earlier drafting session for that document on behalf of the Bond Underwriter Defendants.

174.    On December 9, 2004, following the drafting session, another draft was circulated which Cravath again reviewed and heavily edited on behalf of the Bond Underwriter Defendants, including making significant revisions to the MD&A section. 



Those comments included significant revisions and edits.

178. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ On or about February 23, 2005, Refco filed a third amendment to the Bond Registration Statement, incorporating the comments received from the Bond Underwriter Defendants' counsel, as modified by CSFB.

179. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

180. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

181. The final Bond Registration Statement, which was filed on or about April 6, 2005, contained material untrue statements substantially similar to those set forth above from the Offering Memorandum, including but not limited to the statements set forth in ¶¶ 132-153 above

regarding the Company's reserves for customer receivables, its purported non-participation in proprietary trading, and its maintenance of "excess regulatory capital." These statements were untrue for the same reasons as in the Offering Memorandum. In particular, like the Offering Memorandum, the Bond Registration Statement failed to disclose either the existence of the multi-hundred million dollar receivable owed by RGHI to Refco, or the round-trip "loan" transactions whereby that receivable had been removed from Refco's books at the end of its financial reporting periods.

182.    The Bond Registration Statement contained the Company's audited financial statements for fiscal years 2003 and 2004, as well as Grant Thornton's audit report thereon. In the original Form S-4 filed on October 12, 2004, these audited financial statements and audit opinion were identical to those in the Offering Memorandum, and contained untrue statements of material facts for the same reasons.

183.    In the amendments to the Form S-4, although the figures for net income, total assets, and members' equity were the same as in the Offering Memorandum, different figures were reported for certain line items on the financial statements, including, but not limited to, cash and cash equivalents; receivables from customers; payables to customers; total revenues (as well as all component items of total revenues); and general, administrative and other expenses. In the December 2004 and subsequent amendments of the Bond Registration Statement, the Company reported customer receivables of $1,591,385,000 and $1,490,380,000 for fiscal years 2004 and 2003, respectively (net of $65.2 million and $42.7 million in reserves, respectively); and $170,415,000 and $142,585,000 in general, administrative and other expenses for those periods, respectively. In addition, the December 2004 and subsequent amendments of the Bond

Registration Statement reflect $210 million and $280 million in receivables from equity members, whereas the Offering Memorandum and the original Form S-4 disclosed none.

184.    The audited financial statements in the amendments to the Bond Registration Statement, though different from those in the Offering Memorandum, contained untrue statements of material facts for the same reasons as those in the Offering Memorandum, including the failure of the Company to disclose that Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason. Specifically, the reported results for members' equity and net income were materially overstated, while the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated.

185.    The related-party disclosures in the amendments to the Bond Registration Statement also contained untrue statements of material facts. Specifically, the related-party disclosures in the amendments to the Bond Registration Statement stated:

> The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates. **The $105.3 million due from Refco Group Holdings, Inc., included in "Receivables from equity members" at February 28, 2003, was received by February 29, 2004.**
>
> As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210.2 million and $175.2 million, respectively. **These balances were also included in "Receivables from equity members" and liquidated shortly after each year-end.**

(Emphasis added.) Thus, the same receivables that were characterized as "receivables from customers" in the Offering Memorandum had been recharacterized in the Bond Registration Statement as "receivables from equity members." This change was a result of the SEC's November 10, 2004 comment letter on the Company's October 12, 2004 draft of the Bond

Registration Statement, wherein the SEC questioned why amounts due from equity members (including RGHI) were being characterized as receivables from customers. Collins received a copy of the SEC's comment letter no later than November 11, 2004, the day after it was released. Collins and Mayer Brown, given their intimate knowledge of these receivables, knew or recklessly disregarded well before the SEC reviewed the Bond Registration Statement that those receivables were not customer receivables, yet they had reviewed and given their approval to the Offering Memorandum, which characterized them as customer receivables. Certainly after learning of the SEC's comments and the resulting change in this language, they were aware that the RGHI receivable was being mischaracterized.

186.    Even as modified based on the SEC's comments, the related-party disclosures in the Bond Registration Statement contained untrue statements and omissions of material facts because Defendants failed to disclose the existence and full extent of the related-party transactions and the related-party indebtedness between the Company, RGHI and BAWAG described herein. Further, the Bond Registration Statement failed to disclose the Refco Group guarantees to Customer X and Delta Flyer, or the fact that the receivable from RGHI was "paid" by February 29, 2004 only because the Company had loaned RGHI several hundred million dollars through BAWAG and Customer X to facilitate that "payment" (which was unwound a few days later).

187.    Despite the differences in the financial statements and disclosures contained in the October 12, 2004 Form S-4 filing and the subsequent amendments of the Bond Registration Statement, the same audit report from Grant Thornton, dated October 8, 2004, accompanied each. The audit report in the Bond Registration Statement, which was included with Grant Thornton's consent, contained untrue statements of material facts for the same reasons as set

forth above with respect to the audit report in the Offering Memorandum, namely, it inaccurately represented that Grant Thornton conducted its audits in accordance with GAAS and that the Company's financial statements "present[ed] fairly, in all material respects, the financial position of [the Company] … in conformity with accounting principles generally accepted in the United States of America."

188.    The Notes To Consolidated Financial Statements in the Bond Registration Statement contained the following disclosures concerning customer receivables and payables:

Receivables from customers at each year end are as follows:

|  | 2004 | 2003 |
|---|---|---|
|  | (in thousands) | |
| Futures transactions | $ 212,299 | $ 209,629 |
| Foreign currency and other OTC derivative transactions | 38,724 | 364,711 |
| Securities transactions | 1,340,362 | 916,040 |
|  | $ 1,591,385 | $ 1,490,380 |

\*\*\*

These receivables are generally collateralized with marketable securities. The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies, and generally does not charge-off any of these receivables. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

189.    These disclosures omitted to state material facts, because they failed to disclose that the reserves provided against receivables from customers as of February 29, 2004 and February 28, 2003 were grossly insufficient, given the (at least) $900 million in uncollectible

receivables – amounting to nearly half of the Company's reported receivables – that the Company was carrying on its books. They also failed to disclose that Refco had given Customer X and Delta Flyer written guarantees, assuring them that Refco Group would unconditionally repay their loans to RGHI if RGHI were to default for any reason.

190.    The Bond Registration Statement also contained unaudited financial information relating to periods post-dating the Offering Memorandum. Specifically, the Company reported that it had incurred general, administrative and other expenses in the amounts of $97 million and $76 million for the periods from March 1, 2004 through August 5, 2004 and from August 6, 2004 through November 30, 2004, respectively; that it had earned net income of $98 million and $43 million in those same periods, respectively; and that it had members' equity of $127 million as of November 30, 2004.

191.    Further, the Company provided Unaudited Pro Forma Consolidated Statements of Income for fiscal year 2004, and for the nine months ended November 30, 2004. The Unaudited Pro Forma Consolidated Statements of Income treated the Bond Offering and related transactions as if they had occurred on March 1, 2003. For fiscal year 2004, the Bond Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $190,323,000 and net income of $114,769,000. For the nine months ended November 30, 2004, the Bond Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $181,015,000 and net income of $105,478,000.

192.    The pro forma financial data contained in the Bond Registration Statement was based on the Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts.

193.    In addition to the admissions of Refco and the THL Partner Defendants and other evidence concerning the financial statements in the Offering Memorandum discussed above, Lead Plaintiffs' investigation has revealed that the additional financial statements contained in the Bond Registration Statement contained materially untrue statements and omissions of material fact because:

(a)    For a fourteen-day period bracketing August 31, 2004, the final day of Refco's second quarter for fiscal year 2005, a receivable from RGHI to Refco in the amount of $485,000,000 was temporarily replaced with a receivable in the amount of $485,000,000 from Customer X; and

(b)    For an eight-day period bracketing November 30, 2004, the final day of Refco's third quarter for fiscal year 2005, a receivable from RGHI to Refco in the amount of $545,000,000 was temporarily replaced with a receivable in the amount of $545,000,000 from Customer X.

194.    Based on the untrue statements in the Bond Registration Statement, the issuers were able to consummate the Exchange Offer and exchange Registered Bonds for the outstanding 144A Bonds. Had the issuers been unable to have the Bond Registration Statement declared effective by the SEC, they would have been unable to consummate the Exchange Offer, and the holders of the 144A Bonds would have been entitled to receive an increased rate of interest on their bonds.

**E.    The August 2005 Initial Public Offering**

195.    With the consummation of the LBO and the successful Bond Offering under their belts, Refco's insiders (which included the THL Defendants) were perfectly positioned to cash out by taking the Company public. On or about August 10, 2005, Refco sold approximately 20% of its shares to RH Capital and other members of the Class in the IPO. Defendants Credit Suisse,

Goldman Sachs, and BAS acted as Joint Book-Running Mangers of the IPO. Defendants Deutsche Bank, J.P. Morgan, Sandler O'Neill, and HSBC acted as Co-Managers of the IPO. Defendants William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl acted as underwriters of the IPO.

196.    To market the IPO to investors, Refco's management conducted an extensive road show – arranged by the Stock Underwriter Defendants – ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.

197.    In order to issue stock to the investing public, Refco formed a new holding company. The chart below (taken from the IPO Prospectus) summarizes the structure of the Company upon completion of the IPO:



1.    **The IPO Registration Statement**

198.    In the IPO, Refco offered approximately $670 million worth of stock to the investing public as follows: (1) 26,500,000 shares as part of the initial IPO, and (2) an additional 3,975,000 shares issued pursuant to an option (known as the "green shoe option") granted to the Stock Underwriter Defendants by Refco to cover over-subscriptions of shares.  The IPO was conducted pursuant to a Form S-1 registration statement dated April 8, 2005, a Form-S-1/A registration statement dated May 27, 2005, a Form S-1/A registration statement dated July 1, 2005, a Form S-1/A registration statement dated July 20, 2005, a Form S-1/A registration statement dated July 25, 2005, a Form S-1/A registration statement dated August 8, 2005, a Form S-1/A registration statement dated August 10, 2005, and a Form 424B1 prospectus dated August 10, 2005 (the "IPO Prospectus" or the "Prospectus") (collectively, the "IPO Registration Statement"), which were filed with the SEC.

199.    Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen signed the IPO Registration Statement.

200.    The Underwriter Defendants played a central role in the drafting of the IPO Registration Statement.  According to the organizational materials for the IPO that were prepared by Credit Suisse, Goldman Sachs and BAS, the Underwriter Defendants shared "principal drafting" responsibility for numerous sections of the IPO Registration Statement, including the Prospectus Summary, the Risk Factors, the Selected Financial Data, and the MD&A.

201.    Collins and Mayer Brown likewise were directly involved in reviewing and drafting the IPO Registration Statement, and the IPO Registration Statement specifically disclosed that Mayer Brown acted as counsel to Refco in connection with the transactions. According to the Examiner's Report, Mayer Brown (through Collins) "received and presumably

reviewed the SEC's comments [to the initial S-4 and S-1 filings], Weil's responses, the SEC's replies, and the amended S-1s."

202.    The IPO Registration Statement includes the Company's audited financial statements for fiscal years 2003, 2004, and 2005, which were prepared with substantial assistance and participation by Grant Thornton. These audited financial statements include the Company's audited consolidated statements of income, statement of changes in members' equity and consolidated statements of cash flows, as of February 28, 2005, February 29, 2004, and February 28, 2003, and the Company's audited consolidated balance sheet as of February 28, 2005 and February 29, 2004.

203.    As set forth below, the IPO Registration Statement pursuant to which RH Capital and other members of the Class were induced to purchase Refco stock contained a number of untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. In particular, like the Offering Memorandum for the Bonds and the Bond Registration Statement, the IPO Registration Statement failed to disclose the existence of the multi-hundred million dollar receivable owed by RGHI to Refco, or the round-trip "loan" transactions by which that receivable was systematically removed from Refco's books at the end of its financial reporting periods.

(a)    **The Financial Statements in the IPO Registration Statement Contained Untrue Statements of Material Facts**

204.    The IPO Registration Statement contained financial statements and other statements regarding the Company's financial performance that purported to demonstrate the Company's soundness, but which in reality contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. These statements were made in several contexts, including (1) in the audited

financial statements included in the IPO Registration Statement; (2) in the discussion of certain historical consolidated financial data derived from Refco's audited consolidated financial statements; (3) in the unaudited financial statements included in the IPO Registration Statement; (4) in the discussion of certain historical consolidated financial data derived from Refco's unaudited consolidated financial statements; and (5) in statements made in the MD&A and other textual portions of IPO Registration Statement.

205.    Refco's Consolidated Balance Sheets, as audited and certified by Grant Thornton and as included in the IPO Registration Statement, stated that the Company had receivables from customers (net of $61,190,000 in reserves) of $2,081,968,000 and $1,591,385,000 (net of $65,200,000 in reserves) for fiscal years 2005 and 2004, respectively; total assets of $48,765,349,000 and $33,332,172,000 for fiscal years 2005 and 2004, respectively; and members' equity of $150,250,000 and $616,084,000 for fiscal years 2005 and 2004, respectively.

206.    Refco's Consolidated Statements of Income contained in the IPO Registration Statement reported that the Company had net income of $176,287,000, $187,156,000 and $140,119,000 for fiscal years 2005, 2004, and 2003, respectively; and general, administrative and other expenses of $243,546,000. $170,415,000 and $142,585,000 for fiscal years 2005, 2004, and 2003, respectively.

207.    Grant Thornton gave its written consent to the incorporation of its audit opinion on the Company's fiscal years 2003, 2004, and 2005 financial statements into the IPO Registration Statement.  In the audit opinion, Grant Thornton certified that those financial statements had been prepared in accordance with GAAP.  Grant Thornton's report stated:

## REPORT OF INDEPENDENT REGISTERED
## PUBLIC ACCOUNTING FIRM

To the Members of
**New Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheet of New Refco Group Ltd., LLC (the "Successor" or "Company") (a Delaware limited liability company) and subsidiaries as of February 28, 2005 and the related consolidated statements of income, changes in members' equity and cash flows for the period from August 6, 2004 through February 28, 2005....

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement...

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of New Refco Group Ltd., LLC and subsidiaries as of February 28, 2005, and the results of their operations and their cash flows for the period from August 6, 2004 through February 28, 2005 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note H(1)(i), the notes to the consolidated financial statements have been restated to include summarized financial information related to a significant equity method investment.

Grant Thornton LLP
New York, New York
May 24, 2005 (except for Note H(1)(i) as to which the date is
July 19, 2005)

In a second audit opinion letter incorporated in the IPO Registration Statement, Grant Thornton gave the same opinion regarding the Company's financial statements for Refco's consolidated balance sheet as of February 29, 2004 and the related consolidated statements of income, changes in the members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for fiscal years 2003 and 2004.

85

208.    In addition to the financial statements audited by Grant Thornton, the IPO

Registration Statement presented certain historical consolidated financial data derived from the

Company's audited consolidated financial statements for fiscal years 2002, 2003, 2004, and

2005, including the information set forth in the following chart (in millions):

| | FY 2002 | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|---|
| **Total Assets** | $22,611 | $19,215 | $33,332 | $48,765 |
| **Members Equity** | $515 | $566 | $616 | $150 |

209.    The IPO Registration Statement also included the Company's unaudited financial

statements for the three month periods ending May 31, 2005 and May 31, 2004.  These

unaudited financial statements included the Company's consolidated balance sheets for the three

months ended May 31, 2005, and its consolidated statements of income, consolidated statements

of changes in members' equity and consolidated statements of cash flows for the three months

ended May 31, 2005 and May 31, 2004.  The unaudited financial statements included in the IPO

Registration Statement stated that Refco had:

(a)    Total assets of $74,317,191,000 for the three months ended May 31, 2005;

(b)    Members' equity of $185,427,000 and $671,100,000 for the three months

ended May 31, 2005 and May 31, 2004, respectively;

(c)    Receivables from customers of $1,807,446,000 (net of reserves of

$62,107,000) and $2,081,968,000 (net of reserves of $61,190,000) for the three months

ended May 31, 2005 and fiscal year 2005, respectively; and

(d)    Net income of $42,587,000 and $59,270,000 for the three months ended

May 31, 2005 and May 31, 2004, respectively.

210.    The IPO Registration Statement also included Unaudited Pro Forma Consolidated Statements of Income for the year ended February 28, 2005 and the three months ended May 31, 2005. The Unaudited Pro Forma Consolidated Statements of Income treated the Bond Offering and related transactions as if they had occurred on March 1, 2004. For fiscal year 2005, the IPO Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $247,239,000 and net income of $105,681,000. For the three months ended May 31, 2005, the IPO Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $61,456,000 and net income of $31,920,000.

211.    Further, the IPO Registration Statement included an Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2005. The Unaudited Pro Forma Consolidated Balance Sheet treated the Bond Offering and related transactions as if they had occurred on May 31, 2005. As of May 31, 2005, the IPO Registration Statement reflected, on a pro forma basis, receivables from customers (net of reserves) of $1,807,446,000; total assets of $74,413,468,000; and members' equity of $491,704,000.

212.    In addition, the IPO Registration Statement included financial information derived from the Company's unaudited consolidated financial statements for fiscal year 2001. For example, the IPO Registration Statement reported that the Company had net income of $72 million; total assets of $18,277 million; and members' equity of $500 million for that fiscal year.

213.    The IPO Registration Statement also included a significant amount of financial information set forth in the textual portions of the IPO Prospectus, including the MD&A section. For instance, the IPO Prospectus stated: "[F]or the year ended February 28, 2005, we generated … $176.3 million of net income and for the three months ended May 31, 2005, we generated …

$42.6 million of net income." The Prospectus also makes the following statements, among others, regarding the Company's financial results and business operations:

(a) "operating profit has increased from $61.0 million in fiscal year 2000 to $150.6 million in fiscal year 2005, a compound annual growth rate of 19.8%";

(b) "Derivatives Brokerage & Clearing Operating profit for the three months ended May 31, 2005 decreased $5.4 million, or 13.2%, to $35.5 million from $40.9 million for the three months ended May 31, 2004."

(c) "Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2005 increased $18.5 million, or 58.5%, to $50.1 million from $31.6 million for the three months ended May 31, 2004."

214. In addition, the IPO Registration Statement included certain information regarding Refco's purported compliance with its credit covenants, including the statement that the Company's Consolidated EBITDA for the twelve months ended May 31, 2005 was $296,747,000 and that its Actual Leverage Ratio was 3.03x.

215. These statements were materially untrue because Refco failed to disclose the existence of hundreds of millions of dollars worth of uncollectible receivables, losses and related-party transactions, and failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay RGHI's various loans from Customer X if RGHI were to default for any reason. Among other things, the reported results for receivables from customers, net assets, members' equity, net income and EBITDA discussed above were materially overstated, and the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated. Further, the pro forma financial statements were based on the

Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts. On October 10, 2005, Refco admitted that, because of this uncollectible receivable and the undisclosed related-party transactions, the Company's financial statements for fiscal years 2002, 2003, 2004, 2005 and the quarter ended May 31, 2005, each of which was included in the IPO Registration Statement, could no longer be relied upon. The THL Partner Defendants have likewise admitted in the THL Complaint that the Company's financial statements for each of these periods contained untrue statements of material facts.

216.    In addition to the foregoing admissions of Refco and the THL Partner Defendants, Lead Plaintiffs have gathered substantial evidence concerning the scope of the untrue statements in the financial statements contained in the IPO Registration Statement. As describe above, Lead Plaintiffs have reviewed documents and conducted witness interviews relating to several sets of transactions between Refco and third-party customers of Refco and/or BAWAG, which show, among other things, that the financial statements and description of the Company's historical performance contained in the IPO Registration Statement contained material statements and omissions of material fact because:

(a)    For a twelve-day period bracketing February 28, 2000, the final day of Refco's fiscal year 2000, a receivable from RGHI to Refco in the amount of $610,000,000 was temporarily replaced with (1) a receivable in the amount of $300,000,000 from BAWAG, (2) a receivable in the amount of $150,000,000 from CIM Ventures, (3) a receivable in the amount of $110,000,000 from CS Land, and (4) a receivable in the amount of $50,000,000 from EMF;

(b)     For a twelve-day period bracketing February 28, 2001, the final day of Refco's fiscal year 2001, a receivable from RGHI to Refco in the amount of $750,000,000 was temporarily replaced with (1) a receivable in the amount of $250,000,000 from CIM Ventures, (2) a receivable in the amount of $300,000,000 from BAWAG, and (3) a receivable in the amount of $200,000,000 Delta Flyer;

(c)     For a twelve-day period bracketing February 28, 2002, the final day of Refco's fiscal year 2002, a receivable from RGHI to Refco in the amount of $925,000,000 was temporarily replaced with (1) a receivable in the amount of $325,000,000 from Customer X, (2) a receivable in the amount of $300,000,000 from BAWAG, (3) a receivable in the amount of $175,000,000 from Delta Flyer, and (4) a receivable in the amount of $125,000,000 from Beckenham;

(d)     For a sixteen-day period bracketing February 28, 2003, the final day of Refco's fiscal year 2003, a receivable from RGHI to Refco in the amount of $900,000,000 was temporarily replaced with (1) a receivable in the amount of $500,000,000 from Customer X, (2) a receivable in the amount of $250,000,000 from BAWAG, and (3) a receivable in the amount of $150,000,000 from Delta Flyer;

(e)     For a seventeen-day period bracketing February 29, 2004, the final day of Refco's fiscal year 2004, a receivable from RGHI to Refco in the amount of $970,000,000 was temporarily replaced with (1) a receivable in the amount of $720,000,000 from Customer X; and (2) a receivable in the amount of $250,000,000 from BAWAG;

(f)     For a twelve-day period bracketing May 31, 2004, the final day of Refco's first quarter for fiscal 2005, a receivable from RGHI to Refco in the amount of

$700,000,000 was temporarily replaced with a receivable in the amount of $700,000,000 from Customer X;

(g)     For a fourteen-day period bracketing August 31, 2004, the final day of Refco's second quarter for fiscal 2005, a receivable from RGHI to Refco in the amount of $485,000,000 was temporarily replaced with a receivable in the amount of $485,000,000 from Customer X;

(h)     For an eight-day period bracketing November 30, 2004, the final day of Refco's third quarter for fiscal 2005, a receivable from RGHI to Refco in the amount of $545,000,000 was temporarily replaced with a receivable in the amount of $545,000,000 from Customer X;

(i)     Between December 30, 2004 and January 4, 2005, a receivable from RGHI to Refco in the amount of $550,000,000 was temporarily replaced with a receivable in the amount of $550,000,000 from Customer X;

(j)     For a sixteen-day period bracketing February 28, 2005, the final day of Refco's fiscal year 2005, a receivable from RGHI to Refco in the amount of $595,000,000 was temporarily replaced with (1) a receivable in the amount of $345,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from BAWAG; and

(k)     For a twelve-day period bracketing May 31, 2005, the final day of Refco's first quarter for fiscal year 2006, a receivable from RGHI to Refco in the amount of $450,000,000 was temporarily replaced with a receivable in the amount of $450,000,000 from Customer X.

217.    Defendant Grant Thornton's statements that it had "conducted [its] audits in accordance with the auditing standards generally accepted in the United States of America" and that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and its subsidiaries as of February 28, 2005, and the results of their operations and their cash flows for the period from August 6, 2004 through February 28, 2005 in conformity with accounting principles generally accepted in the United States of America" also constituted untrue statements of material facts. Grant Thornton's second audit opinion letter gave the same opinion regarding the Company's financial statements for Refco's consolidated balance sheet as of February 29, 2004 and the related consolidated statements of income, changes in the members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for fiscal years 2003 and 2004. Grant Thornton, as set forth more fully below, had not conducted its audits in accordance with GAAS. Further, the Company's financial statements for the periods mentioned above and the results of its operations and cash flows for those same periods did not present fairly, in all material respects, the Company's financial position in accordance with GAAP.

**(b)    The Description of Customer Receivables and Related-Party Transactions in the IPO Registration Statement Contained Untrue <u>Statements and Omissions of Material Fact</u>**

218.    To assure investors that the Company was sound, the IPO Registration Statement stated that the Company had adequately accounted for doubtful accounts and related-party transactions. With respect to receivables from and payable to customers, the Notes to the Company's Consolidated Financial Statements state:

**Receivables from and payable to customers**

These balances primarily pertain to margin and open contractual commitments related to customers' futures, foreign currency forward and

securities transactions. Receivables from and payable to customers in connection with futures and foreign currency forward transactions include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions include amounts due on cash and margin transactions.

\* \* \*

The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies. Reserves of $61.2 million and $65.2 million have been provided against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. The Group generally nets receivables and payables related to its customers' futures, foreign currency forwards and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

(Emphasis in original.)

219.    In addition, the MD&A section of the IPO Registration Statement provided:

**Receivables from Customers-Provisions for Doubtful Accounts**. Our receivables are generally collateralized with marketable securities. For some customer receivables that are not fully secured, we establish reserves for doubtful accounts when, in the opinion of management, such reserves are appropriate. We have established reserves of $61.2 million and $65.2 million against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. Our allowance for doubtful accounts is based upon management's continuing review and evaluation of the factors such as collateral value, aging and the financial condition of our customers. The allowance is assessed to reflect best [sic] estimate of probably losses that have been incurred as of the balance sheet date.

(Emphasis in original.)

220.    Further, the Prospectus included the following statement regarding related-party

transactions:

The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates.

As of February 29, 2004, the Group had a deposit with BAWAG Overseas, Inc., a third-party financial institution who was a member, of $210.2 million. This balance was also included in "Receivables from Customers" and liquidated shortly after each year-end.

221.    These statements were untrue and omitted material facts because they failed to disclose the existence of the related-party transactions or the related-party indebtedness between the Company, RGHI and BAWAG. Although early versions of the Form S-1 had included the $105 million receivable from RGHI that had been reflected in the Offering Memorandum and Bond Registration Statement, and had characterized that receivable as being owed by "equity members," the final IPO Registration Statement omitted any reference to that receivable. Collins and Mayer Brown, who participated in the drafting and review of the IPO Registration Statement, knew or recklessly disregarded that RGHI owed the Company not only $105 million but substantially more, yet that receivable was not disclosed.

222.    The IPO Registration Statement also failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay RGHI's various loans from Customer X if RGHI were to default for any reason, or that the reserves provided against receivables from customers as of February 28, 2005 and February 29, 2004 were grossly insufficient given the hundreds of millions of dollars of uncollectible receivables that the Company was carrying on its books. As of February 28, 2005 and February 29, 2004, the Company had $345 million and $970 million in undisclosed uncollectible receivables, respectively, of which the entire $345 million for 2005 and $720 million for the preceding year were removed from Refco's books through round-trip "loan" transactions involving Mayer Brown.

223.    The IPO Registration Statement also mischaracterized and failed to disclose the

full extent of the related-party transactions between Refco and BAWAG, by stating that the

Company had a "deposit" with BAWAG Overseas, Inc. of $210.2 million as of February 29,

2004, without disclosing any of the transactions referenced above.

### (c)    The IPO Registration Statement Misrepresented That the Company Had Taken Adequate Steps to Protect Itself From the Risk of Customer Defaults

224.    The IPO Registration Statement explained Refco's exposure to customer and

counter-party risks as follows:

> We are exposed to the risk that third parties that owe us money, securities
> or other assets will not perform their obligations.  These parties may
> default on their obligations to us due to bankruptcy, lack of liquidity,
> operational failure or other reasons.  As a clearing broker, we generally
> bear the risk of the defaults or misconduct of our customers.  In addition,
> we have experienced, due to competitive factors, pressure to extend credit
> and to price more aggressively the credit risks we take.  Although we
> regularly review credit exposures to specific customers and counterparties
> and to specific industries, countries and regions that we believe may
> present credit concerns, default risk may arise from events or
> circumstances that are difficult to detect or foresee.  In addition, concerns
> about, or a default by, one institution could lead to significant liquidity
> problems, losses or defaults by other institutions, which in turn could
> adversely affect us.

225.    To allay potential investors' concerns over these potential risks, the IPO

Registration Statement touted the Company's supposed ability to "manage risk prudently,"

stating: "We plan to continue to monitor and improve our exposure to customer and

counterparty risk throughout our operations using our comprehensive risk management system."

In addition, the IPO Registration Statement stated:

> As a matter of policy, we continue to upgrade our risk management
> procedures and systems to improve our ability to monitor actual and
> projected risk associated with customer positions.  Our Global Risk
> Management department is responsible for the systematic review of
> customer exposure in both regulated and nonregulated markets.  Our

current system provides the ability to project the impact of market
volatility on price movement.

226.    These statements contained untrue statements and omissions of material facts

because, contrary to the Company's espoused commitment to safeguarding itself against

customer defaults, the Company had experienced significant customer defaults which were not

disclosed to the investing public, and failed to disclose that Refco had given Customer X a

written guarantee, signed by Bennett, assuring Customer X that Refco Group would

unconditionally repay RGHI's various loans from Customer X if RGHI were to default for any

reason, and which materially impaired the Company's working capital.  Further, the Company's

financial statements contained untrue material statements and material omissions concerning its

hundreds of millions of dollars in uncollectible debt.  This uncollectible debt, if properly

disclosed, would have jeopardized the Company's credit rating and its ability to pay down the

senior indebtedness described above, and been a material fact weighed in the investment

decisions of RH Capital and other members of the Class.

### (d)    The IPO Registration Statement Misrepresented That The Company Maintained Excess Regulatory Capital

227.    The IPO Registration Statement disclosed:

> We are extensively regulated by the Commodity Futures Trading
> Commission; the SEC; the National Association of Securities Dealers, our
> designated self-regulatory organization with respect to our registration as a
> broker-dealer; the Chicago Mercantile Exchange, our designated self-
> regulatory organization with respect to our registration as a Futures
> Commission Merchant; the National Futures Association; other exchanges
> of which we are a member; state regulatory agencies; and other domestic
> and foreign clearing organizations.  If we fail to comply with applicable
> laws, rules or regulations, we may be subject to criminal conviction,
> increased reporting requirements, censure, fines, cease-and-desist orders,
> suspension of our business, removal of personnel, civil litigation or other
> sanctions, including revocation of our operating licenses.

228.    To assure potential stock purchasers that the Company was complying with

regulatory capital requirements, the IPO Registration Statement stated that "[a]s a matter of policy, we maintain excess regulatory capital to provide liquidity during periods of unusual market volatility, and this has been sufficient in the past to absorb volatile market events."

229.    The IPO Registration Statement also stated: "[A]s of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital . . . As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of aggregate debit balances and $49.6 million in excess of required net capital . . . ."

230.    These statements contained untrue statements of material fact because the Company's reported regulatory capital was overstated and the Company failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay RGHI's various loans from Customer X if RGHI were to default for any reason.  Upon information and belief, the Company would not have satisfied its regulatory capital requirements during the Class Period if the true facts were disclosed regarding its hundreds of millions of dollars in uncollectible receivables.  To the extent that the Company did maintain excess regulatory capital, the excess amounts were materially less than the figures reported in the IPO Registration Statement and were not sufficient "to absorb volatile market events," as represented in the IPO Registration Statement.

### (e)    The IPO Registration Statement Failed to Disclose BAWAG's Full Ownership Interest in Refco Group

231.    In describing the Company's historical ownership structure, the notes to the financial statements as contained in the IPO Prospectus stated that the Company was 90% owned by RGHI, and 10% owned by "BAWAG Overseas, Inc., a third party financial institution."  This statement was materially incomplete and misleading, because the IPO Prospectus failed to disclose that BAWAG had also held a security interest in another 27% of the Company's equity,

by virtue of its secret loans to DF Capital and other Bennett-controlled entities. As a result, investors were led to believe that BAWAG's prior interest in Refco was limited to 10%, when in fact it held interests in approximately 37% of the Company's equity and therefore was in a position to exercise significant influence and control over the Company. In addition, the description of BAWAG Overseas as a "third-party financial institution" was materially misleading because it failed to disclose the true extent of the business dealings and interlocking relationships between BAWAG, Refco, Bennett, RGHI and other Defendants throughout the Class Period.

**F.    The Truth Begins to Emerge and the Company Collapses**

232.    The existence of the related-party loans between the Company, RGHI, and others, the massive uncollectible receivable that they concealed, and Refco Group's written guarantees to the third parties went undisclosed for years. The truth did not begin to emerge until a newly-hired Controller of the Company, who had begun working at Refco on August 3, 2005, discovered the true nature of these receivables after less than two months on the job.

233.    Refco issued a press release on October 10, 2005 announcing that it had discovered an "undisclosed affiliate transaction." The press release stated, in relevant part, that Refco had:

> discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities.

234.    Although it gave only sparse detail about the receivable, the October 10, 2005

press release conceded that the transaction had not been disclosed in the Company's previously-

filed financial statements and, therefore,

> the Company determined, on October 9, 2005, that its financial statements,
> as of and for the periods ended, February 28, 2002, February 28, 2003,
> February 28, 2004, February 28, 2005, and May 31, 2005, taken as a
> whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance,
> Inc. *should no longer be relied upon*.

(Emphasis added.)

235.    In addition, the October 10, 2005 press release disclosed that the Company's

Board of Directors had essentially fired Defendants Bennett and Maggio, stating that "at the

request of the Board of Directors Mr. Bennett has taken a leave of absence .... Also at the

request of the Board, Santo C. Maggio ... has taken a leave of absence."

236.    The market's reaction to this startling announcement – just two months after

Refco had sold over $670 million worth of stock to the investing public and just one month after

Bennett rang the opening bell on the New York Stock Exchange – was swift.  On October 10,

2005, the price of Refco's stock dropped from a closing price of $28.46 the previous trading day

to close at $15.60 – a 45% drop in a single day – on unprecedented volume of over 24.2 million

shares, which was over fifty times the average daily volume.  Also on October 10, 2005, S&P

lowered its rating on the Bonds from "B" to "B-" and placed the securities on CreditWatch with

negative implications, while Moody's downgraded the Bonds' rating from "B3" to "Caa1."

237.    However, the October 10, 2005 press release did not disclose the full extent of the

problems facing Refco and the price of Refco securities remained artificially inflated despite the

correction caused by this partial disclosure.  For example, the press release downplayed the

probable impact that the matters described in the press release would have on Refco's financial

results and business operations.  For instance, Refco stated that it "believes that all customer

99

funds on deposit are unaffected by these activities." In a further effort to assuage investor concerns, the press release quoted Defendant Sexton as stating, "I am staying at Refco because I believe in our employees, customers and franchise. I am excited about the opportunities ahead and am eager to work with our management team to help the Company achieve even greater success." Similarly, Defendant Murphy was quoted as stating, "We continue to see strong momentum across our businesses with record derivative contract and foreign exchange volume in the quarter."

238.    In addition, the October 10, 2005 press release stated that "Mr. Bennett today repaid the receivable in cash, including all accrued interest." This statement did not disclose that Bennett had in fact obtained the funds to repay the debt from BAWAG, which had loaned him the money in the hours before the October 10, 2005 press release was issued, taking Bennett's shares of Refco as security. The press release also did not disclose that BAWAG, the source of this eleventh-hour loan, was also an entity whose trading losses the circular transactions were designed to conceal, and that BAWAG had repeatedly acted as a conduit for funds in the circular transactions. The October 10, 2005 press release thus omitted to state material facts necessary to make the statements included therein not misleading, and the market price of Refco securities remained artificially inflated as a consequence, such that the price of Refco's securities did not accurately reflect the value of the Company.

239.    On October 11, 2005, the SEC announced commencement of a formal investigation of Refco. On that same day, Refco issued another press release stating that the "Company confirms that it has adequate liquidity to run the business in the ordinary course," even though, as the investing public would learn only two days later, the Company had actually begun to experience liquidity problems grave enough to threaten its ability to operate. The

October 11, 2005 press release also stated that the "receivable in the amount of $430 million was repaid yesterday in full," again failing to disclose the fact that Bennett had obtained the funds to repay the debt through an eleventh-hour loan from BAWAG. The October 11, 2005 press release thus omitted to state material facts necessary to make the statements included therein not misleading. The partial disclosure prompted a further partial correction of the trading prices of Refco securities, causing Refco stock to slide to close at $13.85 on a trading volume of 17.35 million shares and the Bonds – which were trading at 108.625% of par on October 7, 2005 and had never traded below 103% of par in the preceding twelve months – fell to 91.50%.

240.    On October 12, 2005, the Company's securities prices dropped again following news that the United States Attorney for this District had arrested Bennett because he was considered a "flight risk." This news partially disclosed the serious nature of the financial improprieties at the Company – including the previously undisclosed news that Bennett had signed a letter of guaranty to Customer X on behalf of Refco Group for hundreds of millions of dollars – and caused the price of Refco's securities to decline again, with its stock closing at $10.85 on October 12, 2005, on volume of 35 million shares, and its Bonds dropping to approximately 76% of par on the same date.

241.    The truth continued to leak into the market on October 13, 2005, when Refco announced – in a statement that was directly contrary to statements in the October 10 and 11, 2005 press releases – that:

> in light of recent events, the liquidity within the Company's non regulated subsidiary Refco Capital Markets, Ltd., which represents a material portion of the business of the Company is no longer sufficient to continue operations. The Company has therefore imposed a 15 day moratorium on all activities of Refco Capital Market, Ltd. to protect the value of the enterprise.

242.    In response to this news, both Moody's and S&P lowered their ratings on the Bonds on October 13, 2005. S&P's rating was reduced from "B-" to "CCC," while Moody's downgraded the Bonds from "Caa1" to "Ca."

243.    On October 13, 2005, with the price of Refco's shares having fallen to $7.90, the NYSE halted all trading in Refco shares. Trading in Refco stock did not resume for four days. The Bonds continued to trade throughout this period, with the price dropping as low as 16% of par by October 14, 2005, representing a loss of at least 80% of the Bonds' value in only four days. On October 14, 2005, S&P reduced its rating on the Bonds yet again, from "CCC" to "C."

244.    On October 17, 2005, Refco publicly announced that it was filing for bankruptcy court protection in this District. With the trading restrictions lifted following Refco's bankruptcy filing, Refco's stock traded on a massive volume of 28.5 million shares on October 18, 2005, opening at 75 cents and closing at 65 cents per share. Thus, the price of Refco's publicly-traded stock had plummeted from $28.56 to 65 cents in little more than a week – a stunning decline of nearly 98% that resulted in a loss of market capitalization of more than $854 million.

245.    On October 18, 2005, an article in *The Street.com* discussed Mayer Brown's role in the collapse of Refco, noting that "all of the loan documents used in the transactions were drafted by lawyers at the Chicago-based law firm" and that "Mayer Brown is one of the law firms that worked for Refco in the broker's $583 million IPO in August." The article also reported that "the real story" behind the disintegration of the Company was "how a cadre of well-paid accountants, Wall Street bankers and corporate lawyers failed to notice that CEO Phillip Bennett was allegedly cooking the books for the better part of a decade."

246.    The dramatic fall in the prices of the Company's securities from October 10, 2005 to October 18, 2005, and the damages suffered by Plaintiffs and members of the Class, were a

direct result of the disclosure to investors and the market of the untrue statements and omissions of material facts described herein.

247.    Refco and many of the Defendants named herein are currently under investigation by numerous criminal, civil and regulatory bodies, including the SEC, the NASD, and the CFTC.

## VI.    THE COMPANY'S VIOLATIONS OF GAAP

248.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature.  The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB").  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

249.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in accordance with GAAP will be presumed to be false or misleading, despite footnote or other disclosures.

250.    The financial statements issued by the Company for fiscal years 2002, 2003, 2004, and 2005, and the financial statements for the fiscal quarters therein, did not fairly and accurately represent the Company's financial position and the results of its operations because they violated key provisions of GAAP.

251.    By failing to disclose recurring, significant related-party transactions between the Company and RGHI, the Company violated SFAS No. 57, Related Party Disclosures, which

states in relevant part:

> Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include:
>
> a.    The nature of the relationship(s) involved;
>
> b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;
>
> c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; [and]
>
> d.    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

252.    SFAS No. 57 requires the disclosure of relationships between companies under common ownership or management control, when "the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous." Defendant Bennett, as the CEO, Chairman of the Board, and 43% owner of the Company prior to the IPO, exercised control over the Company. Bennett also controlled RGHI, as its sole stockholder. Because the Company and RGHI were clearly under common control, GAAP required full disclosure of all the transactions that took place between these entities.

253.    The Company's related-party transactions with RGHI were not disclosed. At the end of each fiscal quarter, the Company engaged in off balance sheet transactions that removed receivables from RGHI (representing uncollectible customer receivables) from the Company's

books. To accomplish this feat, Defendants Bennett, Maggio and others contacted one or more customers of Refco, and suggested that the customers could borrow money from the Company and then loan that money to RGHI. RGHI used those funds to pay off its loan from the Company, thereby allowing the Company to remove a huge related-party receivable from its books. To ensure that the customer did not suffer any economic risk in the transaction, the Company guaranteed repayment of the customer's loan to RGHI.

254.   When the reporting period for each fiscal period was over, the Company would re-loan the money to RGHI, which would pay off the loan from the customer, which would then repay its loan from the Company. These transactions allowed the Company to re-characterize bad debts as collectible receivables from unrelated parties, thereby materially misleading creditors and investors.

255.   The Company did not fully disclose the nature and amounts of the round-tripping transactions involving RGHI and its customers, in violation of GAAP. The Company's obligation to disclose the related-party transactions was not alleviated when the outstanding balance was paid; it was still a related-party transaction that should have been disclosed to Refco's creditors and investors. Further, Refco's receivables from RGHI were outstanding on Refco's books for all but the first and last few days of each financial reporting period.

256.   The Company also violated SFAS No. 5, Accounting for Contingencies, by failing to take a charge for the uncollectible customer receivables described herein. SFAS No. 5 establishes standards for reporting loss contingencies and requires that an estimated loss from a loss contingency be accrued as a charge to income if a liability has been incurred at the date of the financial statement and the amount of loss can be reasonably estimated. The receivables that were assumed by RGHI were known to be uncollectible since at least 2001, if not earlier, and a

charge should have been taken by 2001 at the latest.

257.    Refco also failed to disclose that it guaranteed the multi-hundreds of millions of loans made by third parties to RGHI in the round-tripping transactions. This material omission violated FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others. Even if the likelihood that Refco might have to make payment pursuant to the guarantee was remote, the Company was still required to disclose the details of such a material transaction, including the nature of the guarantee, the term of the guarantee, how the guarantee arose, and any circumstances that would require Refco to perform under the guarantee. The Company failed to disclose even the existence of the transaction that led to the guarantee, making its financial disclosures non-compliant with GAAP.

258.    The Company also violated APB Opinion No. 22, Disclosure of Accounting Policies, which instructs companies to report changes in accounting policies. Accounting policies adopted by a company significantly affect the presentation of the company's financial position and results of operations. Accordingly, the usefulness of financial statements for purposes of making investment decisions depends significantly upon the investor's understanding of the accounting policies utilized by the company.

259.    The Company devoted several pages of its SEC filings to "Significant Accounting Policies" and "Critical Accounting Policies," yet failed to disclose that it did not comply with those policies. Instead of following these policies, the Company repeatedly concealed uncollectible receivables through undisclosed related-party transactions. These recurring transactions, in effect, became Refco's accounting policy. However, the Company did not report this substantially varied accounting policy because it would have revealed the untruths in its financial statements.

260.    Refco's financial statements also violated several general principles of GAAP, including:

- FASCON No. 1 ¶ 34: "Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."

- FASCON No. 1 ¶ 40: "Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources."

- FASCON No. 1 ¶ 50: "Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."

- FASCON No. 2 ¶ 58-59: "That information should be reliable as well as relevant is a notion that is central to accounting . . . . The reliability of a measure rests on the faithfulness with which it represents what it purports to represent . . . ."

- FASCON No. 2 ¶ 79, 80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

- FASCON No. 2 ¶ 95, 97: Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

- FASCON No. 6 ¶ 145: "[R]ecognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities–including matching of costs and revenues, allocation, and amortization–is the essence of using accrual accounting to measure performance of entities."

261.    The Company's financial statements were not prepared in accordance with these general principles of GAAP because, among other reasons, the Company had not recognized losses that should have been recognized; its financial statements mischaracterized related-party

transactions and uncollectible receivables as legitimate customer receivables; and its financial statements did not disclose all material information necessary for creditors and investors to make informed investment decisions.

## VII.  GRANT THORNTON'S VIOLATIONS OF AUDITING STANDARDS

262.    Public companies rely on independent registered public accounting firms to audit financial statements and review other public disclosures, assess internal controls, and gain the trust of the creditors and investors who will rely on the auditors' reports when deciding whether to invest in a company.  The Public Company Accounting Oversight Board ("PCAOB"), which was established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing standards that are required to be followed by all auditors for public companies.  The PCAOB initially adopted as its Interim Professional Auditing Standards all the auditing standards that had previously been issued by the AICPA.  The auditing standards issued or adopted by the PCAOB, together with the auditing standards issued by the AICPA, are herein encompassed by the term GAAS.  The PCAOB and the AICPA have codified the professional auditing standards (represented herein as "AU") to ensure that audits are conducted in accordance with GAAS.  See AU § 150.

263.    There are ten GAAS provisions, which are divided into three types of standards: (1) general standards, which provide guidelines for auditor training and maintaining independence from the client; (2) standards of fieldwork, which provide guidelines for audit planning, collecting evidential verification for audit findings, and the proper evaluation of internal controls; and (3) standards of reporting, which are primarily concerned with ensuring that financial statements are presented in accordance with GAAP.  As explained in detail below, Grant Thornton violated almost every one of these provisions during its tenure as the Company's purportedly independent auditor.

### A.    Violations of General Standards

264.    GAAS General Standard No. 3 states: "Due professional care is to be exercised in the performance of the audit and the preparation of the report." The exercise of due care includes the application of professional skepticism in lieu of mere acceptance of representations made by management. Grant Thornton audited the Company's financial statements and provided audit reports thereon for the years ended February 28, 2003, February 29, 2004, and February 28, 2005. Grant Thornton failed to exercise due professional care and professional skepticism in the performance of its audits and in the preparation of its audit reports. Among other things, Grant Thornton repeatedly failed to detect huge, nine-figure sham transactions whereby the Company avoided disclosing related-party transactions and uncollectible receivables in its financial statements. After an extensive review, the Examiner concluded that Grant Thornton "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

265.    GAAS General Standard No. 2 states that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors." Prior to 2002, Arthur Andersen served as the Company's independent auditor under the leadership of Mark Ramler ("Ramler"), Arthur Andersen's lead partner assigned to the Refco account. When Arthur Andersen began to collapse under the pressure of the Enron debacle, Ramler moved to Grant Thornton and took the Refco engagement with him. At Grant Thornton, Ramler remained the lead partner assigned to the Refco account. According to the Examiner's Report, Ramler's personnel file at Arthur Andersen states that his relationship with Refco was so

close that he believed its management did not engage in any transactions without soliciting his thoughts and advice, and that Bennett and other senior Refco executives called him almost daily to discuss transactions and business issues. Ramler's longstanding and close relationship with the Company and its management prevented him from maintaining the necessary independence in mental attitude.

### B.  Violations of Standards of Fieldwork

#### 1.  Standard of Fieldwork No. 1 – Audit Planning

266.  GAAS Standard of Fieldwork No. 1 requires audits to be "adequately planned," and provides that particular attention should be paid to matters that, if inaccurately reported in a financial statement, could materially alter a company's financial situation.

267.  GAAS requires that auditors pay significant attention to related-party transactions due to the inherent conflict of interest of such transactions. As noted above, SFAS No. 57, Related Party Disclosures, requires that all related-party transactions be disclosed in the company's financial reports, including the nature of the relationship, a description of the transaction, and the amount of the transaction. SFAS No. 57 warns that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis," and therefore require auditor substantiation.

268.  Similarly, AU § 334, Related Parties, prescribes that independent auditors should be particularly aware of transactions that can be designed or manipulated to obscure related-party transactions, such as those used here to hide the Company's uncollectible receivables from RGHI. As noted in AU § 334.02, the auditor should recognize that the substance of a related party transaction could be significantly different from its form, and that the financial statements should reflect the substance of the transaction and not merely its form.

269.    In planning its audits, an auditor must consider the audit risk posed by related-party transactions and then design and apply appropriate substantive tests to evaluate management's assertions.  According to AU § 9334.19:

> The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be.  For example, the auditor's tests regarding valuation of a receivable from an entity under common control might be more extensive than for a trade receivable of the same size because the common parent may be motivated to obscure the substance of the transaction.

270.    Pursuant to AU § 334.08, the following procedures should be followed to identify material transactions with related parties:

> f.  Consider whether transactions are occurring, but are not being given accounting recognition, such as receiving or providing accounting, management or other services at no charge or a major stockholder absorbing corporate expenses.

> g.  Review accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period.
>    *   *   *

> i.  Review invoices from law firms that have performed regular or special services for the company for indications of the existence of related party transactions.

271.    Once related-party transactions are identified, GAAS provides that the auditor should apply those procedures to obtain satisfaction as to the purpose, nature, and extent of those transactions and their effect on the financial statements, and should not simply rely on management's assertions.

272.    Grant Thornton was well aware that Refco engaged in at least some "significant related party transactions" and that Refco had affiliates that were not audited by Grant Thornton, as reflected in the "Evaluation of Proposed Client Form" that Ramler filled out when Grant Thornton took Refco on as an audit client in 2002.  Nonetheless, Grant Thornton violated the

foregoing GAAS provisions by failing to implement procedures for identifying and ensuring full disclosure of the Company's related-party transactions, such as:

- Procedures for obtaining the names of all related parties, such as requesting the names from management personnel, reviewing the Company's filings with the SEC and other regulatory agencies, and identifying guarantors for large receivables;

- Procedures for identifying related party transactions, such as those set forth in AU § 334.08;

- Procedures for determining the trustworthiness of related-party transactions, such as assessing the extent and nature of the transactions, confirming the amounts and terms of the transactions, and evaluating the probability of repayment of uncollected balances; and/or

- Procedures for reviewing the Company's accounting process for the large and unusual transactions that were taking place at the end of each reporting period.

273.    Grant Thornton's failure to implement appropriate procedures when auditing Refco's related-party transactions allowed the Company to implement a scheme to offload uncollectible receivables to RGHI, a related party, and to hide the existence of these related-party transactions from Plaintiffs and the investing public through round trip loan transactions with (among others) BAWAG, another related party.

274.    GAAS also required Grant Thornton to identify "fraud risk factors," or circumstances that could lend themselves to fraudulent and/or illegal activities, as part of the audit planning process. AU § 316, Consideration of Fraud in a Financial Statement Audit, serves as a roadmap for uncovering accounting fraud by providing examples of "risk factors relating to misstatements arising from fraudulent financial reporting," and requires that independent auditors utilize professional skepticism. There were numerous red flags and "fraud risk factors" at the Company, including:

- "significant related-party transactions" and "significant, unusual, or highly complex transactions, especially those close to period end that pose difficult 'substance over form' questions," including large unsecured receivables from

RGHI that decreased significantly just before the end of each fiscal year and returned a few weeks later, and loans of hundreds of millions of dollars to BAWAG and other parties that were made and then unwound simultaneously with the decrease and return of the RGHI receivable;

- repeated journal entries made at every quarter-end and year-end over a period of several years to reflect loans being made to the customer and other entities to conceal the related-party loans to RGHI, and which were then reversed as the loans to the customer were "paid off" just after the end of the quarter;

- "pressure to perpetrate fraud," including significant pressure to avoid write-offs of bad debts which would have wiped out the Company's profits and members' equity and rendered the Company unable to satisfy its minimum regulatory capital requirements;

- "unusual or unexpected analytical relationships," specifically that the Company's financial statements indicated significant increases in receivable balances without corresponding decreases in uncollectible receivables reserves;

- "domination of management by a single person or small group," being that Bennett was the President, CEO, Chairman of the Board and 43% shareholder, while the THL Partner Defendants and their passive co-investors owned 57% of the Company and the THL Partner Defendants nominated half of the Company's board of directors;

- "significant financial interests in the entity" by management;

- management's desire and intention to sell their stakes in the Company to public investors through the Bond Offering and the IPO;

- "weaknesses in internal control," including an ineffective accounting and internal audit staff and the lack of formal procedures for closing the books;

- the Company's "history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations," including that the Company had been under SEC investigation for stock short sales and aiding money managers in cheating municipalities, that the Company was fined approximately $7 million in a proceeding before the CFTC concerning inadequate record keeping, and that Maggio was under SEC investigation for stock manipulation;

- the resignation of Trosten as the Company's CFO shortly after the Bond Offering, and his receipt of a remarkably rich $45 million severance payment;

- the Company's high debt-to-equity ratio, with long-term debt being eight times greater than its reported members' equity; and

- "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate," in that the Company's allowance for bad debts was dependent on significant and sensitive assumptions, such as its customers' financial condition, the likelihood of payment on receivables, and the value of the underlying securities, of which the slightest change would materially alter the Company's financial results.

275.    While Grant Thornton failed to recognize all of these red flags, it was aware of sufficient risks of fraud that, according to the Examiner's Report, it categorized Refco as a "high-risk client" in 2005 and an internal Grant Thornton email dated June 7, 2005 described the engagement as having "mucho issues/risks." Among the risk factors identified by Grant Thornton were the fact that it engaged in significant and complex related party transactions, its lack of an internal audit function, and its domination by a small number of executives who had personal interests in maximizing the Company's apparent financial health. Nonetheless, Grant Thornton failed to design or apply appropriate audit procedures to counteract those risks.

### 2.    Standard of Fieldwork No. 2 – Evaluation of Internal Controls

276.    GAAS Standard of Fieldwork No. 2 and AU § 319 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls. "Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated." AU § 312. 02, Audit Risk and Materiality in Conducting an Audit. "Internal control" is defined as a process "designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations." AU § 319.06, Consideration of Internal Control in a Financial Statement Audit – Definition of Internal Control. For financial

statement audits, internal controls serve as an integral way "to prevent or detect material misstatements in financial statement assertions."

277.    Grant Thornton's audits of the Company's financial statements were devoid of an adequate assessment of the Company's internal controls. Specifically, although such problems existed at least as early as 2002, it was not until October 2004 – after the Bond Offering – that Grant Thornton identified and reported "significant deficiencies" in the Company's financial reporting internal controls, including the need to increase financial department resources to ensure the Company's reports were in compliance with SEC regulations and a lack of formalized procedures for closing the Company's books. Even then, however, Grant Thornton did not adjust its audit procedures to compensate for the risk created by these significant deficiencies.

278.    [REDACTED]

279.    Despite having identified the same significant deficiencies in Refco's internal controls for two straight years, Grant Thornton still did not adjust its audit procedures to account for the risks associated with those deficiencies.

### 3.    Standard of Fieldwork No. 3 – Obtaining Evidential Matter

280.    GAAS Standard of Fieldwork No. 3 states that "[s]ufficent competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a

reasonable basis for forming an opinion regarding the financial statements under audit." AU §
326, Evidential Matter, explains that the evidential matter collected and evaluated by auditors is
central to a proper audit and serves as the foundation for the auditor's opinion report. Thus,
Grant Thornton was required to investigate and obtain supporting evidential documentation for
the assertions made by the Company in its financial statements, and could not merely take the
word of the Company's management about the accuracy of their financial statements.

281.    For related-party transactions, AU § 334.09 provides that an auditor should obtain
competent evidential matter regarding the purpose, nature and extent of the transactions, and
their impact on the financial statements.

282.    As noted on Ramler's "Evaluation of Proposed Client" form in 2002, Grant
Thornton was aware from the inception of its engagement that Refco has "significant related
party transactions," that Refco had approximately $170 million in unsecured receivables from its
parent, RGHI, that dated back to the 1980s; that RGHI was a "shell entity with no operations;"
that Bennett had promised Arthur Andersen that the RGHI receivable "would no longer increase
and would be paid down over a period of seven years" (including $50 million in fiscal 2003);
and that if the receivable was not paid down it would have to be written off. According to the
Examiner's Report, Grant Thornton "does not appear to have made any meaningful effort to
determine that payments were actually made," and "appears to have simply accepted its client's
false representation as to the true amount of [the RGHI] receivable."

283.    After an intensive investigation and review of Grant Thornton's workpapers, the
Examiner concluded that Grant Thornton did not review the loan documents, payments, or
customer statements for RGHI's account, but instead "ignored its consistently high assessment of

the risks attendant to related party transactions and relied primarily on the representations of

management personnel within Refco." As the Examiner explained:

> … [T]he auditors took virtually no steps to perform
> procedures designed to obtain competent evidential matter
> concerning the nature, substance and amount of the high-risk,
> related-party transactions in order to satisfy themselves that related
> party transactions were adequately disclosed in the financial
> statements.
>
> Significantly, during the 2003 audit (the first year in which
> [Grant Thornton] had the engagement), [Grant Thornton] auditor
> Yonah Dahan e-mailed a list of document requests to Frank
> Mutterer at [Refco Capital LLC] indicating that [Grant Thornton]
> needed a list of payments made during the year by RGHI on the
> $71 million balance in its customer account at [Refco Capital LLC]
> and that [Grant Thornton] would need to trace some of those
> payments to Refco's bank statements. There is no evidence,
> however, that such procedure was ever actually performed.
> Indeed, if it had been, [Grant Thornton] likely would have
> discovered the fraud. [Grant Thornton] could have conducted a
> simple tracing of payments to bank statements for any of the years
> in question but did not. In addition, given the auditors'
> consistently high assessment of the audit risk arising from related-
> party transactions and the possibility that management could
> override controls, the auditors should have obtained and
> scrutinized the customer statements for RGHI's accounts at [Refco
> Capital] and [Refco Capital LLC], which would have revealed key
> aspects of the fraud, but did not do so.

284.    The Examiner concluded that a review of RGHI's account statements at Refco

Capital would also have alerted Grant Thornton that the RGHI accounts were being used to

manipulate Refco's income and expenses.

285.    Grant Thornton also failed to obtain competent evidential matter regarding the nature and purpose of Refco's related-party transactions with BAWAG. Grant Thornton noted a large debit balance in BAWAG's Refco Capital account at the end of fiscal 2003 and sent a confirmation notice to BAWAG, with an account statement attached that showed that the debit balance was primarily the result of a large, $175 million transfer made within a few days before the end of the fiscal year. This transfer was materially greater than the other inflows and outflows in the account, and it appeared on the account statement as a different type of transaction than the others in the account. Yet, according to the Examiner's Report, "there is no indication in the audit workpapers that [Grant Thornton] inquired as to where the cash had gone, or how the debit balance was secured, or why the transaction had occurred, despite the large amount of this extension of credit to a related party. [Grant Thornton] merely confirmed the account ending balance with BAWAG and moved on."

286.    Grant Thornton was also aware of significant transactions with unrelated parties that occurred at the end of Refco's financial reporting periods – which appeared on Refco's books as either "repo" transactions or "time deposits" but were really round-trip loans – yet Grant Thornton made no effort to obtain evidential matter to verify the legitimacy of those transactions. Rather, as with BAWAG, it confined its analysis to a confirmation of certain account balances, without delving into the underlying transactions giving rise to those balances as required by relevant auditing standards.

287.    AU § 342, Auditing Accounting Estimates, explains that an "auditor's objective when evaluating accounting estimates is to obtain sufficient competent evidential matter to provide reasonable assurance that . . . [a]ll accounting estimates that could be material to the financial statements have been developed." See AU § 342.07. Grant Thornton did not obtain

competent evidential matter to provide reasonable assurance of the reasonableness of the Company's estimate of its uncollectible receivables, which had a material effect on the Company's financial statements and was underestimated by more than $400 million.

288.    Additionally, Grant Thornton did not obtain evidential support for the claims in the Company's public filings and statements concerning the Company's internal controls, risk management procedures, and accounting policies.  Obtaining documentation to support these claims would have revealed that the Company had been re-characterizing uncollectible receivables as related-party receivables that were "collected" prior to each quarter-end, and that Refco had not implemented sufficient internal controls or accounting policies.

289.    Had Grant Thornton adequately planned and conducted its audit in accordance with GAAS, it would have discovered these defects, as well as the massive misstatement of the Company's financial statements over many years that ultimately caused the Company's demise. As the Examiner concluded, Grant Thornton "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

### C.    Violations of Reporting Standards

290.    GAAS Standard of Reporting No. 1 states: "The [audit] report shall state whether the financial statements are presented in accordance with [GAAP]."  Grant Thornton issued unqualified audit reports stating that the Company's financial statements were presented fairly and in accordance with GAAP.  In reality, however, the Company's financial statements violated GAAP, as the Company was improperly inflating its assets and earnings by exchanging

uncollectible customer receivables for receivables with a related party and laundering money by round-tripping funds with Bennett, BAWAG, and other intermediaries.

291.    GAAS Standard of Reporting No. 3 provides that "[i]nformative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." Grant Thornton violated this standard by failing to recognize and/or state in its report that the disclosures in the financial statements were not only inadequate, but materially incorrect.

292.    GAAS Standard of Reporting No. 4 and AU § 508, Reports on Audited Financial Statements, provide that an auditor can only give an unqualified audit report if the company's "financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flows in conformity with [GAAP]," and the audit was conducted in accordance with GAAS. Section 508 further provides that if an auditor cannot give an unqualified audit report, the circumstances may require the auditor to give the company an adverse opinion or to include explanatory language in the audit opinion report to explain non-conformities.

293.    In violation of the foregoing provisions, Grant Thornton issued unqualified audit opinions for each of the years ended February 28, 2003, February 29, 2004, and February 28, 2005, indicating that the Company's financial statements complied with GAAP, when in fact they did not. Rather than issuing unqualified audit reports, Grant Thornton should have issued either adverse audit reports noting the Company's non-compliance with GAAP, or issued qualified audit reports highlighting the fact that Refco's financial statements contained untrue statements of material fact and omitted facts necessary to make the statements contained therein not misleading. Grant Thornton did neither.

294.    GAAS Standard of Reporting No. 3 states: "Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." Thus, if the auditor does not qualify its audit report with details of non-compliance or inaccuracies in the financial statements' informative disclosures, investors and creditors will assume that those disclosures are accurate. As alleged herein, the disclosures in the Company's financial statements were not adequate, and were materially untrue, because, among other reasons, they failed to disclose the Company's uncollectible receivables, or the related-party transactions with RGHI and BAWAG that were being used to conceal those receivables.

295.    Despite the Company's internal control problems, untrue statements of financial results, and non-disclosure of related-party transactions and uncollectible receivables, Grant Thornton continued to issue unqualified audit reports, which wrongly signified to creditors and investors that Grant Thornton had confirmed that the Company's financial statements were prepared in accordance with GAAP, that Grant Thornton had confirmed via evidential matter the claims made in the Company's financial statements, and that the Company's financial statements did not contain any materially untrue statements.

### D.    Violations of CFTC Rules and Regulations

296.    In addition to issuing auditors' reports included in filings with the SEC, Grant Thornton issued reports that were included in filings with the CFTC. CFTC rules and regulations require that audits conducted pursuant to the CFTC regulations be conducted in accordance with GAAS. These rules and regulations also provide that the CFTC may deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the CFTC to have engaged in unethical or improper professional conduct either in the course of an adjudicatory, investigative, rulemaking or other proceeding before the

CFTC or otherwise. Grant Thornton failed to comply with the CFTC regulations by failing to perform its audits in accordance with GAAS, as set forth above.

## VIII.  **DEFENDANTS' NEGLIGENCE**

### A.    **The Offering Memorandum and the Bond Registration Statement**

297.    The Bond Underwriter Defendants did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading. In particular, the Bond Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the textual descriptions in the Offering Memorandum and the Bond Registration Statement relating to, among other things, the Company's past performance, operations, business condition, and future prospects. Nor did the Bond Underwriter Defendants conduct a reasonable investigation into the accuracy of the financial information included in the Offering Memorandum and the Bond Registration Statement, including the financial information contained in the textual portions of those documents, as well as that contained in the attached audited and unaudited financial statements.

298.    In addition, the Offering Memorandum and Bond Registration Statement contained risk factors relating to, among other things, the Company's substantial indebtedness; its exposure to customer credit risks; its compliance with regulatory requirements; its internal controls over financial reporting; and risks relating to employee misconduct. Having identified these factors as risks for potential investors, the Bond Underwriter Defendants were obligated to, but did not, conduct an especially diligent investigation into these issues in order to obtain reasonable assurance that the statements contained in the Offering Memorandum and Bond Registration Statement were true and not misleading.

299.    Even after identifying potential discrepancies between the Offering Memorandum and the Company's true financial condition with respect to customer receivables, the Bond Underwriter Defendants did not ensure that the Offering Memorandum was corrected. ■



300.

301.    Despite being aware of significant customer losses dating back more than five years, the Bond Underwriter Defendants did not investigate why the Company had not written those losses off. Had they done so, they likely would have discovered that the receivables were not only uncollectible, but were far in excess of the reserves that had been set up.

302.    The Bond Underwriter Defendants' failure to conduct a reasonable investigation into the unaudited financial statements in the Bond Registration Statement was particularly negligent given the recent seminal opinion in this District, In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628 (DLC) (S.D.N.Y. 2004), which reiterated and confirmed that underwriters

cannot simply rely on an auditors' work when investigating the accuracy of unaudited financial statements. Rather, because "the public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed" (id. at 685), underwriters must conduct their own, independent (and reasonable) investigation into the accuracy of unaudited financial statements.

303.    Defendants Bennett, Trosten, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, the THL Defendants, O'Kelley, Gantcher, and Breitman, each of whom prepared, approved, and/or signed the Offering Memorandum and/or the Bond Registration Statement, did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading.

304.    Grant Thornton, which materially assisted in the preparation of Refco's fiscal 2003 and 2004 financial statements and consented to the inclusion in the Offering Memorandum and Bond Registration Statement of its audit opinions on those financial statements, performed its audits of the Company's financial statements in a negligent manner, which did not comply with GAAS and did not constitute a reasonable investigation of whether the Company's financial statements were accurate and in compliance with GAAP. As set forth above, Grant Thornton acted negligently in that its audit of Refco's financial statements violated, among others, the following basic principles of GAAS:

(a)    General Standard No. 3, in that Grant Thornton failed to exercise due professional care in the performance of its audit and the preparation of its reports;

(b)    Standard of Field Work No. 1, in that Grant Thornton failed to adequately plan and supervise its audit;

124

(c)    Standard of Reporting No. 1, in that Grant Thornton's reports incorrectly stated that Refco's financial statements were presented in conformity with GAAP; and

(d)    Standard of Reporting No. 4, in that Grant Thornton had an insufficient basis for expressing its unqualified opinions, for its audits had not been conducted in accordance with GAAS.

## B.    The IPO Registration Statement

305.    The Stock Underwriter Defendants did not conduct a reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the statements in the IPO Registration Statement were true and not misleading.  In particular, the Stock Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the textual descriptions in the IPO Registration Statement relating to, among other things, the Company's past performance, operations, business condition, and future prospects.  Nor did the Stock Underwriter Defendants conduct a reasonable investigation into the accuracy of the financial information included in the IPO Registration Statement, including the financial information contained in the textual portions of the IPO Registration Statement, as well as that contained in the attached audited and unaudited financial statements.

306.    The Stock Underwriter Defendants were aware prior to the IPO that Grant Thornton had identified significant deficiencies in Refco's internal controls, including a lack of resources and expertise in the accounting department.  Grant Thornton's final management letter dated October 15, 2004 was circulated to representatives of Credit Suisse, BAS and Goldman Sachs on March 30, 2005. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

Upon information and belief, the Stock Underwriter Defendants' counsel requested a response to Grant Thornton's management letter from Bennett and Sherer. ████████████████████

████████████████████████████████████████████████

██████████████████████████

307.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

308.    The Stock Underwriter Defendants' failure to conduct a reasonable investigation into the unaudited financial statements in the IPO Registration Statement was particularly negligent given the recent seminal opinion in this District, In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628 (DLC) (S.D.N.Y. 2004), which reiterated and confirmed that underwriters cannot simply rely on an auditors' work when investigating the accuracy of unaudited financial statements. Rather, because "the public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed" (id. at 685), underwriters must conduct their own, independent (and reasonable) investigation into the accuracy of unaudited financial statements.

309.    In addition, the IPO Registration Statement contained risk factors relating to, among other things, the Company's substantial indebtedness; its compliance with regulatory requirements; its internal controls over financial reporting; and risks relating to employee misconduct. Having identified these factors as risks for potential investors, the Stock

Underwriter Defendants were obligated to, but did not, conduct an especially diligent investigation into these issues in order to obtain reasonable assurance that the statements contained in the IPO Registration Statement were true and not misleading.

310.    Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Harkins, and Schoen, each of whom prepared, approved, and/or signed the IPO Registration Statement, did not conduct a reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the statements in the IPO Registration Statement were true and not misleading.

311.    Grant Thornton, which consented to the inclusion in the IPO Registration Statement of its audit opinions for the Company's fiscal year 2003, fiscal year 2004, and fiscal year 2005 financial statements, performed its audits of the Company's financial statements in a negligent manner, which did not comply with GAAS and did not constitute a reasonable investigation of whether the Company's financial statements were accurate and in compliance with GAAP.  Among other things, Grant Thornton violated the GAAS provisions set forth above by failing to properly plan and conduct its audits of the Company's financial statements.

## IX.    ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY

312.    Plaintiffs incorporate and reallege the allegations set forth above.  In addition to the allegations set forth above, the following allegations demonstrate the control that certain Defendants exercised over Refco and related entities.

### A.    The Officer Defendants

313.    The Officer Defendants had control of Refco by virtue of their executive positions with the Company, the key roles each played in the Company's management, and their direct involvement in its day-to-day operations, including its financial reporting and accounting functions.  Facts demonstrating the Officer Defendants' control of Refco include:

(a)    The Officer Defendants held the top management positions within the Company and thereby controlled the Company individually and collectively. Specifically:

(i)    Bennett was Refco's President, CEO and Chairman from September 1998 through at least October 10, 2005.

(ii)    Maggio was Executive Vice President of Refco, President and CEO of Refco Securities, LLC and President of Refco Capital from 1991 until at least October 10, 2005.

(iii)    Sexton was Executive Vice President and COO of Refco from August 2004 through at least October 10, 2005, whereupon he assumed the position of CEO until at least the end of the Class Period.

(iv)    Murphy was Executive Vice President of Refco and President and CEO of Refco Global Futures, LLC from March of 1999 until at least the end of the Class Period.

(v)    Klejna was Executive Vice President and General Counsel of Refco from January 1999 through at least the end of the Class Period.

(vi)    Sherer was the Executive Vice President and CFO of Refco from January 2005 until at least the close of the Class Period;

(vii)    Silverman was Secretary of the Company from 1999 until at least October 10, 2005. Silverman also held numerous other high-level executive positions within Refco, including Controller of Refco Group during 2004 and the first half of 2005, and Director of Internal Audit at Refco Group at the time of the IPO. As Controller, Silverman was directly responsible for the closing of the

128

Company's books, implementation and maintenance of adequate internal financial controls, as well as the adoption and implementation of appropriate accounting policies for the Company.

(b)    The Offering Memorandum, Bond Registration Statement, and the IPO Registration Statement touted the key role played by the Officer Defendants in the Company's operations and purported success.  For example, the Bond Registration Statement discussed the potential departure of the Officer Defendants in a risk disclosure, emphasizing that:

> **Our business operations could be significantly disrupted if we lost the members of our management team.**
>
> Our future success depends to a significant degree upon the continued contributions of our management team.  Our future performance will be substantially dependent on our ability to retain and motivate them. [...] The loss of the services of any member of our management team...could adversely affect our ability to manage our business effectively or to execute our business strategy.

(Bold and italics in original, as heading).  The Offering Memorandum and IPO Registration Statement each contained substantially similar discussions of the Officer Defendants' importance to the Company's affairs.  In connection with the risk disclosure, the Bond Registration Statement further assured investors that Officer Defendants Bennett, Murphy, Sherer, Sexton, Maggio and Klejna were all subject to non-compete agreements with the Company in the event of their departure.

(c)    The Executive Employment and Non-Competition Agreements pursuant to which Officer Defendants Bennett, Maggio, Sexton, Murphy, Klejna, and Sherer were employed gave each substantial authority over the day-to-day management and operation of the Company. Each of their agreements explicitly stated that they were employed "in a key capacity with the Company," and that they had access to "confidential information

regarding the organization, business and finances of the Company." Each of their employment agreements also placed non-competition, non-solicitation and no-hire restrictions on these defendants. Defendant Bennett's employment agreement, in particular, sets forth in detail his duties and responsibilities, which included:

> (i) formulating and executing the Company's business strategy; (ii) providing senior level counsel as to the business and operations of the Company; (iii) directing the day-to-day management of the Company's affairs; (iv) representing Company in relationships and business dealings within the financial services industry; and (v) participating in and supporting the activities of the Board.

(d)    According to a former senior operating officer of a Europe-based Refco affiliate (the "Former Refco Officer"), who met frequently with Defendants Bennett, Sexton, Murphy, Maggio, and Trosten, those five officers were known to Refco staffers in the Company's offices abroad as the "New York Five" – a reflection of their control and domination of the Company's day-to-day operations from its headquarters in New York.

(e)    Defendant Bennett also controlled Refco because he was one of the Company's largest shareholders. At the time of the Bond Offering, Bennett owned approximately 43% of the equity interests of Refco through RGHI. Following the IPO, Bennett owned 33.8% of Refco's outstanding common stock through RGHI and the Bennett Trust.

(f)    Defendant Silverman also exercised control by virtue of his close relationship with Defendant Bennett. Silverman was a CPA and a close confidant of Bennett, to whom Bennett turned for advice and guidance on accounting matters. Upon information and belief, Silverman had significant influence over Bennett's decision-making on behalf of the Company with respect to accounting-related issues.

### B.    RGHI and the Bennett Trust

314.    Facts demonstrating Defendant RGHI's and the Bennett Trust's control of Refco include:

(a)    At all relevant times, RGHI and the Bennett Trust were instrumentalities of Defendant Bennett, wholly dominated and controlled by Bennett, and with no ability to take any action independent of Bennett. The Offering Memorandum, for example, disclosed that RGHI would be "wholly owned" by Bennett following the LBO. The IPO Registration Statement similarly disclosed that RGHI was "wholly-owned" by Bennett and that he was "both Trustee and Beneficiary" of the Bennett Trust. RGHI and the Bennett Trust had control of Refco by virtue of Defendant Bennett's pervasive control of the Company (discussed above), which was at all times exercised through RGHI and/or the Bennett Trust.

(b)    Bennett used RGHI and the Bennett Trust as instrumentalities to hold and exercise his controlling equity interest in Refco. At the time of the Bond Offering, Defendant Bennett used RGHI as a vehicle to hold his approximately 43% equity interest in Refco. As a result of the IPO, and as set forth in the IPO Registration Statement, "[o]wnership by Phillip R. Bennett, which constitutes 33.8% of our outstanding common stock following the offering, represents direct ownership and indirect ownership through each of Refco Group Holdings, Inc. and the Phillip R. Bennett Three Year Annuity Trust." Following the IPO, RGHI held approximately 60% of Bennett's equity interests in Refco and the Bennett Trust held approximately 40% of Bennett's equity interests in Refco.

(c)    As an instrumentality Bennett used to exercise control of Refco, RGHI

was party to numerous contracts pursuant to which the LBO and consequent securities offerings were achieved. Specifically, RGHI was party to the Equity Purchase and Merger Agreement dated June 8, 2004 (and as amended on July 9, 2004), which provided for the series of transactions forming the LBO, and the Securityholders Agreement, dated August 5, 2004, which governed the rights of Refco's equityholders in advance of the IPO. RGHI became contractually bound to these agreements by virtue of Defendant Bennett's signature.

(d)     As an instrumentality Bennett used to exercise control of Refco, RGHI had the unrestricted right, pursuant to the Securityholders Agreement, to appoint two members of the Board of Directors, one of which was required to be Bennett, and the right to appoint a third jointly with the THL Partner Defendants.

(e)     In addition, Refco has itself admitted that it was a "controlled company" within the meaning of NYSE rules by virtue of Bennett's and the THL Partner Defendants' collective post-IPO position in Refco stock, which consisted of Bennett's 33.8% (held through RGHI and the Bennett Trust) and the THL Partner Defendants' approximate 42.7% interest in Refco's outstanding shares. Refco benefited substantially from its status as a "controlled company" because the boards of directors of controlled companies are exempt from normal NYSE rules requiring that boards of directors, corporate governance committees, and compensation committees be independent.

### C.     Robert C. Trosten

315.    Facts demonstrating Defendant Trosten's control of Refco include:

(a)     Trosten was Executive Vice President and CFO of Refco from 2001 until his sudden resignation in October 2004. As CFO, Trosten was directly responsible for the preparation of Refco's financial statements, the closing of its books, its adoption and

compliance with appropriate accounting policies, and its maintenance of adequate internal financial controls.

(b)    The Offering Memorandum and the Bond Registration Statement highlighted Trosten's importance to the Company's success as a central member of Refco's management team.  The Bond Registration Statement stated that:

> ***Our business operations could be significantly disrupted if we lost members of our management team.***
>
> Our future success depends to a significant degree upon the continued contributions of our management team.  Our future performance will be substantially dependant on our ability to retain and motivate them.  [...] The loss of any member of our management team...could adversely affect our ability to manage our business effectively or execute our business strategy.

(bold and italics in original, as heading).  The Offering Memorandum contained a substantially similar discussion of Trosten's importance to the Company.

(c)    As noted above, according to the Former Refco Officer, Defendant Trosten was among the senior officers known to Refco staffers in the Company's offices abroad as one of the "New York Five" – a moniker reflecting his predominance of the Company's affairs from its headquarters in New York.

D.    **The THL Partner Defendants**

316.    The following facts further evidence the THL Partner Defendants' control of Refco:

(a)    From the time of the LBO until the IPO, the THL Partner Defendants and their affiliates and passive co-investors held a controlling 57% interest in Refco shares. After the IPO, the THL Partner Defendants and their co-investors continued to hold a dominant 42.7% interest.  Thomas H. Lee Partners was, at all times, the beneficial owner of all interests held by the THL Partner Defendants and their co-investors.

(b)     The THL Partner Defendants dominated Refco's Board of Directors. Specifically, half of Refco's eight member Board of Directors (and prior to the IPO, fully half of New Refco's Board of Managers) was filled by the THL Partner Defendants' designees. These designees – the THL Individual Defendants – each held high-level positions within Thomas H. Lee Partners' upper management team, as set forth above. Indeed, the THL Partner Defendants had the unrestricted right, pursuant to a Securityholders Agreement, dated August 5, 2004, entered into in connection with the LBO, to appoint four of the eight members of the Company's Board, and the right to appoint a fifth jointly with RGHI.

(c)     The Offering Memorandum acknowledged that the THL Partner Defendants would, upon consummation of the LBO, "have the ability to control all aspects of [the Company's] business."

(d)     THL Managers V, LLC ("THL Managers"), of which Thomas H. Lee Partners is the Managing Member, was party to a Management Agreement, dated August 5, 2004, with Refco, pursuant to which it provided management and consulting services to Refco. As set forth in the Management Agreement, THL Managers was specifically retained because Refco required its "special skills and management advisory services in connection with [Refco's] business operations and execution of its strategic planning," and because THL Managers was "specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services." The Management Agreement also states that THL Managers was retained to advise Refco "in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to [Refco's] or any of its subsidiaries finances or relationships

134

with banks or other financial institutions," and "with respect to the development and implementation of strategies for improving the operating, marketing and financial performance of [Refco] and other senior management matters related to the business, administration and policies of [Refco] and its subsidiaries." Thus, at the same time that the THL Partner Defendants held a dominant position on Refco's Board of Directors and maintained a controlling interest in Refco stock, an entity controlled by Thomas H. Lee Partners was obligated by the Management Agreement to become deeply involved in the day-to-day management of Refco.

(e)    In addition, Refco has characterized itself as a "controlled company" within the meaning of NYSE rules by virtue of the THL Partners Defendants' and RGHI's collective post-IPO position in Refco stock, which consisted of an approximate 42.7% interest of the THL Partner Defendants and their passive co-investors and RGHI's 33.8% interest in Refco's outstanding shares. Refco benefited substantially from its status as a "controlled company" because the boards of directors of controlled companies are exempt from normal NYSE rules requiring that boards of directors, corporate governance committees, and compensation committees be independent.

### E.    The THL Individual Defendants

317.    Facts demonstrating Defendant Lee's control of Refco include:

(a)    From the time of the LBO through at least the Class Period, Lee was a member of Refco's Board of Directors.

(b)    Lee was the Chairman, CEO, and founder of Thomas H. Lee Partners, which itself controlled Refco.

(c)      Lee provided services to Refco pursuant to the Management Agreement described in ¶ 316(d) above, and was therefore deeply involved in the day-to-day management of Refco.

(d)      Lee was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

318.    Facts demonstrating Defendant Harkins' control of Refco include:

(a)      From the time of the LBO through at least the Class Period, Harkins was a member of Refco's Board of Directors.

(b)      Harkins was the Vice Chairman and Managing Director of Thomas H. Lee Partners, which itself controlled Refco.

(c)      Harkins provided services to Refco pursuant to the Management Agreement described in ¶ 316(d), and was therefore deeply involved in the day-to-day management of Refco.

(d)      Harkins was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

319.    Facts demonstrating Defendant Jaeckel's control of Refco include:

(a)      From the time of the LBO through at least the Class Period, Jaeckel was a member of Refco's Board of Directors.

(b)      Jaeckel was a Managing Director of Thomas H. Lee Partners, which itself controlled Refco.

(c)      Jaeckel provided services to Refco pursuant to the Management Agreement described in ¶ 316(d) above, and was therefore deeply involved in the day-to-day management of Refco.

(d)    Jaeckel was deemed to beneficially own the THL Partner Defendants'
controlling interest in Refco shares.

320.    Facts demonstrating Defendant Schoen's control of Refco include:

(a)    From the time of the LBO through at least the Class Period, Schoen was a
member of Refco's Board of Directors.

(b)    Schoen was a Co-President of Thomas H. Lee Partners, which itself
controlled Refco;

(c)    Schoen provided services to Refco pursuant to the Management
Agreement described in ¶ 316(d) above, and was therefore deeply involved in the day-to-
day management of Refco;

(d)    Schoen was deemed to beneficially own the THL Partner Defendants'
controlling interest in Refco shares.

**F.    The Audit Committee Defendants**

321.    Facts demonstrating the Audit Committee Defendants' control of Refco include:

(a)    Each of the Audit Committee Defendants was a member of the Audit
Committee of New Refco's Board of Managers and subsequently of Refco's Board of
Directors;

(b)    As stated in the IPO Registration Statement, the Audit Committee
Defendants were specifically responsible for overseeing:

(i)    the integrity of Refco's financial statements;

(ii)    Refco's compliance with legal and regulatory requirements;

(iii)    Refco's independent auditors' qualifications and independence;
and

137

(iv)     the performance of Refco's independent auditors and Refco's internal audit function;

(c)     As stated in the IPO Registration Statement, the Audit Committee Defendants were also specifically responsible for preparing the report required to be prepared by the Audit Committee pursuant to SEC rules;

(d)     The Charter of the Audit Committee articulated the Audit Committee's responsibilities in even greater detail.  In addition to the duties disclosed in the IPO Registration Statement, the responsibilities discussed in the Charter demonstrate the Audit Committee's pervasive involvement in the Company's auditing and financial reporting processes.  These additional responsibilities include:

(i)     Reviewing and discussing with management, internal audit and the independent auditor the adequacy and effectiveness of Refco's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, through inquiry and discussions with the independent auditors, management and head of internal audit;

(ii)     Discussing guidelines and policies governing the process by which senior management of Refco and the relevant departments of the Company, including the internal auditing department, assess and manage the Company's exposure to risk, as well as Refco's major financial and other risk exposures and the steps management has taken to monitor and control such exposures;

(iii)     Reviewing and discussing with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by

138

the Audit Committee, assigning additional internal audit projects to the head of

internal audit;

(iv)    Reviewing and discussing with management the Company's

administrative, operational and accounting internal controls, including special

audit steps adopted in light of the discovery of any significant and material

control deficiencies;

(v)    Meeting periodically with the general counsel, and outside counsel

when appropriate, to review legal and regulatory matters, including (i) any

matters that may have a material impact on the financial statements of the

Company and (ii) any matters involving potential or ongoing material violations

of law or breaches of fiduciary duty by the Company or any of its directors,

officers, employees or agents or breaches of fiduciary duty to the Company; and

(vi)    Reviewing and discussing with management, the Company's

independent auditors and the head of internal audit, material financial

arrangements of the Company which do not appear on the financial statements of

the Company.

## X.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT ONE

**For Violations of Section 12(a)(2) of the Securities Act,
On Behalf of Those Who Purchased or Otherwise
Acquired 144A Bonds in the Bond Offering,
Against Bennett, Trosten, Jaeckel, the THL Partner Defendants,
and the Bond Underwriter Defendants**

322.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein, except allegations that the Defendants made the untrue statements of material facts and

omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict

liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

323.    This Claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Bond Underwriter Defendants and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants, on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased or otherwise acquired 144A Bonds in the Bond Offering and were damaged by acts alleged in detail herein (collectively, the "Section 12(a)(2) Bond Plaintiffs").

324.    The Offering Memorandum for the 144A Bonds contained all of the information required to be contained in a Section 10 prospectus, and constituted a prospectus for purposes of Section 12(a)(2) of the Securities Act.  Further, the Bond Offering was a public offering of exempt-from-registration securities.

325.    The Bond Underwriter Defendants were underwriters of the public offering of the Bonds.  Although the Bonds were exempt-from-registration pursuant to Rule 144A, the Bond Underwriter Defendants performed functions identical to those they would have performed if the Bonds were registered.

326.    The Bond Underwriter Defendants sold the 144A Bonds to the Section 12(a)(2) Bond Plaintiffs in the Bond Offering.

327.    Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants, as well as Refco Group, Refco Finance Holdings and the Bond Underwriter Defendants, solicited the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in the Bond Offering.  Their actions of solicitation included preparation and distribution of the Offering Memorandum, inviting the Section 12(a)(2) Bond Plaintiffs to attend the Bond Road Show, and setting up and

140

attending the Bond Road Show, where they aggressively marketed the Bonds to the Section

12(a)(2) Bond Plaintiffs through written and oral presentations.

328.    In soliciting the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in

the Bond Offering, Refco Group, Refco Finance Holdings, the Bond Underwriter Defendants,

and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants were motivated by

their own or the security owner's financial interests.

329.    The Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and

Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants sold and/or offered to sell

the 144A Bonds to the Section 12(a)(2) Bond Plaintiffs by means of the Offering Memorandum

and oral communications at the Bond Road Show, all of which contained untrue statements of

material fact, including, but not limited to, the financial statements of Refco Group and its

subsidiaries, and discussions thereof.  In addition, as alleged in detail herein, the Offering

Memorandum and oral communications at the Bond Road Show omitted to state material facts

necessary to make the statements, in the light of the circumstances in which they were made, not

misleading, including the significant related-party transactions between the Company, BAWAG

and RGHI, and the uncollectibility of hundreds of millions of dollars of the Company's

receivables due to high levels of customer credit losses in prior years.  The facts misstated and

omitted would have been material to a reasonable person reviewing the Offering Memorandum

or hearing the oral representations.

330.    The Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and

Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants each owed the Section

12(a)(2) Bond Plaintiffs the duty to make a reasonable and diligent investigation of the

statements contained in the Offering Memorandum and of the oral and written statements made

141

at the Bond Road Show, to ensure that they did not include untrue statements of material facts or omit to state material facts necessary to make the statements, in the light of the circumstances in which they were made, not misleading.

331.    As alleged in detail herein, the Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants did not make a reasonable and diligent investigation and did not possess reasonable grounds for believing that the statements in the Offering Memorandum and the oral and written statements presented at the Bond Road Show did not include untrue statements of material facts or omit to state material facts necessary to make the statements, in the light of the circumstances in which they were made, not misleading.

332.    At the time the Section 12(a)(2) Bond Plaintiffs purchased Bonds in the Bond Offering, they did not know, nor in the exercise of reasonable diligence could they have known, of any of the untruths or omissions alleged in detail herein.

333.    The Section 12(a)(2) Bond Plaintiffs suffered injury as a result of Defendants' actions in violation of Section 12(a)(2) of the Securities Act.

334.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Bond Offering.

335.    The Section 12(a)(2) Bond Plaintiffs hereby tender their Bonds to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT TWO

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of 144A Bonds in the Bond Offering,
Against the THL Partner Defendants, Lee, Bennett,
RGHI, Grant, Murphy, Trosten, Sexton, Silverman, and Maggio
(Based on Violations of Section 12(a)(2) of the Securities Act
by Refco Group, Refco Finance Holdings, and Refco Finance)**

336.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

337.    This Claim is brought pursuant to Section 15 of the Securities Act against the THL Partner Defendants and Defendants Lee, Bennett, Grant, RGHI, Murphy, Trosten, Sexton, Silverman, and Maggio, on behalf of PIMCO, the PIMCO High Yield Fund, and the other Section 12(a)(2) Bond Plaintiffs.

338.    As alleged in detail herein, Refco Group, Refco Finance Holdings, and Refco Finance violated Section 12(a)(2) of the Securities Act by soliciting the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in the Bond Offering by means of a prospectus (the Offering Memorandum) and oral statements that included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. In soliciting these purchases, Refco Group, Refco Finance Holdings, and Refco Finance were motivated by their own financial interests. Refco Group, Refco Finance Holdings, and Refco Finance failed to exercise reasonable care regarding the accuracy and completeness of the Offering Memorandum and oral statements. The facts misstated and omitted would have been material to a reasonable person.

143

But for the fact that Refco Group, Refco Finance Holdings, and Refco Finance have filed for bankruptcy protection, they would be named as defendants on the Section 12(a)(2) claims alleged herein.

339.    As a direct and proximate result of the violations of Section 12(a)(2) of the Securities Act by Refco Group, Refco Finance Holdings, and Refco Finance, the Section 12(a)(2) Bond Plaintiffs suffered damages in connection with their purchases of 144A Bonds in the Bond Offering and were damaged by the acts alleged in detail herein.

340.    Defendants Bennett, Murphy, Trosten, Sexton, Silverman and Maggio were controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance due (among other reasons alleged in detail herein) to their executive positions with Refco Group and Refco Finance Holdings (of which Refco Finance was a wholly-owned subsidiary at the time of the Bond Offering); their direct involvement in the day-to-day business and operations of each entity, including the preparation of their financial statements; their participation in the Bond Road Show where the Bonds were marketed to investors and the contents of the Offering Memorandum were discussed; and/or their participation in the preparation and dissemination of the inaccurate Offering Memorandum for the Bonds.  By virtue of the foregoing, each of these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, Refco Finance Holdings, and Refco Finance, including the content and dissemination of their financial statements and the Offering Memorandum.

341.    Defendant Bennett was also a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to his substantial ownership

interest (through his ownership interest in RGHI) in New Refco, the sole member of Refco Group.

342.    Defendant RGHI was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to its approximate 43% ownership interest in New Refco, the sole member of Refco Group.

343.    The THL Partner Defendants were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to their approximate 57% ownership interest in New Refco, the sole member of Refco Group.

344.    Defendant Lee was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to his position as Chairman and CEO of Thomas H. Lee Partners, and the fact that Thomas H. Lee Partners or Lee controlled each of the other THL Partner Defendants, which in turn controlled Refco Group.

345.    The THL Partner Defendants and Defendants Lee, Bennett, RGHI, Murphy, Trosten, Sexton, Silverman, and Maggio acted negligently and without reasonable care regarding the accuracy of the information contained in the prospectus for the Bonds, and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

346.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Bond Offering.

347.    Pursuant to Section 15 of the Securities Act, the THL Partner Defendants and Defendants Lee, Bennett, RGHI, Murphy, Trosten, Sexton, Silverman, and Maggio are jointly and severally liable with, and to the same extent as, Refco Group, Refco Finance Holdings, and Refco Finance, for those entities' violations of Section 12(a)(2) of the Securities Act.

145

## COUNT THREE

### For Violations of Section 11 of the Securities Act,
### On Behalf of Purchasers of Registered Bonds,
### Against the Section 11 Bond Defendants

348.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein, except allegations that Defendants made the untrue statements of material facts and

omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict

liability and negligence claims and expressly disclaim any claim of fraud or intentional

misconduct.

349.   This Claim is brought pursuant to Section 11 of the Securities Act against

Defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, Harkins, Jaeckel,

Schoen, O'Kelley, Gantcher, Breitman, Grant Thornton, and the Bond Underwriter Defendants

(collectively, the "Section 11 Bond Defendants"), on behalf of PIMCO, the PIMCO High Yield

Fund, and all other members of the Class who purchased or otherwise acquired Registered Bonds

during the Class Period and were damaged by acts alleged herein (collectively, the "Section 11

Bond Plaintiffs").

350.   The Registered Bonds were issued pursuant to the Bond Registration Statement.

All purchases of Registered Bonds are traceable to the Bond Registration Statement.

351.   The Bond Registration Statement contained untrue statements of material facts,

including, but not limited to, the financial statements of Refco Group and its subsidiaries and

other statements regarding Refco Group's business operations and financial results.  In addition,

the Bond Registration Statement omitted to state material facts required to be stated therein or

necessary to make the statements made not misleading, including the significant related-party

transactions between the Company and RGHI and the uncollectibility of hundreds of millions of

dollars of the Company's receivables. The facts misstated and omitted would have been material to a reasonable person reviewing the Bond Registration Statement.

352.   Refco Group and Refco Finance were the co-issuers of the Bonds pursuant to the Bond Registration Statement, and would be strictly liable for the untrue statements of material fact and omissions to state material facts therein, but for their filing for bankruptcy court protection.

353.   Defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, and Klejna each signed the Bond Registration Statement.

354.   At the time the Bond Registration Statement was filed, Defendants Bennett, Lee, Harkins, Jaeckel, Schoen, O'Kelley, Gantcher, and Breitman were managers of New Refco, which managed and was the sole member of Refco Group. As such, these Defendants performed similar functions to those of directors of Refco Group, a co-issuer of the Bonds.

355.   Defendant Grant Thornton was the auditor for Refco Group and its subsidiaries, and consented to being named in the Bond Registration Statement as a party who certified the audited financial statements contained therein. Grant Thornton's audit report, which was contained in the Bond Registration Statement, incorrectly stated that Grant Thornton's audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

356.   The Bond Underwriter Defendants were underwriters for the Bonds. They served as underwriters in connection with the Bond Offering with the understanding and expectation that the Rule 144A Bonds would later be exchanged for Registered Bonds, and that the Registered Bonds would be registered pursuant to a registration statement that was substantially similar to the Offering Memorandum prepared by the Bond Underwriter Defendants for the

Bond Offering. The Bond Registration Statement, which was prepared with significant participation from the Bond Underwriter Defendants – including participation in drafting sessions by the Bond Underwriter Defendants both individually and through their counsel – included untrue statements of material fact and material omissions, as alleged in detail herein.

357.    The Section 11 Bond Defendants owed the Section 11 Bond Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Bond Registration Statement, to ensure that they did not contain untrue statements of material fact or omit to state material facts required to be stated therein or necessary to make the statements therein not misleading.

358.    As alleged in detail herein, the Section 11 Bond Defendants did not make a reasonable investigation of the statements contained in the Bond Registration Statement, and did not possess reasonable grounds for believing that the Bond Registration Statement did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

359.    The Section 11 Bond Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Bond Registration Statement when they purchased or acquired those Bonds.

360.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Exchange Offer pursuant to the Bond Registration Statement..

361.    By reason of the foregoing, the Section 11 Bond Defendants are liable to the Section 11 Bond Plaintiffs for violations of Section 11 of the Securities Act.

## COUNT FOUR

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of the Section 11 Bond Plaintiffs,
Against the THL Defendants, Bennett, RGHI,
the Bennett Trust, Murphy, Sherer, Sexton, Silverman,
Maggio, Klejna, O'Kelley, Gantcher, and Breitman
(Based on Violation of Section 11 of the Securities Act by Refco Group)**

362.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

363.    This Claim is brought pursuant to Section 15 of the Securities Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman, on behalf of the Section 11 Bond Plaintiffs.

364.    As alleged herein, Refco Group violated Section 11 of the Securities Act by signing and issuing the Bond Registration Statement, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person.  But for the fact that Refco Group has filed for bankruptcy protection, it would be named as a defendant on the Section 11 claims alleged in detail herein.

365.    As a direct and proximate result of Refco Group's violation of Section 11 of the Securities Act, the Section 11 Bond Plaintiffs suffered damages in connection with their purchase and/or acquisition of Registered Bonds during the Class Period and were damaged by the acts alleged in detail herein.

366. The THL Partner Defendants were controlling persons of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to the approximate 57% ownership interest that those Defendants, together with their passive co-investors, had in New Refco, the sole member of Refco Group.

367. The THL Individual Defendants were controlling persons of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to their positions as four of the Company's eight managers, and their executive positions with the THL Partner Defendants, which controlled Refco Group.

368. Defendant Bennett was a controlling person of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to his approximate 43% ownership interest (through his sole ownership of RGHI and control of the Bennett Trust) in New Refco, the sole member of Refco Group.

369. Defendants RGHI and the Bennett Trust were controlling persons of Refco Group when the Bond Registration statement was filed and became effective due (among other reasons alleged in detail herein) to the approximate 43% ownership interest that these Defendants had in New Refco, the sole member of Refco Group.

370. Defendants Bennett, Murphy, Sherer, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco Group due (among other reasons alleged herein) to their executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Bond Registration Statement.

371. Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco Group due (among other reasons alleged herein) to their service on the Audit Committee of New

Refco, which also performed the functions of an audit committee for Refco Group. As members of the Audit Committee, these Defendants were responsible for overseeing Refco Group's financial reporting, accounting, and internal controls; overseeing the activities of Refco Group's outside auditors and reviewing the scope and results of those audits with the auditors; and meeting with and making recommendations to the managers of Refco Group concerning the foregoing activities.

372.    By virtue of the foregoing, the THL Defendants, Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, including the content of its financial statements and of the Bond Registration Statement.

373.    The THL Defendants, Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman acted negligently and without reasonable care regarding the accuracy of the information contained in the Bond Registration Statement, and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

374.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Exchange Offer pursuant to the Bond Registration Statement.

375.    Pursuant to Section 15 of the Securities Act, the THL Defendants, Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman are jointly and severally liable with, and to the same extent as, Refco Group for its violation of Section 11 of the Securities Act.

## COUNT FIVE

**For Violations of Section 11 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock,
Against the Section 11 Stock Defendants**

376.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

377.    This Claim is brought pursuant to Section 11 of the Securities Act against Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Grant Thornton, and the Stock Underwriter Defendants  (collectively, the "Section 11 Stock Defendants"), on behalf of RH Capital and other members of the Class who, during the Class Period, purchased or otherwise acquired Refco common stock issued pursuant and/or traceable to the IPO Registration Statement and were damaged by acts alleged herein (collectively, the "Section 11 Stock Plaintiffs").

378.    Refco issued common stock pursuant to the IPO Registration Statement.  All purchases of Refco common stock are traceable to the IPO Registration Statement.

379.    The IPO Registration Statement contained untrue statements of material fact, including, but not limited to, the financial statements of Refco and its subsidiaries and other statements regarding Refco's business operation and financial results.  In addition, the IPO Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including the significant related-party transactions between the Company and RGHI and the uncollectibility of hundreds of millions of dollars of the Company's receivables.  The facts misstated and omitted would have been material to a

reasonable person reviewing the IPO Registration Statement.

380.    Refco issued stock pursuant to the IPO Registration Statement, and would be strictly liable for the untrue statements of material fact and omissions to state material facts therein, but for its filing for bankruptcy court protection.

381.    Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen each signed the IPO Registration Statement.

382.    At the time the IPO Registration Statement was filed, Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen were directors of Refco.

383.    Defendant Grant Thornton was the auditor for Refco and its subsidiaries, and consented to being named in the IPO Registration Statement as a party who certified the audited financial statements contained therein.  Grant Thornton's audit report, which was contained in the IPO Registration Statement, incorrectly stated that Grant Thornton's audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

384.    The Stock Underwriter Defendants sold shares of Refco stock in the IPO, participated in the preparation of the IPO Registration Statement and were responsible for the contents and dissemination of the IPO Registration Statement.

385.    The Section 11 Stock Defendants owed to the Section 11 Stock Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the IPO Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

386.    As alleged in detail herein, the Section 11 Stock Defendants did not make a

153

reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the IPO Registration Statement did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

387.    The Section 11 Stock Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the IPO Registration Statement when they purchased or acquired the stock.

388.    By reason of the foregoing, the Section 11 Stock Defendants are liable to the Section 11 Stock Plaintiffs for violations of Section 11 of the Securities Act.

<div align="center">

**COUNT SIX**

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock
Against The Section 15 Stock Defendants
(Based on Violations of Section 11 of the Securities Act
by Refco)**

</div>

389.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

390.    This Claim is brought pursuant to Section 15 of the Securities Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Maggio, Klejna, Breitman, Gantcher, and O'Kelley (collectively, the "Section 15 Stock Defendants"), on behalf of RH Capital, and the other members of the Class who purchased who purchased or acquired the stock issued in or traceable to the IPO, and were damaged by acts alleged herein (the "Section 15 Stock Plaintiffs").

391.   As alleged in detail herein, Refco violated Section 11 of the Securities Act with respect to the IPO by an issuing the IPO Registration Statement, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Registration Statement.  But for the fact that Refco has filed for bankruptcy protection, it would be named as a Defendant on the Section 11 claims alleged in detail herein.

392.   The Section 15 Stock Defendants had a duty to disseminate accurate and truthful information with respect to Refco's financial condition and results of operations.

393.   The THL Partner Defendants were controlling persons of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to the approximate 42.7% ownership interest that these Defendants, together with their passive co-investors, had in Refco.

394.   The THL Individual Defendants were controlling persons of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to their positions as four of the Company's eight managers, and their executive positions with the THL Partner Defendants, which controlled Refco.

395.   Defendant Bennett was a controlling person of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to his approximate 33.8% ownership interest (through his sole ownership of RGHI and control of the Bennett Trust) in Refco.

396.    Defendants RGHI and the Bennett Trust were controlling persons of Refco when the IPO Registration statement was filed and became effective due (among other reasons alleged in detail herein) to the approximate 33.8% ownership interest that these Defendants had in Refco.

397.    Defendants Bennett, Murphy, Sherer, Sexton, Maggio and Klejna, were controlling persons of Refco due (among other reasons alleged herein) to their executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the IPO Registration Statement.

398.    Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco due (among other reasons alleged herein) to their service on the Audit Committee of Refco. As members of the Audit Committee, these Defendants were responsible for overseeing Refco's financial reporting, accounting, and internal controls; overseeing the activities of Refco's outside auditors and reviewing the scope and results of those audits with the auditors; and meeting with and making recommendations to the managers of Refco concerning the foregoing activities.

399.    By virtue of the foregoing, the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Maggio, Klejna, O'Kelley, Gantcher, and Breitman each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco, including the content of its financial statements and of the IPO Registration Statement.

400.    Lead Plaintiff RH Capital and the Section 15 Stock Plaintiffs purchased Refco securities issued in, or traceable to, the IPO and were damaged thereby. The IPO was conducted pursuant to the IPO Registration Statement.

401.    The Section 15 Stock Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in the IPO Registration Statement and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

402.    The Section 15 Stock Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the IPO Registration Statement.

403.    The Section 15 Stock Plaintiffs have sustained damages as a result of the inaccurate statements and omissions in the IPO Registration Statement, for which they are entitled to compensation.

404.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the IPO pursuant to the IPO Registration Statement.

405.    Pursuant to Section 15 of the Securities Act, the Section 15 Stock Defendants are jointly and severally liable with and to the same extent as Refco, for its violations of Section 11 of the Securities Act.

## COUNT SEVEN

**For Violations of Section 12(a)(2) of the Securities Act,
On Behalf of Those Who Purchased or Otherwise Acquired
Refco Common Stock in the IPO,
Against the Stock Underwriter Defendants**

406.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

407.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Stock Underwriter Defendants on behalf of RH Capital and other members of the Class who purchased or otherwise acquired Refco common stock in the IPO and were damaged by the acts alleged in detail herein.

408.    The Stock Underwriter Defendants sold shares of Refco stock in the IPO and were responsible for the contents and dissemination of the Prospectus.  As alleged in detail herein, the Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.  The untrue statements of material fact in the Prospectus included, but were not limited to, the financial statements of Refco and other statements regarding Refco's business operation and financial results.  In addition, the Prospectus omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, including the significant related-party transactions between the Company and RGHI, and the uncollectibility of hundreds of millions of dollars of the Company's receivables due to high levels of customer credit losses in prior years.  The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

409.    The Stock Underwriter Defendants owed to the purchasers of Refco stock, including Plaintiff RH Capital, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that it was true and that there was no omission to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

410.    As alleged in detail herein, the Stock Underwriter Defendants did not make a

reasonable and diligent investigation and did not possess reasonable grounds for believing that the Prospectus did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

411.    Plaintiff RH Capital and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Prospectus at the time they acquired Refco stock.

412.    By reason of the foregoing, the Stock Underwriter Defendants are liable to Plaintiff RH Capital and other members of the Class who purchased or otherwise acquired stock issued in the IPO pursuant to the Prospectus for violations of Section 12(a)(2) of the Securities Act, each of whom has been damaged by reason of such violations.

413.    Plaintiff RH Capital and other members of the Class who purchased or otherwise acquired stock issued in the IPO pursuant to the Prospectus hereby tender their shares of Refco stock to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT EIGHT

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock
Against the Section 15 Stock Defendants
(Based on Violations of Section 12(a)(2) of the Securities Act
by Refco)**

414.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

415.    This Claim is brought pursuant to Section 15 of the Securities Act against the Section 15 Stock Defendants on behalf of the Section 15 Stock Plaintiffs.

416.    As alleged in detail herein, Refco violated Section 12(a)(2) of the Securities Act by soliciting the Section 15 Stock Plaintiffs' purchases of Refco's common stock by means of the IPO Prospectus, which included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. In soliciting these purchases, Refco was motivated by its own financial interests. Refco failed to exercise reasonable care regarding the accuracy and completeness of the IPO Prospectus. The facts misstated and omitted would have been material to a reasonable person. The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Prospectus. But for the fact that Refco has filed for bankruptcy protection, it would be named as defendants on the Section 12(a)(2) claims alleged herein.

417.    The Section 15 Stock Defendants had a duty to disseminate accurate and truthful information with respect to Refco's financial condition and results of operations.

418.    As alleged above, the Section 15 Stock Defendants at all relevant times either (i) participated in the operation and management of the Company, and/or (ii) conducted and participated, directly and indirectly, in the conduct of Refco's business affairs, and/or (iii) exerted controlling influence over the Company through the nature of their relationships with Bennett and others. Because of their positions of control and authority over Refco, the Section 15 Stock Defendants were able to, and did, control the contents of the IPO Prospectus.

419.    Lead Plaintiff RH Capital and the Section 15 Stock Plaintiffs purchased Refco securities issued in, or traceable to, the IPO and were damaged thereby. The IPO was conducted pursuant to the IPO Prospectus.

420.    The Section 15 Stock Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in the IPO Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

421.    The Section 15 Stock Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the IPO Prospectus.

422.    The Section 15 Stock Plaintiffs have sustained damages as a result of the inaccurate statements and omissions in the IPO Prospectus, for which they are entitled to compensation.

423.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years of the IPO.

424.    Pursuant to Section 15 of the Securities Act, the Section 15 Stock Defendants are jointly and severally liable with and to the same extent as Refco, for those entities' violations of Section 12(a)(2) of the Securities Act.

## XI.    DEFENDANTS' FRAUDULENT SCHEME

425.    The allegations that follow describe the acts, practices, and a course of conduct engaged in by various Defendants that operated as a fraud on the investing public. As described in more detail below, Defendants Bennett, Maggio, Trosten, Grant, Mayer Brown, Collins and others devised and participated in a fraudulent scheme consisting of a series of sham related-party "loans" that were timed to occur at the end of Refco's financial periods from 1999 through 2005. This scheme was designed to (and did) enable Refco to temporarily transfer uncollectible

debt off of the Company's books by shifting it between wholly-owned Company subsidiaries, related-party companies owned and controlled by Bennett, and several third party customers of Refco. The goal of this scheme was to disguise hundreds of millions of dollars of uncollectible receivables owed to the Company so that the Company could fraudulently avoid taking hundreds of millions of dollars in write-offs.

426. As these Defendants knew, such large write-offs would have been catastrophic to the Company because, among other things, they would have (a) eliminated the Company's members' equity (and thus eliminated any chance for Refco's insiders to accumulate huge personal fortunes); (b) revealed that the Company's business plan and operations exposed the Company to the very same enormous trading and market risks undertaken by its customers; (c) created a host of regulatory capital problems for the Company; and (d) wiped out the Company's income and profits by revealing that the numbers the Company reported as <u>positive</u> were actually <u>negative</u>.

427. Bennett, Trosten and Grant have been indicted by a Grand Jury for their roles in this fraudulent scheme, and are awaiting trial on numerous criminal charges, including securities fraud and conspiracy to commit securities fraud.

## A. Refco and Its Customers Suffer Hundreds of Millions of Dollars in Trading Losses

428. During the 1970s, Bennett was employed by several international commercial banks and developed significant experience in arranging financing for commodities investors. When Bennett was hired as the Company's CFO in 1983, he put his experience into practice by creating a customer finance unit at Refco. Formed in 1982, the customer finance unit extended loans from the Company to its trading clients. These loans allowed the Company's customers to operate on "margin" and leverage their operating capital into increasingly larger trades in the

commodities, derivatives, and futures markets. These larger trades, in turn, generated larger commissions for the Company and led to dramatic increases in its revenues, income and profits.

429.    The Company soon became dependent upon the increased flow of commissions, revenues and profits that these loans generated. In order to continue increasing its revenues and profits, the Company started extending credit to its customers based on little or no assessment of the customer's credit-worthiness. As reported in <u>Bloomberg Markets</u> in February 2006, a Refco broker stated that "Refco was like a used-car dealer: no money down, no credit, no problem."

430.    While these "no questions asked" loans allowed the Company to increase its commissions, revenues and profits, they also exposed it to the severe trading risks undertaken by its clients – clients who often took huge positions in the volatile financial markets around the globe. Thus, if the Company's clients suffered significant trading losses rendering them unable to repay their loans to the Company, the Company would be forced, according to applicable accounting rules and regulations, to "write off" the amounts of the loans from its books. In short, by extending easily-obtained financing to its customers, the Company had created a business model that depended in large part upon the success its own customers achieved making trades in various financial markets around the world.

431.    The inherent dangers posed by this business model materialized – though were not revealed to the public – in 1997 and 1998 when a number of the Company's most significant customers (and the Company itself) suffered massive trading losses in a number of worldwide market collapses. First, in what became known as the "Asian Financial Crisis," two rounds of currency devaluations in Southeast Asia caused the Company and its customers to suffer severe losses. In July 1997, the Thai baht, Malaysian ringgit, Philippine peso, and Indonesian rupiah suffered sharp declines in value. In late 1997, the Taiwan dollar, South Korean won, Brazilian

real, Singaporean dollar, and Hong Kong dollar suffered similar sharp declines. Several of the Company's customers had made large speculative trading "bets" that these currencies would be supported by their respective governments and kept at a fixed value against the United States dollar. When these gambles failed, the customers lost huge sums of money and were unable to repay hundreds of millions of dollars worth of loans they had received from the Company. For instance, as reported in <u>Bloomberg Markets</u> in February 2006, "a person familiar with an internal review that Refco conducted" in October 2005 noted that Refco was unable to collect more than $300 million in amounts owed from eight customers who suffered severe losses in connection with the Asian Financial Crisis.

432.    Second, in early 1998, international prices for oil, copper, gold and aluminum began to decline. The Russian economy was hit especially hard by these price declines because nearly two-thirds of Russia's hard currency earnings depended on exports of oil and non-ferrous metals. As the Russian economy weakened, its tax revenues declined and the Russian government was forced to increase the interest rates on its domestic bonds in order to attract foreign capital. By July 1998, the interest rates on Russian ruble-backed domestic bonds had increased to a staggering 70% and, notwithstanding the increasing risk that the Russian government would default on its repayment obligations, foreign speculators, including Refco and many of its customers, took large positions in those bonds. In addition, many Refco customers purchased hundreds of millions of dollars in "ruble futures" that were due to mature in the Fall of 1998. To fund these purchases, many of the Company's customers drew down on the credit lines extended to them by the Company itself.

433.    In essence, Refco and its customers were speculating that the Russian government would honor its debt obligations and keep the ruble at a fixed value relative to the U.S. dollar.

This speculation proved ill-founded. On August 17, 1998, the Russian government defaulted on its domestic debt <u>and</u> devalued the ruble. These actions caused huge financial reversals and hundreds of millions of dollars in losses for Refco and many of its customers. Refco itself lost $50 million in a single transaction in 1998 on an investment in Russian bonds.

434.    In addition to the foregoing, BAWAG has publicly disclosed that it experienced approximately $1.2 billion in trading losses in accounts maintained at Refco. According to published reports, and confirmed by Lead Plaintiffs' independent investigation, these losses occurred primarily in the trading accounts of Ross Capital, where Wolfgang Flottl had engaged in high-risk currency speculation which resulted in huge losses when the Japanese yen declined for eight straight weeks in 2000. Upon information and belief, a material percentage of the capital employed by Flottl in this speculation was provided by BAWAG and further extended on margin loans by Refco, thus creating both a significant loss for BAWAG and a significant bad debt owed to Refco.

435.    In the wake of these financial reversals, many of Refco's customers were unwilling or unable to repay the huge "margin" loans that had been extended to them by Refco—often with little or no investigation into the customer's creditworthiness. Coupled with the huge trading losses that Refco had suffered in its own proprietary trading accounts, the uncollectible margin loans created a dire financial crisis for Refco. The Company now had hundreds of millions of dollars in unrecoverable debt and losses that would need to be "written off." However, revealing these losses and properly accounting for them as write-offs would have threatened the Company's very survival.

**B.    Bennett Becomes CEO and, With the Aid of Collins, Mayer Brown and Maggio, Transfers Uncollectible Receivables Off Refco's Books**

436.    In September 1998, on the heels of the two world-wide financial catastrophes

described above, Bennett was promoted from CFO to the Chairman and CEO of the Company.

As a former CFO with over seventeen years of experience at the Company and over twenty-eight

years of experience in the fields of commodity and commercial lending, Bennett knew that

revealing the uncollectible loans and the huge trading losses would be catastrophic to the

Company he now led. Indeed, as Bennett knew, if these loans and trading losses were revealed

and properly accounted for, the resulting write-offs would threaten the Company's very survival.

437.    The "life threatening" nature of the financial problems facing Refco at this time is

discussed in a lawsuit filed on August 5, 2004 in the Northern District of Illinois by Thomas H.

Dittmer, a former CEO of Refco, against Edwin L. Cox, Jr., a commodities trader with extensive

dealings with Refco, captioned <u>Thomas H. Dittmer v. Edwin L. Cox, Jr.</u>, No. 5185 (N.D. Ill.). In

that lawsuit, Dittmer alleges that "Cox undertook to evaluate Refco's financial status in

connection with accounts at Refco co-owned by Cox and Dittmer." According to that complaint:

> Prior to August 1999, Cox advised Dittmer that Dittmer's <u>continued
> ownership of equity interests in Refco would cause Dittmer to suffer
> significant financial loss and that it would be in Dittmer's best interest to
> sell his interests in Refco as quickly as possible.</u>

(Emphasis added.) In a facsimile attached to Dittmer's Complaint and dated August 4, 2004,

Cox wrote to Dittmer and stated:

> I am shocked that at this point in time you suddenly take the position that I
> have no claim involving Refco. You have an awfully short memory! I
> took risk, put in capital, endured a lot of grief, spent the time, hired the
> people, negotiated resolutions to your CFTC problems, and generally
> attempted to protect you from liabilities, <u>which we both know were life
> threatening.</u>

(Emphasis added.)

438.    Not only was the situation dire for Refco, but as Collins and Mayer Brown knew,

the collapse of Refco—Collins' crown jewel client—would have drastically reduced the annual

"billings" that Collins generated at Mayer Brown, and would have had negatively impacted

Collins' personal compensation.

439.    Beginning no later than 1997, Bennett, Collins and Mayer Brown, among others, embarked on a scheme to conceal the losses the Company had suffered and the uncollectible receivables owed to it by its customers. Rather than write off these losses, they simply transferred the uncollectible receivables owed to the Company onto the books of RGHI, which Bennett owned and controlled. These uncollectible receivables were then recorded on the Company's books as a receivable owed to it by RGHI, instead of as uncollectible receivables owed by the Company's customers.

440.    For example, as discussed above and in the Examiner's Report, Victor Niederhoffer was one of the Refco customers that sustained significant trading losses in the Asian Financial Crisis and was unwilling or unable to repay the margin loans extended to him by Refco. In October 1997, Collins, Mayer Brown and Bennett negotiated and documented a "settlement" with Niederhoffer whereby Niederhoffer would liquidate his accounts at Refco and turn over the proceeds to the Company. In return, Refco committed in writing—in documents prepared by Collins and Mayer Brown—to release Niederhoffer from liability for the much larger, uncollectible amounts owed by Niederhoffer to Refco (approximately $71 million). In order to conceal the Niederhoffer losses and remove them from Refco's books, Collins, Mayer Brown and Bennett then caused Refco to assign to RGHI the "receivable" representing Niederhoffer's uncollectible debt (which Collins and Mayer Brown knew that Refco had agreed not to pursue). In exchange for receiving this worthless receivable, RGHI agreed—in documents drafted by Mayer Brown—to pay Refco the amount of the uncollectible debt. Through these machinations, the scheme designed and implemented by Collins, Mayer Brown and Bennett fraudulently transferred Niederhoffer's uncollectible debt off of Refco's books and converted it

into a receivable owed from RGHI to Refco.

441.    As Collins and Mayer Brown knew, Refco's transfer of the Niederhoffer receivable to RGHI was a sham transaction that lacked any legitimate business purpose. As an initial matter, the Niederhoffer debt was unenforceable pursuant to written documents Collins himself prepared. There was no legitimate reason for RGHI to agree to pay $71 million to Refco in return for the "right" to collect an unenforceable debt of the same amount. To the contrary, the transaction reeked of fraud and there is only one rational inference as to why the transfer was made: to remove the problematic debt from Refco's books and replace it with one that appeared collectible.

442.    Because Collins and Mayer Brown represented both Refco *and* RGHI in these transactions, and because Bennett was a principal of both entities, they knew that RGHI was a non-operating company without significant cash flow and that it was unable to pay the receivable it owed to Refco. Likewise, Bennett knew – and Mayer Brown and Collins either knew or recklessly disregarded – that Refco could (and did) use RGHI as an off-balance sheet entity to hide uncollectible debts. Nonetheless, Collins and Mayer Brown participated in the transaction, collected their legal fees, and for years concealed the transaction and the uncollectibility of the receivable from public view in their drafting and review of Refco's public disclosures.

443.    Collins and Mayer Brown remained involved with the Niederhoffer debts after the initial arrangements were made to fraudulently transfer them off of Refco's books. According to the Examiner's Report, and based on the Examiner's review of Mayer Brown's time records, in connection with dealing with various investigations initiated by commodities regulators regarding the Niederhoffer debts, Collins (a) reviewed Refco's financial statements and (b) revised footnotes to financial statements that were being delivered to regulators.

444.     Collins and Mayer Brown also were involved in certain tax issues relating to the

losses, which were being handled by Ernst & Young LLP ("E&Y").  Under the tax laws, if the

receivable representing the Niederhoffer losses became worthless after it was "sold" to RGHI, it

would have to be reflected as a loss on Refco's books.  To avoid recognizing the loss, Refco

repeatedly represented to E&Y that the receivable for the Niederhoffer losses was not worthless.

A handwritten document prepared by E&Y and dated November 20, 1997—only a few weeks

after Collins had finished the documentation used to remove the Niederhoffer loan from Refco's

book—states that an E&Y employee had discussed the Niederhoffer debts with another E&Y

employee and questioned:

> Whether we could be viewed as somehow being an accessory to
> some type of fraud.  [E&Y employee] felt that as long as we never
> give them any accounting advice and our tax returns are prepared
> correctly we should not have a concern.

(Emphasis added.)  This note, prepared by E&Y employees far less familiar with Refco than

Collins, demonstrates that a sophisticated professional possessing the level of familiarity with

Refco that Collins did, must have known that the treatment of the Niederhoffer losses was

garden-variety fraud.

445.     Collins and Mayer Brown continued to be involved in issues relating to the

Niederhoffer losses into 1999.  For instance, an internal E&Y Memorandum dated February 9,

1999 states:

> I communicated to [Refco executive] Steve Rossi today that we did
> not agree with the representations in the loan, pledge, and purchase
> agreements which stated that there were no undisclosed liabilities
> on the audited RGL [Refco Group] financial statements and that all
> tax returns and withholding taxes had been filed/paid.  I also told
> him that if asked by Mayer Brown or BAWAG we would need to
> express our views . . . On February 10th [sic] Jim Barry of Mayer
> Brown asked if I was okay with Section 2.16 of the agreement
> regarding Taxes . . . I told Jim that we were not making any
> representations regarding that Section . . . I also told him that there

may very well be material tax issues and that he should discuss these with the client and with Joe Collins who is already aware of some of them.

(Emphasis added.)  According to the Examiner's Report, in March 1999, Collins billed extensive time on the Niederhoffer matter discussing issues such as "bad debt analysis" and conversations with "SR" [Rossi] regarding background arguments for bad debt treatment.

446.    During this same time frame, E&Y sent several memoranda to Refco that explained the treatment of the RGHI receivable, including one dated March 8, 1999 that stated "[Refco] will not write this receivable off on its separate audited income statement on the theory that this receivable will be satisfied by… [RGHI] at some point, perhaps upon a sale of the business." The Examiner concluded that "[b]ecause Mayer Brown and E&Y were working in tandem on these issues, it could be inferred that Mayer Brown was aware of the matters contained in the memoranda E&Y sent to Refco."

447.    Documents in Collins' handwriting demonstrate that by no later than October 1999, Collins and Mayer Brown had knowledge of more than one receivable owed by RGHI to Refco. An October 15, 1999 letter from Bennett to Collins, attaching Refco's unaudited balance sheet as of May 31, 1999 and its consolidated and audited financial statements for the fiscal year ended February 28, 1999, and sent to Collins at his New York office, states that RGHI's "capital (i.e., net worth) is represented by the value of its investment in [Refco]." This statement is bracketed, and in handwriting that the Examiner determined was consistent with Collins', the statement *"Minus Loans to RGH[I]"* is written. These handwritten notes demonstrate that Collins knew that RGHI owed money to Refco, and Collins' use of the plural "loans" demonstrates that he was aware of more than just the Niederhoffer bad debts that he helped transfer to RGHI.

448.    By June 2002, Mayer Brown was aware that the RGHI receivable totaled at least

170

$350 million. In a memorandum to files dated February 11, 2002, a Mayer Brown attorney

discussed a possible sale of a portion of RGHI to a third-party, and noted that the sale price

would be approximately $700 million with "$350,000,000 to be paid by the assumption of

liabilities of [RGHI]." Moreover, a purchase agreement drafted by Mayer Brown and dated June

11, 2002, states:

> The Company agrees that $350 million of the Purchase Price for
> the Participation Right shall be used or caused to be used for the
> retirement of inter-company debt of [RGHI].

(Double Underline in Original.) According to the Examiner's Report, Mayer Brown time

records reflect that on June 11, 2002, Collins spoke with Bennett regarding, among other things,

revisions to documents and a price adjustment and revised the purchase agreement in respect of

credits to the purchase price.

449.    Upon information and belief, Defendant Maggio was also directly involved with

developing and implementing this scheme to transfer the customer receivables to RGHI.

### C. Refco Conceals the Uncollectible Receivable Through a Series of Fraudulent "Round Trip" Loan Transactions

450.    Defendants Bennett and Maggio and others knew that, under applicable

accounting rules and regulations, the existence of a multi-hundred million dollar receivable owed

to the Company by a related-party entity such as RGHI would have to be disclosed as a "related

party transaction." This disclosure, in turn, would attract the attention of, among others,

investors and regulators, who view related-party transactions with suspicion because they are

often used to carry out financial statement manipulations. These Defendants knew that such a

huge related-party receivable could be recognized for what it was: uncollectible debt that had to

be written off, and compelling evidence that the Company's business model was much less

robust than previously perceived.

451.    In order to avoid this result, Bennett and Maggio—again with help from their "go to guy" Collins and Mayer Brown—devised a remarkably simple scheme that should have been obvious to all of the other Defendants (all of whom had unfettered access to the Company's books and records at and before the time of their securities law violations). As described below, pursuant to documents negotiated and drafted by Mayer Brown, Refco engaged in a series of "loan" transactions at the end of each fiscal year from 2000 through 2005, and several fiscal quarters as well, to temporarily pay down the receivable owed to Refco from RGHI and replace it on the Company's books with receivables purportedly owed by BAWAG or third-party customers. More specifically, a few days before Refco closed its books for each financial period, it "loaned" hundreds of millions of dollars from its subsidiary Refco Capital to BAWAG and/or third parties which simultaneously "loaned" the same amount to RGHI (though in point of fact, as discussed below, no money actually changed hands in these "loans"). Refco itself served as the guarantor of the loans between the third parties and RGHI. RGHI then used the proceeds from the "loans" to temporarily pay off the uncollectible receivables it owed to Refco. Then, just days after the financial period ended and Refco closed its books, these transactions were reversed, the "loans" were repaid, the third parties were paid a fee for their participation in the risk-free "loans," and the uncollectible receivables from RGHI were returned to Refco's books.

452.    The scheme involved the repeated manipulation of huge sums of money, and occurred with clockwork-like regularity straddling the end of each of Refco's financial reporting periods. Each of these sham transactions followed a similar format, and each was designed so that the Company could fraudulently avoid taking hundreds of millions of dollars of write-offs for receivables that could not be collected. Mayer Brown was directly involved in no less than seventeen of these sham transactions between 2000 and 2005, sixteen of which were timed to

172

occur within a few days bracketing the ends of Refco's financial periods. Mayer Brown's involvement included negotiating the terms of the loans, drafting and revising the documents relating to the loans, transmitting the documents to the participants, and retaining custody of and distributing the executed copies of the documents. In at least one instance, Mayer Brown even represented the counterparty to the loans, in addition to representing Refco and RGHI.

453.    The counterparties to Refco's round-trip loan transactions included Customer X, BAWAG, CIM Ventures, EMF, Delta Flyer, Beckenham, and CS Land. The transactions with each of these parties are described in detail below.

### 1.    The Fraudulent Transactions With Customer X

454.    Lead Plaintiffs have obtained and reviewed numerous loan agreements, guarantees, correspondence and other documents relating to the transactions described herein. Lead Plaintiffs have also interviewed representatives of Customer X, which was involved in at least ten of these transactions with Refco between February 2002 and August 2005. These representatives include the founder and principal of Customer X (referred to herein as "Principal A"). Principal A has direct knowledge of the origin and structure of approximately ten transactions that took place between Refco and Customer X between February 2002 and August 2005.

455.    Principal A has informed Lead Counsel that, beginning in or about 1999, Customer X used Refco as its prime broker, and conducted hundreds of millions of dollars of business with the Company in that capacity.

456.    According to Principal A, in or about early February 2002, he received a telephone call from Peter McCarthy ("McCarthy"), an executive officer of Refco and Customer X's primary contact at the Company. McCarthy asked Principal A whether Customer X would be interested in participating in a "trade." McCarthy stated that a group of other people were

already involved with these trades, and Refco wanted to get Customer X involved as well. As for the details of the "trade," McCarthy told Principal A to "talk to Sandy Maggio."

457.    Shortly thereafter, Principal A spoke with Defendant Maggio, who explained some, but not all, of the details of the proposed transaction. Maggio stated that the transaction involved a loan from Refco Capital to Customer X and a simultaneous loan from Customer X to RGHI, which would then be reversed several days later. For its participation in this transaction, Maggio explained, Customer X would be entitled to a "spread" – the difference between the interest rate that would be paid by Customer X to Refco Capital, and the slightly higher rate that would be paid by RGHI to Customer X. Maggio told Principal A to speak with Refco's attorneys at Mayer Brown for additional information on the structure and terms of the loan.

458.    Maggio put Principal A in touch with Koury, a senior associate who worked in Mayer Brown's "Derivatives Practice Group" under the supervision of Collins. Koury explained in detail the structure of the transactions suggested by Maggio, and provided Principal A a set of transaction documents, including loan agreements and promissory notes. Principal A has told Lead Counsel that he was intent on obtaining some guarantees for Customer X's participation in the transaction, particularly given that Customer X would make a relatively small profit in a transaction in which it would have several hundred million dollars at risk. Among the documents Mayer Brown drafted and provided to Principal A on or about February 25, 2002 was a side letter from Refco Group, whereby it "unconditionally and absolutely guarantee[d]" to Customer X "the prompt and complete payment and performance when due, whether by acceleration or otherwise, of all obligations and liabilities" of RGHI pursuant to the loan agreement and related note. The guarantee was signed by Defendant Bennett, as President and CEO of Refco Group.

459.    As described below, between February 2002 and August 2005, Customer X participated in ten separate transactions among itself, Refco, Refco Capital and RGHI. Mayer Brown drafted all of the documentation for these transactions, and indeed most of the documents bear a "footer" identifying the documents as being prepared by Mayer Brown.

### i.  The February 2002 Transaction

460.    The first set of round-trip "loan" transactions involving Customer X occurred shortly before the close of the Company's fiscal year 2002. These transactions are memorialized in documents prepared by Mayer Brown and enclosed with a February 26, 2002 cover memorandum (the "February 26, 2002 Memorandum") from Mayer Brown to Principal A. The deal documents pertain to four components of an integrated transaction.

461.    *First*, on or about February 25, 2002, Refco Capital loaned Customer X the sum of $325,000,000. The loan was to be repaid within two weeks, that is, by March 4, 2002. This loan is reflected in a "Loan Agreement" and "Note," each dated February 25, 2002, between Refco Capital and Customer X (here, and for each succeeding transaction, the "Refco Capital/Customer X Loan Agreement"). The agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 1.8375%, calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." David Weaver, the Chief Administrative Officer at Refco Capital, signed the Refco Capital/Customer X Loan Agreement.

462.    Principal A has told Lead Counsel that neither Refco nor Mayer Brown ever informed him that RGHI was not a Refco corporate entity but, rather, a separate holding company 100% owned by Defendants Bennett and Grant with no corporate relationship with Refco. To the contrary, the Refco Capital/Customer X Loan Agreement drafted by Mayer Brown (and the papers for each succeeding set of loans), specifically defined the term "Refco

Parties" to include RGHI, even though Mayer Brown frequently provided substantial legal services to Bennett and RGHI and knew it was not a Refco entity.

463.    The purpose and function of this loan to Customer X was plain from the face of the loan document. The Refco Capital/Customer X Loan Agreement (and each of the succeeding Refco Capital/Customer X Loan Agreements) contained an affirmative "use of proceeds" covenant that obligated Customer X to "[u]se the Loan proceeds only for funding a corresponding loan to [RGHI]."

464.    *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement they signed a loan agreement between Customer X and RGHI (here, and for each succeeding transaction, the "Customer X/RGHI Loan Agreement"), for the same principal amount of $325,000,000. As with the Refco Capital/Customer X loan, the repayment date was set as March 4, 2002.

465.    The Customer X/RGHI Loan Agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 2.8375% calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Thus, the interest rate on this loan was 100 basis points higher than the interest rate on the loan from Refco Capital to Customer X.

466.    The Customer X/RGHI Loan Agreement also defined RGHI as one of the "Refco Parties." Further, and consistent with what Principal A told Lead Counsel regarding his understanding that RGHI was, in fact, a Refco affiliate, the agreement provided that legal notices to RGHI were to be sent to Refco Capital (care of Refco Capital's then-Chief Administrative Officer). Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

467.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group

pursuant to a guaranty dated February 25, 2002, and signed by Bennett. The guaranty assured Customer X that Refco would make it whole if RGHI defaulted on the $325,000,000 loan.

468.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

469.    The $325,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company, and the loans were unwound on or about March 4, 2002, such that the $325,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company. Among other evidence, Lead Counsel has reviewed an internal Refco document confirming that the Company credited $325,000,000 to the account of Customer X on February 25, 2002.

470.    According to Principal A, Customer X never physically received the principal proceeds of this loan (or any of the loans described below). To the contrary, the funds never left Refco. Rather, on the date the loan agreements were signed, Refco Capital caused the funds to be transferred into an account maintained in Customer X's name at Refco, and then the funds were immediately transferred from that account to RGHI. When the repayment date on this loan (and those that followed) arrived, this pattern was reversed so that the funds were transferred from RGHI back into Customer X's account, and then immediately transferred from that account back to Refco Capital. As confirmed by Principal A, Customer X received its fee – the 100 basis point "spread" on the first loan and, as described below, 75 basis points in connection with the later loans – separately. Notably, in each instance, those payments of net interest to Customer X were made by *Refco Capital*, not RGHI.

## ii.  The February 2003 Transaction

471.    This series of transactions was repeated at the close of the Company's fiscal year ended February 28, 2003, pursuant to documents prepared by Mayer Brown.

472.    *First*, on or about February 21, 2003, Refco Capital loaned Customer X the sum of $500,000,000. The loan was to be repaid within two weeks, that is, by March 4, 2003. This loan is reflected in a "Loan Agreement" and "Note," each dated February 21, 2003, between Refco Capital and Customer X. The Refco Capital/Customer X Loan Agreement provides that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 1.31%, calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Notices to Refco Capital under the Refco Capital/Customer X Loan Agreement were to be addressed to Defendant Maggio, who signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

473.    *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement, they signed a loan agreement between Customer X and RGHI, for the same principal amount of $500,000,000. The repayment date on this loan was also March 4, 2003. The Customer X/RGHI Loan Agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 2.06% calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Thus, the interest rate on this loan was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement provided that legal notice to RGHI be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

474.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated February 21, 2003, and signed by Bennett.

475.    The $500,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about March 4, 2003, such that the $500,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### iii. The February 2004 Transaction

476.    This series of transactions was repeated at the close of the Company's fiscal year ended February 29, 2004, pursuant to documents prepared by Mayer Brown.

477.    *First*, on or about February 20, 2004, Refco Capital loaned Customer X the sum of $720,000,000. The loan was to be repaid within two weeks, that is, by March 4, 2004. This loan is reflected in a "Loan Agreement" and "Note," each dated February 20, 2004, between Refco Capital and Customer X. The Refco Capital/Customer X Loan Agreement provides for interest of 1.06% per annum for the days the loan was outstanding. Notices to Refco Capital under the Refco Capital/Customer X Loan Agreement were to be addressed to Defendant Maggio, who signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

478.    *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement they signed a loan agreement between Customer X and RGHI, for the same principal amount of $720,000,000. The repayment date on this loan was also March 4, 2004. The Customer X/RGHI Loan Agreement provided for interest at an annual rate of 1.81%, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement provided that legal notice to RGHI be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

479.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated February 20, 2004, also signed by Defendant Bennett.

480.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

481.    The $720,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about March 4, 2004, such that the $720,000,000 once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### iv. The May 2004 Transaction

482.    This series of transactions was repeated at the close of the Company's fiscal quarter ended May 31, 2004, pursuant to documents prepared by Koury of Mayer Brown. Upon information and belief, this was done with intent by Defendants Bennett, Maggio and others to generate false financial statements for use in connection with the Bond registration process.

483.    *First*, on or about May 27, 2004, Refco Capital loaned Customer X the sum of $700,000,000. The loan was to be repaid within two weeks, that is, by June 7, 2004. The Refco Capital/Customer X Loan Agreement contained substantially similar provisions, including the "use of proceeds" covenant obligating Customer X to loan the $700,000,000 to RGHI, the interest rate spread, the definition of "Refco Parties," and notice provisions as contained in the Refco Capital/Customer X Loan Agreements described above.

484.    *Second*, as in the prior transactions, the parties signed a Customer X/RGHI Loan Agreement, also dated May 27, 2004, whereby Customer X loaned RGHI the same principal amount of $700,000,000, with the same repayment date of June 7, 2004. The interest rate for this loan was 1.81% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement provided that

legal notice to RGHI be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

485.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated May 27, 2004, and signed by Bennett.

486.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

487.    The $700,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about June 7, 2004, such that the $700,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### v.  The August 2004 Transaction

488.    This series of transactions was repeated at the close of the Company's fiscal quarter ended August 31, 2004, pursuant to documents prepared by Mayer Brown. Upon information and belief, this was done by Defendants Bennett and Maggio and others with intent to generate false financial statements for use in connection with the Bond registration process.

489.    *First*, on or about August 25, 2004, Refco Capital loaned Customer X the sum of $485,000,000. The loan was to be repaid within two weeks, that is, by September 7, 2004. The Refco Capital/Customer X Loan Agreement for this transaction has a typewritten amount of $475,000,000, but that amount was crossed out and replaced in handwriting with the amount of $485,000,000, and initialed by Principal A. The Refco Capital/Customer X Loan Agreement provided for interest of 1.50% per annum, and contained the same "use of proceeds" covenant, definition of "Refco Parties" and notice provision as the Refco Capital/Customer X Loan

Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan
Agreement on behalf of Refco Capital.

490.     *Second*, as in the prior transactions, the parties signed a Customer X/RGHI Loan
Agreement, also dated August 25, 2004, whereby Customer X loaned RGHI the same principal
amount of $485,000,000, with the same repayment date of September 7, 2004. The interest rate
for this loan was 2.25% per annum, which was 75 basis points higher than the interest rate on the
loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement contained the
same definition of "Refco Parties" and notice provisions as the Customer X/RGHI Loan
Agreements described above. Defendant Bennett signed the Customer X/RGHI Loan Agreement
on behalf of RGHI.

491.     The Customer X/RGHI Loan Agreement and accompanying note have a
typewritten date of August 26, 2004, but that date was crossed out and replaced in handwriting
with the date of August 25, 2004. As with the Refco Capital/Customer X Loan Agreement, the
Customer X/RGHI Loan Agreement has a typewritten amount of $475,000,000, but that amount
was crossed out and replaced in handwriting with the amount of $485,000,000. These changes
were initialed both by Principal A and Defendant Bennett, as were a number of other handwritten
changes to the document.

492.     *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group
pursuant to a guarantee dated August 25, 2004, and signed by Bennett. This guaranty has a
typewritten date of August 26, 2004, which was crossed out and replaced with August 25, 2004.
This change was initialed by both Principal A and Bennett.

493.     The $485,000,000 in proceeds that originated with Refco Capital was used to pay
down at least a portion of the receivable owed from RGHI to the Company. The loans were

unwound on or about September 7, 2004, such that the $485,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### vi. The November 2004 Transaction

494.    This series of transactions was repeated at the close of the Company's fiscal quarter ended November 30, 2004, pursuant to documents prepared by Mayer Brown. Upon information and belief, this was done with intent to generate false financial statements for use in connection with the Bond registration process.

495.    *First*, on or about November 26, 2004, Refco Capital loaned Customer X the sum of $545,000,000. The loan was to be repaid within two weeks, that is, by December 3, 2004. The Refco Capital/Customer X Loan Agreement for this transaction provides for interest of 2.00% per annum and contained the same notice provision as contained in the Refco Capital/Customer X Loan Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

496.    *Second*, also on November 26, 2004, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $545,000,000. The repayment date on this loan was also December 3, 2004. The interest rate for this loan was to be 2.75% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement contained the same notice provisions as the Customer X/RGHI Loan Agreements described above. Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

497.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated November 26, 2004, and signed by Bennett.

498.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement

or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

499. The $545,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about December 3, 2004, such that the $545,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### vii. The December 2004 Transaction

500. This series of transactions was repeated in December 2004, pursuant to documents prepared by Mayer Brown.

501. *First*, on or about December 30, 2004, Refco Capital loaned Customer X the sum of $550,000,000. The loan was to be repaid within one week, that is, by January 4, 2005. The Refco Capital/Customer X Loan Agreement for this transaction provided for interest of 2.25% per annum, and contained the same notice provisions as the Refco Capital/Customer X Loan Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

502. *Second*, also on December 30, 2004, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $550,000,000. The repayment date on this loan was also January 4, 2005. The interest rate for this loan was to be 3.00% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement was signed by Bennett on behalf of RGHI.

503. *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated December 30, 2004, and signed by Bennett.

504. *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement

or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

505. The $550,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about January 4, 2004 such that the $550,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### viii.  The February 2005 Transaction

506. This series of transactions was repeated at the close of the Company's fiscal year 2005, pursuant to documents prepared by Mayer Brown.

507. *First*, on or about February 23, 2005, Refco Capital loaned Customer X the sum of $345,000,000. The loan was to be repaid within two weeks, that is, by March 8, 2005. This loan is reflected in a "Loan Agreement," "Note," and "First Amendment to Loan Agreement," each dated February 23, 2005, between Refco Capital and Customer X. The Refco Capital/Customer X Loan Agreement provided for an interest rate of 2.50% per annum. The original Refco Capital/Customer X Loan Agreement stated that the amount of the loan was $335,000,000, but pursuant to the First Amendment To Loan Agreement, the amount was increased to $345,000,000. The Refco Capital/Customer X Loan Agreement contained the same "use of proceeds" covenant, definition of "Refco Parties" and notice provisions as the Refco Capital/Customer X Loan Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement and First Amendment To Loan Agreement on behalf of Refco Capital.

508. *Second*, also on February 23, 2005, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $345,000,000. The repayment date on this loan was also March 8, 2005. The Customer X/RGHI Loan Agreement provided for interest at a rate of

3.25% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The original Customer X/RGHI Loan Agreement stated that the amount of the loan was $335,000,000, but, as with the Refco Capital/Customer X loan documents, the amount was increased to $345,000,000. The Customer X/RGHI Loan Agreement contained the same definition of "Refco Parties" and notice provisions as the Customer X/RGHI Loan Agreements described above. Defendant Bennett signed the Customer X/RGHI Loan Agreement and First Amendment To Loan Agreement on behalf of RGHI.

509.    *Third*, the loan from Customer X to RGHI was guaranteed by Refco Group pursuant to a guaranty dated February 23, 2005, and signed by Bennett.

510.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

511.    The $345,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about March 8, 2005, such that the $345,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### ix. The May 2005 Transaction

512.    This series of transactions was repeated at the close of Refco's fiscal quarter ending May 31, 2005, pursuant to documents prepared by Mayer Brown. Upon information and belief, this was done with intent to generate false financial statements for use in connection with the upcoming IPO. According to testimony and/or documents apparently presented to the grand jury and as confirmed to Lead Counsel in substance by Principal A:

(a)    On or about May 25, 2005, Defendant Bennett caused the Company,

through Refco Capital, to loan Customer X approximately $450 million. The loan was to be repaid within two weeks, that is, by June 6, 2005.

      (b)     On the same day that the parties signed the Loan Agreement between Refco Capital and Customer X, they signed a loan agreement between Customer X and RGHI, for the same principal amount of $450 million. The repayment date on this loan was also June 6, 2005.

      (c)     The loan from Customer X to RGHI was signed by Bennett on behalf of RGHI. The interest rate on the loan was 75 basis points higher than the interest rate on the loan from the Company to Customer X.

      (d)     The loan between Customer X and RGHI was guaranteed by the Company pursuant to a guaranty signed by Bennett.

      (e)     The loans were unwound on or about June 6, 2005.

513.    According to testimony and/or documents apparently presented to the grand jury that returned the indictment against Bennett, the $450,000,000 loan that originated with Refco Capital was used to pay down the receivable owed from RGHI to the Company. After it was unwound, the $450,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### x. The August 2005 Transaction

514.    This series of transactions was repeated at the close of Refco's quarter ending August 31, 2005, the first quarter close after the Company completed the IPO. All of the documentation for the transactions was prepared by Mayer Brown.

515.    *First*, on or about August 26, 2005, Refco Capital loaned Customer X the sum of $420,000,000. The loan was to be repaid within two weeks, that is, by September 6, 2005. The Refco Capital/Customer X Loan Agreement for this transaction provided for an interest rate of

3.50% per annum and contained the same "use of proceeds" covenant, definition of "Refco Parties," and notice provisions as the Refco Capital/Customer X Loan Agreements described above. Defendant Maggio signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Capital.

516.    *Second*, also on August 26, 2005, the parties signed a Customer X/RGHI Loan Agreement for the same principal amount of $420,000,000. The repayment date on this loan was also September 6, 2005. The interest rate for this loan was to be 4.25% per annum, which was 75 basis points higher than the interest rate on the loan from Refco Capital to Customer X. The Customer X/RGHI Loan Agreement contained the same notice provisions as the Customer X/RGHI Loan Agreements described above. Defendant Bennett signed the Customer X/RGHI Loan Agreement on behalf of RGHI.

517.    *Third*, the loan between Customer X and RGHI was guaranteed by Refco Group pursuant to a guaranty dated August 26, 2005, and signed by Bennett.

518.    *Fourth*, Refco Group agreed to indemnify Customer X for loss or liability resulting from third party claims arising out of the Refco Capital/Customer X Loan Agreement or the Customer X/RGHI Loan Agreement. Bennett signed the indemnity letter on behalf of Refco Group.

519.    The $420,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from RGHI to the Company. The loans were unwound on or about September 6, 2005, such that the $420,000,000 debt once again appeared on the Company's books as a receivable owed by RGHI to the Company.

### 2.    The Fraudulent Transactions With BAWAG

520.    BAWAG was directly involved in at least six sham "loan" transactions with Refco and RGHI, which occurred at the end of each of Refco's fiscal years from February 2000

through February 2005.

521.    These fraudulent transactions consisted of four components. First, Refco Capital would transfer hundreds of millions of dollars to BAWAG, which BAWAG then immediately "loaned" (apparently without any of the formal loan documentation utilized in the Customer X transactions) to RGHI. Second, BAWAG would extend an additional smaller "loan" – between $40 million and $90 million (again, apparently without any formal documentation) – directly to RGHI at a nominal interest rate. Third, RGHI would use these funds to temporarily pay down a portion of the outstanding receivable it owed to the Company. Finally, after Refco closed its books for the relevant fiscal year, the "loans" would be unwound, with the funds from the first component of the "loan" being returned through BAWAG from RGHI to Refco Capital, and the funds from the second component of the "loan" being repaid to BAWAG, along with a nominal interest rate.

522.    As described below, these multi-hundred million dollar "loans" were total shams designed for the purpose of concealing RGHI's mammoth obligations to the Company. For instance, the transactions were not memorialized with formal loan agreements or promissory notes, but instead were documented on an informal "wink and nod" basis through various e-mails, letters and, on information and belief, telephone calls between executives at BAWAG and Defendants Bennett, Maggio, Trosten and others at Refco. Further, as described below, the majority of these so-called "loans" simply involved shuttling money, through BAWAG, from Refco Capital to RGHI, and therefore were extended on a net interest free basis.

### i.    The February 2000 Transaction

523.    Shortly before the close of the Company's fiscal year 2000, Defendants Bennett, BAWAG, RGHI and others participated in a series of transactions designed to remove at least part of the RGHI receivable from the Company's books and temporarily convert a substantial

part of it into a receivable from BAWAG.

524.    The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 24, 2000, Refco Capital transferred approximately $225 million to BAWAG. On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $225 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions filed in Refco's bankruptcy proceedings. RGHI used the $300 million in proceeds to temporarily reduce a portion of the outstanding receivable it owed to the Company.

525.    On information and belief, Bennett, RGHI, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 2, 2000. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year ending February 28, 2000, where they served to conceal part of RGHI's obligations to Refco.

526.    In addition, the parties agreed that the $225 million transfer from Refco Capital to BAWAG and the subsequent $225 million transfer from BAWAG to RGHI would bear the exact same interest rate, such that <u>BAWAG would not earn any net interest on its $225 million "loan" to RGHI.</u> On information and belief, the parties agreed that the second component of the transaction, the $75 million "loan," would bear a nominal interest rate.

527.    The "unwinding" of these transactions is reflected in a RGHI "Monthly Account Statement" that shows (1) a wire transfer from RGHI to "1ST UNION INTL BK/BAWAG," dated March 2, 2000, in the amount of $75 million, and (2) a wire transfer described as "WT TO RE-ALLOCATE FUNDS," also dated March 2, 2000, in the amount of $225 million. The Monthly Account statement also reflects the interest payment to BAWAG on the $75 million

dollar portion of the transaction. Specifically, the Monthly Account statement shows a $93,333.73 million payment on March 8, 2000, which is described as "WT TO 1ST UNION/BAWAG INT. ON 75MM."

### ii.    The February 2001 Transaction

528.    This series of sham transactions was repeated at the close of the Company's fiscal year 2001. Again, the Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 26, 2001, Refco Capital transferred approximately $225 million to BAWAG. On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $225 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions filed in Refco's bankruptcy proceedings. RGHI used the $300 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

529.    On information and belief, Bennett, RGHI, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 5, 2001. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2001, where they served to conceal part of RGHI's obligations to Refco.

530.    In addition, the parties agreed that the $225 million transfer from Refco Capital to BAWAG and the subsequent $225 million transfer from BAWAG to RGHI would bear the exact same interest rate, such that BAWAG would not earn any net interest on its $225 million "loan" to RGHI. On information and belief, the parties agreed that the second component of the transaction, the $75 million "loan," would bear a nominal interest rate.

531.    The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger Report" that shows (1) a wire transfer from RGHI to "1ST UNION INTL BK/BAWAG," dated

191

March 5, 2001 in the amount of $75 million, and (2) a $225 million wire transfer described as "XFER FOR CREDIT RGF," also dated March 5, 2001.

### iii.     The February 2002 Transaction

532.     This series of sham transactions was repeated at the close of the Company's fiscal year 2002. The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 25, 2002, Refco Capital transferred approximately $210 million to BAWAG. On the same day, BAWAG made a single transfer to RGHI in the total amount of $300 million, consisting of the $210 million "loan" received from RGHI and an additional $90 million "loan" from BAWAG to RGHI. These transfers are reflected in, among other things, e-mails filed in the Refco bankruptcy proceedings. For instance, at 11:04 a.m. on February 21, 2002, Defendant Maggio sent an e-mail to Thomas Hackl, who was then a Managing Director and head of Treasury at BAWAG (and who joined Refco three months later), stating:

> Good Morning Thomas:
>
> This e-mail is to confirm the wire instruction for the following:
>
> 1.     BAWAG will wire 300 million (USD) for value 2/25/02:
>
> * * *
>
> 2.     REFCO will wire 210 million (USD) for value 2/25/02:
>
> * * *
>
> If you have any questions, please contact me at (212) 693-7077.
>
> Regards,
>
> Sandy

533.     RGHI used the $300 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

534. Bennett, Maggio, RGHI, BAWAG and others agreed that these transfers would be unwound approximately seven days later, on March 4, 2002. At 12:23 p.m. on March 1, 2002, Defendant Maggio sent an e-mail to executives at BAWAG, stating:

> Good Morning:
>
> This e-mail is to confirm the following wire instruction
>
> 1.    BAWAG will wire to Refco USD 210,075.133,33 value 04.03.2002
>
>                 * * *
>
> 2.    REFCO will wire to BAWAG USD 210,075.133,33 value 04.03.2002
>
>                 * * *
>
> 3.    REFCO will wire to BAWAG USD 90,040.950, value 04.03.2002
>
>                 * * *
>
> If you have any questions, please contact me at (212) 693-7077.
>
> Regards,
>
> Sandy

535. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2002, where they served to conceal part of RGHI's obligations to Refco.

536. The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger Report" that shows (1) a wire transfer from RGHI to "1ST UNION-BAWAG," dated March 4, 2002 in the amount of approximately $90 million, and (2) an approximate $210 million wire transfer described as "WT TO 1ST UNION-BAWAG," also dated March 4, 2002.

### iv.    The February 2003 Transaction

537. This series of sham transactions was repeated at the close of the Company's fiscal year 2003. The Counterclaim and financial records filed in connection with the Refco

bankruptcy proceeding demonstrate that, on or about February 25, 2003, Refco Capital transferred approximately $175 million to BAWAG. On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $175 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings. RGHI used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

538.    Bennett, Trosten, RGHI, BAWAG and others agreed that these transfers would be unwound approximately seven days later, on March 4, 2003. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2003, where they served to conceal part of RGHI's obligations to Refco.

539.    In addition, the parties agreed that the $175 million transfer from Refco Capital to BAWAG and the subsequent $175 million transfer from BAWAG to RGHI would bear the exact same interest rate, such that <u>BAWAG would not earn any net interest on its $175 million "loan" to RGHI.</u> At 9:37 a.m. on March 3, 2003, executives at BAWAG sent an e-mail to Defendant Trosten (later forwarded to Defendant Maggio), stating "USD 175.00.00: <u>flat – no payments.</u>" (Emphasis added.) These documents also reflect that the parties agreed that the second component of the "loan," the $75 million transfer, would bear a nominal interest rate.

540.    The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger Report" that shows (1) a $75 million wire transfer to BAWAG from RGHI, dated March 4, 2003, and described as "WT TO BAWAG," and (2) a $175 million wire transfer described simply as "TRANSFER," also dated March 4, 2003. On information and belief, this Monthly Account Statement also shows the interest payment on the $75 million component of the "loan," in the form of a $26,486.98 payment dated March 4, 2003 and described as "WT TO BAWAG."

### v.    The February 2004 Transaction

541.    This series of sham transactions was repeated at the close of the Company's fiscal year 2004. Again, the Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 25, 2004, Refco Capital transferred approximately $210 million to BAWAG. On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $210 million and another in the amount of $40 million. These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings. RGHI used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

542.    Bennett, Trosten, RGHI, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 4, 2004. At 6:06 a.m. on February 24, 2004, Monika Weinhengst, a BAWAG executive, sent an e-mail to Defendant Trosten, copying two other BAWAG executives, that stated:

> good morning Rob,
>
> I refer to the following trades dealt 23.02.2004
>
> 1.    we take from Refco Capital Bermuda USD 210,000.000,
>
> * * *
>
> 2.    we place on deposit with Refco Group Holding USD 40,000.000
>
> * * *
>
> 3.    we place on deposit with Refco Group Holding USD 210,000.000,
>
> * * *
>
> for Repayment value 04.03.2004 . . . .

543.    Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 29, 2004, where they served to conceal part of

RGHI's obligations to Refco.

544.    This e-mail further demonstrates that the parties agreed that the $210 million transfer from Refco Capital to BAWAG and the subsequent $210 million transfer from BAWAG to RGHI would bear the exact same interest rate – 1.08% – such that <u>BAWAG would not earn any net interest on its $210 million "loan" to RGHI.</u> In addition, this e-mail reflects that the parties agreed that the second component of the "loan," the $40 million transfer, would bear a nominal interest rate of 1.58%.

545.    The "unwinding" of these transactions is reflected in a RGHI "Customer Ledger Report" that shows (1) a $40,014,044.44 wire transfer to BAWAG from RGHI, dated March 4, 2004, and described as "WT TO BAWAG," and (2) a $210 million wire transfer described simply as "TRANSFER," also dated March 4, 2004.  On information and belief, the additional $14,044.44 reflected in this document comprises the interest payment from Refco to BAWAG on the $40 million component of the transaction.

### vi.    The February 2005 Transaction

546.    This series of sham transactions was repeated at the close of the Company's fiscal year 2005.  The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 23, 2005, Refco Capital transferred approximately $175 million to BAWAG.  On the same day, BAWAG made two separate transfers to RGHI, one in the amount of $175 million and another in the amount of $75 million.  These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings.  RGHI used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

547.    The nature and structure of these transactions is set forth in a February 14, 2005 letter sent from Defendant Bennett to Selcuk Sari of BAWAG.  Among other things, the letter

stated:

> Dear Mr. Sari:
>
> I am pleased you had a nice holiday . . . I am glad to have confirmed the
> arrangements for later this month. As we discussed, the proposed
> transaction will be executed for value Wednesday, February 23, with an
> expiration Tuesday, March 8. Confirming the mechanical arrangements
> these will be as follows:
> 1. A sum of U.S. $250 million is to be placed on deposit with Refco
> Group Holdings, Inc. and wired for value Wednesday, February 23,
> 2005 . . .
>
> <div align="center">* * *</div>
>
> 2. The sum of US$175 million is to be placed on deposit with BAWAG
> by Refco Capital Markets and wired for value February 23, 2005 . . .
>
> <div align="center">* * *</div>
>
> 3. the sum of US$250 million will be repaid for value Tuesday, March 8,
> 2005 . . . . We understand that *the rate to be paid to Refco Capital
> Markets will be the same as the rate charged on the deposits placed
> with Refco Group Holdings, Inc. with a separate rate to be paid by
> Refco Group Holdings Inc. on the difference of $75 million.*
>
> (Emphasis added.)

548.    Thus, Bennett, RGHI, BAWAG and others agreed in advance that these transfers

would be unwound approximately two weeks later, on March 8, 2003, and that BAWAG would

not earn any net interest on its $175 million "loan" to RGHI. Thus, the transfers were in effect

for approximately a one week period bracketing the Company's fiscal year end of February 28,

2005, where they served to conceal part of RGHI's obligations to Refco. The "unwinding" of

these transactions is reflected in documents filed in the Refco bankruptcy proceedings.

### 3.    The Fraudulent Transactions With CIM Ventures

549.    Another customer that was involved in at least two round-trip loan transactions

with Refco was CIM Ventures. CIM Ventures was a subsidiary of Ingram, an information-

technology distributor based in Santa Ana, California. According to the Examiner's Report,

Ingram had a pre-existing account with Refco Capital by virtue of a 1999 transaction – in which Collins and Mayer Brown represented Refco – whereby Refco provided financing to Ingram's overseas subsidiaries.

### i.    The February 2000 Transaction

550.    On February 1, 2000, Refco's then-Chief Administrative Officer, David Weaver, contacted Ingram to discuss a "back-to-back loan" involving Ingram and/or CIM Ventures. Weaver also discussed the transaction with Collins on that date, and Collins' handwritten notes make it clear that he understood the nature, structure and timing of the proposed loans. Those notes state that the principal amount of the loans would be $150 million, that there would be a "15 basis point spread/fee" paid to CIM Ventures, and the loans would be of "one month" duration and would bracket the end of Refco's fiscal year end, "Feb 15 – March 15." Collins' notes also make clear that he was aware that CIM Ventures was simply a conduit that would funnel the proceeds of the loans directly from Refco Capital to RGHI, stating "Refco Capital Markets → CIM" and "CIM – Refco Group Holdings."

551.    During the next several weeks, Mayer Brown prepared documentation for two loans in the amount of $150 million: one from Refco Capital to CIM Ventures, and one from CIM Ventures to RGHI. These documents included the specific loan documents as well as a guarantee by Refco of RGHI's obligation to repay CIM Ventures, and an indemnification agreement whereby Refco agreed to indemnify CIM Ventures against any loss or liability arising out of the transactions. A 15 basis point spread was to be paid to CIM Ventures. The loan agreement between CIM Ventures and Refco Capital made specific reference to the related loan agreement between CIM Ventures and RGHI, and vice versa.

552.    In a February 22, 2000 letter to Monk of Mayer Brown, James F. Ricketts ("Ricketts"), an officer of Ingram and CIM Ventures, described the nature of the transaction as

follows:

> It is planned that RCM [Refco Capital] will deposit the loan proceeds in CIM's account (No. 6800-10101) at RCM on February 25, 2000. CIM will then fax a letter to RCM instructing them to move the funds to RGHI with a 15 basis point uplift in the interest rate. RCM then will withdraw the funds from CIM's account and deposit them in RGHI's account, thereby completing the back-to-back loan transaction. The steps will be reversed on March 9, 2000. *RCM will then transfer the CIM spread on the transaction to its [CIM's] Royal Bank of Canada account in the Cayman Islands.*

(Emphasis added.) Thus, by February 2000, it is clear that Collins, Monk and Mayer Brown knew the nature of the round trip loan transaction and also understood that Refco Capital would be paying the interest "spread" on the loans to CIM Ventures.

553.    The parties executed the loan agreements on or about February 25, 2000, and Refco Group executed a guaranty of CIM Ventures' loan to RGHI. The $150,000,000 in proceeds that originated with Refco Capital was used to pay down a portion of the receivable owed from RGHI to the Company. On or about March 9, 2000, after the close of Refco's fiscal year, the loans were unwound, the net profit was transferred to CIM Ventures' bank account, and the $250 million debt was once again shown on the Company's books as being owed by RGHI to the Company.

554.    A March 10, 2000 letter from Monk to Ricketts, and copying Collins, further confirms Mayer Brown's involvement in this transaction, providing:

> I am enclosing for your files executed originals of the following documents:
>
> 1. Loan Agreement between Refco Capital Markets, Ltd., as lender and CIM Ventures Inc. as Borrower
>
> 2. Loan Agreement between CIM Ventures Inc. as lender and Refco Group Holdings, Inc. as borrower
>
> 3. Indemnification letter from Refco Group Holdings, Inc.

4.  Guarantee of Refco Group Ltd., LLC

In addition, I enclose the original promissory note of CIM Ventures Inc.
to Refco Capital Markets, Ltd., endorsed as paid in full.

The documents enclosed with the letter include a promissory note between CIM Ventures and

Refco Capital that was marked "paid in full" and signed on behalf of Refco Capital by Mayer

Brown attorney Monk as Refco Capital's "authorized agent."

### ii.    The February 2001 Transaction

555.    On or about February 23, 2001, Refco Capital loaned CIM Ventures the sum of

$250,000,000.  On the same day, CIM Ventures loaned $250,000,000 to RGHI.  The repayment

date for both loans was two weeks later, March 6, 2001.  Mayer Brown prepared the

documentation for these loans.  The loan agreement between CIM Ventures and Refco Capital

made specific reference to the related loan agreement between CIM Ventures and RGHI, and

vice versa.

556.    A letter dated February 16, 2001 from Ingram to Collins described these "back-to-

back loan transactions" as follows:

> It is planned that RCM [Refco Capital] will deposit the loan
> proceeds in CIM's account (No. 6800-10101) at RCM on February
> 23, 2001.  CIM will then fax a letter to RCM instructing them to
> move the funds to RGHI with a 15 basis point uplift in the interest
> rate.  RCM then will withdraw the funds from CIM's account and
> deposit them in RGHI's account, thereby completing the back-to-
> back loan transaction.  The steps will be reversed on March 6,
> 2001.  RCM will transfer the CIM spread on the transaction to
> CIM's Royal Bank of Canada account (Acct. No. 2003895) in the
> Cayman Islands.  The account details are the same as used for the
> back-to-back loan done in 2000.

557.    The $250,000,000 in proceeds that originated with Refco Capital was used to pay

down a portion of the receivable owed from RGHI to the Company, and the loans were unwound

on or about March 6, 2001, such that the $250 million debt was once again shown on the

Company's books as being owed by RGHI to the Company. When the loans were unwound, the promissory note, marked "Paid in full," was sent to CIM Ventures with a copy to Collins.

558. 

### iii.    The Aborted February 2002 Transaction

559.    Collins and Mayer Brown were also directly involved in a contemplated—but never executed—round trip loan transaction between Refco and Ingram in February 2002.

560.    In January 2002, Ricketts agreed to participate in a $250 million loan transaction with Refco Capital and RGHI substantially similar to the transactions the two entities had engaged in during prior years. Ricketts made some minor mark-ups to the loan documents and sent them to Collins at Mayer Brown.

561.    The increasing awareness of securities fraud in the wake of the highly-publicized Enron scandal, however, apparently caused Ingram's CFO to have second thoughts about proceeding with the transaction. The CFO notified Ricketts that Ingram should not do the transaction, stating in a January 30, 2002 email that:

> [I] wouldn't take the chance at this point. . . . [G]iven the environment and amounts involved, [I] just wouldn't take the risk or go to the trouble . . . *[I'd] think [Refco] should really be reviewing this area anyways.*

(Emphasis added.)

562.    On January 30, 2002, Ricketts sent an email to executives at Refco stating that Ingram would not be involved in the transaction but, in apparent recognition of the significant role that Mayer Brown had played in connection with the contemplated transaction, Ingram offered to pay Mayer Brown's legal expenses. The January 30, 2002 email was titled "CIM Back-To-Back Loan," and stated in relevant part:

> [T]he Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like IM . . . I spoke with Tom Madden, our worldwide CFO, in Europe and briefed him again on the details of our planned late-February transaction, and we jointly concluded that we should put a hold on the transaction. . . . [W]e would not be taking this step unless we felt strongly that the disclosure risks were too high . . . ***Please be assured that CIM will reimburse Refco for reasonable legal expenses with Mayer Brown in preparing the documents for the back-to-back loan. Send the invoices to me and I will get them paid promptly.***

(Emphasis added.)

### 4.    The Fraudulent Transactions With EMF and Delta Flyer

563.    At the end of each of Refco's fiscal years ended February 2000, 2001, 2002 and 2003, the Company engaged in round-trip loan transactions with two affiliates of EMF Financial, LLC: EMF and Delta Flyer.

### i.    The February 2000 Transaction

564.    On February 25, 2000, Refco engaged in a round-trip loan transaction with EMF. On that date, Refco Capital loaned $50,000,000 to EMF, and EMF loaned $50,000,000 to RGHI. The $50,000,000 in proceeds that originated with Refco Capital was used to pay down a portion of the receivable owed from RGHI to the Company, and the loans were unwound on or about March 3, 2000, such that the $50 million debt was once again shown on the Company's books as being owed by RGHI to the Company. Mayer Brown attorney Monk drafted the documents for the sham transactions and sent the executed documents to EMF. Additionally, once the

transactions were unwounded, a "Paid in full" notation was added to the promissory note for EMF's loan from Refco Capital, and Monk signed that notation on behalf of Refco Capital as its "authorized agent."

### ii.    The February 2001 Transaction

565.    Through loan agreements dated February 26, 2001, which were prepared by Mayer Brown and were substantially identical to the loan agreements used in connection with the other round trip loan transactions discussed herein, Refco Capital loaned $200,000,000 to Delta Flyer and Delta Flyer loaned $200,000,000 to RGHI.  The loan agreement between Delta Flyer and Refco Capital made specific reference to the related loan agreement between Delta Flyer and RGHI, and vice versa.

566.    The $200,000,000 in proceeds that originated with Refco Capital was used to pay down a portion of the receivable owed from RGHI to the Company, and the loans were unwound on or about March 2, 2001, such that the $200 million debt was once again shown on the Company's books as being owed by RGHI to the Company.  Delta Flyer was compensated for its role in the transactions with a 100 basis point "spread."

567.    Collins himself reviewed and edited the documentation for these loans and was involved in negotiating their terms.  For instance, a draft Loan Agreement dated February 26, 2001, which was substantially identical to the loan agreements used in connection with the other round trip loan transactions discussed herein, contains Collins' handwritten "mark-up" making numerous changes that identify the counterparty as Delta Flyer.  Similar changes are made in Collins' handwriting to a guaranty in favor of Delta Flyer from Refco.

568.    According to the Examiner's report, the CFO at Delta Flyer stated that Delta Flyer opened an account at Refco Capital shortly before these transactions were executed, and the account was used solely to facilitate the transactions (rather than for any legitimate business

purpose). Further, the CFO acknowledged that Delta Flyer did not have sufficient funds to cover the loan it agreed to make to RGHI, and that the loan was funded solely by the amounts wired to Delta Flyer's Refco account by Refco Capital. The CFO also stated that—consistent with the other round trip loans described herein—he understood that no funds would actually be exchanged in connection with the transactions other than the net interest profit to Delta Flyer.

### iii.     The February 2002 Transaction

569.     Delta Flyer engaged in a $175 million round trip loan with Refco between February 25, 2002 and March 4, 2002. The structure and terms of this transaction were the same as the prior year's transaction except that the agreements provided for specified interest rates rather than LIBOR-based rates. However, Delta Flyer still received a 100 basis point "spread" as in the prior year. Refco Group provided a guaranty of Delta Flyer's loan to RGHI, and further agreed to indemnify Delta Flyer against third party claims arising out of these round trip loans. Mayer Brown prepared all of the documentation for these loans, and transmitted those documents to Refco by way of a February 13, 2002 memorandum from Collins and Koury to David Weaver. Mayer Brown also sent the final executed transaction documents to Delta Flyer. The loan agreement between Delta Flyer and Refco Capital made specific reference to the related loan agreement between Delta Flyer and RGHI, and vice versa.

### iv.     The February 2003 Transaction

570.     Between February 21, 2003 and March 4, 2003, Refco engaged in a $150 million round-trip loan transaction with Delta Flyer. Mayer Brown attorney Koury again drafted the documents for this loan, and the transaction documents were virtually identical to the previous year's loan, except that Maggio signed on behalf of Refco Capital and the loans had different interest rates. Delta Flyer received a 75 basis point "spread" on the loans. The loan agreement between Delta Flyer and Refco Capital made specific reference to the related loan agreement

between Delta Flyer and RGHI, and vice versa. Bennett signed the promissory note, guaranty and indemnification agreement on behalf of Refco Group, and Maggio signed the loan documents on behalf of Refco Capital.

### 5. The Fraudulent Transaction With Beckenham

571.    Between February 25, 2002 and March 4, 2002, Refco Capital and RGHI engaged in $125 million round-trip loan transactions with Beckenham, a hedge fund specializing in futures and foreign currency trading. The transaction documents were similar to those for the other transactions, and provided for Beckenham to pay interest to Refco Capital at a rate of 1.8375% and receive interest from RGHI at a rate of 2.8375%, thus earning a 100 basis point "spread." Refco Group executed a guaranty of Beckenham's loan to RGHI, and further agreed to indemnify Beckenham against third party claims arising out of these round trip loans. Mayer Brown prepared all of the documentation for these loans, and transmitted drafts of those documents to Refco by way of a February 13, 2002 memorandum from Collins and Koury to David Weaver. The loan agreement between Beckenham and Refco Capital made specific reference to the loan agreement between Beckenham and RGHI, and vice versa.

### 6. The Fraudulent Transaction With CS Land

572.    At the end of Refco's fiscal year 2000, Refco Capital and RGHI engaged in $110 million round-trip loan transactions with CS Land. These transactions were structured substantially identically to the February 2000 transaction with CIM Ventures, with the loans being initiated on February 25, 2000 and unwound on March 3, 2000. CS Land received a 15 basis point "spread" on the transactions. According to the Examiner's Report, on February 23, 2000, when representatives of CS Land raised a question regarding the enforceability of the loan agreements, Maggio contacted Collins to discuss the issue. Mayer Brown attorney Monk drafted all of the transaction documents for the $110 million round trip "loan" involving CS Land.

D.    **Summary and Form of Transactions**

573.    The chart below sets forth a summary of the transactions described above:

| "Loan" Date | Financial Period End | Repayment Date | Total Amount of "Loans |
|---|---|---|---|
| February 24, 2000[B]<br>February 25, 2000[CS]<br>February 25, 2000[EMF]<br>February 25, 2000[CIM] | February 29, 2000 | March 2, 2000 ($300 Million)<br>March 3, 2000 ($110 Million)<br>March 3, 2000 ($50 Million)<br>March 9, 2000 ($150 Million) | $610 Million |
| February 23, 2001[CIM]<br>February 26, 2001[B]<br>February 26, 2001[DF] | February 28, 2001 | March 6, 2001 ($250 Million)<br>March 5, 2001 ($300 Million)<br>March 2, 2001 ($200 Million) | $750 Million |
| February 25, 2002[X]<br>February 25, 2002[B]<br>February 25, 2002[DF]<br>February 25, 2002[BH] | February 28, 2002 | March 4, 2002 ($325 Million)<br>March 4, 2002 ($300 Million)<br>March 4, 2002 ($175 Million)<br>March 4, 2002 ($125 Million) | $925 Million |
| February 21, 2003[X]<br>February 25, 2003[B]<br>February 25, 2003[DF] | February 28, 2003 | March 4, 2003 ($500 Million)<br>March 4, 2003 ($250 Million)<br>March 4, 2003 ($150 Million | $900 Million |
| February 20, 2004[X]<br>February 25, 2004[B] | February 29, 2004 | March 4, 2004 ($720 Million)<br>March 4, 2004 ($250 Million) | $970 Million |
| May 27, 2004[X] | May 31, 2004 | June 7, 2004 ($700 Million) | $700 Million |
| August 25, 2004[X] | August 30, 2004 | Sept. 7, 2004 ($485 Million) | $485 Million |
| November 26, 2004[X] | November 30, 2004 | Dec. 3, 2004 ($545 Million) | $545 Million |
| December 30, 2004[X] | End of Calendar 2004 | January 4, 2005 ($550 Million) | $550 Million |
| February 23, 2005[X]<br>February 23, 2005[B] | February 28, 2005 | March 8, 2005 ($345 Million)<br>March 8, 2005 ($250 Million) | $595 Million |
| May 25, 2005[X] | May 31, 2005 | June 6, 2005 ($450 Million) | $450 Million |

| "Loan" Date | Financial Period End | Repayment Date | Total Amount of "Loans" |
|---|---|---|---|
| August 26, 2005[X] | August 30, 2005 | Sept. 6, 2005 ($420 Million) | $420 Million |

[X] Denotes transaction involving Customer X
[CIM] Denotes transaction involving CIM Ventures
[B] Denotes transaction involving BAWAG
[CS] Denotes transaction involving CS Land
[EMF] Denotes transaction involving EMF
[DF] Denotes transaction involving Delta Flyer
[BH] Denotes transaction involving Beckenham

574.    With the exception of the transactions involving BAWAG, Mayer Brown

documented all of the foregoing round-trip transactions and, as observed by the Examiner, these

transactions were specifically noted in the monthly billing statements Collins prepared and/or

reviewed and sent to Refco.

575.    The following chart sets forth the known interest rates on the loans between the

third party customers, Refco Capital, and RGHI described above:

| Loan Date | Customer & Loan Amount | Interest Rate (Loan from Refco Capital to Customer) | Interest Rate (Loan from Customer to RGHI) | Spread |
|---|---|---|---|---|
| February 2000 | CS Land - $110 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| | EMF - $50 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| | CIM Ventures - $150 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| February 2001 | CIM Ventures - $250 Million | LIBOR | LIBOR plus 0.15% | 0.15% |
| | Delta Flyer - $200 Million | LIBOR | LIBOR plus 1.0% | 1.0% |
| February 2002 | Customer X - $325 Million | 1.8375% | 2.8375% | 1.0% |
| | Delta Flyer - $175 Million | 1.8375% | 2.8375% | 1.0% |
| | Beckenham - $125 Million | 1.8375% | 2.8375% | 1.0% |
| February 2003 | Customer X - $500 Million | 1.31% | 2.06% | 0.75% |
| | Delta Flyer - $150 Million | 1.31% | 2.06% | 0.75% |
| February 2004 | Customer X - $720 Million | 1.06% | 1.81% | 0.75% |
| May 2004 | Customer X - $700 Million | 1.06% | 1.81% | 0.75% |
| August 2004 | Customer X - $485 Million | 1.50% | 2.25% | 0.75% |
| November 2004 | Customer X - $545 Million | 2.00% | 2.75% | 0.75% |

| Loan Date | Customer & Loan Amount | Interest Rate (Loan from Refco Capital to Customer) | Interest Rate (Loan from Customer to RGHI) | Spread |
|---|---|---|---|---|
| December 2004 | Customer X - $550 Million | 2.25% | 3.00% | 0.75% |
| February 2005 | Customer X - $345 Million | 2.50% | 3.25% | 0.75% |
| May 2005 | Customer X - $450 Million | -- | -- | -- |
| August 2005 | Customer X - $420 Million | 3.50% | 4.25% | 0.75% |

576.    Each of the sham transactions described above followed a similar format, and each was designed so that the Company could fraudulently avoid taking hundreds of millions of dollars of write-offs for receivables that could not be collected. The following chart represents the form of the transactions as structured by Refco:



### Transaction Structure
(Days Before Pertinent Financial Period End)

577.    As described herein, after the Company closed its books for the pertinent period,

the fraudulent transaction would be "unwound" and the receivable from RGHI would be reinstated on the Company's books, where it would remain until the close of the next financial period. The following chart represents the form that the "unwinding" of the transactions took after each financial period:



**"Unwinding" The Transactions**
(Days After Pertinent Financial Period End)

### E.    Material Impact on Financial Statements

578.    In addition to undermining the validity of the descriptions of the Company's business model, historical performance, and operational parameters, the financial manipulations above (including those that took place prior to February 2002) rendered the Company's financial results materially false and misleading. These manipulations involved huge related-party transactions between various Refco entities and RGHI, as well as enormous guarantees by Refco Group to third parties and transfers to and from BAWAG. These related-party transactions and

guarantees were required to be disclosed under GAAP and other applicable accounting rules and regulations of the SEC and other regulatory bodies. The result (indeed, the goal) of the fraudulent transactions was to materially overstate the Company's net capital, members' equity and net income while materially understating its reserves for doubtful accounts.

579.    The following chart details the impact that the Company's financial manipulations had on the Company's pre-tax income, net income, and members' equity, for fiscal years 2002, 2003, 2004 and 2005 (in millions):

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal** | **Pre-Tax Income** | | **Net Income** | | **Members' Equity** | |
| **Year** | **Reported** | **Adjusted** | **Reported** | **Adjusted** | **Reported** | **Adjusted** |
| 2002 | $ 116.2 | $ (808.8) | $ 93.6 | $ (743.5) | $ 515.1 | $ (322.1) |
| 2003 | 154.8 | (745.2) | 140.1 | (674.4) | 566.4 | (248.1) |
| 2004 | 189.5 | (780.5) | 187.2 | (690.7) | 616.1 | (261.8) |
| 2005 | 150.6 | (444.4) | 176.3 | (362.2) | 150.3 | (388.2) |

580.    Of the foregoing amounts, the following financial impacts were the result of financial manipulations involving Collins and Mayer Brown:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal** | **Pre-Tax Income** | | **Net Income** | | **Members' Equity** | |
| **Year** | **Reported** | **Adjusted** | **Reported** | **Adjusted** | **Reported** | **Adjusted** |
| 2002 | $ 116.2 | $ (508.8) | $ 93.6 | $ (472.0) | $ 515.1 | $ (50.5) |
| 2003 | 154.8 | (495.2) | 140.1 | (448.2) | 566.4 | (21.9) |
| 2004 | 189.5 | (530.5) | 187.2 | (464.4) | 616.1 | (35.5) |
| 2005 | 150.6 | (194.4) | 176.3 | (135.9) | 150.3 | (161.9) |

581.    The following chart details the impact that the Company's financial manipulations had on the Company's pre-tax income, net income, and members' equity on a quarterly basis for fiscal year 2005 and the first quarter of fiscal 2006 (ended May 31, 2005):

| Quarters | (In Millions) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Pre-Tax Income | | Net Income | | Members' Equity | |
| **2005** | Reported | Adjusted | Reported | Adjusted | Reported | Adjusted |
| Q1 | $ 58.4 | $(641.6) | $ 59.3 | $ (574.2) | $ 671.0 | $ 37.5 |
| Q2 | 49.0 | (436.0) | 45.2 | (393.7) | 81.5 | (357.4) |
| Q3 | 21.3 | (523.7) | 36.1 | (457.1) | 126.7 | (366.5) |
| **2006** | | | | | | |
| Q1 | 43.8 | (406.2) | 42.6 | (364.7) | 185.4 | (221.9) |

582.    Mayer Brown was involved in all of the transactions giving rise to the foregoing financial impacts for these quarterly periods.

583.    The following chart details the impact that the Company's financial manipulations had on the Company's reserves for net capital, maintained pursuant to CFTC and other regulatory requirements for fiscal years 2004 and 2005 (in millions):

| Fiscal CFTC Net Capital | | |
| --- | --- | --- |
| Year | Reported | Adjusted |
| 2004 | 223.6 | (654.3) |
| 2005 | 283.9 | (254.6) |

584.    Of the foregoing amounts, the following financial impacts were the result of financial manipulations involving Collins and Mayer Brown:

| Fiscal CFTC Net Capital | | |
|---|---|---|
| Year | Reported | Adjusted |
| 2004 | 223.6 | (428.0) |
| 2005 | 283.9 | (28.3) |

585.    The following chart details the impact that the Company's financial manipulations had on the Company's reserves for net capital, maintained pursuant to CFTC and other regulatory requirements on a quarterly basis for the first, second and third quarters of 2005 and the first quarter of 2006 (in millions):

| CFTC Net Capital | | |
|---|---|---|
| Quarter | Reported | Adjusted |
| Q1 2005 | 242.7 | (390.8) |
| Q2 2005 | 282.0 | (156.9) |
| Q3 2005 | 301.7 | (191.5) |
| Q1 2006 | 354.5 | (52.8) |

586.    Mayer Brown was involved in all of the transactions giving rise to the foregoing financial impacts for these quarterly periods.

587.    For each period reflected in the preceding charts, the adjusted pre-tax and net income figures are based on the assumption that the uncollectible receivables were first discovered and corrected in that period, and the adjusted net capital figures are based on the assumption that the uncollectible receivables were included as assets when calculating the Company's reported net capital figures.

## XII.    FALSE AND MISLEADING STATEMENTS

588.    In connection with the Bond Offering, the Company and its representatives (including the Officer Defendants, the Audit Committee Defendants, Trosten, Mayer Brown, and Collins) as well as the THL Defendants, the Bond Underwriter Defendants, and Grant Thornton, made numerous false and misleading statements of material fact and omitted to disclose material facts in the Bond Offering Memorandum and/or at the Bond Road Show.  These false and misleading statements and omissions are detailed above at ¶¶ 118-155 and 159-162, which allegations are incorporated herein by reference.

589.    Following the Bond Offering in August 2004, the Company's securities began to trade publicly and the Company became subject to the filing requirements of the Exchange Act. From that point forward, in regular press releases and in periodic filings with the SEC, the Company and the Defendants made numerous materially false and misleading statements, including the untrue statements in the Bond Registration Statement and the IPO Registration Statement as discussed above, as well as statements by the Company and its officers and directors in press releases and in SEC filings on Form 8-K, Form 10-Q, and Form 10-K, as discussed below.

### A.    The May 2005 Press Release and May 2005 8-K

590.    On May 27, 2005, the Company announced the results of its operations for the year and quarter ended February 28, 2005 and filed a Form 8-K (the "May 2005 8-K"), which was signed by Bennett.  A press release dated May 27, 2005 (the "May 2005 Press Release"), which included the Company's consolidated financial statements for the year and quarter ended February 28, 2005, was attached as an exhibit to the May 2005 8-K.

591.    The May 2005 Press Release contained numerous false statements of material fact about the Company's financial results and performance, including the following statement by Bennett:

> Refco Group Ltd., LLC's fourth quarter performance concluded a transforming and successful year for Refco, which reported strong performance in its key operating businesses. Refco's transaction volume growth in derivative brokerage, foreign exchange and fixed income equaled or exceeded the strong secular and cyclical growth trends enjoyed by these global markets and drove revenues to record levels. This is indicative of the key attributes of the Company's business model, its financial performance and cash flows . . . . In summary, fiscal 2005's performance maintained excellent growth in net revenue, net income and cash flow of our business segments.

592.    The May 2005 Press Release stated that the Company's:

(a)     "net income for the fourth quarter decreased by 23.6% to $35.7 million from $46.8 million for the same quarter a year ago"; and

(b)     "net income for the year ended February 28, 2005 decreased by 5.8% to $176.3 million from $187.2 million compared with the year ended February 29, 2004."

593.    The May 2005 Press Release also stated that (a) the Company had established $61.190 million and $65.2 million in reserves for doubtful accounts (for the periods ending February 28, 2005 and February 29, 2004, respectively); (b) the Company's "regulated subsidiaries reported excess regulatory capital of $170.4 million;" (c) the Company's total assets were $48.8 billion; and (d) the Company's "members' equity was $152.8 million."

594.    These statements were materially false and misleading because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, and similarly failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that RGHI used to "pay off" some or all of the receivable days before the close of the

period. As discussed above, Refco and the THL Partner Defendants have admitted that this receivable should have been, but was not, disclosed as a related-party transaction on the Company's reported financial statements. Further, the fraudulent scheme set forth above was designed to, and did, manipulate Refco's financial information such that the Company overstated its (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders equity; and materially understated Refco's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Bennett and Refco.

**B.    The Year End 2005 Press Release and 2005 10-K**

595.    On July 1, 2005, Refco Group filed its Annual Report for fiscal year 2005 on Form 10-K (as amended through a Form 10-K/A filing on July 20, 2005) (collectively, the "2005 10-K"). Bennett and Sherer signed the 2005 10-K.

596.    The 2005 10-K included the Company's audited consolidated financial statements for fiscal years 2003, 2004 and 2005, which the Company's management had prepared with significant assistance and input from Grant Thornton. The consolidated financial statements were accompanied by two unqualified audit opinion letters signed by Grant Thornton on May 24, 2005, which were included in the 2005 10-K, stating that Grant Thornton had conducted audits in accordance with GAAS and opining that the consolidated financial statements included in the 2005 10-K presented fairly, in all material respects, the financial position of the Company for the relevant dates and time periods "in conformity with accounting principles generally accepted in the United States of America."

597.    The Company's audited financial statements included in the 2005 10-K reported, among other things:

(a)    net income of $176,287,000, $187,156,000 and $140,119,000 for fiscal years 2005, 2004 and 2003, respectively;

(b)     receivables from customers (net of reserves) of $2,081,968,000 and $1,591,385,000 as of February 28, 2005 and February 29, 2004, respectively;

(c)     reserves against receivables from customers of $61.2 million and $65.2 million as of February 28, 2005 and February 29, 2004, respectively;

(d)     total assets of $48,767,849,000 and $33,332,172,000 as of February 28, 2005 and February 29, 2004, respectively; and

(e)     members' equity of $152,750,000 as of February 28, 2005.

598.    The notes to the audited financial statements included in the 2005 10-K included the following disclosure regarding related-party transactions:

> [The Company] may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties.  Interest is generally charged at prevailing market rates.

599.    The 2005 10-K also included the following statements regarding the Company's allowance for doubtful accounts in respect to receivables from customers:

> **Receivables from Customers–Provisions for Doubtful Accounts**
>
> Our receivables are generally collateralized with marketable securities. *For some customer receivables that are not fully secured, we establish reserves for doubtful accounts when, in the opinion of management, such reserves are appropriate.  We have established reserves of $61.2 million and $65.2 million against receivables from customers as of February 28, 2005 and February 29, 2004, respectively.  Our allowance for doubtful accounts is based upon management's continuing review and evaluation of the factors such as collateral value, aging and the financial condition of our customers.  The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date.*  Any changes are included in the current period operating results.  We pursue collection of these receivables through various means, including legal action and collection agencies, and generally do not charge-off any of these receivables.  Although these reserves have been adequate historically, the default of a large customer or prolonged period of weakness in global financial markets could adversely affect the ability of our customers to meet their obligations.  We do not

establish reserves for unidentified losses, which may be inherent in our customer base.

(Emphasis added.)

600.    The 2005 10-K contained the following statements, among others, about the Company's compliance with regulatory capital requirements:

> As of February 28, 2005, Refco Securities, LLC had net capital of $82.0 million, which was 24.7% of aggregate debit balance and $75.4 million in excess of required net capital. . . . [A]s of February 28, 2005, Refco, LLC had net capital of $283.9 million, which was $95.0 million in excess of required net capital.

601.    The 2005 10-K also included representations from the Company's management, including Defendants Bennett, Murphy, Sherer, Sexton and Maggio, that:

> Our management evaluated, with the participation of our principal executive and principal financial officer, the effectiveness of our disclosure controls and procedures . . . as of December 31, 2004.  Based on their evaluation, our principal executive and principal financial officer concluded that our disclosure controls and procedures were effective as of February 28, 2005.

602.    Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Exchange Act, Defendants Bennett and Sherer each certified that "the financial statements, and other financial information included in [the 2005 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report." They also certified that the 2005 10-K:

> does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

603.    Defendants Bennett and Sherer further certified that they had disclosed to the Company's auditors and its audit committee "[a]ny fraud, whether or not material, that involves

management or other employees who have a significant role in the registrants' internal control over financial reporting."

604.    Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Bennett and Sherer further certified that (1) "the [2005 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended"; and (2) "the information contained in the [2005 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

605.    As set forth above, these statements were materially false and misleading at the time they were made because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, and similarly failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that RGHI used to "pay off" some or all of the receivable days before the close of the period.  Specifically, these misstatements materially overstated the Company's (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders equity and materially understated the Company's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Defendant Bennett and the Company.

### C.    The First Quarter 2006 Press Release, July 2005 8-K, and First Quarter 2006 10-Q

606.    On July 15, 2005, the Company announced its results of operations for the quarter ended May 31, 2005 and filed a Form 8-K (the "July 2005 8-K"), which was signed by Defendant Bennett.  A press release dated July 15, 2005 (the "First Quarter 2006 Press Release") containing the Company's consolidated financial statements for the quarter ended May 31, 2005 was attached as an exhibit to the July 2005 8-K.

607.    The First Quarter 2006 Press Release contained numerous false statements of material facts about the Company's financial results and performance, including the following statement by Defendant Bennett:

> Refco continues to report solid growth on a sequential basis following its recapitalization in August 2004.  The Company's global footprint and core competence in transaction processing has enabled it to capitalize on the continuing growth trends in exchange traded derivatives as well as the significant growth in foreign exchange brokerage volumes . . . In summary, it has been an encouraging start to the year.

608.    The First Quarter 2006 Press Release stated that:

(a)    "Net income for the first quarter decreased by 28.2% to $42.6 million from $59.3 million for the same quarter a year ago and increased by 19.3% from $35.7 million for the quarter ended February 28, 2005";

(b)    Refco held reserves against receivables from customers in the amount of $62,107,000 as of May 31, 2005;

(c)    the Company's "regulated subsidiaries reported excess regulatory capital of $170.4 million";

(d)    the Company's total assets were $48.8 billion; and

(e)    the Company's "members' equity was $152.8 million."

609.    On July 15, 2005, the Company filed its quarterly report with the SEC on Form 10-Q (the "First Quarter 2006 10-Q"), which was signed by Defendants Bennett and Sherer and contained the Company's unaudited consolidated financial statements for the quarter ended May 31, 2005. The First Quarter 2006 10-Q reiterated the Company's financial results reported in the First Quarter 2006 Press Release including the statements regarding the Company's (i) income, (ii) total assets, (iii) regulatory capital reserves, (iv) shareholders' equity, and (v) reserves for

doubtful accounts. The First Quarter 2006 10-Q reported that members' equity was $187,927,000.

610.    The First Quarter 2006 10-Q contained the following statements, among others, about the Company's compliance with regulatory capital requirements:

> As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of aggregate debit balances and $49.6 million in excess of required net capital . . . As of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital.

611.    The First Quarter 2006 10-Q included the following representation:

> Our management evaluated, with the participation of our principal executive and principal financial officer, the effectiveness of our disclosure controls and procedures . . . as of May 31, 2005. Based on their evaluation, our principal executive and principal financial officer concluded that our disclosure controls and procedures were effective as of May 31, 2005.

612.    Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Exchange Act, Defendants Bennett and Sherer each certified that "the financial statements, and other financial information included in [the First Quarter 2006 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report." They also certified that the First Quarter 2006 10-Q:

> does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

613.    Defendants Bennett and Sherer further certified that they had disclosed to the Company's auditors and its audit committee "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting."

614.    Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Bennett and Sherer further certified that (1) "the [First Quarter 2006 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended"; and (2) "the information contained in the [First Quarter 2006 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

615.    The statements set forth above were materially false and misleading because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that RGHI used to "pay off" some or all of the receivable days before the close of the period, and failed to disclose the multi-hundred million dollar guarantees of Refco Group.  Specifically, these misstatements materially overstated the Company's (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders' equity and materially understated the Company's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Defendant Bennett and the Company.

## XIII.  ADDITIONAL ALLEGATIONS OF SCIENTER

616.    The Officer Defendants, Trosten, and the Audit Committee Defendants (collectively, the "Inside Defendants"), the THL Defendants, Mayer Brown, Collins, and Grant Thornton each acted with scienter with respect to the materially false and misleading statements discussed herein, in that they had actual knowledge that the statements were false or misleading, or acted with reckless disregard for the truth or falsity of these statements.  These Defendants' intent to deceive and/or reckless disregard for the truth is demonstrated both by circumstantial evidence supporting a strong inference of scienter, as well as by the fact that these Defendants had motive and the opportunity to commit fraud.

A.    **Circumstantial Evidence of Scienter**

617.    There is substantial circumstantial evidence supporting a strong inference that the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton acted with scienter.

618.    <u>Grant Thornton's Violations of GAAS.</u>  As discussed above in ¶¶ 262-295, which paragraphs are incorporated herein by reference, Grant Thornton failed to follow GAAS when conducting its audits.  Among other things, Grant Thornton considered Refco a "high risk client," was aware of "significant deficiencies" in Refco's internal controls and of the existence of "significant related party transactions" and of the RGHI receivable, yet made no effort to confirm the nature or purpose of Refco's related party transactions or conduct any meaningful audit of Refco's financial statements.  Grant Thornton's violations of GAAS were so egregious that they amount to a reckless disregard for the truth of Refco's financial statements and of Grant Thornton's own audit opinions.

619.    In fact, Grant Thornton deliberately or recklessly ignored information in its possession that should have alerted it to the fraud.  For instance, as discussed in detail below, Grant Thornton was aware of large end-of-period transactions between Refco and certain customers – including Customer X, Delta Flyer, and Beckenham – yet despite red flags that should have led to further inquiry, it recklessly failed to examine the nature or legitimacy of those transactions.  Had Grant Thornton made even the most basic of inquiries into these matters, it would have discovered that these were sham loan transactions with no purpose other than to manipulate Refco's financial statements.

620.    For example, on April 16, 2003, at Grant Thornton's request in connection with its audit of Refco's fiscal 2003 financial statements, Refco sent requests to Customer X and Delta Flyer for confirmation of certain transactions reflected on their Refco Capital account

statements. The account statements that were attached to the confirmation requests showed a $500 million deposit to Customer X's account and a $150 million deposit to Delta Flyer's account, both in connection with purported "reverse repo" transactions on February 21, 2003. A "reverse repo" is an agreement whereby securities are sold subject to an agreement to repurchase them at a specified future date and price, and such transactions are typically collateralized by the underlying securities. The account statements for Customer X and Delta Flyer reflected that the repurchase date for both transactions was March 4, 2003, and thus these multi-hundred million dollar transactions suspiciously straddled the end of Refco's fiscal year 2002.

621.    Although Grant Thornton was plainly aware of the massive, round-dollar values attached to these purported "reverse repos" and the added highly suspicious circumstance that they both occurred on the same days straddling the end of Refco's fiscal year, Grant Thornton did not review the documentation for the transactions or otherwise do anything to confirm that they were what they purported to be, or that they were supported by collateral. Had Grant Thornton made appropriate inquiries, it would have discovered that these deposits were not from "reverse repo" transactions at all, but were the proceeds of the first leg of the round-trip loans that were being used to conceal Refco's uncollectible receivables. Moreover, had Grant Thornton made any effort whatsoever to obtain the documentation underlying either of these deposits (*i.e.*, the loan agreements between Refco Capital and the customers), it would have readily discovered the other side of the round-trip loans because each loan agreement made specific reference to the customer's separate loan agreement with RGHI. The same was true of all the other round-trip loan agreements alleged herein.

622.    In 2004, Refco retained Grant Thornton to conduct a re-audit of Refco Group's February 2002 year end consolidated financial statements for inclusion in the Bond Registration

Statement. During the course of that re-audit, Grant Thornton noted significant year-end balances in the Refco Capital accounts of Customer X, Delta Flyer, and Beckenham, respectively. Identifying these as "individually significant confirms," Grant Thornton had Refco Capital send confirmation requests to Customer X, Delta Flyer, and Beckenham, asking them to confirm certain information to Grant Thornton. The confirmation requests stated that Refco Group was "in the process of registering public debt," and that this process required audited financial statements for the year ended February 28, 2002. They further explained that Refco Group's fiscal year 2002 financial statements "had been audited by an accounting firm that ceased operations," that is, Arthur Andersen, and "accordingly, a re-audit of [Refco's] fiscal 2002 consolidated financial statements is necessary." The confirmation requests asked Customer X, Delta Flyer, and Beckenham to send its confirmation directly to Grant Thornton.

623.    Attached to each of the September 2004 confirmation requests was a Statement of Account for the customer's account at Refco Capital as of February 28, 2002. The Statements of Account indicated that Customer X, Delta Flyer and Beckenham had year-end account balances of $325 million, $175 million, and $125 million, respectively, which the Statements described as "time deposits." In addition to showing the balance as of February 28, 2002, however, each Statement of Account also showed recent transaction activity in the account. These Statements of Account showed clearly that all three of these customers' account balances were the result of "time deposits" from Refco Capital on February 25, 2002, just three days prior to the end of Refco's fiscal year.

624.    "Time deposits" are loans Refco Capital extended to its customers for purposes of trading, secured by the customers' trading positions. Although the Statements of Account showed on their face that these "time deposits" were not collateralized, Grant Thornton did not

inquire into the lack of collateral or the legitimacy of these massive transactions. Had Grant Thornton performed its audits in a non-reckless manner by making some basic inquiries into the purpose and substance of these "time deposits," it would have readily discovered that there was no collateral, that these loans from Refco Capital occurred simultaneously with loans by these same customers to RGHI, and that these customers were merely serving as middlemen for transfers of hundreds of millions of dollars from Refco Capital to RGHI in the days immediately before Refco closed its books. Additionally, had Grant Thornton reviewed the same customers' account statements for the month of March 2002, it would have seen reversals of these "time deposits" on March 4, 2002, just after the close of the fiscal year.

625.    During the course of their investigation, Lead Plaintiffs discussed Grant Thornton's September 2004 confirmation request with Customer X's operations manager and with Principal A. According to Customer X's operations manager, on October 5, 2004, after confirming within his office that Customer X did in fact owe $325,000,000 to Refco Capital as of February 28, 2002, he signed the confirmation and sent it, along with the Statement of Account, to Grant Thornton. While the Statement of Account should have alerted Grant Thornton to the fact that Refco Capital's $325 million, $175 million, and $125 million debts to Customer X, Delta Flyer and Beckenham were each created a mere three days before the end of the fiscal year, Grant Thornton did not ask any of these customers for any additional information or documents. Customer X's Principal A has told Lead Counsel that if Grant Thornton had requested any documents relating to the February 25, 2002 transaction, he would have first suggested that Grant Thornton ask Mayer Brown for them but, if Grant Thornton asked Customer X to provide them, Principal A would have done so. Grant Thornton's failure to make further inquiries as to the nature of the transactions that created these "individually significant"

account balances, and why Refco Capital had made three such enormous loans on the same date and so close to the end of the fiscal year, raises a strong inference of scienter.

626.    A few months later, during its review of Refco's financial statements for the quarter ended November 30, 2004, Grant Thornton obtained a "Funding Product Accrued Interest Report" that showed not only a purported $545 million "time deposit" to Customer X's Refco Capital account on November 26, 2004, but also – *on the line right above it* – a "time deposit" in the same amount and on the same date in RGHI's Refco Capital account. The existence of these two transactions on the same date and for the same amount was a bright red flag and should have led to further inquiry by Grant Thornton, but it did not. Moreover, according to the Examiner, "it does not appear that [Grant Thornton] questioned why Refco entered into a $545 million reverse repo with an affiliated party or scrutinized the circumstances of that transaction" and "it does not appear that [Grant Thornton] questioned why – if RGHI had indeed paid down its debt to Refco as [Grant Thornton] had been told – Refco appeared to be extending additional unsecured loans or advances to RGHI in such massive amounts." Grant Thornton's failure to make such inquiries is particularly egregious because Customer X—as Grant Thornton knew or recklessly failed to discover—was owned by a single individual, had assets of only a few hundred thousand dollars, was not regularly engaged in the business of securities trading, and utterly lacked any ability to repay "loans" of hundreds of millions of dollars.

627.    The Size and Unusual Nature of the Sham Loans:  The sheer size of the related-party receivable hidden by the transactions described herein and in the following chart raises a strong inference that the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton knew or recklessly disregarded the truth about the transactions.

| "Loan" Date | "Loan" Amounts | Reported Net Income (Relevant Financial Period) | Percentage of Net Income |
|---|---|---|---|
| February 2002 | $925 Million | $93.6 Million (Year ended February 28, 2002) | 988% |
| February 2003 | $900 Million | $140.119 Million (Year ended February 28, 2003) | 642% |
| February 2004 | $970 Million | $187.156 Million (Year ended February 29, 2004) | 518% |
| May 2004 | $700 Million | $59.270 Million (Quarter ended May 31, 2004) | 1,180% |
| August 2004 | $485 Million | $44.20 Million (Quarter ended August31, 2004) | 1,097% |
| November 2004 | $545 Million | $17.9 Million (Quarter ended November 30, 2004) | 3,045% |
| December 2004 | $550 Million | Not applicable | Not applicable |
| February 2005 | $595 Million | $176.3 Million (Year ended February 28, 2005) | 337% |
| May 2005 | $450 Million | $42.587 Million (Quarter ended May 31, 2005) | 1,056% |
| August 2005 | $420 Million | (Financial Statements delayed because of 10/10/05 Disclosure of Uncollectible Receivable) | Not applicable |

That the sums hidden by these sham transactions dwarfed the Company's net income raises a strong inference that the transactions should not have escaped notice. Indeed, Refco's net proceeds from the IPO were only $254,000,000, yet in the circular transaction that took place

only two weeks later, Refco Capital "loaned" its third-party customer the far larger sum of $420,000,000 as part of Refco's fraudulent scheme. The sheer magnitude of the sums hidden by the sham transactions raises a strong inference of scienter.

628.    Not only were the round-trip loan transactions large in comparison to Refco's net income, but – as Grant Thornton knew – they were large in comparison to other loans Refco Capital extended to its customers. For example, Grant Thornton's audit workpapers for the fiscal 2004 and 2005 audits contain lists of Refco Capital's largest "time deposits" into customers' accounts for those years – *i.e.*, loans to customers for purposes of trading – including purported "time deposits" to Customer X's account of $720 million and $345 million for those years, respectively. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ The tremendous size of these purported "time deposits" in comparison to others made by Refco Capital was a bright red flag that should have led to further inquiry into the reasons for those deposits – inquiry that would have led directly to the revelation that these were not time deposits for trading purposes, but rather were transfers in connection with sham round-trip loans. Particularly for Grant Thornton, which <u>knew</u> of the huge magnitude of these loans in comparison to other purportedly similar loans, failure to make that inquiry was reckless at best.

629.    <u>The Timing and Recurrent Nature of the Transactions</u>. The timing of the circular transactions also raises a strong inference of scienter. As discussed above, at the end of every fiscal year from at least 2000 to 2005, and at the end of each fiscal quarter from at least 2004

until August 2005, Refco Capital would "loan" substantial sums to unrelated middlemen and/or

BAWAG, which simultaneously loaned that money to RGHI. RGHI, in turn, would use the sum

to temporarily extinguish its outstanding obligation to Refco. At the beginning of the subsequent

period, and once the financial reporting benefit of this circular arrangement had been realized,

the money would find its way back the way it had come, and Refco Capital would receive

"repayment" of its massive "loan" of several weeks prior. These transactions took place for at

least five years and each involved substantial sums that were unlikely to go unnoticed. Mayer

Brown negotiated and drafted the documentation for seventeen of these sham loan transactions.

The Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton all

knew when Refco's financial periods ended, and understood the requirement that Refco file

financial statements as of the end of those periods. The regularity and suspicious timing of these

transactions raises a strong inference that these Defendants knew or recklessly disregarded the

truth about these transactions. Moreover, because these transactions were conducted on only an

annual basis prior to 2004, a simple review of the Company's quarterly financial statements prior

to 2004 would have revealed the significant receivables from RGHI, and would have caused

these Defendants to question why those receivables vanished at year-end. Their failure to do so

was, at best, reckless. ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

630.    <u>The Unusual Nature of the Transactions</u>. The transactions described above were

highly unusual transactions for Refco and, on their face, raise a strong inference of scienter. The

first step in each of Refco's circular quarter-end transactions involved Refco Capital "lending"

sums far in excess of its net earnings to an outside customer or to BAWAG. A "loan" transferring sums greater than Refco's net income away from the Company should have drawn substantial scrutiny from the Inside Defendants, the THL Defendants, Mayer Brown, Collins and Grant Thornton.

631.    The Guarantees by Refco.  Further, the transactions were unusual in that Refco provided guarantees – drafted by Mayer Brown – for RGHI's obligations to Customer X and other third parties.  The third parties were therefore subject to no economic risk, yet they received "interest" on the "loans."  This is additional evidence that the loans were simply a sham designed to benefit Refco.  Moreover, various loan and note documents that Mayer Brown drafted for Refco contained covenants prohibiting Refco from incurring additional indebtedness beyond set limits and, in certain instances, expressly prohibited the Company from entering into any guarantees.  For instance, Refco Group was a party to a Note Agreement dated June 29, 2000, which was drafted by Mayer Brown and provided that "the Company will not become or be liable in respect of any Guaranty of Indebtedness of [its subsidiaries] and will not permit any [of its subsidiaries] to become or be liable in respect of any Guaranty of Indebtedness of [Refco Capital]."  But for their deliberate intent and/or recklessness, these facts would have alerted the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton to the fraudulent scheme.

632.    Refco Capital Paid the Interest Owed by RGHI.  The net interest to the third-party customers was paid by Refco Capital, even though this amount was owed by RGHI.  Thus, Defendants Bennett, Maggio and others were forcing Refco, through Refco Capital, to pay the interest on a loan extended to a purportedly separate entity owned by Bennett and Grant.  The Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton either knew

or recklessly failed to discover that Refco was paying interest on a loan extended to an entirely separate entity, RGHI.

633.    No Proceeds Changed Hands. For the majority of the round-trip loan transactions, no funds actually changed hands other than the "interest" paid to the third-party participant. As described above, the third-party customers never actually received the proceeds of the multi-hundred million dollar "loans" purportedly extended to them by Refco Capital. Rather, the proceeds would never leave Refco and would be transferred directly from Refco Capital to RGHI and then the pattern was reversed so that they would be transferred from RGHI back to Refco Capital. That no principal actually changed hands in these "loans" should have alerted the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton to their fraudulent nature.

634.    Lack of Business Purpose. The circular transactions also raise a strong inference of scienter because, on their face, they serve no legitimate business purpose. At their core, these transactions involved nothing more than funneling money from Refco through a third-party or BAWAG and RGHI to Refco (and back again), with intermediary steps intended to create the appearance that the funds had a different source. On their face, the transactions were shams with no economic justification. There is no conceivable legitimate reason for Refco to arrange for and guarantee payments for hundreds of millions of dollars of loans (timed to occur at Refco's financial period ends) from third-parties to RGHI, and then have the proceeds of those loans transferred to Refco. The obvious lack of a legitimate business purpose for Refco's circular transactions also raises a strong inference of scienter with respect to the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton.

635.    <u>Insider Status and Access to Inside Information</u>.  The Inside Defendants, the THL Defendants, and Grant Thornton held positions in or with respect to the Company which gave them access to inside information, thus raising a strong inference that they knew or recklessly disregarded the truth about the transactions discussed above.  The Officer Defendants were responsible for the Company's operations and played a critical role in its management.  The IPO Registration Statement, for example, highlighted the critical role played by Refco's management in the Company's operations, stating that the Company's "success depends to a significant degree upon the continued contributions of our management team, particularly our President and Chief Executive Officer, Phillip Bennett."  Similarly, the IPO Registration Statement makes clear that the Audit Committee Defendants were responsible for "the integrity of [the Company's] financial statements."  As Refco's auditor, Grant Thornton was also responsible for the accuracy of Refco's financial statements and had unfettered access to the Company's inside information.  The THL Defendants had an obligation to obtain and review inside information of Refco in connection with their due diligence process for the LBO, and following the LBO, these defendants had unfettered access to Refco's books as a result of their direct role in the day-to-day management of the Company.  In light of the size, timing, unusual nature, and lack of any business purpose for these transactions discussed above, these Defendants' access to, and obligation to monitor, all the underlying facts and circumstances of these transactions raises a strong inference of scienter with respect to the Inside Defendants, the THL Defendants, and Grant Thornton.

636.    <u>The Refco/RGHI Relationship</u>.  The close relationship between Refco and RGHI – the related party in which Refco's uncollectible receivables were stashed – was well-known to the Inside Defendants, the THL Defendants, Mayer Brown, Collins, and Grant Thornton, as was

the fact that RGHI was controlled by Bennett. The IPO Registration Statement and the Bond Registration Statement each plainly state that RGHI is wholly owned by Bennett and disclose numerous ties between RGHI and Refco, the Audit Committee Defendants, and the Officer Defendants. These ties include RGHI's massive ownership of Refco stock (larger than the total number of shares issued in the IPO); RGHI's power to appoint several members to Refco's board of directors; and RGHI's direct payment of over $37.5 million to Officer Defendants Murphy, Maggio, Sexton, and Klejna for their interest in a Company-endorsed profit-sharing agreement in connection with the LBO. Additionally, Mayer Brown represented both RGHI and Refco in each of the round-trip transactions, a fact which confirms Mayer Brown's and Collins' knowledge that the entities were related and that the loans between them were not made at arms'-length. The Inside Defendants the THL Defendants, Mayer Brown, Collins, and Grant Thornton were therefore familiar with RGHI and had every reason to know that it was a related party controlled by Refco's President and CEO. The close relationship between Refco and RGHI, and these Defendants' knowledge thereof, also raises a strong inference of scienter.

637.   _Bennett Involved on Both Sides._  By virtue of their involvement in the drafting of the loan transaction documents and their receipt of the executed documents, Mayer Brown, Collins, and the other Mayer Brown employees who worked on the round trip transactions (including Koury and Monk) knew that Bennett was involved on both sides of most of the transactions, signing the guarantees on behalf of Refco and the loan documents on behalf of RGHI. These facts were also known by Bennett, and were known or recklessly disregarded by the THL Defendants and Grant Thornton, who should have reviewed the documentation for these significant, recurring transactions.

638.    <u>RGHI Had No Liquid Assets</u>.  The Inside Defendants, the THL Defendants,

Mayer Brown, Collins, and Grant Thornton knew that RGHI was not only a related party of

Refco, but also that it was simply an off balance-sheet holding company that Bennett and Grant

used to "park" their significant personal holdings of Refco stock.  These Defendants also knew

that RGHI had no liquid assets and no operational functions, thereby making it highly suspicious

that RGHI would repeatedly need to "borrow" hundreds of millions of dollars (at each of Refco's

financial period ends) for any legitimate purpose.  It was particularly suspicious that RGHI

would need this money at exactly the same time that Refco was closing its books.

639.    <u>Line-Item Records of the Round Trip Transactions</u>.  Internal statements of

RGHI's accounts at Refco Capital contained line-items reflecting the flow of funds in the

circular transactions used to conceal the outstanding receivable.  In particular, the account

statements clearly show massive inflows of cash to RGHI in the days immediately before

Refco's fiscal year end, and massive outflows of like (and often identical) sums of cash several

days after the fiscal year end.  The fund transfers recorded in these account statements were at all

times for material amounts far in excess of Refco's net income for the given year and could,

therefore, not have escaped notice.  The highly suspicious size and timing of this documented

flow of funds should have alerted Grant Thornton to the likelihood of financial manipulation and

raises a strong inference of scienter.  For example:

(a)    Account statements for February and March of 2002 reflect two wire

transfers from "1ST Union – BAWAG" to RGHI on February 25, 2002 in the amounts of

$90,000,000 and $210,000,000.  The same document contains entries for March 4, 2002

showing wire transfers from RGHI back to "1ST Union – BAWAG" in the amounts of

$90,040,950 and $210,075,133.33.  Significantly, this roughly $300,000,000 round-trip

was for an amount over three times the size of Refco's reported net income of

$93,634,000 for the fiscal year ended February 28, 2002.

  (b) Account statements for February and March of 2003 reflect two wire

transfers from "Wachovia NY INTL" to RGHI on February 25, 2003 in the amounts of

$75,000,000 and $175,000,000. Supporting documentation attached to these statements

make clear that the funds from "Wachovia NY INTL" are funds from the accounts of

"BANK FUER ARBEIT UND WIRTSCHAFT"—*i.e.*, from BAWAG. The same account

statements also contain entries for March 4, 2003 showing a wire transfer from RGHI

back to "BAWAG" in the amount of $75,000,000. The very next line contains an entry

for a transfer of $175,000,000 labeled only "TRANSFER." Upon information and belief,

this $175,000,000 was transferred directly to Refco Capital (its original source) rather

than routing the funds back to Refco Capital through BAWAG, which was unnecessary

now that the financial reporting benefit of the circular loans had been achieved.

Significantly, this $250,000,000 round trip was for an amount over $100 million greater

than Refco's reported net income of $140 million for the fiscal year ended February 28,

2003.

  (c) Account statements for February and March of 2004 reflect two wire

transfers from "Wachovia NY INTL" to RGHI on February 25, 2004 in the amounts of

$40,000,000 and $210,000,000. Supporting documentation attached to these statements

make clear that the funds from "Wachovia NY INTL" are funds from the accounts of

"BANK FUER ARBEIT UND WIRTSCHAFT"—*i.e.*, from BAWAG. The same

account statements also contain entries for March 4, 2004 showing a wire transfer from

RGHI back to "BAWAG" in the amount of $40,014,044.44. The same date contains an

entry for a transfer of $210,000,000 labeled only "TRANSFER." Upon information and belief, this $210,000,000 was transferred directly to Refco (its original source) rather than routing the funds back to Refco through BAWAG, which was unnecessary now that the financial reporting benefit of the circular loans had been achieved. Significantly, this $250,000,000 round trip was for an amount over $60 million greater than Refco's reported net income of $187 million for the fiscal year ended February 28, 2004.

640.    Maggio's Control of Refco Capital. Defendant Maggio's control of Refco Capital raises a strong inference of scienter. The funds used in the circular transactions originated with Refco Capital, of which Maggio was the President. Maggio signed several of the Refco Capital/Customer X Loan Agreements (specifically those dated February 21, 2003; February 20, 2004; August 25, 2004; November 26, 2004; December 30, 2004; February 23, 2005; and August 26, 2005), and was listed as the person to receive legal notices for both Refco Capital and RGHI for all transactions with Customer X from February 2003 onward. Maggio was forced from his position at Refco as a result of the disclosure of the circular transactions.

641.    Defendants Bennett, Maggio, Trosten, Mayer Brown, and Collins' Direct Involvement in the Blatantly Fraudulent Transactions. As set forth above, e-mails and letters by and between BAWAG, Bennett, Maggio and Trosten relating to the blatantly fraudulent BAWAG transactions unequivocally demonstrate that those defendants had knowledge of, and participated in, the scheme to conceal the receivable owed by RGHI to the Company. These so-called "loan" transactions did not involve collateral, formal loan documentation or, in large part, interest payments. Thus, these "loan" transactions served no legitimate purpose and were on their face obvious shams designed to further the scheme to misstate Refco's financials. Similarly, as set forth above, Defendants Bennett, Maggio, Collins, and Mayer Brown had

knowledge of, and participated in, the scheme to conceal the receivable owed by RGHI to the Company. Defendants Collins and Mayer Brown negotiated and drafted the documentation for the sham round-trip "loan" transactions at the request of Bennett and Maggio, who signed the documents.

642.    <u>Silverman's Close Connections to Both Refco and RGHI</u>. In addition to serving as Controller and Secretary of Refco, Defendant Silverman was Secretary of RGHI, the Bennett-owned entity that was used to carry out the fraudulent "Round-Robin" transactions. Silverman, a close confidant of Bennett, was placed on leave at or about the same time as Bennett and Maggio. According to a November 16, 2005 article on www.thestreet.com, sources have indicated that Silverman's leave was due to his involvement in the bookkeeping that allowed Bennett to conceal Refco's customer trading losses. Silverman's close ties to Bennett, his knowledge of accounting, his role as Controller of the Company (which included the recording of entries on the Company's books), and his being placed on leave amidst rumors of his involvement in the booking of the fraudulent transactions, are all facts that raise a strong inference of his scienter.

643.    <u>Severance Payment to Trosten</u>. Within a few months of the LBO, Trosten received a severance payment of at least $45 million when he resigned as CFO in October 2004 at the age of 35, after serving in that position for only three years. This severance payment was not disclosed by the Company, and became public only after Trosten was forced to admit receiving it during testimony in an arbitration proceeding in the summer of 2005. Notably, Trosten's resignation and the severance payment occurred at the same time he knew that Grant Thornton was reviewing and/or re-auditing the Company's fiscal year 2002 financial statements.

The Former Refco Officer was one of many who viewed the size of the severance and the timing of Trosten's resignation – just as the IPO planning had begun – as very suspicious.

644.    The approximately $45 million severance payment was exponentially greater than Trosten's annual compensation of $3,139,000 in salary and bonuses for fiscal year 2004 and was grossly disproportionate to his level of experience and expertise.  It also far exceeded the severance package disclosed on page 88 of the Offering Memorandum, which would have entitled him to eighteen months of his base salary and annual bonus as of the date of termination. Trosten's extraordinarily lucrative $45 million severance package, which was one of many that was concealed from the public and was paid while the scheme to conceal the Company's uncollectible debts was actively ongoing and at the same time Grant Thornton was reviewing the Company's 2002 financial statements, raises a strong inference of scienter.  In particular, it raises a strong inference that Trosten knew about the scheme to defraud the Company's investors, and that Bennett and the Company, including the Inside Defendants and the THL Defendants who approved his severance package, paid him off in an effort to buy his silence when he left the Company.

645.    History of Legal Violations. Refco had a history of legal violations and improprieties that should also have alerted the Inside Defendants and Grant Thornton to the risk of financial manipulation.  Indeed, from the time Bennett became the Company's chief financial officer in 1983, the CFTC penalized Refco at least 140 times for violations that included filing false trading reports, inadequate record-keeping, and inadequate supervision of its traders – the worst record in the industry.  As reported in Bloomberg Markets in February 2006, a former CFTC official involved in regulating Refco explained that "Refco was a firm that said 'Show us where the edge is,' and then they played just over it."  Refco's culture of rule-breaking and

repeated legal troubles should have, and but for their recklessness would have, alerted Grant

Thornton, the THL Defendants, Mayer Brown, Collins and the Inside Defendants (who, unlike

outside investors, had unfettered access to Refco's managers, books, and records) to Refco's

fraudulent financial reporting.

646.    For example, Refco was implicated in a SEC investigation related to a

manipulative scheme involving shares of Sedona Corp., an Arizona technology company whose

stock price had collapsed as a result of illegal short selling conducted through Refco. As late as

May 2005, Refco had received a "Wells Notice" from the SEC, recommending civil enforcement

proceedings against Refco for violations of the Securities Act and the Exchange Act – including

violations of the Rule 10b-5 anti-fraud provisions promulgated thereunder. The investigation

also focused on Defendant Maggio, then the President and CEO of Refco Securities, the Refco

subsidiary through which the illegal short sales of Sedona stock had been cleared. The

investigation was still ongoing at the time of Refco's IPO and the bankruptcy filing that occurred

shortly thereafter. Mayer Brown represented Refco in connection with the matter.

647.    Refco was also implicated in CFTC and SEC enforcement actions where Refco

was accused of improperly shifting client funds between related party accounts – the same type

of transactions that Refco used to hide the fraud in this case. For instance, Refco was directly

involved in an enforcement action arising out of the conduct of S. Jay Goldinger ("Goldinger"), a

Beverly Hills-based money manager who was accused of defrauding his clients by hiding losses

in client accounts with Refco's assistance. Functioning much like a Ponzi scheme, the fraud was

achieved by shifting funds between client accounts with losses and gains – profits were placed in

the accounts of clients who asked for their money back while losses were stashed in accounts

that appeared dormant. Refco participated in that scheme by allocating funds among Goldinger's

clients' accounts at the close of each trading day in accordance with Goldinger's instructions. As the Inside Defendants and Grant Thornton knew well before the Class Period, Refco paid $8 million in 1999 to settle charges brought by the CFTC and the Chicago Board of Trade and over $40 million in arbitration awards to defrauded investors.

648.    In yet another forerunner of the circular transactions Refco used to hide its massive related-party receivable, Refco was fined $1.2 million by the CFTC in 1994 for using funds in client accounts to pay off its own debts. As discussed in an October 13, 2005 article available from Bloomberg Newswires, according to the CFTC at the time, Refco improperly availed itself of as much as $123 million in client funds on an "almost daily basis" in order to pay off debts owed by Refco Capital. Refco settled the CFTC action without admitting or denying guilt, but with a promise to stop unlawfully commingling funds. Aspects of this matter sufficient to put the Inside Defendants and Grant Thornton on notice of potential improprieties at Refco were well known to these Defendants before the Class Period.

649.    In another instance involving the improper manipulation of related accounts, Refco hid losses in a client's account from the CFTC and Chicago Board of Trade by depositing its own funds into the client's depleted account and obtaining a promissory note from the client on the side. During the late 1990s, the Eastern Trading Company, a bullion trading company based in Dubai, suffered massive speculative losses resulting in a debit balance of $28 million in their account. Such a debit would have triggered reporting requirements. In order to avoid these requirements, Refco "repaid" the debit balance with its own funds and took a promissory note from the Eastern Trading Company for the same amount. As Judge Richard Posner explained in an opinion issued in 2000 by the United States Court of Appeals for the Seventh Circuit, "it is true that for reasons having to do with reporting requirements imposed by the commodities

exchanges, Refco did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate." <u>Eastern Trading Co. v. Refco, Inc.</u>, 229 F.3d 617, 626 (7th Cir. 2000). Although holding that Refco was entitled to performance on the promissory note, Judge Posner concluded that the arrangement existed "for the disreputable purpose of fooling the Board of Trade and the Commodities Futures Trading Commission." <u>Id</u>. Aspects of this matter sufficient to put the Inside Defendants and Grant Thornton on notice of potential improprieties at Refco were well known to these Defendants before the Class Period.

650.    Refco's history of regulatory violations was also well known to the THL Defendants, even before the LBO.  The THL Defendants' knowledge of Refco's checkered past—dating back even prior to their insider status at the Company—should have caused them to exercise additional scrutiny in reviewing the Company's books and records. The THL Defendants' failure to uncover the Company's fraud, under these circumstances, was at best reckless.

651.    <u>Accounting Department Was In "Shambles."</u>  The Former Refco Officer described above stated that the accounting department at his unit of Refco was overworked and understaffed, with the result that "the Accounts Department was an absolute shambles." This Former Refco Officer also stated that, in or about 2003-2004, it was apparent to him that Refco had "absolutely no financial controls or reporting systems;" that he had "never seen an operation

run anywhere like [he] witnessed at Refco;" and that there was a "very, very laissez faire attitude

toward risk management and compliance in general." In addition, a former member of Refco's

accounting group, who worked in the New York office and was responsible for management

reporting within the futures business, stated that prior to the IPO there was "no internal audit" or

significant accounting infrastructure of any kind. When Refco's management finally did appoint

a Director of Internal Audit shortly before the IPO, they selected Defendant Silverman, whose

role with RGHI and close ties to Bennett prevented him from performing that function in an

objective and independent fashion.

652.    Grant Thornton's Empty Threat to Walk Away From the IPO Process.  The

deficiencies in Refco's accounting department were well known to Grant Thornton, which noted

"significant deficiencies" in Refco's internal controls in October 2004, including a lack of

adequate resources and expertise in Refco's accounting group. When those deficiencies had not

been corrected by December 2004, Grant Thornton's audit team expressed concerns to Grant

Thornton's Professional Standards Group regarding whether Grant Thornton should be involved

in the IPO. Inexplicably, however, Grant Thornton provided its consent to the inclusion of its

audit opinion in the Bond Registration Statement despite these concerns.





653. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ And yet, Grant Thornton had consented to the inclusion of its audit opinion in the Bond Registration Statement.

654. ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ██████████████████████████ Thus, Bennett

called Grant Thornton's bluff and indicated his intent to proceed with the IPO as quickly as possible. Unfortunately for investors, Grant Thornton did not stick to its guns and ultimately consented to the inclusion of its audit report in the IPO Registration Statement despite the Company's failure to correct the "significant deficiencies" in its internal controls – just as Grant Thornton had done in connection with the Bond Registration Statement. Grant Thornton's decision to proceed under these circumstances evinces, at best, a reckless disregard for the truth and accuracy of Refco's financial statements and of Grant Thornton's own audit opinions.

### B.   Motive and Opportunity

655.    The unique factors that motivated the Inside Defendants and the THL Defendants to conceal the Company's massive related-party receivable in order to complete the Bond Offering and the IPO also raise a strong inference of scienter. The LBO in June 2004 and the recapitalization of the Company leading up to Refco's much-anticipated IPO fostered an environment of greed and recklessness amongst Refco insiders eager to cash in on the massive amount of capital suddenly flowing into the thinly-capitalized, highly leveraged firm. Despite the fact that $2.3 billion was raised in connection with the THL Partner Defendants' recapitalization, in the year leading up to the IPO and the subsequent collapse of Refco, the Inside Defendants stripped close to $1 billion from the Company. As described below, they did so through sales of equity interests in the LBO; enormous outright grants of Refco common stock; the "green shoe" oversubscription option on the IPO, the proceeds of which were used to personally enrich RGHI and the Officer Defendants; further grants in the form of "Restricted Stock Units" ("RSU") to the Officer Defendants and the Audit Committee Defendants – awards of large blocks of stock that vest over time upon certain conditions; and several other bonus and compensation plans. Public disclosure of the related-party receivable, and the sham transactions

used to conceal it, would have prevented the LBO (which was financed via the Bond Offering) and the IPO from occurring.

656.    <u>Cashing Out of Equity Interests in the LBO</u>.  The feeding frenzy began in June 2004, when the THL Partner Defendants and their passive co-investors purchased a 57% stake in Refco for approximately $507 million in cash.  According to press reports, these funds were paid to RGHI, which at the time was owned by Bennett and Grant.  In connection with the transactions, Refco Group transferred $550 million in cash plus all of its equity interests in Forstmann-Leff International Associates, LLC (valued at approximately $231 million) to RGHI.  According to an October 20, 2005 article on <u>Bloomberg</u> newswires, through an additional agreement with the THL Partner Defendants, Bennett (along with Grant) was also entitled to another $120 million, which consisted of $12 million in cash and $108 million in the form of debt forgiveness.  Additionally, Bennett (along with Grant) received $24.9 million in penalties for the early redemption of outstanding debt, plus $19.8 million due to certain change-of-control provisions.  Bennett (through RGHI) also rolled over a $383 million equity investment in the Company, representing a 43% stake.

657.    <u>Payments to the Officer Defendants in the LBO</u>.  Officer Defendants Trosten, Murphy, Sexton, Maggio, and Klejna also realized significant financial windfalls in connection with the LBO.  In connection with the THL Partner Defendants' investment, eight Refco executives had their interests in a Company-endorsed profit-sharing agreement liquidated by RGHI, allowing them to share in payments totaling over $100 million, with Trosten receiving $48 million, Bennett receiving $25 million, Murphy receiving $13.7 million, Sexton receiving $9 million, Maggio receiving $8.4 million and Klejna receiving $6.5 million.  This was in addition to the multi-million dollar salaries and bonuses received by these executives over the period of

2003 to 2005 and the generous stock option awards they received in advance of the IPO.

Moreover, of these amounts, over $4 million payable to Murphy, over $2.3 million payable to

Maggio, and nearly $2 million payable to Sexton was scheduled to be paid in equal installments

on December 31, 2005 and December 31, 2006, but would be accelerated if an IPO were

consummated before those dates. These large payments strongly indicate these Defendants'

motivation and intent to use the LBO and the IPO to extract large personal payments, raising a

strong inference of scienter.

658.



███████████████████████████████████

███████████████████████████████████████

██████████████████████████████

659.  _Direct Equity Interests._  In the lead-up to the IPO, the Officer Defendants and the

Audit Committee Defendants received unusually large grants of Refco common stock.  The

benefits of these grants could only be realized through an IPO, which created a public trading

market for the stock and substantially increased its trading value, thereby greatly increasing these

Defendants' personal wealth.  The following chart sets forth the Officer Defendants', Audit

Committee Defendants', and THL Partner Defendants' Refco stock holdings on the eve of the

IPO, and the value thereof at the offering price, as set forth in the Prospectus:

| Defendant | Stock Held at IPO | Value at IPO Price |
|---|---|---|
| Bennett | 48,427,000 shares | $1,065,394,000 |
| Thomas H. Lee Equity Fund V, L.P. | 44,322,000 shares | $975,084,000 |
| Thomas H. Lee Parallel Fund V, L.P. | 11,500,000 shares | $253,000,000 |
| Thomas H. Lee Equity (Cayman) Fund V, L.P. | 611,000 shares | $13,442,000 |
| 1997 Thomas H. Lee Nominee Trust | 73,000 shares | $1,606,000 |
| Sherer | 464,000 shares | $10,208,000 |
| Sexton | 596,000 shares | $13,112,000 |
| Murphy | 534,000 shares | $11,748,000 |
| Maggio | 503,000 shares | $11,066,000 |

| Defendant | Stock Held at IPO | Value at IPO Price |
|-----------|-------------------|--------------------|
| Klejna    | 261,000 shares    | $5,742,000         |
| Breitman  | 13,000 shares     | $286,000           |
| Gantcher  | 13,000 shares     | $286,000           |
| O'Kelley  | 13,000 shares     | $286,000           |

660.    With respect to the 56,432,000 shares of Refco stock that were held by the Thomas H. Lee Equity Fund V, L.P., the Thomas H. Lee Parallel Fund V, L.P. and the Thomas H. Lee Equity (Cayman) Fund V, L.P. just prior to the IPO, the Prospectus also identifies defendants Lee, Harkins, Jaeckel, and Schoen as beneficial owners of those shares.

661.    The substantial pecuniary benefits that these Defendants received, and could only have received, through an IPO raises a strong inference that they acted with scienter. Indeed, the THL Defendants (not including their passive co-investors) collectively sold 7.72 million shares in the IPO, receiving cash proceeds of approximately $170 million while retaining a 37.8% ownership stake. Defendant Bennett (through RGHI) sold 5.375 million shares in the IPO, netting over $118 million in cash while retaining a 33.8% stake in the Company. Significantly, a "lock-up" agreement with the Stock Underwriter Defendants was the only impediment preventing the other Officer Defendants from similarly cashing in all or a portion of their equity interests in the IPO. That "lock-up" agreement prevented the other Officer Defendants and the Audit Committee Defendants from selling their shares for 180 days after the IPO – a date that was ultimately preceded by Refco's collapse. The THL Defendants', Officer Defendants' and Audit Committee Defendants' clear motivation to conduct an IPO raises a strong inference of scienter.

662.    The Green Shoe Option.  The Officer Defendants, the THL Partner Defendants, and RGHI also stood to benefit substantially from the use of the "green shoe" option in case of oversubscription on the IPO.  Refco registered nearly four million additional shares for sale in the IPO in case the 26.5 million shares planned for sale in the IPO were over-subscribed.  As set forth in the Prospectus, the proceeds from the exercise of this "green shoe" option were distributed directly to the shareholders of record before the IPO, including the Officer Defendants, the THL Partner Defendants, and RGHI.  In other words, by creating sufficient demand for Refco stock at the time of the IPO, these Defendants received an extra cash payment from the sale of the shares dedicated to cover the over subscription.  The prospect of these cash payments further motivated these Defendants to conceal and misrepresent Refco's true financial condition.  Ultimately, there was such strong demand generated around the IPO that it triggered the sale of an additional 3,975,000 shares by Refco to cover over-allotments, the extra proceeds of which went directly to Bennett (through RGHI), the THL Partner Defendants and the Officer Defendants in the form of a "dividend" totaling over $82.2 million (after deduction of the Underwriter Defendants' fees).  Upon information and belief, the following chart sets forth the approximate cash payments realized by these Defendants as a consequence of the green shoe option (based on a pro-rata distribution of shares to existing shareholders):

| Defendant | Pre-IPO Interest | Pro Rata Cash Payment |
|---|---|---|
| Bennett (through RGHI) | 42.1% | $34,607,463 |
| Thomas H. Lee Equity Fund V, L.P. | 38.5% | $31,648,155 |
| Thomas H. Lee Parallel Fund V, L.P. | 10.0% | $8,220,300 |
| Thomas H. Lee Equity (Cayman) Fund V, L.P. | 0.53% | $435,676 |

| Defendant | Pre-IPO Interest | Pro Rata Cash Payment |
|---|---|---|
| 1997 Thomas H. Lee Nominee Trust | 0.06% | $49,322 |
| Sherer | 0.40% | $328,812 |
| Sexton | 0.52% | $427,456 |
| Murphy | 0.46% | $378,134 |
| Maggio | 0.44% | $361,693 |
| Klejna | 0.23% | $189,067 |

663.    <u>Defendants Focused on IPO Riches</u>.  By April 2005, the ground work had been laid for the Officer Defendants, the Audit Committee Defendants and the THL Defendants to sell a huge stake of the Company to the investing public through an IPO.  An IPO was extremely attractive to these Defendants because it would allow them to reap huge financial rewards from their ownership stake in the Company.  Not only would these Defendants collectively stand to make more than $1 billion from an IPO, but it would have other benefits as well.  For example, it would (i) create a public trading market that would allow these Defendants to sell their stock for huge profits or, at a minimum, use their Refco stock as collateral for personal loans; (ii) create a significant capital infusion for the Company that would increase the book value of all Refco shares, including the millions of shares that these Defendants would retain after an IPO; and (iii) result in a huge one-time "special dividend" payment through the green shoe option that would be used to line the pockets of these corporate insiders.

664.    A successful IPO would also provide additional benefits to the THL Defendants because they were in the process of marketing a new private equity fund, which required them to raise approximately $7.5 billion from institutional investors.  The THL Defendants could

"leverage" the publicity provided by a high-profile IPO of Refco by touting the quick profits they and their co-investors had realized through their involvement with the Company, and thereby market their new fund and raise billions of dollars of additional capital from institutional investors. By demonstrating a quick profit on the Refco IPO, the THL Defendants greatly increased their chances of raising the capital to form a new fund in the hyper-competitive leveraged buyout community. The THL Defendants stood to make huge fees and profits from their new private equity fund.

665.    For example, the Former Refco Officer stated that Refco purchased the Company at which he previously worked because, in his view, Refco was acquiring brokerage companies solely to build volume in order to "get ready for the big payoff which was the IPO." He stated that the New York Five did not care about the quality of revenue at operating units such as the one he ran, because their only objective was to build volume by opening new offices, without evaluating whether adding these offices was a sound business decision. The Former Refco Officer communicated his concerns over these issues to the New York Five, but they did not respond. While he was at first puzzled by senior management's lack of responsiveness, over time it became clear to him that "really they didn't care, because ultimately this was all a house of cards anyway." According to this Former Refco Officer, "the five guys who were running the company were all hooked into the IPO."

666.    RSU Grants to Officers. The Officer Defendants also received huge grants of RSUs in advance of the IPO, and were consequently motivated to conceal Refco's true financial condition. Under the terms of the Restricted Stock Unit agreements, 50% of a grant would vest ratably over four fiscal years, and the other 50% would vest upon the achievements of undisclosed EBIDTA targets. Upon the closing of the LBO and the Bond Offering on August 5,

2004, Bennett received 1,203,365 RSUs; Murphy, Sexton and Maggio each received 701,963

RSUs; and Klejna received 350,981 RSUs. On December 6, 2004, Sherer was awarded 690,000

RSUs. These large grants of RSUs motivated the Officer Defendants to conceal Refco's true

financial condition in order to conduct an IPO because the RSUs were worthless without a public

market for the underlying shares. Further, the RSUs' emphasis on EBIDTA targets also

motivated the Officer Defendants to conceal Refco's bad debts, because writing off those debts

as required would have substantially reduced EBIDTA and prevented the relevant vesting

conditions from being triggered.

667.    RSU Grants to the Audit Committee. Each of the three Audit Committee

Defendants also received 20,000 RSUs in advance of the IPO. This arrangement was extremely

unusual not only because of its impact on the Audit Committee Defendants' purported

independence, but also because the Audit Committee Defendants were the only members of the

Board to receive these RSU grants. In other words, the three board members responsible for the

"integrity of [Refco's] financial statements" were specially compensated by a massive grant of

RSUs that would have been rendered worthless by revelation of Refco's true financial condition

because such a revelation would have prevented the IPO from occurring. Accordingly, the

highly unusual grant of RSUs to the Audit Committee Defendants also raises a strong inference

of scienter.

668.    Bonus Compensation. The Officer Defendants were also motivated to conceal

Refco's true financial condition as a result of the Senior Management Bonus Pool Plan ("Bonus

Plan"). As discussed in the Prospectus, the Bonus Plan would only pay bonuses to senior

management subject to performance criteria based on EBIDTA. Had they not been concealed,

the uncollectible receivables would have been written off, thereby causing a substantial reduction

in (if not an entire elimination of) Refco's EBIDTA. The Officer Defendants' desire to receive bonuses under the Bonus Plan also raises a strong inference of scienter.

669. Each of the Inside Defendants had the opportunity to commit fraud, because each of them prepared, reviewed and/or approved the financial statements and other documents containing the materially false and misleading statements and omissions as alleged herein, and thus had the ability to influence and control the content of those statements. RGHI had the opportunity to commit fraud by virtue of its exercise of control over the Company, and its ability to influence and control the content of the Company's public statements, including those that were materially false and misleading as alleged herein.

670. <u>Review and Payment of Mayer Brown Legal Fees.</u> As CFOs, Trosten and Sherer were responsible for receiving and authorizing the payment of legal bills from Mayer Brown that, on information and belief, described the legal work performed by Mayer Brown in connection with documenting the transactions described above. As General Counsel, Klejna was responsible for authorizing and supervising this outside legal work, and reviewing the subsequent bills. Accordingly, these Defendants were, or should have been, alerted to a bright red flag regarding the fraudulent activities described herein.

671. <u>Grant Thornton's Motive to Appease Refco's Management.</u> Defendant Grant Thornton was also significantly motivated to actively conceal or recklessly disregard Refco's massive related party receivable and the circular transactions that concealed it. Refco was a prestigious client for Grant Thornton – a client that Grant Thornton did not want to antagonize with probing and thorough audit inquiries. Indeed, Refco had not always taken its auditing business to Grant Thornton. Andersen – the Big Five firm that collapsed in the wake of the notorious Enron scandal – had previously been Refco's auditor. Afterward, former Andersen

partner Mark Ramler, Andersen's engagement partner for Refco, moved to Grant Thornton and brought the Refco account with him. This new business was a major triumph for Grant Thornton, which had picked up the crumbs of Andersen's collection of former clients as it watched the (now) Big Four accounting firms take the overwhelming majority. According to a New York Times article on February 20, 2006, Grant Thornton picked up less than 5% of Andersen's former clients – and none in the S&P 500 – as the remaining firms competed over Andersen's former business. Grant Thornton was thus motivated to restrain its approach to auditing Refco in order to minimize the risk that the Company – the crown jewel former Andersen client – would take its business elsewhere. Willful blindness to Refco's false and misleading financial reporting was the result. In fact, Defendant Grant Thornton performed auditing procedures so deficient, and engaged in such an egregious refusal to see the obvious or to investigate the doubtful, that each time it audited the Company, its audit amounted to no audit at all.

672.    Moreover, Refco was a company that actively anticipated conducting an IPO. The IPO market in 2004 and 2005 had slowed substantially from previous years. At the same time, there was substantial investor interest in companies, like Refco, that dealt in derivatives. In this sluggish market environment, the prospect of acting as Refco's auditor in connection with its IPO, especially in a market eager for investment opportunities in the derivatives business, would have been seen as a major coup for Grant Thornton. Grant Thornton was thus substantially motivated to retain Refco as a client, and ensure that Refco experienced a successful IPO, in order to market itself to other clients in the derivatives industry. This powerful motive also raises a strong inference of Grant Thornton's scienter.

673. 

### C.   <u>Additional Allegations of Scienter As to the Audit Committee</u>

674.   The Audit Committee Defendants acted recklessly in the performance of their duties and, as a direct result, facilitated the fraudulent scheme described herein.  The vital importance of an audit committee to the integrity of a company's financial reporting is emphasized by the SEC in the rules promulgated pursuant to the Sarbanes Oxley Act of 2002:

> The audit committee, composed of members of the board of directors, plays a critical role in providing oversight over and serving as a check and balance on a company's financial reporting system.  The audit committee provides independent review and oversight of a company's financial reporting process, internal controls and independent auditors.  It provides a forum separate from management in which auditors and other interested parties can candidly discuss concerns.  By effectively carrying out its functions and responsibilities, the audit committee helps to ensure that management properly develops and adheres to a sound system of internal controls, that procedures are in place to objectively assess management's practices and internal controls, and that the outside auditors, through their

own review, objectively assess the company's financial reporting practices.

675.    The Audit Committee Defendants were responsible for assisting the entire board in the oversight of Refco's financial statements.  Indeed, it is fundamental that an audit committee have a detailed understanding of the Company, and particularly the adequacy of its financial systems and internal controls, as well as the soundness of the Company's business model (including the procedures for extending "margin" loans to the Company's customers, the existence of related-party transactions, and the collectibility of the Company's receivables).

676.    The IPO Registration Statement set forth the "primary purpose of the audit committee" as:

- Assist the board's oversight of:

  - the integrity of our financial statements;

  - our compliance with legal and regulatory requirements;

  - our independent auditors' qualifications and independence;

  - the performance of our independent auditors and our internal audit function; and

  - prepare the report required to be prepared by the committee pursuant to SEC rules.

677.    The Charter of the Audit Committee also sets forth, in great detail, the duties and responsibilities of the Audit Committee Defendants.  These duties included:

(a)      Reviewing and discussing with management, internal audit and the independent auditor the adequacy and effectiveness of Refco's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, through inquiry and discussions with the independent auditors, management and head of internal audit;

(b)     Discussing guidelines and policies governing the process by which senior management of Refco and the relevant departments of the Company, including the internal auditing department, assess and manage the Company's exposure to risk, as well as Refco's major financial and other risk exposures and the steps management has taken to monitor and control such exposures;

(c)     Reviewing and discussing with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by the Audit Committee, assigning additional internal audit projects to the head of internal audit;

(d)     Reviewing and discussing with management the Company's administrative, operational and accounting internal controls, including special audit steps adopted in light of the discovery of any significant and material control deficiencies;

(e)     Meeting periodically with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Company; and

(f)     Reviewing and discussing with management, the Company's independent auditors and the head of internal audit, material financial arrangements of the Company which do not appear on the financial statements of the Company.

These duties reflect the Audit Committee's comprehensive involvement in Refco's audit and financial reporting processes, and raise a strong inference that, but for the Audit Committee Defendants' reckless disregard for these duties, the falsehoods and misleading disclosures

described above would not have occurred.

678.    The IPO Registration Statement also stated that Defendant O'Kelley would serve as chairman of the audit committee and "qualifies as an independent 'audit committee financial expert' as such term has been defined by the SEC in Item 401(h)(2) of Regulation S-K." In order to satisfy Item 401(h)(2), Defendant O'Kelley was required to have extensive experience relating to reporting financial statements. This Item provides:

> (2) For purposes of this Item, an audit committee financial expert means a person who has the following attributes:
>
>> (i) An understanding of generally accepted accounting principles and financial statements;
>>
>> (ii) The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;
>>
>> (iii) Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;
>>
>> (iv) An understanding of internal control over financial reporting; and
>>
>> (v) An understanding of audit committee functions.

679.    Given these specific responsibilities and their supposed expertise, the Audit Committee Defendants were reckless in failing to detect, and in failing to put in measures to prevent, the fraudulent scheme described herein. Indeed, the Audit Committee's reckless failure to perform its duties is demonstrated by the fact that, as of February 28, 2005, Refco's auditors identified two significant deficiencies in the Company's internal controls. As stated in the IPO Registration Statement, a "significant deficiency" is defined as "a deficiency that results in more than a remote likelihood that a misstatement of the financial statements that is more than inconsequential will not be prevented or detected." The specific deficiencies noted were:

(a)    "the need to increase [the Company's] existing finance department resources to be able to prepare financial statements that are fully compliant with all SEC reporting guidelines on a timely basis"; and

(b)    "lack of formalized procedures for closing [the Company's] books."

680.    These two deficiencies fall squarely into the Audit Committee Defendants' area of responsibility, as described above, and should have alerted them that there was a significant risk of fraudulent activity at the Company. Moreover, these deficiencies created an environment where it was easy for Bennett, Maggio and others to fraudulently manipulate Refco's financial statements. As set forth in AU § 316, "fraud risk factors" include "domination of management by a single person or small group" and "weaknesses in internal control."

681.    The internal control deficiencies noted by Grant Thornton had existed through the entirety of fiscal year 2005, and in prior years as well. However, the existence of these deficiencies was not discovered, disclosed, or corrected by the Audit Committee Defendants. If the Audit Committee Defendants had not been reckless in the performance of their responsibilities, they would have discovered these deficiencies – which go to the heart of their oversight responsibilities – long before the auditors noted them in connection with the February 28, 2005 year-end review. Indeed, within two months after a new Controller was hired to improve the manpower in the Company's finance department, that Controller discovered and blew the whistle on the fraud.

682.    To compound their failure to identify these issues, the Audit Committee Defendants took no steps whatsoever to remedy these issues in a timely fashion. For instance, the IPO Registration Statement states that the Company was "in the process" of hiring "additional internal audit and financial personnel" as of August 10, 2005. Thus, approximately

six months after learning of these deficiencies – which they should have known about much earlier – the Audit Committee Defendants were still in the process of attempting to remedy them. While this delay would be reckless under any circumstance, it is particularly reckless here because in the intervening sixth months Refco had conducted two major transactions with respect to the issuance of public securities: the Exchange Offer for the Registered Bonds and the IPO.

683.    The reckless failure of the Audit Committee Defendants to remedy these identified deficiencies in a timely fashion can be explained, at least in part, by their motivation to effect these two transactions in the Company's securities. As explained above, each of the Audit Committee Defendants was granted 20,000 shares of RSUs that vested over a period of time. These RSUs were essentially worthless unless and until Refco conducted an IPO. Upon consummation of the IPO, these units instantly became worth hundreds of thousands of dollars, with the potential of increasing in value in the future. In order to ensure that nothing impeded them from reaping the monetary rewards of the IPO, the Audit Committee Defendants recklessly ignored their responsibilities to immediately correct the identified "significant deficiencies" in Refco's financial controls.

684.    As set forth above, the fraudulent scheme was eventually discovered by a Refco Controller who had been with the Company for only two months. If the Audit Committee Defendants had performed their duties and ensured that this Controller or other new employees had been hired in a timely fashion prior to the Exchange Offer and the IPO, it is likely that the fraud at Refco would have been revealed much earlier, saving investors hundreds of millions of dollars.

**D.    Additional Allegations of Scienter Against the THL Defendants**

685.    The THL Defendants were on notice of serious problems at Refco, by virtue of their purported "diligence" process in connection with the LBO that afforded them access to significant inside information of Refco.  That process began in late 2003, and involved not only the THL Defendants but also their professional advisors, including legal counsel (the law firm of Weil Gotshal & Manges LLP), a "Big Four" accounting firm (KPMG LLP) and others.  However, during the course of that process, Refco and its management failed to provide the THL Defendants and their advisors with certain information requested by the THL Defendants.  ■

686.

Such information was critical to an understanding of the quality and strength of Refco's balance sheet.

687.

688.



689. The THL Defendants knew that they had not been provided critical financial information from Refco and that Refco's management and accounting functions were of questionable strength. Despite the huge red flags that these facts should have raised, the THL Defendants proceeded to make a formal proposal to conduct the LBO. The THL Defendants also recognized that they lacked complete and adequate information regarding Refco's receivables, as evidenced by the list of "Pending Legal, Financing And Tax Due Diligence Requests" that was attached as Exhibit C to the letter and included "[a]nalysis of receivables as at February 28, 2002, 2003, November 30, 2003 and February 29, 2004 quantifying amounts due from … [c]ustomers; [b]rokers and dealers; [s]hareholder loans; and [o]ther loans, etc."

690.    The THL Defendants' inability to obtain important information regarding Refco's receivables continued after the date of the proposal letter. ████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████████

██████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████

691.    On May 17, 2004, KPMG provided a draft report to the THL Defendants which summarized its conclusions following its due diligence efforts. ████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████  KPMG's report also reflected that Trosten had told KPMG of a $42 million reserve that Refco had been holding for seven years in connection with customer losses in the Asian financial crisis, thus putting the THL

Defendants on notice of long overdue receivables.  Thus, the THL Defendants knew, but recklessly disregarded, that KPMG had not been given adequate information to fully assess the quality of Grant Thornton's audits of Refco's financial statements.  Nonetheless, the THL Defendants forged ahead with the LBO.

692.    According to the VR Complaint, although the THL Defendants at one point requested a meeting with E&Y – Refco's former tax advisor, which had resigned in 2003 due (among other reasons) to Refco's refusal to make its suggested disclosures regarding the RGHI receivables – Bennett refused to allow the meeting, and the THL Defendants simply abandoned the request.  Bennett's refusal to allow the meeting—in light of the THL Defendants' knowledge of the Company's "fast and loose" reputation and of the Company's pattern of failing to provide full responses to their diligence requests—should have raised another red flag with the THL Defendants.  Had the THL Defendants followed the simple step of insisting on the meeting with E&Y, they likely would have uncovered the fraud.

693.



The THL Defendants, accordingly, knew that Refco was willing to sweep damaging information under the rug until after the LBO closed, yet they nonetheless proceeded with that transaction.

694.     In late May 2004, just as they were finalizing the documentation for the LBO and preparing to make a public announcement, the THL Defendants learned even more damaging information about Refco when Schoen received a tip from a senior investment banker at Bear Stearns whose cousin was a former Refco executive.  The investment banker reported to Schoen that his cousin, whom the THL Defendants and KPMG would later refer to as "Deep Throat," had told him that Refco had been "sloughing off" trading losses into a Refco subsidiary during the 1990s, and that all was not well with Refco.  According to the Examiner's Report, the investment banker told Schoen that Deep Throat had worked for Refco during the 1990s while this "sloughing off" of losses was occurring.  Upon information and belief, Schoen also knew that the investment banker himself was the grandson of Refco's founder, which further heightens the credibility of the information the banker provided.  ████████████████████████
████████████████████████████████████████████████████████████
████████████████████

695.     The THL Defendants conveyed the Deep Throat tip to KPMG on May 26, 2004, and on May 28, 2004, KPMG sent Schoen a list of questions and additional diligence procedures for the THL Defendants to follow up on to investigate Deep Throat's report.  The top-priority items on the list of additional procedures were to obtain RGHI's financial statements and recent tax returns, reconcile them to Refco's books, and "[i]solate and investigate all items not flowing through from [Refco]."  KPMG also suggested that the THL Defendants "[o]btain details and understand the nature of inter-company financing arrangements, both on- and off-balance sheet."  According to the Examiner's Report, the KPMG partner who proposed these procedures told the Examiner that they would have been "likely fairly simple" to address promptly, and the Examiner "conclude[d] that these procedures, if implemented, should have detected the fraud."

696.    Incredibly, the THL Defendants never asked KPMG to perform **any** of the additional procedures that KPMG had proposed in response to the Deep Throat tip. Instead, they simply discussed the matter with Bennett, accepted his explanations at face value without any further investigation, and dismissed the tip based solely on his verbal assurances – irrespective of the fact that the tip came from a former Refco employee who claimed to have personal knowledge of the matters he was reporting. ████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████

697.    ███████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████ The THL Defendants accepted those assurances without conducting any further inquiry and without obtaining any corroboration. By recklessly brushing the "Deep Throat" tip under the rug and failing to investigate beyond talking to Bennett—who had a clear incentive to lie if, as the tip suggested, Refco's management was involved in the inappropriate activity—the THL Defendants missed the opportunity to discover that what Deep Throat said

was true: Refco had been inappropriately "sloughing off" massive losses into related party accounts.

698.    Despite knowing that Refco and its management had refused to provide important information, and had gone so far as to try to conceal adverse information from them, and despite being warned about the precise type of fraud whose disclosure would later cause the Company's downfall, the THL Defendants recklessly went forward with the LBO and acquired a controlling 57% interest in Refco, knowing that the risk would be borne by public investors who purchased Refco's Bonds.  Moreover, the THL Defendants undoubtedly took comfort in the fact that they intended to quickly monetize their interests in Refco by conducting a lucrative IPO in the near future, thereby further reducing the THL Defendants' own risk.  The documentation for the LBO was signed on or about June 8, 2004 – a mere week after the THL Defendants heard (but did not verify) Bennett's explanation for the Deep Throat tip.

699.    The week after the Merger Agreement was signed, on June 17, 2004, a jury returned a verdict against Refco in a lawsuit brought by Tradewinds Financial. ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

700.    Once the THL Partner Defendants' positions as controlling shareholders of Refco were solidified with the closing of the LBO, the THL Defendants had unfettered access to all of Refco's books and records and other inside information.  The THL Partner Defendants appointed

four directors (the THL Individual Defendants) to Refco's seven-member board, and Thomas H. Lee Partners executives Schoen, Jaeckel and George Taylor became President, Treasurer, and Secretary, respectively, of Refco. Additionally, pursuant to the Management Agreement, THL Managers (and thereby THL Partners and the THL Individual Defendants) were involved in the day-to-day management of Refco's operations – services for which THL Managers was paid over $31 million upon the closing of the LBO, and was to receive additional annual payments of the greater of $25 million or 1% of Refco's EBITDA.

701. By virtue of their status as insiders at Refco, the THL Defendants were aware of significant problems at the Company, including the gross inadequacy of Refco's accounting and auditing functions, both internal and external. Yet, the THL Defendants failed to correct those problems and instead focused their energies on rapidly unloading a significant portion of their equity stake to unsuspecting public investors through an IPO.

702. For example, on or about March 31, 2005, the THL Defendants received a copy of the letter dated October 15, 2004 from Grant Thornton to Bennett (the "Management Letter"), describing deficiencies in Refco's internal accounting function. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

███████████████████



i.

704.    At this point, the THL Defendants were aware (if they were not before) of serious deficiencies in Refco's internal controls which called into question the accuracy and reliability of its financial reporting.  Nonetheless, the THL Defendants recklessly (or perhaps intentionally) did not take action to ensure that these deficiencies were resolved prior to the IPO.

705.    The THL Defendants also documented – internally – their knowledge of deficiencies in Refco's internal accounting function. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Despite their awareness of these deficiencies in early 2005, the THL Defendants pressed forward with the IPO without taking any steps to ensure that these problems were remedied or that the financial statements being disseminated to public investors were accurate.

706.    Similarly, the THL Defendants chose not to replace Grant Thornton as Refco's outside auditor following the LBO, despite knowing that Grant Thornton lacked the necessary competence and independence to continuing serving in that role. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████





707.  ████████████████████████████████████████

████████████████

708.    A few months later, in February 2005, KPMG was proposing to do a risk evaluation for Refco in advance of the IPO.  On February 25, 2005, Sherer informed KPMG that they would not be proceeding with that evaluation. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

709.    Thus, ultimately, the THL Defendants put their own interests in completing the IPO quickly and avoiding increased scrutiny and a potential restatement, above those of outside investors like Plaintiffs who were relying upon the accuracy of Refco's financial statements. This deliberate choice by the THL Defendants, particularly when coupled with their knowledge of deficiencies in Refco's internal controls and in its financial and accounting functions, demonstrates a blatant and reckless disregard for the accuracy of Refco's financial statements.

### E.    Additional Allegations of Scienter Against Mayer Brown and Collins

#### 1.    Motive and opportunity

710.    Mayer Brown is a sophisticated law firm that served as primary outside counsel for Refco since at least 1994.  As the partner-in-charge of the Refco account, Collins had a

longstanding relationship with the Company going back nearly twenty years. In an article published in *The Street.com* in November 2005, a Refco employee was quoted as stating that "Collins was the go-to-guy at Refco," and that all important transactions and deals were cleared through Collins or Mayer Brown attorneys who worked for Collins.

711.    Refco's dependence on the legal services provided by Mayer Brown is further confirmed by the fact that Refco had a very small in-house legal team which lacked sufficient resources to handle the numerous regulatory, litigation and transaction matters that Refco was involved in on a regular basis. As Refco disclosed in documents publicly filed with the SEC, "most aspects of our business are subject to stringent regulation by U.S. federal and state regulatory agencies and derivatives and securities exchanges and by non-U.S. government agencies or regulatory bodies and exchanges." Refco was regulated domestically by, among others, the Commodity Futures Trading Commission, the SEC, the NASD, the Federal Reserve Board, and the Department of Treasury. Refco also disclosed that its foreign subsidiaries were "regulated extensively by non-U.S. governments, exchanges, self-regulatory organizations, central banks," including the Financial Services Authority in Great Britain and Euronext.liffe. In addition, Refco was involved in numerous litigations and arbitrations in federal and state courts across the country, was the subject of numerous disciplinary actions and fines levied by the various agencies who regulated the Company, and completed approximately nineteen corporate acquisitions between 1999 and 2005. In short, Refco had an enormous need for legal services, and Collins and Mayer Brown were the "go to" outside counsel for Refco from 1994 until October 2005.

712.    Examples of Mayer Brown's representation, through Collins, of Refco, Bennett, and/or Refco-related entities include:

(a)     Representing Bennett and Refco in connection with the LBO;

(b)     Representing Refco in connection with the Bond Offering;

(c)     Representing Refco in connection with the registration of the 144A Bonds;

(d)     Representing Refco in connection with the IPO;

(e)     Representing Bennett in connection with the negotiation of a June 8, 2004 Executive Employment and Non-Competition Agreement between Refco Group Ltd., LLC and Bennett (paragraph 14(ii) of the agreement states that all notices to Bennett under the contract should be directed to Collins);

(f)     Representing Refco in connection with the formation and initial financing of CIM Ventures, Inc., an entity that would later become one of Refco Capital's counterparties in the round-trip transactions;

(g)     Representing Refco in dozens of federal and state court litigations and in arbitrations throughout the world;

(h)     Providing Refco with tax advice;

(i)     Representing Refco in connection with an acquisition of a portion of the Company by BAWAG;

(j)     Representing RGHI in a March 2005 sale of assets to Bridgepoint Capital Ltd.; and

(k)     While Collins' "attorney profile" on the Mayer Brown website now omits any mention of Refco, a profile of him formerly available on "Chambers and Partners" noted that he was the "Lead attorney in Refco's acquisitions of RB&H, Lind-Waldock, LFG, and Main Street Trading Company."

273

713.    In short, the vast majority of important transactions and deals at Refco (including the LBO, Bond Offering, and IPO) were handled by Mayer Brown and billed through Collins. This unquestionably gave Mayer Brown and Collins the opportunity to commit fraud by structuring the sham transactions alleged herein, and by drafting, reviewing, and commenting upon the Company's public disclosures.

714.    Mayer Brown, Collins, and the other Mayer Brown employees who worked on the round trip transactions (including Koury and Monk) also possessed a strong motive to participate in the fraudulent scheme in order to ensure that Bennett and Refco continued to direct a steady flow of lucrative legal work to Mayer Brown. Refco was one of Mayer Brown's largest clients, accounting for approximately $5 million in billings per year. This amount represented approximately half the total amount of billings for which Collins was responsible at the firm. Mayer Brown, Collins, and other Mayer Brown attorneys knew that if they disclosed the fraud taking place at Refco, the Company would collapse and the river of fees Refco provided to them would dry up. Moreover, if the scheme was revealed at any point after Mayer Brown had worked with Refco in transferring its debts to RGHI or in documenting the round-trip transactions, Mayer Brown, Collins, and other Mayer Brown employees would face certain liability for their role (as has proved to be the case). Thus, they were motivated to perpetuate the fraudulent scheme to cover up their involvement. Further, Collins was motivated to participate in the scheme in order to retain and/or increase his salary, bonus and position as an influential partner at Mayer Brown.

### 2.    Knowledge and/or reckless disregard of the fraud

715.    Mayer Brown, Collins, and other attorneys employed by Mayer Brown, including Koury and Monk, acted with scienter with respect to the fraudulent scheme and the materially false and misleading statements discussed herein, in that they had actual knowledge that the

fraudulent scheme lacked any proper business purpose and was a sham designed solely to allow Refco to issue materially false and misleading financial statements and make other materially false and misleading public statements.

716.    As described above, there is abundant direct evidence that Collins and Mayer Brown were knowing and key participants in nearly every aspect of the fraudulent scheme, from the very first efforts by Refco to transfer uncollectible debts to RGHI, through the many years-long cover-up that Collins and Mayer Brown orchestrated and documented through the sham related-party loan transactions.

717.    As described above, Collins and Mayer Brown participated with Bennett and others in orchestrating one of the very first steps of the fraudulent scheme by negotiating, designing, and drafting the documentation for a plan to transfer the uncollectible Niederhoffer debts off the books of Refco and convert them into a sham receivable purportedly owed by RGHI.  These activities involved Collins as well as a number of other attorneys employed by Mayer Brown, including Monk.  Mayer Brown, Collins, and other Mayer Brown attorneys who participated in these activities (including Monk) knew or recklessly disregarded that the scheme to transfer these uncollectible receivables from Refco to RGHI was a blatant fraud.  There was no conceivably valid business purpose for RGHI—which Collins, Monk and Mayer Brown knew was a shell entity that was controlled by Bennett and had no operational component—to agree to pay Refco $71 million for the "right" to collect on the Niederhoffer debt.  This was particularly true since *Mayer Brown, through Collins, negotiated and drafted the documents whereby Refco reduced the value of that "right" to zero by releasing the right to pursue Niederhoffer to repay that debt*.  Thus, Collins and Mayer Brown knew that the so-called "right" to collect on the

Niederhoffer debt was worthless, and the sole purpose for RGHI's "paying" for this debt was so Refco could avoid writing it off in accordance with applicable accounting rules and regulations.

718.    Moreover, Mayer Brown, Collins, and other Mayer Brown attorneys (including Koury and Monk) knew of the existence and increasing amount of the RGHI receivable to Refco. The same general process used to shuffle the Niederhoffer debt off Refco's books was also used to transfer hundreds of millions of dollars of additional uncollectible debt to RGHI. As discussed above, by no later than October 1999, Collins and Mayer Brown knew that the Niederhoffer debt was not the only so-called "receivable" that RGHI owed to Refco. Indeed, on or about October 15, 1999, Collins recorded in his own handwriting that RGHI's net worth was represented by the value of its investment in Refco *"Minus Loans to RGH[I]."* This handwritten note demonstrates that Collins knew that RGHI owed money to Refco, and Collins' use of the plural "loans" compels the conclusion that he was aware of more than just the Niederhoffer bad debts that he himself helped Refco transfer to RGHI.

719.    By June 2002, as discussed above, Collins and Mayer Brown had direct knowledge that the RGHI receivable totaled at least $350 million. Indeed, it appears that Collins himself inserted language into a purchase agreement that Mayer Brown drafted, which acknowledged the existence of a $350 million "inter-company debt of Refco Group Holdings, Inc."

720.    The knowledge of, and direct participation in, the fraudulent scheme by Mayer Brown, Collins, and other Mayer Brown employees is further confirmed by their well-documented involvement in the fraudulent round-trip loan transactions, *i.e.*, the "cover-up." Mayer Brown attorneys drafted all of the documentation for seventeen of those transactions and had a thorough understanding of the nature, timing and purpose of those transactions. In

particular, Mayer Brown, Collins, and the other Mayer Brown employees who participated in the documentation of these transactions (including Koury and Monk) knew or recklessly disregarded that these fraudulent transactions were designed solely to conceal the existence of the RGHI receivable.

721.    The Examiner concluded that "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors." The Examiner concluded that the features of the transactions indicate that the round trip loans "had no legitimate business purpose" and were "uncollateralized short-term, back-to-back loans involving the lending of hundreds of millions of dollars by one Refco entity through a third party to another Refco entity, with guarantees and indemnities by [Refco] to eliminate any risk to the third party. Thus, the transactions appeared to lack any economic substance . . . [and] appear suspicious on their face." Moreover, the Examiner's Report noted that none of the Mayer Brown witnesses interviewed by the Examiner could articulate any legitimate business purpose for the round trip loans.

## XIV.    LOSS CAUSATION

722.    Throughout the Class Period, the prices of the Company's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company, including the misrepresentations about its financial condition and results of operations.

723.    The Company's financial condition and results, including the collectibility of its receivables and the nature and extent of its transactions with related parties, were material information to Plaintiffs and the other members of the Class. Had the truth been disclosed to the market at or before the time of the Bond Offering or the IPO, Plaintiffs and the other Class

members would have been unwilling to purchase the Company's securities, and the Company would have been unable to complete those offerings.

724.    When the truth about the Company was revealed, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant losses to Plaintiffs and the other Class members. The October 10, 2005 disclosure of a $420 million related-party loan to RGHI, and that the Company's prior financial statements could not be relied upon, was a partial disclosure of the misrepresentation and omissions, and led to a flurry of trading in which Refco's stock price plunged 45%, from its $28.56 close on October 7, 2005 to its $15.60 close on October 10. The stock price continued its freefall in the ensuing days, dropping 11% to close at $13.85 on October 11, 2005 following the announcement that the SEC had launched an investigation of Refco, and falling another 22% to close at $10.85 on October 12, 2005 upon news of Bennett's arrest on securities fraud charges. As customers ran for the exits amidst the growing uncertainty caused by the revelation of Defendants' misrepresentations and omissions, Refco was forced to shut down its Refco Capital Markets unit on October 13, whereupon the stock dropped another 27% to $7.90 before trading was halted by the New York Stock Exchange. Similarly, the Bonds – which were trading at 108.625% of par on October 7, 2005 and had never traded below 103% of par in the preceding twelve months – fell to 91.50% on October 11; approximately 76% on October 12; and as low as 16% by October 14, 2005. By October 17, 2005, merely one week after the initial revelation of the previously-undisclosed $420 million loan to Bennett, Refco announced that it was filing for bankruptcy. Following that announcement, the truth was finally revealed to the market, and Refco's stock fell to a price of approximately 65 cents, nearly a 98% decline.

725.    The declines in the Company's securities prices following the revelations of October 11-17, 2005 and the resulting losses suffered by Plaintiffs and the other members of the Class are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's financial condition.

726.    Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and the other members of the Class.

## XV.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

727.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  First, the statutory safe harbor does not apply to false or misleading statements that are made in connection with an initial public offering (such as the Bond Offering and the IPO) and/or are contained in financial statements which purport to have been prepared in accordance with GAAP.  Second, the statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made.  Rather, the false or misleading statements complained of in this Complaint concerned historical and/or current facts and conditions existing at the time the statements were made.

728.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because at the

279

time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Refco or of a Defendant who knew that the statement was materially false or misleading when made.

## XVI.    PRESUMPTION OF RELIANCE

### A.    Reliance Should Be Presumed With Respect to Defendants' Omissions

729.    Throughout the Class Period, Plaintiffs and the members of the Class justifiably expected the Defendants to disclose material information in connection with the offering and sale of the Company's securities, including in the Offering Memorandum for the Bonds, the Bond Registration Statement, the 2005 10-K, the First Quarter 2006 10-Q and the IPO Registration Statement and Prospectus. Plaintiffs and the members of the Class would not have purchased the Company's securities at artificially inflated prices if Defendants had disclosed all material information, including the nature and magnitude of its uncollectible receivables and the undisclosed related-party transactions. Thus, reliance by Plaintiffs and the Class members should be presumed with respect to Defendants' omissions of material information.

### B.    Reliance Upon the Offering Memorandum and Road Show Should Be Presumed For All Purchasers of 144A Bonds in the Initial Offering

730.    The Offering Memorandum for the Bonds instructed: "You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different." Thus, in connection with their decisions to purchase 144A Bonds in the Bond Offering, investors relied heavily on the Offering Memorandum and the financial and other information contained therein, and the information and documentation provided at the Bond Road Show (which was consistent with the information in the Offering Memorandum). Because the Company instructed investors to rely on

that information, such reliance should be presumed for all investors who purchased 144A Bonds in the initial offering.

731.    Moreover, the pricing of the 144A Bonds in the Bond Offering was determined by the Company and the Bond Underwriters, in large part based upon institutional investors' input and indications of interest following the Road Show and their review of the Offering Memoranda. The pricing of the 144A Bonds was also influenced by the ratings given to the 144A Bonds by the ratings agencies, after the Bond Underwriter Defendants, the THL Defendants and Refco presented them with substantially the same information as was presented to investors in the Bond Offering Memorandum and at the Road Show. Had truthful and accurate information been provided to the ratings agencies and to investors in the lead-up to the Bond Offering, the 144A Bond ratings would have been lower and investors in the 144A Bonds – all of whom were sophisticated investors – would have been unwilling to accept the pricing and terms at which the 144A Bonds were ultimately issued. The initial offering price of the 144A Bonds was, therefore, the product of numerous sophisticated institutions' evaluation of the information provided in the Offering Memorandum and at the Road Show, and reliance upon that information should be presumed for all initial offering purchasers of 144A Bonds.

C.    **Reliance Should Be Presumed Because Fraud Created the Market for the Company's Securities**

732.    As alleged herein, in connection with the offer and sale of the Bonds and the Refco stock, certain Defendants entered into and participated in a scheme to employ devices, schemes, and artifices to defraud, and to engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon Plaintiffs and the other members of the Class. This scheme included the offering and sale of the Bonds and Refco stock based on materially misleading information, and without disclosing material facts.

281

733.    The information contained in the Offering Memorandum and disseminated at the Bond Road Show was materially false, as alleged herein.  Had truthful and complete information been provided to potential investors at the time of the Bond Offering, and had investors known that Refco had been engaging in repeated round-trip transactions at the end of each fiscal year since 1999 in order to conceal the existence of hundreds of millions of dollars in uncollectible receivables, there would have been no market for the Bonds.  Likewise, had Refco's true financial picture been disclosed to investors at the time of the Bond Offering, investors would have known that the credit risk associated with the Bonds was substantially greater than they otherwise believed, and Refco would have been in violation of the restrictive covenants of its loan agreements.  Moreover, Refco and/or its subsidiaries likely would have been in violation of the CFTC's minimum net capital requirements and/or other regulatory capital requirements, thereby precluding Refco from conducting a primary line of business and threatening the Company's very existence.  As Refco acknowledged in the Offering Memorandum itself:  "Our failure to maintain the required net capital could result in suspension or revocation of our registration by the SEC and our suspension or expulsion by the NASD, and could ultimately lead to our liquidation."  The Bond Registration Statement similarly stated:  *"If we do not maintain the capital levels required by regulations, we may be fined or barred from conducting business."*  (Emphasis in original.)  Accordingly, if the Company's true financial condition were disclosed at the time of the Bond Offering, there would have been no market for the Bonds.

734.    Similarly, had truthful and complete information been provided to potential investors at the time of the IPO, and had the fraudulent scheme alleged herein not occurred, investors would have known that the Company's financial condition was materially weaker than was represented, Refco would have been in violation of its debt covenants, and Refco and/or its

subsidiaries would likely have been in violation of the CFTC's minimum net capital requirements and/or other regulatory capital requirements, thereby precluding Refco from conducting a primary line of business and threatening the Company's very existence. Under these circumstances, there would have been no market for the Company's stock.

735. The scheme described herein was intended to, and did, bring the Bonds and the Refco stock into the market fraudulently. Thus, the fraud alleged herein created a market for the Bonds and the Refco stock which would not otherwise have existed. Absent the fraud, there would have been no Bond Offering, no Exchange Offer, and no IPO. ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████

736. When purchasing the Company's securities in the Bond Offering, in the IPO, and in the secondary market, Plaintiffs and the Class members reasonably relied on the availability of those securities in the market as an indication of their genuineness. Plaintiffs and the Class members relied on the integrity of the market to furnish securities that were not the product of a fraudulent scheme. Thus, the reliance of Plaintiffs and the Class members on Defendants' fraudulent scheme, including their misstatements and omissions, should be presumed.

### D.    Reliance Should Be Presumed Under the Fraud-on-the-Market Doctrine

737. Throughout the Class Period, the Company's securities traded in an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

738.    Immediately after the Bond Offering, a secondary market developed for trading of the 144A Bonds, which traded in the PORTAL market and among dealers in the Over-the-Counter market.  The market for the 144A Bonds consisted exclusively of institutional investors and other sophisticated investors, known as Qualified Institutional Buyers or QIBs.  These institutional investors employed professional securities analysts who read and analyzed all relevant and publicly available information regarding the Company and the Bonds, and promptly adjusted the prices at which they were willing to buy and sell the Bonds accordingly.  There was extensive trading activity in the secondary market for the 144A Bonds between August 5, 2004 and May 10, 2005, as demonstrated by the fact that the average weekly trading volume as a percentage of the face value of the 144A Bonds was approximately 2%.  Furthermore, the estimated average bid-ask spread for the 144A Bonds was relatively low and was within a range that is indicative of market efficiency.

739.    The secondary market for the Bonds broadened with the issuance of the Registered Bonds in April 2005, which were freely tradeable in the public markets.  At all relevant times, major brokerage houses such as Credit Suisse, Bank of America, Deutsche Bank, Bank of New York, Morgan Stanley Dean Witter, Citigroup Capital Markets, Inc., and J.P. Morgan Chase Bank served as market makers and/or dealers in the Bonds, and information regarding the prices at which the 144A Bonds and Registered Bonds were trading was publicly available through pricing services including the NASD's Trade Reporting and Compliance Engine (TRACE).  There was extensive trading activity in the secondary market for the Registered Bonds between May 11, 2005 and October 7, 2005, as demonstrated by the fact that the average weekly trading volume as a percentage of the face value of the Registered Bonds was in excess of 1%, and close to 2%.  Furthermore, the estimated average bid-ask spread for the

Registered Bonds was relatively low and was within a range that is indicative of market efficiency.

740.    At all times after the Bond Offering, the Company was consistently followed by securities analysts from Moody's and S&P – who published credit ratings on the Bonds. In addition, the business press frequently reported information about the Company. During this period, Refco and the Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts, and institutional investors; assimilated into the ratings agencies' ratings for the Bonds and into analysts' and investors' analysis of the creditworthiness and the probability of default of the Bonds; and reflected in the market price of the Bonds.

741.    The market for Refco's common stock was an efficient market as well, characterized by active trading and significant institutional ownership. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████

742.    From the time of the IPO until October 7, 2005:

    (a)    Refco's stock was actively traded on the New York Stock Exchange;

    (b)    The market price of Refco's stock reacted promptly to the public dissemination of new or unexpected information regarding the Company, including rapid and statistically significant reactions to significant unexpected disclosures;

(c)    There were at least five securities analysts who followed and published research reports regarding Refco that were publicly available to investors, including analysts from BAS; Goldman Sachs; Credit Suisse; Weeden & Co.; and Sandler O'Neill;

(d)    The average weekly trading volume for Refco's stock from August 12, 2005 through October 7, 2005 was over 3.2 million shares, or 2.5% of total outstanding shares, and in fact from August 12, 2005 through October 7, 2005 the weekly trading volume exceeded 1% of the total outstanding shares every week, while exceeding 2% in all but two weeks;

(e)    The Company's market capitalization was in excess of $3 billion;

(f)    Large and sophisticated institutions owned large blocks of Refco common stock (including, among others, Fidelity, Barclays, T. Rowe Price, Wellington Management Company, TIAA-CREF, and Oppenheimer Funds), with over 60% of the IPO shares having been allocated to the top 50 institutional shareholders in the United States; and

(g)    There was active trading of short common stock positions, as well as active trading of option contracts, demonstrating interest and participation by sophisticated investors and arbitrageurs.

(h)    The average bid-ask spread for Refco's stock was relatively low and was within a range that is indicative of market efficiency.

743.    From October 7, 2005 through the end of the Class Period on October 17, 2005, the market for Refco's securities remained efficient, as the trading prices of the Company's securities continued to reflect all publicly available information, including the partial disclosures

286

of the fraud. The indicia of market efficiency discussed above remained present during this time period.

744.    Plaintiffs and the other Class members relied on the integrity of the market price for the Company's securities and are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## XVII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT NINE

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder,
On Behalf of Plaintiffs and All Members of the Class,
Against the Officer Defendants, the Audit Committee Defendants, Trosten,
the THL Defendants, Mayer Brown, Collins, and Grant Thornton**

745.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

746.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class, against Defendants Bennett, Trosten, Murphy, Sherer (with respect to statements and omissions made after he joined Refco in January 2005), Maggio, Sexton, Klejna, Silverman, O'Kelley, Gantcher, Breitman, Lee, Harkins, Jaeckel, Schoen, the THL Partner Defendants, Mayer Brown, Collins, and Grant Thornton (collectively, the "Section 10b-5(b) Defendants").

747.    As alleged herein, throughout the Class Period, the Company and the Section 10b-5(b) Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. Among other things, the Offering

Memorandum, the slides for the Bond Road Show, the Bond Registration Statement, the Forms 10-K and 10-K/A, the IPO Registration Statement, and other SEC filings and press releases by Refco all contained materially false and misleading statements of fact as detailed above.

748.    The Company's and the Section 10b-5(b) Defendants' false and misleading statements and omissions were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiffs and the other members of the Class to purchase the Company's securities at inflated prices.

749.    The Company and the Section 10b-5(b) Defendants were each individually and collectively responsible for making one or more of the statements and omissions alleged herein, by virtue of having made false or misleading verbal statements during the Bond Road Show, or by virtue of having prepared, reviewed, commented on, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.  Additionally, Mayer Brown was identified in the Offering Memorandum and the IPO Registration Statement as Refco's counsel, and readers of those documents understood that Mayer Brown was involved in the preparation and review of those documents.

750.    Mayer Brown and the THL Partner Defendants are each responsible for not only their own acts, but also the acts of all of their partners and employees who violated Section 10(b) and Rule 10b-5(a) and (c), under principles of *respondeat superior*.  The acts alleged herein by Collins, Koury, and Monk and other Mayer Brown partners and employees were undertaken by those individuals as agents of Mayer Brown, were within the scope of their agency, and were calculated to facilitate or promote Mayer Brown's business.  Likewise, the acts alleged herein by

the THL Individual Defendants and other officers and employees of the THL Partner Defendants were undertaken by those individuals as agents of the THL Partner Defendants, were within the scope of their agency, and were calculated to facilitate or promote the THL Partner Defendants' business.

751.    As described above, the Company and the Section 10b-5(b) Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Refco securities during the Class Period.

752.    The Company's and the Section 10b-5(b) Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

753.    In ignorance of the false and misleading nature of the Company's and the Section 10b-5(b) Defendants' statements and omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the securities at artificially inflated prices.

754.    The market price for Refco securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Section 10b-5(b) Defendants, as described above.

755.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT TEN

### For Violations of Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) Promulgated Thereunder, On Behalf of Lead Plaintiffs and All Members of the Class, Against RGHI

756.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

757.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class against RGHI.

758.    As alleged herein, throughout the Class Period, Bennett, the Company, RGHI and others, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for, and market prices of, Refco securities; and (iii) cause Plaintiffs and the other members of the Class to purchase Refco securities at artificially inflated prices.  In furtherance of this unlawful plan, scheme and course of conduct, the Company and RGHI took the actions described at length above.

759.    As described above, the Company and Defendant Bennett engaged in the fraudulent activity described herein knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Refco securities during the Class Period.  The knowledge and scienter of Defendant Bennett, as the sole stockholder and CEO of RGHI, are imputed to RGHI.  Moreover, as a party to the sham transactions alleged herein, with knowledge (through Bennett) that the purpose and effect of those transactions was to manipulate and materially misstate

Refco's reported financial condition, RGHI acted with scienter and is subject to liability under Section 10(b) and Rule 10b-5(a) and (c).

760.    The Company's and RGHI's fraudulent activities occurred in connection with the purchase or sale of the Company's securities.

761.    In ignorance of the Company's and RGHI's fraudulent conduct, and relying directly or indirectly on the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

762.    The market prices for Refco securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by the Company and RGHI, as described above.

763.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT ELEVEN

### Pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder, on Behalf of Plaintiffs and all Class Members Against Mayer Brown and Collins

764.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

765.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class against Collins and Mayer Brown.

766.     As alleged herein, throughout the Class Period, Collins and Mayer Brown, and others, including but not limited to Koury, Monk and other partners and employees of Mayer Brown, in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, orchestrated and carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for, and market prices of, Refco securities; and (iii) cause Plaintiffs and the other members of the Class to purchase Refco securities at artificially inflated prices. In furtherance of this unlawful plan, scheme and course of conduct, Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown took the actions described at length above, including designing and implementing sham transactions used by Refco to fraudulently transfer uncollectible debt and designing and participating in blatantly fraudulent sham loan transactions designed to conceal the uncollectible debt and manipulate Refco's reported financial results while at the same time allowing Mayer Brown to be publicly identified as counsel to Refco. As described above, these "loan" transactions were shams that served no legitimate business purpose and, as Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown knew or recklessly disregarded, they were designed solely for the purpose of furthering the fraudulent scheme described herein.

767.     As described above, Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown engaged in the manipulative and deceptive acts described herein in furtherance of the scheme to materially misstate Refco's financial statements. They directly participated in this scheme knowingly and intentionally or in such an extremely reckless manner

as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Refco securities during the Class Period.

768.    Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown acted with scienter and violated Section 10(b) and Rule 10b-5(a) and (c) in that they participated in the design, negotiation and documentation of the sham transactions alleged herein with knowledge and/or recklessly disregarding that the purpose and effect of those transactions was to manipulate and materially misstate Refco's reported financial condition.

769.    Mayer Brown is responsible for not only its own acts, but also the acts of all of its partners and employees who violated Section 10(b) and Rule 10b-5(a) and (c), including without limitation Collins, Koury, and Monk, under principles of *respondeat superior*. The acts alleged herein by Collins, Koury, and Monk and other Mayer Brown partners and employees were undertaken by those individuals as agents of Mayer Brown, were within the scope of their agency, and were calculated to facilitate or promote Mayer Brown's business.

770.    The fraudulent activities of Collins, Mayer Brown, Koury, Monk, and other employees and partners of Mayer Brown occurred in connection with the purchase or sale of the Company's securities.

771.    In ignorance of the fraudulent conduct of Collins, Mayer Brown, Koury, Monk, and other partners and employees of Mayer Brown, and relying directly or indirectly on the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

772.    The market prices for Refco securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by Collins, Mayer Brown, Koury, Monk, and others, as described above.

773.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT TWELVE

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,
On Behalf of Purchasers of 144A Bonds in the Bond Offering,
Against Bennett, Grant, RGHI, the THL Partner Defendants, Lee, Murphy,
Trosten, Sexton, Silverman, and Maggio
(Based on Violations of Section 10(b) and Rule 10b-5 by Refco Group,
Refco Finance Holdings, and Refco Finance)**

774.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

775.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Bennett, Grant, RGHI, the THL Partner Defendants, Lee, Murphy, Trosten, Sexton, Silverman, and Maggio (collectively, the "Section 20(a) Bond Offering Defendants"), on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased 144A Bonds in the Bond Offering.

776.    As alleged herein, Refco Group, Refco Finance Holdings, and Refco Finance violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct, all in connection with the Bond Offering. This fraudulent conduct was undertaken with scienter because Refco Group, Refco Finance Holdings, and Refco Finance are charged with the knowledge and scienter of

Defendant Bennett and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme. But for the fact that Refco Group, Refco Finance Holdings, and Refco Finance have filed for bankruptcy protection, they would be named as defendants on the Section 10(b) claims alleged herein.

777. PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased 144A Bonds in the Bond Offering suffered damages in connection with their purchases of those securities, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5 by Refco Group, Refco Finance Holdings, and Refco Finance.

778. The THL Partner Defendants were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to their approximate 57% ownership interest in New Refco, the sole member of Refco Group.

779. Defendant Lee was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to his position as Chairman and CEO of Thomas H. Lee Partners, and the fact that Thomas H. Lee Partners or Lee controlled each of the other THL Partner Defendants, which in turn controlled Refco Group.

780. Defendants Bennett and Grant were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to their approximate 43% ownership interest (through their ownership of RGHI) in New Refco, the sole member of Refco Group.

781. Defendant RGHI was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to its approximate 43% ownership interest in New Refco, the sole member of Refco Group.

782.   Defendants Bennett, Murphy, Trosten, Sexton, Silverman and Maggio were controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance at the time of the Bond Offering due (among other reasons alleged herein) to their executive positions with Refco Group and Refco Finance Holdings (of which Refco Finance was a wholly-owned subsidiary at the time of the Bond Offering); their direct involvement in the day-to-day business and operations of each entity, including the preparation of their financial statements; their participation in the Bond Road Show where the Bonds were marketed to investors and the contents of the prospectus were discussed; and/or their participation in the preparation and dissemination of the false and misleading prospectus for the Bonds.

783.   By virtue of the foregoing, the Section 20(a) Bond Offering Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, Refco Finance Holdings, and Refco Finance, including the content and dissemination of their financial statements and Offering Memorandum.

784.   The Section 20(a) Bond Offering Defendants did not act in good faith in connection with the conduct at issue in this Claim.  Further, these defendants directly or indirectly induced the act or acts constituting the violations of Section 10(b) and Rule 10b-5 by Refco Group, Refco Finance Holdings, and Refco Finance by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, approving and assisting in the preparation of the Offering Memorandum, and/or participating in the Bond Road Show where false statements were made to investors.

785.   The Section 20(a) Bond Offering Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless

disregard for the truth.  Facts giving rise to a strong inference of Defendant Grant's culpability include:  (1) that, upon information and belief, he continued to play a significant role in the management of the Company, despite leaving the Company, through the date of the Bond Offering; (2) that he received substantial proceeds from the LBO, which could not have occurred absent the Bond Offering; and (3) his indictment on criminal charges of securities fraud and conspiracy to commit securities fraud in connection with the Bond Offering.  Upon information and belief, Grant and Bennett shared equally in the THL Partner Defendants' $507 million cash payment to RGHI; Refco Group's transfer of $550 million in cash plus equity interests valued at $231 million to RGHI; plus an additional $12 million in cash and $108 million in debt forgiveness.  The facts giving rise to a strong inference of the other Section 20(a) Bond Offering Defendants' culpability are alleged in detail above.

786.    By virtue of their positions as controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance and their culpable participation in those entities' violations of Section 10(b) in connection with the Bond Offering, the Section 20(a) Bond Offering Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco Group, Refco Finance Holdings, and Refco Finance.

### COUNT THIRTEEN

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,
On Behalf of Purchasers of Bonds After the Bond Offering and
Before the Date of the IPO, Against the
THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Trosten,
Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman
(Based on Violations of Section 10(b) and Rule 10b-5 By Refco Group)**

787.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

788.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Trosten, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman (collectively, the "Section 20(a) Pre-IPO Defendants"), on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased Bonds after the Bond Offering but prior to the IPO.

789.    As alleged herein, Refco Group violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct, during the period between the Bond Offering and the IPO.  This conduct was undertaken with scienter, because Refco Group is charged with the knowledge and scienter of Defendant Bennett and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme.  But for the fact that Refco has filed for bankruptcy protection, it would be named as a defendant on the Section 10(b) claims alleged herein.

790.    PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased Bonds after the Bond Offering but prior to the IPO suffered damages in connection with their purchases of those securities, as a direct and proximate result of Refco Group's violations of Section 10(b) and Rule 10b-5.

791.    The THL Defendants were controlling persons of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to an approximate 57% ownership interest in New Refco, the sole member of Refco Group, and the THL Individual Defendants' service on New Refco's Board of Managers.

792.    Defendant Bennett was a controlling person of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to his 43% ownership interest (through RGHI and/or the Bennett Trust) in New Refco, the sole member of Refco Group.

793.    Defendant RGHI was a controlling person of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to its ownership interest in New Refco, the sole member of Refco Group. From the completion of the Bond Offering until the fiscal quarter ended February 28, 2005, RGHI owned approximately 43% of New Refco. During the fiscal quarter ended February 28, 2005, RGHI transferred approximately 40% of its equity interests in New Refco to the Bennett Trust, and thereafter owned approximately 26% of New Refco.

794.    Defendant Bennett Trust was a controlling person of Refco Group from the fiscal quarter ended February 28, 2005 through the date of the IPO, due to its ownership of approximately 17% of New Refco, the sole member of Refco Group.

795.    Defendants Bennett, Murphy, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco Group from the completion of the Bond Offering until the date of the IPO, due (among other reasons alleged herein) to their executive positions with Refco Group; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Bond Registration Statement and other public statements by Refco Group.

796.    Defendant Trosten was a controlling person of Refco Group from the completion of the Bond Offering until his resignation in October 2004, due (among other reasons alleged herein) to his executive positions with Refco Group; his direct involvement in its day-to-day

operations, including his direct responsibility for its financial reporting and accounting functions; and his participation in the preparation and/or dissemination of public statements by Refco Group.

797.    Defendant Sherer was a controlling person of Refco Group from the time he joined the Company in January 2005 until the date of the IPO, due (among other reasons alleged herein) to his executive positions with Refco Group; his direct involvement in its day-to-day operations including his direct responsibility for its financial reporting and accounting functions; and his participation in the preparation and/or dissemination of the Bond Registration Statement and other public statements by Refco Group.

798.    Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco Group from the completion of the initial offering of the Bonds until the date of the IPO, due (among other reasons alleged herein) to their service on the Audit Committee of New Refco, which also performed the functions of an audit committee for Refco Group. As members of the Audit Committee, these defendants were responsible for: overseeing Refco Group's financial reporting, accounting, and internal controls; overseeing the activities of Refco Group's outside auditors and reviewing the scope and results of those audits with the auditors; meeting with and making recommendations to the managers of Refco Group concerning the foregoing activities; and approving the false and misleading financial statements and other public statements as referenced herein.

799.    By virtue of the foregoing, each of the Section 20(a) Pre-IPO Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, including the content and dissemination of its financial statements and

registration statements, from the date of the completion of the initial offering of the Bonds until the date of the IPO.

800.    The Section 20(a) Pre-IPO Defendants did not act in good faith in connection with the conduct at issue in this Claim.  Further, each of these defendants directly or indirectly induced the act or acts constituting Refco Group's violations of the Exchange Act by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, and/or signing and/or approving the false and misleading statements that were issued by Refco Group.

801.    The Section 20(a) Pre-IPO Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that Refco Group's public statements were materially false or misleading, or knowingly omitted material information, or they acted with reckless disregard for the truth.

802.    Facts giving rise to the Section 20(a) Pre-IPO Defendants' culpability are alleged in detail above.

803.    By virtue of their positions as controlling persons of Refco Group and their culpable participation in Refco Group's violations of Section 10(b) and Rule 10b-5 in connection with the purchase or sale of securities after the completion of the initial offering of Bonds and before the IPO, the Section 20(a) Pre-IPO Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco Group.

**COUNT FOURTEEN**

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,
On Behalf of Purchasers of Bonds and/or Refco Common Stock
On and After the Date of the IPO, Against the
THL Defendants and Defendants Bennett, RGHI, the
Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna,
O'Kelley, Gantcher, and Breitman
(Based on Violations of Section 10(b) and Rule 10b-5 By Refco)**

804.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

805.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against the THL Defendants and Defendants Bennett, RGHI, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, and Breitman (collectively, the "Section 20(a) IPO Defendants"), on behalf of Plaintiffs and all members of the Class who purchased Bonds and/or Refco stock during the Class Period.

806.    As alleged herein, Refco violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct in connection with the IPO and thereafter. This fraudulent conduct was undertaken with scienter, because Refco is charged with the knowledge and scienter of Defendant Bennett and others who of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme.

807.    Plaintiffs and the other members of the Class who purchased Bonds or Refco stock during the Class Period suffered damages in connection with their purchases of those securities, as a direct and proximate result of Refco's primary violations of Section 10(b) and Rule 10b-5.

302

808.    The THL Defendants were controlling persons of Refco from the date of the IPO through and including October 17, 2005, due (among other reasons alleged herein) to their approximate 44% direct and indirect ownership interest in Refco, and due to the service of the THL Individual Defendants on Refco's eight-member Board of Directors.

809.    Defendant Bennett was a controlling person of Refco from the date of the IPO through and including October 18, 2005, due (among other reasons alleged herein) to his 34% ownership interest in Refco (through RGHI and the Bennett Trust), as well as his positions as Chairman of the Board, President, and Chief Executive Officer of Refco.

810.    Defendants RGHI and the Bennett Trust were controlling persons of Refco on and after the date of the IPO due (among other reasons alleged herein) to their approximate 20% and 14% respective ownership interests in Refco, and the fact that they were controlled by Bennett and used by him to hold his interest in the Company.

811.    Defendants Bennett, Murphy, Sherer, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco on and after the date of the IPO, due (among other reasons alleged herein) to their executive positions with Refco; their direct involvement in the day-to-day operations of Refco, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of Refco's false financial statements and other public statements.

812.    Defendants O'Kelley, Gantcher, and Breitman were controlling persons of Refco on and after the date of the IPO, due (among other reasons alleged herein) to their service on the Audit Committee of Refco.  As members of the Audit Committee, these defendants were responsible for: overseeing Refco's financial reporting, accounting, and internal controls; overseeing the activities of Refco's outside auditors and reviewing the scope and results of those

audits with the auditors; meeting with and making recommendations to Refco's Board of Directors concerning the foregoing activities; and approving the false and misleading financial statements and other public statements as referenced herein.

813. By virtue of the foregoing, each of the Section 20(a) IPO Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco, including the content and dissemination of the false or misleading statements complained of herein.

814. The Section 20(a) IPO Defendants did not act in good faith in connection with the conduct at issue in this Claim. Further, these defendants directly or indirectly induced the act or acts constituting Refco's violations of the Exchange Act by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, and/or signing and/or approving the false and misleading statements that were issued by Refco.

815. The Section 20(a) IPO Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth.

816. Facts giving rise to a strong inference of the Section 20(a) IPO Defendants' culpability are alleged in detail above.

817. By virtue of their positions as controlling persons of Refco and their culpable participation in the Company's violations of the Exchange Act, the Section 20(a) IPO Defendants are each jointly and severally liable pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco, for Refco's primary violations of Section 10(b) and Rule 10b-5.

## COUNT FIFTEEN

**Control Person Liability Pursuant to Section 20(a) of the
Exchange Act Against Mayer Brown on Behalf of Plaintiffs and all Class Members
(Based on Violations of Section 10(b) and Rule 10b-5 by Collins,
Koury, Monk, and Other Mayer Brown Partners and Employees)**

818.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

819.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against Mayer Brown based on violations of Section 10(b) and Rule 10b-5 by Collins, Koury, Monk, and other Mayer Brown partners and employees.

820.    As alleged herein, Collins, Koury, Monk, and other attorneys at Mayer Brown violated Section 10(b) and Rule 10b-5 by making false and misleading statements in connection with the purchase or sale of securities and/or by participating in a fraudulent scheme and course of business or conduct.  This fraudulent conduct was undertaken with scienter, as alleged above.

821.    Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Refco securities during the Class Period, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5 by Collins, Koury, Monk, and other Mayer Brown partners and employees.

822.    Mayer Brown was a controlling person of Collins, Koury, Monk, and all other Mayer Brown partners and employees at the time of their violations of Section 10(b) and Rule 10b-5, due (among other reasons alleged herein) to:  the fact that Koury, Monk, and other attorneys who engaged in the conduct alleged herein were employees of Mayer Brown; the fact that Collins and other Mayer Brown partners were members of Mayer Brown's partnership and signatories to its partnership agreement and related documents; Mayer Brown's control over the compensation of Collins, Koury, Monk, and all other Mayer Brown partners and employees;

Mayer Brown's control over these individuals' ability to advance in their careers and obtain

promotions and/or partnership at Mayer Brown; Mayer Brown's direct involvement in and

control over the ability of Collins, Koury, Monk, and other Mayer Brown attorneys to accept

clients and to perform services for such clients, including Refco; Mayer Brown's direct

involvement in and control over Collins' submission of bills to clients, including Refco; and

Mayer Brown's direct supervision and control over Koury, Monk, and the other Mayer Brown

partners and employees who were assigned to assist Collins in providing services for his clients,

including Refco. Further, Mayer Brown had knowledge and possession of copies of the

documents alleged by Plaintiffs to have been used in furtherance of the plan, scheme and course

of conduct set forth herein; had knowledge of the activities of Collins, Koury, Monk, and the

other Mayer Brown attorneys who participated in the scheme through, inter alia, discussions at

departmental meetings and periodic review sessions; and had the ability to prevent the scheme

and fraudulent course of conduct.

823.    Mayer Brown's control over Collins, Koury, Monk, and the other Mayer Brown

partners and employees is further demonstrated by the existence of a Management Committee at

Mayer Brown throughout the Class Period, as well as a Policy and Planning Committee. The

Management Committee and the Policy and Planning Committee exercised control over all

Mayer Brown partners and employees and had the power to influence and/or control their

activities as alleged herein.

824.    By virtue of the foregoing, Mayer Brown had the power to influence and control,

and did influence and control, directly or indirectly, the decision-making of Collins, Koury,

Monk, and the other Mayer Brown partners and employees with respect to the conduct

constituting their violations of Section 10(b) and Rule 10b-5, including their involvement in the fraudulent scheme detailed herein.

825.    Mayer Brown did not act in good faith in connection with the conduct at issue in this Claim.  Further, Mayer Brown directly or indirectly induced the act or acts constituting the violations of Section 10(b) and Rules 10b-5 by Collins, Koury, Monk, and other Mayer Brown partners and employees by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated; approving and assisting in the preparation of the Offering Memorandum, the Bond Registration Statement and the IPO Registration Statement; and permitting Mayer Brown to be identified as Refco's counsel in the Offering Memorandum and the IPO Registration Statement.

826.    Mayer Brown is a culpable participant in the matters alleged herein, because it acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or it acted with reckless disregard for the truth.  Facts giving rise to a strong inference of Mayer Brown's scienter are set forth above.

827.    By virtue of its position as a controlling person of Collins, Koury, Monk, and the other Mayer Brown partners and employees who violated Section 10(b) and Rule 10b-5, and by virtue of its culpable participation in those violations, Mayer Brown is jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Collins, Koury, Monk, and the other Mayer Brown partners and employees.

## COUNT SIXTEEN

**Pursuant to Section 20A of the Exchange Act,
On Behalf of Purchasers of Refco Stock,
Against Bennett, Thomas H. Lee Equity Fund V., L.P.,
Thomas H. Lee Parallel Fund V, L.P.,
Thomas H. Lee Equity (Cayman) Fund V, L.P.,
and Thomas H. Lee Investors Limited Partnership**

828.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

829.    This Claim is brought pursuant to Section 20A of the Exchange Act against Defendants Bennett, Thomas H. Lee Equity Fund V., L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors Limited Partnership (collectively, the "Section 20A Defendants") on behalf of all purchasers of Refco common stock pursuant to or traceable to the IPO.

830.    The Section 20A Defendants, by virtue of their positions as insiders of Refco, had access to, and were in possession of, material non-public information about Refco at the time of the IPO. As alleged above, Bennett violated Sections 10(b) and 20(a) of the Exchange Act, and Defendants Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors Limited Partnership violated Section 20(a) of the Exchange Act.

831.    Defendant Bennett sold at least 5.375 million shares of Refco common stock in the IPO. Defendants Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, sold at least 7.719 million shares of Refco common stock in the IPO.

832.    These sales were made contemporaneously with Class members' purchases of Refco common stock in the IPO.

833.    All members of the Class who purchased shares of Refco common stock contemporaneously with sales of Refco common stock by the Section 20A Defendants (i) have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Refco common stock as a result of the violations of Section 10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) would not have purchased Refco common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Section 20A Defendants' false and misleading statements and concealment.  At the time of the purchases of Refco stock by members of the Class who purchased in the IPO, the fair and true market value of Refco common stock was substantially less than the price paid by these Class members.

## JURY DEMAND

834.    Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment in their favor and against Defendants as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, and for all damages sustained as a result of wrongdoing by persons controlled by Defendants and/or for whose conduct Defendants are responsible pursuant to principles of *respondeat superior*, in an amount to be proven at trial, together with interest thereon;

C.      Awarding rescission and/or rescissory damages in favor of Plaintiffs and the other

members of the Class;

D.      Awarding prejudgment interest and/or opportunity cost damages in favor of

Plaintiffs and the other members of the Class;

E.      Awarding Plaintiffs and the Class the fees and expenses incurred in this action,

including attorneys' fees and expert fees; and

F.      Granting such other and further relief as the Court may deem just and proper.


Dated: New York, New York
       December 3, 2007

**GRANT & EISENHOFER P.A.**


By: _____
Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
Jonathan D. Margolis (JM-1128)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:     (646) 722-8500
Facsimile:     (646) 722-8501

        - and -

Megan D. McIntyre
Jeff A. Almeida
Christine M. Mackintosh
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone:     (302) 622-7000
Facsimile:     (302) 622-7100

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**


By: _____
John P. Coffey (JC-3832)
Salvatore J. Graziano (SG-6854)
John C. Browne (JB-0391)
Jeremy P. Robinson
David Webber (DW-3876)
1285 Avenue of the Americas
New York, NY 10019
Telephone:     (212) 554-1400
Facsimile:     (212) 554-1444


*Attorneys for Lead Plaintiffs RH Capital Associates LLC and Pacific Investment Management
Company LLC and Co-Lead Counsel for the Putative Class*

# EXHIBIT 1

**Exhibit 1**

**GLOSSARY OF CERTAIN KEY TERMS**[†]

**144A Bonds**                    - refers to the $600 million of unregistered 9% Senior
                                  Subordinated Notes due in 2012 issued by Refco
                                  pursuant to the Offering Memorandum in 2004.

**Audit
Committee Defendants**            - refers to Defendants O'Kelley, Breitman and
                                  Gantcher.

**BAS**                           - refers to Defendant Banc of America Securities LLC.

**BAWAG**                         - refers to BAWAG P.S.K. Bank für Arbeit und
                                  Wirtschaft und Österreichische Postsparkasse
                                  Aktiengesellschaft

**Beckenham**                      - refers to Beckenham Trading Company, Inc.

**Bennett**                       - refers to Defendant Phillip R. Bennett.

**Bennett Trust**                 - refers to Defendant The Phillip R. Bennett Three
                                  Year Annuity Trust.

**Bond Offering**                 - refers to Refco's issuance of the 144A Bonds in
                                  August 2004 pursuant to the Offering Memorandum.

**Bond Road Show**                - refers to the nationwide road show carried out by
                                  Defendants Bennett, Trosten and Jaeckel, together
                                  with representatives of the Bond Underwriter
                                  Defendants, in July 2004 in an effort to convince
                                  investors to purchase the 144A Bonds.

---

[†] The Glossary of Certain Key Terms is provided for the benefit of the reader only and
does not in any way affect the content, meaning or interpretation of the Complaint.  To
the extent that there is any conflict, inconsistency or difference between statements
included in the Glossary of Certain Key Terms and those in the Complaint -- the
statements included in the Complaint govern.

# GLOSSARY OF CERTAIN KEY TERMS[†]

**Bond Registration Statement** — refers to the Form S-4 Registration Statement that the Company filed with the SEC on October 12, 2004, together with the subsequent amendments through Form S-4/A filings dated December 10, 2004; January 12, 2005; February 23, 2005; March 11, 2005; April 5, 2005; and April 6, 2005.

**Bond Underwriter Defendants** — refers collectively to Defendants Credit Suisse, BAS, and Deutsche Bank.

**Breitman** — refers to Defendant Leo R. Breitman.

**CIM Ventures** — refers to CIM Ventures, Inc., a subsidiary of Ingram

**Class Period** — refers to the period from July 1, 2004 to October 17, 2005.

**Collins** — refers to Defendant Joseph P. Collins, the partner at Mayer Brown LLP who provided substantial legal services to Refco and oversaw the Refco account.

**Company** — refers to Refco Inc. and all of its predecessors and affiliates, including, but not limited to, Refco Group Ltd., LLC, Refco Finance Holdings LLC, and Refco Finance Inc.

**CMG** — refers to Defendant CMG Institutional Trading LLC.

**Credit Suisse** — refers to Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC).

**CS Land** — refers to CS Land Management LLC

**Customer X** — refers to a third-party customer of Refco, which was involved in the undisclosed related-party transactions with Refco between February 2002 and August 2005.

# GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Delta Flyer** | - refers to Delta Flyer Fund, LLC, a limited liability company organized in Delaware on April 26, 2000. |
| **Deutsche Bank** | - refers to Defendant Deutsche Bank Securities, Inc. |
| **DF Capital** | - refers to DF Capital Inc.  DF Capital was incorporated on July 10, 2002 as DF Overseas Inc., with its registered address listed as Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware. Defendant Bennett was the President and Secretary of DF Capital. |
| **EMF** | - refers to EMF Core Fund Limited, an affiliate of hedge fund manager EMF Financial Products, LLC |
| **Exchange Act** | - refers to the Securities Exchange Act of 1934, 15 U.S.C. § 78 et seq. |
| **Exchange Offer** | - refers to Refco's offer to exchange Registered Bonds for the outstanding 144A Bonds |
| **FASCON** | -refers to FASB Concept Statements. |
| **Fiscal Year 2000 (or Fiscal 2000)** | - refers to Refco's fiscal year ending February 29, 2000. |
| **Fiscal Year 2001 (or Fiscal 2001)** | - refers to Refco's fiscal year ending February 28, 2001 |
| **Fiscal Year 2002 (or Fiscal 2002)** | - refers to Refco's fiscal year ending February 28, 2002. |
| **Fiscal Year 2003 (or Fiscal 2003)** | - refers to Refco's fiscal year ending February 28, 2003. |
| **Fiscal Year 2004  (or** | |

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Fiscal 2004)** | - refers to Refco's fiscal year ending February 29, 2004. |
| **Fiscal Year 2005 (or Fiscal 2005)** | - refers to Refco's fiscal year ending February 28, 2005. |
| **Former Refco Officer** | - refers to a former senior operating officer of a Europe-based Refco affiliate. |
| **GAAP** | - refers to generally accepted accounting principles |
| **GAAS** | - refers to generally accepted auditing standards. |
| **Gantcher** | - refers to Defendant Nathan Gantcher. |
| **Goldman Sachs** | - refers to Defendant Goldman, Sachs & Co. |
| **Grant** | - refers to Defendant Tone Grant. |
| **Grant Thornton** | - refers to Defendant Grant Thornton LLP. |
| **Green Shoe Option** | - refers to the option granted to the Stock Underwriter Defendants to purchase additional shares to cover over-subscriptions of shares in connection with the IPO. |
| **Harkins** | - refers to Defendant David V. Harkins. |
| **Harris Nesbitt** | - refers to Defendant Harris Nesbitt Corp. |
| **HSBC** | - refers to Defendant HSBC Securities (USA) Inc. |
| **Ingram** | - refers to Ingram Micro, Inc. an information-technology distributor based in Santa Ana, California. |
| **Inside Defendants** | - refers to the Officer Defendants, Trosten, and the Audit Committee Defendants. |

iv

# GLOSSARY OF CERTAIN KEY TERMS[†]

**IPO**                  - refers to Refco's initial public offering, which took place on or about August 10, 2005.

**IPO Prospectus**       - refers to Refco's Form 424B1 prospectus filed in connection with the IPO.

**IPO Registration Statement** - refers to Refco's Form S-1 registration statement dated April 8, 2005, Form-S-1/A registration statement dated May 27, 2005, Form S-1/A registration statement dated July 1, 2005, Form S-1/A registration statement dated July 20, 2005, Form S-1/A registration statement dated July 25, 2005, Form S-1/A registration statement dated August 8, 2005, Form S-1/A registration statement dated August 10, 2005, and Form 424B1 prospectus dated August 10, 2005, which were filed with the SEC.

**Jaeckel**            - refers to Defendant Scott L. Jaeckel.

**J.P. Morgan**        - refers to Defendant J.P. Morgan Securities, Inc.

**Klejna**            - refers to Defendant Dennis A. Klejna.

**Koury**             - refers to Paul K. Koury, a former Mayer Brown associate lawyer who worked extensively for Collins and performed substantial legal work for Refco.

**LBO**                - refers to the THL Partner Defendants' June 2004 Leveraged Buyout with Refco.

**Lee**                - refers to Defendant Thomas H. Lee.

**Lind-Waldock**      - refers to Lind-Waldock Securities LLC.

**Maggio**           - refers to Defendant Santo C. Maggio, also known as "Sandy" Maggio.

**Mayer Brown**       - refers to Mayer Brown LLP, which was Refco's primary outside legal counsel after 1994.

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **McCarthy** | - refers Peter McCarthy, an executive officer of Refco. |
| **Merger Agreement** | - refers to the June 8, 2004 agreement between the THL Partner Defendants, and their passive co-investors, and Refco Group and RGHI. |
| **Merrill Lynch** | - refers to Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated. |
| **Monk** | - refers to Robert Monk, a former Mayer Brown associate lawyer who worked extensively for Collins and performed substantial legal work for Refco. |
| **Murphy** | - refers to Defendant Joseph J. Murphy. |
| **New Refco** | - refers to New Refco Group Ltd., LLC. |
| **NYSE** | - refers to the New York Stock Exchange. |
| **Offering Memorandum** | - refers to the document used to market the 144A Bonds to PIMCO, other Qualified Institutional Buyers and other members of the Class in July 2004. |
| **Officer Defendants** | - refers to Defendants Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, and Klejna. |
| **O'Kelley** | - refers to Defendant Ronald L. O'Kelley. |
| **PCAOB** | - refers to the Public Company Accounting Oversight Board, which was established by the Sarbanes-Oxley Act of 2002. |
| **PIMCO** | - refers to Lead Plaintiff Pacific Investment Management Company LLC. |
| **PIMCO High Yield Fund** | - refers to Plaintiff PIMCO Funds: Pacific Investment Management Series - PIMCO High Yield Fund. |
| **Principal A** | - refers to the founder and principal of Customer X. |

## GLOSSARY OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Ramirez & Co.** | - refers to Defendant Samuel A. Ramirez & Company, Inc. |
| **Ramler** | - refers to Mark Ramler, Arthur Andersen's engagement partner for Refco prior to 2002, who took the Refco audit account with him to Grant Thornton in or about 2002. |
| **Refco** | - refers to Refco Inc., and all of its predecessors and affiliates, including, but not limited to, Refco Group Ltd., LLC, Refco Finance Holdings LLC, and Refco Finance Inc. |
| **Refco Capital** | - refers to Refco Capital Markets Ltd. |
| **Refco Finance** | - refers to Refco Finance Inc. |
| **Refco Finance Holdings** | - refers to Refco Finance Holdings LLC. |
| **Refco Futures** | - refers to Refco Managed Futures LLC. |
| **Refco Group** | - refers to Refco Group Ltd., LLC. |
| **Registered Bonds** | - refers to the registered bonds issued by Refco Group and Refco Finance pursuant to the Bond Registration Statement on or about April 13, 2005. |
| **RGHI** | - refers to Defendant Refco Group Holdings, Inc. |
| **RH Capital** | - refers to Lead Plaintiff RH Capital Associates LLC. |
| **RSU** | - refers to Restricted Stock Units, which were granted to the Officer Defendants and the Audit Committee Defendants in connection with the IPO. |
| **SFAS** | - refers to Statements of Financial Accounting Statements. |
| **Sandler O'Neil** | - refers to Defendant Sandler O'Neill & Partners, L.P. |

# GLOSSARY OF CERTAIN KEY TERMS[†]

**Schoen**                          - refers to Defendant Scott A. Schoen.

**Securities Act**                  - refers to the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*

**Seibert & Co.**                   - refers to Defendant Muriel Siebert & Co. Inc.

**Sexton**                          - refers to Defendant William M. Sexton.

**Sherer**                          - refers to Defendant Gerald M. Sherer.

**Silverman**                       - refers to Defendant Phillip Silverman.

**Stock Underwriter Defendants**    - refers collectively to Defendants Credit Suisse, BAS, Deutsche Bank, Goldman Sachs, Merrill Lynch, J.P. Morgan, Sandler O'Neill, HSBC, William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl.

**THL Complaint**                   - refers to the Complaint filed by the THL Partner Defendants on November 14, 2005, and styled <u>Thomas H. Lee Equity Fund V., L.P., et al. v. Phillip R. Bennett, et al.</u>, No. 05 Civ. 9608 (S.D.N.Y.).

**THL Defendants**                  - refers collectively to the THL Individual Defendants and the THL Partner Defendants.

**THL Individual Defendants**       - refers to Defendants Lee, Harkins, Jaeckel and Schoen.

**THL Partner Defendants**          - refers to Defendants Thomas H. Lee Partners, THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Acquisition Partners III, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust.

## <u>GLOSSARY OF CERTAIN KEY TERMS[†]</u>

| | |
|---|---|
| **THL Managers** | - refers to THL Managers V, LLC, of which Thomas H. Lee Partners is the Managing Member. |
| **Thomas H. Lee Partners** | - refers to Defendant Thomas H. Lee Partners, L.P. |
| **Trosten** | - refers to Defendant Robert C. Trosten. |
| **Utendahl** | - refers to Defendant Utendahl Capital Partners, L.P. |
| **Westminster-Refco** | - refers to Westminster-Refco Management LLC. |
| **William Blair** | - refers Defendant William Blair & Company, L.L.C. |
| **Williams Capital** | - refers to Defendant The Williams Capital Group, L.P. |

# EXHIBIT 2

**Exhibit 2**
(Reference Chart for Claims)[1]

| Count | I | II | III | IV | V | VI | VII | VIII | IX | X | XI | XII | XIII | XIV | XV | XVI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Officer Defendants* | | | | | | | | | | | | | | | | |
| Bennett | X | X | X | X | X | X | | X | X | | | X | X | X | | X |
| Sherer | | | | X | X | X | | X | X | | | | X | X | | |
| Sexton | | X | X | X | | X | | X | X | | | X | X | X | | |
| Maggio | | X | X | X | | X | | X | X | | | X | X | X | | |
| Murphy | | X | X | X | | X | | X | X | | | X | X | X | | |
| Silverman | | X | X | X | | | | | X | | | X | X | X | | |
| Klejna | | | X | X | | X | | X | X | | | | X | X | | |
| *Bennett Shell-Entity Defendants* | | | | | | | | | | | | | | | | |
| RGHI | | X | | X | | X | | X | X | X | | X | X | X | | |
| Bennett Trust | | | | X | | X | | X | | | | | X | X | | |
| *Mayer Brown Defendants* | | | | | | | | | | | | | | | | |
| Mayer Brown | | | | | | | | | X | | X | | | | X | |
| Joseph Collins | | | | | | | | | X | | X | | | | | |
| *Audit Committee Defendants* | | | | | | | | | | | | | | | | |
| O'Kelley | | | X | X | X | X | | X | X | | | | X | X | | |
| Breitman | | | X | X | X | X | | X | X | | | | X | X | | |
| Gantcher | | | X | X | X | X | | X | X | | | | X | X | | |
| *THL Defendants* | | | | | | | | | | | | | | | | |
| Thomas H. Lee Partners | | | | X | | X | | X | X | | | | X | X | | |
| THL Partner Defendants | X | X | | X | | X | | X | X | | | X | X | X | | X[2] |
| THL Individual Defendants | | | | X | | X | | X | X | | | | X | X | | |
| Lee | | X | X | X | X | X | | X | X | | | X | X | X | | |
| Harkins | | | X | X | X | X | | X | X | | | | X | X | | |
| Jaeckel | X | | X | X | X | X | | X | X | | | | X | X | | |
| Schoen | | | X | X | X | X | | X | X | | | | X | X | | |
| *Other Defendants* | | | | | | | | | | | | | | | | |
| Stock Underwriter Defs. | | | | | X | | X | | | | | | | | | |
| Bond Underwriter Defs. | X | | X | | | | | | | | | | | | | |
| Trosten | X | X | | | | | | | X | | | X | X | | | |
| Grant Thornton | | | X | | X | | | | X | | | | | | | |
| Grant | | X | | | | | | | | | | X | | | | |

*Securities Act*

Count I  Section 12(a)(2) (144 A Bonds)
Count II  Section 15 (144 A Bonds)
Count III  Section 11 (Registered Bonds)
Count IV  Section 15 (Registered Bonds)
Count V  Section 11 (IPO)
Count VI  Section 15 (IPO)
Count VII  Section 12 (a)(2)(IPO)
Count VIII  Section 15 (IPO)

*Exchange Act*

Count IX  Section 10b-5(b)
Count X  Section 10b-5(a) and (c) (RGHI)
Count XI  Section 10b-5(a) and (c) (MB and Collins)
Count XII  Section 20(a) (144 A Bonds)
Count XIII  Section 20(a) (Bonds between Bond Offering and IPO)
Count XIV  Section 20(a) (Bonds or Stock after IPO)
Count XV  Section 20(a) (MB)
Count XVI  Section 20A (Stock)

[1] This chart is provided solely as a reference aid for the reader of the Second Amended Consolidated Class Complaint (the "Complaint"), and is not intended to modify the Complaint. If there are any conflicts between this chart and the Complaint, the Complaint shall control.
[2] This Claim is brought only against the following THL Partner Defendants: Thomas H. Lee Equity Fund V., L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors Limited Partnership.



**Grant & Eisenhofer P.A.**

| | | |
|---|---|---|
| 485 Lexington Avenue<br>New York, NY 10017<br>Tel: 646·722·8500 • Fax: 646·722·8501 | Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE 19801<br>Tel: 302·622·7000 • Fax: 302·622·7100<br><br>www.gelaw.com<br><br>Direct Dial: 302-622-7020<br>Email: mmcintyre@gelaw.com | 1920 L Street, N.W., Suite 400<br>Washington, DC 20036<br>Tel: 202·783·6091 • Fax: 202·350·5908 |

January 25, 2008

**BY ELECTRONIC MAIL**

Greg A. Danilow, Esquire
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

      **Re:**    **In re Refco, Inc. Securities Litigation, 05-cv-8626 (GEL)**

Dear Greg:

      I write in response to your January 22 letter to Jim Sabella, inquiring whether our Second Amended Complaint is intended to replead the plaintiffs' Section 11 and 15 claims (in Counts Three and Four) on behalf of persons who exchanged Rule 144A Bonds for registered bonds in the Exxon Capital exchange. The answer is no. As your letter correctly surmises, those claims were included in the Second Amended Complaint in order to preserve the plaintiffs' appellate rights, and not in an attempt to resurrect those claims through repleading.

                    Very truly yours,

                    Megan D. McIntyre

cc:    All Counsel of Record (by electronic mail)

QuickLinks -- Click here to rapidly navigate through this document

As filed with the Securities and Exchange Commission on October 12, 2004

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM S-4
### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

---

# Refco Group Ltd., LLC
# Refco Finance Inc.
### (Exact Names of Registrants as Specified in Their Charters)

| | | |
|---|---|---|
| **Delaware** | **6200** | **52-2169014** |
| **Delaware** | **6200** | **20-1400416** |
| (States or Other Jurisdictions of Incorporation or Organization) | (Primary Standard Industrial Classification Code Numbers) | (I.R.S. Employer Identification Nos.) |

**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693-7000**
(Address, Including Zip Code, and Telephone Number, Including
Area Code, of Registrant's Principal Executive Offices)

**Phillip R. Bennett**
**Refco Group Ltd., LLC**
**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693-7000**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

---

### SEE TABLE OF ADDITIONAL REGISTRANTS BELOW

---

*Copies to:*
**Todd R. Chandler, Esq.**
**Alexander D. Lynch, Esq.**
**Weil, Gotshal & Manges LLP**
**767 Fifth Avenue**
**New York, New York 10153**
**(212) 310-8000**

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box.  ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit(1) | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee |
|---|---|---|---|---|
| 9% Senior Subordinated Notes due 2012 | $600,000,000 | 100% | $600,000,000 | $76,020 |
| Guarantees of 9% Senior Subordinated Notes due 2012 | — | — | — | (2) |

(1)    Estimated solely for the purposes of calculating the registration fee pursuant to Rule 457(f)(2) under the Securities Act of 1933, as amended.

(2)    The Additional Registrants will guarantee the payment of the 9% Senior Subordinated Notes due 2012. Pursuant to Rule 457(n) of the Securities Act, no separate registration fee for the guarantees is payable.

**The Registrants hereby amend this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrants shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**ADDITIONAL REGISTRANTS**

| Exact Name of Registrant as Specified in Its Charter | State or Other Jurisdiction of Incorporation or Organization | Primary Standard Industrial Classification Code Number | I.R.S. Employer Identification No. | Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices |
|---|---|---|---|---|
| Bersec International LLC | Delaware | 6200 | 52-2169015 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Kroeck & Associates LLC | Delaware | 6200 | 36-4347337 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Lind-Waldock Securities, LLC | Delaware | 6200 | 36-4347338 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Market Educational Institute, LLC | Delaware | 6200 | 22-3836913 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Marshall Metals, LLC | Delaware | 6200 | 52-2169020 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Administration, LLC | Delaware | 6200 | 52-2169052 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Capital Holdings, LLC | Delaware | 6200 | 52-2169021 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Capital Management, LLC | Delaware | 6200 | 52-2169050 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Capital Trading LLC | Delaware | 6200 | 52-2169049 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Capital LLC | Delaware | 6200 | 52-2169060 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco F/X Associates, LLC | Delaware | 6200 | 52-2169046 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Financial, LLC | Delaware | 6200 | 52-2169047 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Fixed Assets Management, LLC | Delaware | 6200 | 52-2169022 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Global Capital Management LLC | Delaware | 6200 | 20-1717081 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Global Futures, LLC | Delaware | 6200 | 52-2169038 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |

| | | | | |
|---|---|---|---|---|
| Refco Global Holdings, LLC | Delaware | 6200 | 52-2169057 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Information Services, LLC | Delaware | 6200 | 52-2169833 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Managed Futures, LLC | Delaware | 6200 | 11-3477632 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Mortgage Securities, LLC | Delaware | 6200 | 52-2169023 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Refco Regulated Companies, LLC | Delaware | 6200 | 52-2169025 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Summit Management, (Newco) LLC | Delaware | 6200 | 52-2169028 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |
| Westminster-Refco Management LLC | Delaware | 6200 | 52-2169030 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693-7000 |

The name, address, including zip code, and telephone number, including area code, of agent for service for each of the Additional Registrants is:

**Phillip R. Bennett**
**Refco Group Ltd., LLC**
**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693-7000**

The information in this prospectus is not complete and may be changed. We may not complete the exchange offer until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**Subject to Completion, Dated October 12, 2004**

**PROSPECTUS**

# Refco Group Ltd., LLC
# and
# Refco Finance Inc.

### Offer to exchange all outstanding
### $600,000,000 9% Senior Subordinated Notes due 2012
### for
### $600,000,000 9% Senior Subordinated Notes due 2012
### registered under the Securities Act of 1933

We are offering to exchange our outstanding notes described above for our new, registered notes described above. In this prospectus, we refer to the outstanding notes as the "old notes" and the new notes as the "registered notes," and we refer to the old notes and the registered notes collectively as the "notes." The form and terms of the registered notes are identical in all material respects to the form and terms of the old notes, except for transfer restrictions, registration rights and additional interest payment provisions relating only to the old notes. We do not intend to apply to have any notes listed on any securities exchange or automated quotation system, and there may be no active trading market for them.

**Material Terms of the Exchange Offer**

- The exchange offer expires at 12:00 midnight, New York City time, on the night of              , 2004, unless extended. Whether or not the exchange offer is extended, we refer to the time at which it ultimately expires as the "time of expiration."

- The only conditions to completing the exchange offer are that the exchange offer not violate any applicable law, regulation or interpretation of the staff of the Securities and Exchange Commission and that no injunction, order or decree of any court or governmental agency that would prohibit, prevent or otherwise materially impair our ability to proceed with the exchange offer shall be in effect.

- All old notes that are validly tendered and not validly withdrawn will be exchanged.

- Tenders of old notes in the exchange offer may be withdrawn at any time prior to the time of expiration.

- We will not receive any cash proceeds from the exchange offer.

None of our affiliates, no broker-dealers that acquired old notes directly from us and no persons engaged in a distribution of registered notes may participate in the exchange offer. Each broker-dealer that receives registered notes for its own account pursuant to the exchange offer must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. The letter of transmittal states that by so acknowledging and by delivering a prospectus, a broker-dealer will not be deemed to admit that it is an "underwriter" within the meaning of the Securities Act. This prospectus, as it may be amended or supplemented from time to time, may be used by a broker-dealer in connection with resales of registered notes received in exchange for old notes where such old notes were acquired by such broker-dealer as a result of market-making activities or other trading activities. We have agreed that, for a period of 180 days after the time of expiration, we will make this prospectus available to any broker-dealer for use in connection with any such resale. See "Plan of Distribution."

### Consider carefully the "Risk Factors" beginning on page 12 of this prospectus.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

The date of this prospectus is              , 2004

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 12 |
| FORWARD-LOOKING STATEMENTS | 27 |
| THE EXCHANGE OFFER | 28 |
| USE OF PROCEEDS | 36 |
| CAPITALIZATION | 37 |
| UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS | 38 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA | 46 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 50 |
| INDUSTRY | 67 |
| BUSINESS | 74 |
| MANAGEMENT | 86 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 89 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 91 |
| DESCRIPTION OF CREDIT FACILITIES | 94 |
| DESCRIPTION OF THE REGISTERED NOTES | 97 |
| MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE OFFER | 154 |
| PLAN OF DISTRIBUTION | 155 |
| LEGAL MATTERS | 156 |
| EXPERTS | 156 |
| GLOSSARY | 157 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

# PROSPECTUS SUMMARY

*This summary highlights key information contained elsewhere in this prospectus. It may not contain all of the information that is important to you. You should read the entire prospectus, including "Risk Factors," our consolidated financial statements and the related notes thereto and the other documents to which this prospectus refers, before deciding to participate in the exchange offer. Except as otherwise required by the context, references in this prospectus to "our company," "we," "us" or "our" refer to Refco Group Ltd., LLC and all of its subsidiaries. References to "Refco Finance" refer to Refco Finance Inc., which is a wholly owned subsidiary of Refco Group Ltd., LLC. References to "the co-issuers" refer to Refco Group Ltd., LLC and Refco Finance. References to "New Refco" refer to New Refco Group Ltd., LLC, the sole member of Refco Group Ltd., LLC. The terms "fiscal year" and "FY" refer to the 52 or 53 weeks ended the final day in February, while the terms "calendar year" and "year" refer to the year ending December 31, of the year referenced. References to "net revenues" refer to total revenues less interest expense. References to "operating profit" refer to income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary. For more information concerning certain industry terms we use in this prospectus, see "Glossary."*

## Our Company

We are a leading independent provider of execution and clearing services for exchange-traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets.

We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide our customers the ability to trade a wide range of products in the derivatives, fixed income and foreign exchange markets.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase ("repo") transactions.

We are organized into two operating business segments for financial reporting purposes, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and we have one non-operating business segment, Corporate & Other.

*Derivatives Brokerage & Clearing.*     We execute and clear customers' orders for exchange-traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for execution and matching. Through our clearing services, we facilitate confirmation and settlement of our customers' derivatives transactions. We also ensure that our customers have the appropriate margin in their accounts to support their derivatives positions.

Our customers include institutional clients, professional traders and retail customers. We provide our customers with access to trading in a wide range of derivatives products, including interest rate, equity index, energy, agriculture, foreign currency and metals contracts across all the major derivatives exchanges.

*Prime Brokerage/Capital Markets.*     We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non-dollar fixed income markets. The majority of our customers are hedge funds and other financial institutions.

## Industry

*We obtained the industry, market and competitive position data used throughout this prospectus from our own research, surveys and studies conducted by third parties and publications, including those published*

1

*by the Bank for International Settlements ("BIS"), the Bond Market Association, the International Swaps and Derivatives Association and the Futures Industry Association ("FIA").*

### Derivatives

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. Derivatives are broadly used in the global economy for risk management and investment. Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the over-the-counter ("OTC") market. Exchange-traded derivatives transactions are executed either electronically and physically on an exchange floor through the traditional open outcry system. Activity on derivatives exchanges is facilitated by Futures Commission Merchants ("FCMs"), such as us, which execute and clear derivatives contract orders on behalf of customers.

According to the BIS, annual trading volume in exchange-traded derivatives has grown at a compound annual growth rate of approximately 22% over the past 15 years and approximately 34% from 2001 to 2003. Volume growth in the exchange-traded derivatives market has been influenced by the following trends:

- the increasing awareness and importance of risk management;

- the introduction of new derivatives products;

- a shift in trading from OTC markets to on-exchange trading;

- the deregulation of the derivatives markets and, more broadly, the financial services industry;

- increased competition among exchange and clearing platforms; and

- a shift towards electronic trading.

### Prime Brokerage/Capital Markets

Prime brokers offer execution, clearing, securities financing, securities lending, custody, trade processing and other administrative services to institutional clients. Prime brokers provide these services across a variety of securities markets, including equities, fixed income and foreign exchange. The increase in the number and size of hedge funds has been driving growth in the prime brokerage market. Below is a description of the securities markets in which we participate.

*Fixed Income.*    Our prime brokerage offerings are aimed primarily at providing customers with competitive access to a variety of fixed income markets, including markets for U.S. Treasury securities, non-dollar sovereign debt, mortgage-backed securities and corporate bonds. Because these securities are traded on OTC markets as opposed to exchanges, the principal sources of liquidity are IDBs. OTC transactions are cleared and regulated by third-party clearing platforms, such as the FICC and LCH. We provide our customers with access to these IDB markets and act as their clearing agent at the FICC and LCH.

Investors in U.S. Treasury securities and repos typically access these markets in order to take a position on the direction of interest rate changes, implement arbitrage or cash management strategies or finance securities positions. Average daily trading volume in the interdealer market for U.S. Treasury securities and the average daily amount outstanding of repurchase agreements have each grown at a compound annual growth rate of 10% over the last five years. Factors influencing this growth include: (i) growth in the total amount of debt outstanding; (ii) growth in interest rate derivatives; (iii) greater sensitivity to credit risk; and (iv) the introduction of electronic trading platforms.

*Foreign Exchange.*    The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.9 trillion having grown at an 8% compound annual growth rate since 1989. A broad array of customers seek access to this market for trading and investment purposes.

2

While transaction volume in this market is dominated by money center banks, an increasing number of investors utilize the services of non-bank market participants, including independent brokers. Factors influencing growth in the foreign exchange markets include: (i) increased cross-border trade and investment; (ii) increasing use of foreign exchange as a hedging tool; (iii) alternative investment asset flows; and (iv) the emergence of electronic brokerage.

## Recent Transactions

On June 8, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., entered into an equity purchase and merger agreement with us, Refco Group Holdings, Inc. and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC becoming our parent and THL Refco Acquisition Partners and its affiliates and co-investors owning an approximate 57% interest in New Refco.

Upon consummation of the transactions contemplated by the Purchase Agreement, the following transactions occurred:

- THL Refco Acquisition Partners and its affiliates and co-investors acquired a portion of our interests for approximately $508.5 million in cash (the "THL Acquisition");

- Phillip Bennett, our chief executive officer, made a rollover equity investment in us of approximately $383.6 million;

- other members of our management made an investment in us for approximately $2.0 million in cash;

- we entered into senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing;

- the co-issuers issued $600.0 million in aggregate principal amount of old notes;

- THL Refco Acquisition Partners and its affiliates and co-investors and Refco Group Holdings, Inc., an entity through which Phillip Bennett held his rollover equity investment in us, contributed their interests in us to New Refco (the "New Refco Contribution"); and

- Refco Finance Holdings LLC merged with and into us, with our company continuing as the surviving entity.

Concurrently with the consummation of the Transactions, we distributed $500.0 million in cash and all of the equity interests of Forstmann-Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business, to New Refco. New Refco thereafter distributed those assets (the "RGHI Distributions") to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett.

We refer to the THL Acquisition, the New Refco Contribution, the RGHI Distributions, the financing transactions (including the issuance of the old notes) and the application of the proceeds from the financing transactions as the "Transactions."

## Our Equity Sponsor

Thomas H. Lee Partners is a leading private equity firm based in Boston that manages several private equity funds, with aggregate capital commitments of approximately $14 billion. Thomas H. Lee Partners has invested in more than 80 businesses and is currently investing for Thomas H. Lee Equity Fund V, L.P., an equity fund with over $6.1 billion of committed capital. Founded in 1974, Thomas H. Lee Partners is focused on identifying and acquiring substantial ownership stakes in mid- to large-capitalization growth companies. Thomas H. Lee Partners invests in companies with leading market positions, proven and experienced management teams, recognized brand names and well-defined

business plans, which include opportunities for growth and expansion in their core and related businesses. Notable transactions sponsored by the firm include American Media, Inc., AXIS Capital Holdings Limited, Cott Corporation, Endurance Specialty Insurance Ltd., Houghton Mifflin Company, Michael Foods, Inc., National Waterworks, Inc., Simmons Company, TransWestern Publishing Company, LLC and Warner Music Group.

### Our Executive Offices

We are a Delaware limited liability company. Our principal executive offices are located at One World Financial Center, 200 Liberty Street Tower A, New York, New York 10281, and our telephone number is (212) 693-7000. We also have a website located at *www.refco.com* . The information that appears on our website is not a part of and is not incorporated into this prospectus.

4

**Summary of the Terms of the Exchange Offer**

On August 5, 2004, the co-issuers issued $600.0 million aggregate principal amount of their 9% senior subordinated notes due 2012, in a transaction exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"). We refer to the issuance of the old notes in this prospectus as the "original issuance."

At the time of the original issuance, we entered into an agreement in which we agreed to register new notes, in substantially the same form and with substantially the same terms as the old notes, and to offer to exchange the registered notes for the old notes. This agreement is referred to in this prospectus as the "registration rights agreement."

If (but only if) you are eligible to exchange your old notes for registered notes and you satisfy the conditions set forth below under "—Resales of the Registered Notes," we believe that the registered notes issued to you in the exchange offer may be resold by you without compliance with the registration and prospectus delivery provisions of the Securities Act. You should read the discussions under the headings "The Exchange Offer" and "Description of the Registered Notes" for further information regarding the registered notes.

| | |
|---|---|
| Registration Rights Agreement | Under the registration rights agreement, we are obligated to offer to exchange the old notes for registered notes. The exchange offer is intended to satisfy that obligation. After the exchange offer is complete, except as set forth in the next paragraph, you will no longer be entitled to any exchange or registration rights with respect to your old notes. |
| | The registration rights agreement requires us to file a registration statement for a continuous offering in accordance with Rule 415 under the Securities Act for your benefit if you would not receive freely tradeable registered notes in the exchange offer or you are ineligible to participate in the exchange offer and indicate that you wish to have your old notes registered under the Securities Act. |
| The Exchange Offer | The co-issuers are offering to exchange $1,000 principal amount of their 9% senior subordinated notes due 2012, which have been registered under the Securities Act, for each $1,000 principal amount of their unregistered 9% senior subordinated notes due 2012 that were issued in the original issuance. |
| | In order to be exchanged, an old note must be validly tendered and accepted. All old notes that are validly tendered and not validly withdrawn will be accepted and exchanged. |
| | As of the date of this prospectus, there are $600.0 million aggregate principal amount of old notes outstanding. |
| | We will issue the registered notes promptly after the time of expiration. |

| | |
|---|---|
| Resales of the Registered Notes | We believe that the registered notes to be issued in the exchange offer may be offered for resale, resold and otherwise transferred by you without compliance with the registration provisions of the Securities Act if (but only if) you meet the following conditions: |
| | • any registered notes received by you will be acquired in the ordinary course of your business; |
| | • you have no arrangements or understanding with any person to participate in the distribution of the registered notes; |
| | • you are not our affiliate, as that term is defined in Rule 405 of the Securities Act; and |
| | • you are not engaged in, and do not intend to engage in, the distribution of the registered notes. |
| | Our belief is based on interpretations by the staff of the Securities and Exchange Commission (the "SEC"), as set forth in no-action letters issued to third parties unrelated to us. The staff has not considered this exchange offer in the context of a no-action letter, and we cannot assure you that the staff would make a similar determination with respect to this exchange offer. |
| | If you do not meet the above conditions, you may not participate in the exchange offer or sell, transfer or otherwise dispose of any old notes unless (i) they have been registered for resale by you under the Securities Act and you deliver a "resale" prospectus meeting the requirements of the Securities Act or (ii) you sell, transfer or otherwise dispose of the registered notes in accordance with an applicable exemption from the registration requirements of the Securities Act. |
| | Each broker-dealer that receives registered notes for its own account in exchange for old notes, where such old notes were acquired by such broker-dealer as a result of market-making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. See "Plan of Distribution." A broker-dealer may use this prospectus for an offer to resell or to otherwise transfer those registered notes for a period of 180 days after the time of expiration. |
| Expiration Date | The exchange offer will expire at the time of expiration, which is 12:00 midnight, New York City time, on the night of                    , 2004, unless we decide to extend the exchange offer. |

| | |
|---|---|
| Conditions to the Exchange Offer | The only conditions to completing the exchange offer are that the exchange offer not violate any applicable law, regulation or applicable interpretation of the staff of the SEC and that no injunction, order or decree of any court or any governmental agency that would prohibit, prevent or otherwise materially impair our ability to proceed with the exchange offer shall be in effect. See "The Exchange Offer—Conditions." |
| Procedures for Tendering Old Notes Held in the Form of Book-Entry Interests | The old notes were issued as global notes in fully registered form without interest coupons. Beneficial interests in the old notes held by direct or indirect participants in The Depository Trust Company, or DTC, are shown on, and transfers of those interests are effected only through, records maintained in book-entry form by DTC with respect to its participants. |
| | If you hold old notes in the form of book-entry interests and you wish to tender your old notes for exchange pursuant to the exchange offer, you must transmit on or prior to the time of expiration either: |
| | • a written or facsimile copy of a properly completed and duly executed letter of transmittal for your notes, including all other documents required by the letter of transmittal, to the exchange agent at the address set forth on the cover page of the letter of transmittal; or |
| | • a computer-generated message transmitted by means of DTC's Automated Tender Offer Program system and received by the exchange agent and forming a part of a confirmation of book-entry transfer, in which you acknowledge and agree to be bound by the terms of the letter of transmittal for your notes. |
| | The exchange agent must also receive on or prior to the time of expiration either: |
| | • a timely confirmation of book-entry transfer of your old notes into the exchange agent's account at DTC pursuant to the procedure for book-entry transfers described in this prospectus under the heading "The Exchange Offer—Book-Entry Transfer;" or |
| | • the documents necessary for compliance with the guaranteed delivery procedures described below. |
| | A letter of transmittal for your notes accompanies this prospectus. By executing the letter of transmittal for your notes or delivering a computer-generated message through DTC's Automated Tender Offer Program system, you will represent to us that, among other things: |
| | • any registered notes received by you will be acquired in the ordinary course of your business; |

- you have no arrangements or understandings with any person to participate in the distribution of the registered notes;

- you are not our affiliate, as that term is defined in Rule 405 under the Securities Act;

- you are not engaged in, and do not intend to engage in, the distribution of the registered notes; and

- if you are a broker-dealer, you will receive registered notes for your own account in exchange for old notes that were acquired as a result of market-making activities or other trading activities and not directly from us and you will comply with the prospectus delivery requirements of the Securities Act.

| | |
|---|---|
| Procedures for Tendering Certificated Old Notes | If you are a holder of book-entry interests in the old notes, you are entitled to receive, in limited circumstances, in exchange for your book-entry interests, certificated notes which are in equal principal amounts to your book-entry interests. See "Description of the Registered Notes—Book Entry; Delivery and Form." If you acquire certificated old notes prior to the time of expiration, you must tender your certificated old notes in accordance with the procedures described in this prospectus under the heading "The Exchange Offer—Procedures for Tendering—Certificated Old Notes." |
| Special Procedures for Beneficial Owners | If your old notes are registered in the name of a broker, dealer, commercial bank, trust company or other nominee and you wish to tender your old notes, you should contact the registered holder promptly and instruct the registered holder to tender on your behalf. If you wish to tender on your own behalf, you must, prior to completing and executing the letter of transmittal for your old notes and delivering your old notes, either make appropriate arrangements to register ownership of the old notes in your name or obtain a properly completed bond power from the registered holder. The transfer of registered ownership may take considerable time. See "The Exchange Offer—Procedures for Tendering—Procedures Applicable to All Holders." |
| Guaranteed Delivery Procedures | If you wish to tender your old notes in the exchange offer and: |

(1)    they are not immediately available;

(2)    time will not permit your old notes or other required documents to reach the exchange agent before the time of expiration; or

(3)    you cannot complete the procedure for book-entry transfer on a timely basis,

8

you may tender your old notes in accordance with the guaranteed delivery procedures set forth in "The Exchange Offer—Procedures for Tendering—Guaranteed Delivery Procedures."

| | |
|---|---|
| Acceptance of Old Notes and Delivery of Registered Notes | Except under the circumstances described above under "Conditions to the Exchange Offer," we will accept for exchange any and all old notes which are properly tendered prior to the time of expiration. The registered notes to be issued to you in the exchange offer will be delivered promptly following the time of expiration. See "The Exchange Offer—Terms of the Exchange Offer." |
| Withdrawal | You may withdraw the tender of your old notes at any time prior to the time of expiration. We will return to you any old notes not accepted for exchange for any reason without expense to you promptly after withdrawal, rejection of tender or termination of the exchange offer. |
| Exchange Agent | Wells Fargo Bank, National Association is serving as the exchange agent in connection with the exchange offer. |
| Consequences of Failure to Exchange | If you do not participate in the exchange offer for your old notes, upon completion of the exchange offer, the liquidity of the market for your old notes could be adversely affected. See "The Exchange Offer—Consequences of Failure to Exchange." |
| Material United States Federal Income Tax Consequences of the Exchange Offer | The exchange of old notes for registered notes will not be a taxable event for United States federal income tax purposes. See "Material United States Federal Income Tax Consequences of the Exchange Offer." |

9

**Summary of Terms of the Registered Notes**

| | |
|---|---|
| Co-Issuers | Refco Group Ltd., LLC and Refco Finance Inc. are the co-issuers of the notes. |
| Notes Issued | $600,000,000 aggregate principal amount of 9% senior subordinated notes due 2012. |
| Maturity Date | August 1, 2012. |
| Interest | 9% per annum, payable semiannually on February 1 and August 1 of each year, commencing on February 1, 2005. |
| Subsidiary Guarantees | All payments on the notes, including principal and interest, are jointly and severally guaranteed on a senior subordinated basis by certain of our current and future subsidiaries. The notes are not guaranteed by our regulated or foreign subsidiaries. See "Description of the Notes—Guaranties." |
| Ranking | The notes and the guarantees are the co-obligors' and our subsidiary guarantors' senior subordinated obligations and rank: |
| | • junior in right of payment to all of our and our subsidiary guarantors' existing and future senior indebtedness, including borrowings under our senior credit facilities; |
| | • equally in right of payment with any of our and our subsidiary guarantors' future senior subordinated indebtedness; |
| | • senior in right of payment to any of our and our subsidiary guarantors' future indebtedness that is expressly subordinated in right of payment to the notes; and |
| | • effectively junior to all existing and future liabilities of our subsidiaries that have not guaranteed the notes. |
| | As of May 31, 2004, after giving pro forma effect to the Transactions, the notes and the guarantees would have ranked junior to approximately $800.0 million of our senior indebtedness, all of which would have consisted of borrowings under our senior credit facilities. |
| | On a pro forma basis, after giving effect to the Transactions, the notes would have been effectively subordinated to the significant liabilities of our non-guarantor subsidiaries, all of which, as of May 31, 2004, related to our customer financing arrangements. See our unaudited pro forma consolidated balance sheets as of May 31, 2004 and note I to our unaudited consolidated financial statements included elsewhere in this prospectus. |
| Optional Redemption | Prior to August 1, 2008, we may redeem all, but not less than all, the notes for cash at a redemption price equal to 100% of their principal amount plus the Applicable Premium (as defined in "Description of the Notes—Optional Redemption") plus accrued and unpaid interest to the redemption date. |

10

We may redeem any of the notes at any time on or after August 1, 2008, in whole or in part, at the redemption prices listed under "Description of the Notes—Optional Redemption," plus accrued and unpaid interest to the date of the redemption.

In addition, on or before August 1, 2007, we may redeem up to 35% of the aggregate principal amount of the notes initially issued and 100% of the aggregate principal amount of notes subsequently issued with the net equity proceeds of certain equity or income deposit securities offerings, provided at least 65% of the aggregate principal amount of the notes initially issued remain outstanding immediately after such redemption.

| | |
|---|---|
| Change of Control | Upon a change in control, we will be required to make an offer to purchase each holder's notes at a price of 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of purchase. See "Description of the Notes—Change of Control." |
| Certain Covenants | The indenture governing the notes contains covenants that, among other things, limit our ability and the ability of our restricted subsidiaries and regulated subsidiaries to: |

- incur or guarantee additional indebtedness;

- sell assets;

- pay dividends or make other equity distributions;

- purchase or redeem capital stock;

- make investments;

- consolidate or merge with or into other companies; and

- engage in transactions with affiliates.

These limitations are subject to a number of important qualifications and exceptions. See "Description of the Notes—Certain Covenants."

## Risk Factors

Investing in the notes involves risks. See "Risk Factors" immediately following this summary for a discussion of risks relating to an investment in the notes and participation in the exchange offer.

11

**RISK FACTORS**

*Participating in the exchange offer and investing in the notes involves a high degree of risk. You should carefully consider the risks described below, together with the other information contained in this prospectus, before making your decision whether to participate in the exchange offer. Any of the following risks, as well as other risks and uncertainties, could harm the value of the notes directly, or our business and financial results and thus indirectly cause the value of the notes to decline. The risks described below are not the only ones that could impact our company or the value of the notes. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business, financial condition or results of operations. As a result of any of these risks, known or unknown, you may lose all or part of your investment in the notes.*

### Risks Relating to the Notes

***Our substantial indebtedness could adversely affect our financial health, harm our ability to react to changes to our business and prevent us from fulfilling our obligations under our indebtedness, including the notes.***

As a result of the Transactions, we have a significant amount of indebtedness. As of May 31, 2004, on a pro forma basis after giving effect to the Transactions, we would have had total debt of approximately $1,400.0 million outstanding. For the twelve months ended May 31, 2004, on a pro forma basis after giving effect to the Transactions, our interest expense would have been $94.0 million.

Our substantial level of indebtedness increases the possibility that we may be unable to generate cash sufficient to pay, when due, the principal of, interest on or other amounts due in respect of our indebtedness. Our substantial debt could also have other significant consequences. For example, it could:

- increase our vulnerability to general economic downturns and adverse competitive and industry conditions;

- require us to dedicate a substantial portion, if not all, of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- place us at a competitive disadvantage compared to competitors that have less debt;

- limit our ability to raise additional financing on satisfactory terms or at all; and

- adversely impact our ability to comply with the financial and other restrictive covenants in the indenture governing the notes and the credit agreement governing our senior credit facilities, which could result in an event of default under such agreements.

Furthermore, our interest expense could increase if interest rates increase because all of the debt under our senior credit facilities is variable-rate debt. See "Description of Credit Facilities—Senior Credit Facilities." If we do not have sufficient earnings, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or sell more securities, none of which we can guarantee we will be able to do.

***Despite current indebtedness levels, we and our subsidiaries may still be able to incur substantially more debt. This could further exacerbate the risks associated with our substantial leverage.***

We and our subsidiaries may be able to incur substantial additional indebtedness in the future. Although the indenture governing the notes and our senior credit facilities contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. For example, we have up to $75.0 million of borrowings available under our new revolving credit

12

facility and have the ability to increase the aggregate amount of our term loan up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. Any additional borrowings could be senior to the notes and the related guarantees. If we incur additional debt, the risks associated with our substantial leverage would increase.

***To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to make payments on and to refinance our indebtedness, including the notes and amounts borrowed under our senior credit facilities, and to fund our operations, will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us under our senior credit facilities or otherwise in amounts sufficient to enable us to service our indebtedness, including the notes and amounts borrowed under our senior credit facilities, or to fund our other liquidity needs. If we cannot service our debt, we will have to take actions such as reducing or delaying capital investments, selling assets, restructuring or refinancing our debt or seeking additional equity capital. We cannot assure you that any of these remedies could, if necessary, be effected on commercially reasonable terms, or at all. In addition, the indenture governing the notes and the credit agreement for our senior credit facilities may restrict us from adopting any of these alternatives. Furthermore, Thomas H. Lee Partners, L.P. and its affiliates and Phillip Bennett have no continuing obligation to provide us with debt or equity financing. Because of these and other factors beyond our control, we may be unable to pay the principal, premium, if any, interest or other amounts on the notes. See "Description of Credit Facilities" and "Description of the Notes."

***We depend almost entirely on the cash flow from our subsidiaries to meet our obligations, and the notes are effectively subordinated to all obligations of our non-guarantor subsidiaries, including our regulated subsidiaries.***

We conduct all of our operations through our subsidiaries and depend almost entirely upon dividends and other inter-company transfers of funds from our subsidiaries to meet our payment obligations under the notes. Unless they are guarantors of the notes, our subsidiaries do not have any obligation to pay amounts due on the notes or to make funds available for that purpose. Only our non-regulated domestic subsidiaries are subsidiary guarantors of the notes. As a result of this structure, the notes are effectively subordinated to all indebtedness and other obligations (such as trade payables) of our non-guarantor subsidiaries, including to the significant liabilities of our regulated subsidiaries that relate to our customer financing arrangements. For further information regarding the liabilities of our non-guarantor subsidiaries, see note I to our unaudited consolidated financial statements. The effect of this subordination is that, in the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding involving a non-guarantor subsidiary, the assets of that subsidiary could not be used to pay you until after all other claims against that subsidiary, including trade payables, have been fully paid. In addition, holders of minority equity interests in non-guarantor subsidiaries may receive distributions prior to or pro rata with us depending on the terms of the equity interests.

***Substantially all of our net revenues and EBITDA are generated by, and substantially all of our assets are held by, our non-guarantor subsidiaries who have no obligations to pay amounts due on the notes and whose indebtedness and all other obligations are effectively senior to the notes.***

The historical consolidated financial data and the pro forma consolidated financial data included in this prospectus are presented on a consolidated basis for our entire business and include our non-guarantor subsidiaries. Substantially all of our net revenues and EBITDA are generated by our non-guarantor subsidiaries. The assets of our non-guarantor subsidiaries, which principally relate to

13

assets relating to customer accounts and our customer financing activities, represent substantially all of our assets. As discussed in the preceding risk factor, these non-guarantor subsidiaries have no obligation to pay amounts due on the notes or to make funds available for these purposes, and the notes are effectively subordinated to all these subsidiaries' liabilities. For further information regarding the assets and liabilities of our non-guarantor subsidiaries, see note I to our unaudited consolidated financial statements.

***Regulatory and legal restrictions may prohibit certain of our subsidiaries from paying dividends and making other payments to us.***

As discussed in the previous two risk factors, we conduct all of our operations through our subsidiaries and will depend almost entirely upon dividends and other inter-company transfers of funds from our subsidiaries to meet our payment obligations under the notes. In addition to not guaranteeing the notes, our regulated subsidiaries are limited in their ability to pay dividends and make other payments to us by applicable laws and regulations. For example, Refco, LLC, one of our subsidiaries registered as an FCM with the Commodity Futures Trading Commission ("CFTC"), must seek regulatory approvals to pay a substantial dividend and will not be able to pay dividends to us if after paying such dividends it would fail to maintain its minimum capital requirements, which as of May 31, 2004 were $125.8 million. See "Business—Regulation."

***Restrictive covenants in the senior credit facilities and the indenture may restrict our ability to pursue our business strategies.***

Our senior credit facilities contain a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to engage in acts that may be in our long-term best interests. Our senior credit facilities include covenants restricting, among other things, our ability to:

- incur or guarantee additional debt;

- incur liens;

- make loans and investments;

- make capital expenditures;

- declare or pay dividends or redeem or repurchase capital stock;

- engage in mergers, acquisitions and other business combinations;

- prepay, redeem or purchase subordinated debt (including the notes);

- amend or otherwise alter terms of subordinated debt (including the notes);

- sell assets and engage in sale leaseback transactions;

- transact with affiliates; and

- alter the business that we conduct.

The indenture relating to the notes also contains numerous covenants including, among other things, restrictions on our ability to:

- incur or guarantee additional indebtedness;

- sell assets;

- declare or pay dividends or make other equity distributions;

- purchase or redeem capital stock;

- make investments;

- consolidate or merge with or into other companies;

14

- engage in transactions with affiliates; and

- alter the business that we conduct.

Our senior credit facilities also include financial covenants, including requirements that we maintain:

- a minimum interest coverage ratio; and

- a maximum leverage ratio.

These financial covenants will become more restrictive over time.

A breach of any covenant or the inability to comply with any required financial ratio contained in either our senior credit facilities or the indenture governing the notes could result in a default under that agreement. If any such default occurs, the lenders under our senior credit facilities or the holders of the notes, as the case may be, may elect to declare all outstanding borrowings, together with accrued and unpaid interest and other amounts payable thereunder, to be immediately due and payable. In addition, a default under the indenture governing the notes would cause a default under the senior credit facilities, and the acceleration of debt under the senior credit facilities or the failure to pay that debt when due would cause a default under the indenture governing the notes. The lenders under our senior credit facilities also have the right upon an event of default thereunder to terminate any commitments they have to provide further borrowings. Further, following an event of default under our senior credit facilities, the lenders under these facilities will have the right to proceed against the collateral granted to them to secure that debt, which includes the available cash of our subsidiaries that guarantee the senior credit facilities, and they will also have the right to prevent us from making debt service payments on the notes. If the debt under our senior credit facilities or the notes offered hereby were to be accelerated, we cannot assure you that our assets would be sufficient to repay in full that debt or any other debt that may become due as a result of that acceleration.

***Your right to receive payments on the notes is subordinated to the borrowings under our senior credit facilities and possibly all of our future borrowings. Further, the guarantees of the notes are junior to all the guarantors' existing senior indebtedness and possibly to all of the guarantors' future borrowings.***

The notes and the guarantees rank in right of payment behind all of the co-issuers' and the guarantors' existing senior indebtedness, including borrowings under our senior credit facilities, and will rank in right of payment behind all of the co-issuers' and the guarantors' future borrowings, except any future indebtedness that expressly provides that it ranks equal or junior in right of payment to the notes and the guarantees. As of May 31, 2004, on a pro forma basis after giving effect to the Transactions, the notes and the guarantees would have been contractually subordinated to approximately $800.0 million of senior term loan debt. In addition, our senior credit facilities and the indenture governing the notes permit us to incur up to $75.0 million in additional borrowings under our revolving credit facility, subject, in the case of our senior credit facilities, to compliance with the covenants and conditions to borrowings under the senior credit facilities, which borrowings would be senior to the notes and the guarantees. Our senior credit facilities and the indenture also permit us to increase the term loan facility under our credit agreement by up to $200.0 million, subject, in the case of the senior credit facilities, to certain conditions. See "Description of Credit Facilities—Senior Credit Facilities." We will also be permitted to incur substantial additional indebtedness, including senior indebtedness, in the future.

As a result of this subordination, upon any distribution to the creditors of the co-issuers or the creditors of the guarantors in a bankruptcy, liquidation or reorganization or similar proceeding relating to the co-issuers or the guarantors or their respective property, the holders of senior debt of the co-issuers and the guarantors will be entitled to be paid in full and in cash before any payment (other than payments in certain junior securities) may be made with respect to the notes or the guarantees, as the case may be.

15

All payments (other than payments in the form of certain junior securities) on the notes and the guarantees will be blocked in the event of a payment default on designated senior debt and may be blocked for up to 179 consecutive days in the event of certain non-payment defaults on designated senior debt.

In the event of a bankruptcy, liquidation or reorganization or similar proceeding relating to the co-issuers or the guarantors, holders of the notes will participate with the trade creditors and all other holders of the co-issuers' and the guarantors' senior subordinated indebtedness, as the case may be, in the assets remaining after the co-issuers and the guarantors have paid all of the senior secured indebtedness. However, because the indenture requires that amounts otherwise payable to holders of the notes in a bankruptcy or similar proceeding be paid to holders of senior indebtedness instead, holders of the notes may receive less, ratably, than holders of trade payables or other unsecured, unsubordinated creditors in any such proceeding. In any of these cases, the co-issuers and the guarantors may not have sufficient funds to pay all of its creditors, and holders of the notes may receive less, ratably, than the holders of senior indebtedness. See "Description of the Notes—Ranking."

***The notes are not secured by our assets and the lenders under our senior credit facilities will be entitled to remedies available to a secured lender, which gives them priority over you to collect amounts due to them.***

In addition to being subordinated to all the co-issuers' and guarantors' existing and future senior debt, the notes and the guarantees are not secured by any of their assets. Our obligations under our senior credit facilities are secured by, among other things, a first priority pledge of all the common equity interests of the co-issuers and substantially all our other assets. If we become insolvent or are liquidated, or if payment under our senior credit facilities or in respect of any other secured indebtedness is accelerated, the lenders under our senior credit facilities or holders of other secured indebtedness will be entitled to exercise the remedies available to a secured lender under applicable law (in addition to any remedies that may be available under documents pertaining to our senior credit facilities or other senior debt). Upon the occurrence of any default under our senior credit facilities (and even without accelerating the indebtedness under our senior credit facilities), the lenders may be able to prohibit the payment of the notes and guarantees either by limiting our ability to access our cash flow or under the subordination provisions contained in the indenture governing the notes. See "Description of Credit Facilities" and "Description of the Notes—Ranking."

***We may not be able to fulfill our repurchase obligations in the event of a change of control.***

Upon the occurrence of any change of control, we will be required to make a change of control offer to repurchase the notes. Any change of control also would constitute a default under our senior credit facilities. Therefore, upon the occurrence of a change of control, the lenders under our senior credit facilities would have the right to accelerate their loans, and if so accelerated, we would be required to repay all of our outstanding obligations under our senior credit facilities. Also, our senior credit facilities generally prohibit us from purchasing any notes if we do not repay all borrowings under such facilities first or obtain the consent of the lenders under such facilities. Accordingly, unless we first repay all such borrowings or obtain the consent of such lenders, we will be prohibited from purchasing the notes upon a change of control.

In addition, if a change of control occurs, there can be no assurance that we will have available funds sufficient to pay the change of control purchase price for any of the notes that might be delivered by holders of the notes seeking to accept the change of control offer and, accordingly, none of the holders of the notes may receive the change of control purchase price for their notes. Our failure to make the change of control offer or to pay the change of control purchase price when due would result in a default under the indenture governing the notes. See "Description of the Registered Notes—Defaults."

16

*Federal and state fraudulent transfer laws permit a court to void the notes and the guarantees, and if that occurs, you may not receive any payments on the notes or you may be required to repay amounts you received.*

The notes are guaranteed by each of the subsidiary guarantors. The co-issuers' issuance of the notes and the issuance of the guarantees by the subsidiary guarantors may be subject to review under federal and state fraudulent transfer and conveyance statutes if a bankruptcy, liquidation or reorganization case or a lawsuit, including circumstances in which bankruptcy is not involved, were commenced at some future date by, or on behalf of, unpaid creditors of the co-issuers or the subsidiary guarantors. While the relevant laws may vary from state to state, under such laws the issuance of the notes or the guarantees and the application of the proceeds from the issuance of the notes will be a fraudulent conveyance if (1) a co-issuer issued the notes or a subsidiary guarantor issued a guarantee with the intent of hindering, delaying or defrauding creditors or (2) a co-issuer or any of the subsidiary guarantors, as applicable, received less than reasonably equivalent value or fair consideration in return for issuing either the notes or a guarantee, and, in the case of (2) only, one of the following is true:

- a co-issuer or any of the subsidiary guarantors were insolvent, or rendered insolvent, by reason of such transactions;

- a co-issuer or any of the subsidiary guarantors were engaged in a business or transaction for which the applicable co-issuer's or subsidiary guarantor's assets constituted unreasonably small capital; or

- a co-issuer or any of the subsidiary guarantors intended to, or believed that it would, be unable to pay its debts as they matured.

If a court were to find that the issuance of the notes or a guarantee were a fraudulent conveyance, the court could void the payment obligations under the notes or such guarantee or subordinate the notes or such guarantee to presently existing and future indebtedness of the applicable co-issuer or guarantor, or require the holders of the notes to repay any amounts received with respect to the notes or such guarantee. In the event of a finding that a fraudulent conveyance occurred, you may not receive any payment on the notes or the guarantees.

The measures of insolvency for purposes of fraudulent transfer laws vary depending upon the governing law. Generally, an entity would be considered insolvent if, at the time it incurred indebtedness:

- the sum of its debts was greater than the fair value of all its assets;

- the present fair saleable value of its assets is less than the amount required to pay the probable liability on its existing debts and liabilities as they become due; or

- it cannot pay its debts as they become due.

A court would likely find that a co-issuer or subsidiary guarantor did not receive reasonably equivalent value or fair consideration for the issuance of the notes or its guarantee if the co-issuer or subsidiary guarantor did not substantially benefit directly or indirectly from the issuance of the notes. Each guarantee will contain a provision intended to limit the subsidiary guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent transfer. This provision may not be effective to protect the guarantees from being voided under fraudulent transfer law.

### Risks Relating to the Exchange Offer

*Your old notes will not be accepted for exchange if you fail to follow the exchange offer procedures.*

We will not accept your old notes for exchange if you do not follow the exchange offer procedures. We will issue registered notes as part of this exchange offer only after a timely receipt of your old notes, a properly completed and duly executed letter of transmittal and all other required documents.

Therefore, if you wish to tender your old notes, please allow sufficient time to ensure timely delivery. If we do not receive your old notes, letter of transmittal and other required documents by the time of expiration of the exchange offer, we will not accept your old notes for exchange. We are under no duty to give notification of defects or irregularities with respect to the tenders of old notes for exchange. If there are defects or irregularities with respect to your tender of old notes, we will not accept your old notes for exchange.

***If you do not exchange your old notes, there will be restrictions on your ability to resell your old notes.***

Following the exchange offer, old notes that you do not tender or that we do not accept will be subject to transfer restrictions. Absent registration, any untendered old notes may therefore be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and applicable state securities laws.

***We cannot assure you that an active trading market will develop for these notes.***

The registered notes are a new issue of securities and there is no established trading market for the registered notes. We do not intend to apply to list the registered notes for trading on any securities exchange or to arrange for quotation on any automated dealer quotation system. As a result of this and the other factors listed below, an active trading market for the registered notes may not develop, in which case the market price and liquidity of the registered notes may be adversely affected.

In addition, you may not be able to sell your registered notes at a particular time or at a price favorable to you. Future trading prices of the registered notes will depend on many factors, including:

- our operating performance and financial condition;

- our prospects or the prospects for companies in our industry generally;

- our ability to complete this exchange offer;

- the interest of securities dealers in making a market in the notes;

- the market for similar securities;

- prevailing interest rates; and

- the other factors described in this prospectus under "Risk Factors."

Historically, the market for non-investment grade debt has been subject to disruptions that have caused volatility in prices. It is possible that the market for the registered notes will be subject to disruptions. A disruption may have a negative effect on you as a holder of the registered notes, regardless of our prospects or performance.

Although the initial purchasers of the old notes have advised us that they intend to make a market in the registered notes, they are not obligated to do so. The initial purchasers may also discontinue any market making activities at any time, in their sole discretion, which could further negatively impact your ability to sell the registered notes or the prevailing market price at the time you choose to sell.

18

**Risks Relating to Our Company**

*Changes in domestic and international market factors that affect trading volumes or interest rates could significantly harm our business.*

We generate revenues primarily from transaction fees we earn from executing and clearing customer orders and from interest income we earn on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. These revenue sources are substantially dependent on customer trading volumes and interest rates. We are, in particular, affected by customer trading volumes on the six primary derivatives exchanges on which we conduct transactions and in the fixed income and foreign exchange markets. The volume of transactions our customers conduct with us and interest rates are directly affected by domestic and international market factors that are beyond our control, including:

- economic, political and market conditions;

- broad trends in industry and finance;

- changes in levels of trading activity in the broader marketplace;

- price levels and price volatility in the derivatives, fixed income, equity, foreign exchange and commodity markets;

- legislative and regulatory changes;

- the actions of our competitors;

- changes in government monetary policies;

- foreign exchange rates; and

- inflation.

Any one or more of these factors, or others, may contribute to reduced trading volumes or changes in interest rates, which could have a material adverse effect on our business, financial condition and operating results.

*We face intense competition from other companies, and if we are not able to successfully compete with them, our business may be harmed.*

The derivatives, securities and financial services industries are highly competitive, and we expect that competition will intensify in the future. We have numerous current and prospective competitors, both domestically and internationally. They include both large, diversified financial institutions, such as major investment banks and independent specialty brokers. Many of our competitors and potential competitors have larger customer bases and greater financial, marketing, technological and personnel resources than we do. These resources may enable them to, among other things:

- develop services similar to ours or new services that are preferred by our customers;

- provide access to trading in products or a range of products that we do not offer;

- provide their services more efficiently and at a lower cost;

- offer better, faster and more reliable technology;

- take greater advantage of acquisitions, alliances and other opportunities;

- more effectively market, promote and sell their services; and

- better leverage their existing relationships with their existing customers.

19

In addition, new or existing competitors could gain access to trading markets in which we currently enjoy a competitive advantage. For example, if additional competitors gained access to the IDB market, it could adversely affect our advantage in providing trading access to the U.S. Treasury securities market. Moreover, we cannot assure you that existing market participants, such as the exchanges, will not expand their services and begin competing with us more directly. Even if new or existing competitors do not significantly erode our market share, we may be required to reduce our fees significantly to remain competitive, which could have a material adverse effect on our profitability. If in any of these cases we fail to compete effectively, our business, financial condition and operating results may be materially harmed.

***Our business could be adversely affected if we are unable to retain our current customers or attract new customers.***

The success of our business depends, in part, on our ability to maintain and increase our customer base. Customers in our market are sensitive to, among other things, the costs of using our services, the quality of the services we offer, the speed and reliability of order execution and the breadth of our service offerings and the products to which we offer access. We cannot assure you that we will be able to offer the pricing, service, speed and reliability of order execution or the service and product breadth that customers desire. As a result, we also cannot assure you that we will retain existing customers or attract new customers, and our failure to maintain or attract customers could have a material adverse effect on our business, financial condition and operating results.

***We rely on relationships with our introducing brokers for obtaining some of our customers. The failure to maintain these relationships could adversely affect our business.***

We have a relationship with introducing brokers who acquire and provide marketing and customer service functions for some of our customers. These introducing brokers receive compensation for introducing customers to us. The failure to maintain our relationships with these introducing brokers would result in a loss of revenues, which could adversely affect our business.

***Our business operations could be significantly disrupted if we lost members of our management team.***

Our success depends to a significant degree upon the continued contributions of our management team. Our future performance will be substantially dependent on our ability to retain and motivate them. We cannot assure you that any of these persons will not voluntarily terminate his or her employment with us. The loss of the services of any member of our management team, particularly our president and chief executive officer, Phillip Bennett, could adversely affect our ability to execute our business strategy. See "Management—Managers and Executive Officers."

***We may not effectively manage our growth, which could materially harm our business.***

We expect that our business will continue to grow. This growth may place a significant strain on our management, personnel, systems and resources. We must continue to improve our operational and financial systems and managerial controls and procedures, and we will need to continue to expand, train and manage our technology workforce. We must also maintain close coordination among our technology, compliance, risk management, accounting, finance, marketing and sales organizations. We cannot assure you that we will manage our growth effectively. If we fail to do so, our business could be materially harmed.

If we continue to grow, we may be required to increase our investment in facilities, personnel and financial and management systems and controls. Continued growth may also require expansion of our procedures for monitoring and assuring our compliance with applicable regulations and that we integrate, train and manage a growing employee base. The expansion of our existing businesses, our

20

expansion into new businesses and the resulting growth of our employee base increase our need for internal audit and monitoring processes that are more extensive and broader in scope than those we have historically required. We may not be successful in implementing all of the processes that are necessary. Further, unless our growth results in an increase in our revenues that is proportionate to the increase in our costs associated with this growth, our operating margins and profitability will be adversely affected.

***Our operations expose us to significant credit risks.***

We act on behalf of our customers for all trades consummated both on exchanges and in OTC markets. Accordingly, we are responsible for our customers' obligations with respect to these transactions, which exposes us to significant credit risk. Our customers may default on their obligations due to bankruptcy, lack of liquidity, operational failure or other reasons. A substantial part of our working capital is at risk if customers default on their obligations to us and their margin and security deposits are insufficient to meet all of their obligations. We cannot assure you that we will not be materially and adversely affected in the event of a significant default by our customers.

***Our acquisition and investment strategy and any other new business initiatives we undertake may involve risks, and if we are unable to effectively manage these risks, our business will be materially harmed.***

To achieve our strategic objectives, in the future we may seek to acquire other companies, businesses or technologies. Acquisitions entail numerous risks, including the following:

- difficulties in the integration of acquired operations, personnel or technologies;

- diversion of management's attention from other business concerns;

- assumption of unknown material liabilities;

- failure to achieve financial or operating objectives;

- amortization of acquired intangible assets, which would reduce future reported earnings; and

- potential loss of customers or key employees of acquired companies.

We also may seek to expand or enhance our operations by forming joint ventures, making other investments or undertaking other business initiatives and entering new lines of businesses. Entering into joint ventures also entails risks, including difficulties in developing and expanding the business of newly formed joint ventures, exercising influence over the activities of joint ventures in which we do not have a controlling interest and potential conflicts with our joint venture partners. Other investments and business initiatives may also involve risks, including but not limited to loss of investment. We cannot assure you that any acquisition, joint venture, investment or other business initiative that we have or may enter into will be successful.

***Our international operations involve special challenges that we may not be able to meet, which could adversely affect our financial results.***

We currently conduct international operations and plan to expand those operations. There are certain risks inherent in doing business in international markets, particularly in the securities trading industry, which is heavily regulated in many jurisdictions outside the United States. These risks include:

- less developed technological infrastructures and generally higher costs, which could result in lower customer acceptance of our services or customers having difficulty accessing our products and services;

- the inability to manage and coordinate the various regulatory requirements of multiple jurisdictions that are constantly evolving and subject to unexpected change;

- difficulties in staffing and managing foreign operations;

- fluctuations in exchange rates; and

- potentially adverse tax consequences.

Our operations in certain less developed countries are also subject to the political, legal and economic risks associated with politically unstable and less developed regions of the world, including the risk of war and other international conflicts, and actions by governmental authorities, insurgent groups, terrorists and others. Specifically, we conduct business in countries whose currencies may be unstable. Future instability in such currencies or the imposition of governmental or regulatory restrictions on such currencies could impede our foreign exchange business and our ability to collect on collateral held in such currencies.

In addition, we are required to comply with the laws and regulations of foreign governmental and regulatory authorities of each country in which we conduct business. These may include laws, rules and regulations relating to many aspects of the derivatives and capital markets businesses. Our compliance with these laws and regulations may be difficult and may require significant expenditures and personnel requirements, and our failure to be in compliance would subject us to legal and regulatory liabilities. We may also experience difficulty in managing our international operations because of, among other things, competitive conditions overseas, management of foreign exchange risk, established domestic markets, language and cultural differences and economic or political instability. Any of these factors could have a material adverse effect on the success of our international operations and, consequently, on our business, financial condition and operating results.

***If we experience systems failures or capacity constraints, our ability to conduct our operations would be materially harmed.***

We are heavily dependent on the capacity and reliability of the computer and communications systems supporting our operations, whether owned and operated internally or by third parties. We receive and process a large portion of our trade orders through electronic means, such as through public and private communications networks. These computer and communications systems and networks are subject to performance degradation or failure from any number of reasons, including loss of power, acts of war or terrorism, human error, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, intentional acts of vandalism, customer error or misuse, lack of proper maintenance or monitoring and similar events. During the terrorist attacks on the World Trade Center on September 11, 2001, we lost access to a significant portion of our communications and computer networks. Although the disruption of our operations as a result of this event was not material, we cannot assure you that the future occurrences of any of the events listed above, or of any other events, would not result in the material degradation or failure of our computer and communications systems and networks.

If such a degradation or failure were to occur, it could cause any number of results, including:

- unanticipated disruptions in service to our customers;

- slower response times;

- delays in our customers' trade execution;

- failed settlement of trades; and

- incomplete or inaccurate accounting, recording or processing of trades.

Further, any of our redundant systems or disaster recovery plans or our personnel, may not be adequate to correct or mitigate any of the above events. Similarly, we cannot be certain that any redundant systems, disaster recovery plans or personnel of our third party service providers will be

adequate to correct or mitigate any of the above events once implemented properly. The occurrence of any of the foregoing events may lead to financial losses, litigation or arbitration claims filed by or on behalf of our customers and regulatory investigations and sanctions, including by the SEC and CFTC, which require that our trade execution and communications systems be able to handle anticipated present and future peak trading volumes. The occurrence of the foregoing events could also have a negative effect on our reputation, which in turn could cause us to lose existing customers to our competitors or make it more difficult for us to attract new customers in the future. Further, any financial loss that we suffer as a result of such degradations or failures could be magnified by price movements of contracts involved in transactions impacted by the degradation or failure, and we may be unable to take corrective action to mitigate any losses we suffer.

***If we fail to maintain our computer and communications systems and networks properly or to upgrade and expand such systems and networks in response to technological change, our business will be materially harmed.***

We need to properly maintain the computer and communications systems and networks that we currently own and operate. We internally support and maintain many of our existing systems and networks, including those that are critical to our derivatives clearing operations. Our failure to adequately maintain these systems and networks could have a material effect on the performance and reliability of such systems and networks, which in turn could materially harm our business.

Further, the markets in which we compete are characterized by rapidly changing technology, changes in customer demand and uses of our services and the emergence of new industry standards and practices that could render our existing technology and systems obsolete. Our future success will depend in part on our ability to anticipate and adapt to technological advancements and changing standards in a timely, cost-efficient and competitive manner, and to upgrade and expand our systems accordingly. Any upgrades or expansions may require significant expenditures of funds and may also increase the probability that we will suffer system degradations and failures. We cannot assure you that we will have sufficient funds to adequately update and expand our networks, nor can we assure you that any upgrade or expansion attempts will be successful and accepted by the marketplace and our customers. Our failure to adequately update and expand our systems and networks would have a material adverse effect on our business.

***We depend on third-party suppliers for a number of services that are important to our business.***

We depend on a number of suppliers, such as banking, clearing and settlement organizations, telephone companies, online service providers, data processors and software and hardware vendors for elements of our trading, clearing and other systems, as well as communications and networking equipment, computer hardware and software and related support and maintenance. We cannot assure you that any of these providers will be able to continue to provide these services in an efficient, cost-effective manner or that they will be able to adequately expand their services to meet our needs. An interruption in or the cessation of service by any service provider and our inability to make alternative arrangements in a timely manner, or at all, could have a material adverse effect on our business, financial condition and operating results.

***Our networks and those of our third-party service providers may be vulnerable to security risks.***

We expect the secure transmission of confidential information over public networks to continue to be a critical element of our operations. Our networks and those of our third-party service providers, the exchanges and counterparties with whom we trade and our customers may be vulnerable to unauthorized access, computer viruses and other security problems. Persons who circumvent security measures could wrongfully use our information or cause interruptions or malfunctions in our operations, any of which could have a material adverse effect on our business, financial condition and

operating results. Additionally, our reputation could be damaged. If an actual, threatened or perceived breach of our security occurs, the market perception of the effectiveness of our security measures could be harmed and could cause customers to reduce or stop their use of our products and services. We may be required to expend significant resources to protect against the threat of security breaches or to alleviate problems, including reputational harm and litigation, caused by any breaches. Although we intend to continue to implement industry-standard security measures, these measures may prove to be inadequate and result in system failures and delays that could lower trading volumes and have an adverse effect on our business, financial condition and operating results.

***We operate in a heavily regulated environment that imposes significant costs and compliance requirements on us. The failure to comply with the regulations to which we are subject could subject us to sanctions.***

We are extensively regulated by the CFTC; the SEC; the National Association of Securities Dealers ("NASD"), our designated self-regulatory organization with respect to our registration as a broker-dealer; the Chicago Mercantile Exchange (the "CME"), our designated self-regulatory organization with respect to our registration as an FCM; the National Futures Association ("NFA"); other exchanges of which we are a member; state regulatory agencies; and other domestic and foreign clearing organizations. If we fail to comply with applicable laws, rules or regulations, we may be subject to criminal conviction, increased reporting requirements, censure, fines, cease-and-desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including revocation of our operating licenses. Changes in laws, rules or regulations or in governmental policies in applying them could further restrict our operations, impose additional administrative or other burdens on our operations or result in an increase in our cost of regulatory compliance, any of which could have a material adverse effect on our business, financial condition and operating results.

The organizations and agencies that regulate us have broad powers to investigate and enforce compliance and punish non-compliance with their rules and regulations. We cannot assure you that we or our managers, officers and employees will be able to fully comply with these rules and regulations and will not be subject to claims or actions by these organizations and agencies.

***We will become subject to additional financial and other reporting and corporate governance requirements that may be difficult for us to satisfy.***

We have historically operated our business as a private company. We will be obligated after the effectiveness of our exchange offer registration statement or shelf registration statement to file with the SEC certain annual and quarterly information and other reports that are specified in Sections 13 and 15(d) of the Exchange Act as applicable to U.S. companies subject to such Sections. We will also become subject to other new financial and other reporting and corporate governance requirements, including certain provisions of the Sarbanes-Oxley Act of 2002 and the regulations promulgated thereunder, which will impose significant compliance obligations upon us. These obligations will require a commitment of additional resources and may in meeting these requirements require the hiring of additional staff and result in the diversion of our senior management's time and attention from our day to day operations. We cannot assure you that we will be successful in complying with these obligations or that the compliance with them will not adversely impact our business or results of operations.

***Our compliance and risk management methods might not be effective, which could increase the risk that we are subject to regulatory action or litigation or otherwise negatively impact our business.***

Our ability to comply with all applicable laws, rules and regulations is largely dependent on our establishment and maintenance of compliance, audit and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. If we fail to effectively establish and maintain such compliance and reporting systems or fail to attract and retain personnel

24

who are capable of designing and operating such systems, it will increase the likelihood that we will become subject to legal and regulatory infractions, including civil litigation.

For us to avoid risks inherent in our business, it is necessary for us to have polices and procedures that identify, monitor and manage our risk exposure. Such policies may not be fully effective. Some of our risk management methods depend upon evaluation of information regarding markets, customers or other matters that are publicly available or otherwise accessible by us. That information may not in all cases be accurate, complete, up-to-date or properly evaluated. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events. We cannot assure you that our policies and procedures will always be effective or that we will always be successful in monitoring or evaluating the risks to which we are or may be exposed. Such a failure could expose us to unforeseen risks, which could have a material adverse effect on our financial condition or results of operations.

***We are subject to significant litigation risk which could adversely affect our business.***

Many aspects of our business involve substantial liability risks, and we could be exposed to substantial liability under federal and state laws and court decisions, as well as rules and regulations promulgated by the SEC, the CFTC and other regulatory organizations. These risks include, among others, potential civil litigation triggered by regulatory investigations, potential liability from disputes over terms of a trade, the claim that a system failure or delay caused monetary losses to a customer, that we entered into an unauthorized transaction or that we provided materially false or misleading statements in connection with a transaction. The volume of claims and the amount of damages claimed in litigation and regulatory proceedings against financial intermediaries have been increasing. Dissatisfied customers frequently make claims against their service providers regarding quality of trade execution, improperly settled trades, mismanagement or even fraud. These risks also include potential liability from disputes over the exercise of our rights with respect to customer margins and security deposits. Although our customer agreements generally provide that we may exercise such rights with respect to customer margins and security deposits as we deem reasonably necessary for our protection, our exercise of these rights in certain cases has led to claims by customers that we have exercised these rights improperly. [For example, we are currently the subject of a lawsuit brought by a customer who has alleged that we improperly liquidated its position in connection with a margin call.] Even if we prevail in this or other lawsuits, we could incur significant legal expenses defending claims, even those without merit. An adverse resolution of any future lawsuit or claim against us could have a material adverse effect on our reputation, financial condition or operating results.

***We could be harmed by employee or introducing broker misconduct or errors that are difficult to detect and deter.***

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Misconduct by our employees or introducing brokers could include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers or improper use of confidential information. Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. It is not always possible to deter employee or introducing broker misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. Our employees or introducing brokers also may commit errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions. For example, the litigation referred to in the preceding risk factor resulted from the actions of employees.

*If we do not maintain the capital levels required by regulations, we may be fined or barred from conducting business.*

The SEC, NASD, CFTC and various other regulatory agencies have stringent rules with respect to the maintenance of specific levels of net capital by securities broker-dealers and FCMs. Our failure to maintain the required net capital could result in suspension or revocation of our registration by the SEC and our suspension or expulsion by the NASD, and could ultimately lead to our liquidation. If net capital rules are changed or expanded, or if we incur an unusually large charge against net capital, our operations that require an intensive use of capital could be limited. Such operations may include dealing activities, marketing and the financing of customer account balances. See "Business—Regulation" for more information on the minimum net capital requirements for our domestic broker-dealer and FCM subsidiaries.

*We have recorded a significant amount of intangible assets, which may never generate the returns we expect.*

Our acquisitions have resulted in significant increases in goodwill and identifiable intangible assets. Goodwill, which relates to the excess of cost over the fair value of the net assets of the businesses acquired by us, and identifiable intangible assets are expected to increase substantially as a result of the Transactions. On a pro forma basis after giving effect to the Transactions as if they occurred on May 31, 2004, we would have had approximately $729.3 million of goodwill and approximately $589.0 million of identifiable intangible assets.

Goodwill and identifiable intangible assets are recorded at fair value on the date of acquisition and, under Financial Accounting Standards Board Statement No. 142, *Goodwill and Other Intangible Assets* ("FAS 142"), goodwill and indefinite lived intangibles are reviewed at least annually for impairment. Finite lived intangibles are reviewed for impairment whenever events or changes in circumstances indicate carrying amounts may not be recoverable. Impairment may result from, among other things, deterioration in the performance of the acquired business, adverse market conditions, adverse changes in applicable laws or regulations, including changes that restrict the activities of the acquired business, and a variety of other circumstances. The amount of any impairment must be written off. We may never realize the full value of our intangible assets. Any future determination requiring the write-off of a significant portion of intangible assets would have an adverse effect on our financial condition and results of operations.

*The interests of our controlling members could conflict with your interests.*

Affiliates of Thomas H. Lee Partners, L.P. (the "THL Funds") and Phillip Bennett beneficially own approximately 57% and 43%, respectively, of our parent's issued and outstanding membership units. The THL Funds have the ability to designate four of our parent's eight managers, and, if our parent fails to meet certain yearly performance requirements, they can designate a fifth manager (with the total board size increasing to nine managers). The THL Funds also have the ability to control all aspects of our business. Mr. Bennett also has significant influence over our business. The THL Funds and Mr. Bennett may pursue transactions that could enhance their equity investment while involving risks to your interests. There can be no assurance that the interests of our controlling members will not conflict with your interests.

26

**FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact included in this prospectus are forward-looking statements. Forward-looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. You can identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "plan," "intend," "believe" and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events.

These forward-looking statements are based on assumptions that we have made in light of our industry experience and on our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (some of which are beyond our control) and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results and cause them to differ materially from those anticipated in the forward-looking statements. These factors include, among others:

- changes in domestic and international market conditions;

- competition;

- our ability to attract and retain customers;

- our relationships with introducing brokers;

- retention of our management team;

- our ability to manage our growth or integrate future acquisitions;

- our exposure to significant credit risks with respect to our customers;

- international operations and expansion;

- system failures;

- the performance of third-party suppliers;

- changes in regulations or exchange membership requirements;

- the effectiveness of compliance and risk management methods;

- potential litigation or investigations;

- employee or introducing broker misconduct or errors; and

- changes in capital requirements.

There may be other factors that may cause our actual results to differ materially from the forward-looking statements.

Because of these factors, we caution that you should not place undue reliance on any of our forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made. New risks and uncertainties arise from time to time, and it is impossible for us to predict those events or how they may affect us. Except as required by law, we have no duty to, and do not intend to, update or revise the forward-looking statements in this prospectus after the date of this prospectus.

**THE EXCHANGE OFFER**

**Purpose and Effect**

The co-issuers issued the old notes on August 5, 2004 in a transaction exempt from registration under the Securities Act. In connection with this original issuance, we entered into an indenture and a registration rights agreement. The registration rights agreement requires that we file a registration statement under the Securities Act with respect to the registered notes to be issued in the exchange offer and, upon the effectiveness of the registration statement, offer you the opportunity to exchange your old notes for a like principal amount of registered notes. Except as set forth below, these registered notes will be issued without a restrictive legend and, we believe, may be reoffered and resold by you without registration under the Securities Act. After we complete the exchange offer, our obligations with respect to the registration of the old notes and the registered notes will terminate, except as provided in the last paragraph of this section. Copies of the indenture relating to the notes and the registration rights agreement have been filed as exhibits to the registration statement of which this prospectus forms a part. Notwithstanding anything to the contrary set forth in this prospectus, this exchange offer is not being made to you, and you may not participate in the exchange offer, if (a) you are our "affiliate" within the meaning of Rule 405 of the Securities Act or (b) you are a broker-dealer that acquired old notes directly from us.

Based on interpretations by the staff of the SEC set forth in no-action letters issued to third parties unrelated to us, we believe that the registered notes issued to you in the exchange offer may be offered for resale, resold and otherwise transferred by you, without compliance with the registration and prospectus delivery provisions of the Securities Act, unless you are a broker-dealer that receives registered notes in exchange for old notes acquired by you as a result of market-making activities or other trading activities. This interpretation, however, is based on your representations to us that:

- any registered notes received by you will be acquired in the ordinary course of your business;

- you have no arrangements or understandings with any person to participate in the distribution of the registered notes: and

- you are not engaged in, and do not intend to engage in, the distribution of the registered notes.

If you have any of the disqualifications described above or cannot make each of the representations set forth above, you may not rely on the interpretations by the staff of the SEC referred to above. Under those circumstances, you must comply with the registration and prospectus delivery requirements of the Securities Act in connection with a sale, transfer or other disposition of any notes unless you are able to utilize an applicable exemption from all of those requirements. In addition, each broker-dealer that receives registered notes for its own account in exchange for old notes, where such old notes were acquired by such broker-dealer as a result of market-making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. See "Plan of Distribution."

If you will not receive freely tradable registered notes in the exchange offer or are not eligible to participate in the exchange offer, you may elect to have your old notes registered in a "shelf" registration statement on an appropriate form pursuant to Rule 415 under the Securities Act. If we are obligated to file a shelf registration statement, we will be required to keep the shelf registration statement effective for a period of two years (or for a longer period if extended pursuant to the registration rights agreement) or such shorter period that will terminate when all of the notes covered by the shelf registration statement (a) have been sold pursuant to the shelf registration statement or (b) can be sold pursuant to Rule 144 under the Securities Act without any volume or manner of sale limitations thereunder. Other than as set forth in this paragraph, you will not have the right to require us to register your old notes under the Securities Act. See "—Procedures for Tendering."

**Consequences of Failure to Exchange**

After we complete the exchange offer, if you have not tendered your old notes, you will not have any further registration rights, except as set forth above. Your old notes may continue to be subject to restrictions on transfer. Therefore, the liquidity of the market for your old notes could be adversely affected upon completion of the exchange offer if you do not participate in the exchange offer.

**Terms of the Exchange Offer**

Upon the terms and subject to the conditions set forth in this prospectus and in the letter of transmittal for your notes, we will accept any and all old notes validly tendered and not withdrawn prior to the time of expiration. We will issue a principal amount of registered notes in exchange for the principal amount of old notes accepted in the exchange offer. You may tender some or all of your old notes pursuant to the exchange offer. However, old notes may be tendered only in integral multiples of $1,000 principal amount.

The form and terms of the registered notes are substantially the same as the form and terms of the old notes, except that the registered notes to be issued in the exchange offer have been registered under the Securities Act and will not bear legends restricting their transfer. The registered notes will be issued pursuant to, and entitled to the benefits of, the indenture which governs the old notes. The registered notes and the old notes will be deemed a single issue of securities under the indenture.

As of the date of this prospectus, $600.0 million aggregate principal amount of old notes are outstanding. This prospectus, together with the letter of transmittal, is being sent to all registered holders and to others believed to have beneficial interests in the old notes. We intend to conduct the exchange offer in accordance with the applicable requirements of the Exchange Act and the rules and regulations of the SEC promulgated under the Exchange Act.

We will be deemed to have accepted validly tendered outstanding notes when, as and if we have given oral or written notice of our acceptance to the exchange agent. The exchange agent will act as our agent for the tendering holders for the purpose of receiving the registered notes from us. If we do not accept any tendered notes because of an invalid tender or the failure of any of the conditions to the exchange offer to be satisfied, we will return the unaccepted old notes, without expense, to the tendering holder promptly after the time of expiration. The conditions to the exchange offer are listed below under "—Conditions."

You will not be required to pay brokerage commissions or fees or, except as set forth below under "—Transfer Taxes," transfer taxes with respect to the exchange of your old notes in the exchange offer. We will pay all charges and expenses, other than applicable taxes, in connection with the exchange offer. See "—Fees and Expenses" below.

**Expiration; Amendments**

The exchange offer will expire at 12:00 midnight, New York City time, on the night of                    , 2004, unless we determine, in our sole discretion, to extend the exchange offer, in which case it will expire at the later date and time to which it is extended. We do not intend to extend the exchange offer, although we reserve the right to do so. If we do extend the exchange offer, we will give oral or written notice of the extension to the exchange agent and give each registered holder of old notes for which the exchange offer is being made notice by means of a press release or other public announcement of any extension prior to 9:00 a.m., New York City time, on the next business day after the scheduled expiration for the exchange offer.

We also reserve the right, in our sole discretion,

29

(1) to delay accepting any old notes or, if any of the conditions set forth below under "—Conditions" have not been satisfied or waived, to terminate the exchange offer by giving oral or written notice of the delay or termination to the exchange agent; or

(2) to amend the terms of the exchange offer in any manner by complying with Rule 14e-1(d) under the Exchange Act to the extent that rule applies.

We acknowledge and undertake to comply with the provisions of Rule 14e-1(c) under the Exchange Act, which requires us to return the old notes surrendered for exchange promptly after the termination or withdrawal of the exchange offer. We will notify you promptly of any extension, termination or amendment.

**Procedures for Tendering**

*Book-Entry Interests*

The old notes were issued as global notes in fully registered form without interest coupons. Beneficial interests in the global notes held by direct or indirect participants in DTC are shown on, and transfers of these interests are effected only through, records maintained in book-entry form by DTC with respect to its participants.

If you hold old notes in the form of book-entry interests and you wish to tender your old notes for exchange pursuant to the exchange offer, you must transmit to the exchange agent on or prior to the time of expiration either:

(1) a written or facsimile copy of a properly completed and duly executed letter of transmittal for your notes, including all other documents required by the letter of transmittal, to the exchange agent at the address set forth on the cover page of the letter of transmittal; or

(2) a computer-generated message transmitted by means of DTC's Automated Tender Offer Program system and received by the exchange agent and forming a part of a confirmation of book-entry transfer, in which you acknowledge and agree to be bound by the terms of the letter of transmittal for your notes.

In addition, in order to deliver old notes held in the form of book-entry interests:

(1) a timely confirmation of book-entry transfer of those notes into the exchange agent's account at DTC pursuant to the procedure for book-entry transfers described below under "—Book-Entry Transfer" must be received by the exchange agent prior to the time of expiration; or

(2) you must comply with the guaranteed delivery procedures described below.

The method of delivery of old notes, the letter of transmittal and all other required documents to the exchange agent is at your election and risk. Instead of delivery by mail, we recommend that you use an overnight or hand delivery service. In all cases, sufficient time should be allowed to assure delivery to the exchange agent before the time of expiration. You should not send the letter of transmittal or old notes to us. You may request your broker, dealer, commercial bank, trust company or other nominee to effect the above transactions for you.

*Certificated Old Notes*

Only registered holders of certificated old notes may tender those notes in the exchange offer. If your old notes are certificated notes and you wish to tender those notes for exchange pursuant to the exchange offer, you must transmit to the exchange agent, on or prior to the time of expiration, a written or facsimile copy of a properly completed and duly executed letter of transmittal, including all

30

other documents required by the letter of transmittal, to the address set forth on the cover page of the letter of transmittal. In addition, in order to validly tender your certificated old notes:

(1)  the certificates representing your old notes must be received by the exchange agent prior to the time of expiration; or

(2)  you must comply with the guaranteed delivery procedures described below.

### Procedures Applicable to All Holders

If you tender an old note and you do not withdraw the tender prior to the time of expiration, you will have made an agreement with us in accordance with the terms and subject to the conditions set forth in this prospectus and in the letter of transmittal for your notes.

If your old notes are registered in the name of a broker, dealer, commercial bank, trust company or other nominee and you wish to tender your old notes, you should contact the registered holder promptly and instruct the registered holder to tender on your behalf. If you wish to tender on your own behalf, you must, prior to completing and executing the letter of transmittal for your old notes and delivering your old notes, either make appropriate arrangements to register ownership of the old notes in your name or obtain a properly completed bond power from the registered holder. The transfer of registered ownership may take considerable time.

Signatures on a letter of transmittal or a notice of withdrawal must be guaranteed by a financial institution, including most banks, savings and loan associations and brokerage houses, that is a participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange Medallion Program or the Stock Exchange Medallion Program, each an "eligible institution," unless:

(1)  old notes tendered in the exchange offer are tendered either:

(A)  by a registered holder who has not completed the box entitled "Special Issuance Instructions" or "Special Delivery Instructions" on the holder's letter of transmittal; or

(B)  for the account of an eligible institution; and

(2)  the box entitled "Special Registration Instructions" on the letter of transmittal has not been completed.

If the letter of transmittal for your notes is signed by a person other than you, your old notes must be endorsed or accompanied by a properly completed bond power and signed by you as your name appears on those old notes.

If the letter of transmittal for your notes or any old notes or bond powers are signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, those persons should so indicate when signing. Unless we waive this requirement, in this instance you must submit with the letter of transmittal for your notes proper evidence satisfactory to us of their authority to act on your behalf.

We will determine, in our sole discretion, all questions regarding the validity, form, eligibility, including time of receipt, acceptance and withdrawal of tendered old notes. This determination will be final and binding. We reserve the absolute right to reject any and all old notes not properly tendered or any old notes our acceptance of which would, in the opinion of our counsel, be unlawful. We also reserve the right to waive any defects, irregularities or conditions of tender as to particular old notes; provided, however, that, in the event that we waive any condition of tender for any noteholder, we will waive that condition for all noteholders, Our interpretation of the terms and conditions of the exchange offer, including the instructions in the letter of transmittal for your notes, will be final and binding on all parties.

You must cure any defects or irregularities in connection with tenders of your old notes within the time period we determine unless we waive that defect or irregularity. Although we intend to notify you of defects or irregularities with respect to your tender of old notes, neither we, the exchange agent nor any other person will incur any liability for failure to give this notification. Your tender will not be deemed to have been made and your notes will be returned to you if:

    (1)  you improperly tender your old notes;

    (2)  you have not cured any defects or irregularities in your tender; and

    (3)  we have not waived those defects, irregularities or improper tender.

The exchange agent will return your notes, unless otherwise provided in the letter of transmittal for your notes, as soon as practicable following the time of expiration.

In addition, we reserve the right in our sole discretion to:

    (1)  purchase or make offers for, or offer registered notes for, any old notes that remain outstanding subsequent to the time of expiration;

    (2)  terminate the exchange offer upon the failure of any condition to the exchange offer to be satisfied; and

    (3)  to the extent permitted by applicable law, purchase notes in the open market, in privately negotiated transactions or otherwise.

The terms of any of these purchases or offers could differ from the terms of the exchange offer. By tendering in the exchange offer, you will represent to us that, among other things:

    (1)  any registered notes received by you will be acquired in the ordinary course of your business;

    (2)  you have no arrangements or understanding with any person to participate in the distribution of the registered notes;

    (3)  you are not our "affiliate," as that term is defined in Rule 405 of the Securities Act;

    (4)  you are not engaged in, and do not intend to engage in, the distribution of the registered notes; and

    (5)  if you are a broker-dealer, you will receive registered notes for your own account in exchange for old notes that were acquired as a result of market-making activities or other trading activities and not directly from us and you will comply with the prospectus delivery requirements of the Securities Act.

In all cases, issuance of registered notes for old notes that are accepted for exchange in the exchange offer will be made only after timely receipt by the exchange agent of certificates for your old notes or a timely book-entry confirmation of your old notes into the exchange agent's account at DTC, a properly completed and duly executed letter of transmittal for your notes and all other required documents. If any tendered old notes are not accepted for any reason set forth in the terms and conditions of the exchange offer or if old notes are submitted for a greater principal amount than you desire to exchange, the unaccepted or non-exchanged old notes, or old notes in substitution therefor, will be returned without expense to you. In addition, in the case of old notes tendered by book-entry transfer into the exchange agent's account at DTC pursuant to the book-entry transfer procedures described below, the non-exchanged old notes will be credited to your account maintained with DTC as promptly as practicable after the time of expiration or the termination of the exchange offer.

If you wish to tender your old notes and your old notes are not immediately available, time will not permit your old notes or other required documents to reach the exchange agent before the time of expiration or you cannot complete the procedure for book-entry transfer on a timely basis, you may tender if:

     (1)   you tender through an eligible institution;

     (2)   prior to the time of expiration, the exchange agent receives from an eligible institution a written or facsimile copy of a properly completed and duly executed letter of transmittal for your notes and notice of guaranteed delivery for your notes, substantially in the form provided by us; and

     (3)   the certificates for all certificated old notes, in proper form for transfer, or a book-entry confirmation, and all other documents required by the letter of transmittal for your notes, are received by the exchange agent within three New York Stock Exchange trading days after the date of execution of the notice of guaranteed delivery for your notes.

The notice of guaranteed delivery for your notes may be sent by facsimile transmission, mail or hand delivery. The notice of guaranteed delivery must set forth:

     (1)   your name and address;

     (2)   the amount of old notes you are tendering; and

     (3)   a statement that your tender is being made by the notice of guaranteed delivery for your notes and that you guarantee that within three New York Stock Exchange trading days after the execution of the notice of guaranteed delivery, the eligible institution will deliver the following documents to the exchange agent:

         (A)   the certificates for all certificated old notes being tendered, in proper form for transfer or a book-entry confirmation of tender;

         (B)   a written or facsimile copy of the letter of transmittal for your notes or a book-entry confirmation instead of the letter of transmittal; and

         (C)   any other documents required by the letter of transmittal for your notes.

## Book-Entry Transfer

The exchange agent will establish accounts with respect to book-entry interests at DTC for purposes of the exchange offer promptly after the date of this prospectus. You must deliver your book-entry interest by book-entry transfer to the account maintained by the exchange agent at DTC for the exchange offer. Any financial institution that is a participant in DTC's systems may make book-entry delivery of book-entry interests by causing DTC to transfer the book-entry interests into the relevant account of the exchange agent at DTC in accordance with DTC's procedures for transfer.

If one of the following situations occurs:

     (1)   you cannot deliver a book-entry confirmation of book-entry delivery of your book-entry interests into the relevant account of the exchange agent at DTC; or

     (2)   you cannot deliver all other documents required by the letter of transmittal to the exchange agent prior to the time of expiration,

then you must tender your book-entry interests according to the guaranteed delivery procedures discussed above.

You may withdraw tenders of your old notes at any time prior to the time of expiration.

For your withdrawal to be effective, the exchange agent must receive a written or facsimile transmission notice of withdrawal at its address set forth below under "—Exchange Agent" prior to the time of expiration.

The notice of withdrawal must:

(1)   state your name;

(2)   identify the specific old notes to be withdrawn, including the certificate number or numbers and the principal amount of notes to be withdrawn;

(3)   be signed by you in the same manner as you signed the letter of transmittal for your notes when you tendered your old notes, including any required signature guarantees, or be accompanied by documents of transfer sufficient for the exchange agent to register the transfer of the old notes into your name; and

(4)   specify the name in which the old notes are to be registered, if different from yours.

We will determine all questions regarding the validity, form and eligibility, including time of receipt, of withdrawal notices. Our determination will be final and binding on all parties. Any old notes withdrawn will be deemed not to have been validly tendered for exchange for purposes of the exchange offer. Any old notes which have been tendered for exchange but which are not exchanged for any reason will be returned to you without cost promptly after withdrawal, rejection of tender or termination of the exchange offer. Properly withdrawn old notes may be retendered by following one of the procedures described under "—Procedures for Tendering" above at any time on or prior to the time of expiration.

**Conditions**

Notwithstanding any other provision of the exchange offer and subject to our obligations under the registration rights agreement, we will not be required to accept for exchange, or to issue registered notes in exchange for, any old notes in the exchange offer and may terminate or amend the exchange offer, if at any time before the time of expiration any of the following events occur:

(1)   any injunction, order or decree has been issued by any court or any governmental agency that would prohibit, prevent or otherwise materially impair our ability to proceed with the exchange offer; or

(2)   the exchange offer violates any applicable law, regulation or applicable interpretation of the staff of the SEC.

These conditions are for our sole benefit, and we may assert them regardless of the circumstances giving rise to them, subject to applicable law. We also may waive in whole or in part at any time and from time to time any particular condition to the exchange offer in our sole discretion. If we waive a condition, we may be required in order to comply with applicable securities laws to extend the time of expiration of the exchange offer. Our failure at any time to exercise any of the foregoing rights will not be deemed a waiver of these rights, and these rights will be deemed ongoing rights which may be asserted at any time (in the case of any condition involving government approvals necessary to the consummation of the exchange offer) and at any time prior to the time of expiration (in the case of all other conditions).

In addition, we will not accept for exchange any old notes tendered, and no registered notes will be issued in exchange for any of those old notes, if at the time the notes are tendered any stop order is

34

threatened by the SEC or in effect with respect to the registration statement of which this prospectus is a part or the qualification of the indenture under the Trust Indenture Act of 1939, as amended.

The exchange offer is not conditioned on any minimum principal amount of old notes being tendered for exchange.

## Exchange Agent

We have appointed Wells Fargo Bank, National Association as exchange agent for the exchange offer. Questions, requests for assistance and requests for additional copies of the prospectus, the letter of transmittal for your notes and other related documents should be directed to the exchange agent addressed as follows:

*By Hand, Regular, Registered or Certified Mail or Overnight Courier:*
Wells Fargo Bank, National Association
Corporate Trust Department
213 Court Street, Suite 703
Middletown, CT 06457
Attention: Joseph P. O'Donnell

*By Facsimile:*
Wells Fargo Bank, National Association
Corporate Trust Department
Attention: Joseph P. O'Donnell
Facsimile No. (806) 704-6219

*By Telephone:*
(860) 704-6217

## Fees and Expenses

We will not pay brokers, dealers or others soliciting acceptances of the exchange offer. The principal solicitation is being made by mail. Additional solicitations, however, may be made in person or by telephone by our officers and employees.

We will pay the cash expenses to be incurred in connection with the exchange offer.

## Transfer Taxes

You will not be obligated to pay any transfer taxes in connection with a tender of your old notes for exchange unless you instruct us to register registered notes in the name of, or request that old notes not tendered or not accepted in the exchange offer be returned to, a person other than the registered tendering holder, in which event, the registered tendering holder will be responsible for the payment of any applicable transfer tax.

## Accounting Treatment

We will not recognize any gain or loss for accounting purposes upon the consummation of the exchange offer. We will amortize the expenses of the exchange offer and the unamortized expenses related to the issuance of the old notes over the remaining term of the registered notes.

## Participating Broker-Dealers

Each broker-dealer that receives registered notes for its own account in exchange for old notes, where such old notes were acquired by such broker-dealer as a result of market-making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. See "Plan of Disbribution."

35

**USE OF PROCEEDS**

The exchange offer is intended to satisfy our obligations under the registration rights agreement. We will not receive any cash proceeds from the issuance of the registered notes.

Proceeds from the offering of the old notes, together with proceeds from our new senior secured credit facility, new senior unsecured facility and other assumed debt, as well as equity contributions from investors, were used to repay our outstanding indebtedness and to pay the THL Acquisition consideration and related fees and expenses in connection with the Transactions. The debt that was repaid consisted of $383.5 million of our existing unsecured senior notes issued under four note purchase agreements with interest rates ranging from 5.99% to 9.18% and maturities ranging from December 18, 2004 to October 15, 2009, and $16.0 million under an intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC bearing interest at the prime rate, currently 4.75%.

36

# CAPITALIZATION

The following table sets forth our unaudited cash and cash equivalents and our unaudited capitalization as of May 31, 2004 on an actual basis and on a pro forma basis giving effect to the Transactions. This table should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

| | As of May 31, 2004 | |
| | Actual | Pro Forma |
| | (in thousands) | |
|---|---|---|
| Cash and cash equivalents | $ 224,116 | $ 147,460 |
| | | |
| Long-term debt | | |
| Senior credit facilities: | | |
| Term loans(1) | — | 800,000 |
| Revolving credit facility(2) | — | |
| Existing unsecured senior notes(3) | 383,500 | — |
| Notes offered hereby | — | 600,000 |
| Subordinated debt(4) | 16,000 | |
| Total long-term debt | 399,500 | 1,400,000 |
| Total members' equity | 671,100 | 71,783 |
| Total capitalization | $ 1,070,600 | $ 1,471,783 |

(1) Our new senior credit facilities provide for $800.0 million in term loans, all of which were drawn in connection with the Transactions.

(2) Our new senior facilities provide for a $75.0 million revolving credit facility, none of which has been drawn.

(3) Represents $383.5 million of our existing unsecured senior notes issued under four note purchase agreements with interest rates ranging from 5.99% to 9.18% and maturities ranging from December 18, 2004 to October 15, 2009. Actual amounts repaid were reduced by scheduled principal payments made after May 31, 2004 and prior to closing.

(4) Represents $16.0 million under an intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC, bearing interest at the prime rate, currently 4.75%.

## UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS

The following unaudited pro forma consolidated financial statements have been derived by application of pro forma adjustments to our historical consolidated audited and unaudited financial statements included elsewhere in this prospectus and the unaudited management accounts of Forstmann-Leff International Associates, LLC.

The unaudited pro forma consolidated financial statements give effect to the following:

- an equity investment made by THL Refco Acquisition Partners and its affiliates and co-investors, totaling approximately $508.5 million in cash;

- a rollover equity investment by Phillip Bennett, our chief executive officer, through his continuing ownership interest in Refco Group Holdings, Inc., of approximately $383.6 million;

- an investment by other members of management of approximately $2.0 million in cash, subject to adjustment;

- the entering into of senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing;

- the issuance by the co-issuers of $600.0 million in aggregate principal amount of senior subordinated notes;

- the merger of Refco Finance Holdings LLC with and into us, with our company continuing as the surviving entity;

- the estimated payments of $24.9 million relating to pre-payment premiums on our existing debt and $19.8 million relating to earn-out obligations triggered by our change of control;

- the repayment of $383.5 million of our existing unsecured senior notes issued under four separate note purchase agreements; and

- the repayment of a $16.0 million intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC.

As part of the Transactions, which were consummated on August 5, 2004, we distributed $550.0 million in cash and other capital distributions and all of the equity interests of Forstmann-Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business (the "Asset Management Distribution"), to New Refco. New Refco thereafter distributed these assets to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett.

The acquisition by THL Refco Acquisition Partners and its affiliates and co-investors of a portion of Refco Group Holdings, Inc.'s interest in us and Refco Group Holdings, Inc.'s contribution of its interest in us to New Refco are each accounted for as a purchase in conformity with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations* , in accordance with Emerging Issues Task Force ("EITF") No. 88-16, *Basis in Leveraged Buy-Out Transactions* , with intangible assets recorded in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets* .

The unaudited pro forma consolidated balance sheet has been prepared to reflect the Transactions as if they had occurred on May 31, 2004. The unaudited pro forma consolidated statements of operations for the year ended February 29, 2004 and the three months ended May 31, 2004 have been prepared to give effect to the Transactions as if they had occurred on March 1, 2003. The assumptions underlying the pro forma adjustments are described in the accompanying notes, which should be read in conjunction with these unaudited pro forma consolidated financial statements.

The unaudited pro forma adjustments are based upon available information and certain assumptions that we believe are reasonable under the circumstances. The unaudited pro forma financial statements do not purport to represent what our results of operations or financial condition would have been had the Transactions actually occurred on the dates indicated, nor do they purport to project the results of our operations or financial condition for any future period or as of any future date.

The unaudited pro forma consolidated financial statements should be read in conjunction with the information contained in "The Transactions," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto appearing elsewhere in this prospectus.

39

**Unaudited Pro Forma Consolidated Balance Sheet**
**as of May 31, 2004**
**(in thousands)**

| | Historical | Asset Management Distribution (a) | Cash Distribution, Acquisition and Related Financing | Pro Forma |
|---|---|---|---|---|
| | | **Adjustments for** | | |
| Cash and cash equivalents | $ 224,116 | $ (26,656) | $ (50,000)(b) | $ 147,460 |
| Cash and securities segregated under federal and other regulations: | | | | |
|    Cash and cash equivalents | 1,436,072 | — | — | 1,436,072 |
|    Securities purchased under agreements to resell | 41,831 | — | — | 41,831 |
| Restricted cash | 500,000 | — | (500,000)(b) | — |
| Securities purchased under agreements to resell | 41,800,629 | — | — | 41,800,629 |
| Deposits with clearing organizations and others | 1,919,371 | — | — | 1,919,371 |
| Receivables from broker-dealers and clearing organizations | 3,511,725 | — | — | 3,511,725 |
| Receivables from customers | 2,290,621 | (31,950) | — | 2,258,671 |
| Securities owned, at market or fair value | 2,897,884 | — | — | 2,897,884 |
| Memberships in exchanges, at adjusted cost | 15,944 | — | 18,589 (c) | 34,533 |
| Goodwill | 291,219 | (141,611) | 579,657 (d) | 729,265 |
| Other intangible assets | 87,674 | (64,973) | 566,268 (e) | 588,969 |
| Deferred financing costs | 2,857 | — | 47,149 (f) | 50,006 |
| Other assets | 209,166 | (11,110) | — | 198,056 |
|    Total assets | $ 55,229,109 | $ (276,300) | $ 661,663 | $ 55,614,472 |
| **Liabilities:** | | | | |
|    Short-term borrowings, including current portion of long-term borrowings | $ 68,000 | — | (68,000)(g) | — |
|    Securities sold under agreements to repurchase | 44,296,847 | — | — | 44,296,847 |
|    Payable to broker-dealers and clearing organizations | 2,381,069 | — | — | 2,381,069 |
|    Payable to customers | 5,911,001 | (36,734) | — | 5,874,267 |
|    Securities sold, not yet purchased, at market or fair value | 1,376,488 | — | — | 1,376,488 |
|    Accounts payable, accrued expenses and other liabilities | 192,649 | (2,480) | 23,394 (h) | 213,563 |
| Long-term borrowings | 315,500 | — | 1,084,500 (g) | 1,400,000 |
| Subordinated debt | 16,000 | — | (16,000)(g) | — |
|    Total liabilities | 54,557,554 | (39,214) | 1,023,894 | 55,542,234 |
| Commitments and contingent liabilities | | | | |
| Membership interests issued by subsidiary | 455 | — | — | 455 |
| Members' equity | 671,100 | (237,086) | (362,231)(b) | 71,783 |
|    Total liabilities and members' equity | $ 55,229,109 | $ (276,300) | $ 661,663 | $ 55,614,472 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

40

**Notes to Unaudited Pro Forma Consolidated Balance Sheet**

**The following pro forma adjustments relate to the unaudited pro forma consolidated balance sheet as of May 31, 2004:**

(a)    Represents the financial position of the Asset Management Distribution as of May 31, 2004 as derived from the unaudited management information of the Asset Management business.

(b)    Adjustments to members' equity reflect the following items:

    (i)    a decrease in equity as a deemed dividend of $369.7 million to reflect the carryover basis of the retained interest by the continuing management investors;

    (ii)    an increase of $557.4 million to reflect the increase in equity related to the Transactions and the step-up of the net assets acquired and liabilities assumed of Refco; and

    (iii)    a decrease in equity, restricted cash and cash and cash equivalents resulting from the distribution of excess capital of $550.0 million.

(c)    Represents the step-up in the value of the memberships in exchanges of $18.6 million, calculated as 42.9% of the predecessor basis and 57.1% of the fair value.

(d)    Represents the increase in goodwill of $579.6 million as a result of the Transactions being accounted for as a leveraged buyout, as described above.

(e)    Represents the step-up in the value of customer relationships of $318.2 million, trade names of $247.1 million and technology of $1.0 million, calculated as 42.9% of the predecessor basis and 57.1% of the fair value.

(f)    Represents a net increase of $47.2 million in deferred financing costs, consisting of an increase of $50.0 million due to the capitalization of the debt issuance costs in connection with the issuance of the old notes together with the new senior credit facility, offset by the remaining financing-related fees of the existing unsecured senior notes of $2.8 million. For purposes of this presentation principal underwriting fees of senior subordinated notes estimated at $15 million have been capitalized.

(g)    Represents indebtedness expected to be incurred, net of existing indebtedness in connection with the Transactions, as follows:

|  | (in thousands) |
|---|---:|
| Existing credit facility | $ — |
| Existing unsecured senior notes—current | 68,000 |
| —long-term | 315,500 |
| Existing subordinated debt | 16,000 |
|    Total existing debt | 399,500 |
| | |
| New revolving credit facility | — |
| New senior term loans | 800,000 |
| New senior subordinated notes | 600,000 |
|    Total debt expected to be incurred | 1,400,000 |
| | |
| Total adjustment to debt as a result of the Transactions | $ 1,000,500 |

    Certain prepayment penalties were incurred due to the early repayment of the existing debt. These penalties are paid from the proceeds of the offering and are included in the computation of goodwill.

(h)    Represents the adjustment to deferred taxes for the temporary differences resulting from the difference between the portion of basis carried over for book purposes and the fair value amount representing that portion of the assets' tax basis. The total pro forma deferred tax adjustment of $23.4 million resulting from these temporary differences has been included in goodwill.

41

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the year ended February 29, 2004**
**(in thousands)**

| | Historical | Adjustments for | | Pro Forma |
|---|---|---|---|---|
| | | Asset Management Distribution (a) | Cash Distribution, Acquisition and Related Financing | |
| Revenues: | | | | |
| Commissions and brokerage | $ 671,034 | $ (24,659) | $ — | $ 646,375 |
| Interest | 1,053,804 | (575) | — | 1,053,229 |
| Principal transactions, net | 175,011 | | — | 175,011 |
| Asset management and advisory fees | 47,911 | (40,656) | — | 7,255 |
| Other | 2,775 | 1,198 | — | 3,973 |
| Total revenues | 1,950,535 | (64,692) | — | 1,885,843 |
| Expenses: | | | | |
| Commissions and order execution costs | 411,894 | — | — | 411,894 |
| Interest | 898,658 | (984) | 65,398(c) | 963,072 |
| Employee compensation and benefits | 238,476 | (33,622) | | 204,854 |
| General, administrative and other | 200,902 | (30,487) | 19,969(e) | 190,384 |
| Total expenses | 1,749,930 | (65,093) | 85,367 | 1,770,204 |
| Income before provision for income taxes and members' interests in earnings of subsidiary | 200,605 | 401 | (85,367) | 115,639 |
| Provision for income taxes | 12,176 | — | (3,415)(f) | 8,761 |
| Income before members' interests in earnings of subsidiary | 188,429 | 401 | (81,952) | 106,878 |
| Members' interest in earnings of subsidiary | 1,273 | — | — | 1,273 |
| Net income | $ 187,156 | $ 401 | $ (81,952) | $ 105,605 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

42

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the three months ended May 31, 2004**
**(in thousands)**

| | Historical | Adjustments for | | Pro Forma |
| | | Asset Management Distribution(a) | Cash Distribution, Acquisition and Related Financing | |
|---|---|---|---|---|
| Revenues: | | | | |
| Commissions and brokerage | $ 220,279 | $ (4,096) | $ — | $ 216,183 |
| Interest | 377,743 | (61) | — | 377,682 |
| Principal transactions, net | 67,300 | (13) | — | 67,287 |
| Asset management and advisory fees | 23,435 | (21,544) | — | 1,891 |
| Other | 978 | | — | 978 |
| Total revenues | 689,735 | (25,714) | — | 664,021 |
| Expenses: | | | | |
| Commissions and order execution costs | 142,706 | — | — | 142,706 |
| Interest | 344,254 | — | 17,334 (b)(c) | 361,588 |
| Employee compensation and benefits | 76,866 | (12,296) | — | 64,570 |
| General, administrative and other | 57,502 | (9,981) | 5,128 (d)(e) | 52,649 |
| Total expenses | 621,328 | (22,277) | 22,462 | 621,514 |
| Income before provision for income taxes and members' interests in earnings of subsidiary | 68,407 | (3,437) | (22,462) | 42,508 |
| Provision for income taxes | 8,211 | — | (898)(f) | 7,313 |
| Income before members' interests in earnings of subsidiary | 60,196 | (3,437) | (21,564) | 35,195 |
| Members' interest in earnings of subsidiary | 926 | — | — | 926 |
| Net income | $ 59,270 | $ (3,437) | $ (21,564) | $ 34,269 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

43

**Notes to Unaudited Pro Forma Consolidated Statements of Operations**

**The following pro forma adjustments relate to the unaudited pro forma consolidated statements of operations for the year ended February 29, 2004 and the three months ended May 31, 2004:**

(a)    Represents the results of operations of the Asset Management business for the year ended February 29, 2004 and the three months ended May 31, 2004, as derived from the unaudited management information of the Asset Management business.

(b)    Represents interest expense for new debt incurred at the following interest rates, net of interest expense associated with existing debt being repaid:

| | |
|---|---|
| New senior credit facility | 5.0% |
| New senior subordinated notes | 9.0% |

The new senior credit facility accrues interest at the LIBOR rate plus 2.75% per annum. The actual rates will vary from those used to compute the above adjustment of interest expense due to floating rates applicable to our new senior credit facility. The effect on pretax income of a $1/8$ % variance in these rates would be approximately $1.0 million for an annual period.

(c)    Represents additional interest expense for the year ended February 29, 2004 and the three months ended May 31, 2004 of $3.8 million and $1.0 million, respectively, related to the amortization of debt issuance costs from debt incurred in relation to the Transactions.

(d)    Represents additional amortization expense as a result of the step-up to fair market value of customer relationships and technology for the year ended February 29, 2004 and the three months ended May 31, 2004 of $17.4 million and $4.3 million, respectively.

(e)    Represents a management fee to be paid to THL Managers V, LLC for certain advisory and consulting services for the year ended February 29, 2004 and the three months ended May 31, 2004 of $2.5 million and $0.8 million, respectively.

(f)    Represents an increase in income tax benefits for the year ended February 29, 2004 and the three months ended May 31, 2004 of $3.4 million and $0.9 million, respectively. This tax benefit is provided at a 4% tax rate, for New York City Unincorporated Business tax, due to the aggregate pro forma decrease in income before provision for income taxes. We will be treated as a partnership for federal income tax purposes and accordingly have not provided for federal income taxes related to our operating results.

**Notes to Unaudited Pro Forma Consolidated Financial Statements**

The pro forma information, including the allocation of the purchase price and the exclusion of the Asset Management Distribution, is based on management's estimates and preliminary valuations of the tangible and intangible assets being acquired. The purchase price allocations for the Transactions are preliminary and further refinements will be made based on the results of final valuations and the resolution of any post-closing purchase price adjustments pursuant to the purchase and contribution agreement. Subject to the consummation of the Transactions, the related costs used in the unaudited pro forma consolidated financial statements have been estimated to be $94.2 million.

The Transactions are expected to be accounted for as a purchase as prescribed by Statement of Financial Accounting Standards No. 141, *Business Combinations* , in accordance with EITF No. 88-16, *Basis in Leveraged Buyout Transactions* . This guidance requires the continuing residual interest retained by the continuing management investors, as a result of the Transactions, be reflected at its predecessor basis. In accordance with EITF Issue No. 90-12, *Allocating Basis to Individual Assets and Liabilities for Transactions* within the Scope of Issue No. 88-16, a step-up of assets and liabilities to fair value has been recorded in purchase accounting as a result of the interest in us held by THL Refco Acquisition Partners and certain of its affiliates through their ownership interests in New Refco. The amount of carryover basis determined has been reflected as deemed dividend of $369.7 million in the unaudited pro forma consolidated balance sheet.

The following table summarizes the purchase price allocation at the date of acquisition:

|  | (in thousands) |
|---|---:|
| Cash and cash equivalents, securities purchased and deposits | $    45,345,363 |
| Receivables, securities owned and other assets | 8,866,336 |
| Memberships in exchanges, at fair value | 34,533 |
| Total assets acquired | 54,246,232 |
| Short-term borrowings, securities sold and payables | 53,928,671 |
| Accounts payable, accrued expenses and other liabilities | 190,169 |
| Total liabilities assumed | 54,118,840 |
| Net tangible assets acquired | 127,392 |
| Purchase Price | 1,849,749 |
| Excess purchase price, representing: | 1,722,357 |
| Intangible assets: |  |
| Customer relationships | 340,884 |
| Trade names | 249,335 |
| Technology | 1,028 |
| Goodwill | 1,131,110 |
|  | — |

45

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

The following table sets forth our selected historical consolidated financial data as of and for the fiscal years ended February 29, 2000 and February 28, 2001, 2002 and 2003 and February 29, 2004, and for the three months ended May 31, 2003 and 2004. The selected historical consolidated financial data as of and for the fiscal years ended February 28, 2002 and 2003 and February 29, 2004 have been derived from our audited consolidated financial statements for fiscal years 2002, 2003 and 2004, and the selected historical consolidated financial data for the fiscal years ended February 29, 2000 and February 28, 2001 have been derived from our unaudited consolidated financial statements for fiscal years 2000 and 2001.

The selected historical consolidated financial data as of May 31, 2004 and for the three months ended May 31, 2003 and 2004 have been derived from our unaudited consolidated financial statements for those periods. The unaudited consolidated financial statements as of May 31, 2004 and for the three months ended May 31, 2003 and 2004 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and result of operations for the period presented.

The selected historical data included below and elsewhere in this prospectus are not necessarily indicative of our future performance and results for the three months ended May 31, 2004 are not necessarily indicative of our results of operations for a full fiscal year. The selected historical financial data for the periods indicated below include the results of our Asset Management business, substantially all of which was distributed as part of the Transactions. The following information is only a summary and should be read in conjunction with "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

46

| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| | (unaudited) | (unaudited) | | | | (unaudited) | (unaudited) |

**Three Months Ended May 31,**

**Fiscal Year Ended February 28,**

(dollars in millions)

| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| **Statement of Operations Data:** | | | | | | | |
| Revenues: | | | | | | | |
| Commissions and brokerage | $ 302 | $ 398 | $ 489 | $ 584 | $ 671 | $ 163 | $ 220 |
| Interest | 601 | 1,528 | 1,713 | 2,389 | 1,054 | 283 | 378 |
| Principal transactions, net | 43 | 103 | 99 | 83 | 175 | 35 | 67 |
| Asset management and advisory fees | 52 | 110 | 63 | 44 | 48 | 11 | 23 |
| Other income | 7 | 2 | 4 | 5 | 2 | 3 | 1 |
| Total revenues | 1,005 | 2,141 | 2,368 | 3,105 | 1,950 | 495 | 689 |
| Expenses: | | | | | | | |
| Commissions and order execution costs | 189 | 251 | 324 | 385 | 412 | 104 | 143 |
| Interest | 508 | 1,408 | 1,558 | 2,182 | 899 | 249 | 344 |
| Employee compensation and benefits | 137 | 213 | 198 | 212 | 238 | 52 | 77 |
| General, administrative and other | 104 | 174 | 172 | 168 | 201 | 43 | 57 |
| Total expenses | 938 | 2,046 | 2,252 | 2,947 | 1,750 | 448 | 621 |
| Income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 67 | 95 | 116 | 158 | 200 | 47 | 68 |
| Provision for income taxes | 8 | 8 | 7 | 2 | 12 | 1 | 8 |
| Income before minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 59 | 87 | 109 | 156 | 188 | 46 | 60 |
| Minority interest | 2 | 1 | — | — | — | — | — |
| Income before dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 57 | 86 | 109 | 156 | 188 | 46 | 60 |
| Dividend on preferred securities issued by subsidiaries | 12 | 14 | 16 | 16 | — | — | — |
| Members' interest in earnings of subsidiary | — | — | — | — | 1 | — | 1 |
| Net income | $ 45 | $ 72 | $ 93 | $ 140 | $ 187 | $ 46 | $ 59 |
| **Balance Sheet Data:** | | | | | | | |
| Total assets | $ 17,662 | $ 18,277 | $ 22,611 | $ 19,215 | $ 33,332 | | $ 55,229 |
| Long-term debt and preferred securities issued by subsidiaries: | | | | | | | |
| Long-term borrowings | 200 | 295 | 262 | 452 | 384 | | 384 |
| Subordinated debt | 43 | 41 | 16 | 16 | 16 | | 16 |
| Preferred securities issued by subsidiaries | 125 | 160 | 160 | 160 | — | | — |
| Total long-term debt and preferred securities issued by subsidiaries | 368 | 496 | 438 | 628 | 400 | | 400 |
| Members' equity | 441 | 500 | 515 | 566 | 616 | | 671 |

47

**Other Financial Data:**

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | Pro Forma Fiscal Year Ended February 29, | Pro Forma Three Months Ended May 31, |
|---|---|---|---|---|---|---|---|---|
| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2004 | 2004 | 2004 |
| | (unaudited) | (unaudited) | | | | | | |
| | | | | (dollars in millions) | | | | |
| EBITDA (2) | $ 92 | $ 140 | $ 179 | $ 211 | $ 258 | $ 66 | $ 82 | $ 82 |
| Depreciation and amortization | 14 | 23 | 38 | 26 | 28 | 10 | 8 | |
| Long-term debt interest | 13 | 23 | 25 | 27 | 31 | 9 | 7 | |
| Dividends on preferred securities issued by subsidiaries | 12 | 14 | 16 | 16 | — | — | — | |
| Capital expenditures | 14 | 28 | 15 | 12 | 11 | | | 6 |
| Ratio of earnings to fixed charges(3) | 3.0x | 3.0x | 2.7x | 3.8x | 6.1x | 7.7x | 2.2x | 2.7x |

| | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004(1) | 2003 | 2004 |
| | | | | (unaudited) | (unaudited) |
| **Segment Data:** | | | | | |
| **Revenues:** | | | | | |
| Derivatives Brokerage & Clearing | $ 692 | $ 746 | $ 836 | $ 197 | $ 262 |
| Prime Brokerage/Capital Markets | 2,217 | 2,610 | 1,277 | 332 | 447 |
| Asset Management | 70 | 58 | 72 | 16 | 27 |
| Corporate & Other | (611) | (309) | (235) | (50) | (47) |
| Total revenues | $ 2,368 | $ 3,105 | $ 1,950 | $ 495 | $ 689 |
| **Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary:** | | | | | |
| Derivatives Brokerage & Clearing | $ 59 | $ 78 | $ 126 | $ 29 | $ 42 |
| Prime Brokerage/Capital Markets | 96 | 101 | 134 | 31 | 38 |
| Asset Management | 14 | 1 | (2) | (1) | 3 |
| Corporate & Other | (53) | (22) | (58) | (12) | (15) |
| Total | $ 116 | $ 158 | $ 200 | $ 47 | $ 68 |

(1)    Year ended February 29.

(2)    EBITDA is a non-GAAP (U.S. generally accepted accounting principles) financial measure that is defined as net income before depreciation and amortization, long-term debt interest, dividends on preferred securities issued by subsidiaries and provision for income taxes. Our management believes that EBITDA is useful in evaluating our operating performance compared to that of other companies in our industry because the calculation of EBITDA generally eliminates the effects of financing and income taxes and the accounting effects of capital spending and acquisitions, which items may vary for different companies for reasons unrelated to overall operating performance. As a result, our management uses EBITDA as a measure to evaluate the performance of our various business lines and for other discretionary purposes. In addition, our management believes EBITDA is useful to investors because it is frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry.

EBITDA has important limitations as an analytical tool, and should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. For example, EBITDA does not reflect:

- our cash expenditures, or future requirements, for capital expenditures or contractual commitments;

- changes in, or cash requirements for, our working capital needs;

- the significant interest expense, or the cash requirements necessary to service interest or principal payments, on our debts;

- tax payments that represent a reduction in cash available to us; and

- any cash requirements for the assets being depreciated and amortized that may have to be replaced in the future.

Because of these limitations, EBITDA should not be considered as a measure of discretionary cash available to us to invest in the growth of our business. We compensate for these limitations by relying primarily on our GAAP results and use the EBITDA only supplementally. Our EBITDA is not necessarily comparable to any measure reported in a financial statement under GAAP, and when analyzing our operating performance, investors should use EBITDA in addition to, and not as an alternative for, operating income (loss) and net (loss) income, each as determined in accordance with GAAP. Because not all companies use identical calculations, our presentation of EBITDA may not be comparable to similarly titled measures of other companies. Furthermore, EBITDA is not intended to be a measure of free cash flow for our management's discretionary use, as it does not consider certain cash requirements such as tax payments and debt service requirements. The amounts shown for EBITDA also differ from the amounts calculated under similarly titled definitions in our debt instruments, which are further adjusted to reflect certain other cash and non-cash charges and are used to determine compliance with financial covenants and our ability to engage in certain activities, such as incurring additional debt and making certain restricted payments.

EBITDA is calculated as follows:

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | |
| | 2000(a) | 2001 | 2002 | 2003 | 2004(a) | 2003 | 2004 |
| | (unaudited) | (unaudited) | | | | (unaudited) | (unaudited) |
| Net income | $ 45 | $ 72 | $ 93 | $ 140 | $ 187 | $ 46 | $ 59 |
| Depreciation and amortization | 14 | 23 | 38 | 26 | 28 | 10 | 8 |
| Long-term debt interest(b) | 13 | 23 | 25 | 27 | 31 | 9 | 7 |
| Dividends on preferred securities issued by subsidiaries | 12 | 14 | 16 | 16 | — | — | — |
| Provision for income taxes | 8 | 8 | 7 | 2 | 12 | 1 | 8 |
| EBITDA | $ 92 | $ 140 | $ 179 | $ 211 | $ 258 | $ 66 | $ 82 |

(a)    Year ended February 29.

(b)    Long-term debt interest includes interest expense related to our long-term debt and amortization of deferred debt issuance costs.

(3)    Earnings consist of income from continuing operations before income taxes, fixed charges, amortization of capitalized interest, distributed income of equity investees, and losses before tax of equity investees for which charges arising from guarantees are included in fixed charges, minus capitalized interest and minority interest in pre-tax income of subsidiaries that have not incurred fixed charges. Fixed charges consist of interest expensed and capitalized, amortization of debt discount and expense and premium and one-third of rental payments which is considered as being representative of the interest factor implicit in our operating leases.

**MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*This prospectus contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in forward-looking statements for many reasons, including the factors described in "Risk Factors" and elsewhere in this prospectus. You should read the following discussion in conjunction with the information included under the captions "Unaudited Pro Forma Consolidated Financial Statements" and "Selected Historical Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus. Further, the following discussion includes information related to our Asset Management business, substantially all the assets of which were distributed to Refco Group Holdings, Inc. on August 5, 2004.*

## General

We provide execution and clearing services for exchange-traded derivatives and for various products in the fixed income and foreign exchange markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our international operations generated $551.6 million, or 28.3%, of our net revenues for the year ended February 29, 2004. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

We have been organized into three operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing, which accounted for 73.6% of fiscal year 2004 net revenue; (ii) Prime Brokerage/Capital Markets, which accounted for 28.2% of fiscal year 2004 net revenue; and (iii) Asset Management, which accounted for 6.7% of fiscal year 2004 net revenue. We also have a Corporate & Other non-operating business segment. Following the distribution of substantially all the assets of our Asset Management business in connection with Transactions, we are organized into two operating business segments for financial reporting purposes, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and have one non-operating business segment, Corporate & Other. The retained assets from our Asset Management business, Refco Alternative Investments, have become part of our Derivatives Brokerage & Clearing business.

## Factors Affecting Our Results

Our results of operations have been and we expect will continue to be principally affected by transaction volumes, interest rates, the level of global market activity and volatility and expense management. Our results of operations have also been affected by acquisitions.

### Transaction Volumes

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues have grown at a 23.9% compound annual growth rate, driven by a 50% average annual increase in contract volume executed or cleared, in part attributable to acquisitions, and a 20% average annual increase in customer deposits. During the same period, our Prime Brokerage/Capital Markets net revenues have grown at a 23.6% compound annual growth rate, driven primarily by strong underlying growth in the number of customers in the markets we serve and new product introductions. Derivatives Brokerage & Clearing transaction volumes have increased consistent with the broad growth trend currently being experienced in the derivatives industry. The continued convergence of derivative and cash markets and the expanded use of derivatives for hedging and investment purposes have been the principal drivers of this trend. The trend has also been global in nature, with a rapid introduction of new products in a variety of

50

international markets. Prime Brokerage/Capital Markets transaction volume has increased in line with expanded U.S. government borrowing activity and the continued long-term growth of foreign exchange markets. Recently, this increase in volume has been accelerated by event-driven volatility, such as political uncertainty in the Middle East and its impact on energy supplies and the uncertain outlook concerning economic growth and interest rates. We have been able to take advantage of the related increase in derivatives transaction volume because of our diversification by customer type, product type and market type and because of the increase in prime brokerage volumes as a result of new product initiatives, including online foreign exchange and emerging market debt brokerage.

### Interest Rates

Due to the fact that a portion of our revenues is derived from interest earned from the investment of customer funds placed with us by customers of our Derivatives Brokerage & Clearing business and the level of secured customer financing transactions in our Prime Brokerage/Capital Markets business, we generally benefit from rising interest rates. Rising interest rates would increase the amount of net interest income earned from such customer funds and the potential financing spread available on secured customer financing transactions. However, our interest expense will increase as a result of rising interest rates because our new senior credit facilities will be variable rate debt.

### Global Market Activity

Each of our principal business segments is global in nature, and the expansion of the global economy in general and the continued growth of globalization in financial markets has benefited our operations. The introduction of derivatives products internationally has accelerated in recent years, with emerging markets in Asia and Latin America supplementing traditional centers in North America and Europe. This growth has been prompted by economic expansion in these regions, deregulation and globalization. Similar trends have emerged in our Prime Brokerage/Capital Markets business as the capital markets in emerging economies become more sophisticated. This has translated directly into new opportunities in non-dollar fixed income, emerging market debt and foreign exchange brokerage. Globalization has assisted in sustaining stable growth by further diversifying our product mix and economic opportunities.

### Expense Management

We have been able to leverage our operating capability in order to achieve increasing benefits from the aggregation of scale in transaction volumes. By adding incremental volume to a pre-existing platform, our marginal cost of growth in transaction processing is minimal. This will become increasingly relevant as more markets automate and move to electronic platforms. As a result, a high proportion of our marginal expense is variable in nature, which provides us an opportunity to improve our cost to income ratio. This characteristic is expected to have a continuing positive impact on operating results.

### Acquisitions

We have completed 11 acquisitions since 1999. Each of these acquistions has been immediately accretive to operating income. It has also been our practice to integrate and rationalize acquired companies as rapidly as possible and transfer operations to our existing platform to maximize the economies of scale offered by such acquisitions. During the fiscal year ended February 28, 2002, we acquired First Options, MST Canada Co. and Main Street Trading, all derivatives brokerage businesses. We acquired two other derivatives brokerage businesses during the fiscal year ended February 28, 2003: Spear, Leeds & Kellogg and CFG Financial Group Inc. During the fiscal year ended February 29, 2004, we acquired one asset management business, Edinburgh Fund Managers Ltd., and five derivatives

51

brokerage businesses, MacFutures Ltd., Carlton Brokerage Ltd., Friedberg Mercantile Group, RB&H and Trafalgar Commodities Ltd.

## Results of Operations

### *Revenues*

We report net revenues on a divisional basis, consisting of total revenues less interest expense, because we believe that the reporting of interest income (expense) on a gross basis unreasonably distorts the presentation of our operations. We generate Derivatives Brokerage & Clearing revenues from (i) transaction fees earned on each contract executed or cleared and (ii) interest income earned on cash balances in our customers' accounts. We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned on each trade and (ii) interest income earned from providing secured customer financing through repo transactions.

The transaction fees we charge are typically based on the type of customer, the type of transaction, the method of trading and the volume of trading activity that a particular customer conducts with us. We generate interest income from the investment of customer funds, placed with us by customers in support of their trading operations. We also earn interest income from the financing of secured customer transactions through repo transactions.

We generate Asset Management revenues primarily from the management fees we charge on funds we raise through the products we distribute. In addition, to the extent that such funds are invested in derivatives markets and prime brokerage markets in which we conduct brokerage operations, we also have the opportunity to generate related commission and interest income from these funds.

### *Net Interest Income*

Our Derivatives Brokerage & Clearing business generates interest income from the investment of customer funds placed with us by customers in support of their trading operations. The amount of interest income we earn is a function of the aggregate amounts a customer deposits with us and the overall level of interest rates. Our Prime Brokerage/Capital Markets business generates interest income by financing customers' securities transactions. This involves taking a customer's security and refinancing it with a qualified financial counterparty. The transaction is secured at all times, and we charge a pre-determined spread above our cost of refinancing.

Interest expense typically includes interest paid to Derivatives Brokerage & Clearing customers on the funds they maintain with us, interest paid to finance counterparties in our Prime Brokerage/Capital Markets business for the financing of customer securities and interest paid to banks and long-term debt holders. Because a substantial portion of our interest expense relates to our customers' accounts and financing activities (and not to debt for borrowed money), we net gross interest expense against gross interest income and report net interest income.

### *Commissions and Order Execution Costs*

Commissions and order execution costs include variable expenses related directly to transactions conducted in our brokerage operations. Fees include exchange and clearing house fees, fees paid to third parties for execution of customer orders and sales commissions paid in those cases where customers are introduced and their orders are handled by non-salaried sales personnel.

### *Employee Compensation and Benefits Expenses*

Employee compensation and benefits expenses include the cost of our global salaried employees. These expenses include base compensation, bonus compensation (whether discretionary or performance related) and the cost of medical insurance and other related employee benefits.

*General, Administrative and Other Expenses*

General, administrative and other expenses include all other operating expenses, including primarily lease expenses, communications and quotation systems expenses, travel and entertainment expenses, depreciation and amortization, professional fees and other miscellaneous expenses.

*Income Taxes*

We will be treated as a partnership for federal income tax purposes. Under applicable regulations, members of a limited liability company treated as a partnership are responsible for their individual income tax liabilities related to the limited liability company's results of operations. Accordingly, we have not provided for federal income taxes related to our results of operations. The provision for income taxes included in our consolidated financial statements relates to income taxes of foreign subsidiaries and New York City unincorporated business taxes.

*Results of Divisional Operations*

The following table summarizes the historical results of our divisional operations. The consolidated financial data for the fiscal years ended February 28, 2002 and 2003 and February 29, 2004 have been derived from our audited consolidated financial statements. The unaudited consolidated financial data for the three months ended May 31, 2003 and 2004 have been derived from our unaudited consolidated financial statements. The unaudited consolidated financial statements for the three months ended May 31, 2003 and 2004 include all adjustments necessary (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and results of operations for the periods presented. The information contained in this table should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical

Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

|  | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
|  | 2002 | 2003 | 2004(1) | 2003 | 2004 |
|  | | | | (unaudited) | (unaudited) |
|  | | | (in millions) | | |
| **Net revenues:** | | | | | |
| Derivatives Brokerage & Clearing | $ 564.0 | $ 673.9 | $ 773.9 | $ 181.2 | $ 242.5 |
| Prime Brokerage/Capital Markets | 240.1 | 244.6 | 297.0 | 64.5 | 89.8 |
| Asset Management | 68.5 | 57.8 | 70.5 | 15.7 | 27.4 |
| Corporate & Other(2) | (18.2) | (4.0) | (33.2) | (7.6) | (8.5) |
| Eliminations(2) | (44.7) | (50.0) | (56.4) | (7.5) | (5.8) |
| Total net revenues | $ 809.7 | $ 922.3 | $ 1,051.8 | $ 246.3 | $ 345.4 |
| **Expenses:** | | | | | |
| Commissions and order execution costs | $ 323.7 | $ 385.4 | $ 411.9 | $ 104.1 | $ 142.7 |
| Employee compensation and benefits | 198.4 | 211.8 | 238.4 | 52.3 | 76.8 |
| General, administrative and other | 171.4 | 167.4 | 200.9 | 42.7 | 57.5 |
| Total | $ 693.5 | $ 764.6 | $ 851.2 | $ 199.1 | $ 277.0 |
| **Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary:** | | | | | |
| Derivatives Brokerage & Clearing | $ 59.4 | $ 77.7 | $ 125.7 | $ 28.9 | $ 41.9 |
| Prime Brokerage/Capital Markets | 95.7 | 101.5 | 133.7 | 30.8 | 37.7 |
| Asset Management | 13.6 | 1.1 | (2.1) | (1.0) | 2.9 |
| Corporate & Other | (52.5) | (22.6) | (56.7) | (11.5) | (14.1) |
| Total | $ 116.2 | $ 157.7 | $ 200.6 | $ 47.2 | $ 68.4 |

(1)    Year ended February 29.

(2)    These line items are included to reconcile these summarized financial tables to our consolidated financial statements. Corporate & Other net revenue and expenses primarily include interest income and interest expense incurred at the parent company level. Also included are non-material fees and other expenses. Eliminations arise upon the consolidation of group operating performance and relate to intercompany balances and transactions.

### Results for the Three Months Ended May 31, 2004 Compared to the Three Months Ended May 31, 2003

   *Net Revenues.*    Net revenues on a consolidated basis for the three months ended May 31, 2004 increased $99.1 million, or 40.2%, to $345.4 million from $246.3 million for the three months ended May 31, 2003. The growth in net revenues for the three months ended May 31, 2004 was due to an increase in transaction volumes in all brokerage products and market segments that we serve. Principal drivers of this growth included dollar price increases in global commodities which increased traditional commodity futures volumes, price volatility in interest rate derivatives, increased customer activity in foreign exchange brokerage and the positive reception to managed futures and property management products introduced by our Asset Management business. The quarter also included for the first time the results of operations of companies acquired in fiscal year 2004 including, in particular, the

54

MacFutures Group, whose professional trade customers largely contributed to the growth in volume in interest rate derivatives.

*Derivatives Brokerage & Clearing Net Revenues.*     Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2004 increased $61.3 million, or 33.8%, to $242.5 million from $181.2 million for the three months ended May 31, 2003. The growth in Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2004 was due to increased transaction volume in all markets and in all geographic sectors that we serve. Global demand for commodity materials resulted in increased activity in physical commodity markets, and interest rate uncertainties increased the level of interest rate derivative volumes. In Europe and Singapore, local foreign exchange operations (reported in Derivatives Brokerage & Clearing) also increased. The resulting increase in commissions and principal transaction revenues more than offset the decline in net interest income due to reduced interest rates. Derivatives Brokerage & Clearing contract volume increased by 45 million, or 41%, to 155 million contracts cleared for the three months ended May 31, 2004 from 110 million contracts cleared for the three months ended May 31, 2003.

*Prime Brokerage/Capital Markets Net Revenues.*     Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2004 increased $25.3 million, or 39.2%, to $89.8 million from $64.5 million for the three months ended May 31, 2003. The growth in Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2004 was due to the further growth of secured customer financing transactions, the related increase in transaction volume and a 42.3% increase in principal transaction net revenue, reflecting the increased activity in foreign exchange markets.

*Asset Management Net Revenues.*     Asset Management net revenues for the three months ended May 31, 2004 increased $11.7 million, or 74.5%, to $27.4 million from $15.7 million for the three months ended May 31, 2003. The increase in Asset Management net revenues for the three months ended May 31, 2004 was due to the positive impact on revenues of new product launches, including a new real estate investment product and the successful expansion of our managed futures product offerings. Additionally, the increase in the level of global equity markets had the effect of increasing assets under management and as a result, fee income, which also impacted favorably on our investment management fee income.

*Commissions and Order Execution Costs.*     Commissions and order execution costs on a consolidated basis for the three months ended May 31, 2004 increased $38.6 million, or 37.1%, to $142.7 million from $104.1 million for the three months ended May 31, 2003. The increase in commissions and order execution costs for the three months ended May 31, 2004 was due primarily to the increase in transaction volume in exchange-traded derivatives.

*Employee Compensation and Benefits Expenses.*     Employee compensation and benefits expenses on a consolidated basis for the three months ended May 31, 2004 increased $24.5 million, or 46.8%, to $76.8 million from $52.3 million for the three months ended May 31, 2003. The growth in employee compensation and benefits expenses for the three months ended May 31, 2004 was due to the addition of several new operating groups acquired during the twelve-month period ended May 31, 2004, such as Trafalgar Commodities and the Wexford Fixed Income Group in New York, and the further expansion of the MacFutures Group.

*General, Administrative and Other Expenses.*     General, administrative and other expenses on a consolidated basis for the three months ended May 31, 2004 increased $14.8 million, or 34.7%, to $57.5 million from $42.7 million for the three months ended May 31, 2003. The growth in general, administrative and other expenses for the three months ended May 31, 2004 was principally due to the inclusion of expenses associated with entities acquired during the twelve-month period ended May 31, 2004.

*Operating Profit.*    Operating profit on a consolidated basis for the three months ended May 31, 2004 increased $21.2 million, or 44.9%, to $68.4 million from $47.2 million for the three months ended May 31, 2003. The increase in operating profit for the three months ended May 31, 2004 was due primarily to the increase in net revenues across all business lines.

*Derivatives Brokerage & Clearing Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2004 increased $13.0 million, or 45.0%, to $41.9 million from $28.9 million for the three months ended May 31, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2004 was due to the growth in transaction volume, the resulting growth in commission and brokerage revenues and an increase in principal brokerage activities, particularly in Europe and Asia. The increase in Derivatives Brokerage & Clearing net revenues accelerated at a faster rate than the increase in related expenses because we continued to benefit from our ability to aggregate volume on existing operating platforms with little, if any, increase in fixed costs.

*Prime Brokerage/Capital Markets Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2004 increased $6.9 million, or 22.4%, to $37.7 million from $30.8 million for the three months ended May 31, 2003. The increase in Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2004 was due to the continued growth in Prime Brokerage/Capital Markets net revenues, particularly the increase in foreign exchange brokerage revenues, along with newly acquired operations such as the Wexford Fixed Income Group. Net revenues grew at a slower rate than related expenses due to expenses at the acquired entities.

*Asset Management Operating Profit.*    Asset Management operating profit for the three months ended May 31, 2004 increased $3.9 million to $2.9 million from a loss of $1.0 million for the three months ended May 31, 2003. The increase in Asset Management operating profit for the three months ended May 31, 2004 was due to the increase in Asset Management net revenues, which reflected the benefits of product diversification including, in particular, the continued expansion of our managed futures product offerings and the addition of real estate fund offerings in the United Kingdom. Increases in advisory fees also reflected the generally higher level of global equity markets. This enabled Asset Management net revenues to significantly outpace expenses.

**Results for the Year Ended February 29, 2004 Compared to the Year Ended February 28, 2003**

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 29, 2004 increased $129.5 million, or 14.0%, to $1,051.8 million from $922.3 million for the year ended February 28, 2003. The increase in net revenues for the year ended February 29, 2004 was due to the significant increase in brokerage transaction volume. The growth in volume reflected underlying industry trends accentuated by our organic growth and the benefits of acquisitions including, in particular, the MacFutures acquisition, which was completed in February 2003. Our Prime Brokerage/Capital Markets business benefited from an increase in foreign exchange brokerage and the continued expansion of our fixed income prime brokerage activities.

*Derivatives Brokerage & Clearing Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 increased $100.0 million, or 14.8%, to $773.9 million from $673.9 million for the year ended February 28, 2003. The growth in Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 was due to increased transaction volume in all geographic and product sectors that we serve. Dollar price increases in physical commodity markets driven by the growth of Asian economies, particularly China, produced strong volume and revenue results in agricultural and metals derivatives brokerage. The changing outlook for interest rates combined with the addition of a MacFutures platform in February 2003 produced a significant increase in financial futures contract volume, particularly interest rate products. Derivatives Brokerage &

56

Clearing contract volume increased by 61 million, or 15%, to 461 million contracts cleared for the year ended February 29, 2004 from 400 million contracts cleared for the year ended February 28, 2003.

*Prime Brokerage/Capital Markets Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 increased $52.4 million, or 21.4%, to $297.0 million from $244.6 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 was due to the increase in transaction volume and revenues of the foreign exchange brokerage activities. This supported the continued expansion of our fixed income clearing operations. Foreign exchange activities reflected the diversification of our product offerings and the launch of online wholesale and retail products in June 2003.

*Asset Management Net Revenues.*    Asset Management net revenues for the year ended February 29, 2004 increased $12.7 million, or 22.0%, to $70.5 million from $57.8 million for the year ended February 28, 2003. The growth in Asset Management net revenues for the year ended February 29, 2004 was due to the improvement in global equity markets, which increased assets under management among traditional equity products, and the success of our newly developed managed futures products.

*Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the year ended February 29, 2004 increased $26.5 million, or 6.9%, to $411.9 million from $385.4 million for the year ended February 28, 2003. The increase in commissions and order execution costs for the year ended February 29, 2004 was due to the increase in overall transaction volume and, in particular, the increase in Derivatives Brokerage & Clearing transactions. This increase was partially offset by a shift in overall product mix towards Prime Brokerage/Capital Markets operations, as most of this volume is conducted by corporate sales groups and not commission-based sales personnel.

*Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses on a consolidated basis for the year ended February 29, 2004 increased $26.6 million, or 12.6%, to $238.4 million from $211.8 million in the year ended February 28, 2003. The growth in employee compensation and benefits expenses for the year ended February 29, 2004 was principally due to the addition to our payroll of the majority of employees of acquired companies, specifically MacFutures, Trafalgar Commodities and Carlton Brokerage (all of which were incremental to earnings).

*General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $33.5 million, or 20.0%, to $200.9 million from $167.4 million for the year ended February 28, 2003. The growth in general, administrative and other expenses for the year ended February 29, 2004 was due to the incremental expenses associated with acquired operations.

*Operating Profit.*    Operating profit on a consolidated basis for the year ended February 29, 2004 increased $42.9 million, or 27.2%, to $200.6 million from $157.7 million for the year ended February 28, 2003. The growth in operating profit for the year ended February 29, 2004 was due to the increase in net revenues derived from increased transaction volume, together with the improvement in operating margins created by the reduction in sales commission costs and our ability to control the overall level of operating costs.

*Derivatives Brokerage & Clearing Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 increased $48.0 million, or 61.8%, to $125.7 million from $77.7 million for the year ended February 28, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 was due to increased volume, a reduction in sales commission costs (reflecting a diminished reliance on commission sales groups) and an increase in net interest income as a result of the substantial growth of customer deposits, which offset lower investment yields.

*Prime Brokerage/Capital Markets Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 increased $32.2 million, or 31.7%, to $133.7 million from $101.5 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 was due to the increase in fixed income transaction volume and related commission revenue and a significant increase in principal transaction activities, primarily foreign exchange. This trend more than offset the reduction in net interest income resulting from the current low interest rate environment and its adverse impact on secured customer financing revenues.

*Asset Management Operating Profit (Loss).*    Asset Management operating profit for the year ended February 29, 2004 decreased $3.2 million to a loss of $2.1 million from a profit of $1.1 million for the year ended February 28, 2003. The decrease in Asset Management operating profit for the year ended February 29, 2004 was due to the fact that assets under management remained low, despite the fact that new initiatives, including the launch in June 2003 of our managed futures product, resulted in an increase in commission revenue. The latter was offset by the costs associated with the build-out of the distribution platform associated with this project.

### Results for the Year Ended February 28, 2003 Compared to the Year Ended February 28, 2002

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 28, 2003 increased $112.6 million, or 13.9%, to $922.3 million from $809.7 million for the year ended February 28, 2002. The growth in net revenues for the year ended February 28, 2003 was due to the record transaction volume in our Derivatives Brokerage & Clearing business, continued growth in our Prime Brokerage/Capital Markets activities, reflecting underlying growth trends in both markets, and expanded market share. The increase in commission income and net interest income from secured customer financing transactions more than compensated for the reduction in foreign exchange principal brokerage and reduced asset management advisory fees.

*Derivatives Brokerage & Clearing Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 increased $109.9 million, or 19.5%, to $673.9 million from $564.0 million for the year ended February 28, 2002. The growth in Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 was due to a higher number of cleared contracts, increased commission income and significant increases in customer deposits. Derivatives Brokerage & Clearing contract volume increased by 54 million, or 16%, to 400 million contracts cleared for the year ended February 28, 2003 from 346 million contracts cleared for the year ended February 28, 2002.

*Prime Brokerage/Capital Markets Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 increased $4.5 million, or 1.9%, to $244.6 million from $240.1 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 was due to the expanded book of secured customer financing transactions, which resulted in increased net interest income and offset the decline in customer volumes, and the realignment of our products.

*Asset Management Net Revenues.*    Asset Management net revenues for the year ended February 28, 2003 decreased $10.7 million, or 15.6%, to $57.8 million from $68.5 million for the year ended February 28, 2002. The decrease in Asset Management net revenues for the year ended February 28, 2003 was due to the decline in investment advisory fees, which reflected a significant decline in assets under management as a result of weak equity markets.

*Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the year ended February 28, 2003 increased $61.7 million, or 19.1%, to $385.4 million from $323.7 million for the year ended February 28, 2002. The increase in commissions and order execution costs for the year ended February 28, 2003 was due to the increase in overall

transaction volume, particularly in Derivatives Brokerage & Clearing, and the impact of increases in the sales commission structure of certain companies we acquired during the year.

*Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses on a consolidated basis for the year ended February 28, 2003 increased $13.4 million, or 6.7%, to $211.8 million from $198.4 million for the year ended February 28, 2002. The growth in employee compensation and benefits expenses for the year ended February 28, 2003 was due to the addition of employees associated with acquisitions made during the year, although the percentage increase was substantially lower than the percentage increase in revenues.

*General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the year ended February 28, 2003 decreased $4.0 million, or 2.3%, to $167.4 million from $171.4 million for the year ended February 28, 2002. The decrease in general, administrative and other expenses for the year ended February 28, 2003 was due to our continued success in the rationalization of acquired operating platforms, particularly the final stage of consolidating Lind-Waldock and the transfer of the business of LFG, LLC, which we acquired in fiscal year 2001, from outside systems vendors to our own operating platform.

*Operating Profit.*    Operating profit on a consolidated basis for the year ended February 28, 2003 increased $41.5 million, or 35.7%, to $157.7 million from $116.2 million for the year ended February 28, 2002. The increase in operating profit for the year ended February 28, 2003 was due to the increase in revenues in our Prime Brokerage/Capital Markets operations, combined with cost control and expense reduction following the consolidation of acquired entities.

*Derivatives Brokerage & Clearing Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 increased $18.3 million, or 30.8%, to $77.7 million from $59.4 million for the year ended February 28, 2002. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 was due to increased volumes, which increased commission and brokerage revenues, combined with increased net interest income resulting from record levels of customer deposits.

*Prime Brokerage/Capital Markets Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 increased $5.8 million, or 6.1%, to $101.5 million from $95.7 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 was due to the expansion primarily of our secured customer financing transactions and the resulting increase in net interest income, which offset the decline in foreign exchange principal brokerage, coupled with tight cost control, including an absolute reduction in general and administrative expenses.

*Asset Management Operating Profit.*    Asset Management operating profit for the year ended February 29, 2003 decreased $12.5 million, or 91.9%, to $1.1 million from $13.6 million for the year ended February 28, 2002. The decrease in Asset Management operating profit for the year ended February 29, 2003 was due to declining assets under management, reflective of continued poor equity market performance, which impacted adversely on revenues and was not offset by reduced operating expenses.

## Seasonality

Our business can experience seasonal fluctuations. Financial markets may experience reduced trading activity during summer months and in the month of December as a result of holidays. Traditional commodity derivatives, such as energy, will reflect changing supply/demand factors related to heating/cooling seasons. As a result of these factors, we may experience relatively higher trading volume and thus revenue during our first and third fiscal quarters and lower trading volume in our second fiscal quarter. However, this trend is not evident in every year and in recent years has been moderated by globalization and an expanded range of products which tend to counter traditional seasonality trends. For these reasons, seasonality was not a major factor in our 2004 fiscal year.

59

*Working Capital*

Our primary requirement for working capital relates to funds we are required to maintain at exchanges or clearing organizations to support our customers' trading activities. We require that our customers deposit funds with us in support of their trading activities, which we in turn deposit with exchanges or clearing organizations to satisfy our obligations. These required deposits account for the majority of our working capital requirements and thus our principal use of working capital is funded directly or indirectly by our customers. Our working capital needs are otherwise primarily limited to regulatory capital requirements which we have satisfied in the past from internally generated cash flow and available funds.

Notwithstanding the self-funding nature of our operations, we may sometimes be required to fund timing differences arising from the delayed receipt of customer funds or timing differences associated with the settlement of customer transactions in securities markets. Historically, these timing differences were funded either with internally generated cash flow or, if needed, with funds drawn under short-term borrowing facilities, including committed lines of credit. We have $75.0 million of available borrowings under a revolving credit facility for working capital purposes. Separately, our finance subsidiary, Refco Capital, LLC, utilizes secured bank facilities to refinance specialized financing arrangements entered into with select customers from time to time. As of May 31, 2004, there are no loans outstanding under these facilities.

Our two principal U.S. regulated subsidiaries are Refco, LLC and Refco Securities, LLC. Refco, LLC is subject to the CFTC minimum financial requirements, which generally require that we maintain net capital equal to 4% of customer funds required to be segregated pursuant to the Commodity Exchange Act, less the market value of certain commodity options. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital. Refco Securities, LLC is subject to the uniform net capital requirements of the SEC, which require the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for by the SEC's rules, which require that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items as defined in the SEC's rules. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate customer-related debit items. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million which was 18.3% of aggregate customer-related debit items and $67.5 million in excess of required net capital.

As a matter of policy, we maintain excess regulatory capital to provide liquidity during periods of unusual market volatility, and this has been sufficient in the past to absorb volatile market events. Similarly, for our brokerage activities in the OTC markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures-style margin methodology to protect us against price movements, and this also reduces the amount of capital needed to conduct business because even if we are required to post funds with clearing organizations in order to facilitate customer-initiated transactions, we are able to use customer deposits for this purpose rather than our own funds. The result is that we can execute a substantial volume of transactions without the need for large amounts of working capital.

Funding for purposes other than working capital requirements, including the financing of acquisitions, has been provided either through internally generated cash flow or through specific long-term financing arrangements (which are described below).

Substantially all the assets of our Asset Management business, which accounted for 6.7% of fiscal year 2004 revenue and an operating loss of $2.1 million in fiscal year 2004, were distributed to Refco

60

Group Holdings, Inc. in connection with the Transactions. Our Asset Management business generated nominal cash flow for fiscal year 2004.

## Long-Term Debt

It has been our policy to match the varied nature of our liquidity requirements with appropriately structured funding sources. We have traditionally financed acquisitions with term debt utilizing medium-term institutionally placed notes. At May 31, 2004 we had $399.5 million (including the current portion of long-term debt) of notes outstanding, $37.0 million of which was repaid on June 29, 2004. The total amount of this debt was retired at the closing of the Transactions. We intend to continue to fund long-term requirements, including acquisitions, with long-term debt.

We incurred a substantial amount of long-term debt in connection with the Transactions. As of May 31, 2004, after giving pro forma effect to the Transactions, we would have had $1,400.0 million of long-term debt outstanding.

The senior credit facilities we entered into in connection with the Transactions consist of a $75.0 million revolving credit facility, none of which was drawn upon consummation of the Transactions, and an $800.0 million term loan facility, which was fully drawn as part of the Transactions. We have an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. For more information on the senior credit facilities, see "Description of Credit Facilities—Senior Credit Facilities." We also issued $600.0 million of the old notes in connection with the Transactions. For more information on the notes, see "Description of the Notes." The proceeds from the term loans, along with the proceeds from the issuance of the old notes, were used to fund the cash payments made to our existing shareholders, repay certain existing indebtedness and pay related transaction fees and expenses. See "The Transactions."

The senior credit facilities require compliance with a minimum interest coverage ratio and a maximum leverage ratio (subject to an equity cure in specified instances). In addition, the senior credit facilities contain certain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross-defaults to certain other indebtedness in excess of specified amounts, certain events of bankruptcy and insolvency, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

Through our Refco Capital, LLC subsidiary, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively. We currently have no outstanding debt under these facilities.

## Liquidity Risk

Ready access to cash is essential to our business. Our liquidity could be impaired by an inability to access lines of credit, an inability to access funds from our subsidiaries or an inability to sell assets. This situation may arise due to circumstances that we may be unable to control, such as a general

market disruption or an operational problem that affects third parties or us. Further, our ability to sell assets may be impaired if other market participants are seeking to sell similar assets at the same time. Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

## Contractual Obligations and Commitments

We have contractual obligations to make future payments under long-term debt and long-term non-cancelable lease agreements and have contingent commitments under a variety of commercial arrangements. See Notes C and H to our consolidated financial statements for further information regarding our commitments and contingencies. The table below shows as of May 31, 2004 on a pro forma basis after giving effect to the Transactions, our contractual obligations and commitments, including our payments due by period:

| | | | Payments due by period | | |
| --- | --- | --- | --- | --- | --- |
| | Total | Less than 1 year | 1-3 years | 4-5 Years | More than 5 years |
| | | | (in millions) | | |
| Long-term debt obligations | $ 1,400.0 | $ 6.0 | $ 16.0 | $ 16.0 | $ 1,362.0 |
| Operating lease obligations | 81.3 | 15.2 | 25.2 | 15.8 | 25.1 |

In addition to the contractual obligations and commitments set forth above, we may be obligated to make earn-out payments in connection with acquisitions we have completed in the past.

## Off Balance Sheet Arrangements

In the normal course of our customer-driven operations, we enter into various contractual commitments, as principal, involving forward settlement. These include exchange-traded futures, fixed income swaps, equity swaps, foreign currency forwards and option contracts. These contracts are generally hedged with offsetting contracts at prices which result in a profit spread for us. We also enter into forward repurchase agreements. Our customers and counterparties consist of entities in and outside the United States.

We record our contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. Our exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments we are exposed to is often limited by other financial instruments recorded both on and off balance sheet. Our management actively monitors our market risk by reviewing the effectiveness of hedging strategies and setting market risk limits.

## Critical Accounting Policies and Estimates

Our discussion of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. During the preparation of these consolidated financial statements, we are required to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosures of contingent assets and liabilities. On an ongoing basis,

we evaluate our estimates and assumptions, including those related to commissions, principal transactions, provisions for doubtful accounts on receivables, fair values of derivative financial instruments and goodwill and intangible assets. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of our analysis form the basis for making assumptions about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions, and the impact of such differences may be material to our consolidated financial statements.

We believe that the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements:

### Commissions

Commissions earned and related expenses on our customers' open futures positions may be recognized on either a half-turn basis, meaning that we recognize commissions on the opening or closing of a futures contract, or on a round turn basis, after the purchase and a subsequent sale, or a sale and a subsequent purchase of a futures contract. We recognize commissions earned on a half-turn basis.

We report gross commission income on transactions executed by introducing brokers and report commissions paid to introducing brokers as commission expense. Presentation of commissions on a gross basis does not impact our net income.

### Principal Transactions

Our company, as a broker of derivatives products, enters into contractual commitments, as principal, involving forward settlement. These contracts are recorded at fair value and are generally immediately hedged with offsetting contracts, which results in a profit spread for us. As the fair values are based on observable market data, this profit spread is recognized immediately in our statement of operations under Principal transactions.

### Receivables from Customers—Provisions for Doubtful Accounts

Our receivables are generally collateralized with marketable securities. For certain customer receivables that are not fully secured, we establish reserves when, in the opinion of management, such reserves are appropriate. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

### Fair Values of Derivative Financial Instruments and Securities

As a broker, we enter into transactions involving derivative financial instruments and securities on behalf of our customers. These transactions are carried at market value or, if market prices are not readily available, fair value. Changes in fair value are recognized immediately in net income. Market values for exchange-traded derivatives are based on quoted market prices. Fair market values for OTC derivative financial instruments are based on pricing models that are in turn based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts. Valuation models include the use of management estimates and current market information. Management is also required to make assumptions on how the fair value of derivative financial instruments and securities is affected by current market conditions. If management's underlying assumptions for evaluating fair value prove to be inaccurate, there could be material differences in our consolidated operating results.

*Goodwill*

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets as of acquisition date. Prior to December 1, 2001, goodwill was amortized over a period of 25 years on a straight-line basis. Effective December 1, 2001, we adopted the treatment of SFAS No. 142, *Goodwill and Other Intangible Assets* . Consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. We are required to record an impairment loss if the estimated fair value of an operating segment is less than its estimated net book value. We derive the fair value of each of our operating segments primarily based on earnings multiples. A prolonged reduction in the earnings of one of our operating segments could result in an impairment charge in our results. Our last annual impairment test was performed during the fourth quarter of fiscal year 2004, and no impairment was identified. As at February 29, 2004, the carrying value of our goodwill was $291.2 million.

*Identifiable Intangible Assets*

Identifiable intangible assets, which consist primarily of customer relationships, asset management contracts, property management contracts and trade names, are amortized over their useful lives. Customer relationships are amortized on an accelerated basis based upon projected cash flows. Asset management contracts and property management contracts are amortized over their estimated useful lives of 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's carrying value may not be fully recoverable. An impairment loss, calculated as the difference between the estimated fair value and the carrying value of the identifiable intangible asset, is recognized if the expected undiscounted cash flows relating to the identifiable intangible asset is less than the corresponding carrying value. Trade names have been classified as indefinite-lived assets and are not amortized but tested annually for impairment. The valuation of our identifiable intangible assets is dependent upon assumptions in areas such as growth rates, customer retention and profitability. Changes to these assumptions or a prolonged period of weakness in global financial markets could adversely impact our businesses and impair the value of our identifiable intangible assets. As at February 29, 2004, the carrying value of our identifiable intangibles was $89.5 million.

*Use of Estimates*

The use of generally accepted accounting principles requires management to make certain estimates. In addition to the estimates we use in connection with fair value measurements and the accounting for goodwill and identifiable intangible assets, the use of estimates is also important in determining provisions for potential losses that may arise from litigation and regulatory proceedings.

**Recent Accounting Pronouncements**

In January 2003, the FASB issued Interpretation 46, *Consolidation of Variable Interest Entities* . In December 2003, the FASB issued Interpretation 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities* . In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. Interpretation 46 R requires a variable interest entity to be combined by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 to variable interest entities created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for "Special Purpose Entities" created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before

January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. As we do not have any interests in variable interest entities, the adoption of this statement did not have an effect on our consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities* . SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB No. 133 *Accounting for Derivative Instruments and Hedging Activities* . This Statement is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on our consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity* . SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity, and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on our consolidated financial statements.

In December 2003, FASB Statement No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits* , was issued. Statement 132 (revised) prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of recognition of those plans. The Statement retains and revises the disclosure requirements contained in the original SFAS 132. It also requires additional disclosures about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit pension plans and other postretirement benefit plans. The Statement generally is effective for fiscal years ending after December 15, 2003. Management does not believe the adoption of this statement will have a material impact on our consolidated financial statements.

## Quantitative and Qualitative Disclosure about Market Risk

Our principal market risks relate to counterparty, interest rate and exchange rate risk.

### *Counterparty Risk*

We are exposed to the risk that third parties that owe us money, securities or other assets will not perform their obligations. These parties may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. As a clearing broker, we finance our customer positions, and we could be held responsible for the defaults or misconduct of our customers. In addition, we have experienced, due to competitive factors, pressure to extend credit and to price more aggressively the credit risks we take. Although we regularly review credit exposures to specific customers and counterparties and to specific industries, countries and regions that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to detect or foresee. In addition, concerns about, or a default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect us.

As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. Our Global Risk Management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets. Our current system provides the ability to project the impact of market volatility on price movement. Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's

65

ability to pay margin. We perform frequent stress tests to our customers' positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

### Interest Rate Risk

In the ordinary course of our operations, we have limited our exposure to interest rate risk. Our balance sheet, which reflects a substantial amount of short-term and highly liquid assets, consists of equally matched assets and liabilities. We generate interest income from the positive spread earned on customer deposits or secured customer financing transactions, and the basis for the calculation of interest received and paid is entirely matched. This remains true in both rising and falling interest rate environments, although we have the opportunity to create higher levels of interest income in a rising interest rate environment.

In the future, we will be more exposed to changes in interest rates. Our new senior credit facilities are variable-rate debt. Interest rate changes therefore generally do not affect the market value of such debt but do impact the amount of our interest payments and our future earnings and cash flows, assuming other factors are held constant. Conversely, for fixed-rate debt, interest rate changes do not impact future cash flows and earnings but do impact the fair market value of such debt, assuming other factors are held constant. Assuming we had completed the Transactions and applied the proceeds as of February 29, 2004, we would have had variable-rate debt of approximately $800.0 million. Assuming we had incurred this debt on March 1, 2003, holding other variables constant, including levels of debt, a one percentage point increase in interest rates would have had an estimated impact on pre-tax earnings and cash flows for the year ended February 29, 2004 of $8.0 million.

While variable-rate debt will increase our interest expense in a rising interest rate environment, the impact will be mitigated in part by increased interest income generated from the investment of customer balances. These balances are invested daily by us in a variety of permissible short-term instruments.

### Exchange Rate Risk

We conduct global operations. Our revenues are denominated predominately in U.S. dollars, but the most significant non-dollar currency flows are denominated in Euros and Pounds Sterling. Our expenses are also denominated predominantly in U.S. dollars and to a lesser extent a variety of local currencies reflecting the location of physical operations, particularly those in the United Kingdom, Canada, France and Singapore.

While a majority of the currency fund flows are therefore matched, currency exposure does exist in respect of international operating expenses. It is our policy to cap any consolidated exposure to foreign currency which exceeds $2.5 million per location through the sale of the currency in question.

INDUSTRY

## Derivatives

### *Overview*

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. A futures contract is a legally binding agreement to buy or sell a commodity or financial instrument at a certain future date at a specific price. Options are contracts that provide for a right, but not an obligation, to buy or sell a commodity or financial instrument over a certain period at a specific price. Derivatives contracts are broadly comprised of two underlying categories: financial and physical. Examples of financial derivatives include contracts on interest rates, equity indices, individual equities and foreign currencies. Examples of physical derivatives include contracts on energy products, agricultural commodities and non-precious and precious metals. Derivatives markets have grown significantly over the past 15 years in terms of the volume of exchange-traded derivatives activity and the notional amounts outstanding of OTC contracts.

Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the OTC market. According to the BIS, the global notional amount outstanding for OTC derivatives at December 31, 2003 was $197 trillion, while the global notional principal amount outstanding for financial exchange-traded derivatives was $37 trillion. There are 60 derivatives exchanges tracked by the FIA located in 26 countries, including 18 exchanges in the United States. Major derivatives exchanges in the United States include the CME, the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), the Chicago Board Options Exchange ("CBOE") and the New York Board of Trade ("NYBOT"). Major derivatives exchanges outside the United States include Eurex, London International Financial Futures and Options Exchange ("LIFFE"), Mercado Oficial de Futuros y Opciones Financieros in Spain ("MEFF"), Euronext N.V., Singapore Derivatives Exchange Ltd. ("SGX") and the Tokyo Stock Exchange ("TSE"). Contracts traded on U.S. exchanges represented approximately 27% of global derivatives volume in 2003. The top five U.S. exchanges accounted for 83% of the global exchange-traded derivatives volume transacted in the United States in 2003.

The customer base for derivatives contracts includes professional traders, financial institutions, institutional and individual investors, as well as major corporations, manufacturers, producers and governments. These customers purchase derivatives primarily for hedging or investment purposes. Hedging involves the practice of managing risk inherent in one market position by taking an offsetting position in another market. For example, corporations use the futures markets to protect their businesses from adverse changes in the costs of their raw materials. Investing involves a market participant taking a position in an attempt to earn a profit from buying and selling futures and options contracts in anticipation of future price movements. When entering into exchange-traded derivatives contracts, customers are required to make good faith margin deposits to ensure future performance under the derivatives contract.

### *Methods of Trade Execution*

Trading in derivatives products has traditionally occurred in "pits" on the physical trading floor of an exchange through an auction process known as open outcry. Only members owning or leasing a seat on the exchange may trade in the pit. Buy and sell orders from individuals and institutions are sent to these members on the trading floor, usually through an FCM. Members of an exchange may exercise their trading privileges as independent market-makers (known as locals) trading for their own account or as floor brokers executing customer orders.

67

The diagram below illustrates the process through which customers place trade orders on an exchange from through an FCM.



In order to expand access to their markets, most derivatives exchanges have supplemented or replaced their open outcry trading facilities with electronic trading platforms. Electronic systems allow investors to obtain real-time information about bid and ask prices and trading volumes and to enter orders directly into the electronic exchange's centralized order book, subject to the agreement of an FCM to process the investors' trades. The emergence of electronic trading has been enabled by the ongoing development of sophisticated electronic order routing and matching systems, as well as advances in communications networks and protocols. Examples of electronic trading platforms include CME's GLOBEX system, the a/c/e platform, which is provided jointly by CBOT and Eurex, LIFFE Connect, which is provided by Euronext.LIFFE, and the Cantor Exchange ("CX"), which is provided by Cantor Fitzgerald, L.P.

### Exchange Clearing Houses

Transactions executed on derivatives exchanges are settled through a clearing house that acts as a central counterparty to the clearing member on each side of the transaction. When a futures transaction has been executed in the pit or on an electronic platform, the clearing house confirms the matching and settlement of the trade with FCMs representing both buyer and seller.

The major clearing houses for futures products include the Clearing Division of the CME, the Clearing Corporation, the LCH, Singapore Exchange Derivatives Clearing Limited and Clearnet. A clearing house manages its counterparty risk through required margin deposits that are managed to ensure effective delivery of the underlying security or commodity, and maintains guarantee funds and capital call rights.

### Futures Commission Merchants

In the United States, customers access the exchange-traded derivatives market through FCMs. FCMs are members of one or more exchanges that solicit or accept orders from customers for the purchase or sale of derivatives and route those orders to the appropriate exchange. FCMs execute customer orders on the exchange and maintain records of each customer's position, margin deposits,

money balances and completed transactions. In return for providing these services, FCMs collect commissions on each trade order from customers. In addition, FCMs earn interest income on cash deposits held on behalf of their customers. FCMs are subject to a number of regulatory requirements, including the maintenance of a minimum level of net capital. FCMs are regulated by the CFTC, an independent federal regulatory agency, and must be a member of the NFA, an industry-wide self-regulatory organization. FCMs are typically either divisions of major investment or commercial banks or independent providers such as our company. Regulatory jurisdictions outside of the United States have similar governing bodies, minimum capital requirements and self-regulatory organizations.

### Industry Growth

According to the BIS, annual trading volume in exchange-traded derivatives has grown at a compound annual growth rate of approximately 22% over the past 15 years, from 388 million contracts traded in 1988 to over eight billion contracts traded in 2003. During the same period, trading volumes increased at a compound annual growth rate of 15% in North America. Excluding single stock and commodity contracts, the compound annual growth rate of trading volumes has been 26% in Europe and 35% in the Asia and Pacific markets during the same period.

**Futures and Options Trading Volume on Global Derivatives Exchanges**
(Contract amounts in millions)



Source:   BIS.

Note:      Data based on calendar year. The "financial" category of derivatives includes interest rate, currency and equity index contracts.

We believe growth in exchange-traded derivatives volumes has been driven by the following factors:

•   *Increasing Importance of Risk Management* —An increasing fluidity of capital and diversification of commercial activity among capital markets has broadened the financial exposures businesses and individuals face and increased the need to hedge their risks. We believe companies and investors focus on controlling exposures in their businesses and providing less volatile earnings

for shareholders. To achieve this goal, management is emphasizing risk management as a means of reducing volatility in their businesses. As risk management needs have increased so have the number of exchange-traded derivatives contracts available to meet these needs.

- *Product Innovation* —In general, the number of contracts available for trading on exchanges has grown significantly in recent years. As of April 2004, the CME, Eurex and CBOT offered for trading a total of 224 contract types, an increase of 109 since January 2000. For example, the e-mini S&P 500 index has experienced rapid growth since being launched in 1997, partially as a result of its small size in relation to most other contracts and its resulting affordability to smaller investors. The e-mini S&P 500 index's annual trading volume reached 161 million contracts in 2003, making it the fifth most actively traded contract in the world six years after its introduction.

- *Structural Shift from OTC Markets to On-Exchange Trading* —The exchange-traded derivatives market for financial derivatives contracts grew at a faster rate than the OTC derivatives market in 2003 based on the total notional amount of contracts outstanding. Exchanges offer customers the advantages of improved price transparency, centralized clearing and credit intermediation. Due in part to these benefits, an increasing proportion of mature and standardized OTC derivatives products (e.g., equity indexes) have shifted to an exchange platform. Given the large size of the OTC derivatives market in terms of notional amount of contracts outstanding, exchanges are developing new products based on the most commonly traded OTC products.

- *Deregulation* —Deregulation of the financial services industry in the United States, Europe and Asia has increased customer access to derivatives products and markets, reduced regulatory barriers to product innovation and encouraged consolidation among exchanges.

  *United States:*    Many regulatory barriers to product development, such as lengthy CFTC review of new contracts, were largely repealed by the enactment of the Commodity Futures Modernization Act of 2000 ("CFMA") in the United States. Among other developments, the CFMA authorized the trading of new products, such as futures contracts on individual stocks and narrow-based stock indexes, which were prohibited under prior law. The CFMA also enabled regulated exchanges to self-certify new contracts and rules, without delays occasioned by regulatory review and approval, permitting quicker product launch and modification.

  *Europe and Asia:*    Deregulation and competition will continue to pressure European exchanges to consolidate across borders to gain operating efficiencies necessary to compete for customers and intermediaries, lowering transaction costs and trading friction, which should continue to attract new market participants. Singapore Derivatives Exchange, the TSE, Eurex and Euronext N.V. are major exchanges for various types of securities in addition to being derivatives exchanges, highlighting the growing convergence between cash and derivatives markets. Euronext N.V., which resulted from the merger of the Amsterdam Exchanges N.V., Paris Bourse SA and Societe de la Bourse de Valeurs Mobilieres de Bruxelles S.A. (the Brussels Exchange) acquired a controlling interest in LIFFE and announced plans to integrate their derivatives markets.

- *Exchange and Clearing Platform Competition* —Competition among exchange and clearing platforms has increased as a result of globalization, deregulation and technological advances. Competition has increased product innovation as evidenced by the proliferation of contract types traded on each derivatives exchange and has led to significant fee reductions. A recent example of exchange competition is the launch by Eurex of a U.S. based exchange, which competes directly with the CBOT in certain product areas. In response to Eurex's entrance, the CBOT has reduced some of its clearing fees. We believe this competition will significantly contribute to transaction volume growth and will benefit other market participants such as FCMs.

- electronic trading—is changing conventional financial markets from floor-based exchanges to an electronic format has enabled exchanges to lower clearing fees, reduce execution times and broaden access. Electronic trading has led to the decentralization of exchanges and has allowed customers to view bid and ask prices and trade derivatives products globally nearly 24 hours a day. Due to the previously mentioned benefits, we believe electronic trading is attracting new customers to the exchange-traded derivatives market and increasing the trading activity among existing customers. For example, from January 2004 through June 2004, the average daily volume of electronically traded Eurodollar contracts increased over 500%. Electronic trading represented 35% of average daily volume on the CME in 2002, 44% in 2003, 48% in the first quarter of 2004 and 55% in May 2004.

## Prime Brokerage

Prime brokerage is an industry term referring to specialized services provided by brokers to institutional customers as a bundled package. The services typically include execution and clearing, securities financing, custody, trade processing, securities lending and other administrative services. These services can be provided on either electronic or voice platforms, or both. Prime brokers serve customers in all major securities markets, such as equity, fixed income and foreign exchange. Prime brokers typically earn revenue through commission or transaction fees and interest income. They are typically divisions of major investment or commercial banks, or independent providers, such as our company.

The fixed income and foreign exchange markets we provide prime brokerage services to are discussed separately below.

### Fixed Income

The fixed income securities market is one of the largest financial markets in the world. In the United States, there are currently over $22.5 trillion of fixed income securities outstanding. The U.S. Treasury securities market, the largest and most liquid fixed-income market, has experienced strong volume growth. Average daily dollar trading volume has increased from $18.3 billion in 1980 to $433.5 billion in 2003, representing a compound annual growth rate of 14.8%.

While there are many types of investors in the U.S. Treasury securities market, financial institutions, corporations and hedge funds comprise a large percentage of the activity. These investors are typically attracted to the U.S. Treasury securities market due to its significant liquidity and low risk profile. Additionally, U.S. Treasury securities are commonly used as part of a larger investment strategy and are primarily financed through the OTC repo market.

The OTC repo market is one of the largest and most active sectors in the U.S. fixed income market. Repos are widely used as a means to inexpensively finance short-term borrowings against collateral (commonly U.S. Treasury securities) and to invest surplus funds on a short-term basis. The largest users of repos are broker-dealers, banks and hedge funds. The largest providers of cash liquidity to the repo market are money market funds, state and local governments and foreign central banks.

Traditionally, the majority of U.S. Treasury securities are bought and sold by investors using the services of a broker (typically a large commercial bank or investment bank). Such customers receive price quotes from these brokers. The broker in turn either buys the security from the market or sells the security from existing inventory. Additionally, they may access the interdealer broker ("IDB") market to match the transaction with another broker. Access to the IDB market has traditionally been limited to brokers dealing with other brokers. The customer compensates the broker for executing this transaction through the payment either of a commission or through a mark up which is added by the broker to the price at which the broker can access the inter-dealer market to execute the transaction.

71

The U.S. Treasury market has been moving away from voice broking to electronic trading in recent years. Many of the major broker-dealers now have electronic order entry platforms that allow customers to ask for bid and offer prices. In some cases the dealer may list current bid and offer prices on the platform. Similarly, the IDB market has also evolved from a predominately voice brokered market to an electronic market. Participants in the IDB market can now see bids and offers shown live on a screen and can execute against these prices electronically.

In order to participate in transactions in the IDB market, a participant must become a netting member of the Fixed Income Clearing Corporation ("FICC"), a clearing house for the U.S. fixed income market. A prospective netting member must complete a lengthy approval process that requires the applicant to (i) be a financial institution, (ii) maintain a minimum level of capital and (iii) be actively involved as a clearer, dealer or broker of government securities. As a result, most FICC netting members are either large investment banks, broker-dealers or commercial banks who use the IDB market to access the best pricing and greatest liquidity for U.S. Treasury securities. These institutions typically buy securities both for their own proprietary trading account or for resale to clients.

We believe growth in the U.S. Treasury securities market and the repurchase agreement market has been driven by the following factors:

- *Growth in the Total Amount of Debt Outstanding* —According to the Bond Market Association, the total size of the U.S. Treasury securities market has increased significantly, with $3.6 trillion outstanding as of December 31, 2003, compared to $616.4 billion at December 31, 1980. Total gross issuance of short- and long-term U.S. Treasury securities for 2003 was a record high of $4.2 trillion.

- *Growth in Interest Rate Derivatives* —Interest rate derivatives are contracts that transfer an asset's risk and return from one party to another without transferring ownership of the underlying asset, allowing market participants to obtain interest protection or assume interest rate exposure associated with fixed-income securities and other debt obligations. Interest rate derivatives provide increased flexibility and liquidity for investors and lenders to diversify their interest rate exposures.

- *Greater Sensitivity to Credit Risk* —U.S. Treasury securities are generally secured by high quality collateral and are a liquid investment, offering relatively low to no credit risk. Given recent past financial crises, including the Asian financial crisis in 1997 and the Russian debt crisis in 1998, an increasing number of investors have sought such low-risk assets.

- *Introduction of Electronic Trading Platforms* —Electronic trading platforms act as central facilities to bring together buyers and sellers. The actions of participants on these platforms are facilitated by an electronic medium that improves some of the manual processes that might otherwise be required. These platforms also have integrated compliance and risk management functions, as well as greater accuracy and decreased probability of erroneous trades than voice brokerage, and as a result, typically provide a lower-cost and more efficient means for price discovery and trade execution.

### Foreign Exchange

The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.9 trillion. By comparison, average daily volume in the next largest financial market, that for U.S. Treasury securities, was approximately $434 billion during 2003.

The majority of foreign exchange volume is traded OTC. Most foreign exchange transactions take place by telephone or through proprietary trading networks established by large financial institutions.

The primary participants in the foreign exchange markets fall into four categories: central banks, banks, brokers and institutional clients of brokers. Banks are the largest participants in the market, as approximately two-thirds of all foreign exchange transactions involve banks trading currencies with one another. Brokers act as intermediaries between other participants in the market, searching for the most favorable rates on behalf of customers and providing a level of anonymity for the buyer and seller. Brokers earn commissions on the trades they execute.

There are three primary types of foreign exchange transactions: spot, forward and options. In a spot transaction a buyer and seller agree on an exchange rate and promptly settle the trade based on that rate. In a forward transaction a buyer and seller agree to trade currencies at a later date at an agreed upon rate, regardless of market exchange rates at that time. The most common type of forward transaction is a swap, in which two parties exchange currencies at a given rate and agree to reverse the transaction at a later date. Options on foreign exchange work the same way as options on equities: they convey a right, not an obligation, to trade at a future date at a certain rate. As of April 2004, spot transactions represented 33% of the OTC traditional foreign exchange daily volume, swap transactions represented 50% and outright forward transactions represented 11% (while estimated gaps in reporting were 6%).

We believe growth in the foreign exchange market has been driven by the following factors:

- *Increased Cross-Border Trade and Investment* —We believe cross-border trade should continue to increase, as the world is more open to free trade than in past years. For U.S. international trade, for example, the average annual increase in exports and imports over the past 40 years was 11% and 12%, respectively. Similarly, foreign direct investment has experienced a long-term growth trend and is expected to continue. This growth in global trade and foreign direct investment is a driver of demand for foreign exchange products.

- *Increasing Use of Foreign Exchange as a Hedging Tool* —Foreign exchange derivatives products, such as foreign exchange forwards and swaps, facilitate the hedging of foreign exchange risk. From 1992 to 2004, forward and swap volumes have been growing as a percentage of total foreign exchange volume. This trend is consistent with the compound annual growth in the derivatives market since 1988 of 22% per annum.

- *Alternative Investment Asset Flows* —Foreign exchange has emerged as a distinct asset class for investment purposes, driven largely by demand from hedge funds whose investments in foreign exchange have risen significantly since 2001 as equity market valuations declined and historically low interest rates rendered many fixed income products less attractive. In addition, retail customer participation in the foreign exchange market has increased as customers have become more aware of foreign exchanges as an investable asset class.

- *Emergence of Electronic Brokerage* —Trading in the OTC market is conducted over the telephone, Internet or trading platform, either directly or through a broker. Electronic brokers play a large role in the market based on their offering of lower costs, higher efficiency and greater transparency compared to direct dealing. The BIS reported that electronic brokers conducted approximately 50% to 70% of foreign exchange transactions in major currency pairs in 2001, compared to approximately 40% and 10% in 1998 and 1995, respectively. Similarly, usage of electronic trading has grown among non-bank foreign exchange investors.

73

**BUSINESS**

## Our Company

We are a leading independent provider of execution and clearing services for exchange-traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets. Annually, we process volumes of exchange-traded derivatives contracts comparable to the volumes traded on many of the world's major derivatives exchanges. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the CBOT and greater than the volume on each of the CBOE and the NYMEX during the same period. We are a leading clearing member of the FICC, a clearing house for the U.S. fixed income markets.

We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide our customers the ability to trade a wide range of products in the derivatives, fixed income and foreign exchange markets. Through our worldwide system of brokers and electronic trading platforms, we provide execution and clearing of our customers' orders with a focus on offering low costs and customer service. Consistent with our customer-oriented philosophy and to avoid potential conflicts with our customers, we do not engage in speculative trading for our own account.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions.

## Competitive Strengths

### Leading Market Position

We are a leading independent provider of execution and clearing services for exchange-traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the CBOT and greater than the volume on each of the CBOE and the NYMEX during the same period. We cleared more contract volume on the CME, the largest derivatives exchange in the United States, than any other FCM in 2003. We are a clearing member on virtually all major domestic and international derivatives exchanges and offer our customers access to a broad range of derivatives contracts. In 2003, we ranked fifth among FICC firms in terms of cleared U.S. Treasury repo transaction volume and ranked in the upper quartile for U.S. Treasury cash transaction volume.

### Diversified Across Customers, Products and Markets

Our business is diversified across business divisions, customer segments, products and markets. Our operating profit is balanced between our Derivatives Brokerage & Clearing division and our Prime Brokerage/Capital Markets division. We provide services to over 200,000 customer accounts, encompassing a large and diversified mix of customers, including corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide access to a wide variety of exchange-traded derivatives products, including interest rate, equity index, energy, agricultural, foreign currency and metals contracts. We are present on nearly all major global derivatives exchanges, including CME, CBOT, Eurex, the LME, Euronext and NYMEX. We also provide access to a wide range of fixed income and foreign exchange products, including U.S. Treasury securities, non-dollar fixed income, spot and forward currencies, currency

74

options, precious metals, OTC options on U.S. Treasury securities, mortgage-backed securities, corporate bonds and related OTC derivatives.

### Attractive Risk Profile

We have built a comprehensive risk management system throughout our operations to limit and monitor our exposure to customer and counterparty risk. We only undertake transactions on behalf of our customers and consequently are not exposed to market risk as a result of proprietary trading. In order to mitigate customer and counterparty risk, we implement margin technologies, mark-to-market risk management tools, internal review and executive approval procedures and rigorous risk monitoring. As a result of our risk management techniques, we have had limited credit losses resulting from our customer or counterparty defaults since fiscal year 2000, even through such recent volatile events as the terrorist attacks on September 11, 2001.

### Scalable Operating Platform

Our significant processing volumes in exchange-traded derivatives, fixed income and foreign exchange have provided us with significant economies of scale. Our existing infrastructure is capable of processing significant and incremental volumes with minimal capital expenditures. In fiscal year 2004, we processed 461 million derivatives contracts, cleared over $9 trillion in U.S. Treasury repurchase transactions and processed over $600 billion in customer volume in the foreign exchange market. We believe our significant annual volume, combined with our variable cost structure and highly automated transaction processing facilities, provide us with cost advantages in the marketplace.

### Significant Free Cash Flow and Minimal Capital Investment Requirements

We generate significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period. In addition, our management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x.

### Proven and Committed Management Team

We are led by a senior management team that has an average of 22 years of industry experience. Phillip Bennett, who has been with us for 23 years, became our President and CEO in 1998 and formed a new senior management team comprised of well respected industry professionals. Mr. Bennett beneficially owns an approximate 43% interest in us. In addition, we have established an equity incentive plan for our senior management team.

## History

We began operations in 1969 by providing execution and clearing services in agricultural commodities. Throughout the 1970s, we expanded our product offerings in response to the introduction of new financial futures products. Our involvement in Prime Brokerage/Capital Markets began in 1982 in response to requests from existing futures customers for the ability to adjust their futures positions after the futures market was closed. We formed the Prime Brokerage/Capital Markets division to provide this service by facilitating customer access to the cash markets, including the interbank foreign exchange market, in our capacity as a broker in principal. The brokerage in principal business model established the foundation both for our foreign exchange operations and for our other cash market

75

brokerage activities. From 1983 to 1985, we emerged as the leading consolidator in the futures industry by acquiring Chicago Grain, ContiCommodities and DLJ Futures. By 1985, we had built an international infrastructure and strong market position in global derivatives markets.

In September 1998, Phillip Bennett was named our chief executive officer. Under his leadership, we hired a new senior executive team with significant industry experience to focus on growing our business and strengthening our regulatory and customer focus. Under our new senior management team, we grew internally and through a number of acquisitions. In 2000, we acquired Lind-Waldock, a prominent online retail derivatives brokerage operation. From 2001 to 2003, we enhanced our strong market position in the professional trader market by, among other things, the acquisition of MacFutures Limited and certain businesses of First Options.

## Services

We are organized into two operating business segments for financial reporting purposes; (i) Derivatives Brokerage & Clearing and (ii) Prime Brokerage/Capital Markets, and we have one non-operating business segment, Corporate & Other. We previously conducted additional operations through our Asset Management division. As part of the Transactions, we distributed all of the equity of Forstmann-Leff International Associates, LLC, which owned substantially all the assets of our Asset Management business, to New Refco. New Refco thereafter distributed those assets to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett.

### *Derivatives Brokerage & Clearing*

We execute and clear customers' orders for exchange-traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for execution and matching. Through our clearing services, we facilitate confirmation and settlement of our customers' derivatives transactions. We also ensure that our customers have the appropriate margin in their accounts to support their derivatives positions. We conduct these activities in our capacity as an FCM. As an FCM, we are responsible to the applicable clearing house for our customers' transactions. We are the largest independent FCM in the United States, based on domestic customer segregated fund balances of approximately $3.6 billion as of May 31, 2004. In 2003, we were the largest customer in terms of contract volume of the CME, the largest derivatives exchange in the United States.

We generate Derivatives Brokerage & Clearing revenues from: (i) transaction fees earned on each contract executed or cleared and (ii) interest income earned on cash balances in our customers' accounts. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at a compound annual growth rate of 23.9% and 40.8%, respectively, driven primarily by a 50% average annual increase in contract volume executed or cleared and a 20% average annual increase in customer deposits. Our growth has been generated both organically and through strategic acquisitions, which have broadened our customer base, service offerings, geographic reach and exchange coverage.

76

Our business is diversified across customers, products and exchanges. The following charts illustrate our diversity across exchanges and contract types for fiscal year 2004:



**Contract Volume by Exchange(1)**



**Contract Volume by Type(1)**

(1)    Total volume: 461 million contracts

*Customers.*    As of May 31, 2004, our Derivatives Brokerage & Clearing division serviced over 185,000 customer accounts. Our customers include institutions, professional traders and retail investors.

Institutions.    Institutions are typically large, mutual funds, hedge funds, financial institutions, pension plans and other non-financial entities. We market to our institutional customers through a sales force of experienced financial services professionals. We offer institutions high service levels, anonymity, unconflicted access to a broad reach of products and markets and competitive pricing. It is also important to institutional customers that we do not speculatively trade with our own capital and therefore avoid potential conflicts with our customers. We believe the quality of execution is very important to our institutional customers and that we are able to provide such customers with efficient execution due to our scale, liquidity and geographic breadth. We have experienced growth in our institutional customer base, in part, driven by the proliferation of hedge funds and an increasing corporate focus on risk management.

Professional Traders.    Professional traders are either locals, who are individual members of derivatives exchanges trading for their own account on the floors of those exchanges that maintain the open outcry method of price discovery, or professionals trading electronically from dedicated facilities built to service their needs. We have a strong market position among professional traders and locals. Professional traders are high volume customers who require an operating platform with rapid execution at a low cost. Locals fulfill an important role in the market as liquidity providers for the exchanges of which they are members. Through internal growth and acquisitions, we have increased our professional trader customer base as part of our strategy to grow transaction volumes and our plan to diversify our customer base. This strategy allows us to integrate and efficiently process very large volumes and to manage effectively the risks associated with this particular customer group. We also believe that control of this particular customer base will be of strategic significance in the future as markets become increasingly automated. Locals are well suited to the development of off-the-floor trading locations, which provide them with direct access to electronic markets and enable us to continue to benefit from the order flow and commission generating potential of these clients. Our MacFutures model is indicative of the opportunities presented by this trend. MacFutures, a London-based business we acquired in March 2003, provides specialty clearing services for individual professional traders, specializing in the electronic derivatives and fixed income markets in Europe. The model, which involves the recruiting and training of professional traders who are provided with access to electronic

77

exchanges on our own off-the-floor trading locations, has now been implemented in Chicago and Montreal.

Retail Investors.    Retail customers are typically experienced individual investors. We have grown our retail customer base historically through internally generated new accounts and through acquisitions. The global retail customer base is growing as new product offerings with a broad investor appeal, such as the e-mini contracts, are listed on exchanges. We offer our retail customers access to a broad range of products and value added services, including research, real time quotes, risk management tools, account information and customer support. Our retail customers also benefit from the operating platform that we have built to service our institutional and professional trader clients. We market to retail customers through an actively managed lead generation and marketing strategy targeted at identifiable customer groups who we believe would be receptive to trading equity derivatives. Specific examples of these initiatives include the following:

- We leverage our prominent Lind-Waldock brand name and its online platform. Lead generation is driven primarily by print media advertising and, increasingly, a broad range of internet marketing initiatives, including key word strategies negotiated with search engines.

- We are developing business-to-business ("B-2-B") relationships to expand the scale of our retail customer base. These are often negotiated with complementary and non-competitive retail brokerage firms such as Charles Schwab & Co., Inc., TD Waterhouse Investor Services, Inc. and Ameritrade Inc. We typically provide access to and execution of exchange-traded derivatives products for the customers of our B-2-B partners.

- We rely on our traditional sales force of account executives and registered introducing brokers who independently (but with corporate product support) market to individual clients throughout North America.

- First time potential clients are targeted using educational marketing strategies often developed in conjunction with seminar providers and investment educational professionals.

Product Access.    We provide our customers access to all significant exchange-traded derivatives contracts, including interest rates, equity indexes, energy, agriculture, foreign currency, precious metals, non-precious metals contracts and managed futures.

Exchanges.    We provide our customers access to nearly all major global derivatives exchanges, including the CME, CBOT, NYMEX, LME, Eurex, Euronext.LIFFE and CBOE. In recognition of the technological advances in the industry, we provide both open outcry and electronic access to the derivatives markets. The electronic exchanges we provide access to include A/C/E, GLOBEX, LIFFE Connect and NYMEX Access.

Competition.    The primary competitors of our Derivatives Brokerage & Clearing business include affiliates of major commercial and investment banks and independent FCMs. We compete for customers and transaction volume on the basis of our access to a broad range of products and exchanges, our service levels, relationships, technology and operating platform and pricing. Many of our investment and commercial banking competitors maintain large proprietary trading operations.

Refco Alternative Investments.    In June 2002, we created Refco Alternative Investments to develop product offerings using alternative assets, such as managed futures, for distribution to our customers. These offerings result in the creation of an asset management fund, utilizing both our sales force and third-party distributors to raise assets. All investment decisions are made by third party managers, and all brokerage activity of the funds is directed exclusively to our derivatives and cash brokerage affiliates, driving transaction volume to our core transaction processing platform. Additionally, such funds typically earn an asset management fee. An important milestone was reached following the negotiation with S&P for the branding of a portfolio of Commodity Trading Advisors and the subsequent creation

78

of a managed futures index, which is marketed under the brand name SPhinX. This product, which took advantage of weaker equity markets and the non-correlated performance of derivatives investing to equity market performance, was successfully launched in March 2003. As of May 31, 2004, approximately $543.0 million has been raised for this product.

### Prime Brokerage/Capital Markets

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non-dollar fixed income markets. The majority of our customers are hedge funds and other financial institutions.

Our fixed income operating platform provides our customers access to the IDB market for U.S. Treasury securities. The IDB market is a wholesale securities market that allows brokers to trade with one another. Access to the IDB market is usually limited to member firms who meet certain membership requirements, such as minimum capital thresholds. We allow our customers to use our IDB membership and operating platform to gain direct access to transparent IDB market pricing and liquidity.

In the case of foreign exchange, we act as a broker for customers wishing to transact business in the Interbank Foreign Exchange Market. We processed over $600 billion in customer transaction volume in fiscal year 2004. We enable our customers to participate in these markets by providing access via several platforms to trading in the majority of the world's principal currencies in the form of spot, forwards and options. These platforms include both voice broking in which our team of brokers place customer orders with market makers, primarily large money center banks, as well as online platforms.

We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned on each trade and (ii) interest income earned from providing secured customer financing through repo transactions. From fiscal year 2000 to fiscal year 2004, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at a compound annual growth rate of approximately 23.6% and 48.8%, respectively. This growth has been driven primarily by an increase in the number of customers, growth in the U.S. Treasury securities market and new product introductions.

Unlike our exchange-traded derivatives business, our Prime Brokerage/Capital Markets activities are not conducted on exchanges. In order to effect Prime Brokerage/Capital Markets transactions for our customers, we act as a principal executing the transaction with our customer and simultaneously executing an offsetting trade in the market. We do not trade speculatively for our own account and only initiate an order in the market to match an offsetting customer transaction. Although we do not trade speculatively for our own account, since we act as broker in principal in our capital markets/fixed income business, these transactions are reported as "principal transactions" on our consolidated statement of operations. We employ mark-to-market and margin risk management procedures identical to those adopted in regulated agent markets. We believe that the risk involved in these transactions is comparable to that incurred in our traditional derivatives brokerage operations.

*Product Access.*    Within our Prime Brokerage/Capital Markets segment, we primarily provide fixed income and foreign exchange products and services.

79

**Our Fiscal Year 2004 Prime Brokerage/Capital Markets Revenue Breakdown**



Fixed Income. Our worldwide trade execution capabilities extend to select sectors of the fixed income market, primarily in U.S. Treasury securities, OTC options on U.S. Treasury securities, corporate debt and related OTC derivatives, sovereign debt and emerging market debt.

Our most important fixed income offerings are U.S. Treasury products available in the IDB market and associated financing primarily through U.S. Treasury securities repurchase agreements. We provide our customers with a single platform, "Refco Trader," to obtain access to dealer prices only available on IDB markets. The efficiency of the Refco Trader platform and the competitive bid offer spread in the IDB market is valuable to the fixed income fund manager and professional trader. Our customers use our platform to buy and sell U.S. Treasury securities and obtain financing through the repo market.

Our IDB product offering has been enhanced in recent years by the consolidation among traditional participants in fixed income markets. We have been able to exploit the consolidation among liquidity providers without incurring any proprietary level risk by providing professional customers and fixed income traders with an alternative source of liquidity through repurchase transactions. Our lack of speculative proprietary trading provides us with a competitive advantage because it eliminates the conflict of interest that exists with other traditional liquidity providers.

We are targeting other fixed income markets, such as mortgage backed securities and European sovereign debt, where we can provide our customers a similar service offering and value proposition as our U.S. Treasury offering. We also have a strong presence in Europe as one of the few non-bank repo clearing members of the LCH and have an expanding presence in Latin American, Eastern European and Southeast Asian markets.

Foreign Exchange.    We are a major international broker of foreign exchange in the areas of execution and prime brokerage, with over $600 billion in volume for the fiscal year 2004. We provide 24 hour trading facility coverage of all major and most minor currencies, with service including spot, forwards, options, swaps and custom derivative overlays.

Our largest foreign exchange business is the traditional voice brokerage business. Customers call us to execute foreign currency transactions. As a broker in principal, we enter into the transaction with our customer and simultaneously enter into an offsetting transaction with a market maker. For providing this service, we earn either a transaction fee or the spread between the price we charge our customer and the price that we pay the market maker. We compete for customers based on service, relationships, price competitiveness and by providing anonymity in trading.

We have an on-line currency trading platform for our institutional customers developed in conjunction with Currenex, a leading global provider of currency pricing systems. This platform provides our customers electronic access to the foreign currency prices of several major market makers. The overall market for trading currency electronically is growing quickly due to the speed and cost

80

benefits and the price transparency. This type of direct access is generally not offered by commercial or investment banks.

We have also developed retail online foreign exchange offerings. These products are Web-enabled, rely on global Internet-based distribution and, most importantly, encourage self-directed trading which requires minimal human interaction at the corporate level. This facilitates the handling of significant customer volumes with very low cost to income characteristics and we believe that we represent the most viable form of retail distribution. An active Web-based marketing strategy is currently in process to take maximum advantage of this recent development. We also own 35% of FXCM, which provides a foreign currency trading platform and execution services to retail investors.

Other.   We have developed a worldwide clearing infrastructure that offers institutional clients and fund managers a single source for execution and all related financing activities in both domestic and international equity markets. These capabilities allow us to offer investors capital leverage through global integrated financing, securities lending, structured products and prime brokerage. We provide securities lending services for customers seeking to borrow equities to cover a short selling strategy or to generate additional income by lending securities already owned. Customers may also leverage equity positions with us through the use of customized derivative products and currency-linked transactions. Our financing structures include equity swaps, zero-cost options and repurchase agreements.

*Customers.*   Our Prime Brokerage/Capital Markets customers are primarily institutions, including hedge funds, mutual funds, banks, broker-dealers and other corporate customers. We also serve a growing number of retail foreign exchange investors. All customers are subject to a detailed application process and credit check.

*Competition.*   The primary competitors of our Prime Brokerage/Capital Markets business include affiliates of major commercial and investment banks and independent broker-dealers. Customers value speed of execution, anonymity in trading, low price, customer service and access to a breadth of products.

## Risk Management

### Liquidity Policy

Our execution and clearing of derivatives requires limited working capital because the margin mechanism used by exchanges results in the customers providing the required funding to maintain positions. We maintain excess regulatory capital to provide liquidity during periods of unusual market volatility. Similarly for our brokerage activities in the cash markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures-style margin methodology to protect us against price movements. Additionally, we have adopted a margin style procedure to control customer positions in our foreign exchange business. This account structure has facilitated considerable growth in the volume of business conducted, while maintaining a low risk profile.

### Regulatory Capital

Our primary U.S. regulated entities are Refco, LLC, an FCM, and Refco Securities, LLC, a broker-dealer. Each entity has regulatory capital requirements. As of February 29, 2004, the excess capital for Refco, LLC and Refco Securities, LLC was $95.6 million and $61.9 million, respectively. These figures may change in the future as a result of the introduction of risk adjusted capital rules. See "— Regulation."

81

*Market Risk/Economic Liquidity*

Our risk is credit related risk or risk related to our customers' ability to meet their margin obligations. Because we do not trade speculatively for our own account, we have no direct exposure to market risk volatility or the potential price or liquidity risk that might arise.

*Counterparty Risk Management*

Our current system provides the ability to project the impact of market volatility on price movement. We perform frequent stress tests of our customer positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments. These tests have resulted in minimal losses due to counterparty exposures. We continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer operations. Our risk management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets.

## Technology and Information Systems

Our information technology group supports 14 locations worldwide, including our major management centers in New York, London and Chicago. Our exchange-traded derivatives central processing capacity is located in Memphis, Tennessee with primary backup in Chicago.

Our core exchange-traded derivatives transaction-processing platform has been owned and developed by us since 1979. This system has accommodated our significant growth in recent years, including the integration of significant levels of acquired volume. Our ability to process transactions on a proprietary platform provides us with a strategic advantage by offering significant flexibility and high levels of responsiveness to changing customer and market conditions. Capital markets transaction processing platforms are outsourced. Fixed income prime brokerage and foreign exchange brokerage operations utilize systems developed by third parties.

Customers currently access our global network through both traditional means, i.e., the use of voice brokers, and electronically. For electronic access, we provide third party vendor systems consistent with our focus on transaction processing rather than front-end technology while also offering a proprietary system for our retail customers. An increasing number of these applications are web-enabled. We have developed a web strategy to enhance access to the system and to use our web site as a driver for business development in the form of lead creation. Among the capabilities that can be accessed online are risk management monitoring and access to tools, the account opening process as well as static forms, account statements and position and funds information.

The continued integrity and security of our systems is key to our business. All of our systems have off-site backups and redundancies. These capabilities have been thoroughly tested, particularly during the events of September 2001 and the blackout of August 2003. In each case and despite the total loss of access to corporate headquarters in New York, our business was comprehensively and effectively redirected to pre-planned alternative locations and operating platforms and services to customers remained essentially uninterrupted.

## Facilities

Our main corporate offices are located in approximately 71,247 square feet of leased office space at One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281-1994. We also lease over 473,000 square feet of additional space throughout North America, Europe and Asia. Our primary management centers are located in Chicago and London and at our New York corporate office. Our exchange-traded derivatives central processing system is run out of a leased facility located

in Memphis, Tennessee. We believe that our leased facilities are adequate to meet anticipated requirements for our current lines of business for the foreseeable future.

## Employees

At May 31, 2004, we had approximately 2,250 employees, excluding our Asset Management business. Approximately 1,500 of our employees are located in the United States. At the present time, no employees are represented by unions, and we believe our relations with our employees are satisfactory.

## Regulation

Most aspects of our business are subject to stringent regulation by U.S. federal and state regulatory agencies and derivatives and securities exchanges and by non-U.S. government agencies or regulatory bodies and exchanges. New laws or regulations or changes to existing laws and regulations (including changes in interpretation or enforcement) could materially adversely affect our financial condition or results of operations. As a global financial institution, to the extent that different regulatory regimes impose inconsistent or iterative requirements on the conduct of our business, we will face complexity and additional costs in our compliance efforts.

As an FCM, Refco, LLC's activities are regulated by the CFTC and the exchanges of which it is a member. Certain other subsidiaries are registered with the CFTC as commodity trading advisors and commodity pool operators. Refco, LLC's business is also regulated by the NFA of which Refco, LLC and certain of its affiliates are members. Violations of the rules of the CFTC, the NFA or the exchanges could result in remedial actions including fines, registration terminations or revocations of exchange memberships.

Refco Securities, LLC is registered as a broker-dealer with the SEC and in all 50 states, the District of Columbia and Puerto Rico and is a member of self-regulatory organizations, including the NASD and certain exchanges, including the CBOE. Broker-dealers are subject to regulations covering all aspects of the securities business, including sales and trading practices, public offerings, publication of research reports, use of customers' funds and securities, capital structure, record keeping and the conduct of directors, managers, officers and employees. Broker-dealers are also regulated by securities administrators in those states where they do business. Violations of regulations governing a broker-dealer's actions could result in censure, fine, the issuance of cease-and-desist orders, the suspension or expulsion from the securities industry of such broker-dealer or its officers or employees, or other similar consequences.

Margin lending by certain broker-dealer subsidiaries is regulated by the Federal Reserve Board's restrictions on lending in connection with customer purchases and short sales of securities, and NASD rules also require such subsidiaries to impose maintenance requirements on the value of securities contained in margin accounts. In many cases, our margin policies are more stringent than these rules.

We conduct some of our government securities activities through Refco Securities, LLC, an NASD member registered as a government securities broker-dealer with the SEC and in certain states. The Department of Treasury has promulgated regulations concerning, among other things, capital adequacy, custody and use of government securities and transfers and control of governmental securities subject to repurchase transactions. The rules of the Municipal Securities Rulemaking Board, which are enforced by the NASD, govern the municipal securities activities of Refco Securities, LLC.

As a registered broker-dealer, Refco Securities, LLC is subject to the SEC's and NASD's net capital rules, and, as an FCM, Refco, LLC is subject to the net capital requirements of the CFTC and various exchanges. Many non-U.S. securities exchanges and regulatory authorities also have imposed rules relating to capital requirements applicable to our non-U.S. subsidiaries. These rules, which specify

minimum capital requirements, are designed to measure general financial integrity and liquidity and require that at least a minimum amount of assets be kept in relatively liquid form. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million, which was 18.3% of aggregate debit balance and $67.5 million in excess of required net capital. Refco, LLC, is required to maintain net capital equal to the greater of 4% of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined, or the sum of 8% of the customer risk maintenance margin requirement puts 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital.

Compliance with the capital requirements may limit our operations requiring the intensive use of capital. Such requirements restrict our ability to withdraw capital from our subsidiaries, which in turn may limit our ability to pay dividends or repay debt. Any change in such rules or the imposition of new rules affecting the scope, coverage, calculation or amount of capital requirements, or a significant operating loss or any unusually large charge against capital, could adversely affect our ability to pay dividends or to expand or maintain present business levels.

The USA PATRIOT Act of 2001 (the "PATRIOT Act") contains anti-money laundering and financial transparency laws and mandates the implementation of various new regulations applicable to FCMs, broker-dealers and other financial services companies, including standards for verifying customer identification at account opening and obligations to monitor customer transactions and detect and report suspicious activities to the government. Institutions subject to the PATRIOT Act must implement specialized employee training programs, designate an anti-money laundering compliance officer and submit to independent audits of the effectiveness of the compliance program. Anti-money laundering laws outside the United States contain similar provisions. We have established policies, procedures and systems designed to comply with these regulations.

Our securities and futures businesses are also regulated extensively by non-U.S. governments, exchanges, self-regulatory organizations, central banks and regulatory bodies, especially in those jurisdictions in which one of our subsidiaries maintains an office. For instance, the Financial Services Authority, LIFFE and Euronext.liffe regulate the activities of Refco Overseas Limited in the United Kingdom. Other subsidiaries are also subject to regulation by securities, banking and finance regulatory authorities, exchanges and other self-regulatory organizations in numerous other countries in which they do business.

## Legal Proceedings

### Tradewinds

On April 1, 1999, Tradewinds Financial Corporation, Tradewinds Debt Strategies Fund, L.P., Tradewinds Offshore Fund, Limited, Tradewinds Clipper Fund Ltd. and Tradewinds Secured Debt Fund (collectively, "Tradewinds") filed an action against Refco Securities, Inc., Refco Capital Markets, Ltd. and Martin Loftus (collectively, "Refco") in the U.S. District Court for the Southern District of New York, alleging, among other things, that Refco breached a customer agreement governing certain margin accounts by requiring Tradewinds to increase the value of collateral securing a margin loan from 60% to 100% in September 1998. Upon the completion of discovery, the parties stipulated that the court lacked jurisdiction over Tradewinds' claims and the case was dismissed. Tradewinds refiled the

action in the Supreme Court of the State of New York. On March 27, 2002, Refco filed a motion for summary judgment. On September 15, 2003, the court granted in part Refco's motion, dismissing six of the seven claims asserted against Refco. The court reserved for trial before a jury Tradewinds' claim that Refco's actions breached the implied contractual duty of good faith and fair dealing. On March 16, 2004, the Appellate Division of the First Department of the State of New York affirmed the decision of the trial court in all respects. In June 2004, the sole remaining claim was tried before a jury. On June 17, 2004, the jury returned a verdict in favor of Tradewinds on the liability issue submitted to it by the trial judge.

Refco believes it has meritorious grounds upon which to overturn the jury's verdict and intends to file post-trial motions asking the trial court to set aside that verdict. If those motions are not granted, Refco intends to appeal. If the jury's verdict is not set aside, a separate trial would be held to determine damages. Tradewinds has indicated that it plans to seek $45 million in damages. Refco believes (and, should a damages trial be held, will present evidence and arguments seeking to demonstrate) that Tradewinds' damages claims greatly overstate the amounts that could be recovered by Tradewinds under applicable law even if the jury's liability verdict were ultimately sustained.

At this time, it is not possible to predict the final outcome of this proceeding with certainty.

### SEC Investigation

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation. The SEC requested that we produce documents relating to any of our accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock and other transactions. In 2002 and 2003, we received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of our former brokers who handled the account of Amro International, S.A., one of our former customers that engaged through its account with us in short sales of Sedona stock and whose financial advisor settled SEC charges with respect to such short sales in February 2003; our relationship with Amro and its two principals; other securities traded by Amro; and our record keeping, supervisory and short sale policies and restrictions. Although there were issues previously raised by the SEC with respect to document production and retention by us, we believe that we have now substantially complied with those subpoenas and requests. In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the SEC. In addition to producing documents in response to the foregoing subpoenas, we have made our employees available to testify before the SEC and to be interviewed by the U.S. Attorneys' office. Refco Securities, LLC has been advised that it is not currently the subject of the U.S. Attorneys' investigation. At the present time, it is not possible to predict the outcome of the foregoing investigations with certainty.

### Other

In addition to the matters discussed above, from time to time, we are party to litigation and administrative proceedings that arise in the ordinary course of our business. We do not have any other pending litigation that, separately or in the aggregate, would in the opinion of management have a material adverse effect on our results of operations or financial condition.

85

MANAGEMENT

**Managers and Executive Officers**

As of October 12, 2004, our executive officers and managers and their respective ages and positions are as follows:

| Name | Age | Position |
|------|-----|----------|
| Phillip R. Bennett | 56 | President, Chief Executive Officer and Chairman |
| Joseph J. Murphy | 44 | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC |
| William M. Sexton | 39 | Executive Vice President and Chief Operating Officer |
| Santo C. Maggio | 53 | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC |

*Phillip R. Bennett* has served as our President and Chief Executive Officer since September 1998. He also serves as the President of Refco Capital Holdings, LLC. Mr. Bennett joined us in 1981 from The Chase Manhattan Bank, where he held various positions involving credit and commercial lending in New York, Toronto, Brussels and London from 1970 to 1981. Among other positions at Chase, Mr. Bennett served as a member of its Commodity Lending Department. He is a graduate of Cambridge University, England.

*Joseph J. Murphy* has served as President of Refco Global Futures, LLC since March 1999. He also serves as our Executive Vice President responsible for global marketing. From 1994 to 1999, Mr. Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Mr. Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation in New York. He also held management positions in the Treasury Department of The Chase Manhattan Bank. Mr. Murphy holds a degree from Providence College located in Providence, Rhode Island. His professional affiliations include memberships with the CBOT and CME. Mr. Murphy is a member of the Board of Directors and Vice Chairman of the FIA and a member of the Board of Governors and Vice Chairman of the Clearing Corp.

*William M. Sexton* has served as our Executive Vice President and Chief Operating Officer since July 2002. He joined us in April 1999. He is responsible for information technology, operations, accounting and finance, credit, margins and risk for our futures businesses. From 1991 to 1997, Mr. Sexton served in various capacities at The Chase Manhattan Bank, including the financial controller for the U.S. FCM, institutional sales for marketing derivatives, foreign exchange and treasury products. Mr. Sexton holds a B.S. in Business Administration from Pace University and an M.B.A. from Fordham University, both with concentrations in finance. He is a member of the NFA. He is also a member of the FIA @ Markets Division Board of Directors, the NYMEX FCM Advisory Committee, the FIA Operations and Technology Divisions and is a member of the Board of Directors of Eurex U.S.

*Santo C. Maggio* has served as our Executive Vice President and President and Chief Executive Officer of Refco Securities, LLC, our NASD broker-dealer, since 2001. Mr. Maggio has also served as President of Refco Capital Markets, Ltd. since 1991. He joined us in 1985. From 1976 to 1982, Mr. Maggio was employed as Vice President of Inland Consultants Corporation and from 1982 to 1985 as Vice President for McMahan Securities. Mr. Maggio holds an accounting degree from Hunter College, City University of New York.

Except as described under "Certain Relationships and Related Transactions—Securityholders Agreement," there are no arrangements or understandings between any member of the management committee or executive officer and any other person pursuant to which that person was elected or appointed to his position.

**Executive Compensation**

The following table sets forth information concerning the compensation of our chief executive officer and each of our four most highly compensated executive officers during each of the last three fiscal years. The bonuses set forth below include amounts earned in the year shown but paid in the subsequent year.

### Summary Compensation Table

| Name and Principal Position | Fiscal Year | Annual Compensation | | Other Annual Compensation ($) | Total Compensation ($) |
|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($) | | |
| Phillip R. Bennett President, Chief Executive Officer and Chairman | 2004 | 1,500,000 | 2,469,000 | 444,840(1) | 4,413,840 |
| | 2003 | 1,500,000 | 2,196,000 | 500,692 | 4,196,692 |
| | 2002 | 1,000,000 | 2,380,000 | 394,103(1) | 3,774,103 |
| | | | | (1) | |
| Robert C. Trosten (2) Executive Vice President and Chief Financial Officer | 2004 | 1,000,000 | 2,139,000 | — | 3,139,000 |
| | 2003 | 1,000,000 | 1,838,000 | — | 2,838,000 |
| | 2002 | 500,000 | 1,700,000 | — | 2,200,000 |
| Joseph J. Murphy Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC | 2004 | 1,000,000 | 1,920,000 | — | 2,920,000 |
| | 2003 | 1,000,000 | 1,640,000 | — | 2,640,000 |
| | 2002 | 600,000 | 1,250,000 | — | 1,850,000 |
| Santo C. Maggio Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC | 2004 | 500,000 | 1,252,000 | — | 1,752,000 |
| | 2003 | 500,000 | 1,084,000 | — | 1,584,000 |
| | 2002 | 500,000 | 985,000 | — | 1,485,000 |
| William M. Sexton Executive Vice President and Chief Operating Officer | 2004 | 500,000 | 960,000 | — | 1,460,000 |
| | 2003 | 500,000 | 820,000 | — | 1,320,000 |
| | 2002 | 400,000 | 400,000 | — | 800,000 |

(1) Consists of premiums for term life insurance and includes an amount equal to the payment to Mr. Bennett to compensate him for the incremental tax impact associated with the payment of the premium.

(2) Mr. Trosten resigned as our Executive Vice President and Chief Financial Officer in October 2004.

**Compensation Committee Interlocks and Insider Participation**

The compensation arrangements for our chief executive officer and each of our executive officers was established pursuant to the terms of the respective employment agreements between us and each executive officer. The terms of the employment agreements were established pursuant to arms-length negotiations between us and each executive officer.

**Board of Managers Compensation**

All members of our board of managers are reimbursed for their usual and customary expenses incurred in connection with attending all board and other committee meetings.

**Management Investment**

Phillip Bennett, through his continuing ownership interest in Refco Group Holdings, Inc., rolled over an approximate \$353.6 million equity investment into the common equity interests of our parent, New Refco. Messrs. Sexton, Murphy and Maggio made investments of \$1.0 million, \$500,000 and \$250,000, respectively, in the common equity interests of New Refco.

87

**Employment Agreements**

*Phillip Bennett Employment Agreement.*    On June 8, 2004, Phillip Bennett entered into an Executive Employment and Non-Competition Agreement with us that became effective on the date of the closing of the Transactions. Under the agreement, Mr. Bennett serves as our Chairman and Chief Executive Officer and reports directly to our Board of Managers for an initial term ending on February 28, 2007. After such date, Mr. Bennett will continue to serve with an automatic renewal thereafter for additional one year terms, unless either party terminates the agreement in accordance with its provisions.

Under the terms of the agreement, we will pay Mr. Bennett an annual base salary of $1,100,000, and he will be eligible to receive an annual bonus as determined in accordance with our Management Bonus Pool Plan and will be able to participate in equity-based compensation plans, including through the grant of Class B Units pursuant to a Restricted Unit Agreement with us. In certain circumstances, Mr. Bennett's termination will entitle him to a severance package including two years of his base salary and annual bonus at the time of termination. In addition, Mr. Bennett has agreed that during the term of the agreement and for a two year period thereafter (but in no event, less than five years), he will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

*Executive Employment Agreements.*    On the date of the closing of the Transactions, Joseph Murphy, William Sexton and Santo Maggio entered into Executive Employment and Non-Competition Agreements with us. Each of these agreements have substantially identical terms, except for the applicable positions and annual base salary amounts for each employee as described below. Under the agreements, each employee is eligible for an annual bonus to be determined in accordance with the Senior Management Bonus Pool Plan adopted by us and will be able to participate in equity-based compensation plans, including through the grant of Class B Units pursuant to Restricted Unit Agreements entered into with us. The position and initial base salary for each of the employees under the agreements is as listed below:

| Name | Position | Base Salary |
|---|---|---|
| Joseph Murphy | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC | $ 1,000,000 |
| William Sexton | Executive Vice President and Chief Operating Officer | 800,000 |
| Santo Maggio | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC | 675,000 |

Each employee will be entitled to a severance package in certain circumstances, which shall entitle such employee to 18 months of his base salary and annual bonus as of the date of termination. In addition, each employee will agree that during the term of the agreement and for an 18-month period thereafter, such employee will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

The Senior Management Bonus Pool Plan enables participating senior managers to receive bonuses based on our performance. If our actual EBITDA (subject to certain adjustments) for a fiscal year is between 95% and 105% of the budgeted EBITDA for the year, the bonus pool amount to be divided among all participating senior managers generally will be the greater of 100% of the aggregate base compensation of such senior managers or, subject to the cap described below, 2.1% of our actual EBITDA (subject to certain adjustments). The bonus pool amount will be adjusted if actual EBITDA (subject to certain adjustments) is more than 105% or less than 95% of budgeted EBITDA. The aggregate bonus pool amount to be divided among all participating senior managers in any event cannot be greater than 150% of the aggregate base compensation of such senior managers.

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

Refco Finance is a wholly owned subsidiary of Refco Group Ltd., LLC, a limited liability company wholly owned by New Refco, a limited liability company whose members include THL Refco Acquisition Partners and certain of its affiliates, partnerships beneficially owned by Thomas H. Lee Partners, L.P. and its affiliates, and Refco Group Holdings, Inc., a subchapter S corporation that is wholly owned by Phillip R. Bennett.

The following table sets forth certain information regarding the beneficial ownership of New Refco, which owns all of our membership interests, by: (i) each person or entity who owns any class of its outstanding securities and (ii) each person who is a member of its board of managers, each person who is a named executive officer, and such members of its board of managers and executive officers as a group. New Refco outstanding securities consist of approximately 493.69 Class A Units. New Refco has also authorized 50 Class B Units, 18.08 of which are outstanding. The Class B Units have been issued under the Restricted Unit Agreement we entered into with certain members of our management, which will begin to vest on February 28, 2005. See "Certain Relationships and Related Transactions—Restricted Unit Agreement." To our knowledge, each such member has sole voting and investment power as to the units shown unless otherwise noted. Beneficial ownership of the units listed in the table has been determined in accordance with the applicable rules and regulations promulgated under the Exchange Act. Unless otherwise indicated, the address for each holder listed below is c/o Refco Group Ltd., LLC, One World Financial Center, 200 Liberty Street Tower A, New York, New York 10281.

| | Securities Beneficially Owned | |
| --- | --- | --- |
| **Name and Address** | **Number of Class A Units** | **Percentage of Class A Units** |
| **Principal Securityholders:** | | |
| Thomas H. Lee Partners and affiliates(1) | 280.78 | 57% |
| c/o Thomas H. Lee Partners, L.P. | | |
| 100 Federal Street | | |
| Boston, MA 02110 | | |
| | | |
| **Managers and Executive Officers:** | | |
| Phillip R. Bennett(2) | 211.83 | 43% |
| Joseph J. Murphy | 0.28 | * |
| William M. Sexton | 0.55 | * |
| Santo C. Maggio | 0.14 | * |
| David V. Harkins(3) | — | — |
| Scott L. Jaeckel(3) | — | — |
| Thomas H. Lee(3) | — | — |
| Scott A. Schoen(3) | — | — |
| All board of managers members and named executive officers as a group (8 persons) | 212.80 | 43% |

\*      Represents less than 1%

(1)      Includes interests owned by each of THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Refco Acquisition Partners III, Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Putnam Investments Holdings, LLC, Putnam Investments Employees' Securities Company I, LLC, and Putnam Investments Employees' Securities Company II, LLC and certain co-investors who have agreed to vote their interests in favor of nominees of affiliates of THL Refco Acquisition Partners as described under "Certain Relationships and Related Transactions—Securityholders Agreement." THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III are each Delaware general partnerships indirectly owned by Thomas H. Lee Equity Fund V, L.P., Thomas

H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., respectively. Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P. are Delaware limited partnerships, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company. Thomas H. Lee Equity (Cayman) Fund V, L.P. is an exempted limited partnership formed under the laws of the Cayman Islands, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company registered in the Cayman Islands as a foreign company. Thomas H. Lee Advisors, LLC, a Delaware limited liability company, is the general partner of Thomas H. Lee Partners, a Delaware limited partnership, which is the sole member of THL Equity Advisors V, LLC. Thomas H. Lee Investors Limited Partnership (f/k/a THL-CCI Limited Partnership) is a Massachusetts limited partnership, whose general partner is THL Investment Management Corp., a Massachusetts corporation. The 1997 Thomas H. Lee Nominee Trust is a trust with US Bank, N.A. serving as Trustee. Thomas H. Lee, a Managing Director of Thomas H. Lee Advisors, LLC, has voting and investment control over common shares owned of record by the 1997 Thomas H. Lee Nominee Trust. Putnam Investments Holdings LLC, Putnam Investments Employees' Securities Company I, LLC and Putnam Investments Employees' Securities Company II, LLC are co-investment entities of Thomas H. Lee Partners and each disclaims beneficial ownership of any securities other than the securities held directly by such entity. The address for the Putnam entities is One Post Office Square, Boston, MA 02109.

(2)    Refco Group Holdings, Inc. is a Delaware corporation that is wholly owned by Phillip R. Bennett. Through his ownership of Refco Group Holdings, Inc., Phillip R. Bennett beneficially owns approximately 43% of our company.

(3)    Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Company. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as President, a Vice President and a Managing Director, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own Class A Units held of record by THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III. Each of these individuals disclaims beneficial ownership of such units except to the extent of their pecuniary interest therein.

90

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**The Equity Purchase and Contribution Agreement**

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with us, Refco Group Holdings, Inc. and certain other parties, which was amended on July 9, 2004 to, among other things, add New Refco as a party and modify the structure of the transactions contemplated by the agreement. The Purchase Agreement provided for a series of transactions that resulted in New Refco becoming our parent and THL Refco Acquisition Partners and its affiliates and co-investors owning an approximate 57% interest in New Refco.

Upon consummation of the transactions contemplated by the Purchase Agreement, the following transactions occurred:

- THL Refco Acquisition Partners and certain of its affiliates and co-investors purchased a portion of our voting membership interests then held by Refco Group Holdings, Inc., one of two holders of our membership interests at that time, for an amount of cash equal to $508.5 million;

- BAWAG Overseas, Inc., the other holder of our membership interests at that time, merged with and into a wholly owned subsidiary of Refco Group Holdings, Inc., and all of the membership interests acquired in the merger were distributed as a dividend to Refco Group Holdings, Inc.;

- we distributed $500.0 million in cash and all of the equity interests of Forstmann-Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business, to New Refco. New Refco thereafter distributed these assets to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett;

- each outstanding membership interest acquired by Refco Group Holdings, Inc., in connection with the merger of BAWAG Overseas, Inc. with and into a wholly owned subsidiary of Refco Group Holdings, Inc., was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc., in connection with its rollover equity investment, was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc. that was not exchanged for a Class A Unit (as described above) was converted into the right to receive cash equal to the quotient determined by dividing approximately $2.25 billion (subject to certain adjustments), by the total number of our membership interests outstanding immediately prior to the effective time of the contribution;

- each membership interest purchased by THL Refco Acquisition Partners and its affiliates and co-investors was exchanged for one Class A Unit; and

- Refco Finance Holdings LLC merged with and into us, with our company as the surviving entity.

**Limited Liability Company Agreement of New Refco**

The amended and restated limited liability company agreement of New Refco authorizes New Refco to issue Class A and Class B units. The Class A and Class B units generally have identical rights and preferences, except that the Class B Units are nonvoting and have different rights as to certain distributions described below.

Distributions of New Refco's property will be made in the following order:

- first, the holders of Class A Units will receive a return of their invested capital;

- second, the holders of the Class A Units will receive an 8% cumulative preferred return on their invested capital; and

91

- thereafter, holders of the Class A Units and Class B Units will receive pro rata distributions based on the number of units held by the holder.

A board of managers will have the exclusive authority to manage and control New Refco's business and affairs. The board of managers' composition will be determined in accordance with the provisions of the securityholders agreement described below and is more fully described in "Management—Board of Managers Compensation."

## Securityholders Agreement

Pursuant to the securityholders agreement entered into in connection with the Transactions, units of New Refco that are beneficially owned by Refco Group Holdings, Inc., THL Refco Acquisition Partners or any of its affiliates or any limited partners of them so long as THL Refco Acquisition Partners or any of its affiliates maintains voting control over the units held, (collectively, the "THL Holders"), the executive investors and certain of New Refco's other employees and employees of New Refco's subsidiaries, which we refer to as employees, are subject to certain restrictions on transfer, as well as the other provisions described below. When we refer to "units" of New Refco in the following discussion, such reference includes New Refco's common stock following a change in corporate form, whether in preparation for an initial public offering or otherwise.

The securityholders agreement provides that the THL Holders, Refco Group Holdings, Inc., the executive investors, employees and all other parties to the agreement will vote all of their shares to elect and continue in office New Refco's board of managers, initially consisting of eight managers composed of:

- four managers designated by the THL Holders;

- three managers designated by Refco Group Holdings, Inc., one of whom will be Phillip Bennett as long as he is willing and able to serve; and

- one independent manager designated by the THL Holders and Refco Group Holdings, Inc.

The board of managers may be increased to nine and the THL Holders will be entitled to designate an additional manager (for a total of five managers designated by the THL Holders) if New Refco fails to meet certain yearly performance requirements.

The securityholders agreement also provides:

- the THL Holders and Refco Group Holdings, Inc. with a "right of first offer" with respect to transfers of New Refco's units held by any securityholder;

- each securityholder with customary "tag-along" rights with respect to transfers of New Refco's Class A Units;

- the THL Holders with "drag-along" rights with respect to New Refco's units owned by the securityholders in a sale of New Refco;

- the THL Holders, Refco Group Holdings, Inc. and executive investors with customary "preemptive rights";

- the THL Holders and Refco Group Holdings, Inc. with certain registration rights, which require New Refco to register units held by them under the Securities Act; and

- New Refco with certain call rights with respect to Class A Units held by executive investors who are terminated for any reason.

92

Pursuant to the management agreement entered into in connection with the Transactions, THL Managers V, LLC will render to New Refco and each of its subsidiaries certain advisory and consulting services. In consideration of those services, either New Refco or we will pay to THL Managers V, LLC semi-annually, an aggregate per annum management fee equal to the greater of:

- $2.5 million; and

- an amount equal to 1.0% of the consolidated earnings before interest, taxes, depreciation and amortization of New Refco and its subsidiaries for such fiscal year, but before deduction of any such fee.

New Refco also paid THL Managers V, LLC at the closing of the Transactions a transaction advisory fee of $30.0 million.

New Refco also agreed to indemnify THL Managers V, LLC and its affiliates from and against all losses, claims, damages and liabilities arising out of or related to the performance by THL Managers V, LLC of the services pursuant to the management agreement.

## Restricted Unit Agreement

Certain members of management are entitled to receive Class B units pursuant to a Restricted Unit Agreement entered into on the closing date of the Transactions. The Restricted Unit Agreement sets forth the vesting schedule with respect to the restricted Class B Units. One half of the Class B Units will vest ratably at the end of each of the first four fiscal years following the Transactions. The remaining half of the Class B Units will vest, subject to annual performance and catch-up provisions, at the end of each of the first four fiscal years following the Transactions. Vesting of all units is subject to acceleration upon a change of control. Upon the termination of an executive holder, unvested Class B Units will be forfeited to New Refco and vested Class B Units may be repurchased by New Refco at fair market value.

## Escrow Agreement

Pursuant to the escrow agreement, New Refco and THL Refco Acquisition Partners delivered $39,014,313 of the purchase price at the closing to HSBC Bank USA, as escrow agent, to satisfy any earn-out amounts that are to be paid by New Refco after the closing. The escrowed funds were separated into seven separate escrow accounts, each representing a separate earn-out amount.

If an earn-out payment is due by New Refco, the escrow agent will release a portion of the funds from the earn-out account designated on written instructions given by New Refco's chief executive officer. If the escrowed amount in a given earn-out account exceeds the amount of all obligations with respect to a particular earn-out account, then the escrow agent will release the amount of any excess to Refco Group Holdings, Inc. upon joint written instructions signed by the chief executive officer, THL Refco Acquisition Partners and Refco Group Holdings, Inc. If the earn-out amount to be distributed by New Refco exceeds the escrowed amount in the designated earn-out account, then Refco Group Holdings, Inc. will be liable for the deficiency.

## Currenex Fees

Through a joint venture with Putnam Investments, Thomas H. Lee Partners, L.P. has an indirect ownership interest in Currenex, Inc., which is a technology firm that has created an electronic platform for trading currencies. We pay fees to Currenex in connection with the use of its platform.

93

### DESCRIPTION OF CREDIT FACILITIES

**Senior Credit Facilities**

We have entered into senior secured credit facilities with Bank of America, N.A., as administrative agent, swingline lender and l/c issuer, Banc of America Securities LLC, Credit Suisse First Boston, acting through its Cayman Islands Branch and Deutsche Bank Securities Inc. as co-lead arrangers and joint book running managers, Credit Suisse First Boston, acting through its Cayman Islands Branch, as syndication agent, and Deutsche Bank Securities Inc. as documentation agent, and various lenders. Set forth below is a summary of the terms of the senior credit facilities.

The senior credit facilities provide for aggregate borrowings of up to $875.0 million, including:

- a revolving credit facility of up to $75.0 million in revolving credit loans and letters of credit, none of which has been drawn, and

- a term loan facility of $800.0 million, all of which was drawn in connection with the Transactions, with an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase and subject to certain closing conditions.

All revolving loans incurred under the senior credit facilities mature six years from the closing date. The term loan facility matures seven years from the closing date.

The senior credit facilities are secured by, among other things:

- a first priority security interest in substantially all of the assets of our company, New Refco and our non-regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of our, New Refco's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by us or any guarantor and (ii) 65% of the voting stock of each of our and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the senior credit facilities are guaranteed by New Refco and our non-regulated restricted domestic subsidiaries.

Borrowings under the senior credit facilities bear interest at a floating rate, which can be either a LIBOR rate plus an applicable margin or, at the borrower's option, an alternative base rate (defined as the higher of (x) the Bank of America prime rate and (y) the federal funds effective rate, plus one half percent (.50%) per annum) plus an applicable margin. The initial applicable margin for LIBOR loans and alternative base loans under the senior credit facilities is 2.75% and 1.75% per annum, respectively. Commencing six months after the closing date, the applicable margin under the revolving credit facility will be subject to adjustment based on a performance pricing grid. The interest rate payable under the senior credit facilities will increase by 2.00% per annum during the continuance of any payment or bankruptcy event of default.

For LIBOR loans, we may select interest periods of one, two, three or six months and, to the extent available to all lenders, nine or twelve months. Interest will be payable at the end of the selected interest period, but no less frequently than every three months within the selected interest period.

The senior credit facilities also require payment of a commitment fee on the difference between committed amounts and amounts actually borrowed under the revolving credit facility. Prior to the maturity date, funds borrowed under the revolving credit facility may be borrowed, repaid and reborrowed, without premium or penalty.

The term loan facility is subject to amortization in equal quarterly installments of principal as set forth in the table below.

| Year | Term Loan Facility |
|------|--------------------|
| 1 | $    8.0 million |
| 2 | $    8.0 million |
| 3 | $    8.0 million |
| 4 | $    8.0 million |
| 5 | $    8.0 million |
| 6 | $    8.0 million |
| 7 | $  752.0 million |

Voluntary prepayments of principal amounts outstanding under the senior credit facilities are permitted at any time. However, if a prepayment of principal is made with respect to a LIBOR loan on a date other than the last day of the applicable interest period, the lenders will require compensation for any funding losses and expenses incurred as a result of the prepayment.

In addition, mandatory prepayments are required to prepay amounts outstanding under the senior credit facilities in an amount equal to:

• 100% of net cash proceeds from certain asset dispositions by New Refco, us or any of our restricted subsidiaries, subject to certain exceptions and reinvestment provisions and limitations on the remittance of funds by our regulated subsidiaries;

• 100% of the net cash proceeds from the issuance or incurrence after the closing date of any additional debt by New Refco, us or any of our restricted subsidiaries (excluding certain permitted debt) and subject to limitations on the remittance of funds by our regulated subsidiaries;

• 50% (which percentage will be reduced upon the achievement of specified performance targets) of the net cash proceeds from the issuance or sale after the closing date of additional equity by New Refco, us or any of our restricted subsidiaries in a public offering or in a private placement underwritten, managed, arranged, placed or initially purchased by an investment bank, excluding proceeds of equity issuances or sales to certain investors and other customary exceptions and subject to limitations on the remittance of funds by our regulated subsidiaries; and

• 50% (which percentage will be reduced upon the achievement of specified performance targets) of excess cash flow, as defined in the senior credit facilities, subject to certain limitations on the remittance of funds by our regulated subsidiaries.

The senior credit facilities require compliance with a minimum interest coverage ratio and a maximum leverage ratio (subject to an equity cure in specified instances). In addition, the senior credit facilities contain certain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross-defaults to certain other indebtedness in excess of specified amounts, certain events of bankruptcy and insolvency, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

95

**Refco Capital, LLC Credit Facilities**

Through our Refco Capital, LLC subsidiary, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively.

We currently have no outstanding indebtedness under these facilities.

**DESCRIPTION OF THE NOTES**

Refco Group Ltd., LLC and Refco Finance Inc. issued the old notes and will issue the registered notes under an Indenture (the " *Indenture* ") among themselves and Wells Fargo Bank, National Association, as Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The old notes and the registered notes will be identical in all material respects, except for transfer restrictions, registration rights and additional interest payment provisions relating only to the old notes. Accordingly, unless specifically stated to the contrary, the following description applies equally to the old notes and the registered notes. The term "Notes" refers to the old notes, the registered notes and any other notes issued under the Indenture.

Certain terms used in this description are defined under the subheading "—Certain Definitions." In this description, the word " *Company* " refers only to Refco Group Ltd., LLC, but not to any of its subsidiaries. In addition, the terms " *Issuers* ," " *we* ," " *our* " and " *us* " refer collectively to Refco Group Ltd., LLC and Refco Finance Inc.

The following description is only a summary of the material provisions of the Indenture. We urge you to read the Indenture because it, not this description, defines your rights as holders of these Notes. You may request copies of these agreements at our address set forth under the heading "Prospectus Summary—Our Executive Offices."

**Brief Description of the Notes**

These Notes:

- are unsecured senior subordinated obligations of the Issuers;

- are subordinated in right of payment to all existing and future Senior Indebtedness of the Issuers;

- are equal in right of payment to any future Senior Subordinated Indebtedness of the Issuers;

- are senior in right of payment to any future Subordinated Obligations of the Issuers;

- are guaranteed by each Subsidiary Guarantor; and

- are subject to registration with the SEC pursuant to the Registration Rights Agreement.

Refco Finance Inc. has no obligations other than the Notes.

**Principal, Maturity and Interest**

On August 5, 2004, the Issuers issued the old notes in an aggregate principal amount of $600.0 million. The Issuers will issue the Notes in denominations of $1,000 and any integral multiple of $1,000. The Notes will mature on August 1, 2012. Subject to our compliance with the covenant described under the subheading "—Certain Covenants—Limitation on Indebtedness," we are permitted to issue more Notes from time to time under the Indenture in an unlimited principal amount (the " *Additional Notes* "). The old notes, the registered notes and any Additional Notes issued by the Issuers, will be treated as a single class for all purposes of the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context otherwise requires, for all purposes of the Indenture and this "Description of the Notes," references to the Notes include any Additional Notes actually issued.

Interest on these Notes will accrue at the rate of 9% per annum and will be payable semiannually in arrears on February 1 and August 1, commencing on February 1, 2005. We will make each interest payment to the holders of record of these Notes on the immediately preceding January 15 and July 15. We will pay interest on overdue principal at 1% per annum in excess of the above rate and will pay interest on overdue installments of interest at such higher rate to the extent lawful.

97

Interest on these Notes will accrue from the date of original issuance. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Additional interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement.

## Optional Redemption

Except as set forth below, we will not be entitled to redeem the Notes at our option prior to their Stated Maturity.

On and after August 1, 2008, we will be entitled at our option to redeem all or a portion of these Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed in percentages of principal amount on the redemption date), plus accrued and unpaid interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period commencing on August 1 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2008 | 104.500% |
| 2009 | 102.250% |
| 2010 and thereafter | 100.000% |

Prior to August 1, 2007, we will be entitled at our option on one or more occasions to redeem Notes in an aggregate principal amount not to exceed the sum of 35% of the aggregate principal amount of the Notes originally issued on the Issue Date plus 100% of the aggregate principal amount of any Additional Notes issued, at a redemption price (expressed as a percentage of principal amount) of 109.000%, plus accrued and unpaid interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), with the Net Cash Proceeds from one or more Designated Offerings ( *provided* that if the Designated Offering is an offering by Parent, a portion of the Net Cash Proceeds thereof equal to the amount required to redeem any such Notes is contributed to the equity capital of the Company); *provided, however* , that

(1)    at least 65% of the aggregate principal amount of Notes originally issued on the Issue Date remains outstanding immediately after the occurrence of each such redemption (other than Notes held, directly or indirectly, by the Company or its Affiliates); and

(2)    each such redemption occurs within 90 days after the date of the related Designated Offering.

Prior to August 1, 2008, we will be entitled at our option to redeem all, but not less than all, of the Notes at a redemption price equal to 100% of the principal amount of the Notes plus the Applicable Premium as of, and accrued and unpaid interest to, the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date). Notice of such redemption must be mailed by first-class mail to each Holder's registered address not less than 30 nor more than 60 days prior to the redemption date.

" *Applicable Premium* " means, with respect to a Note at any redemption date, the excess of (A) the present value at such redemption date of (i) the redemption price of such Note on August 1, 2008 (such redemption price being described in the second paragraph in this "—Optional Redemption" section exclusive of any accrued interest) plus (ii) all required remaining scheduled interest payments due on such Note through August 1, 2008 (but excluding accrued and unpaid interest to the redemption date), computed using a discount rate equal to the Adjusted Treasury Rate, over (B) the principal amount of such Note on such redemption date.

98

" *Adjusted Treasury Rate* " means, with respect to any redemption date, (1) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519)" or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded U.S. Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after August 1, 2008, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined and the Adjusted Treasury Rate shall be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per year equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date, in each case calculated on the third Business Day immediately preceding the redemption date, plus 0.50%.

" *Comparable Treasury Issue* " means the U.S. Treasury security selected by the Quotation Agent as having a maturity comparable to the remaining term of the Notes from the redemption date to August 1, 2008, that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a maturity most nearly equal to August 1, 2008.

" *Comparable Treasury Price* " means, with respect to any redemption date, if clause (2) of the Adjusted Treasury Rate is applicable, the average of three, or such lesser number as is obtained by the Trustee, Reference Treasury Dealer Quotations for such redemption date.

" *Quotation Agent* " means the Reference Treasury Dealer selected by the Trustee after consultation with the Company.

" *Reference Treasury Dealer* " means Credit Suisse First Boston LLC and its successors and assigns and two other nationally recognized investment banking firms selected by the Company that are primary U.S. government securities dealers.

" *Reference Treasury Dealer Quotations* " means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Trustee, of the bid and asked prices for the Comparable Treasury Issue, expressed in each case as a percentage of its principal amount, quoted in writing to the Trustee by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day immediately preceding such redemption date.

**Selection and Notice of Redemption**

If we are redeeming less than all the Notes at any time, the Trustee will select Notes on a *pro rata* basis to the extent practicable.

We will redeem Notes of $1,000 or less in whole and not in part. We will cause notices of redemption to be mailed by first-class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. Notices of redemption may not be conditional, except in connection with a Change of Control Offer in advance of a Change of Control.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount thereof to be redeemed. We will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancelation of the original Note. Notes called for redemption become due on the date fixed for

99

redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption.

## Mandatory Redemption; Offers to Purchase; Open Market Purchases

We are not required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, we may be required to offer to purchase Notes as described under the captions "—Change of Control" and "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock." We may at any time and from time to time purchase Notes in the open market, tender offers, negotiated transactions or otherwise.

## Guaranties

The Subsidiary Guarantors jointly and severally Guarantee, on a senior subordinated basis, our obligations under these Notes. The Subsidiary Guarantors consist of all domestic Subsidiaries that are not Regulated Subsidiaries or subsidiaries thereof. For additional information regarding the net income of the non-guarantor subsidiaries, see Note O to our audited consolidated financial statements and Note I to our unaudited consolidated financial statements included elsewhere in this prospectus.

The obligations of each Subsidiary Guarantor under its Subsidiary Guaranty will be limited as necessary to prevent that Subsidiary Guaranty from constituting a fraudulent conveyance under applicable law. See "Risk Factors—Risks Related to the Exchange Offer and the Notes—Federal and state fraudulent transfer laws permit a court to void the notes and the guarantees, and if that occurs, you may not receive any payments on the notes." Each Subsidiary Guarantor that makes a payment under its Subsidiary Guaranty will be entitled upon payment in full of all Guarantees under the Indenture to a contribution from each other Subsidiary Guarantor in an amount equal to such other Subsidiary Guarantor's *pro rata* portion of such payment based on the respective net assets of all the Subsidiary Guarantors at the time of such payment determined in accordance with GAAP.

If a Subsidiary Guaranty were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the applicable Subsidiary Guarantor, and, depending on the amount of such indebtedness, a Subsidiary Guarantor's liability on its Subsidiary Guaranty could be reduced to zero. See "Risk Factors—Risks Related to the Exchange Offer and the Notes—Your right to receive payments on the notes will be subordinated to the borrowings under our senior credit facilities and possibly all of our future borrowings. Further, the guarantees of the notes are junior to all of the guarantors' existing senior indebtedness and possibly to all the guarantors' future borrowings."

Pursuant to the Indenture, (A) a Subsidiary Guarantor may consolidate with, merge with or into, or transfer all or substantially all its assets to any other Person to the extent described below under "—Certain Covenants—Merger and Consolidation," and (B) the Capital Stock of a Subsidiary Guarantor may be sold or otherwise disposed of to another Person to the extent described below under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock;" *provided, however* , that, in the case of a consolidation, merger or transfer of all or substantially all the assets of such Subsidiary Guarantor, if such other Person is not the Company or a Subsidiary Guarantor, such Subsidiary Guarantor's obligations under its Subsidiary Guaranty must be expressly assumed by such other Person, except that such assumption will not be required in the case of:

(1)     the sale or other disposition (including by way of consolidation or merger) of a Subsidiary Guarantor, including the sale or disposition of Capital Stock of a Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a Subsidiary; or

(2)     the sale or other disposition of all or substantially all the assets of a Subsidiary Guarantor;

100

in each case in compliance with the applicable provisions of the Indenture. Upon any sale or disposition described in clause (1) or (2) above, the obligor on the related Subsidiary Guaranty will be released from its obligations thereunder.

The Subsidiary Guaranty of a Subsidiary Guarantor also will be released:

(1)     upon the designation of such Subsidiary Guarantor as an Unrestricted Subsidiary;

(2)     at such time as such Subsidiary Guarantor does not have any Indebtedness outstanding that would have required such Subsidiary Guarantor to enter into a Guaranty Agreement pursuant to the covenant described under "—Certain Covenants—Future Guarantors;" or

(3)     if we exercise our legal defeasance option or our covenant defeasance option as described under "—Defeasance," or if our obligations under the Indenture are discharged in accordance with the terms of the Indenture.

## Ranking

*Senior Indebtedness versus Notes*

The payment of the principal of, premium, if any, and interest on the Notes and the payment of any Subsidiary Guaranty will be subordinate in right of payment to the prior payment in full of all Senior Indebtedness of the Issuers or the relevant Subsidiary Guarantor, as the case may be.

As of May 31, 2004, after giving *pro forma* effect to the Transactions:

(1)     the Company's Senior Indebtedness would have been approximately $800.0 million, all of which would have been Secured Indebtedness;

(2)     the Subsidiary Guarantors would have had no Senior Indebtedness or Secured Indebtedness, excluding inter-company debt and Guarantees under the Credit Agreement; and

(3)     Refco Finance Inc. would have had no Senior Indebtedness.

Although the Indenture contains limitations on the amount of additional Indebtedness that the Issuers and the Subsidiary Guarantors may incur, under certain circumstances the amount of such Indebtedness could be substantial and, in any case, such Indebtedness may be Senior Indebtedness. See "—Certain Covenants—Limitation on Indebtedness."

*Liabilities of Subsidiaries versus Notes*

All of our operations are conducted through our subsidiaries. Most of our subsidiaries (including all our Regulated Subsidiaries and Foreign Subsidiaries) are not Guaranteeing the Notes, and, as described above under "—Guaranties," Subsidiary Guaranties may be released under certain circumstances. In addition, our future subsidiaries may not be required to Guarantee the Notes. Claims of creditors of any non-guarantor subsidiaries (including all our Regulated Subsidiaries and Foreign Subsidiaries), including trade creditors holding indebtedness or guarantees issued by such non-guarantor subsidiaries, and claims of preferred equityholders of such non-guarantor subsidiaries generally will have priority with respect to the assets and earnings of such non-guarantor subsidiaries over the claims of our creditors, including holders of the Notes, even if such claims do not constitute Senior Indebtedness. Accordingly, the Notes will be effectively subordinated to creditors (including trade creditors) and preferred equityholders, if any, of such non-guarantor subsidiaries.

On a pro forma basis, after giving effect to the Transactions, our subsidiaries (other than the Subsidiary Guarantors) would have had significant liabilities, all of which, as of May 31, 2004, related to our customer financing arrangements. See our unaudited pro forma consolidated balance sheet as of May 31, 2004 and Note I to our unaudited consolidated financial statements included elsewhere in this prospectus. Although the Indenture limits the incurrence of Indebtedness and the issuance of preferred equity by certain of our subsidiaries, such limitation is subject to a number of significant qualifications.

Moreover, the Indenture does not impose any limitation on the incurrence by such subsidiaries of liabilities that are not considered Indebtedness under the Indenture. See "—Certain Covenants—Limitation on Indebtedness."

*Other Senior Subordinated Indebtedness versus Notes*

Only Indebtedness of the Issuers or a Subsidiary Guarantor that is Senior Indebtedness will rank senior in right of payment to the Notes and the relevant Subsidiary Guaranty in accordance with the provisions of the Indenture. The Notes and each Subsidiary Guaranty will in all respects rank *pari passu* with all other Senior Subordinated Indebtedness of the Issuers and the relevant Subsidiary Guarantor, respectively.

We and the Subsidiary Guarantors have agreed in the Indenture that we and they will not Incur any Indebtedness that is subordinate or junior in right of payment to our Senior Indebtedness or the Senior Indebtedness of such Subsidiary Guarantors, unless such Indebtedness is Senior Subordinated Indebtedness of the Issuers or the Subsidiary Guarantors, as applicable, or is expressly subordinated in right of payment to Senior Subordinated Indebtedness of the Issuers or the Subsidiary Guarantors, as applicable. The Indenture does not treat (1) unsecured Indebtedness as subordinated or junior to Secured Indebtedness merely because it is unsecured or (2) Senior Indebtedness as subordinated or junior to any other Senior Indebtedness merely because it has a junior priority with respect to the same collateral.

*Payment of Notes*

We are not permitted to pay principal of, premium, if any, or interest on the Notes or make any deposit pursuant to the provisions described under "—Defeasance" below and may not purchase, redeem or otherwise retire any Notes (collectively, " *pay the Notes* ") (except in the form of Permitted Junior Securities) if either of the following occurs (a " *Payment Default* "):

(1)     any Obligation on any Designated Senior Indebtedness of the Issuers is not paid in full in cash when due; or

(2)     any other default on Designated Senior Indebtedness of the Issuers occurs and the maturity of such Designated Senior Indebtedness is accelerated in accordance with its terms;

unless, in either case, the Payment Default has been cured or waived and any such acceleration has been rescinded, or such Designated Senior Indebtedness has been paid in full in cash. Regardless of the foregoing, we are permitted to pay the Notes if we and the Trustee receive written notice approving such payment from the Representatives of all Designated Senior Indebtedness with respect to which the Payment Default has occurred and is continuing.

During the continuance of any default (other than a Payment Default) with respect to any Designated Senior Indebtedness of the Issuers pursuant to which the maturity thereof may be accelerated without further notice (except such notice as may be required to effect such acceleration) or the expiration of any applicable grace periods, we are not permitted to pay the Notes (except in the form of Permitted Junior Securities) for a period (a " *Payment Blockage Period* ") commencing upon the receipt by the Trustee (with a copy to us) of written notice (a " *Blockage Notice* ") of such default from a Representative of Designated Senior Indebtedness specifying an election to effect a Payment Blockage Period and ending 179 days thereafter. The Payment Blockage Period will end earlier if such Payment Blockage Period is terminated:

(1)     by written notice to the Trustee and us from the Person or Persons who gave such Blockage Notice;

(2)     because the default giving rise to such Blockage Notice is cured, waived or otherwise no longer continuing; or

102

(3)    because such Designated Senior Indebtedness has been discharged or repaid in full in cash.

Notwithstanding the provisions described above, unless the holders of such Designated Senior Indebtedness or a Representative of such Designated Senior Indebtedness have accelerated the maturity of such Designated Senior Indebtedness, we are permitted to resume paying the Notes after the end of such Payment Blockage Period. The Notes shall not be subject to more than one Payment Blockage Period in any consecutive 360-day period irrespective of the number of defaults with respect to Designated Senior Indebtedness of an Issuer during such period.

Upon any payment or distribution of the assets of an Issuer upon a total or partial liquidation or dissolution or reorganization of, or similar proceeding relating to, such Issuer or its property:

(1)    the holders of Senior Indebtedness of the applicable Issuer will be entitled to receive payment in full in cash of such Senior Indebtedness before the holders of the Notes are entitled to receive any payment;

(2)    until the Senior Indebtedness of the applicable Issuer is paid in full in cash, any payment or distribution to which holders of the Notes would be entitled but for the subordination provisions of the Indenture will be made to holders of such Senior Indebtedness as their interests may appear, except that holders of the Notes may receive Permitted Junior Securities; and

(3)    if a distribution is made to holders of the Notes that, due to the subordination provisions of the Indenture, should not have been made to them, such holders of the Notes are required to hold it in trust for the holders of Senior Indebtedness of the applicable Issuer and pay it over to them as their interests may appear.

The subordination and payment blockage provisions described above will not prevent a Default from occurring under the Indenture upon the failure of an Issuer to pay interest or principal with respect to the Notes when due by their terms. If payment of the Notes is accelerated because of an Event of Default, the Company or the Trustee must promptly notify the holders of Designated Senior Indebtedness of the Issuers or the Representatives of such Designated Senior Indebtedness of the acceleration.

A Subsidiary Guarantor's obligations under its Subsidiary Guaranty are senior subordinated obligations. As such, the rights of Noteholders to receive payment by a Subsidiary Guarantor pursuant to its Subsidiary Guaranty will be subordinated in right of payment to the rights of holders of Senior Indebtedness of such Subsidiary Guarantor. The terms of the subordination and payment blockage provisions described above with respect to the Issuers' obligations under the Notes apply equally to a Subsidiary Guarantor and the obligations of such Subsidiary Guarantor under its Subsidiary Guaranty.

By reason of the subordination provisions contained in the Indenture, in the event of a liquidation or insolvency proceeding, creditors of an Issuer or a Subsidiary Guarantor who are holders of Senior Indebtedness of an Issuer or a Subsidiary Guarantor, as the case may be, may recover more, ratably, than the Holders of the Notes, and creditors of the Issuers or a Subsidiary Guarantor who are not holders of Senior Indebtedness may recover less, ratably, than holders of Senior Indebtedness of the Issuers or a Subsidiary Guarantor and may recover more, ratably, than the Holders of the Notes.

The terms of the subordination provisions described above will not apply to payments from money or the proceeds of U.S. Government Obligations held in trust by the Trustee for the payment of principal of and interest on the Notes pursuant to the provisions described under "—Defeasance."

## Book-Entry, Delivery and Form

The Notes initially will be represented by one or more global notes in registered form without interest coupons (the "*Global Notes*"). The Global Notes will be deposited upon issuance with the Trustee as custodian for The Depository Trust Company ("*DTC*"), in New York, New York, and

registered in the name of DTC or its nominee, in each case for credit to an account of a direct or indirect participant in DTC as described below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for Certificated Notes except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of Certificated Notes.

Transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants, which may change from time to time.

*Depositary Procedures*

The following description of the operations and procedures of DTC is provided solely as a matter of convenience. These operations and procedures are solely within the control of the settlement system of DTC and are subject to changes by it. We take no responsibility for these operations and procedures and urge investors to contact DTC or its participants directly to discuss these matters.

DTC has advised us that it is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participating organizations (collectively, the " *participants* ") and to facilitate the clearance and settlement of transactions in those securities between participants through electronic book-entry changes in accounts of its participants. The participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly (collectively, the " *indirect participants* "). Persons who are not participants may beneficially own securities held by or on behalf of DTC only through the participants or the indirect participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the participants and indirect participants.

DTC has also advised us that, pursuant to procedures established by it:

(1)    upon deposit of the Global Notes, DTC will credit the accounts of participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

(2)    ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the participants) or by the participants and the indirect participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Global Notes who are participants in DTC's system may hold their interests therein directly through DTC. Investors in the Global Notes who are not participants may hold their interests therein indirectly through organizations which are participants in such system. All interests in a Global Note may be subject to the procedures and requirements of DTC. The laws of some states require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of participants, which in turn act on behalf of indirect participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, beneficial owners of an interest in the Global Notes will not have Notes registered in their names, will not receive physical delivery of Certificated Notes and will not be considered the registered owners or "Holders" thereof under the Indenture for any purpose.**

Payments in respect of the principal of, and interest, premium and additional interest, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered Holder under the Indenture. Under the terms of the Indenture, the Issuers and the Trustee will treat the Persons in whose names the Notes, including the Global Notes, are registered as the owners of the Notes for the purpose of receiving payments and for all other purposes. Consequently, neither the Issuers, the Trustee nor any agent of the Issuers or the Trustee has or will have any responsibility or liability for:

(1)     any aspect of DTC's records or any participant's or indirect participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any participant's or indirect participant's records relating to the beneficial ownership interests in the Global Notes; or

(2)     any other matter relating to the actions and practices of DTC or any of its participants or indirect participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the Notes (including principal and interest), is to credit the accounts of the relevant participants with the payment on the payment date unless DTC has reason to believe it will not receive payment on such payment date. Each relevant participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the participants and the indirect participants to the beneficial owners of Notes will be governed by standing instructions and customary practices and will be the responsibility of the participants or the indirect participants and will not be the responsibility of DTC, the Trustee or the Issuers. Neither the Issuers nor the Trustee will be liable for any delay by DTC or any of its participants in identifying the beneficial owners of the Notes, and the Issuers and the Trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Transfer Restrictions," transfers between participants in DTC will be effected in accordance with DTC's procedures and will be settled in same-day funds.

DTC has advised the Issuers that it will take any action permitted to be taken by a Holder of Notes only at the direction of one or more participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the Notes as to which such participant or participants has or have given such direction. However, if there is an Event of Default under the Notes, DTC reserves the right to exchange the Global Notes for Certificated Notes, and to distribute such Notes to its participants.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of interests in the Global Notes among participants, it is under no obligation to perform such procedures, and such procedures may be discontinued or changed at any time. Neither the Issuers nor the Trustee nor any of their respective agents will have any responsibility for the performance by DTC or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

105

A Global Note is exchangeable for Certificated Notes if:

(1)     DTC (A) notifies the Issuers that it is unwilling or unable to continue as depositary for the Global Notes or (B) has ceased to be a clearing agency registered under the Exchange Act and, in each case, a successor depositary is not appointed; or

(2)     there has occurred and is continuing a Default with respect to the Notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the Trustee by or on behalf of DTC in accordance with the Indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Transfer Restrictions," unless that legend is not required by applicable law.

*Exchange of Certificated Notes for Global Notes*

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Notes. See "Transfer Restrictions."

*Same Day Settlement and Payment*

The Issuers will make payments in respect of the Notes represented by the Global Notes (including principal, interest and premium and additional interest, if any) by wire transfer of immediately available funds to the accounts specified by the Global Note Holder. The Issuers will make all payments of principal, interest and premium and additional interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the Holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such Holder's registered address. The Notes represented by the Global Notes are expected to be eligible to trade in PORTAL and to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. The Issuers expect that secondary trading in any Certificated Notes will also be settled in immediately available funds.

## Change of Control

Upon the occurrence of any of the following events (each a "*Change of Control*"), each Holder shall have the right to require that the Issuers repurchase such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date):

(1)     the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, written notice or otherwise) that any "person" or "group" (as such terms are used in Sections 13(d) or 14(d) of the Exchange Act), other than one or more Permitted Holders, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company; *provided, however* , that for the purposes of this clause (1), such other Person shall be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "parent entity"), if such other Person is the beneficial owner (as defined

above in this clause (1), directly or indirectly of more than 50% of the voting power of the Voting Stock of such parent entity;

(2)       individuals who on the Acquisition Date constituted the Governing Board of the Company or Parent (together with any new members of such Governing Board whose election by such Governing Board of the Company or Parent or whose nomination for election by the members or shareholders of the Company or Parent, as the case may be, was approved by (a) a vote of a majority of the members of such Governing Board of the Company or Parent, as the case may be, then still in office who were either directors or other members of the Governing Board on the Issue Date or whose election or nomination for election was previously so approved or (b) the Permitted Holders acting in accordance with the Securityholders Agreement) cease for any reason to constitute a majority of the Governing Board of the Company or Parent then in office;

(3)       the adoption of a plan relating to the liquidation or dissolution of the Company;

(4)       other than the Merger, the merger or consolidation of Parent or the Company with or into another Person or the merger of another Person with or into Parent or the Company, or the sale of all or substantially all the assets of Parent or the Company (determined on a consolidated basis) to another Person other than (i) a transaction in which the survivor or transferee is a Person that is controlled by the Permitted Holders or (ii) a transaction following which (A) in the case of a merger or consolidation transaction, holders of securities that represented 100% of the Voting Stock of Parent or the Company immediately prior to such transaction (or other securities into which such securities are converted as part of such merger or consolidation transaction) own directly or indirectly at least a majority of the voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction immediately after such transaction and in substantially the same proportion as before the transaction and (B) in the case of a sale of assets transaction, each transferee becomes a Subsidiary Guarantor and a Subsidiary of the transferor of such assets; or

(5)       the Company ceases to own beneficially or of record, all the Capital Stock of Refco Finance Inc.

In no event will the Transactions result in a Change of Control.

Within 30 days following any Change of Control, we will mail a notice to each Holder with a copy to the Trustee (the "*Change of Control Offer*") stating:

(1)       that a Change of Control has occurred and that such Holder has the right to require us to purchase such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase, plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest on the relevant interest payment date);

(2)       the circumstances and relevant facts regarding such Change of Control;

(3)       the purchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(4)       the instructions, as determined by us, consistent with the covenant described hereunder, that a Holder must follow in order to have its Notes purchased.

We will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all Notes validly tendered and not withdrawn under such Change of Control

Offer. A Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement for the Change of Control is in place at the time of the making of the Change of Control Offer.

We will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the covenant described hereunder, we will comply with the applicable securities laws and regulations and shall not be deemed to have breached our obligations under the covenant described hereunder by virtue of our compliance with such securities laws or regulations.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of the Company and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between the Company and the initial purchasers. We have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to do so in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to Incur additional Indebtedness are contained in the covenant described under "—Certain Covenants—Limitation on Indebtedness." Such restrictions can only be waived with the consent of the holders of a majority in principal amount of the Notes then outstanding. Except for the limitations contained in such covenant, however, the Indenture will not contain any covenants or provisions that may afford holders of the Notes protection in the event of a highly leveraged transaction.

The Credit Agreement prohibits us from purchasing any Notes and also provides that the occurrence of certain change of control events with respect to the Company would constitute a default thereunder. In the event that at the time of such Change of Control the terms of any Senior Indebtedness (including the Credit Agreement) restrict or prohibit the purchase of Notes following such Change of Control, and we do not repay such Senior Indebtedness or obtain the requisite consents under the agreements governing such Indebtedness to permit the repurchase of the Notes, we will remain prohibited from purchasing Notes. In such case, our failure to comply with the foregoing undertaking, after appropriate notice and lapse of time, would result in an Event of Default under the Indenture, which would, in turn, constitute a default under the Credit Agreement. In such circumstances, the subordination provisions in the Indenture would likely restrict payment to the Holders of Notes.

Future indebtedness that we may incur may contain prohibitions on the occurrence of certain events that would constitute a Change of Control or require the repurchase of such indebtedness upon a Change of Control. Moreover, the exercise by the holders of their right to require us to repurchase their Notes could cause a default under such indebtedness, even if the Change of Control itself does not, due to the financial effect of such repurchase on us. Finally, our ability to pay cash to the holders of Notes following the occurrence of a Change of Control may be limited by our then existing financial resources. There can be no assurance that sufficient funds will be available when necessary to make any required repurchases.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Company to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Company. As a

108

result, it may be unclear as to whether a Change of Control has occurred and whether a holder of Notes may require the Issuers to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relative to our obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the holders of a majority in principal amount of the Notes.

## Certain Covenants

The Indenture contains covenants including, among others, the following:

*Limitation on Indebtedness*

(a)   The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, Incur, directly or indirectly, any Indebtedness; *provided, however* , that the Company and the Subsidiary Guarantors will be entitled to Incur Indebtedness if, on the date of such Incurrence and after giving effect thereto on a *pro forma* basis the Consolidated Coverage Ratio exceeds 2.00 to 1.00.

(b)   Notwithstanding the foregoing paragraph (a), the following Indebtedness may be Incurred:

(1)   Indebtedness Incurred by the Company and the Subsidiary Guarantors pursuant to the Credit Facilities; *provided, however* , that, after giving effect to any such Incurrence, the aggregate principal amount of all Indebtedness Incurred under this clause (1) and then outstanding does not exceed $1,075.0 million less the sum of all principal payments with respect to such Indebtedness made pursuant to paragraph (a)(3)(A) of the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock;"

(2)   Indebtedness owed to and held by the Company or any Restricted Subsidiary or Regulated Subsidiary; *provided, however* , that any subsequent issuance or transfer of any Capital Stock which results in any such Subsidiary ceasing to be a Restricted Subsidiary or a Regulated Subsidiary, as applicable, or any subsequent transfer of such Indebtedness (other than to the Company, a Restricted Subsidiary or a Regulated Subsidiary) shall be deemed, in each case, to constitute the Incurrence of such Indebtedness by the obligor thereon;

(3)   (A) the Notes issued on the Issue Date and (B) Exchange Notes in respect of Notes issued on the Issue Date or any Additional Notes;

(4)   Indebtedness of the Company, a Restricted Subsidiary or a Regulated Subsidiary outstanding both on the Issue Date and the Acquisition Date (after giving effect to the Transactions) (other than Indebtedness described in clause (1), (2) or (3) of this covenant);

(5)   Indebtedness of a Restricted Subsidiary or a Regulated Subsidiary Incurred and outstanding on or prior to the date on which such Subsidiary was acquired by the Company (other than Indebtedness Incurred in connection with, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Subsidiary became a Subsidiary or was acquired by the Company); *provided, however* , that on the date of such acquisition and after giving *pro forma* effect thereto, either (A) the Company would have been entitled to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant or (B) the Consolidated Coverage Ratio would be greater than immediately prior to such acquisition;

(6)   Refinancing Indebtedness in respect of Indebtedness Incurred pursuant to paragraph (a) or pursuant to clause (3), (4) or (5) or this clause (6); *provided, however* , that Refinancing Indebtedness Incurred pursuant to this clause (6) may only be Incurred by a Regulated Subsidiary to the extent the Indebtedness being Refinanced directly or indirectly Refinances Indebtedness of a Regulated Subsidiary;

(7) Hedging Obligations of the Company, a Restricted Subsidiary or a Regulated Subsidiary that are Incurred in the ordinary course of business for the purpose of fixing, hedging or swapping interest rate, commodity price or foreign currency exchange rate risk (or to reverse or amend any such agreements previously made for such purposes), and not for speculative purposes, and that do not increase the Indebtedness of the obligor outstanding at any time other than as a result of fluctuations in interest rates, commodity prices or foreign currency exchange rates or by reason of fees, indemnities and compensation payable thereunder;

(8) obligations in respect of performance, bid and surety bonds and completion guarantees provided by the Company, any Restricted Subsidiary or any Regulated Subsidiary in the ordinary course of business;

(9) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided, however* , that such Indebtedness is extinguished within five Business Days of its Incurrence;

(10) Contribution Indebtedness;

(11) (a) if the Company could Incur $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant after giving effect to such borrowing, Indebtedness of Foreign Subsidiaries not otherwise permitted hereunder or (b) if the Company could not incur $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant after giving effect to such borrowing, Indebtedness of Foreign Subsidiaries Incurred for working capital purposes; *provided, however* , that the aggregate principal amount of Indebtedness incurred under this clause (11) which, when aggregated with the principal amount of all other Indebtedness then outstanding and incurred pursuant to this clause (11), does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (11);

(12) Indebtedness consisting of the Subsidiary Guaranty of a Subsidiary Guarantor and any Guarantee by a Restricted Subsidiary or Regulated Subsidiary of Indebtedness permitted to be Incurred pursuant to this covenant; *provided, however* , that, in the case of a Guarantee by a Restricted Subsidiary or Regulated Subsidiary that is not a Subsidiary Guarantor, such Restricted Subsidiary or Regulated Subsidiary complies with the covenant described under "—Future Guarantors;"

(13) Purchase Money Indebtedness or Capital Lease Obligations Incurred to finance the acquisition by the Company, a Restricted Subsidiary or a Regulated Subsidiary of assets that are used or useful in a Related Business, and any Refinancing Indebtedness Incurred to Refinance such Indebtedness, in an aggregate principal amount which, when added together with the principal amount of all other Indebtedness Incurred pursuant to this clause (13) and then outstanding, does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (13);

110

(14) Indebtedness of the Company or a Restricted Subsidiary supported by a letter of credit issued pursuant to the Credit Agreement in a principal amount not in excess of the stated amount of such letter of credit;

(15) Indebtedness consisting of promissory notes issued by the Company or a Subsidiary Guarantor to current or former officers, directors and employees of the Company or such Subsidiary Guarantor, their respective estates, spouses or former spouses to finance the purchase or redemption of Capital Stock of Parent to the extent permitted by the covenant described under "—Limitation on Restricted Payments";

(16) Indebtedness of the Company and the Subsidiary Guarantors not otherwise permitted under the Indenture in an aggregate principal amount which, when taken together with all other Indebtedness of the Company and the Subsidiary Guarantors then outstanding pursuant to this clause (16) does not exceed $150.0 million; and

(17) Indebtedness of Regulated Subsidiaries, not otherwise permitted under the Indenture, in an aggregate principal amount which, when taken together with all other Indebtedness of the Regulated Subsidiaries then outstanding pursuant to this clause (17) does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (17);

(c) For purposes of determining compliance with this covenant:

(1) any Indebtedness outstanding under the Credit Agreement on the Acquisition Date will be deemed to have been Incurred on such date under clause (1) of paragraph (b) above;

(2) in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the types of Indebtedness described in clauses (2) through (17) of paragraph (b) above, or is entitled to be Incurred pursuant to paragraph (a) of this covenant, the Company, in its sole discretion, will classify such item of Indebtedness (or any portion thereof) at the time of Incurrence and may later reclassify such item (or a portion thereof) and will only be required to include the amount and type of such Indebtedness in one of the above clauses; and

(3) the Company will be entitled to divide and classify and reclassify an item of Indebtedness in more than one of the types of Indebtedness described above; *provided, however* , that the Company will be entitled to reclassify Indebtedness Incurred under clause (1) of paragraph (b) above under paragraph (a) above only at a time when the Company is entitled to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) above.

(d) Notwithstanding paragraphs (a) and (b) above, neither the Issuers nor any Subsidiary Guarantor will Incur (1) any Indebtedness if such Indebtedness is subordinate or junior in ranking in any respect to any Senior Indebtedness of the Company or such Subsidiary Guarantor, as applicable, unless such Indebtedness is Senior Subordinated Indebtedness or is expressly subordinated in right of payment to the Notes or the Subsidiary Guaranty of such Subsidiary Guarantor, as applicable, or (2) any Secured Indebtedness that is not Senior Indebtedness of such Person unless contemporaneously therewith such Person makes effective provision to secure the Notes or the relevant Subsidiary Guaranty, as applicable, equally and ratably with such Secured Indebtedness for so long as such Secured Indebtedness is secured by a Lien.

111

(e)  For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness where the Indebtedness Incurred is denominated in a currency other than U.S. dollars, the amount of such Indebtedness will be the U.S. Dollar Equivalent determined on the date of the Incurrence of such Indebtedness; *provided, however* , that if any such Indebtedness denominated in a currency other than U.S. dollars is subject to a Currency Agreement covering all principal, premium, if any, and interest payable on such Indebtedness, the amount of such Indebtedness expressed in U.S. dollars will be as provided in such Currency Agreement. The principal amount of any Refinancing Indebtedness Incurred in the same currency as the Indebtedness being Refinanced will be the U.S. Dollar Equivalent of the Indebtedness Refinanced on the date of Refinancing, except to the extent that (1) such U.S. Dollar Equivalent was determined based on a Currency Agreement, in which case the Refinancing Indebtedness will be determined based on a Currency Agreement in accordance with the preceding sentence and (2) the principal amount of the Refinancing Indebtedness exceeds the principal amount of the Indebtedness being Refinanced, in which case the U.S. Dollar Equivalent of such excess will be determined on the date such Refinancing Indebtedness is Incurred.

*Limitation on Restricted Payments*

(a)  The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary, directly or indirectly, to make a Restricted Payment if at the time the Company or such Restricted Subsidiary or Regulated Subsidiary makes such Restricted Payment:

(1)    a Default shall have occurred and be continuing (or would result therefrom);

(2)    the Company is not entitled to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) of the covenant described under "—Limitation on Indebtedness;" or

(3)    the aggregate amount of such Restricted Payment and all other Restricted Payments since the Issue Date would exceed the sum of (without duplication):

(A)    50% of the Consolidated Net Income accrued during the period (treated as one accounting period) from the beginning of the fiscal quarter immediately following the fiscal quarter during which the Issue Date occurs to the end of the most recent fiscal quarter ending at least 45 days prior to the date of such Restricted Payment (or, in case such Consolidated Net Income shall be a deficit, minus 100% of such deficit); *plus*

(B)    100% of the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company from the issuance or sale of its Capital Stock (other than Disqualified Stock or Designated Preferred Stock) subsequent to the Issue Date (other than (i) Net Cash Proceeds or property received from an issuance or sale of such Capital Stock to a Subsidiary of the Company, (ii) Net Cash Proceeds or property received from an issuance or sale of such Capital Stock to an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees, and (iii) Net Cash Proceeds received by the Company from the sale of such Capital Stock (or such Capital Stock of any Parent to the extent such Net Cash Proceeds are contributed to the common equity of the Company) to employees, officers, directors or consultants of the Company, its Restricted Subsidiaries or its Regulated Subsidiaries subsequent to the Issue Date to the extent such amounts have been applied to Restricted Payments made in accordance with paragraph (b)(4) of this covenant) and 100% of the aggregate amount of cash and the Fair Market Value of property contributed to the capital of the Company by its equityholders subsequent to the Issue Date (other than the Cash Contribution Amount); *plus*

(C)    100% of the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company subsequent to the Issue Date from the issuance or sale of any

112

Indebtedness of the Company convertible into or exchangeable for Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Company that has been so converted or exchanged (less the amount of any cash or the Fair Market Value of property distributed by the Company upon such conversion or exchange), other than issuances or sales to a Subsidiary of the Company or to an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees); *plus*

(D)    an amount equal to the sum of (i) 100% of the aggregate amount in cash and the Fair Market Value of property received from Investments (other than Permitted Investments) made by the Company, any Restricted Subsidiary or Regulated Subsidiary in any Person resulting from repurchases, repayments or redemptions of such Investments by such Person, proceeds realized on the sale of such Investment and proceeds representing the return of capital (excluding dividends and distributions to the extent included in Consolidated Net Income), in each case received by the Company or any Restricted Subsidiary or Regulated Subsidiary, and (ii) to the extent such Person is an Unrestricted Subsidiary, the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary; *provided, however* , that the foregoing sum shall not include amounts with respect to Investments in Unrestricted Subsidiaries to the extent the Investments in such Unrestricted Subsidiaries were made pursuant to clause (7) of the next succeeding paragraph (b).

(b)    The preceding provisions will not prohibit:

(1)    any Restricted Payment made out of the Net Cash Proceeds of the substantially concurrent sale of, or made by exchange for, Capital Stock of the Company (other than Disqualified Stock or Designated Preferred Stock and other than Capital Stock issued or sold to a Subsidiary of the Company or an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees) or a substantially concurrent cash capital contribution received by the Company from its equityholders; *provided, however* , that (A) such Restricted Payment shall be excluded in the calculation of the amount of Restricted Payments and (B) the Net Cash Proceeds from such sale or such cash capital contribution (to the extent so used for such Restricted Payment) shall be excluded from the calculation of amounts under clause (4)(B) of paragraph (a) above;

(2)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations of the Company or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent Incurrence of, Refinancing Indebtedness of such Person which is permitted to be Incurred pursuant to any of the provisions of the covenant described under "—Limitation on Indebtedness;" *provided, however* , that such purchase, repurchase, redemption, defeasance or other acquisition or retirement for value shall be excluded in the calculation of the amount of Restricted Payments;

(3)    dividends or similar distributions paid within 60 days after the date of declaration thereof if at such date of declaration such dividend or similar distribution would have complied with this covenant; *provided, however* , that such dividend or similar distribution shall be included in the calculation of the amount of Restricted Payments;

(4)    the purchase, repurchase, redemption or acquisition for value (or the payment of dividends, other distributions or amounts to Parent in amounts equal to the amounts expended by Parent to purchase, repurchase, redeem or otherwise acquire for value) of Capital Stock of the Company or Parent owned by employees, former employees, directors, former directors, consultants or former consultants of Parent, the Company or any of its Subsidiaries (or

113

permitted transferor, assigns, estates or heirs of such employees, former employees, directors, former directors, consultants or former consultants); *provided, however* , that the aggregate amount paid, loaned or advanced to Parent pursuant to this clause (4) will not, in the aggregate, exceed $5.0 million per fiscal year of the Company; *provided further* that the Company may carry over and make in subsequent fiscal years, in addition to the amounts permitted for such fiscal year, the amount of such purchases, redemptions or other acquisitions or retirements for value permitted to have been made but not made in any preceding fiscal years; *provided further* that such amount in any fiscal year may be increased by an amount not to exceed (i) the Net Cash Proceeds from the sale of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Company (or of Parent to the extent such Net Cash Proceeds are contributed to the common equity of the Company) to employees, officers, directors or consultants of the Company, its Restricted Subsidiaries and its Regulated Subsidiaries that occurs after the Issue Date (to the extent the Net Cash Proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments pursuant to clause (1) above of this paragraph (b) or previously applied to the payment of Restricted Payments pursuant to this clause (4)), plus (ii) the cash proceeds of key man life insurance policies received by the Company, its Restricted Subsidiaries and its Regulated Subsidiaries after the date of the Indenture, less any amounts previously applied to the payment of Restricted Payments pursuant to this clause (4); *provided further* that cancellation of Indebtedness owing to the Company from employees, officers, directors and consultants of the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in connection with a repurchase of Capital Stock of the Company from such Persons will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provisions of the Indenture; *provided further* that the Net Cash Proceeds from such sales of Capital Stock described in clause (i) of this clause (4) shall be excluded from the calculation of amounts under clause (4)(B) of paragraph (a) above to the extent such proceeds have been or are applied to the payment of Restricted Payments pursuant to this clause (4); and *provided further, however* , that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(5)    the declaration and payment of dividends or similar distributions on Disqualified Stock issued pursuant to the covenant described under "—Limitation on Indebtedness;" *provided, however* , that at the time of payment of such dividend or similar distribution, no Default shall have occurred and be continuing (or result therefrom); *provided further, however* , that such dividends or similar distributions shall be excluded in the calculation of the amount of Restricted Payments;

(6)    the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date and the declaration and payment of dividends or distributions to Parent, the proceeds of which will be used to fund the payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of Parent issued after the Issue Date; *provided, however* , that (A) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Company would have had a Consolidated Coverage Ratio of at least 2.00 to 1.00 and (B) the aggregate amount of dividends or distributions declared and paid pursuant to this clause (6) does not exceed the Net Cash Proceeds actually received by or contributed to the Company from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; *provided further, however* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

114

(7)    investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (7) that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash and/or marketable securities, not to exceed the greater of (x) $25.0 million and (y) an amount in U.S. dollars equal to the product of (A) $25.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Fair Issue Date to the end of the most recent fiscal quarter immediately prior to the date on which the applicable Investment is made pursuant to this clause (7) (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however* , that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(8)    the payment of dividends on the Company's common stock following the first public offering of the Company's common stock or the common stock of Parent after the Acquisition Date (with Parent contributing the Net Cash Proceeds of such offering to the Company), of up to 6% *per annum* of the Net Cash Proceeds received by or contributed to the Company in any past or future public offering, other than public offerings with respect to the Company's common stock registered on Form S-8 under the Securities Act; *provided, however* , that such Restricted Payments shall be included in the calculation of the amount of Restricted Payments;

(9)    the declaration and payment of dividends or distributions to, or the making of loans to, Parent in amounts required for such party to pay:

    (A)    franchise taxes and other fees, taxes and expenses required to maintain its corporate existence;

    (B)    customary salary, bonus and other benefits payable to officers and employees of Parent to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Company, the Restricted Subsidiaries and the Regulated Subsidiaries;

    (C)    general corporate overhead expenses (including professional expenses) for Parent to the extent such expenses are attributable to the ownership or operation of the Company, the Restricted Subsidiaries and the Regulated Subsidiaries; and

    (D)    fees and expenses other than to Affiliates related to any unsuccessful equity or debt offering permitted by the Indenture;

*provided, however* , that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(10)   any Restricted Payment, at any time prior to August 1, 2009 if immediately after giving *pro forma* effect to such Restricted Payment pursuant to this clause (10) and the Incurrence of any Indebtedness the net proceeds of which are used to finance such Restricted Payment:

    (A)    the Net Indebtedness to EBITDA Ratio of the Company would not have exceeded 3.75 to 1; and

    (B)    the Net Senior Indebtedness to EBITDA Ratio of the Company would not have exceeded 2.50 to 1;

*provided, however* , that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

115

(11)  repurchases of Capital Stock deemed to occur upon exercise of stock or other equity options if such Capital Stock represents a portion of the exercise price of such options; *provided, however* , that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(12)  cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of the Company; *provided, however* , that any such cash payment shall not be for the purpose of evading the limitation of the covenant described under this subheading (as determined in good faith by the Governing Board); *provided further, however* , that such payments shall be excluded in the calculation of the amount of Restricted Payments;

(13)  in the event of a Change of Control, and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations of the Company or any Subsidiary Guarantor, in each case, at a purchase price not greater than 101% of the principal amount (or, if such Subordinated Obligations were issued with original issue discount, 101% of the accreted value thereof) of such Subordinated Obligations, plus any accrued and unpaid interest thereon; *provided, however* , that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company (or a third party to the extent permitted by the Indenture) has made a Change of Control Offer with respect to the Notes as a result of such Change of Control and has repurchased all Notes validly tendered and not withdrawn in connection with such Change of Control Offer; *provided further, however* , that such payments, purchases, redemptions, defeasances or other acquisitions or retirements shall be included in the calculation of the amount of Restricted Payments;

(14)  in the event of an Asset Disposition that requires the Company to offer to repurchase Notes pursuant to the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock," and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations of the Company or any Subsidiary Guarantor, in each case, at a purchase price not greater than 100% of the principal amount (or, if such Subordinated Obligations were issued with original issue discount, 100% of the accreted value) of such Subordinated Obligations, plus any accrued and unpaid interest thereon; *provided, however* , that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company has made an offer with respect to the Notes pursuant to the provisions of the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock" and has repurchased all Notes validly tendered and not withdrawn in connection with such offer; *provided further, however* , that such Restricted Payments shall be included in the calculation of the amount of Restricted Payments;

(15)  payments of intercompany Indebtedness, the Incurrence of which was permitted under clause (2) of paragraph (b) of the covenant described under "—Limitation on Indebtedness;" *provided, however* , that no Default has occurred and is continuing or would otherwise result therefrom; *provided further, however* , that such payments shall be excluded in the calculation of the amount of Restricted Payments;

(16)  Restricted Payments specified in the Equity Purchase and Merger Agreement to holders of equity interests of Refco Finance Holdings LLC or Refco Group Ltd., LLC in connection with the Transactions or described in this prospectus under "Prospectus Summary—Transactions;" *provided, however* , that such payments shall be excluded in the calculation of the amount of Restricted Payments;

116

(17)    Tax Distribution referred to in paragraph (x) the Company is treated as a pass through or disregarded entity for United States federal income tax purposes or (y) the Company is included in a consolidated, combined or unitary tax return filing group of which it is not the parent; *provided, however* , that such Tax Distributions shall be excluded in the calculation of the amount of Restricted Payments; or

(18)    Restricted Payments in an amount which, when taken together with all other Restricted Payments made pursuant to this clause (18), do not exceed $50.0 million; *provided, however* , that (A) at that time of each such Restricted Payment, no Event of Default shall have occurred and be continuing (or result therefrom) and (B) such Restricted Payments shall be included in the calculation of the amount of Restricted Payments.

*Limitation on Restrictions on Distributions from Restricted Subsidiaries or Regulated Subsidiaries*

The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary or Regulated Subsidiary to (a) pay dividends or make any other distributions on its Capital Stock to the Company, a Restricted Subsidiary or a Regulated Subsidiary or pay any Indebtedness owed to the Company, (b) make any loans or advances to the Company or (c) transfer any of its property or assets to the Company, except:

(1)    with respect to clauses (a), (b) and (c),

(A)    any encumbrance or restriction pursuant to (i) an agreement in effect on or entered into on the Issue Date (including any such agreements of Refco Group Ltd., LLC and its Subsidiaries in effect on such date), (ii) the Credit Agreement, as in effect on the Acquisition Date and (iii) the Escrow Agreement;

(B)    any encumbrance or restriction with respect to a Restricted Subsidiary or Regulated Subsidiary pursuant to an agreement relating to any Indebtedness Incurred by such Restricted Subsidiary or Regulated Subsidiary, as the case may be, on or prior to the date on which such Restricted Subsidiary or Regulated Subsidiary was acquired by the Company (other than Indebtedness Incurred as consideration in, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Restricted Subsidiary or Regulated Subsidiary became a Restricted Subsidiary or Regulated Subsidiary, as the case may be, or was acquired by the Company) and outstanding on such date;

(C)    any encumbrance or restriction in the Indenture or in any indenture relating to Senior Subordinated Indebtedness entered into after the Issue Date; *provided* that the encumbrances or restrictions in such agreements are not materially more restrictive than those contained in the Indenture;

(D)    restrictions on cash or other deposits or net worth imposed by agreements entered into in the ordinary course of business;

(E)    customary provisions in joint venture agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the Capital Stock thereof);

(F)    any encumbrances or restrictions created with respect to the Indebtedness of Restricted Subsidiaries or Regulated Subsidiaries permitted to be Incurred or issued subsequent to the Issue Date pursuant to the provisions of the covenant described under "—Limitation on Indebtedness," *provided* that in the case of this clause the Governing Board of the Company determines (as evidenced by a resolution of the Governing Board) in good faith

117

at the time such encumbrances or restrictions are created that such encumbrances or restrictions would not reasonably be expected to impair the ability of the Company and the Subsidiary Guarantors, taken as a whole, to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due;

(G) any encumbrance or restriction pursuant to an agreement effecting a Refinancing of Indebtedness Incurred pursuant to an agreement referred to in clauses (A) to (F) of clause (1) of this covenant or this clause (G) or contained in any amendment to an agreement referred to in clauses (A) to (F) of clause (1) of this covenant or this clause (G); *provided, however* , that the encumbrances and restrictions with respect to such Restricted Subsidiary or Regulated Subsidiary, as the case may be, contained in any such Refinancing agreement or amendment are not materially less favorable to the Noteholders than encumbrances and restrictions with respect to such Restricted Subsidiary or Regulated Subsidiary contained in such predecessor agreements and do not in the good faith judgment of the chief financial officer of the Company affect the Company's and the Subsidiary Guarantor's ability, taken as a whole, to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due; *provided further, however* , that with respect to agreements existing on the Issue Date or the Credit Agreement as in effect on the Acquisition Date, any Refinancings or amendments thereof contain such encumbrances or restrictions that are not materially less favorable to the Noteholders than the encumbrances or restrictions contained in such agreements as in effect on the Issue Date or, with respect to the Credit Agreement, the Acquisition Date;

(H) any encumbrance or restriction with respect to a Restricted Subsidiary or Regulated Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Capital Stock or assets of such Restricted Subsidiary or Regulated Subsidiary pending the closing of such sale or disposition;

(I) any encumbrance or restriction imposed by applicable law, rule, regulation, consent decree or similar arrangement; and

(2) with respect to clause (c) only,

(A) any encumbrance or restriction consisting of customary nonassignment provisions in leases governing leasehold interests to the extent such provisions restrict the transfer of the lease or the property leased thereunder;

(B) any encumbrance or restriction contained in security agreements or mortgages securing Indebtedness of a Restricted Subsidiary or Regulated Subsidiary to the extent such encumbrance or restriction restricts the transfer of the property subject to such security agreements or mortgages;

(C) restrictions on the transfer of assets subject to any Lien not prohibited by the Indenture imposed by the holder of such Lien; and

(D) any encumbrance or restriction contained in agreements governing Purchase Money Indebtedness.

*Limitation on Sales of Assets and Subsidiary Stock*

(a)  The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, directly or indirectly, consummate any Asset Disposition unless:

(1) the Company or such Restricted Subsidiary or Regulated Subsidiary receives consideration at the time of such Asset Disposition at least equal to the Fair Market Value (including the value

or all non-cash consideration) of the shares or other equity interests and assets subject to such Asset Disposition;

(2)    except in the case of a Permitted Asset Swap, at least 75% of the consideration thereof received by the Company or such Restricted Subsidiary or Regulated Subsidiary is in the form of cash or cash equivalents; and

(3)    an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Company (or such Restricted Subsidiary or Regulated Subsidiary, as the case may be)

    (A)    to prepay, repay, redeem or purchase Senior Indebtedness of the Company or Indebtedness (other than any Disqualified Stock) of a Restricted Subsidiary or Regulated Subsidiary (in each case other than Indebtedness owed to the Company or a Restricted Subsidiary or Regulated Subsidiary) within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash;

    (B)    to acquire Additional Assets within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash; or

    (C)    to make an offer to the holders of the Notes (and to holders of other Senior Subordinated Indebtedness of the Company designated by the Company) to purchase Notes (and such other Senior Subordinated Indebtedness of the Company) pursuant to and subject to the conditions contained in the Indenture;

*provided, however* , that in connection with any prepayment, repayment or purchase of Indebtedness pursuant to clause (A) or (C) above, the Company or such Restricted Subsidiary or Regulated Subsidiary shall permanently retire such Indebtedness and shall cause the related loan commitment (if any) to be permanently reduced in an amount equal to the principal amount so prepaid, repaid or purchased.

Notwithstanding the foregoing provisions of this covenant, the Company, the Restricted Subsidiaries and the Regulated Subsidiaries will not be required to apply any Net Available Cash in accordance with this covenant except to the extent that the aggregate Net Available Cash from all Asset Dispositions which is not applied in accordance with this covenant exceeds $20.0 million. Pending application of Net Available Cash pursuant to this covenant, such Net Available Cash shall be invested in Temporary Cash Investments or applied to temporarily reduce revolving credit Indebtedness.

For the purposes of this covenant, the following are deemed to be cash or cash equivalents:

(1)    the assumption or discharge of Indebtedness or other liabilities reflected on the balance sheet of the Company (other than obligations in respect of Disqualified Stock of the Company) or any Restricted Subsidiary or Regulated Subsidiary (other than obligations in respect of Disqualified Stock or Preferred Stock of a Subsidiary Guarantor) and the release of the Company or such Restricted Subsidiary or Regulated Subsidiary from all liability on such Indebtedness or such other liabilities in connection with such Asset Disposition;

(2)    securities received by the Company or any Restricted Subsidiary or Regulated Subsidiary from the transferee that are converted by the Company or such Restricted Subsidiary or Regulated Subsidiary, as the case may be, within 180 days of the date of receipt thereof into cash, to the extent of cash received in that conversion; and

(3)    any Designated Noncash Consideration received by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in such Asset Disposition having an aggregate Fair Market Value, taken together with all other Designated Noncash Consideration received pursuant to this clause (3) that is at that time outstanding, not to exceed the greater of (x) $75.0 million and (y) an amount in U.S. dollars equal to the product of (A) $75.0 million

119

(and B) I; plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the time of the receipt of such Designated Noncash Consideration (with the Fair Market Value of each item of Designated Noncash Consideration being measured at the time received without giving effect to subsequent changes in value).

(b)   In the event of an Asset Disposition that requires the purchase of Notes (and other Senior Subordinated Indebtedness of the Company) pursuant to clause (a)(3)(C) above, the Company will purchase Notes tendered pursuant to an offer by the Company for the Notes (and such other Senior Subordinated Indebtedness) at a purchase price of 100% of their principal amount (or, in the event such other Senior Subordinated Indebtedness of the Company was issued with significant original issue discount, 100% of the accreted value thereof) without premium, plus accrued but unpaid interest (or, in respect of such other Senior Subordinated Indebtedness of the Company, such lesser price, if any, as may be provided for by the terms of such Senior Subordinated Indebtedness) in accordance with the procedures (including prorating in the event of oversubscription) set forth in the Indenture. If the aggregate purchase price of the securities tendered exceeds the Net Available Cash allotted to their purchase, the Company will select the securities to be purchased on a *pro rata* basis but in round denominations, which in the case of the Notes will be denominations of $1,000 principal amount or multiples thereof. The Company shall not be required to make such an offer to purchase Notes (and other Senior Subordinated Indebtedness of the Company) pursuant to this covenant if the Net Available Cash available therefor is less than $20.0 million (which lesser amount shall be carried forward for purposes of determining whether such an offer is required with respect to the Net Available Cash from any subsequent Asset Disposition). Upon completion of such an offer to purchase, Net Available Cash will be reset to zero.

(c)   The Company will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this covenant. To the extent that the provisions of any securities laws or regulations conflict with provisions of this covenant, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this covenant by virtue of its compliance with such securities laws or regulations.

*Limitation on Affiliate Transactions*

(a)   The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Company involving aggregate consideration in excess of $5.0 million (an " *Affiliate Transaction* ") unless:

(1)   the terms of the Affiliate Transaction are no less favorable to the Company or such Restricted Subsidiary or Regulated Subsidiary than those that could be obtained at the time of the Affiliate Transaction in arm's-length dealings with a Person who is not an Affiliate;

(2)   if such Affiliate Transaction involves an amount in excess of $15.0 million, a majority of the directors or other members of the Governing Board of the Company disinterested with respect to such Affiliate Transaction have determined in good faith that the criteria set forth in clause (1) are satisfied and have approved the relevant Affiliate Transaction as evidenced by a resolution of the Governing Board of the Company; and

(3)   if such Affiliate Transaction involves an amount in excess of $75.0 million, the Governing Board shall also have received a written opinion from an Independent Qualified Party to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the Company, its

120

Restricted Subsidiaries and its Regulated Subsidiaries or is not less favorable to the Company, its Restricted Subsidiaries and its Regulated Subsidiaries than could reasonably be expected to be obtained at the time in an arm's-length transaction with a Person who was not an Affiliate.

(b)    The provisions of the preceding paragraph (a) will not prohibit:

(1)    any Permitted Investment or any Restricted Payment permitted to be made pursuant to the covenant described under "— Limitation on Restricted Payments;"

(2)    any payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Governing Board of the applicable Person;

(3)    loans or advances to employees (or cancellation thereof) in the ordinary course of business in accordance with the past practices of the Company, its Restricted Subsidiaries or its Regulated Subsidiaries, but in any event not to exceed $5.0 million in the aggregate outstanding at any one time;

(4)    the payment of reasonable and customary fees to directors or other members of the Governing Board of Parent, the Company, its Restricted Subsidiaries and its Regulated Subsidiaries who are not employees of Parent, the Company, its Restricted Subsidiaries or its Regulated Subsidiaries and the provision of reasonable and customary indemnities provided on behalf of directors or other members of the Governing Board and officers of Parent, the Company, its Restricted Subsidiaries and its Regulated Subsidiaries;

(5)    any transaction with the Company, a Restricted Subsidiary or a Regulated Subsidiary;

(6)    any transaction with a joint venture or similar entity which would constitute an Affiliate Transaction solely because the Company, a Restricted Subsidiary or a Regulated Subsidiary owns an equity interest in or otherwise controls such joint venture or similar entity;

(7)    the issuance or sale of any Capital Stock (other than Disqualified Stock) of the Company;

(8)    payments to the Equity Sponsor and its Affiliates for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, in connection with acquisitions or divestitures, which payments are approved by the majority of the Governing Board of the Company in good faith;

(9)    payments to the Equity Sponsor under the Management Agreement and reasonable related expenses;

(10)    the Transactions and the payment of all fees and expenses related to the Transactions;

(11)    transactions in which the Company delivers to the Trustee a letter from an Independent Qualified Party to the effect that such Affiliate Transactions are fair from a financial standpoint to the Company, its Restricted Subsidiaries and its Regulated Subsidiaries;

(12)    transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business;

(13)    any tax sharing agreement or arrangement and payments pursuant thereto among the Company and its Subsidiaries and any other Person with which the Company or its Subsidiaries are required or permitted to file a consolidated, combined or unitary return or with which the Company or any of its Subsidiaries are or could be part of a consolidated, combined or unitary group for tax purposes in amounts not to exceed the amount of Tax Distributions for the applicable period net of any Tax Distributions already made with respect to such period;

(14)    any agreement (and cancellation thereof) as in effect as of the Issue Date or any renewals or extensions of any such agreement (so long as such renewals or extensions are not materially less favorable to the Company, the Restricted Subsidiaries or the Regulated Subsidiaries) and the transactions evidenced thereby; and

(15)    transactions between the Company, any Restricted Subsidiary or any Regulated Subsidiary acting in its capacity as general partner (or similar status) of limited partnerships or similar passive collective investment entities that trade derivatives and such limited partnerships or investment entities; *provided* that such transactions are in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business.

### Limitation on Line of Business

The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary, to engage in any business other than a Related Business.

### Limitation on Refco Finance Inc.

Notwithstanding anything to the contrary herein, Refco Finance Inc. may not hold any material assets (other than Indebtedness owing to Refco Finance Inc. by the Company, the Restricted Subsidiaries and the Regulated Subsidiaries and non-material Temporary Cash Investments), become liable for any material obligations or engage in any significant business activities (other than treasury, cash management, hedging and cash pooling activities and activities incidental thereto); *provided, however* , that Refco Finance Inc. may be a co-obligor or guarantor with respect to Indebtedness if the Company is an obligor of such Indebtedness and the net proceeds of such Indebtedness are received by the Company or one or more of the Company's Subsidiary Guarantors.

The Company will not sell or otherwise dispose of any shares of Capital Stock of Refco Finance Inc. and will not permit Refco Finance Inc., directly or indirectly, to sell or otherwise dispose of any shares of its Capital Stock.

### Merger and Consolidation

(a)    Other than the Merger, the Company will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

(1)    the resulting, surviving or transferee Person (the " *Successor Company* ") shall be a Person organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and the Successor Company (if not the Company) shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of the Company under the Notes and the Indenture;

(2)    immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any Restricted Subsidiary or Regulated Subsidiary as a result of such transaction as having been Incurred by such Successor Company or such Restricted Subsidiary or Regulated Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(3)    immediately after giving *pro forma* effect to such transaction, either (A) the Successor Company would be able to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) of the covenant described under "—Limitation on Indebtedness" or (B) the

Consolidated Coverage Ratio would be greater than such ratio immediately prior to such transaction; and

(4)    the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with the Indenture;

*provided, however* , that clause (3) will not be applicable to (A) a Restricted Subsidiary or Regulated Subsidiary consolidating with, merging into or transferring all or part of its properties and assets to the Company (so long as no Capital Stock of the Company is distributed to any Person) or (B) the Company merging with an Affiliate of the Company solely for the purpose and with the sole effect of reincorporating the Company in another jurisdiction.

For purposes of this covenant, the sale, lease, conveyance, assignment, transfer or other disposition of all or substantially all the assets of one or more Subsidiaries of the Company, which assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all the assets of the Company on a consolidated basis, shall be deemed to be the transfer of all or substantially all the assets of the Company.

The Successor Company (if not the Company) will be the successor to the Company and shall succeed to, and be substituted for, and may exercise every right and power of, the Company under the Indenture, and the predecessor Company, except in the case of a lease, shall be released from the obligation to pay the principal of and interest on the Notes.

(b)    Refco Finance Inc. will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

(1)    the resulting, surviving or transferee Person (the " *Successor Finance Issuer* ") shall be a Person organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and the Successor Finance Issuer (if not Refco Finance Inc.) shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of Refco Finance Inc. under the Notes and the Indenture;

(2)    immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Finance Issuer as a result of such transaction as having been Incurred by such Successor Finance Issuer at the time of such transaction), no Default shall have occurred and be continuing and no Change of Control shall have occurred with respect to Refco Finance Inc.; and

(3)    the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with the Indenture.

The Successor Finance Issuer (if not Refco Finance Inc.) will be the successor to Refco Finance Inc. and shall succeed to, and be substituted for, and may exercise every right and power of, Refco Finance Inc. under the Indenture, and Refco Finance Inc., except in the case of a lease, shall be released from the obligation to pay the principal of and interest on the Notes.

(c)    The Company will not permit any Subsidiary Guarantor to consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, all or substantially all its assets to, any Person (other than the Company or another Subsidiary Guarantor) unless:

(1)    except in the case of a Subsidiary Guarantor (x) that has been disposed of in its entirety to another Person, whether through a merger, consolidation or sale of Capital Stock or assets or

123

(c) that, as a result of the disposition of all or substantially all of its Capital Stock ceases to be a Subsidiary, in both cases, if in connection therewith the Company complies with its obligations under the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock" in respect of such disposition, the resulting, surviving or transferee Person (if not such Subsidiary) shall be a Person organized and existing under the laws of the jurisdiction under which such Subsidiary was organized or under the laws of the United States of America, or any state thereof or the District of Columbia, and such Person shall expressly assume, by a Guaranty Agreement, in form reasonably satisfactory to the Trustee, all the obligations of such Subsidiary, if any, under its Subsidiary Guaranty;

(2)     immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the resulting, surviving or transferee Person as a result of such transaction as having been Incurred by such Person at the time of such transaction), no Default shall have occurred and be continuing; and

(3)     the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such Guaranty Agreement, if any, comply with the Indenture.

*Future Guarantors*

The Company will cause (i) each of its domestic Subsidiaries (other than Refco Finance Inc., any Unrestricted Subsidiary or any Regulated Subsidiary) that Incurs any Indebtedness (other than Indebtedness permitted to be Incurred pursuant to clause (2), (7), (8) or (9) of paragraph (b) of the covenant described under "—Limitation on Indebtedness"), (ii) each Foreign Subsidiary that enters into a Guarantee of any Indebtedness (other than a Foreign Subsidiary that Guarantees Indebtedness Incurred by another Foreign Subsidiary) and (iii) each Regulated Subsidiary that enters into a Guarantee of any Indebtedness (other than a Regulated Subsidiary that Guarantees Indebtedness Incurred by another Regulated Subsidiary) to, in each case, at the same time, execute and deliver to the Trustee a Guaranty Agreement pursuant to which such Subsidiary will Guarantee payment of the Notes on the same terms and conditions as those set forth in the Indenture.

*SEC Reports*

Whether or not the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, so long as any Notes are outstanding, the Company will file with the SEC (unless the SEC will not accept such filing) and provide the Trustee and Noteholders, within the time periods specified in the SEC's rules and regulations:

(1)     all quarterly and annual financial information that would be required to be contained in a filing with the SEC on Forms 10-Q and 10-K if the Company were required to file such Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, with respect to the annual information only, a report on the annual financial statements by the Company's certified independent accountants; and

(2)     all current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such reports.

If at any time the Company is not subject to the periodic reporting requirements of the Exchange Act for any reason, the Company will nevertheless continue filing the information and reports specified in the preceding sentence with the SEC within the time periods required unless the SEC will not accept such filings. The Company agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept such filings for any reason, the Company will post the information and reports specified in the preceding paragraph on

its website within the time periods that would apply if the Company were required to file that information and those reports with the SEC.

In addition, if at any time Parent Guarantees the Notes (there being no obligation of Parent to do so), holds no material assets other than cash, Temporary Cash Investments and the Capital Stock of the Company (and performs the related incidental activities associated with such ownership) and complies with the requirements of Rule 3-10 of Regulation S-X promulgated by the SEC (or any successor provision), the reports and information required to be filed and furnished to the Trustee and holders of the Notes pursuant to this covenant may, at the option of the Company, be filed by and be those of Parent rather than the Company.

Notwithstanding the foregoing, such requirements shall be deemed satisfied prior to the commencement of the Registered Exchange Offer or the effectiveness of the Shelf Registration Statement by the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration Statement, and any amendments thereto, with such financial information that satisfies Regulation S-X of the Securities Act.

In addition, the Company will furnish to the Holders of the Notes and to prospective investors, upon the requests of such Holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Notes are not freely transferable under the Securities Act.

## Defaults

Each of the following is an Event of Default:

(1)   a default in the payment of interest on the Notes when due, continued for 30 days;

(2)   a default in the payment of principal of any Note when due at its Stated Maturity, upon optional redemption, upon required purchase, upon declaration of acceleration or otherwise;

(3)   a default in the performance of, or a breach in any covenant, warranty or other agreement contained in the Indenture (other than a default in the performance or breach of a covenant, warranty or agreement which is specifically dealt with in clauses (1) or (2) above) and such default or breach continues for 60 days after notice;

(4)   Indebtedness for borrowed money of an Issuer or any Significant Subsidiary is not paid within any applicable grace period after final maturity or is accelerated by the holders thereof because of a default and the total amount of such Indebtedness unpaid or accelerated exceeds $50.0 million (the " *cross acceleration provision* ");

(5)   certain events of bankruptcy, insolvency or reorganization of either Issuer or any Significant Subsidiary (the " *bankruptcy provisions* ");

(6)   failure by an Issuer or Significant Subsidiary to pay final judgments aggregating in excess of $50.0 million, which judgments are not paid, discharged or stayed for a period of 60 days after such judgments have become final and non-appealable (" *judgment default provision* "); or

(7)   a Subsidiary Guaranty ceases to be in full force and effect (other than in accordance with the terms of such Subsidiary Guaranty) or a Subsidiary Guarantor denies or disaffirms its obligations under its Subsidiary Guaranty and such default continues for 10 days.

However, a default under clause (3) will not constitute an Event of Default until the Trustee or the holders of at least 25% in principal amount of the outstanding Notes notify the Company of the default and the Company does not cure such default within the time specified after receipt of such notice.

If an Event of Default occurs and is continuing, the Trustee or the holders of at least 25% in principal amount of the outstanding Notes may declare the principal of and accrued but unpaid interest on all the Notes to be due and payable. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of an Issuer occurs and is continuing, the principal of and interest on all the Notes will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any holders of the Notes. Under certain circumstances, the holders of at least a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

Subject to the provisions of the Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders of the Notes unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:

    (1)    such holder has previously given the Trustee notice that an Event of Default is continuing;

    (2)    holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

    (3)    such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense;

    (4)    the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

    (5)    holders of at least a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, the holders of at least a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder of a Note or that would involve the Trustee in personal liability.

If a Default occurs, is continuing and is known to the Trustee, the Trustee must mail to each holder of the Notes notice of the Default within 90 days after it occurs. Except in the case of a Default in the payment of principal of or interest on any Note, the Trustee may withhold notice if and so long as a committee of its Trust Officers in good faith determines that withholding notice is not opposed to the interest of the holders of the Notes. In addition, we are required to deliver to the Trustee, within 120 days after the end of each fiscal year, a certificate indicating whether the signers thereof know of any Default that occurred during the previous fiscal year. We are required to deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action we are taking or propose to take in respect thereof.

**Amendments and Waivers**

Subject to certain exceptions, the Indenture may be amended with the consent of the holders of at least a majority in principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange for the Notes), and any past default or compliance with any provisions may also be waived with the consent of the holders of at least a majority in principal amount

126

of the Notes then outstanding. However, without the consent of each holder of an outstanding Note affected thereby, an amendment or waiver may not, among other things:

(1)     reduce the amount of Notes whose holders must consent to an amendment;

(2)     reduce the rate of or extend the time for payment of interest on any Note;

(3)     reduce the principal of or change the Stated Maturity of any Note;

(4)     reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed as described under "—Optional Redemption" or "—Escrow of Proceeds; Special Mandatory Redemption" above;

(5)     make any Note payable in money other than that stated in the Note;

(6)     impair the right of any holder of the Notes to receive payment of principal of and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(7)     make any change in the amendment provisions which require each holder's consent or in the waiver provisions;

(8)     make any change in the ranking or priority of any Note that would adversely affect the Noteholders; or

(9)     make any change in, or release other than in accordance with the Indenture, any Subsidiary Guaranty that would adversely affect the Noteholders.

Notwithstanding the preceding, without the consent of any holder of the Notes, the Issuers, the Subsidiary Guarantors and Trustee may amend the Indenture:

(1)     to cure any ambiguity, omission, defect or inconsistency;

(2)     to provide for the assumption by a successor corporation of the obligations of an Issuer or any Subsidiary Guarantor under the Indenture;

(3)     to provide for uncertificated Notes in addition to or in place of Certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code);

(4)     to add Guarantees with respect to the Notes, including any Subsidiary Guaranties, or to secure the Notes;

(5)     to add to the covenants of the Issuers or a Subsidiary Guarantor for the benefit of the holders of the Notes or to surrender any right or power conferred upon the Issuers or a Subsidiary Guarantor;

(6)     to make any change that does not adversely affect the rights of any holder of the Notes in any material respect;

(7)     to comply with any requirement of the SEC in connection with the qualification of the Indenture under the Trust Indenture Act;

(8)     to make any amendment to the provisions of the Indenture relating to the transfer and legending of Notes; *provided, however* , that (a) compliance with the Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any other applicable securities laws and (b) such amendment does not materially and adversely affect the rights of Holders to transfer Notes; or

127

conform the text of the Indenture or this Subsidiary provision or this Description of the Notes to the extent that such provision of the Indenture or the Notes was intended to be a verbatim recitation of such provision of this Description of the Notes.

However, no amendment may be made to the subordination provisions of the Indenture that adversely affects the rights of any holder of Senior Indebtedness of the Issuers or a Subsidiary Guarantor then outstanding unless the holders of such Senior Indebtedness (or their Representative) consent to such change.

The consent of the holders of the Notes is not necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

After an amendment under the Indenture becomes effective, we are required to mail to holders of the Notes a notice briefly describing such amendment. However, the failure to give such notice to all holders of the Notes, or any defect therein, will not impair or affect the validity of the amendment.

Neither the Issuers nor any Affiliate of the Issuers may, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

## Transfer

The Notes will be issued in registered form and will be transferable only upon the surrender of the Notes being transferred for registration of transfer. We may require payment of a sum sufficient to cover any tax, assessment or other governmental charge payable in connection with certain transfers and exchanges.

## Satisfaction and Discharge

When (1) we deliver to the Trustee all outstanding Notes for cancelation or (2) all outstanding Notes have become due and payable or will become due and payable within one year, whether at maturity or on a redemption date as a result of the mailing of notice of redemption, and, in the case of clause (2), we irrevocably deposit with the Trustee funds in cash or U.S. Government Obligations or a combination thereof sufficient to pay, without consideration of any reinvestment of interest, at maturity or upon redemption all outstanding Notes, including interest thereon to maturity or such redemption date, and if in either case we pay all other sums payable under the Indenture by us, then the Indenture shall, subject to certain exceptions, cease to be of further effect.

## Defeasance

At any time, we may terminate all our obligations under the Notes and the Indenture (" *legal defeasance* "), except for certain obligations, including those respecting the defeasance trust and obligations to register the transfer or exchange of the Notes, to replace mutilated, destroyed, lost or stolen Notes and to maintain a registrar and paying agent in respect of the Notes.

In addition, at any time we may terminate our obligations under "—Change of Control" and under the covenants described under "—Certain Covenants" (other than the covenant described under "—Certain Covenants—Merger and Consolidation"), the operation of the cross acceleration provision, the bankruptcy provisions with respect to Significant Subsidiaries and the judgment default provision, all as described under "—Defaults" above, and the limitations contained in clause (3) of the first paragraph under "—Certain Covenants—Merger and Consolidation" above (" *covenant defeasance* ").

128

We may exercise our legal defeasance option notwithstanding our prior exercise of our covenant defeasance option. If we exercise our legal defeasance option, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. If we exercise our covenant defeasance option, payment of the Notes may not be accelerated because of an Event of Default specified in clause (3) (other than a default in the performance of, or a breach in, the covenant set forth under "—Certain Covenants—Merger and Consolidation"), (4), (5) (with respect only to Significant Subsidiaries), (6) or (7) under "—Defaults" above or because of the failure of the Company to comply with clause (3) of the first paragraph under "—Certain Covenants—Merger and Consolidation" above. If we exercise our legal defeasance option or our covenant defeasance option, each Subsidiary Guarantor will be released from all of its obligations with respect to its Subsidiary Guaranty.

In order to exercise either of our defeasance options, we must irrevocably deposit in trust (the " *defeasance trust* ") with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be, and must comply with certain other conditions, including delivery to the Trustee of an Opinion of Counsel to the effect that holders of the Notes will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred (and, in the case of legal defeasance only, such Opinion of Counsel must be based on a ruling of the Internal Revenue Service or other change in applicable Federal income tax law).

## Concerning the Trustee

Wells Fargo Bank, National Association is the Trustee under the Indenture. Wells Fargo Bank, National Association is the initial registrar and paying agent with regard to the Notes.

The Indenture contains certain limitations on the rights of the Trustee, should it become a creditor of the Issuers or a Subsidiary Guarantor, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions; *provided, however* , if it acquires any conflicting interest it must either eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Holders of at least a majority in principal amount of the outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. If an Event of Default occurs (and is not cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent man in the conduct of his own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of Notes, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense and then only to the extent required by the terms of the Indenture.

## No Personal Liability of Directors or Other Members of the Governing Board, Officers, Employees, Members and Stockholders

No director or other member of the Governing Board, officer, employee, incorporator, member or stockholder of an Issuer or any Subsidiary Guarantor will have any liability for any obligations of an Issuer or any Subsidiary Guarantor under the Notes, any Subsidiary Guaranty or the Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder of the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver and release may not be effective to waive

liabilities under the U.S. federal securities laws, and it is the view of the SEC that such a waiver is against public policy.

## Governing Law

The Indenture and the Notes are governed by, and will be construed in accordance with, the laws of the State of New York.

## Certain Definitions

" *Acquisition* " means the occurrence of both (i) the acquisition of a majority interest in the Company, pursuant to the Equity Purchase and Merger Agreement, by THL Refco Acquisition Partners together with certain affiliates and co-investors and (ii) the Merger.

" *Acquisition Date* " means the date on which the Acquisition is consummated.

" *Additional Assets* " means:

    (1)    any property, plant, equipment or other assets used or useful in a Related Business;

    (2)    the Capital Stock of a Person that becomes a Restricted Subsidiary or Regulated Subsidiary as a result of the acquisition of such Capital Stock by the Company or another Restricted Subsidiary or Regulated Subsidiary, as the case may be; or

    (3)    Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary or Regulated Subsidiary;

*provided, however* , that any such Restricted Subsidiary or Regulated Subsidiary described in clause (2) or (3) above is primarily engaged in a Related Business.

" *Affiliate* " of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

" *Asset Acquisition* " means (a) an Investment by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in any other Person if, as a result of such Investment, such Person shall become a Restricted Subsidiary or Regulated Subsidiary, as the case may be, or shall be merged with or into the Company or any Restricted Subsidiary or Regulated Subsidiary, or (b) the acquisition by the Company or any Restricted Subsidiary or Regulated Subsidiary of the assets of any other Person or any division or line of business of any other Person.

" *Asset Disposition* " means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) by the Company or any Restricted Subsidiary or Regulated Subsidiary, including any disposition by means of a merger, consolidation or similar transaction (each referred to for the purposes of this definition as a " *disposition* "), of:

    (1)    any shares of Capital Stock of a Restricted Subsidiary or Regulated Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Company, a Restricted Subsidiary or a Regulated Subsidiary and Class B Equity Interests);

    (2)    all or substantially all the assets of any division or line of business of the Company or any Restricted Subsidiary or Regulated Subsidiary; or

130

(3)    any other assets of the Company or any Restricted Subsidiary or Regulated Subsidiary (including any accounts receivable) outside of the ordinary course of business of the Company or such Restricted Subsidiary or Regulated Subsidiary

(other than, in the case of clauses (1), (2) and (3) above,

(A)    a disposition (i) by a Restricted Subsidiary or a Regulated Subsidiary to the Company or (ii) by the Company, a Restricted Subsidiary or a Regulated Subsidiary to a Restricted Subsidiary or a Regulated Subsidiary;

(B)    for purposes of the covenant described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" only, (i) a disposition that constitutes a Restricted Payment (or would constitute a Restricted Payment but for the exclusions from the definition thereof) and that is not prohibited by the covenant described under "—Certain Covenants—Limitation on Restricted Payments," including any dividends or distributions to be made as part of the Transactions, or is a Permitted Investment and (ii) a disposition of all or substantially all the assets of the Company in accordance with the covenant described under "—Certain Covenants—Merger and Consolidation;"

(C)    a disposition of assets or sale of Capital Stock with a Fair Market Value of less than $10.0 million;

(D)    the disposition of property or assets that are obsolete, damaged or worn out;

(E)    foreclosures on assets;

(F)    a disposition of cash or Temporary Cash Investments; and

(G)    the creation of a Lien (but not the sale or other disposition of the property subject to such Lien)).

" *Attributable Debt* " in respect of a Sale/Leaseback Transaction means, as of the time of determination, the present value (discounted at the interest rate borne by the Notes, compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended); *provided, however* , that if such Sale/Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

" *Average Life* " means, as of the date of determination, with respect to any Indebtedness, the quotient obtained by dividing:

(1)    the sum of the products of the numbers of years, calculated to the nearest one-twelfth, from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Indebtedness multiplied by the amount of such payment by

(2)    the sum of all such payments.

" *Bank Indebtedness* " means all Obligations pursuant to the Credit Agreement.

" *Broker-Dealer Regulated Subsidiary* " means any Subsidiary that is registered as a broker-dealer under the Exchange Act or any other applicable law requiring such registration.

" *Business Day* " means each day which is not a Legal Holiday.

" *Capital Lease Obligation* " means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation

131

determined in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

" *Capital Stock* " of any Person means any and all shares, interests (including membership and partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

" *Cash Contribution Amount* " means the aggregate amount of cash contributions made to the capital of the Company or any Subsidiary Guarantor described in the definition of "Contribution Indebtedness."

" *Class B Equity Interests* " means the Class B membership interests, or comparable shares of Capital Stock, that are issued from time to time by Refco Securities, LLC or any other Regulated Subsidiary or Restricted Subsidiary, in the ordinary course of their respective businesses and held by employees of Refco Securities, LLC or such other Regulated Subsidiary or Restricted Subsidiary who conduct trading activities in designated proprietary trading accounts established on the books and records of Refco Securities, LLC or such other Regulated Subsidiary or Restricted Subsidiary, as applicable.

" *Code* " means the Internal Revenue Code of 1986, as amended.

" *Commodity Price Protection Agreement* " means, with respect to any Person, any forward contract, commodity swap, commodity option or other similar agreement or arrangement entered into to protect such Person or its Subsidiaries against fluctuations in commodity prices.

" *Consolidated Coverage Ratio* " as of any date of determination means the ratio of (a) the aggregate amount of EBITDA for the period of the most recent four consecutive fiscal quarters for which internal financial statements are available prior to the date of such determination to (b) Consolidated Interest Expense for such four fiscal quarters; *provided, however* , that:

(1)     if the Company or any Restricted Subsidiary or Regulated Subsidiary has Incurred any Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio is an Incurrence of Indebtedness, or both, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving effect on a *pro forma* basis to such Indebtedness as if such Indebtedness had been Incurred on the first day of such period;

(2)     if the Company or any Restricted Subsidiary or Regulated Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Coverage Ratio, EBITDA and Consolidated Interest Expense for such period shall be calculated on a *pro forma* basis as if such repayment, repurchase, defeasance or discharge had occurred on the first day of such period;

(3)     if since the beginning of such period the Company or any Restricted Subsidiary or Regulated Subsidiary shall have made any Asset Disposition, EBITDA for such period shall be reduced by an amount equal to EBITDA (if positive) directly attributable to the assets which are the subject of such Asset Disposition for such period, or increased by an amount equal to EBITDA (if negative), directly attributable thereto for such period, and Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Company or any Restricted Subsidiary

132

or Regulated Subsidiary repaid, repurchased, redeemed or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries or Regulated Subsidiaries in connection with such Asset Disposition for such period (or, if the Capital Stock of any Restricted Subsidiary or Regulated Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary or Regulated Subsidiary to the extent the Company and its continuing Restricted Subsidiaries and Regulated Subsidiaries are no longer liable for such Indebtedness after such sale);

(4)     if since the beginning of such period the Company or any Restricted Subsidiary or Regulated Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary or Regulated Subsidiary (or any Person which becomes a Restricted Subsidiary or Regulated Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction requiring a calculation to be made hereunder, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period; and

(5)     if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or Regulated Subsidiary or was merged with or into the Company or any Restricted Subsidiary or Regulated Subsidiary since the beginning of such period) shall have made any Asset Disposition, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (3) or (4) above if made by the Company or a Restricted Subsidiary or Regulated Subsidiary during such period, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto as if such Asset Disposition, Investment or acquisition had occurred on the first day of such period.

For purposes of calculating the Consolidated Coverage Ratio:

(1)     whenever *pro forma* effect is to be given to any Asset Disposition, Investment or acquisition of assets pursuant to clause (3) or (4) above, the *pro forma* calculations shall be determined in good faith by the chief financial officer of the Company and shall comply with the requirements of Rule 11-02 of Regulation S-X promulgated by the SEC, except that such *pro forma* calculations may include Pro Forma Cost Savings; and

(2)     in calculating Consolidated Interest Expense attributable to interest on any Indebtedness computed on a *pro forma* basis, (a) interest on outstanding Indebtedness determined on a fluctuating basis as of the date of determination and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate *per annum* equal to the rate of interest on such Indebtedness in effect on the calculation date; (b) if interest on any Indebtedness actually incurred on the date of determination may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rates, then the interest rate in effect on the date of determination will be deemed to have been in effect during the four-quarter period; and (c) notwithstanding clause (a) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by any Interest Rate Agreement, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreement.

If any Indebtedness is incurred under a revolving credit facility and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated based on the average daily balance of such Indebtedness for the four fiscal quarters subject to the *pro forma* calculation.

" *Consolidated Interest Expense* " means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries, plus, to the extent not included

in such total interest expense and to the extent incurred by the Company or its Restricted Subsidiaries and Regulated Subsidiaries, without duplication:

(1)    interest expense attributable to Capital Lease Obligations;

(2)    amortization of debt discount;

(3)    non-cash interest expense;

(4)    commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(5)    net cash payments pursuant to Hedging Obligations; and

(6)    dividends accrued in respect of all Disqualified Stock of the Company and all Preferred Stock of any Restricted Subsidiary or Regulated Subsidiary, in each case held by Persons other than the Company or a Wholly Owned Subsidiary (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Company);

*less* interest income actually received in cash for such period (other than interest income attributable to customer financing arrangements). "Consolidated Interest Expense" excludes the (i) amortization of deferred financing fees and the expensing of any bridge or other financing fees, (ii) interest expense attributable to Customer Financing Indebtedness and (iii) net payments pursuant to Hedging Obligations that do not constitute Indebtedness.

" *Consolidated Net Income* " means, for any period, without duplication, the net income of the Company and its consolidated Subsidiaries; *provided, however* , that there shall not be included in such Consolidated Net Income:

(1)    any net income of any Person (other than the Company) if such Person is neither a Restricted Subsidiary nor a Regulated Subsidiary, except that, (A) subject to the exclusion contained in clause (4) below, the Company's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Company or a Restricted Subsidiary or Regulated Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a Restricted Subsidiary or Regulated Subsidiary, to the limitations contained in clause (3) below) and (B) the Company's equity in the net income or loss of FXCM shall be included in such Consolidated Net Income;

(2)    except as provided in the definition of Consolidated Coverage Ratio, any net income (or loss) of any Person acquired by the Company or a Subsidiary in a pooling of interests transaction (or any transaction accounted for in a manner similar to a pooling of interests) for any period prior to the date of such acquisition;

(3)    any net income of any Restricted Subsidiary or Regulated Subsidiary if such Restricted Subsidiary or Regulated Subsidiary, as the case may be, is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary or Regulated Subsidiary, directly or indirectly, to the Company, except that:

(A)    subject to the exclusion contained in clause (4) below, the Company's equity in the net income of any such Restricted Subsidiary or Regulated Subsidiary for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Restricted Subsidiary or Regulated Subsidiary during such period to the Company or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to another Restricted Subsidiary or Regulated Subsidiary, to the limitation contained in this clause); *provided, however* , to the extent that any net income of a Restricted Subsidiary or Regulated

134

Subsidiary for such period would be excluded as a result of this clause (A), such net income shall be included in such Consolidated Net Income if the Company delivers to the Trustee on the date of the event requiring calculation of Consolidated Net Income a certificate of the chief financial officer of the Company certifying that the restrictions on the payments of dividends or the making of distributions by such Restricted Subsidiary or Regulated Subsidiary to the Company do not impair the Company's ability to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due; and

     (B)    the Company's equity in a net loss of any such Restricted Subsidiary or Regulated Subsidiary for such period shall be included in determining such Consolidated Net Income;

(4)    any gain (or loss) realized upon the sale or other disposition of any assets of the Company, its consolidated Subsidiaries or any other Person (including pursuant to any Sale/Leaseback Transaction) which is not sold or otherwise disposed of in the ordinary course of business and any gain (or loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(5)    any net after-tax extraordinary, unusual or nonrecurring gains or losses;

(6)    all restructuring charges, including severance, relocation and transition costs;

(7)    noncash compensation charges, including any such charges arising from stock options, restricted stock grants or other equity-incentive programs;

(8)    any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness;

(9)    any non-cash impairment charges resulting from the application of Statements of Financial Accounting Standards No. 142 and 144 and the amortization of intangibles arising pursuant to Statement of Financial Accounting Standards No. 141; and

(10)    the cumulative effect of a change in accounting principles,

in each case, for such period. Notwithstanding the foregoing, for the purposes of the covenant described under "—Certain Covenants—Limitation on Restricted Payments" only, there shall be excluded from Consolidated Net Income any repurchases, repayments or redemptions of Investments, proceeds realized on the sale of Investments or return of capital to the Company, a Restricted Subsidiary or a Regulated Subsidiary to the extent such repurchases, repayments, redemptions, proceeds or returns increase the amount of Restricted Payments permitted under such covenant pursuant to clause (a)(3)(D) thereof. If the Company or any Successor Company is organized as a corporation and solely for purposes of determining the amount available for Restricted Payments under clause (a)(3) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments," an amount equal to any reduction in current taxes recognized during the applicable period by the Company, its Restricted Subsidiaries and Regulated Subsidiaries as a direct result of deductions arising from (A) the amortization allowed under Section 167 or 197 of the Code for the step-up in the federal income tax bases of goodwill and other assets (tangible or intangible) arising from the Transactions and (B) employee termination and related restructuring reserves established pursuant to purchase accounting for the two-year period commencing with the Issue Date, in each case, will be included in the calculation of "Consolidated Net Income" so long as such addition will not result in double-counting.

    " *Contribution Indebtedness* " means Indebtedness of the Company or any Subsidiary Guarantor in an aggregate principal amount not greater than twice the aggregate amount of cash contributions made

to the capital of the Company or such Subsidiary Guarantor after the Issue Date; *provided* that such Contribution Indebtedness:

    (1)    if the aggregate principal amount of such Contribution Indebtedness is greater than one times such cash contributions to the capital of the Company or such Subsidiary Guarantor, as applicable, the amount of such excess shall be (A)(x) Subordinated Obligations (other than Secured Indebtedness) or (y) Indebtedness that ranks *pari passu* with the Notes (other than Secured Indebtedness) and (B) Indebtedness with a Stated Maturity later than the Stated Maturity of the Notes; and

    (2)    (a) is incurred within 180 days after the making of such cash contributions and (b) is so designated as Contribution Indebtedness pursuant to an Officers' Certificate on the date of the Incurrence thereof.

" *Credit Agreement* " means the Credit Agreement to be entered into by and among the Company, certain of its Subsidiaries, the lenders referred to therein, Bank of America, N.A., as Administrative Agent, Credit Suisse First Boston, as Syndication Agent, and Deutsche Bank Securities Inc., as Documentation Agent, together with the related documents thereto (including the term loans, revolving loans and letters of credit thereunder, any Guarantees and security documents), as amended, extended, renewed, restated, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, maturity, terms, conditions, covenants and other provisions) from time to time, and any agreement (and related document) governing Indebtedness incurred to Refinance, in whole or in part, the borrowings and commitments then outstanding or permitted to be outstanding under such Credit Agreement or a successor Credit Agreement, whether by the same or any other lender or group of lenders or other investors.

" *Credit Facilities* " means one or more debt facilities (including, without limitation, the Credit Agreement), commercial paper facilities or indentures, in each case with banks or other institutional lenders or other investors or a trustee providing for revolving credit loans, term loans, letters of credit or issuances of notes or other debt securities, in each case as amended, modified, renewed, refunded, replaced, restated, substituted or refinanced in whole or in part from time to time.

" *Currency Agreement* " means any foreign exchange contract, currency swap agreement or other similar agreement with respect to currency values.

" *Customer Financing Indebtedness* " means (i) short-term Indebtedness (including without limitation Indebtedness under Swap Contracts) that is incurred in the ordinary course of business and (a) is incurred by any Restricted Subsidiary in conjunction with its customer financing business, (b) is incurred by any Regulated Subsidiary for the purpose of offsetting customer positions or financing customer margined inventory, acquired or cleared or financed in conjunction with customer brokerage activities and is secured by a Lien on the assets being financed, (c) is incurred by any Regulated Subsidiary and consists of obligations under letters of credit posted to support clearing house guarantees issued in the ordinary course of business, or (d) constitutes customer financing entered into by any Regulated Subsidiary; *provided, however* , that, after giving effect to the Incurrence of any such Indebtedness, such Person's Regulatory Net Capital is in compliance with all applicable rules and regulations governing such Person and the conduct of its business, and (ii) Guarantees by the Company of any short-term Indebtedness described in clause (i) of this definition.

" *Default* " means any event which is, or after notice or passage of time or both would be, an Event of Default.

" *Designated Noncash Consideration* " means the Fair Market Value of noncash consideration received by the Company or one of its Restricted Subsidiaries or Regulated Subsidiaries in connection with an Asset Disposition that is so designated as Designated Noncash Consideration pursuant to an Officers' Certificate setting forth the basis of such valuation, less the amount of cash or Temporary

Cash Investments received in connection with a subsequent sale of such Designated Noncash Consideration.

"  *Designated Preferred Stock*  " means Preferred Stock of the Company or Parent (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officers' Certificate, on the issuance date thereof, the Net Cash Proceeds of which are excluded from the calculation set forth in clause (3) of paragraph (a) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

"  *Designated Offering*  " means an Equity Offering or an IDS Offering.

"  *Designated Senior Indebtedness*  ," with respect to a Person means:

  (1)    the Bank Indebtedness; and

  (2)    any other Senior Indebtedness of such Person, other than any Indebtedness of such Person owed to the Company, Refco Finance Inc. or any of their respective Subsidiaries, which, at the date of determination, has an aggregate principal amount outstanding of, or under which, at the date of determination, the holders thereof are committed to lend up to, at least $25.0 million and is specifically designated by such Person in the instrument evidencing or governing such Senior Indebtedness as "Designated Senior Indebtedness" for purposes of the Indenture.

"  *Disqualified Stock*  " means, with respect to any Person, any Capital Stock, other than Class B Equity Interests, which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

  (1)    matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such Person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

  (2)    is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock; or

  (3)    is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part;

in each case on or prior to the 91st day after the Stated Maturity of the Notes; *provided, however* , that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the Stated Maturity of the Notes shall not constitute Disqualified Stock if:

  (1)    the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the terms applicable to the Notes as described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" and "—Change of Control;" and

  (2)    any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to the Indenture; *provided, however* , that if such Disqualified Stock

could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such Person.

" *EBITDA* " for any period means the sum of Consolidated Net Income, plus the following to the extent deducted in calculating such Consolidated Net Income and without duplication:

(1)     all income tax expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries;

(2)     Consolidated Interest Expense;

(3)     depreciation and amortization expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries;

(4)     any reasonable expenses, fees or charges related to any Equity Offering, Permitted Investment, acquisition, recapitalization or Indebtedness permitted to be Incurred under the Indenture or to the Transactions;

(5)     any net gain or loss from Hedging Obligations;

(6)     the amount of management, monitoring, consulting and advisory fees and related expenses paid to the Equity Sponsor (or any accruals relating to such fees and related expenses) during such period in accordance with the Management Agreement; and

(7)     all other non-cash charges of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period) and less all non-cash items of income of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries (other than accruals of revenue by the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries in the ordinary course of business);

in each case for such period. Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation and amortization and non-cash charges of, a Restricted Subsidiary or Regulated Subsidiary shall be added to Consolidated Net Income to compute EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net income or loss of such Restricted Subsidiary or Regulated Subsidiary was included in calculating Consolidated Net Income.

" *Equity Purchase and Merger Agreement* " means the Equity Purchase and Merger Agreement, dated as of June 8, 2004, by and among Refco Group Ltd., LLC, a Delaware limited liability company, Refco Group Holdings, Inc., a Delaware corporation, THL Refco Acquisition Partners, a Delaware limited partnership, and Refco Merger LLC, a Delaware limited liability company, as amended on July 9, 2004 and as the same may be amended or modified prior to the Acquisition Date.

" *Equity Offering* " means an offering (including a private placement) of the Capital Stock (other than Disqualified Stock) of the Company or Parent, other than (i) public offerings with respect to Capital Stock registered on Form S-8 under the Securities Act and (ii) issuances to any Subsidiary of the Issuers.

" *Equity Sponsor* " means Thomas H. Lee Partners, L.P., a Delaware limited partnership.

" *Exchange Act* " means the U.S. Securities Exchange Act of 1934, as amended.

" *Exchange Notes* " means the debt securities of the Issuers issued pursuant to the Indenture in exchange for, and in an aggregate principal amount equal to, the Notes, in compliance with the terms of a Registration Rights Agreement.

" *Fair Market Value* " means, with respect to any asset or property, the price which could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. If the Fair Market Value of the property or assets in question is in excess of $25.0 million, such determination must be confirmed in good faith by the Governing Board of the Company, whose determination will be conclusive and evidenced by a resolution of such Governing Board. For purposes of determining the Fair Market Value of Capital Stock, the value of the Capital Stock of a Person shall be based upon such Person's property and assets, exclusive of goodwill or any similar intangible asset.

" *Foreign Subsidiary* " means any Restricted Subsidiary or Regulated Subsidiary that is not organized under the laws of the United States of America or any state thereof or the District of Columbia.

" *FXCM* " means Forex Capital Markets, LLC.

" *Futures Commission Regulated Subsidiary* " means any Subsidiary that is required to register as a futures commission merchant under the Commodity Exchange Act or any other law requiring such registration.

" *GAAP* " means generally accepted accounting principles in the United States of America as in effect as of the Issue Date, including those set forth in:

    (1)    the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants;

    (2)    statements and pronouncements of the Financial Accounting Standards Board;

    (3)    such other statements by such other entity as approved by a significant segment of the accounting profession; and

    (4)    the rules and regulations of the SEC governing the inclusion of financial statements (including *pro forma* financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act, including opinions and pronouncements in staff accounting bulletins and similar written statements from the accounting staff of the SEC.

" *Governing Board* " of the Company or any other Person means, (i) the managing board or managers forming any controlling committee of managers of the Company or such Person, for so long as the Company or such Person is a limited liability company, (ii) the board of directors of the Company or such Person, if the Company or such Person is a corporation, (iii) any similar governing body or (iv) in the case of any of the forgoing, any authorized committee of the foregoing.

" *Governmental Authority* " means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

" *GP Obligations* " means obligations of the Company, any Restricted Subsidiary or any Regulated Subsidiary with respect to Indebtedness of limited partnerships or similar passive collective investment entities that trade derivatives and in which the Company, such Restricted Subsidiary or such Regulated Subsidiary serves as general partner (or has a similar status) in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business and which have arisen solely as a result of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's role as general partner (or similar status) of such entities.

" *Guarantee* " means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person:

(1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

(2) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

*provided, however* , that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

" *Guaranty Agreement* " means a supplemental indenture, in form reasonably satisfactory to the Trustee, pursuant to which a Subsidiary Guarantor guarantees the Issuers' obligations with respect to the Notes on the terms provided for in the Indenture.

" *Hedging Obligations* " of any Person means the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Price Protection Agreement.

" *Holder* " or " *Noteholder* " means the Person in whose name a Note is registered on the registrar's books.

" *IDS Offering* " means a bona fide offering in the United States or Canada of units consisting of common stock and notes of the Company; *provided* that the net cash proceeds of such offering that are used to redeem notes pursuant to the third paragraph under the caption"—Optional Redemption" shall only consist of the net cash proceeds attributable to the proceeds of the common stock of such offering.

" *Income Tax Liabilities* " means an amount determined by multiplying (a)(i) all taxable income and gains of the Company and its Subsidiaries for such taxable year (the " *Taxable Amount* ") minus (ii) an amount (not to exceed the Taxable Amount for such taxable year) equal to all losses of the Company and its Subsidiaries in any of the three prior taxable years that have not been previously subtracted pursuant to this clause (ii) from the Taxable Amount for any prior year by (b) forty-two percent (42%) or, if there is a change in applicable federal, state or local tax rates, such other rate as the Issuers determine in good faith to be a reasonable approximation of the effective combined federal, state and local income taxation rates generally payable by Parent or direct or indirect owners of the Company with respect to the income and gains of the Company and its Subsidiaries.

" *Incur* " means issue, assume, Guarantee, incur or otherwise become liable for; *provided, however* , that any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or Regulated Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Restricted Subsidiary or Regulated Subsidiary. The term "Incurrence" when used as a noun shall have a correlative meaning. Solely for purposes of determining compliance with "—Certain Covenants—Limitation on Indebtedness":

(1) amortization of debt discount or the accretion of principal with respect to a non-interest bearing or other discount security;

(2) the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Capital Stock in the form of additional Capital Stock of the same class and with the same terms;

(3) increases in liabilities as a result of fluctuations in exchange rates; and

140

will not be deemed to be the Incurrence of Indebtedness.

"*Indebtedness*" means, with respect to any Person on any date of determination (without duplication):

(1)     the principal in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable;

(2)     all Capital Lease Obligations of such Person and all Attributable Debt in respect of Sale/Leaseback Transactions entered into by such Person;

(3)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding any accounts payable or other liability to trade creditors arising in the ordinary course of business);

(4)     all obligations of such Person for the reimbursement of any obligor on any letter of credit, bankers' acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

if, and to the extent that, any of the foregoing Indebtedness (other than letters of credit, bankers' acceptances or similar credit transactions) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(5)     the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person, the principal amount of such Preferred Stock to be determined in accordance with the Indenture (but excluding, in each case, any accrued dividends);

(6)     all obligations of the type referred to in clauses (1) through (5) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor or guarantor, including by means of any Guarantee;

(7)     all obligations of the type referred to in clauses (1) through (6) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the Fair Market Value of such property or assets and the amount of the obligation so secured; and

(8)     to the extent not otherwise included in this definition, Hedging Obligations of such Person.

Notwithstanding the foregoing, "Indebtedness" shall not include (w) Customer Financing Indebtedness, (x) GP Obligations, (y) Hedging Obligations that have been incurred by such Person on behalf of customers or in order to finance the carrying of securities or investment positions and (z) indemnification, adjustment of purchase price, earn-out or similar obligations incurred or assumed by any of the Company, a Restricted Subsidiary or a Regulated Subsidiary in connection with the acquisition or disposition of any of their respective businesses or assets whether or not such acquisition occurred before or after the Issue Date.

141

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all obligations as described above; *provided, however* , that in the case of Indebtedness sold at a discount, the amount of such Indebtedness at any time will be the accreted value thereof at such time.

" *Independent Qualified Party* " means an investment banking firm, accounting firm or appraisal firm of national standing; *provided, however* , that such firm is not an Affiliate of the Company.

" *Interest Rate Agreement* " means any interest rate swap agreement, interest rate cap agreement or other financial agreement or arrangement with respect to exposure to interest rates.

" *Investment* " in any Person means any direct or indirect advance, loan or other extension of credit (including by way of Guarantee or similar arrangements but excluding any advances to customers in the ordinary course of business) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by such Person; *provided* that assets held to secure Customer Financing Indebtedness in the ordinary course of business shall not constitute an Investment. If the Company or any Restricted Subsidiary or Regulated Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary or Regulated Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary or Regulated Subsidiary, any Investment by the Company or any Restricted Subsidiary or Regulated Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time. The acquisition by the Company or any Restricted Subsidiary or Regulated Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary or Regulated Subsidiary in such third Person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its Fair Market Value at the time the Investment is made and without giving effect to subsequent changes in value.

For purposes of the definition of "Unrestricted Subsidiary," the definition of "Restricted Payment" and the covenant described under "—Certain Covenants—Limitation on Restricted Payments":

(1)    "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however* , that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to (A) the Company's "Investment" in such Subsidiary at the time of such redesignation less (B) the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer.

" *Issue Date* " means August 5, 2004.

" *Legal Holiday* " means a Saturday, a Sunday or a day on which banking institutions are not required to be open in the State of New York.

" *Lien* " means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

" *Management Agreement* " means the Management Agreement dated the Acquisition Date by and between Refco Group Ltd., LLC and THL Managers V, LLC, as in effect on such date.

142

" *Merger* " means the merger on the Acquisition Date of Refco Finance Holdings LLC with and into Refco Group Ltd., LLC, with Refco Group Ltd., LLC continuing as the surviving entity, pursuant to the Equity Purchase and Merger Agreement.

" *Moody's* " means Moody's Investors Service, Inc. and any successor to its rating agency business.

" *Net Available Cash* " from an Asset Disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other non-cash form), in each case net of:

(1)     all direct costs relating to such Asset Disposition, including, without limitation, legal, accounting and investment banking fees, sales commissions and any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements;

(2)     all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets, or which must by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by applicable law, be repaid out of the proceeds from such Asset Disposition;

(3)     all distributions and other payments required to be made to minority interest holders in Restricted Subsidiaries and Regulated Subsidiaries as a result of such Asset Disposition;

(4)     the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the property or other assets disposed in such Asset Disposition and retained by the Company or any Restricted Subsidiary or Regulated Subsidiary after such Asset Disposition, including liabilities with respect to severance costs, pension and other post-employment benefit liabilities, liabilities related to environmental matters or indemnification obligations associated with such Asset Disposition; and

(5)     any portion of the purchase price from an Asset Disposition placed in escrow, whether as a reserve for adjustment of the purchase price, for satisfaction of indemnities in respect of such Asset Disposition or otherwise in connection with that Asset Disposition; *provided, however* , that upon the termination of that escrow, Net Available Cash will be increased by any portion of funds in the escrow that are released to the Company or any Restricted Subsidiary or Regulated Subsidiary.

" *Net Cash Proceeds* ," with respect to any issuance or sale of Capital Stock or Indebtedness, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

" *Net Indebtedness to EBITDA Ratio* " means, with respect to any Person, the ratio of: (a) the Indebtedness of the Company and its Restricted Subsidiaries and Regulated Subsidiaries, as of the end of the most recently ended fiscal quarter for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur, *plus* the amount of any Indebtedness Incurred subsequent to the end of the such fiscal quarter, *less* the amount of cash and Temporary Cash Investments (other than cash held as segregated funds with respect to customer accounts) that would be stated on the balance sheet of the Company and held by the Company as of such date of determination, as determined in accordance with GAAP, to (b) the Company's EBITDA for the most recently ended four full fiscal quarters for which internal financial

143

statements are available immediately preceding the date on which the event for which such calculation is being made shall occur (the " *Measurement Period* "); *provided, however* , that: (i) in making such computation, Indebtedness shall include the greater of (x) the average daily balance outstanding under any revolving credit facility during the most recently ended fiscal quarter and (y) the actual amount of Indebtedness outstanding under any revolving credit facility as of the date for which such calculation is being made; and (ii) if the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries consummates a material acquisition or an Asset Disposition or other disposition of assets subsequent to the commencement of the Measurement Period but prior to the event for which the calculation of the Net Indebtedness to EBITDA Ratio is made, then the Net Indebtedness to EBITDA Ratio shall be calculated giving *pro forma* effect to such material acquisition or Asset Disposition or other disposition of assets, as if the same had occurred at the beginning of the applicable period. Any *pro forma* calculations necessary pursuant to this "Net Indebtedness to EBITDA Ratio" shall be made in accordance with the provisions set forth in the second paragraph of the definition of "Consolidated Coverage Ratio."

" *Net Senior Indebtedness to EBITDA Ratio* " means, with respect to any Person, the ratio of: (a) the Senior Indebtedness of the Company and its Restricted Subsidiaries and Regulated Subsidiaries, as of the end of the most recently ended fiscal quarter for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur, *plus* the amount of any Senior Indebtedness Incurred subsequent to the end of such fiscal quarter, *less* the amount of cash and Temporary Cash Investments (other than cash held as segregated funds with respect to customer accounts) that would be stated on the balance sheet of the Company and held by the Company as of such date of determination, as determined in accordance with GAAP, to (b) the Company's EBITDA for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur (the " *Measurement Period* "); *provided, however* , that: (i) in making such computation, Senior Indebtedness shall include the greater of (x) the average daily balance outstanding under any revolving credit facility during the most recently ended fiscal quarter and (y) the actual amount of Senior Indebtedness outstanding under any revolving credit facility as of the date for which such calculation is being made; and (ii) if the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries consummates a material acquisition or an Asset Disposition or other disposition of assets subsequent to the commencement of the Measurement Period but prior to the event for which the calculation of the Net Senior Indebtedness to EBITDA Ratio is made, then the Net Senior Indebtedness to EBITDA Ratio shall be calculated giving *pro forma* effect to such material acquisition or Asset Disposition or other disposition of assets, as if the same had occurred at the beginning of the applicable period. Any *pro forma* calculations necessary pursuant to this "Net Senior Indebtedness to EBITDA Ratio" shall be made in accordance with the provisions set forth in the second paragraph of the definition of "Consolidated Coverage Ratio."

" *Obligations* " means, with respect to any Indebtedness, all obligations for principal, premium, interest, penalties, fees, indemnifications, reimbursements and other amounts payable pursuant to the documentation governing such Indebtedness.

" *Offering Circular* " means the offering circular dated July 22, 2004, relating to the Notes.

" *Officer* " means the Chairman of the Governing Board, the President, any Vice President, the Treasurer or the Secretary of the Company.

" *Officers' Certificate* " means a certificate signed by two Officers.

" *Opinion of Counsel* " means a written opinion from legal counsel who is reasonably acceptable to the Trustee. The counsel may be an employee of or counsel to the Company or the Trustee.

144

" *Parent* " means New Refco Group Ltd. LLC or any other direct or indirect parent company of the Company.

" *Permitted Asset Swap* " means the disposition by the Company or its Restricted Subsidiaries or Regulated Subsidiaries of assets to another Person or Persons in exchange for which the Company and the Restricted Subsidiaries and Regulated Subsidiaries receive assets having, in the reasonable judgment of the disinterested members of the Governing Board of the Company, a Fair Market Value substantially equivalent to or greater than the Fair Market Value of the assets so disposed; *provided, however* , that no such disposition or series of related dispositions shall constitute Permitted Asset Swaps to the extent that the aggregate Fair Market Value of the assets so disposed which combined with the Fair Market Value of the assets disposed of in one or more Permitted Asset Swaps exceeds $100.0 million; *provided further, however* , that if the book value of the assets to be disposed in a Permitted Asset Swap (or in a series of related Permitted Asset Swaps) exceeds $50.0 million, such disposition shall not constitute a Permitted Asset Swap unless an Independent Qualified Party shall have determined in writing that the Fair Market Value of the assets to be received by the Company, its Restricted Subsidiaries and its Regulated Subsidiaries is substantially equivalent to or greater than the Fair Market Value of the assets to be disposed.

" *Permitted Holders* " means:

(1)     the Equity Sponsor or any of its Affiliates;

(2)     Phillip R. Bennett or any of his Subsidiaries; and

(3)     any Person acting in the capacity of underwriter in connection with a Designated Offering.

" *Permitted Investment* " means an Investment by the Company or any Restricted Subsidiary or Regulated Subsidiary in:

(1)     the Company, a Restricted Subsidiary or a Regulated Subsidiary or a Person that will, upon the making of such Investment, become a Restricted Subsidiary or a Regulated Subsidiary, as the case may be; *provided, however* , that the primary business of such Restricted Subsidiary or Regulated Subsidiary is a Related Business;

(2)     another Person if, as a result of such Investment, such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Company, a Restricted Subsidiary or a Regulated Subsidiary; *provided, however* , that such Person's primary business is a Related Business;

(3)     cash and Temporary Cash Investments;

(4)     receivables owing to the Company or any Restricted Subsidiary or Regulated Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided, however* , that such trade terms may include such concessionary trade terms as the Company or any such Restricted Subsidiary or Regulated Subsidiary deems reasonable under the circumstances;

(5)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6)     loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary or Regulated Subsidiary;

(7)     stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or Regulated Subsidiary or in satisfaction of judgments;

145

(8)    any Person to the extent such Investment represents the non-cash portion of the consideration received for an Asset Disposition as permitted pursuant to the covenant described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" or (B) a disposition of assets not constituting an Asset Disposition;

(9)    any Person where such Investment was acquired by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries (A) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary or Regulated Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (B) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(10)    any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary or Regulated Subsidiary;

(11)    any Person to the extent such Investments consist of Hedging Obligations or Guarantees otherwise permitted under the covenant described under "—Certain Covenants—Limitation on Indebtedness;"

(12)    any Person to the extent such Investments exist on the Issue Date, and any extension, modification or renewal of any such Investments existing on the Issue Date, but only to the extent not involving additional advances, contributions or other Investments of cash or other assets or other increases thereof (other than as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities, in each case, pursuant to the terms of such Investment as in effect on the Issue Date);

(13)    any Person if the payment for such Investment consists entirely of Capital Stock (other than Disqualified Stock) of the Company or Parent; and

(14)    Persons to the extent such Investments, when taken together with all other Investments made pursuant to this clause (14) and outstanding on the date such Investment is made, do not exceed the greater of (A) $125.0 million and (B) an amount in U.S. dollars equal to the product of (x) $125.0 million and (y) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date on which the applicable Investment is made pursuant to this clause (14).

" *Permitted Junior Securities* " means (1) Capital Stock of the Issuers, any Subsidiary Guarantor or Parent or (2) unsecured debt securities that are subordinated to all Senior Indebtedness (and any debt securities issued in exchange for Senior Indebtedness) to substantially the same extent as, or to a greater extent than, the Notes and the Subsidiary Guaranties are subordinated to Senior Indebtedness under the Indenture.

" *Person* " means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

" *Preferred Stock* ," as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as

to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

" *principal* " of a Note means the principal of the Note plus the premium, if any, payable on the Note which is due or overdue or is to become due at the relevant time.

" *Pro Forma Cost Savings* " means, with respect to any period, the reduction in net costs and related adjustments that (i) were directly attributable to an Asset Acquisition, Investment or Asset Disposition that occurred during the four-quarter period or after the end of the four-quarter period and on or prior to the date of determination and calculated on a basis that is consistent with Regulation S-X under the Securities Act as in effect and applied as of the date of the Indenture, (ii) were actually implemented by the business that was the subject of any such Asset Acquisition, Investment or Asset Disposition within six months after the date of the applicable Asset Acquisition, Investment or Asset Disposition and prior to the date of determination and are supportable and quantifiable by the underlying accounting records of such business or (iii) relate to the business that is the subject of any such Asset Acquisition, Investment or Asset Disposition and that the Company reasonably determines are probable based upon specifically identifiable actions to be taken within six months of the date of the applicable Asset Acquisition, Investment or Asset Disposition and, in the case of each of (i), (ii) and (iii), are described, as provided below, in an Officers' Certificate, as if all such reductions in costs had been effected as of the beginning of such period. Pro Forma Cost Savings described above shall be accompanied by a certificate delivered to the Trustee from the Company's chief financial officer that outlines the specific actions taken or to be taken, the net cost savings achieved or to be achieved from each such action and that, in the case of clause (iii) above, such savings have been determined to be probable.

" *Purchase Money Indebtedness* " means Indebtedness (including Capital Lease Obligations) (1) consisting of the deferred purchase price of property, conditional sale obligations, obligations under any title retention agreement, other purchase money obligations and obligations in respect of industrial revenue bonds or similar Indebtedness, in each case where the maturity of such Indebtedness does not exceed the anticipated useful life of the asset being financed or (2) Incurred to finance the acquisition (whether directly or through acquisition of Capital Stock) by the Company or a Restricted Subsidiary or Regulated Subsidiary of any asset, including additions and improvements, used or useful in a Related Business in the ordinary course of business; *provided, however* , that such Indebtedness is Incurred within 270 days after such acquisition of such assets.

" *Refinance* " means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Indebtedness. "Refinanced" and "Refinancing" shall have correlative meanings.

" *Refinancing Indebtedness* " means Indebtedness that Refinances any Indebtedness of the Company or any Restricted Subsidiary or Regulated Subsidiary existing on the Issue Date or subsequently Incurred in compliance with the Indenture, including Indebtedness that Refinances Refinancing Indebtedness; *provided, however* , that:

    (1)    such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced;

    (2)    such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being Refinanced;

    (3)    such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then

147

outstanding (plus fees and expenses, including any premium and defeasance costs) under the Indebtedness being Refinanced; and

(4)    if the Indebtedness being Refinanced is subordinated in right of payment to the Notes, such Refinancing Indebtedness is subordinated in right of payment to the Notes at least to the same extent as the Indebtedness being Refinanced;

*provided further, however* , that Refinancing Indebtedness shall not include (A) Indebtedness of a Restricted Subsidiary or Regulated Subsidiary that Refinances Indebtedness of the Company or (B) Indebtedness of the Company, a Restricted Subsidiary or a Regulated Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

" *Registration Rights Agreement* " means the Registration Rights Agreement dated August 5, 2004, among the Issuers and the initial purchasers and, if applicable, the Subsidiary Guarantors and any similar registration rights agreement in respect of Additional Notes.

" *Regulated Subsidiary* " means any Subsidiary of the Company so long as such Subsidiary is (a) a Broker-Dealer Regulated Subsidiary, (b) a Futures Commission Regulated Subsidiary, (c) a Foreign Subsidiary subject to regulation as a futures commission merchant or broker (or the equivalent thereof) under applicable laws, (d) otherwise subject to regulation by any Governmental Authority and for which the incurrence of Indebtedness (including Guarantees) or the granting of Liens with respect to its assets would be prohibited or restricted or would result in a negative impact on any minimum capital or similar requirement applicable to it or (e) subject to regulation by any Regulatory Supervising Organization.

" *Regulatory Net Capital* " means, for each Regulated Subsidiary, the Regulatory Total Capital adjusted by amounts and calculations that are specified in the laws of the applicable Regulatory Supervising Organizations.

" *Regulatory Supervising Organization* " means any of (a) the Commodity Futures Trading Commission, (b) the National Futures Association, (c) the SEC, (d) the National Association of Securities Dealers or (e) any governmental or regulatory organization, exchange, clearing house or financial regulatory authority of which a Regulated Subsidiary is a member or to whose rules it is subject.

" *Regulatory Total Capital* " means, for each Regulated Subsidiary, the amount of capital (including subordinated debt which is characterized as equity for regulatory reporting purposes) as calculated pursuant to the rules of, and reported from time to time to, the applicable Regulatory Supervising Organizations.

" *Related Business* " means any business in which the Company or any of the Restricted Subsidiaries or Regulated Subsidiaries was engaged on the Issue Date and any business related, ancillary or complementary to such business; *provided, however* that order execution for trading in, and clearing of, new risk management and investment products shall be deemed to be a Related Business.

" *Representative* " means, with respect to any Person, any trustee, agent or representative (if any) for an issue of Senior Indebtedness of such Person.

" *Restricted Payment* " with respect to any Person means:

(1)    the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such Person) or similar payment to the direct or indirect holders of its Capital Stock (other than (A) dividends or distributions payable solely in its Capital Stock (other than Disqualified Stock), (B) dividends or distributions payable solely to the Company, a Restricted Subsidiary or a Regulated Subsidiary, (C) *pro rata* dividends or other distributions made by a

148

Subsidiary that is not a Wholly Owned Subsidiary to minority stockholders or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a corporation) and (D) dividends or distributions on Class B Equity Interests in accordance with their terms, other than to any Affiliates of the Company, except to the extent any such Affiliate is an employee.)

(2)     the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of the Company or Parent held by any Person (other than by a Restricted Subsidiary or Regulated Subsidiary), including in connection with any merger or consolidation;

(3)     the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Obligations of the Company or any Subsidiary Guarantor (other than (A) from the Company, a Restricted Subsidiary or a Regulated Subsidiary or (B) the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or retirement); or

(4)     the making of any Investment (other than a Permitted Investment) in any Person.

" *Restricted Subsidiary* " means any Subsidiary of the Company (including, without limitation, Refco Finance Inc.) that is neither an Unrestricted Subsidiary nor a Regulated Subsidiary.

" *Sale/Leaseback Transaction* " means an arrangement relating to property owned by the Company, a Restricted Subsidiary or a Regulated Subsidiary on the Issue Date or thereafter acquired by the Company, a Restricted Subsidiary or a Regulated Subsidiary whereby the Company, such Restricted Subsidiary or such Regulated Subsidiary transfers such property to a Person and the Company, such Restricted Subsidiary or such Regulated Subsidiary leases it from such Person.

" *SEC* " means the U.S. Securities and Exchange Commission.

" *Secured Indebtedness* " of any Person means any Indebtedness of such Person secured by a Lien.

" *Securities Act* " means the U.S. Securities Act of 1933, as amended.

" *Securityholders Agreement* " means the Securityholders Agreement dated the Acquisition Date by and among Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners, the Executive Investors (as defined therein), the Employees (as defined therein) and the other parties from time to time party thereto.

" *Senior Indebtedness* " means with respect to any Person:

(1)     Indebtedness of such Person, whether outstanding on the Issue Date or thereafter Incurred; and

(2)     all other Obligations of such Person (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to such Person whether or not post-filing interest is allowed or allowable in such proceeding) in respect of Indebtedness described in clause (1) above

unless, in the case of clauses (1) and (2), in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such Indebtedness or other Obligations are subordinate or *pari passu* in right of payment to the Notes or the Subsidiary Guaranty of such Person, as the case may be; *provided, however* , that Senior Indebtedness shall not include:

(1)     any liability for federal, state, local or other taxes owed or owing by such Person;

149

(2)    any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(3)    any Indebtedness or other Obligation of such Person which is subordinate or junior in right of payment to any other Indebtedness or other Obligation of such Person; or

(4)    that portion of any Indebtedness which at the time of Incurrence is Incurred in violation of the Indenture.

Without limiting the generality of the foregoing, "Senior Indebtedness" shall also include the principal of, premium, if any, and interest on (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization whether or not post-filing interest is allowed or allowable in such proceeding):

(1)   Bank Indebtedness; and

(2)   all Hedging Obligations (and guarantees thereof) owed by the Company or any Subsidiary Guarantor to any institution that is a lender under the Credit Agreement (or an affiliate of such lender) at the time such Hedging Obligations are incurred,

in each case whether outstanding on the Issue Date or thereafter incurred.

" *Senior Subordinated Indebtedness* " means, with respect to any Person, the Notes (in the case of the Issuers), the Subsidiary Guaranty (in the case of a Subsidiary Guarantor) and any other Indebtedness of such Person that specifically provides that such Indebtedness is to rank *pari passu* with the Notes or such Subsidiary Guaranty, as the case may be, in right of payment and is not subordinated by its terms in right of payment to any Indebtedness or other obligation of such Person which is not Senior Indebtedness of such Person.

" *Significant Subsidiary* " means any Restricted Subsidiary or Regulated Subsidiary that would be a "significant subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC.

" *Standard & Poor's* " means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

" *Stated Maturity* " means, except as otherwise provided, with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the final payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase or repayment of such Indebtedness at the option of the holder thereof or the lender thereunder upon the happening of any contingency unless such contingency has occurred).

" *Subordinated Obligation* " means, with respect to any Person, any Indebtedness of such Person (whether outstanding on the Issue Date or thereafter Incurred) which is subordinate or junior in right of payment to the Notes or a Subsidiary Guaranty of such Person, as the case may be, pursuant to a written agreement to that effect.

" *Subsidiary* " means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of Voting Stock is at the time owned or controlled, directly or indirectly, by:

(1)    such Person;

(2)    such Person and one or more Subsidiaries of such Person; or

(3)    one or more Subsidiaries of such Person.

150

*provided, however* that a limited partnership or similar passive collective investment entity that trades derivatives and in which the Company, any Restricted Subsidiary or any Regulated Subsidiary serves as general partner (or has a similar status) in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business shall not be deemed a Subsidiary.

" *Subsidiary Guarantor* " means each Subsidiary of the Company that executes the Indenture as a Subsidiary Guarantor on the Acquisition Date and each other Subsidiary of the Company that thereafter Guarantees the Notes pursuant to the terms of the Indenture.

" *Subsidiary Guaranty* " means a Guarantee by a Subsidiary Guarantor of the Issuers' obligations with respect to the Notes.

" *Swap Contracts* " means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward contracts, futures contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, repurchase agreements, reverse repurchase agreements, sell buy back and buy sell back agreements, and securities lending and borrowing agreements or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a " *Master Agreement* "), including any such obligations or liabilities under any Master Agreement.

" *Tax Distribution* " means any distribution by the Company to its direct or indirect owners which (i) with respect to quarterly estimated tax payments due in each calendar year shall be equal to twenty-five percent (25%) of the Income Tax Liabilities for such calendar year as estimated in writing by the chief financial officer of the Company, (ii) with respect to tax payments to be made with income tax returns filed for an entire taxable year or with respect to adjustments to such returns imposed by the Internal Revenue Service or other taxing authority, shall be equal to the Income Tax Liabilities for each taxable year minus the aggregate amount distributed for such taxable year as provided in clause (i) above and (iii) with respect to taxes not determined by reference to income, represents the amount of any such taxes imposed on a direct or indirect owner of the Company as a result of such owner's ownership of the equity of the Company. In the event the amount determined under clause (ii) is a negative amount, the amount of any Tax Distributions in the succeeding taxable year (or, if necessary, any subsequent taxable years) shall be reduced by such negative amount.

" *Temporary Cash Investments* " means any of the following:

(1)  readily marketable obligations issued or directly and fully guaranteed or insured by the United States or, any state, commonwealth or territory of the United States or any agency or instrumentality thereof having maturities of not more than two years from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

(2)  time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia,

151

was a member of the Federal Reserve System (ii) issues (or the parent of which issues) commercial paper rated at least P-1 (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by Standard & Poor's and (iii) has combined capital and surplus of at least $200.0 million (any such bank being an " *Approved Domestic Bank* "), in each case with maturities of not more than 360 days from the date of acquisition thereof;

(3)    commercial paper and variable or fixed rate notes issued by an Approved Domestic Bank (or by the parent company thereof) or any variable rate note issued by, or Guaranteed by a domestic corporation rated A-1 (or the equivalent thereof) or better by Standard & Poor's or P-1 (or the equivalent thereof) or better by Moody's, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(4)    repurchase agreements entered into by any Person with a bank or trust company or recognized securities dealer having capital and surplus in excess of $200.0 million for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(5)    investments, classified in accordance with GAAP as current assets of the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $200.0 million, and the portfolios of which are limited such that 95% of such investments are of the character, quality and maturity described in clauses (1), (2), (3), (4) and (6) of this definition;

(6)    solely with respect to any Foreign Subsidiary, non-dollar denominated (i) certificates of deposit of, bankers' acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business *provided* such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from Standard & Poor's is at least A-1 or the equivalent thereof or from Moody's is at least P-1 or the equivalent thereof (any such bank being an " *Approved Foreign Bank* ") and maturing within twelve months of the date of acquisition and (ii) equivalents of demand deposit accounts which are maintained with an Approved Foreign Bank; and at least 100% of the amount of the repurchase obligations; and

(7)    Investments of the type set forth in Commodity Futures Trading Commission Regulation 1.25 and SEC Regulation 15c3-3(e).

" *Transactions* " has the meaning set forth in this Prospectus under the heading "Prospectus Summary—Transactions."

" *Trustee* " means Wells Fargo Bank Minnesota, National Association until a successor replaces it and, thereafter, means the successor.

" *Trust Indenture Act* " means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the Issue Date.

" *Trust Officer* " means the Chairman of the Board, the President or any other officer or assistant officer of the Trustee assigned by the Trustee to administer its corporate trust matters.

152

" *Unrestricted Subsidiary* " means:

(1)     any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Governing Board of the Company in the manner provided below; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

The Governing Board of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary, but excluding Refco Finance Inc.) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Capital Stock or Indebtedness of, or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided, however* , that either (A) the Subsidiary to be so designated has total assets of $1,000 or less or (B) if such Subsidiary has assets greater than $1,000, such designation would be permitted under the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

The Governing Board of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary or a Regulated Subsidiary, as applicable; *provided, however* , that immediately after giving effect to such designation (A) the Company could Incur $1.00 of additional Indebtedness under paragraph (a) of the covenant described under "—Certain Covenants—Limitation on Indebtedness" and (B) no Default shall have occurred and be continuing. Any such designation by the Governing Board of the Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Governing Board of the Company giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

" *U.S. Dollar Equivalent* " means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as published in *The Wall Street Journal* in the "Exchange Rates" column under the heading "Currency Trading" on the date two Business Days prior to such determination.

Except as described under "—Certain Covenants—Limitation on Indebtedness," whenever it is necessary to determine whether the Company has complied with any covenant in the Indenture or a Default has occurred and an amount is expressed in a currency other than U.S. dollars, such amount will be treated as the U.S. Dollar Equivalent determined as of the date such amount is initially determined in such currency.

" *U.S. Government Obligations* " means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable at the issuer's option.

" *Voting Stock* " of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

" *Wholly Owned Subsidiary* " means a Restricted Subsidiary or Regulated Subsidiary all the Capital Stock of which (other than directors' qualifying shares or Class B Equity Interests) is owned by the Company or one or more other Wholly Owned Subsidiaries.

153

## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
## OF THE EXCHANGE OFFER

The following is a summary of the material United States federal income tax consequences relating to the exchange of an old note for a registered note in the exchange offer. It does not contain a complete analysis of all the potential tax considerations relating to the exchange. In addition, this summary is limited to a beneficial owner of an old note who holds the old note, and will hold the registered note, as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended, or the Code (the "Code").

This discussion does not deal with the consequences to special classes of holders of notes, such as dealers in securities or currencies, brokers, traders that mark-to-market their securities, insurance companies, tax-exempt entities, financial institutions or "financial services entities," persons with a functional currency other than the U.S. dollar, regulated investment companies, real estate investment trusts, retirement plans, expatriates or former long-term residents of the United States, persons who hold their notes as part of a straddle, hedge, "conversion transaction," "constructive sale," or other integrated investment, persons subject to the alternative minimum tax, partnerships or other pass-through entities or investors in partnerships or other pass-through entities that hold the notes.

This summary also does not address any tax consequences arising under the tax laws of any U.S. state, local, foreign or other taxing jurisdiction or any possible applicability of the U.S. federal estate or gift tax law.

The discussion below is based upon the provisions of the Code, and the Treasury Regulations promulgated thereunder, and rulings, judicial decisions and administrative interpretations, all as in effect on the date hereof, any of which may be repealed or subject to change, possibly with retroactive effect, so as to result in United States federal income tax consequences different from those discussed below.

For United States federal income tax purposes, the exchange of an old note for a registered note in the exchange offer will not constitute a taxable exchange, and you will not recognize a taxable gain or loss on such exchange to you. The adjusted tax basis of your registered notes will be the same as the adjusted tax basis of your old notes exchanged therefor immediately before the exchange and your holding period will carry over to the registered notes. The United States federal income tax consequences of owning and disposing of the registered notes will be the same as those applicable to the old notes.

**THE PRECEDING DISCUSSION OF UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE OFFER IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH INVESTOR SHOULD CONSULT ITS OWN TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO IT OF EXCHANGING AN OLD NOTE FOR A REGISTERED NOTE, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY PROPOSED CHANGES IN APPLICABLE LAWS.**

154

**PLAN OF DISTRIBUTION**

Each broker-dealer that receives registered notes for its own account pursuant to the exchange offer must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. This prospectus, as it may be amended or supplemented from time to time, may be used by a broker-dealer in connection with resales of registered notes received in exchange for old notes where such old notes were acquired as a result of market-making activities or other trading activities. We have agreed that, for a period of 180 days after the time of expiration, we will make this prospectus, as amended or supplemented, available to any broker-dealer for use in connection with any such resale. In addition, until          ,       , all dealers effecting transactions in the registered notes may be required to deliver a prospectus.

We will not receive any proceeds from any sale of registered notes by broker-dealers. Registered notes received by broker-dealers for their own account pursuant to the exchange offer may be sold from time to time in one or more transactions in the over-the-counter market, in negotiated transactions, through the writing of options on the registered notes or a combination of such methods of resale, at market prices prevailing at the time of resale, at prices related to such prevailing market prices or at negotiated prices. Any such resale may be made directly to purchasers or to or through brokers or dealers who may receive compensation in the form of commissions or concessions from any such broker-dealer or the purchasers of any such registered notes. Any broker-dealer that resells registered notes that were received by it for its own account pursuant to the exchange offer and any broker or dealer that participates in a distribution of such registered notes may be deemed to be an "underwriter" within the meaning of the Securities Act, and any profit on any such resale of registered notes and any commissions or concessions received by any such persons may be deemed to be underwriting compensation under the Securities Act. The letter of transmittal states that, by acknowledging that it will deliver and by delivering a prospectus, a broker-dealer will not be deemed to admit that it is an "underwriter" within the meaning of the Securities Act.

For a period of 180 days after the time of expiration, we will promptly send additional copies of this prospectus and any amendment or supplement to this prospectus to any broker-dealer that requests such documents in the letter of transmittal. We have agreed to pay all expenses incident to the exchange offer (including the expenses of one counsel for the holders of the notes) other than commissions or concessions of any brokers or dealers and will indemnify the holders of the notes (including any broker-dealers) against certain liabilities, including liabilities under the Securities Act.

155

**LEGAL MATTERS**

Weil, Gotshal & Manges LLP, New York, New York has passed upon the validity of the registered notes and the related guarantees on our behalf. Certain partners of Weil, Gotshal & Manges LLP have indirect ownership interests, totaling less than 0.01%, in us as a result of their investments in Thomas H. Lee Investors, L.P.

## EXPERTS

The Refco Group Ltd., LLC consolidated balance sheets as of February 29, 2004 and February 28, 2003 and the related consolidated statements of income, changes in members' equity and cash flows for the three years in the period ended February 29, 2004 and schedule included in this prospectus and elsewhere in this registration statement have been audited by Grant Thornton LLP, independent registered public accountants, as stated in their reports with respect thereto, and is included herein in reliance upon the authority of said firm as experts in accounting and auditing.

156

**GLOSSARY**

| | |
|---|---|
| **Broker in Principal** | An individual or firm who acts as an intermediary or temporary dealer between a buyer and a seller and who either takes title to the asset on behalf of its client or has a client position offset by an equal but opposite position with a dealer. |
| **CBOE** | Chicago Board Options Exchange, which is a securities exchange created in the early 1970s for the public trading of standardized option contracts. Primary place for the trading of stock options, foreign currency options and index options. |
| **CBOT** | Chicago Board of Trade, which is the second largest derivatives exchange in the United States and a pioneer in the development of financial futures and options. |
| **CFMA** | Commodity Futures Modernization Act of 2000, which amended the Commodity Exchange Act, removing much regulation by the CFTC to which OTC derivatives had been subject previously. |
| **CFTC** | Commodity Futures Trading Commission, which is the federal regulatory agency that administers the Commodity Exchange Act. It is the federal oversight agency that monitors the futures and options on futures markets to detect and prevent price distortion and market manipulation and to protect the rights of customers who use the markets for either commercial or investment purposes. |
| **Clearing House** | An agency or corporation that acts as a central counterparty to the clearing members or FCMs on each side of a transaction. Clearing Houses are responsible for settling trading accounts, collecting and maintaining margin monies, regulating delivery and reporting trading data. |
| **CME** | Chicago Mercantile Exchange, which is the largest derivatives exchange in the United States and the second largest exchange in the world for the trading of futures and options on futures. CME has four major product areas based on interest rates, stock indexes, foreign exchange and commodities. |
| **Commodity Exchange Act** | The principal legislation governing the trading of commodities and futures in the United States. |
| **Commodity Pool Operator** | An individual or organization which operates or solicits funds for a pool in which funds contributed by a number of persons are combined for the purpose of trading futures or options contracts. Generally required to be registered with the CFTC. |
| **Commodity Trading Advisor** | A person who directly or indirectly advises others as to the advisability of buying or selling futures or commodity options. Most Commodity Trading Advisors may exercise trading authority over a customer's account. A Commodity Trading Advisor is generally required to be registered with the CFTC. |
| **Currenex** | A leading global provider of currency pricing systems. |

157

**Derivatives**

Financial contracts whose value is derived from a traditional security (such as a stock or bond), an asset (such as a commodity) or a market index. Derivatives may be traded with or without the use of an exchange.

**E-mini**

E-minis are smaller versions of popular index funds that cover the entire S&P 500 and Nasdaq-100 indexes. E-minis are 20% the size of larger index contracts and allow for great flexibility when assembling a portfolio. E-mini trading is popular because it requires less of an initial capital investment, and it enables traders to diversify a portfolio and hedge against more focused investments.

**Eurex**

World's largest derivatives exchange, based on volume. This fully electronic exchange has 432 participants in 17 countries, creating decentralized and standardized access to its markets.

**Euronext**

Europe's first cross-border group of stock exchanges and their derivatives markets, formed by the merger of the stock exchanges of Amsterdam, Brussels and Paris in 2000.

**Exchange**

A marketplace in which shares, options and/or futures on stocks, bonds, commodities and indexes are traded.

**FCM**

Futures Commission Merchant, which is a firm engaged in soliciting or accepting and handling orders for the purchase or sale of futures contracts and accepting money or securities to provide margin for any resulting trades or contracts. An FCM must be registered with the CFTC.

**FICC**

Fixed Income Clearing Corporation, which is one of the leading clearing houses for the fixed income markets.

**Forward**

A contract in which a seller agrees to deliver a specified asset to a buyer at a specified price sometime in the future. In contrast to futures contracts, forward contracts are not standardized, not traded on exchanges and generally contemplate a delivery at settlement.

**Futures**

A legally binding agreement to buy or sell a commodity or financial instrument in a designated future month at a price agreed upon today by the buyer and seller. Futures contracts are standardized according to the quality, quantity, delivery time and location for each commodity.

**FXCM**

An FCM specializing solely in spot foreign exchange. FXCM has operations around the world, services over 40,000 retail customers and over 400 institutional customers from more than 80 countries and executes over 800,000 trades executed each month.

**LCH**

London Clearing House, which is a leading independent clearing house in Europe, serving major international exchanges and platforms, equity markets, exchange-traded derivatives markets, energy markets, the interbank interest rate swaps market and the majority of the Euro-denominated and sterling bond and repo markets.

| | |
|---|---|
| **LME** | London Metal Exchange, which is a market for trading base metals. LME prices are used as reference prices in many world markets by metals producers and fabricators of metal products and are the basis for most major commodity indices. |
| **Margin Deposits** | An amount of money or securities deposited by both buyers and sellers of futures contracts and by sellers of option contracts to ensure performance of the terms of the contract (the making or taking delivery of the commodity or the cancellation of the position by a subsequent offsetting trade). Margin in futures is not a down payment, as in securities, but rather a performance bond. |
| **Mark-to-Market** | To debit or credit a trading account on a daily basis based on the prices established at the close of that day's trading session. |
| **NASD** | National Association of Securities Dealers, which is a nonprofit self-regulatory organization in which almost all registered broker-dealers must be members. |
| **NASDAQ** | The first and world's largest electronic stock market with a listing of nearly 4,100 companies. |
| **Net Capital** | The amount by which current assets exceed liabilities (adjusted for illiquid assets, certain operating capital charges, and potential adverse fluctuations in the value of securities inventory). |
| **NFA** | National Futures Association, which is the industry wide self-regulatory organization of the futures industry. Congress authorized its creation in 1974, and the CFTC designated it a "registered futures association" in 1982. |
| **NYMEX** | New York Mercantile Exchange, which is the world's largest physical commodity derivatives exchange. |
| **NYSE** | New York Stock Exchange, which is the largest equities marketplace in the world. Approximately 3,000 companies and nearly $16 trillion in global market capitalization are listed on the exchange |
| **Option** | A right, but not the obligation, to buy or sell an asset at a set price on or before a given date. |
| **OTC Market** | Over-The-Counter Market, which is a decentralized market where geographically dispersed dealers are linked by telephones and computer screens. The market is for securities not listed on exchanges. |
| **Prime Brokerage** | A suite of specialized brokerage and related services provided by financial institutions to their clients, primarily hedge funds. |
| **Repo** | Repurchase agreement, which is an agreement in which one party sells a security to another party and agrees to repurchase it on a specified date for a specified price. This represents a collateralized short-term loan, where the collateral may be a Treasury security, money market instrument, federal agency security or mortgage-backed security. A reverse repurchase agreement, otherwise known as a "reverse repo," which is the purchase of a security at a specified price with an agreement to sell the same or substantially the same security to the same counterparty at a fixed or determinable price at a future date. |

159

**Repurchase Transaction**          See the definition for "repo."

**SEC**                             Securities and Exchange Commission — A federal agency that regulates the U.S. financial markets. The SEC oversees the securities industry and promotes full disclosure in order to protect the investing public.

**Segregated Funds**                The amount of money, securities and property due to commodity futures or options customers, which is held in segregated accounts in compliance with Section 4d of the Commodity Exchange Act and CFTC Regulations. Such money, securities or property may not be comingled with the money, securities and property of the FCM, but the FCM may earn interest on it.

**Swap**                            Each party agrees to pay the other an amount of interest calculated on a principal amount over several specified periods of time. If the principal amount is the same for both parties, the rate bases of calculation will be different, and it is called an interest rate swap. If the principal amounts are expressed in different currencies, it is called a currency swap.

**TSE**                             Tokyo Stock Exchange, which is the largest stock exchange in Japan with some of the most active trading in the world.

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm                                                                        F-2
Consolidated Balance Sheets as of February 29, 2004 and February 28, 2003                                                      F-3
Consolidated Statements of Income for the years ended February 29, 2004,
February 28, 2003 and February 28, 2002                                                                                        F-4
Consolidated Statements of Changes in Members' Equity for the years ended February 29, 2004, February 28, 2003 and
February 28, 2002                                                                                                              F-5
Consolidated Statements of Cash Flows for the years ended February 29, 2004, February 28, 2003 and February 28, 2002          F-6
Notes to Consolidated Financial Statements                                                                                     F-7
Consolidated Balance Sheets as of May 31, 2004 (unaudited) and February 29, 2004                                               F-33
Consolidated Statements of Income for the three months ended May 31, 2004 and 2003 (unaudited)                                 F-34
Consolidated Statements of Changes in Members' Equity for the three months ended May 31, 2004 and 2003 (unaudited)            F-35
Consolidated Statements of Cash Flows for the three months ended May 31, 2004 and 2003 (unaudited)                             F-36
Notes to Consolidated Financial Statements (unaudited)                                                                         F-37

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members of
 **Refco Group Ltd., LLC**

  We have audited the accompanying consolidated balance sheets of Refco Group Ltd., LLC (the "Company") (a Delaware limited liability company) and subsidiaries (the "Group") as of February 29, 2004 and February 28, 2003, and the related consolidated statements of income, changes in members' equity and cash flows for each of the three years in the period ended February 29, 2004. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these financial statements based on our audits.

  We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

  In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the three years in the period ended February 29, 2004 in conformity with accounting principles generally accepted in the United States of America.

Grant Thornton LLP
New York, New York
October 8, 2004

F-2

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | February 29, 2004 | February 28, 2003 |
|---|---:|---:|
| | *(in thousands)* | |
| Cash and cash equivalents | $ 338,243 | $ 247,103 |
| Cash and securities segregated under federal and other regulations | | |
|    Cash and cash equivalents | 1,375,838 | 1,949,846 |
|    Securities purchased under agreements to resell | 55,061 | 69,161 |
| Securities purchased under agreements to resell | 24,782,874 | 12,163,297 |
| Deposits with clearing organizations and others | 1,831,765 | 1,751,801 |
| Receivables from broker-dealers and clearing organizations | 504,810 | 303,751 |
| Receivables from customers | 1,827,190 | 1,795,445 |
| Securities owned, at market or fair value | 2,032,535 | 490,420 |
| Memberships in exchanges, (market value: 2004: $41,337, 2003: $33,738) | 15,869 | 18,689 |
| Other assets | 567,987 | 425,916 |
|    Total assets | $ 33,332,172 | $ 19,215,429 |
| **Liabilities** | | |
|    Short-term borrowings, including current portion of long-term borrowings | $ 88,890 | $ 245,810 |
|    Securities sold under agreements to repurchase | 25,630,299 | 12,779,456 |
|    Payable to broker-dealers and clearing organizations | 583,643 | 256,783 |
|    Payable to customers | 5,095,717 | 4,435,186 |
|    Securities sold, not yet purchased, at market or fair value | 807,485 | 212,205 |
|    Accounts payable, accrued expenses, and other liabilities | 174,149 | 160,128 |
| Long-term borrowings | 315,500 | 383,500 |
| Subordinated debt | 16,000 | 16,000 |
|    Total liabilities | 32,711,683 | 18,489,068 |
| Commitments and contingent liabilities | | |
| Preferred securities issued by subsidiaries | — | 160,000 |
| Membership interests issued by subsidiary | 4,405 | — |
| Members' equity | 616,084 | 566,361 |
|    Total liabilities and members' equity | $ 33,332,172 | $ 19,215,429 |

The accompanying notes are an integral part of these financial statements.

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

|  | Year ended | | |
|---|---|---|---|
|  | February 29, 2004 | February 28, 2003 | February 28, 2002 |
|  | (in thousands) | | |
| **Revenues** |  |  |  |
| Commissions and brokerage | $ 671,034 | $ 583,525 | $ 488,620 |
| Interest | 1,053,804 | 2,388,953 | 1,713,464 |
| Principal transactions, net | 175,011 | 83,449 | 99,195 |
| Asset management and advisory fees | 47,911 | 44,222 | 62,690 |
| Other | 2,775 | 4,641 | 3,663 |
| Total revenues | 1,950,535 | 3,104,790 | 2,367,632 |
| **Expenses** |  |  |  |
| Commissions and order execution costs | 411,894 | 385,375 | 323,657 |
| Interest | 898,658 | 2,182,466 | 1,557,869 |
| Employee compensation and benefits | 238,476 | 211,830 | 198,453 |
| General, administrative and other | 200,902 | 167,464 | 171,492 |
| Total expenses | 1,749,930 | 2,947,135 | 2,251,471 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 200,605 | 157,655 | 116,161 |
| Provision for income taxes | 12,176 | 1,960 | 6,951 |
| Income before dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 188,429 | 155,695 | 109,210 |
| Dividends on preferred securities issued by subsidiaries | — | 15,576 | 15,576 |
| Members' interest in earnings of subsidiary | 1,273 | — | — |
| NET INCOME | $ 187,156 | $ 140,119 | $ 93,634 |

The accompanying notes are an integral part of these financial statements.

F-4

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

| | Members' equity | | |
| | Common capital | Other comprehensive income | Total |
| --- | --- | --- | --- |
| | | (in thousands) | |
| Balance, February 28, 2001 | $ 509,263 | $ (10,308) | $ 498,955 |
| Capital withdrawals | (75,000) | — | (75,000) |
| Net income | 93,634 | — | 93,634 |
| Currency translation adjustment | — | (2,473) | (2,473) |
| Balance, February 28, 2002 | 527,897 | (12,781) | 515,116 |
| Capital withdrawals | (100,000) | — | (100,000) |
| Net income | 140,119 | — | 140,119 |
| Currency translation adjustment | — | 11,126 | 11,126 |
| Balance, February 28, 2003 | 568,016 | (1,655) | 566,361 |
| Capital withdrawals | (120,000) | — | (120,000) |
| Loss on early extinguishment of preferred securities issued by subsidiaries | (39,774) | — | (39,774) |
| Net income | 187,156 | — | 187,156 |
| Currency translation adjustment | — | 22,341 | 22,341 |
| Balance, February 29, 2004 | $ 595,398 | $ 20,686 | $ 616,084 |

The accompanying notes are an integral part of these financial statements.

F-5

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | (in thousands) | | |
| **Cash flows from operating activities** | | | |
| Net income | $ 187,156 | $ 140,119 | $ 93,634 |
| Noncash items included in net income | | | |
| Depreciation and amortization | 28,368 | 25,445 | 37,949 |
| Members' interest in earnings of subsidiary | 1,273 | — | — |
| (Increase) decrease in operating assets | | | |
| Cash and securities segregated under federal and other regulations | | | |
| Cash and cash equivalents | 574,008 | (1,109,672) | (377,218) |
| Securities purchased under agreements to resell | 14,100 | 86,351 | (82,700) |
| Securities purchased under agreements to resell | (12,619,577) | 4,802,305 | (4,267,460) |
| Deposits with clearing organizations and others | (79,964) | (698,744) | 240,825 |
| Receivables from broker-dealers and clearing organizations | (201,059) | 49,689 | 42,423 |
| Receivables from customers | (31,745) | 551,849 | (319,260) |
| Securities owned, at market or fair value | (1,542,115) | (195,891) | 359,873 |
| Memberships in exchanges | 2,820 | (10,377) | — |
| Other assets | (51,509) | (16,564) | (42,654) |
| Increase (decrease) in operating liabilities | | | |
| Short-term borrowings, including current portion of long-term borrowings | (156,920) | 50,573 | 21,734 |
| Securities sold under agreements to repurchase | 12,850,843 | (4,064,785) | 4,798,815 |
| Payable to broker-dealers and clearing organizations | 326,860 | (42,921) | (169,528) |
| Payable to customers | 660,531 | 595,405 | (50,190) |
| Securities sold, not yet purchased, at market or fair value | 595,280 | (71,327) | (251,709) |
| Accounts payable, accrued expenses and other liabilities | 36,362 | (57,173) | 32,278 |
| Notes payable | — | — | (8,400) |
| Net cash (used in) provided by operating activities | 594,712 | 34,282 | 58,412 |
| **Cash flows from investing activities** | | | |
| Acquisition of businesses, net of cash acquired | (118,930) | (3,473) | — |
| Net cash used in investing activities | (118,930) | (3,473) | — |
| **Cash flows from financing activities** | | | |
| Repayment of subordinated debt | — | — | (25,000) |
| Issuance of long-term borrowings | — | 222,500 | — |
| Repayment of long-term borrowings | (68,000) | (68,000) | (33,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — |
| Net contributions to membership interests issued by subsidiary | 3,132 | — | — |
| Capital withdrawals | (120,000) | (100,000) | (75,000) |
| Net cash (used in) provided by financing activities | (384,642) | 54,500 | (133,000) |
| Net (decrease) increase in cash and cash equivalents | 91,140 | 85,309 | (74,588) |
| Cash and cash equivalents, beginning of year | 247,103 | 161,794 | 236,382 |
| Cash and cash equivalents, end of year | $ 338,243 | $ 247,103 | $ 161,794 |
| **Supplemental cash flow disclosures:** | | | |
| Income taxes paid | $ 3,331 | $ 6,032 | $ 5,229 |

Interest paid                    $   715,942   $  2,250,879   $  2,239,588

The accompanying notes are an integral part of these financial statements.

F-6

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE A—ORGANIZATION

Refco Group Ltd., LLC (the "Company") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The Group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker-dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities and foreign exchange broker.

The Company is 90% owned by Refco Group Holdings, Inc., a Delaware corporation. The remaining 10% is owned by BAWAG Overseas, Inc., a third party financial institution.

## NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which does issue non-voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in "Other Assets."

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Foreign currency translation

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year-end spot rate and revenues and expenses are translated at average rates of exchange for the fiscal year. Gains and losses resulting from foreign currency transactions are included in the consolidated statements of income. Gains and losses resulting from translating foreign currency financial statements into U.S. dollars are included in cumulative currency translation adjustment, which represents other comprehensive income, a separate component of members' equity.

### Cash and cash equivalents

Cash and cash equivalents are defined as cash and short-term liquid investments with original maturities of 90 days or less when acquired.

**Cash and securities segregated under federal and other regulations**

At February 29, 2004, and February 28, 2003, cash and securities of $1,430.9 million and $2,019.0 million, respectively, was segregated under various regulatory requirements.

**Securities purchased under agreements to resell and Securities sold under agreements to repurchase**

Securities purchased under agreements to resell and Securities sold under agreements to repurchase are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. These carrying amounts approximate their fair values. It is the Group's policy to take possession of securities purchased under agreements to resell, which consist largely of securities issued by the U.S. Government. The Group retains the right to re-pledge collateral received in secured financing transactions.

As permitted by FASB Interpretation No. 41, *Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements*, the Group nets certain securities purchased under agreements to resell and securities sold under agreements to repurchase for financial reporting purposes.

**Receivables from and payable to customers**

These balances primarily pertain to margin and open contractual commitments related to customers futures, foreign currencies and securities transactions. Receivables from and payable to customers in connection with futures and foreign currency transactions, include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions, include amounts due on cash and margin transactions. These receivables are generally collateralized with marketable securities. For certain receivables that are not fully secured and where the Group deems appropriate, the Group pursues collection of these receivables through various means, including legal action, and provides reserves when, in the opinion of management, such reserves are appropriate. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively. The Group generally nets receivables and payables related to its customers futures, foreign currency and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

**Financial instruments**

The consolidated balance sheets generally reflects purchases and sales of financial instruments owned or sold on a trade-date basis.

**Securities owned and Securities sold, not yet purchased**

Securities owned and Securities sold, not yet purchased consist primarily of U.S. and foreign equity and fixed-income securities which are stated at quoted market values, with unrealized gains and losses recognized in income under "Principal transactions". Securities not readily marketable are valued at fair value as determined by management. Fair value is the amount at which an instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

<div align="center">F-8</div>

**Derivative financial instruments**

As a broker, the Group enters into transactions involving derivative financial instruments in relation to its customer business. These transactions are generally immediately economically hedged by back-to-back trades with other financial institutions. All derivative financial instruments are carried at market value or, if market prices are not readily available, fair value. Market values for exchange-traded derivatives are based on quoted market prices. Fair market values for over-the-counter derivative financial instruments, are based on pricing models which are based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts.

Derivatives used for economic hedging purposes include swaps, forwards, futures, and purchased options. Unrealized gains or losses on these derivative contracts are recognized currently in the statement of income as Principal transactions. The Group does not apply hedge accounting as defined in SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* , as all financial instruments are marked to market with changes in fair values reflected in earnings. Therefore, the disclosures required in paragraphs 44 and 45 of the Statement are generally not applicable with respect to these financial instruments.

**Memberships in exchanges**

Exchange memberships comprise both rights to trade on exchanges and deposits made in relation to these memberships. Exchange memberships owned are recorded at cost and tested annually for impairment.

**Furniture, equipment and leasehold improvements**

Furniture, equipment and leasehold improvements are recorded at cost less accumulated depreciation and amortization. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, which range from three to seven years. Leasehold improvements are amortized over the lesser of the economic useful life of the improvement or the term of the lease.

**Impairment of assets**

The Company reviews its long-lived assets and intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets.

**Goodwill**

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets at acquisition date. Prior to March 1, 2002, goodwill was amortized over a period of 25 years on a straight-line basis. Effective March 1, 2002, the Group adopted SFAS No. 142, *Goodwill and Other Intangible Assets* ; consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. An impairment loss is triggered if the estimated fair value of an operating segment is less than its estimated net book value. Such loss is calculated as the difference between the estimated fair value of goodwill and its carrying value.

**Identifiable intangible assets**

Identifiable intangible assets consist primarily of customer relationships, asset management contracts, property management contracts and trade names. Customers relationships are amortized on an accelerated basis based upon projected cash flows. Asset management contracts and property management contracts are amortized over their estimated useful lives of 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's or asset group's carrying value may not be fully recoverable in accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets.* An impairment loss, calculated as the difference between the estimated fair value and the carrying value of an asset or asset group, is recognized if the expected undiscounted cash flows relating to the asset or asset group are less than the corresponding carrying value. Trade names have been classified as indefinite-lived assets and are not amortized but tested annually for impairment.

**Income taxes**

The Group has elected to be treated as a limited liability company for federal income tax purposes, as defined in the regulations. Under these regulations, members are responsible for their individual income tax liabilities related to the Group's operating results. Accordingly the Group has not provided for Federal income taxes related to its operating results. The provision for income taxes relates to income taxes of foreign subsidiaries and New York City Unincorporated Business tax.

**Revenue recognition**

Commissions and brokerage are recorded on a trade-date basis as securities transactions occur. Commissions and brokerage includes per contract charges for trade execution and clearing. Fees are charged at various rates based on the product traded and the method of trade. Commissions earned and related expenses on customers' open futures positions are recognized on a half-turn basis. The Group reports gross commission income on transactions executed by introducing brokers and reports commissions paid to introducing brokers as commission expense.

Interest is recognized on an accrual basis. Interest income or interest expense on repurchase agreements and collateralized financing arrangements are recognized as interest over the life of the transaction. Interest income and expense for matched repurchase agreement transactions are presented net in the consolidated statements of income.

The Group, as a broker of derivative products enters into contractual commitments, as principal, involving forward settlement. These contracts are generally immediately hedged with offsetting contracts which result in a profit spread for the Group. Both the contractual commitment and the offsetting contract are recorded at fair value. This profit spread is recognized immediately in the consolidated statements of income under "Principal transactions, net".

Asset management and advisory fees primarily include fees from investment management and other financial service related products. These fees are recognized over the period in which the related service is provided.

F-10

**Recently issued accounting pronouncements**

In January 2003, the FASB issued Interpretation 46, *Consolidation of Variable Interest Entities* . In December 2003, the FASB issued Interpretation 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities* . In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. Interpretation 46 R requires a variable interest entity to be combined by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 to variable interest entities created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for "Special Purpose Entities" created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. As the Group does not have any interests in variable interest entities, the adoption of this statement did not have an effect on its consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*. SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB No. 133 *Accounting for Derivative Instruments and Hedging Activities*. This Statement is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on the Group's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity* . SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity, and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on the Group's consolidated financial statements.

In December 2003, SFAS No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits* , was issued. Statement 132 (revised) prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of recognition of those plans. The Statement retains and revises the disclosure requirements contained in the original SFAS 132. It also requires additional disclosures about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit pension plans and other postretirement benefit plans. The Statement generally is effective for fiscal years ending after December 15, 2003. Management does not believe the adoption of this statement will have a material impact on the Group's consolidated financial statements.

**NOTE C—SHORT-TERM BORROWINGS, LONG-TERM BORROWINGS AND OTHER BORROWINGS**

### Short-term borrowings

The Group obtains short-term borrowings through bank loans. Short-term borrowings also include the portion of long-term borrowings maturing within one year and certain long-term borrowings that may be payable within one year at the option of the holder. The carrying value of these short-term obligations approximates fair value due to their short-term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers.

Short-term borrowings at year end are set forth below:

|  | 2004 | 2003 |
|---|---|---|
|  | (in thousands) | |
| Bank loans | $    20,890 | $    177,810 |
| Current portion of long-term borrowings | 68,000 | 68,000 |
| Total | $    88,890 | $    245,810 |

The weighted average interest rate on outstanding bank loans at February 29, 2004 and February 28, 2003 was 1.58% and 2.25%, respectively.

Interest rates paid on short-term borrowings, excluding the current portion of long-term borrowings for the years ended February 29, 2004 and February 28, 2003 ranged from 1.58% to 2.25% and 1.92% to 4.00%, respectively.

### Long-term borrowings

Long-term borrowings of $383.5 million and $451.5 million for 2004 and 2003, respectively represents unsecured syndicated senior notes with major financial institutions. Long-term borrowings consist of the following loans:

|  | 2004 | 2003 | Maturity Date | Interest Rate |
|---|---|---|---|---|
|  | (in thousands) | | | |
| **Senior Notes** | | | | |
| Series A Senior Notes 2004 | $    17,000 | $    34,000 | 2004 | 7.18% |
| Senior Notes 2005 | 74,000 | 111,000 | 2005 | 9.18% |
| Series B Senior Notes 2006 | 14,000 | 14,000 | 2006 | 7.42% |
| Senior Notes 2007 | 56,000 | 70,000 | 2007 | 8.85% |
| Series A Senior Notes 2007 | 100,000 | 100,000 | 2007 | 5.99% |
| Series B Senior Notes 2009 | 122,500 | 122,500 | 2009 | 6.60% |
|  | $    383,500 | $    451,500 | | |

F-12

The table below sets out the maturities of the Group's long-term borrowings.

| | 2004 | 2003 |
|---|---|---|
| | (in thousands) | |
| 2004 | $ — | $ 68,000 |
| 2005 | 68,000 | 68,000 |
| 2006 | 51,000 | 51,000 |
| 2007 | 28,000 | 28,000 |
| 2008 | 114,000 | 114,000 |
| 2009 | — | — |
| 2010 and thereafter | 122,500 | 122,500 |
| Total Senior Note Liabilities | 383,500 | 451,500 |
| Less: | | |
| Portion included within short-term borrowings | 68,000 | 68,000 |
| Total Long-term Senior Note Liabilities | $ 315,500 | $ 383,500 |

The long-term borrowings are subject to acceleration in the event of a change in control.

**Other borrowings**

Subordinated debt of $16.0 million, included in the consolidated balance sheets, consists of a subordinated loan from a member. The subordinated debt bears interest at the prime rate and matures June 1, 2005. For the years ended February 29, 2004 and February 28, 2003, the weighted-average interest rate on the subordinated debt was 4.08% and 4.60% respectively. Subordinated debt is subordinated to the claims of present and future general creditors.

Refco Preferred Capital Trust I, II and III, subsidiaries of the Company, had issued $160.0 million of Trust Originated Preferred Securities ("TOPRs") to third parties. At the beginning of the year, the Group paid $199.8 million to redeem the TOPRs, resulting in a charge to members' equity of $39.8 million.

**Contractual debt commitments**

The Company's contractual debt commitments are governed by certain agreements which require that the Group maintain specified levels of liquidity, net worth, funded debt to cash flow and cash flow to interest coverage.

**Credit Facilities**

The Group maintains a committed unsecured revolving credit facility of $364.5 million under an agreement with a syndicate of banks. As of February 29, 2004, no portion of the credit facility was utilized.

F-13

Case 1:07-cv-01903-GEL    Document 27-11    Filed 02/01/2008    Page 183 of 241

Securities owned and Securities sold, not yet purchased, consist of trading and investment securities and derivative financial instruments at market or fair value.

| | | 2004 | | 2003 |
|---|---|---:|---|---:|
| Securities owned consists of: | | | | |
| U.S. Treasuries | $ | 1,316,754 | $ | 213,343 |
| Foreign governments | | 290,317 | | 102,149 |
| Options | | 251,623 | | 24,026 |
| Fund investments | | 87,233 | | 84,320 |
| Equities | | 8,697 | | 29,281 |
| Other | | 77,911 | | 37,301 |
| | $ | 2,032,535 | $ | 490,420 |
| | | | | |
| Securities sold, not yet purchased consist of: | | | | |
| U.S. Treasuries | $ | 555,039 | $ | 187,631 |
| Options | | 251,172 | | 24,554 |
| Other | | 1,274 | | 20 |
| | $ | 807,485 | $ | 212,205 |

As of February 29, 2004 and February 28, 2003 the Group had not pledged any securities owned as collateral with counterparties.

## NOTE E—OTHER ASSETS

Other assets are generally less liquid, non-financial assets. The following table sets forth the Group's other assets by type:

| | | 2004 | | 2003 |
|---|---|---:|---|---:|
| | | (in thousands) | | |
| Goodwill(1) | $ | 291,219 | $ | 252,529 |
| Identifiable intangible assets(2) | | 89,536 | | 6,800 |
| Equity-method investments(3) | | 65,504 | | 27,513 |
| Investments | | 36,578 | | 40,255 |
| Furniture, equipment and leasehold improvements(4) | | 47,829 | | 57,728 |
| Miscellaneous receivables and other | | 37,321 | | 41,091 |
| Total | $ | 567,987 | $ | 425,916 |

(1)    Goodwill

Prior to March 1, 2002 goodwill was amortized over 25 years on a straight-line basis. Upon the adoption of SFAS No. 142, amortization of goodwill ceased. The Company did not identify any

impairment upon the adoption of this Standard. Had the provisions of SFAS 142 been applied as of the first day of the year ended February 28, 2002 net income would have been adjusted as follows :

| | Fiscal Year | | |
| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (in thousands) | |
| Net income, as reported | $ 187,156 | $ 140,119 | $ 93,634 |
| Goodwill amortization | — | — | 10,235 |
| Net income, excluding goodwill amortization | $ 187,156 | $ 140,119 | $ 103,869 |

(2)     Identifiable intangible assets

The Company's identifiable intangible assets are comprised of the following:

| | February 29, 2004 | | | February 28, 2003 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| Customer relationships | $ 40,896 | $ 17,666 | $ 23,230 | $ 21,260 | $ 14,460 | $ 6,800 |
| Trade names | 2,278 | — | 2,278 | — | — | — |
| Asset management contracts | 55,414 | 355 | 55,059 | — | — | — |
| Property management contracts | 9,027 | 58 | 8,969 | — | — | — |
| | $ 107,615 | $ 18,079 | $ 89,536 | $ 21,260 | $ 14,460 | $ 6,800 |

The amortization of identifiable intangible assets included in general, administrative and other expenses for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 was $3.62 million, $4.62 million and $7.70 million, respectively.

The estimated amortization expense, based on current identifiable intangible balances, for the next five fiscal years beginning March 1, 2004 is as follows:

| | (in thousands) |
|---|---|
| Fiscal year | |
| 2005 | $ 7,260 |
| 2006 | 6,570 |
| 2007 | 6,153 |
| 2008 | 5,897 |
| 2009 | 5,741 |

(3)     Equity method investments

Equity method investments as of February 29, 2004 comprise:

| | Principal Activity | Percentage Owned | Country of operation | Carrying Value |
|---|---|---|---|---|
| | | | | (in thousands) |
| Forex Capital Markets, LLC | Spot FX broker | 35% | United States | $ 47,522 |
| Friedberg Mercantile Group | Investment dealer, futures commission merchant and fund manager | 50% | Canada | 9,066 |
| Refco Polaris Taiwan | Futures broker | 21.7% | Taiwan | 8,916 |

F-15

Under the equity method of accounting, the Company's initial investment is recorded at cost and is subsequently increased to reflect the Company's share of the investees' income and reduced to reflect the Company's share of the investees' losses or dividends received.

The excess of the Company's acquisition cost over the Company's share of the investee's identifiable net assets was identified as customer relationships, trade names and goodwill. The customer relationships are amortized over their estimated useful lives on an accelerated basis based upon projected cash flows. The related amortization expense was approximately $1.1 million, $0 million and $0 for the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively, resulting in a decrease in the carrying value of the equity method investments.

(4)    Furniture, equipment and leasehold improvements

|  | Cost | Accumulated amortization/depreciation | 2004 Net book value | 2003 Net book value |
|---|---|---|---|---|
|  | | (in thousands) | | |
| Furniture and equipment | $    118,311 | $    82,545 | $    35,766 | $    46,586 |
| Leasehold improvements | 32,323 | 20,260 | 12,063 | 11,142 |
|  | $    150,634 | $    102,805 | $    47,829 | $    57,728 |

Depreciation and amortization expense, included in general, administrative and other expenses, was $20.0 million, $17.8 million and $17.7 million in the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively.

## NOTE F—ACQUISITIONS

During the year ended February 29, 2004, the Group acquired a number of businesses for an aggregate purchase price of $118.9 million. Amounts assigned to major intangible asset classes are as follows:

|  | (in thousands) |
|---|---|
| Goodwill | $    32,575 |
| Customer relationships | 19,636 |
| Asset management contracts | 55,414 |
| Property management contracts | 9,027 |
| Trade names | 2,278 |

## NOTE G—NET CAPITAL REQUIREMENT

The Group's subsidiary, Refco Securities, LLC, is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3-1 (the "Rule") which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of February 29, 2004, Refco Securities, LLC had net capital of $64.9 million, which was 42.9% of aggregate debit balances and $61.9 million in excess of required net capital.

The Group's subsidiary, Refco, LLC, is also subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain

F-16

net capital, as defined. The requirement is equal to the greater of 4 percent of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of February 29, 2004, Refco, LLC had net capital of $223.6 million, which was $95.6 million in excess of required net capital.

## NOTE H—COMMITMENTS AND CONTINGENCIES

### Commitments

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises excluding any escalation adjustments are as follows (in thousands):

| Fiscal year | | |
|---|---|---|
| 2005 | $ | 15,243 |
| 2006 | | 13,669 |
| 2007 | | 11,558 |
| 2008 | | 9,404 |
| 2009 | | 6,383 |
| Thereafter | | 25,038 |
| | $ | 81,295 |

The Group's rent expense for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 was $17.9 million, $15.2 million and $8.6 million, respectively.

### Contingencies

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers, alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003 the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. The remaining claim was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. A separate trial to determine damages is scheduled for the fall of 2004. The Group will seek to set aside the verdict. If the verdict is not set aside, the Group intends to appeal such decision and believes they have meritorious grounds for appeal. The Group also believes that, if that appeal is unsuccessful, the plaintiffs' alleged damages are substantially less than the $45 million they are claiming.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce

F-17

documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents which had been provided to the SEC.

In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

## NOTE I—DERIVATIVE ACTIVITIES, OFF BALANCE SHEET AND CONCENTRATION OF CREDIT RISK

In the normal course of its customer-driven operations, the Group enters into various contractual commitments, as principal, involving forward settlement. These include exchange-traded futures, fixed income swaps, equity swaps, foreign currency forwards and option contracts. These contracts are generally hedged with offsetting contracts at prices which result in a profit spread for the Group. The Group also enters into forward repurchase agreements. Customers and counterparties of the Group consist of entities in and outside the United States.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off balance sheet. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits.

The Group also enters into financing agreements, collateralized primarily by U.S. Government securities, in which it extends short-term credit to counterparties. The value and adequacy of the collateral are continually monitored.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouse its customers' performance under these contracts. The Group provides clearing services of futures and options to introducing brokers, some of which are guaranteed under commodity regulations with respect to their sales activity as a futures broker. The Group may require introducing brokers to deposit funds or pledge their exchange memberships, thereby reducing risks associated with the clearing of futures and options. Additionally, to reduce its risk, the Group requires customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer, which reduces the risk to the Group of

F-18

failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements.

Management believes that the margin deposits held at February 29, 2004 were adequate to minimize the risk of material loss, which could be created by the positions held at that time.

## NOTE J—FAIR VALUE OF FINANCIAL INSTRUMENTS

SFAS No. 107 " *Disclosures about Fair Value of Financial Instruments* " requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Cash, Cash and securities segregated under federal and other regulations, Deposits with clearing organizations and others, Short-term borrowings and Payables to broker-dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long-term borrowings recorded at historical amounts which could differ from fair value as a result of changes in market rates.

The following table provides a summary of the fair value of the Group's long-term borrowings. The fair value of the Group's long-term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

|  | 2004 | 2003 |
|---|---|---|
|  | (in thousands) | |
| Carrying value of long-term borrowings | $    383,500 | $    451,500 |
| Fair value of long-term borrowings | 399,990 | 481,202 |

The Group carries its secured financing activities, including Securities purchased under agreements to resell, Securities borrowed, Securities sold under agreements to repurchase, Securities loaned and Other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short-term in nature, carrying value approximates fair value.

F-19

**NOTE K—SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL AND SECURITIES SOLD UNDER AGREEMENTS TO REPURCHASE**

Securities purchased under agreements to resell ("resale agreements") and Securities sold under agreements to repurchase ("repurchase agreements") are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. The carrying amounts approximate their fair values. Where appropriate, resale and repurchase agreements with the same counterparty are reported on a net basis in accordance with FASB Interpretation No. 41 ("FIN 41"), "*Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements* ." The Group is required to present the following table when repurchase agreements are 10% or greater of total assets.

| | February 29, 2004 | | | | | |
|---|---|---|---|---|---|---|
| | Demand | Overnight | Less than 30 days | 30-90 days | Greater than 90 days | Total |
| | | | (in thousands) | | | |
| **Security Type** | | | | | | |
| US Governments | $ 420,805 | $ 10,980,829 | $ 4,012,729 | $ 2,804,362 | $ 1,098,520 | $ 19,317,245 |
| US Corporations | 101,109 | — | — | — | — | 101,109 |
| Foreign Governments | 68,542 | 178,169 | 680,594 | 470,710 | 339,848 | 1,737,863 |
| Foreign Corporations | 172,879 | — | — | — | — | 172,879 |
| Emerging Market Government | 1,031,446 | 14,268 | 27,329 | — | — | 1,073,043 |
| Other | 1,795,994 | 1,088,527 | 6,461 | 285,928 | 51,250 | 3,228,160 |
| | $ 3,590,775 | $ 12,261,793 | $ 4,727,113 | $ 3,561,000 | $ 1,489,618 | $ 25,630,299 |

| | February 28, 2003 | | | | | |
|---|---|---|---|---|---|---|
| | Demand | Overnight | Less than 30 days | 30-90 days | Greater than 90 days | Total |
| | | | (in thousands) | | | |
| **Security Type** | | | | | | |
| US Governments | $ 2,060,573 | $ 3,042,755 | $ 615,409 | $ 912,946 | $ 2,474,561 | $ 9,106,244 |
| US Corporations | 17,534 | — | — | — | — | 17,534 |
| Foreign Governments | 101,774 | 1,012,168 | 809,633 | 222,370 | 447,945 | 2,593,890 |
| Foreign Corporations | 39,767 | 5,707 | — | — | — | 45,474 |
| Emerging Market Government | 772,677 | 8,691 | 26,519 | — | — | 807,887 |
| Other | 53,182 | 154,742 | 503 | — | — | 208,427 |
| | $ 3,045,507 | $ 4,224,063 | $ 1,452,064 | $ 1,135,316 | $ 2,922,506 | $ 12,779,456 |

The Group's policy is to take possession of securities purchased under resale agreements, which consist largely of securities issued by the U.S. Government. The Group retains the right to re-pledge collateral received in secured financing transactions. As of February 29, 2004, substantially all of the collateral received had been re-pledged in connection with these financing activities. The market value of the collateral the Group received as of February 29, 2004 and February 28, 2003, was $124,416 million and $71,112 million, respectively. The Group continually monitors the market value of the underlying collateral received as compared with the related receivable, including accrued interest, and requests additional collateral where deemed appropriate.

F-20

**NOTE L—RELATED PARTY TRANSACTIONS**

The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates. The $105 million due from Refco Group Holdings, Inc., included in receivables from customers at February 28, 2003, was received by February 29, 2004.

As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210 million and $175 million, respectively. These balances were included in "Receivables from customers" and liquidated shortly after each year-end.

**NOTE M—SEGMENT REPORTING**

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has determined its operating segments to be (1) Derivatives Brokerage and Clearing, (2) Prime Brokerage/Capital Markets, and (3) Asset Management. The Derivatives Brokerage and Clearing business operations consist of execution and clearing services for global exchange-traded derivatives in electronic and open outcry markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Asset Management provides a broad array of asset management services to institutional and individual investors through Refco Alternative Investments (RAI), Forstmann-Leff Associates and Tilney Investment Management.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non-operating segment. Corporate administration costs are not allocated to the respective segments and are included in Corporate & Other.

| | Domestic Brokerage & Clearing | Global Brokerage/ Capital Markets | Asset Management | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **As of and for the year ended February 29, 2004** | | | | | | |
| Interest revenue | $ 143,400 | $ 1,084,204 | $ 606 | $ 20,154 | $ (194,560) | $ 1,053,804 |
| Total revenues | 835,807 | 1,276,709 | 71,662 | 20,180 | (253,823) | 1,950,535 |
| Interest expense | 61,868 | 979,704 | 1,128 | 53,367 | (197,409) | 898,658 |
| Depreciation and amortization | 10,222 | 1,311 | 2,269 | 14,566 | — | 28,368 |
| Income before provision for income taxes and members' interest in earnings of subsidiary | 125,737 | 133,706 | (2,123) | (56,715) | — | 200,605 |
| Total assets | 6,998,420 | 31,763,273 | 276,979 | 863,307 | (6,569,807) | 33,332,172 |
| **As of and for the year ended February 28, 2003** | | | | | | |
| Interest revenue | $ 142,666 | $ 2,507,557 | $ 882 | $ 53,688 | $ (315,840) | $ 2,388,953 |
| Total revenues | 745,967 | 2,609,745 | 57,855 | 58,682 | (367,459) | 3,104,790 |
| Interest expense | 72,064 | 2,365,181 | 121 | 62,741 | (317,641) | 2,182,466 |
| Depreciation and amortization | 7,950 | 647 | 2,006 | 14,842 | — | 25,445 |
| Income before provision for income taxes and dividends on preferred securities issued by subsidiaries | 77,741 | 101,457 | 1,071 | (22,614) | — | 157,655 |
| Total assets | 5,871,193 | 20,505,353 | 183,222 | 1,195,988 | (8,540,327) | 19,215,429 |
| **As of and for the year ended February 28, 2002** | | | | | | |
| Interest revenue | $ 185,610 | $ 2,096,561 | $ 1,672 | $ 46,414 | $ (616,793) | $ 1,713,464 |
| Total revenues | 691,476 | 2,217,095 | 69,836 | 51,434 | (662,209) | 2,367,632 |
| Interest expense | 127,542 | 1,977,022 | 1,260 | 69,588 | (617,543) | 1,557,869 |
| Depreciation and amortization | 10,283 | 755 | 2,112 | 24,799 | — | 37,949 |
| Income before provision for income taxes and dividends on preferred securities issued by subsidiaries | 59,421 | 95,704 | 13,552 | (52,516) | — | 116,161 |
| Total assets | 4,448,444 | 22,834,637 | 224,117 | 1,217,479 | (6,113,639) | 22,611,038 |

F-22

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long-lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | (in thousands) | | |
| **Total revenues:** | | | |
| United States | $ 1,299,579 | $ 2,474,980 | $ 1,532,798 |
| Bermuda | 325,791 | 411,114 | 639,677 |
| United Kingdom | 225,805 | 135,685 | 157,301 |
| Other | 99,360 | 83,011 | 37,856 |
| Total | $ 1,950,535 | $ 3,104,790 | $ 2,367,632 |
| **Long-lived assets:** | | | |
| United States | $ 37,337 | $ 47,278 | |
| Bermuda | 1,900 | 2,816 | |
| United Kingdom | 3,806 | 3,975 | |
| Other | 4,786 | 3,659 | |
| Total | $ 47,829 | $ 57,728 | |

No single customer accounted for greater than 10% of total revenues in the years ended February 29, 2004, February 28, 2003 and February 28, 2002.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvements.

## NOTE N—SUBSEQUENT EVENT

On April 19, 2004, the majority owner executed a letter of intent in which a majority stake of the Group would be acquired.

The resulting change in control would give effect to default provisions contained within the revolving credit facility and unsecured syndicated senior notes.

On June 8, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., entered into an equity purchase and merger agreement with the Group and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC ("New Refco") becoming the Group's parent and THL Refco Acquisition Partners and its affiliates and co-investors owning an approximate 57% interest in New Refco. Upon consummation of the transactions contemplated by the Purchase Agreement on August 5, 2004, the Group became the obligor for senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing. Upon the closing of the transaction, the Group became the issuer along with Refco Finance Inc. of $600.0 million in aggregate principal amount of senior subordinated notes. Concurrently with the consummation of the transactions, the Group distributed $550.0 million in cash and other capital distributions and all of the equity interests of Forstmann-Leff International Associates, LLC, to Refco Group Holdings, Inc.

As a result of the above transactions, goodwill of $579.6 million and identifiable intangible assets of $566.3 million is expected to be recorded, subject to the completion of a third party valuation study.

The following information sets forth the Group condensed consolidating financial statements as of February 29, 2004 and February 28, 2003 and for each of the three years in the period ended February 29, 2004.

**Condensed consolidating balance sheet**

| | February 29, 2004 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Cash and cash equivalents | $ — | $ 4,477 | $ 333,766 | $ — | $ 338,243 |
| Cash and securities segregated under federal and other regulations | | | | | |
| Cash and cash equivalents | — | — | 1,375,838 | — | 1,375,838 |
| Securities purchased under agreements to resell | — | — | 55,061 | — | 55,061 |
| Securities purchased under agreements to resell | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker-dealers, clearing organizations and customers | 314,279 | 1,266,036 | 3,568,703 | (2,817,018) | 2,332,000 |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries | 1,131,766 | 1,160,431 | — | (2,292,197) | — |
| Other assets | 58,612 | 430,084 | 347,948 | (252,788) | 583,856 |
| Total assets | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |
| Liabilities | | | | | |
| Short-term borrowings, including current portion of long-term borrowings | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
| Securities sold under agreements to repurchase | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
| Payable to brokers-dealers and clearing organizations | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers | 465,681 | 1,547,382 | 6,656,600 | (3,573,946) | 5,095,717 |
| Securities sold, not yet purchased, at market value or fair value | — | 2,091 | 805,394 | — | 807,485 |
| Accounts payable, accrued expenses and other liabilities | 23,392 | 68,182 | 146,163 | (63,588) | 174,149 |
| Long-term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 109,056 | (109,056) | 16,000 |
| Total liabilities | 888,573 | 1,617,656 | 36,424,046 | (6,218,592) | 32,711,683 |
| Membership interests issued by subsidiary | — | — | 4,405 | — | 4,405 |
| Members' equity | 616,084 | 1,246,117 | 1,293,282 | (2,539,399) | 616,084 |
| Total liabilities and members' equity | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |

**Condensed consolidating balance sheet**

|  | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
|  |  |  | February 28, 2003 |  |  |
|  |  |  | (in thousands) |  |  |
| Cash and cash equivalents | $ — | $ 4,014 | $ 243,089 | $ — | $ 247,103 |
| Cash and securities segregated under federal and other regulations |  |  |  |  |  |
|     Cash and cash equivalents | — | — | 1,949,846 | — | 1,949,846 |
|     Securities purchased under agreements to resell | — | — | 69,161 | — | 69,161 |
| Securities purchased under agreements to resell | — | — | 15,900,055 | (3,736,758) | 12,163,297 |
| Deposits with clearing organizations and others | — | — | 3,564,498 | (1,812,697) | 1,751,801 |
| Receivables from broker-dealers, clearing organizations and customers | 450,060 | 1,595,825 | 2,574,296 | (2,520,985) | 2,099,196 |
| Securities owned, at market value or fair value | — | 291 | 844,791 | (354,662) | 490,420 |
| Investment in and advances to subsidiaries | 873,033 | 893,128 | — | (1,766,161) | — |
| Other assets | 87,380 | 396,800 | 210,537 | (250,112) | 444,605 |
|     Total assets | $ 1,410,473 | $ 2,890,058 | $ 25,356,273 | $ (10,441,375) | $ 19,215,429 |
| Liabilities |  |  |  |  |  |
|     Short-term borrowings, including current portion of long-term borrowings | $ 228,000 | $ 3,373 | $ 14,437 | $ — | $ 245,810 |
|     Securities sold under agreements to repurchase | — | — | 17,868,915 | (5,089,459) | 12,779,456 |
|     Payable to brokers-dealers and clearing organizations | — | 1,862 | 285,609 | (30,688) | 256,783 |
| Payable to customers | 30,709 | 1,675,879 | 5,714,199 | (2,985,601) | 4,435,186 |
| Securities sold, not yet purchased, at market value or fair value | — | 276 | 211,929 | — | 212,205 |
|     Accounts payable, accrued expenses and other liabilities | 22,902 | 61,027 | 137,665 | (61,466) | 160,128 |
| Long-term borrowings | 383,500 | — | — | — | 383,500 |
| Subordinated debt | 179,000 | — | 96,523 | (259,523) | 16,000 |
|     Total liabilities | 844,111 | 1,742,417 | 24,329,277 | (8,426,737) | 18,489,068 |
| Preferred securities issued by subsidiary | — | — | — | 160,000 | 160,000 |
| Members' equity | 566,362 | 1,147,641 | 1,026,996 | (2,174,638) | 566,361 |
|     Total liabilities and members' equity | $ 1,410,473 | $ 2,890,058 | $ 25,356,273 | $ (10,441,375) | $ 19,215,429 |

**Condensed consolidating statement of income**

| | For the year ended February 29, 2004 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $        — | $      5,666 | $      718,005 | $      (52,637) | $      671,03 |
| Interest | 15,037 | 69,609 | 1,163,718 | (194,560) | 1,053,80 |
| Principal transactions, net | — | 36,041 | 138,970 | — | 175,01 |
| Asset management and advisory fees | — | — | 48,183 | (272) | 47,91 |
| Other | — | 4,066 | 5,063 | (6,354) | 2,77 |
| Total revenues | 15,037 | 115,382 | 2,073,939 | (253,823) | 1,950,53 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 13,039 | 439,833 | (40,978) | 411,89 |
| Interest | 40,404 | 78,831 | 976,832 | (197,409) | 898,65 |
| Employee compensation and benefits | 4,636 | 13,869 | 219,971 | — | 238,47 |
| General, administrative and other | 18,856 | 14,175 | 183,306 | (15,435) | 200,90 |
| Total expenses | 63,896 | 119,914 | 1,819,942 | (253,823) | 1,749,93 |
| Equity in net income of subsidiaries | 237,289 | 241,200 | — | (478,489) | – |
| Income before provision for income taxes, and members' interest in earnings of subsidiary | 188,430 | 236,668 | 253,997 | (478,489) | 200,60 |
| Provision for income taxes | — | | 12,176 | — | 12,17 |
| Income before members' interest in earnings of subsidiary | 188,430 | 236,668 | 241,821 | (478,489) | 188,42 |
| Members' interest in earnings of subsidiary | — | — | 1,273 | — | 1,27 |
| Net income | $   188,430 | $   236,668 | $   240,548 | $   (478,489) | $   187,15 |

F-26

**Condensed consolidating statement of income**

|  | For the year ended February 28, 2003 | | | | |
|---|---|---|---|---|---|
|  | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|  | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 6,278 | $ 611,004 | $ (33,757) | $ 583,52 |
| Interest | 34,908 | 101,573 | 2,568,312 | (315,840) | 2,388,95 |
| Principal transactions, net | | 7,170 | 76,279 | — | 83,44 |
| Asset management and advisory fees | | — | 49,932 | (5,710) | 44,22 |
| Other | 5,007 | 4,087 | 56,501 | (60,954) | 4,64 |
| Total revenues | 39,915 | 119,108 | 3,362,028 | (416,261) | 3,104,79 |
| **Expenses** | | | | | |
| Commissions and order execution costs | | 4,991 | 413,432 | (33,048) | 385,37 |
| Interest | 46,667 | 95,267 | 2,358,173 | (317,641) | 2,182,46 |
| Employee compensation and benefits | 6,479 | 12,085 | 193,266 | — | 211,83 |
| General, administrative and other | 60,850 | 3,687 | 168,498 | (65,571) | 167,46 |
| Total expenses | 113,996 | 116,030 | 3,133,369 | (416,261) | 2,947,13 |
| Equity in net income of subsidiaries | 214,201 | 182,183 | — | (396,384) | – |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries | 140,120 | 185,261 | 228,659 | (396,384) | 157,65 |
| Provision for income taxes | — | — | 1,960 | — | 1,96 |
| Income before dividends on preferred securities issued by subsidiaries | 140,120 | 185,261 | 226,699 | (396,384) | 155,69 |
| Dividends on preferred securities issued by subsidiaries | — | 15,576 | — | — | 15,57 |
| Net income | $ 140,120 | $ 169,685 | $ 226,699 | $ (396,384) | $ 140,11 |

F-27

**Condensed consolidating statement of income**

| | For the year ended February 28, 2002 | | | | |
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $      — | $      30,505 | $      480,278 | $      (22,163) | $      488,62 |
| Interest | 22,836 | 187,480 | 2,119,941 | (616,793) | 1,713,46 |
| Principal transactions, net | — | 3,253 | 95,942 | — | 99,19 |
| Asset management and advisory fees | — | 11 | 68,121 | (5,442) | 62,69 |
| Other | 4,941 | 3,368 | 13,165 | (17,811) | 3,66 |
| Total revenues | 27,777 | 224,617 | 2,777,447 | (662,209) | 2,367,63 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 10,423 | 335,397 | (22,163) | 323,65 |
| Interest | 46,226 | 179,271 | 1,949,915 | (617,543) | 1,557,86 |
| Employee compensation and benefits | 6,711 | 24,150 | 167,592 | | 198,45 |
| General, administrative and other | 18,338 | 9,451 | 166,206 | (22,503) | 171,49 |
| Total expenses | 71,275 | 223,295 | 2,619,110 | (662,209) | 2,251,47 |
| Equity in net income of subsidiaries | 137,132 | 149,915 | — | (287,047) | – |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries | 93,634 | 151,237 | 158,337 | (287,047) | 116,16 |
| Provision for income taxes | — | — | 6,951 | — | 6,95 |
| Income before dividends on preferred securities issued by subsidiaries | 93,634 | 151,237 | 151,386 | (287,047) | 109,21 |
| Dividends on preferred securities issued by subsidiary | — | 15,576 | — | — | 15,57 |
| Net income | $  93,634 | $  135,661 | $  151,386 | $  (287,047) | $  93,63 |

F-28

**Condensed consolidating statement of cash flows**

| | For the Year Ended February 29, 2004 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash generated from/(used in) operating activities | $ 387,774 | $ 23,682 | $ 183,256 | $ — | $ 594,712 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | (23,219) | (95,711) | — | (118,930) |
| Net cash used in investing activities | — | (23,219) | (95,711) | — | (118,930) |
| Cash flows from financing activities | | | | | |
| Repayment of long term borrowings | (68,000) | — | — | — | (68,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — | — | (199,774) |
| Net contributions to membership interest issued by subsidiary | — | — | 3,132 | — | 3,132 |
| Capital withdrawals | (120,000) | — | — | — | (120,000) |
| Net cash used in financing activities | (387,774) | — | 3,132 | — | (384,642) |
| Net increase (decrease) in cash and cash equivalents | — | 463 | 90,677 | — | 91,140 |
| Cash and cash equivalents, beginning of year | — | 4,014 | 243,089 | | 247,103 |
| Cash and cash equivalents, end of year | $ — | $ 4,477 | $ 333,766 | $ — | $ 338,243 |

F-29

For the Year Ended February 28, 2005

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Net cash (used in)/generated from operating activities | $ (54,500) | $ 1,658 | $ 87,124 | $ — | $ 34,282 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | — | (3,473) | — | (3,473) |
| Net cash used in investing activities | — | — | (3,473) | — | (3,473) |
| Cash flows from financing activities | | | | | |
| Issuance of long term debt | 222,500 | — | — | — | 222,500 |
| Repayment of long term borrowings | (68,000) | — | — | — | (68,000) |
| Capital withdrawals | (100,000) | — | — | — | (100,000) |
| Net cash generated from financing activities | 54,500 | — | — | — | 54,500 |
| Net increase in cash and cash equivalents | — | 1,658 | 83,651 | — | 85,309 |
| Cash and cash equivalents, beginning of year | — | 2,356 | 159,438 | — | 161,794 |
| Cash and cash equivalents, end of year | $ — | $ 4,014 | $ 243,089 | $ — | $ 247,103 |

F-30

| | For the Year Ended February 28, 2002 (unaudited) | | | | |
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| --- | --- | --- | --- | --- | --- |
| | | | (in thousands) | | |
| Net cash generated from/(used in) operating activities | $ 133,000 | $ (69) | $ (74,519) | $ — | $ 58,412 |
| | | | | | |
| Cash flows from financing activities | | | | | |
| Repayment of subordinated debt | (25,000) | — | — | — | (25,000) |
| Issuance of long term debt | — | — | — | — | — |
| Repayment of long term borrowings | (33,000) | — | — | — | (33,000) |
| Capital withdrawals | (75,000) | — | — | — | (75,000) |
| Net cash used in financing activities | (133,000) | — | — | — | (133,000) |
| Net (decrease)/increase in cash and cash equivalents | — | (69) | (74,519) | — | (74,588) |
| Cash and cash equivalents, beginning of year | — | 2,425 | 233,957 | | 236,382 |
| Cash and cash equivalents, end of year | $ — | $ 2,356 | $ 159,438 | $ — | $ 161,794 |

F-31

[THIS PAGE IS INTENTIONALLY LEFT BLANK]

(Interim Financial Statements begin on the following page)

F-32

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | May 31, 2004 | February 29, 2004 |
|---|---|---|
| | (unaudited) | |
| | (in thousands) | |
| Cash and cash equivalents | $ 224,116 | $ 338,243 |
| Cash and securities segregated under federal and other regulations: | | |
|     Cash and cash equivalents | 1,436,072 | 1,375,838 |
|     Securities purchased under agreements to resell | 41,831 | 55,061 |
| Restricted cash | 500,000 | — |
| Securities purchased under agreements to resell | 41,800,629 | 24,782,874 |
| Deposits with clearing organizations and others | 1,919,371 | 1,831,765 |
| Receivables from broker-dealers and clearing organizations | 3,511,725 | 504,810 |
| Receivables from customers | 2,290,621 | 1,827,190 |
| Securities owned, at market or fair value | 2,897,884 | 2,032,535 |
| Memberships in exchanges (market value: May 31, 2004: $48,502, February 29, 2004: $41,377) | 15,944 | 15,869 |
| Other assets | 590,916 | 567,987 |
|     Total assets | $ 55,229,109 | $ 33,332,172 |
| **Liabilities** | | |
| Short-term borrowings, including current portion of long-term borrowings | $ 68,000 | $ 88,890 |
| Securities sold under agreements to repurchase | 44,296,847 | 25,630,299 |
| Payable to broker-dealers and clearing organizations | 2,381,069 | 583,643 |
| Payable to customers | 5,911,001 | 5,095,717 |
| Securities sold, not yet purchased, at market or fair value | 1,376,488 | 807,485 |
| Accounts payable, accrued expenses, and other liabilities | 192,649 | 174,149 |
| Long-term borrowings | 315,500 | 315,500 |
| Subordinated debt | 16,000 | 16,000 |
|     Total liabilities | 54,557,554 | 32,711,683 |
| Commitments and contingent liabilities | | |
| Membership interests issued by subsidiary | 455 | 4,405 |
| Members' equity | 671,100 | 616,084 |
|     Total liabilities and members' equity | $ 55,229,109 | $ 33,332,172 |

The accompanying notes are an integral part of these financial statements.

F-33

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

| | For the three months ended | |
| --- | --- | --- |
| | May 31, 2004 | May 31, 2003 |
| | (unaudited) | |
| | (in thousands) | |
| **Revenues** | | |
| Commissions and brokerage | $ 220,279 | $ 163,206 |
| Interest | 377,743 | 283,022 |
| Principal transactions, net | 67,300 | 34,961 |
| Asset management and advisory fees | 23,435 | 11,160 |
| Other | 978 | 2,500 |
| Total revenues | 689,735 | 494,849 |
| | | |
| **Expenses** | | |
| Commissions and order execution costs | 142,706 | 104,162 |
| Interest | 344,254 | 248,489 |
| Employee compensation and benefits | 76,866 | 52,314 |
| General, administrative and other | 57,502 | 42,704 |
| Total expenses | 621,328 | 447,669 |
| | | |
| Income before provision for income taxes and members' interest in earnings of subsidiary | 68,407 | 47,180 |
| Provision for income taxes | 8,211 | 907 |
| Income before members' interest in earnings of subsidiary | 60,196 | 46,273 |
| Members' interest in earnings of subsidiary | 926 | — |
| NET INCOME | $ 59,270 | $ 46,273 |

The accompanying notes are an integral part of these financial statements.

F-34

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

**For the three months ended**

| | Members' equity | | |
| --- | --- | --- | --- |
| | Common capital | Other Comprehensive Income | Total |
| | (unaudited) | | |
| | (in thousands) | | |
| Balance, February 28, 2003 | $ 568,016 | $ (1,655) | $ 566,361 |
| Loss on early extinguishment of preferred securities issued by subsidiaries | (39,774) | — | (39,774) |
| Net income | 46,273 | — | 46,273 |
| Currency translation adjustment | — | 4,526 | 4,526 |
| Balance, May 31, 2003 | $ 574,515 | $ 2,871 | $ 577,386 |
| Balance, February 29, 2004 | $ 595,398 | $ 20,686 | $ 616,084 |
| Net income | 59,270 | — | 59,270 |
| Currency translation adjustment | — | (4,254) | (4,254) |
| Balance, May 31, 2004 | $ 654,668 | $ 16,432 | $ 671,100 |

The accompanying notes are an integral part of these financial statements.

F-35

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the three months ended | |
| --- | --- | --- |
| | May 31, 2004 | May 31, 2003 |
| | (unaudited) | |
| | (in thousands) | |
| **Cash flows from operating activities** | | |
| Net income | $ 59,270 | $ 46,273 |
| Noncash items included in net income | | |
| Depreciation and amortization | 8,097 | 9,747 |
| Members' interest in earnings of subsidiary | 926 | — |
| (Increase) decrease in operating assets | | |
| Cash and securities segregated under federal and other regulations: | | |
| Cash and cash equivalents | (60,234) | (201,923) |
| Securities purchased under agreements to resell | 13,230 | 6,195 |
| Restricted cash | (500,000) | — |
| Securities purchased under agreements to resell | (17,017,755) | (7,998,205) |
| Deposits with clearing organizations and others | (87,606) | (1,472) |
| Receivables from brokers-dealers and clearing organizations | (3,006,915) | (295,947) |
| Receivables from customers | (463,431) | (752,008) |
| Securities owned, at market or fair value | (865,349) | (1,057,412) |
| Membership in exchanges | (75) | (552) |
| Other assets | (31,026) | 9,756 |
| Increase (decrease) in operating liabilities | | |
| Short-term borrowings, including current portion of long-term borrowings | (20,890) | 74,722 |
| Securities sold under agreements to repurchase | 18,666,548 | 9,502,272 |
| Payable to broker-dealers and clearing organizations | 1,797,426 | 142,292 |
| Payable to customers | 815,284 | 269,006 |
| Securities sold, not yet purchased, at market or fair value | 569,003 | 495,858 |
| Accounts payable, accrued expenses and other liabilities | 14,246 | 12,799 |
| Net cash used in operating activities | (109,251) | 261,401 |
| **Cash flows from investing activities** | | |
| Acquisition of businesses, net of cash acquired | — | (24,222) |
| Net cash used in investing activities | — | (24,222) |
| **Cash flows from financing activities** | | |
| Payment for redemption of preferred securities issued by subsidiaries | — | (199,774) |
| Withdrawals of interests by members' of subsidiary | (4,876) | — |
| Net cash used in financing activities | (4,876) | (199,774) |
| Net decrease in cash and cash equivalents | (114,127) | 37,405 |
| Cash and cash equivalents, beginning of period | 338,243 | 247,103 |
| Cash and cash equivalents, end of period | $ 224,116 | $ 284,508 |

The accompanying notes are an integral part of these financial statements.

F-36

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE A—ORGANIZATION

Refco Group Ltd., LLC (the "Company") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker-dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities foreign exchange broker.

The Company is 90% owned by Refco Group Holdings, Inc., a Delaware corporation. The remaining 10% is owned by BAWAG Overseas, Inc., a third party financial institution.

## NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which does issue non-voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in other assets.

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

These unaudited consolidated financial statements reflect all adjustments that are, in the opinion of management, necessary for a fair statement of the results for the interim period presented. These adjustments are of a normal, recurring nature. Interim period operating results may not be indicative of the operating results for a full year. These consolidated financial statements should be read in conjunction with the Group's fiscal year end consolidated financial statements included elsewhere in this Offering Circular.

## NOTE C—NET CAPITAL REQUIREMENT

The Group's subsidiary, Refco Securities, LLC, is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3-1 (the "Rule") which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5 percent of aggregate

debits. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million, which was 18.3 percent of aggregate debit balances and $67.5 million in excess of required net capital.

The Group's subsidiary, Refco, LLC, is also subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4 percent of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital.

## NOTE D—COMMITMENTS AND CONTINGENCIES

### Commitments

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises excluding any escalation adjustments are as follows (in thousands):

| Fiscal period | | |
|---|---|---|
| Nine months ended 2005 | $ | 15,243 |
| 2006 | | 13,669 |
| 2007 | | 11,558 |
| 2008 | | 9,404 |
| 2009 | | 6,383 |
| Thereafter | | 25,038 |
| | $ | 81,295 |

The Group's rent expense for the three months ended May 31, 2004 and 2003 was $4.5 million and $4.0 million, respectively.

### Contingencies

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003 the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. The remaining claim was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. A separate trial to determine damages is scheduled for the fall of 2004. The Group will seek to set aside the verdict. If the verdict is not set aside, the Group intends to appeal such decision and believes they have meritorious grounds for appeal. The Group also believes that, if that appeal is unsuccessful, the plaintiffs' alleged damages are substantially less than the $45 million they are claiming.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents that had been provided to the SEC.

In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

## NOTE E—FAIR VALUE OF FINANCIAL INSTRUMENTS

SFAS No. 107 " *Disclosures about Fair Value of Financial Instruments* " requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Cash, Cash and securities segregated under federal and other regulations, Deposits with clearing organizations and others, Short term borrowings and Payables to broker-dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long-term debt is recorded at historical amounts which could differ from fair value as a result of changes in the market rates.

The following table provides a summary of the fair value of the Group's long-term borrowings. The fair value of the Group's long-term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

| | May 31, 2004 | February 29, 2004 |
|---|---|---|
| | (in thousands) | |
| Carrying value of long-term borrowings | $ 383,500 | $ 383,500 |
| Fair value of long-term borrowings | 391,753 | 399,990 |

The Group carries its secured financing activities, including Securities purchased under agreements to resell, Securities borrowed, Securities sold under agreements to repurchase, Securities loaned and Other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short-term in nature, carrying value approximates fair value. The market value of the collateral the Group received as of May 31, 2004 and February 29, 2004, was approximately $177,000 million and $125,000 million, respectively.

## NOTE F—RESTRICTED CASH

As of May 31, 2004, the Company has on deposit $500 million with BAWAG Overseas, Inc., a member who is a financial institution. The Company will distribute the funds to its members consistent with the terms and conditions as set forth in the Equity Purchase and Merger Agreement dated June 8, 2004 (amended July 9, 2004) between Thomas H. Lee Partners and the selling members, provided it maintain this balance throughout the period between May 31, 2004 and the closing date.

## NOTE G—SEGMENT REPORTING

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has determined its operating segments to be (1) Derivatives Brokerage and Clearing, (2) Prime Brokerage/Capital Markets, and (3) Asset Management. The Derivatives Brokerage and Clearing business operations consist of execution and clearing services for global exchange-traded derivatives in electronic and open outcry Markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Asset Management provides a broad array of asset management services to institutional and individual investors through Refco Alternative Investments (RAI), Forstmann-Leff Associates and Tilney Investment Management.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non-operating segment. Corporate

F-40

administration costs are not allocated to the respective segments and are included in Corporate & Other.

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Asset Management | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **As of and for the three months ended May 31, 2004 (unaudited)** | | | | | | |
| Interest revenue | $ 37,551 | $ 381,034 | $ 70 | $ 6,624 | $ (47,536) | $ 377,743 |
| Total revenues | 262,640 | 446,740 | 27,423 | 7,032 | (54,100) | 689,735 |
| Interest expense | 20,085 | 356,872 | 50 | 15,510 | (48,263) | 344,254 |
| Depreciation and amortization | 3,167 | 558 | 1,751 | 2,621 | — | 8,097 |
| Income before provision for income taxes and members' interest in earnings of subsidiary | 41,907 | 37,655 | 2,905 | (14,060) | — | 68,407 |
| Total assets | 7,225,821 | 54,780,654 | 281,433 | 1,393,954 | (8,452,753) | 55,229,109 |
| **For the three months ended May 31, 2003 (unaudited)** | | | | | | |
| Interest revenue | $ 38,873 | $ 286,934 | $ 123 | $ 6,599 | $ (49,507) | $ 283,022 |
| Total revenues | 197,116 | 332,202 | 15,746 | 7,401 | (57,616) | 494,849 |
| Interest expense | 15,932 | 267,633 | 25 | 15,024 | (50,125) | 248,489 |
| Depreciation and amortization | 6,720 | 338 | 406 | 2,283 | — | 9,747 |
| Income before provision for income taxes | 28,906 | 30,777 | (962) | (11,541) | — | 47,180 |
| **As of February 29, 2004** | | | | | | |
| Total assets | $ 6,998,420 | $ 31,763,273 | $ 276,979 | $ 863,307 | $ (6,569,807) | $ 33,332,172 |

F-41

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long-lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

| | As of and for three months ended | |
|---|---|---|
| | May 31, 2004 | May 31 2003 |
| | (unaudited) | |
| | (in thousands) | |
| **Total revenue:** | | |
| United States | $ 500,724 | $ 350,896 |
| Bermuda | 64,867 | 82,420 |
| United Kingdom | 87,361 | 42,845 |
| Other | 36,783 | 18,688 |
| Total | $ 689,735 | $ 494,849 |

| | As of | |
|---|---|---|
| | May 31, 2004 | February 29 2004 |
| | (unaudited) | |
| **Long-lived assets:** | | |
| United States | $ 35,620 | $ 37,337 |
| Bermuda | 1,790 | 1,900 |
| United Kingdom | 6,261 | 3,806 |
| Other | 4,653 | 4,786 |
| Total | $ 48,324 | $ 47,829 |

No single customer accounted for greater than 10% of total revenues in the three months ended May 31, 2004 and 2003.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvement.

**NOTE H—SUBSEQUENT EVENT**

On June 8, 2004 (amended July 9, 2004), the majority owner executed an equity purchase and merger agreement in which a majority stake of the Group would be acquired. The resulting change in control would give effect to default provisions contained within the Group's revolving credit facility and unsecured syndicated senior notes.

F-42

**NOTE I—CONDENSED CONSOLIDATING FINANCIAL INFORMATION**

The following information sets forth the Group condensed consolidating financial statements as of May 31, 2004 and February 29, 2004 and for each of the three month periods ended May 31, 2004 and May 31, 2003.

**Condensed consolidating balance sheet**

| | May 31, 2004 (unaudited) | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Cash and cash equivalents | $  — | $  17,668 | $  206,448 | $  — | $  224,116 |
| Cash and securities segregated under federal and other regulations | | | | | |
|    Cash and cash equivalents | — | — | 1,436,072 | — | 1,436,072 |
|    Securities purchased under agreements to resell | — | — | 41,831 | — | 41,831 |
|    Restricted cash | 500,000 | — | — | — | 500,000 |
| Securities purchased under agreements to resell | — | — | 43,876,655 | (2,076,026) | 41,800,629 |
| Deposits with clearing organizations and others | — | 1,700 | 3,055,066 | (1,137,395) | 1,919,371 |
| Receivables from broker-dealers, clearing organizations and customers | 341,298 | 2,558,523 | 7,440,440 | (4,537,915) | 5,802,346 |
| Securities owned, at market value or fair value | | 4,862 | 3,244,205 | (351,183) | 2,897,884 |
| Investment in and advances to subsidiaries | 1,119,348 | 1,223,191 | — | (2,342,539) | — |
| Other assets | 64,348 | 430,589 | 362,166 | (250,243) | 606,860 |
|    Total assets | $  2,024,994 | $  4,236,533 | $  59,662,883 | $  (10,695,301) | $  55,229,109 |
| **Liabilities** | | | | | |
|    Short-term borrowings, including current portion of long-term borrowings | 68,000 | — | — | — | 68,000 |
|    Securities sold under agreements to repurchase | — | — | 47,009,284 | (2,712,437) | 44,296,847 |
|    Payable to broker-dealers and clearing organizations | — | 796 | 2,382,621 | (2,348) | 2,381,069 |
|    Payable to customers | 932,846 | 2,849,780 | 7,337,195 | (5,208,820) | 5,911,001 |
|    Securities sold, not yet purchased, at market value or fair value | — | 4,855 | 1,371,633 | — | 1,376,488 |
|    Accounts payable, accrued expenses and other liabilities | 21,548 | 70,935 | 169,801 | (69,635) | 192,649 |
| Long-term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 108,969 | (108,969) | 16,000 |
|    Total liabilities | 1,353,894 | 2,926,366 | 58,379,503 | (8,102,209) | 54,557,554 |
| Membership interests issued by subsidiary | — | — | 455 | — | 455 |
| Members' Equity | 671,100 | 1,310,167 | 1,282,925 | (2,593,092) | 671,100 |
|    Total liabilities and members' equity | $  2,024,994 | $  4,236,533 | $  59,662,883 | $  (10,695,301) | $  55,229,109 |

|  | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
|  | | | February 29, 2004 | | |
|  | | | (in thousands) | | |
| Cash and cash equivalents | $ — | $ 4,477 | $ 333,766 | $ — | $ 338,243 |
| Cash and securities segregated under federal and other regulations | | | | | |
|    Cash and cash equivalents | — | — | 1,375,838 | — | 1,375,838 |
|    Securities purchased under agreements to resell | — | — | 55,061 | — | 55,061 |
| Securities purchased under agreements to resell | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker-dealers, clearing organizations and customers | 314,279 | 1,266,036 | 3,568,703 | (2,817,018) | 2,332,000 |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries | 1,131,766 | 1,160,431 | — | (2,292,197) | — |
| Other assets | 58,612 | 430,084 | 347,948 | (252,788) | 583,856 |
|    Total assets | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |
| Liabilities | | | | | |
|    Short-term borrowings, including current portion of long-term borrowings | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
|    Securities sold under agreements to repurchase | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
|    Payable to brokers-dealers and clearing organizations | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers | 465,681 | 1,547,382 | 6,656,600 | (3,573,946) | 5,095,717 |
|    Securities sold, not yet purchased, at market value or fair value | — | 2,091 | 805,394 | — | 807,485 |
|    Accounts payable, accrued expenses and other liabilities | 23,392 | 68,182 | 146,163 | (63,588) | 174,149 |
| Long-term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 109,056 | (109,056) | 16,000 |
|    Total liabilities | 888,573 | 1,617,656 | 36,424,046 | (6,218,592) | 32,711,683 |
| Membership interests issued by subsidiary | — | — | 4,405 | — | 4,405 |
| Members' equity | 616,084 | 1,246,117 | 1,293,282 | (2,539,399) | 616,084 |
|    Total liabilities and members' equity | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |

F-44

**Condensed consolidating statement of income**

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | For the three months ended May 31, 2004 (unaudited) | | |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 1,893 | $ 224,216 | $ (5,830) | $ 220,279 |
| Interest | 5,919 | 23,045 | 396,315 | (47,536) | 377,743 |
| Principal transactions, net | — | 19,059 | 48,241 | — | 67,300 |
| Asset management and advisory fees | — | — | 23,435 | — | 23,435 |
| Other | 369 | 1,334 | 9 | (734) | 978 |
| Total revenues | 6,288 | 45,331 | 692,216 | (54,100) | 689,735 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 4,660 | 143,149 | (5,103) | 142,706 |
| Interest | 12,273 | 28,874 | 351,370 | (48,263) | 344,254 |
| Employee compensation and benefits | 1,025 | 3,779 | 72,062 | — | 76,866 |
| General, administrative and other | 4,536 | 6,728 | 46,974 | (734) | 57,502 |
| Total expenses | 17,834 | 44,041 | 613,555 | (54,100) | 621,328 |
| Equity in net income of subsidiaries | 71,740 | 70,146 | — | (141,886) | — |
| Income before provision for income taxes, and members' interest in earnings of subsidiary | 60,194 | 71,436 | 78,661 | (141,886) | 68,407 |
| Provision for income taxes | — | — | 8,211 | — | 8,211 |
| | 60,194 | 71,436 | 70,450 | (141,886) | 60,196 |
| Members' interest in earnings of subsidiary | — | — | 926 | — | 926 |
| Net income | $ 60,194 | $ 71,436 | $ 69,524 | $ (141,886) | $ 59,270 |

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Condensed consolidating statement of income**

| | For the three months ended May 31, 2003 (unaudited) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 1,311 | $ 168,834 | $ (6,939) | $ 163,206 |
| Interest | 4,396 | 17,706 | 310,427 | (49,507) | 283,022 |
| Principal transactions, net | — | 3,613 | 31,348 | — | 34,961 |
| Asset management and advisory fees | — | — | 11,187 | (27) | 11,160 |
| Other | 802 | 919 | 1,922 | (1,143) | 2,500 |
| Total revenues | 5,198 | 23,549 | 523,718 | (57,616) | 494,849 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 2,543 | 107,041 | (5,422) | 104,162 |
| Interest | 11,718 | 18,023 | 268,873 | (50,125) | 248,489 |
| Employee compensation and benefits | 1,051 | 2,808 | 48,455 | — | 52,314 |
| General, administrative and other | 2,829 | 920 | 41,023 | (2,069) | 42,704 |
| Total expenses | 15,598 | 24,294 | 465,392 | (57,616) | 447,669 |
| Equity in net income of subsidiaries | 56,674 | 59,013 | — | (115,687) | — |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries | 46,274 | 58,268 | 58,326 | (115,687) | 47,180 |
| Provision for income taxes | — | — | 907 | — | 907 |
| | 46,274 | 58,268 | 57,419 | (115,687) | 46,273 |
| Dividends on preferred securities issued by subsidiaries | — | — | — | — | — |
| Net income | $ 46,274 | $ 58,268 | $ 57,419 | $ (115,687) | $ 46,273 |

F-46

|  | For the three months ended May 31, 2004 (unaudited) | | | | |
|  | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|  | | | (in thousands) | | |
| Net cash generated from (used in) operating activities | $ — | $ 13,191 | $ (122,442) | $ — | $ (109,251) |
| Cash flows from financing activities | | | | | |
| Withdrawals of interests by members of subsidiary | — | — | (4,876) | | (4,876) |
| Net cash used in financing activities | — | — | (4,876) | | (4,876) |
| Net increase (decrease) in cash and cash equivalents | — | 13,191 | (127,318) | | (114,127) |
| Cash and cash equivalents, beginning of period | — | 4,477 | 333,766 | — | 338,243 |
| Cash and cash equivalents, end of period | $ — | $ 17,668 | $ 206,448 | $ — | $ 224,116 |

|  | For the three months ended May 31, 2003 (unaudited) | | | | |
|  | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|  | | | (in thousands) | | |
| Net cash (used in)/generated from operating activities | $ 199,774 | $ 22,213 | $ 39,414 | $ — | $ 261,401 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | (20,521) | (3,701) | — | (24,222) |
| Net cash used in investing activities | — | (20,521) | (3,701) | — | (24,222) |
| Cash flows from financing activities | | | | | |
| Payment for redemption of preferred securities | (199,774) | — | — | — | (199,774) |
| Net cash generated from/(used in) financing activities | (199,774) | — | — | — | (199,774) |
| Net increase (decrease) in cash and cash equivalents | — | 1,692 | 35,713 | — | 37,405 |
| Cash and cash equivalents, beginning of period | — | 4,014 | 243,089 | — | 247,103 |
| Cash and cash equivalents, end of period | $ — | $ 5,706 | $ 278,802 | $ — | $ 284,508 |

F-47

No person has been authorized to give any information or to make any representations other than those contained in this prospectus, and, if given or made, such information and representation must not be relied upon as having been authorized. This prospectus does not constitute an offer to sell or the solicitation of an offer to buy any securities other than the securities to which it relates or any offer to sell or the solicitation of an offer to buy such securities in any circumstances in which such offer or solicitation is unlawful. Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of Refco Group Ltd., LLC or Refco Finance Inc. since the date hereof or that the information contained in this prospectus is correct as of any time subsequent to its date.

---

**Dealer Prospectus Delivery Obligation**

Until                , 2004 all dealers that effect transactions in the old notes or the registered notes, whether or not participating in the exchange offer, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

# REFCO GROUP LTD., LLC
# REFCO FINANCE INC.

**Offer to exchange all
of the outstanding
$600,000,000 9% Senior
Subordinated Notes due 2012**

**for**

**$600,000,000 9% Senior
Subordinated Notes due 2012
registered under the
Securities Act of 1933**

---

**PROSPECTUS**

---

**, 2004**

**PART II**

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 20.**    *Indemnification of Directors, Officers, Managers or Members*

Refco Group Ltd., LLC, Refco Finance Inc., Bersec International LLC, Kroeck & Associates LLC, Lind-Waldock Securities, LLC, Market Educational Institute, LLC, Marshall Metals, LLC, Refco Administration, LLC, Refco Capital Holdings, LLC, Refco Capital Management, LLC, Refco Capital Trading LLC, Refco Capital LLC, Refco F/X Associates, LLC, Refco Financial, LLC, Refco Fixed Assets Management, LLC, Refco Global Capital Management LLC, Refco Global Futures, LLC, Refco Global Holdings, LLC, Refco Information Services, LLC, Refco Managed Futures, LLC, Refco Mortgage Securities, LLC, Refco Regulated Companies, LLC, Summit Management, (Newco) LLC and Westminster-Refco Management LLC are each formed or incorporated under the laws of the State of Delaware.

Section 18-108 of the Delaware Limited Liability Company Act, or DLLCA, provides that a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever, subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement. Section 102 of the Delaware General Corporation Law, or DGCL, as amended, allows a corporation to eliminate the personal liability of directors of a corporation to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except where the director breached the duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of the DGCL or obtained an improper personal benefit.

Generally, Section 145 of the General Corporation Law of the State of Delaware permits a corporation to indemnify certain persons made a party to an action, by reason of the fact that such person is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise. In the case of an action by or in the right of the corporation, no indemnification may be made in respect of any matter as to which that person was adjudged liable to the corporation unless the Delaware Court of Chancery or the court in which the action was brought determines that despite the adjudication of liability that person is fairly and reasonably entitled to indemnity for proper expenses. To the extent that person has been successful in the defense of any matter, that person shall be indemnified against expenses actually and reasonably incurred by him.

The limited liability company agreements or certificate of incorporation of each Registrant provides for the indemnification, to the fullest extent permitted by the DLLCA or DGCL, of all persons who may be indemnified by such Registrant under the DLLCA or DGCL, which would include the members, managers, directors, officers, employees and agents of such Registrant. The indemnification provided by the limited liability company agreements or certificate of incorporation does not limit or exclude any rights, indemnities or limitations of liability to which any person may be entitled, whether as a matter of law, under the by-laws, by agreement, vote of the stockholders or disinterested directors of such Registrant or otherwise. As permitted by the DGCL or DLLCA, the limited liability company agreement or certificate of incorporation of each Registrant includes a provision to eliminate the personal liability of such Registrant's managers, members or directors for monetary damages for breach or alleged breach of their fiduciary duties as managers, members or directors, but does not absolve managers, members or directors of liability for (1) any breach of the directors' duty of loyalty to such Registrant or its members or stockholders, (2) acts or omissions which are not in good faith or which involve intentional misconduct or a knowing violation of law, (3) any transaction from which the member, manager or director derived an improper personal benefit, or (4) in the case of a corporation, any matter in respect of which such director shall be liable under

II-1

Section 174 of Title 8 of the DGCL or any amendment thereto or successor provision thereto, which makes directors personally liable for unlawful dividends or unlawful stock repurchases or redemptions in certain circumstance and expressly sets forth a negligence standard with respect to such liability.

Each of the Registrants maintains insurance policies insuring each of its members, managers, directors and officers against certain civil liabilities, including liabilities under the Securities Act.

**Item 21.** *Exhibits and Financial Statement Schedules*

(a)     Exhibits

| Exhibit | Name of Exhibit |
| --- | --- |
| *3.1 | Certificate of Formation of Refco Group Ltd., LLC. |
| *3.2 | Limited Liability Company Agreement of Refco Group Ltd, LLC. |
| *3.3 | Certificate of Incorporation of Refco Finance Inc. |
| *3.4 | By-laws of Refco Finance Inc. |
| *3.5 | Certificate of Formation of Bersec International LLC. |
| *3.6 | Limited Liability Company Agreement of Bersec International LLC. |
| *3.7 | Certificate of Formation of Kroeck & Associates LLC. |
| *3.8 | Limited Liability Company Agreement of Kroeck & Associates LLC. |
| *3.9 | Certificate of Formation of Lind-Waldock Securities, LLC. |
| *3.10 | Limited Liability Company Agreement of Lind-Waldock Securities, LLC. |
| *3.11 | Certificate of Formation of Market Educational Institute, LLC. |
| *3.12 | Limited Liability Company Agreement of Market Educational Institute, LLC. |
| *3.13 | Certificate of Formation of Marshall Metals, LLC. |
| *3.14 | Limited Liability Company Agreement of Marshall Metals, LLC. |
| *3.15 | Certificate of Formation of Refco Administration, LLC. |
| *3.16 | Limited Liability Company Agreement of Refco Administration, LLC. |
| *3.17 | Certificate of Formation of Refco Capital Holdings, LLC. |
| *3.18 | Limited Liability Company Agreement of Refco Capital Holdings, LLC. |
| *3.19 | Certificate of Formation of Refco Capital Management, LLC. |
| *3.20 | Limited Liability Company Agreement of Refco Capital Management, LLC. |
| *3.21 | Certificate of Formation of Refco Capital Trading LLC. |
| *3.22 | Limited Liability Company Agreement of Refco Capital Trading LLC. |
| *3.23 | Certificate of Formation of Refco Capital LLC. |
| *3.24 | Limited Liability Company Agreement of Refco Capital LLC. |
| *3.25 | Certificate of Formation of Refco F/X Associates, LLC. |
| *3.26 | Limited Liability Company Agreement of Refco F/X Associates, LLC. |
| *3.27 | Certificate of Formation of Refco Financial, LLC. |
| *3.28 | Limited Liability Company Agreement of Refco Financial, LLC. |
| *3.29 | Certificate of Formation of Refco Fixed Assets Management, LLC. |
| *3.30 | Limited Liability Company Agreement of Refco Fixed Assets Management, LLC. |

| | |
|---|---|
| *3.31 | Certificate of Formation of Refco Global Capital Management LLC. |
| *3.32 | Limited Liability Company Agreement of Refco Global Capital Management LLC. |
| *3.33 | Certificate of Formation of Refco Global Futures, LLC. |
| *3.34 | Limited Liability Company Agreement of Refco Global Futures, LLC. |
| *3.35 | Certificate of Formation of Refco Global Holdings, LLC. |
| *3.36 | Limited Liability Company Agreement of Refco Global Holdings, LLC. |
| *3.37 | Certificate of Formation of Refco Information Services, LLC. |
| *3.38 | Limited Liability Company Agreement of Refco Information Services, LLC. |
| *3.39 | Certificate of Formation of Refco Managed Futures, LLC. |
| *3.40 | Limited Liability Company Agreement of Refco Managed Futures, LLC. |
| *3.41 | Certificate of Formation of Refco Mortgage Securities, LLC. |
| *3.42 | Limited Liability Company Agreement of Refco Mortgage Securities, LLC. |
| *3.43 | Certificate of Formation of Refco Regulated Companies, LLC. |
| *3.44 | Limited Liability Company Agreement of Refco Regulated Companies, LLC. |
| *3.45 | Certificate of Formation of Summit Management, (Newco) LLC. |
| *3.46 | Limited Liability Company Agreement of Summit Management, (Newco) LLC. |
| *3.47 | Certificate of Formation of Westminster-Refco Management LLC. |
| *3.48 | Limited Liability Company Agreement of Westminster-Refco Management LLC. |
| 4.1 | Indenture, dated as of August 5, 2004, among Refco Group Ltd., LLC, Refco Finance Inc. and Wells Fargo Bank, National Association, as trustee. |
| 4.2 | Registration Rights Agreement, dated as of August 5, 2004, among Refco Group Ltd., LLC, Refco Finance Inc. and Credit Suisse First Boston LLC, Banc of America Securities LLC and Deutsche Bank Securities Inc. |
| 4.3 | Securityholders Agreement dated New Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners and certain other Affiliates of Thomas H. Lee Partners, L.P. the Limited Partners or Affiliates of Limited Partners, the Executive Investors and the Employees party thereto. |
| *5.1 | Opinion of Weil, Gotshal & Manges LLP. |
| 10.1 | Credit Agreement dated August 5, 2004, among Refco Finance Holdings LLC, New Refco Group Ltd., LLC, the Lenders, Banc of America Securities LLC, Credit Suisse First Boston and Deutsche Bank Securities Inc. |
| 10.2 | Assumption Agreement, dated as of August 5, 2004, made by Refco Group Ltd., LLC, in favor of Bank of America, N.A., as administrative agent. |
| 10.3 | Security Agreement dated August 5, 2004 made by Refco Finance Holdings LLC, New Refco Group Ltd., LLC and the Additional Grantors party thereto to Bank of America, N.A., as administrative agent. |
| 10.4 | Security Agreement Supplement dated August 5, 2004 between Refco Group Ltd, LLC and the Guarantors party thereto. |
| 10.5 | Parent Guaranty dated as of August 5, 2004 made by New Refco Group Ltd., LLC in favor of the Secured Parties party thereto. |

| 10.6 | Subsidiary Guaranty dated as August 5, 2004 by the Guarantors in favor of the Secured Parties party thereto. |
|------|------|
| 10.7 | Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd., LLC and Phillip R. Bennett dated June 8, 2004. |
| 10.8 | Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd., LLC and Santo Maggio dated July 30, 2004. |
| 10.9 | Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd., LLC and William Sexton dated July 30, 2004. |
| 10.10 | Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd., LLC and Joseph Murphy dated June 21, 2004. |
| 10.11 | Management Agreement dated as of August 5, 2004 by and between New Refco Group Ltd., LLC, Refco Group Ltd., LLC and THL Managers V, LLC. |
| 10.12 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Phillip Bennett. |
| 10.13 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and William Sexton. |
| 10.14 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Joseph Murphy. |
| 10.15 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Santo Maggio. |
| 10.16 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Dennis Klejna. |
| 12 | Computation of Ratio of Earnings to Fixed Charges. |
| *21 | List of Subsidiaries. |
| 23.1 | Consent of Independent Registered Public Accounting Firm (Grant Thornton LLP). |
| *23.2 | Consent of Weil, Gotshal & Manges LLP (to be included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included in Part II of this registration statement). |
| 25.1 | Statement of Eligibility of Trustee on Form T-1 under the Trust Indenture Act of 1939 of Wells Fargo Bank, N.A. |
| 99.1 | Form of Letter of Transmittal. |
| 99.2 | Form of Notice of Guaranteed Delivery. |
| 99.3 | Form of Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees. |
| 99.4 | Form of Letter to Clients. |

*      To be filed by amendment.

(b)      Financial Statement Schedules.

II-4

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members of
   **Refco Group Ltd., LLC**

   We have audited in accordance with the standards of the Public Company Accounting Oversight Board (United States) the consolidated financial statements of Refco Group Ltd., LLC and Subsidiaries referred to in our report dated October 8, 2004, which is included in the Prospectus constituting Part I of this Registration Statement. Our audits were conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. Schedule I listed in Item 21 is presented for purposes of additional analysis and is not a required part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

GRANT THORNTON LLP

New York, New York
October 8, 2004

<div align="center">II-5</div>

Condensed Financial Information of Refco Group Ltd., LLC

**REFCO GROUP LTD., LLC**
**CONDENSED BALANCE SHEETS**
**(Parent Company Only)**

| | February 29, 2004 | February 28, 2003 |
|---|---|---|
| | (in thousands) | |
| Receivables from broker-dealers, clearing organizations and customers | $ 314,279 | $ 450,060 |
| Investment in and advances to subsidiaries | 1,131,766 | 873,033 |
| Other assets | 58,612 | 87,380 |
|     Total assets | $ 1,504,657 | $ 1,410,473 |
| **Liabilities** | | |
|     Short-term borrowings, including current portion of long-term borrowings | $ 68,000 | $ 228,000 |
|     Payable to customers | 465,681 | 30,709 |
|     Accounts payable, accrued expenses and other liabilities | 23,392 | 22,902 |
| Long-term borrowings | 315,500 | 383,500 |
| Subordinated debt | 16,000 | 179,000 |
|     Total liabilities | 888,573 | 844,111 |
| Members' equity | 616,084 | 566,362 |
|     Total liabilities and members' equity | $ 1,504,657 | $ 1,410,473 |

The accompanying notes are an integral part of these financial statements.

II-6

**REFCO GROUP LTD., LLC**
**CONDENSED STATEMENTS OF INCOME**
**(Parent Company Only)**

|  | Year ended | | |
|---|---|---|---|
|  | February 29, 2004 | February 28, 2003 | February 28, 2002 |
|  | | (in thousands) | |
| **Revenues** | | | |
| Interest | $ 15,037 | $ 34,908 | $ 22,836 |
| Other | — | 5,007 | 4,941 |
| Total revenues | 15,037 | 39,915 | 27,777 |
| **Expenses** | | | |
| Interest | 40,404 | 46,667 | 46,226 |
| Employee compensation and benefits | 4,636 | 6,479 | 6,711 |
| General, administrative and other | 18,856 | 60,850 | 18,338 |
| Total expenses | 63,896 | 113,996 | 71,275 |
| Equity in net income of subsidiaries | 237,289 | 214,201 | 137,132 |
| Income before provision for income taxes | 188,430 | 140,120 | 93,634 |
| Provision for income taxes | — | — | — |
| NET INCOME | $ 188,430 | $ 140,120 | $ 93,634 |

The accompanying notes are an integral part of these financial statements.

II-7

**REFCO GROUP LTD., LLC**
**CONDENSED STATEMENTS OF CASH FLOWS**
**(Parent Company Only)**

| | Year ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | (in thousands) | | |
| Net cash generated from/(used in) operating activities | $    387,774 | $    (54,500) | $    133,000 |
| Cash flows from financing activities | | | |
| Repayment of subordinated debt | — | — | (25,000) |
| Issuance of long term debt | — | 222,500 | — |
| Repayment of long term borrowings | (68,000) | (68,000) | (33,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — |
| Capital withdrawals | (120,000) | (100,000) | (75,000) |
| Net cash used in/generated from financing activities | (387,774) | 54,500 | (133,000) |
| Net increase (decrease) in cash and cash equivalents | — | — | — |
| Cash and cash equivalents, beginning of year | — | — | — |
| Cash and cash equivalents, end of year | $    — | $    — | $    — |

The accompanying notes are an integral part of these financial statements.

II-8

**REFCO GROUP LTD., LLC**
**NOTES TO CONDEFINANCIAL STATEMENTS**
**(Parent Company Only)**

## NOTE A—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The condensed unconsolidated financial statements of Refco Group Ltd., LLC (the "Parent Company") should be read in conjunction with the consolidated financial statements of Refco Group Ltd., LLC and subsidiaries (collectively the "Consolidated Company") and the notes thereto. Equity in net assets of subsidiaries (investments in affiliates) is accounted for in accordance with the equity method of accounting.

For information on other significant accounting policies, refer to the notes to the consolidated financial statements of the Consolidated Company.

## NOTE B—SHORT-TERM BORROWINGS, LONG-TERM BORROWINGS AND OTHER BORROWINGS

### Short-term borrowings

Short-term borrowings represent the portion of long-term borrowings maturing within one year and certain long-term borrowings that may be payable within one year at the option of the holder. The carrying value of these short-term obligations approximates fair value due to their short-term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Parent Company enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Parent Company's receivables from customers.

Short-term borrowings at year end are set forth below:

|  | February 29, 2004 | February 28, 2003 |
|---|---|---|
|  | (in thousands) | |
| Current portion of long-term borrowings | $     68,000 | $     68,000 |

### Long-term borrowings

Long-term borrowings of $383.5 million and $451.5 million for 2004 and 2003, respectively represents unsecured syndicated senior notes with major financial institutions. Long-term borrowings consist of the following loans:

|  | 2004 | 2003 | Maturity Date | Interest Date |
|---|---|---|---|---|
|  | (in thousands) | | | |
| **Senior Notes** | | | | |
| Series A Senior Notes 2004 | $     17,000 | $     34,000 | 2004 | 7.18% |
| Senior Notes 2005 | 74,000 | 111,000 | 2005 | 9.18% |
| Series B Senior Notes 2006 | 14,000 | 14,000 | 2006 | 7.42% |
| Senior Notes 2007 | 56,000 | 70,000 | 2007 | 8.85% |
| Series A Senior Notes 2007 | 100,000 | 100,000 | 2007 | 5.99% |
| Series B Senior Notes 2009 | 122,500 | 122,500 | 2009 | 6.60% |
|  | $     383,500 | $     451,500 | | |

The table below sets out the maturities of the Group's long-term borrowings.

Case 1:07-md-01902-GEL    Document 27-11    Filed 02/01/2008    Page 228 of 241

| | 2004 | 2003 |
|---|---|---|
| | (in thousands) | |
| 2004 | $ — | $ 68,000 |
| 2005 | 68,000 | 68,000 |
| 2006 | 51,000 | 51,000 |
| 2007 | 28,000 | 28,000 |
| 2008 | 114,000 | 114,000 |
| 2009 | — | 1 |
| 2010 and thereafter | 122,500 | 122,500 |
| Total Senior Note Liabilities | $ 383,500 | $ 451,501 |
| Less: | | |
| Portion included within short-term borrowings | 68,000 | 68,000 |
| Total Long-term Senior Note Liabilities | 315,500 | 383,500 |

The long-term borrowings are subject to acceleration in the event of a change in control.

**Other borrowings**

Subordinated debt of $16.0 million, included in the condensed balance sheets, consists of a subordinated loan from a member. The subordinated debt bears interest at the prime rate and matures June 1, 2005. For the years ended February 29, 2004 and February 28, 2003, the weighted-average interest rate on the subordinated debt was 4.08% and 4.60% respectively. Subordinated debt is subordinated to the claims of present and future general creditors.

Refco Preferred Capital Trust I, II and III, subsidiaries of the Company, had issued $160.0 million of Trust Originated Preferred Securities ("TOPRs") to third parties. At the beginning of the year, the Parent Company paid $199.8 million to redeem the TOPRs, resulting in a charge to members' equity of $39.8 million.

**Contractual debt commitments**

The Parent Company's contractual debt commitments are governed by certain agreements which require that the Consolidated Company maintain specified levels of liquidity, net worth, funded debt to cash flow and cash flow to interest coverage.

**Credit Facilities**

The Parent Company maintains a committed unsecured revolving credit facility of $364.5 million under an agreement with a syndicate of banks. As of February 29, 2004, no portion of the credit facility was utilized.

**NOTE C—FAIR VALUE OF FINANCIAL INSTRUMENTS**

SFAS No. 107 "Disclosures about Fair Value of Financial Instruments" requires the Parent to report the fair value of financial instruments, as defined.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Short term borrowings and Payables to customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Parent Company's long-term debt is recorded at historical amounts which could differ from fair value as a result of changes in the Company's market rates.

The following table provides a summary of the fair value of the Parent Company's long-term borrowings. The fair value of the Parent's long-term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Parent Company's current borrowing rates for similar types of borrowing arrangements.

| | February 29, 2004 | | February 29, 2004 |
| --- | --- | --- | --- |
| | (in thousands) | | |
| Carrying value of long-term borrowings | $ | 383,500 | $ | 451,500 |
| Fair value of long-term borrowings | | 399,990 | | 481,202 |

All other schedules for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and, therefore, have been omitted.

## Item 22.  *Undertakings*

The undersigned registrants hereby undertake:

(1)  To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i)  To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii)  To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in the volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement;

(iii)  To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2)  That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)  To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the exchange offer.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrants pursuant to the foregoing provisions, or otherwise, the registrants have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrants of expenses incurred or paid by a director, officer or controlling person of the registrants in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrants will, unless in the opinion of counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

**EXHIBIT INDEX**

| Exhibit | Name of Exhibit |
|---|---|
| *3.1 | Certificate of Formation of Refco Group Ltd., LLC. |
| *3.2 | Limited Liability Company Agreement of Refco Group Ltd, LLC. |
| *3.3 | Certificate of Incorporation of Refco Finance Inc. |
| *3.4 | By-laws of Refco Finance Inc. |
| *3.5 | Certificate of Formation of Bersec International LLC. |
| *3.6 | Limited Liability Company Agreement of Bersec International LLC. |
| *3.7 | Certificate of Formation of Kroeck & Associates LLC. |
| *3.8 | Limited Liability Company Agreement of Kroeck & Associates LLC. |
| *3.9 | Certificate of Formation of Lind-Waldock Securities, LLC. |
| *3.10 | Limited Liability Company Agreement of Lind-Waldock Securities, LLC. |
| *3.11 | Certificate of Formation of Market Educational Institute, LLC. |
| *3.12 | Limited Liability Company Agreement of Market Educational Institute, LLC. |
| *3.13 | Certificate of Formation of Marshall Metals, LLC. |
| *3.14 | Limited Liability Company Agreement of Marshall Metals, LLC. |
| *3.15 | Certificate of Formation of Refco Administration, LLC. |
| *3.16 | Limited Liability Company Agreement of Refco Administration, LLC. |
| *3.17 | Certificate of Formation of Refco Capital Holdings, LLC. |
| *3.18 | Limited Liability Company Agreement of Refco Capital Holdings, LLC. |
| *3.19 | Certificate of Formation of Refco Capital Management, LLC. |
| *3.20 | Limited Liability Company Agreement of Refco Capital Management, LLC. |
| *3.21 | Certificate of Formation of Refco Capital Trading LLC. |
| *3.22 | Limited Liability Company Agreement of Refco Capital Trading LLC. |
| *3.23 | Certificate of Formation of Refco Capital LLC. |
| *3.24 | Limited Liability Company Agreement of Refco Capital LLC. |
| *3.25 | Certificate of Refco F/X Associates, LLC. |
| *3.26 | Limited Liability Company Agreement of Refco F/X Associates, LLC. |
| *3.27 | Certificate of Formation of Refco Financial, LLC. |
| *3.28 | Limited Liability Company Agreement of Refco Financial, LLC. |
| *3.29 | Certificate of Formation of Refco Fixed Assets Management, LLC. |
| *3.30 | Limited Liability Company Agreement of Refco Fixed Assets Management, LLC. |
| *3.31 | Certificate of Formation of Refco Global Capital Management LLC. |
| *3.32 | Limited Liability Company Agreement of Refco Global Capital Management LLC. |
| *3.33 | Certificate of Formation of Refco Global Futures, LLC. |
| *3.34 | Limited Liability Company Agreement of Refco Global Futures, LLC. |
| *3.35 | Certificate of Formation of Refco Global Holdings, LLC. |

*3.36  Limited Liability Company Agreement of Refco Global Holdings, LLC.
*3.37  Certificate of Formation of Refco Information Services, LLC.
*3.38  Limited Liability Company Agreement of Refco Information Services, LLC.
*3.39  Certificate of Formation of Refco Managed Futures, LLC.
*3.40  Limited Liability Company Agreement of Refco Managed Futures, LLC.
*3.41  Certificate of Formation of Refco Mortgage Securities, LLC.
*3.42  Limited Liability Company Agreement of Refco Mortgage Securities, LLC.
*3.43  Certificate of Formation of Refco Regulated Companies, LLC.
*3.44  Limited Liability Company Agreement of Refco Regulated Companies, LLC.
*3.45  Certificate of Formation of Summit Management, (Newco) LLC.
*3.46  Limited Liability Company Agreement of Summit Management, (Newco) LLC.
*3.47  Certificate of Formation of Westminster-Refco Management LLC.
*3.48  Limited Liability Company Agreement of Westminster-Refco Management LLC.
 4.1   Indenture, dated as of August 5, 2004, among Refco Group Ltd., LLC, Refco Finance Inc. and
       Wells Fargo Bank, National Association, as trustee.
 4.2   Registration Rights Agreement, dated as of August 5, 2004, among Refco Group Ltd., LLC,
       Refco Finance Inc. and Credit Suisse First Boston LLC, Banc of America Securities LLC and
       Deutsche Bank Securities Inc.
 4.3   Securityholders Agreement dated New Refco Group Ltd., LLC, Refco Group Holdings, Inc.,
       THL Refco Acquisition Partners and certain other Affiliates of Thomas H. Lee Partners, L.P.
       the Limited Partners or Affiliates of Limited Partners, the Executive Investors and the
       Employees party thereto.
*5.1   Opinion of Weil, Gotshal & Manges LLP.
 10.1  Credit Agreement dated August 5, 2004, among Refco Finance Holdings LLC, New Refco
       Group Ltd., LLC, the Lenders, Banc of America Securities LLC, Credit Suisse First Boston and
       Deutsche Bank Securities Inc.
 10.2  Assumption Agreement, dated as of August 5, 2004, made by Refco Group Ltd., LLC, in favor
       of Bank of America, N.A., as administrative agent.
 10.3  Security Agreement dated August 5, 2004 made by Refco Finance Holdings LLC, New Refco
       Group Ltd., LLC and the Additional Grantors party thereto to Bank of America, N.A., as
       administrative agent.
 10.4  Security Agreement Supplement dated August 5, 2004 between Refco Group Ltd, LLC and the
       Guarantors party thereto.
 10.5  Parent Guaranty dated as of August 5, 2004 made by New Refco Group Ltd., LLC in favor of
       the Secured Parties party thereto.
 10.6  Subsidiary Guaranty dated as August 5, 2004 by the Guarantors in favor of the Secured Parties
       party thereto.
 10.7  Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd.,
       LLC and Phillip R. Bennett dated June 8, 2004.
 10.8  Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd.,
       LLC and Santo Maggio dated July 30, 2004.

| 10.9 | Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd., LLC and William Sexton dated July 30, 2004. |
| 10.10 | Executive Employment and Non-Competition Agreement, by and between Refco Group Ltd., LLC and Joseph Murphy dated June 21, 2004. |
| 10.11 | Management Agreement dated as of August 5, 2004 by and between New Refco Group Ltd., LLC, Refco Group Ltd., LLC and THL Managers V, LLC. |
| 10.12 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Phillip Bennett. |
| 10.13 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and William Sexton. |
| 10.14 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Joseph Murphy. |
| 10.15 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Santo Maggio. |
| 10.16 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Dennis Klejna. |
| 10.17 | Equity Purchase and Merger Agreement dated June 8, 2004 among Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners and Refco Merger LLC. |
| 12 | Computation of Ratio of Earnings to Fixed Charges. |
| *21 | List of Subsidiaries. |
| 23.1 | Consent of Independent Registered Public Accounting Firm (Grant Thornton LLP). |
| *23.2 | Consent of Weil, Gotshal & Manges LLP (to be included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included in Part II of this registration statement). |
| 25.1 | Statement of Eligibility of Trustee on Form T-1 under the Trust Indenture Act of 1939 of Wells Fargo Bank, N.A. |
| 99.1 | Form of Letter of Transmittal. |
| 99.2 | Form of Notice of Guaranteed Delivery. |
| 99.3 | Form of Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees. |
| 99.4 | Form of Letter to Clients. |

\*      To be filed by amendment.

II-14

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO GROUP LTD., LLC

By:    /s/   PHILLIP R. BENNETT
_____

Name: Phillip R. Bennett
Title: President and Chief Executive Officer

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/   NEW REFCO GROUP LTD., LLC<br>New Refco Group Ltd., LLC | Sole Member | October 12, 2004 |
| *By:       /s/   PHILLIP R. BENNETT<br>Phillip R. Bennett | President, Chief Executive Officer and Chairman | October 12, 2004 |
| /s/   PHILLIP R. BENNETT<br>Phillip R. Bennett | President and Chief Executive Officer (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/   JOSEPH J. MURPHY<br>Joseph J. Murphy | Executive Vice President | October 12, 2004 |
| /s/   WILLIAM M. SEXTON<br>William M. Sexton | Executive Vice President and Chief Operating Officer | October 12, 2004 |
| /s/   SANTO C. MAGGIO<br>Santo C. Maggio | Executive Vice President | October 12, 2004 |
| /s/   PHILIP SILVERMAN<br>Philip Silverman | Secretary | October 12, 2004 |
| /s/   DENNIS KLEJNA<br>Dennis Klejna | Executive Vice President and General Counsel | October 12, 2004 |

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO FINANCE INC.

By:    /s/   PHILLIP R. BENNETT

Name:  Phillip R. Bennett
Title:   President

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/   PHILLIP R. BENNETT<br><br>Phillip R. Bennett | President & Director (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/   PHILIP SILVERMAN<br><br>Philip Silverman | Secretary | October 12, 2004 |

II-16

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

BERSEC INTERNATIONAL LLC

By:      /s/   PHILLIP R. BENNETT
_____

Name: Phillip R. Bennett
Title: President and Manager

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/   PHILLIP R. BENNETT<br>_____<br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/   SANTO C. MAGGIO<br>_____<br>Santo C. Maggio | Manager | October 12, 2004 |
| /s/   PHILIP SILVERMAN<br>_____<br>Philip Silverman | Secretary | October 12, 2004 |

II-17

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrants have duly caused this registration statement to be signed on their behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

KROECK & ASSOCIATES LLC
LIND-WALDOCK SECURITIES, LLC
REFCO ADMINISTRATION, LLC
REFCO CAPITAL HOLDINGS, LLC
REFCO CAPITAL MANAGEMENT, LLC
REFCO CAPITAL TRADING LLC
REFCO F/X ASSOCIATES, LLC
REFCO FINANCIAL, LLC
REFCO FIXED ASSETS MANAGEMENT, LLC
REFCO GLOBAL CAPITAL
   MANAGEMENT LLC
REFCO GLOBAL HOLDINGS, LLC
REFCO INFORMATION SERVICES, LLC
REFCO MORTGAGE SECURITIES, LLC
REFCO REGULATED COMPANIES, LLC
SUMMIT MANAGEMENT, (NEWCO) LLC

By:    /s/  PHILLIP R. BENNETT
_____

Name: Phillip R. Bennett
Title: President and Manager

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br>_____<br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br>_____<br>Philip Silverman | Secretary | October 12, 2004 |

II-18

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

MARKET EDUCATIONAL INSTITUTE, LLC

By:     /s/   PHILLIP R. BENNETT
_____

Name: Phillip R. Bennett
Title: President and Manager

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/   PHILLIP R. BENNETT<br>_____<br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/   JOSEPH J. MURPHY<br>_____<br>Joseph J. Murphy | Manager | October 12, 2004 |
| /s/   PHILIP SILVERMAN<br>_____<br>Philip Silverman | Secretary | October 12, 2004 |

II-19

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

<div align="center">MARSHALL METALS, LLC</div>

By:  /s/  PHILLIP R. BENNETT
_____

Name: Phillip R. Bennett
Title: Vice President and Manager

<div align="center">

**POWER OF ATTORNEY**

</div>

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT <br> _____ <br> Phillip R. Bennett | Vice President & Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  JOSEPH J. MURPHY <br> _____ <br> Joseph J. Murphy | Manager | October 12, 2004 |

<div align="center">II-20</div>

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO CAPITAL LLC

By:    /s/  PHILLIP R. BENNETT
_____

Name: Phillip R. Bennett
Title: President and Manager

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br>_____<br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  SANTO C. MAGGIO<br>_____<br>Santo C. Maggio | Manager | October 12, 2004 |
| /s/  PERRY ROTKOWITZ<br>_____<br>Perry Rotkowitz | Manager | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br>_____<br>Philip Silverman | Secretary | October 12, 2004 |

II-21

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO GLOBAL FUTURES, LLC

By:     /s/   JOSEPH J. MURPHY
        _____

        Name: Joseph J. Murphy
        Title: President and Chief Executive
             Officer and Manager

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/   PHILLIP R. BENNETT | Manager | October 12, 2004 |
| Phillip R. Bennett | | |
| /s/   JOSEPH J. MURPHY | President and Chief Executive Officer and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| Joseph J. Murphy | | |
| /s/   WILLIAM M. SEXTON | Manager | October 12, 2004 |
| William M. Sexton | | |
| /s/   PHILIP SILVERMAN | Secretary | October 12, 2004 |
| Philip Silverman | | |

II-22

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrants have duly caused this registration statement to be signed on their behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO MANAGED FUTURES, LLC
WESTMINSTER-REFCO MANAGEMENT LLC

By:      /s/  JOSEPH J. MURPHY
_____

Name: Joseph J. Murphy
Title: President

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-4 (including all pre-effective and post-effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br>_____<br>Phillip R. Bennett | Manager | October 12, 2004 |
| /s/  JOSEPH J. MURPHY<br>_____<br>Joseph J. Murphy | President (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br>_____<br>Philip Silverman | Secretary | October 12, 2004 |

II-23