**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO, INC. SECURITIES LITIGATION | No. 07-MD-1902 (GEL) |

This Document Relates To:

No. 07-CV-11604 (GEL)

| | |
|---|---|
| MARC S. KIRSCHNER, As Trustee of the Refco Litigation Trust, | **ORAL ARGUMENT REQUESTED** |
| Plaintiff, -vs.- | |
| GRANT THORNTON LLP, et al., | |
| Defendants. | |

**DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM**
**OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

Dated: May 21, 2008

ORRICK, HERRINGTON & SUTCLIFFE LLP

James J. Capra, Jr.
James P. Cusick
666 Fifth Avenue
New York, New York 10103
(212) 506-5000

Kenneth Y. Turnbull (admitted *pro hac vice*)
1152 15th Street, NW
Washington, DC 20005
(202) 339-8400

*Attorneys for Defendant*
*PricewaterhouseCoopers LLP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ......................................................................... 1

SUMMARY OF THE RELEVANT PwC ENGAGEMENTS ............................ 4

ARGUMENT ...................................................................................................... 6

I.      RGL's Malpractice Claim Against PwC Fails To State A Claim For Relief ........ 6

II.     All Four Aiding And Abetting Claims Against PwC Should Be Dismissed ......... 7

      A.     The Complaint Fails to Plead Facts Showing PwC's
             Actual Knowledge ................................................................. 8

           1.     The allegation of PwC's knowledge of the RTLs fail .................. 9

           2.     The allegations of PwC's knowledge of the misuse of
                 RCM customers' assets are insufficient ....................................... 12

           3.     Allegations lumping multiple defendants together are
                 inherently defective under Rule 9(b) ........................................... 15

      B.     The Complaint Fails to Plead Facts Showing Substantial
             Assistance or Proximate Causation ............................................. 16

III.    This Court Should Dismiss All Claims Against PwC Based On Lack
       Of Standing And The In Pari Delicto Doctrine ..................................... 20

      A.     The Trustee Lacks Standing to Recover for Damages to Creditors ........ 20

      B.     The In Pari Delicto Doctrine Bars All Claims Against PwC .................. 23

IV.    This Court Should Dismiss Any Surviving Claims Against PwC
       Based On Improper Venue ................................................................. 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett,
  No. 05-CV-8988 (GEL), 2007 WL 1732427 (S.D.N.Y. June 14, 2007)................................11

Am. Tissue, Inc. v. Arthur Andersen, L.L.P.,
  275 F. Supp. 2d 398 (S.D.N.Y. 2003)..................................................................................23

Bense v. Interstate Battery Sys. of Am., 683 F.2d 718 (2d Cir. 1982)..........................................24

Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985) ............ 16, 19-20

Direct Mail Prod. Servs. Ltd. v. MBNA Corp.,
  No. 99-Civ-10550 (SHS), 2000 WL 1277597 (S.D.N.Y. Sept. 7, 2000) ......................... 24-25

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007).................................................................................17

Global Crossing Estate Rep'r. v. Winnick,
  No. 04-CV-2558 (GEL), 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) ..................................20

Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275 (S.D.N.Y. 1998).............. 23-24

Great Lakes Overseas, Inc. v. Wah Kwong Shipping Group, Ltd.,
  990 F.2d 990 (7th Cir. 1993) ..............................................................................................6

Guttman v. Martin (In re Railworks Corp.), 325 B.R. 709 (Bankr. D. Md. 2005).......................21

Hirsch v. Arthur Andersen & Co., 72 F.3d 1085 (2d Cir. 1995) ........................................... 20-23

In re AlphaStar Ins. Group Ltd., 383 B.R. 231 (Bankr. S.D.N.Y. 2008)......................................9

In re Crude Oil Commodity Litig.,
  No. 06-CV-6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ..............................15

In re Global Crossing, Ltd. Sec. Litig.,
  No. 02-CV-910 (GEL), 2004 WL 2584874 (S.D.N.Y. Nov. 12, 2004) ..................................24

In re Mediators, Inc., 105 F.3d 822 (2d Cir. 1997).......................................................... 20-21, 23

In re Parmalat Sec. Litig., 501 F. Supp. 2d 560 (S.D.N.Y. 2007) ................................. 9, 16, 18-20

In re Parmalat Sec. Litig.,
  No. 04-MD-1653 (LAK), 2007 WL 582981 (S.D.N.Y. Feb. 22, 2007)...................................6

## FEDERAL CASES (continued)

In re Promedicus Health Group, LLP, 359 B.R. 45 (Bankr. W.D.N.Y. 2006) .............................23

In re RCM, Ltd. Brokerage Customers Sec. Litig.,
    No. 06-CV-643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) ..............................1, 21

In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................................1

In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005) ...........................................................................16

Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.,
    975 F. Supp. 483 (W.D.N.Y. 1997) .......................................................................................25

Kolbeck v. LIT Am., Inc., 939 F. Supp. 240 (S.D.N.Y. 1996)..............................................8, 16, 18

Korean Press Agency, Inc. v. Yonhap News Agency,
    421 F. Supp. 2d 775 (S.D.N.Y. 2006)....................................................................................24

Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998)...........................24

Lippe v. Bairnco Corp., 218 B.R. 294 (S.D.N.Y. 1998)..............................................................22-23

Maxwell v. KPMG, LLP, 520 F.3d 713 (7th Cir. 2008)....................................................................3

Medline Indus. Inc. v. Maersk Med. Ltd., 230 F. Supp. 2d 857 (N.D. Ill. 2002)..........................6

Pension Comm. of Univ. of Montreal v. Banc of Am. Sec., LLC,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006).................................................................................8, 16

Podany v. Robertson Stephens, Inc., 350 F. Supp. 2d 375 (S.D.N.Y. 2004).................................10

Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179 (S.D.N.Y. 2000)....................................5

Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991)..............................20-22

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ..............................9, 11, 15

Wight v. BankAmerica Corp., 219 F.3d 79 (2d Cir. 2000) ........................................................16-17

Zucker v. Sasaki, 963 F. Supp. 301 (S.D.N.Y. 1997)......................................................................13

**STATE CASES**

AmBase Corp. v. Davis Polk & Wardwell,
    8 N.Y.3d 428, 834 N.Y.S.2d 705, 866 N.E.2d 1033 (2007)................................................. 6-7

Hubert H. Post & Co. v. Sidney Bitterman, Inc.,
    219 A.D.2d 214, 639 N.Y.S.2d 329 (1st Dep't 1996)...............................................................7

**DOCKETED CASES**

Krys, et al. v. Sugrue, et al., No. 08-CV-3086 (GEL) (S.D.N.Y. filed Mar. 5, 2008)................3

VR Global Partners, L.P. v. Philip R. Bennett,
    No. 07-CV-8686 (S.D.N.Y. filed Oct. 9, 2007)......................................................................21

**STATUTES AND RULES**

28 U.S.C. § 1407...............................................................................................................................24

Fed. R. Civ. P. 9(b) ...................................................................................................... 1, 7-8, 15

Fed. R. Civ. P. 12(b) .......................................................................................................... passim

**MISCELLANEOUS AUTHORITIES**

AICPA, Consulting Services Standards, CS § 100..........................................5

