UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re REFCO, INC. SECURITIES LITIGATION      07 MDL No. 1902 (GEL)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARC S. KIRSCHNER, AS TRUSTEE OF
THE REFCO LITIGATION TRUST,

         Plaintiff,

      - against -

GRANT THORNTON LLP, MAYER BROWN,
ROWE & MAW, LLP, ERNST & YOUNG U.S.
LLP, PRICEWATERHOUSECOOPERS LLP,
CREDIT SUISSE SECURITIES (USA) LLC
(F/K/A CREDIT SUISSE FIRST BOSTON
LLC), BANC OF AMERICA SECURITIES
LLC, DEUTSCHE BANK SECURITIES INC.,
PHILIP R. BENNETT, SANTO C. MAGGIO,       07 Civ. 11604 (GEL)
ROBERT C. TROSTEN, TONE N. GRANT,
REFCO GROUP HOLDINGS, INC., LIBERTY
CORNER CAPITAL STRATEGIES, LLC,       <u>ELECTRONICALLY FILED</u>
WILLIAM T. PIGOTT, EMF FINANCIAL
PRODUCTS, LLC, EMF CORE FUND, LTD.,
DELTA FLYER FUND, LLC, ERIC M.
FLANAGAN, INGRAM MICRO, INC., CIM
VENTURES, INC., BECKENHAM TRADING
CO., INC., ANDREW KRIEGER, COAST
ASSET MANAGEMENT, LLC (F/K/A COAST
ASSET MANAGEMENT LP), CS LAND
MANAGEMENT, LLC, AND CHRISTOPHER
PETITT,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS COUNT THIRTY-SEVEN OF THE COMPLAINT
AS AGAINST INGRAM MICRO INC. AND CIM VENTURES INC.**

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT .......................................................................................... 1

SUMMARY OF ALLEGATIONS ...................................................................................... 3

A.      The Alleged Scheme ..................................................................................... 3

B.      Allegations Regarding Ingram and CIM ...................................................... 5

APPLICABLE STANDARDS............................................................................................. 7

ARGUMENT ....................................................................................................................... 8

I. THE TRUSTEE IS PRECLUDED FROM BRINGING AN AIDING AND ABETTING
   FRAUD CLAIM AGAINST INGRAM OR CIM ........................................................... 9

        A.      The Trustee Does Not Have Standing To Pursue an Aiding and Abetting
                Fraud Claim.................................................................................................... 9

        B.      The Trustee's Claim Is Barred by the Doctrine of *In Pari Delicto* ...................... 14

II. THE TRUSTEE FAILS TO STATE A CAUSE OF ACTION AGAINST INGRAM OR
    CIM FOR AIDING AND ABETTING COMMON LAW FRAUD................................ 15

        A.      Ingram and CIM Are Not Alleged To Have Participated
                in the Primary Fraud...................................................................................... 16

        B.      The Complaint Fails To Allege Particularized Facts Establishing
                that Ingram or CIM Had Actual Knowledge of the Purported Fraud .................. 17

        C.      The Trustee Fails To Allege that Ingram or CIM Substantially
                Assisted the Purported Fraud ........................................................................ 19

                1.      The Trustee Fails To Plead Adequately Any Cognizable
                        Affirmative Assistance by Ingram or CIM ................................................ 20

                2.      The Plaintiff Fails To Plead Adequately that Ingram or CIM
                        Proximately Caused RGL's Harm ............................................................ 22

CONCLUSION ..................................................................................................................... 25

### TABLE OF AUTHORITIES

### Cases

A.I.A. Holdings, S.A. v. Lehman Bros., No. 97 Civ. 4978, 2002 WL 88226 (S.D.N.Y. Jan. 23, 2002) ................................................................................................................ 20

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) ............................................ 17

Am. Tissue, Inc. v. Arthur Andersen LLP, No. 02 Civ. 7751(SAS), 2005 WL 712201 (S.D.N.Y. Mar. 28, 2005).................................................................................... 13, 14

Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 233 F.R.D. 327 (S.D.N.Y. 2005) ............................................................................................................................ 14

Armstrong v. McAlpin, 699 F.2d 79 (2d Cir. 1983) ........................................................ 8

AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202 (2d Cir. 2000) .................... 23, 24

Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007) ................................................. 7

Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985)........ 24

Buechner v. Avery, 836 N.Y.S.2d 1 (N.Y. App. Div. 2007) ................................... 10, 14

Center v. Hampton Affiliates, Inc., 488 N.E.2d 828 (N.Y. 1985) ........................... 11, 12

Chill v. Gen. Elec. Co., 101 F.3d 263 (2d Cir. 1996). ............................................... 8, 17

Cleveland v. Rotman, 297 F.3d 569 (7th Cir. 2002) ...................................................... 24

Cobalt Multifamily Investors I, LLC v. Shapiro, No. 06 Civ. 6468 (KMW) (MHD), 2008 WL 833237 (S.D.N.Y. Mar. 28, 2008) ...................................... 9, 11, 12, 13

Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452 (S.D.N.Y. 2001)................... 15, 17, 20

Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158 (S.D.N.Y. 2003) ...... 20, 22

Filler v. Hanvit Bank, 339 F. Supp. 2d 553 (S.D.N.Y. 2004), aff'd, 156 Fed. Appx. 413 (2d Cir. 2005) ................................................................................. 8, 18, 21, 22

Hefferman v. Bass, 467 F.3d 596 (7th Cir. 2006) .................................................... 15, 17

Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580 (S.D.N.Y. 2008) ............................ 24

PAGE

In re Adelphia Commc'ns Corp., 330 B.R. 364 (Bankr. S.D.N.Y. 2005)....................................15

In re AlphaStar Ins. Group Ltd., 383 B.R. 231 (Bankr. S.D.N.Y. 2008).....................................12

In re Bennett Funding Group, Inc., 336 F.3d 94 (2d Cir. 2003). ...............................10, 11, 13, 14

In re CBI Holding Co., Inc., 318 B.R. 761 (S.D.N.Y. 2004)........................................................12

In re Mediators, Inc., 105 F.3d 822 (2d Cir. 1997). .........................................................9, 10, 13

In re Parmalat Sec. Litig., 421 F. Supp. 2d 703 (S.D.N.Y. 2006)..........................................22, 23

In re Refco Sec. Litig., 530 F. Supp. 2d 1350 (J.P.M.L. 2007) ...................................................11

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) ................................................................................7

Kleen v. Homak Mfg. Co., 749 N.E.2d 26 (Ill. App. Ct. 2001)....................................................24

Kolbeck v. LIT America, Inc., 939 F. Supp. 240 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d
    Cir. 1998) .......................................................................................................18, 20, 23

Laub v. Faessel, 745 N.Y.S.2d 534 (N.Y. App. Div. 2002).........................................................20

Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006) ...........................................................17

Maxwell v. KPMG, LLP, No. 03 C 3524, 2007 WL 2091184 (N.D. Ill. July 19, 2007),
    aff'd, 520 F.3d 713 (7th Cir. 2008) ...............................................................................22

Morgado Family Partners v. Lipper, No. 604396/2002, 6 Misc.3d 1014(A), 2004 WL
    3142198 (N.Y. Sup. Ct. Nov. 9, 2004), aff'd, 800 N.Y.S.2d 128 (N.Y. App. Div.
    2005) ...........................................................................................................................10

Movitz v. First Nat'l Bank of Chicago, 148 F.3d 760 (7th Cir. 1998)...........................................20

