**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re REFCO INC. SECURITIES LITIGATION      :      07 MDL No. 1902 (GEL)

     :

     :

---------------------------------------------------------------x

---------------------------------------------------------------x

MARC S. KIRSCHNER,      :
as Trustee of the Refco Litigation Trust,

     :      Case No. 07 Civ. 11604 (GEL)

              Plaintiff,      :

     :      **DECLARATION OF**

         v.      :      **THOMAS G. WARD IN**

     :      **SUPPORT OF DEFENDANT**

GRANT THORNTON LLP; MAYER      :      **MAYER BROWN LLP'S**
BROWN, ROWE & MAW, LLP; ERNST &      :      **MOTION TO DISMISS**
YOUNG U.S. LLP;

PRICEWATERHOUSECOOPERS LLP;      :
CREDIT SUISSE SECURITIES (USA) LLC
(f/k/a CREDIT SUISSE FIRST BOSTON      :
LLC); BANC OF AMERICA SECURITIES
LLC; DEUTSCHE BANK SECURITIES      :
INC.; PHILLIP R. BENNETT; SANTO C.
MAGGIO; ROBERT C. TROSTEN; TONE N.      :
GRANT; REFCO GROUP HOLDINGS, INC.;
LIBERTY CORNER CAPITAL      :
STRATEGIES, LLC; WILLIAM T. PIGOTT;
EMF FINANCIAL PRODUCTS, LLC; EMF      :
CORE FUND, LTD.; DELTA FLYER FUND,
LLC; ERIC M. FLANAGAN; INGRAM      :
MICRO, INC.; CIM VENTURES, INC.;
BECKENHAM TRADING CO. INC.;      :
ANDREW KRIEGER; COAST ASSET
MANAGEMENT, LLC (f/k/a COAST ASSET      :
MANAGEMENT LP); CS LAND
MANAGEMENT, LLC; and CHRISTOPHER      :
PETITT,

              Defendants.      :

     :

---------------------------------------------------------------x

I, THOMAS G. WARD, declare as follows:

1.      I am a partner of the law firm of Williams & Connolly LLP, attorneys for Defendant Mayer Brown LLP in the above-captioned matter, and a member in good standing of the bar of this Court.  I submit this declaration in support of the Motion to Dismiss of Mayer Brown LLP in the above-captioned matter.

2.      Attached hereto as Exhibit A is a true and correct copy of a diagram created by Defendant Mayer Brown LLP of the "round-trip loan transactions" as alleged in the Complaint.

3.      Attached hereto as Exhibit B is a true and correct copy of the Corporate Ownership Statement, dated October 17, 2005, filed by Refco in *In re Refco Inc., et al.*, 05-Br-60006 (Bankr. S.D.N.Y.).

4.      Attached hereto as Exhibit C is a true and correct copy of the redacted Superseding Indictment, dated January 16, 2007, filed in *United States v. Bennett, et al.*, 05-Cr-1192 (S.D.N.Y.).

5.      Attached hereto as Exhibit D is a true and correct copy of Refco's Form S-1 Registration Statement under the Securities Act of 1933, for Refco Inc., as filed with the Securities and Exchange Commission on April 8, 2005 (exhibits not included).

6.      Attached hereto as Exhibit E is a true and correct copy of Refco's Form S-4 Registration Statement under the Securities Act of 1933, for Refco Group Ltd., LLC, as filed with the Securities and Exchange Commission on October 12, 2004 (exhibits not included).

7.      Attached hereto as Exhibit F is a true and correct copy of Refco's Confidential Offering Circular for the $600,000,000 in 9% Senior Subordinated Notes offered by Refco, dated July 22, 2004.

8.     Attached hereto as Exhibit G are true and correct copies of Appendices D-61 and D-62 to the Report of the Examiner filed in *In re Refco Inc., et al.*, 05-Br-60006 (Bankr. S.D.N.Y.).

9.     Attached hereto as Exhibit H is a true and correct copy of the Equity Purchase and Merger Agreement Among Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners and Refco Merger LLC, dated June 8, 2004.

10.     Attached hereto as Exhibit I is a true and correct copy of a Refco Press Release titled *Refco Inc. Announces Completion of Its Initial Public Offering*, dated August 16, 2005.

11.     Attached hereto as Exhibit J is a true and correct copy of a letter from Phillip Bennett to Joseph P. Collins, Esq., with attachments and handwritten notes, dated October 15, 1999 (MB02071243-58).

12.     Attached hereto as Exhibit K are true and correct copies of email correspondence from a Mayer Brown associate in the firm's New York office, dated August 20, 2004 (MBRM-EX 00094698), November 17, 2004 (MBRM-EX 00094566), and May 20, 2005 (MBRM-EX 00086434).

13.     Attached hereto as Exhibit L is a true and correct copy of email correspondence from Joseph P. Collins to Thomas Yorke, carbon copied to Santo Maggio, dated January 25, 2005 (REFCO-E-002980841-42).

14.     Attached hereto as Exhibit M is a true and correct copy of a draft memorandum from Joseph Collins and Ross Pazzol to Stephen Keating, dated October 11, 2005 (MB02441374-80).

15.    Attached hereto as Exhibit N is a true and correct copy of an email from Joseph P. Collins to Santo C. Maggio, Dennis A. Klejna, and Stephen Keating dated June 24, 2002, attaching a draft memorandum also dated June 24, 2002 (REFCO-E-002464308-12).

16.    Attached hereto as Exhibit O is a true and correct copy of a facsimile from Martha Blonder to Edward Black and Joseph Collins, dated January 31, 1999 (MB02035944).

17.    Attached hereto as Exhibit P is a true and correct copy of a document titled *Definitions Related to Financial Covenants* with handwritten notes, dated June 20, 2004 (MB02011869-70).

18.    Attached hereto as Exhibit Q is a true and correct copy of the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries, dated December 26, 2006, filed in *In re Refco Inc., et al.*, 05-Br-60006 (Bankr. S.D.N.Y.)

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Washington, D.C.
         May 21, 2008

*Thomas G. Ward*

Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Attorney for Defendant Mayer Brown LLP*

# EXHIBIT A



The Trustee makes conclusory allegations that Mayer Brown knew about "round trip loans," which allegedly consisted of three reversible legs. The Trustee has not pleaded any facts, however, to support an inference that Mayer Brown was aware of the critical third leg of the transactions, by which the RGHI Receivable was allegedly concealed and the fraud occurred. The diagram above illustrates the structure of the transactions and the limits of Mayer Brown's awareness. The Trustee's only factual allegations address the two-step, back-to-back loans contained in the large bold rectangle. No factual allegations support an inference that Mayer Brown knew of the fraudulent use of the loan proceeds, which occurred outside the rectangle.

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -x
                         :
       In re             :      Chapter 11
                         :
Refco Inc, et al.,       :      Case No. 05-
                         :
           Debtors.    :      (Jointly Administered)
                         :
- - - - - - - - - - - - - - - - - - - - - -x

## CORPORATE OWNERSHIP STATEMENT

    In accordance with Rule 1007(a)(1) of the Federal Rules of Bankruptcy Procedure, the Debtors hereby states that the following corporations directly or indirectly own 10% or more of the equity interests of Refco Inc.:

- Refco Group Holdings, Inc.[1]
- Thomas H. Lee Equity Fund V, L.P.[2]
- Thomas H. Lee Parallel Fund V, L.P[3]

    Refco Inc. owns all of the outstanding membership interests in New Refco Group Ltd., LLC.

    New Refco Group, Ltd., LLC owns all of the outstanding membership interests in Refco Group Ltd., LLC.

---

[1]     Phillip Bennett directly and indirectly through each of Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust holds 43,052,000 shares (33.8%).

[2]     Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co-President, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own the shares of common stock held of record by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.

[3]     Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co-President, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own the shares of common stock held of record by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.

Refco Group Ltd., LLC owns all of the outstanding membership interests in Bersec International, LLC, Summit Management, LLC, Kroeck & Associates, LLC, Refco Global Capital Management, LLC, Marshall Metals, LLC, Refco Fixed Assets Management, LLC, Refco Mortgage Securities, LLC, Refco Regulated Companies, LLC, and Refco Capital Holdings LLC, and all of the outstanding capital stock of Refco Finance Inc.

Refco Regulated Companies, LLC owns all of the outstanding membership interests in Refco Global Futures, LLC.

Refco Global Futures, LLC owns all of the outstanding membership interests in Refco Global Holdings, LLC, and all of the capital stock in Refco Canada Finance Inc.

Refco Capital Holdings, LLC owns all of the outstanding membership interests in Refco Capital Management, LLC, Refco F/X Associates, LLC, Refco Administration, LLC, Refco Financial LLC, Refco Capital Trading, LLC and Refco Information Services, LLC and all of the outstanding shares in Refco Capital Markets, Ltd.

Refco Capital Management, LLC owns all of the outstanding membership interests in Refco Capital LLC and Refco Global Finance Ltd.

I, the undersigned officer of Refco Inc., one of the companies named as a debtor in the above-captioned cases, declare under penalty of perjury, that I have read the foregoing list and that it is true and correct as of the date referenced therein, to the best of my knowledge, information, and belief.

Dated: October 17, 2005    Signature: _____

             Name:  Dennis Klejna

             Title:

# EXHIBIT C

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :
     -v-                            :
                                    :
PHILLIP R. BENNETT,                 :
ROBERT C. TROSTEN and               :
TONE N. GRANT,                      :
                                    :
          Defendants.               :
                                    :
------------------------------------x
```

**REDACTED**

INDICTMENT

S3 05 Cr. 1192 (NRB)



## COUNT ONE

(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)

The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

1.  At certain times relevant to this Indictment,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York.  From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets.  Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005.  Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held.  Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

2.   At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, directly and indirectly.

3.   At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco.  Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.   At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, GRANT was the President of Refco.  At certain times relevant to this Indictment, GRANT indirectly, held a significant ownership interest in Refco.

5.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in Austria.  BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).  At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

2

6.     At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Indictment, RGHI was owned in whole or in part by PHILLIP R. BENNETT and TONE N. GRANT.

## THE SCHEME TO DEFRAUD

7.     From at least as early as in or about the mid 1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors.  Starting at least as early as the mid 1990s, BENNETT and GRANT embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners.  To that end, over the ensuing years, BENNETT, TROSTEN, GRANT and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

8.     In furtherance of this scheme, PHILLIP R. BENNETT,

3

ROBERT C. TROSTEN, TONE N. GRANT, and others known and unknown
made and caused Refco and others on its behalf to make false and
fraudulent statements to Refco's banks, counterparties,
customers, auditors, and investors, and to create false audited
financial statements and false public filings with the United
States Securities and Exchange Commission ("SEC").  The scheme
included obtaining, through fraud, the following:  lines of
credit for Refco; the private sale of notes prior to 2004; the
sale of 57% of Refco to a group headed by Thomas H. Lee Partners
in 2004; the sale of approximately $600 million of notes to the
public in 2004; approximately $800 million of bank financing
obtained in 2004; and the August 2005 initial public offering of
stock ("IPO") in Refco, Inc., in which the public purchased
approximately $583 million of Refco common stock based on a false
and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

9.    In or about the mid-1990s, Refco was wholly owned
by RGHI, which in turn was owned by PHILLIP R. BENNETT, TONE N.
GRANT and one other partner.  As of early 1997, RGHI owed Refco
at least approximately $106 million.  Starting later in 1997,
Refco directly and indirectly incurred a series of substantial
trading losses that threatened the continued viability of Refco's
business.  In response to these losses, at various times between
in or about May 1997 and in or about October 2005, BENNETT and

4

his coconspirators, including TONE N. GRANT and ROBERT C.
TROSTEN, moved losses and expenses out of Refco and into RGHI,
and artificially padded Refco's revenues at the expense of RGHI,
in an effort to hide Refco's true liabilities, manipulate its
reported earnings, and thereby seek to defraud a purchaser into
buying the firm at a price that would pay off the accumulated
debt and ensure a profit to Refco's owners.  This strategy
resulted in an enormous increase in the already large debt from
RGHI to Refco that eventually totaled more than $1 billion.  The
debt by RGHI to Refco, carried on Refco's books as a receivable
from RGHI, was over time comprised of, among other things, the
following principal components: (a) liabilities incurred by Refco
when brokerage customers to whom it had extended credit defaulted
on their obligations, which were later transferred to RGHI; (b)
Refco's proprietary trading losses; (c) various operating
expenses incurred by Refco and paid in the first instance by
Refco but later transferred to RGHI as an increase in RGHI's debt
to Refco; and (d) transactions designed to pad Refco's revenues
in which the benefits accrued to Refco and the associated costs
were incurred by RGHI.

        10.  As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.  In the later 1990s, certain

Refco customers to whom Refco had extended credit sustained
hundreds of millions of dollars of trading losses in their
accounts at Refco.  When the customers were unable to make
payments on the credit Refco had extended, Refco liquidated
certain of the positions and assumed the resulting losses in the
customers' accounts.  Refco sustained large losses of this type,
among other times, in 1997, totaling at least approximately $225
million.  These customer losses included the following:

### Asian Debt Crisis Customers

11.  In or about May 1997, a group of Refco customers
to whom Refco had extended credit for the purpose of investing in
Asian markets sustained large losses in connection with the Asian
debt crisis.  When those customers were unable to cover their
losses, Refco paid the losses, using hundreds of millions of
dollars of customer funds within the unregulated segments of its
business.  By the end of May 1997, these losses totaled more than
$310 million, and, at the end of December 1997, based on changed
market conditions, they totaled approximately $185 million.

### Customer 1

12.  In or about October 1997, a Refco customer to whom
Refco had extended credit ("Customer 1"), lost more than $90
million in a series of transactions carried out on the Chicago
Mercantile Exchange ("CME").  When Customer 1 could not cover his
margin requirements, Refco was forced to meet the margin call

from the CME, using the proceeds of an intra day loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the intra day loan.

13.   Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, PHILLIP R. BENNETT, TONE N. GRANT and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses.   In addition, BENNETT, GRANT and ROBERT C. TROSTEN significantly misrepresented the size of the loss to Refco's auditors.

14.   PHILLIP R. BENNETT and TONE N. GRANT, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1 from the trading losses to be transferred to become a debt from RGHI to Refco.

### Proprietary Trading Losses

15.   In the late 1990s, Refco also incurred substantial losses from proprietary trades, or trades carried out on its own behalf.   For example, in or about 1998, Refco suffered a loss of at least approximately $40 million on its investment in Russian

7

bonds after the Russian Government defaulted on its obligations.
PHILLIP R. BENNETT, so as to avoid having to acknowledge this
loss on Refco's books, caused Refco to inflate the value of the
bonds in Refco's books and records to hide the full magnitude of
the loss.  Eventually, BENNETT caused those losses to be
transferred to RGHI, so that they appeared as a debt from RGHI to
Refco.

### Refco Expenses Moved To RGHI

16.   Beginning at least as early as 1999, PHILLIP R.
BENNETT and others schemed to reduce Refco's expenses (therefore
falsely increasing Refco's apparent profitability) by moving
Refco expenses off of Refco's books and onto the books of RGHI.
For example:

a. From at least as early as February 1999, and
continuing until at least in or about February 2002, BENNETT and
others caused a total of approximately $46.3 million of computer
systems expenses incurred by Refco to be transferred to RGHI, in
the following years in the following amounts:

8

| Fiscal Year End | Amount Transferred to RGHI |
|-----------------|----------------------------|
| 2000            | $7,378,927.80              |
| 2001            | $8,797,189.98              |
| 2002            | $9,393,846.76              |
| 2003            | $7,002,153.65              |
| 2004            | $4,876,657.60              |
| 2005            | $5,028,053.21              |
| 2006            | $3,895,030.92              |

b. On or about August 9, 1999, BENNETT and others caused a total of approximately $1.5 million of expenses characterized as payroll expenses to be transferred from Refco to RGHI.

17. The result of these actions by PHILLIP R. BENNETT and his coconspirators was to create a large and growing debt owed by RGHI to Refco. By in or about February 1999, RGHI owed Refco at least approximately $252 million. In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary. Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

9

## Refco's Losses Funded By Use Of Customer Funds

18.    Starting at least in or about 1997, PHILLIP R.
BENNETT and TONE N. GRANT caused Refco to use customer funds to
cover its losses.   As a result, Refco was perpetually short of
cash, and was often unable to cover settlement of its customers'
transactions.   Accordingly, BENNETT, GRANT and others caused
Refco to systematically fail to meet settlement on its customer
transactions, often on a daily basis, in amounts that exceeded,
at times, $100 million a day.   BENNETT, GRANT and others then
caused Refco to repeatedly misrepresent to the financial
institutions to whom Refco owed money to settle Refco's
customers' transactions that its failure to make settlement was
an error, when in fact Refco purposefully selected, on a rotating
basis, institutions with whom it would fail to make settlement,
and attempted to stagger its failures to make settlement with
each institution so as not to arouse suspicion from the
institutions that Refco was in fact unable to fulfill its daily
settlement obligations.

## BAWAG Invests In Refco

19.    By the end of 1998, Refco was in a precarious
financial condition, in light of the significant customer and
proprietary trading losses it had absorbed and the resulting
daily failure to make settlement on customer transactions.   In
order to address that problem, in or about late 1998, PHILLIP R.

10

BENNETT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria.  In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

### Hiding The RGHI Receivable

20.   Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT.   Refco and RGHI were related parties.

21.   Beginning at least as early as February 1998, PHILLIP R. BENNETT directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT or Refco. At certain times, BENNETT also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global

11

Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end. BENNETT and, later, ROBERT C. TROSTEN, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004. BENNETT and TROSTEN directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, PHILLIP R. BENNETT, and with respect to 1999, TONE N. GRANT, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, PHILLIP R. BENNETT's year-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August

12

2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.    These transactions typically followed standard patterns.  For example, in or about February 2000, PHILLIP R. BENNETT caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.    Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To

13

ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i).    On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

(ii).   On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by BENNETT on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii).  On or about the same date, BENNETT signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b.    At or around the same time as the

14

transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document this or any of the subsequent BAWAG transactions.

        25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, PHILLIP R. BENNETT, TONE N. GRANT and ROBERT C. TROSTEN, and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.  For example, on or about April 30, 2003 and April 27, 2004, BENNETT and TROSTEN each signed letters to Refco's auditors in which they represented that "[r]elated party transactions and related amounts receivable," including "loans" and "transfers" had all "been properly recorded or disclosed in the consolidated financial statements," when in fact neither BENNETT nor TROSTEN had disclosed the true amount of the related party transactions or indebtedness.

15

## Refco Sells Notes Based On False Financial Information

26.   At various times prior to August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes.  These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.  In particular, BENNETT and TROSTEN caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

## Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.   Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and

16

obtained credit from banks and other financial institutions,
including a revolving line of credit from a number of financial
institutions, including JP Morgan Chase, beginning in or about
1998, that eventually grew to more than $300 million.  For each
such transaction, including the annual renewal of the revolving
line of credit, Refco submitted to the proposed creditor the
fraudulent financial statements and made other false statements
which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.    Between 2000 and 2005, while BAWAG assisted
PHILLIP R. BENNETT in hiding the RGHI receivable in the manner
described above, BENNETT caused Refco to assist BAWAG in hiding
its own balance sheet problem.  In or about early 2000, BAWAG
entrusted approximately €350 million of BAWAG's funds to an
investment advisor, who by the end of 2000 reported to the bank
that he had lost substantially all of those funds.  In order to
disguise this loss on its balance sheet, BAWAG arranged through
BENNETT to hold in an account at Refco certain worthless bonds
and other investments that Refco, at BENNETT's direction,
maintained at a false value that, over time, reached at least
approximately €500 million.  These fake assets were purportedly
housed at Refco and maintained at an inflated value for BAWAG's
benefit until 2005.

17

## BAWAG Invests Further In Refco

29.   In or about 2003 and 2004, BAWAG, through a
series of off-shore corporate entities, made two contributions to
Refco totaling approximately $467,480,000.  In return, BAWAG
received the right to approximately 27.2% of the proceeds of the
sale of Refco and, together with its existing interest in 20
percent of Refco, had rights to approximately 47 percent of the
proceeds of a sale of the company.

## BENNETT's "Exit Strategy" Develops

30.   In or about 2003, PHILLIP R. BENNETT caused Refco
to hire the investment bank Credit Suisse First Boston ("CSFB")
to assist in selling Refco.  BENNETT asked CSFB to find a major
investment bank or commercial bank to purchase Refco, but no such
buyer was found to be interested.  After efforts to sell Refco to
such a first line buyer failed, BENNETT directed CSFB to look for
other purchasers for the company, with the understanding that it
would be taken public.

31.   In connection with PHILLIP R. BENNETT's plan to
sell Refco, BENNETT and ROBERT C. TROSTEN (a) continued to siphon
Refco expenses and losses into RGHI, and (b) padded Refco's
reported revenue in order to hit budgeted income targets set by
BENNETT and others to disguise the ongoing operational problems
at the company.

32.   For example, in or about March 2004, PHILLIP R.

18

BENNETT and others caused approximately $7.9 million in Refco consulting fee expenses to be transferred to RGHI. In addition, during the fiscal year that ended in February 2004, BENNETT and ROBERT C. TROSTEN caused approximately $4.8 million in Refco computer expenses to be shifted to RGHI.

33. In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

### The Fraudulent Leveraged Buyout Transaction

34. In or about 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction. As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

19

35.   As a precursor to this transaction, PHILLIP R.
BENNETT purchased TONE N. GRANT's ownership interest in Refco for
approximately $4 million, plus a 50% interest in profits made by
BENNETT in a future sale of BENNETT's interest in Refco.  As a
result of their agreement, GRANT was no longer responsible for
RGHI's debt to Refco, which as of February 2004 totaled more than
approximately $1 billion, and BENNETT controlled all of RGHI
immediately prior to the sale to the Lee entities.

### Lies To Thomas H. Lee Partners

36.   In connection with the leveraged buyout
transaction, on or about July 9, 2004, PHILLIP R. BENNETT
executed an officer's questionnaire in which he falsely
certified, among other things, that (a) he had no direct or
indirect interest in any transaction with Refco or its affiliates
within the prior fiscal year of more than $60,000; and (b) had
not, in the prior fiscal year, been indebted to Refco or its
affiliates.  In fact, during the prior fiscal year, BENNETT owned
a substantial interest in RGHI, which had engaged in transactions
worth more than $1.5 billion during the year-end cover-up
transactions with Refco, and which owed Refco more than
$1 billion as of late February 2004.

37.   In connection with the leveraged buyout
transaction, on or about July 2, 2004, ROBERT C. TROSTEN executed
an officer's questionnaire in which he falsely certified, among

other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the Offering Circular provided to you or which you believe may be inaccurately stated therein," even though TROSTEN knew that the related party and expense shifting transactions had not been disclosed in the offering documents related to the transaction.

38.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.   The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.   The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

39.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others

falsely stated that Refco did not engage in proprietary trading,
when in fact, as they well knew, it did, had incurred substantial
losses through that trading, and had transferred some of those
losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

40.    In connection with the leveraged buyout
transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others
provided to the note underwriters and note purchasers the
following false and misleading information:

a.    Refco's audited financial statements for the
year ended February 29, 2004, containing the same false and
misleading statements described above in paragraph 37;

b.    BENNETT, TROSTEN and others falsely
represented that Refco did not suffer significant historical
customer losses, and specifically denied that Refco incurred a
significant loss from the collapse of the Asian markets which, in
fact, caused the Asian Debt Crisis Customer Losses; and

c.    BENNETT, TROSTEN and others falsely stated
that Refco did not engage in proprietary trading, when in fact,
as they well knew, it did, had incurred substantial losses
through that trading, and had transferred some of those losses to
RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

41.    In connection with the leveraged buyout

22

transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.    BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

42.    The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.    Thereafter, PHILLIP R. BENNETT caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

23

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| TROSTEN | $48 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $112 million |

43.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN falsely represented to Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout.  In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG.  At the end of the leveraged buyout transaction, BENNETT distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

44.   In or about August 2004, after completion of the leveraged buyout transaction, ROBERT C. TROSTEN left Refco.

24

PHILLIP R. BENNETT caused RGHI to pay TROSTEN approximately $48 million from the proceeds of the TH Lee transaction, in order to keep TROSTEN from revealing the ongoing fraud scheme.

## BENNETT Plans To Take Refco Public

45.   After the leveraged buyout, PHILLIP R. BENNETT, who remained the Chief Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

46.   Between the August 2004 leveraged buyout and the August 2005 IPO, PHILLIP R. BENNETT continued his manipulation of Refco's finances:   At each quarter and year-end period, BENNETT caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and BENNETT continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.   BENNETT caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|------|------|------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

25

47.    Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions. In particular, BENNETT caused the following transactions, among others, to artificially inflate Refco's revenues:

a.    On or about November 17, 2004, BENNETT caused RGHI, in a total of approximately 50 transactions, to purportedly purchase a total of approximately $1.25 billion in US Treasury notes from Refco, and then reversed the transactions the same day, at a loss to RGHI and a profit to Refco of approximately $7.8 million.

b.    On or about February 11, 2005, BENNETT caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

c.    On or about February 17, 2005, BENNETT caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco. RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a

26

result of the transactions.  The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

48.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

49.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. PHILLIP R. BENNETT signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

50.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for

27

the year ended February 28, 2005 on Form 10K.  PHILLIP R. BENNETT
signed the annual report on or about July 19, 2005 in New York,
New York.  BENNETT also signed two certifications regarding the
annual report.  In those certifications, BENNETT attested that he
had reviewed the annual report and (a) that it did "not contain
any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in light of
the circumstances under which such statements were made, not
misleading with respect to the period covered by th[e] report";
and (b) that "the information contained in the Report fairly
present[ed], in all material respects, the financial condition
and results of operations of the Company."  As noted above, the
financial statements were fraudulent in that, among other things,
they failed to reflect the related party receivables, the padded
revenue, and the shifted expenses.

        51.   On or about August 8, 2005, Refco filed an S-1
registration statement with the SEC in connection with its
initial public offering of common stock.  PHILLIP R. BENNETT
signed that registration statement on or about August 8, 2005, in
New York, New York.

        52.   The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by PHILLIP R. BENNETT each
required the disclosure of (a) certain transactions between Refco
and its management and (b) certain debts owed directly or

indirectly by any executive officer of Refco to Refco, during
Refco's past fiscal year and, for the registration statements,
during Refco's prior two fiscal years.  These disclosures were
required in order to apprize investors of, among other things,
potential conflicts of interest by management.

53.   The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by PHILLIP R. BENNETT each
failed to disclose the related party transactions and the related
party indebtedness between Refco and RGHI outlined above.   In
particular, these public filings failed to disclose: (a) the
existence of hundreds of millions of dollars of indebtedness by
RGHI to Refco during 2004 and 2005; (b) the transactions at
quarter- and fiscal year-end during 2004 and 2005 by which RGHI
temporarily paid down its debt to Refco, the guaranties by Refco
of the third party lenders' loans to RGHI, and the subsequent re-
assumption of the debt by RGHI, each of which was a related party
transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

54.   On or about August 10, 2005, in reliance on, among
other things, Refco's public filings and the accompanying audited
financial statements, the public bought approximately $583
million of Refco's common stock.   PHILLIP R. BENNETT, through
RGHI, sold Refco stock in the IPO valued at more than $100
million, while retaining a substantial ownership interest in

Refco.  Following the initial public offering, Refco's common

stock was listed on the New York Stock Exchange under ticker

symbol "RFX."

## End Of Quarter Transactions In August 2005

55.  In or about late August 2005, after the completion

of Refco's IPO, PHILLIP R. BENNETT caused Refco to carry out $420

million in cover-up transactions with a Refco customer that

temporarily transformed all or part of the RGHI receivable into a

receivable from that customer.  After the August 31, 2005 end of

Refco's second quarter, the $420 million in cover-up transactions

were unwound.

## Public Disclosure Of The Related Party Debt

56.  In or about early October 2005, Refco discovered

an approximately $430 million receivable on its books from RGHI.

It demanded repayment of the debt by PHILLIP R. BENNETT, who

repaid Refco approximately $430 million on or about October 10,

2005, having received an emergency loan in that approximate

amount from BAWAG.

57.  On or about October 10, 2005, Refco issued a press

release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

30

believes that the receivable was the result of the
assumption by an entity controlled by Mr. Bennett
of certain historical obligations owed by
unrelated third parties to the Company, which may
have been uncollectible. The Company believes that
all customer funds on deposit are unaffected by
these activities. Independent counsel and forensic
auditors have been retained to assist the Audit
Committee in an investigation of these matters.

58.  Following Refco's announcement of its discovery of
this related party receivable, the market price of Refco stock
plummeted, resulting in a loss of well more than $1 billion in
market capitalization.

59.  On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

60.  From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly did combine, conspire, confederate, and agree
together and with each other to commit offenses against the
United States, namely: (a) to commit fraud in connection with the
purchase and sale of securities issued by Refco, in violation of
Sections 78j(b) and 78ff of Title 15, United States Code, and

31

Section 240.10b-5 of Title 17, Code of Federal Regulations; (b)
to make and cause to be made false and misleading statements of
material fact in reports and documents required to be filed with
the SEC under the Securities Exchange Act of 1934, and the rules
and regulations promulgated thereunder, in violation of Title 15,
United States Code, Sections 78o(d) and 78ff; (c) to make and
cause to be made false statements in a registration statement
filed under the Securities Act of 1933, in violation of Title 15,
United States Code, Section 77x; (d) to commit wire fraud, in
violation of Section 1343 of Title 18, United States Code; (e) to
make and cause to be made false statements and omissions to
Refco's auditors, in violation of Title 15, United States Code,
Sections 78m and 78ff; Title 17, Code of Federal Regulations,
Section 240.13b2-2; (f) to commit bank fraud, in violation of
Section 1344 of Title 18, United States Code; and (g) to commit
money laundering, in violation of Section 1957(a) of Title 18,
United States Code, Section 1957.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

61.  It was a part and object of the conspiracy that
PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly, by the use of the means and instrumentalities of
interstate commerce, the mails, and facilities of national

32

securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

62.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

33

## False Statements In SEC Filings - Securities Act

63.    It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## Wire Fraud

64.    It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

65.    It was further a part and object of the conspiracy

that PHILLIP R. BENNETT, the defendant, being an officer and
director of Refco, an issuer obligated to file reports pursuant
to section 15(d) of the Securities and Exchange Act of 1934 and
subsequently with a class of securities registered pursuant to
section 12 of the Securities Exchange Act of 1934, unlawfully,
willfully and knowingly, directly and indirectly, (a) made and
caused to be made materially false and misleading statements; and
(b) omitted to state, and caused others to omit to state,
material facts necessary in order to make statements made, in
light of the circumstances under which they were made, not
misleading to accountants in connection with (i) audits, reviews
and examinations of the financial statements of Refco required to
be filed under the Securities and Exchange Act of 1934; and (ii)
the preparation and filing of documents and reports required to
be filed with the SEC pursuant to rules and regulations
promulgated by the SEC.

## Bank Fraud

66. It was further a part and object of the conspiracy
that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT,
the defendants, unlawfully, willfully and knowingly, would and
did execute, and attempt to execute, a scheme and artifice to
defraud a financial institution, to wit, HSBC, and to obtain
moneys, funds, credits, assets, securities and other property
owned by, and under the custody and control of, a financial

institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

67.    It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN and TONE N. GRANT, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

68.    Among the means and methods by which PHILLIP R. BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.    PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public the size of customer losses for which Refco was responsible.

b.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators

36

transferred losses incurred by Refco to BENNETT's company, RGHI.

   c.   PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

   d.   PHILLIP R. BENNETT, the defendant, and his coconspirators caused Refco to file false and fraudulent statements with the SEC.

   e.   PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators, made and caused to be made material false statements and omissions to Refco's auditors.

   f.   PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

   g.   PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

37

## Overt Acts

69.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about late 1997, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.   On or about May 15, 1998, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.   On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.   On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an

38

approximately $720 million loan from a Refco customer to RGHI.

        e.   On or about April 27, 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

        f.   On or about May 17, 2004, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

        g.   On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to ROBERT C. TROSTEN, the defendant, approximately $48 million.

        h.   On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $4 million.

        i.   On or about August 8, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $12 million.

        j.   On or about February 23, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $345 million loan from a Refco customer to RGHI.

        k.   On or about April 6, 2005, in New York, New

York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4
registration statement.

l.    On or about May 25, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter
on behalf of Refco Group Ltd., LLC. regarding an approximately
$450 million loan from a Refco customer to RGHI.

m.    On or about July 19, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed Refco's annual
report on Form 10K.

n.    On or about August 8, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1
registration statement.

(Title 18, United States Code, Section 371).

### COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

70.    The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

71.    From in or about the mid-1990s up to in or about
2004, in the Southern District of New York and elsewhere, PHILLIP
R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants,
unlawfully, willfully, and knowingly, directly and indirectly, by
the use of means and instrumentalities of interstate commerce,

40

the mails, and the facilities of national securities exchanges,
did use and employ, in connection with the purchase and sale of
securities, manipulative and deceptive devices and contrivances,
in violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices,
and courses of business which operated and would operate as a
fraud and deceit upon a person, in connection with the purchase
and sale of 9% Senior Subordinated Notes due 2012, issued by
Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

### COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

72. The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

73. From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and

41

knowingly, directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in connection with the purchase and sale of the
common stock of Refco, Inc.

> (Title 15, United States Code, Sections 78j(b) and 78ff; Title
> 17, Code of Federal Regulations, Section 240.10b-5; and
> Title 18, United States Code, Section 2).

### COUNT FOUR

(False Filing With The SEC – Exchange Act)

The Grand Jury further charges:

74.    The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

75.    On or about July 19, 2005, in the Southern
District of New York and elsewhere, PHILLIP R. BENNETT, the
defendant, unlawfully, willfully, and knowingly made and caused

42

to be made statements in a report and document required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., Refco's Form 10-K.

(Title 15, United States Code, Sections 78o(d) and 78ff;
Title 17, Code of Federal Regulations, Section 240.15d-2;
and Title 18, United States Code, Section 2.)

## COUNTS FIVE AND SIX

(False Filing With The SEC - Securities Act)

The Grand Jury further charges:

76.    The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

77.    On or about the dates specified below, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York,

43

to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|:-----:|:----------------:|:----:|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

### COUNTS SEVEN THROUGH THIRTEEN

(Wire Fraud)

The Grand Jury further charges:

78.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

79.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

44

| Count | Defendant | Approximate Date | Wire Communication |
|-------|-----------|------------------|--------------------|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago, Illinois |
| TWELVE | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |
| THIRTEEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOURTEEN

(Material Misstatements To Auditors)

The Grand Jury further charges:

80.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

81.   From in or about April 2005 to in or about October

45

2005, in the Southern District of New York, PHILLIP R. BENNETT,
the defendant, being an officer and director of Refco, an issuer
obligated to file reports pursuant to section 15(d) of the
Securities and Exchange Act of 1934 and subsequently with a class
of securities registered pursuant to section 12 of the Securities
Exchange Act of 1934, unlawfully, willfully and knowingly,
directly and indirectly, (a) made and caused to be made
materially false and misleading statements; and (b) omitted to
state, and caused others to omit to state, material facts
necessary in order to make statements made, in light of the
circumstances under which they were made, not misleading to
accountants in connection with (i) audits, reviews and
examinations of the financial statements of Refco required to be
filed under the Securities and Exchange Act of 1934; and (ii) the
preparation and filing of documents and reports required to be
filed with the SEC pursuant to rules and regulations promulgated
by the SEC.

> (Title 15, United States Code, Sections 78m and
> 78ff; Title 17, Code of Federal Regulations, Section
> 240.13b2-2; and Title 18, United States Code, Section 2).

## COUNT FIFTEEN

(Bank Fraud)

The Grand Jury further charges:

82.    The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if

46

fully set forth herein.

83.   On or about August 5, 2004, in the Southern
District of New York, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and
TONE N. GRANT, the defendants, unlawfully, willfully and
knowingly, would and did execute, and attempt to execute, a
scheme and artifice to defraud a financial institution, to wit,
HSBC, and to obtain moneys, funds, credits, assets, securities
and other property owned by, and under the custody and control
of, a financial institution, to wit, HSBC, whose deposits were
insured by the Federal Deposit Insurance Corporation, by means of
false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

### COUNTS SIXTEEN THROUGH TWENTY

(Money Laundering)

The Grand Jury further charges:

84.   The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

85.   On or about the dates set forth below, in the
Southern District of New York, the defendants set forth below, in
an offense involving and affecting interstate and foreign
commerce, unlawfully, willfully and knowingly would and did
engage and attempt to engage in monetary transactions in
criminally derived property that was of a value greater than

47

$10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a):

| Count | Defendant | Approximate Date | Transaction |
|-------|-----------|------------------|-------------|
| SIXTEEN | PHILLIP R. BENNETT | August 5, 2004 | $25,322,810 transfer from RGHI's JP Morgan Chase account in New York, NY to BENNETT's JP Morgan Chase account in New York, NY |
| SEVENTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $46,069,300 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| EIGHTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $1,950,000 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| NINETEEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago Illinois |
| TWENTY | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |

(Title 18, United States Code, Sections 1957(a) and 2).

### FORFEITURE ALLEGATION WITH RESPECT TO
### COUNTS ONE THROUGH FOURTEEN

86.   As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five, Six and Fourteen; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of this Indictment, PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Two, Seven, and Eight), and TONE GRANT, the defendant (as to acts alleged in Counts One, Two, and Eleven) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following:

a.   At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendants are jointly and severally liable, including but not limited to:

1.   The contents of Account No. ████6752,

49

in the name of Refco Group Holdings, Inc., held at JP Morgan Chase Bank, New York (approximately $63,393.20);

    2.    The contents of Account No. ████2791 in the name of Phillip R. Bennett And/or Valerie Bennett, held at JP Morgan Chase Bank, New York (approximately $905,314.91);

    3.    The contents of Account No. ████5-00-7, in the name of Phillip Bennett Grantor Retained Annuity Trust ("GRAT"), held at JP Morgan Chase Bank, New York (approximately $13,880,143.28);

    4.    All funds from the Liquidation of the Limited Capital Account for Sphinx Managed Futures Index Fund, LP, in the name of Philip Bennett, held at the BISYS Group, Inc. (approximately $974,533.91);

    5.    The contents of Account No. ████0832, in the name of Phillip Bennett, held at Citibank, N.A., New York, New York (approximately $13,810,347.00);

    6.    The contents of Account No. ████████0258, in the name of Valerie Bennett, held at Wachovia Bank, Charlotte, North Carolina (approximately $440,014.55);

    7.    The contents of Account No. ████7710, in the name of Valerie Bennett, held at Merrill Lynch, New York (approximately $1,828,492.00);

    8.    The contents of Account. No. ████████10-19, in the name of Zahava R. Trosten, held at JP Morgan

50

Chase Bank, New York (approximately $30,024,148.66);

9.  The contents of Account No. ████████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

10.  The contents of Account No. ████████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53);

11. Any and all funds in Account No. ████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

12. Any and all right, title and interest in the real property and appurtenances known as ████████████, Sarasota, Florida 34236; and

13.  A sum of at least $1,900,000.00 from Account Nos. ██████4805 and ██████0709, in the name of Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New Jersey.

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE AND FIFTEEN THROUGH TWENTY

87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts One and Fifteen of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts Sixteen through Twenty of this Indictment,

PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Fifteen, Seventeen, and Eighteen), and TONE GRANT, the defendant (as to acts alleged in Counts One, Fifteen, and Nineteen) shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.  At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 in the forfeiture allegation above; and

b.  At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 of the forfeiture allegation above.

## SUBSTITUTE ASSETS PROVISION

88.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

(i)   cannot be located upon the exercise of due diligence;

(ii)   has been transferred or sold to, or deposited with, a third party;

(iii)   has been placed beyond the jurisdiction of the court;

(iv)   has been substantially diminished in value; or

(v)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

1.   Any and all right, title and interest in the real property and appurtenances known as ▮▮▮▮▮▮▮▮, Gladstone, New Jersey 07934;

2.   Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ▮▮▮▮ ▮▮▮▮▮▮▮▮, New York, New York 10028; and

3.   Any and all right, title and interest in the

53

real property and appurtenances known as 

 Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 982, 1343,
1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d),
78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5,
240.15d-2; Title 21, United States, Section 853(p); and Title 28,
United States Code, Section 2461.)


FOREPERSON

MICHAEL J. GARCIA
United States Attorney

54

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### PHILLIP R. BENNETT,
### ROBERT C. TROSTEN,
### TONE N. GRANT

**Defendants.**

## INDICTMENT

S3 05 Cr. 1192 (NRB)

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR § 240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR, §240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18 USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

# EXHIBIT D

# Refco Inc.

ONE WORLD FINANCIAL CENTER
200 LIBERTY STREET, TOWER A
NEW YORK, NY 10281
212–693–7000

# S–1

**S–1**
**Filed on 04/08/2005**
File Number 333–123969



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks –– Click here to rapidly navigate through this document

**As filed with the Securities and Exchange Commission on April 8, 2005**

Registration No. 333–

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM S–1
**REGISTRATION STATEMENT**
UNDER
**THE SECURITIES ACT OF 1933**

## Refco Inc.
(Exact Name of Registrant as Specified in Its Charter)

| | | |
|---|---|---|
| **Delaware** | **6200** | **20–2537426** |
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693–7000**
(Address, Including Zip Code, and Telephone Number,
Including
Area Code, of Registrant's Principal Executive Offices)

**Dennis A. Klejna**
**Refco Inc.**
**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693–7000**
(Name, Address, Including Zip Code, and Telephone
Number, Including Area Code, of Agent For Service)

*Copies to:*

| | | |
|---|---|---|
| **Alexander D. Lynch, Esq.** | **Joseph P. Collins, Esq.** | **George A. Stephanakis, Esq.** |
| **Todd R. Chandler, Esq.** | **Edward S. Best, Esq.** | **Cravath, Swaine & Moore LLP** |
| **Weil, Gotshal & Manges LLP** | **Mayer, Brown, Rowe and Maw LLP** | **Worldwide Plaza** |
| **767 Fifth Avenue** | **190 South LaSalle Street** | **825 Eighth Avenue** |
| **New York, New York 10153** | **Chicago, Illinois 60603** | **New York, New York 10019** |
| **(212) 310–8000** | **(312) 782–0600** | **(212) 474–1000** |

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after the effective date of this Registration Statement.**

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended (the "Securities Act"), check the following box.  ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this form is a post effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this form is a post effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box.  ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee |
|---|---|---|
| Common Stock, $0.01 par value | $575,000,000 | $67,677.50 |

*(1)*      Estimated solely for the purposes of computing the amount of the registration fee pursuant to Rule 457(o) under the Securities Act.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the**

Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.

The information in this prospectus is not complete and may be changed. We and the selling stockholders may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

SUBJECT TO COMPLETION, DATED APRIL 8, 2005

Shares



# Refco Inc.
## Common Stock

Prior to this offering, there has been no public market for our common stock. The initial public offering price of our common stock is expected to be between $        and $        per share. We are selling        shares of common stock and the selling stockholders are selling        shares of common stock. We will not receive any of the proceeds from the shares of common stock sold by the selling stockholders. We will apply to list our common stock on the New York Stock Exchange under the symbol "RFX."

The underwriters have an option to purchase a maximum of        additional shares to cover over–allotments of shares.

**Investing in our common stock involves risks. See "Risk Factors" on page 11.**

|  | Price to Public | Underwriting Discounts and Commissions | Proceeds to Refco | Proceeds to Selling Stockholders |
|---|---|---|---|---|
| Per Share | $ | $ | $ | $ |
| Total | $ | $ | $ | $ |

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

Delivery of the shares of common stock will be made on or about        , 2005.

*Joint Book–Running Managers*

## Credit Suisse First Boston

## Goldman, Sachs & Co.

## Banc of America Securities LLC

*Co–Managers*

## Deutsche Bank Securities

## JPMorgan

## Merrill Lynch & Co.

## Sandler O'Neill & Partners, L.P.

## HSBC

The date of this prospectus is        , 2005

## TABLE OF CONTENTS

| | Page |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 11 |
| FORWARD–LOOKING STATEMENTS | 30 |
| USE OF PROCEEDS | 31 |
| DIVIDEND POLICY | 31 |
| CAPITALIZATION | 32 |
| DILUTION | 33 |
| UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS | 35 |
| SELECTED CONSOLIDATED FINANCIAL DATA | 44 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 47 |
| INDUSTRY | 72 |
| BUSINESS | 79 |
| MANAGEMENT | 93 |
| PRINCIPAL AND SELLING STOCKHOLDERS | 101 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 103 |
| DESCRIPTION OF CAPITAL STOCK | 108 |
| DESCRIPTION OF INDEBTEDNESS | 111 |
| SHARES ELIGIBLE FOR FUTURE SALE | 115 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES | 117 |
| UNDERWRITING | 120 |
| NOTICE TO CANADIAN RESIDENTS | 124 |
| LEGAL MATTERS | 125 |
| EXPERTS | 125 |
| AVAILABLE INFORMATION | 125 |
| GLOSSARY | 126 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F–1 |

**You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these securities. The information in this document may only be accurate on the date of this document.**

"REFCO" and the Refco logo are our trademarks. Other service marks, trademarks and trade names referred to in this prospectus are the property of their respective owners. As indicated in this prospectus, we have included market data and industry forecasts that were obtained from industry publications.

**Dealer Prospectus Delivery Obligation**

**Until          , 2005 (25 days after the commencement of this offering), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealer's obligation to deliver a prospectus when acting as an underwriter with respect to unsold allotments or subscriptions.**

**PROSPECTUS SUMMARY**

*This summary highlights key information contained elsewhere in this prospectus. It may not contain all of the information that is important to you. You should read the entire prospectus, including "Risk Factors," our consolidated financial statements and the related notes thereto and the other documents to which this prospectus refers, before making an investment decision. In this prospectus, the terms "Refco," "we," "our" and "us" refer to Refco Inc. and its subsidiaries. The terms "fiscal year" and "FY" refer to the 52 or 53 weeks ended on the final day in February, while the terms "calendar year" and "year" refer to the year ended December 31 of the year referenced.*

**Our Company**

We are a leading independent provider of execution and clearing services for exchange–traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets. We offer our customers rapid, low–cost trade execution and clearing services on a broad spectrum of derivatives exchanges and over–the–counter markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries with a focus on delivering superior customer service. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

In 2004, we were the largest provider of customer transaction volume to the Chicago Mercantile Exchange, the largest derivatives exchange in the United States. In fiscal year 2004, we processed 461 million derivatives contracts, a volume of derivatives contracts comparable to that traded on the Chicago Board of Trade and greater than the volume traded on either the Chicago Board Options Exchange or the New York Mercantile Exchange during the same period. We are more diversified than any individual exchange, as we offer access to multiple products on virtually all major derivatives exchanges worldwide as well as over–the–counter markets.

In fiscal year 2004, we cleared over $9 trillion in U.S. Treasury repurchase transactions and processed over $680 billion in customer volume in the foreign exchange market. In 2004, we ranked fourth among Fixed Income Clearing Corporation firms in terms of cleared U.S. Treasury repurchase transaction volume and eighth for U.S. Treasury cash transaction volume.

Our revenues are primarily comprised of:

- transaction fees earned from executing and clearing customer orders; and

- interest income earned on cash balances in our customers' accounts and from providing financing through repurchase transactions.

For the twelve months ended November 30, 2004, we generated $1,250.7 million of net revenues and $187.3 million of net income.

We have positioned ourselves to benefit from strong growth in the exchange–traded derivatives, fixed income and foreign exchange markets. We have also acquired businesses that have enabled us to enter new markets and geographic regions. As a result, our business has grown significantly over the last several years, as exemplified by the following:

- volume of cleared transactions in exchange–traded derivatives contracts has increased from 80.8 million in fiscal year 2001 to 460.9 million in fiscal year 2004, a compound annual growth rate of 78.7%;

- volume of cleared U.S. Treasury repurchase transactions has increased from 0.4 million in fiscal year 2000 to 1.7 million in fiscal year 2004, a compound annual growth rate of 43.6%;

- volume of global foreign exchange transactions processed has increased from $482.4 billion in fiscal year 2002 to $682.4 billion in fiscal year 2004, a compound annual growth rate of 18.9%;

- net revenues have grown from $461.0 million in fiscal year 2000 to $1,007.7 million in fiscal year 2004, a compound annual growth rate of 21.6%; and

- operating income has increased from $61.0 million in fiscal year 2000 to $189.5 million in fiscal year 2004, a compound annual growth rate of 32.8%.

<div align="center">

**Our Competitive Strengths**

</div>

We believe our following competitive strengths will enable us to continue to successfully grow our business and increase our profitability:

- ***Established Market Position.***    As of November 30, 2004, we were the largest independent Futures Commission Merchant in the United States based on domestic customer segregated fund balances of approximately $3.8 billion. We are a clearing member on virtually all major domestic and international derivatives exchanges. We believe our leading market position allows us to provide our customers a broad product offering, superior customer service and leading technology at low cost.

- ***Diversified Across Customers, Products and Markets.***    We serve more than 200,000 accounts for customers that include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We believe this diversification reduces our overall earnings volatility and dependence on any one customer segment, product or market.

- ***Direct Customer Relationships.***    We serve as an essential intermediary between our customers and the financial markets and, unlike an exchange, we maintain direct relationships with our customers. These customer relationships allow us to benefit from customer trading of a variety of products across multiple exchanges and markets.

- ***Scalable Operating Platform.***    Our business benefits from a scalable operating platform. Our existing infrastructure is capable of processing significant additional volumes with limited incremental increases in our Employee Compensation and Benefits expenses and General, Administrative and Other expenses.

- ***Ability to Generate Free Cash Flow and Reduce Financial Leverage.***    We generate significant free cash flow, which is available for reinvestment in our business, debt service and reduction, acquisitions and other uses. In January 2005, we voluntarily prepaid $150.0 million of our bank debt.

- ***Proven and Committed Management Team.***    The members of our senior management team have an average of 24 years of industry experience. Under their leadership, net revenues have grown at a compound annual growth rate of 21.6% from fiscal year 2000 through fiscal year 2004.

<div align="center">

**Our Business Strategy**

</div>

We plan on continuing to capitalize on the economies of scale arising from our large execution and clearing volumes and to increase our transaction volumes, revenues and profitability by executing the following strategies:

- ***Capitalize on Growing Markets and New Product Opportunities.***    We will continue to identify opportunities for growth within our markets and for new product offerings while leveraging the customer relationships, liquidity and transaction processing platform of our existing businesses.

- ***Profit from Maturing Markets.***    We seek to continue to take advantage of our scale and operating efficiency to profit from providing execution and clearing services at a low cost to customers in transparent, highly liquid, commoditized markets.

<div align="center">2</div>

- ***Offer Unconflicted Access to Markets.***   We strive to differentiate our business offerings from our competitors' offerings by focusing solely on customer business and leveraging our transaction processing capabilities. We believe our focus on acting as an agent is important to customers concerned about quality of execution and potential conflicts of interest.

- ***Grow Our Customer Base.***   The significant growth of the markets in which we participate creates opportunities for us to attract new customers. Our dedicated sales force of over 1,000 individuals focuses on developing new corporate and institutional accounts and deepening existing relationships. We have also developed online platforms to attract the growing base of customers who trade over the Internet. As we continue to grow, we will maintain our focus on providing high levels of customer service.

- ***Capitalize on Shift to Electronic Trading.***   Many markets and exchanges are increasingly using electronic trading and moving away from the traditional open outcry method. We believe increased electronic trading has created an opportunity for us to increase market share in our various markets as our operating platform is well suited to accommodate this technological shift.

- ***Manage Risk Prudently.***   We plan to continue to monitor and improve our exposure to customer and counterparty risk throughout our operations using our comprehensive risk management system.

- ***Pursue Selective Strategic Acquisitions.***   We intend to pursue selective acquisitions that will expand our service capabilities or customer base or provide greater access to trading in a wider range of products.

### Our Businesses

We are organized into two operating business segments for financial reporting purposes: Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets.

### *Derivatives Brokerage & Clearing*

We provide our customers with access to trading in a wide range of derivatives products, including interest rate, equity index, energy, agriculture, foreign currency and metals contracts, across virtually all of the major derivatives exchanges. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for exchange–traded derivatives contracts, which we direct to the appropriate exchange for matching. We also facilitate confirmation and settlement of our customers' derivatives transactions and ensure that our customers have the appropriate collateral in their accounts to support their derivatives positions. We conduct these activities in our capacity as a regulated Futures Commission Merchant.

Annual global trading volume in exchange–traded derivatives grew to approximately 8.8 billion contracts in 2004, representing a compound annual growth rate of approximately 20% over the past 15 years and approximately 25% from 2001 to 2004, according to the Bank for International Settlements. Volume growth in the exchange–traded derivatives market has been influenced by the following trends:

- a shift towards electronic trading;

- the increasing awareness and importance of risk management;

- the introduction of new derivatives products and exchanges;

- a shift in trading from over–the–counter markets to on–exchange trading; and

- increased competition among exchange and clearing platforms.

3

From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at compound annual growth rates of 24.1% and 39.6%, respectively.

### Prime Brokerage/Capital Markets

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, non–dollar fixed income and foreign exchange markets. Our customers include hedge funds and other financial institutions.

*Fixed Income.*   Our fixed income operating platform provides our customers access to the interdealer broker market for U.S. Treasury securities. The interdealer broker market is an over–the–counter, wholesale securities market that allows brokers to trade with one another. In 2004, we ranked fourth in terms of cleared U.S. Treasury repurchase transaction volume and eighth for U.S. Treasury cash transaction volume. From 1999 to 2004, average daily trading volume in the interdealer broker market for U.S. Treasury securities and the average daily amount outstanding of repurchase agreements grew at compound annual growth rates of 17.4% and 16.1%, respectively. As we do not engage in strategy–based or directional proprietary trading, we do not face the same conflicts of interest with our customers as our competitors that engage in both agency and proprietary trading. We therefore provide our customers with unconflicted market access, in addition to price transparency, anonymity, high service levels and low–cost execution and clearing. Factors contributing to transaction volume growth in the interdealer broker market include:

- growth in the total amount of debt outstanding;

- increasing use of interest rate derivatives;

- greater sensitivity to credit risk; and

- the introduction of electronic trading platforms.

*Foreign Exchange.*   We enable our customers to trade in the majority of the world's principal currencies in the form of spot, forwards and options in over–the–counter foreign exchange markets via several trading platforms. The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.9 trillion, having grown at a 7.3% compound annual growth rate since 1989. While transaction volume in this market is dominated by money center banks, an increasing number of investors utilize the services of non–bank market participants, including independent brokers such as us. Factors contributing to transaction volume growth in the foreign exchange markets include:

- increased cross–border trade and investment;

- increasing use of foreign exchange as a hedging tool;

- alternative investment asset flows; and

- the emergence of electronic brokerage.

From fiscal year 2000 through fiscal year 2004, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at compound annual growth rates of 22.6% and 46.2%, respectively.

### Recent Transactions

On August 5, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., and its affiliates and co–investors acquired approximately 57% of the equity interests in our indirect subsidiary, Refco Group Ltd., LLC ("Refco Group"), which they hold through our direct subsidiary New Refco Group Ltd., LLC ("New Refco"), for approximately $507.0 million in cash. In connection

4

with the transaction, Phillip Bennett, our President and Chief Executive Officer, exchanged his existing $382.5 million investment in Refco Group for an approximate 42.3% equity interest in New Refco, and other members of our management made an investment in New Refco aggregating approximately $4.5 million in cash. Concurrently with the closing of the acquisition, Refco Group entered into senior credit facilities providing for a fully drawn $800.0 million term loan and an undrawn $75.0 million revolving loan facility, and, together with Refco Finance Inc., issued $600.0 million in aggregate principal amount of senior subordinated notes. Also concurrently with the consummation of the transactions described above, Refco Group distributed $550.0 million in cash and all of the equity interests of Forstmann–Leff International Associates, LLC, which at that time owned substantially all the assets of Refco Group's Asset Management business to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett. We refer to the foregoing transactions collectively as the "THL Transactions."

Prior to this offering, we conducted our business through Refco Group and its direct and indirect subsidiaries. Immediately prior to the closing of this offering, Refco Inc., a newly formed Delaware corporation that will act as a holding company for our business, will enter into the following transactions:

- Refco Inc. will issue an aggregate of          shares of its common stock to Thomas H. Lee Partners, L.P. and its affiliates and co–investors in exchange for the direct or indirect equity interests in New Refco held by such parties;

- Refco Group Holdings, Inc., which is wholly–owned by Phillip Bennett, our President and Chief Executive Officer, will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for          shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for          shares of its common stock;

- Our officers who hold Class A member interests in New Refco will contribute all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of          shares of its common stock; and

- Our officers, directors and employees who hold Class B member interests in New Refco will contribute all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of          shares of its common stock, which shares shall be subject to vesting and a right of repurchase.

We refer to the transactions listed above as the "Reincorporation."

As a result of these transactions, Refco Inc. will own all of the outstanding member interests of New Refco. Refco Inc. will be a Delaware "C" corporation, and as such will be subject to federal and state income taxes. Our previous holding company, New Refco, was a limited liability company not subject to federal or state income taxes, and as such, the historical financial data included in this prospectus does not reflect what our financial position and results of operations would have been had we been a taxable corporation. We expect to record a net deferred tax asset and a corresponding credit to our provision for income taxes of $149.3 million upon becoming a "C" corporation immediately before the closing of this offering. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns. Prior to the closing of the offering, New Refco intends to make a cash distribution of approximately $      million to the members of New Refco to enable them to meet their estimated income tax obligations for the period from January 1, 2005 to the date of the Reincorporation. The

5

amount of this distribution will be based on New Refco's estimated net taxable income from January 1, 2005 to the date of the Reincorporation. Purchasers of shares in the offering will not receive this distribution. Prior to the offering, Refco Group Holdings, Inc. will make a cash contribution of approximately $         million to New Refco, which amount is equal to the amount of tax distributions that Refco Group Holdings, Inc. received from New Refco in excess of its pro rata share of all tax distributions made to members of New Refco prior to the offering.

This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting the offering and until the consummation of the transactions described above, will hold no material assets and will not engage in any operations.

For more information on the THL Transactions and the Reincorporation, see "Certain Relationships and Related Transactions."

Our ownership and corporate structure immediately following the Reincorporation are set forth in the following chart:



---

(1)     Represents direct ownership and indirect ownership through each of Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust.

(2)     Undrawn as of November 30, 2004.

(3)     As of November 30, 2004, $798.0 million remained outstanding under the term loan. During the quarter ended February 28, 2005, we repaid $150.0 million of the term loan.

(4)     We intend to use a portion of the net proceeds of this offering to redeem $210.0 million aggregate principal amount of the outstanding senior subordinated notes due 2012.

### Our Executive Offices

We are a Delaware corporation. Our principal executive offices are located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281, and our telephone number is (212) 693–7000. We also have a website located at *www.refco.com*. The information that appears on our website is not a part of and is not incorporated into this prospectus.

**The Offering**

| | |
|---|---|
| Common stock offered by us | shares. |
| Common stock offered by the selling stockholders | shares. |
| Total offering | shares. |
| Common stock to be outstanding after this offering | shares. |
| Use of proceeds | We intend to use the net proceeds of this offering to redeem $210.0 million aggregate principal amount of our outstanding senior subordinated notes due 2012 (together with the related premium and accrued and unpaid interest thereon to the redemption date) and for general corporate purposes, including working capital and potential acquisitions. See "Use of Proceeds." We will not receive any of the proceeds from the sale of shares of common stock by the selling stockholders. |
| Dividend policy | We do not anticipate paying any dividends on our common stock in the foreseeable future. |
| Proposed New York Stock Exchange symbol | RFX. |
| Risk factors | See "Risk Factors" beginning on page 11 of this prospectus for a discussion of factors you should carefully consider before deciding to invest in our common stock. |

Unless otherwise indicated, all of the information in this prospectus:

- gives effect to the transactions described under "Prospectus Summary—Recent Transactions;"

- excludes        shares of our common stock reserved for future grants under our compensation plans;

- assumes no exercise of the underwriters' option to purchase up to an additional        shares from us and up to an additional        shares from the selling stockholders; and

- assumes an initial public offering price of $        per share, the midpoint of the offering range set forth on the cover of this prospectus.

7

**Summary Historical and Pro Forma Consolidated Financial Data**

Set forth below is summary historical and pro forma consolidated financial data, at the dates and for the periods indicated, for Refco Group, which holds all of our operating subsidiaries and will be an indirect subsidiary of Refco Inc. following the Reincorporation. This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting this offering and until the consummation of the Reincorporation, will hold no material assets and will not engage in any operations.

We derived the summary historical consolidated financial data for the years ended February 28, 2002 and 2003 and February 29, 2004 from our audited consolidated financial statements. We derived the summary historical consolidated financial data for the nine months ended November 30, 2003 and for the period from March 1, 2004 through August 5, 2004 and the period from August 6, 2004 through November 30, 2004 from our unaudited interim consolidated financial statements. The unaudited consolidated financial statements as of November 30, 2004 and for the nine months ended November 30, 2003, for the period from March 1, 2004 through August 5, 2004 and for the period from August 6, 2004 through November 30, 2004 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and result of operations for the period presented. The results for the nine months ended November 30, 2004 are not necessarily indicative of our results of operations for a full fiscal year.

The unaudited summary pro forma financial data presented for all periods indicated below were derived from the unaudited pro forma financial statements included elsewhere in this prospectus. The pro forma statement of income data gives effect, in all periods presented, to the completion of (i) the THL Transactions, (ii) the Reincorporation and the conduct of our operations under Refco Inc., a new holding company that is a Delaware "C" corporation, and (iii) this offering and application of the net proceeds therefrom as if they had all occurred on March 1, 2003. The pro forma balance sheet data gives effect to the completion of (i) the Reincorporation and (ii) this offering and the application of the net proceeds therefrom as if they had occurred on November 30, 2004. Prior to the Reincorporation, all federal and state taxes on the income of New Refco have been payable by the members. As a "C" corporation, we will be responsible for the payment of all federal and state corporate income taxes and, accordingly, the unaudited pro forma consolidated statement of income data give effect to the pro forma provision for income tax expense for all periods set forth below. The pro forma data gives effect to our issuance of          shares of common stock in this offering at the assumed initial public offering price of $      per share, which is the mid–point of the price range set forth on the cover page of this prospectus and the application of the net proceeds for this offering, after deducting the underwriting discounts, commissions and estimated expenses payable by us in connection with this offering, as described under "Use of Proceeds."

The pro forma financial data is included for informational purposes only and does not purport to represent what our results of operations would have actually been had we operated as a separate, independent company during the periods presented, nor does the pro forma data give effect to any events other than those discussed above and in the related notes. As a result, the pro forma operating results are not necessarily indicative of the operating results for any future period. See "Certain Relationships and Related Transactions" for a description of the Reincorporation.

You should read the data set forth below in conjunction with our consolidated financial statements and the related notes thereto, "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Unaudited Pro Forma Consolidated Financial Statements," "Capitalization," "Selected Historical and Pro Forma Consolidated Financial Data," "Certain Relationships and Related Transactions" and other financial information included elsewhere in this prospectus.

8

| | Fiscal Year Ended February 28, | | | Pro Forma Year Ended February 29, 2004 | Nine Months Ended November 30, 2003 | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through November 30, 2004 | Pro Forma Nine Months Ended November 30, 2004 |
|---|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004(1) | | | | | |
| | | | | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| | | | | | (dollars in millions) | | | |
| **Statement of Income Data:** | | | | | | | | |
| Revenues: | | | | | | | | |
| Commissions and brokerage | $ 478 | $ 572 | $ 645 | $ 645 | $ 473 | $ 362 | $ 262 | $ 624 |
| Interest | 1,711 | 2,387 | 1,052 | 1,052 | 726 | 769 | 985 | 1,754 |
| Principal transactions, net | 99 | 83 | 166 | 166 | 114 | 119 | 83 | 202 |
| Asset management and advisory fees | 6 | — | 7 | 7 | 6 | 4 | 6 | 10 |
| Other income | 4 | 4 | 4 | 4 | 4 | 3 | 2 | 5 |
| Total revenues | 2,298 | 3,046 | 1,874 | 1,874 | 1,323 | 1,257 | 1,338 | 2,595 |
| Expenses: | | | | | | | | |
| Commissions and order execution costs | 324 | 385 | 412 | 412 | 298 | 244 | 194 | 438 |
| Interest | 1,557 | 2,182 | 898 | 937 | 615 | 707 | 953 | 1,670 |
| Employee compensation and benefits | 167 | 181 | 205 | 205 | 145 | 109 | 86 | 194 |
| General, administrative and other | 149 | 143 | 170 | 185 | 126 | 97 | 76 | 179 |
| Total expenses | 2,197 | 2,891 | 1,685 | 1,739 | 1,184 | 1,157 | 1,309 | 2,481 |
| Provision for income taxes(2) | 5 | 1 | 12 | 56 | 5 | 8 | 4 | 46 |
| Members' interest in earnings of subsidiary | — | — | 1 | 1 | — | 6 | 1 | 7 |
| Dividends on preferred securities issued by subsidiaries | 16 | 16 | — | — | — | — | — | — |
| Income from equity investees | 1 | 2 | 11 | 11 | 7 | 8 | 19 | 27 |
| Discontinued operations, net of taxes | 12 | — | — | — | — | 4 | — | — |
| Net income(2) | $ 93 | $ 140 | $ 187 | $ 90 | $ 141 | $ 98 | $ 43 | $ 87 |
| **Net income per share data:** | | | | | | | | |
| Net income per share: | | | | | | | | |
| Basic | | | | $ | | | $ | |
| Diluted | | | | $ | | | $ | |
| **Weighted average shares outstanding:** | | | | | | | | |
| Basic | | | | | | | | |
| Diluted | | | | | | | | |

| | As of February 28, | | | As of November 30, 2004 | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004(3) | Actual | Pro Forma |
| | | | | (unaudited) | (unaudited) |
| | | | | (dollars in millions) | |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 22,611 | $ 19,215 | $ 33,332 | $ 46,733 | $ |
| Long-term debt and preferred securities issued by subsidiaries: | | | | | |
| Long-term borrowings | 262 | 384 | 316 | 1,390 | |
| Subordinated debt | 16 | 16 | 16 | — | |
| Preferred securities issued by subsidiaries | 160 | 160 | — | — | |
| Total long-term debt and preferred securities issued by subsidiaries | 438 | 560 | 332 | 1,390 | |
| Members' equity | 515 | 566 | 616 | 124 | |
| Stockholders' equity | | | | | |

| | Fiscal Year Ended February 28, | | | Nine Months Ended November 30, 2003 | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through November 30, 2004 |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004(1) | | | |
| | | | | (unaudited) | (unaudited) | (unaudited) |
| | | | | (dollars in millions) | | |
| **Other Financial Data:** | | | | | | |
| Depreciation and amortization | $ 34 | $ 23 | $ 26 | $ 21 | $ 12 | $ 12 |
| Long-term debt interest | 25 | 27 | 31 | 24 | 12 | 31 |
| Capital expenditures | 15 | 12 | 11 | 7 | 5 | 3 |

9

| | Fiscal Year Ended February 28, | | | Nine Months Ended November 30, | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004(1)** | **2003** | **2004** |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| **Other Data:** | | | | | |
| Derivatives contract volume (contracts in millions) | 346 | 401 | 461 | 338 | 482 |
| Foreign exchange volume (in billions) | $ 482 | $ 474 | $ 682 | $ 388 | $ 811 |
| Average customer deposits (in billions) | $ 2.8 | $ 3.6 | $ 4.0 | $ 3.4 | $ 3.9 |
| Average domestic net repo book (in billions) | $ 19 | $ 21 | $ 25 | $ 25 | $ 33 |

(1)      Year ended February 29.

(2)      Historical net income and provision for income taxes do not give effect to our reorganization as a "C" corporation and do not reflect additional federal, state and local income taxes that we would have been required to pay had we been a taxable corporation during the periods presented. The pro forma combined effective federal, foreign, state and local tax rate for all periods presented is 41%. Upon becoming a "C" corporation, we will record a cumulative net deferred tax asset and corresponding credit to our income tax provision of approximately $149.3 million. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns.

(3)      As of February 29.

## RISK FACTORS

*An investment in our common stock involves a high degree of risk. Presented below are all the risks that management deems material to an investment in our common stock. You should carefully consider the risks described below, together with the other information contained in this prospectus, before making an investment decision. As a result of any of these risks our business, results of operations or financial condition may be adversely affected, and you may lose all or part of your investment in our common stock.*

### Risks Relating to Our Company

***Changes in domestic and international market factors that reduce trading volumes or interest rates could significantly harm our business.***

We generate revenues primarily from transaction fees we earn from executing and clearing customer orders and from interest income we earn on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. These revenue sources are substantially dependent on customer trading volumes and interest rates. We are, in particular, affected by customer trading volumes on the derivatives exchanges on which we conduct transactions and in the fixed income and foreign exchange markets. The volume of transactions our customers conduct with us and interest rates are directly affected by domestic and international market factors that are beyond our control, including:

- economic, political and market conditions;

- broad trends in industry and finance;

- changes in levels of trading activity in the broader marketplace;

- price levels and price volatility in the derivatives, fixed income, equity, foreign exchange and commodity markets;

- legislative and regulatory changes;

- the actions of our competitors;

- changes in government monetary policies;

- foreign exchange rates; and

- inflation.

Any one or more of these factors, or others, may contribute to reduced trading volumes or changes in interest rates. Any material decrease in trading volume in the securities markets in general, or the derivatives, fixed income and foreign exchange markets in particular, or any decline in prevailing interest rates would have a material adverse effect on our business, financial condition and operating results. By way of example, during the second quarter of fiscal year 2005, the seasonal decrease in exchange–traded derivative volumes in Europe (Eurex) and Chicago (the Chicago Mercantile Exchange), exacerbated by historically low levels of volatility in underlying equity and fixed income markets, resulted in a decrease of 5.0% in our transaction volume and a decrease of 9.3% in Derivative Brokerage & Clearing revenues for the quarter ended August 31, 2004 as compared with the quarter ended May 31, 2004.

***We face intense competition from other companies, and if we are not able to successfully compete with them, our business may be harmed.***

The derivatives, securities and financial services industries are highly competitive, and we expect that competition will intensify in the future. We have numerous current and prospective competitors, both domestically and internationally. Our primary competitors include both large, diversified financial institutions, such as major commercial and investment banks and independent Futures Commission

11

Merchants, foreign broker–dealers and other specialty broker–dealers. Many of our competitors and potential competitors have larger customer bases, more established name recognition and greater financial, marketing, technological and personnel resources than we do. These resources may enable them to, among other things:

- develop services similar to ours or new services that are preferred by our customers;

- provide access to trading in products or a range of products that we do not offer;

- provide better execution and clearing and lower transaction costs;

- offer better, faster and more reliable technology;

- take greater advantage of new or existing acquisitions, alliances and other opportunities;

- more effectively market, promote and sell their services; and

- better leverage their relationships with their customers.

In addition, new or existing competitors could gain access to trading markets in which we currently enjoy a competitive advantage. For example, if additional competitors gained access to the interdealer broker market, it could adversely affect our advantage in providing trading access to the U.S. Treasury securities market. Other market participants, such as the exchanges, may expand their services and begin competing with us more directly. Even if new or existing competitors do not significantly erode our market share, they may offer their services at lower prices, and we may be required to reduce our fees significantly to remain competitive, which could have a material adverse effect on our profitability. If we fail to compete effectively, our business, financial condition and operating results could be materially harmed.

***Our business could be adversely affected if we are unable to retain our existing customers or attract new customers.***

The success of our business depends, in part, on our ability to maintain and increase our customer base. Customers in our market are sensitive to, among other things, the costs of using our services, the quality of the services we offer, the speed and reliability of order execution and the breadth of our service offerings and the products and markets to which we offer access. We may not be able to continue to offer the pricing, service, speed and reliability of order execution or the service, product and market breadth that customers desire. In addition, our existing customers are not obligated to use our services and can switch providers of execution and clearing services or decrease their trading activity conducted through us at any time. As a result, we may fail to retain existing customers or be unable to attract new customers. Our failure to maintain or attract customers could have a material adverse effect on our business, financial condition and operating results.

***We rely on relationships with our introducing brokers for obtaining some of our customers. The failure to maintain these relationships could adversely affect our business.***

We have relationships with introducing brokers who assist us in establishing new customer relationships and provide marketing and customer service functions for some of our customers. These introducing brokers receive compensation for introducing customers to us. Many of our relationships with introducing brokers are non–exclusive or may be cancelled on relatively short notice. In addition, our introducing brokers have no obligation to provide new customer relationships or minimum levels of transaction volume. Our failure to maintain these relationships with these introducing brokers or the failure of these introducing brokers to establish and maintain customer relationships would result in a loss of revenues, which could adversely affect our business.

12

***Our business operations could be significantly disrupted if we lost members of our management team.***

Our future success depends to a significant degree upon the continued contributions of our management team. Our future performance will be substantially dependent on our ability to retain and motivate them. Any of these persons may voluntarily terminate his employment with us. The loss of the services of any member of our management team, particularly Phillip Bennett, our President and Chief Executive Officer, could adversely affect our ability to manage our business effectively or execute our business strategy. None of our agreements governing our debt instruments or other contracts includes a provision requiring the continued service of any key employee, and we do not maintain key man life insurance policies on any of our executive officers. See "Management—Directors and Executive Officers." Phillip Bennett, Joseph Murphy, Gerald Sherer, William Sexton, Santo Maggio and Dennis Klejna have entered into agreements in which each respectively agrees not to compete with us for a specified period of time.

***We may not be able to attract and retain the highly skilled employees we need to support our business.***

Our future success also depends upon the efforts of our qualified and highly trained sales personnel and upon our ability to recruit and retain highly skilled and often specialized personnel, particularly in light of the rapid pace of technological advances. The level of competition in our industry for individuals with this level of experience or these skills is intense. If we are not able to attract and retain highly skilled employees, it could have a material adverse effect on our business, financial condition and operating results.

***We may not effectively manage our growth, which could materially harm our business.***

The growth of our business has placed and may continue to place a significant strain on our management, personnel, systems and resources. We must continue to improve our operational and financial systems and managerial controls and procedures, and we will need to continue to expand, train and manage our technology workforce. We must also maintain close coordination among our technology, compliance, risk management, accounting, finance, marketing and sales organizations. We may not manage our growth effectively. If we fail to do so, our business could be materially harmed.

If we continue to grow, we may be required to increase our investment in facilities, personnel and financial and management systems and controls. Continued growth may also require expansion of our procedures for monitoring and assuring our compliance with applicable regulations and that we recruit, integrate, train and manage a growing employee base. The expansion of our existing businesses, our expansion into new businesses and the resulting growth of our employee base increase our need for internal audit and monitoring processes that are more extensive and broader in scope than those we have historically required. We may not be successful in implementing all of the processes that are necessary. Further, unless our growth results in an increase in our revenues that is proportionate to the increase in our costs associated with this growth, our operating margins and profitability will be adversely affected.

***Our operations expose us to significant credit risks.***

We act on behalf of our customers for all trades consummated both on exchanges and in over–the–counter markets. Accordingly, we are responsible for our customers' obligations with respect to these transactions, which exposes us to significant credit risk. Our customers may default on their obligations due to bankruptcy, lack of liquidity, operational failure or other reasons. A substantial part of our working capital is at risk if customers default on their obligations to us and their account balances and security deposits are insufficient to meet all of their obligations. As of November 30, 2004, February 29, 2004 and February 28, 2003, our reserve against receivables from customers was $75.6 million, $65.2 million and $42.7 million, respectively. We may be materially and adversely affected in the event of a significant default by our customers.

***Our compliance and risk management methods might not be effective, which could increase the risk that we are subject to regulatory action or litigation or otherwise negatively impact our business.***

Our ability to comply with applicable laws, rules and regulations is largely dependent on our establishment and maintenance of compliance, audit and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. If we fail to effectively establish and maintain such compliance and reporting systems or fail to attract and retain personnel who are capable of designing and operating such systems, it will increase the likelihood that we will become subject to legal and regulatory infractions, including civil litigation and investigations by regulatory agencies.

For us to avoid a number of risks inherent in our business, it is necessary for us to have polices and procedures that identify, monitor and manage our risk exposure. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events. Such policies may not be fully effective. Some of our risk management policies and procedures depend upon evaluation of information regarding markets, customers or other matters that are publicly available or otherwise accessible by us. That information may not in all cases be accurate, complete, up–to–date or properly evaluated. Further, our risk management policies and procedures rely on a combination of technical and human controls and supervision, which are subject to error and failure. Some of our risk management policies and procedures are based on internally developed controls and observed historical market behavior and also involve reliance on industry standard practices. These policies and procedures may not adequately prevent future losses, particularly as they relate to extreme market movements, which may be significantly greater than comparable historical movements. While we have no reason to believe that our policies and procedures will not continue to be effective, they may not always be effective in the future, and we may not always be successful in monitoring or evaluating the risks to which we are or may be exposed. If our risk management efforts are ineffective, we could suffer losses that could have a material adverse effect on our financial condition or operating results.

***Our acquisition, joint venture and investment strategies and any other new business initiatives we undertake involve risks, and if we are unable to manage these risks effectively, our business will be materially harmed.***

In the past, we have expanded our business through acquisitions, and to achieve our strategic objectives in the future, we may seek to acquire other companies, businesses or technologies. Acquisitions entail numerous risks, including the following:

- difficulties in the integration of acquired operations, personnel or technologies;

- diversion of management's attention from other business concerns;

- assumption of unknown material liabilities or regulatory non–compliance issues;

- failure to achieve financial or operating objectives;

- amortization of acquired intangible assets, which would reduce future reported earnings; and

- potential loss of customers or key employees of acquired companies.

Failure to manage our acquisitions to avoid these risks could have a material adverse effect on our business, financial condition and operating results.

We also may seek to expand or enhance our operations by forming joint ventures, making other investments or undertaking other business initiatives and entering new lines of businesses. Entering into joint ventures also entails risks, including difficulties in developing and expanding the business of newly formed joint ventures, exercising influence over the activities of joint ventures in which we do not have a controlling interest and potential conflicts with our joint venture partners. Other investments and business initiatives may also involve risks, including but not limited to loss of investment. Any

14

acquisition, joint venture, investment or other business initiative that we have or may enter into may not be successful. Unsuccessful joint ventures, investments and other business initiatives could harm our business, financial condition and operating results.

***Our international operations involve special challenges that we may not be able to meet, which could adversely affect our financial results.***

We currently conduct international operations and plan to expand those operations. There are a number of risks inherent in doing business in international markets, particularly in the derivatives, fixed income and foreign exchange markets, which are heavily regulated in many jurisdictions outside the United States. These risks include:

- less developed technological infrastructures and generally higher costs, which could result in lower customer acceptance of our services or customers having difficulty accessing our products and services;

- the inability to manage and coordinate the various regulatory requirements of multiple jurisdictions that are constantly evolving and subject to unexpected change;

- difficulties in staffing and managing foreign operations;

- fluctuations in currency exchange rates; and

- potentially adverse tax consequences.

Our operations in some less developed countries are also subject to the political, legal and economic risks associated with politically unstable and less developed regions of the world, including the risk of war and other international conflicts and actions by governmental authorities, insurgent groups, terrorists and others. Specifically, we conduct business in countries whose currencies may be unstable. Future instability in such currencies or the imposition of governmental or regulatory restrictions on such currencies could impede our foreign exchange business and our ability to collect on collateral held in such currencies.

In addition, we are required to comply with the laws and regulations of foreign governmental and regulatory authorities of each country in which we conduct business. These may include laws, rules and regulations, including registration requirements relating to many aspects of the derivatives, fixed income and foreign exchange markets. Our compliance with these laws and regulations may be difficult and time consuming and may require significant expenditures and personnel requirements, and our failure to be in compliance would subject us to legal and regulatory liabilities. We have customers in numerous countries around the world in which we are not registered. As a result, we may become subject to the regulatory requirements of those countries. We may also experience difficulty in managing our international operations because of, among other things, competitive conditions overseas, management of foreign exchange risk, established domestic markets, language and cultural differences and economic or political instability. Any of these factors could have a material adverse effect on the success of our international operations or limit our ability to grow our international operations and, consequently, on our business, financial condition and operating results.

***Our operating results are subject to significant fluctuations due to seasonality. As a result, you should not rely on our operating results in any particular period as an indication of our future performance.***

Our business experiences seasonal fluctuations. Financial markets often experience reduced trading activity during summer months and in the last fiscal quarter as a result of holidays. Traditional commodity derivatives, such as energy, will reflect changing supply/demand factors related to heating/cooling seasons. As a result of these factors, we may experience relatively higher trading volume and thus revenue during our first and third fiscal quarters and lower trading volume in our second fiscal quarter.

15

***If we experience systems failures or capacity constraints, our ability to conduct our operations would be materially harmed.***

We are heavily dependent on the capacity and reliability of the computer and communications systems supporting our operations, whether owned and operated internally or by third parties. We receive and process a large portion of our trade orders through electronic means, such as through public and private communications networks. These computer and communications systems and networks are subject to performance degradation or failure from any number of reasons, including loss of power, acts of war or terrorism, human error, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, intentional acts of vandalism, customer error or misuse, lack of proper maintenance or monitoring and similar events. During the terrorist attacks on the World Trade Center on September 11, 2001, we lost access to a significant portion of our communications and computer networks. Although the disruption of our operations as a result of this event was not material, future occurrences of any of the events listed above, or of any other events, could result in the material degradation or failure of our computer and communications systems and networks.

If such a degradation or failure were to occur, it could cause any number of results, including:

- unanticipated disruptions in service to our customers;

- slower response times;

- delays in our customers' trade execution;

- failed settlement of trades; and

- incomplete or inaccurate accounting, recording or processing of trades.

Further, any of our redundant systems or disaster recovery plans may not have been implemented properly, and these systems and plans or our personnel may not be adequate to correct or mitigate any of the above events. In addition, any redundant systems, disaster recovery plans or personnel of our third–party service providers may not be adequate to correct or mitigate any of the above events or be implemented properly. The occurrence of degradation or failure of the communications and computer systems on which we rely may lead to financial losses, litigation or arbitration claims filed by or on behalf of our customers and regulatory investigations and sanctions, including by the Securities and Exchange Commission and the Commodity Futures Trading Commission, which require that our trade execution and communications systems be able to handle anticipated present and future peak trading volumes. Any such degradation or failure could also have a negative effect on our reputation, which in turn could cause us to lose existing customers to our competitors or make it more difficult for us to attract new customers in the future. Further, any financial loss that we suffer as a result of such degradations or failures could be magnified by price movements of contracts involved in transactions impacted by the degradation or failure, and we may be unable to take corrective action to mitigate any losses we suffer.

***If we fail to maintain our computer and communications systems and networks properly or to upgrade and expand such systems and networks in response to technological change, our business will be materially harmed.***

We need to properly maintain the computer and communications systems and networks that we currently own and operate. We internally support and maintain many of our existing systems and networks, including those that are critical to our derivatives clearing operations. Our failure to adequately maintain these systems and networks could have a material effect on the performance and reliability of such systems and networks, which in turn could materially harm our business.

Further, the markets in which we compete are characterized by rapidly changing technology, evolving customer demand and uses of our services and the emergence of new industry standards and practices that could render our existing technology and systems obsolete. Our future success will

depend in part on our ability to anticipate and adapt to technological advancements, evolving customer demands and changing standards in a timely, cost–efficient and competitive manner and to upgrade and expand our systems accordingly. Any upgrades or expansions may require significant expenditures of funds and may also increase the probability that we will suffer system degradations and failures. We may not have sufficient funds to adequately update and expand our networks, and any upgrade or expansion attempts may not be successful and accepted by the marketplace and our customers. Our failure to adequately update and expand our systems and networks or to adapt our systems and technology to evolving customer demands or emerging industry standards would have a material adverse effect on our business.

*We depend on third–party suppliers for a number of services, which are important to our business.*

We depend on a number of suppliers, such as banking, clearing and settlement organizations, telephone companies, online service providers, data processors and software and hardware vendors for elements of our trading, clearing and other systems, as well as communications and networking equipment, computer hardware and software and related support and maintenance. These providers may not be able to continue to provide these services in an efficient, cost–effective manner or be able to adequately expand their services to meet our needs. In addition, our agreements with these providers come up for renewal or may be terminated from time to time. In such an event, we may be required to renegotiate the terms of an agreement on terms that are not as favorable as under the existing agreement, or we may be required to find a replacement supplier. An interruption in or the cessation of service by any service provider and our inability to make alternative arrangements on favorable terms, in a timely manner or at all, could have a material adverse effect on our business, financial condition and operating results.

*Our networks and those of our third–party service providers may be vulnerable to security risks, which could result in the wrongful use of our or our customers' information, interruptions or malfunctions in our operations or damage to our reputation.*

The secure transmission of confidential information over public networks is a critical element of our operations. Our networks and those of our third–party service providers, the exchanges and counterparties with whom we trade and our customers may be vulnerable to unauthorized access, computer viruses and other security problems. Persons who circumvent security measures could wrongfully use our or our customers' information or cause interruptions or malfunctions in our operations, any of which could have a material adverse effect on our business, financial condition and operating results. Additionally, our reputation could be damaged. If an actual, threatened or perceived breach of our or our security providers' security occurs, the market perception of the effectiveness of our security measures could be harmed and could cause customers to reduce or stop their use of our services. We or our service providers may be required to expend significant resources to protect against the threat of security breaches or to alleviate problems, including reputational harm and litigation, caused by any breaches. Any security measures implemented by us or our service providers may prove to be inadequate and may not prevent system failures and delays that could lower trading volumes and have an adverse effect on our business, financial condition and operating results.

*We may be unable to protect our intellectual property rights or technology effectively, which would allow competitors to duplicate or replicate our technology and could adversely affect our ability to compete.*

Intellectual property is important to our success and ability to compete, and if we fail to protect our intellectual property rights adequately, our competitors might gain access to our technology. We rely primarily on a combination of copyright, trademark and trade secret laws in the United States and other jurisdictions, as well as license agreements, third–party nondisclosure and other agreements and other contractual provisions and technical measures to protect our intellectual property rights. We attempt to negotiate beneficial intellectual property ownership provisions in our contracts and also

17

require employees, consultants, advisors and collaborators to enter into confidentiality agreements in an effort to protect the confidentiality of our proprietary information. However, laws and our actual contractual terms may not be sufficient to protect our technology from use or theft by third parties. For instance, a third party might reverse engineer or otherwise obtain and use our technology without our permission and without our knowledge, thereby infringing our rights and allowing competitors to duplicate or replicate our products. Furthermore, we cannot assure you that these protections will be adequate to prevent our competitors from independently developing technologies that are substantially equivalent or superior to our technology.

We may have legal or contractual rights that we could assert against illegal use of our intellectual property rights, but lawsuits claiming infringement or misappropriation are complex and expensive, and the outcome would not be certain. In addition, the laws of some countries in which we now or may in the future operate may not protect intellectual property rights to the same extent as the laws of the United States.

Defending against intellectual property infringement and related claims could be expensive and disruptive to our business. If we are found to infringe the proprietary rights of others, we could be required to redesign our services, pay royalties or enter into license agreements with third parties.

***Claims that we misuse the intellectual property of others could subject us to litigation and significant liability and disrupt our business.***

There is frequent litigation based on allegations of infringement or other violations of intellectual property rights related to the development or use of technology, including suits in our industry. As the number of participants in our market increases and the number of patents and other intellectual property registrations increase, the possibility of an intellectual property claim against us grows. We have been sued on intellectual property grounds in the past and are currently the subject of a patent infringement lawsuit by Trading Technologies International, Inc. A third party may assert in the future that our technology or the manner in which we operate our business violates its intellectual property rights. From time to time, in the ordinary course of business, we may become subject to legal proceedings and claims relating to the intellectual property rights of others, and we expect that third parties may assert intellectual property claims against us, particularly as we expand the complexity and scope of our business, the number of electronic trading platforms increases and the functionality of these platforms further overlap. Any claims, whether with or without merit, could:

- be expensive and time consuming to defend;

- prevent us from operating our business, or portions of our business;

- cause us to cease developing, licensing or using all or any part of our electronic trading platform that incorporate the challenged intellectual property;

- require us to redesign our products or services, which may not be feasible;

- result in significant monetary liability;

- divert management's attention and resources; and

- require us to pay royalties or enter into licensing agreements in order to obtain the right to use necessary technologies, which may not be possible on commercially reasonable terms.

Third parties may assert infringement claims against us in the future with respect to our electronic trading platforms or any of our other current or future services, and any such assertion may require us to cease providing such services, try to redesign our services, enter into royalty agreements, if available, or become involved in litigation that could be costly to us. Any of these events could have a material affect on our business, financial condition and operating results.

18

***We operate in a heavily regulated environment that imposes significant costs and compliance requirements on us. The failure to comply with the regulations to which we are subject could subject us to sanctions.***

We are extensively regulated by the Commodity Futures Trading Commission; the Securities and Exchange Commission; the National Association of Securities Dealers, our designated self–regulatory organization with respect to our registration as a broker–dealer; the Chicago Mercantile Exchange, our designated self–regulatory organization with respect to our registration as a Futures Commission Merchant; the National Futures Association; other exchanges of which we are a member; state regulatory agencies; and other domestic and foreign clearing organizations. If we fail to comply with applicable laws, rules or regulations, we may be subject to criminal conviction, increased reporting requirements, censure, fines, cease–and–desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including revocation of our operating licenses.

In 2002 and 2003, we received subpoenas and requests for information from the Securities and Exchange Commission in connection with its investigation into short sales of common stock of Sedona Corporation. Although there were issues previously raised by the Securities and Exchange Commission with respect to document production and retention by us in connection with that matter, we believe that we have now substantially complied with those subpoenas and requests. In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the Securities and Exchange Commission. For a more detailed description of these investigations, see "Business—Legal Proceedings—SEC Investigation." At the present time, it is not possible to predict the outcome of the foregoing investigations with certainty.

The organizations and agencies that regulate us have broad powers to investigate and enforce compliance and punish non–compliance with their rules and regulations. Neither we nor our managers, officers and employees may be able to fully comply with these rules and regulations, and we may be subject to claims or actions by these organizations and agencies, which could adversely affect our business.

***Changes in legislation or regulations may affect our ability to conduct our business or reduce our profitability.***

The legislative and regulatory environment in which we operate has undergone significant change in the past and may undergo significant change again in the future. The Commodity Futures Trading Commission, the Securities and Exchange Commission, the National Association of Securities Dealers, the Chicago Mercantile Exchange, the National Futures Association or other U.S. or foreign governmental authorities continuously review legislative and regulatory initiatives and may adopt new or revised laws and regulations. These legislative and regulatory initiatives may affect the way in which we conduct our business and may make our business less profitable. Changes in the interpretation or enforcement of existing laws and regulations by those entities may also adversely affect our business.

In addition, we use the Internet as the distribution channel to provide services to our customers. A number of regulatory agencies have recently adopted regulations regarding customer privacy and the use of customer information by service providers. Additional laws and regulations relating to the Internet may be adopted in the future, including regulations regarding the pricing, taxation, content and quality of products and services delivered over the Internet. Complying with these laws and regulations is expensive and time consuming and could limit our ability to use the Internet as a distribution channel, which could adversely affect our business.

***We will become subject to additional financial and other reporting and corporate governance requirements that may be difficult for us to satisfy. Evolving regulation of corporate governance and public disclosure may result in additional expenses and continuing uncertainty.***

We have historically operated our business as a private company. Following the effectiveness of our registration statement filed with the Securities and Exchange Commission regarding our senior

19

subordinated notes, we became obligated to file with the Securities and Exchange annual and quarterly information and other reports that are specified in Sections 13 and 15(d) of the Exchange Act. Upon completion of this offering, we will also become subject to other new financial and other reporting and corporate governance requirements, including the requirements of the New York Stock Exchange and certain provisions of the Sarbanes–Oxley Act of 2002 and the regulations promulgated thereunder, which will impose significant compliance obligations upon us. These obligations will require a commitment of additional resources, and meeting these requirements may require the hiring of additional staff and result in the diversion of our senior management's time and attention from our day to day operations. In particular, we will be required to:

- create or expand the roles and duties of our board of directors, our board committees and management;

- institute a more comprehensive compliance function;

- establish an internal audit function;

- prepare and distribute periodic public reports in compliance with our obligations under the federal securities laws;

- involve and retain to a greater degree outside counsel and accountants in the activities listed above;

- establish an investor relations function; and

- establish new internal policies, such as those relating to disclosure controls and procedures and insider trading.

We may not be successful in complying with these obligations, or compliance with them could adversely affect our business or operating results.

Changing laws, regulations and standards relating to corporate governance and public disclosure, including the Sarbanes–Oxley Act of 2002, new Securities and Exchange Commission regulations and New York Stock Exchange rules are creating uncertainty for public companies. We are presently evaluating and monitoring developments with respect to new and proposed rules and cannot predict or estimate the amount of the additional costs we may incur or the timing of those costs. These new or changed laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. If our efforts to comply with new or changed laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, regulatory authorities may initiate legal proceedings against us, which could adversely affect our business.

***We will be exposed to risks relating to the evaluation of our internal controls over financial reporting as required by Section 404 of the Sarbanes–Oxley Act of 2002.***

We are in the process of evaluating, testing and implementing internal controls over financial reporting to enable management to report on, and our independent registered accounting firm to attest to, such internal controls as required by Section 404 of the Sarbanes–Oxley Act of 2002. While we anticipate being compliant with the requirements of Section 404 by our February 28, 2007 deadline, we cannot be certain as to the timing of the completion of our evaluation, testing and remediation actions or the impact of the same on our operations. If we are not able to implement the requirements of Section 404 in a timely manner or with adequate compliance, we may be subject to investigation and sanctions by regulatory authorities, such as the Securities and Exchange Commission and the New York Stock Exchange. As a result, there could be a negative reaction in the financial markets due to a loss of

confidence in the reliability of our financial statements. In addition, we may be required to incur costs in improving our internal controls and the hiring of additional personnel. Any such actions could negatively affect our results of operations.

***We are subject to significant litigation risk, which could adversely affect our business.***

Many aspects of our business involve substantial liability risks, and we could be exposed to substantial liability under federal and state laws and court decisions, as well as regulatory action by the Securities and Exchange Commission, the Commodity Futures Trading Commission and other regulatory organizations. These risks include, among others, potential civil litigation triggered by regulatory investigations, potential liability from disputes over terms of a trade, the claim that a system failure or delay caused monetary losses to a customer, that we entered into an unauthorized transaction or that we provided materially false or misleading statements in connection with a transaction. The volume of claims and the amount of damages claimed in litigation and regulatory proceedings against financial intermediaries have been increasing. Dissatisfied customers frequently make claims against their service providers regarding quality of trade execution, improperly settled trades, mismanagement or even fraud. These risks also include potential liability from disputes over the exercise of our rights with respect to customer accounts and collateral. Although our customer agreements generally provide that we may exercise such rights with respect to customer accounts and collateral as we deem reasonably necessary for our protection, our exercise of these rights has at times led to claims by customers that we have exercised these rights improperly. For example, we are currently the subject of a lawsuit brought by a customer who has alleged that we improperly liquidated its position in connection with a margin call. See "Business—Legal Proceedings—Tradewinds." Even if we prevail in this or other cases or claims, we could incur significant legal expenses defending the cases or claims, even those without merit. An adverse resolution of any future cases or claims against us could have a material adverse effect on our reputation, financial condition or operating results.

***We could be harmed by employee or introducing broker misconduct or errors that are difficult to detect and deter.***

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Misconduct by our employees or introducing brokers could include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers, improper use of confidential information or use of improper marketing materials. For example, during the mid–1990s, one of our brokers engaged in conduct that was violative of regulations of the Commodity Futures Trading Commission and the Chicago Board of Trade. This conduct resulted in awards and settlements of private arbitrations in 2001 of approximately $42 million and the payment by us of an aggregate $7.0 million in fines to the Commodity Futures Trading Commission and the Chicago Board of Trade in 1999. Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. It is not always possible to deter employee or introducing broker misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. Our employees or introducing brokers also may commit errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions. We have been subject to claims by our customers relating to errors committed by our employees. Employee, broker or introducing broker misconduct or errors could subject us to financial losses or regulatory sanctions and seriously harm our reputation and could adversely affect our business, financial condition and operating results.

*Our business may be adversely affected if our reputation is harmed.*

Our ability to attract and retain customers and employees may be adversely affected to the extent our reputation is damaged. If we fail, or appear to fail, to deal with various issues that may give rise to reputational risk, our reputation may be harmed, which could harm our business prospects. These issues include, but are not limited to, appropriately dealing with potential conflicts of interest, legal and regulatory requirements, ethical issues, money–laundering, privacy, record–keeping, sales and trading practices, and the proper identification of the legal, reputational, credit, liquidity and market risks inherent in our business. Failure to appropriately address these issues could also give rise to additional legal risk to us, which could, in turn, increase the size and number of claims and damages asserted against us or subject us to regulatory enforcement actions, fines and penalties.

*Procedures and requirements of the PATRIOT Act may expose us to significant costs or penalties.*

As participants in the financial services industry, our subsidiaries are subject to laws and regulations, including the PATRIOT Act of 2001, which require that they know certain information about their customers and monitor transactions for suspicious financial activities. The cost of complying with the PATRIOT Act and related laws and regulations is significant. As an online broker with customers worldwide, we may face particular difficulties in identifying our international customers, gathering the required information about them and monitoring their activities. We face risks that our policies, procedures, technology and personnel directed toward complying with the PATRIOT Act are insufficient and that we could be subject to significant criminal and civil penalties due to noncompliance. Such penalties could have a material adverse effect on our business, financial condition and operating results.

*If we do not maintain the capital levels required by regulations, we may be fined or barred from conducting business.*

The Securities and Exchange Commission, National Association of Securities Dealers, Commodity Futures Trading Commission and various other regulatory agencies have stringent rules with respect to the maintenance of specific levels of net capital by securities broker–dealers and Futures Commission Merchants. Our failure to maintain the required net capital could result in suspension or revocation of our registration by the Securities and Exchange Commission or the Commodity Futures Trading Commission and our suspension or expulsion by the National Association of Securities Dealers or other U.S. and international regulatory bodies and could ultimately lead to our liquidation or the liquidation of one of our subsidiaries. If net capital rules are changed or expanded, or if we incur an unusually large charge against net capital, our operations that require an intensive use of capital could be limited. Such operations may include dealing activities, marketing and the financing of customer account balances. See "Business—Regulation" for more information on the minimum net capital requirements for our domestic broker–dealer and Futures Commission Merchant subsidiaries.

*We require a significant amount of liquidity.*

Ready access to cash is essential to our business. Our liquidity could be impaired by an inability to access lines of credit, an inability to access funds from our subsidiaries or an inability to liquidate customer positions or otherwise sell assets. This situation may arise due to circumstances that we may be unable to control, such as a general market disruption or an operational problem that affects third parties or us. Further, our ability to liquidate customer positions or otherwise sell assets may be impaired if other market participants are seeking to sell similar assets at the same time. Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized

financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements. The occurrence of any of the foregoing events could have a material effect on our financial condition or results of operations.

***We have recorded a significant amount of intangible assets, which may never generate the returns we expect.***

Our acquisitions and the THL Transactions have resulted in significant amounts of goodwill and identifiable intangible assets. Goodwill relates to the excess of cost over the fair value of the net assets of the businesses acquired by us. After giving effect to the THL Transactions, we had approximately $716.6 million of goodwill and approximately $573.9 million of identifiable intangible assets.

Goodwill and identifiable intangible assets are recorded at fair value on the date of acquisition, and under Financial Accounting Standards Board Statement No. 142, *Goodwill and Other Intangible Assets,* goodwill and indefinite lived intangibles are reviewed at least annually for impairment. Finite lived intangibles are reviewed for impairment whenever events or changes in circumstances indicate carrying amounts may not be recoverable. Impairment may result from, among other things, deterioration in the performance of the acquired business, adverse market conditions, adverse changes in applicable laws or regulations, including changes that restrict the activities of the acquired business, and a variety of other circumstances. The amount of any impairment must be written off. We may never realize the full value of our intangible assets. Any future determination requiring the write–off of a significant portion of intangible assets would have an adverse effect on our financial condition and results of operations.

### Risks Related to Our Substantial Indebtedness

***Our substantial indebtedness could adversely affect our financial health, harm our ability to react to changes to our business and prevent us from fulfilling our obligations under our indebtedness.***

As a result of the THL Transactions, we have a significant amount of indebtedness. As of November 30, 2004, after giving effect to our repayment of $150.0 million of borrowings outstanding under our senior credit facility during the quarter ended February 28, 2005 and completion of this offering and application of the net proceeds therefrom, we would have had total debt of approximately $1,038.0 million outstanding. Based on that level of indebtedness and interest applicable at November 30, 2004, our annual interest expense would have been $59.5 million.

Our substantial level of indebtedness increases the possibility that we may be unable to generate cash sufficient to pay, when due, the principal of, interest on or other amounts due in respect of our indebtedness. Our substantial debt could also have other significant consequences. For example, it could:

- increase our vulnerability to general economic downturns and adverse competitive and industry conditions;

- require us to dedicate a substantial portion, if not all, of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to pay dividends or fund working capital, capital expenditures and other general corporate expenditures;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- place us at a competitive disadvantage compared to competitors that have less debt;

23

- limit our ability to raise additional financing on satisfactory terms or at all; and

- adversely impact our ability to comply with the financial and other restrictive covenants in the agreements governing our debt instruments, which could result in an event of default under such agreements.

Furthermore, we are subject to interest rate risk in connection with our variable rate indebtedness. Interest rate changes could increase the amount of our interest payments and thus negatively impact our future earnings and cash flows. We currently estimate that our annual interest expense on our floating rate indebtedness would increase by $6.5 million for each increase in interest rates of 1%. If we do not have sufficient earnings, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or sell more securities, none of which we can guarantee we will be able to do.

***Despite current indebtedness levels, we and our subsidiaries may still be able to incur substantially more debt. This could further exacerbate the risks associated with our substantial leverage.***

We and our subsidiaries may be able to incur substantial additional indebtedness in the future. Although the agreements governing our debt instruments contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. For example, we have up to $75.0 million of borrowings available under our revolving credit facility and have the ability to increase the aggregate amount of our term loan under our senior credit facilities up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. If we incur additional debt above the levels currently in effect, the risks associated with our substantial leverage would increase.

***To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to make payments on and to refinance our indebtedness and to fund our operations will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Specific events that might adversely affect our cash flow include: a default by a customer in the payment of a large margin call; losses incurred by the clearing houses of which we are a member, which could result in a capital call against us; a loss by us of any of the registrations or licenses required for us to conduct business; or a permanent decline in the level of customer business activity.

Our business may not generate sufficient cash flow from operations, and we may be unable to make future borrowings under our senior credit facilities or otherwise in amounts sufficient to enable us to service our indebtedness or to fund our other liquidity needs. If we cannot service our debt, we will have to take actions such as reducing or delaying capital investments, selling assets, restructuring or refinancing our debt or seeking additional equity capital. We may not be able to effect any of these alternatives on commercially reasonable terms, or at all. In addition, the agreements governing our debt instruments may restrict us from adopting any of these alternatives. The implementation of these alternatives may adversely impact our business, financial condition and operating results.

***We are a holding company with no business operations of our own and depend on our subsidiaries for cash.***

We are a holding company with no significant business operations of our own. Our business operations are conducted through our subsidiaries. Dividends from, and cash generated by, our subsidiaries will be our principal sources of cash to repay indebtedness, fund operations and pay dividends. Accordingly, our ability to repay our indebtedness, fund operations and pay dividends to our

24

stockholders is dependent on the earnings and the distributions of funds from our subsidiaries. The agreements governing our debt instruments significantly restrict our subsidiaries from paying dividends and otherwise transferring cash or other assets to us. In addition, some of our subsidiaries are subject to minimum regulatory capital requirements, which may limit their ability to pay dividends or distributions or make loans to us. Furthermore, our subsidiaries are permitted under the agreements governing our debt instruments to incur additional indebtedness that may severely restrict or prohibit the making of distributions, the payment of dividends or the making of loans by our subsidiaries to us.

*Restrictive covenants in the agreements governing our debt instruments may restrict our ability to pursue our business strategies.*

The agreements governing our debt instruments contain a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to pursue our business strategies or engage in acts that may be in our best interests. Our senior credit facilities include covenants restricting, among other things, our ability to:

- incur or guarantee additional debt;

- incur liens;

- make loans and investments;

- make capital expenditures;

- declare or pay dividends or redeem or repurchase capital stock;

- engage in mergers, acquisitions and other business combinations;

- prepay, redeem or purchase subordinated debt;

- amend or otherwise alter terms of subordinated debt;

- sell assets and engage in sale leaseback transactions;

- transact with affiliates; and

- alter the business that we conduct.

The indenture relating to our senior subordinated notes also contains numerous covenants including, among other things, restrictions on our ability to:

- incur or guarantee additional indebtedness;

- sell assets;

- declare or pay dividends or make other equity distributions;

- purchase or redeem capital stock;

- make investments;

- consolidate or merge with or into other companies;

- engage in transactions with affiliates; and

- alter the business that we conduct.

25

Our senior credit facilities also include financial covenants, including requirements that we maintain:

- a minimum interest coverage ratio; and

- a maximum leverage ratio.

These financial covenants will become more restrictive over time.

A breach of any covenant or the inability to comply with any required financial ratio contained in either of the agreements governing our debt instruments could result in a default under that agreement. If any such default occurs, the lenders under our senior credit facilities or the holders of our senior subordinated notes, as the case may be, may elect to declare all outstanding borrowings, together with accrued and unpaid interest and other amounts payable thereunder, to be immediately due and payable. In addition, a default under the indenture governing our senior subordinated notes would cause a default under our senior credit facilities, and the acceleration of debt under our senior credit facilities or the failure to pay that debt when due would cause a default under the indenture governing our senior subordinated notes. The lenders under our senior credit facilities also have the right upon an event of default thereunder to terminate any commitments they have to provide further borrowings. Further, following an event of default under our senior credit facilities, the lenders under these facilities will have the right to proceed against the collateral granted to them to secure that debt, which includes the available cash of our subsidiaries that guarantee our senior credit facilities, and they will also have the right to prevent us from making debt service payments on our senior subordinated notes. If the debt under our senior credit facilities or our senior subordinated notes were to be accelerated, we cannot assure you that our assets would be sufficient to repay in full that debt or any other debt that may become due as a result of that acceleration, which could have a material adverse effect on the value of our common stock.

### Risks Relating to Our Common Stock and this Offering

*Our quarterly revenues and operating results can fluctuate substantially and be difficult to forecast.*

Our quarterly revenues and operating results are difficult to forecast. We may experience substantial fluctuations in revenues and operating results from quarter to quarter. The reasons for these fluctuations may include, but are not limited to:

- competition;

- seasonal fluctuations in our business;

- costs of compliance with regulatory requirements;

- our relationships with our significant customers;

- our relationships with introducing brokers;

- changes in personnel and management;

- credit risk;

- costs associated with protecting our intellectual property and proprietary rights;

- the timing of acquisitions;

- changes in prevailing interest rates;

- systems failures, capacity constraints or network problems;

26

- general changes to the U.S. and global economies; and

- political conditions or events.

Period–to–period comparisons of our operating results are not necessarily meaningful and should not be relied upon as indications of future performance. We cannot assure you that our revenues will increase or be sustained in future periods or that we will be profitable in any future period. Any shortfalls in revenues or net income in any given period from levels expected by securities or industry analysts could have an immediate and significant adverse effect on the trading price of our common stock.

*There may not be an active, liquid trading market for our common stock.*

Prior to this offering, there has been no public market for our common stock. We cannot predict the extent to which a trading market will develop or how liquid that market may become. If an active trading market does not develop, you may have difficulty selling any of our common stock that you purchase. The initial public offering price of our common stock was determined by negotiation between us and representatives of the underwriters based upon a number of factors and may not be indicative of prices that will prevail following the completion of this offering. The market price of our common stock may decline below the initial public offering price, and you may not be able to resell your shares of our common stock at or above the initial offering price.

*We expect that our stock price will fluctuate significantly, and you may not be able to resell your shares at or above the initial public offering price.*

The trading price of our common stock is likely to be volatile and subject to wide price fluctuations in response to various factors, including:

- market conditions in the broader stock market in general, or in the financial services industry in particular;

- actual or anticipated fluctuations in our quarterly financial and operating results;

- developments or disputes concerning our intellectual property or proprietary rights;

- introduction of new services by us or our competitors;

- issuance of new or changed securities analysts' reports or recommendations;

- additions or departures of key personnel;

- regulatory developments;

- litigation and governmental investigations; and

- economic and political conditions or events.

These and other factors may cause the market price and demand for our common stock to fluctuate substantially, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, in the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders brought a lawsuit against us, we could incur substantial costs defending the lawsuit. Such a lawsuit could also divert the time and attention of our management from our business.

27

***If the ownership of our common stock continues to be highly concentrated, it may prevent you and other stockholders from influencing significant corporate decisions and may result in conflicts of interest that could cause our stock price to decline.***

We are controlled by affiliates of Thomas H. Lee Partners, L.P. and Phillip Bennett, our President and Chief Executive Officer. Thomas H. Lee Partners, L.P. and its affiliates and Phillip Bennett will beneficially own or control approximately     % and     %, respectively, of our common stock following the completion of this offering. Accordingly, Thomas H. Lee Partners, L.P. and its affiliates, acting as a group, and Phillip Bennett will be able to control matters that require stockholder approval, including the election of directors, any merger, consolidation or sale of all or substantially all of our assets or other significant corporate transactions. Our controlling stockholders may have interests that differ from your interests and may vote in a way with which you may disagree and which may be adverse to your interests. Corporate action may be taken even if other stockholders, including those who purchase shares in this offering, oppose them. These stockholders may also delay or prevent a change of control of us, even if that a change of control would benefit our other stockholders, which could deprive our stockholders of the opportunity to receive a premium for their common stock. The significant concentration of stock ownership may adversely affect the trading price of our common stock due to investors' perception that conflicts of interest may exist or arise.

***If securities or industry analysts do not publish research or reports about our business, if they change their recommendations regarding our stock adversely or if our operating results do not meet their expectations, our stock price and trading volume could decline.***

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts publish about us or our business. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline. Moreover, if one or more of the analysts who cover us downgrade our stock or if our operating results do not meet their expectations, our stock price could decline.

***Future sales of common stock may cause our stock price to fall.***

After giving effect to this offering and the Reincorporation, we will have           shares of common stock outstanding, assuming no exercise of the underwriters' over–allotment option. Of these shares of common stock, the           shares of common stock being sold in this offering, plus any shares issued upon exercise of the underwriters' over–allotment option, will be freely tradeable without restriction under the Securities Act, except for any such shares that may be held or acquired by an "affiliate" of ours, as that term is defined in Rule 144 promulgated under the Securities Act, which shares will be subject to the volume limitations and other restrictions of Rule 144. The remaining shares of common stock held by our existing stockholders upon completion of this offering, other than those subject to the underwriters' over–allotment option to the extent it is exercised, will be "restricted securities," as that phrase is defined in Rule 144, and may not be resold, in the absence of registration under the Securities Act, except pursuant to an exemption from such registration. After the lock–up agreements delivered to the underwriters by our executive officers, directors and substantially all of our stockholders expire or are terminated, all of our additional shares may be sold in the public market, subject to legal restrictions on transfer. See "Underwriting" and "Shares Eligible for Future Sale." Approximately 180 days after the date of this prospectus, approximately           million shares will be available for sale pursuant to various exemptions from registration. Additionally, we may sell additional shares of common stock in subsequent public offerings. The market price of our common stock could decline as a result of any such sales in the market after this offering, or the perception that these sales could occur. These sales might also make it more difficult for us to sell equity securities at a time and price that we deem appropriate.

***Provisions of our charter documents or Delaware law could delay or prevent an acquisition of our company, even if the acquisition would be beneficial to our stockholders, and could make it more difficult for you to change management.***

Following the Reincorporation, our certificate of incorporation and bylaws and Delaware law will contain provisions that could depress the trading price of our common stock by acting to discourage, delay or prevent a change of control of our company or changes in management that our stockholders might deem advantageous. Specific provisions in our certificate of incorporation will include:

- our ability to issue preferred stock with terms that the board of directors may determine, without stockholder approval;

- limitations on the ability to remove directors;

- advance notice requirements for stockholder proposals and nominations; and

- limitations on convening stockholder meetings.

As a result of the provisions in our certificate of incorporation and Delaware law, the price investors may be willing to pay in the future for shares of our common stock may be limited.

***We do not anticipate paying any cash dividends in the foreseeable future.***

We currently intend to retain our future earnings, if any, for the foreseeable future, to repay indebtedness and to fund the development and growth of our business. We do not intend to pay any dividends to holders of our common stock. In addition, the terms of our existing debt agreements restrict our ability to pay dividends to our shareholders. As a result, capital appreciation in the price of our common stock, if any, will be your only source of gain on an investment in our common stock.

***New investors in our common stock will experience immediate and substantial book value dilution after this offering.***

The initial public offering price of our common stock will be substantially higher than the pro forma net tangible book value per share of the outstanding common stock immediately after the offering. Based on an assumed initial public offering price of $       per share (the midpoint of the price range set forth on the cover of this prospectus) and our net tangible book value as of       , 2004, if you purchase our common stock in this offering you will pay more for your shares than the amounts paid by existing shareholders for their shares and you will suffer immediate dilution of approximately $            per share in pro forma net tangible book value. As a result of this dilution, investors purchasing stock in this offering may receive significantly less than the full purchase price that they paid for the shares purchased in this offering in the event of a liquidation. See "Dilution."

29

## FORWARD–LOOKING STATEMENTS

This prospectus contains forward–looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact included in this prospectus are forward–looking statements. Forward–looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. You can identify forward–looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "plan," "intend," "believe" and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events.

These forward–looking statements are based on assumptions that we have made in light of our industry experience and on our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (some of which are beyond our control) and assumptions. Although we believe that these forward–looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results and cause them to differ materially from those anticipated in the forward–looking statements. These factors include, among others:

- changes in domestic and international market conditions;

- competition;

- our ability to attract and retain customers;

- our relationships with introducing brokers;

- retention of our management team;

- our ability to manage our growth or integrate future acquisitions;

- our exposure to significant credit risks with respect to our customers;

- international operations and expansion;

- system failures;

- the performance of third–party suppliers;

- changes in regulations or exchange membership requirements;

- the effectiveness of compliance and risk management methods;

- potential litigation or investigations;

- employee or introducing broker misconduct or errors;

- reputational harm;

- changes in capital requirements; and

- the other factors described under "Risk Factors."

There may be other factors that may cause our actual results to differ materially from the forward–looking statements.

Because of these factors, we caution that you should not place undue reliance on any of our forward–looking statements. Further, any forward–looking statement speaks only as of the date on which it is made. New risks and uncertainties arise from time to time, and it is impossible for us to predict those events or how they may affect us. Except as required by law, we have no duty to, and do not intend to, update or revise the forward–looking statements in this prospectus after the date of this prospectus.

## USE OF PROCEEDS

We estimate that the net proceeds from this offering with respect to the shares to be sold by us will be $              million, after deducting underwriting discounts and commissions and estimated expenses payable by us in connection with this offering and assuming a public offering price of $              per share (the midpoint of the price range set forth on the cover of this prospectus). We will not receive any of the proceeds from the sale of shares by the selling stockholders.

We intend to use a portion of the net proceeds of this offering to redeem $210.0 million aggregate principal amount of the $600.0 million aggregate principal amount outstanding of our senior subordinated notes due 2012 (together with the related premium of $18.9 million and accrued and unpaid interest thereon to the redemption date) and for general corporate purposes, including working capital and potential acquisitions. Our senior subordinated notes mature on August 1, 2012 and bear interest at a rate of 9% per annum.

Pending the specific application of the net proceeds as described above, we intend to invest the net proceeds from this offering in short–term, investment–grade, interest–bearing securities.

## DIVIDEND POLICY

New Refco and its predecessor paid aggregate distributions to their equity holders of $75.0 million, $100.0 million and $120.0 million in the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004, respectively. As a limited liability company, we made these distributions to equity holders periodically during the above periods. From March 1, 2004 through November 30, 2004, New Refco and its predecessor paid no distributions. Prior to the closing of the offering, New Refco intends to make a cash distribution of approximately $              million to the members of New Refco to enable them to meet their estimated income tax obligations for the period from January 1, 2005 to the date of the Reincorporation. The amount of this distribution will be based on New Refco's estimated net taxable income from January 1, 2005 to the date of the Reincorporation. Purchasers of shares in the offering will not receive this distribution.

Upon the Reincorporation and the completion of this offering, we intend to retain all available funds and any future earnings to reduce debt and fund the development and growth of our business and do not anticipate paying any cash dividends on our capital stock in the foreseeable future.

Our ability to pay dividends on our common stock may also be restricted by the terms of the outstanding indebtedness of our subsidiaries (see "Description of Indebtedness"), by the terms of any future indebtedness that we or our subsidiaries may incur and by legal and regulatory requirements. We are a holding company with no significant business operations of our own. Our business operations are conducted through our subsidiaries. Dividends from, and cash generated by, our subsidiaries will be our principal sources of cash to repay indebtedness, fund operations and pay dividends. Accordingly, our ability to pay dividends to our stockholders is dependent on the earnings and the distributions of funds from our subsidiaries. In addition, certain of our regulated subsidiaries must maintain minimum capital requirements. Compliance with these capital requirements restrict our ability to withdraw capital from our subsidiaries, which in turn may limit our ability to pay dividends.

Any future determination to pay dividends will be at the discretion of our board of directors and will take into account:

- general economic and business conditions;

- our financial condition and results of operations;

- our capital requirements and the capital requirements of our subsidiaries;

- our ability to receive dividends and distributions from our operating subsidiaries; and

- such other factors as our board of directors may deem relevant.

31

## CAPITALIZATION

The following table sets forth our unaudited cash and cash equivalents and our unaudited capitalization as of November 30, 2004:

- on an actual historical basis;

- on a pro forma basis after giving effect to the Reincorporation and the issuance and sale of shares of common stock in this offering at an assumed initial offering price of $            per share (the midpoint of the price range set forth on the cover of this prospectus), after deducting the underwriting discounts and commissions and estimated expenses payable in connection with this offering and the application of the net proceeds to us from this offering by us.

This table should be read in conjunction with "Use of Proceeds," "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical and Pro Forma Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

| | As of November 30, 2004 | |
| --- | --- | --- |
| | Actual | Pro Forma |
| | (in thousands) | |
| Cash and cash equivalents | $ 278,754 | $ |
| Current portion of long–term debt(1) | $ 8,000 | $ |
| Long–term debt: | | |
| Senior credit facilities: | | |
| Term loans(1) | 790,000 | |
| Revolving credit facility(2) | — | |
| 9% senior subordinated notes due 2012 | 600,000 | |
| Total long–term debt | $ 1,390,000 | |
| Membership interest issued by subsidiary | 7,122 | |
| Members'/Stockholders' equity: | | |
| Members' equity | 124,242 | |
| Preferred Stock, $0.01 par value,            shares authorized; no shares issued or outstanding | | |
| Common Stock, $0.01 par value,            shares authorized; no shares outstanding, actual;            shares issued and outstanding, pro forma; and            shares issued and outstanding, pro forma | | |
| Additional paid–in capital | | |
| Retained earnings | | |
| Total members'/stockholders' equity | 124,242 | |
| Total capitalization | $ 1,529,364 | $ |

(1) Our senior credit facilities provide for $800.0 million in term loans, all of which were drawn in connection with the THL Transactions. We repaid $2.0 million of our term loans during the quarter ended November 30, 2004. We repaid $150.0 million of our term loans during the quarter ended February 28, 2005. $8.0 million of our borrowings under our senior credit facilities are reflected in the current portion of our long–term debt.

(2) Our senior facilities provide for a $75.0 million revolving credit facility, none of which has been drawn.

## DILUTION

If you invest in our common stock in this offering, your ownership interest will be diluted to the extent of the difference between the initial public offering price per share and the pro forma net tangible book value per share of common stock upon the completion of this offering and the Reincorporation. Dilution results from the fact that the per share offering price of common stock in this offering will be substantially in excess of the book value per share attributable to the shares of common stock to be held by our existing stockholders following the Reincorporation. Pro forma net tangible book value per share represents our total tangible assets less total liabilities divided by the pro forma total number of shares of common stock outstanding (excluding shares of common stock to be issued in connection with this offering), giving effect to the Reincorporation. On a pro forma basis, giving effect to the Reincorporation, our net tangible book value as of November 30, 2004 was approximately $              million, or approximately $              per share.

After giving effect to the sale of the shares of common stock at an assumed initial public offering price of $              per share (the midpoint of the price range set forth on the cover of this prospectus) and after deducting underwriting discounts and commissions and estimated expenses payable by us in connection with this offering, our pro forma as adjusted net tangible book value as of November 30, 2004 would have been approximately $              million, or $              per share of common stock. This represents an immediate increase in net tangible book value of $              per share to our existing stockholders and an immediate dilution of $              per share to new investors purchasing shares of common stock in this offering at the assumed initial offering price. The following table illustrates this dilution on a per share basis:

| | |
|---|---|
| Assumed initial public offering price per share | $ |
| Pro forma net tangible book value per share as of November 30, 2004 | $ |
| Increase in pro forma net tangible book value per share attributable to the sale of shares in this offering | |
| Pro forma as adjusted net tangible book value per share after this offering | |
| Pro forma dilution per share to new investors | $ |

The following table summarizes on a pro forma basis as of              , 2004, giving effect to the Reincorporation and this offering, the number of shares of our common stock purchased from us, the total consideration paid to us, and the average price per share paid to us by our existing stockholders and to be paid by new investors purchasing shares of our common stock from us in this offering. The table is based on an assumed initial public offering price of $              per share before deduction of underwriting discounts and commissions and estimated expenses payable by us in connection with this offering:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| | (in thousands) | | (in thousands) | | |
| Existing stockholders | | % | $ | % | $ |
| New investors | | | | | |
| Total | | 100% | $ | 100% | |

33

The above discussion and tables:

- exclude                 shares of our common stock reserved for future grants under our compensation plans; and

- assume no exercise of the underwriters' option to purchase up to                 additional shares from us and up to                 shares from selling stockholders.

If the underwriters execute their over–allotment option in full:

- the percentage of our common stock held by our existing stockholders will decrease to approximately    % of the total outstanding amount of our common stock after the Reincorporation and this offering; and

- the percentage of our common stock held by new investors will increase to approximately    % of the total outstanding amount of our common stock after the Reincorporation and this offering.

34

**UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS**

The following unaudited pro forma consolidated financial statements of Refco Inc. and its subsidiaries for the year ended February 29, 2004 and the nine months ended November 30, 2004 have been derived by application of pro forma adjustments to the historical consolidated audited and unaudited financial statements included elsewhere in this prospectus and the unaudited management accounts of Forstmann–Leff International Associates, LLC. The unaudited pro forma adjustments are based upon available information and assumptions that management believes are reasonable under the circumstances. The unaudited pro forma financial statements do not purport to represent what our results of operations or financial condition would have been had the THL Transactions, the Reincorporation and the Offering actually occurred on the dates indicated, nor do they purport to project the results of our operations or financial condition for any future period or as of any future date.

The unaudited pro forma statements of income for the year ended February 29, 2004 and the nine months ended November 30, 2004 give effect to the following transactions as if they had occurred on March 1, 2003:

*The THL Transactions—*

- an equity investment made by THL Refco Acquisition Partners and its affiliates and co–investors in New Refco, totaling approximately $507.0 million in cash through their acquisition of a portion of Refco Group's membership interests for cash and their subsequent exchange of those interests for membership interests of New Refco;

- the exchange of the existing equity investment of Phillip Bennett, our President and Chief Executive Officer, through Refco Group Holdings, Inc., of approximately $382.5 million of interests in Refco Group for an approximate 42.8% equity interest in New Refco;

- an investment by other members of management of approximately $4.5 million in cash in New Refco;

- the entering into by Refco Group (as successor of Refco Finance Holdings, LLC) and New Refco of senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Transactions, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing;

- the issuance by Refco Finance Holdings LLC and Refco Finance Inc. of $600.0 million in aggregate principal amount of senior subordinated notes;

- the merger of Refco Finance Holdings LLC with and into Refco Group, with Refco Group continuing as the surviving entity;

- the payments of $24.9 million relating to pre–payment premiums on Refco Group's existing debt and $19.8 million relating to obligations triggered by Refco Group's change of control;

- the repayment of $383.5 million of unsecured senior notes issued by Refco Group under four separate note purchase agreements; and

- the repayment of a $16.0 million intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group.

As part of the THL Transactions, Refco Group distributed $550.0 million in cash and other capital distributions and all of the equity interests of Forstmann–Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business (the "Asset Management Distribution"), to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip

35

Bennett and that is now wholly owned by Phillip Bennett. Following the distribution of Forstmann–Leff International Associates, LLC, Refco Group is organized into two operating business segments, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and has one non–operating business segment, Corporate & Other. Forstmann–Leff International Associates, LLC is accounted for as discontinued operations in our pro forma consolidated financial statements and our audited consolidated financial statements included elsewhere in this prospectus. The component from Refco Group's Asset Management business that was retained after the Asset Management Distribution, Refco Alternative Investments, has become part of its Derivatives Brokerage & Clearing business.

Refco Alternative Investments has an existing arms–length distribution agreement with Tilney Holdings, a subsidiary of Forstmann–Leff International Associates, LLC, whereby Refco Alternative Investments receives an advisory fee from Tilney Holdings for certain of Tilney Holdings' hedge fund products, which are sold through its distribution platform. The advisory fee is based on the volume of the product sold through its distribution platform and for as long as they are managed by Tilney Holdings. The fees received by us from Tilney Holdings are not material.

The acquisition by THL Refco Acquisition Partners and its affiliates and co–investors of a portion of Refco Group Holdings, Inc.'s interest in Refco Group and Refco Group Holdings, Inc.'s contribution of its interest in Refco Group to New Refco are each accounted for as a purchase in conformity with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*, in accordance with Emerging Issues Task Force ("EITF") No. 88–16, *Basis in Leveraged Buyout Transactions*, with intangible assets recorded in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. This guidance requires the continuing residual interest retained by the continuing management investors as a result of the THL Transactions to be reflected at its predecessor basis and a partial step–up of the assets and liabilities to fair value for the portion acquired by THL Refco Acquisition Partners, its affiliates and co–investors.

*The Reincorporation and this offering—*

- Each of THL Refco Blocker Corp., THL Refco Blocker Corp. II and THL Refco Blocker Corp. III (each of which is a general partner of THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III, respectively) will merge with and into Refco Inc. with Refco Inc. continuing as the surviving entity, and pursuant to such mergers, Refco Inc. will issue an aggregate of          shares of its common stock in exchange for all of the common and preferred stock of such entities;

- THL Refco GP LLC, the other general partner of THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III, will contribute all of its general partnership interests in each of such entities to Refco Inc. in exchange for no consideration;

- Each of the other affiliates and co–investors of Thomas H. Lee Partners, L.P. holding Class A member interests in New Refco will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of          shares of its common stock;

- Refco Group Holdings, Inc., which is wholly–owned by Phillip Bennett, our President and Chief Executive Officer, will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for          shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for          shares of common stock;

- Our officers who hold Class A member interests in New Refco will contribute all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of          shares of its commons stock; and

- Our officers, directors and employees who hold Class B member interests in New Refco shall contribute all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of                    shares of its common stock, which shares shall be subject to vesting and a right of repurchase.

- Our becoming taxable as a corporation.

- Our issuance of                    shares in this offering at the assumed initial public offering price of $          per share, which is the mid–point of the price range set forth on the cover page of this prospectus, and the application of the net proceeds for this offering, after deducting the underwriting discounts, commissions and estimated expenses payable by us, as described under "Use of Proceeds."

The unaudited pro forma balance sheet as of November 30, 2004 gives effect to the Reincorporation and this offering as if such transactions occurred as of November 30, 2004.

The assumptions underlying the pro forma adjustments are described in the accompanying notes, which should be read in conjunction with these unaudited pro forma consolidated financial statements.

The unaudited pro forma consolidated financial statements should be read in conjunction with the information contained in "Selected Historical and Pro Forma Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Certain Relationships and Related Transactions" and the consolidated financial statements and the related notes thereto appearing elsewhere in this prospectus.

The unaudited pro forma consolidated statements of income do not give effect to one–time effects of events that are directly attributable to the Reincorporation and this offering. As a "C" corporation, we will be subject to federal and state income taxes. Our previous holding company, New Refco, was a limited liability company and was not subject to federal or state taxes. These one–time events include the following transactions and related tax effects that are expected to occur during the fiscal year ended February 28, 2006 and are not included in the pro forma consolidated statements of income:

- recognition of a credit to our income tax provision of approximately $149.3 million corresponding to a net deferred tax asset recognized upon becoming a "C" corporation immediately before the consummation of this offering;

- recognition of a loss for the write–off of debt issuance costs of $7.4 million, which relates to the redemption of $210.0 million of our senior subordinated notes using a portion of the net proceeds from this offering; and

- recognition of the final management fee payment of $          by New Refco to THL Managers V, LLC in connection with the termination of the management agreement by THL Managers V, LLC upon consummation of this offering in accordance with the terms of the management agreement.

Any recurring effect of the events described in this paragraph has been reflected in the Unaudited Pro Forma Condensed Consolidated Statements of Income.

37

**Refco Inc. and Subsidiaries**

**Unaudited Pro Forma Consolidated Balance Sheet**
**as of November 30, 2004**
**(in thousands)**

| | Historical | Adjustments for | | Pro Forma |
| | | The Reincorporation | The Offering | |
|---|---|---|---|---|
| Cash and cash equivalents | $ 278,754 | $ — | $ (b)(c)(d)(e) | |
| Cash and securities segregated under federal and other regulations: | | | | |
| Cash and cash equivalents | 946,515 | — | — | |
| Securities purchased under agreements to resell | 19,771 | — | — | |
| Securities purchased under agreements to resell | 32,968,876 | — | — | |
| Deposits with clearing organizations and others | 698,435 | — | — | |
| Receivables from broker–dealers and clearing organizations | 1,985,670 | — | — | |
| Receivables from customers, net of reserves | 1,767,347 | — | — | |
| Securities owned, at market or fair value | 6,476,821 | — | — | |
| Memberships in exchanges | 36,521 | — | — | |
| Other assets | 1,554,145 | 149,345(a) | (7,447)(f) | |
| Total assets | $ 46,732,855 | $ 149,345 | $ | |
| Liabilities: | | | | |
| Short–term borrowings, including current portion of long–term borrowings | $ 8,000 | $ — | $ — | |
| Securities sold under agreements to repurchase | 32,015,382 | — | — | |
| Payable to broker–dealers and clearing organizations | 1,478,510 | — | — | |
| Payable to customers | 6,865,766 | — | — | |
| Securities sold, not yet purchased, at market or fair value | 4,554,005 | — | — | |
| Accounts payable, accrued expenses, and other liabilities | 289,828 | — | — | |
| Long–term borrowings | 1,390,000 | — | (210,000)(c) | |
| Total liabilities | 46,601,491 | — | (210,000) | |
| Commitments and contingent liabilities | | | | |
| Membership interests issued by subsidiary | 7,122 | — | — | |
| Members' equity/stockholders' equity | 124,242 | 149,345(a) | (b)(d)(e)(f) | |
| Total liabilities and members'/stockholders' equity | $ 46,732,855 | $ 149,345 | $ | |

The accompanying notes are an integral part of the unaudited
pro forma consolidated financial statements

38

**Notes to Unaudited Pro Forma Consolidated Balance Sheet**

**The following pro forma adjustments relate to the unaudited pro forma consolidated balance sheet as of November 30, 2004:**

*(a)*  Represents the recognition of a one–time, non–cash credit to our income tax provision to recognize previously unrecognized net deferred tax assets of approximately $149.3 million upon becoming a "C" corporation immediately before the consummation of this offering. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns.

*(b)*  Represents the net proceeds of $     million received from the issuance of           shares of common stock in this offering.

*(c)*  Represents the redemption of $210.0 million aggregate principal amount of our senior subordinated notes from a portion of the net proceeds from this offering.

*(d)*  Represents an adjustment for a redemption premium of $18.9 million paid in connection with the redemption of $210.0 million aggregate principal amount of our senior subordinated notes.

*(e)*  Represents the payment of the final management fee of $     to THL Managers V, LLC in connection with the termination of the management agreement upon the consummation of this offering in accordance with the terms of the management agreement.

*(f)*  Represents an adjustment to other assets related to the write–off of $7.4 million of unamortized debt issuance costs in connection with the redemption of $210.0 million aggregate principal amount of our senior subordinated notes.

39

**Refco Inc. & Subsidiaries**
**Unaudited Pro Forma Condensed Consolidated Statement of Income**
**Year ended February 29, 2004**
**(in thousands)**

| | | Adjustments for | | | | |
|---|---|---|---|---|---|---|
| | | The THL Transactions | | | | |
| | Historical | Asset Management Distribution (a) | Acquisition and Related Financing | The Reincorporation | The Offering | Pro Forma |
| **Revenues:** | | | | | | |
| Commissions and brokerage | $ 645,440 | $ — | $ — | $ — | $ — | $ 645,440 |
| Interest | 1,051,695 | — | — | — | — | 1,051,695 |
| Principal transactions, net | 165,936 | — | — | — | — | 165,936 |
| Asset management and advisory fees | 7,255 | — | — | — | — | 7,255 |
| Other | 3,973 | — | — | — | — | 3,973 |
| Total revenues | 1,874,299 | — | — | — | — | 1,874,299 |
| **Expenses:** | | | | | | |
| Commissions and order execution costs | 411,894 | — | — | — | — | 411,894 |
| Interest | 897,674 | — | 59,651(b)(c) | — | (19,870)(h)(i) | 937,455 |
| Employee compensation and benefits | 204,854 | — | — | — | — | 204,854 |
| General, administrative and other | 170,415 | — | 16,679(d)(e) | — | (2,500)(j) | 184,594 |
| Total expenses | 1,684,837 | — | 76,330 | — | (22,370) | 1,738,797 |
| Income before provision for income taxes, income from equity investees, members' interests in earnings of subsidiary and discontinued operations | 189,462 | — | (76,330) | — | 22,370 | 135,502 |
| Provision for income taxes | 11,687 | — | (3,053)(f) | 46,922(g) | — | 55,556 |
| Income before income from equity investees, members' interests in earnings of subsidiary and discontinued operations | 177,775 | — | (73,277) | (46,922) | 22,370 | 79,946 |
| Income from equity investees | 11,544 | — | — | — | — | 11,544 |
| Members' interest in earnings of subsidiary | 1,273 | — | — | — | — | 1,273 |
| Income from continuing operations | 188,046 | — | (73,277) | (46,922) | 22,370 | 90,217 |
| **Discontinued operations:** | | | | | | |
| Loss from discontinued operations | (401) | 401 | — | — | — | — |
| Applicable income tax expense | 489 | (489) | — | — | — | — |
| Net income | $ 187,156 | $ 890 | $ (73,277) | $ (46,922) | $ 22,370 | $ 90,217 |
| Net income per common share | $ | $ | $ | $ | $ | $ (k) |
| Weighted average shares outstanding | | | | | | (l) |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements

40

**Refco Inc. & Subsidiaries**
**Unaudited Pro Forma Condensed Consolidated Statements of Income**
**Nine months ended November 30, 2004**
**(in thousands)**

| | Historical | | The THL Transactions | | Adjustments for | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through November 30, 2004 | Asset Management Distribution(a) | Acquisition and Related Financing | The Reincorporation | The Offering | Pro Forma |
| **Revenues:** | | | | | | | |
| Commissions and brokerage | $ 362,020 | $ 262,354 | $ — | $ — | $ — | $ — | $ 624,374 |
| Interest | 768,713 | 985,361 | — | — | — | — | 1,754,074 |
| Principal transactions, net | 119,235 | 82,917 | — | — | — | — | 202,152 |
| Asset management and advisory fees | 3,676 | 5,817 | — | — | — | — | 9,493 |
| Other | 2,469 | 2,112 | — | — | — | — | 4,581 |
| Total revenues | 1,256,113 | 1,338,561 | — | — | — | — | 2,594,674 |
| **Expenses:** | | | | | | | |
| Commissions and order execution costs | 244,009 | 194,137 | — | — | — | — | 438,146 |
| Interest | 706,640 | 953,460 | — | 24,889 (b)(c) | — | (14,902)(h)(i) | 1,670,087 |
| Employee compensation and benefits | 108,528 | 85,641 | — | — | — | — | 194,169 |
| General, administrative and other | 97,576 | 75,988 | — | 7,546 (d)(e) | — | (1,970)(j) | 179,140 |
| Total expenses | 1,156,753 | 1,309,226 | — | 32,435 | — | (16,872) | 2,481,542 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 99,360 | 29,335 | — | (32,435) | — | 16,872 | 113,132 |
| Provision for income taxes | 7,994 | 4,149 | — | (1,297)(f) | 35,538 (g) | — | 46,384 |
| Income before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 91,366 | 25,186 | — | (31,138) | (35,538) | 16,872 | 66,748 |
| Income from equity investees | 8,345 | 18,560 | — | — | — | — | 26,905 |
| Members' interest in earnings of subsidiary | 5,771 | 1,162 | — | — | — | — | 6,933 |
| Income from continuing operations | 93,940 | 42,584 | — | (31,138) | (35,538) | 16,872 | 86,720 |
| **Discontinued operations:** | | | | | | | |
| Income from discontinued operations | 7,383 | — | (7,383) | — | — | — | — |
| Applicable income tax expense | 3,344 | — | (3,344) | — | — | — | — |
| Net income | $ 97,979 | $ 42,584 | $ (4,039) | $ (31,138) | $ (35,538) | $ 16,872 | $ 86,720 |
| Net income per common share | $ | $ | $ | $ | $ | $ | $ (k) |
| Weighted average shares outstanding | | | | | | | (l) |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements

41

**Notes to Unaudited Pro Forma Consolidated Statements of Income**

**The following pro forma adjustments relate to the unaudited pro forma consolidated statements of income for the year ended February 29, 2004 and the nine months ended November 30, 2004:**

*(a)*

Represents the results of operations of the Asset Management business for the year ended February 29, 2004 and the nine months ended November 30, 2004, as derived from the unaudited management information of the Asset Management business. Forstmann–Leff International Associates, LLC, which owns substantially all the assets of the Asset Management business of the Group, was distributed to Refco Group Holdings, Inc., as part of the THL Transactions consummated on August 5, 2004. This distribution does not include the retained assets from our Asset Management business, Refco Alternative Investments, which have been retained and the results of operations of which have become part of our Derivatives Brokerage & Clearing business.

*(b)*

Represents interest expense for new debt incurred in connection with the THL Transactions at the following interest rates, net of interest expense associated with existing debt being repaid:

| | |
|---|---|
| New senior credit facility | 3.77% |
| New senior subordinated notes | 9.0% |

The additional interest expense is calculated as the new interest on the $800.0 million new senior credit facility at 3.77% per year plus the new interest on the $600.0 million new senior subordinated notes at 9.0% per year, net of the existing interest expense for the year ended February 29, 2004 and the nine months period ended November 30, 2004 of $31.1 million and $41.1 million, respectively.

The senior credit facility accrues interest at the LIBOR rate plus 2.00% per annum. The actual rates will vary from those used to compute the above adjustment of interest expense due to floating rates applicable to our new senior credit facility. The effect on pretax income of a $1/8\%$ variance in these rates would be approximately $1.0 million for an annual period.

*(c)*

Represents additional interest expense for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $3.4 million and $2.9 million, respectively, related to the amortization of debt issuance costs from debt incurred in relation to the THL Transactions.

*(d)*

Represents additional amortization expense as a result of the partial step–up to fair market value of customer relationships and technology for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $17.4 million and $6.7 million, respectively. The pro forma value of the customer relationships are amortized on an accelerated basis over a weighted average economic useful life of 13 years based on patterns of usage. Technology is amortized over an estimated useful life of three years. The additional amortization expense is net of the existing amortization expense for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $3.2 million and $8.7 million, respectively.

*(e)*

Represents a management fee to be paid to THL Managers V, LLC for advisory and consulting services for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $2.5 million and $2.0 million, respectively.

*(f)*

Represents an increase in income tax benefits for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $3.1 million and $1.3 million, respectively. This tax benefit is provided at a 4% tax rate for the New York City Unincorporated Business tax due to the aggregate pro forma decrease in income before provision for income taxes. Prior to the consummation of the Reincorporation, New Refco was treated as a partnership for federal income tax purposes, and accordingly, we have not provided for federal income taxes related to New Refco's operating results.

42

(g)     Represents the adjustment for an estimated increase in income tax provision calculated at an effective rate of 41.0% as a "C" corporation, net of existing tax paid on foreign subsidiaries and New York City Unincorporated Business Tax. The increased income tax totals $46.9 million and $35.5 million for the year ended February 29, 2004 and the nine months ended November 30, 2004, respectively, and reflects additional federal and state income taxes that we would have been required to pay had we been a taxable corporation since March 1, 2003.

(h)     Represents a reduction in interest expense for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $18.9 million and $14.2 million, respectively, related to the repayment of $210.0 million of our outstanding senior subordinated notes with a portion of the net proceeds from this offering.

(i)     Represents a reduction to the amortization of debt issuance costs for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $1.0 million and $0.7 million, respectively, related to the repayment of debt in relation to this offering.

(j)     Represents the elimination of the management fee paid to THL Managers V, LLC for advisory and consulting services for the year ended February 29, 2004 and the nine months ended November 30, 2004 of $2.5 million and $2.0 million, respectively. Upon the consummation of this offering, THL Managers V, LLC will terminate this agreement pursuant to its terms.

(k)     Calculated after considering the impact of the pro forma adjustments described above and based on            million weighted average shares of common stock outstanding, as applicable, after giving effect to the            million shares of common stock issued in connection with this offering.

(l)     Reflects the issuance of            million shares of common stock in this offering as of the earliest date presented.

43

### SELECTED CONSOLIDATED FINANCIAL DATA

Set forth below is selected consolidated financial data, at the dates and for the periods indicated, for Refco Group, which holds all of our operating subsidiaries and will be an indirect subsidiary of Refco Inc. following the Reincorporation, as of and for the fiscal years ended February 29, 2000 and February 28, 2001, 2002 and 2003 and February 29, 2004 and for the nine months ended November 30, 2003 and 2004.

This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting this offering and until the consummation of the Reincorporation, will hold no material assets and will not engage in any operations.

The selected consolidated financial data as of and for the fiscal years ended February 28, 2002 and 2003 and February 29, 2004 have been derived from Refco Group's audited consolidated financial statements for fiscal years 2002, 2003 and 2004, and the selected consolidated financial data for the fiscal years ended February 29, 2000 and February 28, 2001 have been derived from Refco Group's unaudited consolidated financial statements for fiscal years 2000 and 2001.

The selected consolidated financial data as of November 30, 2004 and for the nine months ended November 30, 2003 and 2004 have been derived from Refco Group's unaudited interim consolidated financial statements for those periods. The financial data for the nine months ended November 30, 2004 include the financial data for the period from March 1, 2004 through August 5, 2004 combined with the period from August 6, 2004 through November 30, 2004. The unaudited consolidated financial statements as of November 30, 2004 and for the nine months ended November 30, 2003 and 2004 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and result of operations for the period presented. The results for the nine months ended November 30, 2004 are not necessarily indicative of our results of operations for a full fiscal year. The selected historical financial data for the periods indicated below include the results of our Asset Management business, substantially all of which was distributed as part of the THL Transactions.

You should read the data set forth below in conjunction with "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Unaudited Pro Forma Consolidated Financial Statements," "Certain Relationships and Related Transactions" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

44

| | Fiscal Year Ended February 28, | | | | | Nine Months Ended November 30, 2003 | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through November 30, 2004 |
|---|---|---|---|---|---|---|---|---|
| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | | | |
| | (unaudited) | (unaudited) | | | | (unaudited) | (unaudited) | (unaudited) |
| | | | | | (dollars in millions) | | | |
| **Statement of Income Data:** | | | | | | | | |
| Revenues: | | | | | | | | |
| Commissions and brokerage | $ 301 | $ 397 | $ 478 | $ 572 | $ 645 | $ 473 | $ 362 | $ 262 |
| Interest | 601 | 1,528 | 1,711 | 2,387 | 1,052 | 726 | 769 | 985 |
| Principal transactions, net | 42 | 103 | 99 | 83 | 166 | 114 | 119 | 83 |
| Asset management and advisory fees | 4 | 10 | 6 | — | 7 | 6 | 4 | 6 |
| Other income | 7 | 2 | 4 | 4 | 4 | 4 | 3 | 2 |
| Total revenues | 955 | 2,040 | 2,298 | 3,046 | 1,874 | 1,323 | 1,257 | 1,338 |
| Expenses: | | | | | | | | |
| Commissions and order execution costs | 189 | 250 | 324 | 385 | 412 | 298 | 244 | 194 |
| Interest | 507 | 1,406 | 1,557 | 2,182 | 898 | 615 | 707 | 953 |
| Employee compensation and benefits | 116 | 169 | 167 | 181 | 205 | 145 | 109 | 86 |
| General, administrative and other | 82 | 140 | 149 | 143 | 170 | 126 | 97 | 76 |
| Total expenses | 894 | 1,965 | 2,197 | 2,891 | 1,685 | 1,184 | 1,157 | 1,309 |
| Income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 61 | 75 | 101 | 155 | 189 | 139 | 100 | 29 |
| Provision for income taxes(2) | 8 | 6 | 5 | 1 | 12 | 5 | 8 | 4 |
| Income before minority interest, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 53 | 69 | 96 | 154 | 177 | 134 | 92 | 25 |
| Minority interest | 2 | 1 | — | — | — | — | — | — |
| Income before dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 51 | 68 | 96 | 154 | 177 | 134 | 92 | 25 |
| Dividends on preferred securities issued by subsidiaries | 12 | 14 | 16 | 16 | — | — | — | — |
| Income from equity investees | — | — | 1 | 2 | 11 | 7 | 8 | 19 |
| Members' interest in earnings of subsidiary | — | — | — | — | 1 | — | 6 | 1 |
| Income from continuing operations | 39 | 54 | 81 | 140 | 187 | 141 | 94 | 43 |
| Discontinued operations: | | | | | | | | |
| Income from discontinued operations | 6 | 20 | 14 | 1 | — | — | 7 | — |
| Applicable income tax expense | — | 2 | 2 | 1 | — | — | 3 | — |
| Net income(2) | $ 45 | $ 72 | $ 93 | $ 140 | $ 187 | $ 141 | $ 98 | $ 43 |

45

| | As of February 28, | | | | | As of November 30, 2004 | |
|---|---|---|---|---|---|---|---|
| | 2000(4) | 2001 | 2002 | 2003 | 2004(3) | Actual | Pro Forma(4) |
| | (unaudited) | (unaudited) | | | | (unaudited) | (unaudited) |
| | | | | (dollars in millions) | | | |
| **Balance Sheet Data:** | | | | | | | |
| Total assets | $ 17,662 | $ 18,277 | $ 22,611 | $ 19,215 | $ 33,332 | $ 46,733 | $ |
| Long–term debt and preferred securities issued by subsidiaries: | | | | | | | |
| Long–term borrowings | 200 | 295 | 262 | 384 | 316 | 1,390 | |
| Subordinated debt | 43 | 41 | 16 | 16 | 16 | — | |
| Preferred securities issued by subsidiaries | 125 | 160 | 160 | 160 | — | — | |
| Total long–term debt and preferred securities issued by subsidiaries | 368 | 496 | 438 | 560 | 332 | 1,390 | |
| Members' equity | 441 | 500 | 515 | 566 | 616 | 124 | |
| Stockholders' equity | | | | | | | |

| | Fiscal Year Ended February 28, | | | | | Nine Months Ended November 30, 2003 | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through November 30, 2004 |
|---|---|---|---|---|---|---|---|---|
| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | | | |
| | (unaudited) | (unaudited) | | | | (unaudited) | (unaudited) | (unaudited) |
| | | | | | (dollars in millions) | | | |
| **Other Financial Data:** | | | | | | | | |
| Depreciation and amortization | $ 13 | $ 22 | $ 34 | $ 23 | $ 26 | $ 21 | $ 12 | $ 12 |
| Long–term debt interest | 13 | 23 | 25 | 27 | 31 | 24 | 12 | 31 |
| Dividends on preferred securities | | | | | | | | |
| Capital expenditures | 14 | 28 | 15 | 12 | 11 | 7 | 5 | 3 |

| | Fiscal Year Ended February 28, | | | Nine Months Ended November 30, 2003 | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through November 30, 2004 |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004(1) | | | |
| | | | | (unaudited) | (unaudited) | (unaudited) |
| | | | (dollars in millions) | | | |
| **Segment Data:** | | | | | | |
| Revenues: | | | | | | |
| Derivatives Brokerage & Clearing | $ 692 | $ 746 | $ 840 | $ 617 | $ 446 | $ 334 |
| Prime Brokerage/Capital Markets | 2,217 | 2,609 | 1,268 | 883 | 913 | 1,111 |
| Corporate & Other | (611) | (309) | (234) | (177) | (103) | (107) |
| Total revenues | $ 2,298 | $ 3,046 | $ 1,874 | $ 1,323 | $ 1,256 | $ 1,338 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | | | | | | |
| Derivatives Brokerage & Clearing | $ 58 | $ 77 | $ 122 | $ 89 | $ 60 | $ 39 |
| Prime Brokerage/Capital Markets | 96 | 101 | 125 | 91 | 67 | 42 |
| Corporate & Other | (53) | (23) | (57) | (41) | (27) | (52) |
| Total | $ 101 | $ 155 | $ 189 | $ 139 | $ 100 | $ 29 |

(1)     Year ended February 29.

(2)     Net income and provision for income taxes do not give effect to our reorganization as a "C" corporation and do not reflect additional federal, state and local income taxes that we would have been required to pay had we been a taxable corporation during the periods presented. The combined pro forma effective federal, foreign, state and local tax rate for all periods presented is 41%. Upon becoming a "C" corporation, we will record a cumulative net deferred tax asset and corresponding credit to our income tax provision of approximately $149.3 million. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns.

(3)     As of February 29.

(4)     The pro forma balance sheet data gives effect to the completion of (i) the Reincorporation (ii) our becoming taxable as a corporation and (iii) this offering and the application of the net proceeds therefrom, as if each of them had occurred on November 30, 2004.

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This prospectus contains forward–looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in forward–looking statements for many reasons, including the factors described in "Risk Factors" and elsewhere in this prospectus. You should read the following discussion in conjunction with the information included under the captions "Unaudited Pro Forma Consolidated Financial Statements" and "Selected Historical and Pro Forma Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus. Further, the following discussion includes information related to our Asset Management business, substantially all the assets of which were distributed to Refco Group Holdings, Inc. on August 5, 2004. Reference to the nine months ended November 30, 2004 include the period from March 1, 2004 through August 5, 2004 combined with the period from August 6, 2004 through November 30, 2004.*

### General

We provide execution and clearing services for exchange–traded derivatives and provide prime brokerage services in the fixed income and foreign exchange markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our international operations generated $443.3 million, or 44.0%, of our net revenues for the year ended February 29, 2004 and $449.6 million, or 46.1%, of our net revenues for the nine months ended November 30, 2004. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

We were historically organized into three operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing; (ii) Prime Brokerage/Capital Markets; and (iii) Asset Management. We also have historically had a Corporate & Other non–operating business segment. Following the distribution of substantially all the assets of our Asset Management business in connection with the THL Transactions described below, we are now organized into two operating business segments for financial reporting purposes, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and we have one non–operating business segment, Corporate & Other. We report the retained assets from our Asset Management business, Refco Alternative Investments, as part of our Derivatives Brokerage & Clearing business.

### The THL Transactions and the Reincorporation

On August 5, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., and its affiliates and co–investors acquired approximately 57% of the equity interests in our indirect subsidiary, Refco Group Ltd., LLC ("Refco Group"), which they hold through our direct subsidiary New Refco Group Ltd., LLC ("New Refco"), for approximately $507.0 million in cash. In connection with the transaction, Phillip Bennett, our President and Chief Executive Officer, exchanged his existing $382.5 million equity investment in Refco Group for an approximate 43% interest in New Refco, and other members of our management made an investment in New Refco aggregating approximately $4.5 million in cash. Concurrently with the closing of the acquisition, Refco Group entered into senior credit facilities providing for a fully drawn $800.0 million term loan and an undrawn $75.0 million revolving loan facility, and, together with Refco Finance Inc., issued $600.0 million in aggregate principal amount of senior subordinated notes. Also concurrently with the consummation of the transactions described above, Refco Group distributed $550.0 million in cash and all of the equity interests of Forstmann–Leff International Associates, LLC, which at that time owned substantially all the assets of Refco Group's Asset Management business, to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett. We refer to the foregoing transactions collectively as the "THL Transactions."

Prior to this offering, we conducted our business through Refco Group and its direct and indirect subsidiaries. Immediately prior to the closing of this offering, Refco Inc., a newly formed Delaware

47

corporation that will act as a holding company for our business, will enter into the following transactions:

- Refco Inc. will issue an aggregate of          shares of its common stock to Thomas H. Lee Partners, L.P. and its affiliates and co–investors in exchange for the direct or indirect equity interests in New Refco held by such parties;

- Refco Group Holdings, Inc., which is wholly–owned by Phillip Bennett, our President and Chief Executive Officer, will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for          shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for          shares of its common stock;

- Our officers who hold Class A member interests in New Refco will contribute all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of          shares of its common stock; and

- Our officers, directors and employees who hold Class B member interests in New Refco will contribute all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of          shares of its common stock, which shares shall be subject to vesting and a right of repurchase.

We refer to the transactions listed above as the "Reincorporation."

As a result of these transactions, Refco Inc. will own all of the outstanding member interests of New Refco. Refco Inc. will be a Delaware "C" corporation, and as such will be subject to federal and state income taxes. New Refco was a limited liability company not subject to state or federal income taxes, and as such, the historical financial data included in this prospectus does not reflect what our financial position and results of operations would have been had we been a taxable corporation. We expect to record a net deferred tax asset and a corresponding credit to our provision for income taxes of $149.3 million upon becoming a "C" corporation immediately before the closing of this offering. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns. Prior to the closing of the offering, New Refco intends to make a cash distribution of approximately $     million to the members of New Refco to enable them to meet their estimated income tax obligations for the period from January 1, 2005 to the date of the Reincorporation. The amount of this distribution will be based on New Refco's estimated net taxable income from January 1, 2005 to the closing date of this offering. Purchasers of shares in the offering will not receive any of this distribution. Prior to the offering, Refco Group Holdings, Inc. will make a cash contribution of approximately $     million to New Refco, which amount is equal to the amount of tax distributions that Refco Group Holdings, Inc. received from New Refco in excess of its pro rata share of all tax distributions made to members of New Refco prior to the offering.

This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting the offering and until the consummation of the transactions described above, will hold no material assets and will not engage in any operations. Upon completion of the transactions described above, Refco Inc. will become the parent of New Refco and its wholly–owned and majority–owned subsidiaries and will have no other assets or operations.

For more information on the THL Transactions and the Reincorporation, see "Certain Relationships and Related Transactions."

48

**Factors Affecting Our Results**

Our results of operations have been, and we expect will continue to be, affected principally by transaction volumes, interest rates, the level of global market activity, market volatility and expense management. Our results of operations have also been affected by acquisitions.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders, which we record as commissions and brokerage or principal transactions, net depending on the nature of the transaction, and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues increased at a compound annual growth rate of 24.1%, due primarily to annual increases in contract volumes executed or cleared and in part attributable to acquisitions and annual increases in customer deposits. During the same period, our Prime Brokerage/Capital Markets net revenues increased at a compound annual growth rate of 22.6%, due primarily to increases in both the number of customers and markets we serve as well as new product introductions and acquisitions.

*Transaction Volumes*

Since 2001, Derivatives Brokerage & Clearing transaction volumes, measured in numbers of contracts, have increased, reflecting the broad growth trend in contract trading volumes currently being experienced in the derivatives industry. The continued convergence of derivatives and cash markets and the expanded use of derivatives for hedging and investment purposes have been the principal drivers of this industry trend. This industry trend has been global in nature, with a rapid introduction of new products in a variety of international markets. Prime Brokerage/Capital Markets transaction volumes, specifically foreign exchange dollar volumes and our customer securities financing and clearing volumes, increased reflecting expanded U.S. government borrowing activity and the continued long–term growth of foreign exchange markets. Recently, this increase in volume has been accelerated by market volatility caused by political uncertainty in the Middle East and its impact on energy supplies and the uncertain outlook concerning economic growth, interest rates and, in particular, the changing value of the U.S. dollar. We have been able to take advantage of the increase in derivatives transaction volume because of our diverse customer base, product offering and market coverage and have benefited from the increase in prime brokerage volumes as a result of new product initiatives, including online foreign exchange and emerging market debt brokerage.

*Interest Rates*

Due to the fact that a portion of our revenues is derived from interest earned from the investment of funds deposited with us primarily by customers of our Derivatives Brokerage & Clearing business and the level of secured customer financing transactions in our Prime Brokerage/Capital Markets business, the level of prevailing interest rates affects our revenues. We generally benefit from rising interest rates. Rising interest rates increase the amount of net interest income earned from these customer deposits and the potential financing spread available on secured customer financing transactions. However, our interest expense also increases as a result of rising interest rates because borrowings under our new senior credit facilities accrue interest at variable rates. Declining interest rates decrease the amount of net interest income earned on customer deposits and the spread available on secured customer financing transactions. This is only partially offset by a decreases in interest rates on borrowings under our senior credit facilities.

*Global Market Activity*

Each of our principal business segments is global in nature, and the general expansion of the global economy and continued globalization of financial markets have had a positive impact on our results of operations. The introduction of derivatives products internationally has accelerated in recent years, with emerging markets in Asia and Latin America supplementing traditional centers in North America and Europe. This growth has been prompted by economic expansion in these regions,

deregulation and globalization. Similar trends have emerged in our Prime Brokerage/Capital Markets business as the capital markets in emerging economies have become more sophisticated. We believe this has presented us with growth opportunities in non–dollar fixed income, emerging market debt and foreign exchange brokerage.

### *Expense Management*

We have been able to leverage our operating capabilities to benefit from increased scale in our transaction volumes. By adding incremental volume to a pre–existing platform, our marginal cost of growth in transaction processing has been minimal. We believe we will benefit from the scalable nature of our transactions processed capabilities as more markets automate and move to electronic platforms. A high proportion of our marginal expense is variable in nature, which provides us an opportunity to improve our cost to income ratio. We believe this characteristic will have a continuing positive impact on our results of operations.

### *Acquisitions*

We have completed 14 acquisitions since 1999. It has been our practice to integrate and rationalize acquired companies as rapidly as possible, transferring operations to our existing platform. During the fiscal year ended February 28, 2002, we acquired the professional floor trader business of First Options, MST Canada Co. and Main Street Trading, all derivatives brokerage businesses. We acquired two other derivatives brokerage businesses during the fiscal year ended February 28, 2003: a division of Spear, Leeds & Kellogg and CFG Financial Group Inc. During the fiscal year ended February 29, 2004, we acquired three asset management businesses, Edinburgh Fund Managers Ltd., Societe Generale Investment Managers and Cardales UK Ltd., and five derivatives brokerage businesses, MacFutures Ltd., Carlton Brokerage Ltd., Friedberg Mercantile Group, RB&H and Trafalgar Commodities Ltd. In September 2004, we acquired the customer accounts and related assets of Pioneer Futures, a division of Pioneer Futures, Inc.

### Results of Operations

### *Revenues*

*Total Revenues.*   The components of our total revenues are commissions and brokerage, interest, principal transactions, net, asset management and advisory fees and other income.

Commissions and brokerage revenue.   Commissions and brokerage revenues represent transaction fees earned on executed or cleared contracts in our Derivatives Brokerage & Clearing business and transaction fees on trades in our Prime Brokerage/Capital Markets business. The transaction fees we charge are based on the type of customer, the type of transaction, the method of trading and the volume of trading activity that a particular customer conducts with us. The aggregate amount of commissions and brokerage revenues is a function of the number of transactions we process and the amount of gross commissions charged to customers in respect of those transactions.

Interest revenue.   Interest revenue represents both interest earned from the investment of customer funds deposited with us as margin for their trading activities in our Derivatives Brokerage & Clearing business and interest earned from providing secured customer financing through repurchase agreements as part of our Prime Brokerage/Capital Markets business. The latter involves taking a customer's security and refinancing it with a qualified financial counterparty. We earn interest revenue on these transactions by charging our customer a pre–determined spread above our cost of refinancing. Overall, interest revenue is driven by the level of customer deposits placed with our brokerage operations, the level of secured financing transactions we provide to our customers and the level of prevailing interest rates. Typically, the net interest that we earn is lower in a low interest rate environment and higher in a higher interest rate environment.

Principal transactions, net.    Principal transactions, net revenue is generated mainly by our Prime Brokerage/Capital Markets business and is derived from broking transactions in non–exchange traded derivatives and foreign exchange products. To execute a customer's order in non–exchange traded derivatives and foreign exchange products we enter into a transaction with our customer and a simultaneous and offsetting transaction in the market. We generally price the customer transaction such that we earn a small positive spread on the offsetting transactions, which we record on our income statement as principal transactions, net. This revenue represents our compensation for executing our customers' orders, and therefore is analogous to the commissions we earn when executing our clearing contracts for exchange traded derivative contracts. Foreign exchange transactions represented 76.6% of principal transactions, net revenue for the nine months ended November 30, 2004. The remaining balance consisted of similar transactions conducted by us on behalf of our customers in the U.S. Treasury note market.

Although the absence of a central clearing counterparty requires us to broker such transactions as principal, the risks associated with such transactions are not materially greater than those associated with the brokerage of exchange–traded derivatives. Our customers bear the risk of the economic results of such transactions, and we confine ourselves to earning the positive spread on the transaction. Nonetheless, because of our principal role, we are required to record certain other aspects of the transactions, including a record of realized and unrealized gains and losses relating to such customer transactions. These transaction gains are for the benefit of our customers and any losses are for the account of our customers who secure the payment to us of any such losses by depositing margin funds as collateral. Analyses of the realized and unrealized gains and losses as recognized and recorded under principal transactions, net for each of the years ended February 29, 2004, February 28, 2003 and February 28, 2002 and the nine month periods ended November 30, 2004 and November 30, 2003 are included in our consolidated financial statements and the related notes thereto included elsewhere in this prospectus. See Note B to our audited consolidated financial statements and Note E to our unaudited consolidated financial statements.

Asset management and advisory fees revenues.    Asset management and advisory fees revenues primarily represent fees we charge for managing funds. The amount of these revenues has traditionally fluctuated with the level of funds under management and the investment performance of these funds.

*Net Revenues.*    Although we report total revenues on a gross basis in our consolidated financial statements for purposes of segment reporting and analyzing our revenues, we believe that net revenues provide a more meaningful indication of our operating results. Net revenues represent total revenues less interest expense. Interest expense includes interest paid to Derivatives Brokerage & Clearing customers on the funds they maintain with us and interest paid to finance counterparties in our Prime Brokerage/Capital Markets business for the financing of customer securities. For purposes of calculating net revenues, interest expense excludes interest paid on long–term debt. We net interest expense against revenues because a substantial portion of our interest expense pertains to customer transactions from which we derive interest income but in which we have a related charge for interest expense.

### Expenses

*Commissions and Order Execution Costs.*    Commissions and order execution costs include variable expenses related directly to transactions conducted in our brokerage operations. These costs include exchange and clearing house fees, fees paid to third parties for execution of customer orders and sales commissions paid in those cases where customers are introduced and their orders are handled by non–salaried sales personnel.

*Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses include the cost of our global salaried employees. These expenses include base compensation, bonus compensation (whether discretionary or performance related) and the cost of medical insurance and other related employee benefits.

51

*General, Administrative and Other Expenses.*    General, administrative and other expenses include all other operating expenses, including primarily lease expenses, communications and quotation systems expenses, travel and entertainment expenses, depreciation and amortization, professional fees and other miscellaneous expenses.

### Income from Equity Investees

We own minority interests in various businesses. We record income earned by these businesses based on our proportionate ownership. This income is recorded on our income statement as income from equity investees.

### Operating Profit

Operating profit represents income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations.

### Income Taxes

Prior to the Reincorporation, New Refco operated as a limited liability company and was treated as a partnership for federal income tax purposes. Under applicable regulations, members of a limited liability company treated as a partnership are responsible for their individual income tax liabilities related to the limited liability company's results of operations. Because we generated taxable income, we included in distributions to our members amounts sufficient to facilitate the payment of tax liabilities arising from the limited liability company's income. Accordingly, we have not provided for federal income taxes related to our results of operations. We made aggregate distributions, which included distributions with respect to members' tax liabilities arising from the limited liability company's income, of $75.0 million, $100.0 million, $120.0 million and $0 million in the years ended February 28, 2002, February 28, 2003 and February 29, 2004 and for the nine months ended November 30, 2004, respectively. The provision for income taxes included in our consolidated financial statements relates to income taxes of foreign subsidiaries. After the Reincorporation, we will be taxed as a corporation. After the Reincorporation, we anticipate that our effective tax rate will be 41%, and we will have to increase our provision for income taxes accordingly.

### Periodic Results

The following tables summarize our results of operations for the periods indicated and include our consolidated net revenues and net revenues and income before taxes and certain other items by segment. The consolidated financial data for the fiscal years ended February 28, 2002 and 2003 and February 29, 2004 have been derived from our audited consolidated financial statements. The unaudited consolidated financial data for the nine months ended November 30, 2003 and 2004 have been derived from our unaudited consolidated financial statements. The unaudited consolidated financial statements for the nine months ended November 30, 2003 and 2004 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and results of operations for the periods presented.

For purposes of the tables and discussions below, the results of operations for the nine months ended November 30, 2004 represent the historical amounts for the period prior to the THL Transactions (March 1, 2004 through August 5, 2004) and the period subsequent to the THL Transactions (August 6, 2004 through November 30, 2004) and are not indicative of the results that would actually have been obtained if the THL Transactions had occurred on March 1, 2004.

The information contained in the following tables should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical and Pro Forma Consolidated Financial

Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

| | Fiscal Year Ended February 28, | | | Nine Months Ended November 30, | |
| | 2002 | 2003 | 2004(1) | 2003 | 2004(2) |
| | | | | (unaudited) | (unaudited) |
| | | | (in millions) | | |
| Commissions and brokerage | $ 477.8 | $ 571.5 | $ 645.4 | $ 473.5 | $ 624.4 |
| Interest | 1,711.1 | 2,387.3 | 1,051.7 | 726.5 | 1,754.1 |
| Principal transactions, net | 99.3 | 82.6 | 165.9 | 113.7 | 202.2 |
| Asset Management and advisory fees | 6.4 | 0.1 | 7.3 | 5.5 | 9.5 |
| Other income | 3.5 | 4.6 | 4.0 | 4.4 | 4.5 |
| Total Revenue | $ 2,298.1 | $ 3,046.1 | $ 1,874.3 | $ 1,323.6 | $ 2,594.7 |
| Interest expense | (1,556.6) | (2,182.3) | (897.7) | (614.9) | (1,660.1) |
| Interest expense from long–term borrowings | 24.5 | 27.2 | 31.1 | 24.0 | 41.1 |
| Net Revenue | $ 766.0 | $ 891.0 | $ 1,007.7 | $ 732.7 | $ 975.7 |

| | Fiscal Year Ended February 28, | | | Nine Months Ended November 30, | |
| | 2002 | 2003 | 2004(1) | 2003 | 2004(2) |
| | | | | (unaudited) | (unaudited) |
| | | | (in millions) | | |
| Net revenues: | | | | | |
| Derivatives Brokerage & Clearing | $ 564.2 | $ 674.0 | $ 778.3 | $ 568.7 | $ 709.0 |
| Prime Brokerage/Capital Markets | 240.1 | 243.7 | 287.9 | 206.3 | 302.7 |
| Corporate & Other(3) | 6.3 | 23.1 | (2.1) | (0.9) | (15.6) |
| Eliminations(3) | (44.6) | (49.8) | (56.4) | (41.4) | (20.4) |
| Total net revenues | $ 766.0 | $ 891.0 | $ 1,007.7 | $ 732.7 | $ 975.7 |
| Expenses: | | | | | |
| Commissions and order execution costs | $ 323.6 | $ 385.4 | $ 411.9 | $ 298.0 | $ 438.1 |
| Employee compensation and benefits | 167.4 | 181.0 | 204.9 | 145.3 | 194.1 |
| General, administrative and other | 149.0 | 142.6 | 170.3 | 126.5 | 173.7 |
| Total | $ 640.0 | $ 709.0 | $ 787.1 | $ 569.8 | $ 805.9 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings of subsidiary and discontinued operations: | | | | | |
| Derivatives Brokerage & Clearing | $ 58.3 | $ 76.9 | $ 121.5 | $ 88.9 | $ 98.7 |
| Prime Brokerage/Capital Markets | 95.7 | 100.6 | 124.6 | 90.6 | 109.0 |
| Corporate & Other | (52.5) | (22.7) | (56.6) | (40.6) | (79.0) |
| Total | $ 101.5 | $ 154.8 | $ 189.5 | $ 138.9 | $ 128.7 |

(1)      Year ended February 29.

(2)      Includes the period from March 1, 2004 through August 5, 2004 combined with the period from August 6, 2004 through November 30, 2004.

(3)      These line items are included to reconcile these summarized financial tables to our consolidated financial statements. Corporate & Other net revenue and expenses primarily include interest income and interest expense incurred at the parent company level as well as non–material fees and other expenses. Eliminations arise upon the consolidation of group operating performance and relate to intercompany balances and transactions.

**Results for the Nine Months Ended November 30, 2004 Compared to the Nine Months Ended November 30, 2003**

  *Net Revenues.*   Net revenues on a consolidated basis for the nine months ended November 30, 2004 increased $243.0 million, or 33.2%, to $975.7 million from $732.7 million for the nine months ended November 30, 2003. The increase in net revenues for the nine months ended November 30, 2004

53

was primarily due to the growth in transaction volumes that reflects broad secular trends across all major market segments that we serve. Commissions and brokerage revenue for the nine months ended November 30, 2004 increased $150.9 million, or 31.9%, to $624.4 million from $473.5 million for the nine months ended November 30, 2003. The increase was primarily due to an increase of 42.6% in derivative transaction volumes to 482 million contracts cleared for the nine months ended November 30, 2004. Net interest revenue, excluding interest from long–term borrowings, for the nine months ended November 30, 2004 decreased $0.5 million, or 0.4%, to $135.1 million from $135.6 million for the nine months ended November 30, 2003. The decline in net interest revenues was driven by lower interest rates realized on customer deposits as well as the impact of the timing and duration at which investments mature. Principal transactions, net revenue for the nine months ended November 30, 2004 increased $88.5 million, or 77.8%, to $202.2 million from $113.7 million for the nine months ended November 30, 2003. This increase was primarily due to a 108.9% increase in foreign exchange dollar volumes to $811.4 billion for the nine months ended November 30, 2004.

    *Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the nine months ended November 30, 2004 increased $140.1 million, or 47.0%, to $438.1 million from $298.0 million for the nine months ended November 30, 2003. The increase in commissions and order execution costs for the nine months ended November 30, 2004 was primarily due to the increase in transaction volume in all of our business segments and the addition of new business operations.

    *Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses on a consolidated basis for the nine months ended November 30, 2004 increased $48.8 million, or 33.6%, to $194.1 million from $145.3 million for the nine months ended November 30, 2003. The increase in employee compensation and benefits expenses was due in part to the addition of several new operating groups acquired during the twelve–month period ended November 30, 2004. These groups include Trafalgar Commodities and the Wexford Fixed Income Group in New York as well as the further expansion of the MacFutures Group, particularly the commencement of its U.S. operations where the start–up expenses have exceeded anticipated revenues. In addition, bonus accruals increased as a function of increased profitability in certain business segments in the geographical markets that we serve, including Asia and Europe, where local currency appreciation also had the effect of increasing equivalent U.S. dollar compensation levels.

    *General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the nine months ended November 30, 2004 increased $47.2 million, or 37.3%, to $173.7 million from $126.5 million for the nine months ended November 30, 2003. The increase in general, administrative and other expenses for the nine months ended November 30, 2004 was due in part to expenses associated with acquisitions during the twelve–month period ended November 30, 2004, including $9.8 million of expenses associated with the physical integration of acquired businesses, which we believe are non–recurring costs. Our results for the nine months ended November 30, 2004 reflect the financial impact of the THL Transactions. The THL Transactions resulted in an increase in depreciation and amortization expense associated with the amortization of customer relationships determined as a result of the THL Transactions. The increase in amortization of the customer relationships determined as a result of the THL Transactions for the nine months ended November 30, 2004 was $4.7 million compared to the nine months ended November 30, 2003. Total depreciation and amortization expense was $24.0 million and $20.9 million for the nine months ended November 30, 2004 and 2003, respectively. Excluding the increase in amortization expense due to the THL Transactions, general, administrative and other expenses would have increased by 33.6% to $169.0 million for the nine months ended November 30, 2004.

    *Operating Profit.*    Operating profit for the nine months ended November 30, 2004 decreased $10.2 million, or 7.3%, to $128.7 million from $138.9 million for the nine months ended November 30, 2003. Operating profit for the nine months ended November 30, 2004 includes significant incremental

54

expenses associated with the THL Transactions. In addition to the increased cost of depreciation and amortization of customer relationships, interest expense on long–term borrowings increased compared to the nine months ended November 30, 2003. For the nine months ended November 30, 2004, these incremental expenses related to the THL Transactions totaled $8.5 million and $41.1 million, respectively, compared with pre–Transactions expenses of $3.8 million and $24.0 million, respectively, for the nine months ended November 30, 2003. The THL Transactions therefore resulted in a total increase in expenses of $21.8 million for the nine months ended November 30, 2004.

In addition, we record operating profit exclusive of the income we derive from investments in non–consolidated equity investees. Income from investments in non–consolidated equity investees is recorded in income from equity investees and included in income from continuing operations. These companies are engaged in both derivatives brokerage and prime brokerage operations in key product segments (such as retail foreign exchange brokerage) and important geographical markets (such as the Taiwan derivatives markets). Because we consider these activities integral to our global operations and material to our results of operations, we historically included earnings from these activities in operating profit. Operating profit excluding the earnings from equity investees for the nine months ended November 30, 2004 decreased $10.2 million, or 7.3%, to $128.7 million from $138.9 million for the nine months ended November 30, 2003. The decrease in operating profit reflected a shift in product weighting within our operations to products offered by equity investees, particularly retail foreign exchange brokerage. Income from our share of our equity investees' operations totaled $26.9 million for the nine months ended November 30, 2004 compared with $7.6 million for the nine months ended November 30, 2003. Our total operating profit and income from equity investees was $155.6 million for the nine months ended November 30, 2004, an increase of 6.2% over the comparable operating profit for the nine months ended November 30, 2003. Our total operating profit, including income from equity investees and adjusted for increased amortization of customer relationships and increased interest expense, was $177.4 million for the nine months ended November 30, 2004, an increase of 21.1% over the comparable operating profit of $146.5 million for the nine months ended November 30, 2003.

### Segment Information

#### *Derivatives Brokerage & Clearing*

*Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the nine months ended November 30, 2004 increased $140.3 million, or 24.7%, to $709.0 million from $568.7 million for the nine months ended November 30, 2003. The increase in Derivatives Brokerage & Clearing net revenues for the nine months ended November 30, 2004 was primarily due to increased transaction volume in all markets and in all geographic sectors that we serve, particularly electronic markets utilized by our professional trading customers and non–ferrous metals brokerage activities in Europe, which are reflected in commissions and brokerage revenues and principal transactions, net. Global demand for commodity materials resulted in increased activity in physical commodity markets, while interest rate uncertainties increased the level of interest rate derivative volumes. In Europe and Singapore, local foreign exchange operations (reported in Derivatives Brokerage & Clearing) also increased. Derivatives Brokerage & Clearing contract volume for the nine months ended November 30, 2004 increased by 144 million contracts, or 42.6%, to 482 million contracts cleared from 338 million contracts cleared for the nine months ended November 30, 2003. Commissions and brokerage income increased by 23.5%, or by 29.4% when European and Singapore foreign exchange and European non–ferrous metals brokerage revenues are included, as a result of increased transaction volume and changing customer mix. This increase was partially offset by the decline of 7.6% in net interest income resulting from lower average interest rates. Substantially all of the assets of our Asset Management business were distributed to Refco Group Holdings, Inc. as part of the THL Transactions. We report the retained assets from the Asset Management business, Refco Alternative Investments, as part of our Derivatives Brokerage & Clearing business. Refco Alternative Investments' net revenues for the nine months ended November 30, 2004 increased $3.3 million, or 66.0%, to $8.3 million from $5.0 million for the nine months ended November 30, 2003.

55

*Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the nine months ended November 30, 2004 increased $9.8 million, or 11.0%, to $98.7 million from $88.9 million for the nine months ended November 30, 2003. Operating profit includes expenses associated with the THL Transactions, most notably the increase in the amortization of customer relationships determined as a result of the THL Transactions. The increased amortization for the Derivatives Brokerage & Clearing customer relationships determined as a result of the THL Transactions for the nine months ended November 30, 2004 was $0.2 million. The increase in Derivatives Brokerage & Clearing operating profit for the nine months ended November 30, 2004 was primarily due to commissions and brokerage income that increased by 23.5% as a result of increased transaction volume offset in part by a decline of 7.6% in net interest income on customer deposits resulting from lower average interest rates.

### Prime Brokerage/Capital Markets

*Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the nine months ended November 30, 2004 increased $96.4 million, or 46.7%, to $302.7 million from $206.3 million for the nine months ended November 30, 2003. The increase in Prime Brokerage/Capital Markets net revenues for the nine months ended November 30, 2004 was primarily due to the increase of 31.3% in the average net customer securities financing portfolio to $33.1 billion from $25.2 billion for the nine months ended November 30, 2003 and a 108.9% increase in foreign exchange dollar volumes, which totaled $811.4 billion for the nine months ended November 30, 2004, up from $388.4 billion for the nine months ended November 30, 2003.

*Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the nine months ended November 30, 2004 increased $18.4 million, or 20.3%, to $109.0 million from $90.6 million for the nine months ended November 30, 2003. Operating profit includes expenses associated with the THL Transactions, most notably the increase in the amortization of customer relationships determined as a result of the THL Transactions. The increased amortization for the Prime Brokerage/Capital Markets customer relationships recognized on the THL Transactions for the nine months ended November 30, 2004 was $4.6 million. Additionally, Prime Brokerage/Capital Markets operating profit excludes income from equity investees, which totaled $19.5 million for the nine months ended November 30, 2004. Including income from equity investees, our total operating profit for the nine months ended November 30, 2004 was $128.5 million, an increase of 33.7% over the comparable operating profit of $96.1 million for the nine months ended November 30, 2003. Adjusting operating profit for the increased amortization of customer relationships further increases operating profit to $133.1 million for the nine months ended November 30, 2004. The underlying increase in Prime Brokerage/Capital Markets operating profit for the nine months ended November 30, 2004 was primarily due to the continued growth in Prime Brokerage/Capital Markets net revenues, particularly the 108.9% increase in foreign exchange dollar volumes to a total for the nine months ended November 30, 2004 of $811.4 billion and the inclusion of the Wexford Fixed Income Group, which was acquired in January 2004 and contributed $3.9 million to operating profit in the nine months ended November 30, 2004.

### Results for the Year Ended February 29, 2004 Compared to the Year Ended February 28, 2003

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 29, 2004 increased $116.7 million, or 13.1%, to $1,007.7 million from $891.0 million for the year ended February 28, 2003. The increase in net revenues for the year ended February 29, 2004 was primarily due to the significant increase in brokerage transaction volume, which was partially offset by a decline in net interest revenues. In general, our volumes have increased as the volumes in our industry and sector have increased. Commissions and brokerage revenues for the year ended February 29, 2004 increased $73.9 million, or 12.9%, to $645.4 million from $571.5 million for the year ended February 29, 2003. Derivative contracts cleared increased by 60 million contracts to 461 million

contracts for the year ended February 29, 2004. This increase was primarily the result of the acquisition of MacFutures in February 2003, which was included in the full results of operations for the year ended February 29, 2004. While customer deposits increased 7.9% from $3.8 billion for the year ended February 28, 2003 to $4.1 billion for the year ended February 29, 2004 and customer secured financing transactions increased 19.0% with average net customer securities financing portfolio of $25.1 billion for the year ended February 29, 2004, net interest revenues for the year ended February 29, 2004 decreased 20.3% to $185.1 million from $232.2 million for the year ended February 28, 2003 primarily as a result of the very low interest rate environment and the impact of the timing and duration at which investments mature. Principal transactions, net revenue for the year ended February 29, 2004 increased $83.3 million, or 100.8%, to $165.9 million from $82.6 million for the year ended February 28, 2003. The increase was due primarily to a 43.8% increase in customer foreign exchange transaction volumes worldwide to $682.4 billion for the year ended February 29, 2004. Asset management and advisory fees revenues for the year ended February 29, 2004 increased $7.2 million to $7.3 million from $0.1 million for the year ended February 28, 2003 as a result of improved investment performance resulting from stronger equity markets. Overall, transaction pricing across products and markets remained generally consistent with the prior year.

*Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the year ended February 29, 2004 increased $26.5 million, or 6.9%, to $411.9 million from $385.4 million for the year ended February 28, 2003. The increase in commissions and order execution costs for the year ended February 29, 2004 was primarily due to a 15.0% increase in Derivatives Brokerage & Clearing transactions volume. However, the rate of increase of expenses was lower than the increase in transaction volumes across both business segments, in part because of a shift in overall product mix towards Prime Brokerage/Capital Market operations. Most of the latter volume is conducted by corporate sales groups and not commission–based sales personnel.

*Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses on a consolidated basis for the year ended February 29, 2004 increased $23.9 million, or 13.2%, to $204.9 million from $181.0 million for the year ended February 28, 2003. The increase in employee compensation and benefits expenses for the year ended February 29, 2004 was primarily due to the addition to our payroll of the majority of employees of acquired companies, specifically MacFutures, Trafalgar Commodities and Carlton Brokerage.

*General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $27.7 million, or 19.4%, to $170.3 million from $142.6 million for the year ended February 28, 2003. The increase in general, administrative and other expenses for the year ended February 29, 2004 was primarily due to the incremental expenses associated with acquired operations. Total depreciation and amortization expense was $26.2 million and $23.5 million for the years ended February 29, 2004 and February 28, 2003, respectively.

*Operating Profit.*    Operating profit on a consolidated basis for the year ended February 29, 2004 increased $34.7 million, or 22.4%, to $189.5 million from $154.8 million for the year ended February 28, 2003. The increase in operating profit for the year ended February 29, 2004 was primarily due to the increase in net revenues derived from the increased transaction volume noted above, together with the improvement in operating margins created by the reduction in sales commission costs and our ability to control the overall level of general and administrative expenses.

### Segment Information

#### *Derivatives Brokerage & Clearing*

*Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 increased $104.3 million, or 15.5%, to $778.3 million from $674.0 million for the year ended

February 28, 2003. The increase in Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 was primarily due to increased transaction volume in all major geographic and product sectors that we serve. Dollar price increases in physical commodity markets driven by the growth of Asian economies, particularly China, resulted in an increase in trading of agricultural and metals derivatives contracts. The changing outlook for interest rates combined with the addition of the MacFutures platform in March 2003, increased financial futures contract volume, particularly interest rate products. Derivatives Brokerage & Clearing contract volume for the year ended February 29, 2004 increased by 60 million, or 15.0%, to 461 million contracts cleared from 401 million contracts cleared for the year ended February 28, 2003. Commissions and brokerage income increased by 13.7%, primarily as a result of increased transaction volume, and this was additionally increased by an increase of 14.3% in net interest revenue resulting from increased customer deposits and changes in the timing and duration of investments. Approximately $6.8 million, or 0.7%, of net revenues was attributable to our Asset Management business.

*Operating Profit.*   Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 increased $44.6 million, or 58.0%, to $121.5 million from $76.9 million for the year ended February 28, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 was primarily due to a 15.0% increase in derivative contracts cleared and a 9.0% reduction in sales commission costs (calculated as a percent of commissions and brokerage revenue) reflecting a reduced reliance on commission sales groups. Additionally, net interest income rose primarily as a result of the 7.9% increase in customer deposits to a record $4.1 billion. This offset lower investment yields resulting from the generally lower interest rate environment.

### Prime Brokerage/Capital Markets

*Net Revenues.*   Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 increased $44.2 million, or 18.1%, to $287.9 million from $243.7 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 was primarily due to the increase in transaction volume and revenues of our foreign exchange brokerage activities. The increase in transaction volume reflected the continued expansion of our fixed income clearing operations. The increase in foreign exchange revenues reflected the diversification of our product offerings and the launch of online wholesale and retail products in June 2003. Prime Brokerage/Capital Markets net revenues also increased as a result of an increase in the average net customer securities financing portfolio to $25.1 billion from $20.8 billion for the year ended February 28, 2003. The decrease in net interest revenue of 26.6% to $104.5 million for the year ended February 29, 2004 was mainly due to the lower interest rate environment and changes in the timing and duration of investments.

*Operating Profit.*   Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 increased $24.0 million, or 23.9%, to $124.6 million from $100.6 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets operating profits was primarily due to the 43.8% increase in foreign exchange dollar volumes to $682.4 billion for the year ended February 29, 2004.

### Results for the Year Ended February 28, 2003 Compared to the Year Ended February 28, 2002

*Net Revenues.*   Net revenues on a consolidated basis for the year ended February 28, 2003 increased $125.0 million, or 16.3%, to $891.0 million from $766.0 million for the year ended February 28, 2002. Commissions and brokerage revenue for the year ended February 28, 2003 increased $93.7 million, or 19.6%, to $571.5 million from $477.8 million for the year ended February 28, 2002 mainly due to a 15.9% increase in derivative contracts cleared, which totaled 401 million for the year ended February 28, 2003. Net interest revenue for the year ended February 28, 2003 increased $53.2 million, or 29.7%, to $232.2 million from $179.0 million for the year ended February 28, 2002, as the expanded portfolio of secured customer financing transactions, which rose by 10.0% to an average

58

for the year ended February 28, 2003 of $20.8 billion, resulted in an increase in net interest of 19.1%. This combined with an increase in customer deposits of 15.2% to $3.8 billion for the year ended February 28, 2003 primarily accounted for the increase in net interest revenues. Principal transactions, net revenues for the year ended February 28, 2003 decreased $16.7 million, or 16.8%, to $82.6 million from $99.3 million for the year ended February 28, 2002 primarily due to the decline in foreign exchange volume, the principal driver of principal transactions, net revenues, of 1.6%. Asset management and advisory fees revenues for the year ended February 28, 2003 decreased $6.3 million, or 98.4%, to $0.1 million from $6.4 million for the year ended February 28, 2002. This reduction in asset management and advisory fees reflected the lower levels of assets under our management. Overall, transaction volume growth and expanded financing operations, together with the increases in customer deposits, were partially offset by the reduction in foreign exchange volumes and asset management and advisory fees.

*Commissions and Order Execution Costs.*   Commissions and order execution costs on a consolidated basis for the year ended February 28, 2003 increased $61.8 million, or 19.1%, to $385.4 million from $323.6 million for the year ended February 28, 2002. The increase in commissions and order execution costs for the year ended February 28, 2003 was mainly due to the 15.9% increase in derivative contracts cleared. The increase in the percentage of commission and order execution costs as a percentage of net revenues from 42.2% for the year ended February 28, 2002 to 43.3% for the year ended February 28, 2003 reflected the higher sales commission structure of certain companies we acquired during the year ended February 28, 2002, including Professional Market Brokerage Inc.

*Employee Compensation and Benefits Expenses.*   Employee compensation and benefits expenses on a consolidated basis for the year ended February 28, 2003 increased $13.6 million, or 8.1%, to $181.0 million from $167.4 million for the year ended February 28, 2002. The increase in employee compensation and benefits expenses for the year ended February 28, 2003 was primarily due to the addition of employees associated with acquisitions made during the year.

*General, Administrative and Other Expenses.*   General, administrative and other expenses on a consolidated basis for the year ended February 28, 2003 decreased $6.4 million, or 4.3%, to $142.6 million from $149.0 million for the year ended February 28, 2002. The decrease in general, administrative and other expenses for the year ended February 28, 2003 was primarily due to our continued success in the rationalization of acquired operating platforms, particularly the final stage of consolidating Lind–Waldock and the transfer of the business of LFG, LLC, which we acquired in fiscal year 2001, from outside systems vendors to our own operating platform. Total depreciation and amortization expense was $23.5 million and $34.0 million for the years ended February 28, 2003 and 2002, respectively.

*Operating Profit.*   Operating profit on a consolidated basis for the year ended February 28, 2003 increased $53.3 million, or 52.5%, to $154.8 million from $101.5 million for the year ended February 28, 2002. The increase in operating profit for the year ended February 28, 2003 was primarily due to the increase in net revenues in our Prime Brokerage/Capital Markets operations of 5.1% for the year ended February 28, 2003, combined with cost control and expense reduction following the consolidation of acquired entities.

### Segment Information

#### *Derivatives Brokerage & Clearing*

*Net Revenues.*   Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 increased $109.8 million, or 19.5%, to $674.0 million from $564.2 million for the year ended February 28, 2002. The increase in Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 was primarily due to a higher number of cleared contracts, increased commission income and significant increases in customer deposits. Derivatives Brokerage & Clearing contract

59

volume for the year ended February 28, 2003 increased by 55 million, or 15.9%, to 401 million contracts cleared from 346 million contracts cleared for the year ended February 28, 2002, partially as a result of our acquisition of derivatives brokerage businesses, and customer deposits increased by 15.2% to $3.8 billion for the year ended February 28, 2003. Commissions and brokerage income increased by 22.3% to $575.8 million as a result of increased transaction volume, and interest income increased by 21.8% to $69.9 million as a result of increased customer deposits and higher average interest rates.

*Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 increased $18.6 million, or 31.9%, to $76.9 million from $58.3 million for the year ended February 28, 2002. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 was primarily due to a 15.9% increase in contracts cleared for the year ended February 28, 2003, which increased commissions and brokerage revenues, combined with increased net interest income resulting from a 15.2% increase in levels of customer deposits.

### Prime Brokerage/Capital Markets

*Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 increased $3.6 million, or 1.5%, to $243.7 million from $240.1 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 was primarily due to the expanded book of secured customer financing transactions, which increased by 10.0% to an average for the year ended February 28, 2003 of $20.8 billion. This resulted in an increase in net interest revenue of 19.1% to $142.3 million for the year ended February 28, 2003, offset by a decline in foreign exchange volume of 1.6%, which reduced principal transactions, net revenues by 21.0% from $88.5 million for the year ended February 28, 2002 to $69.9 million for the year ended February 28, 2003.

*Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 increased $4.9 million, or 5.1%, to $100.6 million from $95.7 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 was primarily due to the expanded book of secured customer financing transactions, which increased by 10.0% to an average for the year ended February 28, 2003 of $20.8 billion. This resulted in an increase in net interest of 19.1% for the year ended February 28, 2003 to $142.3 million offset by the decline in foreign exchange volume of 1.6%, which reduced the principal transactions, net revenues by 21.0% from $88.5 million for the year ended February 28, 2002 to $69.9 million for the year ended February 28, 2003.

## Seasonality

Our business has experienced seasonal fluctuations. Financial markets often experience reduced trading activity during summer months and in the last fiscal quarter as a result of holidays. Traditional commodity derivatives, such as energy contracts, will reflect changing supply/demand factors related to heating/cooling seasons. As a result of these factors, we may experience relatively high trading volume and revenue during our first and third fiscal quarters and lower trading volume in our second fiscal quarter. However, this trend is not evident in every year and in recent years has been moderated by globalization and an expanded range of products that tend to counteract traditional seasonality trends. For these reasons, seasonality was not a major factor in our 2004 fiscal year.

## Liquidity and Capital Resources

We expect our principal uses of cash over the next twelve months to be for working capital and debt service. Also, consistent with past practice and policy, we may from time to time evaluate acquisition opportunities in our core businesses. If we were to consummate an acquisition, we may utilize cash for that purpose.

*Cash Flows*

As a financial institution, our cash flows are complex and interrelated and highly dependent upon our operating performance, levels of customer activity and secured financing activities. Our cash flows from operations were $727.9 million for the year ended February 29, 2004 as compared to $80.6 million for the year ended February 28, 2003 as earnings and operating assets and liabilities exceeded cash and cash equivalents utilized in secured financing activities. During the year ended February 29, 2004, we increased cash by $90.0 million overall as cash flows from operating activities exceeded cash used in investing activities, financing activities and discontinued operations of $118.9 million, $384.7 million and $134.3 million, respectively. During the year ended February 28, 2003, we increased cash and cash equivalents by $81.5 million as cash flows from operating activities and financing activities of $80.6 million and $54.5 million, respectively, exceeded cash used in investing activities and discontinued operations of $3.5 million and $50.1 million, respectively. During the year ended February 28, 2002, cash and cash equivalents decreased by $62.7 million overall as cash used in financing activities of $133.0 million exceeded cash provided by operating activities and discontinued operations of $54.4 million and $15.9 million, respectively.

We had cash flow from operating activities of $528.9 million and $10.5 million for the period from March 1, 2004 to August 5, 2004 and for the period from August 6, 2004 to November 30, 2004, respectively. This compared to cash flow from operating activities of $181.0 million for the nine months ended November 30, 2003. For the period from March 1, 2004 to August 5, 2004, we used cash and cash equivalents of $71.2 million, primarily due to fluctuations in operating asset and liability balances and the distribution of $550.0 million to our discontinued operations. For the period from August 6, 2004 to November 30, 2004, we generated cash and cash equivalents of $33.8 million, primarily due to the net proceeds upon consummation of the THL Transactions, offset by the negative movements in operating asset and liability balances and our acquisition of the Pioneer Futures customer accounts for $17.2 million. During the nine months ended November 30, 2003, total cash and cash equivalents decreased by $34.1 million as cash flows from operating activities and discontinued activities of $181.0 million and $73.3 million, respectively, offset cash used in investing and financing activities of $52.0 million and $236.4 million, respectively.

Historically, we included a portion of our excess cash balances from our Derivatives Brokerage & Clearing business in segregated cash accounts to maximize the investment yield on these funds. We included approximately $370.3 million, $257.1 million, $199.5 million and $306.8 million in the segregated cash account balance as of November 30, 2004, February 29, 2004, November 30, 2003 and February 28, 2003, respectively. Consequently, changes in our cash and cash equivalent balance included in the segregated account affects our cash flow from operating activities. For example, our cash flows from operating activities for the period from August 6, 2004 through November 30, 2004 were negatively impacted by the increase of $113.2 million of our cash and cash equivalent balance included in the segregated account. We believe our unswept excess cash included in the segregated accounts is sufficient and can be used to meet our debt service obligations without any restrictions. See "—Contractual Obligations and Commitments" and Note H to our unaudited consolidated financial statements included elsewhere in this prospectus.

*Working Capital*

Our primary requirement for working capital relates to funds we are required to maintain at exchanges or clearing organizations to support our customers' trading activities. We require that our customers deposit funds with us in support of their trading activities, which we in turn deposit with exchanges or clearing organizations to satisfy our obligations. These required deposits account for the majority of our working capital requirements and thus our principal use of working capital is funded directly or indirectly by our customers. Our working capital needs are otherwise primarily limited to regulatory capital requirements which we have satisfied in the past from internally generated cash flow and available funds.

Notwithstanding the self–funding nature of our operations, we may sometimes be required to fund timing differences arising from the delayed receipt of customer funds or timing differences associated with the settlement of customer transactions in securities markets. Historically, these timing differences have been funded either with internally generated cash flow or, if needed, with funds drawn under short–term borrowing facilities, including committed lines of credit. We have $75.0 million of available borrowings under a revolving credit facility for working capital purposes. Separately, our finance subsidiary, Refco Capital, LLC, utilizes secured bank facilities to refinance specialized financing arrangements entered into with select customers from time to time. As of November 30, 2004, there were no borrowings outstanding under these facilities.

Our two principal U.S. regulated subsidiaries are Refco, LLC and Refco Securities, LLC. Refco, LLC is subject to the Commodity Futures Trading Commission ("CFTC") minimum financial requirements, which requires it to maintain net capital equal to the sum of 8% of the total risk margin requirements for all positions carried in customer accounts and 4% of the total risk margin requirements for all positions carried in non–customer accounts. As of November 30, 2004, Refco, LLC had net capital of $301.7 million, which was $139.6 million in excess of required net capital. Refco Securities, LLC is subject to the uniform net capital requirements of the SEC, which require the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for by the SEC's rules, which require that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items as defined in the SEC's rules. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate customer–related debit items. As of November 30, 2004, Refco Securities, LLC had net capital of $75.5 million which was 27.2% of aggregate customer–related debit items and $69.9 million in excess of required net capital.

As a matter of policy, we maintain excess regulatory capital to provide liquidity during periods of unusual market volatility, and this has been sufficient in the past to absorb volatile market events. Similarly, for our brokerage activities in the OTC markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures–style margin methodology to protect us against price movements, and this also reduces the amount of capital needed to conduct business because even if we are required to post funds with clearing organizations in order to facilitate customer–initiated transactions, we are able to use customer deposits for this purpose rather than our own funds. As a result, we are able to execute a substantial volume of transactions without the need for large amounts of working capital.

Funding for purposes other than working capital requirements, including the financing of acquisitions, has been provided either through internally generated cash flow or through specific long–term financing arrangements described below. Substantially all the assets of our Asset Management business, which accounted for 3.3% of fiscal year 2004 revenue and an operating loss of $0.4 million in fiscal year 2004, were distributed to Refco Group Holdings, Inc. in connection with the THL Transactions. Our Asset Management business generated nominal cash flow for fiscal year 2004.

### Long–Term Debt

It has been our policy to match the varied nature of our liquidity requirements with appropriately structured funding sources. Prior to the THL Transactions, our long–term debt consisted principally of long–term notes, which we had traditionally used to finance acquisitions. We repaid all these notes in connection with the THL Transactions. However, in connection with the THL Transactions we incurred a substantial amount of new long–term debt. As of November 30, 2004, we had $1,398.0 million of long–term debt outstanding, including the current portion of long–term debt. We intend to continue to fund long–term requirements, including acquisitions, with long–term debt. Our long–term debt currently consists of our senior credit facilities and the notes.

Our senior credit facilities consist of a $75.0 million revolving credit facility, none of which was drawn upon consummation of the THL Transactions, and an $800.0 million term loan facility, which was fully drawn as part of the THL Transactions. We have an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. During the quarter ended February 28, 2005, we repaid $150.0 million of the senior term loan with cash from operations. For more information on the senior credit facilities, see "Description of Indebtedness—Senior Credit Facilities." We also issued $600.0 million aggregate principal amount of senior subordinated notes in connection with the THL Transactions. For more information on the notes, see "Description of Indebtedness—Senior Subordinated Notes." The proceeds from the term loans, along with the proceeds from the issuance of the senior subordinated notes, were used to fund the cash payments made to our existing shareholders, repay existing indebtedness and pay related transaction fees and expenses. See "Certain Relationships and Related Transactions—The Equity Purchase and Contribution Agreement."

The senior credit facilities contain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements. In addition, the senior credit facilities require compliance with a variety of covenants. We were in compliance with those covenants as of November 30, 2004. The most restrictive covenants relate to ratios of Consolidated EBITDA to Consolidated Interest Charges (interest coverage ratio), Adjusted Consolidated Funded Indebtedness (net of Cash on Hand) to Consolidated EBITDA (total leverage ratio), and maximum capital expenditures, all as defined in the senior credit facilities. The minimum interest coverage and maximum leverage ratios are computed based on our results for the last twelve months ended. More specifically, the senior credit facilities' covenants require us to maintain:

- a minimum interest coverage ratio of 2.15:1.00 from November 30, 2004 through November 30, 2005; 2.25:1.00 from February 28, 2006 through November 30, 2006; 2.45:1.00 from February 28, 2007 to November 30, 2007; 2.70:1.00 from February 29, 2008 through November 30, 2008; and 3:00:1.00 as of February 28, 2009 and through each fiscal quarter ending thereafter through November 30, 2011.

- a maximum leverage ratio of 6.50:1.00 as of November 30, 2004; 6.25:1.00 as of February 28, 2005 and May 31, 2005; 6.00:1.00 as of August 31, 2005 and November 30, 2005; 5.50:1.00 as of February 28, 2006 and May 31, 2006; 5.25:1.00 as of August 31, 2006 and November 30, 2006; 5.00:1.00 as of February 28, 2007 and May 31, 2007; 4.75:1.00 as of August 31, 2007 and November 30, 2007; 4.25:1 from February 29, 2008 through November 30, 2008; 3.50:1.00 from February 28, 2009 through November 30, 2009; and 3:00:1.00 as of February 28, 2010 and each fiscal quarter ending thereafter through November 30, 2011.

- a maximum capital expenditure limitation of $30.0 million from August 5, 2004 through February 28, 2005; $40.0 million for fiscal year 2006; $45.0 million for fiscal year 2007; $50.0 million for fiscal year 2008; $70.0 million for fiscal year 2009; and $55.0 million from fiscal year 2010 through fiscal year 2012 with the ability to roll forward to future years unused amounts from the previous fiscal year.

We expect to maintain compliance with these covenants for the foreseeable future. Consolidated EBITDA, as defined in the senior credit facilities, differs from the term "EBITDA" as it is commonly used in our industry. In addition to adjusting net income to exclude interest expense, income taxes and depreciation and amortization, Consolidated EBITDA, as defined in the senior credit facilities, also adjusts net income by excluding items or expenses not typically excluded in the calculation of "EBITDA": letter of credit fees; non-cash expenses resulting from employee benefit and management compensation plans, the grant of stock and stock options to our employees or the treatment of such options under variable plan accounting; extraordinary charges; non-cash amortization of financing costs;

63

cash expenses incurred in connection with the THL Transactions, permitted investments and issuances of equity or debt (in each case, whether or not consummated); any losses realized upon the disposition of property or assets outside the ordinary course of business; to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions of any agreement on connection with a permitted acquisition; to the extent covered by insurance, expenses with respect to liability or casualty events or business interruptions; permitted management fees; non–cash purchase accounting adjustments and step–ups with respect to re–valuing assets and liabilities in connection with the THL Transactions or any permitted investments; non–cash losses from joint ventures and non–cash minority interest reductions; fees and expenses in connection with permitted exchanges or refinancings; non–cash, non–recurring charges with respect to employee severance; other non–cash, non–recurring charges that do not result in a cash charge in a future period; cash charges that do not exceed $25.0 million in the aggregate or $15.0 million during any fiscal year; other expenses reducing Consolidated Net Income that do not represent a cash item in such period or any future period; fines, penalties, settlement payments or judgment payments related to the Tradewinds litigation or the SEC and/or U.S. attorneys' investigation into the sale of stock of Sedona Corporation (to the extent the payments do not exceed $10.0 million in the aggregate and are made on or prior to August 5, 2005 or Refco Group is indemnified for such payments); and, for purposes of calculating the ratios described above, the net cash proceeds of certain equity issuances in an amount as is necessary to ensure compliance with the ratios, solely to the extent that such net cash proceeds are (i) received no later than twenty business days after the date of delivery of the applicable compliance certificate and (ii) not otherwise required to be applied to prepay borrowings under the senior credit facilities or to determine the permissibility of a transaction under the senior credit facilities; less non–cash income, extraordinary gains and gains realized upon the disposition of property outside the ordinary course of business; plus/ minus unrealized gains/losses in respect of certain hedging arrangements.

We present Consolidated EBITDA because it is a material component of the covenants contained in our senior credit facilities. Non–compliance with those covenants could result in the acceleration of all amounts outstanding under the senior credit facilities, which could have a material adverse effect on our results of operations, financial position and cash flow. While the determination of "unusual and non–recurring losses" is subject to interpretation and requires judgment of management, we believe the items and calculations set forth below are in accordance with the senior credit facilities. Consolidated EBITDA does not represent net income or cash flow from operations as those terms are defined by GAAP and does not necessarily indicate whether cash flows will be sufficient to fund cash needs.

The following is a calculation of our minimum interest coverage and maximum leverage ratios under our senior credit facilities as of November 30, 2004. The terms and related calculations are defined in the senior credit facilities, which is included as Exhibit 10.3 to our registration statement of which this prospectus forms a part (in thousands, except ratios).

| | November 30, 2004 |
| --- | --- |
| Calculation of minimum Interest Coverage Ratio: | |
| Twelve months ended Consolidated EBITDA(1) | $ 282,594 |
| Consolidated Interest Charges(2) | $ 45,205 |
| Actual Interest Coverage Ratio(3) | 6.25x |
| Minimum permitted Interest Coverage Ratio | 2.15x |
| | |
| Calculation of maximum Leverage Ratio: | |
| Adjusted Consolidated Funded Indebtedness (net of Cash on Hand) | $ 1,156,894 |
| Twelve months ended Consolidated EBITDA(1) | $ 282,594 |
| Actual Leverage Ratio(4) | 4.09x |
| Maximum permitted Leverage Ratio | 6.50x |

*(1)*

Consolidated EBITDA for the twelve months ended November 30, 2004 adds back to Consolidated Net Income: Refco Interest Expense with respect to Consolidated Funded Indebtedness; income,

franchise and similar taxes and permitted tax distributions; depreciation and amortization expense; and non–cash expenses resulting from employee benefit and management compensation plans, the grant of stock and stock options to our employees or the treatment of such options under variable plan accounting. In addition, for purposes of our senior credit facilities, Consolidated EBITDA was fixed at $65.0 million for the fiscal quarter ended February 29, 2004 and $78.0 million for the fiscal quarter ended May 31, 2004. Consolidated EBITDA for the twelve months ended November 30, 2004 includes these fixed amounts. Consolidated EBITDA for the twelve months ended November 30, 2004 includes $0.6 million of net income from discontinued operations. In future periods, net income from discontinued operations will not be included.

(2)    Consolidated Interest Charges for the twelve months ended November 30, 2004 follows (in thousands):

| | | |
|---|---|---:|
| Interest expense on Consolidated Funded Indebtedness | $ | 48,218 |
| Interest income on Cash on Hand | | (3,013) |
| Consolidated Interest Charges | $ | 45,205 |

(3)    Represents ratio of Consolidated EBITDA to Consolidated Interest Charges.

(4)    Represents ratio of Adjusted Consolidated Funded Indebtedness (net of Cash on Hand) to Consolidated EBITDA.

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross–defaults to other indebtedness in excess of specified amounts, events of bankruptcy and insolvency specified in the senior credit facilities, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

Through our Refco Capital, LLC subsidiary, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of some of commercial customers who maintain futures trading accounts with us. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively. We currently have no outstanding debt under these facilities. Through our subsidiary Refco Overseas Limited, we have uncommitted credit facilities with HSBC Bank plc and UniCredito Italiano S.p.A. for €30.0 million and €40.0 million, respectively. Refco Group has given guarantees in favor of both facilities for $45.0 million and €40.0 million, respectively. We currently have no outstanding debt under these facilities. We believe that our cash flow is sufficient to meet our term debt service requirements.

We believe our cash and cash equivalents as well as cash flow from operations will be sufficient to fund our operations for the foreseeable future.

**Liquidity Risk**

Ready access to cash is essential to our business. Our liquidity could be impaired by an inability to access lines of credit, an inability to access funds from our subsidiaries or an inability to liquidate customer positions or otherwise sell assets. This situation may arise due to circumstances that we may be unable to control, such as a general market disruption or an operational problem that affects third parties or us. Further, our ability to liquidate customer positions or otherwise sell assets may be impaired if other market participants are seeking to sell similar assets at the same time. Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets

or trigger our obligations under bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

**Contractual Obligations and Commitments**

We have contractual obligations to make future payments under long–term debt and long–term non–cancelable lease agreements and have contingent commitments under a variety of commercial arrangements. See Notes C and H to our consolidated financial statements for further information regarding our commitments and contingencies. The table below shows as of November 30, 2004 our contractual obligations and commitments, including our payments due by period:

| | | Payments due by period | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **Total** | | **Less than 1 year** | | **1–3 years** | | **4–5 years** | | **More than 5 years** | |
| | | | | | (in millions) | | | | | |
| Long–term debt obligations | $ | 1,398.0 | $ | 8.0 | $ | 16.0 | $ | 16.0 | $ | 1,358.0 |
| Operating lease obligations | | 69.9 | | 17.5 | | 11.6 | | 15.8 | | 25.0 |
| Total | $ | 1,467.9 | $ | 25.5 | $ | 27.6 | $ | 31.8 | $ | 1,383.0 |

In addition to the contractual obligations and commitments set forth above, we may be obligated to make earn–out payments in connection with acquisitions we have completed in the past.

**Off Balance Sheet Arrangements**

In the normal course of our customer brokerage activities in Prime Brokerage/Capital Markets products, where no central clearing counterparty (such as an exchange) exists, we enter into various contractual commitments as a principal in order to facilitate the execution of a customer transaction. Such commitments often involve forward settlement and include exchange–traded futures, fixed income and equity swaps, foreign currency forwards and option contracts. We use these commitments to offset the customer order and generate a positive profit spread for us. We also enter into forward repurchase agreements. Such activities involve customers and counterparties in and outside the United States.

The following table shows the gross notional or contractual amounts of contracts held or issued by us that require forward settlement. This table reflects only off–balance sheet contracts. It should be noted that these off–balance sheet contracts are often offset by on–balance sheet items not shown here.

| | As of February 28, 2003 | | | As of February 29, 2004 | | | As of November 30, 2004 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **Notional** | | **Fair Value** | **Notional** | | **Fair Value** | **Notional** | | **Fair Value** |
| | | | (in millions) | | | | | | |
| Forward currency contracts | $ | 28,303.4 | $ 0.9 | $ 41,586.9 | $ | (0.7) | $ 78,868.1 | $ | (5.7) |
| Swaps contracts | | 90.0 | 2.0 | 2,927.4 | | 1.3 | 1,904.4 | | 0.3 |
| Options contracts, sold or written | | 117,827.8 | (224.8) | 10,383.3 | | (272.1) | 95,930.4 | | (584.3) |
| Options contracts, purchased | | 119,908.9 | 224.3 | 10,723.6 | | 272.5 | 92,365.6 | | 597.5 |
| Exchange–traded futures | | 2,355.4 | (7.1) | 3,735.8 | | (1.6) | 9,313.1 | | (1.7) |
| Total | $ | 268,485.5 | $ (4.7) | $ 69,357.0 | $ | (0.6) | $ 278,381.6 | $ | 6.1 |

66

We record our contractual commitments at market or fair value. Changes in market or fair value are recorded currently in income. The level of reported market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. However, in our case the level of reported market and financial risk associated with these contractual commitments is mitigated by our role as principal broker and the fact that such transactions are offset ultimately by our obligation to pay the customers profits relating to such transactions and our practice of ensuring that losses, whether realized or unrealized, are secured with customer deposits. As a practical matter, the actual level of market risk on financial instruments entered into on behalf of customers is limited by other financial instruments recorded on and, as in the case of the above table, off balance sheet. This limits overall market risk and the net impact of such transactions on our income statement. To ensure this our management actively monitors those positions to review the effectiveness of the offset or hedging strategy.

## Critical Accounting Policies and Estimates

Our discussion of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. During the preparation of these consolidated financial statements, we are required to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosures of contingent assets and liabilities. On an ongoing basis, we evaluate our estimates and assumptions, including those related to principal transactions, provisions for doubtful accounts on receivables, fair values of derivative financial instruments and goodwill and intangible assets. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of our analysis form the basis for making assumptions about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions, and the impact of such differences may be material to our consolidated financial statements.

We believe that the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements:

### Principal Transactions

As a broker of prime brokerage and capital markets products (e.g., foreign exchange), which do not trade on regulated exchanges, we enter into contractual commitments, as principal, involving forward settlement in order to execute customer transactions in such markets. We record these contracts at market or fair value and generally immediately hedge these contracts with offsetting contracts, which results in a profit spread for us. Because the market or fair value of these transactions are based on observable market data, this profit spread is recognized immediately in our statement of income under "principal transactions, net." We recognized net revenues of $165.9 million, $82.6 million and $99.3 million from principal transactions for the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively. Because the market or fair value of these contracts may vary over time, it is our policy whenever possible to enter into hedging, (i.e., offsetting) arrangements that fully secure the value of the spread achieved when the transaction is first executed. In certain instances, it may be possible to secure only a portion of the spread achieved, exposing us to potential adverse changes in the market or fair value of the instrument. We believe, however, that our exposure to adverse changes in the market or fair value instruments we hold is immaterial because typically we are able to fully hedge the value of the spread achieved and, in many instances in which we are not able to do so, any changes in the market or fair value of the contractual commitments we enter into as principal generally offset each other.

### Receivables from Customers—Provisions for Doubtful Accounts

Our receivables are generally collateralized with marketable securities. For some customer receivables that are not fully secured, we establish reserves for doubtful accounts when, in the opinion

of management, such reserves are appropriate. We have established reserves of $65.2 million and $42.7 million against receivables from customers as of February 29, 2004 and February 28, 2003, respectively. Our allowance for doubtful accounts is based upon management's continuing review and evaluation of the factors such as collateral value, aging and the financial condition of our customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. We pursue collection of these receivables through various means, including legal action and collection agencies, and generally do not charge–off any of these receivables. Although these reserves have been adequate historically, the default of a large customer or prolonged period of weakness in global financial markets could adversely affect the ability of our customers to meet their obligations. We do not establish reserves for unidentified losses, which may be inherent in our customer base.

### Fair Values of Derivative Financial Instruments and Securities

As a broker, we enter into transactions involving derivative financial instruments and securities on behalf of our customers. These transactions are carried at market value or, if market prices are not readily available, fair value. Changes in fair value are recognized immediately in net income. Market values for exchange–traded derivatives are based on quoted market prices. Fair market values for OTC derivative financial instruments are based on pricing models that are in turn based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts. Valuation models include the use of management estimates and current market information. Management is also required to make assumptions on how the fair value of derivative financial instruments and securities is affected by current market conditions. If management's underlying assumptions for evaluating fair value prove to be inaccurate, there could be material differences in our consolidated operating results.

Substantially all of our holdings of securities owned and securities sold, not yet purchased are based on quoted market values or pricing models which are based on observable market data.

### Goodwill

Goodwill is the cost of acquired companies or businesses in excess of the fair value of identifiable net assets as of acquisition date. Prior to December 1, 2001, we amortized goodwill over a period of 25 years on a straight–line basis. Effective December 1, 2001, we adopted SFAS No. 142, *Goodwill and Other Intangible Assets*. Consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. We are required to record an impairment loss if the estimated fair value of an operating segment is less than its estimated net book value. We derive the fair value of each of our operating segments primarily based on earnings multiples. A prolonged reduction in the earnings of one of our operating segments could result in an impairment charge in our results. We performed our last annual impairment test during the fourth quarter of fiscal year 2004 and identified no impairment. As of November 30, 2004, the carrying value of our goodwill was $716.6 million.

### Identifiable Intangible Assets

Identifiable intangible assets, which consist primarily of customer relationships, and trade names, are amortized over their weighted average economic useful lives. Customer relationships are amortized on an accelerated basis based upon patterns of usage. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's carrying value may not be fully recoverable. An impairment loss, calculated as the difference between the estimated fair value and the carrying value of the identifiable intangible asset, is recognized if the expected undiscounted cash flows relating to the identifiable intangible asset is less than the corresponding carrying value. Trade names have been classified as indefinite–lived assets and are not amortized but tested annually for impairment. The valuation of our identifiable intangible assets is dependent upon assumptions in areas such as growth rates, customer retention and profitability. Changes to these assumptions or a prolonged period of weakness in global financial markets could adversely impact our businesses and

68

impair the value of our identifiable intangible assets. We performed our last impairment test during the fourth quarter of fiscal year 2004 and identified no impairment. We discontinued the MacFutures trade name on November 10, 2004 and wrote off the book value of the trade name, which was approximately $0.5 million, in the three months ended November 30, 2004. As of November 30, 2004, the carrying value of our identifiable intangibles was $583.1 million.

*Use of Estimates*

The use of generally accepted accounting principles requires management to make estimates. In addition to the estimates we use in connection with fair value measurements and the accounting for goodwill and identifiable intangible assets, the use of estimates is also important in determining provisions for potential losses that may arise from litigation and regulatory proceedings.

**Recent Accounting Pronouncements**

In November 2002, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees* ("FIN 45"). FIN 45 requires a guarantor to recognize a liability at the inception of certain guarantees for the fair value of the obligation, including the ongoing obligation to stand ready to perform over the term of the guarantee. Guarantees, as defined in FIN 45, include contracts that require us to make payments on a contingent basis to a guaranteed party based on changes in an underlying obligation that is related to an asset, liability or equity security of the guaranteed party, performance guarantees, indemnification agreements or indirect guarantees of indebtedness of others. This new accounting is effective for certain guarantees issued or modified after December 31, 2002. We adopted FIN 45, and adoption of this statement did not have an effect on our consolidated financial statements.

In January 2003, the FASB issued FASB Interpretation No. 46, *Consolidation of Variable Interest Entities*. In December 2003, the FASB issued FASB Interpretation No. 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities*. Variable interest entities ("VIEs") are entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinate financial support from other parties, certain of which are also referred to as special–purpose entities ("SPEs"). Under the provisions of Interpretation 46 R, a company is deemed to be the "primary beneficiary," and thus is required to consolidate a VIE, if the company has a variable interest (or combination of variable interests) that will absorb a majority of the VIE's expected losses, that will receive a majority of the VIE's expected residual returns, or both. A "variable interest" is a contractual, ownership or other interest that changes with changes in the fair value of the VIE's net assets. "Expected losses" and "expected residual returns" are measures of variability in the expected cash flows of a VIE. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 for VIE's created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for SPEs created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the VIE was established. The adoption of this statement did not have a material impact on our consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*. SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. SFAS No. 149 is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on our consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*. SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity, and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on our consolidated financial statements.

In December 2003, the FASB issued SFAS No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits* ("SFAS 132R"). SFAS 132R prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of recognition of those plans. The statement retains and revises the disclosure requirements contained in the original SFAS No. 132. It also requires additional disclosures about the assets, obligations, cash flows and net periodic benefit costs of defined benefit pension plans and other postretirement benefit plans. The statement generally is effective for fiscal years ending after December 15, 2003. Management does not believe the adoption of this statement will have a material impact on our consolidated financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised), *Share–Based Payment* ("SFAS 123R"). SFAS 123R requires an entity to measure the cost of employee services received in exchange for an award of equity instruments based on the grant–date fair value of the award with the cost to be recognized over the period during which an employee is required to provide service in exchange for the award. We are required to adopt the provisions of SFAS 123R as of the beginning of the first interim period that begins after June 15, 2005, although earlier adoption is permitted. We are in the process of determining the impact, if any, of SFAS 123R on our consolidated financial statements.

**Quantitative and Qualitative Disclosure about Market Risk**

Our principal market risks relate to counterparty, interest rate and exchange rate risk.

*Counterparty Risk*

We are exposed to the risk that third parties that owe us money, securities or other assets will not perform their obligations. These parties may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. As a clearing broker, we generally bear the risk of the defaults or misconduct of our customers. In addition, we have experienced, due to competitive factors, pressure to extend credit and to price more aggressively the credit risks we take. Although we regularly review credit exposures to specific customers and counterparties and to specific industries, countries and regions that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to detect or foresee. In addition, concerns about, or a default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect us.

As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. Our Global Risk Management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets. Our current system provides the ability to project the impact of market volatility on price movement. Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's ability to pay margin. We perform frequent stress tests to our customers' positions, including intra–day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

We have a policy that requires customers to deposit margin in respect of their trading accounts irrespective of the credit rating of the customer in question. This policy also applies to daily margin

70

calls. As of November 30, 2004, the dollar value of customer margin calls in excess of $500,000 was $40.3 million relating to 22 customer accounts in our Derivatives Brokerage & Clearing business and margin calls in excess of $100,000 totaled $1.0 million relating to five customer accounts in our Prime Brokerage/Capital Markets business. The total amount of margin calls over $50,000 that had been outstanding for more than three days as of November 30, 2004 was $3.3 million in our Derivatives Brokerage & Clearing business and Prime Brokerage/Capital Markets business. We also have exposure with respect to certain credit line customers and clearing organizations associated with the exchanges of which we are a member. As of November 29, 2004, our aggregate exposure to margin financing was $15.3 million.

*Interest Rate Risk*

In the ordinary course of our operations, we have limited our exposure to interest rate risk. Our balance sheet, which reflects a substantial amount of short–term and highly liquid assets, consists of equally matched assets and liabilities. We generate interest income from the positive spread earned on customer deposits or secured customer financing transactions, and the basis for the calculation of interest received and paid is entirely matched. This is the case in both rising and falling interest rate environments, although we have the opportunity to create higher levels of interest income in a rising interest rate environment.

In the future, we expect to have greater exposure to changes in interest rates. Borrowings under our new senior credit facilities accrue interest at variable rates. Interest rate changes may therefore impact the amount of our interest payments and our future earnings and cash flows. Conversely, interest rate changes may affect the fair market value of our fixed rate debt, such as the senior subordinated notes. Assuming we had completed the THL Transactions and applied the proceeds as of February 29, 2004, we would have had variable–rate debt of approximately $800.0 million. Assuming we had incurred this debt on March 1, 2003, holding other variables constant, including levels of debt, a one percentage point increase in interest rates would have had an estimated impact on pre–tax earnings and cash flows for the year ended February 29, 2004 of $8.0 million (or $6.5 million after giving effect to our repayment of $150.0 million of borrowings outstanding under our senior credit facility during the quarter ended February 28, 2005). Although interest expense related to our variable–rate debt may increase in a rising interest rate environment, we expect the impact to be mitigated in part by increased interest income generated from the investment of customer balances. We invest these balances on a daily basis in a variety of permissible short–term instruments.

*Exchange Rate Risk*

We conduct global operations. Our revenues are denominated predominately in U.S. dollars with our most significant non–dollar currency flows being denominated in Euros and Pounds Sterling. Our expenses are also denominated predominantly in U.S. dollars and to a lesser extent in a variety of local currencies reflecting the location of physical operations, including in the United Kingdom, Canada, France and Singapore.

Currently, our general practice is to invest in assets that match the currency in which we expect related liabilities to be paid. Members' equity held in local business units is kept primarily in local currencies to the extent that members' equity is required to satisfy regulatory and self–imposed capital requirements. This facilitates our efforts to ensure that capital held in local business units will be able to support the local business irrespective of currency movements. However, this may adversely affect our reported combined members' equity when expressed in U.S. dollars. The table below shows the approximate effect on members' equity of instantaneous adverse movements in currency exchange rates of 10% on our major currency exposures at November 30, 2004 against the U.S. dollar.

|  | Adverse exchange rate movement against the U.S. dollar | Approximate decline in members' equity (in millions) |
| --- | --- | --- |
| Euro | 10% | $ 4.3 |
| Pounds sterling | 10% | 6.2 |
| Canadian dollar | 10% | 0.5 |

**INDUSTRY**

**Derivatives**

*Overview*

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. A futures contract is a legally binding agreement to buy or sell a commodity or financial instrument at a future date at a specific price. Options are contracts that provide for a right, but not an obligation, to buy or sell a commodity or financial instrument over a specified period at a specific price. Derivatives contracts are broadly comprised of two underlying categories: financial and physical. Examples of financial derivatives include contracts on interest rates, equity indices, individual equities and foreign currencies. Examples of physical derivatives include contracts on energy products, agricultural commodities and non–precious and precious metals. Derivatives markets have grown significantly over the past 15 years in terms of the volume of exchange–traded derivatives activity and the notional amounts outstanding of over–the–counter ("OTC") contracts.

Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the OTC market. According to the Bank for International Settlements ("BIS"), the global notional amount outstanding for OTC derivatives at June 30, 2004 was $220 trillion, while the global notional principal amount outstanding for financial exchange–traded derivatives was $47 trillion. There are 61 derivatives exchanges tracked by the Futures Industry Association ("FIA") located in 24 countries, including 17 exchanges in the United States. Major derivatives exchanges in the United States include the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), the Chicago Board Options Exchange ("CBOE") and the New York Board of Trade ("NYBOT"). Major derivatives exchanges outside the United States include Eurex, Euronext.liffe, the International Petroleum Exchange ("IPE"), Mercado Oficial de Futuros y Opciones Financieros in Spain ("MEFF"), Euronext N.V., Singapore Derivatives Exchange Ltd. ("SGX") and the Tokyo Stock Exchange ("TSE"). Contracts traded on the top five U.S. exchanges represented approximately 26% of global derivatives volume in 2004. The top five U.S. exchanges accounted for 83% of the global exchange–traded derivatives volume transacted in the United States in 2004.

The customer base for derivatives contracts includes professional traders, financial institutions, institutional and individual investors, as well as major corporations, manufacturers, producers and governments. These customers purchase derivatives primarily for hedging or investment purposes. Hedging involves the practice of managing risk inherent in one market position by taking an offsetting position in another market. For example, corporations use the futures markets to protect their businesses from adverse changes in the costs of their raw materials. Investing involves a market participant taking a position in an attempt to earn a profit from buying and selling futures and options contracts in anticipation of future price movements. When entering into exchange–traded derivatives contracts, customers are required to make good faith margin deposits to ensure future performance under the derivatives contract.

*Methods of Trade Execution*

Trading in derivatives products has traditionally occurred in "pits" on the physical trading floor of an exchange through an auction process known as open outcry. Only members owning or leasing a seat on the exchange may trade in the pit. Buy and sell orders from individuals and institutions are sent to these members on the trading floor, usually through a Futures Commission Merchant ("FCM"). Members of an exchange may exercise their trading privileges as independent market–makers (known as locals) trading for their own account or as floor brokers executing customer orders.

72

The diagram below illustrates the process through which customers place trade orders on an exchange floor through an FCM.



In order to expand access to their markets, most derivatives exchanges have supplemented or replaced their open outcry trading facilities with electronic trading platforms. Electronic systems allow investors to obtain real–time information about bid and ask prices and trading volumes and to enter orders directly into the electronic exchange's centralized order book, subject to the agreement of an FCM to process the investors' trades. The emergence of electronic trading has been enabled by the ongoing development of sophisticated electronic order routing and matching systems, as well as advances in communications networks and protocols. Examples of electronic trading platforms include CME's GLOBEX system, LIFFE CONNECT, which is provided by Euronext.liffe, and the Cantor Exchange, which is provided by Cantor Fitzgerald, L.P.

*Exchange Clearing Houses*

Transactions executed on derivatives exchanges are settled through a clearing house that acts as a central counterparty to the clearing member on each side of the transaction. When a futures transaction has been executed in the pit or on an electronic platform, the clearing house confirms the matching and settlement of the trade with FCMs representing both the buyer and seller.

The major clearing houses for futures products include the Clearing Division of the CME, the Options Clearing Corporation, the LCH.Clearnet Group Limited and Singapore Exchange Derivatives Clearing Limited. A clearing house manages its counterparty risk through required margin deposits that are managed to ensure effective delivery of the underlying security or commodity and maintaining guarantee funds and capital call rights.

*Futures Commission Merchants*

In the United States, customers access the exchange–traded derivatives market through FCMs. We operate as an FCM in our derivatives and clearing business. FCMs are members of one or more exchanges that solicit or accept orders from customers for the purchase or sale of derivatives and route those orders to the appropriate exchange. FCMs execute customer orders on the exchange and

maintain records of each customer's position, margin deposits, money balances and completed transactions. In return for providing these services, FCMs collect commissions on each trade order from customers. In addition, FCMs earn interest income on cash deposits held on behalf of their customers. FCMs are subject to a number of regulatory requirements, including the maintenance of a minimum level of net capital. FCMs are regulated by the CFTC, an independent federal regulatory agency, and must be a member of the National Futures Association ("NFA"), an industry–wide self–regulatory organization. FCMs are typically either divisions of major investment or commercial banks or independent providers such as our company. Regulatory jurisdictions outside of the United States have similar governing bodies, minimum capital requirements and self–regulatory organizations.

*Industry Growth*

According to the BIS, annual global trading volume in exchange–traded derivatives has grown at a compound annual growth rate of 21% over the past 15 years, from 488 million contracts traded in 1989 to approximately 8.8 billion contracts traded in 2004. During the same period, trading volumes increased at a compound annual growth rate of 10% in North America. Excluding single stock and commodity contracts, the compound annual growth rate of trading volumes has been 21% in Europe and 27% in the Asia and Pacific markets during the same period.

**Futures and Options Trading Volume on Global Derivatives Exchanges**
(Contract amounts in millions)



Source:          BIS.
Note:            Data based on calendar year. The "financial" category of derivatives includes interest rate, currency and equity index contracts.

We believe growth in exchange–traded derivatives volumes has been driven by the following factors:

- *Electronic Trading*—The ongoing conversion of the derivatives markets from floor–based exchanges to an electronic format has enabled exchanges to lower clearing fees, reduce

74

execution times and broaden access. Electronic trading has led to the decentralization of exchanges and has allowed customers to view bid and ask prices and trade derivatives products globally nearly 24 hours a day. Due to the previously mentioned benefits, we believe electronic trading is attracting new customers to the exchange–traded derivatives market and increasing the trading activity among existing customers. For example, from January 2004 through June 2004, the average daily volume of electronically traded Eurodollar contracts on CME's GLOBEX platform increased over 500%. Electronic trading represented 35% of average daily volume on the CME in 2002, 44% in 2003 and 57% in 2004.

- *Increasing Importance of Risk Management*—An increasing fluidity of capital and diversification of commercial activity among capital markets has broadened the financial exposure that businesses and individuals face and increased the need to hedge their risks. We believe companies and investors focus on controlling exposures in their businesses and providing less volatile earnings for shareholders. To achieve this goal, managers are emphasizing risk management as a means of reducing volatility in their businesses. As risk management needs have increased so have the number of exchange–traded derivatives contracts available to meet these needs.

- *Product Innovation*—In general, the number of contracts available for trading on exchanges has grown significantly in recent years. As of December 2004, the CME, Eurex and CBOT offered for trading a total of 264 contract types, an increase of 149 since January 2000. For example, the e–mini S&P 500 index has experienced rapid growth since being launched in 1997, partially as a result of its small size in relation to most other contracts and its resulting affordability to smaller investors. The e–mini S&P 500 index's annual trading volume reached 167 million contracts in 2004.

- *Structural Shift from OTC Markets to On–Exchange Trading*—The exchange–traded derivatives market for financial derivatives contracts grew at a faster rate than the OTC derivatives market in 2003 based on the total notional amount of contracts outstanding. Exchanges offer customers the advantages of improved price transparency, centralized clearing and credit intermediation. Due in part to these benefits, an increasing proportion of mature and standardized OTC derivatives products (e.g., equity indexes) have shifted to an exchange platform. Given the large size of the OTC derivatives market in terms of notional amount of contracts outstanding, exchanges are developing new products based on the most commonly traded OTC products.

- *Exchange and Clearing Platform Competition*—Competition among exchange and clearing platforms has increased as a result of globalization, deregulation and technological advances. Competition has increased product innovation as evidenced by the proliferation of contract types traded on each derivatives exchange and has led to significant fee reductions. An example of exchange competition is the launch by Eurex of a U.S.–based exchange, which competes directly with the CBOT in some product areas. In response to Eurex's entrance, the CBOT has reduced some of its clearing fees. We believe this competition will significantly contribute to transaction volume growth and will benefit other market participants such as FCMs.

- *Deregulation*—Deregulation of the financial services industry in the United States, Europe and Asia has increased customer access to derivatives products and markets, reduced regulatory barriers to product innovation and encouraged consolidation among exchanges.

*United States:*  Many regulatory barriers to product development, such as lengthy CFTC review of new contracts, were largely repealed by the enactment of the Commodity Futures Modernization Act of 2000 ("CFMA") in the United States. Among other developments, the CFMA authorized the trading of new products, such as futures contracts on individual stocks and narrow–based stock indexes, which were prohibited under prior law. The CFMA also

75

enabled regulated exchanges to self–certify new contracts and rules, without delays occasioned by regulatory review and approval, permitting quicker product launch and modification.

*Europe and Asia:*    Deregulation and competition will continue to pressure European exchanges to consolidate across borders to gain operating efficiencies necessary to compete for customers and intermediaries, lowering transaction costs and trading friction, which should continue to attract new market participants. The Singapore Derivatives Exchange, the TSE, Eurex and Euronext N.V. are major exchanges for various types of securities in addition to being derivatives exchanges, highlighting the growing convergence between cash and derivatives markets. Euronext N.V., which resulted from the merger of the Amsterdam Exchanges N.V., Paris Bourse SA and Societe de la Bourse de Valeurs Mobilieres de Bruxelles S.A. (the Brussels Exchange) acquired a controlling interest in LIFFE and integrated their derivatives markets into Euronext.liffe.

## Prime Brokerage

Prime brokerage is an industry term referring to specialized services provided by brokers to institutional customers as a bundled package. The services typically include execution and clearing, securities financing, custody, trade processing, securities lending and other administrative services. These services can be provided on either electronic or voice platforms, or both. Prime brokers serve customers in all major securities markets, such as equity, fixed income and foreign exchange. Prime brokers typically earn revenue through commission or transaction fees and interest income. They are typically divisions of major investment or commercial banks, or independent providers, such as our company.

The fixed income and foreign exchange markets we provide prime brokerage services to are discussed separately below.

### *Fixed Income*

The fixed income securities market is one of the largest financial markets in the world. In the United States, there were approximately $23.6 trillion of fixed income securities outstanding at the end of 2004. The U.S. Treasury securities market, the largest and most liquid fixed–income market, has experienced strong volume growth. Average daily dollar trading volume has increased from $18.3 billion in 1980 to $497.9 billion in 2004, representing a compound annual growth rate of 14.8%.

While there are many types of investors in the U.S. Treasury securities market, financial institutions, corporations and hedge funds comprise a large percentage of the activity. These investors are typically attracted to the U.S. Treasury securities market due to its significant liquidity and low risk profile. Additionally, U.S. Treasury securities are commonly used as part of a larger investment strategy and are primarily financed through the OTC repurchase agreement ("repo") market.

The OTC repo market is one of the largest and most active sectors in the U.S. fixed income market. Repos are widely used as a means to inexpensively finance short–term borrowings against collateral (commonly U.S. Treasury securities) and to invest surplus funds on a short–term basis. The largest users of repos are broker–dealers, banks and hedge funds. The largest providers of cash liquidity to the repo market are money market funds, state and local governments and foreign central banks.

Traditionally, the majority of U.S. Treasury securities are bought and sold by investors using the services of a broker (typically a large commercial bank or investment bank). Such customers receive price quotes from these brokers. The broker in turn either buys the security from the market or sells the security from existing inventory. Additionally, they may access the interdealer broker ("IDB") market to match the transaction with another broker. Access to the IDB market has traditionally been limited to brokers dealing with other brokers. The customer compensates the broker for executing this

76

transaction through the payment either of a commission or through a mark up that is added by the broker to the price at which the broker can access the IDB market to execute the transaction.

The U.S. Treasury market has been moving away from voice broking to electronic trading in recent years. Many of the major broker–dealers now have electronic order entry platforms, which allow customers to ask for bid and offer prices. In some cases the dealer may list current bid and offer prices on the platform. Similarly, the IDB market has also evolved from a predominately voice brokered market to an electronic market. Participants in the IDB market can now see bids and offers shown live on a screen and can execute against these prices electronically.

In order to participate in transactions in the IDB market, a participant must become a netting member of the Fixed Income Clearing Corporation ("FICC"), a clearing house for the U.S. fixed income market. A prospective netting member must complete a lengthy approval process that requires the applicant to (i) be a financial institution, (ii) maintain a minimum level of capital and (iii) be actively involved as a clearer, dealer or broker of government securities. As a result, most FICC netting members are either large investment banks, broker–dealers or commercial banks who use the IDB market to access the best pricing and greatest liquidity for U.S. Treasury securities. These institutions typically buy securities both for their own proprietary trading account or for resale to clients.

We believe growth in the U.S. Treasury securities market and the repurchase agreement market has been driven by the following factors:

- *Growth in the Total Amount of Debt Outstanding*—According to the Bond Market Association, the total size of the U.S. Treasury securities market has increased significantly, with $3.9 trillion outstanding as of December 31, 2004, compared to $616.4 billion at December 31, 1980. Total gross issuance of short– and long–term U.S. Treasury securities for 2004 was $3.5 trillion.

- *Growth in Interest Rate Derivatives*—Interest rate derivatives are contracts that transfer an asset's risk and return from one party to another without transferring ownership of the underlying asset, allowing market participants to obtain interest protection or assume interest rate exposure associated with fixed–income securities and other debt obligations. Interest rate derivatives provide increased flexibility and liquidity for investors and lenders to diversify their interest rate exposures.

- *Greater Sensitivity to Credit Risk*—U.S. Treasury securities are generally secured by high quality collateral and are a liquid investment, offering relatively low to no credit risk. Given recent past financial crises, including the Asian financial crisis in 1997 and the Russian debt crisis in 1998, an increasing number of investors have sought such low–risk assets.

- *Introduction of Electronic Trading Platforms*—Electronic trading platforms act as central facilities to bring together buyers and sellers. The actions of participants on these platforms are facilitated by an electronic medium that improves some of the manual processes that might otherwise be required. These platforms also have integrated compliance and risk management functions, as well as greater accuracy and decreased probability of erroneous trades than voice brokerage, and as a result, typically provide a lower–cost and more efficient means for price discovery and trade execution.

### Foreign Exchange

The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.9 trillion. By comparison, average daily volume in the next largest financial market, that for U.S. Treasury securities, was approximately $497.9 billion during 2004.

The majority of foreign exchange volume is traded OTC. Most foreign exchange transactions take place by telephone or through proprietary trading networks established by large financial institutions.

The primary participants in the foreign exchange markets fall into four categories: central banks, banks, brokers and institutional clients of brokers. Banks are the largest participants in the market, as approximately two–thirds of all foreign exchange transactions involve banks trading currencies with one another. Brokers act as intermediaries between other participants in the market, searching for the most favorable rates on behalf of customers and providing a level of anonymity for the buyer and seller. Brokers earn commissions on the trades they execute.

There are three primary types of foreign exchange transactions: spot, forward and options. In a spot transaction, a buyer and seller agree on an exchange rate and promptly settle the trade based on that rate. In a forward transaction, a buyer and seller agree to settle the traded currencies at a later date at an agreed upon rate, regardless of market exchange rates at that time. The most common type of forward transaction is a swap, in which two parties exchange currencies at a given rate and agree to reverse the transaction at a later date. Options on foreign exchange work the same way as options on equities: they convey a right, not an obligation, to trade at a future date at a certain rate. As of April 2004, spot transactions represented 33% of the OTC traditional foreign exchange daily volume, swap transactions represented 50% and outright forward transactions represented 11% (while estimated gaps in reporting were 6%).

We believe growth in the foreign exchange market has been driven by the following factors:

- *Increased Cross–Border Trade and Investment*—We believe cross–border trade should continue to increase, as the world is more open to free trade than in past years. For U.S. international trade, for example, the average annual increase in exports and imports over the past 40 years was 10% and 12%, respectively. Similarly, foreign direct investment has experienced a long–term growth trend and is expected to continue. This growth in global trade and foreign direct investment is a driver of demand for foreign exchange products.

- *Increasing Use of Foreign Exchange as a Hedging Tool*—Foreign exchange derivatives products, such as foreign exchange forwards and swaps, facilitate the hedging of foreign exchange risk. From 1992 to 2004, forward and swap volumes have been growing as a percentage of total foreign exchange volume. This trend is consistent with the compound annual growth in the exchange–traded derivatives market since 1988 of 20%.

- *Alternative Investment Asset Flows*—Foreign exchange has emerged as a distinct asset class for investment purposes, driven largely by demand from hedge funds whose investments in foreign exchange have risen significantly since 2001 as equity market valuations declined and historically low interest rates rendered many fixed income products less attractive. In addition, retail customer participation in the foreign exchange market has increased as customers have become more aware of foreign exchange contracts as an investable asset class.

- *Emergence of Electronic Brokerage*—Trading in the OTC market is conducted over the telephone, Internet or trading platform, either directly or through a broker. Electronic brokers play a large role in the market based on their offering of lower costs, higher efficiency and greater transparency compared to direct dealing. The BIS reported that electronic brokers conducted approximately 50% to 70% of foreign exchange transactions in major currency pairs in 2001, compared to approximately 40% and 10% in 1998 and 1995, respectively. Similarly, usage of electronic trading has grown among non–bank foreign exchange investors.

78

**BUSINESS**

### Our Company

We are a leading independent provider of execution and clearing services for exchange–traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets. We offer our customers rapid, low–cost trade execution and clearing services on a broad spectrum of derivative exchanges and OTC markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries with a focus on delivering superior customer service. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

In 2004, we were the largest provider of customer transaction volume to the CME, the largest derivatives exchange in the United States. In fiscal year 2004, we processed 461 million derivatives contracts, a volume of derivatives contracts comparable to that traded on the CBOT and greater than the volume traded on either the CBOE or the NYMEX during the same period. In fiscal years 2002 and 2003, we processed 346 million and 401 million of derivatives contracts, respectively. We are more diversified than any individual exchange, as we offer access to multiple products on virtually all major derivatives exchanges as well as OTC markets.

In fiscal year 2004, we cleared over $9 trillion in U.S. Treasury repurchase transactions and processed over $680 billion in customer volume in the foreign exchange market. In 2004, we ranked fourth among FICC firms in terms of cleared U.S. Treasury repurchase transaction volume and eighth for U.S. Treasury cash transaction volume.

Our revenues are primarily comprised of:

- transaction fees earned from executing and clearing customer orders; and

- interest income earned on cash balances in our customers' accounts and from providing financing through repurchase transactions.

For the twelve months ended November 30, 2004, we generated $1,250.7 million of net revenues and $187.3 million of net income.

### Competitive Strengths

We believe our following competitive strengths will enable us to continue to successfully grow our business and increase our profitability:

#### Established Market Position

As of November 30, 2004, we were the largest independent FCM in the United States based on domestic customer segregated fund balances of approximately $3.8 billion. We are a clearing member on virtually all major domestic and international derivatives exchanges, including the CME, CBOT, Eurex, the London Metal Exchange ("LME"), Euronext.liffe, NYMEX and the IPE, and offer our customers access to a broad range of derivatives contracts. In fiscal year 2004, we processed 461 million derivatives contracts, cleared over $9 trillion in U.S. Treasury repurchase transactions and processed over $680 billion in customer volume in the foreign exchange market. In 2004, we ranked fourth among FICC firms in terms of cleared U.S. Treasury repo transaction volume and eighth for U.S. Treasury cash transaction volume. We believe our leading market position allows us to provide our customers a broad product offering, superior customer service and leading technology at low cost.

#### Diversified Across Customers, Products and Markets

We serve more than 200,000 accounts for customers that include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. No single customer represents more than 1% of our gross commission revenue. In

79

our Derivatives Brokerage & Clearing division, we provide our customers access to a wide variety of exchange–traded derivatives products. We also provide access to a wide range of OTC fixed income and foreign exchange products through our Prime Brokerage/Capital Markets division. In fiscal 2004, our operating profit for our Derivatives Brokerage & Clearing division and our Prime Brokerage/Capital Markets division were comparable. We believe this diversification reduces our overall earnings volatility and dependence on any one customer segment, product or market.

### Direct Customer Relationships

We serve as an essential intermediary between our customers and the financial markets and, unlike an exchange, we maintain direct relationships with our customers. These customer relationships allow us to benefit from customer trading of a variety of products across multiple exchanges and markets. In order to gain access to the markets we serve and to satisfy regulatory requirements, our customers maintain account balances with us, and we generally earn interest income on these balances. As of November 30, 2004, we held approximately $3.8 billion of domestic customer deposits.

### Scalable Operating Platform

Our business benefits from a scalable operating platform. Our existing infrastructure is capable of processing significant additional volumes with limited incremental increases in our Employee Compensation and Benefits expenses and General, Administrative and Other expenses. Our operating platform services both floor traders and electronic trading, and we expect to further benefit from the trend towards electronic trading. Our operating income margin has increased from 13.2% ($61.0 million) in fiscal year 2000 to 18.8% ($189.5 million) in fiscal year 2004.

### Ability to Generate Free Cash Flow and Reduce Financial Leverage

We generate significant free cash flow, which is available for reinvestment in our business, debt service and reduction, acquisitions and other uses. Our cash flow is generated by high margins and a business model that allows us to grow without significant capital expenditures. For the periods from March 1, 2004 through August 5, 2004 and the period from August 6, 2004 through November 30, 2004, we incurred capital expenditures of $5.0 million and $3.5 million, respectively. In January 2005, we voluntarily prepaid $150.0 million of our bank debt.

### Proven and Committed Management Team

The members of our senior management team have an average of 24 years of industry experience. Phillip Bennett, who has been with us for 23 years, became our President and Chief Executive Officer in 1998. Under their leadership, net revenues have grown at a compound annual growth rate of 21.6% from fiscal year 2000 through fiscal year 2004. Following this offering, Mr. Bennett will beneficially own an approximate     % interest in us.

## Our Business Strategy

We plan on continuing to capitalize on the economies of scale arising from our large execution and clearing volumes and to increase our transaction volumes, revenues and profitability by executing the following strategies:

### Capitalize on Growing Markets and New Product Opportunities

We will continue to identify opportunities for growth within our markets and for new product offerings while leveraging the customer relationships, liquidity and transaction processing platform of our existing businesses. Because of our global presence, we believe we can react quickly to emerging opportunities throughout the world. We have positioned our business within growing markets and benefit from increasing transaction volumes. We maintain a strong presence on the world's major

exchanges and OTC markets in which we operate, offer access to trading in an extensive suite of products to a diversified and growing customer base and continually seek to reduce our cost structure. In the past, we have grown our Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets businesses by offering new products and services to our customers as they expand their trading activities into new asset classes and financial markets. We plan to expand our product offering into other markets where our focus on access to markets and efficient execution on behalf of customers is a competitive advantage. We continually work to identify new market and product opportunities where we can leverage our transaction processing platform.

### Profit from Maturing Markets

We seek to continue to take advantage of our scale and operating efficiency to profit from providing execution and clearing services at a low cost to customers active in transparent, highly liquid, commoditized markets. The economics of these markets are characterized by low per unit revenues levied on each of millions of transactions. Many former competitors have chosen to exit these markets and potential competitors have chosen not to enter them because the financial returns are relatively unattractive for a sub–scale operation. As other existing markets mature, becoming more liquid and standardized, and market participants demand more efficient access to the same services at potentially lower costs, we expect to be able to service these markets profitably while our competitors operating with less scale will likely generate lower profit margins and may choose to exit these markets altogether.

### Offer Unconflicted Access to Markets

We strive to differentiate our business offerings from our competitors' offerings by focusing solely on customer business and leveraging our transaction processing capabilities. Unlike many of our competitors in the brokerage industry, we do not trade in a directional or strategy–based manner for our own account. We focus on attracting customers and providing them with access to markets. We strive to provide our customers with low transaction costs, rapid order execution and access to pricing data that allows customers to see the price of the security and the commission or transaction fee paid to us. We target market participants who value this service offering as an important part of their investment strategies. For example, we believe our domestic fixed income prime brokerage business is attractive to fixed income hedge funds that require low cost access to the prices in the IDB market in order to execute their investment strategies. We believe our focus on acting as an agent is important to customers concerned about quality of execution and potential conflicts of interest.

### Grow Our Customer Base

The significant growth of the markets in which we participate creates opportunities for us to attract new customers. We have also developed online platforms to attract the growing base of customers who trade over the Internet. As we continue to grow, we will maintain our focus on providing high levels of customer service to address the diverse needs of our three key customer segments.

*Institutions*—We have a dedicated sales force of over 1,000 individuals calling on institutional customers. Our ability to provide institutional customers unconflicted access to a wide range of markets is an advantage when soliciting new customers. We believe recent trends such as growth in the hedge fund industry and increased cross–border commerce have increased the demand among corporations, institutional investors and hedge funds for a wider variety of products with which to hedge risks and invest for profit. We plan to take advantage of what we believe is a valuable cross–selling opportunity by continuing to educate our institutional customers about our full range of derivatives, fixed income and foreign exchange services.

*Professional Traders and Locals*—We have been building our strong market position as a provider of clearing services to professional traders on the world's major exchanges. Professional traders and locals are typically high trading volume customers and have contributed significantly to our volume growth. An increasing number of professional traders access the markets electronically. As part of our strategy to penetrate the market for locals, we have begun to offer training programs and high performance trading facilities for those moving from the trading floor to electronic trading and for new professional traders.

*Retail*—Our retail operations include our Lind–Waldock division, a leading online retail derivatives brokerage operation. We believe we are well positioned to capitalize on an increased awareness and understanding of the derivatives and foreign exchange markets among retail customers. We plan to continue encouraging this increased understanding through targeted marketing via direct mail, the Internet, customer education seminars and other media. In order to serve the wide variety of customers in this segment, we offer a complete suite of retail–focused products and services, including online and broker–assisted trading and research.

### Capitalize on Shift to Electronic Trading

Many markets and exchanges are increasingly using electronic trading and moving away from the traditional open outcry method. We believe increased electronic trading has created an opportunity for us to increase market share in our various markets as our operating platform is well suited to accommodate this technological shift. We plan to take advantage of this opportunity by utilizing our existing relationships with floor–based brokers as well as our scale, technology and market knowledge to adapt our service offering to meet evolving customer demands. We believe our training programs and high performance trading facilities, together with our technology platform and electronic trading capabilities, provide rapid trade execution and market visibility as well as an attractive platform for new professional traders and those moving from the trading floor to electronic trading.

We have provided electronic trading systems in the markets we serve and have gained a level of expertise in providing these systems to a global and diverse customer base. As electronic trading has comprised a growing proportion of the volume in our markets, we have seen total market volumes increase substantially. Electronic trading also allows us to execute and clear orders more efficiently, as we can better employ technology for functions such as margin and risk management. We have continued to develop these systems to satisfy our customers' evolving trading requirements. The characteristics of the electronic platforms that interface with exchange matching engines are complex in functionality and in configuration. We have integrated them into our operational infrastructure and can handle rapidly increasing trading volumes. We believe we will be able to realize the efficiency afforded by electronic trading when it is applied to all the exchanges' current floor–transacted volume. These systems and our expert implementation capabilities and operation of a global network of multi–exchange electronic order flow allows us to manage order flow straight through processing on a scale that significantly exceeds traditional physical order execution processes.

### Manage Risk Prudently

We plan to continue to monitor and improve our exposure to customer and counterparty risk throughout our operations using our comprehensive risk management system. We are not exposed to market risk as a result of strategy–based or directional proprietary trading. In order to mitigate customer and counterparty risk, we will continue to utilize a number of proactive risk management tools.

### Pursue Selective Strategic Acquisitions

We intend to pursue selective acquisitions that will expand our service capabilities or customer base or provide greater access to trading in a wider range of products. Our flexible operating platform

82

can facilitate the efficient transfer and integration of the customer positions and operations of acquired companies. Our historical results have benefited from a focused acquisition program that has expanded our service offering and strengthened our market position within our customer segments. Since 1999, we have acquired and integrated 14 businesses.

## History

We began operations in 1969 by providing execution and clearing services in agricultural commodities. Throughout the 1970s, we expanded our product offerings in response to the introduction of new financial futures products. Our involvement in Prime Brokerage/Capital Markets began in 1982 in response to requests from existing futures customers for the ability to adjust their futures positions after the futures market was closed. We formed the Prime Brokerage/Capital Markets division to provide this service by facilitating customer access to the cash markets, including the interbank foreign exchange market, in our capacity as a broker in principal. The brokerage in principal business model established the foundation both for our foreign exchange operations and for our other cash market brokerage activities. From 1983 to 1985, we emerged as a leading consolidator in the futures industry by acquiring Chicago Grain, ContiCommodities and DLJ Futures. By 1985, we had built an international infrastructure and strong market position in global derivatives markets.

In September 1998, Phillip Bennett was named our chief executive officer. Under his leadership, we formed a new senior executive team with significant industry experience to focus on growing our business and strengthening our regulatory and customer focus. Under our new senior management team, we grew internally and through a number of acquisitions. In 2000, we acquired Lind–Waldock, a leading retail derivatives brokerage operation. From 2001 to 2003, we enhanced our strong market position in the professional trader market by, among other things, the acquisition of MacFutures Limited and the professional floor trader business of First Options.

## Services

We are organized into two operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing and (ii) Prime Brokerage/Capital Markets, and we have one non–operating business segment, Corporate & Other.

### *Derivatives Brokerage & Clearing*

We execute and clear customers' orders for exchange–traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for matching. We also facilitate confirmation and settlement of our customers' derivatives transactions and ensure that our customers have the appropriate collateral in their accounts to support their derivatives positions. We conduct these activities in our capacity as a regulated FCM. As an FCM, we are responsible to the applicable clearing house for our customers' transactions. We are the largest independent FCM in the United States based on domestic customer segregated fund balances of approximately $3.8 billion as of November 30, 2004. In 2004, we were the largest customer in terms of contract volume of the CME, the largest derivatives exchange in the United States.

We generate Derivatives Brokerage & Clearing revenues from: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at a compound annual growth rate of 24.1% and 39.6%, respectively, driven primarily by annual increases in contract volumes executed or cleared and annual increases in customer deposits. Our growth has been generated both organically and through strategic acquisitions, which have broadened our customer base, service offerings, geographic reach and exchange coverage.

83

Our business is diversified across customers, products and exchanges. The following charts illustrate our diversity across exchanges and contract types for fiscal year 2004:



**Contract Volume by Exchange(1)**

NYMEX 5%
Other 7%
LIFFE 6%
LME 8%
Eurex 9%
CBOT 24%
CME 41%

**Contract Volume by Type(1)**

Metals 10%
Equity Indices 18%
Agricultural 10%
Energy 5%
Foreign Exchange 5%
Individual Equities less than 1%
Other 2%
Interest Rate 49%

*(1)*          Total volume: 461 million contracts

*Customers.*   As of November 30, 2004, our Derivatives Brokerage & Clearing division serviced over 188,000 customer accounts. Our customers include institutions, professional traders and retail investors.

*Institutions.*   Institutions are typically large mutual funds, hedge funds, financial institutions, pension plans and other non–financial entities. We market to our institutional customers through a sales force of experienced financial services professionals. We offer institutions high service levels, anonymity, unconflicted access to a broad range of products and markets and competitive pricing. We believe that it is important to institutional customers that we do not speculatively trade with our own capital in a strategy–based or directional manner and therefore avoid potential conflicts with our customers. We believe the quality of execution is very important to our institutional customers and that we are able to provide such customers with efficient execution due to our scale, liquidity and geographic breadth. We have experienced growth in our institutional customer base, in part, driven by the proliferation of hedge funds and an increasing corporate focus on risk management.

*Professional Traders.*   Professional traders are either locals, who are individual members of derivatives exchanges trading for their own account on the floors of those exchanges that maintain the open outcry method of price discovery, or professionals trading electronically from dedicated facilities built to service their needs. We have a strong market position among professional traders and locals. Professional traders are high volume customers who require an operating platform with rapid execution at a low cost. Locals fulfill an important role in the market as liquidity providers for the exchanges of which they are members. Through internal growth and acquisitions, we have increased our professional trader customer base as part of our strategy to grow transaction volumes and our plan to diversify our customer base. This strategy allows us to integrate and efficiently process very large volumes and to manage effectively the risks associated with this particular customer group. We also believe that this particular customer base will be of strategic significance in the future as markets become increasingly automated. Locals are well suited to the development of off–the–floor trading locations, which provide them with direct access to electronic markets and enable us to continue to benefit from the order flow and commission generating potential of these clients. Our MacFutures model is indicative of the opportunities presented by this trend. MacFutures, a London– based business we acquired in March 2003, provides specialty clearing services for individual professional traders, specializing in the electronic derivatives and fixed income markets in Europe. The model, which involves the recruiting

84

and training of professional traders who are provided with access to electronic exchanges on our own off–the–floor trading locations, has now been implemented in Chicago and Montreal.

*Retail Investors.*    Retail customers are typically experienced individual investors. We have grown our retail customer base historically through internally generated new accounts and through acquisitions. The global retail customer base is growing as new product offerings with a broad investor appeal, such as the e–mini contracts, are listed on exchanges. We offer our retail customers access to a broad range of products and value added services, including research, real time quotes, risk management tools, account information and customer support. Our retail customers also benefit from the operating platform that we have built to service our institutional and professional trader clients. We market to retail customers through an actively managed lead generation and marketing strategy targeted at identifiable customer groups who we believe would be receptive to trading equity derivatives. Specific examples of these initiatives include the following:

- We leverage our prominent Lind–Waldock brand name and its online platform. Lead generation is driven primarily by print media advertising and, increasingly, a broad range of internet marketing initiatives, including key word strategies negotiated with search engines.

- We are developing business–to–business ("B–2–B") relationships to expand the scale of our retail customer base. These are often negotiated with complementary and non–competitive retail brokerage firms such as Charles Schwab & Co., Inc., TD Waterhouse Investor Services, Inc. and Ameritrade Inc. We typically provide access to and execution of exchange–traded derivatives products for the customers of our B–2–B partners.

- We rely on our traditional sales force of account executives and registered introducing brokers who independently (but with corporate product support) market to individual clients throughout North America.

- First time potential clients are targeted using educational marketing strategies often developed in conjunction with seminar providers and investment educational professionals.

*Product Access.*    We provide our customers access to all significant exchange–traded derivatives contracts, including interest rates, equity indexes, energy, agriculture, foreign currency, metals contracts and managed futures.

*Exchanges.*    We provide our customers access to virtually all major global derivatives exchanges, including the CME, CBOT, NYMEX, LME, Eurex, Euronext.liffe, CBOE and IPE. In recognition of the technological advances in the industry, we provide both open outcry and electronic access to the derivatives markets. The electronic exchanges we provide access to include GLOBEX, LIFFE CONNECT and NYMEX Access.

*Competition.*    The primary competitors of our Derivatives Brokerage & Clearing business include affiliates of major commercial and investment banks and independent FCMs. We compete for customers and transaction volume on the basis of our access to a broad range of products and exchanges, our service levels, relationships, technology and operating platform and pricing. Many of our investment and commercial banking competitors maintain large proprietary trading operations.

*Refco Alternative Investments.*    In June 2002, we created Refco Alternative Investments to develop product offerings using alternative assets, such as managed futures, for distribution to our customers. These offerings result in the creation of asset management funds, utilizing both our sales force and third–party distributors to raise assets. All investment decisions are made by third party managers, and all brokerage activity of the funds is directed exclusively to our derivatives and cash brokerage affiliates, driving transaction volume to our core transaction processing platform. Additionally, such funds typically earn an asset management fee. An important milestone was reached following the negotiation with Standard and Poor's for the branding of a portfolio of Commodity Trading Advisors and the

subsequent creation of a managed futures index, which tracked by a public fund and a series of private funds. This product, which took advantage of weaker equity markets and the non–correlated performance of derivatives investing to equity market performance, was successfully launched in March 2003. As of November 30, 2004, approximately $782.4 million has been raised for this product, including our investment of approximately $0.4 million. We have earned approximately $3.2 million in management fees for the nine month period ended November 30, 2004.

### Prime Brokerage/Capital Markets

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non–dollar fixed income markets. Our customers include hedge funds and other financial institutions.

Our fixed income operating platform provides our customers access to the IDB market for U.S. Treasury securities. The IDB market is an OTC, wholesale securities market that allows brokers to trade with one another. Access to the IDB market is usually limited to member firms who can meet its membership requirements, such as the minimum capital requirement. We allow our customers to use our IDB membership and operating platform to gain direct access to transparent IDB market pricing and liquidity.

In the case of foreign exchange, we act as a broker for customers wishing to transact business in the interbank foreign exchange market. We processed over $680 billion in customer transaction volume in fiscal year 2004. We enable our customers to trade in the majority of the world's principal currencies in the form of spot, forwards and options in OTC foreign exchange markets via several trading platforms. These platforms include both voice broking in which our team of brokers place customer orders with market makers, primarily large money center banks, as well as online platforms.

We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned from providing financing through repo transactions. From fiscal year 2000 through fiscal year 2004, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at compound annual growth rates of approximately 22.6% and 46.2%, respectively. This growth has been driven primarily by an increase in the number of customers, growth in the U.S. Treasury securities market and new product introductions. We have also grown through acquisitions.

Unlike our exchange–traded derivatives business, our Prime Brokerage/Capital Markets activities are not conducted on exchanges. In order to effect Prime Brokerage/Capital Markets transactions for our customers, we act as a principal executing the transaction with our customer and simultaneously executing an offsetting trade in the market. We do not trade speculatively in a directional or strategy–based manner for our own account and only initiate an order in the market to match an offsetting customer transaction. Since we act as broker in principal in our capital markets/fixed income business, these transactions are reported as "principal transactions, net" on our consolidated statement of income. We employ mark–to–market and margin risk management procedures identical to those adopted in regulated agent markets. We believe that the risk involved in these transactions is comparable to that incurred in our traditional derivatives brokerage operations.

*Product Access.*    Within our Prime Brokerage/Capital Markets segment, we primarily provide fixed income and foreign exchange products and services.

**Fiscal Year 2004 Prime Brokerage/Capital Markets Revenue Breakdown**



*Fixed Income.*    Our worldwide trade execution capabilities extend to select sectors of the fixed income market, primarily in U.S. Treasury securities, OTC options on U.S. Treasury securities, corporate debt and related OTC derivatives, sovereign debt and emerging market debt.

Our most important fixed income offerings are U.S. Treasury products available in the IDB market and associated financing primarily through U.S. Treasury securities repurchase agreements. We provide our customers with a single platform, "Refco Trader," to obtain access to dealer prices only available on IDB markets. Our customers use this platform to buy and sell U.S. Treasury securities and obtain financing through the repo market. We believe that the efficiency of the Refco Trader platform and the competitive bid offer spread in the IDB market is valuable to the fixed income fund manager and professional trader.

Our IDB product offering has been enhanced in recent years by the consolidation among traditional participants in fixed income markets. We have been able to exploit the consolidation among liquidity providers without incurring any undue risk by providing professional customers and fixed income traders with an alternative source of liquidity through repurchase transactions. As we do not trade speculatively in a directional or strategy–based manner for our own account, we do not face the conflicts of interests with our customers as our competitors that engage in both agency and proprietary trading.

We are targeting other fixed income markets, such as mortgage backed securities and European sovereign debt, where we can provide our customers a similar service offering and value proposition as our U.S. Treasury offering. We also have a strong presence in Europe as one of the few non–bank repo clearing members of the London Clearing House ("LCH") and have an expanding presence in Latin American, Eastern European and Southeast Asian markets.

*Foreign Exchange.*    We are a major international broker of foreign exchange in the areas of execution and prime brokerage, processing over $680 billion in transaction volume during fiscal year 2004. We provide 24 hour trading facility coverage of all major and most minor currencies, with service including spot, forwards, options, swaps and custom derivative overlays.

Our largest foreign exchange business is the traditional voice brokerage business. Customers call us to execute foreign currency transactions. As a broker in principal, we enter into the transaction with our customer and simultaneously enter into an offsetting transaction with a market maker. For providing this service, we earn either a transaction fee or the spread between the price we charge our customer and the price that we pay the market maker. We compete for customers based on service, relationships, price competitiveness and by providing anonymity in trading.

We have an online currency trading platform for our institutional customers developed in conjunction with Currenex, a leading global provider of currency pricing systems. This platform provides our customers electronic access to the foreign currency prices of several major market makers. The overall market for trading currency electronically is growing quickly due to the speed and cost benefits and the price transparency. This type of direct access is generally not offered by commercial or investment banks.

87

We have also developed retail online foreign exchange offerings. These products are web–enabled, rely on global Internet–based distribution and, most importantly, encourage self–directed trading, which requires minimal human interaction on our part. This facilitates the handling of significant customer volumes with very low cost to income characteristics. An active web–based marketing strategy is currently in process to take maximum advantage of this market opportunity. We also own 35% of FXCM, which provides a foreign currency trading platform and execution services to retail investors.

*Other.*    We have developed a worldwide clearing infrastructure that offers institutions and fund managers a single source for execution and all related financing activities in both domestic and international equity markets. These capabilities allow us to offer investors capital leverage through global integrated financing, securities lending, structured products and prime brokerage. We provide securities lending services for customers seeking to borrow equities to cover a short selling strategy or to generate additional income by lending securities already owned. Customers may also leverage equity positions with us through the use of customized derivative products and currency–linked transactions. Our financing structures include equity swaps, zero–cost options and repurchase agreements.

*Customers.*    Our Prime Brokerage/Capital Markets customers are primarily institutions, including hedge funds, mutual funds, banks, broker–dealers and other corporate customers. We also serve a growing number of retail foreign exchange investors. All customers are subject to a detailed application process and credit check.

*Competition.*    The primary competitors of our Prime Brokerage/Capital Markets business include affiliates of major commercial and investment banks and independent broker–dealers. Customers value speed of execution, anonymity in trading, low price, customer service and access to a breadth of products.

## Risk Management

### Liquidity Policy

Our execution and clearing of derivatives requires limited working capital because the margin mechanism used by exchanges results in the customers providing the required funding to maintain positions. We maintain excess regulatory capital to provide liquidity during periods of unusual market volatility. Similarly for our brokerage activities in the cash markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures–style margin methodology in which customer positions are valued daily and resulting realized or unrealized losses must be paid immediately in cash. This practice protects us against the risk that adverse price movements may prevent customers from meeting their financial obligations to us. Additionally, we have adopted a margin style procedure to control customer positions in our foreign exchange business. This account structure has facilitated considerable growth in the volume of business conducted, while maintaining a low risk profile.

### Regulatory Capital

Our primary U.S. regulated entities are Refco, LLC, an FCM, and Refco Securities, LLC, a broker–dealer. Each entity has regulatory capital requirements. As of November 30, 2004, the excess capital for Refco, LLC and Refco Securities, LLC was $139.6 million and $69.9 million, respectively. See "—Regulation."

### Market Risk/Economic Liquidity

Our risk is credit related risk or risk related to our customers' ability to meet their margin obligations. Because we do not trade speculatively in a directional or strategy–based manner for our own account, we have no direct exposure to market risk volatility or the potential price or liquidity risk that might arise.

88

*Counterparty Risk Management*

Our current system provides the ability to project the impact of market volatility on price movement. We perform frequent stress tests of our customer positions, including intra–day trading analysis, daily equity change analysis, concentration risk analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments. These tests have resulted in minimal losses due to counterparty exposures. We continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer operations. Our risk management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets.

### Technology and Information Systems

Our information technology group supports 14 locations worldwide, including our major management centers in New York, London and Chicago. Our exchange–traded derivatives central processing capacity is located in Memphis, Tennessee with primary backup in Chicago.

Our core exchange–traded derivatives transaction–processing platform has been owned and developed by us since 1979. This system has accommodated our significant growth in recent years, including the integration of significant levels of acquired volume. Our ability to process transactions on a proprietary platform provides us with a strategic advantage by offering significant flexibility and high levels of responsiveness to changing customer and market conditions. Capital markets transaction processing platforms are outsourced. Fixed income prime brokerage and foreign exchange brokerage operations utilize systems developed by third parties.

Customers currently access our global network through both traditional means (i.e., the use of voice brokers) and electronically. For electronic access, we provide third party vendor systems consistent with our focus on transaction processing rather than front–end technology while also offering a proprietary system for our retail customers. An increasing number of these applications are web–enabled. We have developed a web strategy to enhance access to the system and to use our website as a driver for business development in the form of lead creation. Among the capabilities that can be accessed online are risk management monitoring and access to tools, the account opening process as well as static forms, account statements and position and funds information.

The continued integrity and security of our systems is key to our business. All of our systems have off–site backups and redundancies. These capabilities have been thoroughly tested, particularly during the events of September 2001 and the blackout of August 2003. In each case and despite the total loss of access to corporate headquarters in New York, our business was comprehensively and effectively redirected to pre–planned alternative locations and operating platforms and services to customers remained essentially uninterrupted.

### Facilities

Our main corporate offices are located in approximately 71,247 square feet of leased office space at One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281–1994. We also lease over 473,000 square feet of additional space throughout North America, Europe and Asia. Our primary management centers are located in Chicago and London and at our New York corporate office. Our exchange–traded derivatives central processing system is run out of a leased facility located in Memphis, Tennessee. We believe that our leased facilities are adequate to meet anticipated requirements for our current lines of business for the foreseeable future.

### Employees

At November 30, 2004, we had approximately 2,434 employees. Approximately 1,664 of our employees are located in the United States. At the present time, no employees are represented by unions, and we believe our relations with our employees are satisfactory.

**Regulation**

Most aspects of our business are subject to stringent regulation by U.S. federal and state regulatory agencies and derivatives and securities exchanges and by non–U.S. government agencies or regulatory bodies and exchanges. New laws or regulations or changes to existing laws and regulations (including changes in interpretation or enforcement) could materially adversely affect our financial condition or results of operations. As a global financial institution, to the extent that different regulatory regimes impose inconsistent or iterative requirements on the conduct of our business, we will face complexity and additional costs in our compliance efforts.

As an FCM, Refco, LLC's activities are regulated by the CFTC and the exchanges of which it is a member. Other of our subsidiaries, including Refco Alternative Investments LLC, Refco Fund Management Inc. and Refcofund Holdings Corporation, are registered with the CFTC as commodity trading advisors and commodity pool operators. Refco, LLC's business is also regulated by the NFA of which Refco, LLC and certain of its affiliates are members. Violations of the rules of the CFTC, the NFA or the exchanges could result in remedial actions including fines, registration terminations or revocations of exchange memberships.

Refco Securities, LLC is registered as a broker–dealer with the SEC and in all 50 states, the District of Columbia and Puerto Rico and is a member of self–regulatory organizations, including the National Association of Securities Dealers ("NASD") and certain exchanges, including the CBOE. Broker–dealers are subject to regulations covering all aspects of the securities business, including sales and trading practices, public offerings, publication of research reports, use of customers' funds and securities, capital structure, record keeping and the conduct of directors, managers, officers and employees. Broker–dealers are also regulated by securities administrators in those states where they do business. Violations of regulations governing a broker–dealer's actions could result in censure, fine, the issuance of cease–and–desist orders, the suspension or expulsion from the securities industry of such broker–dealer or its officers or employees, or other similar consequences.

Margin lending by some of our broker–dealer subsidiaries is regulated by the Federal Reserve Board's restrictions on lending in connection with customer purchases and short sales of securities, and NASD rules also require such subsidiaries to impose maintenance requirements on the value of securities contained in margin accounts. In many cases, our margin policies are more stringent than these rules.

We conduct some of our government securities activities through Refco Securities, LLC, an NASD member registered as a government securities broker–dealer with the SEC and in certain states. The Department of Treasury has promulgated regulations concerning, among other things, capital adequacy, custody and use of government securities and transfers and control of governmental securities subject to repurchase transactions. The rules of the Municipal Securities Rulemaking Board, which are enforced by the NASD, govern the municipal securities activities of Refco Securities, LLC.

As a registered broker–dealer, Refco Securities, LLC is subject to the SEC's and NASD's net capital rules, and, as an FCM, Refco, LLC is subject to the net capital requirements of the CFTC and various exchanges. Many non–U.S. securities exchanges and regulatory authorities also have imposed rules relating to capital requirements applicable to our non–U.S. subsidiaries. These rules, which specify minimum capital requirements, are designed to measure general financial integrity and liquidity and require that at least a minimum amount of assets be kept in relatively liquid form. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3–3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of November 30, 2004, Refco Securities, LLC had net capital of $75.5 million, which was 27.2% of aggregate debit balance and $69.9 million in excess of required net capital. Refco, LLC, is required to maintain net capital equal to the sum of 8% of the total risk

margin requirements for all positions carried in customer accounts and 4% of the total risk margin requirements for all positions carried in non–customer accounts. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 110% of its net capital requirement. As of November 30, 2004, Refco, LLC had net capital of $301.7 million, which was $139.6 million in excess of required net capital.

Compliance with the capital requirements may limit our operations requiring the intensive use of capital. Such requirements restrict our ability to withdraw capital from our subsidiaries, which in turn may limit our ability to pay dividends or repay debt. Any change in such rules or the imposition of new rules affecting the scope, coverage, calculation or amount of capital requirements, or a significant operating loss or any unusually large charge against capital, could adversely affect our ability to pay dividends or to expand or maintain present business levels.

The USA PATRIOT Act of 2001 (the "PATRIOT Act") contains anti–money laundering and financial transparency laws and mandates the implementation of various new regulations applicable to FCMs, broker–dealers and other financial services companies, including standards for verifying customer identification at account opening and obligations to monitor customer transactions and detect and report suspicious activities to the government. Institutions subject to the PATRIOT Act must implement specialized employee training programs, designate an anti–money laundering compliance officer and submit to independent audits of the effectiveness of the compliance program. Anti–money laundering laws outside the United States contain similar provisions. We have established policies, procedures and systems designed to comply with these regulations.

Our securities and futures businesses are also regulated extensively by non–U.S. governments, exchanges, self–regulatory organizations, central banks and regulatory bodies, especially in those jurisdictions in which one of our subsidiaries maintains an office. For instance, the Financial Services Authority and Euronext.liffe regulate the activities of Refco Overseas Limited in the United Kingdom. Other subsidiaries are also subject to regulation by securities, banking and finance regulatory authorities, exchanges and other self–regulatory organizations in numerous other countries in which they do business.

**Geographic Distribution of Our Business**

We conduct the majority of our business and earn the majority of our revenues in the United States. We also have material operations in Bermuda and the United Kingdom. Our foreign operations expose us to numerous risks, including operating in countries with less developed technological infrastructures than the United States, operating in differing and often extensively regulated environments and exposing us to exchange rate fluctuations. See Note M to our audited financial statements and Note K to our unaudited consolidated financial statements and "Risk Factors—Risks Relating to Our Company—Our international operations involve special challenges that we may not be able to meet, which could adversely affect our financial results."

**Legal Proceedings**

*Tradewinds*

On April 1, 1999, Tradewinds Financial Corporation, Tradewinds Debt Strategies Fund, L.P., Tradewinds Offshore Fund, Limited, Tradewinds Clipper Fund Ltd. and Tradewinds Secured Debt Fund (collectively, "Tradewinds") filed an action against Refco Securities, Inc., Refco Capital Markets, Ltd. and Martin Loftus (collectively, "Refco") in the U.S. District Court for the Southern District of New York, alleging, among other things, that Refco breached a customer agreement governing certain margin accounts by requiring Tradewinds to increase the value of collateral securing a margin loan from 60% to 100% in September 1998. Upon the completion of discovery, the parties stipulated that the court lacked jurisdiction over Tradewinds' claims and the case was dismissed. Tradewinds refiled the action in the Supreme Court of the State of New York. On March 27, 2002, Refco filed a motion for summary judgment. On September 15, 2003, the court granted in part Refco's motion, dismissing six of

91

the seven claims asserted against Refco. The court reserved for trial before a jury Tradewinds' claim that Refco's actions breached the implied contractual duty of good faith and fair dealing. On March 16, 2004, the Appellate Division of the First Department of the State of New York affirmed the decision of the trial court in all respects. In June 2004, the sole remaining claim was tried before a jury. On June 17, 2004, the jury returned a verdict in favor of Tradewinds on the liability issue submitted to it by the trial judge. By memorandum decision and order dated March 3, 2005, the trial court granted Refco's post–trial motion to set aside the jury verdict as against the weight of the evidence and ordered a new trial. The court also ordered counsel to appear for a pre–trial conference on April 8, 2005.

At this time, it is not possible to predict the final outcome of this proceeding with certainty.

### SEC Investigation

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation. The SEC requested that we produce documents relating to any of our accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock and other transactions. In 2002 and 2003, we received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of our former brokers who handled the account of Amro International, S.A., one of our former customers that engaged through its account with us in short sales of Sedona stock and whose financial advisor settled SEC charges with respect to such short sales in February 2003; our relationship with Amro and its two principals; other securities traded by Amro; and our record keeping, supervisory and short sale policies and restrictions. Although there were issues previously raised by the SEC with respect to document production and retention by us, we believe that we have now substantially complied with those subpoenas and requests. In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the SEC. In addition to producing documents in response to the foregoing subpoenas, we have made our employees available to testify before the SEC and to be interviewed by the U.S. Attorneys' office. Refco Securities, LLC has been advised orally that it is not currently the subject of the U.S. Attorneys' investigation. At the present time, it is not possible to predict the outcome of the foregoing investigations with certainty.

### Trading Technologies

On March 1, 2005, Trading Technologies International, Inc. filed an action against Refco Group, Refco, LLC and Refco EasySolutions, LLC (collectively, the "Refco parties") in the U.S. District Court for the Northern District of Illinois, Eastern Division, alleging that the Refco parties infringed upon certain patents owned by Trading Technologies relating to electronic trading software. In its complaint, Trading Technologies demanded a preliminary and permanent injunction against the Refco parties, as well as unspecified damages and costs. We are currently analyzing the merits of the claim and intend to file an answer to the complaint by mid–April 2005.

### Other

In addition to the matters discussed above, from time to time, we are party to litigation and administrative proceedings that arise in the ordinary course of our business. We do not have any other pending litigation that, separately or in the aggregate, would in the opinion of management have a material adverse effect on our results of operations or financial condition.

## MANAGEMENT

**Directors and Executive Officers**

Following the Reincorporation and the consummation of this offering, we will conduct our business through Refco Inc. and its direct and indirect subsidiaries. The following table sets forth the names and ages as of April 8, 2005 of each person who will be a director and executive officer of Refco Inc. upon the completion of this offering. Prior to and following this offering, each of our executive officers held and will retain the same position at Refco Group.

| Name | Age | Position |
|------|-----|----------|
| Phillip R. Bennett | 56 | President, Chief Executive Officer and Chairman |
| Joseph J. Murphy | 44 | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC |
| Gerald M. Sherer | 57 | Executive Vice President and Chief Financial Officer |
| William M. Sexton | 40 | Executive Vice President and Chief Operating Officer |
| Santo C. Maggio | 53 | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC |
| Dennis A. Klejna | 58 | Executive Vice President and General Counsel |
| Leo R. Breitman | 64 | Director |
| Nathan Gantcher | 64 | Director |
| David V. Harkins | 64 | Director |
| Scott L. Jaeckel | 34 | Director |
| Thomas H. Lee | 61 | Director |
| Ronald L. O'Kelley | 60 | Director |
| Scott A. Schoen | 46 | Director |

*Phillip R. Bennett* has served as President, Chief Executive Officer and Chairman of Refco Group since September 1998. He also serves as the President of Refco Capital Holdings, LLC and as the President and Chief Executive Officer of New Refco. Mr. Bennett joined Refco Group in 1981 from The Chase Manhattan Bank, where he held various positions involving credit and commercial lending in New York, Toronto, Brussels and London from 1970 to 1981. Among other positions at Chase, Mr. Bennett served as a member of its Commodity Lending Department. He is a graduate of Cambridge University, England.

*Joseph J. Murphy* has served as President of Refco Global Futures, LLC, one of our subsidiaries, since March 1999. He also serves as Executive Vice President of Refco Group responsible for global marketing and as President Refco, LLC, our FCM subsidiary. From 1994 to 1999, Mr. Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Mr. Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation in New York. He also held management positions in the Treasury Department of The Chase Manhattan Bank. Mr. Murphy holds a degree from Providence College located in Providence, Rhode Island. His professional affiliations include memberships with the CBOT and CME. Mr. Murphy is a member of the Board of Directors and Chairman of the FIA and a member of the Board of Directors and Vice Chairman of The Clearing Corporation.

*Gerald M. Sherer* has served as Executive Vice President and Chief Financial Officer of Refco Group since January 2005. From 1997 to 2004, Mr. Sherer held various positions at Deutsche Bank, including Deputy Global Head of Controlling and the Chief Financial Officer of the Investment Bank,

93

and most recently, served as Chief Financial Officer of the Americas and the Global Head of Internal Controls. Previously, Mr. Sherer was Chief Financial Officer of all U.S. operations at CIBC Woody Gundy in New York from 1995 to 1997. He also served as Senior Vice President of the Finance Division for Goldman Sachs from 1982 to 1995. Mr. Sherer holds a B.S. in Computer Science from Northern Arizona University and an M.B.A from Fordham University.

*William M. Sexton* has served as Executive Vice President and Chief Operating Officer of Refco Group since August 2004. He joined Refco Group in April 1999 and has served in various capacities, including as Executive Vice President and Chief Operating Officer of Refco, LLC, our FCM subsidiary, since July 2001. He is responsible for information technology, operations, accounting and finance, credit, margins and risk for our futures businesses. From 1991 to 1997, Mr. Sexton served in various capacities at The Chase Manhattan Bank, including the financial controller for the U.S. FCM, institutional sales for marketing derivatives, foreign exchange and treasury products. Mr. Sexton holds a B.S. in Business Administration from Pace University and an M.B.A. from Fordham University, both with concentrations in finance. He is a member of the NFA. He is also a member of the FIA, the NYMEX FCM Advisory Committee, the FIA Operations and Technology Divisions and is a member of the Board of Directors of Eurex U.S.

*Santo C. Maggio* has served as Executive Vice President of Refco Group and President and Chief Executive Officer of Refco Securities, LLC, our NASD broker–dealer subsidiary, since 1991. Mr. Maggio has also served as President of Refco Capital Markets, Ltd., one of our subsidiaries, since 2001. He joined Refco Group in 1985. From 1976 to 1982, Mr. Maggio was employed as Vice President of Inland Consultants Corporation and from 1982 to 1985 as Vice President for McMahan Securities. Mr. Maggio holds an accounting degree from Hunter College, City University of New York.

*Dennis A. Klejna* has served as Executive Vice President and General Counsel of Refco Group since joining Refco Group in January 1999. Prior to joining Refco Group, Mr. Klejna was in private law practice in the Washington, D.C. office of Vinson & Elkins, L.L.P. from 1996 to 1998, where his practice was focused on derivatives trading regulation. He was Director of the Division of Enforcement at the CFTC from 1983 to 1995. Mr. Klejna is a member of the Committee on Futures Regulation of the Bar Association of the City of New York, the New York State Bar Association Committee on Futures and Derivatives Regulation and the Committee on the Regulation of Futures and Derivative Instruments of the American Bar Association. He serves on the Executive Committee of the Law and Compliance Division of the FIA and the Board of Editors of the Futures and Derivatives Law Report. As an Adjunct Professor at the Georgetown University Law Center from 1998 to 2000, he taught futures and derivatives regulation. Mr. Klejna is a graduate of Fordham College and Fordham Law School and served as a Captain in the U.S. Army Judge Advocate General's Corps.

*Leo R. Breitman* was Chairman and Chief Executive Officer of Fleet Bank—Massachusetts from 1991 through March 2004 and also served as Senior Lending Officer of FleetBoston Financial Corporation from 2002 through March 2004. He retired in May 2004. From 1996 to 2002, Mr. Breitman was Managing Director of the Commercial Banking Division of FleetBoston Financial Corporation. Mr. Bretiman is a director of American Biltrite Inc. and Metris Companies, Inc. Mr. Breitman holds a B.B.A in Finance from The George Washington University and an M.B.A in Finance from Boston University.

*Nathan Gantcher* was Co–chairman, President and Chief Executive Officer of Alpha Investment Management L.L.C. from 2002 until August 2004 when the firm was sold. Prior to joining Alpha Investment Management, Mr. Gantcher was a private investor from 1999 to 2001. Mr. Gantcher served as Vice Chairman of CIBC Oppenheimer Corp. from 1997 to 1999. Prior to becoming Vice Chairman of CIBC Oppenheimer Corp., Mr. Gantcher served as Co–Chief Executive Officer of Oppenheimer & Co., Inc. Mr. Gantcher currently serves as a director of Mack–Cali Realty Corporation and is a member of its audit, nominating and corporate governance and executive committees. He serves as a member of the board of trustees of CharterMac and is a member of its nominating and governance, compensation

94

and capital markets committees. He also has served as a member of the board of directors of NDS Group plc since January 2004 and is a member of its audit and compensation committees. Mr. Gantcher currently serves as a member of each of the Council of Foreign Relations and the Overseers Committee of the Columbia University Graduate School of Business. Mr. Gantcher received his A.B. in economics and biology from Tufts University and his M.B.A. from the Columbia University Graduate School of Business.

*David V. Harkins* is Vice Chairman and Managing Director of Private Equity Funds of Thomas H. Lee Partners, L.P. In the past five years, Mr. Harkins has also served as President of Thomas H. Lee Partners, L.P. Mr. Harkins served briefly as the interim Chief Executive Officer of Conseco, Inc., an insurance and financial services company, from April 2000 until June 2000. Mr. Harkins is also a director of Nortek, Inc., Metris Companies, Inc., National Dentex Corporation and Syratech Corporation. Mr. Harkins is a graduate of the U.S. Military Academy.

*Scott L. Jaeckel* is a Managing Director of Thomas H. Lee Partners, L.P. He served as a Vice President of Thomas H. Lee Partners, L.P. from 2001 until December 2004. Previously, Mr. Jaeckel worked at Thomas H. Lee Company from 1994 to 1996, rejoining in 1998 as an Associate. From 1992 to 1994, Mr. Jaeckel worked at Morgan Stanley & Co. Incorporated in the Corporate Finance Department. He currently serves as a director of Paramax Capital Group and Warner Music Group. He holds a B.A. in Economics and Mathematics from the University of Virginia and an M.B.A. from Harvard Business School.

*Thomas H. Lee* founded the Thomas H. Lee Company, the predecessor of Thomas H. Lee Partners, L.P., in 1974 and since that time has served as its Chairman and CEO. From 1966 through 1974, Mr. Lee was with First National Bank of Boston where he directed the bank's high technology lending group from 1968 to 1974 and became a Vice President in 1973. Prior to 1966, Mr. Lee was a securities analyst in the institutional research department of L.F. Rothschild in New York. Mr. Lee serves or has served as a Director of numerous public and private companies in which THL and its affiliates have invested, including Finlay Enterprises, Inc., The Smith & Wollensky Restaurant Group, Inc., General Nutrition Companies, Metris Companies, Inc., Playtex Products, Inc., Snapple Beverage Corp., Vertis Holdings, Inc., Warner Music Group, and Wyndham International, Inc. In addition, Mr. Lee is a Member of the JP Morgan National Advisory Board. Mr. Lee is currently a Trustee of Lincoln Center for the Performing Arts, The Museum of Modern Art, NYU Medical Center, The Rockefeller University, and Whitney Museum of American Art among other civic and charitable organizations. He also serves on the Executive Committee for Harvard University's Committee on University Resources. Mr. Lee is a 1965 graduate of Harvard College.

*Ronald L. O'Kelley* has been Chairman and Chief Executive Officer of Atlantic Coast Venture Investments Inc., a private investment company, since 2002. Mr. O'Kelley served as Executive Vice President, Chief Financial Officer and Treasurer of State Street Corporation from 1995 to 2002, as Chief Financial Officer at Douglas Aircraft Company from 1991 to 1995 and as Chief Financial Officer at Rolls Royce Inc. from 1983 to 1991. He also served in senior financial positions at Citicorp from 1975 to 1983 and at Texas Instruments Incorporated from 1969 to 1975. Mr. O'Kelley is a director of U.S. Shipping Partners L.P. and Selective Insurance Group, Inc. Mr. O'Kelley holds an A.B. in Mathematics from Duke University and an M.B.A. from Carnegie Mellon University.

*Scott A. Schoen* is a Co–President of Thomas H. Lee Partners, L.P., which he joined in 1986. He served as a Managing Director of Thomas H. Lee Partners, L.P. from 1992 to 2004 and a Vice President from 1988 to 1992. Prior to joining the firm, Mr. Schoen was in the Private Finance Department of Goldman, Sachs & Co. Mr. Schoen is a director of AXIS Capital Holdings Limited, Affordable Residential Communities, Inc., TransWestern Publishing, L.P., United Industries Corporation, Wyndham International and Simmons Company. Mr. Schoen is a Vice Chairman of the Board and a member of the Executive Committee of the United Way of Massachusetts Bay. He is also

95

a member of the Advisory Board of the Yale School of Management. Mr. Schoen is a 1980 graduate of Yale College and holds an M.B.A. from Harvard Business School and a J.D. from Harvard Law School.

There are no arrangements or understandings between any director or executive officer of Refco Inc. and any other person pursuant to which that person was elected or appointed to his position.

**Board Composition**

Upon completion of this offering, our bylaws will provide for a board of directors consisting of up to nine members. Upon completion of the offering, the composition of the board of directors will satisfy the independence requirements of the New York Stock Exchange, including its transitional rules.

**Committees**

Upon the completion of this offering, our board of directors will have three standing committees: the audit committee, the nominating and corporate governance committee and the compensation committee.

The primary purpose of the audit committee is to:

- assist the board's oversight of:

  - the integrity of our financial statements;

  - our compliance with legal and regulatory requirements;

  - our independent auditors' qualifications and independence; and

  - the performance of our independent auditors and our internal audit function; and

- prepare the report required to be prepared by the committee pursuant to SEC rules.

Messrs. O'Kelley, Breitman and Gantcher will serve on the audit committee upon consummation of the offering. Mr. O'Kelley will serve as chairman of the audit committee and also qualifies as an independent "audit committee financial expert" as such term has been defined by the SEC in Item 401(h)(2) of Regulation S–K. In accordance with the rules of the New York Stock Exchange and relevant federal securities laws and regulations, each member of our audit committee is independent within the meaning of such rules.

The primary purpose of the nominating and corporate governance committee is to:

- identify and to recommend to the board individuals qualified to serve as directors of our company and on committees of the board;

- advise the board with respect to the board composition, procedures and committees;

- develop and recommend to the board a set of corporate governance principles and guidelines applicable to us; and

- oversee the evaluation of the board and our management.

Messrs. Breitman, Harkins and Schoen will serve on the nominating and corporate governance committee upon consummation of the offering. Mr. Breitman will serve as the chairman of the corporate governance and nominating committee. Mr. Breitman is independent within the meaning of the rules of the New York Stock Exchange and the relevant federal securities laws and regulations. In accordance with the transitional rules of the New York Stock Exchange, a majority of the members of the nominating and corporate governance committee will be independent within 90 days of the closing of the offering and all members will be independent within 180 days of the closing of the offering.

The primary purpose of our compensation committee is to oversee our compensation and employee benefit plans and practices and to produce a report on executive compensation as required by SEC rules. Messrs. Gantcher, Bennett and Schoen will serve on the compensation committee upon consummation of the offering. Mr. Gantcher will serve as the chairman of the compensation

committee. Mr. Gantcher is independent within the meaning of the rules of the New York Stock Exchange and the relevant federal securities laws and regulations. In accordance with the transitional rules of the New York Stock Exchange, a majority of the members of the compensation committee will be independent within 90 days of the closing of the offering and all members will be independent within 180 days of the closing of the offering.

**Director Compensation**

It is anticipated that each of our directors, other than those who are also our employees, will receive director fees of $50,000 per year, together with $1,000 for each board meeting attended. All members of our board of directors will be reimbursed for their usual and customary expenses incurred in connection with attending all board and other committee meetings. In addition, it is anticipated that the chairman of the audit committee will receive an additional $10,000 per year and the chairmen of the other committees will receive an additional $5,000 per year.

In November 2004, New Refco granted 20,000 Class B Units to each of Leo Breitman, Nathan Gantcher and Ronald O'Kelley, who are members of its board of managers, pursuant to their respective restricted unit agreements. The Class B Units granted to Messrs. Breitman, Gantcher and O'Kelley vest ratably on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008.

Vesting of all units is subject to acceleration upon a change of control. In the event that any of Messrs. Breitman, Gantcher and O'Kelley is no longer a member of New Refco's board of managers, his unvested Class B Units will be forfeited to New Refco and his vested Class B Units may be repurchased by New Refco at fair market value.

In connection with the formation of Refco Inc., holders of Class B Units will contribute their Class B Units to Refco Inc. in exchange for the number of shares of Refco Inc.'s common stock that its Board of Directors determines in good faith has a fair value at least equal to the fair value of the Class B Units being exchanged. Following the exchange, the current vesting schedule will continue to apply to the shares of common stock received in the exchange.

**Executive Compensation**

The following table sets forth information concerning the compensation awarded to, earned by or paid by Refco Group to Refco Group's chief executive officer and each of Refco Group's four most

highly compensated executive officers during each of the last three fiscal years. The bonuses set forth below include amounts earned in the year shown but paid in the subsequent year.

## Summary Compensation Table

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Restricted Stock Awards ($) | Total Compensation ($) |
|---|---|---|---|---|---|---|
| | | **Annual Compensation** | | | **Long–Term Compensation** | |
| Phillip R. Bennett President, Chief Executive Officer and Chairman | 2005(1) 2004 2003 | 1,266,667 1,500,000 1,500,000 | 2,007,438 2,469,000 2,196,000 | 461,671(2) 444,840(2) 500,692(2) | 250,800(3) — — | 3,986,576 4,413,840 4,196,692 |
| Joseph J. Murphy Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC | 2005(1) 2004 2003 | 1,000,000 1,000,000 1,000,000 | 1,475,551 1,920,000 1,640,000 | — — — | 146,300(3) — — | 2,621,851 2,920,000 2,640,000 |
| Gerald M. Sherer(4) Executive Vice President and Chief Financial Officer | 2005(1) 2004 2003 | 166,667 — — | — — — | — — — | 543,000(3) — — | 709,667 — — |
| William M. Sexton Executive Vice President and Chief Operating Officer | 2005(1) 2004 2003 | 675,000 500,000 500,000 | 737,775 960,000 820,000 | — — — | 146,300(3) — — | 1,559,075 1,460,000 1,320,000 |
| Santo C. Maggio Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC | 2005(1) 2004 2003 | 602,083 500,000 500,000 | 943,664 1,252,000 1,084,000 | — — — | 146,300(3) — — | 1,692,047 1,752,000 1,584,000 |
| Robert C. Trosten(5) Executive Vice President and Chief Financial Officer | 2005(1) 2004 2003 | 583,335 1,000,000 1,000,000 | 1,629,967 2,139,000 1,838,000 | — — — | — — — | 2,213,302 3,139,000 2,838,000 |

(1)   With respect to the period from August 5, 2004 to February 28, 2005, information is presented for New Refco.

(2)   Consists of premiums for term life insurance and includes an amount equal to the payment to Mr. Bennett to compensate him for the incremental tax impact associated with the payment of the premium.

(3)   Represents the value of Class B Units vested as of February 28, 2005.

(4)   Mr. Sherer commenced his employment with us effective January 3, 2005.

(5)   Effective October 4, 2004, Robert Trosten resigned as Refco Group's Executive Vice President and Chief Financial Officer in order to pursue other financial interests.

*Restricted Unit Agreements.*   In connection with the THL Transactions, New Refco granted Class B Units to Phillip Bennett, Joseph Murphy, William Sexton, Santo Maggio and Robert Trosten approximately 5.94, 3.47, 3.47, 3.47 and 3.47 Class B Units, respectively. Upon Mr. Trosten's resignation, his Class B Units were forfeited and returned to New Refco.

On October 31, 2004, New Refco declared a 202,551.721–for–one split of its Class A and Class B units (the "Unit Split"). On December 6, 2004, New Refco granted 690,000 Class B Units to Gerald Sherer, our Executive Vice President and Chief Financial Officer.

The Class B Units granted to management are subject to vesting requirements under restricted unit agreements as follows:

- 50% of the Class B Units vest based on time, with 25% of these units vesting on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008.

- The remaining 50% of the Class B Units vest based upon New Refco's achievement of certain EBITDA targets. Any performance–based units that do not vest based on performance will vest in full on the 8th anniversary of issuance, provided that the employee has maintained continuous employment with New Refco or its subsidiaries.

Vesting of all units is subject to acceleration upon a change of control. Upon the termination of a holder, unvested Class B Units are forfeited to New Refco and vested Class B Units may be repurchased by New Refco at fair market value. For a discussion of all Class B Units granted, see "Certain Relationships and Related Transactions—Restricted Unit Agreements."

In connection with the formation of Refco Inc., holders of Class B Units will contribute their Class B Units to Refco Inc. in exchange for the number of shares of its common stock that its Board of Directors determines in good faith to have a fair value at least equal to the fair value of the Class B Units being exchanged. Following the exchange, the current vesting schedule will continue to apply to the shares of common stock received in the exchange.

There were no option grants to the executive officers listed in the table above in fiscal 2005.

### Compensation Committee Interlocks and Insider Participation

Upon the completion of this offering, none of our executive officers will serve on the compensation committee or board of directors of any other company of which any of the members of our compensation committee or any of our directors is an executive officer.

### Employment Agreements

**Phillip Bennett Employment Agreement.**   On June 8, 2004, Phillip Bennett entered into an Executive Employment and Non–Competition Agreement with Refco Group that became effective on the date of the closing of the THL Transactions. Under the agreement, Mr. Bennett serves as Refco Group's Chairman, President and Chief Executive Officer and reports directly to Refco Group's Board of Managers for an initial term ending on February 28, 2007. After such date, Mr. Bennett will continue to serve with an automatic renewal thereafter for additional one year terms, unless either party terminates the agreement in accordance with its provisions.

Under the terms of the agreement, Refco Group will pay Mr. Bennett an annual base salary of $1,100,000, and he will be eligible to receive an annual bonus as determined in accordance with Refco Group's Management Bonus Pool Plan and will be able to participate in equity–based compensation plans, including through the grant of Class B Units pursuant to a Restricted Unit Agreement with New Refco. In certain circumstances, Mr. Bennett's termination will entitle him to a severance package including two years of his base salary and annual bonus at the time of termination. In addition, Mr. Bennett has agreed that during the term of the agreement and for a two year period thereafter (but in no event, less than five years), he will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

**Executive Employment Agreements.**   In connection with the THL Transactions, Joseph Murphy, William Sexton, Santo Maggio and Dennis Klejna entered into Executive Employment and Non–Competition Agreements with Refco Group. In December, 2004, Gerald Sherer entered into an Executive Employment and Non–Competition Agreement with Refco Group. Each of these agreements has substantially identical terms, except for the applicable positions and annual base salary amounts for

99

each employee as described below. In addition, Mr. Sherer's agreement provides that if after February 28, 2006 the aggregate value of any Class B Units granted to him and any other equity incentive issued to him is less than $3.5 million, we will pay him the difference in cash. The same provision applies if we terminate Mr. Sherer without cause prior to February 28, 2006. Under all the agreements, each employee is eligible for an annual bonus to be determined in accordance with the Senior Management Bonus Pool Plan adopted by Refco Group and will be able to participate in equity–based compensation plans, including through the grant of Class B Units pursuant to Restricted Unit Agreements entered into with New Refco. The position and initial base salary for each of the employees under the agreements is as listed below:

| Name | Position | Base Salary |
|---|---|---|
| Joseph Murphy | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC | $ 1,000,000 |
| Gerald Sherer | Executive Vice President and Chief Financial Officer | 1,000,000 |
| William Sexton | Executive Vice President and Chief Operating Officer | 800,000 |
| Santo Maggio | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC | 675,000 |
| Dennis Klejna | Executive Vice President and General Counsel | 650,000 |

Each employee will be entitled to a severance package in certain circumstances, which shall entitle such employee to 18 months of his base salary and annual bonus as of the date of termination. In addition, each employee will agree that during the term of the agreement and for an 18–month period thereafter, such employee will not, directly or indirectly (i) compete with Refco Group, (ii) solicit or hire any of Refco Group's officers, managers, consultants or executives or (iii) solicit any of Refco Group's customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

**Senior Management Bonus Pool Plan**

The Senior Management Bonus Pool Plan enables participating senior managers to receive bonuses based on Refco Group's performance. If Refco Group's actual EBITDA (subject to specified adjustments) for a fiscal year is between 95% and 105% of the budgeted EBITDA for the year, the bonus pool amount to be divided among all participating senior managers generally will be the greater of 100% of the aggregate base compensation of such senior managers or, subject to the cap described below, 2.1% of our actual EBITDA (subject to specified adjustments). The bonus pool amount will be adjusted if actual EBITDA (subject to specified adjustments) is more than 105% or less than 95% of budgeted EBITDA. The aggregate bonus pool amount to be divided among all participating senior managers in any event cannot be greater than 150% of the aggregate base compensation of such senior managers. For purposes of calculating the bonus pool amount, EBITDA is our consolidated earnings before income taxes, depreciation and amortization. EBITDA is then adjusted to take into account the estimated amount of the bonus pool and add back the management fees payable pursuant to the Management Agreement with THL Managers V, LLC. See "Certain Relationships and Related Transactions—Management Agreement."

100

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table sets forth certain information regarding the beneficial ownership of our outstanding equity securities before and after the completion of this offering, as adjusted to reflect the Reincorporation, by:

- each person or entity known to beneficially own more than 5% of our outstanding common stock;

- each of our directors and executive officers;

- all of our directors and executive officers as a group; and

- each of our stockholders who are selling shares in this offering.

Beneficial ownership of shares is determined under rules of the SEC and generally includes any shares over which a person exercises sole or shared voting or investment power. The table also includes the number of shares underlying options and warrants that are exercisable within 60 days of the date of this offering. Common stock subject to these options or warrants is deemed to be outstanding for the purpose of computing the ownership percentage of the person holding such options or warrants, but are not deemed to be outstanding for the purpose of computing the ownership percentage of any other person. As of the date of this prospectus, after giving effect to the Reincorporation, there would have been          shares of common stock outstanding held by          holders of record, and after giving effect to this offering, there would have been          shares of common stock outstanding.

We and certain of the selling stockholders have granted the underwriters a 30–day option to purchase up to          additional shares of common stock. If this option is exercised in full, we and the selling stockholders will sell        and          shares of common stock, respectively, to the underwriters.

Except as otherwise indicated, the persons named in the table below have sole voting and investment power with respect to all shares of capital stock held by them. Unless otherwise indicated, the address for each executive officer and director listed below is c/o Refco Inc., One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281.

| Name and Address | Number of Shares Beneficially Owned | | Number of Shares to be Sold in Offering | Percent of Shares Beneficially Owned | |
| --- | --- | --- | --- | --- | --- |
| | Before Offering | After Offering | | Before Offering | After Offering |
| **5% Securityholders:** | | | | | |
| Thomas H. Lee Partners and affiliates(1) | | | | | |
| c/o Thomas H. Lee Partners, L.P. | | | | | |
| 100 Federal Street | | | | | |
| Boston, MA 02110 | | | | | |
| **Executive Officers and Directors:** | | | | | |
| Phillip R. Bennett(2) | | | | | |
| Gerald M. Sherer | | | | | |
| William M. Sexton | | | | | |
| Joseph J. Murphy | | | | | |
| Santo C. Maggio | | | | | |
| Dennis A. Klejna | | | | | |
| Leo R. Breitman | | | | | |
| Nathan Gantcher | | | | | |
| David V. Harkins(3) | | | | | |
| Scott L. Jaeckel(3) | | | | | |
| Thomas H. Lee(3) | | | | | |
| Ronald L. O'Kelley | | | | | |
| Scott A. Schoen(3) | | | | | |
| All directors and executive officers as a group (13 persons) | | | | | |

\*          Represents less than 1%

(1)

Includes shares of common stock owned by each of THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Refco Acquisition Partners III, Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Putnam Investments Holdings, LLC, Putnam Investments Employees' Securities Company I, LLC, and Putnam Investments Employees' Securities Company II, LLC and certain co–investors who have agreed to vote their interests in favor of nominees of affiliates of THL Refco Acquisition Partners as described under "Certain Relationships and Related Transactions—Securityholders Agreement." THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III are each Delaware general partnerships indirectly owned by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., respectively. Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P. are Delaware limited partnerships, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company. Thomas H. Lee Equity (Cayman) Fund V, L.P. is an exempted limited partnership formed under the laws of the Cayman Islands, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company registered in the Cayman Islands as a foreign company. Thomas H. Lee Advisors, LLC, a Delaware limited liability company, is the general partner of Thomas H. Lee Partners, a Delaware limited partnership, which is the sole member of THL Equity Advisors V, LLC. Thomas H. Lee Investors Limited Partnership (f/k/a THL–CCI Limited Partnership) is a Massachusetts limited partnership, whose general partner is THL Investment Management Corp., a Massachusetts corporation. The 1997 Thomas H. Lee Nominee Trust is a trust with US Bank, N.A. serving as Trustee. Thomas H. Lee, a Managing Director of Thomas H. Lee Advisors, LLC, has voting and investment control over common shares owned of record by the 1997 Thomas H. Lee Nominee Trust. Putnam Investments Holdings LLC, Putnam Investments Employees' Securities Company I, LLC and Putnam Investments Employees' Securities Company II, LLC are co–investment entities of Thomas H. Lee Partners and each disclaims beneficial ownership of any securities other than the securities held directly by such entity. The address for the Putnam entities is One Post Office Square, Boston, MA 02109.

(2)

Represents shares held by Phillip Bennett directly and indirectly through each of Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust.

(3)

Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co–President, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own          shares of common stock held of record by THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III. Each of these individuals disclaims beneficial ownership of such shares of common stock except to the extent of their pecuniary interest therein.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**The Reincorporation**

Prior to this offering, we conducted our business through Refco Group and its direct subsidiaries. Immediately prior to the closing of this offering, Refco Inc., a newly formed Delaware corporation that will act as a holding company for our business, will enter into the following transactions:

- Each of THL Refco Blocker Corp., THL Refco Blocker Corp. II and THL Refco Blocker Corp. III (each of which is a general partner of THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III, respectively) will merge with and into Refco Inc. as the surviving entity, and pursuant to such merger, Refco Inc. will issue an aggregate of              shares of its common stock in exchange for all of the common and preferred stock of such entities (which common and preferred stock will be distributed to three affiliates of Thomas H. Lee Partners, L.P.);

- THL Refco GP LLC, the other general partner of THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III, will contribute all of its general partnership interests in each of such entities to Refco Inc. in exchange for no consideration;

- Each of the other affiliates and co–investors of Thomas H. Lee Partners, L.P. holding Class A member interests in New Refco will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of              shares of its common stock;

- Refco Group Holdings, Inc., which is wholly–owned by Phillip Bennett, our President and Chief Executive Officer, will contribute all of its Class A member interests in New Refco to Refco Inc. in exchange for              shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, will contribute all of its respective Class A member interests in New Refco to Refco Inc. in exchange for              shares of its common stock;

- Our officers who hold Class A member interests in New Refco will contribute all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of              shares of its common stock; and

- Our officers, directors and employees who hold Class B member interests in New Refco will contribute all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of              shares of its common stock, which shares shall be subject to vesting and a right of repurchase.

**The Equity Purchase and Contribution Agreement**

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with Refco Group, Refco Group Holdings, Inc. and other parties named therein, which was amended on July 9, 2004 to, among other things, add New Refco as a party and modify the structure of the transactions contemplated by the agreement. The Purchase Agreement provided for a series of transactions that resulted in New Refco becoming Refco Group's parent and THL Refco Acquisition Partners and its affiliates and co–investors owning an approximate 57% interest in New Refco, based on a valuation of New Refco of approximately $2.3 billion.

Upon consummation of the transactions contemplated by the Purchase Agreement, the following transactions occurred:

- THL Refco Acquisition Partners and its affiliates and co–investors purchased a portion of the voting membership interests in Refco Group then held by Refco Group Holdings, Inc., one of two holders of Refco Group's membership interests at that time, for an amount of cash equal to $507.0 million;

103

- BAWAG Overseas, Inc., the other holder of Refco Group's membership interests at that time, merged with and into a wholly owned subsidiary of Refco Group Holdings, Inc., and all of the membership interests acquired in the merger were distributed as a dividend to Refco Group Holdings, Inc.;

- Refco Group distributed $550.0 million in cash and all of the equity interests in Forstmann–Leff International Associates, LLC, which at that time owned substantially all the assets of Refco Group's Asset Management business, to Refco Group Holdings, Inc., an entity that was then owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett;

- each outstanding membership interest of Refco Group acquired by Refco Group Holdings, Inc., in connection with the merger of BAWAG Overseas, Inc. with and into a wholly owned subsidiary of Refco Group Holdings, Inc., was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest of Refco Group held by Refco Group Holdings, Inc., in connection with its rollover equity investment, was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc. that was not exchanged for a Class A Unit (as described above) was converted into the right to receive cash equal to the quotient determined by dividing approximately $2.3 billion (subject to certain adjustments), by the total number of Refco Group's membership interests outstanding immediately prior to the effective time of the contribution;

- each membership interest of Refco Group purchased by THL Refco Acquisition Partners and its affiliates and co–investors was exchanged for one Class A Unit of New Refco; and

- Refco Finance Holdings LLC, a co–issuer with Refco Finance Inc. of our senior subordinated notes, merged with and into Refco Group, with Refco Group as the surviving entity.

Upon consummation of the THL Transactions, THL Refco Acquisition Partners and its affiliates and co–investors owned 57% of the equity interests of New Refco, and Phillip R. Bennett, our President and Chief Executive Officer, through his wholly–owned subsidiary, Refco Group Holdings, Inc., owned approximately 43% of the equity interests of New Refco.

In connection with the THL Transactions, Refco Group Holdings, Inc. agreed to reimburse THL Refco Acquisition Partners and its assignees for certain tax benefits received by Refco Group Holdings, Inc. related to the acquisition of membership interests in Refco Group held by BAWAG Overseas, Inc. In March 2005, Refco Group Holdings, Inc. paid THL Refco Acquisition Partners approximately $2.2 million pursuant to the agreement. No further payments will accrue under the agreement upon completion of this offering.

**Limited Liability Company Agreement of New Refco**

The amended and restated limited liability company agreement of New Refco authorized New Refco to issue Class A and Class B units. The Class A and Class B units generally have identical rights and preferences, except that the Class B Units are nonvoting and have different rights as to certain distributions. Prior to the consummation of this offering, our officers, directors and employees who hold Class B Units will contribute all of their Class B Units in New Refco to Refco Inc. in exchange for an aggregate of          shares of its common stock, which shares shall be subject to vesting and a right of repurchase.

A board of managers has the exclusive authority to manage and control New Refco's business and affairs. The board of managers' composition is determined in accordance with the provisions of the securityholders agreement described below and is more fully described in "Management—Board of Managers Compensation."

104

**Securityholders Agreement**

Pursuant to the securityholders agreement entered into in connection with the THL Transactions, units of New Refco that are beneficially owned by Refco Group Holdings, Inc., THL Refco Acquisition Partners or any of its affiliates or any limited partners of them so long as THL Refco Acquisition Partners or any of its affiliates maintains voting control over the units held, (collectively, the "THL Holders"), the executive investors and certain of New Refco's other employees and employees of New Refco's subsidiaries, which we refer to as employees, are subject to restrictions on transfer, as well as the other provisions described below.

The securityholders agreement provides that the THL Holders, Refco Group Holdings, Inc., the executive investors, employees and all other parties to the agreement will vote all of their units to elect and continue in office New Refco's board of managers, initially consisting of eight managers composed of:

- four managers designated by the THL Holders;

- three managers designated by Refco Group Holdings, Inc., one of whom will be Phillip Bennett as long as he is willing and able to serve; and

- one independent manager designated by the THL Holders and Refco Group Holdings, Inc.

The board of managers may be increased to nine and the THL Holders will be entitled to designate an additional manager (for a total of five managers designated by the THL Holders) if New Refco fails to meet specified yearly performance requirements.

The securityholders agreement also provides:

- the THL Holders and Refco Group Holdings, Inc. with a "right of first offer" with respect to transfers of New Refco's units held by any securityholder;

- each securityholder with customary "tag–along" rights with respect to transfers of New Refco's Class A Units;

- the THL Holders with "drag–along" rights with respect to New Refco's units owned by the securityholders in a sale of New Refco;

- the THL Holders, Refco Group Holdings, Inc. and executive investors with customary "preemptive rights";

- the THL Holders and Refco Group Holdings, Inc. with certain registration rights, which require New Refco to register units held by them under the Securities Act; and

- New Refco with certain call rights with respect to Class A Units held by executive investors who are terminated for any reason.

Upon completion of this offering, many of the foregoing provisions will terminate, other than the provisions relating to "tag along" rights, which will remain effective for three years following the offering, and the provisions relating to call rights and registration rights.

**Management Agreement**

Pursuant to the management agreement entered into in connection with the THL Transactions, THL Managers V, LLC will render to New Refco and each of its subsidiaries advisory and consulting services. In consideration of those services, either New Refco or Refco Group will pay to THL Managers V, LLC semi–annually, an aggregate *per annum* management fee equal to the greater of:

- $2.5 million; and

- an amount equal to 1.0% of the consolidated earnings before interest, taxes, depreciation and amortization of New Refco and its subsidiaries for such fiscal year, but before deduction of any such fee.

New Refco also paid THL Managers V, LLC at the closing of the THL Transactions a transaction advisory fee of $30.0 million.

New Refco also agreed to indemnify THL Managers V, LLC and its affiliates from and against all losses, claims, damages and liabilities arising out of or related to the performance by THL Managers V, LLC of the services pursuant to the management agreement. Upon the consummation of this offering, THL Managers V, LLC intends to terminate the agreement pursuant to its terms, which will require New Refco to make a final payment of $   million to THL Managers V, LLC.

### Restricted Unit Agreements

In connection with the THL Transactions, members of senior management were granted Class B Units of New Refco pursuant to restricted unit agreements entered into on the closing date of the THL Transactions. Phillip Bennett, Joseph Murphy, William Sexton, Santo Maggio, Robert Trosten and Dennis Klejna were granted approximately 5.94, 3.47, 3.47, 3.47, 3.47 and 1.73 Class B Units, respectively. Upon Mr. Trosten's resignation, his Class B Units were forfeited and returned to New Refco.

On October 31, 2004, New Refco declared a 202,551.721–for–one split of its Class A and Class B Units (the "Unit Split"). New Refco also granted an aggregate of 1,664,655.1 Class B Units to certain employees of Refco Group and its subsidiaries. In November 2004, New Refco granted an aggregate of 60,000 Class B Units to Messrs. Breitman, Gantcher and O'Kelley who are members of its board of managers. On December 6, 2004, New Refco granted 690,000 Class B Units to Gerald Sherer, our Executive Vice President and Chief Financial Officer.

The Class B Units granted to management and employees are subject to vesting requirements under restricted unit agreements as follows:

- 50% of the Class B Units will vest based on time, with 25% of these units vesting on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008.

- The remaining 50% of the Class B Units will vest based upon New Refco's achievement of certain EBITDA targets. Any performance–based units that do not vest based on performance will vest in full on the 8th anniversary of issuance, provided that the employee has maintained continuous employment with New Refco or its subsidiaries.

The Class B Units granted to the members of New Refco's board of managers vest ratably on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008.

Vesting of all units is subject to acceleration upon a change of control. Upon the termination of a holder, unvested Class B Units are forfeited to New Refco and vested Class B Units may be repurchased by New Refco at fair market value.

In connection with the formation of Refco Inc., holders of Class B Units will contribute their Class B Units to Refco Inc. in exchange for the number of shares of its common stock that its Board of Directors determines in good faith to have a fair value at least equal to the fair value of the Class B Units being exchanged. Following the exchange, the current vesting schedule will continue to apply to the shares of common stock received in the exchange.

### Escrow Agreement

Pursuant to the escrow agreement entered into in connection with the THL Transactions, New Refco and THL Refco Acquisition Partners delivered approximately $39.0 million of the purchase price at the closing to HSBC Bank USA, as escrow agent, to satisfy any earn–out amounts that are to be paid by New Refco after the closing of the THL Transactions. The escrowed funds were separated into seven separate escrow accounts, each representing a separate earn–out amount.

106

If an earn−out payment is due by New Refco, the escrow agent will release a portion of the funds from the earn−out account designated on written instructions given by New Refco's chief executive officer. If the escrowed amount in a given earn−out account exceeds the amount of all obligations with respect to a particular earn−out account, then the escrow agent will release the amount of any excess to Refco Group Holdings, Inc. upon joint written instructions signed by the chief executive officer, THL Refco Acquisition Partners and Refco Group Holdings, Inc. If the earn−out amount to be distributed by New Refco exceeds the escrowed amount in the designated earn−out account, then Refco Group Holdings, Inc. will be liable for the deficiency.

In November 2004, pursuant to the procedures set forth in the escrow agreement, approximately $22.2 million of escrowed funds were paid to Refco Group with respect to MacFutures Ltd. The balance of the $25.0 million originally designated for the MacFutures escrow account was remitted to Refco Group Holdings, Inc. No other amounts have been paid under the escrow agreement.

**Management Investment**

In connection with the THL Transactions, Phillip Bennett, through his continuing ownership interest in Refco Group Holdings, Inc., rolled over an approximate $382.5 million equity investment into the common equity interests of New Refco. Upon consummation of this offering, Mr. Bennett will beneficially own approximately     % of our common stock. Messrs. Sexton, Murphy, Maggio and Klejna made investments of $1.0 million, $500,000, $250,000 and $200,000, respectively, in the common equity interests of New Refco in connection with the THL Transactions.

**Profit Sharing Agreement**

Prior to the consummation of the THL Transactions, Refco Group Holdings, Inc., which is wholly owned by Phillip Bennett, our President and Chief Executive Officer who beneficially owns an approximate 43% interest in New Refco through Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust, was part of a profit sharing agreement with Joseph J. Murphy, our Executive Vice President and the President and Chief Executive Officer of Refco Global Futures, LLC; William M. Sexton, our Executive Vice President and Chief Operating Officer; Santo C. Maggio, our Executive Vice President and Chief Executive Officer of Refco Securities, LLC; and Dennis A. Klejna, our Executive Vice President and General Counsel. Upon consummation of the THL Transactions, Refco Group Holdings, Inc. acquired the interests in the profit sharing agreement held by Messrs. Murphy, Sexton, Maggio and Klejna for approximately $13.7 million, $9.0 million, $8.4 million and $6.5 million, respectively. Refco Group Holdings, Inc. paid Messrs. Murphy, Sexton, Maggio and Klejna approximately $9.5 million, $7.0 million, $6.0 million and $6.5 million, respectively, on the closing date of the THL Transactions. The outstanding amounts due to Messrs. Murphy, Sexton and Maggio are payable in equal installments from Refco Group Holdings, Inc. on December 31, 2005 and December 31, 2006. These payments will be accelerated upon the consummation of this offering.

**Currenex Fees**

Through a joint venture with Putnam Investments, Thomas H. Lee Partners, L.P. has an indirect ownership interest in Currenex, Inc., which is a technology firm that has created an electronic platform for trading currencies. We paid fees of $0.3 million and $0.9 million for the year ended February 29, 2004 and the nine months ended November 30, 2004, respectively, to Currenex in connection with the use of its platform.

**DESCRIPTION OF CAPITAL STOCK**

**General**

Upon the Reincorporation and the consummation of this offering, our certificate of incorporation will authorize us to issue shares of common stock, $.01 par value, and          shares of preferred stock, $0.01 par value. After giving effect to this offering and the Reincorporation, there will be    shares of common stock and no shares of preferred stock outstanding. The following discussion is a summary of the material provisions of our capital stock, certificate of incorporation and bylaws as will be in effect following the Reincorporation and this offering and is subject to, and qualified in its entirety by, our certificate of incorporation and bylaws, which are included as exhibits to the registration statement of which this prospectus forms a part, and by the provisions of applicable Delaware law.

**Common Stock**

The holders of common stock are entitled to one vote per share on all matters to be voted upon by the stockholders. Our certificate of incorporation does not provide for cumulative voting in connection with the election of directors, and accordingly, holders of more than 50% of voting shares will be able to elect all of the directors standing for election. Subject to preferences that may be applicable to any series of preferred stock that may be outstanding at the time, the holders of common stock are entitled to receive ratably any dividends that may be declared from time to time by the board of directors out of funds legally available for that purpose. Our ability to declare and pay dividends on our common stock will be restricted by the terms of our senior credit facilities, the indenture governing our senior subordinated notes and various regulatory requirements. In the event of our liquidation, dissolution or winding up, the holders of common stock are entitled to share ratably in all assets remaining after payment of liabilities, subject to prior distribution rights of preferred stock, if any, then outstanding. The common stock has no preemptive or conversion rights or other subscription rights. There are no redemption or sinking fund provisions applicable to the common stock. All outstanding shares of common stock are fully paid and nonassessable, and the shares of common stock to be issued upon the closing of this offering will be fully paid and nonassessable.

**Preferred Stock**

Our board of directors will have the authority, subject to any limitations imposed by law or New York Stock Exchange rules, without further action by the stockholders, to issue up to          shares of preferred stock in one or more series and to fix the rights, preferences, privileges and restrictions of each series of such preferred stock. These rights, preferences and privileges include dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences, sinking fund terms and the number of shares constituting any series or the designation of that series, any or all of which may be greater than the rights of common stock. The issuance of preferred stock could adversely affect the voting power of holders of common stock and the likelihood that those holders will receive dividend payments and payments upon liquidation. In addition, the issuance of preferred stock could have the effect of delaying, deferring or preventing a change in control of our company without further action by the stockholders. We have no present plan to issue any shares of preferred stock.

**Options**

We have no outstanding options.

**Anti–Takeover Effects of our Certificate of Incorporation and By–laws**

Our certificate of incorporation and by–laws will contain certain provisions that are intended to enhance the likelihood of continuity and stability in the composition of the board of directors and that

may have the effect of delaying, deferring or preventing a future takeover or change in control of our company, even in those cases where such a transaction may be at a premium to the current market price of our common stock.

These provisions include:

*Action by Written Consent; Special Meetings of Stockholders.*    Our certificate of incorporation will provide that stockholder action can be taken only at an annual or special meeting of stockholders and cannot be taken by written consent in lieu of a meeting. Our certificate of incorporation and the by–laws will provide that, except as otherwise required by law, special meetings of the stockholders can only be called by the chairman of the board, or pursuant to a resolution adopted by a majority of the board of directors. Stockholders will not be permitted to call a special meeting or to require the board of directors to call a special meeting.

*Advance Notice Procedures.*    Our by–laws will establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to the board of directors. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of the board of directors or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given our Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although the by–laws will not give the board of directors the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, the by–laws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of the company.

*Authorized but Unissued Shares.*    Our authorized but unissued shares of common stock and preferred stock will be available for future issuance without stockholder approval. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. The existence of authorized but unissued shares of common stock and preferred stock could render more difficult or discourage an attempt to obtain control of a majority of our common stock by means of a proxy contest, tender offer, merger or otherwise.

## Section 203 of Delaware Law

Upon consummation of the Reincorporation and this offering, we will elect not to be subject to the provisions of Section 203 of the Delaware General Corporation Law. Subject to exceptions specified therein, Section 203 of the Delaware General Corporation Law prohibits a publicly–held Delaware corporation from engaging in a "business combination" with an "interested stockholder," including general mergers or consolidations or acquisitions of additional shares of the corporation, for a three–year period following the time that such stockholder became an interested stockholder.

Except as otherwise specified in Section 203, an "interested stockholder" is defined to include:

- any person that is the owner of 15% or more of the outstanding voting stock of the corporation, or is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation at any time within three years immediately prior to the date of determination; and

- the affiliates and associates of any such person.

The statute is intended to prohibit or delay mergers or other takeover or change in control attempts. Although we have elected to opt out of the statute's provisions, we could elect to be subject to Section 203 in the future.

**Limitations on Liability and Indemnification of Officers and Directors**

Our certificate of incorporation limits the liability of directors to the fullest extent permitted by the Delaware General Corporation Law. In addition, our certificate of incorporation provides that we shall indemnify our directors and officers to the fullest extent permitted by such law.

**Registration Rights**

For a description of the registration rights that will be held by certain of our stockholders following the Reincorporation and this offering, see "Shares Eligible for Future Sale—Registration Rights" and "Certain Relationships and Related Transactions—Securityholders Agreement."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is                    .

**New York Stock Exchange Listing**

We intend to apply to have our common stock listed on the New York Stock Exchange for quotation under the symbol "RFX."

110

## DESCRIPTION OF INDEBTEDNESS

**Senior Credit Facilities**

Refco Group has entered into senior secured credit facilities with Bank of America, N.A., as administrative agent, swingline lender and l/c issuer, Banc of America Securities LLC, Credit Suisse First Boston, acting through its Cayman Islands Branch and Deutsche Bank Securities Inc. as co–lead arrangers and joint book running managers, Credit Suisse First Boston, acting through its Cayman Islands Branch, as syndication agent, and Deutsche Bank Securities Inc. as documentation agent, and various lenders. Set forth below is a summary of the terms of the senior credit facilities.

The senior credit facilities provide for aggregate borrowings of up to $875.0 million, including:

- a revolving credit facility of up to $75.0 million in revolving credit loans and letters of credit, none of which has been drawn, and

- a term loan facility of $800.0 million, all of which was drawn in connection with the THL Transactions, with an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase and subject to certain closing conditions.

All revolving loans incurred under the senior credit facilities mature on August 5, 2010. The term loan facility matures on August 5, 2011. As of November 30, 2004, $798.0 million remained outstanding on the term loan (excluding accrued interest) and the revolving credit facility was undrawn.

The senior credit facilities are secured by, among other things:

- a first priority security interest in substantially all of the assets of Refco Group, New Refco and Refco Group's non–regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of Refco Group's, New Refco's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by Refco Group or any guarantor and (ii) 65% of the voting stock of each of Refco Group's and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the senior credit facilities are guaranteed by New Refco and Refco Group's non–regulated restricted domestic subsidiaries.

Borrowings under the senior credit facilities bear interest at a floating rate, which can be either a LIBOR rate plus an applicable margin or, at the borrower's option, an alternative base rate (defined as the higher of (x) the Bank of America prime rate and (y) the federal funds effective rate, plus one half percent (.50%) per annum) plus an applicable margin. The applicable margins for LIBOR loans and alternative base loans in respect of the revolving credit facility are 2.75% and 1.75% per annum, respectively, and in respect of the term loan facility are 2.00% and 1.00% respectively. The applicable margins under the revolving credit facility are subject to adjustment based on a performance pricing grid. The applicable margins under the term loan facility are subject to adjustment based on the debt ratings of the senior credit facilities by S&P and Moodys. The interest rate payable under the senior credit facilities will increase by 2.00% per annum during the continuance of any payment or bankruptcy event of default.

For LIBOR loans, Refco Group may select interest periods of one, two, three or six months and, to the extent available to all lenders, nine or twelve months. Interest will be payable at the end of the

selected interest period, but no less frequently than every three months within the selected interest period.

The senior credit facilities also require payment of a commitment fee on the difference between committed amounts and amounts actually borrowed under the revolving credit facility. Prior to the maturity date, funds borrowed under the revolving credit facility may be borrowed, repaid and reborrowed, without premium or penalty.

The term loan facility is subject to amortization in equal quarterly installments of principal as set forth in the table below.

| Year | Term Loan Facility |
| --- | --- |
| 1 | $    8.0 million |
| 2 | $    8.0 million |
| 3 | $    8.0 million |
| 4 | $    8.0 million |
| 5 | $    8.0 million |
| 6 | $    8.0 million |
| 7 | $  752.0 million |

Voluntary prepayments of principal amounts outstanding under the senior credit facilities are permitted at any time. A 1% prepayment penalty will be assessed to any prepayment of principal made on the term loan facility where (a) such prepayment is made with the proceeds of, or in connection with, a new tranche of senior secured term loans incurred on or before March 21, 2006, (b) such new term loans have an interest rate margin that is less than the applicable rate on the term loan facility, and (c) such new term loans are incurred for the primary purpose of refinancing the term loan facility. Further, if a prepayment of principal is made with respect to a LIBOR loan on a date other than the last day of the applicable interest period, the lenders will require compensation for any funding losses and expenses incurred as a result of the prepayment. In January 2005, Refco Group voluntarily prepaid $150.0 million of the term loan.

In addition, mandatory prepayments are required to prepay amounts outstanding under the senior credit facilities in an amount equal to:

- 100% of net cash proceeds from certain asset dispositions by New Refco, Refco Group or any of Refco Group's restricted subsidiaries, subject to certain exceptions and reinvestment provisions and limitations on the remittance of funds by our regulated subsidiaries;

- 100% of the net cash proceeds from the issuance or incurrence after the closing date of any additional debt by New Refco, Refco Group or any of Refco Group's restricted subsidiaries (excluding certain permitted debt) and subject to limitations on the remittance of funds by Refco Group's regulated subsidiaries;

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of the net cash proceeds from the issuance or sale after the closing date of additional equity by New Refco, Refco Group or any of Refco Group's restricted subsidiaries in a public offering or in a private placement underwritten, managed, arranged, placed or initially purchased by an investment bank, excluding proceeds of equity issuances or sales to certain investors, proceeds from this offering used to redeem our senior subordinated notes and other customary exceptions and subject to limitations on the remittance of funds by Refco Group's regulated subsidiaries; and

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of excess cash flow, as defined in the senior credit facilities, subject to certain limitations on the remittance of funds by Refco Group's regulated subsidiaries.

112

The senior credit facilities require compliance with a minimum interest coverage ratio and a maximum leverage ratio (subject to an equity cure in specified instances). In addition, the senior credit facilities contain certain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross–defaults to certain other indebtedness in excess of specified amounts, certain events of bankruptcy and insolvency, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

## Senior Subordinated Notes

In connection with the THL Transactions, Refco Group, together with Refco Finance Inc. as co–issuer, issued $600.0 million aggregate principal amount of 9% senior subordinated notes. The senior subordinated notes rank equally in right of payment with all of Refco Group's existing and future senior indebtedness and rank senior in right of payment to all Refco Group's existing and future subordinated indebtedness. These notes are not secured, and as such, have no underlying assets to secure the payment of principal or interest. The senior subordinated notes are guaranteed on a senior unsecured basis by Refco Group's non–regulated domestic subsidiaries. The senior subordinated notes mature on August 1, 2012, with interest at a rate of 9% payable semi–annually in arrears on February 1 and August 1, commencing on February 1, 2005.

The senior subordinated notes may be redeemed at any time, in whole or in part, on or after August 1, 2008 at a redemption price equal to 104.5% of the principal amount of the senior subordinated notes in the first year, declining yearly to par at August 1, 2010, plus accrued and unpaid interest, if any, to the date of redemption. In addition, at any time prior to August 1, 2007, Refco Group may redeem the senior subordinated notes in the aggregate up to 35% of the original principal amount using the net proceeds of certain equity offerings (including this offering) at a redemption price equal to 109.0% of the principal amount of the senior subordinated notes, plus accrued and unpaid interest, if any, to the date of redemption.

We intend to redeem a portion of the senior subordinated notes using a portion of the net proceeds from this offering. See "Use of Proceeds."

Upon the occurrence of a change of control, each holder of the senior subordinated notes will have the right to require Refco Group to repurchase that holder's senior subordinated notes at a price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The indenture governing the senior subordinated notes contains covenants that, among other things, limit the ability of Refco Group and its subsidiaries, subject to certain qualifications and exceptions, to: incur or guarantee additional indebtedness; sell assets; pay dividends and make other equity distributions; purchase or redeem capital stock; make investments; consolidate or merge with or into other companies; and engage in transactions with affiliates.

The senior subordinated notes contain certain events of default, including failure to pay principal and interest on the notes, failure to comply with covenants, subject to a 60–day grace period in certain instances, and certain bankruptcy, insolvency or reorganization events with respect to Refco Group or its subsidiary guarantors.

113

We intend to apply a portion of the net proceeds of this offering to redeem $210.0 million aggregate principal amount of our senior subordinated notes and to pay the related premium and accrued and unpaid interest thereon to the redemption date.

**Refco Capital, LLC Credit Facilities**

Through our subsidiary Refco Capital, LLC, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively.

We currently have no outstanding indebtedness under these facilities.

**Refco Overseas Limited Credit Facilities**

Through our subsidiary Refco Overseas Limited, we have uncommitted credit facilities with HSBC Bank plc and UniCredito Italiano S.p.A. for €30.0 million and €40.0 million, respectively. Refco Group has given guarantees in favor of both facilities for $45.0 million and €40.0 million, respectively. We currently have no outstanding debt under these facilities.

114

## SHARES ELIGIBLE FOR FUTURE SALE

Prior to this offering, there was no market for our common stock. We can make no predictions as to the effect, if any, that sales of shares of common stock or the availability of shares of common stock for sale will have on the market price prevailing from time to time. Nevertheless, sales of significant amounts of our common stock in the public market, or the perception that such sales may occur, could adversely affect prevailing market prices.

If permitted under our current and future agreements governing our debt, such as our senior credit facilities, we may issue shares of common stock from time to time as consideration for future acquisitions, investments or other purposes. In the event of any such acquisition, investment or other transaction is significant, the number of shares that we may issue may be significant, which may have an adverse effect on the market price of our common stock. In addition, we may also grant registration rights covering those shares of common stock issued in connection with any such acquisitions, investments or other transactions.

### Sale of Restricted Shares

After giving effect to this offering and the Reincorporation, we will have                shares of common stock outstanding, assuming no exercise of the underwriters' over–allotment option. Of these shares of common stock, the                shares of common stock being sold in this offering, plus any shares issued upon exercise of the underwriters' over–allotment option, will be freely tradeable without restriction under the Securities Act, except for any such shares that may be held or acquired by an "affiliate" of ours, as that term is defined in Rule 144 promulgated under the Securities Act, which shares will be subject to the volume limitations and other restrictions of Rule 144 described below. The remaining shares of common stock held by our existing stockholders upon completion of this offering, other than those subject to the underwriters' over–allotment option to the extent it is exercised, will be "restricted securities," as that phrase is defined in Rule 144, and may not be resold, in the absence of registration under the Securities Act, except pursuant to an exemption from such registration, including among others, the exemptions provided by Rules 144, 144(k) or 701 under the Securities Act, which rules are summarized below. All of these restricted securities will be subject to the lock–up agreements described below.

The restricted shares and the shares held by our affiliates will be available for sale in the public market as follows:

- shares will be eligible for immediate sale on the date of this prospectus because such shares may be sold pursuant to Rule 144(k);

- shares will be eligible for sale at various times beginning 90 days after the date of this prospectus pursuant to Rules 144, 144(k) and 701; and

- shares subject to the lock–up agreements will be eligible for sale at various time beginning 180 days after the date of this prospectus pursuant to Rules 144, 144(k) and 701.

### Rule 144

In general, under Rule 144 as currently in effect, beginning 90 days after the date of this prospectus, a person or persons whose shares are aggregated, who has beneficially owned restricted shares for at least one year, including persons who may be deemed to be our "affiliates," would be entitled to sell within any three–month period a number of shares that does not exceed the greater of:

- 1.0% of the number of shares of common stock then outstanding, which will equal approximately                shares immediately after this offering; or

- the average weekly trading volume of our common stock on the New York Stock Exchange during the four calendar weeks before a notice of the sale on Form 144 is filed.

Sales under Rule 144 are also subject to certain manner of sale provisions and notice requirements and to the availability of certain public information about us. The Rule 144 holding period for approximately          million of the restricted shares issued in connection with the Reincorporation should be deemed not to commence until the completion of the Reincorporation, and, accordingly, such shares would not be available for sale in the public market pursuant to Rule 144 until one year after the completion of the Reincorporation or pursuant to Rule 144(k) until two years after the completion of the Reincorporation.

**Rule 144(k)**

Under Rule 144(k), a person who is not deemed to have been one of our "affiliates" at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least two years, including the holding period of any prior owner other than an "affiliate," is entitled to sell these shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144.

**Rule 701**

Securities issued in reliance on Rule 701 are also restricted and may be sold by stockholders other than affiliates of ours subject only to the manner of sale provisions of Rule 144 and by affiliates under Rule 144 without compliance with its one–year holding period requirement. Upon completion of this offering, we will have issued          million restricted shares pursuant to Rule 701.

**Options**

We intend to file a registration statement on Form S–8 under the Securities Act to register approximately          shares of common stock reserved for issuance under a management stock option plan. This registration statement is expected to be filed approximately six months following the date of this prospectus and will be effective upon filing. Shares issued upon the exercise of stock options after the effective date of the Form S–8 registration statement will be eligible for resale in the public market without restriction, subject to Rule 144 limitations applicable to affiliates and the lock–up agreements described below.

**Lock–Up Agreements**

Notwithstanding the foregoing, our executive officers, directors and existing stockholders have agreed not to offer, sell, contract to sell or otherwise dispose of any shares of our common stock for a period of 180 days after the date of this prospectus pursuant to agreements with Credit Suisse First Boston LLC, Goldman, Sachs & Co. and Banc of America Securities LLC, as representatives of the underwriters. This lock–up period may be extended in certain circumstances. See "Underwriting."

**Registration Rights**

Pursuant to the securityholders agreement entered into in connection with the THL Transactions, the THL Holders holding a majority of common stock held by all THL Holders are entitled to request up to six registrations of our common stock under the Securities Act. In addition, following an initial registration request by the THL Holders, Refco Group Holdings, Inc. is entitled to request up to two registrations of our common stock under the Securities Act. All holders have the right to have their shares of common stock registered in connection with any registration statement (other than on Form S–8) that we propose to file. Any requested registration is subject to customary cut–backs and blackout periods. Each signatory of the securityholders agreement agreed that in connection with any such registration, it will vote, or cause to be voted, all common stock over which that holder has power to vote to effect any stock split deemed necessary to facilitate the effectiveness of a requested registration.

## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

**General**

The following is a general discussion of the material U.S. federal income and estate tax consequences of the ownership and disposition of common stock that may be relevant to you if you are a non–U.S. Holder. In general, a "non–U.S. Holder" is any person or entity that is, for U.S. federal income tax purposes, a foreign corporation, a nonresident alien individual or a foreign estate or trust. This discussion is based on current law, which is subject to change, possibly with retroactive effect, or different interpretations. This discussion is limited to non–U.S. Holders who hold shares of common stock as capital assets within the meaning of the U.S. Internal Revenue Code. Moreover, this discussion is for general information only and does not address all the tax consequences that may be relevant to you in light of your personal circumstances, nor does it discuss special tax provisions, which may apply to you if you relinquished U.S. citizenship or residence.

If you are an individual, you may, in many cases, be deemed to be a resident alien, as opposed to a nonresident alien, by virtue of being present in the United States for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three–year period ending in the current calendar year. For these purposes all the days present in the current year, one–third of the days present in the immediately preceding year, and one–sixth of the days present in the second preceding year are counted. Resident aliens are subject to U.S. federal income tax as if they were U.S. citizens.

If a partnership, including any entity treated as a partnership for U.S. federal income tax purposes, is a holder of our common stock, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. A holder that is a partnership, and the partners in such partnership, should consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of our common stock.

EACH PROSPECTIVE PURCHASER OF COMMON STOCK IS ADVISED TO CONSULT A TAX ADVISOR WITH RESPECT TO CURRENT AND POSSIBLE FUTURE TAX CONSEQUENCES OF PURCHASING, OWNING AND DISPOSING OF OUR COMMON STOCK AS WELL AS ANY TAX CONSEQUENCES THAT MAY ARISE UNDER THE LAWS OF ANY U.S. STATE, MUNICIPALITY OR OTHER TAXING JURISDICTION.

**Dividends**

We do not anticipate paying any cash dividends on our common stock in the foreseeable future. See "Dividend Policy." If dividends are paid on shares of our common stock, such distributions will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings or profits, as determined under U.S. federal income tax principles. If a distribution exceeds our current and accumulated earnings and profits, it will constitute a return of capital that is applied and reduces, but not below zero, a non–U.S. Holder's adjusted tax basis in our common stock. Any remainder will constitute gain from the sale or exchange of the common stock.

If dividends are paid, as a non–U.S. Holder, you will be subject to withholding of U.S. federal income tax at a 30% rate or a lower rate as may be specified by an applicable income tax treaty. To claim the benefit of a lower rate under an income tax treaty, you must properly file with the payor an Internal Revenue Service Form W–8BEN, or successor form, claiming an exemption from or reduction in withholding under the applicable tax treaty. In addition, where dividends are paid to a non–U.S. Holder that is a partnership or other pass–through entity, persons holding an interest in the entity may need to provide certification claiming an exemption or reduction in withholding under the applicable treaty.

If dividends are considered effectively connected with the conduct of a trade or business by you within the United States and, where a tax treaty applies, are attributable to a U.S. permanent

117

establishment of yours, those dividends will be subject to U.S. federal income tax on a net basis at applicable graduated individual or corporate rates but will not be subject to withholding tax, provided an Internal Revenue Service Form W–8ECI, or successor form, is filed with the payor. If you are a foreign corporation, any effectively connected dividends may, under certain circumstances, be subject to an additional "branch profits tax" at a rate of 30% or a lower rate as may be specified by an applicable income tax treaty.

You must comply with the certification procedures described above, or, in the case of payments made outside the United States with respect to an offshore account, certain documentary evidence procedures, directly or under certain circumstances through an intermediary, to obtain the benefits of a reduced rate under an income tax treaty with respect to dividends paid with respect to your common stock. In addition, if you are required to provide an Internal Revenue Service Form W–8ECI or successor form, as discussed above, you must also provide your tax identification number.

If you are eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty, you may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the Internal Revenue Service.

**Gain on Disposition of Common Stock**

As a non–U.S. Holder, you generally will not be subject to U.S. federal income tax on any gain recognized on a sale or other disposition of common stock unless:

- the gain is considered effectively connected with the conduct of a trade or business by you within the United States and, where a tax treaty applies, is attributable to a U.S. permanent establishment of yours (in which case you will be taxed in the same manner as a U.S. person, and if you are a foreign corporation, you may be subject to an additional branch profits tax equal to 30% or a lower rate as may be specified by an applicable income tax treaty);

- you are an individual who holds the common stock as a capital asset and are present in the United States for 183 or more days in the taxable year of the sale or other disposition and certain other conditions are met (in which case you will be subject to a 30% tax on the gain); or

- we are or become a U.S. real property holding corporation ("USRPHC"). We believe that we are not currently, and are not likely not to become, a USRPHC. If we were to become a USRPHC, then gain on the sale or other disposition of common stock by you generally would not be subject to U.S. federal income tax provided:

  - the common stock was "regularly traded on an established securities market"; and

  - you do not actually or constructively own more than 5% of the common stock during the shorter of (i) the five–year period ending on the date of such disposition or (ii) the period of time during which you held such shares.

**Federal Estate Tax**

If you are an individual, common stock held at the time of your death will be included in your gross estate for U.S. federal estate tax purposes, and may be subject to U.S. federal estate tax, unless an applicable estate tax treaty provides otherwise.

**Information Reporting and Backup Withholding Tax**

We must report annually to the Internal Revenue Service and to each of you the amount of dividends paid to you and the tax withheld with respect to those dividends, regardless of whether withholding was required. Copies of the information returns reporting those dividends and withholding

118

may also be made available to the tax authorities in the country in which you reside under the provisions of an applicable income tax treaty or other applicable agreements.

Backup withholding is generally imposed (currently at a 28% rate) on certain payments to persons that fail to furnish the necessary identifying information to the payor. You generally will be subject to backup withholding tax with respect to dividends paid on your common stock unless you certify your non–U.S. status. Dividends subject to withholding of U.S. federal income tax as described above in "Dividends" would not be subject to backup withholding.

The payment of proceeds of a sale of common stock effected by or through a U.S. office of a broker is subject to both backup withholding and information reporting unless you provide the payor with your name and address and you certify your non–U.S. status or you otherwise establish an exemption. In general, backup withholding and information reporting will not apply to the payment of the proceeds of a sale of common stock by or through a foreign office of a broker. If, however, such broker is, for U.S. federal income tax purposes, a U.S. person, a controlled foreign corporation, a foreign person that derives 50% or more of its gross income for certain periods from the conduct of a trade or business in the United States or a foreign partnership that at any time during its tax year either is engaged in the conduct of a trade or business in the United States or has as partners one or more U.S. persons that, in the aggregate, hold more than 50% of the income or capital interest in the partnership, backup withholding will not apply but such payments will be subject to information reporting, unless such broker has documentary evidence in its records that you are a non–U.S. Holder and certain other conditions are met or you otherwise establish an exemption.

Any amounts withheld under the backup withholding rules generally will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is furnished in a timely manner to the Internal Revenue Service.

119

**UNDERWRITING**

Under the terms and subject to the conditions contained in an underwriting agreement dated          , 2005, we and the selling stockholders have agreed to sell to the underwriters named below, for whom Credit Suisse First Boston LLC, Goldman, Sachs & Co. and Banc of America Securities LLC are acting as representatives, the following respective numbers of shares of common stock:

| Underwriter | Number of Shares |
| --- | --- |
| Credit Suisse First Boston LLC | |
| Goldman, Sachs & Co. | |
| Banc of America Securities LLC | |
| Deutsche Bank Securities Inc. | |
| J.P. Morgan Securities Inc. | |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| Sandler O'Neill & Partners, L.P. | |
| HSBC Securities (USA) Inc. | |
| Total | |

The underwriting agreement provides that the underwriters are obligated to purchase all the shares of common stock in the offering if any are purchased, other than those shares covered by the over–allotment option described below. The underwriting agreement also provides that, if an underwriter defaults, the purchase commitments of non–defaulting underwriters may be increased or the offering may be terminated.

We and the selling stockholders have granted to the underwriters a 30–day option to purchase on a pro rata basis up to          additional shares from us and up to          additional outstanding shares from the selling stockholders at the initial public offering price less the underwriting discounts and commissions. The option may be exercised only to cover any over–allotments of common stock.

The underwriters propose to offer the shares of common stock initially at the public offering price on the cover page of this prospectus and to selling group members at that price less a selling concession of $          per share. The underwriters and selling group members may allow a discount of $          per share on sales to other broker/dealers. After the initial public offering, the representatives may change the public offering price and concession and discount to broker/dealers.

The following table summarizes the compensation and estimated expenses we and the selling stockholders will pay:

| | Per Share | | Total | |
| --- | --- | --- | --- | --- |
| | Without Over–allotment | With Over–allotment | Without Over–allotment | With Over–allotment |
| Underwriting discounts and commissions paid by us | $ | $ | $ | $ |
| Expenses payable by us | $ | $ | $ | $ |
| Underwriting discounts and commissions paid by the selling stockholders | $ | $ | $ | $ |
| Expenses payable by the selling stockholders | $ | $ | $ | $ |

The underwriters have informed us that they do not expect sales to accounts over which they have discretionary authority to exceed 5% of the shares of common stock being offered.

We have agreed that we will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, or file with the Securities and Exchange Commission a registration statement under the Securities Act relating to, any shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock, or publicly disclose the intention to

120

make any offer, sale, pledge, disposition or filing, without the prior written consent of the representatives for a period of 180 days after the date of this prospectus. However, in the event that either (1) during the last 17 days of the "lock–up" period, we release earnings results or material news or a material event relating to us occurs or (2) prior to the expiration of the "lock–up' period, we announce that we will release earnings results during the 16–day period beginning on the last day of the "lock–up" period, then in either case the expiration of the "lock–up" will be extended until the expiration of the 18–day period beginning on the date of the release of the earnings results or the occurrence of the material news or event, as applicable, unless the representatives waive, in writing, such an extension.

Our officers and directors and our stockholders have agreed that they will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock, enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of our common stock, whether any of these transactions are to be settled by delivery of our common stock or other securities, in cash or otherwise, or publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, without, in each case, the prior written consent of the representatives for a period of 180 days after the date of this prospectus. However, in the event that either (1) during the last 17 days of the "lock–up" period, we release earnings results or material news or a material event relating to us occurs or (2) prior to the expiration of the "lock–up" period, we announce that we will release earnings results during the 16–day period beginning on the last day of the "lock–up" period, then in either case the expiration of the "lock–up" will be extended until the expiration of the 18–day period beginning on the date of the release of the earnings results or the occurrence of the material news or event, as applicable, unless the representatives waive, in writing, such an extension. The foregoing agreement does not restrict our officers, directors and stockholders from transferring shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock (1) as a bona fide gift to any person, (2) to a family member, affiliate or trust or (3) to limited or general partners or stockholders; provided that, in each case, the transferee agrees to be bound in writing by the terms of the foregoing agreement prior to such transfer.

The underwriters have reserved for sale at the initial public offering price up to          shares of the common stock for employees, directors and other persons associated with us who have expressed an interest in purchasing common stock in the offering. The number of shares available for sale to the general public in the offering will be reduced to the extent these persons purchase the reserved shares. Any reserved shares not so purchased will be offered by the underwriters to the general public on the same terms as the other shares.

We and the selling stockholders have agreed to indemnify the underwriters against liabilities under the Securities Act, or contribute to payments that the underwriters may be required to make in that respect.

We intend to apply to list the shares of common stock on the New York Stock Exchange.

Certain of the underwriters and their respective affiliates have from time to time performed various financial advisory, commercial banking and investment banking services for us and our affiliates in the ordinary course of business, for which they received customary compensation. Certain of the underwriters and their respective affiliates may also perform various financial advisory, commercial banking and investment banking services for us and our affiliates in the future. In particular, certain of the underwriters or their affiliates act as lenders under our senior secured credit facilities and also act in other capacities in connection with such facilities. Further, certain of the underwriters have engaged, and may continue to engage, in transactions with us in the ordinary course of our business as a

121

provider of execution and clearing services in the derivatives, foreign exchange and fixed income markets for which they or us received customary compensation.

Prior to this offering, there has been no public market for our common stock. The initial public offering price will be determined by a negotiation between us and the underwriters and will not necessarily reflect the market price of the common stock following the offering. The principal factors that will be considered in determining the public offering price will include:

- the information in this prospectus and otherwise available to the underwriters;

- market conditions for initial public offerings;

- the history and the prospects for the industry in which we compete;

- the ability of our management;

- the prospects for our future earnings;

- the present state of our development and our current financial condition;

- the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies; and

- the general condition of the securities markets at the time of this offering.

We cannot assure you that the initial public offering price will correspond to the price at which the common stock will trade in the public market subsequent to the offering or that an active trading market for the common stock will develop and continue after the offering.

In connection with the offering, the underwriters may engage in stabilizing transactions, over–allotment transactions, syndicate covering transactions and penalty bids in accordance with Regulation M under the Securities Exchange Act of 1934, as amended;

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- Over–allotment involves sales by the underwriters of shares in excess of the number of shares the underwriters are obligated to purchase, which creates a syndicate short position. The short position may be either a covered short position or a naked short position. In a covered short position, the number of shares over–allotted by the underwriters is not greater than the number of shares that they may purchase in the over–allotment option. In a naked short position, the number of shares involved is greater than the number of shares in the over–allotment option. The underwriters may close out any covered short position by either exercising their over–allotment option and/or purchasing shares in the open market.

- Syndicate covering transactions involve purchases of the common stock in the open market after the distribution has been completed in order to cover syndicate short positions. In determining the source of shares to close out the short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the over–allotment option. If the underwriters sell more shares than could be covered by the over–allotment option, a naked short position, the position can only be closed out by buying shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there could be downward pressure on the price of the shares in the open market after pricing that could adversely affect investors who purchase in the offering.

- Penalty bids permit the representatives to reclaim a selling concession from a syndicate member when the common stock originally sold by the syndicate member is purchased in a stabilizing or syndicate covering transaction to cover syndicate short positions.

These stabilizing transactions and syndicate covering transactions may have the effect of raising or maintaining the market price of our common stock or preventing or retarding a decline in the market price

of the common stock. As a result the price of our common stock may be higher than the price that might otherwise exist in the open market. These transactions may be effected on the New York Stock Exchange or otherwise and, if commenced, may be discontinued at any time.

Each underwriter has represented, warranted and agreed that: (i) it has not offered or sold and, prior to the expiry of a period of six months from the closing date of this offering, will not offer or sell any shares to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995; (ii) it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received by it in connection with the issue or sale of any shares in circumstances in which section 21(1) of the FSMA does not apply to the Issuer; and (iii) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the shares in, from or otherwise involving the United Kingdom.

The shares may not be offered or sold, transferred or delivered, as part of their initial distribution or at any time thereafter, directly or indirectly, to any individual or legal entity in the Netherlands other than to individuals or legal entities who or which trade or invest in securities in the conduct of their profession or trade, which includes banks, securities intermediaries, insurance companies, pension funds, other institutional investors and commercial enterprises which, as an ancillary activity, regularly trade or invest in securities.

The shares may not be offered or sold by means of any document other than to persons whose ordinary business is to buy or sell shares or debentures, whether as principal or agent, or in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32) of Hong Kong, and no advertisement, invitation or document relating to the shares may be issued, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made thereunder.

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation or subscription or purchase, of the securities may not be circulated or distributed, nor may the securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than under circumstances in which such offer, sale or invitation does not constitute an offer or sale, or invitation for subscription or purchase, of the securities to the public in Singapore.

The securities have not been and will not be registered under the Securities and Exchange Law of Japan (the Securities and Exchange Law) and each underwriter has agreed that it will not offer or sell any securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re–offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

A prospectus in electronic format may be made available on the websites maintained by one or more of the underwriters, or selling group members, if any, participating in this offering. The representatives may agree to allocate a number of shares to underwriters and selling group members for sale to their online brokerage account holders. Internet distributions will be allocated by the underwriters and selling group members that will make internet distributions on the same basis as other allocations.

123

**NOTICE TO CANADIAN RESIDENTS**

**Resale Restrictions**

The distribution of the common stock in Canada is being made only on a private placement basis exempt from the requirement that we and the selling stockholders prepare and file a prospectus with the securities regulatory authorities in each province where trades of the common stock are made. Any resale of the common stock in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the common stock.

**Representations of Purchasers**

By purchasing common stock in Canada and accepting a purchase confirmation a purchaser is representing to us, the selling stockholders and the dealer from whom the purchase confirmation is received that:

- the purchaser is entitled under applicable provincial securities laws to purchase the common stock without the benefit of a prospectus qualified under those securities laws,

- where required by law, that the purchaser is purchasing as principal and not as agent, and

- the purchaser has reviewed the text above under Resale Restrictions.

**Rights of Action—Ontario Purchasers Only**

Under Ontario securities legislation, a purchaser who purchases a security offered by this prospectus during the period of distribution will have a statutory right of action for damages, or while still the owner of the common stock, for rescission against us and the selling stockholders in the event that this circular contains a misrepresentation. A purchaser will be deemed to have relied on the misrepresentation. The right of action for damages is exercisable not later than the earlier of 180 days from the date the purchaser first had knowledge of the facts giving rise to the cause of action and three years from the date on which payment is made for the common stock. The right of action for rescission is exercisable not later than 180 days from the date on which payment is made for the common stock. If a purchaser elects to exercise the right of action for rescission, the purchaser will have no right of action for damages against us or the selling stockholders. In no case will the amount recoverable in any action exceed the price at which the common stock was offered to the purchaser and if the purchaser is shown to have purchased the securities with knowledge of the misrepresentation, we and the selling stockholders, will have no liability. In the case of an action for damages, we and the selling stockholders, will not be liable for all or any portion of the damages that are proven to not represent the depreciation in value of the common stock as a result of the misrepresentation relied upon. These rights are in addition to, and without derogation from, any other rights or remedies available at law to an Ontario purchaser. The foregoing is a summary of the rights available to an Ontario purchaser. Ontario purchasers should refer to the complete text of the relevant statutory provisions.

**Enforcement of Legal Rights**

All of our directors and officers as well as the experts named herein and the selling stockholders may be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon us or those persons. All or a substantial portion of our assets and the assets of those persons may be located outside of Canada and, as a result, it may not be possible to satisfy a judgment against us or those persons in Canada or to enforce a judgment obtained in Canadian courts against us or those persons outside of Canada.

**Taxation and Eligibility for Investment**

Canadian purchasers of the common stock should consult their own legal and tax advisors with respect to the tax consequences of an investment in the common stock in their particular circumstances and about the eligibility of the common stock for investment by the purchaser under relevant Canadian legislation.

124

## LEGAL MATTERS

Weil, Gotshal & Manges LLP, New York, New York has passed upon the validity of the common stock offered hereby on behalf of us. Mayer, Brown, Rowe & Maw LLP has also represented us in connection with this offering. The underwriters have been represented by Cravath, Swaine & Moore LLP, New York, New York. Certain partners of Weil, Gotshal & Manges LLP have indirect ownership interests, totaling less than 0.01%, in us.

## EXPERTS

The Refco Group Ltd., LLC consolidated balance sheets as of February 29, 2004 and February 28, 2003 and the related consolidated statements of income, changes in members' equity and cash flows for the three years in the period ended February 29, 2004 and schedules included in this prospectus and elsewhere in this registration statement have been audited by Grant Thornton LLP, independent registered public accountants, as stated in their reports with respect thereto, and is included herein in reliance upon the authority of said firm as experts in accounting and auditing.

## AVAILABLE INFORMATION

We have filed with the SEC a registration statement on Form S–1 under the Securities Act with respect to the common stock offered hereby. This prospectus does not contain all of the information set forth in the registration statement and the exhibits and schedules thereto. For further information with respect to Refco Inc. and the common stock offered hereby, you should refer to the registration statement and to the exhibits and schedules filed therewith. Statements contained in this prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and each such statement is qualified in all respects by reference to the full text of such contract or other document filed as an exhibit to the registration statement. Our subsidiary, Refco Group Ltd., LLC has filed a registration statement on Form S–4 under the Securities Act. This prospectus does not contain all of the information set forth in Refco Group Ltd., LLC's S–4 filing. A copy of the registration statement and the exhibits and schedules thereto may be inspected without charge at the public reference room maintained by the SEC located at 450 Fifth Street, N.W., Washington, D.C. 20549. Copies of all or any portion of the registration statements and the filings may be obtained from such offices upon payment of prescribed fees. The public may obtain information on the operation of the public reference room by calling the SEC at 1–800–SEC–0330. The SEC maintains a website at *www.sec.gov* that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

You may obtain a copy of any of our filings, at no cost, by writing or telephoning us at:

<div align="center">

Refco Inc.
One World Financial Center
200 Liberty Street, Tower A
New York, New York 10281
Attn: Investor Relations
(212) 693–7000

125

</div>

**GLOSSARY**

| | |
|---|---|
| **Broker in Principal** | An individual or firm who acts as an intermediary or temporary dealer between a buyer and a seller and who either takes title to the asset on behalf of its client or has a client position offset by an equal but opposite position with a dealer. |
| **CBOE** | Chicago Board Options Exchange, which is a securities exchange created in the early 1970s for the public trading of standardized option contracts. Primary place for the trading of stock options, foreign currency options and index options. |
| **CBOT** | Chicago Board of Trade, which is the second largest derivatives exchange in the United States and a pioneer in the development of financial futures and options. |
| **CFMA** | Commodity Futures Modernization Act of 2000, which amended the Commodity Exchange Act, removing much regulation by the CFTC to which OTC derivatives had been subject previously. |
| **CFTC** | Commodity Futures Trading Commission, which is the federal regulatory agency that administers the Commodity Exchange Act. It is the federal oversight agency that monitors the futures and options on futures markets to detect and prevent price distortion and market manipulation and to protect the rights of customers who use the markets for either commercial or investment purposes. |
| **Clearing House** | An agency or corporation that acts as a central counterparty to the clearing members or FCMs on each side of a transaction. Clearing Houses are responsible for settling trading accounts, collecting and maintaining margin monies, regulating delivery and reporting trading data. |
| **CME** | Chicago Mercantile Exchange, which is the largest derivatives exchange in the United States and the second largest exchange in the world for the trading of futures and options on futures. CME has four major product areas based on interest rates, stock indexes, foreign exchange and commodities. |
| **Commodity Exchange Act** | The principal legislation governing the trading of commodities and futures in the United States. |
| **Commodity Pool Operator** | An individual or organization which operates or solicits funds for a pool in which funds contributed by a number of persons are combined for the purpose of trading futures or options contracts. Generally required to be registered with the CFTC. |
| **Commodity Trading Advisor** | A person who directly or indirectly advises others as to the advisability of buying or selling futures or commodity options. Most Commodity Trading Advisors may exercise trading authority over a customer's account. A Commodity Trading Advisor is generally required to be registered with the CFTC. |

| | |
|---|---|
| **E–mini** | E–minis are smaller versions of popular index funds that cover the entire S&P 500 and Nasdaq–100 indexes. E-minis are 20% the size of larger index contracts and allow for great flexibility when assembling a portfolio. E–mini trading is popular because it requires less of an initial capital investment, and it enables traders to diversify a portfolio and hedge against more focused investments. |
| **Eurex** | World's largest derivatives exchange, based on volume. This fully electronic exchange has 432 participants in 17 countries, creating decentralized and standardized access to its markets. |
| **Euronext** | Europe's first cross–border group of stock exchanges and their derivatives markets, formed by the merger of the stock exchanges of Amsterdam, Brussels and Paris in 2000. |
| **Exchange** | A marketplace in which shares, options and/or futures on stocks, bonds, commodities and indexes are traded. |
| **FCM** | Futures Commission Merchant, which is a firm engaged in soliciting or accepting and handling orders for the purchase or sale of futures contracts and accepting money or securities to provide margin for any resulting trades or contracts. An FCM must be registered with the CFTC. |
| **Forward** | A contract in which a seller agrees to deliver a specified asset to a buyer at a specified price sometime in the future. In contrast to futures contracts, forward contracts are not standardized, not traded on exchanges and generally contemplate a delivery at settlement. |
| **FXCM** | An FCM specializing solely in spot foreign exchange. FXCM has operations around the world, services over 40,000 retail customers and over 400 institutional customers from more than 80 countries and executes over 800,000 trades executed each month. |
| **LCH** | London Clearing House, which is a leading independent clearing house in Europe, serving major international exchanges and platforms, equity markets, exchange–traded derivatives markets, energy markets, the interbank interest rate swaps market and the majority of the Euro–denominated and sterling bond and repo markets. |
| **LME** | London Metal Exchange, which is a market for trading base metals. LME prices are used as reference prices in many world markets by metals producers and fabricators of metal products and are the basis for most major commodity indices. |
| **Mark–to–Market** | To debit or credit a trading account on a daily basis based on the prices established at the close of that day's trading session. |
| **Net Capital** | The amount by which current assets exceed liabilities (adjusted for illiquid assets, certain operating capital charges, and potential adverse fluctuations in the value of securities inventory). |

| | |
|---|---|
| **NFA** | National Futures Association, which is the industry wide self–regulatory organization of the futures industry. Congress authorized its creation in 1974, and the CFTC designated it a "registered futures association" in 1982. |
| **NYMEX** | New York Mercantile Exchange, which is the world's largest physical commodity derivatives exchange. |
| **OTC Market** | Over–The–Counter Market, which is a decentralized market where geographically dispersed dealers are linked by telephones and computer screens. The market is for securities not listed on exchanges. |
| **Repo** | Repurchase agreement, which is an agreement in which one party sells a security to another party and agrees to repurchase it on a specified date for a specified price. This represents a collateralized short–term loan, where the collateral may be a Treasury security, money market instrument, federal agency security or mortgage–backed security. A reverse repurchase agreement, otherwise known as a "reverse repo," which is the purchase of a security at a specified price with an agreement to sell the same or substantially the same security to the same counterparty at a fixed or determinable price at a future date. |
| **Repurchase Transaction** | See the definition for "repo." |
| **Segregated Funds** | The amount of money, securities and property due to commodity futures or options customers, which is held in segregated accounts in compliance with Section 4d of the Commodity Exchange Act and CFTC Regulations. Such money, securities or property may not be comingled with the money, securities and property of the FCM, but the FCM may earn interest on it. |
| **TSE** | Tokyo Stock Exchange, which is the largest stock exchange in Japan with some of the most active trading in the world. |

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

**Refco Group Ltd., LLC (Predecessor)**
Report of Independent Registered Public Accounting Firm                                                                                    F–2
Consolidated Balance Sheets as of February 29, 2004 and February 28, 2003                                                                 F–3
Consolidated Statements of Income for the years ended February 29, 2004,
February 28, 2003 and February 28, 2002                                                                                                   F–4
Consolidated Statements of Changes in Members' Equity for the years ended February 29, 2004, February 28, 2003 and February 28, 2002      F–5
Consolidated Statements of Cash Flows for the years ended February 29, 2004, February 28, 2003 and February 28, 2002                      F–6
Notes to Consolidated Financial Statements                                                                                               F–7
**New Refco Group Ltd., LLC (Successor)**
Consolidated Balance Sheets as of November 30, 2004 (unaudited) and February 29, 2004                                                     F–38
Consolidated Statements of Income for the three months ended November 30, 2004 and 2003 (unaudited)                                       F–39
Consolidated Statements of Income for the nine months ended November 30, 2004 and 2003 (unaudited)                                        F–40
Consolidated Statement of Changes in Members' Equity for the nine months ended November 30, 2004 and 2003 (unaudited)                     F–41
Consolidated Statements of Cash Flows for the nine months ended November 30, 2004 and 2003 (unaudited)                                    F–42
Notes to Consolidated Financial Statements (unaudited)                                                                                    F–43

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members of
  **Refco Group Ltd., LLC**

     We have audited the accompanying consolidated balance sheets of Refco Group Ltd., LLC (the "Company") (a Delaware limited liability company) and subsidiaries (the "Group") as of February 29, 2004 and February 28, 2003, and the related consolidated statements of income, changes in members' equity and cash flows for each of the three years in the period ended February 29, 2004. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these financial statements based on our audits.

     We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

     In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the three years in the period ended February 29, 2004 in conformity with accounting principles generally accepted in the United States of America.

Grant Thornton LLP
New York, New York
October 8, 2004

F–2

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | February 29, 2004 | | February 28, 2003 | |
|---|---|---|---|---|
| | | (in thousands) | | |
| Cash and cash equivalents | $ | 316,213 | $ | 226,165 |
| Cash and securities segregated under federal and other regulations: | | | | |
|    Cash and cash equivalents | | 1,375,838 | | 1,949,846 |
|    Securities purchased under agreements to resell | | 55,061 | | 69,161 |
| Securities purchased under agreements to resell | | 24,782,874 | | 12,163,297 |
| Deposits with clearing organizations and others | | 1,831,765 | | 1,751,801 |
| Receivables from broker–dealers and clearing organizations | | 504,810 | | 303,751 |
| Receivables from customers, net of $65,200 and $42,700 in reserves, respectively | | 1,591,385 | | 1,490,380 |
| Receivables from equity members | | 210,223 | | 280,545 |
| Securities owned, at market or fair value | | 2,032,535 | | 490,420 |
| Memberships in exchanges (market value: 2004: $41,337, 2003: $33,738) | | 15,869 | | 18,689 |
| Assets of discontinued operations (Note B) | | 276,012 | | 178,603 |
| Other assets | | 339,587 | | 292,771 |
|     Total assets | $ | 33,332,172 | $ | 19,215,429 |
| **Liabilities** | | | | |
|    Short–term borrowings, including current portion of long–term borrowings | $ | 88,890 | $ | 245,810 |
|    Securities sold under agreements to repurchase | | 25,630,299 | | 12,779,456 |
|    Payable to broker–dealers and clearing organizations | | 583,643 | | 256,783 |
|    Payable to customers | | 5,053,337 | | 4,357,055 |
|    Securities sold, not yet purchased, at market or fair value | | 807,485 | | 212,205 |
|    Liabilities of discontinued operations (Note B) | | 44,878 | | 80,864 |
|    Accounts payable, accrued expenses, and other liabilities | | 171,651 | | 157,395 |
| Long–term borrowings | | 315,500 | | 383,500 |
| Subordinated debt | | 16,000 | | 16,000 |
|    Total liabilities | | 32,711,683 | | 18,489,068 |
| Commitments and contingent liabilities | | | | |
| Preferred securities issued by subsidiaries | | — | | 160,000 |
| Membership interests issued by subsidiary | | 4,405 | | — |
| Members' equity | | 616,084 | | 566,361 |
|    Total liabilities and members' equity | $ | 33,332,172 | $ | 19,215,429 |

The accompanying notes are an integral part of these financial statements.

F–3

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

| | Year Ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | (in thousands) | | |
| **Revenues** | | | |
| Commissions and brokerage | $ 645,440 | $ 571,520 | $ 477,806 |
| Interest | 1,051,695 | 2,387,339 | 1,711,109 |
| Principal transactions, net | 165,936 | 82,554 | 99,293 |
| Asset management and advisory fees | 7,255 | 123 | 6,433 |
| Other | 3,973 | 4,563 | 3,424 |
| Total revenues | 1,874,299 | 3,046,099 | 2,298,065 |
| **Expenses** | | | |
| Commissions and order execution costs | 411,894 | 385,375 | 323,608 |
| Interest | 897,674 | 2,182,346 | 1,556,609 |
| Employee compensation and benefits | 204,854 | 180,962 | 167,373 |
| General, administrative and other | 170,415 | 142,585 | 148,967 |
| Total expenses | 1,684,837 | 2,891,268 | 2,196,557 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 189,462 | 154,831 | 101,508 |
| Provision for income taxes | 11,687 | 1,223 | 5,409 |
| Income before dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 177,775 | 153,608 | 96,099 |
| Dividends on preferred securities | — | 15,576 | 15,576 |
| Income from equity investees | 11,544 | 1,673 | 708 |
| Members' interest in earnings of subsidiary | 1,273 | — | — |
| Income from continuing operations | 188,046 | 139,705 | 81,231 |
| Discontinued operations (Note B) | | | |
| (Loss) income from discontinued operations | (401) | 1,151 | 13,945 |
| Applicable income tax expense | 489 | 737 | 1,542 |
| Net income | $ 187,156 | $ 140,119 | $ 93,634 |

The accompanying notes are an integral part of these financial statements.

F–4

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

| | Members' equity | | |
| --- | --- | --- | --- |
| | Common capital | Other comprehensive income | Total |
| | (in thousands) | | |
| Balance, February 28, 2001 | $ 509,263 | $ (10,308) | $ 498,955 |
| Capital withdrawals | (75,000) | — | (75,000) |
| Net income | 93,634 | — | 93,634 |
| Currency translation adjustment | — | (2,473) | (2,473) |
| Balance, February 28, 2002 | 527,897 | (12,781) | 515,116 |
| Capital withdrawals | (100,000) | — | (100,000) |
| Net income | 140,119 | — | 140,119 |
| Currency translation adjustment | — | 11,126 | 11,126 |
| Balance, February 28, 2003 | 568,016 | (1,655) | 566,361 |
| Capital withdrawals | (120,000) | — | (120,000) |
| Loss on early extinguishment of preferred securities issued by subsidiaries | (39,774) | — | (39,774) |
| Net income | 187,156 | — | 187,156 |
| Currency translation adjustment | — | 22,341 | 22,341 |
| Balance, February 29, 2004 | $ 595,398 | $ 20,686 | $ 616,084 |

The accompanying notes are an integral part of these financial statements.

F–5

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | | (in thousands) | |
| **Cash flows from operating activities** | | | |
| Net income | $ 187,156 | $ 140,119 | $ 93,634 |
| (Loss) income from discontinued operations (Note B) | (890) | 414 | 12,403 |
| Net income from continuing operations | 188,046 | 139,705 | 81,231 |
| Noncash items included in net income | | | |
| Depreciation and amortization | 26,161 | 23,499 | 33,959 |
| Members' interest in earnings of subsidiary | 1,273 | — | — |
| (Increase) decrease in operating assets | | | |
| Cash and securities segregated under federal and other regulations: | | | |
| Cash and cash equivalents | 574,008 | (1,109,672) | (377,218) |
| Securities purchased under agreements to resell | 14,100 | 86,351 | (82,700) |
| Securities purchased under agreements to resell | (12,619,577) | 4,802,305 | (4,267,460) |
| Deposits with clearing organizations and others | (79,964) | (698,744) | 240,825 |
| Receivables from broker–dealers and clearing organizations | (201,059) | 49,689 | 42,423 |
| Receivables from customers | (101,005) | 394,443 | (354,698) |
| Receivables from equity members | 70,322 | 108,678 | 41,000 |
| Securities owned, at market or fair value | (1,542,115) | (195,891) | 359,873 |
| Memberships in exchanges | 2,820 | (10,377) | — |
| Other assets | 45,953 | (11,746) | (40,604) |
| Increase (decrease) in operating liabilities | | | |
| Short–term borrowings, including current portion of long–term borrowings | (156,920) | 50,573 | 21,734 |
| Securities sold under agreements to repurchase | 12,850,843 | (4,064,785) | 4,798,815 |
| Payable to broker–dealers and clearing organizations | 326,860 | (42,921) | (169,528) |
| Payable to customers | 696,282 | 661,646 | (48,945) |
| Securities sold, not yet purchased, at market or fair value | 595,280 | (71,327) | (251,709) |
| Accounts payable, accrued expenses and other liabilities | 36,597 | (30,816) | 35,756 |
| Notes payable | — | — | (8,400) |
| Net cash provided by operating activities | 727,905 | 80,610 | 54,354 |
| **Cash flows from investing activities** | | | |
| Acquisition of businesses, net of cash acquired | (118,930) | (3,473) | — |
| Net cash used in investing activities | (118,930) | (3,473) | — |
| **Cash flows from financing activities** | | | |
| Repayment of subordinated debt | — | — | (25,000) |
| Issuance of long–term borrowings | — | 222,500 | — |
| Repayment of long–term borrowings | (68,000) | (68,000) | (33,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — |
| Net contributions to membership interests issued by subsidiary | 3,132 | — | — |
| Capital withdrawals | (120,000) | (100,000) | (75,000) |
| Net cash (used in) provided by financing activities | (384,642) | 54,500 | (133,000) |
| Net cash (used in) provided by discontinued operations (Note B) | (134,285) | (50,150) | 15,919 |
| Net (decrease) increase in cash and cash equivalents | 90,048 | 81,487 | (62,727) |
| Cash and cash equivalents, beginning of year | 226,165 | 144,678 | 207,405 |
| Cash and cash equivalents, end of year | $ 316,213 | $ 226,165 | $ 144,678 |
| **Supplemental cash flow disclosures:** | | | |
| Income taxes paid | $ 3,331 | $ 6,032 | $ 5,229 |
| Interest paid | $ 713,142 | $ 2,250,879 | $ 2,235,388 |

The accompanying notes are an integral part of these financial statements.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE A—ORGANIZATION

Refco Group Ltd., LLC (the "Company") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The Group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker–dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities and foreign exchange broker.

The Company is 90% owned by Refco Group Holdings, Inc., a Delaware corporation. The remaining 10% is owned by BAWAG Overseas, Inc., a third party financial institution.

## NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which does issue non–voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in "Other Assets."

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

As discussed in Note N, on August 5, 2004, the Company distributed all the equity interests of Forstmann–Leff International Associates, LLC, which owned substantially all the assets of the Company's Asset Management business, to Refco Group Holdings, Inc.

The assets, liabilities, results of operations and cash flows from Forstmann–Leff International Associates, LLC have been segregated from continuing operations and presented separately as discontinued operations. Prior period information has been adjusted on the same basis to reflect this presentation.

Operating results for Forstmann–Leff International Associates, LLC included in the discontinued operations are presented in the following table.

| | Year Ended | | |
| --- | --- | --- | --- |
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | (in thousands) | | |
| Revenue | $ 64,692 | $ 57,018 | $ 68,859 |
| Expenses | 65,093 | 55,867 | 54,914 |
| Income before income taxes | (401) | 1,151 | 13,945 |
| Income tax expenses | 489 | 737 | 1,542 |
| Net income | $ (890) | $ 414 | $ 12,403 |

F–7

The following table presents the carrying amounts of major classes of assets and liabilities of Forstmann–Leff International Associates, LLC as of February 29, 2004. These assets and liabilities are included under the captions "Assets of discontinued operations" and "Liabilities of discontinued operations" on our February 29, 2004 consolidated balance sheet.

| | February 29, 2004 |
|---|---|
| | (in thousands) |
| Cash and cash equivalents | $ 22,030 |
| Receivable from customers | 25,582 |
| Other assets | 228,400 |
| Total assets | $ 276,012 |
| Payable to customers | $ 42,380 |
| Other liabilities(a) | 2,498 |
| Total liabilities | $ 44,878 |

(a) includes accounts payable and accrued expenses

**Foreign currency translation**

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year–end spot rate and revenues and expenses are translated at average rates of exchange for the fiscal year. Gains and (losses) resulting from foreign currency transactions, included in the consolidated statements of income, was $(0.7) million, $(15.7) million and $2.7 million for the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively. Gains and (losses) resulting from translating foreign currency financial statements into U.S. dollars are included in cumulative currency translation adjustment, which represents other comprehensive income, a separate component of members' equity.

**Cash and cash equivalents**

Cash and cash equivalents are defined as cash and short–term liquid investments with original maturities of 90 days or less when acquired.

F–8

**Cash and securities segregated under federal and other regulations**

Cash and cash equivalents have been segregated in special reserve bank accounts for the benefit of clients under various regulatory requirements. These requirements at year–end are set forth below:

| | 2004 | | 2003 |
|---|---|---|---|
| | (in thousands) | | |
| Rule 15c3–3 of the Securities Exchange Act of 1934 | $ 25,271 | $ | 22,657 |
| Section 1.20 of the Commodity Exchange Act | 924,613 | | 1,708,959 |
| Foreign subsidiaries regulated under various foreign regulations | 425,954 | | 218,230 |
| | $ 1,375,838 | $ | 1,949,846 |

As of February 29, 2004 and February 28, 2003, securities purchased under agreements to resell of $55.1 million and $69.2 million, respectively are held for the benefit of clients under Rule 15c3–3 of the Securities Exchange Act of 1934.

**Securities purchased under agreements to resell and Securities sold under agreements to repurchase**

Securities purchased under agreements to resell and Securities sold under agreements to repurchase are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. These carrying amounts approximate their fair values. It is the Group's policy to take possession of securities purchased under agreements to resell, which consist largely of securities issued by the U.S. Government. The Group retains the right to re–pledge collateral received in secured financing transactions.

As permitted by Financial Accounting Standards Board ("FASB") Interpretation No. 41, *Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements*, the Group nets certain securities purchased under agreements to resell and securities sold under agreements to repurchase for financial reporting purposes.

**Receivables from and payable to customers**

These balances primarily pertain to margin and open contractual commitments related to customers' futures, foreign currency forward and securities transactions. Receivables from and payable to customers in connection with futures and foreign currency forward transactions include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions include amounts due on cash and margin transactions.

Receivables from customers at each year end are as follows:

| | 2004 | | 2003 |
|---|---|---|---|
| | (in thousands) | | |
| Futures transactions | $ 212,299 | $ | 209,629 |
| Foreign currency and other OTC derivative transactions | 38,724 | | 364,711 |
| Securities transactions | 1,340,362 | | 916,040 |
| | $ 1,591,385 | $ | 1,490,380 |

Payable from customers at each year end are as follows:

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | (in thousands) | | | |
| Futures transactions | $ | 4,052,363 | $ | 3,616,699 |
| Foreign currency and other OTC derivative transactions | | 394,936 | | 372,747 |
| Securities transactions | | 606,038 | | 367,609 |
| | $ | 5,053,337 | $ | 4,357,055 |

These receivables are generally collateralized with marketable securities. The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies, and generally does not charge–off any of these receivables. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively. The Group generally nets receivables and payables related to its customers futures, foreign currency forwards and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

**Financial instruments**

The consolidated balance sheets generally reflects purchases and sales of financial instruments owned or sold on a trade–date basis.

**Securities owned and Securities sold, not yet purchased**

Securities owned and Securities sold, not yet purchased consist primarily of U.S. and foreign equity and fixed–income securities which are stated at quoted market values, with unrealized gains and losses recognized in income under "Principal transactions, net." Securities not readily marketable are valued at fair value as determined by management. Fair value is the amount at which an instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

**Derivative financial instruments**

As a broker, the Group enters into transactions involving derivative financial instruments in relation to its customer business. These transactions are generally immediately economically hedged by back–to–back trades with other financial institutions. All derivative financial instruments are carried at market value or, if market prices are not readily available, fair value. Market values for exchange–traded derivatives are based on quoted market prices. Fair market values for over–the–counter derivative financial instruments are based on pricing models that are based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts.

Derivatives used for economic hedging purposes include swaps, forwards, futures and purchased options. Unrealized gains or losses on these derivative contracts are recognized currently in the

F–10

statement of income as Principal transactions. The Group does not apply hedge accounting as defined in Statement of Financial Accounting Standards ("SFAS") No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as all financial instruments are marked to market with changes in fair values reflected in earnings. Therefore, the disclosures required in paragraphs 44 and 45 of the statement are generally not applicable with respect to these financial instruments.

**Memberships in exchanges**

Exchange memberships comprise both rights to trade on exchanges and deposits made in relation to these memberships. Exchange memberships owned are recorded at cost and tested annually for impairment.

**Furniture, equipment and leasehold improvements**

Furniture, equipment and leasehold improvements are recorded at cost less accumulated depreciation and amortization. Depreciation is computed using the straight–line method over the estimated useful lives of the assets, which range from three to seven years. Leasehold improvements are amortized over the lesser of the economic useful life of the improvement or the term of the lease.

**Impairment of assets**

The Company reviews its long–lived assets and intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets.

**Goodwill**

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets at acquisition date. Prior to March 1, 2002, goodwill was amortized over a period of 25 years on a straight–line basis. Effective March 1, 2002, the Group adopted SFAS No. 142, *Goodwill and Other Intangible Assets*; consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. An impairment loss is triggered if the estimated fair value of an operating segment is less than its estimated net book value. Such loss is calculated as the difference between the estimated fair value of goodwill and its carrying value.

**Identifiable intangible assets**

Identifiable intangible assets consist primarily of customer relationships and trade names. Customers relationships are amortized on an accelerated basis based upon patterns of usage over a weighted–average economic useful life of approximately 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's or asset group's carrying value may not be fully recoverable in accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long–Lived Assets.* An impairment loss, calculated as the difference between the estimated fair value and the carrying value of an asset or asset group, is recognized if the expected undiscounted cash flows relating to the asset or asset group are less than the corresponding

carrying value. Trade names have been classified as indefinite–lived assets and are not amortized but tested annually for impairment.

**Income taxes**

The Group has elected to be treated as a limited liability company for federal income tax purposes, as defined in the regulations. Under these regulations, members are responsible for their individual income tax liabilities related to the Group's operating results. Accordingly, the Group has not provided for Federal income taxes related to its operating results. The provision for income taxes relates to income taxes of foreign subsidiaries.

**Revenue recognition**

Commissions and brokerage are recorded on a trade–date basis as securities transactions occur. Commissions and brokerage includes per contract charges for trade execution and clearing. Fees are charged at various rates based on the product traded and the method of trade. Commissions earned and related expenses on customers' open futures positions are recognized on a half–turn basis. The Group reports gross commission income on transactions executed by introducing brokers and reports commissions paid to introducing brokers as commission expense.

Interest is recognized on an accrual basis. Interest income or interest expense on repurchase agreements and collateralized financing arrangements are recognized as interest over the life of the transaction. Interest income and expense for matched repurchase agreement transactions are presented net in the consolidated statements of income.

Certain Prime Brokerage/Capital Markets transaction fee revenues are recorded as principal transactions, net in the Consolidated Statements of Income. In these instances the customer may not pay a separately billed commission rate related to a given transaction. Instead, the equivalent of a commission is included in the revenues of the transaction following its execution on behalf of the customer. These transactions are specific to those markets in which no third party clearing organization is utilized and involve primarily client foreign exchange transactions.

The Group generally enters into offsetting contracts to achieve economic hedges, which results in a profit spread for the Group. Both the contractual commitment and the offsetting contract are recorded at fair value. The Group does not apply hedge accounting as defined in SFAS No. 133, and all offsetting contracts are marked to market and included in the Consolidated Statements of Income.

F–12

Both realized and unrealized gains and losses are recognized and recorded in the consolidated statements of income under "Principal transactions, net" as follows:

| | 2004 | | | 2003 | | | 2002 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Net | | | Net | | | Net | | |
| | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) |
| | (in thousands) | | | | | | | | |
| Foreign currency forwards | $ 83,660 | $ (198) | $ 83,462 | $ 54,293 | $ (34,785) | $ 19,508 | $ 150,150 | $ 32,889 | $ 183,039 |
| Futures | 54,186 | (6,661) | 47,525 | (49,753) | 177,742 | 127,989 | 60,743 | (178,600) | (117,857) |
| Options | (5,973) | 5,165 | (808) | (121,989) | 123,851 | 1,862 | 160,998 | (136,754) | 24,244 |
| Treasury notes | 35,878 | 3,492 | 39,370 | (76,714) | 1,012 | (75,702) | (11,101) | 545 | (10,556) |
| Bonds | (2,725) | (1,141) | (3,866) | 40,561 | (14,839) | 25,722 | 12,180 | 7,029 | 19,209 |
| Other | (1,304) | 1,557 | 253 | (16,735) | (90) | (16,825) | (3,450) | 4,664 | 1,214 |
| Total | $ 163,722 | $ 2,214 | $ 165,936 | $ (170,337) | $ 252,891 | $ 82,554 | $ 369,520 | $ (270,227) | $ 99,293 |

The following table shows the gross notional or contractual amounts of derivatives held by the Group.

| | As of February 29, 2004 | | As of February 28, 2003 | |
|---|---|---|---|---|
| | Notional | Fair Value | Notional | Fair Value |
| | (in thousands) | | | |
| Forward currency contracts | $ 41,586,917 | $ (715) | $ 28,303,354 | $ 852 |
| Swap contracts | 2,927,400 | 1,304 | 90,000 | 1,988 |
| Option contracts sold or written | 10,383,291 | (272,078) | 117,827,820 | (224,769) |
| Option contracts purchased | 10,723,550 | 272,528 | 119,908,856 | 224,337 |
| Exchange–traded futures | 3,735,774 | (1,585) | 2,355,479 | (7,068) |
| Total | $ 69,356,932 | $ (546) | $ 268,485,509 | $ (4,660) |

Assest management and advisory fees primarily include fees from investment management and other financial service related products, and they are recognized as services are provided. They are determined in accordance with contracts based upon a percentage of assets under management or the volume of financial service products sold through our distribution platform.

**Recently issued accounting pronouncements**

In November 2002, the FASB issued FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees* ("FIN 45"). FIN 45 requires a guarantor to recognize a liability at the inception of certain guarantees for the fair value of the obligation, including the ongoing obligation to stand ready to perform for the term of the guarantee. Guarantees, as defined in FIN 45, include contracts that contingently require the Group to make payments to a guaranteed party based on changes in an underlying that is related to an asset, liability or equity security of the guaranteed party, performance guarantees, indemnification agreements or indirect guarantees of indebtedness of others. This new accounting is effective for certain guarantees issued or modified after December 31, 2002. The Group adopted FIN 45, and adoption of this statement did not have an effect on the Group's consolidated financial statements.

F–13

In January 2003, the FASB issued FASB Interpretation No. 46, *Consolidation of Variable Interest Entities.* In December 2003, the FASB issued Interpretation No. 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities.* Variable interest entities ("VIEs") are entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinate financial support from other parties, certain of which are also referred to as special–purpose entities ("SPEs"). Under the provisions of Interpretation 46 R, a company is deemed to be the "primary beneficiary," and thus is required to consolidate a VIE, if the company has a variable interest (or combination of variable interests) that will absorb a majority of the VIE's expected losses, that will receive a majority of the VIE's expected residual returns, or both. A "variable interest" is a contractual ownership or other interest that changes with changes in the fair value of the VIE's net assets. "Expected losses" and "expected residual returns" are measures of variability in the expected cash flows of a VIE. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 to variable interest entities created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for SPEs created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the VIE was established.

As of February 29, 2004, the Group held variable interests in certain VIEs with respect to which the Group is deemed not to be the primary beneficiary. Those VIEs include several managed futures funds with aggregate net asset value of approximately $255.1 million managed by Refco Alternative Investments since April 1, 2003. Refco Alternative Investments earns fixed investment management fees and, in certain cases, incentive fees and other fees from these managed funds. As of February 29, 2004, the Group's maximum exposure to loss from the funds managed by Refco Alternative Investments is not material.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities.* SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB No. 133 *Accounting for Derivative Instruments and Hedging Activities.* This statement is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on the Group's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity.* SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on the Group's consolidated financial statements.

In December 2003, the FASB issued SFAS No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits* ("SFAS 132R"). SFAS 132R prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of

recognition of those plans. The statement retains and revises the disclosure requirements contained in the original SFAS No. 132. It also requires additional disclosures about the assets, obligations, cash flows and net periodic benefit costs of defined benefit pension plans and other postretirement benefit plans. The Statement generally is effective for fiscal years ending after December 15, 2003. Management does not believe the adoption of this statement will have a material impact on the Group's consolidated financial statements.

**NOTE C—SHORT–TERM BORROWINGS, LONG–TERM BORROWINGS AND OTHER BORROWINGS**

**Short–term borrowings**

The Group obtains short–term borrowings through bank loans. Short–term borrowings also include the portion of long–term borrowings maturing within one year and certain long–term borrowings that may be payable within one year at the option of the holder. The carrying value of these short–term obligations approximates fair value due to their short–term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short–term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers.

Short–term borrowings at year end are set forth below:

|  | 2004 | | 2003 |
|---|---|---|---|
|  | (in thousands) | | |
| Bank loans | $ 20,890 | $ | 177,810 |
| Current portion of long–term borrowings | 68,000 | | 68,000 |
| Total | $ 88,890 | $ | 245,810 |

The weighted average interest rate on outstanding bank loans at February 29, 2004 and February 28, 2003 was 1.58% and 2.25%, respectively.

Interest rates paid on short–term borrowings, excluding the current portion of long–term borrowings, for the years ended February 29, 2004 and February 28, 2003 ranged from 1.58% to 2.25% and 1.92% to 4.00%, respectively.

F–15

**Long–term borrowings**

Long–term borrowings of $383.5 million and $451.5 million for the years ended February 29, 2004 and February 28, 2003, respectively, represent unsecured syndicated senior notes with major financial institutions. Long–term borrowings consist of the following loans:

| | February 29, 2004 | | February 28, 2003 | | Maturity Date | Interest Rate |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **Senior Notes** | | | | | | |
| Series A Senior Notes 2004 | $ | 17,000 | $ | 34,000 | 2004 | 7.18% |
| Senior Notes 2005 | | 74,000 | | 111,000 | 2005 | 9.18% |
| Series B Senior Notes 2006 | | 14,000 | | 14,000 | 2006 | 7.42% |
| Senior Notes 2007 | | 56,000 | | 70,000 | 2007 | 8.85% |
| Series A Senior Notes 2007 | | 100,000 | | 100,000 | 2007 | 5.99% |
| Series B Senior Notes 2009 | | 122,500 | | 122,500 | 2009 | 6.60% |
| | $ | 383,500 | $ | 451,500 | | |

The table below sets out the maturities of the Group's long–term borrowings.

| | Year Ended | | | |
|---|---|---|---|---|
| | February 29, 2004 | | February 28, 2003 | |
| | (in thousands) | | | |
| 2004 | $ | — | $ | 68,000 |
| 2005 | | 68,000 | | 68,000 |
| 2006 | | 51,000 | | 51,000 |
| 2007 | | 28,000 | | 28,000 |
| 2008 | | 114,000 | | 114,000 |
| 2009 | | — | | — |
| 2010 and thereafter | | 122,500 | | 122,500 |
| Total Senior Note Liabilities | $ | 383,500 | $ | 451,500 |
| Less: | | | | |
| Portion included within short–term borrowings | | 68,000 | | 68,000 |
| Total Long–term Senior Note Liabilities | $ | 315,500 | $ | 383,500 |

The long–term borrowings are subject to acceleration in the event of a change in control.

For the years ended February 29, 2004, February 28, 2003 and February 28, 2002, interest expense from long–term borrowings was $31.1 million, $27.2 million and $21.5 million, respectively.

**Other borrowings**

Subordinated debt of $16.0 million, included in the consolidated balance sheets, consists of a subordinated loan from a member. The subordinated debt outstanding at February 29, 2004 bears interest at the prime rate and matures June 1, 2005. For the years ended February 29, 2004 and

February 28, 2003, the weighted–average interest rate on the subordinated debt was 4.08% and 4.60%, respectively. Subordinated debt is subordinated to the claims of present and future general creditors.

*Preferred Securities Issued by Subsidiary Trusts*

Preferred securities of subsidiary trusts consisted of the following as of February 29, 2004 and February 28, 2003:

| Security | Interest Rate | Maturity | February 29, 2004 | | February 28, 2003 | |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| Refco Preferred Capital Trust Securities I | 9.44% | 02/27/08 | $ | — | $ | 75,000 |
| Refco Preferred Capital Trust Securities II | 9.65% | 05/19/08 | | — | | 50,000 |
| Refco Preferred Capital Trust Securities III | 10.49% | 07/21/06 | | — | | 35,000 |
| Total | | | $ | — | $ | 160,000 |

Three subsidiary trusts of the Company, Refco Preferred Capital Trust I, II and III (collectively, the "Trusts"), issued Trust Originated Preferred Shares ("TOPRs") to third parties with a liquidation amount of $250,000 per preferred security.

The Trusts used the proceeds from the sale of the applicable preferred securities and trust common securities to purchase $75.0 million, $50.0 million and $35.0 million, respectively, of the Company's 9.44%, 9.65% and 10.49% subordinated loans on the date of issue of the TOPRs. These loans are the sole assets of the Trusts. Interest on the loans is payable semi–annually.

Scheduled repayment dates and principal amounts of the subordinated loans are as follows.

| | Repayment Date | Amount (in thousands) | |
|---|---|---|---|
| Refco Preferred Capital Trust I | 02/27/05 | $ | 18,750 |
| | 02/27/06 | | 18,750 |
| | 02/27/07 | | 18,750 |
| | 02/27/08 | | 18,750 |
| | | $ | 75,000 |
| Refco Preferred Capital Trust II | 05/19/05 | $ | 12,500 |
| | 05/19/06 | | 12,500 |
| | 05/19/07 | | 12,500 |
| | 05/19/08 | | 12,500 |
| | | $ | 50,000 |
| Refco Preferred Capital Trust III | 07/21/06 | $ | 35,000 |

The Group had the right to redeem the subordinated loans at any time before the scheduled principal repayment dates in whole or in part together with any accrued and unpaid interest and a loan premium which is equal to the excess, if any of (i) the discounted value of the remaining scheduled payment of the loan over (ii) the redemption amount of such loan that is to be redeemed, provided that this premium is not less than zero.

In April 2003, the Group paid $199.8 million to redeem the TOPRs, resulting in a charge to members' equity of $39.8 million.

F–17

**Contractual debt commitments**

The Company's contractual debt commitments are governed by certain agreements which require that the Group maintain specified levels of liquidity, net worth, funded debt to cash flow and cash flow to interest coverage. The Company was in compliance with all contractual debt commitments as of February 29, 2004 and February 28, 2003, respectively.

**Credit Facilities**

The Group maintains a committed unsecured revolving credit facility of $364.5 million under an agreement with a syndicate of banks. As of February 29, 2004, no portion of the credit facility was utilized.

**NOTE D—SECURITIES OWNED AND SECURITIES SOLD, NOT YET PURCHASED**

Securities owned and Securities sold, not yet purchased, consist of trading and investment securities and derivative financial instruments at market or fair value.

| | 2004 | 2003 |
|---|---|---|
| | (in thousands) | |
| Securities owned consists of: | | |
| U.S. Treasuries | $ 1,316,754 | $ 213,343 |
| Foreign governments | 290,317 | 102,149 |
| Options | 251,623 | 24,026 |
| Fund investments | 87,233 | 84,320 |
| Equities | 8,697 | 29,281 |
| Other | 77,911 | 37,301 |
| | $ 2,032,535 | $ 490,420 |
| Securities sold, not yet purchased consist of: | | |
| U.S. Treasuries | $ 555,039 | $ 187,631 |
| Options | 251,172 | 24,554 |
| Other | 1,274 | 20 |
| | $ 807,485 | $ 212,205 |

As of February 29, 2004 and February 28, 2003, the Group had not pledged any securities owned as collateral with counterparties.

F−18

## NOTE E—OTHER ASSETS

Other assets are generally less liquid, non−financial assets. The following table sets forth the Group's other assets by type:

| | 2004 | | 2003 | |
|---|---:|---|---:|---|
| | *(in thousands)* | | | |
| Goodwill(1) | $ | 145,718 | $ | 126,381 |
| Identifiable intangible assets(2) | | 23,272 | | 6,800 |
| Equity−method investments(3) | | 65,504 | | 27,513 |
| Investments(4) | | 32,241 | | 54,531 |
| Furniture, equipment and leasehold improvements(5) | | 44,351 | | 53,628 |
| Miscellaneous receivables and other | | 28,501 | | 23,918 |
| Total | $ | 339,587 | $ | 292,771 |

*(1)*        Goodwill

Prior to March 1, 2002, goodwill was amortized over 25 years on a straight−line basis. Upon the adoption of SFAS No. 142, amortization of goodwill ceased. The Company did not identify any impairment upon the adoption of this statement. Had the provisions of SFAS 142 been applied as of the first day of the year ended February 28, 2002, net income would have been adjusted as follows:

| | Fiscal Year | | | | | |
|---|---:|---|---:|---|---:|---|
| | 2004 | | 2003 | | 2002 | |
| | *(in thousands)* | | | | | |
| Net income, as reported | $ | 187,156 | $ | 140,119 | $ | 93,634 |
| Goodwill amortization | | — | | — | | 10,235 |
| Net income, excluding goodwill amortization | $ | 187,156 | $ | 140,119 | $ | 103,869 |

The changes in goodwill by reportable segment for the year ended February 29, 2004 and February 28, 2003 are as follows:

| | Derivatives Brokerage & Clearing | | Prime Brokerage/Capital Markets | | Total | |
|---|---:|---|---:|---|---:|---|
| | *(in thousands)* | | | | | |
| **Balance as of March 1, 2002** | $ | 108,152 | $ | 4,410 | $ | 112,562 |
| Acquisition | | 13,819 | | — | | 13,819 |
| Disposition | | — | | — | | — |
| Impairment losses | | — | | — | | — |
| **Balance as of February 28, 2003** | | 121,971 | | 4,410 | | 126,381 |
| Acquisition | | 19,337 | | — | | 19,337 |
| Disposition | | — | | — | | — |
| Impairment losses | | — | | — | | — |
| **Balance as of February 29, 2004** | $ | 141,308 | $ | 4,410 | $ | 145,718 |

*(2)*        Identifiable intangible assets

F−19

The Company's identifiable intangible assets are comprised of the following:

| | February 29, 2004 | | | February 28, 2003 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| | (in thousands) | | | | | |
| Customer relationships | $ 39,861 | $ 17,649 | $ 22,212 | $ 21,260 | $ 14,460 | $ 6,800 |
| Trade names | 1,060 | — | 1,060 | — | — | — |
| | $ 40,921 | $ 17,649 | $ 23,272 | $ 21,260 | $ 14,460 | $ 6,800 |

The amortization of identifiable intangible assets included in general, administrative and other expenses for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 was $3.6 million, $4.6 million and $7.7 million, respectively.

The estimated amortization expense, based on current identifiable intangible balances, for the next five fiscal years beginning March 1, 2004 is as follows:

| Fiscal year | (in thousands) |
|---|---|
| 2005 | $ 2,099 |
| 2006 | 1,445 |
| 2007 | 1,058 |
| 2008 | 826 |
| 2009 | 690 |

*(3)*        Equity method investments

Equity method investments as of February 29, 2004 comprise:

| | Principal Activity | Percentage Owned | Country of operation | Carrying Value |
|---|---|---|---|---|
| | | | | (in thousands) |
| Forex Capital Markets, LLC | Spot FX broker | 35% | United States | $ 47,522 |
| Friedberg Mercantile Group | Investment dealer, futures commission merchant and fund manager | 50% | Canada | 9,066 |
| Refco Polaris Taiwan | Futures broker | 21.7% | Taiwan | 8,916 |
| | | | | $ 65,504 |

Under the equity method of accounting, the Company's initial investment is recorded at cost and is subsequently increased to reflect the Company's share of the investees' income and reduced to reflect the Company's share of the investees' losses or dividends received. The Company's income from equity investees was $11.5 million, $1.7 million and $0.7 million for the years ended February 29, 2004, February 29, 2003 and February 28, 2002, respectively.

The excess of the Company's acquisition cost over the Company's share of the investee's identifiable net assets was identified as customer relationships, trade names and goodwill. The customer relationships are amortized over their weighted average economic useful lives on an accelerated basis based upon patterns of usage. The related amortization expense was approximately $1.1 million, $0.1 million and $0 for the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively, resulting in a decrease in the carrying value of the equity method investments.

F–20

*(4)*     Investments

As part of its corporate strategy and in the normal course of its business, the Company makes investments in companies engaged in its core business and in companies engaged in closely related market activities. As of February 28, 2003, the value of such investments was $54.5 million and as of February 29, 2004, the value of such investments was $32.2 million.

Investments made in core activities consist primarily of investments made in international derivative brokerage operations. As of February 28, 2003, these included investments in Cantor Index, a specialty derivative brokerage operation in the United Kingdom and Sino Gold, a physical bullion operation in the People's Republic of China. As of February 29, 2004, international derivative brokerage investments included HanMag Futures Corp., a derivative clearing company in Seoul, Korea and Sify–India, a derivative brokerage operation in India.

Investments in closely related fields as of February 28, 2003, included investments in Collins Stewart Holdings, a leading U.K.–based inter–dealer broker of financial instruments, and KSP, a European banking and asset management distribution platform. As of February 29, 2004, related market investments also included Xinhua Financial Inc., a market leader in providing financial and commodity research and price information to financial market users in the People's Republic of China.

A further category of investments are investments made in software providers considered strategically important to Refco's product delivery infrastructure in derivatives and prime brokerage. There were no such investments as of February 28, 2003, but as of February 29, 2004, the Company had investments in Easy Solutions, a leading provider of front–end order entry software for global derivatives markets and QV Trading, the pricing platform upon which certain of the Company's fixed income prime brokerage operations are built.

*(5)*     Furniture, equipment and leasehold improvements

| | Cost | Accumulated amortization/depreciation | 2004 Net book value | 2003 Net book value |
|---|---|---|---|---|
| | | (in thousands) | | |
| Furniture and equipment | $ 106,330 | $ 72,533 | $ 33,797 | $ 44,556 |
| Leasehold improvements | 26,750 | 16,196 | 10,554 | 9,072 |
| | $ 133,080 | $ 88,729 | $ 44,351 | $ 53,628 |

Depreciation and amortization expense, included in general, administrative and other expenses, was $26.2 million, $23.5 million and $34.0 million in the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively.

**NOTE F—ACQUISITIONS**

During the year ended February 29, 2004, the Group acquired three asset management businesses, Edinburgh Fund Managers, Ltd., Society Generale Investment Managers and Cardales UK Ltd., and four derivatives brokerage businesses, MacFutures Ltd., Carlton Brokerage Ltd., RB&H and Trafalgar Commodities Ltd., for an aggregate purchase price of $118.9 million.

As part of the transactions described in Note N, the Group distributed all of the equity interests of Forstmann–Leff International Associates, LLC to Refco Group Holdings, Inc. Forstmann–Leff International Associates, LLC was previously disclosed within the Asset Management segment. Edinburgh Fund Managers, Ltd., Society Generale Investment Managers and Cardales UK Ltd. were

included in Forstmann–Leff International Associates, LLC after their acquisition and have been reclassified as discontinued operations in the financial statements.

Amounts assigned to major intangible asset classes for the other acquisitions are as follow:

|  | (in thousands) |
|---|---|
| Goodwill | $ 13,459 |
| Customer relationships | 18,601 |
| Trade names | 1,060 |

- MacFutures Ltd., based in London, UK, provides specialty clearing services for individual traders specializing in electronic fixed income markets in Europe.

- Carlton Brokerage Ltd., based in London, UK, is a coffee and cocoa options executor on the London International Financial Futures and Options Exchange.

- RB&H based in Chicago, USA, is a member firm of the Chicago Mercantile Exchange.

- Trafalgar Commodities Ltd., based in London, UK, is a specialist energy floor broker and is a non–clearing floor member of the International Petroleum Exchange.

Goodwill on these acquisitions was assigned to the Derivatives Brokerage and Clearing segment.

## NOTE G—NET CAPITAL REQUIREMENT

The Group's subsidiary Refco Securities, LLC is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3–1 (the "Rule"), which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3–3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of February 29, 2004, Refco Securities, LLC had net capital of $64.9 million, which was 42.9% of aggregate debit balances and $61.9 million in excess of required net capital.

The Group's subsidiary Refco, LLC is subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4% of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined, or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non–customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of February 29, 2004, Refco, LLC had net capital of $223.6 million, which was $95.6 million in excess of required net capital.

**NOTE H—COMMITMENTS AND CONTINGENCIES**

**Commitments**

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises, excluding any escalation adjustments, are as follows (in thousands):

| Fiscal year | | |
|---|---|---|
| 2005 | $ | 15,243 |
| 2006 | | 13,669 |
| 2007 | | 11,558 |
| 2008 | | 9,404 |
| 2009 | | 6,383 |
| Thereafter | | 25,038 |
| | $ | 81,295 |

The Group's rent expense for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 was $14.0 million, $12.1 million and $5.6 million, respectively.

**Contingencies**

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers, alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003, the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. By Order dated March 16, 2004, the appellate court (Appellate Division, First Department) affirmed the trial court's decision. On May 11, 2004, the trial court granted the Group's motion to bifurcate the trial of liability from any trial on damages. The remaining claim of liability was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. The Group moved the trial court (a) for judgment in favor of the Group as a matter of law, (b) to set aside the verdict and (c)(i) to direct entry of judgment for the Group as a matter of law, or (ii) in the alternative, to order a new trial on plaintiffs' second cause of action. The trial court intends to schedule a separate trial to determine damages, if necessary, after determination of the Group's post–trial motions. After consultation with legal counsel, the Group will continue to vigorously defend against plaintiff's claim, and does not believe it is probable the initial verdict as to liability will be upheld upon appeal. The Group also believes that, if its appeal is unsuccessful, the plaintiffs' alleged damages are substantially less than the $45.0 million they are claiming.

After consultation with legal counsel, management believes that it is not probable that a material loss will result from the final verdict. The Group raised its margin requirements to 100% and/or terminated plaintiffs' financing on specific bonds and issued resulting margin calls to plaintiffs, who defaulted. The Appellate Division, First Department previously ruled that the Group had the contractual right to terminate margin loans to plaintiffs and thus did not breach any express provision of the customer agreements. The Group believes the sole issue remaining for the jury to determine was

F–23

whether the Group breached the implied covenant of good faith and fair dealing when it exercised its contractual rights. The Group does not believe it breached the implied covenant when it exercised its contractual rights. Upon retrial, the Group believes the plaintiff will not be able to sustain its burden. Accordingly, the Group has not recorded an accrual for any losses that might arise from the final verdict.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents which had been provided to the SEC. In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation. At the present time, it is not possible to predict the outcome of the foregoing investigation with any certainty.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

## NOTE I—DERIVATIVE ACTIVITIES, OFF BALANCE SHEET AND CONCENTRATION OF CREDIT RISK

In the normal course of its customer–driven operations, the Group enters into various contractual commitments, as principal, involving forward settlement. These include exchange–traded futures, fixed income swaps, equity swaps, foreign currency forwards and option contracts. The Group generally enters into offsetting contracts to achieve economic hedges at prices that result in a profit spread for the Group. The Group also enters into forward repurchase agreements. Customers and counterparties of the Group consist of entities in and outside the United States.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off balance sheet. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits.

The Group also enters into financing agreements, collateralized primarily by U.S. Government securities, in which it extends short–term credit to counterparties. The value and adequacy of the collateral are continually monitored.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouse

F–24

its customers' performance under these contracts. The Group provides clearing services of futures and options to introducing brokers. The Group may require introducing brokers to deposit funds or pledge their exchange memberships, thereby reducing risks associated with the clearing of futures and options. Additionally, to reduce its risk, the Group requires customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer, which reduces the risk to the Group of failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements.

The Group is unable to develop an estimate of the maximum payout under these guarantees. However, its management believes that the margin deposits held at February 29, 2004 were adequate to minimize the risk of material loss, which could be created by the positions held at that time, and it is unlikely the Group will have to make material payments under these arrangements. The Group has applied the initial recognition and measurement provisions of FIN 45, but has not recorded a liability for these guarantees because the estimated fair value of such guarantees was zero based on the Group's qualitative analysis.

## NOTE J—FAIR VALUE OF FINANCIAL INSTRUMENTS

SFAS No. 107, *Disclosures about Fair Value of Financial Instruments,* requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include cash, cash and securities segregated under federal and other regulations, deposits with clearing organizations and others, short–term borrowings and payable to broker–dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long–term borrowings are recorded at historical amounts, which could differ from fair value as a result of changes in market rates.

The following table provides a summary of the fair value of the Group's long–term borrowings. The fair value of the Group's long–term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

|  | 2004 | 2003 |
| --- | --- | --- |
| | (in thousands) | |
| Carrying value of long–term borrowings | $ 383,500 | $ 451,500 |
| Fair value of long–term borrowings | 399,990 | 481,202 |

The Group carries its secured financing activities, including securities purchased under agreements to resell, securities borrowed, securities sold under agreements to repurchase, securities loaned and other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short–term in nature, carrying value approximates fair value.

F–25

**NOTE K—SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL AND SECURITIES SOLD UNDER AGREEMENTS TO REPURCHASE**

Securities purchased under agreements to resell ("resale agreements") and Securities sold under agreements to repurchase ("repurchase agreements") are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. The carrying amounts approximate their fair values. Where appropriate, resale and repurchase agreements with the same counterparty are reported on a net basis in accordance with FASB Interpretation No. 41, *Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements*. The Group is required to present the following table when repurchase agreements are 10% or greater of total assets.

**February 29, 2004**

| | Demand | Overnight | Less than 30 days | 30–90 days | Greater than 90 days | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **Security Type** | | | | | | |
| US Governments | $ 420,805 | $ 10,980,829 | $ 4,012,729 | $ 2,804,362 | $ 1,098,520 | $ 19,317,245 |
| US Corporations | 101,109 | — | — | — | — | 101,109 |
| Foreign Governments | 68,542 | 178,169 | 680,594 | 470,710 | 339,848 | 1,737,863 |
| Foreign Corporations | 172,879 | — | — | — | — | 172,879 |
| Emerging Market Government | 1,031,446 | 14,268 | 27,329 | — | — | 1,073,043 |
| Other | 1,795,994 | 1,088,527 | 6,461 | 285,928 | 51,250 | 3,228,160 |
| | $ 3,590,775 | $ 12,261,793 | $ 4,727,113 | $ 3,561,000 | $ 1,489,618 | $ 25,630,299 |

**February 28, 2003**

| | Demand | Overnight | Less than 30 days | 30–90 days | Greater than 90 days | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **Security Type** | | | | | | |
| US Governments | $ 2,060,573 | $ 3,042,755 | $ 615,409 | $ 912,946 | $ 2,474,561 | $ 9,106,244 |
| US Corporations | 17,534 | — | — | — | — | 17,534 |
| Foreign Governments | 101,774 | 1,012,168 | 809,633 | 222,370 | 447,945 | 2,593,890 |
| Foreign Corporations | 39,767 | 5,707 | — | — | — | 45,474 |
| Emerging Market Government | 772,677 | 8,691 | 26,519 | — | — | 807,887 |
| Other | 53,182 | 154,742 | 503 | — | — | 208,427 |
| | $ 3,045,507 | $ 4,224,063 | $ 1,452,064 | $ 1,135,316 | $ 2,922,506 | $ 12,779,456 |

The Group's policy is to take possession of securities purchased under resale agreements, which consist largely of securities issued by the U.S. Government. The Group retains the right to re–pledge collateral received in secured financing transactions. As of February 29, 2004, substantially all of the collateral received had been re–pledged in connection with these financing activities. The market value of the collateral the Group received as of February 29, 2004 and February 28, 2003 was $124.4 billion and $71.1 billion, respectively. The Group continually monitors the market value of the underlying collateral received as compared with the related receivable, including accrued interest, and requests additional collateral where deemed appropriate.

## NOTE L—RELATED PARTY TRANSACTIONS

The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates. The $105.3 million due from Refco Group Holdings, Inc., included in "Receivables from equity members" at February 28, 2003, was received by February 29, 2004.

As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210.2 million and $175.2 million, respectively. These balances were also included in "Receivables from equity members" and liquidated shortly after each year–end.

Through a joint venture with Putnam Investments, Thomas H. Lee Partners L.P. has an indirect ownership interest in Currenex, Inc., which is a technology firm that has created an electronic platform for trading currencies. For the years ended February 29, 2004, February 28, 2003 and February 28, 2002, the Company paid fees of $0.3 million, $0 and $0, respectively, to Currenex in connection with the use of its platform.

## NOTE M—SEGMENT REPORTING

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

As part of the transactions described in Note N, the Group distributed all of the equity interests of Forstmann–Leff International Associates, LLC to Refco Group Holdings, Inc. Forstmann–Leff International Associates, LLC was previously disclosed within the Asset Management segment. The Group's remaining operations include two operating segments: (1) Derivatives Brokerage & Clearing; and (2) Prime Brokerage/Capital Markets. The Derivatives Brokerage & Clearing business operations consist of execution and clearing services for global exchange–traded derivatives in electronic and open outcry markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. The retained assets from the Asset Management segment, Refco Alternative Investments, have become part of our Derivatives Brokerage & Clearing segment. Segment data has been reclassified to reflect the current segment structure.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non–operating segment. Corporate administration costs are not allocated to the respective segments and are included in Corporate & Other. Eliminations consist of intersegment interest income and interest expense derived in the Group's normal course of business from intercompany funding.

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **As of and for the year ended February 29, 2004** | | | | | |
| Interest revenue | $ 141,897 | $ 1,084,204 | $ 20,154 | $ (194,560) | $ 1,051,695 |
| Total revenues | 840,308 | 1,267,634 | 20,180 | (253,823) | 1,874,299 |
| Interest expense | 62,012 | 979,704 | 53,367 | (197,409) | 897,674 |
| Depreciation and amortization | 10,284 | 1,311 | 14,566 | — | 26,161 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 121,546 | 124,631 | (56,715) | — | 189,462 |
| Total assets | 7,275,399 | 31,763,273 | 863,307 | (6,569,807) | 33,332,172 |
| **As of and for the year ended February 28, 2003** | | | | | |
| Interest revenue | $ 141,934 | $ 2,507,557 | $ 53,688 | $ (315,840) | $ 2,387,339 |
| Total revenues | 746,026 | 2,608,850 | 58,682 | (367,459) | 3,046,099 |
| Interest expense | 72,065 | 2,365,181 | 62,741 | (317,641) | 2,182,346 |
| Depreciation and amortization | 8,010 | 647 | 14,842 | — | 23,499 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 76,883 | 100,562 | (22,614) | — | 154,831 |
| Total assets | 6,054,415 | 20,505,353 | 1,195,988 | (8,540,327) | 19,215,429 |
| **As of and for the year ended February 28, 2002** | | | | | |
| Interest revenue | $ 184,927 | $ 2,096,561 | $ 46,414 | $ (616,793) | $ 1,711,109 |
| Total revenues | 691,745 | 2,217,095 | 51,434 | (662,209) | 2,298,065 |
| Interest expense | 127,542 | 1,977,022 | 69,588 | (617,543) | 1,556,609 |
| Depreciation and amortization | 10,346 | 755 | 22,858 | — | 33,959 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 58,320 | 95,704 | (52,516) | — | 101,508 |
| Total assets | 4,672,561 | 22,834,637 | 1,217,479 | (6,113,639) | 22,611,038 |

F–28

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long–lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (in thousands) | |
| **Total revenues:** | | | |
| United States | $ 1,272,622 | $ 2,455,450 | $ 1,504,760 |
| Bermuda | 325,791 | 411,114 | 639,677 |
| United Kingdom | 177,461 | 96,524 | 115,772 |
| Other | 98,425 | 83,011 | 37,856 |
| Total | $ 1,874,299 | $ 3,046,099 | $ 2,298,065 |
| | | | |
| **Long–lived assets:** | | | |
| United States | $ 35,661 | $ 45,102 | |
| Bermuda | 1,900 | 2,816 | |
| United Kingdom | 2,004 | 2,051 | |
| Other | 4,786 | 3,659 | |
| Total | $ 44,351 | $ 53,628 | |

No single customer accounted for greater than 10% of total revenues in the years ended February 29, 2004, February 28, 2003 and February 28, 2002.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvements.

**NOTE N—SUBSEQUENT EVENT**

On April 19, 2004, the majority owner executed a letter of intent in which a majority stake of the Group would be acquired.

The resulting change in control would give effect to default provisions contained within the revolving credit facility and unsecured syndicated senior notes.

On June 8, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., entered into an equity purchase and merger agreement with the Group and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC ("New Refco") becoming the Group's parent and THL Refco Acquisition Partners and its affiliates and co–investors owning an approximate 57% interest in New Refco. Upon consummation of the transactions contemplated by the Purchase Agreement on August 5, 2004, the Company and certain of its subsidiaries became the obligors for senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing. Upon the closing of the transaction, the Company became a co–issuer, together with Refco Finance Inc., of $600.0 million in aggregate principal amount of senior subordinated notes. Concurrently with the consummation of the transactions, the Group distributed $550.0 million in cash and other capital distributions and all of the equity interests of Forstmann–Leff International Associates, LLC to Refco Group Holdings, Inc.

As a result of the above transactions, goodwill of $579.6 million and identifiable intangible assets of $566.3 million is expected to be recorded, subject to the completion of a third party valuation study.

F–29

**NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION**

The following information sets forth the Group condensed consolidating financial statements as of February 29, 2004 and February 28, 2003 and for each of the three years in the period ended February 29, 2004.

**Condensed consolidating balance sheet**

|  | February 29, 2004 | | | | |
|---|---|---|---|---|---|
|  | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|  | | | (in thousands) | | |
| Cash and cash equivalents | $ — | $ 4,477 | $ 311,736 | $ — | $ 316,213 |
| Cash and securities segregated under federal and other regulations |  |  |  |  |  |
| Cash and cash equivalents | — | — | 1,375,838 | — | 1,375,838 |
| Securities purchased under agreements to resell | — | — | 55,061 | — | 55,061 |
| Securities purchased under agreements to resell | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker–dealers, clearing organizations and customers, net of reserves | 314,279 | 1,266,036 | 3,332,898 | (2,817,018) | 2,096,195 |
| Receivables from equity members | — | — | 210,223 | — | 210,223 |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries | 1,131,766 | 1,160,431 | — | (2,292,197) | — |
| Assets of discontinued operations | — | — | 276,012 | — | 276,012 |
| Other assets | 58,612 | 430,084 | 119,548 | (252,788) | 355,456 |
| Total assets | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |
| Liabilities |  |  |  |  |  |
| Short–term borrowings, including current portion of long–term borrowings | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
| Securities sold under agreements to repurchase | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
| Payable to broker–dealers and clearing organizations | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers | 465,681 | 1,547,382 | 6,614,220 | (3,573,946) | 5,053,337 |
| Securities sold, not yet purchased, at market value or fair value | — | 2,091 | 805,394 | — | 807,485 |
| Liabilities of discontinued operations | — | — | 44,878 | — | 44,878 |
| Accounts payable, accrued expenses and other liabilities | 23,392 | 68,182 | 143,665 | (63,588) | 171,651 |
| Long–term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 109,056 | (109,056) | 16,000 |
| Total liabilities | 888,573 | 1,617,656 | 36,424,046 | (6,218,592) | 32,711,683 |
| Membership interests issued by subsidiary | — | — | 4,405 | — | 4,405 |
| Members' equity | 616,084 | 1,246,117 | 1,293,282 | (2,539,399) | 616,084 |
| Total liabilities and members' equity | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |

**Condensed consolidating balance sheet**

| | February 28, 2003 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Cash and cash equivalents | $ — | $ 4,014 | $ 222,151 | $ — | $ 226,165 |
| Cash and securities segregated under federal and other regulations | | | | | |
|   Cash and cash equivalents | — | — | 1,949,846 | — | 1,949,846 |
|   Securities purchased under agreements to resell | — | — | 69,161 | | 69,161 |
| Securities purchased under agreements to resell | — | — | 15,900,055 | (3,736,758) | 12,163,297 |
| Deposits with clearing organizations and others | — | — | 3,564,498 | (1,812,697) | 1,751,801 |
| Receivables from broker–dealers, clearing organizations and customers, net of reserves | 450,060 | 1,511,884 | 2,353,172 | (2,520,985) | 1,794,131 |
| Receivables from equity members | — | 83,941 | 196,604 | | 280,545 |
| Securities owned, at market value or fair value | — | 291 | 844,791 | (354,662) | 490,420 |
| Investment in and advances to subsidiaries | 873,033 | 893,128 | — | (1,766,161) | — |
| Assets of discontinued operations | — | — | 178,603 | | 178,603 |
| Other assets | 87,380 | 396,800 | 77,392 | (250,112) | 311,460 |
|     Total assets | $ 1,410,473 | $ 2,890,058 | $ 25,356,273 | $ (10,441,375) | $ 19,215,429 |
| **Liabilities** | | | | | |
|   Short–term borrowings, including current portion of long–term borrowings | $ 228,000 | $ 3,373 | $ 14,437 | $ — | $ 245,810 |
|   Securities sold under agreements to repurchase | — | — | 17,868,915 | (5,089,459) | 12,779,456 |
|   Payable to broker–dealers and clearing organizations | — | 1,862 | 285,609 | (30,688) | 256,783 |
|   Payable to customers | 30,709 | 1,675,879 | 5,636,068 | (2,985,601) | 4,357,055 |
|   Securities sold, not yet purchased, at market value or fair value | — | 276 | 211,929 | — | 212,205 |
|   Liabilities of discontinued operations | — | — | 80,864 | — | 80,864 |
|   Accounts payable, accrued expenses and other liabilities | 22,902 | 61,027 | 134,932 | (61,466) | 157,395 |
| Long–term borrowings | 383,500 | — | — | — | 383,500 |
| Subordinated debt | 179,000 | — | 96,523 | (259,523) | 16,000 |
|     Total liabilities | 844,111 | 1,742,417 | 24,329,277 | (8,426,737) | 18,489,068 |
| Preferred securities issued by subsidiary | — | — | — | 160,000 | 160,000 |
| Members' equity | 566,362 | 1,147,641 | 1,026,996 | (2,174,638) | 566,361 |
|     Total liabilities and members' equity | $ 1,410,473 | $ 2,890,058 | $ 25,356,273 | $ (10,441,375) | $ 19,215,429 |

**Condensed consolidating statement of income**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | Year Ended February 29, 2004 | | |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 5,666 | $ 692,411 | $ (52,637) | $ 645,440 |
| Interest | 15,037 | 68,075 | 1,163,143 | (194,560) | 1,051,695 |
| Principal transactions, net | — | 26,966 | 138,970 | — | 165,936 |
| Asset management and advisory fees | — | — | 7,527 | (272) | 7,255 |
| Other | — | 4,066 | 6,261 | (6,354) | 3,973 |
| Total revenues | 15,037 | 104,773 | 2,008,312 | (253,823) | 1,874,299 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 13,039 | 439,833 | (40,978) | 411,894 |
| Interest | 40,404 | 78,831 | 975,848 | (197,409) | 897,674 |
| Employee compensation and benefits | 4,636 | 13,869 | 186,349 | — | 204,854 |
| General, administrative and other | 18,856 | 14,175 | 152,819 | (15,435) | 170,415 |
| Total expenses | 63,896 | 119,914 | 1,754,849 | (253,822) | 1,684,837 |
| Equity in net income of subsidiaries | 236,015 | 241,200 | — | (477,215) | — |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 187,156 | 226,059 | 253,463 | (477,216) | 189,462 |
| Provision for income taxes | — | — | 11,687 | — | 11,687 |
| Income before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 187,156 | 226,059 | 241,776 | (477,216) | 177,775 |
| Income from equity investees | — | 10,609 | 935 | — | 11,544 |
| Members' interest in earnings of subsidiary | — | — | 1,273 | — | 1,273 |
| Income from continuing operations | 187,156 | 236,668 | 241,438 | (477,216) | 188,046 |
| **Discontinued operations:** | | | | | |
| Loss from discontinued operations | — | — | (401) | — | (401) |
| Applicable income tax expense | — | — | 489 | — | 489 |
| Net income | $ 187,156 | $ 236,668 | $ 240,548 | $ (477,216) | $ 187,156 |

**Condensed consolidating statement of income**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | Year Ended February 28, 2003 | | |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 6,278 | $ 598,999 | $ (33,757) | $ 571,520 |
| Interest | 34,908 | 100,795 | 2,567,476 | (315,840) | 2,387,339 |
| Principal transactions, net | — | 6,275 | 76,279 | — | 82,554 |
| Asset management and advisory fees | — | — | 5,833 | (5,710) | 123 |
| Other | 5,007 | 4,087 | 56,423 | (60,954) | 4,563 |
| Total revenues | 39,915 | 117,435 | 3,305,010 | (416,261) | 3,046,099 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 4,991 | 413,432 | (33,048) | 385,375 |
| Interest | 46,667 | 95,267 | 2,358,053 | (317,641) | 2,182,346 |
| Employee compensation and benefits | 6,479 | 12,085 | 162,398 | — | 180,962 |
| General, administrative and other | 60,850 | 3,687 | 143,619 | (65,571) | 142,585 |
| Total expenses | 113,996 | 116,030 | 3,077,502 | (416,260) | 2,891,268 |
| Equity in net income of subsidiaries | 214,200 | 182,183 | — | (396,383) | — |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 140,119 | 183,588 | 227,508 | (396,384) | 154,831 |
| Provision for income taxes | — | — | 1,223 | — | 1,223 |
| Income before dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 140,119 | 183,588 | 226,285 | (396,384) | 153,608 |
| Dividends on preferred securities issued by subsidiary | — | 15,576 | — | — | 15,576 |
| Income from equity investees | — | 1,673 | — | — | 1,673 |
| Income from continuing operations | 140,119 | 169,685 | 226,285 | (396,384) | 139,705 |
| Discontinued operations: | | | | | |
| Income from discontinued operations | — | — | 1,151 | — | 1,151 |
| Applicable income tax expense | — | — | 737 | — | 737 |
| Net income | $ 140,119 | $ 169,685 | $ 226,699 | $ (396,384) | $ 140,119 |

F–33

**Condensed consolidating statement of income**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | Year Ended February 28, 2002 | | |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 30,505 | $ 469,464 | $ (22,163) | $ 477,806 |
| Interest | 22,836 | 186,772 | 2,118,294 | (616,793) | 1,711,109 |
| Principal transactions, net | — | 3,253 | 96,040 | — | 99,293 |
| Asset management and advisory fees | — | 11 | 11,864 | (5,442) | 6,433 |
| Other | 4,941 | 3,368 | 12,926 | (17,811) | 3,424 |
| Total revenues | 27,777 | 223,909 | 2,708,588 | (662,209) | 2,298,065 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 10,423 | 335,348 | (22,163) | 323,608 |
| Interest | 46,226 | 179,271 | 1,948,655 | (617,543) | 1,556,609 |
| Employee compensation and benefits | 6,711 | 24,150 | 136,512 | — | 167,373 |
| General, administrative and other | 18,338 | 9,451 | 143,681 | (22,503) | 148,967 |
| Total expenses | 71,275 | 223,295 | 2,564,196 | (662,209) | 2,196,557 |
| Equity in net income of subsidiaries | 137,132 | 149,915 | — | (287,047) | — |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 93,634 | 150,529 | 144,392 | (287,047) | 101,508 |
| Provision for income taxes | — | — | 5,409 | — | 5,409 |
| Income before dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 93,634 | 150,529 | 138,983 | (287,047) | 96,099 |
| Dividends on preferred securities issued by subsidiary | — | 15,576 | — | — | 15,576 |
| Income from equity investees | — | 708 | — | — | 708 |
| Income from continuing operations | 93,634 | 135,661 | 138,983 | (287,047) | 81,231 |
| Discontinued operations: | | | | | |
| Income from discontinued operations | — | — | 13,945 | — | 13,945 |
| Applicable income tax expense | — | — | 1,542 | — | 1,542 |
| Net income | $ 93,634 | $ 135,661 | $ 151,386 | $ (287,047) | $ 93,634 |

F–34

**Condensed consolidating statement of cash flows**

| | Year Ended February 29, 2004 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash generated from operating activities | $ 387,774 | $ 23,682 | $ 316,449 | $ — | $ 727,905 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | (23,219) | (95,711) | — | (118,930) |
| Net cash used in investing activities | — | (23,219) | (95,711) | — | (118,930) |
| Cash flows from financing activities | | | | | |
| Repayment of long term borrowings | (68,000) | — | — | — | (68,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — | — | (199,774) |
| Net contributions to membership interest issued by subsidiary | — | — | 3,132 | — | 3,132 |
| Capital withdrawals | (120,000) | — | — | — | (120,000) |
| Net cash used in financing activities | (387,774) | — | 3,132 | — | (384,642) |
| Net cash used in discontinued operations | — | — | (134,285) | — | (134,285) |
| Net increase in cash and cash equivalents | — | 463 | 89,585 | — | 90,048 |
| Cash and cash equivalents, beginning of year | — | 4,014 | 222,151 | — | 226,165 |
| Cash and cash equivalents, end of year | $ — | $ 4,477 | $ 311,736 | $ — | $ 316,213 |

| | Year Ended February 28, 2003 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash (used in) generated from operating activities | $ (54,500) | $ 1,658 | $ 133,452 | $ — | $ 80,610 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | — | (3,473) | — | (3,473) |
| Net cash used in investing activities | — | — | (3,473) | — | (3,473) |
| Cash flows from financing activities | | | | | |
| Issuance of long term debt | 222,500 | — | — | — | 222,500 |
| Repayment of long term borrowings | (68,000) | — | — | — | (68,000) |
| Capital withdrawals | (100,000) | — | — | — | (100,000) |
| Net cash generated from financing activities | 54,500 | — | — | — | 54,500 |
| Net cash used in discontinued operations | — | — | (50,150) | — | (50,150) |
| Net increase in cash and cash equivalents | — | 1,658 | 79,829 | — | 81,487 |
| Cash and cash equivalents, beginning of year | — | 2,356 | 142,322 | — | 144,678 |
| Cash and cash equivalents, end of year | $ — | $ 4,014 | $ 222,151 | $ — | $ 226,165 |

F–35

**Condensed consolidating statement of cash flows**

| | Year Ended February 28, 2002 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash generated from (used in) operating activities | $    133,000 | $    (69) | $    (78,577) | $    — | $    54,354 |
| Cash flows from financing activities | | | | | |
| Repayment of subordinated debt | (25,000) | — | — | — | (25,000) |
| Issuance of long term debt | — | — | — | — | — |
| Repayment of long term borrowings | (33,000) | — | — | — | (33,000) |
| Capital withdrawals | (75,000) | — | — | — | (75,000) |
| Net cash used in financing activities | (133,000) | — | — | — | (133,000) |
| Net cash provided by discontinued operations | — | — | 15,919 | — | 15,919 |
| Net decrease in cash and cash equivalents | — | (69) | (62,658) | — | (62,727) |
| Cash and cash equivalents, beginning of year | — | 2,425 | 204,980 | — | 207,405 |
| Cash and cash equivalents, end of year | $    — | $    2,356 | $    142,322 | $    — | $    144,678 |

F–36

[THIS PAGE IS INTENTIONALLY LEFT BLANK]

(Interim Financial Statements begin on the following page)

F–37

NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

| | Successor | Predecessor |
|---|---|---|
| | November 30, 2004 | February 29, 2004 |
| | (unaudited) | |
| | (in thousands) | |
| Cash and cash equivalents | $        278,754 | $        316,213 |
| Cash and securities segregated under federal and other regulations: | | |
|     Cash and cash equivalents | 946,515 | 1,375,838 |
|     Securities purchased under agreements to resell | 19,771 | 55,061 |
| Securities purchased under agreements to resell | 32,968,876 | 24,782,874 |
| Deposits with clearing organizations and others | 698,435 | 1,831,765 |
| Receivables from broker–dealers and clearing organizations | 1,985,670 | 504,810 |
| Receivables from customers, net of $75,567 and $65,200 in reserves, respectively | 1,767,347 | 1,591,385 |
| Receivables from equity members | — | 210,223 |
| Securities owned, at market or fair value | 6,476,821 | 2,032,535 |
| Memberships in exchanges (market value: November 30, 2004: $58,671, February 29, 2004: $41,377) | 36,521 | 15,869 |
| Assets of discontinued operations (Note C) | — | 276,012 |
| Other assets | 1,554,145 | 339,587 |
|       Total assets | $     46,732,855 | $     33,332,172 |
| Liabilities | | |
|     Short–term borrowings, including current portion of long–term borrowings | $          8,000 | $        88,890 |
|     Securities sold under agreements to repurchase | 32,015,382 | 25,630,299 |
|     Payable to broker–dealers and clearing organizations | 1,478,510 | 583,643 |
|     Payable to customers | 6,865,766 | 5,053,337 |
|     Securities sold, not yet purchased, at market or fair value | 4,554,005 | 807,485 |
|     Liabilities of discontinued operations (Note C) | — | 44,878 |
|     Accounts payable, accrued expenses and other liabilities | 289,828 | 171,651 |
| Long–term borrowings | 1,390,000 | 315,500 |
| Subordinated debt | — | 16,000 |
|       Total liabilities | 46,601,491 | 32,711,683 |
| Commitments and contingent liabilities | | |
| Membership interests issued by subsidiary | 7,122 | 4,405 |
| Members' equity | 124,242 | 616,084 |
|       Total liabilities and members' equity | $     46,732,855 | $     33,332,172 |

The accompanying notes are an integral part of these financial statements.

NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF INCOME

| | Successor | Predecessor |
|---|---|---|
| | Three Months Ended November 30, 2004 | Three Months Ended November 30, 2003 |
| | (unaudited) (in thousands) | |
| **Revenues** | | |
| Commissions and brokerage | $ 212,633 | $ 155,371 |
| Interest | 790,659 | 243,550 |
| Principal transactions, net | 61,340 | 46,454 |
| Asset management and advisory fees | 5,021 | 834 |
| Other | 1,748 | 1,599 |
| Total revenues | 1,071,401 | 447,808 |
| **Expenses** | | |
| Commissions and order execution costs | 159,120 | 96,266 |
| Interest | 766,735 | 205,141 |
| Employee compensation and benefits | 67,735 | 49,012 |
| General, administrative and other | 56,531 | 50,650 |
| Total expenses | 1,050,121 | 401,069 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 21,280 | 46,739 |
| Provision for income taxes | 3,332 | 2,265 |
| Income before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 17,948 | 44,474 |
| Income from equity investees | 18,727 | 3,533 |
| Members' interest in earnings of subsidiary | 555 | 191 |
| Income from continuing operations | 36,120 | 47,816 |
| Discontinued operations (Note C): | | |
| Loss from discontinued operations | — | (623) |
| Applicable income tax expense | — | (61) |
| Net income | $ 36,120 | $ 47,254 |

The accompanying notes are an integral part of these financial statements.

F–39

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

|  | Successor | Predecessor | |
| --- | --- | --- | --- |
|  | Period from August 6, 2004 through November 30, 2004 | Period from March 1, 2004 through August 5, 2004 | Nine Months Ended November 30, 2003 |
|  |  | (unaudited) (in thousands) | |
| **Revenues** |  |  |  |
| Commissions and brokerage | $ 262,354 | $ 362,020 | $ 473,530 |
| Interest | 985,361 | 768,713 | 726,547 |
| Principal transactions, net | 82,917 | 119,235 | 113,676 |
| Asset management and advisory fees | 5,817 | 3,676 | 5,500 |
| Other | 2,112 | 2,469 | 4,308 |
| Total revenues | 1,338,561 | 1,256,113 | 1,323,561 |
| **Expenses** |  |  |  |
| Commissions and order execution costs | 194,137 | 244,009 | 298,008 |
| Interest | 953,460 | 706,640 | 614,884 |
| Employee compensation and benefits | 85,641 | 108,528 | 145,329 |
| General, administrative and other | 75,988 | 97,576 | 126,483 |
| Total expenses | 1,309,226 | 1,156,753 | 1,184,704 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 29,335 | 99,360 | 138,857 |
| Provision for income taxes | 4,149 | 7,994 | 5,340 |
| Income before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 25,186 | 91,366 | 133,517 |
| Income from equity investees | 18,560 | 8,345 | 7,641 |
| Members' interest in earnings of subsidiary | 1,162 | 5,771 | 311 |
| Income from continuing operations | 42,584 | 93,940 | 140,847 |
| Discontinued operations (Note C): |  |  |  |
| Income (loss) from discontinued operations | — | 7,383 | (488) |
| Applicable income tax expense | — | 3,344 | (25) |
| Net income | $ 42,584 | $ 97,979 | $ 140,384 |

The accompanying notes are an integral part of these financial statements.

F–40

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF CHANGES IN MEMBERS' EQUITY**

| | Members' equity | | |
| --- | --- | --- | --- |
| | Common capital | Other Comprehensive Income | Total |
| | | (unaudited) | |
| | | (in thousands) | |
| Balance, February 28, 2003 (predecessor) | $ 568,016 | $ (1,655) | $ 566,361 |
| Loss on early extinguishment of preferred securities issued by subsidiaries | (39,774) | — | (39,774) |
| Net income | 140,384 | — | 140,384 |
| Currency translation adjustment | — | 12,844 | 12,844 |
| Balance, November 30, 2003 (predecessor) | $ 668,626 | $ 11,189 | $ 679,815 |
| Balance, February 29, 2004 (predecessor) | $ 595,398 | $ 20,686 | $ 616,084 |
| Net income | 97,979 | | 97,979 |
| Currency translation adjustment | — | (4,900) | (4,900) |
| Balance, August 5, 2004 (predecessor) | $ 693,377 | $ 15,786 | $ 709,163 |
| Distribution of Asset Management business | (230,913) | (6,922) | (237,835) |
| Distribution of cash | (550,000) | — | (550,000) |
| Balance, August 5, 2004 (predecessor, adjusted) | (87,536) | 8,864 | (78,672) |
| Resetting of equity accounts due to the Transactions | 87,536 | (8,864) | 78,672 |
| Balance on August 5, 2004 (successor) | — | — | — |
| Push down of capital contribution to fund portion of purchase price | 511,494 | — | 511,494 |
| Carry over of predecessor basis | (33,661) | — | (33,661) |
| Deemed dividend | (403,612) | — | (403,612) |
| Balance, August 6, 2004 as adjusted to give effect to the Transactions (successor) | 74,221 | — | 74,221 |
| Net income | 42,584 | — | 42,584 |
| Repurchase of Class A Units | (2,500) | — | (2,500) |
| Issuance of Class B Units to employees | 576 | — | 576 |
| Currency translation adjustment | — | 9,361 | 9,361 |
| Balance, November 30, 2004 | $ 114,881 | $ 9,361 | $ 124,242 |

The accompanying notes are an integral part of these financial statements.

NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | Predecessor | |
|---|---|---|---|
| | Period from August 6, 2004 through November 30, 2004 | Period from March 1, 2004 through August 5, 2004 | Nine Months Ended November 30, 2003 |
| | | (unaudited) (in thousands) | |
| Cash flows from operating activities | | | |
| Net income | $ 42,584 | $ 97,979 | $ 140,384 |
| Income (loss) from discontinued operations (Note C) | — | 4,039 | (463) |
| Net income from continuing operations | 42,584 | 93,940 | 140,847 |
| Noncash items included in net income | | | |
| Depreciation and amortization | 11,946 | 11,993 | 20,861 |
| Stock compensation expense | 576 | | |
| Members' interest in earnings of subsidiary | 1,162 | 5,771 | 311 |
| (Increase) decrease in operating assets | | | |
| Cash and securities segregated under federal and other regulations: | | | |
| Cash and cash equivalents | (126,558) | 555,880 | 1,194,731 |
| Securities purchased under agreements to resell | 33,392 | 1,898 | 15,158 |
| Securities purchased under agreements to resell | 3,745,747 | (11,931,749) | (15,082,279) |
| Deposits with clearing organizations and others | 659,857 | 473,473 | 1,408,866 |
| Receivables from broker–dealers and clearing organizations | (771,084) | (709,776) | (608,140) |
| Receivables from customers | 819,357 | (995,096) | (489,017) |
| Receivables from equity members | | 210,000 | 174,499 |
| Securities owned, at market or fair value | (3,710,753) | (733,533) | (2,819,020) |
| Memberships in exchanges | (305) | (2,010) | (492) |
| Other assets | 28,337 | (93,670) | (135,678) |
| Increase (decrease) in operating liabilities | | | |
| Short–term borrowings, including current portion of long–term borrowings | — | (20,890) | (31,815) |
| Securities sold under agreements to repurchase | (4,738,791) | 11,123,874 | 13,505,547 |
| Payable to broker–dealers and clearing organizations | (12,574) | 907,441 | 279,106 |
| Payable to customers | 1,613,896 | 198,533 | (157,443) |
| Securities sold, not yet purchased, at market or fair value | 2,333,845 | 1,412,675 | 2,666,162 |
| Accounts payable, accrued expenses and other liabilities | 79,821 | 20,108 | 98,796 |
| Net cash provided by operating activities | 10,455 | 528,862 | 181,000 |
| Cash flows from investing activities | | | |
| Distribution of cash in Asset Management business | — | (24,457) | — |
| Payment of acquisition fees | (46,989) | (3,536) | — |
| Acquisition of businesses, net of cash acquired | (17,225) | — | (52,043) |
| Net cash used in investing activities | (64,214) | (27,993) | (52,043) |
| Cash flows from financing activities | | | |
| Proceeds from new borrowings | 1,400,000 | — | — |
| Repayment of long–term borrowings | (387,436) | (37,000) | (37,000) |
| Payment to former shareholders | (19,815) | — | — |
| Payment to former shareholder for sale of interest in predecessor | (861,749) | — | — |
| Payment of deferred financing costs | (43,648) | — | — |
| Payment for redemption of preferred securities issued by subsidiaries | — | — | (199,774) |
| Repurchase of Class A Units | (2,500) | — | — |
| Distribution of cash | — | (550,000) | — |
| Net contributions (withdrawals) of interests by members of subsidiary | 2,675 | (6,891) | 356 |
| Net cash provided by (used in) financing activities | 87,527 | (593,891) | (236,418) |
| Net cash provided by discontinued operations (Note C) | — | 21,795 | 73,318 |
| Net increase (decrease) in cash and cash equivalents | 33,768 | (71,227) | (34,143) |
| Cash and cash equivalents, beginning of period | 244,986 | 316,213 | 226,165 |
| Cash and cash equivalents, end of period | $ 278,754 | $ 244,986 | $ 192,022 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Noncash investing and financing activities | | | |
| Pushdown of partial step–up of assets and liabilities in Transactions | $ 567,719 | $ — | $ — |
| Distribution of Asset Management business, net of cash | 213,378 | — | — |

The accompanying notes are an integral part of these financial statements.

F–42

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE A—ORGANIZATION**

New Refco Group Ltd., LLC (the "Company" or "Successor") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The Group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker–dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore and securities foreign exchange broker.

For purposes of identification and description, Refco Group Ltd., LLC and its subsidiaries are referred to as the "Predecessor" for the period prior to the Transactions, and New Refco Group Ltd., LLC and its subsidiaries are referred to as the "Successor" for the period subsequent to the Transactions. New Refco Group Ltd., LLC is the direct parent of Refco Group Ltd., LLC.

*The Transactions*

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with Refco Group Ltd., LLC, Refco Group Holdings, Inc. ("RGHI") and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC ("New Refco") becoming Refco Group Ltd., LLC's parent and THL Refco Acquisition Partners and its affiliates and co–investors acquiring a 56.7% interest in the Company, based on a valuation of the Company of $2.3 billion, following the closing of the Transactions on August 5, 2004. THL Refco Acquisition Partners and its affiliates are affiliates of Thomas H. Lee Partners, L.P. Thomas H. Lee Partners, L.P. is a leading private equity firm focused on identifying and acquiring substantial ownership stakes in mid–to large–cap growth companies.

Prior to the closing date of the Transactions on August 5, 2004, the Group was 90% owned by RGHI, a Delaware corporation. The remaining 10% was owned by BAWAG Overseas, Inc., a third party financial institution.

Concurrently with the consummation of the Transactions, the Predecessor distributed $550.0 million in cash and other capital distributions and all the equity interests of Forstmann–Leff International Associates, LLC, which upon consummation of the Transactions owned substantially all the assets of the Predecessor's Asset Management business (the "Asset Management Distribution"), to RGHI, an entity wholly owned by Phillip Bennett upon consummation of the Transactions. This distribution did not include the retained assets from the Group's Asset Management Business, Refco Alternative Investments, which have been retained and became part of the Group's Derivatives Brokerage & Clearing business.

The financing for the Transactions, including the refinancing of the outstanding debt, was provided by:

*(i)*      borrowings under a new $875.0 million Senior Secured Credit Facility, consisting of an $800.0 million term loan facility and a $75.0 million revolving credit facility in revolving credit loans and letters of credit for working capital and general corporate purposes. The term loan

F–43

was drawn prior to the consummation of the Transactions, with none of the revolving credit facility drawn as yet;

*(ii)*

    the issuance of $600.0 million senior subordinated notes by co–issuers Refco Finance Holdings LLC and Refco Finance Inc.;

*(iii)*

    $507.0 million of capital provided in cash by THL Refco Acquisition Partners and its affiliates and co–investors;

*(iv)*

    exchange of the existing equity investment in the Predecessor of $382.5 million by Phillip Bennett, the Company's chief executive officer; and

*(v)*

    management ownership investments of $4.5 million in cash.

    As a result, THL Refco Acquisition Partners and its affiliates and co–investors acquired 56.7% of the Company, Phillip Bennett received 42.8% of ownership and management purchased an ownership of 0.5%. Furthermore, THL Refco Acquisition Partners and its affiliates and co–investors and RGHI contributed their interests in Refco Group Ltd., LLC to the Company (the "New Refco Contribution"); and Refco Finance Holdings LLC merged with and into Refco Group Ltd., LLC with Refco Group Ltd., LLC continuing as the surviving entity.

    The acquisition by THL Refco Acquisition Partners and its affiliates and co–investors of a portion of RGHI's interest in Refco Group Ltd., LLC and RGHI's contribution of its interest in Refco Group Ltd., LLC to the Company are each accounted for as a purchase in conformity with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*, in accordance with Emerging Issues Task Force ("EITF") No. 88–16, *Basis in Leveraged Buyout Transactions*, with intangible assets recorded in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. This guidance requires the continuing residual interest retained by the continuing management investors, as a result of the Transactions, be reflected at its predecessor basis. In accordance with EITF Issue No. 90–12, *Allocating Basis to Individual Assets and Liabilities for Transactions within the Scope of Issue No. 88–16*, a step–up of assets and liabilities to fair value was recorded in purchase accounting for the remaining interest in the Refco Group Ltd., LLC acquired by THL Refco Acquisition Partners and its affiliates and co–investors. The amount of the distribution to the selling shareholders in excess of the predecessor basis was reflected as a deemed dividend of $403.6 million in equity in the opening consolidated balance sheet.

The purchase price including transaction costs was approximately $2.3 billion. The sources and uses of funds in connection with the acquisition are summarized below (in thousands):

| | | |
|---|---|---:|
| *Sources:* | | |
| Proceeds from Secured Term Loan | $ | 800,000 |
| Proceeds from Senior Subordinated Notes | | 600,000 |
| Proceeds from equity investors | | 511,494 |
| Available cash | | 172 |
| Fair value of existing equity investment | | 382,507 |
| Total sources | $ | 2,294,173 |
| | | |
| *Uses:* | | |
| Purchase of member units directly by equity investors | $ | 511,494 |
| Purchase of member units from debt proceeds | | 861,748 |
| Repayment of old debt and penalties | | 387,436 |
| Transaction and debt financing fees | | 94,173 |
| Payments to former shareholders | | 19,815 |
| Other | | 37,000 |
| Fair value of existing equity investment | | 382,507 |
| Total uses | $ | 2,294,173 |

The Company has prepared an allocation of the purchase price to the assets acquired and liabilities assumed based upon their respective fair values as determined by an independent third party valuation firm as of the date of the acquisition. The allocation of the purchase price to the fair value of the net assets acquired is summarized below (in thousands):

| | Predecessor Basis | Fair Value | Deemed Dividend | Push–down of existing carry–over basis | | Successor Basis |
|---|---|---|---|---|---|---|
| Cash and cash equivalents, securities purchased and deposits | $ 39,191,022 | $ 39,191,022 | $ — | $ — | $ — | $ 39,191,022 |
| Receivables, securities owned and other assets | 6,810,999 | 6,810,999 | — | — | — | 6,810,999 |
| Memberships in exchanges, at fair value | 17,879 | 49,997 | (13,781) | — | — | 36,216(a) |
| Total assets acquired | 46,019,900 | 46,052,018 | (13,781) | — | — | 46,038,237 |
| Short–term borrowings, securities sold and payables | 45,717,287 | 45,717,287 | — | — | — | 45,717,287 |
| Accounts payable, accrued expenses and other liabilities | 199,945 | 222,654 | — | — | — | 222,654 |
| Total liabilities assumed | 45,917,232 | 45,939,941 | — | — | — | 45,939,941 |
| Net tangible assets | 102,668 | 112,077 | (13,781) | — | — | 98,296 |
| Intangible assets | 24,556 | 986,800 | (412,862) | — | — | 573,938(a) |
| Net assets acquired | 127,224 | 1,098,877 | (426,643) | — | — | 672,234 |
| Purchase price, including carryover basis by Phillip Bennett | | 2,248,691 | (403,612) | (382,507) | (33,661) | 1,428,911 |
| Excess purchase price | | 1,149,814 | 23,031 | (382,507) | (33,661) | 756,677 |
| Goodwill | | 1,109,702 | 23,031 | (382,507) | (33,661) | 716,565 |
| Deferred financing costs, net | | 40,112 | — | — | — | 40,112 |
| | | $ 1,149,814 | $ 23,031 | $ (382,507) | $ (33,661) | $ 756,677 |

*(a)*

    As mandated by EITF Issue No. 88–16, successor basis reflects a partial stepped–up value calculated as 42.8% of predecessor basis plus 57.2% of fair value.

    Purchase price includes payments made to or for the account of existing equity holders, including $24.9 million relating to pre–payment penalties on the Predecessor's existing debt, and $19.8 million relating to obligations triggered by the Predecessor's change of control.

    Goodwill of $716.6 million was assigned to the Derivatives Brokerage & Clearing, Prime Brokerage/Capital Markets in the amounts of $286.6 million and $430.0 million, respectively. Final allocation of goodwill to the Group's segments is still in the process of being finalized.

    Of the $573.9 million intangible assets recognized on the Transaction, $232.2 million assigned to trade names is not subject to amortization. The remaining $341.7 million intangible assets recognized have a weighted–average economic useful life of approximately 13 years, which is comprised of customer relationship of $340.7 million with a 13 years estimated useful life and technology intangible of $1.0 million with a three–year estimated useful life.

F–46

The following unaudited pro forma consolidated summary of operations presents information of the Company as if the Transactions had occurred on March 1, 2003 and 2004, respectively.

| | Three Months Ended November 30, 2003 | Nine Months Ended November 30, | |
| | | 2004 | 2003 |
|---|---|---|---|
| | (unaudited) (in thousands) | (unaudited) (in thousands) | |
| Total revenue | $ 447,808 | $ 2,594,674 | $ 1,323,561 |
| Net income | $ 29,945 | $ 105,478 | $ 87,734 |

These pro forma results are for illustrative purposes. They do not purport to be indicative of the results of operations that actually would have resulted had the Transactions occurred as of March 1, 2003 or 2004, or the future results of operations of the Company.

Refco Group Ltd., LLC plans to issue 9% Senior Subordinated Notes due 2012 (the "Exchange Notes") in exchange for all New Notes and has filed a Form S–4 exchange offer registration statement whereby holders of the New Notes will receive Exchange Notes that have been registered under the Securities Act of 1933, as amended, having terms substantially identical in all material aspects to the New Notes.

## NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which issues non–voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in "Other Assets."

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

These unaudited consolidated financial statements reflect all adjustments that are, in the opinion of management, necessary for a fair statement of the results for the interim period presented. These adjustments are of a normal, recurring nature. Interim period operating results may not be indicative of the operating results for a full year. These consolidated financial statements should be read in conjunction with the Group's fiscal year–end consolidated financial statements.

### Stock–based compensation

The Group measures compensation expense for its employee stock–based compensation plans using the fair value method prescribed by SFAS No. 123, *Accounting for Stock–Based Compensation.*

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123 (revised), *Share–Based Payment* ("SFAS 123R"). SFAS 123R requires an entity to measure the cost of

F–47

employee services received in exchange for an award of equity instruments based on the grant–date fair value of the award with the cost to be recognized over the period during which an employee is required to provide service in exchange for the award. The Company is required to adopt the provisions of SFAS 123R as of the beginning of the first interim period that begins after June 15, 2005, although earlier adoption is permitted. The Company is in the process of determining the impact, if any, of SFAS 123R on its consolidated financial statements.

## NOTE C—DISCONTINUED OPERATIONS

On August 5, 2004, the Predecessor distributed all the equity interests of Forstmann–Leff International Associates, LLC, which owned substantially all the assets of the Predecessor's Asset Management business, to Refco Group Holdings, Inc., an entity wholly owned by Phillip Bennett upon consummation of the Transactions.

Financial information related to Forstmann–Leff International Associates, LLC is reported separately in our income statement as discontinued operations. Prior period information has been adjusted on the same basis to reflect this presentation.

Operating results for Forstmann–Leff International Associates, LLC included in the discontinued operations are presented in the following table.

| | Three Months Ended November 30, 2003 | | Period from March 1, 2004 through August 5, 2004 | | Nine Months Ended November 30, 2003 |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Revenue | $ | 16,449 | $ | 47,660 | $ | 45,576 |
| Expenses | | 17,072 | | 40,277 | | 46,064 |
| Income before income taxes | | (623) | | 7,383 | | (488) |
| Income tax expenses | | (61) | | 3,344 | | (25) |
| Net income | $ | (562) | $ | 4,039 | $ | (463) |

The following table presents the carrying amounts of major classes of assets and liabilities of Forstmann–Leff International Associates, LLC as of February 29, 2004. These assets and liabilities are

included under the captions "Assets of discontinued operations" and "Liabilities of discontinued operations" on our February 29, 2004 consolidated balance sheet.

|  | February 29, 2004 |
|---|---|
|  | (in thousands) |
| Cash and cash equivalents | $ 22,030 |
| Receivable from customers | 25,582 |
| Other assets | 228,400 |
| Total assets | $ 276,012 |
| Payable to customers | $ 42,380 |
| Other liabilities(a) | 2,498 |
| Total liabilities | $ 44,878 |

(a) includes accounts payable and accrued expenses

## NOTE D—NET CAPITAL REQUIREMENT

The Group's subsidiary Refco Securities, LLC is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3–1 (the "Rule"), which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3–3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of November 30, 2004, Refco Securities, LLC had net capital of $75.5 million, which was 27.2% of aggregate debit balances and $69.9 million in excess of required net capital.

The Group's subsidiary Refco, LLC is subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4% of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined, or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non–customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 110% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of November 30, 2004, Refco, LLC had net capital of $301.7 million, which was $139.6 million in excess of required net capital.

## NOTE E—PRINCIPAL TRANSACTIONS, NET

The Group, as a broker of derivative products, enters into contractual commitments, as a principal, involving forward settlement. The Group generally enters into offsetting contracts to achieve economic hedges, which result in a profit spread for the Group. Both the contractual commitment and the offsetting contract are recorded at fair value. Both realized and unrealized gains and losses are

F–49

recognized and recorded in the consolidated statements of income under "Principals transactions, net" as follows:

| | Three Months Ended November 30, 2004 | | | Three Months Ended November 30, 2003 | | |
|---|---|---|---|---|---|---|
| | Net | | | Net | | |
| | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) |
| | (in thousands) | | | | | |
| Foreign currency forwards | $ 20,841 | $ (7,646) | $ 13,195 | $ 806 | $ 11,614 | $ 12,420 |
| Futures | 18,013 | (17,053) | 960 | 21,949 | (6,390) | 15,559 |
| Options | 7,050 | (548) | 6,502 | (105,332) | 110,540 | 5,208 |
| Treasury notes | 28,876 | 6,684 | 35,560 | 14,310 | (8,411) | 5,899 |
| Bonds | (357) | 823 | 466 | 2,505 | (1,991) | 514 |
| Other | 4,221 | 436 | 4,657 | 7,571 | (717) | 6,854 |
| Total | $ 78,644 | $ (17,304) | $ 61,340 | $ (58,191) | $ 104,645 | $ 46,454 |

| | Period from August 6, 2004 through November 30, 2004 | | | Period from March 1, 2004 through August 5, 2004 | | | Nine Months Ended November 30, 2003 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Net | | | Net | | | Net | | |
| | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) |
| | (in thousands) | | | | | | | | |
| Foreign currency forwards | $ 24,000 | $ (12,442) | $ 11,558 | $ 15,243 | $ 9,034 | $ 24,277 | $ 35,180 | $ 16,949 | $ 52,129 |
| Futures | 35,173 | (14,014) | 21,159 | 17,235 | 26,236 | 43,471 | 52,835 | (24,836) | 27,999 |
| Options | 12,069 | (245) | 11,824 | 8,621 | 7,375 | 15,996 | (111,317) | 115,873 | 4,556 |
| Treasury notes | 29,878 | 5,893 | 35,771 | 43,530 | (7,278) | 36,252 | 32,046 | (40) | 32,006 |
| Bonds | 155 | 162 | 317 | 4,564 | (3,181) | 1,383 | (9,713) | (461) | (10,174) |
| Other | 2,021 | 267 | 2,288 | (1,558) | (586) | (2,144) | 6,263 | 897 | 7,160 |
| Total | $ 103,296 | $ (20,379) | $ 82,917 | $ 87,635 | $ 31,600 | $ 119,235 | $ 5,294 | $ 108,382 | $ 113,676 |

The following table shows the gross notional or contractual amounts of derivatives held by the Group.

| | As of November 30, 2004 | | As of February 29, 2004 | |
|---|---|---|---|---|
| | Notional | Fair Value | Notional | Fair Value |
| | (in thousands) | | | |
| Forward currency contracts | $ 78,868,136 | $ (5,675) | $ 41,586,917 | $ (715) |
| Swap contracts | 1,904,400 | 323 | 2,927,400 | 1,304 |
| Option contracts sold or written | 95,930,372 | (584,327) | 10,383,291 | (272,078) |
| Option contracts purchased | 92,365,554 | 597,482 | 10,723,550 | 272,528 |
| Exchange–traded futures | 9,313,127 | (1,698) | 3,735,774 | (1,585) |
| Total | $ 278,381,589 | $ 6,105 | $ 69,356,932 | $ (546) |

**NOTE F—COMMITMENTS AND CONTINGENCIES**

**Commitments**

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises, excluding any escalation adjustments, are as follows (in thousands):

| Fiscal period | | |
|---|---|---:|
| Three months ended 2005 | $ | 3,811 |
| 2006 | | 13,669 |
| 2007 | | 11,558 |
| 2008 | | 9,404 |
| 2009 | | 6,383 |
| Thereafter | | 25,038 |
| | $ | 69,863 |

The Group's rent expense for the three months ended November 30, 2004 and 2003 was $3.7 million and $3.6 million, respectively. The Group's rent expense for the period from August 6, 2004 through November 30, 2004, the period from March 1, 2004 through August 5, 2004 and the nine months ended November 30, 2003 was $4.7 million, $5.9 million and $10.1 million, respectively.

**Contingencies**

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

On March 1, 2005, Trading Technologies International, Inc. filed an action against Refco Group Ltd., LLC, Refco, LLC and Refco EasySolutions, LLC (collectively, the "Refco parties") in the U.S. District Court for the Norther District of Illinois, Eastern Division, alleging that the Refco parties infringed upon certain patents owned by Trading Technologies relating to electronic trading software. In its complaint, Trading Technologies demanded a preliminary and permanent injunction against the Refco parties, as well as unspecified damages and costs. The Group is currently analyzing the merits of the claim and intends to file an answer to the complaint by mid–April 2005.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003, the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. By Order dated March 16, 2004, the appellate court (Appellate Division, First Department) affirmed the trial court's decision. On May 11, 2004, the trial court granted the Group's motion to bifurcate the trial of liability from any trial on damages. The remaining claim of liability was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiff's claim as to the Group's liability. The Group moved the trial court (a) for judgment in favor of the Group as a matter of law, (b) to set aside the verdict and (c)(i) to direct entry of judgment for the Group as a matter of law, or

(ii) in the alternative, to order a new trial on plaintiffs' second cause of action. By memorandum decision and order dated March 3, 2005, the trial court granted the Group's post–trial motion to set aside the jury verdict as against the weight of the evidence and ordered a new trial.

After consultation with legal counsel, management believes that it is not probable that a material loss will result from the final verdict. The Group raised its margin requirements to 100% and/or terminated plaintiffs' financing on specific bonds and issued resulting margin calls to plaintiffs, who defaulted. The Appellate Division, First Department previously ruled that the Group had the contractual right to terminate margin loans to plaintiffs and thus did not breach any express provision of the customer agreements. The Group believes the sole issue remaining for the jury to determine was whether the Group breached the implied covenant of good faith and fair dealing when it exercised its contractual rights. The Group does not believe it breached the implied covenant when it exercised its contractual rights. Upon retrial, the Group believes the plaintiff will not be able to sustain its burden. Accordingly, the Group has not recorded an accrual for any losses that might arise from the final verdict.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents that had been provided to the SEC. In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation. At the present time, it is not possible to predict the outcome of the foregoing with any certainty.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

**NOTE G—CLASS A AND B UNITS**

On August 5, 2004, New Refco Group Ltd., LLC, authorized 101.0 million Class A Units and issued 100.3 million Class A Units and 7.0 million Class B Units and issued 4.4 million Class B Units, valued at $0.83 per unit, to the Company's employees. The Class A and Class B units generally have identical rights and preferences, except the Class B Units are non–voting and have different rights as to certain distributions than the Class A Units.

The Company repurchased 0.3 million of its Class A Units on October 5, 2004 for $2.5 million, which has been reported as a reduction in members' equity. As of November 30, 2004, the Company had 100.0 million Class A Units outstanding.

F–52

One half of the Class B Units (the "Non Performance–Based Units") will vest 25% on each of February 28, 2005, February 28, 2007 and February 29, 2008. The other half of the Class B Units (the "Performance Units") will vest based upon the Company's achievement of EBITDA targets as defined in the agreements set forth for each of the Company's fiscal years ended February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008. Any unvested Performance Units will vest automatically and immediately on the eighth anniversary date from the date of issuance if employees remain employed on a full–time basis.

On October 31, 2004, the Company declared a 202,551.721–for–one split of its Class A and Class B units (the "Unit Split"). The Unit Split entitled each Unit holder to receive 202,550.721 units for every outstanding Class A and Class B unit held on that date. All units included in the accompanying consolidated financial statements for all periods presented have been adjusted to retroactively reflect the Unit Split.

On October 31, 2004, November 10, 2004 and November 19, 2004, the Company issued 1,664,655.1, 40,000 and 20,000 additional Class B Units, respectively, to the Company's employees and members of its board of managers. The units issued to the members of the Company's board of managers are all Non Performance–Based Units and will vest 25% on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008. The fair value of the additional units is $1.32 per unit.

Stock–based compensation expense was $0.6 million for the period from August 6, 2004 through November 30, 2004. The fair value of the Class B Units was calculated by a third party valuation firm using the average of the Black–Scholes option pricing model and Exit Scenarios Analysis with the following weighted average assumptions.

| Black–Scholes option pricing model | | Exit Scenarios Analysis | |
|---|---|---|---|
| Risk–free interest rate | 2.92% | Exit EBITDA Multiple | 8.0x |
| Expected lives | 3.50 years | Required rate of return | 30.0% |
| | | Capital structure | |
| Expected volatility | 21.67% | Class A Units | 96.0% |
| Expected dividend rate | 0.00% | Class B Units | 4.0% |

For the Class B Units issued on October 31, 2004, November 10, 2004 and November 19, 2004, a secondary exit scenario analysis was also performed by the third party valuation firm using a required rate of return of 16.6%, and this was factored into the fair value of the Class B Units issued on these dates.

The values derived from these two approaches were calculated on the original grant date in August 2004 and in October 2004. These values derived under the two approaches are as follows:

| | Fair Value per Class B Unit | | | |
|---|---|---|---|---|
| Methodology | | Initial Valuation | | October Valuation |
| Black–Scholes | $ | 0.84 | $ | 0.79 |
| Exit Scenario Analysis | $ | 0.83 | $ | 1.67 |

F–53

Change in the Class B Units during the period from August 6, 2004 through November 30, 2004 is as follows:

| | Number of Units |
|---|---|
| | (in thousands) |
| Outstanding at August 5, 2004 | — |
| Issued | 6,087 |
| Exercised | — |
| Forfeited | (702) |
| Outstanding at November 30, 2004 | 5,385 |

**NOTE H—LONG–TERM BORROWINGS**

Long–term debt consisted of the following at November 30, 2004 and February 29, 2004:

| | November 30, 2004 | | February 29, 2004 | |
|---|---|---|---|---|
| | (in thousands) | | | |
| New Senior Credit Facility: | | | | |
| Secured Term Loan | $ | 798,000 | $ | — |
| Secured Revolving Loan | | — | | — |
| 9% Senior Subordinated Notes, due August 1, 2012 | | 600,000 | | — |
| Old Senior Notes: | | | | |
| Series A Senior Notes 2004 | | — | | 17,000 |
| Senior Notes 2005 | | — | | 74,000 |
| Series B Senior Notes 2006 | | — | | 14,000 |
| Senior Notes 2007 | | — | | 56,000 |
| Series A Senior Notes 2007 | | — | | 100,000 |
| Series B Senior Notes 2009 | | — | | 122,500 |
| | | 1,398,000 | | 383,500 |
| Less: Portion included within short–term borrowings | | 8,000 | | 68,000 |
| | $ | 1,390,000 | $ | 315,500 |

In connection with the Transactions on August 5, 2004, Refco Group Ltd., LLC entered into a new Senior Credit Facility (the "New Senior Credit Facility"), and issued 9% Senior Subordinated Notes due 2012, a portion of which repaid the outstanding amounts under the old senior notes and the old subordinated loan from a member.

The New Senior Credit Facility provides for a $75.0 million revolving credit facility in revolving credit loans and letters of credit. The revolving credit facility will mature six years from the closing date of August 5, 2004. The New Senior Credit Facility also provides for an $800.0 million Secured term loan. The Secured term loan has a final scheduled maturity of seven years from the closing date.

The Secured term loan was fully drawn immediately after the closing of the Transactions on August 5, 2004. None of the revolving credit facility had been drawn as of this date. This facility will meet the Group's future needs for working capital and general corporate purposes.

F–54

The New Senior Credit Facility bears interest at the Group's choice of LIBOR or Base Rate (both as defined), plus an applicable interest rate margin. The initial applicable margin for LIBOR loans and alternative base loans under the senior credit facilities will be 2.75% and 1.75% per annum, respectively. Commencing six months after the closing date, the applicable margin under the revolving credit facility will be subject to adjustment based on a performance pricing grid. The interest rate payable under the senior credit facilities will increase by 2.00% per annum during the continuance of any payment or bankruptcy event of default.

The weighted average interest rates per annum in effect as of November 30, 2004 for the Secured term loan was 4.52%. The senior credit facilities are also secured by, among other things:

- a first priority security interest in substantially all of the assets of the Company and the Company's non–regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of Refco Group Ltd., LLC and the Company, the Company's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by the Company or any guarantor and (ii) 65% of the voting stock of each of the Company and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the senior credit facilities will be guaranteed by the Company and the Company's non–regulated restricted domestic subsidiaries.

The table below sets out the maturities of the Group's long–term borrowings (in thousands):

Fiscal period ended:

| | | |
|---|---|---|
| 2005 | $ | 2,000 |
| 2006 | | 8,000 |
| 2007 | | 8,000 |
| 2008 | | 8,000 |
| 2009 | | 8,000 |
| 2010 | | 8,000 |
| 2011 and thereafter | | 1,356,000 |
| | $ | 1,398,000 |

On August 5, 2004, the Refco Group Ltd., LLC completed a financing, which consisted of the sale of $600.0 million of 9% Senior Subordinated Notes due 2012 (the "New Notes") pursuant to a private offering. The New Notes bear interest at the rate of 9% per annum, which is payable semi–annually in cash in arrears on February 1 and August 1. The New Notes mature on August 1, 2012. The payment of the principal of, premium, if any, and interest on the New Notes and the payment of any Subsidiary Guaranty will be subordinate in right of payment to the prior payment in full of all Senior Indebtedness of the Issuers or the relevant Subsidiary Guarantor, as the case may be. Refco Group Ltd., LLC plans to issue 9% Senior Subordinated Notes due 2012 (the "Exchange Notes") in exchange

for all New Notes, pursuant to an exchange offer whereby holders of the New Notes will receive Exchange Notes that have been registered under the Securities Act of 1933, as amended, having terms substantially identical in all material aspects to the New Notes, except that the Exchange Notes will not contain terms with respect to transfer restrictions.

At any time prior to August 1, 2007, Refco Group Ltd., LLC may redeem up to 35% of the aggregate principal amount of the New Notes at a price of 109.000% in connection with a Designated Offering, as defined. With the exception of a Designated Offering, the New Notes are redeemable at the option of Refco Group Ltd., LLC beginning August 1, 2008 at prices decreasing from 104.500% of the principal amount thereof to par on August 1, 2010 and thereafter. Refco Group Ltd., LLC is not required to make mandatory redemption or sinking fund payments with respect to the New Notes. Prior to August 1, 2008, Refco Group Ltd., LLC has the option to redeem all, but not less than all, of the Notes at a redemption price equal to 100% of the principal amount of the Notes.

The indenture for the New Notes requires Refco Group Ltd., LLC and its subsidiaries to comply with certain restrictive covenants, including a restriction on dividends; and limitations on the incurrence of indebtedness, certain payments and distributions and sales of Refco Group Ltd., LLC's assets and stock. Refco Group Ltd., LLC was in compliance with all contractual debt commitments as of November 30, 2004.

The New Notes are fully and unconditionally guaranteed on an unsecured, senior subordinated basis by all of the Company's active domestic non–regulated subsidiaries. The Condensed Consolidating Financial Information in Note I provides additional guarantor/non–guarantor information.

The Group's interest expense for long–term borrowings for the three months ended November 30, 2004 and 2003 was $23.4 million and $7.6 million, respectively. The Group's interest expense from long–term borrowings for the period from August 6, 2004 through November 30, 2004, the period from March 1, 2004 through August 5, 2004 and the nine months ended November 30, 2003 was $29.4 million, $11.7 million and $24.0 million, respectively.

## NOTE I—FAIR VALUE OF FINANCIAL INSTRUMENTS

SFAS No. 107, *Disclosures about Fair Value of Financial Instruments*, requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include cash, cash and securities segregated under federal and other regulations, deposits with clearing organizations and others, short–term borrowings and payable to broker–dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long–term debt is recorded at historical amounts, which could differ from fair value as a result of changes in the Company's creditworthiness.

The following table provides a summary of the fair value of the Group's long–term borrowings. The fair value of the Group's long–term borrowings was estimated using either quoted market prices or

F–56

discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

|  | November 30, 2004 | | February 29, 2004 |
|---|---|---|---|
|  | (in thousands) | | |
| Carrying value of long–term borrowings | $  1,398,000 | $ | 383,500 |
| Fair value of long–term borrowings | $  1,383,480 | $ | 399,990 |

The Group carries its secured financing activities, including securities purchased under agreements to resell, securities borrowed, securities sold under agreements to repurchase, securities loaned and other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short–term in nature, carrying value approximates fair value. The market value of the collateral the Group received as of November 30, 2004 and February 29, 2004, was approximately $186.8 billion and $112.2 billion, respectively.

## NOTE J—ACQUISITIONS

On September 1, 2004, the Group entered into a purchase agreement to acquire the customer accounts and related customer assets of Pioneer Futures, a division of Pioneer Futures Inc., for approximately $17.2 million in cash. The full amount paid has been assigned to customer relationships. These customer relationships are amortized on an accelerated basis over a weighted–average economic useful life of 13 years, based on a preliminary valuation analysis. Pioneer Futures Inc., a Futures Commission Merchant, provides clearing services to professional floor traders and brokers in futures and options on futures contracts and acts as a clearing firm for certain introducing brokers.

## NOTE K—SEGMENT REPORTING

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has reported the results of operations related to Forstmann–Leff International Associates, LLC as discontinued operations (see Note C). Forstmann–Leff International Associates, LLC was previously disclosed within the Asset Management segment. The Group's remaining operations include two operating segments: (1) Derivatives Brokerage & Clearing; and (2) Prime Brokerage/Capital Markets. The Derivatives Brokerage & Clearing business operations consist of execution and clearing services for global exchange–traded derivatives in electronic and open outcry markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Segment data has been reclassified to reflect the current segment structure.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, the Group has established a Corporate & Other non–operating segment. Corporate administration costs are not allocated to the respective segments and are included in

F–57

Corporate & Other. Eliminations consist of intersegment interest income and interest expense derived in the Group's normal course of business from intercompany funding.

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Three Months Ended November 30, 2004 (unaudited)** | | | | | |
| Interest revenue | $ 50,814 | $ 820,064 | $ 1,881 | $ (82,100) | $ 790,659 |
| Total revenues | 270,791 | 887,523 | 2,233 | (89,146) | 1,071,401 |
| Interest expense | 28,282 | 787,173 | 33,380 | (82,100) | 766,735 |
| Depreciation and amortization | 4,200 | 3,632 | 1,350 | — | 9,182 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 32,835 | 29,961 | (41,516) | — | 21,280 |
| **As of November 30, 2004 (unaudited)** | | | | | |
| Total assets | $ 8,763,666 | $ 49,195,865 | $ 764,508 | $ (11,991,184) | $ 46,732,855 |
| **Three Months Ended November 30, 2003 (unaudited)** | | | | | |
| Interest revenue | $ 37,691 | $ 252,251 | $ 3,015 | $ (49,407) | $ 243,550 |
| Total revenues | 216,608 | 302,885 | 3,598 | (75,283) | 447,808 |
| Interest expense | 16,911 | 225,938 | 12,488 | (50,196) | 205,141 |
| Depreciation and amortization | 4,749 | 329 | 6,210 | — | 11,288 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 30,087 | 33,196 | (16,544) | — | 46,739 |
| **Period from August 6, 2004 through November 30, 2004 (unaudited)** | | | | | |
| Interest revenue | $ 62,079 | $ 1,021,816 | $ 2,880 | $ (101,414) | $ 985,361 |
| Total revenues | 334,153 | 1,111,463 | 3,356 | (110,411) | 1,338,561 |
| Interest expense | 34,222 | 978,575 | 42,077 | (101,414) | 953,460 |
| Depreciation and amortization | 5,140 | 4,595 | 2,211 | — | 11,946 |
| Income before provision for income taxes, income from equity investees and members' interest in earnings of subsidiary | 38,952 | 42,307 | (51,924) | — | 29,335 |
| **Period from March 1, 2004 through August 5, 2004 (unaudited)** | | | | | |
| Interest revenue | $ 65,265 | $ 794,982 | $ 7,256 | $ (98,790) | $ 768,713 |
| Total revenues | 445,733 | 913,392 | 7,970 | (110,982) | 1,256,113 |
| Interest expense | 36,587 | 743,621 | 25,948 | (99,516) | 706,640 |
| Depreciation and amortization | 4,801 | 937 | 6,255 | — | 11,993 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 59,790 | 66,681 | (27,111) | — | 99,360 |
| **Nine Months Ended November 30, 2003 (unaudited)** | | | | | |
| Interest revenue | $ 109,705 | $ 751,552 | $ 13,590 | $ (148,300) | $ 726,547 |
| Total revenues | 617,263 | 883,112 | 15,607 | (192,421) | 1,323,561 |
| Interest expense | 48,524 | 676,786 | 40,498 | (150,924) | 614,884 |
| Depreciation and amortization | 9,074 | 997 | 10,790 | — | 20,861 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 88,901 | 90,610 | (40,654) | — | 138,857 |
| **As of February 29, 2004** | | | | | |
| Total assets | $ 7,275,399 | $ 31,763,273 | $ 863,307 | $ (6,569,807) | $ 33,332,172 |

F—58

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long–lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

| | Three Months Ended November 30, 2004 | Three Months Ended November 30, 2003 | Period from August 6, 2004 through November 30, 2004 | Period from March 1, 2004 through August 5, 2004 | Nine Months Ended November 30, 2003 |
|---|---|---|---|---|---|
| | | | (unaudited)(in thousands) | | |
| **Total revenue:** | | | | | |
| United States | $ 863,426 | $ 289,559 | $ 1,071,465 | $ 941,010 | $ 878,805 |
| Bermuda | 105,546 | 82,696 | 142,955 | 139,727 | 251,956 |
| United Kingdom | 69,806 | 49,075 | 84,026 | 117,053 | 124,120 |
| Other | 32,623 | 26,478 | 40,115 | 58,323 | 68,680 |
| Total | $ 1,071,401 | $ 447,808 | $ 1,338,561 | $ 1,256,113 | $ 1,323,561 |

| | As of November 30, 2004 | As of February 29, 2004 |
|---|---|---|
| | (unaudited)(in thousands) | |
| **Long–lived assets:** | | |
| United States | $ 33,241 | $ 35,661 |
| Bermuda | 1,480 | 1,900 |
| United Kingdom | 5,025 | 2,004 |
| Other | 6,415 | 4,786 |
| Total | $ 46,161 | $ 44,351 |

No single customer accounted for greater than 10% of total revenues in the three months ended November 30, 2004 or the three months ended November 30, 2003.

No single customer accounted for greater than 10% of total revenues in the four months ended November 30, 2004, the five months ended August 5, 2004 or the nine months ended November 30, 2003.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvement.

**NOTE L—SUBSEQUENT EVENTS**

On December 6, 2004, the Company issued 690,000 Class B Units to its Chief Financial Officer pursuant to a restricted unit agreement. One half of the Class B Units will vest 25% on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 28, 2008. The other half of the Class B Units will vest based upon the Company's achievement of EBITDA targets, as defined in the agreement, set forth for each of the Company's fiscal years ended February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008. Any unvested Performance Units will vest automatically

and immediately on the eighth anniversary date from the date of issuance if the employee remains employed on a full–time basis.

On January 24, 2005, the Group made a voluntary prepayment of the principal amount outstanding of the Secured term loan in the amount of $150.0 million.

On March 15, 2005, the Group amended its New Senior Credit Facility (the "Amended Credit Facility"). Under the Amended Credit Facility, the Secured term loan bears interest at the Group's choice of LIBOR or Base Rate plus an applicable margin of 2.00% or 1.00%, respectively.

In April 2005, the Board of Directors of Refco Inc., a newly–formed Delaware corporation, approved the filing with the Securities and Exchange Commission of a registration statement on Form S–1 in connection with the proposed initial public offering (the "Offering") of its common stock. Immediately prior to consummation of the Offering, the Company's existing members will contribute all of their Class A and Class B units in the Company to Refco Inc. in exchange for shares of common stock of Refco Inc. As a result, Refco Inc. will own all of the outstanding membership interests in the Company. There can be no assurance that the Offering will be consummated.

Refco Inc. is a Delaware "C" corporation, and as such will be subject to federal and state income taxes. Deferred tax assets and liabilities will be recognized for the tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities will be measured using enacted tax rates applied to taxable income in the years in which those temporary differences are expected to be recovered or settled. A deferred tax asset valuation allowance will be recorded if it is more likely than not that all or a portion of the recorded deferred tax assets will not be realized.

**NOTE M—CONDENSED CONSOLIDATING FINANCIAL INFORMATION**

The following information sets forth the Groups condensed consolidating financial statements as of November 30, 2004 and February 29, 2004 and for each of the three and nine months ended November 30, 2004 and 2003. New Refco Group refers to New Refco Group Ltd., LLC as parent of Refco Group Ltd., LLC, and Refco Group refers to Refco Group Ltd., LLC as issuer of the senior subordinated notes.

**Condensed consolidating balance sheet**

| | November 30, 2004 (unaudited) | | | | | |
|---|---|---|---|---|---|---|
| | New Refco Group | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | (in thousands) | | | | | |
| Cash and cash equivalents | $ — | $ — | $ 19,575 | $ 259,179 | $ — | $ 278,754 |
| Cash and cash securities segregated under federal and other regulations | | | | | | |
|   Cash and cash equivalents | — | — | — | 946,515 | — | 946,515 |
|   Securities purchased under agreements to resell | — | — | — | 19,771 | — | 19,771 |
| Restricted cash | — | — | — | — | — | — |
| Securities purchased under agreements to resell | — | — | — | 36,652,919 | (3,684,043) | 32,968,876 |
| Deposits with clearing organizations and others | — | — | 5,248 | 3,473,679 | (2,780,492) | 698,435 |
| Receivables from broker–dealers, clearing organizations and customers, net of reserves | — | 156,970 | 2,870,964 | 5,459,712 | (4,734,629) | 3,753,017 |
| Securities owned, at market value or fair value | — | — | 1,017 | 6,903,444 | (427,640) | 6,476,821 |
| Investment in and advances to subsidiaries | 126,742 | 2,426,062 | 798,742 | — | (3,351,546) | — |
| Other assets | — | 22,900 | 455,100 | 1,379,297 | (266,631) | 1,590,666 |
|     Total assets | $ 126,742 | $ 2,605,932 | $ 4,150,646 | $ 55,094,516 | $ (15,244,981) | $ 46,732,855 |
| Liabilities | | | | | | |
|   Short–term borrowings, including current portion of long–term borrowings | $ — | $ 8,000 | $ — | $ — | $ — | $ 8,000 |
|   Securities sold under agreements to repurchase | — | — | — | 37,472,566 | (5,457,184) | 32,015,382 |
|   Payable to broker–dealers and clearing organizations | — | — | 873 | 1,486,819 | (9,182) | 1,478,510 |
|   Payable to customers | — | 1,026,015 | 3,188,311 | 8,634,060 | (5,982,620) | 6,865,766 |
|   Securities sold, not yet purchased, at market value or fair value | — | — | 1,031 | 4,552,974 | — | 4,554,005 |
| Accounts payable, accrued expenses and other liabilities | 2,500 | 55,175 | 74,430 | 225,924 | (68,201) | 289,828 |
| Long–term borrowings | — | 1,390,000 | — | — | — | 1,390,000 |
| Subordinated debt | — | — | — | 109,307 | (109,307) | — |
| Total liabilities | 2,500 | 2,479,190 | 3,264,645 | 52,481,650 | (11,626,494) | 46,601,491 |
| Membership interests issued by subsidiary | — | — | — | 7,122 | — | 7,122 |
| Members' equity | 124,242 | 126,742 | 886,001 | 2,605,744 | (3,618,487) | 124,242 |
|     Total liabilities and members' equity | $ 126,742 | $ 2,605,932 | $ 4,150,646 | $ 55,094,516 | $ (15,244,981) | $ 46,732,855 |

**Condensed consolidating balance sheet**

|  | February 29, 2004 | | | | |
|---|---|---|---|---|---|
|  | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|  | (in thousands) | | | | |
| Cash and cash equivalents | $ — | $ 4,477 | $ 311,736 | $ — | $ 316,213 |
| Cash and securities segregated under federal and other regulations |  |  |  |  |  |
|   Cash and cash equivalents | — | — | 1,375,838 | — | 1,375,838 |
|   Securities purchased under agreements to resell | — | — | 55,061 | — | 55,061 |
| Securities purchased under agreements to resell | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker–dealers, clearing organizations and customers, net of reserves | 314,279 | 1,266,036 | 3,332,898 | (2,817,018) | 2,096,195 |
| Receivables from equity members | — | — | 210,223 | — | 210,223 |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries | 1,131,766 | 1,160,431 | — | (2,292,197) | — |
| Assets of discontinued operations | — | — | 276,012 | — | 276,012 |
| Other assets | 58,612 | 430,084 | 119,548 | (252,788) | 355,456 |
|   Total assets | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |
| **Liabilities** |  |  |  |  |  |
|   Short–term borrowings, including current portion of long–term borrowings | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
| Securities sold under agreements to repurchase | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
| Payable to broker–dealers and clearing organizations | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers | 465,681 | 1,547,382 | 6,614,220 | (3,573,946) | 5,053,337 |
| Securities sold, not yet purchased, at market value or fair value | — | 2,091 | 805,394 | — | 807,485 |
| Liabilities of discontinued operations | — | — | 44,878 | — | 44,878 |
| Accounts payable, accrued expenses and other liabilities | 23,392 | 68,182 | 143,665 | (63,588) | 171,651 |
| Long–term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 109,056 | (109,056) | 16,000 |
|   Total liabilities | 888,573 | 1,617,656 | 36,424,046 | (6,218,592) | 32,711,683 |
| Membership interests issued by subsidiary | — | — | 4,405 | — | 4,405 |
| Members' equity | 616,084 | 1,246,117 | 1,293,282 | (2,539,399) | 616,084 |
|   Total liabilities and members' equity | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |

F–62

**Condensed consolidating statements of income**

| | New Refco Group | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|---|
| | | | **Three Months Ended November 30, 2004** | | | |
| | | | (unaudited) | | | |
| | | | (in thousands) | | | |
| **Revenues** | | | | | | |
| Commissions and brokerage | $        — | $        — | $        798 | $    217,781 | $    (5,946) | $    212,633 |
| Interest | — | 944 | 23,635 | 848,180 | (82,100) | 790,659 |
| Principal transactions, net | — | — | 20,026 | 41,314 | — | 61,340 |
| Asset management and advisory fees | — | — | — | 5,021 | — | 5,021 |
| Other income | — | 380 | (88) | 2,557 | (1,101) | 1,748 |
| Total revenues | — | 1,324 | 44,371 | 1,114,853 | (89,147) | 1,071,401 |
| **Expenses** | | | | | | |
| Commissions and order execution costs | — | — | 16,982 | 148,083 | (5,945) | 159,120 |
| Interest | — | 29,229 | 24,068 | 795,538 | (82,100) | 766,735 |
| Employee compensation and benefits | — | 3,042 | 5,497 | 59,196 | — | 67,735 |
| General, administrative and other | — | 11,843 | 1,184 | 44,605 | (1,101) | 56,531 |
| Total expenses | — | 44,114 | 47,731 | 1,047,422 | (89,146) | 1,050,121 |
| Equity in net income of subsidiaries | 36,120 | 78,655 | 42,560 | — | (157,335) | — |
| Income before provision for income taxes, income (loss) from equity investees and members' interest in earnings of subsidiary | 36,120 | 35,865 | 39,200 | 67,431 | (157,336) | 21,280 |
| Provision for income taxes | — | (255) | — | 3,587 | — | 3,332 |
| Income before income (loss) from equity investees and members' interest in earnings of subsidiary | 36,120 | 36,120 | 39,200 | 63,844 | (157,336) | 17,948 |
| Income from equity investees | — | — | 18,730 | (3) | — | 18,727 |
| Members' interest in earnings of subsidiary | — | — | — | 555 | — | 555 |
| Net income | $    36,120 | $    36,120 | $    57,930 | $    63,286 | $    (157,336) | $    36,120 |

F–63

**Condensed consolidating statements of income**

| | Three Months Ended November 30, 2003 | | | | |
| | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | (unaudited) (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 1,529 | $ 175,435 | $ (21,593) | $ 155,371 |
| Interest | 2,484 | 15,064 | 275,409 | (49,407) | 243,550 |
| Principal transactions, net | — | 6,723 | 39,731 | — | 46,454 |
| Asset management and advisory fees | — | — | 1,079 | (245) | 834 |
| Other income | 583 | 1,021 | 4,033 | (4,038) | 1,599 |
| Total revenues | 3,067 | 24,337 | 495,687 | (75,283) | 447,808 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 3,503 | 115,798 | (23,035) | 96,266 |
| Interest | 9,287 | 19,470 | 226,580 | (50,196) | 205,141 |
| Employee compensation and benefits | 1,121 | 2,982 | 44,909 | — | 49,012 |
| General, administrative and other | 6,552 | 4,880 | 41,269 | (2,051) | 50,650 |
| Total expenses | 16,960 | 30,835 | 428,556 | (75,282) | 401,069 |
| Equity in net income of subsidiaries | 61,147 | 32,999 | — | (94,146) | — |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 47,254 | 26,501 | 67,131 | (94,147) | 46,739 |
| Provision for income taxes | — | — | 2,265 | — | 2,265 |
| Income before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 47,254 | 26,501 | 64,866 | (94,147) | 44,474 |
| Income from equity investees | — | 3,058 | 475 | — | 3,533 |
| Members' interest in earnings of subsidiary | — | — | 191 | — | 191 |
| Income from continuing operations | 47,254 | 29,559 | 65,150 | (94,147) | 47,816 |
| **Discontinued operations:** | | | | | |
| Income from discontinued operations | — | — | (623) | — | (623) |
| Applicable income tax expense | — | — | (61) | — | (61) |
| Net income | $ 47,254 | $ 29,559 | $ 64,588 | $ (94,147) | $ 47,254 |

F–64

**Condensed consolidating statements of income**

| | New Refco Group | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|---|
| | | | | **(unaudited)** | | |
| | | | | **(in thousands)** | | |
| **Revenues** | | | | | | |
| Commissions and brokerage | $ — | $ — | $ 924 | $ 268,908 | $ (7,478) | $ 262,354 |
| Interest | — | 2,009 | 32,294 | 1,052,472 | (101,414) | 985,361 |
| Principal transactions, net | — | — | 21,334 | 61,583 | — | 82,917 |
| Asset management and advisory fees | — | — | — | 5,817 | — | 5,817 |
| Other income | — | 485 | 368 | 2,778 | (1,519) | 2,112 |
| Total revenues | — | 2,494 | 54,920 | 1,391,558 | (110,411) | 1,338,561 |
| **Expenses** | | | | | | |
| Commissions and order execution costs | — | — | 19,482 | 182,133 | (7,478) | 194,137 |
| Interest | — | 36,864 | 32,075 | 985,935 | (101,414) | 953,460 |
| Employee compensation and benefits | — | 4,311 | 7,101 | 74,229 | — | 85,641 |
| General, administrative and other | — | 10,618 | 3,028 | 63,861 | (1,519) | 75,988 |
| Total expenses | — | 51,793 | 61,686 | 1,306,158 | (110,411) | 1,309,226 |
| Equity in net income of subsidiaries | 42,584 | 91,628 | 48,731 | — | (182,943) | — |
| Income before provision for income taxes, income from equity investees and members' interest in earnings of subsidiary | 42,584 | 42,329 | 41,965 | 85,400 | (182,943) | 29,335 |
| Provision for income taxes | — | (255) | — | 4,404 | — | 4,149 |
| Income before income from equity investees and members' interest in earnings of subsidiary | 42,584 | 42,584 | 41,965 | 80,996 | (182,943) | 25,186 |
| Income from equity investees | — | — | 18,373 | 187 | — | 18,560 |
| Members' interest in earnings of subsidiary | — | — | — | 1,162 | — | 1,162 |
| Net income | $ 42,584 | $ 42,584 | $ 60,338 | $ 80,021 | $ (182,943) | $ 42,584 |

F–65

**Condensed consolidating statements of income**

|  | Period from March 1, 2004 through August 5, 2004 | | | | |
|  | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
|  | | | (unaudited) | | |
|  | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 2,618 | $ 369,810 | $ (10,408) | $ 362,020 |
| Interest | 5,789 | 43,382 | 818,332 | (98,790) | 768,713 |
| Principal transactions, net | — | 17,742 | 101,493 | | 119,235 |
| Asset management and advisory fees | — | — | 3,676 | — | 3,676 |
| Other | 639 | 2,316 | 1,298 | (1,784) | 2,469 |
| Total revenues | 6,428 | 66,058 | 1,294,609 | (110,982) | 1,256,113 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 8,727 | 244,963 | (9,681) | 244,009 |
| Interest | 20,212 | 47,567 | 738,378 | (99,517) | 706,640 |
| Employee compensation and benefits | 2,136 | 7,950 | 98,442 | — | 108,528 |
| General, administrative and other | 6,964 | 9,017 | 83,379 | (1,784) | 97,576 |
| Total expenses | 29,312 | 73,261 | 1,165,162 | (110,982) | 1,156,753 |
| Equity in net income of subsidiaries | 120,863 | 60,837 | — | (181,700) | — |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 97,979 | 53,634 | 129,447 | (181,700) | 99,360 |
| Provision for income taxes | — | — | 7,994 | — | 7,994 |
| Income before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 97,979 | 53,634 | 121,453 | (181,700) | 91,366 |
| Income from equity investees | — | 7,770 | 575 | — | 8,345 |
| Members' interest in earnings of subsidiary | — | — | 5,771 | — | 5,771 |
| Income from continuing operations | 97,979 | 61,404 | 116,257 | (181,700) | 93,940 |
| **Discontinued operations:** | | | | | |
| Income from discontinued operations | — | — | 7,383 | — | 7,383 |
| Applicable income tax expense | — | — | 3,344 | — | 3,344 |
| Net income | $ 97,979 | $ 61,404 | $ 120,296 | $ (181,700) | $ 97,979 |

F–66

**Condensed consolidating statements of income**

| | Nine Months Ended November 30, 2003 | | | | |
|---|---|---|---|---|---|
| | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (unaudited) (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $  — | $  4,120 | $  504,691 | $  (35,281) | $  473,530 |
| Interest | 9,982 | 44,346 | 820,519 | (148,300) | 726,547 |
| Principal transactions, net | — | 14,211 | 99,465 | — | 113,676 |
| Asset management and advisory fees | — | — | 5,772 | (272) | 5,500 |
| Other income | 2,017 | 2,764 | 8,095 | (8,568) | 4,308 |
| Total revenues | 11,999 | 65,441 | 1,438,542 | (192,421) | 1,323,561 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 8,971 | 324,556 | (35,519) | 298,008 |
| Interest | 30,719 | 53,431 | 681,658 | (150,924) | 614,884 |
| Employee compensation and benefits | 3,146 | 9,024 | 133,159 | — | 145,329 |
| General, administrative and other | 12,606 | 8,558 | 111,297 | (5,978) | 126,483 |
| Total expenses | 46,471 | 79,984 | 1,250,670 | (192,421) | 1,184,704 |
| Equity in net income of subsidiaries | 174,856 | 97,811 | — | (272,667) | — |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 140,384 | 83,268 | 187,872 | (272,667) | 138,857 |
| Provision for income taxes | — | — | 5,340 | — | 5,340 |
| Income before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 140,384 | 83,268 | 182,532 | (272,667) | 133,517 |
| Income from equity investees | — | 6,910 | 731 | — | 7,641 |
| Members' interest in earnings of subsidiary | — | — | 311 | — | 311 |
| Income from continuing operations | 140,384 | 90,178 | 182,952 | (272,667) | 140,847 |
| **Discontinued operations:** | | | | | |
| Income (loss) from discontinued operations | — | — | (488) | — | (488) |
| Applicable income tax expense | — | — | (25) | — | (25) |
| Net income | $  140,384 | $  90,178 | $  182,489 | $  (272,667) | $  140,384 |

F–67

**Condensed consolidating statement of cash flows**

| | For the period from August 6, 2004 through November 30, 2004 | | | | | |
|---|---|---|---|---|---|---|
| | New Refco Group | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (unaudited) | | | |
| | | | (in thousands) | | | |
| Net cash generated from (used in) operating activities | $ 2,500 | $ (40,363) | $ 30,235 | $ 18,083 | $ — | $ 10,455 |
| Cash flows from investing activities | | | | | | |
| Payment of acquisition fees | — | (46,989) | — | — | — | (46,989) |
| Acquisition of businesses, net of cash acquired | — | — | (17,225) | — | — | (17,225) |
| Net cash used in investing activities | — | (46,989) | (17,225) | — | — | (64,214) |
| Cash flows from financing activities | | | | | | |
| Proceeds from new borrowings | — | 1,400,000 | — | — | — | 1,400,000 |
| Repayment of long–term borrowings | — | (387,436) | — | — | — | (387,436) |
| Payment to former shareholders | — | (19,815) | — | — | — | (19,815) |
| Payment to former shareholder for sale of interest in predecessor | — | (861,749) | — | — | — | (861,749) |
| Payment of deferred financing costs | — | (43,648) | — | — | — | (43,648) |
| Purchase of treasury stock | (2,500) | — | — | — | — | (2,500) |
| Withdrawals of interests by members of subsidiary | — | — | — | 2,675 | — | 2,675 |
| Net cash provided by financing activities | (2,500) | 87,352 | — | 2,675 | — | 87,527 |
| Net increase in cash and cash equivalents | — | — | 13,010 | 20,758 | — | 33,768 |
| Cash and cash equivalents, beginning of period | — | — | 6,565 | 238,421 | — | 244,986 |
| Cash and cash equivalents, end of period | $ — | $ — | $ 19,575 | $ 259,179 | $ — | $ 278,754 |

F–68

**Condensed consolidating statement of cash flows**

| | Period from March 1, 2004 through August 5, 2004 | | | | |
|---|---|---|---|---|---|
| | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (unaudited) | | |
| | | | (in thousands) | | |
| Net cash generated from (used in) operating activities | $ 590,536 | $ 567 | $ (62,241) | $ — | $ 528,862 |
| Cash flows from investing activities | | | | | |
| Distribution of cash in Asset Management business | — | — | (24,457) | — | (24,457) |
| Payment of acquisition fees | (3,536) | — | — | — | (3,536) |
| Net cash used in investing activities | (3,536) | — | (24,457) | — | (27,993) |
| Cash flows from financing activities | | | | | |
| Repayment of long–term borrowings | (37,000) | — | — | — | (37,000) |
| Distribution of cash | (550,000) | — | — | — | (550,000) |
| Withdrawals of interests by members of subsidiary | — | — | (6,891) | — | (6,891) |
| Net cash used in financing activities | (587,000) | — | (6,891) | — | (593,891) |
| Net cash provided by discontinued operations | — | — | 21,795 | — | 21,795 |
| Net decrease in cash and cash equivalents | — | 567 | (71,794) | — | (71,227) |
| Cash and cash equivalents, beginning of period | — | 5,998 | 310,215 | — | 316,213 |
| Cash and cash equivalents, end of period | $ — | $ 6,565 | $ 238,421 | $ — | $ 244,986 |

F–69

**Condensed consolidating statement of cash flows**

| | Nine Months Ended November 30, 2003 | | | | |
| | Refco Group | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| --- | --- | --- | --- | --- | --- |
| | | | (unaudited) | | |
| | | | (in thousands) | | |
| Net cash generated from (used in) operating activities | $    236,774 | $    27,141 | $    (82,915) | $    — | $    181,000 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | (23,219) | (28,824) | — | (52,043) |
| Net cash used in investing activities | — | (23,219) | (28,824) | — | (52,043) |
| Cash flows from financing activities | | | | | |
| Payment for redemption of preferred securities | (199,774) | — | — | — | (199,774) |
| Repayment of long–term borrowings | (37,000) | — | — | — | (37,000) |
| Withdrawals of interests by members of subsidiary | — | — | 356 | — | 356 |
| Net cash provided by financing activities | (236,774) | — | 356 | — | (236,418) |
| Net cash provided by discontinued operations | — | — | 73,318 | — | 73,318 |
| Net increase in cash and cash equivalents | — | 3,922 | (38,065) | — | (34,143) |
| Cash and cash equivalents, beginning of period | — | 4,014 | 222,151 | — | 226,165 |
| Cash and cash equivalents, end of period | $    — | $    7,936 | $    184,086 | $    — | $    192,022 |



# EXHIBIT E

# Refco Group Ltd., LLC

ONE WORLD FINANCIAL CENTER
200 LIBERTY STREET, TOWER A
NEW YORK, NY 10281
212–693–7000

# S–4

**S–4**
**Filed on 10/12/2004**
File Number 333–119701



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks −− Click here to rapidly navigate through this document

**As filed with the Securities and Exchange Commission on October 12, 2004**

Registration No. 333–

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM S–4
**REGISTRATION STATEMENT**
UNDER
**THE SECURITIES ACT OF 1933**

## Refco Group Ltd., LLC
## Refco Finance Inc.
(Exact Names of Registrants as Specified in Their Charters)

| Delaware | 6200 | 52–2169014 |
|---|---|---|
| Delaware | 6200 | 20–1400416 |
| (States or Other Jurisdictions of Incorporation or Organization) | (Primary Standard Industrial Classification Code Numbers) | (I.R.S. Employer Identification Nos.) |

**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693–7000**
(Address, Including Zip Code, and Telephone Number, Including
Area Code, of Registrant's Principal Executive Offices)

**Phillip R. Bennett**
**Refco Group Ltd., LLC**
**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693–7000**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

**SEE TABLE OF ADDITIONAL REGISTRANTS BELOW**

*Copies to:*
**Todd R. Chandler, Esq.**
**Alexander D. Lynch, Esq.**
**Weil, Gotshal & Manges LLP**
**767 Fifth Avenue**
**New York, New York 10153**
**(212) 310–8000**

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post−effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit(1) | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee |
|---|---|---|---|---|
| 9% Senior Subordinated Notes due 2012 | $600,000,000 | 100% | $600,000,000 | $76,020 |
| Guarantees of 9% Senior Subordinated Notes due 2012 | — | — | — | (2) |

*(1)*

Estimated solely for the purposes of calculating the registration fee pursuant to Rule 457(f)(2) under the Securities Act of 1933, as amended.

*(2)*

The Additional Registrants will guarantee the payment of the 9% Senior Subordinated Notes due 2012. Pursuant to Rule 457(n) of the Securities Act, no separate registration fee for the guarantees is payable.

**The Registrants hereby amend this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrants shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**ADDITIONAL REGISTRANTS**

| Exact Name of Registrant as Specified in Its Charter | State or Other Jurisdiction of Incorporation or Organization | Primary Standard Industrial Classification Code Number | I.R.S. Employer Identification No. | Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices |
|---|---|---|---|---|
| Bersec International LLC | Delaware | 6200 | 52–2169015 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Kroeck & Associates LLC | Delaware | 6200 | 36–4347337 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Lind–Waldock Securities, LLC | Delaware | 6200 | 36–4347338 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Market Educational Institute, LLC | Delaware | 6200 | 22–3836913 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Marshall Metals, LLC | Delaware | 6200 | 52–2169020 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Administration, LLC | Delaware | 6200 | 52–2169052 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Capital Holdings, LLC | Delaware | 6200 | 52–2169021 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Capital Management, LLC | Delaware | 6200 | 52–2169050 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Capital Trading LLC | Delaware | 6200 | 52–2169049 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Capital LLC | Delaware | 6200 | 52–2169060 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco F/X Associates, LLC | Delaware | 6200 | 52–2169046 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Financial, LLC | Delaware | 6200 | 52–2169047 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Fixed Assets Management, LLC | Delaware | 6200 | 52–2169022 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Global Capital Management LLC | Delaware | 6200 | 20–1717081 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| Refco Global Futures, LLC | Delaware | 6200 | 52–2169038 | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |

| | | | | |
|---|---|---|---|---|
| Refco Global Holdings, LLC | | | | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| | Delaware | 6200 | 52–2169057 | |
| Refco Information Services, LLC | | | | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| | Delaware | 6200 | 52–2169833 | |
| Refco Managed Futures, LLC | | | | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| | Delaware | 6200 | 11–3477632 | |
| Refco Mortgage Securities, LLC | | | | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| | Delaware | 6200 | 52–2169023 | |
| Refco Regulated Companies, LLC | | | | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| | Delaware | 6200 | 52–2169025 | |
| Summit Management, (Newco) LLC | | | | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| | Delaware | 6200 | 52–2169028 | |
| Westminster–Refco Management LLC | | | | One World Financial Center 200 Liberty Street, Tower A New York, New York 10281 (212) 693–7000 |
| | Delaware | 6200 | 52–2169030 | |

The name, address, including zip code, and telephone number, including area code, of agent for service for each of the Additional Registrants is:

**Phillip R. Bennett**
**Refco Group Ltd., LLC**
**One World Financial Center**
**200 Liberty Street, Tower A**
**New York, New York 10281**
**(212) 693–7000**

The information in this prospectus is not complete and may be changed. We may not sell or offer these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**Subject to Completion, Dated October 12, 2004**

**PROSPECTUS**

# Refco Group Ltd., LLC
# and
# Refco Finance Inc.

**Offer to exchange all outstanding**
**$600,000,000 9% Senior Subordinated Notes due 2012**
**for**
**$600,000,000 9% Senior Subordinated Notes due 2012**
**registered under the Securities Act of 1933**

We are offering to exchange our outstanding notes described above for our new, registered notes described above. In this prospectus, we refer to the outstanding notes as the "old notes" and the new notes as the "registered notes," and we refer to the old notes and the registered notes collectively as the "notes." The form and terms of the registered notes are identical in all material respects to the form and terms of the old notes, except for transfer restrictions, registration rights and additional interest payment provisions relating only to the old notes. We do not intend to apply to have any notes listed on any securities exchange or automated quotation system, and there may be no active trading market for them.

**Material Terms of the Exchange Offer**

- The exchange offer expires at 12:00 midnight, New York City time, on the night of                , 2004, unless extended. Whether or not the exchange offer is extended, we refer to the time at which it ultimately expires as the "time of expiration."

- The only conditions to completing the exchange offer are that the exchange offer not violate any applicable law, regulation or interpretation of the staff of the Securities and Exchange Commission and that no injunction, order or decree of any court or governmental agency that would prohibit, prevent or otherwise materially impair our ability to proceed with the exchange offer shall be in effect.

- All old notes that are validly tendered and not validly withdrawn will be exchanged.

- Tenders of old notes in the exchange offer may be withdrawn at any time prior to the time of expiration.

- We will not receive any cash proceeds from the exchange offer.

None of our affiliates, no broker–dealers that acquired old notes directly from us and no persons engaged in a distribution of registered notes may participate in the exchange offer. Each broker–dealer that receives registered notes for its own account pursuant to the exchange offer must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. The letter of transmittal states that by so acknowledging and by delivering a prospectus, a broker–dealer will not be deemed to admit that it is an "underwriter" within the meaning of the Securities Act. This prospectus, as it may be amended or supplemented from time to time, may be used by a broker–dealer in connection with resales of registered notes received in exchange for old notes where such old notes were acquired by such broker–dealer as a result of market–making activities or other trading activities. We have agreed that, for a period of 180 days after the time of expiration, we will make this prospectus available to any broker–dealer for use in connection with any such resale. See "Plan of Distribution."

**Consider carefully the "Risk Factors" beginning on page 12 of this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

The date of this prospectus is                , 2004

**TABLE OF CONTENTS**

| | PAGE |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 12 |
| FORWARD–LOOKING STATEMENTS | 27 |
| THE EXCHANGE OFFER | 28 |
| USE OF PROCEEDS | 36 |
| CAPITALIZATION | 37 |
| UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS | 38 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA | 46 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 50 |
| INDUSTRY | 67 |
| BUSINESS | 74 |
| MANAGEMENT | 86 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 89 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 91 |
| DESCRIPTION OF CREDIT FACILITIES | 94 |
| DESCRIPTION OF THE REGISTERED NOTES | 97 |
| MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE OFFER | 154 |
| PLAN OF DISTRIBUTION | 155 |
| LEGAL MATTERS | 156 |
| EXPERTS | 156 |
| GLOSSARY | 157 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F–1 |

i

**PROSPECTUS SUMMARY**

*This summary highlights key information contained elsewhere in this prospectus. It may not contain all of the information that is important to you. You should read the entire prospectus, including "Risk Factors," our consolidated financial statements and the related notes thereto and the other documents to which this prospectus refers, before deciding to participate in the exchange offer. Except as otherwise required by the context, references in this prospectus to "our company," "we," "us" or "our" refer to Refco Group Ltd., LLC and all of its subsidiaries. References to "Refco Finance" refer to Refco Finance Inc., which is a wholly owned subsidiary of Refco Group Ltd., LLC. References to "the co−issuers" refer to Refco Group Ltd., LLC and Refco Finance. References to "New Refco" refer to New Refco Group Ltd., LLC, the sole member of Refco Group Ltd., LLC. The terms "fiscal year" and "FY" refer to the 52 or 53 weeks ended the final day in February, while the terms "calendar year" and "year" refer to the year ending December 31, of the year referenced. References to "net revenues" refer to total revenues less interest expense. References to "operating profit" refer to income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary. For more information concerning certain industry terms we use in this prospectus, see "Glossary."*

**Our Company**

We are a leading independent provider of execution and clearing services for exchange−traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets.

We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide our customers the ability to trade a wide range of products in the derivatives, fixed income and foreign exchange markets.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase ("repo") transactions.

We are organized into two operating business segments for financial reporting purposes, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and we have one non−operating business segment, Corporate & Other.

*Derivatives Brokerage & Clearing.* We execute and clear customers' orders for exchange−traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for execution and matching. Through our clearing services, we facilitate confirmation and settlement of our customers' derivatives transactions. We also ensure that our customers have the appropriate margin in their accounts to support their derivatives positions.

Our customers include institutional clients, professional traders and retail customers. We provide our customers with access to trading in a wide range of derivatives products, including interest rate, equity index, energy, agriculture, foreign currency and metals contracts across all the major derivatives exchanges.

*Prime Brokerage/Capital Markets.* We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non−dollar fixed income markets. The majority of our customers are hedge funds and other financial institutions.

**Industry**

*We obtained the industry, market and competitive position data used throughout this prospectus from our own research, surveys and studies conducted by third parties and publications, including those published*

*by the Bank for International Settlements ("BIS"), the Bond Market Association, the International Swaps and Derivatives Association and the Futures Industry Association ("FIA").*

### Derivatives

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. Derivatives are broadly used in the global economy for risk management and investment. Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the over–the–counter ("OTC") market. Exchange–traded derivatives transactions are executed either electronically or physically on an exchange floor through the traditional open outcry system. Activity on derivatives exchanges is facilitated by Futures Commission Merchants ("FCMs"), such as us, which execute and clear derivatives contract orders on behalf of customers.

According to the BIS, annual trading volume in exchange–traded derivatives has grown at a compound annual growth rate of approximately 22% over the past 15 years and approximately 34% from 2001 to 2003. Volume growth in the exchange–traded derivatives market has been influenced by the following trends:

- the increasing awareness and importance of risk management;

- the introduction of new derivatives products;

- a shift in trading from OTC markets to on–exchange trading;

- the deregulation of the derivatives markets and, more broadly, the financial services industry;

- increased competition among exchange and clearing platforms; and

- a shift towards electronic trading.

### Prime Brokerage/Capital Markets

Prime brokers offer execution, clearing, securities financing, securities lending, custody, trade processing and other administrative services to institutional clients. Prime brokers provide these services across a variety of securities markets, including equities, fixed income and foreign exchange. The increase in the number and size of hedge funds has been driving growth in the prime brokerage market. Below is a description of the securities markets in which we participate.

*Fixed Income.* Our prime brokerage offerings are aimed primarily at providing customers with competitive access to a variety of fixed income markets, including markets for U.S. Treasury securities, non–dollar sovereign debt, mortgage–backed securities and corporate bonds. Because these securities are traded on OTC markets as opposed to exchanges, the principal sources of liquidity are IDBs. OTC transactions are cleared and regulated by third–party clearing platforms, such as the FICC and LCH. We provide our customers with access to these IDB markets and act as their clearing agent at the FICC and LCH.

Investors in U.S. Treasury securities and repos typically access these markets in order to take a position on the direction of interest rate changes, implement arbitrage or cash management strategies or finance securities positions. Average daily trading volume in the interdealer market for U.S. Treasury securities and the average daily amount outstanding of repurchase agreements have each grown at a compound annual growth rate of 10% over the last five years. Factors influencing this growth include: (i) growth in the total amount of debt outstanding; (ii) growth in interest rate derivatives; (iii) greater sensitivity to credit risk; and (iv) the introduction of electronic trading platforms.

*Foreign Exchange.* The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.9 trillion having grown at an 8% compound annual growth rate since 1989. A broad array of customers seek access to this market for trading and investment purposes.

While transaction volume in this market is dominated by money center banks, an increasing number of investors utilize the services of non–bank market participants, including independent brokers. Factors influencing growth in the foreign exchange markets include: (i) increased cross–border trade and investment; (ii) increasing use of foreign exchange as a hedging tool; (iii) alternative investment asset flows; and (iv) the emergence of electronic brokerage.

### Recent Transactions

On June 8, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., entered into an equity purchase and merger agreement with us, Refco Group Holdings, Inc. and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC becoming our parent and THL Refco Acquisition Partners and its affiliates and co–investors owning an approximate 57% interest in New Refco.

Upon consummation of the transactions contemplated by the Purchase Agreement, the following transactions occurred:

- THL Refco Acquisition Partners and its affiliates and co–investors acquired a portion of our interests for approximately $508.5 million in cash (the "THL Acquisition");

- Phillip Bennett, our chief executive officer, made a rollover equity investment in us of approximately $383.6 million;

- other members of our management made an investment in us for approximately $2.0 million in cash;

- we entered into senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing;

- the co–issuers issued $600.0 million in aggregate principal amount of old notes;

- THL Refco Acquisition Partners and its affiliates and co–investors and Refco Group Holdings, Inc., an entity through which Phillip Bennett held his rollover equity investment in us, contributed their interests in us to New Refco (the "New Refco Contribution"); and

- Refco Finance Holdings LLC merged with and into us, with our company continuing as the surviving entity.

Concurrently with the consummation of the Transactions, we distributed $500.0 million in cash and all of the equity interests of Forstmann–Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business, to New Refco. New Refco thereafter distributed those assets (the "RGHI Distributions") to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett.

We refer to the THL Acquisition, the New Refco Contribution, the RGHI Distributions, the financing transactions (including the issuance of the old notes) and the application of the proceeds from the financing transactions as the "Transactions."

### Our Equity Sponsor

Thomas H. Lee Partners is a leading private equity firm based in Boston that manages several private equity funds, with aggregate capital commitments of approximately $14 billion. Thomas H. Lee Partners has invested in more than 80 businesses and is currently investing for Thomas H. Lee Equity Fund V, L.P., an equity fund with over $6.1 billion of committed capital. Founded in 1974, Thomas H. Lee Partners is focused on identifying and acquiring substantial ownership stakes in mid– to large–capitalization growth companies. Thomas H. Lee Partners invests in companies with leading market positions, proven and experienced management teams, recognized brand names and well–defined

business plans, which include opportunities for growth and expansion in their core and related businesses. Notable transactions sponsored by the firm include American Media, Inc., AXIS Capital Holdings Limited, Cott Corporation, Endurance Specialty Insurance Ltd., Houghton Mifflin Company, Michael Foods, Inc., National Waterworks, Inc., Simmons Company, TransWestern Publishing Company, LLC and Warner Music Group.

## Our Executive Offices

We are a Delaware limited liability company. Our principal executive offices are located at One World Financial Center, 200 Liberty Street Tower A, New York, New York 10281, and our telephone number is (212) 693–7000. We also have a website located at *www.refco.com*. The information that appears on our website is not a part of and is not incorporated into this prospectus.

4

**Summary of the Terms of the Exchange Offer**

On August 5, 2004, the co–issuers issued $600.0 million aggregate principal amount of their 9% senior subordinated notes due 2012, in a transaction exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"). We refer to the issuance of the old notes in this prospectus as the "original issuance."

At the time of the original issuance, we entered into an agreement in which we agreed to register new notes, in substantially the same form and with substantially the same terms as the old notes, and to offer to exchange the registered notes for the old notes. This agreement is referred to in this prospectus as the "registration rights agreement."

If (but only if) you are eligible to exchange your old notes for registered notes and you satisfy the conditions set forth below under "—Resales of the Registered Notes," we believe that the registered notes issued to you in the exchange offer may be resold by you without compliance with the registration and prospectus delivery provisions of the Securities Act. You should read the discussions under the headings "The Exchange Offer" and "Description of the Registered Notes" for further information regarding the registered notes.

| | |
|---|---|
| Registration Rights Agreement | Under the registration rights agreement, we are obligated to offer to exchange the old notes for registered notes. The exchange offer is intended to satisfy that obligation. After the exchange offer is complete, except as set forth in the next paragraph, you will no longer be entitled to any exchange or registration rights with respect to your old notes. |
| | The registration rights agreement requires us to file a registration statement for a continuous offering in accordance with Rule 415 under the Securities Act for your benefit if you would not receive freely tradeable registered notes in the exchange offer or you are ineligible to participate in the exchange offer and indicate that you wish to have your old notes registered under the Securities Act. |
| The Exchange Offer | The co–issuers are offering to exchange $1,000 principal amount of their 9% senior subordinated notes due 2012, which have been registered under the Securities Act, for each $1,000 principal amount of their unregistered 9% senior subordinated notes due 2012 that were issued in the original issuance. |
| | In order to be exchanged, an old note must be validly tendered and accepted. All old notes that are validly tendered and not validly withdrawn will be accepted and exchanged. |
| | As of the date of this prospectus, there are $600.0 million aggregate principal amount of old notes outstanding. |
| | We will issue the registered notes promptly after the time of expiration. |

| | |
|---|---|
| Resales of the Registered Notes | We believe that the registered notes to be issued in the exchange offer may be offered for resale, resold and otherwise transferred by you without compliance with the registration provisions of the Securities Act if (but only if) you meet the following conditions: |

- any registered notes received by you will be acquired in the ordinary course of your business;

- you have no arrangements or understanding with any person to participate in the distribution of the registered notes;

- you are not our affiliate, as that term is defined in Rule 405 of the Securities Act; and

- you are not engaged in, and do not intend to engage in, the distribution of the registered notes.

Our belief is based on interpretations by the staff of the Securities and Exchange Commission (the "SEC"), as set forth in no–action letters issued to third parties unrelated to us. The staff has not considered this exchange offer in the context of a no–action letter, and we cannot assure you that the staff would make a similar determination with respect to this exchange offer.

If you do not meet the above conditions, you may not participate in the exchange offer or sell, transfer or otherwise dispose of any old notes unless (i) they have been registered for resale by you under the Securities Act and you deliver a "resale" prospectus meeting the requirements of the Securities Act or (ii) you sell, transfer or otherwise dispose of the registered notes in accordance with an applicable exemption from the registration requirements of the Securities Act.

Each broker–dealer that receives registered notes for its own account in exchange for old notes, where such old notes were acquired by such broker–dealer as a result of market–making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. See "Plan of Distribution." A broker–dealer may use this prospectus for an offer to resell or to otherwise transfer those registered notes for a period of 180 days after the time of expiration.

| | |
|---|---|
| Expiration Date | The exchange offer will expire at the time of expiration, which is 12:00 midnight, New York City time, on the night of                    , 2004, unless we decide to extend the exchange offer. |

| | |
|---|---|
| Conditions to the Exchange Offer | The only conditions to completing the exchange offer are that the exchange offer not violate any applicable law, regulation or applicable interpretation of the staff of the SEC and that no injunction, order or decree of any court or any governmental agency that would prohibit, prevent or otherwise materially impair our ability to proceed with the exchange offer shall be in effect. See "The Exchange Offer—Conditions." |
| Procedures for Tendering Old Notes Held in the Form of Book–Entry Interests | The old notes were issued as global notes in fully registered form without interest coupons. Beneficial interests in the old notes held by direct or indirect participants in The Depository Trust Company, or DTC, are shown on, and transfers of those interests are effected only through, records maintained in book–entry form by DTC with respect to its participants. |

If you hold old notes in the form of book–entry interests and you wish to tender your old notes for exchange pursuant to the exchange offer, you must transmit on or prior to the time of expiration either:

- a written or facsimile copy of a properly completed and duly executed letter of transmittal for your notes, including all other documents required by the letter of transmittal, to the exchange agent at the address set forth on the cover page of the letter of transmittal; or

- a computer–generated message transmitted by means of DTC's Automated Tender Offer Program system and received by the exchange agent and forming a part of a confirmation of book–entry transfer, in which you acknowledge and agree to be bound by the terms of the letter of transmittal for your notes.

The exchange agent must also receive on or prior to the time of expiration either:

- a timely confirmation of book–entry transfer of your old notes into the exchange agent's account at DTC pursuant to the procedure for book–entry transfers described in this prospectus under the heading "The Exchange Offer—Book–Entry Transfer;" or

- the documents necessary for compliance with the guaranteed delivery procedures described below.

A letter of transmittal for your notes accompanies this prospectus. By executing the letter of transmittal for your notes or delivering a computer–generated message through DTC's Automated Tender Offer Program system, you will represent to us that, among other things:

- any registered notes received by you will be acquired in the ordinary course of your business;

- you have no arrangements or understandings with any person to participate in the distribution of the registered notes;

- you are not our affiliate, as that term is defined in Rule 405 under the Securities Act;

- you are not engaged in, and do not intend to engage in, the distribution of the registered notes; and

- if you are a broker–dealer, you will receive registered notes for your own account in exchange for old notes that were acquired as a result of market–making activities or other trading activities and not directly from us and you will comply with the prospectus delivery requirements of the Securities Act.

| | |
|---|---|
| Procedures for Tendering Certificated Old Notes | If you are a holder of book–entry interests in the old notes, you are entitled to receive, in limited circumstances, in exchange for your book–entry interests, certificated notes which are in equal principal amounts to your book–entry interests. See "Description of the Registered Notes—Book Entry; Delivery and Form." If you acquire certificated old notes prior to the time of expiration, you must tender your certificated old notes in accordance with the procedures described in this prospectus under the heading "The Exchange Offer—Procedures for Tendering—Certificated Old Notes." |
| Special Procedures for Beneficial Owners | If your old notes are registered in the name of a broker, dealer, commercial bank, trust company or other nominee and you wish to tender your old notes, you should contact the registered holder promptly and instruct the registered holder to tender on your behalf. If you wish to tender on your own behalf, you must, prior to completing and executing the letter of transmittal for your old notes and delivering your old notes, either make appropriate arrangements to register ownership of the old notes in your name or obtain a properly completed bond power from the registered holder. The transfer of registered ownership may take considerable time. See "The Exchange Offer—Procedures for Tendering—Procedures Applicable to All Holders." |
| Guaranteed Delivery Procedures | If you wish to tender your old notes in the exchange offer and: |

    (1)    they are not immediately available;

    (2)    time will not permit your old notes or other required documents to reach the exchange agent before the time of expiration; or

    (3)    you cannot complete the procedure for book–entry transfer on a timely basis,

| | you may tender your old notes in accordance with the guaranteed delivery procedures set forth in "The Exchange Offer—Procedures for Tendering—Guaranteed Delivery Procedures." |
|---|---|
| Acceptance of Old Notes and Delivery of Registered Notes | Except under the circumstances described above under "Conditions to the Exchange Offer," we will accept for exchange any and all old notes which are properly tendered prior to the time of expiration. The registered notes to be issued to you in the exchange offer will be delivered promptly following the time of expiration. See "The Exchange Offer—Terms of the Exchange Offer." |
| Withdrawal | You may withdraw the tender of your old notes at any time prior to the time of expiration. We will return to you any old notes not accepted for exchange for any reason without expense to you promptly after withdrawal, rejection of tender or termination of the exchange offer. |
| Exchange Agent | Wells Fargo Bank, National Association is serving as the exchange agent in connection with the exchange offer. |
| Consequences of Failure to Exchange | If you do not participate in the exchange offer for your old notes, upon completion of the exchange offer, the liquidity of the market for your old notes could be adversely affected. See "The Exchange Offer—Consequences of Failure to Exchange." |
| Material United States Federal Income Tax Consequences of the Exchange Offer | The exchange of old notes for registered notes will not be a taxable event for United States federal income tax purposes. See "Material United States Federal Income Tax Consequences of the Exchange Offer." |

9

### Summary of Terms of the Registered Notes

| | |
|---|---|
| Co–Issuers | Refco Group Ltd., LLC and Refco Finance Inc. are the co–issuers of the notes. |
| Notes Issued | $600,000,000 aggregate principal amount of 9% senior subordinated notes due 2012. |
| Maturity Date | August 1, 2012. |
| Interest | 9% per annum, payable semiannually on February 1 and August 1 of each year, commencing on February 1, 2005. |
| Subsidiary Guarantees | All payments on the notes, including principal and interest, are jointly and severally guaranteed on a senior subordinated basis by certain of our current and future subsidiaries. The notes are not guaranteed by our regulated or foreign subsidiaries. See "Description of the Notes—Guaranties." |
| Ranking | The notes and the guarantees are the co–obligors' and our subsidiary guarantors' senior subordinated obligations and rank: |

- junior in right of payment to all of our and our subsidiary guarantors' existing and future senior indebtedness, including borrowings under our senior credit facilities;

- equally in right of payment with any of our and our subsidiary guarantors' future senior subordinated indebtedness;

- senior in right of payment to any of our and our subsidiary guarantors' future indebtedness that is expressly subordinated in right of payment to the notes; and

- effectively junior to all existing and future liabilities of our subsidiaries that have not guaranteed the notes.

As of May 31, 2004, after giving pro forma effect to the Transactions, the notes and the guarantees would have ranked junior to approximately $800.0 million of our senior indebtedness, all of which would have consisted of borrowings under our senior credit facilities.

On a pro forma basis, after giving effect to the Transactions, the notes would have been effectively subordinated to the significant liabilities of our non–guarantor subsidiaries, all of which, as of May 31, 2004, related to our customer financing arrangements. See our unaudited pro forma consolidated balance sheets as of May 31, 2004 and note I to our unaudited consolidated financial statements included elsewhere in this prospectus.

| | |
|---|---|
| Optional Redemption | Prior to August 1, 2008, we may redeem all, but not less than all, the notes for cash at a redemption price equal to 100% of their principal amount plus the Applicable Premium (as defined in "Description of the Notes—Optional Redemption") plus accrued and unpaid interest to the redemption date. |

10

We may redeem any of the notes at any time on or after August 1, 2008, in whole or in part, at the redemption prices listed under "Description of the Notes—Optional Redemption," plus accrued and unpaid interest to the date of the redemption.

In addition, on or before August 1, 2007, we may redeem up to 35% of the aggregate principal amount of the notes initially issued and 100% of the aggregate principal amount of notes subsequently issued with the net equity proceeds of certain equity or income deposit securities offerings, provided at least 65% of the aggregate principal amount of the notes initially issued remain outstanding immediately after such redemption.

| Change of Control | Upon a change in control, we will be required to make an offer to purchase each holder's notes at a price of 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of purchase. See "Description of the Notes—Change of Control." |
|---|---|

Certain Covenants

The indenture governing the notes contains covenants that, among other things, limit our ability and the ability of our restricted subsidiaries and regulated subsidiaries to:

- incur or guarantee additional indebtedness;
- sell assets;
- pay dividends or make other equity distributions;
- purchase or redeem capital stock;
- make investments;
- consolidate or merge with or into other companies; and
- engage in transactions with affiliates.

These limitations are subject to a number of important qualifications and exceptions. See "Description of the Notes—Certain Covenants."

**Risk Factors**

Investing in the notes involves risks. See "Risk Factors" immediately following this summary for a discussion of risks relating to an investment in the notes and participation in the exchange offer.

11

**RISK FACTORS**

*Participating in the exchange offer and investing in the notes involves a high degree of risk. You should carefully consider the risks described below, together with the other information contained in this prospectus, before making your decision whether to participate in the exchange offer. Any of the following risks, as well as other risks and uncertainties, could harm the value of the notes directly, or our business and financial results and thus indirectly cause the value of the notes to decline. The risks described below are not the only ones that could impact our company or the value of the notes. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business, financial condition or results of operations. As a result of any of these risks, known or unknown, you may lose all or part of your investment in the notes.*

**Risks Relating to the Notes**

***Our substantial indebtedness could adversely affect our financial health, harm our ability to react to changes to our business and prevent us from fulfilling our obligations under our indebtedness, including the notes.***

As a result of the Transactions, we have a significant amount of indebtedness. As of May 31, 2004, on a pro forma basis after giving effect to the Transactions, we would have had total debt of approximately $1,400.0 million outstanding. For the twelve months ended May 31, 2004, on a pro forma basis after giving effect to the Transactions, our interest expense would have been $94.0 million.

Our substantial level of indebtedness increases the possibility that we may be unable to generate cash sufficient to pay, when due, the principal of, interest on or other amounts due in respect of our indebtedness. Our substantial debt could also have other significant consequences. For example, it could:

- increase our vulnerability to general economic downturns and adverse competitive and industry conditions;

- require us to dedicate a substantial portion, if not all, of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- place us at a competitive disadvantage compared to competitors that have less debt;

- limit our ability to raise additional financing on satisfactory terms or at all; and

- adversely impact our ability to comply with the financial and other restrictive covenants in the indenture governing the notes and the credit agreement governing our senior credit facilities, which could result in an event of default under such agreements.

Furthermore, our interest expense could increase if interest rates increase because all of the debt under our senior credit facilities is variable–rate debt. See "Description of Credit Facilities—Senior Credit Facilities." If we do not have sufficient earnings, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or sell more securities, none of which we can guarantee we will be able to do.

***Despite current indebtedness levels, we and our subsidiaries may still be able to incur substantially more debt. This could further exacerbate the risks associated with our substantial leverage.***

We and our subsidiaries may be able to incur substantial additional indebtedness in the future. Although the indenture governing the notes and our senior credit facilities contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. For example, we have up to $75.0 million of borrowings available under our new revolving credit

12

facility and have the ability to increase the aggregate amount of our term loan up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. Any additional borrowings could be senior to the notes and the related guarantees. If we incur additional debt, the risks associated with our substantial leverage would increase.

***To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to make payments on and to refinance our indebtedness, including the notes and amounts borrowed under our senior credit facilities, and to fund our operations, will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us under our senior credit facilities or otherwise in amounts sufficient to enable us to service our indebtedness, including the notes and amounts borrowed under our senior credit facilities, or to fund our other liquidity needs. If we cannot service our debt, we will have to take actions such as reducing or delaying capital investments, selling assets, restructuring or refinancing our debt or seeking additional equity capital. We cannot assure you that any of these remedies could, if necessary, be effected on commercially reasonable terms, or at all. In addition, the indenture governing the notes and the credit agreement for our senior credit facilities may restrict us from adopting any of these alternatives. Furthermore, Thomas H. Lee Partners, L.P. and its affiliates and Phillip Bennett have no continuing obligation to provide us with debt or equity financing. Because of these and other factors beyond our control, we may be unable to pay the principal, premium, if any, interest or other amounts on the notes. See "Description of Credit Facilities" and "Description of the Notes."

***We depend almost entirely on the cash flow from our subsidiaries to meet our obligations, and the notes are effectively subordinated to all obligations of our non–guarantor subsidiaries, including our regulated subsidiaries.***

We conduct all of our operations through our subsidiaries and depend almost entirely upon dividends and other inter–company transfers of funds from our subsidiaries to meet our payment obligations under the notes. Unless they are guarantors of the notes, our subsidiaries do not have any obligation to pay amounts due on the notes or otherwise to make funds available for that purpose. Only our non–regulated domestic subsidiaries are subsidiary guarantors of the notes. As a result of this structure, the notes are effectively subordinated to all indebtedness and other obligations (such as trade payables) of our non–guarantor subsidiaries, including to the significant liabilities of our regulated subsidiaries that relate to our customer financing arrangements. For further information regarding the liabilities of our non–guarantor subsidiaries, see note I to our unaudited consolidated financial statements. The effect of this subordination is that, in the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding involving a non–guarantor subsidiary, the assets of that subsidiary could not be used to pay you until after all other claims against that subsidiary, including trade payables, have been fully paid. In addition, holders of minority equity interests in non–guarantor subsidiaries may receive distributions prior to or pro rata with us depending on the terms of the equity interests.

***Substantially all of our net revenues and EBITDA are generated by, and substantially all of our assets are held by, our non–guarantor subsidiaries who have no obligations to pay amounts due on the notes and whose indebtedness and all other obligations are effectively senior to the notes.***

The historical consolidated financial data and the pro forma consolidated financial data included in this prospectus are presented on a consolidated basis for our entire business and include our non–guarantor subsidiaries. Substantially all of our net revenues and EBITDA are generated by our non–guarantor subsidiaries. The assets of our non–guarantor subsidiaries, which principally relate to

13

assets relating to customer accounts and our customer financing activities, represent substantially all of our assets. As discussed in the preceding risk factor, these non–guarantor subsidiaries have no obligation to pay amounts due on the notes or to make funds available for these purposes, and the notes are effectively subordinated to all these subsidiaries' liabilities. For further information regarding the assets and liabilities of our non–guarantor subsidiaries, see note I to our unaudited consolidated financial statements.

***Regulatory and legal restrictions may prohibit certain of our subsidiaries from paying dividends and making other payments to us.***

As discussed in the previous two risk factors, we conduct all of our operations through our subsidiaries and will depend almost entirely upon dividends and other inter–company transfers of funds from our subsidiaries to meet our payment obligations under the notes. In addition to not guaranteeing the notes, our regulated subsidiaries are limited in their ability to pay dividends and make other payments to us by applicable laws and regulations. For example, Refco, LLC, one of our subsidiaries registered as an FCM with the Commodity Futures Trading Commission ("CFTC"), must seek regulatory approvals to pay a substantial dividend and will not be able to pay dividends to us if after paying such dividends it would fail to maintain its minimum capital requirements, which as of May 31, 2004 were $125.8 million. See "Business—Regulation."

***Restrictive covenants in the senior credit facilities and the indenture may restrict our ability to pursue our business strategies.***

Our senior credit facilities contain a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to engage in acts that may be in our long–term best interests. Our senior credit facilities include covenants restricting, among other things, our ability to:

- incur or guarantee additional debt;

- incur liens;

- make loans and investments;

- make capital expenditures;

- declare or pay dividends or redeem or repurchase capital stock;

- engage in mergers, acquisitions and other business combinations;

- prepay, redeem or purchase subordinated debt (including the notes);

- amend or otherwise alter terms of subordinated debt (including the notes);

- sell assets and engage in sale leaseback transactions;

- transact with affiliates; and

- alter the business that we conduct.

The indenture relating to the notes also contains numerous covenants including, among other things, restrictions on our ability to:

- incur or guarantee additional indebtedness;

- sell assets;

- declare or pay dividends or make other equity distributions;

- purchase or redeem capital stock;

- make investments;

- consolidate or merge with or into other companies;

14

- engage in transactions with affiliates; and

- alter the business that we conduct.

Our senior credit facilities also include financial covenants, including requirements that we maintain:

- a minimum interest coverage ratio; and

- a maximum leverage ratio.

These financial covenants will become more restrictive over time.

A breach of any covenant or the inability to comply with any required financial ratio contained in either our senior credit facilities or the indenture governing the notes could result in a default under that agreement. If any such default occurs, the lenders under our senior credit facilities or the holders of the notes, as the case may be, may elect to declare all outstanding borrowings, together with accrued and unpaid interest and other amounts payable thereunder, to be immediately due and payable. In addition, a default under the indenture governing the notes would cause a default under the senior credit facilities, and the acceleration of debt under the senior credit facilities or the failure to pay debt when due would cause a default under the indenture governing the notes. The lenders under our senior credit facilities also have the right upon an event of default thereunder to terminate any commitments they have to provide further borrowings. Further, following an event of default under our senior credit facilities, the lenders under these facilities will have the right to proceed against the collateral granted to them to secure that debt, which includes the available cash of our subsidiaries that guarantee the senior credit facilities, and they will also have the right to prevent us from making debt service payments on the notes. If the debt under our senior credit facilities or the notes offered hereby were to be accelerated, we cannot assure you that our assets would be sufficient to repay in full that debt or any other debt that may become due as a result of that acceleration.

***Your right to receive payments on the notes is subordinated to the borrowings under our senior credit facilities and possibly all of our future borrowings. Further, the guarantees of the notes are junior to all the guarantors' existing senior indebtedness and possibly to all of the guarantors' future borrowings.***

The notes and the guarantees rank in right of payment behind all of the co–issuers' and the guarantors' existing senior indebtedness, including borrowings under our senior credit facilities, and will rank in right of payment behind all of the co–issuers' and the guarantors' future borrowings, except any future indebtedness that expressly provides that it ranks equal or junior in right of payment to the notes and the guarantees. As of May 31, 2004, on a pro forma basis after giving effect to the Transactions, the notes and the guarantees would have been contractually subordinated to approximately $800.0 million of senior term loan debt. In addition, our senior credit facilities and the indenture governing the notes permit us to incur up to $75.0 million in additional borrowings under our revolving credit facility, subject, in the case of our senior credit facilities, to compliance with the covenants and conditions to borrowings under the senior credit facilities, which borrowings would be senior to the notes and the guarantees. Our senior credit facilities and the indenture also permit us to increase the term loan facility under our credit agreement by up to $200.0 million, subject, in the case of the senior credit facilities, to certain conditions. See "Description of Credit Facilities—Senior Credit Facilities." We will also be permitted to incur substantial additional indebtedness, including senior indebtedness, in the future.

As a result of this subordination, upon any distribution to the creditors of the co–issuers or the creditors of the guarantors in a bankruptcy, liquidation or reorganization or similar proceeding relating to the co–issuers or the guarantors or their respective property, the holders of senior debt of the co–issuers and the guarantors will be entitled to be paid in full and in cash before any payment (other than payments in certain junior securities) may be made with respect to the notes or the guarantees, as the case may be.

15

All payments (other than payments in the form of certain junior securities) on the notes and the guarantees will be blocked in the event of a payment default on designated senior debt and may be blocked for up to 179 consecutive days in the event of certain non–payment defaults on designated senior debt.

In the event of a bankruptcy, liquidation or reorganization or similar proceeding relating to the co–issuers or the guarantors, holders of the notes will participate with the trade creditors and all other holders of the co–issuers' and the guarantors' senior subordinated indebtedness, as the case may be, in the assets remaining after the co–issuers and the guarantors have paid all of the senior secured indebtedness. However, because the indenture requires that amounts otherwise payable to holders of the notes in a bankruptcy or similar proceeding be paid to holders of senior indebtedness instead, holders of the notes may receive less, ratably, than holders of trade payables or other unsecured, unsubordinated creditors in any such proceeding. In any of these cases, the co–issuers and the guarantors may not have sufficient funds to pay all of its creditors, and holders of the notes may receive less, ratably, than the holders of senior indebtedness. See "Description of the Notes—Ranking."

***The notes are not secured by our assets and the lenders under our senior credit facilities will be entitled to remedies available to a secured lender, which gives them priority over you to collect amounts due to them.***

In addition to being subordinated to all the co–issuers' and guarantors' existing and future senior debt, the notes and the guarantees are not secured by any of their assets. Our obligations under our senior credit facilities are secured by, among other things, a first priority pledge of all the common equity interests of the co–issuers and substantially all our other assets. If we become insolvent or are liquidated, or if payment under our senior credit facilities or in respect of any other secured indebtedness is accelerated, the lenders under our senior credit facilities or holders of other secured indebtedness will be entitled to exercise the remedies available to a secured lender under applicable law (in addition to any remedies that may be available under documents pertaining to our senior credit facilities or other senior debt). Upon the occurrence of any default under our senior credit facilities (and even without accelerating the indebtedness under our senior credit facilities), the lenders may be able to prohibit the payment of the notes and guarantees either by limiting our ability to access our cash flow or under the subordination provisions contained in the indenture governing the notes. See "Description of Credit Facilities" and "Description of the Notes—Ranking."

***We may not be able to fulfill our repurchase obligations in the event of a change of control.***

Upon the occurrence of any change of control, we will be required to make a change of control offer to repurchase the notes. Any change of control also would constitute a default under our senior credit facilities. Therefore, upon the occurrence of a change of control, the lenders under our senior credit facilities would have the right to accelerate their loans, and if so accelerated, we would be required to repay all of our outstanding obligations under our senior credit facilities. Also, our senior credit facilities generally prohibit us from purchasing any notes if we do not repay all borrowings under such facilities first or obtain the consent of the lenders under such facilities. Accordingly, unless we first repay all such borrowings or obtain the consent of such lenders, we will be prohibited from purchasing the notes upon a change of control.

In addition, if a change of control occurs, there can be no assurance that we will have available funds sufficient to pay the change of control purchase price for any of the notes that might be delivered by holders of the notes seeking to accept the change of control offer and, accordingly, none of the holders of the notes may receive the change of control purchase price for their notes. Our failure to make the change of control offer or to pay the change of control purchase price when due would result in a default under the indenture governing the notes. See "Description of the Registered Notes—Defaults."

***Federal and state fraudulent transfer laws permit a court to void the notes and the guarantees, and if that occurs, you may not receive any payments on the notes or you may be required to repay amounts you received.***

The notes are guaranteed by each of the subsidiary guarantors. The co–issuers' issuance of the notes and the issuance of the guarantees by the subsidiary guarantors may be subject to review under federal and state fraudulent transfer and conveyance statutes if a bankruptcy, liquidation or reorganization case or a lawsuit, including circumstances in which bankruptcy is not involved, were commenced at some future date by, or on behalf of, unpaid creditors of the co–issuers or the subsidiary guarantors. While the relevant laws may vary from state to state, under such laws the issuance of the notes or the guarantees and the application of the proceeds from the issuance of the notes will be a fraudulent conveyance if (1) a co–issuer issued the notes or a subsidiary guarantor issued a guarantee with the intent of hindering, delaying or defrauding creditors or (2) a co–issuer or any of the subsidiary guarantors, as applicable, received less than reasonably equivalent value or fair consideration in return for issuing either the notes or a guarantee, and, in the case of (2) only, one of the following is true:

- a co–issuer or any of the subsidiary guarantors were insolvent, or rendered insolvent, by reason of such transactions;

- a co–issuer or any of the subsidiary guarantors were engaged in a business or transaction for which the applicable co–issuer's or subsidiary guarantor's assets constituted unreasonably small capital; or

- a co–issuer or any of the subsidiary guarantors intended to, or believed that it would, be unable to pay its debts as they matured.

If a court were to find that the issuance of the notes or a guarantee were a fraudulent conveyance, the court could void the payment obligations under the notes or such guarantee or subordinate the notes or such guarantee to presently existing and future indebtedness of the applicable co–issuer or guarantor, or require the holders of the notes to repay any amounts received with respect to the notes or such guarantee. In the event of a finding that a fraudulent conveyance occurred, you may not receive any payment on the notes or the guarantees.

The measures of insolvency for purposes of fraudulent transfer laws vary depending upon the governing law. Generally, an entity would be considered insolvent if, at the time it incurred indebtedness:

- the sum of its debts was greater than the fair value of all its assets;

- the present fair saleable value of its assets is less than the amount required to pay the probable liability on its existing debts and liabilities as they become due; or

- it cannot pay its debts as they become due.

A court would likely find that a co–issuer or subsidiary guarantor did not receive reasonably equivalent value or fair consideration for the issuance of the notes or its guarantee if the co–issuer or subsidiary guarantor did not substantially benefit directly or indirectly from the issuance of the notes. Each guarantee will contain a provision intended to limit the subsidiary guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent transfer. This provision may not be effective to protect the guarantees from being voided under fraudulent transfer law.

### Risks Relating to the Exchange Offer

***Your old notes will not be accepted for exchange if you fail to follow the exchange offer procedures.***

We will not accept your old notes for exchange if you do not follow the exchange offer procedures. We will issue registered notes as part of this exchange offer only after a timely receipt of your old notes, a properly completed and duly executed letter of transmittal and all other required documents.

Therefore, if you wish to tender your old notes, please allow sufficient time to ensure timely delivery. If we do not receive your old notes, letter of transmittal and other required documents by the time of expiration of the exchange offer, we will not accept your old notes for exchange. We are under no duty to give notification of defects or irregularities with respect to the tenders of old notes for exchange. If there are defects or irregularities with respect to your tender of old notes, we will not accept your old notes for exchange.

**If you do not exchange your old notes, there will be restrictions on your ability to resell your old notes.**

Following the exchange offer, old notes that you do not tender or that we do not accept will be subject to transfer restrictions. Absent registration, any untendered old notes may therefore be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and applicable state securities laws.

**We cannot assure you that an active trading market will develop for these notes.**

The registered notes are a new issue of securities and there is no established trading market for the registered notes. We do not intend to apply to list the registered notes for trading on any securities exchange or to arrange for quotation on any automated dealer quotation system. As a result of this and the other factors listed below, an active trading market for the registered notes may not develop, in which case the market price and liquidity of the registered notes may be adversely affected.

In addition, you may not be able to sell your registered notes at a particular time or at a price favorable to you. Future trading prices of the registered notes will depend on many factors, including:

- our operating performance and financial condition;

- our prospects or the prospects for companies in our industry generally;

- our ability to complete this exchange offer;

- the interest of securities dealers in making a market in the notes;

- the market for similar securities;

- prevailing interest rates; and

- the other factors described in this prospectus under "Risk Factors."

Historically, the market for non−investment grade debt has been subject to disruptions that have caused volatility in prices. It is possible that the market for the registered notes will be subject to disruptions. A disruption may have a negative effect on you as a holder of the registered notes, regardless of our prospects or performance.

Although the initial purchasers of the old notes have advised us that they intend to make a market in the registered notes, they are not obligated to do so. The initial purchasers may also discontinue any market making activities at any time, in their sole discretion, which could further negatively impact your ability to sell the registered notes or the prevailing market price at the time you choose to sell.

18

**Risks Relating to Our Company**

***Changes in domestic and international market factors that affect trading volumes or interest rates could significantly harm our business.***

We generate revenues primarily from transaction fees we earn from executing and clearing customer orders and from interest income we earn on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. These revenue sources are substantially dependent on customer trading volumes and interest rates. We are, in particular, affected by customer trading volumes on the six primary derivatives exchanges on which we conduct transactions and in the fixed income and foreign exchange markets. The volume of transactions our customers conduct with us and interest rates are directly affected by domestic and international market factors that are beyond our control, including:

- economic, political and market conditions;

- broad trends in industry and finance;

- changes in levels of trading activity in the broader marketplace;

- price levels and price volatility in the derivatives, fixed income, equity, foreign exchange and commodity markets;

- legislative and regulatory changes;

- the actions of our competitors;

- changes in government monetary policies;

- foreign exchange rates; and

- inflation.

Any one or more of these factors, or others, may contribute to reduced trading volumes or changes in interest rates, which could have a material adverse effect on our business, financial condition and operating results.

***We face intense competition from other companies, and if we are not able to successfully compete with them, our business may be harmed.***

The derivatives, securities and financial services industries are highly competitive, and we expect that competition will intensify in the future. We have numerous current and prospective competitors, both domestically and internationally. They include both large, diversified financial institutions, such as major investment banks and independent specialty brokers. Many of our competitors and potential competitors have larger customer bases and greater financial, marketing, technological and personnel resources than we do. These resources may enable them to, among other things:

- develop services similar to ours or new services that are preferred by our customers;

- provide access to trading in products or a range of products that we do not offer;

- provide their services more efficiently and at a lower cost;

- offer better, faster and more reliable technology;

- take greater advantage of acquisitions, alliances and other opportunities;

- more effectively market, promote and sell their services; and

- better leverage their existing relationships with their existing customers.

19

In addition, new or existing competitors could gain access to trading markets in which we currently enjoy a competitive advantage. For example, if additional competitors gained access to the IDB market, it could adversely affect our advantage in providing trading access to the U.S. Treasury securities market. Moreover, we cannot assure you that existing market participants, such as the exchanges, will not expand their services and begin competing with us more directly. Even if new or existing competitors do not significantly erode our market share, we may be required to reduce our fees significantly to remain competitive, which could have a material adverse effect on our profitability. If in any of these cases we fail to compete effectively, our business, financial condition and operating results may be materially harmed.

***Our business could be adversely affected if we are unable to retain our current customers or attract new customers.***

The success of our business depends, in part, on our ability to maintain and increase our customer base. Customers in our market are sensitive to, among other things, the costs of using our services, the quality of the services we offer, the speed and reliability of order execution and the breadth of our service offerings and the products to which we offer access. We cannot assure you that we will be able to offer the pricing, service, speed and reliability of order execution or the service and product breadth that customers desire. As a result, we also cannot assure you that we will retain existing customers or attract new customers, and our failure to maintain or attract customers could have a material adverse effect on our business, financial condition and operating results.

***We rely on relationships with our introducing brokers for obtaining some of our customers. The failure to maintain these relationships could adversely affect our business.***

We have a relationship with introducing brokers who acquire and provide marketing and customer service functions for some of our customers. These introducing brokers receive compensation for introducing customers to us. The failure to maintain our relationships with these introducing brokers would result in a loss of revenues, which could adversely affect our business.

***Our business operations could be significantly disrupted if we lost members of our management team.***

Our success depends to a significant degree upon the continued contributions of our management team. Our future performance will be substantially dependent on our ability to retain and motivate them. We cannot assure you that any of these persons will not voluntarily terminate his or her employment with us. The loss of the services of any member of our management team, particularly our president and chief executive officer, Phillip Bennett, could adversely affect our ability to execute our business strategy. See "Management—Managers and Executive Officers."

***We may not effectively manage our growth, which could materially harm our business.***

We expect that our business will continue to grow. This growth may place a significant strain on our management, personnel, systems and resources. We must continue to improve our operational and financial systems and managerial controls and procedures, and we will need to continue to expand, train and manage our technology workforce. We must also maintain close coordination among our technology, compliance, risk management, accounting, finance, marketing and sales organizations. We cannot assure you that we will manage our growth effectively. If we fail to do so, our business could be materially harmed.

If we continue to grow, we may be required to increase our investment in facilities, personnel and financial and management systems and controls. Continued growth may also require expansion of our procedures for monitoring and assuring our compliance with applicable regulations and that we integrate, train and manage a growing employee base. The expansion of our existing businesses, our

20

expansion into new businesses and the resulting growth of our employee base increase our need for internal audit and monitoring processes that are more extensive and broader in scope than those we have historically required. We may not be successful in implementing all of the processes that are necessary. Further, unless our growth results in an increase in our revenues that is proportionate to the increase in our costs associated with this growth, our operating margins and profitability will be adversely affected.

***Our operations expose us to significant credit risks.***

We act on behalf of our customers for all trades consummated both on exchanges and in OTC markets. Accordingly, we are responsible for our customers' obligations with respect to these transactions, which exposes us to significant credit risk. Our customers may default on their obligations due to bankruptcy, lack of liquidity, operational failure or other reasons. A substantial part of our working capital is at risk if customers default on their obligations to us and their margin and security deposits are insufficient to meet all of their obligations. We cannot assure you that we will not be materially and adversely affected in the event of a significant default by our customers.

***Our acquisition and investment strategy and any other new business initiatives we undertake may involve risks, and if we are unable to effectively manage these risks, our business will be materially harmed.***

To achieve our strategic objectives, in the future we may seek to acquire other companies, businesses or technologies. Acquisitions entail numerous risks, including the following:

- difficulties in the integration of acquired operations, personnel or technologies;

- diversion of management's attention from other business concerns;

- assumption of unknown material liabilities;

- failure to achieve financial or operating objectives;

- amortization of acquired intangible assets, which would reduce future reported earnings; and

- potential loss of customers or key employees of acquired companies.

We also may seek to expand or enhance our operations by forming joint ventures, making other investments or undertaking other business initiatives and entering new lines of businesses. Entering into joint ventures also entails risks, including difficulties in developing and expanding the business of newly formed joint ventures, exercising influence over the activities of joint ventures in which we do not have a controlling interest and potential conflicts with our joint venture partners. Other investments and business initiatives may also involve risks, including but not limited to loss of investment. We cannot assure you that any acquisition, joint venture, investment or other business initiative that we have or may enter into will be successful.

***Our international operations involve special challenges that we may not be able to meet, which could adversely affect our financial results.***

We currently conduct international operations and plan to expand those operations. There are certain risks inherent in doing business in international markets, particularly in the securities trading industry, which is heavily regulated in many jurisdictions outside the United States. These risks include:

- less developed technological infrastructures and generally higher costs, which could result in lower customer acceptance of our services or customers having difficulty accessing our products and services;

- the inability to manage and coordinate the various regulatory requirements of multiple jurisdictions that are constantly evolving and subject to unexpected change;

21

- difficulties in staffing and managing foreign operations;

- fluctuations in exchange rates; and

- potentially adverse tax consequences.

Our operations in certain less developed countries are also subject to the political, legal and economic risks associated with politically unstable and less developed regions of the world, including the risk of war and other international conflicts, and actions by governmental authorities, insurgent groups, terrorists and others. Specifically, we conduct business in countries whose currencies may be unstable. Future instability in such currencies or the imposition of governmental or regulatory restrictions on such currencies could impede our foreign exchange business and our ability to collect on collateral held in such currencies.

In addition, we are required to comply with the laws and regulations of foreign governmental and regulatory authorities of each country in which we conduct business. These may include laws, rules and regulations relating to many aspects of the derivatives and capital markets businesses. Our compliance with these laws and regulations may be difficult and may require significant expenditures and personnel requirements, and our failure to be in compliance would subject us to legal and regulatory liabilities. We may also experience difficulty in managing our international operations because of, among other things, competitive conditions overseas, management of foreign exchange risk, established domestic markets, language and cultural differences and economic or political instability. Any of these factors could have a material adverse effect on the success of our international operations and, consequently, on our business, financial condition and operating results.

*If we experience systems failures or capacity constraints, our ability to conduct our operations would be materially harmed.*

We are heavily dependent on the capacity and reliability of the computer and communications systems supporting our operations, whether owned and operated internally or by third parties. We receive and process a large portion of our trade orders through electronic means, such as through public and private communications networks. These computer and communications systems and networks are subject to performance degradation or failure from any number of reasons, including loss of power, acts of war or terrorism, human error, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, intentional acts of vandalism, customer error or misuse, lack of proper maintenance or monitoring and similar events. During the terrorist attacks on the World Trade Center on September 11, 2001, we lost access to a significant portion of our communications and computer networks. Although the disruption of our operations as a result of this event was not material, we cannot assure you that the future occurrences of any of the events listed above, or of any other events, would not result in the material degradation or failure of our computer and communications systems and networks.

If such a degradation or failure were to occur, it could cause any number of results, including:

- unanticipated disruptions in service to our customers;

- slower response times;

- delays in our customers' trade execution;

- failed settlement of trades; and

- incomplete or inaccurate accounting, recording or processing of trades.

Further, any of our redundant systems or disaster recovery plans or our personnel, may not be adequate to correct or mitigate any of the above events. Similarly, we cannot be certain that any redundant systems, disaster recovery plans or personnel of our third party service providers will be

22

adequate to correct or mitigate any of the above events or be implemented properly. The occurrence of any of the foregoing events may lead to financial losses, litigation or arbitration claims filed by or on behalf of our customers and regulatory investigations and sanctions, including by the SEC and CFTC, which require that our trade execution and communications systems be able to handle anticipated present and future peak trading volumes. The occurrence of the foregoing events could also have a negative effect on our reputation, which in turn could cause us to lose existing customers to our competitors or make it more difficult for us to attract new customers in the future. Further, any financial loss that we suffer as a result of such degradations or failures could be magnified by price movements of contracts involved in transactions impacted by the degradation or failure, and we may be unable to take corrective action to mitigate any losses we suffer.

***If we fail to maintain our computer and communications systems and networks properly or to upgrade and expand such systems and networks in response to technological change, our business will be materially harmed.***

We need to properly maintain the computer and communications systems and networks that we currently own and operate. We internally support and maintain many of our existing systems and networks, including those that are critical to our derivatives clearing operations. Our failure to adequately maintain these systems and networks could have a material effect on the performance and reliability of such systems and networks, which in turn could materially harm our business.

Further, the markets in which we compete are characterized by rapidly changing technology, changes in customer demand and uses of our services and the emergence of new industry standards and practices that could render our existing technology and systems obsolete. Our future success will depend in part on our ability to anticipate and adapt to technological advancements and changing standards in a timely, cost−efficient and competitive manner, and to upgrade and expand our systems accordingly. Any upgrades or expansions may require significant expenditures of funds and may also increase the probability that we will suffer system degradations and failures. We cannot assure you that we will have sufficient funds to adequately update and expand our networks, nor can we assure you that any upgrade or expansion attempts will be successful and accepted by the marketplace and our customers. Our failure to adequately update and expand our systems and networks would have a material adverse effect on our business.

***We depend on third−party suppliers for a number of services that are important to our business.***

We depend on a number of suppliers, such as banking, clearing and settlement organizations, telephone companies, online service providers, data processors and software and hardware vendors for elements of our trading, clearing and other systems, as well as communications and networking equipment, computer hardware and software and related support and maintenance. We cannot assure you that any of these providers will be able to continue to provide these services in an efficient, cost−effective manner or that they will be able to adequately expand their services to meet our needs. An interruption in or the cessation of service by any service provider and our inability to make alternative arrangements in a timely manner, or at all, could have a material adverse effect on our business, financial condition and operating results.

***Our networks and those of our third−party service providers may be vulnerable to security risks.***

We expect the secure transmission of confidential information over public networks to continue to be a critical element of our operations. Our networks and those of our third−party service providers, the exchanges and counterparties with whom we trade and our customers may be vulnerable to unauthorized access, computer viruses and other security problems. Persons who circumvent security measures could wrongfully use our information or cause interruptions or malfunctions in our operations, any of which could have a material adverse effect on our business, financial condition and

23

operating results. Additionally, our reputation could be damaged. If an actual, threatened or perceived breach of our security occurs, the market perception of the effectiveness of our security measures could be harmed and could cause customers to reduce or stop their use of our products and services. We may be required to expend significant resources to protect against the threat of security breaches or to alleviate problems, including reputational harm and litigation, caused by any breaches. Although we intend to continue to implement industry–standard security measures, these measures may prove to be inadequate and result in system failures and delays that could lower trading volumes and have an adverse effect on our business, financial condition and operating results.

***We operate in a heavily regulated environment that imposes significant costs and compliance requirements on us. The failure to comply with the regulations to which we are subject could subject us to sanctions.***

We are extensively regulated by the CFTC; the SEC; the National Association of Securities Dealers ("NASD"), our designated self–regulatory organization with respect to our registration as a broker–dealer; the Chicago Mercantile Exchange (the "CME"), our designated self–regulatory organization with respect to our registration as an FCM; the National Futures Association ("NFA"); other exchanges of which we are a member; state regulatory agencies; and other domestic and foreign clearing organizations. If we fail to comply with applicable laws, rules or regulations, we may be subject to criminal conviction, increased reporting requirements, censure, fines, cease–and–desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including revocation of our operating licenses. Changes in laws, rules or regulations or in governmental policies in applying them could further restrict our operations, impose additional administrative or other burdens on our operations or result in an increase in our cost of regulatory compliance, any of which could have a material adverse effect on our business, financial condition and operating results.

The organizations and agencies that regulate us have broad powers to investigate and enforce compliance and punish non–compliance with their rules and regulations. We cannot assure you that we or our managers, officers and employees will be able to fully comply with these rules and regulations and will not be subject to claims or actions by these organizations and agencies.

***We will become subject to additional financial and other reporting and corporate governance requirements that may be difficult for us to satisfy.***

We have historically operated our business as a private company. We will be obligated after the effectiveness of our exchange offer registration statement or shelf registration statement to file with the SEC certain annual and quarterly information and other reports that are specified in Sections 13 and 15(d) of the Exchange Act as applicable to U.S. companies subject to such Sections. We will also become subject to other new financial and other reporting and corporate governance requirements, including certain provisions of the Sarbanes–Oxley Act of 2002 and the regulations promulgated thereunder, which will impose significant compliance obligations upon us. These obligations will require a commitment of additional resources and may in meeting these requirements require the hiring of additional staff and result in the diversion of our senior management's time and attention from our day to day operations. We cannot assure you that we will be successful in complying with these obligations or that the compliance with them will not adversely impact our business or results of operations.

***Our compliance and risk management methods might not be effective, which could increase the risk that we are subject to regulatory action or litigation or otherwise negatively impact our business.***

Our ability to comply with all applicable laws, rules and regulations is largely dependent on our establishment and maintenance of compliance, audit and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. If we fail to effectively establish and maintain such compliance and reporting systems or fail to attract and retain personnel

24

who are capable of designing and operating such systems, it will increase the likelihood that we will become subject to legal and regulatory infractions, including civil litigation.

For us to avoid risks inherent in our business, it is necessary for us to have polices and procedures that identify, monitor and manage our risk exposure. Such policies may not be fully effective. Some of our risk management methods depend upon evaluation of information regarding markets, customers or other matters that are publicly available or otherwise accessible by us. That information may not in all cases be accurate, complete, up–to–date or properly evaluated. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events. We cannot assure you that our policies and procedures will always be effective or that we will always be successful in monitoring or evaluating the risks to which we are or may be exposed. Such a failure could expose us to unforeseen risks, which could have a material adverse effect on our financial condition or results of operations.

***We are subject to significant litigation risk which could adversely affect our business.***

Many aspects of our business involve substantial liability risks, and we could be exposed to substantial liability under federal and state laws and court decisions, as well as rules and regulations promulgated by the SEC, the CFTC and other regulatory organizations. These risks include, among others, potential civil litigation triggered by regulatory investigations, potential liability from disputes over terms of a trade, the claim that a system failure or delay caused monetary losses to a customer, that we entered into an unauthorized transaction or that we provided materially false or misleading statements in connection with a transaction. The volume of claims and the amount of damages claimed in litigation and regulatory proceedings against financial intermediaries have been increasing. Dissatisfied customers frequently make claims against their service providers regarding quality of trade execution, improperly settled trades, mismanagement or even fraud. These risks also include potential liability from disputes over the exercise of our rights with respect to customer margins and security deposits. Although our customer agreements generally provide that we may exercise such rights with respect to customer margins and security deposits as we deem reasonably necessary for our protection, our exercise of these rights in certain cases has led to claims by customers that we have exercised these rights improperly. [For example, we are currently the subject of a lawsuit brought by a customer who has alleged that we improperly liquidated its position in connection with a margin call.] Even if we prevail in this or other lawsuits, we could incur significant legal expenses defending claims, even those without merit. An adverse resolution of any future lawsuit or claim against us could have a material adverse effect on our reputation, financial condition or operating results.

***We could be harmed by employee or introducing broker misconduct or errors that are difficult to detect and deter.***

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Misconduct by our employees or introducing brokers could include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers or improper use of confidential information. Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. It is not always possible to deter employee or introducing broker misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. Our employees or introducing brokers also may commit errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions. For example, the litigation referred to in the preceding risk factor resulted from the actions of employees.

***If we do not maintain the capital levels required by regulations, we may be fined or barred from conducting business.***

The SEC, NASD, CFTC and various other regulatory agencies have stringent rules with respect to the maintenance of specific levels of net capital by securities broker–dealers and FCMs. Our failure to maintain the required net capital could result in suspension or revocation of our registration by the SEC and our suspension or expulsion by the NASD, and could ultimately lead to our liquidation. If net capital rules are changed or expanded, or if we incur an unusually large charge against net capital, our operations that require an intensive use of capital could be limited. Such operations may include dealing activities, marketing and the financing of customer account balances. See "Business—Regulation" for more information on the minimum net capital requirements for our domestic broker–dealer and FCM subsidiaries.

***We have recorded a significant amount of intangible assets, which may never generate the returns we expect.***

Our acquisitions have resulted in significant increases in goodwill and identifiable intangible assets. Goodwill, which relates to the excess of cost over the fair value of the net assets of the businesses acquired by us, and identifiable intangible assets are expected to increase substantially as a result of the Transactions. On a pro forma basis after giving effect to the Transactions as if they occurred on May 31, 2004, we would have had approximately $729.3 million of goodwill and approximately $589.0 million of identifiable intangible assets.

Goodwill and identifiable intangible assets are recorded at fair value on the date of acquisition and, under Financial Accounting Standards Board Statement No. 142, *Goodwill and Other Intangible Assets* ("FAS 142"), goodwill and indefinite lived intangibles are reviewed at least annually for impairment. Finite lived intangibles are reviewed for impairment whenever events or changes in circumstances indicate carrying amounts may not be recoverable. Impairment may result from, among other things, deterioration in the performance of the acquired business, adverse market conditions, adverse changes in applicable laws or regulations, including changes that restrict the activities of the acquired business, and a variety of other circumstances. The amount of any impairment must be written off. We may never realize the full value of our intangible assets. Any future determination requiring the write–off of a significant portion of intangible assets would have an adverse effect on our financial condition and results of operations.

***The interests of our controlling members could conflict with your interests.***

Affiliates of Thomas H. Lee Partners, L.P. (the "THL Funds") and Phillip Bennett beneficially own approximately 57% and 43%, respectively, of our parent's issued and outstanding membership units. The THL Funds have the ability to designate four of our parent's eight managers, and, if our parent fails to meet certain yearly performance requirements, they can designate a fifth manager (with the total board size increasing to nine managers). The THL Funds also have the ability to control all aspects of our business. Mr. Bennett also has significant influence over our business. The THL Funds and Mr. Bennett may pursue transactions that could enhance their equity investment while involving risks to your interests. There can be no assurance that the interests of our controlling members will not conflict with your interests.

26

## FORWARD–LOOKING STATEMENTS

This prospectus contains forward–looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact included in this prospectus are forward–looking statements. Forward–looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. You can identify forward–looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "plan," "intend," "believe" and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events.

These forward–looking statements are based on assumptions that we have made in light of our industry experience and on our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (some of which are beyond our control) and assumptions. Although we believe that these forward–looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results and cause them to differ materially from those anticipated in the forward–looking statements. These factors include, among others:

- changes in domestic and international market conditions;

- competition;

- our ability to attract and retain customers;

- our relationships with introducing brokers;

- retention of our management team;

- our ability to manage our growth or integrate future acquisitions;

- our exposure to significant credit risks with respect to our customers;

- international operations and expansion;

- system failures;

- the performance of third–party suppliers;

- changes in regulations or exchange membership requirements;

- the effectiveness of compliance and risk management methods;

- potential litigation or investigations;

- employee or introducing broker misconduct or errors; and

- changes in capital requirements.

There may be other factors that may cause our actual results to differ materially from the forward–looking statements.

Because of these factors, we caution that you should not place undue reliance on any of our forward–looking statements. Further, any forward–looking statement speaks only as of the date on which it is made. New risks and uncertainties arise from time to time, and it is impossible for us to predict those events or how they may affect us. Except as required by law, we have no duty to, and do not intend to, update or revise the forward–looking statements in this prospectus after the date of this prospectus.

**THE EXCHANGE OFFER**

**Purpose and Effect**

The co–issuers issued the old notes on August 5, 2004 in a transaction exempt from registration under the Securities Act. In connection with this original issuance, we entered into an indenture and a registration rights agreement. The registration rights agreement requires that we file a registration statement under the Securities Act with respect to the registered notes to be issued in the exchange offer and, upon the effectiveness of the registration statement, offer you the opportunity to exchange your old notes for a like principal amount of registered notes. Except as set forth below, these registered notes will be issued without a restrictive legend and, we believe, may be reoffered and resold by you without registration under the Securities Act. After we complete the exchange offer, our obligations with respect to the registration of the old notes and the registered notes will terminate, except as provided in the last paragraph of this section. Copies of the indenture relating to the notes and the registration rights agreement have been filed as exhibits to the registration statement of which this prospectus forms a part. Notwithstanding anything to the contrary set forth in this prospectus, this exchange offer is not being made to you, and you may not participate in the exchange offer, if (a) you are our "affiliate" within the meaning of Rule 405 of the Securities Act or (b) you are a broker–dealer that acquired old notes directly from us.

Based on interpretations by the staff of the SEC set forth in no–action letters issued to third parties unrelated to us, we believe that the registered notes issued to you in the exchange offer may be offered for resale, resold and otherwise transferred by you, without compliance with the registration and prospectus delivery provisions of the Securities Act, unless you are a broker–dealer that receives registered notes in exchange for old notes acquired by you as a result of market–making activities or other trading activities. This interpretation, however, is based on your representations to us that:

- any registered notes received by you will be acquired in the ordinary course of your business;

- you have no arrangements or understandings with any person to participate in the distribution of the registered notes: and

- you are not engaged in, and do not intend to engage in, the distribution of the registered notes.

If you have any of the disqualifications described above or cannot make each of the representations set forth above, you may not rely on the interpretations by the staff of the SEC referred to above. Under those circumstances, you must comply with the registration and prospectus delivery requirements of the Securities Act in connection with a sale, transfer or other disposition of any notes unless you are able to utilize an applicable exemption from all of those requirements. In addition, each broker–dealer that receives registered notes for its own account in exchange for old notes, where such old notes were acquired by such broker–dealer as a result of market–making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. See "Plan of Distribution."

If you will not receive freely tradable registered notes in the exchange offer or are not eligible to participate in the exchange offer, you may elect to have your old notes registered in a "shelf" registration statement on an appropriate form pursuant to Rule 415 under the Securities Act. If we are obligated to file a shelf registration statement, we will be required to keep the shelf registration statement effective for a period of two years (or for a longer period if extended pursuant to the registration rights agreement) or such shorter period that will terminate when all of the notes covered by the shelf registration statement (a) have been sold pursuant to the shelf registration statement or (b) can be sold pursuant to Rule 144 under the Securities Act without any volume or manner of sale limitations thereunder. Other than as set forth in this paragraph, you will not have the right to require us to register your old notes under the Securities Act. See "—Procedures for Tendering."

28

**Consequences of Failure to Exchange**

After we complete the exchange offer, if you have not tendered your old notes, you will not have any further registration rights, except as set forth above. Your old notes may continue to be subject to restrictions on transfer. Therefore, the liquidity of the market for your old notes could be adversely affected upon completion of the exchange offer if you do not participate in the exchange offer.

**Terms of the Exchange Offer**

Upon the terms and subject to the conditions set forth in this prospectus and in the letter of transmittal for your notes, we will accept any and all old notes validly tendered and not withdrawn prior to the time of expiration. We will issue a principal amount of registered notes in exchange for the principal amount of old notes accepted in the exchange offer. You may tender some or all of your old notes pursuant to the exchange offer. However, old notes may be tendered only in integral multiples of $1,000 principal amount.

The form and terms of the registered notes are substantially the same as the form and terms of the old notes, except that the registered notes to be issued in the exchange offer have been registered under the Securities Act and will not bear legends restricting their transfer. The registered notes will be issued pursuant to, and entitled to the benefits of, the indenture which governs the old notes. The registered notes and the old notes will be deemed a single issue of securities under the indenture.

As of the date of this prospectus, $600.0 million aggregate principal amount of old notes are outstanding. This prospectus, together with the letter of transmittal, is being sent to all registered holders and to others believed to have beneficial interests in the old notes. We intend to conduct the exchange offer in accordance with the applicable requirements of the Exchange Act and the rules and regulations of the SEC promulgated under the Exchange Act.

We will be deemed to have accepted validly tendered outstanding notes when, as and if we have given oral or written notice of our acceptance to the exchange agent. The exchange agent will act as our agent for the tendering holders for the purpose of receiving the registered notes from us. If we do not accept any tendered notes because of an invalid tender or the failure of any of the conditions to the exchange offer to be satisfied, we will return the unaccepted old notes, without expense, to the tendering holder promptly after the time of expiration. The conditions to the exchange offer are listed below under "—Conditions."

You will not be required to pay brokerage commissions or fees or, except as set forth below under "—Transfer Taxes," transfer taxes with respect to the exchange of your old notes in the exchange offer. We will pay all charges and expenses, other than applicable taxes, in connection with the exchange offer. See "—Fees and Expenses" below.

**Expiration; Amendments**

The exchange offer will expire at 12:00 midnight, New York City time, on the night of                , 2004, unless we determine, in our sole discretion, to extend the exchange offer, in which case it will expire at the later date and time to which it is extended. We do not intend to extend the exchange offer, although we reserve the right to do so. If we do extend the exchange offer, we will give oral or written notice of the extension to the exchange agent and give each registered holder of old notes for which the exchange offer is being made notice by means of a press release or other public announcement of any extension prior to 9:00 a.m., New York City time, on the next business day after the scheduled expiration for the exchange offer.

We also reserve the right, in our sole discretion,

29

(1)   to delay accepting any old notes or, if any of the conditions set forth below under "—Conditions" have not been satisfied or waived, to terminate the exchange offer by giving oral or written notice of the delay or termination to the exchange agent; or

(2)   to amend the terms of the exchange offer in any manner by complying with Rule 14e−1(d) under the Exchange Act to the extent that rule applies.

We acknowledge and undertake to comply with the provisions of Rule 14e−1(c) under the Exchange Act, which requires us to return the old notes surrendered for exchange promptly after the termination or withdrawal of the exchange offer. We will notify you promptly of any extension, termination or amendment.

## Procedures for Tendering

### Book−Entry Interests

The old notes were issued as global notes in fully registered form without interest coupons. Beneficial interests in the global notes held by direct or indirect participants in DTC are shown on, and transfers of these interests are effected only through, records maintained in book−entry form by DTC with respect to its participants.

If you hold old notes in the form of book−entry interests and you wish to tender your old notes for exchange pursuant to the exchange offer, you must transmit to the exchange agent on or prior to the time of expiration either:

(1)   a written or facsimile copy of a properly completed and duly executed letter of transmittal for your notes, including all other documents required by the letter of transmittal, to the exchange agent at the address set forth on the cover page of the letter of transmittal; or

(2)   a computer−generated message transmitted by means of DTC's Automated Tender Offer Program system and received by the exchange agent and forming a part of a confirmation of book−entry transfer, in which you acknowledge and agree to be bound by the terms of the letter of transmittal for your notes.

In addition, in order to deliver old notes held in the form of book−entry interests:

(1)   a timely confirmation of book−entry transfer of those notes into the exchange agent's account at DTC pursuant to the procedure for book−entry transfers described below under "—Book−Entry Transfer" must be received by the exchange agent prior to the time of expiration; or

(2)   you must comply with the guaranteed delivery procedures described below.

The method of delivery of old notes, the letter of transmittal and all other required documents to the exchange agent is at your election and risk. Instead of delivery by mail, we recommend that you use an overnight or hand delivery service. In all cases, sufficient time should be allowed to assure delivery to the exchange agent before the time of expiration. You should not send the letter of transmittal or old notes to us. You may request your broker, dealer, commercial bank, trust company or other nominee to effect the above transactions for you.

### Certificated Old Notes

Only registered holders of certificated old notes may tender those notes in the exchange offer. If your old notes are certificated notes and you wish to tender those notes for exchange pursuant to the exchange offer, you must transmit to the exchange agent, on or prior to the time of expiration, a written or facsimile copy of a properly completed and duly executed letter of transmittal, including all

30

other documents required by the letter of transmittal, to the address set forth on the cover page of the letter of transmittal. In addition, in order to validly tender your certificated old notes:

(1)  the certificates representing your old notes must be received by the exchange agent prior to the time of expiration; or

(2)  you must comply with the guaranteed delivery procedures described below.

**_Procedures Applicable to All Holders_**

If you tender an old note and you do not withdraw the tender prior to the time of expiration, you will have made an agreement with us in accordance with the terms and subject to the conditions set forth in this prospectus and in the letter of transmittal for your notes.

If your old notes are registered in the name of a broker, dealer, commercial bank, trust company or other nominee and you wish to tender your old notes, you should contact the registered holder promptly and instruct the registered holder to tender on your behalf. If you wish to tender on your own behalf, you must, prior to completing and executing the letter of transmittal for your old notes and delivering your old notes, either make appropriate arrangements to register ownership of the old notes in your name or obtain a properly completed bond power from the registered holder. The transfer of registered ownership may take considerable time.

Signatures on a letter of transmittal or a notice of withdrawal must be guaranteed by a financial institution, including most banks, savings and loan associations and brokerage houses, that is a participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange Medallion Program or the Stock Exchange Medallion Program, each an "eligible institution," unless:

(1)  old notes tendered in the exchange offer are tendered either:

(A)  by a registered holder who has not completed the box entitled "Special Issuance Instructions" or "Special Delivery Instructions" on the holder's letter of transmittal; or

(B)  for the account of an eligible institution; and

(2)  the box entitled "Special Registration Instructions" on the letter of transmittal has not been completed.

If the letter of transmittal for your notes is signed by a person other than you, your old notes must be endorsed or accompanied by a properly completed bond power and signed by you as your name appears on those old notes.

If the letter of transmittal for your notes or any old notes or bond powers are signed by trustees, executors, administrators, guardians, attorneys−in−fact, officers of corporations or others acting in a fiduciary or representative capacity, those persons should so indicate when signing. Unless we waive this requirement, in this instance you must submit with the letter of transmittal for your notes proper evidence satisfactory to us of their authority to act on your behalf.

We will determine, in our sole discretion, all questions regarding the validity, form, eligibility, including time of receipt, acceptance and withdrawal of tendered old notes. This determination will be final and binding. We reserve the absolute right to reject any and all old notes not properly tendered or any old notes our acceptance of which would, in the opinion of our counsel, be unlawful. We also reserve the right to waive any defects, irregularities or conditions of tender as to particular old notes; provided, however, that, in the event that we waive any condition of tender for any noteholder, we will waive that condition for all noteholders, Our interpretation of the terms and conditions of the exchange offer, including the instructions in the letter of transmittal for your notes, will be final and binding on all parties.

31

You must cure any defects or irregularities in connection with tenders of your old notes within the time period we determine unless we waive that defect or irregularity. Although we intend to notify you of defects or irregularities with respect to your tender of old notes, neither we, the exchange agent nor any other person will incur any liability for failure to give this notification. Your tender will not be deemed to have been made and your notes will be returned to you if:

      (1)  you improperly tender your old notes;

      (2)  you have not cured any defects or irregularities in your tender; and

      (3)  we have not waived those defects, irregularities or improper tender.

The exchange agent will return your notes, unless otherwise provided in the letter of transmittal for your notes, as soon as practicable following the time of expiration.

In addition, we reserve the right in our sole discretion to:

      (1)  purchase or make offers for, or offer registered notes for, any old notes that remain outstanding subsequent to the time of expiration;

      (2)  terminate the exchange offer upon the failure of any condition to the exchange offer to be satisfied; and

      (3)  to the extent permitted by applicable law, purchase notes in the open market, in privately negotiated transactions or otherwise.

The terms of any of these purchases or offers could differ from the terms of the exchange offer. By tendering in the exchange offer, you will represent to us that, among other things:

      (1)  any registered notes received by you will be acquired in the ordinary course of your business;

      (2)  you have no arrangements or understanding with any person to participate in the distribution of the registered notes;

      (3)  you are not our "affiliate," as that term is defined in Rule 405 of the Securities Act;

      (4)  you are not engaged in, and do not intend to engage in, the distribution of the registered notes; and

      (5)  if you are a broker–dealer, you will receive registered notes for your own account in exchange for old notes that were acquired as a result of market–making activities or other trading activities and not directly from us and you will comply with the prospectus delivery requirements of the Securities Act.

In all cases, issuance of registered notes for old notes that are accepted for exchange in the exchange offer will be made only after timely receipt by the exchange agent of certificates for your old notes or a timely book–entry confirmation of your old notes into the exchange agent's account at DTC, a properly completed and duly executed letter of transmittal for your notes and all other required documents. If any tendered old notes are not accepted for any reason set forth in the terms and conditions of the exchange offer or if old notes are submitted for a greater principal amount than you desire to exchange, the unaccepted or non–exchanged old notes, or old notes in substitution therefor, will be returned without expense to you. In addition, in the case of old notes tendered by book–entry transfer into the exchange agent's account at DTC pursuant to the book–entry transfer procedures described below, the non–exchanged old notes will be credited to your account maintained with DTC as promptly as practicable after the time of expiration or the termination of the exchange offer.

*Guaranteed Delivery Procedures*

If you wish to tender your old notes and your old notes are not immediately available, time will not permit your old notes or other required documents to reach the exchange agent before the time of expiration or you cannot complete the procedure for book–entry transfer on a timely basis, you may tender if:

    (1)  you tender through an eligible institution;

    (2)  prior to the time of expiration, the exchange agent receives from an eligible institution a written or facsimile copy of a properly completed and duly executed letter of transmittal for your notes and notice of guaranteed delivery for your notes, substantially in the form provided by us; and

    (3)  the certificates for all certificated old notes, in proper form for transfer, or a book–entry confirmation, and all other documents required by the letter of transmittal for your notes, are received by the exchange agent within three New York Stock Exchange trading days after the date of execution of the notice of guaranteed delivery for your notes.

The notice of guaranteed delivery for your notes may be sent by facsimile transmission, mail or hand delivery. The notice of guaranteed delivery must set forth:

    (1)  your name and address;

    (2)  the amount of old notes you are tendering; and

    (3)  a statement that your tender is being made by the notice of guaranteed delivery for your notes and that you guarantee that within three New York Stock Exchange trading days after the execution of the notice of guaranteed delivery, the eligible institution will deliver the following documents to the exchange agent:

        (A)  the certificates for all certificated old notes being tendered, in proper form for transfer or a book–entry confirmation of tender;

        (B)  a written or facsimile copy of the letter of transmittal for your notes or a book–entry confirmation instead of the letter of transmittal; and

        (C)  any other documents required by the letter of transmittal for your notes.

**Book–Entry Transfer**

The exchange agent will establish accounts with respect to book–entry interests at DTC for purposes of the exchange offer promptly after the date of this prospectus. You must deliver your book–entry interest by book–entry transfer to the account maintained by the exchange agent at DTC for the exchange offer. Any financial institution that is a participant in DTC's systems may make book–entry delivery of book–entry interests by causing DTC to transfer the book–entry interests into the relevant account of the exchange agent at DTC in accordance with DTC's procedures for transfer.

If one of the following situations occurs:

    (1)  you cannot deliver a book–entry confirmation of book–entry delivery of your book–entry interests into the relevant account of the exchange agent at DTC; or

    (2)  you cannot deliver all other documents required by the letter of transmittal to the exchange agent prior to the time of expiration,

then you must tender your book–entry interests according to the guaranteed delivery procedures discussed above.

**Withdrawal Rights**

You may withdraw tenders of your old notes at any time prior to the time of expiration.

For your withdrawal to be effective, the exchange agent must receive a written or facsimile transmission notice of withdrawal at its address set forth below under "—Exchange Agent" prior to the time of expiration.

The notice of withdrawal must:

      (1)  state your name;

      (2)  identify the specific old notes to be withdrawn, including the certificate number or numbers and the principal amount of notes to be withdrawn;

      (3)  be signed by you in the same manner as you signed the letter of transmittal for your notes when you tendered your old notes, including any required signature guarantees, or be accompanied by documents of transfer sufficient for the exchange agent to register the transfer of the old notes into your name; and

      (4)  specify the name in which the old notes are to be registered, if different from yours.

We will determine all questions regarding the validity, form and eligibility, including time of receipt, of withdrawal notices. Our determination will be final and binding on all parties. Any old notes withdrawn will be deemed not to have been validly tendered for exchange for purposes of the exchange offer. Any old notes which have been tendered for exchange but which are not exchanged for any reason will be returned to you without cost promptly after withdrawal, rejection of tender or termination of the exchange offer. Properly withdrawn old notes may be retendered by following one of the procedures described under "—Procedures for Tendering" above at any time on or prior to the time of expiration.

**Conditions**

Notwithstanding any other provision of the exchange offer and subject to our obligations under the registration rights agreement, we will not be required to accept for exchange, or to issue registered notes in exchange for, any old notes in the exchange offer and may terminate or amend the exchange offer, if at any time before the time of expiration any of the following events occur:

      (1)  any injunction, order or decree has been issued by any court or any governmental agency that would prohibit, prevent or otherwise materially impair our ability to proceed with the exchange offer; or

      (2)  the exchange offer violates any applicable law, regulation or applicable interpretation of the staff of the SEC.

These conditions are for our sole benefit, and we may assert them regardless of the circumstances giving rise to them, subject to applicable law. We also may waive in whole or in part at any time and from time to time any particular condition to the exchange offer in our sole discretion. If we waive a condition, we may be required in order to comply with applicable securities laws to extend the time of expiration of the exchange offer. Our failure at any time to exercise any of the foregoing rights will not be deemed a waiver of these rights, and these rights will be deemed ongoing rights which may be asserted at any time (in the case of any condition involving government approvals necessary to the consummation of the exchange offer) and at any time prior to the time of expiration (in the case of all other conditions).

In addition, we will not accept for exchange any old notes tendered, and no registered notes will be issued in exchange for any of those old notes, if at the time the notes are tendered any stop order is

threatened by the SEC or in effect with respect to the registration statement of which this prospectus is a part or the qualification of the indenture under the Trust Indenture Act of 1939, as amended.

The exchange offer is not conditioned on any minimum principal amount of old notes being tendered for exchange.

## Exchange Agent

We have appointed Wells Fargo Bank, National Association as exchange agent for the exchange offer. Questions, requests for assistance and requests for additional copies of the prospectus, the letter of transmittal for your notes and other related documents should be directed to the exchange agent addressed as follows:

*By Hand, Regular, Registered or Certified Mail or Overnight Courier:*
Wells Fargo Bank, National Association
Corporate Trust Department
213 Court Street, Suite 703
Middletown, CT 06457
Attention: Joseph P. O'Donnell

*By Facsimile:*
Wells Fargo Bank, National Association
Corporate Trust Department
Attention: Joseph P. O'Donnell
Facsimile No. (806) 704–6219

*By Telephone:*
(860) 704–6217

## Fees and Expenses

We will not pay brokers, dealers or others soliciting acceptances of the exchange offer. The principal solicitation is being made by mail. Additional solicitations, however, may be made in person or by telephone by our officers and employees.

We will pay the cash expenses to be incurred in connection with the exchange offer.

## Transfer Taxes

You will not be obligated to pay any transfer taxes in connection with a tender of your old notes for exchange unless you instruct us to register registered notes in the name of, or request that old notes not tendered or not accepted in the exchange offer be returned to, a person other than the registered tendering holder, in which event, the registered tendering holder will be responsible for the payment of any applicable transfer tax.

## Accounting Treatment

We will not recognize any gain or loss for accounting purposes upon the consummation of the exchange offer. We will amortize the expenses of the exchange offer and the unamortized expenses related to the issuance of the old notes over the remaining term of the registered notes.

## Participating Broker–Dealers

Each broker–dealer that receives registered notes for its own account in exchange for old notes, where such old notes were acquired by such broker–dealer as a result of market–making activities or other trading activities, must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. See "Plan of Distribution."

35

## USE OF PROCEEDS

The exchange offer is intended to satisfy our obligations under the registration rights agreement. We will not receive any cash proceeds from the issuance of the registered notes.

Proceeds from the offering of the old notes, together with proceeds from our new senior secured credit facility, new senior unsecured facility and other assumed debt, as well as equity contributions from investors, were used to repay our outstanding indebtedness and to pay the THL Acquisition consideration and related fees and expenses in connection with the Transactions. The debt that was repaid consisted of $383.5 million of our existing unsecured senior notes issued under four note purchase agreements with interest rates ranging from 5.99% to 9.18% and maturities ranging from December 18, 2004 to October 15, 2009, and $16.0 million under an intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC bearing interest at the prime rate, currently 4.75%.

## CAPITALIZATION

The following table sets forth our unaudited cash and cash equivalents and our unaudited capitalization as of May 31, 2004 on an actual basis and on a pro forma basis giving effect to the Transactions. This table should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

| | As of May 31, 2004 | |
| --- | --- | --- |
| | Actual | Pro Forma |
| | (in thousands) | |
| Cash and cash equivalents | $ 224,116 | $ 147,460 |
| | | |
| Long−term debt | | |
| Senior credit facilities: | | |
|   Term loans(1) | — | 800,000 |
|   Revolving credit facility(2) | — | — |
| Existing unsecured senior notes(3) | 383,500 | — |
| Notes offered hereby | — | 600,000 |
| Subordinated debt(4) | 16,000 | — |
|   Total long−term debt | 399,500 | 1,400,000 |
| Total members' equity | 671,100 | 71,783 |
|   Total capitalization | $ 1,070,600 | $ 1,471,783 |

(1)

    Our new senior credit facilities provide for $800.0 million in term loans, all of which were drawn in connection with the Transactions.

(2)

    Our new senior facilities provide for a $75.0 million revolving credit facility, none of which has been drawn.

(3)

    Represents $383.5 million of our existing unsecured senior notes issued under four note purchase agreements with interest rates ranging from 5.99% to 9.18% and maturities ranging from December 18, 2004 to October 15, 2009. Actual amounts repaid were reduced by scheduled principal payments made after May 31, 2004 and prior to closing.

(4)

    Represents $16.0 million under an intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC, bearing interest at the prime rate, currently 4.75%.

**UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS**

The following unaudited pro forma consolidated financial statements have been derived by application of pro forma adjustments to our historical consolidated audited and unaudited financial statements included elsewhere in this prospectus and the unaudited management accounts of Forstmann–Leff International Associates, LLC.

The unaudited pro forma consolidated financial statements give effect to the following:

- an equity investment made by THL Refco Acquisition Partners and its affiliates and co–investors, totaling approximately $508.5 million in cash;

- a rollover equity investment by Phillip Bennett, our chief executive officer, through his continuing ownership interest in Refco Group Holdings, Inc., of approximately $383.6 million;

- an investment by other members of management of approximately $2.0 million in cash, subject to adjustment;

- the entering into of senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing;

- the issuance by the co–issuers of $600.0 million in aggregate principal amount of senior subordinated notes;

- the merger of Refco Finance Holdings LLC with and into us, with our company continuing as the surviving entity;

- the estimated payments of $24.9 million relating to pre–payment premiums on our existing debt and $19.8 million relating to earn–out obligations triggered by our change of control;

- the repayment of $383.5 million of our existing unsecured senior notes issued under four separate note purchase agreements; and

- the repayment of a $16.0 million intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC.

As part of the Transactions, which were consummated on August 5, 2004, we distributed $550.0 million in cash and other capital distributions and all of the equity interests of Forstmann–Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business (the "Asset Management Distribution"), to New Refco. New Refco thereafter distributed these assets to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett.

The acquisition by THL Refco Acquisition Partners and its affiliates and co–investors of a portion of Refco Group Holdings, Inc.'s interest in us and Refco Group Holdings, Inc.'s contribution of its interest in us to New Refco are each accounted for as a purchase in conformity with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*, in accordance with Emerging Issues Task Force ("EITF") No. 88–16, *Basis in Leveraged Buy–Out Transactions*, with intangible assets recorded in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*.

The unaudited pro forma consolidated balance sheet has been prepared to reflect the Transactions as if they had occurred on May 31, 2004. The unaudited pro forma consolidated statements of operations for the year ended February 29, 2004 and the three months ended May 31, 2004 have been prepared to give effect to the Transactions as if they had occurred on March 1, 2003. The assumptions underlying the pro forma adjustments are described in the accompanying notes, which should be read in conjunction with these unaudited pro forma consolidated financial statements.

38

The unaudited pro forma adjustments are based upon available information and certain assumptions that we believe are reasonable under the circumstances. The unaudited pro forma financial statements do not purport to represent what our results of operations or financial condition would have been had the Transactions actually occurred on the dates indicated, nor do they purport to project the results of our operations or financial condition for any future period or as of any future date.

The unaudited pro forma consolidated financial statements should be read in conjunction with the information contained in "The Transactions," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto appearing elsewhere in this prospectus.

**Unaudited Pro Forma Consolidated Balance Sheet**
**as of May 31, 2004**
**(in thousands)**

| | Historical | Adjustments for | | Pro Forma |
| | | Asset Management Distribution (a) | Cash Distribution, Acquisition and Related Financing | |
|---|---|---|---|---|
| Cash and cash equivalents | $ 224,116 | $ (26,656) | $ (50,000)(b) | $ 147,460 |
| Cash and securities segregated under federal and other regulations: | | | | |
| Cash and cash equivalents | 1,436,072 | — | — | 1,436,072 |
| Securities purchased under agreements to resell | 41,831 | — | — | 41,831 |
| Restricted cash | 500,000 | — | (500,000)(b) | — |
| Securities purchased under agreements to resell | 41,800,629 | — | — | 41,800,629 |
| Deposits with clearing organizations and others | 1,919,371 | — | — | 1,919,371 |
| Receivables from broker–dealers and clearing organizations | 3,511,725 | — | — | 3,511,725 |
| Receivables from customers | 2,290,621 | (31,950) | — | 2,258,671 |
| Securities owned, at market or fair value | 2,897,884 | — | — | 2,897,884 |
| Memberships in exchanges, at adjusted cost | 15,944 | — | 18,589 (c) | 34,533 |
| Goodwill | 291,219 | (141,611) | 579,657 (d) | 729,265 |
| Other intangible assets | 87,674 | (64,973) | 566,268 (e) | 588,969 |
| Deferred financing costs | 2,857 | — | 47,149 (f) | 50,006 |
| Other assets | 209,166 | (11,110) | — | 198,056 |
| Total assets | $ 55,229,109 | $ (276,300) | $ 661,663 | $ 55,614,472 |
| **Liabilities:** | | | | |
| Short–term borrowings, including current portion of long–term borrowings | $ 68,000 | — | (68,000)(g) | |
| Securities sold under agreements to repurchase | 44,296,847 | — | — | 44,296,847 |
| Payable to broker–dealers and clearing organizations | 2,381,069 | — | — | 2,381,069 |
| Payable to customers | 5,911,001 | (36,734) | — | 5,874,267 |
| Securities sold, not yet purchased, at market or fair value | 1,376,488 | — | — | 1,376,488 |
| Accounts payable, accrued expenses and other liabilities | 192,649 | (2,480) | 23,394 (h) | 213,563 |
| Long–term borrowings | 315,500 | — | 1,084,500 (g) | 1,400,000 |
| Subordinated debt | 16,000 | — | (16,000)(g) | — |
| Total liabilities | 54,557,554 | (39,214) | 1,023,894 | 55,542,234 |
| Commitments and contingent liabilities | | | | |
| Membership interests issued by subsidiary | 455 | — | — | 455 |
| Members' equity | 671,100 | (237,086) | (362,231)(b) | 71,783 |
| Total liabilities and members' equity | $ 55,229,109 | $ (276,300) | $ 661,663 | $ 55,614,472 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

40

### Notes to Unaudited Pro Forma Consolidated Balance Sheet

**The following pro forma adjustments relate to the unaudited pro forma consolidated balance sheet as of May 31, 2004:**

*(a)*

    Represents the financial position of the Asset Management Distribution as of May 31, 2004 as derived from the unaudited management information of the Asset Management business.

*(b)*

    Adjustments to members' equity reflect the following items:

*(i)*

    a decrease in equity as a deemed dividend of $369.7 million to reflect the carryover basis of the retained interest by the continuing management investors;

*(ii)*

    an increase of $557.4 million to reflect the increase in equity related to the Transactions and the step–up of the net assets acquired and liabilities assumed of Refco; and

*(iii)*

    a decrease in equity, restricted cash and cash and cash equivalents resulting from the distribution of excess capital of $550.0 million.

*(c)*

    Represents the step–up in the value of the memberships in exchanges of $18.6 million, calculated as 42.9% of the predecessor basis and 57.1% of the fair value.

*(d)*

    Represents the increase in goodwill of $579.6 million as a result of the Transactions being accounted for as a leveraged buyout, as described above.

*(e)*

    Represents the step–up in the value of customer relationships of $318.2 million, trade names of $247.1 million and technology of $1.0 million, calculated as 42.9% of the predecessor basis and 57.1% of the fair value.

*(f)*

    Represents a net increase of $47.2 million in deferred financing costs, consisting of an increase of $50.0 million due to the capitalization of the debt issuance costs in connection with the issuance of the old notes together with the new senior credit facility, offset by the remaining financing–related fees of the existing unsecured senior notes of $2.8 million. For purposes of this presentation principal underwriting fees of senior subordinated notes estimated at $15 million have been capitalized.

*(g)*

    Represents indebtedness expected to be incurred, net of existing indebtedness in connection with the Transactions, as follows:

|  | (in thousands) |
| --- | ---: |
| Existing credit facility | $ — |
| Existing unsecured senior notes—current | 68,000 |
|     —long–term | 315,500 |
| Existing subordinated debt | 16,000 |
| Total existing debt | 399,500 |
| New revolving credit facility | — |
| New senior term loans | 800,000 |
| New senior subordinated notes | 600,000 |
| Total debt expected to be incurred | 1,400,000 |
| Total adjustment to debt as a result of the Transactions | $ 1,000,500 |

    Certain prepayment penalties were incurred due to the early repayment of the existing debt. These penalties are paid from the proceeds of the offering and are included in the computation of goodwill.

*(h)*

    Represents the adjustment to deferred taxes for the temporary differences resulting from the difference between the portion of basis carried over for book purposes and the fair value amount representing that portion of the assets' tax basis. The total pro forma deferred tax adjustment of $23.4 million resulting from these temporary differences has been included in goodwill.

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the year ended February 29, 2004**
**(in thousands)**

| | Historical | | Adjustments for | | | Pro Forma |
|---|---|---|---|---|---|---|
| | | | Asset Management Distribution (a) | Cash Distribution, Acquisition and Related Financing | | |
| Revenues: | | | | | | |
| Commissions and brokerage | $ | 671,034 | $ (24,659) | $ — | $ | 646,375 |
| Interest | | 1,053,804 | (575) | — | | 1,053,229 |
| Principal transactions, net | | 175,011 | | — | | 175,011 |
| Asset management and advisory fees | | 47,911 | (40,656) | — | | 7,255 |
| Other | | 2,775 | 1,198 | — | | 3,973 |
| Total revenues | | 1,950,535 | (64,692) | — | | 1,885,843 |
| Expenses: | | | | | | |
| Commissions and order execution costs | | 411,894 | — | — | | 411,894 |
| Interest | | 898,658 | (984) | 65,398 (b)(c) | | 963,072 |
| Employee compensation and benefits | | 238,476 | (33,622) | — | | 204,854 |
| General, administrative and other | | 200,902 | (30,487) | 19,969 (d)(e) | | 190,384 |
| Total expenses | | 1,749,930 | (65,093) | 85,367 | | 1,770,204 |
| Income before provision for income taxes and members' interests in earnings of subsidiary | | 200,605 | 401 | (85,367) | | 115,639 |
| Provision for income taxes | | 12,176 | — | (3,415)(f) | | 8,761 |
| Income before members' interests in earnings of subsidiary | | 188,429 | 401 | (81,952) | | 106,878 |
| Members' interest in earnings of subsidiary | | 1,273 | — | — | | 1,273 |
| Net income | $ | 187,156 | $ 401 | $ (81,952) | $ | 105,605 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

42

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the three months ended May 31, 2004**
**(in thousands)**

| | Historical | Asset Management Distribution(a) | Cash Distribution, Acquisition and Related Financing | Pro Forma |
|---|---|---|---|---|
| | | **Adjustments for** | | |
| **Revenues:** | | | | |
| Commissions and brokerage | $ 220,279 | $ (4,096) | $ — | $ 216,183 |
| Interest | 377,743 | (61) | — | 377,682 |
| Principal transactions, net | 67,300 | (13) | — | 67,287 |
| Asset management and advisory fees | 23,435 | (21,544) | — | 1,891 |
| Other | 978 | | — | 978 |
| Total revenues | 689,735 | (25,714) | — | 664,021 |
| **Expenses:** | | | | |
| Commissions and order execution costs | 142,706 | — | — | 142,706 |
| Interest | 344,254 | — | 17,334 (b)(c) | 361,588 |
| Employee compensation and benefits | 76,866 | (12,296) | — | 64,570 |
| General, administrative and other | 57,502 | (9,981) | 5,128 (d)(e) | 52,649 |
| Total expenses | 621,328 | (22,277) | 22,462 | 621,514 |
| Income before provision for income taxes and members' interests in earnings of subsidiary | 68,407 | (3,437) | (22,462) | 42,508 |
| Provision for income taxes | 8,211 | — | (898)(f) | 7,313 |
| Income before members' interests in earnings of subsidiary | 60,196 | (3,437) | (21,564) | 35,195 |
| Members' interest in earnings of subsidiary | 926 | — | — | 926 |
| Net income | $ 59,270 | $ (3,437) | $ (21,564) | $ 34,269 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

43

**Notes to Unaudited Pro Forma Consolidated Statements of Operations**

**The following pro forma adjustments relate to the unaudited pro forma consolidated statements of operations for the year ended February 29, 2004 and the three months ended May 31, 2004:**

(a)

Represents the results of operations of the Asset Management business for the year ended February 29, 2004 and the three months ended May 31, 2004, as derived from the unaudited management information of the Asset Management business.

(b)

Represents interest expense for new debt incurred at the following interest rates, net of interest expense associated with existing debt being repaid:

| | |
|---|---|
| New senior credit facility | 5.0% |
| New senior subordinated notes | 9.0% |

The new senior credit facility accrues interest at the LIBOR rate plus 2.75% per annum. The actual rates will vary from those used to compute the above adjustment of interest expense due to floating rates applicable to our new senior credit facility. The effect on pretax income of a $1/8\%$ variance in these rates would be approximately $1.0 million for an annual period.

(c)

Represents additional interest expense for the year ended February 29, 2004 and the three months ended May 31, 2004 of $3.8 million and $1.0 million, respectively, related to the amortization of debt issuance costs from debt incurred in relation to the Transactions.

(d)

Represents additional amortization expense as a result of the step–up to fair market value of customer relationships and technology for the year ended February 29, 2004 and the three months ended May 31, 2004 of $17.4 million and $4.3 million, respectively.

(e)

Represents a management fee to be paid to THL Managers V, LLC for certain advisory and consulting services for the year ended February 29, 2004 and the three months ended May 31, 2004 of $2.5 million and $0.8 million, respectively.

(f)

Represents an increase in income tax benefits for the year ended February 29, 2004 and the three months ended May 31, 2004 of $3.4 million and $0.9 million, respectively. This tax benefit is provided at a 4% tax rate, for New York City Unincorporated Business tax, due to the aggregate pro forma decrease in income before provision for income taxes. We will be treated as a partnership for federal income tax purposes and accordingly have not provided for federal income taxes related to our operating results.

44

**Notes to Unaudited Pro Forma Consolidated Financial Statements**

The pro forma information, including the allocation of the purchase price and the exclusion of the Asset Management Distribution, is based on management's estimates and preliminary valuations of the tangible and intangible assets being acquired. The purchase price allocations for the Transactions are preliminary and further refinements will be made based on the results of final valuations and the resolution of any post–closing purchase price adjustments pursuant to the purchase and contribution agreement. Subject to the consummation of the Transactions, the related costs used in the unaudited pro forma consolidated financial statements have been estimated to be $94.2 million.

The Transactions are expected to be accounted for as a purchase as prescribed by Statement of Financial Accounting Standards No. 141, *Business Combinations*, in accordance with EITF No. 88–16, *Basis in Leveraged Buyout Transactions*. This guidance requires the continuing residual interest retained by the continuing management investors, as a result of the Transactions, be reflected at its predecessor basis. In accordance with EITF Issue No. 90–12, *Allocating Basis to Individual Assets and Liabilities for Transactions* within the Scope of Issue No. 88–16, a step–up of assets and liabilities to fair value has been recorded in purchase accounting as a result of the interest in us held by THL Refco Acquisition Partners and certain of its affiliates through their ownership interests in New Refco. The amount of carryover basis determined has been reflected as deemed dividend of $369.7 million in the unaudited pro forma consolidated balance sheet.

The following table summarizes the purchase price allocation at the date of acquisition:

|  | (in thousands) |
|---|---:|
| Cash and cash equivalents, securities purchased and deposits | $ 45,345,363 |
| Receivables, securities owned and other assets | 8,866,336 |
| Memberships in exchanges, at fair value | 34,533 |
| Total assets acquired | 54,246,232 |
| Short–term borrowings, securities sold and payables | 53,928,671 |
| Accounts payable, accrued expenses and other liabilities | 190,169 |
| Total liabilities assumed | 54,118,840 |
| Net tangible assets acquired | 127,392 |
| Purchase Price | 1,849,749 |
| Excess purchase price, representing: | 1,722,357 |
| Intangible assets: |  |
| Customer relationships | 340,884 |
| Trade names | 249,335 |
| Technology | 1,028 |
| Goodwill | 1,131,110 |
|  | — |

**SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA**

The following table sets forth our selected historical consolidated financial data as of and for the fiscal years ended February 29, 2000 and February 28, 2001, 2002 and 2003 and February 29, 2004, and for the three months ended May 31, 2003 and 2004. The selected historical consolidated financial data as of and for the fiscal years ended February 28, 2002 and 2003 and February 29, 2004 have been derived from our audited consolidated financial statements for fiscal years 2002, 2003 and 2004, and the selected historical consolidated financial data for the fiscal years ended February 29, 2000 and February 28, 2001 have been derived from our unaudited consolidated financial statements for fiscal years 2000 and 2001.

The selected historical consolidated financial data as of May 31, 2004 and for the three months ended May 31, 2003 and 2004 have been derived from our unaudited consolidated financial statements for those periods. The unaudited consolidated financial statements as of May 31, 2004 and for the three months ended May 31, 2003 and 2004 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and result of operations for the period presented.

The selected historical data included below and elsewhere in this prospectus are not necessarily indicative of our future performance and results for the three months ended May 31, 2004 are not necessarily indicative of our results of operations for a full fiscal year. The selected historical financial data for the periods indicated below include the results of our Asset Management business, substantially all of which was distributed as part of the Transactions. The following information is only a summary and should be read in conjunction with "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

46

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | |
| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2003 | 2004 |
| | (unaudited) | (unaudited) | | | | (unaudited) | (unaudited) |
| | | | | (dollars in millions) | | | |
| **Statement of Operations Data:** | | | | | | | |
| Revenues: | | | | | | | |
| Commissions and brokerage | $ 302 | $ 398 | $ 489 | $ 584 | $ 671 | $ 163 | $ 220 |
| Interest | 601 | 1,528 | 1,713 | 2,389 | 1,054 | 283 | 378 |
| Principal transactions, net | 43 | 103 | 99 | 83 | 175 | 35 | 67 |
| Asset management and advisory fees | 52 | 110 | 63 | 44 | 48 | 11 | 23 |
| Other income | 7 | 2 | 4 | 5 | 2 | 3 | 1 |
| Total revenues | 1,005 | 2,141 | 2,368 | 3,105 | 1,950 | 495 | 689 |
| Expenses: | | | | | | | |
| Commissions and order execution costs | 189 | 251 | 324 | 385 | 412 | 104 | 143 |
| Interest | 508 | 1,408 | 1,558 | 2,182 | 899 | 249 | 344 |
| Employee compensation and benefits | 137 | 213 | 198 | 212 | 238 | 52 | 77 |
| General, administrative and other | 104 | 174 | 172 | 168 | 201 | 43 | 57 |
| Total expenses | 938 | 2,046 | 2,252 | 2,947 | 1,750 | 448 | 621 |
| Income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 67 | 95 | 116 | 158 | 200 | 47 | 68 |
| Provision for income taxes | 8 | 8 | 7 | 2 | 12 | 1 | 8 |
| Income before minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 59 | 87 | 109 | 156 | 188 | 46 | 60 |
| Minority interest | 2 | 1 | — | — | — | — | — |
| Income before dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 57 | 86 | 109 | 156 | 188 | 46 | 60 |
| Dividend on preferred securities issued by subsidiaries | 12 | 14 | 16 | 16 | — | — | — |
| Members' interest in earnings of subsidiary | — | — | — | — | 1 | — | 1 |
| Net income | $ 45 | $ 72 | $ 93 | $ 140 | $ 187 | $ 46 | $ 59 |
| **Balance Sheet Data:** | | | | | | | |
| Total assets | $ 17,662 | $ 18,277 | $ 22,611 | $ 19,215 | $ 33,332 | | $ 55,229 |
| Long–term debt and preferred securities issued by subsidiaries: | | | | | | | |
| Long–term borrowings | 200 | 295 | 262 | 452 | 384 | | 384 |
| Subordinated debt | 43 | 41 | 16 | 16 | 16 | | 16 |
| Preferred securities issued by subsidiaries | 125 | 160 | 160 | 160 | — | | |
| Total long–term debt and preferred securities issued by subsidiaries | 368 | 496 | 438 | 628 | 400 | | 400 |
| Members' equity | 441 | 500 | 515 | 566 | 616 | | 671 |

47

**Other Financial Data:**

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | Pro Forma Fiscal Year Ended February 29, | Pro Forma Three Months Ended May 31, |
|---|---|---|---|---|---|---|---|---|
| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2004 | 2004 | 2004 |
| | (unaudited) | (unaudited) | | | | | | |
| EBITDA (2) | $ 92 | $ 140 | $ 179 | $ 211 | $ 258 | $ 66 | $ 82 | |
| Depreciation and amortization | 14 | 23 | 38 | 26 | 28 | 10 | 8 | |
| Long–term debt interest | 13 | 23 | 25 | 27 | 31 | 9 | 7 | |
| Dividends on preferred securities issued by subsidiaries | 12 | 14 | 16 | 16 | — | — | — | |
| Capital expenditures | 14 | 28 | 15 | 12 | 11 | | | 6 |

(dollars in millions)

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | Pro Forma Fiscal Year Ended February 29, | Pro Forma Three Months Ended May 31, |
|---|---|---|---|---|---|---|---|---|
| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2004 | 2004 | 2004 |
| Ratio of earnings to fixed charges(3) | 3.0x | 3.0x | 2.7x | 3.8x | 6.1x | 7.7x | 2.2x | 2.7x |

**Segment Data:**

| | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004(1) | 2003 | 2004 |
| | | | | (unaudited) | (unaudited) |
| **Revenues:** | | | | | |
| Derivatives Brokerage & Clearing | $ 692 | $ 746 | $ 836 | $ 197 | $ 262 |
| Prime Brokerage/Capital Markets | 2,217 | 2,610 | 1,277 | 332 | 447 |
| Asset Management | 70 | 58 | 72 | 16 | 27 |
| Corporate & Other | (611) | (309) | (235) | (50) | (47) |
| Total revenues | $ 2,368 | $ 3,105 | $ 1,950 | $ 495 | $ 689 |
| **Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary:** | | | | | |
| Derivatives Brokerage & Clearing | $ 59 | $ 78 | $ 126 | $ 29 | $ 42 |
| Prime Brokerage/Capital Markets | 96 | 101 | 134 | 31 | 38 |
| Asset Management | 14 | 1 | (2) | (1) | 3 |
| Corporate & Other | (53) | (22) | (58) | (12) | (15) |
| Total | $ 116 | $ 158 | $ 200 | $ 47 | $ 68 |

(1)    Year ended February 29.

(2)    EBITDA is a non–GAAP (U.S. generally accepted accounting principles) financial measure that is defined as net income before depreciation and amortization, long–term debt interest, dividends on preferred securities issued by subsidiaries and provision for income taxes. Our management believes that EBITDA is useful in evaluating our operating performance compared to that of other companies in our industry because the calculation of EBITDA generally eliminates the effects of financing and income taxes and the accounting effects of capital spending and acquisitions, which items may vary for different companies for reasons unrelated to overall operating performance. As a result, our management uses EBITDA as a measure to evaluate the performance of our various business lines and for other discretionary purposes. In addition, our management believes EBITDA is useful to investors because it is frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry.

EBITDA has important limitations as an analytical tool, and should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. For example, EBITDA does not reflect:

- our cash expenditures, or future requirements, for capital expenditures or contractual commitments;

- changes in, or cash requirements for, our working capital needs;

- the significant interest expense, or the cash requirements necessary to service interest or principal payments, on our debts;

- tax payments that represent a reduction in cash available to us; and

- any cash requirements for the assets being depreciated and amortized that may have to be replaced in the future.

48

Because of these and other limitations, we rely primarily on our results under GAAP and use EBITDA only supplementally. EBITDA is not a recognized measurement under GAAP, and when analyzing our operating performance, investors should use EBITDA in addition to, and not as an alternative for, operating income (loss) and net (loss) income, each as determined in accordance with GAAP. Because not all companies use identical calculations, our presentation of EBITDA may not be comparable to similarly titled measures of other companies. Furthermore, EBITDA is not intended to be a measure of free cash flow for our management's discretionary use, as it does not consider certain cash requirements such as tax payments and debt service requirements. The amounts shown for EBITDA also differ from the amounts calculated under similarly titled definitions in our debt instruments, which are further adjusted to reflect certain other cash and non–cash charges and are used to determine compliance with financial covenants and our ability to engage in certain activities, such as incurring additional debt and making certain restricted payments.

EBITDA is calculated as follows:

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | |
| | 2000(a) | 2001 | 2002 | 2003 | 2004(a) | 2003 | 2004 |
| | (unaudited) | (unaudited) | | | | (unaudited) | (unaudited) |
| Net income | $        45 | $        72 | $    93 | $    140 | $    187 | $    46 | $    59 |
| Depreciation and amortization | 14 | 23 | 38 | 26 | 28 | 10 | 8 |
| Long–term debt interest(b) | 13 | 23 | 25 | 27 | 31 | 9 | 7 |
| Dividends on preferred securities issued by subsidiaries | 12 | 14 | 16 | 16 | — | — | — |
| Provision for income taxes | 8 | 8 | 7 | 2 | 12 | 1 | 8 |
| EBITDA | $        92 | $        140 | $    179 | $    211 | $    258 | $    66 | $    82 |

(a)      Year ended February 29.

(b)      Long–term debt interest includes interest expense related to our long–term debt and amortization of deferred debt issuance costs.

(3)      Earnings consist of income from continuing operations before income taxes, fixed charges, amortization of capitalized interest, distributed income of equity investees, and losses before tax of equity investees for which charges arising from guarantees are included in fixed charges, minus capitalized interest and minority interest in pre–tax income of subsidiaries that have not incurred fixed charges. Fixed charges consist of interest expensed and capitalized, amortization of debt discount and expense and premium and one–third of rental payments which is considered as being representative of the interest factor implicit in our operating leases.

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This prospectus contains forward–looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in forward–looking statements for many reasons, including the factors described in "Risk Factors" and elsewhere in this prospectus. You should read the following discussion in conjunction with the information included under the captions "Unaudited Pro Forma Consolidated Financial Statements" and "Selected Historical Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus. Further, the following discussion includes information related to our Asset Management business, substantially all the assets of which were distributed to Refco Group Holdings, Inc. on August 5, 2004.*

### General

We provide execution and clearing services for exchange–traded derivatives and for various products in the fixed income and foreign exchange markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our international operations generated $551.6 million, or 28.3%, of our net revenues for the year ended February 29, 2004. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

We have been organized into three operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing, which accounted for 73.6% of fiscal year 2004 net revenue; (ii) Prime Brokerage/Capital Markets, which accounted for 28.2% of fiscal year 2004 net revenue; and (iii) Asset Management, which accounted for 6.7% of fiscal year 2004 net revenue. We also have a Corporate & Other non–operating business segment. Following the distribution of substantially all the assets of our Asset Management business in connection with Transactions, we are organized into two operating business segments for financial reporting purposes, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and have one non–operating business segment, Corporate & Other. The retained assets from our Asset Management business, Refco Alternative Investments, have become part of our Derivatives Brokerage & Clearing business.

### Factors Affecting Our Results

Our results of operations have been and we expect will continue to be principally affected by transaction volumes, interest rates, the level of global market activity and volatility and expense management. Our results of operations have also been affected by acquisitions.

#### Transaction Volumes

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues have grown at a 23.9% compound annual growth rate, driven by a 50% average annual increase in contract volume executed or cleared, in part attributable to acquisitions, and a 20% average annual increase in customer deposits. During the same period, our Prime Brokerage/Capital Markets net revenues have grown at a 23.6% compound annual growth rate, driven primarily by strong underlying growth in the number of customers in the markets we serve and new product introductions. Derivatives Brokerage & Clearing transaction volumes have increased consistent with the broad growth trend currently being experienced in the derivatives industry. The continued convergence of derivative and cash markets and the expanded use of derivatives for hedging and investment purposes have been the principal drivers of this trend. The trend has also been global in nature, with a rapid introduction of new products in a variety of

50

international markets. Prime Brokerage/Capital Markets transaction volume has increased in line with expanded U.S. government borrowing activity and the continued long–term growth of foreign exchange markets. Recently, this increase in volume has been accelerated by event–driven volatility, such as political uncertainty in the Middle East and its impact on energy supplies and the uncertain outlook concerning economic growth and interest rates. We have been able to take advantage of the related increase in derivatives transaction volume because of our diversification by customer type, product type and market type and because of the increase in prime brokerage volumes as a result of new product initiatives, including online foreign exchange and emerging market debt brokerage.

*Interest Rates*

Due to the fact that a portion of our revenues is derived from interest earned from the investment of customer funds placed with us by customers of our Derivatives Brokerage & Clearing business and the level of secured customer financing transactions in our Prime Brokerage/Capital Markets business, we generally benefit from rising interest rates. Rising interest rates would increase the amount of net interest income earned from such customer funds and the potential financing spread available on secured customer financing transactions. However, our interest expense will increase as a result of rising interest rates because our new senior credit facilities will be variable rate debt.

*Global Market Activity*

Each of our principal business segments is global in nature, and the expansion of the global economy in general and the continued growth of globalization in financial markets has benefited our operations. The introduction of derivatives products internationally has accelerated in recent years, with emerging markets in Asia and Latin America supplementing traditional centers in North America and Europe. This growth has been prompted by economic expansion in these regions, deregulation and globalization. Similar trends have emerged in our Prime Brokerage/Capital Markets business as the capital markets in emerging economies become more sophisticated. This has translated directly into new opportunities in non–dollar fixed income, emerging market debt and foreign exchange brokerage. Globalization has assisted in sustaining stable growth by further diversifying our product mix and economic opportunities.

*Expense Management*

We have been able to leverage our operating capability in order to achieve increasing benefits from the aggregation of scale in transaction volumes. By adding incremental volume to a pre–existing platform, our marginal cost of growth in transaction processing is minimal. This will become increasingly relevant as more markets automate and move to electronic platforms. As a result, a high proportion of our marginal expense is variable in nature, which provides us an opportunity to improve our cost to income ratio. This characteristic is expected to have a continuing positive impact on operating results.

*Acquisitions*

We have completed 11 acquisitions since 1999. Each of these acquistions has been immediately accretive to operating income. It has also been our practice to integrate and rationalize acquired companies as rapidly as possible and transfer operations to our existing platform to maximize the economies of scale offered by such acquisitions. During the fiscal year ended February 28, 2002, we acquired First Options, MST Canada Co. and Main Street Trading, all derivatives brokerage businesses. We acquired two other derivatives brokerage businesses during the fiscal year ended February 28, 2003: Spear, Leeds & Kellogg and CFG Financial Group Inc. During the fiscal year ended February 29, 2004, we acquired one asset management business, Edinburgh Fund Managers Ltd., and five derivatives

51

brokerage businesses, MacFutures Ltd., Carlton Brokerage Ltd., Friedberg Mercantile Group, RB&H and Trafalgar Commodities Ltd.

**Results of Operations**

*Revenues*

We report net revenues on a divisional basis, consisting of total revenues less interest expense, because we believe that the reporting of interest income (expense) on a gross basis unreasonably distorts the presentation of our operations. We generate Derivatives Brokerage & Clearing revenues from (i) transaction fees earned on each contract executed or cleared and (ii) interest income earned on cash balances in our customers' accounts. We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned on each trade and (ii) interest income earned from providing secured customer financing through repo transactions.

The transaction fees we charge are typically based on the type of customer, the type of transaction, the method of trading and the volume of trading activity that a particular customer conducts with us. We generate interest income from the investment of customer funds, placed with us by customers in support of their trading operations. We also earn interest income from the financing of secured customer transactions through repo transactions.

We generate Asset Management revenues primarily from the management fees we charge on funds we raise through the products we distribute. In addition, to the extent that such funds are invested in derivatives markets and prime brokerage markets in which we conduct brokerage operations, we also have the opportunity to generate related commission and interest income from these funds.

*Net Interest Income*

Our Derivatives Brokerage & Clearing business generates interest income from the investment of customer funds placed with us by customers in support of their trading operations. The amount of interest income we earn is a function of the aggregate amounts a customer deposits with us and the overall level of interest rates. Our Prime Brokerage/Capital Markets business generates interest income by financing customers' securities transactions. This involves taking a customer's security and refinancing it with a qualified financial counterparty. The transaction is secured at all times, and we charge a pre–determined spread above our cost of refinancing.

Interest expense typically includes interest paid to Derivatives Brokerage & Clearing customers on the funds they maintain with us, interest paid to finance counterparties in our Prime Brokerage/Capital Markets business for the financing of customer securities and interest paid to banks and long–term debt holders. Because a substantial portion of our interest expense relates to our customers' accounts and financing activities (and not to debt for borrowed money), we net gross interest expense against gross interest income and report net interest income.

*Commissions and Order Execution Costs*

Commissions and order execution costs include variable expenses related directly to transactions conducted in our brokerage operations. Fees include exchange and clearing house fees, fees paid to third parties for execution of customer orders and sales commissions paid in those cases where customers are introduced and their orders are handled by non–salaried sales personnel.

*Employee Compensation and Benefits Expenses*

Employee compensation and benefits expenses include the cost of our global salaried employees. These expenses include base compensation, bonus compensation (whether discretionary or performance related) and the cost of medical insurance and other related employee benefits.

*General, Administrative and Other Expenses*

General, administrative and other expenses include all other operating expenses, including primarily lease expenses, communications and quotation systems expenses, travel and entertainment expenses, depreciation and amortization, professional fees and other miscellaneous expenses.

*Income Taxes*

We will be treated as a partnership for federal income tax purposes. Under applicable regulations, members of a limited liability company treated as a partnership are responsible for their individual income tax liabilities related to the limited liability company's results of operations. Accordingly, we have not provided for federal income taxes related to our results of operations. The provision for income taxes included in our consolidated financial statements relates to income taxes of foreign subsidiaries and New York City unincorporated business taxes.

*Results of Divisional Operations*

The following table summarizes the historical results of our divisional operations. The consolidated financial data for the fiscal years ended February 28, 2002 and 2003 and February 29, 2004 have been derived from our audited consolidated financial statements. The unaudited consolidated financial data for the three months ended May 31, 2003 and 2004 have been derived from our unaudited consolidated financial statements. The unaudited consolidated financial statements for the three months ended May 31, 2003 and 2004 include all adjustments necessary (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and results of operations for the periods presented. The information contained in this table should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical

53

Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

| | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
| | 2002 | 2003 | 2004(1) | 2003 | 2004 |
| | | | | (unaudited) | (unaudited) |
| | | | (in millions) | | |
| **Net revenues:** | | | | | |
| Derivatives Brokerage & Clearing | $ 564.0 | $ 673.9 | $ 773.9 | $ 181.2 | $ 242.5 |
| Prime Brokerage/Capital Markets | 240.1 | 244.6 | 297.0 | 64.5 | 89.8 |
| Asset Management | 68.5 | 57.8 | 70.5 | 15.7 | 27.4 |
| Corporate & Other(2) | (18.2) | (4.0) | (33.2) | (7.6) | (8.5) |
| Eliminations(2) | (44.7) | (50.0) | (56.4) | (7.5) | (5.8) |
| Total net revenues | $ 809.7 | $ 922.3 | $ 1,051.8 | $ 246.3 | $ 345.4 |
| **Expenses:** | | | | | |
| Commissions and order execution costs | $ 323.7 | $ 385.4 | $ 411.9 | $ 104.1 | $ 142.7 |
| Employee compensation and benefits | 198.4 | 211.8 | 238.4 | 52.3 | 76.8 |
| General, administrative and other | 171.4 | 167.4 | 200.9 | 42.7 | 57.5 |
| Total | $ 693.5 | $ 764.6 | $ 851.2 | $ 199.1 | $ 277.0 |
| **Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary:** | | | | | |
| Derivatives Brokerage & Clearing | $ 59.4 | $ 77.7 | $ 125.7 | $ 28.9 | $ 41.9 |
| Prime Brokerage/Capital Markets | 95.7 | 101.5 | 133.7 | 30.8 | 37.7 |
| Asset Management | 13.6 | 1.1 | (2.1) | (1.0) | 2.9 |
| Corporate & Other | (52.5) | (22.6) | (56.7) | (11.5) | (14.1) |
| Total | $ 116.2 | $ 157.7 | $ 200.6 | $ 47.2 | $ 68.4 |

(1)    Year ended February 29.

(2)    These line items are included to reconcile these summarized financial tables to our consolidated financial statements. Corporate & Other net revenue and expenses primarily include interest income and interest expense incurred at the parent company level. Also included are non–material fees and other expenses. Eliminations arise upon the consolidation of group operating performance and relate to intercompany balances and transactions.

*Results for the Three Months Ended May 31, 2004 Compared to the Three Months Ended May 31, 2003*

*Net Revenues.*    Net revenues on a consolidated basis for the three months ended May 31, 2004 increased $99.1 million, or 40.2%, to $345.4 million from $246.3 million for the three months ended May 31, 2003. The growth in net revenues for the three months ended May 31, 2004 was due to an increase in transaction volumes in all brokerage products and market segments that we serve. Principal drivers of this growth included dollar price increases in global commodities which increased traditional commodity futures volumes, price volatility in interest rate derivatives, increased customer activity in foreign exchange brokerage and the positive reception to managed futures and property management products introduced by our Asset Management business. The quarter also included for the first time the results of operations of companies acquired in fiscal year 2004 including, in particular, the

54

MacFutures Group, whose professional trader customers largely contributed to the growth in volume in interest rate derivatives.

*Derivatives Brokerage & Clearing Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2004 increased $61.3 million, or 33.8%, to $242.5 million from $181.2 million for the three months ended May 31, 2003. The growth in Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2004 was due to increased transaction volume in all markets and in all geographic sectors that we serve. Global demand for commodity materials resulted in increased activity in physical commodity markets, and interest rate uncertainties increased the level of interest rate derivative volumes. In Europe and Singapore, local foreign exchange operations (reported in Derivatives Brokerage & Clearing) also increased. The resulting increase in commissions and principal transaction revenues more than offset the decline in net interest income due to reduced interest rates. Derivatives Brokerage & Clearing contract volume increased by 45 million, or 41%, to 155 million contracts cleared for the three months ended May 31, 2004 from 110 million contracts cleared for the three months ended May 31, 2003.

*Prime Brokerage/Capital Markets Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2004 increased $25.3 million, or 39.2%, to $89.8 million from $64.5 million for the three months ended May 31, 2003. The growth in Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2004 was due to the further growth of secured customer financing transactions, the related increase in transaction volume and a 42.3% increase in principal transaction net revenue, reflecting the increased activity in foreign exchange markets.

*Asset Management Net Revenues.*    Asset Management net revenues for the three months ended May 31, 2004 increased $11.7 million, or 74.5%, to $27.4 million from $15.7 million for the three months ended May 31, 2003. The increase in Asset Management net revenues for the three months ended May 31, 2004 was due to the positive impact on revenues of new product launches, including a new real estate investment product and the successful expansion of our managed futures product offerings. Additionally, the increase in the level of global equity markets had the effect of increasing assets under management and as a result, fee income, which also impacted favorably on our investment management fee income.

*Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the three months ended May 31, 2004 increased $38.6 million, or 37.1%, to $142.7 million from $104.1 million for the three months ended May 31, 2003. The increase in commissions and order execution costs for the three months ended May 31, 2004 was due primarily to the increase in transaction volume in exchange–traded derivatives.

*Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses on a consolidated basis for the three months ended May 31, 2004 increased $24.5 million, or 46.8%, to $76.8 million from $52.3 million for the three months ended May 31, 2003. The growth in employee compensation and benefits expenses for the three months ended May 31, 2004 was due to the addition of several new operating groups acquired during the twelve–month period ended May 31, 2004, such as Trafalgar Commodities and the Wexford Fixed Income Group in New York, and the further expansion of the MacFutures Group.

*General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the three months ended May 31, 2004 increased $14.8 million, or 34.7%, to $57.5 million from $42.7 million for the three months ended May 31, 2003. The growth in general, administrative and other expenses for the three months ended May 31, 2004 was principally due to the inclusion of expenses associated with entities acquired during the twelve–month period ended May 31, 2004.

*Operating Profit.*    Operating profit on a consolidated basis for the three months ended May 31, 2004 increased $21.2 million, or 44.9%, to $68.4 million from $47.2 million for the three months ended May 31, 2003. The increase in operating profit for the three months ended May 31, 2004 was due primarily to the increase in net revenues across all business lines.

*Derivatives Brokerage & Clearing Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2004 increased $13.0 million, or 45.0%, to $41.9 million from $28.9 million for the three months ended May 31, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2004 was due to the growth in transaction volume, the resulting growth in commission and brokerage revenues and an increase in principal brokerage activities, particularly in Europe and Asia. The increase in Derivatives Brokerage & Clearing net revenues accelerated at a faster rate than the increase in related expenses because we continued to benefit from our ability to aggregate volume on existing operating platforms with little, if any, increase in fixed costs.

*Prime Brokerage/Capital Markets Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2004 increased $6.9 million, or 22.4%, to $37.7 million from $30.8 million for the three months ended May 31, 2003. The increase in Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2004 was due to the continued growth in Prime Brokerage/Capital Markets net revenues, particularly the increase in foreign exchange brokerage revenues, along with newly acquired operations such as the Wexford Fixed Income Group. Net revenues grew at a slower rate than related expenses due to expenses at the acquired entities.

*Asset Management Operating Profit.*    Asset Management operating profit for the three months ended May 31, 2004 increased $3.9 million to $2.9 million from a loss of $1.0 million for the three months ended May 31, 2003. The increase in Asset Management operating profit for the three months ended May 31, 2004 was due to the increase in Asset Management net revenues, which reflected the benefits of product diversification including, in particular, the continued expansion of our managed futures product offerings and the addition of real estate fund offerings in the United Kingdom. Increases in advisory fees also reflected the generally higher level of global equity markets. This enabled Asset Management net revenues to significantly outpace expenses.

### Results for the Year Ended February 29, 2004 Compared to the Year Ended February 28, 2003

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 29, 2004 increased $129.5 million, or 14.0%, to $1,051.8 million from $922.3 million for the year ended February 28, 2003. The increase in net revenues for the year ended February 29, 2004 was due to the significant increase in brokerage transaction volume. The growth in volume reflected underlying industry trends accentuated by our organic growth and the benefits of acquisitions including, in particular, the MacFutures acquisition, which was completed in February 2003. Our Prime Brokerage/Capital Markets business benefited from an increase in foreign exchange brokerage and the continued expansion of our fixed income prime brokerage activities.

*Derivatives Brokerage & Clearing Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 increased $100.0 million, or 14.8%, to $773.9 million from $673.9 million for the year ended February 28, 2003. The growth in Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 was due to increased transaction volume in all geographic and product sectors that we serve. Dollar price increases in physical commodity markets driven by the growth of Asian economies, particularly China, produced strong volume and revenue results in agricultural and metals derivatives brokerage. The changing outlook for interest rates combined with the addition of a MacFutures platform in February 2003 produced a significant increase in financial futures contract volume, particularly interest rate products. Derivatives Brokerage &

56

Clearing contract volume increased by 61 million, or 15%, to 461 million contracts cleared for the year ended February 29, 2004 from 400 million contracts cleared for the year ended February 28, 2003.

*Prime Brokerage/Capital Markets Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 increased $52.4 million, or 21.4%, to $297.0 million from $244.6 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 was due to the increase in transaction volume and revenues of the foreign exchange brokerage activities. This supported the continued expansion of our fixed income clearing operations. Foreign exchange activities reflected the diversification of our product offerings and the launch of online wholesale and retail products in June 2003.

*Asset Management Net Revenues.*    Asset Management net revenues for the year ended February 29, 2004 increased $12.7 million, or 22.0%, to $70.5 million from $57.8 million for the year ended February 28, 2003. The growth in Asset Management net revenues for the year ended February 29, 2004 was due to the improvement in global equity markets, which increased assets under management among traditional equity products, and the success of our newly developed managed futures products.

*Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the year ended February 29, 2004 increased $26.5 million, or 6.9%, to $411.9 million from $385.4 million for the year ended February 28, 2003. The increase in commissions and order execution costs for the year ended February 29, 2004 was due to the increase in overall transaction volume and, in particular, the increase in Derivatives Brokerage & Clearing transactions. This increase was partially offset by a shift in overall product mix towards Prime Brokerage/Capital Markets operations, as most of this volume is conducted by corporate sales groups and not commission–based sales personnel.

*Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses on a consolidated basis for the year ended February 29, 2004 increased $26.6 million, or 12.6%, to $238.4 million from $211.8 million in the year ended February 28, 2003. The growth in employee compensation and benefits expenses for the year ended February 29, 2004 was principally due to the addition to our payroll of the majority of employees of acquired companies, specifically MacFutures, Trafalgar Commodities and Carlton Brokerage (all of which were incremental to earnings).

*General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $33.5 million, or 20.0%, to $200.9 million from $167.4 million for the year ended February 28, 2003. The growth in general, administrative and other expenses for the year ended February 29, 2004 was due to the incremental expenses associated with acquired operations.

*Operating Profit.*    Operating profit on a consolidated basis for the year ended February 29, 2004 increased $42.9 million, or 27.2%, to $200.6 million from $157.7 million for the year ended February 28, 2003. The growth in operating profit for the year ended February 29, 2004 was due to the increase in net revenues derived from increased transaction volume, together with the improvement in operating margins created by the reduction in sales commission costs and our ability to control the overall level of operating costs.

*Derivatives Brokerage & Clearing Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 increased $48.0 million, or 61.8%, to $125.7 million from $77.7 million for the year ended February 28, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 was due to increased volume, a reduction in sales commission costs (reflecting a diminished reliance on commission sales groups) and an increase in net interest income as a result of the substantial growth of customer deposits, which offset lower investment yields.

*Prime Brokerage/Capital Markets Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 increased $32.2 million, or 31.7%, to $133.7 million from $101.5 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 was due to the increase in fixed income transaction volume and related commission revenue and a significant increase in principal transaction activities, primarily foreign exchange. This trend more than offset the reduction in net interest income resulting from the current low interest rate environment and its adverse impact on secured customer financing revenues.

*Asset Management Operating Profit (Loss).*    Asset Management operating profit for the year ended February 29, 2004 decreased $3.2 million to a loss of $2.1 million from a profit of $1.1 million for the year ended February 28, 2003. The decrease in Asset Management operating profit for the year ended February 29, 2004 was due to the fact that assets under management remained low, despite the fact that new initiatives, including the launch in June 2003 of our managed futures product, resulted in an increase in commission revenue. The latter was offset by the costs associated with the build–out of the distribution platform associated with this project.

### Results for the Year Ended February 28, 2003 Compared to the Year Ended February 28, 2002

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 28, 2003 increased $112.6 million, or 13.9%, to $922.3 million from $809.7 million for the year ended February 28, 2002. The growth in net revenues for the year ended February 28, 2003 was due to the record transaction volume in our Derivatives Brokerage & Clearing business, continued growth in our Prime Brokerage/Capital Markets activities, reflecting underlying growth trends in both markets, and expanded market share. The increase in commission income and net interest income from secured customer financing transactions more than compensated for the reduction in foreign exchange principal brokerage and reduced asset management advisory fees.

*Derivatives Brokerage & Clearing Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 increased $109.9 million, or 19.5%, to $673.9 million from $564.0 million for the year ended February 28, 2002. The growth in Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 was due to a higher number of cleared contracts, increased commission income and significant increases in customer deposits. Derivatives Brokerage & Clearing contract volume increased by 54 million, or 16%, to 400 million contracts cleared for the year ended February 28, 2003 from 346 million contracts cleared for the year ended February 28, 2002.

*Prime Brokerage/Capital Markets Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 increased $4.5 million, or 1.9%, to $244.6 million from $240.1 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 was due to the expanded book of secured customer financing transactions, which resulted in increased net interest income and offset the decline in customer volumes, and the realignment of our products.

*Asset Management Net Revenues.*    Asset Management net revenues for the year ended February 28, 2003 decreased $10.7 million, or 15.6%, to $57.8 million from $68.5 million for the year ended February 28, 2002. The decrease in Asset Management net revenues for the year ended February 28, 2003 was due to the decline in investment advisory fees, which reflected a significant decline in assets under management as a result of weak equity markets.

*Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the year ended February 28, 2003 increased $61.7 million, or 19.1%, to $385.4 million from $323.7 million for the year ended February 28, 2002. The increase in commissions and order execution costs for the year ended February 28, 2003 was due to the increase in overall

transaction volume, particularly in Derivatives Brokerage & Clearing, and the impact of increases in the sales commission structure of certain companies we acquired during the year.

*Employee Compensation and Benefits Expenses.*   Employee compensation and benefits expenses on a consolidated basis for the year ended February 28, 2003 increased $13.4 million, or 6.7%, to $211.8 million from $198.4 million for the year ended February 28, 2002. The growth in employee compensation and benefits expenses for the year ended February 28, 2003 was due to the addition of employees associated with acquisitions made during the year, although the percentage increase was substantially lower than the percentage increase in revenues.

*General, Administrative and Other Expenses.*   General, administrative and other expenses on a consolidated basis for the year ended February 28, 2003 decreased $4.0 million, or 2.3%, to $167.4 million from $171.4 million for the year ended February 28, 2002. The decrease in general, administrative and other expenses for the year ended February 28, 2003 was due to our continued success in the rationalization of acquired operating platforms, particularly the final stage of consolidating Lind–Waldock and the transfer of the business of LFG, LLC, which we acquired in fiscal year 2001, from outside systems vendors to our own operating platform.

*Operating Profit.*   Operating profit on a consolidated basis for the year ended February 28, 2003 increased $41.5 million, or 35.7%, to $157.7 million from $116.2 million for the year ended February 28, 2002. The increase in operating profit for the year ended February 28, 2003 was due to the increase in revenues in our Prime Brokerage/Capital Markets operations, combined with cost control and expense reduction following the consolidation of acquired entities.

*Derivatives Brokerage & Clearing Operating Profit.*   Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 increased $18.3 million, or 30.8%, to $77.7 million from $59.4 million for the year ended February 28, 2002. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 was due to increased volumes, which increased commission and brokerage revenues, combined with increased net interest income resulting from record levels of customer deposits.

*Prime Brokerage/Capital Markets Operating Profit.*   Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 increased $5.8 million, or 6.1%, to $101.5 million from $95.7 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 was due to the expansion primarily of our secured customer financing transactions and the resulting increase in net interest income, which offset the decline in foreign exchange principal brokerage, coupled with tight cost control, including an absolute reduction in general and administrative expenses.

*Asset Management Operating Profit.*   Asset Management operating profit for the year ended February 29, 2003 decreased $12.5 million, or 91.9%, to $1.1 million from $13.6 million for the year ended February 28, 2002. The decrease in Asset Management operating profit for the year ended February 29, 2003 was due to declining assets under management, reflective of continued poor equity market performance, which impacted adversely on revenues and was not offset by reduced operating expenses.

## Seasonality

Our business can experience seasonal fluctuations. Financial markets may experience reduced trading activity during summer months and in the month of December as a result of holidays. Traditional commodity derivatives, such as energy, will reflect changing supply/demand factors related to heating/cooling seasons. As a result of these factors, we may experience relatively higher trading volume and thus revenue during our first and third fiscal quarters and lower trading volume in our second fiscal quarter. However, this trend is not evident in every year and in recent years has been moderated by globalization and an expanded range of products which tend to counter traditional seasonality trends. For these reasons, seasonality was not a major factor in our 2004 fiscal year.

**Liquidity and Capital Resources**

*Working Capital*

Our primary requirement for working capital relates to funds we are required to maintain at exchanges or clearing organizations to support our customers' trading activities. We require that our customers deposit funds with us in support of their trading activities, which we in turn deposit with exchanges or clearing organizations to satisfy our obligations. These required deposits account for the majority of our working capital requirements and thus our principal use of working capital is funded directly or indirectly by our customers. Our working capital needs are otherwise primarily limited to regulatory capital requirements which we have satisfied in the past from internally generated cash flow and available funds.

Notwithstanding the self–funding nature of our operations, we may sometimes be required to fund timing differences arising from the delayed receipt of customer funds or timing differences associated with the settlement of customer transactions in securities markets. Historically, these timing differences were funded either with internally generated cash flow or, if needed, with funds drawn under short–term borrowing facilities, including committed lines of credit. We have $75.0 million of available borrowings under a revolving credit facility for working capital purposes. Separately, our finance subsidiary, Refco Capital, LLC, utilizes secured bank facilities to refinance specialized financing arrangements entered into with select customers from time to time. As of May 31, 2004, there are no loans outstanding under these facilities.

Our two principal U.S. regulated subsidiaries are Refco, LLC and Refco Securities, LLC. Refco, LLC is subject to the CFTC minimum financial requirements, which generally require that we maintain net capital equal to 4% of customer funds required to be segregated pursuant to the Commodity Exchange Act, less the market value of certain commodity options. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital. Refco Securities, LLC is subject to the uniform net capital requirements of the SEC, which require the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for by the SEC's rules, which require that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items as defined in the SEC's rules. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate customer–related debit items. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million which was 18.3% of aggregate customer–related debit items and $67.5 million in excess of required net capital.

As a matter of policy, we maintain excess regulatory capital to provide liquidity during periods of unusual market volatility, and this has been sufficient in the past to absorb volatile market events. Similarly, for our brokerage activities in the OTC markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures–style margin methodology to protect us against price movements, and this also reduces the amount of capital needed to conduct business because even if we are required to post funds with clearing organizations in order to facilitate customer–initiated transactions, we are able to use customer deposits for this purpose rather than our own funds. The result is that we can execute a substantial volume of transactions without the need for large amounts of working capital.

Funding for purposes other than working capital requirements, including the financing of acquisitions, has been provided either through internally generated cash flow or through specific long–term financing arrangements (which are described below).

Substantially all the assets of our Asset Management business, which accounted for 6.7% of fiscal year 2004 revenue and an operating loss of $2.1 million in fiscal year 2004, were distributed to Refco

Group Holdings, Inc. in connection with the Transactions. Our Asset Management business generated nominal cash flow for fiscal year 2004.

### Long–Term Debt

It has been our policy to match the varied nature of our liquidity requirements with appropriately structured funding sources. We have traditionally financed acquisitions with term debt utilizing medium–term institutionally placed notes. At May 31, 2004 we had $399.5 million (including the current portion of long–term debt) of notes outstanding, $37.0 million of which was repaid on June 29, 2004. The total amount of this debt was retired at the closing of the Transactions. We intend to continue to fund long–term requirements, including acquisitions, with long–term debt.

We incurred a substantial amount of long–term debt in connection with the Transactions. As of May 31, 2004, after giving pro forma effect to the Transactions, we would had had $1,400.0 million of long–term debt outstanding.

The senior credit facilities we entered into in connection with the Transactions consist of a $75.0 million revolving credit facility, none of which was drawn upon consummation of the Transactions, and an $800.0 million term loan facility, which was fully drawn as part of the Transactions. We have an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. For more information on the senior credit facilities, see "Description of Credit Facilities—Senior Credit Facilities." We also issued $600.0 million of the old notes in connection with the Transactions. For more information on the notes, see "Description of the Notes." The proceeds from the term loans, along with the proceeds from the issuance of the old notes, were used to fund the cash payments made to our existing shareholders, repay certain existing indebtedness and pay related transaction fees and expenses. See "The Transactions."

The senior credit facilities require compliance with a minimum interest coverage ratio and a maximum leverage ratio (subject to an equity cure in specified instances). In addition, the senior credit facilities contain certain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross–defaults to certain other indebtedness in excess of specified amounts, certain events of bankruptcy and insolvency, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

Through our Refco Capital, LLC subsidiary, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively. We currently have no outstanding debt under these facilities.

### Liquidity Risk

Ready access to cash is essential to our business. Our liquidity could be impaired by an inability to access lines of credit, an inability to access funds from our subsidiaries or an inability to sell assets. This situation may arise due to circumstances that we may be unable to control, such as a general

market disruption or an operational problem that affects third parties or us. Further, our ability to sell assets may be impaired if other market participants are seeking to sell similar assets at the same time. Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

**Contractual Obligations and Commitments**

We have contractual obligations to make future payments under long–term debt and long–term non–cancelable lease agreements and have contingent commitments under a variety of commercial arrangements. See Notes C and H to our consolidated financial statements for further information regarding our commitments and contingencies. The table below shows as of May 31, 2004 on a pro forma basis after giving effect to the Transactions, our contractual obligations and commitments, including our payments due by period:

| | Payments due by period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1–3 years | 4–5 Years | More than 5 years |
| | | | (in millions) | | |
| Long–term debt obligations | $ 1,400.0 | $ 6.0 | $ 16.0 | $ 16.0 | $ 1,362.0 |
| Operating lease obligations | 81.3 | 15.2 | 25.2 | 15.8 | 25.1 |

In addition to the contractual obligations and commitments set forth above, we may be obligated to make earn–out payments in connection with acquisitions we have completed in the past.

**Off Balance Sheet Arrangements**

In the normal course of our customer–driven operations, we enter into various contractual commitments, as principal, involving forward settlement. These include exchange–traded futures, fixed income swaps, equity swaps, foreign currency forwards and option contracts. These contracts are generally hedged with offsetting contracts at prices which result in a profit spread for us. We also enter into forward repurchase agreements. Our customers and counterparties consist of entities in and outside the United States.

We record our contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. Our exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments we are exposed to is often limited by other financial instruments recorded both on and off balance sheet. Our management actively monitors our market risk by reviewing the effectiveness of hedging strategies and setting market risk limits.

**Critical Accounting Policies and Estimates**

Our discussion of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. During the preparation of these consolidated financial statements, we are required to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosures of contingent assets and liabilities. On an ongoing basis,

62

we evaluate our estimates and assumptions, including those related to commissions, principal transactions, provisions for doubtful accounts on receivables, fair values of derivative financial instruments and goodwill and intangible assets. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of our analysis form the basis for making assumptions about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions, and the impact of such differences may be material to our consolidated financial statements.

We believe that the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements:

### Commissions

Commissions earned and related expenses on our customers' open futures positions may be recognized on either a half–turn basis, meaning that we recognize commissions on the opening or closing of a futures contract, or on a round turn basis, after the purchase and a subsequent sale, or a sale and a subsequent purchase of a futures contract. We recognize commissions earned on a half–turn basis.

We report gross commission income on transactions executed by introducing brokers and report commissions paid to introducing brokers as commission expense. Presentation of commissions on a gross basis does not impact our net income.

### Principal Transactions

Our company, as a broker of derivatives products, enters into contractual commitments, as principal, involving forward settlement. These contracts are recorded at fair value and are generally immediately hedged with offsetting contracts, which results in a profit spread for us. As the fair values are based on observable market data, this profit spread is recognized immediately in our statement of operations under Principal transactions.

### Receivables from Customers—Provisions for Doubtful Accounts

Our receivables are generally collateralized with marketable securities. For certain customer receivables that are not fully secured, we establish reserves when, in the opinion of management, such reserves are appropriate. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

### Fair Values of Derivative Financial Instruments and Securities

As a broker, we enter into transactions involving derivative financial instruments and securities on behalf of our customers. These transactions are carried at market value or, if market prices are not readily available, fair value. Changes in fair value are recognized immediately in net income. Market values for exchange–traded derivatives are based on quoted market prices. Fair market values for OTC derivative financial instruments are based on pricing models that are in turn based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts. Valuation models include the use of management estimates and current market information. Management is also required to make assumptions on how the fair value of derivative financial instruments and securities is affected by current market conditions. If management's underlying assumptions for evaluating fair value prove to be inaccurate, there could be material differences in our consolidated operating results.

*Goodwill*

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets as of acquisition date. Prior to December 1, 2001, goodwill was amortized over a period of 25 years on a straight–line basis. Effective December 1, 2001, we adopted the treatment of SFAS No. 142, *Goodwill and Other Intangible Assets*. Consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. We are required to record an impairment loss if the estimated fair value of an operating segment is less than its estimated net book value. We derive the fair value of each of our operating segments primarily based on earnings multiples. A prolonged reduction in the earnings of one of our operating segments could result in an impairment charge in our results. Our last annual impairment test was performed during the fourth quarter of fiscal year 2004, and no impairment was identified. As at February 29, 2004, the carrying value of our goodwill was $291.2 million.

*Identifiable Intangible Assets*

Identifiable intangible assets, which consist primarily of customer relationships, asset management contracts, property management contracts and trade names, are amortized over their useful lives. Customer relationships are amortized on an accelerated basis based upon projected cash flows. Asset management contracts and property management contracts are amortized over their estimated useful lives of 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's carrying value may not be fully recoverable. An impairment loss, calculated as the difference between the estimated fair value and the carrying value of the identifiable intangible asset, is recognized if the expected undiscounted cash flows relating to the identifiable intangible asset is less than the corresponding carrying value. Trade names have been classified as indefinite–lived assets and are not amortized but tested annually for impairment. The valuation of our identifiable intangible assets is dependent upon assumptions in areas such as growth rates, customer retention and profitability. Changes to these assumptions or a prolonged period of weakness in global financial markets could adversely impact our businesses and impair the value of our identifiable intangible assets. As at February 29, 2004, the carrying value of our identifiable intangibles was $89.5 million.

*Use of Estimates*

The use of generally accepted accounting principles requires management to make certain estimates. In addition to the estimates we use in connection with fair value measurements and the accounting for goodwill and identifiable intangible assets, the use of estimates is also important in determining provisions for potential losses that may arise from litigation and regulatory proceedings.

**Recent Accounting Pronouncements**

In January 2003, the FASB issued Interpretation 46, *Consolidation of Variable Interest Entities*. In December 2003, the FASB issued Interpretation 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities*. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. Interpretation 46 R requires a variable interest entity to be combined by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 to variable interest entities created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for "Special Purpose Entities" created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before

64

January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. As we do not have any interests in variable interest entities, the adoption of this statement did not have an effect on our consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*. SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB No. 133 *Accounting for Derivative Instruments and Hedging Activities*. This Statement is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on our consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*. SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity, and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on our consolidated financial statements.

In December 2003, FASB Statement No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits*, was issued. Statement 132 (revised) prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of recognition of those plans. The Statement retains and revises the disclosure requirements contained in the original SFAS 132. It also requires additional disclosures about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit pension plans and other postretirement benefit plans. The Statement generally is effective for fiscal years ending after December 15, 2003. Management does not believe the adoption of this statement will have a material impact on our consolidated financial statements.

**Quantitative and Qualitative Disclosure about Market Risk**

Our principal market risks relate to counterparty, interest rate and exchange rate risk.

*Counterparty Risk*

We are exposed to the risk that third parties that owe us money, securities or other assets will not perform their obligations. These parties may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. As a clearing broker, we finance our customer positions, and we could be held responsible for the defaults or misconduct of our customers. In addition, we have experienced, due to competitive factors, pressure to extend credit and to price more aggressively the credit risks we take. Although we regularly review credit exposures to specific customers and counterparties and to specific industries, countries and regions that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to detect or foresee. In addition, concerns about, or a default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect us.

As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. Our Global Risk Management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets. Our current system provides the ability to project the impact of market volatility on price movement. Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's

ability to pay margin. We perform frequent stress tests to our customers' positions, including intra–day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

### Interest Rate Risk

In the ordinary course of our operations, we have limited our exposure to interest rate risk. Our balance sheet, which reflects a substantial amount of short–term and highly liquid assets, consists of equally matched assets and liabilities. We generate interest income from the positive spread earned on customer deposits or secured customer financing transactions, and the basis for the calculation of interest received and paid is entirely matched. This remains true in both rising and falling interest rate environments, although we have the opportunity to create higher levels of interest income in a rising interest rate environment.

In the future, we will be more exposed to changes in interest rates. Our new senior credit facilities are variable–rate debt. Interest rate changes therefore generally do not affect the market value of such debt but do impact the amount of our interest payments and our future earnings and cash flows, assuming other factors are held constant. Conversely, for fixed–rate debt, interest rate changes do not impact future cash flows and earnings but do impact the fair market value of such debt, assuming other factors are held constant. Assuming we had completed the Transactions and applied the proceeds as of February 29, 2004, we would have had variable–rate debt of approximately $800.0 million. Assuming we had incurred this debt on March 1, 2003, holding other variables constant, including levels of debt, a one percentage point increase in interest rates would have had an estimated impact on pre–tax earnings and cash flows for the year ended February 29, 2004 of $8.0 million.

While variable–rate debt will increase our interest expense in a rising interest rate environment, the impact will be mitigated in part by increased interest income generated from the investment of customer balances. These balances are invested daily by us in a variety of permissible short–term instruments.

### Exchange Rate Risk

We conduct global operations. Our revenues are denominated predominately in U.S. dollars, but the most significant non–dollar currency flows are denominated in Euros and Pounds Sterling. Our expenses are also denominated predominantly in U.S. dollars and to a lesser extent a variety of local currencies reflecting the location of physical operations, particularly those in the United Kingdom, Canada, France and Singapore.

While a majority of the currency fund flows are therefore matched, currency exposure does exist in respect of international operating expenses. It is our policy to cap any consolidated exposure to foreign currency which exceeds $2.5 million per location through the sale of the currency in question.

**INDUSTRY**

**Derivatives**

*Overview*

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. A futures contract is a legally binding agreement to buy or sell a commodity or financial instrument at a certain future date at a specific price. Options are contracts that provide for a right, but not an obligation, to buy or sell a commodity or financial instrument over a certain period at a specific price. Derivatives contracts are broadly comprised of two underlying categories: financial and physical. Examples of financial derivatives include contracts on interest rates, equity indices, individual equities and foreign currencies. Examples of physical derivatives include contracts on energy products, agricultural commodities and non–precious and precious metals. Derivatives markets have grown significantly over the past 15 years in terms of the volume of exchange–traded derivatives activity and the notional amounts outstanding of OTC contracts.

Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the OTC market. According to the BIS, the global notional amount outstanding for OTC derivatives at December 31, 2003 was $197 trillion, while the global notional principal amount outstanding for financial exchange–traded derivatives was $37 trillion. There are 60 derivatives exchanges tracked by the FIA located in 26 countries, including 18 exchanges in the United States. Major derivatives exchanges in the United States include the CME, the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), the Chicago Board Options Exchange ("CBOE") and the New York Board of Trade ("NYBOT"). Major derivatives exchanges outside the United States include Eurex, London International Financial Futures and Options Exchange ("LIFFE"), Mercado Oficial de Futuros y Opciones Financieros in Spain ("MEFF"), Euronext N.V., Singapore Derivatives Exchange Ltd. ("SGX") and the Tokyo Stock Exchange ("TSE"). Contracts traded on U.S. exchanges represented approximately 27% of global derivatives volume in 2003. The top five U.S. exchanges accounted for 83% of the global exchange–traded derivatives volume transacted in the United States in 2003.

The customer base for derivatives contracts includes professional traders, financial institutions, institutional and individual investors, as well as major corporations, manufacturers, producers and governments. These customers purchase derivatives primarily for hedging or investment purposes. Hedging involves the practice of managing risk inherent in one market position by taking an offsetting position in another market. For example, corporations use the futures markets to protect their businesses from adverse changes in the costs of their raw materials. Investing involves a market participant taking a position in an attempt to earn a profit from buying and selling futures and options contracts in anticipation of future price movements. When entering into exchange–traded derivatives contracts, customers are required to make good faith margin deposits to ensure future performance under the derivatives contract.

*Methods of Trade Execution*

Trading in derivatives products has traditionally occurred in "pits" on the physical trading floor of an exchange through an auction process known as open outcry. Only members owning or leasing a seat on the exchange may trade in the pit. Buy and sell orders from individuals and institutions are sent to these members on the trading floor, usually through an FCM. Members of an exchange may exercise their trading privileges as independent market–makers (known as locals) trading for their own account or as floor brokers executing customer orders.

67

The diagram below illustrates the process through which customers place trade orders on an exchange floor through an FCM.



In order to expand access to their markets, most derivatives exchanges have supplemented or replaced their open outcry trading facilities with electronic trading platforms. Electronic systems allow investors to obtain real–time information about bid and ask prices and trading volumes and to enter orders directly into the electronic exchange's centralized order book, subject to the agreement of an FCM to process the investors' trades. The emergence of electronic trading has been enabled by the ongoing development of sophisticated electronic order routing and matching systems, as well as advances in communications networks and protocols. Examples of electronic trading platforms include CME's GLOBEX system, the a/c/e platform, which is provided jointly by CBOT and Eurex, LIFFE Connect, which is provided by Euronext.LIFFE, and the Cantor Exchange ("CX"), which is provided by Cantor Fitzgerald, L.P.

### Exchange Clearing Houses

Transactions executed on derivatives exchanges are settled through a clearing house that acts as a central counterparty to the clearing member on each side of the transaction. When a futures transaction has been executed in the pit or on an electronic platform, the clearing house confirms the matching and settlement of the trade with FCMs representing both buyer and seller.

The major clearing houses for futures products include the Clearing Division of the CME, the Clearing Corporation, the LCH, Singapore Exchange Derivatives Clearing Limited and Clearnet. A clearing house manages its counterparty risk through required margin deposits that are managed to ensure effective delivery of the underlying security or commodity, and maintains guarantee funds and capital call rights.

### Futures Commission Merchants

In the United States, customers access the exchange–traded derivatives market through FCMs. FCMs are members of one or more exchanges that solicit or accept orders from customers for the purchase or sale of derivatives and route those orders to the appropriate exchange. FCMs execute customer orders on the exchange and maintain records of each customer's position, margin deposits,

money balances and completed transactions. In return for providing these services, FCMs collect commissions on each trade order from customers. In addition, FCMs earn interest income on cash deposits held on behalf of their customers. FCMs are subject to a number of regulatory requirements, including the maintenance of a minimum level of net capital. FCMs are regulated by the CFTC, an independent federal regulatory agency, and must be a member of the NFA, an industry–wide self–regulatory organization. FCMs are typically either divisions of major investment or commercial banks or independent providers such as our company. Regulatory jurisdictions outside of the United States have similar governing bodies, minimum capital requirements and self–regulatory organizations.

### Industry Growth

According to the BIS, annual trading volume in exchange–traded derivatives has grown at a compound annual growth rate of approximately 22% over the past 15 years, from 388 million contracts traded in 1988 to over eight billion contracts traded in 2003. During the same period, trading volumes increased at a compound annual growth rate of 15% in North America. Excluding single stock and commodity contracts, the compound annual growth rate of trading volumes has been 26% in Europe and 35% in the Asia and Pacific markets during the same period.

**Futures and Options Trading Volume on Global Derivatives Exchanges**
(Contract amounts in millions)



Source:    BIS.

Note:    Data based on calendar year. The "financial" category of derivatives includes interest rate, currency and equity index contracts.

We believe growth in exchange–traded derivatives volumes has been driven by the following factors:

- *Increasing Importance of Risk Management*—An increasing fluidity of capital and diversification of commercial activity among capital markets has broadened the financial exposures businesses and individuals face and increased the need to hedge their risks. We believe companies and investors focus on controlling exposures in their businesses and providing less volatile earnings

69

for shareholders. To achieve this goal, managers are emphasizing risk management as a means of reducing volatility in their businesses. As risk management needs have increased so have the number of exchange–traded derivatives contracts available to meet these needs.

- *Product Innovation*—In general, the number of contracts available for trading on exchanges has grown significantly in recent years. As of April 2004, the CME, Eurex and CBOT offered for trading a total of 224 contract types, an increase of 109 since January 2000. For example, the e–mini S&P 500 index has experienced rapid growth since being launched in 1997, partially as a result of its small size in relation to most other contracts and its resulting affordability to smaller investors. The e–mini S&P 500 index's annual trading volume reached 161 million contracts in 2003, making it the fifth most actively traded contract in the world six years after its introduction.

- *Structural Shift from OTC Markets to On–Exchange Trading*—The exchange–traded derivatives market for financial derivatives contracts grew at a faster rate than the OTC derivatives market in 2003 based on the total notional amount of contracts outstanding. Exchanges offer customers the advantages of improved price transparency, centralized clearing and credit intermediation. Due in part to these benefits, an increasing proportion of mature and standardized OTC derivatives products (e.g., equity indexes) have shifted to an exchange platform. Given the large size of the OTC derivatives market in terms of notional amount of contracts outstanding, exchanges are developing new products based on the most commonly traded OTC products.

- *Deregulation*—Deregulation of the financial services industry in the United States, Europe and Asia has increased customer access to derivatives products and markets, reduced regulatory barriers to product innovation and encouraged consolidation among exchanges.

  *United States:*   Many regulatory barriers to product development, such as lengthy CFTC review of new contracts, were largely repealed by the enactment of the Commodity Futures Modernization Act of 2000 ("CFMA") in the United States. Among other developments, the CFMA authorized the trading of new products, such as futures contracts on individual stocks and narrow–based stock indexes, which were prohibited under prior law. The CFMA also enabled regulated exchanges to self–certify new contracts and rules, without delays occasioned by regulatory review and approval, permitting quicker product launch and modification.

  *Europe and Asia:*   Deregulation and competition will continue to pressure European exchanges to consolidate across borders to gain operating efficiencies necessary to compete for customers and intermediaries, lowering transaction costs and trading friction, which should continue to attract new market participants. Singapore Derivatives Exchange, the TSE, Eurex and Euronext N.V. are major exchanges for various types of securities in addition to being derivatives exchanges, highlighting the growing convergence between cash and derivatives markets. Euronext N.V., which resulted from the merger of the Amsterdam Exchanges N.V., Paris Bourse SA and Societe de la Bourse de Valeurs Mobilieres de Bruxelles S.A. (the Brussels Exchange) acquired a controlling interest in LIFFE and announced plans to integrate their derivatives markets.

- *Exchange and Clearing Platform Competition*—Competition among exchange and clearing platforms has increased as a result of globalization, deregulation and technological advances. Competition has increased product innovation as evidenced by the proliferation of contract types traded on each derivatives exchange and has led to significant fee reductions. A recent example of exchange competition is the launch by Eurex of a U.S. based exchange, which competes directly with the CBOT in certain product areas. In response to Eurex's entrance, the CBOT has reduced some of its clearing fees. We believe this competition will significantly contribute to transaction volume growth and will benefit other market participants such as FCMs.

70

- *Electronic Trading*—The ongoing conversion of the derivatives markets from floor–based exchanges to an electronic format has enabled exchanges to lower clearing fees, reduce execution times and broaden access. Electronic trading has led to the decentralization of exchanges and has allowed customers to view bid and ask prices and trade derivatives products globally nearly 24 hours a day. Due to the previously mentioned benefits, we believe electronic trading is attracting new customers to the exchange–traded derivatives market and increasing the trading activity among existing customers. For example, from January 2004 through June 2004, the average daily volume of electronically traded Eurodollar contracts increased over 500%. Electronic trading represented 35% of average daily volume on the CME in 2002, 44% in 2003, 48% in the first quarter of 2004 and 55% in May 2004.

## Prime Brokerage

Prime brokerage is an industry term referring to specialized services provided by brokers to institutional customers as a bundled package. The services typically include execution and clearing, securities financing, custody, trade processing, securities lending and other administrative services. These services can be provided on either electronic or voice platforms, or both. Prime brokers serve customers in all major securities markets, such as equity, fixed income and foreign exchange. Prime brokers typically earn revenue through commission or transaction fees and interest income. They are typically divisions of major investment or commercial banks, or independent providers, such as our company.

The fixed income and foreign exchange markets we provide prime brokerage services to are discussed separately below.

### *Fixed Income*

The fixed income securities market is one of the largest financial markets in the world. In the United States, there are currently over $22.5 trillion of fixed income securities outstanding. The U.S. Treasury securities market, the largest and most liquid fixed–income market, has experienced strong volume growth. Average daily dollar trading volume has increased from $18.3 billion in 1980 to $433.5 billion in 2003, representing a compound annual growth rate of 14.8%.

While there are many types of investors in the U.S. Treasury securities market, financial institutions, corporations and hedge funds comprise a large percentage of the activity. These investors are typically attracted to the U.S. Treasury securities market due to its significant liquidity and low risk profile. Additionally, U.S. Treasury securities are commonly used as part of a larger investment strategy and are primarily financed through the OTC repo market.

The OTC repo market is one of the largest and most active sectors in the U.S. fixed income market. Repos are widely used as a means to inexpensively finance short–term borrowings against collateral (commonly U.S. Treasury securities) and to invest surplus funds on a short–term basis. The largest users of repos are broker–dealers, banks and hedge funds. The largest providers of cash liquidity to the repo market are money market funds, state and local governments and foreign central banks.

Traditionally, the majority of U.S. Treasury securities are bought and sold by investors using the services of a broker (typically a large commercial bank or investment bank). Such customers receive price quotes from these brokers. The broker in turn either buys the security from the market or sells the security from existing inventory. Additionally, they may access the interdealer broker ("IDB") market to match the transaction with another broker. Access to the IDB market has traditionally been limited to brokers dealing with other brokers. The customer compensates the broker for executing this transaction through the payment either of a commission or through a mark up which is added by the broker to the price at which the broker can access the inter–dealer market to execute the transaction.

71

The U.S. Treasury market has been moving away from voice broking to electronic trading in recent years. Many of the major broker–dealers now have electronic order entry platforms that allow customers to ask for bid and offer prices. In some cases the dealer may list current bid and offer prices on the platform. Similarly, the IDB market has also evolved from a predominately voice brokered market to an electronic market. Participants in the IDB market can now see bids and offers shown live on a screen and can execute against these prices electronically.

In order to participate in transactions in the IDB market, a participant must become a netting member of the Fixed Income Clearing Corporation ("FICC"), a clearing house for the U.S. fixed income market. A prospective netting member must complete a lengthy approval process that requires the applicant to (i) be a financial institution, (ii) maintain a minimum level of capital and (iii) be actively involved as a clearer, dealer or broker of government securities. As a result, most FICC netting members are either large investment banks, broker–dealers or commercial banks who use the IDB market to access the best pricing and greatest liquidity for U.S. Treasury securities. These institutions typically buy securities both for their own proprietary trading account or for resale to clients.

We believe growth in the U.S. Treasury securities market and the repurchase agreement market has been driven by the following factors:

- *Growth in the Total Amount of Debt Outstanding*—According to the Bond Market Association, the total size of the U.S. Treasury securities market has increased significantly, with $3.6 trillion outstanding as of December 31, 2003, compared to $616.4 billion at December 31, 1980. Total gross issuance of short– and long–term U.S. Treasury securities for 2003 was a record high of $4.2 trillion.

- *Growth in Interest Rate Derivatives*—Interest rate derivatives are contracts that transfer an asset's risk and return from one party to another without transferring ownership of the underlying asset, allowing market participants to obtain interest protection or assume interest rate exposure associated with fixed–income securities and other debt obligations. Interest rate derivatives provide increased flexibility and liquidity for investors and lenders to diversify their interest rate exposures.

- *Greater Sensitivity to Credit Risk*—U.S. Treasury securities are generally secured by high quality collateral and are a liquid investment, offering relatively low to no credit risk. Given recent past financial crises, including the Asian financial crisis in 1997 and the Russian debt crisis in 1998, an increasing number of investors have sought such low–risk assets.

- *Introduction of Electronic Trading Platforms*—Electronic trading platforms act as central facilities to bring together buyers and sellers. The actions of participants on these platforms are facilitated by an electronic medium that improves some of the manual processes that might otherwise be required. These platforms also have integrated compliance and risk management functions, as well as greater accuracy and decreased probability of erroneous trades than voice brokerage, and as a result, typically provide a lower–cost and more efficient means for price discovery and trade execution.

### Foreign Exchange

The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.9 trillion. By comparison, average daily volume in the next largest financial market, that for U.S. Treasury securities, was approximately $434 billion during 2003.

The majority of foreign exchange volume is traded OTC. Most foreign exchange transactions take place by telephone or through proprietary trading networks established by large financial institutions.

The primary participants in the foreign exchange markets fall into four categories: central banks, banks, brokers and institutional clients of brokers. Banks are the largest participants in the market, as approximately two–thirds of all foreign exchange transactions involve banks trading currencies with one another. Brokers act as intermediaries between other participants in the market, searching for the most favorable rates on behalf of customers and providing a level of anonymity for the buyer and seller. Brokers earn commissions on the trades they execute.

There are three primary types of foreign exchange transactions: spot, forward and options. In a spot transaction a buyer and seller agree on an exchange rate and promptly settle the trade based on that rate. In a forward transaction a buyer and seller agree to trade currencies at a later date at an agreed upon rate, regardless of market exchange rates at that time. The most common type of forward transaction is a swap, in which two parties exchange currencies at a given rate and agree to reverse the transaction at a later date. Options on foreign exchange work the same way as options on equities: they convey a right, not an obligation, to trade at a future date at a certain rate. As of April 2004, spot transactions represented 33% of the OTC traditional foreign exchange daily volume, swap transactions represented 50% and outright forward transactions represented 11% (while estimated gaps in reporting were 6%).

We believe growth in the foreign exchange market has been driven by the following factors:

- *Increased Cross–Border Trade and Investment*—We believe cross–border trade should continue to increase, as the world is more open to free trade than in past years. For U.S. international trade, for example, the average annual increase in exports and imports over the past 40 years was 11% and 12%, respectively. Similarly, foreign direct investment has experienced a long–term growth trend and is expected to continue. This growth in global trade and foreign direct investment is a driver of demand for foreign exchange products.

- *Increasing Use of Foreign Exchange as a Hedging Tool*—Foreign exchange derivatives products, such as foreign exchange forwards and swaps, facilitate the hedging of foreign exchange risk. From 1992 to 2004, forward and swap volumes have been growing as a percentage of total foreign exchange volume. This trend is consistent with the compound annual growth in the derivatives market since 1988 of 22% per annum.

- *Alternative Investment Asset Flows*—Foreign exchange has emerged as a distinct asset class for investment purposes, driven largely by demand from hedge funds whose investments in foreign exchange have risen significantly since 2001 as equity market valuations declined and historically low interest rates rendered many fixed income products less attractive. In addition, retail customer participation in the foreign exchange market has increased as customers have become more aware of foreign exchanges as an investable asset class.

- *Emergence of Electronic Brokerage*—Trading in the OTC market is conducted over the telephone, Internet or trading platform, either directly or through a broker. Electronic brokers play a large role in the market based on their offering of lower costs, higher efficiency and greater transparency compared to direct dealing. The BIS reported that electronic brokers conducted approximately 50% to 70% of foreign exchange transactions in major currency pairs in 2001, compared to approximately 40% and 10% in 1998 and 1995, respectively. Similarly, usage of electronic trading has grown among non–bank foreign exchange investors.

73

**BUSINESS**

**Our Company**

We are a leading independent provider of execution and clearing services for exchange–traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets. Annually, we process volumes of exchange–traded derivatives contracts comparable to the volumes traded on many of the world's major derivatives exchanges. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the CBOT and greater than the volume on each of the CBOE and the NYMEX during the same period. We are a leading clearing member of the FICC, a clearing house for the U.S. fixed income markets.

We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide our customers the ability to trade a wide range of products in the derivatives, fixed income and foreign exchange markets. Through our worldwide system of brokers and electronic trading platforms, we provide execution and clearing of our customers' orders with a focus on offering low costs and customer service. Consistent with our customer–oriented philosophy and to avoid potential conflicts with our customers, we do not engage in speculative trading for our own account.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions.

**Competitive Strengths**

*Leading Market Position*

We are a leading independent provider of execution and clearing services for exchange–traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the CBOT and greater than the volume on each of the CBOE and the NYMEX during the same period. We cleared more contract volume on the CME, the largest derivatives exchange in the United States, than any other FCM in 2003. We are a clearing member on virtually all major domestic and international derivatives exchanges and offer our customers access to a broad range of derivatives contracts. In 2003, we ranked fifth among FICC firms in terms of cleared U.S. Treasury repo transaction volume and ranked in the upper quartile for U.S. Treasury cash transaction volume.

*Diversified Across Customers, Products and Markets*

Our business is diversified across business divisions, customer segments, products and markets. Our operating profit is balanced between our Derivatives Brokerage & Clearing division and our Prime Brokerage/Capital Markets division. We provide services to over 200,000 customer accounts, encompassing a large and diversified mix of customers, including corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide access to a wide variety of exchange–traded derivatives products, including interest rate, equity index, energy, agricultural, foreign currency and metals contracts. We are present on nearly all major global derivatives exchanges, including CME, CBOT, Eurex, the LME, Euronext and NYMEX. We also provide access to a wide range of fixed income and foreign exchange products, including U.S. Treasury securities, non–dollar fixed income, spot and forward currencies, currency

74

options, precious metals, OTC options on U.S. Treasury securities, mortgage–backed securities, corporate bonds and related OTC derivatives.

*Attractive Risk Profile*

We have built a comprehensive risk management system throughout our operations to limit and monitor our exposure to customer and counterparty risk. We only undertake transactions on behalf of our customers and consequently are not exposed to market risk as a result of proprietary trading. In order to mitigate customer and counterparty risk, we implement margin technologies, mark–to–market risk management tools, internal review and executive approval procedures and rigorous risk monitoring. As a result of our risk management techniques, we have had limited credit losses resulting from our customer or counterparty defaults since fiscal year 2000, even through such recent volatile events as the terrorist attacks on September 11, 2001.

*Scalable Operating Platform*

Our significant processing volumes in exchange–traded derivatives, fixed income and foreign exchange have provided us with significant economies of scale. Our existing infrastructure is capable of processing significant and incremental volumes with minimal capital expenditures. In fiscal year 2004, we processed 461 million derivatives contracts, cleared over $9 trillion in U.S. Treasury repurchase transactions and processed over $600 billion in customer volume in the foreign exchange market. We believe our significant annual volume, combined with our variable cost structure and highly automated transaction processing facilities, provide us with cost advantages in the marketplace.

*Significant Free Cash Flow and Minimal Capital Investment Requirements*

We generate significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period. In addition, our management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long–term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x.

*Proven and Committed Management Team*

We are led by a senior management team that has an average of 22 years of industry experience. Phillip Bennett, who has been with us for 23 years, became our President and CEO in 1998 and formed a new senior management team comprised of well respected industry professionals. Mr. Bennett beneficially owns an approximate 43% interest in us. In addition, we have established an equity incentive plan for our senior management team.

### History

We began operations in 1969 by providing execution and clearing services in agricultural commodities. Throughout the 1970s, we expanded our product offerings in response to the introduction of new financial futures products. Our involvement in Prime Brokerage/Capital Markets began in 1982 in response to requests from existing futures customers for the ability to adjust their futures positions after the futures market was closed. We formed the Prime Brokerage/Capital Markets division to provide this service by facilitating customer access to the cash markets, including the interbank foreign exchange market, in our capacity as a broker in principal. The brokerage in principal business model established the foundation both for our foreign exchange operations and for our other cash market

75

brokerage activities. From 1983 to 1985, we emerged as the leading consolidator in the futures industry by acquiring Chicago Grain, ContiCommodities and DLJ Futures. By 1985, we had built an international infrastructure and strong market position in global derivatives markets.

In September 1998, Phillip Bennett was named our chief executive officer. Under his leadership, we hired a new senior executive team with significant industry experience to focus on growing our business and strengthening our regulatory and customer focus. Under our new senior management team, we grew internally and through a number of acquisitions. In 2000, we acquired Lind–Waldock, a prominent online retail derivatives brokerage operation. From 2001 to 2003, we enhanced our strong market position in the professional trader market by, among other things, the acquisition of MacFutures Limited and certain businesses of First Options.

**Services**

We are organized into two operating business segments for financial reporting purposes; (i) Derivatives Brokerage & Clearing and (ii) Prime Brokerage/Capital Markets, and we have one non–operating business segment, Corporate & Other. We previously conducted additional operations through our Asset Management division. As part of the Transactions, we distributed all of the equity of Forstmann–Leff International Associates, LLC, which owned substantially all the assets of our Asset Management business, to New Refco. New Refco thereafter distributed those assets to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett.

*Derivatives Brokerage & Clearing*

We execute and clear customers' orders for exchange–traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for execution and matching. Through our clearing services, we facilitate confirmation and settlement of our customers' derivatives transactions. We also ensure that our customers have the appropriate margin in their accounts to support their derivatives positions. We conduct these activities in our capacity as an FCM. As an FCM, we are responsible to the applicable clearing house for our customers' transactions. We are the largest independent FCM in the United States, based on domestic customer segregated fund balances of approximately $3.6 billion as of May 31, 2004. In 2003, we were the largest customer in terms of contract volume of the CME, the largest derivatives exchange in the United States.

We generate Derivatives Brokerage & Clearing revenues from: (i) transaction fees earned on each contract executed or cleared and (ii) interest income earned on cash balances in our customers' accounts. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at a compound annual growth rate of 23.9% and 40.8%, respectively, driven primarily by a 50% average annual increase in contract volume executed or cleared and a 20% average annual increase in customer deposits. Our growth has been generated both organically and through strategic acquisitions, which have broadened our customer base, service offerings, geographic reach and exchange coverage.

76

Our business is diversified across customers, products and exchanges. The following charts illustrate our diversity across exchanges and contract types for fiscal year 2004:



**Contract Volume by Exchange(1)**

NYMEX 5%
Other 7%
LIFFE 6%
LME 8%
Eurex 9%
CBOT 24%
CME 41%



**Contract Volume by Type(1)**

Metals 10%
Equity Indices 18%
Agricultural 10%
Energy 5%
Foreign Exchange 5%
Individual Equities less than 1%
Other 2%
Interest Rate 49%

(1)   Total volume: 461 million contracts

*Customers.*   As of May 31, 2004, our Derivatives Brokerage & Clearing division serviced over 185,000 customer accounts. Our customers include institutions, professional traders and retail investors.

Institutions.   Institutions are typically large, mutual funds, hedge funds, financial institutions, pension plans and other non–financial entities. We market to our institutional customers through a sales force of experienced financial services professionals. We offer institutions high service levels, anonymity, unconflicted access to a broad reach of products and markets and competitive pricing. It is also important to institutional customers that we do not speculatively trade with our own capital and therefore avoid potential conflicts with our customers. We believe the quality of execution is very important to our institutional customers and that we are able to provide such customers with efficient execution due to our scale, liquidity and geographic breadth. We have experienced growth in our institutional customer base, in part, driven by the proliferation of hedge funds and an increasing corporate focus on risk management.

Professional Traders.   Professional traders are either locals, who are individual members of derivatives exchanges trading for their own account on the floors of those exchanges that maintain the open outcry method of price discovery, or professionals trading electronically from dedicated facilities built to service their needs. We have a strong market position among professional traders and locals. Professional traders are high volume customers who require an operating platform with rapid execution at a low cost. Locals fulfill an important role in the market as liquidity providers for the exchanges of which they are members. Through internal growth and acquisitions, we have increased our professional trader customer base as part of our strategy to grow transaction volumes and our plan to diversify our customer base. This strategy allows us to integrate and efficiently process very large volumes and to manage effectively the risks associated with this particular customer group. We also believe that control of this particular customer base will be of strategic significance in the future as markets become increasingly automated. Locals are well suited to the development of off–the–floor trading locations, which provide them with direct access to electronic markets and enable us to continue to benefit from the order flow and commission generating potential of these clients. Our MacFutures model is indicative of the opportunities presented by this trend. MacFutures, a London–based business we acquired in March 2003, provides specialty clearing services for individual professional traders, specializing in the electronic derivatives and fixed income markets in Europe. The model, which involves the recruiting and training of professional traders who are provided with access to electronic

77

exchanges on our own off–the–floor trading locations, has now been implemented in Chicago and Montreal.

Retail Investors.    Retail customers are typically experienced individual investors. We have grown our retail customer base historically through internally generated new accounts and through acquisitions. The global retail customer base is growing as new product offerings with a broad investor appeal, such as the e–mini contracts, are listed on exchanges. We offer our retail customers access to a broad range of products and value added services, including research, real time quotes, risk management tools, account information and customer support. Our retail customers also benefit from the operating platform that we have built to service our institutional and professional trader clients. We market to retail customers through an actively managed lead generation and marketing strategy targeted at identifiable customer groups who we believe would be receptive to trading equity derivatives. Specific examples of these initiatives include the following:

- We leverage our prominent Lind–Waldock brand name and its online platform. Lead generation is driven primarily by print media advertising and, increasingly, a broad range of internet marketing initiatives, including key word strategies negotiated with search engines.

- We are developing business–to–business ("B–2–B") relationships to expand the scale of our retail customer base. These are often negotiated with complementary and non–competitive retail brokerage firms such as Charles Schwab & Co., Inc., TD Waterhouse Investor Services, Inc. and Ameritrade Inc. We typically provide access to and execution of exchange–traded derivatives products for the customers of our B–2–B partners.

- We rely on our traditional sales force of account executives and registered introducing brokers who independently (but with corporate product support) market to individual clients throughout North America.

- First time potential clients are targeted using educational marketing strategies often developed in conjunction with seminar providers and investment educational professionals.

Product Access.    We provide our customers access to all significant exchange–traded derivatives contracts, including interest rates, equity indexes, energy, agriculture, foreign currency, precious metals, non–precious metals contracts and managed futures.

Exchanges.    We provide our customers access to nearly all major global derivatives exchanges, including the CME, CBOT, NYMEX, LME, Eurex, Euronext.LIFFE and CBOE. In recognition of the technological advances in the industry, we provide both open outcry and electronic access to the derivatives markets. The electronic exchanges we provide access to include A/C/E, GLOBEX, LIFFE Connect and NYMEX Access.

Competition.    The primary competitors of our Derivatives Brokerage & Clearing business include affiliates of major commercial and investment banks and independent FCMs. We compete for customers and transaction volume on the basis of our access to a broad range of products and exchanges, our service levels, relationships, technology and operating platform and pricing. Many of our investment and commercial banking competitors maintain large proprietary trading operations.

Refco Alternative Investments.    In June 2002, we created Refco Alternative Investments to develop product offerings using alternative assets, such as managed futures, for distribution to our customers. These offerings result in the creation of an asset management fund, utilizing both our sales force and third– party distributors to raise assets. All investment decisions are made by third party managers, and all brokerage activity of the funds is directed exclusively to our derivatives and cash brokerage affiliates, driving transaction volume to our core transaction processing platform. Additionally, such funds typically earn an asset management fee. An important milestone was reached following the negotiation with S&P for the branding of a portfolio of Commodity Trading Advisors and the subsequent creation

78

of a managed futures index, which is marketed under the brand name SPhinX. This product, which took advantage of weaker equity markets and the non–correlated performance of derivatives investing to equity market performance, was successfully launched in March 2003. As of May 31, 2004, approximately $543.0 million has been raised for this product.

***Prime Brokerage/Capital Markets***

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non–dollar fixed income markets. The majority of our customers are hedge funds and other financial institutions.

Our fixed income operating platform provides our customers access to the IDB market for U.S. Treasury securities. The IDB market is a wholesale securities market that allows brokers to trade with one another. Access to the IDB market is usually limited to member firms who meet certain membership requirements, such as minimum capital thresholds. We allow our customers to use our IDB membership and operating platform to gain direct access to transparent IDB market pricing and liquidity.

In the case of foreign exchange, we act as a broker for customers wishing to transact business in the Interbank Foreign Exchange Market. We processed over $600 billion in customer transaction volume in fiscal year 2004. We enable our customers to participate in these markets by providing access via several platforms to trading in the majority of the world's principal currencies in the form of spot, forwards and options. These platforms include both voice broking in which our team of brokers place customer orders with market makers, primarily large money center banks, as well as online platforms.

We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned on each trade and (ii) interest income earned from providing secured customer financing through repo transactions. From fiscal year 2000 to fiscal year 2004, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at a compound annual growth rate of approximately 23.6% and 48.8%, respectively. This growth has been driven primarily by an increase in the number of customers, growth in the U.S. Treasury securities market and new product introductions.

Unlike our exchange–traded derivatives business, our Prime Brokerage/Capital Markets activities are not conducted on exchanges. In order to effect Prime Brokerage/Capital Markets transactions for our customers, we act as a principal executing the transaction with our customer and simultaneously executing an offsetting trade in the market. We do not trade speculatively for our own account and only initiate an order in the market to match an offsetting customer transaction. Although we do not trade speculatively for our own account, since we act as broker in principal in our capital markets/fixed income business, these transactions are reported as "principal transactions" on our consolidated statement of operations. We employ mark–to–market and margin risk management procedures identical to those adopted in regulated agent markets. We believe that the risk involved in these transactions is comparable to that incurred in our traditional derivatives brokerage operations.

*Product Access.*    Within our Prime Brokerage/Capital Markets segment, we primarily provide fixed income and foreign exchange products and services.

79

**Our Fiscal Year 2004 Prime Brokerage/Capital Markets Revenue Breakdown**



Fixed Income. Our worldwide trade execution capabilities extend to select sectors of the fixed income market, primarily in U.S. Treasury securities, OTC options on U.S. Treasury securities, corporate debt and related OTC derivatives, sovereign debt and emerging market debt.

Our most important fixed income offerings are U.S. Treasury products available in the IDB market and associated financing primarily through U.S. Treasury securities repurchase agreements. We provide our customers with a single platform, "Refco Trader," to obtain access to dealer prices only available on IDB markets. The efficiency of the Refco Trader platform and the competitive bid offer spread in the IDB market is valuable to the fixed income fund manager and professional trader. Our customers use our platform to buy and sell U.S. Treasury securities and obtain financing through the repo market.

Our IDB product offering has been enhanced in recent years by the consolidation among traditional participants in fixed income markets. We have been able to exploit the consolidation among liquidity providers without incurring any proprietary level risk by providing professional customers and fixed income traders with an alternative source of liquidity through repurchase transactions. Our lack of speculative proprietary trading provides us with a competitive advantage because it eliminates the conflict of interest that exists with other traditional liquidity providers.

We are targeting other fixed income markets, such as mortgage backed securities and European sovereign debt, where we can provide our customers a similar service offering and value proposition as our U.S. Treasury offering. We also have a strong presence in Europe as one of the few non–bank repo clearing members of the LCH and have an expanding presence in Latin American, Eastern European and Southeast Asian markets.

Foreign Exchange.    We are a major international broker of foreign exchange in the areas of execution and prime brokerage, with over $600 billion in volume for the fiscal year 2004. We provide 24 hour trading facility coverage of all major and most minor currencies, with service including spot, forwards, options, swaps and custom derivative overlays.

Our largest foreign exchange business is the traditional voice brokerage business. Customers call us to execute foreign currency transactions. As a broker in principal, we enter into the transaction with our customer and simultaneously enter into an offsetting transaction with a market maker. For providing this service, we earn either a transaction fee or the spread between the price we charge our customer and the price that we pay the market maker. We compete for customers based on service, relationships, price competitiveness and by providing anonymity in trading.

We have an on–line currency trading platform for our institutional customers developed in conjunction with Currenex, a leading global provider of currency pricing systems. This platform provides our customers electronic access to the foreign currency prices of several major market makers. The overall market for trading currency electronically is growing quickly due to the speed and cost

80

benefits and the price transparency. This type of direct access is generally not offered by commercial or investment banks.

We have also developed retail online foreign exchange offerings. These products are Web–enabled, rely on global Internet–based distribution and, most importantly, encourage self–directed trading which requires minimal human interaction at the corporate level. This facilitates the handling of significant customer volumes with very low cost to income characteristics and we believe that we represent the most viable form of retail distribution. An active Web–based marketing strategy is currently in process to take maximum advantage of this recent development. We also own 35% of FXCM, which provides a foreign currency trading platform and execution services to retail investors.

Other.    We have developed a worldwide clearing infrastructure that offers institutional clients and fund managers a single source for execution and all related financing activities in both domestic and international equity markets. These capabilities allow us to offer investors capital leverage through global integrated financing, securities lending, structured products and prime brokerage. We provide securities lending services for customers seeking to borrow equities to cover a short selling strategy or to generate additional income by lending securities already owned. Customers may also leverage equity positions with us through the use of customized derivative products and currency–linked transactions. Our financing structures include equity swaps, zero–cost options and repurchase agreements.

*Customers.*    Our Prime Brokerage/Capital Markets customers are primarily institutions, including hedge funds, mutual funds, banks, broker–dealers and other corporate customers. We also serve a growing number of retail foreign exchange investors. All customers are subject to a detailed application process and credit check.

*Competition.*    The primary competitors of our Prime Brokerage/Capital Markets business include affiliates of major commercial and investment banks and independent broker–dealers. Customers value speed of execution, anonymity in trading, low price, customer service and access to a breadth of products.

## Risk Management

### Liquidity Policy

Our execution and clearing of derivatives requires limited working capital because the margin mechanism used by exchanges results in the customers providing the required funding to maintain positions. We maintain excess regulatory capital to provide liquidity during periods of unusual market volatility. Similarly for our brokerage activities in the cash markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures–style margin methodology to protect us against price movements. Additionally, we have adopted a margin style procedure to control customer positions in our foreign exchange business. This account structure has facilitated considerable growth in the volume of business conducted, while maintaining a low risk profile.

### Regulatory Capital

Our primary U.S. regulated entities are Refco, LLC, an FCM, and Refco Securities, LLC, a broker–dealer. Each entity has regulatory capital requirements. As of February 29, 2004, the excess capital for Refco, LLC and Refco Securities, LLC was $95.6 million and $61.9 million, respectively. These figures may change in the future as a result of the introduction of risk adjusted capital rules. See "—Regulation."

*Market Risk/Economic Liquidity*

Our risk is credit related risk or risk related to our customers' ability to meet their margin obligations. Because we do not trade speculatively for our own account, we have no direct exposure to market risk volatility or the potential price or liquidity risk that might arise.

*Counterparty Risk Management*

Our current system provides the ability to project the impact of market volatility on price movement. We perform frequent stress tests of our customer positions, including intra–day trading analysis, daily equity change analysis, concentration risk analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments. These tests have resulted in minimal losses due to counterparty exposures. We continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer operations. Our risk management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets.

## Technology and Information Systems

Our information technology group supports 14 locations worldwide, including our major management centers in New York, London and Chicago. Our exchange–traded derivatives central processing capacity is located in Memphis, Tennessee with primary backup in Chicago.

Our core exchange–traded derivatives transaction–processing platform has been owned and developed by us since 1979. This system has accommodated our significant growth in recent years, including the integration of significant levels of acquired volume. Our ability to process transactions on a proprietary platform provides us with a strategic advantage by offering significant flexibility and high levels of responsiveness to changing customer and market conditions. Capital markets transaction processing platforms are outsourced. Fixed income prime brokerage and foreign exchange brokerage operations utilize systems developed by third parties.

Customers currently access our global network through both traditional means, i.e., the use of voice brokers, and electronically. For electronic access, we provide third party vendor systems consistent with our focus on transaction processing rather than front–end technology while also offering a proprietary system for our retail customers. An increasing number of these applications are web–enabled. We have developed a web strategy to enhance access to the system and to use our web site as a driver for business development in the form of lead creation. Among the capabilities that can be accessed online are risk management monitoring and access to tools, the account opening process as well as static forms, account statements and position and funds information.

The continued integrity and security of our systems is key to our business. All of our systems have off–site backups and redundancies. These capabilities have been thoroughly tested, particularly during the events of September 2001 and the blackout of August 2003. In each case and despite the total loss of access to corporate headquarters in New York, our business was comprehensively and effectively redirected to pre–planned alternative locations and operating platforms and services to customers remained essentially uninterrupted.

## Facilities

Our main corporate offices are located in approximately 71,247 square feet of leased office space at One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281–1994. We also lease over 473,000 square feet of additional space throughout North America, Europe and Asia. Our primary management centers are located in Chicago and London and at our New York corporate office. Our exchange–traded derivatives central processing system is run out of a leased facility located

in Memphis, Tennessee. We believe that our leased facilities are adequate to meet anticipated requirements for our current lines of business for the foreseeable future.

**Employees**

At May 31, 2004, we had approximately 2,250 employees, excluding our Asset Management business. Approximately 1,500 of our employees are located in the United States. At the present time, no employees are represented by unions, and we believe our relations with our employees are satisfactory.

**Regulation**

Most aspects of our business are subject to stringent regulation by U.S. federal and state regulatory agencies and derivatives and securities exchanges and by non–U.S. government agencies or regulatory bodies and exchanges. New laws or regulations or changes to existing laws and regulations (including changes in interpretation or enforcement) could materially adversely affect our financial condition or results of operations. As a global financial institution, to the extent that different regulatory regimes impose inconsistent or iterative requirements on the conduct of our business, we will face complexity and additional costs in our compliance efforts.

As an FCM, Refco, LLC's activities are regulated by the CFTC and the exchanges of which it is a member. Certain other subsidiaries are registered with the CFTC as commodity trading advisors and commodity pool operators. Refco, LLC's business is also regulated by the NFA of which Refco, LLC and certain of its affiliates are members. Violations of the rules of the CFTC, the NFA or the exchanges could result in remedial actions including fines, registration terminations or revocations of exchange memberships.

Refco Securities, LLC is registered as a broker–dealer with the SEC and in all 50 states, the District of Columbia and Puerto Rico and is a member of self–regulatory organizations, including the NASD and certain exchanges, including the CBOE. Broker–dealers are subject to regulations covering all aspects of the securities business, including sales and trading practices, public offerings, publication of research reports, use of customers' funds and securities, capital structure, record keeping and the conduct of directors, managers, officers and employees. Broker–dealers are also regulated by securities administrators in those states where they do business. Violations of regulations governing a broker–dealer's actions could result in censure, fine, the issuance of cease–and–desist orders, the suspension or expulsion from the securities industry of such broker–dealer or its officers or employees, or other similar consequences.

Margin lending by certain broker–dealer subsidiaries is regulated by the Federal Reserve Board's restrictions on lending in connection with customer purchases and short sales of securities, and NASD rules also require such subsidiaries to impose maintenance requirements on the value of securities contained in margin accounts. In many cases, our margin policies are more stringent than these rules.

We conduct some of our government securities activities through Refco Securities, LLC, an NASD member registered as a government securities broker–dealer with the SEC and in certain states. The Department of Treasury has promulgated regulations concerning, among other things, capital adequacy, custody and use of government securities and transfers and control of governmental securities subject to repurchase transactions. The rules of the Municipal Securities Rulemaking Board, which are enforced by the NASD, govern the municipal securities activities of Refco Securities, LLC.

As a registered broker–dealer, Refco Securities, LLC is subject to the SEC's and NASD's net capital rules, and, as an FCM, Refco, LLC is subject to the net capital requirements of the CFTC and various exchanges. Many non–U.S. securities exchanges and regulatory authorities also have imposed rules relating to capital requirements applicable to our non–U.S. subsidiaries. These rules, which specify

minimum capital requirements, are designed to measure general financial integrity and liquidity and require that at least a minimum amount of assets be kept in relatively liquid form. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3–3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million, which was 18.3% of aggregate debit balance and $67.5 million in excess of required net capital. Refco, LLC, is required to maintain net capital equal to the greater of 4% of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined, or the sum of 8% of the customer risk maintenance margin requirement puts 4% of the non–customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital.

Compliance with the capital requirements may limit our operations requiring the intensive use of capital. Such requirements restrict our ability to withdraw capital from our subsidiaries, which in turn may limit our ability to pay dividends or repay debt. Any change in such rules or the imposition of new rules affecting the scope, coverage, calculation or amount of capital requirements, or a significant operating loss or any unusually large charge against capital, could adversely affect our ability to pay dividends or to expand or maintain present business levels.

The USA PATRIOT Act of 2001 (the "PATRIOT Act") contains anti–money laundering and financial transparency laws and mandates the implementation of various new regulations applicable to FCMs, broker–dealers and other financial services companies, including standards for verifying customer identification at account opening and obligations to monitor customer transactions and detect and report suspicious activities to the government. Institutions subject to the PATRIOT Act must implement specialized employee training programs, designate an anti–money laundering compliance officer and submit to independent audits of the effectiveness of the compliance program. Anti–money laundering laws outside the United States contain similar provisions. We have established policies, procedures and systems designed to comply with these regulations.

Our securities and futures businesses are also regulated extensively by non–U.S. governments, exchanges, self–regulatory organizations, central banks and regulatory bodies, especially in those jurisdictions in which one of our subsidiaries maintains an office. For instance, the Financial Services Authority, LIFFE and Euronext.liffe regulate the activities of Refco Overseas Limited in the United Kingdom. Other subsidiaries are also subject to regulation by securities, banking and finance regulatory authorities, exchanges and other self–regulatory organizations in numerous other countries in which they do business.

## Legal Proceedings

### *Tradewinds*

On April 1, 1999, Tradewinds Financial Corporation, Tradewinds Debt Strategies Fund, L.P., Tradewinds Offshore Fund, Limited, Tradewinds Clipper Fund Ltd. and Tradewinds Secured Debt Fund (collectively, "Tradewinds") filed an action against Refco Securities, Inc., Refco Capital Markets, Ltd. and Martin Loftus (collectively, "Refco") in the U.S. District Court for the Southern District of New York, alleging, among other things, that Refco breached a customer agreement governing certain margin accounts by requiring Tradewinds to increase the value of collateral securing a margin loan from 60% to 100% in September 1998. Upon the completion of discovery, the parties stipulated that the court lacked jurisdiction over Tradewinds' claims and the case was dismissed. Tradewinds refiled the

84

action in the Supreme Court of the State of New York. On March 27, 2002, Refco filed a motion for summary judgment. On September 15, 2003, the court granted in part Refco's motion, dismissing six of the seven claims asserted against Refco. The court reserved for trial before a jury Tradewinds' claim that Refco's actions breached the implied contractual duty of good faith and fair dealing. On March 16, 2004, the Appellate Division of the First Department of the State of New York affirmed the decision of the trial court in all respects. In June 2004, the sole remaining claim was tried before a jury. On June 17, 2004, the jury returned a verdict in favor of Tradewinds on the liability issue submitted to it by the trial judge.

Refco believes it has meritorious grounds upon which to overturn the jury's verdict and intends to file post–trial motions asking the trial court to set aside that verdict. If those motions are not granted, Refco intends to appeal. If the jury's verdict is not set aside, a separate trial would be held to determine damages. Tradewinds has indicated that it plans to seek $45 million in damages. Refco believes (and, should a damages trial be held, will present evidence and arguments seeking to demonstrate) that Tradewinds' damages claims greatly overstate the amounts that could be recovered by Tradewinds under applicable law even if the jury's liability verdict were ultimately sustained.

At this time, it is not possible to predict the final outcome of this proceeding with certainty.

### SEC Investigation

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation. The SEC requested that we produce documents relating to any of our accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock and other transactions. In 2002 and 2003, we received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of our former brokers who handled the account of Amro International, S.A., one of our former customers that engaged through its account with us in short sales of Sedona stock and whose financial advisor settled SEC charges with respect to such short sales in February 2003; our relationship with Amro and its two principals; other securities traded by Amro; and our record keeping, supervisory and short sale policies and restrictions. Although there were issues previously raised by the SEC with respect to document production and retention by us, we believe that we have now substantially complied with those subpoenas and requests. In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the SEC. In addition to producing documents in response to the foregoing subpoenas, we have made our employees available to testify before the SEC and to be interviewed by the U.S. Attorneys' office. Refco Securities, LLC has been advised that it is not currently the subject of the U.S. Attorneys' investigation. At the present time, it is not possible to predict the outcome of the foregoing investigations with certainty.

### Other

In addition to the matters discussed above, from time to time, we are party to litigation and administrative proceedings that arise in the ordinary course of our business. We do not have any other pending litigation that, separately or in the aggregate, would in the opinion of management have a material adverse effect on our results of operations or financial condition.

## MANAGEMENT

### Managers and Executive Officers

As of October 12, 2004, our executive officers and managers and their respective ages and positions are as follows:

| Name | Age | Position |
| --- | --- | --- |
| Phillip R. Bennett | 56 | President, Chief Executive Officer and Chairman |
| Joseph J. Murphy | 44 | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC |
| William M. Sexton | 39 | Executive Vice President and Chief Operating Officer |
| Santo C. Maggio | 53 | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC |

*Phillip R. Bennett* has served as our President and Chief Executive Officer since September 1998. He also serves as the President of Refco Capital Holdings, LLC. Mr. Bennett joined us in 1981 from The Chase Manhattan Bank, where he held various positions involving credit and commercial lending in New York, Toronto, Brussels and London from 1970 to 1981. Among other positions at Chase, Mr. Bennett served as a member of its Commodity Lending Department. He is a graduate of Cambridge University, England.

*Joseph J. Murphy* has served as President of Refco Global Futures, LLC since March 1999. He also serves as our Executive Vice President responsible for global marketing. From 1994 to 1999, Mr. Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Mr. Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation in New York. He also held management positions in the Treasury Department of The Chase Manhattan Bank. Mr. Murphy holds a degree from Providence College located in Providence, Rhode Island. His professional affiliations include memberships with the CBOT and CME. Mr. Murphy is a member of the Board of Directors and Vice Chairman of the FIA and a member of the Board of Governors and Vice Chairman of the Clearing Corp.

*William M. Sexton* has served as our Executive Vice President and Chief Operating Officer since July 2002. He joined us in April 1999. He is responsible for information technology, operations, accounting and finance, credit, margins and risk for our futures businesses. From 1991 to 1997, Mr. Sexton served in various capacities at The Chase Manhattan Bank, including the financial controller for the U.S. FCM, institutional sales for marketing derivatives, foreign exchange and treasury products. Mr. Sexton holds a B.S. in Business Administration from Pace University and an M.B.A. from Fordham University, both with concentrations in finance. He is a member of the NFA. He is also a member of the FIA @ Markets Division Board of Directors, the NYMEX FCM Advisory Committee, the FIA Operations and Technology Divisions and is a member of the Board of Directors of Eurex U.S.

*Santo C. Maggio* has served as our Executive Vice President and President and Chief Executive Officer of Refco Securities, LLC, our NASD broker–dealer, since 2001. Mr. Maggio has also served as President of Refco Capital Markets, Ltd. since 1991. He joined us in 1985. From 1976 to 1982, Mr. Maggio was employed as Vice President of Inland Consultants Corporation and from 1982 to 1985 as Vice President for McMahan Securities. Mr. Maggio holds an accounting degree from Hunter College, City University of New York.

Except as described under "Certain Relationships and Related Transactions—Securityholders Agreement," there are no arrangements or understandings between any member of the management committee or executive officer and any other person pursuant to which that person was elected or appointed to his position.

## Executive Compensation

The following table sets forth information concerning the compensation of our chief executive officer and each of our four most highly compensated executive officers during each of the last three fiscal years. The bonuses set forth below include amounts earned in the year shown but paid in the subsequent year.

### Summary Compensation Table

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Total Compensation ($) |
|---|---|---|---|---|---|
| Phillip R. Bennett | 2004 | 1,500,000 | 2,469,000 | 444,840(1) | 4,413,840 |
| President, Chief Executive Officer | 2003 | 1,500,000 | 2,196,000 | 500,692(1) | 4,196,692 |
| and Chairman | 2002 | 1,000,000 | 2,380,000 | 394,103(1) | 3,774,103 |
| Robert C. Trosten (2) | 2004 | 1,000,000 | 2,139,000 | — | 3,139,000 |
| Executive Vice President and | 2003 | 1,000,000 | 1,838,000 | — | 2,838,000 |
| Chief Financial Officer | 2002 | 500,000 | 1,700,000 | — | 2,200,000 |
| Joseph J. Murphy | 2004 | 1,000,000 | 1,920,000 | — | 2,920,000 |
| Executive Vice President; President and | 2003 | 1,000,000 | 1,640,000 | — | 2,640,000 |
| Chief Executive Officer of Refco | 2002 | 600,000 | 1,250,000 | — | 1,850,000 |
| Global Futures, LLC | | | | | |
| Santo C. Maggio | 2004 | 500,000 | 1,252,000 | — | 1,752,000 |
| Executive Vice President; President and | 2003 | 500,000 | 1,084,000 | — | 1,584,000 |
| Chief Executive Officer of Refco | 2002 | 500,000 | 985,000 | — | 1,485,000 |
| Securities, LLC | | | | | |
| William M. Sexton | 2004 | 500,000 | 960,000 | — | 1,460,000 |
| Executive Vice President and Chief | 2003 | 500,000 | 820,000 | — | 1,320,000 |
| Operating Officer | 2002 | 400,000 | 400,000 | — | 800,000 |

(1) Consists of premiums for term life insurance and includes an amount equal to the payment to Mr. Bennett to compensate him for the incremental tax impact associated with the payment of the premium.

(2) Mr. Trosten resigned as our Executive Vice President and Chief Financial Officer in October 2004.

### Compensation Committee Interlocks and Insider Participation

The compensation arrangements for our chief executive officer and each of our executive officers was established pursuant to the terms of the respective employment agreements between us and each executive officer. The terms of the employment agreements were established pursuant to arms–length negotiations between us and each executive officer.

### Board of Managers Compensation

All members of our board of managers are reimbursed for their usual and customary expenses incurred in connection with attending all board and other committee meetings.

### Management Investment

Phillip Bennett, through his continuing ownership interest in Refco Group Holdings, Inc., rolled over an approximate $383.6 million equity investment into the common equity interests of our parent, New Refco. Messrs. Sexton, Murphy and Maggio made investments of $1.0 million, $500,000 and $250,000, respectively, in the common equity interests of New Refco.

87

**Employment Agreements**

*Phillip Bennett Employment Agreement.*    On June 8, 2004, Phillip Bennett entered into an Executive Employment and Non–Competition Agreement with us that became effective on the date of the closing of the Transactions. Under the agreement, Mr. Bennett serves as our Chairman and Chief Executive Officer and reports directly to our Board of Managers for an initial term ending on February 28, 2007. After such date, Mr. Bennett will continue to serve with an automatic renewal thereafter for additional one year terms, unless either party terminates the agreement in accordance with its provisions.

Under the terms of the agreement, we will pay Mr. Bennett an annual base salary of $1,100,000, and he will be eligible to receive an annual bonus as determined in accordance with our Management Bonus Pool Plan and will be able to participate in equity–based compensation plans, including through the grant of Class B Units pursuant to a Restricted Unit Agreement with us. In certain circumstances, Mr. Bennett's termination will entitle him to a severance package including two years of his base salary and annual bonus at the time of termination. In addition, Mr. Bennett has agreed that during the term of the agreement and for a two year period thereafter (but in no event, less than five years), he will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

*Executive Employment Agreements.*    On the date of the closing of the Transactions, Joseph Murphy, William Sexton and Santo Maggio entered into Executive Employment and Non–Competition Agreements with us. Each of these agreements have substantially identical terms, except for the applicable positions and annual base salary amounts for each employee as described below. Under the agreements, each employee is eligible for an annual bonus to be determined in accordance with the Senior Management Bonus Pool Plan adopted by us and will be able to participate in equity–based compensation plans, including through the grant of Class B Units pursuant to Restricted Unit Agreements entered into with us. The position and initial base salary for each of the employees under the agreements is as listed below:

| Name | Position | Base Salary |
|---|---|---|
| Joseph Murphy | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC | $    1,000,000 |
| William Sexton | Executive Vice President and Chief Operating Officer | 800,000 |
| Santo Maggio | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC | 675,000 |

Each employee will be entitled to a severance package in certain circumstances, which shall entitle such employee to 18 months of his base salary and annual bonus as of the date of termination. In addition, each employee will agree that during the term of the agreement and for an 18–month period thereafter, such employee will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

The Senior Management Bonus Pool Plan enables participating senior managers to receive bonuses based on our performance. If our actual EBITDA (subject to certain adjustments) for a fiscal year is between 95% and 105% of the budgeted EBITDA for the year, the bonus pool amount to be divided among all participating senior managers generally will be the greater of 100% of the aggregate base compensation of such senior managers or, subject to the cap described below, 2.1% of our actual EBITDA (subject to certain adjustments). The bonus pool amount will be adjusted if actual EBITDA (subject to certain adjustments) is more than 105% or less than 95% of budgeted EBITDA. The aggregate bonus pool amount to be divided among all participating senior managers in any event cannot be greater than 150% of the aggregate base compensation of such senior managers.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Refco Finance is a wholly owned subsidiary of Refco Group Ltd., LLC, a limited liability company wholly owned by New Refco, a limited liability company whose members include THL Refco Acquisition Partners and certain of its affiliates, partnerships beneficially owned by Thomas H. Lee Partners, L.P. and its affiliates, and Refco Group Holdings, Inc., a subchapter S corporation that is wholly owned by Phillip R. Bennett.

The following table sets forth certain information regarding the beneficial ownership of New Refco, which owns all of our membership interests, by: (i) each person or entity who owns any class of its outstanding securities and (ii) each person who is a member of its board of managers, each person who is a named executive officer, and such members of its board of managers and executive officers as a group. New Refco outstanding securities consist of approximately 493.69 Class A Units. New Refco has also authorized 50 Class B Units, 18.08 of which are outstanding. The Class B Units have been issued under the Restricted Unit Agreement we entered into with certain members of our management, which will begin to vest on February 28, 2005. See "Certain Relationships and Related Transactions—Restricted Unit Agreement." To our knowledge, each such member has sole voting and investment power as to the units shown unless otherwise noted. Beneficial ownership of the units listed in the table has been determined in accordance with the applicable rules and regulations promulgated under the Exchange Act. Unless otherwise indicated, the address for each holder listed below is c/o Refco Group Ltd., LLC, One World Financial Center, 200 Liberty Street Tower A, New York, New York 10281.

| | Securities Beneficially Owned | |
| --- | --- | --- |
| **Name and Address** | **Number of Class A Units** | **Percentage of Class A Units** |
| **Principal Securityholders:** | | |
| Thomas H. Lee Partners and affiliates(1) | 280.78 | 57% |
| c/o Thomas H. Lee Partners, L.P. | | |
| 100 Federal Street | | |
| Boston, MA 02110 | | |
| | | |
| **Managers and Executive Officers:** | | |
| Phillip R. Bennett(2) | 211.83 | 43% |
| Joseph J. Murphy | 0.28 | * |
| William M. Sexton | 0.55 | * |
| Santo C. Maggio | 0.14 | * |
| David V. Harkins(3) | — | — |
| Scott L. Jaeckel(3) | — | — |
| Thomas H. Lee(3) | — | — |
| Scott A. Schoen(3) | — | — |
| All board of managers members and named executive officers as a group (8 persons) | 212.80 | 43% |

\*       Represents less than 1%

*(1)*       Includes interests owned by each of THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Refco Acquisition Partners III, Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Putnam Investments Holdings, LLC, Putnam Investments Employees' Securities Company I, LLC, and Putnam Investments Employees' Securities Company II, LLC and certain co–investors who have agreed to vote their interests in favor of nominees of affiliates of THL Refco Acquisition Partners as described under "Certain Relationships and Related Transactions—Securityholders Agreement." THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III are each Delaware general partnerships indirectly owned by Thomas H. Lee Equity Fund V, L.P., Thomas

89

H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., respectively. Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P. are Delaware limited partnerships, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company. Thomas H. Lee Equity (Cayman) Fund V, L.P. is an exempted limited partnership formed under the laws of the Cayman Islands, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company registered in the Cayman Islands as a foreign company. Thomas H. Lee Advisors, LLC, a Delaware limited liability company, is the general partner of Thomas H. Lee Partners, a Delaware limited partnership, which is the sole member of THL Equity Advisors V, LLC. Thomas H. Lee Investors Limited Partnership (f/k/a THL−CCI Limited Partnership) is a Massachusetts limited partnership, whose general partner is THL Investment Management Corp., a Massachusetts corporation. The 1997 Thomas H. Lee Nominee Trust is a trust with US Bank, N.A. serving as Trustee. Thomas H. Lee, a Managing Director of Thomas H. Lee Advisors, LLC, has voting and investment control over common shares owned of record by the 1997 Thomas H. Lee Nominee Trust. Putnam Investments Holdings LLC, Putnam Investments Employees' Securities Company I, LLC and Putnam Investments Employees' Securities Company II, LLC are co−investment entities of Thomas H. Lee Partners and each disclaims beneficial ownership of any securities other than the securities held directly by such entity. The address for the Putnam entities is One Post Office Square, Boston, MA 02109.

*(2)*

Refco Group Holdings, Inc. is a Delaware corporation that is wholly owned by Phillip R. Bennett. Through his ownership of Refco Group Holdings, Inc., Phillip R. Bennett beneficially owns approximately 43% of our company.

*(3)*

Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Company. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as President, a Vice President and a Managing Director, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own Class A Units held of record by THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III. Each of these individuals disclaims beneficial ownership of such units except to the extent of their pecuniary interest therein.

90

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**The Equity Purchase and Contribution Agreement**

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with us, Refco Group Holdings, Inc. and certain other parties, which was amended on July 9, 2004 to, among other things, add New Refco as a party and modify the structure of the transactions contemplated by the agreement. The Purchase Agreement provided for a series of transactions that resulted in New Refco becoming our parent and THL Refco Acquisition Partners and its affiliates and co–investors owning an approximate 57% interest in New Refco.

Upon consummation of the transactions contemplated by the Purchase Agreement, the following transactions occurred:

- THL Refco Acquisition Partners and certain of its affiliates and co–investors purchased a portion of our voting membership interests then held by Refco Group Holdings, Inc., one of two holders of our membership interests at that time, for an amount of cash equal to $508.5 million;

- BAWAG Overseas, Inc., the other holder of our membership interests at that time, merged with and into a wholly owned subsidiary of Refco Group Holdings, Inc., and all of the membership interests acquired in the merger were distributed as a dividend to Refco Group Holdings, Inc.;

- we distributed $500.0 million in cash and all of the equity interests of Forstmann–Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business, to New Refco. New Refco thereafter distributed these assets to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett;

- each outstanding membership interest acquired by Refco Group Holdings, Inc., in connection with the merger of BAWAG Overseas, Inc. with and into a wholly owned subsidiary of Refco Group Holdings, Inc., was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc., in connection with its rollover equity investment, was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc. that was not exchanged for a Class A Unit (as described above) was converted into the right to receive cash equal to the quotient determined by dividing approximately $2.25 billion (subject to certain adjustments), by the total number of our membership interests outstanding immediately prior to the effective time of the contribution;

- each membership interest purchased by THL Refco Acquisition Partners and its affiliates and co–investors was exchanged for one Class A Unit; and

- Refco Finance Holdings LLC merged with and into us, with our company as the surviving entity.

**Limited Liability Company Agreement of New Refco**

The amended and restated limited liability company agreement of New Refco authorizes New Refco to issue Class A and Class B units. The Class A and Class B units generally have identical rights and preferences, except that the Class B Units are nonvoting and have different rights as to certain distributions described below.

Distributions of New Refco's property will be made in the following order:

- first, the holders of Class A Units will receive a return of their invested capital;

- second, the holders of the Class A Units will receive an 8% cumulative preferred return on their invested capital; and

91

- thereafter, holders of the Class A Units and Class B Units will receive pro rata distributions based on the number of units held by the holder.

A board of managers will have the exclusive authority to manage and control New Refco's business and affairs. The board of managers' composition will be determined in accordance with the provisions of the securityholders agreement described below and is more fully described in "Management—Board of Managers Compensation."

**Securityholders Agreement**

Pursuant to the securityholders agreement entered into in connection with the Transactions, units of New Refco that are beneficially owned by Refco Group Holdings, Inc., THL Refco Acquisition Partners or any of its affiliates or any limited partners of them so long as THL Refco Acquisition Partners or any of its affiliates maintains voting control over the units held, (collectively, the "THL Holders"), the executive investors and certain of New Refco's other employees and employees of New Refco's subsidiaries, which we refer to as employees, are subject to certain restrictions on transfer, as well as the other provisions described below. When we refer to "units" of New Refco in the following discussion, such reference includes New Refco's common stock following a change in corporate form, whether in preparation for an initial public offering or otherwise.

The securityholders agreement provides that the THL Holders, Refco Group Holdings, Inc., the executive investors, employees and all other parties to the agreement will vote all of their shares to elect and continue in office New Refco's board of managers, initially consisting of eight managers composed of:

- four managers designated by the THL Holders;

- three managers designated by Refco Group Holdings, Inc., one of whom will be Phillip Bennett as long as he is willing and able to serve; and

- one independent manager designated by the THL Holders and Refco Group Holdings, Inc.

The board of managers may be increased to nine and the THL Holders will be entitled to designate an additional manager (for a total of five managers designated by the THL Holders) if New Refco fails to meet certain yearly performance requirements.

The securityholders agreement also provides:

- the THL Holders and Refco Group Holdings, Inc. with a "right of first offer" with respect to transfers of New Refco's units held by any securityholder;

- each securityholder with customary "tag−along" rights with respect to transfers of New Refco's Class A Units;

- the THL Holders with "drag−along" rights with respect to New Refco's units owned by the securityholders in a sale of New Refco;

- the THL Holders, Refco Group Holdings, Inc. and executive investors with customary "preemptive rights";

- the THL Holders and Refco Group Holdings, Inc. with certain registration rights, which require New Refco to register units held by them under the Securities Act; and

- New Refco with certain call rights with respect to Class A Units held by executive investors who are terminated for any reason.

92

**Management Agreement**

Pursuant to the management agreement entered into in connection with the Transactions, THL Managers V, LLC will render to New Refco and each of its subsidiaries certain advisory and consulting services. In consideration of those services, either New Refco or we will pay to THL Managers V, LLC semi–annually, an aggregate per annum management fee equal to the greater of:

- $2.5 million; and

- an amount equal to 1.0% of the consolidated earnings before interest, taxes, depreciation and amortization of New Refco and its subsidiaries for such fiscal year, but before deduction of any such fee.

New Refco also paid THL Managers V, LLC at the closing of the Transactions a transaction advisory fee of $30.0 million.

New Refco also agreed to indemnify THL Managers V, LLC and its affiliates from and against all losses, claims, damages and liabilities arising out of or related to the performance by THL Managers V, LLC of the services pursuant to the management agreement.

**Restricted Unit Agreement**

Certain members of management are entitled to receive Class B units pursuant to a Restricted Unit Agreement entered into on the closing date of the Transactions. The Restricted Unit Agreement sets forth the vesting schedule with respect to the restricted Class B Units. One half of the Class B Units will vest ratably at the end of each of the first four fiscal years following the Transactions. The remaining half of the Class B Units will vest, subject to annual performance and catch–up provisions, at the end of each of the first four fiscal years following the Transactions. Vesting of all units is subject to acceleration upon a change of control. Upon the termination of an executive holder, unvested Class B Units will be forfeited to New Refco and vested Class B Units may be repurchased by New Refco at fair market value.

**Escrow Agreement**

Pursuant to the escrow agreement, New Refco and THL Refco Acquisition Partners delivered $39,014,313 of the purchase price at the closing to HSBC Bank USA, as escrow agent, to satisfy any earn–out amounts that are to be paid by New Refco after the closing. The escrowed funds were separated into seven separate escrow accounts, each representing a separate earn–out amount.

If an earn–out payment is due by New Refco, the escrow agent will release a portion of the funds from the earn–out account designated on written instructions given by New Refco's chief executive officer. If the escrowed amount in a given earn–out account exceeds the amount of all obligations with respect to a particular earn–out account, then the escrow agent will release the amount of any excess to Refco Group Holdings, Inc. upon joint written instructions signed by the chief executive officer, THL Refco Acquisition Partners and Refco Group Holdings, Inc. If the earn–out amount to be distributed by New Refco exceeds the escrowed amount in the designated earn–out account, then Refco Group Holdings, Inc. will be liable for the deficiency.

**Currenex Fees**

Through a joint venture with Putnam Investments, Thomas H. Lee Partners, L.P. has an indirect ownership interest in Currenex, Inc., which is a technology firm that has created an electronic platform for trading currencies. We pay fees to Currenex in connection with the use of its platform.

## DESCRIPTION OF CREDIT FACILITIES

**Senior Credit Facilities**

We have entered into senior secured credit facilities with Bank of America, N.A., as administrative agent, swingline lender and l/c issuer, Banc of America Securities LLC, Credit Suisse First Boston, acting through its Cayman Islands Branch and Deutsche Bank Securities Inc. as co–lead arrangers and joint book running managers, Credit Suisse First Boston, acting through its Cayman Islands Branch, as syndication agent, and Deutsche Bank Securities Inc. as documentation agent, and various lenders. Set forth below is a summary of the terms of the senior credit facilities.

The senior credit facilities provide for aggregate borrowings of up to $875.0 million, including:

- a revolving credit facility of up to $75.0 million in revolving credit loans and letters of credit, none of which has been drawn, and

- a term loan facility of $800.0 million, all of which was drawn in connection with the Transactions, with an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase and subject to certain closing conditions.

All revolving loans incurred under the senior credit facilities mature six years from the closing date. The term loan facility matures seven years from the closing date.

The senior credit facilities are secured by, among other things:

- a first priority security interest in substantially all of the assets of our company, New Refco and our non–regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of our, New Refco's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by us or any guarantor and (ii) 65% of the voting stock of each of our and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the senior credit facilities are guaranteed by New Refco and our non–regulated restricted domestic subsidiaries.

Borrowings under the senior credit facilities bear interest at a floating rate, which can be either a LIBOR rate plus an applicable margin or, at the borrower's option, an alternative base rate (defined as the higher of (x) the Bank of America prime rate and (y) the federal funds effective rate, plus one half percent (.50%) per annum) plus an applicable margin. The initial applicable margin for LIBOR loans and alternative base loans under the senior credit facilities is 2.75% and 1.75% per annum, respectively. Commencing six months after the closing date, the applicable margin under the revolving credit facility will be subject to adjustment based on a performance pricing grid. The interest rate payable under the senior credit facilities will increase by 2.00% per annum during the continuance of any payment or bankruptcy event of default.

For LIBOR loans, we may select interest periods of one, two, three or six months and, to the extent available to all lenders, nine or twelve months. Interest will be payable at the end of the selected interest period, but no less frequently than every three months within the selected interest period.

The senior credit facilities also require payment of a commitment fee on the difference between committed amounts and amounts actually borrowed under the revolving credit facility. Prior to the maturity date, funds borrowed under the revolving credit facility may be borrowed, repaid and reborrowed, without premium or penalty.

94

The term loan facility is subject to amortization in equal quarterly installments of principal as set forth in the table below.

| Year | Term Loan Facility |
|------|--------------------|
| 1 | $   8.0 million |
| 2 | $   8.0 million |
| 3 | $   8.0 million |
| 4 | $   8.0 million |
| 5 | $   8.0 million |
| 6 | $   8.0 million |
| 7 | $   752.0 million |

Voluntary prepayments of principal amounts outstanding under the senior credit facilities are permitted at any time. However, if a prepayment of principal is made with respect to a LIBOR loan on a date other than the last day of the applicable interest period, the lenders will require compensation for any funding losses and expenses incurred as a result of the prepayment.

In addition, mandatory prepayments are required to prepay amounts outstanding under the senior credit facilities in an amount equal to:

- 100% of net cash proceeds from certain asset dispositions by New Refco, us or any of our restricted subsidiaries, subject to certain exceptions and reinvestment provisions and limitations on the remittance of funds by our regulated subsidiaries;

- 100% of the net cash proceeds from the issuance or incurrence after the closing date of any additional debt by New Refco, us or any of our restricted subsidiaries (excluding certain permitted debt) and subject to limitations on the remittance of funds by our regulated subsidiaries;

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of the net cash proceeds from the issuance or sale after the closing date of additional equity by New Refco, us or any of our restricted subsidiaries in a public offering or in a private placement underwritten, managed, arranged, placed or initially purchased by an investment bank, excluding proceeds of equity issuances or sales to certain investors and other customary exceptions and subject to limitations on the remittance of funds by our regulated subsidiaries; and

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of excess cash flow, as defined in the senior credit facilities, subject to certain limitations on the remittance of funds by our regulated subsidiaries.

The senior credit facilities require compliance with a minimum interest coverage ratio and a maximum leverage ratio (subject to an equity cure in specified instances). In addition, the senior credit facilities contain certain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross–defaults to certain other indebtedness in excess of specified amounts, certain events of bankruptcy and insolvency, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

95

**Refco Capital, LLC Credit Facilities**

Through our Refco Capital, LLC subsidiary, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively.

We currently have no outstanding indebtedness under these facilities.

## DESCRIPTION OF THE NOTES

Refco Group Ltd., LLC and Refco Finance Inc. issued the old notes and will issue the registered notes under an Indenture (the "*Indenture*") among themselves and Wells Fargo Bank, National Association, as Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The old notes and the registered notes will be identical in all material respects, except for transfer restrictions, registration rights and additional interest payment provisions relating only to the old notes. Accordingly, unless specifically stated to the contrary, the following description applies equally to the old notes and the registered notes. The term "Notes" refers to the old notes, the registered notes and any other notes issued under the Indenture.

Certain terms used in this description are defined under the subheading "—Certain Definitions." In this description, the word "*Company*" refers only to Refco Group Ltd., LLC, but not to any of its subsidiaries. In addition, the terms "*Issuers*," "*we*," "*our*" and "*us*" refer collectively to Refco Group Ltd., LLC and Refco Finance Inc.

The following description is only a summary of the material provisions of the Indenture. We urge you to read the Indenture because it, not this description, defines your rights as holders of these Notes. You may request copies of these agreements at our address set forth under the heading "Prospectus Summary—Our Executive Offices."

### Brief Description of the Notes

These Notes:

- are unsecured senior subordinated obligations of the Issuers;

- are subordinated in right of payment to all existing and future Senior Indebtedness of the Issuers;

- are equal in right of payment to any future Senior Subordinated Indebtedness of the Issuers;

- are senior in right of payment to any future Subordinated Obligations of the Issuers;

- are guaranteed by each Subsidiary Guarantor; and

- are subject to registration with the SEC pursuant to the Registration Rights Agreement.

Refco Finance Inc. has no obligations other than the Notes.

### Principal, Maturity and Interest

On August 5, 2004, the Issuers issued the old notes in an aggregate principal amount of $600.0 million. The Issuers will issue the Notes in denominations of $1,000 and any integral multiple of $1,000. The Notes will mature on August 1, 2012. Subject to our compliance with the covenant described under the subheading "—Certain Covenants—Limitation on Indebtedness," we are permitted to issue more Notes from time to time under the Indenture in an unlimited principal amount (the "*Additional Notes*"). The old notes, the registered notes and any Additional Notes issued by the Issuers, will be treated as a single class for all purposes of the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context otherwise requires, for all purposes of the Indenture and this "Description of the Notes," references to the Notes include any Additional Notes actually issued.

Interest on these Notes will accrue at the rate of 9% per annum and will be payable semiannually in arrears on February 1 and August 1, commencing on February 1, 2005. We will make each interest payment to the holders of record of these Notes on the immediately preceding January 15 and July 15. We will pay interest on overdue principal at 1% per annum in excess of the above rate and will pay interest on overdue installments of interest at such higher rate to the extent lawful.

Interest on these Notes will accrue from the date of original issuance. Interest will be computed on the basis of a 360–day year comprised of twelve 30–day months.

Additional interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement.

**Optional Redemption**

Except as set forth below, we will not be entitled to redeem the Notes at our option prior to their Stated Maturity.

On and after August 1, 2008, we will be entitled at our option to redeem all or a portion of these Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed in percentages of principal amount on the redemption date), plus accrued and unpaid interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve–month period commencing on August 1 of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2008 | 104.500% |
| 2009 | 102.250% |
| 2010 and thereafter | 100.000% |

Prior to August 1, 2007, we will be entitled at our option on one or more occasions to redeem Notes in an aggregate principal amount not to exceed the sum of 35% of the aggregate principal amount of the Notes originally issued on the Issue Date plus 100% of the aggregate principal amount of any Additional Notes issued, at a redemption price (expressed as a percentage of principal amount) of 109.000%, plus accrued and unpaid interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), with the Net Cash Proceeds from one or more Designated Offerings (*provided* that if the Designated Offering is an offering by Parent, a portion of the Net Cash Proceeds thereof equal to the amount required to redeem any such Notes is contributed to the equity capital of the Company); *provided, however,* that

(1)        at least 65% of the aggregate principal amount of Notes originally issued on the Issue Date remains outstanding immediately after the occurrence of each such redemption (other than Notes held, directly or indirectly, by the Company or its Affiliates); and

(2)        each such redemption occurs within 90 days after the date of the related Designated Offering.

Prior to August 1, 2008, we will be entitled at our option to redeem all, but not less than all, of the Notes at a redemption price equal to 100% of the principal amount of the Notes plus the Applicable Premium as of, and accrued and unpaid interest to, the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date). Notice of such redemption must be mailed by first–class mail to each Holder's registered address not less than 30 nor more than 60 days prior to the redemption date.

"*Applicable Premium*" means, with respect to a Note at any redemption date, the excess of (A) the present value at such redemption date of (i) the redemption price of such Note on August 1, 2008 (such redemption price being described in the second paragraph in this "—Optional Redemption" section exclusive of any accrued interest) plus (ii) all required remaining scheduled interest payments due on such Note through August 1, 2008 (but excluding accrued and unpaid interest to the redemption date), computed using a discount rate equal to the Adjusted Treasury Rate, over (B) the principal amount of such Note on such redemption date.

"*Adjusted Treasury Rate*" means, with respect to any redemption date, (1) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519)" or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded U.S. Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after August 1, 2008, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined and the Adjusted Treasury Rate shall be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per year equal to the semi–annual equivalent yield to maturity of the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date, in each case calculated on the third Business Day immediately preceding the redemption date, plus 0.50%.

"*Comparable Treasury Issue*" means the U.S. Treasury security selected by the Quotation Agent as having a maturity comparable to the remaining term of the Notes from the redemption date to August 1, 2008, that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a maturity most nearly equal to August 1, 2008.

"*Comparable Treasury Price*" means, with respect to any redemption date, if clause (2) of the Adjusted Treasury Rate is applicable, the average of three, or such lesser number as is obtained by the Trustee, Reference Treasury Dealer Quotations for such redemption date.

"*Quotation Agent*" means the Reference Treasury Dealer selected by the Trustee after consultation with the Company.

"*Reference Treasury Dealer*" means Credit Suisse First Boston LLC and its successors and assigns and two other nationally recognized investment banking firms selected by the Company that are primary U.S. government securities dealers.

"*Reference Treasury Dealer Quotations*" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Trustee, of the bid and asked prices for the Comparable Treasury Issue, expressed in each case as a percentage of its principal amount, quoted in writing to the Trustee by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day immediately preceding such redemption date.

**Selection and Notice of Redemption**

If we are redeeming less than all the Notes at any time, the Trustee will select Notes on a *pro rata* basis to the extent practicable.

We will redeem Notes of $1,000 or less in whole and not in part. We will cause notices of redemption to be mailed by first–class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. Notices of redemption may not be conditional, except in connection with a Change of Control Offer in advance of a Change of Control.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount thereof to be redeemed. We will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancelation of the original Note. Notes called for redemption become due on the date fixed for

redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

We are not required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, we may be required to offer to purchase Notes as described under the captions "—Change of Control" and "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock." We may at any time and from time to time purchase Notes in the open market, tender offers, negotiated transactions or otherwise.

**Guaranties**

The Subsidiary Guarantors jointly and severally Guarantee, on a senior subordinated basis, our obligations under these Notes. The Subsidiary Guarantors consist of all domestic Subsidiaries that are not Regulated Subsidiaries or subsidiaries thereof. For additional information regarding the net income of the non–guarantor subsidiaries, see Note O to our audited consolidated financial statements and Note I to our unaudited consolidated financial statements included elsewhere in this prospectus.

The obligations of each Subsidiary Guarantor under its Subsidiary Guaranty will be limited as necessary to prevent that Subsidiary Guaranty from constituting a fraudulent conveyance under applicable law. See "Risk Factors—Risks Related to the Exchange Offer and the Notes—Federal and state fraudulent transfer laws permit a court to void the notes and the guarantees, and if that occurs, you may not receive any payments on the notes." Each Subsidiary Guarantor that makes a payment under its Subsidiary Guaranty will be entitled upon payment in full of all Guarantees under the Indenture to a contribution from each other Subsidiary Guarantor in an amount equal to such other Subsidiary Guarantor's *pro rata* portion of such payment based on the respective net assets of all the Subsidiary Guarantors at the time of such payment determined in accordance with GAAP.

If a Subsidiary Guaranty were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the applicable Subsidiary Guarantor, and, depending on the amount of such indebtedness, a Subsidiary Guarantor's liability on its Subsidiary Guaranty could be reduced to zero. See "Risk Factors—Risks Related to the Exchange Offer and the Notes—Your right to receive payments on the notes will be subordinated to the borrowings under our senior credit facilities and possibly all of our future borrowings. Further, the guarantees of the notes are junior to all of the guarantors' existing senior indebtedness and possibly all the guarantors' future borrowings."

Pursuant to the Indenture, (A) a Subsidiary Guarantor may consolidate with, merge with or into, or transfer all or substantially all its assets to any other Person to the extent described below under "—Certain Covenants—Merger and Consolidation," and (B) the Capital Stock of a Subsidiary Guarantor may be sold or otherwise disposed of to another Person to the extent described below under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock;" *provided, however,* that, in the case of a consolidation, merger or transfer of all or substantially all the assets of such Subsidiary Guarantor, if such other Person is not the Company or a Subsidiary Guarantor, such Subsidiary Guarantor's obligations under its Subsidiary Guaranty must be expressly assumed by such other Person, except that such assumption will not be required in the case of:

(1)     the sale or other disposition (including by way of consolidation or merger) of a Subsidiary Guarantor, including the sale or disposition of Capital Stock of a Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a Subsidiary; or

(2)     the sale or other disposition of all or substantially all the assets of a Subsidiary Guarantor;

100

in each case in compliance with the applicable provisions of the Indenture. Upon any sale or disposition described in clause (1) or (2) above, the obligor on the related Subsidiary Guaranty will be released from its obligations thereunder.

The Subsidiary Guaranty of a Subsidiary Guarantor also will be released:

(1)
   upon the designation of such Subsidiary Guarantor as an Unrestricted Subsidiary;

(2)
   at such time as such Subsidiary Guarantor does not have any Indebtedness outstanding that would have required such Subsidiary Guarantor to enter into a Guaranty Agreement pursuant to the covenant described under "—Certain Covenants—Future Guarantors;" or

(3)
   if we exercise our legal defeasance option or our covenant defeasance option as described under "—Defeasance," or if our obligations under the Indenture are discharged in accordance with the terms of the Indenture.

## Ranking

### Senior Indebtedness versus Notes

The payment of the principal of, premium, if any, and interest on the Notes and the payment of any Subsidiary Guaranty will be subordinate in right of payment to the prior payment in full of all Senior Indebtedness of the Issuers or the relevant Subsidiary Guarantor, as the case may be.

As of May 31, 2004, after giving *pro forma* effect to the Transactions:

(1)
   the Company's Senior Indebtedness would have been approximately $800.0 million, all of which would have been Secured Indebtedness;

(2)
   the Subsidiary Guarantors would have had no Senior Indebtedness or Secured Indebtedness, excluding inter–company debt and Guarantees under the Credit Agreement; and

(3)
   Refco Finance Inc. would have had no Senior Indebtedness.

Although the Indenture contains limitations on the amount of additional Indebtedness that the Issuers and the Subsidiary Guarantors may incur, under certain circumstances the amount of such Indebtedness could be substantial and, in any case, such Indebtedness may be Senior Indebtedness. See "—Certain Covenants—Limitation on Indebtedness."

### Liabilities of Subsidiaries versus Notes

All of our operations are conducted through our subsidiaries. Most of our subsidiaries (including all our Regulated Subsidiaries and Foreign Subsidiaries) are not Guaranteeing the Notes, and, as described above under "—Guaranties," Subsidiary Guaranties may be released under certain circumstances. In addition, our future subsidiaries may not be required to Guarantee the Notes. Claims of creditors of any non–guarantor subsidiaries (including all our Regulated Subsidiaries and Foreign Subsidiaries), including trade creditors holding indebtedness or guarantees issued by such non–guarantor subsidiaries, and claims of preferred equityholders of such non–guarantor subsidiaries generally will have priority with respect to the assets and earnings of such non–guarantor subsidiaries over the claims of our creditors, including holders of the Notes, even if such claims do not constitute Senior Indebtedness. Accordingly, the Notes will be effectively subordinated to creditors (including trade creditors) and preferred equityholders, if any, of such non–guarantor subsidiaries.

On a pro forma basis, after giving effect to the Transactions, our subsidiaries (other than the Subsidiary Guarantors) would have had significant liabilities, all of which, as of May 31, 2004, related to our customer financing arrangements. See our unaudited pro forma consolidated balance sheet as of May 31, 2004 and Note I to our unaudited consolidated financial statements included elsewhere in this prospectus. Although the Indenture limits the incurrence of Indebtedness and the issuance of preferred equity by certain of our subsidiaries, such limitation is subject to a number of significant qualifications.

Moreover, the Indenture does not impose any limitation on the incurrence by such subsidiaries of liabilities that are not considered Indebtedness under the Indenture. See "—Certain Covenants—Limitation on Indebtedness."

*Other Senior Subordinated Indebtedness versus Notes*

Only Indebtedness of the Issuers or a Subsidiary Guarantor that is Senior Indebtedness will rank senior in right of payment to the Notes and the relevant Subsidiary Guaranty in accordance with the provisions of the Indenture. The Notes and each Subsidiary Guaranty will in all respects rank *pari passu* with all other Senior Subordinated Indebtedness of the Issuers and the relevant Subsidiary Guarantor, respectively.

We and the Subsidiary Guarantors have agreed in the Indenture that we and they will not Incur any Indebtedness that is subordinate or junior in right of payment to our Senior Indebtedness or the Senior Indebtedness of such Subsidiary Guarantors, unless such Indebtedness is Senior Subordinated Indebtedness of the Issuers or the Subsidiary Guarantors, as applicable, or is expressly subordinated in right of payment to Senior Subordinated Indebtedness of the Issuers or the Subsidiary Guarantors, as applicable. The Indenture does not treat (1) unsecured Indebtedness as subordinated or junior to Secured Indebtedness merely because it is unsecured or (2) Senior Indebtedness as subordinated or junior to any other Senior Indebtedness merely because it has a junior priority with respect to the same collateral.

*Payment of Notes*

We are not permitted to pay principal of, premium, if any, or interest on the Notes or make any deposit pursuant to the provisions described under "—Defeasance" below and may not purchase, redeem or otherwise retire any Notes (collectively, "*pay the Notes*") (except in the form of Permitted Junior Securities) if either of the following occurs (a "*Payment Default*"):

(1)

any Obligation on any Designated Senior Indebtedness of the Issuers is not paid in full in cash when due; or

(2)

any other default on Designated Senior Indebtedness of the Issuers occurs and the maturity of such Designated Senior Indebtedness is accelerated in accordance with its terms;

unless, in either case, the Payment Default has been cured or waived and any such acceleration has been rescinded, or such Designated Senior Indebtedness has been paid in full in cash. Regardless of the foregoing, we are permitted to pay the Notes if we and the Trustee receive written notice approving such payment from the Representatives of all Designated Senior Indebtedness with respect to which the Payment Default has occurred and is continuing.

During the continuance of any default (other than a Payment Default) with respect to any Designated Senior Indebtedness of the Issuers pursuant to which the maturity thereof may be accelerated without further notice (except such notice as may be required to effect such acceleration) or the expiration of any applicable grace periods, we are not permitted to pay the Notes (except in the form of Permitted Junior Securities) for a period (a "*Payment Blockage Period*") commencing upon the receipt by the Trustee (with a copy to us) of written notice (a "*Blockage Notice*") of such default from a Representative of Designated Senior Indebtedness specifying an election to effect a Payment Blockage Period and ending 179 days thereafter. The Payment Blockage Period will end earlier if such Payment Blockage Period is terminated:

(1)

by written notice to the Trustee and us from the Person or Persons who gave such Blockage Notice;

(2)

because the default giving rise to such Blockage Notice is cured, waived or otherwise no longer continuing; or

102

*(3)*  because such Designated Senior Indebtedness has been discharged or repaid in full in cash.

Notwithstanding the provisions described above, unless the holders of such Designated Senior Indebtedness or a Representative of such Designated Senior Indebtedness have accelerated the maturity of such Designated Senior Indebtedness, we are permitted to resume paying the Notes after the end of such Payment Blockage Period. The Notes shall not be subject to more than one Payment Blockage Period in any consecutive 360–day period irrespective of the number of defaults with respect to Designated Senior Indebtedness of an Issuer during such period.

Upon any payment or distribution of the assets of an Issuer upon a total or partial liquidation or dissolution or reorganization of, or similar proceeding relating to, such Issuer or its property:

*(1)*  the holders of Senior Indebtedness of the applicable Issuer will be entitled to receive payment in full in cash of such Senior Indebtedness before the holders of the Notes are entitled to receive any payment;

*(2)*  until the Senior Indebtedness of the applicable Issuer is paid in full in cash, any payment or distribution to which holders of the Notes would be entitled but for the subordination provisions of the Indenture will be made to holders of such Senior Indebtedness as their interests may appear, except that holders of the Notes may receive Permitted Junior Securities; and

*(3)*  if a distribution is made to holders of the Notes that, due to the subordination provisions of the Indenture, should not have been made to them, such holders of the Notes are required to hold it in trust for the holders of Senior Indebtedness of the applicable Issuer and pay it over to them as their interests may appear.

The subordination and payment blockage provisions described above will not prevent a Default from occurring under the Indenture upon the failure of an Issuer to pay interest or principal with respect to the Notes when due by their terms. If payment of the Notes is accelerated because of an Event of Default, the Company or the Trustee must promptly notify the holders of Designated Senior Indebtedness of the Issuers or the Representatives of such Designated Senior Indebtedness of the acceleration.

A Subsidiary Guarantor's obligations under its Subsidiary Guaranty are senior subordinated obligations. As such, the rights of Noteholders to receive payment by a Subsidiary Guarantor pursuant to its Subsidiary Guaranty will be subordinated in right of payment to the rights of holders of Senior Indebtedness of such Subsidiary Guarantor. The terms of the subordination and payment blockage provisions described above with respect to the Issuers' obligations under the Notes apply equally to a Subsidiary Guarantor and the obligations of such Subsidiary Guarantor under its Subsidiary Guaranty.

By reason of the subordination provisions contained in the Indenture, in the event of a liquidation or insolvency proceeding, creditors of an Issuer or a Subsidiary Guarantor who are holders of Senior Indebtedness of an Issuer or a Subsidiary Guarantor, as the case may be, may recover more, ratably, than the Holders of the Notes, and creditors of the Issuers or a Subsidiary Guarantor who are not holders of Senior Indebtedness may recover less, ratably, than holders of Senior Indebtedness of the Issuers or a Subsidiary Guarantor and may recover more, ratably, than the Holders of the Notes.

The terms of the subordination provisions described above will not apply to payments from money or the proceeds of U.S. Government Obligations held in trust by the Trustee for the payment of principal of and interest on the Notes pursuant to the provisions described under "—Defeasance."

**Book–Entry, Delivery and Form**

The Notes initially will be represented by one or more global notes in registered form without interest coupons (the "*Global Notes*"). The Global Notes will be deposited upon issuance with the Trustee as custodian for The Depository Trust Company ("*DTC*"), in New York, New York, and

103

registered in the name of DTC or its nominee, in each case for credit to an account of a direct or indirect participant in DTC as described below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for Certificated Notes except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of Certificated Notes.

Transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants, which may change from time to time.

*Depositary Procedures*

The following description of the operations and procedures of DTC is provided solely as a matter of convenience. These operations and procedures are solely within the control of the settlement system of DTC and are subject to changes by it. We take no responsibility for these operations and procedures and urge investors to contact DTC or its participants directly to discuss these matters.

DTC has advised us that it is a limited–purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participating organizations (collectively, the "*participants*") and to facilitate the clearance and settlement of transactions in those securities between participants through electronic book–entry changes in accounts of its participants. The participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly (collectively, the "*indirect participants*"). Persons who are not participants may beneficially own securities held by or on behalf of DTC only through the participants or the indirect participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the participants and indirect participants.

DTC has also advised us that, pursuant to procedures established by it:

(1)
    upon deposit of the Global Notes, DTC will credit the accounts of participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

(2)
    ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the participants) or by the participants and the indirect participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Global Notes who are participants in DTC's system may hold their interests therein directly through DTC. Investors in the Global Notes who are not participants may hold their interests therein indirectly through organizations which are participants in such system. All interests in a Global Note may be subject to the procedures and requirements of DTC. The laws of some states require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of participants, which in turn act on behalf of indirect participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

104

**Except as described below, beneficial owners of an interest in the Global Notes will not have Notes registered in their names, will not receive physical delivery of Certificated Notes and will not be considered the registered owners or "Holders" thereof under the Indenture for any purpose.**

Payments in respect of the principal of, and interest, premium and additional interest, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered Holder under the Indenture. Under the terms of the Indenture, the Issuers and the Trustee will treat the Persons in whose names the Notes, including the Global Notes, are registered as the owners of the Notes for the purpose of receiving payments and for all other purposes. Consequently, neither the Issuers, the Trustee nor any agent of the Issuers or the Trustee has or will have any responsibility or liability for:

*(1)*

any aspect of DTC's records or any participant's or indirect participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any participant's or indirect participant's records relating to the beneficial ownership interests in the Global Notes; or

*(2)*

any other matter relating to the actions and practices of DTC or any of its participants or indirect participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the Notes (including principal and interest), is to credit the accounts of the relevant participants with the payment on the payment date unless DTC has reason to believe it will not receive payment on such payment date. Each relevant participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the participants and the indirect participants to the beneficial owners of Notes will be governed by standing instructions and customary practices and will be the responsibility of the participants or the indirect participants and will not be the responsibility of DTC, the Trustee or the Issuers. Neither the Issuers nor the Trustee will be liable for any delay by DTC or any of its participants in identifying the beneficial owners of the Notes, and the Issuers and the Trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Transfer Restrictions," transfers between participants in DTC will be effected in accordance with DTC's procedures and will be settled in same–day funds.

DTC has advised the Issuers that it will take any action permitted to be taken by a Holder of Notes only at the direction of one or more participants to whose account DTC credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the Notes as to which such participant or participants has or have given such direction. However, if there is an Event of Default under the Notes, DTC reserves the right to exchange the Global Notes for Certificated Notes, and to distribute such Notes to its participants.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of interests in the Global Notes among participants, it is under no obligation to perform such procedures, and such procedures may be discontinued or changed at any time. Neither the Issuers nor the Trustee nor any of their respective agents will have any responsibility for the performance by DTC or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

*Exchange of Global Notes for Certificated Notes*

A Global Note is exchangeable for Certificated Notes if:

*(1)*

DTC (A) notifies the Issuers that it is unwilling or unable to continue as depositary for the Global Notes or (B) has ceased to be a clearing agency registered under the Exchange Act and, in each case, a successor depositary is not appointed; or

*(2)*

there has occurred and is continuing a Default with respect to the Notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the Trustee by or on behalf of DTC in accordance with the Indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Transfer Restrictions," unless that legend is not required by applicable law.

*Exchange of Certificated Notes for Global Notes*

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Notes. See "Transfer Restrictions."

*Same Day Settlement and Payment*

The Issuers will make payments in respect of the Notes represented by the Global Notes (including principal, interest and premium and additional interest, if any) by wire transfer of immediately available funds to the accounts specified by the Global Note Holder. The Issuers will make all payments of principal, interest and premium and additional interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the Holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such Holder's registered address. The Notes represented by the Global Notes are expected to be eligible to trade in PORTAL and to trade in DTC's Same–Day Funds Settlement System, and any permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. The Issuers expect that secondary trading in any Certificated Notes will also be settled in immediately available funds.

**Change of Control**

Upon the occurrence of any of the following events (each a "*Change of Control*"), each Holder shall have the right to require that the Issuers repurchase such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date):

*(1)*

the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, written notice or otherwise) that any "person" or "group" (as such terms are used in Sections 13(d) or 14(d) of the Exchange Act), other than one or more Permitted Holders, is or becomes the beneficial owner (as defined in Rules 13d–3 and 13d–5 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company; *provided, however*, that for the purposes of this clause (1), such other Person shall be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "parent entity"), if such other Person is the beneficial owner (as defined

106

above in this clause (1)), directly or indirectly, of more than 50% of the voting power of the Voting Stock of such parent entity;

*(2)*

individuals who on the Acquisition Date constituted the Governing Board of the Company or Parent (together with any new members of such Governing Board whose election by such Governing Board of the Company or Parent or whose nomination for election by the members or shareholders of the Company or Parent, as the case may be, was approved by (a) a vote of a majority of the members of such Governing Board of the Company or Parent, as the case may be, then still in office who were either directors or other members of the Governing Board on the Issue Date or whose election or nomination for election was previously so approved or (b) the Permitted Holders acting in accordance with the Securityholders Agreement) cease for any reason to constitute a majority of the Governing Board of the Company or Parent then in office;

*(3)*

the adoption of a plan relating to the liquidation or dissolution of the Company;

*(4)*

other than the Merger, the merger or consolidation of Parent or the Company with or into another Person or the merger of another Person with or into Parent or the Company, or the sale of all or substantially all the assets of Parent or the Company (determined on a consolidated basis) to another Person other than (i) a transaction in which the survivor or transferee is a Person that is controlled by the Permitted Holders or (ii) a transaction following which (A) in the case of a merger or consolidation transaction, holders of securities that represented 100% of the Voting Stock of Parent or the Company immediately prior to such transaction (or other securities into which such securities are converted as part of such merger or consolidation transaction) own directly or indirectly at least a majority of the voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction immediately after such transaction and in substantially the same proportion as before the transaction and (B) in the case of a sale of assets transaction, each transferee becomes a Subsidiary Guarantor and a Subsidiary of the transferor of such assets; or

*(5)*

the Company ceases to own beneficially or of record, all the Capital Stock of Refco Finance Inc.

In no event will the Transactions result in a Change of Control.

Within 30 days following any Change of Control, we will mail a notice to each Holder with a copy to the Trustee (the "*Change of Control Offer*") stating:

*(1)*

that a Change of Control has occurred and that such Holder has the right to require us to purchase such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase, plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest on the relevant interest payment date);

*(2)*

the circumstances and relevant facts regarding such Change of Control;

*(3)*

the purchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

*(4)*

the instructions, as determined by us, consistent with the covenant described hereunder, that a Holder must follow in order to have its Notes purchased.

We will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all Notes validly tendered and not withdrawn under such Change of Control

Offer. A Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement for the Change of Control is in place at the time of the making of the Change of Control Offer.

We will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the covenant described hereunder, we will comply with the applicable securities laws and regulations and shall not be deemed to have breached our obligations under the covenant described hereunder by virtue of our compliance with such securities laws or regulations.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of the Company and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between the Company and the initial purchasers. We have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to do so in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to Incur additional Indebtedness are contained in the covenant described under "—Certain Covenants—Limitation on Indebtedness." Such restrictions can only be waived with the consent of the holders of a majority in principal amount of the Notes then outstanding. Except for the limitations contained in such covenant, however, the Indenture will not contain any covenants or provisions that may afford holders of the Notes protection in the event of a highly leveraged transaction.

The Credit Agreement prohibits us from purchasing any Notes and also provides that the occurrence of certain change of control events with respect to the Company would constitute a default thereunder. In the event that at the time of such Change of Control the terms of any Senior Indebtedness (including the Credit Agreement) restrict or prohibit the purchase of Notes following such Change of Control, and we do not repay such Senior Indebtedness or obtain the requisite consents under the agreements governing such Indebtedness to permit the repurchase of the Notes, we will remain prohibited from purchasing Notes. In such case, our failure to comply with the foregoing undertaking, after appropriate notice and lapse of time, would result in an Event of Default under the Indenture, which would, in turn, constitute a default under the Credit Agreement. In such circumstances, the subordination provisions in the Indenture would likely restrict payment to the Holders of Notes.

Future indebtedness that we may incur may contain prohibitions on the occurrence of certain events that would constitute a Change of Control or require the repurchase of such indebtedness upon a Change of Control. Moreover, the exercise by the holders of their right to require us to repurchase their Notes could cause a default under such indebtedness, even if the Change of Control itself does not, due to the financial effect of such repurchase on us. Finally, our ability to pay cash to the holders of Notes following the occurrence of a Change of Control may be limited by our then existing financial resources. There can be no assurance that sufficient funds will be available when necessary to make any required repurchases.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Company to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Company. As a

108

result, it may be unclear as to whether a Change of Control has occurred and whether a holder of Notes may require the Issuers to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relative to our obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the holders of a majority in principal amount of the Notes.

**Certain Covenants**

The Indenture contains covenants including, among others, the following:

*Limitation on Indebtedness*

(a)  The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, Incur, directly or indirectly, any Indebtedness; *provided, however*, that the Company and the Subsidiary Guarantors will be entitled to Incur Indebtedness if, on the date of such Incurrence and after giving effect thereto on a *pro forma* basis the Consolidated Coverage Ratio exceeds 2.00 to 1.00.

(b)  Notwithstanding the foregoing paragraph (a), the following Indebtedness may be Incurred:

*(1)*

Indebtedness Incurred by the Company and the Subsidiary Guarantors pursuant to the Credit Facilities; *provided, however*, that, after giving effect to any such Incurrence, the aggregate principal amount of all Indebtedness Incurred under this clause (1) and then outstanding does not exceed $1,075.0 million less the sum of all principal payments with respect to such Indebtedness made pursuant to paragraph (a)(3)(A) of the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock;"

*(2)*

Indebtedness owed to and held by the Company or any Restricted Subsidiary or Regulated Subsidiary; *provided, however*, that any subsequent issuance or transfer of any Capital Stock which results in any such Subsidiary ceasing to be a Restricted Subsidiary or a Regulated Subsidiary, as applicable, or any subsequent transfer of such Indebtedness (other than to the Company, a Restricted Subsidiary or a Regulated Subsidiary) shall be deemed, in each case, to constitute the Incurrence of such Indebtedness by the obligor thereon;

*(3)*

(A) the Notes issued on the Issue Date and (B) Exchange Notes in respect of Notes issued on the Issue Date or any Additional Notes;

*(4)*

Indebtedness of the Company, a Restricted Subsidiary or a Regulated Subsidiary outstanding both on the Issue Date and the Acquisition Date (after giving effect to the Transactions) (other than Indebtedness described in clause (1), (2) or (3) of this covenant);

*(5)*

Indebtedness of a Restricted Subsidiary or a Regulated Subsidiary Incurred and outstanding on or prior to the date on which such Subsidiary was acquired by the Company (other than Indebtedness Incurred in connection with, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Subsidiary became a Subsidiary or was acquired by the Company); *provided, however*, that on the date of such acquisition and after giving *pro forma* effect thereto, either (A) the Company would have been entitled to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant or (B) the Consolidated Coverage Ratio would be greater than immediately prior to such acquisition;

*(6)*

Refinancing Indebtedness in respect of Indebtedness Incurred pursuant to paragraph (a) or pursuant to clause (3), (4) or (5) or this clause (6); *provided, however*, that Refinancing Indebtedness Incurred pursuant to this clause (6) may only be Incurred by a Regulated Subsidiary to the extent the Indebtedness being Refinanced directly or indirectly Refinances Indebtedness of a Regulated Subsidiary;

*(7)*

     Hedging Obligations of the Company, a Restricted Subsidiary or a Regulated Subsidiary that are incurred in the ordinary course of business for the purpose of fixing, hedging or swapping interest rate, commodity price or foreign currency exchange rate risk (or to reverse or amend any such agreements previously made for such purposes), and not for speculative purposes, and that do not increase the Indebtedness of the obligor outstanding at any time other than as a result of fluctuations in interest rates, commodity prices or foreign currency exchange rates or by reason of fees, indemnities and compensation payable thereunder;

*(8)*

     obligations in respect of performance, bid and surety bonds and completion guarantees provided by the Company, any Restricted Subsidiary or any Regulated Subsidiary in the ordinary course of business;

*(9)*

     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided, however,* that such Indebtedness is extinguished within five Business Days of its Incurrence;

*(10)*

     Contribution Indebtedness;

*(11)*

     (a) if the Company could Incur $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant after giving effect to such borrowing, Indebtedness of Foreign Subsidiaries not otherwise permitted hereunder or (b) if the Company could not incur $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant after giving effect to such borrowing, Indebtedness of Foreign Subsidiaries Incurred for working capital purposes; *provided, however,* that the aggregate principal amount of Indebtedness incurred under this clause (11) which, when aggregated with the principal amount of all other Indebtedness then outstanding and incurred pursuant to this clause (11), does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (11);

*(12)*

     Indebtedness consisting of the Subsidiary Guaranty of a Subsidiary Guarantor and any Guarantee by a Restricted Subsidiary or Regulated Subsidiary of Indebtedness permitted to be Incurred pursuant to this covenant; *provided, however,* that, in the case of a Guarantee by a Restricted Subsidiary or Regulated Subsidiary that is not a Subsidiary Guarantor, such Restricted Subsidiary or Regulated Subsidiary complies with the covenant described under "—Future Guarantors;"

*(13)*

     Purchase Money Indebtedness or Capital Lease Obligations Incurred to finance the acquisition by the Company, a Restricted Subsidiary or a Regulated Subsidiary of assets that are used or useful in a Related Business, and any Refinancing Indebtedness Incurred to Refinance such Indebtedness, in an aggregate principal amount which, when added together with the principal amount of all other Indebtedness Incurred pursuant to this clause (13) and then outstanding, does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (13);

(14)     Indebtedness of the Company or a Restricted Subsidiary supported by a letter of credit issued pursuant to the Credit Agreement in a principal amount not in excess of the stated amount of such letter of credit;

(15)     Indebtedness consisting of promissory notes issued by the Company or a Subsidiary Guarantor to current or former officers, directors and employees of the Company or such Subsidiary Guarantor, their respective estates, spouses or former spouses to finance the purchase or redemption of Capital Stock of Parent to the extent permitted by the covenant described under "—Limitation on Restricted Payments";

(16)     Indebtedness of the Company and the Subsidiary Guarantors not otherwise permitted under the Indenture in an aggregate principal amount which, when taken together with all other Indebtedness of the Company and the Subsidiary Guarantors then outstanding pursuant to this clause (16) does not exceed $150.0 million; and

(17)     Indebtedness of Regulated Subsidiaries, not otherwise permitted under the Indenture, in an aggregate principal amount which, when taken together with all other Indebtedness of the Regulated Subsidiaries then outstanding pursuant to this clause (17) does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (17);

(c)  For purposes of determining compliance with this covenant:

(1)     any Indebtedness outstanding under the Credit Agreement on the Acquisition Date will be deemed to have been Incurred on such date under clause (1) of paragraph (b) above;

(2)     in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the types of Indebtedness described in clauses (2) through (17) of paragraph (b) above, or is entitled to be Incurred pursuant to paragraph (a) of this covenant, the Company, in its sole discretion, will classify such item of Indebtedness (or any portion thereof) at the time of Incurrence and may later reclassify such item (or a portion thereof) and will only be required to include the amount and type of such Indebtedness in one of the above clauses; and

(3)     the Company will be entitled to divide and classify and reclassify an item of Indebtedness in more than one of the types of Indebtedness described above; *provided, however*, that the Company will be entitled to reclassify Indebtedness Incurred under clause (1) of paragraph (b) above under paragraph (a) above only at a time when the Company is entitled to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) above.

(d)  Notwithstanding paragraphs (a) and (b) above, neither the Issuers nor any Subsidiary Guarantor will Incur (1) any Indebtedness if such Indebtedness is subordinate or junior in ranking in any respect to any Senior Indebtedness of the Company or such Subsidiary Guarantor, as applicable, unless such Indebtedness is Senior Subordinated Indebtedness or is expressly subordinated in right of payment to the Notes or the Subsidiary Guaranty of such Subsidiary Guarantor, as applicable, or (2) any Secured Indebtedness that is not Senior Indebtedness of such Person unless contemporaneously therewith such Person makes effective provision to secure the Notes or the relevant Subsidiary Guaranty, as applicable, equally and ratably with such Secured Indebtedness for so long as such Secured Indebtedness is secured by a Lien.

(e)  For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness where the Indebtedness Incurred is denominated in a currency other than U.S. dollars, the amount of such Indebtedness will be the U.S. Dollar Equivalent determined on the date of the Incurrence of such Indebtedness; *provided, however*, that if any such Indebtedness denominated in a currency other than U.S. dollars is subject to a Currency Agreement covering all principal, premium, if any, and interest payable on such Indebtedness, the amount of such Indebtedness expressed in U.S. dollars will be as provided in such Currency Agreement. The principal amount of any Refinancing Indebtedness Incurred in the same currency as the Indebtedness being Refinanced will be the U.S. Dollar Equivalent of the Indebtedness Refinanced on the date of Refinancing, except to the extent that (1) such U.S. Dollar Equivalent was determined based on a Currency Agreement, in which case the Refinancing Indebtedness will be determined based on a Currency Agreement in accordance with the preceding sentence and (2) the principal amount of the Refinancing Indebtedness exceeds the principal amount of the Indebtedness being Refinanced, in which case the U.S. Dollar Equivalent of such excess will be determined on the date such Refinancing Indebtedness is Incurred.

*Limitation on Restricted Payments*

(a)  The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary, directly or indirectly, to make a Restricted Payment if at the time the Company or such Restricted Subsidiary or Regulated Subsidiary makes such Restricted Payment:

*(1)*

a Default shall have occurred and be continuing (or would result therefrom);

*(2)*

the Company is not entitled to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) of the covenant described under "—Limitation on Indebtedness;" or

*(3)*

the aggregate amount of such Restricted Payment and all other Restricted Payments since the Issue Date would exceed the sum of (without duplication):

*(A)*

50% of the Consolidated Net Income accrued during the period (treated as one accounting period) from the beginning of the fiscal quarter immediately following the fiscal quarter during which the Issue Date occurs to the end of the most recent fiscal quarter ending at least 45 days prior to the date of such Restricted Payment (or, in case such Consolidated Net Income shall be a deficit, minus 100% of such deficit); *plus*

*(B)*

100% of the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company from the issuance or sale of its Capital Stock (other than Disqualified Stock or Designated Preferred Stock) subsequent to the Issue Date (other than (i) Net Cash Proceeds or property received from an issuance or sale of such Capital Stock to a Subsidiary of the Company, (ii) Net Cash Proceeds or property received from an issuance or sale of such Capital Stock to an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees, and (iii) Net Cash Proceeds received by the Company from the sale of such Capital Stock (or such Capital Stock of any Parent to the extent such Net Cash Proceeds are contributed to the common equity of the Company) to employees, officers, directors or consultants of the Company, its Restricted Subsidiaries or its Regulated Subsidiaries subsequent to the Issue Date to the extent such amounts have been applied to Restricted Payments made in accordance with paragraph (b)(4) of this covenant) and 100% of the aggregate amount of cash and the Fair Market Value of property contributed to the capital of the Company by its equityholders subsequent to the Issue Date (other than the Cash Contribution Amount); *plus*

*(C)*

100% of the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company subsequent to the Issue Date from the issuance or sale of any

112

Indebtedness of the Company convertible into or exchangeable for Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Company that has been so converted or exchanged (less the amount of any cash or the Fair Market Value of property distributed by the Company upon such conversion or exchange), other than issuances or sales to a Subsidiary of the Company or to an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees); *plus*

(D)        an amount equal to the sum of (i) 100% of the aggregate amount in cash and the Fair Market Value of property received from Investments (other than Permitted Investments) made by the Company, any Restricted Subsidiary or Regulated Subsidiary in any Person resulting from repurchases, repayments or redemptions of such Investments by such Person, proceeds realized on the sale of such Investment and proceeds representing the return of capital (excluding dividends and distributions to the extent included in Consolidated Net Income), in each case received by the Company or any Restricted Subsidiary or Regulated Subsidiary, and (ii) to the extent such Person is an Unrestricted Subsidiary, the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary; *provided, however,* that the foregoing sum shall not include amounts with respect to Investments in Unrestricted Subsidiaries to the extent the Investments in such Unrestricted Subsidiaries were made pursuant to clause (7) of the next succeeding paragraph (b).

(b)   The preceding provisions will not prohibit:

(1)        any Restricted Payment made out of the Net Cash Proceeds of the substantially concurrent sale of, or made by exchange for, Capital Stock of the Company (other than Disqualified Stock or Designated Preferred Stock and other than Capital Stock issued or sold to a Subsidiary of the Company or an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees) or a substantially concurrent cash capital contribution received by the Company from its equityholders; *provided, however,* that (A) such Restricted Payment shall be excluded in the calculation of the amount of Restricted Payments and (B) the Net Cash Proceeds from such sale or such cash capital contribution (to the extent so used for such Restricted Payment) shall be excluded from the calculation of amounts under clause (4)(B) of paragraph (a) above;

(2)        any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations of the Company or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent Incurrence of, Refinancing Indebtedness of such Person which is permitted to be Incurred pursuant to any of the provisions of the covenant described under "—Limitation on Indebtedness;" *provided, however*, that such purchase, repurchase, redemption, defeasance or other acquisition or retirement for value shall be excluded in the calculation of the amount of Restricted Payments;

(3)        dividends or similar distributions paid within 60 days after the date of declaration thereof if at such date of declaration such dividend or similar distribution would have complied with this covenant; *provided, however,* that such dividend or similar distribution shall be included in the calculation of the amount of Restricted Payments;

(4)        the purchase, repurchase, redemption or acquisition for value (or the payment of dividends, other distributions or amounts to Parent in amounts equal to the amounts expended by Parent to purchase, repurchase, redeem or otherwise acquire for value) of Capital Stock of the Company or Parent owned by employees, former employees, directors, former directors, consultants or former consultants of Parent, the Company or any of its Subsidiaries (or

113

permitted transferees, assigns, estates or heirs of such employees, former employees, directors, former directors, consultants or former consultants); *provided, however*, that the aggregate amount paid, loaned or advanced to Parent pursuant to this clause (4) will not, in the aggregate, exceed $5.0 million per fiscal year of the Company; *provided further* that the Company may carry over and make in subsequent fiscal years, in addition to the amounts permitted for such fiscal year, the amount of such purchases, redemptions or other acquisitions or retirements for value permitted to have been made but not made in any preceding fiscal years; *provided further* that such amount in any fiscal year may be increased by an amount not to exceed (i) the Net Cash Proceeds from the sale of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Company (or of Parent to the extent such Net Cash Proceeds are contributed to the common equity of the Company) to employees, officers, directors or consultants of the Company, its Restricted Subsidiaries and its Regulated Subsidiaries that occurs after the Issue Date (to the extent the Net Cash Proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments pursuant to clause (1) above of this paragraph (b) or previously applied to the payment of Restricted Payments pursuant to this clause (4)), plus (ii) the cash proceeds of key man life insurance policies received by the Company, its Restricted Subsidiaries and its Regulated Subsidiaries after the date of the Indenture, less any amounts previously applied to the payment of Restricted Payments pursuant to this clause (4); *provided further* that cancellation of Indebtedness owing to the Company from employees, officers, directors and consultants of the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in connection with a repurchase of Capital Stock of the Company from such Persons will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provisions of the Indenture; *provided further* that the Net Cash Proceeds from such sales of Capital Stock described in clause (i) of this clause (4) shall be excluded from the calculation of amounts under clause (4)(B) of paragraph (a) above to the extent such proceeds have been or are applied to the payment of Restricted Payments pursuant to this clause (4); and *provided further, however*, that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(5)

the declaration and payment of dividends or similar distributions on Disqualified Stock issued pursuant to the covenant described under "—Limitation on Indebtedness;" *provided, however*, that at the time of payment of such dividend or similar distribution, no Default shall have occurred and be continuing (or result therefrom); *provided further, however*, that such dividends or similar distributions shall be excluded in the calculation of the amount of Restricted Payments;

(6)

the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date and the declaration and payment of dividends or distributions to Parent, the proceeds of which will be used to fund the payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of Parent issued after the Issue Date; *provided, however*, that (A) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Company would have had a Consolidated Coverage Ratio of at least 2.00 to 1.00 and (B) the aggregate amount of dividends or distributions declared and paid pursuant to this clause (6) does not exceed the Net Cash Proceeds actually received by or contributed to the Company from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; *provided further, however* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

114

*(7)*      Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (7) that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash and/or marketable securities, not to exceed the greater of (x) $25.0 million and (y) an amount in U.S. dollars equal to the product of (A) $25.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date on which the applicable Investment is made pursuant to this clause (7) (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however*, that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

*(8)*      the payment of dividends on the Company's common stock following the first public offering of the Company's common stock or the common stock of Parent after the Acquisition Date (with Parent contributing the Net Cash Proceeds of such offering to the Company), of up to 6% *per annum* of the Net Cash Proceeds received by or contributed to the Company in any past or future public offering, other than public offerings with respect to the Company's common stock registered on Form S–8 under the Securities Act; *provided, however*, that such Restricted Payments shall be included in the calculation of the amount of Restricted Payments;

*(9)*      the declaration and payment of dividends or distributions to, or the making of loans to, Parent in amounts required for such party to pay:

*(A)*      franchise taxes and other fees, taxes and expenses required to maintain its corporate existence;

*(B)*      customary salary, bonus and other benefits payable to officers and employees of Parent to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Company, the Restricted Subsidiaries and the Regulated Subsidiaries;

*(C)*      general corporate overhead expenses (including professional expenses) for Parent to the extent such expenses are attributable to the ownership or operation of the Company, the Restricted Subsidiaries and the Regulated Subsidiaries; and

*(D)*      fees and expenses other than to Affiliates related to any unsuccessful equity or debt offering permitted by the Indenture;

*provided, however*, that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

*(10)*     any Restricted Payment, at any time prior to August 1, 2009 if immediately after giving *pro forma* effect to such Restricted Payment pursuant to this clause (10) and the Incurrence of any Indebtedness the net proceeds of which are used to finance such Restricted Payment:

*(A)*      the Net Indebtedness to EBITDA Ratio of the Company would not have exceeded 3.75 to 1; and

*(B)*      the Net Senior Indebtedness to EBITDA Ratio of the Company would not have exceeded 2.50 to 1;
           *provided, however*, that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(11)   repurchases of Capital Stock deemed to occur upon exercise of stock or other equity options if such Capital Stock represents a portion of the exercise price of such options; *provided, however,* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(12)   cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of the Company; *provided, however,* that any such cash payment shall not be for the purpose of evading the limitation of the covenant described under this subheading (as determined in good faith by the Governing Board); *provided further, however,* that such payments shall be excluded in the calculation of the amount of Restricted Payments;

(13)   in the event of a Change of Control, and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations of the Company or any Subsidiary Guarantor, in each case, at a purchase price not greater than 101% of the principal amount (or, if such Subordinated Obligations were issued with original issue discount, 101% of the accreted value thereof) of such Subordinated Obligations, plus any accrued and unpaid interest thereon; *provided, however,* that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company (or a third party to the extent permitted by the Indenture) has made a Change of Control Offer with respect to the Notes as a result of such Change of Control and has repurchased all Notes validly tendered and not withdrawn in connection with such Change of Control Offer; *provided further, however,* that such payments, purchases, redemptions, defeasances or other acquisitions or retirements shall be included in the calculation of the amount of Restricted Payments;

(14)   in the event of an Asset Disposition that requires the Company to offer to repurchase Notes pursuant to the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock," and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations of the Company or any Subsidiary Guarantor, in each case, at a purchase price not greater than 100% of the principal amount (or, if such Subordinated Obligations were issued with original issue discount, 100% of the accreted value) of such Subordinated Obligations, plus any accrued and unpaid interest thereon; *provided, however,* that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company has made an offer with respect to the Notes pursuant to the provisions of the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock" and has repurchased all Notes validly tendered and not withdrawn in connection with such offer; *provided further, however,* that such Restricted Payments shall be included in the calculation of the amount of Restricted Payments;

(15)   payments of intercompany Indebtedness, the Incurrence of which was permitted under clause (2) of paragraph (b) of the covenant described under "—Limitation on Indebtedness;" *provided, however,* that no Default has occurred and is continuing or would otherwise result therefrom; *provided further, however,* that such payments shall be excluded in the calculation of the amount of Restricted Payments;

(16)   Restricted Payments specified in the Equity Purchase and Merger Agreement to holders of equity interests of Refco Finance Holdings LLC or Refco Group Ltd., LLC in connection with the Transactions or described in this prospectus under "Prospectus Summary—Transactions;" *provided, however,* that such payments shall be excluded in the calculation of the amount of Restricted Payments;

116

*(17)*

Tax Distributions for so long as (x) the Company is treated as a pass–through or disregarded entity for United States federal income tax purposes or (y) the Company is included in a consolidated, combined or unitary tax return filing group of which it is not the parent; *provided, however*, that such Tax Distributions shall be excluded in the calculation of the amount of Restricted Payments; or

*(18)*

Restricted Payments in an amount which, when taken together with all other Restricted Payments made pursuant to this clause (18), do not exceed $50.0 million; *provided, however*, that (A) at that time of each such Restricted Payment, no Event of Default shall have occurred and be continuing (or result therefrom) and (B) such Restricted Payments shall be included in the calculation of the amount of Restricted Payments.

*Limitation on Restrictions on Distributions from Restricted Subsidiaries or Regulated Subsidiaries*

The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary or Regulated Subsidiary to (a) pay dividends or make any other distributions on its Capital Stock to the Company, a Restricted Subsidiary or a Regulated Subsidiary or pay any Indebtedness owed to the Company, (b) make any loans or advances to the Company or (c) transfer any of its property or assets to the Company, except:

*(1)*

with respect to clauses (a), (b) and (c),

*(A)*

any encumbrance or restriction pursuant to (i) an agreement in effect on or entered into on the Issue Date (including any such agreements of Refco Group Ltd., LLC and its Subsidiaries in effect on such date), (ii) the Credit Agreement, as in effect on the Acquisition Date and (iii) the Escrow Agreement;

*(B)*

any encumbrance or restriction with respect to a Restricted Subsidiary or Regulated Subsidiary pursuant to an agreement relating to any Indebtedness Incurred by such Restricted Subsidiary or Regulated Subsidiary, as the case may be, on or prior to the date on which such Restricted Subsidiary or Regulated Subsidiary was acquired by the Company (other than Indebtedness Incurred as consideration in, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Restricted Subsidiary or Regulated Subsidiary became a Restricted Subsidiary or Regulated Subsidiary, as the case may be, or was acquired by the Company) and outstanding on such date;

*(C)*

any encumbrance or restriction in the Indenture or in any indenture relating to Senior Subordinated Indebtedness entered into after the Issue Date; *provided* that the encumbrances or restrictions in such agreements are not materially more restrictive than those contained in the Indenture;

*(D)*

restrictions on cash or other deposits or net worth imposed by agreements entered into in the ordinary course of business;

*(E)*

customary provisions in joint venture agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the Capital Stock thereof);

*(F)*

any encumbrances or restrictions created with respect to the Indebtedness of Restricted Subsidiaries or Regulated Subsidiaries permitted to be Incurred or issued subsequent to the Issue Date pursuant to the provisions of the covenant described under "—Limitation on Indebtedness," *provided* that in the case of this clause the Governing Board of the Company determines (as evidenced by a resolution of the Governing Board) in good faith

117

at the time such encumbrances or restrictions are created that such encumbrances or restrictions would not reasonably be expected to impair the ability of the Company and the Subsidiary Guarantors, taken as a whole, to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due;

(G)     any encumbrance or restriction pursuant to an agreement effecting a Refinancing of Indebtedness Incurred pursuant to an agreement referred to in clauses (A) to (F) of clause (1) of this covenant or this clause (G) or contained in any amendment to an agreement referred to in clauses (A) to (F) of clause (1) of this covenant or this clause (G); *provided, however*, that the encumbrances and restrictions with respect to such Restricted Subsidiary or Regulated Subsidiary, as the case may be, contained in any such Refinancing agreement or amendment are not materially less favorable to the Noteholders than encumbrances and restrictions with respect to such Restricted Subsidiary or Regulated Subsidiary contained in such predecessor agreements and do not in the good faith judgment of the chief financial officer of the Company affect the Company's and the Subsidiary Guarantor's ability, taken as a whole, to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due; *provided further, however*, that with respect to agreements existing on the Issue Date or the Credit Agreement as in effect on the Acquisition Date, any Refinancings or amendments thereof contain such encumbrances or restrictions that are not materially less favorable to the Noteholders than the encumbrances or restrictions contained in such agreements as in effect on the Issue Date or, with respect to the Credit Agreement, the Acquisition Date;

(H)     any encumbrance or restriction with respect to a Restricted Subsidiary or Regulated Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Capital Stock or assets of such Restricted Subsidiary or Regulated Subsidiary pending the closing of such sale or disposition;

(I)     any encumbrance or restriction imposed by applicable law, rule, regulation, consent decree or similar arrangement; and

(2)     with respect to clause (c) only,

(A)     any encumbrance or restriction consisting of customary nonassignment provisions in leases governing leasehold interests to the extent such provisions restrict the transfer of the lease or the property leased thereunder;

(B)     any encumbrance or restriction contained in security agreements or mortgages securing Indebtedness of a Restricted Subsidiary or Regulated Subsidiary to the extent such encumbrance or restriction restricts the transfer of the property subject to such security agreements or mortgages;

(C)     restrictions on the transfer of assets subject to any Lien not prohibited by the Indenture imposed by the holder of such Lien; and

(D)     any encumbrance or restriction contained in agreements governing Purchase Money Indebtedness.

*Limitation on Sales of Assets and Subsidiary Stock*

(a)   The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, directly or indirectly, consummate any Asset Disposition unless:

(1)     the Company or such Restricted Subsidiary or Regulated Subsidiary receives consideration at the time of such Asset Disposition at least equal to the Fair Market Value (including the value

118

of all non–cash consideration) of the shares or other equity interests and assets subject to such Asset Disposition;

*(2)*

except in the case of a Permitted Asset Swap, at least 75% of the consideration thereof received by the Company or such Restricted Subsidiary or Regulated Subsidiary is in the form of cash or cash equivalents; and

*(3)*

an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Company (or such Restricted Subsidiary or Regulated Subsidiary, as the case may be)

*(A)*

to prepay, repay, redeem or purchase Senior Indebtedness of the Company or Indebtedness (other than any Disqualified Stock) of a Restricted Subsidiary or Regulated Subsidiary (in each case other than Indebtedness owed to the Company or a Restricted Subsidiary or Regulated Subsidiary) within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash;

*(B)*

to acquire Additional Assets within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash; or

*(C)*

to make an offer to the holders of the Notes (and to holders of other Senior Subordinated Indebtedness of the Company designated by the Company) to purchase Notes (and such other Senior Subordinated Indebtedness of the Company) pursuant to and subject to the conditions contained in the Indenture;

*provided, however*, that in connection with any prepayment, repayment or purchase of Indebtedness pursuant to clause (A) or (C) above, the Company or such Restricted Subsidiary or Regulated Subsidiary shall permanently retire such Indebtedness and shall cause the related loan commitment (if any) to be permanently reduced in an amount equal to the principal amount so prepaid, repaid or purchased.

Notwithstanding the foregoing provisions of this covenant, the Company, the Restricted Subsidiaries and the Regulated Subsidiaries will not be required to apply any Net Available Cash in accordance with this covenant except to the extent that the aggregate Net Available Cash from all Asset Dispositions which is not applied in accordance with this covenant exceeds $20.0 million. Pending application of Net Available Cash pursuant to this covenant, such Net Available Cash shall be invested in Temporary Cash Investments or applied to temporarily reduce revolving credit Indebtedness.

For the purposes of this covenant, the following are deemed to be cash or cash equivalents:

*(1)*

the assumption or discharge of Indebtedness or other liabilities reflected on the balance sheet of the Company (other than obligations in respect of Disqualified Stock of the Company) or any Restricted Subsidiary or Regulated Subsidiary (other than obligations in respect of Disqualified Stock or Preferred Stock of a Subsidiary Guarantor) and the release of the Company or such Restricted Subsidiary or Regulated Subsidiary from all liability on such Indebtedness or such other liabilities in connection with such Asset Disposition;

*(2)*

securities received by the Company or any Restricted Subsidiary or Regulated Subsidiary from the transferee that are converted by the Company or such Restricted Subsidiary or Regulated Subsidiary, as the case may be, within 180 days of the date of receipt thereof into cash, to the extent of cash received in that conversion; and

*(3)*

any Designated Noncash Consideration received by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in such Asset Disposition having an aggregate Fair Market Value, taken together with all other Designated Noncash Consideration received pursuant to this clause (3) that is at that time outstanding, not to exceed the greater of (x) $75.0 million and (y) an amount in U.S. dollars equal to the product of (A) $75.0 million

119

and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the time of the receipt of such Designated Noncash Consideration (with the Fair Market Value of each item of Designated Noncash Consideration being measured at the time received without giving effect to subsequent changes in value).

(b)   In the event of an Asset Disposition that requires the purchase of Notes (and other Senior Subordinated Indebtedness of the Company) pursuant to clause (a)(3)(C) above, the Company will purchase Notes tendered pursuant to an offer by the Company for the Notes (and such other Senior Subordinated Indebtedness) at a purchase price of 100% of their principal amount (or, in the event such other Senior Subordinated Indebtedness of the Company was issued with significant original issue discount, 100% of the accreted value thereof) without premium, plus accrued but unpaid interest (or, in respect of such other Senior Subordinated Indebtedness of the Company, such lesser price, if any, as may be provided for by the terms of such Senior Subordinated Indebtedness) in accordance with the procedures (including prorating in the event of oversubscription) set forth in the Indenture. If the aggregate purchase price of the securities tendered exceeds the Net Available Cash allotted to their purchase, the Company will select the securities to be purchased on a  *pro rata* basis but in round denominations, which in the case of the Notes will be denominations of $1,000 principal amount or multiples thereof. The Company shall not be required to make such an offer to purchase Notes (and other Senior Subordinated Indebtedness of the Company) pursuant to this covenant if the Net Available Cash available therefor is less than $20.0 million (which lesser amount shall be carried forward for purposes of determining whether such an offer is required with respect to the Net Available Cash from any subsequent Asset Disposition). Upon completion of such an offer to purchase, Net Available Cash will be reset to zero.

(c)   The Company will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this covenant. To the extent that the provisions of any securities laws or regulations conflict with provisions of this covenant, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this covenant by virtue of its compliance with such securities laws or regulations.

*Limitation on Affiliate Transactions*

(a)   The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Company involving aggregate consideration in excess of $5.0 million (an "*Affiliate Transaction*") unless:

*(1)*
    the terms of the Affiliate Transaction are no less favorable to the Company or such Restricted Subsidiary or Regulated Subsidiary than those that could be obtained at the time of the Affiliate Transaction in arm's–length dealings with a Person who is not an Affiliate;

*(2)*
    if such Affiliate Transaction involves an amount in excess of $15.0 million, a majority of the directors or other members of the Governing Board of the Company disinterested with respect to such Affiliate Transaction have determined in good faith that the criteria set forth in clause (1) are satisfied and have approved the relevant Affiliate Transaction as evidenced by a resolution of the Governing Board of the Company; and

*(3)*
    if such Affiliate Transaction involves an amount in excess of $75.0 million, the Governing Board shall also have received a written opinion from an Independent Qualified Party to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the Company, its

120

Restricted Subsidiaries and its Regulated Subsidiaries or is not less favorable to the Company, its Restricted Subsidiaries and its Regulated Subsidiaries than could reasonably be expected to be obtained at the time in an arm's–length transaction with a Person who was not an Affiliate.

*(b)*

The provisions of the preceding paragraph (a) will not prohibit:

*(1)*

any Permitted Investment or any Restricted Payment permitted to be made pursuant to the covenant described under "—Limitation on Restricted Payments;"

*(2)*

any payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Governing Board of the applicable Person;

*(3)*

loans or advances to employees (or cancellation thereof) in the ordinary course of business in accordance with the past practices of the Company, its Restricted Subsidiaries or its Regulated Subsidiaries, but in any event not to exceed $5.0 million in the aggregate outstanding at any one time;

*(4)*

the payment of reasonable and customary fees to directors or other members of the Governing Board of Parent, the Company, its Restricted Subsidiaries and its Regulated Subsidiaries who are not employees of Parent, the Company, its Restricted Subsidiaries or its Regulated Subsidiaries and the provision of reasonable and customary indemnities provided on behalf of directors or other members of the Governing Board and officers of Parent, the Company, its Restricted Subsidiaries and its Regulated Subsidiaries;

*(5)*

any transaction with the Company, a Restricted Subsidiary or a Regulated Subsidiary;

*(6)*

any transaction with a joint venture or similar entity which would constitute an Affiliate Transaction solely because the Company, a Restricted Subsidiary or a Regulated Subsidiary owns an equity interest in or otherwise controls such joint venture or similar entity;

*(7)*

the issuance or sale of any Capital Stock (other than Disqualified Stock) of the Company;

*(8)*

payments to the Equity Sponsor and its Affiliates for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, in connection with acquisitions or divestitures, which payments are approved by the majority of the Governing Board of the Company in good faith;

*(9)*

payments to the Equity Sponsor under the Management Agreement and reasonable related expenses;

*(10)*

the Transactions and the payment of all fees and expenses related to the Transactions;

*(11)*

transactions in which the Company delivers to the Trustee a letter from an Independent Qualified Party to the effect that such Affiliate Transactions are fair from a financial standpoint to the Company, its Restricted Subsidiaries and its Regulated Subsidiaries;

*(12)*

transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business;

*(13)*

any tax sharing agreement or arrangement and payments pursuant thereto among the Company and its Subsidiaries and any other Person with which the Company or its Subsidiaries are required or permitted to file a consolidated, combined or unitary return or with which the Company or any of its Subsidiaries are or could be part of a consolidated, combined or unitary group for tax purposes in amounts not to exceed the amount of Tax Distributions for the applicable period net of any Tax Distributions already made with respect to such period;

121

*(14)*

    any agreement as in effect on the Issue Date or any renewals or extensions of any such agreement (so long as such renewals or extensions are not materially less favorable to the Company, the Restricted Subsidiaries or the Regulated Subsidiaries) and the transactions evidenced thereby; and

*(15)*

    transactions between the Company, any Restricted Subsidiary or any Regulated Subsidiary acting in its capacity as general partner (or similar status) of limited partnerships or similar passive collective investment entities that trade derivatives and such limited partnerships or investment entities; *provided* that such transactions are in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business.

*Limitation on Line of Business*

    The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary, to engage in any business other than a Related Business.

*Limitation on Refco Finance Inc.*

    Notwithstanding anything to the contrary herein, Refco Finance Inc. may not hold any material assets (other than Indebtedness owing to Refco Finance Inc. by the Company, the Restricted Subsidiaries and the Regulated Subsidiaries and non−material Temporary Cash Investments), become liable for any material obligations or engage in any significant business activities (other than treasury, cash management, hedging and cash pooling activities and activities incidental thereto); *provided, however*, that Refco Finance Inc. may be a co−obligor or guarantor with respect to Indebtedness if the Company is an obligor of such Indebtedness and the net proceeds of such Indebtedness are received by the Company or one or more of the Company's Subsidiary Guarantors.

    The Company will not sell or otherwise dispose of any shares of Capital Stock of Refco Finance Inc. and will not permit Refco Finance Inc., directly or indirectly, to sell or otherwise dispose of any shares of its Capital Stock.

*Merger and Consolidation*

    (a)  Other than the Merger, the Company will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

*(1)*

    the resulting, surviving or transferee Person (the "*Successor Company*") shall be a Person organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and the Successor Company (if not the Company) shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of the Company under the Notes and the Indenture;

*(2)*

    immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any Restricted Subsidiary or Regulated Subsidiary as a result of such transaction as having been Incurred by such Successor Company or such Restricted Subsidiary or Regulated Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

*(3)*

    immediately after giving *pro forma* effect to such transaction, either (A) the Successor Company would be able to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) of the covenant described under "—Limitation on Indebtedness" or (B) the

122

Consolidated Coverage Ratio would be greater than such ratio immediately prior to such transaction; and

*(4)* the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with the Indenture;

*provided, however*, that clause (3) will not be applicable to (A) a Restricted Subsidiary or Regulated Subsidiary consolidating with, merging into or transferring all or part of its properties and assets to the Company (so long as no Capital Stock of the Company is distributed to any Person) or (B) the Company merging with an Affiliate of the Company solely for the purpose and with the sole effect of reincorporating the Company in another jurisdiction.

For purposes of this covenant, the sale, lease, conveyance, assignment, transfer or other disposition of all or substantially all the assets of one or more Subsidiaries of the Company, which assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all the assets of the Company on a consolidated basis, shall be deemed to be the transfer of all or substantially all the assets of the Company.

The Successor Company (if not the Company) will be the successor to the Company and shall succeed to, and be substituted for, and may exercise every right and power of, the Company under the Indenture, and the predecessor Company, except in the case of a lease, shall be released from the obligation to pay the principal of and interest on the Notes.

(b)    Refco Finance Inc. will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

*(1)* the resulting, surviving or transferee Person (the "*Successor Finance Issuer*") shall be a Person organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and the Successor Finance Issuer (if not Refco Finance Inc.) shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of Refco Finance Inc. under the Notes and the Indenture;

*(2)* immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Finance Issuer as a result of such transaction as having been Incurred by such Successor Finance Issuer at the time of such transaction), no Default shall have occurred and be continuing and no Change of Control shall have occurred with respect to Refco Finance Inc.; and

*(3)* the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with the Indenture.

The Successor Finance Issuer (if not Refco Finance Inc.) will be the successor to Refco Finance Inc. and shall succeed to, and be substituted for, and may exercise every right and power of, Refco Finance Inc. under the Indenture, and Refco Finance Inc., except in the case of a lease, shall be released from the obligation to pay the principal of and interest on the Notes.

(c)    The Company will not permit any Subsidiary Guarantor to consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, all or substantially all its assets to, any Person (other than the Company or another Subsidiary Guarantor) unless:

*(1)* except in the case of a Subsidiary Guarantor (x) that has been disposed of in its entirety to another Person, whether through a merger, consolidation or sale of Capital Stock or assets or

123

(y) that, as a result of the disposition of all or a portion of its Capital Stock, ceases to be a Subsidiary, in both cases, if in connection therewith the Company complies with its obligations under the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock" in respect of such disposition, the resulting, surviving or transferee Person (if not such Subsidiary) shall be a Person organized and existing under the laws of the jurisdiction under which such Subsidiary was organized or under the laws of the United States of America, or any state thereof or the District of Columbia, and such Person shall expressly assume, by a Guaranty Agreement, in form reasonably satisfactory to the Trustee, all the obligations of such Subsidiary, if any, under its Subsidiary Guaranty;

*(2)*

immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the resulting, surviving or transferee Person as a result of such transaction as having been Incurred by such Person at the time of such transaction), no Default shall have occurred and be continuing; and

*(3)*

the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such Guaranty Agreement, if any, comply with the Indenture.

*Future Guarantors*

The Company will cause (i) each of its domestic Subsidiaries (other than Refco Finance Inc., any Unrestricted Subsidiary or any Regulated Subsidiary) that Incurs any Indebtedness (other than Indebtedness permitted to be Incurred pursuant to clause (2), (7), (8) or (9) of paragraph (b) of the covenant described under "—Limitation on Indebtedness"), (ii) each Foreign Subsidiary that enters into a Guarantee of any Indebtedness (other than a Foreign Subsidiary that Guarantees Indebtedness Incurred by another Foreign Subsidiary) and (iii) each Regulated Subsidiary that enters into a Guarantee of any Indebtedness (other than a Regulated Subsidiary that Guarantees Indebtedness Incurred by another Regulated Subsidiary) to, in each case, at the same time, execute and deliver to the Trustee a Guaranty Agreement pursuant to which such Subsidiary will Guarantee payment of the Notes on the same terms and conditions as those set forth in the Indenture.

*SEC Reports*

Whether or not the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, so long as any Notes are outstanding, the Company will file with the SEC (unless the SEC will not accept such filing) and provide the Trustee and Noteholders, within the time periods specified in the SEC's rules and regulations:

*(1)*

all quarterly and annual financial information that would be required to be contained in a filing with the SEC on Forms 10–Q and 10–K if the Company were required to file such Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, with respect to the annual information only, a report on the annual financial statements by the Company's certified independent accountants; and

*(2)*

all current reports that would be required to be filed with the SEC on Form 8–K if the Company were required to file such reports.

If at any time the Company is not subject to the periodic reporting requirements of the Exchange Act for any reason, the Company will nevertheless continue filing the information and reports specified in the preceding sentence with the SEC within the time periods required unless the SEC will not accept such filings. The Company agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept such filings for any reason, the Company will post the information and reports specified in the preceding paragraph on

its website within the time periods that would apply if the Company were required to file that information and those reports with the SEC.

In addition, if at any time Parent Guarantees the Notes (there being no obligation of Parent to do so), holds no material assets other than cash, Temporary Cash Investments and the Capital Stock of the Company (and performs the related incidental activities associated with such ownership) and complies with the requirements of Rule 3–10 of Regulation S–X promulgated by the SEC (or any successor provision), the reports and information required to be filed and furnished to the Trustee and holders of the Notes pursuant to this covenant may, at the option of the Company, be filed by and be those of Parent rather than the Company.

Notwithstanding the foregoing, such requirements shall be deemed satisfied prior to the commencement of the Registered Exchange Offer or the effectiveness of the Shelf Registration Statement by the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration Statement, and any amendments thereto, with such financial information that satisfies Regulation S–X of the Securities Act.

In addition, the Company will furnish to the Holders of the Notes and to prospective investors, upon the requests of such Holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Notes are not freely transferable under the Securities Act.

## Defaults

Each of the following is an Event of Default:

> *(1)*
>
> a default in the payment of interest on the Notes when due, continued for 30 days;

> *(2)*
>
> a default in the payment of principal of any Note when due at its Stated Maturity, upon optional redemption, upon required purchase, upon declaration of acceleration or otherwise;

> *(3)*
>
> a default in the performance of, or a breach in any covenant, warranty or other agreement contained in the Indenture (other than a default in the performance or breach of a covenant, warranty or agreement which is specifically dealt with in clauses (1) or (2) above) and such default or breach continues for 60 days after notice;

> *(4)*
>
> Indebtedness for borrowed money of an Issuer or any Significant Subsidiary is not paid within any applicable grace period after final maturity or is accelerated by the holders thereof because of a default and the total amount of such Indebtedness unpaid or accelerated exceeds $50.0 million (the "*cross acceleration provision*");

> *(5)*
>
> certain events of bankruptcy, insolvency or reorganization of either Issuer or any Significant Subsidiary (the "*bankruptcy provisions*");

> *(6)*
>
> failure by an Issuer or Significant Subsidiary to pay final judgments aggregating in excess of $50.0 million, which judgments are not paid, discharged or stayed for a period of 60 days after such judgments have become final and non–appealable ("*judgment default provision*"); or

> *(7)*
>
> a Subsidiary Guaranty ceases to be in full force and effect (other than in accordance with the terms of such Subsidiary Guaranty) or a Subsidiary Guarantor denies or disaffirms its obligations under its Subsidiary Guaranty and such default continues for 10 days.

However, a default under clause (3) will not constitute an Event of Default until the Trustee or the holders of at least 25% in principal amount of the outstanding Notes notify the Company of the default and the Company does not cure such default within the time specified after receipt of such notice.

If an Event of Default occurs and is continuing, the Trustee or the holders of at least 25% in principal amount of the outstanding Notes may declare the principal of and accrued but unpaid interest on all the Notes to be due and payable. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of an Issuer occurs and is continuing, the principal of and interest on all the Notes will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any holders of the Notes. Under certain circumstances, the holders of at least a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

Subject to the provisions of the Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders of the Notes unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:

(1)     such holder has previously given the Trustee notice that an Event of Default is continuing;

(2)     holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

(3)     such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense;

(4)     the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

(5)     holders of at least a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60–day period.

Subject to certain restrictions, the holders of at least a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder of a Note or that would involve the Trustee in personal liability.

If a Default occurs, is continuing and is known to the Trustee, the Trustee must mail to each holder of the Notes notice of the Default within 90 days after it occurs. Except in the case of a Default in the payment of principal of or interest on any Note, the Trustee may withhold notice if and so long as a committee of its Trust Officers in good faith determines that withholding notice is not opposed to the interest of the holders of the Notes. In addition, we are required to deliver to the Trustee, within 120 days after the end of each fiscal year, a certificate indicating whether the signers thereof know of any Default that occurred during the previous fiscal year. We are required to deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action we are taking or propose to take in respect thereof.

**Amendments and Waivers**

Subject to certain exceptions, the Indenture may be amended with the consent of the holders of at least a majority in principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange for the Notes), and any past default or compliance with any provisions may also be waived with the consent of the holders of at least a majority in principal amount

126

of the Notes then outstanding. However, without the consent of each holder of an outstanding Note affected thereby, an amendment or waiver may not, among other things:

(1)
reduce the amount of Notes whose holders must consent to an amendment;

(2)
reduce the rate of or extend the time for payment of interest on any Note;

(3)
reduce the principal of or change the Stated Maturity of any Note;

(4)
reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed as described under "—Optional Redemption" or "—Escrow of Proceeds; Special Mandatory Redemption" above;

(5)
make any Note payable in money other than that stated in the Note;

(6)
impair the right of any holder of the Notes to receive payment of principal of and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(7)
make any change in the amendment provisions which require each holder's consent or in the waiver provisions;

(8)
make any change in the ranking or priority of any Note that would adversely affect the Noteholders; or

(9)
make any change in, or release other than in accordance with the Indenture, any Subsidiary Guaranty that would adversely affect the Noteholders.

Notwithstanding the preceding, without the consent of any holder of the Notes, the Issuers, the Subsidiary Guarantors and Trustee may amend the Indenture:

(1)
to cure any ambiguity, omission, defect or inconsistency;

(2)
to provide for the assumption by a successor corporation of the obligations of an Issuer or any Subsidiary Guarantor under the Indenture;

(3)
to provide for uncertificated Notes in addition to or in place of Certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code);

(4)
to add Guarantees with respect to the Notes, including any Subsidiary Guaranties, or to secure the Notes;

(5)
to add to the covenants of the Issuers or a Subsidiary Guarantor for the benefit of the holders of the Notes or to surrender any right or power conferred upon the Issuers or a Subsidiary Guarantor;

(6)
to make any change that does not adversely affect the rights of any holder of the Notes in any material respect;

(7)
to comply with any requirement of the SEC in connection with the qualification of the Indenture under the Trust Indenture Act;

(8)
to make any amendment to the provisions of the Indenture relating to the transfer and legending of Notes; *provided, however*, that (a) compliance with the Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any other applicable securities laws and (b) such amendment does not materially and adversely affect the rights of Holders to transfer Notes; or

127

*(9)*      to conform the text of the Indenture or the Notes to any provision of this Description of the Notes to the extent that such provision of the Indenture or the Notes was intended to be a verbatim recitation of such provision of this Description of the Notes.

However, no amendment may be made to the subordination provisions of the Indenture that adversely affects the rights of any holder of Senior Indebtedness of the Issuers or a Subsidiary Guarantor then outstanding unless the holders of such Senior Indebtedness (or their Representative) consent to such change.

The consent of the holders of the Notes is not necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

After an amendment under the Indenture becomes effective, we are required to mail to holders of the Notes a notice briefly describing such amendment. However, the failure to give such notice to all holders of the Notes, or any defect therein, will not impair or affect the validity of the amendment.

Neither the Issuers nor any Affiliate of the Issuers may, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

## Transfer

The Notes will be issued in registered form and will be transferable only upon the surrender of the Notes being transferred for registration of transfer. We may require payment of a sum sufficient to cover any tax, assessment or other governmental charge payable in connection with certain transfers and exchanges.

## Satisfaction and Discharge

When (1) we deliver to the Trustee all outstanding Notes for cancelation or (2) all outstanding Notes have become due and payable or will become due and payable within one year, whether at maturity or on a redemption date as a result of the mailing of notice of redemption, and, in the case of clause (2), we irrevocably deposit with the Trustee funds in cash or U.S. Government Obligations or a combination thereof sufficient to pay, without consideration of any reinvestment of interest, at maturity or upon redemption all outstanding Notes, including interest thereon to maturity or such redemption date, and if in either case we pay all other sums payable under the Indenture by us, then the Indenture shall, subject to certain exceptions, cease to be of further effect.

## Defeasance

At any time, we may terminate all our obligations under the Notes and the Indenture ("*legal defeasance*"), except for certain obligations, including those respecting the defeasance trust and obligations to register the transfer or exchange of the Notes, to replace mutilated, destroyed, lost or stolen Notes and to maintain a registrar and paying agent in respect of the Notes.

In addition, at any time we may terminate our obligations under "—Change of Control" and under the covenants described under "—Certain Covenants" (other than the covenant described under "—Certain Covenants—Merger and Consolidation"), the operation of the cross acceleration provision, the bankruptcy provisions with respect to Significant Subsidiaries and the judgment default provision, all as described under "—Defaults" above, and the limitations contained in clause (3) of the first paragraph under "—Certain Covenants—Merger and Consolidation" above ("*covenant defeasance*").

We may exercise our legal defeasance option notwithstanding our prior exercise of our covenant defeasance option. If we exercise our legal defeasance option, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. If we exercise our covenant defeasance option, payment of the Notes may not be accelerated because of an Event of Default specified in clause (3) (other than a default in the performance of, or a breach in, the covenant set forth under "—Certain Covenants—Merger and Consolidation"), (4), (5) (with respect only to Significant Subsidiaries), (6) or (7) under "—Defaults" above or because of the failure of the Company to comply with clause (3) of the first paragraph under "—Certain Covenants—Merger and Consolidation" above. If we exercise our legal defeasance option or our covenant defeasance option, each Subsidiary Guarantor will be released from all of its obligations with respect to its Subsidiary Guaranty.

In order to exercise either of our defeasance options, we must irrevocably deposit in trust (the "*defeasance trust*") with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be, and must comply with certain other conditions, including delivery to the Trustee of an Opinion of Counsel to the effect that holders of the Notes will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred (and, in the case of legal defeasance only, such Opinion of Counsel must be based on a ruling of the Internal Revenue Service or other change in applicable Federal income tax law).

## Concerning the Trustee

Wells Fargo Bank, National Association is the Trustee under the Indenture. Wells Fargo Bank, National Association is the initial registrar and paying agent with regard to the Notes.

The Indenture contains certain limitations on the rights of the Trustee, should it become a creditor of the Issuers or a Subsidiary Guarantor, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions; *provided, however*, if it acquires any conflicting interest it must either eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Holders of at least a majority in principal amount of the outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. If an Event of Default occurs (and is not cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent man in the conduct of his own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of Notes, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense and then only to the extent required by the terms of the Indenture.

## No Personal Liability of Directors or Other Members of the Governing Board, Officers, Employees, Members and Stockholders

No director or other member of the Governing Board, officer, employee, incorporator, member or stockholder of an Issuer or any Subsidiary Guarantor will have any liability for any obligations of an Issuer or any Subsidiary Guarantor under the Notes, any Subsidiary Guaranty or the Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder of the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver and release may not be effective to waive

129

liabilities under the U.S. federal securities laws, and it is the view of the SEC that such a waiver is against public policy.

**Governing Law**

The Indenture and the Notes are governed by, and will be construed in accordance with, the laws of the State of New York.

**Certain Definitions**

"*Acquisition*" means the occurrence of both (i) the acquisition of a majority interest in the Company, pursuant to the Equity Purchase and Merger Agreement, by THL Refco Acquisition Partners together with certain affiliates and co–investors and (ii) the Merger.

"*Acquisition Date*" means the date on which the Acquisition is consummated.

"*Additional Assets*" means:

> (1)
>
> > any property, plant, equipment or other assets used or useful in a Related Business;
>
> (2)
>
> > the Capital Stock of a Person that becomes a Restricted Subsidiary or Regulated Subsidiary as a result of the acquisition of such Capital Stock by the Company or another Restricted Subsidiary or Regulated Subsidiary, as the case may be; or
>
> (3)
>
> > Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary or Regulated Subsidiary;

*provided, however*, that any such Restricted Subsidiary or Regulated Subsidiary described in clause (2) or (3) above is primarily engaged in a Related Business.

"*Affiliate*" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Asset Acquisition*" means (a) an Investment by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in any other Person if, as a result of such Investment, such Person shall become a Restricted Subsidiary or Regulated Subsidiary, as the case may be, or shall be merged with or into the Company or any Restricted Subsidiary or Regulated Subsidiary, or (b) the acquisition by the Company or any Restricted Subsidiary or Regulated Subsidiary of the assets of any other Person or any division or line of business of any other Person.

"*Asset Disposition*" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) by the Company or any Restricted Subsidiary or Regulated Subsidiary, including any disposition by means of a merger, consolidation or similar transaction (each referred to for the purposes of this definition as a "*disposition*"), of:

> (1)
>
> > any shares of Capital Stock of a Restricted Subsidiary or Regulated Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Company, a Restricted Subsidiary or a Regulated Subsidiary and Class B Equity Interests);
>
> (2)
>
> > all or substantially all the assets of any division or line of business of the Company or any Restricted Subsidiary or Regulated Subsidiary; or

130

(3)        any other assets of the Company or any Restricted Subsidiary or Regulated Subsidiary (including any accounts receivable) outside of the ordinary course of business of the Company or such Restricted Subsidiary or Regulated Subsidiary

(other than, in the case of clauses (1), (2) and (3) above,

(A)        a disposition (i) by a Restricted Subsidiary or a Regulated Subsidiary to the Company or (ii) by the Company, a Restricted Subsidiary or a Regulated Subsidiary to a Restricted Subsidiary or a Regulated Subsidiary;

(B)        for purposes of the covenant described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" only, (i) a disposition that constitutes a Restricted Payment (or would constitute a Restricted Payment but for the exclusions from the definition thereof) and that is not prohibited by the covenant described under "—Certain Covenants—Limitation on Restricted Payments," including any dividends or distributions to be made as part of the Transactions, or is a Permitted Investment and (ii) a disposition of all or substantially all the assets of the Company in accordance with the covenant described under "—Certain Covenants—Merger and Consolidation;"

(C)        a disposition of assets or sale of Capital Stock with a Fair Market Value of less than $10.0 million;

(D)        the disposition of property or assets that are obsolete, damaged or worn out;

(E)        foreclosures on assets;

(F)        a disposition of cash or Temporary Cash Investments; and

(G)        the creation of a Lien (but not the sale or other disposition of the property subject to such Lien)).

"*Attributable Debt*" in respect of a Sale/Leaseback Transaction means, as of the time of determination, the present value (discounted at the interest rate borne by the Notes, compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended); *provided, however*, that if such Sale/Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"*Average Life*" means, as of the date of determination, with respect to any Indebtedness, the quotient obtained by dividing:

(1)        the sum of the products of the numbers of years, calculated to the nearest one–twelfth, from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Indebtedness multiplied by the amount of such payment by

(2)        the sum of all such payments.

"*Bank Indebtedness*" means all Obligations pursuant to the Credit Agreement.

"*Broker–Dealer Regulated Subsidiary*" means any Subsidiary that is registered as a broker–dealer under the Exchange Act or any other applicable law requiring such registration.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Lease Obligation*" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation

131

determined in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"*Capital Stock*" of any Person means any and all shares, interests (including membership and partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"*Cash Contribution Amount*" means the aggregate amount of cash contributions made to the capital of the Company or any Subsidiary Guarantor described in the definition of "Contribution Indebtedness."

"*Class B Equity Interests*" means the Class B membership interests, or comparable shares of Capital Stock, that are issued from time to time by Refco Securities, LLC or any other Regulated Subsidiary or Restricted Subsidiary, in the ordinary course of their respective businesses and held by employees of Refco Securities, LLC or such other Regulated Subsidiary or Restricted Subsidiary who conduct trading activities in designated proprietary trading accounts established on the books and records of Refco Securities, LLC or such other Regulated Subsidiary or Restricted Subsidiary, as applicable.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commodity Price Protection Agreement*" means, with respect to any Person, any forward contract, commodity swap, commodity option or other similar agreement or arrangement entered into to protect such Person or its Subsidiaries against fluctuations in commodity prices.

"*Consolidated Coverage Ratio*" as of any date of determination means the ratio of (a) the aggregate amount of EBITDA for the period of the most recent four consecutive fiscal quarters for which internal financial statements are available prior to the date of such determination to (b) Consolidated Interest Expense for such four fiscal quarters; *provided, however*, that:

(1)  if the Company or any Restricted Subsidiary or Regulated Subsidiary has Incurred any Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio is an Incurrence of Indebtedness, or both, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving effect on a *pro forma* basis to such Indebtedness as if such Indebtedness had been Incurred on the first day of such period;

(2)  if the Company or any Restricted Subsidiary or Regulated Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Coverage Ratio, EBITDA and Consolidated Interest Expense for such period shall be calculated on a *pro forma* basis as if such repayment, repurchase, defeasance or discharge had occurred on the first day of such period;

(3)  if since the beginning of such period the Company or any Restricted Subsidiary or Regulated Subsidiary shall have made any Asset Disposition, EBITDA for such period shall be reduced by an amount equal to EBITDA (if positive) directly attributable to the assets which are the subject of such Asset Disposition for such period, or increased by an amount equal to EBITDA (if negative), directly attributable thereto for such period, and Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Company or any Restricted Subsidiary

132

or Regulated Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries or Regulated Subsidiaries in connection with such Asset Disposition for such period (or, if the Capital Stock of any Restricted Subsidiary or Regulated Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary or Regulated Subsidiary to the extent the Company and its continuing Restricted Subsidiaries and Regulated Subsidiaries are no longer liable for such Indebtedness after such sale);

(4)     if since the beginning of such period the Company or any Restricted Subsidiary or Regulated Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary or Regulated Subsidiary (or any Person which becomes a Restricted Subsidiary or Regulated Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction requiring a calculation to be made hereunder, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period; and

(5)     if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or Regulated Subsidiary or was merged with or into the Company or any Restricted Subsidiary or Regulated Subsidiary since the beginning of such period) shall have made any Asset Disposition, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (3) or (4) above if made by the Company or a Restricted Subsidiary or Regulated Subsidiary during such period, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto as if such Asset Disposition, Investment or acquisition had occurred on the first day of such period.

For purposes of calculating the Consolidated Coverage Ratio:

(1)     whenever *pro forma* effect is to be given to any Asset Disposition, Investment or acquisition of assets pursuant to clause (3) or (4) above, the *pro forma* calculations shall be determined in good faith by the chief financial officer of the Company and shall comply with the requirements of Rule 11–02 of Regulation S–X promulgated by the SEC, except that such *pro forma* calculations may include Pro Forma Cost Savings; and

(2)     in calculating Consolidated Interest Expense attributable to interest on any Indebtedness computed on a *pro forma* basis, (a) interest on outstanding Indebtedness determined on a fluctuating basis as of the date of determination and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate *per annum* equal to the rate of interest on such Indebtedness in effect on the calculation date; (b) if interest on any Indebtedness actually incurred on the date of determination may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rates, then the interest rate in effect on the date of determination will be deemed to have been in effect during the four–quarter period; and (c) notwithstanding clause (a) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by any Interest Rate Agreement, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreement.

If any Indebtedness is incurred under a revolving credit facility and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated based on the average daily balance of such Indebtedness for the four fiscal quarters subject to the *pro forma* calculation.

"*Consolidated Interest Expense*" means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries, plus, to the extent not included

133

in such total interest expense and to the extent incurred by the Company or its Restricted Subsidiaries and Regulated Subsidiaries, without duplication:

(1)
    interest expense attributable to Capital Lease Obligations;

(2)
    amortization of debt discount;

(3)
    non−cash interest expense;

(4)
    commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(5)
    net cash payments pursuant to Hedging Obligations; and

(6)
    dividends accrued in respect of all Disqualified Stock of the Company and all Preferred Stock of any Restricted Subsidiary or Regulated Subsidiary, in each case held by Persons other than the Company or a Wholly Owned Subsidiary (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Company);

*less* interest income actually received in cash for such period (other than interest income attributable to customer financing arrangements). "Consolidated Interest Expense" excludes the (i) amortization of deferred financing fees and the expensing of any bridge or other financing fees, (ii) interest expense attributable to Customer Financing Indebtedness and (iii) net payments pursuant to Hedging Obligations that do not constitute Indebtedness.

"*Consolidated Net Income*" means, for any period, without duplication, the net income of the Company and its consolidated Subsidiaries; *provided, however*, that there shall not be included in such Consolidated Net Income:

(1)
    any net income of any Person (other than the Company) if such Person is neither a Restricted Subsidiary nor a Regulated Subsidiary, except that, (A) subject to the exclusion contained in clause (4) below, the Company's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Company or a Restricted Subsidiary or Regulated Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a Restricted Subsidiary or Regulated Subsidiary, to the limitations contained in clause (3) below) and (B) the Company's equity in the net income or loss of FXCM shall be included in such Consolidated Net Income;

(2)
    except as provided in the definition of Consolidated Coverage Ratio, any net income (or loss) of any Person acquired by the Company or a Subsidiary in a pooling of interests transaction (or any transaction accounted for in a manner similar to a pooling of interests) for any period prior to the date of such acquisition;

(3)
    any net income of any Restricted Subsidiary or Regulated Subsidiary if such Restricted Subsidiary or Regulated Subsidiary, as the case may be, is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary or Regulated Subsidiary, directly or indirectly, to the Company, except that:

(A)
    subject to the exclusion contained in clause (4) below, the Company's equity in the net income of any such Restricted Subsidiary or Regulated Subsidiary for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Restricted Subsidiary or Regulated Subsidiary during such period to the Company or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to another Restricted Subsidiary or Regulated Subsidiary, to the limitation contained in this clause); *provided, however*, to the extent that any net income of a Restricted Subsidiary or Regulated

134

Subsidiary for such period would be excluded as a result of this clause (A), such net income shall be included in such Consolidated Net Income if the Company delivers to the Trustee on the date of the event requiring calculation of Consolidated Net Income a certificate of the chief financial officer of the Company certifying that the restrictions on the payments of dividends or the making of distributions by such Restricted Subsidiary or Regulated Subsidiary to the Company do not impair the Company's ability to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due; and

(B) the Company's equity in a net loss of any such Restricted Subsidiary or Regulated Subsidiary for such period shall be included in determining such Consolidated Net Income;

(4) any gain (or loss) realized upon the sale or other disposition of any assets of the Company, its consolidated Subsidiaries or any other Person (including pursuant to any Sale/Leaseback Transaction) which is not sold or otherwise disposed of in the ordinary course of business and any gain (or loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(5) any net after–tax extraordinary, unusual or nonrecurring gains or losses;

(6) all restructuring charges, including severance, relocation and transition costs;

(7) noncash compensation charges, including any such charges arising from stock options, restricted stock grants or other equity–incentive programs;

(8) any net after–tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness;

(9) any non–cash impairment charges resulting from the application of Statements of Financial Accounting Standards No. 142 and 144 and the amortization of intangibles arising pursuant to Statement of Financial Accounting Standards No. 141; and

(10) the cumulative effect of a change in accounting principles,

in each case, for such period. Notwithstanding the foregoing, for the purposes of the covenant described under "—Certain Covenants—Limitation on Restricted Payments" only, there shall be excluded from Consolidated Net Income any repurchases, repayments or redemptions of Investments, proceeds realized on the sale of Investments or return of capital to the Company, a Restricted Subsidiary or a Regulated Subsidiary to the extent such repurchases, repayments, redemptions, proceeds or returns increase the amount of Restricted Payments permitted under such covenant pursuant to clause (a)(3)(D) thereof. If the Company or any Successor Company is organized as a corporation and solely for purposes of determining the amount available for Restricted Payments under clause (a)(3) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments," an amount equal to any reduction in current taxes recognized during the applicable period by the Company, its Restricted Subsidiaries and Regulated Subsidiaries as a direct result of deductions arising from (A) the amortization allowed under Section 167 or 197 of the Code for the step–up in the federal income tax bases of goodwill and other assets (tangible or intangible) arising from the Transactions and (B) employee termination and related restructuring reserves established pursuant to purchase accounting for the two–year period commencing with the Issue Date, in each case, will be included in the calculation of "Consolidated Net Income" so long as such addition will not result in double–counting.

"*Contribution Indebtedness*" means Indebtedness of the Company or any Subsidiary Guarantor in an aggregate principal amount not greater than twice the aggregate amount of cash contributions made

135

to the capital of the Company or such Subsidiary Guarantor after the Issue Date; *provided* that such Contribution Indebtedness:

(1)

if the aggregate principal amount of such Contribution Indebtedness is greater than one times such cash contributions to the capital of the Company or such Subsidiary Guarantor, as applicable, the amount of such excess shall be (A)(x) Subordinated Obligations (other than Secured Indebtedness) or (y) Indebtedness that ranks *pari passu* with the Notes (other than Secured Indebtedness) and (B) Indebtedness with a Stated Maturity later than the Stated Maturity of the Notes; and

(2)

(a) is incurred within 180 days after the making of such cash contributions and (b) is so designated as Contribution Indebtedness pursuant to an Officers' Certificate on the date of the Incurrence thereof.

"*Credit Agreement*" means the Credit Agreement to be entered into by and among the Company, certain of its Subsidiaries, the lenders referred to therein, Bank of America, N.A., as Administrative Agent, Credit Suisse First Boston, as Syndication Agent, and Deutsche Bank Securities Inc., as Documentation Agent, together with the related documents thereto (including the term loans, revolving loans and letters of credit thereunder, any Guarantees and security documents), as amended, extended, renewed, restated, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, maturity, terms, conditions, covenants and other provisions) from time to time, and any agreement (and related document) governing Indebtedness incurred to Refinance, in whole or in part, the borrowings and commitments then outstanding or permitted to be outstanding under such Credit Agreement or a successor Credit Agreement, whether by the same or any other lender or group of lenders or other investors.

"*Credit Facilities*" means one or more debt facilities (including, without limitation, the Credit Agreement), commercial paper facilities or indentures, in each case with banks or other institutional lenders or other investors or a trustee providing for revolving credit loans, term loans, letters of credit or issuances of notes or other debt securities, in each case as amended, modified, renewed, refunded, replaced, restated, substituted or refinanced in whole or in part from time to time.

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement or other similar agreement with respect to currency values.

"*Customer Financing Indebtedness*" means (i) short–term Indebtedness (including without limitation Indebtedness under Swap Contracts) that is incurred in the ordinary course of business and (a) is incurred by any Restricted Subsidiary in conjunction with its customer financing business, (b) is incurred by any Regulated Subsidiary for the purpose of offsetting customer positions or financing customer margined inventory, acquired or cleared or financed in conjunction with customer brokerage activities and is secured by a Lien on the assets being financed, (c) is incurred by any Regulated Subsidiary and consists of obligations under letters of credit posted to support clearing house guarantees issued in the ordinary course of business, or (d) constitutes customer financing entered into by any Regulated Subsidiary; *provided, however*, that, after giving effect to the Incurrence of any such Indebtedness, such Person's Regulatory Net Capital is in compliance with all applicable rules and regulations governing such Person and the conduct of its business, and (ii) Guarantees by the Company of any short–term Indebtedness described in clause (i) of this definition.

"*Default*" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"*Designated Noncash Consideration*" means the Fair Market Value of noncash consideration received by the Company or one of its Restricted Subsidiaries or Regulated Subsidiaries in connection with an Asset Disposition that is so designated as Designated Noncash Consideration pursuant to an Officers' Certificate setting forth the basis of such valuation, less the amount of cash or Temporary

136

Cash Investments received in connection with a subsequent sale of such Designated Noncash Consideration.

"*Designated Preferred Stock*" means Preferred Stock of the Company or Parent (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officers' Certificate, on the issuance date thereof, the Net Cash Proceeds of which are excluded from the calculation set forth in clause (3) of paragraph (a) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

"*Designated Offering*" means an Equity Offering or an IDS Offering.

"*Designated Senior Indebtedness*," with respect to a Person means:

(1)      the Bank Indebtedness; and

(2)      any other Senior Indebtedness of such Person, other than any Indebtedness of such Person owed to the Company, Refco Finance Inc. or any of their respective Subsidiaries, which, at the date of determination, has an aggregate principal amount outstanding of, or under which, at the date of determination, the holders thereof are committed to lend up to, at least $25.0 million and is specifically designated by such Person in the instrument evidencing or governing such Senior Indebtedness as "Designated Senior Indebtedness" for purposes of the Indenture.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock, other than Class B Equity Interests, which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(1)      matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such Person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(2)      is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock; or

(3)      is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part;

in each case on or prior to the 91st day after the Stated Maturity of the Notes; *provided, however*, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the Stated Maturity of the Notes shall not constitute Disqualified Stock if:

(1)      the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the terms applicable to the Notes as described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" and "—Change of Control;" and

(2)      any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to the Indenture; *provided, however*, that if such Disqualified Stock

could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such Person.

"*EBITDA*" for any period means the sum of Consolidated Net Income, plus the following to the extent deducted in calculating such Consolidated Net Income and without duplication:

(1)     all income tax expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries;

(2)     Consolidated Interest Expense;

(3)     depreciation and amortization expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries;

(4)     any reasonable expenses, fees or charges related to any Equity Offering, Permitted Investment, acquisition, recapitalization or Indebtedness permitted to be Incurred under the Indenture or to the Transactions;

(5)     any net gain or loss from Hedging Obligations;

(6)     the amount of management, monitoring, consulting and advisory fees and related expenses paid to the Equity Sponsor (or any accruals relating to such fees and related expenses) during such period in accordance with the Management Agreement; and

(7)     all other non–cash charges of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries (excluding any such non–cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period) and less all non–cash items of income of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries (other than accruals of revenue by the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries in the ordinary course of business);

in each case for such period. Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation and amortization and non–cash charges of, a Restricted Subsidiary or Regulated Subsidiary shall be added to Consolidated Net Income to compute EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net income or loss of such Restricted Subsidiary or Regulated Subsidiary was included in calculating Consolidated Net Income.

"*Equity Purchase and Merger Agreement*" means the Equity Purchase and Merger Agreement, dated as of June 8, 2004, by and among Refco Group Ltd., LLC, a Delaware limited liability company, Refco Group Holdings, Inc., a Delaware corporation, THL Refco Acquisition Partners, a Delaware limited partnership, and Refco Merger LLC, a Delaware limited liability company, as amended on July 9, 2004 and as the same may be amended or modified prior to the Acquisition Date.

"*Equity Offering*" means an offering (including a private placement) of the Capital Stock (other than Disqualified Stock) of the Company or Parent, other than (i) public offerings with respect to Capital Stock registered on Form S–8 under the Securities Act and (ii) issuances to any Subsidiary of the Issuers.

"*Equity Sponsor*" means Thomas H. Lee Partners, L.P., a Delaware limited partnership.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

"*Exchange Notes*" means the debt securities of the Issuers issued pursuant to the Indenture in exchange for, and in an aggregate principal amount equal to, the Notes, in compliance with the terms of a Registration Rights Agreement.

138

"*Fair Market Value*" means, with respect to any asset or property, the price which could be negotiated in an arm's–length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. If the Fair Market Value of the property or assets in question is in excess of $25.0 million, such determination must be confirmed in good faith by the Governing Board of the Company, whose determination will be conclusive and evidenced by a resolution of such Governing Board. For purposes of determining the Fair Market Value of Capital Stock, the value of the Capital Stock of a Person shall be based upon such Person's property and assets, exclusive of goodwill or any similar intangible asset.

"*Foreign Subsidiary*" means any Restricted Subsidiary or Regulated Subsidiary that is not organized under the laws of the United States of America or any state thereof or the District of Columbia.

"*FXCM*" means Forex Capital Markets, LLC.

"*Futures Commission Regulated Subsidiary*" means any Subsidiary that is required to register as a futures commission merchant under the Commodity Exchange Act or any other law requiring such registration.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect as of the Issue Date, including those set forth in:

*(1)*
    the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants;

*(2)*
    statements and pronouncements of the Financial Accounting Standards Board;

*(3)*
    such other statements by such other entity as approved by a significant segment of the accounting profession; and

*(4)*
    the rules and regulations of the SEC governing the inclusion of financial statements (including *pro forma* financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act, including opinions and pronouncements in staff accounting bulletins and similar written statements from the accounting staff of the SEC.

"*Governing Board*" of the Company or any other Person means, (i) the managing board or managers forming any controlling committee of managers of the Company or such Person, for so long as the Company or such Person is a limited liability company, (ii) the board of directors of the Company or such Person, if the Company or such Person is a corporation, (iii) any similar governing body or (iv) in the case of any of the forgoing, any authorized committee of the foregoing.

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*GP Obligations*" means obligations of the Company, any Restricted Subsidiary or any Regulated Subsidiary with respect to Indebtedness of limited partnerships or similar passive collective investment entities that trade derivatives and in which the Company, such Restricted Subsidiary or such Regulated Subsidiary serves as general partner (or has a similar status) in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business and which have arisen solely as a result of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's role as general partner (or similar status) of such entities.

139

"*Guarantee*" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person:

*(1)*

to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such Person (whether arising by virtue of partnership arrangements, or by agreements to keep–well, to purchase assets, goods, securities or services, to take–or–pay or to maintain financial statement conditions or otherwise); or

*(2)*

entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

*provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"*Guaranty Agreement*" means a supplemental indenture, in form reasonably satisfactory to the Trustee, pursuant to which a Subsidiary Guarantor guarantees the Issuers' obligations with respect to the Notes on the terms provided for in the Indenture.

"*Hedging Obligations*" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Price Protection Agreement.

"*Holder*" or "*Noteholder*" means the Person in whose name a Note is registered on the registrar's books.

"*IDS Offering*" means a bona fide offering in the United States or Canada of units consisting of common stock and notes of the Company; *provided* that the net cash proceeds of such offering that are used to redeem notes pursuant to the third paragraph under the caption "—Optional Redemption" shall only consist of the net cash proceeds attributable to the proceeds of the common stock of such offering.

"*Income Tax Liabilities*" means an amount determined by multiplying (a)(i) all taxable income and gains of the Company and its Subsidiaries for such taxable year (the "*Taxable Amount*") minus (ii) an amount (not to exceed the Taxable Amount for such taxable year) equal to all losses of the Company and its Subsidiaries in any of the three prior taxable years that have not been previously subtracted pursuant to this clause (ii) from the Taxable Amount for any prior year by (b) forty–two percent (42%) or, if there is a change in applicable federal, state or local tax rates, such other rate as the Issuers determine in good faith to be a reasonable approximation of the effective combined federal, state and local income taxation rates generally payable by Parent or direct or indirect owners of the Company with respect to the income and gains of the Company and its Subsidiaries.

"*Incur*" means issue, assume, Guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or Regulated Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Restricted Subsidiary or Regulated Subsidiary. The term "Incurrence" when used as a noun shall have a correlative meaning. Solely for purposes of determining compliance with "—Certain Covenants—Limitation on Indebtedness":

*(1)*

amortization of debt discount or the accretion of principal with respect to a non–interest bearing or other discount security;

*(2)*

the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Capital Stock in the form of additional Capital Stock of the same class and with the same terms;

*(3)*

increases in liabilities as a result of fluctuations in exchange rates; and

140

*(4)*
 the premium, if any, payable on the Note which is due or overdue or is to become due at the relevant time.

will not be deemed to be the Incurrence of Indebtedness.

"*Indebtedness*" means, with respect to any Person on any date of determination (without duplication):

*(1)*
 the principal in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable;

*(2)*
 all Capital Lease Obligations of such Person and all Attributable Debt in respect of Sale/Leaseback Transactions entered into by such Person;

*(3)*
 all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding any accounts payable or other liability to trade creditors arising in the ordinary course of business);

*(4)*
 all obligations of such Person for the reimbursement of any obligor on any letter of credit, bankers' acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

if, and to the extent that, any of the foregoing Indebtedness (other than letters of credit, bankers' acceptances or similar credit transactions) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

*(5)*
 the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person, the principal amount of such Preferred Stock to be determined in accordance with the Indenture (but excluding, in each case, any accrued dividends);

*(6)*
 all obligations of the type referred to in clauses (1) through (5) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor or guarantor, including by means of any Guarantee;

*(7)*
 all obligations of the type referred to in clauses (1) through (6) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the Fair Market Value of such property or assets and the amount of the obligation so secured; and

*(8)*
 to the extent not otherwise included in this definition, Hedging Obligations of such Person.

Notwithstanding the foregoing, "Indebtedness" shall not include (w) Customer Financing Indebtedness, (x) GP Obligations, (y) Hedging Obligations that have been incurred by such Person on behalf of customers or in order to finance the carrying of securities or investment positions and (z) indemnification, adjustment of purchase price, earn–out or similar obligations incurred or assumed by any of the Company, a Restricted Subsidiary or a Regulated Subsidiary in connection with the acquisition or disposition of any of their respective businesses or assets whether or not such acquisition occurred before or after the Issue Date.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all obligations as described above; *provided, however*, that in the case of Indebtedness sold at a discount, the amount of such Indebtedness at any time will be the accreted value thereof at such time.

"*Independent Qualified Party*" means an investment banking firm, accounting firm or appraisal firm of national standing; *provided, however*, that such firm is not an Affiliate of the Company.

"*Interest Rate Agreement*" means any interest rate swap agreement, interest rate cap agreement or other financial agreement or arrangement with respect to exposure to interest rates.

"*Investment*" in any Person means any direct or indirect advance, loan or other extension of credit (including by way of Guarantee or similar arrangements but excluding any advances to customers in the ordinary course of business) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by such Person; *provided* that assets held to secure Customer Financing Indebtedness in the ordinary course of business shall not constitute an Investment. If the Company or any Restricted Subsidiary or Regulated Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary or Regulated Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary or Regulated Subsidiary, any Investment by the Company or any Restricted Subsidiary or Regulated Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time. The acquisition by the Company or any Restricted Subsidiary or Regulated Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary or Regulated Subsidiary in such third Person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its Fair Market Value at the time the Investment is made and without giving effect to subsequent changes in value.

For purposes of the definition of "Unrestricted Subsidiary," the definition of "Restricted Payment" and the covenant described under "—Certain Covenants—Limitation on Restricted Payments":

(1)      "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to (A) the Company's "Investment" in such Subsidiary at the time of such redesignation less (B) the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)      any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer.

"*Issue Date*" means August 5, 2004.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions are not required to be open in the State of New York.

"*Lien*" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"*Management Agreement*" means the Management Agreement dated the Acquisition Date by and between Refco Group Ltd., LLC and THL Managers V, LLC, as in effect on such date.

142

"*Merger*" means the merger on the Acquisition Date of Refco Finance Holdings LLC with and into Refco Group Ltd., LLC, with Refco Group Ltd., LLC continuing as the surviving entity, pursuant to the Equity Purchase and Merger Agreement.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Net Available Cash*" from an Asset Disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other non–cash form), in each case net of:

(1)    all direct costs relating to such Asset Disposition, including, without limitation, legal, accounting and investment banking fees, sales commissions and any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements;

(2)    all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets, or which must by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by applicable law, be repaid out of the proceeds from such Asset Disposition;

(3)    all distributions and other payments required to be made to minority interest holders in Restricted Subsidiaries and Regulated Subsidiaries as a result of such Asset Disposition;

(4)    the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the property or other assets disposed of in such Asset Disposition and retained by the Company or any Restricted Subsidiary or Regulated Subsidiary after such Asset Disposition, including liabilities with respect to severance costs, pension and other post–employment benefit liabilities, liabilities related to environmental matters or indemnification obligations associated with such Asset Disposition; and

(5)    any portion of the purchase price from an Asset Disposition placed in escrow, whether as a reserve for adjustment of the purchase price, for satisfaction of indemnities in respect of such Asset Disposition or otherwise in connection with that Asset Disposition; *provided, however*, that upon the termination of that escrow, Net Available Cash will be increased by any portion of funds in the escrow that are released to the Company or any Restricted Subsidiary or Regulated Subsidiary.

"*Net Cash Proceeds*," with respect to any issuance or sale of Capital Stock or Indebtedness, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

"*Net Indebtedness to EBITDA Ratio*" means, with respect to any Person, the ratio of: (a) the Indebtedness of the Company and its Restricted Subsidiaries and Regulated Subsidiaries, as of the end of the most recently ended fiscal quarter for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur, *plus* the amount of any Indebtedness Incurred subsequent to the end of the such fiscal quarter, *less* the amount of cash and Temporary Cash Investments (other than cash held as segregated funds with respect to customer accounts) that would be stated on the balance sheet of the Company and held by the Company as of such date of determination, as determined in accordance with GAAP, to (b) the Company's EBITDA for the most recently ended four full fiscal quarters for which internal financial

statements are available immediately preceding the date on which the event for which such calculation is being made shall occur (the "*Measurement Period*"); *provided, however*, that: (i) in making such computation, Indebtedness shall include the greater of (x) the average daily balance outstanding under any revolving credit facility during the most recently ended fiscal quarter and (y) the actual amount of Indebtedness outstanding under any revolving credit facility as of the date for which such calculation is being made; and (ii) if the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries consummates a material acquisition or an Asset Disposition or other disposition of assets subsequent to the commencement of the Measurement Period but prior to the event for which the calculation of the Net Indebtedness to EBITDA Ratio is made, then the Net Indebtedness to EBITDA Ratio shall be calculated giving *pro forma* effect to such material acquisition or Asset Disposition or other disposition of assets, as if the same had occurred at the beginning of the applicable period. Any *pro forma* calculations necessary pursuant to this "Net Indebtedness to EBITDA Ratio" shall be made in accordance with the provisions set forth in the second paragraph of the definition of "Consolidated Coverage Ratio."

"*Net Senior Indebtedness to EBITDA Ratio*" means, with respect to any Person, the ratio of: (a) the Senior Indebtedness of the Company and its Restricted Subsidiaries and Regulated Subsidiaries, as of the end of the most recently ended fiscal quarter for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur, *plus* the amount of any Senior Indebtedness Incurred subsequent to the end of such fiscal quarter, *less* the amount of cash and Temporary Cash Investments (other than cash held as segregated funds with respect to customer accounts) that would be stated on the balance sheet of the Company and held by the Company as of such date of determination, as determined in accordance with GAAP, to (b) the Company's EBITDA for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur (the "*Measurement Period*"); *provided, however*, that: (i) in making such computation, Senior Indebtedness shall include the greater of (x) the average daily balance outstanding under any revolving credit facility during the most recently ended fiscal quarter and (y) the actual amount of Senior Indebtedness outstanding under any revolving credit facility as of the date for which such calculation is being made; and (ii) if the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries consummates a material acquisition or an Asset Disposition or other disposition of assets subsequent to the commencement of the Measurement Period but prior to the event for which the calculation of the Net Senior Indebtedness to EBITDA Ratio is made, then the Net Senior Indebtedness to EBITDA Ratio shall be calculated giving *pro forma* effect to such material acquisition or Asset Disposition or other disposition of assets, as if the same had occurred at the beginning of the applicable period. Any *pro forma* calculations necessary pursuant to this "Net Senior Indebtedness to EBITDA Ratio" shall be made in accordance with the provisions set forth in the second paragraph of the definition of "Consolidated Coverage Ratio."

"*Obligations*" means, with respect to any Indebtedness, all obligations for principal, premium, interest, penalties, fees, indemnifications, reimbursements and other amounts payable pursuant to the documentation governing such Indebtedness.

"*Offering Circular*" means the offering circular dated July 22, 2004, relating to the Notes.

"*Officer*" means the Chairman of the Governing Board, the President, any Vice President, the Treasurer or the Secretary of the Company.

"*Officers' Certificate*" means a certificate signed by two Officers.

"*Opinion of Counsel*" means a written opinion from legal counsel who is reasonably acceptable to the Trustee. The counsel may be an employee of or counsel to the Company or the Trustee.

144

"*Parent*" means New Refco Group Ltd. LLC or any other direct or indirect parent company of the Company.

"*Permitted Asset Swap*" means the disposition by the Company or its Restricted Subsidiaries or Regulated Subsidiaries of assets to another Person or Persons in exchange for which the Company and the Restricted Subsidiaries and Regulated Subsidiaries receive assets having, in the reasonable judgment of the disinterested members of the Governing Board of the Company, a Fair Market Value substantially equivalent to or greater than the Fair Market Value of the assets so disposed; *provided, however*, that no such disposition or series of related dispositions shall constitute Permitted Asset Swaps to the extent that the aggregate Fair Market Value of the assets so disposed which combined with the Fair Market Value of the assets disposed of in one or more Permitted Asset Swaps exceeds $100.0 million; *provided further, however*, that if the book value of the assets to be disposed in a Permitted Asset Swap (or in a series of related Permitted Asset Swaps) exceeds $50.0 million, such disposition shall not constitute a Permitted Asset Swap unless an Independent Qualified Party shall have determined in writing that the Fair Market Value of the assets to be received by the Company, its Restricted Subsidiaries and its Regulated Subsidiaries is substantially equivalent to or greater than the Fair Market Value of the assets to be disposed.

"*Permitted Holders*" means:

(1)     the Equity Sponsor or any of its Affiliates;

(2)     Phillip R. Bennett or any of his Subsidiaries; and

(3)     any Person acting in the capacity of underwriter in connection with a Designated Offering.

"*Permitted Investment*" means an Investment by the Company or any Restricted Subsidiary or Regulated Subsidiary in:

(1)     the Company, a Restricted Subsidiary or a Regulated Subsidiary or a Person that will, upon the making of such Investment, become a Restricted Subsidiary or a Regulated Subsidiary, as the case may be; *provided, however*, that the primary business of such Restricted Subsidiary or Regulated Subsidiary is a Related Business;

(2)     another Person if, as a result of such Investment, such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Company, a Restricted Subsidiary or a Regulated Subsidiary; *provided, however*, that such Person's primary business is a Related Business;

(3)     cash and Temporary Cash Investments;

(4)     receivables owing to the Company or any Restricted Subsidiary or Regulated Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided, however*, that such trade terms may include such concessionary trade terms as the Company or any such Restricted Subsidiary or Regulated Subsidiary deems reasonable under the circumstances;

(5)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6)     loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary or Regulated Subsidiary;

(7)     stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or Regulated Subsidiary or in satisfaction of judgments;

145

*(8)*  any Person to the extent such Investment represents the non–cash portion of the consideration received for (A) an Asset Disposition as permitted pursuant to the covenant described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" or (B) a disposition of assets not constituting an Asset Disposition;

*(9)*  any Person where such Investment was acquired by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries (A) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary or Regulated Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (B) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

*(10)*  any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary or Regulated Subsidiary;

*(11)*  any Person to the extent such Investments consist of Hedging Obligations or Guarantees otherwise permitted under the covenant described under "—Certain Covenants—Limitation on Indebtedness;"

*(12)*  any Person to the extent such Investments exist on the Issue Date, and any extension, modification or renewal of any such Investments existing on the Issue Date, but only to the extent not involving additional advances, contributions or other Investments of cash or other assets or other increases thereof (other than as a result of the accrual or accretion of interest or original issue discount or the issuance of pay–in–kind securities, in each case, pursuant to the terms of such Investment as in effect on the Issue Date);

*(13)*  any Person if the payment for such Investment consists entirely of Capital Stock (other than Disqualified Stock) of the Company or Parent; and

*(14)*  Persons to the extent such Investments, when taken together with all other Investments made pursuant to this clause (14) and outstanding on the date such Investment is made, do not exceed the greater of (A) $125.0 million and (B) an amount in U.S. dollars equal to the product of (x) $125.0 million and (y) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date on which the applicable Investment is made pursuant to this clause (14).

"*Permitted Junior Securities*" means (1) Capital Stock of the Issuers, any Subsidiary Guarantor or Parent or (2) unsecured debt securities that are subordinated to all Senior Indebtedness (and any debt securities issued in exchange for Senior Indebtedness) to substantially the same extent as, or to a greater extent than, the Notes and the Subsidiary Guaranties are subordinated to Senior Indebtedness under the Indenture.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, association, joint–stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*," as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as

146

to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"*principal*" of a Note means the principal of the Note plus the premium, if any, payable on the Note which is due or overdue or is to become due at the relevant time.

"*Pro Forma Cost Savings*" means, with respect to any period, the reduction in net costs and related adjustments that (i) were directly attributable to an Asset Acquisition, Investment or Asset Disposition that occurred during the four–quarter period or after the end of the four–quarter period and on or prior to the date of determination and calculated on a basis that is consistent with Regulation S–X under the Securities Act as in effect and applied as of the date of the Indenture, (ii) were actually implemented by the business that was the subject of any such Asset Acquisition, Investment or Asset Disposition within six months after the date of the applicable Asset Acquisition, Investment or Asset Disposition and prior to the date of determination and are supportable and quantifiable by the underlying accounting records of such business or (iii) relate to the business that is the subject of any such Asset Acquisition, Investment or Asset Disposition and that the Company reasonably determines are probable based upon specifically identifiable actions to be taken within six months of the date of the applicable Asset Acquisition, Investment or Asset Disposition and, in the case of each of (i), (ii) and (iii), are described, as provided below, in an Officers' Certificate, as if all such reductions in costs had been effected as of the beginning of such period. Pro Forma Cost Savings described above shall be accompanied by a certificate delivered to the Trustee from the Company's chief financial officer that outlines the specific actions taken or to be taken, the net cost savings achieved or to be achieved from each such action and that, in the case of clause (iii) above, such savings have been determined to be probable.

"*Purchase Money Indebtedness*" means Indebtedness (including Capital Lease Obligations) (1) consisting of the deferred purchase price of property, conditional sale obligations, obligations under any title retention agreement, other purchase money obligations and obligations in respect of industrial revenue bonds or similar Indebtedness, in each case where the maturity of such Indebtedness does not exceed the anticipated useful life of the asset being financed or (2) Incurred to finance the acquisition (whether directly or through acquisition of Capital Stock) by the Company or a Restricted Subsidiary or Regulated Subsidiary of any asset, including additions and improvements, used or useful in a Related Business in the ordinary course of business;  *provided, however*, that such Indebtedness is Incurred within 270 days after such acquisition of such assets.

"*Refinance*" means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Indebtedness. "Refinanced" and "Refinancing" shall have correlative meanings.

"*Refinancing Indebtedness*" means Indebtedness that Refinances any Indebtedness of the Company or any Restricted Subsidiary or Regulated Subsidiary existing on the Issue Date or subsequently Incurred in compliance with the Indenture, including Indebtedness that Refinances Refinancing Indebtedness; *provided, however*, that:

    *(1)*

        such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced;

    *(2)*

        such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being Refinanced;

    *(3)*

        such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then

147

outstanding (plus fees and expenses, including any premium and defeasance costs) under the Indebtedness being Refinanced; and

(4)        if the Indebtedness being Refinanced is subordinated in right of payment to the Notes, such Refinancing Indebtedness is subordinated in right of payment to the Notes at least to the same extent as the Indebtedness being Refinanced;

*provided further, however,* that Refinancing Indebtedness shall not include (A) Indebtedness of a Restricted Subsidiary or Regulated Subsidiary that Refinances Indebtedness of the Company or (B) Indebtedness of the Company, a Restricted Subsidiary or a Regulated Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

"*Registration Rights Agreement*" means the Registration Rights Agreement dated August 5, 2004, among the Issuers and the initial purchasers and, if applicable, the Subsidiary Guarantors and any similar registration rights agreement in respect of Additional Notes.

"*Regulated Subsidiary*" means any Subsidiary of the Company so long as such Subsidiary is (a) a Broker–Dealer Regulated Subsidiary, (b) a Futures Commission Regulated Subsidiary, (c) a Foreign Subsidiary subject to regulation as a futures commission merchant or broker (or the equivalent thereof) under applicable laws, (d) otherwise subject to regulation by any Governmental Authority and for which the incurrence of Indebtedness (including Guarantees) or the granting of Liens with respect to its assets would be prohibited or restricted or would result in a negative impact on any minimum capital or similar requirement applicable to it or (e) subject to regulation by any Regulatory Supervising Organization.

"*Regulatory Net Capital*" means, for each Regulated Subsidiary, the Regulatory Total Capital adjusted by amounts and calculations that are specified in the laws of the applicable Regulatory Supervising Organizations.

"*Regulatory Supervising Organization*" means any of (a) the Commodity Futures Trading Commission, (b) the National Futures Association, (c) the SEC, (d) the National Association of Securities Dealers or (e) any governmental or regulatory organization, exchange, clearing house or financial regulatory authority of which a Regulated Subsidiary is a member or to whose rules it is subject.

"*Regulatory Total Capital*" means, for each Regulated Subsidiary, the amount of capital (including subordinated debt which is characterized as equity for regulatory reporting purposes) as calculated pursuant to the rules of, and reported from time to time to, the applicable Regulatory Supervising Organizations.

"*Related Business*" means any business in which the Company or any of the Restricted Subsidiaries or Regulated Subsidiaries was engaged on the Issue Date and any business related, ancillary or complementary to such business; *provided, however* that order execution for trading in, and clearing of, new risk management and investment products shall be deemed to be a Related Business.

"*Representative*" means, with respect to any Person, any trustee, agent or representative (if any) for an issue of Senior Indebtedness of such Person.

"*Restricted Payment*" with respect to any Person means:

(1)        the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such Person) or similar payment to the direct or indirect holders of its Capital Stock (other than (A) dividends or distributions payable solely in its Capital Stock (other than Disqualified Stock), (B) dividends or distributions payable solely to the Company, a Restricted Subsidiary or a Regulated Subsidiary, (C) *pro rata* dividends or other distributions made by a

148

Subsidiary that is not a Wholly Owned Subsidiary to minority stockholders (or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a corporation) and (D) dividends or distributions on Class B Equity Interests in accordance with their terms, other than to any Affiliates of the Company, except to the extent any such Affiliate is an employee.)

*(2)*

the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of the Company or Parent held by any Person (other than by a Restricted Subsidiary or Regulated Subsidiary), including in connection with any merger or consolidation;

*(3)*

the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Obligations of the Company or any Subsidiary Guarantor (other than (A) from the Company, a Restricted Subsidiary or a Regulated Subsidiary or (B) the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or retirement); or

*(4)*

the making of any Investment (other than a Permitted Investment) in any Person.

"*Restricted Subsidiary*" means any Subsidiary of the Company (including, without limitation, Refco Finance Inc.) that is neither an Unrestricted Subsidiary nor a Regulated Subsidiary.

"*Sale/Leaseback Transaction*" means an arrangement relating to property owned by the Company, a Restricted Subsidiary or a Regulated Subsidiary on the Issue Date or thereafter acquired by the Company, a Restricted Subsidiary or a Regulated Subsidiary whereby the Company, such Restricted Subsidiary or such Regulated Subsidiary transfers such property to a Person and the Company, such Restricted Subsidiary or such Regulated Subsidiary leases it from such Person.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Indebtedness*" of any Person means any Indebtedness of such Person secured by a Lien.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Securityholders Agreement*" means the Securityholders Agreement dated the Acquisition Date by and among Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners, the Executive Investors (as defined therein), the Employees (as defined therein) and the other parties from time to time party thereto.

"*Senior Indebtedness*" means with respect to any Person:

*(1)*

Indebtedness of such Person, whether outstanding on the Issue Date or thereafter Incurred; and

*(2)*

all other Obligations of such Person (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to such Person whether or not post–filing interest is allowed or allowable in such proceeding) in respect of Indebtedness described in clause (1) above

unless, in the case of clauses (1) and (2), in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such Indebtedness or other Obligations are subordinate or *pari passu* in right of payment to the Notes or the Subsidiary Guaranty of such Person, as the case may be; *provided, however*, that Senior Indebtedness shall not include:

*(1)*

any liability for federal, state, local or other taxes owed or owing by such Person;

149

*(2)*

      any accounts payable or other liability to trade creditors arising in the ordinary course of business;

*(3)*

      any Indebtedness or other Obligation of such Person which is subordinate or junior in right of payment to any other Indebtedness or other Obligation of such Person; or

*(4)*

      that portion of any Indebtedness which at the time of Incurrence is Incurred in violation of the Indenture.

Without limiting the generality of the foregoing, "Senior Indebtedness" shall also include the principal of, premium, if any, and interest on (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization whether or not post–filing interest is allowed or allowable in such proceeding):

    (1)  Bank Indebtedness; and

    (2)  all Hedging Obligations (and guarantees thereof) owed by the Company or any Subsidiary Guarantor to any institution that is a lender under the Credit Agreement (or an affiliate of such lender) at the time such Hedging Obligations are incurred,

in each case whether outstanding on the Issue Date or thereafter incurred.

    "*Senior Subordinated Indebtedness*" means, with respect to any Person, the Notes (in the case of the Issuers), the Subsidiary Guaranty (in the case of a Subsidiary Guarantor) and any other Indebtedness of such Person that specifically provides that such Indebtedness is to rank *pari passu* with the Notes or such Subsidiary Guaranty, as the case may be, in right of payment and is not subordinated by its terms in right of payment to any Indebtedness or other obligation of such Person which is not Senior Indebtedness of such Person.

    "*Significant Subsidiary*" means any Restricted Subsidiary or Regulated Subsidiary that would be a "significant subsidiary" of the Company within the meaning of Rule 1–02 under Regulation S–X promulgated by the SEC.

    "*Standard & Poor's*" means Standard & Poor's, a division of The McGraw–Hill Companies, Inc., and any successor to its rating agency business.

    "*Stated Maturity*" means, except as otherwise provided, with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the final payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase or repayment of such Indebtedness at the option of the holder thereof or the lender thereunder upon the happening of any contingency unless such contingency has occurred).

    "*Subordinated Obligation*" means, with respect to any Person, any Indebtedness of such Person (whether outstanding on the Issue Date or thereafter Incurred) which is subordinate or junior in right of payment to the Notes or a Subsidiary Guaranty of such Person, as the case may be, pursuant to a written agreement to that effect.

    "*Subsidiary*" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of Voting Stock is at the time owned or controlled, directly or indirectly, by:

*(1)*

      such Person;

*(2)*

      such Person and one or more Subsidiaries of such Person; or

*(3)*

      one or more Subsidiaries of such Person.

*provided, however*, that a limited partnership or similar passive collective investment entity that trades derivatives and in which the Company, any Restricted Subsidiary or any Regulated Subsidiary serves as general partner (or has a similar status) in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business shall not be deemed a Subsidiary.

"*Subsidiary Guarantor*" means each Subsidiary of the Company that executes the Indenture as a Subsidiary Guarantor on the Acquisition Date and each other Subsidiary of the Company that thereafter Guarantees the Notes pursuant to the terms of the Indenture.

"*Subsidiary Guaranty*" means a Guarantee by a Subsidiary Guarantor of the Issuers' obligations with respect to the Notes.

"*Swap Contracts*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward contracts, futures contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross–currency rate swap transactions, currency options, spot contracts, repurchase agreements, reverse repurchase agreements, sell buy back and buy sell back agreements, and securities lending and borrowing agreements or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

"*Tax Distribution*" means any distribution by the Company to its direct or indirect owners which (i) with respect to quarterly estimated tax payments due in each calendar year shall be equal to twenty–five percent (25%) of the Income Tax Liabilities for such calendar year as estimated in writing by the chief financial officer of the Company, (ii) with respect to tax payments to be made with income tax returns filed for an entire taxable year or with respect to adjustments to such returns imposed by the Internal Revenue Service or other taxing authority, shall be equal to the Income Tax Liabilities for each taxable year minus the aggregate amount distributed for such taxable year as provided in clause (i) above and (iii) with respect to taxes not determined by reference to income, represents the amount of any such taxes imposed on a direct or indirect owner of the Company as a result of such owner's ownership of the equity of the Company. In the event the amount determined under clause (ii) is a negative amount, the amount of any Tax Distributions in the succeeding taxable year (or, if necessary, any subsequent taxable years) shall be reduced by such negative amount.

"*Temporary Cash Investments*" means any of the following:

*(1)*  readily marketable obligations issued or directly and fully guaranteed or insured by the United States or, any state, commonwealth or territory of the United States or any agency or instrumentality thereof having maturities of not more than two years from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

*(2)*  time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia,

151

and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated at least P–1 (or the then equivalent grade) by Moody's or at least "A–1" (or the then equivalent grade) by Standard & Poor's and (iii) has combined capital and surplus of at least $200.0 million (any such bank being an "*Approved Domestic Bank*"), in each case with maturities of not more than 360 days from the date of acquisition thereof;

*(3)*      commercial paper and variable or fixed rate notes issued by an Approved Domestic Bank (or by the parent company thereof) or any variable rate note issued by, or Guaranteed by a domestic corporation rated A–1 (or the equivalent thereof) or better by Standard & Poor's or P–1 (or the equivalent thereof) or better by Moody's, in each case with maturities of not more than 360 days from the date of acquisition thereof;

*(4)*      repurchase agreements entered into by any Person with a bank or trust company or recognized securities dealer having capital and surplus in excess of $200.0 million for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

*(5)*      investments, classified in accordance with GAAP as current assets of the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $200.0 million, and the portfolios of which are limited such that 95% of such investments are of the character, quality and maturity described in clauses (1), (2), (3), (4) and (6) of this definition;

*(6)*      solely with respect to any Foreign Subsidiary, non–dollar denominated (i) certificates of deposit of, bankers' acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business *provided* such country is a member of the Organization for Economic Cooperation and Development, and whose short–term commercial paper rating from Standard & Poor's is at least A–1 or the equivalent thereof or from Moody's is at least P–1 or the equivalent thereof (any such bank being an "*Approved Foreign Bank*") and maturing within twelve months of the date of acquisition and (ii) equivalents of demand deposit accounts which are maintained with an Approved Foreign Bank; and at least 100% of the amount of the repurchase obligations; and

*(7)*      Investments of the type set forth in Commodity Futures Trading Commission Regulation 1.25 and SEC Regulation 15c3–3(e).

"*Transactions*" has the meaning set forth in this Prospectus under the heading "Prospectus Summary—Transactions."

"*Trustee*" means Wells Fargo Bank Minnesota, National Association until a successor replaces it and, thereafter, means the successor.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa–77bbbb) as in effect on the Issue Date.

"*Trust Officer*" means the Chairman of the Board, the President or any other officer or assistant officer of the Trustee assigned by the Trustee to administer its corporate trust matters.

"*Unrestricted Subsidiary*" means:

(1)      any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Governing Board of the Company in the manner provided below; and

(2)      any Subsidiary of an Unrestricted Subsidiary.

The Governing Board of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary, but excluding Refco Finance Inc.) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Capital Stock or Indebtedness of, or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided, however*, that either (A) the Subsidiary to be so designated has total assets of $1,000 or less or (B) if such Subsidiary has assets greater than $1,000, such designation would be permitted under the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

The Governing Board of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary or a Regulated Subsidiary, as applicable; *provided, however*, that immediately after giving effect to such designation (A) the Company could Incur $1.00 of additional Indebtedness under paragraph (a) of the covenant described under "—Certain Covenants—Limitation on Indebtedness" and (B) no Default shall have occurred and be continuing. Any such designation by the Governing Board of the Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Governing Board of the Company giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"*U.S. Dollar Equivalent*" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as published in *The Wall Street Journal* in the "Exchange Rates" column under the heading "Currency Trading" on the date two Business Days prior to such determination.

Except as described under "—Certain Covenants—Limitation on Indebtedness," whenever it is necessary to determine whether the Company has complied with any covenant in the Indenture or a Default has occurred and an amount is expressed in a currency other than U.S. dollars, such amount will be treated as the U.S. Dollar Equivalent determined as of the date such amount is initially determined in such currency.

"*U.S. Government Obligations*" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable at the issuer's option.

"*Voting Stock*" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

"*Wholly Owned Subsidiary*" means a Restricted Subsidiary or Regulated Subsidiary all the Capital Stock of which (other than directors' qualifying shares or Class B Equity Interests) is owned by the Company or one or more other Wholly Owned Subsidiaries.

<div align="center">153</div>

## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
## OF THE EXCHANGE OFFER

The following is a summary of the material United States federal income tax consequences relating to the exchange of an old note for a registered note in the exchange offer. It does not contain a complete analysis of all the potential tax considerations relating to the exchange. In addition, this summary is limited to a beneficial owner of an old note who holds the old note, and will hold the registered note, as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended, or the Code (the "Code").

This discussion does not deal with the consequences to special classes of holders of notes, such as dealers in securities or currencies, brokers, traders that mark–to–market their securities, insurance companies, tax–exempt entities, financial institutions or "financial services entities," persons with a functional currency other than the U.S. dollar, regulated investment companies, real estate investment trusts, retirement plans, expatriates or former long–term residents of the United States, persons who hold their notes as part of a straddle, hedge, "conversion transaction," "constructive sale," or other integrated investment, persons subject to the alternative minimum tax, partnerships or other pass–through entities or investors in partnerships or other pass–through entities that hold the notes.

This summary also does not address any tax consequences arising under the tax laws of any U.S. state, local, foreign or other taxing jurisdiction or any possible applicability of the U.S. federal estate or gift tax law.

The discussion below is based upon the provisions of the Code, and the Treasury Regulations promulgated thereunder, and rulings, judicial decisions and administrative interpretations, all as in effect on the date hereof, any of which may be repealed or subject to change, possibly with retroactive effect, so as to result in United States federal income tax consequences different from those discussed below.

For United States federal income tax purposes, the exchange of an old note for a registered note in the exchange offer will not constitute a taxable exchange, and you will not recognize a taxable gain or loss on such exchange to you. The adjusted tax basis of your registered notes will be the same as the adjusted tax basis of your old notes exchanged therefor immediately before the exchange and your holding period will carry over to the registered notes. The United States federal income tax consequences of owning and disposing of the registered notes will be the same as those applicable to the old notes.

**THE PRECEDING DISCUSSION OF UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE OFFER IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH INVESTOR SHOULD CONSULT ITS OWN TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO IT OF EXCHANGING AN OLD NOTE FOR A REGISTERED NOTE, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY PROPOSED CHANGES IN APPLICABLE LAWS.**

**PLAN OF DISTRIBUTION**

Each broker–dealer that receives registered notes for its own account pursuant to the exchange offer must acknowledge that it will deliver a prospectus in connection with any resale of such registered notes. This prospectus, as it may be amended or supplemented from time to time, may be used by a broker–dealer in connection with resales of registered notes received in exchange for old notes where such old notes were acquired as a result of market–making activities or other trading activities. We have agreed that, for a period of 180 days after the time of expiration, we will make this prospectus, as amended or supplemented, available to any broker–dealer for use in connection with any such resale. In addition, until            ,      , all dealers effecting transactions in the registered notes may be requird to deliver a prospectus.

We will not receive any proceeds from any sale of registered notes by broker–dealers. Registered notes received by broker–dealers for their own account pursuant to the exchange offer may be sold from time to time in one or more transactions in the over–the–counter market, in negotiated transactions, through the writing of options on the registered notes or a combination of such methods of resale, at market prices prevailing at the time of resale, at prices related to such prevailing market prices or at negotiated prices. Any such resale may be made directly to purchasers or to or through brokers or dealers who may receive compensation in the form of commissions or concessions from any such broker–dealer or the purchasers of any such registered notes. Any broker–dealer that resells registered notes that were received by it for its own account pursuant to the exchange offer and any broker or dealer that participates in a distribution of such registered notes may be deemed to be an "underwriter" within the meaning of the Securities Act, and any profit on any such resale of registered notes and any commissions or concessions received by any such persons may be deemed to be underwriting compensation under the Securities Act. The letter of transmittal states that, by acknowledging that it will deliver and by delivering a prospectus, a broker–dealer will not be deemed to admit that it is an "underwriter" within the meaning of the Securities Act.

For a period of 180 days after the time of expiration, we will promptly send additional copies of this prospectus and any amendment or supplement to this prospectus to any broker–dealer that requests such documents in the letter of transmittal. We have agreed to pay all expenses incident to the exchange offer (including the expenses of one counsel for the holders of the notes) other than commissions or concessions of any brokers or dealers and will indemnify the holders of the notes (including any broker–dealers) against certain liabilities, including liabilities under the Securities Act.

155

## LEGAL MATTERS

Weil, Gotshal & Manges LLP, New York, New York has passed upon the validity of the registered notes and the related guarantees on our behalf. Certain partners of Weil, Gotshal & Manges LLP have indirect ownership interests, totaling less than 0.01%, in us as a result of their investments in Thomas H. Lee Investors, L.P.

## EXPERTS

The Refco Group Ltd., LLC consolidated balance sheets as of February 29, 2004 and February 28, 2003 and the related consolidated statements of income, changes in members' equity and cash flows for the three years in the period ended February 29, 2004 and schedule included in this prospectus and elsewhere in this registration statement have been audited by Grant Thornton LLP, independent registered public accountants, as stated in their reports with respect thereto, and is included herein in reliance upon the authority of said firm as experts in accounting and auditing.

156

# GLOSSARY

| | |
|---|---|
| **Broker in Principal** | An individual or firm who acts as an intermediary or temporary dealer between a buyer and a seller and who either takes title to the asset on behalf of its client or has a client position offset by an equal but opposite position with a dealer. |
| **CBOE** | Chicago Board Options Exchange, which is a securities exchange created in the early 1970s for the public trading of standardized option contracts. Primary place for the trading of stock options, foreign currency options and index options. |
| **CBOT** | Chicago Board of Trade, which is the second largest derivatives exchange in the United States and a pioneer in the development of financial futures and options. |
| **CFMA** | Commodity Futures Modernization Act of 2000, which amended the Commodity Exchange Act, removing much regulation by the CFTC to which OTC derivatives had been subject previously. |
| **CFTC** | Commodity Futures Trading Commission, which is the federal regulatory agency that administers the Commodity Exchange Act. It is the federal oversight agency that monitors the futures and options on futures markets to detect and prevent price distortion and market manipulation and to protect the rights of customers who use the markets for either commercial or investment purposes. |
| **Clearing House** | An agency or corporation that acts as a central counterparty to the clearing members or FCMs on each side of a transaction. Clearing Houses are responsible for settling trading accounts, collecting and maintaining margin monies, regulating delivery and reporting trading data. |
| **CME** | Chicago Mercantile Exchange, which is the largest derivatives exchange in the United States and the second largest exchange in the world for the trading of futures and options on futures. CME has four major product areas based on interest rates, stock indexes, foreign exchange and commodities. |
| **Commodity Exchange Act** | The principal legislation governing the trading of commodities and futures in the United States. |
| **Commodity Pool Operator** | An individual or organization which operates or solicits funds for a pool in which funds contributed by a number of persons are combined for the purpose of trading futures or options contracts. Generally required to be registered with the CFTC. |
| **Commodity Trading Advisor** | A person who directly or indirectly advises others as to the advisability of buying or selling futures or commodity options. Most Commodity Trading Advisors may exercise trading authority over a customer's account. A Commodity Trading Advisor is generally required to be registered with the CFTC. |
| **Currenex** | A leading global provider of currency pricing systems. |

**Derivatives**          Financial contracts whose value is derived from a traditional security (such as a stock or bond), an asset (such as a commodity) or a market index. Derivatives may be traded with or without the use of an exchange.

**E–mini**          E–minis are smaller versions of popular index funds that cover the entire S&P 500 and Nasdaq–100 indexes. E–minis are 20% the size of larger index contracts and allow for great flexibility when assembling a portfolio. E–mini trading is popular because it requires less of an initial capital investment, and it enables traders to diversify a portfolio and hedge against more focused investments.

**Eurex**          World's largest derivatives exchange, based on volume. This fully electronic exchange has 432 participants in 17 countries, creating decentralized and standardized access to its markets.

**Euronext**          Europe's first cross–border group of stock exchanges and their derivatives markets, formed by the merger of the stock exchanges of Amsterdam, Brussels and Paris in 2000.

**Exchange**          A marketplace in which shares, options and/or futures on stocks, bonds, commodities and indexes are traded.

**FCM**          Futures Commission Merchant, which is a firm engaged in soliciting or accepting and handling orders for the purchase or sale of futures contracts and accepting money or securities to provide margin for any resulting trades or contracts. An FCM must be registered with the CFTC.

**FICC**          Fixed Income Clearing Corporation, which is one of the leading clearing houses for the fixed income markets.

**Forward**          A contract in which a seller agrees to deliver a specified asset to a buyer at a specified price sometime in the future. In contrast to futures contracts, forward contracts are not standardized, not traded on exchanges and generally contemplate a delivery at settlement.

**Futures**          A legally binding agreement to buy or sell a commodity or financial instrument in a designated future month at a price agreed upon today by the buyer and seller. Futures contracts are standardized according to the quality, quantity, delivery time and location for each commodity.

**FXCM**          An FCM specializing solely in spot foreign exchange. FXCM has operations around the world, services over 40,000 retail customers and over 400 institutional customers from more than 80 countries and executes over 800,000 trades executed each month.

**LCH**          London Clearing House, which is a leading independent clearing house in Europe, serving major international exchanges and platforms, equity markets, exchange–traded derivatives markets, energy markets, the interbank interest rate swaps market and the majority of the Euro–denominated and sterling bond and repo markets.

| | |
|---|---|
| **LME** | London Metal Exchange, which is a market for trading base metals. LME prices are used as reference prices in many world markets by metals producers and fabricators of metal products and are the basis for most major commodity indices. |
| **Margin Deposits** | An amount of money or securities deposited by both buyers and sellers of futures contracts and by sellers of option contracts to ensure performance of the terms of the contract (the making or taking delivery of the commodity or the cancellation of the position by a subsequent offsetting trade). Margin in futures is not a down payment, as in securities, but rather a performance bond. |
| **Mark–to–Market** | To debit or credit a trading account on a daily basis based on the prices established at the close of that day's trading session. |
| **NASD** | National Association of Securities Dealers, which is a nonprofit self–regulatory organization in which almost all registered broker–dealers must be members. |
| **NASDAQ** | The first and world's largest electronic stock market with a listing of nearly 4,100 companies. |
| **Net Capital** | The amount by which current assets exceed liabilities (adjusted for illiquid assets, certain operating capital charges, and potential adverse fluctuations in the value of securities inventory). |
| **NFA** | National Futures Association, which is the industry wide self–regulatory organization of the futures industry. Congress authorized its creation in 1974, and the CFTC designated it a "registered futures association" in 1982. |
| **NYMEX** | New York Mercantile Exchange, which is the world's largest physical commodity derivatives exchange. |
| **NYSE** | New York Stock Exchange, which is the largest equities marketplace in the world. Approximately 3,000 companies and nearly $16 trillion in global market capitalization are listed on the exchange |
| **Option** | A right, but not the obligation, to buy or sell an asset at a set price on or before a given date. |
| **OTC Market** | Over–The–Counter Market, which is a decentralized market where geographically dispersed dealers are linked by telephones and computer screens. The market is for securities not listed on exchanges. |
| **Prime Brokerage** | A suite of specialized brokerage and related services provided by financial institutions to their clients, primarily hedge funds. |
| **Repo** | Repurchase agreement, which is an agreement in which one party sells a security to another party and agrees to repurchase it on a specified date for a specified price. This represents a collateralized short–term loan, where the collateral may be a Treasury security, money market instrument, federal agency security or mortgage–backed security. A reverse repurchase agreement, otherwise known as a "reverse repo," which is the purchase of a security at a specified price with an agreement to sell the same or substantially the same security to the same counterparty at a fixed or determinable price at a future date. |

**Repurchase Transaction**  See the definition for "repo."

**SEC**  Securities and Exchange Commission — A federal agency that regulates the U.S. financial markets. The SEC oversees the securities industry and promotes full disclosure in order to protect the investing public.

**Segregated Funds**  The amount of money, securities and property due to commodity futures or options customers, which is held in segregated accounts in compliance with Section 4d of the Commodity Exchange Act and CFTC Regulations. Such money, securities or property may not be comingled with the money, securities and property of the FCM, but the FCM may earn interest on it.

**Swap**  Each party agrees to pay the other an amount of interest calculated on a principal amount over several specified periods of time. If the principal amount is the same for both parties, the rate bases of calculation will be different, and it is called an interest rate swap. If the principal amounts are expressed in different currencies, it is called a currency swap.

**TSE**  Tokyo Stock Exchange, which is the largest stock exchange in Japan with some of the most active trading in the world.

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–2 |
| Consolidated Balance Sheets as of February 29, 2004 and February 28, 2003 | F–3 |
| Consolidated Statements of Income for the years ended February 29, 2004, | |
| February 28, 2003 and February 28, 2002 | F–4 |
| Consolidated Statements of Changes in Members' Equity for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 | F–5 |
| Consolidated Statements of Cash Flows for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 | F–6 |
| Notes to Consolidated Financial Statements | F–7 |
| Consolidated Balance Sheets as of May 31, 2004 (unaudited) and February 29, 2004 | F–33 |
| Consolidated Statements of Income for the three months ended May 31, 2004 and 2003 (unaudited) | F–34 |
| Consolidated Statements of Changes in Members' Equity for the three months ended May 31, 2004 and 2003 (unaudited) | F–35 |
| Consolidated Statements of Cash Flows for the three months ended May 31, 2004 and 2003 (unaudited) | F–36 |
| Notes to Consolidated Financial Statements (unaudited) | F–37 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members of
**Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheets of Refco Group Ltd., LLC (the "Company") (a Delaware limited liability company) and subsidiaries (the "Group") as of February 29, 2004 and February 28, 2003, and the related consolidated statements of income, changes in members' equity and cash flows for each of the three years in the period ended February 29, 2004. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the three years in the period ended February 29, 2004 in conformity with accounting principles generally accepted in the United States of America.

Grant Thornton LLP
New York, New York
October 8, 2004

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | February 29, 2004 | | February 28, 2003 |
|---|---|---|---|
| | (in thousands) | | |
| Cash and cash equivalents | $ | 338,243 | $ 247,103 |
| Cash and securities segregated under federal and other regulations | | | |
|    Cash and cash equivalents | | 1,375,838 | 1,949,846 |
|    Securities purchased under agreements to resell | | 55,061 | 69,161 |
| Securities purchased under agreements to resell | | 24,782,874 | 12,163,297 |
| Deposits with clearing organizations and others | | 1,831,765 | 1,751,801 |
| Receivables from broker–dealers and clearing organizations | | 504,810 | 303,751 |
| Receivables from customers | | 1,827,190 | 1,795,445 |
| Securities owned, at market or fair value | | 2,032,535 | 490,420 |
| Memberships in exchanges, (market value: 2004: $41,337, 2003: $33,738) | | 15,869 | 18,689 |
| Other assets | | 567,987 | 425,916 |
|      Total assets | $ | 33,332,172 | $ 19,215,429 |
| **Liabilities** | | | |
|    Short–term borrowings, including current portion of long–term borrowings | $ | 88,890 | $ 245,810 |
|    Securities sold under agreements to repurchase | | 25,630,299 | 12,779,456 |
|    Payable to broker–dealers and clearing organizations | | 583,643 | 256,783 |
|    Payable to customers | | 5,095,717 | 4,435,186 |
|    Securities sold, not yet purchased, at market or fair value | | 807,485 | 212,205 |
|    Accounts payable, accrued expenses, and other liabilities | | 174,149 | 160,128 |
| Long–term borrowings | | 315,500 | 383,500 |
| Subordinated debt | | 16,000 | 16,000 |
|      Total liabilities | | 32,711,683 | 18,489,068 |
| Commitments and contingent liabilities | | | |
| Preferred securities issued by subsidiaries | | — | 160,000 |
| Membership interests issued by subsidiary | | 4,405 | — |
| Members' equity | | 616,084 | 566,361 |
|      Total liabilities and members' equity | $ | 33,332,172 | $ 19,215,429 |

The accompanying notes are an integral part of these financial statements.

F–3

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

| | Year ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | (in thousands) | | |
| **Revenues** | | | |
| Commissions and brokerage | $ 671,034 | $ 583,525 | $ 488,620 |
| Interest | 1,053,804 | 2,388,953 | 1,713,464 |
| Principal transactions, net | 175,011 | 83,449 | 99,195 |
| Asset management and advisory fees | 47,911 | 44,222 | 62,690 |
| Other | 2,775 | 4,641 | 3,663 |
| Total revenues | 1,950,535 | 3,104,790 | 2,367,632 |
| **Expenses** | | | |
| Commissions and order execution costs | 411,894 | 385,375 | 323,657 |
| Interest | 898,658 | 2,182,466 | 1,557,869 |
| Employee compensation and benefits | 238,476 | 211,830 | 198,453 |
| General, administrative and other | 200,902 | 167,464 | 171,492 |
| Total expenses | 1,749,930 | 2,947,135 | 2,251,471 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 200,605 | 157,655 | 116,161 |
| Provision for income taxes | 12,176 | 1,960 | 6,951 |
| Income before dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary | 188,429 | 155,695 | 109,210 |
| Dividends on preferred securities issued by subsidiaries | — | 15,576 | 15,576 |
| Members' interest in earnings of subsidiary | 1,273 | — | — |
| **NET INCOME** | $ 187,156 | $ 140,119 | $ 93,634 |

The accompanying notes are an integral part of these financial statements.

F–4

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

| | Members' equity | | |
| | Common capital | Other comprehensive income | Total |
| --- | --- | --- | --- |
| | | (in thousands) | |
| Balance, February 28, 2001 | $ 509,263 | $ (10,308) | $ 498,955 |
| Capital withdrawals | (75,000) | — | (75,000) |
| Net income | 93,634 | — | 93,634 |
| Currency translation adjustment | — | (2,473) | (2,473) |
| Balance, February 28, 2002 | 527,897 | (12,781) | 515,116 |
| Capital withdrawals | (100,000) | — | (100,000) |
| Net income | 140,119 | — | 140,119 |
| Currency translation adjustment | — | 11,126 | 11,126 |
| Balance, February 28, 2003 | 568,016 | (1,655) | 566,361 |
| Capital withdrawals | (120,000) | — | (120,000) |
| Loss on early extinguishment of preferred securities issued by subsidiaries | (39,774) | — | (39,774) |
| Net income | 187,156 | — | 187,156 |
| Currency translation adjustment | — | 22,341 | 22,341 |
| Balance, February 29, 2004 | $ 595,398 | $ 20,686 | $ 616,084 |

The accompanying notes are an integral part of these financial statements.

F–5

REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | (in thousands) | | |
| Cash flows from operating activities | | | |
| Net income | $ 187,156 | $ 140,119 | $ 93,634 |
| Noncash items included in net income | | | |
| Depreciation and amortization | 28,368 | 25,445 | 37,949 |
| Members' interest in earnings of subsidiary | 1,273 | — | — |
| (Increase) decrease in operating assets | | | |
| Cash and securities segregated under federal and other regulations | | | |
| Cash and cash equivalents | 574,008 | (1,109,672) | (377,218) |
| Securities purchased under agreements to resell | 14,100 | 86,351 | (82,700) |
| Securities purchased under agreements to resell | (12,619,577) | 4,802,305 | (4,267,460) |
| Deposits with clearing organizations and others | (79,964) | (698,744) | 240,825 |
| Receivables from broker–dealers and clearing organizations | (201,059) | 49,689 | 42,423 |
| Receivables from customers | (31,745) | 551,849 | (319,260) |
| Securities owned, at market or fair value | (1,542,115) | (195,891) | 359,873 |
| Memberships in exchanges | 2,820 | (10,377) | — |
| Other assets | (51,509) | (16,564) | (42,654) |
| Increase (decrease) in operating liabilities | | | |
| Short–term borrowings, including current portion of long–term borrowings | (156,920) | 50,573 | 21,734 |
| Securities sold under agreements to repurchase | 12,850,843 | (4,064,785) | 4,798,815 |
| Payable to broker–dealers and clearing organizations | 326,860 | (42,921) | (169,528) |
| Payable to customers | 660,531 | 595,405 | (50,190) |
| Securities sold, not yet purchased, at market or fair value | 595,280 | (71,327) | (251,709) |
| Accounts payable, accrued expenses and other liabilities | 36,362 | (57,173) | 32,278 |
| Notes payable | — | — | (8,400) |
| Net cash (used in) provided by operating activities | 594,712 | 34,282 | 58,412 |
| Cash flows from investing activities | | | |
| Acquisition of businesses, net of cash acquired | (118,930) | (3,473) | — |
| Net cash used in investing activities | (118,930) | (3,473) | — |
| Cash flows from financing activities | | | |
| Repayment of subordinated debt | — | — | (25,000) |
| Issuance of long–term borrowings | — | 222,500 | — |
| Repayment of long–term borrowings | (68,000) | (68,000) | (33,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — |
| Net contributions to membership interests issued by subsidiary | 3,132 | — | — |
| Capital withdrawals | (120,000) | (100,000) | (75,000) |
| Net cash (used in) provided by financing activities | (384,642) | 54,500 | (133,000) |
| Net (decrease) increase in cash and cash equivalents | 91,140 | 85,309 | (74,588) |
| Cash and cash equivalents, beginning of year | 247,103 | 161,794 | 236,382 |
| Cash and cash equivalents, end of year | $ 338,243 | $ 247,103 | $ 161,794 |
| Supplemental cash flow disclosures: | | | |
| Income taxes paid | $ 3,331 | $ 6,032 | $ 5,229 |
| Interest paid | $ 713,142 | $ 2,250,879 | $ 2,235,388 |

The accompanying notes are an integral part of these financial statements.

F–6

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE A—ORGANIZATION**

Refco Group Ltd., LLC (the "Company") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The Group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker–dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities and foreign exchange broker.

The Company is 90% owned by Refco Group Holdings, Inc., a Delaware corporation. The remaining 10% is owned by BAWAG Overseas, Inc., a third party financial institution.

**NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of preparation**

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which does issue non–voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in "Other Assets."

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Foreign currency translation**

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year–end spot rate and revenues and expenses are translated at average rates of exchange for the fiscal year. Gains and losses resulting from foreign currency transactions are included in the consolidated statements of income. Gains and losses resulting from translating foreign currency financial statements into U.S. dollars are included in cumulative currency translation adjustment, which represents other comprehensive income, a separate component of members' equity.

**Cash and cash equivalents**

Cash and cash equivalents are defined as cash and short–term liquid investments with original maturities of 90 days or less when acquired.

**Cash and securities segregated under federal and other regulations**

At February 29, 2004, and February 28, 2003, cash and securities of $1,430.9 million and $2,019.0 million, respectively, was segregated under various regulatory requirements.

**Securities purchased under agreements to resell and Securities sold under agreements to repurchase**

Securities purchased under agreements to resell and Securities sold under agreements to repurchase are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. These carrying amounts approximate their fair values. It is the Group's policy to take possession of securities purchased under agreements to resell, which consist largely of securities issued by the U.S. Government. The Group retains the right to re–pledge collateral received in secured financing transactions.

As permitted by FASB Interpretation No. 41, *Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements*, the Group nets certain securities purchased under agreements to resell and securities sold under agreements to repurchase for financial reporting purposes.

**Receivables from and payable to customers**

These balances primarily pertain to margin and open contractual commitments related to customers futures, foreign currencies and securities transactions. Receivables from and payable to customers in connection with futures and foreign currency transactions, include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions, include amounts due on cash and margin transactions. These receivables are generally collateralized with marketable securities. For certain receivables that are not fully secured and where the Group deems appropriate, the Group pursues collection of these receivables through various means, including legal action, and provides reserves when, in the opinion of management, such reserves are appropriate. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively. The Group generally nets receivables and payables related to its customers futures, foreign currency and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

**Financial instruments**

The consolidated balance sheets generally reflects purchases and sales of financial instruments owned or sold on a trade–date basis.

**Securities owned and Securities sold, not yet purchased**

Securities owned and Securities sold, not yet purchased consist primarily of U.S. and foreign equity and fixed–income securities which are stated at quoted market values, with unrealized gains and losses recognized in income under "Principal transactions". Securities not readily marketable are valued at fair value as determined by management. Fair value is the amount at which an instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

**Derivative financial instruments**

As a broker, the Group enters into transactions involving derivative financial instruments in relation to its customer business. These transactions are generally immediately economically hedged by back–to–back trades with other financial institutions. All derivative financial instruments are carried at market value or, if market prices are not readily available, fair value. Market values for exchange–traded derivatives are based on quoted market prices. Fair market values for over–the–counter derivative financial instruments, are based on pricing models which are based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts.

Derivatives used for economic hedging purposes include swaps, forwards, futures, and purchased options. Unrealized gains or losses on these derivative contracts are recognized currently in the statement of income as Principal transactions. The Group does not apply hedge accounting as defined in SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as all financial instruments are marked to market with changes in fair values reflected in earnings. Therefore, the disclosures required in paragraphs 44 and 45 of the Statement are generally not applicable with respect to these financial instruments.

**Memberships in exchanges**

Exchange memberships comprise both rights to trade on exchanges and deposits made in relation to these memberships. Exchange memberships owned are recorded at cost and tested annually for impairment.

**Furniture, equipment and leasehold improvements**

Furniture, equipment and leasehold improvements are recorded at cost less accumulated depreciation and amortization. Depreciation is computed using the straight–line method over the estimated useful lives of the assets, which range from three to seven years. Leasehold improvements are amortized over the lesser of the economic useful life of the improvement or the term of the lease.

**Impairment of assets**

The Company reviews its long–lived assets and intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets.

**Goodwill**

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets at acquisition date. Prior to March 1, 2002, goodwill was amortized over a period of 25 years on a straight–line basis. Effective March 1, 2002, the Group adopted SFAS No. 142, *Goodwill and Other Intangible Assets*; consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. An impairment loss is triggered if the estimated fair value of an operating segment is less than its estimated net book value. Such loss is calculated as the difference between the estimated fair value of goodwill and its carrying value.

**Identifiable intangible assets**

Identifiable intangible assets consist primarily of customer relationships, asset management contracts, property management contracts and trade names. Customers relationships are amortized on an accelerated basis based upon projected cash flows. Asset management contracts and property management contracts are amortized over their estimated useful lives of 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's or asset group's carrying value may not be fully recoverable in accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long–Lived Assets.* An impairment loss, calculated as the difference between the estimated fair value and the carrying value of an asset or asset group, is recognized if the expected undiscounted cash flows relating to the asset or asset group are less than the corresponding carrying value. Trade names have been classified as indefinite–lived assets and are not amortized but tested annually for impairment.

**Income taxes**

The Group has elected to be treated as a limited liability company for federal income tax purposes, as defined in the regulations. Under these regulations, members are responsible for their individual income tax liabilities related to the Group's operating results. Accordingly the Group has not provided for Federal income taxes related to its operating results. The provision for income taxes relates to income taxes of foreign subsidiaries and New York City Unincorporated Business tax.

**Revenue recognition**

Commissions and brokerage are recorded on a trade–date basis as securities transactions occur. Commissions and brokerage includes per contract charges for trade execution and clearing. Fees are charged at various rates based on the product traded and the method of trade. Commissions earned and related expenses on customers' open futures positions are recognized on a half–turn basis. The Group reports gross commission income on transactions executed by introducing brokers and reports commissions paid to introducing brokers as commission expense.

Interest is recognized on an accrual basis. Interest income or interest expense on repurchase agreements and collateralized financing arrangements are recognized as interest over the life of the transaction. Interest income and expense for matched repurchase agreement transactions are presented net in the consolidated statements of income.

The Group, as a broker of derivative products enters into contractual commitments, as principal, involving forward settlement. These contracts are generally immediately hedged with offsetting contracts which result in a profit spread for the Group. Both the contractual commitment and the offsetting contract are recorded at fair value. This profit spread is recognized immediately in the consolidated statements of income under "Principal transactions, net".

Asset management and advisory fees primarily include fees from investment management and other financial service related products. These fees are recognized over the period in which the related service is provided.

**Recently issued accounting pronouncements**

In January 2003, the FASB issued Interpretation 46, *Consolidation of Variable Interest Entities*. In December 2003, the FASB issued Interpretation 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities*. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. Interpretation 46 R requires a variable interest entity to be combined by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 to variable interest entities created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for "Special Purpose Entities" created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. As the Group does not have any interests in variable interest entities, the adoption of this statement did not have an effect on its consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities.* SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB No. 133 *Accounting for Derivative Instruments and Hedging Activities.* This Statement is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on the Group's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*. SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity, and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on the Group's consolidated financial statements.

In December 2003, SFAS No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits*, was issued. Statement 132 (revised) prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of recognition of those plans. The Statement retains and revises the disclosure requirements contained in the original SFAS 132. It also requires additional disclosures about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit pension plans and other postretirement benefit plans. The Statement generally is effective for fiscal years ending after December 15, 2003. Management does not believe the adoption of this statement will have a material impact on the Group's consolidated financial statements.

**NOTE C—SHORT–TERM BORROWINGS, LONG–TERM BORROWINGS AND OTHER BORROWINGS**

**Short–term borrowings**

The Group obtains short–term borrowings through bank loans. Short–term borrowings also include the portion of long–term borrowings maturing within one year and certain long–term borrowings that may be payable within one year at the option of the holder. The carrying value of these short–term obligations approximates fair value due to their short–term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short–term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers.

Short–term borrowings at year end are set forth below:

| | 2004 | 2003 |
|---|---|---|
| | (in thousands) | |
| Bank loans | $ 20,890 | $ 177,810 |
| Current portion of long–term borrowings | 68,000 | 68,000 |
| Total | $ 88,890 | $ 245,810 |

The weighted average interest rate on outstanding bank loans at February 29, 2004 and February 28, 2003 was 1.58% and 2.25%, respectively.

Interest rates paid on short–term borrowings, excluding the current portion of long–term borrowings for the years ended February 29, 2004 and February 28, 2003 ranged from 1.58% to 2.25% and 1.92% to 4.00%, respectively.

**Long–term borrowings**

Long–term borrowings of $383.5 million and $451.5 million for 2004 and 2003, respectively represents unsecured syndicated senior notes with major financial institutions. Long–term borrowings consist of the following loans:

| | 2004 | 2003 | Maturity Date | Interest Rate |
|---|---|---|---|---|
| | (in thousands) | | | |
| **Senior Notes** | | | | |
| Series A Senior Notes 2004 | $ 17,000 | $ 34,000 | 2004 | 7.18% |
| Senior Notes 2005 | 74,000 | 111,000 | 2005 | 9.18% |
| Series B Senior Notes 2006 | 14,000 | 14,000 | 2006 | 7.42% |
| Senior Notes 2007 | 56,000 | 70,000 | 2007 | 8.85% |
| Series A Senior Notes 2007 | 100,000 | 100,000 | 2007 | 5.99% |
| Series B Senior Notes 2009 | 122,500 | 122,500 | 2009 | 6.60% |
| | $ 383,500 | $ 451,500 | | |

F–12

The table below sets out the maturities of the Group's long–term borrowings.

|  | 2004 | 2003 |
|---|---|---|
|  | (in thousands) | |
| 2004 | $        — | $      68,000 |
| 2005 | 68,000 | 68,000 |
| 2006 | 51,000 | 51,000 |
| 2007 | 28,000 | 28,000 |
| 2008 | 114,000 | 114,000 |
| 2009 | — | — |
| 2010 and thereafter | 122,500 | 122,500 |
| Total Senior Note Liabilities | 383,500 | 451,500 |
| Less: | | |
| Portion included within short–term borrowings | 68,000 | 68,000 |
| Total Long–term Senior Note Liabilities | $    315,500 | $    383,500 |

The long–term borrowings are subject to acceleration in the event of a change in control.

**Other borrowings**

Subordinated debt of $16.0 million, included in the consolidated balance sheets, consists of a subordinated loan from a member. The subordinated debt bears interest at the prime rate and matures June 1, 2005. For the years ended February 29, 2004 and February 28, 2003, the weighted–average interest rate on the subordinated debt was 4.08% and 4.60% respectively. Subordinated debt is subordinated to the claims of present and future general creditors.

Refco Preferred Capital Trust I, II and III, subsidiaries of the Company, had issued $160.0 million of Trust Originated Preferred Securities ("TOPRs") to third parties. At the beginning of the year, the Group paid $199.8 million to redeem the TOPRs, resulting in a charge to members' equity of $39.8 million.

**Contractual debt commitments**

The Company's contractual debt commitments are governed by certain agreements which require that the Group maintain specified levels of liquidity, net worth, funded debt to cash flow and cash flow to interest coverage.

**Credit Facilities**

The Group maintains a committed unsecured revolving credit facility of $364.5 million under an agreement with a syndicate of banks. As of February 29, 2004, no portion of the credit facility was utilized.

**NOTE D—SECURITIES OWNED AND SECURITIES SOLD, NOT YET PURCHASED**

Securities owned and Securities sold, not yet purchased, consist of trading and investment securities and derivative financial instruments at market or fair value.

| | 2004 | | 2003 | |
|---|---|---|---|---|
| Securities owned consists of: | | | | |
| U.S. Treasuries | $ | 1,316,754 | $ | 213,343 |
| Foreign governments | | 290,317 | | 102,149 |
| Options | | 251,623 | | 24,026 |
| Fund investments | | 87,233 | | 84,320 |
| Equities | | 8,697 | | 29,281 |
| Other | | 77,911 | | 37,301 |
| | $ | 2,032,535 | $ | 490,420 |
| | | | | |
| Securities sold, not yet purchased consist of: | | | | |
| U.S. Treasuries | $ | 555,039 | $ | 187,631 |
| Options | | 251,172 | | 24,554 |
| Other | | 1,274 | | 20 |
| | $ | 807,485 | $ | 212,205 |

As of February 29, 2004 and February 28, 2003 the Group had not pledged any securities owned as collateral with counterparties.

**NOTE E—OTHER ASSETS**

Other assets are generally less liquid, non-financial assets. The following table sets forth the Group's other assets by type:

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | (in thousands) | | | |
| Goodwill(1) | $ | 291,219 | $ | 252,529 |
| Identifiable intangible assets(2) | | 89,536 | | 6,800 |
| Equity-method investments(3) | | 65,504 | | 27,513 |
| Investments | | 36,578 | | 40,255 |
| Furniture, equipment and leasehold improvements(4) | | 47,829 | | 57,728 |
| Miscellaneous receivables and other | | 37,321 | | 41,091 |
| Total | $ | 567,987 | $ | 425,916 |

*(1)*

      Goodwill

Prior to March 1, 2002 goodwill was amortized over 25 years on a straight-line basis. Upon the adoption of SFAS No. 142, amortization of goodwill ceased. The Company did not identify any

impairment upon the adoption of this Standard. Had the provisions of SFAS 142 been applied as of the first day of the year ended February 28, 2002 net income would have been adjusted as follows:

|  | Fiscal Year | | |
|  | 2004 | 2003 | 2002 |
|  | (in thousands) | | |
|---|---|---|---|
| Net income, as reported | $ 187,156 | $ 140,119 | $ 93,634 |
| Goodwill amortization | — | — | 10,235 |
| Net income, excluding goodwill amortization | $ 187,156 | $ 140,119 | $ 103,869 |

*(2)*    Identifiable intangible assets

The Company's identifiable intangible assets are comprised of the following:

|  | February 29, 2004 | | | February 28, 2003 | | |
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|  | (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| Customer relationships | $ 40,896 | $ 17,666 | $ 23,230 | $ 21,260 | $ 14,460 | $ 6,800 |
| Trade names | 2,278 | — | 2,278 | — | — | — |
| Asset management contracts | 55,414 | 355 | 55,059 | — | — | — |
| Property management contracts | 9,027 | 58 | 8,969 | — | — | — |
|  | $ 107,615 | $ 18,079 | $ 89,536 | $ 21,260 | $ 14,460 | $ 6,800 |

The amortization of identifiable intangible assets included in general, administrative and other expenses for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 was $3.62 million, $4.62 million and $7.70 million, respectively.

The estimated amortization expense, based on current identifiable intangible balances, for the next five fiscal years beginning March 1, 2004 is as follows:

|  | (in thousands) |
|---|---|
| Fiscal year |  |
| 2005 | $ 7,260 |
| 2006 | 6,570 |
| 2007 | 6,153 |
| 2008 | 5,897 |
| 2009 | 5,741 |

*(3)*    Equity method investments

Equity method investments as of February 29, 2004 comprise:

|  | Principal Activity | Percentage Owned | Country of operation | Carrying Value |
|  |  |  |  | (in thousands) |
|---|---|---|---|---|
| Forex Capital Markets, LLC | Spot FX broker | 35% | United States | $ 47,522 |
| Friedberg Mercantile Group | Investment dealer, futures commission merchant and fund manager | 50% | Canada | 9,066 |
| Refco Polaris Taiwan | Futures broker | 21.7% | Taiwan | 8,916 |
|  |  |  |  | $ 65,504 |

F–15

Under the equity method of accounting, the Company's initial investment is recorded at cost and is subsequently increased to reflect the Company's share of the investees' income and reduced to reflect the Company's share of the investees' losses or dividends received.

The excess of the Company's acquisition cost over the Company's share of the investee's identifiable net assets was identified as customer relationships, trade names and goodwill. The customer relationships are amortized over their estimated useful lives on an accelerated basis based upon projected cash flows. The related amortization expense was approximately $1.1 million, $0 million and $0 for the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively, resulting in a decrease in the carrying value of the equity method investments.

*(4)*      Furniture, equipment and leasehold improvements

| | Cost | | Accumulated amortization/depreciation | | 2004 Net book value | | 2003 Net book value | |
|---|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | | |
| Furniture and equipment | $ | 118,311 | $ | 82,545 | $ | 35,766 | $ | 46,586 |
| Leasehold improvements | | 32,323 | | 20,260 | | 12,063 | | 11,142 |
| | $ | 150,634 | $ | 102,805 | $ | 47,829 | $ | 57,728 |

Depreciation and amortization expense, included in general, administrative and other expenses, was $20.0 million, $17.8 million and $17.7 million in the years ended February 29, 2004, February 28, 2003 and February 28, 2002, respectively.

**NOTE F—ACQUISITIONS**

During the year ended February 29, 2004, the Group acquired a number of businesses for an aggregate purchase price of $118.9 million. Amounts assigned to major intangible asset classes are as follows:

| | (in thousands) | |
|---|---|---|
| Goodwill | $ | 32,575 |
| Customer relationships | | 19,636 |
| Asset management contracts | | 55,414 |
| Property management contracts | | 9,027 |
| Trade names | | 2,278 |

**NOTE G—NET CAPITAL REQUIREMENT**

The Group's subsidiary, Refco Securities, LLC, is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3–1 (the "Rule") which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3–3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of February 29, 2004, Refco Securities, LLC had net capital of $64.9 million, which was 42.9% of aggregate debit balances and $61.9 million in excess of required net capital.

The Group's subsidiary, Refco, LLC, is also subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain

F–16

net capital, as defined. The requirement is equal to the greater of 4 percent of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non–customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of February 29, 2004, Refco, LLC had net capital of $223.6 million, which was $95.6 million in excess of required net capital.

## NOTE H—COMMITMENTS AND CONTINGENCIES

### Commitments

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises excluding any escalation adjustments are as follows (in thousands):

| Fiscal year | | |
|---|---|---|
| 2005 | $ | 15,243 |
| 2006 | | 13,669 |
| 2007 | | 11,558 |
| 2008 | | 9,404 |
| 2009 | | 6,383 |
| Thereafter | | 25,038 |
| | $ | 81,295 |

The Group's rent expense for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 was $17.9 million, $15.2 million and $8.6 million, respectively.

### Contingencies

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers, alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003 the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. The remaining claim was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. A separate trial to determine damages is scheduled for the fall of 2004. The Group will seek to set aside the verdict. If the verdict is not set aside, the Group intends to appeal such decision and believes they have meritorious grounds for appeal. The Group also believes that, if that appeal is unsuccessful, the plaintiffs' alleged damages are substantially less than the $45 million they are claiming.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce

F–17

documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents which had been provided to the SEC.

In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

## NOTE I—DERIVATIVE ACTIVITIES, OFF BALANCE SHEET AND CONCENTRATION OF CREDIT RISK

In the normal course of its customer–driven operations, the Group enters into various contractual commitments, as principal, involving forward settlement. These include exchange–traded futures, fixed income swaps, equity swaps, foreign currency forwards and option contracts. These contracts are generally hedged with offsetting contracts at prices which result in a profit spread for the Group. The Group also enters into forward repurchase agreements. Customers and counterparties of the Group consist of entities in and outside the United States.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off balance sheet. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits.

The Group also enters into financing agreements, collateralized primarily by U.S. Government securities, in which it extends short–term credit to counterparties. The value and adequacy of the collateral are continually monitored.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouse its customers' performance under these contracts. The Group provides clearing services of futures and options to introducing brokers, some of which are guaranteed under commodity regulations with respect to their sales activity as a futures broker. The Group may require introducing brokers to deposit funds or pledge their exchange memberships, thereby reducing risks associated with the clearing of futures and options. Additionally, to reduce its risk, the Group requires customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer, which reduces the risk to the Group of

failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements.

Management believes that the margin deposits held at February 29, 2004 were adequate to minimize the risk of material loss, which could be created by the positions held at that time.

**NOTE J—FAIR VALUE OF FINANCIAL INSTRUMENTS**

SFAS No. 107 "*Disclosures about Fair Value of Financial Instruments*" requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Cash, Cash and securities segregated under federal and other regulations, Deposits with clearing organizations and others, Short–term borrowings and Payables to broker–dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long–term borrowings recorded at historical amounts which could differ from fair value as a result of changes in market rates.

The following table provides a summary of the fair value of the Group's long–term borrowings. The fair value of the Group's long–term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

|  | 2004 | 2003 |
|---|---|---|
|  | *(in thousands)* | |
| Carrying value of long–term borrowings | $  383,500 | $  451,500 |
| Fair value of long–term borrowings | 399,990 | 481,202 |

The Group carries its secured financing activities, including Securities purchased under agreements to resell, Securities borrowed, Securities sold under agreements to repurchase, Securities loaned and Other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short–term in nature, carrying value approximates fair value.

**NOTE K—SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL AND SECURITIES SOLD UNDER AGREEMENTS TO REPURCHASE**

Securities purchased under agreements to resell ("resale agreements") and Securities sold under agreements to repurchase ("repurchase agreements") are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. The carrying amounts approximate their fair values. Where appropriate, resale and repurchase agreements with the same counterparty are reported on a net basis in accordance with FASB Interpretation No. 41 ("FIN 41"), "*Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements.*" The Group is required to present the following table when repurchase agreements are 10% or greater of total assets.

**February 29, 2004**

| | Demand | Overnight | Less than 30 days | 30–90 days | Greater than 90 days | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **Security Type** | | | | | | |
| US Governments | $        420,805 | $   10,980,829 | $     4,012,729 | $     2,804,362 | $     1,098,520 | $   19,317,245 |
| US Corporations | 101,109 | — | — | — | — | 101,109 |
| Foreign Governments | 68,542 | 178,169 | 680,594 | 470,710 | 339,848 | 1,737,863 |
| Foreign Corporations | 172,879 | — | — | — | — | 172,879 |
| Emerging Market Government | 1,031,446 | 14,268 | 27,329 | — | — | 1,073,043 |
| Other | 1,795,994 | 1,088,527 | 6,461 | 285,928 | 51,250 | 3,228,160 |
| | $     3,590,775 | $   12,261,793 | $     4,727,113 | $     3,561,000 | $     1,489,618 | $   25,630,299 |

**February 28, 2003**

| | Demand | Overnight | Less than 30 days | 30–90 days | Greater than 90 days | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **Security Type** | | | | | | |
| US Governments | $     2,060,573 | $     3,042,755 | $        615,409 | $        912,946 | $     2,474,561 | $     9,106,244 |
| US Corporations | 17,534 | — | — | — | — | 17,534 |
| Foreign Governments | 101,774 | 1,012,168 | 809,633 | 222,370 | 447,945 | 2,593,890 |
| Foreign Corporations | 39,767 | 5,707 | — | — | — | 45,474 |
| Emerging Market Government | 772,677 | 8,691 | 26,519 | — | — | 807,887 |
| Other | 53,182 | 154,742 | 503 | — | — | 208,427 |
| | $     3,045,507 | $     4,224,063 | $     1,452,064 | $     1,135,316 | $     2,922,506 | $   12,779,456 |

The Group's policy is to take possession of securities purchased under resale agreements, which consist largely of securities issued by the U.S. Government. The Group retains the right to re–pledge collateral received in secured financing transactions. As of February 29, 2004, substantially all of the collateral received had been re–pledged in connection with these financing activities. The market value of the collateral the Group received as of February 29, 2004 and February 28, 2003, was $124,416 million and $71,112 million, respectively. The Group continually monitors the market value of the underlying collateral received as compared with the related receivable, including accrued interest, and requests additional collateral where deemed appropriate.

**NOTE L—RELATED PARTY TRANSACTIONS**

The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates. The $105 million due from Refco Group Holdings, Inc., included in receivables from customers at February 28, 2003, was received by February 29, 2004.

As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210 million and $175 million, respectively. These balances were included in "Receivables from customers" and liquidated shortly after each year–end.

**NOTE M—SEGMENT REPORTING**

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has determined its operating segments to be (1) Derivatives Brokerage and Clearing, (2) Prime Brokerage/Capital Markets, and (3) Asset Management. The Derivatives Brokerage and Clearing business operations consist of execution and clearing services for global exchange–traded derivatives in electronic and open outcry markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Asset Management provides a broad array of asset management services to institutional and individual investors through Refco Alternative Investments (RAI), Forstmann–Leff Associates and Tilney Investment Management.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non–operating segment. Corporate administration costs are not allocated to the respective segments and are included in Corporate & Other.

F–21

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Asset Management | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **As of and for the year ended February 29, 2004** | | | | | | |
| Interest revenue | $ 143,400 | $ 1,084,204 | $ 606 | $ 20,154 | $ (194,560) | $ 1,053,804 |
| Total revenues | 835,807 | 1,276,709 | 71,662 | 20,180 | (253,823) | 1,950,535 |
| Interest expense | 61,868 | 979,704 | 1,128 | 53,367 | (197,409) | 898,658 |
| Depreciation and amortization | 10,222 | 1,311 | 2,269 | 14,566 | — | 28,368 |
| Income before provision for income taxes and members' interest in earnings of subsidiary | 125,737 | 133,706 | (2,123) | (56,715) | — | 200,605 |
| Total assets | 6,998,420 | 31,763,273 | 276,979 | 863,307 | (6,569,807) | 33,332,172 |
| **As of and for the year ended February 28, 2003** | | | | | | |
| Interest revenue | $ 142,666 | $ 2,507,557 | $ 882 | $ 53,688 | $ (315,840) | $ 2,388,953 |
| Total revenues | 745,967 | 2,609,745 | 57,855 | 58,682 | (367,459) | 3,104,790 |
| Interest expense | 72,064 | 2,365,181 | 121 | 62,741 | (317,641) | 2,182,466 |
| Depreciation and amortization | 7,950 | 647 | 2,006 | 14,842 | — | 25,445 |
| Income before provision for income taxes and dividends on preferred securities issued by subsidiaries | 77,741 | 101,457 | 1,071 | (22,614) | — | 157,655 |
| Total assets | 5,871,193 | 20,505,353 | 183,222 | 1,195,988 | (8,540,327) | 19,215,429 |
| **As of and for the year ended February 28, 2002** | | | | | | |
| Interest revenue | $ 185,610 | $ 2,096,561 | $ 1,672 | $ 46,414 | $ (616,793) | $ 1,713,464 |
| Total revenues | 691,476 | 2,217,095 | 69,836 | 51,434 | (662,209) | 2,367,632 |
| Interest expense | 127,542 | 1,977,022 | 1,260 | 69,588 | (617,543) | 1,557,869 |
| Depreciation and amortization | 10,283 | 755 | 2,112 | 24,799 | — | 37,949 |
| Income before provision for income taxes and dividends on preferred securities issued by subsidiaries | 59,421 | 95,704 | 13,552 | (52,516) | — | 116,161 |
| Total assets | 4,448,444 | 22,834,637 | 224,117 | 1,217,479 | (6,113,639) | 22,611,038 |

F–22

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long–lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  | (in thousands) | | |
| **Total revenues:** | | | |
| United States | $ 1,299,579 | $ 2,474,980 | $ 1,532,798 |
| Bermuda | 325,791 | 411,114 | 639,677 |
| United Kingdom | 225,805 | 135,685 | 157,301 |
| Other | 99,360 | 83,011 | 37,856 |
| Total | $ 1,950,535 | $ 3,104,790 | $ 2,367,632 |
| **Long–lived assets:** | | | |
| United States | $ 37,337 | $ 47,278 | |
| Bermuda | 1,900 | 2,816 | |
| United Kingdom | 3,806 | 3,975 | |
| Other | 4,786 | 3,659 | |
| Total | $ 47,829 | $ 57,728 | |

No single customer accounted for greater than 10% of total revenues in the years ended February 29, 2004, February 28, 2003 and February 28, 2002.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvements.

## NOTE N—SUBSEQUENT EVENT

On April 19, 2004, the majority owner executed a letter of intent in which a majority stake of the Group would be acquired.

The resulting change in control would give effect to default provisions contained within the revolving credit facility and unsecured syndicated senior notes.

On June 8, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., entered into an equity purchase and merger agreement with the Group and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC ("New Refco") becoming the Group's parent and THL Refco Acquisition Partners and its affiliates and co–investors owning an approximate 57% interest in New Refco. Upon consummation of the transactions contemplated by the Purchase Agreement on August 5, 2004, the Group became the obligor for senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing. Upon the closing of the transaction, the Group became the issuer along with Refco Finance Inc. of $600.0 million in aggregate principal amount of senior subordinated notes. Concurrently with the consummation of the transactions, the Group distributed $550.0 million in cash and other capital distributions and all of the equity interests of Forstmann–Leff International Associates, LLC, to Refco Group Holdings, Inc.

As a result of the above transactions, goodwill of $579.6 million and identifiable intangible assets of $566.3 million is expected to be recorded, subject to the completion of a third party valuation study.

F–23

**NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION**

The following information sets forth the Group condensed consolidating financial statements as of February 29, 2004 and February 28, 2003 and for each of the three years in the period ended February 29, 2004.

**Condensed consolidating balance sheet**

| | February 29, 2004 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | (in thousands) | | | | |
| Cash and cash equivalents | $ — | $ 4,477 | $ 333,766 | $ — | $ 338,243 |
| Cash and securities segregated under federal and other regulations | | | | | |
| Cash and cash equivalents | — | — | 1,375,838 | — | 1,375,838 |
| Securities purchased under agreements to resell | — | — | 55,061 | — | 55,061 |
| Securities purchased under agreements to resell | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker–dealers, clearing organizations and customers | 314,279 | 1,266,036 | 3,568,703 | (2,817,018) | 2,332,000 |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries | 1,131,766 | 1,160,431 | — | (2,292,197) | — |
| Other assets | 58,612 | 430,084 | 347,948 | (252,788) | 583,856 |
| **Total assets** | **$ 1,504,657** | **$ 2,863,773** | **$ 37,721,733** | **$ (8,757,991)** | **$ 33,332,172** |
| **Liabilities** | | | | | |
| Short–term borrowings, including current portion of long–term borrowings | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
| Securities sold under agreements to repurchase | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
| Payable to brokers–dealers and clearing organizations | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers | 465,681 | 1,547,382 | 6,656,600 | (3,573,946) | 5,095,717 |
| Securities sold, not yet purchased, at market value or fair value | — | 2,091 | 805,394 | — | 807,485 |
| Accounts payable, accrued expenses and other liabilities | 23,392 | 68,182 | 146,163 | (63,588) | 174,149 |
| Long–term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 109,056 | (109,056) | 16,000 |
| **Total liabilities** | **888,573** | **1,617,656** | **36,424,046** | **(6,218,592)** | **32,711,683** |
| Membership interests issued by subsidiary | — | — | 4,405 | — | 4,405 |
| Members' equity | 616,084 | 1,246,117 | 1,293,282 | (2,539,399) | 616,084 |
| **Total liabilities and members' equity** | **$ 1,504,657** | **$ 2,863,773** | **$ 37,721,733** | **$ (8,757,991)** | **$ 33,332,172** |

F–24

**Condensed consolidating balance sheet**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | **February 28, 2003** | | |
| | | | **(in thousands)** | | |
| Cash and cash equivalents | $ — | $ 4,014 | $ 243,089 | $ — | $ 247,103 |
| Cash and securities segregated under federal and other regulations | | | | | |
|     Cash and cash equivalents | — | — | 1,949,846 | — | 1,949,846 |
|     Securities purchased under agreements to resell | — | — | 69,161 | | 69,161 |
| Securities purchased under agreements to resell | — | — | 15,900,055 | (3,736,758) | 12,163,297 |
| Deposits with clearing organizations and others | — | — | 3,564,498 | (1,812,697) | 1,751,801 |
| Receivables from broker–dealers, clearing organizations and customers | 450,060 | 1,595,825 | 2,574,296 | (2,520,985) | 2,099,196 |
| Securities owned, at market value or fair value | — | 291 | 844,791 | (354,662) | 490,420 |
| Investment in and advances to subsidiaries | 873,033 | 893,128 | — | (1,766,161) | — |
| Other assets | 87,380 | 396,800 | 210,537 | (250,112) | 444,605 |
|     Total assets | $ 1,410,473 | $ 2,890,058 | $ 25,356,273 | $ (10,441,375) | $ 19,215,429 |
| **Liabilities** | | | | | |
|     Short–term borrowings, including current portion of long–term borrowings | $ 228,000 | $ 3,373 | $ 14,437 | $ — | $ 245,810 |
|     Securities sold under agreements to repurchase | — | — | 17,868,915 | (5,089,459) | 12,779,456 |
|     Payable to brokers–dealers and clearing organizations | — | 1,862 | 285,609 | (30,688) | 256,783 |
| Payable to customers | 30,709 | 1,675,879 | 5,714,199 | (2,985,601) | 4,435,186 |
|     Securities sold, not yet purchased, at market value or fair value | — | 276 | 211,929 | — | 212,205 |
|     Accounts payable, accrued expenses and other liabilities | 22,902 | 61,027 | 137,665 | (61,466) | 160,128 |
| Long–term borrowings | 383,500 | — | — | — | 383,500 |
| Subordinated debt | 179,000 | — | 96,523 | (259,523) | 16,000 |
|     Total liabilities | 844,111 | 1,742,417 | 24,329,277 | (8,426,737) | 18,489,068 |
| Preferred securities issued by subsidiary | — | — | — | 160,000 | 160,000 |
| Members' equity | 566,362 | 1,147,641 | 1,026,996 | (2,174,638) | 566,361 |
|     Total liabilities and members' equity | $ 1,410,473 | $ 2,890,058 | $ 25,356,273 | $ (10,441,375) | $ 19,215,429 |

**Condensed consolidating statement of income**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | For the year ended February 29, 2004 | | |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 5,666 | $ 718,005 | $ (52,637) | $ 671,034 |
| Interest | 15,037 | 69,609 | 1,163,718 | (194,560) | 1,053,804 |
| Principal transactions, net | — | 36,041 | 138,970 | — | 175,011 |
| Asset management and advisory fees | — | — | 48,183 | (272) | 47,911 |
| Other | — | 4,066 | 5,063 | (6,354) | 2,775 |
| Total revenues | 15,037 | 115,382 | 2,073,939 | (253,823) | 1,950,535 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 13,039 | 439,833 | (40,978) | 411,894 |
| Interest | 40,404 | 78,831 | 976,832 | (197,409) | 898,658 |
| Employee compensation and benefits | 4,636 | 13,869 | 219,971 | — | 238,476 |
| General, administrative and other | 18,856 | 14,175 | 183,306 | (15,435) | 200,902 |
| Total expenses | 63,896 | 119,914 | 1,819,942 | (253,823) | 1,749,930 |
| Equity in net income of subsidiaries | 237,289 | 241,200 | — | (478,489) | — |
| Income before provision for income taxes, and members' interest in earnings of subsidiary | 188,430 | 236,668 | 253,997 | (478,489) | 200,605 |
| Provision for income taxes | — | — | 12,176 | — | 12,176 |
| Income before members' interest in earnings of subsidiary | 188,430 | 236,668 | 241,821 | (478,489) | 188,429 |
| Members' interest in earnings of subsidiary | — | — | 1,273 | — | 1,273 |
| Net income | $ 188,430 | $ 236,668 | $ 240,548 | $ (478,489) | $ 187,156 |

F–26

**Condensed consolidating statement of income**

|  | For the year ended February 28, 2003 | | | | |
|---|---|---|---|---|---|
|  | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|  | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 6,278 | $ 611,004 | $ (33,757) | $ 583,525 |
| Interest | 34,908 | 101,573 | 2,568,312 | (315,840) | 2,388,953 |
| Principal transactions, net | | 7,170 | 76,279 | — | 83,449 |
| Asset management and advisory fees | | — | 49,932 | (5,710) | 44,222 |
| Other | 5,007 | 4,087 | 56,501 | (60,954) | 4,641 |
| Total revenues | 39,915 | 119,108 | 3,362,028 | (416,261) | 3,104,790 |
| **Expenses** | | | | | |
| Commissions and order execution costs | | 4,991 | 413,432 | (33,048) | 385,375 |
| Interest | 46,667 | 95,267 | 2,358,173 | (317,641) | 2,182,466 |
| Employee compensation and benefits | 6,479 | 12,085 | 193,266 | — | 211,830 |
| General, administrative and other | 60,850 | 3,687 | 168,498 | (65,571) | 167,464 |
| Total expenses | 113,996 | 116,030 | 3,133,369 | (416,261) | 2,947,135 |
| Equity in net income of subsidiaries | 214,201 | 182,183 | — | (396,384) | — |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries | 140,120 | 185,261 | 228,659 | (396,384) | 157,655 |
| Provision for income taxes | — | — | 1,960 | — | 1,960 |
| Income before dividends on preferred securities issued by subsidiaries | 140,120 | 185,261 | 226,699 | (396,384) | 155,695 |
| Dividends on preferred securities issued by subsidiaries | — | 15,576 | — | — | 15,576 |
| Net income | $ 140,120 | $ 169,685 | $ 226,699 | $ (396,384) | $ 140,119 |

F–27

**Condensed consolidating statement of income**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | *For the year ended February 28, 2002* | | |
| | | | *(in thousands)* | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 30,505 | $ 480,278 | $ (22,163) | $ 488,620 |
| Interest | 22,836 | 187,480 | 2,119,941 | (616,793) | 1,713,464 |
| Principal transactions, net | — | 3,253 | 95,942 | — | 99,195 |
| Asset management and advisory fees | — | 11 | 68,121 | (5,442) | 62,690 |
| Other | 4,941 | 3,368 | 13,165 | (17,811) | 3,663 |
| Total revenues | 27,777 | 224,617 | 2,777,447 | (662,209) | 2,367,632 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 10,423 | 335,397 | (22,163) | 323,657 |
| Interest | 46,226 | 179,271 | 1,949,915 | (617,543) | 1,557,869 |
| Employee compensation and benefits | 6,711 | 24,150 | 167,592 | | 198,453 |
| General, administrative and other | 18,338 | 9,451 | 166,206 | (22,503) | 171,492 |
| Total expenses | 71,275 | 223,295 | 2,619,110 | (662,209) | 2,251,471 |
| Equity in net income of subsidiaries | 137,132 | 149,915 | — | (287,047) | — |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries | 93,634 | 151,237 | 158,337 | (287,047) | 116,161 |
| Provision for income taxes | — | — | 6,951 | — | 6,951 |
| Income before dividends on preferred securities issued by subsidiaries | 93,634 | 151,237 | 151,386 | (287,047) | 109,210 |
| Dividends on preferred securities issued by subsidiary | — | 15,576 | — | — | 15,576 |
| Net income | $ 93,634 | $ 135,661 | $ 151,386 | $ (287,047) | $ 93,634 |

F–28

**Condensed consolidating statement of cash flows**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | **For the Year Ended February 29, 2004** | | |
| | | | *(in thousands)* | | |
| Net cash generated from/(used in) operating activities | $ 387,774 | $ 23,682 | $ 183,256 | $ — | $ 594,712 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | (23,219) | (95,711) | — | (118,930) |
| Net cash used in investing activities | — | (23,219) | (95,711) | — | (118,930) |
| Cash flows from financing activities | | | | | |
| Repayment of long term borrowings | (68,000) | — | — | — | (68,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — | — | (199,774) |
| Net contributions to membership interest issued by subsidiary | — | — | 3,132 | — | 3,132 |
| Capital withdrawals | (120,000) | — | — | — | (120,000) |
| Net cash used in financing activities | (387,774) | — | 3,132 | — | (384,642) |
| Net increase (decrease) in cash and cash equivalents | — | 463 | 90,677 | — | 91,140 |
| Cash and cash equivalents, beginning of year | — | 4,014 | 243,089 | — | 247,103 |
| Cash and cash equivalents, end of year | $ — | $ 4,477 | $ 333,766 | $ — | $ 338,243 |

F–29

**For the Year Ended February 28, 2003**

| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Net cash (used in)/generated from operating activities | $ (54,500) | $ 1,658 | $ 87,124 | $ — | $ 34,282 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | — | (3,473) | — | (3,473) |
| Net cash used in investing activities | — | — | (3,473) | — | (3,473) |
| Cash flows from financing activities | | | | | |
| Issuance of long term debt | 222,500 | — | — | — | 222,500 |
| Repayment of long term borrowings | (68,000) | — | — | — | (68,000) |
| Capital withdrawals | (100,000) | — | — | — | (100,000) |
| Net cash generated from financing activities | 54,500 | — | — | — | 54,500 |
| Net increase in cash and cash equivalents | — | 1,658 | 83,651 | — | 85,309 |
| Cash and cash equivalents, beginning of year | — | 2,356 | 159,438 | — | 161,794 |
| Cash and cash equivalents, end of year | $ — | $ 4,014 | $ 243,089 | $ — | $ 247,103 |

F–30

**Condensed consolidating statement of cash flows**

|  | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
|  |  |  | For the Year Ended February 28, 2002 (unaudited) |  |  |
|  |  |  | (in thousands) |  |  |
| Net cash generated from/(used in) operating activities | $ 133,000 | $ (69) | $ (74,519) | $ — | $ 58,412 |
| Cash flows from financing activities |  |  |  |  |  |
| Repayment of subordinated debt | (25,000) | — | — | — | (25,000) |
| Issuance of long term debt | — | — | — | — | — |
| Repayment of long term borrowings | (33,000) | — | — | — | (33,000) |
| Capital withdrawals | (75,000) | — | — | — | (75,000) |
| Net cash used in financing activities | (133,000) | — | — | — | (133,000) |
| Net (decrease)/increase in cash and cash equivalents | — | (69) | (74,519) | — | (74,588) |
| Cash and cash equivalents, beginning of year | — | 2,425 | 233,957 | — | 236,382 |
| Cash and cash equivalents, end of year | $ — | $ 2,356 | $ 159,438 | $ — | $ 161,794 |

[THIS PAGE IS INTENTIONALLY LEFT BLANK]

(Interim Financial Statements begin on the following page)

F–32

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | May 31, 2004 | February 29, 2004 |
|---|---|---|
| | (unaudited) | |
| | (in thousands) | |
| Cash and cash equivalents | $ 224,116 | $ 338,243 |
| Cash and securities segregated under federal and other regulations: | | |
|    Cash and cash equivalents | 1,436,072 | 1,375,838 |
|    Securities purchased under agreements to resell | 41,831 | 55,061 |
| Restricted cash | 500,000 | — |
| Securities purchased under agreements to resell | 41,800,629 | 24,782,874 |
| Deposits with clearing organizations and others | 1,919,371 | 1,831,765 |
| Receivables from broker–dealers and clearing organizations | 3,511,725 | 504,810 |
| Receivables from customers | 2,290,621 | 1,827,190 |
| Securities owned, at market or fair value | 2,897,884 | 2,032,535 |
| Memberships in exchanges (market value: May 31, 2004: $48,502, February 29, 2004: $41,377) | 15,944 | 15,869 |
| Other assets | 590,916 | 567,987 |
|    Total assets | $ 55,229,109 | $ 33,332,172 |
| | | |
| **Liabilities** | | |
|    Short–term borrowings, including current portion of long–term borrowings | $ 68,000 | $ 88,890 |
|    Securities sold under agreements to repurchase | 44,296,847 | 25,630,299 |
|    Payable to broker–dealers and clearing organizations | 2,381,069 | 583,643 |
|    Payable to customers | 5,911,001 | 5,095,717 |
|    Securities sold, not yet purchased, at market or fair value | 1,376,488 | 807,485 |
|    Accounts payable, accrued expenses, and other liabilities | 192,649 | 174,149 |
| Long–term borrowings | 315,500 | 315,500 |
| Subordinated debt | 16,000 | 16,000 |
|    Total liabilities | 54,557,554 | 32,711,683 |
| Commitments and contingent liabilities | | |
| Membership interests issued by subsidiary | 455 | 4,405 |
| Members' equity | 671,100 | 616,084 |
|    Total liabilities and members' equity | $ 55,229,109 | $ 33,332,172 |

The accompanying notes are an integral part of these financial statements.

F–33

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

| | For the three months ended | |
|---|---|---|
| | May 31, 2004 | May 31, 2003 |
| | (unaudited) | |
| | (in thousands) | |
| **Revenues** | | |
| Commissions and brokerage | $ 220,279 | $ 163,206 |
| Interest | 377,743 | 283,022 |
| Principal transactions, net | 67,300 | 34,961 |
| Asset management and advisory fees | 23,435 | 11,160 |
| Other | 978 | 2,500 |
| Total revenues | 689,735 | 494,849 |
| **Expenses** | | |
| Commissions and order execution costs | 142,706 | 104,162 |
| Interest | 344,254 | 248,489 |
| Employee compensation and benefits | 76,866 | 52,314 |
| General, administrative and other | 57,502 | 42,704 |
| Total expenses | 621,328 | 447,669 |
| Income before provision for income taxes and members' interest in earnings of subsidiary | 68,407 | 47,180 |
| Provision for income taxes | 8,211 | 907 |
| Income before members' interest in earnings of subsidiary | 60,196 | 46,273 |
| Members' interest in earnings of subsidiary | 926 | — |
| NET INCOME | $ 59,270 | $ 46,273 |

The accompanying notes are an integral part of these financial statements.

F–34

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

**For the three months ended**

| | Members' equity | | |
| --- | --- | --- | --- |
| | Common capital | Other Comprehensive Income | Total |
| | | (unaudited) | |
| | | (in thousands) | |
| Balance, February 28, 2003 | $ 568,016 | $ (1,655) | $ 566,361 |
| Loss on early extinguishment of preferred securities issued by subsidiaries | (39,774) | — | (39,774) |
| Net income | 46,273 | — | 46,273 |
| Currency translation adjustment | — | 4,526 | 4,526 |
| Balance, May 31, 2003 | $ 574,515 | $ 2,871 | $ 577,386 |
| Balance, February 29, 2004 | $ 595,398 | $ 20,686 | $ 616,084 |
| Net income | 59,270 | — | 59,270 |
| Currency translation adjustment | — | (4,254) | (4,254) |
| Balance, May 31, 2004 | $ 654,668 | $ 16,432 | $ 671,100 |

The accompanying notes are an integral part of these financial statements.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | For the three months ended | |
|---|---|---|
| | May 31, 2004 | May 31, 2003 |
| | (unaudited) | |
| | (in thousands) | |
| Cash flows from operating activities | | |
| Net income | $      59,270 | $      46,273 |
| Noncash items included in net income | | |
| Depreciation and amortization | 8,097 | 9,747 |
| Members' interest in earnings of subsidiary | 926 | — |
| (Increase) decrease in operating assets | | |
| Cash and securities segregated under federal and other regulations: | | |
| Cash and cash equivalents | (60,234) | (201,923) |
| Securities purchased under agreements to resell | 13,230 | 6,195 |
| Restricted cash | (500,000) | — |
| Securities purchased under agreements to resell | (17,017,755) | (7,998,205) |
| Deposits with clearing organizations and others | (87,606) | (1,472) |
| Receivables from brokers–dealers and clearing organizations | (3,006,915) | (295,947) |
| Receivables from customers | (463,431) | (752,008) |
| Securities owned, at market or fair value | (865,349) | (1,057,412) |
| Membership in exchanges | (75) | (552) |
| Other assets | (31,026) | 9,756 |
| Increase (decrease) in operating liabilities | | |
| Short–term borrowings, including current portion of long–term borrowings | (20,890) | 74,722 |
| Securities sold under agreements to repurchase | 18,666,548 | 9,502,272 |
| Payable to broker–dealers and clearing organizations | 1,797,426 | 142,292 |
| Payable to customers | 815,284 | 269,006 |
| Securities sold, not yet purchased, at market or fair value | 569,003 | 495,858 |
| Accounts payable, accrued expenses and other liabilities | 14,246 | 12,799 |
| Net cash used in operating activities | (109,251) | 261,401 |
| Cash flows from investing activities | | |
| Acquisition of businesses, net of cash acquired | — | (24,222) |
| Net cash used in investing activities | — | (24,222) |
| Cash flows from financing activities | | |
| Payment for redemption of preferred securities issued by subsidiaries | — | (199,774) |
| Withdrawals of interests by members' of subsidiary | (4,876) | — |
| Net cash used in financing activities | (4,876) | (199,774) |
| Net decrease in cash and cash equivalents | (114,127) | 37,405 |
| Cash and cash equivalents, beginning of period | 338,243 | 247,103 |
| Cash and cash equivalents, end of period | $      224,116 | $      284,508 |

The accompanying notes are an integral part of these financial statements.

F–36

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

#### NOTE A—ORGANIZATION

Refco Group Ltd., LLC (the "Company") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker–dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities foreign exchange broker.

The Company is 90% owned by Refco Group Holdings, Inc., a Delaware corporation. The remaining 10% is owned by BAWAG Overseas, Inc., a third party financial institution.

#### NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of preparation**

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which does issue non–voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in other assets.

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

These unaudited consolidated financial statements reflect all adjustments that are, in the opinion of management, necessary for a fair statement of the results for the interim period presented. These adjustments are of a normal, recurring nature. Interim period operating results may not be indicative of the operating results for a full year. These consolidated financial statements should be read in conjunction with the Group's fiscal year end consolidated financial statements included elsewhere in this Offering Circular.

#### NOTE C—NET CAPITAL REQUIREMENT

The Group's subsidiary, Refco Securities, LLC, is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3–1 (the "Rule") which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3–3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5 percent of aggregate

F–37

debits. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million, which was 18.3 percent of aggregate debit balances and $67.5 million in excess of required net capital.

The Group's subsidiary, Refco, LLC, is also subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4 percent of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non–customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital.

## NOTE D—COMMITMENTS AND CONTINGENCIES

**Commitments**

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises excluding any escalation adjustments are as follows (in thousands):

| Fiscal period | |
|---|---|
| Nine months ended 2005 | $ 15,243 |
| 2006 | 13,669 |
| 2007 | 11,558 |
| 2008 | 9,404 |
| 2009 | 6,383 |
| Thereafter | 25,038 |
| | $ 81,295 |

The Group's rent expense for the three months ended May 31, 2004 and 2003 was $4.5 million and $4.0 million, respectively.

**Contingencies**

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003 the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. The remaining claim was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. A separate trial to determine damages is scheduled for the fall of 2004. The Group will seek to set aside the verdict. If the verdict is not set aside, the Group intends to appeal such decision and believes they have meritorious grounds for appeal. The Group also believes that, if that appeal is unsuccessful, the plaintiffs' alleged damages are substantially less than the $45 million they are claiming.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents that had been provided to the SEC.

In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

**NOTE E—FAIR VALUE OF FINANCIAL INSTRUMENTS**

SFAS No. 107 "*Disclosures about Fair Value of Financial Instruments*" requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Cash, Cash and securities segregated under federal and other regulations, Deposits with clearing organizations and others, Short term borrowings and Payables to broker–dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long–term debt is recorded at historical amounts which could differ from fair value as a result of changes in the market rates.

The following table provides a summary of the fair value of the Group's long–term borrowings. The fair value of the Group's long–term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

| | May 31, 2004 | | February 29, 2004 | |
|---|---|---|---|---|
| | (in thousands) | | | |
| Carrying value of long–term borrowings | $ | 383,500 | $ | 383,500 |
| Fair value of long–term borrowings | | 391,753 | | 399,990 |

The Group carries its secured financing activities, including Securities purchased under agreements to resell, Securities borrowed, Securities sold under agreements to repurchase, Securities loaned and Other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short–term in nature, carrying value approximates fair value. The market value of the collateral the Group received as of May 31, 2004 and February 29, 2004, was approximately $177,000 million and $125,000 million, respectively.

## NOTE F—RESTRICTED CASH

As of May 31, 2004, the Company has on deposit $500 million with BAWAG Overseas, Inc., a member who is a financial institution. The Company will distribute the funds to its members consistent with the terms and conditions as set forth in the Equity Purchase and Merger Agreement dated June 8, 2004 (amended July 9, 2004) between Thomas H. Lee Partners and the selling members, provided it maintain this balance throughout the period between May 31, 2004 and the closing date.

## NOTE G—SEGMENT REPORTING

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has determined its operating segments to be (1) Derivatives Brokerage and Clearing, (2) Prime Brokerage/Capital Markets, and (3) Asset Management. The Derivatives Brokerage and Clearing business operations consist of execution and clearing services for global exchange–traded derivatives in electronic and open outcry Markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Asset Management provides a broad array of asset management services to institutional and individual investors through Refco Alternative Investments (RAI), Forstmann–Leff Associates and Tilney Investment Management.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non–operating segment. Corporate

administration costs are not allocated to the respective segments and are included in Corporate & Other.

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Asset Management | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | **(in thousands)** | | | |
| **As of and for the three months ended May 31, 2004 (unaudited)** | | | | | | |
| Interest revenue | $ 37,551 | $ 381,034 | $ 70 | $ 6,624 | $ (47,536) | $ 377,743 |
| Total revenues | 262,640 | 446,740 | 27,423 | 7,032 | (54,100) | 689,735 |
| Interest expense | 20,085 | 356,872 | 50 | 15,510 | (48,263) | 344,254 |
| Depreciation and amortization | 3,167 | 558 | 1,751 | 2,621 | — | 8,097 |
| Income before provision for income taxes and members' interest in earnings of subsidiary | 41,907 | 37,655 | 2,905 | (14,060) | — | 68,407 |
| Total assets | 7,225,821 | 54,780,654 | 281,433 | 1,393,954 | (8,452,753) | 55,229,109 |
| **For the three months ended May 31, 2003 (unaudited)** | | | | | | |
| Interest revenue | $ 38,873 | $ 286,934 | $ 123 | $ 6,599 | $ (49,507) | $ 283,022 |
| Total revenues | 197,116 | 332,202 | 15,746 | 7,401 | (57,616) | 494,849 |
| Interest expense | 15,932 | 267,633 | 25 | 15,024 | (50,125) | 248,489 |
| Depreciation and amortization | 6,720 | 338 | 406 | 2,283 | — | 9,747 |
| Income before provision for income taxes | 28,906 | 30,777 | (962) | (11,541) | — | 47,180 |
| **As of February 29, 2004** | | | | | | |
| Total assets | $ 6,998,420 | $ 31,763,273 | $ 276,979 | $ 863,307 | $ (6,569,807) | $ 33,332,172 |

F–41

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long–lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

| | As of and for three months ended | | | |
| | May 31, 2004 | | May 31 2003 | |
| | (unaudited) | | | |
| | (in thousands) | | | |
|---|---|---|---|---|
| **Total revenue:** | | | | |
| United States | $ | 500,724 | $ | 350,896 |
| Bermuda | | 64,867 | | 82,420 |
| United Kingdom | | 87,361 | | 42,845 |
| Other | | 36,783 | | 18,688 |
| Total | $ | 689,735 | $ | 494,849 |

| | As of | | | |
| | May 31, 2004 | | February 29 2004 | |
| | (unaudited) | | | |
|---|---|---|---|---|
| **Long–lived assets:** | | | | |
| United States | $ | 35,620 | $ | 37,337 |
| Bermuda | | 1,790 | | 1,900 |
| United Kingdom | | 6,261 | | 3,806 |
| Other | | 4,653 | | 4,786 |
| Total | $ | 48,324 | $ | 47,829 |

No single customer accounted for greater than 10% of total revenues in the three months ended May 31, 2004 and 2003.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvement.

**NOTE H—SUBSEQUENT EVENT**

On June 8, 2004 (amended July 9, 2004), the majority owner executed an equity purchase and merger agreement in which a majority stake of the Group would be acquired. The resulting change in control would give effect to default provisions contained within the Group's revolving credit facility and unsecured syndicated senior notes.

**NOTE I—CONDENSED CONSOLIDATING FINANCIAL INFORMATION**

The following information sets forth the Group condensed consolidating financial statements as of May 31, 2004 and February 29, 2004 and for each of the three month periods ended May 31, 2004 and May 31, 2003.

**Condensed consolidating balance sheet**

| | May 31, 2004 (unaudited) | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | (in thousands) | | | | |
| Cash and cash equivalents | $ — | $ 17,668 | $ 206,448 | $ — | $ 224,116 |
| Cash and securities segregated under federal and other regulations | | | | | |
| Cash and cash equivalents | — | — | 1,436,072 | — | 1,436,072 |
| Securities purchased under agreements to resell | — | — | 41,831 | — | 41,831 |
| Restricted cash | 500,000 | — | | — | 500,000 |
| Securities purchased under agreements to resell | — | — | 43,876,655 | (2,076,026) | 41,800,629 |
| Deposits with clearing organizations and others | — | 1,700 | 3,055,066 | (1,137,395) | 1,919,371 |
| Receivables from broker–dealers, clearing organizations and customers | 341,298 | 2,558,523 | 7,440,440 | (4,537,915) | 5,802,346 |
| Securities owned, at market value or fair value | — | 4,862 | 3,244,205 | (351,183) | 2,897,884 |
| Investment in and advances to subsidiaries | 1,119,348 | 1,223,191 | — | (2,342,539) | — |
| Other assets | 64,348 | 430,589 | 362,166 | (250,243) | 606,860 |
| Total assets | $ 2,024,994 | $ 4,236,533 | $ 59,662,883 | $ (10,695,301) | $ 55,229,109 |
| Liabilities | | | | | |
| Short–term borrowings, including current portion of long–term borrowings | 68,000 | — | — | — | 68,000 |
| Securities sold under agreements to repurchase | — | — | 47,009,284 | (2,712,437) | 44,296,847 |
| Payable to broker–dealers and clearing organizations | — | 796 | 2,382,621 | (2,348) | 2,381,069 |
| Payable to customers | 932,846 | 2,849,780 | 7,337,195 | (5,208,820) | 5,911,001 |
| Securities sold, not yet purchased, at market value or fair value | — | 4,855 | 1,371,633 | — | 1,376,488 |
| Accounts payable, accrued expenses and other liabilities | 21,548 | 70,935 | 169,801 | (69,635) | 192,649 |
| Long–term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 108,969 | (108,969) | 16,000 |
| Total liabilities | 1,353,894 | 2,926,366 | 58,379,503 | (8,102,209) | 54,557,554 |
| Membership interests issued by subsidiary | | | 455 | | 455 |
| Members' Equity | 671,100 | 1,310,167 | 1,282,925 | (2,593,092) | 671,100 |
| Total liabilities and members' equity | $ 2,024,994 | $ 4,236,533 | $ 59,662,883 | $ (10,695,301) | $ 55,229,109 |

F–43

**Condensed consolidating balance sheet**

|  | February 29, 2004 | | | | |
|  | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
|  | | | (in thousands) | | |
| Cash and cash equivalents | $ — | $ 4,477 | $ 333,766 | $ — | $ 338,243 |
| Cash and securities segregated under federal and other regulations | | | | | |
|   Cash and cash equivalents | — | — | 1,375,838 | — | 1,375,838 |
|   Securities purchased under agreements to resell | — | — | 55,061 | | 55,061 |
| Securities purchased under agreements to resell | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker–dealers, clearing organizations and customers | 314,279 | 1,266,036 | 3,568,703 | (2,817,018) | 2,332,000 |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries | 1,131,766 | 1,160,431 | — | (2,292,197) | — |
| Other assets | 58,612 | 430,084 | 347,948 | (252,788) | 583,856 |
|     Total assets | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |
| **Liabilities** | | | | | |
|   Short–term borrowings, including current portion of long–term borrowings | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
|   Securities sold under agreements to repurchase | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
|   Payable to brokers–dealers and clearing organizations | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers | 465,681 | 1,547,382 | 6,656,600 | (3,573,946) | 5,095,717 |
|   Securities sold, not yet purchased, at market value or fair value | — | 2,091 | 805,394 | — | 807,485 |
|   Accounts payable, accrued expenses and other liabilities | 23,392 | 68,182 | 146,163 | (63,588) | 174,149 |
| Long–term borrowings | 315,500 | — | — | — | 315,500 |
| Subordinated debt | 16,000 | — | 109,056 | (109,056) | 16,000 |
|     Total liabilities | 888,573 | 1,617,656 | 36,424,046 | (6,218,592) | 32,711,683 |
| Membership interests issued by subsidiary | — | — | 4,405 | — | 4,405 |
| Members' equity | 616,084 | 1,246,117 | 1,293,282 | (2,539,399) | 616,084 |
|     Total liabilities and members' equity | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,172 |

F–44

**Condensed consolidating statement of income**

| | For the three months ended May 31, 2004 (unaudited) | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 1,893 | $ 224,216 | $ (5,830) | $ 220,279 |
| Interest | 5,919 | 23,045 | 396,315 | (47,536) | 377,743 |
| Principal transactions, net | — | 19,059 | 48,241 | — | 67,300 |
| Asset management and advisory fees | — | — | 23,435 | — | 23,435 |
| Other | 369 | 1,334 | 9 | (734) | 978 |
| Total revenues | 6,288 | 45,331 | 692,216 | (54,100) | 689,735 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 4,660 | 143,149 | (5,103) | 142,706 |
| Interest | 12,273 | 28,874 | 351,370 | (48,263) | 344,254 |
| Employee compensation and benefits | 1,025 | 3,779 | 72,062 | — | 76,866 |
| General, administrative and other | 4,536 | 6,728 | 46,974 | (734) | 57,502 |
| Total expenses | 17,834 | 44,041 | 613,555 | (54,100) | 621,328 |
| Equity in net income of subsidiaries | 71,740 | 70,146 | — | (141,886) | — |
| Income before provision for income taxes, and members' interest in earnings of subsidiary | 60,194 | 71,436 | 78,661 | (141,886) | 68,407 |
| Provision for income taxes | — | — | 8,211 | | 8,211 |
| | 60,194 | 71,436 | 70,450 | (141,886) | 60,196 |
| Members' interest in earnings of subsidiary | — | — | 926 | — | 926 |
| Net income | $ 60,194 | $ 71,436 | $ 69,524 | $ (141,886) | $ 59,270 |

F–45

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Condensed consolidating statement of income

|  | | For the three months ended May 31, 2003 (unaudited) | | | | | | | | |
|  | | Parent | | Guarantor Subsidiaries | | Non–Guarantor Subsidiaries | | Consolidation Adjustments | | Consolidation Totals |
|  | | (in thousands) | | | | | | | | |
| **Revenues** | | | | | | | | | | |
| Commissions and brokerage | $ | — | $ | 1,311 | $ | 168,834 | $ | (6,939) | $ | 163,206 |
| Interest | | 4,396 | | 17,706 | | 310,427 | | (49,507) | | 283,022 |
| Principal transactions, net | | — | | 3,613 | | 31,348 | | — | | 34,961 |
| Asset management and advisory fees | | — | | — | | 11,187 | | (27) | | 11,160 |
| Other | | 802 | | 919 | | 1,922 | | (1,143) | | 2,500 |
| Total revenues | | 5,198 | | 23,549 | | 523,718 | | (57,616) | | 494,849 |
| **Expenses** | | | | | | | | | | |
| Commissions and order execution costs | | — | | 2,543 | | 107,041 | | (5,422) | | 104,162 |
| Interest | | 11,718 | | 18,023 | | 268,873 | | (50,125) | | 248,489 |
| Employee compensation and benefits | | 1,051 | | 2,808 | | 48,455 | | — | | 52,314 |
| General, administrative and other | | 2,829 | | 920 | | 41,023 | | (2,069) | | 42,704 |
| Total expenses | | 15,598 | | 24,294 | | 465,392 | | (57,616) | | 447,669 |
| Equity in net income of subsidiaries | | 56,674 | | 59,013 | | — | | (115,687) | | — |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries | | 46,274 | | 58,268 | | 58,326 | | (115,687) | | 47,180 |
| Provision for income taxes | | — | | — | | 907 | | — | | 907 |
| | | 46,274 | | 58,268 | | 57,419 | | (115,687) | | 46,273 |
| Dividends on preferred securities issued by subsidiaries | | — | | — | | — | | — | | — |
| Net income | $ | 46,274 | $ | 58,268 | $ | 57,419 | $ | (115,687) | $ | 46,273 |

F–46

**Condensed consolidating statement of cash flows**

| | For the three months ended May 31, 2004 (unaudited) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash generated from (used in) operating activities | $ — | $ 13,191 | $ (122,442) | $ — | $ (109,251) |
| Cash flows from financing activities | | | | | |
| Withdrawals of interests by members of subsidiary | — | — | (4,876) | — | (4,876) |
| Net cash used in financing activities | — | — | (4,876) | — | (4,876) |
| Net increase (decrease) in cash and cash equivalents | — | 13,191 | (127,318) | — | (114,127) |
| Cash and cash equivalents, beginning of period | — | 4,477 | 333,766 | — | 338,243 |
| Cash and cash equivalents, end of period | $ — | $ 17,668 | $ 206,448 | $ — | $ 224,116 |

| | For the three months ended May 31, 2003 (unaudited) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parent | Guarantor Subsidiaries | Non–Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash (used in)/generated from operating activities | $ 199,774 | $ 22,213 | $ 39,414 | $ — | $ 261,401 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | (20,521) | (3,701) | — | (24,222) |
| Net cash used in investing activities | — | (20,521) | (3,701) | — | (24,222) |
| Cash flows from financing activities | | | | | |
| Payment for redemption of preferred securities | (199,774) | — | — | — | (199,774) |
| Net cash generated from/(used in) financing activities | (199,774) | — | — | — | (199,774) |
| Net increase (decrease) in cash and cash equivalents | — | 1,692 | 35,713 | — | 37,405 |
| Cash and cash equivalents, beginning of period | — | 4,014 | 243,089 | — | 247,103 |
| Cash and cash equivalents, end of period | $ — | $ 5,706 | $ 278,802 | $ — | $ 284,508 |

No person has been authorized to give any information or to make any representations other than those contained in this prospectus, and, if given or made, such information and representation must not be relied upon as having been authorized. This prospectus does not constitute an offer to sell or the solicitation of an offer to buy any securities other than the securities to which it relates or any offer to sell or the solicitation of an offer to buy such securities in any circumstances in which such offer or solicitation is unlawful. Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of Refco Group Ltd., LLC or Refco Finance Inc. since the date hereof or that the information contained in this prospectus is correct as of any time subsequent to its date.

**Dealer Prospectus Delivery Obligation**

Until                , 2004 all dealers that effect transactions in the old notes or the registered notes, whether or not participating in the exchange offer, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

# REFCO GROUP LTD., LLC
# REFCO FINANCE INC.

**Offer to exchange all
of the outstanding
$600,000,000 9% Senior
Subordinated Notes due 2012**

**for**

**$600,000,000 9% Senior
Subordinated Notes due 2012
registered under the
Securities Act of 1933**

**PROSPECTUS**

, 2004

# PART II

# INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 20.**   *Indemnification of Directors, Officers, Managers or Members*

Refco Group Ltd., LLC, Refco Finance Inc., Bersec International LLC, Kroeck & Associates LLC, Lind–Waldock Securities, LLC, Market Educational Institute, LLC, Marshall Metals, LLC, Refco Administration, LLC, Refco Capital Holdings, LLC, Refco Capital Management, LLC, Refco Capital Trading LLC, Refco Capital LLC, Refco F/X Associates, LLC, Refco Financial, LLC, Refco Fixed Assets Management, LLC, Refco Global Capital Management LLC, Refco Global Futures, LLC, Refco Global Holdings, LLC, Refco Information Services, LLC, Refco Managed Futures, LLC, Refco Mortgage Securities, LLC, Refco Regulated Companies, LLC, Summit Management, (Newco) LLC and Westminster–Refco Management LLC are each formed or incorporated under the laws of the State of Delaware.

Section 18–108 of the Delaware Limited Liability Company Act, or DLLCA, provides that a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever, subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement. Section 102 of the Delaware General Corporation Law, or DGCL, as amended, allows a corporation to eliminate the personal liability of directors of a corporation to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except where the director breached the duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of the DGCL or obtained an improper personal benefit.

Generally, Section 145 of the General Corporation Law of the State of Delaware permits a corporation to indemnify certain persons made a party to an action, by reason of the fact that such person is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise. In the case of an action by or in the right of the corporation, no indemnification may be made in respect of any matter as to which that person was adjudged liable to the corporation unless the Delaware Court of Chancery or the court in which the action was brought determines that despite the adjudication of liability that person is fairly and reasonably entitled to indemnity for proper expenses. To the extent that person has been successful in the defense of any matter, that person shall be indemnified against expenses actually and reasonably incurred by him.

The limited liability company agreements or certificate of incorporation of each Registrant provides for the indemnification, to the fullest extent permitted by the DLLCA or DGCL, of all persons who may be indemnified by such Registrant under the DLLCA or DGCL, which would include the members, managers, directors, officers, employees and agents of such Registrant. The indemnification provided by the limited liability company agreements or certificate of incorporation does not limit or exclude any rights, indemnities or limitations of liability to which any person may be entitled, whether as a matter of law, under the by–laws, by agreement, vote of the stockholders or disinterested directors of such Registrant or otherwise. As permitted by the DGCL or DLLCA, the limited liability company agreement or certificate of incorporation of each Registrant includes a provision to eliminate the personal liability of such Registrant's managers, members or directors for monetary damages for breach or alleged breach of their fiduciary duties as managers, members or directors, but does not absolve managers, members or directors of liability for (1) any breach of the directors' duty of loyalty to such Registrant or its members or stockholders, (2) acts or omissions which are not in good faith or which involve intentional misconduct or a knowing violation of law, (3) any transaction from which the member, manager or director derived an improper personal benefit, or (4) in the case of a corporation, any matter in respect of which such director shall be liable under

II–1

Section 174 of Title 8 of the DGCL or any amendment thereto or successor provision thereto, which makes directors personally liable for unlawful dividends or unlawful stock repurchases or redemptions in certain circumstance and expressly sets forth a negligence standard with respect to such liability.

Each of the Registrants maintains insurance policies insuring each of its members, managers, directors and officers against certain civil liabilities, including liabilities under the Securities Act.

**Item 21.**  *Exhibits and Financial Statement Schedules*

*(a)*
        Exhibits

| Exhibit | Name of Exhibit |
|---|---|
| *3.1 | Certificate of Formation of Refco Group Ltd., LLC. |
| *3.2 | Limited Liability Company Agreement of Refco Group Ltd, LLC. |
| *3.3 | Certificate of Incorporation of Refco Finance Inc. |
| *3.4 | By–laws of Refco Finance Inc. |
| *3.5 | Certificate of Formation of Bersec International LLC. |
| *3.6 | Limited Liability Company Agreement of Bersec International LLC. |
| *3.7 | Certificate of Formation of Kroeck & Associates LLC. |
| *3.8 | Limited Liability Company Agreement of Kroeck & Associates LLC. |
| *3.9 | Certificate of Formation of Lind–Waldock Securities, LLC. |
| *3.10 | Limited Liability Company Agreement of Lind–Waldock Securities, LLC. |
| *3.11 | Certificate of Formation of Market Educational Institute, LLC. |
| *3.12 | Limited Liability Company Agreement of Market Educational Institute, LLC. |
| *3.13 | Certificate of Formation of Marshall Metals, LLC. |
| *3.14 | Limited Liability Company Agreement of Marshall Metals, LLC. |
| *3.15 | Certificate of Formation of Refco Administration, LLC. |
| *3.16 | Limited Liability Company Agreement of Refco Administration, LLC. |
| *3.17 | Certificate of Formation of Refco Capital Holdings, LLC. |
| *3.18 | Limited Liability Company Agreement of Refco Capital Holdings, LLC. |
| *3.19 | Certificate of Formation of Refco Capital Management, LLC. |
| *3.20 | Limited Liability Company Agreement of Refco Capital Management, LLC. |
| *3.21 | Certificate of Formation of Refco Capital Trading LLC. |
| *3.22 | Limited Liability Company Agreement of Refco Capital Trading LLC. |
| *3.23 | Certificate of Formation of Refco Capital LLC. |
| *3.24 | Limited Liability Company Agreement of Refco Capital LLC. |
| *3.25 | Certificate of Formation of Refco F/X Associates, LLC. |
| *3.26 | Limited Liability Company Agreement of Refco F/X Associates, LLC. |
| *3.27 | Certificate of Formation of Refco Financial, LLC. |
| *3.28 | Limited Liability Company Agreement of Refco Financial, LLC. |
| *3.29 | Certificate of Formation of Refco Fixed Assets Management, LLC. |
| *3.30 | Limited Liability Company Agreement of Refco Fixed Assets Management, LLC. |

II–2

| | |
|---|---|
| *3.31 | Certificate of Formation of Refco Global Capital Management LLC. |
| *3.32 | Limited Liability Company Agreement of Refco Global Capital Management LLC. |
| *3.33 | Certificate of Formation of Refco Global Futures, LLC. |
| *3.34 | Limited Liability Company Agreement of Refco Global Futures, LLC. |
| *3.35 | Certificate of Formation of Refco Global Holdings, LLC. |
| *3.36 | Limited Liability Company Agreement of Refco Global Holdings, LLC. |
| *3.37 | Certificate of Formation of Refco Information Services, LLC. |
| *3.38 | Limited Liability Company Agreement of Refco Information Services, LLC. |
| *3.39 | Certificate of Formation of Refco Managed Futures, LLC. |
| *3.40 | Limited Liability Company Agreement of Refco Managed Futures, LLC. |
| *3.41 | Certificate of Formation of Refco Mortgage Securities, LLC. |
| *3.42 | Limited Liability Company Agreement of Refco Mortgage Securities, LLC. |
| *3.43 | Certificate of Formation of Refco Regulated Companies, LLC. |
| *3.44 | Limited Liability Company Agreement of Refco Regulated Companies, LLC. |
| *3.45 | Certificate of Formation of Summit Management, (Newco) LLC. |
| *3.46 | Limited Liability Company Agreement of Summit Management, (Newco) LLC. |
| *3.47 | Certificate of Formation of Westminster–Refco Management LLC. |
| *3.48 | Limited Liability Company Agreement of Westminster–Refco Management LLC. |
| 4.1 | Indenture, dated as of August 5, 2004, among Refco Group Ltd., LLC, Refco Finance Inc. and Wells Fargo Bank, National Association, as trustee. |
| 4.2 | Registration Rights Agreement, dated as of August 5, 2004, among Refco Group Ltd., LLC, Refco Finance Inc. and Credit Suisse First Boston LLC, Banc of America Securities LLC and Deutsche Bank Securities Inc. |
| 4.3 | Securityholders Agreement dated New Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners and certain other Affiliates of Thomas H. Lee Partners, L.P. the Limited Partners or Affiliates of Limited Partners, the Executive Investors and the Employees party thereto. |
| *5.1 | Opinion of Weil, Gotshal & Manges LLP. |
| 10.1 | Credit Agreement dated August 5, 2004, among Refco Finance Holdings LLC, New Refco Group Ltd., LLC, the Lenders, Banc of America Securities LLC, Credit Suisse First Boston and Deutsche Bank Securities Inc. |
| 10.2 | Assumption Agreement, dated as of August 5, 2004, made by Refco Group Ltd., LLC, in favor of Bank of America, N.A., as administrative agent. |
| 10.3 | Security Agreement dated August 5, 2004 made by Refco Finance Holdings LLC, New Refco Group Ltd., LLC and the Additional Grantors party thereto to Bank of America, N.A., as administrative agent. |
| 10.4 | Security Agreement Supplement dated August 5, 2004 between Refco Group Ltd, LLC and the Guarantors party thereto. |
| 10.5 | Parent Guaranty dated as of August 5, 2004 made by New Refco Group Ltd., LLC in favor of the Secured Parties party thereto. |

| | |
|---|---|
| 10.6 | Subsidiary Guaranty dated as August 5, 2004 by the Guarantors in favor of the Secured Parties party thereto. |
| 10.7 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and Phillip R. Bennett dated June 8, 2004. |
| 10.8 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and Santo Maggio dated July 30, 2004. |
| 10.9 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and William Sexton dated July 30, 2004. |
| 10.10 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and Joseph Murphy dated June 21, 2004. |
| 10.11 | Management Agreement dated as of August 5, 2004 by and between New Refco Group Ltd., LLC, Refco Group Ltd., LLC and THL Managers V, LLC. |
| 10.12 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Phillip Bennett. |
| 10.13 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and William Sexton. |
| 10.14 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Joseph Murphy. |
| 10.15 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Santo Maggio. |
| 10.16 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Dennis Klejna. |
| 12 | Computation of Ratio of Earnings to Fixed Charges. |
| *21 | List of Subsidiaries. |
| 23.1 | Consent of Independent Registered Public Accounting Firm (Grant Thornton LLP). |
| *23.2 | Consent of Weil, Gotshal & Manges LLP (to be included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included in Part II of this registration statement). |
| 25.1 | Statement of Eligibility of Trustee on Form T–1 under the Trust Indenture Act of 1939 of Wells Fargo Bank, N.A. |
| 99.1 | Form of Letter of Transmittal. |
| 99.2 | Form of Notice of Guaranteed Delivery. |
| 99.3 | Form of Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees. |
| 99.4 | Form of Letter to Clients. |

---

\*

      To be filed by amendment.

*(b)*

      Financial Statement Schedules.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members of
  **Refco Group Ltd., LLC**

    We have audited in accordance with the standards of the Public Company Accounting Oversight Board (United States) the consolidated financial statements of Refco Group Ltd., LLC and Subsidiaries referred to in our report dated October 8, 2004, which is included in the Prospectus constituting Part I of this Registration Statement. Our audits were conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. Schedule I listed in Item 21 is presented for purposes of additional analysis and is not a required part of the basic financial statements. This schedule has been subjected to the auditing procedures applied in the audits of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

GRANT THORNTON LLP

New York, New York
October 8, 2004

Condensed Financial Information of Refco Group Ltd., LLC

**REFCO GROUP LTD., LLC**
**CONDENSED BALANCE SHEETS**
**(Parent Company Only)**

| | February 29, 2004 | | February 28, 2003 | |
|---|---|---|---|---|
| | (in thousands) | | | |
| Receivables from broker–dealers, clearing organizations and customers | $ | 314,279 | $ | 450,060 |
| Investment in and advances to subsidiaries | | 1,131,766 | | 873,033 |
| Other assets | | 58,612 | | 87,380 |
| Total assets | $ | 1,504,657 | $ | 1,410,473 |
| Liabilities | | | | |
| Short–term borrowings, including current portion of long–term borrowings | $ | 68,000 | $ | 228,000 |
| Payable to customers | | 465,681 | | 30,709 |
| Accounts payable, accrued expenses and other liabilities | | 23,392 | | 22,902 |
| Long–term borrowings | | 315,500 | | 383,500 |
| Subordinated debt | | 16,000 | | 179,000 |
| Total liabilities | | 888,573 | | 844,111 |
| Members' equity | | 616,084 | | 566,362 |
| Total liabilities and members' equity | $ | 1,504,657 | $ | 1,410,473 |

The accompanying notes are an integral part of these financial statements.

II–6

**REFCO GROUP LTD., LLC**
**CONDENSED STATEMENTS OF INCOME**
**(Parent Company Only)**

| | | Year ended | | | | |
|---|---|---|---|---|---|---|
| | | February 29, 2004 | | February 28, 2003 | | February 28, 2002 |
| | | (in thousands) | | | | |
| Revenues | | | | | | |
| Interest | $ | 15,037 | $ | 34,908 | $ | 22,836 |
| Other | | — | | 5,007 | | 4,941 |
| Total revenues | | 15,037 | | 39,915 | | 27,777 |
| Expenses | | | | | | |
| Interest | | 40,404 | | 46,667 | | 46,226 |
| Employee compensation and benefits | | 4,636 | | 6,479 | | 6,711 |
| General, administrative and other | | 18,856 | | 60,850 | | 18,338 |
| Total expenses | | 63,896 | | 113,996 | | 71,275 |
| Equity in net income of subsidiaries | | 237,289 | | 214,201 | | 137,132 |
| Income before provision for income taxes | | 188,430 | | 140,120 | | 93,634 |
| Provision for income taxes | | — | | — | | — |
| NET INCOME | $ | 188,430 | $ | 140,120 | $ | 93,634 |

The accompanying notes are an integral part of these financial statements.

II–7

**REFCO GROUP LTD., LLC**
**CONDENSED STATEMENTS OF CASH FLOWS**
**(Parent Company Only)**

| | Year ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | (in thousands) | | |
| Net cash generated from/(used in) operating activities | $      387,774 | $      (54,500) | $      133,000 |
| | | | |
| Cash flows from financing activities | | | |
| Repayment of subordinated debt | — | — | (25,000) |
| Issuance of long term debt | — | 222,500 | — |
| Repayment of long term borrowings | (68,000) | (68,000) | (33,000) |
| Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — |
| Capital withdrawals | (120,000) | (100,000) | (75,000) |
| Net cash used in/generated from financing activities | (387,774) | 54,500 | (133,000) |
| | | | |
| Net increase (decrease) in cash and cash equivalents | — | — | — |
| Cash and cash equivalents, beginning of year | — | — | — |
| Cash and cash equivalents, end of year | $      — | $      — | $      — |

The accompanying notes are an integral part of these financial statements.

II–8

**REFCO GROUP LTD., LLC**
**NOTES TO CONDEFINANCIAL STATEMENTS**
**(Parent Company Only)**

## NOTE A—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of preparation**

The condensed unconsolidated financial statements of Refco Group Ltd., LLC (the "Parent Company") should be read in conjunction with the consolidated financial statements of Refco Group Ltd., LLC and subsidiaries (collectively the "Consolidated Company") and the notes thereto. Equity in net assets of subsidiaries (investments in affiliates) is accounted for in accordance with the equity method of accounting.

For information on other significant accounting policies, refer to the notes to the consolidated financial statements of the Consolidated Company.

## NOTE B—SHORT–TERM BORROWINGS, LONG–TERM BORROWINGS AND OTHER BORROWINGS

**Short–term borrowings**

Short–term borrowings represent the portion of long–term borrowings maturing within one year and certain long–term borrowings that may be payable within one year at the option of the holder. The carrying value of these short–term obligations approximates fair value due to their short–term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short–term market rates. The Parent Company enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Parent Company's receivables from customers.

Short–term borrowings at year end are set forth below:

|  | February 29, 2004 | February 28, 2003 |
|---|---|---|
|  | (in thousands) | |
| Current portion of long–term borrowings | $          68,000 | $          68,000 |

**Long–term borrowings**

Long–term borrowings of $383.5 million and $451.5 million for 2004 and 2003, respectively represents unsecured syndicated senior notes with major financial institutions. Long–term borrowings consist of the following loans:

|  | 2004 | 2003 | Maturity Date | Interest Date |
|---|---|---|---|---|
|  | (in thousands) | | | |
| **Senior Notes** | | | | |
| Series A Senior Notes 2004 | $          17,000 | $          34,000 | 2004 | 7.18% |
| Senior Notes 2005 | 74,000 | 111,000 | 2005 | 9.18% |
| Series B Senior Notes 2006 | 14,000 | 14,000 | 2006 | 7.42% |
| Senior Notes 2007 | 56,000 | 70,000 | 2007 | 8.85% |
| Series A Senior Notes 2007 | 100,000 | 100,000 | 2007 | 5.99% |
| Series B Senior Notes 2009 | 122,500 | 122,500 | 2009 | 6.60% |
|  | $          383,500 | $          451,500 | | |

II–9

The table below sets out the maturities of the Group's long–term borrowings.

|  | 2004 | | 2003 |
|---|---|---|---|
|  | (in thousands) | | |
| 2004 | $ — | $ | 68,000 |
| 2005 | 68,000 | | 68,000 |
| 2006 | 51,000 | | 51,000 |
| 2007 | 28,000 | | 28,000 |
| 2008 | 114,000 | | 114,000 |
| 2009 | — | | 1 |
| 2010 and thereafter | 122,500 | | 122,500 |
| Total Senior Note Liabilities | $ 383,500 | $ | 451,501 |
| Less: | | | |
| Portion included within short–term borrowings | 68,000 | | 68,000 |
| Total Long–term Senior Note Liabilities | 315,500 | | 383,500 |

The long–term borrowings are subject to acceleration in the event of a change in control.

**Other borrowings**

Subordinated debt of $16.0 million, included in the condensed balance sheets, consists of a subordinated loan from a member. The subordinated debt bears interest at the prime rate and matures June 1, 2005. For the years ended February 29, 2004 and February 28, 2003, the weighted–average interest rate on the subordinated debt was 4.08% and 4.60% respectively. Subordinated debt is subordinated to the claims of present and future general creditors.

Refco Preferred Capital Trust I, II and III, subsidiaries of the Company, had issued $160.0 million of Trust Originated Preferred Securities ("TOPRs") to third parties. At the beginning of the year, the Parent Company paid $199.8 million to redeem the TOPRs, resulting in a charge to members' equity of $39.8 million.

**Contractual debt commitments**

The Parent Company's contractual debt commitments are governed by certain agreements which require that the Consolidated Company maintain specified levels of liquidity, net worth, funded debt to cash flow and cash flow to interest coverage.

**Credit Facilities**

The Parent Company maintains a committed unsecured revolving credit facility of $364.5 million under an agreement with a syndicate of banks. As of February 29, 2004, no portion of the credit facility was utilized.

**NOTE C—FAIR VALUE OF FINANCIAL INSTRUMENTS**

SFAS No. 107 "Disclosures about Fair Value of Financial Instruments" requires the Parent to report the fair value of financial instruments, as defined.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Short term borrowings and Payables to customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Parent Company's long–term debt is recorded at historical amounts which could differ from fair value as a result of changes in the Company's market rates.

II–10

The following table provides a summary of the fair value of the Parent Company's long–term borrowings. The fair value of the Parent's long–term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Parent Company's current borrowing rates for similar types of borrowing arrangements.

|  | February 29, 2004 | February 29, 2004 |
|---|---|---|
|  | (in thousands) | |
| Carrying value of long–term borrowings | $  383,500 | $  451,500 |
| Fair value of long–term borrowings | 399,990 | 481,202 |

All other schedules for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and, therefore, have been omitted.

**Item 22.** *Undertakings*

The undersigned registrants hereby undertake:

(1)  To file, during any period in which offers or sales are being made, a post–effective amendment to this registration statement:

(i)  To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii)  To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post–effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in the volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement;

(iii)  To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2)  That, for the purpose of determining any liability under the Securities Act of 1933, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)  To remove from registration by means of a post–effective amendment any of the securities being registered which remain unsold at the termination of the exchange offer.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrants pursuant to the foregoing provisions, or otherwise, the registrants have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrants of expenses incurred or paid by a director, officer or controlling person of the registrants in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrants will, unless in the opinion of counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

II–11

## EXHIBIT INDEX

| Exhibit | Name of Exhibit |
|---|---|
| *3.1 | Certificate of Formation of Refco Group Ltd., LLC. |
| *3.2 | Limited Liability Company Agreement of Refco Group Ltd, LLC. |
| *3.3 | Certificate of Incorporation of Refco Finance Inc. |
| *3.4 | By–laws of Refco Finance Inc. |
| *3.5 | Certificate of Formation of Bersec International LLC. |
| *3.6 | Limited Liability Company Agreement of Bersec International LLC. |
| *3.7 | Certificate of Formation of Kroeck & Associates LLC. |
| *3.8 | Limited Liability Company Agreement of Kroeck & Associates LLC. |
| *3.9 | Certificate of Formation of Lind–Waldock Securities, LLC. |
| *3.10 | Limited Liability Company Agreement of Lind–Waldock Securities, LLC. |
| *3.11 | Certificate of Formation of Market Educational Institute, LLC. |
| *3.12 | Limited Liability Company Agreement of Market Educational Institute, LLC. |
| *3.13 | Certificate of Formation of Marshall Metals, LLC. |
| *3.14 | Limited Liability Company Agreement of Marshall Metals, LLC. |
| *3.15 | Certificate of Formation of Refco Administration, LLC. |
| *3.16 | Limited Liability Company Agreement of Refco Administration, LLC. |
| *3.17 | Certificate of Formation of Refco Capital Holdings, LLC. |
| *3.18 | Limited Liability Company Agreement of Refco Capital Holdings, LLC. |
| *3.19 | Certificate of Formation of Refco Capital Management, LLC. |
| *3.20 | Limited Liability Company Agreement of Refco Capital Management, LLC. |
| *3.21 | Certificate of Formation of Refco Capital Trading LLC. |
| *3.22 | Limited Liability Company Agreement of Refco Capital Trading LLC. |
| *3.23 | Certificate of Formation of Refco Capital LLC. |
| *3.24 | Limited Liability Company Agreement of Refco Capital LLC. |
| *3.25 | Certificate of Formation of Refco F/X Associates, LLC. |
| *3.26 | Limited Liability Company Agreement of Refco F/X Associates, LLC. |
| *3.27 | Certificate of Formation of Refco Financial, LLC. |
| *3.28 | Limited Liability Company Agreement of Refco Financial, LLC. |
| *3.29 | Certificate of Formation of Refco Fixed Assets Management, LLC. |
| *3.30 | Limited Liability Company Agreement of Refco Fixed Assets Management, LLC. |
| *3.31 | Certificate of Formation of Refco Global Capital Management LLC. |
| *3.32 | Limited Liability Company Agreement of Refco Global Capital Management LLC. |
| *3.33 | Certificate of Formation of Refco Global Futures, LLC. |
| *3.34 | Limited Liability Company Agreement of Refco Global Futures, LLC. |
| *3.35 | Certificate of Formation of Refco Global Holdings, LLC. |

II–12

| | | |
|---|---|---|
| *3.36 | Limited Liability Company Agreement of Refco Global Holdings, LLC. | |
| *3.37 | Certificate of Formation of Refco Information Services, LLC. | |
| *3.38 | Limited Liability Company Agreement of Refco Information Services, LLC. | |
| *3.39 | Certificate of Formation of Refco Managed Futures, LLC. | |
| *3.40 | Limited Liability Company Agreement of Refco Managed Futures, LLC. | |
| *3.41 | Certificate of Formation of Refco Mortgage Securities, LLC. | |
| *3.42 | Limited Liability Company Agreement of Refco Mortgage Securities, LLC. | |
| *3.43 | Certificate of Formation of Refco Regulated Companies, LLC. | |
| *3.44 | Limited Liability Company Agreement of Refco Regulated Companies, LLC. | |
| *3.45 | Certificate of Formation of Summit Management, (Newco) LLC. | |
| *3.46 | Limited Liability Company Agreement of Summit Management, (Newco) LLC. | |
| *3.47 | Certificate of Formation of Westminster–Refco Management LLC. | |
| *3.48 | Limited Liability Company Agreement of Westminster–Refco Management LLC. | |
| 4.1 | Indenture, dated as of August 5, 2004, among Refco Group Ltd., LLC, Refco Finance Inc. and Wells Fargo Bank, National Association, as trustee. | |
| 4.2 | Registration Rights Agreement, dated as of August 5, 2004, among Refco Group Ltd., LLC, Refco Finance Inc. and Credit Suisse First Boston LLC, Banc of America Securities LLC and Deutsche Bank Securities Inc. | |
| 4.3 | Securityholders Agreement dated New Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners and certain other Affiliates of Thomas H. Lee Partners, L.P. the Limited Partners or Affiliates of Limited Partners, the Executive Investors and the Employees party thereto. | |
| *5.1 | Opinion of Weil, Gotshal & Manges LLP. | |
| 10.1 | Credit Agreement dated August 5, 2004, among Refco Finance Holdings LLC, New Refco Group Ltd., LLC, the Lenders, Banc of America Securities LLC, Credit Suisse First Boston and Deutsche Bank Securities Inc. | |
| 10.2 | Assumption Agreement, dated as of August 5, 2004, made by Refco Group Ltd., LLC, in favor of Bank of America, N.A., as administrative agent. | |
| 10.3 | Security Agreement dated August 5, 2004 made by Refco Finance Holdings LLC, New Refco Group Ltd., LLC and the Additional Grantors party thereto to Bank of America, N.A., as administrative agent. | |
| 10.4 | Security Agreement Supplement dated August 5, 2004 between Refco Group Ltd, LLC and the Guarantors party thereto. | |
| 10.5 | Parent Guaranty dated as of August 5, 2004 made by New Refco Group Ltd., LLC in favor of the Secured Parties party thereto. | |
| 10.6 | Subsidiary Guaranty dated as August 5, 2004 by the Guarantors in favor of the Secured Parties party thereto. | |
| 10.7 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and Phillip R. Bennett dated June 8, 2004. | |
| 10.8 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and Santo Maggio dated July 30, 2004. | |

| 10.9 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and William Sexton dated July 30, 2004. |
|---|---|
| 10.10 | Executive Employment and Non–Competition Agreement, by and between Refco Group Ltd., LLC and Joseph Murphy dated June 21, 2004. |
| 10.11 | Management Agreement dated as of August 5, 2004 by and between New Refco Group Ltd., LLC, Refco Group Ltd., LLC and THL Managers V, LLC. |
| 10.12 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Phillip Bennett. |
| 10.13 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and William Sexton. |
| 10.14 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Joseph Murphy. |
| 10.15 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Santo Maggio. |
| 10.16 | Restricted Unit Agreement dated as of August 5, 2004 between New Refco Group Ltd. and Dennis Klejna. |
| 10.17 | Equity Purchase and Merger Agreement dated June 8, 2004 among Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners and Refco Merger LLC. |
| 12 | Computation of Ratio of Earnings to Fixed Charges. |
| *21 | List of Subsidiaries. |
| 23.1 | Consent of Independent Registered Public Accounting Firm (Grant Thornton LLP). |
| *23.2 | Consent of Weil, Gotshal & Manges LLP (to be included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included in Part II of this registration statement). |
| 25.1 | Statement of Eligibility of Trustee on Form T–1 under the Trust Indenture Act of 1939 of Wells Fargo Bank, N.A. |
| 99.1 | Form of Letter of Transmittal. |
| 99.2 | Form of Notice of Guaranteed Delivery. |
| 99.3 | Form of Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees. |
| 99.4 | Form of Letter to Clients. |

---

\*

To be filed by amendment.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO GROUP LTD., LLC

By:    /s/  PHILLIP R. BENNETT

Name: Phillip R. Bennett
Title: President and Chief Executive Officer

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney–in–fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S–4 (including all pre–effective and post–effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys–in–fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney–in–fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  NEW REFCO GROUP LTD., LLC | Sole Member | October 12, 2004 |
| New Refco Group Ltd., LLC | | |
| *By:   /s/  PHILLIP R. BENNETT | President, Chief Executive Officer and Chairman | October 12, 2004 |
| Phillip R. Bennett | | |
| /s/  PHILLIP R. BENNETT | President and Chief Executive Officer (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| Phillip R. Bennett | | |
| /s/  JOSEPH J. MURPHY | Executive Vice President | October 12, 2004 |
| Joseph J. Murphy | | |
| /s/  WILLIAM M. SEXTON | Executive Vice President and Chief Operating Officer | October 12, 2004 |
| William M. Sexton | | |
| /s/  SANTO C. MAGGIO | Executive Vice President | October 12, 2004 |
| Santo C. Maggio | | |
| /s/  PHILIP SILVERMAN | Secretary | October 12, 2004 |
| Philip Silverman | | |
| /s/  DENNIS KLEJNA | Executive Vice President and General Counsel | October 12, 2004 |
| Dennis Klejna | | |

II–15

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO FINANCE INC.

By:　　　/s/  PHILLIP R. BENNETT

Name:  Phillip R. Bennett
Title:    President

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney−in−fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S−4 (including all pre−effective and post−effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys−in−fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney−in−fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br>Phillip R. Bennett | President & Director (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br>Philip Silverman | Secretary | October 12, 2004 |

II−16

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

BERSEC INTERNATIONAL LLC

By:        /s/  PHILLIP R. BENNETT

Name: Phillip R. Bennett
Title: President and Manager

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney−in−fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S−4 (including all pre−effective and post−effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys−in−fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney−in−fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br><br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  SANTO C. MAGGIO<br><br>Santo C. Maggio | Manager | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br><br>Philip Silverman | Secretary | October 12, 2004 |

II−17

# SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrants have duly caused this registration statement to be signed on their behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

> KROECK & ASSOCIATES LLC
> LIND–WALDOCK SECURITIES, LLC
> REFCO ADMINISTRATION, LLC
> REFCO CAPITAL HOLDINGS, LLC
> REFCO CAPITAL MANAGEMENT, LLC
> REFCO CAPITAL TRADING LLC
> REFCO F/X ASSOCIATES, LLC
> REFCO FINANCIAL, LLC
> REFCO FIXED ASSETS MANAGEMENT, LLC
> REFCO GLOBAL CAPITAL
>     MANAGEMENT LLC
> REFCO GLOBAL HOLDINGS, LLC
> REFCO INFORMATION SERVICES, LLC
> REFCO MORTGAGE SECURITIES, LLC
> REFCO REGULATED COMPANIES, LLC
> SUMMIT MANAGEMENT, (NEWCO) LLC

By:    /s/  PHILLIP R. BENNETT

Name: Phillip R. Bennett
Title: President and Manager

# POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney–in–fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S–4 (including all pre–effective and post–effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys–in–fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney–in–fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br><br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br><br>Philip Silverman | Secretary | October 12, 2004 |

II–18

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

MARKET EDUCATIONAL INSTITUTE, LLC

By:      /s/  PHILLIP R. BENNETT

Name: Phillip R. Bennett
Title: President and Manager

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney–in–fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S–4 (including all pre–effective and post–effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys–in–fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney–in–fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br><br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  JOSEPH J. MURPHY<br><br>Joseph J. Murphy | Manager | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br><br>Philip Silverman | Secretary | October 12, 2004 |

II–19

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

MARSHALL METALS, LLC

By:      /s/  PHILLIP R. BENNETT

Name: Phillip R. Bennett
Title: Vice President and Manager

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney–in–fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S–4 (including all pre–effective and post–effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys–in–fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney–in–fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br>Phillip R. Bennett | Vice President & Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  JOSEPH J. MURPHY<br>Joseph J. Murphy | Manager | October 12, 2004 |

II–20

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO CAPITAL LLC

By: /s/ PHILLIP R. BENNETT

    Name: Phillip R. Bennett
    Title: President and Manager

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney–in–fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S–4 (including all pre–effective and post–effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys–in–fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney–in–fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ PHILLIP R. BENNETT<br><br>Phillip R. Bennett | President and Manager (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/ SANTO C. MAGGIO<br><br>Santo C. Maggio | Manager | October 12, 2004 |
| /s/ PERRY ROTKOWITZ<br><br>Perry Rotkowitz | Manager | October 12, 2004 |
| /s/ PHILIP SILVERMAN<br><br>Philip Silverman | Secretary | October 12, 2004 |

II–21

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO GLOBAL FUTURES, LLC

By:      /s/  JOSEPH J. MURPHY
_____

Name: Joseph J. Murphy
Title: President and Chief Executive
          Officer and Manager

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney−in−fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S−4 (including all pre−effective and post−effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys−in−fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney−in−fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br>_____<br>Phillip R. Bennett | Manager | October 12, 2004 |
| /s/  JOSEPH J. MURPHY<br>_____<br>Joseph J. Murphy | President and Chief Executive Officer and Manager<br>(Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  WILLIAM M. SEXTON<br>_____<br>William M. Sexton | Manager | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br>_____<br>Philip Silverman | Secretary | October 12, 2004 |

II–22

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrants have duly caused this registration statement to be signed on their behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 12, 2004.

REFCO MANAGED FUTURES, LLC
WESTMINSTER–REFCO MANAGEMENT LLC

By:     /s/  JOSEPH J. MURPHY
_____

Name: Joseph J. Murphy
Title: President

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints each of Phillip R. Bennett, Philip Silverman and Frank Mutterer or any of them, each acting alone, his true and lawful attorney–in–fact and agent, with full power of substitution and resubstitution, for such person and in his name, place and stead, in any and all capacities, to sign this Registration Statement on Form S–4 (including all pre–effective and post–effective amendments), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys–in–fact and agents, each acting alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming that any such attorney–in–fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/  PHILLIP R. BENNETT<br>_____<br>Phillip R. Bennett | Manager | October 12, 2004 |
| /s/  JOSEPH J. MURPHY<br>_____<br>Joseph J. Murphy | President (Principal Executive, Financial and Accounting Officer) | October 12, 2004 |
| /s/  PHILIP SILVERMAN<br>_____<br>Philip Silverman | Secretary | October 12, 2004 |

II–23

QuickLinks

ADDITIONAL REGISTRANTS
TABLE OF CONTENTS
PROSPECTUS SUMMARY
Our Company
Industry
Recent Transactions
Our Equity Sponsor
Our Executive Offices
Summary of the Terms of the Exchange Offer
Summary of Terms of the Registered Notes
Risk Factors
RISK FACTORS
Risks Relating to the Notes
Risks Relating to the Exchange Offer
Risks Relating to Our Company
FORWARD–LOOKING STATEMENTS
THE EXCHANGE OFFER
USE OF PROCEEDS
CAPITALIZATION
UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS
Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2004 (in thousands)
Notes to Unaudited Pro Forma Consolidated Balance Sheet
Unaudited Pro Forma Consolidated Statement of Operations For the year ended February 29, 2004 (in thousands)
Unaudited Pro Forma Consolidated Statement of Operations For the three months ended May 31, 2004 (in thousands)
Notes to Unaudited Pro Forma Consolidated Statements of Operations
Notes to Unaudited Pro Forma Consolidated Financial Statements
SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
INDUSTRY
Futures and Options Trading Volume on Global Derivatives Exchanges (Contract amounts in millions)
BUSINESS
Our Fiscal Year 2004 Prime Brokerage/Capital Markets Revenue Breakdown
MANAGEMENT
Summary Compensation Table
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
DESCRIPTION OF CREDIT FACILITIES
DESCRIPTION OF THE NOTES
MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE OFFER
PLAN OF DISTRIBUTION
LEGAL MATTERS
EXPERTS
GLOSSARY
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF INCOME
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS
REFCO GROUP LTD., LLC AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF INCOME
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY For the three months ended
REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS
REFCO GROUP LTD., LLC AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
REFCO GROUP LTD., LLC AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
PART II INFORMATION NOT REQUIRED IN PROSPECTUS
REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
Condensed Financial Information of Refco Group Ltd., LLC
REFCO GROUP LTD., LLC CONDENSED BALANCE SHEETS (Parent Company Only)
REFCO GROUP LTD., LLC CONDENSED STATEMENTS OF INCOME (Parent Company Only)
REFCO GROUP LTD., LLC CONDENSED STATEMENTS OF CASH FLOWS (Parent Company Only)
REFCO GROUP LTD., LLC NOTES TO CONDEFINANCIAL STATEMENTS (Parent Company Only)
EXHIBIT INDEX
SIGNATURES
POWER OF ATTORNEY

SIGNATURES
POWER OF ATTORNEY
SIGNATURES
POWER OF ATTORNEY
SIGNATURES
POWER OF ATTORNEY
SIGNATURES
POWER OF ATTORNEY
SIGNATURES
POWER OF ATTORNEY
SIGNATURES
POWER OF ATTORNEY
SIGNATURES
POWER OF ATTORNEY
SIGNATURES
POWER OF ATTORNEY

# EXHIBIT F

CONFIDENTIAL OFFERING CIRCULAR

$600,000,000



**REFCO**®

## Refco Finance Holdings LLC
to be merged with and into
## Refco Group Ltd., LLC

## Refco Finance Inc.
### 9% Senior Subordinated Notes due 2012

We are offering $600,000,000 of our 9% Senior Subordinated Notes due 2012. We will pay interest on the notes on February 1 and August 1 of each year, commencing on February 1, 2005. The notes will mature on August 1, 2012.

Prior to August 1, 2008, we may redeem all the notes at a price equal to 100% of the principal amount of the notes plus the applicable premium set forth in this offering circular. We may redeem some or all of the notes on or after August 1, 2008 at the redemption prices set forth in this offering circular. Prior to August 1, 2007, we may redeem up to 35% of the notes using net equity proceeds from certain equity or income deposit securities offerings. There is no sinking fund for the notes.

This offering is being conducted in connection with a series of transactions, including the merger of Refco Finance Holdings LLC into Refco Group Ltd., LLC, that will result in affiliates of Thomas H. Lee Partners, L.P. and their co-investors acquiring an approximate 57% interest in Refco Group Ltd., LLC. In the event that we consummate this offering prior to the date on which the acquisition occurs, the indenture governing the notes will contain a special mandatory redemption provision. Pursuant to that provision, if the acquisition is not consummated on or prior to September 20, 2004 or the equity purchase and merger agreement is terminated at any time prior thereto, the notes will be redeemed at a price equal to 100% of the principal amount of the notes plus accrued and unpaid interest to the redemption date. Unless we close this offering concurrently with the acquisition, it will be a condition to the closing of this offering that an amount of cash or treasury securities sufficient to pay the special mandatory redemption price, when and if due, be deposited with an escrow agent.

In the event that funds to effect the special mandatory redemption are placed into escrow, if the acquisition is consummated on or prior to September 20, 2004, consummation of the merger of Refco Finance Holdings LLC with and into Refco Group Ltd., LLC will occur immediately following the release of the escrowed funds. In the event that we consummate this offering on the same date on which the acquisition occurs, consummation of this offering will occur immediately prior to consummation of the merger of Refco Finance Holdings LLC with and into Refco Group Ltd., LLC.

The notes will be our unsecured senior subordinated obligations and will rank junior to all our existing and future senior indebtedness. Upon consummation of the merger, Refco Group Ltd., LLC will assume all obligations of Refco Finance Holdings LLC under the notes. At that time, our obligations under the notes will be guaranteed on a senior subordinated basis by certain of the subsidiaries of Refco Group Ltd., LLC. Our obligations under the notes will not be guaranteed by the foreign subsidiaries of Refco Group Ltd., LLC or any of the regulated subsidiaries of Refco Group Ltd., LLC that are futures commission merchants or broker-dealers.

We will agree to file an exchange offer registration statement or, under specific circumstances, a shelf registration statement, pursuant to a registration rights agreement. In the event we fail to comply with certain of our obligations under the registration rights agreement, we will pay additional interest on the notes.

Refco Finance Inc., a wholly owned subsidiary of Refco Finance Holdings LLC, will be a co-obligor on the notes. Refco Finance Inc.'s obligations with respect to the notes will be joint and several with Refco Finance Holdings LLC prior to the merger and joint and several with Refco Group Ltd., LLC following the merger.

We expect that the notes will be eligible for trading in The PORTAL℠ Market ("PORTAL"), a subsidiary of The Nasdaq Stock Market, Inc.

**Investing in the notes involves risks. See "Risk Factors" beginning on page 19.**

**Price: 100%**

plus accrued interest, if any, from August 5, 2004.

Delivery of the notes in book-entry form will be made on or about August 5, 2004.

The notes have not been registered under the Securities Act of 1933. The notes may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A and to certain persons in offshore transactions in reliance on Regulation S. You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.

*Joint Book-Running Managers*

## Credit Suisse First Boston

## Banc of America Securities LLC

## Deutsche Bank Securities

The date of this confidential offering circular is July 22, 2004.

_____

## TABLE OF CONTENTS

| | Page |
|---|---|
| Notice to Investors | ii |
| Notice to New Hampshire Residents | iii |
| Sec Review | iii |
| Industry and Market Data | iv |
| Forward-Looking Statements | v |
| Where You Can Find Additional Information | vi |
| Offering Circular Summary | 1 |
| Risk Factors | 19 |
| The Transactions | 34 |
| Use of Proceeds | 35 |
| Capitalization | 36 |
| Unaudited Pro Forma Consolidated Financial Statements | 37 |
| Selected Historical Consolidated Financial Data | 46 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 50 |
| Industry | 65 |

| | Page |
|---|---|
| Business | 72 |
| Management | 85 |
| Security Ownership of Certain Beneficial Owners and Management | 89 |
| Certain Relationships and Related Transactions | 91 |
| Description of Credit Facilities | 95 |
| Description of the Notes | 98 |
| Certain U.S. Federal Income Tax Consequences | 160 |
| Plan of Distribution | 166 |
| Notice to Canadian Residents | 169 |
| Transfer Restrictions | 170 |
| Legal Matters | 172 |
| Independent Auditors | 172 |
| Glossary | 173 |
| Index to Consolidated Financial Statements | F-1 |

_____

**You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these securities. The information in this document may only be accurate on the date of this document.**

It is expected that delivery of the notes will be made against payment therefor on or about the date specified on the cover of this offering circular, which is the tenth business day following the date of pricing of the notes (such settlement cycle being referred to as "T+10"). You should note that trading of the notes on the date of pricing or the next six succeeding business days may be affected by the T+10 settlement. See "Plan of Distribution."

## NOTICE TO INVESTORS

This offering circular is being furnished by us on a confidential basis (1) to "qualified institutional buyers" and (2) in offshore transactions complying with Rule 903 or Rule 904 of Regulation S under the Securities Act of 1933, as amended (the "Securities Act") in connection with an offering that is exempt from registration under, or not subject to, the Securities Act, and applicable state securities laws solely to allow a prospective investor to consider purchasing the notes. Its use for any other purpose is not authorized. This offering circular is personal to the offeree to whom it has been delivered by the initial purchasers and does not constitute an offer to any other person or to the public generally. Distribution of this offering circular to any person other than the offeree and any person retained to advise such offeree is unauthorized, and any disclosure of the contents of this offering circular without our prior written consent is prohibited. By accepting delivery of this offering circular, you agree to the foregoing and to make no reproductions of this offering circular or any documents referred to herein.

No person is authorized in connection with any offering made by this offering circular to give any information or to make any representation not contained in this offering circular and, if given or made, any other information or representation must not be relied upon as having been authorized by us or the initial purchasers. The information contained in this offering circular is as of the date hereof and subject to change, completion or amendment without notice. Neither the delivery of this offering circular at any time nor any subsequent commitment to enter into any financing shall, under any circumstances, create any implication that there has been no change in the information set forth in this offering circular or in our affairs since the date of this offering circular. The offering is being made on the basis of this offering circular and is subject to the terms described in this offering circular and the indenture relating to the notes. Any decision to purchase the notes in the offering must be based on the information contained in this document. In making an investment decision, investors must rely on their own examination of us and the terms of this offering, including the merits and risks involved.

The information contained in this offering circular has been furnished by us and other sources we believe to be reliable. The initial purchasers make no representations or warranties, express or implied, as to the accuracy or completeness of any of the information set forth in this offering circular, and you should not rely on anything contained in this offering circular as a promise or representation, whether as to the past or the future. This offering circular contains summaries, believed to be accurate, of the terms we consider material of certain documents, but reference is made to the actual documents, copies of which will be made available upon request, for the complete information contained therein. All such summaries are qualified in their entirety by this reference. See "Where You Can Find Additional Information."

We reserve the right to withdraw the offering of the notes at any time, and we and the initial purchasers reserve the right to reject any commitment to subscribe for the notes, in whole or in part, and to allot to you less than the full amount of notes subscribed for by you.

This offering circular does not constitute an offer to sell or a solicitation of an offer to buy the notes to any person in any jurisdiction where it is unlawful to make such offer or solicitation. You are not to construe the contents of this offering circular as investment, legal or tax advice. You should consult your own counsel, accountant and other advisors as to legal, tax, business, financial and related aspects of a purchase of the notes. We are not, and the initial purchasers are not, making any representation to you regarding the legality of an investment in the notes by you under appropriate legal investment or similar laws.

The notes described in this offering circular have not been registered with, recommended by or approved by the Securities and Exchange Commission (the "SEC") or any other federal or state securities commission or regulatory authority, nor has the SEC or any state securities commission or

regulatory authority passed upon the accuracy or adequacy of this offering circular. Any representation to the contrary is a criminal offense.

The offering is being made in reliance upon an exemption from registration under the Securities Act for an offer and sale of securities that does not involve a public offering. In making your purchase, you will be deemed to have made certain acknowledgments, representations and agreements set forth in this offering circular under the caption "Transfer Restrictions." The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or an exemption from registration. See "Transfer Restrictions." You should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time.

The distribution of this offering circular and the offer and the sale of the notes may be restricted by law in certain jurisdictions. Persons into whose possession this offering circular or any of the notes come must inform themselves about, and observe, any such restrictions. See "Plan of Distribution" and "Transfer Restrictions."

The notes may not be offered or sold in the United Kingdom by means of any document except in circumstances which do not constitute an offer to the public within the meaning of the Public Offers of Securities Regulations 1995. All applicable provisions of the Financial Services and Markets Act 2000 must be complied with in respect to anything done in relation to the notes in, from or otherwise involving the United Kingdom.

The notes have not been and will not be qualified under the securities laws of any province or territory of Canada. The notes are not being offered or sold, directly or indirectly, in Canada or to or for the account of any resident of Canada in contravention of the securities laws of any province or territory thereof.

The notes will initially be available in book-entry form only. We expect that the notes will be issued in the form of one or more registered global notes. The global notes will be deposited with, or on behalf of, The Depository Trust Company ("DTC") and registered in its name or in the name of Cede & Co., its nominee. Beneficial interests in the global notes will be shown on, and transfers of beneficial interests in the global notes will be effected only through, records maintained by DTC and its participants. After the initial issuance of the global notes, certificated notes will be issued in exchange for global notes only in the limited circumstances set forth in the indenture governing the notes. See "Description of the Notes—Book-Entry, Delivery and Form."

## NOTICE TO NEW HAMPSHIRE RESIDENTS

**Neither the fact that a registration statement or an application for a license has been filed under Chapter 421-B of the New Hampshire Revised Statutes with the State of New Hampshire nor the fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the Secretary of State that any document filed under RSA 421-B is true, complete and not misleading. Neither any such fact nor the fact that an exemption or exception is available for a security or a transaction means that the Secretary of State has passed in any way upon the merits or qualifications of, or recommended or given approval to, any person, security or transaction. It is unlawful to make, or cause to be made, to any prospective purchaser, customer, or client any representation inconsistent with the provisions of this paragraph.**

## SEC REVIEW

As a result of the review by the SEC of the registration statement for the exchange offer or the shelf registration to be filed relating to the notes, it is possible that changes or modifications will be made to the description of our business and other information, including financial information, in this

iii

offering circular. Any such changes or modifications could be significant. In particular, we note that the SEC has adopted certain guidelines regarding the use of financial measures that do not comply with accounting principles generally accepted in the United States ("GAAP"), which guidelines will be applicable to the exchange offer registration statement or shelf registration statement to be filed with respect to the notes. The SEC may take the view that the non-GAAP financial measures included in this offering circular, including, for example, EBITDA, do not comply with these new guidelines and require us to remove them from, or to change the way we report our non-GAAP financial measures in, the exchange offer registration statement or shelf registration statement to comply with such guidelines. Any such changes would result in differences between the non-GAAP financial measures included in this offering circular and those included in the registration statement for the exchange offer or shelf registration, and any such changes could be significant. See the footnotes included in "Offering Circular Summary—Summary Historical and Pro Forma Consolidated Financial Data" and "—Summary Unaudited Pro Forma Consolidated Financial Data" and "Selected Historical Consolidated Financial Data" for a description of the calculation of these measures.

In addition, the consolidated financial statements included in this offering circular consist of consolidated audited balance sheets as of February 29, 2004 and February 28, 2003; consolidated audited statements of income and cash flows for the years ended February 29, 2004 and February 28, 2003; and consolidated unaudited statements of income and cash flows for the year ended February 28, 2002. The registration statement for the exchange offer or the shelf registration statement filed with respect to the notes will be required to include consolidated audited balance sheets as of the end of each of the two most recent fiscal years and audited statements of income and cash flows for each of the three fiscal years preceding the date of the most recent audited balance sheet.

## INDUSTRY AND MARKET DATA

We obtained the industry, market and competitive position data used throughout this offering circular from our own research, surveys and studies conducted by third parties and publications, including those published by the Bank for International Settlements ("BIS"), the Bond Market Association, the International Swaps and Derivatives Association and the Futures Industry Association ("FIA"). References to the "BIS survey" refer to the Bank for International Settlements' Triennial Central Bank Survey dated March 2002. While we believe that each of these surveys, studies and publications is reliable, neither we nor the initial purchasers have independently verified such data, and neither we nor the initial purchasers make any representations as to the accuracy of such information. Similarly, we believe our internal research is reliable but it has not been verified by any independent sources. Our statement that we are the largest independent Futures Commission Merchant in the United States is based on domestic customer segregated fund balances as of May 31, 2004.

iv

## FORWARD-LOOKING STATEMENTS

This offering circular contains forward-looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact included in this offering circular are forward-looking statements. Forward-looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. You can identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "plan," "intend," "believe" and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events.

These forward-looking statements are based on assumptions that we have made in light of our industry experience and on our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this offering circular, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (some of which are beyond our control) and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results and cause them to differ materially from those anticipated in the forward-looking statements. These factors include, among other things:

- changes in domestic and international market conditions;

- our ability to attract and retain customers;

- competition;

- our exposure to significant credit risks with respect to our customers;

- system failures;

- the performance of third-party suppliers;

- changes in regulations or exchange membership requirements;

- the effectiveness of compliance and risk management methods;

- changes in capital requirements;

- potential litigation or investigations;

- employee or introducing broker misconduct or errors;

- our ability to manage our growth or integrate future acquisitions;

- our relationships with introducing brokers;

- international operations and expansion; and

- retention of our management team.

Because of these factors, we caution that you should not place undue reliance on any of our forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made. New risks and uncertainties arise from time to time, and it is impossible for us to predict those events or how they may affect us. Except as required by law, we have no duty to, and do not intend to, update or revise the forward-looking statements in this offering circular after the date of this offering circular.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

Each purchaser of the notes from an initial purchaser will be furnished with a copy of this offering circular and any related amendments or supplements hereto. You acknowledge that (i) you have been afforded an opportunity to request from us, and to review and have received, all additional information considered by you to be necessary to verify the accuracy and completeness of the information contained herein, (ii) you have not relied on the initial purchasers or any person affiliated with the initial purchasers in connection with your investigation of the accuracy of such information or your investment decision and (iii) except as provided pursuant to clause (i) above, no person has been authorized to give any information or to make any representation concerning the notes offered hereby other than those contained in this offering circular and, if given or made, such other information or representation should not be relied upon as having been authorized by us or the initial purchasers.

While any notes remain outstanding, we will make available, upon request, to any holder and any prospective purchaser of notes the information required pursuant to Rule 144A(d)(4) under the Securities Act, during any period in which we are not subject to Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act").

## OFFERING CIRCULAR SUMMARY

*This summary highlights key information contained elsewhere in this offering circular. It may not contain all of the information that is important to you. You should read the entire offering circular, including "Risk Factors," our consolidated financial statements and the related notes thereto and the other documents to which this offering circular refers, before making an investment decision. Except as otherwise required by the context, references in this offering circular to "our company," "we," "us" or "our" refer to Refco Group Ltd., LLC and all of its subsidiaries. References to "Refco Finance" refer to Refco Finance Inc., which following the transactions contemplated by this offering circular will be a wholly owned subsidiary of Refco Group Ltd., LLC. References to "the co-issuers" refer to Refco Finance Holdings LLC and Refco Finance Inc., and following the merger of Refco Finance Holdings LLC with and into Refco Group Ltd., LLC, refer to Refco Group Ltd., LLC and Refco Finance. The terms "fiscal year" and "FY" refer to the 52 or 53 weeks ended the final day in February, while the terms "calendar year" and "year" refer to the year ending December 31, of the year referenced. References to "net revenues" refer to total revenues less interest expense. References to "operating profit" refer to income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary. This offering circular was prepared in connection with a series of transactions at the completion of which affiliates of Thomas H. Lee Partners, L.P. and co-investors will hold an approximate 57% interest in our parent, New Refco Group Ltd., LLC, referred to herein as "New Refco." For more information concerning these transactions, see "The Transactions." For more information concerning certain industry terms we use in this offering circular, see "Glossary."*

### Our Company

We are a leading independent provider of execution and clearing services for exchange-traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets. Annually, we process volumes of exchange-traded derivatives contracts comparable to the volumes traded on many of the world's major derivatives exchanges. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the Chicago Board of Trade ("CBOT") and greater than the volume on each of the Chicago Board Options Exchange ("CBOE") and the New York Mercantile Exchange ("NYMEX") during the same period. We are a leading clearing member of the Fixed Income Clearing Corporation ("FICC"), a clearing house for the U.S. fixed income markets. From fiscal year 2000 through fiscal year 2004, our net revenues and EBITDA (as defined in "—Summary Historical and Pro Forma Consolidated Financial Data") have increased at a compound annual growth rate of 20.6% and 29.4%, respectively, as a result of organic growth and acquisitions. For the twelve months ended May 31, 2004 ("LTM") on a pro forma basis after giving effect to the Transactions, we generated $1,008.0 million and $269.0 million of net revenues and EBITDA, respectively.

We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide our customers the ability to trade a wide range of products in the derivatives, fixed income and foreign exchange markets. Through our worldwide system of brokers and electronic trading platforms, we provide execution and clearing of our customers' orders with a focus on offering low costs and customer service. Consistent with our customer-oriented philosophy and to avoid potential conflicts with our customers, we do not engage in speculative trading for our own account.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase ("repo") transactions. We are focused on serving growing markets with a business model that benefits from increasing transaction volumes and requires minimal capital expenditures. For instance, we are a leader in the exchange-traded derivatives market,

1

which has experienced a compound annual growth rate in trading volume of 30% over the last five years.

After giving effect to the Transactions, we will be organized into two operating business segments for financial reporting purposes: Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and we will have one non-operating business segment, Corporate & Other.

### *Derivatives Brokerage & Clearing (72% of Pro Forma LTM Net Revenue and 50% of Pro Forma LTM Operating Profit)*

We execute and clear customers' orders for exchange-traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for execution and matching. Through our clearing services, we facilitate confirmation and settlement of our customers' derivatives transactions. We also ensure that our customers have the appropriate margin in their accounts to support their derivatives positions. We conduct these activities in our capacity as a Futures Commission Merchant (an "FCM"). As an FCM, we are responsible to the applicable clearing house for our customers' transactions. We are the largest independent FCM in the United States, based on domestic customer segregated fund balances of approximately $3.6 billion as of May 31, 2004. In 2003, we were the largest customer in terms of contract volume of the Chicago Mercantile Exchange ("CME"), the largest derivatives exchange in the United States.

Our business is diversified across customers, products and exchanges. Our customers include institutional clients, professional traders and retail customers. We provide our customers with access to trading in a wide range of derivatives products, including interest rate, equity index, energy, agriculture, foreign currency and metals contracts across all the major derivatives exchanges. The following charts illustrate our diversity across exchanges and contract types for fiscal year 2004:



**Contract Volume by Exchange(1)**



**Contract Volume by Type(1)**

(1) Total volume: 461 million contracts

We generate Derivatives Brokerage & Clearing revenues from: (i) transaction fees earned on each contract executed or cleared and (ii) interest income earned on cash balances in our customers' accounts. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at a compound annual growth rate of 23.9% and 40.8%, respectively, driven primarily by a 50% average annual increase in contract volume executed or cleared and a 20% average annual increase in customer deposits. Our growth has been generated both organically and through strategic acquisitions, which have broadened our customer base, service offerings, geographic reach and exchange coverage.

2

*Prime Brokerage/Capital Markets (28% of Pro Forma LTM Net Revenue and 50% of Pro Forma LTM Operating Profit)*

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non-dollar fixed income markets. The majority of our customers are hedge funds and other financial institutions to whom we offer unconflicted access to select markets, price transparency and anonymity.

Our fixed income operating platform provides our customers access to the interdealer broker ("IDB") market for U.S. Treasury securities. The IDB market is a wholesale securities market that allows brokers to trade with one another. Access to the IDB market is usually limited to member firms who meet certain membership requirements, such as minimum capital thresholds. We allow our customers to use our IDB membership and operating platform to gain direct access to transparent IDB market pricing and liquidity. This contrasts with our primary dealer competitors who do not offer their customers similar direct access because of potential conflicts with their institutional sales and proprietary investing operations. In 2003, we ranked fifth among FICC firms in terms of cleared U.S. Treasury repurchase transaction volume and ranked in the upper quartile for U.S. Treasury cash transaction volume. We also have a strong presence in Europe as one of the few non-bank repo clearing members of the London Clearing House ("LCH") and have an expanding presence in the Latin American, Eastern European and Southeast Asian fixed income markets.

In the case of foreign exchange, we act as a broker for customers wishing to transact business in the Interbank Foreign Exchange Market. We processed over $600 billion in customer transaction volume in fiscal year 2004. We enable our customers to participate in these markets by providing access via several platforms to trading in the majority of the world's principal currencies in the form of spot, forwards and options. These platforms include both voice broking in which our team of brokers place customer orders with market makers, primarily large money center banks, as well as online platforms. One such platform developed in conjunction with Currenex, a leading global provider of currency pricing systems, provides institutional customers with direct access to wholesale dealer markets. A separate online system has been developed specifically for retail customers and is offered to them both directly and through FXCM, a company in which we own a 35% interest.

We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned on each trade and (ii) interest income earned from providing secured customer financing through repo transactions. From fiscal year 2000 through fiscal year 2004, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at a compound annual growth rate of approximately 23.6% and 48.8%, respectively. This growth has been driven primarily by an increase in the number of customers, growth in the U.S. Treasury securities market and new product introductions.

## Industry

### Derivatives

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. Derivatives are broadly used in the global economy for risk management and investment. Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the OTC market. Exchange-traded derivatives transactions are executed either electronically or physically on an exchange floor through the traditional open outcry system. Activity on derivatives exchanges is facilitated by FCMs, such as us, which execute and clear derivatives contract orders on behalf of customers.

According to the BIS, annual trading volume in exchange-traded derivatives has grown at a compound annual growth rate of approximately 22% over the past 15 years and approximately 34% from 2001 to 2003. Volume growth in the exchange-traded derivatives market has been influenced by the following trends:

- the increasing awareness and importance of risk management;

- the introduction of new derivatives products;

- a shift in trading from over-the-counter ("OTC") markets to on-exchange trading;

- the deregulation of the derivatives markets and, more broadly, the financial services industry;

- increased competition among exchange and clearing platforms; and

- a shift towards electronic trading.

### Prime Brokerage/Capital Markets

Prime brokers offer execution, clearing, securities financing, securities lending, custody, trade processing and other administrative services to institutional clients. Prime brokers provide these services across a variety of securities markets, including equities, fixed income and foreign exchange. The increase in the number and size of hedge funds has been driving growth in the prime brokerage market. Below is a description of the securities markets in which we participate.

*Fixed Income.*   Our prime brokerage offerings are aimed primarily at providing customers with competitive access to a variety of fixed income markets, including those for U.S. Treasury securities, non-dollar sovereign debt, mortgage-backed securities and corporate bonds. Because these securities are traded on OTC markets as opposed to exchanges, the principal sources of liquidity are IDBs. OTC transactions are cleared and regulated by third-party clearing platforms, such as the FICC and LCH. We provide our customers with access to these IDB markets and act as their clearing agent at the FICC and LCH.

Investors in U.S. Treasury securities and repos typically access these markets in order to take a position on the direction of interest rate changes, implement arbitrage or cash management strategies or finance securities positions. Average daily trading volume in the interdealer market for U.S. Treasury securities and the average daily amount outstanding of repurchase agreements have each grown at a compound annual growth rate of 10% over the last five years. Factors influencing this growth include: (i) growth in the total amount of debt outstanding; (ii) growth in interest rate derivatives; (iii) greater sensitivity to credit risk; and (iv) the introduction of electronic trading platforms.

*Foreign Exchange.*   The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.4 trillion. The BIS survey estimates that dollar volume grew at a 6% compound annual growth rate from 1989 to 2001. A broad array of customers seek access to this market for trading and investment purposes. While transaction volume in this market is dominated by money center banks, an increasing number of investors utilize the services of non-bank market participants, including independent brokers. Factors influencing growth in the foreign exchange markets include: (i) increased cross-border trade and investment; (ii) increasing use of foreign exchange as a hedging tool; (iii) alternative investment asset flows; and (iv) the emergence of electronic brokerage.

### Competitive Strengths

### Leading Market Position

We are a leading independent provider of execution and clearing services for exchange-traded derivatives. We are also a major provider of execution and clearing services to institutions and

individuals trading in the fixed income and foreign exchange markets. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the CBOT and greater than the volume on each of the CBOE and the NYMEX during the same period. We cleared more contract volume on the CME, the largest derivatives exchange in the United States, than any other FCM in 2003. We are a clearing member on virtually all major domestic and international derivatives exchanges and offer our customers access to a broad range of derivatives contracts. In 2003, we ranked fifth among FICC firms in terms of cleared U.S. Treasury repo transaction volume and ranked in the upper quartile for U.S. Treasury cash transaction volume. We believe our leading market position gives us scale advantages in providing our customers a broad product offering, strong customer service, leading technology and low cost.

### Diversified Across Customers, Products and Markets

Our business is diversified across business divisions, customer segments, products and markets. Our operating profit is balanced between our Derivatives Brokerage & Clearing division and our Prime Brokerage/Capital Markets division. We provide services to over 200,000 customer accounts, encompassing a large and diversified mix of customers, including corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide access to a wide variety of exchange-traded derivatives products, including interest rate, equity index, energy, agricultural, foreign currency and metals contracts. We are present on nearly all major global derivatives exchanges, including CME, CBOT, Eurex, the London Metal Exchange ("LME"), Euronext and NYMEX. We also provide access to a wide range of fixed income and foreign exchange products, including U.S. Treasury securities, non-dollar fixed income, spot and forward currencies, currency options, precious metals, OTC options on U.S. Treasury securities, mortgage-backed securities, corporate bonds and related OTC derivatives.

### Attractive Risk Profile

We have built a comprehensive risk management system throughout our operations to limit and monitor our exposure to customer and counterparty risk. We only undertake transactions on behalf of our customers and consequently are not exposed to market risk as a result of proprietary trading. In order to mitigate customer and counterparty risk, we implement margin technologies, mark-to-market risk management tools, internal review and executive approval procedures and rigorous risk monitoring. As a result of our risk management techniques, we have had limited credit losses resulting from our customer or counterparty defaults since fiscal year 2000, even through such recent volatile events as the terrorist attacks on September 11, 2001.

### Scalable Operating Platform

Our significant processing volumes in exchange-traded derivatives, fixed income and foreign exchange have provided us with significant economies of scale. Our existing infrastructure is capable of processing significant and incremental volumes with minimal capital expenditures. In fiscal year 2004, we processed 461 million derivatives contracts, cleared over $9 trillion in U.S. Treasury repurchase transactions and processed over $600 billion in customer volume in the foreign exchange market. We believe our significant annual volume, combined with our variable cost structure and highly automated transaction processing facilities, provide us with cost advantages in the marketplace. Largely as a result of our efficient and scalable transaction processing platform, successful acquisition integration and leveraging of our fixed cost base, our EBITDA margins have increased from 18.5% in fiscal year 2000 to 24.5% in fiscal year 2004.

### Significant Free Cash Flow and Minimal Capital Investment Requirements

We generate significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to fiscal year 2004, our average capital expenditures were $16.0 million for the same period. In addition, our management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x.

### Proven and Committed Management Team

We are led by a senior management team that has an average of 22 years of industry experience. Phillip Bennett, who has been with us for 23 years, became our President and CEO in 1998 and formed a new senior management team comprised of well respected industry professionals. Under the leadership of our senior management team, net revenues and EBITDA have grown at a compound annual growth rate of 20.6% and 29.4%, respectively, from fiscal year 2000 to fiscal year 2004. Upon consummation of the Transactions, Mr. Bennett will beneficially own an approximate 43% interest in us. In addition, we intend to establish an equity incentive plan for our senior management team.

## Our Business Strategy

### Capitalize on Growing Markets

We have built our business within growing markets and have a revenue model that benefits from increasing transaction volumes. We continually work to identify new market and product opportunities where we can leverage our transaction processing platform. We maintain a strong presence on the world's major exchanges and OTC markets in which we operate, offer access to trading in an extensive suite of products to a diversified and growing customer base and continually seek to reduce our cost structure. We believe our strategy allows us to identify new and rapidly growing markets and to capitalize quickly on this growth.

### Leverage Our Leading Market Position

The economies of scale that arise from our large execution and clearing volumes allow us to improve our service offerings and build on our strong foundation as a leader in many of the markets we serve. We believe our leading market position is strengthened by the fact that we invest in technology, offer a broad range of products and provide our customers value-added services such as market research and 24-hour customer service. In addition, we maintain these service levels while maintaining competitive pricing. We believe our strong market position in derivatives execution and clearing among professional traders, who require low costs and quality service, and among retail investors, who demand rapid execution and a high level of customer service, serves to illustrate the quality, breadth and price competitiveness of the services we offer. We plan to continue to use the benefits of our economies of scale to improve our product and service offerings.

### Pursue Focused Business Model

We employ a focused business model that emphasizes high service levels and unconflicted access to markets for our customers. Across our divisions, we provide customers price transparency, reliable execution and competitive pricing. Consistent with our customer-oriented philosophy and to avoid potential conflicts with our customers, we do not engage in speculative trading for our own account. We have targeted specific markets where our service offerings allow us to compete effectively. In Derivatives Brokerage & Clearing, we distinguish ourselves when compared to many larger global

investment and commercial banking firms based on the breadth of our product and exchange offerings, our execution capabilities, our focus on a broad spectrum of customers and our low cost trading system. In Prime Brokerage/Capital Markets, we have focused on markets where unconflicted access, price transparency, anonymity, service and price allow us to offer differentiated services in comparison to our larger competitors who may have business model conflicts with either their proprietary trading group or their fixed income sales and trading group.

### Grow Our Customer Base

We plan to continue to grow our customer base and increase revenues from our existing customer base by tailoring our services and our customer acquisition strategies to address the diverse needs of our three key customer segments:

*Institutions*—We have a dedicated sales force of over 1,000 individuals calling on corporate and hedge fund customers. Our ability to provide institutional customers unconflicted access to a wide range of markets is an advantage when soliciting new customers. We believe recent trends such as growth in the hedge fund industry and increased cross-border commerce have increased the demand among corporations and hedge funds for a wider variety of products with which to hedge risks and invest for profit. We plan to take advantage of what we believe is a valuable cross-selling opportunity by continuing to educate our institutional customers about our full range of derivatives, fixed income and foreign exchange services.

*Professional Traders and "Locals"*—We have been building our strong market position as a provider of clearing services to professional traders on the world's major exchanges. Professional traders and locals are typically high trading volume customers and have contributed significantly to our volume growth. An increasing number of professional traders access the markets electronically. As part of our strategy to penetrate the market for locals, we have begun to offer training programs and high performance trading facilities for those moving from the trading floor to electronic trading and for new professional traders.

*Retail*—Our retail operations include our Lind-Waldock division, a prominent online retail derivatives brokerage operation. We believe we are well positioned to capitalize on an increased awareness and understanding of the derivatives and foreign exchange markets among retail customers. We plan to continue encouraging this increased understanding through targeted marketing via direct mail, the Internet, customer education seminars and other media. In order to serve the wide variety of customers in this segment, we offer a complete suite of retail-focused products and services, including online and broker-assisted trading and research.

### Capitalize on Shift to Electronic Trading

We believe the increased prevalence of electronic trading has: (i) encouraged higher trading volumes through lower execution costs; (ii) focused customers on the importance of technology through an increased awareness of execution speed; (iii) changed the types of customer service functions customers demand; and (iv) attracted a new group of customers to the markets we serve. We believe increased electronic trading has created an opportunity for us to increase market share in our various markets as our platform is well suited to accommodate these changes. We plan to take advantage of this opportunity by utilizing our scale, technology and market knowledge to adapt our service offerings as customer demands evolve.

### Pursue Selective Strategic Acquisitions

We intend to pursue selective acquisitions that will expand our service capabilities or customer base or provide greater access to trading in a wider range of products. Our flexible operating platform can facilitate the efficient transfer and integration of the customer positions and operations of acquired

companies. Our historical results have benefited from a focused acquisition program that has expanded our service offering and strengthened our market position within our customer segments. Since 1999, we have successfully acquired and integrated 11 businesses.

## Transactions

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with us, Refco Group Holdings, Inc. and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement") to, among other things, add New Refco as a party and modify the structure of the transactions contemplated by the agreement. The Purchase Agreement provides for a series of transactions, which will result in New Refco Group Ltd., LLC becoming our parent and THL Refco Acquisition Partners and its affiliates and co-investors owning an approximate 57% interest in New Refco, based on a valuation of New Refco of approximately $2.25 billion following the closing of the Transactions. THL Refco Acquisition Partners and its affiliates are affiliates of Thomas H. Lee Partners, L.P.

The Purchase Agreement and related documents contemplate the occurrence of the following transactions:

- an equity investment made by THL Refco Acquisition Partners and its affiliates and co-investors through the acquisition of a portion of our equity interests for approximately $513.0 million in cash, subject to adjustment (the "THL Acquisition");

- a rollover equity investment in us of approximately $387.0 million, subject to adjustment, by Phillip Bennett, our chief executive officer, through his continuing ownership interest in Refco Group Holdings, Inc., which will contribute its interest in us to New Refco;

- the entering into of senior credit facilities providing for approximately $800.0 million in term loans, which will be fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which will be drawn at closing;

- the issuance of $600.0 million in aggregate principal amount of senior subordinated notes, which are being offered hereby;

- the contribution by THL Refco Acquisition Partners and its affiliates and co-investors and Refco Group Holdings, Inc. of their interests in us to New Refco (the "New Refco Contribution"); and

- the merger of Refco Finance Holdings LLC with and into us, with our company continuing as the surviving entity.

The Purchase Agreement also provides that the earnings and losses generated by the business (other than the Asset Management business) from March 1, 2004 onward are for the account of our new equity holders.

Concurrently with the consummation of the Transactions, we will distribute $500.0 million in cash and all the equity interests of Forstmann-Leff International Associates, LLC, which upon consummation of the Transactions will own substantially all the assets of our Asset Management business, to New Refco. New Refco will immediately thereafter distribute these assets (the "RGHI Distributions") to Refco Group Holdings, Inc., an entity that is currently owned by Tone Grant and Phillip Bennett and that will be wholly owned by Phillip Bennett upon consummation of the Transactions.

We refer to the THL Acquisition, the New Refco Contribution, the RGHI Distributions, the financing transactions (including the issuance of the notes offered hereby) and the application of the proceeds from the financing transactions as the "Transactions." The following table illustrates the

estimated sources and uses of funds for the acquisition and financing transactions assuming their completion as of May 31, 2004. Actual amounts may differ.

| Sources (in millions) | | Uses (in millions) | |
|---|---|---|---|
| Cash on hand . . . . . . . . . . . . . . . . . . | $    50 | Equity proceeds(3) . . . . . . . . . . . . . . | $1,463 |
| Senior credit facilities(1) . . . . . . . . . . | 800 | Debt repayment(4) . . . . . . . . . . . . . . | 400 |
| Notes offered hereby . . . . . . . . . . . . | 600 | Rollover equity . . . . . . . . . . . . . . . . | 387 |
| Rollover equity(2) . . . . . . . . . . . . . . | 387 | Transaction fees and expenses(5) . . . . | 100 |
| THL capital investment . . . . . . . . . . | 513 | | |
| Total sources . . . . . . . . . . . . . . . . . . | $2,350 | Total uses . . . . . . . . . . . . . . . . . . . . | $2,350 |

---

(1) Our senior credit facilities will provide for loans in an aggregate principal amount of $875.0 million, including senior term loans in the amount of $800.0 million, all of which will be drawn immediately prior to closing, and a revolving credit facility providing for loans up to $75.0 million, none of which will be drawn at closing. See "Description of Credit Facilities—Senior Credit Facilities."

(2) A rollover equity investment by Phillip Bennett, our chief executive officer, through his continuing ownership interest in Refco Group Holdings, Inc., which will rollover approximately $387.0 million in equity, subject to adjustment.

(3) Represents payments made to or for the account of the existing equity holders, including an estimated $44.0 million relating to pre-payment premiums on our existing debt and approximately $13.0 million relating to earn-out obligations triggered by our change of control.

(4) Represents (i) $383.5 million of our existing unsecured senior notes issued under four note purchase agreements with interest rates ranging from 5.99% to 9.18% and maturities ranging from December 18, 2004 to October 15, 2009 and (ii) $16.0 million under an intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC. Actual amounts to be repaid will be reduced by any scheduled principal payment required after May 31, 2004 and prior to closing.

(5) Transaction costs include estimated discounts to the initial purchasers in connection with this offering, commitment and financing fees payable in connection with our senior credit facilities and investment banking, legal, accounting and other costs for professional services in connection with the Transactions, including fees payable to affiliates of Thomas H. Lee Partners, L.P. All fees and expenses are estimates, and if actual amounts are less, the equity investment by THL Refco Acquisition Partners and its affiliates and co-investors and the rollover equity of Phillip Bennett will be adjusted proportionately.

Subject to the receipt on or prior to August 5, 2004 of certain regulatory approvals and other consents necessary to consummate the THL Acquisition, the closing of this offering of notes will occur immediately prior to the completion of the THL Acquisition and certain other related financing transactions described above. In the event such approvals and consents are not received on or prior to August 5, 2004, the indenture governing the notes will have a special mandatory redemption provision, and it will be a condition to the closing of this offering that an amount sufficient to pay the special

mandatory redemption price be deposited with an escrow agent. Following the Transactions, our corporate structure will be as set forth in the following chart:



For a further description of the THL Acquisition, the New Refco Contribution, the RGHI Distributions and the related financing transactions, see ''The Transactions.''

### Our Equity Sponsor

Thomas H. Lee Partners is a leading private equity firm based in Boston that manages several private equity funds, with aggregate capital commitments of approximately $14 billion. Thomas H. Lee Partners has invested in more than 80 businesses and is currently investing for Thomas H. Lee Equity Fund V, L.P., an equity fund with over $6.1 billion of committed capital. Founded in 1974, Thomas H. Lee Partners is focused on identifying and acquiring substantial ownership stakes in mid- to large-capitalization growth companies. Thomas H. Lee Partners invests in companies with leading market positions, proven and experienced management teams, recognized brand names and well-defined business plans, which include opportunities for growth and expansion in their core and related businesses. Notable transactions sponsored by the firm include American Media, Inc., AXIS Capital Holdings Limited, Cott Corporation, Endurance Specialty Insurance Ltd., Houghton Mifflin Company, Michael Foods, Inc., National Waterworks, Inc., Simmons Company, TransWestern Publishing Company, LLC and Warner Music Group.

### Our Executive Offices

We are a Delaware limited liability company. Our principal executive offices are located at One World Financial Center, 200 Liberty Street Tower A, New York, New York 10281, and our telephone number is (212) 693-7000. We also have a website located at *www.refco.com*. The information that appears on our website is not a part of and is not incorporated into this offering circular.

## The Offering

Co-Issuers . . . . . . . . . . . . . . . . . .   Refco Finance Holdings LLC and Refco Finance Inc. will be the co-issuers of the notes. On the date of the THL Acquisition, Refco Finance Holdings LLC will merge with and into Refco Group Ltd., LLC, with Refco Group Ltd., LLC continuing as the surviving entity and becoming a co-obligor under the notes.

Notes Offered . . . . . . . . . . . . . . .   $600,000,000 aggregate principal amount of 9% senior subordinated notes due 2012.

Maturity Date . . . . . . . . . . . . . . .   August 1, 2012.

Interest . . . . . . . . . . . . . . . . . . . .   9% per annum, payable semiannually on February 1 and August 1 of each year, commencing on February 1, 2005.

Subsidiary Guarantees . . . . . . . . . .   All payments on the notes, including principal and interest, will be jointly and severally guaranteed on a senior subordinated basis by certain of our current and future subsidiaries. The notes will not be guaranteed by our regulated or foreign subsidiaries. Notwithstanding the foregoing, if the THL Acquisition is not consummated on or prior to September 20, 2004 or the Purchase Agreement is terminated at any time prior thereto, a special mandatory redemption of the notes will be required and none of our subsidiaries will guarantee the notes. See "Description of the Notes—Guaranties."

Ranking . . . . . . . . . . . . . . . . . . . .   The notes and the guarantees will be the co-obligors' and our subsidiary guarantors' senior subordinated obligations and will rank:

- junior in right of payment to all of our and our subsidiary guarantors' existing and future senior indebtedness, including borrowings under our senior credit facilities;

- equally in right of payment with any of our and our subsidiary guarantors' future senior subordinated indebtedness;

- senior in right of payment to any of our and our subsidiary guarantors' future indebtedness that is expressly subordinated in right of payment to the notes; and

- effectively junior to all existing and future liabilities of our subsidiaries that have not guaranteed the notes.

As of May 31, 2004, after giving pro forma effect to the Transactions, the notes and the guarantees would have ranked junior to approximately $800.0 million of our senior indebtedness, all of which would have consisted of borrowings under our senior credit facilities.

On a pro forma basis, after giving effect to the Transactions, the notes would have been effectively subordinated to the significant liabilities of our non-guarantor subsidiaries, all of which, as of May 31, 2004, related to our customer financing arrangements. See our unaudited pro forma consolidated balance sheets as of May 31, 2004 and note I to our unaudited consolidated financial statements included elsewhere in this offering circular.

Optional Redemption . . . . . . . . . .

Prior to August 1, 2008, we may redeem all, but not less than all, the notes for cash at a redemption price equal to 100% of their principal amount plus the Applicable Premium (as defined in "Description of the Notes—Optional Redemption") plus accrued and unpaid interest to the redemption date.

We may redeem any of the notes at any time on or after August 1, 2008, in whole or in part, at the redemption prices listed under "Description of the Notes—Optional Redemption," plus accrued and unpaid interest to the date of the redemption.

In addition, on or before August 1, 2007, we may redeem up to 35% of the aggregate principal amount of the notes initially issued and 100% of the aggregate principal amount of notes subsequently issued with the net equity proceeds of certain equity or income deposit securities offerings, provided at least 65% of the aggregate principal amount of the notes initially issued remain outstanding immediately after such redemption.

Escrow of Proceeds; Special Mandatory Redemption . . . . . . . .

In the event that we consummate this offering prior to the date on which the THL Acquisition occurs, the indenture governing the notes will contain a special mandatory redemption provision. Pursuant to that provision, if the THL Acquisition is not consummated on or prior to September 20, 2004 or the Purchase Agreement is terminated at any time prior thereto, the notes will be redeemed at a price equal to 100% of the principal amount thereof plus accrued and unpaid interest to the redemption date. Unless we close this offering on the same date as the THL Acquisition, it will be a condition to the closing of this offering that an amount of cash or treasury securities sufficient to pay the special mandatory redemption price, when and if due, be deposited with an escrow agent. If the THL Acquisition is consummated on or prior to September 20, 2004, the escrowed funds will be released to Refco Finance Holdings LLC, which will use the funds in connection with the closing of the THL Acquisition. See "Description of the Notes—Escrow of Proceeds; Special Mandatory Redemption."

Change of Control . . . . . . . . . . .

Upon a change in control, we will be required to make an offer to purchase each holder's notes at a price of 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of purchase. See "Description of the Notes— Change of Control."

Certain Covenants . . . . . . . . . . . .

The indenture governing the notes will contain covenants that will, among other things, limit our ability and the ability of our restricted subsidiaries and regulated subsidiaries to:

12

- incur or guarantee additional indebtedness;

- sell assets;

- pay dividends or make other equity distributions;

- purchase or redeem capital stock;

- make investments;

- consolidate or merge with or into other companies; and

- engage in transactions with affiliates.

These limitations will be subject to a number of important qualifications and exceptions. See "Description of the Notes—Certain Covenants."

Exchange Offer;
Registration Rights . . . . . . . . . . . .    We will agree to file a registration statement with respect to an offer to exchange the notes for a new issue of equivalent notes registered under the Securities Act on or prior to 180 days after this offering closes. We have also agreed to use our reasonable best efforts to cause the registration statement to be declared effective within 260 days after this offering closes. We may be required to provide a shelf registration statement to cover resales of the notes under certain circumstances.

If we fail to satisfy these obligations, we may be required to pay you additional interest. See "Description of the Notes—Registered Exchange Offer; Registration Rights."

Transfer Restrictions . . . . . . . . . . .    The notes and the guarantees have not been registered under the Securities Act and may not be offered or sold, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. See "Transfer Restrictions."

No Prior Market; PORTAL$^{SM}$
Market Listing . . . . . . . . . . . . . . .    The notes will be new securities for which there is no market. Although the initial purchasers have informed us that they intend to make a market in the notes and, if issued, the exchange notes, they are not obligated to do so and may discontinue market-making at any time without notice. Accordingly, we cannot assure you that a liquid market for the notes or exchange notes will develop or be maintained. We do not intend to list the notes on any securities exchange. We expect that the notes will be made eligible for trading in PORTAL.

Use of Proceeds . . . . . . . . . . . . . .    The proceeds from this offering, along with the proceeds from the term loans under our senior credit facility, will be used to fund cash payments to be made to our existing equity holders, repay certain existing indebtedness and pay related transaction fees and expenses (or if required, to fund the special mandatory redemption). See "Use of Proceeds."

## Risk Factors

Investing in the notes involves risk. See "Risk Factors" immediately following this summary for a discussion of risks relating to an investment in the notes.

### Summary Historical and Pro Forma Consolidated Financial Data

The following table sets forth our summary historical and pro forma consolidated financial data. The summary historical consolidated statement of operations and balance sheet data as of and for the fiscal years ended February 29, 2000, February 28, 2001, 2002 and 2003 and February 29, 2004 were derived from our audited consolidated financial statements for fiscal years 2003 and 2004 and unaudited consolidated financial statements for fiscal years 2000, 2001 and 2002. In the opinion of management, the unaudited consolidated financial statements for fiscal years 2000, 2001 and 2002 have been prepared on the same basis as the audited consolidated financial statements.

The unaudited pro forma consolidated statement of operations data for the twelve months ended May 31, 2004 give effect to the Transactions, including this offering, as if they occurred on March 1, 2003. The unaudited pro forma consolidated balance sheet data as of May 31, 2004 give effect to the Transactions, including this offering, as if they occurred on May 31, 2004. The pro forma adjustments are based upon available information and certain assumptions that we consider reasonable. Our pro forma unaudited consolidated financial data are not necessarily indicative of the results of operations that would have been achieved had the transactions reflected therein been consummated on the date indicated. We have presented our pro forma consolidated financial data for the twelve months ended May 31, 2004 because our management believes investors may find such data to be a useful measure of our recent operating performance.

The summary historical and pro forma data included below and elsewhere in this offering circular are not necessarily indicative of our future performance. The summary historical financial data for the periods indicated below include the results of our Asset Management business, substantially all of which is being distributed as part of the Transactions and will cease to be part of our business. This information is only a summary and should be read in conjunction with "Capitalization," "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this offering circular.

| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | Pro Forma Twelve Months Ended May 31, 2004 |
|---|---|---|---|---|---|---|
| | (unaudited) | (unaudited) | (unaudited) | | | (unaudited) |
| | | | (dollars in millions) | | | |
| **Statement of Operations Data:** | | | | | | |
| Revenues: | | | | | | |
| Commissions and brokerage . . . . . . . . . | $ 302 | $ 398 | $ 489 | $ 584 | $ 671 | $ 704 |
| Interest . . . . . . . . . . . . . . . . . . . . . . | 601 | 1,528 | 1,713 | 2,389 | 1,054 | 1,148 |
| Principal transactions, net . . . . . . . . . . . | 43 | 103 | 99 | 83 | 175 | 208 |
| Asset management and advisory fees . . . . | 52 | 110 | 63 | 44 | 48 | 6 |
| Other income . . . . . . . . . . . . . . . . . . . | 7 | 2 | 4 | 5 | 2 | 2 |
| Total revenues . . . . . . . . . . . . . . . . . | 1,005 | 2,141 | 2,368 | 3,105 | 1,950 | 2,068 |
| Expenses: | | | | | | |
| Commissions and order execution costs . . | 189 | 251 | 324 | 385 | 412 | 452 |
| Interest . . . . . . . . . . . . . . . . . . . . . . | 508 | 1,408 | 1,558 | 2,182 | 899 | 1,060 |
| Employee compensation and benefits . . . . | 137 | 213 | 198 | 212 | 238 | 223 |
| General, administrative and other . . . . . . | 104 | 174 | 172 | 168 | 201 | 199 |
| Total expenses . . . . . . . . . . . . . . . . . | 938 | 2,046 | 2,252 | 2,947 | 1,750 | 1,934 |
| Income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . . . . | 67 | 95 | 116 | 158 | 200 | 134 |
| Provision for income taxes . . . . . . . . . . | 8 | 8 | 7 | 2 | 12 | 16 |
| Income before minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . | 59 | 87 | 109 | 156 | 188 | 118 |
| Minority interest . . . . . . . . . . . . . . . . . | 2 | 1 | — | — | — | — |
| Income before dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . | 57 | 86 | 109 | 156 | 188 | 118 |
| Dividend on preferred securities issued by subsidiaries . . . . . . . . . . . . . . . . . . . | 12 | 14 | 16 | 16 | — | — |
| Members' interest in earnings of subsidiary | — | — | — | — | 1 | 2 |
| Net income . . . . . . . . . . . . . . . . . . . . | $ 45 | $ 72 | $ 93 | $ 140 | $ 187 | $ 116 |
| **Balance Sheet Data:** | | | | | | |
| Long-term debt and preferred securities issued by subsidiaries: | | | | | | |
| Long-term borrowings . . . . . . . . . . . . . | $ 200 | $ 295 | $ 262 | $ 452 | $ 384 | $1,400 |
| Subordinated debt . . . . . . . . . . . . . . . . | 43 | 41 | 16 | 16 | 16 | |
| Preferred securities issued by subsidiaries . | 125 | 160 | 160 | 160 | — | |
| Total long-term debt and preferred securities issued by subsidiaries . . . . . | 368 | 496 | 438 | 628 | 400 | 1,400 |
| Members' equity . . . . . . . . . . . . . . . . . | 441 | 500 | 515 | 566 | 616 | 76 |
| **Other Financial Data:** | | | | | | |
| EBITDA (2) . . . . . . . . . . . . . . . . . . . . | $ 92 | $ 140 | $ 179 | $ 211 | $ 258 | $ 269 |
| Depreciation and amortization . . . . . . . . | 14 | 23 | 38 | 26 | 28 | 43 |
| Long-term debt interest . . . . . . . . . . . . . | 13 | 23 | 25 | 27 | 31 | 94 |
| Dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . . . . . . . . | 12 | 14 | 16 | 16 | — | — |
| Capital expenditures . . . . . . . . . . . . . . . | 14 | 28 | 15 | 12 | 11 | |
| Ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA . . . . . . . . . . . . . . . . . . . . . | 4.0x | 3.5x | 2.5x | 3.0x | 1.5x | 5.2x |
| Ratio of EBITDA to long-term debt interest and dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . . | 3.7x | 3.8x | 4.4x | 4.9x | 8.3x | 2.9x |

Fiscal Year Ended February 28,

| | Fiscal Year Ended February 28, | | |
| --- | --- | --- | --- |
| | 2002 | 2003 | 2004(1) |
| | (unaudited) | | |
| **Segment Data:** | | | |
| Revenues: | | | |
| Derivatives Brokerage & Clearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 692 | $ 746 | $ 836 |
| Prime Brokerage/Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,217 | 2,610 | 1,277 |
| Asset Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70 | 58 | 72 |
| Corporate & Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (611) | (309) | (235) |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,368 | $3,105 | $1,950 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary: | | | |
| Derivatives Brokerage & Clearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 59 | $ 78 | $ 126 |
| Prime Brokerage/Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 96 | 101 | 134 |
| Asset Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 1 | (2) |
| Corporate & Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (53) | (22) | (58) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 116 | $ 158 | $ 200 |

(1) Year ended February 29.

(2) EBITDA represents earnings before long-term debt interest, dividends on preferred securities issued by subsidiaries, income taxes, depreciation and amortization. Our management believes EBITDA is useful to investors because it is frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry. In addition, our management believes that EBITDA is useful in evaluating our operating performance compared to that of other companies in our industry because the calculation of EBITDA generally eliminates the effects of financing and income taxes and the accounting effects of capital spending and acquisitions, which items may vary for different companies for reasons unrelated to overall operating performance. As a result, our management uses EBITDA as a measure to evaluate the performance of our various business lines and for other discretionary purposes.

However, EBITDA is not a recognized measurement under U.S. generally accepted accounting principles ("GAAP"), and when analyzing our operating performance, investors should use EBITDA in addition to, and not as an alternative for, operating income (loss) and net (loss) income, each as determined in accordance with GAAP. Because not all companies use identical calculations, our presentation of EBITDA may not be comparable to similarly titled measures of other companies. Furthermore, EBITDA is not intended to be a measure of free cash flow for our management's discretionary use as it does not consider certain cash requirements such as tax payments and debt service requirements. The amounts shown for EBITDA also differ from the amounts calculated under similarly titled definitions in our debt instruments, which are further adjusted to reflect certain other cash and non-cash charges and are used to determine compliance with financial covenants and our ability to engage in certain activities, such as incurring additional debt and making certain restricted payments.

EBITDA is calculated as follows:

| | Fiscal Year Ended February 28, | | | | | Pro Forma Twelve Months Ended May 31, |
| --- | --- | --- | --- | --- | --- | --- |
| | 2000(a) | 2001 | 2002 | 2003 | 2004(a) | 2004 |
| | (unaudited) | (unaudited) | (unaudited) | | | (unaudited) |
| Net income . . . . . . . . . . . . . . . . . . . | $ 45 | $ 72 | $ 93 | $140 | $187 | $116 |
| Depreciation and amortization . . . . . . . . | 14 | 23 | 38 | 26 | 28 | 43 |
| Provision for income taxes . . . . . . . . . . | 8 | 8 | 7 | 2 | 12 | 16 |
| Long-term debt interest . . . . . . . . . . . . | 13 | 23 | 25 | 27 | 31 | 94 |
| Dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . . . . . . . | 12 | 14 | 16 | 16 | — | — |
| EBITDA . . . . . . . . . . . . . . . . . . . . | $ 92 | $140 | $179 | $211 | $258 | $269 |

(a) Year ended February 29.

### Summary Unaudited Pro Forma Consolidated Financial Data

The following table sets forth our summary unaudited pro forma consolidated financial data for the twelve months ended February 29, 2004, three months ended May 31, 2003 and 2004 and twelve months ended May 31, 2004, giving effect to the Transactions, including this offering, as if they had occurred on the dates indicated below. The unaudited pro forma consolidated statement of operations data for the twelve months ended February 29, 2004, three months ended May 31, 2003 and 2004 and twelve months ended May 31, 2004 give effect to the Transactions, including this offering, as if they had occurred on March 1, 2003. The unaudited pro forma consolidated balance sheet data as of May 31, 2004 gives effect to the Transactions as if they occurred on May 31, 2004.

The pro forma adjustments are based upon available information and certain assumptions that we consider reasonable. Our pro forma unaudited consolidated financial data are not necessarily indicative of the results of operations that would have been achieved had the transactions reflected therein been consummated on the date indicated. We have presented pro forma consolidated financial data for the twelve months ended February 29, 2004, three months ended May 31, 2003 and 2004 and twelve months ended May 31, 2004 because our management believes investors may find such data to be a useful measure of our recent operating performance.

The summary pro forma data included below and elsewhere in this offering circular are not necessarily indicative of our future performance. This information is only a summary and should be read in conjunction with "Capitalization," "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this offering circular.

| | Twelve Months Ended February 29, 2004 | Three Months Ended May 31, 2003 | Three Months Ended May 31, 2004 | Twelve Months Ended May 31, 2004 |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| **Statement of Operations Data:** | | | | |
| Revenues: | | | | |
| Commissions and brokerage . . . . . . . . . . . . . . . . | $ 647 | $158 | $216 | $ 704 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,053 | 283 | 378 | 1,148 |
| Principal transactions, net . . . . . . . . . . . . . . . . . . | 175 | 35 | 67 | 208 |
| Asset management and advisory fees . . . . . . . . . . | 7 | 3 | 2 | 6 |
| Other income . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 2 | 1 | 2 |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . | $1,886 | $481 | $664 | $ 2,068 |
| Expenses: | | | | |
| Commissions and order execution costs . . . . . . . . | $ 412 | $102 | $143 | $ 452 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 963 | 267 | 361 | 1,060 |
| Employee compensation and benefits . . . . . . . . . . | 205 | 46 | 65 | 223 |
| General, administrative and other . . . . . . . . . . . . | 188 | 41 | 52 | 199 |
| Total expenses . . . . . . . . . . . . . . . . . . . . . . . | $1,768 | $456 | $621 | $ 1,934 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . | $ 118 | $ 25 | $ 43 | $ 134 |
| Provision for income taxes . . . . . . . . . . . . . . . . . . | 9 | — | 7 | 16 |
| Net income before dividends . . . . . . . . . . . . . . | 109 | 25 | 36 | 118 |
| Dividends on preferred securities . . . . . . . . . . . . . | — | — | — | — |
| Members' interest in earnings of subsidiary . . . . . . . . | 1 | — | 1 | 2 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 108 | $ 25 | $ 35 | $ 116 |

| | As of and for the | | | |
| --- | --- | --- | --- | --- |
| | Twelve Months Ended February 29, 2004 | Three Months Ended May 31, 2003 | Three Months Ended May 31, 2004 | Twelve Months Ended May 31, 2004 |
| | (Dollars in millions) | | | |
| **Balance Sheet Data:** | | | | |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . | | | | $55,619 |
| Long-term debt: | | | | |
|   Long-term borrowings . . . . . . . . . . . . . . . . . . | | | | 1,400 |
|   Subordinated debt . . . . . . . . . . . . . . . . . . . . . | | | | — |
|     Total long-term debt . . . . . . . . . . . . . . . . . . | | | | 1,400 |
| Members' equity . . . . . . . . . . . . . . . . . . . . . . | | | | 76 |
| **Other Financial Data:** | | | | |
| EBITDA (1) . . . . . . . . . . . . . . . . . . . . . . . . . | $ 256 | $ 63 | $ 78 | $ 269 |
| Depreciation and amortization . . . . . . . . . . . . . . . | 45 | 14 | 12 | 43 |
| Long-term debt interest . . . . . . . . . . . . . . . . . . . | 94 | 24 | 24 | 94 |
| Ratio of long-term debt to EBITDA . . . . . . . . . . | 5.5x | | | 5.2x |
| Ratio of EBITDA to long-term debt interest . . . . . . | 2.7x | | | 2.9x |

(1) EBITDA represents earnings before long-term debt interest, income taxes, depreciation and amortization. Our management believes EBITDA is useful to investors because it is frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry. In addition, our management believes that EBITDA is useful in evaluating our operating performance compared to that of other companies in our industry because the calculation of EBITDA generally eliminates the effects of financing and income taxes and the accounting effects of capital spending and acquisitions, which items may vary for different companies for reasons unrelated to overall operating performance. As a result, our management uses EBITDA as a measure to evaluate the performance of our various business lines and for other discretionary purposes.

However, EBITDA is not a recognized measurement under U.S. generally accepted accounting principles ("GAAP"), and when analyzing our operating performance, investors should use EBITDA in addition to, and not as an alternative for, operating income (loss) and net (loss) income, each as determined in accordance with GAAP. Because not all companies use identical calculations, our presentation of EBITDA may not be comparable to similarly titled measures of other companies. Furthermore, EBITDA is not intended to be a measure of free cash flow for our management's discretionary use as it does not consider certain cash requirements such as tax payments and debt service requirements. The amounts shown for EBITDA also differ from the amounts calculated under similarly titled definitions in our debt instruments, which are further adjusted to reflect certain other cash and non-cash charges and are used to determine compliance with financial covenants and our ability to engage in certain activities, such as incurring additional debt and making certain restricted payments.

EBITDA is calculated as follows:

| | Twelve Months Ended February 29, 2004 | Three Months Ended May 31, 2003 | Three Months Ended May 31, 2004 | Twelve Months Ended May 31, 2004 |
| --- | --- | --- | --- | --- |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . | $108 | $25 | $35 | $116 |
| Depreciation and amortization . . . . . . . . . . . | 45 | 14 | 12 | 43 |
| Provision for income taxes . . . . . . . . . . . . . . | 9 | — | 7 | 16 |
| Long-term debt interest . . . . . . . . . . . . . . . . | 94 | 24 | 24 | 94 |
| EBITDA . . . . . . . . . . . . . . . . . . . . . . . . . | $256 | $63 | $78 | $269 |

## RISK FACTORS

*An investment in the notes involves a high degree of risk. You should carefully consider the risks described below, together with the other information contained in this offering circular, before making your decision to invest in the notes. Any of the following risks, as well as other risks and uncertainties, could harm the value of the notes directly, or our business and financial results and thus indirectly cause the value of the notes to decline. The risks described below are not the only ones that could impact our company or the value of the notes. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business, financial condition or results of operations. As a result of any of these risks, known or unknown, you may lose all or part of your investment in the notes.*

### Risks Relating to this Offering and the Notes

***Our substantial indebtedness could adversely affect our financial health, harm our ability to react to changes to our business and prevent us from fulfilling our obligations under our indebtedness, including the notes.***

As a result of the Transactions, we will have a significant amount of indebtedness. As of May 31, 2004, on a pro forma basis after giving effect to the Transactions, we would have had total debt of approximately $1,400.0 million outstanding. For the twelve months ended May 31, 2004, on a pro forma basis after giving effect to the Transactions, our interest expense would have been $94.0 million.

Our substantial level of indebtedness increases the possibility that we may be unable to generate cash sufficient to pay, when due, the principal of, interest on or other amounts due in respect of our indebtedness. Our substantial debt could also have other significant consequences. For example, it could:

- increase our vulnerability to general economic downturns and adverse competitive and industry conditions;

- require us to dedicate a substantial portion, if not all, of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- place us at a competitive disadvantage compared to competitors that have less debt;

- limit our ability to raise additional financing on satisfactory terms or at all; and

- adversely impact our ability to comply with the financial and other restrictive covenants in the indenture governing the notes and the credit agreement governing our senior credit facilities, which could result in an event of default under such agreements.

Furthermore, our interest expense could increase if interest rates increase because all of the debt under our senior credit facilities is variable-rate debt. See "Description of Credit Facilities—Senior Credit Facilities." If we do not have sufficient earnings, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or sell more securities, none of which we can guarantee we will be able to do.

***Despite current indebtedness levels, we and our subsidiaries may still be able to incur substantially more debt. This could further exacerbate the risks associated with our substantial leverage.***

We and our subsidiaries may be able to incur substantial additional indebtedness in the future. Although the indenture governing the notes and our senior credit facilities contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. For example, we will have up to $75.0 million of borrowings available under our new revolving credit

facility following the consummation of the Transactions and will have the ability to increase the aggregate amount of our term loan up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. Any additional borrowings could be senior to the notes and the related guarantees. If we incur additional debt above the levels in effect upon the closing of the Transactions, the risks associated with our substantial leverage would increase.

***To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to make payments on and to refinance our indebtedness, including the notes and amounts borrowed under our senior credit facilities, and to fund our operations, will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control.

We cannot assure you that our business will generate sufficient cash flow from operations or that future borrowings will be available to us under our senior credit facilities or otherwise in amounts sufficient to enable us to service our indebtedness, including the notes and amounts borrowed under our senior credit facilities, or to fund our other liquidity needs. If we cannot service our debt, we will have to take actions such as reducing or delaying capital investments, selling assets, restructuring or refinancing our debt or seeking additional equity capital. We cannot assure you that any of these remedies could, if necessary, be effected on commercially reasonable terms, or at all. In addition, the indenture governing the notes and the credit agreement for our senior credit facilities may restrict us from adopting any of these alternatives. Furthermore, Thomas H. Lee Partners, L.P. and its affiliates and Phillip Bennett have no continuing obligation to provide us with debt or equity financing. Because of these and other factors beyond our control, we may be unable to pay the principal, premium, if any, interest or other amounts on the notes. See "Description of Credit Facilities" and "Description of the Notes."

***We depend almost entirely on the cash flow from our subsidiaries to meet our obligations, and the notes will be effectively subordinated to all obligations of our non-guarantor subsidiaries, including our regulated subsidiaries.***

We conduct all of our operations through our subsidiaries and will depend almost entirely upon dividends and other inter-company transfers of funds from our subsidiaries to meet our payment obligations under the notes. Unless they are guarantors of the notes, our subsidiaries do not have any obligation to pay amounts due on the notes or to make funds available for that purpose. Upon the consummation of the Transactions, the subsidiary guarantors of the notes will include only our non-regulated domestic subsidiaries. As a result of this structure, the notes will be effectively subordinated to all indebtedness and other obligations (such as trade payables) of our non-guarantor subsidiaries, including to the significant liabilities of our regulated subsidiaries that relate to our customer financing arrangements. For further information regarding the liabilities of our non-guarantor subsidiaries, see note I to our unaudited consolidated financial statements. The effect of this subordination is that, in the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding involving a non-guarantor subsidiary, the assets of that subsidiary could not be used to pay you until after all other claims against that subsidiary, including trade payables, have been fully paid. In addition, holders of minority equity interests in non-guarantor subsidiaries may receive distributions prior to or pro rata with us depending on the terms of the equity interests.

***A majority of our net revenues and EBITDA are generated by, and a majority of our assets are held by, our non-guarantor subsidiaries who have no obligations to pay amounts due on the notes and whose indebtedness and all other obligations are effectively senior to the notes.***

The historical consolidated financial data and the pro forma consolidated financial data included in this offering circular are presented on a consolidated basis for our entire business and include our

non-guarantor subsidiaries. For the twelve months ended May 31, 2004 on a pro forma basis after giving effect to the Transactions, the aggregate net revenues and EBITDA of our non-guarantor subsidiaries before considering our Corporate & Other segment were $1,035.0 million and $281.0 million, respectively, representing approximately 103% of our total consolidated net revenues and approximately 104% of our total consolidated EBITDA. The assets of our non-guarantor subsidiaries, which principally relate to assets relating to customer accounts and our customer financing activities, represent substantially all our assets. As discussed in the preceding risk factor, these non-guarantor subsidiaries have no obligation to pay amounts due on the notes or to make funds available for these purposes and the notes will be effectively subordinated to all these subsidiaries' liabilities. For further information regarding the assets and liabilities of our non-guarantor subsidiaries, see note I to our unaudited consolidated financial statements.

***Regulatory and legal restrictions may prohibit certain of our subsidiaries from paying dividends and making other payments to us.***

As discussed in the previous two risk factors, we conduct all of our operations through our subsidiaries and will depend almost entirely upon dividends and other inter-company transfers of funds from our subsidiaries to meet our payment obligations under the notes. In addition to not guaranteeing the notes, our regulated subsidiaries are limited in their ability to pay dividends and make other payments to us by applicable laws and regulations. For example, Refco, LLC, one of our subsidiaries registered as an FCM with the Commodity Futures Trading Commission ("CFTC"), must seek regulatory approvals to pay a substantial dividend and will not be able to pay dividends to us if after paying such dividends it would fail to maintain its minimum capital requirements, which as of May 31, 2004 were $125.8 million. See "Business—Regulation."

***Restrictive covenants in the senior credit facilities and the indenture may restrict our ability to pursue our business strategies.***

Our senior credit facilities contain a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to engage in acts that may be in our long-term best interests. Our senior credit facilities include covenants restricting, among other things, our ability to:

- incur or guarantee additional debt;
- incur liens;
- make loans and investments;
- make capital expenditures;
- declare or pay dividends or redeem or repurchase capital stock;
- engage in mergers, acquisitions and other business combinations;
- prepay, redeem or purchase subordinated debt (including the notes);
- amend or otherwise alter terms of subordinated debt (including the notes);
- sell assets and engage in sale leaseback transactions;
- transact with affiliates; and
- alter the business that we conduct.

The indenture relating to the notes also contains numerous covenants including, among other things, restrictions on our ability to:

- incur or guarantee additional indebtedness;
- sell assets;
- declare or pay dividends or make other equity distributions;

- purchase or redeem capital stock;

- make investments;

- consolidate or merge with or into other companies;

- engage in transactions with affiliates; and

- alter the business that we conduct.

Our senior credit facilities also will include financial covenants, including requirements that we maintain:

- a minimum interest coverage ratio; and

- a maximum leverage ratio.

These financial covenants will become more restrictive over time.

A breach of any covenant or the inability to comply with any required financial ratio contained in either our senior credit facilities or the indenture governing the notes could result in a default under that agreement. If any such default occurs, the lenders under our senior credit facilities or the holders of the notes, as the case may be, may elect (after the expiration of any applicable notice or grace periods) to declare all outstanding borrowings, together with accrued and unpaid interest and other amounts payable thereunder, to be immediately due and payable. In addition, a default under the indenture governing the notes would cause a default under the senior credit facilities, and the acceleration of debt under the senior credit facilities or the failure to pay that debt when due (assuming the amount of that debt is in excess of $50.0 million) would cause a default under the indenture governing the notes. The lenders under our senior credit facilities also have the right upon an event of default thereunder to terminate any commitments they have to provide further borrowings. Further, following an event of default under our senior credit facilities, the lenders under these facilities will have the right to proceed against the collateral granted to them to secure that debt, which includes the available cash of our subsidiaries that guarantee the senior credit facilities, and they will also have the right to prevent us from making debt service payments on the notes. If the debt under our senior credit facilities or the notes offered hereby were to be accelerated, we cannot assure you that our assets would be sufficient to repay in full that debt or any other debt that may become due as a result of that acceleration.

Notwithstanding the restrictions on our ability to pay dividends, redeem or purchase capital stock and make certain other restricted payments, the indenture governing the notes will allow us to make significant restricted payments in certain circumstances. For example, prior to August 1, 2009, we will be allowed to make restricted payments in an unlimited amount upon the achievement of certain leverage and senior leverage ratios, and will continue to be able to make such payments in an unlimited amount for so long as we maintain those ratios. See "Description of the Notes—Certain Covenants—Limitation on Restricted Payments."

***Your right to receive payments on the notes will be subordinated to the borrowings under our senior credit facilities and possibly all of our future borrowings. Further, the guarantees of the notes are junior to all the guarantors' existing senior indebtedness and possibly to all of the guarantors' future borrowings.***

The notes and the guarantees rank in right of payment behind all of the co-issuers' and the guarantors' existing senior indebtedness, including borrowings under our senior credit facilities, and will rank in right of payment behind all of the co-issuers' and the guarantors' future borrowings, except any future indebtedness that expressly provides that it ranks equal or junior in right of payment to the notes and the guarantees. As of May 31, 2004, on a pro forma basis after giving effect to the Transactions, the notes and the guarantees would have been contractually subordinated to approximately $800.0 million of senior term loan debt. In addition, our senior credit facilities and the indenture governing the notes permit us to incur up to $75.0 million in additional borrowings under

22

our revolving credit facility, subject, in the case of our senior credit facilities, to compliance with the covenants and conditions to borrowings under the senior credit facilities, which borrowings would be senior to the notes and the guarantees. Our senior credit facilities and the indenture will also permit us to increase the term loan facility under our credit agreement by up to $200.0 million, subject, in the case of the senior credit facilities, to certain conditions. See "Description of Credit Facilities—Senior Credit Facilities." We will also be permitted to incur substantial additional indebtedness, including senior indebtedness, in the future.

As a result of this subordination, upon any distribution to the creditors of the co-issuers or the creditors of the guarantors in a bankruptcy, liquidation or reorganization or similar proceeding relating to the co-issuers or the guarantors or their respective property, the holders of senior debt of the co-issuers and the guarantors will be entitled to be paid in full and in cash before any payment (other than payments in certain junior securities) may be made with respect to the notes or the guarantees, as the case may be.

All payments (other than payments in the form of certain junior securities) on the notes and the guarantees will be blocked in the event of a payment default on designated senior debt and may be blocked for up to 179 consecutive days in the event of certain non-payment defaults on designated senior debt.

In the event of a bankruptcy, liquidation or reorganization or similar proceeding relating to the co-issuers or the guarantors, holders of the notes will participate with the trade creditors and all other holders of the co-issuers' and the guarantors' senior subordinated indebtedness, as the case may be, in the assets remaining after the co-issuers and the guarantors have paid all of the senior secured indebtedness. However, because the indenture requires that amounts otherwise payable to holders of the notes in a bankruptcy or similar proceeding be paid to holders of senior indebtedness instead, holders of the notes may receive less, ratably, than holders of trade payables or other unsecured, unsubordinated creditors in any such proceeding. In any of these cases, the co-issuers and the guarantors may not have sufficient funds to pay all of its creditors, and holders of the notes may receive less, ratably, than the holders of senior indebtedness. See "Description of the Notes—Ranking."

***The notes are not secured by our assets and the lenders under our senior credit facilities will be entitled to remedies available to a secured lender, which gives them priority over you to collect amounts due to them.***

In addition to being subordinated to all the co-issuers' and guarantors' existing and future senior debt, the notes and the guarantees will not be secured by any of their assets. Our obligations under our senior credit facilities are secured by, among other things, a first priority pledge of all the common equity interests of the co-issuers and substantially all our other assets. If we become insolvent or are liquidated, or if payment under our senior credit facilities or in respect of any other secured indebtedness is accelerated, the lenders under our senior credit facilities or holders of other secured indebtedness will be entitled to exercise the remedies available to a secured lender under applicable law (in addition to any remedies that may be available under documents pertaining to our senior credit facilities or other senior debt). Upon the occurrence of any default under our senior credit facilities (and even without accelerating the indebtedness under our senior credit facilities), the lenders may be able to prohibit the payment of the notes and guarantees either by limiting our ability to access our cash flow or under the subordination provisions contained in the indenture governing the notes. See "Description of Credit Facilities" and "Description of the Notes—Ranking."

***Federal and state fraudulent transfer laws permit a court to void the notes and the guarantees, and if that occurs, you may not receive any payments on the notes.***

Upon consummation of the Transactions, the notes will be guaranteed by each of the subsidiary guarantors. The co-issuers' issuance of the notes and the issuance of the guarantees by the subsidiary guarantors may be subject to review under federal and state fraudulent transfer and conveyance statutes if a bankruptcy, liquidation or reorganization case or a lawsuit, including circumstances in

23

which bankruptcy is not involved, were commenced at some future date by, or on behalf of, unpaid creditors of the co-issuers or the subsidiary guarantors. While the relevant laws may vary from state to state, under such laws the issuance of the notes or the guarantees and the application of the proceeds from the issuance of the notes will be a fraudulent conveyance if (1) a co-issuer issued the notes or a subsidiary guarantor issued a guarantee with the intent of hindering, delaying or defrauding creditors or (2) a co-issuer or any of the subsidiary guarantors, as applicable, received less than reasonably equivalent value or fair consideration in return for issuing either the notes or a guarantee, and, in the case of (2) only, one of the following is true:

- a co-issuer or any of the subsidiary guarantors were insolvent, or rendered insolvent, by reason of such transactions;

- a co-issuer or any of the subsidiary guarantors were engaged in a business or transaction for which the applicable co-issuer's or subsidiary guarantor's assets constituted unreasonably small capital; or

- a co-issuer or any of the subsidiary guarantors intended to, or believed that it would, be unable to pay its debts as they matured.

If a court were to find that the issuance of the notes or a guarantee were a fraudulent conveyance, the court could void the payment obligations under the notes or such guarantee or subordinate the notes or such guarantee to presently existing and future indebtedness of the applicable co-issuer or guarantor, or require the holders of the notes to repay any amounts received with respect to the notes or such guarantee. In the event of a finding that a fraudulent conveyance occurred, you may not receive any payment on the notes or the guarantees.

The measures of insolvency for purposes of fraudulent transfer laws vary depending upon the governing law. Generally, an entity would be considered insolvent if, at the time it incurred indebtedness:

- the sum of its debts was greater than the fair value of all its assets;

- the present fair saleable value of its assets is less than the amount required to pay the probable liability on its existing debts and liabilities as they become due; or

- it cannot pay its debts as they become due.

A court would likely find that a co-issuer or subsidiary guarantor did not receive reasonably equivalent value or fair consideration for the issuance of the notes or its guarantee if the co-issuer or subsidiary guarantor did not substantially benefit directly or indirectly from the issuance of the notes. Each guarantee will contain a provision intended to limit the subsidiary guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent transfer. This provision may not be effective to protect the guarantees from being voided under fraudulent transfer law.

***There are restrictions on your ability to resell your notes.***

The notes have not been registered under the Securities Act or any state securities laws. Absent registration, the notes may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and applicable state securities laws. Although the co-issuers and the guarantors will agree to file, and to use their reasonable best efforts to have declared effective, a registration statement relating to an exchange offer for the notes, we cannot assure you that a registration statement will become or remain effective.

***We cannot assure you that an active trading market will develop for these notes.***

The notes are a new issue of securities and there is no established trading market for the notes. Although the notes have been designated for trading in PORTAL, we do not intend to apply to list the notes for trading on any securities exchange or to arrange for quotation on any automated dealer

quotation system. As a result of this and the other factors listed below, an active trading market for the notes may not develop, in which case the market price and liquidity of the notes may be adversely affected.

In addition, you may not be able to sell your notes at a particular time or at a price favorable to you. Future trading prices of the notes will depend on many factors, including:

- our operating performance and financial condition;
- our prospects or the prospects for companies in our industry generally;
- our ability to complete the offer to exchange the notes for registered notes or to register the notes for resale;
- the interest of securities dealers in making a market in the notes;
- the market for similar securities;
- prevailing interest rates; and
- the other factors described in this offering circular under "Risk Factors."

Historically, the market for non-investment grade debt has been subject to disruptions that have caused volatility in prices. It is possible that the market for the notes will be subject to disruptions. A disruption may have a negative effect on you as a holder of the notes, regardless of our prospects or performance.

Although the initial purchasers have advised us that they intend to make a market in the notes, they are not obligated to do so. The initial purchasers may also discontinue any market making activities at any time, in their sole discretion, which could further negatively impact your ability to sell the notes or the prevailing market price at the time you choose to sell.

***In the event that the THL Acquisition is not consummated on or prior to September 20, 2004 or the Purchase Agreement is terminated at any time prior thereto, the notes will be subject to a special mandatory redemption.***

In the event that we consummate this offering prior to the date on which the THL Acquisition occurs, the indenture governing the notes will contain a special mandatory redemption provision. Pursuant to that provision, if the THL Acquisition is not consummated on or prior to September 20, 2004 or the Purchase Agreement is terminated at any time prior thereto, the notes will be redeemed at a price equal to 100% of the principal amount thereof plus accrued and unpaid interest to the redemption date. Unless we close this offering on the same date as the THL Acquisition, it will be a condition to the closing of this offering that an amount of cash or treasury securities sufficient to pay the special mandatory redemption price, when and if due, be deposited with an escrow agent. See "Description of the Notes—Escrow of Proceeds; Special Mandatory Redemption." If the notes are redeemed as a result of the special mandatory redemption, you may not obtain the return you expect to receive on the notes.

***We may not be able to fulfill our repurchase obligations in the event of a change of control.***

Upon the occurrence of any change of control, we will be required to make a change of control offer to repurchase the notes. Any change of control also would constitute a default under our senior credit facilities. Therefore, upon the occurrence of a change of control, the lenders under our senior credit facilities would have the right to accelerate their loans, and if so accelerated, we would be required to repay all of our outstanding obligations under our senior credit facilities. Also, our senior credit facilities will generally prohibit us from purchasing any notes if we do not repay all borrowings under such facilities first or obtain the consent of the lenders under such facilities. Accordingly, unless we first repay all such borrowings or obtain the consent of such lenders, we will be prohibited from purchasing the notes upon a change of control.

In addition, if a change of control occurs, there can be no assurance that we will have available funds sufficient to pay the change of control purchase price for any of the notes that might be delivered by holders of the notes seeking to accept the change of control offer and, accordingly, none of the holders of the notes may receive the change of control purchase price for their notes. Our failure to make the change of control offer or to pay the change of control purchase price when due would result in a default under the indenture governing the notes. See "Description of the Notes—Defaults."

## Risks Relating to Our Company

***Changes in domestic and international market factors that affect trading volumes or interest rates could significantly harm our business.***

We generate revenues primarily from transaction fees we earn from executing and clearing customer orders and from interest income we earn on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. These revenue sources are substantially dependent on customer trading volumes and interest rates. We are, in particular, affected by customer trading volumes on the six primary derivatives exchanges on which we conduct transactions and in the fixed income and foreign exchange markets. The volume of transactions our customers conduct with us and interest rates are directly affected by domestic and international market factors that are beyond our control, including:

- economic, political and market conditions;

- broad trends in industry and finance;

- changes in levels of trading activity in the broader marketplace;

- price levels and price volatility in the derivatives, fixed income, equity, foreign exchange and commodity markets;

- legislative and regulatory changes;

- the actions of our competitors;

- changes in government monetary policies;

- foreign exchange rates; and

- inflation.

Any one or more of these factors, or others, may contribute to reduced trading volumes or changes in interest rates, which could have a material adverse effect on our business, financial condition and operating results.

***We face intense competition from other companies, and if we are not able to successfully compete with them, our business may be harmed.***

The derivatives, securities and financial services industries are highly competitive, and we expect that competition will intensify in the future. We have numerous current and prospective competitors, both domestically and internationally. They include both large, diversified financial institutions, such as major investment banks and independent specialty brokers. Many of our competitors and potential competitors have larger customer bases and greater financial, marketing, technological and personnel resources than we do. These resources may enable them to, among other things:

- develop services similar to ours or new services that are preferred by our customers;

- provide access to trading in products or a range of products that we do not offer;

- provide their services more efficiently and at a lower cost;

- offer better, faster and more reliable technology;

- take greater advantage of acquisitions, alliances and other opportunities;

- more effectively market, promote and sell their services; and

- better leverage their existing relationships with their existing customers.

In addition, new or existing competitors could gain access to trading markets in which we currently enjoy a competitive advantage. For example, if additional competitors gained access to the IDB market, it could adversely affect our advantage in providing trading access to the U.S. Treasury securities market. Moreover, we cannot assure you that existing market participants, such as the exchanges, will not expand their services and begin competing with us more directly. Even if new or existing competitors do not significantly erode our market share, we may be required to reduce our fees significantly to remain competitive, which could have a material adverse effect on our profitability. If in any of these cases we fail to compete effectively, our business, financial condition and operating results may be materially harmed.

***Our business could be adversely affected if we are unable to retain our current customers or attract new customers.***

The success of our business depends, in part, on our ability to maintain and increase our customer base. Customers in our market are sensitive to, among other things, the costs of using our services, the quality of the services we offer, the speed and reliability of order execution and the breadth of our service offerings and the products to which we offer access. We cannot assure you that we will be able to offer the pricing, service, speed and reliability of order execution or the service and product breadth that customers desire. As a result, we also cannot assure you that we will retain existing customers or attract new customers, and our failure to maintain or attract customers could have a material adverse effect on our business, financial condition and operating results.

***We rely on relationships with our introducing brokers for obtaining some of our customers. The failure to maintain these relationships could adversely affect our business.***

We have a relationship with introducing brokers who acquire and provide marketing and customer service functions for some of our customers. These introducing brokers receive compensation for introducing customers to us. The failure to maintain our relationships with these introducing brokers would result in a loss of revenues, which could adversely affect our business.

***Our business operations could be significantly disrupted if we lost members of our management team.***

Our success depends to a significant degree upon the continued contributions of our management team. Our future performance will be substantially dependent on our ability to retain and motivate them. We cannot assure you that any of these persons will not voluntarily terminate his or her employment with us. The loss of the services of any member of our management team, particularly our president and chief executive officer, Phillip Bennett, could adversely affect our ability to execute our business strategy. See "Management—Managers and Executive Officers."

***We may not effectively manage our growth, which could materially harm our business.***

We expect that our business will continue to grow. This growth may place a significant strain on our management, personnel, systems and resources. We must continue to improve our operational and financial systems and managerial controls and procedures, and we will need to continue to expand, train and manage our technology workforce. We must also maintain close coordination among our technology, compliance, risk management, accounting, finance, marketing and sales organizations. We cannot assure you that we will manage our growth effectively. If we fail to do so, our business could be materially harmed.

If we continue to grow, we may be required to increase our investment in facilities, personnel and financial and management systems and controls. Continued growth may also require expansion of our procedures for monitoring and assuring our compliance with applicable regulations and that we integrate, train and manage a growing employee base. The expansion of our existing businesses, our

expansion into new businesses and the resulting growth of our employee base increase our need for internal audit and monitoring processes that are more extensive and broader in scope than those we have historically required. We may not be successful in implementing all of the processes that are necessary. Further, unless our growth results in an increase in our revenues that is proportionate to the increase in our costs associated with this growth, our operating margins and profitability will be adversely affected.

***Our operations expose us to significant credit risks.***

We act on behalf of our customers for all trades consummated both on exchanges and in OTC markets. Accordingly, we are responsible for our customers' obligations with respect to these transactions, which exposes us to significant credit risk. Our customers may default on their obligations due to bankruptcy, lack of liquidity, operational failure or other reasons. A substantial part of our working capital is at risk if customers default on their obligations to us and their margin and security deposits are insufficient to meet all of their obligations. We cannot assure you that we will not be materially and adversely affected in the event of a significant default by our customers.

***Our acquisition and investment strategy and any other new business initiatives we undertake may involve risks, and if we are unable to effectively manage these risks, our business will be materially harmed.***

To achieve our strategic objectives, in the future we may seek to acquire other companies, businesses or technologies. Acquisitions entail numerous risks, including the following:

- difficulties in the integration of acquired operations, personnel or technologies;

- diversion of management's attention from other business concerns;

- assumption of unknown material liabilities;

- failure to achieve financial or operating objectives;

- amortization of acquired intangible assets, which would reduce future reported earnings; and

- potential loss of customers or key employees of acquired companies.

We also may seek to expand or enhance our operations by forming joint ventures, making other investments or undertaking other business initiatives and entering new lines of businesses. Entering into joint ventures also entails risks, including difficulties in developing and expanding the business of newly formed joint ventures, exercising influence over the activities of joint ventures in which we do not have a controlling interest and potential conflicts with our joint venture partners. Other investments and business initiatives may also involve risks, including but not limited to loss of investment. We cannot assure you that any acquisition, joint venture, investment or other business initiative that we have or may enter into will be successful.

***Our international operations involve special challenges that we may not be able to meet, which could adversely affect our financial results.***

We currently conduct international operations and plan to expand those operations. There are certain risks inherent in doing business in international markets, particularly in the securities trading industry, which is heavily regulated in many jurisdictions outside the United States. These risks include:

- less developed technological infrastructures and generally higher costs, which could result in lower customer acceptance of our services or customers having difficulty accessing our products and services;

- the inability to manage and coordinate the various regulatory requirements of multiple jurisdictions that are constantly evolving and subject to unexpected change;

- difficulties in staffing and managing foreign operations;

- fluctuations in exchange rates; and

- potentially adverse tax consequences.

Our operations in certain less developed countries are also subject to the political, legal and economic risks associated with politically unstable and less developed regions of the world, including the risk of war and other international conflicts, and actions by governmental authorities, insurgent groups, terrorists and others. Specifically, we conduct business in countries whose currencies may be unstable. Future instability in such currencies or the imposition of governmental or regulatory restrictions on such currencies could impede our foreign exchange business and our ability to collect on collateral held in such currencies.

In addition, we are required to comply with the laws and regulations of foreign governmental and regulatory authorities of each country in which we conduct business. These may include laws, rules and regulations relating to many aspects of the derivatives and capital markets businesses. Our compliance with these laws and regulations may be difficult and may require significant expenditures and personnel requirements, and our failure to be in compliance would subject us to legal and regulatory liabilities. We may also experience difficulty in managing our international operations because of, among other things, competitive conditions overseas, management of foreign exchange risk, established domestic markets, language and cultural differences and economic or political instability. Any of these factors could have a material adverse effect on the success of our international operations and, consequently, on our business, financial condition and operating results.

***If we experience systems failures or capacity constraints, our ability to conduct our operations would be materially harmed.***

We are heavily dependent on the capacity and reliability of the computer and communications systems supporting our operations, whether owned and operated internally or by third parties. We receive and process a large portion of our trade orders through electronic means, such as through public and private communications networks. These computer and communications systems and networks are subject to performance degradation or failure from any number of reasons, including loss of power, acts of war or terrorism, human error, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, intentional acts of vandalism, customer error or misuse, lack of proper maintenance or monitoring and similar events. During the terrorist attacks on the World Trade Center on September 11, 2001, we lost access to a significant portion of our communications and computer networks. Although the disruption of our operations as a result of this event was not material, we cannot assure you that the future occurrences of any of the events listed above, or of any other events, would not result in the material degradation or failure of our computer and communications systems and networks.

If such a degradation or failure were to occur, it could cause any number of results, including:

- unanticipated disruptions in service to our customers;

- slower response times;

- delays in our customers' trade execution;

- failed settlement of trades; and

- incomplete or inaccurate accounting, recording or processing of trades.

Further, any of our redundant systems or disaster recovery plans or our personnel, may not be adequate to correct or mitigate any of the above events. Similarly, we cannot be certain that any redundant systems, disaster recovery plans or personnel of our third party service providers will be

adequate to correct or mitigate any of the above events or be implemented properly. The occurrence of any of the foregoing events may lead to financial losses, litigation or arbitration claims filed by or on behalf of our customers and regulatory investigations and sanctions, including by the SEC and CFTC, which require that our trade execution and communications systems be able to handle anticipated present and future peak trading volumes. The occurrence of the foregoing events could also have a negative effect on our reputation, which in turn could cause us to lose existing customers to our competitors or make it more difficult for us to attract new customers in the future. Further, any financial loss that we suffer as a result of such degradations or failures could be magnified by price movements of contracts involved in transactions impacted by the degradation or failure, and we may be unable to take corrective action to mitigate any losses we suffer.

*If we fail to maintain our computer and communications systems and networks properly or to upgrade and expand such systems and networks in response to technological change, our business will be materially harmed.*

We need to properly maintain the computer and communications systems and networks that we currently own and operate. We internally support and maintain many of our existing systems and networks, including those that are critical to our derivatives clearing operations. Our failure to adequately maintain these systems and networks could have a material effect on the performance and reliability of such systems and networks, which in turn could materially harm our business.

Further, the markets in which we compete are characterized by rapidly changing technology, changes in customer demand and uses of our services and the emergence of new industry standards and practices that could render our existing technology and systems obsolete. Our future success will depend in part on our ability to anticipate and adapt to technological advancements and changing standards in a timely, cost-efficient and competitive manner, and to upgrade and expand our systems accordingly. Any upgrades or expansions may require significant expenditures of funds and may also increase the probability that we will suffer system degradations and failures. We cannot assure you that we will have sufficient funds to adequately update and expand our networks, nor can we assure you that any upgrade or expansion attempts will be successful and accepted by the marketplace and our customers. Our failure to adequately update and expand our systems and networks would have a material adverse effect on our business.

*We depend on third-party suppliers for a number of services that are important to our business.*

We depend on a number of suppliers, such as banking, clearing and settlement organizations, telephone companies, online service providers, data processors and software and hardware vendors for elements of our trading, clearing and other systems, as well as communications and networking equipment, computer hardware and software and related support and maintenance. We cannot assure you that any of these providers will be able to continue to provide these services in an efficient, cost-effective manner or that they will be able to adequately expand their services to meet our needs. An interruption in or the cessation of service by any service provider and our inability to make alternative arrangements in a timely manner, or at all, could have a material adverse effect on our business, financial condition and operating results.

*Our networks and those of our third-party service providers may be vulnerable to security risks.*

We expect the secure transmission of confidential information over public networks to continue to be a critical element of our operations. Our networks and those of our third-party service providers, the exchanges and counterparties with whom we trade and our customers may be vulnerable to unauthorized access, computer viruses and other security problems. Persons who circumvent security measures could wrongfully use our information or cause interruptions or malfunctions in our operations, any of which could have a material adverse effect on our business, financial condition and

operating results. Additionally, our reputation could be damaged. If an actual, threatened or perceived breach of our security occurs, the market perception of the effectiveness of our security measures could be harmed and could cause customers to reduce or stop their use of our products and services. We may be required to expend significant resources to protect against the threat of security breaches or to alleviate problems, including reputational harm and litigation, caused by any breaches. Although we intend to continue to implement industry-standard security measures, these measures may prove to be inadequate and result in system failures and delays that could lower trading volumes and have an adverse effect on our business, financial condition and operating results.

***We operate in a heavily regulated environment that imposes significant costs and compliance requirements on us. The failure to comply with the regulations to which we are subject could subject us to sanctions.***

We are extensively regulated by the CFTC; the SEC; the National Association of Securities Dealers ("NASD"), our designated self-regulatory organization with respect to our registration as a broker-dealer; the CME, our designated self-regulatory organization with respect to our registration as an FCM; the National Futures Association ("NFA"); other exchanges of which we are a member; state regulatory agencies and other domestic and foreign clearing organizations. If we fail to comply with applicable laws, rules or regulations, we may be subject to criminal conviction, increased reporting requirements, censure, fines, cease-and-desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including revocation of our operating licenses. Changes in laws, rules or regulations or in governmental policies in applying them could further restrict our operations, impose additional administrative or other burdens on our operations or result in an increase in our cost of regulatory compliance, any of which could have a material adverse effect on our business, financial condition and operating results.

The organizations and agencies that regulate us have broad powers to investigate and enforce compliance and punish non-compliance with their rules and regulations. We cannot assure you that we or our managers, officers and employees will be able to fully comply with these rules and regulations and will not be subject to claims or actions by these organizations and agencies.

***We will become subject to additional financial and other reporting and corporate governance requirements that may be difficult for us to satisfy.***

We have historically operated our business as a private company. We will be obligated after the effectiveness of our exchange offer registration statement or shelf registration statement to file with the SEC certain annual and quarterly information and other reports that are specified in Sections 13 and 15(d) of the Exchange Act as applicable to U.S. companies subject to such Sections. We will also become subject to other new financial and other reporting and corporate governance requirements, including certain provisions of the Sarbanes-Oxley Act of 2002 and the regulations promulgated thereunder, which will impose significant compliance obligations upon us. These obligations will require a commitment of additional resources and may in meeting these requirements require the hiring of additional staff and result in the diversion of our senior management's time and attention from our day to day operations. We cannot assure you that we will be successful in complying with these obligations or that the compliance with them will not adversely impact our business or results of operations.

***Our compliance and risk management methods might not be effective, which could increase the risk that we are subject to regulatory action or litigation or otherwise negatively impact our business.***

Our ability to comply with all applicable laws, rules and regulations is largely dependent on our establishment and maintenance of compliance, audit and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. If we fail to effectively establish and maintain such compliance and reporting systems or fail to attract and retain personnel

who are capable of designing and operating such systems, it will increase the likelihood that we will become subject to legal and regulatory infractions, including civil litigation.

For us to avoid risks inherent in our business, it is necessary for us to have polices and procedures that identify, monitor and manage our risk exposure. Such policies may not be fully effective. Some of our risk management methods depend upon evaluation of information regarding markets, customers or other matters that are publicly available or otherwise accessible by us. That information may not in all cases be accurate, complete, up-to-date or properly evaluated. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events. We cannot assure you that our policies and procedures will always be effective or that we will always be successful in monitoring or evaluating the risks to which we are or may be exposed. Such a failure could expose us to unforeseen risks, which could have a material adverse effect on our financial condition or results of operations.

*We are subject to significant litigation risk which could adversely affect our business.*

Many aspects of our business involve substantial liability risks, and we could be exposed to substantial liability under federal and state laws and court decisions, as well as rules and regulations promulgated by the SEC, the CFTC and other regulatory organizations. These risks include, among others, potential civil litigation triggered by regulatory investigations, potential liability from disputes over terms of a trade, the claim that a system failure or delay caused monetary losses to a customer, that we entered into an unauthorized transaction or that we provided materially false or misleading statements in connection with a transaction. The volume of claims and the amount of damages claimed in litigation and regulatory proceedings against financial intermediaries have been increasing. Dissatisfied customers frequently make claims against their service providers regarding quality of trade execution, improperly settled trades, mismanagement or even fraud. These risks also include potential liability from disputes over the exercise of our rights with respect to customer margins and security deposits. Although our customer agreements generally provide that we may exercise such rights with respect to customer margins and security deposits as we deem reasonably necessary for our protection, our exercise of these rights in certain cases has led to claims by customers that we have exercised these rights improperly. For example, we are currently the subject of a lawsuit brought by a customer who has alleged that we improperly liquidated its position in connection with a margin call. Even if we prevail in this or other lawsuits, we could incur significant legal expenses defending claims, even those without merit. An adverse resolution of any future lawsuit or claim against us could have a material adverse effect on our reputation, financial condition or operating results.

*We could be harmed by employee or introducing broker misconduct or errors that are difficult to detect and deter.*

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Misconduct by our employees or introducing brokers could include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers or improper use of confidential information. Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. It is not always possible to deter employee or introducing broker misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. Our employees or introducing brokers also may commit errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions. For example, the litigation referred to in the preceding risk factor resulted from the actions of employees.

***If we do not maintain the capital levels required by regulations, we may be fined or barred from conducting business.***

The SEC, NASD, CFTC and various other regulatory agencies have stringent rules with respect to the maintenance of specific levels of net capital by securities broker-dealers and FCMs. Our failure to maintain the required net capital could result in suspension or revocation of our registration by the SEC and our suspension or expulsion by the NASD, and could ultimately lead to our liquidation. If net capital rules are changed or expanded, or if we incur an unusually large charge against net capital, our operations that require an intensive use of capital could be limited. Such operations may include dealing activities, marketing and the financing of customer account balances. See "Business— Regulation" for more information on the minimum net capital requirements for our domestic broker-dealer and FCM subsidiaries.

***We have recorded a significant amount of intangible assets, which may never generate the returns we expect.***

Our acquisitions have resulted in significant increases in goodwill and identifiable intangible assets. Goodwill, which relates to the excess of cost over the fair value of the net assets of the businesses acquired by us, and identifiable intangible assets are expected to increase substantially as a result of the Transactions. On a pro forma basis after giving effect to the Transactions as if they occurred on May 31, 2004, we would have had approximately $731.0 million of goodwill and approximately $588.0 million of identifiable intangible assets.

Goodwill and identifiable intangible assets are recorded at fair value on the date of acquisition and, under Financial Accounting Standards Board Statement No. 142, *Goodwill and Other Intangible Assets* ("FAS 142"), goodwill and indefinite lived intangibles are reviewed at least annually for impairment. Finite lived intangibles are reviewed for impairment whenever events or changes in circumstances indicate carrying amounts may not be recoverable. Impairment may result from, among other things, deterioration in the performance of the acquired business, adverse market conditions, adverse changes in applicable laws or regulations, including changes that restrict the activities of the acquired business, and a variety of other circumstances. The amount of any impairment must be written off. We may never realize the full value of our intangible assets. Any future determination requiring the write-off of a significant portion of intangible assets would have an adverse effect on our financial condition and results of operations.

***The interests of our controlling members could conflict with your interests.***

Upon consummation of the Transactions, affiliates of Thomas H. Lee Partners, L.P. (the "THL Funds") and Phillip Bennett will beneficially own approximately 57% and 43%, respectively, of our parent's issued and outstanding membership units. The THL Funds will have the ability to designate four of our parent's eight managers, and, if our parent fails to meet certain yearly performance requirements, they can designate a fifth manager (with the total board size increasing to nine managers). The THL Funds will also have the ability to control all aspects of our business. Mr. Bennett will also have significant influence over our business. The THL Funds and Mr. Bennett may pursue transactions that could enhance their equity investment while involving risks to your interests. There can be no assurance that the interests of our controlling members will not conflict with your interests.

## THE TRANSACTIONS

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with us, Refco Group Holdings, Inc. and certain other parties, which was amended on July 9, 2004 to, among other things, add New Refco as a party and modify the structure of the transactions contemplated by the agreement. The Purchase Agreement provides for a series of transactions, which will result in New Refco Group Ltd., LLC becoming our parent and THL Refco Acquisition Partners and its affiliates and co-investors owning an approximate 57% interest in New Refco, based on a valuation of New Refco of approximately $2.25 billion following the closing of the Transactions. THL Refco Acquisition Partners and its affiliates are affiliates of Thomas H. Lee Partners, L.P.

The Purchase Agreement and related documents contemplate the occurrence of the following transactions:

- an equity investment made by THL Refco Acquisition Partners and its affiliates and co-investors through the acquisition of a portion of our equity interests for approximately $513.0 million in cash, subject to adjustment;

- a rollover equity investment in us of approximately $387.0 million, subject to adjustment, by Phillip Bennett, our chief executive officer, through his continuing ownership interest in Refco Group Holdings, Inc., which will contribute its interest in us to New Refco;

- the entering into of senior credit facilities providing for approximately $800.0 million in term loans, which will be fully drawn immediately prior to closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which will be drawn at closing;

- the issuance of $600.0 million in aggregate principal amount of senior subordinated notes, which are being offered hereby;

- the contribution by THL Refco Acquisition Partners and its affiliates and co-investors and Refco Group Holdings, Inc. of their interests in us to New Refco; and

- the merger of Refco Finance Holdings LLC with and into us, with our company continuing as the surviving entity.

The Purchase Agreement also provides that the earnings and losses generated by the business (other than the Asset Management business) from March 1, 2004 onward are for the account of our new equity holders.

Concurrently with the consummation of the Transactions, we will distribute $500.0 million in cash and all the equity interests of Forstmann-Leff International Associates, LLC, which upon consummation of the Transactions will own substantially all the assets of our Asset Management business, to New Refco. New Refco will immediately thereafter distribute these assets to Refco Group Holdings, Inc., an entity that is currently owned by Tone Grant and Phillip Bennett and that will be wholly owned by Phillip Bennett upon consummation of the Transactions.

## USE OF PROCEEDS

The proceeds from the issuance of the notes, along with the proceeds of the term loans under our new credit facility will be used to fund the cash payments to be made to our existing shareholders, repay certain existing indebtedness and pay related transaction fees and expenses (or if required, to fund the special mandatory redemption).

The following table illustrates the estimated sources and uses of funds for the Transactions assuming their completion as of May 31, 2004. Actual amounts may differ.

| Sources (in millions) | | Uses (in millions) | |
|---|---|---|---|
| Cash on hand . . . . . . . . . . . . . . . . . | $   50 | Equity proceeds(3) . . . . . . . . . . . . . | $1,463 |
| Senior credit facilities(1) . . . . . . . . . | 800 | Debt repayment(4) . . . . . . . . . . . . . . | 400 |
| Notes offered hereby . . . . . . . . . . . . | 600 | Rollover equity . . . . . . . . . . . . . . . . | 387 |
| Rollover equity(2) . . . . . . . . . . . . . . | 387 | Transaction fees and expenses(5) . . . . | 100 |
| THL capital investment . . . . . . . . . . | 513 | | |
| Total sources . . . . . . . . . . . . . . . . . | $2,350 | Total uses . . . . . . . . . . . . . . . . . . . . | $2,350 |

(1) Our senior credit facilities will provide for loans in an aggregate principal amount of $875.0 million, including senior term loans in the amount of $800.0 million, all of which will be drawn immediately prior to closing, and a revolving credit facility providing for loans up to $75.0 million, none of which will be drawn at closing. See "Description of Credit Facilities—Senior Credit Facilities."

(2) A rollover equity investment by Phillip Bennett, our chief executive officer, through his continuing ownership interest in Refco Group Holdings, Inc., which will rollover approximately $387.0 million in equity, subject to adjustment.

(3) Represents payments made to or for the account of the existing equity holders, including an estimated $44.0 million relating to pre-payment premiums on our existing debt and approximately $13.0 million relating to earn-out obligations triggered by our change of control.

(4) Represents (i) $383.5 million of our existing unsecured senior notes issued under four note purchase agreements with interest rates ranging from 5.99% to 9.18% and maturities ranging from December 18, 2004 to October 15, 2009 and (ii) $16.0 million under an intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC. Actual amounts to be repaid will be reduced by any scheduled principal payment required after May 31, 2004 and prior to closing.

(5) Transaction costs include estimated discounts to the initial purchasers in connection with this offering, commitment and financing fees payable in connection with our senior credit facilities and investment banking, legal, accounting and other costs for professional services in connection with the Transactions, including fees payable to affiliates of Thomas H. Lee Partners, L.P. All fees and expenses are estimates, and if actual amounts are less, the equity investment by THL Refco Acquisition Partners and its affiliates and co-investors and the rollover equity of Phillip Bennett will be adjusted proportionately.

## CAPITALIZATION

The following table sets forth our unaudited cash and cash equivalents and our unaudited capitalization as of May 31, 2004 on an actual basis and on a pro forma basis giving effect to the Transactions. This table should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this offering circular.

| | As of May 31, 2004 | |
| | Actual | Pro Forma |
| | (in thousands) | |
| Cash and cash equivalents | $ 224,116 | $ 147,460 |
| | | |
| Long-term debt | | |
| Senior credit facilities: | | |
| Term loans(1) | — | 800,000 |
| Revolving credit facility(2) | — | — |
| Existing unsecured senior notes(3) | 383,500 | — |
| Notes offered hereby | — | 600,000 |
| Subordinated debt(4) | 16,000 | — |
| Total long-term debt | 399,500 | 1,400,000 |
| Total members' equity | 671,100 | 75,911 |
| Total capitalization | $1,070,600 | $1,475,911 |

(1) Our new senior credit facilities will provide for $800.0 million in term loans, all of which will be drawn immediately prior to the closing of this offering.

(2) Our new senior facilities will provide for a $75.0 million revolving credit facility, none of which will be drawn at the closing of this offering.

(3) Represents $383.5 million of our existing unsecured senior notes issued under four note purchase agreements with interest rates ranging from 5.99% to 9.18% and maturities ranging from December 18, 2004 to October 15, 2009. Actual amounts to be repaid will be reduced by any scheduled principal payment required after May 31, 2004 and prior to closing.

(4) Represents $16.0 million under an intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC.

### UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS

The following unaudited pro forma consolidated financial statements have been derived by application of pro forma adjustments to our historical consolidated audited and unaudited financial statements included elsewhere in this offering circular and the unaudited management accounts of Forstmann-Leff International Associates, LLC.

The unaudited pro forma consolidated financial statements give effect to the following:

- an equity investment made by THL Refco Acquisition Partners and its affiliates and co-investors, totaling approximately $513.0 million in cash, subject to adjustment;

- a rollover equity investment by Phillip Bennett, our chief executive officer, through his continuing ownership interest in Refco Group Holdings, Inc., of approximately $387.0 million, subject to adjustment;

- the entering into of senior credit facilities providing for approximately $800.0 million in term loans, which will be fully drawn immediately prior to the closing of the THL Acquisition, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which will be drawn at closing;

- the issuance of $600.0 million in aggregate principal amount of senior subordinated notes, which are being offered hereby;

- the merger of Refco Finance Holdings LLC with and into Refco Group Ltd., LLC, with our company continuing as the surviving entity;

- the estimated payments of $44.0 million relating to pre-payment premiums on our existing debt and $13.0 million relating to earn-out obligations triggered by our change of control;

- the repayment of $383.5 million of our existing unsecured senior notes issued under four separate note purchase agreements; and

- the repayment of a $16.0 million intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group Ltd., LLC.

As part of the Transactions, we will distribute $550.0 million in cash and other capital distributions and all of the equity interests of Forstmann-Leff International Associates, LLC, which upon consummation of the Transactions will own substantially all the assets of our Asset Management business (the "Asset Management Distribution"), to New Refco. New Refco will immediately thereafter distribute these assets to Refco Group Holdings, Inc., an entity that is currently owned by Tone Grant and Phillip Bennett and that will be wholly owned by Phillip Bennett upon consummation of the Transactions.

The acquisition by THL Refco Acquisition Partners and its affiliates and co-investors of a portion of Refco Group Holdings, Inc.'s interest in us and Refco Group Holdings, Inc.'s contribution of its interest in us to New Refco are each accounted for as a purchase in conformity with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*, in accordance with Emerging Issues Task Force ("EITF") No. 88-16, *Basis in Leveraged Buy-Out Transactions,* with intangible assets recorded in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets.*

The unaudited pro forma consolidated balance sheet has been prepared to reflect the Transactions as if they had occurred on May 31, 2004. The unaudited pro forma consolidated statements of operations for the year ended February 29, 2004 and the twelve and three months ended May 31, 2004 have been prepared to give effect to the Transactions as if they had occurred on March 1, 2003. The assumptions underlying the pro forma adjustments are described in the accompanying notes, which should be read in conjunction with these unaudited pro forma consolidated financial statements.

The unaudited pro forma adjustments are based upon available information and certain assumptions that we believe are reasonable under the circumstances. The unaudited pro forma financial statements do not purport to represent what our results of operations or financial condition would have been had the Transactions actually occurred on the dates indicated, nor do they purport to project the results of our operations or financial condition for any future period or as of any future date.

The unaudited pro forma consolidated financial statements should be read in conjunction with the information contained in "The Transactions," "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto appearing elsewhere in this offering circular.

**Unaudited Pro Forma Consolidated Balance Sheet**
**as of May 31, 2004**
**(in thousands)**

| | Historical | Asset Management Distribution (a) | Cash Distribution, Acquisition and Related Financing | Pro Forma |
|---|---|---|---|---|
| | | **Adjustments for** | | |
| Cash and cash equivalents . . . . . . . . . . . . | $ 224,116 | $ (26,656) | $ (50,000)(b) | $ 147,460 |
| Cash and securities segregated under federal and other regulations: | | | | |
| Cash and cash equivalents . . . . . . . . . . . | 1,436,072 | — | — | 1,436,072 |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . . | 41,831 | — | — | 41,831 |
| Restricted cash . . . . . . . . . . . . . . . . . . . . | 500,000 | — | (500,000)(b) | — |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . . . . . | 41,800,629 | — | — | 41,800,629 |
| Deposits with clearing organizations and others . . . . . . . . . . . . . . . . . . . . . . | 1,919,371 | — | — | 1,919,371 |
| Receivables from broker-dealers and clearing organizations . . . . . . . . . . . . | 3,511,725 | — | — | 3,511,725 |
| Receivables from customers . . . . . . . . . . | 2,290,621 | (31,950) | — | 2,258,671 |
| Securities owned, at market or fair value . . | 2,897,884 | — | — | 2,897,884 |
| Memberships in exchanges, at adjusted cost . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,944 | — | 18,558 (c) | 34,502 |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . | 291,219 | (141,611) | 581,614 (d) | 731,222 |
| Other intangible assets . . . . . . . . . . . . . . . | 87,674 | (64,973) | 565,338 (e) | 588,039 |
| Deferred financing costs . . . . . . . . . . . . . . | 2,857 | — | 50,243 (f) | 53,100 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . | 209,166 | (11,110) | — | 198,056 |
| Total assets . . . . . . . . . . . . . . . . . . . . . | $55,229,109 | $(276,300) | $ 665,753 | $55,618,562 |
| **Liabilities:** | | | | |
| Short-term borrowings, including current portion of long-term borrowings . . . . . | $ 68,000 | — | (68,000)(g) | — |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . | 44,296,847 | — | — | 44,296,847 |
| Payable to broker-dealers and clearing organizations . . . . . . . . . . . . . . . . . . . | 2,381,069 | — | — | 2,381,069 |
| Payable to customers . . . . . . . . . . . . . . . . | 5,911,001 | (36,734) | — | 5,874,267 |
| Securities sold, not yet purchased, at market or fair value . . . . . . . . . . . . . . | 1,376,488 | — | — | 1,376,488 |
| Accounts payable, accrued expenses and other liabilities . . . . . . . . . . . . . . . . . | 192,649 | (2,480) | 23,356 (h) | 213,525 |
| Long-term borrowings . . . . . . . . . . . . . . . | 315,500 | — | 1,084,500 (g) | 1,400,000 |
| Subordinated debt . . . . . . . . . . . . . . . . . . | 16,000 | — | (16,000)(g) | — |
| Total liabilities . . . . . . . . . . . . . . . . . . | 54,557,554 | (39,214) | 1,023,856 | 55,542,196 |
| Commitments and contingent liabilities | | | | |
| Membership interests issued by subsidiary . | 455 | — | — | 455 |
| Members' equity . . . . . . . . . . . . . . . . . . . | 671,100 | (237,086) | (358,103)(b) | 75,911 |
| Total liabilities and members' equity . . . . | $55,229,109 | $(276,300) | $ 665,753 | $55,618,562 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

39

### Notes to Unaudited Pro Forma Consolidated Balance Sheet

**The following pro forma adjustments relate to the unaudited pro forma consolidated balance sheet as of May 31, 2004:**

(a)  Represents the financial position of the Asset Management Distribution as of May 31, 2004 as derived from the unaudited management information of the Asset Management business.

(b)  Adjustments to members' equity reflect the following items:

   (i) a decrease in equity as a deemed dividend of $362.7 million to reflect the carryover basis of the retained interest by the continuing management investors;

   (ii) an increase of $554.6 million to reflect the increase in equity related to the Transactions and the step-up of the net assets acquired and liabilities assumed of Refco; and

   (iii) a decrease in equity, restricted cash and cash and cash equivalents resulting from the distribution of excess capital of $550.0 million.

(c)  Represents the step-up in the value of the memberships in exchanges of $18.6 million, calculated as 43% of the predecessor basis and 57% of the fair value.

(d)  Represents the increase in goodwill of $581.6 million as a result of the Transactions being accounted for as a leveraged buyout, as described above.

(e)  Represents the step-up in the value of customer relationships of $317.6 million, trade names of $246.7 million and technology of $1.0 million, calculated as 43% of the predecessor basis and 57% of the fair value.

(f)  Represents a net increase of $50.2 million in deferred financing costs, consisting of an increase of $53.1 million due to the capitalization of the debt issuance costs in connection with the issuance of the notes offered hereby together with the new senior credit facility, offset by the remaining financing-related fees of the existing unsecured senior notes of $2.8 million. For purposes of this presentation principal underwriting fees of senior subordinated notes estimated at $16.0 million have been capitalized.

(g)  Represents indebtedness expected to be incurred, net of existing indebtedness in connection with the Transactions, as follows:

|  | (in thousands) |
|---|---:|
| Existing credit facility | $ — |
| Existing unsecured senior notes—current | 68,000 |
| —long-term | 315,500 |
| Existing subordinated debt | 16,000 |
| Total existing debt | $ 399,500 |
| New revolving credit facility | — |
| New senior term loans | 800,000 |
| New senior subordinated notes | 600,000 |
| Total debt expected to be incurred | $1,400,000 |
| Total adjustment to debt as a result of the Transactions | $1,000,500 |

    Certain prepayment penalties were incurred due to the early repayment of the existing debt. These penalties are paid from the proceeds of the offering and are included in the computation of goodwill.

(h)  Represents the adjustment to deferred taxes for the temporary differences resulting from the difference between the portion of basis carried over for book purposes and the fair value amount representing that portion of the assets' tax basis. The total pro forma deferred tax adjustment of $23.4 million resulting from these temporary differences has been included in goodwill.

40

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the year ended February 29, 2004**
**(in thousands)**

| | Historical | Adjustments for | | Pro Forma |
|---|---|---|---|---|
| | | Asset Management Distribution (a) | Cash Distribution, Acquisition and Related Financing | |
| Revenues: | | | | |
| Commissions and brokerage . . . . . . . . . | $ 671,034 | $(24,659) | $ — | $ 646,375 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . | 1,053,804 | (575) | — | 1,053,229 |
| Principal transactions, net . . . . . . . . . . | 175,011 | | — | 175,011 |
| Asset management and advisory fees . . | 47,911 | (40,656) | — | 7,255 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . | 2,775 | 1,198 | — | 3,973 |
| Total revenues . . . . . . . . . . . . . . . . . | 1,950,535 | (64,692) | — | 1,885,843 |
| Expenses: | | | | |
| Commissions and order execution costs | 411,894 | — | — | 411,894 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . | 898,658 | (984) | 65,789 (b)(c) | 963,463 |
| Employee compensation and benefits . . | 238,476 | (33,622) | — | 204,854 |
| General, administrative and other . . . . | 200,902 | (30,487) | 17,388 (d) | 187,803 |
| Total expenses . . . . . . . . . . . . . . . . . | 1,749,930 | (65,093) | 83,177 | 1,768,014 |
| Income before provision for income taxes and members' interests in earnings of subsidiary . . . . . . . . . . | 200,605 | 401 | (83,177) | 117,829 |
| Provision for income taxes . . . . . . . . . . . | 12,176 | — | (3,327)(e) | 8,849 |
| Income before members' interests in earnings of subsidiary . . . . . . . . . . | 188,429 | 401 | (79,850) | 108,980 |
| Members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . . . | 1,273 | — | — | 1,273 |
| Net income . . . . . . . . . . . . . . . . . | $ 187,156 | $ 401 | $(79,850) | $ 107,707 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

41

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the twelve months ended May 31, 2004**
**(in thousands)**

| | Historical | Asset Management Distribution(a) | Cash Distribution, Acquisition and Related Financing | Pro Forma |
|---|---|---|---|---|
| | | *Adjustments for* | | |
| **Revenues:** | | | | |
| Commissions and brokerage . . . . . . | $ 728,107 | $(23,993) | $ — | $ 704,114 |
| Interest . . . . . . . . . . . . . . . . . . . . | 1,148,525 | (525) | — | 1,148,000 |
| Principal transactions, net . . . . . . . . | 207,350 | (13) | — | 207,337 |
| Asset management and advisory fees . . . . . . . . . . . . . . . . . . . | 60,186 | (53,885) | — | 6,301 |
| Other . . . . . . . . . . . . . . . . . . . . . | 1,253 | 1,241 | — | 2,494 |
| Total revenues . . . . . . . . . . . . . | 2,145,421 | (77,175) | — | 2,068,246 |
| **Expenses:** | | | | |
| Commissions and order execution costs . . . . . . . . . . . . . . . . . . . . | 450,438 | 1,572 | — | 452,010 |
| Interest . . . . . . . . . . . . . . . . . . . . | 994,423 | (984) | 67,246 (b)(c) | 1,060,685 |
| Employee compensation and benefits . . . . . . . . . . . . . . . . . . | 263,028 | (40,126) | — | 222,902 |
| General, administrative and other . . | 215,700 | (34,090) | 17,389 (d) | 198,999 |
| Total expenses . . . . . . . . . . . . . | 1,923,589 | (73,628) | 84,635 | 1,934,596 |
| Income before provision for income taxes and members' interests in earnings of subsidiary . . . . . . . . . . . . . . . | 221,832 | (3,547) | (84,635) | 133,650 |
| Provision for income taxes . . . . . . . . | 19,480 | — | (3,385)(e) | 16,095 |
| Income before members' interests in earnings of subsidiary . . . . . . | 202,352 | (3,547) | (81,250) | 117,555 |
| Members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . | 2,199 | — | — | 2,199 |
| Net income . . . . . . . . . . . . . . . . | $ 200,153 | $ (3,547) | $ (81,250) | $ 115,356 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

42

**Unaudited Pro Forma Consolidated Statement of Operations**
**For the three months ended May 31, 2004**
**(in thousands)**

| | Historical | Adjustments for | | Pro Forma |
|---|---|---|---|---|
| | | Asset Management Distribution(a) | Cash Distribution, Acquisition and Related Financing | |
| **Revenues:** | | | | |
| Commissions and brokerage . . . . . . . . . | $220,279 | $ (4,096) | $ — | $216,183 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . | 377,743 | (61) | — | 377,682 |
| Principal transactions, net . . . . . . . . . . . | 67,300 | (13) | — | 67,287 |
| Asset management and advisory fees . . . | 23,435 | (21,544) | — | 1,891 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . | 978 | | — | 978 |
| Total revenues . . . . . . . . . . . . . . . . | 689,735 | (25,714) | — | 664,021 |
| **Expenses:** | | | | |
| Commissions and order execution costs . | 142,706 | — | — | 142,706 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . | 344,254 | — | 17,432 (b)(c) | 361,686 |
| Employee compensation and benefits . . | 76,866 | (12,296) | — | 64,570 |
| General, administrative and other . . . . . | 57,502 | (9,981) | 4,347 (d) | 51,868 |
| Total expenses . . . . . . . . . . . . . . . . | 621,328 | (22,277) | 21,779 | 620,830 |
| Income before provision for income taxes and members' interests in earnings of subsidiary . . . . . . . . . | 68,407 | (3,437) | (21,779) | 43,191 |
| Provision for income taxes . . . . . . . . . . . | 8,211 | — | (871)(e) | 7,340 |
| Income before members' interests in earnings of subsidiary . . . . . . . . . . . | 60,196 | (3,437) | (20,908) | 35,851 |
| Members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . . . | 926 | — | — | 926 |
| Net income . . . . . . . . . . . . . . . . . . . | $ 59,270 | $ (3,437) | $(20,908) | $ 34,925 |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements.

## Notes to Unaudited Pro Forma Consolidated Statements of Operations

**The following pro forma adjustments relate to the unaudited pro forma consolidated statements of operations for the year ended February 29, 2004, and the twelve and three months ended May 31, 2004:**

(a) Represents the results of operations of the Asset Management business for the year ended February 29, 2004 and the twelve and three months ended May 31, 2004, as derived from the unaudited management information of the Asset Management business.

(b) Represents interest expense for new debt incurred at the following interest rates, net of interest expense associated with existing debt being repaid:

New senior credit facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5.0%
New senior subordinated notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9.0%

The new senior credit facility accrues interest at the LIBOR rate plus 2.75% per annum. The actual rates will vary from those used to compute the above adjustment of interest expense due to floating rates applicable to our new senior credit facility. The effect on pretax income of a ⅛% variance in these rates would be approximately $1.0 million for an annual period.

(c) Represents additional interest expense for the year ended February 29, 2004 and the twelve and three months ended May 31, 2004 of $4.2 million, $4.1 million and $1.1 million, respectively. This increase results from increased debt issuance costs from debt expected to be incurred in relation to the Transactions.

(d) Represents additional amortization expense as a result of the step-up to fair market value of customer relationships and technology for the year ended February 29, 2004 and the twelve and three months ended May 31, 2004 of $17.4 million, $17.4 million and $4.3 million, respectively.

(e) Represents an increase in income tax benefits for the year ended February 29, 2004 and the twelve and three months ended May 31, 2004 of $3.3 million, $3.4 million and $0.9 million, respectively. This tax benefit is provided at a 4% tax rate, for New York City Unincorporated Business tax, due to the aggregate pro forma decrease in income before provision for income taxes. We will be treated as a partnership for federal income tax purposes and accordingly have not provided for federal income taxes related to our operating results.

## Notes to Unaudited Pro Forma Consolidated Financial Statements

The pro forma information, including the allocation of the purchase price and the exclusion of the Asset Management Distribution, is based on management's estimates and preliminary valuations of the tangible and intangible assets being acquired. The purchase price allocations for the Transactions are preliminary and further refinements will be made based on the results of final valuations and the resolution of any post-closing purchase price adjustments pursuant to the purchase and contribution agreement. Subject to the consummation of the Transactions, the related costs used in the unaudited pro forma consolidated financial statements have been estimated to be $100.0 million.

The Transactions are expected to be accounted for as a purchase as prescribed by Statement of Financial Accounting Standards No. 141, *Business Combinations,* in accordance with EITF No. 88-16, *Basis in Leveraged Buyout Transactions.* This guidance requires the continuing residual interest retained by the continuing management investors, as a result of the Transactions, be reflected at its predecessor basis. In accordance with EITF Issue No. 90-12, *Allocating Basis to Individual Assets and Liabilities for Transactions* within the Scope of Issue No. 88-16, a step-up of assets and liabilities to fair value has been recorded in purchase accounting as a result of the interest in us held by THL Refco Acquisition Partners and certain of its affiliates through their ownership interests in New Refco. The amount of carryover basis determined has been reflected as deemed dividend of $362.7 million in the unaudited pro forma consolidated balance sheet.

The following table summarizes the purchase price allocation at the date of acquisition:

|  | (in thousands) |
|---|---:|
| Cash and cash equivalents, securities purchased and deposits | $45,345,363 |
| Receivables, securities owned and other assets | 8,866,336 |
| Memberships in exchanges, at fair value | 34,502 |
| Total assets acquired | 54,246,201 |
| Short-term borrowings, securities sold and payables | 53,928,671 |
| Accounts payable, accrued expenses and other liabilities | 190,169 |
| Total liabilities assumed | 54,118,840 |
| Net tangible assets acquired | 127,361 |
| Purchase Price | 1,843,500 |
| Excess purchase price, representing: | 1,716,139 |
| Intangible assets: | |
| Customer relationships | 340,361 |
| Trade names | 248,930 |
| Technology | 1,026 |
| Goodwill | 1,125,822 |
| | — |

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

The following table sets forth our selected historical consolidated financial data as of and for the fiscal years ended February 29, 2000 and February 28, 2001, 2002 and 2003 and February 29, 2004, and for the three months ended May 31, 2003 and 2004. The selected historical consolidated financial data as of and for the fiscal years ended February 28, 2003 and February 29, 2004 have been derived from our audited consolidated financial statements for fiscal years 2003 and 2004, and the selected historical consolidated financial data for the fiscal years ended February 29, 2000 and February 28, 2001 and 2002 have been derived from our unaudited consolidated financial statements for fiscal years 2000, 2001 and 2002.

The selected historical consolidated financial data as of May 31, 2004 and for the three months ended May 31, 2003 and 2004 have been derived from our unaudited consolidated financial statements for those periods. The unaudited consolidated financial statements as of May 31, 2004 and for the three months ended May 31, 2003 and 2004 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and result of operations for the period presented.

The selected historical data included below and elsewhere in this offering circular are not necessarily indicative of our future performance and results for the three months ended May 31, 2004 are not necessarily indicative of our results of operations for a full fiscal year. The selected historical financial data for the periods indicated below include the results of our Asset Management business, substantially all of which is being distributed as part of the Transactions. The following information is only a summary and should be read in conjunction with "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this offering circular.

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|---|
| | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2003 | 2004 |
| | (unaudited) | (unaudited) | (unaudited) | | | (unaudited) | (unaudited) |
| | | | (dollars in millions) | | | | |
| **Statement of Operations Data:** | | | | | | | |
| Revenues: | | | | | | | |
| Commissions and brokerage . . . | $   302 | $   398 | $   489 | $   584 | $   671 | $163 | $   220 |
| Interest . . . . . . . . . . . . . . . | 601 | 1,528 | 1,713 | 2,389 | 1,054 | 283 | 378 |
| Principal transactions, net . . . . . | 43 | 103 | 99 | 83 | 175 | 35 | 67 |
| Asset management and advisory fees . . . . . . . . . . . . . . . . | 52 | 110 | 63 | 44 | 48 | 11 | 23 |
| Other income . . . . . . . . . . . | 7 | 2 | 4 | 5 | 2 | 3 | 1 |
| Total revenues . . . . . . . . . . | 1,005 | 2,141 | 2,368 | 3,105 | 1,950 | 495 | 689 |
| Expenses: | | | | | | | |
| Commissions and order execution costs . . . . . . . . . . | 189 | 251 | 324 | 385 | 412 | 104 | 143 |
| Interest . . . . . . . . . . . . . . . | 508 | 1,408 | 1,558 | 2,182 | 899 | 249 | 344 |
| Employee compensation and benefits . . . . . . . . . . . . . . | 137 | 213 | 198 | 212 | 238 | 52 | 77 |
| General, administrative and other . . . . . . . . . . . . . . . . | 104 | 174 | 172 | 168 | 201 | 43 | 57 |
| Total expenses . . . . . . . . . . | 938 | 2,046 | 2,252 | 2,947 | 1,750 | 448 | 621 |
| Income before provision for income taxes, minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . . . . . . | 67 | 95 | 116 | 158 | 200 | 47 | 68 |
| Provision for income taxes . . . . | 8 | 8 | 7 | 2 | 12 | 1 | 8 |
| Income before minority interest, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . . . . . . | 59 | 87 | 109 | 156 | 188 | 46 | 60 |
| Minority interest . . . . . . . . . | 2 | 1 | — | — | — | — | — |
| Income before dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . . . . . . | 57 | 86 | 109 | 156 | 188 | 46 | 60 |
| Dividend on preferred securities issued by subsidiaries . . . . . . | 12 | 14 | 16 | 16 | — | — | — |
| Members' interest in earnings of subsidiary . . . . . . . . . . . . . | — | — | — | — | 1 | — | 1 |
| Net income . . . . . . . . . . . | $   45 | $   72 | $   93 | $   140 | $   187 | $ 46 | $   59 |
| **Balance Sheet Data:** | | | | | | | |
| Total assets . . . . . . . . . . . . . | $17,662 | $18,277 | $22,611 | $19,215 | $33,332 | | $55,229 |
| Long-term debt and preferred securities issued by subsidiaries: | | | | | | | |
| Long-term borrowings . . . . . . | 200 | 295 | 262 | 452 | 384 | | 384 |
| Subordinated debt . . . . . . . . . | 43 | 41 | 16 | 16 | 16 | | 16 |
| Preferred securities issued by subsidiaries . . . . . . . . . . . . | 125 | 160 | 160 | 160 | — | | — |
| Total long-term debt and preferred securities issued by subsidiaries . . . . . . . . . . | 368 | 496 | 438 | 628 | 400 | | 400 |
| Members' equity . . . . . . . . . . . | 441 | 500 | 515 | 566 | 616 | | 671 |

|  | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|---|
|  | 2000(1) | 2001 | 2002 | 2003 | 2004(1) | 2003 | 2004 |
|  | (unaudited) | (unaudited) | (unaudited) | | | (unaudited) | (unaudited) |
|  | | | | (dollars in millions) | | | |
| **Other Financial Data:** | | | | | | | |
| EBITDA (2) . . . . . . . . . . . . . . . | $  92 | $  140 | $  179 | $  211 | $  258 | $ 66 | $  82 |
| Depreciation and amortization  . . . | 14 | 23 | 38 | 26 | 28 | 10 | 8 |
| Long-term debt interest . . . . . . . . | 13 | 23 | 25 | 27 | 31 | 9 | 7 |
| Dividends on preferred securities issued by subsidiaries . . . . . . . . | 12 | 14 | 16 | 16 | — | — | — |
| Capital expenditures . . . . . . . . . . | 14 | 28 | 15 | 12 | 11 | | 6 |
| Ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA . . . . . . | 4.0x | 3.5x | 2.5x | 3.0x | 1.5x | | |
| Ratio of EBITDA to long-term debt interest and dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . . . | 3.7x | 3.8x | 4.4x | 4.9x | 8.3x | | 11.7x |

|  | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004(1) | 2003 | 2004 |
|  | (unaudited) | | | (unaudited) | (unaudited) |
| **Segment Data:** | | | | | |
| **Revenues:** | | | | | |
| Derivatives Brokerage & Clearing . . . . . . . . . . . | $  692 | $  746 | $  836 | $197 | $262 |
| Prime Brokerage/Capital Markets . . . . . . . . . . . . | 2,217 | 2,610 | 1,277 | 332 | 447 |
| Asset Management . . . . . . . . . . . . . . . . . . . . . . | 70 | 58 | 72 | 16 | 27 |
| Corporate & Other . . . . . . . . . . . . . . . . . . . . . . | (611) | (309) | (235) | (50) | (47) |
| Total revenues . . . . . . . . . . . . . . . . . . . . . | $2,368 | $3,105 | $1,950 | $495 | $689 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary: | | | | | |
| Derivatives Brokerage & Clearing . . . . . . . . . . . | $  59 | $  78 | $  126 | $ 29 | $ 42 |
| Prime Brokerage/Capital Markets . . . . . . . . . . . . | 96 | 101 | 134 | 31 | 38 |
| Asset Management . . . . . . . . . . . . . . . . . . . . . . | 14 | 1 | (2) | (1) | 3 |
| Corporate & Other . . . . . . . . . . . . . . . . . . . . . . | (53) | (22) | (58) | (12) | (15) |
| Total  . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  116 | $  158 | $  200 | $ 47 | $ 68 |

(1)  Year ended February 29.

(2)  EBITDA represents earnings before long-term debt interest, dividends on preferred securities issued by subsidiaries, income taxes, depreciation and amortization. Our management believes EBITDA is useful to investors because it is frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry. In addition, our management believes that EBITDA is useful in evaluating our operating performance compared to that of other companies in our industry because the calculation of EBITDA generally eliminates the effects of financing and income taxes and the accounting effects of capital spending and acquisitions, which items may vary for different companies for reasons unrelated to overall operating performance. As a result, our management uses EBITDA as a measure to evaluate the performance of our various business lines and for other discretionary purposes.

However, EBITDA is not a recognized measurement under U.S. generally accepted accounting principles ("GAAP"), and when analyzing our operating performance, investors should use EBITDA in addition to, and not as an alternative for, operating income (loss) and net (loss) income, each as determined in accordance with GAAP. Because not all companies use identical calculations, our presentation of EBITDA may not be comparable to similarly titled measures of other companies. Furthermore, EBITDA is not intended to be a measure of free cash flow for our management's discretionary use, as it does not consider certain cash requirements such as tax payments and debt service requirements. The amounts shown for EBITDA also differ from the amounts calculated under similarly titled definitions in our debt instruments, which are further adjusted to reflect certain other cash and non-cash charges and are used to determine compliance with financial covenants and our ability to engage in certain activities, such as incurring additional debt and making certain restricted payments.

EBITDA is calculated as follows:

| | Fiscal Year Ended February 28, | | | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|---|
| | 2000(a) | 2001 | 2002 | 2003 | 2004(a) | 2003 | 2004 |
| | (unaudited) | (unaudited) | (unaudited) | | | (unaudited) | (unaudited) |
| Net income . . . . . . . . . . . . . | $ 45 | $ 72 | $ 93 | $140 | $187 | $46 | $59 |
| Depreciation and amortization . | 14 | 23 | 38 | 26 | 28 | 10 | 8 |
| Provision for income taxes . . . . | 8 | 8 | 7 | 2 | 12 | 1 | 8 |
| Long-term debt interest . . . . . | 13 | 23 | 25 | 27 | 31 | 9 | 7 |
| Dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . | 12 | 14 | 16 | 16 | — | — | — |
| EBITDA . . . . . . . . . . . . . . | $ 92 | $140 | $179 | $211 | $258 | $66 | $82 |

(a)  Year ended February 29.

**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*This offering circular contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in forward-looking statements for many reasons, including the factors described in "Risk Factors" and elsewhere in this offering circular. You should read the following discussion in conjunction with the information included under the captions "Unaudited Pro Forma Consolidated Financial Statements" and "Selected Historical Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this offering circular. Further, the following discussion includes information related to our Asset Management business, substantially all the assets of which are being distributed to Refco Group Holdings, Inc., an entity that is currently owned by Tone Grant and Phillip Bennett and that will be wholly owned by Phillip Bennett upon consummation of the Transactions. See "The Transactions."*

**General**

We provide execution and clearing services for exchange-traded derivatives and for various products in the fixed income and foreign exchange markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our international operations generated $551.6 million, or 28.3%, of our net revenues for the year ended February 29, 2004. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

We have been organized into three operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing, which accounted for 73.6% of fiscal year 2004 net revenue; (ii) Prime Brokerage/Capital Markets, which accounted for 28.2% of fiscal year 2004 net revenue; and (iii) Asset Management, which accounted for 6.7% of fiscal year 2004 net revenue. We also have a Corporate & Other non-operating business segment. Following the distribution of substantially all the assets of our Asset Management business in connection with Transactions, we will be organized into two operating business segments for financial reporting purposes: Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and will have one non-operating business segment, Corporate & Other. The retained assets from our Asset Management business, Refco Alternative Investments, will become part of our Derivatives Brokerage & Clearing business.

**Factors Affecting Our Results**

Our results of operations have been and we expect will continue to be principally affected by transaction volumes, interest rates, the level of global market activity and volatility and expense management. Our results of operations have also been affected by acquisitions.

*Transaction Volumes*

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues have grown at a 23.9% compound annual growth rate, driven by a 50% average annual increase in contract volume executed or cleared, in part attributable to acquisitions, and a 20% average annual increase in customer deposits. During the same period, our Prime Brokerage/Capital Markets net revenues have grown at a 23.6% compound annual growth rate, driven primarily by strong underlying growth in the number of customers in the markets we serve and new product introductions. Derivatives Brokerage & Clearing transaction volumes have increased consistent with the broad growth trend currently being experienced in the derivatives industry. The continued convergence of derivative and cash markets and the expanded use of derivatives for hedging and investment purposes have been the principal drivers of this trend. The trend has also been global in nature, with a rapid introduction of new products in a variety of international markets. Prime Brokerage/Capital Markets transaction volume has increased in line with

expanded U.S. government borrowing activity and the continued long-term growth of foreign exchange markets. Recently, this increase in volume has been accelerated by event-driven volatility, such as political uncertainty in the Middle East and its impact on energy supplies and the uncertain outlook concerning economic growth and interest rates. We have been able to take advantage of the related increase in derivatives transaction volume because of our diversification by customer type, product type and market type and because of the increase in prime brokerage volumes as a result of new product initiatives, including online foreign exchange and emerging market debt brokerage.

### Interest Rates

Due to the fact that a portion of our revenues is derived from interest earned from the investment of customer funds placed with us by customers of our Derivatives Brokerage & Clearing business and the level of secured customer financing transactions in our Prime Brokerage/Capital Markets business, we generally benefit from rising interest rates. Rising interest rates would increase the amount of net interest income earned from such customer funds and the potential financing spread available on secured customer financing transactions. However, our interest expense will increase as a result of rising interest rates because our new senior credit facilities will be variable rate debt.

### Global Market Activity

Each of our principal business segments is global in nature, and the expansion of the global economy in general and the continued growth of globalization in financial markets has benefited our operations. The introduction of derivatives products internationally has accelerated in recent years, with emerging markets in Asia and Latin America supplementing traditional centers in North America and Europe. This growth has been prompted by economic expansion in these regions, deregulation and globalization. Similar trends have emerged in our Prime Brokerage/Capital Markets business as the capital markets in emerging economies become more sophisticated. This has translated directly into new opportunities in non-dollar fixed income, emerging market debt and foreign exchange brokerage. Globalization has assisted in sustaining stable growth by further diversifying our product mix and economic opportunities.

### Expense Management

We have been able to leverage our operating capability in order to achieve increasing benefits from the aggregation of scale in transaction volumes. By adding incremental volume to a pre-existing platform, our marginal cost of growth in transaction processing is minimal. This will become increasingly relevant as more markets automate and move to electronic platforms. As a result, a high proportion of our marginal expense is variable in nature, which provides us an opportunity to improve our cost to income ratio. This characteristic is expected to have a continuing positive impact on operating results.

### Acquisitions

We have completed 11 acquisitions since 1999. Each of these acquistions has been immediately accretive to operating income. It has also been our practice to integrate and rationalize acquired companies as rapidly as possible and transfer operations to our existing platform to maximize the economies of scale offered by such acquisitions. During the fiscal year ended February 28, 2002, we acquired First Options, MST Canada Co. and Main Street Trading, all derivatives brokerage businesses. We acquired two other derivatives brokerage businesses during the fiscal year ended February 28, 2003: Spear, Leeds & Kellogg and CFG Financial Group Inc. During the fiscal year ended February 29, 2004, we acquired one asset management business, Edinburgh Fund Managers Ltd., and five derivatives brokerage businesses, MacFutures Ltd., Carlton Brokerage Ltd., Friedberg Mercantile Group, RB&H and Trafalgar Commodities Ltd.

**Results of Operations**

*Revenues*

We report net revenues on a divisional basis, consisting of total revenues less interest expense, because we believe that the reporting of interest income (expense) on a gross basis unreasonably distorts the presentation of our operations. We generate Derivatives Brokerage & Clearing revenues from (i) transaction fees earned on each contract executed or cleared and (ii) interest income earned on cash balances in our customers' accounts. We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned on each trade and (ii) interest income earned from providing secured customer financing through repo transactions.

The transaction fees we charge are typically based on the type of customer, the type of transaction, the method of trading and the volume of trading activity that a particular customer conducts with us. We generate interest income from the investment of customer funds, placed with us by customers in support of their trading operations. We also earn interest income from the financing of secured customer transactions through repo transactions.

We generate Asset Management revenues primarily from the management fees we charge on funds we raise through the products we distribute. In addition, to the extent that such funds are invested in derivatives markets and prime brokerage markets in which we conduct brokerage operations, we also have the opportunity to generate related commission and interest income from these funds.

*Net Interest Income*

Our Derivatives Brokerage & Clearing business generates interest income from the investment of customer funds placed with us by customers in support of their trading operations. The amount of interest income we earn is a function of the aggregate amounts a customer deposits with us and the overall level of interest rates. Our Prime Brokerage/Capital Markets business generates interest income by financing customers' securities transactions. This involves taking a customer's security and refinancing it with a qualified financial counterparty. The transaction is secured at all times, and we charge a pre-determined spread above our cost of refinancing.

Interest expense typically includes interest paid to Derivatives Brokerage & Clearing customers on the funds they maintain with us, interest paid to finance counterparties in our Prime Brokerage/Capital Markets business for the financing of customer securities and interest paid to banks and long-term debt holders. Because a substantial portion of our interest expense relates to our customers' accounts and financing activities (and not to debt for borrowed money), we net gross interest expense against gross interest income and report net interest income.

*Commissions and Order Execution Costs*

Commissions and order execution costs include variable expenses related directly to transactions conducted in our brokerage operations. Fees include exchange and clearing house fees, fees paid to third parties for execution of customer orders and sales commissions paid in those cases where customers are introduced and their orders are handled by non-salaried sales personnel.

*Employee Compensation and Benefits Expenses*

Employee compensation and benefits expenses include the cost of our global salaried employees. These expenses include base compensation, bonus compensation (whether discretionary or performance related) and the cost of medical insurance and other related employee benefits.

*General, Administrative and Other Expenses*

General, administrative and other expenses include all other operating expenses, including primarily lease expenses, communications and quotation systems expenses, travel and entertainment expenses, depreciation and amortization, professional fees and other miscellaneous expenses.

*Income Taxes*

We will be treated as a partnership for federal income tax purposes. Under applicable regulations, members of a limited liability company treated as a partnership are responsible for their individual income tax liabilities related to the limited liability company's results of operations. Accordingly, we have not provided for federal income taxes related to our results of operations. The provision for income taxes included in our consolidated financial statements relates to income taxes of foreign subsidiaries and New York City unincorporated business taxes.

*Results of Divisional Operations*

The following table summarizes the historical results of our divisional operations. The consolidated financial data for the fiscal years ended February 28, 2003 and February 29, 2004 have been derived from our audited consolidated financial statements. The unaudited consolidated financial data for the fiscal years ended February 28, 2002 and the three months ended May 31, 2003 and 2004 have been derived from our unaudited consolidated financial statements. The unaudited consolidated financial statements for the three months ended May 31, 2003 and 2004 include all adjustments necessary (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and results of operations for the periods presented. The information contained in this table should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this offering circular.

| | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004(1)** | **2003** | **2004** |
| | (unaudited) | | | (unaudited) | (unaudited) |
| | | | (in millions) | | |
| **Net revenues:** | | | | | |
| Derivatives Brokerage & Clearing . . . . . . | $ 564.0 | $ 673.9 | $ 773.9 | $ 181.2 | $ 242.5 |
| Prime Brokerage/Capital Markets . . . . . . . | 240.1 | 244.6 | 297.0 | 64.5 | 89.8 |
| Asset Management . . . . . . . . . . . . . . . . | 68.5 | 57.8 | 70.5 | 15.7 | 27.4 |
| Corporate & Other(2) . . . . . . . . . . . . . . | (18.2) | (4.0) | (33.2) | (7.6) | (8.5) |
| Eliminations(2) . . . . . . . . . . . . . . . . . . | (44.7) | (50.0) | (56.4) | (7.5) | (5.8) |
| Total net revenues . . . . . . . . . . . . . . | $ 809.7 | $ 922.3 | $ 1,051.8 | $ 246.3 | $ 345.4 |
| **Expenses:** | | | | | |
| Commissions and order execution costs . . | $ 323.7 | $ 385.4 | $ 411.9 | $ 104.1 | $ 142.7 |
| Employee compensation and benefits . . . . | 198.4 | 211.8 | 238.4 | 52.3 | 76.8 |
| General, administrative and other . . . . . . | 171.4 | 167.4 | 200.9 | 42.7 | 57.5 |
| Total . . . . . . . . . . . . . . . . . . . . . . . | $ 693.5 | $ 764.6 | $ 851.2 | $ 199.1 | $ 277.0 |
| **Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary:** | | | | | |
| Derivatives Brokerage & Clearing . . . . . . | $ 59.4 | $ 77.7 | $ 125.7 | $ 28.9 | $ 41.9 |
| Prime Brokerage/Capital Markets . . . . . . . | 95.7 | 101.5 | 133.7 | 30.8 | 37.7 |
| Asset Management . . . . . . . . . . . . . . . . | 13.6 | 1.1 | (2.1) | (1.0) | 2.9 |
| Corporate & Other . . . . . . . . . . . . . . . . | (52.5) | (22.6) | (56.7) | (11.5) | (14.1) |
| Total . . . . . . . . . . . . . . . . . . . . . . . | $ 116.2 | $ 157.7 | $ 200.6 | $ 47.2 | $ 68.4 |

(1) Year ended February 29.

(2) These line items are included to reconcile these summarized financial tables to our consolidated financial statements. Corporate & Other net revenue and expenses primarily include interest income and interest expense incurred at the parent company level. Also included are non-material fees and other expenses. Eliminations arise upon the consolidation of group operating performance and relate to intercompany balances and transactions.

*Results for the Three Months Ended May 31, 2004 Compared to the Three Months Ended May 31, 2003*

*Net Revenues.*   Net revenues on a consolidated basis for the three months ended May 31, 2004 increased $99.1 million, or 40.2%, to $345.4 million from $246.3 million for the three months ended May 31, 2003. The growth in net revenues for the three months ended May 31, 2004 was due to an increase in transaction volumes in all brokerage products and market segments that we serve. Principal drivers of this growth included dollar price increases in global commodities which increased traditional commodity futures volumes, price volatility in interest rate derivatives, increased customer activity in foreign exchange brokerage and the positive reception to managed futures and property management products introduced by our Asset Management business. The quarter also included for the first time the results of operations of companies acquired in fiscal year 2004 including, in particular, the MacFutures Group, whose professional trader customers largely contributed to the growth in volume in interest rate derivatives.

*Derivatives Brokerage & Clearing Net Revenues.*   Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2004 increased $61.3 million, or 33.8%, to $242.5 million from $181.2 million for the three months ended May 31, 2003. The growth in Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2004 was due to increased transaction volume in all markets and in all geographic sectors that we serve. Global demand for commodity materials resulted in increased activity in physical commodity markets, and interest rate uncertainties increased the level of interest rate derivative volumes. In Europe and Singapore, local foreign exchange operations (reported in Derivatives Brokerage & Clearing) also increased. The resulting increase in commissions and principal transaction revenues more than offset the decline in net interest income due to reduced interest rates. Derivatives Brokerage & Clearing contract volume increased by 45 million, or 41%, to 155 million contracts cleared for the three months ended May 31, 2004 from 110 million contracts cleared for the three months ended May 31, 2003.

*Prime Brokerage/Capital Markets Net Revenues.*   Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2004 increased $25.3 million, or 39.2%, to $89.8 million from $64.5 million for the three months ended May 31, 2003. The growth in Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2004 was due to the further growth of secured customer financing transactions, the related increase in transaction volume and a 42.3% increase in principal transaction net revenue, reflecting the increased activity in foreign exchange markets.

*Asset Management Net Revenues.*   Asset Management net revenues for the three months ended May 31, 2004 increased $11.7 million, or 74.5%, to $27.4 million from $15.7 million for the three months ended May 31, 2003. The increase in Asset Management net revenues for the three months ended May 31, 2004 was due to the positive impact on revenues of new product launches, including a new real estate investment product and the successful expansion of our managed futures product offerings. Additionally, the increase in the level of global equity markets had the effect of increasing assets under management and as a result, fee income, which also impacted favorably on our investment management fee income.

*Commissions and Order Execution Costs.*   Commissions and order execution costs on a consolidated basis for the three months ended May 31, 2004 increased $38.6 million, or 37.1%, to $142.7 million from $104.1 million for the three months ended May 31, 2003. The increase in commissions and order execution costs for the three months ended May 31, 2004 was due primarily to the increase in transaction volume in exchange-traded derivatives.

*Employee Compensation and Benefits Expenses.*   Employee compensation and benefits expenses on a consolidated basis for the three months ended May 31, 2004 increased $24.5 million, or 46.8%, to $76.8 million from $52.3 million for the three months ended May 31, 2003. The growth in employee compensation and benefits expenses for the three months ended May 31, 2004 was due to the addition

54

of several new operating groups acquired during the twelve-month period ended May 31, 2004, such as Trafalgar Commodities and the Wexford Fixed Income Group in New York, and the further expansion of the MacFutures Group.

*General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the three months ended May 31, 2004 increased $14.8 million, or 34.7%, to $57.5 million from $42.7 million for the three months ended May 31, 2003. The growth in general, administrative and other expenses for the three months ended May 31, 2004 was principally due to the inclusion of expenses associated with entities acquired during the twelve-month period ended May 31, 2004.

*Operating Profit.*    Operating profit on a consolidated basis for the three months ended May 31, 2004 increased $21.2 million, or 44.9%, to $68.4 million from $47.2 million for the three months ended May 31, 2003. The increase in operating profit for the three months ended May 31, 2004 was due primarily to the increase in net revenues across all business lines.

*Derivatives Brokerage & Clearing Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2004 increased $13.0 million, or 45.0%, to $41.9 million from $28.9 million for the three months ended May 31, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2004 was due to the growth in transaction volume, the resulting growth in commission and brokerage revenues and an increase in principal brokerage activities, particularly in Europe and Asia. The increase in Derivatives Brokerage & Clearing net revenues accelerated at a faster rate than the increase in related expenses because we continued to benefit from our ability to aggregate volume on existing operating platforms with little, if any, increase in fixed costs.

*Prime Brokerage/Capital Markets Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2004 increased $6.9 million, or 22.4%, to $37.7 million from $30.8 million for the three months ended May 31, 2003. The increase in Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2004 was due to the continued growth in Prime Brokerage/Capital Markets net revenues, particularly the increase in foreign exchange brokerage revenues, along with newly acquired operations such as the Wexford Fixed Income Group. Net revenues grew at a slower rate than related expenses due to expenses at the acquired entities.

*Asset Management Operating Profit.*    Asset Management operating profit for the three months ended May 31, 2004 increased $3.9 million to $2.9 million from a loss of $1.0 million for the three months ended May 31, 2003. The increase in Asset Management operating profit for the three months ended May 31, 2004 was due to the increase in Asset Management net revenues, which reflected the benefits of product diversification including, in particular, the continued expansion of our managed futures product offerings and the addition of real estate fund offerings in the United Kingdom. Increases in advisory fees also reflected the generally higher level of global equity markets. This enabled Asset Management net revenues to significantly outpace expenses.

### Results for the Year Ended February 29, 2004 Compared to the Year Ended February 28, 2003

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 29, 2004 increased $129.5 million, or 14.0%, to $1,051.8 million from $922.3 million for the year ended February 28, 2003. The increase in net revenues for the year ended February 29, 2004 was due to the significant increase in brokerage transaction volume. The growth in volume reflected underlying industry trends accentuated by our organic growth and the benefits of acquisitions including, in particular, the MacFutures acquisition, which was completed in February 2003. Our Prime Brokerage/ Capital Markets business benefited from an increase in foreign exchange brokerage and the continued expansion of our fixed income prime brokerage activities.

*Derivatives Brokerage & Clearing Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 increased $100.0 million, or 14.8%, to $773.9 million from $673.9 million for the year ended February 28, 2003. The growth in Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 was due to increased transaction volume in all geographic and product sectors that we serve. Dollar price increases in physical commodity markets driven by the growth of Asian economies, particularly China, produced strong volume and revenue results in agricultural and metals derivatives brokerage. The changing outlook for interest rates combined with the addition of a MacFutures platform in February 2003 produced a significant increase in financial futures contract volume, particularly interest rate products. Derivatives Brokerage & Clearing contract volume increased by 61 million, or 15%, to 461 million contracts cleared for the year ended February 29, 2004 from 400 million contracts cleared for the year ended February 28, 2003.

*Prime Brokerage/Capital Markets Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 increased $52.4 million, or 21.4%, to $297.0 million from $244.6 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 was due to the increase in transaction volume and revenues of the foreign exchange brokerage activities. This supported the continued expansion of our fixed income clearing operations. Foreign exchange activities reflected the diversification of our product offerings and the launch of online wholesale and retail products in June 2003.

*Asset Management Net Revenues.*    Asset Management net revenues for the year ended February 29, 2004 increased $12.7 million, or 22.0%, to $70.5 million from $57.8 million for the year ended February 28, 2003. The growth in Asset Management net revenues for the year ended February 29, 2004 was due to the improvement in global equity markets, which increased assets under management among traditional equity products, and the success of our newly developed managed futures products.

*Commissions and Order Execution Costs.*    Commissions and order execution costs on a consolidated basis for the year ended February 29, 2004 increased $26.5 million, or 6.9%, to $411.9 million from $385.4 million for the year ended February 28, 2003. The increase in commissions and order execution costs for the year ended February 29, 2004 was due to the increase in overall transaction volume and, in particular, the increase in Derivatives Brokerage & Clearing transactions. This increase was partially offset by a shift in overall product mix towards Prime Brokerage/Capital Markets operations, as most of this volume is conducted by corporate sales groups and not commission-based sales personnel.

*Employee Compensation and Benefits Expenses.*    Employee compensation and benefits expenses on a consolidated basis for the year ended February 29, 2004 increased $26.6 million, or 12.6%, to $238.4 million from $211.8 million in the year ended February 28, 2003. The growth in employee compensation and benefits expenses for the year ended February 29, 2004 was principally due to the addition to our payroll of the majority of employees of acquired companies, specifically MacFutures, Trafalgar Commodities and Carlton Brokerage (all of which were incremental to earnings).

*General, Administrative and Other Expenses.*    General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $33.5 million, or 20.0%, to $200.9 million from $167.4 million for the year ended February 28, 2003. The growth in general, administrative and other expenses for the year ended February 29, 2004 was due to the incremental expenses associated with acquired operations.

*Operating Profit.*    Operating profit on a consolidated basis for the year ended February 29, 2004 increased $42.9 million, or 27.2%, to $200.6 million from $157.7 million for the year ended February 28, 2003. The growth in operating profit for the year ended February 29, 2004 was due to the increase in net revenues derived from increased transaction volume, together with the improvement in

operating margins created by the reduction in sales commission costs and our ability to control the overall level of operating costs.

*Derivatives Brokerage & Clearing Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 increased $48.0 million, or 61.8%, to $125.7 million from $77.7 million for the year ended February 28, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 was due to increased volume, a reduction in sales commission costs (reflecting a diminished reliance on commission sales groups) and an increase in net interest income as a result of the substantial growth of customer deposits, which offset lower investment yields.

*Prime Brokerage/Capital Markets Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 increased $32.2 million, or 31.7%, to $133.7 million from $101.5 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 was due to the increase in fixed income transaction volume and related commission revenue and a significant increase in principal transaction activities, primarily foreign exchange. This trend more than offset the reduction in net interest income resulting from the current low interest rate environment and its adverse impact on secured customer financing revenues.

*Asset Management Operating Profit (Loss).*    Asset Management operating profit for the year ended February 29, 2004 decreased $3.2 million to a loss of $2.1 million from a profit of $1.1 million for the year ended February 28, 2003. The decrease in Asset Management operating profit for the year ended February 29, 2004 was due to the fact that assets under management remained low, despite the fact that new initiatives, including the launch in June 2003 of our managed futures product, resulted in an increase in commission revenue. The latter was offset by the costs associated with the build-out of the distribution platform associated with this project.

### Results for the Year Ended February 28, 2003 Compared to the Year Ended February 28, 2002

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 28, 2003 increased $112.6 million, or 13.9%, to $922.3 million from $809.7 million for the year ended February 28, 2002. The growth in net revenues for the year ended February 28, 2003 was due to the record transaction volume in our Derivatives Brokerage & Clearing business, continued growth in our Prime Brokerage/Capital Markets activities, reflecting underlying growth trends in both markets, and expanded market share. The increase in commission income and net interest income from secured customer financing transactions more than compensated for the reduction in foreign exchange principal brokerage and reduced asset management advisory fees.

*Derivatives Brokerage & Clearing Net Revenues.*    Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 increased $109.9 million, or 19.5%, to $673.9 million from $564.0 million for the year ended February 28, 2002. The growth in Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2003 was due to a higher number of cleared contracts, increased commission income and significant increases in customer deposits. Derivatives Brokerage & Clearing contract volume increased by 54 million, or 16%, to 400 million contracts cleared for the year ended February 28, 2003 from 346 million contracts cleared for the year ended February 28, 2002.

*Prime Brokerage/Capital Markets Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 increased $4.5 million, or 1.9%, to $244.6 million from $240.1 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2003 was due to the expanded book of secured customer financing transactions, which resulted in increased net interest income and offset the decline in customer volumes, and the realignment of our products.

57

*Asset Management Net Revenues.*   Asset Management net revenues for the year ended February 28, 2003 decreased $10.7 million, or 15.6%, to $57.8 million from $68.5 million for the year ended February 28, 2002. The decrease in Asset Management net revenues for the year ended February 28, 2003 was due to the decline in investment advisory fees, which reflected a significant decline in assets under management as a result of weak equity markets.

*Commissions and Order Execution Costs.*   Commissions and order execution costs on a consolidated basis for the year ended February 28, 2003 increased $61.7 million, or 19.1%, to $385.4 million from $323.7 million for the year ended February 28, 2002. The increase in commissions and order execution costs for the year ended February 28, 2003 was due to the increase in overall transaction volume, particularly in Derivatives Brokerage & Clearing, and the impact of increases in the sales commission structure of certain companies we acquired during the year.

*Employee Compensation and Benefits Expenses.*   Employee compensation and benefits expenses on a consolidated basis for the year ended February 28, 2003 increased $13.4 million, or 6.7%, to $211.8 million from $198.4 million for the year ended February 28, 2002. The growth in employee compensation and benefits expenses for the year ended February 28, 2003 was due to the addition of employees associated with acquisitions made during the year, although the percentage increase was substantially lower than the percentage increase in revenues.

*General, Administrative and Other Expenses.*   General, administrative and other expenses on a consolidated basis for the year ended February 28, 2003 decreased $4.0 million, or 2.3%, to $167.4 million from $171.4 million for the year ended February 28, 2002. The decrease in general, administrative and other expenses for the year ended February 28, 2003 was due to our continued success in the rationalization of acquired operating platforms, particularly the final stage of consolidating Lind-Waldock and the transfer of the business of LFG, LLC, which we acquired in fiscal year 2001, from outside systems vendors to our own operating platform.

*Operating Profit.*   Operating profit on a consolidated basis for the year ended February 28, 2003 increased $41.5 million, or 35.7%, to $157.7 million from $116.2 million for the year ended February 28, 2002. The increase in operating profit for the year ended February 28, 2003 was due to the increase in revenues in our Prime Brokerage/Capital Markets operations, combined with cost control and expense reduction following the consolidation of acquired entities.

*Derivatives Brokerage & Clearing Operating Profit.*   Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 increased $18.3 million, or 30.8%, to $77.7 million from $59.4 million for the year ended February 28, 2002. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2003 was due to increased volumes, which increased commission and brokerage revenues, combined with increased net interest income resulting from record levels of customer deposits.

*Prime Brokerage/Capital Markets Operating Profit.*   Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 increased $5.8 million, or 6.1%, to $101.5 million from $95.7 million for the year ended February 28, 2002. The increase in Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2003 was due to the expansion primarily of our secured customer financing transactions and the resulting increase in net interest income, which offset the decline in foreign exchange principal brokerage, coupled with tight cost control, including an absolute reduction in general and administrative expenses.

*Asset Management Operating Profit.*   Asset Management operating profit for the year ended February 29, 2003 decreased $12.5 million, or 91.9%, to $1.1 million from $13.6 million for the year ended February 28, 2002. The decrease in Asset Management operating profit for the year ended February 29, 2003 was due to declining assets under management, reflective of continued poor equity market performance, which impacted adversely on revenues and was not offset by reduced operating expenses.

**Seasonality**

Our business can experience seasonal fluctuations. Financial markets may experience reduced trading activity during summer months and in the month of December as a result of holidays. Traditional commodity derivatives, such as energy, will reflect changing supply/demand factors related to heating/cooling seasons. As a result of these factors, we may experience relatively higher trading volume and thus revenue during our first and third fiscal quarters and lower trading volume in our second fiscal quarter. However, this trend is not evident in every year and in recent years has been moderated by globalization and an expanded range of products which tend to counter traditional seasonality trends. For these reasons, seasonality was not a major factor in our 2004 fiscal year.

**Liquidity and Capital Resources**

*Working Capital*

Our primary requirement for working capital relates to funds we are required to maintain at exchanges or clearing organizations to support our customers' trading activities. We require that our customers deposit funds with us in support of their trading activities, which we in turn deposit with exchanges or clearing organizations to satisfy our obligations. These required deposits account for the majority of our working capital requirements and thus our principal use of working capital is funded directly or indirectly by our customers. Our working capital needs are otherwise primarily limited to regulatory capital requirements which we have satisfied in the past from internally generated cash flow and available funds.

Notwithstanding the self-funding nature of our operations, we may sometimes be required to fund timing differences arising from the delayed receipt of customer funds or timing differences associated with the settlement of customer transactions in securities markets. Historically, these timing differences were funded either with internally generated cash flow or, if needed, with funds drawn under short-term borrowing facilities, including committed lines of credit. Following the Transactions, we expect to have $75.0 million of available borrowings under a revolving credit facility for working capital purposes. Separately, our finance subsidiary, Refco Capital, LLC, utilizes secured bank facilities to refinance specialized financing arrangements entered into with select customers from time to time. As of May 31, 2004, there are no loans outstanding under these facilities.

Our two principal U.S. regulated subsidiaries are Refco, LLC and Refco Securities, LLC. Refco, LLC is subject to the CFTC minimum financial requirements, which generally require that we maintain net capital equal to 4% of customer funds required to be segregated pursuant to the Commodity Exchange Act, less the market value of certain commodity options. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital. Refco Securities, LLC is subject to the uniform net capital requirements of the SEC, which require the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for by the SEC's rules, which require that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items as defined in the SEC's rules. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate customer-related debit items. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million which was 18.3% of aggregate customer-related debit items and $67.5 million in excess of required net capital.

As a matter of policy, we maintain excess regulatory capital to provide liquidity during periods of unusual market volatility, and this has been sufficient in the past to absorb volatile market events. Similarly, for our brokerage activities in the OTC markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures-style margin methodology to protect us against price movements, and this also reduces the amount of capital needed to conduct business because even if we are required to post funds with clearing organizations in order to facilitate customer-initiated transactions, we are able to use customer deposits for this purpose rather than our own funds. The result is that we can execute a substantial volume of transactions without the need for large amounts of working capital.

Funding for purposes other than working capital requirements, including the financing of acquisitions, has been provided either through internally generated cash flow or through specific long-term financing arrangements (which are described below).

Substantially all the assets of our Asset Management business, which accounted for 6.7% of fiscal year 2004 revenue and an operating loss of $2.1 million in fiscal year 2004, will be distributed to Refco Group Holdings, Inc. in connection with the Transactions. Our Asset Management business generated nominal cash flow for fiscal year 2004.

*Long-Term Debt*

It has been our policy to match the varied nature of our liquidity requirements with appropriately structured funding sources. We have traditionally financed acquisitions with term debt utilizing medium-term institutionally placed notes. At May 31, 2004 we had $399.5 million (including the current portion of long-term debt) of notes outstanding, $37.0 million of which was repaid on June 29, 2004. The total amount of this debt will be retired as a condition of and at the closing of the Transactions. We intend to continue to fund long-term requirements, including acquisitions, with long-term debt.

We will incur a substantial amount of long-term debt in connection with the Transactions. As of May 31, 2004, after giving pro forma effect to the Transactions, we would have had $1,400.0 million of long-term debt outstanding.

The senior credit facilities we expect to enter into in connection with the Transactions will consist of a $75.0 million revolving credit facility, none of which will be drawn upon consummation of the Transactions, and an $800.0 million term loan facility, which will be fully drawn as part of the Transactions. We will have an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. For more information on the senior credit facilities, see "Description of Credit Facilities—Senior Credit Facilities." We are also issuing $600.0 million of the notes in connection with the Transactions. For more information on the notes, see "Description of the Notes." The proceeds from the term loans, along with the proceeds from the issuance of the notes, will be used to fund the cash payments to be made to our existing shareholders, repay certain existing indebtedness and pay related transaction fees and expenses. See "The Transactions."

Through our Refco Capital, LLC subsidiary, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively. We currently have no outstanding debt under these facilities.

*Liquidity Risk*

Ready access to cash is essential to our business. Our liquidity could be impaired by an inability to access lines of credit, an inability to access funds from our subsidiaries or an inability to sell assets. This situation may arise due to circumstances that we may be unable to control, such as a general market disruption or an operational problem that affects third parties or us. Further, our ability to sell assets may be impaired if other market participants are seeking to sell similar assets at the same time. Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

## Contractual Obligations and Commitments

We have contractual obligations to make future payments under long-term debt and long-term non-cancelable lease agreements and have contingent commitments under a variety of commercial arrangements. See Notes C and H to our consolidated financial statements for further information regarding our commitments and contingencies. The table below shows as of May 31, 2004 on a pro forma basis after giving effect to the Transactions, our contractual obligations and commitments, including our payments due by period:

| | Payments due by period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 years | 4-5 Years | More than 5 years |
| | | (in millions) | | | |
| Long-term debt obligations . . . . . . . . . . . . . . . . . . . . . . . | $1,400.0 | $ 6.0 | $16.0 | $16.0 | $1,362.0 |
| Operating lease obligations . . . . . . . . . . . . . . . . . . . . . . . | 81.3 | 15.2 | 25.2 | 15.8 | 25.1 |

## Off Balance Sheet Arrangements

We currently have no off balance sheet arrangements.

## Critical Accounting Policies and Estimates

Our discussion of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. During the preparation of these consolidated financial statements, we are required to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosures of contingent assets and liabilities. On an ongoing basis, we evaluate our estimates and assumptions, including those related to commissions, principal transactions, provisions for doubtful accounts on receivables, fair values of derivative financial instruments and goodwill and intangible assets. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of our analysis form the basis for making assumptions about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions, and the impact of such differences may be material to our consolidated financial statements.

We believe that the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements:

### Commissions

Commissions earned and related expenses on our customers' open futures positions may be recognized on either a half-turn basis, meaning that we recognize commissions on the opening or closing of a futures contract, or on a round turn basis, after the purchase and a subsequent sale, or a sale and a subsequent purchase of a futures contract. We recognize commissions earned on a half-turn basis.

We report gross commission income on transactions executed by introducing brokers and report commissions paid to introducing brokers as commission expense. Presentation of commissions on a gross basis does not impact our net income.

### Principal Transactions

Our company, as a broker of derivatives products, enters into contractual commitments, as principal, involving forward settlement. These contracts are recorded at fair value and are generally immediately hedged with offsetting contracts, which results in a profit spread for us. As the fair values are based on observable market data, this profit spread is recognized immediately in our statement of operations under Principal transactions.

### Receivables from Customers—Provisions for Doubtful Accounts

Our receivables are generally collateralized with marketable securities. For certain customer receivables that are not fully secured, we establish reserves when, in the opinion of management, such reserves are appropriate. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

### Fair Values of Derivative Financial Instruments and Securities

As a broker, we enter into transactions involving derivative financial instruments and securities on behalf of our customers. These transactions are carried at market value or, if market prices are not readily available, fair value. Changes in fair value are recognized immediately in net income. Market values for exchange-traded derivatives are based on quoted market prices. Fair market values for OTC derivative financial instruments are based on pricing models that are in turn based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts. Valuation models include the use of management estimates and current market information. Management is also required to make assumptions on how the fair value of derivative financial instruments and securities is affected by current market conditions. If management's underlying assumptions for evaluating fair value prove to be inaccurate, there could be material differences in our consolidated operating results.

### Goodwill

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets as of acquisition date. Prior to December 1, 2001, goodwill was amortized over a period of 25 years on a straight-line basis. Effective December 1, 2001, we adopted the treatment of SFAS No. 142, *Goodwill and Other Intangible Assets*. Consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. We are required to record an impairment loss if the estimated fair value of an operating segment is less than its estimated net book value. We derive the fair value of each of our operating segments primarily based on earnings multiples. A prolonged reduction in the earnings of one of our operating segments could result in an impairment charge in our results. Our last annual impairment test was performed during the fourth quarter of fiscal year 2004, and no impairment was identified. As at February 29, 2004, the carrying value of our goodwill was $291.2 million.

### Identifiable Intangible Assets

Identifiable intangible assets, which consist primarily of customer relationships, asset management contracts, property management contracts and trade names, are amortized over their useful lives. Customer relationships are amortized on an accelerated basis based upon projected cash flows. Asset management contracts and property management contracts are amortized over their estimated useful lives of 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's carrying value may not be fully recoverable. An impairment loss, calculated as the difference between the estimated fair value and the carrying value of the identifiable intangible asset, is recognized if the expected undiscounted cash flows relating to the identifiable intangible asset is less than the corresponding carrying value. Trade names have been classified as indefinite-lived assets and are not amortized but tested annually for impairment. The valuation of our identifiable intangible assets is dependent upon assumptions in areas such as growth rates, customer retention and profitability. Changes to these assumptions or a prolonged period of weakness in global financial markets could adversely impact our businesses and impair the value of our identifiable intangible assets. As at February 29, 2004, the carrying value of our identifiable intangibles was $89.5 million.

### Use of Estimates

The use of generally accepted accounting principles requires management to make certain estimates. In addition to the estimates we use in connection with fair value measurements and the

accounting for goodwill and identifiable intangible assets, the use of estimates is also important in determining provisions for potential losses that may arise from litigation and regulatory proceedings.

**Recent Accounting Pronouncements**

In January 2003, the FASB issued Interpretation 46, *Consolidation of Variable Interest Entities.* In December 2003, the FASB issued Interpretation 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities.* In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. Interpretation 46 R requires a variable interest entity to be combined by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 to variable interest entities created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for "Special Purpose Entities" created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. As we do not have any interests in variable interest entities, the adoption of this statement did not have an effect on our consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities.* SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB No. 133 *Accounting for Derivative Instruments and Hedging Activities.* This Statement is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on our consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity.* SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity, and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on our consolidated financial statements.

In December 2003, FASB Statement No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits,* was issued. Statement 132 (revised) prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of recognition of those plans. The Statement retains and revises the disclosure requirements contained in the original SFAS 132. It also requires additional disclosures about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit pension plans and other postretirement benefit plans. The Statement generally is effective for fiscal years ending after December 15, 2003. Management does not believe the adoption of this statement will have a material impact on our consolidated financial statements.

**Quantitative and Qualitative Disclosure about Market Risk**

Our principal market risks relate to counterparty, interest rate and exchange rate risk.

*Counterparty Risk*

We are exposed to the risk that third parties that owe us money, securities or other assets will not perform their obligations. These parties may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. As a clearing broker, we finance our customer positions, and we could be held responsible for the defaults or misconduct of our customers. In

addition, we have experienced, due to competitive factors, pressure to extend credit and to price more aggressively the credit risks we take. Although we regularly review credit exposures to specific customers and counterparties and to specific industries, countries and regions that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to detect or foresee. In addition, concerns about, or a default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect us.

As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. Our Global Risk Management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets. Our current system provides the ability to project the impact of market volatility on price movement. Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's ability to pay margin. We perform frequent stress tests to our customers' positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

*Interest Rate Risk*

In the ordinary course of our operations, we have limited our exposure to interest rate risk. Our balance sheet, which reflects a substantial amount of short-term and highly liquid assets, consists of equally matched assets and liabilities. We generate interest income from the positive spread earned on customer deposits or secured customer financing transactions, and the basis for the calculation of interest received and paid is entirely matched. This remains true in both rising and falling interest rate environments, although we have the opportunity to create higher levels of interest income in a rising interest rate environment.

In the future, we will be more exposed to changes in interest rates. Our new senior credit facilities that we expect to enter into in connection with the Transactions will be variable-rate debt. Interest rate changes therefore generally do not affect the market value of such debt but do impact the amount of our interest payments and our future earnings and cash flows, assuming other factors are held constant. Conversely, for fixed-rate debt, interest rate changes do not impact future cash flows and earnings but do impact the fair market value of such debt, assuming other factors are held constant. Assuming we had completed the Transactions and applied the proceeds as of February 29, 2004, we would have had variable-rate debt of approximately $800.0 million. Assuming we had incurred this debt on March 1, 2003, holding other variables constant, including levels of debt, a one percentage point increase in interest rates would have had an estimated impact on pre-tax earnings and cash flows for the year ended February 29, 2004 of $8.0 million.

While variable-rate debt will increase our interest expense in a rising interest rate environment, the impact will be mitigated in part by increased interest income generated from the investment of customer balances. These balances are invested daily by us in a variety of permissible short-term instruments.

*Exchange Rate Risk*

We conduct global operations. Our revenues are denominated predominately in U.S. dollars, but the most significant non-dollar currency flows are denominated in Euros and Pounds Sterling. Our expenses are also denominated predominantly in U.S. dollars and to a lesser extent a variety of local currencies reflecting the location of physical operations, particularly those in the United Kingdom, Canada, France and Singapore.

While a majority of the currency fund flows are therefore matched, currency exposure does exist in respect of international operating expenses. It is our policy to cap any consolidated exposure to foreign currency which exceeds $2.5 million per location through the sale of the currency in question.

## INDUSTRY

**Derivatives**

*Overview*

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. A futures contract is a legally binding agreement to buy or sell a commodity or financial instrument at a certain future date at a specific price. Options are contracts that provide for a right, but not an obligation, to buy or sell a commodity or financial instrument over a certain period at a specific price. Derivatives contracts are broadly comprised of two underlying categories: financial and physical. Examples of financial derivatives include contracts on interest rates, equity indices, individual equities and foreign currencies. Examples of physical derivatives include contracts on energy products, agricultural commodities and non-precious and precious metals. Derivatives markets have grown significantly over the past 15 years in terms of the volume of exchange-traded derivatives activity and the notional amounts outstanding of OTC contracts.

Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the OTC market. According to the BIS, the global notional amount outstanding for OTC derivatives at December 31, 2003 was $197 trillion, while the global notional principal amount outstanding for financial exchange-traded derivatives was $37 trillion. There are 60 derivatives exchanges tracked by the FIA located in 26 countries, including 18 exchanges in the United States. Major derivatives exchanges in the United States include the CME, CBOT, NYMEX, CBOE and the New York Board of Trade ("NYBOT"). Major derivatives exchanges outside the United States include Eurex, London International Financial Futures and Options Exchange ("LIFFE"), Mercado Oficial de Futuros y Opciones Financieros in Spain ("MEFF"), Euronext N.V., Singapore Derivatives Exchange Ltd. ("SGX") and the Tokyo Stock Exchange ("TSE"). Contracts traded on U.S. exchanges represented approximately 27% of global derivatives volume in 2003. The top five U.S. exchanges accounted for 83% of the global exchange-traded derivatives volume transacted in the United States in 2003.

The customer base for derivatives contracts includes professional traders, financial institutions, institutional and individual investors, as well as major corporations, manufacturers, producers and governments. These customers purchase derivatives primarily for hedging or investment purposes. Hedging involves the practice of managing risk inherent in one market position by taking an offsetting position in another market. For example, corporations use the futures markets to protect their businesses from adverse changes in the costs of their raw materials. Investing involves a market participant taking a position in an attempt to earn a profit from buying and selling futures and options contracts in anticipation of future price movements. When entering into exchange-traded derivatives contracts, customers are required to make good faith margin deposits to ensure future performance under the derivatives contract.

*Methods of Trade Execution*

Trading in derivatives products has traditionally occurred in "pits" on the physical trading floor of an exchange through an auction process known as open outcry. Only members owning or leasing a seat on the exchange may trade in the pit. Buy and sell orders from individuals and institutions are sent to these members on the trading floor, usually through an FCM. Members of an exchange may exercise their trading privileges as independent market-makers (known as locals) trading for their own account or as floor brokers executing customer orders.

The diagram below illustrates the process through which customers place trade orders on an exchange floor through an FCM.



In order to expand access to their markets, most derivatives exchanges have supplemented or replaced their open outcry trading facilities with electronic trading platforms. Electronic systems allow investors to obtain real-time information about bid and ask prices and trading volumes and to enter orders directly into the electronic exchange's centralized order book, subject to the agreement of an FCM to process the investors' trades. The emergence of electronic trading has been enabled by the ongoing development of sophisticated electronic order routing and matching systems, as well as advances in communications networks and protocols. Examples of electronic trading platforms include CME's GLOBEX system, the a/c/e platform, which is provided jointly by CBOT and Eurex, LIFFE Connect™, which is provided by Euronext.LIFFE, and the Cantor Exchange ("CX"), which is provided by Cantor Fitzgerald, L.P.

*Exchange Clearing Houses*

Transactions executed on derivatives exchanges are settled through a clearing house that acts as a central counterparty to the clearing member on each side of the transaction. When a futures transaction has been executed in the pit or on an electronic platform, the clearing house confirms the matching and settlement of the trade with FCMs representing both buyer and seller.

The major clearing houses for futures products include the Clearing Division of the CME, the Clearing Corporation, the LCH, Singapore Exchange Derivatives Clearing Limited and Clearnet. A clearing house manages its counterparty risk through required margin deposits that are managed to ensure effective delivery of the underlying security or commodity, and maintains guarantee funds and capital call rights.

*Futures Commission Merchants*

In the United States, customers access the exchange-traded derivatives market through FCMs. FCMs are members of one or more exchanges that solicit or accept orders from customers for the purchase or sale of derivatives and route those orders to the appropriate exchange. FCMs execute customer orders on the exchange and maintain records of each customer's position, margin deposits,

money balances and completed transactions. In return for providing these services, FCMs collect commissions on each trade order from customers. In addition, FCMs earn interest income on cash deposits held on behalf of their customers. FCMs are subject to a number of regulatory requirements, including the maintenance of a minimum level of net capital. FCMs are regulated by the CFTC, an independent federal regulatory agency, and must be a member of the NFA, an industry-wide self-regulatory organization. FCMs are typically either divisions of major investment or commercial banks or independent providers such as our company. Regulatory jurisdictions outside of the United States have similar governing bodies, minimum capital requirements and self-regulatory organizations.

### Industry Growth

According to the BIS, annual trading volume in exchange-traded derivatives has grown at a compound annual growth rate of approximately 22% over the past 15 years, from 388 million contracts traded in 1988 to over eight billion contracts traded in 2003. During the same period, trading volumes increased at a compound annual growth rate of 15% in North America. Excluding single stock and commodity contracts, the compound annual growth rate of trading volumes has been 26% in Europe and 35% in the Asia and Pacific markets during the same period.

**Futures and Options Trading Volume on Global Derivatives Exchanges**
(Contract amounts in millions)



Source:   BIS.
Note:     Data based on calendar year. The "financial" category of derivatives includes interest rate, currency and equity index contracts.

We believe growth in exchange-traded derivatives volumes has been driven by the following factors:

- *Increasing Importance of Risk Management*—An increasing fluidity of capital and diversification of commercial activity among capital markets has broadened the financial exposures businesses and individuals face and increased the need to hedge their risks. We believe companies and investors focus on controlling exposures in their businesses and providing less volatile earnings

for shareholders. To achieve this goal, managers are emphasizing risk management as a means of reducing volatility in their businesses. As risk management needs have increased so have the number of exchange-traded derivatives contracts available to meet these needs.

- *Product Innovation*—In general, the number of contracts available for trading on exchanges has grown significantly in recent years. As of April 2004, the CME, Eurex and CBOT offered for trading a total of 224 contract types, an increase of 109 since January 2000. For example, the e-mini S&P 500 index has experienced rapid growth since being launched in 1997, partially as a result of its small size in relation to most other contracts and its resulting affordability to smaller investors. The e-mini S&P 500 index's annual trading volume reached 161 million contracts in 2003, making it the fifth most actively traded contract in the world six years after its introduction.

- *Structural Shift from OTC Markets to On-Exchange Trading*—The exchange-traded derivatives market for financial derivatives contracts grew at a faster rate than the OTC derivatives market in 2003 based on the total notional amount of contracts outstanding. Exchanges offer customers the advantages of improved price transparency, centralized clearing and credit intermediation. Due in part to these benefits, an increasing proportion of mature and standardized OTC derivatives products (e.g., equity indexes) have shifted to an exchange platform. Given the large size of the OTC derivatives market in terms of notional amount of contracts outstanding, exchanges are developing new products based on the most commonly traded OTC products.

- *Deregulation*—Deregulation of the financial services industry in the United States, Europe and Asia has increased customer access to derivatives products and markets, reduced regulatory barriers to product innovation and encouraged consolidation among exchanges.

  *United States:* Many regulatory barriers to product development, such as lengthy CFTC review of new contracts, were largely repealed by the enactment of the Commodity Futures Modernization Act of 2000 ("CFMA") in the United States. Among other developments, the CFMA authorized the trading of new products, such as futures contracts on individual stocks and narrow-based stock indexes, which were prohibited under prior law. The CFMA also enabled regulated exchanges to self-certify new contracts and rules, without delays occasioned by regulatory review and approval, permitting quicker product launch and modification.

  *Europe and Asia:* Deregulation and competition will continue to pressure European exchanges to consolidate across borders to gain operating efficiencies necessary to compete for customers and intermediaries, lowering transaction costs and trading friction, which should continue to attract new market participants. Singapore Derivatives Exchange, the TSE, Eurex and Euronext N.V. are major exchanges for various types of securities in addition to being derivatives exchanges, highlighting the growing convergence between cash and derivatives markets. Euronext N.V., which resulted from the merger of the Amsterdam Exchanges N.V., Paris Bourse SA and Societe de la Bourse de Valeurs Mobilieres de Bruxelles S.A. (the Brussels Exchange) acquired a controlling interest in LIFFE and announced plans to integrate their derivatives markets.

- *Exchange and Clearing Platform Competition*—Competition among exchange and clearing platforms has increased as a result of globalization, deregulation and technological advances. Competition has increased product innovation as evidenced by the proliferation of contract types traded on each derivatives exchange and has led to significant fee reductions. A recent example of exchange competition is the launch by Eurex of a U.S. based exchange, which competes directly with the CBOT in certain product areas. In response to Eurex's entrance, the CBOT has reduced some of its clearing fees. We believe this competition will significantly contribute to transaction volume growth and will benefit other market participants such as FCMs.

- *Electronic Trading*—The ongoing conversion of the derivatives markets from floor-based exchanges to an electronic format has enabled exchanges to lower clearing fees, reduce execution times and broaden access. Electronic trading has led to the decentralization of exchanges and has allowed customers to view bid and ask prices and trade derivatives products globally nearly 24 hours a day. Due to the previously mentioned benefits, we believe electronic trading is attracting new customers to the exchange-traded derivatives market and increasing the trading activity among existing customers. For example, from January 2004 through June 2004, the average daily volume of electronically traded Eurodollar contracts increased over 500%. Electronic trading represented 35% of average daily volume on the CME in 2002, 44% in 2003, 48% in the first quarter of 2004 and 55% in May 2004.

## Prime Brokerage

Prime brokerage is an industry term referring to specialized services provided by brokers to institutional customers as a bundled package. The services typically include execution and clearing, securities financing, custody, trade processing, securities lending and other administrative services. These services can be provided on either electronic or voice platforms, or both. Prime brokers serve customers in all major securities markets, such as equity, fixed income and foreign exchange. Prime brokers typically earn revenue through commission or transaction fees and interest income. They are typically divisions of major investment or commercial banks, or independent providers, such as our company.

The fixed income and foreign exchange markets we provide prime brokerage services to are discussed separately below.

### Fixed Income

The fixed income securities market is one of the largest financial markets in the world. In the United States, there are currently over $22.5 trillion of fixed income securities outstanding. The U.S. Treasury securities market, the largest and most liquid fixed-income market, has experienced strong volume growth. Average daily dollar trading volume has increased from $18.3 billion in 1980 to $433.5 billion in 2003, representing a compound annual growth rate of 14.8%.

While there are many types of investors in the U.S. Treasury securities market, financial institutions, corporations and hedge funds comprise a large percentage of the activity. These investors are typically attracted to the U.S. Treasury securities market due to its significant liquidity and low risk profile. Additionally, U.S. Treasury securities are commonly used as part of a larger investment strategy and are primarily financed through the OTC repo market.

The OTC repo market is one of the largest and most active sectors in the U.S. fixed income market. Repos are widely used as a means to inexpensively finance short-term borrowings against collateral (commonly U.S. Treasury securities) and to invest surplus funds on a short-term basis. The largest users of repos are broker-dealers, banks and hedge funds. The largest providers of cash liquidity to the repo market are money market funds, state and local governments and foreign central banks.

Traditionally, the majority of U.S. Treasury securities are bought and sold by investors using the services of a broker (typically a large commercial bank or investment bank). Such customers receive price quotes from these brokers. The broker in turn either buys the security from the market or sells the security from existing inventory. Additionally, they may access the IDB market to match the transaction with another broker. Access to the IDB market has traditionally been limited to brokers dealing with other brokers. The customer compensates the broker for executing this transaction through the payment either of a commission or through a mark up which is added by the broker to the price at which the broker can access the inter-dealer market to execute the transaction.

The U.S. Treasury market has been moving away from voice broking to electronic trading in recent years. Many of the major broker-dealers now have electronic order entry platforms that allow customers to ask for bid and offer prices. In some cases the dealer may list current bid and offer prices on the platform. Similarly, the IDB market has also evolved from a predominately voice brokered market to an electronic market. Participants in the IDB market can now see bids and offers shown live on a screen and can execute against these prices electronically.

In order to participate in transactions in the IDB market, a participant must become a netting member of the FICC. A prospective netting member must complete a lengthy approval process that requires the applicant to (i) be a financial institution, (ii) maintain a minimum level of capital and (iii) be actively involved as a clearer, dealer or broker of government securities. As a result, most FICC netting members are either large investment banks, broker-dealers or commercial banks who use the IDB market to access the best pricing and greatest liquidity for U.S. Treasury securities. These institutions typically buy securities both for their own proprietary trading account or for resale to clients.

We believe growth in the U.S. Treasury securities market and the repurchase agreement market have been driven by the following factors:

- *Growth in the Total Amount of Debt Outstanding*—According to the Bond Market Association, the total size of the U.S. Treasury securities market has increased significantly, with $3.6 trillion outstanding as of December 31, 2003, compared to $616.4 billion at December 31, 1980. Total gross issuance of short- and long-term U.S. Treasury securities for 2003 was a record high of $4.2 trillion.

- *Growth in Interest Rate Derivatives*—Interest rate derivatives are contracts that transfer an asset's risk and return from one party to another without transferring ownership of the underlying asset, allowing market participants to obtain interest protection or assume interest rate exposure associated with fixed-income securities and other debt obligations. Interest rate derivatives provide increased flexibility and liquidity for investors and lenders to diversify their interest rate exposures.

- *Greater Sensitivity to Credit Risk*—U.S. Treasury securities are generally secured by high quality collateral and are a liquid investment, offering relatively low to no credit risk. Given recent past financial crises, including the Asian financial crisis in 1997 and the Russian debt crisis in 1998, an increasing number of investors have sought such low-risk assets.

- *Introduction of Electronic Trading Platforms*—Electronic trading platforms act as central facilities to bring together buyers and sellers. The actions of participants on these platforms are facilitated by an electronic medium that improves some of the manual processes that might otherwise be required. These platforms also have integrated compliance and risk management functions, as well as greater accuracy and decreased probability of erroneous trades than voice brokerage, and as a result, typically provide a lower-cost and more efficient means for price discovery and trade execution.

### Foreign Exchange

The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.4 trillion. By comparison, average daily volume in the next largest financial market, that for U.S. Treasury securities, was approximately $434 billion during 2003.

The majority of foreign exchange volume is traded OTC. Most foreign exchange transactions take place by telephone or through proprietary trading networks established by large financial institutions.

The primary participants in the foreign exchange markets fall into four categories: central banks, banks, brokers and institutional clients of brokers. Banks are the largest participants in the market, as approximately two-thirds of all foreign exchange transactions involve banks trading currencies with one another. Brokers act as intermediaries between other participants in the market, searching for the most favorable rates on behalf of customers and providing a level of anonymity for the buyer and seller. Brokers earn commissions on the trades they execute.

There are three primary types of foreign exchange transactions: spot, forward and options. In a spot transaction a buyer and seller agree on an exchange rate and promptly settle the trade based on that rate. In a forward transaction a buyer and seller agree to trade currencies at a later date at an agreed upon rate, regardless of market exchange rates at that time. The most common type of forward transaction is a swap, in which two parties exchange currencies at a given rate and agree to reverse the transaction at a later date. Options on foreign exchange work the same way as options on equities: they convey a right, not an obligation, to trade at a future date at a certain rate. As of April 2001, spot transactions represented 32% of the OTC traditional foreign exchange daily volume, swap transactions represented 55% and outright forward transactions represented 11% (while estimated gaps in reporting were 2%).

We believe growth in the foreign exchange market has been driven by the following factors:

- *Increased Cross-Border Trade and Investment*—We believe cross-border trade should continue to increase, as the world is more open to free trade than in past years. For U.S. international trade, for example, the average annual increase in exports and imports over the past 40 years was 11% and 12%, respectively. Similarly, foreign direct investment has experienced a long-term growth trend and is expected to continue. This growth in global trade and foreign direct investment is a driver of demand for foreign exchange products.

- *Increasing Use of Foreign Exchange as a Hedging Tool*—Foreign exchange derivatives products, such as foreign exchange forwards and swaps, facilitate the hedging of foreign exchange risk. According to the BIS survey, from 1992 to 2001, forward and swap volumes have been growing as a percentage of total foreign exchange volume. This trend is consistent with the compound annual growth in the derivatives market since 1988 of 22% per annum.

- *Alternative Investment Asset Flows*—Foreign exchange has emerged as a distinct asset class for investment purposes, driven largely by demand from hedge funds whose investments in foreign exchange have risen significantly since 2001 as equity market valuations declined and historically low interest rates rendered many fixed income products less attractive. In addition, retail customer participation in the foreign exchange market has increased as customers have become more aware of foreign exchanges as an investable asset class.

- *Emergence of Electronic Brokerage*—Trading in the OTC market is conducted over the telephone, Internet or trading platform, either directly or through a broker. Electronic brokers play a large role in the market based on their offering of lower costs, higher efficiency and greater transparency compared to direct dealing. The BIS reported that electronic brokers conducted approximately 50% to 70% of foreign exchange transactions in major currency pairs in 2001, compared to approximately 40% and 10% in 1998 and 1995, respectively. Similarly, usage of electronic trading has grown among non-bank foreign exchange investors.

# BUSINESS

## Our Company

We are a leading independent provider of execution and clearing services for exchange-traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets. Annually, we process volumes of exchange-traded derivatives contracts comparable to the volumes traded on many of the world's major derivatives exchanges. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the CBOT and greater than the volume on each of the CBOE and the NYMEX during the same period. We are a leading clearing member of the FICC, a clearing house for the U.S. fixed income markets. From fiscal year 2000 through fiscal year 2004, our net revenues and EBITDA have increased at a compound annual growth rate of 20.6% and 29.4%, respectively, as a result of organic growth and acquisitions. For the twelve months ended May 31, 2004 on a pro forma basis after giving effect to the Transactions, we generated $1,008.0 million and $269.0 million of net revenues and EBITDA, respectively.

We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide our customers the ability to trade a wide range of products in the derivatives, fixed income and foreign exchange markets. Through our worldwide system of brokers and electronic trading platforms, we provide execution and clearing of our customers' orders with a focus on offering low costs and customer service. Consistent with our customer-oriented philosophy and to avoid potential conflicts with our customers, we do not engage in speculative trading for our own account.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. We are focused on serving growing markets with a business model that benefits from increasing transaction volumes and requires minimal capital expenditures. For instance, we are a leader in the exchange-traded derivatives market, which has experienced a compound annual growth rate in trading volume of 30% over the last five years.

## Competitive Strengths

### *Leading Market Position*

We are a leading independent provider of execution and clearing services for exchange-traded derivatives. We are also a major provider of execution and clearing services to institutions and individuals trading in the fixed income and foreign exchange markets. In fiscal year 2004, we processed 461 million derivatives contracts, which was comparable to the volume on the CBOT and greater than the volume on each of the CBOE and the NYMEX during the same period. We cleared more contract volume on the CME, the largest derivatives exchange in the United States, than any other FCM in 2003. We are a clearing member on virtually all major domestic and international derivatives exchanges and offer our customers access to a broad range of derivatives contracts. In 2003, we ranked fifth among FICC firms in terms of cleared U.S. Treasury repo transaction volume and ranked in the upper quartile for U.S. Treasury cash transaction volume. We believe our leading market position gives us scale advantages in providing our customers a broad product offering, strong customer service, leading technology and low cost.

### *Diversified Across Customers, Products and Markets*

Our business is diversified across business divisions, customer segments, products and markets. Our operating profit is balanced between our Derivatives Brokerage & Clearing division and our Prime Brokerage/Capital Markets division. We provide services to over 200,000 customer accounts,

encompassing a large and diversified mix of customers, including corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We provide access to a wide variety of exchange-traded derivatives products, including interest rate, equity index, energy, agricultural, foreign currency and metals contracts. We are present on nearly all major global derivatives exchanges, including CME, CBOT, Eurex, the LME, Euronext and NYMEX. We also provide access to a wide range of fixed income and foreign exchange products, including U.S. Treasury securities, non-dollar fixed income, spot and forward currencies, currency options, precious metals, OTC options on U.S. Treasury securities, mortgage-backed securities, corporate bonds and related OTC derivatives.

### Attractive Risk Profile

We have built a comprehensive risk management system throughout our operations to limit and monitor our exposure to customer and counterparty risk. We only undertake transactions on behalf of our customers and consequently are not exposed to market risk as a result of proprietary trading. In order to mitigate customer and counterparty risk, we implement margin technologies, mark-to-market risk management tools, internal review and executive approval procedures and rigorous risk monitoring. As a result of our risk management techniques, we have had limited credit losses resulting from our customer or counterparty defaults since fiscal year 2000, even through such recent volatile events as the terrorist attacks on September 11, 2001.

### Scalable Operating Platform

Our significant processing volumes in exchange-traded derivatives, fixed income and foreign exchange have provided us with significant economies of scale. Our existing infrastructure is capable of processing significant and incremental volumes with minimal capital expenditures. In fiscal year 2004, we processed 461 million derivatives contracts, cleared over $9 trillion in U.S. Treasury repurchase transactions and processed over $600 billion in customer volume in the foreign exchange market. We believe our significant annual volume, combined with our variable cost structure and highly automated transaction processing facilities, provide us with cost advantages in the marketplace. Largely as a result of our efficient and scalable transaction processing platform, successful acquisition integration and leveraging of our fixed cost base, our EBITDA margins have increased from 18.5% in fiscal year 2000 to 24.5% in fiscal year 2004.

### Significant Free Cash Flow and Minimal Capital Investment Requirements

We generate significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period. In addition, our management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x.

### Proven and Committed Management Team

We are led by a senior management team that has an average of 22 years of industry experience. Phillip Bennett, who has been with us for 23 years, became our President and CEO in 1998 and formed a new senior management team comprised of well respected industry professionals. Under the leadership of our senior management team, net revenues and EBITDA have grown at a compound annual growth rate of 20.6% and 29.4%, respectively, from fiscal year 2000 to fiscal year 2004. Upon consummation of the Transactions, Mr. Bennett will beneficially own an approximate 43% interest in us. In addition, we intend to establish an equity incentive plan for our senior management team.

## Our Business Strategy

### *Capitalize on Growing Markets*

We have built our business within growing markets and have a revenue model that benefits from increasing transaction volumes. We continually work to identify new market and product opportunities where we can leverage our transaction processing platform. We maintain a strong presence on the world's major exchanges and OTC markets in which we operate, offer access to trading in an extensive suite of products to a diversified and growing customer base and continually seek to reduce our cost structure. We believe our strategy allows us to identify new or rapidly growing markets and to quickly capitalize on this growth.

### *Leverage Our Leading Market Position*

The economies of scale that arise from our large execution and clearing volumes allow us to improve our service offerings and build on our strong foundation as a leader in many of the markets we serve. We believe our leading market position is strengthened by the fact that we invest in technology, offer a broad range of products and provide our customers value-added services such as market research and 24-hour customer service. In addition, we maintain these service levels while maintaining competitive pricing. We believe our strong market position in derivatives execution and clearing among professional traders, who require low costs and quality service, and among retail investors, who demand rapid execution and a high level of customer service, serves to illustrate the quality, breadth and price competitiveness of the services we offer. We plan to continue to use the benefits of our economies of scale to improve our product and service offerings.

### *Pursue Focused Business Model*

We employ a focused business model that emphasizes high service levels and unconflicted access to markets for our customers. Across our divisions, we provide customers price transparency, reliable execution and competitive pricing. Consistent with our customer-oriented philosophy and to avoid potential conflicts with our customers, we do not engage in speculative trading for our own account. We have targeted specific markets where our service offerings allow us to compete effectively. In Derivatives Brokerage & Clearing, we distinguish ourselves when compared to many larger global investment and commercial banking firms based on the breadth of our product and exchange offerings, our execution capabilities, our focus on a broad spectrum of customers and our low cost trading system. In Prime Brokerage/Capital Markets, we have focused on markets where unconflicted access, price transparency, anonymity, service and price allow us to offer differentiated services in comparison to our larger competitors who may have business model conflicts with either their proprietary trading group or their fixed income sales and trading group.

### *Grow Our Customer Base*

We plan to continue to grow our customer base and increase revenues from our existing customer base by tailoring our services and our customer acquisition strategies to address the diverse needs of our three key customer segments:

*Institutions*—We have a dedicated sales force of over 1,000 individuals calling on corporate and hedge fund customers. Our ability to provide institutional customers unconflicted access to a wide range of markets is an advantage when soliciting new customers. We believe recent trends such as growth in the hedge fund industry and increased cross-border commerce have increased the demand among corporations and hedge funds for a wider variety of products with which to hedge risks and invest for profit. We plan to take advantage of what we believe is a valuable cross-selling opportunity by continuing to educate our institutional customers about our full range of derivatives, fixed income and foreign exchange services.

*Professional Traders and "Locals"*—We have been building our strong market position as a provider of clearing services to professional traders on the world's major exchanges. Professional traders and locals are typically high trading volume customers and have contributed significantly to our volume growth. An increasing number of professional traders access the markets electronically. As part of our strategy to penetrate the market for locals, we have begun to offer training programs and high performance trading facilities for those moving from the trading floor to electronic trading and for new professional traders.

*Retail*—Our retail operations include our Lind-Waldock division, a prominent online retail derivatives brokerage operation. We believe we are well positioned to capitalize on an increased awareness and understanding of the derivatives and foreign exchange markets among retail customers. We plan to continue encouraging this increased understanding through targeted marketing via direct mail, the Internet, customer education seminars and other media. In order to serve the wide variety of customers in this segment, we offer a complete suite of retail-focused products and services, including online and broker-assisted trading and research.

### Capitalize on Shift to Electronic Trading

We believe the increased prevalence of electronic trading has: (i) encouraged higher trading volumes through lower execution costs; (ii) focused customers on the importance of technology through an increased awareness of execution speed; (iii) changed the types of customer service functions customers demand; and (iv) attracted a new group of customers to the markets we serve. We believe increased electronic trading has created an opportunity for us to increase market share in our various markets as our platform is well suited to accommodate these changes. We plan to take advantage of this opportunity by utilizing our scale, technology and market knowledge to adapt our service offerings as customer demands evolve.

### Pursue Selective Strategic Acquisitions

We intend to pursue selective acquisitions that will expand our service capabilities or customer base or provide greater access to trading in a wider range of products. Our flexible operating platform can facilitate the efficient transfer and integration of the customer positions and operations of acquired companies. Our historical results have benefited from a focused acquisition program that has expanded our service offering and strengthened our market position within our customer segments. Since 1999, we have successfully acquired and integrated 11 businesses.

### History

We began operations in 1969 by providing execution and clearing services in agricultural commodities. Throughout the 1970s, we expanded our product offerings in response to the introduction of new financial futures products. Our involvement in Prime Brokerage/Capital Markets began in 1982 in response to requests from existing futures customers for the ability to adjust their futures positions after the futures market was closed. We formed the Prime Brokerage/Capital Markets division to provide this service by facilitating customer access to the cash markets, including the interbank foreign exchange market, in our capacity as a broker in principal. The brokerage in principal business model established the foundation both for our foreign exchange operations and for our other cash market brokerage activities. From 1983 to 1985, we emerged as the leading consolidator in the futures industry by acquiring Chicago Grain, ContiCommodities and DLJ Futures. By 1985, we had built an international infrastructure and strong market position in global derivatives markets.

In September 1998, Phillip Bennett was named our chief executive officer. Under his leadership, we hired a new senior executive team with significant industry experience to focus on growing our business and strengthening our regulatory and customer focus. Under our new senior management team, we grew internally and through a number of acquisitions. In 2000, we acquired Lind-Waldock, a

prominent online retail derivatives brokerage operation. From 2001 to 2003, we enhanced our strong market position in the professional trader market by, among other things, the acquisition of MacFutures Limited and certain businesses of First Options.

**Services**

After giving effect to the Transactions, we will be organized into two operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing and (ii) Prime Brokerage/Capital Markets, and we will have one non-operating business segment, Corporate & Other. We previously conducted additional operations through our Asset Management division. As part of the Transactions, we are distributing all of the equity of Forstmann-Leff International Associates, LLC, which upon consummation of the Transactions will own substantially all the assets of our asset management business, to New Refco. New Refco will immediately thereafter distribute these assets to Refco Group Holdings, Inc., an entity that is currently owned by Tone Grant and Phillip Bennett and that will be wholly owned by Phillip Bennett upon consummation of the Transactions.

***Derivatives Brokerage & Clearing (72% of Pro Forma LTM Net Revenue and 50% of Pro Forma LTM Operating Profit)***

We execute and clear customers' orders for exchange-traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for execution and matching. Through our clearing services, we facilitate confirmation and settlement of our customers' derivatives transactions. We also ensure that our customers have the appropriate margin in their accounts to support their derivatives positions. We conduct these activities in our capacity as an FCM. As an FCM, we are responsible to the applicable clearing house for our customers' transactions. We are the largest independent FCM in the United States, based on domestic customer segregated fund balances of approximately $3.6 billion as of May 31, 2004. In 2003, we were the largest customer in terms of contract volume of the CME, the largest derivatives exchange in the United States.

We generate Derivatives Brokerage & Clearing revenues from: (i) transaction fees earned on each contract executed or cleared and (ii) interest income earned on cash balances in our customers' accounts. From fiscal year 2000 through fiscal year 2004, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at a compound annual growth rate of 23.9% and 40.8%, respectively, driven primarily by a 50% average annual increase in contract volume executed or cleared and a 20% average annual increase in customer deposits. Our growth has been generated both organically and through strategic acquisitions, which have broadened our customer base, service offerings, geographic reach and exchange coverage.

Our business is diversified across customers, products and exchanges. The following charts illustrate our diversity across exchanges and contract types for fiscal year 2004:



**Contract Volume by Exchange(1)**

NYMEX 5%
Other 7%
LIFFE 6%
LME 8%
Eurex 9%
CBOT 24%
CME 41%



**Contract Volume by Type(1)**

Metals 10%
Equity Indices 18%
Agricultural 10%
Energy 5%
Foreign Exchange 5%
Individual Equities less than 1%
Other 2%
Interest Rate 49%

(1)  Total volume: 461 million contracts

*Customers.*    As of May 31, 2004, our Derivatives Brokerage & Clearing division serviced over 185,000 customer accounts. Our customers include institutions, professional traders and retail investors.

Institutions.    Institutions are typically large, mutual funds, hedge funds, financial institutions, pension plans and other non-financial entities. We market to our institutional customers through a sales force of experienced financial services professionals. We offer institutions high service levels, anonymity, unconflicted access to a broad reach of products and markets and competitive pricing. It is also important to institutional customers that we do not speculatively trade with our own capital and therefore avoid potential conflicts with our customers. We believe the quality of execution is very important to our institutional customers and that we are able to provide such customers with efficient execution due to our scale, liquidity and geographic breadth. We have experienced growth in our institutional customer base, in part, driven by the proliferation of hedge funds and an increasing corporate focus on risk management.

Professional Traders.    Professional traders are either locals, who are individual members of derivatives exchanges trading for their own account on the floors of those exchanges that maintain the open outcry method of price discovery, or professionals trading electronically from dedicated facilities built to service their needs. We have a strong market position among professional traders and locals. Professional traders are high volume customers who require an operating platform with rapid execution at a low cost. Locals fulfill an important role in the market as liquidity providers for the exchanges of which they are members. Through internal growth and acquisitions, we have increased our professional trader customer base as part of our strategy to grow transaction volumes and our plan to diversify our customer base. This strategy allows us to integrate and efficiently process very large volumes and to manage effectively the risks associated with this particular customer group. We also believe that control of this particular customer base will be of strategic significance in the future as markets become increasingly automated. Locals are well suited to the development of off-the-floor trading locations, which provide them with direct access to electronic markets and enable us to continue to benefit from the order flow and commission generating potential of these clients. Our MacFutures model is indicative of the opportunities presented by this trend. MacFutures, a London-based business we acquired in March 2003, provides specialty clearing services for individual professional traders, specializing in the electronic derivatives and fixed income markets in Europe. The model, which involves the recruiting and training of professional traders who are provided with access to electronic exchanges on our own off-the-floor trading locations, has now been implemented in Chicago and Montreal.

Retail Investors.    Retail customers are typically experienced individual investors. We have grown our retail customer base historically through internally generated new accounts and through acquisitions. The global retail customer base is growing as new product offerings with a broad investor appeal, such as the e-mini contracts, are listed on exchanges. We offer our retail customers access to a broad range of products and value added services, including research, real time quotes, risk management tools, account information and customer support. Our retail customers also benefit from the operating platform that we have built to service our institutional and professional trader clients. We market to retail customers through an actively managed lead generation and marketing strategy targeted at identifiable customer groups who we believe would be receptive to trading equity derivatives. Specific examples of these initiatives include the following:

- We leverage our prominent Lind-Waldock brand name and its online platform. Lead generation is driven primarily by print media advertising and, increasingly, a broad range of internet marketing initiatives, including key word strategies negotiated with search engines.

- We are developing business-to-business ("B-2-B") relationships to expand the scale of our retail customer base. These are often negotiated with complementary and non-competitive retail brokerage firms such as Charles Schwab & Co., Inc., TD Waterhouse Investor Services, Inc. and

Ameritrade Inc. We typically provide access to and execution of exchange-traded derivatives products for the customers of our B-2-B partners.

- We rely on our traditional sales force of account executives and registered introducing brokers who independently (but with corporate product support) market to individual clients throughout North America.

- First time potential clients are targeted using educational marketing strategies often developed in conjunction with seminar providers and investment educational professionals.

*Product Access.*   We provide our customers access to all significant exchange-traded derivatives contracts, including interest rates, equity indexes, energy, agriculture, foreign currency, precious metals, non-precious metals contracts and managed futures.

*Exchanges.*   We provide our customers access to nearly all major global derivatives exchanges, including the CME, CBOT, NYMEX, LME, Eurex, Euronext.LIFFE and CBOE. In recognition of the technological advances in the industry, we provide both open outcry and electronic access to the derivatives markets. The electronic exchanges we provide access to include A/C/E, GLOBEX, LIFFE Connect and NYMEX Access.

*Competition.*   The primary competitors of our Derivatives Brokerage & Clearing business include affiliates of major commercial and investment banks and independent FCMs.  We compete for customers and transaction volume on the basis of our access to a broad range of products and exchanges, our service levels, relationships, technology and operating platform and pricing. Many of our investment and commercial banking competitors maintain large proprietary trading operations.

*Refco Alternative Investments.*   In June 2002, we created Refco Alternative Investments to develop product offerings using alternative assets, such as managed futures, for distribution to our customers. These offerings result in the creation of an asset management fund, utilizing both our sales force and third-party distributors to raise assets. All investment decisions are made by third party managers, and all brokerage activity of the funds is directed exclusively to our derivatives and cash brokerage affiliates, driving transaction volume to our core transaction processing platform. Additionally, such funds typically earn an asset management fee. An important milestone was reached following the negotiation with S&P for the branding of a portfolio of Commodity Trading Advisors and the subsequent creation of a managed futures index, which is marketed under the brand name SPhinX. This product, which took advantage of weaker equity markets and the non-correlated performance of derivatives investing to equity market performance, was successfully launched in March 2003. As of May 31, 2004, approximately $543.0 million has been raised for this product.

### Prime Brokerage/Capital Markets (28% of Pro Forma LTM Net Revenue and 50% of Pro Forma LTM Operating Profit)

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non-dollar fixed income markets. The majority of our customers are hedge funds and other financial institutions.

Our fixed income operating platform provides our customers access to the IDB market for U.S. Treasury securities. The IDB market is a wholesale securities market that allows brokers to trade with one another. Access to the IDB market is usually limited to member firms who meet certain membership requirements, such as minimum capital thresholds. We allow our customers to use our IDB membership and operating platform to gain direct access to transparent IDB market pricing and liquidity.

In the case of foreign exchange, we act as a broker for customers wishing to transact business in the Interbank Foreign Exchange Market. We processed over $600 billion in customer transaction

volume in fiscal year 2004. We enable our customers to participate in these markets by providing access via several platforms to trading in the majority of the world's principal currencies in the form of spot, forwards and options. These platforms include both voice broking in which our team of brokers place customer orders with market makers, primarily large money center banks, as well as online platforms.

We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned on each trade and (ii) interest income earned from providing secured customer financing through repo transactions. From fiscal year 2000 to fiscal year 2004, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at a compound annual growth rate of approximately 23.6% and 48.8%, respectively. This growth has been driven primarily by an increase in the number of customers, growth in the U.S. Treasury securities market and new product introductions.

Unlike our exchange-traded derivatives business, our Prime Brokerage/Capital Markets activities are not conducted on exchanges. In order to effect Prime Brokerage/Capital Markets transactions for our customers, we act as a principal executing the transaction with our customer and simultaneous executing an offsetting trade in the market. We do not trade speculatively for our own account and only initiate an order in the market to match an offsetting customer transaction. Although we do not trade speculatively for our own account, since we act as broker in principal in our capital markets/fixed income business, these transactions are reported as "principal transactions" on our consolidated statement of operations. We employ mark-to-market and margin risk management procedures identical to those adopted in regulated agent markets. We believe that the risk involved in these transactions is comparable to that incurred in our traditional derivatives brokerage operations.

*Product Access.*   Within our Prime Brokerage/Capital Markets segment, we primarily provide fixed income and foreign exchange products and services.

**Our Fiscal Year 2004 Prime Brokerage/Capital Markets Revenue Breakdown**



Fixed Income — 54%  
Foreign Exchange — 42%  
Other — 4%

Fixed Income.   Our worldwide trade execution capabilities extend to select sectors of the fixed income market, primarily in U.S. Treasury securities, OTC options on U.S. Treasury securities, corporate debt and related OTC derivatives, sovereign debt and emerging market debt.

Our most important fixed income offerings are U.S. Treasury products available in the IDB market and associated financing primarily through U.S. Treasury securities repurchase agreements. We provide our customers with a single platform, "Refco Trader," to obtain access to dealer prices only available on IDB markets. The efficiency of the Refco Trader platform and the competitive bid offer spread in the IDB market is valuable to the fixed income fund manager and professional trader. Our customers use our platform to buy and sell U.S. Treasury securities and obtain financing through the repo market.

Our IDB product offering has been enhanced in recent years by the consolidation among traditional participants in fixed income markets. We have been able to exploit the consolidation among liquidity providers without incurring any proprietary level risk by providing professional customers and fixed income traders with an alternative source of liquidity through repurchase transactions. Our lack of speculative proprietary trading provides us with a competitive advantage because it eliminates the conflict of interest that exists with other traditional liquidity providers.

We are targeting other fixed income markets, such as mortgage backed securities and European sovereign debt, where we can provide our customers a similar service offering and value proposition as our U.S. Treasury offering. We also have a strong presence in Europe as one of the few non-bank repo clearing members of the LCH and have an expanding presence in Latin American, Eastern European and Southeast Asian markets.

Foreign Exchange.   We are a major international broker of foreign exchange in the areas of execution and prime brokerage, with over $600 billion in volume for the fiscal year 2004. We provide 24 hour trading facility coverage of all major and most minor currencies, with service including spot, forwards, options, swaps and custom derivative overlays.

Our largest foreign exchange business is the traditional voice brokerage business. Customers call us to execute foreign currency transactions. As a broker in principal, we enter into the transaction with our customer and simultaneously enter into an offsetting transaction with a market maker. For providing this service, we earn either a transaction fee or the spread between the price we charge our customer and the price that we pay the market maker. We compete for customers based on service, relationships, price competitiveness and by providing anonymity in trading.

We have an on-line currency trading platform for our institutional customers developed in conjunction with Currenex, a leading global provider of currency pricing systems. This platform provides our customers electronic access to the foreign currency prices of several major market makers. The overall market for trading currency electronically is growing quickly due to the speed and cost benefits and the price transparency. This type of direct access is generally not offered by commercial or investment banks.

We have also developed retail online foreign exchange offerings. These products are Web-enabled, rely on global Internet-based distribution and, most importantly, encourage self-directed trading which requires minimal human interaction at the corporate level. This facilitates the handling of significant customer volumes with very low cost to income characteristics and we believe that we represent the most viable form of retail distribution. An active Web-based marketing strategy is currently in process to take maximum advantage of this recent development. We also own 35% of FXCM, which provides foreign currency trading platform and execution services to retail investors.

Other.   We have developed a worldwide clearing infrastructure that offers institutional clients and fund managers a single source for execution and all related financing activities in both domestic and international equity markets. These capabilities allow us to offer investors capital leverage through global integrated financing, securities lending, structured products and prime brokerage. We provide securities lending services for customers seeking to borrow equities to cover a short selling strategy or to generate additional income by lending securities already owned. Customers may also leverage equity positions with us through the use of customized derivative products and currency-linked transactions. Our financing structures include equity swaps, zero-cost options and repurchase agreements.

*Customers.*   Our Prime Brokerage/Capital Markets customers are primarily institutions, including hedge funds, mutual funds, banks, broker-dealers and other corporate customers. We also serve a growing number of retail foreign exchange investors. All customers are subject to a detailed application process and credit check.

*Competition.*   The primary competitors of our Prime Brokerage/Capital Markets business include affiliates of major commercial and investment banks and independent broker-dealers. Customers value speed of execution, anonymity in trading, low price, customer service and access to a breadth of products.

## Risk Management

### Liquidity Policy

Our execution and clearing of derivatives requires limited working capital because the margin mechanism used by exchanges results in the customers providing the required funding to maintain positions. We maintain excess regulatory capital to provide liquidity during periods of unusual market volatility. Similarly for our brokerage activities in the cash markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures-style margin methodology to protect us against price movements. Additionally, we have adopted a margin style procedure to control customer positions in our foreign exchange business. This account structure has facilitated considerable growth in the volume of business conducted, while maintaining a low risk profile.

### Regulatory Capital

Our primary U.S. regulated entities are Refco, LLC, an FCM, and Refco Securities, LLC, a broker-dealer. Each entity has regulatory capital requirements. As of February 29, 2004, the excess capital for Refco, LLC and Refco Securities, LLC was $95.6 million and $61.9 million, respectively. These figures may change in the future as a result of the introduction of risk adjusted capital rules. See "—Regulation."

### Market Risk/Economic Liquidity

Our risk is credit related risk or risk related to our customers' ability to meet their margin obligations. Because we do not trade speculatively for our own account, we have no direct exposure to market risk volatility or the potential price or liquidity risk that might arise.

#### Counterparty Risk Management

Our current system provides the ability to project the impact of market volatility on price movement. We perform frequent stress tests of our customer positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments. These tests have resulted in minimal losses due to counterparty exposures. We continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer operations. Our risk management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets.

## Technology and Information Systems

Our information technology group supports 14 locations worldwide, including our major management centers in New York, London and Chicago. Our exchange-traded derivatives central processing capacity is located in Memphis, Tennessee with primary backup in Chicago.

Our core exchange-traded derivatives transaction-processing platform has been owned and developed by us since 1979. This system has accommodated our significant growth in recent years, including the integration of significant levels of acquired volume. Our ability to process transactions on a proprietary platform provides us with a strategic advantage by offering significant flexibility and high levels of responsiveness to changing customer and market conditions. Capital markets transaction processing platforms are outsourced. Fixed income prime brokerage and foreign exchange brokerage operations utilize systems developed by third parties.

Customers currently access our global network through both traditional means, i.e., the use of voice brokers, and electronically. For electronic access, we provide third party vendor systems consistent with our focus on transaction processing rather than front-end technology while also offering a proprietary system for our retail customers. An increasing number of these applications are web-enabled. We have developed a web strategy to enhance access to the system and to use our web site as a driver for business development in the form of lead creation. Among the capabilities that can

be accessed online are risk management monitoring and access to tools, the account opening process as well as static forms, account statements and position and funds information.

The continued integrity and security of our systems is key to our business. All of our systems have off-site backups and redundancies. These capabilities have been thoroughly tested, particularly during the events of September 2001 and the blackout of August 2003. In each case and despite the total loss of access to corporate headquarters in New York, our business was comprehensively and effectively redirected to pre-planned alternative locations and operating platforms and services to customers remained essentially uninterrupted.

**Facilities**

Our main corporate offices are located in approximately 71,247 square feet of leased office space at One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281-1994. We also lease over 473,000 square feet of additional space throughout North America, Europe and Asia. Our primary management centers are located in Chicago and London and at our New York corporate office. Our exchange-traded derivatives central processing system is run out of a leased facility located in Memphis, Tennessee. We believe that our leased facilities are adequate to meet anticipated requirements for our current lines of business for the foreseeable future.

**Employees**

At May 31, 2004, we had approximately 2,250 employees, excluding our Asset Management business. Approximately 1,500 of our employees are located in the United States. At the present time, no employees are represented by unions, and we believe our relations with our employees are satisfactory.

**Regulation**

Most aspects of our business are subject to stringent regulation by U.S. federal and state regulatory agencies and derivatives and securities exchanges and by non-U.S. government agencies or regulatory bodies and exchanges. New laws or regulations or changes to existing laws and regulations (including changes in interpretation or enforcement) could materially adversely affect our financial condition or results of operations. As a global financial institution, to the extent that different regulatory regimes impose inconsistent or iterative requirements on the conduct of our business, we will face complexity and additional costs in our compliance efforts.

As an FCM, Refco, LLC's activities are regulated by the CFTC and the exchanges of which it is a member. Certain other subsidiaries are registered with the CFTC as commodity trading advisors and commodity pool operators. Refco, LLC's business is also regulated by the NFA of which Refco, LLC and certain of its affiliates are members. Violations of the rules of the CFTC, the NFA or the exchanges could result in remedial actions including fines, registration terminations or revocations of exchange memberships.

Refco Securities, LLC is registered as a broker-dealer with the SEC and in all 50 states, the District of Columbia and Puerto Rico and is a member of self-regulatory organizations, including the NASD and certain exchanges, including the CBOE. Broker-dealers are subject to regulations covering all aspects of the securities business, including sales and trading practices, public offerings, publication of research reports, use of customers' funds and securities, capital structure, record keeping and the conduct of directors, managers, officers and employees. Broker-dealers are also regulated by securities administrators in those states where they do business. Violations of regulations governing a broker-dealer's actions could result in censure, fine, the issuance of cease-and-desist orders, the suspension or expulsion from the securities industry of such broker-dealer or its officers or employees, or other similar consequences.

Margin lending by certain broker-dealer subsidiaries is regulated by the Federal Reserve Board's restrictions on lending in connection with customer purchases and short sales of securities, and NASD

rules also require such subsidiaries to impose maintenance requirements on the value of securities contained in margin accounts. In many cases, our margin policies are more stringent than these rules.

We conduct some of our government securities activities through Refco Securities, LLC, an NASD member registered as a government securities broker-dealer with the SEC and in certain states. The Department of Treasury has promulgated regulations concerning, among other things, capital adequacy, custody and use of government securities and transfers and control of governmental securities subject to repurchase transactions. The rules of the Municipal Securities Rulemaking Board, which are enforced by the NASD, govern the municipal securities activities of Refco Securities, LLC.

As a registered broker-dealer, Refco Securities, LLC is subject to the SEC's and NASD's net capital rules, and, as an FCM, Refco, LLC is subject to the net capital requirements of the CFTC and various exchanges. Many non-U.S. securities exchanges and regulatory authorities also have imposed rules relating to capital requirements applicable to our non-U.S. subsidiaries. These rules, which specify minimum capital requirements, are designed to measure general financial integrity and liquidity and require that at least a minimum amount of assets be kept in relatively liquid form. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million, which was 18.3% of aggregate debit balance and $67.5 million in excess of required net capital. Refco, LLC, is required to maintain net capital equal to the greater of 4% of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined, or the sum of 8% of the customer risk maintenance margin requirement puts 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital.

Compliance with the capital requirements may limit our operations requiring the intensive use of capital. Such requirements restrict our ability to withdraw capital from our subsidiaries, which in turn may limit our ability to pay dividends or repay debt. Any change in such rules or the imposition of new rules affecting the scope, coverage, calculation or amount of capital requirements, or a significant operating loss or any unusually large charge against capital, could adversely affect our ability to pay dividends or to expand or maintain present business levels.

The USA PATRIOT Act of 2001 (the "PATRIOT Act") contains anti-money laundering and financial transparency laws and mandates the implementation of various new regulations applicable to FCMs, broker-dealers and other financial services companies, including standards for verifying customer identification at account opening and obligations to monitor customer transactions and detect and report suspicious activities to the government. Institutions subject to the PATRIOT Act must implement specialized employee training programs, designate an anti-money laundering compliance officer and submit to independent audits of the effectiveness of the compliance program. Anti-money laundering laws outside the United States contain similar provisions. We have established policies, procedures and systems designed to comply with these regulations.

Our securities and futures businesses are also regulated extensively by non-U.S. governments, exchanges, self-regulatory organizations, central banks and regulatory bodies, especially in those jurisdictions in which one of our subsidiaries maintains an office. For instance, the Financial Services Authority, LIFFE and Euronext.liffe regulate the activities of Refco Overseas Limited in the United Kingdom. Other subsidiaries are also subject to regulation by securities, banking and finance regulatory authorities, exchanges and other self-regulatory organizations in numerous other countries in which they do business.

**Legal Proceedings**

*Tradewinds*

On April 1, 1999, Tradewinds Financial Corporation, Tradewinds Debt Strategies Fund, L.P., Tradewinds Offshore Fund, Limited, Tradewinds Clipper Fund Ltd. and Tradewinds Secured Debt Fund (collectively, "Tradewinds") filed an action against Refco Securities, Inc., Refco Capital Markets, Ltd. and Martin Loftus (collectively, "Refco") in the U.S. District Court for the Southern District of New York, alleging, among other things, that Refco breached a customer agreement governing certain margin accounts by requiring Tradewinds to increase the value of collateral securing a margin loan from 60% to 100% in September 1998. Upon the completion of discovery, the parties stipulated that the court lacked jurisdiction over Tradewinds' claims and the case was dismissed. Tradewinds refiled the action in the Supreme Court of the State of New York. On March 27, 2002, Refco filed a motion for summary judgment. On September 15, 2003, the court granted in part Refco's motion, dismissing six of the seven claims asserted against Refco. The court reserved for trial before a jury Tradewinds' claim that Refco's actions breached the implied contractual duty of good faith and fair dealing. On March 16, 2004, the Appellate Division of the First Department of the State of New York affirmed the decision of the trial court in all respects. In June 2004, the sole remaining claim was tried before a jury. On June 17, 2004, the jury returned a verdict in favor of Tradewinds on the liability issue submitted to it by the trial judge.

Refco believes it has meritorious grounds upon which to overturn the jury's verdict and intends to file post-trial motions asking the trial court to set aside that verdict. If those motions are not granted, Refco intends to appeal. If the jury's verdict is not set aside, a separate trial would be held to determine damages. Tradewinds has indicated that it plans to seek $45 million in damages. Refco believes (and, should a damages trial be held, will present evidence and arguments seeking to demonstrate) that Tradewinds' damages claims greatly overstate the amounts that could be recovered by Tradewinds under applicable law even if the jury's liability verdict were ultimately sustained.

At this time, it is not possible to predict the final outcome of this proceeding with certainty.

*SEC Investigation*

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation. The SEC requested that we produce documents relating to any of our accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock and other transactions. In 2002 and 2003, we received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of our former brokers who handled the account of Amro International, S.A., one of our former customers that engaged through its account with us in short sales of Sedona stock and whose financial advisor settled SEC charges with respect to such short sales in February 2003; our relationship with Amro and its two principals; other securities traded by Amro; and our record keeping, supervisory and short sale policies and restrictions. Although there were issues previously raised by the SEC with respect to document production and retention by us, we believe that we have now substantially complied with those subpoenas and requests. In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the SEC. In addition to producing documents in response to the foregoing subpoenas, we have made our employees available to testify before the SEC and to be interviewed by the U.S. Attorneys' office. Refco Securities, LLC has been advised that it is not currently the subject of the U.S. Attorneys' investigation. At the present time, it is not possible to predict the outcome of the foregoing investigations with certainty.

*Other*

In addition to the matters discussed above, from time to time, we are party to litigation and administrative proceedings that arise in the ordinary course of our business. We do not have any other pending litigation that, separately or in the aggregate, would in the opinion of management have a material adverse effect on our results of operations or financial condition.

## MANAGEMENT

**Managers and Executive Officers**

Upon consummation of the Transactions, we will be a wholly owned subsidiary of New Refco, whose members include affiliates of Thomas H. Lee Partners, L.P., and Refco Group Holdings, Inc., which is owned by Phillip Bennett. For more information, see "The Transactions."

After the consummation of the Transactions, our executive officers and managers and their respective ages and positions will be as follows:

| Name | Age | Position |
|---|---|---|
| Phillip R. Bennett . . . . . . . . . . . . . . | 55 | President, Chief Executive Officer and Chairman |
| Joseph J. Murphy . . . . . . . . . . . . . . | 43 | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC |
| Robert C. Trosten . . . . . . . . . . . . . . | 35 | Executive Vice President and Chief Financial Officer |
| William M. Sexton . . . . . . . . . . . . . | 39 | Executive Vice President and Chief Operating Officer |
| Santo C. Maggio . . . . . . . . . . . . . . | 53 | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC |
| David V. Harkins . . . . . . . . . . . . . . | 63 | Manager |
| Scott L. Jaeckel . . . . . . . . . . . . . . | 33 | Manager |
| Thomas H. Lee . . . . . . . . . . . . . . | 60 | Manager |
| Scott A. Schoen . . . . . . . . . . . . . . | 45 | Manager |

*Phillip R. Bennett* has served as our President and Chief Executive Officer since September 1998. He also serves as the President of Refco Capital Holdings, LLC. Mr. Bennett joined us in 1981 from The Chase Manhattan Bank, where he held various positions involving credit and commercial lending in New York, Toronto, Brussels and London from 1970 to 1981. Among other positions at Chase, Mr. Bennett served as a member of its Commodity Lending Department. He is a graduate of Cambridge University, England.

*Joseph J. Murphy* has served as President of Refco Global Futures, LLC since March 1999. He also serves as our Executive Vice President responsible for global marketing. From 1994 to 1999, Mr. Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Mr. Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation in New York. He also held management positions in the Treasury Department of The Chase Manhattan Bank. Mr. Murphy holds a degree from Providence College located in Providence, Rhode Island. His professional affiliations include memberships with the CBOT and CME. Mr. Murphy is a member of the Board of Directors and Vice Chairman of the FIA and a member of the Board of Governors and Vice Chairman of the Clearing Corp.

*Robert C. Trosten* has served as our Executive Vice President and Chief Financial Officer since 2001 and is a member of our management committee. His responsibilities include global accounting and budgeting, regulatory reporting, establishment of accounting policies, global tax planning and the development and execution of key strategic initiatives at the corporate level. Mr. Trosten joined us in 1997 as part of our corporate finance team. From August 1992 through June 1997, Mr. Trosten served as Vice President of Corporate and Regulatory Accounting at Lehman Brothers Inc. He is a Certified Public Accountant and received his B.S. in Accounting from the State University of New York at Albany.

*William M. Sexton* has served as our Executive Vice President and Chief Operating Officer since July 2002. He joined us in April 1999. He is responsible for information technology, operations, accounting and finance, credit, margins and risk for our futures businesses. From 1991 to 1997, Mr. Sexton served in various capacities at The Chase Manhattan Bank, including the financial controller for the U.S. FCM, institutional sales for marketing derivatives, foreign exchange and treasury

products. Mr. Sexton holds a B.S. in Business Administration from Pace University and an M.B.A. from Fordham University, both with concentrations in finance. He is a member of the NFA. He is also a member of the FIA @ Markets Division Board of Directors, the NYMEX FCM Advisory Committee, the FIA Operations and Technology Divisions and is a member of the Board of Directors of Eurex U.S.

*Santo C. Maggio* has served as our Executive Vice President and President and Chief Executive Officer of Refco Securities, LLC, our NASD broker-dealer, since 2001. Mr. Maggio has also served as President of Refco Capital Markets, Ltd. since 1991. He joined us in 1985. From 1976 to 1982, Mr. Maggio was employed as Vice President of Inland Consultants Corporation and from 1982 to 1985 as Vice President for McMahan Securities. Mr. Maggio holds an accounting degree from Hunter College, City University of New York.

*David V. Harkins* has served as President of Thomas H. Lee Partners, L.P. over the past five years. Mr. Harkins served briefly as the interim Chief Executive Officer of Conseco, Inc., an insurance and financial services company, from April 2000 until June 2000. Mr. Harkins is also a director of Cott Corporation, Metris Companies, Inc., National Dentex Corporation and Syratech Corporation. Mr. Harkins is a graduate of the U.S. Military Academy.

*Scott L. Jaeckel* has served as a Vice President at Thomas H. Lee Partners, L.P. since 2001. Previously, Mr. Jaeckel worked at Thomas H. Lee Company from 1994 to 1996, rejoining in 1998. From 1992 to 1994, Mr. Jaeckel worked at Morgan Stanley & Co. Incorporated in the Corporate Finance Department. He currently serves as a director of Paramax Capital Group and Warner Music Group. He holds a B.A. in Economics and Mathematics from the University of Virginia and an M.B.A. from Harvard Business School.

*Thomas H. Lee* founded the Thomas H. Lee Company, the predecessor of Thomas H. Lee Partners, L.P., in 1974 and serves as its Chairman and CEO. From 1966 through 1974, Mr. Lee was with First National Bank of Boston where he directed the bank's high technology lending group from 1968 to 1974 and became a Vice President in 1973. Prior to 1966, Mr. Lee was a securities analyst in the institutional research department of L.F. Rothschild in New York. Mr. Lee serves or has served as a Director of numerous public and private companies in which THL and its affiliates have invested, including Finlay Enterprises, Inc., General Nutrition Companies, Metris Companies, Inc., Playtex Products, Inc., Snapple Beverage Corp., Vertis Holdings, Inc., and Wyndham International, Inc. In addition, Mr. Lee is a Member of the JP Morgan National Advisory Board. Mr. Lee is currently a Trustee of Lincoln Center for the Performing Arts, The Museum of Modern Art, NYU Medical Center, The Rockefeller University, and Whitney Museum of American Art among other civic and charitable organizations. He also serves on the Executive Committee for Harvard University's Committee on University Resources. Mr. Lee is a 1965 graduate of Harvard College.

*Scott A. Schoen* is a Managing Director of Thomas H. Lee Partners, L.P., which he joined in 1986. Prior to joining the firm, Mr. Schoen was in the Private Finance Department of Goldman, Sachs & Co. Mr. Schoen is a director of AXIS Capital Holdings Limited, Affordable Residential Communities, Inc., Syratech Corporation, TransWestern Publishing, L.P., United Industries Corporation, Wyndham International and Simmons Company. Mr. Schoen is a Vice Chairman of the Board and a member of the Executive Committee of the United Way of Massachusetts Bay. He is also a member of the Advisory Board of the Yale School of Management. Mr. Schoen is a 1980 graduate of Yale College and holds an M.B.A. from Harvard Business School and a J.D. from Harvard Law School.

Except as described under "Certain Relationships and Related Transactions—Securityholders Agreement," there are no arrangements or understandings between any member of the management committee or executive officer and any other person pursuant to which that person was elected or appointed to his position.

## Executive Compensation

The following table sets forth information concerning the compensation of our chief executive officer and each of our four most highly compensated executive officers during each of the last three fiscal years. The bonuses set forth below include amounts earned in the year shown but paid in the subsequent year.

### Summary Compensation Table

| | | Annual Compensation | | | |
| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Total Compensation ($) |
|---|---|---|---|---|---|
| Phillip R. Bennett . . . . . . . . . . . . . . . . . . . . . | 2004 | 1,500,000 | 2,469,000 | 444,840(1) | 4,413,840 |
| President, Chief Executive Officer | 2003 | 1,500,000 | 2,196,000 | 500,692(1) | 4,196,692 |
| and Chairman | 2002 | 1,000,000 | 2,380,000 | 394,103(1) | 3,774,103 |
| Robert C. Trosten . . . . . . . . . . . . . . . . . . . . | 2004 | 1,000,000 | 2,139,000 | — | 3,139,000 |
| Executive Vice President and | 2003 | 1,000,000 | 1,838,000 | — | 2,838,000 |
| Chief Financial Officer | 2002 | 500,000 | 1,700,000 | — | 2,200,000 |
| Joseph J. Murphy. . . . . . . . . . . . . . . . . . . . . . | 2004 | 1,000,000 | 1,920,000 | — | 2,920,000 |
| Executive Vice President; President and | 2003 | 1,000,000 | 1,640,000 | — | 2,640,000 |
| Chief Executive Officer of Refco | 2002 | 600,000 | 1,250,000 | — | 1,850,000 |
| Global Futures, LLC | | | | | |
| Santo C. Maggio . . . . . . . . . . . . . . . . . . . . . | 2004 | 500,000 | 1,252,000 | — | 1,752,000 |
| Executive Vice President; President and | 2003 | 500,000 | 1,084,000 | — | 1,584,000 |
| Chief Executive Officer of Refco | 2002 | 500,000 | 985,000 | — | 1,485,000 |
| Securities, LLC | | | | | |
| William M. Sexton . . . . . . . . . . . . . . . . . . . . | 2004 | 500,000 | 960,000 | — | 1,460,000 |
| Executive Vice President and Chief | 2003 | 500,000 | 820,000 | — | 1,320,000 |
| Operating Officer | 2002 | 400,000 | 400,000 | — | 800,000 |

(1) Consists of premiums for term life insurance and includes an amount equal to the payment to Mr. Bennett to compensate him for the incremental tax impact associated with the payment of the premium.

## Compensation Committee Interlocks and Insider Participation

The compensation arrangements for our chief executive officer and each of our executive officers was established pursuant to the terms of the respective employment agreements between us and each executive officer. The terms of the employment agreements were established pursuant to arms-length negotiations between us and each executive officer.

## Board of Managers Compensation

All members of our board of managers are reimbursed for their usual and customary expenses incurred in connection with attending all board and other committee meetings.

## Management Investment

Phillip Bennett, through his continuing ownership interest in Refco Group Holdings, Inc., will roll over an approximate $387.0 million equity investment, subject to adjustment, into the common equity interests of our parent, New Refco. We expect that Messrs. Trosten, Sexton, Maggio and Murphy will make investments of $2.5 million, $1.0 million, $250,000 and $250,000, respectively, in the common equity interests of New Refco.

## Employment Agreements

*Phillip Bennett Employment Agreement.*   On June 8, 2004, Phillip Bennett entered into an Executive Employment and Non-Competition Agreement with us that will become effective on the date of the closing of the Transactions. Under the agreement, Mr. Bennett will serve as our Chairman and Chief Executive Officer and will report directly to our Board of Managers for an initial term ending on February 28, 2007. After such date, Mr. Bennett will continue to serve with an automatic renewal thereafter for additional one year terms, unless either party terminates the agreement in accordance with its provisions.

Under the terms of the agreement, we will pay Mr. Bennett an annual base salary of $1,100,000, and he will be eligible to receive an annual bonus as determined in accordance with our Management Bonus Pool Plan and will be able to participate in equity-based compensation plans, including through the grant of Class B Units pursuant to a Restricted Unit Agreement with us. In certain circumstances, Mr. Bennett's termination will entitle him to a severance package including two years of his base salary and annual bonus at the time of termination. In addition, Mr. Bennett has agreed that during the term of the agreement and for a two year period thereafter (but in no event, less than five years), he will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

*Executive Employment Agreements.*   On the date of the closing of the Transactions, Joseph Murphy, Robert Trosten, William Sexton and Santo Maggio will enter into Executive Employment and Non-Competition Agreements with us. Each of these agreements will have substantially identical terms, except for the applicable positions and annual base salary amounts for each employee as described below. Under the agreements, each employee is eligible for an annual bonus to be determined in accordance with the Senior Management Bonus Pool Plan adopted by us and will be able to participate in equity-based compensation plans, including through the grant of Class B Units pursuant to Restricted Unit Agreements to be entered into with us. The position and initial base salary for each of the employees under the agreements is as listed below:

| Name | Position | Base Salary |
|---|---|---|
| Joseph Murphy . . . . . . . . . | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC | $1,000,000 |
| Robert Trosten . . . . . . . . . | Executive Vice President and Chief Financial Officer | 1,000,000 |
| William Sexton . . . . . . . . . | Executive Vice President and Chief Operating Officer | 800,000 |
| Santo Maggio . . . . . . . . . | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC | 675,000 |

Each employee will be entitled to a severance package in certain circumstances, which shall entitle such employee to 18 months of his base salary and annual bonus as of the date of termination. In addition, each employee will agree that during the term of the agreement and for an 18-month period thereafter, such employee will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

The Senior Management Bonus Pool Plan will enable participating senior managers to receive bonuses based on our performance. If our actual EBITDA (subject to certain adjustments) for a fiscal year is between 95% and 105% of the budgeted EBITDA for the year, the bonus pool amount to be divided among all participating senior managers generally will be the greater of 100% of the aggregate base compensation of such senior managers or, subject to the cap described below, 2.1% of our actual EBITDA (subject to certain adjustments). The bonus pool amount will be adjusted if actual EBITDA (subject to certain adjustments) is more than 105% or less than 95% of budgeted EBITDA. The aggregate bonus pool amount to be divided among all participating senior managers in any event cannot be greater than 150% of the aggregate base compensation of such senior managers.

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

Following the Transactions, Refco Finance will be a wholly owned subsidiary of Refco Group Ltd., LLC, a limited liability company wholly owned by New Refco, a limited liability company whose members will include THL Refco Acquisition Partners and certain of its affiliates, partnerships beneficially owned by Thomas H. Lee Partners, L.P. and its affiliates, and Refco Group Holdings, Inc., a subchapter S corporation that will be wholly owned by Phillip R. Bennett.

The following table sets forth certain information regarding the expected beneficial ownership, as of the date of the consummation of the Transactions, of New Refco, which will own all of our membership interests, by: (i) each person or entity who will own any class of its outstanding securities and (ii) each person who will be a member of its board of managers, each person who will be a named executive officer, and such executive officers as a group. Following the Transactions, we expect that New Refco outstanding securities will consist of approximately 501.81 Class A Units. New Refco has also authorized 50 Class B Units, 25.09 of which will be outstanding as of the date of the consummation of the Transactions. The Class B Units will be issued under the Restricted Unit Agreement we entered into with certain members of our management, which will begin to vest on February 28, 2005. See "Certain Relationships and Related Transactions—Restricted Unit Agreement." To our knowledge, each such member has sole voting and investment power as to the units shown unless otherwise noted. Beneficial ownership of the units listed in the table has been determined in accordance with the applicable rules and regulations promulgated under the Exchange Act. The numbers presented in the table below are subject to change based on the price payable with respect to the shares of units in connection with the Transactions. Unless otherwise indicated, the address for each holder listed below is c/o Refco Group Ltd., LLC, One World Financial Center, 200 Liberty Street Tower A, New York, New York 10281.

| | Securities Beneficially Owned | |
|---|---|---|
| Name and Address | Number of Class A Units | Percentage of Class A Units |
| **Principal Securityholders:** | | |
| Thomas H. Lee Partners and affiliates(1) | 284.70 | 57% |
|   c/o Thomas H. Lee Partners, L.P. | | |
|   100 Federal Street | | |
|   Boston, MA 02110 | | |
| **Managers and Executive Officers:** | | |
| Phillip R. Bennett(2) | 214.77 | 43% |
| Joseph J. Murphy | 0.14 | * |
| Robert C. Trosten | 1.39 | * |
| William M. Sexton | 0.56 | * |
| Santo C. Maggio | 0.14 | * |
| David V. Harkins(3) | — | — |
| Scott L. Jaeckel(3) | — | — |
| Thomas H. Lee(3) | — | — |
| Scott A. Schoen(3) | — | — |
| All management committee members and named executive officers as a group (9 persons) | 217.00 | 43% |

---

\*    Represents less than 1%

(1)  Includes interests owned by each of THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Refco Acquisition Partners III, Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Putnam Investments Holdings, LLC, Putnam Investments

Employees' Securities Company I, LLC, and Putnam Investments Employees' Securities Company II, LLC and certain co-investors who have agreed to vote their interests in favor of nominees of affiliates of THL Refco Acquisition Partners as described under "Certain Relationships and Related Transactions—Securityholders Agreement." THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III are each Delaware general partnerships indirectly owned by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., respectively. Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P. are Delaware limited partnerships, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company. Thomas H. Lee Equity (Cayman) Fund V, L.P. is an exempted limited partnership formed under the laws of the Cayman Islands, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company registered in the Cayman Islands as a foreign company. Thomas H. Lee Advisors, LLC, a Delaware limited liability company, is the general partner of Thomas H. Lee Partners, a Delaware limited partnership, which is the sole member of THL Equity Advisors V, LLC. Thomas H. Lee Investors Limited Partnership (f/k/a THL-CCI Limited Partnership) is a Massachusetts limited partnership, whose general partner is THL Investment Management Corp., a Massachusetts corporation. The 1997 Thomas H. Lee Nominee Trust is a trust with US Bank, N.A. serving as Trustee. Thomas H. Lee, a Managing Director of Thomas H. Lee Advisors, LLC, has voting and investment control over common shares owned of record by the 1997 Thomas H. Lee Nominee Trust. Putnam Investments Holdings LLC, Putnam Investments Employees' Securities Company I, LLC and Putnam Investments Employees' Securities Company II, LLC are co-investment entities of Thomas H. Lee Partners and each disclaims beneficial ownership of any securities other than the securities held directly by such entity. The address for the Putnam entities is One Post Office Square, Boston, MA 02109.

(2) Refco Group Holdings, Inc. is a Delaware corporation that will be wholly owned by Phillip R. Bennett following the Transactions. Through his ownership of Refco Group Holdings, Inc., Phillip R. Bennett will beneficially own approximately 43% of our company.

(3) Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Company. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as President, a Vice President and a Managing Director, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own Class A Units held of record by THL Refco Acquisition Partners, THL Refco Acquistion Partners II and THL Refco Acquisition Partners III. Each of these individuals disclaims beneficial ownership of such units except to the extent of their pecuniary interest therein.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**The Equity Purchase and Contribution Agreement**

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with us, Refco Group Holdings, Inc. and certain other parties, which was amended on July 9, 2004 to, among other things, add New Refco as a party and modify the structure of the transactions contemplated by the agreement. The Purchase Agreement provides for a series of transactions, which will result in New Refco Group Ltd., LLC becoming our parent and THL Refco Acquisition Partners and its affiliates and co-investors owning an approximate 57% interest in New Refco, based on a valuation of New Refco of approximately $2.25 billion following the closing of the Transactions.

The Purchase Agreement and related documents contemplate the following transactions will occur prior to the contribution of all our outstanding membership interests to New Refco:

- THL Refco Acquisition Partners and certain of its affiliates and co-investors will purchase a portion of our voting membership interests currently held by Refco Group Holdings, Inc., one of two current holders of our membership interests, for an amount of cash equal to the quotient determined by dividing approximately $2.25 billion (subject to certain adjustments), by the total number of our membership interests outstanding immediately prior to the contribution;

- BAWAG Overseas, Inc., the other current holder of our membership interests, will merge with and into a wholly owned subsidiary of Refco Group Holdings, Inc. and all of the membership interests acquired in the merger will be distributed as a dividend to Refco Group Holdings, Inc.;

The Purchase Agreement contemplates the following transactions will occur in connection with the contribution of all our outstanding membership interests to New Refco:

- we will distribute $500.0 million in cash and all the equity interests of Forstmann-Leff International Associates, LLC, which upon consummation of the Transactions will own substantially all the assets of our Asset Management business, to New Refco. New Refco will immediately thereafter distribute these assets to Refco Group Holdings, Inc., an entity that will be wholly owned by Phillip Bennett upon consummation of the Transactions.

- each outstanding membership interest acquired by Refco Group Holdings, Inc., in connection with the merger of BAWAG Overseas, Inc. with and into a wholly owned subsidiary of Refco Group Holdings, Inc., will be exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc. in connection with its rollover equity investment will be exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc. that is not exchanged for a Class A Unit (as described above) will be converted into the right to receive cash equal to the quotient determined by dividing approximately $2.25 billion (subject to certain adjustments), by the total number of our membership interests outstanding immediately prior to the effective time of the contribution;

- each membership interest purchased by THL Refco Acquisition Partners and its affiliates and co-investors will be exchanged for one Class A Unit; and

- Refco Finance Holdings LLC will merge with and into us, with our company as the surviving entity.

The closing of the agreement is subject to customary provisions, including representations and warranties, indemnification provisions and covenants with respect to the conduct of business prior to the closing of the agreement. The closing is also subject to the satisfaction or waiver of certain

conditions, including that there will be (1) no injunction, other governmental order or legal restraint that has the effect of prohibiting consummation of the transactions contemplated by the agreement or any proceeding pending that seeks to impose any of the foregoing or to impose any modification to any of the Transactions that would be materially adverse to us; (2) receipt of certain governmental, regulatory and third party approvals and consents and the expiration of all statutory waiting periods in respect of the agreement; (3) the continued accuracy of representations and warranties of each party; and (4) the performance of obligations of each party. These conditions shall be deemed to be satisfied, however, if, individually or in the aggregate, breaches or violations would not be deemed to have a material adverse effect on our company.

The obligation of THL Refco Acquisition Partners and its affiliates and co-investors to consummate the transactions contemplated by the Purchase Agreement is subject to a number of conditions to closing, including (1) the receipt of proceeds from the offering of the senior subordinated notes offered hereby, (2) the repayment of all our indebtedness and (3) consummation of the other debt financing necessary to fund a portion of the purchase price for our company.

**Limited Liability Company Agreement of New Refco**

The amended and restated limited liability company agreement of New Refco will authorize New Refco to issue Class A and Class B units. The Class A and Class B units generally have identical rights and preferences, except that the Class B Units are nonvoting and have different rights as to certain distributions described below.

Distributions of New Refco's property will be made in the following order:

- first, the holders of Class A Units will receive a return of their invested capital;

- second, the holders of the Class A Units will receive an 8% cumulative preferred return on their invested capital; and

- thereafter, holders of the Class A Units and Class B Units will receive pro rata distributions based on the number of units held by the holder.

A board of managers will have the exclusive authority to manage and control New Refco's business and affairs. The board of managers' composition will be determined in accordance with the provisions of the securityholders agreement described below and is more fully described in "Management—Board of Managers Compensation."

**Securityholders Agreement**

Pursuant to the securityholders agreement to be entered into in connection with the Transactions, units of New Refco that are beneficially owned by Refco Group Holdings, Inc., THL Refco Acquisition Partners or any of its affiliates or any limited partners of them so long as THL Refco Acquisition Partners or any of its affiliates maintains voting control over the units held, (collectively, the "THL Holders"), the executive investors and certain of New Refco's other employees and employees of New Refco's subsidiaries, which we refer to as employees, are subject to certain restrictions on transfer, as well as the other provisions described below. When we refer to "units" of New Refco in the following discussion, such reference includes New Refco's common stock following a change in corporate form, whether in preparation for an initial public offering or otherwise.

The securityholders agreement provides that the THL Holders, Refco Group Holdings, Inc., the executive investors, employees and all other parties to the agreement will vote all of their shares to elect and continue in office New Refco's board of managers, initially consisting of eight managers composed of:

- four managers designated by the THL Holders;

- three managers designated by Refco Group Holdings, Inc., one of whom will be Phillip Bennett as long as he is willing and able to serve; and

- one independent manager designated by the THL Holders and Refco Group Holdings, Inc.

The board of managers may be increased to nine and the THL Holders will be entitled to designate an additional manager (for a total of five managers designated by the THL Holders) if New Refco fails to meet certain yearly performance requirements.

The securityholders agreement also provides:

- the THL Holders and Refco Group Holdings, Inc. with a "right of first offer" with respect to transfers of New Refco's units held by any securityholder;

- each securityholder with customary "tag-along" rights with respect to transfers of New Refco's Class A Units;

- the THL Holders with "drag-along" rights with respect to New Refco's units owned by the securityholders in a sale of New Refco;

- the THL Holders, Refco Group Holdings, Inc. and executive investors with customary "preemptive rights";

- the THL Holders and Refco Group Holdings, Inc. with certain registration rights, which require New Refco to register units held by them under the Securities Act; and

- New Refco with certain call rights with respect to Class A Units held by executive investors who are terminated for any reason.

**Management Agreement**

Pursuant to the management agreement entered into in connection with the Transactions, THL Managers V, LLC will render to New Refco and each of its subsidiaries certain advisory and consulting services. In consideration of those services, either New Refco or we will pay to THL Managers V, LLC semi-annually, an aggregate per annum management fee equal to the greater of:

- $2.5 million; and

- an amount equal to 1.0% of the consolidated earnings before interest, taxes, depreciation and amortization of New Refco and its subsidiaries for such fiscal year, but before deduction of any such fee.

New Refco will also agree to pay THL Managers V, LLC at the closing of the Transactions a transaction advisory fee of $30.0 million.

New Refco or we will also agree to indemnify THL Managers V, LLC and its affiliates from and against all losses, claims, damages and liabilities arising out of or related to the performance by THL Managers V, LLC of the services pursuant to the management agreement.

**Restricted Unit Agreement**

Certain members of management will be entitled to receive Class B units pursuant to a Restricted Unit Agreement to be entered into on the closing date of the Transactions. The Restricted Unit Agreement will set forth the vesting schedule with respect to the restricted Class B Units. One half of the Class B Units will vest ratably at the end of each of the first four fiscal years following the Transactions. The remaining half of the Class B Units will vest, subject to annual performance and catch-up provisions, at the end of each of the first four fiscal years following the Transactions. Vesting of all units is subject to acceleration upon a change of control. Upon the termination of an executive

93

holder, unvested Class B Units will be forfeited to New Refco and vested Class B Units may be repurchased by New Refco at fair market value.

**Escrow Agreement**

Pursuant to the escrow agreement, New Refco and THL Refco Acquisition Partners will deliver $39,014,313 of the purchase price at the closing to HSBC Bank USA, as escrow agent, to satisfy any earn-out amounts that are to be paid by New Refco after the closing. The escrowed funds will be separated into seven separate escrow accounts, each representing a separate earn-out amount.

If an earn-out payment is due by New Refco, the escrow agent will release a portion of the funds from the earn-out account designated on written instructions given by New Refco's chief executive officer. If the escrowed amount in a given earn-out account exceeds the amount of all obligations with respect to a particular earn-out account, then the escrow agent will release the amount of any excess to Refco Group Holdings, Inc. upon joint written instructions signed by the chief executive officer, THL Refco Acquisition Partners and Refco Group Holdings, Inc. If the earn-out amount to be distributed by New Refco exceeds the escrowed amount in the designated earn-out account, then Refco Group Holdings, Inc. will be liable for the deficiency.

**Currenex Fees**

Through a joint venture with Putnam Investments, Thomas H. Lee Partners, L.P. has an indirect ownership interest in Currenex, Inc., which is a technology firm that has created an electronic platform for trading currencies. We pay fees to Currenex in connection with the use of its platform.

## DESCRIPTION OF CREDIT FACILITIES

**Senior Credit Facilities**

In connection with the Transactions, we expect to become party to senior secured credit facilities with Bank of America, N.A., as administrative agent, swingline lender and l/c issuer, Banc of America Securities LLC, Credit Suisse First Boston, acting through its Cayman Islands Branch and Deutsche Bank Securities Inc. as co-lead arrangers and joint book running managers, Credit Suisse First Boston, acting through its Cayman Islands Branch, as syndication agent, and Deutsche Bank Securities Inc. as documentation agent, and various lenders. Set forth below is a summary of the anticipated terms of the senior credit facilities. As the final terms of the senior credit facilities have not been agreed upon, the final terms may differ from those set forth herein and, in certain cases, such differences may be significant.

The senior credit facilities will provide for aggregate borrowings of up to $875.0 million, including:

- a revolving credit facility of up to $75.0 million in revolving credit loans and letters of credit, none of which will be drawn upon consummation of the Transactions, and

- a term loan facility of $800.0 million, all of which will be drawn immediately prior to consummation of the Transactions, with an option to increase the aggregate amount of term loans up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase and subject to certain closing conditions.

All revolving loans incurred under the senior credit facilities will mature six years from the closing date. The term loan facility will mature seven years from the closing date.

The senior credit facilities will be secured by, among other things:

- a first priority security interest in substantially all of the assets of our company, New Refco and our non-regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of our, New Refco's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by us or any guarantor and (ii) 65% of the voting stock of each of our and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the senior credit facilities will be guaranteed by New Refco and our non-regulated restricted domestic subsidiaries.

Borrowings under the senior credit facilities will bear interest at a floating rate, which can be either a LIBOR rate plus an applicable margin or, at the borrower's option, an alternative base rate (defined as the higher of (x) the Bank of America prime rate and (y) the federal funds effective rate, plus one half percent (.50%) per annum) plus an applicable margin. The initial applicable margin for LIBOR loans and alternative base loans under the senior credit facilities will be 2.75% and 1.75% per annum, respectively. Commencing six months after the closing date, the applicable margin under the revolving credit facility will be subject to adjustment based on a performance pricing grid to be agreed upon. The interest rate payable under the senior credit facilities will increase by 2.00% per annum during the continuance of any payment or bankruptcy event of default. All rates described above are subject to final pricing.

For LIBOR loans, we may select interest periods of one, two, three or six months and, to the extent available to all lenders, nine or twelve months. Interest will be payable at the end of the selected interest period, but no less frequently than every three months within the selected interest period.

The senior credit facilities also requires payment of a commitment fee on the difference between committed amounts and amounts actually borrowed under the revolving credit facility. Prior to the maturity date, funds borrowed under the revolving credit facility may be borrowed, repaid and reborrowed, without premium or penalty.

The term loan facility will be subject to amortization in equal quarterly installments of principal as set forth in the table below.

| Year | Term Loan Facility |
|------|-------------------:|
| 1 | $ 8.0 million |
| 2 | $ 8.0 million |
| 3 | $ 8.0 million |
| 4 | $ 8.0 million |
| 5 | $ 8.0 million |
| 6 | $ 8.0 million |
| 7 | $ 752.0 million |

Voluntary prepayments of principal amounts outstanding under the senior credit facilities will be permitted at any time. However, if a prepayment of principal is made with respect to a LIBOR loan on a date other than the last day of the applicable interest period, the lenders will require compensation for any funding losses and expenses incurred as a result of the prepayment.

In addition, mandatory prepayments will be required to prepay amounts outstanding under the senior credit facilities in an amount equal to:

- 100% of net cash proceeds from certain asset dispositions by New Refco, us or any of our restricted subsidiaries, subject to certain exceptions and reinvestment provisions and limitations on the remittance of funds by our regulated subsidiaries;

- 100% of the net cash proceeds from the issuance or incurrence after the closing date of any additional debt by New Refco, us or any of our restricted subsidiaries (excluding certain permitted debt) and subject to limitations on the remittance of funds by our regulated subsidiaries;

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of the net cash proceeds from the issuance or sale after the closing date of additional equity by New Refco, us or any of our restricted subsidiaries in a public offering or in a private placement underwritten, managed, arranged, placed or initially purchased by an investment bank, excluding proceeds of equity issuances or sales to certain investors and other customary exceptions and subject to limitations on the remittance of funds by our regulated subsidiaries; and

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of excess cash flow, as defined in the senior credit facilities, subject to certain limitations on the remittance of funds by our regulated subsidiaries.

The senior credit facilities will require compliance with a minimum interest coverage ratio and a maximum leverage ratio (subject to an equity cure in specified instances). In addition, the senior credit facilities will contain certain restrictive covenants which will, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

The senior credit facilities will contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross-defaults to certain other indebtedness in excess of specified amounts, certain events of bankruptcy and insolvency, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

**Refco Capital, LLC Credit Facilities**

Through our Refco Capital, LLC subsidiary, we have credit facilities with various banks, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under these facilities are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We have two such facilities that provide for loans of $25.0 million and $30.0 million, respectively.

We currently have no outstanding indebtedness under these facilities.

## DESCRIPTION OF THE NOTES

Refco Finance Holdings LLC and Refco Finance Inc. will issue the Notes under an Indenture (the "*Indenture*") among themselves and Wells Fargo Bank, National Association, as Trustee. As part of the Transactions, it is contemplated that Refco Finance Holdings LLC will merge with and into Refco Group Ltd., LLC, with Refco Group Ltd., LLC as the surviving entity. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

Certain terms used in this description are defined under the subheading "—Certain Definitions." In this description, the word "*Company*" refers only to Refco Finance Holdings LLC, prior to the merger described in the previous paragraph, and Refco Group Ltd., LLC, following the merger, but not to any of their respective subsidiaries. In addition, the terms "*Issuers*," "*we*," "*our*" and "*us*" refer collectively to Refco Finance Holdings LLC and Refco Finance Inc., before the merger, and Refco Group Ltd., LLC and Refco Finance Inc., after the merger.

The following description is only a summary of the material provisions of the Indenture, the Registration Rights Agreement and the Escrow Agreement. We urge you to read the Indenture, the Registration Rights Agreement and the Escrow Agreement because they, not this description, define your rights as holders of these Notes. You may request copies of these agreements at our address set forth under the heading "Offering Circular Summary—Our Executive Offices."

### Brief Description of the Notes

These Notes:

- are unsecured senior subordinated obligations of the Issuers;

- are subordinated in right of payment to all existing and future Senior Indebtedness of the Issuers;

- are equal in right of payment to any future Senior Subordinated Indebtedness of the Issuers;

- are senior in right of payment to any future Subordinated Obligations of the Issuers;

- are guaranteed by each Subsidiary Guarantor; and

- are subject to registration with the SEC pursuant to the Registration Rights Agreement.

Refco Finance Inc. has no obligations other than the Notes.

### Principal, Maturity and Interest

The Issuers will issue the Notes initially with a maximum aggregate principal amount of $600.0 million. The Issuers will issue the Notes in denominations of $1,000 and any integral multiple of $1,000. The Notes will mature on August 1, 2012. Subject to our compliance with the covenant described under the subheading "—Certain Covenants—Limitation on Indebtedness," we are permitted to issue more Notes from time to time under the Indenture in an unlimited principal amount (the "*Additional Notes*"). The Notes and the Additional Notes, if any, will be treated as a single class for all purposes of the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context otherwise requires, for all purposes of the Indenture and this "Description of the Notes," references to the Notes include any Additional Notes actually issued.

Interest on these Notes will accrue at the rate of 9% per annum and will be payable semiannually in arrears on February 1 and August 1, commencing on February 1, 2005. We will make each interest payment to the holders of record of these Notes on the immediately preceding January 15 and July 15.

We will pay interest on overdue principal at 1% per annum in excess of the above rate and will pay interest on overdue installments of interest at such higher rate to the extent lawful.

Interest on these Notes will accrue from the date of original issuance. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Additional interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement.

## Optional Redemption

Except as set forth below, we will not be entitled to redeem the Notes at our option prior to their Stated Maturity.

On and after August 1, 2008, we will be entitled at our option to redeem all or a portion of these Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed in percentages of principal amount on the redemption date), plus accrued and unpaid interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period commencing on August 1 of the years set forth below:

| Period | Redemption Price |
| --- | --- |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 104.500% |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 102.250% |
| 2010 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.000% |

Prior to August 1, 2007, we will be entitled at our option on one or more occasions to redeem Notes in an aggregate principal amount not to exceed the sum of 35% of the aggregate principal amount of the Notes originally issued on the Issue Date plus 100% of the aggregate principal amount of any Additional Notes issued, at a redemption price (expressed as a percentage of principal amount) of 109.000%, plus accrued and unpaid interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), with the Net Cash Proceeds from one or more Designated Offerings (*provided* that if the Designated Offering is an offering by Parent, a portion of the Net Cash Proceeds thereof equal to the amount required to redeem any such Notes is contributed to the equity capital of the Company); *provided, however,* that

(1) at least 65% of the aggregate principal amount of Notes originally issued on the Issue Date remains outstanding immediately after the occurrence of each such redemption (other than Notes held, directly or indirectly, by the Company or its Affiliates); and

(2) each such redemption occurs within 90 days after the date of the related Designated Offering.

Prior to August 1, 2008, we will be entitled at our option to redeem all, but not less than all, of the Notes at a redemption price equal to 100% of the principal amount of the Notes plus the Applicable Premium as of, and accrued and unpaid interest to, the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date). Notice of such redemption must be mailed by first-class mail to each Holder's registered address not less than 30 nor more than 60 days prior to the redemption date.

"*Applicable Premium*" means, with respect to a Note at any redemption date, the excess of (A) the present value at such redemption date of (i) the redemption price of such Note on August 1, 2008 (such redemption price being described in the second paragraph in this "—Optional Redemption" section exclusive of any accrued interest) plus (ii) all required remaining scheduled interest payments due on such Note through August 1, 2008 (but excluding accrued and unpaid interest to the

redemption date), computed using a discount rate equal to the Adjusted Treasury Rate, over (B) the principal amount of such Note on such redemption date.

*"Adjusted Treasury Rate"* means, with respect to any redemption date, (1) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519)" or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded U.S. Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after August 1, 2008, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined and the Adjusted Treasury Rate shall be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per year equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date, in each case calculated on the third Business Day immediately preceding the redemption date, plus 0.50%.

*"Comparable Treasury Issue"* means the U.S. Treasury security selected by the Quotation Agent as having a maturity comparable to the remaining term of the Notes from the redemption date to August 1, 2008, that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a maturity most nearly equal to August 1, 2008.

*"Comparable Treasury Price"* means, with respect to any redemption date, if clause (2) of the Adjusted Treasury Rate is applicable, the average of three, or such lesser number as is obtained by the Trustee, Reference Treasury Dealer Quotations for such redemption date.

*"Quotation Agent"* means the Reference Treasury Dealer selected by the Trustee after consultation with the Company.

*"Reference Treasury Dealer"* means Credit Suisse First Boston LLC and its successors and assigns and two other nationally recognized investment banking firms selected by the Company that are primary U.S. government securities dealers.

*"Reference Treasury Dealer Quotations"* means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Trustee, of the bid and asked prices for the Comparable Treasury Issue, expressed in each case as a percentage of its principal amount, quoted in writing to the Trustee by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day immediately preceding such redemption date.

### Escrow of Proceeds; Special Mandatory Redemption

If the Issue Date occurs prior to the Acquisition Date, we will enter into an escrow agreement (the "Escrow Agreement") with Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent"). If we enter into the Escrow Agreement, it will be a condition to the closing of this offering that escrowed funds be deposited with the Escrow Agent in an amount sufficient to redeem in cash, on the latest possible redemption date, the Notes, at a redemption price equal to 100% of the principal amount of the Notes plus accrued and unpaid interest to such redemption date. Such deposited funds will consist of the gross proceeds from this offering together with an amount in cash or Treasury Securities (as defined below) sufficient to make such a redemption pursuant to the procedures described in this paragraph. The Notes will be subject to a special mandatory redemption in the event that the Acquisition is not consummated on or prior to September 20, 2004 or the Equity Purchase and Merger Agreement is terminated at any time prior thereto. We will cause the notice of special

100

mandatory redemption to be mailed no later than the second Business Day following September 20, 2004 or following the date the Equity Purchase and Merger Agreement is terminated, as applicable, and will redeem the Notes three Business Days following the date of notice of redemption.

The Issuers will only be entitled to direct the Escrow Agent to release the escrowed funds in accordance with the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrow Agent will release the escrowed funds upon satisfaction of certain conditions, including the presentation by us of an officers' certificate certifying that (1) the Acquisition and the other Transactions will be consummated in substantially the manner described in this offering circular on the date of such release, which date shall be on or prior to September 20, 2004 and (2) following the release of the escrowed funds, such funds, together with the proceeds of the other Transactions, will be applied by us in the manner described under "Use of Proceeds."

The Indenture will provide that to the extent Refco Group Ltd., LLC or any of the Restricted Subsidiaries shall have Incurred Indebtedness, made any Restricted Payments, consummated any Asset Dispositions, entered into any Affiliate Transactions or otherwise taken any action or engaged in any activities during the period beginning on the Issue Date and ending on the earliest of the Acquisition Date, September 20, 2004 or the date the Equity Purchase and Merger Agreement is terminated, such actions and activities shall be treated and classified under the Indenture (including but not limited to impacting relevant baskets) as if the Indenture and the covenants set forth therein had applied to Refco Group Ltd., LLC and its Restricted Subsidiaries during such period; *provided*, *however*, that the Transactions will be deemed not to constitute a Change of Control of the Company or otherwise be prohibited by the Indenture.

As long as the escrowed funds are deposited with the Escrow Agent, they will be invested by the Escrow Agent at our instruction in Treasury Securities and other Escrow Investments. "*Treasury Securities*" means any investment in obligations issued or guaranteed by the United States government or any agency thereof, in each case, maturing within 360 days of the date of acquisition thereof. "*Escrow Investments*" means (1) Treasury Securities, (2) investments in time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof, entitled to U.S. federal deposit insurance for the full amount thereof or issued by a bank or trust company (including the Escrow Agent or an affiliate of the Escrow Agent), which is organized under the laws of the United States of America or any state thereof having capital, surplus and undivided profits aggregating in excess of $500.0 million and (3) repurchase obligations with a term of not more than 30 days entered into with a nationally recognized broker-dealer, with respect to which the purchased securities are obligations issued or guaranteed by the United States government or any agency thereof, which repurchase obligations shall be entered into pursuant to written agreements.

If the Escrow Agent receives a notice of special mandatory redemption pursuant to the terms of the Notes, the Escrow Agent will liquidate all escrowed funds then held by it not later than the last Business Day prior to the special mandatory redemption date. Concurrently with such release to the paying agent, the Escrow Agent will release any excess of escrowed funds over the special mandatory redemption price to us, and we will be permitted to use such funds at our discretion.

Certain provisions relating to the Issuers' obligations to redeem the Notes pursuant to the special mandatory redemption described above may not be waived or modified without the written consent of each holder of Notes.

**Selection and Notice of Redemption**

If we are redeeming less than all the Notes at any time, the Trustee will select Notes on a *pro rata* basis to the extent practicable.

We will redeem Notes of $1,000 or less in whole and not in part. We will cause notices of redemption to be mailed by first-class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. Notices of redemption may not be conditional, except in connection with a Change of Control Offer in advance of a Change of Control.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount thereof to be redeemed. We will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancelation of the original Note. Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption.

### Mandatory Redemption; Offers to Purchase; Open Market Purchases

We are not required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, we may be required to offer to purchase Notes as described under the captions "—Change of Control" and "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock." We may at any time and from time to time purchase Notes in the open market, tender offers, negotiated transactions or otherwise.

### Guaranties

On the Acquisition Date, each of our Restricted Subsidiaries that is a guarantor under the Credit Agreement will execute and deliver to the Trustee a Guaranty Agreement pursuant to which such Restricted Subsidiary will become a Subsidiary Guarantor, fully and unconditionally Guaranteeing the Notes. The Subsidiary Guarantors will jointly and severally Guarantee, on a senior subordinated basis, our obligations under these Notes. The Subsidiary Guarantors will consist of all domestic Subsidiaries that are not Regulated Subsidiaries or subsidiaries thereof. For additional information regarding the net income of the non-guarantor subsidiaries, see Note O to our audited consolidated financial statements and Note I to our unaudited consolidated financial statements included elsewhere in this offering circular.

The obligations of each Subsidiary Guarantor under its Subsidiary Guaranty will be limited as necessary to prevent that Subsidiary Guaranty from constituting a fraudulent conveyance under applicable law. See "Risk Factors—Risks Related to this Offering and the Notes—Federal and state fraudulent transfer laws permit a court to void the notes and the guarantees, and if that occurs, you may not receive any payments on the notes." Each Subsidiary Guarantor that makes a payment under its Subsidiary Guaranty will be entitled upon payment in full of all Guarantees under the Indenture to a contribution from each other Subsidiary Guarantor in an amount equal to such other Subsidiary Guarantor's *pro rata* portion of such payment based on the respective net assets of all the Subsidiary Guarantors at the time of such payment determined in accordance with GAAP.

If a Subsidiary Guaranty were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the applicable Subsidiary Guarantor, and, depending on the amount of such indebtedness, a Subsidiary Guarantor's liability on its Subsidiary Guaranty could be reduced to zero. See "Risk Factors—Risks Related to this Offering and the Notes—Your right to receive payments on the notes will be subordinated to the borrowings under our senior credit facilities and possibly all of our future borrowings. Further, the guarantees of the notes are junior to all of the guarantors' existing senior indebtedness and possibly to all the guarantors' future borrowings."

Pursuant to the Indenture, (A) a Subsidiary Guarantor may consolidate with, merge with or into, or transfer all or substantially all its assets to any other Person to the extent described below under "—Certain Covenants—Merger and Consolidation," and (B) the Capital Stock of a Subsidiary Guarantor may be sold or otherwise disposed of to another Person to the extent described below under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock;" *provided, however,* that, in the case of a consolidation, merger or transfer of all or substantially all the assets of such Subsidiary Guarantor, if such other Person is not the Company or a Subsidiary Guarantor, such Subsidiary Guarantor's obligations under its Subsidiary Guaranty must be expressly assumed by such other Person, except that such assumption will not be required in the case of:

(1) the sale or other disposition (including by way of consolidation or merger) of a Subsidiary Guarantor, including the sale or disposition of Capital Stock of a Subsidiary Guarantor following which such Subsidiary Guarantor is no longer a Subsidiary; or

(2) the sale or other disposition of all or substantially all the assets of a Subsidiary Guarantor;

in each case in compliance with the applicable provisions of the Indenture. Upon any sale or disposition described in clause (1) or (2) above, the obligor on the related Subsidiary Guaranty will be released from its obligations thereunder.

The Subsidiary Guaranty of a Subsidiary Guarantor also will be released:

(1) upon the designation of such Subsidiary Guarantor as an Unrestricted Subsidiary;

(2) at such time as such Subsidiary Guarantor does not have any Indebtedness outstanding that would have required such Subsidiary Guarantor to enter into a Guaranty Agreement pursuant to the covenant described under "—Certain Covenants—Future Guarantors;" or

(3) if we exercise our legal defeasance option or our covenant defeasance option as described under "—Defeasance," or if our obligations under the Indenture are discharged in accordance with the terms of the Indenture.

**Ranking**

*Senior Indebtedness versus Notes*

The payment of the principal of, premium, if any, and interest on the Notes and the payment of any Subsidiary Guaranty will be subordinate in right of payment to the prior payment in full of all Senior Indebtedness of the Issuers or the relevant Subsidiary Guarantor, as the case may be.

As of May 31, 2004, after giving *pro forma* effect to the Transactions:

(1) the Company's Senior Indebtedness would have been approximately $800.0 million, all of which would have been Secured Indebtedness;

(2) the Subsidiary Guarantors would have had no Senior Indebtedness or Secured Indebtedness, excluding inter-company debt and Guarantees under the Credit Agreement; and

(3) Refco Finance Inc. would have had no Senior Indebtedness.

Although the Indenture contains limitations on the amount of additional Indebtedness that the Issuers and the Subsidiary Guarantors may incur, under certain circumstances the amount of such Indebtedness could be substantial and, in any case, such Indebtedness may be Senior Indebtedness. See "—Certain Covenants—Limitation on Indebtedness."

*Liabilities of Subsidiaries versus Notes*

All of our operations are conducted through our subsidiaries. Most of our subsidiaries (including all our Regulated Subsidiaries and Foreign Subsidiaries) are not Guaranteeing the Notes, and, as described above under "—Guaranties," Subsidiary Guaranties may be released under certain circumstances. In addition, our future subsidiaries may not be required to Guarantee the Notes. Claims of creditors of any non-guarantor subsidiaries (including all our Regulated Subsidiaries and Foreign Subsidiaries), including trade creditors holding indebtedness or guarantees issued by such non-guarantor subsidiaries, and claims of preferred equityholders of such non-guarantor subsidiaries generally will have priority with respect to the assets and earnings of such non-guarantor subsidiaries over the claims of our creditors, including holders of the Notes, even if such claims do not constitute Senior Indebtedness. Accordingly, the Notes will be effectively subordinated to creditors (including trade creditors) and preferred equityholders, if any, of such non-guarantor subsidiaries.

On a pro forma basis, after giving effect to the Transactions, our subsidiaries (other than the Subsidiary Guarantors) would have had significant liabilities, all of which, as of May 31, 2004, related to our customer financing arrangements. See our unaudited pro forma consolidated balance sheet as of May 31, 2004 and Note I to our unaudited consolidated financial statements included elsewhere in this offering circular. Although the Indenture limits the incurrence of Indebtedness and the issuance of preferred equity by certain of our subsidiaries, such limitation is subject to a number of significant qualifications. Moreover, the Indenture does not impose any limitation on the incurrence by such subsidiaries of liabilities that are not considered Indebtedness under the Indenture. See "—Certain Covenants—Limitation on Indebtedness."

*Other Senior Subordinated Indebtedness versus Notes*

Only Indebtedness of the Issuers or a Subsidiary Guarantor that is Senior Indebtedness will rank senior in right of payment to the Notes and the relevant Subsidiary Guaranty in accordance with the provisions of the Indenture. The Notes and each Subsidiary Guaranty will in all respects rank *pari passu* with all other Senior Subordinated Indebtedness of the Issuers and the relevant Subsidiary Guarantor, respectively.

We and the Subsidiary Guarantors have agreed in the Indenture that we and they will not Incur any Indebtedness that is subordinate or junior in right of payment to our Senior Indebtedness or the Senior Indebtedness of such Subsidiary Guarantors, unless such Indebtedness is Senior Subordinated Indebtedness of the Issuers or the Subsidiary Guarantors, as applicable, or is expressly subordinated in right of payment to Senior Subordinated Indebtedness of the Issuers or the Subsidiary Guarantors, as applicable. The Indenture does not treat (1) unsecured Indebtedness as subordinated or junior to Secured Indebtedness merely because it is unsecured or (2) Senior Indebtedness as subordinated or junior to any other Senior Indebtedness merely because it has a junior priority with respect to the same collateral.

*Payment of Notes*

We are not permitted to pay principal of, premium, if any, or interest on the Notes or make any deposit pursuant to the provisions described under "—Defeasance" below and may not purchase, redeem or otherwise retire any Notes (collectively, "*pay the Notes*") (except in the form of Permitted Junior Securities) if either of the following occurs (a "*Payment Default*"):

(1) any Obligation on any Designated Senior Indebtedness of the Issuers is not paid in full in cash when due; or

(2) any other default on Designated Senior Indebtedness of the Issuers occurs and the maturity of such Designated Senior Indebtedness is accelerated in accordance with its terms;

unless, in either case, the Payment Default has been cured or waived and any such acceleration has been rescinded, or such Designated Senior Indebtedness has been paid in full in cash. Regardless of the foregoing, we are permitted to pay the Notes if we and the Trustee receive written notice approving such payment from the Representatives of all Designated Senior Indebtedness with respect to which the Payment Default has occurred and is continuing.

During the continuance of any default (other than a Payment Default) with respect to any Designated Senior Indebtedness of the Issuers pursuant to which the maturity thereof may be accelerated without further notice (except such notice as may be required to effect such acceleration) or the expiration of any applicable grace periods, we are not permitted to pay the Notes (except in the form of Permitted Junior Securities) for a period (a "*Payment Blockage Period*") commencing upon the receipt by the Trustee (with a copy to us) of written notice (a "*Blockage Notice*") of such default from a Representative of Designated Senior Indebtedness specifying an election to effect a Payment Blockage Period and ending 179 days thereafter. The Payment Blockage Period will end earlier if such Payment Blockage Period is terminated:

(1) by written notice to the Trustee and us from the Person or Persons who gave such Blockage Notice;

(2) because the default giving rise to such Blockage Notice is cured, waived or otherwise no longer continuing; or

(3) because such Designated Senior Indebtedness has been discharged or repaid in full in cash.

Notwithstanding the provisions described above, unless the holders of such Designated Senior Indebtedness or a Representative of such Designated Senior Indebtedness have accelerated the maturity of such Designated Senior Indebtedness, we are permitted to resume paying the Notes after the end of such Payment Blockage Period. The Notes shall not be subject to more than one Payment Blockage Period in any consecutive 360-day period irrespective of the number of defaults with respect to Designated Senior Indebtedness of an Issuer during such period.

Upon any payment or distribution of the assets of an Issuer upon a total or partial liquidation or dissolution or reorganization of, or similar proceeding relating to, such Issuer or its property:

(1) the holders of Senior Indebtedness of the applicable Issuer will be entitled to receive payment in full in cash of such Senior Indebtedness before the holders of the Notes are entitled to receive any payment;

(2) until the Senior Indebtedness of the applicable Issuer is paid in full in cash, any payment or distribution to which holders of the Notes would be entitled but for the subordination provisions of the Indenture will be made to holders of such Senior Indebtedness as their interests may appear, except that holders of the Notes may receive Permitted Junior Securities; and

(3) if a distribution is made to holders of the Notes that, due to the subordination provisions of the Indenture, should not have been made to them, such holders of the Notes are required to hold it in trust for the holders of Senior Indebtedness of the applicable Issuer and pay it over to them as their interests may appear.

The subordination and payment blockage provisions described above will not prevent a Default from occurring under the Indenture upon the failure of an Issuer to pay interest or principal with respect to the Notes when due by their terms. If payment of the Notes is accelerated because of an Event of Default, the Company or the Trustee must promptly notify the holders of Designated Senior Indebtedness of the Issuers or the Representatives of such Designated Senior Indebtedness of the acceleration.

A Subsidiary Guarantor's obligations under its Subsidiary Guaranty are senior subordinated obligations. As such, the rights of Noteholders to receive payment by a Subsidiary Guarantor pursuant to its Subsidiary Guaranty will be subordinated in right of payment to the rights of holders of Senior Indebtedness of such Subsidiary Guarantor. The terms of the subordination and payment blockage provisions described above with respect to the Issuers' obligations under the Notes apply equally to a Subsidiary Guarantor and the obligations of such Subsidiary Guarantor under its Subsidiary Guaranty.

By reason of the subordination provisions contained in the Indenture, in the event of a liquidation or insolvency proceeding, creditors of an Issuer or a Subsidiary Guarantor who are holders of Senior Indebtedness of an Issuer or a Subsidiary Guarantor, as the case may be, may recover more, ratably, than the Holders of the Notes, and creditors of the Issuers or a Subsidiary Guarantor who are not holders of Senior Indebtedness may recover less, ratably, than holders of Senior Indebtedness of the Issuers or a Subsidiary Guarantor and may recover more, ratably, than the Holders of the Notes.

The terms of the subordination provisions described above will not apply to payments from money or the proceeds of U.S. Government Obligations held in trust by the Trustee for the payment of principal of and interest on the Notes pursuant to the provisions described under "—Defeasance."

**Book-Entry, Delivery and Form**

The Notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("*Rule 144A Notes*"). Notes also may be offered and sold in offshore transactions in reliance on Regulation S ("*Regulation S Notes*"). Following the initial distribution of Rule 144A Notes and Regulation S Notes, such Notes may be transferred to certain institutional "accredited investors" in the secondary market ("*IAI Notes*"). Except as set forth below, Notes will be issued in registered, global form in minimum denominations of $1,000 and integral multiples of $1,000 in excess of $1,000. Notes will be issued at the closing of this offering only against payment in immediately available funds.

Rule 144A Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "*Rule 144A Global Notes*"). Regulation S Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "*Temporary Regulation S Global Notes*"). IAI Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "*IAI Global Notes*"). Beneficial ownership interests in a Temporary Regulation S Global Note will be exchangeable for interests in a Rule 144A Global Note, an IAI Global Note, a permanent global note (the "*Permanent Regulation S Global Note*") or a definitive note in registered certificated form (a "*Certificated Note*") only after the expiration of the period through and including the 40th day after the later of the commencement and the closing of this offering (the "*Distribution Compliance Period*") and then only (1) upon certification in form reasonably satisfactory to the Trustee that beneficial ownership interests in such Temporary Regulation S Global Note are owned either by non-U.S. persons or U.S. persons who purchased such interests in a transaction that did not require registration under the Securities Act, (2) in the case of an exchange for an interest in an IAI Global Note, upon certification that the interest in the Temporary Regulation S Global Note is being transferred to an "accredited investor" under the Securities Act that is an institutional "accredited investor" acquiring the securities for its own account or for the account of an institutional "accredited investor" and (3) in the case of an exchange for a Certificated Note, in compliance with the requirements described under "—Exchange of Global Notes for Certificated Notes." The Temporary Regulation S Global Notes and the Permanent Regulation S Global Notes are referred to herein as the "*Regulation S Global Notes*," and the Rule 144A Global Notes, the IAI Global Notes and the Regulation S Global Notes are collectively referred to herein as the "*Global Notes*." The Global Notes will be deposited upon issuance with the Trustee as custodian for The Depository Trust Company ("*DTC*"), in New York, New York, and registered in the name of DTC or its nominee, in each case for credit to an account of a direct or indirect participant in DTC as described below. Beneficial interests in the Rule 144A Global Notes may

not be exchanged for beneficial interests in the Regulation S Global Notes or the IAI Global Notes at any time except in the limited circumstances described below. See "—Exchanges among Global Notes."

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for Certificated Notes except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of Certificated Notes.

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Transfer Restrictions." Regulation S Notes and IAI Notes will also be subject to certain restrictions on transfer and will also bear the legend as described under "Transfer Restrictions." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants, which may change from time to time.

*Depositary Procedures*

The following description of the operations and procedures of DTC is provided solely as a matter of convenience. These operations and procedures are solely within the control of the settlement system of DTC and are subject to changes by it. We take no responsibility for these operations and procedures and urge investors to contact DTC or its participants directly to discuss these matters.

DTC has advised us that it is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participating organizations (collectively, the "*participants*") and to facilitate the clearance and settlement of transactions in those securities between participants through electronic book-entry changes in accounts of its participants. The participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly (collectively, the "*indirect participants*"). Persons who are not participants may beneficially own securities held by or on behalf of DTC only through the participants or the indirect participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the participants and indirect participants.

DTC has also advised us that, pursuant to procedures established by it:

(1)  upon deposit of the Global Notes, DTC will credit the accounts of participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

(2)  ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the participants) or by the participants and the indirect participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Global Notes who are participants in DTC's system may hold their interests therein directly through DTC. Investors in the Global Notes who are not participants may hold their interests therein indirectly through organizations which are participants in such system. All interests in a Global Note may be subject to the procedures and requirements of DTC. The laws of some states require that certain persons take physical delivery in definitive form of securities that they own.

Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of participants, which in turn act on behalf of indirect participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, beneficial owners of an interest in the Global Notes will not have Notes registered in their names, will not receive physical delivery of Certificated Notes and will not be considered the registered owners or "Holders" thereof under the Indenture for any purpose.**

Payments in respect of the principal of, and interest, premium and additional interest, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered Holder under the Indenture. Under the terms of the Indenture, the Issuers and the Trustee will treat the Persons in whose names the Notes, including the Global Notes, are registered as the owners of the Notes for the purpose of receiving payments and for all other purposes. Consequently, neither the Issuers, the Trustee nor any agent of the Issuers or the Trustee has or will have any responsibility or liability for:

(1) any aspect of DTC's records or any participant's or indirect participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any participant's or indirect participant's records relating to the beneficial ownership interests in the Global Notes; or

(2) any other matter relating to the actions and practices of DTC or any of its participants or indirect participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the Notes (including principal and interest), is to credit the accounts of the relevant participants with the payment on the payment date unless DTC has reason to believe it will not receive payment on such payment date. Each relevant participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the participants and the indirect participants to the beneficial owners of Notes will be governed by standing instructions and customary practices and will be the responsibility of the participants or the indirect participants and will not be the responsibility of DTC, the Trustee or the Issuers. Neither the Issuers nor the Trustee will be liable for any delay by DTC or any of its participants in identifying the beneficial owners of the Notes, and the Issuers and the Trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Transfer Restrictions," transfers between participants in DTC will be effected in accordance with DTC's procedures and will be settled in same-day funds.

DTC has advised the Issuers that it will take any action permitted to be taken by a Holder of Notes only at the direction of one or more participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the Notes as to which such participant or participants has or have given such direction. However, if there is an Event of Default under the Notes, DTC reserves the right to exchange the Global Notes for Certificated Notes, and to distribute such Notes to its participants.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of interests in the Global Notes among participants, it is under no obligation to perform such procedures, and such procedures may be discontinued or changed at any time. Neither the Issuers nor the Trustee nor any of their respective agents will have any responsibility for the performance by DTC or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

*Exchange of Global Notes for Certificated Notes*

A Global Note is exchangeable for Certificated Notes if:

(1) DTC (A) notifies the Issuers that it is unwilling or unable to continue as depositary for the Global Notes or (B) has ceased to be a clearing agency registered under the Exchange Act and, in each case, a successor depositary is not appointed; or

(2) there has occurred and is continuing a Default with respect to the Notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the Trustee by or on behalf of DTC in accordance with the Indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Transfer Restrictions," unless that legend is not required by applicable law.

*Exchange of Certificated Notes for Global Notes*

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Notes. See "Transfer Restrictions."

*Exchanges among Global Notes*

Beneficial interests in a Temporary Regulation S Global Note may be exchanged for beneficial interests in a Permanent Regulation S Global Note, a Rule 144A Global Note or an IAI Global Note only after the expiration of the Distribution Compliance Period and then only upon certification in form reasonably satisfactory to the Trustee that, among other things, (1) beneficial ownership interests in such Temporary Regulation S Global Note are owned by or being transferred to either non-U.S. persons or U.S. persons who purchased such interests in a transaction that did not require registration under the Securities Act and (2) in the case of an exchange for an interest in an IAI Global Note, the interest in the Temporary Regulation S Global Note is being transferred to an "accredited investor" under the Securities Act that is an institutional "accredited investor" acquiring the securities for its own account or for the account of an institutional "accredited investor."

Beneficial interests in a Rule 144A Global Note or an IAI Global Note may be transferred to a person who takes delivery in the form of an interest in a Regulation S Global Note, whether before or after the expiration of the Distribution Compliance Period, only if the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144.

Beneficial interests in a Rule 144A Global Note may be exchanged for a beneficial interest in an IAI Global Note only upon certification in form reasonably satisfactory to the Trustee that, among other things, (i) the beneficial interest in such Rule 144A Global Note is being transferred to an "accredited investor" under the Securities Act that is an institutional "accredited investor" acquiring the securities for its own account or for the account of an institutional "accredited investor" and (ii) such transfer is being made in accordance with all applicable securities laws of the states of the United States of America and other jurisdictions. Beneficial interests in an IAI Global Note may be exchanged for beneficial interests in a Rule 144A Global Note only upon certification in form reasonably satisfactory to the Trustee that, among other things, such interest is being transferred in a transaction in accordance with Rule 144A.

109

Transfers involving exchanges of beneficial interests among the Regulation S Global Notes, the IAI Global Notes and the Rule 144A Global Notes will be effected through DTC by means of an instruction originated by the Trustee through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect the changes in the principal amounts of the Regulation S Global Notes, the IAI Global Notes and the Rule 144A Global Notes, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in another Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest.

*Same Day Settlement and Payment*

The Issuers will make payments in respect of the Notes represented by the Global Notes (including principal, interest and premium and additional interest, if any) by wire transfer of immediately available funds to the accounts specified by the Global Note Holder. The Issuers will make all payments of principal, interest and premium and additional interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the Holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such Holder's registered address. The Notes represented by the Global Notes are expected to be eligible to trade in PORTAL and to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. The Issuers expect that secondary trading in any Certificated Notes will also be settled in immediately available funds.

**Registered Exchange Offer; Registration Rights**

We have agreed pursuant to the Registration Rights Agreement that we will, subject to certain exceptions,

(1) within 180 days after the Issue Date, file a registration statement (the "*Exchange Offer Registration Statement*") with the SEC with respect to a registered offer (the "*Registered Exchange Offer*") to exchange the Notes for new notes of the Issuers (the "*Exchange Notes*") having terms substantially identical in all material respects to the Notes (except that the Exchange Notes will not contain terms with respect to transfer restrictions);

(2) use our reasonable best efforts to cause the Exchange Offer Registration Statement to be declared effective under the Securities Act within 260 days after the Issue Date;

(3) as soon as practicable after the effectiveness of the Exchange Offer Registration Statement (the "*Effectiveness Date*"), offer the Exchange Notes in exchange for surrender of the Notes;

(4) keep the Registered Exchange Offer open for not less than 20 Business Days (or longer, if required by applicable law) after the date notice of the Registered Exchange Offer is mailed to the Holders of the Notes; and

(5) consummate the Registered Exchange Offer not later than 40 days after the Effectiveness Date.

For each Note validly tendered to us and not withdrawn pursuant to the Registered Exchange Offer, we will issue to the Holder of such Note an Exchange Note having a principal amount equal to that of the surrendered Note. Interest on each Exchange Note will accrue from the last interest payment date on which interest was paid on the Note surrendered in exchange therefor, or, if no interest has been paid on such Note, from the date of its original issue.

Under existing SEC interpretations, the Exchange Notes will be freely transferable by Holders other than our affiliates after the Registered Exchange Offer without further registration under the Securities Act if the Holder of the Exchange Notes represents to us in the Registered Exchange Offer that it is acquiring the Exchange Notes in the ordinary course of its business, that it has no arrangements or understanding with any person to participate in the distribution within the meaning of the Securities Act of the Exchange Notes and that it is not an affiliate of the Issuers, as defined in Rule 405 of the Securities Act; *provided, however,* that broker-dealers ("*Participating Broker-Dealers*") receiving Exchange Notes in the Registered Exchange Offer will have a prospectus delivery requirement with respect to resales of such Exchange Notes. The SEC has taken the position that Participating Broker-Dealers may fulfill their prospectus delivery requirements with respect to Exchange Notes (other than a resale of an unsold allotment from the original sale of the Notes) with the prospectus contained in the Exchange Offer Registration Statement.

Under the Registration Rights Agreement, the Issuers are required to allow Participating Broker-Dealers and other persons, if any, with similar prospectus delivery requirements to use the prospectus contained in the Exchange Offer Registration Statement in connection with the resale of such Exchange Notes for 180 days following the Effectiveness Date (or such shorter period during which Participating Broker-Dealers and such other persons are required by law to deliver such prospectus).

A Holder of Notes (other than certain specified holders) who wishes to exchange such Notes for Exchange Notes in the Registered Exchange Offer will be required to represent that any Exchange Notes to be received by it will be acquired in the ordinary course of its business and that at the time of the commencement of the Registered Exchange Offer it has no arrangements or understanding with any person to participate in the distribution (within the meaning of the Securities Act) of the Exchange Notes and that it is not an "affiliate" of any of the Issuers, as defined in Rule 405 of the Securities Act, or if it is an affiliate, that it will comply with the registration and prospectus delivery requirements of the Securities Act to the extent applicable.

In the event that:

(1) any change in law or in applicable interpretations thereof by the staff of the SEC do not permit us to effect such a Registered Exchange Offer;

(2) for any other reason we consummate the Registered Exchange Offer later than 40 days after the Effectiveness Date;

(3) an initial purchaser shall notify us within 30 days following consummation of the Registered Exchange Offer that Notes held by it are not eligible to be exchanged for Exchange Notes in the Registered Exchange Offer; or

(4) certain Holders shall notify us within 30 days following consummation of the Registered Exchange Offer that they were prohibited by law or SEC policy from participating in the Registered Exchange Offer, that they did not receive freely tradeable Exchange Notes or that they may not resell the Exchange Notes acquired by them in the Registered Exchange Offer to the public without delivering a prospectus and the prospectus contained in the Exchange Offer Registration Statement is not sufficient or available for such purpose,

then, we will, subject to certain exceptions,

(5) promptly file a shelf registration statement (the "*Shelf Registration Statement*") with the SEC covering resales of the Notes or the Exchange Notes, as the case may be;

(6) (A) in the case of clause (1) above, use our reasonable best efforts to cause the Shelf Registration Statement to be declared effective under the Securities Act on or prior to the 260th day after the Issue Date and (B) in the case of clause (2), (3) or (4) above, use our reasonable best efforts to cause the Shelf Registration Statement to be declared effective

111

under the Securities Act on or prior to the 90th day after the date on which the Shelf Registration Statement is required to be filed; and

(7) keep the Shelf Registration Statement effective until the earliest of (A) the time when the Notes and Exchange Notes covered by the Shelf Registration Statement can be sold pursuant to Rule 144 without any limitations under clauses (c), (e), (f) or (h) of Rule 144, (B) two years after the Issue Date, and (C) the date on which all Notes or Exchange Notes registered thereunder are disposed of in accordance therewith.

We will, in the event a Shelf Registration Statement is filed, among other things, provide to each Holder for whom such Shelf Registration Statement was filed copies of the prospectus which is a part of the Shelf Registration Statement, notify each such Holder when the Shelf Registration Statement has become effective and take certain other actions as are required to permit unrestricted resales of the Notes or the Exchange Notes, as the case may be. A Holder selling such Notes or Exchange Notes pursuant to the Shelf Registration Statement generally would be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under the Securities Act in connection with such sales and will be bound by the provisions of the Registration Rights Agreement that are applicable to such Holder (including certain indemnification obligations).

We may require each Holder requesting to be named as a selling security holder to furnish to us such information regarding such Holder and the distribution of the Notes or Exchange Notes by such Holder as we may from time to time reasonably require for the inclusion of such Holder in the Shelf Registration Statement, including requiring the Holder to properly complete and execute such selling security holder questionnaires, and any amendments or supplements thereto, as we may reasonably deem necessary or appropriate. We may refuse to name any Holder as a selling security holder that fails to provide us with such information.

We will pay additional cash interest on the Notes and Exchange Notes, subject to certain exceptions,

(1) if the Issuers fail to file an Exchange Offer Registration Statement with the SEC on or prior to the 180th day after the Issue Date,

(2) if the Exchange Offer Registration Statement is not declared effective by the SEC on or prior to the 260th day after the Issue Date or, if obligated to file a Shelf Registration Statement pursuant to clause 6(A) above, the Shelf Registration Statement is not declared effective by the SEC on or prior to the 260th day after the Issue Date,

(3) if the Registered Exchange Offer is not consummated on or before the 40th day after the Effectiveness Date,

(4) if obligated to file a Shelf Registration Statement pursuant to clause 6(B) above, the Issuers fail to file the Shelf Registration Statement with the SEC on or prior to the 30th day (the "*Shelf Filing Date*") after the date on which the obligation to file the Shelf Registration Statement arises,

(5) if obligated to file a Shelf Registration Statement pursuant to clause 6(B) above, the Shelf Registration Statement is not declared effective by the SEC on or prior to the 90th day after the Shelf Filing Date, or

(6) after the Exchange Offer Registration Statement or the Shelf Registration Statement, as the case may be, is declared effective, such Registration Statement thereafter ceases to be effective or usable (subject to certain exceptions) during any period for which such Registration Statement is required to remain effective (each such event referred to in the preceding clauses (1) through (6), a "*Registration Default*");

112

from and including the date on which any such Registration Default shall occur to but excluding the date on which all Registration Defaults have been cured.

The rate of additional interest will be 0.25% *per annum* for the first 90-day period immediately following the occurrence of a Registration Default, and such rate will increase by an additional 0.25% *per annum* with respect to each subsequent 90-day period until all Registration Defaults have been cured, up to a maximum additional interest rate of 1.00% *per annum*. We will pay such additional interest on regular interest payment dates. Such additional interest will be in addition to any other interest payable from time to time with respect to the Notes and the Exchange Notes.

All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any additional interest pursuant to the Registration Rights Agreement.

If we effect the Registered Exchange Offer, we will be entitled to close the Registered Exchange Offer 20 Business Days after the commencement thereof provided that we have accepted all Notes theretofore validly tendered in accordance with the terms of the Registered Exchange Offer.

**Change of Control**

Upon the occurrence of any of the following events (each a "*Change of Control*"), each Holder shall have the right to require that the Issuers repurchase such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date):

(1)  the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, written notice or otherwise) that any "person" or "group" (as such terms are used in Sections 13(d) or 14(d) of the Exchange Act), other than one or more Permitted Holders, is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company; *provided, however,* that for the purposes of this clause (1), such other Person shall be deemed to beneficially own any Voting Stock of a Person held by any other Person (the "parent entity"), if such other Person is the beneficial owner (as defined above in this clause (1)), directly or indirectly, of more than 50% of the voting power of the Voting Stock of such parent entity;

(2)  individuals who on the Acquisition Date constituted the Governing Board of the Company or Parent (together with any new members of such Governing Board whose election by such Governing Board of the Company or Parent or whose nomination for election by the members or shareholders of the Company or Parent, as the case may be, was approved by (a) a vote of a majority of the members of such Governing Board of the Company or Parent, as the case may be, then still in office who were either directors or other members of the Governing Board on the Issue Date or whose election or nomination for election was previously so approved or (b) the Permitted Holders acting in accordance with the Securityholders Agreement) cease for any reason to constitute a majority of the Governing Board of the Company or Parent then in office;

(3)  the adoption of a plan relating to the liquidation or dissolution of the Company;

(4)  other than the Merger, the merger or consolidation of Parent or the Company with or into another Person or the merger of another Person with or into Parent or the Company, or the sale of all or substantially all the assets of Parent or the Company (determined on a consolidated basis) to another Person other than (i) a transaction in which the survivor or transferee is a Person that is controlled by the Permitted Holders or (ii) a transaction

following which (A) in the case of a merger or consolidation transaction, holders of securities that represented 100% of the Voting Stock of Parent or the Company immediately prior to such transaction (or other securities into which such securities are converted as part of such merger or consolidation transaction) own directly or indirectly at least a majority of the voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction immediately after such transaction and in substantially the same proportion as before the transaction and (B) in the case of a sale of assets transaction, each transferee becomes a Subsidiary Guarantor and a Subsidiary of the transferor of such assets; or

(5)  the Company ceases to own beneficially or of record, all the Capital Stock of Refco Finance Inc.

In no event will the Transactions as contemplated by this offering circular result in a Change of Control.

Within 30 days following any Change of Control, we will mail a notice to each Holder with a copy to the Trustee (the "*Change of Control Offer*") stating:

(1)  that a Change of Control has occurred and that such Holder has the right to require us to purchase such Holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof on the date of purchase, plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest on the relevant interest payment date);

(2)  the circumstances and relevant facts regarding such Change of Control;

(3)  the purchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(4)  the instructions, as determined by us, consistent with the covenant described hereunder, that a Holder must follow in order to have its Notes purchased.

We will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. A Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement for the Change of Control is in place at the time of the making of the Change of Control Offer.

We will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the covenant described hereunder, we will comply with the applicable securities laws and regulations and shall not be deemed to have breached our obligations under the covenant described hereunder by virtue of our compliance with such securities laws or regulations.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of the Company and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between the Company and the initial purchasers. We have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to do so in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to Incur additional Indebtedness

114

are contained in the covenant described under "—Certain Covenants—Limitation on Indebtedness." Such restrictions can only be waived with the consent of the holders of a majority in principal amount of the Notes then outstanding. Except for the limitations contained in such covenant, however, the Indenture will not contain any covenants or provisions that may afford holders of the Notes protection in the event of a highly leveraged transaction.

The Credit Agreement will prohibit us from purchasing any Notes and will also provide that the occurrence of certain change of control events with respect to the Company would constitute a default thereunder. In the event that at the time of such Change of Control the terms of any Senior Indebtedness (including the Credit Agreement) restrict or prohibit the purchase of Notes following such Change of Control, and we do not repay such Senior Indebtedness or obtain the requisite consents under the agreements governing such Indebtedness to permit the repurchase of the Notes, we will remain prohibited from purchasing Notes. In such case, our failure to comply with the foregoing undertaking, after appropriate notice and lapse of time, would result in an Event of Default under the Indenture, which would, in turn, constitute a default under the Credit Agreement. In such circumstances, the subordination provisions in the Indenture would likely restrict payment to the Holders of Notes.

Future indebtedness that we may incur may contain prohibitions on the occurrence of certain events that would constitute a Change of Control or require the repurchase of such indebtedness upon a Change of Control. Moreover, the exercise by the holders of their right to require us to repurchase their Notes could cause a default under such indebtedness, even if the Change of Control itself does not, due to the financial effect of such repurchase on us. Finally, our ability to pay cash to the holders of Notes following the occurrence of a Change of Control may be limited by our then existing financial resources. There can be no assurance that sufficient funds will be available when necessary to make any required repurchases.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Company to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Company. As a result, it may be unclear as to whether a Change of Control has occurred and whether a holder of Notes may require the Issuers to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relative to our obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the holders of a majority in principal amount of the Notes.

**Certain Covenants**

The Indenture contains covenants including, among others, the following:

*Limitation on Indebtedness*

(a)  The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, Incur, directly or indirectly, any Indebtedness; *provided, however,* that the Company and the Subsidiary Guarantors will be entitled to Incur Indebtedness if, on the date of such Incurrence and after giving effect thereto on a *pro forma* basis the Consolidated Coverage Ratio exceeds 2.00 to 1.00.

(b)  Notwithstanding the foregoing paragraph (a), the following Indebtedness may be Incurred:

(1)  Indebtedness Incurred by the Company and the Subsidiary Guarantors pursuant to the Credit Facilities; *provided, however,* that, after giving effect to any such Incurrence, the aggregate principal amount of all Indebtedness Incurred under this clause (1) and then outstanding does

not exceed $1,075.0 million less the sum of all principal payments with respect to such Indebtedness made pursuant to paragraph (a)(3)(A) of the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock;"

(2) Indebtedness owed to and held by the Company or any Restricted Subsidiary or Regulated Subsidiary; *provided, however,* that any subsequent issuance or transfer of any Capital Stock which results in any such Subsidiary ceasing to be a Restricted Subsidiary or a Regulated Subsidiary, as applicable, or any subsequent transfer of such Indebtedness (other than to the Company, a Restricted Subsidiary or a Regulated Subsidiary) shall be deemed, in each case, to constitute the Incurrence of such Indebtedness by the obligor thereon;

(3) (A) the Notes issued on the Issue Date and (B) Exchange Notes in respect of Notes issued on the Issue Date or any Additional Notes;

(4) Indebtedness of the Company, a Restricted Subsidiary or a Regulated Subsidiary outstanding both on the Issue Date and the Acquisition Date (after giving effect to the Transactions) (other than Indebtedness described in clause (1), (2) or (3) of this covenant);

(5) Indebtedness of a Restricted Subsidiary or a Regulated Subsidiary Incurred and outstanding on or prior to the date on which such Subsidiary was acquired by the Company (other than Indebtedness Incurred in connection with, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Subsidiary became a Subsidiary or was acquired by the Company); *provided, however,* that on the date of such acquisition and after giving *pro forma* effect thereto, either (A) the Company would have been entitled to Incur at least $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant or (B) the Consolidated Coverage Ratio would be greater than immediately prior to such acquisition;

(6) Refinancing Indebtedness in respect of Indebtedness Incurred pursuant to paragraph (a) or pursuant to clause (3), (4) or (5) or this clause (6); *provided, however,* that Refinancing Indebtedness Incurred pursuant to this clause (6) may only be Incurred by a Regulated Subsidiary to the extent the Indebtedness being Refinanced directly or indirectly Refinances Indebtedness of a Regulated Subsidiary;

(7) Hedging Obligations of the Company, a Restricted Subsidiary or a Regulated Subsidiary that are incurred in the ordinary course of business for the purpose of fixing, hedging or swapping interest rate, commodity price or foreign currency exchange rate risk (or to reverse or amend any such agreements previously made for such purposes), and not for speculative purposes, and that do not increase the Indebtedness of the obligor outstanding at any time other than as a result of fluctuations in interest rates, commodity prices or foreign currency exchange rates or by reason of fees, indemnities and compensation payable thereunder;

(8) obligations in respect of performance, bid and surety bonds and completion guarantees provided by the Company, any Restricted Subsidiary or any Regulated Subsidiary in the ordinary course of business;

(9) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided, however,* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(10) Contribution Indebtedness;

(11) (a) if the Company could Incur $1.00 of additional Indebtedness pursuant to paragraph (a) of this covenant after giving effect to such borrowing, Indebtedness of Foreign Subsidiaries not otherwise permitted hereunder or (b) if the Company could not incur $1.00 of additional

116

Indebtedness pursuant to paragraph (a) of this covenant after giving effect to such borrowing, Indebtedness of Foreign Subsidiaries Incurred for working capital purposes; *provided, however,* that the aggregate principal amount of Indebtedness incurred under this clause (11) which, when aggregated with the principal amount of all other Indebtedness then outstanding and incurred pursuant to this clause (11), does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (11);

(12) Indebtedness consisting of the Subsidiary Guaranty of a Subsidiary Guarantor and any Guarantee by a Restricted Subsidiary or Regulated Subsidiary of Indebtedness permitted to be Incurred pursuant to this covenant; *provided, however,* that, in the case of a Guarantee by a Restricted Subsidiary or Regulated Subsidiary that is not a Subsidiary Guarantor, such Restricted Subsidiary or Regulated Subsidiary complies with the covenant described under "—Future Guarantors;"

(13) Purchase Money Indebtedness or Capital Lease Obligations Incurred to finance the acquisition by the Company, a Restricted Subsidiary or a Regulated Subsidiary of assets that are used or useful in a Related Business, and any Refinancing Indebtedness Incurred to Refinance such Indebtedness, in an aggregate principal amount which, when added together with the principal amount of all other Indebtedness Incurred pursuant to this clause (13) and then outstanding, does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (13);

(14) Indebtedness of the Company or a Restricted Subsidiary supported by a letter of credit issued pursuant to the Credit Agreement in a principal amount not in excess of the stated amount of such letter of credit;

(15) Indebtedness consisting of promissory notes issued by the Company or a Subsidiary Guarantor to current or former officers, directors and employees of the Company or such Subsidiary Guarantor, their respective estates, spouses or former spouses to finance the purchase or redemption of Capital Stock of Parent to the extent permitted by the covenant described under "—Limitation on Restricted Payments";

(16) Indebtedness of the Company and the Subsidiary Guarantors not otherwise permitted under the Indenture in an aggregate principal amount which, when taken together with all other Indebtedness of the Company and the Subsidiary Guarantors then outstanding pursuant to this clause (16) does not exceed $150.0 million; and

(17) Indebtedness of Regulated Subsidiaries, not otherwise permitted under the Indenture, in an aggregate principal amount which, when taken together with all other Indebtedness of the Regulated Subsidiaries then outstanding pursuant to this clause (17) does not exceed the greater of (x) $50.0 million and (y) an amount in U.S. dollars equal to the product of (A) $50.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue

117

Date to the end of the most recent fiscal quarter immediately prior to the date of Incurrence of the applicable Indebtedness pursuant to this clause (17);

(c)    For purposes of determining compliance with this covenant:

(1)    any Indebtedness outstanding under the Credit Agreement on the Acquisition Date will be deemed to have been Incurred on such date under clause (1) of paragraph (b) above;

(2)    in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the types of Indebtedness described in clauses (2) through (17) of paragraph (b) above, or is entitled to be Incurred pursuant to paragraph (a) of this covenant, the Company, in its sole discretion, will classify such item of Indebtedness (or any portion thereof) at the time of Incurrence and may later reclassify such item (or a portion thereof) and will only be required to include the amount and type of such Indebtedness in one of the above clauses; and

(3)    the Company will be entitled to divide and classify and reclassify an item of Indebtedness in more than one of the types of Indebtedness described above; *provided, however,* that the Company will be entitled to reclassify Indebtedness Incurred under clause (1) of paragraph (b) above under paragraph (a) above only at a time when the Company is entitled to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) above.

(d)    Notwithstanding paragraphs (a) and (b) above, neither the Issuers nor any Subsidiary Guarantor will Incur (1) any Indebtedness if such Indebtedness is subordinate or junior in ranking in any respect to any Senior Indebtedness of the Company or such Subsidiary Guarantor, as applicable, unless such Indebtedness is Senior Subordinated Indebtedness or is expressly subordinated in right of payment to the Notes or the Subsidiary Guaranty of such Subsidiary Guarantor, as applicable, or (2) any Secured Indebtedness that is not Senior Indebtedness of such Person unless contemporaneously therewith such Person makes effective provision to secure the Notes or the relevant Subsidiary Guaranty, as applicable, equally and ratably with such Secured Indebtedness for so long as such Secured Indebtedness is secured by a Lien.

(e)    For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness where the Indebtedness Incurred is denominated in a currency other than U.S. dollars, the amount of such Indebtedness will be the U.S. Dollar Equivalent determined on the date of the Incurrence of such Indebtedness; *provided, however,* that if any such Indebtedness denominated in a currency other than U.S. dollars is subject to a Currency Agreement covering all principal, premium, if any, and interest payable on such Indebtedness, the amount of such Indebtedness expressed in U.S. dollars will be as provided in such Currency Agreement. The principal amount of any Refinancing Indebtedness Incurred in the same currency as the Indebtedness being Refinanced will be the U.S. Dollar Equivalent of the Indebtedness Refinanced on the date of Refinancing, except to the extent that (1) such U.S. Dollar Equivalent was determined based on a Currency Agreement, in which case the Refinancing Indebtedness will be determined based on a Currency Agreement in accordance with the preceding sentence and (2) the principal amount of the Refinancing Indebtedness exceeds the principal amount of the Indebtedness being Refinanced, in which case the U.S. Dollar Equivalent of such excess will be determined on the date such Refinancing Indebtedness is Incurred.

*Limitation on Restricted Payments*

(a)    The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary, directly or indirectly, to make a Restricted Payment if at the time the Company or such Restricted Subsidiary or Regulated Subsidiary makes such Restricted Payment:

(1)    a Default shall have occurred and be continuing (or would result therefrom);

(2) the Company is not entitled to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) of the covenant described under "—Limitation on Indebtedness;" or

(3) the aggregate amount of such Restricted Payment and all other Restricted Payments since the Issue Date would exceed the sum of (without duplication):

(A) 50% of the Consolidated Net Income accrued during the period (treated as one accounting period) from the beginning of the fiscal quarter immediately following the fiscal quarter during which the Issue Date occurs to the end of the most recent fiscal quarter ending at least 45 days prior to the date of such Restricted Payment (or, in case such Consolidated Net Income shall be a deficit, minus 100% of such deficit); *plus*

(B) 100% of the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company from the issuance or sale of its Capital Stock (other than Disqualified Stock or Designated Preferred Stock) subsequent to the Issue Date (other than (i) Net Cash Proceeds or property received from an issuance or sale of such Capital Stock to a Subsidiary of the Company, (ii) Net Cash Proceeds or property received from an issuance or sale of such Capital Stock to an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees, and (iii) Net Cash Proceeds received by the Company from the sale of such Capital Stock (or such Capital Stock of any Parent to the extent such Net Cash Proceeds are contributed to the common equity of the Company) to employees, officers, directors or consultants of the Company, its Restricted Subsidiaries or its Regulated Subsidiaries subsequent to the Issue Date to the extent such amounts have been applied to Restricted Payments made in accordance with paragraph (b)(4) of this covenant) and 100% of the aggregate amount of cash and the Fair Market Value of property contributed to the capital of the Company by its equityholders subsequent to the Issue Date (other than the Cash Contribution Amount); *plus*

(C) 100% of the aggregate Net Cash Proceeds and the Fair Market Value of property received by the Company subsequent to the Issue Date from the issuance or sale of any Indebtedness of the Company convertible into or exchangeable for Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Company that has been so converted or exchanged (less the amount of any cash or the Fair Market Value of property distributed by the Company upon such conversion or exchange), other than issuances or sales to a Subsidiary of the Company or to an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees); *plus*

(D) an amount equal to the sum of (i) 100% of the aggregate amount in cash and the Fair Market Value of property received from Investments (other than Permitted Investments) made by the Company, any Restricted Subsidiary or Regulated Subsidiary in any Person resulting from repurchases, repayments or redemptions of such Investments by such Person, proceeds realized on the sale of such Investment and proceeds representing the return of capital (excluding dividends and distributions to the extent included in Consolidated Net Income), in each case received by the Company or any Restricted Subsidiary or Regulated Subsidiary, and (ii) to the extent such Person is an Unrestricted Subsidiary, the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time such Unrestricted Subsidiary is designated a Restricted Subsidiary; *provided, however,* that the foregoing sum shall not include amounts with respect to Investments in Unrestricted Subsidiaries to the extent the Investments in such Unrestricted Subsidiaries were made pursuant to clause (7) of the next succeeding paragraph (b).

119

(b) The preceding provisions will not prohibit:

(1) any Restricted Payment made out of the Net Cash Proceeds of the substantially concurrent sale of, or made by exchange for, Capital Stock of the Company (other than Disqualified Stock or Designated Preferred Stock and other than Capital Stock issued or sold to a Subsidiary of the Company or an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees) or a substantially concurrent cash capital contribution received by the Company from its equityholders; *provided, however,* that (A) such Restricted Payment shall be excluded in the calculation of the amount of Restricted Payments and (B) the Net Cash Proceeds from such sale or such cash capital contribution (to the extent so used for such Restricted Payment) shall be excluded from the calculation of amounts under clause (4)(B) of paragraph (a) above;

(2) any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations of the Company or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent Incurrence of, Refinancing Indebtedness of such Person which is permitted to be Incurred pursuant to any of the provisions of the covenant described under "—Limitation on Indebtedness;" *provided, however,* that such purchase, repurchase, redemption, defeasance or other acquisition or retirement for value shall be excluded in the calculation of the amount of Restricted Payments;

(3) dividends or similar distributions paid within 60 days after the date of declaration thereof if at such date of declaration such dividend or similar distribution would have complied with this covenant; *provided, however,* that such dividend or similar distribution shall be included in the calculation of the amount of Restricted Payments;

(4) the purchase, repurchase, redemption or acquisition for value (or the payment of dividends, other distributions or amounts to Parent in amounts equal to the amounts expended by Parent to purchase, repurchase, redeem or otherwise acquire for value) of Capital Stock of the Company or Parent owned by employees, former employees, directors, former directors, consultants or former consultants of Parent, the Company or any of its Subsidiaries (or permitted transferees, assigns, estates or heirs of such employees, former employees, directors, former directors, consultants or former consultants); *provided, however,* that the aggregate amount paid, loaned or advanced to Parent pursuant to this clause (4) will not, in the aggregate, exceed $5.0 million per fiscal year of the Company; *provided further* that the Company may carry over and make in subsequent fiscal years, in addition to the amounts permitted for such fiscal year, the amount of such purchases, redemptions or other acquisitions or retirements for value permitted to have been made but not made in any preceding fiscal years; *provided further* that such amount in any fiscal year may be increased by an amount not to exceed (i) the Net Cash Proceeds from the sale of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Company (or of Parent to the extent such Net Cash Proceeds are contributed to the common equity of the Company) to employees, officers, directors or consultants of the Company, its Restricted Subsidiaries and its Regulated Subsidiaries that occurs after the Issue Date (to the extent the Net Cash Proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments pursuant to clause (1) above of this paragraph (b) or previously applied to the payment of Restricted Payments pursuant to this clause (4)), plus (ii) the cash proceeds of key man life insurance policies received by the Company, its Restricted Subsidiaries and its Regulated Subsidiaries after the date of the Indenture, less any amounts previously applied to the payment of Restricted Payments pursuant to this clause (4); *provided further* that cancellation of Indebtedness owing to the Company from employees, officers, directors and consultants of the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in connection with a repurchase of Capital Stock of the Company from such Persons will not be

120

deemed to constitute a Restricted Payment for purposes of this covenant or any other provisions of the Indenture; *provided further* that the Net Cash Proceeds from such sales of Capital Stock described in clause (i) of this clause (4) shall be excluded from the calculation of amounts under clause (4)(B) of paragraph (a) above to the extent such proceeds have been or are applied to the payment of Restricted Payments pursuant to this clause (4); and *provided further*, *however*, that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(5)    the declaration and payment of dividends or similar distributions on Disqualified Stock issued pursuant to the covenant described under "—Limitation on Indebtedness;" *provided, however,* that at the time of payment of such dividend or similar distribution, no Default shall have occurred and be continuing (or result therefrom); *provided further, however,* that such dividends or similar distributions shall be excluded in the calculation of the amount of Restricted Payments;

(6)    the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date and the declaration and payment of dividends or distributions to Parent, the proceeds of which will be used to fund the payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of Parent issued after the Issue Date; *provided, however,* that (A) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Company would have had a Consolidated Coverage Ratio of at least 2.00 to 1.00 and (B) the aggregate amount of dividends or distributions declared and paid pursuant to this clause (6) does not exceed the Net Cash Proceeds actually received by or contributed to the Company from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; *provided further, however* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(7)    Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (7) that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash and/or marketable securities, not to exceed the greater of (x) $25.0 million and (y) an amount in U.S. dollars equal to the product of (A) $25.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date on which the applicable Investment is made pursuant to this clause (7) (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value); *provided, however,* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(8)    the payment of dividends on the Company's common stock following the first public offering of the Company's common stock or the common stock of Parent after the Acquisition Date (with Parent contributing the Net Cash Proceeds of such offering to the Company), of up to *6% per annum* of the Net Cash Proceeds received by or contributed to the Company in any past or future public offering, other than public offerings with respect to the Company's common stock registered on Form S-8 under the Securities Act; *provided, however,* that such Restricted Payments shall be included in the calculation of the amount of Restricted Payments;

(9)  the declaration and payment of dividends or distributions to, or the making of loans to, Parent in amounts required for such party to pay:

    (A)  franchise taxes and other fees, taxes and expenses required to maintain its corporate existence;

    (B)  customary salary, bonus and other benefits payable to officers and employees of Parent to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Company, the Restricted Subsidiaries and the Regulated Subsidiaries;

    (C)  general corporate overhead expenses (including professional expenses) for Parent to the extent such expenses are attributable to the ownership or operation of the Company, the Restricted Subsidiaries and the Regulated Subsidiaries; and

    (D)  fees and expenses other than to Affiliates related to any unsuccessful equity or debt offering permitted by the Indenture;

*provided, however,* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(10)  any Restricted Payment, at any time prior to August 1, 2009 if immediately after giving *pro forma* effect to such Restricted Payment pursuant to this clause (10) and the Incurrence of any Indebtedness the net proceeds of which are used to finance such Restricted Payment:

    (A)  the Net Indebtedness to EBITDA Ratio of the Company would not have exceeded 3.75 to 1; and

    (B)  the Net Senior Indebtedness to EBITDA Ratio of the Company would not have exceeded 2.50 to 1;

*provided, however,* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(11)  repurchases of Capital Stock deemed to occur upon exercise of stock or other equity options if such Capital Stock represents a portion of the exercise price of such options; *provided, however,* that such Restricted Payments shall be excluded in the calculation of the amount of Restricted Payments;

(12)  cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of the Company; *provided, however,* that any such cash payment shall not be for the purpose of evading the limitation of the covenant described under this subheading (as determined in good faith by the Governing Board); *provided further, however,* that such payments shall be excluded in the calculation of the amount of Restricted Payments;

(13)  in the event of a Change of Control, and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations of the Company or any Subsidiary Guarantor, in each case, at a purchase price not greater than 101% of the principal amount (or, if such Subordinated Obligations were issued with original issue discount, 101% of the accreted value thereof) of such Subordinated Obligations, plus any accrued and unpaid interest thereon; *provided, however,* that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company (or a third party to the extent permitted by the Indenture) has made a Change of Control Offer with respect to the Notes as a result of such Change of Control and has repurchased all Notes validly tendered and not withdrawn in connection with such Change of Control Offer; *provided further, however,* that such payments, purchases,

122

redemptions, defeasances or other acquisitions or retirements shall be included in the calculation of the amount of Restricted Payments;

(14) in the event of an Asset Disposition that requires the Company to offer to repurchase Notes pursuant to the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock," and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations of the Company or any Subsidiary Guarantor, in each case, at a purchase price not greater than 100% of the principal amount (or, if such Subordinated Obligations were issued with original issue discount, 100% of the accreted value) of such Subordinated Obligations, plus any accrued and unpaid interest thereon; *provided, however,* that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company has made an offer with respect to the Notes pursuant to the provisions of the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock" and has repurchased all Notes validly tendered and not withdrawn in connection with such offer; *provided further, however,* that such Restricted Payments shall be included in the calculation of the amount of Restricted Payments;

(15) payments of intercompany Indebtedness, the Incurrence of which was permitted under clause (2) of paragraph (b) of the covenant described under "—Limitation on Indebtedness;" *provided, however,* that no Default has occurred and is continuing or would otherwise result therefrom; *provided further, however,* that such payments shall be excluded in the calculation of the amount of Restricted Payments;

(16) Restricted Payments specified in the Equity Purchase and Merger Agreement to holders of equity interests of Refco Finance Holdings LLC or Refco Group Ltd., LLC in connection with the Transactions or described in this offering circular under "Offering Circular Summary—Transactions;" *provided, however,* that such payments shall be excluded in the calculation of the amount of Restricted Payments;

(17) Tax Distributions for so long as (x) the Company is treated as a pass-through or disregarded entity for United States federal income tax purposes or (y) the Company is included in a consolidated, combined or unitary tax return filing group of which it is not the parent; *provided, however,* that such Tax Distributions shall be excluded in the calculation of the amount of Restricted Payments; or

(18) Restricted Payments in an amount which, when taken together with all other Restricted Payments made pursuant to this clause (18), do not exceed $50.0 million; *provided, however,* that (A) at that time of each such Restricted Payment, no Event of Default shall have occurred and be continuing (or result therefrom) and (B) such Restricted Payments shall be included in the calculation of the amount of Restricted Payments.

*Limitation on Restrictions on Distributions from Restricted Subsidiaries or Regulated Subsidiaries*

The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary or Regulated Subsidiary to (a) pay dividends or make any other distributions on its Capital Stock to the Company, a Restricted Subsidiary or a Regulated Subsidiary or pay any Indebtedness owed to the Company, (b) make any loans or advances to the Company or (c) transfer any of its property or assets to the Company, except:

(1)  with respect to clauses (a), (b) and (c),

    (A)  any encumbrance or restriction pursuant to (i) an agreement in effect on or entered into on the Issue Date (including any such agreements of Refco Group Ltd., LLC and its Subsidiaries in effect on such date), (ii) the Credit Agreement, as in effect on the Acquisition Date and (iii) the Escrow Agreement;

    (B)  any encumbrance or restriction with respect to a Restricted Subsidiary or Regulated Subsidiary pursuant to an agreement relating to any Indebtedness Incurred by such Restricted Subsidiary or Regulated Subsidiary, as the case may be, on or prior to the date on which such Restricted Subsidiary or Regulated Subsidiary was acquired by the Company (other than Indebtedness Incurred as consideration in, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Restricted Subsidiary or Regulated Subsidiary became a Restricted Subsidiary or Regulated Subsidiary, as the case may be, or was acquired by the Company) and outstanding on such date;

    (C)  any encumbrance or restriction in the Indenture or in any indenture relating to Senior Subordinated Indebtedness entered into after the Issue Date; *provided* that the encumbrances or restrictions in such agreements are not materially more restrictive than those contained in the Indenture;

    (D)  restrictions on cash or other deposits or net worth imposed by agreements entered into in the ordinary course of business;

    (E)  customary provisions in joint venture agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the Capital Stock thereof);

    (F)  any encumbrances or restrictions created with respect to the Indebtedness of Restricted Subsidiaries or Regulated Subsidiaries permitted to be Incurred or issued subsequent to the Issue Date pursuant to the provisions of the covenant described under "—Limitation on Indebtedness," *provided* that in the case of this clause the Governing Board of the Company determines (as evidenced by a resolution of the Governing Board) in good faith at the time such encumbrances or restrictions are created that such encumbrances or restrictions would not reasonably be expected to impair the ability of the Company and the Subsidiary Guarantors, taken as a whole, to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due;

    (G)  any encumbrance or restriction pursuant to an agreement effecting a Refinancing of Indebtedness Incurred pursuant to an agreement referred to in clauses (A) to (F) of clause (1) of this covenant or this clause (G) or contained in any amendment to an agreement referred to in clauses (A) to (F) of clause (1) of this covenant or this clause (G); *provided, however,* that the encumbrances and restrictions with respect to such Restricted Subsidiary or Regulated Subsidiary, as the case may be, contained in any such Refinancing agreement or amendment are not materially less favorable to the

124

Noteholders than encumbrances and restrictions with respect to such Restricted Subsidiary or Regulated Subsidiary contained in such predecessor agreements and do not in the good faith judgment of the chief financial officer of the Company affect the Company's and the Subsidiary Guarantor's ability, taken as a whole, to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due; *provided further, however*, that with respect to agreements existing on the Issue Date or the Credit Agreement as in effect on the Acquisition Date, any Refinancings or amendments thereof contain such encumbrances or restrictions that are not materially less favorable to the Noteholders than the encumbrances or restrictions contained in such agreements as in effect on the Issue Date or, with respect to the Credit Agreement, the Acquisition Date;

(H) any encumbrance or restriction with respect to a Restricted Subsidiary or Regulated Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Capital Stock or assets of such Restricted Subsidiary or Regulated Subsidiary pending the closing of such sale or disposition;

(I) any encumbrance or restriction imposed by applicable law, rule, regulation, consent decree or similar arrangement; and

(2) with respect to clause (c) only,

(A) any encumbrance or restriction consisting of customary nonassignment provisions in leases governing leasehold interests to the extent such provisions restrict the transfer of the lease or the property leased thereunder;

(B) any encumbrance or restriction contained in security agreements or mortgages securing Indebtedness of a Restricted Subsidiary or Regulated Subsidiary to the extent such encumbrance or restriction restricts the transfer of the property subject to such security agreements or mortgages;

(C) restrictions on the transfer of assets subject to any Lien not prohibited by the Indenture imposed by the holder of such Lien; and

(D) any encumbrance or restriction contained in agreements governing Purchase Money Indebtedness.

*Limitation on Sales of Assets and Subsidiary Stock*

(a) The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, directly or indirectly, consummate any Asset Disposition unless:

(1) the Company or such Restricted Subsidiary or Regulated Subsidiary receives consideration at the time of such Asset Disposition at least equal to the Fair Market Value (including the value of all non-cash consideration) of the shares or other equity interests and assets subject to such Asset Disposition;

(2) except in the case of a Permitted Asset Swap, at least 75% of the consideration thereof received by the Company or such Restricted Subsidiary or Regulated Subsidiary is in the form of cash or cash equivalents; and

(3) an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Company (or such Restricted Subsidiary or Regulated Subsidiary, as the case may be)

(A) to prepay, repay, redeem or purchase Senior Indebtedness of the Company or Indebtedness (other than any Disqualified Stock) of a Restricted Subsidiary or Regulated Subsidiary (in each case other than Indebtedness owed to the Company or a Restricted

125

Subsidiary or Regulated Subsidiary) within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash;

(B) to acquire Additional Assets within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash; or

(C) to make an offer to the holders of the Notes (and to holders of other Senior Subordinated Indebtedness of the Company designated by the Company) to purchase Notes (and such other Senior Subordinated Indebtedness of the Company) pursuant to and subject to the conditions contained in the Indenture;

*provided, however*, that in connection with any prepayment, repayment or purchase of Indebtedness pursuant to clause (A) or (C) above, the Company or such Restricted Subsidiary or Regulated Subsidiary shall permanently retire such Indebtedness and shall cause the related loan commitment (if any) to be permanently reduced in an amount equal to the principal amount so prepaid, repaid or purchased.

Notwithstanding the foregoing provisions of this covenant, the Company, the Restricted Subsidiaries and the Regulated Subsidiaries will not be required to apply any Net Available Cash in accordance with this covenant except to the extent that the aggregate Net Available Cash from all Asset Dispositions which is not applied in accordance with this covenant exceeds $20.0 million. Pending application of Net Available Cash pursuant to this covenant, such Net Available Cash shall be invested in Temporary Cash Investments or applied to temporarily reduce revolving credit Indebtedness.

For the purposes of this covenant, the following are deemed to be cash or cash equivalents:

(1) the assumption or discharge of Indebtedness or other liabilities reflected on the balance sheet of the Company (other than obligations in respect of Disqualified Stock of the Company) or any Restricted Subsidiary or Regulated Subsidiary (other than obligations in respect of Disqualified Stock or Preferred Stock of a Subsidiary Guarantor) and the release of the Company or such Restricted Subsidiary or Regulated Subsidiary from all liability on such Indebtedness or such other liabilities in connection with such Asset Disposition;

(2) securities received by the Company or any Restricted Subsidiary or Regulated Subsidiary from the transferee that are converted by the Company or such Restricted Subsidiary or Regulated Subsidiary, as the case may be, within 180 days of the date of receipt thereof into cash, to the extent of cash received in that conversion; and

(3) any Designated Noncash Consideration received by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in such Asset Disposition having an aggregate Fair Market Value, taken together with all other Designated Noncash Consideration received pursuant to this clause (3) that is at that time outstanding, not to exceed the greater of (x) $75.0 million and (y) an amount in U.S. dollars equal to the product of (A) $75.0 million and (B) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the time of the receipt of such Designated Noncash Consideration (with the Fair Market Value of each item of Designated Noncash Consideration being measured at the time received without giving effect to subsequent changes in value).

(b) In the event of an Asset Disposition that requires the purchase of Notes (and other Senior Subordinated Indebtedness of the Company) pursuant to clause (a)(3)(C) above, the Company will purchase Notes tendered pursuant to an offer by the Company for the Notes (and such other Senior Subordinated Indebtedness) at a purchase price of 100% of their principal amount (or, in the event such other Senior Subordinated Indebtedness of the Company was issued with significant original issue

discount, 100% of the accreted value thereof) without premium, plus accrued but unpaid interest (or, in respect of such other Senior Subordinated Indebtedness of the Company, such lesser price, if any, as may be provided for by the terms of such Senior Subordinated Indebtedness) in accordance with the procedures (including prorating in the event of oversubscription) set forth in the Indenture. If the aggregate purchase price of the securities tendered exceeds the Net Available Cash allotted to their purchase, the Company will select the securities to be purchased on a *pro rata* basis but in round denominations, which in the case of the Notes will be denominations of $1,000 principal amount or multiples thereof. The Company shall not be required to make such an offer to purchase Notes (and other Senior Subordinated Indebtedness of the Company) pursuant to this covenant if the Net Available Cash available therefor is less than $20.0 million (which lesser amount shall be carried forward for purposes of determining whether such an offer is required with respect to the Net Available Cash from any subsequent Asset Disposition). Upon completion of such an offer to purchase, Net Available Cash will be reset to zero.

(c) The Company will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this covenant. To the extent that the provisions of any securities laws or regulations conflict with provisions of this covenant, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this covenant by virtue of its compliance with such securities laws or regulations.

*Limitation on Affiliate Transactions*

(a) The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary to, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Company involving aggregate consideration in excess of $5.0 million (an *"Affiliate Transaction"*) unless:

(1) the terms of the Affiliate Transaction are no less favorable to the Company or such Restricted Subsidiary or Regulated Subsidiary than those that could be obtained at the time of the Affiliate Transaction in arm's-length dealings with a Person who is not an Affiliate;

(2) if such Affiliate Transaction involves an amount in excess of $15.0 million, a majority of the directors or other members of the Governing Board of the Company disinterested with respect to such Affiliate Transaction have determined in good faith that the criteria set forth in clause (1) are satisfied and have approved the relevant Affiliate Transaction as evidenced by a resolution of the Governing Board of the Company; and

(3) if such Affiliate Transaction involves an amount in excess of $75.0 million, the Governing Board shall also have received a written opinion from an Independent Qualified Party to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the Company, its Restricted Subsidiaries and its Regulated Subsidiaries or is not less favorable to the Company, its Restricted Subsidiaries and its Regulated Subsidiaries than could reasonably be expected to be obtained at the time in an arm's-length transaction with a Person who was not an Affiliate.

(b) The provisions of the preceding paragraph (a) will not prohibit:

(1) any Permitted Investment or any Restricted Payment permitted to be made pursuant to the covenant described under "—Limitation on Restricted Payments;"

(2) any payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Governing Board of the applicable Person;

(3) loans or advances to employees (or cancellation thereof) in the ordinary course of business in accordance with the past practices of the Company, its Restricted Subsidiaries or its Regulated Subsidiaries, but in any event not to exceed $5.0 million in the aggregate outstanding at any one time;

(4) the payment of reasonable and customary fees to directors or other members of the Governing Board of Parent, the Company, its Restricted Subsidiaries and its Regulated Subsidiaries who are not employees of Parent, the Company, its Restricted Subsidiaries or its Regulated Subsidiaries and the provision of reasonable and customary indemnities provided on behalf of directors or other members of the Governing Board and officers of Parent, the Company, its Restricted Subsidiaries and its Regulated Subsidiaries;

(5) any transaction with the Company, a Restricted Subsidiary or a Regulated Subsidiary;

(6) any transaction with a joint venture or similar entity which would constitute an Affiliate Transaction solely because the Company, a Restricted Subsidiary or a Regulated Subsidiary owns an equity interest in or otherwise controls such joint venture or similar entity;

(7) the issuance or sale of any Capital Stock (other than Disqualified Stock) of the Company;

(8) payments to the Equity Sponsor and its Affiliates for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, in connection with acquisitions or divestitures, which payments are approved by the majority of the Governing Board of the Company in good faith;

(9) payments to the Equity Sponsor under the Management Agreement and reasonable related expenses;

(10) the Transactions and the payment of all fees and expenses related to the Transactions;

(11) transactions in which the Company delivers to the Trustee a letter from an Independent Qualified Party to the effect that such Affiliate Transactions are fair from a financial standpoint to the Company, its Restricted Subsidiaries and its Regulated Subsidiaries;

(12) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business;

(13) any tax sharing agreement or arrangement and payments pursuant thereto among the Company and its Subsidiaries and any other Person with which the Company or its Subsidiaries are required or permitted to file a consolidated, combined or unitary return or with which the Company or any of its Subsidiaries are or could be part of a consolidated, combined or unitary group for tax purposes in amounts not to exceed the amount of Tax Distributions for the applicable period net of any Tax Distributions already made with respect to such period;

(14) any agreement as in effect on the Issue Date or any renewals or extensions of any such agreement (so long as such renewals or extensions are not materially less favorable to the Company, the Restricted Subsidiaries or the Regulated Subsidiaries) and the transactions evidenced thereby; and

(15) transactions between the Company, any Restricted Subsidiary or any Regulated Subsidiary acting in its capacity as general partner (or similar status) of limited partnerships or similar passive collective investment entities that trade derivatives and such limited partnerships or investment entities; *provided* that such transactions are in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business.

*Limitation on Line of Business*

The Company will not, and will not permit any Restricted Subsidiary or Regulated Subsidiary, to engage in any business other than a Related Business.

*Limitation on Refco Finance Inc.*

Notwithstanding anything to the contrary herein, Refco Finance Inc. may not hold any material assets (other than Indebtedness owing to Refco Finance Inc. by the Company, the Restricted Subsidiaries and the Regulated Subsidiaries and non-material Temporary Cash Investments), become liable for any material obligations or engage in any significant business activities (other than treasury, cash management, hedging and cash pooling activities and activities incidental thereto); *provided, however,* that Refco Finance Inc. may be a co-obligor or guarantor with respect to Indebtedness if the Company is an obligor of such Indebtedness and the net proceeds of such Indebtedness are received by the Company or one or more of the Company's Subsidiary Guarantors.

The Company will not sell or otherwise dispose of any shares of Capital Stock of Refco Finance Inc. and will not permit Refco Finance Inc., directly or indirectly, to sell or otherwise dispose of any shares of its Capital Stock.

*Merger and Consolidation*

(a)   Other than the Merger, the Company will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

(1) the resulting, surviving or transferee Person (the "*Successor Company*") shall be a Person organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and the Successor Company (if not the Company) shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of the Company under the Notes and the Indenture;

(2) immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any Restricted Subsidiary or Regulated Subsidiary as a result of such transaction as having been Incurred by such Successor Company or such Restricted Subsidiary or Regulated Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(3) immediately after giving *pro forma* effect to such transaction, either (A) the Successor Company would be able to Incur an additional $1.00 of Indebtedness pursuant to paragraph (a) of the covenant described under "—Limitation on Indebtedness" or (B) the Consolidated Coverage Ratio would be greater than such ratio immediately prior to such transaction; and

(4) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with the Indenture;

*provided, however*, that clause (3) will not be applicable to (A) a Restricted Subsidiary or Regulated Subsidiary consolidating with, merging into or transferring all or part of its properties and assets to the Company (so long as no Capital Stock of the Company is distributed to any Person) or (B) the Company merging with an Affiliate of the Company solely for the purpose and with the sole effect of reincorporating the Company in another jurisdiction.

129

For purposes of this covenant, the sale, lease, conveyance, assignment, transfer or other disposition of all or substantially all the assets of one or more Subsidiaries of the Company, which assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all the assets of the Company on a consolidated basis, shall be deemed to be the transfer of all or substantially all the assets of the Company.

The Successor Company (if not the Company) will be the successor to the Company and shall succeed to, and be substituted for, and may exercise every right and power of, the Company under the Indenture, and the predecessor Company, except in the case of a lease, shall be released from the obligation to pay the principal of and interest on the Notes.

(b) Refco Finance Inc. will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

(1) the resulting, surviving or transferee Person (the "*Successor Finance Issuer*") shall be a Person organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and the Successor Finance Issuer (if not Refco Finance Inc.) shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of Refco Finance Inc. under the Notes and the Indenture;

(2) immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Finance Issuer as a result of such transaction as having been Incurred by such Successor Finance Issuer at the time of such transaction), no Default shall have occurred and be continuing and no Change of Control shall have occurred with respect to Refco Finance Inc.; and

(3) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with the Indenture.

The Successor Finance Issuer (if not Refco Finance Inc.) will be the successor to Refco Finance Inc. and shall succeed to, and be substituted for, and may exercise every right and power of, Refco Finance Inc. under the Indenture, and Refco Finance Inc., except in the case of a lease, shall be released from the obligation to pay the principal of and interest on the Notes.

(c) The Company will not permit any Subsidiary Guarantor to consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, all or substantially all its assets to, any Person (other than the Company or another Subsidiary Guarantor) unless:

(1) except in the case of a Subsidiary Guarantor (x) that has been disposed of in its entirety to another Person, whether through a merger, consolidation or sale of Capital Stock or assets or (y) that, as a result of the disposition of all or a portion of its Capital Stock, ceases to be a Subsidiary, in both cases, if in connection therewith the Company complies with its obligations under the covenant described under "—Limitation on Sales of Assets and Subsidiary Stock" in respect of such disposition, the resulting, surviving or transferee Person (if not such Subsidiary) shall be a Person organized and existing under the laws of the jurisdiction under which such Subsidiary was organized or under the laws of the United States of America, or any state thereof or the District of Columbia, and such Person shall expressly assume, by a Guaranty Agreement, in form reasonably satisfactory to the Trustee, all the obligations of such Subsidiary, if any, under its Subsidiary Guaranty;

(2) immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the resulting, surviving or transferee Person as a result of such

transaction as having been Incurred by such Person at the time of such transaction), no Default shall have occurred and be continuing; and

(3) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such Guaranty Agreement, if any, comply with the Indenture.

*Future Guarantors*

After the Acquisition Date, the Company will cause (i) each of its domestic Subsidiaries (other than Refco Finance Inc., any Unrestricted Subsidiary or any Regulated Subsidiary) that Incurs any Indebtedness (other than Indebtedness permitted to be Incurred pursuant to clause (2), (7), (8) or (9) of paragraph (b) of the covenant described under "—Limitation on Indebtedness"), (ii) each Foreign Subsidiary that enters into a Guarantee of any Indebtedness (other than a Foreign Subsidiary that Guarantees Indebtedness Incurred by another Foreign Subsidiary) and (iii) each Regulated Subsidiary that enters into a Guarantee of any Indebtedness (other than a Regulated Subsidiary that Guarantees Indebtedness Incurred by another Regulated Subsidiary) to, in each case, at the same time, execute and deliver to the Trustee a Guaranty Agreement pursuant to which such Subsidiary will Guarantee payment of the Notes on the same terms and conditions as those set forth in the Indenture.

*SEC Reports*

Whether or not the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, so long as any Notes are outstanding, the Company will file with the SEC (unless the SEC will not accept such filing) and provide the Trustee and Noteholders, within the time periods specified in the SEC's rules and regulations:

(1) all quarterly and annual financial information that would be required to be contained in a filing with the SEC on Forms 10-Q and 10-K if the Company were required to file such Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, with respect to the annual information only, a report on the annual financial statements by the Company's certified independent accountants; and

(2) all current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such reports.

If at any time the Company is not subject to the periodic reporting requirements of the Exchange Act for any reason, the Company will nevertheless continue filing the information and reports specified in the preceding sentence with the SEC within the time periods required unless the SEC will not accept such filings. The Company agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept such filings for any reason, the Company will post the information and reports specified in the preceding paragraph on its website within the time periods that would apply if the Company were required to file that information and those reports with the SEC.

In addition, if at any time Parent Guarantees the Notes (there being no obligation of Parent to do so), holds no material assets other than cash, Temporary Cash Investments and the Capital Stock of the Company (and performs the related incidental activities associated with such ownership) and complies with the requirements of Rule 3-10 of Regulation S-X promulgated by the SEC (or any successor provision), the reports and information required to be filed and furnished to the Trustee and holders of the Notes pursuant to this covenant may, at the option of the Company, be filed by and be those of Parent rather than the Company.

Notwithstanding the foregoing, such requirements shall be deemed satisfied prior to the commencement of the Registered Exchange Offer or the effectiveness of the Shelf Registration

Statement by the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration Statement, and any amendments thereto, with such financial information that satisfies Regulation S-X of the Securities Act.

In addition, the Company will furnish to the Holders of the Notes and to prospective investors, upon the requests of such Holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Notes are not freely transferable under the Securities Act.

**Defaults**

Each of the following is an Event of Default:

(1)  a default in the payment of interest on the Notes when due, continued for 30 days;

(2)  a default in the payment of principal of any Note when due at its Stated Maturity, upon optional redemption, upon required purchase, upon declaration of acceleration or otherwise;

(3)  a default in the performance of, or a breach in any covenant, warranty or other agreement contained in the Indenture (other than a default in the performance or breach of a covenant, warranty or agreement which is specifically dealt with in clauses (1) or (2) above) and such default or breach continues for 60 days after notice;

(4)  Indebtedness for borrowed money of an Issuer or any Significant Subsidiary is not paid within any applicable grace period after final maturity or is accelerated by the holders thereof because of a default and the total amount of such Indebtedness unpaid or accelerated exceeds $50.0 million (the "*cross acceleration provision*");

(5)  certain events of bankruptcy, insolvency or reorganization of either Issuer or any Significant Subsidiary (the "*bankruptcy provisions*");

(6)  failure by an Issuer or Significant Subsidiary to pay final judgments aggregating in excess of $50.0 million, which judgments are not paid, discharged or stayed for a period of 60 days after such judgments have become final and non-appealable ("*judgment default provision*"); or

(7)  a Subsidiary Guaranty ceases to be in full force and effect (other than in accordance with the terms of such Subsidiary Guaranty) or a Subsidiary Guarantor denies or disaffirms its obligations under its Subsidiary Guaranty and such default continues for 10 days.

However, a default under clause (3) will not constitute an Event of Default until the Trustee or the holders of at least 25% in principal amount of the outstanding Notes notify the Company of the default and the Company does not cure such default within the time specified after receipt of such notice.

If an Event of Default occurs and is continuing, the Trustee or the holders of at least 25% in principal amount of the outstanding Notes may declare the principal of and accrued but unpaid interest on all the Notes to be due and payable. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of an Issuer occurs and is continuing, the principal of and interest on all the Notes will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any holders of the Notes. Under certain circumstances, the holders of at least a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

Subject to the provisions of the Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders of the Notes unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:

(1)  such holder has previously given the Trustee notice that an Event of Default is continuing;

(2)  holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

(3) such holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense;

(4) the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

(5) holders of at least a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, the holders of at least a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder of a Note or that would involve the Trustee in personal liability.

If a Default occurs, is continuing and is known to the Trustee, the Trustee must mail to each holder of the Notes notice of the Default within 90 days after it occurs. Except in the case of a Default in the payment of principal of or interest on any Note, the Trustee may withhold notice if and so long as a committee of its Trust Officers in good faith determines that withholding notice is not opposed to the interest of the holders of the Notes. In addition, we are required to deliver to the Trustee, within 120 days after the end of each fiscal year, a certificate indicating whether the signers thereof know of any Default that occurred during the previous fiscal year. We are required to deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action we are taking or propose to take in respect thereof.

**Amendments and Waivers**

Subject to certain exceptions, the Indenture may be amended with the consent of the holders of at least a majority in principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange for the Notes), and any past default or compliance with any provisions may also be waived with the consent of the holders of at least a majority in principal amount of the Notes then outstanding. However, without the consent of each holder of an outstanding Note affected thereby, an amendment or waiver may not, among other things:

(1) reduce the amount of Notes whose holders must consent to an amendment;

(2) reduce the rate of or extend the time for payment of interest on any Note;

(3) reduce the principal of or change the Stated Maturity of any Note;

(4) reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed as described under "—Optional Redemption" or "—Escrow of Proceeds; Special Mandatory Redemption" above;

(5) make any Note payable in money other than that stated in the Note;

(6) impair the right of any holder of the Notes to receive payment of principal of and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(7) make any change in the amendment provisions which require each holder's consent or in the waiver provisions;

(8) make any change in the ranking or priority of any Note that would adversely affect the Noteholders; or

133

(9)  make any change in, or release other than in accordance with the Indenture, any Subsidiary Guaranty that would adversely affect the Noteholders.

Notwithstanding the preceding, without the consent of any holder of the Notes, the Issuers, the Subsidiary Guarantors and Trustee may amend the Indenture:

(1)  to cure any ambiguity, omission, defect or inconsistency;

(2)  to provide for the assumption by a successor corporation of the obligations of an Issuer or any Subsidiary Guarantor under the Indenture;

(3)  to provide for uncertificated Notes in addition to or in place of Certificated Notes (provided that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code);

(4)  to add Guarantees with respect to the Notes, including any Subsidiary Guaranties, or to secure the Notes;

(5)  to add to the covenants of the Issuers or a Subsidiary Guarantor for the benefit of the holders of the Notes or to surrender any right or power conferred upon the Issuers or a Subsidiary Guarantor;

(6)  to make any change that does not adversely affect the rights of any holder of the Notes in any material respect;

(7)  to comply with any requirement of the SEC in connection with the qualification of the Indenture under the Trust Indenture Act;

(8)  to make any amendment to the provisions of the Indenture relating to the transfer and legending of Notes; *provided, however,* that (a) compliance with the Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any other applicable securities laws and (b) such amendment does not materially and adversely affect the rights of Holders to transfer Notes; or

(9)  to conform the text of the Indenture or the Notes to any provision of this Description of the Notes to the extent that such provision of the Indenture or the Notes was intended to be a verbatim recitation of such provision of this Description of the Notes.

However, no amendment may be made to the subordination provisions of the Indenture that adversely affects the rights of any holder of Senior Indebtedness of the Issuers or a Subsidiary Guarantor then outstanding unless the holders of such Senior Indebtedness (or their Representative) consent to such change.

The consent of the holders of the Notes is not necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

After an amendment under the Indenture becomes effective, we are required to mail to holders of the Notes a notice briefly describing such amendment. However, the failure to give such notice to all holders of the Notes, or any defect therein, will not impair or affect the validity of the amendment.

Neither the Issuers nor any Affiliate of the Issuers may, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

**Transfer**

The Notes will be issued in registered form and will be transferable only upon the surrender of the Notes being transferred for registration of transfer. We may require payment of a sum sufficient to cover any tax, assessment or other governmental charge payable in connection with certain transfers and exchanges.

**Satisfaction and Discharge**

When (1) we deliver to the Trustee all outstanding Notes for cancelation or (2) all outstanding Notes have become due and payable or will become due and payable within one year, whether at maturity or on a redemption date as a result of the mailing of notice of redemption, and, in the case of clause (2), we irrevocably deposit with the Trustee funds in cash or U.S. Government Obligations or a combination thereof sufficient to pay, without consideration of any reinvestment of interest, at maturity or upon redemption all outstanding Notes, including interest thereon to maturity or such redemption date, and if in either case we pay all other sums payable under the Indenture by us, then the Indenture shall, subject to certain exceptions, cease to be of further effect.

**Defeasance**

At any time, we may terminate all our obligations under the Notes and the Indenture ("*legal defeasance*"), except for certain obligations, including those respecting the defeasance trust and obligations to register the transfer or exchange of the Notes, to replace mutilated, destroyed, lost or stolen Notes and to maintain a registrar and paying agent in respect of the Notes.

In addition, at any time we may terminate our obligations under "—Change of Control" and under the covenants described under "—Certain Covenants" (other than the covenant described under "—Certain Covenants—Merger and Consolidation"), the operation of the cross acceleration provision, the bankruptcy provisions with respect to Significant Subsidiaries and the judgment default provision, all as described under "—Defaults" above, and the limitations contained in clause (3) of the first paragraph under "—Certain Covenants—Merger and Consolidation" above ("*covenant defeasance*").

We may exercise our legal defeasance option notwithstanding our prior exercise of our covenant defeasance option. If we exercise our legal defeasance option, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. If we exercise our covenant defeasance option, payment of the Notes may not be accelerated because of an Event of Default specified in clause (3) (other than a default in the performance of, or a breach in, the covenant set forth under "—Certain Covenants—Merger and Consolidation"), (4), (5) (with respect only to Significant Subsidiaries), (6) or (7) under "—Defaults" above or because of the failure of the Company to comply with clause (3) of the first paragraph under "—Certain Covenants—Merger and Consolidation" above. If we exercise our legal defeasance option or our covenant defeasance option, each Subsidiary Guarantor will be released from all of its obligations with respect to its Subsidiary Guaranty.

In order to exercise either of our defeasance options, we must irrevocably deposit in trust (the "*defeasance trust*") with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be, and must comply with certain other conditions, including delivery to the Trustee of an Opinion of Counsel to the effect that holders of the Notes will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred (and, in the case of legal defeasance only, such Opinion of Counsel must be based on a ruling of the Internal Revenue Service or other change in applicable Federal income tax law).

**Concerning the Trustee**

Wells Fargo Bank, National Association is to be the Trustee under the Indenture. Wells Fargo Bank, National Association is to be the initial registrar and paying agent with regard to the Notes.

The Indenture contains certain limitations on the rights of the Trustee, should it become a creditor of the Issuers or a Subsidiary Guarantor, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions; *provided, however*, if it acquires any conflicting interest it must either eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Holders of at least a majority in principal amount of the outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. If an Event of Default occurs (and is not cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent man in the conduct of his own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of Notes, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense and then only to the extent required by the terms of the Indenture.

**No Personal Liability of Directors or Other Members of the Governing Board, Officers, Employees, Members and Stockholders**

No director or other member of the Governing Board, officer, employee, incorporator, member or stockholder of an Issuer or any Subsidiary Guarantor will have any liability for any obligations of an Issuer or any Subsidiary Guarantor under the Notes, any Subsidiary Guaranty or the Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder of the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver and release may not be effective to waive liabilities under the U.S. federal securities laws, and it is the view of the SEC that such a waiver is against public policy.

**Governing Law**

The Indenture and the Notes will be governed by, and construed in accordance with, the laws of the State of New York.

**Certain Definitions**

"*Acquisition*" means the occurrence of both (i) the acquisition of a majority interest in the Company, pursuant to the Equity Purchase and Merger Agreement, by THL Refco Acquisition Partners together with certain affiliates and co-investors and (ii) the Merger.

"*Acquisition Date*" means the date on which the Acquisition is consummated.

"*Additional Assets*" means:

(1)  any property, plant, equipment or other assets used or useful in a Related Business;

(2)  the Capital Stock of a Person that becomes a Restricted Subsidiary or Regulated Subsidiary as a result of the acquisition of such Capital Stock by the Company or another Restricted Subsidiary or Regulated Subsidiary, as the case may be; or

(3)  Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary or Regulated Subsidiary;

*provided, however*, that any such Restricted Subsidiary or Regulated Subsidiary described in clause (2) or (3) above is primarily engaged in a Related Business.

"*Affiliate*" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Asset Acquisition*" means (a) an Investment by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries in any other Person if, as a result of such Investment, such Person shall become a Restricted Subsidiary or Regulated Subsidiary, as the case may be, or shall be merged with or into the Company or any Restricted Subsidiary or Regulated Subsidiary, or (b) the acquisition by the Company or any Restricted Subsidiary or Regulated Subsidiary of the assets of any other Person or any division or line of business of any other Person.

"*Asset Disposition*" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) by the Company or any Restricted Subsidiary or Regulated Subsidiary, including any disposition by means of a merger, consolidation or similar transaction (each referred to for the purposes of this definition as a "*disposition*"), of:

(1) any shares of Capital Stock of a Restricted Subsidiary or Regulated Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Company, a Restricted Subsidiary or a Regulated Subsidiary and Class B Equity Interests);

(2) all or substantially all the assets of any division or line of business of the Company or any Restricted Subsidiary or Regulated Subsidiary; or

(3) any other assets of the Company or any Restricted Subsidiary or Regulated Subsidiary (including any accounts receivable) outside of the ordinary course of business of the Company or such Restricted Subsidiary or Regulated Subsidiary

(other than, in the case of clauses (1), (2) and (3) above,

(A) a disposition (i) by a Restricted Subsidiary or a Regulated Subsidiary to the Company or (ii) by the Company, a Restricted Subsidiary or a Regulated Subsidiary to a Restricted Subsidiary or a Regulated Subsidiary;

(B) for purposes of the covenant described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" only, (i) a disposition that constitutes a Restricted Payment (or would constitute a Restricted Payment but for the exclusions from the definition thereof) and that is not prohibited by the covenant described under "—Certain Covenants—Limitation on Restricted Payments," including any dividends or distributions to be made as part of the Transactions, or is a Permitted Investment and (ii) a disposition of all or substantially all the assets of the Company in accordance with the covenant described under "—Certain Covenants—Merger and Consolidation;"

(C) a disposition of assets or sale of Capital Stock with a Fair Market Value of less than $10.0 million;

(D) the disposition of property or assets that are obsolete, damaged or worn out;

(E) foreclosures on assets;

(F) a disposition of cash or Temporary Cash Investments; and

(G) the creation of a Lien (but not the sale or other disposition of the property subject to such Lien)).

"*Attributable Debt*" in respect of a Sale/Leaseback Transaction means, as of the time of determination, the present value (discounted at the interest rate borne by the Notes, compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended); *provided, however,* that if such Sale/Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"*Average Life*" means, as of the date of determination, with respect to any Indebtedness, the quotient obtained by dividing:

(1) the sum of the products of the numbers of years, calculated to the nearest one-twelfth, from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Indebtedness multiplied by the amount of such payment by

(2) the sum of all such payments.

"*Bank Indebtedness*" means all Obligations pursuant to the Credit Agreement.

"*Broker-Dealer Regulated Subsidiary*" means any Subsidiary that is registered as a broker-dealer under the Exchange Act or any other applicable law requiring such registration.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Lease Obligation*" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"*Capital Stock*" of any Person means any and all shares, interests (including membership and partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"*Cash Contribution Amount*" means the aggregate amount of cash contributions made to the capital of the Company or any Subsidiary Guarantor described in the definition of "Contribution Indebtedness."

"*Class B Equity Interests*" means the Class B membership interests, or comparable shares of Capital Stock, that are issued from time to time by Refco Securities, LLC or any other Regulated Subsidiary or Restricted Subsidiary, in the ordinary course of their respective businesses and held by employees of Refco Securities, LLC or such other Regulated Subsidiary or Restricted Subsidiary who conduct trading activities in designated proprietary trading accounts established on the books and records of Refco Securities, LLC or such other Regulated Subsidiary or Restricted Subsidiary, as applicable.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commodity Price Protection Agreement*" means, with respect to any Person, any forward contract, commodity swap, commodity option or other similar agreement or arrangement entered into to protect such Person or its Subsidiaries against fluctuations in commodity prices.

138

"*Consolidated Coverage Ratio*" as of any date of determination means the ratio of (a) the aggregate amount of EBITDA for the period of the most recent four consecutive fiscal quarters for which internal financial statements are available prior to the date of such determination to (b) Consolidated Interest Expense for such four fiscal quarters; *provided, however*, that:

(1)  if the Company or any Restricted Subsidiary or Regulated Subsidiary has Incurred any Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Consolidated Coverage Ratio is an Incurrence of Indebtedness, or both, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving effect on a *pro forma* basis to such Indebtedness as if such Indebtedness had been Incurred on the first day of such period;

(2)  if the Company or any Restricted Subsidiary or Regulated Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Coverage Ratio, EBITDA and Consolidated Interest Expense for such period shall be calculated on a *pro forma* basis as if such repayment, repurchase, defeasance or discharge had occurred on the first day of such period;

(3)  if since the beginning of such period the Company or any Restricted Subsidiary or Regulated Subsidiary shall have made any Asset Disposition, EBITDA for such period shall be reduced by an amount equal to EBITDA (if positive) directly attributable to the assets which are the subject of such Asset Disposition for such period, or increased by an amount equal to EBITDA (if negative), directly attributable thereto for such period, and Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Company or any Restricted Subsidiary or Regulated Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries or Regulated Subsidiaries in connection with such Asset Disposition for such period (or, if the Capital Stock of any Restricted Subsidiary or Regulated Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary or Regulated Subsidiary to the extent the Company and its continuing Restricted Subsidiaries and Regulated Subsidiaries are no longer liable for such Indebtedness after such sale);

(4)  if since the beginning of such period the Company or any Restricted Subsidiary or Regulated Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary or Regulated Subsidiary (or any Person which becomes a Restricted Subsidiary or Regulated Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction requiring a calculation to be made hereunder, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period; and

(5)  if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or Regulated Subsidiary or was merged with or into the Company or any Restricted Subsidiary or Regulated Subsidiary since the beginning of such period) shall have made any Asset Disposition, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (3) or (4) above if made by the Company or a Restricted Subsidiary or Regulated Subsidiary during such period, EBITDA and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto as if such Asset Disposition, Investment or acquisition had occurred on the first day of such period.

For purposes of calculating the Consolidated Coverage Ratio:

(1) whenever *pro forma* effect is to be given to any Asset Disposition, Investment or acquisition of assets pursuant to clause (3) or (4) above, the *pro forma* calculations shall be determined in good faith by the chief financial officer of the Company and shall comply with the requirements of Rule 11-02 of Regulation S-X promulgated by the SEC, except that such *pro forma* calculations may include Pro Forma Cost Savings; and

(2) in calculating Consolidated Interest Expense attributable to interest on any Indebtedness computed on a *pro forma* basis, (a) interest on outstanding Indebtedness determined on a fluctuating basis as of the date of determination and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate *per annum* equal to the rate of interest on such Indebtedness in effect on the calculation date; (b) if interest on any Indebtedness actually incurred on the date of determination may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rates, then the interest rate in effect on the date of determination will be deemed to have been in effect during the four-quarter period; and (c) notwithstanding clause (a) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by any Interest Rate Agreement, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreement.

If any Indebtedness is incurred under a revolving credit facility and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated based on the average daily balance of such Indebtedness for the four fiscal quarters subject to the *pro forma* calculation.

"*Consolidated Interest Expense*" means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries, plus, to the extent not included in such total interest expense and to the extent incurred by the Company or its Restricted Subsidiaries and Regulated Subsidiaries, without duplication:

(1) interest expense attributable to Capital Lease Obligations;

(2) amortization of debt discount;

(3) non-cash interest expense;

(4) commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(5) net cash payments pursuant to Hedging Obligations; and

(6) dividends accrued in respect of all Disqualified Stock of the Company and all Preferred Stock of any Restricted Subsidiary or Regulated Subsidiary, in each case held by Persons other than the Company or a Wholly Owned Subsidiary (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Company);

*less* interest income actually received in cash for such period (other than interest income attributable to customer financing arrangements). "Consolidated Interest Expense" excludes the (i) amortization of deferred financing fees and the expensing of any bridge or other financing fees, (ii) interest expense attributable to Customer Financing Indebtedness and (iii) net payments pursuant to Hedging Obligations that do not constitute Indebtedness.

"*Consolidated Net Income*" means, for any period, without duplication, the net income of the Company and its consolidated Subsidiaries; *provided, however*, that there shall not be included in such Consolidated Net Income:

(1) any net income of any Person (other than the Company) if such Person is neither a Restricted Subsidiary nor a Regulated Subsidiary, except that, (A) subject to the exclusion contained in clause (4) below, the Company's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Company or a Restricted Subsidiary or Regulated Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a Restricted Subsidiary or Regulated Subsidiary, to the limitations contained in clause (3) below) and (B) the Company's equity in the net income or loss of FXCM shall be included in such Consolidated Net Income;

(2) except as provided in the definition of Consolidated Coverage Ratio, any net income (or loss) of any Person acquired by the Company or a Subsidiary in a pooling of interests transaction (or any transaction accounted for in a manner similar to a pooling of interests) for any period prior to the date of such acquisition;

(3) any net income of any Restricted Subsidiary or Regulated Subsidiary if such Restricted Subsidiary or Regulated Subsidiary, as the case may be, is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary or Regulated Subsidiary, directly or indirectly, to the Company, except that:

(A) subject to the exclusion contained in clause (4) below, the Company's equity in the net income of any such Restricted Subsidiary or Regulated Subsidiary for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Restricted Subsidiary or Regulated Subsidiary during such period to the Company or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to another Restricted Subsidiary or Regulated Subsidiary, to the limitation contained in this clause); *provided, however,* to the extent that any net income of a Restricted Subsidiary or Regulated Subsidiary for such period would be excluded as a result of this clause (A), such net income shall be included in such Consolidated Net Income if the Company delivers to the Trustee on the date of the event requiring calculation of Consolidated Net Income a certificate of the chief financial officer of the Company certifying that the restrictions on the payments of dividends or the making of distributions by such Restricted Subsidiary or Regulated Subsidiary to the Company do not impair the Company's ability to make payments of interest and scheduled payments of principal in respect of the Notes, in each case as and when due; and

(B) the Company's equity in a net loss of any such Restricted Subsidiary or Regulated Subsidiary for such period shall be included in determining such Consolidated Net Income;

(4) any gain (or loss) realized upon the sale or other disposition of any assets of the Company, its consolidated Subsidiaries or any other Person (including pursuant to any Sale/Leaseback Transaction) which is not sold or otherwise disposed of in the ordinary course of business and any gain (or loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(5) any net after-tax extraordinary, unusual or nonrecurring gains or losses;

(6) all restructuring charges, including severance, relocation and transition costs;

141

(7) noncash compensation charges, including any such charges arising from stock options, restricted stock grants or other equity-incentive programs;

(8) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness;

(9) any non-cash impairment charges resulting from the application of Statements of Financial Accounting Standards No. 142 and 144 and the amortization of intangibles arising pursuant to Statement of Financial Accounting Standards No. 141; and

(10) the cumulative effect of a change in accounting principles,

in each case, for such period. Notwithstanding the foregoing, for the purposes of the covenant described under "—Certain Covenants—Limitation on Restricted Payments" only, there shall be excluded from Consolidated Net Income any repurchases, repayments or redemptions of Investments, proceeds realized on the sale of Investments or return of capital to the Company, a Restricted Subsidiary or a Regulated Subsidiary to the extent such repurchases, repayments, redemptions, proceeds or returns increase the amount of Restricted Payments permitted under such covenant pursuant to clause (a)(3)(D) thereof. If the Company or any Successor Company is organized as a corporation and solely for purposes of determining the amount available for Restricted Payments under clause (a)(3) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments," an amount equal to any reduction in current taxes recognized during the applicable period by the Company, its Restricted Subsidiaries and Regulated Subsidiaries as a direct result of deductions arising from (A) the amortization allowed under Section 167 or 197 of the Code for the step-up in the federal income tax bases of goodwill and other assets (tangible or intangible) arising from the Transactions and (B) employee termination and related restructuring reserves established pursuant to purchase accounting for the two-year period commencing with the Issue Date, in each case, will be included in the calculation of "Consolidated Net Income" so long as such addition will not result in double-counting.

"*Contribution Indebtedness*" means Indebtedness of the Company or any Subsidiary Guarantor in an aggregate principal amount not greater than twice the aggregate amount of cash contributions made to the capital of the Company or such Subsidiary Guarantor after the Issue Date; *provided* that such Contribution Indebtedness:

(1) if the aggregate principal amount of such Contribution Indebtedness is greater than one times such cash contributions to the capital of the Company or such Subsidiary Guarantor, as applicable, the amount of such excess shall be (A)(x) Subordinated Obligations (other than Secured Indebtedness) or (y) Indebtedness that ranks *pari passu* with the Notes (other than Secured Indebtedness) and (B) Indebtedness with a Stated Maturity later than the Stated Maturity of the Notes; and

(2) (a) is incurred within 180 days after the making of such cash contributions and (b) is so designated as Contribution Indebtedness pursuant to an Officers' Certificate on the date of the Incurrence thereof.

"*Credit Agreement*" means the Credit Agreement to be entered into by and among the Company, certain of its Subsidiaries, the lenders referred to therein, Bank of America, N.A., as Administrative Agent, Credit Suisse First Boston, as Syndication Agent, and Deutsche Bank Securities Inc., as Documentation Agent, together with the related documents thereto (including the term loans, revolving loans and letters of credit thereunder, any Guarantees and security documents), as amended, extended, renewed, restated, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, maturity, terms, conditions, covenants and other provisions) from time to time, and any agreement (and related document) governing Indebtedness incurred to Refinance, in whole or in part, the borrowings and commitments then outstanding or permitted to be outstanding under such Credit

Agreement or a successor Credit Agreement, whether by the same or any other lender or group of lenders or other investors.

"*Credit Facilities*" means one or more debt facilities (including, without limitation, the Credit Agreement), commercial paper facilities or indentures, in each case with banks or other institutional lenders or other investors or a trustee providing for revolving credit loans, term loans, letters of credit or issuances of notes or other debt securities, in each case as amended, modified, renewed, refunded, replaced, restated, substituted or refinanced in whole or in part from time to time.

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement or other similar agreement with respect to currency values.

"*Customer Financing Indebtedness*" means (i) short-term Indebtedness (including without limitation Indebtedness under Swap Contracts) that is incurred in the ordinary course of business and (a) is incurred by any Restricted Subsidiary in conjunction with its customer financing business, (b) is incurred by any Regulated Subsidiary for the purpose of offsetting customer positions or financing customer margined inventory, acquired or cleared or financed in conjunction with customer brokerage activities and is secured by a Lien on the assets being financed, (c) is incurred by any Regulated Subsidiary and consists of obligations under letters of credit posted to support clearing house guarantees issued in the ordinary course of business, or (d) constitutes customer financing entered into by any Regulated Subsidiary; *provided*, *however*, that, after giving effect to the Incurrence of any such Indebtedness, such Person's Regulatory Net Capital is in compliance with all applicable rules and regulations governing such Person and the conduct of its business, and (ii) Guarantees by the Company of any short-term Indebtedness described in clause (i) of this definition.

"*Default*" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"*Designated Noncash Consideration*" means the Fair Market Value of noncash consideration received by the Company or one of its Restricted Subsidiaries or Regulated Subsidiaries in connection with an Asset Disposition that is so designated as Designated Noncash Consideration pursuant to an Officers' Certificate setting forth the basis of such valuation, less the amount of cash or Temporary Cash Investments received in connection with a subsequent sale of such Designated Noncash Consideration.

"*Designated Preferred Stock*" means Preferred Stock of the Company or Parent (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officers' Certificate, on the issuance date thereof, the Net Cash Proceeds of which are excluded from the calculation set forth in clause (3) of paragraph (a) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

"*Designated Offering*" means an Equity Offering or an IDS Offering.

"*Designated Senior Indebtedness*," with respect to a Person means:

(1) the Bank Indebtedness; and

(2) any other Senior Indebtedness of such Person, other than any Indebtedness of such Person owed to the Company, Refco Finance Inc. or any of their respective Subsidiaries, which, at the date of determination, has an aggregate principal amount outstanding of, or under which, at the date of determination, the holders thereof are committed to lend up to, at least $25.0 million and is specifically designated by such Person in the instrument evidencing or governing such Senior Indebtedness as "Designated Senior Indebtedness" for purposes of the Indenture.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock, other than Class B Equity Interests, which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(1) matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such Person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(2) is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock; or

(3) is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part;

in each case on or prior to the 91st day after the Stated Maturity of the Notes; *provided, however*, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the Stated Maturity of the Notes shall not constitute Disqualified Stock if:

(1) the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the terms applicable to the Notes as described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" and "—Change of Control;" and

(2) any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to the Indenture; *provided*, *however*, that if such Disqualified Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such Person.

"*EBITDA*" for any period means the sum of Consolidated Net Income, plus the following to the extent deducted in calculating such Consolidated Net Income and without duplication:

(1) all income tax expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries;

(2) Consolidated Interest Expense;

(3) depreciation and amortization expense of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries;

(4) any reasonable expenses, fees or charges related to any Equity Offering, Permitted Investment, acquisition, recapitalization or Indebtedness permitted to be Incurred under the Indenture or to the Transactions;

(5) any net gain or loss from Hedging Obligations;

(6) the amount of management, monitoring, consulting and advisory fees and related expenses paid to the Equity Sponsor (or any accruals relating to such fees and related expenses) during such period in accordance with the Management Agreement; and

(7) all other non-cash charges of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period) and less all non-cash items of income of the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries (other than accruals of revenue by the Company and its consolidated Restricted Subsidiaries and Regulated Subsidiaries in the ordinary course of business);

in each case for such period. Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation and amortization and non-cash charges of, a Restricted Subsidiary or Regulated Subsidiary shall be added to Consolidated Net Income to compute EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net income or loss of such Restricted Subsidiary or Regulated Subsidiary was included in calculating Consolidated Net Income.

"*Equity Purchase and Merger Agreement*" means the Equity Purchase and Merger Agreement, dated as of June 8, 2004, by and among Refco Group Ltd., LLC, a Delaware limited liability company, Refco Group Holdings, Inc., a Delaware corporation, THL Refco Acquisition Partners, a Delaware limited partnership, and Refco Merger LLC, a Delaware limited liability company, as amended on July 9, 2004 and as the same may be amended or modified prior to the Acquisition Date.

"*Equity Offering*" means an offering (including a private placement) of the Capital Stock (other than Disqualified Stock) of the Company or Parent, other than (i) public offerings with respect to Capital Stock registered on Form S-8 under the Securities Act and (ii) issuances to any Subsidiary of the Issuers.

"*Equity Sponsor*" means Thomas H. Lee Partners, L.P., a Delaware limited partnership.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

"*Exchange Notes*" means the debt securities of the Issuers issued pursuant to the Indenture in exchange for, and in an aggregate principal amount equal to, the Notes, in compliance with the terms of a Registration Rights Agreement.

"*Fair Market Value*" means, with respect to any asset or property, the price which could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. If the Fair Market Value of the property or assets in question is in excess of $25.0 million, such determination must be confirmed in good faith by the Governing Board of the Company, whose determination will be conclusive and evidenced by a resolution of such Governing Board. For purposes of determining the Fair Market Value of Capital Stock, the value of the Capital Stock of a Person shall be based upon such Person's property and assets, exclusive of goodwill or any similar intangible asset.

"*Foreign Subsidiary*" means any Restricted Subsidiary or Regulated Subsidiary that is not organized under the laws of the United States of America or any state thereof or the District of Columbia.

"*FXCM*" means Forex Capital Markets, LLC.

"*Futures Commission Regulated Subsidiary*" means any Subsidiary that is required to register as a futures commission merchant under the Commodity Exchange Act or any other law requiring such registration.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect as of the Issue Date, including those set forth in:

(1) the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants;

(2)  statements and pronouncements of the Financial Accounting Standards Board;

(3)  such other statements by such other entity as approved by a significant segment of the accounting profession; and

(4)  the rules and regulations of the SEC governing the inclusion of financial statements (including *pro forma* financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act, including opinions and pronouncements in staff accounting bulletins and similar written statements from the accounting staff of the SEC.

"*Governing Board*" of the Company or any other Person means, (i) the managing board or managers forming any controlling committee of managers of the Company or such Person, for so long as the Company or such Person is a limited liability company, (ii) the board of directors of the Company or such Person, if the Company or such Person is a corporation, (iii) any similar governing body or (iv) in the case of any of the forgoing, any authorized committee of the foregoing.

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*GP Obligations*" means obligations of the Company, any Restricted Subsidiary or any Regulated Subsidiary with respect to Indebtedness of limited partnerships or similar passive collective investment entities that trade derivatives and in which the Company, such Restricted Subsidiary or such Regulated Subsidiary serves as general partner (or has a similar status) in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business and which have arisen solely as a result of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's role as general partner (or similar status) of such entities.

"*Guarantee*" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person:

(1)  to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

(2)  entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

*provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"*Guaranty Agreement*" means a supplemental indenture, in form reasonably satisfactory to the Trustee, pursuant to which a Subsidiary Guarantor guarantees the Issuers' obligations with respect to the Notes on the terms provided for in the Indenture.

"*Hedging Obligations*" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Price Protection Agreement.

"*Holder*" or "*Noteholder*" means the Person in whose name a Note is registered on the registrar's books.

"*IDS Offering*" means a bona fide offering in the United States or Canada of units consisting of common stock and notes of the Company; *provided* that the net cash proceeds of such offering that are used to redeem notes pursuant to the third paragraph under the caption "—Optional Redemption" shall only consist of the net cash proceeds attributable to the proceeds of the common stock of such offering.

146

"*Income Tax Liabilities*" means an amount determined by multiplying (a)(i) all taxable income and gains of the Company and its Subsidiaries for such taxable year (the "*Taxable Amount*") minus (ii) an amount (not to exceed the Taxable Amount for such taxable year) equal to all losses of the Company and its Subsidiaries in any of the three prior taxable years that have not been previously subtracted pursuant to this clause (ii) from the Taxable Amount for any prior year by (b) forty-two percent (42%) or, if there is a change in applicable federal, state or local tax rates, such other rate as the Issuers determine in good faith to be a reasonable approximation of the effective combined federal, state and local income taxation rates generally payable by Parent or direct or indirect owners of the Company with respect to the income and gains of the Company and its Subsidiaries.

"*Incur*" means issue, assume, Guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or Regulated Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Restricted Subsidiary or Regulated Subsidiary. The term "Incurrence" when used as a noun shall have a correlative meaning. Solely for purposes of determining compliance with "—Certain Covenants—Limitation on Indebtedness":

(1) amortization of debt discount or the accretion of principal with respect to a non-interest bearing or other discount security;

(2) the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Capital Stock in the form of additional Capital Stock of the same class and with the same terms;

(3) increases in liabilities as a result of fluctuations in exchange rates; and

(4) the premium, if any, payable on the Note which is due or overdue or is to become due at the relevant time.

will not be deemed to be the Incurrence of Indebtedness.

"*Indebtedness*" means, with respect to any Person on any date of determination (without duplication):

(1) the principal in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable;

(2) all Capital Lease Obligations of such Person and all Attributable Debt in respect of Sale/ Leaseback Transactions entered into by such Person;

(3) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding any accounts payable or other liability to trade creditors arising in the ordinary course of business);

(4) all obligations of such Person for the reimbursement of any obligor on any letter of credit, bankers' acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (1) through (3) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

if, and to the extent that, any of the foregoing Indebtedness (other than letters of credit, bankers' acceptances or similar credit transactions) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(5) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock of such Person or, with respect to any Preferred Stock of any Subsidiary of such Person, the principal amount of such Preferred Stock to be determined in accordance with the Indenture (but excluding, in each case, any accrued dividends);

(6) all obligations of the type referred to in clauses (1) through (5) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor or guarantor, including by means of any Guarantee;

(7) all obligations of the type referred to in clauses (1) through (6) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the Fair Market Value of such property or assets and the amount of the obligation so secured; and

(8) to the extent not otherwise included in this definition, Hedging Obligations of such Person.

Notwithstanding the foregoing, "Indebtedness" shall not include (w) Customer Financing Indebtedness, (x) GP Obligations, (y) Hedging Obligations that have been incurred by such Person on behalf of customers or in order to finance the carrying of securities or investment positions and (z) indemnification, adjustment of purchase price, earn-out or similar obligations incurred or assumed by any of the Company, a Restricted Subsidiary or a Regulated Subsidiary in connection with the acquisition or disposition of any of their respective businesses or assets whether or not such acquisition occurred before or after the Issue Date.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all obligations as described above; *provided*, *however*, that in the case of Indebtedness sold at a discount, the amount of such Indebtedness at any time will be the accreted value thereof at such time.

"*Independent Qualified Party*" means an investment banking firm, accounting firm or appraisal firm of national standing; *provided*, *however*, that such firm is not an Affiliate of the Company.

"*Interest Rate Agreement*" means any interest rate swap agreement, interest rate cap agreement or other financial agreement or arrangement with respect to exposure to interest rates.

"*Investment*" in any Person means any direct or indirect advance, loan or other extension of credit (including by way of Guarantee or similar arrangements but excluding any advances to customers in the ordinary course of business) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by such Person; *provided* that assets held to secure Customer Financing Indebtedness in the ordinary course of business shall not constitute an Investment. If the Company or any Restricted Subsidiary or Regulated Subsidiary issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary or Regulated Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary or Regulated Subsidiary, any Investment by the Company or any Restricted Subsidiary or Regulated Subsidiary in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time. The acquisition by the Company or any Restricted Subsidiary or Regulated Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary or Regulated Subsidiary in such third Person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its Fair Market Value at the time the Investment is made and without giving effect to subsequent changes in value.

For purposes of the definition of "Unrestricted Subsidiary," the definition of "Restricted Payment" and the covenant described under "—Certain Covenants—Limitation on Restricted Payments":

(1) "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to (A) the Company's "Investment" in such Subsidiary at the time of such redesignation less (B) the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer.

"*Issue Date*" means August 5, 2004.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions are not required to be open in the State of New York.

"*Lien*" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof).

"*Management Agreement*" means the Management Agreement dated the Acquisition Date by and between Refco Group Ltd., LLC and THL Managers V, LLC, as in effect on such date.

"*Merger*" means the merger on the Acquisition Date of Refco Finance Holdings LLC with and into Refco Group Ltd., LLC, with Refco Group Ltd., LLC continuing as the surviving entity, pursuant to the Equity Purchase and Merger Agreement.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Net Available Cash*" from an Asset Disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other non-cash form), in each case net of:

(1) all direct costs relating to such Asset Disposition, including, without limitation, legal, accounting and investment banking fees, sales commissions and any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements;

(2) all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets, or which must by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by applicable law, be repaid out of the proceeds from such Asset Disposition;

(3) all distributions and other payments required to be made to minority interest holders in Restricted Subsidiaries and Regulated Subsidiaries as a result of such Asset Disposition;

(4) the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the property or other assets disposed in such Asset Disposition and retained by the Company or any Restricted Subsidiary or Regulated Subsidiary after such Asset Disposition, including liabilities with respect to severance costs, pension and other post-employment benefit liabilities, liabilities related to environmental matters or indemnification obligations associated with such Asset Disposition; and

(5)  any portion of the purchase price from an Asset Disposition placed in escrow, whether as a reserve for adjustment of the purchase price, for satisfaction of indemnities in respect of such Asset Disposition or otherwise in connection with that Asset Disposition; *provided*, *however*, that upon the termination of that escrow, Net Available Cash will be increased by any portion of funds in the escrow that are released to the Company or any Restricted Subsidiary or Regulated Subsidiary.

"*Net Cash Proceeds*," with respect to any issuance or sale of Capital Stock or Indebtedness, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

"*Net Indebtedness to EBITDA Ratio*" means, with respect to any Person, the ratio of: (a) the Indebtedness of the Company and its Restricted Subsidiaries and Regulated Subsidiaries, as of the end of the most recently ended fiscal quarter for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur, *plus* the amount of any Indebtedness Incurred subsequent to the end of the such fiscal quarter, *less* the amount of cash and Temporary Cash Investments (other than cash held as segregated funds with respect to customer accounts) that would be stated on the balance sheet of the Company and held by the Company as of such date of determination, as determined in accordance with GAAP, to (b) the Company's EBITDA for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur (the "*Measurement Period*"); *provided*, *however*, that: (i) in making such computation, Indebtedness shall include the greater of (x) the average daily balance outstanding under any revolving credit facility during the most recently ended fiscal quarter and (y) the actual amount of Indebtedness outstanding under any revolving credit facility as of the date for which such calculation is being made; and (ii) if the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries consummates a material acquisition or an Asset Disposition or other disposition of assets subsequent to the commencement of the Measurement Period but prior to the event for which the calculation of the Net Indebtedness to EBITDA Ratio is made, then the Net Indebtedness to EBITDA Ratio shall be calculated giving *pro forma* effect to such material acquisition or Asset Disposition or other disposition of assets, as if the same had occurred at the beginning of the applicable period. Any *pro forma* calculations necessary pursuant to this "Net Indebtedness to EBITDA Ratio" shall be made in accordance with the provisions set forth in the second paragraph of the definition of "Consolidated Coverage Ratio."

"*Net Senior Indebtedness to EBITDA Ratio*" means, with respect to any Person, the ratio of: (a) the Senior Indebtedness of the Company and its Restricted Subsidiaries and Regulated Subsidiaries, as of the end of the most recently ended fiscal quarter for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur, *plus* the amount of any Senior Indebtedness Incurred subsequent to the end of such fiscal quarter, *less* the amount of cash and Temporary Cash Investments (other than cash held as segregated funds with respect to customer accounts) that would be stated on the balance sheet of the Company and held by the Company as of such date of determination, as determined in accordance with GAAP, to (b) the Company's EBITDA for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which the event for which such calculation is being made shall occur (the "*Measurement Period*"); *provided*, *however*, that: (i) in making such computation, Senior Indebtedness shall include the greater of (x) the average daily balance outstanding under any revolving credit facility during the most recently ended fiscal quarter and (y) the actual amount of Senior Indebtedness outstanding under any revolving credit facility as of the date for which such calculation is being made; and (ii) if the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries consummates a material acquisition or an Asset Disposition or other disposition of assets subsequent to the commencement of the Measurement Period but prior to the event for which

the calculation of the Net Senior Indebtedness to EBITDA Ratio is made, then the Net Senior Indebtedness to EBITDA Ratio shall be calculated giving *pro forma* effect to such material acquisition or Asset Disposition or other disposition of assets, as if the same had occurred at the beginning of the applicable period. Any *pro forma* calculations necessary pursuant to this "Net Senior Indebtedness to EBITDA Ratio" shall be made in accordance with the provisions set forth in the second paragraph of the definition of "Consolidated Coverage Ratio."

"*Obligations*" means, with respect to any Indebtedness, all obligations for principal, premium, interest, penalties, fees, indemnifications, reimbursements and other amounts payable pursuant to the documentation governing such Indebtedness.

"*Offering Circular*" means this offering circular dated July 22, 2004, relating to the Notes.

"*Officer*" means the Chairman of the Governing Board, the President, any Vice President, the Treasurer or the Secretary of the Company.

"*Officers' Certificate*" means a certificate signed by two Officers.

"*Opinion of Counsel*" means a written opinion from legal counsel who is reasonably acceptable to the Trustee. The counsel may be an employee of or counsel to the Company or the Trustee.

"*Parent*" means New Refco Group Ltd. LLC or any other direct or indirect parent company of the Company.

"*Permitted Asset Swap*" means the disposition by the Company or its Restricted Subsidiaries or Regulated Subsidiaries of assets to another Person or Persons in exchange for which the Company and the Restricted Subsidiaries and Regulated Subsidiaries receive assets having, in the reasonable judgment of the disinterested members of the Governing Board of the Company, a Fair Market Value substantially equivalent to or greater than the Fair Market Value of the assets so disposed; *provided*, *however*, that no such disposition or series of related dispositions shall constitute Permitted Asset Swaps to the extent that the aggregate Fair Market Value of the assets so disposed which combined with the Fair Market Value of the assets disposed of in one or more Permitted Asset Swaps exceeds $100.0 million; *provided further*, *however*, that if the book value of the assets to be disposed in a Permitted Asset Swap (or in a series of related Permitted Asset Swaps) exceeds $50.0 million, such disposition shall not constitute a Permitted Asset Swap unless an Independent Qualified Party shall have determined in writing that the Fair Market Value of the assets to be received by the Company, its Restricted Subsidiaries and its Regulated Subsidiaries is substantially equivalent to or greater than the Fair Market Value of the assets to be disposed.

"*Permitted Holders*" means:

(1)  the Equity Sponsor or any of its Affiliates;

(2)  Phillip R. Bennett or any of his Subsidiaries; and

(3)  any Person acting in the capacity of underwriter in connection with a Designated Offering.

"*Permitted Investment*" means an Investment by the Company or any Restricted Subsidiary or Regulated Subsidiary in:

(1)  the Company, a Restricted Subsidiary or a Regulated Subsidiary or a Person that will, upon the making of such Investment, become a Restricted Subsidiary or a Regulated Subsidiary, as the case may be; *provided*, *however*, that the primary business of such Restricted Subsidiary or Regulated Subsidiary is a Related Business;

(2)  another Person if, as a result of such Investment, such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Company, a Restricted Subsidiary or a Regulated Subsidiary; *provided*, *however*, that such Person's primary business is a Related Business;

(3)  cash and Temporary Cash Investments;

(4) receivables owing to the Company or any Restricted Subsidiary or Regulated Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided*, *however*, that such trade terms may include such concessionary trade terms as the Company or any such Restricted Subsidiary or Regulated Subsidiary deems reasonable under the circumstances;

(5) payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6) loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary or Regulated Subsidiary;

(7) stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or Regulated Subsidiary or in satisfaction of judgments;

(8) any Person to the extent such Investment represents the non-cash portion of the consideration received for (A) an Asset Disposition as permitted pursuant to the covenant described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" or (B) a disposition of assets not constituting an Asset Disposition;

(9) any Person where such Investment was acquired by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries (A) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary or Regulated Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (B) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(10) any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary or Regulated Subsidiary;

(11) any Person to the extent such Investments consist of Hedging Obligations or Guarantees otherwise permitted under the covenant described under "—Certain Covenants—Limitation on Indebtedness;"

(12) any Person to the extent such Investments exist on the Issue Date, and any extension, modification or renewal of any such Investments existing on the Issue Date, but only to the extent not involving additional advances, contributions or other Investments of cash or other assets or other increases thereof (other than as a result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities, in each case, pursuant to the terms of such Investment as in effect on the Issue Date);

(13) any Person if the payment for such Investment consists entirely of Capital Stock (other than Disqualified Stock) of the Company or Parent; and

(14) Persons to the extent such Investments, when taken together with all other Investments made pursuant to this clause (14) and outstanding on the date such Investment is made, do not exceed the greater of (A) $125.0 million and (B) an amount in U.S. dollars equal to the product of (x) $125.0 million and (y) 1 plus a percentage equal to the percentage of the net increase in "members' equity" (or, following any reorganization of the Company as a corporation, "stockholders' equity") on the consolidated balance sheet of the Company from the Issue Date to the end of the most recent fiscal quarter immediately prior to the date on which the applicable Investment is made pursuant to this clause (14).

"*Permitted Junior Securities*" means (1) Capital Stock of the Issuers, any Subsidiary Guarantor or Parent or (2) unsecured debt securities that are subordinated to all Senior Indebtedness (and any debt securities issued in exchange for Senior Indebtedness) to substantially the same extent as, or to a greater extent than, the Notes and the Subsidiary Guaranties are subordinated to Senior Indebtedness under the Indenture.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*," as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"*principal*" of a Note means the principal of the Note plus the premium, if any, payable on the Note which is due or overdue or is to become due at the relevant time.

"*Pro Forma Cost Savings*" means, with respect to any period, the reduction in net costs and related adjustments that (i) were directly attributable to an Asset Acquisition, Investment or Asset Disposition that occurred during the four-quarter period or after the end of the four-quarter period and on or prior to the date of determination and calculated on a basis that is consistent with Regulation S-X under the Securities Act as in effect and applied as of the date of the Indenture, (ii) were actually implemented by the business that was the subject of any such Asset Acquisition, Investment or Asset Disposition within six months after the date of the applicable Asset Acquisition, Investment or Asset Disposition and prior to the date of determination and are supportable and quantifiable by the underlying accounting records of such business or (iii) relate to the business that is the subject of any such Asset Acquisition, Investment or Asset Disposition and that the Company reasonably determines are probable based upon specifically identifiable actions to be taken within six months of the date of the applicable Asset Acquisition, Investment or Asset Disposition and, in the case of each of (i), (ii) and (iii), are described, as provided below, in an Officers' Certificate, as if all such reductions in costs had been effected as of the beginning of such period. Pro Forma Cost Savings described above shall be accompanied by a certificate delivered to the Trustee from the Company's chief financial officer that outlines the specific actions taken or to be taken, the net cost savings achieved or to be achieved from each such action and that, in the case of clause (iii) above, such savings have been determined to be probable.

"*Purchase Money Indebtedness*" means Indebtedness (including Capital Lease Obligations) (1) consisting of the deferred purchase price of property, conditional sale obligations, obligations under any title retention agreement, other purchase money obligations and obligations in respect of industrial revenue bonds or similar Indebtedness, in each case where the maturity of such Indebtedness does not exceed the anticipated useful life of the asset being financed or (2) Incurred to finance the acquisition (whether directly or through acquisition of Capital Stock) by the Company or a Restricted Subsidiary or Regulated Subsidiary of any asset, including additions and improvements, used or useful in a Related Business in the ordinary course of business; *provided, however,* that such Indebtedness is Incurred within 270 days after such acquisition of such assets.

"*Refinance*" means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Indebtedness. "Refinanced" and "Refinancing" shall have correlative meanings.

"*Refinancing Indebtedness*" means Indebtedness that Refinances any Indebtedness of the Company or any Restricted Subsidiary or Regulated Subsidiary existing on the Issue Date or subsequently

Incurred in compliance with the Indenture, including Indebtedness that Refinances Refinancing Indebtedness; *provided*, *however*, that:

(1) such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced;

(2) such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being Refinanced;

(3) such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses, including any premium and defeasance costs) under the Indebtedness being Refinanced; and

(4) if the Indebtedness being Refinanced is subordinated in right of payment to the Notes, such Refinancing Indebtedness is subordinated in right of payment to the Notes at least to the same extent as the Indebtedness being Refinanced;

*provided further*, *however*, that Refinancing Indebtedness shall not include (A) Indebtedness of a Restricted Subsidiary or Regulated Subsidiary that Refinances Indebtedness of the Company or (B) Indebtedness of the Company, a Restricted Subsidiary or a Regulated Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

"*Registration Rights Agreement*" means the Registration Rights Agreement dated August 5, 2004, among the Issuers and the initial purchasers and, if applicable, the Subsidiary Guarantors and any similar registration rights agreement in respect of Additional Notes.

"*Regulated Subsidiary*" means any Subsidiary of the Company so long as such Subsidiary is (a) a Broker-Dealer Regulated Subsidiary, (b) a Futures Commission Regulated Subsidiary, (c) a Foreign Subsidiary subject to regulation as a futures commission merchant or broker (or the equivalent thereof) under applicable laws, (d) otherwise subject to regulation by any Governmental Authority and for which the incurrence of Indebtedness (including Guarantees) or the granting of Liens with respect to its assets would be prohibited or restricted or would result in a negative impact on any minimum capital or similar requirement applicable to it or (e) subject to regulation by any Regulatory Supervising Organization.

"*Regulatory Net Capital*" means, for each Regulated Subsidiary, the Regulatory Total Capital adjusted by amounts and calculations that are specified in the laws of the applicable Regulatory Supervising Organizations.

"*Regulatory Supervising Organization*" means any of (a) the Commodity Futures Trading Commission, (b) the National Futures Association, (c) the SEC, (d) the National Association of Securities Dealers or (e) any governmental or regulatory organization, exchange, clearing house or financial regulatory authority of which a Regulated Subsidiary is a member or to whose rules it is subject.

"*Regulatory Total Capital*" means, for each Regulated Subsidiary, the amount of capital (including subordinated debt which is characterized as equity for regulatory reporting purposes) as calculated pursuant to the rules of, and reported from time to time to, the applicable Regulatory Supervising Organizations.

"*Related Business*" means any business in which the Company or any of the Restricted Subsidiaries or Regulated Subsidiaries was engaged on the Issue Date and any business related, ancillary or complementary to such business; *provided*, *however* that order execution for trading in, and clearing of, new risk management and investment products shall be deemed to be a Related Business.

"*Representative*" means, with respect to any Person, any trustee, agent or representative (if any) for an issue of Senior Indebtedness of such Person.

"*Restricted Payment*" with respect to any Person means:

(1) the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such Person) or similar payment to the direct or indirect holders of its Capital Stock (other than (A) dividends or distributions payable solely in its Capital Stock (other than Disqualified Stock), (B) dividends or distributions payable solely to the Company, a Restricted Subsidiary or a Regulated Subsidiary, (C) *pro rata* dividends or other distributions made by a Subsidiary that is not a Wholly Owned Subsidiary to minority stockholders (or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a corporation) and (D) dividends or distributions on Class B Equity Interests in accordance with their terms, other than to any Affiliates of the Company, except to the extent any such Affiliate is an employee.)

(2) the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of the Company or Parent held by any Person (other than by a Restricted Subsidiary or Regulated Subsidiary), including in connection with any merger or consolidation;

(3) the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Obligations of the Company or any Subsidiary Guarantor (other than (A) from the Company, a Restricted Subsidiary or a Regulated Subsidiary or (B) the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Obligations purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or retirement); or

(4) the making of any Investment (other than a Permitted Investment) in any Person.

"*Restricted Subsidiary*" means any Subsidiary of the Company (including, without limitation, Refco Finance Inc.) that is neither an Unrestricted Subsidiary nor a Regulated Subsidiary.

"*Sale/Leaseback Transaction*" means an arrangement relating to property owned by the Company, a Restricted Subsidiary or a Regulated Subsidiary on the Issue Date or thereafter acquired by the Company, a Restricted Subsidiary or a Regulated Subsidiary whereby the Company, such Restricted Subsidiary or such Regulated Subsidiary transfers such property to a Person and the Company, such Restricted Subsidiary or such Regulated Subsidiary leases it from such Person.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Indebtedness*" of any Person means any Indebtedness of such Person secured by a Lien.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Securityholders Agreement*" means the Securityholders Agreement dated the Acquisition Date by and among Refco Group Ltd., LLC, Refco Group Holdings, Inc., THL Refco Acquisition Partners, the Executive Investors (as defined therein), the Employees (as defined therein) and the other parties from time to time party thereto.

"*Senior Indebtedness*" means with respect to any Person:

(1) Indebtedness of such Person, whether outstanding on the Issue Date or thereafter Incurred; and

(2) all other Obligations of such Person (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to such Person whether or not post-filing

interest is allowed or allowable in such proceeding) in respect of Indebtedness described in clause (1) above

unless, in the case of clauses (1) and (2), in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such Indebtedness or other Obligations are subordinate or *pari passu* in right of payment to the Notes or the Subsidiary Guaranty of such Person, as the case may be; *provided*, *however*, that Senior Indebtedness shall not include:

(1)  any liability for federal, state, local or other taxes owed or owing by such Person;

(2)  any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(3)  any Indebtedness or other Obligation of such Person which is subordinate or junior in right of payment to any other Indebtedness or other Obligation of such Person; or

(4)  that portion of any Indebtedness which at the time of Incurrence is Incurred in violation of the Indenture.

Without limiting the generality of the foregoing, "Senior Indebtedness" shall also include the principal of, premium, if any, and interest on (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization whether or not post-filing interest is allowed or allowable in such proceeding):

(1)  Bank Indebtedness; and

(2)  all Hedging Obligations (and guarantees thereof) owed by the Company or any Subsidiary Guarantor to any institution that is a lender under the Credit Agreement (or an affiliate of such lender) at the time such Hedging Obligations are incurred,

in each case whether outstanding on the Issue Date or thereafter incurred.

*"Senior Subordinated Indebtedness"* means, with respect to any Person, the Notes (in the case of the Issuers), the Subsidiary Guaranty (in the case of a Subsidiary Guarantor) and any other Indebtedness of such Person that specifically provides that such Indebtedness is to rank *pari passu* with the Notes or such Subsidiary Guaranty, as the case may be, in right of payment and is not subordinated by its terms in right of payment to any Indebtedness or other obligation of such Person which is not Senior Indebtedness of such Person.

"*Significant Subsidiary*" means any Restricted Subsidiary or Regulated Subsidiary that would be a "significant subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC.

"*Standard & Poor's*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Stated Maturity*" means, except as otherwise provided, with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the final payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase or repayment of such Indebtedness at the option of the holder thereof or the lender thereunder upon the happening of any contingency unless such contingency has occurred).

"*Subordinated Obligation*" means, with respect to any Person, any Indebtedness of such Person (whether outstanding on the Issue Date or thereafter Incurred) which is subordinate or junior in right of payment to the Notes or a Subsidiary Guaranty of such Person, as the case may be, pursuant to a written agreement to that effect.

"*Subsidiary*" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of Voting Stock is at the time owned or controlled, directly or indirectly, by:

(1)   such Person;

(2)   such Person and one or more Subsidiaries of such Person; or

(3)   one or more Subsidiaries of such Person.

*provided*, *however*, that a limited partnership or similar passive collective investment entity that trades derivatives and in which the Company, any Restricted Subsidiary or any Regulated Subsidiary serves as general partner (or has a similar status) in the ordinary course of the Company's, such Restricted Subsidiary's or such Regulated Subsidiary's brokerage or asset management business shall not be deemed a Subsidiary.

"*Subsidiary Guarantor*" means each Subsidiary of the Company that executes the Indenture as a Subsidiary Guarantor on the Acquisition Date and each other Subsidiary of the Company that thereafter Guarantees the Notes pursuant to the terms of the Indenture.

"*Subsidiary Guaranty*" means a Guarantee by a Subsidiary Guarantor of the Issuers' obligations with respect to the Notes.

"*Swap Contracts*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward contracts, futures contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, repurchase agreements, reverse repurchase agreements, sell buy back and buy sell back agreements, and securities lending and borrowing agreements or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

"*Tax Distribution*" means any distribution by the Company to its direct or indirect owners which (i) with respect to quarterly estimated tax payments due in each calendar year shall be equal to twenty-five percent (25%) of the Income Tax Liabilities for such calendar year as estimated in writing by the chief financial officer of the Company, (ii) with respect to tax payments to be made with income tax returns filed for an entire taxable year or with respect to adjustments to such returns imposed by the Internal Revenue Service or other taxing authority, shall be equal to the Income Tax Liabilities for each taxable year minus the aggregate amount distributed for such taxable year as provided in clause (i) above and (iii) with respect to taxes not determined by reference to income, represents the amount of any such taxes imposed on a direct or indirect owner of the Company as a result of such owner's ownership of the equity of the Company. In the event the amount determined under clause (ii) is a negative amount, the amount of any Tax Distributions in the succeeding taxable year (or, if necessary, any subsequent taxable years) shall be reduced by such negative amount.

"*Temporary Cash Investments*" means any of the following:

(1)   readily marketable obligations issued or directly and fully guaranteed or insured by the United States or, any state, commonwealth or territory of the United States or any agency or instrumentality thereof having maturities of not more than two years from the date of

acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

(2) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated at least P-1 (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by Standard & Poor's and (iii) has combined capital and surplus of at least $200.0 million (any such bank being an "*Approved Domestic Bank*"), in each case with maturities of not more than 360 days from the date of acquisition thereof;

(3) commercial paper and variable or fixed rate notes issued by an Approved Domestic Bank (or by the parent company thereof) or any variable rate note issued by, or Guaranteed by a domestic corporation rated A-1 (or the equivalent thereof) or better by Standard & Poor's or P-1 (or the equivalent thereof) or better by Moody's, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(4) repurchase agreements entered into by any Person with a bank or trust company or recognized securities dealer having capital and surplus in excess of $200.0 million for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(5) investments, classified in accordance with GAAP as current assets of the Company or any of its Restricted Subsidiaries or Regulated Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $200.0 million, and the portfolios of which are limited such that 95% of such investments are of the character, quality and maturity described in clauses (1), (2), (3), (4) and (6) of this definition;

(6) solely with respect to any Foreign Subsidiary, non-dollar denominated (i) certificates of deposit of, bankers' acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business *provided* such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from Standard & Poor's is at least A-1 or the equivalent thereof or from Moody's is at least P-1 or the equivalent thereof (any such bank being an "*Approved Foreign Bank*") and maturing within twelve months of the date of acquisition and (ii) equivalents of demand deposit accounts which are maintained with an Approved Foreign Bank; and at least 100% of the amount of the repurchase obligations; and

(7) Investments of the type set forth in Commodity Futures Trading Commission Regulation 1.25 and SEC Regulation 15c3-3(e).

"*Transactions*" has the meaning set forth in this Offering Circular under the heading "Offering Circular Summary—Transactions."

"*Trustee*" means Wells Fargo Bank Minnesota, National Association until a successor replaces it and, thereafter, means the successor.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the Issue Date.

"*Trust Officer*" means the Chairman of the Board, the President or any other officer or assistant officer of the Trustee assigned by the Trustee to administer its corporate trust matters.

"*Unrestricted Subsidiary*" means:

(1) any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Governing Board of the Company in the manner provided below; and

(2) any Subsidiary of an Unrestricted Subsidiary.

The Governing Board of the Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary, but excluding Refco Finance Inc.) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Capital Stock or Indebtedness of, or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided*, *however*, that either (A) the Subsidiary to be so designated has total assets of $1,000 or less or (B) if such Subsidiary has assets greater than $1,000, such designation would be permitted under the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

The Governing Board of the Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary or a Regulated Subsidiary, as applicable; *provided*, *however*, that immediately after giving effect to such designation (A) the Company could Incur $1.00 of additional Indebtedness under paragraph (a) of the covenant described under "—Certain Covenants—Limitation on Indebtedness" and (B) no Default shall have occurred and be continuing. Any such designation by the Governing Board of the Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Governing Board of the Company giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"*U.S. Dollar Equivalent*" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as published in *The Wall Street Journal* in the "Exchange Rates" column under the heading "Currency Trading" on the date two Business Days prior to such determination.

Except as described under "—Certain Covenants—Limitation on Indebtedness," whenever it is necessary to determine whether the Company has complied with any covenant in the Indenture or a Default has occurred and an amount is expressed in a currency other than U.S. dollars, such amount will be treated as the U.S. Dollar Equivalent determined as of the date such amount is initially determined in such currency.

"*U.S. Government Obligations*" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable at the issuer's option.

"*Voting Stock*" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

"*Wholly Owned Subsidiary*" means a Restricted Subsidiary or Regulated Subsidiary all the Capital Stock of which (other than directors' qualifying shares or Class B Equity Interests) is owned by the Company or one or more other Wholly Owned Subsidiaries.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain material U.S. federal income, and to a limited extent under the caption "Non-U.S. Holders," estate tax consequences of the purchase, ownership and disposition of the notes. This discussion is a general summary only and does not address all tax aspects of the purchase, ownership and disposition of the notes that may be relevant to a prospective investor's particular circumstances. This discussion deals only with the U.S. federal income tax consequences to persons who are beneficial owners of notes, who purchased such notes at original issuance for their original "issue price" and who hold such notes as capital assets within the meaning of Section 1221 of the Code, as defined below, and does not deal with the consequences to special classes of holders of the notes, such as dealers in securities or currencies, brokers, traders that mark-to-market their securities, insurance companies, tax-exempt entities, financial institutions or "financial services entities," persons with a functional currency other than the U.S. dollar, regulated investment companies, real estate investment trusts, retirement plans, expatriates or former long-term residents of the United States, persons who hold their notes as part of a straddle, hedge, "conversion transaction," "constructive sale," or other integrated investment, persons subject to the alternative minimum tax, partnerships or other pass-through entities or investors in partnerships or other pass-through entities that hold the notes. For purposes of this discussion, "issue price" is the first price at which a substantial amount of the notes are sold to the public for money, excluding sales to bond houses, brokers or similar persons acting in the capacity of underwriters, placement agents or wholesalers. For purposes of this discussion "we," "us," or "our" refer to Refco Group Ltd., LLC. This summary also does not address any tax consequences arising under the tax laws of any U.S. state, local, foreign or other taxing jurisdiction or, except to a limited extent under the caption "Non-U.S. Holders," any possible applicability of the U.S. federal estate or gift tax law. The discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury Regulations promulgated thereunder, and rulings and judicial interpretations thereof, all as in effect on the date of this offering circular, any of which may be repealed or subject to change, possibly with retroactive effect. In addition, this discussion relies upon the description provided to us by DTC of its depositary procedures and the procedures of its participants and indirect participants in maintaining a book-entry system reflecting beneficial ownership of the notes.

For purposes of the following discussion, a "U.S. Holder" is a beneficial owner of a note that is, for U.S. federal income tax purposes: (1) an individual who is a citizen or resident of the United States, (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) organized or created under the laws of the United States, any state thereof, or the District of Columbia, (3) an estate whose income is includible in gross income for U.S. federal income tax purposes regardless of its source or (4) a trust (i) if (x) a court within the United States can exercise primary supervision over its administration and (y) one or more U.S. persons have authority to control all of its substantial decisions or (ii) if it has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. In addition, for purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of a note that is an individual, a corporation, an estate or a trust other than a U.S. Holder. Because U.S. federal tax law uses different tests to determine whether an individual is a non-resident alien for income tax and estate tax purposes, some individuals may be "Non-U.S. Holders" for purposes of the U.S. federal income tax discussion, but not for the purpose of the U.S. federal estate tax discussion and vice versa.

Purchasers of the notes should consult their own tax advisors concerning the U.S. federal income tax consequences resulting from their particular situations, and concerning any U.S. state, local, gift and estate tax consequences or other consequences under the laws of any other taxing jurisdiction.

**U.S. Holders**

### Payment of Interest

Payment of stated interest on a note will be taxable as ordinary interest income at the time it is received or accrued, depending upon the method of accounting applicable to the U.S. Holder of the note.

### Sale or Exchange of the Notes

Unless a non-recognition provision applies, upon a sale or exchange (including a redemption or a repurchase, for example in the event of a change in control) of a note, a U.S. Holder will recognize gain or loss equal to the difference between the sum of all cash plus the fair market value of all property received on such sale or exchange (less any portion allocable to accrued but unpaid interest, which will be treated as a payment of interest for U.S. federal income tax purposes) and the U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in a note generally will be the U.S. Holder's cost therefor.

Gain or loss recognized by a U.S. Holder on the sale or exchange of a note will be capital gain or loss, and will be long-term capital gain or loss if the note has been held by the U.S. Holder for more than one year at the time of the disposition. In the case of a non-corporate U.S. Holder, long-term capital gain is currently subject to a maximum U.S. federal tax rate of 15%. The deductibility of capital losses by U.S. Holders is subject to certain limitations.

### Exchange Offer in Connection with Registration of the Notes

The exchange of notes for registered notes (with substantially identical terms) in the exchange offer, as described under "Description of the Notes—Registered Exchange Offer; Registration Rights" will not be a taxable event for U.S. federal income tax purposes, and a U.S. Holder will have the same adjusted tax basis and holding period in such registered notes that the U.S. Holder had in the exchanged notes immediately before the exchange. The U.S. federal income tax consequences of holding and disposing of such registered notes will be the same as those for the notes described in this offering circular.

### Discharge

Were we to obtain a discharge of the indenture with respect to all of the notes then outstanding, as described above under "Description of the Notes—Satisfaction and Discharge," such discharge would generally be deemed to constitute a taxable exchange of the notes outstanding for other property—namely, the funds deposited with the Trustee. In such case, a U.S. Holder would generally be required to recognize capital gain or loss in connection with such deemed exchange in a manner comparable to that discussed above under "—Sale or Exchange of the Notes." In addition, after such deemed exchange, a U.S. Holder may also be required to recognize income from the property deemed to have been received in such exchange over the remaining life of the transaction in a manner or amount that is different than had the discharge not occurred. U.S. Holders should consult their tax advisors as to the specific consequences arising from a discharge in their particular situations.

### Registration Rights; Additional Interest; Change of Control Repurchase

Our failure to fulfill our obligation concerning the registration of the notes, as described under "Description of the Notes—Registered Exchange Offer; Registration Rights," will cause additional

161

interest to accrue on the notes in the manner described therein. According to the applicable Treasury Regulations, the possibility of a change in the interest rate on the notes will not affect the amount or timing of interest income recognized by a holder of a note if the likelihood of the change, as of the date the notes are issued, is remote. We intend to take the position, which is not binding on the Internal Revenue Service (the "IRS"), that the possibility of payment of additional interest on the notes is remote and do not intend to treat that possibility as affecting the yield to maturity of the notes (for purposes of the original issue discount provisions of the Code). Accordingly, any additional interest payable to holders of the notes should be includible in gross income by a U.S. Holder at the time the payment is made or accrues in accordance with such U.S. Holder's regular method of tax accounting. If the IRS were to successfully challenge our position, the amount or timing of interest income recognized by a holder of a note may have to be redetermined.

Similarly, we intend to take the position that the likelihood of a repurchase of notes by us in the event of a change in control is remote under applicable Treasury Regulations and do not intend to treat that possibility as affecting the yield to maturity of the notes (for purposes of the original issue discount provisions of the Code).

We have the option to redeem a portion of the notes at any time on or before a certain date, and to redeem all or a portion of the notes on or after a certain date prior to the maturity date. Under applicable Treasury Regulations, we will be deemed to have exercised that option if the exercise of that option would lower the yield of the notes. We believe that we will not be treated as having exercised that option under these Treasury Regulations.

### Backup Withholding and Information Reporting

In general, a U.S. Holder of a note will be subject to backup withholding (currently at the rate of 28%) with respect to interest, principal and premium, if any, paid on the note, payments received on the sale or exchange of the note (including a redemption or a repurchase, for example in the event of a change in control or a discharge (as described above under "Description of the Notes—Satisfaction and Discharge" and under "—Discharge")), and any payments with respect to the property or rights to the property deemed to have been received as described above under "—Discharge," unless the U.S. Holder (1) is an entity (including a corporation or a tax-exempt entity) that is exempt from withholding and, when required, demonstrates this fact or (2) provides us or our paying agent with its Taxpayer Identification Number ("TIN") (which, for an individual, would be the U.S. Holder's Social Security Number), certifies that (i) the TIN provided is correct, (ii) it is a U.S. person (including a U.S. resident alien) and (iii) it is exempt from backup withholding, it has not been notified by the IRS that it is subject to backup withholding due to underreporting of interest or dividends or it has been notified by the IRS that it is no longer subject to backup withholding, and otherwise complies with the applicable requirements of the backup withholding rules. In addition, such payments of interest, principal and premium, if any, such payments received on the sale or exchange of a note (including a redemption or a repurchase, for example in the event of a change in control or a discharge (as described above under "Description of the Notes—Satisfaction and Discharge" and under "—Discharge")), and any payments with respect to the property or rights to the property deemed to have been received as described above under "—Discharge," to U.S. Holders that are not corporations or tax-exempt organizations will generally be subject to information reporting requirements.

Backup withholding is not an additional tax. The amount of any backup withholding from a payment to a U.S. Holder will be allowed as a credit against such U.S. Holder's federal income tax liability and may entitle such U.S. Holder to a refund, provided that the required information is furnished to the IRS.

162

**Non-U.S. Holders**

For purposes of the discussion below, interest and any gain on the sale or exchange (including a redemption or a repurchase, for example in the event of a change in control or a discharge, as described above under "Description of the Notes—Satisfaction and Discharge") of a note will be considered to be "U.S. trade or business income" if such income or gain is (1) effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business or (2) in the case of a treaty resident, described in clause (1) above, and attributable to a U.S. permanent establishment (or, in the case of an individual, a fixed base) maintained by the Non-U.S. Holder in the United States.

*Payment of Interest*

Subject to the discussion below concerning backup withholding, generally, interest paid on a note will not be subject to U.S. federal income or withholding tax if such interest is not U.S. trade or business income and is "portfolio interest." Generally, interest on the notes will qualify as portfolio interest and will be eligible for the portfolio interest exemption if the Non-U.S. Holder (1) does not actually or constructively own 10% or more of the total combined voting power of all of our classes of stock entitled to vote, in the case that we are taxable as a corporation for federal income tax purposes, or 10% or more of the capital and profits interests in us, in the case that we are treated as a partnership for federal income tax purposes, (2) is not a "controlled foreign corporation" with respect to which we are a "related person," as such terms are defined in the Code, (3) is not a bank described in Section 881(c)(3)(A) of the Code and (4) provides the required certifications, under penalties of perjury, that the beneficial owner of the notes is not a U.S. person on a properly completed and executed IRS Form W-8BEN prior to the payment.

The gross amount of payments of interest that do not qualify for the portfolio interest exemption and that are not U.S. trade or business income will be subject to U.S. withholding tax at a rate of 30% unless a treaty applies to reduce or eliminate withholding. U.S. trade or business income will be taxed on a net basis at regular graduated U.S. federal income tax rates rather than the 30% gross rate. In the case of a Non-U.S. Holder that is a corporation, such U.S. trade or business income also may be subject to the branch profits tax. To claim an exemption from withholding in the case of U.S. trade or business income, or to claim the benefits of a treaty, a Non-U.S. Holder must provide a properly executed IRS Form W-8ECI (in the case of U.S. trade or business income) or IRS Form W-8BEN (in the case of a treaty), or any successor form as the IRS designates, as applicable, prior to the payment of interest. These forms must be periodically updated. If the notes are traded on an established financial market, a Non-U.S. Holder who is claiming the benefits of a treaty will not be required to obtain and to provide a U.S. TIN on the IRS Form W-8BEN. In certain circumstances, in lieu of providing an IRS Form W-8BEN, the Non-U.S. Holder may provide certain documentary evidence issued by foreign governmental authorities to prove residence in a foreign country in order to claim treaty benefits.

Special procedures relating to U.S. withholding taxes are provided under applicable Treasury Regulations for payments through qualified intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

*Sales or Exchange of the Notes*

Except as described below and subject to the discussion below on backup withholding, gain realized by a Non-U.S. Holder on the sale or exchange (including a redemption or a repurchase, for example in the event of a change in control or a discharge, as described above under "Description of the Notes—Satisfaction and Discharge") of a note generally will not be subject to U.S. federal income

or withholding tax, unless (1) such gain constitutes U.S. trade or business income, which will be taxed as discussed above (including, if applicable, at tax rates for capital gain income), or (2) the Non-U.S. Holder is an individual who holds the note as a capital asset and is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

### Discharge

As described above under "—U.S. Holders—Discharge," a Non-U.S. Holder also may be required to recognize income with respect to the property or rights to the property deemed to have been received in such taxable exchange over the remaining life of the transaction in a manner or amount that is different than had the discharge not occurred, and such income may be subject to U.S. income and/or withholding taxes. Non-U.S. Holders should consult their tax advisors as to the specific consequences arising from a discharge in their particular situations.

### Federal Estate Tax

Any notes held (or treated as held) by an individual who is a Non-U.S. Holder at the time of his or her death will not be subject to U.S. federal estate tax, provided that the individual does not actually or constructively own 10% or more of the total combined voting power of all of our classes of stock entitled to vote, in the case that we are taxable as a corporation for federal income tax purposes, or 10% or more of the capital and profits interests in us, in the case that we are treated as a partnership for federal income tax purposes, and income on the notes was not U.S. trade or business income.

### Information Reporting and Backup Withholding

We must report annually to the IRS and to each Non-U.S. Holder any interest that is paid to a Non-U.S. Holder. Copies of these information returns may also be made available to the tax authorities of the country in which the Non-U.S. Holder resides under the provisions of various treaties or agreements for the exchange of information.

Non-U.S. Holders other than corporations may be subject to backup withholding and additional information reporting. Backup withholding will not apply to payments of interest on the notes to a Non-U.S. Holder if the Non-U.S. Holder properly certifies that it is not a U.S. person or otherwise establishes an exemption. However, such certification or exemption is not effective if we or our paying agent has actual knowledge, or reason to know, that such holder is a U.S. person or that the conditions of another exemption relied upon by the Non-U.S. Holder are not, in fact, satisfied.

The payment of the gross proceeds from the sale or exchange (including a redemption or a repurchase, for example in the event of a change in control or a discharge, as described under "Description of the Notes—Satisfaction and Discharge" and "—Discharge") of the notes to or through the U.S. office of any broker, U.S. or foreign, will be subject to information reporting and possible backup withholding unless the Non-U.S. Holder certifies as to its non-U.S. status under penalties of perjury or otherwise establishes an exemption, provided that the broker does not have actual knowledge, or reason to know, that the Non-U.S. Holder is a U.S. person or that the conditions of any other exemption are not, in fact, satisfied. The payment of the gross proceeds from the sale or exchange (including a redemption or a repurchase, for example in the event of a change in control or a discharge, as described under "Description of the Notes—Satisfaction and Discharge" and "—Discharge") of the notes to or through a non-U.S. office of a non-U.S. broker will not be subject to information reporting or backup withholding unless the non-U.S. broker has certain types of relationships with the United States (a "U.S. related person"). In the case of the payment of the gross proceeds from the sale or exchange (including a redemption or a repurchase, for example in the event

164

of a change in control or a discharge, as described under "Description of the Notes—Satisfaction and Discharge" and "—Discharge") of the notes to or through a non-U.S. office of a broker that is either a U.S. person or a U.S. related person, the Treasury Regulations require information reporting (but not backup withholding) on the payment unless the broker has documentary evidence in its files that the owner is not a U.S. person and the broker has no knowledge, or reason to know, to the contrary.

In addition, in general, any payments with respect to the property or rights to the property deemed to have been received, as described above under "—Discharge," may be subject to information reporting and possible backup withholding, unless the Non-U.S. holder certifies as to its non-U.S. status under penalties of perjury or otherwise establishes an exemption, provided that the payor does not have actual knowledge, or reason to know, that the Non-U.S. Holder is a U.S. person or that the conditions of any other exemption are not, in fact, satisfied.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to a Non-U.S. Holder will be allowed as a refund or credit against such Non-U.S. Holder's federal income tax liability, provided that the required information is provided to the IRS.

**THE PRECEDING DISCUSSION OF THE MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE NOTES IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH INVESTOR SHOULD CONSULT ITS OWN TAX ADVISOR AS TO PARTICULAR TAX CONSEQUENCES TO IT OF PURCHASING, HOLDING AND DISPOSING OF NOTES, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY PROPOSED CHANGES IN APPLICABLE LAW.**

## PLAN OF DISTRIBUTION

Under the terms and subject to the conditions contained in a purchase agreement dated July 22, 2004, we have agreed to sell to the initial purchasers, for whom Credit Suisse First Boston LLC is acting as representative, the following respective principal amounts of the notes:

| Initial Purchasers | Principal Amount |
|---|---|
| Credit Suisse First Boston LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $270,000,000 |
| Banc of America Securities LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 165,000,000 |
| Deutsche Bank Securities Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 165,000,000 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $600,000,000 |

The purchase agreement provides that the initial purchasers are obligated to purchase all of the notes if any are purchased. The purchase agreement also provides that if an initial purchaser defaults the purchase commitments of the non-defaulting initial purchasers may be increased or the offering may be terminated.

The initial purchasers propose to offer the notes in the United States and Canada initially at the offering price on the cover page of this offering circular and may also offer the notes to selling group members at the offering price less a selling concession. After the initial offering, the offering price may be changed.

The notes have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except to qualified institutional buyers in reliance on Rule 144A under the Securities Act and to persons in offshore transactions in reliance on Regulation S under the Securities Act. Each of the initial purchasers has agreed that, except as permitted by the purchase agreement, it will not offer, sell or deliver the notes (i) as part of its distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the closing date, within the United States or to, or for the account or benefit of, U.S. persons, and it will have sent to each broker-dealer to which it sells notes in reliance on Regulation S during such 40-day period, a confirmation or other notice detailing the restrictions on offers and sales of the notes within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act. Resales of the notes are restricted as described under "Transfer Restrictions."

In addition, until 40 days after the commencement of the offering, an offer or sale of notes within the United States by a broker-dealer (whether or not it is participating in the offering), may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than pursuant to Rule 144A.

Each of the initial purchasers severally represents and agrees that:

- it has not offered or sold and prior to the expiry of a period of six months from the closing date, will not offer or sell any notes to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995;

- it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the

meaning of Section 21 of the Financial Services and Markets Act 2000 (the "FSMA")) received by it in connection with the issue or sale of any notes in circumstances in which Section 21(1) of the FSMA does not apply to us or the guarantors; and

- it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

We have agreed that we will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, or file with the SEC a registration statement (except pursuant to the registration rights agreement in respect of the notes) under the Securities Act relating to, any U.S. dollar-denominated debt securities issued or guaranteed by us and having a maturity of more than one year from the date of issue, or publicly disclose our intention to make any offer, sale, pledge, disposition or filing, without the prior written consent of Credit Suisse First Boston LLC for a period of 180 days after the date of this offering circular.

We have agreed to indemnify the initial purchasers against liabilities or to contribute to payments which they may be required to make in that respect.

The notes are a new issue of securities for which there currently is no market. The notes are expected to be made eligible for trading in PORTAL. The initial purchasers have advised us that they intend to make a market in the notes as permitted by applicable law. They are not obligated, however, to make a market in the notes, and any market-making may be discontinued at any time at their sole discretion. In addition, any such market-making activity will be subject to the limits imposed by the Securities Act and the Exchange Act and may be limited during the exchange offer and the pendency of any shelf registration statement. Accordingly, no assurance can be given as to the development or liquidity of any market for the notes.

We expect that delivery of the notes will be made against payment therefore on or about the closing date specified on the cover page of this offering circular, which will be the tenth business day following the date of this offering circular (this settlement cycle being referred to as "T+10"). Under Rule 15c6-1 of the SEC under the Exchange Act, trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade notes on the date of this offering circular or the next succeeding business days will be required, by virtue of the fact that the notes initially will settle in T+10, to specify an alternate settlement cycle at the time of any such trade to prevent a failed settlement. Purchasers of notes who wish to trade notes on the date hereof or the next six succeeding business days should consult their own advisor.

The initial purchasers may engage in over-allotment, stabilizing transactions, covering transactions and penalty bids in accordance with Regulation M under the Exchange Act.

- Over-allotment involves sales in excess of the offering size, which creates a short position for the initial purchasers.

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- Covering transactions involve purchases of the notes in the open market after the distribution has been completed in order to cover short positions.

- Penalty bids permit the initial purchasers to reclaim a selling concession from a broker-dealer when the notes originally sold by such broker-dealer are purchased in a stabilizing or covering transaction to cover short positions.

These stabilizing transactions, covering transactions and penalty bids may cause the price of the notes to be higher than it would otherwise be in the absence of these transactions. These transactions, if commenced, may be discontinued at any time.

The initial purchasers and their affiliates have engaged in transactions with, and from time to time have performed services for, us, for which they received customary compensation. The initial purchasers and their affiliates may also engage in transactions with us or perform services for us in the future. In particular, each of the initial purchasers or their affiliates will act as lenders under our new senior credit facilities and may also act in other capacities thereunder. Each of the initial purchasers has engaged, and may continue to engage, in transactions with us in the ordinary course of our business as a provider of execution and clearing services in the derivatives, foreign exchange and fixed income markets for which they or us received customary compensation. Credit Suisse First Boston LLC also advised us in connection with the acquisition of us by affiliates of Thomas H. Lee Partners.

## NOTICE TO CANADIAN RESIDENTS

**Resale Restrictions**

The distribution of the notes in Canada is being made only on a private placement basis exempt from the requirement that we prepare and file a prospectus with the securities regulatory authorities in each province where trades of the notes are made. Any resale of the notes in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the notes.

**Representations of Purchasers**

By purchasing the notes in Canada and accepting a purchase confirmation a purchaser is representing to us and the dealer from whom the purchase confirmation is received that:

- the purchaser is entitled under applicable provincial securities laws to purchase the notes without the benefit of a prospectus qualified under those securities laws,

- where required by law, that the purchaser is purchasing as principal and not as agent, and

- the purchaser has reviewed the text above under "—Resale Restrictions."

**Rights of Action—Ontario Purchasers Only**

Under Ontario securities legislation, a purchaser who purchases a security offered by this circular during the period of distribution will have a statutory right of action for damages, or while still the owner of the notes, for rescission against us in the event that this circular contains a misrepresentation. A purchaser will be deemed to have relied on the misrepresentation. The right of action for damages is exercisable not later than the earlier of 180 days from the date the purchaser first had knowledge of the facts giving rise to the cause of action and three years from the date on which payment is made for the notes. The right of action for rescission is exercisable not later than 180 days from the date on which payment is made for the notes. If a purchaser elects to exercise the right of action for rescission, the purchaser will have no right of action for damages against us. In no case will the amount recoverable in any action exceed the price at which the notes were offered to the purchaser and if the purchaser is shown to have purchased the securities with knowledge of the misrepresentation, we will have no liability. In the case of an action for damages, we will not be liable for all or any portion of the damages that are proven to not represent the depreciation in value of the notes as a result of the misrepresentation relied upon. These rights are in addition to, and without derogation from, any other rights or remedies available at law to an Ontario purchaser. The foregoing is a summary of the rights available to an Ontario purchaser. Ontario purchasers should refer to the complete text of the relevant statutory provisions.

**Enforcement of Legal Rights**

All of our managers or directors and officers as well as the experts named herein may be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon us or those persons. All or a substantial portion of our assets and the assets of those persons may be located outside of Canada and, as a result, it may not be possible to satisfy a judgment against us or those persons in Canada or to enforce a judgment obtained in Canadian courts against us or those persons outside of Canada.

**Taxation and Eligibility for Investment**

Canadian purchasers of the notes should consult their own legal and tax advisors with respect to the tax consequences of an investment in the notes in their particular circumstances and about the eligibility of the notes for investment by the purchaser under relevant Canadian legislation.

## TRANSFER RESTRICTIONS

The notes have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S under the Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the initial purchasers are offering the notes only to (a) qualified institutional buyers in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 144A and (b) persons in offshore transactions in reliance on Regulation S.

Each purchaser of the notes offered otherwise than in reliance on Regulation S (the "Restricted Notes") will be deemed to have represented and agreed as follows (terms used in this paragraph that are defined in Rule 144A, Regulation S or Regulation D under the Securities Act are used herein as defined therein):

(1) The purchaser (i) is a qualified institutional buyer, (ii) is aware that the sale to it is being made in reliance on Rule 144A and (iii) is acquiring the notes for its own account or for the account of a qualified institutional buyer.

(2) The purchaser understands that the Restricted Notes are being offered in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that such notes have not been and, except as described in this offering circular, will not be registered under the Securities Act and that (A) if in the future it decides to offer, resell, pledge or otherwise transfer any of the notes, such notes may be offered, resold, pledged or otherwise transferred only (i) in the United States to a person whom the seller reasonably believes is a qualified institutional buyer in a transaction meeting the requirements of Rule 144A, (ii) outside the United States in a transaction complying with the provisions of Rule 904 under the Securities Act, (iii) to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) that, prior to such transfer, furnishes to the trustee a signed letter containing certain representations and agreements relating to the transfer of the notes and, if such transfer is in respect of an aggregate principal amount of notes less than $250,000, an opinion of counsel acceptable to the company that such transfer is in compliance with the Securities Act, (iv) pursuant to an exemption from registration under the Securities Act provided by Rule 144 (if available) or (v) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (v), in accordance with any applicable securities laws of any state of the United States, and that (B) the purchaser will, and each subsequent holder is required to, notify any subsequent purchaser of the notes from it of the resale restrictions referred to in (A) above.

(3) The purchaser understands that the Restricted Notes will, until the expiration of the applicable holding period with respect to the notes set forth in Rule 144(k) of the Securities Act, unless otherwise agreed by us and the holder thereof, bear a legend substantially to the following effect (the "Restricted Notes Legend"):

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THIS NOTE IS HEREBY NOTIFIED THAT THE SELLER OF THIS NOTE MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS NOTE AGREES FOR THE BENEFIT OF THE ISSUERS THAT (A) THIS NOTE MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (I) IN THE UNITED STATES TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) TO AN "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501(a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT) THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS RELATING TO THE TRANSFER OF THIS NOTE (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NOTES LESS THAN $250,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUERS THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT, (IV) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE) OR (V) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (V), IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

Each purchaser of the notes offered in reliance on Regulation S will be deemed to have represented and agreed that it is not a U.S. person and is purchasing such notes in an offshore transaction (as such terms are defined in Regulation S) pursuant to Regulation S and understands that such notes will, unless otherwise agreed by us and the holder thereof, bear a legend substantially to the following effect (the "Regulation S Legend"):

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.

Restricted Notes may be exchanged for notes not bearing the Restricted Notes Legend but bearing the Regulation S Legend upon certification by the transferor in the form set forth in the Indenture that the transfer of any such Restricted Notes has been made in accordance with Rule 904 under the Securities Act.

Each purchaser of the notes will be deemed to have represented and agreed as follows:

(1) Either: (A) the purchaser is not a Plan (which term includes (i) employee benefit plans that are subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) plans, individual retirement accounts and other arrangements that are subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or to provisions under applicable federal, state, local, non-U.S. or other laws or

regulations that are similar to such provisions of ERISA or the Code ("Similar Laws") and (iii) entities the underlying assets of which are considered to include "plan assets" of such plans, accounts and arrangements) and it is not purchasing the notes on behalf of, or with the "plan assets" of, any Plan; or (B) the purchaser's purchase, holding and subsequent disposition of the notes either (i) are not a prohibited transaction under ERISA or the Code and are otherwise permissible under all applicable Similar Laws or (ii) are entitled to exemptive relief from the prohibited transaction provisions of ERISA and the Code in accordance with one or more available statutory, class or individual prohibited transaction exemptions and are otherwise permissible under all applicable Similar Laws; and

(2)  The purchaser will not transfer the notes to any person or entity, unless such person or entity could itself truthfully make the foregoing representations and covenants.

## LEGAL MATTERS

Weil, Gotshal & Manges LLP, New York, New York has passed upon the validity of the notes offered hereby on behalf of the issuers. Refco Group Ltd., LLC has been represented by Mayer, Brown, Rowe & Maw LLP, Chicago, Illinois. The initial purchasers have been represented by Cravath, Swaine & Moore LLP, New York, New York.

## INDEPENDENT AUDITORS

The consolidated financial statements as of February 29, 2004 and February 28, 2003 and for the years then ended, included in this offering circular, have been audited by Grant Thornton LLP, independent auditors, as stated in their report appearing herein.

## GLOSSARY

| | |
|---|---|
| **Broker in Principal** | An individual or firm who acts as an intermediary or temporary dealer between a buyer and a seller and who either takes title to the asset on behalf of its client or has a client position offset by an equal but opposite position with a dealer. |
| **CBOE** | Chicago Board Options Exchange, which is a securities exchange created in the early 1970s for the public trading of standardized option contracts. Primary place for the trading of stock options, foreign currency options and index options. |
| **CBOT** | Chicago Board of Trade, which is the second largest derivatives exchange in the United States and a pioneer in the development of financial futures and options. |
| **CFMA** | Commodity Futures Modernization Act of 2000, which amended the Commodity Exchange Act, removing much regulation by the CFTC to which OTC derivatives had been subject previously. |
| **CFTC** | Commodity Futures Trading Commission, which is the federal regulatory agency that administers the Commodity Exchange Act. It is the federal oversight agency that monitors the futures and options on futures markets to detect and prevent price distortion and market manipulation and to protect the rights of customers who use the markets for either commercial or investment purposes. |
| **Clearing House** | An agency or corporation that acts as a central counterparty to the clearing members or FCMs on each side of a transaction. Clearing Houses are responsible for settling trading accounts, collecting and maintaining margin monies, regulating delivery and reporting trading data. |
| **CME** | Chicago Mercantile Exchange, which is the largest derivatives exchange in the United States and the second largest exchange in the world for the trading of futures and options on futures. CME has four major product areas based on interest rates, stock indexes, foreign exchange and commodities. |
| **Commodity Exchange Act** | The principal legislation governing the trading of commodities and futures in the United States. |
| **Commodity Pool Operator** | An individual or organization which operates or solicits funds for a pool in which funds contributed by a number of persons are combined for the purpose of trading futures or options contracts. Generally required to be registered with the CFTC. |
| **Commodity Trading Advisor** | A person who directly or indirectly advises others as to the advisability of buying or selling futures or commodity options. Most Commodity Trading Advisors may exercise trading authority over a customer's account. A Commodity Trading Advisor is generally required to be registered with the CFTC. |
| **Currenex** | A leading global provider of currency pricing systems. |

| | |
|---|---|
| **Derivatives** | Financial contracts whose value is derived from a traditional security (such as a stock or bond), an asset (such as a commodity) or a market index. Derivatives may be traded with or without the use of an exchange. |
| **E-mini** | E-minis are smaller versions of popular index funds that cover the entire S&P 500 and Nasdaq-100 indexes. E-minis are 20% the size of larger index contracts and allow for great flexibility when assembling a portfolio. E-mini trading is popular because it requires less of an initial capital investment, and it enables traders to diversify a portfolio and hedge against more focused investments. |
| **Eurex** | World's largest derivatives exchange, based on volume. This fully electronic exchange has 432 participants in 17 countries, creating decentralized and standardized access to its markets. |
| **Euronext** | Europe's first cross-border group of stock exchanges and their derivatives markets, formed by the merger of the stock exchanges of Amsterdam, Brussels and Paris in 2000. |
| **Exchange** | A marketplace in which shares, options and/or futures on stocks, bonds, commodities and indexes are traded. |
| **FCM** | Futures Commission Merchant, which is a firm engaged in soliciting or accepting and handling orders for the purchase or sale of futures contracts and accepting money or securities to provide margin for any resulting trades or contracts. An FCM must be registered with the CFTC. |
| **FICC** | Fixed Income Clearing Corporation, which is one of the leading clearing houses for the fixed income markets. |
| **Forward** | A contract in which a seller agrees to deliver a specified asset to a buyer at a specified price sometime in the future. In contrast to futures contracts, forward contracts are not standardized, not traded on exchanges and generally contemplate a delivery at settlement. |
| **Futures** | A legally binding agreement to buy or sell a commodity or financial instrument in a designated future month at a price agreed upon today by the buyer and seller. Futures contracts are standardized according to the quality, quantity, delivery time and location for each commodity. |
| **FXCM** | An FCM specializing solely in spot foreign exchange. FXCM has operations around the world, services over 40,000 retail customers and over 400 institutional customers from more than 80 countries and executes over 800,000 trades executed each month. |
| **LCH** | London Clearing House, which is a leading independent clearing house in Europe, serving major international exchanges and platforms, equity markets, exchange-traded derivatives markets, energy markets, the interbank interest rate swaps market and the majority of the Euro-denominated and sterling bond and repo markets. |

**LME**                  London Metal Exchange, which is a market for trading base metals. LME prices are used as reference prices in many world markets by metals producers and fabricators of metal products and are the basis for most major commodity indices.

**Margin Deposits**      An amount of money or securities deposited by both buyers and sellers of futures contracts and by sellers of option contracts to ensure performance of the terms of the contract (the making or taking delivery of the commodity or the cancellation of the position by a subsequent offsetting trade). Margin in futures is not a down payment, as in securities, but rather a performance bond.

**Mark-to-Market**       To debit or credit a trading account on a daily basis based on the prices established at the close of that day's trading session.

**NASD**                 National Association of Securities Dealers, which is a nonprofit self-regulatory organization in which almost all registered broker-dealers must be members.

**NASDAQ**               The first and world's largest electronic stock market with a listing of nearly 4,100 companies.

**Net Capital**          The amount by which current assets exceed liabilities (adjusted for illiquid assets, certain operating capital charges, and potential adverse fluctuations in the value of securities inventory).

**NFA**                  National Futures Association, which is the industry wide self-regulatory organization of the futures industry. Congress authorized its creation in 1974, and the CFTC designated it a "registered futures association" in 1982.

**NYMEX**                New York Mercantile Exchange, which is the world's largest physical commodity derivatives exchange.

**NYSE**                 New York Stock Exchange, which is the largest equities marketplace in the world. Approximately 3,000 companies and nearly $16 trillion in global market capitalization are listed on the exchange

**Option**               A right, but not the obligation, to buy or sell an asset at a set price on or before a given date.

**OTC Market**           Over-The-Counter Market, which is a decentralized market where geographically dispersed dealers are linked by telephones and computer screens. The market is for securities not listed on exchanges.

**Prime Brokerage**      A suite of specialized brokerage and related services provided by financial institutions to their clients, primarily hedge funds.

**Repo**                 Repurchase agreement, which is an agreement in which one party sells a security to another party and agrees to repurchase it on a specified date for a specified price. This represents a collateralized short-term loan, where the collateral may be a Treasury security, money market instrument, federal agency security or mortgage-backed security. A reverse repurchase agreement, otherwise known as a "reverse repo," which is the purchase of a security at a specified price with an agreement to sell the same or substantially the same security to the same counterparty at a fixed or determinable price at a future date.

175

| | |
|---|---|
| **Repurchase Transaction** | See the definition for "repo." |
| **SEC** | Securities and Exchange Commission — A federal agency that regulates the U.S. financial markets. The SEC oversees the securities industry and promotes full disclosure in order to protect the investing public. |
| **Segregated Funds** | The amount of money, securities and property due to commodity futures or options customers, which is held in segregated accounts in compliance with Section 4d of the Commodity Exchange Act and CFTC Regulations. Such money, securities or property may not be comingled with the money, securities and property of the FCM, but the FCM may earn interest on it. |
| **Swap** | Each party agrees to pay the other an amount of interest calculated on a principal amount over several specified periods of time. If the principal amount is the same for both parties, the rate bases of calculation will be different, and it is called an interest rate swap. If the principal amounts are expressed in different currencies, it is called a currency swap. |
| **TSE** | Tokyo Stock Exchange, which is the largest stock exchange in Japan with some of the most active trading in the world. |

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Certified Public Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-2

Consolidated Balance Sheets as of February 29, 2004 and February 28, 2003 . . . . . . . . . . . . . .     F-3

Consolidated Statements of Income for the years ended February 29, 2004,
   February 28, 2003 and February 28, 2002 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-4

Consolidated Statements of Changes in Members' Equity for the years ended February 29,
   2004, February 28, 2003 and February 28, 2002 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . .     F-5

Consolidated Statements of Cash Flows for the years ended February 29, 2004, February 28,
   2003 and February 28, 2002 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-6

Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-7

Consolidated Balance Sheets as of May 31, 2004 (unaudited) and February 29, 2004 . . . . . . . .     F-34

Consolidated Statements of Income for the three months ended May 31, 2004 and 2003
   (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-35

Consolidated Statements of Changes in Members' Equity for the three months ended May 31,
   2004 and 2003 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-36

Consolidated Statements of Cash Flows for the three months ended May 31, 2004 and 2003
   (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-37

Notes to Consolidated Financial Statements (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-38

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To the Members of
  **Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheets of Refco Group Ltd., LLC (the "Company") (a Delaware limited liability company) and subsidiaries (the "Group") as of February 29, 2004 and February 28, 2003, and the related consolidated statements of income, changes in members' equity and cash flows for each of the two years then ended. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the consolidated financial statements for the year ended February 28, 2002, and accordingly we do not express an opinion on them.

We conducted our audits in accordance with the auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the two years then ended in conformity with accounting principles generally accepted in the United States of America.


Grant Thornton LLP

New York, New York
April 27, 2004
(except for the matter described in Note H
for which the date is June 17, 2004)

REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

| | February 29, 2004 | February 28, 2003 |
|---|---|---|
| | (in thousands) | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 338,243 | $ 247,103 |
| Cash and securities segregated under federal and other regulations | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,375,838 | 1,949,846 |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . | 55,061 | 69,161 |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . . | 24,782,874 | 12,163,297 |
| Deposits with clearing organizations and others . . . . . . . . . . . . . . . . . . . . . . | 1,831,765 | 1,751,801 |
| Receivables from broker-dealers and clearing organizations . . . . . . . . . . . . | 504,810 | 303,751 |
| Receivables from customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,827,190 | 1,795,445 |
| Securities owned, at market or fair value . . . . . . . . . . . . . . . . . . . . . . . . . | 2,032,535 | 490,420 |
| Memberships in exchanges, (market value: 2004: $41,337, 2003: $33,738) . . | 15,869 | 18,689 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 567,987 | 425,916 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $33,332,172 | $19,215,429 |
| | | |
| Liabilities | | |
| Short-term borrowings, including current portion of long-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 88,890 | $ 245,810 |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . | 25,630,299 | 12,779,456 |
| Payable to broker-dealers and clearing organizations . . . . . . . . . . . . . . . | 583,643 | 256,783 |
| Payable to customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,095,717 | 4,435,186 |
| Securities sold, not yet purchased, at market or fair value . . . . . . . . . . . . | 807,485 | 212,205 |
| Accounts payable, accrued expenses, and other liabilities . . . . . . . . . . . . | 174,149 | 160,128 |
| Long-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 315,500 | 383,500 |
| Subordinated debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,000 | 16,000 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32,711,683 | 18,489,068 |
| Commitments and contingent liabilities | | |
| Preferred securities issued by subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . | — | 160,000 |
| Membership interests issued by subsidiary . . . . . . . . . . . . . . . . . . . . . . . . . | 4,405 | — |
| Members' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 616,084 | 566,361 |
| Total liabilities and members' equity . . . . . . . . . . . . . . . . . . . . . . . . | $33,332,172 | $19,215,429 |

The accompanying notes are an integral part of these financial statements.

F-3

## REFCO GROUP LTD., LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF INCOME

| | Year ended | | |
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
|---|---|---|---|
| | | (in thousands) | (unaudited) |
| **Revenues** | | | |
| Commissions and brokerage . . . . . . . . . . . . . . . . . . . . . . . | $ 671,034 | $ 583,525 | $ 488,620 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,053,804 | 2,388,953 | 1,713,464 |
| Principal transactions, net . . . . . . . . . . . . . . . . . . . . . . . . | 175,011 | 83,449 | 99,195 |
| Asset management and advisory fees . . . . . . . . . . . . . . . . . | 47,911 | 44,222 | 62,690 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,775 | 4,641 | 3,663 |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,950,535 | 3,104,790 | 2,367,632 |
| **Expenses** | | | |
| Commissions and order execution costs . . . . . . . . . . . . . . . | 411,894 | 385,375 | 323,657 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 898,658 | 2,182,466 | 1,557,869 |
| Employee compensation and benefits . . . . . . . . . . . . . . . . . | 238,476 | 211,830 | 198,453 |
| General, administrative and other . . . . . . . . . . . . . . . . . . . . | 200,902 | 167,464 | 171,492 |
| Total expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,749,930 | 2,947,135 | 2,251,471 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . | 200,605 | 157,655 | 116,161 |
| Provision for income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | 12,176 | 1,960 | 6,951 |
| Income before dividends on preferred securities issued by subsidiaries and members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 188,429 | 155,695 | 109,210 |
| Dividends on preferred securities issued by subsidiaries . . . . . . | — | 15,576 | 15,576 |
| Members' interest in earnings of subsidiary . . . . . . . . . . . . . . | 1,273 | — | — |
| NET INCOME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 187,156 | $ 140,119 | $ 93,634 |

The accompanying notes are an integral part of these financial statements.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY

| | Members' equity | | |
|---|---|---|---|
| | Common capital | Other comprehensive income | Total |
| | | (in thousands) | |
| Balance, February 28, 2001 (unaudited) . . . . . . . . . . . . . . . . . . . | $ 509,263 | $(10,308) | $ 498,955 |
| Capital withdrawals (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . | (75,000) | — | (75,000) |
| Net income (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 93,634 | — | 93,634 |
| Currency translation adjustment (unaudited) . . . . . . . . . . . . . . | — | (2,473) | (2,473) |
| Balance, February 28, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 527,897 | (12,781) | 515,116 |
| Capital withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (100,000) | — | (100,000) |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140,119 | — | 140,119 |
| Currency translation adjustment . . . . . . . . . . . . . . . . . . . . . . . | — | 11,126 | 11,126 |
| Balance, February 28, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 568,016 | (1,655) | 566,361 |
| Capital withdrawals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (120,000) | — | (120,000) |
| Loss on early extinguishment of preferred securities issued by subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (39,774) | — | (39,774) |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 187,156 | — | 187,156 |
| Currency translation adjustment . . . . . . . . . . . . . . . . . . . . . . . | — | 22,341 | 22,341 |
| Balance, February 29, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 595,398 | $ 20,686 | $ 616,084 |

The accompanying notes are an integral part of these financial statements.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended | | |
|---|---|---|---|
| | February 29, 2004 | February 28, 2003 | February 28, 2002 |
| | | (in thousands) | (unaudited) |
| Cash flows from operating activities | | | |
| Net income ........................................ | $  187,156 | $  140,119 | $  93,634 |
| Noncash items included in net income | | | |
| Depreciation and amortization ....................... | 28,368 | 25,445 | 37,949 |
| Members' interest in earnings of subsidiary ................. | 1,273 | — | — |
| (Increase) decrease in operating assets | | | |
| Cash and securities segregated under federal and other regulations | | | |
| Cash and cash equivalents ...................... | 574,008 | (1,109,672) | (377,218) |
| Securities purchased under agreements to resell ....... | 14,100 | 86,351 | (82,700) |
| Securities purchased under agreements to resell .......... | (12,619,577) | 4,802,305 | (4,267,460) |
| Deposits with clearing organizations and others ........... | (79,964) | (698,744) | 240,825 |
| Receivables from broker-dealers and clearing organizations ... | (201,059) | 49,689 | 42,423 |
| Receivables from customers ........................ | (31,745) | 551,849 | (319,260) |
| Securities owned, at market or fair value ............... | (1,542,115) | (195,891) | 359,873 |
| Memberships in exchanges ......................... | 2,820 | (10,377) | — |
| Other assets ................................... | (51,509) | (16,564) | (42,654) |
| Increase (decrease) in operating liabilities | | | |
| Short-term borrowings, including current portion of long-term borrowings ................................. | (156,920) | 50,573 | 21,734 |
| Securities sold under agreements to repurchase ........... | 12,850,843 | (4,064,785) | 4,798,815 |
| Payable to broker-dealers and clearing organizations ....... | 326,860 | (42,921) | (169,528) |
| Payable to customers ............................. | 660,531 | 595,405 | (50,190) |
| Securities sold, not yet purchased, at market or fair value ..... | 595,280 | (71,327) | (251,709) |
| Accounts payable, accrued expenses and other liabilities ..... | 36,362 | (57,173) | 32,278 |
| Notes payable ................................. | — | — | (8,400) |
| Net cash (used in) provided by operating activities ..... | 594,712 | 34,282 | 58,412 |
| Cash flows from investing activities | | | |
| Acquisition of businesses, net of cash acquired .............. | (118,930) | (3,473) | — |
| Net cash used in investing activities ................. | (118,930) | (3,473) | — |
| Cash flows from financing activities | | | |
| Repayment of subordinated debt ...................... | — | — | (25,000) |
| Issuance of long-term borrowings ..................... | — | 222,500 | — |
| Repayment of long-term borrowings..................... | (68,000) | (68,000) | (33,000) |
| Payment for redemption of preferred securities issued by subsidiaries .................................... | (199,774) | — | — |
| Net contributions to membership interests issued by subsidiary ... | 3,132 | — | — |
| Capital withdrawals ............................. | (120,000) | (100,000) | (75,000) |
| Net cash (used in) provided by financing activities ...... | (384,642) | 54,500 | (133,000) |
| Net (decrease) increase in cash and cash equivalents .... | 91,140 | 85,309 | (74,588) |
| Cash and cash equivalents, beginning of year ................. | 247,103 | 161,794 | 236,382 |
| Cash and cash equivalents, end of year ..................... | $  338,243 | $  247,103 | $  161,794 |
| Supplemental cash flow disclosures: | | | |
| Income taxes paid ............................... | $    3,331 | $    6,032 | $    5,229 |
| Interest paid................................... | $  713,142 | $ 2,250,879 | $ 2,235,388 |

The accompanying notes are an integral part of these financial statements.

F-6

REFCO GROUP LTD., LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE A—ORGANIZATION

Refco Group Ltd., LLC (the "Company") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The Group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker-dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities and foreign exchange broker.

The Company is 90% owned by Refco Group Holdings, Inc., a Delaware corporation. The remaining 10% is owned by BAWAG Overseas, Inc., a third party financial institution.

## NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which does issue non-voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in "Other Assets."

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

The consolidated financial statements for the year ended February 28, 2002 are unaudited and in the opinion of management have been prepared on the same basis as the consolidated financial statements, for the fiscal years ended February 29, 2004 and February 28, 2003.

### Foreign currency translation

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year-end spot rate and revenues and expenses are translated at average rates of exchange for the fiscal year. Gains and losses resulting from foreign currency transactions are included in the consolidated statements of income. Gains and losses resulting from translating foreign currency financial statements into U.S. dollars are included in cumulative currency translation adjustment, which represents other comprehensive income, a separate component of members' equity.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

**Cash and cash equivalents**

Cash and cash equivalents are defined as cash and short-term liquid investments with original maturities of 90 days or less when acquired.

**Cash and securities segregated under federal and other regulations**

At February 29, 2004, and February 28, 2003, cash and securities of $1,430.9 million and $2,019.0 million, respectively, was segregated under various regulatory requirements.

**Securities purchased under agreements to resell and Securities sold under agreements to repurchase**

Securities purchased under agreements to resell and Securities sold under agreements to repurchase are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. These carrying amounts approximate their fair values. It is the Group's policy to take possession of securities purchased under agreements to resell, which consist largely of securities issued by the U.S. Government. The Group retains the right to re-pledge collateral received in secured financing transactions.

As permitted by FASB Interpretation No. 41, *Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements*, the Group nets certain securities purchased under agreements to resell and securities sold under agreements to repurchase for financial reporting purposes.

**Receivables from and payable to customers**

These balances primarily pertain to margin and open contractual commitments related to customers futures, foreign currencies and securities transactions. Receivables from and payable to customers in connection with futures and foreign currency transactions, include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions, include amounts due on cash and margin transactions. These receivables are generally collateralized with marketable securities. For certain receivables that are not fully secured and where the Group deems appropriate, the Group pursues collection of these receivables through various means, including legal action, and provides reserves when, in the opinion of management, such reserves are appropriate. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively. The Group generally nets receivables and payables related to its customers futures, foreign currency and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

**Financial instruments**

The consolidated balance sheets generally reflects purchases and sales of financial instruments owned or sold on a trade-date basis.

**Securities owned and Securities sold, not yet purchased**

Securities owned and Securities sold, not yet purchased consist primarily of U.S. and foreign equity and fixed-income securities which are stated at quoted market values, with unrealized gains and losses

F-8

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

recognized in income under "Principal transactions". Securities not readily marketable are valued at fair value as determined by management. Fair value is the amount at which an instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

**Derivative financial instruments**

As a broker, the Group enters into transactions involving derivative financial instruments in relation to its customer business. These transactions are generally immediately economically hedged by back-to-back trades with other financial institutions. All derivative financial instruments are carried at market value or, if market prices are not readily available, fair value. Market values for exchange-traded derivatives are based on quoted market prices. Fair market values for over-the-counter derivative financial instruments, are based on pricing models which are based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts.

Derivatives used for economic hedging purposes include swaps, forwards, futures, and purchased options. Unrealized gains or losses on these derivative contracts are recognized currently in the statement of income as Principal transactions. The Group does not apply hedge accounting as defined in SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as all financial instruments are marked to market with changes in fair values reflected in earnings. Therefore, the disclosures required in paragraphs 44 and 45 of the Statement are generally not applicable with respect to these financial instruments.

**Memberships in exchanges**

Exchange memberships comprise both rights to trade on exchanges and deposits made in relation to these memberships. Exchange memberships owned are recorded at cost and tested annually for impairment.

**Furniture, equipment and leasehold improvements**

Furniture, equipment and leasehold improvements are recorded at cost less accumulated depreciation and amortization. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, which range from three to seven years. Leasehold improvements are amortized over the lesser of the economic useful life of the improvement or the term of the lease.

**Impairment of assets**

The Company reviews its long-lived assets and intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets.

**Goodwill**

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets at acquisition date. Prior to March 1, 2002, goodwill was amortized over a period of 25 years on a straight-line basis. Effective March 1, 2002, the Group adopted SFAS No. 142, *Goodwill and Other*

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

*Intangible Assets*; consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. An impairment loss is triggered if the estimated fair value of an operating segment is less than its estimated net book value. Such loss is calculated as the difference between the estimated fair value of goodwill and its carrying value.

**Identifiable intangible assets**

Identifiable intangible assets consist primarily of customer relationships, asset management contracts, property management contracts and trade names. Customers relationships are amortized on an accelerated basis based upon projected cash flows. Asset management contracts and property management contracts are amortized over their estimated useful lives of 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's or asset group's carrying value may not be fully recoverable in accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets.* An impairment loss, calculated as the difference between the estimated fair value and the carrying value of an asset or asset group, is recognized if the expected undiscounted cash flows relating to the asset or asset group are less than the corresponding carrying value. Trade names have been classified as indefinite-lived assets and are not amortized but tested annually for impairment.

**Income taxes**

The Group has elected to be treated as a limited liability company for federal income tax purposes, as defined in the regulations. Under these regulations, members are responsible for their individual income tax liabilities related to the Group's operating results. Accordingly the Group has not provided for Federal income taxes related to its operating results. The provision for income taxes relates to income taxes of foreign subsidiaries and New York City Unincorporated Business tax.

**Revenue recognition**

Commissions and brokerage are recorded on a trade-date basis as securities transactions occur. Commissions and brokerage includes per contract charges for trade execution and clearing. Fees are charged at various rates based on the product traded and the method of trade. Commissions earned and related expenses on customers' open futures positions are recognized on a half-turn basis. The Group reports gross commission income on transactions executed by introducing brokers and reports commissions paid to introducing brokers as commission expense.

Interest is recognized on an accrual basis. Interest income or interest expense on repurchase agreements and collateralized financing arrangements are recognized as interest over the life of the transaction. Interest income and expense for matched repurchase agreement transactions are presented net in the consolidated statements of income.

The Group, as a broker of derivative products enters into contractual commitments, as principal, involving forward settlement. These contracts are generally immediately hedged with offsetting contracts which result in a profit spread for the Group. Both the contractual commitment and the offsetting contract are recorded at fair value. This profit spread is recognized immediately in the consolidated statements of income under "Principal transactions, net".

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Asset management and advisory fees primarily include fees from investment management and other financial service related products. These fees are recognized over the period in which the related service is provided.

**Recently issued accounting pronouncements**

In January 2003, the FASB issued Interpretation 46, *Consolidation of Variable Interest Entities*. In December 2003, the FASB issued Interpretation 46 Revised ("Interpretation 46 R"), *Consolidation of Variable Interest Entities*. In general, a variable interest entity is a corporation, partnership, trust, or any other legal structure used for business purposes that either (a) does not have equity investors with voting rights or (b) has equity investors that do not provide sufficient financial resources for the entity to support its activities. Interpretation 46 R requires a variable interest entity to be combined by a company if that company is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. The consolidation requirements of Interpretation 46 R apply in the first fiscal year or interim period ending after December 15, 2003 to variable interest entities created after January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after December 15, 2003 for "Special Purpose Entities" created before January 31, 2003. The consolidation requirements apply in the first fiscal year or interim period ending after March 15, 2004 for other entities created before January 31, 2003. Certain of the disclosure requirements apply to all financial statements issued after January 31, 2003, regardless of when the variable interest entity was established. As the Group does not have any interests in variable interest entities, the adoption of this statement did not have an effect on its consolidated financial statements.

In April 2003, the FASB issued SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*. SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FASB No. 133 *Accounting for Derivative Instruments and Hedging Activities*. This Statement is effective for derivative contracts and hedging instruments entered into after June 30, 2003. The adoption of this statement did not have a material impact on the Group's consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*. SFAS No. 150 establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity, and imposes certain additional disclosure requirements. The provisions of SFAS No. 150 are effective for financial instruments entered into or modified after May 31, 2003 and must be applied to all financial instruments at the beginning of the third quarter of 2003. The adoption of this statement did not have an effect on the Group's consolidated financial statements.

In December 2003, SFAS No. 132 (revised), *Employers' Disclosures about Pensions and Other Postretirement Benefits*, was issued. Statement 132 (revised) prescribes employers' disclosures about pension plans and other postretirement benefit plans; it does not change the measurement of recognition of those plans. The Statement retains and revises the disclosure requirements contained in the original SFAS 132. It also requires additional disclosures about the assets, obligations, cash flows, and net periodic benefit cost of defined benefit pension plans and other postretirement benefit plans. The Statement generally is effective for fiscal years ending after December 15, 2003. Management does

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

not believe the adoption of this statement will have a material impact on the Group's consolidated financial statements.

**NOTE C—SHORT-TERM BORROWINGS, LONG-TERM BORROWINGS AND OTHER BORROWINGS**

**Short-term borrowings**

The Group obtains short-term borrowings through bank loans. Short-term borrowings also include the portion of long-term borrowings maturing within one year and certain long-term borrowings that may be payable within one year at the option of the holder. The carrying value of these short-term obligations approximates fair value due to their short-term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers.

Short-term borrowings at year end are set forth below:

|  | 2004 | 2003 |
|---|---|---|
|  | (in thousands) | |
| Bank loans | $20,890 | $177,810 |
| Current portion of long-term borrowings | 68,000 | 68,000 |
| Total | $88,890 | $245,810 |

The weighted average interest rate on outstanding bank loans at February 29, 2004 and February 28, 2003 was 1.58% and 2.25%, respectively.

Interest rates paid on short-term borrowings, excluding the current portion of long-term borrowings for the years ended February 29, 2004 and February 28, 2003 ranged from 1.58% to 2.25% and 1.92% to 4.00%, respectively.

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE C—SHORT-TERM BORROWINGS, LONG-TERM BORROWINGS AND OTHER BORROWINGS (Continued)**

**Long-term borrowings**

Long-term borrowings of $383.5 million and $451.5 million for 2004 and 2003, respectively represents unsecured syndicated senior notes with major financial institutions. Long-term borrowings consist of the following loans:

| | 2004 | 2003 | Maturity Date | Interest Rate |
|---|---|---|---|---|
| | | (in thousands) | | |
| **Senior Notes** | | | | |
| Series A Senior Notes 2004 . . . . . . . . . . . . | $ 17,000 | $ 34,000 | 2004 | 7.18% |
| Senior Notes 2005 . . . . . . . . . . . . . . . . . . . | 74,000 | 111,000 | 2005 | 9.18% |
| Series B Senior Notes 2006 . . . . . . . . . . . . | 14,000 | 14,000 | 2006 | 7.42% |
| Senior Notes 2007 . . . . . . . . . . . . . . . . . . . | 56,000 | 70,000 | 2007 | 8.85% |
| Series A Senior Notes 2007 . . . . . . . . . . . . | 100,000 | 100,000 | 2007 | 5.99% |
| Series B Senior Notes 2009 . . . . . . . . . . . . | 122,500 | 122,500 | 2009 | 6.60% |
| | $383,500 | $451,500 | | |

The table below sets out the maturities of the Group's long-term borrowings.

| | 2004 | 2003 |
|---|---|---|
| 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ 68,000 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68,000 | 68,000 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51,000 | 51,000 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,000 | 28,000 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 114,000 | 114,000 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| 2010 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $122,500 | $122,500 |
| Total Senior Note Liabilities . . . . . . . . . . . . . . . . . . . . . . | 383,500 | 451,500 |
| Less: | | |
| Portion included within short-term borrowings . . . . . . . . . . | 68,000 | 68,000 |
| Total Long-term Senior Note Liabilities . . . . . . . . . . . . . . | $315,500 | $383,500 |

The long-term borrowings are subject to acceleration in the event of a change in control.

**Other borrowings**

Subordinated debt of $16.0 million, included in the consolidated balance sheets, consists of a subordinated loan from a member. The subordinated debt bears interest at the prime rate and matures June 1, 2005. For the years ended February 29, 2004 and February 28, 2003, the weighted-average interest rate on the subordinated debt was 4.08% and 4.60% respectively. Subordinated debt is subordinated to the claims of present and future general creditors.

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE C—SHORT-TERM BORROWINGS, LONG-TERM BORROWINGS AND OTHER BORROWINGS (Continued)**

Refco Preferred Capital Trust I, II and III, subsidiaries of the Company, had issued $160.0 million of Trust Originated Preferred Securities ("TOPRs") to third parties. At the beginning of the year, the Group paid $199.8 million to redeem the TOPRs, resulting in a charge to members' equity of $39.8 million.

**Contractual debt commitments**

The Company's contractual debt commitments are governed by certain agreements which require that the Group maintain specified levels of liquidity, net worth, funded debt to cash flow and cash flow to interest coverage.

**Credit Facilities**

The Group maintains a committed unsecured revolving credit facility of $364.5 million under an agreement with a syndicate of banks. As of February 29, 2004, no portion of the credit facility was utilized.

**NOTE D—SECURITIES OWNED AND SECURITIES SOLD, NOT YET PURCHASED**

Securities owned and Securities sold, not yet purchased, consist of trading and investment securities at market or fair value.

|  | 2004 | 2003 |
|---|---|---|
| Securities owned consists of: | | |
| U.S. Treasuries | $1,316,754 | $213,343 |
| Foreign governments | 290,317 | 102,149 |
| Options | 251,623 | 24,026 |
| Fund investments | 87,233 | 84,320 |
| Equities | 8,697 | 29,281 |
| Other | 77,911 | 37,301 |
|  | $2,032,535 | $490,420 |
| Securities sold, not yet purchased consist of: | | |
| U.S. Treasuries | $ 555,039 | $187,631 |
| Options | 251,172 | 24,554 |
| Other | 1,274 | 20 |
|  | $ 807,485 | $212,205 |

As of February 29, 2004 and February 28, 2003 the Group had not pledged any securities owned as collateral with counterparties.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE E—OTHER ASSETS

Other assets are generally less liquid, non-financial assets. The following table sets forth the Group's other assets by type:

|  | 2004 | 2003 |
|---|---|---|
|  | (in thousands) | |
| Goodwill(1) | $291,219 | $252,529 |
| Identifiable intangible assets(2) | 89,536 | 6,800 |
| Equity-method investments(3) | 65,504 | 27,513 |
| Investments | 36,578 | 40,255 |
| Furniture, equipment and leasehold improvements(4) | 47,829 | 57,728 |
| Miscellaneous receivables and other | 37,321 | 41,091 |
| Total | $567,987 | $425,916 |

(1) Goodwill

Prior to March 1, 2002 goodwill was amortized over 25 years on a straight-line basis. Upon the adoption of SFAS No. 142, amortization of goodwill ceased. The Company did not identify any impairment upon the adoption of this Standard. Had the provisions of SFAS 142 been applied as of the first day of the year ended February 28, 2002 net income would have been adjusted as follows:

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2004 | 2003 | 2002 |
|  | (in thousands) | | |
|  | | | (unaudited) |
| Net income, as reported | $187,156 | $140,119 | $ 93,634 |
| Goodwill amortization | — | — | 10,235 |
| Net income, excluding goodwill amortization | $187,156 | $140,119 | $103,869 |

(2) Identifiable intangible assets

The Company's identifiable intangible assets are comprised of the following:

|  | February 29, 2004 | | | February 28, 2003 | | |
|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|  | (in thousands) | | | | | |
| Customer relationships | $ 40,896 | $17,666 | $23,230 | $21,260 | $14,460 | $6,800 |
| Trade names | 2,278 | — | 2,278 | — | — | — |
| Asset management contracts | 55,414 | 355 | 55,059 | — | — | — |
| Property management contracts | 9,027 | 58 | 8,969 | — | — | — |
|  | $107,615 | $18,079 | $89,536 | $21,260 | $14,460 | $6,800 |

The amortization of identifiable intangible assets included in general, administrative and other expenses for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 (unaudited) was $3.62 million, $4.62 million and $7.70 million, respectively.

F-15

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE E—OTHER ASSETS (Continued)**

The estimated amortization expense, based on current identifiable intangible balances, for the next five fiscal years beginning March 1, 2004 is as follows:

|  | (in thousands) |
|---|---|
| Fiscal year | |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $7,260 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,570 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,153 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,897 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,741 |

(3) Equity method investments

Equity method investments as of February 29, 2004 comprise:

|  | Principal Activity | Percentage Owned | Country of operation | Carrying Value |
|---|---|---|---|---|
|  |  |  |  | (in thousands) |
| Forex Capital Markets, LLC . | Spot FX broker | 35% | United States | $47,522 |
| Friedberg Mercantile Group . | Investment dealer, futures commission merchant and fund manager | 50% | Canada | 9,066 |
| Refco Polaris Taiwan . . . . . . | Futures broker | 21.7% | Taiwan | 8,916 |
|  |  |  |  | $65,504 |

Under the equity method of accounting, the Company's initial investment is recorded at cost and is subsequently increased to reflect the Company's share of the investees' income and reduced to reflect the Company's share of the investees' losses or dividends received.

The excess of the Company's acquisition cost over the Company's share of the investee's identifiable net assets was identified as customer relationships, trade names and goodwill. The customer relationships are amortized over their estimated useful lives on an accelerated basis based upon projected cash flows. The related amortization expense was approximately $1.1 million, $0 million and $0 for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 (unaudited), respectively, resulting in a decrease in the carrying value of the equity method investments.

(4) Furniture, equipment and leasehold improvements

|  | Cost | Accumulated amortization/depreciation | 2004 Net book value | 2003 Net book value |
|---|---|---|---|---|
|  |  | (in thousands) | | |
| Furniture and equipment . . . . . . . . . . . | $118,311 | $ 82,545 | $35,766 | $46,586 |
| Leasehold improvements . . . . . . . . . . . | 32,323 | 20,260 | 12,063 | 11,142 |
|  | $150,634 | $102,805 | $47,829 | $57,728 |

Depreciation and amortization expense, included in general, administrative and other expenses, was $20.0 million, $17.8 million and $17.7 million in the years ended February 29, 2004, February 28, 2003 and February 28, 2002 (unaudited), respectively.

F-16

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE F—ACQUISITIONS**

During the year ended February 29, 2004, the Group acquired a number of businesses for an aggregate purchase price of $118.9 million. Amounts assigned to major intangible asset classes are as follows:

|  | (in thousands) |
|---|---|
| Goodwill | $32,575 |
| Customer relationships | 19,636 |
| Asset management contracts | 55,414 |
| Property management contracts | 9,027 |
| Trade names | 2,278 |

The Group is obtaining third party valuations of certain intangible assets and the allocation of purchase price for acquisitions which occurred after January 1, 2004 is therefore subject to refinement.

**NOTE G—NET CAPITAL REQUIREMENT**

The Group's subsidiary, Refco Securities, LLC, is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3-1 (the "Rule") which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of February 29, 2004, Refco Securities, LLC had net capital of $64.9 million, which was 42.9% of aggregate debit balances and $61.9 million in excess of required net capital.

The Group's subsidiary, Refco, LLC, is also subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4 percent of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of February 29, 2004, Refco, LLC had net capital of $223.6 million, which was $95.6 million in excess of required net capital.

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE H—COMMITMENTS AND CONTINGENCIES

### Commitments

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises excluding any escalation adjustments are as follows (in thousands):

| Fiscal year | |
|---|---:|
| 2005 | $15,243 |
| 2006 | 13,669 |
| 2007 | 11,558 |
| 2008 | 9,404 |
| 2009 | 6,383 |
| Thereafter | 25,038 |
| | $81,295 |

The Group's rent expense for the years ended February 29, 2004, February 28, 2003 and February 28, 2002 (unaudited) was $17.9 million, $15.2 million and $8.6 million, respectively.

### Contingencies

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers, alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003 the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. The remaining claim was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. A separate trial to determine damages is scheduled for the fall of 2004. The Group will seek to set aside the verdict. If the verdict is not set aside, the Group intends to appeal such decision and believes they have meritorious grounds for appeal. The Group also believes that, if that appeal is unsuccessful, the plaintiffs' alleged damages are substantially less than the $45 million they are claiming.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE H—COMMITMENTS AND CONTINGENCIES (Continued)**

United States Attorney's Office for the Southern District of New York, which called for the production of documents which had been provided to the SEC.

In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

**NOTE I—DERIVATIVE ACTIVITIES, OFF BALANCE SHEET AND CONCENTRATION OF CREDIT RISK**

In the normal course of its customer-driven operations, the Group enters into various contractual commitments, as principal, involving forward settlement. These include exchange-traded futures, fixed income swaps, equity swaps, foreign currency forwards and option contracts. These contracts are generally hedged with offsetting contracts at prices which result in a profit spread for the Group. The Group also enters into forward repurchase agreements. Customers and counterparties of the Group consist of entities in and outside the United States.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off balance sheet. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits.

The Group also enters into financing agreements, collateralized primarily by U.S. Government securities, in which it extends short-term credit to counterparties. The value and adequacy of the collateral are continually monitored.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouse its customers' performance under these contracts. The Group provides clearing services of futures and options to introducing brokers, some of which are guaranteed under commodity regulations with respect to their sales activity as a futures broker. The Group may require introducing brokers to deposit funds or pledge their exchange memberships, thereby reducing risks associated with the clearing of futures and options. Additionally, to reduce its risk, the Group requires customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer, which reduces the risk to the Group of failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements.

Management believes that the margin deposits held at February 29, 2004 were adequate to minimize the risk of material loss, which could be created by the positions held at that time.

F-19

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE J—FAIR VALUE OF FINANCIAL INSTRUMENTS**

SFAS No. 107 "*Disclosures about Fair Value of Financial Instruments*" requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Cash, Cash and securities segregated under federal and other regulations, Deposits with clearing organizations and others, Short-term borrowings and Payables to broker-dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long-term borrowings recorded at historical amounts which could differ from fair value as a result of changes in the Group's creditworthiness.

The following table provides a summary of the fair value of the Group's long-term borrowings. The fair value of the Group's long-term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

| | 2004 | 2003 |
|---|---|---|
| | (in thousands) | |
| Carrying value of long-term borrowings | $383,500 | $451,500 |
| Fair value of long-term borrowings | 399,990 | 481,202 |

The Group carries its secured financing activities, including Securities purchased under agreements to resell, Securities borrowed, Securities sold under agreements to repurchase, Securities loaned and Other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short-term in nature, carrying value approximates fair value.

F-20

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE K—SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL AND SECURITIES SOLD UNDER AGREEMENTS TO REPURCHASE

Securities purchased under agreements to resell ("resale agreements") and Securities sold under agreements to repurchase ("repurchase agreements") are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. The carrying amounts approximate their fair values. Where appropriate, resale and repurchase agreements with the same counterparty are reported on a net basis in accordance with FASB Interpretation No. 41 ("FIN 41"), "*Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements.*" The Group is required to present the following table when repurchase agreements are 10% or greater of total assets.

| | | | February 29, 2004 | | | |
|---|---|---|---|---|---|---|
| Security Type | Demand | Overnight | Less than 30 days | 30-90 days | Greater than 90 days | Total |
| | | | (in thousands) | | | |
| US Governments . . . . . . . . . | $ 420,805 | $10,980,829 | $4,012,729 | $2,804,362 | $1,098,520 | $19,317,245 |
| US Corporations . . . . . . . . . . | 101,109 | — | — | — | — | 101,109 |
| Foreign Governments . . . . . . | 68,542 | 178,169 | 680,594 | 470,710 | 339,848 | 1,737,863 |
| Foreign Corporations . . . . . . | 172,879 | — | — | — | — | 172,879 |
| Emerging Market Government . | 1,031,446 | 14,268 | 27,329 | — | — | 1,073,043 |
| Other . . . . . . . . . . . . . . . . . . | 1,795,994 | 1,088,527 | 6,461 | 285,928 | 51,250 | 3,228,160 |
| | $3,590,775 | $12,261,793 | $4,727,113 | $3,561,000 | $1,489,618 | $25,630,299 |

| | | | February 28, 2003 | | | |
|---|---|---|---|---|---|---|
| Security Type | Demand | Overnight | Less than 30 days | 30-90 days | Greater than 90 days | Total |
| | | | (in thousands) | | | |
| US Governments . . . . . . . . . | $2,060,573 | $ 3,042,755 | $ 615,409 | $ 912,946 | $2,474,561 | $ 9,106,244 |
| US Corporations . . . . . . . . . . | 17,534 | — | — | — | — | 17,534 |
| Foreign Governments . . . . . . | 101,774 | 1,012,168 | 809,633 | 222,370 | 447,945 | 2,593,890 |
| Foreign Corporations . . . . . . | 39,767 | 5,707 | — | — | — | 45,474 |
| Emerging Market Government . | 772,677 | 8,691 | 26,519 | — | — | 807,887 |
| Other . . . . . . . . . . . . . . . . . . | 53,182 | 154,742 | 503 | — | — | 208,427 |
| | $3,045,507 | $ 4,224,063 | $1,452,064 | $1,135,316 | $2,922,506 | $12,779,456 |

The Group's policy is to take possession of securities purchased under resale agreements, which consist largely of securities issued by the U.S. Government. The Group retains the right to re-pledge collateral received in secured financing transactions. As of February 29, 2004, substantially all of the collateral received had been re-pledged in connection with these financing activities. The market value of the collateral the Group received as of February 29, 2004 and February 28, 2003, was $124,416 million and $71,112 million, respectively. The Group continually monitors the market value of the underlying collateral received as compared with the related receivable, including accrued interest, and requests additional collateral where deemed appropriate.

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE L—RELATED PARTY TRANSACTIONS**

The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates. The $105 million due from Refco Group Holdings, Inc., included in receivables from customers at February 28, 2003, was received by February 29, 2004.

As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210 million and $175 million, respectively. These balances were included in "Receivables from customers" and liquidated shortly after each year-end.

**NOTE M—SEGMENT REPORTING**

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has determined its operating segments to be (1) Derivatives Brokerage and Clearing, (2) Prime Brokerage/Capital Markets, and (3) Asset Management. The Derivatives Brokerage and Clearing business operations consist of execution and clearing services for global exchange-traded derivatives in electronic and open outcry markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Asset Management provides a broad array of asset management services to institutional and individual investors through Refco Alternative Investments (RAI), Forstmann-Leff Associates and Tilney Investment Management.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non-operating segment. Corporate administration costs are not allocated to the respective segments and are included in Corporate & Other.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE M—SEGMENT REPORTING (Continued)**

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Asset Management | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **As of and for the year ended February 29, 2004** | | | | | | |
| Interest revenue . . . . . . . . . . . | $ 143,400 | $ 1,084,204 | $ 606 | $ 20,154 | $ (194,560) | $ 1,053,804 |
| Total revenues . . . . . . . . . . . . | 835,807 | 1,276,709 | 71,662 | 20,180 | (253,823) | 1,950,535 |
| Interest expense . . . . . . . . . . . | 61,868 | 979,704 | 1,128 | 53,367 | (197,409) | 898,658 |
| Depreciation and amortization . . | 10,222 | 1,311 | 2,269 | 14,566 | — | 28,368 |
| Income before provision for income taxes and members' interest in earnings of subsidiary . . . . . . . . . . . . . . | 125,737 | 133,706 | (2,123) | (56,715) | — | 200,605 |
| Total assets . . . . . . . . . . . . . . | 6,872,159 | 31,758,863 | 201,057 | 1,069,900 | (6,569,807) | 33,332,172 |
| **As of and for the year ended February 28, 2003** | | | | | | |
| Interest revenue . . . . . . . . . . . | $ 142,666 | $ 2,507,557 | $ 882 | $ 53,688 | $ (315,840) | $ 2,388,953 |
| Total revenues . . . . . . . . . . . . | 745,967 | 2,609,745 | 57,855 | 58,682 | (367,459) | 3,104,790 |
| Interest expense . . . . . . . . . . . | 72,064 | 2,365,181 | 121 | 62,741 | (317,641) | 2,182,466 |
| Depreciation and amortization . . | 7,950 | 647 | 2,006 | 14,842 | — | 25,445 |
| Income before provision for income taxes and dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . . | 77,741 | 101,457 | 1,071 | (22,614) | — | 157,655 |
| Total assets . . . . . . . . . . . . . . | 5,752,724 | 20,500,943 | 107,300 | 1,394,789 | (8,540,327) | 19,215,429 |
| **As of and for the year ended February 28, 2002 (unaudited)** | | | | | | |
| Interest revenue . . . . . . . . . . . | $ 185,610 | $ 2,096,561 | $ 1,672 | $ 46,414 | $ (616,793) | $ 1,713,464 |
| Total revenues . . . . . . . . . . . . | 691,476 | 2,217,095 | 69,836 | 51,434 | (662,209) | 2,367,632 |
| Interest expense . . . . . . . . . . . | 127,542 | 1,977,022 | 1,260 | 69,588 | (617,543) | 1,557,869 |
| Depreciation and amortization . . | 10,283 | 755 | 2,112 | 24,799 | — | 37,949 |
| Income before provision for income taxes and dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . . | 59,421 | 95,704 | 13,552 | (52,516) | — | 116,161 |
| Total assets . . . . . . . . . . . . . . | 4,341,169 | 22,830,227 | 148,195 | 1,405,086 | (6,113,639) | 22,611,038 |

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE M—SEGMENT REPORTING (Continued)**

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long-lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  |  | (in thousands) | (unaudited) |
| **Total revenues:** |  |  |  |
| United States . . . . . . . . . . . . . . . . . . . . . . | $1,299,579 | $2,474,980 | $1,532,798 |
| Bermuda . . . . . . . . . . . . . . . . . . . . . . . . . | 325,791 | 411,114 | 639,677 |
| United Kingdom . . . . . . . . . . . . . . . . . . . . | 225,805 | 135,685 | 157,301 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99,360 | 83,011 | 37,856 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,950,535 | $3,104,790 | $2,367,632 |
|  |  |  |  |
| **Long-lived assets:** |  |  |  |
| United States . . . . . . . . . . . . . . . . . . . . . . | $    37,337 | $    47,278 |  |
| Bermuda . . . . . . . . . . . . . . . . . . . . . . . . . | 1,900 | 2,816 |  |
| United Kingdom . . . . . . . . . . . . . . . . . . . . | 3,806 | 3,975 |  |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,786 | 3,659 |  |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    47,829 | $    57,728 |  |

No single customer accounted for greater than 10% of total revenues in the years ended February 29, 2004, February 28, 2003 and February 28, 2002 (unaudited).

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvements.

**NOTE N—SUBSEQUENT EVENT**

On April 19, 2004, the majority owner executed a letter of intent in which a majority stake of the Group would be acquired.

The resulting change in control would give effect to default provisions contained within the revolving credit facility and unsecured syndicated senior notes.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION

The following information sets forth the Group condensed consolidating financial statements as of February 29, 2004 and February 28, 2003 and for each of the three years in the period ended February 29, 2004.

**Condensed consolidating balance sheet**

| | February 29, 2004 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Cash and cash equivalents . . . . . . . . . . | $ — | $ 5,998 | $ 332,245 | $ — | $ 338,243 |
| Cash and securities segregated under federal and other regulations | | | | | |
| Cash and cash equivalents . . . . . . . . | — | — | 1,375,838 | — | 1,375,838 |
| Securities purchased under agreements to resell . . . . . . . . . . . | — | — | 55,061 | — | 55,061 |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others . . . . . . . . . . . . . . . . . . . . . | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker-dealers, clearing organizations and customers . | 314,279 | 1,270,024 | 3,564,715 | (2,817,018) | 2,332,000 |
| Securities owned, at market value or fair value . . . . . . . . . . . . . . . . . . . . | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries . . . . . . . . . . . . . . . . . . . | 990,425 | 1,160,431 | — | (2,150,856) | — |
| Other assets . . . . . . . . . . . . . . . . . . . . | 199,953 | 418,751 | 217,940 | (252,788) | 583,856 |
| Total assets . . . . . . . . . . . . . . . . . | $1,504,657 | $2,857,949 | $37,586,216 | $(8,616,650) | $33,332,172 |
| Liabilities | | | | | |
| Short-term borrowings, including current portion of long-term borrowings . . . . . . . . . . . . . . . . . | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
| Payable to brokers-dealers and clearing organizations . . . . . . . . . . | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers . . . . . . . . . . . | 465,681 | 1,556,529 | 6,647,453 | (3,573,946) | 5,095,717 |
| Securities sold, not yet purchased, at market value or fair value . . . . . . . | — | 2,091 | 805,394 | — | 807,485 |
| Accounts payable, accrued expenses and other liabilities . . . . . . . . . . . . | 23,392 | 68,962 | 145,383 | (63,588) | 174,149 |
| Long-term borrowings . . . . . . . . . . . . . | 315,500 | — | — | — | 315,500 |
| Subordinated debt . . . . . . . . . . . . . . . | 16,000 | — | 109,056 | (109,056) | 16,000 |
| Total liabilities . . . . . . . . . . . . . . . | 888,573 | 1,627,583 | 36,414,119 | (6,218,592) | 32,711,683 |
| Membership interests issued by subsidiary . . . . . . . . . . . . . . . . . . . . | — | — | 4,405 | — | 4,405 |
| Members' equity . . . . . . . . . . . . . . . . . | 616,084 | 1,230,366 | 1,167,692 | (2,398,058) | 616,084 |
| Total liabilities and members' equity | $1,504,657 | $2,857,949 | $37,586,216 | $(8,616,650) | $33,332,172 |

F-25

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

**Condensed consolidating balance sheet**

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | February 28, 2003 | | |
| | | | (in thousands) | | |
| Cash and cash equivalents . . . . . . . . | $ — | $ 4,014 | $ 243,089 | $ — | $ 247,103 |
| Cash and securities segregated under federal and other regulations | | | | | |
| Cash and cash equivalents . . . . . | — | — | 1,949,846 | — | 1,949,846 |
| Securities purchased under agreements to resell . . . . . . . | — | — | 69,161 | — | 69,161 |
| Securities purchased under agreements to resell . . . . . . . . . . . | — | — | 15,900,055 | (3,736,758) | 12,163,297 |
| Deposits with clearing organizations and others . . . . . . . . . . . . . . . . | — | — | 3,564,498 | (1,812,697) | 1,751,801 |
| Receivables from broker-dealers, clearing organizations and customers . . . . . . . . . . . . . . . . . | 450,060 | 1,599,461 | 2,570,660 | (2,520,985) | 2,099,196 |
| Securities owned, at market value or fair value . . . . . . . . . . . . . . . . . . | — | 291 | 844,791 | (354,662) | 490,420 |
| Investment in and advances to subsidiaries . . . . . . . . . . . . . . . . | 734,975 | 893,128 | — | (1,628,103) | |
| Other assets . . . . . . . . . . . . . . . . . . | 225,438 | 385,126 | 84,153 | (250,112) | 444,605 |
| Total assets . . . . . . . . . . . . . | $1,410,473 | $2,882,020 | $25,226,253 | $(10,303,317) | $19,215,429 |
| Liabilities | | | | | |
| Short-term borrowings, including current portion of long-term borrowings . . . . . . . . . . . . . . . | $ 228,000 | $ 3,373 | $ 14,437 | $ — | $ 245,810 |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . | — | — | 17,868,915 | (5,089,459) | 12,779,456 |
| Payable to brokers-dealers and clearing organizations . . . . . . . . | — | 1,862 | 285,609 | (30,688) | 256,783 |
| Payable to customers . . . . . . . . . . | 30,709 | 1,680,383 | 5,709,695 | (2,985,601) | 4,435,186 |
| Securities sold, not yet purchased, at market value or fair value . . . | — | 276 | 211,929 | — | 212,205 |
| Accounts payable, accrued expenses and other liabilities . . . | 22,902 | 61,331 | 137,361 | (61,466) | 160,128 |
| Long-term borrowings . . . . . . . . . . | 383,500 | — | — | — | 383,500 |
| Subordinated debt . . . . . . . . . . . . . . | 179,000 | — | 96,523 | (259,523) | 16,000 |
| Total liabilities . . . . . . . . . . | 844,111 | 1,747,225 | 24,324,469 | (8,426,737) | 18,489,068 |
| Preferred securities issued by subsidiary . . . . . . . . . . . . . . . . . . | — | — | — | 160,000 | 160,000 |
| Members' equity . . . . . . . . . . . . . . . | 566,362 | 1,134,795 | 901,784 | (2,036,580) | 566,361 |
| Total liabilities and members' equity . . . . . . . . . . . . . . | $1,410,473 | $2,882,020 | $25,226,253 | $(10,303,317) | $19,215,429 |

F-26

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)**

**Condensed consolidating statement of income**

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage . . . . . | $    — | $    6,009 | $  717,662 | $  (52,637) | $  671,034 |
| Interest . . . . . . . . . . . . . . . . . . . | 15,037 | 69,640 | 1,163,687 | (194,560) | 1,053,804 |
| Principal transactions, net . . . . . . . | — | 36,055 | 138,956 | — | 175,011 |
| Asset management and advisory fees . . . . . . . . . . . . . . . | — | 6,241 | 41,942 | (272) | 47,911 |
| Other  . . . . . . . . . . . . . . . . . . . . | — | 4,407 | 4,722 | (6,354) | 2,775 |
| Total revenues  . . . . . . . . . . . . . | 15,037 | 122,352 | 2,066,969 | (253,823) | 1,950,535 |
| **Expenses** | | | | | |
| Commissions and order execution costs . . . . . . . . . . . . . | — | 16,852 | 436,020 | (40,978) | 411,894 |
| Interest . . . . . . . . . . . . . . . . . . . | 40,404 | 78,975 | 976,688 | (197,409) | 898,658 |
| Employee compensation and benefits  . . . . . . . . . . . . . . . . . | 4,636 | 16,120 | 217,720 | — | 238,476 |
| General, administrative and other . | 18,856 | 16,659 | 180,823 | (15,436) | 200,902 |
| Total expenses  . . . . . . . . . . . . . | 63,896 | 128,606 | 1,811,251 | (253,823) | 1,749,930 |
| Equity in net income of subsidiaries . | 237,289 | 241,200 | — | (478,489) | — |
| Income before provision for income taxes, and members' interest in earnings of subsidiary . . . . . . . . . . . . . . . | 188,430 | 234,946 | 255,718 | (478,489) | 200,605 |
| Provision for income taxes . . . . . . . . | — | — | 12,176 | — | 12,176 |
| Income before members' interest in earnings of subsidiary . . . . . | 188,430 | 234,946 | 243,542 | (478,489) | 188,429 |
| Members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . . | — | — | 1,273 | — | 1,273 |
| Net income . . . . . . . . . . . . . . . . | $188,430 | $234,946 | $  242,269 | $(478,489) | $  187,156 |

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

**Condensed consolidating statement of income**

| | For the year ended February 28, 2003 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Revenues | | | | | |
| Commissions and brokerage . . . . . | $   — | $   6,447 | $   610,835 | $  (33,757) | $   583,525 |
| Interest . . . . . . . . . . . . . . . . . . . | 34,908 | 101,619 | 2,568,266 | (315,840) | 2,388,953 |
| Principal transactions, net . . . . . . . | | 7,144 | 76,305 | — | 83,449 |
| Asset management and advisory fees . . . . . . . . . . . . . . . | | 649 | 49,283 | (5,710) | 44,222 |
| Other  . . . . . . . . . . . . . . . . . . . . | 5,007 | 4,087 | 56,501 | (60,954) | 4,641 |
| Total revenues  . . . . . . . . . . . . | 39,915 | 119,946 | 3,361,190 | (416,261) | 3,104,790 |
| Expenses | | | | | |
| Commissions and order execution costs . . . . . . . . . . . . . | | 5,033 | 413,390 | (33,048) | 385,375 |
| Interest . . . . . . . . . . . . . . . . . . . | 46,667 | 95,268 | 2,358,172 | (317,641) | 2,182,466 |
| Employee compensation and benefits  . . . . . . . . . . . . . . . . . | 6,479 | 12,085 | 193,266 | — | 211,830 |
| General, administrative and other . | 60,850 | 4,561 | 167,625 | (65,572) | 167,464 |
| Total expenses  . . . . . . . . . . . . | 113,996 | 116,947 | 3,132,453 | (416,261) | 2,947,135 |
| Equity in net income of subsidiaries . | 214,201 | 182,183 | — | (396,384) | — |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries . . . . . . . . . . . | 140,120 | 185,182 | 228,737 | (396,384) | 157,655 |
| Provision for income taxes . . . . . . . . | — | — | 1,960 | — | 1,960 |
| Income before dividends on preferred securities issued by subsidiaries  . . . . . . . . . . . . . | 140,120 | 185,182 | 226,777 | (396,384) | 155,695 |
| Dividends on preferred securities issued by subsidiaries . . . . . . . . . . | — | 15,576 | — | — | 15,576 |
| Net income . . . . . . . . . . . . . . . . | $140,120 | $169,606 | $   226,777 | $(396,384) | $   140,119 |

F-28

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

**Condensed consolidating statement of income**

| | For the year ended February 28, 2002 (unaudited) | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Revenues | | | | | |
| Commissions and brokerage . . . . . . . . | $ — | $ 30,587 | $ 480,196 | $ (22,163) | $ 488,620 |
| Interest . . . . . . . . . . . . . . . . . . . . . | 22,836 | 187,505 | 2,119,916 | (616,793) | 1,713,464 |
| Principal transactions, net . . . . . . . . . . | — | 3,351 | 95,844 | — | 99,195 |
| Asset management and advisory fees . . | — | 783 | 67,349 | (5,442) | 62,690 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . | 4,941 | 3,368 | 13,165 | (17,811) | 3,663 |
| Total revenues . . . . . . . . . . . . . . | 27,777 | 225,594 | 2,776,470 | (662,209) | 2,367,632 |
| Expenses | | | | | |
| Commissions and order execution costs . | — | 10,487 | 335,333 | (22,163) | 323,657 |
| Interest . . . . . . . . . . . . . . . . . . . . . | 46,226 | 179,271 | 1,949,915 | (617,543) | 1,557,869 |
| Employee compensation and benefits . . | 6,711 | 24,274 | 167,468 | | 198,453 |
| General, administrative and other . . . . | 18,338 | 10,633 | 165,024 | (22,503) | 171,492 |
| Total expenses . . . . . . . . . . . . . . | 71,275 | 224,665 | 2,617,740 | (662,209) | 2,251,471 |
| Equity in net income of subsidiaries . . . . . | 137,132 | 149,915 | — | (287,047) | — |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries . . | 93,634 | 150,844 | 158,730 | (287,047) | 116,161 |
| Provision for income taxes . . . . . . . . . . . | — | — | 6,951 | — | 6,951 |
| Income before dividends on preferred securities issued by subsidiaries . . . . . . . . . . . . . . . | 93,634 | 150,844 | 151,779 | (287,047) | 109,210 |
| Dividends on preferred securities issued by subsidiary . . . . . . . . . . . . . . . . . | — | 15,576 | — | — | 15,576 |
| Net income . . . . . . . . . . . . . . . | $ 93,634 | $135,268 | $ 151,779 | $(287,047) | $ 93,634 |

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

**Condensed consolidating statement of cash flows**

| | For the Year Ended February 29, 2004 | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash generated from/(used in) operating activities . . . . . . . . . . . . . | $ 387,774 | $25,203 | $ 181,735 | $ — | $ 594,712 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired . . . . . . . . . . . . . . . . . . . | — | (23,219) | (95,711) | — | (118,930) |
| Net cash used in investing activities . . . | — | (23,219) | (95,711) | — | (118,930) |
| Cash flows from financing activities | | | | | |
| Repayment of long term borrowings . . | (68,000) | — | — | — | (68,000) |
| Payment for redemption of preferred securities issued by subsidiaries . . . . | (199,774) | — | — | — | (199,774) |
| Net contributions to membership interest issued by subsidiary . . . . . . | — | — | 3,132 | — | 3,132 |
| Capital withdrawals . . . . . . . . . . . . . . | (120,000) | — | — | — | (120,000) |
| Net cash used in financing activities . . . . . . . . . . . . . . . . | (387,774) | — | 3,132 | — | (384,642) |
| Net increase (decrease) in cash and cash equivalents . . . . . . . . | — | 1,984 | 89,156 | — | 91,140 |
| Cash and cash equivalents, beginning of year . . . . . . . . . . . . . . . . . . . . . . . | — | 4,014 | 243,089 | — | 247,103 |
| Cash and cash equivalents, end of year . . | $ — | $ 5,998 | $ 332,245 | $ — | $ 338,243 |

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)**

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | For the Year Ended February 28, 2003 | | |
| | | | (in thousands) | | |
| Net cash (used in)/generated from operating activities . . . . . . . . . . . . . . . | $(54,500) | $ 1,658 | $ 87,124 | $ — | $ 34,282 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired . . . . . . . . . . . . . . . . . . . | — | — | (3,473) | — | (3,473) |
| Net cash used in investing activities . . . | — | — | (3,473) | — | (3,473) |
| Cash flows from financing activities | | | | | |
| Issuance of long term debt . . . . . . . . . | 222,500 | — | — | — | 222,500 |
| Repayment of long term borrowings . . . | (68,000) | — | — | — | (68,000) |
| Capital withdrawals . . . . . . . . . . . . . . | (100,000) | — | — | — | (100,000) |
| Net cash generated from financing activities . . . . . . . . . . . . . . . . | 54,500 | — | — | — | 54,500 |
| Net increase in cash and cash equivalents . . . . . . . . . . . . . . . . | — | 1,658 | 83,651 | — | 85,309 |
| Cash and cash equivalents, beginning of year . . . . . . . . . . . . . . . . . . . . . . . | — | 2,356 | 159,438 | — | 161,794 |
| Cash and cash equivalents, end of year . . . | $ — | $ 4,014 | $243,089 | $ — | $ 247,103 |

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE O—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

**Condensed consolidating statement of cash flows**

| | For the Year Ended February 28, 2002 (unaudited) | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash generated from/(used in) operating activities . . . . . . . . . . . . . . | $ 133,000 | $ (69) | $ (74,519) | $ — | $ 58,412 |
| Cash flows from financing activities | | | | | |
| Repayment of subordinated debt . . . . . | (25,000) | — | — | — | (25,000) |
| Issuance of long term debt . . . . . . . . . | — | — | — | — | — |
| Repayment of long term borrowings . . | (33,000) | — | — | — | (33,000) |
| Capital withdrawals . . . . . . . . . . . . . . | (75,000) | — | — | — | (75,000) |
| Net cash used in financing activities . . . . . . . . . . . . . . . . | (133,000) | — | — | — | (133,000) |
| Net (decrease)/increase in cash and cash equivalents . . . . . . . . | — | (69) | (74,519) | — | (74,588) |
| Cash and cash equivalents, beginning of year . . . . . . . . . . . . . . . . . . . . . . . | — | 2,425 | 233,957 | — | 236,382 |
| Cash and cash equivalents, end of year . . | $ — | $ 2,356 | $ 159,438 | $ — | $ 161,794 |

[THIS PAGE IS INTENTIONALLY LEFT BLANK]
(Interim Financial Statements begin on the following page)

REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

| | May 31, 2004 | February 29, 2004 |
|---|---|---|
| | (unaudited) (in thousands) | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    224,116 | $    338,243 |
| Cash and securities segregated under federal and other regulations: . . . . . . | | |
|     Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,436,072 | 1,375,838 |
|     Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . | 41,831 | 55,061 |
| Restricted cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500,000 | — |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . | 41,800,629 | 24,782,874 |
| Deposits with clearing organizations and others . . . . . . . . . . . . . . . . . . . . . | 1,919,371 | 1,831,765 |
| Receivables from broker-dealers and clearing organizations . . . . . . . . . . . | 3,511,725 | 504,810 |
| Receivables from customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,290,621 | 1,827,190 |
| Securities owned, at market or fair value . . . . . . . . . . . . . . . . . . . . . . . . | 2,897,884 | 2,032,535 |
| Memberships in exchanges (market value: May 31, 2004: $48,502, | | |
|     February 29, 2004: $41,377) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15,944 | 15,869 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 590,916 | 567,987 |
|     Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $55,229,109 | $33,332,172 |
| **Liabilities** | | |
| Short-term borrowings, including current portion of long-term | | |
|     borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $      68,000 | $      88,890 |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . | 44,296,847 | 25,630,299 |
| Payable to broker-dealers and clearing organizations . . . . . . . . . . . . . . | 2,381,069 | 583,643 |
| Payable to customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,911,001 | 5,095,717 |
| Securities sold, not yet purchased, at market or fair value . . . . . . . . . . . | 1,376,488 | 807,485 |
| Accounts payable, accrued expenses, and other liabilities . . . . . . . . . . . | 192,649 | 174,149 |
| Long-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 315,500 | 315,500 |
| Subordinated debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,000 | 16,000 |
|     Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 54,557,554 | 32,711,683 |
| Commitments and contingent liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| Membership interests issued by subsidiary . . . . . . . . . . . . . . . . . . . . . . . . . | 455 | 4,405 |
| Members' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 671,100 | 616,084 |
|     Total liabilities and members' equity . . . . . . . . . . . . . . . . . . . . . . . . | $55,229,109 | $33,332,172 |

The accompanying notes are an integral part of these financial statements.

## REFCO GROUP LTD., LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF INCOME

| | For the three months ended | |
| --- | --- | --- |
| | May 31, 2004 | May 31, 2003 |
| | (unaudited) (in thousands) | |
| Revenues | | |
| Commissions and brokerage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $220,279 | $163,206 |
| Interest | 377,743 | 283,022 |
| Principal transactions, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67,300 | 34,961 |
| Asset management and advisory fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23,435 | 11,160 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 978 | 2,500 |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 689,735 | 494,849 |
| Expenses | | |
| Commissions and order execution costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | 142,706 | 104,162 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 344,254 | 248,489 |
| Employee compensation and benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76,866 | 52,314 |
| General, administrative and other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 57,502 | 42,704 |
| Total expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 621,328 | 447,669 |
| Income before provision for income taxes and members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68,407 | 47,180 |
| Provision for income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,211 | 907 |
| Income before members' interest in earnings of subsidiary . . . . . . . . . . . | 60,196 | 46,273 |
| Members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . . . . . . . | 926 | — |
| NET INCOME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 59,270 | $ 46,273 |

The accompanying notes are an integral part of these financial statements.

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

**For the three months ended**

| | Members' equity | | |
| | Common capital | Other Comprehensive Income | Total |
|---|---|---|---|
| | | (unaudited) (in thousands) | |
| Balance, February 28, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $568,016 | $(1,655) | $566,361 |
| Loss on early extinguishment of preferred securities issued by subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (39,774) | — | (39,774) |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46,273 | — | 46,273 |
| Currency translation adjustment . . . . . . . . . . . . . . . . . . . . . . . . . | — | 4,526 | 4,526 |
| Balance, May 31, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $574,515 | $ 2,871 | $577,386 |
| | | | |
| Balance, February 29, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $595,398 | $20,686 | $616,084 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59,270 | — | 59,270 |
| Currency translation adjustment . . . . . . . . . . . . . . . . . . . . . . . . . | — | (4,254) | (4,254) |
| Balance, May 31, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $654,668 | $16,432 | $671,100 |

The accompanying notes are an integral part of these financial satements.

F-36

REFCO GROUP LTD., LLC AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | For the three months ended | |
|---|---|---|
|  | May 31, 2004 | May 31, 2003 |
|  | (unaudited) (in thousands) | |
| Cash flows from operating activities |  |  |
| Net income | $ 59,270 | $ 46,273 |
| Noncash items included in net income |  |  |
| Depreciation and amortization | 8,097 | 9,747 |
| Members' interest in earnings of subsidiary | 926 | — |
| (Increase) decrease in operating assets |  |  |
| Cash and securities segregated under federal and other regulations: |  |  |
| Cash and cash equivalents | (60,234) | (201,923) |
| Securities purchased under agreements to resell | 13,230 | 6,195 |
| Restricted cash | (500,000) | — |
| Securities purchased under agreements to resell | (17,017,755) | (7,998,205) |
| Deposits with clearing organizations and others | (87,606) | (1,472) |
| Receivables from brokers-dealers and clearing organizations | (3,006,915) | (295,947) |
| Receivables from customers | (463,431) | (752,008) |
| Securities owned, at market or fair value | (865,349) | (1,057,412) |
| Membership in exchanges | (75) | (552) |
| Other assets | (31,026) | 9,756 |
| Increase (decrease) in operating liabilities |  |  |
| Short-term borrowings, including current portion of long-term borrowings | (20,890) | 74,722 |
| Securities sold under agreements to repurchase | 18,666,548 | 9,502,272 |
| Payable to broker-dealers and clearing organizations | 1,797,426 | 142,292 |
| Payable to customers | 815,284 | 269,006 |
| Securities sold, not yet purchased, at market or fair value | 569,003 | 495,858 |
| Accounts payable, accrued expenses and other liabilities | 14,246 | 12,799 |
| Net cash used in operating activities | (109,251) | 261,401 |
| Cash flows from investing activities |  |  |
| Acquisition of businesses, net of cash acquired | — | (24,222) |
| Net cash used in investing activities | — | (24,222) |
| Cash flows from financing activities |  |  |
| Payment for redemption of preferred securities issued by subsidiaries | — | (199,774) |
| Withdrawals of interests by members' of subsidiary | (4,876) | — |
| Net cash used in financing activities | (4,876) | (199,774) |
| Net decrease in cash and cash equivalents | (114,127) | 37,405 |
| Cash and cash equivalents, beginning of period | 338,243 | 247,103 |
| Cash and cash equivalents, end of period | $ 224,116 | $ 284,508 |

The accompanying notes are an integral part of these financial statements.

F-37

REFCO GROUP LTD., LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE A—ORGANIZATION

Refco Group Ltd., LLC (the "Company") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker-dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities foreign exchange broker.

The Company is 90% owned by Refco Group Holdings, Inc., a Delaware corporation. The remaining 10% is owned by BAWAG Overseas, Inc., a third party financial institution.

## NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, which does issue non-voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in other assets.

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

These unaudited consolidated financial statements reflect all adjustments that are, in the opinion of management, necessary for a fair statement of the results for the interim period presented. These adjustments are of a normal, recurring nature. Interim period operating results may not be indicative of the operating results for a full year. These consolidated financial statements should be read in conjunction with the Group's fiscal year end consolidated financial statements included elsewhere in this Offering Circular.

## NOTE C—NET CAPITAL REQUIREMENT

The Group's subsidiary, Refco Securities, LLC, is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3-1 (the "Rule") which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5 percent of aggregate

## REFCO GROUP LTD., LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE C—NET CAPITAL REQUIREMENT (Continued)**

debits. As of May 31, 2004, Refco Securities, LLC had net capital of $75.7 million, which was 18.3 percent of aggregate debit balances and $67.5 million in excess of required net capital.

The Group's subsidiary, Refco, LLC, is also subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4 percent of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 150% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of May 31, 2004, Refco, LLC had net capital of $242.7 million, which was $116.9 million in excess of required net capital.

**NOTE D—COMMITMENTS AND CONTINGENCIES**

**Commitments**

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises excluding any escalation adjustments are as follows (in thousands):

| Fiscal period | |
|---|---|
| Nine months ended 2005 . . . . . . . . . . . . | $ 15,243 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . | 13,669 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . | 11,558 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . | 9,404 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . | 6,383 |
| Thereafter . . . . . . . . . . . . . . . . . . . . . | 25,038 |
| | $ 81,295 |

The Group's rent expense for the three months ended May 31, 2004 and 2003 was $4.5 million and $4.0 million, respectively.

**Contingencies**

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003 the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. The remaining claim was tried before a jury in June 2004.

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE D—COMMITMENTS AND CONTINGENCIES (Continued)**

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. A separate trial to determine damages is scheduled for the fall of 2004. The Group will seek to set aside the verdict. If the verdict is not set aside, the Group intends to appeal such decision and believes they have meritorious grounds for appeal. The Group also believes that, if that appeal is unsuccessful, the plaintiffs' alleged damages are substantially less than the $45 million they are claiming.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents that had been provided to the SEC.

In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

**NOTE E—FAIR VALUE OF FINANCIAL INSTRUMENTS**

SFAS No. 107 "*Disclosures about Fair Value of Financial Instruments*" requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include Cash, Cash and securities segregated under federal and other regulations, Deposits with clearing organizations and others, Short term borrowings and Payables to broker-dealers, clearing organizations and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long-term debt is recorded at historical amounts which could differ from fair value as a result of changes in the Company's creditworthiness.

F-40

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE E—FAIR VALUE OF FINANCIAL INSTRUMENTS (Continued)

The following table provides a summary of the fair value of the Group's long-term borrowings. The fair value of the Group's long-term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

|  | May 31, 2004 | February 29, 2004 |
|---|---|---|
|  | (in thousands) | |
| Carrying value of long-term borrowings | $383,500 | $383,500 |
| Fair value of long-term borrowings | 391,753 | 399,990 |

The Group carries its secured financing activities, including Securities purchased under agreements to resell, Securities borrowed, Securities sold under agreements to repurchase, Securities loaned and Other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short-term in nature, carrying value approximates fair value. The market value of the collateral the Group received as of May 31, 2004 and February 29, 2004, was approximately $177,000 million and $125,000 million, respectively.

## NOTE F—RESTRICTED CASH

As of May 31, 2004, the Company has on deposit $500 million with BAWAG Overseas, Inc., a member who is a financial institution. The Company will distribute the funds to its members consistent with the terms and conditions as set forth in the Equity Purchase and Merger Agreement dated June 8, 2004 (amended July 9, 2004) between Thomas H. Lee Partners and the selling members, provided it maintain this balance throughout the period between May 31, 2004 and the closing date.

## NOTE G—SEGMENT REPORTING

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has determined its operating segments to be (1) Derivatives Brokerage and Clearing, (2) Prime Brokerage/Capital Markets, and (3) Asset Management. The Derivatives Brokerage and Clearing business operations consist of execution and clearing services for global exchange-traded derivatives in electronic and open outcry Markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Asset Management provides a broad array of asset management services to institutional and individual investors through Refco Alternative Investments (RAI), Forstmann-Leff Associates and Tilney Investment Management.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non-operating segment. Corporate

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE G—SEGMENT REPORTING (Continued)

administration costs are not allocated to the respective segments and are included in Corporate & Other.

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Asset Management | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (in thousands) | | | |
| **As of and for the three months ended May 31, 2004 (unaudited)** | | | | | | |
| Interest revenue . . . . . . . . . . . | $ 37,551 | $ 381,034 | $ 70 | $ 6,624 | $ (47,536) | $ 377,743 |
| Total revenues . . . . . . . . . . . | 262,640 | 446,740 | 27,423 | 7,032 | (54,100) | 689,735 |
| Interest expense . . . . . . . . . . | 20,085 | 356,872 | 50 | 15,510 | (48,263) | 344,254 |
| Depreciation and amortization | 3,167 | 558 | 1,751 | 2,621 | — | 8,097 |
| Income before provision for income taxes and members' interest in earnings of subsidiary . . . . . . . . . . . . . . | 41,907 | 37,655 | 2,905 | (14,060) | — | 68,407 |
| Total assets . . . . . . . . . . . . . | 7,098,288 | 54,776,244 | 281,433 | 1,525,897 | (8,452,753) | 55,229,109 |
| **For the three months ended May 31, 2003 (unaudited)** | | | | | | |
| Interest revenue . . . . . . . . . . . | $ 38,873 | $ 286,934 | $ 123 | $ 6,599 | $ (49,507) | $ 283,022 |
| Total revenues . . . . . . . . . . . | 197,116 | 332,202 | 15,746 | 7,401 | (57,616) | 494,849 |
| Interest expense . . . . . . . . . . . | 15,932 | 267,633 | 25 | 15,024 | (50,125) | 248,489 |
| Depreciation and amortization | 6,720 | 338 | 406 | 2,283 | — | 9,747 |
| Income before provision for income taxes . . . . . . . . . . | 28,906 | 30,777 | (962) | (11,541) | — | 47,180 |
| **As of February 29, 2004** | | | | | | |
| Total assets . . . . . . . . . . . . . | $6,872,159 | $31,758,863 | $ 201,057 | $1,069,900 | $(6,569,807) | $33,332,172 |

F-42

**REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE G—SEGMENT REPORTING (Continued)**

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long-lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

|  | As of and for three months ended | |
|---|---|---|
|  | May 31, 2004 | May 31 2003 |
|  | (unaudited) (in thousands) | |
| **Total revenue:** | | |
| United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $500,724 | $350,896 |
| Bermuda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64,867 | 82,420 |
| United Kingdom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 87,361 | 42,845 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36,783 | 18,688 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $689,735 | $494,849 |

|  | As of | |
|---|---|---|
|  | May 31, 2004 | February 29 2004 |
|  | (unaudited) | |
| **Long-lived assets:** | | |
| United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 35,620 | $ 37,337 |
| Bermuda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,790 | 1,900 |
| United Kingdom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,261 | 3,806 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,653 | 4,786 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 48,324 | $ 47,829 |

No single customer accounted for greater than 10% of total revenues in the three months ended May 31, 2004 and 2003.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvement.

**NOTE H—SUBSEQUENT EVENT**

On June 8, 2004 (amended July 9, 2004), the majority owner executed an equity purchase and merger agreement in which a majority stake of the Group would be acquired. The resulting change in control would give effect to default provisions contained within the Group's revolving credit facility and unsecured syndicated senior notes.

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE I—CONDENSED CONSOLIDATING FINANCIAL INFORMATION

The following information sets forth the Group condensed consolidating financial statements as of May 31, 2004 and February 29, 2004 and for each of the three month periods ended May 31, 2004 and May 31, 2003.

**Condensed consolidating balance sheet**

| | May 31, 2004 (unaudited) | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Cash and cash equivalents . . . . . . . . . . | $ — | $ 19,192 | $ 204,924 | $ — | $ 224,116 |
| Cash and securities segregated under federal and other regulations . . . . . . . | | | | | |
| Cash and cash equivalents . . . . . . . | — | — | 1,436,072 | — | 1,436,072 |
| Securities purchased under agreements to resell . . . . . . . . . . | — | — | 41,831 | — | 41,831 |
| Restricted cash . . . . . . . . . . . . . . | 500,000 | — | — | — | 500,000 |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . | — | — | 43,876,655 | (2,076,026) | 41,800,629 |
| Deposits with clearing organizations and others . . . . . . . . . . . . . . . . . . . . . | — | 1,700 | 3,055,066 | (1,137,395) | 1,919,371 |
| Receivables from broker-dealers, clearing organizations and customers . | 341,298 | 2,562,724 | 7,436,239 | (4,537,915) | 5,802,346 |
| Securities owned, at market value or fair value . . . . . . . . . . . . . . . . . . . . . . . | — | 4,862 | 3,244,205 | (351,183) | 2,897,884 |
| Investment in and advances to subsidiaries . . . . . . . . . . . . . . . . . . . | 1,053,607 | 1,223,191 | — | (2,276,798) | — |
| Other assets . . . . . . . . . . . . . . . . . . . | 130,089 | 419,061 | 307,953 | (250,243) | 606,860 |
| Total assets . . . . . . . . . . . . . . . | $2,024,994 | $4,230,730 | $59,602,945 | $(10,629,560) | $55,229,109 |
| **Liabilities** | | | | | |
| Short-term borrowings, including current portion of long-term borrowings . . . . . . . . . . . . . . . . | 68,000 | — | — | — | 68,000 |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . . . | — | — | 47,009,284 | (2,712,437) | 44,296,847 |
| Payable to broker-dealers and clearing organizations . . . . . . . . . . . . . . . . | — | 796 | 2,382,621 | (2,348) | 2,381,069 |
| Payable to customers . . . . . . . . . . . | 932,846 | 2,859,475 | 7,327,500 | (5,208,820) | 5,911,001 |
| Securities sold, not yet purchased, at market value or fair value . . . . . . . | — | 4,855 | 1,371,633 | — | 1,376,488 |
| Accounts payable, accrued expenses and other liabilities . . . . . . . . . . . | 21,548 | 71,721 | 169,015 | (69,635) | 192,649 |
| Long-term borrowings . . . . . . . . . . . . . | 315,500 | — | — | — | 315,500 |
| Subordinated debt . . . . . . . . . . . . . . | 16,000 | — | 108,969 | (108,969) | 16,000 |
| Total liabilities . . . . . . . . . . . . . | 1,353,894 | 2,936,847 | 58,369,022 | (8,102,209) | 54,557,554 |
| Membership interests issued by subsidiary . . . . . . . . . . . . . . . . . . . | — | — | 455 | — | 455 |
| Members' Equity . . . . . . . . . . . . . . . . | 671,100 | 1,293,883 | 1,233,468 | (2,527,351) | 671,100 |
| Total liabilities and members' equity . . . . . . . . . . . . . . . . . | $2,024,994 | $4,230,730 | $59,602,945 | $(10,629,560) | $55,229,109 |

REFGO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE I—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

**Condensed consolidating balance sheet**

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | *(in thousands)* | | |
| Cash and cash equivalents . . . . . . . . . . . . . . | $ — | $ 5,998 | $ 332,245 | $ — | $ 338,243 |
| Cash and securities segregated under federal and other regulations | | | | | |
| Cash and cash equivalents . . . . . . . . . . . | — | — | 1,375,838 | — | 1,375,838 |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 55,061 | — | 55,061 |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 26,818,141 | (2,035,267) | 24,782,874 |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,765 |
| Receivables from broker-dealers, clearing organizations and customers . . . . . . . . . . | 314,279 | 1,270,024 | 3,564,715 | (2,817,018) | 2,332,000 |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,535 |
| Investment in and advances to subsidiaries . . . | 990,425 | 1,160,431 | — | (2,150,856) | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . | 199,953 | 418,751 | 217,940 | (252,788) | 583,856 |
| Total assets . . . . . . . . . . . . . . . . . . . . . | $1,504,657 | $2,857,949 | $37,586,216 | $(8,616,650) | $33,332,172 |
| **Liabilities** | | | | | |
| Short-term borrowings, including current portion of long-term borrowings . . . . . . . | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,890 |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . | — | — | 28,075,311 | (2,445,012) | 25,630,299 |
| Payable to broker-dealers and clearing organizations . . . . . . . . . . . . . . . . . . . . | — | 1 | 610,632 | (26,990) | 583,643 |
| Payable to customers . . . . . . . . . . . . . . . . | 465,681 | 1,556,529 | 6,647,453 | (3,573,946) | 5,095,717 |
| Securities sold, not yet purchased, at market value or fair value . . . . . . . . . . . . . . . . | — | 2,091 | 805,394 | — | 807,485 |
| Accounts payable, accrued expenses and other liabilities . . . . . . . . . . . . . . . . . . | 23,392 | 68,962 | 145,383 | (63,588) | 174,149 |
| Long-term borrowings . . . . . . . . . . . . . . . . | 315,500 | — | — | — | 315,500 |
| Subordinated debt . . . . . . . . . . . . . . . . . . . . | 16,000 | — | 109,056 | (109,056) | 16,000 |
| Total liabilities . . . . . . . . . . . . . . . . . | 888,573 | 1,627,583 | 36,414,119 | (6,218,592) | 32,711,683 |
| Membership interests issued by subsidiary . . . . | — | — | 4,405 | — | 4,405 |
| Members' equity . . . . . . . . . . . . . . . . . . . . . | 616,084 | 1,230,366 | 1,167,692 | (2,398,058) | 616,084 |
| Total liabilities and members' equity . . . | $1,504,657 | $2,857,949 | $37,586,216 | $(8,616,650) | $33,332,172 |

Table header spanning: February 29, 2004

F-45

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE I—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

Condensed consolidating statement of income

| | For the three months ended May 31, 2004 (unaudited) | | | | |
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Revenues | | | | | |
| Commissions and brokerage . . . . . . . . . . | $    — | $   1,893 | $224,216 | $  (5,830) | $220,279 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . | 5,919 | 23,054 | 396,306 | (47,536) | 377,743 |
| Principal transactions, net . . . . . . . . . . . . | — | 19,057 | 48,243 | — | 67,300 |
| Asset management and advisory fees . . . . . | — | 1,702 | 21,733 | — | 23,435 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . | 369 | 1,334 | 9 | (734) | 978 |
| Total revenues . . . . . . . . . . . . . . . . . . . | 6,288 | 47,040 | 690,507 | (54,100) | 689,735 |
| Expenses | | | | | |
| Commissions and order execution costs . . . | — | 4,978 | 142,831 | (5,103) | 142,706 |
| Interest . . . . . . . . . . . . . . . . . . . . . . . . . | 12,273 | 28,924 | 351,320 | (48,263) | 344,254 |
| Employee compensation and benefits . . . . | 1,025 | 4,925 | 70,916 | — | 76,866 |
| General, administrative and other . . . . . . . | 4,536 | 7,456 | 46,244 | (734) | 57,502 |
| Total expenses . . . . . . . . . . . . . . . . . . . | 17,834 | 46,283 | 611,311 | (54,100) | 621,328 |
| Equity in net income of subsidiaries . . . . . . . | 71,740 | 70,146 | — | (141,886) | — |
| Income before provision for income taxes, and members' interest in earnings of subsidiary . . . . . . . . . . . . . . . . . . . . . . . | 60,194 | 70,903 | 79,196 | (141,886) | 68,407 |
| Provision for income taxes . . . . . . . . . . . . . | — | — | 8,211 | — | 8,211 |
| | 60,194 | 70,903 | 70,985 | (141,886) | 60,196 |
| Members' interest in earnings of subsidiary . . | — | — | 926 | — | 926 |
| Net income . . . . . . . . . . . . . . . . . . . . . . | $60,194 | $ 70,903 | $ 70,059 | $(141,886) | $ 59,270 |

F-46

REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE I—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

Condensed consolidating statement of income

| | For the three months ended May 31, 2003 (unaudited) | | | | |
|---|---|---|---|---|---|
| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Revenues | | | | | |
| Commissions and brokerage . . . . . . | $ — | $ 1,338 | $168,807 | $ (6,939) | $163,206 |
| Interest . . . . . . . . . . . . . . . . . . . . . | 4,396 | 17,718 | 310,415 | (49,507) | 283,022 |
| Principal transactions, net . . . . . . . . | — | 3,624 | 31,337 | — | 34,961 |
| Asset management and advisory fees . . . . . . . . . . . . . . . . | — | 2,465 | 8,722 | (27) | 11,160 |
| Other . . . . . . . . . . . . . . . . . . . . . | 802 | 919 | 1,922 | (1,143) | 2,500 |
| Total revenues . . . . . . . . . . . . | 5,198 | 26,064 | 521,203 | (57,616) | 494,849 |
| Expenses | | | | | |
| Commissions and order execution costs . . . . . . . . . . . . . . | — | 4,464 | 105,120 | (5,422) | 104,162 |
| Interest . . . . . . . . . . . . . . . . . . . . . | 11,718 | 18,048 | 268,848 | (50,125) | 248,489 |
| Employee compensation and benefits . . . . . . . . . . . . . . . . . . . | 1,051 | 3,280 | 47,983 | — | 52,314 |
| General, administrative and other . . | 2,829 | 1,468 | 40,476 | (2,069) | 42,704 |
| Total expenses . . . . . . . . . . . . . | 15,598 | 27,260 | 462,427 | (57,616) | 447,669 |
| Equity in net income of subsidiaries . . | 56,674 | 59,013 | — | (115,687) | — |
| Income before provision for income taxes, and dividends on preferred securities issued by subsidiaries . . . . . . . . . . . | 46,274 | 57,817 | 58,776 | (115,687) | 47,180 |
| Provision for income taxes . . . . . . . . | — | — | 907 | — | 907 |
| | 46,274 | 57,817 | 57,869 | (115,687) | 46,273 |
| Dividends on preferred securities issued by subsidiaries . . . . . . . . . . | — | — | — | — | — |
| Net income . . . . . . . . . . . . . . . . . . | $46,274 | $57,817 | $ 57,869 | $(115,687) | $ 46,273 |

## REFCO GROUP LTD., LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

#### NOTE I—CONDENSED CONSOLIDATING FINANCIAL INFORMATION (Continued)

**Consecutive consolidating statement of cash flows**

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | For the three months ended May 31, 2004 (unaudited) | | |
| | | | (in thousands) | | |
| Net cash generated from (used in) operating activities . . . . . . . . . . . . . . . | $ — | $ 13,194 | $ (122,445) | $ — | $ (109,251) |
| Cash flows from financing activities | | | | | |
| Withdrawals of interests by members of subsidiary . . . . . . . . . . . . . . . . . . . . | — | — | (4,876) | — | (4,876) |
| Net cash used in financing activities . . . . | — | — | (4,876) | — | (4,876) |
| Net increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . . . . . . | — | 13,194 | (127,321) | — | (114,127) |
| Cash and cash equivalents, beginning of period . . . . . . . . . . . . . . . . . . . . . . . . | — | 5,998 | 332,245 | — | 338,243 |
| Cash and cash equivalents, end of period . . | $ — | $ 19,192 | $ 204,924 | $ — | $ 224,116 |

| | Parent | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | For the three months ended May 31, 2003 (unaudited) | | |
| | | | (in thousands) | | |
| Net cash (used in)/generated from operating activities . . . . . . . . . . . . . . . | $ 199,774 | $22,213 | $ 39,414 | $ — | $ 261,401 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired . . . . . . . . . . . . . . . . . . . . . . | — | (20,521) | (3,701) | — | (24,222) |
| Net cash used in investing activities . . . . | — | (20,521) | (3,701) | — | (24,222) |
| Cash flows from financing activities | | | | | |
| Payment for redemption of preferred securities . . . . . . . . . . . . . . . . . . . . . . . | (199,774) | — | — | — | (199,774) |
| Net cash generated from/(used in) financing activities . . . . . . . . . . . . . | (199,774) | — | — | — | (199,774) |
| Net increase (decrease) in cash and cash equivalents . . . . . . . . . . . . . . . | — | 1,692 | 35,713 | — | 37,405 |
| Cash and cash equivalents, beginning of period . . . . . . . . . . . . . . . . . . . . . . . . | — | 4,014 | 243,089 | — | 247,103 |
| Cash and cash equivalents, end of period . . | $ — | $ 5,706 | $ 278,802 | $ — | $ 284,508 |

F-48

[THIS PAGE IS INTENTIONALLY LEFT BLANK]

[THIS PAGE IS INTENTIONALLY LEFT BLANK]



# EXHIBIT G

# APPENDIX D-61

| From: | Schoen, Scott |
|---|---|
| Sent: | Monday, May 31, 2004 11:15 AM |
| To: | Lee, Tom |
| Cc: | Harkins, David |
| Subject: | RE: Update |

Agreed. I think if we describe it as a problem we want to deal with together with him, we have a shot. Call me later and let me know how it goes. Thanks.

-----Original Message-----
From: Lee, Tom
Sent: Sunday, May 30, 2004 11:24 PM
To: Schoen, Scott
Subject: Re: Update

Sorry that I didn't read your original message carefully enough. Thanks for including me, although it's not a meeting I relish!

-----Original Message-----
From: Schoen, Scott <SSchoen@THLee.com>
To: Lee, Tom <TLee@THLee.com>; Westra, James <James.Westra@Weil.com>
CC: Harkins, David <DHarkins@THLee.com>; Jaeckel, Scott <SJaeckel@THLee.com>; Taylor, George <GTaylor@THLee.com>
Sent: Sun May 30 21:06:58 2004
Subject: Update

Tom:
We have a consensus as to how to proceed. We believe the best course of action is as follows:
1) You should call Phil tomorrow afternoon. His home, office and cell numbers are listed below. He will be in the office all day.
2) You should follow a rough script as set forth below, and suggest that you, Dave and I would like to meet with him in New York Tuesday morning to discuss this in detail, agree upon a course of action, and try to put this to bed.
3) The script would go generally like this:
    a) We want to sign the deal and go forward.
    b) This allegation has been brought to us by someone we have known on Wall Street for a long time and we trust, but it is brought second hand.
    c) We don't believe it, but we owe it to ourselves, our fiduciary role with our LP's, and to Phil as our prospective partner to discuss it openly and directly
        and try to address it together.
    d) We have thought about how to put it to bed, and believe that we can lay out concrete steps together to quell any concerns without disrupting the transaction
        schedule.
    e) Dave, Scott and you can all be available in New York Tuesday morning, and would like to sit down with Phil to deal with this together.

If you agree, please respond by e-mail to me and to Dave. If you would like to discuss further, I will be home until 9 am tomorrow. I will have my Blackberry and cell phone (cell # is 617-901-4136) with me all day. You can also discuss with Dave tomorrow afternoon before you call Phil.

Phil's contact information is as follows:
Office: 212-693-7200
Cell: 917-855-0300
Home: 908-781-5190

I will ask Markie to schedule for me and Dave to leave Hanscom at 8:30 am Tuesday. We can be available at Phil's office downtown at 10 am to join you for a meeting.

1

CONFIDENTIAL

Thanks. Scott

2

CONFIDENTIAL

THL/UCC 00033267

# APPENDIX D-62



"Schoen, Scott"
<SSchoen@THLee.com>
06/02/2004 06:17 AM

To  "Jaeckel, Scott" <SJaeckel@THLee.com>

cc  "Taylor, George" <GTaylor@THLee.com>, "Strasburg, Max"
<MStrasburg@THLee.com>, James
Westra/BO/WGM/US@WGM, Jay
Tabor/DA/WGM/US@WGM

bcc

Subject  Royce Yesterday

The meeting went very well. Phil was very constructive. Threethings of note:
1) He says Overseas Ltd and Royce Paris were unconsolidted subs in the 1990's.
In f/x, where they broker as principal (with the client behind them with
margin), there were some losses in the 1990's (less than 10 million dollars)
that they ran through those subs to offset European taxable income, rather
than paying taxes thereon other earnings and generating foreign tax crdits.
Since 1999 for Overseas Ltd and 2000 forParis, all have been fully
consolidated in the LLC rather than owned as separate entities by the S Corp.
2) Phil will review with me tomorrow how the owners of the S Corp have handled
the tax liabilities stemming from Royce.
3) Weil is supposed to speak to the lawyer for the IB and see the subpoenas.
This may have happened last night. Phil again emphasized that they were only a
passive broker, and got dragged in because they refused the tolling agreement.

Documents are very close after a call with Jay, Joe, me and Phil at 5 pm. Joe
to review with Phil this morning. Jim and I will meet them at Mayer Brown
mid-day. Jake, if you can join me I would really appreciate it. Let George and
Max stay on the lenders from Boston. If you head to the New York office, I can
find you there when my TWP meeting is done late morning. Jim is at Weil's
offices.

Phil also offered to rep that both historically and going forward the S Corp
has had and will have no brokerage accounts with any Royce entities, as
further assurance that there are no trades where the losses are being passed
away.

Talk to you later this morning. Let meknow your travel plans.

Scott

CONFIDENTIAL                                      WGM-L0025237

# EXHIBIT H

Execution Copy

**CONFIDENTIAL**

---

**EQUITY PURCHASE AND MERGER AGREEMENT**

**AMONG**

**REFCO GROUP LTD., LLC,**

**REFCO GROUP HOLDINGS, INC.,**

**THL REFCO ACQUISITION PARTNERS**

**AND**

**REFCO MERGER LLC**

**DATED AS OF JUNE 8, 2004**

---

DA1:\367401\21\7VHL22!.DOC\77356.0036

**MB02055006**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

TABLE OF CONTENTS

Page

ARTICLE 1       MEMBERSHIP INTERESTS PURCHASE; MERGER.................. 2

    Section 1.1       Purchase and Sale of the Membership Interests ..................... 2

    Section 1.2       The Merger.................................................................. 3

    Section 1.3       Effective Time ............................................................ 3

    Section 1.4       Effects of the Merger ................................................... 3

    Section 1.5       Limited Liability Company Agreement............................... 3

    Section 1.6       Closing ..................................................................... 3

ARTICLE 2       CONVERSION OF MEMBERSHIP INTERESTS;
                PAYMENT OF CONSIDERATION; CONTRIBUTION OF
                EQUITY INTERESTS................................................ 4

    Section 2.1       Conversion of Membership Interests .............................. 4

    Section 2.2       Debt and Excess Expense Amount; Payment of Cash at
                Closing .................................................................... 5

    Section 2.3       Escrow..................................................................... 5

    Section 2.4       Post Closing Earn-Out Amounts........................................ 5

    Section 2.5       Contribution of Equity Interests....................................... 6

ARTICLE 3       REPRESENTATIONS AND WARRANTIES OF RGHI.................. 6

    Section 3.1       Organization of the Company ....................................... 6

    Section 3.2       Authorization ............................................................ 6

    Section 3.3       Capitalization of the Company ...................................... 7

    Section 3.4       No Conflict or Violation ............................................. 7

    Section 3.5       Governmental and Third Party Consents............................. 8

    Section 3.6       Compliance with Law; Permits...................................... 8

    Section 3.7       No Defaults .............................................................. 9

    Section 3.8       Subsidiaries ............................................................. 9

    Section 3.9       Financial Statements ................................................... 9

    Section 3.10      Absence of Undisclosed Liabilities ..................................10

    Section 3.11      Absence of Certain Changes..........................................10

    Section 3.12      Interests of Officers and Directors...................................10

    Section 3.13      Litigation ................................................................11

    Section 3.14      Taxes......................................................................11

    Section 3.15      Material Contracts.......................................................12

MB02055007

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

TABLE OF CONTENTS

(Cont'd)

| | | Page |
|---|---|---|
| Section 3.16 | Employee Plans | 14 |
| Section 3.17 | Environmental, Health, and Safety Matters | 16 |
| Section 3.18 | Intellectual Property | 17 |
| Section 3.19 | Labor Matters | 18 |
| Section 3.20 | Real and Personal Property | 18 |
| Section 3.21 | Insurance | 19 |
| Section 3.22 | Working Capital | 19 |
| Section 3.23 | Assets of Asset Manager Entities | 19 |
| Section 3.24 | Liabilities Relating to Asset Manager Entities | 19 |
| Section 3.25 | Brokers | 19 |
| Section 3.26 | Brokerage Accounts | 20 |
| Section 3.27 | Exclusivity of Representations and Warranties | 20 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF THE BUYER AND MERGER COMPANY | 20 |
| Section 4.1 | Organization | 20 |
| Section 4.2 | Authority | 21 |
| Section 4.3 | No Conflict or Violation | 21 |
| Section 4.4 | Governmental and Third Party Consents | 22 |
| Section 4.5 | Brokers | 22 |
| Section 4.6 | Financing | 22 |
| ARTICLE 5 | COVENANTS | 23 |
| Section 5.1 | Conduct of Business of the Company | 23 |
| Section 5.2 | Tax Matters | 25 |
| Section 5.3 | Access to Information | 25 |
| Section 5.4 | Efforts to Consummate | 26 |
| Section 5.5 | Public Announcements | 27 |
| Section 5.6 | Exclusive Dealing | 27 |
| Section 5.7 | Employee Benefits | 27 |
| Section 5.8 | No Disposition or Encumbrance of Membership Interests | 28 |

MB02055008

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# TABLE OF CONTENTS
## (Cont'd)

Page

| | | |
|---|---|---|
| Section 5.9 | Segregation of Funds | 28 |
| Section 5.10 | 2002 Financials | 28 |
| Section 5.11 | Financial Information | 29 |
| Section 5.12 | Management Bonus Pool Plan | 29 |
| Section 5.13 | BAWAG Interest Transfer Transactions | 29 |
| Section 5.14 | Certain Distributions | 30 |
| ARTICLE 6 | CONDITIONS TO CLOSING | 30 |
| Section 6.1 | Conditions to the Obligations of the Parties | 30 |
| Section 6.2 | Other Conditions to the Obligations of the Buyer | 30 |
| Section 6.3 | Other Conditions to the Obligations of RGHI | 32 |
| ARTICLE 7 | TERMINATION; AMENDMENT; WAIVER | 33 |
| Section 7.1 | Termination | 33 |
| Section 7.2 | Effect of Termination | 34 |
| Section 7.3 | Fees and Expenses | 35 |
| Section 7.4 | Amendment | 35 |
| Section 7.5 | Extension; Waiver | 35 |
| ARTICLE 8 | SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION | 35 |
| Section 8.1 | Survival of Representations | 35 |
| Section 8.2 | General Indemnification | 36 |
| Section 8.3 | Third Party Claims | 37 |
| Section 8.4 | Limitations on Indemnification Obligations | 38 |
| Section 8.5 | Knowledge | 38 |
| Section 8.6 | Exclusive Remedy | 39 |
| Section 8.7 | Proration | 39 |
| ARTICLE 9 | MISCELLANEOUS | 39 |
| Section 9.1 | Entire Agreement; Assignment | 39 |
| Section 9.2 | Notices | 40 |
| Section 9.3 | Governing Law | 42 |
| Section 9.4 | Construction; Interpretation | 42 |

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# TABLE OF CONTENTS
## (Cont'd)

| | | Page |
|---|---|---|
| Section 9.5 | Parties in Interest | 42 |
| Section 9.6 | Severability | 42 |
| Section 9.7 | Counterparts | 42 |
| Section 9.8 | Knowledge of the Company | 42 |
| Section 9.9 | Waiver of Jury Trial | 42 |
| Section 9.10 | Schedules | 43 |
| Section 9.11 | Definitions | 44 |
| Section 9.12 | Obligations for Indemnification | 48 |

MB02055010

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

SCHEDULES:

| | | |
|---|---|---|
| 2.4 | - | Post Closing Earn-Out Escrow Amount |
| 3.3 | - | Capitalization |
| 3.4 | - | Impairment of Contracts |
| 3.5 | - | Governmental and Third Party Consents |
| 3.6 | - | Permits |
| 3.8 | - | Investments |
| 3.10 | - | Liabilities |
| 3.11 | - | Absence of Certain Changes |
| 3.12 | - | Interests of Officers and Directors |
| 3.13 | - | Litigation |
| 3.14 | - | Taxes |
| 3.15 | - | Material Contracts |
| 3.16 | - | Employee Plans |
| 3.18 | - | Intellectual Property |
| 3.19 | - | Labor Matters |
| 3.20(b) | - | Leased Real Property |
| 3.20(c) | - | Personal Property Liens |
| 3.25 | - | Brokers |
| 4.4(a) | - | Governmental and Third Party Consents of the Buyer |
| 4.4(b) | - | Governmental and Third Party Consents of Merger Company |
| 4.5 | - | Brokers |
| 4.6 | - | Financing |
| 5.1(c) | | Asset Manager Entities |
| 5.1(g) | - | Capital Structure of the Company or Any Subsidiary |
| 6.2(f) | - | Financing/Term Sheets |


EXHIBITS:

| | | |
|---|---|---|
| A | - | Members of the Company |
| B | - | List of Subsidiaries |
| C | - | Form of Amended and Restated Limited Liability Company Agreement |
| D | - | Form of Escrow Agreement |
| E | - | Form of Management Bonus Pool Plan |
| F | - | Form of Securityholders Agreement |
| G | - | Form of Management Agreement |
| H | - | Form of Letter Agreement |

MB02055011

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

## DEFINITIONS

The following terms which appear in this Agreement are defined in the following Sections:

| Term | Section or Other Location |
|------|---------------------------|
| Affiliate | Section 9.11 |
| Agreement | Preamble |
| Aggregate Consideration Amount | Section 1.1(a) |
| Amended and Restated Limited Liability Company Agreement | Section 1.5 |
| Antitrust Laws | Section 9.11 |
| Asset Manager Entities | Section 5.1(c) |
| Balance Sheets | Section 3.10 |
| BAWAG | Preamble |
| BAWAG Interest Transfer Transactions | Section 5.13 |
| BAWAG Merger | Section 5.13 |
| BAWAG Transferred Interests | Section 2.1(a)(i) |
| BOI | Recitals |
| Business Day | Section 9.11 |
| Buyer Indemnitee | Section 8.2(a) |
| Buyer | Preamble |
| Certificate of Merger | Section 1.3 |
| CFTC | Section 9.11 |
| Class A Common Unit | Section 2.1(a)(i) |
| Closing | Section 1.6(a) |
| Closing Date | Section 1.6(a) |
| CME | Section 9.11 |
| COBRA | Section 3.16(h) |
| Code | Section 9.11 |
| Company | Preamble |
| Company Employees | Section 5.7 |
| Company Indebtedness | Section 9.11 |
| Company Intellectual Property and Technology | Section 3.18(a) |
| Company Plans | Section 3.16(a) |
| Company Transaction Expenses | Section 9.11 |
| Customer Financing Indebtedness | Section 9.11 |
| Debt and Excess Expense Amount | Section 1.1(a) |
| DLLCA | Section 1.2 |
| Effective Time | Section 1.3 |
| Enforceability Limitations | Section 3.2 |
| Environmental, Health, and Safety Requirements | Section 3.17(c) |
| ERISA | Section 9.11 |
| ERISA Affiliate | Section 3.16(a) |

MB02055012

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

| Term | Section or Other Location |
|------|--------------------------|
| Escrow Agent | Section 2.3 |
| Escrow Agreement | Section 2.3 |
| Excluded Employees | Section 5.7(b) |
| Finance Company | Section 9.11 |
| Financial Statements | Section 3.9 |
| GAAP | Section 3.9(a) |
| Governmental Authority | Section 9.11 |
| Governmental Order | Section 9.11 |
| HSR Act | Section 9.11 |
| Indemnified Party | Section 8.3(a) |
| Intellectual Property | Section 9.11 |
| IRS | Section 9.11 |
| Law | Section 9.11 |
| Leased Real Property | Section 3.20(b) |
| Legal Proceeding | Section 9.11 |
| Letter Agreement | Section 6.2(n) |
| Lien | Section 9.11 |
| Limited Liability Company Agreement | Recitals |
| Loss | Section 8.2(a) |
| Management Agreement | Section 6.2(n) |
| Material Adverse Effect | Section 9.11 |
| Material Contracts | Section 3.15 |
| Material Leases | Section 3.20(b) |
| Membership Interests | Recitals |
| Memphis Holdings Purchase Agreement | Section 1.1(a) |
| Merger | Recitals |
| Merger Company | Preamble |
| Non-U.S. Employees | Section 3.16(n) |
| Non-Voting Membership Interests | Recitals |
| Organizational Documents | Section 9.11 |
| Parties | Preamble |
| Per Share Amount | Section 1.1(a) |
| Permits | Section 9.11 |
| Permitted Exceptions | Section 9.11 |
| Person | Section 9.11 |
| Post Closing Earn-Out Amounts | Section 9.11 |
| Post Closing Earn-Out Escrow Amount | Section 2.3 |
| Pre-Closing Tax Returns | Section 5.2(a) |
| Purchased Membership Interests | Section 1.1(b) |
| Responsible Party | Section 8.3(a) |
| RGHI | Preamble |
| RGHI Equity Portion | Section 9.11 |
| SEC | Section 9.11 |
| Securities Act | Section 3.3 |

MB02055013

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

| Term | Section or Other Location |
|------|---------------------------|
| Securityholders Agreement | Section 6.2(i) |
| Self-Regulatory Organization | Section 9.11 |
| Seller Indemnitee | Section 8.2(b) |
| Separate Account | Section 5.9 |
| Subsidiary | Section 9.11 |
| Surviving Company | Section 1.2 |
| Taxes | Section 9.11 |
| Tax Return | Section 9.11 |
| Technology | Section 9.11 |
| Termination Date | Section 7.1(b) |
| Third Party Claim | Section 8.3(a) |
| THL | Section 6.2(n) |
| Threshold | Section 8.4(a)(ii) |
| Updated Schedules | Section 9.10(a) |
| Voting Membership Interests | Recitals |

DA1:\367401\22\7VHL22!.DOC\77356.0036

MB02055014

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EQUITY PURCHASE AND MERGER AGREEMENT

THIS EQUITY PURCHASE AND MERGER AGREEMENT (this "Agreement"), dated as of June 8, 2004, is made by and among Refco Group Ltd., LLC, a Delaware limited liability company (the "Company"), Refco Group Holdings, Inc., a Delaware c orporation ("RGHI"), T HL R efco A cquisition Partners, a D elaware g eneral partnership (the "Buyer") and Refco Merger LLC, a Delaware limited liability company ("Merger Company"). In addition, (i) Alinea Holding GmbH ("BAWAG") is a party to the Agreement solely for purposes of Section 5.13, and (ii) Phillip R. Bennett and Tone Grant are parties to this Agreement solely for purposes of Section 9.12. The Company, RGHI, the Buyer and Merger Company shall be referred to herein from time to time collectively as the "Parties" and individually as a "Party."

WHEREAS, in accordance with the limited liability company agreement of the Company as currently in effect (the "Limited Liability Company Agreement"), there are issued and outstanding 947 Voting Membership Shares of the Company (the "Voting Membership Interests") and 53 Non-Voting Membership Shares of the Company (the "Non-Voting Membership Interests," and, together with the Voting Membership Interests, the "Membership Interests");

WHEREAS, as of the date hereof, RGHI and BAWAG Overseas, Inc. ("BOI") are the owners of all of the Membership Interests in the respective amounts as set forth in Exhibit A attached hereto;

WHEREAS, as of the date of this Agreement, BAWAG is the sole owner of all equity interests of BOI;

WHEREAS, t he C ompany o wns, d irectly o r i ndirectly, a ll o r a m ajority o f t he equity interests in the entities listed in Exhibit B attached hereto;

WHEREAS, the Buyer desires to purchase, subject to the terms and conditions hereof, certain Membership Interests from RGHI;

WHEREAS, subject to the terms and conditions hereof, Merger Company will merge with and into the Company, with the Company being the surviving entity of the merger (the "Merger");

NOW, THEREFORE, in consideration of the premises and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

MB02055015

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# ARTICLE 1
## MEMBERSHIP INTERESTS PURCHASE; MERGER

**Section 1.1**    **Purchase and Sale of the Membership Interests**.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, at the Closing the Buyer will purchase from RGHI, and RGHI will sell to the Buyer, three hundred forty-nine and six/tenths (349.6) Voting Membership Interests, for cash equal to the Per Share Amount for each Voting Membership Interest. "Per Share Amount" means the quotient of the Aggregate Consideration Amount divided by the total number of Membership Interests issued and outstanding immediately prior to the Merger. "Aggregate Consideration Amount" means $2,250,000,000 minus the sum of (i) the total amount of Company Indebtedness outstanding as of immediately prior to the Closing (including amounts required to be repaid as a condition to the Closing in accordance with Section 6.2(l)), plus (ii) any out-of-pocket expenses or other additional amounts (other than interest accrued prior to the Closing), including prepayment premiums, that are required to be paid in order to fully repay as promptly as practicable in connection with or following the Closing any Company Indebtedness outstanding as of immediately prior to the Closing, plus (iii) any amounts that were paid by the Company or any of the Subsidiaries following February 29, 2004 and prior to the Closing for or in connection with the repayment of any Company Indebtedness (other than payments of interest accrued prior to such repayment), plus (iv) any amounts that have been paid following February 29, 2004 and prior to the Closing by the Company or any of the Subsidiaries that represent any deferred (whether or not contingent) obligation to pay purchase price or other consideration in connection with any acquisition of a business or any business combination transaction, plus (v) any Company Transaction Expenses in excess of $20,000,000 in the aggregate, plus (vi) any amounts payable by the Company pursuant to a Change in Control (as defined in the Memphis Holdings Purchase Agreement) pursuant to that certain Stock Purchase Agreement, dated as of January 2, 2001, between Memphis Holdings, LLC and the Company (the "Memphis Holdings Purchase Agreement"). The items in clauses (i) through (vi) collectively are referred to herein as the "Debt and Excess Expense Amount." The parties acknowledge and agree that it is their intention that the Per Share Amount will result in the net earnings or losses, as the case may be, of the Company and the Subsidiaries (other than the net earnings or losses, as the case may be, of the Asset Manager Entities), for all periods following February 29, 2004, accruing to the benefit of Persons who will be the owners of the Company from and following the Closing.

(b)    The number of Voting Membership Interests purchased by the Buyer pursuant to Section 1.1(a) may be reduced or increased at the election of the Buyer; provided, however, that such number of Voting Membership Interests cannot be increased above the number that can be purchased for $627,000,000 at the Per Share Amount. Such election to reduce or increase the number of purchased Voting Membership Interests will have the effect of increasing or reducing, respectively, the number of Voting Membership Interests held by RGHI that are converted into the right to receive cash pursuant to the Merger, as specified in Section 2.1(a). The Voting

MB02055016

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Membership Interests purchased by the Buyer pursuant to <u>Section 1.1(a)</u> are referred to herein as the "<u>Purchased Membership Interests</u>."

(c)     At the Closing, RGHI shall deliver to the Buyer certificate(s) representing the Purchased Membership Interests, duly endorsed in blank or accompanied by stock powers or any other proper instrument of assignment endorsed in blank in proper form for transfer.  At the Closing, the Buyer shall pay to RGHI, in consideration for the Purchased Membership Interests, by wire transfer of immediately available funds to the account designated by RGHI, the cash amount provided in <u>Section 1.1(a)</u>.

Section 1.2     <u>**The Merger**</u>.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing at the time provided for in <u>Section 1.6(b)</u>, and upon the terms and subject to the conditions in this Agreement and in accordance with the Delaware Limited Liability Company Act (the "<u>DLLCA</u>"), Merger Company shall be merged with and into the Company pursuant to the Merger.  Following the Merger, the Company shall continue as the surviving limited liability company (the "<u>Surviving Company</u>") and the separate existence of Merger Company shall cease.

Section 1.3     <u>**Effective Time**</u>.  Subject to the provisions of this Agreement, the Company and Merger Company shall cause the Merger to be consummated by filing an appropriate Certificate of Merger or other appropriate documents (the "<u>Certificate of Merger</u>") with the Secretary of State of the State of Delaware in such form as required by, and executed in accordance with, the relevant provisions of the DLLCA, on the Closing Date.  The Merger shall become effective on the Closing Date at the time specified in <u>Section 1.6(b)</u> (the "<u>Effective Time</u>").

Section 1.4     <u>**Effects of the Merger**</u>.  The Merger shall have the effects set forth in the DLLCA.  Without limiting the foregoing, and subject thereto, at the Effective Time, all the properties, rights, privileges, powers and franchises of the Company and Merger Company shall vest in the Surviving Company, and all debts, liabilities and duties of the Company and Merger Company shall become the debts, liabilities and duties of the Surviving Company.

Section 1.5     <u>**Limited Liability Company Agreement**</u>.  Upon the Effective Time, the limited liability company agreement of the Company shall be amended to read as set forth in the form attached hereto as <u>Exhibit C</u> (the "<u>Amended and Restated Limited Liability Company Agreement</u>").

Section 1.6     <u>**Closing**</u>.

(a)     <u>Time and Place of Closing</u>.  The closing of the transactions contemplated hereby (the "<u>Closing</u>") shall take place at 10:00 a.m., New York time, on a date to be specified by the Parties, which shall be no later than the second Business Day after satisfaction (or waiver) of the conditions set forth in <u>Article 6</u> other than those conditions that, by their terms cannot be satisfied until the Closing (the "<u>Closing Date</u>"),

**MB02055017**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

at the offices of Mayer, Brown, Rowe & Maw LLP, 1675 Broadway, New York, New York 10019, unless another time, date or place is agreed to in writing by the Parties.

(b)    Closing Procedures.  At the Closing, the following transactions will occur in the following chronological order:  (i) the purchase of the Purchased Membership Interests in accordance with Section 1.1, (ii) the BAWAG Interest Transfer Transactions (in the order specified in Section 5.13), (iii) the distributions set forth in Section 5.14 (subject, in the case of the $500 million cash distribution referred to in Section 5.14, to the provisions of Section 5.9), and (iv) the Merger.

## ARTICLE 2
## CONVERSION OF MEMBERSHIP INTERESTS; PAYMENT OF CONSIDERATION; CONTRIBUTION OF EQUITY INTERESTS

Section 2.1    Conversion of Membership Interests.

(a)    At the Effective Time:

(i)    each outstanding Voting Membership Interest and Non-Voting Membership Interest held by RGHI that was acquired by RGHI pursuant to the BAWAG Interest Transfer Transactions (the "BAWAG Transferred Interests") shall, by virtue of the Merger and without any action on the part of the Company or Merger Company, be converted into one Class A Common Unit (as defined in the Amended and Restated Limited Liability Company Agreement) of the Surviving Company (each, a "Class A Common Unit");

(ii)    in the case of the number of outstanding Voting Membership Interests other than BAWAG Transferred Interests held by RGHI that is equal to the RGHI Equity Portion, each such outstanding Voting Membership Interest shall, by virtue of the Merger and without any action on the part of the Company or Merger Company, be converted into one Class A Common Unit;

(iii)    in the case of the outstanding Voting Membership Interests held by RGHI that are not converted into Class A Common Units in accordance with clauses (i) and (ii) above, each such outstanding Voting Membership Interest shall, by virtue of the Merger and without any action on the part of the Company or Merger Company, be converted into the right to receive, subject to the terms and conditions of this Agreement, the Per Share Amount in cash;

(iv)    each of the Purchased Membership Interests shall, by virtue of the Merger and without any action on the part of the Company or Merger Company, be converted into one Class A Common Unit; and

(v)    in the case of the outstanding membership interests of Merger Company, each membership interest automatically shall be canceled and

MB02055018

CONFIDENTIAL TREATMENT REQUESTED BY WILLIAMS AND CONNOLLY LLP

retired and shall cease to exist, without any conversion thereof, and no consideration shall be delivered in exchange therefor.

(b)    Surrender of Certificates.    At the Closing, each holder of Membership Interests will surrender to the Surviving Company each certificate that represents Membership Interests held by such holder. Upon the proper receipt of such certificates from any such holder, such holder will be entitled to receive (i) cash in the amount provided in Section 2.1(a) for any Membership Interests of such holder that were converted into the right to receive the Per Share Amount, and (ii) certificates representing any Class A Common Units issued to such holder pursuant to the Merger for any Membership Interests o f s uch h older t hat w ere converted i nto t he r ight t o r eceive o ne Class A Common Unit for each such Membership Interest.

(c)    No Further Ownership Rights.    From and following the Effective Time, the Membership Interests shall be extinguished and thereafter shall not represent any right of ownership in the Company or the Surviving Company but, instead, will represent o nly t he r ight t o r eceive c ash o r C lass A C ommon U nits a s p rovided i n t his Article 2.

**Section 2.2    Debt and Excess Expense Amount; Payment of Cash at Closing.** A reasonable period of time prior to the Closing Date, the Company shall provide to the Buyer (a) a calculation reflecting the Debt and Excess Expense Amount and (b) supporting documentation sufficient for the Buyer to fully verify t he Debt and Excess Expense Amount, which documentation will include statements from relevant attorneys, accountants, advisors and investment bankers reflecting the total fees and expenses of such professionals that would be included as Company Transaction Expenses.

**Section 2.3    Escrow.** Notwithstanding the provisions of Sections 1.1 and 2.1, at the Closing, $39,014,313 (the "Post Closing Earn-Out Escrow Amount") that otherwise would be paid in cash at the Closing to RGHI instead shall be deposited by the Buyer and the Surviving Company (on a pro rata basis in accordance with the respective amounts of cash otherwise being paid by the Buyer and the Surviving Company to RGHI at the Closing) with HSBC Bank USA (the "Escrow Agent") pursuant to the Escrow Agreement in substantially the form attached hereto as Exhibit D with other reasonable changes as the Escrow Agent may request (the "Escrow Agreement"). The Post Closing Earn-Out Escrow Amount will reduce the cash amount paid at the Closing to RGHI.

**Section 2.4    Post Closing Earn-Out Amounts.** When any particular Post Closing Earn-Out Amount is required to be paid following the Closing, such amount shall be paid to the Surviving Company out of the specific portion of the Post Closing Earn-Out Escrow Amount that is allocated to such particular Post Closing Earn-Out Amount on S chedule 2 .4. If t he p ortion o f t he P ost C losing E arn-Out E scrow Amount t hat i s allocated to such Post Closing Earn-Out Amount on Schedule 2.4 is insufficient to pay such amount or if no portion of the Post Closing Earn-Out Escrow Amount is allocated to such Post-Closing Earn-Out Amount, then RGHI shall be liable for such deficiency. If

MB02055019

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

any portion of the Post Closing Earn-Out Escrow Amount that is allocated to a particular Post Closing Earn-Out Amount on Schedule 2.4 remains after such Post Closing Earn-Out Amount has been satisfied in full, such remaining amount will be paid to RGHI.

Section 2.5    **Contribution of Equity Interests**.    Immediately following the Merger, the Surviving Company shall (a) contribute to Finance Company all of the equity interests in any Subsidiary that are owned directly by the Surviving Company and (b) cause Finance Company to distribute to the Surviving Company, on account of such contribution, the net proceeds received by Finance Company from the debt financing transactions referred to in Section 6.2(f).    Such net proceeds shall provide the cash that is to be paid at the Closing by the Surviving Company on account of the Merger.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF RGHI

RGHI hereby represents and warrants to the Buyer as follows:

Section 3.1    **Organization of the Company**.    The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and is qualified to do business in, and is in good standing under the laws of, each jurisdiction where the failure to so qualify has had or would r easonably b e e xpected t o h ave a M aterial A dverse E ffect. E ach S ubsidiary i s duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and is qualified to do business as a foreign entity in, and is in good standing under the laws of each jurisdiction in which the failure to so qualify has had or would reasonably be expected to have a Material Adverse Effect. Each Subsidiary has all requisite power and authority to own, lease and operate its properties and to carry on its business as presently being, and contemplated to be, conducted. The Company has all requisite power and authority to own, lease and operate its properties, and to carry on its business as presently being, and contemplated to be, conducted. The corporate minute books of the Company's predecessor, the limited liability company minute books of the Company and the minute books of each Subsidiary previously made available to the Buyer are true, correct and complete and contain the minutes of all the meetings of, and other actions taken by, the Company's or such Subsidiary's directors, managers, officers, members and stockholders through the date hereof. RGHI is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation.

Section 3.2    **Authorization**.    The Company and RGHI have all requisite power and authority to execute and deliver this Agreement and the other agreements and instruments executed by each in connection herewith, perform its respective obligations hereunder and thereunder, and consummate the transactions contemplated hereby and thereby. The Company and RGHI have duly authorized the execution, delivery and performance of this Agreement. This Agreement has been duly executed and delivered by the Company and RGHI and is a valid and binding obligation of the Company and RGHI, enforceable against each in accordance with its terms, except as such

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization o r s imilar l aws i n e ffect t hat a ffect t he e nforcement o f creditors' r ights generally and by equitable limitations on the availability of specific remedies and by principles of equity (collectively, "Enforceability Limitations"). No other proceedings on the part of the Company or RGHI are necessary to authorize the execution and delivery of this Agreement by the Company and RGHI, or the performance by the Company and RGHI of the obligations of each hereunder, and the consummation by the Company and RGHI of the transactions contemplated hereby.

Section 3.3    Capitalization of the Company.    All of the outstanding Membership I nterests have been duly a uthorized and are validly issued, d uly paid and non-assessable. None of the Membership Interests were issued in violation of any preemptive or similar rights of any other person or entity, nor in violation of the United States Securities Act of 1933, as amended (the "Securities Act"), or applicable securities laws of any other jurisdiction. Exhibit A hereto sets forth a true, complete and correct list of all of the members of the Company immediately preceding the execution and delivery of this Agreement and the number of Membership Interests owned by each such Member. Except for this Agreement and as described in Schedule 3.3, there are no other agreements, written or oral, between the Company or any Subsidiary and any holder of its respective equity interests, relating to the acquisition, disposition or voting of its equity interests. There are no outstanding subscriptions, options, warrants, calls, commitments or any other agreements of any character obligating the Company or any Subsidiary to issue any equity interests at any time or under any circumstance, including conversion of debt into equity and including any rights to receive securities in any public offering by the Company or its successors, except as disclosed in Schedule 3.3. RGHI owns the Membership Interests reflected as owned by it on Exhibit A hereto, free and clear of all Liens. U pon e ffectiveness o f t he B AWAG Interest T ransfer T ransactions ( and i n a ny event as of the time immediately prior to the Merger), RGHI will own the Membership Interests reflected as owned by BOI on Exhibit A hereto, free and clear of all Liens. The Company and each of the Subsidiaries that are subject to such minimum net capital requirements maintains and has at all times maintained net capital in excess of the minimum level(s) of net capital required by the SEC, CFTC, CME or other applicable Governmental Authorities or Self Regulatory Organizations by an amount sufficient in order to avoid the triggering of any "early warning" notification provisions or similar provisions.

Section 3.4    No Conflict or Violation.    The execution, delivery and performance by the Company and RGHI of this Agreement and the consummation by the Company and RGHI of the transactions contemplated hereby do not and will not (1) conflict with or violate any provision of the Organizational Documents of RGHI or the Company or any of the Subsidiaries; (2) except as set forth on Schedule 3.4, violate, conflict with or constitute or result in (or with notice, lapse of time or both become) a default or a breach under or result in the acceleration, termination or cancellation of (or entitle a ny P erson o r g ive a ny P erson t he r ight t o a ccelerate, t erminate or c ancel) a ny obligation under any contract or agreement to which RGHI or the Company or any of the

MB02055021

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Subsidiaries is a party or by which any of the assets or property of RGHI or the Company or any of the Subsidiaries is bound, except for any of such matters or consequences that would not reasonably be expected to have a Material Adverse Effect or adversely affect the ability of RGHI to consummate the transactions contemplated by this Agreement; or (3) contravene or violate any law, statute, rule or regulation applicable to RGHI or the Company or any of the Subsidiaries or any of their respective assets or properties, or any Governmental Order to which RGHI or the Company or any of the Subsidiaries is a party or by which any of them or any of their respective assets or properties is bound, except for any of such matters or consequences that would not reasonably be expected to have a Material Adverse Effect or adversely affect or restrict the ability of RGHI to consummate the transactions contemplated by this Agreement.

**Section 3.5    Governmental and Third Party Consents**.    Except for (1) compliance with Antitrust Laws, (2) the filing of amended registration forms with the applicable futures and securities authorities, (3) approval by each Self-Regulatory Organization of which a Subsidiary is a member, and (4) the other actions set forth on Schedule 3.5, the execution, delivery and performance by the Company and RGHI of this Agreement and the consummation by the Company and/or RGHI of the transactions contemplated hereby do not and will not, to the knowledge of the Company, require RGHI, the Company or any Subsidiary to obtain the approval, consent or authorization of, to make any declaration, filing or registration with, or to give notice to, any Governmental Authority, any Self-Regulatory Organization or any other Person, except to the extent the failure to obtain, make or give any of the foregoing would not reasonably be expected to have a Material Adverse Effect.  Schedule 3.5 sets forth each of the approvals or consents of any Self-Regulatory Organization of which a Subsidiary is a member that, to the knowledge of the Company, is required to be obtained by the Company or any Subsidiary as a result of the execution and delivery of this Agreement by the Company or RGHI or the consummation by the Company and RGHI of the transactions contemplated hereby.

**Section 3.6    Compliance with Law; Permits**.    Except as set forth on Schedule 3.6, the Company possesses, and all Subsidiaries possess, all Permits that are material to the operation of their respective businesses as presently conducted and as presently intended to be conducted, all such Permits are in full force and effect, and the Company or the applicable Subsidiary has filed all required amendments to such Permits. The Company and each Subsidiary is in compliance with (and has conducted its business so as to comply with), all Laws and Governmental Orders of any Governmental Authority applicable to their respective operations or with respect to which compliance is a condition of engaging in the business thereof except for non-compliance that has not had and would not reasonably be expected to have a Material Adverse Effect.  Neither the Company nor any Subsidiary has received any extraordinary supervisory letter from, or adopted any resolutions at the request of, any Self-Regulatory Organization or Governmental Authority charged with the supervision or regulation of any Subsidiary. Except as set forth on Schedule 3.6, to the knowledge of the Company, neither the

MB02055022

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Company nor any Subsidiary is under investigation with respect to the violation of any Laws.

**Section 3.7     No Defaults**. Neither the Company nor any Subsidiary is, or has received notice that with the passage of time it would be, in violation of any provision of its O rganizational D ocuments. N either t he C ompany n or a ny S ubsidiary has r eceived notice that it is or would be with the passage of time, in default or violation of any term, condition or provision of (i) any Governmental Order or stipulation applicable to it, or (ii) any agreement, note, mortgage, indenture, contract, lease, instrument, permit, concession, franchise or license to which it is a party or by which any of them or their respective properties or assets may be bound or affected, other than any default or violation that has not had and would not reasonably be expected to have a Material Adverse Effect.

**Section 3.8     Subsidiaries**. Except for the Subsidiaries listed in <u>Exhibit B</u> and the investments listed in <u>Schedule 3.8</u> and any other investments valued at $1,000,000 or less, the Company does not have, directly or indirectly, any ownership interest or other investment in any corporation, association, partnership, business, trust or other entity. <u>Exhibit B</u> lists e ach S ubsidiary's j urisdiction o f incorporation. E xcept a s s et forth o n <u>Exhibit B</u> or on <u>Schedule 3.8</u>, each outstanding share of capital stock of, or other ownership interests in, each of the Subsidiaries or other entity in which any interest exists is owned by the Company and is duly authorized, validly issued, fully paid and nonassessable and each such share or other interest owned by the Company or any Subsidiary is free and clear of all Liens.

**Section 3.9     Financial Statements**. The Company has furnished to the Buyer true, complete and accurate copies of its audited consolidated financial statements at and for the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004, and the related audited statements of income and cash flows for the periods then ended, (such financial statements and accompanying notes and schedules are collectively referred to herein as the "<u>Financial Statements</u>").

(a)     The Financial Statements have been prepared from the books and records of the Company and its Subsidiaries on a consolidated basis, present fairly in all material respects the consolidated financial position, results of operations and cash flows of the Company and its Subsidiaries on a consolidated basis at and for the periods stated therein, and, except as may be noted in the notes thereto, are in conformity with generally accepted accounting principles and practices in the United States consistently applied ("<u>GAAP</u>").

(b)     The books and records of the Company and its Subsidiaries on a consolidated basis have been maintained in all material respects in accordance with applicable accounting requirements, reflect only bona fide transactions, are complete and correct and accurately reflect the basis for the financial position, results of operations and cash flows of the Company and its Subsidiaries on a consolidated basis as set forth in the Financial Statements. The Company and each of the Subsidiaries maintains systems of

MB02055023

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

internal accounting controls sufficient to provide commercially reasonable assurances that all assets and transactions are accounted for in accordance with GAAP.

(c)    Except for o perating guarantees o f o bligations o f a ny S ubsidiary made by the Company or any Subsidiary in the ordinary course of business or as reflected in the Financial Statements, neither the Company nor any of the Subsidiaries on a consolidated basis has any debt, guaranty, liability, claim or obligation of any nature, whether accrued, absolute, contingent or otherwise, whether due or to become due, and whether known or unknown, and no basis exists for the assertion against the Company and the Subsidiaries on a consolidated basis of any such debt, guaranty, liability, claim or obligation, except current liabilities incurred, and obligations under agreements entered into, in the ordinary course of business.

(d)    All reserves established by the Company and the Subsidiaries on a consolidated basis with respect to assets of the Company and the Subsidiaries on a consolidated basis are adequate to the knowledge of the Company at the time created, and there has been no change in the accounting policies of the Company and the Subsidiaries on a consolidated basis, except as described in the notes to the Financial Statements.

Section 3.10    **Absence of Undisclosed Liabilities**.  Neither the Company nor any Subsidiary has any liabilities or obligations (whether absolute, accrued or contingent, and whether or not determined or determinable) of a character which, under GAAP, should be accrued, shown or disclosed on a balance sheet of the Company (including the Subsidiaries on a consolidated basis) included in the Financial Statements (including the footnotes thereto), except liabilities (i) adequately provided for in the balance sheets included in the Financial Statement (the "Balance Sheets"), (ii) incurred in the ordinary course of business and not required under GAAP to be reflected on the Balance Sheets, (iii) incurred since the date of the Balance Sheets and which are not, individually or in the aggregate, material, or (iv) except for Liabilities set forth on Schedule 3.10.

Section 3.11    **Absence of Certain Changes**.   Except as set forth on Schedule 3.11, since March 1, 2004, there has not been: (a) any event that has had or would reasonably be expected to have a Material Adverse Effect, (b) any damage, destruction or loss with respect to the Company or any Subsidiary, whether covered by insurance or not, that would reasonably be expected to have a Material Adverse Effect, or (c) any event, action or occurrence that would have violated Section 5.1 if this Agreement had been in effect at all times since such date.

Section 3.12    **Interests of Officers and Directors**.   Except as set forth on Schedule 3.12, since March 1, 2003, no officer, manager, director, or member of the Company o r a ny S ubsidiary, o r a ny A ffiliate o f a ny s uch o fficer, d irector, m ember o r other equity holder, has had, either directly or indirectly, a material interest in any contract or agreement to which the Company or any Subsidiary is a party or by which any of their properties or assets may be bound or affected, except for employment contracts entered into on an arm's-length basis.

MB02055024

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 3.13  Litigation**.  Except as set forth on <u>Schedule 3.13</u>, (a) there is no Legal Proceeding or, to the Company's knowledge, governmental investigation pending or, to the Company's knowledge, threatened against the Company or any Subsidiary (or against RGHI or any of its Affiliates and related to the Company or any Subsidiary), or any property or asset of the Company or any of the Subsidiaries, that has had or would reasonably be expected to have a Material Adverse Effect or adversely affect the ability of the Company or RGHI to consummate the transactions contemplated by this Agreement and (b) none of RGHI or the Company or any Subsidiary is a party to, or in default under, any outstanding Governmental Order that has had or would reasonably be expected to have a Material Adverse Effect.

**Section 3.14  Taxes**.  Except as set forth on <u>Schedule 3.14</u>:

(i)     Each of the Company and the Subsidiaries has timely filed all Tax Returns required to be filed by it, and has paid all Taxes required to be paid, and has made adequate provision on its financial statements in accordance with GAAP for all Taxes not yet due and payable.  All such Tax Returns are true, correct and complete in all material respects.

(ii)     No deficiency or proposed adjustment which has not been resolved or settled for any amount of Tax has been proposed, asserted or assessed in writing by any taxing authority against the Company or any of the Subsidiaries.

(iii)     The Company and the Subsidiaries have duly and timely complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and have withheld and paid over to the appropriate taxing authorities all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party.

(iv)     Neither the Company nor any of the Subsidiaries has been notified in writing that any Tax Return is currently under audit by the IRS or any state or local taxing authority or that it intends to conduct such an audit and no action, suit, investigation, claim or assessment is pending or, to the knowledge of the Company or any of the Subsidiaries, proposed with respect to any Taxes.  The Company has made available to the Buyer copies of all Tax Returns of the Company and the Subsidiaries for all taxable periods beginning on or after January 1, 2000 and all examination reports and written statements of deficiencies assessed against or agreed to by the Company or any of the Subsidiaries since January 1, 2000.

(v)     Neither the Company nor any of the Subsidiaries: (a) has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency or (b) is a party to any Tax allocation, sharing or similar agreement with any Person.

**MB02055025**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(vi)    No claim has been made by a taxing authority in a jurisdiction where the Company or any of the Subsidiaries does not file Tax Returns such that it is or may be subject to taxation by that jurisdiction or that its direct or indirect partners or members, by reason of their status as such, are or may be subject to taxation by that jurisdiction.

(vii)    Neither the Company nor any other Person (including any of the Subsidiaries) on behalf of the Company or any of the Subsidiaries have (i) agreed to or are required to make any adjustments pursuant to Section 481(a) of the Code or any similar provision of state, local or foreign law by reason of a change in accounting method or have any knowledge that the IRS has proposed any such adjustment or change in accounting method, or have any application pending with any taxing authority requesting permission for any changes in accounting methods that relate to the business or operations of the Company or any of the Subsidiaries or (ii) executed or entered into a closing agreement pursuant to Section 7121 of the Code or any predecessor provision thereof or any similar provision of state, local or foreign law with respect to the Company or any of the Subsidiaries.

(viii)    As of the Closing Date, the Company will have at least $150 million of intangible assets which are amortizable for federal income tax purposes.

(ix)    The Company is, and has been since the date of its formation, treated and properly classified as a partnership for federal income tax purposes. The Subsidiaries are, and have been since the date of their respective formations, treated and properly classified as disregarded entities for federal income tax purposes. Neither the Company not any of the Subsidiaries has ever been a "publicly traded partnership" within the meaning of Section 7704 of the Code. Neither the Company not any of the Subsidiaries has ever made any election to be excluded from all or any part of Subtitle A, Chapter 1, Subchapter K of the Code.

**Section 3.15  Material Contracts**.    Except as set forth on Schedule 3.15 (collectively, the "Material Contracts") and except for this Agreement and except for any Material Lease and except for Customer Financing Indebtedness, neither the Company nor any Subsidiary is a party to or bound by any:

(i)    contract for the employment of any officer, individual employee or other person on a full-time, part-time, consulting or other basis providing annual compensation in excess of $250,000;

(ii)    agreement or indenture with any third party imposing a Lien on any of the Company's or any Subsidiary's assets or relating to the incurrence, assumption or guarantee of any indebtedness for borrowed money, except for indebtedness for borrowed money for an amount less than $1,000,000;

MB02055026

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(iii)    lease or agreement under which the Company or any Subsidiary is lessee of or holds or operates any property (other than real property), owned by any other party, except for any lease or agreement under which the aggregate annual rental payments do not exceed $500,000;

(iv)    lease or agreement under which the Company or any Subsidiary is lessor of or permits any third party to hold or operate any property (other than real property), owned or controlled by the Company or any Subsidiary, except for any lease or agreement under which the aggregate annual rental payments do not exceed $250,000;

(v)    contract or group of related contracts with the same party or group of affiliated parties the performance of which provides for the expenditure of more than $500,000 annually or $5,000,000 in the aggregate;

(vi)    agreement which contains restrictions with respect to payment of any distribution in respect of any of the Membership Interests;

(vii)    except for contracts for the employment of any officer, individual employee or other person on a full-time, part-time, consulting or other basis providing for annual compensation of $250,000 or less, agreement, contract or commitment containing covenants of the Company or any of the Subsidiaries not to compete in any line of business or with any person in any geographical area or covenants of any other person not to compete with the Company or any of the Subsidiaries in any line of business or in any geographical area, or that otherwise materially restricts the right of the Company or any of the Subsidiaries to engage in a particular line of business;

(viii)    any collective bargaining agreement, labor contract or other written agreement, arrangement with any labor union or any employee organization;

(ix)    any contract, arrangement or understanding that relates to the future disposition or acquisition of material assets or properties, or any merger or business combination; or

(x)    except for contracts for the employment of any officer, individual employee or other person on a full-time, part-time, consulting or other basis providing for annual compensation of $250,000 or less, any contract providing for severance, retention, change in control or other similar payments as a result (whether in and of itself or in conjunction with one or more events or transactions) of the consummation of the transactions contemplated by this Agreement.

(b)    Except as set forth on Schedule 3.15, each Material Contract is valid and binding on the Company or the applicable Subsidiary and, to the Company's

MB02055027

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

knowledge, on the other parties thereto and is in full force and effect. Except as set forth on Schedule 3.15, the Company and each Subsidiary, and, to the Company's knowledge, each of the other parties thereto, has performed in all material respects all material obligations required to be performed by it under each Material Contract. No party to any of the Material Contracts has exercised any termination rights with respect thereto. The Company has delivered or otherwise made available to Buyer true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

### Section 3.16    Employee Plans.

(a)    Schedule 3.16 sets forth: (i) all "employee benefit plans", as defined in Section 3(3) of ERISA, and all other employee benefit arrangements or payroll practices, including bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation for disability, hospitalization, medical insurance, life insurance, scholarship programs maintained by Company or to which the Company contributed or is obligated to contribute thereunder for current or former employees of the Company (the "Company Plans"). Neither the Company or any trade or business (whether or not incorporated) which is or has at any time within the last six years been under common control, or which is or has at any time within the last six years been treated as a single employer, with the Company under Section 4 14(b), (c), (m) o r ( o) o f t he C ode ( "ERISA A ffiliate") h as, b oth at any time within the last six years and during the time while an ERISA Affiliate of the Company, maintained, contributed to, or had any obligation to contribute to, or has any liability (fixed or contingent) with respect to, any plan subject to Title IV of ERISA or to the funding requirements of Section 412 of the Code including any plan which constituted a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA or any plan subject to Sections 4063 or 4064 of ERISA ("multiple employer plan").

(b)    To the extent applicable, true, correct and complete copies of the following documents, with respect to each of the Company Plans, have been made available or delivered to the Buyer by the Company (i) any plans and related trust documents, and amendments thereto; (ii) the most recent Forms 5500 and schedules thereto; (iii) the last IRS determination letter; (iv) the most recent financial statements and actuarial valuations; (v) summary plan descriptions; (vi) material written communications to employees relating to the Company Plans; and (vii) written descriptions of all material non-written agreements relating to the Company Plans.

(c)    The Company Plans intended to qualify under Section 401(a) of the Code have received a favorable determination or opinion letter from the Internal Revenue Service with respect to their qualified status under Section 401(a) of the Code and the tax-exempt status of the related trust under Section 501 of the Code, and nothing has occurred with respect to the operation of the Company Plans which could cause the loss of such qualification or exemption or the imposition of any liability, penalty or tax under ERISA or the Code.

MB02055028

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(d)    Except as set forth on Schedule 3.16, all contributions (including all employer contributions and employee salary reduction contributions) required to have been made under any of the Company Plans or by law, to any funds or trusts established thereunder or in connection therewith have been made by the due date thereof (including any valid extension), and all contributions for any period ending on or before the Closing Date which are not yet due will have been paid or accrued on the Balance Sheets on or prior to the Effective Time.

(e)    There are no pending actions, claims or lawsuits which have been asserted or instituted against the Company Plans, the assets of any of the trusts under such plans or the plan sponsor or the plan administrator, or against any fiduciary of the Company Plans with respect to the operation of such plans (other than routine benefit claims), nor does the Company have knowledge of facts which could reasonably form the basis for any such claim or lawsuit.

(f)    All amendments and actions required to bring the Company Plans into conformity in all material respects with all of the applicable provisions of the Code, ERISA and other applicable laws have been made or taken except to the extent that such amendments or actions are not required by law to be made or taken until a date after the Effective Time.

(g)    The Company Plans have been maintained, in all material respects, in accordance with their terms and with all provisions of ERISA, the Code (including rules and regulations thereunder) and other applicable federal and state laws and regulations, and, except as set forth on Schedule 3.16, neither the Company nor, to the knowledge of the Company, any "party in interest" or "disqualified person" with respect to the Company Plans has engaged in a non-exempt "prohibited transaction" within the meaning of Section 4975 of the Code or Section 406 of ERISA.  To the knowledge of the Company, no fiduciary has any liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any Company Plan.

(h)    None of the Company Plans which are "welfare benefit plans" within the meaning of Section 3(1) of ERISA provide for continuing benefits or coverage for any participant or any beneficiary of a participant post-termination of employment except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") and at the expense of the participant or the participant's beneficiary.  The Company and any ERISA Affiliate which maintains a "group health plan" within the meaning Section 5000(b)(1) of the Code has complied with the notice and continuation requirements of Section 4980B of the Code, COBRA, Part 6 of Subtitle B of Title I of ERISA and the regulations thereunder.

(i)    No liability under any Company Plan has been funded nor had any such obligation been satisfied with the purchase of a contract from an insurance company that is not rated AA by Standard & Poor's Corporation and the equivalent by each other nationally recognized rating agency.

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(j)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee (current, former or retired) of the Company, (ii) increase any benefits otherwise payable under any Company Plan or (iii) result in the acceleration of the time of payment or vesting of any such benefits.

(k)     The Company has no contract, plan or commitment, whether legally binding or not, to create any additional Company Plan or to modify any existing Company Plan.

(l)     With respect to any period for which any contribution to or in respect of any Company Plan (including workers compensation) is due and owing, the Company has made due and sufficient current accruals for such contributions and other payments in accordance with GAAP, and such current accruals through February 29, 2004 are duly and fully provided for in the balance sheet of the Company as of such date.

(m)     Any individual who performs services for the Company (other than through a contract with an organization other than such individual) and who is not treated as an employee for federal income tax purposes by the Company is not an employee for such purposes.

(n)     All Company Plans maintained outside the United States primarily for the benefit of persons substantially all of whom are nonresident aliens ("Non-U.S. Employees") are statutory benefits required to be provided under foreign law.

**Section 3.17    Environmental, Health, and Safety Matters.**

(a)     The Company and the Subsidiaries are and have been in compliance with Environmental, Health, and Safety Requirements (including obtaining all Permits required thereunder), except for such noncompliance as has not had or would not reasonably be expected to have a Material Adverse Effect. Neither the Company nor any Subsidiary has received any written notice, report or other information regarding any violation of Environmental, Health, and Safety Requirements relating to the Company or any Subsidiary and arising under Environmental, Health, and Safety Requirements, the subject of which has had or would reasonably be expected to have a Material Adverse Effect.

(b)     Notwithstanding anything contained herein to the contrary, this Section 3.17 contains the sole and exclusive representations and warranties of the Company with respect to any environmental, health, or safety matters, including any arising under any Environmental, Health, and Safety Requirements.

(c)     As used herein, "Environmental, Health, and Safety Requirements" shall mean all federal, state and local statutes, regulations, and ordinances concerning pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal,

MB02055030

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, as such requirements are enacted and in effect on or prior to the Closing Date.

**Section 3.18    Intellectual Property**. Schedule 3.18 sets forth an accurate and complete list of all Patents, registered Trademarks and registered Copyrights and applications to register Trademarks and Copyrights owned by the Company. Except as set forth on Schedule 3.18 or except as has not had or would not reasonably be expected to have a Material Adverse Effect:

(a)    the Company and the Subsidiaries are the sole and exclusive owners of all right, title and interest in or have a valid license to use all Intellectual Property and Technology, in each case, necessary for the conduct of its business as presently conducted ("Company Intellectual Property and Technology"), free and clear of all Liens other than Permitted Exceptions;

(b)    the Company and its Subsidiaries are the sole and exclusive owners of all right, title and interest in, or have a valid, unconditional, worldwide, perpetual, royalty-free license to use, any Copyrights in any computer programs, whether in source code or object code, databases, compilations, technical data, firmware or middleware, including all improvements and enhancements to any and all of the foregoing, used or currently contemplated to be used in the conduct of the business, in each case that have been prepared by or on behalf of the Company or its Subsidiaries by any employee, officer, consultant or contractor;

(c)    to the knowledge of the Company and each of its Subsidiaries: (i) the Company Intellectual Property and Technology does not infringe upon or misappropriate any Intellectual Property rights of any Person; (ii) no claims or allegations of infringement or unauthorized use involving any Company Intellectual Property or Technology by the Company or any Subsidiary of the Company are pending against a third party; (iii) there are no pending claims or allegations of infringement or unauthorized use of any third party Intellectual Property or Technology against the Company or any of its Subsidiaries; and (iv) no circumstances exist that would form the basis for any claim of infringement, unauthorized use, or violation of any Company Intellectual Property and Technology, or challenge the ownership, use, validity or enforceability of any Company Intellectual Property or Technology;

(d)    all Patents, registered Trademarks and registered Copyrights and applications to register Trademarks and Copyrights set forth on Schedule 3.18 are in effect and all renewal fees and other maintenance fees have been paid and all other maintenances actions have been taken;

(e)    to the knowledge of the Company and its Subsidiaries, all Technology owned or used by the Company and its Subsidiaries: (i) operates and performs in material conformance with its documentation and functional specifications and otherwise as required in the operation the business of the Company and its

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Subsidiaries; (ii) does not contain any "time bombs," "Trojan horses," "back doors," "trap doors," "worms," viruses, bugs, faults, devices or elements that (A) enable or assist any Person to access such Technology without authorization or (B) otherwise adversely affect the functionality of such Technology; and (iii) has not been subject to any unauthorized access by any Person.

Section 3.19  **Labor Matters**.  The Company is in compliance with all Laws applicable to it respecting employment and employment practices, terms and conditions of employment and wages and hours and has not engaged, and is not engaging, in any unfair labor practice with respect to employees of the Company except to the extent such failure to comply or such engagement has not had and would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.19, as of the date hereof, (i) there is no union organizing effort pending, or to the knowledge of the Company, threatened, with respect to the employees of the Company; (ii) no complaint against the Company is pending before the National Labor Relations Board, or to the knowledge of the Company, threatened; (iii) there is no labor strike, dispute, slowdown or stoppage pending or, to the knowledge of the Company, threatened, against or involving the Company; (iv) no grievance or arbitration proceeding arising out of or under any collective bargaining agreement with respect to employees of the Company is pending, and no claim therefor has been asserted; and (v) there are no material labor or employment claims or proceedings pending between the Company and any of its employees.  Schedule 3.19 sets forth, on an employee by employee basis, payments due, if any, to any employee of the Company as a result of this Agreement (other than payments to RGHI of the Purchase Price, a portion of which will thereafter be received from RGHI by Phillip R. Bennett).

Section 3.20  **Real and Personal Property.**

(a)  Owned Real Properties.  As of the date hereof, neither the Company nor any Subsidiary owns any real property.

(b)  Leased Real Properties.  Schedule 3.20(b) sets forth (whether as lessee or lessor) leases of real property ("Leased Real Property") to which the Company or any Subsidiary is a party or by which it is bound, in each case, as of the date hereof, except for any lease or agreement under which the aggregate annual rental payments do not exceed $500,000 (each a "Material Lease", and collectively the "Material Leases").  Except as set forth on Schedule 3.20(b), each Material Lease is valid and binding on the Company and its Subsidiaries and, to the Company's knowledge, on the other parties thereto and is in full force and effect.  Neither the Company nor any Subsidiary has received or given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by the Company or any Subsidiary under any of the Material Leases and, to the Company's knowledge, no other party is in default thereof, and no party of the Material Leases has exercised any termination rights with respect thereto.  Except as set forth on Schedule 3.20(b), the Company and, to the Company's knowledge as of the date hereof, each of the other parties thereto has performed in all material respects all material obligations required to be performed by it under each

MB02055032

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Material Lease. The Leased Real Property complies with all applicable Laws and is benefited by those Permits required to be maintained for the development, or use or occupancy of any portion of the Leased Real Property, except to the extent such failure to comply has not had and would not reasonably be expected to have a Material Adverse Effect. The Company has delivered or made available to Buyer complete and accurate copies of each of the Material Leases as currently in effect.

(c)    Personal Property. Except as set forth on Schedule 3.20(c), as of the date hereof, the Company and the Subsidiaries have good and marketable title to or hold under valid leases all material tangible personal property necessary for the conduct of its business as currently conducted, and such items of property are not subject to any Lien except for Permitted Exceptions.

Section 3.21    Insurance. The Company and the Subsidiaries have insurance policies in full force and effect for such amounts as are sufficient for all requirements of Law and all agreements to which the Company or any of the Subsidiaries is a party or by which it is bound. Neither the Company nor any of the Subsidiaries is in default with respect to its obligations under any material insurance policy maintained by them. Neither the Company nor any of the Subsidiaries has received written notice of termination, cancellation or non-renewal of any such insurance policies from any of its insurance brokers or carriers. All appropriate insurers under such insurance policies have been notified of all potentially insurable losses and pending litigation and legal matters, to the extent known by the Company, and no such insurer has informed the Company or any of its Subsidiaries in writing of any denial of coverage or reservation of rights thereto.

Section 3.22    Working Capital. After giving effect to the $500,000,000 cash distribution by the Company to RGHI as provided in Section 5.1(c)(i), the Company and the Subsidiaries will have sufficient working capital for the normal operation of the Company's or any Subsidiary's business as currently conducted.

Section 3.23    Assets of Asset Manager Entities. The Asset Manager Entities do not own any assets or otherwise possess any rights that are necessary for the continuation and normal operation of the Company's or any Subsidiary's business (other than the business conducted by the Asset Manager Entities) as currently conducted.

Section 3.24    Liabilities Relating to Asset Manager Entities. To the Company's knowledge, from and following the Closing, the Company and the Subsidiaries will not have any liabilities, nor will they suffer any other Losses following the Closing, relating to any of the Asset Manager Entities or arising from or in connection with the sale or other disposition of the Asset Manager Entities.

Section 3.25    Brokers. Except as set forth on Schedule 3.25, no broker, finder or investment banker is entitled to any brokerage, finder's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based

MB02055033

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

upon arrangements made by and on behalf of the Company, any member of the Company or any of their respective Affiliates.

Section 3.26  **Brokerage Accounts.**  Since January 1, 2000, none of RGHI or any of its Affiliates has or has had a brokerage or similar account with the Company or any of its Subsidiaries.

Section 3.27  **Exclusivity of Representations and Warranties**.  THE REPRESENTATIONS AND WARRANTIES MADE IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES.  RGHI HEREBY DISCLAIMS ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIONS OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA).  EXCEPT AS SET FORTH IN <u>SECTION 3.23</u> AND <u>SECTION 3.24</u>, NEITHER THE COMPANY NOR RGHI IS MAKING ANY REPRESENTATIONS AND WARRANTIES WHATSOEVER WITH RESPECT TO THE ASSET MANAGER ENTITIES AND ALL OF THE REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND RGHI SET FORTH IN THIS AGREEMENT RELATING TO RGHI, THE COMPANY AND/OR THE SUBSIDIARIES SHALL BE DEEMED TO EXCLUDE THE ASSET MANAGER ENTITIES.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES**
**OF THE BUYER AND MERGER COMPANY**

Buyer and Merger Company represent and warrant to the Company and RGHI as follows:

Section 4.1  **Organization**.

(a)  Buyer is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all requisite power and authority to carry on its businesses as now being conducted, except where the failure to have such power or authority would not be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder.

(b)  Merger Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has all requisite power and authority to carry on its businesses as now being conducted, except where the failure to have such power or authority would not be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder.  Merger Company has no substantial assets or operations other than its ownership of 100% of the equity interest in Finance Company.  Finance Company has no

MB02055034

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

substantial assets or operations other than with respect to the financing transactions contemplated by <u>Section 6.2(f)</u>.

### Section 4.2     <u>Authority</u>.

(a)     Buyer has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Buyer and no other proceeding on the part of Buyer is necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Buyer and constitutes a valid, legal and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by the Enforceability Limitations.

(b)     Merger Company has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated h ereby h ave b een d uly a uthorized b y a ll n ecessary a ction o n t he p art o f Merger Company and no other proceeding on the part of Merger Company is necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Merger Company and c onstitutes a v alid, legal a nd b inding agreement o f M erger C ompany, e nforceable against it in accordance with its terms, except as such enforceability may be limited by the Enforceability Limitations.

### Section 4.3     <u>No Conflict or Violation.</u>

(a)     Neither the execution, delivery and performance of this Agreement by the Buyer nor the consummation by Buyer of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of the Organizational Documents of the Buyer or (b) violate any Law applicable to the Buyer or any of its properties or assets, or any Governmental Order to which the Buyer or any of its assets or properties is bound, except, in the case of clause (b) above, for violations which would not, individually or in the aggregate, be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder.

(b)     Neither the execution, delivery and performance of this Agreement by Merger Company nor the consummation by Merger Company of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of the Organizational Documents of Merger Company or (b) violate any Law applicable to Merger Company or any of its properties or assets, or any Governmental Order to which Merger Company or any of its assets or properties is bound, except, in the case of clause (b) above, for violations which would not, individually or in the aggregate, be reasonably expected to prevent or materially delay the consummation of the transactions contemplated hereunder.

MB02055035

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 4.4    Governmental and Third Party Consents.**

(a)    Except for (1) compliance with Antitrust Laws, (2) the filing of amended registration forms with the applicable futures and securities authorities, (3) approval by each Self-Regulatory Organization of which a Subsidiary is a member, and (4) the other actions set forth on Schedule 4.4(a), the execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the transactions contemplated hereby do not and will not require, to the knowledge of the Buyer, the Buyer to obtain the approval, consent or authorization of, to make any declaration, filing or registration with, or to give notice to, any Governmental Authority, any Self-Regulatory Organization or any other Person, except to the extent the failure to obtain, make or give any of the foregoing would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereunder. Schedule 4.4(a) sets forth each of the approvals or consents of any Self-Regulatory Organization of which a Subsidiary is a member that, to the knowledge of the Buyer, is required to be obtained by the Buyer as a result of the execution and delivery of this Agreement by the Buyer and the consummation by the Buyer of the transactions contemplated hereby,

(b)    Except for (1) compliance with Antitrust Laws, (2) the filing of amended registration forms with the applicable futures and securities authorities, (3) approval by each Self-Regulatory Organization of which a Subsidiary is a member, and (4) the other actions set forth on Schedule 4.4(b), the execution, delivery and performance by Merger Company of this Agreement and the consummation by Merger Company of the transactions contemplated hereby do not and will not require, to the knowledge of Merger Company, Merger Company to obtain the approval, consent or authorization of, to make any declaration, filing or registration with, or to give notice to, any Governmental Authority, any Self-Regulatory Organization or any other Person, except to the extent the failure to obtain, make or give any of the foregoing would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereunder. Schedule 4.4(b) sets forth each of the approvals or consents of any Self-Regulatory Organization of which a Subsidiary is a member that, to the knowledge of the Buyer, is required to be obtained by Merger Company as a result of the execution and delivery of this Agreement by Merger Company and the consummation by the Merger Company of the transactions contemplated hereby.

**Section 4.5    Brokers**. Except as set forth on Schedule 4.5, no broker, finder or investment banker is entitled to any brokerage, finder's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by and on behalf of the Buyer.

**Section 4.6    Financing**.    Finance Company has executed with lenders the commitment letters and/or "highly-confident" letters listed on Schedule 4.6 in connection with the financing arrangements for the senior indebtedness and subordinated indebtedness that is contemplated in connection with the Closing.

MB02055036

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**ARTICLE 5**
**COVENANTS**

**Section 5.1    Conduct of Business of the Company**. Except as contemplated by this Agreement, during the period from the date hereof to the Closing Date, the Company will conduct, and will cause each of the Subsidiaries to conduct, its operations in the ordinary course of business consistent with past practice, and the Company shall use, and shall cause each of the Subsidiaries to use, reasonable efforts to preserve substantially intact its business organization, to keep available the services of its present officers and key employees and to preserve the present commercial relationships with key persons with whom it does business. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, during the period from the date hereof to the Closing Date, the Company will not (and will not, to the extent applicable, permit any o f the Subsidiaries to), without the prior written c onsent of the Buyer:

(a)    amend its Organizational Documents;

(b)    issue, sell or agree or commit to issue (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise) any membership interests of any class or any other equity securities or equity equivalents;

(c)    split, combine or reclassify any of its membership interests or declare, set aside or pay any dividends or other distributions (whether in cash or otherwise) in respect of its membership interests or other equity interests or repurchase or commit to repurchase any membership interests or other equity interests; provided, however, that, (i) subject to the provisions of Section 5.9, the Company shall distribute at the Closing (at the time described in Section 1.6(b)) to RGHI the $500,000,000 cash amount contemplated by Section 5.9, (ii) the Company shall distribute to RGHI at the Closing (at the time described in Section 1.6(b)) the equity interests of Forstmann-Leff International A ssociates LLC, w hich d irectly o r indirectly h olds all o f t he o utstanding equity interests of the entities listed on Schedule 5.1(c) (collectively, Forstmann-Leff International Associates LLC and the entities listed on Schedule 5.1(c) are referred to as the "Asset Manager Entities"), and (iii) the Company may make distributions to RGHI of up to $120,000,000 that was accrued a s of February 29, 2004 (provided that not more than $12,000,000 of such $120,000,000 amount is distributed in cash and the remaining distribution does not result in any net distribution of cash but, instead, merely results in a reduction in amounts owed to the Company from one or more members of the Company);

(d)    except as contemplated by this Agreement and other than Customer Financing Indebtedness, (i) incur or assume any indebtedness for borrowed money exceeding $5,000,000 in the aggregate, or (ii) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other person, except for obligations not exceeding $5,000,000 in the aggregate;

**MB02055037**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(e) except as may be required by law, (i) enter into, adopt or amend or terminate any material bonus, profit sharing, compensation, severance, termination, option, appreciation right, restricted unit, performance unit, pension, retirement, deferred compensation, employment, severance or other employee benefit agreement, trust, plan, fund or other arrangement for the benefit or welfare of any director, officer or employee of the Company in any material manner, (ii) except for normal salary increases and bonus payments in the ordinary course of business consistent with past practice, increase in any material manner the compensation of any director, officer or employee of the Company or (iii) pay any material benefit not required by any plan and arrangement as in effect as of the date hereof;

(f) other than sales and acquisitions of securities made in the ordinary course of business by the Company (provided that the Company is not taking any proprietary risk with respect to such sale or acquisition) sell, lease or dispose of or acquire any assets which have a value in the aggregate in excess of $5,000,000 in the aggregate; provided, however, that the Company (i) may make the distributions expressly permitted by Section 5.1(c) and (ii) may effect the acquisition by the Asset Manager Entities referred to in Section 5.1(k);

(g) except as expressly contemplated by this Agreement or as set forth in Schedule 5.1(g), alter through merger, liquidation, reorganization, restructuring or in any other fashion the capital structure of the Company or such Subsidiary;

(h) cause or allow the net capital levels of the Company and the Subsidiaries that are subject to such minimum net capital requirements to fall below the minimum level(s) of capital required by the SEC, CFTC, CME or other applicable Governmental Authority or Self-Regulatory Organization.

(i) effect any change in any of its methods of accounting, except as may be required by GAAP;

(j) fail to maintain the status of the Company as a partnership for federal income tax purposes;

(k) use any funds, other than funds generated by the Asset Manager Entities, to fund the Asset Manager Entities or their operations, except that the Company may contribute up to $5,100,000 to the Asset Manager Entities to permit the Asset Manager Entities to complete the transactions contemplated by the Asset Purchase Agreement, dated April 23, 2004, between Forstmann-Leff Associates, LLC and Schroder Investment Management North America Inc., as amended, as previously disclosed to the Buyer;

(l) settle or compromise any Legal Proceeding or governmental investigation (i) for an amount payable by the Company or any of the Subsidiaries in excess of $1,000,000, (ii) in a manner that requires the Company or any Subsidiary to

MB02055038

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

change its method of operation or of conducting business or (iii) that otherwise is material in amount or nature;

(m)    effect any acquisition of another Person or business for an amount in excess of $5,000,000 (or for an aggregate amount for all such acquisitions in excess of $10,000,000), or, with the exception of the acquisition referred to in Section 5.1(k), permit any Asset Manager Entity to effect any acquisition of another Person or business;

(n)    make or revoke any election relating to Taxes (other than the making of a Section 754 election as contemplated in the last sentence of Section 5.2(a)), settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, except as required by applicable Law, or make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recently filed federal income Tax Return, or prepare or file any Tax Return (or any amendment thereof) without having provided the Buyer with a copy thereof (together with supporting work papers) at least ten days prior to the due date thereof for Buyer's review and approval; or

(o)    agree to do any of the foregoing.

## Section 5.2    Tax Matters.

(a)    Any Tax Returns with respect to income or similar Taxes of the Company with respect to a period ending on or prior to the Closing Date not filed as of the Closing Date ("Pre-Closing Tax Returns") shall be timely filed by the Surviving Company in accordance with the prior practice of the Company with the appropriate taxing authorities; provided, however, that such Pre-Closing Tax Returns shall be prepared by treating items on the Pre-Closing Tax Returns in a manner consistent with the past practices of the Company with respect to such items.  RGHI agrees that the Surviving Company will file a Section 754 election on its last Pre-Closing Tax Return.

(b)    All transfer, sales and use, value added, registration, documentary, stamp and similar Taxes imposed directly in connection with the sale of the Membership Interests or any other transaction that occurs pursuant to this Agreement shall be borne 50% by the Buyer and 50% by RGHI.

## Section 5.3    Access to Information.

(a)    Between the date hereof and the Closing Date, upon reasonable notice, the Company will provide to the Buyer and its financing sources and their respective authorized representatives during normal business hours reasonable access to all officers and to all books and records of the Company, and will cause the officers of the Company to furnish the Buyer with such financial and operating data and other information with respect to the business and properties of the Company as the Buyer may from time to time reasonably request.  All of such information shall be treated as

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Confidential Information, as defined in and pursuant to the terms of the Confidentiality Agreement, dated November 4, 2003, between the Company and Thomas H. Lee Partners, L.P., the provisions of which are by this reference incorporated herein and which shall survive until the Closing. The Company shall provide reasonable cooperation in connection with the contemplated debt financing in connection with the transactions contemplated by this Agreement, including making senior management reasonably available for road shows or similar matters.

(b)    In order to facilitate the resolution of any claims made by or against or incurred by RGHI or the Surviving Company or for any other reasonable purpose, for the seven year period commencing on the Closing Date, the Surviving Company (or its successor) will provide RGHI and their authorized representatives during normal business hours reasonable access at RGHI's expense (including the right to make photocopies) to all books and records of the Surviving Company (or such successor) and other written information with respect to the Surviving Company (or such successor) that relate to periods prior to the Closing as RGHI may from time to time reasonably request.

**Section 5.4    <u>Efforts to Consummate</u>.**

(a)    Subject to the terms and conditions herein provided, each of RGHI, the Buyer and the Company agrees to use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including (i) cooperation in the preparation and filing of any filings that may be required under the HSR Act and any amendments thereto; <u>provided, however</u>, that the Buyer will not be required to agree to the sale or other disposal or divestiture by the Buyer or any of its Affiliates of any particular or specified assets, category of assets or businesses, nor will the Buyer be required to agree not to compete in any geographic area or line of business, (ii) making all filings, applications, statements and reports to all Governmental Authorities, Self-Regulatory Organizations and other Persons which are required to be made prior to the Closing Date by or on behalf of RGHI, the Company, any of the Subsidiaries, the Buyer or Merger Company pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby, (iii) the compliance with all requirements under the HSR Act applicable to the transactions contemplated hereby, (iv) contesting any Legal Proceeding relating to the transactions contemplated hereunder, (v) consummating all of the financing transactions contemplated by the commitment letters, term sheets and/or "highly-confident" letters listed on <u>Schedule 4.6</u>, and (vi) the execution of any additional instruments necessary to consummate the transactions contemplated hereby. RGHI and the Buyer each agrees to use reasonable best efforts to make, or cause to be made, all filings applicable to them or their ultimate parent entities of notification and report forms pursuant to the HSR Act with respect to the transactions contemplated hereunder within fifteen Business Days after the date of this Agreement (or, if applicable as a result of any change in requirements under the HSR Act, as promptly as practicable after such requirement becomes applicable) and to supply

MB02055040

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

promptly any additional information and documentary material that may be requested pursuant to the HSR Act.

(b)    Subject to the provisions of Section 7.3, all fees, costs and expenses required in connection with the application for or prosecution of any consent, approval, authorization, registration, filing or submission or in respect of any action relating to any Permits issued by any Governmental Authorities shall be borne by the party making such application.

**Section 5.5    Public Announcements.** Prior to the Closing, without the prior written consent of the other Parties (which will not be unreasonably withheld), or except as otherwise required by Law, no Party nor any Affiliate or representative of such Party may directly or indirectly issue any press release, or otherwise make any public statements or other public disclosure, regarding this Agreement or in any way relating to the transactions contemplated hereby.

**Section 5.6    Exclusive Dealing.** During the period from the date of this Agreement through the Closing Date or the termination of this Agreement pursuant to Section 7.1, neither RGHI or the Company shall take, nor will RGHI or the Company permit any of their respective Affiliates, representatives, consultants, financial advisors, attorneys, accountants or other agents to take, any action to solicit, encourage, initiate or engage in discussions or negotiations with, or provide any information to or enter into any agreement with any Person (other than the Buyer or its Affiliates) concerning any purchase of any of the Company's equity securities or any merger, sale of substantial assets or similar transaction involving the Company (other than assets sold in the ordinary course of business).

**Section 5.7    Employee Benefits.**

(a)    After the Closing, employees of the Surviving Company ("Company Employees") shall receive credit for purposes of eligibility to participate and vesting (and, for vacation and severance plans only, determination of the levels of benefits), but not for purposes of any benefit accruals under any plan, under each employee benefit plan, program or arrangement established or maintained for Company Employees by the Surviving Company, the Buyer or any Affiliate of the Buyer for service accrued or deemed accrued with the Company and its Affiliates prior to and on the Closing Date, to the extent such service was recognized as of the Closing Date for such employees for similar purposes under comparable plans to which the Company was a party; provided, however, that such crediting of service shall not operate to duplicate any benefit or the funding of any such benefit. Any employee welfare benefit plan (as defined in Section 3(1) of ERISA) maintained for Company Employees by the Surviving Company, the Buyer or any Affiliate of the Buyer shall recognize expenses and claims incurred by any Company Employee (and any eligible dependents or beneficiaries thereof) in the year in which the Closing Date occurs and on or prior to the Closing Date for the purposes of computing deductible amounts, co-payments or other limitations on coverage, and shall recognize service for any Company Employee (and any eligible

MB02055041

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

dependents thereof) for purposes of satisfying any pre-existing health condition of any Company Employee (and any eligible dependents or beneficiaries thereof) to the extent such service was taken into consideration for similar purposes as of the Closing Date under a comparable plan to which the Company was a party.

(b)    Prior to the Effective Time, in connection with the sale or distribution of the Asset Manager Entities, the Company shall cause all current and former employees of the Asset Manager Entities ("Excluded Employees") to be covered under benefit plans (including, but not limited to a "group health plan" within the meaning of Section 5000(b)(1) of the Code such that the Surviving Company will have no obligation to provide notice or continuation coverage under COBRA) to be established by a purchaser or the distributee of the Asset Manager Entities and the Surviving Company will have no further liability (contingent or otherwise) or obligations with respect to the Excluded Employees.

**Section 5.8    No Disposition or Encumbrance of Membership Interests**. Prior to the Closing, except as expressly provided in Section 5.13, the members of the Company will not sell or transfer, or permit the imposition or existence of any Lien with respect to, any Membership Interests.

**Section 5.9    Segregation of Funds**.    The Company shall establish promptly upon the signing of this Agreement a separate account in its name to be designated account number 00151-111-955 at BAWAG Bank in Vienna, Austria (the "Separate Account"). The Separate Account shall be maintained by the Company until the earlier of the Closing Date or the termination of this Agreement and shall have at all times during such time period a cash balance of not less than $500,000,000. None of the cash in the Separate Account shall (i) except in connection with the distribution described in the final sentence of this Section 5.9, be withdrawn from the Separate Account, (ii) be utilized or taken into account for purposes of any regulatory capital calculation or financial calculation or for any similar purpose, (iii) be referred to or included as capital or other resources of the Company or any of its Subsidiaries for purposes of representations to or dealings with any customer, lender, or other third party with whom the Company or any Subsidiary transacts business, or (iv) otherwise be utilized in any way for the conduct of business. $500,000,000 of the amount on deposit in the Separate Account may be distributed to RGHI in accordance with Section 5.1(c)(i) only if the Company has fully complied with Section 5.9 and the segregation of funds in the Separate Account and the Company's compliance with Section 5.9 has not had an adverse impact on the business or operations of the Company and its Subsidiaries as currently conducted.

**Section 5.10    2002 Financials**.  The Company will use reasonable best efforts to attempt to obtain and deliver to the Buyer prior to the Closing (but in any event, no later than sixty (60) days following the Closing) audited financial statements meeting the requirements of Regulation S-X promulgated by the SEC for financial statements included in filings of registration statements under the Securities Act of 1933, as amended, with respect to the Company's fiscal year ended February 28, 2002, which audited financial statements will be consistent with the financial statements covering such

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

periods that previously have been delivered to the Buyer, except as such financial statements may be restated to reflect depreciation of intangible assets as required pursuant to Financial Accounting Standard 141.

**Section 5.11    Financial Information**.  Within thirty (30) days after the end of each month between the date of this Agreement and the Closing, the Company shall deliver to Buyer the Company's monthly reporting package, including the unaudited balance sheet of the Company as of the end of such month and unaudited statements of income for such month and for the current fiscal year to date.  Within forty-five (45) days after the end of each of the fiscal quarters ended May 31, 2004 and August 31, 2004, the Company shall deliver to Buyer unaudited balance sheets of the Company as of the end of such fiscal quarter, unaudited statements of income, and unaudited statements of cash flows for such fiscal quarter and for the current fiscal year to date.  All of the foregoing financial statements shall be prepared in accordance with generally accepted accounting principles c onsistently applied ( other t han o mission o f a ccompanying n otes) a nd, w ith respect to quarterly statements, compared with both the actual results from the corresponding quarter of the previous fiscal year and the budget for the current fiscal year, all in reasonable detail, which detail shall be generally consistent with the Company's past practices.

**Section 5.12    Management Bonus Pool Plan**.  As promptly as practicable following the Closing, RGHI and the Buyer will cause the Company to adopt a Management Bonus Pool Plan in substantially the form attached hereto as Exhibit E.

**Section 5.13    BAWAG I nterest T ransfer T ransactions**.  Each of RGHI and BAWAG jointly and severally covenants to the Buyer that, (i) at the Closing (and immediately following the purchase of the Purchased Interests in accordance with Section 1.1), RGHI and BAWAG will fully complete the merger of BOI with and into a newly formed wholly owned Subsidiary of RGHI in accordance with the terms of the Plan and Agreement of Merger, dated as of the date hereof, among RGHI, RGHI Merger Corp., a Delaware corporation, BOI and BAWAG as such agreement is in effect as of the execution and delivery of this Agreement (the "BAWAG Merger"), and (ii) the BAWAG Merger will result in such wholly owned Subsidiary of RGHI owning, of record and beneficially, all of the Membership Interests that are owned by BOI as of the date hereof. BAWAG hereby represents and warrants that neither the execution, delivery and performance by BAWAG of this Agreement nor any agreement relating to the BAWAG Merger does or shall (1) conflict with or violate any Organizational Document of BAWAG, any Law or any a greement to which B AWAG is a party or ( 2) require any consent or approval of any Governmental Authority.  RGHI covenants to the Buyer that at the Closing, immediately following the completion of the BAWAG Merger and immediately prior to the completion of the distributions described in Section 5.14, RGHI will cause all of the Membership Interests that, as a result of the BAWAG Merger, are held by such wholly owned Subsidiary of RGHI to be distributed as a dividend (or otherwise distributed in a manner reasonably satisfactory to the Buyer) to RGHI.  The transactions described in this Section 5.13 are collectively referred to herein as the "BAWAG Interest Transfer Transactions."

MB02055043

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Section 5.14  **Certain Distributions.**  At the Closing, immediately following the completion of the BAWAG Interest Transfer Transactions and immediately prior to the Merger, (i) the Limited Liability Company Agreement shall be amended in a manner reasonably satisfactory to RGHI and the Buyer to provide that the Buyer waives any right that it would otherwise have to receive any portion of the distributions referred to in this Section 5.14, (ii) subject to the provisions of Section 5.9, the Company will effect the $500,000,000 distribution described in the final sentence of Section 5.9, (iii) the Company will effect the distribution of the Asset Manager Entities as described in Section 5.1(c)(ii) and (iv) the Company will effect the distribution to RGHI of up to $120,000,000 as described in Section 5.1(c)(iii).

## ARTICLE 6
## CONDITIONS TO CLOSING

Section 6.1  **Conditions to the Obligations of the Parties**.  The obligations of the Parties to consummate the transactions contemplated hereunder are subject to the satisfaction ( or, i f p ermitted b y applicable l aw, waiver b y t he P arty for whose b enefit such condition exists) of the following conditions:

(a)  Any applicable waiting period under the HSR Act relating to the transactions contemplated hereunder shall have expired or been terminated; and

(b)  No statute, rule, regulation, executive order, decree, temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereunder shall be in effect and there shall be no proceeding that is pending that seeks to impose any of the foregoing or to impose any modification to any of the transactions contemplated hereby that would be materially adverse to the Company or any of the Subsidiaries.

Section 6.2  **Other Conditions to the Obligations of the Buyer**.  The obligations of the Buyer to consummate the transactions contemplated hereunder are subject to the satisfaction or, if permitted by applicable law, waiver by the Buyer of the following further conditions:

(a)  The representations and warranties of RGHI set forth in Article 3 hereof that are not qualified by materiality or "Material Adverse Effect" shall be true and correct in all material respects, and the representations and warranties of RGHI set forth in Article 3 hereof that are qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, in each case as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except to the extent such representations and warranties are made on and as of a specified date, in which case the same shall continue on the Closing Date to be true and correct (in all material respects or in all respects, as applicable) as of the specified date, and the Buyer shall have received a certificate of RGHI to such effect;

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(b)    The Company and RGHI shall have performed and complied in all material respects with all covenants required to be performed or complied with by the Company and RGHI under this Agreement on or prior to the Closing Date, and Phillip R. Bennett and Tone Grant shall have complied in all respects with their covenant set forth in Section 9.12 and the Buyer shall have received a certificate signed by Phillip R. Bennett and Tone Grant to such effect;

(c)    No Material Adverse Effect shall have occurred since the date of this Agreement and no event or change shall have occurred since the date of this Agreement that has had or would reasonably be expected to have a Material Adverse Effect;

(d)    The Company shall have delivered to the Buyer audited financial statements meeting the requirements of Regulation S-X promulgated by the SEC for financial statements included in filings of registration statements under the Securities Act of 1933, as amended, with respect to the Company's fiscal years ended February 28, 2003 and February 28, 2004, which audited financial statements will be consistent with the financial statements covering such periods that previously have been delivered to the Buyer except as such financial statements may be restated to reflect depreciation of intangible assets as required pursuant to Financial Accounting Standard 141;

(e)    Buyer shall have received all consents and approvals set forth on Schedule 4.4(a) or Schedule 4.4(b) and marked with an asterisk (and any other such consents and approvals that in the reasonable good faith judgment of the Buyer are required in order to avoid a material adverse impact on the Company or the operation of its business) and shall have received written evidence reasonably satisfactory to Buyer that all consents and approvals set forth on Schedule 3.4 or Schedule 3.5 and marked with an asterisk (and any other such consents and approvals that in the reasonable good faith judgment of the Buyer are required in order to avoid a material adverse impact on the Company or the operation of its business) have been obtained;

(f)    Finance Company shall have received proceeds from funded debt in the aggregate of at least $1,250,000,000 from (i) the senior indebtedness contemplated by the commitment letters described on Schedule 4.6, on the terms and conditions set forth therein, and (ii) the subordinated indebtedness, on terms and conditions not substantially less favorable than those set forth in the term sheets attached as Schedule 6.2(f);

(g)    The Employment Agreement entered into as of the execution of this Agreement (but to be effective as of the Closing) with Phillip Bennett shall be effective as of the Closing;

(h)    The Amended and Restated Limited Liability Company Agreement shall have been duly executed and delivered by RGHI;

MB02055045

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(i)    The Securityholders Agreement in the form attached hereto as Exhibit F (the "Securityholders Agreement") shall have been duly executed and delivered by RGHI and Phillip Bennett; and

(j)    The Escrow Agreement shall have been duly executed and delivered by the Escrow Agent, the Company and RGHI.

(k)    Any approval, authorization or registration referred to in Section 6.2(e) that has been obtained shall have been obtained without any term, limitation, restriction or condition that would negatively impact the ability of the Company or any Subsidiary to conduct its business as previously conducted or require the Buyer to undertake any commitments to or on behalf of the Company or any Subsidiary;

(l)    All Company Indebtedness shall have been repaid prior to the Closing and the Buyer shall have received evidence, reasonably satisfactory to it, (i) of the repayment or satisfaction of such Company Indebtedness and (ii) that all obligations to the lenders with respect thereto have been extinguished;

(m)    The Management Agreement (the "Management Agreement") between the Company and Thomas H. Lee Equity Fund V, L.P. and/or its Affiliates ("THL") in substantially the form attached hereto as Exhibit G shall have been duly executed and delivered by the Company; and

(n)    The tax reimbursement letter agreement (the "Letter Agreement") between RGHI and Buyer in substantially the form attached hereto as Exhibit H shall have been duly executed and delivered by RGHI.

**Section 6.3    Other Conditions to the Obligations of RGHI**.  The obligations of RGHI to consummate the transactions contemplated hereunder are subject to the satisfaction or, if permitted by applicable law, waiver by RGHI of the following further conditions:

(a)    The representations and warranties of the Buyer set forth in Article 4 hereof that are not qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, and the representations and warranties of the Buyer set forth in Article 4 hereof that are qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, in each case as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except to the extent such representations and warranties are made on and as of a specified date, in which case the same shall continue on the Closing Date to be true and correct (in all material respects or in all respects, as applicable) as of the specified date, and RGHI shall have received a certificate of an officer of the Buyer to such effect;

(b)    The Buyer shall have performed and complied in all material respects with all covenants required to be performed or complied with by the Buyer under

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

this Agreement on or prior to the Closing Date, and RGHI shall have received a certificate of an officer of the Buyer signed on behalf of the Buyer to such effect;

(c)    The Company and RGHI shall have received all consents and approvals set forth on Schedule 3.4 or Schedule 3.5 and marked with an asterisk (and any other such consents and approvals that are in the reasonable good faith judgment of RGHI required in order to avoid a material adverse impact on the Company or the operation of its business) and shall have received written evidence reasonably satisfactory to RGHI that all consents and approvals set forth on Schedule 4.4(a) or Schedule 4.4(b) and marked with an asterisk (and any other such consents and approvals that in the reasonable good faith judgment of RGHI are required in order to avoid a material adverse impact on the Company or the operation of its business) have been obtained;

(d)    Finance Company shall have received the proceeds from funded debt in the aggregate of at least $1,250,000,000 from (i) the senior indebtedness contemplated by the commitment letters described on Schedule 4.6, on the terms and conditions set forth therein, and (ii) the subordinated indebtedness, on terms not substantially less favorable than those set forth in the term sheets or "highly-confident" letters described on Schedule 4.6;

(e)    The Company shall not have been prohibited from paying to RGHI the distributions accrued as of February 29, 2004 as provided in Section 5.1(c)(iii) and the $500,000,000 distribution by the Company to RGHI at the Closing as provided in Section 5.14;

(f)    The Management Agreement shall have been duly executed and delivered by THL;

(g)    The Amended and Restated Limited Liability Company Agreement shall have been duly executed and delivered by the Buyer;

(h)    The Securityholders Agreement shall have been duly executed and delivered by the Buyer;

(i)    The Escrow Agreement shall have been duly executed and delivered by the Escrow Agent and the Buyer; and

(j)    The Letter Agreement shall have been duly executed and delivered by the Buyer.

## ARTICLE 7
## TERMINATION; AMENDMENT; WAIVER

Section 7.1    **Termination**.    This Agreement may be terminated and the transactions contemplated hereunder may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of the Buyer and RGHI;

MB02055047

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

(b)     by the Buyer or RGHI if the transactions contemplated hereunder shall not have been consummated on or before October 5, 2004 (the "Termination Date"); provided, however, that the Termination Date shall be automatically extended as necessary in the event that any filing under the HSR Act becomes necessary as a result of any change in requirements under the HSR Act.

(c)     by either the Buyer or by RGHI if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated hereunder and such order, decree or ruling or other action shall have become final and nonappealable; provided, that the Party seeking to terminate this Agreement pursuant to this paragraph (c) shall have used commercially reasonable efforts to remove such order, decree, ruling, judgment or injunction;

(d)     by the Buyer in the event of a breach by the Company or RGHI of any representation, warranty, covenant or other agreement contained in this Agreement which (i) would give rise to the failure of a condition set forth in Sections 6.2(a) or 6.2(b) hereof and (ii) cannot be or has not been cured within 20 Business Days after the giving of written notice thereof to RGHI by the Buyer; or

(e)     by RGHI in the event of a breach by the Buyer of any representation, warranty, covenant or other agreement contained in this Agreement which (i) would give rise to the failure of a condition set forth in Sections 6.3(a) or 6.3(b) hereof and (ii) cannot be or has not been cured within 20 Business Days after the giving of written notice thereof to the Buyer by RGHI.

**Section 7.2     Effect of Termination.**   In the event of the termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become void, and there shall be no liability or obligation on the part of the Buyer, RGHI, Merger Company or the Company or, to the extent applicable, their respective officers, directors or equityholders, other than (a) the provisions of this Section 7.2, the second to last sentence of Section 5.3(a), Section 5.5, Section 7.3 and Article 9 (except Section 9.12), and (b) any liability of any Party or other signatory for any breach of this Agreement prior to such termination. Notwithstanding anything to the contrary set forth in this Agreement, in the event of a termination of this Agreement by the Buyer as a result of a breach of a representation or warranty of the Company or RGHI in accordance with Section 7.1(d), or by RGHI as a result of a breach of a representation or warranty of the Buyer in accordance with Section 7.1(e), the liabilities and obligations of the breaching Party (and their respective officers, directors or equityholders) shall in no event be greater than the actual, out-of-pocket expenses incurred by the non-breaching Party in connection with the transactions contemplated hereby, which expenses shall be reasonably substantiated in writing by the non-breaching Party (and which, with respect to a breach by RGHI, shall in no event include any fees or expenses payable to THL in connection with the transactions contemplated by this Agreement).

MB02055048

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 7.3**    <u>Fees and Expenses</u>.  All fees and expenses incurred in connection with the transactions contemplated hereunder, this Agreement and the transactions contemplated by this Agreement, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such fees or expenses.  Notwithstanding the foregoing, at the Closing, the Surviving Company shall pay (i) the Company Transaction Expenses (to the extent not in excess of $20,000,000 in the aggregate), (ii) any fees or expenses payable to THL in connection with the transactions contemplated by this Agreement and (iii) the expenses of the Buyer in connection with the transactions contemplated hereby, which expenses shall be reasonably substantiated in writing by Buyer.

**Section 7.4**    <u>Amendment</u>.  This Agreement may be amended or modified only by a written agreement executed and delivered by all of the Parties and, solely with respect to an amendment to <u>Section 9.12</u> (or to the other sections of this Agreement referred to in <u>Section 9.12</u>), by Phillip R. Bennett and Tone Grant.

**Section 7.5**    <u>Extension; Waiver</u>.  At any time prior to the Closing, RGHI may (a) extend the time for the performance of any of the obligations or other acts of the Buyer contained herein, (b) waive any inaccuracies in the representations and warranties of the Buyer contained herein or in any document, certificate or writing delivered by the Buyer pursuant hereto or (c) waive compliance by the Buyer or Merger Company with any of the covenants, agreements or conditions contained herein.  At any time prior to the Closing, the Buyer may (i) extend the time for the performance of any of the obligations or other acts of RGHI or the Company contained herein, (ii) waive any inaccuracies in the representations and warranties of RGHI contained herein or in any document, certificate or writing delivered by RGHI pursuant hereto, or (iii) waive compliance by the Company or RGHI with any of the covenants, agreements or conditions contained herein.  Any agreement on the part of any Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of such rights.

## ARTICLE 8
## SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

**Section 8.1**    <u>Survival of Representations</u>.  The representations and warranties of RGHI and of the Buyer contained in this Agreement (whether or not contained in <u>Articles 3</u> and <u>4</u>) or in any certificate delivered pursuant to <u>Sections 6.2</u> or <u>6.3</u> shall survive the Closing and remain in effect until the later to occur of (x) 30 days after receipt by the Surviving Company of the completed audit of its financial statements for its fiscal year ending February 28, 2005 and (y) June 30, 2005; provided, that (i) the representations and warranties in <u>Section 3.14</u> (Taxes) and <u>Section 3.25</u> (Brokers) shall survive until thirty (30) days after the termination of the applicable statute of limitations (including any extensions thereof) and (ii) the representations and warranties in <u>Section 3.1</u> (Organization of the Company), <u>Section 3.2</u> (Authorization) and <u>Section 3.3</u> (Capitalization of the Company) (other than the last sentence of <u>Section 3.3</u>) shall survive indefinitely.

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

### Section 8.2     General Indemnification.

(a)     If, after the Closing Date, the Buyer (and following the Closing the Surviving Company and any of the Subsidiaries) and/or their officers, directors, employees, affiliates and/or agents (each a "Buyer Indemnitee" and together the "Buyer Indemnitees") suffer any damages, losses, liabilities, obligations, claims of any kind, interest or expenses (including reasonable attorneys' fees and expenses) ("Loss") as a result of, in connection with, or arising out of (i) the failure of any representation or warranty made by RGHI in this Agreement (whether or not contained in Article 3) or in any certificate delivered to the Buyer pursuant to Sections 6.2(a) and/or 6.2(b) to be true and correct in all respects as of the date of this Agreement or as of the Closing Date, provided that, solely for the purposes of this Section 8.2(a)(i), the failure of such representations and warranties to be true and correct as of the date of this Agreement or as of the Closing Date shall be determined without regard to any materiality or Material Adverse Effect qualifiers contained therein, (ii) any breach by RGHI of any of its covenants or agreements contained herein which are to be performed by RGHI on or before the Closing Date, (iii) any breach by RGHI of any of its covenants or agreements contained herein which are to be performed by RGHI after the Closing Date, (iv) any breach by the Company of any of its covenants or agreements contained herein which are to be performed by the Company on or before the Closing Date, (v) any liabilities of or relating to any of the Asset Manager Entities or any Losses arising from or in connection with the sale or other disposition of the Asset Manager Entities or (vi) any Taxes owed by the Company or any Subsidiary with respect to any taxable periods ending on or prior to the Closing Date and the pre-Closing portion of all taxable periods beginning before and ending after the Closing Date, then, in any such case and subject to the other provisions of this Article 8, RGHI agrees to indemnify, defend and hold each Buyer Indemnitee harmless from any such Loss.

(b)     After the Closing, the Buyer agrees to, subject to the other provisions of this Article 8, indemnify, defend and hold RGHI and/or its respective agents (each a "Seller Indemnitee" and together the "Seller Indemnitees") harmless from any Loss suffered or paid, directly or indirectly, as a result of, in connection with, or arising out of (i) the failure of any representation or warranty made by the Buyer in this Agreement (whether or not contained in Article 4) or in any certificate delivered to RGHI pursuant to Sections 6.3(a) and/or 6.3(b) to be true and correct in all respects as of the date of this Agreement or as of the Closing Date, (ii) any breach by the Buyer or Merger Company of any of its covenants or agreements contained herein, and (iii) any breach by the Surviving Company of any of its covenants or agreements contained herein which are to be performed by the Surviving Company after the Closing Date.

(c)     The obligations to indemnify and hold harmless (x) pursuant to clause (i) of Section 8.2(a) and pursuant to clause (i) of Section 8.2(b) shall survive the consummation of the transactions contemplated hereby for the period set forth in Section 8.1, except for claims for indemnification pursuant to such clauses asserted prior to the end of such period, which claims shall survive until final resolution thereof and (y)

MB02055050

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

pursuant to any other clauses of <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> shall survive the consummation of the transactions contemplated hereby indefinitely.

**Section 8.3**    **Third Party Claims**.

(a)    If a claim, action, suit or proceeding by a third party (a "<u>Third Party Claim</u>") is made against any person or entity entitled to indemnification pursuant to <u>Section 8.2</u> hereof (an "<u>Indemnified Party</u>"), and if such Indemnified Party intends to seek indemnity with respect thereto under this <u>Article 8</u>, such Indemnified Party shall promptly notify the Party obligated to indemnify such Indemnified Party (or, in the case of a Buyer Indemnitee seeking indemnification, such Buyer Indemnitee shall promptly notify R GHI) ( such n otified p arty, t he "<u>Responsible P arty</u>") o f s uch claims; p rovided, that the failure to so notify shall not relieve the Responsible Party of its obligations hereunder, except to the extent that the Responsible Party is actually and materially prejudiced thereby. Except as provided in the last sentence of this <u>Section 8.3(a)</u>, the Responsible Party shall have 30 days after receipt of such notice to assume the conduct and control, through counsel reasonably acceptable to the Indemnified Party at the expense of the Responsible Party, of the settlement or defense thereof, and the Indemnified Party shall cooperate with it in connection therewith; provided that the Responsible Party shall permit the Indemnified Party to participate in such settlement or defense through counsel chosen by such Indemnified Party, provided that the fees and expenses of such counsel shall be borne by such Indemnified Party. So long as the Responsible Party is reasonably contesting any such claim in good faith, the Indemnified Party shall not pay or settle any such claim. Notwithstanding the foregoing, the Indemnified Party shall have the right to pay or settle any such claim, provided that in such event it shall waive any right to indemnity therefor by the Responsible Party for such claim unless the Responsible Party shall have consented to such payment or settlement. If the Responsible Party does not notify the Indemnified Party within 30 days after the receipt of the Indemnified Party's notice of a claim of indemnity hereunder that it elects to undertake the defense thereof, the Indemnified Party shall have the right to contest, settle or compromise the claim but shall not thereby waive any right to indemnity therefor pursuant to this Agreement. The Responsible Party shall not, except with the consent of the Indemnified Party, enter into any settlement that does not include as an unconditional term thereof the giving by the person or persons asserting such claim to all Indemnified Parties of an unconditional release from all liability with respect to such claim or consent to entry of any judgment. Notwithstanding the foregoing, the Company shall have the right to control any Third Party C laim with respect to Taxes; provided, however, that the Company shall not settle or compromise any such claim without the consent of RGHI which consent shall not be unreasonably withheld or delayed.

(b)    All of the Parties shall cooperate in the defense or prosecution of any Third Party Claim in respect of which indemnity may be sought hereunder and shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested in connection therewith.

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Section 8.4**    **Limitations on Indemnification Obligations**.

(a)    Subject to the provisions of <u>Section 8.4(b)</u> below, the rights of the Buyer Indemnitees to indemnification pursuant to <u>Section 8.2(a)</u> are subject to the following limitations:

(i)    the Buyer Indemnitees shall not be entitled to recover for any particular Loss pursuant to clause (i), (ii) or (iv) of <u>Section 8.2(a)</u> unless such Loss (or group of related Losses) equals or exceeds $250,000;

(ii)    the Buyer Indemnitees will not be entitled to recover Losses pursuant to clause (i), (ii) or (iv) of <u>Section 8.2(a)</u> until the total amount which the Buyer Indemnitees would recover under clauses (i), (ii) and (iv) of <u>Section 8.2(a)</u> (as limited by the provisions of <u>Sections 8.4(a)(i)</u> and <u>8.4(c)</u>), but for this <u>Section 8.4(a)(ii)</u>, exceeds $10,000,000 (the "<u>Threshold</u>"), at which time all amounts from the first dollar of Loss may be recovered; and

(iii)    the Buyer Indemnitees will be entitled to recover Losses pursuant to clauses (i), (ii) and (iv) of <u>Section 8.2(a)</u> in an aggregate amount of no more than 30% of the Aggregate Consideration Amount.

(b)    Notwithstanding anything to the contrary contained herein, the provisions of <u>Section 8.4(a)</u> shall not apply to any Losses resulting from a breach of a representation or warranty contained in any of <u>Section 3.1</u> (Organization of the Company), <u>Section 3.2</u> (Authorization), <u>Section 3.3</u> (Capitalization of the Company) (other than the last sentence of <u>Section 3.3</u>), <u>Section 3.14</u> (Taxes) and <u>Section 3.26</u> (Brokers).

(c)    The amount of any and all Losses indemnified pursuant to this <u>Article 8</u> will be determined net of (i) amounts actually received by the Indemnified Party under any insurance policy with respect to such Losses (except to the extent that recovery under such insurance policy results in a premium increase or other damage to the Indemnified Party), (ii) any Tax benefit actually realized by the Indemnified Party arising from the facts or circumstances giving rise to such Losses and (iii) any recoveries obtained by the Indemnified Person from any other third party. Each Indemnified Party shall exercise commercially reasonable efforts to obtain such amounts, benefits and recoveries. If any such amounts, proceeds or recoveries are received by an Indemnified Party with respect to any Losses after an Indemnifying Party has made a payment to the Indemnified Party with respect thereto, the Indemnified Party shall pay to the Indemnifying Party the amount of such amounts, benefits or recoveries (up to the amount of the Indemnifying Party's payment).

**Section 8.5**    **Knowledge**.   Notwithstanding anything contained herein to the contrary, no Party to this Agreement shall have any liability for any breach of or inaccuracy in any representation or warranty by such Party, if the other Party or any of its officers, employees, counsel or other representatives had actual knowledge at or before

MB02055052

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

the execution of this Agreement of the facts as a result of which such representation or warranty was breached or inaccurate. The Parties to this Agreement acknowledge and agree that the burden of proving that another Party had actual knowledge of the facts or events described in the preceding sentence shall rest with the Party asserting the existence of such knowledge.

Section 8.6    **Exclusive Remedy**. N otwithstanding a nything e lse c ontained i n this Agreement to the contrary, after the Closing, (i) indemnification pursuant to the provisions of this <u>Article 8</u> shall be the exclusive remedy for damages for the Parties for any misrepresentation or breach of any warranty, covenant or other provision contained in this Agreement (other than the covenants contained in <u>Section 5.2</u>) or in any certificate delivered pursuant hereto and (ii) making a claim hereunder shall be the sole and exclusive remedy available to the Parties for any Loss, Losses or other amounts arising under the indemnification obligations set forth herein, or otherwise in respect of the transactions contemplated hereby, except that the foregoing shall not apply to the actual fraud or willful or intentional misconduct of RGHI.

Section 8.7    **Proration**. In the case of Taxes that are payable with respect to any taxable period which begins before, and ends after, the Closing Date, the pre-Closing portion of any such tax shall be:

(i)    in the case of Taxes that are either (A) based upon or related to income or receipts, or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), deemed equal to the amount that would be payable if the taxable year ended with (and included) the Closing Date; and

(ii)    in the case of Taxes that are imposed on a periodic basis with respect to the assets of the Company or any Subsidiary, deemed to be the amount of such Taxes for the entire period, multiplied by a fraction the numerator of which is the number of calendar days in the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period.

**ARTICLE 9**
**MISCELLANEOUS**

Section 9.1    **Entire Agreement; Assignment**. This Agreement (a) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and (b) shall not be assigned by any Party (whether by operation of law or otherwise) prior to the Closing without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that each of the Buyer or Merger Company may assign all or a portion of their rights under this Agreement (i) to any of their Affiliates, (ii) for collateral purposes in connection with financing transactions, or (iii) to a Person to whom equity interests in the Surviving Company may be transferred

MB02055053

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

by the Buyer following the Closing pursuant to the Securityholders Agreement (provided that such assignment relates only to the right to purchase a number of Purchased Membership Interests that is no greater than the number that could be so transferred in accordance with the Securityholders Agreement).

Section 9.2    **Notices**.    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, facsimile or telex, or by registered or certified mail (postage prepaid, return receipt requested) to any Party as follows:

(a)    To the Company, RGHI or Phillip R. Bennett:

Refco Group Ltd., LLC
One World Financial Center
200 Liberty Street
New York, NY 10281
Attention: Phillip R. Bennett
Facsimile: (212) 693-7686

with a copy (which shall not constitute notice to the Company or RGHI) to:

Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, NY 10019
Attention: Joseph P. Collins
(212) 262-1910

(b)    To Merger Company or the Buyer:

MB02055054

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Refco Merger LLC
THL Refco Acquisition Partners
c/o Thomas H. Lee Partners, L.P.
100 Federal Street
Boston, MA 02110
Attention:  Scott Schoen
            Scott Jaeckel
            George Taylor
Facsimile:  (617) 227-3514

with a copy (which shall not constitute notice to the Buyer) to:

Weil, Gotshal & Manges LLP
100 Federal Street
Boston, MA 02110
Attention: James Westra
Facsimile: (617) 772-8333

and

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
Attention: R. Jay Tabor
Facsimile: (214) 746-7777

(c)    To BAWAG or BOI:

Alinea Holdings GmbH
c/o McDermott, Will & Emery
50 Rockefeller Plaza – 11th Floor
New York, NY  10020-1605
Attention: John Sullivan
Facsimile: (212) 547-5444

(d)    To Tone Grant:

Mr. Tone Grant
875 N. Michigan Avenue
Suite 2720
Chicago, IL  60611
Facsimile: (312) 787-7503

or to such other address as the Party to whom notice is given may have previously
furnished to the other in writing in the manner set forth above.

DA1:\367401\22\7VHL22!.DOC\77356.0036                41                          **MB02055055**

**CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP**

**Section 9.3     Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

**Section 9.4     Construction; Interpretation.**  The headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.  Article, section, exhibit, schedule, annex, party, preamble and recital references are to this Agreement unless otherwise stated.  No Party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions hereof, and all provisions of this Agreement shall be construed according to their fair meaning and not strictly for or against any Party.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

**Section 9.5     Parties in Interest.**  T his A greement s hall b e b inding u pon and inure s olely to t he b enefit o f e ach P arty a nd i ts s uccessors a nd p ermitted a ssigns a nd, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.  Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of any Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of any Buyer, nor any director, officer, employee, representative, agent or other controlling Person of any Buyer shall have any liability or obligation arising under this Agreement or the transactions contemplated hereby.

**Section 9.6     Severability.**  If any term or other provision of this Agreement is invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

**Section 9.7     Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

**Section 9.8     Knowledge of the Company.**  For all purposes of this Agreement, the phrase "to the Company's knowledge", "to the knowledge of the Company" and "known by the Company" shall mean as of the applicable date, the actual knowledge of Phillip R. Bennett, Robert C. Trosten, Santo C. Maggio, Joseph R. Murphy, William M. Sexton and Dennis Klejna, after reasonable inquiry by such individuals of the Person or Persons who report directly to each such individual.

**Section 9.9     Waiver of Jury Trial.**  The Parties each hereby waive, to the fullest extent permitted by law, any right to trial by jury of any claim, demand, action, or cause of action (i) arising under this Agreement or (ii) in any way connected with or

DAI:\367401\22\7VHL22!.DOC\77356.0036                    42                    MB02055056

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

related or incidental to the dealings of the Parties in respect of this Agreement or any of the transactions related hereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise. The Parties each hereby agree and consent that any such claim, demand, action, or cause of action shall be decided by court trial without a jury and that the Parties may file an original counterpart of a copy of this Agreement with any court as written evidence of the consent of the Parties to the waiver of their right to trial by jury.

**Section 9.10    Schedules.**

(a)     Any information disclosed pursuant to any schedule hereto shall be deemed to be disclosed to Buyer for all purposes of any other schedule or section of this Agreement to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other schedule or section of this Agreement. Neither the specification of any dollar amount in any representation or warranty contained in this Agreement nor the inclusion of any specific item or matter in any schedule hereto is intended to imply that such amount, or higher or lower amounts, or the item or matter so included or other items or matters, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any such item or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any schedule is or is not material for purposes of this Agreement. Unless this Agreement specifically provides otherwise, neither the specification of any item or matter in any representation or warranty contained in this Agreement nor the inclusion of any specific item or matter in any schedule hereto is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary c ourse o f b usiness, a nd n o p arty s hall u se t he fact o f t he s etting forth or t he inclusion of any such item or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in any schedule is or is not in the ordinary course of business for purposes of this Agreement. RGHI may, from time to time prior to or at the Closing, by notice in accordance with the terms of this Agreement, supplement or amend any schedule, including one or more supplements or amendments to correct any matter which would constitute a breach of any representation, warranty, covenant or obligation contained herein (the "Updated Schedules"). Except as expressly set forth in Section 9.10(b), any new or revised information in the Updated Schedules (i) shall be deemed to be for informational purposes only and (ii) shall not modify or qualify any rights or remedies of the Buyer under this Agreement.

(b)     New or revised information in an Updated Schedule shall be deemed to modify the representations and warranties to which such Updated Schedule relates and will not be deemed to be or to cause a breach of any such representations or warranties ( as i f s uch n ew o r revised i nformation h ad b een s et forth i n t he a pplicable schedule as of the date of this Agreement) only if (i) such new or revised information sets forth facts or events that occurred after the date of this Agreement and did not arise from any matter or condition that existed and was required to have been disclosed in the schedules a s o f t he d ate o f t his A greement i n o rder t o  avoid  a  b reach o r u ntruth o f a

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

representation or warranty but that was not so disclosed, (ii) except in the case of an update to <u>Schedules 3.13</u>, the penultimate sentence and the last sentence of <u>3.6</u>, <u>3.14(iv)</u> or <u>(vi)</u>, <u>3.16(e)</u> or the last sentence of <u>3.17(a)</u> (where no such acknowledgment shall be necessary), RGHI acknowledges in writing that such new or revised information would permit the Buyer to exercise its right not to effect the Closing pursuant to <u>Section 6.2</u> and (iii) the Buyer nevertheless elects to effect the Closing.

**Section 9.11    <u>Definitions</u>.**

"<u>Affiliate</u>" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person through the ownership of more than 50% of such Person's voting securities, by contract or otherwise.

"<u>Antitrust Laws</u>" means any applicable antitrust or trade regulatory laws of any Governmental Authority, including the HSR Act.

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>CFTC</u>" means the Commodity Futures Trading Commission.

"<u>CME</u>" means the Chicago Mercantile Exchange.

"<u>Company Indebtedness</u>" means any indebtedness of the Company or any of the Subsidiaries for borrowed money other than Customer Financing Indebtedness.

"<u>Company Transaction Expenses</u>" means the out-of-pocket fees and expenses of Phillip Bennett, the Company and RGHI in connection with the transactions contemplated by this Agreement, including fees and expenses of attorneys, accountants, advisors and investment bankers (but not including (i) any fees or expenses payable to THL in connection with the transactions contemplated by this Agreement, which fees and expenses shall be paid solely by the Surviving Company as provided in <u>Section 7.3</u> or (ii) any fees or expenses payable to any broker, finder or investment banker in connection with the transactions contemplated by this Agreement based upon arrangements made by and on behalf of any Buyer).

"<u>Customer Financing Indebtedness</u>" means (i) indebtedness which is short term in nature, incurred in the ordinary course of business consistent with past practice and which is either (a) indebtedness of Refco Capital, LLC in conjunction with its customer

DA1:\367401\22\7VHL22!.DOC\77356.0036                    44

MB02055058

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

financing business, (b) indebtedness incurred for the purpose of financing customer margined inventory, acquired or cleared or financed in conjunction with customer brokerage activities which indebtedness is secured by the asset(s) being financed, (c) obligations in respect of letters of credit posted in connection with clearinghouse guarantees or (d) secured customer financing entered into by regulated Subsidiaries of the Company from time to time, (ii) guarantees by the Company of indebtedness of any Subsidiary in the ordinary course of its brokerage business and by any Subsidiary of indebtedness of any other Subsidiary and (iii) indebtedness of the Company to any Subsidiary and of any Subsidiary to the Company or any other Subsidiary.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Finance Company" means Refco Finance Holdings LLC, a Delaware limited liability company that is wholly owned by Merger Company.

"Governmental Authority" means any court, government (federal, state, local, foreign or multinational), department, commission, board, bureau, agency, official or other regulatory, administrative or governmental authority.

"Governmental Order" means any order, writ, injunction, decree, award, judgment or ruling entered by or with any Governmental Authority.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Intellectual Property" means all worldwide rights in any or all of the following: (a) patents, applications therefor and all reissues, divisions, renewals, reexaminations, extensions, provisionals, continuations, and continuations-in-part (the "Patents"), inventions (whether patentable or not), invention disclosures and trade secrets; (b) trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor together with all goodwill associated therewith, (the "Trademarks"); (c) Internet Web addresses, sites and domain names; (d) industrial designs and any registrations and applications therefor; (e) copyrights, copyright registrations and applications therefor and all other rights corresponding thereto, including mask works and registrations and applications therefor (the "Copyrights"); and (f) and all other proprietary or intellectual property rights.

"IRS" means the Internal Revenue Service.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement.

"Legal Proceeding" means any judicial, administrative or arbitration actions, suits, proceedings (public or private) or claims or proceedings by or before a Governmental Authority.

MB02055059

CONFIDENTIAL TREATMENT REQUESTED BY WILLIAMS AND CONNOLLY LLP

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, encumbrance or any other restriction or limitation whatsoever.

"Material Adverse Effect" means any change or effect that, individually or in combination with other factors, is material and adverse to the financial condition, assets or results of operations of the Company and the Subsidiaries, taken as a whole, provided that any change or effect relating to or arising out of any of the following shall be deemed not to constitute a Material Adverse Effect: (1) any change or trend in the economy in general or in the national, international, local or regional markets or industries in which the Company operates, (2) acts of terrorism or war (whether or not declared) occurring prior to, on or after the date of this Agreement, (3) any change or trend in the securities or financial markets in the United States or in any other country or region in which the Company operates, (4) any changes or effects resulting from the execution of this Agreement or the announcement, implementation and closing of this Agreement and the transactions contemplated hereby and (5) the unreasonable failure of Buyer to consent to any of the actions proscribed by Section 5.1 that are necessary for the preservation of the business of the Company and the Subsidiaries as currently conducted. The Parties acknowledge and agree that the mere fact that a change or effect is foreseeable as of the date of this Agreement will not, in and of itself, prevent such change or effect from being determined to be a Material Adverse Effect.

"Organizational Documents" means the charter, articles, memorandum or certificate of incorporation or association, partnership agreement, certificate of limited partnership, operating agreement, limited liability company agreement, certificate of formation, bylaws, stockholder or shareholder agreements and/or similar formation or governance documents and agreements of any Person, whether or not filed with any Governmental Authority, including any amendments thereto.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Authority.

"Permitted Exceptions" means (i) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, provided an appropriate reserve is established therefor on the financial statements in accordance with GAAP; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business that are not material to the business, operations and financial condition of the property so encumbered and that are not resulting from a breach, default or violation by the Company or any of the Subsidiaries of any contract or Law; (iii) zoning, entitlement and other land use and environmental regulations by any Governmental Authority, provided that such regulations have not been violated; and (iv) such other imperfections in title, charges, easements, restrictions and encumbrances which do not materially detract from the value of or materially interfere with the present use of any property subject thereto or affected thereby.

MB02055060

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

"Person" means and includes an individual, a partnership, a corporation, a limited liability company, a trust, a joint venture, an unincorporated organization, an association, a joint stock company and any Governmental Authority or Self-Regulatory Organization.

"Post Closing Earn-Out Amounts" means any amounts that are required to be paid following the Closing by the Company or any of the Subsidiaries that represent any deferred (whether or not contingent) obligation to pay purchase price or other consideration in connection with any acquisition of a business or any business combination transaction (provided that such payment obligation arises from a contractual obligation incurred by the Company or any of the Subsidiaries prior to the Closing).

"RGHI Equity Portion" means the number of the Voting Membership Interests other than BAWAG Transferred Interests held by RGHI that must be converted into Class A Common Units in order that the total number of Class A Common Units that are issued to RGHI pursuant to the Merger (including Class A Common Units that are issued to RGHI on account of the conversion of BAWAG Transferred Interests) will represent 43% of the total Class A Common Units that will be issued and outstanding immediately following the Merger.

"SEC" means the Securities and Exchange Commission.

"Self-Regulatory Organization" means the National Association of Securities Dealers, Inc., the American Stock Exchange, the National Futures Association, the Chicago Mercantile Exchange, the Chicago Board of Trade, the New York Stock Exchange, Inc., any national securities exchange (as defined in the Securities Exchange Act of 1934, as amended), any other securities exchange, futures exchange, contract market, commodities market, any other such exchange, clearinghouse or corporation or other similar federal, state or foreign self-regulatory body or organization.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by the Company.

"Taxes" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i) and (iii) any liability in respect of any items described in clause (i) or (ii) as a successor, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any other Law) or as an indemnitor. guarantor, surety or in a similar capacity under any contract, arrangement, agreement, understanding or commitment (whether oral or written). .

MB02055061

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means collectively, all designs, formulae, algorithms, procedures, methods, techniques, know-how, research and development, technical data, computer programs, whether in source code or object code, databases, compilations, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all associated documentation, apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

**Section 9.12    Obligations for Indemnification.**    From and following the Closing, each of Phillip R. Bennett and Tone Grant hereby (i) guarantees the obligations of RGHI under Section 2.4, Section 5.13 and Article 8 (provided, that each such party guarantees only 50% of such obligations of RGHI) and (ii) warrants and covenants that, at the time the Closing is to occur, the statements and covenants in Section 10.10 of the Securityholders Agreement will be accurate and will not have been violated. The guarantees set forth in this Section 9.12 are unconditional and shall survive any amendment or modification of the terms of this Agreement or the Securityholders Agreement.

MB02055062

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

IN WITNESS WHEREOF, each of the Parties has caused this Equity Purchase and Merger Agreement to be duly executed on its behalf as of the day and year first above written.

REFCO GROUP LTD., LLC

By: _____
Name: _____
Title: _____

REFCO GROUP HOLDINGS, INC.

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055063

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

THL REFCO ACQUISITION PARTNERS

By:  THL Refco GP LLC, a general partner

By: _____
Name: Scott Schoen
Title:   President

MB02055064

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

REFCO MERGER LLC

By: _____
Name: Scott Schoen
Title:  President

MB02055065

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of Section 5.13:

ALINEA HOLDING GMBH

By: _____

Name: __JOHANN MAUTLER__ | FRANZ LUSTIG

Title: _____

MB02055066

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of Section 9.12:

PHILIP R. BENNETT

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055067

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Solely for purposes of <u>Section 9.12</u>:

TONE GRANT

_____

SIGNATURE PAGE TO
EQUITY PURCHASE AND MERGER AGREEMENT

MB02055068

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT I

Exhibit 99.1



Refco Inc.
One World Financial Center
200 Liberty Street – Tower A
New York, NY 10281
212–693–7000
www.refco.com

**Company Contact:**
For Refco Inc.
Roger Ma
212– 587–6355
rma@refco.com

## REFCO INC. ANNOUNCES COMPLETION OF ITS
## INITIAL PUBLIC OFFERING

NEW YORK, NY, August 16, 2005 – Refco Inc. (NYSE: RFX), a diversified financial services company, today announced that it has consummated its initial public offering of 26,500,000 shares of common stock at $22.00 per share.  Refco sold 12,500,000 shares, and 14,000,000 shares were sold by existing stockholders.  An additional 3,975,000 shares were sold by Refco pursuant to the exercise of the underwriters' option to purchase such shares to cover over–allotments.

Proceeds from the 12,500,000 shares sold by Refco not subject to the over–allotment option will be used to redeem outstanding indebtedness and for general corporate purposes.  Proceeds from the exercise of the underwriters' over–allotment option will be paid as a dividend to Refco's stockholders of record prior to the offering.

Credit Suisse First Boston LLC, Goldman, Sachs & Co. and Banc of America Securities LLC were the joint book–running managers for the IPO.  Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Sandler O'Neill & Partners, L.P. and HSBC Securities (USA) Inc. were the co–managers.

A copy of the final prospectus relating to the offering may be obtained from: Credit Suisse First Boston LLC, Prospectus Department, Eleven Madison Avenue, New York, NY 10010 (212–325–2580); Goldman, Sachs & Co., Prospectus Department, 85 Broad Street, New York, NY 10004 (212–902–1171); and Banc of America Securities LLC, Prospectus Department, 100 West 33rd Street, 3rd Floor, New York, NY 10001 (646–733–4166).

A registration statement relating to these securities has been declared effective by the Securities and Exchange Commission.  This press release shall not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be any sale of these securities in any state in which such an offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state.

Refco is a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base. Refco's worldwide subsidiaries are members of principal U.S. and international exchanges, and are

among the most active members of futures exchanges in Chicago, New York, London, Paris and Singapore. In addition to its futures brokerage activities, Refco is a major broker of cash market products, including foreign exchange, foreign exchange options, government securities, domestic and international equities, emerging market debt, and OTC financial and commodity products. Refco is one of the largest global clearing firms for derivatives.

# EXHIBIT J

**Refco Group Ltd., LLC**

One World Financial Center
200 Liberty Street • Tower A
New York, NY 10281-1094

Telephone
212-693-7000

*Q's: ① if combine loan to Hvldgs + L + d ⇒ what % of K, sub debt + total debt?*

October 15, 1999

**REFCO**®

Joseph P. Collins. Esq.
Mayer, Brown & Platt
1675 Broadway – 19 floor
New York, NY 10019

*② if loan to parent*
*% of parent's K, sub debt, Total debt.*

Dear Joe:

RE: **BAWAG/Refco**

Following our discussions on the structure of the Refco/BAWAG deal I had tried to analyze the Wells Fargo footnote as a means of responding in a comparable way to questions concerning the BAWAG loan to Refco Group Holdings. I found this difficult particularly as the definition of "Borrower" in the footnote is not all together clear and I was not sure whether the interpretation applied to Wells Fargo's investment in its subsidiary or the financing activities of that subsidiary with third-party clients. It may prove, therefore, that the comparison is not entirely valid.

In light of this, I think it may be better to focus on an overall analysis of the financial resources of Refco Group and repeat, once again, the arms-length nature of the loan transaction between BAWAG and Refco Group Holdings. Specifically:-

1.  Refco Group Holdings is a non-operating holding company. The principal and overwhelming asset is its 90% ownership of Refco Group Ltd. and subsidiaries.

2.  Refco Group Holdings is closely held and with the exception of the BAWAG loan has no third-party lending arrangements or equity investors. This, together with a historical policy of strict confidentiality, is the principal reason that the company does not (and is not obligated to) produce financial statements. Refco Group Ltd. and subsidiaries on the other hand produces regular audited financial statements.

3.  Given the fact that it is not an operating company, Refco Group Holdings capital (i.e. net worth) is represented by the value of its investment in Refco Group Limited. At May 31, 1999, the net worth of Refco Group Ltd. totaled $446 million. In addition, Refco Group Holdings holds a $16 million subordinated note from a subsidiary of Refco Group Ltd., Refco, Inc. The combined value of Refco

*net worth minus loans to RGH*

MB02071243

*2*

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

**Refco Group Ltd., LLC**

October 15, 1999
BAWAG/Refco
Page 2

Group Holdings 90% interest in the equity of Refco Group Ltd. plus the principal of the subordinated note is, therefore, approximately $418 million.

4.  The loan extended by BAWAG to Refco Group Holdings has a principal value of $85 million. This loan, subject to a Separate Loan Agreement, has been negotiated at arms length and is not convertible into either equity of Refco Group Holdings or equity of Refco Group Ltd. The principal balance of the loan represents approximately 20.3% of the value of Refco Group Holding's investment in Refco Group Ltd.

5.  In terms of the commercial viability of the loan, interest and principal can readily be covered by the remittance of dividend payments or distributions from Refco Group Ltd. and its subsidiaries to Refco Group Holdings, its parent entity. There would be not additional call upon the assets of Refco Group Ltd. for debt service.

Given the absence of third-party liabilities or investors at the Refco Group Holdings level and the concentration of Refco Group Holdings assets and net worth in Refco Group Ltd., an audited entity, we can clearly state that the BAWAG loan to Refco Group Holdings, quite apart from being arms-length in nature does not represent a disproportionate share of the capital value of Refco Group Holdings and is in fact less than 25% of that number. Furthermore, the loan has no direct or indirect rights in respect of ownership or financial claims against Refco Group Ltd., which should further support the view that there is no implication of control derived from the existence of the loan.

A copy of the internal management accounts for May 31, 1999, and the audited financial statements for February 28, 1999, are enclosed for information in support of the above financial analysis. Please let me know if you have additional questions.

Yours sincerely,

*[signature]*

Phillip Bennett
President and CEO

kf
Enclosure

*[handwritten: by 11/30 70MM L-T-Debt to insure COS]*

MB02071244                                    3

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 4/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.04/17

Refco Group Ltd., LLC and Subsidiaries
Consolidated Balance Sheet
May 31, 1999
(USD, in thousands)

|  | May 31, 1999 |
|---|---|
| **ASSETS** | |
| Cash and short-term investments, at market value | $ 332,822 |
| Margin deposits with commodity exchanges, clearing associations and brokers | 778,256 |
| Receivables: | |
| Brokers and dealers | 95,463 |
| Loans | 436,723 |
| Customers | 1,562,161 |
| Other | 151,623 |
| Financial instruments owned, at market value | 1,302,007 |
| Securities purchased under agreements to resell | 5,996,623 |
| Other assets | 244,551 |
|  | $ 10,900,229 |
| | |
| **LIABILITIES AND SHARE CAPITAL** | |
| Payable to brokers, dealers and other financial institutions | $ 82,275 |
| Payable to customers | 2,409,657 |
| Bank loans | 330,885 |
| Notes payable | 28,335 |
| Loans payable | 10,627 |
| Financial instruments sold not yet purchased, at market value | 442,821 |
| Securities sold under agreements to repurchase | 6,740,758 |
| Accounts payable and other liabilities | 112,007 |
|  | 10,155,346 |
| Long-term debt | 130,000 |
|  | 10,285,346 |
| | |
| Subordinated debt | 16,000 |
| Minority interest | 27,522 |
| Preferred securities issued by a subsidiary | 125,000 |
| | |
| Share capital | |
| Membership shares, $1 par value; 1,000 shares authorized, issued and outstanding | 1 |
| Additional paid-in capital | 223,505 |
| Retained earnings | 228,091 |
| Currency translation adjustment | (5,236) |
|  | 446,361 |
|  | $ 10,900,229 |

The above financial statement is unaudited and is to be used for internal management purposes only.

MB02071245

4

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 5/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.05/17

Refco Group Ltd., LLC and Subsidiaries
Consolidated Statement of Income and Retained Earnings
For the Three Months Ended May 31, 1999
(USD, in thousands)

|  | May 31, 1999 |
|---|---|
| **REVENUES** |  |
| Commissions | $ 59,957 |
| Brokerage | 15,473 |
| Interest | 351,026 |
| Principal transactions, net | 13,472 |
| Asset management and advisory fees | 9,461 |
| Other income | 2,088 |
|  | 451,477 |
|  |  |
| **EXPENSES** |  |
| Commissions and order execution costs | 46,456 |
| Interest | 332,731 |
| Employee compensation and benefits | 33,034 |
| General, administrative and other | 23,518 |
|  | 435,739 |
|  |  |
| Income before provision for income taxes, minority interest and dividends on preferred securities issued by a subsidiary | 15,738 |
| Provision for income taxes | 1,968 |
| Income before minority interest and dividends on preferred securities issued by a subsidiary | 13,770 |
| Minority interest | 524 |
| Income before dividends on preferred securities issued by a subsidiary | 13,246 |
| Dividends on preferred securities issued by a subsidiary | 2,976 |
| Net income | 10,270 |
| RETAINED EARNINGS AS OF MARCH 1 | 217,821 |
| RETAINED EARNINGS AS OF MAY 31 | $ 228,091 |

The above financial statement is unaudited and is to be used for internal management purposes only.

MB02071246

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 6/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540     P.06/17



**Refco Group, Ltd. and Subsidiaries**
Consolidated Financial Statements
February 28, 1999

MB02071247

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 7/17
OCT 19 '99 19:08 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.07/17

# ARTHUR ANDERSEN LLP

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Refco Group, Ltd.:

We have audited the accompanying consolidated balance sheet of Refco Group, Ltd. (a Delaware corporation) and subsidiaries as of February 28, 1999, and the related consolidated statements of income, changes in stockholder's equity and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Refco Group, Ltd. and subsidiaries as of February 28, 1999, and the results of their operations and their cash flows for the year then ended in conformity with generally accepted accounting principles.

*Arthur Andersen LLP*

New York, New York
May 19, 1999

MB02071248

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 8/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.08/17

# REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEET

### FEBRUARY 28, 1999

(000's omitted)

### ASSETS

| | |
|---|---|
| CASH AND SHORT-TERM INVESTMENTS, at market value | $ 226,910 |
| MARGIN DEPOSITS WITH COMMODITY EXCHANGES, CLEARING ASSOCIATIONS AND BROKERS | 844,949 |
| RECEIVABLES: | |
| Brokers and dealers | 159,759 |
| Loans | 257,477 |
| Customers | 1,317,291 |
| Other | 190,986 |
| FINANCIAL INSTRUMENTS OWNED, at market or fair value | 730,715 |
| SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL | 5,092,298 |
| OTHER ASSETS | 236,791 |
| Total assets | $ 9,059,156 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

| | |
|---|---|
| LIABILITIES: | |
| Payable to brokers, dealers and financial institutions | $ 211,762 |
| Payable to customers | 1,866,920 |
| Bank loans | 244,000 |
| Notes payable | 221,335 |
| Loans payable | 1,351 |
| Financial instruments sold but not yet purchased, at market or fair value | 498,465 |
| Securities sold under agreements to repurchase | 5,196,704 |
| Accounts payable and other liabilities | 171,234 |
| | 8,411,791 |
| LONG-TERM DEBT | 146,000 |
| | 8,557,791 |
| SUBORDINATED DEBT | 16,000 |
| MINORITY INTEREST | 26,998 |
| PREFERRED SECURITIES ISSUED BY SUBSIDIARIES | 125,000 |
| STOCKHOLDERS' EQUITY: | |
| Common stock, $1 par value; 1,000 shares authorized, issued and outstanding | 1 |
| Additional paid-in capital | 120,605 |
| Retained earnings | 217,821 |
| Currency translation adjustment | (5,060) |
| Total stockholder's equity | 333,367 |
| Total liabilities and stockholder's equity | $ 9,059,156 |

The accompanying notes are an integral part of this consolidated balance sheet.

MB02071249

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

<u>REFCO GROUP, LTD. AND SUBSIDIARIES</u>

<u>CONSOLIDATED STATEMENT OF INCOME</u>

<u>FOR THE YEAR ENDED FEBRUARY 28, 1999</u>

(000's omitted)

| | |
|---|---:|
| **REVENUES:** | $   235,687 |
| Commissions | 70,438 |
| Brokerage income | 1,290,553 |
| Interest | 90,425 |
| Principal transactions, net | 34,768 |
| Asset management and advisory fees | 6,660 |
| Other income | 1,728,531 |
| | |
| **EXPENSES:** | 213,510 |
| Commissions and order execution costs | 1,222,903 |
| Interest | 140,845 |
| Employee compensation and benefits | 109,920 |
| General, administrative and other | 1,687,178 |
| Income before restructuring charge, provision for income taxes, minority interest, and dividends on preferred securities issued by subsidiaries | 41,353 |
| RESTRUCTURING CHARGE | 5,000 |
| Income before provision for income taxes, minority interest, and dividends on preferred securities issued by subsidiaries | 36,353 |
| PROVISION FOR INCOME TAXES | 4,497 |
| Income before minority interest and dividends on preferred securities issued by subsidiaries | 31,856 |
| MINORITY INTEREST | 877 |
| Income before dividends on preferred securities issued by subsidiaries | 30,979 |
| DIVIDENDS ON PREFERRED SECURITIES ISSUED BY SUBSIDIARIES | 10,859 |
| Net income | $   20,120 |

The accompanying notes are an integral part of this consolidated statement.

MB02071250

9

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 10/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.10/17

## REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY

## FOR THE YEAR ENDED FEBRUARY 28, 1999

### (000's omitted)

| | | | Stockholder's Equity | | |
| --- | --- | --- | --- | --- | --- |
| | Common Stock | Additional Paid-in Capital | Retained Earnings | Currency Translation Adjustment | Total |
| BALANCE, February 28, 1998 | $ 1 | $ 35,605 | $ 197,701 | $ (2,283) | $ 231,024 |
| Contributed capital | - | 85,000 | - | - | 85,000 |
| Net income | - | - | 20,120 | - | 20,120 |
| Currency translation adjustment | - | - | - | (2,777) | (2,777) |
| BALANCE, February 28, 1999 | $ 1 | $ 120,605 | $ 217,821 | $ (5,060) | $ 333,367 |

The accompanying notes are an integral part of this consolidated statement.

-4-

MB02071251

10

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 11/17
OCT 19 '99 19:09 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540    P.11/17

## REFCO GROUP, LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CASH FLOWS

## FOR THE YEAR ENDED FEBRUARY 28, 1999

### (000's omitted)

| | |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | |
| Net income | $    20,120 |
| Noncash items included in net income- | |
| Depreciation and amortization | 13,223 |
| Minority interest in earnings of subsidiaries | 877 |
| (Increase) decrease in operating assets- | |
| Margin deposits with commodity exchanges, clearing associations and brokers | (14,050) |
| Receivable from brokers and dealers | (74,648) |
| Loans receivable | (19,926) |
| Receivable from customers | 248,746 |
| Other receivables | (49,029) |
| Financial instruments owned | 396,352 |
| Securities purchased under agreements to resell | (4,169,786) |
| Other assets | (34,345) |
| | (3,702,586) |
| Increase (decrease) in operating liabilities- | |
| Payable to brokers, dealers and financial institutions | (45,509) |
| Payable to customers | (54,311) |
| Bank loans | 87,251 |
| Notes payable | 71,260 |
| Loans payable | (64,948) |
| Financial instruments sold but not yet purchased | (450,264) |
| Securities sold under agreements to repurchase | 3,922,192 |
| Accounts payable and other liabilities | 19,650 |
| | 3,485,321 |
| Cash used in operating activities | (197,145) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | |
| Repayment of long-term debt | (34,400) |
| Repayment of subordinated debt | (12,295) |
| Issuance of preferred securities by a subsidiary | 50,000 |
| Proceeds from contributed capital | 85,000 |
| Net cash provided by financing activities | 88,305 |
| Net decrease in cash and short-term investments | (108,840) |
| CASH AND SHORT-TERM INVESTMENTS, February 28, 1998 | 337,750 |
| CASH AND SHORT-TERM INVESTMENTS, February 28, 1999 | $    228,910 |

The accompanying notes are an integral part of this consolidated statement.

-5-

MB02071252

11

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 12/17
OCT 19 '99 19:10 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128455540          P.12/17

REFCO GROUP, LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

FEBRUARY 28, 1999

## 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements include the accounts of Refco Group, Ltd. (the "Company") and its subsidiaries (the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Company's worldwide headquarters in Chicago is complemented by a network of United States and international offices.

The consolidated financial statements include the accounts of each of the Company's subsidiaries, all of which are either wholly or majority owned. All material intercompany transactions and balances have been eliminated in consolidation.

The preparation of consolidated financial statements requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements. In the opinion of management, these estimates are not material to the financial position of the Group.

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year-end spot rate. Gains and losses resulting from foreign currency transactions are included in the consolidated statement of income. Gains and losses resulting from translating foreign currency financial statements into U.S. dollars are included in currency translation adjustment, as a separate component of stockholder's equity.

Cash and short-term investments are defined as segregated and nonsegregated cash and short-term, liquid investments with maturities of 90 days or less when acquired.

Financial instruments owned and financial instruments sold but not yet purchased are recorded on a trade date basis and consist primarily of U.S. and foreign equity and fixed income securities as well as derivative financial instruments which are stated at market value or fair value, with unrealized gains and losses included in income.

Loans receivable are stated at principal value, are generally due on demand and bear interest at variable market rates. Loans receivable are renewed at the option of the Group.

-6-

MB02071253

12

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Securities purchased under agreements to resell and securities sold under agreements to repurchase are accounted for as collateralized financing transactions and are recorded at the amount at which the securities will be resold or repurchased, including accrued interest. The Group generally controls access to the collateral pledged by the counterparties, which consists largely of securities issued by the U.S. Government and foreign sovereign governments. The value and adequacy of the collateral are continually monitored. Consequently, the risk of credit loss from counterparties' failure to perform in connection with collateralized lending activities is minimal.

The Company continues to report assets as owned when they are pledged as collateral in secured financing arrangements and the secured party cannot sell or repledge the assets or the Company can substitute collateral or otherwise redeem it on short notice. The Company continues not to report securities received as collateral in secured financing arrangements because the debtor typically has the right to substitute or redeem the collateral on short notice.

The Company recognizes commissions earned on customers' open futures positions on a half-turn basis.

## 2. RECEIVABLES FROM AND PAYABLE TO BROKERS AND DEALERS, FINANCIAL INSTITUTIONS AND CUSTOMERS

These balances primarily pertain to margin and open contractual commitments related to futures, foreign currencies and securities transactions. These receivables are generally secured or collateralized. For certain receivables that are not fully secured and where the Company deems appropriate, the Company pursues collection of these receivables through various means, including legal action, and provides reserves when, in the opinion of management, such reserves are appropriate. The Group nets receivables and payables related to its foreign currency and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

## 3. BANK LOANS, NOTES PAYABLE, SUBORDINATED DEBT, AND LONG-TERM DEBT

The Company maintains a committed unsecured revolving credit facility of $135 million under an agreement with a syndicate of banks. The agreement contains covenants which require, among other things, that the Company maintain specified levels of liquidity and tangible net worth, as defined in the agreement. Borrowings under this line at February 28, 1999 totaled $85 million and are included under bank loans in the accompanying financial statements.

Remaining Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers. At February 28, 1999, the Group had approximately $128 million of secured bank loans for which the Group had collateral pledged of approximately $223 million.

Notes payable include amounts due to former shareholders of acquired companies, a term loan from a financial institution, and obligations issued by a subsidiary. These notes bear interest at negotiated rates and have maturity dates through December 31, 2000.

MB02071254

13

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Subordinated debt due to the stockholder bears interest at the prime rate and is subordinated to the claims of present and future general creditors. During 1999, the weighted average interest rate on subordinated debt was 8.23%. The maturity date is May 31, 2000.

Subordinated debt can be repaid only if after giving effect to such repayment, certain regulated subsidiaries meet the capital requirements governing repayment of subordinated debt.

Long-term debt of $146 million represents unsecured senior notes with maturities ranging from May 16, 1999 to December 18, 2006. These loans bear interest at rates ranging from 7.18% to 8.21%, which are fixed rates based upon market rates at their respective dates of issuance.

## 4. REGULATORY CAPITAL REQUIREMENTS

The Company operates globally through a network of subsidiaries, with several being subject to regulatory requirements in the United States. Certain subsidiaries of the Company are subject to either minimum financial requirements as set forth by the Commodities Futures Trading Commission or the net capital requirement of the Securities Exchange Commission (the "SEC"). In accordance with these regulations, at February 28, 1999, these subsidiaries are required to maintain minimum net capital, as defined, of approximately $55.3 million and have excess net capital of approximately $94.7 million.

## 5. CONTINGENCIES

Two subsidiaries of the Company, together with several other financial institutions, including primary government securities dealers, have been named as defendants in civil actions. Another subsidiary of the Group has been named as a defendant in several lawsuits and arbitrations which involve claims that aggregate to substantial amounts.

With regard to these civil actions and arbitrations, the Company, its subsidiaries and legal counsel believe that the resolution for these matters will not have a material adverse effect on the financial condition and results of operations of the Company.

## 6. INCOME TAXES

Effective January 1, 1997, the Group's parent filed an election with the United States Internal Revenue Service to be treated as an S corporation for U.S. federal income tax purposes, as defined in the regulations. Under these regulations, the stockholder of the Group is responsible for the federal income tax liability related to the Group's operating results, except for Refco, Inc., a subsidiary, which files its own federal corporate tax return. Accordingly, the Group did not record any U.S. federal income tax liability related to its operating results. This election does not affect foreign, state or city taxes. A provision for foreign, state and city taxes is included in the consolidated financial statements.

Income taxes are allocated to members of the consolidated group by computing such taxes as if the member were a separate taxpayer. Income taxes are payable to its parent.

-8-

MB02071255                          14

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP -

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 15/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR H9 312 782 2770 TO 12128495540     P.15/17

### 7. RELATED PARTY TRANSACTIONS

During the year ended February 28, 1999, the Group loaned money to and borrowed money from its stockholder, affiliated companies and other related parties. At year-end, these balances included net loans receivable of approximately $252 million due from these related parties. Those transactions occurred in the normal course of the Group's business. Interest was generally charged at prevailing market rates.

### 8. OFF-BALANCE SHEET AND CONCENTRATION OF CREDIT RISK

In the normal course of its customer-driven operations, the Group enters into various contractual commitments involving forward settlement. These include exchange-traded futures, fixed income swaps, equity swaps, foreign currency forwards and options contracts. Most contracts entered into are fully hedged with offsetting contracts or the underlying cash instrument.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off-balance sheet.

Derivatives are generally based on notional values. Notional values are not recorded on the consolidated balance sheet, but rather are utilized solely as a basis for determining future cash flows to be exchanged. Although notional or contractual amounts may be indicative of the level of transactions, they do not measure the Group's exposure to market or credit risk. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits. Management believes the Group's exposure to market risk, however, is expected to be immaterial relative to the underlying notional amounts.

A summary of the approximate notional amounts of derivative financial instruments at February 28, 1999 appears below (in millions):

| | |
|---|---:|
| Forward currency contracts: | |
| Commitments to sell | $ 8,007 |
| Commitments to purchase | 7,787 |
| Forward financing transactions: | |
| Commitments to purchase securities under agreements to resell | 382 |
| Commitments to sell securities under agreements to repurchase | 2,185 |
| Swap contracts: | |
| Commitments to sell | 11 |
| Commitments to purchase | 16 |
| Option contracts sold or written | 10,959 |
| Option contracts purchased | 10,965 |

-9-

MB02071256

15

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 16/17
OCT 19 '99 19:11 FR MBP CHGO 35TH FLR H9 312 782 2770 TO 12128495540     P.16/17

A summary of the market or fair value of derivative financial instruments at February 28, 1999 appears below (in millions); averages are based on quarter-end balances.

|  | Assets | | Liabilities | |
|---|---|---|---|---|
|  | February 28, 1999 | Average | February 28, 1999 | Average |
| Forward currency contracts | $  29 | $ 144 | $  41 | $ 142 |
| Option contracts | 180 | 569 | 189 | 571 |
| Swap contracts | 1 | 12 | 3 | 12 |

The Group regularly transacts business with corporations and other financial institutions and owns securities issued by a broad range of governments and U.S. and foreign corporations. The Group also enters into collateralized financing agreements in which it extends short-term credit to financial institutions and customers. The Group generally controls access to the collateral pledged by the counterparties, which consists largely of securities issued by the U.S. Government and foreign sovereign governments. The value and adequacy of the collateral are continually monitored. Consequently, the risk of credit loss from counterparties' failure to perform in connection with collateralized lending activities is minimal.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouses its customers' performance under these contracts. To reduce its risk, the Group requires its customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer which reduces the risk to the Group of failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements. Management believes that the margin deposits held at February 28, 1999 were adequate to minimize the risk of material loss which could be created by the positions held at that time.

The Group engages in various trading activities which include the use of derivative instruments described in the aforementioned table. The net principal transactions revenues related to the trading of foreign exchange, fixed income and equity derivatives comprise principal transactions, net on the accompanying consolidated statement of income.

## 9. PREFERRED SECURITIES ISSUED BY SUBSIDIARIES

During calendar year 1998, Refco Preferred Capital Trust I and II, consolidated subsidiaries of the Company, issued $125 million of Trust Originated Preferred Securities ("TOPRs") to third parties with a weighted average interest rate of 9.52%. The Company has guaranteed payment of all distributions on the TOPRs, with the guarantees being subordinated to all senior indebtedness. Distributions are payable semiannually if funds are legally available. These securities have maturities extending through 2008. The TOPRs are recorded as Preferred Securities Issued by Subsidiaries on the accompanying consolidated balance sheet.

-10-

MB02071257

16

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Received 10/19/1999 19:54 in 05:50 on line [0] for JSH * Pg 17/17
OCT 19 '99 19:12 FR MBP CHGO 35TH FLR #9 312 782 2770 TO 12128495540          P.17/17

## 10. RESTRUCTURING

The Company recorded a $5 million restructuring charge related to certain actions taken to improve ongoing profitability. These actions are a result of specific business reviews and the reorganization of certain corporate functions. These reviews resulted in reductions of both business unit and corporate personnel. The charge primarily consists of severance payments made to terminated employees.

## 11. SUBSEQUENT EVENTS (UNAUDITED)

In May 1999, the Company reorganized into a Delaware limited liability company, Refco Group, Ltd. LLC, and sold 10% of LLC interests to a subsidiary of Bank fur Arbeit und Wirtschaft (BAWAG) for $95 million. The amounts sold represent 4.9% voting LLC interests and 5.1% non-voting LLC interests.

MB02071258

17

** TOTAL PAGE.17 **

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT K

**From:**      Koury, Paul J.
**Sent:**      Friday, August 20, 2004 4:33 PM
**To:**        'Santo C. Maggio (E-mail)'
**Subject:**   Liberty Corner Capital Strategies, LLC.

TO:      Santo Maggio

FROM:    Paul J. Koury

RE:   Liberty Corner Capital Strategies, LLC

Attached please find the following documents for use in connection with the loans for Liberty Corner Capital Strategies, LLC ("Liberty"):

1.      Loan Agreement between Liberty and Refco Capital Markets, Ltd. ("RCM") and the Note from Liberty to RCM, dated August 26, 2004 for a loan amount of $475,000,000 payable on September 7, 2004 at an interest rate of 1.50% (document number 17242161_1).

2.      Loan Agreement between Liberty and Refco Group Holdings, Inc. ("RGHI") and the Note from RGHI to Liberty, both dated August 26, 2004 for a loan amount of $475,000,000 payable on September 7, 2004 at an interest rate of 2.25% (document number 17242162_1).

3.      Refco Group Ltd., LLC ("RGL") Guaranty to Liberty, dated August 26, 2004 (document number 17242160_1).

4.      RGL Indemnity Letter to Liberty, dated August 26, 2004 (document number 17242159_1).

If you have any questions or comments, please do not hesitate to contact me at 212-506-2637.


**Paul J. Koury**
**Mayer, Brown, Rowe & Maw LLP**
**1675 Broadway**
**New York, NY 10019**
**Tel: 212-506-2637**
**Fax: 212-262-1910**
**E-mail: pkoury@mayerbrown.com**

17242162_1.pdf     17242159_1.pdf     17242160_1.pdf     17242161_1.pdf
(87 KB)            (16 KB)            (20 KB)            (87 KB)

1

Confidential

| | |
|---|---|
| **From:** | Koury, Paul J. |
| **Sent:** | Wednesday, November 17, 2004 2:26 PM |
| **To:** | Koury, Paul J.; 'Santo C. Maggio (E-mail)' |
| **Subject:** | Liberty Corner Capital Strategies, LLC. |

TO:     Santo Maggio

FROM:   Paul J. Koury

RE:     <u>Liberty Corner Capital Strategies, LLC</u>

Attached please find the following documents for use in connection with the loans for Liberty Corner Capital Strategies, LLC ("Liberty"):

1.     Loan Agreement between Liberty and Refco Capital Markets, Ltd. ("RCM") and the Note from Liberty to RCM, dated November 26, 2004 for a loan amount of $545,000,000 payable on December 3, 2004 at an interest rate of 2.00%.

2.     Loan Agreement between Liberty and Refco Group Holdings, Inc. ("RGHI") and the Note from RGHI to Liberty, both dated December 26,2004 for a loan amount of $545,000,000 payable on December 3, 2004 at an interest rate of 2.75%.

3.     Refco Group Ltd., LLC ("RGL") Guaranty to Liberty, dated November 26, 2004.

4.     RGL Indemnity Letter to Liberty, dated November 26, 2004.

If you have any questions or comments, please do not hesitate to contact me at 212-506-2637.

**Paul J. Koury**
**Mayer, Brown, Rowe & Maw LLP**
**1675 Broadway**
**New York, NY 10019**
**Tel: 212-506-2637**
**Fax: 212-262-1910**
**E-mail: pkoury@mayerbrown.com**

   

Liberty-RGH       Liberty-Guaranty-N  Liberty-Indemnificat  Liberty-RCM
an-NOVEMBER 2004  ovember 2004...     ion- Novem...         oan-November 2004

1

MBRM-EX 00094566

.

---

**From:**  Koury, Paul J.
**Sent:**  Friday, May 20, 2005 5:24 PM
**To:**  SMaggio@refco.com
**Cc:**  Collins, Joseph P.; Pazzol, Ross; Schultz, Peter
**Subject:** Liberty Corner Capital Strategies, LLC

TO:        Santo Maggio

FROM:      Paul J. Koury

C.C.:      Joseph P. Collins
           Peter Schultz
           Ross Pazzol

RE:    Liberty Corner Capital Strategies, LLC

Attached please find the following documents for use in connection with the loans for Liberty Corner Capital Strategies, LLC ("Liberty"):

1.    Loan Agreement between Liberty and Refco Capital Markets, Ltd. ("RCM") and the Note from Liberty to RCM, both dated  May 25, 2005 for a loan amount of $450,000,000  payable on June 5, 2005 at an interest rate of 3% (document number 17298550.1).

2.    Loan Agreement between Liberty and Refco Group Holdings, Inc. ("RGHI") and the Note from RGHI to Liberty, both dated May 25, 2005 for a loan amount of $450,000,000 payable on June 5, 2005 at an interest rate of 3.75% (document number 17298552.1).

3.    Refco Group Ltd., LLC ("RGL") Guaranty to Liberty, dated May 25, 2005 (document number 17298518.1).

4.    RGL Indemnity Letter to Liberty, dated May 25, 2005 (document number 17298519.1).

As I mentioned to you, I accepted a job with a client of the firm and today is my last day.  If you have any questions or comments regarding the attached, please do not hesitate to contact Peter Schultz (312-701-8477) or Ross Pazzol (312-701-7168).  Also, in the future

It was a pleasure working with you over the past 5 years, and I wish you and all of Refco much success in the future.  Below please find my new contact information:

Paul J. Koury
Assistant General Counsel
Dresdner Kleinwort Wasserstein Securities, LLC
1301 Avenue of the Americas, 41st Floor
New York, NY 10019-6163
212-895-6725

Confidential

# EXHIBIT L

| From: | Collins, Joseph P. | Sent: 1/25/2005 9:17 PM |
|---|---|---|
| To: | Yorke, Thomas | |
| Cc: | smaggio@refco.com | |
| Bcc: | | |
| Subject: | RE: PCMG XII, KP I, KP II - Qualified Custodians | |

Tom,
Here are some preliminary thoughts on this matter:
1. The new IA registration rules do not go into effect until 2/1/06.
2. The IA Custody Rule applies now to any registered IA. The new February 2006 registration date does not change the obligation for already registered advisers.
3. Client assets (cash and securities but not futures, swaps, or FX contracts) have to be held at a qualified custodian.
4. RCM could be a qualified custodian if it customarily holds financial assets for its customers, provided that the adviser's client assets must be segregated from RCM's proprietary assets in accounts that contain only those clients' assets and under the name of the adviser as agent or trustee for its clients.
5. In order to use RCM, the adviser must have a reasonable belief that RCM will provide a level of asset safety similar to that which would be provided by a qualified US custodian. The adviser also has to inform its clients about any material risks relating to the use of RCM as a custodian. Such disclosure can be a one time disclosure if multiple custodians are used.
6. The preliminary solutions seem to be:
A. Stall on the IA registration and avoid immediate application of the rule;
B. Segregate the funds and make the necessary disclosures;
C. Keep the funds at RSL or Refco,LLC;
D. Convince the adviser that its clients assets are the derivatives, not securities, and that the cash deposits support such trading and therefore are beyond the scope of the Custody Rule;or
E.
Use some RGL credit support agreement or guaranty to alleviate any concerns over the foreign nature of the custodian and do the segregation required by the Rule.
We can discuss this matter further to arrive at a satisfactory solution.

-----Original Message-----
From: Yorke, Thomas [mailto:TYorke@refco.com]
Sent: Monday, January 24, 2005 10:28 AM
To: Collins, Joseph P.
Subject: PCMG XII, KP I, KP II - Qualified Custodians


Joe

Walt has been discussing some new guidelines for Funds and/or CTA's concerning entities that are considered official "Custodians". I understand the determination has been made Refco Capital Markets can't be a qualified "custodian" due in part to the Non Segregation of customer funds. We have some larger accounts who are operated as Investment Advisors and will now be looking to transfer funds from RCM to Refco Securities LLC as a result of this change.

When will this change take affect ?
When is the effective date, i.e.: the date funds would need to move assets or positions to be in compliance with the rule change.

CONFIDENTIAL TREATMENT REQUESTED BY REFCO

Could RCM qualify if we maintained two separate accounts at Chase for RCM ?

This change could mean an extremely large asset transfer away from RCM.

Thanks

This email and any files transmitted with it are confidential and intended solely for
the use of the individual or entity to whom they are addressed. If you have received
this email in error please notify the system manager. This message contains
confidential information and is intended only for the individual named. If you are not
the named addressee you should not disseminate, distribute or copy this e-mail.
This email and any files transmitted with it are confidential and intended solely for
the use of the individual or entity to whom they are addressed. If you have received
this email in error please notify the system manager. This message contains
confidential information and is intended only for the individual named. If you are not
the named addressee you should not disseminate, distribute or copy this e-mail.

CONFIDENTIAL TREATMENT REQUESTED BY REFCO

# EXHIBIT M

# MEMORANDUM

October ___, 2005

**TO:**      Stephen Keating

**FROM:**   Joseph Collins
           Ross Pazzol

**RE:**      Refco Capital Markets, Ltd.

---

I.    **Background**.

Refco Securities, LLC. ("RSL") is registered as a broker-dealer with the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (the "Act") and is a member of the National Association of Securities Dealers, Inc., the Chicago Board Options Exchange, Incorporated, the Pacific Exchange and the Philadelphia Stock Exchange. Refco Capital Markets, Ltd. ("RCM") is organized under the laws of Bermuda and acts principally as a broker and as a dealer in foreign currency and in structured derivative products.

RCM executes transactions with, and provides prime brokerage and financing services for, certain non-U.S. accounts introduced to it by RSL. More specifically, RCM engages in the following activities:

A.    **Foreign Exchange ("FX")**.

RCM engages in FX trading as a dealer and maintains trading lines with leading dealers in the interbank FX market. RCM also provides FX clearing, margining and custodial facilities for Refco FX Associates, LLC and for other smaller FX dealers.

B.    **Derivative Trading**.

RCM provides secured loans and conducts the derivative trading often associated with structured transactions. Most of the derivatives used are total return swaps on baskets and indices of securities. Some long-dated options are written on these same indices and baskets.

C.    **Emerging Market Debt**.

RCM's trades emerging market debt and engages in related lending and borrowing transactions. All of the customers in these transactions are non-U.S. persons, and a registered broker-dealer in Miami generally acts as an agent for both RCM and the customer in these

**MB02441374**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP



Stephen Keating
October __, 2005
Page 2

transactions. There are no common customers of RCM and RSL for these transactions, and all of the RCM customers are non-U.S. persons.

### D.     Financing.

RCM provides financing for some non-U.S. persons on equity portfolios by means of total return swaps written on these portfolios. The portfolios contain some U.S. equities.

### E.     Equity Trading.

For a small portion of clients (principally an Italian institutional client), RCM buys and sells securities (including U.S. securities) and serves as the prime broker for those clients.

### F.     Convertible Trading.

RCM trades convertible debt securities for some non-U.S. customers. The activities consist of selling stock or a convertible debt instrument under Regulation D, Regulation S, or an existing shelf registration or pursuant to a prospectus in a registered offering.

## II.     Operations.

RSL provides RCM with the personnel, data-processing services and other facilities required to permit RCM to carry customer and proprietary accounts and clear the securities transactions effected in these accounts.     In this regard, RSL issues and delivers trade confirmations and reviews documentation necessary to complete comparisons of transactions listed on RCM's end-of-day records. RSL also computes and produces calculations of RCM's customers' current and pending settlement obligations, and all other calculations as are necessary to permit RCM to balance, monitor and reconcile all positions for RCM's customer and proprietary accounts.     Further, RSL monitors RCM's customer accounts for purposes of requiring customers to remit payment for purchases, deliver securities sold and transfer securities to and from their accounts against payment or receipt of funds. RSL also provides RCM with custody services for U.S. securities which RCM may require from time to time. All of these accounts are carried on the books of RCM, and RSL acts as a liaison between RCM and these accounts.

RCM no longer maintains any personnel or operations in Bermuda, and that all of its functions and operations are performed by RSL personnel that are located in the United States. In view of this development, you have inquired whether RCM may continue to operate in the manner described above without registering as a broker-dealer with the Securities and Exchange Commission (the "SEC").

## III.     Discussion.

Section 15 of the Act generally provides that it is unlawful for any broker or dealer to make use of the mails or any other means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security unless such broker or dealer is registered as such with the SEC. By its terms, this registration requirement is

CHDB03 9044938.5  11-Oct-05 12:00                                          **MB02441375**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Stephen Keating
October __, 2005
Page 3

applicable even to brokers and dealers that do not conduct business from a physical location in the United States. However, the broad scope of this requirement is limited by Section 30(b) of the Act which provides, in relevant part, that "the provisions of this title or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate to prevent the evasion of his title." Thus, to the extent that RCM is deemed to be conducting a business in securities "without the jurisdiction" of the United States, it will not be required to register under the Act.

To date, the SEC has not promulgated any rules or regulations pursuant to Section 30(b) of the Act. It also has not provided any guidance on the circumstances under which a person will be deemed to be conducting a securities business "without the jurisdiction" of the United States. As a general matter, the courts that have considered this issue use a "conduct" or "effects" test to analyze whether a person's activities are subject to the provisions of the Act. As discussed below, these courts generally have held that where a person: (1) has engaged in "significant" conduct in the United States; or (2) has engaged in conduct outside the United States that has a "significant" effect in the United States, then that person will be subject to the provisions of the Act.

For example, in <u>SEC v. United Financial Group, Inc.</u>, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶93,747 (9th Cir. 1973), the court analyzed whether the activities of certain offshore investment companies controlled by a United States-based holding company were subject to the provisions of the Act. In making this determination, the court noted that the activities of these companies were directed and controlled by their United States-based holding company. Further, the United States mails and other facilities of interstate commerce were used to prepare and distribute prospectuses for the investment companies, to set up sales meetings and to consummate investment transactions. Moreover, these investment companies advertised their securities for sale in overseas editions of United States newspapers, and sold their securities to United States citizens living abroad. Accordingly, the court held that the investment companies were engaged in "significant" conduct within the United States and were thus subject to the provisions of the Act.

A person also may be engaged in "significant" conduct in the United States when it repeatedly uses the United States mails and other facilities of interstate commerce to communicate with others with respect to a securities transaction and the transaction is closed in the United States, even if the securities in question are foreign securities. In <u>Travis v. Anthes Imperial Limited, et al.</u>, 473 F.2d 515 (8th Cir. 1973), United States resident shareholders of a Canadian corporation successfully brought a Rule 10b-5 action against another Canadian corporation for making misleading statements in connection with the corporation's tender offer for their shares. The court noted that although some significant steps in the defendant's fraudulent scheme took place in Canada, the defendant also repeatedly made misleading statements to the plaintiff about the tender offer by using the United States mails and other instrumentalities of interstate commerce and that the sale of the plaintiff's shares to the defendant

**MB02441376**

CHDB03 9044938.5  11-Oct-05 12:00

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Stephen Keating
October __, 2005
Page 4

closed in the United States. Accordingly, the court held that the defendant engaged in "significant" conduct in the United States and was thus subject to the provisions of the Act.

Conversely, a defendant may not be engaged in "significant" conduct in the United States where the transaction in question is "predominantly foreign." In <u>Fidenas AG v. Compagnie Internationale</u>, 606 F.2d 5 (2nd Cir. 1979), the court analyzed whether it had jurisdiction over a case in which a Swiss company sold phony securities to another Swiss company in a series of transactions consummated in Switzerland. The court noted that the defendant's only connection to the United States was based on the plaintiff's contention that the defendant's main office was located in the United States and that persons working in that office knew of the fraudulent transactions. The court stated that, even assuming the defendant's assertion were true, jurisdiction would be lacking because the transaction was "predominantly foreign." In particular, the court noted that the plaintiff and defendant were foreign and that any activities in the United States were essentially ancillary to the fraudulent conduct that occurred in Switzerland. Accordingly, the court held that any minor activity which may have occurred in the United States did not justify subjecting the defendant to the provisions of the Act, particularly where the defendant's alleged misconduct took the form of culpable nonfeasance.

Finally, it is important to note that in analyzing whether a person has engaged in fraudulent conduct under Rule 10b-5, one court has held that an analysis of whether a person engaged in "significant" conduct in the United States depends on whether the persons affected by such conduct are United States citizens or foreigners. In <u>Bersch v. Drexel Firestone, Inc.</u>, 519 F.2d 974 (1975), the court analyzed whether certain activity conducted in the United States to prepare for a public offering of a Canadian corporation's stock to overseas investors was sufficient to subject the defendants to the provisions of the Act. The court stated that "[while merely preparatory activities in the United States are not enough to trigger application of the securities laws for injury to foreigners located abroad, they are sufficient when the injury is to Americans so resident." <u>Id.</u> at 992. Accordingly, the Court held that the Act did not apply to the sale of the company's stock to foreign purchasers.

Although we have not engaged in an exhaustive review of the relevant case law, it appears that RCM will be deemed to be engaged in "significant" conduct in the United States. Similar to the situation in <u>United Financial Group</u>, RCM's activities are directed and controlled by persons that are located in the U.S. In this regard, all transactions conducted by RCM are negotiated and executed by RSL personnel in the name of RCM without the need for further approval by RCM personnel that are located outside the U.S. Moreover, all RCM operations are conducted by RSL and RCM does not posses any operations or facilities which are available to assist RCM in conducting these transactions. Because RCM personnel located outside the U.S are not involved in these transactions in any respect, it seems difficult to avoid the conclusion that RCM is engaged in significant conduct within the United States. Therefore, it appears that the exemption from broker-dealer registration provided under Section 30(b) of the Act will not be available to RCM.

Given the limited amount of guidance available with respect to the scope of Section 30(b), it may be useful to analyze other guidance the SEC staff has provided in similar, but not identical, situations. For example, in a 1986 exemptive order issued to Citicorp and its registered

CHDB03 9044938.5 11-Oct-05 12:00

MB02441377

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Stephen Keating
October __, 2005
Page 5

broker-dealer subsidiary Vickers da Costa Securities, Inc. ("Vickers"),[1] the SEC permitted various Citicorp subsidiaries that were unregistered foreign broker-dealers ("Citicorp's Foreign Dealers") and Vickers to enter into an arrangement in which Vickers would act as a broker or as riskless principal in transactions ultimately between Vickers' U.S. customers and Citicorp's Foreign Dealers.

Vickers was a NASDAQ market-maker in certain foreign securities and American Depositary Receipts on such securities. As such, Vickers was required to continuously display bid and ask quotations for these securities and buy and sell these securities for its own account at its displayed quotations. For each security in which Vickers acted as a market maker, Citicorp's Foreign Dealers would place standing purchase and sale orders with Vickers each week before the opening of trading in the United States. Thus, the quotations Vickers published in the NASDAQ system always reflected the orders placed with Vickers by Citicorp's Foreign Dealers. As a result, Vickers' activities were limited to executing any orders received from U.S. customers against the standing orders placed by Citicorp's Foreign Dealers.

In its exemptive order, the SEC allowed Citicorp's Foreign Dealers to buy and sell securities through Vickers without requiring them to register as broker-dealers in the United States. However, the SEC required Citicorp's Foreign Dealers to limit their control over the price and size of their standing orders in order to permit Vickers to have some discretion over the execution of these orders. The purpose of this restriction was to permit Vickers to take independent positions and thus preclude it from acting as a mere conduit for Citicorp's Foreign Dealers.

In the Citicorp/Vickers letter, the SEC staff did not require Citicorp's Foreign Dealers to register as broker-dealers with the SEC on the grounds that Vickers exercised some independent control over its operations. In contrast, RSL personnel make all of the trading decisions and perform all of the operations for RCM. Accordingly, we believe that the SEC staff would not be likely to take the view that RCM's operations are separate and distinct from those of RSL.

Further, in analyzing RCM's operations, Refco must consider previous statements made by the SEC staff regarding the use of foreign entities as "booking" locations to avoid U.S. regulatory requirements. For example, the application of certain SRO transaction reporting rules and SEC transaction fee requirements vary depending on whether a transaction is deemed to have been effected in the United States.

The SEC staff has stated that it would be a violation of these requirements for persons located in the United States to negotiate all of the terms of a transaction in the U.S. and then "book" the transaction to a foreign entity in order to avoid these requirements.[2] While we cannot be certain, it seems likely that the SEC staff would take a similar view with respect to the arrangement between RSL and RCM.

---

[1]    See Vickers De Costa/Citicorp, SEC Lexis 2305 (August 13, 1986).
[2]    See Securities Exchange Act Release No. 28899 (February 20, 1991).

CHDB03 9044938.5  11-Oct-05 12:00

MB02441378

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Stephen Keating
October __, 2005
Page 6

### IV.    Rule 15a-6.

Assuming that RCM is operating within the jurisdiction of the United States, the next question is whether it is exempt from broker-dealer registration under Rule 15a-6. As you know, SEC Rule 15a-6 may permit RCM to deal directly with persons that are physically located in the United States under certain circumstances. For example, under Rule 15a-6(a)(1), a foreign broker-dealer may effect unsolicited transactions without registering as a broker-dealer under the Act. In addition, under Rule 15a-6(a)(4)(i), a foreign broker-dealer may deal with a registered broker-dealer acting for its own account or as agent for customers without registering as a broker-dealer under the Act.

Under Rule 15a-6(b)(3), a "foreign broker-dealer" is a broker-dealer that is a non-U.S. resident person (including any U.S. person engaged in business as a broker-dealer entirely outside the United States) and is not an office or branch of a U.S. broker-dealer. The SEC has not defined what it means to be a resident of the U.S. under Rule 15a-6. Moreover, the SEC has stated that it would not be appropriate to establish a separate standard of residency for purposes of Rule 15a-6 which differs from those generally established under state or federal law.

We have not undertaken an analysis of the various residency requirements that apply under federal and state law to determine whether RCM would be deemed to be a resident of the U.S. under these standards. As a practical matter, it seems clear that RCM's current structure and operations weigh in favor of a determination that RCM is a resident of the U.S., not Bermuda. Further, the parenthetical clause set forth in the preceding paragraph indicates that the SEC would take the position that the geographical location in which broker-dealer actually conducts its business, rather than the jurisdiction of its organization, is the relevant factor in determining where the broker-dealer resides. Accordingly, it does not appear that RCM will be able to rely on the exemption provided by Rule 15a-6 because it is not a "foreign broker-dealer" under that Rule.

### V.    Conclusion.

Generally, the FX and derivatives trading and financing activities of RCM are not subject to the federal securities laws and would not require RCM to register as a broker-dealer. However, certain aspects of RCM's operations likely do fall within the reach of the federal securities laws. Specifically, the purchase and sale of options on baskets or indices of securities will be considered subject to such laws. Similarly, RCM's convertible securities and emerging market debt activities likely would be deemed the conduct of a brokerage business subject to the federal securities laws. It may be prudent, therefore, for RCM to consider terminating its securities related activities and transfer its securities trading operations and customers to RSL.

<center>*        *        *        *        *</center>

**MB02441379**

CHDB03 9044938.5  11-Oct-05 12:00

**CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP**

Stephen Keating
October __, 2005
Page 7

After you have reviewed this Memorandum, we can discuss this matter further at your convenience.

J.P.C
R.P.

**MB02441380**

CHDB03 9044938.5   11-Oct-05 12:00

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT N

From:     Collins, Joseph P.                                        Sent:6/24/2002 2:13 PM
To:       Santo C. ("Sandy") Maggio (E-mail); Dennis A. Klejna (E-mail); Keating Stephen (E-mail)
Cc:       Spehr, Richard A.; Hewitt, John R.; Farley, Ryan P.
Bcc:
Subject:  Refco Capital Markets, Ltd.

<<CoverMemo.DOC>> <<Memo.DOC>>


*******************************************************************************
Joseph P. Collins
Mayer, Brown, Rowe & Maw Mayer, Brown, Rowe & Maw
190 South La Salle Street 1675 Broadway
Chicago, IL 60603 New York, NY 10019
Phone: 312-701-8353 Phone: 212-506-2657
Fax: 312-706-9101 Fax: 212-849-5657
Email: jcollins@mayerbrownrowe.com

# MAYER, BROWN, ROWE & MAW

190 SOUTH LA SALLE STREET

CHICAGO, ILLINOIS 60603-3441

**JOSEPH P. COLLINS**
DIRECT DIAL (312) 701-8353
DIRECT FAX (312) 706-9101
jcollins@mayerbrownrowe.com

MAIN TELEPHONE
(312) 782-0600
MAIN FAX
(312) 701-7711

## M E M O R A N D U M

June 24, 2002

**VIA E-MAIL**

| | |
|---|---|
| **TO:** | Santo C. Maggio |
| | Dennis A. Klejna |
| | Stephen Keating |
| **FROM:** | Joseph P. Collins |
| **RE:** | Refco Capital Markets, Ltd. |

---

Attached for your review and comments is a memorandum based upon our discussion last week. It is in draft form so that the facts and related analysis can be confirmed. Let me know your thoughts and comments. We look forward to seeing everyone at 3:00 pm tomorrow afternoon in Refco's offices.

J. P. C.

Enclosure

cc:    Richard A. Spehr
       John R. Hewitt
       Ryan P. Farley

Brussels  Charlotte  Chicago  Cologne  Frankfurt  Houston  London  Los Angeles  Manchester  New York  Palo Alto  Paris  Washington, D.C.
Independent Mexico City Correspondent:  Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw is a U.S. General Partnership. We operate in combination with our associated English partnership in the offices listed above.

CONFIDENTIAL TREATMENT REQUESTED BY REFCO

DRAFT: 6/24/02

**CONFIDENTIAL AND PRIVILEGED**

**M E M O R A N D U M**

June 24, 2002

**TO:**    File

**FROM:**    Joseph P. Collins

**RE:**    Refco Capital Markets, Ltd.

The following memorandum sets forth information regarding the present activities of Refco Capital Markets, Ltd., a Bermuda corporation ("RCM"). Most of the information was obtained during a discussion on June 19, 2002 with Sandy Maggio and Dennis Klejna.

## I.    RCM Activities.

### A.    Foreign Exchange ("FX")

The principal activity of RCM in terms of transactional volume and notional amount is FX trading. RCM engages in FX trading as a dealer and maintains trading lines with leading dealers in the interbank FX market. RCM also provides FX clearing, margining and custodial facilities for Refco FX Associates, LLC and for other smaller FX dealers. FX contracts are not securities for purposes of the federal securities laws.

### B.    Derivative Trading and Financing of Tax-Driven Strategies

A large revenue produce for FCM is the trading and financing activity related to various tax-motivated strategies designed by accounting firms and other tax planners. Refco will provide secured loans and conduct the derivative trading often used in these strategies. Most of the derivatives used are total return swaps on baskets and indices of securities. Some long-dated options are written on these same indices and baskets. The swaps would not be deemed securities for purposes of the federal securities laws, but the options are considered securities subject to those laws.

### C.    Emerging Market Debt

About 20% of RCM's revenues are derived from the trading of emerging market debt instruments. RCM buys and sells these securities and engages in related lending and borrowing transactions. All of the customers in these transactions are non-U.S. persons, and a registered broker-dealer in Miami generally acts as an agent for both RCM and the customer in these transactions.

4961774.1 062402 1255C 94131984

CONFIDENTIAL TREATMENT REQUESTED BY REFCO    REFCO-E-002464310

There are no common customers of RCM and Refco Securities, LLC ("RSL") for these transactions, and all of the RCM customers are non-U.S. persons.

All the sovereign and corporate debt issues traded by RCM are considered securities for purposes of the federal securities laws.

While RCM trades these instruments with its customers, RCM does not hold itself out as a dealer making a two-way market in these instruments.

### D.    Financing

RCM provides financing for some non-U.S. persons on equity portfolios by means of total return swaps written on these portfolios. The portfolios contain some U.S. equities. For purposes of the federal securities laws, these swaps are not considered securities.

### E.    Equity Trading

For a small portion of clients (principally an Italian institutional client), RCM buys and sells securities (including U.S. securities) and serves as the prime broker for those clients. The SEC generally has found prime brokerage activities to be those of a broker-dealer.

### F.    Convertible Trading

In 2001, RCM began trading convertible debt securities for some non-U.S. customers. The persons conducting such trading at RCM are also employees of RSL.

The activities consist of selling stock or a convertible debt instrument under Regulation D, Regulation S, or an existing shelf registration or pursuant to a prospectus in a registered offering.

The non-U.S. customers are carried on the books of RCM which, in turn, has an omnibus account at RSL. All applicable margin requirements are met by RCM on behalf of these customers. In fact, extraordinary margin is collected by RCM to avoid the risk of failed deliveries in some thinly-traded issues. All U.S. customers are carried directly on the books of RSL.

All the securities being traded are U.S. securities subject to the federal securities laws. As noted, RCM does not carry the customer accounts but may call some U.S. brokers (such as Pond Securities) which make markets in these securities in order to effect trades that are given up to RSL. RCM provides some financing for customers to engage in this trading.

## II.    Analysis and Recommendations

Generally, the FX and derivatives trading and financing activities of RCM are not subject to the federal securities laws and would not require RCM to register as a broker-dealer. Certain aspects of RCM's operations likely do fall within the reach of the federal securities laws. Specifically, the purchase and sale of options on baskets or indices of securities will be

CONFIDENTIAL TREATMENT REQUESTED BY REFCO                    REFCO-E-002464311

considered subject to such laws. Similarly, the convertible trading business likely would be deemed the conduct of a brokerage business subject to the federal securities laws.

It is a closer question whether the Emerging Market Debt Trading would be subject to SEC jurisdiction. The subject securities and the customers are all non-U.S. securities and persons, respectively. In addition, RCM does not act as a dealer since it does not regularly make two-way markets in the securities. Further, a U.S. broker-dealer acts as a dual agent in these transactions, thereby providing the customers with the benefits of the federal securities laws. While similar activities are conducted by the U.S. private backing offices of overseas banks, the SEC might assert jurisdiction over these RCM activities if they are principally conducted from a U.S. location.

It may be prudent, therefore, for RCM to take the following actions:

(1)  Cease the buying and selling of options on baskets and indices of securities.

(2)  Consider the transfer of existing options to RSL.

(3)  Transfer any equity trading client to RSL.

(4)  Transfer the non-U.S. convertible trading customers to RSL.

(5)  The Emerging Market Debt business should be re-evaluated based upon the level of SEC staff interest and other business considerations.

CONFIDENTIAL TREATMENT REQUESTED BY REFCO                    REFCO-E-002464312

# EXHIBIT O

Received Jan 31 01:51PM (01:12) on RightFax4 Line [0] for 'JOC'     WORKSRV4 printed FAX36B4603D41BB on Jan 31 01:54PM * Pg 1/3
        JAN-31-99  14:58  FROM:REFCO                                                ID:212  390  8708                           PAGE   1/3

# REFCO

## PRIVILEGED AND CONFIDENTIAL FACSIMILE

**31 January 1999**

| | |
|---|---|
| **To:** | **Edward Black; Joe Collins – Mayer Brown & Platt** |
| **Cc:** | **David Miller** |
| **From:** | **Martha Blonder, Refco** |
| **Facsimile:** | **212 390-8708** |
| **Telephone:** | **212 693-7276** |
| **Re:** | **Legal Opinion** |

Dear Edward;

Thank you for your opinion with respect to trading foreign exchange with certain European counterparties and customers out of Refco Capital Markets, Ltd ("RCM"). As I discussed briefly with Joe Collins, your opinion seemed to cover transactions contemplated or entered by Refco Overseas Limited (London)("ROL"). In fact, ROL may (or may not) introduce FX transactions to RCM (Bermuda). Could you please expand your opinion to cover the "introduction" of business by ROL to RCM. Also, would you recommend changes to the current operations or language in the confirmations to address the relationship of the two Refco affiliates.

Per David Miller, if ROL introduces transactions to RCM, does that relationship change the anti-money laundering procedures currently being followed for RCM? Please contact me if you require more details.

For your information, I also attach a letter I recently received from another broker. As you can see, FX forwards are absent from the trades they may introduce to their New York affiliate. Other non-bank FX counterparties are following similar guidelines, e.g., "large transaction" restrictions.

Finally, before spending more time on these issues, please check with Joe Collins to ensure they will not become moot by virtue of current projects underway with respect to Refco's FX business.

Otherwise, please sign and return by facsimile, and I will create and forward originals.

Thank you very much for your attention.

Very truly yours.

MB02035944

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT P

JUN-25-2004 08:43AM   FROM-

T-315  P.001/002  F-580
6/20/04

Refco Credit Agreement

# Definitions Related to Financial Covenants

*Rob, As we know, a difficult concept.*

## Average Cash on Hand

*"Restricted Cash" as "Non-Restricted" won or better.*

- Identify "House Cash" and segregate from customer cash and regulated cash
- Is it feasible to have Grant Thorton break out this number in a footnote in future quarterly filings?   *No!! Impossible @ break out. Too restrictive practically ie. funds.*

## Consolidated Funded Indebtedness   *Non Current*

- Need to make sure that we only pick up non-repo and other ordinary course of business indebtedness.)  *— Carve out for RCC & Securities (RCM secured fin'ing*
- How will future financial statements break out debt associated with funding this transaction and any other items that we would consider non-ordinary course long term debt, including current maturities?

*— Confirm this is non-current ?*

## Consolidated Interest Charges

- We plan to pick up all interest expense associated with respect to Consolidated Funded Indebtedness.
- If we define Consolidated Funded Indebtedness correctly, is there any reason that this will not work?
- Is it feasible to have Grant Thorton break out this number in a footnote in future quarterly filings?

## Consolidated Net Income

- Is there anything atypical that we need to discuss?   *. Funded / Non Funded.*

*· Exclude repos.*
*· Short Term e.g. RCC etc.*

## Consolidated EBITDA

- The portion of interest that will be added back to Net Consolidated Net Income is the amount of Consolidated Interest Charges, as defined.
- Is there anything else that is atypical that we need to discuss?

## Excess Cash Flow

- What accounts are included in working capital?
- We need to pick up changes in regulatory capital.

## General Financial Covenant Issues

- Capex covenant levels and carryover period (1 year versus 2 years)
- First financial covenant test date – November 2004

MB02011869

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

Refco Credit Agreement

## Basket Summary

| Covenant | General Basket |
|---|---|
| Liens | • General Basket - $25,000,000 |
| Investments | • Scheduled investments. <br> • Permitted Acquisitions  *Too Small - Real world probling* <br>  ○ $50 million per year with unlimited carryforward. <br>  ○ Acquired entity to become a wholly owned subsidiary (and therefore a Guarantor). <br>  ○ Subject to pro forma covenant compliance. <br> • General Basket:  *O.K.* <br>  ○ $10 million per fiscal year. <br>  ○ No limit on investments in existing JVs pursuant to existing arrangements. <br>  ○ Baskets may be used for Permitted Acquisitions. <br>  ○ Baskets increased by Permitted Equity Issuances. <br>  ○ Subject to pro-forma covenant compliance. <br>  ○ Investments by Loan Parties in non-Loan Parties and Foreign Subsidiaries limited to a TBD amount. <br> • Loans / Officer advances limited to $5 million. |
| Indebtedness | • Permitted Subordinated Indebtedness of Company: <br>  ○ Up to $15 million permitted without restriction on use of proceeds. <br>  ○ Amounts greater than $15 million permitted but must be used to pay down term debt. <br> • Regulated Subsidiaries Debt– limited to a TBD amount. <br> • Foreign Subsidiary Debt <br>  ○ Indebtedness of Foreign and Restricted Subsidiary to Holdings or any Loan Party – a TBD amount. <br>  ○ Third party indebtedness of Foreign Subsidiaries – a TBD amount. <br> • Permitted secured debt <br>  ○ Limited to $25 million <br>  ○ Of which up to $10 million can be purchase money debt. <br> • General Basket for Company and Subs <br>  ○ $50 million at any time outstanding. <br> • Holdings: <br>  ○ Permitted Holdco Debt – No cap. <br>  ○ Subject to 4.50:1 leverage at Holdings and 3.5:1 leverage at Company. <br>  ○ Pro forma covenant compliance required if amount is greater than $25 million in any fiscal quarter. |
| Asset Sales | • Sale and leaseback - $25 million (proceeds applied to pay down term loan). <br> • General Basket - $50 million (proceeds applied to pay down term loan). |
| Restricted Payments | • Permit restricted payments with proceeds of and to service Permitted Holdco Debt. <br> • Restricted Payments by Company to Holdings permitted in a maximum amount of $10 million, $20 million if Leverage Ratio is less than 4:1 and $30 million if Leverage Ratio is less than 3:1 plus 25% of cumulative free cash flow. |
| Mandatory Prepayments | • Excess cash flow – 50% steps down to 25% when leverage ratio is below 4.0:1 and 0% when leverage ratio is below 3.0:1. Excess cash flow start date – 2/28/05 or 2/28/06? <br> • Asset Sales – 100% for certain permitted sales (subject to certain exceptions, including first $10 million in any fiscal year and any disposition for less than $5 million). <br> • Specifies Equity Issuances – 50% steps down to 25% when leverage ratio is below 4.0:1 and 0% when leverage ratio is below 3.0:1. <br> • Permitted Subordinated Indebtedness, certain Foreign Subsidiary Debt and certain other indebtedness – 100% |

MB02011870

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

# EXHIBIT Q

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Refco Inc., *et al.*, | : | Case No. 05-60006 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MODIFIED JOINT CHAPTER 11 PLAN OF REFCO INC. AND
CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES**

J. Gregory Milmoe
Sally McDonald Henry
J. Gregory St. Clair
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Refco Inc., *et al.*

Tina L. Brozman
Timothy B. DeSieno
Mark W. Deveno
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Attorneys for Marc S. Kirschner, the Chapter 11 Trustee
for Refco Capital Markets, Ltd.

Luc A. Despins
Susheel Kirpalani
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

Attorneys for the Official Committee of Unsecured
Creditors of Refco Inc., *et al.*

David S. Rosner
Andrew K. Glenn
Jeffrey R. Gleit
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for the Additional Committee of Unsecured
Creditors of Refco Inc., *et al.*

Dated:  New York, New York
         December 14, 2006

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ................................................ 1
    **1.1**    *Additional Committee* ....................................................................................... 1
    **1.2**    *Additional RCM Claim* ...................................................................................... 1
    **1.3**    *Ad Hoc Committee of Senior Subordinated Note Holders* ................................. 1
    **1.4**    *Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses* ......... 1
    **1.5**    *Ad Hoc Equity Committee* ................................................................................. 2
    **1.6**    *Ad Hoc Equity Committee Fees and Expenses* .................................................. 2
    **1.7**    *Adjusted Contributing Debtors Distributive Assets* ........................................... 2
    **1.8**    *Administrative Claim* ........................................................................................ 2
    **1.9**    *Administrative/Priority Claims Reserve* ............................................................ 2
    **1.10**    *Administrative Claims Adjustment* .................................................................... 2
    **1.11**    *Administrative Claims Objection Deadline* ....................................................... 2
    **1.12**    *Administrative Professionals* ............................................................................ 2
    **1.13**    *Affiliate Debtor(s)* ............................................................................................ 2
    **1.14**    *AlixPartners* ..................................................................................................... 3
    **1.15**    *Allotted Administrative Claims* ........................................................................ 3
    **1.16**    *Allowed* ............................................................................................................ 3
    **1.17**    *"Allowed ... Claim"* ......................................................................................... 3
    **1.18**    *Asset Schedule* ................................................................................................. 3
    **1.19**    *Ballot* ............................................................................................................... 3
    **1.20**    *Bankruptcy Code* ............................................................................................. 3
    **1.21**    *Bankruptcy Court* ............................................................................................ 3
    **1.22**    *Bankruptcy Rules* ............................................................................................ 3
    **1.23**    *Bar Date* .......................................................................................................... 3
    **1.24**    *BAWAG* ........................................................................................................... 3
    **1.25**    *BAWAG Allocation Order* ................................................................................ 3
    **1.26**    *BAWAG Contingent Proceeds* .......................................................................... 4
    **1.27**    *BAWAG Guaranteed Proceeds* ........................................................................ 4
    **1.28**    *BAWAG Proceeds* ............................................................................................ 4
    **1.29**    *BAWAG Settlement* .......................................................................................... 4
    **1.30**    *Business Day* .................................................................................................... 4
    **1.31**    *Capstone* .......................................................................................................... 4
    **1.32**    *Cargill* ............................................................................................................. 4
    **1.33**    *Cargill Administrative Claim* ........................................................................... 4
    **1.34**    *Cash* ................................................................................................................. 4
    **1.35**    *Cash-Out Option Agreement* ............................................................................ 4
    **1.36**    *Chapter 11 Case(s)* .......................................................................................... 4
    **1.37**    *Claim* ............................................................................................................... 4
    **1.38**    *Claims Distribution Account* ............................................................................ 4
    **1.39**    *Claims Objection Deadline* ............................................................................... 4
    **1.40**    *Class* ................................................................................................................ 5
    **1.41**    *Class Actions Claims* ....................................................................................... 5
    **1.42**    *Combined Recoveries* ...................................................................................... 5
    **1.43**    *Committees* ...................................................................................................... 5
    **1.44**    *Confirmation* .................................................................................................... 5
    **1.45**    *Confirmation Date* ........................................................................................... 5
    **1.46**    *Confirmation Hearing* ...................................................................................... 5
    **1.47**    *Confirmation Order* .......................................................................................... 5
    **1.48**    *Contributed Claims* .......................................................................................... 5
    **1.49**    *Contributed Claims Recoveries* ........................................................................ 5

| | | |
|---|---|---|
| 1.50 | *Contributing Debtors* ..................................................................................... | 5 |
| 1.51 | *Contributing Debtors BAWAG Proceeds* .................................................... | 5 |
| 1.52 | *Contributing Debtors Cash Distribution* .................................................... | 5 |
| 1.53 | *Contributing Debtors Distributive Assets* .................................................. | 5 |
| 1.54 | *Contributing Debtors Effective Date Claims* .............................................. | 6 |
| 1.55 | *Contributing Debtors General Unsecured BAWAG Proceeds* .................... | 6 |
| 1.56 | *Contributing Debtors General Unsecured Claim* ......................................... | 6 |
| 1.57 | *Contributing Debtors General Unsecured Distribution* ............................... | 6 |
| 1.58 | *Contributing Debtors Post-Effective Date Claims* ..................................... | 6 |
| 1.59 | *Contributing Debtors Projection* ................................................................. | 6 |
| 1.60 | *Contributing Non-Debtor Affiliate* ............................................................. | 6 |
| 1.61 | *Contributing Non-Debtor Affiliate Management* ........................................ | 6 |
| 1.62 | *Contributing Non-Debtor Affiliate Trigger Date* ....................................... | 6 |
| 1.63 | *Convenience Claims* ...................................................................................... | 7 |
| 1.64 | *Credit Agreement* .......................................................................................... | 7 |
| 1.65 | *Creditors' Committee* .................................................................................... | 7 |
| 1.66 | *Debtor* ............................................................................................................ | 7 |
| 1.67 | *Debtors* .......................................................................................................... | 7 |
| 1.68 | *Disbursing Agent* .......................................................................................... | 7 |
| 1.69 | *Disclosure Statement* .................................................................................... | 7 |
| 1.70 | *Disputed Claim* .............................................................................................. | 7 |
| 1.71 | *"Disputed ... Claim"* .................................................................................... | 7 |
| 1.72 | *Disputed Claim Amount* ................................................................................ | 7 |
| 1.73 | *Disputed Claims Reserve* .............................................................................. | 7 |
| 1.74 | *Distribution* ................................................................................................... | 7 |
| 1.75 | *Distribution Date* .......................................................................................... | 7 |
| 1.76 | *Distribution Record Date* .............................................................................. | 8 |
| 1.77 | *Early Payment Order* ..................................................................................... | 8 |
| 1.78 | *Effective Date* ................................................................................................ | 8 |
| 1.79 | *Effective Beneficiaries* .................................................................................. | 8 |
| 1.80 | *Employee Benefit Plans* ................................................................................ | 8 |
| 1.81 | *ERISA* ............................................................................................................. | 8 |
| 1.82 | *Estate(s)* ........................................................................................................ | 8 |
| 1.83 | *Estimated Unsatisfied Credit Agreement Claims* ....................................... | 8 |
| 1.84 | *Examiner* ........................................................................................................ | 8 |
| 1.85 | *Examiner Order* .............................................................................................. | 8 |
| 1.86 | *Excess Priority Claims* .................................................................................. | 8 |
| 1.87 | *Exhibit* ........................................................................................................... | 8 |
| 1.88 | *Exhibit Filing Date* ........................................................................................ | 8 |
| 1.89 | *Fee Committee* ............................................................................................... | 8 |
| 1.90 | *Final Order* .................................................................................................... | 8 |
| 1.91 | *FXA* ................................................................................................................ | 9 |
| 1.92 | *FXA Cash Accounts* ....................................................................................... | 9 |
| 1.93 | *FXA Convenience Claims* .............................................................................. | 9 |
| 1.94 | *FXA Distributive Assets* ................................................................................ | 9 |
| 1.95 | *FXA General Unsecured Claim* ..................................................................... | 9 |
| 1.96 | *FXA General Unsecured Claim Distribution* ............................................... | 9 |
| 1.97 | *FXCM* .............................................................................................................. | 9 |
| 1.98 | *FXCM Committee* ........................................................................................... | 9 |
| 1.99 | *General Unsecured Claim* ............................................................................. | 9 |
| 1.100 | *Holder* ............................................................................................................ | 9 |
| 1.101 | *Houlihan* ........................................................................................................ | 9 |
| 1.102 | *Impaired* ........................................................................................................ | 9 |
| 1.103 | *Intercompany Claim* ...................................................................................... | 10 |
| 1.104 | *Interest* .......................................................................................................... | 10 |

| | | |
|---|---|---|
| 1.105 | *IPO Underwriter Claims Recovery* | 10 |
| 1.106 | *JPMC Fees and Expenses* | 10 |
| 1.107 | *Joinder Parties* | 10 |
| 1.108 | *Joint Sub-Committee* | 10 |
| 1.109 | *KK Japan* | 10 |
| 1.110 | *Leuthold* | 10 |
| 1.111 | *Lien* | 10 |
| 1.112 | *Litigation Claims* | 10 |
| 1.113 | *Litigation Trust* | 10 |
| 1.114 | *Litigation Trust Agreement* | 10 |
| 1.115 | *Litigation Trust Beneficiaries* | 10 |
| 1.116 | *Litigation Trust Committee* | 11 |
| 1.117 | *Litigation Trustee* | 11 |
| 1.118 | *Litigation Trust Interests* | 11 |
| 1.119 | *Loan Documents* | 11 |
| 1.120 | *Loans* | 11 |
| 1.121 | *MAC Contributing Debtors Assets* | 11 |
| 1.122 | *MAC RCM Assets* | 11 |
| 1.123 | *MCG Members* | 11 |
| 1.124 | *Master Ballot* | 11 |
| 1.125 | *Non-Debtor Affiliates* | 11 |
| 1.126 | *Non-Estate Refco Claims* | 12 |
| 1.127 | *Non-Tax Priority Claim* | 12 |
| 1.128 | *Old Equity Interests* | 12 |
| 1.129 | *Other Related Claim* | 12 |
| 1.130 | *Other Secured Claim* | 12 |
| 1.131 | *Person* | 12 |
| 1.132 | *Petition Date* | 12 |
| 1.133 | *Plan* | 12 |
| 1.134 | *Plan Administrator* | 12 |
| 1.135 | *Plan Administrator Agreement* | 13 |
| 1.136 | *Plan Committee* | 13 |
| 1.137 | *Plan Document* | 13 |
| 1.138 | *Plan Filing Date* | 13 |
| 1.139 | *Plan Proponents* | 13 |
| 1.140 | *Plan Support Agreement* | 13 |
| 1.141 | *Post-Confirmation RCM* | 13 |
| 1.142 | *Post-Petition Management* | 13 |
| 1.143 | *Pre-Conversion Administrative Claim Amount* | 13 |
| 1.144 | *Priority Claims* | 13 |
| 1.145 | *Priority Tax Claim* | 13 |
| 1.146 | *Private Actions Trust* | 13 |
| 1.147 | *Private Actions Trust Agreement* | 13 |
| 1.148 | *Private Actions Trust Election* | 13 |
| 1.149 | *Private Actions Trustee* | 13 |
| 1.150 | *Professional* | 14 |
| 1.151 | *Professional Fee Claim* | 14 |
| 1.152 | *Pro Rata* | 14 |
| 1.153 | *Qualifying Plan* | 14 |
| 1.154 | *Quarterly Distribution Date* | 14 |
| 1.155 | *RCM* | 14 |
| 1.156 | *RCM Administrative/Priority Claims Reserve* | 14 |
| 1.157 | *RCM Administrative Professional* | 14 |
| 1.158 | *RCM Advance* | 14 |
| 1.159 | *RCM BAWAG Proceeds* | 14 |

| | | |
|---|---|---|
| 1.160 | *RCM Cash Distribution* | 14 |
| 1.161 | *RCM Difference* | 14 |
| 1.162 | *RCM Claims Distribution Account* | 15 |
| 1.163 | *RCM Distribution Reserve* | 15 |
| 1.164 | *RCM Excess Priority Claims* | 15 |
| 1.165 | *RCM FX/Unsecured Claims* | 15 |
| 1.166 | *RCM FX/Unsecured Claims Distribution* | 15 |
| 1.167 | *RCM FX/Unsecured Convenience Claims* | 15 |
| 1.168 | *RCM Implied Deficiency Claim* | 15 |
| 1.169 | *RCM Intercompany Claims* | 15 |
| 1.170 | *RCM Intercompany Claim Distribution* | 15 |
| 1.171 | *RCM Leuthold Metals Claim* | 15 |
| 1.172 | *RCM Leuthold Metals Claim Distribution* | 15 |
| 1.173 | *RCM Projection* | 15 |
| 1.174 | *RCM Related Claims* | 15 |
| 1.175 | *RCM Related Claim Subordination Form* | 16 |
| 1.176 | *RCM Reserves* | 16 |
| 1.177 | *RCM Rights Distribution* | 16 |
| 1.178 | *RCM Securities Customer Claims* | 16 |
| 1.179 | *RCM Securities Customer Convenience Claims* | 16 |
| 1.180 | *RCM Securities Customer Claims Distribution* | 16 |
| 1.181 | *RCM Settlement Agreement* | 16 |
| 1.182 | *RCM Substantial Contribution Fees* | 16 |
| 1.183 | *RCM Trustee* | 17 |
| 1.184 | *RCM Unclaimed Distribution Reserve* | 17 |
| 1.185 | *RCM Wind-Down Reserve* | 17 |
| 1.186 | *Reinstated* | 17 |
| 1.187 | *Refco Entities* | 17 |
| 1.188 | *Related Claims* | 17 |
| 1.189 | *Released/Subordinated Claims* | 17 |
| 1.190 | *Released Parties* | 17 |
| 1.191 | *Reorganized Debtors* | 17 |
| 1.192 | *Reorganized FXA* | 17 |
| 1.193 | *Reorganized Refco* | 17 |
| 1.194 | *Reserves* | 17 |
| 1.195 | *Restated Corporate Governance Documents* | 17 |
| 1.196 | *Retained Causes of Action* | 17 |
| 1.197 | *RGL* | 18 |
| 1.198 | *RGL FXCM Distribution* | 18 |
| 1.199 | *Rogers Funds* | 18 |
| 1.200 | *Scheduled* | 18 |
| 1.201 | *Schedules* | 18 |
| 1.202 | *Secured Lender(s)* | 18 |
| 1.203 | *Secured Lender Agent* | 18 |
| 1.204 | *Secured Lender BAWAG Proceeds* | 18 |
| 1.205 | *Secured Lender Claims* | 18 |
| 1.206 | *Secured Lender Indemnification Claims* | 18 |
| 1.207 | *Secured Lender Payment Date* | 18 |
| 1.208 | *Secured Lender Released Claims* | 18 |
| 1.209 | *Secured Lender Releasee* | 19 |
| 1.210 | *Secured Lender's Collateral* | 19 |
| 1.211 | *Securities Class Action Stipulation* | 19 |
| 1.212 | *Senior Subordinated Note Allocation* | 19 |
| 1.213 | *Senior Subordinated Note Claims* | 19 |
| 1.214 | *Senior Subordinated Note Holder BAWAG Proceeds* | 19 |

**1.215** *Senior Subordinated Note Holder Distribution* ................................................... 19
**1.216** *Senior Subordinated Note Holder Fee Distribution* ............................................. 19
**1.217** *Senior Subordinated Note Indenture* .................................................................. 19
**1.218** *Senior Subordinated Note Indenture Trustee* ..................................................... 20
**1.219** *Senior Subordinated Note Indenture Trustee Charging Lien* ............................. 20
**1.220** *Senior Subordinated Note Indenture Trustee Fees* ............................................ 20
**1.221** *Senior Subordinated Notes* ................................................................................. 20
**1.222** *Specified Difference* ........................................................................................... 20
**1.223** *Subordinated Claim* ............................................................................................ 20
**1.224** *Subsidiary Claims and Interests* ........................................................................ 20
**1.225** *Tranche A Litigation Trust Interests* .................................................................. 20
**1.226** *Tranche B Litigation Trust Interests* .................................................................. 20
**1.227** *Unclaimed Distribution Reserve* ........................................................................ 20
**1.228** *Unclassified Claims* ............................................................................................ 20
**1.229** *Unimpaired* .......................................................................................................... 20
**1.230** *Voting Deadline* .................................................................................................. 21
**1.231** *Voting Record Date* ............................................................................................ 21
**1.232** *VR* ........................................................................................................................ 21
**1.233** *VR/Leuthold Guarantee Claims* ......................................................................... 21
**1.234** *Wind-Down Reserves* .......................................................................................... 21

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ........................................... 21
**2.1** *Introduction* ......................................................................................................... 21
**2.2** *Classification of Claims and Interests of the Contributing Debtors* ................... 22
**2.3** *Classification of Claims of FXA* ......................................................................... 23
**2.4** *Classification of Claims of RCM* ......................................................................... 23

ARTICLE III TREATMENT OF CLAIMS AND INTERESTS .................................................. 24
**3.1** *Treatment of Claims and Interests of the Contributing Debtors* ......................... 24
**3.2** *Treatment of Claims of FXA* ............................................................................... 26
**3.3** *Treatment of Claims of RCM* ............................................................................... 28
**3.4** *Allowed Claims and Interests* .............................................................................. 30
**3.5** *Alternative Treatment* .......................................................................................... 30
**3.6** *Limitation on Recoveries* ..................................................................................... 30
**3.7** *Special Provision Regarding Unimpaired Claims* .............................................. 30
**3.8** *Claims and Interests of Non-Debtor Affiliates* ................................................... 30
**3.9** *Classification and Treatment of Intercompany Claims* ....................................... 31
**3.10** *Claims of Debtors against RCM* .......................................................................... 31

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN .............................................. 31
**4.1** *Classes Entitled To Vote* ...................................................................................... 31
**4.2** *Acceptance By Impaired Classes* ......................................................................... 31
**4.3** *Presumed Acceptance by Unimpaired Classes* .................................................... 31
**4.4** *Classes Deemed to Reject the Plan* ..................................................................... 31
**4.5** *Summary of Classes Voting on the Plan* .............................................................. 31
**4.6** *Elimination Of Classes* ........................................................................................ 31
**4.7** *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code* ................... 31

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 32
**5.1** *Merger Of Subsidiaries Into Refco Inc.* .............................................................. 32
**5.2** *Continued Corporate Existence And Dissolution Of Reorganized Debtors* ........ 32
**5.3** *Corporate Governance Documentation* ............................................................... 32
**5.4** *Directors, Managers And Officers; Effectuating Documents; Further Transactions* ........... 33
**5.5** *The Plan Administrator* ........................................................................................ 33
**5.6** *Administration of Post-Confirmation RCM* ......................................................... 35

| | | |
|---|---|---|
| **5.7** | ***Litigation Trust*** | 36 |
| **5.8** | ***Private Actions Trust*** | 38 |
| **5.9** | ***No Revesting of Assets*** | 39 |
| **5.10** | ***Preservation of Rights of Action; Settlement of Litigation*** | 39 |
| **5.11** | ***The Committees and the Plan Committee*** | 40 |
| **5.12** | ***Fee Committee*** | 41 |
| **5.13** | ***Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests*** | 41 |
| **5.14** | ***Sources of Cash for Plan Distributions*** | 42 |
| **5.15** | ***Risk Sharing in Respect of Cargill Administrative Claim*** | 42 |
| **5.16** | ***Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims*** | 42 |
| **5.17** | ***Additional RCM Claim*** | 43 |
| **5.18** | ***Contributing Debtors BAWAG Proceeds*** | 43 |
| **5.19** | ***Exemption from Transfer Taxes*** | 43 |
| **5.20** | ***RCM Settlement Agreement and Conversion*** | 44 |
| **5.21** | ***Allowance of VR/Leuthold Guarantee Claims*** | 44 |
| **5.22** | ***Wind-Up of Non-Debtor Affiliates*** | 44 |
| **5.23** | ***FXCM*** | 44 |
| **5.24** | ***Examiner*** | 45 |
| **5.25** | ***Transfer of Tranche B Litigation Trust Interests*** | 45 |

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ............................................................. 45

| | | |
|---|---|---|
| **6.1** | ***RCM Rights Distribution*** | 45 |
| **6.2** | ***Distributions for Claims Allowed as of the Effective Date*** | 45 |
| **6.3** | ***Distributions of Proceeds of the Litigation Trust*** | 45 |
| **6.4** | ***Single Distribution*** | 45 |
| **6.5** | ***Accounts; Escrows; Reserves for the Reorganized Debtors*** | 46 |
| **6.6** | ***Accounts; Escrows; Reserves for the Post-Confirmation RCM*** | 47 |
| **6.7** | ***Interest and Penalties on Claims*** | 49 |
| **6.8** | ***Distributions by Disbursing Agent and RCM Trustee*** | 49 |
| **6.9** | ***Delivery of Distributions and Undeliverable or Unclaimed Distributions*** | 49 |
| **6.10** | ***Record Date for Distributions*** | 50 |
| **6.11** | ***Distributions to Holders of Senior Subordinated Note Claims*** | 50 |
| **6.12** | ***Senior Subordinated Notes Indenture Trustee as Claim Holder*** | 51 |
| **6.13** | ***Allocation of Plan Distributions Between Principal and Interest*** | 51 |
| **6.14** | ***Means of Cash Payment*** | 51 |
| **6.15** | ***Withholding and Reporting Requirements*** | 51 |
| **6.16** | ***Setoffs*** | 51 |
| **6.17** | ***Fractional Dollars*** | 51 |
| **6.18** | ***Release of Liens*** | 51 |

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................... 52

| | | |
|---|---|---|
| **7.1** | ***Rejected Contracts and Leases*** | 52 |
| **7.2** | ***Bar to Rejection Damages*** | 52 |
| **7.3** | ***Assumed and Assigned Contracts and Leases*** | 52 |
| **7.4** | ***Compensation and Benefit Programs*** | 52 |
| **7.5** | ***Treatment of RCM Executory Contracts and Unexpired Leases*** | 52 |

ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS ............................................................. 52

| | | |
|---|---|---|
| **8.1** | ***Objection Deadline; Prosecution of Objections*** | 52 |
| **8.2** | ***No Distributions Pending Allowance*** | 53 |
| **8.3** | ***Distributions After Allowance*** | 53 |

ARTICLE IX CONFIRMATION AND CONSUMMATION OF THE PLAN ..................................................... 53
    **9.1**     *Conditions to Confirmation* ............................................................................................. 53
    **9.2**     *Conditions to Effective Date* ........................................................................................... 54
    **9.3**     *Waiver of Conditions* ...................................................................................................... 54
    **9.4**     *Consequences of Non-Occurrence of Effective Date* ....................................................... 54

ARTICLE X EFFECT OF PLAN CONFIRMATION ................................................................................. 55
    **10.1**     *Binding Effect* ................................................................................................................. 55
    **10.2**     *Releases* ........................................................................................................................... 55
    **10.3**     *Exculpation and Limitation of Liability* ......................................................................... 57
    **10.4**     *No Discharge of Claims; Injunction* ............................................................................... 57
    **10.5**     *Term of Bankruptcy Injunction or Stays* ........................................................................ 58
    **10.6**     *Continuation of Forex Adversary* ................................................................................... 58

ARTICLE XI RETENTION OF JURISDICTION ....................................................................................... 58
    **11.1**     *Exclusive Jurisdiction of the Bankruptcy Court* ............................................................ 58

ARTICLE XII MISCELLANEOUS PROVISIONS ..................................................................................... 60
    **12.1**     *Effectuating Documents and Further Transactions* ........................................................ 60
    **12.2**     *Corporate Action* ........................................................................................................... 60
    **12.3**     *Bar Dates for Certain Claims* ......................................................................................... 60
    **12.4**     *Payment of Statutory Fees* .............................................................................................. 61
    **12.5**     *Amendment or Modification of the Plan* ......................................................................... 61
    **12.6**     *Severability of Plan Provisions* ...................................................................................... 61
    **12.7**     *Successors and Assigns* .................................................................................................. 62
    **12.8**     *Revocation, Withdrawal, or Non-Consummation* ........................................................... 62
    **12.9**     *Notice* ............................................................................................................................. 62
    **12.10**     *Governing Law* ............................................................................................................... 63
    **12.11**     *Tax Reporting and Compliance* ...................................................................................... 63
    **12.12**     *Filing of Additional Documents* ..................................................................................... 63
    **12.13**     *Limit on Precedential Effect* ........................................................................................... 63
    **12.14**     *Claims Preserved Pending Consummation* ..................................................................... 63
    **12.15**     *Continuation of RCM Settlement Agreement* .................................................................. 63
    **12.16**     *Continuation of Early Payment Order* ............................................................................ 64

EXHIBITS

EXHIBIT A              LISTING OF AFFILIATE DEBTORS

EXHIBIT B              RCM SETTLEMENT AGREEMENT

EXHIBIT C              RESTATED CORPORATE GOVERNANCE DOCUMENTS

EXHIBIT D              EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED

EXHIBIT E              PLAN ADMINISTRATOR AGREEMENT

EXHIBIT F              LITIGATION TRUST AGREEMENT

EXHIBIT G              PRIVATE ACTIONS TRUST AGREEMENT

EXHIBIT H              ASSET SCHEDULE

EXHIBIT I              EARLY PAYMENT ORDER

EXHIBIT J              BYLAWS OF FXCM COMMITTEE

EXHIBIT K              NON-EXCLUSIVE LIST OF RETAINED CAUSES OF ACTION

EXHIBIT L              LISTING OF CONTRIBUTING NON-DEBTOR AFFILIATES

EXHIBIT M              PRIVATE ACTIONS TRUST ELECTION

<u>SCHEDULES</u>

SCHEDULE 1.56          LIST OF CONTRIBUTING NON-DEBTOR AFFILIATE MANAGEMENT

SCHEDULE 2.2(c)        SUB-CLASSES OF CLAIMS AGAINST THE CONTRIBUTING DEBTORS

## INTRODUCTION

Refco Inc. and certain of its direct and indirect subsidiaries identified on the annexed <u>Exhibit A</u> along with co-Plan Proponents Marc S. Kirschner, the chapter 11 trustee of the Estate of Refco Capital Markets, Ltd., the Official Committee of Unsecured Creditors of Refco Inc., *et al.*, and the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* propose the following joint chapter 11 plan that contemplates the disposition of the Debtors' assets and the resolution of the outstanding Claims against and Interests in the Debtors and RCM. This Plan does not contemplate the disposition of assets or the resolution of Claims against and Interests in Refco, LLC as such Claims and Interests are being addressed separately in conjunction with the administration of the Refco, LLC chapter 7 case. In addition, although the Plan outlines certain aspects of the disposition of the assets of RCM and the votes by certain creditors of RCM will be solicited, the Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. In the event of such a conversion to chapter 7, this Plan shall constitute a settlement and compromise between the RCM Estate and the Debtors' Estates and among the Estates of the various Debtors and certain creditors, for which approval is sought simultaneously with the confirmation of this Plan. Furthermore, the Plan incorporates the terms of the Early Payment Order, a copy of which is attached hereto as <u>Exhibit I</u>. To the extent that the provisions herein, or in the Confirmation Order, differ from the terms of the Early Payment Order with respect to the treatment of the Secured Lenders, the terms of the Early Payment Order shall govern. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business, properties, and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1     ***Additional Committee*** means the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by notice on August 3, 2006 (and as amended from time to time).

1.2     ***Additional RCM Claim*** means the additional Claim of RCM, if any, as more fully set forth in section 5.17 hereof.

1.3     ***Ad Hoc Committee of Senior Subordinated Note Holders*** means that certain *ad hoc* committee of Holders of Senior Subordinated Notes.

1.4     ***Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses*** means fees and expenses of counsel to the ad hoc committee of Holders of Senior Subordinated Notes subject to application pursuant to section 503(b) of the Bankruptcy Code, to which the parties to the Plan Support Agreement, other than the Debtors, may not object and (ii) the Debtors, in the event that they do object to such application, may object solely with respect to the reasonableness, compensability and allocation of the fees and expenses incurred.

      **1.5**     *Ad Hoc Equity Committee* means that certain *ad hoc* committee of equity interest holders of Refco Inc.

      **1.6**     *Ad Hoc Equity Committee Fees and Expenses* means up to $1.5 million in professional fees and expenses incurred by the Ad Hoc Equity Committee during the pendency of the Chapter 11 Cases.

      **1.7**     *Adjusted Contributing Debtors Distributive Assets* means the Contributing Debtors Distributive Assets after reduction for the payment of the RCM Excess Priority Claim.

      **1.8**     *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without duplication: (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors and RCM (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and premises) and Claims of governmental units for taxes (including tax audit Claims related to tax years commencing after the Petition Date, but excluding Claims relating to tax periods, or portions thereof, ending on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred after the Petition Date and prior to the Effective Date; (c) the amounts contributed to the Wind-Down Reserve; (d) all fees and charges assessed against the Estates under 28 U.S.C. § 1930; (e) the Senior Subordinated Note Indenture Trustee Fees, (f) the JPMC Fees and Expenses, (g) the substantial contribution claims represented by the RCM Substantial Contribution Fees,  the Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses and the Ad Hoc Equity Committee Fees and Expenses, to the extent allowed by the Bankruptcy Court; (h) any amounts due to RCM for the RCM Advance and (i) all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court.  In the event that the Chapter 11 Case of RCM is converted to a case administered under chapter 7, an Allowed Claim against RCM or its Estate of the type described above in respect of administering the RCM case in chapter 7 shall be included in the definition of Administrative Claim.

      **1.9**     *Administrative/Priority Claims Reserve* means the Reserve account(s) to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the Distribution to Holders of Administrative and Allowed Priority Claims against FXA and the Contributing Debtors.

      **1.10**     *Administrative Claims Adjustment* means an adjustment whereby the amount of the RCM Cash Distribution shall be reduced by the Pre-Conversion Administrative Claim Amount, if any.  For the avoidance of doubt, while the Administrative Claims Adjustment, if any, shall affect the timing and accounts from which Distributions in respect of Allowed Administrative Claims are made, such adjustment shall not affect the ultimate allocation of Administrative Claims as set forth in section 5.16 of this Plan.

      **1.11**     *Administrative Claims Objection Deadline* means the last day for filing an objection to any request for the payment of an Allowed Administrative Claim, which shall be (a) the later of (i) 60 days after the Effective Date or (ii) 30 days after the filing of such Administrative Claim or (b) such other date specified in this Plan or ordered by the Bankruptcy Court.  The filing of a motion to extend the Administrative Claims Objection Deadline shall automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion.  In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, or if approved by the Bankruptcy Court and reversed on appeal, the Administrative Claims Objection Deadline shall be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Administrative Claims Objection Deadline.

      **1.12**     *Administrative Professionals* means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the Plan Administrator (in their capacities as such).

      **1.13**     *Affiliate Debtor(s)* means, individually or collectively, the debtors and debtors-in-possession identified on <u>Exhibit A</u> annexed hereto.

1.14    ***AlixPartners*** means collectively, AlixPartners LLC and its affiliate, AP Services, LLC.

1.15    ***Allotted Administrative Claims*** means Allowed Administrative Claims accrued against RCM or the Contributing Debtors from the Petition Date through the Effective Date, but excluding (A) Allowed Administrative Claims paid prior to August 31, 2006, (B) rent and other ordinary operating expenses of the Debtors or RCM, (C) fees and commissions of the RCM Trustee, (D) repayment of the RCM Advance, and (E) the JPMC Fees and Expenses.

1.16    ***Allowed*** means (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) that was incurred by the Debtors or RCM in the ordinary course of business during the Chapter 11 Cases; *provided, however,* that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; or (b) when used with respect to a Claim other than an Administrative Claim, such Claim against a Debtor or RCM or any portion thereof (i) that has been allowed by a Final Order of the Bankruptcy Court, (ii) as to which, on or by the Effective Date, (w) no proof of claim has been filed with the Bankruptcy Court and (x) the liquidated and noncontingent amount of which is Scheduled, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, (iii) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (y) no objection to its allowance has been filed by the Claims Objection Deadline or the Administrative Claims Objection Deadline (as applicable), or within any period specified by the Bankruptcy Code or an order of the Bankruptcy Court, or (x) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan.

1.17    ***"Allowed ... Claim"*** means an Allowed Claim of the particular type or Class described.

1.18    ***Asset Schedule*** means the schedule prepared by Houlihan to describe the estimated value of assets of the Debtors as of August 31, 2006, attached hereto as <u>Exhibit H</u>.

1.19    ***Ballot*** means each of the ballot forms distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

1.20    ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter amended (if such amendment applies to the Debtors and RCM).

1.21    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

1.22    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.23    ***Bar Date*** means the deadline established by the Bankruptcy Court by order dated March 27, 2006, for filing proofs of Claim in the Chapter 11 Cases.

1.24    ***BAWAG*** means the BAWAG Parties as such term is defined in paragraph 4(a) of the Stipulation and Order of Settlement entered by the Bankruptcy Court on July 6, 2006 (Docket No. 2348).

1.25    ***BAWAG Allocation Order*** means one or more orders of the Bankruptcy Court approving the allocation of the BAWAG Proceeds, which may include the Confirmation Order.

**1.26** ***BAWAG Contingent Proceeds*** means an amount, if any, whether or not monetized prior to the Effective Date, of the BAWAG Proceeds up to $150,000,000 to be paid pursuant to the BAWAG Settlement upon a sale or recapitalization as set forth in the BAWAG Settlement within two (2) years of the date of approval of the BAWAG Settlement.

**1.27** ***BAWAG Guaranteed Proceeds*** means that portion of the BAWAG Proceeds equal to a guaranteed amount of $506,250,000 in Cash paid pursuant to the BAWAG Settlement.

**1.28** ***BAWAG Proceeds*** means the sum of (a) the BAWAG Guaranteed Proceeds plus (b) the BAWAG Contingent Proceeds, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement.

**1.29** ***BAWAG Settlement*** means the settlement stipulation among the Creditors Committee, BAWAG, and the Refco Entities as approved by the Bankruptcy Court by an order entered on July 6, 2006. A copy of the BAWAG Settlement is annexed as an Exhibit to the Disclosure Statement.

**1.30** ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.31** ***Capstone*** means Capstone Advisory Group, LLC.

**1.32** ***Cargill*** means Cargill, Incorporated and any of Cargill, Incorporated's affiliates who filed proofs of claim in any of the Chapter 11 Cases.

**1.33** ***Cargill Administrative Claim*** means an Administrative Claim of Cargill, if any, against the Contributing Debtors.

**1.34** ***Cash*** means legal tender of the United States of America and equivalents thereof.

**1.35** ***Cash-Out Option Agreement*** means the agreement, if any, between one or more third parties and the Holders of Litigation Trust Interests to be executed as of the Effective Date establishing the terms and conditions by which third parties may purchase Litigation Trust Interests from such Holders, the form of which Cash-Out Option Agreement will be attached as an exhibit to the Litigation Trust Agreement.

**1.36** ***Chapter 11 Case(s)*** means (a) when used with reference to a particular Debtor or RCM, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to the Debtors and RCM, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors and RCM in the Bankruptcy Court.

**1.37** ***Claim*** means a "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.38** ***Claims Distribution Account*** means the account established and maintained by the Reorganized Debtors from which Distributions to Holders of Allowed Claims against the Contributing Debtors or FXA shall be made and from which reserves on behalf of the Reorganized Debtors will be funded for the benefit of Holders of Disputed Claims.

**1.39** ***Claims Objection Deadline*** means the last day for filing objections to Claims against the Debtors and RCM, which day shall be (a) the later of (i) 90 days after the Effective Date or (ii) 60 days after the filing of a proof of claim for, or request for payment of, such Claim or (b) such other date as the Bankruptcy Court may order. The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Claims Objection Deadline.

1.40    *Class* means a category of Holders of Claims or Interests, as described in Article II hereof.

1.41    *Class Actions Claims* means (i) claims for violation of securities laws arising under and pursuant to Section 10(b) and 20(a) of the Securities Exchange Act of 1934 that currently are being asserted in the class action styled In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, 06-CIV 643 (GEL) (S.D.N.Y.) (the "Brokerage Customer Securities Litigation"), (ii) claims asserted in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, and (iii) other claims currently being asserted in class actions relating to the Debtors and RCM, if any.

1.42    *Combined Recoveries* means the aggregate of Contributed Claims Recoveries and recoveries obtained by the Private Actions Trust, net of the costs of administration of the Private Actions Trust, including, but not limited to, fees associated with the litigation of the Non-Estate Refco Claims.

1.43    *Committees* means, collectively, the Creditors' Committee and the Additional Committee.

1.44    *Confirmation* means the confirmation of the Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

1.45    *Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.46    *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.47    *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.48    *Contributed Claims* means any and all Litigation Claims of the Debtors, RCM or their Estates (including claims being pursued by the Committees on behalf of the Debtors), which shall be contributed by the Debtors, RCM and their Estates to the Litigation Trust and, to the extent of any election, or deemed election, by Holders of RCM Related Claims to exchange and subordinate such Claims in accordance with section 6.6(c) of this Plan, such RCM Related Claims shall be deemed to remain unpaid liabilities of the Debtors and their Estates immediately prior to the contribution of Litigation Claims to the Litigation Trust. The term Contributed Claims shall specifically exclude the Released/Subordinated Claims.

1.49    *Contributed Claims Recoveries* means any recoveries obtained on account of the Contributed Claims net of the costs of administration of the Litigation Trust, including, but not limited to, fees associated with the litigation of the Contributed Claims.

1.50    *Contributing Debtors* means the Debtors excluding FXA.

1.51    *Contributing Debtors BAWAG Proceeds* means that portion of the BAWAG Proceeds that compose the Secured Lender BAWAG Proceeds, the Senior Subordinated Note Holder BAWAG Proceeds and the Contributing Debtors General Unsecured BAWAG Proceeds.

1.52    *Contributing Debtors Cash Distribution* means $94 million of Cash, which amount shall be adjusted, upwards or downwards, by an amount equal to the Specified Difference.

1.53    *Contributing Debtors Distributive Assets* means the assets of the Contributing Debtors after the payment of the Contributing Debtors Effective Date Claims, Allowed Other Secured Claims against the Contributing Debtors, Allowed Secured Lender Claims against the Contributing Debtors, the Senior Subordinated Note Holder Distribution, the Senior Subordinated Note Holder Fee Distribution (each to the extent payable under the Plan) and the funding of any required reserves (provided that upon the release of any funds from reserves for

Plan - 5

payment of the Contributing Debtors General Unsecured Distribution or RCM Intercompany Claim Distribution, such released funds shall be counted as Contributing Debtors Distributive Assets). The term Contributing Debtors Distributive Assets shall include the assets of the Contributing Debtors reflected on the Asset Schedule and, without duplication, to the extent not inconsistent with the Asset Schedule, (i) any amounts paid to the Contributing Debtors or RCM on or after September 1, 2006, (ii) the BAWAG Proceeds, and (iii) any amounts paid to the Contributing Debtors or RCM from Non-Debtor Affiliates on or after September 1, 2006 (except to the extent any such amounts have been deemed "Assets in Place" or "Additional Property," as defined in the RCM Settlement Agreement, by applicable Court Orders); *provided, however*, that any amounts paid by direct or indirect subsidiaries of RCM on or after September 1, 2006 shall not constitute Contributing Debtors Distributive Assets. The term Contributing Debtors Distributive Assets shall not include any value in respect of the RGL FXCM Distribution nor any interest in Contributed Claims.

1.54    ***Contributing Debtors Effective Date Claims*** means Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims and Allowed Administrative Claims accrued through and including the Effective Date, each to the extent required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan.

1.55    ***Contributing Debtors General Unsecured BAWAG Proceeds*** means (i) $56,250,000 of the BAWAG Guaranteed Proceeds and (ii) a portion of the BAWAG Contingent Proceeds allocable to the Contributing Debtors Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases offered by the BAWAG Settlement, Holders of Allowed Contributing Debtors General Unsecured Claims.

1.56    ***Contributing Debtors General Unsecured Claim*** means a General Unsecured Claim against a Contributing Debtor.

1.57    ***Contributing Debtors General Unsecured Distribution*** means a Distribution from the Contributing Debtors Distributive Assets equal to (A) the Contributing Debtors Cash Distribution after reduction for the payment of the Allowed Contributing Debtors Post-Effective Date Claims plus (B) 50% of the RGL FXCM Distribution; *provided, however*, the amount of such Distribution under (A) and (B) shall not exceed 40% of the Allowed Contributing Debtors General Unsecured Claims. The Contributing Debtors General Unsecured Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

1.58    ***Contributing Debtors Post-Effective Date Claims*** means Administrative Claims accrued after the Effective Date by the Contributing Debtors, which are required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan (including amounts, if any, in respect of repaying the RCM Advance).

1.59    ***Contributing Debtors Projection*** means a projection of the Cash or value to be available from the MAC Contributing Debtors Assets for Distribution in respect of the Contributing Debtors Cash Distribution.

1.60    ***Contributing Non-Debtor Affiliate*** means the Non-Debtor Affiliates listed on <u>Exhibit L</u> hereto who are reasonably expected to contribute assets to or release Claims against the Debtors or RCM pursuant to the provisions of this Plan, including, but not limited to, section 5.22.

1.61    ***Contributing Non-Debtor Affiliate Management*** means the directors and officers of certain foreign Contributing Non-Debtor Affiliates, a list of which officers and directors is set forth on Schedule 1.56 hereto.

1.62    ***Contributing Non-Debtor Affiliate Trigger Date*** means, with respect to any Contributing Non-Debtor Affiliate, the earlier of (i) the date at which such Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash (consistent with its books and records and claims pending against it) to the Contributing Debtors and RCM or, if insufficient Cash will be available (consistent with the Contributing Non-Debtor Affiliate's books and records and claims pending against it) for Distribution to the Contributing Debtors and RCM, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors, or, if such events occur

prior to the Effective Date, the Effective Date or (ii) a date determined by the RCM Trustee, with the consent of the Plan Committee, on notice to the Bankruptcy Court, as necessary to accomplish the purposes of clause (i) of this definition.

       **1.63**    *Convenience Claims* means collectively FXA Convenience Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims.

       **1.64**    *Credit Agreement* means the credit agreement, dated August 5, 2004 (as amended), among RGL as successor by merger to Refco Finance Holdings LLC, New Refco Group Ltd, LLC, the Secured Lender Agent and the Secured Lenders party thereto.

       **1.65**    *Creditors' Committee* means the Official Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on October 28, 2006, as reconstituted on March 29, 2006, July 21, 2006 and August 3, 2006 (and as amended from time to time).

       **1.66**    *Debtor* means any of Refco Inc. or the Affiliate Debtors in its individual capacity.

       **1.67**    *Debtors* means, collectively, Refco Inc. and all of the Affiliate Debtors.

       **1.68**    *Disbursing Agent* means, solely in its capacity as agent to effectuate Distributions on behalf of FXA and the Contributing Debtors pursuant to the Plan, the Plan Administrator or such other entity as may be designated by the Plan Proponents and appointed by the Bankruptcy Court as set forth in the Confirmation Order. For the avoidance of doubt, the RCM Trustee shall act as the Disbursing Agent for Post-Confirmation RCM.

       **1.69**    *Disclosure Statement* means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, distributed contemporaneously herewith in accordance with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018, as it may be amended or supplemented from time to time.

       **1.70**    *Disputed Claim* means any Claim other than an Allowed Claim.

       **1.71**    *"Disputed ... Claim"* means a Disputed Claim of the type described.

       **1.72**    *Disputed Claim Amount* means (a) with respect to a contingent or unliquidated Claim, zero or the amount estimated by the Bankruptcy Court prior to the initial Distribution Date, for purposes of allowance, reserves or Distributions in respect of such Claim in accordance with section 502(c) of the Bankruptcy Code or (b) with respect to any Disputed Claim that is not contingent or unliquidated, the amount set forth in a timely filed proof of claim; *provided, however*, that for purposes of establishing the Disputed Claims Reserve, the Disputed Claim Amount shall not exceed an amount equal to the applicable deductible or self-retention portion plus any uninsured amount in respect of Disputed Claims that are covered by insurance.

       **1.73**    *Disputed Claims Reserve* means the reserve of Contributing Debtors Distributive Assets and FXA Distributive Assets established and maintained by the Reorganized Debtors for Holders of Disputed Claims; *provided, however*, that any reserve from Contributing Debtors Distributive Assets shall be a reserve from amounts to be paid on the Contributing Debtors Unsecured Claim Distribution and shall not result in a reserve against amounts to be paid on the RCM Cash Distribution in accordance with section 6.6(b) of this Plan.

       **1.74**    *Distribution* means any distribution pursuant to the Plan to the Holders of Allowed Claims.

       **1.75**    *Distribution Date* means the Effective Date (subject to section 6.2 hereof) or any Quarterly Distribution Date.

1.76    **Distribution Record Date** means, with respect to all Claims other than Senior Subordinated Note Claims, initially the Voting Deadline (unless a different date is agreed to by the Plan Proponents and filed with the Bankruptcy Court) and thereafter, 45 days prior to each scheduled Distribution Date.

1.77    **Early Payment Order** means the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement of Controversies and Disputes Among the Debtors, the RCM Trustee, the Secured Lenders, and Certain Other Parties dated September 27, 2006 (Docket No. 2958) attached hereto as <u>Exhibit I</u>.

1.78    **Effective Date** means the Business Day this Plan becomes effective as provided in Article IX hereof.

1.79    **Effective Beneficiaries** means (i) the Litigation Trust Beneficiaries (other than RCM) and (ii) the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that benefit from RCM's beneficial interest in the Litigation Trust.

1.80    **Employee Benefit Plans** means those "employee benefit plans" (as defined in Section 3(3) of ERISA (whether or not such plan is subject to ERISA)), other material plans, policies, programs, practice, agreements, and understandings or arrangements maintained, sponsored, or contributed to for the benefit of current or former employees of the Debtors.

1.81    **ERISA** shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

1.82    **Estate(s)** means, individually, the estate of any of the Debtors or RCM and, collectively, the estates of all of the Debtors and RCM created under section 541 of the Bankruptcy Code.

1.83    **Estimated Unsatisfied Credit Agreement Claims** has the meaning ascribed to such term in the Early Payment Order.

1.84    **Examiner** means Joshua R. Hochberg, the examiner appointed by United States Trustee pursuant to 11 U.S.C. § 1104(c)(2) and approved by the Bankruptcy Court in accordance with the Examiner Order.

1.85    **Examiner Order** means the Order Granting the Motion of the United States Trustee for the Appointment of an Examiner entered on March 16, 2006 (Docket No. 1487).

1.86    **Excess Priority Claims** means that portion of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims against the Contributing Debtors and RCM, or their respective Estates, accrued through the Effective Date that exceed $180 million in the aggregate, excluding any amounts paid as of August 31, 2006, as more particularly set forth in section 5.16 of this Plan.

1.87    **Exhibit** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

1.88    **Exhibit Filing Date** means the date on which Exhibits to the Plan shall be filed with the Bankruptcy Court and posted on the refcodocket.com website, which date shall be at least ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice to parties-in-interest.

1.89    **Fee Committee** means the committee established by the Bankruptcy Court pursuant to the order entered on July 24, 2006 (Docket No. 2482).

1.90    **Final Order** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment

thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Bankruptcy Rules or any analogous rule may be, but has not been filed shall not cause an order not to be a Final Order.

      **1.91**    *FXA* means Refco F/X Associates, LLC.

      **1.92**    *FXA Cash Accounts* means the Cash accounts of FXA listed in the Schedules of FXA, which consist of the following accounts at the bank and with the account numbers designated herein: (i) Fleet Bank of New York, acct: 9421286511; (ii) Fleet Bank of New York, acct: 9421286589; (iii) Fleet Bank of New York, acct: 9421286693; (iv) Fleet Bank of New York, acct: 9421286896; (v) Fleet Bank of New York, acct: 9489924815; (vi) HK and Shanghai Banking Corp., acct: 009-030925-001; and (vii) Wachovia Bank, N.A., acct: 200017918646.

      **1.93**    *FXA Convenience Claims* means any FXA General Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the FXA General Unsecured Claim to $10,000 on the applicable Ballot; *provided*, *however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to FXA Convenience Claims shall be limited to $5 million. To the extent that the amount of FXA General Unsecured Claims electing to receive a FXA Convenience Claim exceeds $5 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $5 million cap is reached.

      **1.94**    *FXA Distributive Assets* means (i) the FXA Cash Accounts, allocated as agreed or otherwise resolved between FXA and KK Japan, plus (ii) proceeds, if any, of the sale of the customer list of FXA.

      **1.95**    *FXA General Unsecured Claim* means a General Unsecured Claim against FXA.

      **1.96**    *FXA General Unsecured Claim Distribution* means a Distribution from the FXA Distributive Assets after the payment of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Priority Tax Claims, Allowed Other Secured Claims and Allowed Secured Lender Claims against FXA, and less any amounts paid to the Holders of Allowed FXA Convenience Claims. The FXA General Unsecured Claim Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

      **1.97**    *FXCM* means Forex Capital Markets, LLC.

      **1.98**    *FXCM Committee* means a five person committee composed of the RCM Trustee and four creditors of either RCM or the Contributing Debtors (and chaired by the RCM Trustee) formed to coordinate on all matters relating to the disposition or distribution of RGL's 35% interest in FXCM.

      **1.99**    *General Unsecured Claim* means a Claim that is not an Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Other Secured Claim, Secured Lender Claim, Senior Subordinated Note Claim, RCM Intercompany Claim, FXA Convenience Claim, RCM Securities Customer Claim, RCM Leuthold Metals Claim, RCM Securities Customer Convenience Claim, RCM FX/Unsecured Convenience Claim, Subordinated Claim or Old Equity Interest.

      **1.100**    *Holder* means an entity holding a Claim or Interest and, with respect to Senior Subordinated Note Claims, the beneficial holder of the Senior Subordinated Notes.

      **1.101**    *Houlihan* means Houlihan Lokey Howard & Zukin Capital Advisors, Inc.

      **1.102**    *Impaired* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.103**   ***Intercompany Claim*** means any Claim held by a Refco Entity against any other Refco Entity, including any intercompany book entries reflecting obligations owed by one Refco Entity with respect to any other Refco Entity.

**1.104**   ***Interest*** means the legal, equitable, contractual, and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor or RCM, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor.

**1.105**   ***IPO Underwriter Claims Recovery*** means any recovery from a claim brought by the Litigation Trust against an underwriter in connection with the initial public offering of Refco Inc., net of the fees and expenses incurred in pursuing such recovery.

**1.106**   ***JPMC Fees and Expenses*** means the reasonable fees and expenses of JPMorgan Chase Bank, N.A., agreed to by RCM as part of that certain settlement between RCM and JPMorgan Chase Bank, N.A., approved by the Bankruptcy Court on [December 12, 2006 (docket no. _____)].

**1.107**   ***Joinder Parties*** has the meaning set forth in the RCM Settlement Agreement.

**1.108**   ***Joint Sub-Committee*** means the joint sub-committee comprised of the Committee and the Additional Committee pursuant to a stipulation and protocol approved by order of the Bankruptcy Court, dated August 17, 2006 (Docket No. 2711).

**1.109**   ***KK Japan*** means RefcoFX Japan KK.

**1.110**   ***Leuthold*** means, collectively, Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.

**1.111**   ***Lien*** shall mean any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

**1.112**   ***Litigation Claims*** means the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or RCM may hold against any Person (after netting cross margin obligations, if applicable, to the extent required under the cross margining arrangement or to the extent determined necessary by the applicable Debtor or RCM) excluding the Released/Subordinated Claims and also excluding, with respect to RCM, any claims, rights of action, suits, or proceedings (A) pursuant to sections 547, 749 and to the extent a recovery is predicated on such sections, section 550 of the Bankruptcy Code, (B) to recover Assets in Place as defined in the RCM Settlement Agreement or (C) against RCM customers and creditors arising from trading or other ordinary course business transactions or contracts with RCM, including loan and deposit transactions; *provided, however*, that the claims commenced and settled by the Creditors' Committee against SPhinX Managed Futures Fund, LLC, and BAWAG shall not constitute Litigation Claims.

**1.113**   ***Litigation Trust*** means the trust established on the Effective Date to hold the Litigation Claims.

**1.114**   ***Litigation Trust Agreement*** means the agreement to be executed as of the Effective Date establishing the Litigation Trust pursuant to the Plan attached as Exhibit F hereto.

**1.115**   ***Litigation Trust Beneficiaries*** means the Estate of RCM, Holders of Allowed Contributing Debtors General Unsecured Claims, Holders of Allowed FXA General Unsecured Claims, Holders of Allowed Contributing Debtors Subordinated Claims, Holders of Allowed Old Equity Interests and the Disputed Claims Reserve.

**1.116** *Litigation Trust Committee* means the Committee established pursuant to section 5.7(d) of this Plan to participate in management of the Litigation Trust.

**1.117** *Litigation Trustee* means the Person appointed pursuant to section 5.7(a) of the Plan to act as trustee of and administer the Litigation Trust and identified on or before the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Private Actions Trustee.

**1.118** *Litigation Trust Interests* means the beneficial interests in the Litigation Trust.

**1.119** *Loan Documents* has the meaning ascribed to such term in the Early Payment Order.

**1.120** *Loans* has the meaning ascribed to such term in the Early Payment Order.

**1.121** *MAC Contributing Debtors Assets* means (x) the estimated value of the sum of the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds), less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the RCM Cash Distribution (without reduction for the Administrative Claims Adjustment), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan, provided that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.122** *MAC RCM Assets* means (x) the estimated value of the sum of (A) the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds) less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the Contributing Debtors Cash Distribution (without adjustment for the Contributing Debtors Post-Effective Date Claims), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan; *provided, however,* that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.123** *MCG Members* has the meaning set forth in the RCM Settlement Agreement.

**1.124** *Master Ballot* means the ballot distributed to brokers, nominees or other agents for Holders of the Senior Subordinated Notes to record the votes of the beneficial Holders of Senior Subordinated Notes.

**1.125** *Non-Debtor Affiliates* means Refco LLC, Refco Canada Finance Inc., Refco Commodity Management Inc., Refco Administrative Services Inc., Refco Securities LLC, Refco Clearing LLC, Refco EasySolutions LLC, RefcoFund Management LLC, Haut Commodities LLC, Refco Local Divisions LLC, RefcoFund Holdings LLC, Refco Alternative Investments LLC, Refco Trading Services LLC, Refco Securities Ltd. (in liquidation), Refco Energy (UK) Ltd., Refco Ltd., Westminster Clearing Ltd., Refco Trading Services Ltd., Refco Trading Services (UK) Ltd., Refco Equity Derivatives Ltd., Refco Europe Ltd., Refco Overseas Ltd., Refco East Services Ltd. (in liquidation), Just Commodity Inc., Just (Dalian) Trading Co Ltd., Refco Capital Singapore Pte Ltd, Refco India Pvt Ltd, Refco Singapore Pte Ltd, Refco Investment Services Pte Ltd, Refco Forex Ltd (in liquidation), Refco Securities SA, Refco Trading Services (Gibraltar) Ltd., Refco Capital Markets International Ltd, Refco Capital Markets International Services Ltd, ACM Advanced Currency Markets SA, C.I. Investor Services, Limited. East Client Svc. Ltd., Eastern Refco (L) Labaun, Easylink Limited, Easyscreen Employee Services Limited, Easyscreen Ltd.. Easyscreen Trustees Limited, Forex Capital Markets, L.L.C., Forex Trading, L.L.C., Greenwich Europe Limited, Greenwich SA (Pty) Limited, Hanmag Refco Futures Corp, Just Commodity Pte. Ltd., Just Commodity Software Solutions Pte. Ltd., Kaf-Refco Futures (Malaysia), Lind-Waldock Financial Partners LLC, MacFutures, Mactechonologies Ltd, Market Educational Institute, LLC, MCC Futures Management L.P., Partners Capital Investment Group, LLC, Polaris-Refco Futures Co Ltd, Refco Canada Co., Refco Capital India Private Ltd.,

Refco Carlton Ltd, Refco Commodity India PVT Ltd., Refco Futures, AG (Zurich), Refco Futures GMbH (Hamburg), Refco Hong Kong Ltd., Refco International Investment Svc. Ltd., Refco Japan, Ltd., Refco Overseas Suisse SA, Refco Resources Ltd., Refco Sify Securities (India) Ltd, Refco Trading Services (Australia) PTY Ltd, S&P Managed Futures Index Fund, L.P., Sino Refco Investments Limited Partnership, Sino Refco Investments LLC, SN Bank Ltd, Sphinx Managed Futures Index Fund, L.P., Trafalgar Commodities Ltd, Wells Limited and Westminster-Refco Holding Company, LLC.

1.126    *Non-Estate Refco Claims* means non-estate causes of action arising from any matter involving any Refco Entity including, without limitation, causes of action against: (i) all current and former officers, directors or employees of the Refco Entities; (ii) all persons or entities that conducted transactions with the Refco Entities; and (iii) all persons or entities that provided services to the Refco Entities, including, without limitation, all attorneys, accountants, financial advisors and parties providing services to the Refco Entities in connection with the public issuance of debt or equity, including, without limitation, all underwriters; *provided, however,* Non-Estate Refco Claims shall exclude (i) contract claims against third parties and (ii) Class Action Claims.

1.127    *Non-Tax Priority Claim* means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.128    *Old Equity Interests* means the common stock of Refco Inc. outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of common stock of Refco Inc. or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

1.129    *Other Related Claim* means, other than an RCM Related Claim, any Claim or cause of action of any Holder of an Impaired Claim against RCM or any Debtor arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against its primary Debtor obligor or RCM; *provided, however*, that the term Other Related Claim shall not include any Claim, based on a contractual guarantee or other direct contractual undertaking, against RCM or any Debtor that is not such Holder's primary Debtor obligor.

1.130    *Other Secured Claim* means a Claim (other than an Administrative Claim or Secured Lender Claim) that is secured by a lien on property in which a Debtor's Estate or RCM's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.131    *Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.132    *Petition Date* means, with respect to a Debtor or RCM, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

1.133    *Plan* means this chapter 11 plan, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.134    *Plan Administrator* means the person designated pursuant to section 5.5 hereof prior to the Confirmation Date and approved by the Bankruptcy Court pursuant to the Confirmation Order to administer the Plan on behalf of the Contributing Debtors and FXA in accordance with the terms of the Plan and the Plan Administrator Agreement and to take such other actions as may be authorized under the Plan Administrator Agreement, and any successor thereto.

**1.135    Plan Administrator Agreement** means the agreement between and among the Contributing Debtors and the Plan Administrator specifying the rights, duties, and responsibilities of and to be performed by the Plan Administrator under the Plan, in substantially the same form as the agreement attached to the Plan as Exhibit E.

**1.136    Plan Committee** means the committee as appointed pursuant to section 5.11(b) hereof as of the Effective Date, which will supervise and direct the Plan Administrator, to monitor implementation of the Plan, and to take such other actions and have such other rights as are set forth in the Plan, all as described in Article V of this Plan.

**1.137    Plan Document** means the Plan, together with any contract, instrument, release, or other agreement or document entered into in connection with Plan.

**1.138    Plan Filing Date** means September 14, 2006.

**1.139    Plan Proponents** means the Debtors, the RCM Trustee and the Committees.

**1.140    Plan Support Agreement** means that certain agreement among the RCM Trustee, certain Non-Debtor Affiliates, the Committees, certain individual customers and creditors of RCM and the Debtors, and the chapter 7 trustee for Refco, LLC, in his capacity as chapter 7 trustee for Refco, LLC, filed with the Bankruptcy Court on September 15, 2006 (Docket No. 2861).

**1.141    Post-Confirmation RCM** means the estate of RCM on and after the entry of the Confirmation Order as administered by the RCM Trustee.

**1.142    Post-Petition Management** means AlixPartners and Harrison J. Goldin, Goldin Associates, LLC, and any directors appointed to the board of directors of Refco Inc. subsequent to Mr. Goldin's appointment as Chief Executive Officer of Refco Inc. on January 25, 2006.

**1.143    Pre-Conversion Administrative Claim Amount** means, if determined necessary by the RCM Trustee, any amount deposited by the Contributing Debtors into a reserve for the benefit of Holders of Administrative Claims against RCM arising or accruing prior to the date of conversion, if any, of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (including RCM Substantial Contribution Fees). The Pre-Conversion Administrative Claim Amount shall in no case exceed an amount equal to (i) $60 million plus (ii) the RCM Excess Priority Claims that RCM is responsible for bearing pursuant to section 5.16 of this Plan.

**1.144    Priority Claims** means, collectively, all Priority Tax Claims and Non-Tax Priority Claims.

**1.145    Priority Tax Claim** means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.146    Private Actions Trust** means the trust established on the Effective Date pursuant to section 5.8 of the Plan to hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates.

**1.147    Private Actions Trust Agreement** means the agreement to be executed as of the Effective Date establishing the Private Actions Trust pursuant to the Plan attached as Exhibit G hereto.

**1.148    Private Actions Trust Election** means, in respect of a Holder of an Allowed Old Equity Interest, the agreement of such Holder to assign and contribute such Holder's Non-Estate Refco Claims, and the proceeds of Class Action Claims to the Private Actions Trust, which election shall be evidenced by the submission of the election form attached hereto as Exhibit M.

**1.149    Private Actions Trustee** means the Person appointed pursuant to the Private Actions Trust Agreement of the Plan to act as trustee of and administer the Private Actions Trust and identified on or before

the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Litigation Trustee.

        **1.150**    *Professional* means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

        **1.151**    *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.

        **1.152**    *Pro Rata* means, with respect to Claims or Interests (i) within the same Class or sub-Class, the proportion that a Claim or Interest bears to the sum of all Claims or Interests, as the case may be, within such Class or sub-Class, and (ii) among all Classes, the proportion that a Class of Claims or Interests bears to the sum of all Claims or Interests, as the case may be; *provided, however*, that for purposes of distributing Litigation Trust Interests, Pro Rata share shall exclude Convenience Claims.

        **1.153**    *Qualifying Plan* has the meaning ascribed to such term in the Early Payment Order.

        **1.154**    *Quarterly Distribution Date* means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however*, that if the Effective Date is within 30 days of the end of a calendar quarter, the first Quarterly Distribution Date shall be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

        **1.155**    *RCM* means Refco Capital Markets, Ltd.

        **1.156**    *RCM Administrative/Priority Claims Reserve* means the Reserve account(s) to be established and maintained by the RCM Trustee, on behalf of Post-Confirmation RCM, to fund the Distribution to Holders of Administrative and Priority Claims against RCM.

        **1.157**    *RCM Administrative Professional* means any professional employed in the RCM Chapter 11 Case pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise.

        **1.158**    *RCM Advance* means a post-petition advance, if any, by RCM to or for the benefit of one or more of the Contributing Debtors in the amount of up to $115 million.

        **1.159**    *RCM BAWAG Proceeds* means (i) $200,000,000.00 of the BAWAG Guaranteed Proceeds (whether directly allocated to RCM or recovered by RCM on account of its RCM Intercompany Claim), and (ii) a portion of the BAWAG Contingent Proceeds allocable to payment of the RCM Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases required by the BAWAG Settlement, Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims.

        **1.160**    *RCM Cash Distribution* means the sum of (i) $460 million of Cash (inclusive of RCM BAWAG Proceeds) payable from Contributing Debtor Distributive Assets, which amount shall be adjusted upwards or downwards, by an amount equal to the Specified Difference plus (ii) payment to RCM of any amounts available from the Contributing Debtors General Unsecured Distribution, to the extent that such amounts are not paid to Holders of Allowed Contributing Debtors General Unsecured Claims as a result of recoveries for Holders of Allowed Contributing Debtors General Unsecured Claims (from Contributing Debtors Distributive Assets and the RGL FXCM Distribution) having reached 40%; *provided, however*, such Distribution shall be subject to the Administrative Claims Adjustment.

        **1.161**    *RCM Difference* means the amount by which the Allowed amount of any RCM FX/Unsecured Claim filed by Cargill is reduced by  allowance of the Cargill Administrative Claim.

**1.162    *RCM Claims Distribution Account*** means the account established and maintained by the Post-Confirmation RCM from which Distributions to Holders of Allowed Claims against RCM shall be made and from which reserves on behalf of RCM will be funded.

**1.163    *RCM Distribution Reserve*** means the reserve established by the Plan Administrator or RCM, as the case may be, to hold that portion of the RCM Cash Distribution and that portion of the RGL FXCM Distribution applicable to Holders of a right to demand an applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, but who have not tendered an RCM Related Claim Subordination Form.

**1.164    *RCM Excess Priority Claims*** means that portion of Excess Priority Claims that are to be borne by RCM pursuant to section 5.16 of this Plan.

**1.165    *RCM FX/Unsecured Claims*** has the meaning given to the term "FX/Unsecured Claim" in the RCM Settlement Agreement.

**1.166    *RCM FX/Unsecured Claims Distribution*** means the Distribution for Holders of RCM FX/Unsecured Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM FX/ Unsecured Convenience Claims.

**1.167    *RCM FX/Unsecured Convenience Claims*** means any RCM FX/Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM FX/Unsecured Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM FX/ Unsecured Convenience Claims shall be limited to $1.458 million.  To the extent that the amount of RCM FX/Unsecured Claims reducing and electing treatment of such Claims as RCM FX/Unsecured Convenience Claims exceeds $1.458 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $1.458 million cap is reached.

**1.168    *RCM Implied Deficiency Claim*** has the meaning given to the term "Implied Deficiency Claim" in §8(b) of the RCM Settlement Agreement.

**1.169    *RCM Intercompany Claims*** means Claims of RCM against one or more of the Debtors. Unless and until Allowed in a definitive amount, for purposes of calculations herein, the RCM Intercompany Claims shall be deemed to be in an amount that is no less than the amount necessary to cause all Holders of Allowed RCM Securities Customer Claims and Allowed FX/Unsecured Claims to receive payment in full.

**1.170    *RCM Intercompany Claim Distribution*** means the sum of (i) the RCM Rights Distribution, (ii) the Additional RCM Claim, (iii) 50% of the RGL FXCM Distribution, (iv) the RCM BAWAG Proceeds and (v) the allocable share of the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

**1.171    *RCM Leuthold Metals Claim*** has the meaning given to the term "Leuthold Metals Claim" in the RCM Settlement Agreement.

**1.172    *RCM Leuthold Metals Claim Distribution*** means the Distribution for Holders of RCM Leuthold Metals Claims set forth in the RCM Settlement Agreement.

**1.173    *RCM Projection*** means a projection of the Cash or value to be available from the MAC RCM Assets for Distribution in respect of the RCM Cash Distribution and the Additional RCM Claim.

**1.174    *RCM Related Claims*** means any Claim or cause of action of any Holder of an Impaired Claim against the Debtors and Non-Debtor Affiliates arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against RCM; *provided, however*, that the term RCM Related Claim shall not include any Claim of a Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim against any Contributing Debtor or FXA based on contractual guarantees or other direct contractual undertakings.

**1.175** *RCM Related Claim Subordination Form* means, in respect of a Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim, either (i) a ballot cast by such Holder in respect of the Plan whereby the Holder has elected (by means of not affirmatively opting out of such election) to (A) assign such Holder's RCM Related Claims against the Debtors, if any, to the Litigation Trust; (B) affirming its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate will be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing claims against and equity interests in the applicable Contributing Non-Debtor Affiliate (and that such RCM Related Claim may be deemed released upon the determination of the RCM Trustee, with the consent of the Plan Committee, in accordance with section 10.2(c) of the Plan); (C) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any; and (D) receive such Holder's applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution or (ii) any agreement, in a form satisfactory to the Plan Administrator, by which such Holder agrees to do the forgoing.  For the avoidance of doubt, any ballot properly cast by the Voting Deadline and satisfying the conditions above shall be deemed to have been "provided" to the RCM Trustee and the Plan Administrator for purposes of section 6.6(c) of this Plan.

**1.176** *RCM Reserves* means (A) the RCM Disputed Claims Reserve, (B) the RCM Administrative/Priority Reserve, (C) the RCM Wind-Down Reserve, (D) the RCM Unclaimed Distribution Reserve, and (E) any other reserves required to be established by the RCM Trustee under the RCM Settlement Agreement.

**1.177** *RCM Rights Distribution* means the transfer to the RCM Trustee, as part of the RCM Intercompany Claims Distribution, of rights which will allow each Holder of an Allowed RCM Securities Customers Claim on account of its RCM Implied Deficiency Claim and each Holder of an Allowed RCM FX/Unsecured Claim to make a demand for payment from the Plan Administrator or RCM, as the case may be, for such Holder's Pro-Rata share of the RCM Distribution Reserve to the extent that such Holder satisfies the conditions set forth in section 6.6(c) of this Plan.

**1.178** *RCM Securities Customer Claims* has the meaning given to the term "Securities Customer Claims" in the RCM Settlement Agreement.

**1.179** *RCM Securities Customer Convenience Claims* means any RCM Securities Customer Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM Securities Customer Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM Securities Customer Convenience Claims shall be limited to $0.333 million.  To the extent that the amount of RCM Securities Customer Convenience Claims reducing and electing treatment of such Claims as RCM Securities Customer Convenience Claims exceeds $0.333 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $0.333 million cap is reached.

**1.180** *RCM Securities Customer Claims Distribution* means the Distribution for Holders of RCM Securities Customer Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM Securities Customer Convenience Claims.

**1.181** *RCM Settlement Agreement* means, collectively, (i) the settlement agreement dated as of June 29, 2006 by and among the RCM Trustee and certain creditors of RCM and (ii) the Joinder Agreement dated as of July 20, 2006 between the RCM Trustee and the Rogers Funds, in each case as amended (copies of which are attached hereto as Exhibit B).

**1.182** *RCM Substantial Contribution Fees* means the approximate amount of $4.3 million constituting the substantial contribution Claim of the MCG Members and the Joinder Parties under sections 503(b)(3)(d), 507(a)(2) and 752(a) of the Bankruptcy Code as set forth in the RCM Settlement Agreement.

**1.183**   *RCM Trustee* means Marc S. Kirschner, the chapter 11 trustee appointed in the RCM Chapter 11 Case in connection with the March 22, 2006 order issued by the Bankruptcy Court authorizing appointment of one disinterested person as Chapter 11 trustee for the Estate of RCM.  The term includes any successor chapter 11 trustee or, if the RCM Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7 of the Bankruptcy Code, the chapter 7 trustee.

**1.184**   *RCM Unclaimed Distribution Reserve* means the reserve or reserves established in respect of unclaimed Distributions for RCM pursuant to Article VI of the Plan.

**1.185**   *RCM Wind-Down Reserve* means a reserve, if determined necessary by the RCM Trustee, of up to $15 million from the Cash or value available for the RCM Cash Distribution, with the amount of such RCM Wind-Down Reserve to be subject to downward adjustment from time to time by the RCM Trustee, to the extent the RCM Trustee determines that RCM's wind-down expenses after the Effective Date will be less than $15 million.

**1.186**   *Reinstated* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, and (iii) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

**1.187**   *Refco Entities* means the Debtors, RCM and the Non-Debtor Affiliates.

**1.188**   *Related Claims* means any RCM Related Claim or Other Related Claim.

**1.189**   *Released/Subordinated Claims* means the claims or causes of actions described in sections 10.2(a), (b), (c) and (d) of the Plan or claims or causes of action that have been otherwise released or waived pursuant to an order of the Bankruptcy Court (including, without limitation, the Early Payment Order).

**1.190**   *Released Parties* means, acting in such capacity, (i) the Post-Petition Management, (ii) the Secured Lender Releasees, (iii) the Senior Subordinated Note Indenture Trustee, its directors, officers, and employees (all in such capacity) and (iv) present and former holders of the Senior Subordinated Notes in their capacity as Holders of the Senior Subordinated Notes.

**1.191**   *Reorganized Affiliate Debtor* means any Affiliate Debtor on and after the Effective Date.

**1.192**   *Reorganized Debtors* means Reorganized Refco, Reorganized FXA and any Reorganized Affiliate Debtor.

**1.193**   *Reorganized FXA* means FXA on and after the Effective Date.

**1.194**   *Reorganized Refco* means Refco Inc. on and after the Effective Date.

**1.195**   *Reserves* means, collectively, the Disputed Claims Reserve, Unclaimed Distribution Reserve, Administrative/Priority Claims Reserve and the RCM Reserves (if held by the Plan Administrator, rather than the RCM Trustee) and the Wind-Down Reserve.

**1.196**   *Restated Corporate Governance Documents* means the restated corporate governance documents of the Reorganized Debtors in substantially the form attached to this Plan as Exhibit C.

**1.197**   *Retained Causes of Action* means all of the Debtors' and RCM's claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds,

bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments against any party, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, and regardless of whether arising in law, equity or under or pursuant to Chapter 5 of the Bankruptcy Code, including, but not limited to, the Litigation Claims. A non-exclusive list of the Retained Causes of Action is set forth on Exhibit K attached hereto.

      **1.198**     *RGL* means Refco Group Limited LLC.

      **1.199**     *RGL FXCM Distribution* means RGL's 35% interest in FXCM, which for purposes of the cap on Distributions to Holders of Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets and the RGL FXCM Distribution shall have a value equal to (i) if liquidated prior to the Effective Date, the value obtained through liquidation and (ii) if not liquidated prior to the Effective Date, a deemed value of $90 million.

      **1.200**     *Rogers Funds* means Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund, L.P.

      **1.201**     *Scheduled* means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

      **1.202**     *Schedules* means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs filed by the Debtors or RCM pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rules, as such schedules have been or may be further modified, amended, or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

      **1.203**     *Secured Lender(s)* has the meaning assigned to the term "Lender(s)" in the Early Payment Order.

      **1.204**     *Secured Lender Agent* has the meaning assigned to the term "Agent" in the Early Payment Order.

      **1.205**     *Secured Lender BAWAG Proceeds* means $100 million of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed exclusively offered to pay and accepted by the Holders of Allowed Secured Lender Claims.

      **1.206**     *Secured Lender Claims* has the meaning assigned to the term "Secured Claim" in the Early Payment Order.

      **1.207**     *Secured Lender Indemnification Claims* means any and all Estimated Unsatisfied Credit Agreement Claims and all other claims of the Secured Lender Agent and/or the Secured Lenders of the type specified in paragraph 9(b) of the Early Payment Order.

      **1.208**     *Secured Lender Payment Date* has the meaning assigned to the term "Payment Date" in the Early Payment Order.

      **1.209**     *Secured Lender Released Claims* means any and all actual or potential demands, claims, causes of action (including, without limitation, derivative causes of action), suits, assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity (including, without limitation, actions seeking to recharacterize, avoid, subordinate, set aside or disallow the liens or claims of any Secured Lender Releasee, or seeking turnover of property, damages or any other affirmative recovery from any Secured Lender Releasee, including, without limitation, any claim for contribution), whether asserted or unasserted, known or unknown, foreseen or unforeseen, pending or anticipated, arising under the Bankruptcy Code or under otherwise applicable law, that any Person ever had, now has or hereafter may have (whether by assignment or otherwise) based in whole or in part upon any act or failure to act by any of the Secured Lender Releasees, on or prior to the Secured Lender Payment Date, in contemplation of the execution of the Loan Documents, in connection

with the execution of the Loan Documents or the making or repayment of the Loans, or in connection with any transactions directly or indirectly related or connected in any way to the Loan Documents, the Secured Lender's Collateral, the use of proceeds of Loans made under the Loan Documents, or any other transactions related to or in connection with any of the foregoing.

        **1.210**    *Secured Lender Releasee* has the meaning assigned to the term "Lender Releasee" in the Early Payment Order.

        **1.211**    *Secured Lender's Collateral* has the meaning assigned to the term "Collateral" in the Early Payment Order.

        **1.212**    *Securities Class Action Stipulation* means that certain Stipulation and Agreement of Settlement entered into on September 7, 2006 between BAWAG and the lead plaintiffs in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, or any future settlement between the parties as contemplated therein.

        **1.213**    *Senior Subordinated Note Allocation* means an allocation of the Senior Subordinated Note Holder Fee Distribution on account of the Senior Subordinated Note Indenture Trustee Fees and Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses, which allocation shall be agreed upon between the Senior Subordinated Note Indenture Trustee and the Ad Hoc Committee of Senior Subordinated NoteHolders. Any amount of Senior Subordinated Note Indenture Trustee Fees not paid on account of such allocation may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

        **1.214**    *Senior Subordinated Note Claims* means all Claims of any kind arising from or related to the Senior Subordinated Notes, and including, without limitation, any Claims arising from any guarantees under the Senior Subordinated Note Indenture, which Claims shall be Allowed Claims in the amount of $397,413,324.50.

        **1.215**    *Senior Subordinated Note Holder BAWAG Proceeds* means $150,000,000 of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for releases required in the BAWAG Settlement, Holders of Allowed Senior Subordinated Note Claims.

        **1.216**    *Senior Subordinated Note Holder Distribution* means $331,522,195.30, which, pursuant to the compromises and settlements contained in this Plan document, constitutes 83.42% of the outstanding balance of principal and prepetition interest of the Senior Subordinated Note Claims. Such Distribution shall be paid to the Senior Subordinated Note Indenture Trustee on the Effective Date to the extent of available Cash after taking into account the funding of the Administrative/Priority Claims Reserve, with any balance paid from time to time to the Senior Subordinate Note Indenture Trustee from available Cash with interest accruing, beginning January 1, 2007, on the unpaid balance at the same rate of interest that Refco LLC earns on its invested Cash and cash equivalents, payable from the Senior Subordinated Note Holder BAWAG Proceeds and, to the extent of any deficiencies, the Contributing Debtors Distributive Assets.

        **1.217**    *Senior Subordinated Note Holder Fee Distribution* means an amount up to $6.0 million of the (i) Senior Subordinated Note Indenture Trustee Fees, and (ii) the Allowed Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses. Such Distribution shall be paid on the Effective Date from the Contributing Debtors Distributive Assets to the Senior Subordinated Note Indenture Trustee and counsel to the Ad Hoc Committee of Senior Subordinated Note Holders , subject to the Senior Subordinated Note Allocation. For the avoidance of doubt, any portion of the Senior Subordinated Note Indenture Trustee Fees not paid by the Senior Subordinated Note Holder Fee Distribution may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

        **1.218**    *Senior Subordinated Note Indenture* means the indenture dated as of August 5, 2004, among Refco Finance Holdings LLC (now known as Refco Group Ltd., LLC) and Refco Finance Inc., as issuers, and Wells Fargo Bank, National Association, as indenture trustee, relating to the Senior Subordinated Notes, as it may be amended, supplemented, or modified from time to time.

**1.219**   *Senior Subordinated Note Indenture Trustee* means Wells Fargo Bank, National Association, the indenture trustee under the Senior Subordinated Note Indenture, or any successor thereto.

**1.220**   *Senior Subordinated Note Indenture Trustee Charging Lien* means any Lien or other priority in payment or right available to the Senior Subordinated Note Indenture Trustee pursuant to the Senior Subordinated Note Indenture or otherwise available to the Senior Subordinate Note Indenture Trustee under applicable law, for the payment of Senior Subordinated Note Indenture Trustee Fees.

**1.221**   *Senior Subordinated Note Indenture Trustee Fees* means the fees, costs, expenses and indemnity claims of the Senior Subordinated Note Indenture Trustee and the fees and expenses of its counsel and financial advisor.

**1.222**   *Senior Subordinated Notes* means the 9% Senior Subordinated Notes due 2012 issued by RGL and Refco Finance Inc. under the Senior Subordinated Note Indenture and guaranteed by certain of the Debtors.

**1.223**   *Specified Difference* means 50% of the difference (positive or negative) between the value of the Adjusted Contributing Debtors Distributive Assets and $554 million (in making such calculation the Adjusted Contributing Debtors Distributive Assets shall not be subject to the Administrative Claims Adjustment); *provided, however*, that once the portion of the Contributing Debtors General Unsecured Distribution has reached 40% exclusive of the value of the Tranche A Litigation Trust Interests, 100% of the remainder of the positive difference shall be added to the RCM Cash Distribution.  For the avoidance of doubt, any BAWAG Proceeds received pursuant to the BAWAG Settlement, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement, shall be included in the calculation of Adjusted Contributing Debtors Distributive Assets.

**1.224**   *Subordinated Claim* means any Claim which (i) is subordinated pursuant to section 510(c) of the Bankruptcy Code, (ii) arising from recision of a purchase or sale of a debt security of the Debtors, for damages arising from the purchase or sale of such debt security, or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such Claims, or  (iii) is a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code or otherwise.

**1.225**   *Subsidiary Claims and Interests* means Claim against or an Interest in any of the Refco Entities held by any other Refco Entity other than the RCM Intercompany Claims.

**1.226**   *Tranche A Litigation Trust Interests* means the Litigation Trust Interests distributed to (i) the RCM Estate, (ii) Holders of Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lender Claims or, the Senior Subordinated Note Claims) and (iii) the Holders of FXA General Unsecured Claims (which for the sake of clarity, shall not include FXA Convenience Class Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims) in accordance with section 5.7(c) hereof.

**1.227**   *Tranche B Litigation Trust Interests* means interests in the Litigation Trust given by the beneficiaries of the Tranche A Litigation Trust Interests to Holders of Allowed Old Equity Interests that have made the Private Actions Trust Election and consisting of 3% of the first $500 million of Combined Recoveries, 7.5% of the Combined Recoveries greater than $500 million and 15% of the Combined Recoveries greater than $1 billion, as set forth in section 5.7(c) hereof.

**1.228**   *Unclaimed Distribution Reserve* means the reserve or reserves established in respect of unclaimed Distributions for FXA and the Contributing Debtors pursuant to Article VI of the Plan.

**1.229**   *Unclassified Claims* means Administrative Claims and Priority Tax Claims

**1.230**   *Unimpaired* means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.231** *Voting Deadline* means [●], 2006 at [●] p.m. (prevailing Eastern Time).

**1.232** *Voting Record Date* means [●].

**1.233** *VR* means, collectively, VR Global Partners, L.P. and its affiliates.

**1.234** *VR/Leuthold Guarantee Claims* means the Claims against RGL arising from (i) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Capital Group Ltd., (ii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Argentina Recovery Fund, Ltd., (iii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Global Partners, L.P., and (iv) that certain guarantee agreement, dated September 1, 2005 between Refco Group Ltd., LLC and Leuthold Funds, Inc. and (v) any other documents, agreements or transactions in any way related to (i) through (iv) above.

**1.235** *Wind-Down Reserves* means the reserve accounts to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the administration of this Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals.

*Rules Of Interpretation And Computation Of Time*. For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to sections and articles are references to sections and articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any Distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits*. All Exhibits to the Plan are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036-6522 (Attn. David R. Hurst, Esq.), counsel to the Debtors or by downloading such Exhibits from the Bankruptcy Court's website at http://www.nysb.uscourts.gov (registration required), the Refco website at http://www.refcoinc.com or http://www.refcodocket.com. To the extent any Exhibit is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of this Plan shall control; *provided, however*, in all relevant cases, to the extent this Plan is inconsistent with the RCM Settlement Agreement, the RCM Settlement Agreement shall control.

# ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1** *Introduction*.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors and RCM. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below, have not been classified and are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

This Plan is premised on a consensual pooling of assets and liabilities by the Contributing Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases, including the Debtors, the RCM Trustee, the Committees, the Secured Lenders and certain of the Holders of Senior Subordinated Notes. If for any reason the Bankruptcy Court determines that such compromises and settlements, as embodied herein, should not be implemented as set forth herein, the Plan Proponents may elect to seek confirmation of the Plan on the basis of complete or partial substantive consolidation or on a Debtor by Debtor basis identifying sub-Classes of each of the listed Classes of Claims of the Contributing Debtors for each Contributing Debtor.

**The provisions set forth below also describe the classification of RCM Claims and Interests, but the provisions applicable to the RCM Claims and Interests are qualified in their entirety by reference to the RCM Settlement Agreement with respect to the Claims against RCM. To the extent that the summary below conflicts with the provisions of the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code shall govern. This Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of Claims between the Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan.**

The provisions set forth below also describe the classification of Secured Lender Claims, but the provisions applicable to the Secured Lender Claims are qualified in their entirety by reference to the Early Payment Order.

## 2.2     *Classification of Claims and Interests of the Contributing Debtors*.

(a)     *Unclassified Claims – Contributing Debtors* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)     *Unimpaired Classes of Claims – Contributing Debtors* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)    *Impaired Classes of Claims – Contributing Debtors* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - General Unsecured Claims.

Class 5(b) - Related Claims

Class 6 - RCM Intercompany Claims.

Class 7 - Subordinated Claims.

Each of Classes 4 and 5 shall contain sub-Classes corresponding to each of the Contributing Debtors.  A schedule of such sub-Classes is attached hereto as Schedule 2.2(c).

(d)    *Impaired Classes of Interests – Contributing Debtors*  (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 8 - Old Equity Interests.

**2.3    *Classification of Claims of FXA*.**

(a)    *Unclassified Claims – FXA* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)    *Unimpaired Classes of Claims – FXA* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - FXA Non-Tax Priority Claims.

Class 2 - FXA Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)    *Impaired Classes of Claims – FXA* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - FXA General Unsecured Claims.

Class 5(b) - Related Claims.

Class 6 - FXA Convenience Claims.

Class 7 - FXA Subordinated Claims.

**2.4    *Classification of Claims of RCM*.**

      (a)      *Unclassified Claims – RCM* (not entitled to vote on the Plan).

                  Administrative Claims.

                  Priority Tax Claims.

      (b)      *Unimpaired Classes of Claims – RCM* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

                  Class 1 - Non-Tax Priority Claims.

                  Class 2 - Other Secured Claims.

      (c)      *Impaired Classes of Claims – RCM* (Classes 3, 4, 5, 6, 7 and 8 are entitled to vote on the Plan; Class 9 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

                  Class 3 - RCM FX/Unsecured Claims.

                  Class 4 - RCM Securities Customer Claims.

                  Class 5 - RCM Leuthold Metals Claims.

                  Class 6 - RCM FX/Unsecured Convenience Claims.

                  Class 7 - RCM Securities Customer Convenience Claims.

                  Class 8 - Related Claims.

                  Class 9 - RCM Subordinated Claims.

## ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

**3.1**      ***Treatment of Claims and Interests of the Contributing Debtors***.

      (a)      *Unclassified Claims – Contributing Debtors*

          (i)      *Administrative Claims.*  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim against the Contributing Debtors, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan. Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by a Contributing Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the Contributing Debtors or the Plan Administrator.  Subsection (b) of the second sentence in this section 3.1(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)     *Priority Tax Claims.* On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the Contributing Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim against the Contributing Debtors, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Contributing Debtors or the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)     *Unimpaired Classes of Claims – Contributing Debtors.*

(i)     *Class 1 - Non-Tax Priority Claims.* On (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim against the Contributing Debtors, each Holder of an Allowed Class 1 Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)     *Class 2 - Other Secured Claims.* On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against the Contributing Debtors shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii)     *Class 3 - Secured Lender Claims.* The Secured Lender Claims against the Contributing Debtors shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash. In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c)     *Impaired Classes of Claims – Contributing Debtors.*

(i)     *Class 4 - Senior Subordinated Note Claims.* On the Effective Date, each Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors shall receive, to the extent not previously paid, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Senior Subordinated Note Claim and any and all Claims against the Refco Entities, its Pro Rata share of the Senior Subordinated Note Holder Distribution (subject to the Senior Subordinated Note Indenture Trustee Charging Lien); and the Debtors shall pay the Senior Subordinated Note Holder Fee Distribution; *provided, however,* to the extent that a Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors elects to not receive the Senior Subordinated Note Holder BAWAG Proceeds, such Holder's Distribution shall consist of its Pro Rata share of the Senior Subordinated Note Holder Distribution less such Holder's portion of the Senior Subordinated Note Holder BAWAG Proceeds.

(ii)    *Class 5(a) - Contributing Debtors General Unsecured Claims.*  Subject to section 6.4 of this Plan, on the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), each Holder of an Allowed Class 5(a) Contributing Debtors General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Contributing Debtors General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the Contributing Debtors General Unsecured Distribution; *provided, however*, to the extent that a Holder of an Allowed Class 5(a) General Unsecured Claim against the Contributing Debtors elects to not receive the Contributing Debtors General Unsecured BAWAG Proceeds, if any, such Holder's Distribution shall consist of its Pro Rata share of the Contributing Debtors General Unsecured Distribution less such Holder's portion of the Contributing Debtors General Unsecured BAWAG Proceeds.

(iii)    *Class 5(b) - Related Claims.*  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against any Contributing Debtor shall be subordinated and shall receive no Distribution from the Contributing Debtors Distributive Assets unless and until such time as all Holders of Allowed Contributing Debtors General Unsecured Claims and Allowed RCM Intercompany Claims have been paid in full; *provided*, *however*, that any Holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

(iv)    *Class 6 - RCM Intercompany Claims.*  On the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), the RCM Trustee, on behalf of RCM, shall receive the RCM Intercompany Claim Distribution.

(v)    *Class 7 - Subordinated Claims.*  No Holder of a Class 7 Subordinated Claim against the Contributing Debtors shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

(d)    *Impaired Classes of Interests – Contributing Debtors.*

(i)    *Class 8 - Old Equity Interests.*  No Holder of a Class 8 Old Equity Interest shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 8 Old Equity Interest; *provide, however,* that Holders of Class 8 Old Equity Interests have been given certain rights to participate in the Litigation Trust and the Private Actions Trust as set forth in section 5.25 hereof.

**3.2    *Treatment of Claims of FXA.***

(a)    *Unclassified Claims – FXA.*

(i)    *Administrative Claims.*  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Administrative Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by FXA in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and FXA or the Plan Administrator.  Subsection (b) of the second sentence in this section 3.2(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii) *Priority Tax Claims*. On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of FXA, each Holder of an Allowed Priority Tax Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which FXA or the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b) *Unimpaired Classes of Claims – FXA.*

(i) *Class 1 - FXA Non-Tax Priority Claims.* On (a) the Effective Date if such Non-Tax Priority Claim against FXA is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against FXA shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Class 1 FXA Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Class 1 FXA Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii) *Class 2 - FXA Other Secured Claims*. On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 2 Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Class 2 Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Class 2 Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Class 2 Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii) *Class 3 - FXA Secured Lender Claims.* The Secured Lender Claims against FXA shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims against FXA, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash. In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c) *Impaired Classes of Claims – FXA.*

(i) *Class 4 - FXA Senior Subordinated Note Claims*. On the Effective Date, based on the agreements and settlement set forth in this Plan, each Holder of an Allowed Class 4 FXA Senior Subordinated Note Claim shall waive its share of the FXA General Unsecured Claims Distribution in return for the releases set forth in sections 10.2(a) and (b) of the Plan.

(ii) *Class 5(a) - FXA General Unsecured Claims*. On the Effective Date, each Holder of an Allowed Class 5(a) FXA General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 5(a) FXA General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the FXA General Unsecured Claim Distribution.

(iii) *Class 5(b) –Related Claims*. On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against FXA shall be subordinated and shall receive no Distribution from the FXA Distributive Assets unless and until such time as all Holders of Allowed FXA

Plan - 27

General Unsecured Claims have been paid in full; *provided*, *however*, that any holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

        (iv)    *Class 6 - FXA Convenience Claims.* On the Effective Date, each Holder of an Allowed Class 6 FXA Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 FXA Convenience Claim, Cash equal to 40% of its Allowed Class 6 FXA Convenience Claim. Holders of Allowed Class 6 FXA Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

        (v)    *Class 7 - FXA Subordinated Claims.* No Holder of a Class 7 Subordinated Claim against FXA shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

    **3.3**    ***Treatment of Claims of RCM****.*

        **The following section is a summary of the treatment of RCM Claims set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code. This Plan summary of the treatment of RCM Claims is qualified in its entirety by reference to the RCM Settlement Agreement. To the extent that the summary treatment below conflicts with the treatment afforded in the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement shall govern the treatment of RCM Claims.**

        (a)    *Unclassified Claims – RCM.*

        (i)    *Administrative Claim.* As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan. Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by RCM in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the RCM Trustee. Subsection (b) of the second sentence in this section 3.3(a)(i) of the Plan shall not be construed to avoid relieving the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

        (ii)    *Priority Tax Claims.* As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the RCM Trustee, each Holder of an Allowed Priority Tax Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the RCM Trustee and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)    *Unimpaired Classes of Claims – RCM.*

(i)    *Class 1 - RCM Non-Tax Priority Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim against RCM on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against RCM shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)    *Class 2 - RCM Other Secured Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(c)    *Impaired Classes of Claims – RCM.*

(i)    *Class 3 - RCM FX/Unsecured Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 3 RCM FX/Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM FX/Unsecured Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM FX/Unsecured Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(ii)    *Class 4 - RCM Securities Customer Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 4 RCM Securities Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Securities Customer Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM Securities Customer Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(iii)    *Class 5 - RCM Leuthold Metals Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 5 RCM Leuthold Metals Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Leuthold Metals Claim, its Pro Rata share of the RCM Leuthold Metals Claim Distribution.

(iv)    *Class 6 – RCM FX/Unsecured Convenience Claims.*  On the Effective Date, each Holder of an Allowed Class 6 RCM FX/Unsecured Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 RCM FX/Unsecured Convenience Claim, Cash equal to 60% of its Allowed Class 6 RCM FX/Unsecured Convenience Claim.  Holders of Allowed Class 6 RCM FX/Unsecured Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v) *Class 7 – RCM Securities Customer Convenience Claims*. On the Effective Date, each Holder of an Allowed Class 7 RCM Securities Customer Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 7 RCM Securities Customer Convenience Claim, Cash equal to 100% of its Allowed Class 7 RCM Securities Customer Convenience Claim. Holders of Allowed Class 7 RCM Securities Customer Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(vi) *Class 8 - Related Claims.* On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 8 Other Related Claim against RCM shall be subordinated and shall receive no Distribution from RCM unless and until such time as all Holders of Allowed RCM FX/Unsecured Claims, Allowed RCM Securities Customer Claims and Allowed RCM Leuthold Metals Claims have been paid in full.

(vii) *Class 9 - RCM Subordinated Claims.* No Holder of a Class 6 Subordinated Claim against RCM shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 9 RCM Subordinated Claim. On the Effective Date, all Class 9 RCM Subordinated Claims shall be cancelled and extinguished.

**3.4** **Allowed Claims and Interests**. Except as provided in the Early Payment Order, notwithstanding any provision herein to the contrary, the Disbursing Agent, on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall make Distributions only to Holders of Allowed Claims and Interests. A Holder of a Disputed Claim or Disputed Interest shall receive only a Distribution on account thereof when and to the extent that its Disputed Claim or Disputed Interest becomes an Allowed Claim or an Allowed Interest, as applicable.

**3.5** **Alternative Treatment**. Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the Distribution or treatment to which it is entitled hereunder, any other less favorable Distribution or treatment to which it, the Plan Proponents and FXA (in respect of FXA), the Plan Administrator (in respect of the Contributing Debtors) or the RCM Trustee (in respect of RCM) may agree in writing.

**3.6** **Limitation on Recoveries**. Notwithstanding anything contained herein to the contrary but subject to interest on Claims set forth in section 5.7 of the Plan, in the event that each Holder of an Allowed Claim in any Class of Claims is to receive Distributions in excess of one hundred percent (100%) of each Holder's Allowed Claim in such Class, then, any amounts remaining to be distributed to such Holders in excess of one hundred percent (100%) shall be redistributed to Holders of Allowed Claims or Interests immediately junior to such class as set forth in Article III of this Plan and shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Claims or Interests, including, without limitation, the RCM Settlement Agreement and the Bankruptcy Code.

**3.7** **Special Provision Regarding Unimpaired Claims**. Except as otherwise provided in this Plan, the RCM Settlement Agreement or a Final Order of the Bankruptcy Court (including, without limitation, the Early Payment Order), nothing shall affect the Debtors', RCM's, the Reorganized Debtors' or Post-Confirmation RCM's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, setoffs against, or recoupments of Unimpaired Claims.

**3.8** **Claims and Interests of Non-Debtor Affiliates**. Claims of Non-Debtor Affiliates (other than those of Refco LLC) against the Debtors or RCM , unless otherwise resolved prior to the Effective Date, shall be released and receive no Distribution under the Plan; *provided, however*, that, notwithstanding such release of Claims, the Contributing Debtors, RCM and the Non-Debtor Affiliates may, but are not obligated to, treat such Claims as though they survive solely for purposes of entering into netting or similar arrangements between the Contributing Debtors, RCM and one or more Non-Debtor Affiliates. Interests of Non-Debtor Affiliates shall be treated in accordance with the provisions of this Plan, including, but not limited to, sections 5.1 and 5.22 below.

**3.9**    *Classification and Treatment of Intercompany Claims*.  Except as provided herein, Intercompany Claims among the Debtors or RCM are deemed to be resolved and satisfied by the provisions of and in accordance with this Plan.  Notwithstanding the compromises and settlements set forth herein, each such Intercompany Claim shall be deemed to be an unsatisfied liability of each of the Debtors and RCM immediately prior to their contribution of Contributed Claims to the Litigation Trust.

**3.10**    *Claims of Debtors against RCM*.  Notwithstanding anything in this Plan to the contrary, Claims against RCM held by any other Debtor will receive no Distribution consistent with the settlement among RCM and the Debtors contained in and implemented by this Plan.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1**    *Classes Entitled To Vote*.  Each Impaired Class of Claims of the Contributing Debtors, FXA or RCM  that is entitled to receive or retain property or any interest in property under the Plan  is entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote.  Holders of Claims and Interests in Classes that are not entitled to receive or retain any property under the Plan are presumed to have rejected the Plan and such Holders  are also not entitled to vote.

**4.2**    *Acceptance By Impaired Classes*.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code or any insider.

**4.3**    *Presumed Acceptance by Unimpaired Classes*.  Classes 1, 2 and 3 of each of the Contributing Debtors and FXA and RCM Classes 1 and 2 are Unimpaired by this Plan.  Under section 1126(f) of the Bankruptcy Code, Holders of such Claims or Interests are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims or Interests will not be solicited.

**4.4**    *Classes Deemed to Reject the Plan*.  Classes 7 and 8 of the Contributing Debtors, FXA Class 7 and RCM Class 9 are deemed to reject the Plan and, therefore, votes to accept or reject the Plan will not be solicited from Holders of Claims or Interests in such Classes.

**4.5**    *Summary of Classes Voting on the Plan*.  As a result of the provision of sections 4.3 and 4.4 of this Plan, only the votes of Holders of Claims of the Contributing Debtors in Classes  4, 5 and 6, Holders of FXA Claims in Classes  4, 5 and 6 and Holders of RCM Claims in Classes 3, 4, 5,6 ,7 and 8 will be solicited with respect to this Plan.

**4.6**    *Elimination Of Classes*.  Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

**4.7**    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*.  To the extent that any Impaired Class votes to reject the Plan or is deemed to have rejected it, the Plan Proponents shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

      5.1    *Merger Of Subsidiaries Into Refco Inc.*  As soon after the Effective Date that the Plan Administrator determines, in consultation with the Litigation Trustee, that it is appropriate, each of the Affiliate Debtors may be merged with and into Refco Inc., with Refco Inc. as the surviving entity. Notwithstanding anything to the contrary in this section of the Plan, mergers in fact of each of the Affiliate Debtors, other than FXA, with and into Refco Inc. referenced in such section shall occur no earlier than the Effective Date. Upon the occurrence of such a merger, the Plan Administrator, on behalf of the Reorganized Debtors, shall file all appropriate and required documentation with applicable state governmental agencies to reflect the occurrence of such mergers.

      5.2    *Continued Corporate Existence And Dissolution Of Reorganized Debtors*.

      (a)    Refco Inc., FXA and, until they are wound up and dissolved, the Affiliate Debtors shall continue to exist as Reorganized Refco, Reorganized FXA and/or the applicable Reorganized Affiliate Debtor, respectively, after the Effective Date pursuant to the certificate of incorporation, certificate of formation or other corporate governance document, as applicable, and by-laws, operating agreement or other corporate governance document in effect prior to the Effective Date, except to the extent that such corporate governance documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates, and making Distributions in accordance with the Plan.

      (b)    As soon as practicable after the Plan Administrator, liquidates or otherwise disposes of assets of the Estates of the Reorganized Debtors and makes the final Distribution under the Plan, the Plan Administrator shall, at the expense of the Estates of the Reorganized Debtors and in consultation with the Plan Committee, (i) provide for the retention and storage of the books, records, and files that shall have been delivered to or created by the Plan Administrator until such time as all such books, records, and files are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books, records, and files are being stored, (ii) file a certification stating that the Plan Administrator has liquidated or otherwise disposed of the assets of the Estates of the Reorganized Debtors and made a final Distribution under the Plan, (iii) file the necessary paperwork with the Office of the Secretary of State for the State of Delaware to effectuate the dissolution of the Reorganized Debtors in accordance with the laws of the State of Delaware, and (iv) resign as the sole officer, manager or director, as applicable, of the Reorganized Debtors. Upon the filing of the certificates described in sub-section (ii) of the preceding sentence, the Reorganized Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be made in connection therewith.

      (c)    The RCM Trustee shall have sole discretion with respect to determining the timing and manner of dissolution of Post-Confirmation RCM in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

      5.3    *Corporate Governance Documentation*. The certificate of incorporation of Reorganized Refco shall be restated to, among other things: (a) authorize issuance of one share of new common stock, $0.01 par value per share that will be held by the Plan Administrator; (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (c) limit the activities of the Reorganized Refco to matters related to the implementation of the Plan and to matters reasonably incidental thereto. The corporate governance documents of Reorganized FXA shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of the Reorganized FXA to matters related to the implementation of the Plan and to matters reasonably incidental thereto. To the extent that the Plan Administrator decides it necessary, the corporate governance documents of the Affiliate Debtors that will continue in existence following the Effective Date pending the wind up of their businesses shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of such Reorganized Affiliate Debtor to matters related to the implementation

of the Plan and to matters reasonably incidental thereto.  The form of the restated corporate governance documents are attached hereto as Exhibit C.

> **5.4**    *Directors, Managers And Officers; Effectuating Documents; Further Transactions*.
From and after the Effective Date, the Plan Administrator shall serve as the sole officer and director or manager, as applicable, of the Reorganized Debtors and the RCM Trustee shall serve as the sole representative of RCM. The Plan Administrator on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

> **5.5**    *The Plan Administrator*.

>> (a)    *Appointment*.  From and after the Effective Date, a person or entity designated by the Joint Sub- Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) prior to the Confirmation Date, shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan.

>> (b)    *Plan Administrator Agreement*.  Prior to or on the Effective Date, the Contributing Debtors and FXA shall execute a Plan Administrator Agreement in substantially the same form as Exhibit E hereto with the Plan Administrator.  The form of Plan Administrator Agreement is hereby approved.  Any nonmaterial modifications to the Plan Administrator Agreement by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement necessary to implement the provisions of this Plan.

>> (c)    *Separate Administration of the RCM Estates*.  Notwithstanding anything herein to the contrary, all references in the Plan to the Plan Administrator shall refer exclusively to the administration of the Estates of the Contributing Debtors and FXA.  The RCM Estate shall be administered separately by the RCM Trustee and the RCM Trustee shall wind down the RCM Estate in accordance with the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

>> (d)    *Rights, Powers, And Duties Of The Reorganized Debtors And The Plan Administrator*.  The Reorganized Debtors shall retain and have all the rights, powers, and duties necessary to carry out their responsibilities under the Plan.  Such rights, powers, and duties, which shall be exercisable by the Plan Administrator on behalf of the Reorganized Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement, shall include, among others:

>>> (i)    liquidating the Reorganized Debtors' assets;

>>> (ii)    investing the Cash of the Estates of the Reorganized Debtors, including, but not limited to, the Cash held in the Reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court;

>>> (iii)    calculating and paying all Distributions in accordance with the terms of the Plan, the Plan Administrator Agreement, and other orders of the Bankruptcy Court by the Plan Administrator to Holders of Allowed Claims;

(iv)   employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Reorganized Debtors and their Estates;

(v)   making and filing tax returns for any of the Contributing Debtors, FXA or the Reorganized Debtors;

(vi)   as provided in Article V, objecting to Claims or Interests filed against the Estates of any of the Contributing Debtors, FXA or the Reorganized Debtors on any basis except to the extent such Claims or Interests have previously been allowed by a Final Order;

(vii)   seeking estimation of contingent or unliquidated Claims against the Contributing Debtors, FXA or the Reorganized Debtors under section 502(c) of the Bankruptcy Code;

(viii)   seeking determination of tax liability for the Contributing Debtors, FXA and the Reorganized Debtors under section 505 of the Bankruptcy Code;

(ix)   closing the Chapter 11 Cases of the Reorganized Debtors;

(x)   dissolving and winding up the Reorganized Debtors;

(xi)   exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan Administrator Agreement; and

(xii)   taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the Plan Administrator Agreement.

(e)     *Compensation Of The Plan Administrator.*  The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms and conditions of the Plan Administrator Agreement.  Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve.  The payment of the reasonable fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided*, *however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(f)     *Indemnification.*  The Reorganized Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer,  director or manager, as applicable of the Reorganized Debtors), (ii) such individuals as may serve as officers, directors or managers, as applicable of the Reorganized Debtors, if any, and (iii) the Administrative Professionals (collectively, the "Indemnified Parties"), from and against, and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan or Plan Administration Agreement.  To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Indemnified Party in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve.  The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(g)     *Insurance.*  The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, and the Reorganized Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Reorganized Debtors or their

Estates and (ii) the liabilities, duties, and obligations of the Plan Administrator and its agents, representatives, employees, or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Plan Administrator, remain in effect for a reasonable period (not to exceed seven years) after the termination of the Plan Administrator Agreement.

(h)    *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder or by Court order, after consultation with the Plan Committee, (i) to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims against any of the Contributing Debtors' or FXA's Estates, in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements of claims:

(i)    If the proposed face amount at which the Disputed Claim is to be allowed is less than or equal to $500,000, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any party or Bankruptcy Court approval and the Plan Administrator shall have no liability to any party for the reasonableness of such settlement, except to the extent such settlement is determined by a Final Order to have been the product of the Plan Administrator's gross negligence or willful misconduct.

(ii)    If the proposed face amount at which the Disputed Claim is to be allowed is greater than $500,000, but less than or equal to $10 million, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized and empowered to settle such Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee approval or, if such approval of the Plan Committee is not forthcoming, upon Bankruptcy Court approval of such settlement.

(iii)    If the proposed face amount at which the Disputed Claim is to be allowed is greater than $10 million, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee and Bankruptcy Court approval of such settlement.

Other than as set forth in section 5.21 herein, parties in interest (other than the Reorganized Debtors and Plan Administrator, whose objection deadlines are set forth in section 8.1 of the Plan) shall have 90 days following the Effective Date to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates to the extent that under the Bankruptcy Code such parties are permitted (to the extent not previously allowed pursuant to the Plan or by order of the Bankruptcy Court), and have standing, to assert such objections. Notwithstanding anything to the contrary in this section of the Plan, Disputed Claims may not be resolved absent Bankruptcy Court approval under the procedures set forth in this section of the Plan until the date that is on or after 90 days following the Effective Date.

5.6    *Administration of Post-Confirmation RCM.*

(a)    *Rights, Powers, And Duties Of The RCM Trustee.* The RCM Trustee shall retain and have all the rights, powers, and duties necessary to carry out his responsibilities under the Plan, the RCM Settlement Agreement or applicable law. Such rights, powers, and duties, which shall be exercisable by the RCM Trustee on behalf of Post-Confirmation RCM and the RCM Estate pursuant to the Plan and the RCM Settlement Agreement, shall include, among others:

(i)    liquidating Post-Confirmation RCM's assets;

(ii)    investing Post-Confirmation RCM's Cash, including, but not limited to, the Cash held in any reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under  section 345 of the Bankruptcy Code or as otherwise order by the Bankruptcy Court;

(iii)    calculating and paying all Distributions to be made under the Plan, the RCM Settlement Agreement, and other orders of the Bankruptcy Court to Holders of Allowed Claims against RCM;

(iv)    employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Post-Confirmation RCM including professionals engaged for the valuation, sale or other disposition of Post-Confirmation RCM's assets or proceeds thereof;

(v)    making and filing tax returns, if any are required, for Post-Confirmation RCM;

(vi)    as provided in Article V, objecting to Claims or Interests filed against RCM or Post-Confirmation RCM on any basis except to the extent such Claims or Interests have previously been Allowed;

(vii)    seeking estimation of contingent or unliquidated Claims against RCM or Post-Confirmation RCM under section 502(c) of the Bankruptcy Code;

(viii)    seeking determination of tax liability, if any, for RCM and Post-Confirmation RCM under section 505 of the Bankruptcy Code;

(ix)    closing the RCM Chapter 11 Case or chapter 7 case;

(x)    dissolving and winding up Post-Confirmation RCM;

(xi)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the RCM Settlement Agreement or applicable law; and

(xii)    taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the RCM Settlement Agreement or to administer the RCM Estate.

(b)    *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the RCM Trustee, on behalf of Post-Confirmation RCM, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder, under the RCM Settlement Agreement or by Court order (i) to object to any Claims or Interests filed against the RCM Estate and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle any such Disputed Claims asserted against RCM.

5.7    *Litigation Trust*.

(a)    *Establishment of the Litigation Trust*.  The Litigation Trust shall be established for pursuit of the Contributed Claims and shall become effective on the Effective Date as summarized below and in accordance with the terms and conditions set forth in more detail in the Litigation Trust Agreement attached hereto as <u>Exhibit F</u>. The Litigation Trustee will be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture

Trustee), and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing.

(b)    *Transfer of Assets.*  The transfer of the Contributed Claims to the Litigation Trust shall be made, as provided herein, for the ratable benefit of the Litigation Trust Beneficiaries as set forth herein.  On the Effective Date, the Contributed Claims, held by the Debtors and RCM on behalf of the Litigation Trust Beneficiaries shall be transferred to the Litigation Trust in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust Beneficiaries.  Upon transfer of the Contributed Claims to the Litigation Trust, the Debtors, RCM and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust and the Litigation Trustee shall be a representative of the Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code with respect to the Contributed Claims. To the extent that any Contributed Claims cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Contributed Claims shall be deemed to have been retained by the Reorganized Debtors and RCM, as applicable, and the Litigation Trustee shall be deemed to have been designated as a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Contributed Claims on behalf of the Estates.  Notwithstanding the foregoing, all net proceeds of the Contributed Claims shall be transferred to the Effective Beneficiaries consistent with the remaining provisions of this Plan and the Litigation Trust Agreement.

(c)    *Structure of the Litigation Trust and Trust Distributions.*  The Litigation Trust shall be structured in a manner that provides for a Tranche A and a Tranche B.  All Contributed Claims Recoveries, whether applicable to Tranche A or Tranche B, will be distributed Pro Rata according to the beneficial interests in Tranche A and Tranche B.  The Litigation Trustee (in consultation with the Litigation Trust Committee) may establish further separate sub-Tranches, as necessary, in respect of the beneficial interests of the Litigation Trust Beneficiaries in Tranche A and Tranche B.  To the extent deemed "securities," the Litigation Trust Interests (or any redistribution of such interests or related interests by the RCM Trustee to the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims) will be exempt from registration to the extent provided in section 1145 of the Bankruptcy Code.

(i)    *Tranche A Litigation Trust Interests.*  Beneficiaries of Tranche A Litigation Trust Interests will be the RCM Estate (for Distribution in accordance with the RCM Settlement Agreements), Holders of Allowed Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lenders, the Senior Subordinated Note Indenture Trustee or the Holders of Senior Subordinated Notes) and Holders of Allowed FXA General Unsecured Claims (which for the sake of clarity, shall not include Holders of FXA Convenience Class Claims, RCM Securities Customer Convenience Claims or RCM FX/General Unsecured Convenience Claims) and such Beneficiaries shall share the Tranche A Litigation Trust Interests Pro Rata based on (x) in the case of the RCM Estate, the aggregate amount of Allowed RCM Implied Deficiency Claims and the Allowed RCM FX/Unsecured Claims and (y) in the case of Holders of Contributing Debtors General Unsecured Claims and the Holders of FXA General Unsecured Claims, the amount of each such Holder's Allowed Claim.

(ii)    *Tranche B Litigation Trust Interests.*  Beneficiaries of Tranche B Litigation Trust Interests will be the Holders of Old Equity Interests who have made a Private Actions Trust Election and such Beneficiaries shall share the Tranche B Litigation Trust Interests Pro Rata based on the number of shares held by the Holders of such Interests or the number of shares previously held to the extent that the Holder has asserted a Claim related to such shares.

(d)    *Management of the Litigation Trust.*  The Litigation Trust shall be managed and operated by the Litigation Trustee.  A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings shall have certain approval rights on key issues relating to the operation and management of the Litigation Trust.  The Four members (other than VR) shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee). No Holder of Tranche A Litigation Trust Interests (except to the extent such Holder is a member of the Litigation

Trust Committee) and no Holder of Tranche B Litigation Trust Interests shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust

        (e)    *Funding the Litigation Trust*. The Litigation Trust may be funded (i) from a loan that is non-recourse to RCM, the Debtors or the Estates, secured only by the proceeds of the Contributed Claims from one or more lenders who agree to make such loan on terms acceptable to the RCM Trustee, the Committees and the Super Majority (as defined in the RCM Settlement Agreement) or (ii) with up to $25 million drawn from the Contributing Debtors Distributive Assets, deducted on a Pro Rata basis from the Distributions that otherwise would be made to (x) Holders of Contributing Debtors General Unsecured Claims in accordance with the calculation of the Contributing Debtors General Unsecured Distribution and (y) to the RCM Estate in accordance with the calculation of the RCM Intercompany Claims Distribution in section 3.1 of this Plan. Any failure or inability of the Litigation Trust to obtain funding will not affect the consummation of this Plan.

        (f)    *Distributions by the Litigation Trust*. Any Contributed Claims Recoveries will first be used to repay the funding described in section 5.7(e) above and then will be transferred to the Disbursing Agent or the RCM Trustee, as applicable, for distribution to the Litigation Trust Beneficiaries as set forth herein. In addition, to the extent that the Reorganized Debtors or Post-Confirmation RCM become liable for the payment of any Claims arising under section 502(h) of the Bankruptcy Code by reason of the Litigation Trustee's prosecution of the Litigation Claims, the Litigation Trustee will be responsible for making Distributions on account of such Claims from the assets of the Litigation Trust.

        (g)    *Cash-Out Option.* As set forth more fully in the Cash-Out Option Agreement, if any, the form of which would be attached as an exhibit to the Litigation Trust Agreement, one or more third parties may offer, to Purchase Litigation Trust Interests from the Litigation Trust Beneficiaries.

        (h)    *Duration of Trust.* The Litigation Trust shall have an initial term of five (5) years, provided that if reasonably necessary to realize maximum value with respect to the assets in the Litigation Trust and following Bankruptcy Court approval, the term of the Litigation Trust may be extended for one or more one (1) year terms. The Litigation Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing all of or the last of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and the RCM Case to the extent the RCM Case was converted to chapter 7; and (ii) the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust Agreement.

        (i)    *Certain Federal Income Tax Matters.*

        (j)    For federal income tax purposes, the Debtors, RCM, the Litigation Trustee and the Effective Beneficiaries will treat the transfer of assets to the Litigation Trust and issuance of Litigation Trust Interests as a transfer by the Debtors and RCM of the assets to the Effective Beneficiaries, followed by a transfer of such assets by the Effective Beneficiaries to the Litigation Trust in exchange for direct or indirect beneficial interests in the Litigation Trust. For federal income tax purposes, the Effective Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Litigation Trust.

        (k)    The Litigation Trustee, the Debtors and RCM will determine the fair market value as of the Effective Date of all assets transferred to the Litigation Trust, and such determined fair market value shall be used by the Debtors, RCM, the Litigation Trust, the Litigation Trustee and the Effective Beneficiaries for all federal income tax purposes.

    **5.8**    *Private Actions Trust*.

        (a)    On the Effective Date the Private Actions Trust will be established on the terms set forth in the Private Actions Trust Agreement attached hereto as Exhibit G. The Private Actions Trust shall hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates. Beneficiaries of the Private Actions

Trust will be Holders of Contributing Debtors General Unsecured Claims, FXA General Unsecured Claims, RCM Securities Customer Claims, RCM FX/Unsecured Claims and those Old Equity Interests that make the Private Actions Trust Election, who shall be given interests in the Private Actions Trust to the same extent as in the Litigation Trust; *provided, however*, that a secondary purchaser of a Contributing Debtors General Unsecured Claim, FXA General Unsecured Claim, RCM Securities Customer Claim or RCM FX/Unsecured Claim may participate in the Private Actions Trust only if such purchaser has received an assignment of Non-Estate Refco Claims from the original holder of such claims and has elected to (i) assign such Non-Estate Refco Claims to the Private Actions Trust and (ii) assign (or cause to be assigned) its allocable share of any proceeds of Class Action Claims to the Private Actions Trust. The Private Actions Trust shall be managed and operated by the Private Actions Trustee. The Private Actions Trustee will be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust, and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing. A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings (in each case, only to the extent such parties have assigned their Non-Estate Refco Claims to the Private Actions Trust) shall have certain approval rights on key issues relating to the operation and management of the Private Actions Trust. The Four members (other than VR) shall be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust.

(b)     To the extent that any Non-Estate Refco Claims cannot be transferred to the Private Actions Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Non-Estate Refco Claims shall be deemed to have been retained by the grantor, as applicable, and the Private Actions Trustee shall be deemed to have been designated as a representative of such grantor to enforce and pursue such Non-Estate Refco Claims on behalf of such grantor. Notwithstanding the foregoing, all net proceeds of such Non-Estate Refco Claims shall be transferred to the Private Actions Trust Beneficiaries consistent with the other provisions of this Plan and the Private Actions Trust Agreement.

**5.9     *No Revesting of Assets*.** Other than as set forth herein, the remaining property of the respective Estates, other than the Contributed Claims, which shall be transferred to and vest in the Litigation Trust, shall not revest in the Debtors or RCM on or following the Confirmation Date or Effective Date, but shall remain property of the respective Estates and continue to be subject to the jurisdiction of the Bankruptcy Court until distributed to Holders of Allowed Claims in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement. From and after the Effective Date, all such property shall be distributed in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement, without further order of the Court (except as specifically required). For the avoidance of doubt, the Debtors' or RCM's insurance policies shall remain property of their respective Estates in accordance with this section of the Plan, and shall not be subject to the rejection provisions of section 7.1 of the Plan.

**5.10     *Preservation on Rights of Action; Settlement of Litigation***

(a)     *Preservation Of Rights Of Action*. Except as otherwise provided herein, the Confirmation Order, the RCM Settlement Agreement, or in any other Plan Document, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors and RCM shall retain all Retained Causes of Action notwithstanding the Confirmation of the Plan and the occurrence of the Effective Date, to be administered and prosecuted after the Effective Date pursuant to the terms of the Plan.

(b)     *Settlement Of Litigation Claims Prior to the Effective Date*. At any time prior to the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors (and the RCM Trustee on behalf of RCM with respect to Litigation Claims of RCM) may settle any or all of the Litigation Claims with Bankruptcy Court approval pursuant to Bankruptcy Rule 9019, following notice to parties-in-interest and a hearing.

Any net proceeds obtained in respect of Litigation Claims prior to the Effective Date shall be contributed to the Litigation Trust.

### 5.11   *The Committees and the Plan Committee*.

(a)   *Dissolution of the Committees*.  The Committees shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and such other duties as they may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Committees shall be dissolved and their members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committees' attorneys, accountants, professionals and other agents shall terminate, except with respect to (i) all Professional Fees and matters relating to the Fee Committee, (ii) any appeals of the Confirmation Order and (iii) the continuation and completion of any litigation to which the Creditors' Committee or the Additional Committee, as applicable, is a party as of the Effective Date.  All expenses of members of the Committees and the fees and expenses of the Committees' professionals through the Effective Date shall be paid in accordance with any applicable orders of the Bankruptcy Court.  Counsel to the  Committees shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities authorized hereunder without further court approval upon the submission of invoices to the Reorganized Debtors.  Following the Effective Date, subject to actual conflicts of interest, none of the Committees' professionals shall be precluded from representing any entity acting for any successor fiduciaries or other entities created by this Plan, including the Plan Administrator, Plan Committee, Litigation Trustee or any of the Reorganized Debtors.

(b)   *Creation of Plan Committee; Procedures*.

(i)   Unless there are no parties in interest willing to serve, on the Effective Date, the Plan Committee shall be formed and constituted.  The Plan Committee shall be of a size determined by and composed of members chosen by the Joint Sub-Committee (exclusive of the Senior Subordinated Note Indenture Trustee and any Holder of a Senior Subordinated Note Claim); *provided, however*, that the Plan Committee shall include VR, Leuthold and Cargill and shall include the Senior Subordinated Note Indenture Trustee until such time as all payments in respect of the Senior Subordinated Note Holder Distribution have been made.  All proposed members of the Plan Committee shall be disclosed to the Bankruptcy Court on or before the Confirmation Hearing.  Membership on the Plan Committee shall be on an institutional and not on an individual basis.  In the event that a member of the Plan Committee resigns from its position on the Plan Committee, the remaining members shall have the right to designate its successor on the Plan Committee as set forth in the Plan Administrator Agreement.  The Plan Committee shall, absent further order of the Bankruptcy Court, have not fewer than three members.

(ii)   In the event that there are fewer than three members of the Plan Committee for a period of sixty (60) consecutive days, then the Plan Administrator may, during such vacancy and thereafter, in its sole discretion, ignore any reference in the Plan, the Plan Administrator Agreement or the Confirmation Order to the Plan Committee, and all references to the Plan Committee's ongoing duties and rights in the Plan, the Plan Administrator Agreement and the Confirmation Order shall be null and void.

(c)   *Standing of Plan Committee.*  The Plan Committee shall have independent standing to appear and be heard in the Bankruptcy Court as to any matter relating to the Plan, the Plan Administrator, the Estates or the Reorganized Debtors, including any matter as to which the Bankruptcy Court has retained jurisdiction pursuant to Article XI of the Plan.

(d)   *Function and Duration; Compensation and Expenses.*  The Plan Committee shall have ultimate supervisory authority over the Plan Administrator (but shall have no authority over the RCM Trustee, the RCM Estate or the Litigation Trustee, in such capacity).  The Plan Administrator shall report to the Plan Committee and the Plan Committee shall have the power to remove the Plan Administrator with or without cause.  The Plan Committee (i) shall be responsible for (A) instructing and supervising the Reorganized Debtors and the Plan Administrator with respect to their responsibilities under the Plan and the Plan Administrator Agreement, (B)

reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof, (C) reviewing and approving objections to and proposed settlements of Disputed Claims against the Contributing Debtors, FXA or the Reorganized Debtors, (D) performing such other duties that may be necessary and proper to assist the Plan Administrator and its retained professionals, and (ii) shall remain in existence until such time as the final Distributions under the Plan have been made by the Disbursing Agent, on behalf of the Reorganized Debtors. The members of the Plan Committee shall serve without compensation for their performance of services as members of the Plan Committee, except that they shall be entitled to reimbursement of reasonable expenses by the Reorganized Debtors to be paid from the Wind-Down Reserve. The Plan Committee may retain counsel or other professionals who shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses to be paid from the Wind-Down Reserve upon the submission of invoices to the Reorganized Debtors; provided, however, that any disputes related to such fees and expenses may be brought before the Bankruptcy Court.

(e)  *Liability; Indemnification.*  Neither the Plan Committee, nor any of its members or designees, nor any duly designated agent or representative of the Plan Committee, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Committee, nor shall any member be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Committee, other than acts or omissions resulting from such member's willful misconduct or gross negligence. The Reorganized Debtors shall indemnify and hold harmless the Plan Committee and its members and designees, and any duly designated agent or representative thereof (in their capacity as such), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan. To the extent the Reorganized Debtors indemnify and holds harmless the Plan Committee and its members and designees, or any duly designated agent or representative thereof (in their capacity as such), as provided above, the legal fees and related costs incurred by counsel to the Plan Committee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be advanced to the Plan Committee (and the Plan Committee undertakes to repay such amounts if it ultimately shall be determined that the Plan Committee is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any applicable insurance.

**5.12**  *Fee Committee.*  From and after the Confirmation Date, the members of the Fee Committee (including the RCM Trustee) and the Fee Committee's professionals shall continue to serve and be authorized to continue, in a manner consistent with practice before the Confirmation Date, to review, analyze, and prepare advisory reports with respect to applications for the payment of fees and the reimbursement of expenses of professionals retained in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court during the period up to and including the Confirmation Date, including, without limitation, final fee applications in accordance with sections 328, 330, 331, and 503 of the Bankruptcy Code. From and after the Confirmation Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the members of the Fee Committee to satisfy their duties and responsibilities. Notwithstanding the foregoing, unless otherwise provided by the Bankruptcy Court, the Fee Committee shall be dissolved and the members thereof and the professionals retained by the Fee Committee shall be released and discharged from their respective obligations upon the earlier to occur of (i) the date which is six (6) months after the Confirmation Date and (ii) resolution of all duties of the Fee Committee set forth in this section of the Plan.

**5.13**  *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests.*  With the exception of the equity interests of any Refco Entity held by any other Refco Entity pending wind-up and dissolution of such entities pursuant to this Plan, and except as otherwise provided in the Plan and in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Article V, the promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors or RCM under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged; provided, however, that the Senior Subordinated Notes Indenture shall continue in effect solely for the purposes of allowing the Senior Note Indenture Trustee to enforce the indemnity provisions of

the Senior Subordinated Note Indenture on account of the Senior Subordinated Note Indenture Trustee's service on the Plan Committee, to make the Distributions to be made on account of Senior Subordinated Note Claims under the Plan and, to the extent necessary, enforce the Senior Subordinated Note Indenture Trustee Charging Lien, after which point the Senior Subordinated Note Indenture shall be cancelled and discharged. The Holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan.

       **5.14**    *Sources of Cash for Plan Distributions*.  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors and the Plan Administrator to make payments pursuant to the Plan shall be obtained from the Reorganized Debtors' Cash balances and the liquidation of the Reorganized Debtors' and the Reorganized Debtors' remaining non-Cash assets, if any, including the Contributing Debtors BAWAG Proceeds. Cash payments to be made pursuant to the Plan to Holders of Allowed Claims and to the Senior Subordinated Note Indenture Trustee for the benefit of the Holders of Senior Subordinated Note Claims shall be made by the Reorganized Debtors (or any successor thereto) or, if the Disbursing Agent is an entity other than the Reorganized Debtors, the Disbursing Agent, which may be the Senior Subordinated Note Indenture Trustee. Distributions to be made on behalf of the RCM Estate pursuant to the Plan or the RCM Settlement Agreement shall be made by the RCM Trustee in accordance with the Plan, the RCM Settlement Agreement and applicable law.

       **5.15**    *Risk Sharing in Respect of Cargill Administrative Claim*.  In the event that Cargill receives a Cargill Administrative Claim, the amount of such Claim shall be borne by RCM and the Contributing Debtors as follows: (i) to the extent the allowance of the Cargill Administrative Claim reduces the Allowed amount of any RCM FX/Unsecured Claim held by Cargill, RCM shall bear for the benefit of the Contributing Debtors a portion of the Cargill Administrative Claim equal to forty percent (40%) of the amount of the RCM Difference; (ii) the Contributing Debtors shall next pay an amount up to the remainder of the Cargill Administrative Claim Amount; *provided, however,* that such payment pursuant to this subsection (ii) shall be capped at the amount that would cause recoveries of Holders of Allowed Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets plus the Contributing Debtors portion of the RGL FXCM Distribution to fall below 30% of the face amount of such Allowed Contributing Debtors General Unsecured Claims; and (iii) if not yet paid in full, the remainder of the Cargill Administrative Claim will be borne by the Contributing Debtors and RCM equally. For the avoidance of doubt, amounts to be borne by the Contributing Debtors shall be deducted from the amounts available for the Contributing Debtors General Unsecured Distribution and amounts to be borne by RCM shall be deducted from the amounts available for the RCM Cash Distribution.

       **5.16**    *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims*. Payment of Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims of the Contributing Debtors and of the RCM Estate and Allowed Administrative Claims of the Contributing Debtors and of the RCM Estate, other than amounts in respect of the RCM Advance, accrued through the Effective Date (excluding any amounts paid as of August 31, 2006) will be allocated such that RCM will first provide up to $60 million, the Contributing Debtors will next provide up to $120 million and to the extent that such Claims exceed $180 million in the aggregate, RCM and the Contributing Debtors will bear the cost of such excess (the "Excess Priority Claims") equally. Notwithstanding the preceding sentence, the Contributing Debtors may fund the payment of any Pre-Conversion Administrative Claim Amounts if and to the extent that the RCM Trustee and the Contributing Debtors determine such funding necessary to facilitate Distributions in respect of such amounts on the Effective Date; *provided, however,* that any amounts so paid by the Contributing Debtors shall be deducted from the RCM Cash Distribution in a manner that causes RCM to ultimately bear the cost of the Pre-Conversion Administrative Claim Amounts. FXA shall be responsible for all of its Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, *provided, however,* that professional services (other than those related to FXA's claims resolution process and issues unique to FXA after the initial date of the filing of this Plan) and overhead allocable to FXA in the period between the Plan Filing Date and the Plan Effective Date shall be borne by RCM and the Contributing Debtors as set forth in the preceding sentence. Only Allowed Administrative Claims accrued from the Petition Date through the Plan Effective Date that were or are paid after August 31, 2006 shall be counted toward the sharing allocation of the preceding three sentences; provided that the Contributing Debtors shall alone bear the cost of repaying the RCM Advance. To the extent RCM is responsible for bearing amounts in respect of Excess Priority Claims, payment of such amounts shall be made from Cash otherwise available for the RCM Cash Distribution. Allowed Administrative

Claims incurred by the Contributing Debtors after the Effective Date shall be borne by the Contributing Debtors out of the Cash or value that would otherwise be paid to Holders of Allowed Contributing Debtors General Unsecured Claims.  Allowed Administrative Claims incurred by RCM after the Effective Date shall be borne by RCM from the RCM Wind-Down Reserve, and, to the extent the RCM Wind-Down Reserve is not sufficient to pay such Allowed Administrative Claims, such Claims shall be paid directly by RCM out of the Cash or value that would otherwise be paid to Holders of Allowed Securities Customer Claims and RCM FX/Unsecured Claims as more particularly set forth in the RCM Settlement Agreement.  Allowed Administrative Claims incurred by FXA after the Effective Date shall be borne by the FXA out of the Cash or value that would otherwise be paid to Holders of Allowed FXA General Unsecured Claims.  All costs and expenses of administering the Litigation Trust described in section 5.7 shall be separately funded by the Litigation Trust and shall not be included in the calculation of the allocations of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims above.

       5.17    **Additional RCM Claim**.  If, at the conclusion of the claims reconciliation process, (x) the total Allowed Contributing Debtors General Unsecured Claims are less than $394 million, and (y) the Distributions to be made to Holders of Allowed Contributing Debtors General Unsecured Claims would result in a recovery for such Holders in excess of 35% from the sum of the Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution, RCM shall be entitled to an additional Claim.  Specifically, RCM shall be entitled to an additional Claim equal to the positive difference between $394 million minus the amount of the Allowed Contributing Debtors General Unsecured Claims.  This "Additional RCM Claim" shall participate Pro Rata in all Distributions from Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims that exceed the 35% recovery threshold set forth in clause (y) above; *provided*, *however*, that such Additional RCM Claim shall not be subject to the 40% limit on Distributions set forth in the Contributing Debtors General Unsecured Distribution.

       5.18    **Contributing Debtors BAWAG Proceeds**.  Notwithstanding the actual timing and source of any payments hereunder, so long as not inconsistent with the BAWAG Allocation Order, (i) a portion of BAWAG Guaranteed Proceeds equal to $100 million will be deemed to have been received by the Contributing Debtors and paid to the Secured Lenders under the Early Payment Order, (ii) a portion of BAWAG Guaranteed Proceeds equal to $150 million will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Senior Subordinated Note Claims, (iii) a portion of BAWAG Guaranteed Proceeds equal to $56.25 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims, and (iv) a portion of BAWAG Guaranteed Proceeds equal to $200 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by RCM or the Contributing Debtors and made available for Distribution to Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims.  For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan.  To the extent that a Holder of an Allowed Senior Subordinated Note Claim against the Contributing Debtors, a Holder of an Allowed Contributing Debtors General Unsecured Claim, a Holder of an Allowed RCM Securities Customer Claim or a Holder of an Allowed RCM FX/Unsecured Claim elects not to receive its allocable share of the Senior Subordinated Note Holder BAWAG Proceeds, the Contributing Debtors General Unsecured BAWAG Proceeds or the RCM BAWAG Proceeds, as applicable, such portion of BAWAG Proceeds shall be returned to BAWAG in accordance with the BAWAG Settlement.  For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan.

       5.19    **Exemption from Transfer Taxes**.  Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of any contract, lease, or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer

tax, or other similar tax. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property, approved by the Bankruptcy Court on or prior to the Effective Date, shall be deemed to have been in furtherance of, or in connection with, the Plan. Notwithstanding anything in this section of the Plan to the contrary, the exemption from taxes referenced in this section of the Plan shall only be to the extent permitted for under section 1146 of the Bankruptcy Code.

        **5.20**    ***RCM Settlement Agreement and Conversion***. This Plan incorporates the RCM Settlement Agreement in its entirety. On or prior to the Effective Date, the RCM Chapter 11 Case will, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM Chapter 11 Case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of claims between the chapter 7 Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan. In the event that the RCM Estate does not convert to chapter 7, the Distributions to RCM's creditors shall be governed by the terms of the RCM Settlement Agreement and this Plan.

        **5.21**    ***Allowance of VR/Leuthold Guarantee Claims***. The VR/Leuthold Guarantee Claims shall be Allowed Contributing Debtors General Unsecured Claims (subject, however, to allowance of the underlying Claims against RCM) unless objected to by the Contributing Debtors prior to entry of the Confirmation Order. No party other than the Contributing Debtors shall be authorized to object to or otherwise challenge the VR/Leuthold Guarantee Claims. The Contributing Debtors will not object to or otherwise challenge the VR/Leuthold Guarantee Claims based on or related to any of the following theories or issues: the corporate structure or business practices of any of the Contributing Debtors; alter ego; substantive consolidation; fraud; or any other theories or causes of action similar to the foregoing. The Contributing Debtors, however, may object to the VR/Leuthold Guarantee Claims based on facts specific to a particular VR/Leuthold Guarantee Claim, including, but not limited to, objections based on Bankruptcy Code avoidance theories or challenges to the purported dollar amount of the asserted claims.

        **5.22**    ***Wind-Up of Non-Debtor Affiliates***. All Non-Debtor Affiliates, other than the direct or indirect subsidiaries of RCM and Refco LLC, shall be wound up and dissolved as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to the Contributing Debtors and Refco LLC on account of intercompany balances (or equity dividends where applicable). All Non-Debtor Affiliates that are direct or indirect subsidiaries of RCM shall be wound up as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to RCM on account of intercompany balances (or equity dividends where appropriate). The direct and indirect subsidiaries of RCM shall be wound up and dissolved by the RCM Trustee and the remainder of the Non-Debtor Affiliates shall be wound up and dissolved by the Plan Administrator.

        **5.23**    ***FXCM***. If not liquidated in advance of the Effective Date, RGL's 35% interest in FXCM shall become an interest of and be held by Reorganized Refco upon the merger of RGL into Reorganized Refco pursuant to section 5.1 of this Plan. The Plan Administrator shall exercise all rights of Reorganized Refco in respect of the 35% interest in FXCM. Notwithstanding the above, the FXCM Committee shall be formed to coordinate on all matters relating to the disposition or distribution of the 35% interest in FXCM. If not formed as of the Effective Date pursuant to the Plan Support Agreement, the members of the FXCM Committee, other than the RCM Trustee, shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee). All decisions in respect of the disposition or distribution of the 35% interest in FXCM shall be made by Reorganized Refco; *provided, however*, that no such decision shall be made by Reorganized Refco without first consulting with the FXCM Committee and, to the extent permitted by applicable law, obtaining the consent of the FXCM Committee. Bylaws of the FXCM Committee shall be established by the FXCM Committee after its formation and shall be substantially in the form attached hereto as Exhibit J.

**5.24** **Examiner**. No provision of the Plan shall be construed as impairing the Examiner's investigation, and his authority to file his report in accordance with the provisions of the Examiner Order and the additional directions given by the Bankruptcy Court at the Hearing held on June 21, 2006, even if such investigation concludes, and such filing occurs, after the occurrence of the Effective Date. Unless otherwise ordered by the Bankruptcy Court prior to the Effective Date, the procedures with respect to the filing and consideration of the Examiner's Fee Applications and Requests for Reimbursements of Expenses shall continue after the Effective Date in the same manner as prior to the Effective Date as provided in the Examiner Order.

**5.25** **Transfer of Tranche B Litigation Trust Interests**. In consideration of the litigation expenses and potential delay avoided by the withdrawal of the objections to this Plan asserted by the Ad Hoc Equity Committee, the Beneficiaries of Tranche A Litigation Trust Interests (the RCM Estate, Holders of Allowed Contributing Debtors General Unsecured Claims and Holders of Allowed FXA General Unsecured Claims) shall be deemed to have transferred to each Holder of an Allowed Class 8 Old Equity Interest who has made a Private Actions Trust Election a Pro Rata share of the Tranche B Litigation Trust Interests.

# ARTICLE VI

# PROVISIONS GOVERNING DISTRIBUTIONS

**6.1** **RCM Rights Distribution**. On the Effective Date the Plan Administrator shall be deemed to have made the RCM Rights Distribution to the RCM Trustee and the Plan Administrator or the RCM Trustee, as the case may be, shall establish the RCM Distribution Reserve. Unless a Holder of an RCM FX/Unsecured Claim or RCM Securities Customer Claim has decided to not participate in the RCM Cash Distribution by electing not to (i) assign such Holder's RCM Related Claims, if any, to the Litigation Trust; (ii) affirm its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate shall be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing Claims against and equity Interests in the applicable Contributing Non-Debtor Affiliate, and (iii) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any, such Holder will receive its applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution. Upon contribution of the RCM Related Claims against any Debtor to the Litigation Trust, such Claims will be deemed Allowed.

**6.2** **Distributions for Claims Allowed as of the Effective Date**. Except as otherwise provided herein or as ordered by the Bankruptcy Court, Distributions to be made on account of Claims against FXA, the Contributing Debtors or RCM that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable; *provided*, *however*, that the Disbursing Agent, on behalf of the Reorganized Debtors, shall not make Distributions to Holders of Allowed Claims (other than Allowed Secured Lender Claims) that are not Senior Subordinated Note Claims until all Reserves have been established and adequately funded in accordance with the terms of this Plan and the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution have been paid in full; *provided further*, *however*, that the RCM Trustee shall not be required to make Distributions until all RCM Reserves have been established and adequately funded in accordance with the terms of this Plan and the RCM Settlement Agreement. Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**6.3** **Distributions of Proceeds of the Litigation Trust**. Pursuant to the terms and conditions set forth in the Litigation Trust Agreement, the Litigation Trustee shall transfer all the Contributed Claims Recoveries to the Disbursing Agent or the RCM Trustee for Distribution in accordance with the provisions of this Plan and the RCM Settlement Agreement.

**6.4** **Single Distribution**. Except with respect to Allowed Secured Lender Claims and Senior Subordinated Note Claims, any Holder of a Claim asserted against more than one Debtor (or a Debtor and RCM), shall be entitled to a Distribution from only the Refco Entity with which such Holder was in privity or had another direct right to payment not predicated upon theories of fraud, piercing the corporate veil, alter ego, domination,

constructive trust or other equitable principles arising from a lack of knowledge of the true prepetition financial condition of the Refco Entities (whether that results in Distribution from RCM, FXA, or the Contributing Debtors), and all RCM Related Claims and Other Related Claims shall be subordinated and shall receive no Distribution from the assets of the applicable Debtor or RCM, as the case may be, unless and until such time as all Allowed General Unsecured Claims (or in the case of RCM, all Allowed RCM Securities Customer Claims, Allowed RCM FX/Unsecured Claims and Allowed Leuthold Metals Claims) against the applicable Debtor or RCM, as the case may be, have been paid in full; *provided, however*, that (A) any Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by RCM, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from RCM under this Plan), (B) any Holder of a Contributing Debtors General Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by such Contributing Debtor, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the guaranteeing Contributing Debtor shall not be limited to the amount remaining after recovery from non-guaranteeing Contributing Debtor under this Plan) and (C) any Holder of a Claim against FXA with an independent Claim against the Contributing Debtors or RCM based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by FXA, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from FXA under this Plan). In addition, subject to the earning of interest in respect of the Litigation Trust as set forth in section 5.7 of this Plan no Holder of a Claim against one or more Debtors (or a Debtor and RCM) shall receive a Distribution under the Plan that results in greater than a 100% recovery on such Holder's Claim (which, in the case of a Holder of both a primary Claim against a Debtor or RCM and a contractual guarantee from another Debtor or RCM, shall mean no more than a cumulative 100% recovery on the underlying Claim amount owed by the primary obligor).

      **6.5**    *Accounts; Escrows; Reserves for the Reorganized Debtors*. The Plan Administrator, on behalf of the Reorganized Debtors, in accordance with the provisions of the Plan Administrator Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan. The Plan Administrator shall dispose of non-Cash assets of the Estates of the Reorganized Debtors, if any, in accordance with the provisions of the Plan and the Plan Administrator Agreement.

      (a)    *Administrative/Priority Claims Reserve.* On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator shall, subject to the provisions of section 5.16 hereof, create and fund the Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of the Contributing Debtors and FXA, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full. The Plan Administrator may increase the amount of the Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the Claims Distribution Account.

      (b)    *Disputed Claims Reserve.*

      (i)    The Plan Administrator shall create and fund the Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Contributing Debtors General Unsecured Distribution or the FXA General Unsecured Distribution, as applicable, that would have been made to each Holder of a Disputed Claim against the Contributing Debtors or FXA if such Claim were an Allowed Contributing Debtors General Unsecured Claim or an Allowed FXA General Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided*, *however*, that the Debtors, the Plan Administrator or the

Reorganized Debtors may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

            (ii)   The Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims against the Contributing Debtors or FXA whose Claims have become Allowed Claims.

            (iii)   If any Cash or Litigation Trust Interests remains in the Disputed Claims Reserve after all Disputed Claims against the Contributing Debtors and FXA have been resolved, such remaining assets shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, the Plan Administrator may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

            (iv)   The Plan Administrator shall maintain two sub-accounts within the Disputed Claims Reserve for (i) the Contributing Debtors and (ii) FXA.

        (c)    *Wind-Down Reserves.*  On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator, on behalf of the Reorganized Debtors, shall create and fund the Wind-Down Reserve with sufficient Cash to administer the Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals.  The Plan Administrator may make reasonable adjustments to the Wind-Down Reserve as necessary.  Any Cash in the Wind-Down Reserve which is unnecessary for the administration of the Plan shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution to Holders of Allowed Claims against the Contributing Debtors or FXA, as applicable, in accordance with the terms hereof.

        **6.6**    *Accounts; Escrows; Reserves for the Post-Confirmation RCM*.  The RCM Trustee, on behalf of Post-Confirmation RCM, in accordance with the provisions of the RCM Settlement Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, RCM Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan.  The RCM Trustee shall dispose of non-Cash assets of the RCM Estate, if any, in accordance with the provisions of the Plan and the RCM Settlement Agreement and applicable law.

        (a)    *RCM Administrative/Priority Claims Reserve*.  On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee shall, subject to the provisions of section 5.16 hereof, create and fund the RCM Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of RCM, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full.  The RCM Trustee may increase the amount of the RCM Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the RCM Claims Distribution Account.  If the Chapter 11 Case of RCM is converted to a case in chapter 7, prior to any conversion the RCM Trustee shall be entitled to set aside appropriate reserves for Administrative Claims incurred or to be incurred prior to conversion, with the amounts of such Administrative Claims to be payable from the reserves upon allowance of the Claims therefor so long as the RCM Trustee has determined that there are or will be sufficient funds available to pay all Administrative Claims of the chapter 7 case.

(b)     *RCM Disputed Claims Reserve*.

(i)    The RCM Trustee shall create and fund the RCM Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Distribution that would have been made to each holder of a Disputed Claim against RCM if such Claim were an Allowed RCM Securities Customer Claim or RCM FX/Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however*, that the RCM, Post-Confirmation RCM or the RCM Trustee may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)    The RCM Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the RCM Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims whose Claims against RCM have become Allowed Claims.

(iii)    If any Cash or Litigation Trust Interests remain in the RCM Disputed Claims Reserve after all Disputed Claims against RCM have been resolved, such remaining amounts shall be transferred to Post-Confirmation RCM for Distribution in accordance with the terms of the Plan and the RCM Settlement Agreement.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim against RCM, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however*, that, if the estimate constitutes the maximum limitation on such Claim, the RCM Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)    The RCM Trustee shall maintain sub-accounts within the RCM Disputed Claims Reserve for RCM Securities Customer Claims and RCM FX/Unsecured Claims.  Each sub-account shall be further subdivided for Assets in Place and Additional Property (each as defined in the RCM Settlement Agreement).  The RCM Trustee may maintain such other reserves as are permitted by the RCM Settlement Agreement.

(v)    Distributions of Additional Property under the RCM Settlement Agreement on behalf of RCM Securities Customer Claims and RCM FX/Unsecured Claims shall be made Pro Rata (as such term is defined in the RCM Settlement Agreement).  True up Distributions (as defined in the RCM Settlement Agreement)  shall be made from time to time from Additional Property as determined by the RCM Trustee.  The RCM Reserves shall take into account the requirement to true up with respect to Pro Rata (as defined in the RCM Settlement Agreement) shares of Additional Property.

(c)     *RCM Distribution Reserve*.  On the Effective Date, the Plan Administrator shall create and fund the RCM Distribution Reserve.  Each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the Plan Administrator with an RCM Related Claim Subordination Form shall receive from the Plan Administrator on the next available Distribution Date its allocable share (as determined by the RCM Trustee consistent with their elections) of the RCM Distribution Reserve (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot); *provided, however*, if the RCM Settlement Agreement is amended prior to the Confirmation Hearing so as to permit the RCM Trustee to receive conditional Distributions of Additional Property (as defined in the RCM Settlement Agreement) and to not require an immediate distribution of all assets received by the RCM Trustee to Holders of Allowed Claims against RCM, any amounts that would have been held in the RCM Distribution Reserve shall be transferred to the RCM Trustee who shall then distribute such funds on the next available Distribution Date to each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the RCM Trustee with an RCM Related

Claim Subordination Form (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot). In the event that any Holder of an RCM Related Claim has not provided an RCM Related Claim Subordination Form, but the RCM Related Claim of such Holder is subsequently expunged by objection of the Plan Administrator, the reserve in respect of such Claim shall be distributed (net of costs of expunging the RCM Related Claim) by the RCM Trustee or the Plan Administrator, as applicable, Pro Rata (as defined in the RCM Settlement Agreement) to such Holder and to those Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that provided the Plan Administrator or the RCM Trustee, as applicable, with an RCM Related Claim Subordination Form. In the event that any RCM Related Claim becomes an Allowed Claim, the reserve in respect of such Claim shall be deposited in the Claims Distribution Account for Distribution in accordance with the terms of this Plan.

(d)    *RCM Wind-Down Reserve.* On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee or the Plan Administrator, as the case may be, on behalf of Post-Confirmation RCM, shall create and fund the RCM Wind-Down Reserve with sufficient Cash from the RCM Cash Distribution to administer the Plan and the RCM Settlement Agreement, including, but not limited to, compensation of the RCM Trustee and RCM Administrative Professionals. The RCM Trustee may make reasonable adjustments to the RCM Wind-Down Reserve as necessary. Any Cash in the RCM Wind-Down Reserve which is unnecessary for the administration of the Plan and the RCM Settlement Agreement shall be transferred to Post-Confirmation RCM for Distribution to Holders of Allowed Claims against RCM in accordance with the terms hereof.

6.7    *Interest and Penalties on Claims*. Unless otherwise specifically provided for in this Plan, the Confirmation Order or another order of the Court (including, without limitation, the Early Payment Order), or if required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

6.8    *Distributions by Disbursing Agent and RCM Trustee*. All Distributions under the Plan on behalf of the Reorganized Debtors shall be made by the Disbursing Agent at the direction of the Plan Administrator and all Distributions under the Plan and the RCM Settlement Agreement on behalf of RCM shall be made by the RCM Trustee. The Disbursing Agent and the RCM Trustee shall be deemed to hold all property to be distributed by each hereunder in trust for Persons entitled to receive the same. The Disbursing Agent and the RCM Trustee shall not hold an economic or beneficial interest in such property.

6.9    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*.

(a)    *Delivery Of Distributions In General.* Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' or RCM's records unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001; *provided*, *however*, Distributions on account of Senior Subordinated Note Claims shall be made to the Senior Subordinated Note Indenture Trustee who shall, in turn, administer such Distributions to the Holders of Senior Subordinated Note Claims in accordance with the terms of the Senior Subordinated Note Indenture. The Senior Subordinated Note Indenture Trustee shall be authorized but not required to effect any Distribution under the Plan through the book entry transfer facilities of The Depositary Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution. Distributions on account of Secured Lender Claims shall be made to the Secured Lender Agent, who shall in turn administer such Distributions in accordance with the terms of the Credit Agreement.

(b)    *Undeliverable and Unclaimed Distributions.*

(i)    *Holding and Investment of Undeliverable and Unclaimed Distributions*. If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent or the RCM Trustee, as applicable, as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent or the RCM Trustee, as applicable, is notified in writing of such Holder's then current address. Undeliverable and unclaimed Distributions shall be deposited in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as the case may be, until

such time as a Distribution becomes deliverable or is unclaimed in accordance with this section of the Plan. The accounts for the Unclaimed Distribution Reserve and RCM Unclaimed Distribution Reserve may be interest-bearing accounts, provided that any interest accruing on funds in the Unclaimed Distribution Reserve shall be transferred to the Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof and any interest accruing on funds in the RCM Unclaimed Distribution Reserve shall be transferred to the RCM Trustee for Distribution in accordance with the terms of this Plan and the RCM Settlement Agreement.

     (ii)  *After Distributions Become Deliverable*. The Disbursing Agent or RCM Trustee, as applicable, shall make all Distributions that have become deliverable or have been claimed since the Effective Date or the next Quarterly Distribution Date as soon as practicable after such Distribution has become deliverable.

     (iii)  *Failure to Claim Undeliverable Distributions*. Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed Distribution within one year after the applicable date of Distribution shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtors, RCM or their Estates, the Reorganized Debtors, the Plan Administrator, Post-Confirmation RCM, the RCM Trustee or their property. In such cases, any Cash in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as applicable, for Distribution on account of such Claims for undeliverable or unclaimed Distributions shall become the property of the applicable Estate free of any restrictions thereon. Such unclaimed or undeliverable funds shall be transferred to the Reorganized Debtors or Post-Confirmation RCM, as applicable, to be distributed in accordance with the terms of the Plan or the RCM Settlement Agreement. Nothing contained in this Plan, the Plan Administrator Agreement or the RCM Settlement Agreement shall require the Disbursing Agent or the RCM Trustee to attempt to locate any Holder of an Allowed Claim.

    (c)  *Time Bar to Cash Payments*. Checks issued by the Disbursing Agent or the RCM Trustee, as applicable, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent or the RCM Trustee, as applicable, by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors or RCM, as the case may be, shall retain all monies related thereto for the sole purpose of redistribution to Holders of Allowed Claims or Interests in accordance with the terms of this Plan and the RCM Settlement Agreement, as applicable.

    **6.10**  *Record Date for Distributions*. With respect to all Claims except Senior Subordinated Note Claims, the Disbursing Agent or the Plan Administrator or the RCM Trustee, as applicable, shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes herein to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date. No Distribution Record Date shall be established for Distributions on account of Senior Subordinated Note Claims.

    **6.11**  *Distributions to Holders of Senior Subordinated Note Claims*. As a condition precedent to receiving any Distribution under this Plan on account of an Allowed Senior Subordinated Note Claim, the registered Holders (as defined in the Senior Subordinated Note Indenture) of such Senior Subordinated Note Claim shall surrender any certificate(s) evidencing such Senior Subordinated Note Claim in accordance with written instructions to be provided to such registered Holders (as defined in the Senior Subordinated Note Indenture) and the Senior Subordinated Note Indenture Trustee by the Plan Administrator (in consultation with the Senior Subordinated

Note Indenture Trustee, and consistent with customary market practice), unless waived in writing by the Debtors or the Plan Administrator.

      **6.12**     *Senior Subordinated Notes Indenture Trustee as Claim Holder*.  Consistent with Bankruptcy Rule 3003(c), the Debtors or the Plan Administrator, as the case may be, shall recognize a proof of claim filed by the Senior Subordinated Notes Indenture Trustee in respect of the Senior Subordinated Notes Claims. Accordingly, any Senior Subordinated Note Claim, proof of which is filed by the registered or beneficial Holder of a Senior Subordinated Note Claim, may be disallowed as duplicative of any Senior Subordinated Note Claims of the Senior Subordinated Notes Indenture Trustee, without need for any further action or Bankruptcy Court order.  For the avoidance of doubt, the Senior Subordinated Notes Indenture Trustee shall be authorized to distribute amounts received in respect of Senior Subordinated Note Holder Distributions.

      **6.13**     *Allocation of Plan Distributions Between Principal and Interest*.  Except for Distributions made in respect of Allowed Secured Lender Claims, which shall be made in accordance with the Credit Agreement, to the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

      **6.14**     *Means of Cash Payment*.  Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Plan Administrator or the RCM Trustee, as applicable, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Plan Administrator or the RCM Trustee, as applicable.  Cash payments to foreign creditors may be made, at the option of the Plan Administrator or the RCM Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

      **6.15**     *Withholding and Reporting Requirements*.  In connection with this Plan and all Distributions thereunder, the Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, on behalf of the Reorganized Debtors, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent, the Plan Administrator and the RCM Trustee, on behalf of the Reorganized Debtors and RCM, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

      **6.16**     *Setoffs*.  Unless prohibited by the terms of this Plan or any other Plan Document, the Plan Administrator on behalf of the Reorganized Debtors or the RCM Trustee on behalf of Post-Confirmation RCM, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever (other than the Released/Subordinated Claims) that the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or Post-Confirmation RCM of any such claim that the Debtors, RCM, Post-Confirmation RCM or the Reorganized Debtors may have against such Holder.

      **6.17**     *Fractional Dollars*.  Notwithstanding any other provision of the Plan, the Plan Administrator Agreement or the RCM Settlement Agreement, none of the Plan Administrator, the Reorganized Debtors, the RCM Trustee or RCM, as applicable, shall be required to make Distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

      **6.18**     *Release of Liens*.  Except as otherwise provided in this Plan or in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, all mortgages, deeds of trust, liens, pledges, or other security interests (collectively, the "Mortgages") in and against the property of any Estate automatically shall be fully released and discharged, and all such property shall be free and

clear of all such Mortgages. Nothing in the Plan shall be deemed, asserted or construed to affect the Senior Subordinated Notes Indenture Trustee Charging Lien.

# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1** **Rejected Contracts and Leases.** Except as otherwise provided in the Confirmation Order, the Plan, or in any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is identified in Exhibit D to this Plan as a contract or lease to be assumed; *provided*, *however*, that the Debtors may amend such exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.2** **Bar to Rejection Damages.** If the rejection of an executory contract or unexpired lease pursuant to section 7.1 above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Reorganized Debtors, the Plan Administrator, or their respective successors or properties unless a proof of Claim is filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

**7.3** **Assumed and Assigned Contracts and Leases.** Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code assuming, as of the Effective Date, those executory contracts and unexpired leases listed on Exhibit D to this Plan; *provided*, *however*, that the Debtors may amend such Exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.4** **Compensation and Benefit Programs.** All Employee Benefit Plans, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date shall be deemed to be, and shall be treated as if they were, executory contracts that are subject to rejection in accordance with section 7.1 of the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code).

**7.5** **Treatment of RCM Executory Contracts and Unexpired Leases.** Notwithstanding the preceding sections of this Article VII, the RCM Trustee shall determine the appropriate treatment for the executory contracts and unexpired leases of RCM in accordance with applicable law and the RCM Settlement Agreement.

# ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**8.1** **Objection Deadline; Prosecution of Objections.** Subject to section 5.21 of this Plan, no later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the Plan Administrator on behalf of the Reorganized Debtors, after consultation with the Plan Committee, may file objections to Claims or Interests against FXA and the Contributing Debtors that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. No later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the RCM

Trustee on behalf of Post-Confirmation RCM may file objections to Claims or Interests against RCM that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. Nothing contained herein, however, shall limit the ability of the Plan Administrator or the RCM Trustee, as applicable, to object to Claims or Interests, if any, filed or amended after the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable. Subject to limitations set forth in the Plan Administrator Agreement and the Plan, as applicable, the Plan Administrator shall be authorized to, and shall, dispose of all Disputed Claims or Interests by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court as may have jurisdiction the validity, nature, and/or amount thereof. The RCM Trustee shall have sole discretion and authority to object to any RCM Claims or Interests in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

>      **8.2**      *No Distributions Pending Allowance*. Notwithstanding any other provision of this Plan, no payments or Distributions shall be made with respect to any disputed portion of a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest have been settled or withdrawn or have been determined by Final Order and the Disputed Claim or Interest, or some portion thereof, has become an Allowed Claim or Interest.

>      **8.3**      *Distributions After Allowance*. The Disbursing Agent on behalf of the Reorganized Debtors and the RCM Trustee on behalf of RCM shall make payments and Distributions from the Disputed Claims Reserve and the RCM Disputed Claims Reserve, as applicable, to the Holder of any Disputed Claim or Interest that has become an Allowed Claim or Interest, or any portion of which has become Allowed, on the first Quarterly Distribution Date following the date that such Disputed Claim or Interest becomes an Allowed Claim. Such Distributions shall be made in accordance with the Plan, the Plan Administrator Agreement and the RCM Settlement Agreement, as applicable.

# ARTICLE IX

## CONFIRMATION AND CONSUMMATION OF THE PLAN

>      **9.1**      *Conditions to Confirmation*.

>           (a)      The Confirmation Order shall be reasonably acceptable in form and substance to the Plan Proponents (and with respect to any matter affecting the Secured Lender Agent and/or the Secured Lenders, the Secured Lender Agent);

>           (b)      The Confirmation Date of this Plan shall have occurred on or before December 15, 2006; and

>           (c)      The Plan Proponents shall have determined and shall have filed with the Bankruptcy Court a notice confirming that the Allotted Administrative Claims are not reasonably expected to exceed, in the aggregate, $180 million;

>           (d)      Houlihan and Capstone shall have each filed with the Bankruptcy Court in advance of the Voting Deadline, its respective RCM Projection and Contributing Debtors Projection.

>           (e)      Either (i) both of the Houlihan and Capstone RCM Projections shall be equal to or exceed $430 million, or (ii) in the event that one such RCM Projection is less than $430 million and the other is equal to or exceeds $430 million, the Bankruptcy Court (after reviewing both RCM Projections and the assumptions therein) shall have determined that the appropriate RCM Projection is equal to or exceeds $430 million; and

>           (f)      Either (i) both of the Houlihan and Capstone Contributing Debtors Projections shall be equal to or exceed $64 million, or (ii) in the event that one such Contributing Debtors Projection is less than $64 million and the other is equal to or exceeds $64 million, the Bankruptcy Court (after reviewing both RCM

Projections and the assumptions therein) shall have determined that the appropriate Contributing Debtors Projection is equal to or exceeds $64 million.

     **9.2**      *Conditions to Effective Date*. The Plan Proponents shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Plan Proponents in accordance with the terms hereof prior to December 31, 2006:

     (a)     The Confirmation Order, in form and substance reasonably satisfactory to the Plan Proponents, shall have been entered and not thereafter stayed, reversed or vacated and shall, among other things, provide that:

     (i)     the Debtors, the Plan Administrator, on behalf of the Reorganized Debtors, and the RCM Trustee on behalf of Post-Confirmation RCM are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; and

     (ii)     the provisions of the Confirmation Order are non severable and mutually dependent.

     (b)     Unless the condition set forth in paragraph 15(a) of the Early Payment Order that the Early Payment Order shall have become a Final Order in full force and effect shall have been waived in accordance therewith, the Early Payment Order shall have become a Final Order and shall be in full force and effect;

     (c)     The RCM Settlement Agreement shall have been approved by the Bankruptcy Court and shall have become effective by satisfaction of all conditions to effectiveness therein.

     (d)     All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

     (e)     The Secured Lender Payment Date shall have occurred; and

     (f)     The Debtors shall have sufficient Cash to make all required payments to be made on the Effective Date.

     (g)     All amounts owed, as of the Effective Date, to the Secured Lender Agent and/or any Secured Lender pursuant to paragraph 12 of the Early Payment Order shall have been paid in full.

     **9.3**      *Waiver of Conditions*. Each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the Plan Proponents by agreement, without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided, however,* in the event that such waiver is not unanimous, the waiving Plan Proponents shall be required to obtain approval of the Bankruptcy Court to effect such waiver, following notice and a hearing and; *provided further,* the conditions set forth in the parenthetical of section 9.1(a) and sections 9.2(b), (e) and (g) hereof shall not be waived without the consent of the Secured Lender Agent and Secured Lenders that hold the number and amount of Secured Lender Claims required to accept a plan pursuant to section 1126(c) of the Bankruptcy Code (as if, for purposes of this paragraph, such Secured Lender Claims were impaired). The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Plan Proponents. The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

     **9.4**      *Consequences of Non-Occurrence of Effective Date*. In the event that the Effective Date does not timely occur, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court

directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan, other than those contained in the RCM Settlement Agreement, be null and void. In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of 60 days after the date the Confirmation Order is vacated, without prejudice to further extensions.

## ARTICLE X

## EFFECT OF PLAN CONFIRMATION

      10.1    *Binding Effect*. This Plan, and all compromises and settlements contemplated hereby or incorporated by reference herein, shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors and any Chapter 7 trustee appointed to administer any of the Estates.

      10.2    *Releases*.

      (a)    **Releases by the Debtors and RCM. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and RCM (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, RCM, Post-Confirmation RCM, the Chapter 11 Cases, this Plan, the Disclosure Statement or the RCM Settlement Agreement and that could have been asserted by or on behalf of the Debtors, RCM, their Estates, the Reorganized Debtors or Post-Confirmation RCM, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in any such case, against the Released Parties. For the avoidance of doubt, Released/Subordinated Claims shall include any and all claims and causes of action against the Released Parties, acting in such capacity, arising from or relating to (w) the Debtors' and RCM's centralized cash management system and intercompany transfers other than the RCM Intercompany Claim and Intercompany Claims with respect to Non-Debtor Affiliates, (x) the leveraged recapitalization in August 2004, (y) the initial public offering, and any related transactions effectuated in August 2005/September 2005, and (z) any transfer or payment made in respect of the Credit Agreement or the Senior Subordinated Note Indenture, including any redemption of Senior Subordinated Notes, which shall include any Claim or cause of action arising therefrom pursuant to sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.**

      (b)    **Releases by Holders of Claims and Interests in Respect of Released Parties. On the Effective Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities (other than the right to enforce Released Parties' obligations under the Plan, the Confirmation Order, and the contracts, instruments, releases, agreements, and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the**

Plan - 55

Effective Date in any way relating to the Debtors, RCM the Chapter 11 Cases, the Plan, or the Disclosure Statement, in any such case, against the Released Parties.

(c)     *Releases and Subordination by Holders of Claims and Interests in Respect of Contributing Non-Debtor Affiliates and Contributing Non-Debtor Affiliate Management.*  On each Contributing Non-Debtor Affiliate Trigger Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution under the Plan in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to (a) subordinate all claims of the type described in section 10.2(b) against the applicable Contributing Non-Debtor Affiliate to all other existing claims against and equity interests in such Contributing Non-Debtor Affiliate, and (b) release all claims of the type described in section 10.2(b) against parties who are Contributing Non-Debtor Affiliate Management of such Contributing Non-Debtor Affiliate; *provided, however*, that the RCM Trustee, with the consent of the Plan Committee, may deem any subordination referenced in section 10.2(c) to be a "release" of claims (and may request the Bankruptcy Court to enter an Order confirming the same) to the extent the RCM Trustee determines such a release necessary to ensuring that the applicable Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash to the Contributing Debtors and RCM or, if insufficient Cash will be available for Distribution to RCM and the Contributing Debtors, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors.

(d)     *Qualifying Plan Releases.*  In order to obtain for the estates of the Debtors the full benefits of the Early Payment Order, including the final allowance of Secured Lender Indemnification Claims at zero for purposes of the Chapter 11 Cases pursuant to paragraph 9(a) and (b) of the Early Payment Order, any Secured Lender Released Claims not previously released under the Early Payment Order are hereby fully, finally and forever released as of the Effective Date.   For the avoidance of doubt, the releases provided under this section 10.2(d) of the Plan shall be interpreted such that their scope will satisfy the requirements under the Early Payment Order for the Plan to be a Qualifying Plan thereunder.

(e)     *Releases by Recipients of BAWAG Proceeds.*  On the Effective Date, or in the case of Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims, the later of the Effective Date and the date at which an RCM Related Claim Subordination Form is provided (i) each Holder of a Secured Lender Claim, (ii) each Holder, that has not affirmatively exercised its option to be excluded from any Distribution of BAWAG Proceeds prior to the Voting Deadline, of (A) a Senior Subordinated Note Claim, or (B) a Contributing Debtors General Unsecured Claim, or (iii) each Holder, that has provided an RCM Related Claim Subordination Form electing to receive RCM BAWAG Proceeds, of (A) an RCM Securities Customer Claim or (B) an RCM FX/Unsecured Claim, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities against BAWAG, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way arising from or relating to Refco or the RGHI Entities (each as defined in the BAWAG Settlement), and any transactions involving such parties, including, but not limited to, claims or actions arising from or related to (a) the allegations set forth in the Complaint and the Counterclaim (each as defined in the BAWAG Settlement), (b) the allegations set forth in the Adversary Proceeding (as defined in the BAWAG Settlement), or (c) any allegations that could have been made by any of the Refco Parties (as defined in the BAWAG Settlement); *provided however,* that pursuant to the Securities Class Action Stipulation, any Holder of a Claim or Interest against the Debtors, that is also a member of the securities class action class described in the Securities Class Action Stipulation may, assuming approval of the Securities Class Action Stipulation (and the settlement contained therein), elect to receive BAWAG Proceeds without releasing BAWAG of its Securities Class Action claims as set forth in this subparagraph.

(f)     *Injunction Related to Releases.*  The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively, or otherwise, of any

**claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this Plan or the Early Payment Order, including, but not limited to, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released in this section of the Plan. For the avoidance of doubt, neither the Litigation Trust nor the Private Actions Trust shall bring any action to recover on any Released/Subordinated Claims.  Notwithstanding any provision contained herein or any provision in any documents incorporating or implementing in any manner the Plan to the contrary, nothing in this Plan or the transactions approved hereby is intended to or shall release any non debtor of any liabilities or obligations to the United States of America or its agencies or subdivisions (the "United States"), nor shall it enjoin or bar any claim by the United States against any Non-Debtor Affiliate.**

        **10.3**    *Exculpation and Limitation of Liability*.  To the maximum extent permitted by the Bankruptcy Code and applicable law, none of the (a) Debtors, (b) RCM, (c) the Reorganized Debtors, (d) the Plan Administrator, (e) any professionals retained by the Debtors or the RCM Trustee pursuant to an order of the Bankruptcy Court, (f) the Committees (including any present and former members thereof), (g) the RCM Trustee, (h) the parties to the RCM Settlement Agreement and the Plan Support Agreement (in such capacities), (i) the Post-Petition Management, (j) Post-Confirmation RCM, (k) the chapter 7 trustee appointed in Refco LLC's chapter 7 case, (l) AlixPartners, (m) the members of the Portfolio Management Advisory Committee and the Plan, Negotiation, and Litigation Advisory Committee, in each case, established under the RCM Settlement Agreement and in each case acting in such capacities, (n) the Ad Hoc Equity Committee, (o) the Ad Hoc Committee of  Senior Subordinated Note Holders. (p) the Senior Subordinated Note Indenture Trustee in its role of effectuating Distributions to Holders of Senior Subordinated Notes nor (q) any of their respective representatives, agents, officers, directors, employees, advisors, or attorneys shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the RCM Settlement Agreement or, if on or prior to the Effective Date, RCM's Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7, related to, or arising out of, the chapter 7 case, formulating, negotiating, or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

        **10.4**    *No Discharge of Claims; Injunction*.

        (a)    Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Contributing Debtors, FXA and RCM; provided, however, that no holder of a Claim against or Interest in any Contributing Debtor, FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against the Estates of any Contributing Debtor, FXA or RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their respective properties, except as expressly provided herein.  Accordingly, except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold, or may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM, the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined from taking any of the following actions against any of the Contributing Debtors, FXA, RCM, the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that (x) nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of this Plan and (y) the preliminary injunction of actions against the Contributing Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property (if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized Debtors and Post-Confirmation RCM and completion of the winding up of their affairs.  Notwithstanding anything to the contrary set

forth in this Plan, creditors' rights of setoff and recoupment are preserved, and the injunctions referenced in this section or section 10.5 of the Plan shall not enjoin the valid exercise of such rights of setoff and recoupment.

(b)    By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in this Article X.

**10.5    *Term of Bankruptcy Injunction or Stays*.**  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all of the property of the Estates of the Contributing Debtors, FXA, the Reorganized Debtors and Post-Confirmation RCM have been distributed and the Contributing Debtors and the Reorganized Debtors have been merged into the Reorganized Debtors, dissolved or otherwise liquidated, as the case may be, in accordance with the terms of the Plan or any Plan Document, and the Estate of Post-Confirmation RCM shall have been fully administered and the RCM Trustee discharged from his duties; *provided, however,* that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court), shall be continued without modification, notwithstanding anything to the contrary contained in this Plan.

**10.6    *Continuation of Forex Adversary*.**  Notwithstanding any provision herein to the contrary, neither this Plan nor any contract, instrument, release, agreement or document executed or delivered in connection therewith, nor the occurrence of the Effective Date (i) shall release, waive or discharge any of the claims or causes of action asserted in that certain adversary proceeding styled Forex Trading, LLC and The Ad Hoc Refco F/X Customer Committee v. Refco F/X Associates, LLC and Refco Capital Markets, Ltd., Adv. Proc. No. 06-01748 (RDD) (the "Forex Adversary") against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property, and/or (ii) shall permanently or preliminarily enjoin, prohibit or prevent in any way the continuation and/or prosecution of the Forex Adversary and the claims and causes of action asserted therein against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property; and all such claims and causes of action, as well as any and all defenses and counterclaims of FXA and RCM (including, without limitation, FXA's right to argue that the constructive trust claim asserted against RCM in the Forex Adversary belongs to FXA and not Forex Trading LLC or the Ad Hoc Refco F/X Customer Committee, as defined in the Forex Adversary), are hereby expressly preserved.

## ARTICLE XI

## RETENTION OF JURISDICTION

**11.1    *Exclusive Jurisdiction of the Bankruptcy Court*.**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases, this Plan and the RCM Settlement Agreement to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Allowed Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

(c)      Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor or RCM is a party or with respect to which any Debtor or RCM may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(d)      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the RCM Settlement Agreement, as applicable;

(e)      Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors or RCM that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(f)      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the RCM Settlement Agreement and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the RCM Settlement Agreement, the Disclosure Statement or the Confirmation Order;

(g)      Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or the RCM Settlement Agreement or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan the RCM Settlement Agreement or any entity's rights arising from or obligations incurred in connection with this Plan the RCM Settlement Agreement;

(h)      Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any other Plan Document, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(i)      Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Confirmation Date the payment of fees and expenses of the Reorganized Debtors and the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(j)      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(k)      Hear and determine causes of action by or on behalf of the Contributing Debtor, FXA, RCM, the Reorganized Debtors, the Litigation Trustee, the Private Actions Trustee or Post-Confirmation RCM;

(l)      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or Distributions pursuant to this Plan are enjoined or stayed;

(n)      Determine any other matters that may arise in connection with or relate to this Plan, the RCM Settlement Agreement, the Disclosure Statement, the Confirmation Order or any other Plan Document;

(o)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or any subsequent chapter 7 case, as applicable (which jurisdiction shall be non-exclusive except as otherwise provided by Titles 11 and 28 of the United States Code);

(p)    Hear and determine all matters related to (i) the property of the Estates of the Reorganized Debtors and Post-Confirmation RCM from and after the Confirmation Date, (ii) the winding up of the Debtors' and RCM's affairs, and (iii) the activities of the Plan Administrator and the RCM Trustee, including (A) challenges to or approvals of the Reorganized Debtors', the Plan Administrator's, the RCM Trustee's or Post-Confirmation RCM's activities, (B) resignation, incapacity, or removal of the Plan Administrator or the RCM Trustee and selection of a successor, (C) reporting by, termination of, and accounting by the Reorganized Debtors, the Plan Administrator, the RCM Trustee and Post-Confirmation RCM, and (D) release of the Plan Administrator or the RCM Trustee from their duties;

(q)    Hear and determine disputes with respect to compensation of (i) the Reorganized Debtors' and Post-Confirmation RCM's professional advisors and (ii) the Plan Administrator, the RCM Trustee, the Litigation Trustee, the Private Actions Trustee and their professional advisors;

(r)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(s)    Enter an order closing the Chapter 11 Cases or chapter 7 case of RCM, if any, as applicable.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.1    *Effectuating Documents and Further Transactions*.**  Each of the Debtors, RCM,  the Plan Administrator on behalf of the Reorganized Debtors and the RCM Trustee on behalf of Post-Confirmation RCM shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**12.2    *Corporate Action*.**  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, members, directors or managers of one or more of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM are incorporated or formed without any requirement of further action by the stockholders, members, directors or managers, as applicable, of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM.

**12.3    *Bar Dates for Certain Claims*.**

(a)    *Administrative Claims.*  The Confirmation Order shall establish an Administrative Claims Bar Date for filing Administrative Claims against all Debtors and RCM which date shall be thirty (30) days after the Effective Date.  Holders of asserted Administrative Claims not paid prior to the Confirmation Date shall submit requests for the payment of administrative expenses on or before such Administrative Claims Bar Date or forever be barred from doing so.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) shall set forth such date and constitute notice of this Administrative Claims Bar Date.  The Reorganized Debtors and the RCM Trustee shall have until the Administrative Claims Objection Deadline to object to such claims.

(b)     *Professional Fee Claims.*  All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date shall file and serve on the Reorganized Debtors and counsel for the Reorganized Debtors and on the RCM Trustee and his counsel an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, the RCM Trustee and his counsel, and the requesting Professional or other entity no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for compensation or reimbursement was served.  Upon the Confirmation Date, any requirement that Professionals comply with sections 328, 330, or 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  Professional Fee Claims relating to fees and expenses incurred after the Effective Date shall be paid in the ordinary course of business.

(c)     *Professional Fee Holdback.*  Within 10 calendar days prior to the Confirmation Hearing, each Professional shall provide to the Plan Proponents (with a copy to the Fee Committee) a notice of Professional Fee Claim containing (i) a disclosure of fees and expenses incurred, unbilled and unpaid in the Chapter 11 Cases, including any amounts that may be sought by any Professional as an enhancement of the fees billed by it in the Chapter 11 Cases based on the results achieved in the Chapter 11 Cases  and (ii) an estimate of additional fees and expenses expected to be incurred by each such Professional through the Effective Date (in the aggregate, the "Professional Fee Claims").  On the Effective Date, the Reorganized Debtors and Post-Confirmation RCM shall fund an escrow account consisting of 110% of (x) the amount of any holdbacks on previously billed and paid amounts and (y) the amount of the Professional Fee Claims estimated in (ii) of the first sentence of this subparagraph 12.3(c).  Amounts held in such escrow account shall be used to pay amounts not previously paid and subsequently allowed by the Bankruptcy Court following compliance with the interim compensation procedures established by the Bankruptcy Court in these Chapter 11 Cases and/or a hearing on the Professionals' final fee applications.  When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to the Reorganized Debtors and Post-Confirmation RCM.

**12.4     *Payment of Statutory Fees*.**  All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM shall remain liable for any quarterly fees validly due and owing to the United States Trustee under 28 U.S.C. § 1930 through and including such dates that their respective Chapter 11 Cases are converted to cases under chapter 7, dismissed, or closed.

**12.5     *Amendment or Modification of the Plan*.**  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan; *provided, however,* that no such alteration, amendment or modification shall conflict with any Final Order (including, without limitation, the Early Payment Order).  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**12.6     *Severability of Plan Provisions*.**  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.7**  *Successors and Assigns*.  This Plan shall be binding upon and inure to the benefit of the Debtors, RCM, and their respective successors and assigns, including, without limitation, any chapter 7 trustee subsequently appointed.  The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**12.8**  *Revocation, Withdrawal, or Non-Consummation*.  The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects, (ii) except as provided in sections 12.15 and 12.16 of the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Proponents or any other Person, (B) prejudice in any manner the rights of the Plan Proponents or any Person in any further proceedings involving the Plan Proponents, or (C) constitute an admission of any sort by the Plan Proponents or any other Person.

**12.9**  *Notice*.  All notices, requests, and demands to or upon the Reorganized Debtors and Post-Confirmation RCM to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> SKADDEN, ARPS, SLATE, MEAGHER
>    & FLOM LLP
> Four Times Square
> New York, New York  10036-6522
> Telephone:  (212) 735-3000
> Facsimile:  (212) 735-2000
> Att'n:    J. Gregory Milmoe, Esq.
>              Sally McDonald Henry, Esq.
>              J. Gregory St. Clair, Esq.
>
> Attorneys for Debtors and Debtors-in-Possession
>
>
> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Telephone: (212) 530-5000
> Facsimile: (212) 530-5219
> Att'n:    Luc A. Despins
>              Susheel Kirpalani
>              Dennis C. O'Donnell
>
> Counsel for the Official Committee of Unsecured Creditors of Refco Inc., *et al.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile:
Att'n:    David S. Rosner
          Andrew K. Glenn
          Jeffrey R. Gleit

Counsel for Additional Committee of Unsecured Creditors of Refco Inc., *et al.*


BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
Att'n:    Tina L. Brozman
          Timothy B. DeSieno
          Mark W. Deveno

Counsel for the Chapter 11 Trustee for Refco Capital Markets, Ltd.

**12.10    *Governing Law*.**  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware without giving effect to the principles of conflicts of law of such jurisdiction.

**12.11    *Tax Reporting and Compliance*.**  The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**12.12    *Filing of Additional Documents*.**  On or before substantial consummation of this Plan, the Plan Proponents shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**12.13    *Limit on Precedential Effect*.**  The structure of this Plan and the classification of creditors or groups of creditors within one Class contained herein shall have no evidentiary or precedential effect if the such Plan is not confirmed and consummated.

**12.14    *Claims Preserved Pending Consummation*.**  Except as provided in the Early Payment Order and the RCM Settlement Agreement, in the event this Plan is not consummated, all parties-in-interest expressly reserve their claims and rights, as well as all defenses to such claims and rights and causes of action against such other parties, including, without limitation, (i) the subrogation claim of any Debtor that is a Guarantor under the Credit Agreement against any other Debtor that is a Loan Party under the Credit Agreement, arising out of the payment to the Secured Lenders, (ii) all claims of RCM and Holders of RCM Customer Claims and RCM FX/Unsecured Claims against the Contributing Debtors, Refco LLC and other third parties, (iii) all claims of the Contributing Debtors and Refco LLC, and their respective creditors, against RCM and other third parties and (iv) avoidance actions and other causes of action against creditors of RCM and the Contributing Debtors.

**12.15    *Continuation of RCM Settlement Agreement*.**  Neither any term or provision of this Plan, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11

Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the RCM Settlement Agreement, which will at all times operate and be binding in accordance with its terms.

      **12.16**  ***Continuation of Early Payment Order***.  Neither any term or provision of this Plan or the Confirmation Order, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the Early Payment Order, which will at all times operate and be binding in accordance with its terms.

Dated:  New York, New York
       December 14, 2006

REFCO INC.
    (for itself and on behalf of the Affiliate Debtors other than Refco Finance Inc. and Refco Global Finance Ltd.)


By: _____/s/ Harrison J. Goldin_____
    Name:    Harrison J. Goldin
    Title:     Chief Executive Officer


REFCO FINANCE INC.


By: _____/s/ Harrison J. Goldin_____
    Name:    Harrison J. Goldin
    Title:     President


REFCO GLOBAL FINANCE LTD.


By: _____/s/ Harrison J. Goldin_____
    Name:    Harrison J. Goldin
    Title:     Executive Vice President


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    Attorneys for Refco Inc. and the Affiliate Debtors


By: _____/s/ J. Gregory Milmoe_____
    J. Gregory Milmoe (JGM 0919)
    Sally McDonald Henry (SMH 0839)
    J. Gregory St. Clair (GS 8344)
    Four Times Square
    New York, New York 10036-6522
    (212) 735-3000

REFCO CAPITAL MARKETS, LTD.


By: _____/s/ Marc S. Kirschner_____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


RCM Trustee


By: _____/s/ Marc S. Kirschner_____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


BINGHAM McCUTCHEN LLP
    Attorneys for Marc S. Kirschner, the Chapter 11 Trustee for
    Refco Capital Markets, Ltd.


By: _____/s/ Tina L. Brozman_____
    Tina L. Brozman
    Timothy B. DeSieno
    Mark W. Deveno
    399 Park Avenue
    New York, NY 10022
    (212) 705-7000


MILBANK, TWEED, HADLEY & McCLOY LLP
    Attorneys for the Official Committee of
    Unsecured Creditors of Refco Inc., *et al.*


By: _/s/ Susheel Kirpalani_____
    Luc A. Despins
    Susheel Kirpalani
    Dennis C. O'Donnell
    One Chase Manhattan Plaza
    New York, New York 10005
    (212) 530-5000

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
    Attorneys for the Additional Committee of Unsecured Creditors of Refco Inc., *et al.*


By:  /s/ David S. Rosner
    David S. Rosner
    Andrew K. Glenn
    Jeffrey R. Gleit
    1633 Broadway
    New York, New York 10019
    (212) 506-1700