UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
In re REFCO, INC. SECURITIES LITIGATION    :    07 MDL No. 1902 (GEL)
                                                            :
------------------------------------------------------------x
------------------------------------------------------------x
                                                            :
MARC S. KIRSCHNER, As Trustee of the Refco  :
Litigation Trust,                                           :
                                                            :
                            <u>Plaintiff</u>,                :
                                                            :    07 Civ. 11604 (GEL)
           -v-                                              :
                                                            :    **OPINION AND ORDER**
GRANT THORNTON LLP, MAYER BROWN,            :
ROWE & MAW, LLP, ERNST & YOUNG U.S.          :
LLP, PRICEWATERHOUSECOOPERS LLP,            :
CREDIT SUISSE SECURITIES (USA) LLC           :
(f/k/a CREDIT SUISSE FIRST BOSTON LLC),     :
BANC OF AMERICA SECURITIES LLC,             :
DEUTSCHE BANK SECURITIES INC., PHILIP       :
R. BENNETT, SANTO C. MAGGIO, ROBERT         :
C. TROSTEN, TONE N. GRANT, REFCO            :
GROUP HOLDINGS, INC., LIBERTY CORNER        :
CAPITAL STRATEGIES, LLC, WILLIAM T.          :
PIGOTT, EMF FINANCIAL PRODUCTS, LLC,        :
EMF CORE FUND, LTD., DELTA FLYER            :
FUND, LLC, ERIC M. FLANAGAN, INGRAM         :
MICRO, INC., CIM VENTURES, INC.,            :
BECKENHAM TRADING CO., INC., ANDREW         :
KREIGER, COAST ASSET MANAGEMENT             :
LLC (f/k/a COAST ASSET MANAGEMENT LP),     :
CS LAND MANAGEMENT, LLC, and                :
CHRISTOPHER PETITT,                         :
                                                            :
                            <u>Defendants</u>.              :
                                                            :
------------------------------------------------------------x

Richard I. Werder, Jr., Michael B. Carlinsky,
Susheel Kirpalani, Sascha N. Rand, Quinn Emanuel
Urquhart Oliver & Hedges LLP, New York, NY,
<u>for Plaintiff</u>.

Sean M. Berkowitz, Janet Malloy Link, Miles N.
Ruthberg, Christopher Harris, Latham &
Watkins LLP, Chicago, IL, Los Angeles, CA, and
New York, NY, for Defendant Ernst & Young LLP.

GERARD E. LYNCH, District Judge:

Plaintiff Marc S. Kirschner, in his capacity as Trustee of the Refco Litigation Trust ("Trustee"), originally filed this action in the Circuit Court of Cook County, Illinois, asserting claims under Illinois state law against certain Refco insiders, professionals, and advisors for breach of fiduciary duty, fraud, aiding and abetting breach of fiduciary duty and fraud, malpractice, and negligent misrepresentation. The case was removed by certain defendants to the Northern District of Illinois and subsequently transferred by the Panel on Multidistrict Litigation ("MDL Panel") to this Court, where a multitude of other Refco-related actions are pending. In a recent decision, the Court denied the Trustee's motion to remand or, in the alternative, to abstain. See In re Refco, Inc. Secs. Litig., No. 07 Civ. 11604, 2008 WL 1827644, at *13 (S.D.N.Y. April 21, 2008). This Opinion and Order addresses a motion by defendant Ernst & Young LLP ("EY")[1] to stay proceedings as to it pending mediation and, if necessary, arbitration. For the reasons stated below, the motion will be granted.

**BACKGROUND**

**I.    The Refco Fraud**

Prior to its collapse in the fall of 2005, Refco was among the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets.

---

[1] The complaint refers to EY under the incorrect name of "Ernst & Young U.S. LLP." (D. Mem. 1 n.1.)