## PRELIMINARY STATEMENT

PricewaterhouseCoopers LLP ("PwC"), pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), 12(b)(6), and 9(b), moves to dismiss all counts of the Complaint directed at it. This action arises out of the collapse of Refco Inc. ("Refco"), which filed for bankruptcy on October 17, 2005. Plaintiff, a litigation trustee ("Trustee") appointed under Refco's bankruptcy plan (Compl. ¶¶ 31-32), brings claims against PwC on behalf of two Refco affiliates, Refco Group Ltd., LLC ("RGL") and its indirect subsidiary, Refco Capital Markets, Ltd. ("RCM"). Specifically, the Trustee brings claims by:

- RGL for:
  (1) malpractice (Count 31)
  (2) aiding and abetting breach of fiduciary duty (Count 32)
  (3) aiding and abetting fraud (Count 33) (Compl. ¶¶ 549-64)

- RCM for:
  (1) aiding and abetting breach of fiduciary duty (Count 13)
  (2) aiding and abetting fraud (Count 14) (Compl. ¶¶ 430-39)

The Trustee's claims are based on the same alleged Refco frauds discussed in this Court's opinions in related cases in which PwC has *not* been sued – i.e., Refco's use of round trip loans ("RTLs") to conceal a related-party receivable and its use of RCM customers' assets to fund operations. See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 618-20 (S.D.N.Y. 2007); In re RCM, Ltd. Brokerage Customers Sec. Litig., 06-CV-643 (GEL), 2007 WL 2694469, at *1 - *4 (S.D.N.Y. Sept. 13, 2007).

PwC was engaged by RGL on May 5, 2004 to provide advisory services in connection with its leveraged buyout ("LBO") and again on March 8, 2005 in connection with its initial public offering ("IPO"). Compl. ¶¶ 282, 287.[1] PwC provided advice to RGL, a private

---

[1] These engagement letters are attached as Exhibits 1 and 2 to the Declaration of James J. Capra, Jr. ["Capra Decl."]. See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 623 (court may consider documents referenced in Complaint or relied on by plaintiff on motion to dismiss). The Complaint alleges that PwC had access to information through other engagements with RGL (Compl. ¶ 289), but does not assert any claims or damages based on these other engagements. See Compl. ¶¶ 433, 436, 554, 559, 564 (all claims based on RGL's "enter[ing] into the LBO" and effect of LBO and IPO on RCM). PwC was not engaged by RCM.

company, regarding financial reporting matters applicable to its LBO Offering Circular and S-4 and S-1 filings.  <u>See</u> Capra Decl. Ex. 1-2.  PwC was not RGL's auditor.

The Trustee's claims against PwC fail as a matter of law for several reasons. <u>First</u>, RGL's malpractice claim is premised on the assertion that "[a]s a proximate result of PwC's breach of its duty of care, RGL entered into the LBO" and was harmed.  Compl. ¶ 554. However, the Complaint pleads that the LBO negotiations began in November 2003, more than five months before PwC was engaged, and that RGL signed a letter of intent on April 16, 2004, several weeks before PwC was engaged.  Compl. ¶¶ 112, 334.  Thus, the specific allegations of the Complaint concede that PwC's advice could not have caused RGL to "enter[] into the LBO." Moreover, the scope of PwC's work, as defined by the engagement letter referenced in the Complaint, did not include advising RGL on its business decision to enter into the LBO.

<u>Second</u>, the Complaint fails to plead facts or circumstances from which one could draw a strong inference that PwC had actual knowledge of the underlying Refco frauds, an essential element of the remaining four aiding and abetting claims.  Despite access to more than 600,000 pages of PwC documents and other parties' voluminous records,[2] the Trustee identifies only *one* document, an e-mail, that allegedly demonstrates PwC's knowledge of these frauds. Compl. ¶¶ 293-94.  The attempt to infer PwC's knowledge from this single e-mail is not only an unreasonable inference, but an absurd leap that does not support a cause of action.

<u>Third</u>, the aiding and abetting claims also fail because the Complaint fails to plead facts showing that PwC substantially assisted in the primary wrongdoing or proximately caused the alleged harms.  The Complaint does *not* allege that PwC assisted in the RTLs or diversion of RCM customers' assets – <u>e.g.</u>, by providing loans or transferring assets.  While significant, this

---

[2] <u>See</u> Compl. at 2 (Complaint based on review of documents); Capra Decl. ¶ 11 (explaining that more than 600,000 pages of PwC documents were made available to Trustee's counsel in or shortly after December 2006).

omission is not surprising:  The Complaint admits that, by the time PwC was engaged in 2004, the Refco conspiracy had been on-going for seven years, eleven of the RTLs had occurred, and RCM already was owed $2 billion based on diverted customer assets.  Compl. ¶¶ 4, 59, 84, 102.  Thus, no assistance from PwC was required to carry out these transactions.

Instead, the Trustee strives to link PwC to the Refco frauds by pointing to the effect of the LBO and IPO on Refco's inability to repay pre-existing debt.  The Complaint alleges that, beginning in 1997, Refco transferred customers' assets to its affiliates and accounted for these transfers as undocumented intercompany loans.  Compl. ¶¶ 4, 7, 59, 97-99.  By the time of the LBO, RCM was owed $2 billion on these loans.  Id. ¶ 102.  This debt was subordinated to new debt in the LBO and IPO, so that RGL could not repay RCM ("its largest creditor") and RCM could not repay its customers.  Id. ¶¶ 9, 32, 127, 136.  The Trustee asserts that, but for PwC's "commenting on disclosures" in LBO and IPO documents, RGL and RCM would have avoided the same $2 billion in damages that each entity claims.  Id. ¶¶ 433, 438, 552, 558, 563.

Such but-for allegations fail to satisfy the substantial assistance and proximate causation elements.  And, as explained below, the more specific allegations of the Complaint concede multiple causal disconnects between Refco's misuse of RCM customers' assets and the ultimate non-repayment of those customers following an LBO for which PwC provided only discrete advisory services.  In light of PwC's limited role, it is no surprise that PwC has not been sued for these services by Refco's stockholders or customers – only by litigation trustees who, in the words of one court, lack typical litigation "inhibitions" and have "little to do besides filing claims[.]"  Maxwell v. KPMG, LLP, 520 F.3d 713, 718 (7th Cir. 2008).[3]

---

[3] In the numerous Refco-related actions in the MDL proceeding, PwC is named as a defendant in only one other case, brought by the joint liquidators of an RCM customer for which, in a separate engagement, PwC served as the auditor.  Krys, et al. v. Sugrue, et al., No. 08-CV-3086 (GEL) (S.D.N.Y. filed Mar. 5, 2008).

Fourth, the Complaint plainly alleges a fraud directed at Refco's customers – not Refco itself. Compl. ¶¶ 4, 7, 9, 59, 96, 104. The Trustee has not identified any distinct corporate harm to Refco, only its inability "to repay the customers from whose accounts assets had been swiped." Id. ¶ 9. The Trustee lacks standing to recover for injuries to Refco's creditors.

Finally, all claims against PwC are barred by the in pari delicto doctrine. Four principal Refco officers have been indicted for fraud (Compl. ¶¶ 36-39). Recently, three have pled guilty and one has been convicted.[4]

## SUMMARY OF THE RELEVANT PwC ENGAGEMENTS

RGL's claims are based on PwC's May 5, 2004 LBO engagement. Compl. ¶¶ 283, 549-64. RCM's claims are based on the LBO engagement and PwC's March 8, 2005 IPO engagement. Id. ¶¶ 287, 430-39. PwC's duties and responsibilities under those engagement letters were circumscribed and limited.