Nat'l Westminster Bank USA v. Weksel, 511 N.Y.S.2d 626 (N.Y. App. Div. 1987)....................18

Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc., 280 F. Supp. 2d 184 (S.D.N.Y 2003) ..................14

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000).............................................................................16

Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67 (2d Cir. 1998) ...........................................15

Pelman v. McDonald's Corp., 237 F. Supp. 2d 512 (S.D.N.Y. 2003)..........................................22

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F.
    Supp. 2d 163 (S.D.N.Y. 2006) ......................................................................................23

PAGE

Renner v. Chase Manhattan Bank, No. 98 CIV. 926 (CSH), 2000 WL 781081 (S.D.N.Y.
    June 16, 2000), aff'd, 85 Fed. Appx. 782 (2d Cir. 2004) ........................................ 18

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) .......................................................... 6

Ryan v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept.
    20, 2000) ............................................................................................................... 19

Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991) ........................ 8, 9, 10

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ................................. 8, 18

Thornwood, Inc. v. Jenner & Block, 799 N.E.2d 756 (Ill. App. Ct. 2003) .................................. 16

Time Savers, Inc. v. LaSalle Bank, N.A., 863 N.E.2d 1156 (Ill. App. Ct. 2007) ........................ 15

Townsend v. Sears, Roebuck & Co., 879 N.E.2d 893 (Ill. 2007) ................................. 11

UCAR Int'l Inc. v. Union Carbide Corp., 119 Fed. Appx. 300 (2d Cir. 2004) ............................ 14

UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485 (S.D.N.Y. 2003) ........ 20

Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34 (Bankr.
    S.D.N.Y. 1997) .................................................................................................... 13

Wight v. Bankamerica Corp., 219 F.3d 79 (2d Cir. 2000) ........................................ 9, 11

**Statutes and Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 1

Fed. R. Civ. P. 8(a)(2) ................................................................................................. 7

Fed. R. Civ. P. 9(b) .............................................................................................. 1, 7, 17

Defendants Ingram Micro Inc. ("Ingram") and CIM Ventures Inc. ("CIM") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), to dismiss count thirty-seven of the Complaint filed by Marc S. Kirschner as Trustee of the Refco Litigation Trust (the "Trustee") for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity.

## PRELIMINARY STATEMENT

The Trustee alleges that certain company insiders harmed Refco and various of its operating subsidiaries through an elaborate, multi-year scheme that permitted them to hide mounting losses within the company and eventually to "cash-out" their interest in Refco before its inevitable collapse. Among other things, the Trustee contends that these insiders caused Refco to enter into a series of short-term lending agreements with numerous third parties (the "Round Trip Loan" or "RTL" Defendants, as defined in the Complaint) that enabled them to alter the company's financial statements. Ingram and CIM are alleged to be among the RTL Defendants, and in count thirty-seven, the only count alleged against them, to be liable for aiding and abetting the Refco fraud. The Trustee does not and cannot allege, however, that the transactions involving Ingram and CIM were themselves fraudulent or that Ingram or CIM had actual knowledge that the insiders were using the loans to hide company losses or to assist in the preparation of allegedly misleading financial statements. The Trustee's claim against Ingram and CIM must be dismissed for several reasons.

First, it is well settled that a trustee of a bankrupt corporation lacks standing to pursue a claim for aiding and abetting fraud against third parties where those third parties are alleged to have assisted the corporation's managers in committing the alleged fraud. This prudential

limitation on standing bars the Trustee's claim here because his allegations are based solely on the premise that Ingram and CIM assisted company insiders in committing the alleged fraud.

Second, even assuming that the Trustee could somehow overcome his lack of standing, his claim is barred by the doctrine of *in pari delicto*, as the Trustee's Complaint is replete with admissions of wrongdoing that establish Refco was an active and voluntary participant in the alleged fraud.

Finally, the Trustee's claim must be dismissed for the independent reason that the allegations in the Complaint concerning Ingram and CIM are insufficient as a matter of law to plead a claim for relief based on aiding and abetting the alleged fraud at Refco. The Complaint fails to allege particularized facts demonstrating that Ingram or CIM had the requisite actual knowledge that the insiders intended to use the transactions to alter Refco's financial statements. In addition, the Complaint fails to plead sufficiently that Ingram or CIM substantially assisted the alleged fraud. To plead substantial assistance, the Trustee must allege both that Ingram and CIM advanced the commission of the fraud through overt acts and that their conduct proximately caused the damage allegedly suffered by Refco. Ingram and CIM are not alleged to, and did not, have any role in the preparation of Refco's purportedly misleading financial statements or in the alleged stripping of Refco's assets by the company insiders. The only overt acts alleged to have been committed by Ingram or CIM were entering into two short-term lending arrangements with Refco over three years before the company's purported injury. Merely entering into such transactions – which the Trustee alleges were subsequently used by Refco to alter the appearance of its financial statements – cannot, without more, rise to the level of substantial assistance. In addition, Ingram and CIM cannot have been the proximate cause of the injury for which the Trustee seeks recompense because the Trustee concedes that Refco needed to engage in new

loans during each subsequent reporting period to continue the alleged manipulation of its financial statements. These subsequent acts necessarily broke any tangential causal connection between the conduct of Ingram or CIM and Refco's alleged much later injury.

## SUMMARY OF ALLEGATIONS

### A.    The Alleged Scheme

The Trustee, representing the interests of Refco Inc. and certain of its direct and indirect subsidiaries (collectively "Refco"), including Refco Group Ltd., LLC ("RGL"), filed this action in Illinois state court in August 2007. The prolix Complaint alleges that certain company insiders conspired to conceal Refco's trading losses and marginal performance through a three-part scheme that allowed them to create "the illusion of a thriving company" and eventually "to steal billions of dollars from Refco" by orchestrating a "buy-out" of their interest in RGL. (Compl. ¶¶ 2, 4.) Numerous defendants, including Ingram and CIM, are alleged to have assisted in parts of the insiders' scheme. (Compl. ¶ 1.)

According to the Complaint, the "Refco Insiders," defendants Phillip R. Bennett, Santo C. Maggio, Robert C. Trosten, and Tone N. Grant, commenced the first phase of their scheme in 1997, shortly after an Asian market collapse saddled Refco with hundreds of millions of dollars in customer and proprietary trading losses. (Compl. ¶¶ 62-66.) Recognizing that the disclosure of such losses would have "severely eroded" Refco's "considerable goodwill" and otherwise "severely damaged" Refco's business, the Refco Insiders allegedly "converted" Refco's trading losses into a receivable owed to Refco by Refco Group Holdings, Inc. ("RGHI"), a company that Bennett and Grant co-owned and which held a 90% interest in RGL.[1] (Compl. ¶¶ 35, 39-40, 63,

---

[1] The Trustee alleges that the "remaining 10% in RGL was held by a subsidiary of Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG"), a foreign financial institution closely tied to Bennett." (Compl. ¶ 35.)

65-66.) Through their conduct, the Refco Insiders were purportedly able to make the "patently worthless receivables . . . appear[] to be a legitimate and collectible receivable" (the "RGHI Receivable"). (Compl. ¶ 66.) Nowhere does the Complaint suggest that Ingram or CIM were aware of the RGHI Receivable, let alone that they knew of its origins or assisted in its "conversion."