(Compl. ¶ 56.[2]) Beginning in the late 1990s, members of Refco's senior management, allegedly with the aid of certain of Refco's professionals and financial advisors (collectively, the "defendants"), orchestrated a fraudulent scheme to artificially boost Refco's performance and conceal Refco's true financial condition so that these senior executives, through the company's August 2004 leveraged-buy-out and August 2005 initial public offering ("IPO"), could cash out their interests in Refco on lucrative terms. (Id. ¶¶ 4-7, 32, 59-149.) Defendants allegedly carried out this scheme by "concealing substantial Refco trading losses and operating expenses, recording hundreds of millions in fictitious Refco income, and funding Refco's operating expenses and acquisitions with misappropriated customer assets." In re Refco, 2008 WL 1827644, at *1 (internal quotation marks omitted).

On October 10, 2005, just two months after its IPO, Refco announced that it had discovered an undisclosed $430 million receivable due from Refco Group Holdings, Inc. ("RGHI"), an entity controlled by Refco's CEO, Philip R. Bennett. (Comp. ¶¶ 147-48.) As a result, the company announced that its financial statements for the preceding four years could no longer be relied upon. (Id. ¶ 148.) Following these disclosures, Refco's stock plummeted and was de-listed by the New York Stock Exchange, leading to over $1 billion in lost market capitalization. (Id. ¶¶ 148-49.) On October 17, 2005, Refco Inc. and over twenty of its subsidiaries filed for bankruptcy protection. (See id. ¶¶ 32, 34.)

---

[2] All references to the complaint in this opinion are to the complaint originally filed in the Circuit Court of Cook County, Illinois. All factual allegations in the complaint are assumed to be true for purposes of this motion. See Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001).

**II.     EY's Provision of Tax-Related Services to Refco**

   A.     EY's Role in the Refco Fraud

The complaint alleges that EY "actively participated in and substantially assisted the Refco Insiders and others" in carrying out the fraudulent scheme at Refco. (Id. ¶ 248.) From 1991 through at least 2005, EY provided tax-related services to various Refco entities. (Id. ¶¶ 249, 274.) EY was initially retained by Refco to review tax returns and answer tax questions. (Id. ¶ 249.) By 1993 or 1994, EY began preparing Refco's tax returns and later assisted with IRS, state, and municipal audits. (Id.) EY also provided tax consulting and advice on numerous Refco transactions beginning in the mid-1990s through 2002. (Id. ¶¶ 251-273.)

The complaint alleges that as early as 1997, EY was concerned about its own liability for helping the Refco insiders with their fraud but consciously decided to continue to participate in the scheme. (Id. ¶¶ 268-69.) By 1998, EY allegedly knew that Refco insiders were falsifying Refco's financial statements and hiding bad debts and losses in the RGHI receivable. (Id. ¶ 260.) Throughout the period of the Refco fraud, EY allegedly "prepar[ed] false tax returns based on . . . phony financial results." (P. Mem. 3-4, citing Compl. ¶¶ 249-50, 276-77.) Between 1997 and 2002, EY also structured various transactions that allegedly enabled Refco insiders to hide Refco's losses and "monetize and cash-out their interests in Refco for far more than those interests were worth." (Compl. ¶ 251; see id. ¶¶ 252-56, 278.)

In November 2003, EY "purported to resign from the Refco engagement based in large part on its concerns over potential liability for aiding and abetting the Refco Fraud." (Id. ¶ 273.) The complaint, however, alleges that EY "did not really resign" and that it "continued to perform tax services for Refco through at least 2005." (Id. ¶ 274.)

B.     The Engagement Letters

Although EY presumably entered into written agreements with Refco setting forth the terms of EY's tax assistance throughout the entire period of the engagement from 1991 through 2005 (id. ¶¶ 249, 274), the parties in this case have only located engagement letters dated May 7, 2001 (the "2001 Engagement Letter"), July 25, 2002 (the "2002 Engagement Letter"), and September 9, 2003 (the "2003 Engagement Letter"), all of which were found in EY's files. (Berkowitz Decl. Exs. 1-3.)  Each of the Engagement Letters contains an arbitration clause requiring mediation of all disputes, and if mediation is not successful, then binding arbitration:

> Any controversy or claim arising out of or relating to tax and tax
> related services now or hereafter provided by us to the Company
> (including any such matter involving any parent, subsidiary,
> affiliate, successor in interest, or agent of the Company or of Ernst
> & Young LLP) shall be submitted first to voluntary mediation, and
> if mediation is not successful, then to binding arbitration.