First, PwC was not engaged to advise RGL whether to enter into the LBO or IPO. No such advice is identified in the Complaint, and Plaintiff concedes that, before engaging PwC, RGL negotiated and signed a letter of intent for the LBO. Compl. ¶¶ 112, 334. As set forth in the engagement letters (id. ¶¶ 283, 287), PwC was hired to give advice in connection with the financial statements included in the LBO Offering Circular and S-4 and S-1 filings of RGL, a private company not previously subject to public company reporting requirements.[5] PwC did so largely by reviewing and commenting on RGL's current private financial statements as of February 29, 2004, audited by Grant Thornton LLP. Id. ¶¶ 42, 309.

---

[4] Public documents relating to the pleas and conviction are attached collectively at Capra Decl. Ex. 3 and at PwC's Request for Judicial Notice ("RJN") Ex. 1.

[5] See Capra Decl. Ex. 1 (PwC would provide "advice with respect to accounting and financial reporting matters relevant to the Rule 144A Offering."), Ex. 2. The LBO bonds were registered on Form S-4 (Oct. 12, 2004), which was amended in the SEC comment process. PwC provided comments on these S-4 filings. Compl. ¶¶ 140, 338-39.

      <u>Second</u>, while PwC provided advice and comments on accounting and disclosure requirements, it did not agree to, and was not required to, audit, test, or verify the accounting information contained in RGL's audited financial statements or elsewhere.  On the contrary, as set forth in the May 5, 2004 and March 8, 2005 engagement letters (Capra Decl. Ex. 1, 2), PwC and RGL agreed that:

- RGL had "sole responsibility" for its Rule 144A Offering (Ex. 1) and for its "[f]inancial [r]eporting" in connection with its S-1 filing (Ex. 2).

- RGL was "responsible for properly recording transactions in the accounting records and establishing and maintaining internal controls sufficient to permit the preparation of the Rule 144A Offering" (Ex. 1) and for providing "accurate and complete" information to PwC in connection with its S-1 filing (Ex. 2).

- PwC's work would not constitute "an audit . . ., an examination of internal controls[,] or other attestation or review services" (Ex. 1) or "an audit, examination or a review . . . or other attestation or review services" (Ex. 2).

- For both engagements, PwC's work would be governed by American Institute of Certified Public Accountants ("AICPA") Standards for Consulting Services.

      The AICPA standards expressly distinguish consulting engagements from attest (<u>i.e.</u>, audit) engagements, because, unlike an auditor, the consultant does ***not*** "express[] a conclusion about the reliability of a written assertion that is the responsibility of another party" and is ***not*** required to test the client data used as the basis for the consultant's recommendations.[6] While the Trustee asserts that "[i]f PwC had fulfilled its professional obligations, it would have investigated" RGL (Compl. ¶ 299), the PwC contracts referenced in the Complaint (¶¶ 283, 287) imposed no such obligation.  <u>See</u> <u>Rapoport v. Asia Elecs. Holding Co.</u>, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (when documents referenced in complaint "contradict [its] allegations . . . the documents control and the court need not accept as true the allegations").

---

[6] <u>See</u> AICPA, Consulting Services Standards, CS §§ 100.02, 100.06 (attached at Capra Decl. Ex. 4).

# ARGUMENT

## I.    RGL's Malpractice Claim Against PwC Fails To State A Claim For Relief

RGL's malpractice claim against PwC (Count 31) should be dismissed pursuant

to Rule 12(b)(6).[7]  The Complaint alleges that "PwC knew that RGL was not in a position to

undergo the LBO" (Compl. ¶ 553) and that:

> [a]s a proximate cause of PwC's breach of its duty of care, RGL entered into the
> LBO whereby it incurred $1.4 billion in new LBO debt . . . [and] was no longer
> able to repay the funds diverted from RCM to RGL . . . and was thereby damaged.

Id. ¶ 554.  Thus, the malpractice claim is premised entirely on PwC's failure to advise RGL

against, or otherwise prevent RGL from, entering into the LBO.  RGL's malpractice claim fails

as a matter of law.

First, a malpractice claim cannot be premised on a professional's alleged failure

to provide advice on issues outside the scope of its engagement.  In AmBase Corp. v. Davis Polk

& Wardwell, 8 N.Y.3d 428, 834 N.Y.S.2d 705, 866 N.E.2d 1033 (2007), plaintiff engaged its

attorneys to represent it in litigating a tax dispute with the IRS.  After a favorable result, plaintiff

sued its attorneys for failing to advise it that a trust, established pursuant to the liquidation of

plaintiff's former parent corporation, was contractually liable for any disputed tax amounts and

that plaintiff only was secondarily liable.  Id. at 431-33, 834 N.Y.S.2d at 706-08, 866 N.E.2d at

1034-35.  The Court of Appeals affirmed the grant of the attorneys' motion to dismiss on the

grounds that:

---

[7] New York law applies to all claims against PwC. Both engagement letters provide that "[t]he laws of the state of
New York shall govern this contract."  Capra Decl. Ex. 1-2.  Courts in the transferor forum, whose choice of law
rules control as to state law, "generally give effect to contractual choice of law clauses."  Great Lakes Overseas, Inc.
v. Wah Kwong Shipping Group, Ltd., 990 F.2d 990, 994 (7th Cir. 1993).  Even if the contracts were not controlling
on this point, New York law would apply under Illinois' "most significant relationship test" because Refco had its
principal place of business and filed for bankruptcy in New York, PwC's engagement letters were addressed to
Refco in New York, and PwC performed its consulting work in New York.  Compl. ¶¶ 31, 283, 287.  See Medline
Indus. Inc. v. Maersk Med. Ltd., 230 F. Supp. 2d 857, 864 (N.D. Ill. 2002) (defining Illinois test); In re Parmalat
Sec. Litig., No. 04-MD-1653 (LAK), 2007 WL 582981, at *8 (S.D.N.Y. Feb. 22, 2007) (under Illinois test,
applicable law is determined by the place where the insolvent client was located and the parties' relationship arose).

> The plain language of the retainer agreement indicates that Davis Polk was retained to litigate the amount of tax liability and not to determine whether the tax liability could be allocated to another entity. Thus, the issue whether plaintiff was primarily or secondarily liable for the subject tax liability was outside the scope of its representation.

Id. at 435, 834 N.Y.S.2d at 709, 866 N.E.2d at 1037.

The same reasoning applies here. PwC was not retained to advise RGL whether to enter into the LBO. Indeed, RGL had agreed to enter into the LBO *before* PwC was engaged. Compl. ¶¶ 283, 334. Rather, the scope of PwC's engagement was "providing advice with respect to accounting and financial reporting matters relevant to the Rule 144A Offering." Capra Decl. Ex. 1. Providing advice on accounting and financial reporting matters in the transaction documents is not the same as advising whether to enter into the transaction in the first place. Just as the lawyers in AmBase did not breach their duty of care by failing to provide advice outside the scope of their representation, so too PwC did not breach its duty of care by failing to advise RGL not to enter an LBO that PwC was not engaged to evaluate and that was already underway.

Second, because RGL already had agreed to enter into the LBO, PwC's "accounting and financial reporting" advice could not have caused RGL to complete the LBO. Thus, the malpractice claim also fails on proximate cause grounds. See Hubert H. Post & Co. v. Sidney Bitterman, Inc., 219 A.D.2d 214, 223, 639 N.Y.S.2d 329, 335 (1st Dep't 1996) (causation is essential element of accountant malpractice claim).