During the second phase of the scheme, certain of the Refco Insiders are alleged to have "propped up the perceived financial condition of RGL" in part through the use of a series of "Round Trip Loans" or "RTLs" that were purportedly "timed to straddle Refco's financial reporting and audit periods."[2] (Compl. ¶¶ 6, 75, 463.) According to the Complaint, during the first leg of each of the RTLs, a Refco entity would extend a loan to an unrelated, third-party customer of Refco, which Refco would record on its books as a receivable owed by that customer. (Compl. ¶ 77-78.) In the second leg of the transaction, the customer would lend the same amount it received from Refco to RGHI at a slightly higher interest rate. (Compl. ¶¶ 78, 80.) For most of the RTLs, including those involving CIM, RGL acted as a guarantor of RGHI's obligations. (Compl. ¶¶ 81, 225.) After receiving the loan, RGHI would execute the third leg of the RTL by using the funds it received to pay down the RGHI Receivable, thereby reducing the total amount of the RGHI Receivable that appeared on Refco's financial reports during the pendency of a RTL. (Compl. ¶¶ 77-78.) Nowhere in the Complaint does the Trustee allege, however, that any RTL Defendant, including Ingram and CIM, was aware of this final leg of the RTLs.

After a brief period of time, the RTLs would be "unwound," effectively restoring the outstanding RGHI Receivable to its initial value on Refco's books. (Compl. ¶ 79.) The Trustee

---

[2] It appears from the Complaint that defendant Grant is not alleged to have personally participated in this aspect of the alleged scheme. (Compl. Counts 18, 37.)

avers that, in this manner, the Refco Insiders were able to disguise the full magnitude of the RGHI Receivable during reporting periods and avoid the "scrutiny and skepticism" that would have been associated with such a large receivable having been owed to Refco by a related party. (Compl. ¶ 75, 78.)  As compensation for participating in the RTLs, the third-party customers kept as a fee the "spread" between the interest rate of the two loans.  (Compl. ¶ 79-80.)

Having successfully maintained the illusion of Refco's financial health through the RTLs and other purportedly deceptive or fraudulent techniques, the Complaint alleges that in 2004 RGHI and the Refco Insiders implemented the final phase of their scheme – "the Cash-Out" – by "caus[ing] RGL to borrow $1.4 billion of bank and bond debt" to fund a leveraged buy out ("LBO") of RGHI's control of Refco.  (Compl. ¶¶ 9, 121.)  As a result of the LBO, RGL was purportedly "stripped of its assets and saddled with $1.4 billion in new debt."  (Compl. ¶ 9.) Continuing their same scheme, a year later the Refco Insiders initiated an initial public offering ("IPO") that, among other things, allegedly "caused Refco Inc. to pay down over $230 million of RGL's LBO debt" and also allegedly "allowed the Refco Insiders to strip out all of Refco's remaining assets."  (Compl. ¶ 10.)  Significantly, the Trustee does not allege that RGL relied on the 2000 or 2001 RTLs – the only RTLs in which Ingram or CIM allegedly participated – or the financial statements they purportedly affected when it decided to enter into the 2004 LBO.

**B.    Allegations Regarding Ingram and CIM**

Although the Complaint is replete with generalized references to the group of "RTL Defendants" (a term the Trustee uses to refer collectively to thirteen different entities (Compl. ¶¶ 6, 29)), the Trustee has advanced only a handful of specific allegations against Ingram and CIM, none of which are sufficient to support a claim for aiding and abetting fraud.

The Trustee alleges, for example, that between the years 2000 and 2005 there were "at least 18" RTLs, as well as "approximately 12 additional wire transfer RTLs."  (Compl. ¶¶ 82,

5

84.)  Of these thirty RTLs, Ingram allegedly "agreed to use its subsidiary," CIM, to participate in just two:  the first on February 25, 2000 for $150 million, which was unwound on March 9, 2000, and the second on February 23, 2001 for $250 million, which was unwound on March 6, 2001.  (Compl. ¶¶ 52, 84.)  The Trustee further claims that Ingram, which had "previously served as a conduit" for the RTLs, "opted to cease participating" in them in 2002 "because of concerns about their propriety."  (Compl. ¶ 89.)  In support of this claim, the Trustee quotes from a single email Ingram "sent Refco . . . backing out of the proposed [2002] RTL, referencing the Enron debacle and heightened scrutiny from the SEC."  (Compl. ¶ 89, 226.)

Notably, the Complaint contains no other specific allegations about the alleged role of Ingram or CIM in the Refco Insiders' scheme, and attempts to rely instead on generalized allegations against all of the "RTL Defendants."  The Trustee alleges, for example, that each of them knew or consciously avoided knowing that: (a) the timing of the RTLs was designed to manipulate Refco's financial condition during fiscal and audit reporting periods because, by conducting "business with Refco [they] were each aware that Refco's annual reporting year closed at the end of February"; (b) the RTL's were not "isolated transactions" and that certain RTL defendants (*though not Ingram or CIM*) were aware that the RTLs occurred "with more frequency as Refco's LBO and IPO approached"; (c) the size of the RTLs was "suspicious" because they were for "specific and extremely large" amounts that increased each year; (d) the RTLs were "suspicious and without any legitimate business purpose" and "guaranteed by the corporate subsidiary [RGL] of an insolvent parent [RGHI]";[3] and (e) the RTL loan documents

---

[3] In further support of this claim, the Trustee alleges that the RTLs provided some participants "with lucrative interest payments" that, in at least one case, reached more than $1.1 million.  (Compl. ¶ 347(d).)  The Trustee fails to acknowledge, however, that CIM reportedly made a net profit of just $19,583.33 in connection with its participation in the two RTL transactions.  See the Final Report of the Court-appointed Independent Examiner, dated July 11, 2007, at 33 ("Examiner's Report"), an excerpt of which is attached as Exhibit A to the Declaration of Robert F. Wise, Jr., dated May 21, 2008 ("Wise Decl."), on which the Trustee has acknowledged relying.  (Compl. at 2.)  Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (observing that for purposes of a motion to dismiss, a

6

indicated that each RTL Defendant "was bound to act as a conduit for transfers from a Refco

entity to RGHI just before the end of the relevant period," and that the loans were "unwound just

after the beginning of the new period." (Compl. ¶ 347.) All other allegations directed at the

RTL defendants are either hopelessly vague (e.g., Compl. ¶ 75) or entirely conclusory (e.g.,

Compl. ¶¶ 91, 586-588).

## APPLICABLE STANDARDS

Under the pleading standard set forth in Rule 8(a)(2) of the Federal Rules of Civil

Procedure, the Trustee's Complaint must include "a short and plain statement of the claim

showing that the pleader is entitled to relief." As the Second Circuit has recently explained, this

rule imposes "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with

some factual allegations in those contexts where such amplification is needed to render the claim

plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (citing Bell Atlantic Corp. v.

Twombly, 127 S.Ct. 1955 (2007)). Under this standard, a complaint must be dismissed where it

fails to plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 127

S.Ct. at 1974. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of actions will not do." Id. at 1965 (internal quotation marks omitted). In order to state a claim,

the factual allegations "must be enough to raise a right to relief above the speculative level." Id.