(Berkowitz Decl. Exs. 1-3.)  The 2002 and 2003 Engagement Letters were both executed by the Chief Financial Officer of Refco Group Ltd., LLC ("RGL"), a Refco parent company which entered into the Engagement Letter agreements on behalf of itself and several affiliated entities, including Refco Capital Markets, Ltd. ("RCM").[3]  The 2001 Engagement Letter was not signed by Refco.

---

[3] The Engagement Letters define "Company" as "Refco Group, Ltd., LLC and its affiliates."  (Berkowitz Decl. Exs. 1-3.)  Pursuant to the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries, RGL and RCM contributed their claims against EY to the Refco Litigation Trust.  See In re Refco, 2008 WL 1827644, at *2. Accordingly, the Trustee, who is asserting claims on behalf of RCM and RGL, is a "successor in interest" of the "Company" under the terms of the arbitration clause.  (Berkowitz Decl. Exs. 1-3.)

5

The 2001 Engagement Letter attaches and incorporates a separate document setting forth dispute resolution procedures ("DRPs") applicable to any mediation or arbitration between Refco and EY.  The DRPs invoke the Federal Arbitration Act and provide that disputes regarding the arbitrability of an issue are to be resolved by the arbitrators.[4]  Although the 2002 Engagement Letter did not attach another copy of the DRPs, it specifically references "the dispute resolution procedures [EY] sent [Refco] previously" — i.e., the DRPs attached to the 2001 Engagement Letter.  (Id. Ex. 2.)  The 2003 Engagement Letter refers to the "dispute resolution procedures set forth in the attachment to this letter," but that letter, which was produced from EY's files, did not include any such attachment.  (Id. Ex. 3.)  According to the Trustee, a search of Refco's available files "did not locate either (i) the May 7, 2001 engagement letter or the [DRPs] or (ii) any [DRPs] referenced in, or purportedly attached to" the 2002 or 2003 Engagement Letters.  (Rand Decl. ¶ 5.)

## III.  Procedural History

On August 21, 2007, the Trustee filed this action in the Circuit Court of Cook County, Illinois.  As noted above, the case was removed by certain defendants (not including EY) to the United States District Court for the Northern District of Illinois and subsequently transferred by the MDL Panel to this Court.  See In re Refco, 2008 WL 1827644, at *2.  Following transfer of the action, the Court denied the Trustee's motion to remand or, in the alternative, to abstain.  See id. at *13.  In the pending motion, EY contends that, pursuant to the arbitration clause contained

---

[4] See Berkowitz Decl. Ex. 1 ("Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators.").

in the Engagement Letters, the Trustee's claims against it must be resolved through mediation or, if necessary, by arbitration, rather than by litigation in this Court. Accordingly, EY requests that the claims against it be stayed pending mediation and, if mediation is not successful, arbitration.

## DISCUSSION

### I.    The Federal Arbitration Act

Pursuant to the Federal Arbitration Act ("FAA"), an arbitration clause within any "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is no dispute that the arbitration agreement at issue in this case is part of a contract "affecting" interstate commerce, and is thus governed by the FAA. See Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003).

As evidenced by the FAA's language, "[f]ederal policy strongly favors arbitration as an alternative dispute resolution process." Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995) (alteration in original). The Supreme Court has instructed that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983). Accordingly, "federal policy favoring arbitration requires [courts] to construe arbitration clauses as broadly as possible." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 847 (2d Cir. 1987). Arbitration should thus be favored "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Mehler v. Terminix Intern. Co. L.P., 205 F.3d 44, 49 (2d Cir. 2000) (internal quotation marks omitted).