## II.    All Four Aiding And Abetting Claims Should Be Dismissed

All aiding and abetting claims by RGL (Counts 32-33) and RCM (Counts 13-14) should be dismissed pursuant to Rules 12(b)(6) and 9(b). RGL asserts claims against PwC for aiding and abetting breach of fiduciary duty and aiding and abetting fraud. Both claims are based on the assertion that the LBO was improper because: (i) RGL already had undocumented intercompany debt – i.e., amounts owed to other Refco affiliates for their transfers of customers'

7

assets – and could not afford additional debt and (ii) RGL's S-4 filing did not disclose the RTLs and misuse of customers' assets. Compl. ¶¶ 555-64. PwC allegedly assisted this wrongdoing by "advising and guiding Refco through the LBO" and "commenting on disclosures" filed with the SEC. Id. ¶¶ 558, 563. Further, "as a proximate result of PwC's . . . substantial assistance, RGL entered into the LBO" and was damaged. Id. ¶¶ 559, 564. RCM's aiding and abetting claims assert that PwC substantially assisted RCM by "commenting on disclosures" in the LBO and IPO, and, as a proximate result, "RCM transferred over $2 billion to affiliates without the financial wherewithal or intent to repay these amounts" and was thereby harmed. Id. ¶¶ 433-34, 438-39.

The elements of an aiding and abetting claim are: (i) a primary violator's fraud or breach of fiduciary duty; (ii) defendant's "actual knowledge" of the same; (iii) defendant's providing "substantial assistance" to the commission of the underlying tort; and (iv) the aiding and abetting must have "proximately caused the harm on which the primary liability is predicated. 'But-for' causation is insufficient[.]" Pension Comm. of Univ. of Montreal v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 201-02 (S.D.N.Y. 2006).

A.    **The Complaint Fails to Plead Facts Showing PwC's Actual Knowledge**

"[A]ctual knowledge is required to impose liability on an aider and abettor under New York law." Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998) (table decision). Where, as here, "the underlying primary violations are based on fraud," facts demonstrating actual knowledge must be pled with particularity pursuant to Rule 9(b). Id. at 245; see also Compl. ¶¶ 433, 558 (PwC aided breaches of fiduciary duty by "commenting on disclosures which failed to disclose"); id. ¶¶ 438, 563 (PwC aided fraud). Thus, the Trustee must "allege facts that give rise to a 'strong inference' of the defendant's culpable state of mind." In re Parmalat Sec. Litig., 501 F. Supp. 2d 560, 573 (S.D.N.Y. 2007). In ruling

on the sufficiency of aiding and abetting allegations, courts in this Circuit have applied the Supreme Court's decision in <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2510 (2007), which defines a strong inference as "'cogent and compelling, thus strong in light of other explanations.'" <u>In re Parmalat Sec. Litig.</u>, 501 F. Supp. 2d at 573 n.88 (quoting <u>Tellabs</u>).[8]

The Trustee's aiding and abetting claims against PwC are based on the assertion that PwC had knowledge of the RTLs used to conceal the Refco Group Holdings Inc. ("RGHI") receivable and the misuse of RCM customers' assets. However, the Complaint fails to plead facts that give rise to any plausible inference, let alone a strong one, that PwC had actual knowledge of these frauds.

### 1.    The allegations of PwC's knowledge of the RTLs fail

The sole basis for plaintiff's allegation that PwC knew of the RTLs is a November 22, 2004 e-mail exchange between a Refco assistant controller, Victor Zarate, and the PwC manager on the RGL engagement, Henri Steenkamp. Compl. ¶¶ 293-94. Zarate sent Steenkamp a list of fiscal year-end and month-end deposits at RGL from BAWAG, a foreign financial institution, which was a 10% owner of RGL before the LBO (<u>id.</u> ¶ 35) and a related party for financial statement disclosure purposes. In response, Steenkamp asked Zarate to provide the "RGHI loan balances" for the same dates. Plaintiff claims that this e-mail exchange "establishes that PwC was fully aware of the wire transfer RTLs in which BAWAG served as a conduit." <u>Id.</u> ¶ 292. The document is reproduced in its entirety herein (and attached to the Capra Declaration as Exhibit 5):

---

[8] <u>See generally</u> <u>In re AlphaStar Ins. Group Ltd.</u>, 383 B.R. 231, 257 n.5 (Bankr. S.D.N.Y. 2008) (noting that the PSLRA "strong inference" standard "has been applied in this Circuit to non-securities fraud claims" and applying <u>Tellabs</u> to a trustee's common law fraud-based claims).

```
DOCNO: 127656
DATE: 11/22/2004
TIME: 17:21:56
AUTHOREMAIL: CN=Henri Steenkamp/OU=US/OU=ABAS/O=PwC
SENTTO: "Zarate, Victor" <VZarate@refco.com>@INTL
CC: CN=Macrina Kgil/OU=US/OU=ABAS/O=PwC@Americas-US;CN=Jonathan
Chen/OU=US/OU=ABAS/O=PwC@Americas-US
SUBJECT: Re: BAWAG deposits

BODY: Hi Victor
Could we please have the RGHI loan balances as well for the periods below.
Thanks for the info
Henri
"Zarate, Victor" <VZarate@refco.com>
11/22/2004 02:27 PM
                              To
            Henri Steenkamp/US/ABAS/PwC@Americas-US
            cc
                  Subject
            BAWAG deposits
                                          Henri,
    BAWAG Information:
    2/29/04 - 210,223k
    2/28/03 - 175,223k
    2/28/02 - 210,223k
    2/28/01 - 225,223k
    8/31/04 - 223k
    7/31/04 - 223k
    8/31/03 - 223k
    Victor

    CUSTODIAN: Henri Steenkamp
    FOLDER: ($AllDocuments)
    ATTACHMENT:
```

The Trustee's assertion that this lone e-mail is "[e]videnc[e]" that "PwC understood that these 'deposits' related to improper RTLs" (Compl. ¶ 294) is an absurd leap. The RTLs consisted of a set of *transactions* involving multiple parties and the use of proceeds to pay down a receivable. See Compl. ¶ 79 (RTLs consisted of an "entire process"). The e-mail exchange, however, simply inquires about discrete year-end (or month-end) *balances*. It does not refer to a transaction at all, much less a transaction between RGHI and BAWAG (or any of the alleged RTL participants). Nor does it refer to any reduction in the RGHI loan balances as a result of a transaction, or the unwinding of a transaction. Absent such references, it is unreasonable and impermissible to infer that PwC had actual knowledge of the alleged RTL scheme. See Podany v. Robertson Stephens, Inc., 350 F. Supp. 2d 375, 381 (S.D.N.Y. 2004) ("Fraud may not be alleged based on a tortured reading . . . [of a] casual e-mail remark . . . .");

Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett, No. 05-CV-8988 (GEL), 2007 WL 1732427, at * 2

(S.D.N.Y. June 14, 2007) (on motion to dismiss, court accepts "reasonable inferences").

   Even if the Trustee's inference were reasonable, it would not be "strong" in light

of "plausible nonculpable explanations for the defendant's conduct." Tellabs, 127 S. Ct. at 2510.