In addition, because the Trustee purports to assert claims against Ingram and CIM for

aiding and abetting fraud, his allegations are subject to the heightened pleading requirements of

Rule 9(b) of the Federal Rules of Civil Procedure, pursuant to which "the circumstances

---

court may consider "any written instrument . . . incorporated in [a Complaint] by reference, as well as public
disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the
plaintiffs either possessed or knew about and upon which they relied in bringing the suit") (internal citations
omitted).

constituting fraud [must] be stated with particularity." See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir. 1994); Armstrong v. McAlpin, 699 F.2d 79, 92-93 (2d Cir. 1983); Filler v. Hanvit Bank, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004), aff'd, 156 Fed. Appx. 413 (2d Cir. 2005).  While "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally," courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations." Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996).  Indeed, for the Trustee's claim to survive dismissal he "must allege facts that give rise to a strong inference of fraudulent intent." Id. at 267; see also Shields, 25 F.3d at 1128.

## ARGUMENT

The Trustee's claim against Ingram and CIM for aiding and abetting fraud must be dismissed as a matter of law for three reasons.  First, it is well settled that under the "Wagoner rule" a bankruptcy trustee lacks standing to assert claims against third parties for defrauding the corporation he represents where those third parties are alleged to have assisted corporate managers in committing the alleged fraud.  Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991).  Second, even assuming that the Trustee could somehow overcome his lack of standing, his claim against Ingram and CIM is barred by the doctrine of *in pari delicto*, as the Trustee's Complaint is replete with admissions of wrongdoing which establish that RGL, through its agents, was an active and voluntary participant in the alleged fraud.  Finally, the Trustee's claim must be dismissed because the allegations in the Complaint concerning Ingram and CIM, even if accepted as true, fail as a matter of law to establish that the alleged conduct aided or abetted the fraud that purportedly caused RGL's injury.

# I.

## THE TRUSTEE IS PRECLUDED FROM BRINGING AN AIDING AND ABETTING FRAUD CLAIM AGAINST INGRAM OR CIM

**A.    The Trustee Does Not Have Standing To Pursue
         an Aiding and Abetting Fraud Claim**

It is well settled that a trustee lacks standing to pursue a claim for aiding and abetting

fraud against a third party where, as here, the Trustee is suing on behalf of the very corporation

that engaged in the underlying fraud.[4]  As recently explained in Cobalt Multifamily Investors I,

LLC v. Shapiro, No. 06 Civ. 6468 (KMW) (MHD), 2008 WL 833237, at *2 (S.D.N.Y. Mar. 28,

2008), a long line of cases beginning with Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d

114, 118 (2d Cir. 1991), establish "the 'well settled' principle that a bankruptcy trustee has

standing to assert only those claims held by the bankrupt corporation."  Cobalt Multifamily

Investors, 2008 WL 833237, at *2.  Under Wagoner, "[a] bankrupt corporation lacks standing to

assert claims against third parties for defrauding the corporation where those third parties

assisted corporate managers in committing the alleged fraud. . . . [Therefore,] a bankruptcy

trustee also lacks standing to assert such claims against third parties."  Cobalt Multifamily

Investors, 2008 WL 833237, at *2.  This "Wagoner rule" is premised on the law of agency,

"which generally imputes the misconduct of corporate managers, as agents of the corporation, to

the corporation itself."  Id. at *2 n.6 (citing Wight v. Bankamerica Corp., 219 F.3d 79, 86-87 (2d

Cir. 2000)).[5]

---

[4] In addition, as set forth more fully in Point I.B.1. of the Investment Banks' Memorandum of Law in
support of their Motion to Dismiss claims 15, 34, 35, 36, 43, and 44, dated May 21, 2008, which Ingram and CIM
hereby adopt and incorporate by reference, the Trustee also lacks standing to bring such claims on behalf of RGL
because he alleges no distinct injury to RGL beyond an injury to its supposed creditors.

[5] It is inconsequential that Kirchner is a "litigation trustee," and not a "bankruptcy trustee." A party suing
on behalf of a debtor, even if not formally a bankruptcy trustee, stands in a position analogous to that of a
bankruptcy trustee. See In re Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997) (finding a court-appointed creditors'
committee "analogous" to a bankruptcy trustee for purposes of Wagoner analysis because it was empowered to sue

Whether a given claim belongs to the debtor corporation or its creditors is a matter of state law.  In re Mediators, Inc., 105 F.3d 822, 825 (2d Cir. 1997).  In New York, it is well settled that "[a] claim against a third party for defrauding a corporation with the cooperation of management, accrues to creditors, not to the guilty corporation."  In re Bennett Funding Group, Inc., 336 F.3d 94, 102 (2d Cir. 2003) (citing Wagoner, 944 F.2d at 120).  This remains true even when the action seeks to recover for harm to the corporation.  See Wagoner, 944 F.2d at 120 (holding that a trustee lacked standing to pursue an aiding and abetting claim even "to the extent that the [complaint] alleges money damages to [the corporation] itself" because corporate management was allegedly involved in the primary fraud); Buechner v. Avery, 836 N.Y.S.2d 1, 2-3 (N.Y. App. Div. 2007) (accepting application of the Wagoner rule by the trial court to dismiss a suit by a bankruptcy trustee against third parties alleged to have facilitated insiders' misappropriation of funds).

Here there can be no question that Wagoner bars the Trustee from bringing an aiding and abetting fraud claim against Ingram or CIM because the underlying fraud about which the Trustee complains – the concealment of Refco's trading losses and eventual "looting" of RGL through the LBO – was "caused" by the alleged misconduct of three "Refco Insiders," all of whom were members of RGL's senior management.  (Compl. ¶¶ 2, 4, 9, 463-65.)  In particular, the Trustee alleges that Bennett was the President, CEO, and Chairman of RGL throughout the relevant period; that Maggio was the  Executive Vice President of RGL; and that Trosten was a member of Refco's corporate finance team and, as of 2001, RGL's CFO.  (Compl. ¶¶ 36-38.) Moreover, Bennett and Grant are alleged to have owned 90% of RGL prior to the LBO through

---

on behalf of the debtor); Morgado Family Partners, LP v. Lipper, No. 604396/2002, 6 Misc.3d 1014(A), 2004 WL 3142198, at *3 n.1 (N.Y. Sup. Ct. Nov. 9, 2004), (finding a court-appointed liquidating trustee sufficiently analogous to a bankruptcy trustee for purposes of standing), aff'd, 800 N.Y.S.2d 128 (N.Y. App. Div. 2005).

RGHI, while the other 10% was controlled by "a foreign financial institution closely tied to

Bennett." (Compl. ¶ 35.)  Given their controlling ownership interests in RGL and senior

executive and directorial positions within the company, any misconduct by the Refco Insiders is

imputed to RGL.  Accordingly, <u>Wagoner</u> bars the Trustee from asserting claims against Ingram

or CIM for defrauding RGL because they are based solely on the premise that Ingram and CIM

assisted the Refco Insiders – RGL's corporate managers – in committing the alleged fraud.  <u>See</u>

<u>Cobalt Multifamily Investors</u>, 2008 WL 833237, at *2 (citing <u>In re Bennett Funding Group</u>, 336

F.3d at 99-100).[6]

Although there is a limited exception to the <u>Wagoner</u> rule where the insiders acted

"solely to enrich themselves" (Compl. ¶ 12), it is not applicable here.  New York state and

federal courts have repeatedly recognized that the "adverse interest exception" is "narrow and

applies only when the agent 'totally abandoned' the principal's interests." <u>Wight</u>, 219 F.3d at

87; <u>Center v. Hampton Affiliates, Inc.</u>, 488 N.E.2d 828, 830 (N.Y. 1985) ("To come within the

exception, the agent must have totally abandoned his principal's interests and be acting entirely