**II.      Motion to Stay Proceedings**

Section 3 of the FAA authorizes a stay of federal proceedings "where the court is satisfied that the issue before it is arbitrable under the agreement." Genesco, 815 F.2d at 844; see 9 U.S.C. § 3 (providing for proceedings to be stayed in district courts when an issue is "referable to arbitration"). When asked to stay proceedings pursuant to § 3, a court must address two issues: "first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement." Mehler, 205 F.3d at 47 (internal quotation marks omitted); see Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1063 (2d Cir. 1993). Bearing in mind the FAA's statutory mandate and the federal policy favoring arbitration, the Court turns to this two-step inquiry.

      A.      Existence of Agreement to Arbitrate

Because arbitration agreements are creatures of contract, "the ultimate question of whether the parties agreed to arbitrate is determined by state law." Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002), citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003). Under the applicable state law,[5] the party seeking arbitration has the burden of establishing the intention of both parties to be bound by an arbitration clause. See Peterson v. Beale, No. 92 Civ. 5412, 1995 WL 479425, at *3 (S.D.N.Y. Aug. 11, 1995) (noting that "the burden of proving agreement to arbitrate is on the party seeking to resolve the dispute in that forum").

---

[5] The Court need not resolve whether New York or Illinois state law governs this case because "there is no material difference between them as to the issues raised by E&Y in its motion papers." (P. Mem. 7 n.4.)

The Trustee contends that EY "has not proven a meeting of the minds regarding arbitration" because none of the three Engagement Letters created an enforceable agreement to arbitrate. (P. Mem. 7.) Specifically, the Trustee asserts that the 2001 Engagement Letter was merely a "draft" document that was never signed, received, or agreed to by any Refco entity. (Id. at 5.) While conceding that the 2002 and 2003 Engagement Letters *were* executed by Refco, the Trustee contends that these agreements are "not sufficiently definite and certain to form a contract regarding arbitration because the [DRPs] were explicitly made an essential part of the letters," and EY "has not come forward with any evidence that these procedures were agreed to or that they were attached to any of the relevant engagement letters sent to [Refco]." (Id. at 9.) Accordingly, the Trustee contends that EY has failed to meet its burden of demonstrating an agreement to arbitrate under any of the Engagement Letters.

The threshold issue of whether EY and Refco reached an agreement to arbitrate is a matter for the Court, rather than for the arbitrator, to decide. See Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003). In arguing that the 2001 Engagement Letter was merely a "draft," the Trustee confuses the relevant document with a draft of the *following* year's engagement letter. As the record evidence demonstrates, EY sent a cover letter to Refco dated July 17, 2002, which attached a draft engagement letter ("2002 Draft") for EY's preparation of Refco's 2001 tax returns. (Rand Decl. Ex. A.) The 2002 Draft was created by updating the 2001 Engagement Letter (for the 2000 tax year) with new deadlines, fees and payment dates. (Id.) The parties signed the final version of the agreement a week later in the form of the 2002 Engagement Letter. (Berkowitz Decl. Ex. 2.) In contrast to the 2002 Draft — which contained a "draft" designation at the top of the document and was not printed on EY letterhead nor signed

9

by EY — the 2001 Engagement Letter was executed by EY, printed on EY letterhead, and did not contain any "draft" designation. (Compare Rand Decl. Ex. A, with Berkowitz Decl. Ex. 1.) These differences, coupled with the parties' use of the 2001 Engagement Letter as a template for updating the following year's engagement letter, indicate that, contrary to the Trustee's contention, the 2001 Engagement Letter was not a "draft" document, but rather, a formal retainer letter that was sent by EY to Refco but never executed or returned.

Under these circumstances, Refco's failure to sign the 2001 Engagement Letter would not invalidate the letter's arbitration clause. The lack of a signature on a contract does not affect its validity where the non-signing party received the contract and knowingly accepted its benefits. See Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 778 (2d Cir. 1995); Deloitte, 9 F.3d at 1064 (noting that where non-signatory "failed to object to the Agreement when it received it" and "knowingly accepted the benefits of the Agreement," that party "is estopped from denying its obligation to arbitrate under the . . . Agreement"); see also Genesco, 815 F.2d at 846 ("[W]hile the [FAA] requires a writing, it does not require that the writing be signed by the parties."). Here, it is undisputed that Refco received a "direct benefit" from EY's preparation of its 2000 tax returns. Camferdam v. Ernst & Young Int'l, Inc., No. 02 Civ. 10100, 2004 WL 307292, at *5 (S.D.N.Y. Feb. 13, 2004) (internal quotation marks omitted). Accordingly, if Refco received the 2001 Engagement Letter, it is clearly bound by the letter's arbitration clause.