RGL's audited financial statements, contained in the July 22, 2004 LBO Offering Circular

(Compl. ¶ 307) – which predated Zarate's email – included the following related-party

disclosure:

> The Group may loan money to and may borrow money from its affiliates,
> members, affiliated companies and other related parties.  Interest is generally
> charged at prevailing market rates.  The $105 million due from Refco Group
> Holdings Inc. [RGHI], included in receivables from customers at February 28,
> 2003, was received by February 29, 2004.
>
> As of February 29, 2004 and February 28, 2003, the Group had a deposit with
> BAWAG Overseas, Inc., a third party financial institution who is a member, of
> $210 million and $175 million, respectively.  These balances were included in
> "Receivables from customers" and liquidated shortly after each year-end.

RGL included the identical disclosure in its Form S-4, filed October 12, 2004.[9]

   Thus, before the November 2004 e-mail exchange occurred, RGL's LBO Offering

Circular and Form S-4 had identified RGHI and BAWAG in the same note as parties related to

RGL and had disclosed the amounts owed by each of them to RGL.  The November 2004 e-mail

plainly concerns this related-party footnote disclosure.  The BAWAG loan balances as of

02/29/04 and 02/28/03 referenced in the e-mail ($210M and $175M) are identical to the publicly-

disclosed BAWAG loan balances in the Offering Circular quoted above.  (By contrast, these

balances do *not* correspond to any of the RTL amounts alleged in the Complaint.  Compl. ¶ 84.)

It is unsurprising that, after receiving the list of BAWAG deposits, PwC asked for a list of RGHI

---

[9] The LBO Offering Circular and RGL's S-4 filings are referenced in the Complaint (Compl. ¶¶ 140, 332); relevant
pages are attached respectively at Capra Decl. Ex. 6 and Ex. 7.

loan balances, because the two items had been identified in the same note in the prior Offering Circular and in the S-4, the latter of which PwC was continuing to review in connection with the SEC comment process.[10] This benign explanation negates any inference that PwC knew "Refco was 'depositing' money with BAWAG and that, concurrently, the RGHI Receivable was being reduced by a like amount." Id. ¶ 295.

### 2. The allegations of PwC's knowledge of the misuse of RCM customers' assets are insufficient

The Trustee also conclusorily alleges that PwC "knew and/or consciously avoided knowing that Refco was looting RCM's customer assets." Compl. ¶ 305. This scheme consisted of allegedly improper transfers of RCM customers' assets to fund operations of other Refco entities and accounting for these transfers as intercompany loans owed to RCM. Id. ¶¶ 95-99.

First, it is significant that the Trustee has not identified a single document demonstrating or even suggesting that transfers of customer assets were discussed with, or disclosed to, PwC. Absent such direct evidence, the Complaint sets forth the following convoluted allegations based on PwC's review of publicly disseminated documents: (i) RGL included amounts for "payables to customers" in its condensed consolidating balance sheet and Note O of the financial statements in its LBO Offering Circular (Compl. ¶ 125); (ii) PwC was among a group of four "Professional Defendants . . . deeply familiar with Refco's corporate structure and its operations" (id. ¶ 126); (iii) by virtue of this familiarity, PwC knew that Refco entities other than RCM did not have significant customer obligations (id.); (iv) thus, "PwC knew that the 'payable to customer' line item referred to intercompany loans" (id. ¶ 308); and

---

[10] On December 10, 2004, several weeks after the November e-mail exchange, RGL filed Amendment No. 1 to Form S-4 (relevant pages attached at Capra Decl. Ex. 8), which continued to disclose the same amounts due from BAWAG and RGHI. See Compl. ¶ 140 (noting that S-4 was amended in the SEC comment process).

(v) PwC "understood that these 'payable to customer balances' referenced RCM customer assets that were being siphoned" off (id. ¶ 309).

The Trustee admits, however, that the transfers of customer assets are not apparent on the face of the Offering Circular. See id. ¶ 126 (an "outsider would have been unable to discern [this] from the condensed consolidating financial information"). Plaintiff tries to overcome that lack of transparency by asserting that PwC was "deeply familiar with Refco's corporate structure and its operations" and, therefore, knew that certain RGL subsidiaries lacked significant customer obligations. Id. This is a conclusory assertion, not a factual allegation, and it provides no basis from which to infer actual knowledge of the RCM customer asset transfers. See Zucker v. Sasaki, 963 F. Supp. 301, 309 (S.D.N.Y. 1997) (allegation of accountant's access to client and documents insufficient to show fraud).

Moreover, the claim that PwC was so deeply familiar with Refco operations that it must have known some subsidiaries lacked customer obligations is not supported by other factual allegations. PwC was engaged by RGL, not by RCM or any of the other subsidiaries referenced in RGL's consolidated balance sheet. Id. ¶¶ 33, 125, 283. Also, PwC had been engaged less than three months at the time the Trustee asserts it was "deeply familiar" with Refco and its operations. Id. ¶¶ 125, 283. These allegations do not support a strong inference that PwC knew the extent of subsidiary customer obligations. The inference is especially weak given the allegation that the private equity firm investing in Refco in the LBO did not discover the transfers of RCM customers' assets despite conducting extensive due diligence. Id. ¶¶ 114-17.

Second, even if a reader of RGL's consolidated financial statements knew that certain subsidiaries lacked significant customer obligations, it would not follow that the reader knew that "these 'payables to customer balances' referenced RCM customers' assets that were

being siphoned to fund the operations of other Refco related entities" (Compl. ¶ 309), much less that none of those amounts would be repaid as a result of the LBO (id. ¶ 129). Indeed, the Complaint alleges that the intercompany loans were "undocumented" and "fraudulently misrepresented" in *RCM's* financial statements, which PwC is not even alleged to have reviewed. Id. ¶ 361.

The only document cited in support of the Trustee's allegations is a handwritten comment on a June 14, 2004 draft of RGL's audited financial statements, which were being edited for the LBO Offering Circular. Compl. ¶ 309. The comment was to move a sentence from its location under Note B ("Summary of Significant Accounting Policies") to Note K ("Related Party Transactions"). That sentence reads: "In the normal course of business, a member of the Group engages in customer related activities which result in receivable from or payable to customer balances, which change daily." Id.[11] Plaintiff claims this comment shows that "PwC understood that these 'payable to customer balances' referenced RCM customer assets that were being siphoned to fund the operations of other Refco-related entities." Id.

The comment to move this sentence was made approximately one month after PwC began its first Refco engagement. Compl. ¶ 283. The sentence itself refers to receivables and payables to customers, not to transfers of RCM customer assets to other Refco entities or the use of intercompany loans to account for those transfers. Nor is it clear how the mere movement of this sentence within the notes to the financial statements shows actual knowledge of any scheme. Plaintiff's theory seems to be that (i) one would not make this suggestion unless one understood that RGL "misleadingly referred to intercompany and related party obligations" as

---

[11] Attached at Capra Decl. Ex. 9 are excerpts from RGL's draft financial statements for the fiscal year ended February 29, 2004, marked "MASTER COPY 6/14/04" and bearing a June 14, 2004 facsimile header. Plaintiff alleges that the handwritten note on the document is PwC's, although that is not clear. It does not matter, for purposes of this motion, whether PwC authored the handwritten note.

"payables owed to . . . 'customers.'" (id. ¶ 126) and (ii) movement of the sentence reflects

knowledge that the customer balances in fact represented intercompany (i.e., related party)

obligations used to account for customer assets being siphoned off to fund Refco's operations.