---

[6] The fact that this case was originally filed in Illinois state court does not alter this conclusion.  We have not identified any case under Illinois law that would permit a trustee to sue third parties for aiding and abetting a fraud committed by the corporation.  Moreover, even assuming a conflict existed between Illinois and New York law, the latter should govern because New York has more significant contacts to the parties and occurrences involved in this action than Illinois:  (1) the headquarters and principal places of business of Refco, Inc. and a number of the defendants were or are in New York (Refco Inc. IPO Prospectus (Aug. 10, 2005) ("Prospectus"), at 8 (<i>available at</i> http://sec.gov/Archives/edgar/data/1321746/000104746905021309/a2162155z424b1.htm); <u>In re Refco Sec. Litig.</u>, 530 F. Supp. 2d 1350, 1351 (J.P.M.L. 2007)); (2) Refco's executive officers and directors, including Santo Maggio, who allegedly oversaw the round trip loan transactions, had New York business addresses, (Prospectus at 113); (3) the registration statement filed with the SEC in connection with Refco's 2005 initial public offering was signed in New York (Refco, Inc., SEC Registration Statement, Reg. No. 333-123969 (Aug. 8, 2005), at S-1 (<i>available at</i> http://sec.gov/Archives/edgar/data/1321746/000104746905009682/a2149035zs-1.htm)); (4) the loan transactions giving rise to the Trustee's claims against Ingram and CIM were negotiated and/or signed by Refco's officers and employees located in New York, including Santo Maggio and Phillip Bennett (Examiner's Report at 31, 33-34) (Wise Decl. Ex. A); (5) most of the loan documents the Trustee alleges give rise to its aiding and abetting claim contain express New York choice of law provisions (Examiner's Report at 35 & App. D-2) (Wise Decl. Exs. A & B); and (6) as the Panel on Multi-District Litigation noted in transferring the case to this court, "[r]elevant documents and witnesses can be expected to be found within the Southern District of New York," <u>In re Refco Sec. Litig.</u>, 530 F. Supp. 2d at 1351.  <u>See</u> <u>Townsend v. Sears, Roebuck & Co.</u>, 879 N.E.2d 893, 901 (Ill. 2007) (explaining that Illinois courts must apply the law of the state with the "most significant relationship" to the litigation).  For these reasons, both the <u>Wagoner</u> rule and <i>in pari delicto</i> doctrine are applicable and mandate that the Trustee's claims must be dismissed.

for his own or another's purpose."); Cobalt Multifamily Investors, 2008 WL 833237, at *4 (quoting Center, 488 N.E.2d at 830).  "[W]here a corporation benefits to *any* extent from the fraudulent acts of its agents, the agents cannot be said to have 'totally abandoned' the interests of the corporation."  Cobalt Multifamily Investors, 2008 WL 833237, at *4 n.10; see also In re AlphaStar Ins. Group Ltd., 383 B.R. 231, 272-73 (Bankr. S.D.N.Y. 2008) (finding the adverse interest exception did not apply because of allegations in the complaint that the corporate principals acted partially in the interests of the corporation); In re CBI Holding Co., Inc., 318 B.R. 761, 765 (S.D.N.Y. 2004) (finding that the adverse interest exception does not apply where there is "some evidence that various corporate purposes were served by the managers' acts of fraud").

Here, the Complaint itself reveals that the Refco Insiders did not "totally abandon" the interests of Refco and RGL.  The Complaint alleges, for example, that when Refco's debilitating trading losses mounted, "the Refco's Insiders set out to prop up Refco's reputation" because they feared that "customers would not do business with Refco's operating subsidiaries, and that Refco's considerable goodwill would be severely eroded." (Compl. ¶¶ 63-64.)  Similarly, the Refco Insiders are alleged to have used their scheme to "finance RGL and other Refco affiliates" (Compl. ¶ 7), to "satisfy Refco's substantial working capital needs" (Compl. ¶ 305), "to keep Refco appearing to be a fast-growing group of companies" that were "highly profitable" (Compl. ¶ 94), and to induce other Refco entities "to spend over $200 million dollars [sic] on RGL" (Compl. ¶¶ 136, 341).  Because these acts of promotion and capital infusion plainly benefited RGL, the Refco Insiders cannot be said to have "totally abandoned" the company's interest when they engaged in their scheme.  Certainly, there is no allegation – nor can there be – that the Refco Insiders had totally abandoned RGL and Refco in 2001, which is the last time Ingram or

CIM allegedly participated in an RTL, more than 3 years before the LBO and more than 4 years before the IPO. The adverse interest exception is therefore unavailable. See Cobalt Multifamily Investors, 2008 WL 833237, at *4 (observing adverse interest inapplicable where the defendants' misconduct "provided at least some financial benefit" to the corporation).

Even if the Trustee could establish that he was entitled to the benefit of the adverse interest exception, the "sole actor" rule would nevertheless prohibit the Trustee from bringing his aiding and abetting claim. Effectively an exception to the adverse interest exception, the sole actor rule is triggered when the agents or officers "dominate" the corporation such that they are considered the principal, and the actions of the agents are imputed to the principal. See In re Mediators, 105 F.3d at 827. This can happen either because the agent in question is the corporation's sole shareholder, id., or because the agent completely controlled the defrauded corporation, Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36 (Bankr. S.D.N.Y. 1997) (holding that the adverse interest exception does not apply where "all relevant shareholders and/or decisionmakers are involved in the fraud").

The sole actor rule is plainly applicable to the Trustee's claims against Ingram and CIM – despite the Trustee's repeated allusions to certain, unnamed "innocent directors, officers, and agents" of Refco – because at all relevant times two of the Refco Insiders, Bennett and Grant, are alleged to have owned 100% of RGHI, Refco's principal holding company and the controlling shareholder of RGL.[7] (Compl. ¶¶ 35, 40.) Given their dominant ownership position, as well as

---

[7] The Trustee's repeated references to these supposed "innocent directors, officers and agents" may also signal an attempt by the Trustee to lay a foundation for the so called "innocent insider" exception. Under this exception, the Wagoner rule would not apply if a party can show both that there was an innocent manager at the corporation and that the manager had the power to stop the misconduct and would have done so given knowledge of the wrongdoing. See, e.g., In re Bennett Funding Group, 336 F.3d at 101 (an allegedly innocent insider was deemed insufficient to meet the exception because the insider was "impotent to actually do anything" about the fraud); Wechsler, 212 B.R. at 36 (holding that in order to for the exception to apply, the complaint must allege both the existence of an insider and an explanation of "how he could and would have brought the fraud to an end"). This exception, however, has been characterized as "controversial," Am. Tissue, Inc. v. Arthur Andersen LLP, No. 02

their highly-placed positions within RGL and related Refco entities, there can be no doubt that the Refco Insiders "completely controlled" Refco and RGL. Indeed, the Complaint is devoid of any allegations of any ownership or control by any Refco insiders not purportedly involved with the fraud. Accordingly, the sole actor exception applies and the <u>Wagoner</u> rule bars the Trustee from asserting an aiding and abetting fraud claim against Ingram or CIM.