Although the evidence points to the conclusion that Refco did receive the 2001 Engagement Letter, the Court need not decide this factual question because even assuming *arguendo* that Refco did not receive that letter, the arbitration clauses contained in the 2002 and

2003 Engagement Letters are sufficient to create a binding agreement to arbitrate. The Trustee's sole objection to the 2002 and 2003 Engagement Letters is that the DRPs referenced in them were not attached to the letters. As an initial matter, the mere fact that the DRPs were not attached to the copies of the 2002 and 2003 Engagement Letters located through discovery is not conclusive on the question of whether Refco actually failed to receive the DRPs. The 2002 Engagement Letter refers only to "the dispute resolution procedures we sent you previously" (Berkowitz Decl. Ex. 2) — i.e., in the 2001 Engagement Letter — and thus, by its express terms, the 2002 Engagement Letter would not have attached the DRPs. Although the 2003 Engagement Letter does specifically reference the "dispute resolution procedures set forth in the attachment to this letter" (id. Ex. 3), the copy of the 2003 Engagement Letter in the record is the countersigned copy of the letter that Refco returned to EY. The absence of any DRPs attached to the countersigned copy does not mean that the letter that EY initially sent *to* Refco did not attach the DRPs. The Trustee's failure to locate a copy of the DRPs in Refco's files, moreover, is of little probative value since the Trustee also failed to locate copies of the 2002 and 2003 Engagement Letters, which Refco plainly countersigned and thus must have received.

As with Refco's alleged failure to receive the 2001 Engagement Letter, however, the Court need not resolve the factual question of whether Refco received the DRPs because, as a matter of law, if the parties' "intent to arbitrate is clear from the text of the [Engagement Letter], . . . whether the Attachment setting forth the specific procedures was actually included with the [Engagement Letter] has no bearing" on the validity of the arbitration agreement. Camferdam, 2004 WL 307292, at *3. The 2002 and 2003 Engagement Letters contain an express arbitration clause covering "[a]ny controversy or claim arising out of or relating to tax and tax related

services now or hereafter provided by [EY] to [Refco]." (Berkowitz Decl. Exs. 2-3.) It is undisputed that Refco signed the 2002 and 2003 Engagement Letters and returned them to EY. Contrary to the Trustee's contention, nothing in those letters even remotely suggests that the agreement to arbitrate was conditioned on the parties reaching an agreement on arbitration procedures. See Camferdam, 2004 WL 307292, at *4 n.5 ("Parties can agree to arbitrate without specifying the procedures to govern such arbitration."). Based on these facts, it is clear that the Trustee, as the successor in interest to RCM and RGL,[6] is bound by the arbitration clause in the 2002 and 2003 Engagement Letters. See In re Hagerstown Fiber Ltd. P'ship, 277 B.R. 181, 199 (Bankr. S.D.N.Y. 2002) ("Where the trustee sues as successor to the debtor, he is bound by an arbitration clause in the debtor's pre-petition contract.").