However, on this theory, the movement of the sentence to the "Related Party Transactions" Note

would tend to *expose* this use of intercompany loans and, therefore, is inconsistent with

plaintiff's claim that PwC abetted RGL's fraud. Id. ¶ 585.  Because the sentence at issue does

not refer to transfers of customers' assets, and because its movement to a different footnote is

inconsistent with fraud, the handwritten comment attributed to PwC hardly supports a "strong

inference" of PwC's actual knowledge of a complex scheme involving undocumented loans. Id.

¶¶ 97, 123, 335.  See Tellabs, 127 S. Ct. at 2509.

### 3.    Allegations lumping multiple defendants together are inherently defective under Rule 9(b)

Finally, the Complaint contains entirely conclusory allegations made with regard

to a group of "Professional Defendants" defined to include PwC.  See Compl. ¶¶ 49 (defining

"Professional Defendants"), 104, 125-31, 138, 142-44, 472.  Such allegations are inherently

deficient under Rule 9(b).  See In re Crude Oil Commodity Litig., No. 06-CV-6677 (NRB), 2007

WL 1946553, at *6 (S.D.N.Y. June 28, 2007) (granting Rule 9(b) motion to dismiss; noting that

"the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping'

all defendants together fails to satisfy the particularity requirement").  The multi-defendant

allegations are especially deficient here, as the Complaint pleads that each of the "Professional

Defendants" had different engagements, with different duties, over different time periods, and

with different degrees of contact with Refco.  Compare, e.g., Compl. ¶¶ 42, 154, 161 with id. ¶¶

44, 283.

**B.      The Complaint Fails to Plead Facts Showing Substantial Assistance or Proximate Causation**

       The Complaint must plead facts showing substantial assistance, which "may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur. [T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'" In re Sharp Int'l Corp., 403 F.3d 43, 50 (2d Cir. 2005) (quoting Kaufman v. Cohen, 307 A.D.2d 113, 126, 760 N.Y.S.2d 157, 170 (1st Dep't 2003) (alteration in original) (citation omitted). This element effectively merges into the proximate causation requirement because "[w]hether the assistance is substantial or not is measured . . . by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'" Pension Comm. of Univ. of Montreal, 446 F. Supp. 2d at 202 (quoting JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005)) (alteration in original).[12]

       Here, the Complaint does not allege that PwC provided *any* assistance to RGL or RCM in committing the underlying frauds – i.e., the RTLs and diversion of RCM customer assets. There is no allegation, for example, that PwC obtained or provided any of the round trip loans or helped transfer RCM customers' assets to Refco affiliates. Compare Compl. ¶¶ 75, 82 (alleging "active assistance" of certain professional and other defendants – but not PwC – in implementing RTLs); Wight v. BankAmerica Corp., 219 F.3d 79, 92 (2d Cir. 2000) (substantial

---

[12] See also In re Sharp Int'l Corp., 403 F.3d at 51 (plaintiff "must allege that [defendant] committed affirmative acts that furthered the . . . breaches of fiduciary duty . . . and caused" the loss); In re Parmalat Sec. Litig., 501 F. Supp. 2d at 578-79 ("Plaintiffs cannot succeed on any of their claims [including aiding and abetting] unless they establish that defendants' conduct caused the Companies' losses. It is not sufficient that they show 'but for' causation. They must also prove that defendants' actions were the proximate cause of the Companies' losses.") (discussing Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985)); Kolbeck, 939 F. Supp. at 249 ("Aiding and abetting liability arises only when plaintiffs' injury was a direct or reasonably foreseeable result of the complained-of conduct. 'But-for' causation does not suffice; the breach must proximately cause the loss.") (internal quotation marks and citations omitted); see generally Bloor, 754 F.2d at 61-62 (pre-Central Bank § 10(b) aiding and abetting claim).

assistance alleged where the defendant "arrang[ed] for and indeed supervis[ed]" fraudulent

transfers); Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 356,

372-73 (S.D.N.Y. 2007) (substantial assistance alleged where defendant knowingly copied

primary violator's inflated asset valuations to its own letterhead and sent false confirms to

auditor). Instead, plaintiff's aiding and abetting claims are based on the allegations that PwC

provided substantial assistance to Refco by "commenting on disclosures" in connection with the

LBO and IPO. Compl. ¶¶ 433, 558. These allegations fail as a matter of law for three reasons.

     First, RGL's only proximate cause allegation is that "[a]s a proximate result of

PwC's . . . assistance, RGL entered into the LBO." Compl. ¶¶ 559, 564. This allegation fails

because, as shown above, PwC was never engaged by RGL to provide advice on the business

decision whether to enter into the LBO. See Capra Decl. Ex. 1. Indeed, the Complaint concedes

that a letter of intent already had been signed by RGL before PwC was engaged. Id. ¶¶ 283, 334.

     Second, RCM's only proximate cause allegation is that "[a]s a result of PwC's . . .

assistance, RCM transferred over $2 billion to Refco affiliates without the financial wherewithal

or intent to repay these amounts." Compl. ¶¶ 434, 439. The Complaint does not explain how

PwC's "commenting on disclosures" in transaction documents assisted in transferring funds from

RCM customers' accounts to Refco affiliates. Id. ¶¶ 433, 438.[13] On the contrary, the Complaint

concedes that these transfers occurred before PwC was engaged, and independently of the LBO

and IPO, such that PwC could not have caused them. Id. ¶¶ 96-99, 102. The Trustee's assertion

that PwC assisted in these transfers is based, instead, on the following, elaborate causal chain:

---

[13] The purported PwC comment on RGL's June 14, 2004 draft financial statements (Compl. ¶ 309) is addressed
above (supra note 11). The Complaint does not identify any PwC comment on the S-1 filed for the IPO. Instead, it
alleges that the $105 million RGHI receivable as of February 2003, previously disclosed in RGL's S-4, was omitted
from Refco's final S-1 filing. Compl. ¶ 303. However, the Complaint fails to allege facts suggesting that PwC was
responsible for the omission. Nor does it explain why the omission of this information is actionable. Id.

(i) but for PwC's comments on financial statements included in RGL's Offering Circular and SEC filings, Refco could not have completed the LBO; (ii) but for the LBO, RGL would not have incurred debt in addition to its intercompany debt, i.e., amounts owed to RCM for assets transferred from customers' accounts; (iii) but for management's decision not to use LBO (and, later, IPO) proceeds to repay RCM, RGL would have repaid RCM; (iv) but for the non-repayment by RGL, RCM would have repaid its customers; and (v) but for the non-repayment of these customers, Refco would not be insolvent in the alleged amount of $2 billion.

Compl. ¶¶ 9-10, 121, 431-34, 436-39.

These but-for allegations are far too speculative and remote to plead proximate cause. Proximate cause depends, in part, on duty – i.e., whether the alleged injury "was a direct or reasonably foreseeable result of the complained-of conduct." Kolbeck, 939 F. Supp. at 249 (internal quotes and citation omitted). Here, PwC's duty was to RGL, not its indirect subsidiary RCM. Id. ¶¶ 283, 287. Moreover, the LBO Offering Circular stated that the LBO debt would be subordinated to the existing liabilities of subsidiaries. Id. ¶ 124. Under these circumstances, it would not have been foreseeable to PwC that, as a result of the LBO or IPO, RGL would become unable to repay undocumented intercompany loans to RCM, and RCM, in turn, would become unable to repay its customers. See In re Parmalat Sec. Litig., 501 F. Supp. 2d at 580 (holding on motion to dismiss that it is not foreseeable to auditor of parent corporation that subsidiary will be injured by transaction whose "proceeds are upstreamed to the parent and looted by corrupt insiders").