**B.    The Trustee's Claim Is Barred**
**by the Doctrine of *In Pari Delicto***

Even assuming *arguendo* that the Trustee could somehow overcome his lack of standing, his claim against Ingram and CIM is separately barred by the doctrine of *in pari delicto*. The doctrine of *in pari delicto* (in equal fault) is roughly equivalent to the equitable doctrine of "unclean hands" and functions as an affirmative defense barring recovery for a plaintiff who is an "'active, voluntary participant in the unlawful activity that is the subject of the suit.'" <u>Nomura Sec. Int'l, Inc. v. E\*Trade Sec., Inc.</u>, 280 F. Supp. 184, 200 (S.D.N.Y. 2003) (internal quotation marks omitted); <u>see also</u> <u>UCAR Int'l Inc. v. Union Carbide Corp.</u>, 119 Fed. App'x 300, 301-02 (2d Cir. 2004) (explaining that the doctrine of *in pari delicto* prohibits suits in which "the plaintiff is as or more culpable than the defendant in the conduct forming the basis of the complaint"); <u>Buechner v. Avery</u>, 836 N.Y.S.2d 1, 2-3 (N.Y. App. Div. 2007) (concluding *in pari delicto* doctrine precluded bankruptcy trustee from bringing tort claims against third parties that were based upon the cooperation of the management in committing the alleged wrongs). While they require similar analyses, the doctrine of *in pari delicto* and the <u>Wagoner</u>

---

Civ. 7751(SAS), 2005 WL 712201, at \*2 n.160 (S.D.N.Y. 2005), and on at least one occasion this Court has declined altogether to adopt the exception. <u>See</u> <u>Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 233 F.R.D. 327, 330 (S.D.N.Y. 2005) (Lynch, J.). Even were it applied to the case at bar, however, the exception would not be satisfied because the Trustee's allegations offer only unsubstantiated speculation that innocent insiders would or could have stopped the alleged fraud. (E.g., Compl. ¶¶ 235, 363.) <u>See</u> <u>Am. Tissue</u>, 2005 WL 712201, at \*3 (quoting <u>In re Bennett Funding Group</u>, 336 F.3d at 101) ("[T]he <u>Wagoner</u> rule [cannot be] defeated by a would-a, could-a, should-a test. To apply the 'innocent insider' exception in this case would perversely reward [the debtor] for having selected a chairman who played almost no role in policing the activities of the corporation.").

rule provide distinct reasons for dismissing the Complaint.  See In re Adelphia Commc'ns Corp., 330 B.R. 364, 381 n.51 (Bankr. S.D.N.Y. 2005).

As discussed above, the Trustee's Complaint is replete with admissions of wrongdoing by the Refco Insiders as they went about their alleged scheme.  Because these admissions establish that RGL, through its agents, was an active and voluntary participant in the alleged fraud, the *in pari delicto* defense has been satisfied on the face of the Complaint, and the Court may apply the defense at this stage of the proceedings.  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998) (observing "[a]n affirmative defense may be raised by a pre-answer motion to dismiss . . . if the defense appears on the face of the complaint").  Accordingly, the Trustee's claim against Ingram and CIM must be dismissed as a matter of law.

## II.

### THE TRUSTEE FAILS TO STATE A CAUSE OF ACTION AGAINST INGRAM OR CIM FOR AIDING AND ABETTING COMMON LAW FRAUD

In order to state a cause of action for aiding and abetting common law fraud under New York law, a plaintiff must plead facts demonstrating: (i) the existence of a fraud by the primary wrongdoer; (ii) that the defendant had actual knowledge of the primary fraud; and (iii) the defendant provided substantial assistance to advance the fraud's commission.  See Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).[8]  The Trustee's allegations against Ingram and CIM plainly fail to satisfy the latter two elements.

---

[8] To the extent the Trustee alleges his claim under Illinois law, the outcome would be no different.  To state a cause of action for aiding and abetting common law fraud in Illinois, a plaintiff must plead facts demonstrating: (i) the party whom the defendant aids performed a wrongful act causing an injury; (ii) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (iii) the defendant knowingly and substantially assisted the violation.  See Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir. 2006) (applying Illinois law); Time Savers, Inc. v. LaSalle Bank, N.A., 863 N.E.2d 1156, 1168 (Ill. App. Ct. 2007); Thornwood, Inc. v. Jenner & Block, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003).  Although the elements under either state's law are substantially the same, we principally rely on New York case law because it is more developed.  Were there an actual conflict between the laws of Illinois and New York in the application of an aiding and abetting claim, for the reasons set out in footnote 6 above New York law would apply to the Trustee's claim.

A.    **Ingram and CIM Are Not Alleged To Have
      Participated in the Primary Fraud**

The primary fraud alleged by the Trustee is that three Refco Insiders – Bennett, Maggio, and Trosten – engaged in a multi-year scheme to manipulate Refco's financial statements and keep Refco afloat in order to allow "RGL to enter into an imprudent LBO" and purportedly saddle the company with new debt.  (Compl. ¶¶ 9, 463-46.)  The Complaint does not allege, however, that Ingram or CIM were in any way involved in the LBO or otherwise "cashed-out" an interest in RGL.

Instead, the Trustee alleges that Ingram and CIM aided and abetted the Refco Insiders in their alleged fraud by entering into arm's length, negotiated business transactions in 2000 and 2001 – more than three years before RGL was allegedly "stripped of its assets" by the Refco Insiders through the LBO.  (Compl. ¶ 9, 84.)  And although the Trustee maintains that these RTLs enabled the Refco Insiders to "conceal[] a related-party receivable" and thereby "prop[] up the perceived financial condition of RGL," (Compl. ¶ 463, 586), he does not and cannot allege that Ingram or CIM knew of or understood the fraudulent nature of the RGHI Receivable, were aware that RGHI would engage in the third leg of the RTLs by using the loan to temporarily pay down the RGHI Receivable, or that they should have foreseen that the Refco Insiders would engage in the LBO years after their involvement with the RTLs ended.  Under the circumstances, alleging that Ingram or CIM were directly responsible for the Refco Insiders' fraud would amount to a classic case of "fraud by hindsight," for which defendants may not be held liable. See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).

16

**B.    The Complaint Fails To Allege Particularized
        Facts Establishing that Ingram or CIM Had
        Actual Knowledge of the Purported Fraud**

To establish that Ingram and CIM aided and abetted the Refco Insiders' fraud, the

Trustee must allege particularized facts giving rise to a strong inference that they had actual

knowledge, at the time they entered into the RTLs, of the Refco Insiders' plan to use those loans

to misrepresent RGL's financial condition and "cash-out" their interest in the company.  See

Cromer, 137 F. Supp. 2d at 470; see also Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.

1995) (explaining that Rule 9(b) requires a party to "allege facts that give rise to a strong

inference of fraudulent intent"); Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292-93 (2d Cir. 2006)

(applying 9(b) analysis to the actual knowledge requirement and holding that although plaintiffs

alleged in detail that the defendant banks knew of attorney's improper conduct, such allegations

did not give rise to the requisite "strong inference" of actual knowledge of the looting of client

funds); see also Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir. 2006) (applying Rule 9(b) to

Illinois aiding and abetting claim to require plaintiff allege detailed facts such as "the identity of

the person making the misrepresentation, the time, place, and content of the misrepresentation,

and the method by which the misrepresentation was communicated to the plaintiff").

It is axiomatic that the Trustee cannot rely on conclusory assertions to establish actual

knowledge.  See, e.g., Lerner, 459 F.3d at 293.  Boilerplate allegations, such as those averring

that the RTL Defendants "knew . . . the RTLs were concealing a related-party receivable" or that

they "were aware of their own roles in [the Refco Insiders' scheme] to conceal the RGHI

Receivable" (Compl. ¶¶ 586-87), are patently insufficient to establish actual knowledge of the

broader fraudulent scheme.  See, e.g., Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996)

("Plaintiffs still have the burden of pleading circumstances that provide at least a minimal factual

basis for their conclusory allegations of scienter.") (internal citations and quotation marks

17

omitted); <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994); <u>Nat'l

Westminster Bank USA v. Weksel</u>, 511 N.Y.S.2d 626, 629 (N.Y. App. Div. 1987) (finding that

conclusory allegations that defendant law firm knew or should have known that documents

originally prepared for filing with the SEC would be used in connection with obtaining loans

from plaintiff bank are insufficient to establish actual knowledge).