B.  Scope of Arbitration Agreement

Having concluded that the 2002 and 2003 Engagement Letters created a binding agreement to arbitrate between EY and Refco, the Court must next determine whether the claims asserted by the Trustee against EY fall within the scope of that agreement. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002) (noting that in the absence of "clear[] and

---

[6] See supra note 3. The Trustee contends that the 2002 and 2003 Engagement Letters do not bind RCM because the letters were signed only by RCM's parent, RGL. The arbitration clause at issue, however, specifically covers disputes involving "any . . . subsidiary, [or] affiliate" of RGL. (Berkowitz Decl. Exs. 2-3.) The 2002 and 2003 Engagement Letters also expressly define "Company" as "Refco Group, Ltd., LLC and its affiliates." (Id.) RGL, as the parent company, thus executed the Engagement Letters on behalf of its affiliates, including RCM, thereby binding RCM to the arbitration agreement. See Nardi v. Povich, 824 N.Y.S.2d 764 (N.Y. Sup. Ct. 2006). Moreover, it is undisputed that EY prepared RCM's federal tax filings for 2001 and 2002 as part of EY's role in preparing "tax returns for RGL and its subsidiaries and affiliates." (Compl. ¶ 249.) Accordingly, even though RCM did not itself sign the 2002 or 2003 Engagement Letters, it is nevertheless bound by the arbitration agreements because it accepted EY's services under those contracts. See Thomson-CSF, 64 F.3d at 778.

unmistakabl[e] evidence" that the parties intended the arbitrator to resolve questions of arbitrability, "whether an arbitration clause . . . applies to a particular type of controversy is for the court").[7] The Second Circuit has instructed that:

> In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims "touch matters" covered by the parties' . . . agreements, then those claims must be arbitrated, whatever the legal labels attached to them.

Collins, 58 F.3d at 20-21, quoting Genesco, 815 F.2d at 846.

The arbitration clause at issue in this case "is a classically broad one," Mehler, 205 F.3d at 49, providing for arbitration of "*any* controversy or claim *arising out of or relating to* tax and tax related services now or hereafter provided" by EY to Refco (Berkowitz Decl. Ex. 2-3 (emphasis added)). This provision is "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability," Mehler, 205 F.3d at 49 (internal quotation marks omitted), and arbitration is favored "unless it can be said 'with positive assurance' that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute," Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 35 (2d Cir. 2002), quoting Thomas James Assocs., Inc. v. Jameson, 102 F.3d 60, 65 (2d Cir. 1996). The allegations in the complaint underlying the Trustee's claims against EY for malpractice, negligent misrepresentation, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty, all "aris[e] out of or relat[e] to tax and

---

[7] Although the DRPs provide that "[a]ny issue concerning the extent to which any dispute is subject to arbitration . . . shall be . . . resolved by the arbitrators" (Berkowitz Decl. Ex. 1), it is not entirely clear whether Refco ever received the DRPs. See supra at 11. Accordingly, there is not sufficiently "clear[] and unmistakabl[e] evidence" that the parties intended the issue of arbitrability to be determined by the arbitrators. Howsam, 537 U.S. at 83.

tax related services" provided by EY to Refco (Berkowitz Decl. Exs. 2-3),[8] and thus clearly "touch matters" covered by the parties' arbitration agreement. Collins, 58 F.3d at 21.

The Trustee nevertheless asserts that his claims against EY fall outside the scope of the arbitration clause because they are "based, in large part, on services and conduct that pre-date" the July 25, 2002, Engagement Letter. (P. Mem. 11.) Noting that the arbitration clause covers only claims "arising out of or relating to any tax and tax related services *now or hereafter provided* by" EY to Refco (Berkowitz Decl. Exs. 2-3 (emphasis added)), the Trustee contends that the "bulk of the allegations regarding E&Y's wrongdoing relate to actions taken by E&Y prior" to the 2002 Engagement Letter, and thus "the claims against E&Y are not arbitrable under the plain language of the engagement letters." (P. Mem. 11.) By stating that his claims are based *mainly* ("in large part" or "bulk") on EY's pre-July 2002 conduct, however, the Trustee effectively concedes that his claims, at least in part, "relat[e] to" tax services provided after the 2002 Engagement Letter. (Berkowitz Decl. Exs. 2-3.) An examination of the complaint, moreover, reveals that the Trustee drafted his claims against EY in extremely broad strokes, alleging, in essence, that EY was an active participant in the Refco fraud from beginning to end. Specifically, the complaint describes a virtually uninterrupted stream of tax-related work that EY performed for various Refco entities beginning in the 1990s through at least 2005, including