Third, the Trustee's speculative, but-for assertions are contradicted by more specific allegations of the Complaint, which concede that the causes of RGL's and RCM's alleged damages were not the LBO and IPO transactions (much less PwC's commenting on disclosures contained in transaction documents), but independent actions by Refco Insiders. Specifically, the Complaint asserts that, even before the LBO, Refco was doomed by management's initial transfers of customer assets to affiliates that could not repay loans used to

account for the transfers.  See Compl. ¶ 102 ("[a]t the time of the LBO, RCM was owed approximately $2 billion by Refco affiliates"); id. ¶ 386 ("RCM's loans were made to Refco entities that lacked the intention or ability to repay the diverted RCM [customer] assets."); id. ¶ 353 (RGL management "knew that the Refco affiliates to whom RCM's assets were being transferred would not repay these amounts.").  Any subordination of concededly unpayable intercompany debt through the LBO did not render RGL more unable to repay RCM, or RCM more unable to repay its customers.  Id. ¶¶ 350, 353, 386; see generally In re Parmalat Sec. Litig., 501 F. Supp. 2d at 574 ("[A] company's insolvency is not deepened simply by the incurrence of new debt.").

The Trustee may be alleging that LBO proceeds ought to have been used to repay this debt.  See Compl. ¶ 121 ("The LBO proceeds were not used to retire the full amount of the RGHI Receivable . . . or repay any of the loans owed to RCM.").  This is an admission that the non-repayment was due, not to the LBO itself, but to management's imprudent use of LBO proceeds.  PwC cannot be a proximate cause of this non-repayment because the Trustee does not allege that PwC was engaged to provide, or did provide, advice regarding the use of LBO proceeds.  See Compl. ¶ 336 (debt priority discussed by Refco management with others, not PwC); Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985) (affirming judgment on the pleadings on proximate cause grounds where attorney prepared securities filings, and holding that "[a]ny damage sustained . . . occurred later, after the securities transactions were completed, when the proceeds of those transactions were allegedly funneled into unwise investments or diverted to the personal use of" principal officers).

Similarly, the alleged harm of the IPO consisted not of transfers of RCM customers' assets to other Refco entities, which already had occurred (Compl. ¶ 102), but of management's decision to use "the vast majority of [the] IPO proceeds" to redeem RGL's senior

19

subordinated notes at a time when RGL allegedly was insolvent. Id. ¶ 341. The allegation that the proceeds should have been used to repay RCM (and, in turn, RCM customers) fails to establish that PwC substantially assisted a breach of fiduciary duty or fraud, because use of the IPO proceeds was admittedly a management decision (id.) and there is no allegation that PwC was engaged to provide, or did provide, advice on this. See Bloor, 754 F.2d at 62. Moreover, the Complaint alleges that "[a]t all relevant times, RCM was insolvent or operating in the zone of insolvency." Compl. ¶ 350. If RCM already was insolvent at the time of the IPO, it could not have been harmed by the IPO, much less by PwC's commenting on S-1 disclosures. See In re Parmalat Sec. Litig., 501 F. Supp. 2d at 573-76 (additional debt may injure creditors, but not insolvent corporation, except in rare cases of claims for delayed reorganization).

## III.  This Court Should Dismiss All Claims Against PwC Based On Lack Of Standing And The *In Pari Delicto* Doctrine

This Court should dismiss all claims against PwC, pursuant to Rules 12(b)(1) and 12(b)(6), on the additional grounds that the Trustee fails to allege any distinct corporate harm to Refco and lacks standing to "recover against [a] third party for damages to the creditors." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991). The Trustee's claims also should be dismissed under the in pari delicto doctrine, which bars claims brought by a plaintiff who bears "equal fault" with a defendant. Global Crossing Estate Rep'r. v. Winnick, No. 04-CV-2558 (GEL), 2006 WL 2212776, at *12 n.16 (S.D.N.Y. Aug. 3, 2006).

### A.    The Trustee Lacks Standing to Recover for Damages to Creditors

The Trustee has the burden to establish standing to bring claims against PwC. Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995). The Trustee stands in the shoes of RGL and RCM and may only bring claims that those companies could have asserted before bankruptcy. See In re Mediators, Inc., 105 F.3d 822, 825-26 (2d Cir. 1997) (citing Caplin

v. Marine Midland Grace Trust Co., 406 U.S. 416, 428-29 (1972)); Wagoner, 944 F.2d at 118;

Guttman v. Martin (In re Railworks Corp.), 325 B.R. 709, 719 (Bankr. D. Md. 2005) (post-

confirmation trustee).  Here, the claims purportedly brought on behalf of RGL and RCM are, at

bottom, claims for "damage[s] to the creditors," Wagoner, 944 F.2d at 118, specifically, RCM's

customers.  RCM's customers already are prosecuting these claims, both in a class action and in

at least one individual action.[14]

     While the Trustee conclusorily pleads in places that PwC's assistance "caus[ed]"

RCM's assets to be transferred," Compl. ¶¶ 431, 430-39, the more specific allegations of the

Complaint reveal that the Refco Insiders converted assets belonging, not to RCM, but to its

customers.  See Hirsch, 72 F.3d at 1092 ("General, conclusory allegations need not be credited

. . . when they are belied by more specific allegations of the complaint.").  The Refco Insiders

allegedly (emphasis added throughout):

- "fund[ed] virtually every aspect of Refco's operations and expenses with assets belonging to *customers*."  Compl. ¶ 4.

- "funded Refco's operations by routinely swiping RCM's *customer's* assets and using them to finance RGL and other Refco affiliates that had essentially no ability and no intention of repaying the RCM *customer* funds."  Id. ¶ 7.

- engineered an LBO that left RCM "unable to repay the *customers* from whose accounts assets had been swiped to fund Refco's business . . . "  Id. ¶ 9.

- "fund[ed] Refco's operations with *customer* assets looted from RCM."  Id. ¶ 59.

- caused "assets in the accounts of RCM *customers* [to be] transferred out of RCM for use by other Refco entities."  Id. ¶ 96.

- caused "RCM *customer* assets [to be] diverted" through "intercompany transfers."  Id. ¶ 101.

- perpetrated a "fraudulent scheme . . . on the RCM *customers* . . . ."  Id. ¶ 104.

---

[14] See In re RCM, Ltd. Brokerage Customer Sec. Litig., 2007 WL 2694469, at *1 (granting leave to amend class action complaint); VR Global Partners, L.P. v. Philip R. Bennett, No. 07-CV-8686 (filed Oct. 9, 2007) (individual customer action).

On the Trustee's own allegations, the assets improperly transferred were those of RCM's customers (now creditors). The Trustee lacks standing to recover for these damages. See Lippe v. Bairnco Corp., 218 B.R. 294, 301 (S.D.N.Y. 1998) (dismissing abetting claims against outside professionals where complaint alleged "scheme to defraud the company's creditors").