Constructive knowledge of the primary fraud – the possession of information which

would cause a person exercising reasonable care to become aware of the fraud – is also

insufficient.  <u>Kolbeck v. LIT America, Inc.</u>, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996), <u>aff'd</u>,

152 F.3d 918 (2d Cir. 1998); <u>see also</u> <u>Filler v. Hanvit Bank</u>, 339 F. Supp. 2d 553, 557-58

(S.D.N.Y. 2004) (concluding banks' alleged constructive knowledge of the effect factoring

agreements would have on corporation's financial statements did not support the inference that

banks actually knew corporation was attempting to defraud its investors).  Thus, the Trustee's

assertion that Ingram had "concerns about [the RTLs'] propriety" because they sent an email

"referencing the Enron debacle and heightened scrutiny from the SEC" (Compl. ¶ 89, 226), does

not satisfy the requirement of alleging actual knowledge.  <u>See, e.g.</u>, <u>Renner v. Chase Manhattan

Bank</u>, No. 98 CIV. 926 (CSH), 2000 WL 781081, at *12 (S.D.N.Y. June 16, 2000) (observing

that although the defendant bank had previously "rejected the transactions on the basis that they

were potential vehicles for fraud, there is no factual basis for the assertion that [bank] officials

actually knew that the fraud was, in fact, occurring"), <u>aff'd</u>, 85 Fed. Appx. 782 (2d Cir. 2004).

The allegations about this email, even taken at face value and without relevant context, prove

only that Ingram and CIM refused to participate in any RTLs after 2001 for their own reasons,

not that Ingram or CIM knew that the Refco Insiders would use these loans as part of an

allegedly broader scheme to strip the company of its assets more than three years later through an

LBO. Likewise, the Trustee's allegations concerning the suspicious timing, size, and frequency, of the RTLs – which are alleged generally as to all the RTL Defendants – fall short of satisfying his pleading obligations because at best they suggest that Ingram or CIM should have *suspected* fraud, not that they actually *knew* of it. See, e.g., Ryan v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) ("Allegations that [a defendant] suspected fraudulent activity . . . do not raise an inference of actual knowledge of [the] fraud.").

Far from establishing actual knowledge, the Trustee's allegations against Ingram and CIM are fatally flawed because they fail to aver: (1) that Ingram or CIM were even aware of the existence of the RGHI Receivable at the time they entered into the RTLs; (2) that they knew of its fraudulent nature; or (3) that they understood that the Refco Insiders, through the third leg of the RTLs, used the loan RGHI received from CIM to temporarily pay down the RGHI Receivable. Without such knowledge, Ingram and CIM would have had no reason to know that the Refco Insiders were using the RTLs to disguise the existence of the RGHI Receivable on Refco's financial statements, let alone that this conduct was part of an even broader fraudulent scheme to "cash-out" the Refco Insiders' interest in RGL years later through the LBO.

Because the Complaint fails to allege with particularity facts giving rise to a strong inference that Ingram or CIM had actual knowledge of the Refco Insiders' scheme to "cash-out" their interest in RGL, the Trustee has failed to state a cause of action for aiding and abetting the Refco Insiders' fraud and his claim against Ingram and CIM must be dismissed.

## C.    The Trustee Fails To Allege that Ingram or CIM Substantially Assisted the Purported Fraud

In addition to establishing actual knowledge of the underlying fraud, the Trustee must allege that defendants substantially assisted in the purported fraud. Substantial assistance requires proof of two elements: (i) conduct furthering the fraud, and (ii) proximate causation;

19

these two elements are also referred to as "transaction causation" and "loss causation." See, e.g.,

Laub v. Faessel, 745 N.Y.S.2d 534, 536 (N.Y. App. Div. 2002) ("To establish causation, plaintiff

must show both that defendant's misrepresentation induced plaintiff to engage in the transaction

in question (transaction causation) and that the misrepresentations directly caused the loss about

which plaintiff complains (loss causation)."); Movitz v. First Nat'l Bank of Chicago, 148 F.3d

760, 762-63 (7th Cir. 1998) (holding that Illinois law requires allegations that show both

transaction causation and loss causation in all common law tort claims).  The element of

transaction causation is satisfied only if one "affirmatively assists, helps conceal, or by virtue of

failing to act when required to do so enables the fraud to proceed." UniCredito Italiano SPA v.

JPMorgan Chase Bank, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003) (internal citations and

quotation marks omitted).  In addition, there must also be loss causation, which requires that "the

actions of the aider/abettor proximately caused the harm on which the primary liability is

predicated." Id.; see also Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 167

(S.D.N.Y. 2003) ("Substantial assistance requires a defendant's participation to be the proximate

cause of plaintiff's injury.").  "In other words, 'aider and abettor liability requires the injury to be

a direct or reasonably foreseeable result of the conduct.'" A.I.A. Holdings, S.A. v. Lehman

Bros., Inc., No. 97 Civ. 4978, 2002 WL 88226, at *12 (S.D.N.Y. Jan. 23, 2002) (quoting

Cromer, 137 F. Supp. 2d at 470).  Allegations of a "but-for" causal relationship are insufficient.

Cromer, 137 F. Supp. 2d at 470; Kolbeck, 939 F. Supp. at 249.

      1.      The Trustee Fails To Plead Adequately Any
                 Cognizable Affirmative Assistance by Ingram or CIM

As discussed above, the Trustee alleges that the Refco Insiders engaged in several

schemes to "prop[] up" RGL's financial condition, including hiding the size and nature of the

RGHI Receivable via the RTLs.  Other than having participated in two RTLs, however, the

Trustee does not allege that Ingram or CIM did anything that would have assisted the Refco

Insiders in their alleged fraud.  For the RTLs to constitute "substantial assistance," however, the

Trustee must establish that Ingram and CIM acted with the intent to assist the Refco Insiders to

disguise the RGHI Receivable.  See Filler, 339 F. Supp. 2d at 557-58.  The Trustee's allegations

do not and cannot support such a conclusion.

Indeed, the Trustee's affirmative assistance allegations against Ingram and CIM are even

more deficient than those that were dismissed by the Second Circuit in Filler, where the bank

defendants entered into factoring arrangements stating that they agreed to purchase accounts

receivables "without recourse."  Id. at 556.  The plaintiff in Filler alleged that the banks also

executed side agreements which changed the terms of the factoring agreements so that the banks'

purchases would be "with recourse."  Id.  It was further alleged that defendants signed

documents prepared in connection with a global audit by KPMG which falsely confirmed that

the money the bank had paid was held in unrestricted accounts, and therefore subject to recourse.

Id.  Notwithstanding the presence of such affirmative improper actions by the defendant bank,

the court held that they had not substantially assisted the primary wrongdoer because the plaintiff

in Filler (like the Trustee here) failed to allege that the defendants had acted with the intent of

assisting in the creation of the allegedly misleading financial statements (in this case, those that

the Refco Insiders allegedly generated as a result of the RTLs).  Id. at 557-58.