---

[8] See Compl. ¶ 528 (alleging that "E&Y breached its duty of care to RGL by, among other things, preparing false tax returns for RGL"); id. ¶ 534 (alleging that "[i]n preparing RGL's tax returns, E&Y negligently misrepresented RGL's financial condition"); id. ¶ 428 (alleging that "E&Y knowingly and substantially assisted in the fraud by among other things . . . preparing and filing inaccurate federal, state, and municipal tax returns"); id. ¶ 423 (alleging that "E&Y knowingly and substantially assisted in Bennett and Maggio's breaches of their fiduciary duties to RCM by, among other things . . . preparing and filing inaccurate federal, state, and municipal tax returns").

preparation of tax returns, assistance with regulatory audits, and tax consulting and advice on numerous Refco transactions. (See, e.g., Compl. ¶¶ 251-74.) Having framed his claims broadly, the Trustee cannot now construe them narrowly or piecemeal to avoid the parties' agreement to arbitrate.[9] Furthermore, to the extent any ambiguity remains, federal policy requires that "any doubts concerning the scope of the arbitrable issues . . . be resolved in favor of arbitration." Moses H. Cone, 460 U.S. at 24-25.

In light of the strong federal policy favoring arbitration, as well as the broad language of the parties' agreement to arbitrate and the equally broad allegations asserted in the Trustee's complaint, the claims against EY in this case clearly fall within the scope of the arbitration clause contained in the 2002 and 2003 Engagement Letters. Accordingly, EY's request for a stay of proceedings pending mediation and, if necessary, arbitration will be granted.[10]

Pursuant to the parties' arbitration agreement, mediation is a prerequisite to arbitration. Accordingly, this action will be stayed 30 days from the entry of this Opinion and Order to allow

---

[9] The Trustee's citation to Fehribach v. Ernst and Young LLP, No. 02 Civ. 1270, 2003 WL 1906136 (S.D. Ind. Jan. 6, 2003) does not alter this conclusion. In Fehribach, the court held that a Chapter 7 trustee's claims for negligence and breach of contract arising out of an audit performed by the defendant in 1995 were not covered by an arbitration agreement that was entered into by the parties in 1996. Id. at *6-7. The claims deemed non-arbitrable in Fehribach were thus based on a specific discrete act — the defendant's 1995 audit — that was completed before the parties' agreement to arbitrate was formed. In contrast, the claims asserted against EY in this action are based on wide-ranging allegations covering tax-related services provided by EY to Refco both before and after the 2002 Engagement Letter. (See, e.g., Compl. ¶¶ 251-74.)

[10] The Trustee contends that EY's request for a stay is "premature" because EY has not provided written notice demanding arbitration as required by the arbitration clause and the DRPs. (P. Mem. 10 n.5.) See Berkowitz Decl. Exs. 1-3. As EY convincingly explains, however, it is the Trustee who commenced this dispute, and EY is not seeking to bypass the mediation process as it is requesting a stay in favor of mediation and, only if necessary, arbitration. EY's request for a stay is thus entirely appropriate.

EY to give written notice to the Trustee and submit the Trustee's claims against it to mediation. If the matter is submitted to mediation, any further proceedings as to EY in this Court will be stayed pending mediation and, if necessary, arbitration. Should arbitration ultimately become necessary, any remaining disputes regarding the "construction of the contract and of the parties' rights and obligations under it are within the jurisdiction of the arbitrator." McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988); Collins, 58 F.3d at 21.

## CONCLUSION

For the foregoing reasons, defendant Ernst & Young LLP's motion to stay proceedings as to it pending mediation and, if necessary, arbitration, is granted. Proceedings in this case as to Ernst & Young LLP are hereby stayed for 30 days to permit Ernst & Young LLP to submit plaintiff's claims against it to mediation. If the matter is submitted to mediation, the stay will continue in effect pending completion of the mediation and, if necessary, arbitration.

SO ORDERED.

Dated: New York, New York
      May 21, 2008

_____
GERARD E. LYNCH
United States District Judge