The Trustee's damages prayer confirms that he seeks to recover for damages to creditors, not Refco, and so lacks standing. He alleges that, as a result of PwC's assistance, RCM became "unable to satisfy its obligations to its customers, and was insolvent or operating in the zone of insolvency." Compl. ¶¶ 434, 439. His $2 billion damages measure is identical to the amount of RCM's asserted insolvency – i.e., the amount it owes its customer-creditors. See Hirsch, 72 F.3d at 1091 (trustee alleging "injuries identical to those of the creditors" lacks standing).

Likewise, RGL's claims are all based on the allegation that "RGL entered the LBO . . . [and] was no longer able to repay the funds diverted from RCM to RGL." Compl. ¶¶ 554, 559, 564. The Trustee seeks damages based on RGL's inability to repay RCM (id.), which the Complaint describes as RGL's "largest creditor" (id. ¶¶ 9, 120). As shown above, the "funds diverted from RCM" consist entirely of amounts originally belonging to, and now owed to, RCM's customers. The Trustee asserts that Refco's intercompany accounting for these transfers was part of a fraud on RCM's customers (id. ¶ 104) and pleads the same $2 billion of outstanding debt to RCM's customers as RGL's alleged damages (id. ¶¶ 9, 554).

In sum, RCM's and RGL's aiding and abetting claims are based on a "fraudulent scheme [perpetrated] on the RCM customers" (Compl. ¶ 104) and are "duplicative of pending litigation" by those creditors, Hirsch, 72 F.3d at 1093. Such claims seek to recover damages to creditor-customers, not to RCM or RGL. Wagoner, 944 F.2d at 118. Accordingly, this Court should dismiss all of the Trustee's claims for lack of standing.

**B.     The *In Pari Delicto* Doctrine Bars All Claims Against PwC**

The Trustee's claims on behalf of RGL and RCM also must be dismissed based
on the in pari delicto doctrine, which bars claims by a plaintiff (and trustee standing in the shoes
of a debtor corporation) where the plaintiff was "an active, voluntary participant in the unlawful
activity that is the subject of the suit" and bears "at least substantially equal responsibility" as the
defendant.  Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 308 (S.D.N.Y.
1998) (internal quotations omitted).  Courts in this Circuit have dismissed, on Rule 12 motions, a
myriad of trustee claims against third-party professionals on this basis.[15]

Here, the Trustee stands in the shoes of RGL and RCM.  His own allegations
detail a fraud by Refco Insiders who served, variously, as RGL's President, CEO, Chairman,
Executive VP and CFO, as RCM's President, and as directors and officers of RGL and RCM.
See Compl. ¶¶ 1-13, 36-39, 59-149.  Further, the Trustee's own allegations show that RGL and
RCM bear at least substantially equal responsibility as PwC for any harm.  Specifically:

- RGL allegedly engaged in eleven of the RTL transactions before PwC was even
engaged.  Moreover, PwC never directed or participated in any of the alleged RTLs.
Compl. ¶¶ 84, 283.

- Refco Insiders – not PwC – allegedly misused RCM customer assets to fund Refco
operations.  Id. ¶¶ 4, 7, 8, 59, 96, 102.

- Whereas the Refco Insiders "engineer[ed]" the allegedly wrongful transactions, PwC
allegedly provided "assistance" primarily by "commenting on" RGL's disclosures.
Id. ¶¶ 32(b), 59, 360, 434, 438, 558, 563.

- Four of the Refco Insiders have been indicted on criminal charges; three have pled
guilty to fraud, and one has been convicted.  Id. ¶¶ 36, 38-39; Capra Decl. Ex. 3;
PwC's RJN Ex. 1.

---

[15] See In re Mediators, Inc., 105 F.3d 822, 824-26 (2d Cir. 1996) (affirming dismissal of aiding and abetting breach
of fiduciary duty claim against law firm); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1094 (2d Cir. 1995)
(accountant malpractice); Am. Tissue, Inc. v. Arthur Andersen, L.L.P., 275 F. Supp. 2d 398, 405 (S.D.N.Y. 2003)
(accountant malpractice); In re Promedicus Health Group, LLP, 359 B.R. 45, 47-48 (Bankr. W.D.N.Y. 2006) (legal
malpractice); Lippe v. Bairnco Corp., 218 B.R. 294, 301 (S.D.N.Y. 1998) (aiding and abetting claims against
accountant and law firms).

As one district court has held in granting a motion to dismiss, "'we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to the liability in the first place.'" Granite Partners, 17 F. Supp. 2d at 310 & n.20 (quoting Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 313 (1985)).

### IV.    This Court Should Dismiss Any Surviving Claims Against PwC Based On Improper Venue

Finally, if this Court does not dismiss all claims against PwC for the reasons given above, it should dismiss any surviving claims based on improper venue. Both of the engagement letters provide that "[t]he federal or state courts of the state of New York shall have *exclusive* jurisdiction of *any* claims arising out of this engagement." See Capra Decl. Ex 1-2 (emphasis added). Thus, the original venue of this action – Illinois – was improper. The transfer of this action under 28 U.S.C. § 1407 has not cured the venue defect, because following pre-trial proceedings this action would be remanded to Illinois. See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 40-41 (1998).[16] For this reason, this Court should dismiss any remaining claims against PwC pursuant to Rule 12(b)(3) and PwC's forum selection clause.

Federal law applies to PwC's venue motion. See Korean Press Agency, Inc. v. Yonhap News Agency, 421 F. Supp. 2d 775, 778 (S.D.N.Y. 2006) (forum clause is procedural and governed by federal law). Courts in this Circuit regularly enforce forum selection clauses in contract cases and tort cases that arise out of the parties' contractual relationship. See, e.g., Bense v. Interstate Battery Sys. of Am., 683 F.2d 718, 720-22 (2d Cir. 1982); Korean Press Agency, 421 F. Supp. 2d at 781; Direct Mail Prod. Servs. Ltd. v. MBNA Corp., No. 99-Civ-

---

[16] PwC's objection to venue does not prevent this Court from deciding the other grounds of PwC's motion to dismiss. See In re Global Crossing, Ltd. Sec. Litig., No. 02-CV-910 (GEL), 2004 WL 2584874, at *2 (S.D.N.Y. Nov. 12, 2004) ("nothing in Lexecon prohibits the dismissal of actions . . . during the pretrial phase").

10550 (SHS), 2000 WL 1277597, at * 6 (S.D.N.Y. Sept. 7, 2000) (citing <u>Hugel v. Corp. of</u> <u>Lloyd's</u>, 999 F.2d 206, 209 (7th Cir. 1993)).  Courts in this Circuit also enforce forum clauses against non-signatories, like RCM, that are closely related to the contracting party (here, RGL). See <u>Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.</u>, 975 F. Supp. 483, 486 (W.D.N.Y. 1997) (A non-signatory may "be bound by the clause if the entity is 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." ) (quoting <u>Hugel</u>, 999 F.2d at 209); <u>Direct Mail</u>, 2000 WL 1277597, at * 5.

## CONCLUSION

For all of the foregoing reasons, PwC's motion to dismiss should be granted, and Plaintiff's Complaint against PwC should be dismissed without leave to amend.


Dated: New York, NY
     May 21, 2008

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
James J. Capra, Jr.
James P. Cusick
666 5th Avenue
New York, New York 10103
(212) 506-5000

Kenneth Y. Turnbull (admitted *pro hac vice*)
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

*Attorneys for Defendant*
*PricewaterhouseCoopers LLP*