Although the Trustee alleges that the RTLs were "suspicious" (Compl. ¶ 347(d)), he does

not and cannot allege any improper conduct by Ingram or CIM relating to the RTLs.

Significantly, unlike the defendants in Filler, Ingram and CIM are not alleged to have lied to

accountants or to have entered into and hidden side agreements that changed the terms of their

transaction.  The Complaint contains no particularized allegations that Ingram or CIM were

aware of the RGHI Receivable or the fact that the Refco Insiders' intended to hide its existence by directing RGHI to engage in the third leg of the RTL.  Nor does the Complaint contain any allegation that RGL actually relied on the allegedly misleading financial statements that would have been generated as a result of the RTLs to which CIM was a party.  In short, the Trustee seeks to hold Ingram and CIM responsible for aiding and abetting a massive fraudulent scheme – one alleged to have involved completely unrelated acts and the assistance of numerous company advisors – based simply on the allegation that CIM was a party to two sets of loan documents. Such an allegation, without more, is legally insufficient to prove substantial assistance.  See Filler, 339 F. Supp. 2d at 559-60.

       2.       The Plaintiff Fails To Plead Adequately
                     that Ingram or CIM Proximately Caused RGL's Harm

In order to make a showing of substantial assistance, the Trustee must also allege facts showing that Ingram's and CIM's conduct proximately caused the underlying injuries.  Dubai Islamic Bank, 256 F. Supp. 2d at 167; see also Maxwell v. KPMG, LLP, No. 03 C 3524, 2007 WL 2091184, at *4 (N.D. Ill. July 19, 2007).  Although at times a question of fact, proximate cause may be determined as a matter of law where the facts alleged do not sufficiently demonstrate legal cause.  Pelman v. McDonald's Corp., 237 F. Supp. 2d 512, 538 (S.D.N.Y. 2003) ("The issue of proximate cause may be determined as a matter of law where no reasonable person could find causation based on the facts alleged in the complaint."); In re Parmalat Sec. Litig., 421 F. Supp. 2d 703, 721-22 (S.D.N.Y. 2006) (applying Illinois law and dismissing claim as a matter of law for want of causation), aff'd, 520 F.3d 713 (7th Cir. 2008).  Legal cause "involves an assessment of foreseeability," which requires that the injury be "of a type that a reasonable person would see as a likely result of his or her conduct."  In re Parmalat Sec. Litig., 421 F. Supp. 2d at 721.

The Complaint fails to plead proximate cause because it alleges only a "but-for" connection between Ingram, CIM, and the alleged injury to RGL that was caused by the Refco Insiders' fraud.  "But-for" causation, that is, conduct that merely creates a condition that makes the resulting injury possible, is insufficient to establish substantial assistance; rather, the injury must be a direct or reasonably foreseeable result of the conduct.  See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 201-02 (S.D.N.Y. 2006); Kolbeck, 939 F. Supp. at 249; In re Parmalat Sec. Litig., 421 F. Supp. 2d at 721-22.  To establish that the 2000 and 2001 RTLs are a proximate cause of RGL's alleged injury, the Trustee would have to allege with sufficient particularity that Ingram and CIM knew or could have reasonably foreseen:  (i) that the Refco Insiders were hiding Refco trading losses that predated the RTLs on the books of RGHI; (ii) that the Refco Insiders were going to use the funds RGHI received from the RTLs to disguise the size of the RGHI Receivable; (iii) that years later the Refco Insiders would cause RGL to enter into the LBO; (iv) that RGL would, years later, be induced to enter into the LBO based upon the financial statements on which the RGHI Receivable had been disguised as a result of the RTLs; and (v) that the Refco Insiders would subsequently engage in the alleged stripping of RGL's assets.  None of these facts are alleged to have been known to, or to have been reasonably foreseeable by, Ingram or CIM.

The Second Circuit's decision in Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985), is dispositive.  In Bloor, a bankruptcy trustee alleged the company's officers and controlling stockholders engaged in a massive scheme in which they mismanaged the firm and looted its funds.  Id. at 59.  The trustee sued several defendants for securities fraud, including a law firm that had assisted in the preparation of several public filings that allegedly misrepresented the company's financial condition.  Id. at 61-62.  The trustee alleged that the law

23

firm was liable to the corporation because the filings had allowed the company to raise large amounts of capital that were later looted during the ongoing fraud within the company.  Id. at 62. The Second Circuit disagreed, concluding that the trustee's allegations were insufficient to plead loss causation because the conduct at issue amounted only to "but-for" causation because the company's losses were caused by theft or mismanagement of corporate funds, not the raising of the funds that occurred with the help of the law firm.[9]  Id. at 62-63.  The same reasoning applies here:  Even if the 2000 and 2001 RTLs assisted the Refco Insiders' scheme to disguise the losses Refco had already incurred, the injuries the Trustee claims RGL suffered were caused by the supposed stripping out of the corporate assets by the Refco Insiders, not by the RTLs.  See also Cleveland v. Rotman, 297 F.3d 569, 573 (7th Cir. 2002) (applying Illinois law, finding that "[a] proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause") (citing Kleen v. Homak Mfg. Co., 749 N.E.2d 26, 29 (Ill. App. Ct. 2001)).

Finally, there can be no question that, after they were unwound, the 2000 and 2001 RTLs had no effect on the appearance of the RGHI Receivable.  The debt that had been purportedly masked through the use of the RTLs was restored to Refco's books.  Indeed, the Refco Insiders allegedly had to start from scratch during each subsequent reporting period to conceal anew the entire (and increasingly massive) RGHI Receivable.  (Compl. ¶¶ 73, 83-84.)  Because the 2000 and 2001 RTLs could not have disguised the RGHI Receivable immediately prior to the LBO, and because there is no allegation that RGL relied on the 2000 or 2001 RTLs or the financial

---

[9] While Bloor involved a federal securities fraud claim, the Second Circuit has held that the causation analysis under the securities laws embodies traditional notions of proximate cause, including both "transaction causation" and "loss causation."  AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 209 (2d Cir. 2000); see also Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 592 (S.D.N.Y. 2008) (holding that, because "the elements of common law fraud are substantially identical to those governing § 10(b), the identical analysis applies").

statements they purportedly affected when it decided to enter into the 2004 LBO, those RTLs cannot be said to have proximately caused RGL's injury. Stated differently, the subsequent conduct of the Refco Insiders, including their use of additional RTLs, broke any tangential causal connection between the conduct of Ingram and CIM and RGL's eventual injury.

Having failed to allege sufficiently a causal connection between the conduct of Ingram or CIM and RGL's injury, the Trustee's claim for aiding and abetting fraud must be dismissed.

## **CONCLUSION**

For the reasons set forth above, Defendants Ingram Micro Inc. and CIM Ventures Inc. respectfully request that the Court dismiss with prejudice count thirty-seven of the Complaint as against them.

Dated:  New York, New York
      May 21, 2008

                                 DAVIS POLK & WARDWELL

                                 By:   s/ Robert F. Wise, Jr.
                                       Robert F. Wise, Jr. (RW-1508)
                                       Paul Spagnoletti (PS-5298)

                                 450 Lexington Avenue
                               New York, New York  10017
                               (212) 450-4000

                               -and-

                               Peter C. John
                               WILLIAMS MONTGOMERY & JOHN LTD
                               20 North Wacker Drive, Suite 2100
                               Chicago, Illinois 60606
                               (312) 443-3200

                               *Attorneys for Defendants Ingram Micro Inc.*
                               *and CIM Ventures Inc.*