IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: REFCO INC. SECURITIES LITIGATION | 07 MDL No. 1902 (GEL) |
| MARC S. KIRSCHNER, As Trustee of the Refco Litigation Trust, <br><br> Plaintiff, <br><br> v. <br><br> GRANT THORNTON LLP, MAYER BROWN, ROWE & MAW, LLP; ERNST & YOUNG U.S. LLP; PRICEWATERHOUSECOOPERS LLP; CREDIT SUISSE SECURITIES (USA) LLC (f/k/a CREDIT SUISSE FIRST BOSTON LLC); BANC OF AMERICA SECURITIES LLC; DEUTSCHE BANK SECURITIES INC.; PHILLIP R. BENNETT; SANTO C. MAGGIO; ROBERT C. TROSTEN; TONE N. GRANT; REFCO GROUP HOLDINGS, INC.; LIBERTY CORNER CAPITAL STRATEGIES, LLC; WILLIAM T. PIGOTT; EMF FINANCIAL PRODUCTS, LLC; EMF CORE FUND, LTD.; DELTA FLYER FUND, LLC; ERIC M. FLANAGAN; INGRAM MICRO, INC.; CIM VENTURES, INC.; BECKENHAM TRADING CO. INC.; ANDREW KRIEGER; COAST ASSET MANAGEMENT, LLC (f/k/a COAST ASSET MANAGEMENT LP); CS LAND MANAGEMENT, LLC; and CHRISTOPHER PETITT, <br><br> Defendants. | Case No. 07 Civ. 11604 (GEL) <br><br> **DECLARATION OF SASCHA N. RAND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

I, SASCHA N. RAND, declare pursuant to 28 U.S.C. § 1746 as follows:

        1.     I am a partner in the law firm of Quinn Emanuel Urquhart Oliver &

Hedges LLP, attorneys for Plaintiff Marc S. Kirschner as Trustee of the Refco Litigation Trust

(the "Trustee"), and a member in good standing of the bar of this Court. I submit this declaration

in opposition to the motions to dismiss filed by defendants Grant Thornton LLP, Mayer Brown

LLP, Mayer Brown International LLP, PricewaterhouseCoopers LLP, Liberty Corner Capital

Strategies, LLC and William T. Pigott, Ingram Micro Inc. and CIM Ventures Inc., and the

Investment Bank Defendants (Banc of America Securities LLC, Credit Suisse Securities (USA)

LLC, and Deutsche Bank Securities Inc.).

        2.     In May of this year I provided the Assistant United States Attorneys I

understand to be responsible for the prosecution of the indictment of Mayer Brown partner

Joseph Collins with a general list of topics which the Trustee wished to explore through

depositions of Mayer Brown witnesses. Among the topics was Mayer Brown's management

structure and organization. I was subsequently advised that the United States Attorney's Office

preferred that the Trustee not seek to take deposition discovery of Mayer Brown witnesses or the

listed topics at that time.

        3.     Attached hereto as Exhibit A is a true and correct copy of the Final Report

of the Court-appointed Examiner, dated July 11, 2007.

        4.     Attached hereto as Exhibit B is a true and correct copy of the Indictment

of Joseph P. Collins, *United States v. Collins*, No. 07 Cr. 01170 (S.D.N.Y., Filed Dec. 18, 2007).

        5.     Attached hereto as Exhibit C is a true and correct copy of the Complaint in

*Thomas H. Lee Equity Fund V, L.P. et al. v. Grant Thornton LLP*, 07 Civ. 8663 (GEL)

(S.D.N.Y.).

6.      Attached hereto as Exhibit D is a true and correct copy of the First Amended Complaint in *Thomas H. Lee Equity Fund V, L.P. et al. v. Mayer Brown Rowe & Maw LLP*, 07 Civ. 6767 (GEL) (S.D.N.Y.), and the exhibits annexed thereto.

7.      Attached hereto as Exhibit E is a true and correct copy of the Declaration of David R. Kessaram, dated August 27, 2008, and the exhibits attached thereto.

8.      Attached hereto as Exhibit F is a true and correct copy of the draft Letter Agreement between, *inter alia*, Refco Group Ltd., LLC, and Refco Group Holdings, Inc., dated July 12, 2002.

9.      Attached hereto as Exhibit G is a true and correct copy of Moving Defendants' Motion for Transfer of Action to the Southern District of New York Pursuant to 28 U.S.C. § 1407 (MDL No. 1902, Filed Sept. 19, 2007).

10.     Attached hereto as Exhibit H is a true and correct copy of this Court's Deposition Protocol Order in, *inter alia*, *In re Refco Secs. Litig.*, 07 MDL 1902 (GEL) (S.D.N.Y., Ordered December 10, 2007).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
       August 29, 2008

_Sascha N. Rand_
Sascha N. Rand

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  | § | Chapter 11 |
| In re: | § |  |
|  | § | Case No. 05-60006 (RDD) |
| REFCO INC., *et al.*, | § |  |
|  | § | Jointly Administered |
| Debtors. | § |  |
|  | § |  |

# **Final Report of Examiner**

JOSHUA R. HOCHBERG (JRH 9440)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, DC 20006-1108
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

*Court Appointed Examiner*

CHARLES E. CAMPBELL (CEC 6100)
ROBERT A. BARTLETT (RAB 0550)
MCKENNA LONG & ALDRIDGE LLP
Suite 5300, 303 Peachtree Street, NE
Atlanta, GA 30308
Telephone:  (404) 527-4000
Facsimile:  (404) 527-4198

*Counsel to the Examiner*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

    A.   OVERVIEW OF THE FINAL REPORT ...................................................... 1

    B.   SUMMARY OF THE MATTER UNDER INVESTIGATION ........................... 3

    C.   SCOPE OF THE EXAMINATION.............................................................. 5

    D.   SUMMARY OF CONCLUSIONS .............................................................. 7

II.  PROCESS OF THE EXAMINATION ............................................................ 8

    A.   ESTABLISHING THE SCOPE OF THE EXAMINATION............................... 8

    B.   FACTORS THAT INFLUENCED THE EXAMINATION ................................ 9

        1.   Factors that Aided the Examination......................................... 9

        2.   Limitations on the Examination ............................................. 11

    C.   PROCEDURAL ASPECTS OF THE EXAMINATION ................................. 13

        1.   Staffing the Examination........................................................ 13

        2.   Coordinating the Examination................................................ 14

        3.   Monitoring and Participating in the Bankruptcy Cases ......... 14

        4.   Obtaining and Reviewing the Documents............................... 15

        5.   Witness Interviews................................................................. 16

III. HISTORY OF REFCO AND ITS AFFILIATES............................................ 16

    A.   BRIEF HISTORY OF THE REFCO DEBTORS ......................................... 16

    B.   ROUND TRIP LOANS AND SIMILAR TRANSACTIONS............................ 22

        1.   Overview ................................................................................ 22

        2.   Impact of Loans on RGHI Receivable .................................... 23

        3.   The 1998 and 1999 Wire Transfer Loans .............................. 26

        4.   The 2000 - 2005 Round Trip Loans........................................ 29

        5.   The Individual Round Trip Loan Participants......................... 33

        6.   The BAWAG Loans ............................................................... 57

IV.  REFCO'S AUDITORS .................................................................................. 60

    A.   INTRODUCTION AND SUMMARY OF THE EXAMINER'S INVESTIGATION OF THE
        ROLE OF THE AUDITING PROFESSIONALS.......................................... 60

        1.   Preliminary Comments Concerning Arthur Andersen............. 60

        2.   Preliminary Comments Concerning Grant Thornton.............. 61

# TABLE OF CONTENTS
## (*continued*)

Page

|  |  |  |  |  |
|---|---|---|---|---|
|  | 3. | Summary of the Examiner's Findings and Conclusions | 63 |
| B. | OVERVIEW OF THE PROFESSIONAL STANDARDS GOVERNING AUDITING PROFESSIONALS | 66 |
|  | 1. | The Goal of an Audit | 68 |
|  | 2. | Due Professional Care and Professional Skepticism in the Performance of Work | 68 |
|  | 3. | Audit Documentation | 69 |
|  | 4. | Auditing Related Party Transactions | 70 |
|  | 5. | Consideration of Fraud in a Financial Statement Audit | 73 |
| C. | BACKGROUND OF REFCO'S AUDITOR ENGAGEMENTS | 75 |
|  | 1. | The Audits Performed by AA | 75 |
|  | 2. | The Audits and Reviews Performed by GT | 80 |
| D. | THE AUDITORS FAILED TO CONDUCT AUDITS OF REFCO'S FINANCIAL STATEMENTS IN ACCORDANCE WITH GAAS | 86 |
|  | 1. | AA's Failure to Properly Audit Refco's Related Party Transactions | 86 |
|  | 2. | GT's Failure to Properly Audit Refco's Related Party Transactions | 116 |
| E. | EVIDENCE SUGGESTING GT'S ACTUAL KNOWLEDGE OF FRAUD | 157 |
| F. | CONCLUSIONS: ANALYSIS OF POTENTIAL CLAIMS AGAINST THE AUDITING PROFESSIONALS | 159 |
|  | 1. | Negligence and Professional Malpractice | 159 |
|  | 2. | Aiding and Abetting Breach of Fiduciary Duty/Fraud | 164 |
| V. | REFCO'S TAX ACCOUNTANTS | 169 |
| A. | ERNST & YOUNG LLP | 169 |
|  | 1. | Introduction and Overview of Investigation | 169 |
|  | 2. | Background Facts | 171 |
|  | 3. | Conclusions: Analysis of Potential Claims Against E&Y | 202 |
| B. | LEVINE, JACOBS & COMPANY, L.L.C. | 217 |
|  | 1. | Introduction and Background | 217 |
|  | 2. | Additional Factual Background | 218 |
|  | 3. | Conclusions: Analysis of Potential Claims Against Levine Jacobs | 229 |

# TABLE OF CONTENTS
(*continued*)

| | | | | Page |
|---|---|---|---|---|

VI.   REFCO'S ATTORNEYS .......................................................................... 230

    A.   MAYER, BROWN, ROWE & MAW LLP .......................................... 230

        1.   Introduction ........................................................... 230

        2.   Factual Conclusions ................................................ 233

        3.   Conclusions: Analysis of Potential Claims Against Mayer Brown ....... 273

    B.   WEIL, GOTSHAL & MANGES LLP .................................. 281

        1.   Introduction and Overview of Investigation ....................... 281

        2.   Overview of Weil's Representation of Refco ..................... 284

        3.   Background Regarding LBO and Related Matters ................. 287

        4.   Refco Engagement of Weil in Connection with Securities Filings and IPO Diligence ..................................... 302

        5.   Conclusions: Analysis of Potential Claims Against Weil ........... 316

VII.   $82.2 MILLION DIVIDEND IN CONNECTION WITH THE IPO ........... 325

    A.   INTRODUCTION AND SUMMARY ....................................... 325

        1.   Scope of Investigation ............................................... 325

        2.   Summary of Facts .................................................... 325

    B.   SUMMARY OF FINDINGS AND CONCLUSIONS ....................... 326

    C.   FACTUAL BACKGROUND RELEVANT TO DECLARATION OF THE DIVIDEND ......... 326

        1.   Solvency Opinion ................................................... 326

        2.   Declaration of Dividend ............................................ 330

        3.   October 10, 2005 Refco Press Release Disavowing Financial Statements ............................................. 331

    D.   CONCLUSIONS CONCERNING THEORIES OF RECOVERY AGAINST DIRECTORS .... 333

        1.   Violation of Delaware Statute 8 Del. C. § 174(a) ............... 333

        2.   Breach of Fiduciary Duties of Care and Loyalty ................. 337

    E.   CONCLUSIONS CONCERNING THEORIES OF RECOVERY AGAINST DIVIDEND RECIPIENTS ......... 339

        1.   Violation of Federal and State Fraudulent Conveyance Laws ....... 339

VIII.   OTHER PROFESSIONALS ................................................ 345

    A.   MCDERMOTT WILL & EMERY LLP .................................. 345

    B.   KPMG LLP ................................................................... 347

# TABLE OF CONTENTS
## (*continued*)

                                                                                    Page

        1.    Introduction ................................................................ 347

        2.    Tax Related Engagements ................................................. 348

        3.    Engagements with Refco Entities ..................................... 348

        4.    THL Engagements ........................................................ 349

        5.    Conclusion .................................................................. 349

   C.    PRICEWATERHOUSECOOPERS, LLP .................................................. 350

IX.    MISCELLANEOUS CONSIDERATIONS ........................................ 350

   A.    ISSUES CONCERNING REFCO'S SOLVENCY OR INSOLVENCY .............. 350

   B.    PREFERENTIAL TRANSFERS ............................................................ 355

   C.    DAMAGES ................................................................................... 356

   D.    APPLICABILITY OF THE WAGONER RULE AND DOCTRINE OF IN PARI
       DELICTO TO POTENTIAL CLAIMS AGAINST REFCO'S PROFESSIONALS ............... 358

EXHIBIT 1 GLOSSARY ............................................................................... 1

EXHIBIT 2 PRIVATE PARTIES WHOSE DOCUMENTS ARE REFERRED TO IN
   THE REPORT ...................................................................................... 1

EXHIBIT 3 WITNESSES INTERVIEWED BY THE EXAMINER AND HIS
   COUNSEL .......................................................................................... 1

APPENDIX A THE LAW RELATING TO PROFESSIONAL LIABILITY ........................... 1

I.    INTRODUCTION .................................................................... 1

II.    CHOICE OF LAW .................................................................. 1

III.    MALPRACTICE/PROFESSIONAL NEGLIGENCE .................................... 3

   A.    INTRODUCTION ............................................................................. 3

   B.    DISTINCTIONS BETWEEN THE STANDARDS OF CARE APPLICABLE TO
       AUDITORS, ATTORNEYS, AND ACCOUNTANTS .................................... 3

        1.    Auditors ................................................................... 3

        2.    Attorneys .................................................................. 5

        3.    Accountants .............................................................. 7

   C.    CAUSATION AND DAMAGES ........................................................... 7

   D.    DEFENSES TO CLAIMS FOR MALPRACTICE ........................................ 9

**TABLE OF CONTENTS**
(*continued*)

**Page**

IV.    AIDING AND ABETTING FRAUD/AIDING AND ABETTING BREACH OF
FIDUCIARY DUTY .................................................................................. 11

    A.    INTRODUCTION .................................................................................. 11

    B.    THE MAJORITY VIEW REQUIREMENT OF ACTUAL KNOWLEDGE .......................... 13

    C.    THE REQUIREMENT OF PARTICIPATION OR SUBSTANTIAL ASSISTANCE ................ 14

    D.    CAUSATION AND DAMAGES .................................................................. 16

    E.    THE STATUTE OF LIMITATIONS FOR AIDING AND ABETTING CLAIMS .................. 17

V.    CONTRACTUAL AFFIRMATIVE DEFENSES AVAILABLE TO
ACCOUNTING PROFESSIONALS ................................................................ 18

APPENDIX B THE LAW RELATING TO AVOIDANCE ACTIONS ..................................... 1

I.    INTRODUCTION ...................................................................................... 1

II.    PREFERENTIAL TRANSFERS ...................................................................... 1

    A.    ELEMENTS OF A PREFERENTIAL TRANSFER ............................................... 1

    B.    POTENTIAL DEFENSES TO AVOIDANCE OF A PREFERENTIAL TRANSFER ................ 2

III.    FRAUDULENT CONVEYANCES .................................................................... 4

    A.    ACTUAL FRAUDULENT CONVEYANCES ...................................................... 5

    B.    CONSTRUCTIVE FRAUDULENT CONVEYANCES ............................................. 7

        1.    Unfair Exchange ........................................................................ 7

        2.    Failure of a Solvency Test ............................................................ 9

IV.    SOLVENCY DETERMINATIONS .................................................................. 10

APPENDIX C THE LAW RELATING TO THE WAGONER RULE ....................................... 1

I.    INTRODUCTION ...................................................................................... 1

II.    THE WAGONER RULE .............................................................................. 1

III.    EXCEPTIONS TO THE WAGONER RULE ......................................................... 2

    A.    THE ADVERSE INTEREST EXCEPTION ....................................................... 2

    B.    THE INNOCENT INSIDER EXCEPTION ....................................................... 5

    C.    THE SOLE ACTOR EXCEPTION TO THE ADVERSE INTEREST EXCEPTION AND
THE INNOCENT INSIDER EXCEPTION ....................................................... 7

APPENDIX D SELECTED DOCUMENTS REFERRED TO IN THE REPORT ......................... 1

# I.   INTRODUCTION

## A.   OVERVIEW OF THE FINAL REPORT

This is the Final Report of the Examiner (the "Report").  The Report documents the findings and conclusions of Joshua R. Hochberg, the duly-appointed examiner (the "Examiner") in the bankruptcy cases (the "Bankruptcy Cases") of Refco Inc. and its affiliated debtors (collectively, "Refco" or the "Debtors").

Part I explains the structure and content of this Report, provides an overview of the Debtors and their Bankruptcy Cases, and summarizes the Examiner's findings on potential causes of action held by the Debtors' estates.

Part II of this Report discusses the procedural aspects of the Examination.  This Part details the Examiner's appointment, the scope of the Examination, and various factors affecting the Examination.  Part II also discusses the Examiner's investigative efforts, coordination with governmental agencies and other interested third-parties, and other factors that aided or limited the Examiner's investigative efforts.

Part III of this Report provides a history of the Debtors and describes the "Round Trip Loan" transactions which were used to conceal certain related-party receivables and, when disclosed, precipitated Refco's bankruptcy.

Part IV of the Report details the role of the auditing professionals that were subjects of the Examination, Arthur Andersen LLP and Grant Thornton LLP.  Part IV also analyzes each auditing professional's relationship to the Debtors, and reaches conclusions as to the potential liability of each of the auditing professionals.

Part V of the Report details the role of the two accounting professionals (tax accountants) that were subjects of the Examination, Ernst & Young LLP, and Levine Jacobs & Company,

L.L.C.  Part V also analyzes each accounting professional's relationship to the Debtors, and reaches conclusions as to the potential liability of each of the accounting professionals.

Part VI of the Report details the role of the principal legal professionals that were subjects of the Examination, Mayer, Brown, Rowe & Maw LLP and Weil, Gotshal & Manges LLP.  Part VI also analyzes each legal professional's relationship to the Debtors, and reaches conclusions as to the potential liability of each of the legal professionals.

Part VII of the Report analyzes the circumstances surrounding the declaration and payment of the $82.2 million dividend made by Refco in connection with its IPO, and the likelihood of recovering the dividend or related damages for the benefit of the bankruptcy estates.

Part VIII of the Report briefly discusses certain professionals that were subjects of the Examination, but for whom a detailed discussion in this Report was determined not to be necessary.

Part IX discusses certain considerations regarding determination of the solvency of the Debtors, recovery of preferential transfers, calculation of damages, and application of the *Wagoner* rule.

The Report also contains exhibits and appendices.  Exhibit 1 is a glossary of key terms used in the Report.  Exhibits 2 and 3 list the parties whose documents were reviewed, and the witnesses interviewed by the Examiner and his counsel. Appendices A through C contain discussions of the law applicable to the potential causes of action identified in the Examiner's investigation and conclusions, with appropriate citations to authority, which are provided to assist in the evaluation and analysis of the potential claims and defenses discussed herein.

Appendix D is a compilation of copies of certain of the documents referred to and relied on in the Report.

### B.  SUMMARY OF THE MATTER UNDER INVESTIGATION

Phillip R. Bennett ("Bennett"), Robert C. Trosten ("Trosten"), and Tone N. Grant ("Grant") are individuals under indictment for orchestrating and participating in a massive fraudulent scheme designed to manipulate the financial statements of various Refco companies that were publicly reported and supplied to lending institutions and to regulators.[1]  These Refco companies' financial statements were prepared on a consolidated basis under Refco Group Ltd., LLC ("RGL").  The financial information of Refco Group Holdings, Inc. ("RGHI"), a holding company owned principally by Bennett, was not consolidated with Refco and was not public.  In August 2005, Refco made an Initial Public Offering ("IPO") of its stock and was subsequently listed on the New York Stock Exchange.  Shortly thereafter, in October 2005, revelations concerning the fraudulent manipulation of Refco's financial statements precipitated Refco's bankruptcy and losses of hundreds of millions of dollars by creditors and equity holders.

The roots of the scheme that was used to conceal losses and money owed to Refco by RGHI began at least in 1997 or 1998. At that time, Refco suffered millions of dollars in losses as certain of its customers could not make good on their own trading losses. There is evidence that Bennett and others caused these bad debts to be "sold" or transferred from Refco entities to the unconsolidated parent company, RGHI.  As a result, the bad debts would not have to be recognized as losses on the books of a Refco company. The "sale" price of the bad debt transferred directly or indirectly to RGHI was treated as a receivable, due from RGHI, on the books of Refco (the "RGHI Receivable").  Over time, the amount of the RGHI Receivable

---

[1] *See* Indictment, *United States v. Bennett, et al.*, 05-CR-1192 (S.D.N.Y. Jan. 16, 2007) ("Superseding Indictment").

fluctuated as interest accrued, other bad debts were transferred to RGHI, and certain

professionals' fees and computer expenses were also transferred out of the consolidated reporting

Refco companies.  To hide the RGHI Receivable, as each reporting period came to a close,

Bennett and others caused the consolidated reporting Refco companies to manipulate their books

through a series of transactions commonly referred to as "Round Trip Loans." The loans made it

appear that the RGHI Receivable was due from unrelated third parties rather than from RGHI.

This concealment of the true nature of the RGHI Receivable also provided comfort to outsiders

that the receivable was collectible. The mechanics of the typical Round Trip Loans is described

below.

- The Round Trip Loans were two short term loans of several weeks duration that spanned the end of Refco's fiscal year-end or quarterly financial reporting periods. The first loan was made by a Refco entity to a third party at a certain interest rate for a certain period of time.  The second one was made by that same third party to RGHI for the same period of time, but at a higher interest rate.  The repayment of the loan by RGHI to the third party was guaranteed by RGL and the third party was also indemnified by RGL against any loss or expense for entering into the Round Trip Loan.

- The funds or credit advanced for the loan to the third party were deposited into the third party's account with RCM.  Those funds were then transferred at the third party's request from the third party's account at RCM to RGHI's account at RCM.  The effect of these transactions was to reduce RGHI's receivable balance owed to RCM by the amount of the Round Trip Loan, and to substitute a receivable in that amount from the third party.  In most cases, these were bookkeeping entries and no cash actually "moved."  After the end of the applicable reporting period, the process was reversed and unwound.

These Round Trip Loans were sham transactions with no economic substance which were

entered into solely to "dress up" Refco's consolidated financial statements.  The loans involved

no risk to the third party because they included secret guarantees by Refco that were not reflected

on Refco's books.  The guarantees obligated Refco to pay back RGHI's obligation in case RGHI

defaulted.  The loans were also falsely reported to be "repo" transactions when, in fact, unlike a

true repo, there was no security on deposit at Refco to act as collateral for the loan. The effect of

the loans was to expose Refco to risk and to cause Refco to pay interest, with no resulting economic benefit to Refco.

Bennett and others caused Refco to engage in these schemes at every annual reporting period from at least 1998 through 2005. Starting in 2000, attorneys at Mayer Brown prepared the loan documentation and the guarantee and otherwise assisted with the loan process for virtually every Round Trip Loan. At the end of each financial reporting period, first Arthur Andersen and later Grant Thornton audited RGL's books and issued unqualified audit opinions that did not disclose the Round Trip Loans or the full extent of the related-party RGHI Receivable.

The scheme to conceal the large related-party receivable went undetected during the course of a leveraged buyout transaction in August 2004. It was also undetected when certain senior subordinated notes issued by Refco were registered with the SEC in April 2005 in a public exchange offering, and during the IPO in August 2005. After the IPO a new Refco employee discovered the irregularities on the books and brought them to the attention of RGL's Audit Committee. Shortly thereafter, on October 17, 2005 ("Petition Date"), Refco and 23 of its affiliated companies filed for protection under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended and supplemented, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Court"). On March 22, 2006, the Court approved the appointment of the Examiner in these cases, and McKenna Long & Aldridge LLP ("MLA") was retained as the Examiner's counsel.

C.    SCOPE OF THE EXAMINATION

As explained in more detail in Section II.A., below, the scope of the Examination included the investigation of, and reporting on, potential claims which might be brought by the Debtors' estates against any of Refco's prepetition professionals, and any causes of action that

might be brought to recover the $82.2 million dividend paid in connection with the IPO, or damages arising from its payment.[2]  The Examination included consideration of how the fraud was perpetrated through the use of Round Trip Loans in order to understand whether or not the professionals were negligent or complicit.  The Examiner evaluated potential liability with respect to the following entities and subject matters:

- Arthur Andersen LLP ("AA") was Refco's outside auditor from at least the late 1980s to 2002.

- Grant Thornton LLP ("GT") was Refco's outside auditor from approximately October 2002 until the filing of the Refco Bankruptcy Cases in October 2005.

- Ernst & Young LLP ("E&Y") provided various services to Refco entities, including tax accounting and consulting services, from 1991 until 2004.

- Levine Jacobs & Company, L.L.C. ("Levine Jacobs") provided tax accounting services to various Refco entities from 2004 to 2005.

- Mayer, Brown, Rowe & Maw LLP ("Mayer Brown") served as the main outside counsel for Refco and its related entities from approximately 1994 until the filing of the Refco Bankruptcy Cases.

- Weil, Gotshal & Manges LLP ("Weil") represented various Thomas H. Lee entities in connection with the LBO in 2004 and thereafter represented both Thomas H. Lee and various Refco entities (and certain members of Refco's Board of Directors) in connection with various matters including Refco's IPO.

- Payment of Dividend.  An approximately $82.2 million dollar dividend to pre-IPO shareholders was paid in connection with Refco's IPO.

---

[2] The Examiner evaluated potential claims of the Refco Debtors as a whole, without distinguishing transactions and claims among the various Refco entities. Although some issues discussed herein are relevant to claims held by RCM, such claims are not separately considered or discussed herein because they were excluded from the scope of the Examination. (Docket # 1487).

D.    SUMMARY OF CONCLUSIONS

This Report is the work product of the Examiner and his counsel.  The information and statements contained herein, representing the Examiner's conclusions and opinions, should not be taken as admissions or findings for or against any person or entity.[3]

The Examiner concludes that the Debtors' estates could state claims for relief, sufficient to withstand a motion to dismiss, against certain of Refco's prepetition professionals who contributed to, or failed to prevent, the harm suffered by Refco, including:

- Claims for professional negligence against GT, E&Y, and Mayer Brown.

- Claims for aiding and abetting fraud and breaches of fiduciary duty against Mayer Brown and, although it is a close question, E&Y.

- Claims for avoidance and recovery of preferential transfers against Refco's professionals who received payments on or within the 90-days prior to the Petition Date.

As to Weil, although it is a close question, the Examiner concludes that there are facts that could support an allegation that Weil failed to adhere to the standard of care applicable to its representation of Refco.

Additional claims might be asserted against certain of the directors responsible for the declaration of the $82.2 million dividend and those who received the dividend, including:

- Claims for breaches of fiduciary duties and violation of Delaware General Corporate Law against Bennett.

- Claims for avoidance and recovery of fraudulent conveyances and/or preferential transfers, and damages, against Bennett/RGHI and Thomas H. Lee entities as the recipients of the $82.2 million dividend.

---

[3] The Report includes discussions of facts that may be helpful to understanding the conclusions reached herein, but relate to non-professionals and topics that were not subjects of the Examination.  The Examiner does not reach any conclusions concerning persons or entities other than those specifically identified in the Report; and, nothing in the Report should be interpreted as meaning the Examiner reached any conclusions as to the liability of, among others, the Round Trip Loan Participants, Thomas H. Lee entities, and the underwriters, because these persons and entities were beyond the scope of the Examination.

The Examiner believes further investigation is warranted to determine whether evidence exists to support other claims, including:

- Claims for aiding and abetting fraud and breaches of fiduciary duty against AA and GT.

- Claims for damages arising out of the declaration of the $82.2 million dividend against certain other members of Refco's Board of Directors.

Several significant factual and legal defenses are potentially available to all parties against whom claims may be asserted. Among the most significant potential defenses are the "*Wagoner*" rule and, in some cases, the statute of limitations.

## II.   PROCESS OF THE EXAMINATION

### A.   ESTABLISHING THE SCOPE OF THE EXAMINATION

Following Court approval of his appointment by the Office of the United States Trustee ("U.S. Trustee"), the Examiner's initial efforts were directed toward familiarizing himself with the background of the cases and the investigations in progress by other parties, including governmental agencies. Prior to commencing his investigation, as directed by the Court in an Order entered on March 16, 2005 ("Examiner Appointment Order") (Docket # 1487), the Examiner developed a work plan and budget in consultation with the Debtors and the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases ("Creditors Committee"). This process of developing a work plan culminated in a hearing on June 21, 2006, at which the Court indicated that it was appropriate for the Examiner to focus on investigating possible claims against professionals, as outlined by the Examiner in an alternative work plan and budget filed under seal with the Court. The Court also requested that the Examiner investigate possible claims arising out of the dividend paid to the pre-IPO shareholders of Refco in connection with the IPO. Thus, the scope of the Examination was determined to include the investigation and reporting on causes of action which might be brought by the Refco estates against Refco's

prepetition professionals, including causes of action arising out of or related to the LBO, the IPO, and related transactions and services, and causes of action that might be brought against any subjects arising out of the payment of the $82.2 million dividend in connection with the IPO. The Court directed the Examiner to file his final report by April 16, 2007. The Court did not require the filing of any interim reports. Immediately after the June 21 hearing, the Examiner commenced the investigation.

### B.    FACTORS THAT INFLUENCED THE EXAMINATION

#### 1.    Factors that Aided the Examination

a.    The Court's availability to set hearings and *in camera* conferences and deliver prompt rulings on contested matters, and otherwise, was most helpful in moving the investigation forward.

b.    The Court directed the Examiner to establish protocols and to coordinate and avoid interference with investigations being conducted by the Securities and Exchange Commission ("SEC"), the United States Attorney's Office for the Southern District of New York ("USAO"), the Commodities Futures Trading Commission ("CFTC"), and other governmental agencies. The Examiner established protocols with the SEC, USAO and CFTC, which resulted in a minimum of interference with the ongoing governmental investigations while allowing the Examination to proceed. Specifically, the Examiner coordinated his efforts with the Assistant United States Attorneys handling the Bennett and related investigations to minimize interference with the criminal investigations. The protocols with the investigatory agencies were intended to facilitate the sharing of information to the extent that such sharing would benefit the Debtors' estates. As explained below, the deference afforded to the USAO's criminal investigation limited the Examiner's ability to interview certain witnesses deemed central to the USAO's criminal proceedings, and to access certain documents.

c.      The Examiner coordinated with the SEC throughout his investigation.  Based on the Examiner's role as a court-appointed fiduciary, the SEC granted the Examiner's "access request," a formal mechanism through which the Examiner gained access to documents produced to the SEC by third parties.  Thereafter, the SEC was particularly cooperative in providing the Examiner access to these documents.  The SEC also made itself readily available to the Examiner for consultations regarding coordination as part of the Examiner's efforts to avoid interference with governmental investigations.

d.      The Examiner also received a high degree of cooperation from the U.S. Trustee, particularly with regard to clarifying provisions of the Debtors' Joint Chapter 11 Plan that impacted the Examiner and his investigation.

e.      Cooperation from several of the major parties in interest was helpful to the Examiner throughout the course of the Examination.  The Examiner received cooperation from, and consulted frequently with, among others, the Debtors, their restructuring personnel, and their counsel; the RCM Trustee and his counsel; and the Creditors Committee (and later the Litigation Trustee), its counsel and its conflicts counsel.  The Debtors and their counsel, and the RCM Trustee and his counsel, among others, provided the Examiner access to a tremendous volume of documents, including privileged documents.  Sharing of these documents was provided by way of access to Debtors' counsel's intranet site on which electronic images of the documents had been loaded.  Similarly, the Creditors Committee's counsel was helpful in arranging for access to documents which had been produced to it by third parties.  The Examiner arranged for counsel to the Litigation Trustee to attend each interview with the consent of the parties being interviewed, which resulted in efficiencies and cost savings for the estates.

f.      Prior to the Examiner's appointment, the Debtors and the Creditors Committee retained consultants in the Bankruptcy Cases (Goldin Associates, LLC, AP Services, LLC and FTI Consulting, Inc. for the Debtors; Houlihan Lokey Howard & Zukin Capital, Inc. and FTI Consulting, Inc. for the Creditors Committee). Based on the Court's admonition against retaining additional consultants unless absolutely necessary, the Examiner determined that his investigation could proceed without the retention of more consultants whose expertise would overlap that of the Debtors' and Creditors Committee's consultants. While retention of his own consultants would have enabled a more in-depth and extensive expert review of certain financial and accounting issues, the Examiner was able to obtain sufficient information with the cooperation of the existing consultants to conduct the investigation.

### 2.      Limitations on the Examination

a.      The period from the June 21, 2006 hearing, at which authorization to proceed was received, to the filing of this Report spanned less than ten months calendar time and was a short time period within which to complete and report on the Examination. The Examiner and his counsel engaged in an extensive review of over one million pages of documents, conducted extensive legal research, and conducted numerous witness interviews, culminating in an analysis applying the complex set of facts discovered against existing law, and the writing of this Report. With the volume of documents in existence, large number of witnesses to be interviewed, and the complexity of the underlying transactions to be investigated, the Examiner believes he would have benefited from additional time, but understood that the Court intended for the Report to be completed six months before the two-year anniversary of the Petition Date. The Examiner believes that his efforts, together with the efforts of his professionals, resulted in the review of most of the key documents, and interviews of the most knowledgeable witnesses, available to the Examiner.

b.      The Examiner, as did the Creditors Committee, provided advance notice to the USAO of proposed interviews to allow the USAO an opportunity to object if the USAO believed an interview would compromise its criminal investigation.  As noted above, out of deference to ongoing governmental investigations, the Examiner was unable to interview certain witnesses believed to have valuable knowledge of the facts underlying the fraudulent schemes.  Because of the ongoing criminal investigation, it is also likely that some participants would have refused to be interviewed or to testify.  The witnesses unavailable to the Examiner included high-level Refco officers and directors, key GT principals and employees, and a few of the third-party participants in some, but not all, of the Round Trip Loan transactions.  The Examiner was also unable to review certain reports provided to the USAO by Latham & Watkins regarding the internal investigation performed at the request of Refco's Audit Committee immediately prior to the bankruptcy filings.

c.      The Examiner received a large volume of documents during the course of the investigation.  The Examiner did not review every document provided to him due to the volume of documents, the timing of their receipt, and the limited time within which to conduct the Examination.  The vast majority of these documents were loaded into a searchable computer database.  Based on the OCR (optical character recognition) search methodology employed, the Examiner is confident that the most significant and relevant documents were reviewed to adequately inform this Report.

d.      The Court requested that the Examiner not retain additional consultants unless absolutely necessary, but instead utilize consultants previously retained by the Debtors and the Creditors Committee.  The Examiner honored this request and did not employ additional consultants.

C.    PROCEDURAL ASPECTS OF THE EXAMINATION

1.    Staffing the Examination

The Examiner organized the investigation by assembling teams at MLA to assist him in discharging his duties.  The Examiner staffed the investigation with a core group of thirteen lawyers, and one non-lawyer professional who has specialized knowledge in securities and derivatives matters.  These professionals were divided into an administrative team, five investigatory teams, and a bankruptcy/legal research/report writing team, with each team consisting generally of one partner and one associate. Each of the five investigatory teams was assigned to investigate certain subjects within the scope of the Examination, as follows:  (1) GT and AA, Refco's prepetition outside auditors; (2) E&Y, Levine Jacobs and other accountants; (3) Mayer Brown; (4) attorneys Weil and McDermott Will & Emery LLP ("McDermott Will"); and (5) the $82.2 million dividend paid at the time of the IPO.  In addition, the report writing team was charged with the responsibility of working with the Examiner in coordinating and developing the report of the Examiner with input of information from the various investigative teams.

The teams were occasionally and temporarily augmented as necessary to deal with spikes in activity in the investigative process.  Additionally, several lawyers with specialized knowledge in areas (such as securities and tax law) were consulted as appropriate; associates were brought in to assist with various legal research needs; and paralegals were utilized to assist with many of the necessary tasks, including the assembly and review of documents, the review, preparation and service of fee applications and reports to the Fee Review Committee, subject to review by a partner of the firm, and reviewing the Court docket in the Bankruptcy Cases on a periodic basis to alert the Examiner and his counsel to pleadings that might bear on the Examiner's investigation or his status as a party in interest in the Refco cases.

The Examiner was in overall control of the investigation, coordinated activities of the various teams, interacted with the USAO and other parties in interest, and, in consultation with his legal advisors, made the final decisions with respect to any conclusions and the content of this Report. An administrative team assisted the Examiner in coordinating the investigation and carrying out the directives of the Examiner with respect to positions taken by the Examiner in Court proceedings or in meetings with other parties in interest. The administrative team also utilized a non-lawyer technology expert with expertise in litigation support databases and related matters, who was responsible for establishing and overseeing the third party database for documents reviewed and used by the investigative teams, and coordinating with other parties regarding the use of their electronic databases.

### 2.    Coordinating the Examination

The Examiner, from time to time, required periodic reports from each investigative team with respect to the activities of the team. This ensured that the investigation and the activities of the investigative teams were adequately coordinated and that unnecessary duplication was avoided. Further, weekly conference calls were conducted with the leaders of each investigative team and the Examiner to review the progress of the investigation, the planned work for the coming weeks, and to resolve any problems or issues that may have arisen.

The investigation was organized so as to be completed in three stages: (1) document review and research; (2) interviews and depositions; and (3) conclusions and drafting of the Report. Of course, given practicalities in the timing of receipt of certain documents and the availability of witnesses, there was necessarily some overlap of the stages.

### 3.    Monitoring and Participating in the Bankruptcy Cases

The Examiner's administrative team monitored and participated, as appropriate, in the Debtors' Bankruptcy Cases. The Examiner filed several motions in the cases, including motions

to seal certain filings that contained information that may have been prejudicial to the

investigation and prosecution of estate causes of action had the information been disclosed

prematurely.  The pleadings filed by the Examiner under seal included his initial assessment of

the case, proposed work plan and budget and filings related to the established fee application

process.  The Examiner also provided input to the Debtors and Creditors Committee regarding

the Debtors' Chapter 11 Plan's provisions regarding the continuation of the Examiner's duties

after confirmation of the Plan.  On March 9, 2007, the Examiner filed a motion[4] for authority to

file this Report under seal, on a temporary basis, to establish procedures for removing the

temporary seal, and to resolve assertions of confidentiality and privilege regarding information

provided to the Examiner and used in this Report.

### 4.    Obtaining and Reviewing the Documents

The Examiner received a very large volume of documents from numerous sources

throughout the course of the investigation, including:  the Debtors and their counsel, with the

consent of the RCM Trustee and his counsel pursuant to a common interest agreement among the

Debtors, the RCM Trustee and the Examiner; counsel to the Creditors Committee, and conflicts

counsel to the Creditors Committee, who each provided documents previously produced to them

from third parties; the SEC, which provided documents previously produced to it from third

parties pursuant to subpoenas; and other third parties, pursuant to agreements or stipulations with

the Examiner, and pursuant to Court orders and/or Bankruptcy Rule 2004 subpoenas.  In

addition, the Examiner entered into separate common interest agreements with (a) the Debtors

and the RCM Trustee, and (b) the Creditors Committee, to facilitate the production and sharing

---

[4] Docket # 4596.

of documents.  Exhibit 2 to the Report lists the parties who produced documents referred to in this Report.

### 5. <u>Witness Interviews</u>

The Examiner and his investigative teams interviewed thirty-three fact witnesses. The interviews were taken on a consensual basis or pursuant to Bankruptcy Rule 2004 subpoenas. The interviews were not conducted under oath. Some of the interviews were transcribed.  The Examiner did not conduct interviews of every possible witness.  He selected the most appropriate available persons based on factors including time, resources and the desire to avoid interviewing witnesses with substantially overlapping knowledge.  Counsel for the Litigation Trustee attended the interviews.  Exhibit 3 lists all witnesses interviewed by the Examiner and his counsel.

## III. <u>HISTORY OF REFCO AND ITS AFFILIATES</u>

### A. <u>BRIEF HISTORY OF THE REFCO DEBTORS</u>

Refco Inc. and its subsidiaries were a commodities and futures trading brokerage conglomerate that provided execution and clearing services for exchange-traded derivatives, and also provided prime brokerage services in the fixed income and foreign exchange markets. Refco employed over 2,000 employees for its operations in fourteen countries, supervising and managing over 200,000 customer accounts.

The Refco Debtors' primary line of business was their futures trading business, consisting of the execution and clearance of trades of exchange-traded derivatives.  Hedge funds, investment companies and similar customers used Refco to trade commodities and financial products, among other things.  Some of Refco's business activities were subject to the regulations of the CFTC as well as the regulations of the Chicago Mercantile Exchange ("CME") and other applicable commodities exchanges on which the Debtors traded.

Refco, largely through its subsidiary, Refco Capital Markets Ltd. ("RCM"), a Bermuda company, also operated various unregulated businesses. For example, RCM invested and traded in over-the-counter derivatives and other financial products, primarily on behalf of wealthy individuals and related companies. The Debtors, through Refco Securities Ltd. ("RSL"), also operated as a regulated securities dealer subject to the regulation of the SEC in addition to the regulations of the exchanges on which RSL conducted business. RSL never filed for relief under the Bankruptcy Code, and substantially completed a winding down of its securities business during the pendency of the Bankruptcy Cases.

For much of the time period in question, Refco was wholly or partially owned by RGHI, a company that is not one of the Debtors in the Bankruptcy Cases.[5]

In early 1999, plans were made for an Austrian Bank called BAWAG P.S.K. Bank für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG") to purchase a 10% interest in RGL for $95 million. Prior to this purchase, RGL and all of its subsidiaries (except Refco, Inc.) were converted to LLCs. BAWAG's purchase of 10% of RGL closed in 1999. At the same time, BAWAG loaned $85 million to RGHI, which, in turn, loaned the $85 million plus an additional $10 million to a newly-created entity called Refco Group Holdings, LLC ("RGHL"), which used the money to purchase a 10% interest in RGL.[6] After the above transactions, RGL (now an LLC) was owned as follows: BAWAG — 10%; RGHI — 80%; and RGHL — 10%.[7]

---

[5] The ownership of RGHI changed over time. Initially, RGHI was owned by three individuals — Thomas Dittmer (51%), Bennett (24.5%), and Grant (24.5%). Later, Dittmer and Grant were bought out.

[6] The loan from BAWAG to RGHI included an option by BAWAG to purchase an additional 10% interest in RGL.

[7] RGHL was 90% owned by RGHI and 10% owned by two RGHI shareholders, Bennett and Grant.

Within the fourteen month period prior to the filing of these Bankruptcy Cases, the Debtors conducted first (i) a leveraged buy-out transaction on August 5, 2004 ("LBO"), which included issuance of certain senior subordinated notes which were subsequently registered with the SEC in a public exchange; and then (ii) an IPO on August 16, 2005.

In the LBO, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., and its affiliates and co-investors (collectively, "THL"), in exchange for a $507 million cash payment, acquired a portion of New Refco Group Ltd., LLC ("New Refco"), thereby acquiring an approximate 57% equity interest in RGL.  Through the LBO, Bennett exchanged his existing $382.5 million equity position in RGL for an approximate 42.8% equity interest in New Refco.  In addition, other Refco managers invested in New Refco.  Additional funding for the LBO included a fully-drawn $800 million term loan pursuant to a credit agreement dated as of August 5, 2004 between Refco Finance Holdings LLC (which became RGL), as borrower, and Bank of America, N.A., as administrative agent, with a number of RGL's affiliates guaranteeing the debt.  At the closing of the LBO, RGL distributed $550 million in cash, and all of the equity interests in an RGL affiliate (which owned substantially all of the asset management business of Refco) to RGHI (owned at that time by Grant and Bennett).  As part of the LBO, Refco Finance Holdings LLC and Refco Finance Inc. co-issued $600 million of senior subordinated notes by way of a Rule 144A Exchange Offer, known as the 9% Senior Subordinated Notes due August 1, 2012 ("Senior Subordinated Notes").  The Senior Subordinated Notes were guaranteed, jointly and severally, on a senior unsecured basis, by many of RGL's non-regulated domestic subsidiaries.

RGL was the company through which Refco's business was conducted. New Refco became the parent of, and owned all of the outstanding membership interests in, RGL upon completion of the LBO, after which the companies were structured as follows:

- Bennett owned 100% of RGHI;

- New Refco was owned by THL (57%) and RGHI (43%);

- New Refco owned 100% of RGL;

- RGL was the company through which all of Refco's operations were conducted.

Refco Inc. was formed in connection with the IPO, and issued the stock sold in the IPO. In connection with its August 2005 IPO, 30,475,000 shares of Refco Inc. were sold. Refco sold 12,500,000 shares, and existing shareholders sold 14,000,000 shares, of common stock at a price of $22.00 per share. An additional 3,975,000 shares were sold by Refco pursuant to the exercise of the IPO's underwriters' over-allotment purchase option. Proceeds from the sale of Refco's shares were used to redeem $210 million aggregate principal amount of the outstanding Senior Subordinated Notes, and for general corporate purposes. The proceeds from the over-allotment sale were used, on August 18, 2005, to pay an aggregate dividend of $82,203,000 to its pre-IPO shareholders, mostly THL and RGHI (owned by Bennett).

Approximately two months after consummation of the IPO, on October 10, 2005, Refco issued a press release disclosing the existence of a previously undisclosed $430 million receivable from RGHI. This receivable had previously been recorded on the Debtors' financial statements as a receivable from an unaffiliated third party. The true nature of this receivable had been concealed through the use of the fraudulent Round Trip Loan scheme designed to present a false financial picture at various points in Refco's history, including at the times of the LBO and IPO. The October 10 press release also stated that due to the material nature of the discovery of

this undisclosed receivable, Refco's previously-issued financial statements could no longer be relied upon.

Immediately prior to the bankruptcy filings, the undisclosed receivable was investigated internally by Refco's Audit Committee, which hired the law firm of Latham & Watkins LLP and financial consultant FTI Consulting Inc. to aid in the investigation. Subsequent to the discovery, the Board of Directors demanded immediate repayment of the receivable from RGHI/Bennett,[8] including interest. This payment was made by RGHI on October 10, 2005 using money obtained from BAWAG.[9] The public disclosure that Refco's previously issued financial statements could not be relied upon, together with related events, precipitated an immediate and extraordinary crisis at Refco, which ultimately led to the Debtors seeking relief under the Bankruptcy Code.

In the one week between the disclosure and the bankruptcy filings, Refco's customers engaged in a "run on the bank" resulting in a decline in customer deposits at Refco LLC, from approximately $7.5 billion on October 10, to approximately $5.7 billion by October 17. Refco's publicly-traded stock declined in value from an October 7, 2005 closing price of $28.56 (up from its IPO price of $22.00 per share) to an October 18, 2005 closing price of $0.65 per share. While Refco's regulated affiliates had maintained sufficient capital to satisfy the barrage of customer demands for withdrawals of their deposits, Refco's unregulated business, principally RCM, did not maintain sufficient cash on hand to satisfy customer withdrawal requests during this "run on

---

[8] The Board suspended Bennett from his duties at Refco pending conclusion of the investigation. Thereafter, on or about October 11, 2005, Bennett was arrested and is currently under indictment in the United States District Court for the Southern District of New York. In subsequent superseding indictments, Trosten and Grant were also indicted.

[9] BAWAG sued the Debtors in the Bankruptcy Cases to recover the loan. The Creditors Committee, with Court approval, counterclaimed on behalf of the Debtors. Ultimately, settlements were reached among BAWAG, the Debtors, the Creditors Committee, the USAO, THL, and other parties, providing for the payment by BAWAG of guaranteed amounts totaling $867 million to the Debtors, the USAO, and others, together with additional contingent payments and BAWAG's release of $480 million of claims it had asserted against the Debtors. As part of the settlements, BAWAG made significant admissions concerning its role in the fraudulent transactions.

the bank" period.  This lack of cash reserves, coupled with the high level of customer withdrawal demands, resulted in the declaration by the Board of Directors of a temporary moratorium on customer withdrawals as of October 13, 2005.

On October 17, 2005, the Debtors filed petitions for relief under the Bankruptcy Code.[10] Other than RCM, for which a chapter 11 trustee was subsequently appointed, all of the Debtors operated as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code during the pendency of their Bankruptcy Cases and until the Effective Date of the confirmed Joint Chapter 11 Plan in the Bankruptcy Cases — December 26, 2006.  The Creditors Committee was duly appointed, and retained counsel, and conflicts counsel, to represent interests of creditors in the Bankruptcy Cases.

In the first months of the Bankruptcy Cases, the Debtors effectuated the liquidation of substantially all of their valuable, non-contingent business assets which effectively resulted in the cessation of the Debtors' operations as going concerns. On December 9, 2005, the U.S. Trustee filed a motion for the appointment of a chapter 11 trustee in these Bankruptcy Cases. The motion was predicated on the alleged fraud and malfeasance of certain controlling members of the Debtors' prepetition management.  The Court conditionally denied the motion for appointment of a chapter 11 trustee subject to the Debtors meeting certain conditions, which were met.  Thereafter, the U.S. Trustee, on January 27, 2006, filed a motion for the appointment of an examiner, which was approved by the Court on March 16, 2006.

On December 15, 2006, the Court entered an order confirming the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries. On the

---

[10] On November 25, 2005, Refco, LLC filed a petition for relief under Chapter 7 of the Bankruptcy Code. On June 5, 2006 three additional affiliated companies also filed petitions for relief under the Bankruptcy Code.

Effective Date of the Plan, a Litigation Trustee, to pursue claims of the estates, and a Plan

Administrator, to wind down the affairs of the estates, were named pursuant to provisions of the

Plan. The Plan also provided for the Examiner to continue with his investigation and file his

report pursuant to the Examiner Appointment Order.

### B.    ROUND TRIP LOANS AND SIMILAR TRANSACTIONS

### 1.    Overview

Beginning in no later than February 1998, Refco's senior management used several forms

of purported short-term loans that straddled the end of Refco's financial reporting periods to

mask substantial portions of the RGHI Receivable. In this section of the Report, the Examiner

describes those loans, and explains their impact on the RGHI Receivable.

The RGHI Receivable was composed of the debit balances in three Refco accounts:

(i) the account of RGHI at RCM; (ii) the account of RGHI at Refco Capital Corporation (later,

Refco Capital LLC) ("RCC"); and (iii) the account of Refco Global Finance ("RGF") at RCM

(RGF was a subsidiary of RCM in which a portion of the RGHI Receivable — the so-called

"Asian receivable" — was "parked"). As of January 1998, the total RGHI Receivable was over

$376 million.[11]  It ballooned to over $1 billion by January 2004.[12]

Between 1998 and 1999, transactions similar to what later became known as Round Trip

Loans (or RTLs) were used to mask the RGHI Receivable. These did not involve any loan

documentation. These transactions will be referred to as "Wire Transfer Loans" or "WTLs."

Like the RTLs, the WTLs involved purported "loans" from a third party to RGHI in late

---

[11] *See* FTI Consulting Schedule 3, at App. D-1.

[12] *Id.*

February, which RGHI would subsequently repay in early March after the close of Refco's fiscal year. The third party WTL participants were paid interest for their funds by RCM.

Between February 2000 and September 2005, the RTLs with unaffiliated third parties ("RTL Participants") were used to conceal the RGHI Receivable. The RTLs were initially done at the end of Refco's financial reporting year (end of February), but later the transactions became more frequent, occurring at quarter and calendar year end as well. Based on the loan documents, the total principal amount of these loans was $6,250,000,000. Further, based on the loan documents, the total cost to Refco in net interest paid to the RTL Participants was $1,227,042.82.

Another type of short term loan used to mask the RGHI Receivable was also done at the end of Refco's financial reporting year for the years 2000 through 2005 between Refco and BAWAG (the "BAWAG Loans"). The BAWAG Loans were substantially funded by RCM, with BAWAG providing some additional funds for which it was paid interest by RCM. The total principal amount of these loans was $1,650,000,000, and their cost to Refco was $347,042.97.

### 2. Impact of Loans on RGHI Receivable

The proceeds of the short-term loans were used to reduce the total outstanding balance of the RGHI Receivable. These proceeds were credited to one or more of the accounts that had a debit balance representing a portion of the then-existing RGHI Receivable. The effect of such credits was to reduce the debit balance. After the end of the financial reporting period, the proceeds of these loans that had been temporarily credited to the various accounts evidencing the RGHI Receivable were returned, thereby reinstating the receivable in its prior amount, and increasing it by the amount of the interest charged on those loans.

Set forth below is a table showing the effect on the then-existing RGHI Receivable of these short term loans that straddled the end of Refco's financial reporting periods starting with February 1998, and continuing through September 2005.

For substantially all of the periods (with the notable exception of July-August 2004 when the LBO closed), the total amount of the short-term RTLs, WTLs, and BAWAG Loans tracked the net reduction in the RGHI Receivable shown at the end of a reporting period, and the increase in the receivable when they were reversed generally equaled or exceeded the amounts of these short-term loans.[13]

## IMPACT OF SHORT TERM LOANS ON RGHI RECEIVABLE

| Year /Month Accounting Period End Date[14] | Total Loans (RTLs, WTLs, BAWAG)[15] | Net Reduction in Receivable[16] | Month End Combined RGHI Receivable Balance |
|---|---|---|---|
| January 31, 1998 | | | $376,678,786 |
| February 28, 1998 | $175,000,000 | $165,095,248 | $211,583,538 |
| March 31, 1998 | | | $387,708,499 |
| | | | |
| January 31, 1999 | | | $409,398,142 |
| February 28, 1999 | $265,000,000 | $275,462,834 | $133,935,308 |
| March 31, 1999 | | | $455,135,660 |
| | | | |
| January 31, 2000 | | | 308,951,450 |
| February 29, 2000 | $610,000,000 | $325,299,510 | (16,348,060) |
| March 31, 2000 | | | 596,676,711 |
| | | | |

---

[13] These accounts were also used for other purposes. As a result, there is a substantial, but not a direct, dollar-for-dollar correlation between the short term loans, the reduction in the RGHI Receivable when they were made, and its increase when they were unwound.

[14] This column identifies the end date for the month end accounting period. It is generally, but not always, the last day of the month.

[15] The total loan amount for each period is a total of all RTLs, WTLs, and BAWAG Loans made during that period.

[16] Net reduction in receivable is calculated using balances reflected on account statements for accounts held by RGHI at RCM and RCC, and by RGF at RCM. The net reduction is the cumulative difference between the closing balance as of the last day of the prior monthly accounting period and the closing balance on the last day of the subsequent monthly accounting period. *See* FTI Consulting Schedule 3, at App. D-1.

## IMPACT OF SHORT TERM LOANS
## ON RGHI RECEIVABLE

| Year /Month Accounting Period End Date[14] | Total Loans (RTLs, WTLs, BAWAG)[15] | Net Reduction in Receivable[16] | Month End Combined RGHI Receivable Balance |
|---|---|---|---|
| January 31, 2001 | | | 656,856,470 |
| February 28, 2001 | $750,000,000 | $656,765,194 | 91,276 |
| March 31, 2001 | | | 709,888,962 |
| | | | |
| January 31, 2002 | | | 852,871,155 |
| February 28, 2002 | $925,000,000 | $857,508,816 | (4,637,661) |
| March 31, 2002 | | | 849,144,785 |
| | | | |
| January 31, 2003 | | | $981,676,171 |
| February 28, 2003 | $900,000,000 | $971,967,903 | $9,708,268 |
| March 31, 2003 | | | $943,939,524 |
| | | | |
| January 31, 2004 | | | $1,018,169,785 |
| February 27, 2004 | $970,000,000 | $1,081,847,495 | ($63,677,710) |
| March 31, 2004 | | | $918,410,130 |
| | | | |
| April 30, 2004 | | | $927,869,697 |
| May 31, 2004 | $700,000,000 | $975,513,269 | ($47,643,590) |
| June 30, 2004 | | | $1,020,630,338 |
| | | | |
| July 30, 2004 | | | $1,047,734,097 |
| August 31, 2004[17] | $485,000,000 | $1,047,734,094 | $3 |
| September 30, 2004 | | | $509,921,688 |

---

[17] This is the month in which the LBO was consummated, and the RGHI Receivable was partially reduced by proceeds from the LBO paid to RGHI.

### IMPACT OF SHORT TERM LOANS
### ON RGHI RECEIVABLE

| Year /Month Accounting Period End Date[14] | Total Loans (RTLs, WTLs, BAWAG)[15] | Net Reduction in Receivable[16] | Month End Combined RGHI Receivable Balance |
|---|---|---|---|
| October 29, 2004 | | | $507,896,761 |
| November 30, 2004 | $545,000,000 | $505,060,909 | $2,835,852 |
| December 2004[18] | $550,000,000 | $547,641,494 | $2,358,506 |
| January 2005 | | | 526,621,060 |
| February 28, 2005 | $595,000,000 | $526,727,143 | (106,083) |
| March 31, 2005 | | | 560,900,215 |
| April 29, 2005 | | | 626,425,628 |
| May 31, 2005 | $450,000,000 | $629,849,370 | (3,423,742) |
| June 30, 2005 | | | 488,348,647 |
| July 29, 2005 | | | 496,620,598 |
| August 31, 2005 | $420,000,000 | $495,177,116 | 1,443,482 |
| September 30, 2005 | | | (8,076) |
| October 11, 2005 | | | 418,701,276 |

### 3.     The 1998 and 1999 Wire Transfer Loans

The WTLs engaged in by Refco and RGHI in 1998 and 1999 involved purported "loans" from third parties to RGHI in late February, which RGHI purportedly "repaid" in early March after the close of Refco's fiscal year. These transactions were not booked as loans, but, rather,

---

[18] This RTL was made at calendar year end rather than at the end of a Refco financial reporting period. Because there was a RTL in the previous month of November 2004, the Net Reduction in the RGHI Receivable for this December RTL is calculated with reference to the month end balance of the combined RGHI Receivable at the end of October 2004.

were described as short term "repos" with "repo termination dates" in early March. No loan documentation was prepared for the WTLs. The WTLs were an early method of manipulating the RGHI Receivable.

The first of the WTLs occurred on February 26 and 27, 1998, just days before the close of Refco's 1998 fiscal year. As a result of a series of four WTLs, RGHI's account at RCC was credited by a total of $175 million. On February 26, 1998, Tradewinds Debt Strategies Fund transferred $50 million from its RCM account to RGHI's account at RCC, and MLC Emerging Markets HSE-Cox ("MLC")[19] transferred $50 million from its RCM account to RGHI's account at RCC. On February 27, 1998, Tradewinds Emerging Debt Fund transferred $25 million from its RCM account to RGHI's account at RCC, and MLC transferred another $50 million from the same account to RGHI's account at RCC. On March 3, 1998, each of these transactions was reversed, with interest.[20]

The second set of the WTLs occurred in February 1999, and as a result of these WTLs, RGHI's accounts at RCC and RCM were credited by a total of $265 million. Both the 1998 and 1999 WTLs involved funding by RCM. That is, for each wire transfer made by the entities involved in the 1998 and 1999 WTLs, RCM made corresponding short term loans in the same principal amounts to those entities.

On February 23, 1999, MLC made four separate transfers (three via wire transfer and one via journal entry) totaling $125 million from its account at RCM to RGHI's accounts at RCC and

---

[19] There were several MLC-related entities involved in the WTLs. For ease of reference, they are collectively called "MLC."

[20] The information pertaining to these transactions is derived from flowcharts and RCM account information for each of the WTL Participants provided to the Examiner by FTI Consulting.

RCM.  On the same day, $125 million was credited to MLC's account at RCM in a transaction described as a "US Dollar Term Loan."

On February 24, 1999, three similar transactions took place: (i) the Bulgarian-Russian Investment Bank ("BriBank") wire transferred $50 million from its account at RCM to RGHI's account at RCC, and RCM credited BriBank's account with $50 million by means of a short term loan; (ii) GlobeInvest Corp., an entity related to BriBank ("GlobeInvest"), wire transferred $40 million from its account at RCM to RGHI's account at RCC, and RCM credited BriBank's account with $40 million by means of a short term loan; and (iii) EMF, Ltd. wire transferred $50 million from its account at RCM to RGHI's account at RCC, and RCM credited EMF's account with $50 million by means of a short term loan.  On March 3, 1999, each of these transactions was reversed, with interest.

Set forth below is a table outlining each known WTL transaction as well as the identity of each WTL Participant, the dates and amount of the transactions.

### WIRE TRANSFER LOAN TRANSACTIONS

| Start Date | End Date | WTL Participant | Amount |
|------------|----------|-----------------|--------|
| 02/26/1998 | 03/03/1998 | Tradewinds Debt Strategies Fund | $50,000,000 |
| 02/27/1998 | 03/03/1998 | Tradewinds Emerging Debt Fund | $25,000,000 |
| 02/26/1998 | 03/03/1998 | MLC | $50,000,000 |
| 02/27/1998 | 03/03/1998 | MLC | $50,000,000 |
| **TOTAL 1998** | | | **$175,000,000** |
| 02/24/1999 | 03/03/1999 | EMF, Ltd. | $50,000,000 |
| 02/24/1999 | 03/03/1999 | BriBank | $50,000,000 |
| 02/24/1999 | 03/03/1999 | GlobeInvest Corp. | $40,000,000 |
| 02/23/1999 | 03/03/1999 | MLC | $9,600,000 |
| 02/23/1999 | 03/03/1999 | MLC | $2,772,000 |
| 02/23/1999 | 03/03/1999 | MLC | $4,253,000 |
| 02/23/1999 | 03/03/1999 | MLC | $108,375,000 |
| **TOTAL 1999** | | | **$265,000,000** |

### 4.    The 2000 - 2005 Round Trip Loans

Refco engaged in RTL transactions from February 2000 through August 2005. The RTLs had two primary costs to Refco. First, Refco paid a total of $1,227,042.48 in interest to the RTL Participants to engage in these loan transactions. Second, each of the RTLs exposed RGL to potential claims because RGL guaranteed RGHI's full repayment to each RTL Participant and agreed to indemnify the RTL Participant for any claims arising out of the transactions.

These Round Trip Loan transactions generally followed a pattern. First, RCM would "loan" between $50 million and $720 million to a RTL Participant at a fixed rate of interest (typically LIBOR). The loan would be "funded" by means of a credit to an account at RCM in the name of the RTL Participant.

Simultaneously with the RCM loan to the RTL Participant, a loan in the same amount would be made by the RTL Participant to RGHI at an interest rate that was between 15 and 100 basis points higher than the interest rate charged by RCM to the RTL Participant. The loan to RGHI would be "funded" by transferring the credit in the RTL Participant's account at RCM to RGHI's account at RCM.

Since the RGHI account at RCM had a debit balance representing the RGHI Receivable (or portion thereof), the crediting of the purported loan funds from the RTL Participant's account at RCM to that RGHI account had the effect of reducing the RGHI Receivable in a like amount. At times, entries would also be made to further transfer funds from the RGHI account at RCM to an RCC or RGF account.

The net effect of these transactions was that at the end of the reporting period it appeared on Refco's books that RCM was owed money from the RTL Participant, and the amount that had been owed by RGHI was reduced in an amount equal to the Round Trip Loan or eliminated.

A few days after the close of the reporting period, the transactions would be unwound. The amount RGHI "borrowed" from the RTL Participant would be "repaid" by a transfer from RGHI's account at RCM to the Round Trip Loan Participant's account at RCM, plus interest, thereby causing a debit in the RGHI account in that amount and a corresponding increase in the RGHI Receivable.

Then, an amount would be deducted from the RTL Participant's account to "repay" its loan from RCM, with interest. Because the interest rate on the Round Trip Loan Participant's loan to RGHI was 15 to 100 basis points higher than the rate of the RTL Participant's loan from RCM, the RTL Participant would "earn" a profit equal to the difference between the two interest payments. The net profit made by the RTL Participants on each transaction ranged from $1,500 to nearly $200,000, depending on the amount "loaned," the interest spread, and the duration of the loans.

Although characterized as "loans," generally no funds moved in these transactions except for the profits paid to the Round Trip Loan Participants. Rather, the funds moved on a book basis by making adjustments to the RCM accounts of the Round Trip Loan Participants and RGHI.

The repayment of RGHI's loans to each RTL Participant was guaranteed by RGL, thereby insuring that the RTL Participant had the funds to repay its loan to RCM (RCM was a subsidiary of RGL). RGL also agreed to indemnify each RTL Participant for any claims arising out of either loan transaction.

Other than the amounts, dates, and interest rates, the documentation for each RTL transaction was generally the same and consisted of the following six documents:

- RCM Loan: short term loan from RCM to the RTL Participant;

- RCM Note:  promissory note made by the RTL Participant payable to RCM in the same amount reflected in the RCM Loan;

- RGHI Loan:  short term loan from the RTL Participant to RGHI;

- RGHI Note:  promissory note made by RGHI payable to the RTL Participant in the same amount reflected in the RGHI Loan;

- Guaranty:  guaranty from RGL guaranteeing RGHI's repayment of the RGHI Loan; and

- Indemnity:  indemnity from RGL indemnifying the RTL Participant from any claims arising from either the RCM or RGHI Loans.

The RTL Participants were all entities who had preexisting business relationships with Refco.  For many of them, Refco served as their prime broker.  Although many of them held various investment accounts at RCM, they generally opted to run the RTL transactions through small accounts at RCM that did not contain any investor or customer money, and in many cases, the accounts appear to have been opened solely for the purpose of doing RTLs.

Different Refco individuals — Nick Mascio ("Mascio"), Peter McCarthy ("McCarthy"), and David Weaver ("Weaver") — approached different RTL Participants to engage in the transactions, although it appears that Santo Maggio ("Maggio") of Refco oversaw most of these transactions.

The loans from each RTL Participant to RGHI were always signed by Bennett.  The RGL guaranty and indemnity were also signed by Bennett in all instances except one.  The loan from RCM to each RTL Participant was signed in one instance by Bennett, in several instances by Weaver, and in the remaining instances by Maggio.

The RTL Participants all denied having any knowledge that the transactions were used to manipulate Refco's balance sheets; but, as explained below, some did suspect that the transactions were being used for "balance sheet clean-up" or "to dress up Refco's balance sheet." Most of the RTL Participants indicated that the main reason they agreed to participate in the

RTLs was because they felt that the structure of the transaction effectively eliminated any risk that they would not be repaid the amounts they loaned to RGHI and therefore, the transaction was simply a "risk free" way to make a relatively small profit.

The RTL Participants said that they did not know who first designed the RTL transactions. As discussed in more detail below, some of the early RTL Participants did request the addition of certain provisions to the RTL documentation — provisions mainly designed to eliminate any risk that they would not be repaid on their loan to RGHI and therefore be left without the funds to repay their loan to RCM. In later years, however, there was little negotiation and few changes made to the standard RTL transaction documents. All of the Round Trip Loan Participants stated that they did not know whether there were other Round Trip Loan Participants or who they were.

Set forth below is a chart outlining each of the Refco RTL transactions from February 2000 to September 2005, the identity of the RTL Participant, and the dates and amount of the transaction. As the chart illustrates, in the early years, Refco engaged in RTLs with multiple parties for each year-end reporting period. Starting in 2003, however, Refco engaged in RTLs only with Liberty Corner Capital Strategies, and started doing the transactions multiple times per year.

### ROUND TRIP LOAN TRANSACTIONS

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/25/2000 | 03/09/2000 | CIM Ventures, Inc. | $150,000,000 |
| 02/25/2000 | 03/03/2000 | EMF Core Fund, Ltd. | $50,000,000 |
| 02/25/2000 | 03/03/2000 | CS Land Management, LLC | $110,000,000 |
| **TOTAL 2000** | | | **$310,000,000** |
| 02/23/2001 | 03/06/2001 | CIM Ventures, Inc. | $250,000,000 |
| 02/26/2001 | 03/02/2001 | Delta Flyer Fund, LLC | $200,000,000 |
| **TOTAL 2001** | | | **$450,000,000** |
| 02/25/2002 | 03/04/2002 | Liberty Corner Capital Strategies, LLC | $325,000,000 |
| 02/25/2002 | 03/04/2002 | Delta Flyer Fund, LLC | $175,000,000 |
| 02/25/2002 | 03/04/2002 | Beckenham Trading Company, Inc. | $125,000,000 |
| **TOTAL 2002** | | | **$625,000,000** |
| 02/21/2003 | 03/04/2003 | Liberty Corner Capital Strategies, LLC | $500,000,000 |

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/21/2003 | 03/04/2003 | Delta Flyer Fund, LLC | $150,000,000 |
| **TOTAL 2003** | | | **$650,000,000** |
| 02/20/2004 | 03/04/2004 | Liberty Corner Capital Strategies, LLC | $720,000,000 |
| 05/27/2004 | 06/07/2004 | Liberty Corner Capital Strategies, LLC | $700,000,000 |
| 08/25/2004 | 09/07/2004 | Liberty Corner Capital Strategies, LLC | $485,000,000 |
| 11/26/2004 | 12/03/2004 | Liberty Corner Capital Strategies, LLC | $545,000,000 |
| 12/30/2004 | 1/05/2005 | Liberty Corner Capital Strategies, LLC | $550,000,000 |
| **TOTAL 2004** | | | **$3,000,000,000** |
| 02/23/2005 | 03/08/2005 | Liberty Corner Capital Strategies, LLC | $345,000,000 |
| 05/25/2005 | 06/06/2005 | Liberty Corner Capital Strategies, LLC | $450,000,000 |
| 08/26/2005 | 09/06/2005 | Liberty Corner Capital Strategies, LLC | $420,000,000 |
| **TOTAL 2005** | | | **$1,215,000,000** |

## 5.    The Individual Round Trip Loan Participants

### a.    CIM Ventures

CIM Ventures, Inc. ("CIM Ventures") is a subsidiary of Ingram Micro, Inc. ("Ingram Micro"), a worldwide distributor of information technology products based in Santa Ana, California.  CIM Ventures engaged in RTLs in February 2000 and February 2001 for $150,000,000 and $250,000,000 respectively.  CIM Ventures made a total net profit of $19,583.33 on the two RTLs.

The Examiner's counsel conducted voluntary interviews of two Ingram Micro employees who were involved in the RTLs with Refco — James Ricketts, Ingram Micro's corporate treasurer ("Ricketts"), and Thomas Madden, Ingram Micro's former CFO ("Madden").  In addition, Ingram Micro's outside counsel and general counsel made a presentation to the Examiner's counsel and the Creditors Committee's counsel in a meeting in December 2006 regarding the results of their own investigation into the RTLs engaged in by CIM Ventures.

The CIM Ventures RTL transactions were conducted through an account at RCM held by CIM Ventures created in late 1999 to provide short-term financing to Ingram Micro's overseas subsidiaries.  Prior to engaging in the RTLs, CIM Ventures had entered into a deal for Refco to provide such financing that closed in mid-December 1999, in which Refco was represented by

Joseph Collins ("Collins") and Robert Monk ("Monk") of Mayer Brown. The primary Refco contacts in that transaction were Maggio and Weaver, and Ricketts was the primary CIM Ventures contact.

Ricketts stated that the topic of doing a RTL first arose on February 1, 2000, when Weaver contacted him to broach the subject. Ricketts' contemporaneous handwritten notes from his conversation with Weaver show that they discussed a "back-to-back loan arrangement," with one loan at LIBOR with RCM, a second loan at LIBOR plus 15 basis points with "Refco Holdings," and the term of the loan going from February 25 to March 9.[21] Ricketts' notes also indicate that the contemplated documentation for the RTL transaction were "notes," an "indemnification letter," and "a right of offset letter."

On February 4, 2000, a few days after the initial call between Ricketts and Weaver, Monk sent Ricketts drafts of a loan agreement between RCM and CIM Ventures, a loan agreement between CIM Ventures and RGHI, and an indemnity letter from RGHI.[22] The loan amount was $150,000,000. It appears that at this stage, the RTL transaction documents did not contain the guaranty and the indemnity was from RGHI, not RGL.

After receiving the initial drafts from Mayer Brown, Ricketts had a number of questions and changes he wanted made in the RTL transaction documents. First, Ricketts wanted provisions added to the loan agreements in which RCM and RGHI would represent that they were and would remain in compliance with any applicable anti-money laundering regulations

---

[21] IM-SEC 008435; *see also* IM-SEC 007448.

[22] IM-SEC 007529-64.

during the term of the loans.[23]  Ricketts also raised some questions about the relationship

between RGHI and RGL.  On February 8, 2000, Weaver sent Ricketts an e-mail in which he

explained that "[RGHI] is outside the org chart and represents [t]he shareholders of RGL.

[RGHI] is an affiliate of RGL.  Both companies have the same shareholders."[24]  It also appears

that at some point Ricketts asked Mayer Brown to add the guaranty to the RTL transaction

documents.

Monk incorporated Ricketts' proposed changes into the transaction documents and sent a

revised draft to Ricketts for review on February 11, 2000.[25]  This revised set of documents

included: (1) a guaranty by RGL; (2) the indemnity now made by RGL instead of RGHI;

(3) anti-money laundering language added to both loan agreements; and (4) additional changes to

the language of the indemnity letter that was proposed by Ricketts and others at Ingram Micro.[26]

The February 11, 2000 drafts forwarded by Monk did not differ in substance from the

final RTL documents that were ultimately executed by the parties as of February 25, 2000.[27]  The

Examiner's review of the documents produced by all of the subsequent RTL Participants

indicates that subsequent RTLs (whether with CIM Ventures or other RTL Participants) basically

used the same template that was agreed to by CIM Ventures and Refco in February 2000.

---

[23] IM-SEC 007566-68.  Ricketts stated that he wanted this language included in the agreements because Ingram Micro conducted significant business in Caribbean and Latin American countries, many of which have strict anti-money laundering regulations.

[24] IM-SEC 007565.

[25] IM-SEC 007581-619.

[26] *Compare* IM-SEC 007616-17 *with* IM-SEC 007563-64.

[27] IM-SEC 007326-65, at App. D-2; MB02325109.

A few days prior to execution on February 21, 2000, CIM Ventures' Board of Directors approved the transaction because it concluded that "it is in the best interest of the Company and its shareholders to enter into a back-to-back loan arrangement with [RCM and RGHI]."[28]

Ricketts stated that it was his understanding from the outset that the entire transaction would be done on a book basis, with no cash moving, except for the net profit on the interest spread. On February 22, 2000, Ricketts sent Monk a letter summarizing and detailing the mechanics of the transaction[29] — information Ricketts stated he obtained from either Weaver or Maggio at Refco. The transaction was run through CIM Ventures' RCM account, which Ricketts stated was opened at the time of Refco's investment in CIM Ventures in late 1999. Ricketts further stated that CIM Ventures used this account for a variety of other unrelated short-term cash investments in addition to the RTLs with Refco.

Pursuant to the agreements, the RTL was reversed on March 9, 2000. On that date, Ricketts sent an e-mail to Weaver requesting that the transaction be reversed pursuant to the two loan agreements, that the $8,125 net profit on the transaction be transferred to CIM Ventures' bank account in the Cayman Islands, and the two promissory notes be signed and marked as cancelled and returned to the respective makers.[30] On March 9, 2000, Monk transmitted the original promissory note which CIM Ventures had signed in connection with the RTL, which he (Monk) endorsed as "paid in full" as the authorized agent of RCM.[31]

In late 2000, Refco renewed its investment in CIM for a second year. Shortly after the CIM transaction was renewed, Ricketts was again approached by Weaver to do another RTL.

---

[28] IM-SEC 001107.

[29] IM-SEC 007368.

[30] IM-SEC 007310-11.

[31] *See* IM-SEC 007313-14.

Once again, Monk handled the drafting of the documents, substituting new dates and a new loan amount of $250,000,000.

Monk discussed the 2001 documents with CIM Ventures' outside counsel, at whose suggestion clauses were added to the loan agreements to provide that if repayment of one of the loans was accelerated due to a default, the lender under the other loan could also accelerate payment.[32]

The 2001 loan documents were executed on February 16, 2001,[33] with the loans commencing on February 23, 2001.[34]  On February 16th, Ricketts sent a letter to Collins at Mayer Brown, confirming all the details and mechanics of the transaction.[35]  On February 23, 2001, Ricketts sent Refco written authorization to transfer the $250,000,000 RCM had deposited in CIM Ventures' account to RGHI's account.[36]  The transaction was unwound on March 6, 2001, with the $11,458.33 net profit being transferred to the bank account identified by Ricketts in his February 16 letter to Mayer Brown, and the RCM Note being returned to Ingram Micro marked as "paid in full."[37]

On April 2, 2001, Ingram Micro received an audit confirmation request from Refco's outside auditor at the time, AA.[38]  The confirmation request asked Ingram Micro to confirm the details of CIM's account at RCM.  Attached to the confirmation request letter was the February

---

[32] IM-SEC 001349.

[33] IM-SEC 006330.

[34] IM-SEC 006289, 6296-329; MB 02339880-81, MB 02339869-70.  The Examiner could not locate a signed copy of the RGHI Note for this transaction.

[35] IM-SEC 006330.

[36] IM-SEC 006293.

[37] IM-SEC 006288-89.

[38] IM-SEC 006049-52.

2001 CIM account statement, showing the deposit of the $250,000,000 RTL amount. Ricketts signed the confirmation and noted no exceptions.

Ricketts denied knowing what Refco's business purpose was for the RTLs. Ricketts acknowledged that he knew that Refco's financial reporting year ended on February 28, but he stated that the fact that the terms of the RTLs straddled Refco's fiscal year-end did not raise any concerns with him or anyone at CIM Ventures or Ingram Micro, nor did he suspect that Refco was using the transactions to manipulate its financial statements.

Ricketts stated that Ingram Micro's purpose in doing the RTLs was primarily to bring in additional income for CIM to offset some of CIM's operating expenses in the Cayman Islands. Ricketts acknowledged that the $8,125 and $11,458 profit CIM made on the two transactions was not substantial or significant when viewed in comparison to CIM's overall finances. Ricketts stated that Ingram Micro also engaged in the transactions because it wanted to grow its business relationship with Refco.

In January 2002, Ingram Micro no longer needed a minority partner in CIM Ventures because of tax law changes. As such, Ingram Micro bought out Refco's interest in CIM Ventures. This buyout closed on January 31, 2002. CIM Ventures still exists today as a wholly-owned subsidiary of Ingram Micro.

While Ingram Micro and Refco were working on buying out Refco's investment in CIM Ventures, Weaver contacted Ricketts on January 7, 2002 to do another RTL.[39] Weaver proposed a RTL for the same amount as 2001 ($250,000,000), but now with a 25 basis point spread and a one-week term starting on February 25, 2002, and ending on March 4, 2002. The 10 basis point

---

[39] IM-SEC 005415-16.

increase was to account for the shorter term so that the net profit to CIM Ventures would be approximately the same as 2001.[40]

Ricketts wanted to do the transaction again and sought approval for the 2002 RTL from Ingram Micro's general counsel, and Madden, Ingram Micro's then-new CFO. Ricketts provided the following description of the transaction to them:

> Rec'd this today from Refco asking us to do the back-to-back loan/investment out of CIM again at the end of February. This would be the third time for the transaction. As you may recall, CIM would borrow $250 million from REFCO Capital Markets LTD (Bermuda company) at LIBOR and then lend these same funds to REFCO Group Holdings, Inc. with a mark-up (they are ok with a 25bp spread). REFCO Group Ltd, LLC provides a guarantee to CIM backing the repayment of the loan by REFCO Group Holdings. REFCO Capital Markets agrees to a right of offset if REFCO Group Holdings does not repay CIM. No cash would move under the transaction (all done on a book basis) except for the payment of our spread to the Royal Bank of Canada account. REFCO would also sign an indemnity letter relative to money laundering regulations. All legal costs would be paid by REFCO.[41]

The evidence shows that both Ingram Micro's general counsel and Madden initially approved the transaction.[42] Upon receiving approval, Ricketts proceeded to mark up the 2001 RTL documents to reflect the new dates and interest rate and sent his markups to Collins.[43]

On January 30, 2002, Madden stated that he had second thoughts about proceeding with the 2002 RTL based on the then recent news of the Enron scandal.[44] In response, Ricketts noted that he had already told Refco that they would do the transaction and that Refco had already

---

[40] IM-SEC 005415-16.

[41] *Id.*

[42] IM-SEC 005415, 5462.

[43] IM-SEC 005462, 006247-83. The proposed revisions were sent to Collins because Monk left Mayer Brown on February 16, 2001, around the time the 2001 RTL transaction documents were executed. IM-SEC 006366.

[44] IM-SEC 006204-05.

engaged outside counsel to draft the documents.[45]  Ricketts also explained that, given the CIM

buy-out was set to close the next day (January 31), "optically the Refco folks may feel like we

misled them so as to get the CIM minority share redemption completed without challenge

tomorrow," and "I would hate to create bad blood over a small transaction like this.  I'd rather

tell them of our concerns and indicate that we cannot continue the practice next year."[46]

   The points raised by Ricketts did not convince Madden to proceed with the transaction.

In response, Madden wrote:

> Jim[:]  [I] wouldn't take the chance at this point.  [W]e don't know
> what the new disclosures will be, but it looks like a total revamp.
> [A]lso, given the environment, [I] wouldn't feel comfortable with
> this unless we briefed [the CEO] and the board in advance, which
> ([I'm] sure they'd want an outside legal opnion), [sic] given the
> environment and amounts involved, [I] just wouldn't take the risk
> or go to the trouble. . . .  *[I'd] think [Refco] should really be
> reviewing this area anyways.*[47]

   When asked about his January 30 e-mails to Ricketts and his overall reaction to the 2002

RTL, Madden stated that his only concern with the transaction from the very beginning was that

it was "too complicated," which Madden explained meant that he simply thought the amount of

the loan was too large for the amount of profit CIM would be making on the transaction.

Madden stated that the other reasons he set forth in his e-mails to Ricketts were all secondary to

his primary concern regarding the "complexity" of the transaction, and that he mainly provided

those additional reasons to Ricketts because, as a new CFO, he wanted to be "polite."  Madden

denied that the Enron scandal, the use of an offshore entity in the Cayman Islands, or possible

new SEC disclosure rules played any significant role in his decision to back out of the 2002

---

[45] IM-SEC 006204.

[46] *Id*.

[47] *Id*. (emphasis supplied).

RTL.  Madden did not recall what he meant when he said that Refco "should really be reviewing

this area anyways."

Ricketts ultimately accepted Madden's decision.[48]  He sent Weaver and Maggio an e-

mail in the late evening on January 30 informing them that Ingram Micro would not be engaging

in the 2002 RTL in which he stated the following:

> Dave/Sandy:  As you know, the Enron debacle is putting pressure
> in the SEC to increase the level of financial disclosure by large
> companies like IM.  Don't know how closely you have been
> following this, but our accounting types (inside and outside) and
> attorneys have been monitoring the situation very closely, and they
> advised me late this evening (now 10:30pm) that we should avoid
> doing any large transactions thru offshore tax havens (in our case
> the Caymans) until the picture becomes clearer on new financial
> disclosure rules.  I spoke with Tom Madden, our worldwide CFO,
> in Europe and briefed him again on the details of our planned late-
> February transaction, and we jointly concluded that we should put
> a hold on the transaction.  Please understand that we both
> recognize and appreciate the warm, partnership relationship we've
> had with Refco over the past two years, and we would not be
> taking this step unless we felt strongly that the disclosures risks
> were too high.  Also, do not interpret this change of mind on our
> part as a statement about our trust in Refco.  That is not the issue
> here.  Refco has always acted in a responsible and professional
> manner in its dealings with CIM . . . .[49]

Neither Weaver nor Maggio had any response to Ricketts' e-mail,[50] and both Ricketts and

Madden stated that neither Weaver nor Maggio raised the topic with them at any time after

January 30, 2002.  The redemption of Refco shares in CIM went forward without incident the

next day.  After the investment in CIM was redeemed, Ingram Micro did not have any further

business dealings with Refco.

---

[48] IM-SEC 005502.

[49] IM-SEC 001409, at App. D-3.

[50] IM-SEC 001412.

### b.    CS Land

CS Land Management LLC ("CS Land") is a company related to Coast Asset Management, L.P. ("Coast") based in Santa Monica, California.  CS Land engaged in a RTL with Refco from February 25, 2000, to March 3, 2000, for $110,000,000,[51] and CS Land made a net profit of $3,208.33 on the transaction.

Although CS Land produced executed copies of the documents, Christopher Petitt ("Petitt"), Coast's former chief operating officer who apparently signed the RTL transaction documents on behalf of CS Land, had no recollection of the transaction.[52]

The documents produced by Coast indicate that Coast's relationship with Refco began as early as 1996;[53] and by at least 1998, Coast was a party to a Global Master Repurchase Agreement with Refco.[54]  Coast's business relationship with Refco continued until at least 2003.[55]  Coast's primary contact at Refco was Mascio, but Maggio and Richard Gill ("Gill") of Refco also appear to have been involved in the relationship.[56]

The earliest reference to the RTL transaction is in a February 23, 2000 e-mail exchange between Petitt and Mascio, in which Petitt inquired whether the "transaction will have a legal opinion regarding enforceability, encumbency and all that good stuff?"[57]  Mascio forwarded Petitt's inquiry to Maggio, who responded:

---

[51] C 05557, 05560, 05564-606, 05614-15.

[52] Based on a representation by Coast's counsel that Petitt had no recollection of the transaction, the Examiner did not interview Petitt.

[53] C 05548-49.

[54] REFCO-E-002543224, 002541776; C 05501-22, 05526-45.

[55] C 05441-68, 5384-440, 5469-500.

[56] REFCO-E-002543224, 002541776, 002635410, 002635710.

[57] C 00465.

> No legal opinio[n] is attached unless they are asking if Refco has
> the right under its charter to enter in [t]hese transactions. Between
> you and I there is enough paperwork to protect them if anything
> should happen to us during the week of the trade.[58]

On February 24, 2000, there was an e-mail exchange between Mascio and Maggio, in

which Mascio stated:

> Coast wants to know who we have done this trade with before
> because it looks like the documents have been used before. If they
> know that the docs have been used before maybe they would feel
> more comfortable with not getting the enforceability letter.[59]

In response, Maggio confirmed that the documents had been used before and stated that:

> I have been doing this for the past several years. *The purpose is to
> [n]et down my offshore company balances as to not show so much
> passive income.*[60]

Mascio forwarded Maggio's explanation to Petitt, who responded by asking whether

"your lawyer has spoken to ours?"[61] Mascio responded that he believed the lawyers had spoken

and asked Petitt to confirm with his counsel so Mascio could start working on the transaction

documents. Mascio also asked Petitt, "What counterparty will I face?"[62] At some point after this

e-mail, CS Land was identified as the counterparty in the transaction and that information was

conveyed to Monk, who used that entity to create the initial drafts of the CS Land RTL

documents.

---

[58] C 00465. Based on a review of Mayer Brown's billing records, it appears that Maggio contacted Collins to discuss the issue raised by Petitt. On February 23, 2000, Collins has a time entry that reads: "[Telephone conference with] [Maggio] re need for enforceability opinion." MBRM-EX 00052902.

[59] C 00470.

[60] *Id.* (emphasis added).

[61] *Id.*

[62] *Id.*

On February 24, 2000, Monk sent drafts of RTL documents to CS Land and its outside counsel for review and execution.[63]  No changes were made to the documents, except outside counsel requested that a New York choice-of-law clause be added to the indemnity letter.[64]  The CS Land RTL documents were executed as of February 25, 2000.[65]  Petitt signed the documents on behalf of CS Land.  Monk sent Petitt a full set of the executed RTL documents on February 28, 2000.[66]  The RTL transaction was conducted through an account opened by Maggio at RCM on behalf of CS Land on February 25, 2000.[67]

The RTL was reversed on March 3, 2000.  Also on March 3, Monk sent Petitt a copy of the CS Land Note payable to RCM that Monk had endorsed as "Paid in full – March 3, 2000."[68]

### c.    EMF/Delta Flyer

Three entities affiliated with EMF Financial Products, LLC ("EMF Financial") – EMF, Ltd., EMF Core Fund Limited ("EMF Core Fund"), and Delta Flyer Fund, LLC ("Delta Flyer") (collectively, the "EMF/Delta Entities") engaged in RTLs with Refco.  EMF Financial is a hedge fund manager that was set up in 1998.  Eric Flanagan ("Flanagan") is the President of EMF Financial, H. Whitney Tindale ("Tindale") is the chief financial officer,[69] and Vincent Messina ("Messina") is the chief technology officer.  All three had involvement in the EMF/Delta Entities RTL transactions.

---

[63] C 05620-21.

[64] C 05617-19.

[65] C 05557, 05560, 05564-606, 05614-15.

[66] C 05561.

[67] REFCO-E-013811073, REFCO-E-009758808.

[68] C 05558-59.

[69] Prior to joining EMF Financial, Tindale worked at Coast.  Tindale left Coast in the spring of 1999.  The documents relating to the CS Land RTL do not show that Tindale had any involvement with Refco or RTLs while he was employed at Coast.

EMF, Ltd. and EMF Core Fund[70] were government arbitrage funds managed by EMF Financial. As discussed herein, EMF, Ltd. did a WTL in 1999 for $50,000,000. EMF Core Fund did a RTL in 2000 for $50,000,000. Delta Flyer was a small venture capital fund (less than $500,000 initially invested) started by Flanagan in 1999 in which Flanagan and some of his personal friends pooled some money primarily to make investments in Internet start-up companies. Although Delta Flyer was not an EMF Financial-managed hedge fund, it had a close relationship with EMF Financial given that Flanagan and Messina were both investors in the fund, and Tindale provided financial administration to Delta Flyer. Delta Flyer did three RTLs with Refco: (i) 2001 for $200,000,000;[71] (ii) 2002 for $175,000,000; and (iii) 2003 for $150,000,000. The EMF/Delta Entities made a net profit of $77,562.00 for engaging in the one WTL and four RTLs.[72]

Refco served as the prime broker for the EMF Financial hedge funds. This relationship began in October 1998, when the first EMF Financial hedge fund was launched and continued until Refco's bankruptcy.

In 2000, Refco engaged in a RTL transaction with EMF Core Fund for $50,000,000.[73] The loans were made on February 25, 2000, and were unwound on March 3, 2000. The documents were drafted by Monk,[74] and Weaver was the Refco person involved in this

---

[70] EMF Core was liquidated on December 31, 2005. EMFEXMR 001269.

[71] DFF00169-200, 202-05, 07.

[72] DFF00083, EMFEXMR 000331.

[73] EMFFP03831-66, MB02046176, MB02046212-15, MB02046317.

[74] MB02046009.

transaction.[75]  Flanagan received the documents on February 24, 2000,[76] and he signed and returned them to Monk the next day.[77]

Other than a different loan amount ($50 million versus $150 million) and a shorter loan term (7 days versus 13 days), the documentation for the EMF Core Fund RTL was the same as the documentation used for the 2000 CIM Ventures RTL.  In fact, the EMF Core Fund RTL documents included all of the provisions that CIM Ventures requested be added to the transaction documents (*e.g.*, anti-money laundering provisions).[78]

Based on an interview with Tindale, the Delta Flyer loan came about as follows: Sometime in early February, McCarthy of Refco contacted EMF to inquire whether they would be interesting in doing another RTL in 2001.  Tindale also stated that Flanagan had a close relationship with McCarthy, who was an investor in Delta Flyer.  Tindale discussed the transaction with Flanagan, who informed him that they had done the transaction in the prior year through EMF Core Fund, and that EMF's prior CFO had reviewed the 2000 RTL documentation and did not see any problems in proceeding with the transaction.  Because Tindale was not employed by EMF at the time of the 2000 RTL and was not familiar with the 2000 RTL, Weaver faxed copies of the 2000 RTL documentation to Tindale for his review.[79]

Upon reviewing the documents, Tindale did not think the transaction was unusual, but he expressed concerns to Flanagan and Messina about doing the transaction through one of the EMF funds because the EMF funds were primarily used for leveraged government bond trades.

---

[75] MB02046009, MB02046123.

[76] MB02046009.

[77] MB02046011, MB02046165.

[78] The EMF Core Fund RTL documents, however, did not contain the New York choice-of-law clause that was added to the indemnity for the CS Land 2000 RTL at the request of CS Land's counsel.

[79] EMFFP03831-66.

Because the RTL was not a government bond transaction, Tindale, Flanagan, and Messina all agreed to do the transaction in Delta Flyer instead.

Tindale stated that he was aware that Refco's financial reporting year ended on February 28 and that McCarthy told him that Refco needed to do the transaction as "part of their year-end capital planning." Tindale interpreted this to mean that either Refco was using the transactions to "manage their balance sheets"/"do a balance sheet cleanup" or Refco was doing a "tax trade" — *i.e.*, a transaction designed to reduce tax liability.

Tindale stated that he had seen transactions similar to the RTLs done for tax purposes in similar amounts (hundreds of millions to billions of dollars) in order to move income from an onshore entity to a related offshore entity to avoid taxes. Tindale stated that at the time he suspected the RTL was likely a "tax trade" because it involved onshore and offshore Refco entities. Tindale also stated that at the time of the transaction he thought that RGHI was a subsidiary of RGL.

The 2001 RTL documents were drafted by Paul Koury ("Koury") of Mayer Brown.[80] Tindale stated that his primary concern with the transaction documents was to make sure that Delta Flyer got a guaranty from the parent company to insure that the transaction was risk-free. Tindale had the 2001 RTL documents reviewed by his attorneys because he wanted to be sure that the transaction was appropriate from a tax perspective, given that he understood the transaction involved loans from on-shore and off-shore entities. After review by counsel, Tindale was satisfied that the tax issues had been addressed.

The 2001 RTL documents were similar to those used in the 2000 RTL with EMF Core Fund, except that the term of the loan was shorter (February 26, 2001 to March 2, 2001 — four

---

[80] EMFFP03907, EMFFP03870.

days), the interest rate on the RGHI Loan was much higher (LIBOR plus 100 basis points), and

the guaranty and indemnity were both signed on behalf of RGL by Trosten, instead of Bennett —

the only instance where this occurred.[81]  Flanagan executed the documents on behalf of Delta

Flyer.  The transaction was executed in an account set up for Delta Flyer at RCM,[82] and the

profit on the transaction was wired to a Delta Flyer bank account.  Tindale stated that the Delta

Flyer RCM account was opened shortly before the 2001 RTL, and that the account was not used

for any other purpose.

Tindale acknowledged that Delta Flyer did not have the funds to cover the transaction —

*i.e.*, if RCM had not loaned Delta Flyer the money first, Delta Flyer would not have had

sufficient funds to make a $200,000,000 loan to RGHI.  Tindale understood that no cash was

moving in the transactions other than the net interest profit.

In February 2002, McCarthy again contacted Delta Flyer to inquire whether Delta Flyer

would be interested in doing the RTL transaction again.  Delta agreed to do the transaction again.

The 2002 Delta Flyer RTL was for $175,000,000, and the term of the loans was from

February 25, 2002, to March 4, 2002.[83]  The structure and terms of the transaction were the same

as the prior year's RTL, except that the documents now included specified interest rates instead

of interest rates based on LIBOR (1.8375% for the RCM Loan, and 2.8375% for the RGHI

Loan).  Koury again drafted the documents.[84]  Weaver signed on behalf of RCM, Bennett signed

the RGHI loan on behalf of RGHI and the guaranty and indemnity on behalf of RGL, and

---

[81] The RGHI Loan and Note were still signed by Bennett.

[82] DFF00044, DFFF00040.

[83] EMFFP03991-4041.

[84] EMFFP04003-06.

Messina executed the documents on behalf of Delta Flyer.  Koury sent the final executed documents to Tindale on February 26, 2002.[85]

The transaction was once again done in Delta Flyer's account at RCM, and Flanagan and Tindale requested that Refco wire the net profit on the transaction to a Delta Flyer account at Fleet Bank.[86]

In 2003, McCarthy again approached Delta Flyer to determine whether it would agree to do another RTL transaction through Delta Flyer in February-March 2003.  Koury, working with Weaver, again drafted the documents starting in mid-February 2003.[87]  The 2003 RTL was for $150,000,000, and the term of the loans was from February 21, 2003, to March 4, 2003.[88]  The transaction documents for the 2003 RTL were the same as the previous year's, except that Maggio signed on behalf of RCM instead of Weaver and the interest rates were different (1.31% on the RCM Loan, and 2.06% on the RGHI Loan).  Koury sent final executed copies of the transaction documents to Tindale on March 13, 2003.[89]  The transaction again was run through Delta Flyer's account at RCM, and Delta Flyer netted $18,638.88 on the 2003 transaction.[90]

In early February 2004, McCarthy again approached Delta Flyer about doing another RTL with Refco, but the offer was rejected because Delta Flyer was in the process of being dissolved.  Tindale stated that he was never presented with transaction documents for a RTL in 2004, although it appears that Mayer Brown had taken steps to draft such documentation.[91]  EMF

---

[85] REFCO-HC-0533324.

[86] DFF00277, EMFFP03990.

[87] MBRM-EX 00092678-713.

[88] DFF00220-55.

[89] DFF00220.

[90] EMFEXMR 000331.

[91] MB 00068-100.

Financial continued to do business with Refco until Refco's bankruptcy. Refco did not approach Delta Flyer or EMF Financial to do any RTLs after Delta Flyer declined to do the 2004 RTL. Delta Flyer was dissolved in 2005.

### d.    Beckenham Trading Company

Beckenham Trading Company, Inc. ("Beckenham Trading") engaged in a single RTL with Refco in 2002 for $125,000,000 and made a net profit of $24,305.55 on the transaction.[92]

The Examiner's counsel interviewed Andrew Krieger ("Krieger") who stated that Beckenham Trading was one of several investment funds started by him in the late 1980s and early 1990s. Krieger's entities specialized in futures and foreign currency trading as well as trading in other highly speculative markets. Starting in the late 1990s, Refco served as the prime broker for Krieger's entities, and Krieger continued to do business with Refco until Refco's bankruptcy. Beckenham Trading did not contain any customer funds, but rather was used as a "beta testing entity" in which Krieger would experiment with new trading strategies and allow new traders to gain experience without placing customer money at risk. Peter Molyneaux ("Molyneaux"), who is now deceased, handled back office duties for Beckenham Trading and the other Krieger entities.

Beckenham Trading produced 213 pages of documents that were reviewed by the Examiner's counsel, along with information relating to Beckenham Trading among documents produced by Mayer Brown and Refco.

All of the documents reviewed by the Examiner's counsel indicate that Molyneaux was the point person at Beckenham Trading for the transaction, and that Krieger did not have any significant role. This was confirmed by Krieger's statements during his interview.

---

[92] BTC 000057-92; REFCO-0005-118759.

Beckenham Trading produced fully executed copies of the 2002 RTL transaction documents that appear to have been signed by Krieger.[93]  The terms of the Beckenham Trading RTL are identical to those set forth in other RTL transactions, except that the applicable interest rates for the Beckenham Trading RTL were not based on LIBOR, but instead were specified in the transaction documents themselves (1.8375% for the RCM Loan and 2.8375% for the RGHI Loan).  The transaction was run through a Beckenham Trading account at RCM, which does not appear to have been used for any purpose other than the 2002 RTL.  The transaction documents were prepared by Koury, who then forwarded the documents to Molyneaux for review and execution.[94]  Krieger noted that Molyneaux had a good relationship with Maggio.  Krieger did not know Koury and stated he had no dealings with him.

Krieger stated he had no recollection of signing the Beckenham Trading RTL documents, but did acknowledge that he did sign documents on occasion without reading them.  Krieger stated that he would have heard if $125 million were either deposited or withdrawn from the Beckenham Trading account, but that he did not recall ever hearing anything about such a transaction taking place.

### e.    Liberty Corner

Liberty Corner Capital Strategies, LLC ("Liberty Corner") was a hedge fund manager located in Summit, New Jersey, that engaged in ten RTLs with Refco between February 2002 and August 2005.  Liberty Corner was wholly owned by William T. Pigott ("Pigott"), the primary person involved in each of the Liberty Corner RTL transactions.  Refco paid Liberty

---

[93] BTC 000057-92.  Krieger was not certain that the signatures on the agreement were actually his.

[94] BTC 000057.

Corner a little over $1.1 million to engage in these transactions.  The profit on the transactions went to Liberty Corner or to Pigott personally.

The Examiner's counsel conducted targeted searches of the approximately 1.6 million pages of documents Liberty Corner produced to governmental agencies and the Creditors Committee.  The Examiner also found information relating to the Liberty Corner RTLs among documents produced by Mayer Brown and Refco.

The Examiner's counsel conducted voluntary interviews of Pigott, as well as two other Liberty Corner employees: a portfolio manager at Liberty Corner who received some e-mails regarding the transactions but stated she had limited involvement in the RTLs; and a back-office employee who signed requests received from Refco's auditor (GT) confirming Liberty Corner's account at RCM, where the RTLs took place.

Liberty Corner managed a number of hedge funds that primarily traded in government treasury bills.  Refco served as Liberty Corner's prime broker.  Liberty Corner's business relationship with Refco continued up to Refco's bankruptcy.  The hedge funds that Liberty Corner managed were closed down in early 2006, and since that time Liberty Corner has been dormant.[95]

In February 2001, Refco explored doing a RTL with one of the hedge funds managed by Liberty Corner — Liberty Corner Patriot Master Fund, Ltd. ("LCPMF").  Work on this RTL appears to have begun on February 16, 2001, when Weaver faxed Pigott's contact information to Collins.[96]  Handwritten notes on this fax identify the basic terms of the proposed transaction —

---

[95] Pigott indicated that he knew Flanagan and EMF Financial, but had no business dealings with them.  Pigott also stated that Liberty Corner managed an account for Coast and that he worked with Petitt at Coast.  Pigott stated that he had no knowledge that either EMF Financial/Delta Flyer or Coast/CS Land had been involved in RTLs with Refco.

[96] MB02035219.

namely, a $200,000,000 RTL with LCPMF from February 26, 2001, to March 2, 2001, with a 15

basis point profit to LCPMF. Mayer Brown's files contain unexecuted drafts of a 2001 RTL

transaction with LCPMF.[97]  On February 21, 2001, Collins sent drafts of the transaction

documents to Weaver and Mascio.[98]  Weaver then sent drafts of these documents to Liberty

Corner on February 22, 2001.[99]

The RTL with LCPMF did not occur.  No one at Liberty Corner recalled the proposed

2001 RTL, nor did they know why the transaction with LCPMF did not proceed.  Mayer

Brown's files contain copies of the 2001 LCPMF RTL documents with handwritten mark-ups by

Collins in which he changed all references from LCPMF to Delta Flyer.[100]  The amount and term

of the loan remained the same, and Refco ultimately went through with the transaction with

Delta Flyer in 2001.

Liberty Corner and Refco engaged in ten RTLs starting in February 2002.  The amounts

ranged from $325,000,000 to $720,000,000.  In 2002 and 2003, Liberty Corner did only one

RTL transaction in February-March of each year,[101] but starting in 2004, the frequency of the

RTLs increased, with RTLs occurring quarterly, up to September 6, 2005 — the end date for the

last Liberty Corner RTL.[102]  The net interest spread on each Liberty Corner RTL was 75 basis

points, except for 2002, when the interest spread was 100 basis points.

---

[97] MB 00476, MB00003905-36.

[98] MB00003937.

[99] LC-SEC-EM 001388360.

[100] MB02035673-706.

[101] 2002 RTL:  LC-USAO 000001-36.  2003 RTL:  LC-USAO 000037-72.

[102] February 2004 RTL:  LC-USAO 000073-105.  May 2004 RTL:  LC-USAO 000139-56, MB02293240-54
(Liberty Corner did not produce a copy of the RCM Loan agreement).  August 2004 RTL:  LC-USAO 000157-87.
November 2004 RTL:  LC-USAO 000188-218.  December 2004 RTL:  LC-USAO 000221-51.  February 2005 RTL:
LC-USAO 000272-309 (executed copies of the RCM Loan agreement or the RCM Note could not be located).  May
2005 RTL:  REFCO-0002-000147-49, REFCO-0002-000118-30, REFCO-0002-000132-44, REFCO-HC-0533922,

*(footnote continued on next page)*

Pigott recalled that sometime in early February 2002 he was approached by McCarthy and Maggio regarding the RTL. Maggio directed Pigott to contact Koury. Pigott recalled having a conference call with Koury during which he was provided additional information about the transaction.

Mayer Brown's earliest drafts of the 2002 RTL documents (created on February 12, 2002) had LCPMF, not Liberty Corner, as the counter-party.[103] At some point after February 12, 2002, Liberty Corner was substituted for LCPMF. Pigott stated that he requested the RTLs be done with Liberty Corner, a management company, as the counter-party, rather than one of the funds managed by Liberty Corner, because the RTL was not the type of transaction normally executed in the funds. Pigott stated that the funds primarily did treasury bill arbitrage transactions, and he did not believe the RTL would be consistent with the type of transaction that he marketed to investors that he would be doing in the Liberty Corner-managed funds. Furthermore, Pigott was concerned that if anything went wrong with the transaction (*i.e.*, RGHI did not repay its loan and the RGL guaranty was unenforceable), he did not want to place investor money located in one of the Liberty Corner-managed funds at risk.

Koury e-mailed copies of the proposed 2002 RTL transaction documents to Pigott on February 14, 2002.[104] Pigott then forwarded these documents to his counsel for review.[105] Pigott

---

*(footnote continued from previous page)*

REFCO-HC-0533908 (Liberty Corner did not produce copies of the May 2005 RTL transaction documents). August 2005 RTL: LC-USAO 000310-26, LC-USAO 000341-53, REFCO-0002-000098 (Liberty Corner did not produce a copy of the RGHI Note for this transaction). Although in some cases Liberty Corner did not produce executed copies of documents, the Examiner was able to obtain executed copies from Refco's and Mayer Brown's documents.

[103] MB02048044-87.

[104] LC-SEC-EM 001610388-89.

[105] *Id.*

stated that his only concern about any of the RTLs was whether he would be able to get his money back in case RGHI defaulted on its loan.

Pigott stated that he understood RGL to be the parent of RGHI, so he believed he was getting a guaranty from RGHI's parent. According to Pigott, the presence of the guaranty from RGL was the primary reason he engaged in the transaction because Pigott felt secure that, if RGHI defaulted on its obligation to Liberty Corner, he would still be able to collect from RGL, whom he viewed to be the Refco parent company with the financial capability of covering RGHI's loan obligation. Pigott indicated that his counsel had reviewed the documents and had advised him that he had sufficient protection in case of an RGHI default.

Pigott stated that other than the RTL transactions, Liberty Corner had never engaged in transactions involving amounts in the hundreds of millions of dollars, and that Liberty Corner only had a capitalization of a few hundred thousand dollars. Pigott also explained that, other than the RTLs, Liberty Corner only engaged in transactions involving the purchases of securities and that the RTLs were the only non-collateralized cash transactions that Liberty Corner did. Pigott stated that at no time prior to the Refco bankruptcy did he have any knowledge or understanding that Refco was using the RTLs for anything other than a legitimate business purpose.

Pigott stated that the RTL transactions were run through Liberty Corner's account at RCM, which Pigott indicated he used on occasion to make trades on his own behalf. Pigott stated that the profit on each of the Liberty Corner RTLs was wired from the Liberty Corner RCM account to either a Liberty Corner bank account or Pigott's own personal bank account.[106]

---

[106] 2002 RTL: LC-USAO 000357, REFCO-0009-025570-71. 2003 RTL: REFCO-0009-025587-90. February 2004 RTL: REFCO-E-001599522-23, REFCO-0009-025593-94. May 2004 RTL: REFCO-0009-028804-05, REFCO-E-001052706. August 2004 RTL: REFCO-0009-28800-01, REFCO-0009-028797-98. November 2004

*(footnote continued on next page)*

Once the parties agreed on the documents for the 2002 RTL, that same format was used for the subsequent RTLs between Liberty Corner and Refco.

Mayer Brown documents indicate that Koury drafted most of the Liberty Corner RTL documents.[107]  Both Weaver and Maggio were involved in the 2002 RTL,[108] but Maggio appears to have been the key Refco contact on the Liberty Corner RTLs from 2003 forward.[109]  In each year, Bennett signed the Liberty Corner RTL documents on behalf of RGL and RGHI, and Pigott signed on behalf of Liberty Corner.  Maggio signed on behalf of RCM for all of the Liberty Corner RTLs except for the 2002, when Weaver signed for RCM.

For the August 2004 RTL, the original transaction documents were drafted with a loan amount of $475,000,000 and a term starting on August 26, 2004, but handwritten amendments on the transaction documents increased the loan amount to $485,000,000 and changed the start date to August 25, 2004.[110]  Similarly, the original RTL transaction documents for the February 2005 RTL were drafted with a loan amount of $335,000,000, but Koury drafted amendments that changed the loan amount to $345,000,000.[111]  Pigott stated that the changes to the August 2004 and February 2005 RTLs were all made at Refco's request.

Liberty Corner received annual requests from GT asking for confirmation of the February/March RTL transactions that took place in Liberty Corner's account at RCM.  The

---

*(footnote continued from previous page)*

RTL:  REFCO-0009-028792-93, REFCO-0009-028788-90.  December 2004 RTL:  REFCO-0009-028788-91, LC-SEC-EM 001492774, LC-USAO 000373.  February 2005 RTL:  REFCO-0009-025615-16, REFCO-0009-025613-14, LC-USAO 000374.  May 2005 RTL:  REFCO-0009-025621-22, REFCO-0009-028775-76, LC-USAO 376-77.  August 2005:  LC-USAO 000378-79.

[107] MBRM-EX 00052003-04, 00052014, 00052024, 00052026-29.

[108] MBRM-EX 00052004.

[109] MBRM-EX 0052014, 00052024, 00052026-29.

[110] LC-USAO 000157-87.

[111] LC-USAO 000272-75.  MBRM-EX 00052029.

individual who signed the requests stated that, when he received the requests, he only confirmed that the transaction actually took place and that the date and amount as reflected on the attached statements were correct.[112]

### 6.    The BAWAG Loans

From February 2000 through February 2005, Refco engaged in yearly transactions with BAWAG that Refco used to temporarily pay down the RGHI Receivable at the end of Refco's fiscal year.  The BAWAG Loans involved transfers of amounts from BAWAG to RGHI in late February, with those transactions subsequently being reversed in early March.  BAWAG made $347,042.97 by engaging in these transactions.

The BAWAG Loans to RGHI were done primarily through wire transfers.  The BAWAG Loans were not papered with any loan agreements, promissory notes, indemnities, or guarantees.

Each BAWAG Loan involved two separate and concurrent transfers from BAWAG to RGHI — one larger transfer ranging from $175,000,000 to $225,000,000, and a smaller transfer in the $40,000,000 to $75,000,000 range.

Funding for the larger portion of the loan came from RCM, generally through wire transfers into an account that RCM held at BAWAG, where it appeared to be a deposit.  Once RCM transferred funds into its BAWAG account, BAWAG used those funds as security to loan a like amount to RGHI by depositing that amount into an account that RGHI held at BAWAG.[113] Those funds would then be wire transferred to RGHI's account at either RCM or RCC, and the

---

[112] 2002 RTL:  LC-USAO 000361-64.  2003 RTL:  GT SEC 0015053-54 (unsigned).  February 2004 RTL:  GT SEC 0010499-501.  February 2005 RTL:  GT SEC 0001942-43.

[113] BAWAG 001213.  Starting in 2003 (at BAWAG'S request), RCM provided written authorization to BAWAG to take the "deposited" funds if RGHI failed to repay the full amount of the loan.  BAWAG 000810, 000883, 000890, 001227.

credit to the benefit of RGHI resulting from such deposit would be applied against the debit evidencing the then-existing RGHI Receivable.

The smaller portion of the loan was funded directly by BAWAG.  BAWAG would simply deposit funds for the smaller portion of the loan into the account that RGHI held at BAWAG, and then those funds would also be wire transferred to RGHI's account at either RCM or RCC.

In early March of each year, the BAWAG loans were unwound.  An amount equal to the principal of the smaller portion of the loan, plus interest, would be transferred from the RGHI account at either RCM or RCC into which the funds had been deposited, with the account being debited, thereby reinstating the RGHI Receivable in its prior amount, and increasing it by the amount of the interest charged on those loans.

Repayment of the larger portion of the loan to RGHI varied somewhat (*e.g.*, some years it was repaid via wire transfers, in other years through journal entries), but followed the same pattern, in that an amount equal to the principal of the larger portion of the loan would be transferred from the RGHI account at either RCM or RCC into which the funds had been deposited, with the account being debited, thereby reinstating the RGHI Receivable in its prior amount.  There was no interest on this loan.

The BAWAG Loans appear to have been first proposed by Maggio in January 2000.  Maggio was one of the key Refco people involved in these transactions, although Trosten and Bennett were also involved.[114]  There is little doubt that BAWAG had clear knowledge of the

---

[114] BAWAG 000722-23, 000859-90, 000893, 001041, 001056.

true purpose of the transactions, as numerous documents produced by BAWAG describe the

transactions as a BAWAG "cleanup" of the Refco inter-company receivable.[115]

    Set forth below are the dates and amounts for each of the BAWAG Loans:

### BAWAG LOAN TRANSACTIONS[116]

| Start Date | End Date | Participant | Amount |
|---|---|---|---|
| | | | $225,000,000 |
| 02/24/2000 | 03/02/2000 | BAWAG | $75,000,000 |
| **TOTAL 2000** | | | **$300,000,000** |
| | | | $225,000,000 |
| 02/26/2001 | 03/05/2001 | BAWAG | $75,000,000 |
| **TOTAL 2001** | | | **$300,000,000** |
| | | | $210,000,000 |
| 02/25/2002 | 03/04/2002 | BAWAG | $90,000,000 |
| **TOTAL 2002** | | | **$300,000,000** |
| | | | $175,000,000 |
| 02/25/2003 | 03/05/2003 | BAWAG | $75,000,000 |
| **TOTAL 2003** | | | **$250,000,000** |
| | | | $210,000,000 |
| 02/25/2004 | 03/04/2004 | BAWAG | $40,000,000 |
| **TOTAL 2004** | | | **$250,000,000** |
| | | | $175,000,000 |
| 02/23/2005 | 03/08/2005 | BAWAG | $75,000,000 |
| **TOTAL 2005** | | | **$250,000,000** |

---

[115] BAWAG 001305 ("I/C cleanup provided for by BAWAG"); *see also* BAWAG 000892, 001225-26, 001264, 001273, 001281, 001284 (all describing the transaction as a "clean up").

[116] 2000: BAWAG 001062-64, 001183-85.  2001: BAWAG 000612, 001011-14, 001019, 001024, 001028-35, 001164-71, 001173, 001177, 001272, 001180-82.  2002: BAWAG 000520, 000893, 000953-56,000989, 001140-42, 001145-52, 001161-63, 001198-200.  2003: BAWAG 000479, 000880, 000883, 000892, 000895, 000905-07, 000915-19, 000928-32, 001124, 001126, 001129, 001131, 001133-39, 0001201-03, 001305.  2004: BAWAG 000799-804, 000811, 000816-18, 000824, 000841-42, 000848-53, 000861-66, 001090-92, 001114-16, 001204-06, 001264.  2005: BAWAG 000706-11, 000747, 000753-61, 000779-80, 000785, 000788-791, 000794-97, 001069-71, 001207-09, 001213, 001218, 001233.

## IV.    REFCO'S AUDITORS

### A.    INTRODUCTION AND SUMMARY OF THE EXAMINER'S INVESTIGATION OF THE ROLE OF THE AUDITING PROFESSIONALS

AA performed annual audits of Refco from at least the late 1980s through the audit of Refco's fiscal year 2002.  Thereafter, GT became Refco's auditor.  The Examiner has combined his review of the AA and GT engagements because Mark Ramler ("Ramler") was the lead partner on the engagement at both firms.

#### 1.    Preliminary Comments Concerning Arthur Andersen

The Examiner had access to and reviewed AA's audit workpapers from the Refco engagement for the audit years 1995 through 2002, as well as e-mails and desk files for the Refco audit team members, including Ramler.  In early December 2006, counsel to the Examiner approached AA's counsel seeking production of documents — specifically, detailed billing records, audit manuals, reviews by concurring or professional standards partners in connection with AA's audits of Refco, and personnel files of certain former AA employees who worked on Refco audits.  The Examiner also sought interviews of selected former AA employees and an examination of AA through a designee.  The Examiner attempted to negotiate terms by which this discovery could be obtained relatively quickly and without the need to consume judicial resources.  Specifically, the Examiner asked that AA acknowledge by stipulation the Examiner's authority to issue subpoenas rather than requiring the Examiner to seek a ruling from the Court through motion practice pursuant to Bankruptcy Rule 2004.[117]  However, AA declined to

---

[117] After first requesting these documents from AA, counsel to the Examiner promptly sent AA's counsel a proposed stipulation permitting the Examiner to issue subpoenas to AA pursuant to Rule 2004.  AA's counsel was aware that this stipulation was intended to eliminate the need for the Examiner and AA to litigate the Examiner's authority to issue subpoenas, which courts have routinely upheld.  AA's counsel also knew that any objections to the subpoenas themselves were expressly reserved until after service of those subpoenas, except for an objection to the Examiner's authority to issue the subpoenas.

stipulate to the Examiner's authority to issue subpoenas.[118]  The Examiner filed a Rule 2004 motion, which was granted in full.

The Examiner then issued a subpoena to AA for documents.  After numerous meet-and-confer efforts, the Examiner's counsel was finally able to review (but was prohibited from copying) records reflecting performance evaluations of AA personnel assigned to the Refco audits.  The Examiner only obtained some of the relevant portions of AA's internal guidance on the performance of audits as this Report was nearing completion.

### 2.    Preliminary Comments Concerning Grant Thornton

The Examiner's investigation of GT's audits and reviews of Refco was based entirely on documents.  The Examiner had access to documents that GT had previously produced to various government agencies and the Creditors Committee.  These documents included GT's workpapers from its annual audits and quarterly reviews of Refco, the desk files of Ramler and other GT employees, and e-mails and attachments.  The Examiner also obtained documents directly from GT using subpoenas issued pursuant to Bankruptcy Rule 2004.  In all, the Examiner had access to over 400,000 pages of documents produced by GT.  Pursuant to the protocol with the USAO, the Examiner did not interview Ramler or any employees of GT, or Refco employees who dealt with Ramler.

The Examiner sought and issued subpoenas to GT pursuant to Bankruptcy Rule 2004. After extensive negotiations, the Examiner eventually obtained many of the subpoenaed documents.  In mid-November 2006, counsel to the Examiner first approached GT's counsel to

---

[118] AA's counsel indicated that AA was unable to so stipulate because it objected to standard language in the proposed stipulation by which it would have acknowledged the jurisdiction of the Court over matters pertaining to subpoenas issued by the Examiner and language permitting the Examiner to bring a motion to compel if AA failed to comply with the subpoenas.  AA's counsel even indicated that AA objected to the language in the proposed stipulation that would permit the Examiner to issue multiple "subpoenas" rather than "a subpoena."  AA's counsel ultimately declined to stipulate that the Examiner had authority to issue subpoenas.

seek production of documents relevant to the Examiner's inquiry but to which the Examiner did not then have access. More specifically, the Examiner's counsel requested that GT produce GT's detailed billing records concerning the Refco audits, GT's audit manuals, reviews by concurring or professional standards partners in connection with GT's audits of Refco, personnel files of certain GT employees involved with the Refco audits, and tax preparation documents reflecting the tax work GT had performed for Bennett as part of a separate GT engagement.

As an alternative to producing the documents voluntarily, the Examiner asked GT to stipulate to the Examiner's authority to issue subpoenas pursuant to Rule 2004.[119] GT declined to stipulate, and the Examiner filed a Rule 2004 motion. Just before the motion was heard by the Court, GT and the Examiner reached an agreement on a proposed order, and the Examiner's motion was granted.

In response to the Examiner's subpoena, GT interposed a number of objections that served mainly, in the Examiner's opinion, to delay its production of materials.[120] Most of those objections were resolved through negotiation between counsel, and GT has since produced documents to the Examiner on a rolling basis. However, GT's responses to the Examiner's requests delayed substantially GT's production of documents and limited their usefulness to the Examination.

---

[119] The stipulation proposed by the Examiner expressly reserved any objection GT wished to raise as to the terms of any subpoena with the exception of an objection to the Examiner's authority to issue subpoenas.

[120] For instance, GT objected to the Examiner's request for detailed billing records as "not relevant" and "unrelated to the Chapter 11 Debtors' estates" even though GT had filed proofs of claims against the Debtors' estates based, in part, on uncollected fees for professional services. Likewise, GT's counsel asserted relevancy objections against the Examiner's requests for basic information such as audit manuals and personnel files of individuals involved in the Refco audits.

### 3.    Summary of the Examiner's Findings and Conclusions

The Examiner concludes that both auditing firms, AA and GT, failed to meet the standard of care required of professional auditors.  However, the three-year statute of limitations for professional malpractice (which is a form of negligence) likely bars this claim against AA unless further evidence is developed that AA engaged in fraudulent concealment.

Due principally to limitations on the Examiner's investigation, the Examiner is unable to reach a conclusion as to whether there is sufficient evidence to support a claim for aiding and abetting a breach of fiduciary duty and/or aiding and abetting fraud against AA or GT.  These claims require proof of actual knowledge.  While circumstantial evidence suggests that the auditors may have had actual knowledge of the fraud, further investigation is warranted.

### a.    Overview of the Failings of Both Sets of Auditors

AA had been Refco's auditor for many years when, in 2002, Ramler brought the engagement with him from AA to GT.  For the years in question in this Report, Ramler was the engagement partner at both firms for the Refco audits.  Other audit personnel assigned to the Refco engagement changed frequently.  Therefore, the Examiner fully reviewed AA's role both to assess potential liability of AA and because the knowledge obtained by Ramler during the course of the AA audits is relevant to evaluating the adequacy of GT's audits under Ramler's direction.  In short, many of the audit procedures (or lack thereof) were carried over from AA to GT.

Specifically, Ramler knew that:  (i) RGHI was not audited by AA or by GT; (ii) RGHI's financial results were not included in RGL's consolidated financial statements; and (iii) there was a high risk of material misstatement arising from related party transactions between Refco

and RGHI.  For a number of reasons, both AA and GT assessed as "high" the risk that Refco's management could override controls in order to falsify Refco's financial results.[121]

The auditors were further aware that RGHI owed large sums to Refco from schedules provided by the company.[122]  Beginning with AA's audit of Refco's February 28, 1998 financial statements, Ramler informed Bennett and Trosten that those borrowings could no longer increase and needed to be repaid by RGHI over a five-to-seven year period.

Both AA and GT knew of the existence of related-party accounts held by RGHI at RCC and RCM that reflected receivables due Refco from RGHI.[123]  However, the auditors took virtually no steps to perform procedures designed to obtain competent evidential matter concerning the nature, substance and amount of the high risk, related-party transactions in order to satisfy themselves that related party transactions were adequately disclosed in the financial statements.[124]

---

[121] Part of the risk involved the fact that Bennett intended to sell Refco. Ramler knew, as early as May 1998, that Bennett desired to sell a significant portion of RGHI's interest in Refco over the next three to ten years.  Ramler was also aware, during the audit of Refco's February 28, 2005 financial statements, of the impending IPO and attendant risk that management may override controls in order to improve Refco's financial results.

[122] In fiscal year 1998, the schedule was entitled, "Restricted Schedule of Loans to Stockholders and Unconsolidated affiliates."  The auditors also obtained such a schedule in earlier years, although it was referred to by other titles such as "Affiliate Receivable/Payable" or "Receivable/Payable Non Consolidated Affiliates."

[123] AA's workpapers contained a Customer Payables/Receivables schedule for RCM as of February 28, 1998 indicating that RGHI, through its customer account no. 004521-0000, owed $97.4 million to RCM as of that date.  Similarly, the auditors were aware during their audit of Refco's February 28, 2000 financial statements that RGHI continued to engage in related party transactions through its customer account at RCM (which had, by then, been re-designated as account no. 10002657).  Likewise, GT knew at the time of the audit of Refco's February 28, 2003 financial statements that $71 million of the $105 million in related party loans disclosed in the footnotes to RGL's financial statements was contained within RGHI's customer account at RCC (account no. 1690-001).

[124] Such steps are required in order to comply with Generally Accepted Auditing Standards ("GAAS").  For further discussion of GAAS requirements, *see* Section IV.B, below. For example, the auditors did not verify that RGHI was actually making payments by examining bank statements.  Furthermore, the actual steps taken were clearly ineffectual.  For example, from 1998 to 2001, AA issued confirmation requests to RGHI asking it to confirm the balance of the amount it owed to Refco.  That practice, however, was discontinued during the 2002 audit, when Ramler and audit manager, Dara Moore Schneider, decided that such confirmations were of little utility because they were being sent to a related party.  Thereafter, nothing appears to have been done to test the validity of related party transactions between RGHI and Refco, and this lack of diligence and skepticism appears to have carried over to the audits performed by GT for fiscal years 2003, 2004 and 2005.

Significantly, during the 2003 audit (the first year in which GT had the engagement), GT auditor Yonah Dahan e-mailed a list of document requests to Frank Mutterer at RCC indicating that GT needed a list of payments made during the year by RGHI on the $71 million balance in its customer account at RCC and that GT would need to trace some of those payments to Refco's bank statements. There is no evidence, however, that such procedure was ever actually performed. Indeed, if it had been, GT likely would have discovered the fraud. Both AA and GT could have conducted a simple tracing of payments to bank statements for any of the years in question but did not. In addition, given the auditors' consistently high assessment of the audit risk arising from related-party transactions and the possibility that management could override controls, the auditors should have obtained and scrutinized the customer statements for RGHI's accounts at RCM and RCC, which would have revealed key aspects of the fraud, but did not do so.

It appears efforts were made by Bennett, Trosten, and others at Refco, to deceive the auditors. Therefore, the auditors would likely attempt to defend a professional malpractice claim by pointing to the misrepresentations of Refco management. For example, management letters were routinely provided to the auditors representing that all related party transactions and relationships had been properly recorded or disclosed. Similarly, the balances in RGHI's customer accounts at RCM and RCC were manipulated at the end of each accounting period so as to hide the true magnitude of the amounts RGHI owed Refco. However, an auditor exercising professional skepticism "neither assumes that management is dishonest nor assumes unquestioned honesty."[125] Indeed, if management assurances were sufficient in and of themselves, there would be little point in engaging auditors in the first place.

---

[125] AU § 230.09, SAS 82.

Furthermore, the auditors were in possession of a series of "red flags" that should have alerted a properly skeptical auditor to the fraud, or at least caused it to seek additional evidential matter that would have led to its discovery.[126]  For example, GT was aware that, in each year that it audited (2003, 2004, and 2005) and in each quarter that Refco was required to obtain quarterly reviews (May 2004 to August 2005), Refco extended several hundred million dollars in uncollateralized loans to Liberty Corner that were "repaid" shortly after the end of each of Refco's accounting periods.  GT knew that Refco accounted for these uncollateralized loans as "reverse repo" transactions despite the fact that, by GT's own definition, such a transaction was required to be collateralized.

The Examiner concludes that both AA and GT failed to adequately test high-risk related party transactions, failed to approach their audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company.  The Examiner is unable to reach a definitive conclusion as to whether AA or GT knowingly aided and abetted the breach of a fiduciary duty.

## B.    OVERVIEW OF THE PROFESSIONAL STANDARDS GOVERNING AUDITING PROFESSIONALS

AA and GT's potential professional liability depends on whether they planned and performed their respective audits in accordance with generally accepted auditing standards

---

[126] For example, during its 2000 audit, AA attached to its confirmation request to RGHI a copy of the February 2000 customer statement for RGHI's account at RCM (no. 10002657).  On its face, that statement disclosed that, as of the beginning of the month of February 2000, RGHI owed RCM approximately $350 million.  That two-page statement also disclosed that on February 25, 2000 (just three days before Refco's fiscal year end), $357 million worth of credits were booked to the account and effectively eliminated the amount owed to Refco by RGHI.  AA failed to take notice of this despite the otherwise relatively small activity in the account and the fact that, when Ramler emphasized the need to pay down the RGHI Receivable in May 1998, Bennett indicated that RGHI would do so *if* RGL's earnings were $50 million or greater so that it could pay a dividend to RGHI, which in turn could be used to

*(footnote continued on next page)*

("GAAS"), as well as common law and legal precedents applying those standards.[127]  The

American Institute of Certified Public Accountants ("AICPA") issues pronouncements called

Statements on Auditing Standards ("SAS"), which amplify, modify, and interpret the ten general,

fieldwork, and reporting standards.[128]  The SAS have been codified in a volume of professional

standards, referred to as auditing interpretations, which are cited to using the prefix "AU."  In

conducting an audit, the auditor has a responsibility to consider the SAS, and justify any

departure from them.

---

*(footnote continued from previous page)*

pay down the receivable.  A properly skeptical auditor would have questioned how RGHI suddenly obtained $350 million and taken steps to find competent evidence sufficient to support the answer given by management.

[127] *See United States v. Arthur Young & Co.*, 465 U.S. 805, 811 (1984).

[128] The ten standards are as follows:

A. General Standards
   1.    Training and proficiency.  The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.
   2.    Independence.  In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.
   3.    Due care.  Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

B. Fieldwork Standards
   4.    Planning and supervision.  The work is to be adequately planned, and assistants, if any, are to be properly supervised.
   5.    Internal control.   A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.
   6.    Evidential matter.  Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

C. Reporting Standards
   7.    GAAP.  The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.
   8.    Consistency.  The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
   9.    Disclosure.  Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.
   10.   Reporting obligation.  The report shall contain either an expression of opinion regarding the financial statements taken as a whole or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the reasons should be stated.  In all cases where an auditor's name is associated with financial statements, the report shall contain
         a.    A clear-cut indication of the auditor's work, if any.
         b.    The degree of responsibility the auditor is taking.

*(footnote continued on next page)*

In evaluating AA's and GT's respective audits, the Examiner has focused on the auditors' performance of their duties in those areas in which the fraud at Refco occurred. The relevant standards are discussed below after a brief discussion on the goal of an audit.

### 1.    The Goal of an Audit

The goal of an audit of financial statements by an independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, the financial position, results of operations, and cash flows in conformity with generally accepted accounting principles.[129]  To achieve this objective, the auditor "has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."[130]

### 2.    Due Professional Care and Professional Skepticism in the Performance of Work

An independent auditor is required to plan and perform his or her work with due professional care.[131]  Due professional care requires the auditor to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence.  The auditor should use the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.[132]

---

*(footnote continued from previous page)*

AU § 150.02.  An "AU" is described in the text of the Report, above.

[129] AU § 110.01.

[130] AU § 110.02.

[131] AU § 230.02.

[132] AU § 230.07.  This paragraph was added by SAS 82, which is effective for audits of financial statements for periods ending on or after December 15, 1997.

"Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence.  Since evidence is gathered and evaluated throughout the audit process, professional skepticism should be exercised throughout the audit process."[133]  In exercising professional skepticism, the auditor "neither assumes that management is dishonest nor assumes unquestioned honesty"[134] and "should not be satisfied with less than persuasive evidence because of a belief that management is honest."[135]  Thus, management's representations "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."[136]

### 3.    Audit Documentation

AU § 339, "Working Papers," makes clear that the information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions reached concerning significant matters.  The working papers ordinarily should contain documentation showing that:

- The work has been adequately planned and supervised;

- A sufficient understanding of internal control has been obtained to plan the audit and determine the nature, extent and timing of the tests performed; and

- The audit evidence obtained, the auditing procedures applied, and the testing performed have provided sufficient competent evidential matter to afford a reasonable basis for an opinion.

Effective for audits of periods beginning after May 15, 2002, AU § 339 became known as "Audit Documentation."

---

[133] AU § 230.08, SAS 82.

[134] AU § 230.09, SAS 82.

[135] *Id.*

4.    **Auditing Related Party Transactions**

AU § 334 sets forth the requirements for auditing related party transactions.  The auditor should view related party transactions within the framework of existing pronouncements, placing primary emphasis on the adequacy of disclosure.  In addition, the auditor should be aware that the substance of a particular transaction could be significantly different from its form and that financial statements should recognize the substance of particular transactions rather than merely their legal form.[137]  Arm's length transactions with outside parties are usually subjected to less detailed scrutiny than intercompany transactions or transactions with officers and employees, where the same degree of disinterested dealing cannot be assumed.[138]  "During the course of the audit, the auditor should be aware of the possible existence of related party transactions that could affect the financial statements and common ownership or management control relationships for which Financial Accounting Standards Board ("FASB") requires disclosure even though there are no transactions."[139]

The auditor's procedures for examining related party transactions should provide reasonable assurance that identified related party transactions do not contain misstatements that, when aggregated with misstatements in other balances or classes of transactions, could be material to the financial statements taken as a whole.[140]  As in examining other material account

---

*(footnote continued from previous page)*

[136] AU § 333.02, SAS 19.

[137] AU § 334.02.

[138] AU § 150.05, SAS 43 (effective November 1972).

[139] AU § 334.04.

[140] AU § 9334.17: Related Parties – Auditing Interpretations of Section 334.  "Interpretations" are recommendations, issued under the authority of the AICPA Accounting Standards Board, on how to apply the SAS in specific circumstances.  For example, AU § 9334 provides guidance on how to apply the requirements of AU § 334. Interpretations are not auditing standards; however, auditors should be aware of and consider them and be prepared

*(footnote continued on next page)*

balances, the auditor needs to consider the audit risk posed by related party transactions and then design and apply appropriate substantive tests to evaluate management's assertions.[141]

Notably, the risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions. "The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be. For example, the auditor's tests regarding valuation of a receivable from an entity under common control might be more extensive than for a trade receivable of the same size because the common parent may be motivated to obscure the substance of the transaction."[142]

To identify material transactions with known related parties, AU § 334 requires the auditor to employ, among others, the following procedures:

> *f.* Consider whether transactions are occurring, but are not being given accounting recognition, such as receiving or providing accounting, management or other services at no charge or a major stockholder absorbing corporate expenses.
>
> *g.* Review accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period.
>
> \* \* \*
>
> *i.* Review invoices from law firms that have performed regular or special services for the company for indications of the existence of related party transactions.[143]

---

*(footnote continued from previous page)*

to explain how they complied with the relevant SAS requirements addressed by such guidance. AU § 150.05, as amended by SAS 95 in December 2001. GT's internal guidance appears to be consistent with AU § 9334.

[141] *Id.*

[142] AU § 9334.19.

[143] AU § 334.08.

Further, if the auditor assigns a high degree of risk to related party transactions, he or she might respond by, among other things, engaging in discussions with tax preparers regarding their knowledge of related parties.[144]

After identifying related party transactions, the auditor should apply the procedures he or she considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements.  Such procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management.[145]

For each material related party transaction (or aggregation of similar transactions) or common ownership or management control relationship for which FASB Statement No. 57 requires disclosure, the auditor should consider whether he or  she has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements. He should then evaluate all the information available concerning the related party transaction or control relationship and satisfy himself on the basis of his professional judgment that it is adequately disclosed in the financial statements.[146]

---

[144] Accounting and Auditing for Related Parties and Related Party Transactions, A Toolkit for Accountants and Auditors, prepared by the staff of the AICPA, December 2001.  This Toolkit was not intended by staff to "break any new ground," but rather to "provide accountants and auditors with an overview of selected authoritative accounting and auditing literature, SEC requirements and nonauthoritive best practice guidance concerning related parties and related party transactions." *Id.*  The Toolkit is an "other auditing publication" as defined in SAS 95 and it has no authoritative status.  Nonetheless, other auditing publications are intended to help auditors understand and apply the SAS.  Had the auditors consulted Refco's tax preparers, they would likely have learned facts that ultimately would have led to the disclosure of the fraud.

[145] AU § 334.09.

[146] AU § 334.11.

5.     **Consideration of Fraud in a Financial Statement Audit**

Although the Enron scandal and the Sarbanes-Oxley Act of 2002 increased the level of scrutiny on corporate fraud and led to a heightening of the applicable auditing standards, the requirement that an auditor assess the risk of material misstatement due to fraud is not new. AU § 316, "Consideration of Fraud in a Financial Statement Audit" based on SAS 82, was issued in 1997. As described in further detail later in this Report, Refco began to manipulate significantly the RGHI Receivable in fiscal-year 1998, and, consequently, the Examiner focused on AA's performance of its audits for fiscal-years 1998 through 2002. During each of those years, AA was required to comply with the requirements of SAS 82.

SAS 99 was issued in October 2002 and replaced SAS 82 for audit periods ending on or after December 15, 2002. SAS 99, however, did not change the auditor's underlying responsibility to obtain reasonable assurance as to whether the financial statements were free of material misstatement, whether caused by error or fraud. But, SAS 99 did provide some additional performance requirements in fulfilling that responsibility as it relates to fraud, such as the requirement that the audit team discuss where and how the financial statements may be susceptible to misstatement caused by fraud.

a.     **SAS 82 Requirements**

SAS 82 required an auditor to specifically assess the risk of material misstatement due to fraud and provided categories of fraud risk factors to be considered in the auditor's assessment.[147] In doing so, the auditor must exercise professional skepticism. Some examples demonstrating the application of professional skepticism in response to the auditor's assessment of the risk of material misstatement due to fraud include: (a) increased sensitivity in the

---

[147] SAS 82, ¶ 1.

selection of the nature and extent of documentation to be examined in support of material transactions; and (b) increased recognition of the need to corroborate management explanations or representations concerning material matters — such as further analytical procedures, examination of documentation, or discussion with others within or outside the entity.[148]

Specific responses to the auditor's assessment of the risk of material misstatement due to fraud will vary depending upon the types or combinations of fraud risk factors or conditions identified and the account balances, classes of transactions, and assertions they may affect. If these factors or conditions indicate a particular risk applicable to specific account balances or types of transactions, audit procedures addressing these specific areas should be considered that will, in the auditor's judgment, limit audit risk to an appropriate level in light of the risk factors or conditions identified. The following are specific examples of responses:

- Perform a detailed review of the entity's quarter-end or year-end adjusting entries and investigate any that appear unusual as to nature or amount.

- For significant and unusual transactions, particularly those occurring at or near year end, investigate (*a*) the possibility of related parties and (*b*) the sources of financial resources supporting the transactions.[149]

### b.    SAS 99 Requirements

SAS 99 applies to audits of financial statements for periods ending on or after December 15, 2002. It stresses the importance of exercising professional skepticism[150] and requires discussion or "brainstorming" among audit engagement personnel regarding the risks of material misstatement due to fraud. The discussion among the audit team members should emphasize the

---

[148] SAS 82, ¶ 27.

[149] SAS 82, ¶ 29.

[150] SAS 99, ¶ 13.

need to maintain a questioning mind and to exercise professional skepticism in gathering and evaluating evidence throughout the audit.[151]

SAS 99 warns practitioners that management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls that otherwise appear to be operating effectively.  By its nature, management override of controls can occur in unpredictable ways.  Accordingly, in addition to overall procedures that address specifically identified risks of material misstatement due to fraud, the following procedures should be performed to further address the risk of management override of controls:

- Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud.[152]

- Reviewing accounting estimates for biases that could result in material misstatement due to fraud.[153]

- Evaluating the business rationale for significant unusual transactions.[154]

**C.    BACKGROUND OF REFCO'S AUDITOR ENGAGEMENTS**

**1.    The Audits Performed by AA**

From 1998 to 2002, AA only audited and issued reports for the following Refco entities: RCM, RCC, Refco, Inc. (later Refco LLC), RGL (on a consolidated basis), and other foreign subsidiaries.  According to statements made during interviews of former AA personnel, RCM and RCC were audited to comply with loan covenants of lenders and to provide "sufficient coverage" to support the issuance of an audit opinion on the consolidated financial statements of

---

[151] SAS 99, ¶¶ 14-16.

[152] SAS 99, ¶ 58.

[153] SAS 99, ¶ 63.

[154] SAS 99, ¶ 66.

RGL.  It appears that, by auditing the above-specified Refco subsidiaries, AA did obtain sufficient coverage for the consolidated financial statements of RGL under its own guidelines.

The Examiner was provided access to and reviewed AA's audit workpapers from the Refco engagement for the audit years 1995 through 2002, totaling approximately 35,000 pages. The review emphasized records from 1998 forward.  The Examiner reviewed approximately 6,000 pages of e-mails and desk files for the Refco audit team members, including Ramler.

From at least 1992 though the end of AA's tenure as Refco's auditors in 2002, Ramler served as the engagement partner, with various other individuals performing in the roles of audit manager, audit senior, and staff auditors (Associates and Experienced Associates).[155]  The Examiner interviewed the audit managers for the Refco audits of 1999 through 2002, Melissa Kesh[156] and Dara Moore Schneider.[157]  The Examiner also interviewed lower level audit staff identified in the workpapers as performing the audit confirmation processing and testing of relevant financial statements.[158]  Given the time that has passed since the involvement of these witnesses in the Refco audits, their recollections were limited.  However, each represented to the Examiner that the AA workpapers documented the procedures performed for each audit, and were intended as stand-alone support for the audit opinions.  This is consistent with AU § 339,

---

[155] GT SEC 0130512 at 0130518, at App. D-4 (GT "Evaluation of Proposed Client" form completed by Ramler noting that "I was an engagement partner on the client at Andersen for 10 years").

[156] Kesh was also the audit senior for the fiscal year 1998 audit.

[157] Schneider, a former AA audit manager assigned to the Refco engagement, explained that in order to obtain coverage sufficient to form an "adequate assurance" to support the audit opinion, AA needed to audit 90 percent of the audit client's assets and revenues.  Schneider further explained that the 90 percent test was AA policy, and, in Refco's case, meant that AA needed to audit 90 percent of RGL's consolidated assets and revenues.  Schneider Interview, February 8, 2007.

[158] These persons were: William Denehy (year 2001 and 2002 Experienced Associate); Jason Blumkin (year 2001 Experienced Senior); Brian Falahee (2001 Experienced Associate); Amy Lynn Murphy (2002 Experienced Associate).

providing that the working papers for an audit constitute the principal record of the work the auditor has done and the conclusions reached concerning significant matters.

Based upon a review of the available audit workpapers and the interviews of two former managers assigned to the Refco audits of 1999 through 2002, the annual engagement followed a fairly regular practice. The Refco entities' fiscal year ended in February; thus planning for audits usually began each year in the fall prior to the fiscal year end under audit. In the November or December prior to Refco's fiscal year end, the AA audit staff would meet to set staffing for the upcoming audit and review the prior year's audit workpapers. Ramler, and whoever served as the audit manager in that particular year, would hold one or more pre-audit meetings with Refco management to inquire about any new developments during the year, discuss issues noted in the closing meeting of the prior year, and plan the audit timeline. The field work for the audits was generally performed in late March or early April, with a usual completion deadline of May 19 to May 21 that was driven by the debt covenants that RGL, RCM, and RCC held with various lenders.

AA's engagement included providing an auditor's report expressing an opinion on the RGL consolidated financial statements and on the stand-alone financial statements of the Refco subsidiaries audited by AA.[159] AA's engagement required it to examine, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assess the accounting principles used and significant estimates made by management, and evaluate the overall financial statement presentation.[160] For this purpose, AA's engagement required Refco to make available all financial records and related information and personnel with information of

---

[159] *See, e.g.,* AAREF 00010141 (AA 2001 Audit Engagement Letter).

[160] *See id.*

relevance to the audits.[161]  The scope of its audit engagement included obtaining an

understanding of Refco's internal controls for audit planning and determining the nature, timing,

and extent of audit procedures.[162]  While AA was not engaged to provide assurances on the

internal controls or to identify deficiencies in the controls,[163] GAAS required AA to obtain

reasonable assurance that the financial statements were free of material misstatement, whether by

error or fraud.[164]

For each of Refco's fiscal years 1998 through 2002, AA issued an "unqualified opinion,"

meaning that AA opined that Refco's financial statements presented fairly, in all material

respects, the financial position of Refco as of the particular balance sheet date under audit, and

the results of Refco's operations and cash flows for the year then ended were in conformity with

GAAP.[165]  Each of AA's audit reports also represented that:

> We conducted our audit in accordance with generally accepted
> auditing standards.  Those standards require that we plan and
> perform the audit to obtain reasonable assurance about whether the
> financial statements are free from material misstatement.  An audit
> includes examining, on a test basis, evidence supporting the
> amounts and disclosures in the financial statements.  An audit also
> includes assessing the accounting principles used and significant
> estimates made by management, as well as evaluating the overall
> financial statement presentation.  We believe that our audit
> provides a reasonable basis for our opinion.[166]

As explained in detail below, however, the Examiner concludes that AA failed to conduct

its audits of Refco in accordance with GAAS because, among other things, it failed to:

---

[161] *See id.*

[162] *See id.*

[163] *See id.*

[164] SAS 1 at AU § 110.02.

[165] *See, e.g.*, AAREF 00004978, Report of Independent Public Accountants, May 19, 1999.

[166] *Id.*

(1) adequately test related party transactions to which it had assigned a high degree of risk;

(2) maintain a properly skeptical attitude; (3) obtain sufficient evidentiary matter to support its

opinions; and (4) adequately consider and evaluate the potential for fraud knowing that Refco

was controlled by a few individuals who intended to sell their interests in Refco and who could

override controls in order to maximize the apparent value of Refco.

Following AA's audit in fiscal year 2002, and at a time when AA had effectively

disbanded, Ramler left AA, accepting a position with GT in August 2002.[167]  Refco followed,

moving its audit engagement to GT through Ramler.  In addition to assessing AA's potential

liability for professional malpractice, a significant focus of the Examiner's investigation of AA's

audits of Refco was on the activities of Ramler as the engagement partner.  The audit methods

used by AA and GT were very similar, and Ramler was the apparent link between the two

engagements.  No other former AA personnel having experience on the Refco audits were

identified as moving with Ramler to GT.  Ramler was knowledgeable of Refco's business and

the relationships between its various entities, and carried that knowledge with him to GT.

Notably, while at AA, Ramler claimed to have had such a close relationship with Refco that he

believed its management did not engage in any transactions without his thoughts and advice and

stated that Bennett and other senior Refco management called him on an almost daily basis to

discuss transactions and business issues.[168]  When he joined GT, he explained: "I was the audit

partner on the Refco engagement while at Andersen.  The client is very loyal to its professional

service advisers (*sic*) and has agreed to follow me to [GT].  My relationship and knowledge of

---

[167] On August 31, 2002, AA relinquished, or consented to revocation of, its firm permits in all states where it was licensed to practice public accountancy with state regulators.  AA continues to exist as a legal entity, but all former partners have resigned from the firm.

[168] Ramler's personnel file contains this claim.  AA allowed the Examiner to review, at AA's office, this and other personnel files for those who worked on the Refco engagement but did not permit the Examiner to copy them.

Refco dates back to the late 1980s."[169]  Thus, the activities of AA, under Ramler's supervision,

in conducting the fiscal year 1998 through 2002 Refco audits are highly relevant to assessing the

manner in which GT, also under Ramler's supervision, continued the engagement through fiscal

year 2005.

AA was paid $1,835,000 in professional fees for its financial statement audit services to

Refco from fiscal years 1998 to 2002.[170]

### 2.    The Audits and Reviews Performed by GT

After AA ceased functioning as an auditing firm, Ramler joined the New York office of

GT as a partner in August 2002.  Ramler proposed Refco to GT as a prospective client in late

2002, and GT accepted the Refco engagement in March 2003.  As explained above, Ramler was

well aware of the risks inherent in auditing Refco from his time as the partner in charge of the

Refco engagement at AA, and GT categorized Refco as a "high-risk client."[171]  GT assessed

Refco as a high-risk client in part because it engaged in significant and complex related party

transactions,[172] lacked an internal audit function,[173] and was dominated by a limited number of

---

[169] *See, e.g.,* GT SEC 0130512 at 130515, at App. D-4 (GT "Evaluation of Proposed Client" form completed by Ramler).

[170] From Professional Fee Summary provided by Refco.

[171] GT SEC 0031551 ███████████████████.*  *See also* GT E EX 000004, a spreadsheet from 2005 listing Refco among "High Risk Clients as Identified by RPPS in Annual Office Visit."  RPPS is an acronym used by GT for its "Regional Partner in Charge of Professional Standards."  The risks associated with the Refco engagement were apparently well-known throughout GT: the engagement was once described as having "mucho issues/risks."  GT E EX 000942 (June 7, 2005 e-mail re: "ARM" from Maria Manasses at GT to Linda McAninch and Jennifer Carney at GT).

\* All redactions in the Report are made pursuant to Order of the Court (Docket No. 5516).

[172] GT SEC 0031029 ("Inherent Risk Indicators-General" for audit of Refco Group Ltd., LLC and Subsidiaries, dated April 3, 2003).

[173] *Id.*

senior executives and managers[174] who had an interest in maximizing the apparent financial health of the company.[175]

GT conducted financial statement audits for Refco's fiscal years ending February 28, 2003, February 29, 2004, and February 28, 2005. At first, GT's audits included RGL as well as separate audits of the stand-alone financial statements of RCC and RCM. GT never conducted audits of RGF, a third Refco subsidiary involved in the Round Trip Loans, and no longer separately audited RCC when it audited the February 28, 2005 financial statements of Refco. GT also conducted audits or reviews of Refco entities that were apparently not involved in the financial statement manipulations, including Refco Securities LLC, Refco LLC, RefcoFund Holdings, and multiple foreign Refco subsidiaries.

In May 2004, Refco engaged PricewaterhouseCoopers LLP ("PwC") to assist with Refco's SEC and external reporting function.[176] Beginning around the time of the LBO, PwC began to assist with Refco's internal bookkeeping and its filings under the Securities Exchange Act of 1933.

In anticipation of the LBO, GT performed additional services during 2004, such as a re-audit of Refco's financial statements for the fiscal year ended February 28, 2002[177] and a review

---

[174] GT SEC 0028264 ("Refco Group Ltd., LLC & Subsidiaries (or New Refco Group, Ltd., LLC) Planning Meeting – Inherent Risk Discussion February 28, 2005").

[175] GT SEC 0004084 at 4085, at App. D-5 (Memorandum dated 4/11/05 re: Refco Group Ltd., LLC – Discussion and Risk of Misstatement Due to Fraud to The Files from Ramler).

[176] GT SEC 0004084 at 4088, at App. D-5.

[177] GT E SEC 20001312.0001- 0007 (Engagement letter dated June 8, 2004 from Richard C. Flowers at GT to Trosten).

of Refco's financial statements for the quarters ended May 31, 2003 and May 31, 2004. After the LBO, GT continued to conduct quarterly reviews of Refco in addition to the annual audits. [178]

In November 2004, Refco filed its initial Form S-4, which became effective on April 8, 2005, to publicly register the Senior Subordinated Notes. On April 8, 2005, Refco also filed a Form S-1 in connection with the IPO. In connection with these public filings, GT conducted reviews of Refco's financial statements for the quarters ended August and November of 2003 and 2004. [179]

As a result of the LBO, a Board of Directors was established consisting of representatives of THL and Refco management. In January 2005, three independent directors joined the Board of Directors and also formed Refco's Audit Committee.

Apparently in anticipation of Refco's filing of its annual report (Form 10-Q) with the SEC, in June 2005, Refco engaged GT to conduct reviews of its May 31, 2005, August 31, 2005, and November 30, 2005 quarterly financial statements. [180] GT reviewed the May and August financial statements, but Refco filed for bankruptcy before the November review could be performed.

According to its engagement letters with Refco, GT's audits were to be conducted in accordance with auditing standards generally acceptable in the United States. The audits were to

---

[178] GT understood that, in connection with the LBO, $500 million in cash was paid as a dividend to RGHI and concluded that the foregoing events made Refco a highly leveraged company. GT SEC 0004084-85, at App. D-5 (Memorandum dated 4/11/05 re: Refco Group Ltd., LLC – Discussion and Risk of Misstatement Due to Fraud to The Files from Ramler).

[179] Because the LBO occurred during this quarter, the review covered the period from June 1, 2004 through August 5, 2004 and the "successor period" after the LBO from August 6, 2004 through August 31, 2004.

[180] These quarterly reviews apparently were conducted pursuant to GT's March 21, 2005 engagement letter with Refco for the February 28, 2005 audit, GT SEC 0028162, which permitted Refco's audit committee and shareholders to appoint GT to conduct such reviews subject to the terms of the March 21 engagement letter in the event no separate engagement letter was issued. GT prepared a separate engagement letter for these quarterly audits, but it was never executed. GT E SEC 20000980.

involve GT's examining, "on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgments and estimates made by management, as well as evaluating the overall financial statement presentation."[181]  GT was responsible for "obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed."[182]  GT disclaimed responsibility for identifying deficiencies in internal control, guaranteeing the accuracy of financial statements, or detecting illegal acts within Refco.[183] However, GT committed to "communicate significant deficiencies or material weaknesses in internal control" coming to its attention during the audit.[184]

The objective of GT's engagement was the completion of the audit and rendering of an opinion on Refco's financial statements, but GT noted the possibility that "due to unexpected circumstances we may determine that we are unable to complete the audit engagement or that we . . . cannot form an opinion.  In those circumstances, we may decline to express an opinion or . . . to issue a report."[185]  The engagement letter permitted GT to resign from the engagement "if . . . the circumstances require."[186]  As explained in an internal GT memorandum concerning the audit of the financial reporting period ended February 28, 2005, GT "audited the consolidated

---

[181] *See, e.g.*, GT SEC 0113599 (Engagement letter dated March 14, 2003 for audits of consolidated financial statements of Refco Group Ltd. LLC and Subsidiaries as of February 28, 2003 from Ramler to Trosten).

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.*

statement of income, changes in members' equity and cash flows" of Refco during the audit period.[187]

GT issued unqualified audit opinion letters on Refco's financial statements for the fiscal years ended February 28, 2003, February 29, 2004, and February 28, 2005.  Further, an unqualified audit opinion by GT concerning the February 28, 2003 and February 29, 2004 financial statements was included within Refco's Offering Circular in connection with the registration of the Senior Subordinated Notes following the LBO.[188]  Although GT appears to have in fact conducted a re-audit of Refco's February 28, 2002 financial statements, its audit report in the Offering Circular asserts that no such audit was conducted.[189]

GT's unqualified opinion letters for the fiscal years ended in 2003, 2004, and 2005 were included in Refco's fiscal year 2005 Annual Report on Forms 10-K and 10-KA and stated:

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  The Company is not required to have, nor were we engaged to perform an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting.  Accordingly, we express no such opinion.  An audit also includes examining, on

---

[187] GT SEC 0027911 (Memorandum dated May 13, 2005 to New Refco Group Audit Files from GT auditor Joe London re: Refco Group Ltd. LLC Summary of Significant Matters).

[188] WGM-L 0014497 at 0014681-14727 (July 22, 2004 Confidential Offering Circular of Refco for $600,000,000 in 9% Senior Subordinated Notes).

[189] Although the February 28, 2002 financial information included with the LBO offering memorandum was designated "unaudited" and GT disclaimed having performed such an audit in its opinion letter, it did, in fact, review AA's 2002 audit workpapers and conduct audit procedures on Refco's 2002 financial information.  It also billed Refco $750,000 for this re-audit.  GT SEC 0078297 (October 18, 2004 invoice for professional fees from GT to Trosten at Refco).  It is unclear why GT claimed in the offering memorandum that such an audit was not conducted, and the Examiner was unable to interview GT and/or Refco personnel in order to find out why this statement was made.

> a test basis, evidence supporting the amounts and disclosures in the
> financial statements, assessing the accounting principles used and
> significant estimates made by management, as well as evaluating
> the overall financial statement presentation. We believe that our
> audits provide a reasonable basis for our opinion.[190]

The Examiner concludes that GT failed to plan, perform, and document its audits in a manner sufficient to provide a reasonable assurance that the financial statements were free of material misstatement — even though the fraud was perpetrated largely through related party transactions that GT had assessed as creating a high risk of misstatement.

GT's professional relationship with Refco continued until the time the fraud was revealed. Shortly after Refco collapsed, GT released the following statement: "While our professional consideration is still underway, it appears to be a purposeful deception that required participation by senior management, hidden well enough to also evade numerous other detailed financial inspections performed by many of the most well-respected financial institutions in the country."[191] While it does appear that attempts were made to hide the fraud, the Examiner concludes that an auditor employing the requisite degree of professional skepticism in its review of RGHI's customer statements for its accounts at RCC and RCM would have detected the fraud.

GT has filed claims against Refco's estates asserting, among other claims, indemnification under the engagement letters it had entered into with Refco.[192] Specifically, GT's proofs of claim seek indemnity and contribution from Refco for legal fees incurred in responding to actions against it as Refco's auditor. GT also reserved the right to argue that any

---

[190] Refco Group Ltd., LLC Form 10-K for the fiscal year ended February 28, 2005 at pages F-2 and F-3, filed with the SEC dated July 1, 2005, and available at: http://www.sec.gov/Archives/edgar/data/1305464/00010474690 5018583/a2159496z10-k.htm.

[191] Ben White and Terrence O'Hara, "Crisis at Refco Raises Questions About Accounting," The Washington Post, October 15, 2005 at D01.

[192] See, e.g., Proof of Claim of Grant Thornton LLP, No. 11536 (July 17, 2006), filed in In re Refco Capital Markets, Ltd., No. 05-60018.

claims asserted against it by Refco are subject to the rights of setoff and recoupment. The only engagement letters that contained any indemnification language were those for the audits of Refco's February 28, 2003 and February 29, 2004 financial statements.[193] Engagement letters for subsequent reviews and audits did not contain this language, possibly because in May 2004 GT realized that SEC independence rules did not permit such indemnification language to be included in engagement letters of auditors for registrants.[194] In fact, at one point GT intended to rescind its original engagement letters from the 2003 and 2004 annual audits and prepared letters to that effect, but it does not appear that such letters were ever executed.[195]

GT was paid $9,279,568 in professional fees for its financial statement audit and review services to Refco.[196] Some of these payments may be preferences under the Bankruptcy Code.[197]

### D.    THE AUDITORS FAILED TO CONDUCT AUDITS OF REFCO'S FINANCIAL STATEMENTS IN ACCORDANCE WITH GAAS

#### 1.    AA's Failure to Properly Audit Refco's Related Party Transactions

Throughout the audit periods memorialized by the documents available to the Examiner, RGHI was the unconsolidated parent of RGL and the various audited and unaudited subsidiaries. From at least the beginning of Ramler's involvement in the Refco engagement from the late

---

[193] See, e.g., GT SEC 0078275 at 78276 (March 9, 2004 Engagement Letter for February 29, 2004 financial statements audit of Refco): "The Company shall indemnify and hold us harmless from any liability, damages, fees, expenses and costs (including defense costs) arising from or relating to misrepresentations by management."

[194] GT E SEC 20001297 (e-mail string dated May 24-25, 2004 between Linda McAninch, partner at GT, and Ramler re: Refco Engagement Letters).

[195] See, e.g., GT E SEC 20007608 (unexecuted draft engagement letter from GT to Refco dated June 7, 2004): "Due to the change in the terms and conditions associated with the proposed offering as indicated in the Scope of Services section, this engagement letter replaces the previously issued engagement letters dated March 14, 2003 and March 9, 2004 for the period of time and for the services included in the Scope of Services paragraphs solely with respect to any indemnification provisions or other clauses that are not permitted by the U.S. Securities and Exchange Commission."

[196] From Professional Fee Summary provided by Refco.

[197] See Section IX.B., below.

-86-

1980s, AA was aware of the relationship of RGHI to the other Refco entities, the regularity of

transactions between them, and the substantial amounts owed by RGHI to Refco subsidiaries.[198]

### a. AA's Knowledge of the RGHI Related Party Receivable

As discussed herein, the fraud was perpetrated in large part by manipulation of customer

accounts held by RGHI at RCC and RCM beginning in 1998.  These manipulations hid only a

portion of the amounts owed to RGL by RGHI in each year audited by AA.  Each year Refco

provided AA an inaccurate  "Schedule of Loans to Shareholders and Unconsolidated Affiliates."

These schedules disclosed some, but not all, of the related party receivables due RGL:

| Audit / Review Period | | RGHI @ RCM | RGHI @ RCC | RGF@RCM | Total |
|---|---|---|---|---|---|
| 1998 | Actual Balance 1/31/98 | 96,865,728 | 128,120,110 | 151,692,948 | 376,678,786 |
| | As Reported 2/28/98 | | | | 125,403,000 |
| 1999 | Actual Balance 1/31/99 | 104,375,137 | 148,130,941 | 156,892,064 | 409,398,142 |
| | As Reported 2/28/99 | | | | 170,000,000 |
| 2000 | Actual Balance 1/31/00 | 354,380,648 | 15,064,012 | (60,493,210) | 308,951,450 |
| | As Reported 2/29/00 | | | | 228,389,000 |
| 2001 | Actual Balance 1/31/01 | 133,730,287 | 315,283,602 | 207,842,581 | 656,856,470 |
| | As Reported 2/28/01 | | | | 205,000,000 |
| 2002 | Actual Balance 1/31/02 | 142,683,966 | 461,110,624 | 249,076,565 | 852,871,155 |
| | As Reported 2/28/02 | | | | 179,427,000 |

[199]

---

[198] AAREF 00033405 (1995 Schedule of Loans from Affiliates); GT SEC 0130512 at 521, at App. D-4 (Ramler's explanation of related party transactions for GT "Evaluation of Proposed Client" Form).  In seeking approval of the Refco engagement moving to GT, Ramler stated on the new engagement form that the receivable balances then existing on the RGL financial statements pre-dated his involvement with the Refco audits by AA to at least the 1980s.  *See id.*  ("Evaluation of Proposed Client" form).  The Examiner did not have access to audit materials from the AA audits of Refco conducted in the 1980s, or to Refco financial reports or data from that period.  Thus, while Ramler confirmed the existence of those balances in the 1980s, the particular amounts of the receivable balances in those years are unknown.

[199] The "Actual Balance" amounts for each year reflect the balances from the customer account statements of RGHI at RCM (no. 10002657) and RCC (no. 1690-001), and of RGF at RCM (no. 10001295), as of January 31 each year, prior to the annual manipulations of the balances for these accounts in February.  *See* FTI Consulting Schedule 3, at App. D-1.  The "As Reported" amounts are taken from the Schedule of Loans to Shareholders and Unconsolidated Affiliates contained in the workpapers for each AA audit year and tie to the related party transaction disclosures in

*(footnote continued on next page)*

Beginning at least as early as 1998, AA raised concerns over the amount of debt owed by RGHI and the need for management to adopt a plan to pay down the debt. For example, in 1998 an audit status memorandum was prepared to document in the workpapers issues related to the 1998 audit discussed with Refco management. It shows that AA believed there was essentially no equity in RGL "because the intercompany receivable balance would reduce equity if there was no intent and no ability to pay it down."[200] Refco management responded that "if [RGL's] earnings were $50 million or greater they would pay down the receivable balance by dividending money to [RGHI] and then having RGHI pay down the intercompany balance."[201] AA resolved to review the status of the pay down plan the following year.[202]

But in fiscal year 1999, AA observed no change in the overall status of the related party receivables.[203] Refco was advised of AA's concern over the high risks posed by related party receivables and the need for RGHI to actively reduce the balance through a 1999 Ramler memorandum to Bennett.[204] In that memorandum, Ramler set forth the balance of the related party receivables, then purportedly $227 million, and pointed out that "[a] key consideration in reporting amounts due from stockholders and their affiliates as assets is if such shareholders

---

*(footnote continued from previous page)*

RGL's audited financial statements for those years. *See* AAREF 00015843, at App. D-6 (1998 Schedule of Loans to Shareholders and Unconsolidated Affiliates); AAREF 00004999, at App. D-6 (1999 Schedule of Loans to Shareholders and Unconsolidated Affiliates); AAREF 00005557, at App. D-6 (2000 Schedule of Loans to Shareholders and Unconsolidated Affiliates); AAREF 00010202, at App. D-6 (2001 Schedule of Loans to Shareholders and Unconsolidated Affiliates); AAREF 00012494, at App. D-6 (2002 Schedule of Loans to Shareholders and Unconsolidated Affiliates). According to these schedules, in addition to RGHI, Refco had engaged in loan transactions with approximately eight other stockholders and unconsolidated affiliates, including Refco Advisors, Refco Paris, Strategic Opportunities Fund, T. Dittmer Trading, Wells, Ltd., and Westminster Inc.

[200] AAREF 00020226 (May 12, 1998 Audit Status Memorandum to fiscal year 1998 audit workpapers).

[201] *Id.*

[202] *See id.*

[203] *See* AAREF 00003035 at 3038 (Agenda for January 7, 1999 Audit Planning Meeting with Refco management).

[204] *See* AAREF 00011967, at App. D-7 (May 10, 1999 Memorandum from Ramler to Bennett and Jim Friedlieb).

intend to pay back amounts owed in the relatively near future. Without a clear indication of intent, such amounts owed would likely be reported as a debit in stockholder's equity or an effective deemed distribution of equity capital."[205]  It was AA's view that "shareholder management has to clearly and formally demonstrate their intent to pay down [the receivables] in a reasonable timeframe [five to eight years]."[206]  Ramler further recommended that interest on the receivables be payable currently rather than be allowed to accrue.[207]

At the sign-off meeting for the 1999 audit, management and AA discussed Ramler's memorandum and the priority of paying down affiliate receivables.[208]  Refco committed to a minimum $25 million annual pay down, and AA committed to review the balances again the following year.[209]  Yet, for fiscal year 2000, there was no reference to discussion of the affiliate receivables during the audit period beyond Bennett's representation that there had been no additions to the balance and the attachment of Ramler's 1999 memorandum to the planning meeting report for the fiscal year 2000 audit.[210]

>  **b.**    **AA's Recognition of the High Risk of Misstatement Attendant to Related Party Transactions**

AA provided standard tools to its auditors for assessing audit risk, some of which were used to determine whether the engagement would be retained year to year.  From at least 1998

---

[205] *Id.*

[206] *Id.*

[207] *See id.*

[208] *See* AAREF 00003029 at 3032, at App. D-8 (May 19, 1999 Audit Sign Off Meeting Memorandum).  AA also discussed the receivables with Bennett and Trosten at a 1999 audit pre-closing meeting days prior to the closing meeting.  AAREF 00003022 (May 6, 1999 Audit Pre-Closing Meeting Memorandum).  It was at this meeting that AA first proposed a plan for Refco to pay down the debt over five years, explaining that "Refco needs to have the intent and ability to pay down the receivable or else it is deemed a dividend," and Refco management first committed to paying the receivable balance down by $25 million per year through a dividend.  *Id.* at 00003024.

[209] *See id.*

through 2002, AA auditors, as part of the pre-audit procedures, completed the "Smart Tool" electronic form provided by AA.[211]  The completed Smart Tool forms maintained in the workpapers for the 1998 through 2000 audits show that AA identified as "significant" or "very significant" audit risk areas that ultimately were the very means used to commit the fraud at Refco.  Yet, AA failed to design audit procedures addressing these risks to reduce them to an acceptable level.

For example, for the audit of fiscal year 1999, the Smart Tool form for the Refco audit shows that in assessing "Accounting and Financial Reporting Risk" that may lead to the risk of financial statement misstatements, the auditors considered the "Transactions with related parties," one of three risk factors under "Complex/risky transactions," as "Very Significant."[212]  Under the misstatement risk from "Complex/risky accounts," the auditors rated both "Collectability of receivables" and "Investment audited by others or unaudited" as "Significant."[213]

The Smart Tool forms also show that AA considered the risk presented by the fact that Refco's parent, RGHI, was not audited.[214]  This risk factor carried a specific warning that "There may be significant risks due to the fact the entity's parent is audited by other auditors or unaudited," and required that a resolution of this risk be documented.[215]  For the 1999 audit, the

---

*(footnote continued from previous page)*

[210] *See* AAREF 00007740 at 7741, 7745 (November 2, 1999 Audit Closing and Planning Memorandum to fiscal year 2000 audit workpapers).

[211] *See, e.g,* AAREF 00020019 (Fiscal Year 1998 Smart Tool form); AAREF 00002635 (Fiscal Year 1999 Smart Tool form); AAREF 00011972 (Fiscal Year 2000 Smart Tool form); AAREF 00012138 (Fiscal Year 2002 Smart Tool form).

[212] AAREF 00002635 at 2645 (Fiscal Year 1999 Audit Smart Tool form).

[213] *Id.*

[214] *See id.* at 2655.

[215] *Id.*

auditors resolved it simply by noting on the form, "As the majority of balances in Refco Group

Holdings, Inc. are intercompany accounts, which have been tested through the audit of the Group

or are guaranteed by shareholders of the Company, there is limited risk."[216]  As discussed later in

this Report, however, related party transactions were not audited in conformance with GAAS,

especially considering AA's determination that related party transactions created a very

significant risk.

For the audit of fiscal year 2000, the auditors repeated the same notation for resolving the

risk from an unconsolidated parent as that quoted above.[217]  The balance of Smart Tool risk

factor assessments likewise mirrored those of 1999.[218]  But once again, the Examiner could find

no procedures or tasks memorialized in the workpapers for the 2000 audit specifically geared to

ameliorating these risks through the design and implementation of appropriate audit procedures.

In 2002, the auditors employed a new audit tool, "The Business Audit," in addition to

using the Smart Tool.[219]  The Business Audit Tool provided a checklist of review items for a

completed audit, including questions related to whether other audit tools were used, such as the

Smart Tool and fraud risk forms, to which the auditor was to respond "yes" or "no," explaining

any "no" answers.[220]  Specifically as to related parties, the Business Audit tool asked "Were

procedures performed (including inquiry) to obtain evidence regarding the identification and

disclosure of related parties and the effect of material related party transactions on the financial

---

[216] *Id.*

[217] *See* AAREF 00011972 at 979 (Fiscal Year 2000 Audit Smart Tool form).

[218] *See id.*

[219] AAREF 00012114.

[220] *See generally id.*

statements?"[221]  The Refco auditors responded, "yes."[222]  Yet the Examiner could not identify

any procedures in the 2002 audit workpapers directed to determining the effect of material

related party transactions on the financial statements, or any other procedure directed to related

party identification and disclosure, different than those that were ineffective in past years.

### c.    AA's Failure to Comply with GAAS with Respect to Auditing the Transactions with RGHI

The Examiner could not determine what, if any, specific planning for or testing of related

party transactions AA undertook because there was no written audit plan contained in the audit

workpapers for any of the audit years 1998 through 2002.  Witnesses confirmed that there was

no formal audit plan during the 1998 to 2002 audit years.[223]  And, despite repeated requests by

the Examiner, AA failed to identify any.[224]

Moreover, although AA repeatedly expressed concern over related party loans in 1998

and 1999, and obtained a commitment from Refco management to retire the debt by at least $25

million per year, the Examiner did not identify any verification by AA that the loans were

actually being paid down.  Nor did the Examiner locate any evidence that AA verified by review

of source documentation either the loans themselves or any accrued interest charges.  Rather,

---

[221] *Id.* at 12119.

[222] *Id.*

[223] The Examiner interviewed several former AA employees assigned to the Refco audits of 1998 through 2002, and none could recall the preparation or even existence of any formal audit plan for the Refco audits of those years. Rather, the witnesses represented that the audit team informally, mostly verbally, kept track of being "on plan" for the audit and that "experienced people knew what had to be done to gain comfort."  Kesh Interview, January 30, 2007.

[224] The only evidence of audit plans of any type located in AA's workpapers predate 1998.  For example, the Examiner found that for the 1996 audit, AA prepared a "Work Program" for the RCC audit.  *See* AAREF 00025711-7114 (Liabilities); AAREF 00025545-546 (Financial Reporting Cycle).  AA also prepared "audit Planning Memos" for the audits of RGL, AAREF 00034360 (1995 Audit Planning Memo); AAREF 00027144 (1997 Audit Planning Memo), RCC, AAREF 00034352 (1995); AAREF 00025331 (1996); AAREF 00027136 (1997), and RGF, AAREF 00035795 (1995); AAREF 00023726 (1996).  Audit procedures were also generally described in an "audit planning memorandum" dated April 9, 1997 specific to the audit of RCM.  *See* AAREF 00027151.

beginning with the year 2000 audit, it appears AA simply accepted at face value the "Schedule of Loans to Shareholders and Unconsolidated Affiliates" provided by Refco for each of years 2000, 2001 and 2002 showing a $16 million credit from a subordinated debt owed by Refco to RGHI and a $10 million "Capital Infusion" credit ($26 million total) deducted from the overall affiliate loan net total balance as being in compliance with management's agreement to reduce the loan balance by at least $25 million per year.[225]

If AA had tested the loan balances as scheduled in comparison to the year-end transactions between the affiliates, it would have learned that, while ostensibly reducing its related party debt, RGHI was actually *receiving* substantial credits[226] from the same related parties to whom the schedules stated it was indebted.  For example, the "Schedule of Loans to Shareholders and Unconsolidated Affiliates" for year 2001 lists a loan from RGF to RGHI of $66.4 million.[227]  But on February 23, 2001, only days before the end of the fiscal year, RGF transferred $250 million from its account at RCM to the credit of RGHI.[228]  This transaction was documented on the RGF statement of its RCM account maintained in the AA workpapers as support for amounts "Due from Affiliates."[229]  Similarly, the 2002 "Schedule of Loans to Shareholders and Unconsolidated Affiliates" referenced a loan from RGF to RGHI with a year-end balance of $65.4 million.[230]  But on February 25, 2002, again only days before the end of the fiscal year, RGF made a $625 million wire transfer "TO RGHI" from its account at RCM.[231]

---

[225] *See, supra*, n. 208.

[226] The Examiner was unable to determine that any cash was transferred in any years except for certain wire transfers in 1998 and 1999, and possibly 2000.

[227] *See* AAREF 00010202 (2001 Schedule of Loans to Stockholders and Unconsolidated Affiliates).

[228] *See* AAREF 00009159 at 9162 (February 2001 customer statement for RGF's account at RCM (no. 13 006)).

[229] *See id.*

[230] *See* AAREF 00012494 (2002 Schedule of Loans to Stockholders and Unconsolidated Affiliates).

Though AA was provided both the schedules of loans and the RGF account statements reflecting these transfers, it apparently never questioned the large round-dollar amount transfers from one unconsolidated, unaudited related party to another near the end of a fiscal year.[232]

The Examiner has determined that rather than obtaining and reviewing loan documentation and other source documents,[233] the extent of AA's review of related party receivables — aside from simply accepting the balances as reflected on the various Refco-provided financial statements — was apparently to send a confirmation request to related parties seeking to have the related party confirm the balance of its customer account, or confirm its loan balances and accrued interest.

As a regular part of the audit process, AA was provided with a list of RCC, RCM and Refco, Inc. customer account balances. Using forms to determine a level of materiality of individual account balances in relation to the total amount of all account balances, *i.e.*, the level at which a customer account balance error could materially affect the total customer payable or receivable balance on a given entity's financial statement, AA determined what minimum and above account balances would be confirmed with the individual customer as part of the audit

---

*(footnote continued from previous page)*

[231] *See* AAREF 00013257 at 13259 (February 2002 customer statement for RGF's account at RCM (no. 13 001)).

[232] In the years prior to the 1998 audit, AA also audited RGF. In the 1996 audit of RGF, while auditing the loans reflected on RGF's financial statements, AA found that related party "loans [were] properly recorded on RGF's and its affiliates' books and records and the proper disclosures [were] made in the financial statements." AAREF 00023726 at 728 (RGF Audit Planning Memo for fiscal year 1996). But for the audit years 1998 through 2002, AA issued no audited financial statements for RGF. Nor does it appear that AA reviewed any RGF financial statements. Rather, AA limited its review of RGF "to be determined based on materiality of individual account balances" at year end. AAREF 00002665 at 2671 (1999 PBC list). For the 1998 to 2002 audit years, the only RGF materials AA maintained in the work files were the RGF statements of its account at RCM.

[233] For the 1998 audit, Kesh prepared a memorandum to the workpaper file detailing the loan procedures of RCC. The memorandum explains that RCC required a promissory note for *all* loans to affiliates. AAREF 00018577 at 579.

process.[234]  AA then prepared a letter for the client's signature requesting the customer to review

an attached account statement, or account balances printed directly on the letter request, to

confirm the ending account balance was properly stated, sign the request, and return it to the

auditor.[235]  AA mailed the confirmation requests, and received and logged the responses.[236]

Further review would only be done if the customer disputed the account balance referenced on

the request.

From 1998 to 2001, AA not only sent these confirmation requests to third-party

customers, but also to any related parties having accounts with RCM, RCC or Refco, Inc.  For

RGHI, AA simply sent confirmation requests annually asking it to confirm its RCM account

balances.[237]  Similarly, AA sent confirmation requests to RGHI annually asking it to confirm its

unsecured loan balances with RCC.[238]

This *de minimis* procedure involving a confirmation request to a related party ceased in

2002 when Ramler and manager Schneider determined it was a useless exercise.  Schneider

explained to the Examiner during her interview that the practice of sending a confirmation to a

related party was not worth doing because it did not provide the level of assurance that would be

obtained when confirming a balance due from an *un*related party.  According to Schneider, it

made little sense having Phil Silverman ("Silverman"), the Controller of RCC, send an audit

confirmation to himself as Controller of RGHI.[239]  Schneider discussed the lack of effectiveness

---

[234] *See* AAREF 00005802 at 5803 (Note to Refco, Inc. Customer Equity Report); AAREF 00011779 at 780 (April 30, 2001 Memorandum to fiscal year 2001 audit workpaper on Confirmation Issues).

[235] *See, e.g., id.*; AAREF 00002663.

[236] *See, e.g., id.*; AAREF 00002663.

[237] *See* AAREF 00006387 at 6388 (April 20, 2000 Confirmation Request Letter from RCM to RGHI).

[238] *See* AAREF 00007369 (April 13, 2000 Confirmation Request Letter from RCC to RGHI).

[239] Schneider Interview, February 8, 2007.

of such a confirmation process with Ramler, and he agreed there was no reason to continue to send confirmation requests to RGHI.[240]

AA apparently did not perform any alternative procedures that would have provided adequate assurance that related party transactions were accurately presented in Refco's financial statements, despite the tacit acknowledgement that the confirmation procedures on which AA had previously relied were essentially worthless.

In each of the 1998 through 2002 RGL consolidated financial statements, the footnotes referencing related party transactions reflected the total affiliate receivable and payable balances as provided by Refco. The footnotes identify these balances as occurring "in the normal course of [RGL's] business,"[241] ostensibly including those with RGHI. The Examiner could find no basis for this statement. There is no indication in the workpapers that AA ever examined any of the transactions making up these balances in order to determine their business purpose. In fact, when clearing the initial engagement with GT, Ramler stated that RGHI was the parent of Refco with no operations, and its loans with subsidiaries pre-dated even his involvement with the Refco audits beginning in the late 1980s.[242] Former audit personnel interviewed by the Examiner's counsel confirmed that the review of these balances went no further than verifying that an affiliate receivable of one consolidated entity was offset by a payable on the books of another related party.[243]

---

[240] *See id.*

[241] *See, e.g.*, AAREF 0004976 at 4986 (Fiscal Year 1999 RGL Consolidated Financial Statement, Footnote 7 – Related Party Transactions).

[242] *See* GT SEC 0130512 at 521, at App. D-4 (Ramler's explanation of related party transactions for GT "Evaluation of Proposed Client" Form).

[243] *See, e.g.,* AAREF 00012317 (May 30, 2002 Memorandum to 2002 Audit File explaining related party information was tied to financial statements of each related party).

Moreover, although AA knew that a portion of the related party loan balance referenced in the footnotes of RGL's financial statements arose from RGHI's customer account balances with RCM and RCC, there is no evidence that the auditors reviewed those accounts or the statements used for confirmations beyond confirming the end balances.  Had AA simply requested and analyzed the monthly statements for these accounts, as a reasonably skeptical auditor would have done before concluding that the related party loans arose in the "normal course of business," it likely would have discovered the fraudulent manipulation.[244]

For example, the audit year 1999 RCM account confirmation request sent to RGHI included an account statement showing a swing in the RGHI account balance during the final month of Refco's fiscal year from an $82 million *debit* balance to a $25 million *credit* balance.[245] The account statement accompanying the RCM account confirmation request to RGHI for the 2000 audit year showed four separate large round-dollar cash transfers to RGHI's account, totaling $357 million, only days before the fiscal year end, taking RGHI's account from a $334 million *debit* balance to a $19 million *credit* balance.[246]  Nothing in these account statements or AA's workpapers supports the assertion that these year-end transactions with RGHI were "in the normal course of business" as represented by the footnotes on related party transactions contained in the RGL financial statements.[247]

---

[244] AU § 334 *et seq*.

[245] *See* AAREF 00000569 at 575, at App. D-9 (April 7, 1999 Confirmation Request Letter from RCM to RGHI and attached February 1999 RGHI Statement of Account at RCM).

[246] *See* AAREF 00006387 at 6388 (April 14, 2000 Confirmation Request Letter from RCM to RGHI).

[247] *See, e.g.*, AAREF 0004976 at 4986 (Fiscal Year 1999 RGL Consolidated Financial Statement, Footnote 7 – Related Party Transactions).

      **d.**     **AA's Failure to Discover the Manipulation of the Niederhoffer Losses Through Proper Testing of Related Party Transactions with RGHI**

As a result of the 1997 collapse of the Asian markets, Refco incurred losses which were hidden. As part of its business, Refco extended credit to customers who engaged in securities, commodities, and futures trades. One of those customers was a money manager named Victor Niederhoffer ("Niederhoffer"), who lost more than $90 million on investments placed through Refco, Inc. when the Asian markets collapsed in 1997, and Refco was required to meet the margin call on Niederhoffer's investments.

To hide these losses, Refco purportedly assigned to Wells, Ltd. (a subsidiary of RGHI) $71 million of the amounts lost by Niederhoffer.[248] AA apparently was unaware of this assignment agreement and the full extent of the losses incurred by Refco, Inc. in covering Niederhoffer's margin calls. Further, AA was apparently unaware that Refco, Inc. moved $71 million of that loss off its books and increased the receivable due from RGHI by a like amount.

During the course of its audit of Refco's fiscal year ended February 28, 1998, AA was well aware that Niederhoffer had most likely suffered large losses in his accounts held at Refco due to the collapse of the Asian markets, and that Refco "might be on the hook for millions."[249] AA apparently accepted management's representations that the Niederhoffer losses were much less than they really were.[250]

---

[248] Assignment Agreement dated October 28, 1997 between Refco, Inc. and Wells Ltd., at App. D-10.

[249] AA's workpapers for the audit of Refco's fiscal year ended February 28, 1998 included a press article describing Niederhoffer's losses and indicating that Refco might be liable for his losses. *See* AAREF 00020014-15, Wall Street Journal Article found in AA's workpapers entitled, *The Market Calms Down: Niederhoffer is Sunk by Market Maelstrom.*

[250] During the audit for the 1998 fiscal year, AA accepted the debit balances (*i.e.*, the purported amounts due from Niederhoffer to Refco, Inc.) as $27.6 million. Indeed, from the 1998 audit period forward, the audit workpapers consistently show that AA tracked the Niederhoffer Funds' balances as presented by the Refco Inc. financial statements and recommendations for bad debt reserves on the accounts provided by Refco's management, with no

*(footnote continued on next page)*

While AA did apparently send out audit confirmation letters to confirm the balance of the losses — *i.e.*, the amounts that Refco books disclosed were incurred in covering losses on Niederhoffer's behalf, those confirmations were of little utility because AA knew from press articles that Refco had taken over the accounts.[251]   In other words, AA, in essence, sent confirmation requests to Refco itself.

More fundamentally, AA failed to verify the full amount of the Niederhoffer losses borne by Refco, Inc., or that a substantial portion of such losses had been shifted from Refco, Inc. to RGHI, even though compliance with GAAS in the auditing of related party transactions with RGHI could have uncovered the fraudulent entries.[252]

RGHI, as the parent of Refco, was a known related party that supposedly transacted business in the ordinary course with Refco subsidiaries such as RCM and RCC.  Thus, in order to obtain a reasonable assurance of the nature, substance and amount of Refco's related party

---

*(footnote continued from previous page)*

meaningful testing of the balances referenced at any time.  *See, e.g.,* AAREF 00020226 (May 12, 1998 Audit Status Meeting Agenda recommending a $13.5 million reserve for Niederhoffer).  This tracking continued through the 1998, 1999 and 2000 audit years.

More specifically, during the 1999 fiscal year audit, the Refco, Inc. financial statements showed the Niederhoffer balance as lower than the prior year, $26.1 million, but there is no indication AA verified the basis for the reduction, [AAREF 00001742 (fiscal year 1999 Refco, Inc. A/R Allowance Analysis)] even though AA required that Refco increase the reserve against the Niederhoffer accounts to $20 million.  *See* AAREF 00003022 at 3025 (May 6, 1999 Pre-closing Meeting Memo).  For the fiscal year 2000 audit, AA recommended fully reserving the $26.1 million Niederhoffer balance.  *See* AAREF 00007247 at 7248 (notes to fiscal year 2000 Refco, Inc. listing of Significant Customer Debit Balances).  Then, during the 2001 fiscal year audit, AA noted that $8.7 million of the Niederhoffer balance was unsecured and reserved in the Refco, Inc. financial statements, with the balance of $18 million being carried on the financial statements of RGL.  *See* AAREF 00009683 at 9684 (notes to fiscal year 2001 Refco, Inc. listing of Significant Customer Debit Balances).  The $8.8 million remaining with Refco, Inc. was then written off in fiscal year 2002.  *See* GT SEC 0129191 (April 26, 2002 Audit Status Meeting Agenda).  Thus, although AA dutifully reserved against the amount Refco represented was due from Niederhoffer, it failed to discover the true amount of the losses Refco had to cover on Niederhoffer's behalf because it failed to properly audit related party transactions between RGHI and Refco, Inc.

[251]  *See* AAREF 00020014-15, Wall Street Journal Article found in AA's workpapers entitled, *The Market Calms Down: Niederhoffer is Sunk by Market Maelstrom* ("Refco, Inc. … has taken effective control of what remains of the portfolio").

[252]  *See* AU § 334, *et seq.*; SAS 82 ¶ 29.

transactions with RGHI, AA should have obtained and reviewed the account statements for

RGHI's customer account at RCM (in 1997, account no. 004521-00000, but changed

subsequently to no. 10002657). If it had done so, AA would have noticed that those statements

reflected a $71 million debit (*i.e.*, an increase in the amount owed to RCM by RGHI) to

"RECORD REC'BLE FR WELLS 10/29[/97]."[253] Because AA also knew that Wells Ltd. was a

related party,[254] it most likely would have questioned why the receivable due to RCM from

RGHI was being increased in order to book an amount due to Refco from Wells Ltd. In addition,

a properly skeptical auditor, employing a questioning mind and making a critical evaluation of

audit evidence, would have requested documentation supporting this transaction.[255] If AA had

done so, it very likely would have discovered that Refco, Inc. shifted its losses relating to

Niederhoffer off its books and onto those of an unconsolidated related party. AA's failure to

obtain and review the statements for RGHI's customer account at RCM is evidence of its

negligence.

e.     **AA's Failure to Detect and/or Act upon "Red Flags" Regarding Refco Related Party Transactions**

(i)     *The Initial Manipulation of RGHI's Account Balance at RCM*

One of the first manipulations of the RGHI Receivable during the relevant years occurred

on February 26 and 27, 1998, just days before the close of RGL's 1998 fiscal year. On those

dates, RGHI's account at RCC was credited by $175 million in a series of four WTLs booked by

---

[253] Customer statement for RGHI account no. 004521-00000 at RCM for October 1997.

[254] *See* AAREF 00015841 at 15843, at App. D-6 (1998 Schedule of Loans to Stockholders and Unconsolidated Affiliates).

[255] AU § 334, *et seq.*; SAS 82 ¶ 29.

RCM as "repos" [256] through the accounts of three RCM customers. AA apparently failed to review the customer statement for the RGHI account at RCC, and there is nothing in the work papers analyzing this massive influx of cash just days before year end. If it had done so, it would have noticed the source of the funds and likely would have discovered, from other documents AA had already obtained, that Refco had moved the funds of four RCM customers into RGHI's account at RCC.

Specifically, Tradewinds Debt Strategies Fund transferred $50 million from its RCM account (no. 004177-00000) to RGHI's account (no. 1690-001) at RCC. [257] The transfer was booked by RCM as a "repo" but identified as a "US DOLLAR LOAN" dated February 26, 1998 with a repo termination date of March 3, 1998 — just after the close of the 1998 fiscal year. [258] Tradewinds Emerging Debt Fund transferred $25 million from its RCM account (no. 004233-00000) to RGHI's account (no. 1690-001) at RCC. [259] The transfer was booked by RCM as a repo, but identified as a "US DOLLAR LOAN" dated February 27, 1998 with a repo termination date of March 3, 1998. [260] Similarly, MLC transferred $50 million from its RCM account (no. 004292-10403) to RGHI's account (no. 1690-001) at RCC on February 26, 1998, and then

---

[256] Repo and reverse repo transactions were a significant portion of Refco's assets. "Repo" is an abbreviation of "repurchase." Repo and reverse repo transactions are both securities sale and repurchase agreements executed between two parties. In both transactions, the party selling the security receives cash against the value of the security and promises to buy the security back from the purchaser at some point in the future. Typically, the party providing the cash (*i.e.*, the purchaser) will take possession of the securities involved in the transaction as collateral for its temporary outlay of cash to the seller. In essence, the transactions are loans collateralized by securities.

[257] *Compare* February 1998 customer statement for Tradewinds Debt Strategies Fund's account at RCM (no. 004177-00000) *with* February 1998 customer statement for RGHI's account at RCC (no. 1690-001).

[258] *See* AAREF 00019260 at 264 (February 1998 RCM EQ division Forward Repo/Reverse Repo Report).

[259] *Compare* February 1998 customer statement for Tradewinds Emerging Debt Fund's account at RCM (no. 004233-00000) *with* the February 1998 customer statement for RGHI's customer account at RCC (no. 1690-001).

[260] *See, supra*, n.258.

another $50 million from the same account to RGHI's RCC account on February 27, 1998.[261]

Both transfers were booked by RCM as "repos," but each was identified as a "US DOLLAR

LOAN" with a repo termination date of March 3, 1998.[262]

The result of these transfers was to take RGHI's RCM account balance from a $130

million *debit* balance to a $43 million *credit* balance.  During the 1998 fiscal year audit, AA

confirmed loan account balances for RCC customers, including that for RGHI's account number

1690-002 with a $4.99 million debit balance.[263]  But AA apparently took no steps to confirm the

$43 million *credit* balance of RHGI's RCM account number 1690-001.  Moreover, AA reviewed

the "Forward Repo/Reverse Repo Report" for RCM, which included the "repos" used to make

the transfers to RGHI's RCC account.[264]  During the same audit, AA was reviewing and

documenting the plans for MLC to receive $100 million in preferred stock from RCM

International, detailed in a memorandum to the working papers by audit senior Kesh on April 22,

1998.[265]  Still, the workpapers do not reflect that AA questioned at all the $100 million in "US

DOLLAR LOANS" taken out from RCM by MLC days before fiscal year end and having a

termination date only three days after the close of the fiscal year, even though the memorandum

reflects that as part of the preferred stock arrangement, MLC was to receive a $50 million dollar

(versus $100 million) credit facility from RGL or one of its affiliates.[266]

---

[261] *Compare* February 1998 customer statement for MLC's account at RCM (no. 004292-10403) *with* the February 1998 customer statement for RGHI's account at RCC (no. 690-001).

[262] AAREF 00019260 at 265.

[263] *See* AAREF 00018667 (April 4, 1998 Confirmation Request Letter from RCC to RGHI).

[264] AAREF 00019260 (February 1998 RCM EQ division Forward Repo/Reverse Repo Report).

[265] *See* AAREF 00016535 at 536 (April 22, 1998 $100 million Preferred Security Memorandum to fiscal year 1998 audit workpapers).

[266] *Id.*

### (ii)    Additional MLC Funds Transfer to RGHI

For the 1999 audit, AA sent a confirmation request to RGHI concerning its account at

RCM.[267]  The account statement accompanying the request shows a beginning *debit* balance of

$82 million and an ending *credit* balance of $25 million.[268]  The huge swing in balance within

the month of February 1999 was the result of a $108 million cash transfer on February 23, 1999

from an entity called "MLC," listed as a "TRANSFER FR MLC TO RGHI."[269]

The transaction was mirrored in MLC's statement accompanying the confirmation

request sent to MLC as part of the 1999 audit for its account at RCM.[270]  MLC's statement listed

a "TRANSFER FR MLC TO RGHI" of $108 million on February 23, 1999, taking MLC's RCM

account from a $5,303 *credit* balance to a $108 million *debit* balance.  In addition, MLC's

February 1999 RCM account statement listed additional transfers to RGHI, but to RGHI's

account at RCC.  Listed on the MLC statement are three transfers on February 23, 1999

described as "WIRE TO RCC A/C RGHI," the first for $9.6 million, the second for $2.772

million, and a third for $4.253 million.[271]  In sum, the MLC account statement reflects MLC

transferring $125 million from its RCM account for the credit of RGHI, taking the account from

a $5,303 *credit* balance to a $125 million *debit* balance.[272]

To mask the transactions, the statement also lists a February 23, 1999 "credit" to MLC

for a "PHYSICAL SETTLEMENT" of $125 million, reducing the ending balance of MLC's

---

[267] *See* AAREF 00000569, at App. D-9 (April 7, 1999 Confirmation Request Letter from RCM to RGHI with February 1999 RGHI Account Statement).

[268] *See id.* at 576.

[269] *See id.* at 575.

[270] *See* AAREF 00004724 (April 7, 1999 Confirmation Request Letter from RCM to MLC with February 1999 MLC Account Statement).

[271] *See id.* at 4727.

[272] *See id.*

RCM account for February 1999 back to a $5,303 *credit* cash balance.[273]  The statement details

this "credit" as a "US Dollar Term Loan" for $125 million dated February 23, 1999.[274]  The

"loan" is secured by "inventory" of 1 million shares of preferred convertible stock in RCM

International valued, per the account statement, at $100 per share for a total stated value of $100

million.[275]  The "inventory" section of the MLC account statement also lists the $125 million

short term loan as a "debit," resulting in a $25 million "net" inventory debit balance,[276] and a

$25.1 million *debit* balance as the February 28, 1999 "total account value."[277]

    AA was aware of MLC's inventory of preferred RCM International stock.  Audit senior

Kesh prepared a memorandum to the 1998 audit work file on RCM's investment in MLC.[278]  AA

then reviewed RCM's investment in MLC during the 1999 audit, including a review of MLC's

financial statements.[279]  Furthermore, AA was aware of and addressed the debit balance of

MLC's account with RCM.[280]  As part of its audit, AA tested RCM accounts with debit balances

and assessed them for collectability.[281]  For the 1999 fiscal year audit, AA prepared a "Debit

Balance Testing Memo," listing "issues [with] debit balances."[282]  But for the MLC debit

balance, the extent of AA's test for collectability of the MLC's accounts, or any review of MLC

accounts with RCM at all, was to note:  "Accounts returned to credit balance a few days after

---

[273] *See id.*

[274] *See id.* at 4728.

[275] *See id.*

[276] *See id.*

[277] *See id.* at 4729.

[278] *See* AAREF 00016535 at 536 (April 22, 1998 $100 million Preferred Security Memorandum to fiscal year 1998 audit workpapers).

[279] *See* AAREF 00002516 (April 9, 1999 Letter request for investment confirmation from RGL to MLC).

[280] *See* AAREF 00000505 at 509 (fiscal year 1999 audit Debit Testing memo to audit workpapers).

[281] *See id.*

year end when Refco repaid the $100 million preferred securities.  On an overall basis, MLC maintained a credit balance."[283]  The Examiner found no evidence that AA analyzed the MLC account beyond confirmation of the debit balance and review of the post year-end balance. Despite MLC's status as a related party by virtue of RCM's investment, and the complete lack of any role by RGHI in the MLC investment transaction, AA apparently made no inquiry into the $125 million transfer to various RGHI accounts days before year end 1999 funded by moneys RCM loaned to MLC.  The complete lack of any questions regarding this series of related party transactions shows AA failed to exercise appropriate skepticism.[284]

### (iii)    BriBank Funds Transfer to RGHI

The 1999 audit confirmation requests in AA's workpapers reflected a further wire transfer to RGHI of $50 million from BriBank.[285]  The account statement accompanying the account confirmation request to BriBank for its account with RCM listed the $50 million "WIRE TRANSFER TO RGHI" from BriBank's account on February 24, 1999.[286]  At the time, BriBank's account had a $9.7 million *debit* cash balance.[287]  The wire transfer took BriBank's RCM account to a $59.7 million *debit* balance, but this was then offset through a $50 million short term *loan* by RCM to BriBank on the same day, February 24, 1999, bringing BriBank's account back to a $9.7 million *debit* cash balance.[288]

---

*(footnote continued from previous page)*

[282] *See id.*

[283] *See id.*

[284] AU §§ 334.04, 334.8; SAS 82 ¶ 29.

[285] *See* AAREF 00601 (April 7, 1999 Confirmation Request Letter from RCM to BriBank with February 1999 BriBank Account Statement).

[286] *See id.* at 604.

[287] *See id.*

[288] *See id.*

BriBank was the subject of an inquiry by AA in 1999.  As with MLC, BriBank was singled out during AA's debit testing process as a customer with a debit balance of questionable collectability.[289]  AA was concerned about BriBank's ability to pay down its $9.9 million *debit* balance with RCM.  More specifically, AA notes show that it learned from Refco management that BriBank was on a $200,000 per month installment plan (which matches the installment payment the account statement shows for February 1999), with plans for installments and collateral deposits to pay off the debit balance by December 1999.[290]  But given AA's concern over the collectability of BriBank's $9.9 million debit balance, one would expect a reasonable auditor to note and ask why BriBank was given an unsecured $50 million loan and wired those funds to RGHI immediately prior to the end of Refco's fiscal year.[291]  However, there is no evidence AA recognized either the total amount of debt or the unexplained wire transfer to affiliate RGHI.

### (iv)    *EMF Funds Transfer to RGHI*

The 1999 audit confirmation requests in AA's workpapers also reflected a wire transfer to RGHI of $50 million from EMF, Ltd.[292]  The account statement accompanying the account confirmation request to EMF for its RCM account lists a $50 million "WIRE TRANSFER TO RGHI" from EMF's account on February 24, 1999.[293]  At the time, EMF's account had a $2.5

---

[289] *See* AAREF 00003029 at 3030, at App. D-8 (May 19, 1999 Sign-off Meeting Memorandum to workpapers); AAREF 00000505 at 507 (fiscal year 1999 audit Debit Testing memo to audit workpapers).

[290] *See* AAREF 00000505 at 507 (fiscal year 1999 audit Debit Testing memo to audit workpapers).

[291] The Examiner discovered through a review of later AA e-mail correspondence that in approximately 1998-99, Refco obtained an ownership interest in BriBank by absorbing BriBank's losses in the Russian currency markets. *See* REFCO-E-002405482 (January 8, 2004 Refco internal e-mail).  Thus, BriBank was a related party, but it appears that AA was not aware of that fact during the 1999 fiscal year audit.

[292] *See* AAREF 00004553 at 4579 (April 7, 1999 Confirmation Request Letter from RCM to EMF with February 1999 EMF Account Statement).

[293] *See id.*

million *credit* cash balance.[294]   The wire transfer took EMF's account to a $47.5 million *debit* balance, but this was then offset by a $50 million short term *loan* by RCM to EMF on the same day, February 24, 1999, bringing EMF's account back to a $2.5 million *credit* cash balance.[295]

   As with BriBank, EMF was singled out by AA during the 1999 fiscal year audit as a customer with a debit balance having questionable collectability.[296]   Yet AA apparently did not question its $50 million transfer to RGHI days before the close of fiscal year 1999, or even wonder why Refco would extend an additional $50 million loan to EMF.[297]   Instead, AA only noted that EMF's account balance was returned to a credit balance by May 17, 1999, after the close of the 1999 fiscal year.[298]

### (v)     *Major Changes to RGHI Account Balances*

   For the 2000 audit, as in prior years, AA confirmed the balance for RGHI's account at RCM (no. 10002657).   The statement of account identified four separate large round-dollar cash transfers on February 25, 2000 to RGHI's account at RCM, totaling $357 million, and taking RGHI's account from a $334 million *debit* balance on February 1, 2000 to a $19 million *credit* balance on February 28, 2000.[299]   The account statement lists three of these transfers as "FUNDS RECEIVED" in amounts of $50 million, $110 million and $150 million on February 25, 2000,

---

[294] *See id.*

[295] *See id.*

[296] *See* AAREF 00000505 at 508 (fiscal year 1999 audit Debit Testing memo to audit workpapers).

[297] *See id.*

[298] *See id.*

[299] *See* AAREF 00006387 at 6388-6389 (April 14, 2000 Confirmation Request Letter from RCM to RGHI with February 2000 RGHI Account Statement).

and the fourth as "REC FDS FOR REFCO GLOBAL HOLDINGS" in the amount of $47 million the same day.[300]

There is no evidence AA questioned the source of funds or the drastic change in the account balance only days before the close of the fiscal year.[301]  Had AA questioned the source of funds, it would likely have found that the three transfers labeled as "FUNDS RECEIVED" were transfers from the accounts of three other RCM customers, with EMF transferring $50 million from its RCM account (no. 10003358);[302] CS Land transferring $110 million from an account opened *on that day* (no. 10008225) using money loaned to it by RCM for this purpose;[303] and CIM Ventures transferring $150 million from its RCM account (no. 006800-10101).[304]  The fourth transfer for $47 million was from RGHI's account number 1690-001 at RCC, which had just received $300 million from BAWAG.[305]

---

[300] *See id.* at 6388.

[301] Similarly, the MLC transfer to RGHI in February 1999 detailed above showed the transaction brought RGHI's RCM customer account balance from a February 1999 beginning debit balance of $82 million to an ending credit balance of $25 million.  *See* AAREF 0000569 at 575 (April 7, 1999 Confirmation Request Letter from RCM to RGHI with February 1999 RGHI Account Statement).

[302] The February 25, 2000 Cash Disbursements Journal for RCM shows the $50 million, $110 million, and $150 million payments being taken from the three customers' accounts with the description "WIRE TFR TO REFCO GROUP H." That same document shows those funds being credited to RGHI's account at RCM (no. 10002657) as "FUNDS RECEIVED."  *See also* AA review of the Margin Call Summary Report for RCM's EQ Division, AAREF 00005997 at 5999, listing EMF account 10003358 as having an equity debit balance of $49,999,884.

[303] *See, supra,* n.302.  *See also* AA review of the Margin Call Summary Report for RCM's EQ Division, AAREF 00005997 at 5999, listing CS Land account 10008225 as having an equity debit balance of $110 million.

[304] *See, supra,* n.302.  *See also* AA review of the Customer Receivables for RCM's EQ Division, including a Time Deposit Directory report listing CIM Ventures account 006800 as having a US Dollar Loan of $150 million dated February 25, 2000 with a termination ate of March 9, 2000.  *See* AAREF 00006093 at 6096.

[305] February 2000 customer statement for RGHI's account at RCC (no. 1690-001).

### (vi)  *Unusual Relationship Between the RGHI Receivable Balance and Interest on that Balance*

### (a)  *RGHI Interest Accrual Issues*

For the year 2000 audit, AA sent a request to RGHI seeking confirmation of its unsecured loan balances with RCC.[306]  The request detailed RGHI's customer account number 1690-001 as having a principal balance of $44.3 million and an accrued interest charge of $9.6 million.[307] The Examiner could find no evidence in the workpapers that AA analyzed this loan, reviewed the loan documentation,[308] tested the interest accrual, or questioned why the reported accrued interest of $9.6 million on the $44.3 million principal balance equates to a 22% annual interest rate.[309]

Had AA tested the interest accrual, or reviewed the account statements for the RGHI account at RCC, it likely would have discovered the fraud.  Account statements the Examiner reviewed demonstrated that in January 2000, RGHI had a $255 million account *debit* balance until January 25, 2000, when a series of four $60 million wire transfer credits reduced the debit balance.[310]  Thereafter, on February 24, 2000, through four journal entries to the RGHI account at RCC, the four $60 million transfers were "reversed" as part of a series of transactions whereby $47 million was wired out to another RGHI account, and $300 million was wired into the account from BAWAG.[311]

---

[306] *See* AAREF 00007369 (April 13, 2000 Confirmation Request Letter from RCC to RGHI).

[307] *See id.*

[308] *See, supra*, 1998 Kesh memorandum, n.233.

[309] The 1998 Kesh memorandum also reported that the interest charged related parties ranged from the prime rate to three points above prime.  *See id.*

[310] January 2000 Customer Statement for RGHI's account at RCC (no. 1690-001).

[311] February 2000 Customer Statement for RGHI's account at RCC (no. 1690-001).

### (b)     *Issues Revealed by AA Analyses*

During the 2001 audit, AA performed a variation analysis comparing the interest income and expense booked by RCC in the fiscal years 2000 and 2001 tied to related party loans.[312]  The comparison revealed that from fiscal 2000 to fiscal 2001, RCC's interest income increased 44.4% from $48.8 million to $70.1 million.[313]  RCC's interest expense also increased significantly, from $43.6 million in fiscal 2000 to $55.5 million in fiscal 2001, a 27.3% increase.[314]  But between the two years, the comparison showed that total loan balances remained flat, with loans receivable for fiscal 2000 being $656.8 million compared to $675.9 million in 2001 (a 2.9% increase), and loans payable actually falling from $624.7 million in fiscal 2000 to $620.2 million for fiscal 2001 (a 0.7% reduction).[315]  AA apparently sought an explanation for the large interest revenue and expense increases year to year while loans receivable and payable remained flat, discussing the findings with Silverman.[316]  But AA apparently did no more with its questions than note Silverman's response, "These [loan] balances fluctuate through out the year.  The balance was much higher throughout the year, resulting in increases in interest income and expense for the year."[317]  Had AA properly discharged its duty of skepticism[318] and sought to verify the validity of Silverman's representation, it may have discovered the fraud by reviewing the loan accounts and finding the large, round-dollar reductions in loan balances just before each fiscal year end.

---

[312] *See* AAREF 00009117 at 9119 (fiscal year 2001 Interest Income and Expense Variation Analysis).

[313] *See id.*

[314] *See id.*

[315] *See id.*

[316] *See id.* at 9118.

[317] *See id.*

[318] *See* AU §§ 230.8, 333.02, 334.04, 334.08.

f.    AA's Awareness of and Failure to Properly Audit Related
Party Transactions with BAWAG in Accordance with GAAS

A January 7, 1999 agenda for a meeting between AA and Refco management shows that

Refco advised AA that BAWAG planned to invest in RGL, purchasing a ten percent share of

RGL for $85 million.[319]   AA understood that the transaction would include a $95 million loan

from BAWAG to RGL "in anticipation of BAWAG buying another 10% by February 15,

2000."[320]   AA followed up on the status of the BAWAG investment in a pre-closing meeting on

May 6, 1999, noting in a memorandum to the file the following discussions with management

during the meeting: "On May 14, 1999, BAWAG is expected to convert its $95 million loan to

RGL to an equity interest," with the original $85 million investment to "be extended to five years

on the same day as the equity investment is made on May 14, 1999."[321]

The memorandum for the closing meeting makes no mention of any discussion regarding

the BAWAG investment, or the status of the anticipated May 14, 1999 conversion of the

BAWAG $95 million loan to equity.[322]   It appears that AA did not inquire and had no knowledge

as to whether the additional 10% interest was ever purchased.   Moreover, former managers Kesh

and Schneider denied any knowledge that BAWAG had purchased an additional, undisclosed

interest in Refco.

---

[319] AAREF 00003035 at 3039 (Agenda for January 7, 1999 Audit Status Meeting with Refco management).

[320] *See id.   See also* AAREF 00005096 at 5098-99 (April 22, 1999 Kesh Memorandum to File detailing the "BAWAG Loan Transaction").

[321] *See* AAREF 00003022 at 3024 (notes from May 6, 1999 pre-closing meeting with Refco management).

[322] *See* AAREF 00003029, at App. D-8 (May 19, 1999 memorandum of notes to fiscal year 1999 audit workpapers on audit closing meeting with Refco management).

### (i) AA's Knowledge of the Annual BAWAG Year-End Receivable

In addition to its knowledge of BAWAG's investment in RGL, and its related party status, AA also knew that BAWAG had large unsecured receivables owed to RCM.  AA's workpapers for the fiscal year 2001 audit related to debit testing for RCM show that AA observed the unsecured $225 million debit balance of BAWAG's account.[323]  AA apparently took no further action other than noting that BAWAG had a 10% ownership interest in Refco and that "Refco" was "required to post margin because BAWAG is a regulated entity."[324]

During the fiscal year 2002 audit, AA again reviewed RCM's significant unsecured customer debit balances.[325]  AA noted a $210 million unsecured debit balance for BAWAG's account with RCM.[326]  AA again apparently took no action concerning the unsecured debit balance because "the referenced accounts are related parties, reducing the risk of loss through default."[327]

### (ii) AA's Failure to Comply with GAAS with Respect to Auditing the Related Party Transactions with BAWAG

The Examiner could not determine what, if any, specific planning for or testing of related party transactions AA undertook because there was no written audit plan for any of the audit years 1998 through 2002 contained in the audit workpapers.

Although AA recognized BAWAG was a related party, it failed to exercise any professional skepticism regarding BAWAG's transactions with Refco related parties.  Indeed,

---

[323] AAREF 00010576 at 577 (fiscal year 2001 Debit Testing workpapers for RCM EQ division).

[324] *See id.*

[325] *See* AAREF 00013519 (fiscal year 2002 RCM Unsecured Debits Report).

[326] *See id.*

[327] *See id.*

even knowing that BAWAG had invested in RGL *after* management's expression of an exit strategy to sell Refco, there was no effort by AA to obtain competent evidentiary matter from which to determine the nature, purpose and amount of BAWAG's investment.  Rather, and contrary to the professional guidance, [328] it appears AA simply accepted management's representations regarding the significant debit balances BAWAG incurred with RCM just days before the close of the 2001 and 2002 fiscal years.[329]

In each of the 2001 and 2002 RGL financial statements on which AA issued an unqualified opinion, the footnotes disclosed related party transactions as occurring "in the normal course of [RGL's] business."[330]  AA knew that BAWAG was a related party — even justifying there being no reserve on its $210 million unsecured debit balance for the fiscal year 2002 audit *because* it was a *known* related party.[331]

Yet, despite this recognition of BAWAG's related party status, the BAWAG receivable was not included in the related party transactions footnote disclosures for either of the 2001 or 2002 RGL Consolidated Financial Statements.  The BAWAG receivable should have been disclosed.

> **(iii)    AA's Failure to Detect and/or Act Upon "Red Flags" Regarding the Related Party Transactions with BAWAG**

Despite its knowledge of BAWAG's ownership interest and related party status, AA failed to obtain and evaluate competent evidence of the nature and purpose of the related party

---

[328] *See* Professional Standards section IV.B.4, *supra*.

[329] *See* AAREF 00010576 at 577 (fiscal year 2001 RCM Debit Testing Memo); AAREF 00013519 (fiscal year 2002 RCM Unsecured Debits Report).

[330] *See* AAREF 00010176 at 188 (Fiscal Year 2001 RGL "Browncover" Consolidated Financial Statement, Footnote 8 – Related Party Transactions); AAREF 00013715 at 725 (Fiscal Year 2002 RGL Consolidated Financial Statement, Footnote 9 – Related Party Transactions).

[331] *See, supra,* footnote 326.

transactions resulting in BAWAG's debit balances at RCM in 2001 and 2002. Rather, for the 2001 fiscal year audit, AA's debit testing documentation reflects that AA apparently accepted an explanation by Refco management that "Refco" was "required to post margin because BAWAG is a regulated entity."[332] The AA audit manager reviewed the work papers at her interview and advised that she assumed that this was necessary in order for RCM to trade with BAWAG.[333] She further claimed that the $225 million was not "unsecured" because it was a deposit by Refco with a right to have it returned.[334]

The Examiner could find no basis for a requirement that RCM post margin with BAWAG, and certainly none that would require posting margin to BAWAG's trading account at RCM. The memorandum for the 1999 fiscal year audit planning meeting with management explains that the BAWAG investment and relationship with Refco was in part fueled by a business effort to have BAWAG's banking and investment customers served by Refco, but doing so through BAWAG given Refco's lack of name recognition and experience with BAWAG's customers.[335] Refco management advised at that meeting that it planned to place personnel at BAWAG; AA noted: "Customers will be customers of the bank, Refco will be the executioner. Customers don't want to deal with Refco because not enough credit, but will deal with BAWAG."[336] By the post-1999 audit closing meeting on November 2, 1999, Refco management made AA aware that RCM's fiscal year 2000 results year-to-date were "disappointing; expecting

---

[332] *See* AAREF 00010576 (fiscal year 2001 RCM Debit Testing Memo).

[333] Schneider interview, February 8, 2007.

[334] *See id.*

[335] *See* AAREF 00003035 at 3039 (Agenda for January 7, 1999 Audit Planning Meeting with Refco management).

[336] *See id.*

to leverage off of BAWAG relationship and increase accounts in October 99."[337]  Thus, the

explanation received by AA during the 2001 audit — that Refco had to post margins for that year

in order to trade with BAWAG — does not make sense; no such requirement was in place in

1999.

Despite AA's knowledge of BAWAG's related party status for the 2001 fiscal year audit,

the Examiner could find no indication in AA's workpapers that AA reviewed the customer

statements for BAWAG's account at RCM.  If AA had done so, it would have seen that

BAWAG was generally making small foreign currency trades, compared to which the $225

million debit immediately prior to the close of the 2001 fiscal year stood out starkly both in the

amount and because it was in U.S. dollars.[338]  Further, the account statement showed the debit

balance to be the result of a single transaction having nothing to do with RCM "posting margin"

for trades it made with BAWAG.[339]

During the fiscal year 2002 audit, AA again failed to exercise the required skepticism

regarding BAWAG's significant $210 million debit balance with RCM.  AA once again

identified BAWAG's RCM debit balance as a material unsecured balance, but characterized it as

having a low risk of default due simply to BAWAG's status as a related party.[340]  As in 2001, the

Examiner's review showed that if AA had examined BAWAG's RCM account statement, it

would have seen that this balance was the result of a single transaction again occurring

immediately before RCM's fiscal year end.[341]  That should have led to questions by AA as to

---

[337] *See* AAREF 00007740 at 7742 (November 2, 1999 Audit Closing and Planning Memorandum to fiscal year 2000 audit workpapers).

[338] February 2001 Customer Statement for BAWAG's account no. 3905 at RCM.

[339] *See id.*

[340] *See* AAREF 00013519 (fiscal year 2002 RCM Unsecured Debits Report).

[341] February 2002 Customer Statement for BAWAG's account no. 3905 at RCM.

why such transactions occurred in consecutive years just days before the fiscal year end, and could very likely have led to a detection of related party fraud.

## 2.    GT's Failure to Properly Audit Refco's Related Party Transactions

GT knew that Refco engaged in substantial and complex related party transactions and knew the risk associated with such transactions, but failed to conducts its audits of those transactions in accordance with GAAS.  GT was also keenly aware of the risks posed to Refco by its own management, particularly in management's ability to override controls (which GT had identified as deficient at Refco in the first place), but failed to perform GAAS-compliant audit steps to detect possible of such management-driven fraud.  In addition, GT received numerous "red flags" pointing to the Round Trip Loan fraud in conducting its audits of Refco but failed to recognize and follow up on those flags as one would have expected a sufficiently skeptical auditor to do.  Instead, GT appears to have relied much too heavily on its perception of the "integrity" of Refco's management.

### a.    GT Failed to Audit Refco's Related Party Transactions in Accordance with GAAS

Despite being aware of the existence of related party transactions and assessing them as a high risk factor, GT failed to comply with GAAS in auditing such transactions.

#### (i)    *GT Was Aware that Refco Engaged in Significant Related Party Transactions*

Ramler had become familiar with issues concerning Refco's related party transactions during his years at AA, and brought this knowledge with him to GT.  When he proposed Refco to GT as a client and completed GT's new client evaluation form, Ramler indicated that Refco

engaged in significant related party transactions and that certain such related parties were either not audited or were audited by other firms.[342]

At that time, Ramler further noted that RGHI, which was the corporate parent of RGL, was a shell entity with no operations other than its relationship with RGL and that it owed RGL approximately $170 million as of February 28, 2002.[343]  Although Ramler acknowledged that these receivables pre-dated his association with Refco, he stated that he had no indication that they were the result of losses that should have been recognized by RGL.[344]

As part of the new client evaluation process, Ramler outlined and provided updated information about the agreements that AA had reached with Bennett concerning the related party balances in 1999 — *i.e.*, that the balances owed by RGHI to Refco would no longer increase, the balances would be paid down over a period of seven years, and during fiscal year 2003, at least another $50 million would be paid off.[345]  Thus, from the outset of GT's involvement with Refco, Ramler had gone on record regarding the existence of material related party receivables and the need for RGHI to repay these receivables so that they did not have to be written off against its equity in RGL.  GT was also cognizant of the fact that related party transactions with RGHI created a high degree of risk of material misstatement.[346]

---

[342] Ramler noted several risk factors applicable to the proposed Refco engagement by checking boxes on the GT "Evaluation of Proposed Client" form.  Boxes are checked next to the statements on the form indicating that the proposed client had "associated entities that are not audited or are being audited by firms outside GT" and engaged in "significant related party transactions."  GT SEC 00130512 at 519-20, at App. D-4.

[343] GT SEC 0130512 at 521, at App. D-4 (Ramler's explanation of related party transactions for GT "Evaluation of Proposed Client" Form).

[344] *See id.*

[345] *Id.*

[346] The 1999 agreements between Refco and AA concerning these balances are discussed above in Section IV.D.1.a.  Briefly, in 1999, Ramler informed Bennett that it was important for accounting purposes that shareholders demonstrate actual intent to repay outstanding receivables to Refco in the "relatively near future" — five to eight years.  AAREF 00011967, at App. D-7.  Refco apparently agreed to repay $25 million per year.  AAREF 00003030 at 00003032.  When he proposed Refco to GT as a client in late 2002 or early 2003, Ramler outlined action steps for

*(footnote continued on next page)*

Finally, GT, like AA, was aware that BAWAG was a related party.[347]  GT was also aware that Refco engaged in substantial transactions with BAWAG.[348]

As discussed in the Round Trip Loan section of this Report, RGHI's debt to Refco was, in reality, substantially greater than what was presented to GT at the end of each financial reporting period.  The fraud at Refco was accomplished by manipulating the amount RGHI owed to Refco shortly before the end of the financial reporting period (first annually at the end of February, then quarterly beginning in May 2004) and then unwinding the fraudulent entries shortly after the close of the financial reporting period.  Although GT apparently never looked at the statements for RGHI's significant customer accounts at Refco, those statements reflect the

---

*(footnote continued from previous page)*

GT to take in the 2003 audit related to the inter-company receivable, including: "Obtaining written rep from the shareholder/ CEO of their intent as of a date certain to pay down these balances. To the best of our ability document our understanding of the financial resources and ability to pay these balances down in 3 to 4 years. Document our agreement, that if they fail to adhere to the payments, the remaining balance will be written-off through equity."  GT SEC 0130512 at 521, at App. D-4.  As explained further below, GT apparently obtained repayment assurance from Bennett in connection with the 2003 financial statements audit.  GT SEC 0032255.

[347] GT SEC 0130530 at 130531 ("New Client Background Investigation" report by GT's National Professional Standards Investigative Research Group dated October 31, 2002 concerning RGL and Subsidiaries, Bennett, Trosten, and Grant): "since May 1999, a 10 percent stake in Refco Group has been held by [BAWAG]."

[348] GT SEC 0031573 (Paper Explorer File for audit period ended 2/28/03, "Refco Group Ltd. LLC and Subsidiaries, Developing the Audit Plan").  For instance, GT's 2005 audit workpapers contained the following summary of related party loans outstanding as of the end of the prior four fiscal years:

|  | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|
| BAWAG | 210,223,000 | 175,223,000 | 210,223,000 | 225,223,000 |
| RGHI | - 0 - | 105,322,000 | 179,000,000 | 205,000,000 |
| Total: | 210,223,000 | 280,545,000 | 389,223,000 | 430,223,000 |

GT SEC 0029090 (page from workpapers for audit of New Refco Group, Ltd. February 28, 2005 financial statements).

-118-

following balances immediately before and as of the close of the audited financial statement periods (credit balances appear in parentheses):[349]

| Period | Statement Ending | RGHI @ RCM (no. 10002657) Ending Balance | RGHI @ RCC (no. 1690-001) Ending Balance | Total |
|---|---|---|---|---|
|  | 1/31/2003 | 147,454,498 | 555,548,961 | 703,003,459 |
| 2003 | 2/28/2003 | 70,094 | 71,813,726 | 71,883,820 |
|  | 1/30/2004 | 0 | 701,420,345 | 701,420,345 |
| 2004 | 2/27/2004 | 0 | (5,251,847) | (5,251,847) |
|  | 4/30/2004 | 0 | 602,192,916 | 602,192,916 |
| Q1 2005 | 5/31/2004 | 0 | 80,317 | 80,317 |
|  | 7/30/2004 | 408,314 | 711,869,064 | 712,277,378 |
| Q2 2005 | 8/31/2004 | 3 | 0 | 3 |
|  | 10/29/2004 | 507,896,761 | 0 | 507,896,761 |
| Q3 2005 | 11/30/2004 | 2,835,852 | 0 | 2,835,852 |
|  | 1/31/2005 | 526,621,060 | 0 | 526,621,060 |
| Q4 2005 | 2/28/2005 | (106,083) | 0 | (106,083) |
|  | 4/29/2005 | 626,425,628 | 0 | 626,425,628 |
| Q1 2006 | 5/31/2005 | (3,423,742) | 0 | (3,423,742) |
|  | 7/29/2005 | 496,620,598 | 0 | 496,620,598 |
| Q2 2006 | 8/31/2005 | 1,443,482 | 0 | 1,443,482 |

   **(ii)   GT Knew that Related Party Transactions Presented High Risks of Misstatement**

Related party transactions are not like typical business transactions because they cannot be assumed to have been conducted at arm's length.[350]  Related party transactions have

---

[349] The figures that appear in this chart were taken from the customer statements for RGHI's account at RCM (account no. 10002657) and at RCC (account no. 1690-001).

[350] AU § 150.05 (based on SAS 43, issued November 1972).  GT's internal guidance was consistent with the standards interpretation.  *See* GT EX 003460 ██████████████████████████████ ██████████.

historically been associated with major business frauds. While related party transactions, if properly disclosed, do not require different accounting than transactions with non-related parties, they do pose financial statement risks, such as misstatement motivated by a desire to give the appearance of certain business results.[351]  Consequently, related party transactions generally merit more scrutiny than transactions with unaffiliated entities, and particular care is warranted when related parties are not audited or are audited by a different accounting firm.[352]  Moreover, the auditor must understand the business purpose of the transaction before the audit can be completed.[353]

Beginning in at least 2004, the risks associated with related party transactions were made ever more apparent to GT in connection with an SEC enforcement action in which GT was a respondent.  On August 5, 2004, the SEC announced that it had settled an administrative proceeding against GT arising from GT's 1998 audit of MCA Financial Corporation ("MCA").[354]  The matter had been pending since at least January 5, 2004, when the SEC instituted the administrative proceeding.[355]

The MCA-related enforcement action alleged that GT permitted its audit client to conceal material related party transactions, of which GT's auditors were allegedly aware, in connection with the client's SEC filings and public debt offerings.  Among other allegations, the SEC noted that "despite their knowledge of millions of dollars of undisclosed related party transactions, [the

---

[351] AU §§ 334.04, 9334.17, 9334.19.

[352] *See id.  See also* AU §§ 334.08; 334.09.  GT's internal guidance was consistent with these standards.  *See* GT EX 003460 at 3461, 3465 ███████████████████████████████.

[353] AU § 334.09.

[354] *In the Matter of Grant Thornton LLP, et al.*, Administrative Proceeding No. 3-11377, Exchange Act Release No. 50148, Accounting and Auditing Enforcement Release No. 2076 (August 5, 2004) (available at http://www.sec.gov/litigation/admin/34-50148.pdf).

[355] *Id.*

auditors] did not design audit procedures to test the total amount of undisclosed related party [transactions]."[356]  The SEC alleged that GT had engaged in improper professional conduct in auditing MCA because it did not adequately plan the 1998 MCA audit, did not act with sufficient skepticism in conducting the audit, and did not obtain enough evidence to support its conclusions.[357]  In order to settle the administrative proceeding, GT agreed to pay a fine and to provide enhanced fraud detection training to its audit staff.  In addition, the SEC censured GT pursuant to SEC Rule 102(e).[358]

In light of this SEC proceeding, GT had an additional reason to have conducted its ongoing audits of Refco with an enhanced awareness of the need to plan audits adequately, the professional requirement of skepticism, the importance of gathering sufficient evidential matter to support audit conclusions, and the risks associated with related party transactions.  Further, GT's 2005 audits were conducted after GT had promised the SEC that it would enhance its fraud detection training of audit staff as part of the settlement for the pending enforcement action.

The Examiner finds no evidence that the Consent Decree and the obligations it imposed on GT led to audit procedures directed to discovering the type of related-party fraud that was occurring at Refco.

GT was aware of certain Refco-specific risks concerning related-party transactions.  GT knew that there was a very large receivable from RGHI to Refco, that the receivable had existed for a very long time, and that it was unsecured.[359]  Issues concerning related party receivables

---

[356] *Id.* at ¶ 93.

[357] *See id.* at ¶ 120.

[358] *See id.* at ¶ 25.

[359] *See, e.g.,* GT SEC 0031027-30.  An "Inherent Risk Indicators" assessment showing risk of "significant and/or complex related party transactions" as "high."  *Id.* at 31029.

were apparently also discussed at an audit planning meeting attended by the GT Refco audit

team prior to the 2003 financial statements audit.[360]

### (iii) GT Had Procedures for Conducting Audits Involving Related Parties

The GT personnel working on the Refco engagement had an obligation to follow

professional standards in their audit procedures and develop audit procedures tailored

specifically to the Refco engagement.  The professional standards for auditing related party

transactions call for reasonably necessary procedures to obtain competent evidential matter

sufficient to provide the auditor with an understanding of the purpose, nature and extent of the

transactions and their effect on the financial statements.[361]  That same guidance requires auditors

not to merely accept management representations concerning the purpose, nature, and extent of

related party transactions.[362]  Rather, auditors should substantiate management representations

concerning related party transactions.[363]

Further, RGHI and BAWAG were not merely related parties - they were related parties

that were not audited by GT.  Auditors should be particularly skeptical of transactions with such

entities.[364]  When auditing transactions with related parties that GT did not audit, GT auditors

---

[360] In connection with the 2003 audit, GT prepared a power point briefing titled "Refco Planning Meeting."  One of the slides for that briefing identified several "Audit Issues."  The audit issues identified in advance of the 2003 audit included unsecured debits, related party receivables, and "overall F/S [financial statement] disclosures."  GT SEC 0129858 at 0129863.

[361] AU §§ 344.02, 344.04, 344.08, 334.09, 9334.17, 9334.19; GT's internal guidance was consistent with these standards.  *See* GT EX 003460 at 3465 ███████████████████████████████.

[362] *See, e.g.,* AU § 334.09.

[363] AU §§ 334.09, 9334.19.

[364] AU §§ 334.09, 334.11, 9334.17.  GT's internal audit guidance was consistent with these standards.  *See* GT EX 003460 at 003465-66 ███████████████████████.

were obligated to consider adding additional procedures with respect to the related party in an effort to gain some independent verification of the nature of those transactions.[365]

As a carry-over from his audits of Refco while at AA, Ramler continued to focus on the need for RGHI to repay its debt to Refco. In connection with the audit of the 2003 financial statements, on April 28, 2003, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down the RGHI Receivable.[366] In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of the receivable, then totaling $105 million, by at least $35 million per year, resulting in full repayment by February 28, 2006.[367] GT does not appear to have made any meaningful effort to determine that payments were actually made.

### (iv)   *GT's Failure to Properly Audit Related Party Transactions*

In spite of the identified risks and its own audit procedures, GT failed to conduct appropriate audit procedures of related party transactions.

### (a)   *GT's Audit of the Related Party Receivable from RGHI Was Ineffective and Failed to Incorporate Appropriate Audit Procedures*

The related party receivable at Refco consisted primarily of receivables from RGHI to several different consolidating Refco entities.[368] Although Refco management attempted to deceive GT as to the true magnitude of the RGHI Receivable, GT, like AA before it, failed to

---

[365] AU §§ 334.09, 334.11, 9334.17. GT's internal guidance reflect an understanding of and adopts these requirements. *See* GT EX 003460 at 3465-66 ███████████████████████████████ ██.

[366] GT SEC 0032255 (letter dated April 28, 2003 from Bennett to Ramler re: Related Party Transactions). Such letter was of questionable utility given that Ramler knew Bennett had previously promised to pay down the related party receivables and the balance of RGHI's loan from RCC had been identified as increasing from approximately $41 million to $71 million during fiscal year 2003.

[367] *Id.*

perform procedures adequate to assess its true amount.  Instead, GT appears to have simply accepted its client's false representation as to the true amount of that receivable.

During the 2003 audit, for example, GT was told by Bennett that the RGHI Receivable was $105 million.[369]  Yet, apart from ensuring that it was consistent with other summary-level internal Refco documentation, GT apparently performed no testing to verify the accuracy of this representation.  During its 2004 and 2005 audits, GT likewise failed to obtain evidence sufficient to provide a reasonable assurance that related party transactions were properly reflected in the financial statements.

> **(b)      GT Failed to Follow its Own Procedures Specific to Auditing Related Party Transactions**

In its workpapers for the 2003 audit, GT noted that it had considered transactions entered into with related parties not audited by GT, and that material balances with RGHI and BAWAG were audited and documented.[370]  However, the Examiner was unable to locate any documentation in the workpapers indicating that GT did anything more than accept management's representation as to what the balances were, ensure that information was

---

*(footnote continued from previous page)*

[368] For instance, while at AA, Ramler obtained a "Schedule of Loans to Stockholders and Unconsolidated Affiliates," which reflected a total related party loan balance as of February 28, 2002 of $179.4 million.  *See* AAREF 00012494.  Over $100 million of that amount was owed by RGHI.

[369] *See* GT SEC 0032255 (letter from Bennett to Ramler re: Related Party Transactions, dated April 28, 2003).

[370] In a "Paper Explorer File" titled "Refco Group Ltd., LLC and Subsidiaries / Developing the Audit Plan" for the February 28, 2003 audit [GT SEC 0031573], GT adopted the following step:

> 3.  Related Parties
>
> > * * *
>
> > (b) Consider the implications of transactions with related parties that we do not audit.
>
> > GT has considered transactions entered into with related parties not audited by GT.  Balances that are material with RGHI and BAWAG, the entities were audited and appropriate documentation was obtained.

internally consistent (in the case of the RGHI Receivable),[371] and confirm the balance with the

customer (in the case of the BAWAG receivable).[372]

Documents relating to audit and review planning in later periods reflect that GT

contemplated steps to scrutinize related party transactions, particularly those involving entities

not audited by GT, but did not implement any of these steps.[373]  GT's adopted audit procedures

which acknowledged that related party transactions should be reviewed for whether they occur in

the ordinary course of business or are unusual or have not been accorded appropriate accounting

treatment.[374]

One way in which GT planned to review certain related party transactions was to tie them

back to the books of the related party.  For example, in conducting its audit of RCC in 2003, GT

told Refco that it needed to see certain loan receivables to RCC on the books of the affiliate

owing the money.[375]  When making this inquiry, GT specifically requested the information about

the loan from RCC to RGHI purporting to have a balance of $71,813,725.99, including:

(a) source documents to verify the loan principal, interest rates and payment schedule; and (b) a

detailed schedule of payments made during the year, indicating that GT would trace some

---

[371] *See* GT SEC 0031852-54, at App. D-6 (workpaper documents showing a Refco-generated "Schedule of Loans to Stockholders and Unconsolidated Affiliates" tied to a list of "Customer Divisional Loans Receivable" from RCC). For instance, the cited workpaper reflects that the amount of the RGHI Receivable at RCC was "traced to Refco Capital explorer file workpapers," but does not reflect any attempt at independent verification such as review of RGHI's account statement.

[372] *See* GT SEC 0014361-461 (April 8, 2003 customer confirmation request letter from Refco to BAWAG appending statement for BAWAG's account at RCM dated February 28, 2003).

[373] *See, e.g.*, GT SEC 0107113 (Refco LLC, 2/28/04 Audit Program): "Consider the implications of transactions with related parties that we do not audit."

[374] *See* GT SEC 00135423 (GT audit program "activity log" for "Borrowings" from audit of RCC 2/28/03 financial statements).

[375] *See* GT E SEC 20010934, at App. D-11, e-mail from GT auditor Yonah Dahan to Frank Mutterer at Refco transmitting a list of items GT needed for the RCC audit.

payments into Refco's bank statements.[376]  In other words, GT requested documentation to verify the existence and terms of the loan and ensure that RGHI was actually making payments that were reflected in RCC's bank statements.  In apparent violation of GT's own practices and GAAS, there is no indication that these critical procedures were ever carried out.  If they had been, GT would likely have either uncovered the fraud or, if Refco failed to provide the requested information, would have had to consider seriously whether to issue a qualified audit opinion or withdraw from the engagement in 2003 without issuing an audit opinion.

### (c)     GT Failed to Audit RCC's Transactions with RGHI in Accordance with GAAS

The primary component of the reported $105 million related party loan balance, as of February 28, 2003, was a $71 million debit balance in RGHI's account at RCC (no. 1690-001).  Knowing this, GT should have followed the professional audit standards requiring it to obtain sufficient competent evidentiary matter to satisfy itself as to the purpose, nature, and extent of the transactions leading to RGHI's loan balance, such as reviewing loan documents and payments.[377]  Although GT obtained a Refco-provided summary sheet indicating that the RGHI account balance was a debit of $71,813,725.99 in principal and approximately $8.7 million in accrued interest,[378] GT's workpapers do not indicate that it reviewed the customer statement for RGHI's account.

The customer statement for RGHI's account at RCC for the month of February 2003 indicate that:

- Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI owed Refco more than $720 million.

---

[376] *See* GT E SEC 20010934.0007.0010, at App. D-11.

[377] AU § 334.09.

[378] *See* GT SEC 0031853 (schedule of "Customer Divisional Loans Receivable" at RCC as of 2/28/2003).

- On February 21, 2003, RGHI's account at RCC received a cash transfer "from margins" for $308 million, reducing the amount that RGHI owed RCC.

- On February 25, 2003, the same day BAWAG transferred $175 million from its own account at RCM, RGHI received a $175 million credit from a "WT From Wachovia NY Int'l" (the bank used by BAWAG in New York).[379]

Given the high degree of risk GT knew was associated with related party transactions at Refco, GT should have examined the customer statement for the RGHI account at RCC for the month of March 2003. Had GT done so, it would have learned that the above-described entries were reversed shortly after Refco's year end, and the amount RGHI owed to RCC ballooned from $71.8 million on February 28, 2003 back up to $630 million by March 4, 2003.[380]

Moreover, the 2003 receivable balance in RGHI's RCC account of $71.8 million represented an approximately $30 million increase over the prior year.[381] Although GT inquired as to the reason for the increase and was told by Trosten that it represented "additional loans,"[382] GT apparently never questioned why, or the implications of, the fact that during a time when RGHI was supposed to be paying down the debit balance, RCC was extending RGHI additional credit.

GT apparently also did not obtain or review any loan documents concerning the RGHI Receivable at RCC, despite Ramler's assertion at the time he brought Refco to GT as a new client, that the receivable represented "actual borrowing of funds."[383] Nor did GT perform any

---

[379] *See* REFCO-0009-001274 and 0009-001280 (Customer Ledger Report for RGHI's customer account at RCC). Prior to November 1999, the account number was 004521-00000. In December 1999, the account number was changed to 1690-0001.

[380] REFCO-0009-001280.

[381] *Compare* GT SEC 0031852, at App. D-6 (Schedule of Loans to Stockholders and Unconsolidated Affiliates as of 2/28/2003) *with* AAREF 00012494 (fiscal year 2002 Schedule of Loans to Stockholders and Unconsolidated Affiliates). *See* App. D-6.

[382] *See* GT SEC 00135303 (schedule of "Loans Receivable" at RCC dated February 28, 2003).

[383] *See* GT SEC 0130512 at 130521, at App. D-4 (portion of "Evaluation of Proposed Client" form completed by Ramler).

assessment of the interest income represented by Refco to have accrued on the RGHI

Receivable, although GT did report in the notes to the financial statements of RGL and RCC that

interest on related party loans was generally charged at prevailing market rates.[384]  Both of these

procedures were called for under GT's audit plan for Refco, but there is no evidence that they

were ever performed.

After the 2003 audit, GT apparently failed to perform any procedures whatsoever to

monitor or test the RGHI Receivable at RCC.  The Schedule of Loans to Stockholders and

Unconsolidated Affiliates that was obtained and reviewed in every audit since 1996, first by AA

and then by GT, was not contained in GT's workpapers after 2003.  By the time of the audit of

Refco's financial statements ending February 29, 2004, Refco was representing to GT that the

related party loan balance outstanding in the prior year ($105 million) had been repaid in full.

GT appears to have done nothing to question this representation and allowed it to be repeated in

the footnotes to the consolidated financial statements of RGL for the period ended February 29,

2004.[385]

For audit years 2004 and 2005, GT neither requested nor received evidence sufficient to

obtain a reasonable assurance that RGHI no longer engaged in related party transactions with

RCC.  Although Ramler knew, from his audits of Refco while at AA and from GT's 2003 audit,

that RGHI maintained a customer account at RCC, GT apparently failed to obtain and examine

the customer statement for RGHI's account at RCC.  Had GT done so, it would have learned that

Refco management's representation that the debt had been repaid was false.  Although as of

February 29, 2004 Refco's management had again fraudulently manipulated the balance of the

---

[384] *See, e.g.*, GT SEC 0130611 (Note I, Related Party Transactions, in Consolidated Financial Statements of Refco Group Ltd. LLC and Subsidiaries, February 29, 2004).

[385] *See id.*

RGHI account at RCC to levels far below the true receivable (this time leaving a credit balance of approximately $5.2 million), even a cursory review of the customer account statement would have revealed a debit balance (*i.e.*, amount owed to RCC) of almost $700 million until just days before and after Refco's fiscal year end.[386]

Instead, by taking Refco management at its word that the related party debit balance had been repaid in full and that all related party transactions and relationships had been properly recorded or disclosed,[387] GT failed to detect the accounting fraud and issued an unqualified audit opinion. GT's Refco audit team repeated this failure in its audit of Refco's 2005 financial statements.

### (d)    GT Failed to Audit RCM's Transactions with RGHI in Accordance with GAAS

Refco management apparently also deceived GT as to the true amount of RGHI's balances at RCM. In fact, as reflected in the table of RGHI accounts in Section (i) above, the information presented to GT by Refco's management at the time of its audits and quarterly reviews did not show RGHI's account at RCM to have substantial balances. However, Ramler knew that in the past RGHI owed substantial sums of money to Refco through its account at RCM.[388] Even though the balances in RGHI's account would have appeared small to GT at the end of various financial statement reporting periods, GT still should have performed additional procedures on this related party account to ensure it was being properly recorded on Refco's

---

[386] *See* REFCO-0009-001370, 0009-001378, at App. D-12 (Customer Ledger Report for RGHI's customer account at RCC).

[387] *See* GT SEC 00134839-41 (RCC's Management Representation Letter to GT dated April 27, 2004). Management representations, however, are "not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02 (Reliance on Management Representations).

books.[389]  As independent auditors, GT's knowledge of the significant risk attendant to Refco's related party relationships obligated it to review accounting records for "large, unusual or non-recurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period."[390]  GT was further charged with obtaining "sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements."[391]

As with the RCC account, one relatively simple procedure would have been to review a copy of the customer statement for RGHI's account at RCM.  The account statement for February 2003 indicated that:

- The debit balance in the account as of February 1, 2003 was $147.4 million;[392] and

- On February 7, 2003, an adjustment was made to credit the account for $147.5 million, leaving a small debit balance on February 28, 2003 of $70,094.[393]

Similarly, it does not appear from GT's workpapers that GT obtained any information at all about RGHI's account at RCM during its November 30, 2004 review.  Had GT done so, it would have discovered the balance in RGHI's account at RCM as of November 30, 2004 to be a

---

*(footnote continued from previous page)*

[388] *Compare* AAREF 00005557 (Schedule of Loans to Stockholders and Unconsolidated Affiliates February 29, 2000), referencing payable due RGHI from RCM of $277,000, *with* AAREF 00006387 at 6389 (AA Confirmation Request to RGHI for account 10002657 for net credit balance of $276,670).

[389] AU § 334.04 ("the auditor should be aware of the possible existence of material related party transactions that could affect the financial statements and of common ownership or management control relationships for which FASB Statement No. 57 requires disclosure even though there are no transactions.").

[390] AU § 334.08(g).

[391] AU § 334.11.

[392] *See* REFCO-0009-000240-41 (Statement of Account for RGHI's customer account at RCM for February 2003).

[393] *See id.*

relatively small debit balance of $2,835,851.51.[394]  A scanning of the customer statement for this

related party account from the financial reporting period under review (*i.e.*, November 2004)

through the time of the audit fieldwork (which occurred in January 2005), however, would have

shown:

- As of November 1, 2004, RGHI's account at RCM had a net debit balance of approximately $508 million;[395]

- On November 26, 2004 (just four days prior to the close of the quarter ended November 30, 2004), RGHI's account at RCM was credited by $545 million, reducing the net balance to $2,835,851.51;[396] and

- On January 4, 2005, $550 million was transferred out of RGHI's account at RCM, resulting in a debit balance in the account by January 31, 2005 of $526,621,059.54.[397]

Thus, the fraudulent manipulations of the RGHI debit balance at RCM would have been

plainly evident from a simple scanning of RGHI's account statement at RCM.  Moreover, had

GT's auditors exercised proper professional skepticism by employing an inquisitive mind and

making a critical evaluation of audit evidence, it could have recognized the link between the

$545 million credit applied to RGHI's account at RCM on November 26, 2004 and the $545

million debit arising in Liberty Corner's account at RCM on that same day.  Recognition of that

connection likely would have led GT to discover the fraudulent use of the transactions between

RGHI and Liberty Corner.

In summary, GT failed to follow its own audit procedures to verify the amount, nature

and substance of related party transactions with RGHI.  GT's workpapers do not indicate that it

---

[394] *See* REFCO-0009-000282-290, at App. D-13 (Customer Statement for RGHI's account at RCM for November 2004).

[395] *See id.*

[396] *See id.*

[397] *See* Customer Statement for RGHI's account at RCM for January 2005.

obtained or reviewed loan documents evidencing the amount owed by RGHI. The workpapers also do not indicate that GT reviewed the customer statements for RGHI's accounts at RCC or RCM. There is also no indication that GT sought evidence corroborating the repayment of the RGHI Receivable even though Ramler had made the repayment an audit priority in every year since 1998. Had GT taken these simple steps, it likely would have discovered the fraud at Refco. Instead, GT ignored its own consistently high assessment of the risks attendant to related party transactions and relied primarily on the representations of management personnel within Refco. Thus, GT's performance of its audits fell well short of the appropriate standard of care.[398]

### (e)    GT's Auditing of Related-Party Transactions with BAWAG Was Similarly Deficient

GT knew that BAWAG was a related party, that it was not audited by GT, and that it had a customer account at RCM. A review of a BAWAG customer account statement available to GT reveals that, for the most part, the account was used for executing foreign currency trades in relatively small amounts.[399]

In addition to flagging related party receivables and other transactions as a high risk area, GT had identified unsecured debit balances as a risk area for Refco.[400] During each audit it conducted of Refco, GT obtained information concerning BAWAG's account at RCM and each time GT noted a large debit balance in BAWAG's account as of the end of Refco's fiscal year.

These debit balances represented funds funneled from BAWAG to RGHI to effect fraudulent round trip loan transactions. As described above, GT had adopted certain procedures applicable to related party receivables and other related party transactions. Although those

---

[398] AU § 334.09

[399] *See* GT SEC 0014362-14461 (February 28, 2003 statement for BAWAG's customer account at RCM).

procedures called for an assessment of the transaction to verify its business purpose and other audit measures,[401] GT failed to perform any of those steps with respect to the recurring BAWAG debit balances.

Instead, GT simply sent confirmation requests to BAWAG. For example, in April 2003, GT sent an account confirmation letter to BAWAG concerning BAWAG's account number 3905 at RCM.[402] The account confirmation sent by GT included a complete account statement listing all transactions during February 2003, a summary of activity during the month, and the opening and closing balances of the account.[403] The account balance at the beginning of February was a debit of $723,500; by the end of that month the account had a debit balance of $179,503,130.12.[404] Most of the debit portion of the balance arose in the last few days of February 2003 when BAWAG transferred $175,000,000 out of its account.[405] The account statement does not indicate where the funds were transferred, but clearly indicates that the funds were transferred out of the account.[406] Both the amount and the nature of this transaction stand out starkly from the other transactions in the account, which are primarily foreign currency trades covering a range of values below $10,000,000.[407] Yet, there is no indication in the audit

---

*(footnote continued from previous page)*

[400] *See* GT SEC 0129863 (March 11, 2003 PowerPoint briefing titled "Refco Planning Meeting," apparently prepared in connection with audits of Refco's financial statements dated February 28, 2003).

[401] *See* GT SEC 0065938 ("Trading" section of GT "Audit Program" for February 28, 2003 audit of RCM financial statements); *see also* GT EX 003460-79 (GT internal guidance concerning audits of related party transactions).

[402] *See* GT SEC 0014361-461 (April 8, 2003 customer confirmation request letter from Refco to BAWAG appending statement for BAWAG's customer account at RCM as of February 28, 2003).

[403] *See id.*

[404] *See* GT SEC 0014362.

[405] *See* GT SEC 0014445.

[406] The line item for this transaction reflects a "DR" (debit) of the $175,000,000 on 2/25/03. The description of the transaction is "Vostro transfer," indicating a transfer to the account of another bank.

[407] *See* GT SEC 0014361-461.

workpapers that GT inquired as to where the cash had gone, or how the debit balance was secured, or why the transaction had occurred, despite the large amount of this extension of credit to a related party.  GT merely confirmed the account ending balance with BAWAG and moved on.

In the audit of Refco's February 29, 2004 financial statements, GT again reviewed a significant debit balance in BAWAG's account at RCM.  The information Refco provided GT to review was not as detailed as in the prior year and did not include a full account statement.  But, GT was given information sufficient to show that, as of February 29, 2004, BAWAG's account at RCM contained a debit balance of $209,789,475.00.  GT sent a confirmation request to BAWAG and BAWAG confirmed the balance.[408]

Unlike in 2003, GT's procedures in 2004 included a credit risk analysis on BAWAG's debit balance at RCM.  The debit balance again appeared to GT as essentially an unsecured cash loan, but GT apparently was reassured that there was no credit risk based on the fact that BAWAG was a 10% shareholder of RGL and "is the largest bank in Vienna."  In addition, by the time of the audit fieldwork (during April 2004), BAWAG's account showed a credit balance of $5.8 million.[409]  Thus, GT apparently determined that the amount due from BAWAG was not a credit risk.  However, GT failed to independently determine the purpose, nature, and extent of this extension of credit to a related party.  Just as in 2003, there is no evidence that GT questioned the business purpose of this transaction or asked where the money had gone.  It simply confirmed the balance and conducted a cursory assessment of the account's credit risk.

---

[408] *See* GT SEC 0011208-09 (April 12, 2004 letter from Refco to BAWAG requesting confirmation of account; "Daily Account Equity Statement" for BAWAG's customer account no. 3905 at RCM); GT SEC 0012902 (confirmation request from Refco to BAWAG signed and dated by BAWAG as of April 20, 2004).

[409] *See* GT SEC 0003375 at 3378 ("Refco Capital Markets Ltd. Credit Risk - Customer Cash Debit Balances 2/29/04" workpaper.  The document reflects the net value of BAWAG's account as of 4/21/04).

In the audit of the February 28, 2005 financial statements, GT again noted a large debit balance in the account of BAWAG at RCM.  The level of detail available to GT concerning this balance was similar to that in the prior year and did not include a detailed RCM account statement for BAWAG.  However, GT had information showing a cash transfer of $175,000,000 out of BAWAG's RCM account, resulting in a debit account balance of $176,023,989.52.[410] Again, the workpapers do not indicate that GT questioned this transaction.  Instead it appears that GT simply assessed the credit risk posed by the transaction and determined that, because the debit balance had largely been repaid by the time of the audit fieldwork, the account posed no credit risk.[411]

In connection with the audit of Refco's February 28, 2005 financial statements, Refco provided GT with a schedule of related party loans as of each prior fiscal year end from 2001 to 2004.[412]  That schedule showed that BAWAG owed Refco at least $175 million, and usually more than $210 million, at the end of each of Refco's fiscal years from 2001 to 2004.  Yet, even though these receivables were paid off every year shortly after year-end and, in at least one case, GT knew that they were incurred shortly *before* year-end, GT failed to exercise proper professional skepticism and appears never to have questioned this pattern as called for by

---

[410] *See* GT SEC 0007273 ("Daily Account Equity Statement" for BAWAG's customer account no. 3905 at RCM as of 2/28/05).

[411] *See* GT E SEC 20004482.0004-0007 ("Refco Capital Markets, Ltd. Credit Risk - Customer Cash Debit Balances 2/29/2005" [sic] workpaper, showing BAWAG's net account balance as of 4/22/05 as $1,171,784, and noting that that balance was "collectible").  By the time of GT's audit of Refco's February 28, 2005 financial statements, BAWAG was no longer a 10% owner of Refco.  Apparently as a result of this change in ownership following the LBO, Refco's 2005 financial statements included in its 10-K do not identify the $175 million debit balance as an amount due from a related party, as was reflected in prior SEC filings such as Refco's S-4.  However, even though BAWAG was no longer a related party, Refco's historical relationship with BAWAG and the similarity between this transaction and those occurring in prior years should have triggered additional skepticism of this transaction on the part of GT.

[412] *See* GT SEC 0029090.

professional audit standards.[413]  Had GT investigated these transactions to determine the purpose, nature, extent, and effect on Refco's financial statements, GT would likely have discovered this aspect of the fraud.

The BAWAG unsecured debit balances from 2003 and 2004 are not mentioned in the GT-audited financial statements of RGL.  However, such balances are disclosed in the consolidated financial statements of RGL appended to Refco's S-4 filing.  Note L (Related Party Transactions) to Refco's S-4 filing provides: "As of February 29, 2004 and February 28, 2003, the Group had a deposit with a third party financial institution, who was a member, of $210 million and $175 million, respectively.  These balances were included in 'Receivables from customers' and liquidated shortly after year-end."[414]  The representation concerning how the balances were recorded on Refco's books and that they had been repaid shortly after year end was included at Ramler's suggestion.[415]

The related party transactions with BAWAG were components of the fraudulent Round Trip Loan scheme that resulted in Refco's collapse.  Although GT was aware of the related party receivables due from BAWAG, it apparently never sought source documentation to determine their nature or business purpose.  GT also never questioned the annual pattern of these cyclical loan transactions.  Instead, as had been Ramler's practice previously at AA, GT did nothing more

---

[413] *See, e.g.,* AU § 334.08(g) (advising particular attention accorded to end of period transaction).

[414] *See* WGM-L 0014681-14727 at 14701.

[415] *See* GT E SEC 20000669, e-mail from Ramler to Mutterer (Refco) and Henri Steenkamp (PwC) re: "Refco financial statements - 06.24.04 draft comments" dated June 26, 2004.  Ramler's suggested addition to the financial statements notes — that the loans were "repaid shortly after each year-end" — suggests recognition of the pattern used in the Round Trip Loan accounting fraud at Refco.

In addition, there is an open question as to why these debit balances were not originally included as separate line item related party receivables disclosed in the notes to Refco's financial statements for the financial period ended February 29, 2004.  GT SEC 0027609-23.  Handwritten annotations on a copy of Refco's audited financial statements from February 28, 2003 suggest that, at some point in time, GT contemplated adding the BAWAG debit

*(footnote continued on next page)*

than confirm the year-end balance and ask if it had been repaid after year end.  GT's audits of these transactions with BAWAG did not employ procedures dictated by GAAS and its own audit protocols.[416]

*(v)*    ***GT Apparently Failed to Detect Management's Manipulation of Income and Expense Through the Use of Related Party Transactions***

From February 1999 through August 2005, Refco appears to have inflated its revenues and shifted certain expenses to RGHI.  As discussed further below, the auditors were aware of the high risk that management had the incentive and the ability to override controls in order to falsify the financial statements and should have uncovered at least some of the fraudulent transactions used to manipulate Refco's revenues and expenses.

*(a)*    ***The Auditing Guidance Cautioned Auditors to Watch for This Kind of Fraud***

As discussed in the Overview of Professional Standards Governing Auditors, SAS 82 described in detail how an auditor must address the possibility of fraud.[417]  It further stressed the importance of professional skepticism and provided examples of how such skepticism may be demonstrated, including: (a) increased sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions; and (b) increased recognition of the need to corroborate management explanations or representations concerning material

---

*(footnote continued from previous page)*

balance to the 2004 financial statement notes.  *See* GT SEC 0063789 at 0063798 (noting "Need to add Shareholder a/c balance $200 million").

[416] See generally, AU §§ 334, et seq.

[417] SAS 82, ¶ 1.

-137-

matters — such as further analytical procedures, examination of documentation, or discussion with others within or outside the entity.[418]

In further emphasizing the importance of skepticism, SAS 99 noted that the auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present regardless of any past experience with the entity and regardless of the auditor's belief about the integrity of management.  In exercising skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.[419]

> **(b)     The Auditors Were Well Aware of the Risks that Refco's Management Could Override Controls**

As discussed previously, Ramler was aware as early as 1998 of Bennett's plan to sell a substantial portion of Refco, when during the 1998 audit closing meeting Bennett expressed the desire to increase earnings and maintain RGL's book value.[420]  Bennett informed AA that Refco intended to restructure Refco over the next 3-10 years as the shareholders would eventually want to liquidate their positions.[421]  Through the review of workpapers, it is clear that AA considered this exit strategy as a potential area of audit fraud risk.  Specifically, when preparing the AA standard audit form for assessing fraud risks for the 1998 audit, the auditors wrote as the initial assessment: "Management indicated that there would be plans over the next 3 – 10 years for the shareholders to sell Refco to a third party.  Therefore, there is the risk that profits could be inflated to attract a higher selling price."[422]  Yet, the risk was considered "low", "as a strong

---

[418] SAS 82, ¶ 27.

[419] SAS 99, ¶ 13.

[420] *See* AAREF 00020226 at 227 (May 12, 1999 Audit Status Meeting memorandum to audit workpapers).

[421] *See id.*

[422] AAREF 00020042 (Fraud Risk Assessment Sheet, Part II, section A.).

separation of duties exist and no fraud or material misstatements have been noted in prior years."[423]  This assessment is concluded by noting: "No modification of the audit plan is required."[424]

Further, as part of its "Smart Tool" analysis of the audit risk at Refco, AA recognized that the risk of misstatement due to "Domination of management by a single person or small group," was "Significant" due to the potential for improper journal entries.[425]  Domination by a small group or one person allows for management override of the accounting controls.[426]

Ramler was also aware, at the time of the audit of Refco's February 28, 2005 financial statements, of the impending IPO and the attendant risk that management may override controls and overstate income.[427]  Further, Ramler knew that there was a risk that erroneous entries could be made to the general ledger to improve Refco's financial results.[428]

> **(c)    *GT Apparently Failed to Detect the Income and Expense Manipulations Because It Failed to Review the Customer Statements for RGHI's Accounts at RCM and RCC*

To address the above-described risks, Ramler indicated in the April 11, 2005 Memorandum to the File that GT would review the detail of journal entries made to the general

---

[423] *Id.*

[424] *Id.*

[425] *See, e.g, supra*, n.211.

[426] Interview of Dara Schneider, February 8, 2007.

[427] *See* Ramler's April 11, 2005 Memorandum to the Files, GT SEC 0004084, at App. D-5, in which Ramler stated "the risk of fraud has to be seriously considered with the LBO and the potential IPO.  The IPO price will be based on a multiple of proforma earnings so there is a considerable gain to shareholders in overstating earnings in presenting the most favorable financial picture."  Ramler was also aware that Refco had become a highly leveraged company after the LBO.

[428] *See id.*

ledger for Refco, LLC, Refco Capital Markets and Refco Securities.[429]  It appears, however, that GT never actually did so.[430]

If GT had audited related party transactions between RGHI and RCM by obtaining and reviewing the customer statements for RGHI's accounts at RCM and RCC during the course of its 2005 audit, it would have learned that income had been manipulated as follows:  (1) on November 17, 2004, RGHI engaged in 50 US Treasury note transactions and lost $7.8 million in the process, while RCM gained a like amount;[431] and (2) on February 11, 2005, RGL recognized $12 million in interest income and increased the receivable due from RGHI by a $12 million "INT ADJUSTMENT."[432]  It also would have learned that the debit balance owed by RGHI, as of February 1, 2005, was $526 million, but had been "reduced" to a credit balance due to RGHI of $106,083 as of the last day of Refco's fiscal year, by a massive influx of funds just days before year end from the Round Trip Loan transactions with BAWAG ($250 million) and Liberty Corner ($345 million).[433]

Similarly, a review of the customer statements in earlier years would have revealed not only that the true amount of the RGHI Receivable was being hidden, but that RGHI's customer

---

[429] *See id.*

[430] GT's workpapers for the 2003 audit indicate that GT "did not observe any unusual entries at the end of the year." GT SEC 0031621 (Concluding Procedures for Refco Group Ltd. LLC and Subsidiaries Period Ended 2/28/03 Paper Explorer File).  GT cross-referenced as support for this observation the "eliminating entries at workpapers 2000." Workpapers 2000, however, pertain solely to the intercompany eliminating entries used in arriving at the consolidated financial statements of RGL.  *See* GT SEC 0032653-32669, "Refco Group 2003 Workpapers" relating to Refco Group Consolidation and Elimination Entries.

[431] According to the customer statement for RGHI's account at RCM, RGHI engaged in 25 transactions on November 17, 2004 in which it *purchased* $50 million of US Treasury notes in 25 separate transactions totaling $1.25 billion.  *See* REFCO-0009-000284-287, at App. D-13.  That same day, RGHI engaged in 25 *sales* of those same US Treasury notes for $49.68 million each.  *Id.*  The resulting loss to RGHI and gain to RCM was $7.8 million ([$50,000,000 – $49,688,500] x 25).  *Id.*  Thus, RGHI "lost" $311,500 on each of the 25 purchases and sales of the US Treasury notes in which it engaged on November 17, 2004.

[432] REFCO-0009-000302.

[433] *See* REFCO-0009-000300-304.

accounts at RCC and RCM were being used to manipulate income and expense. For example, a review of the 2004 customer statements for RGHI's account at RCC would have revealed that, on March 19, 2004, the RGHI Receivable was increased by $7.9 million.[434] This entry should then have warranted further review because, with the exception of the fraudulent entries made at the end of each accounting period, it was the largest entry in the account during fiscal year 2004. Further examination would likely have revealed that the entry was used to shift to RGHI $7.9 million in consulting fees incurred by Refco.

While these items would have stood out had the auditors examined the customer account statements, they would have paled in comparison to the size of the debit balance due from RGHI and the amounts of funds hitting the account just prior to year end in order to reduce greatly or eliminate the debit balance. Thus, even if the income and expense manipulations were not noticed initially by the auditors, they would eventually have discovered them once they had digested the Round Trip Loan fraud evident from the customer statements.

Another way GT could have detected the fraud was to vary the timing of its testing of the RGHI Receivable balance.[435] Had GT tested the RGHI Receivable balance at times other than the end of the fiscal year, or the end of the quarter, it would likely have learned of the fraud as early as the audit of fiscal 2003 because Refco did not manipulate the balance of the RGHI Receivable at the end of each and every month.

---

[434] *See* REFCO-0009-001387 (Customer Ledger Report for RGHI's account at RCC).

[435] *See, e.g.*, SAS 99, ¶ 50 (the auditor should incorporate an element of unpredictability in the auditing testing from year to year, such as adjusting the timing of the testing of a particular account from that which is otherwise expected).

## b.    GT Apparently Overlooked Significant Red Flags Revealing that Refco Was Misusing "Repo" Transactions to Commit Fraud

During its audits and reviews of Refco, GT encountered numerous red flags indicative of the continuing accounting fraud at Refco. A significant number of these red flags arose in the context of GT's review of repo, reverse repo, and time deposit financing transactions at RCM. In apparent violation of GAAS, GT failed to investigate these matters further and issued audit reports with unqualified opinions.

### (i)    Repo and Reverse Repo Transactions and Time Deposits

Repo and reverse repo transactions were a significant portion of Refco's assets. "Repo" is an abbreviation of "repurchase." Repo and reverse repo transactions are both securities sale and repurchase agreements executed between two parties. In both transactions, the party selling the security receives cash against the value of the security and promises to buy the security back from the purchaser at some point in the future. Typically, the party providing the cash (*i.e.*, the purchaser) will take possession of the securities involved in the transaction as collateral for its temporary outlay of cash to the seller. In essence, the transactions are loans collateralized by securities.[436]

---

[436] *See also* Financial Accounting Standards Board, FASB Interpretation No. 41, "Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements" (Dec. 1994) at n. 1 and 2 ("FIN 41"):

> Footnote 1:  For purposes of this Interpretation, a repurchase agreement (repo) refers to a transaction that is accounted for as a collateralized borrowing in which a seller-borrower of securities sells those securities to a buyer-lender with an agreement to repurchase them at a stated price plus interest at a specified date or in specified circumstances. The "payable" under a repurchase agreement refers to the amount of the seller-borrower's obligation recognized for the future repurchase of the securities from the buyer-lender. In certain industries, the terminology is reversed; that is, entities in those industries refer to this type of agreement as a "reverse repo."

> Footnote 2:  For purposes of this Interpretation, a reverse repurchase agreement (reverse repo) refers to a transaction that is accounted for as a collateralized lending in which a buyer-lender buys securities with an agreement to resell them

*(footnote continued on next page)*

Whether a particular transaction involving the sale and repurchase of securities is called a "repo" or a "reverse repo" depends entirely on the perspective of the party to the transaction. GT's audit workpapers describe repos as transactions involving the purchase of securities under an agreement to resell and reverse repos as transactions involving the sale of securities under agreement to repurchase.[437]   In fact, the terms are ambiguous (as are GT's definitions from its workpapers) unless the party from whose perspective the transaction is being described is identified.   Indeed, as used in Refco's books and records, the transactions in question characterized as "reverse repos" were made to appear as if Refco were the purchaser of securities from the counterparty, because they resulted in a debit balance for the account of the purchaser[438] and were generally treated as "time deposits" by Refco.  A "time deposit," as used by Refco, is simply a loan extended to a customer for purposes of trading.[439]   These loans are secured by the customer's security positions.[440]   The so-called "reverse repo" transactions in RCM's customer accounts were also characterized as time deposits by Refco and were reviewed as time deposits

---

*(footnote continued from previous page)*

to the seller-borrower at a stated price plus interest at a specified date or in specified circumstances.  The "receivable" under a reverse repurchase agreement refers to the amount due from the seller-borrower for the repurchase of the securities from the buyer-lender.  In certain industries, the terminology is reversed; that is, entities in those industries refer to this type of agreement as a "repo."

[437] *See* GT SEC 0003351 (memorandum re: "Repo's and Reverse Repo's confirmation sampling" to Refco Capital Markets Ltd. 2/29/04 Audit File from GT auditor Juan Cruz, dated April 12, 2004).

[438] This accounting is, to a certain extent, consistent with the definition of a reverse repo in FIN 41 in that the purported transactions gave rise to receivables to Refco from the counterparty.  Of course, the transactions still lacked collateral.

[439] *See* GT SEC 0003373 (Memo re: Refco Capital Markets Ltd. Credit Risk Analysis — Debit Balances, Repo / Reverse Repo & Time Deposits, 2/29/04).

[440] *See id.*

by GT.[441]  To a large degree, at least in characterizing the transactions described below, Refco appears to have used the terms interchangeably.  However, as explained below, these transactions were not actually time deposits or reverse repos — that is merely how they were described in Refco's books and records.

### (ii)    Risk Assessment Concerning Reverse Repo Transactions and Time Deposits

Because repos, reverse repos, and time deposits all involve agreements with third parties who may fail to honor the terms of those agreements, such transactions present a credit risk.[442]  In addition, there is a risk that the audit client will (either intentionally or unintentionally) provide inaccurate information about repos, reverse repos, or other balances owed to or by third parties.  GT's review of these transactions also occurred against the background of its general assessment of Refco as a high risk client due to its lack of an effective internal audit function,[443] involvement in significant and complex related party transactions,[444] and domination by a limited number of individuals such as Bennett, Maggio, and the controllers of each division.[445]  As a result, GT was aware of serious financial statement risks associated with Refco's reverse repo and time deposit transactions.

---

[441] *See*, *e.g.*, GT SEC 0003361-0003382 (materials from GT's 2004 Audit of RCM showing Liberty Corner transaction for $720,000,000 in "Reverse Repo / Repo sampling analysis" and reviewing it as a "Time Deposit" on a "Credit Risk Analysis" workpaper).

[442] *See*, *e.g.*, *id.*

[443] *See* GT SEC 0031029 ("Inherent Risk Indicators-General" dated April 3, 2003 for audit of Refco Group Ltd., LLC and Subsidiaries).

[444] *See id.*

[445] *See* GT SEC 0028264.

> ### (iii)    Audit Procedures Relevant to Testing Repo and Reverse Repo Transactions and Time Deposits

GT adopted procedures for verifying the existence and amount of repo and reverse repo transactions and time deposits at Refco. To accomplish this, GT sent account confirmations to repo and reverse repo transaction and time deposit counterparties. These account confirmations included either an account statement or a summary of that account statement and asked the account holder to confirm the accuracy of the account statement.[446] To identify customers with which to confirm balances, GT obtained a Refco-produced report called the "Repo Risk Analysis Report" or "RPT551." GT then prepared a summary of this report, and selected customer account balances for confirmation that exceeded a materiality threshold GT calculated from year to year.[447]

Professional audit standards advise auditors to be particularly diligent when confirming transactions that are large, unusual, or complex, and that such transactions, particularly when occurring at year end, are associated with a particularly high level of risk.[448] Consequently, auditors are counseled to confirm the terms of such transactions and not merely their amount.[449]

In addition to the confirmation process, GT adopted procedures to assess the credit risk of repo and reverse repo transactions and time deposits.[450] This process primarily involved assessing whether customer debit balances arising from repo or reverse repo transactions or time deposits were secured by adequate collateral. As GT knew, it was the policy of Refco to take

---

[446] *See, e.g.*, GT SEC 0016260 (April 16, 2003 confirmation request from Refco to Liberty Corner).

[447] *See, e.g.*, GT E SEC 20004419 (March 31, 2005 Memorandum to RCM audit file concerning Repos and Reverse Repos confirmation sampling).

[448] AU §§ 334.8(g); 9334.18. GT's internal guidance was consistent with these standards. *See* GT EX 003403.

[449] *See* AU § 334.8(g).

[450] *See, e.g.*, GT SEC 0003373-82 (Memo re: Refco Capital Markets Ltd. Credit Risk Analysis — Debit Balances, Repo / Reverse Repo & Time Deposits, 2/29/04).

possession of securities purchased (presumably, purchased by Refco) under an agreement to resell,[451] which is how the purported "reverse repo" transactions or "time deposits" would have appeared to GT.  In addition, GT knew that "time deposits" were supposed to be secured by a customer's security positions.[452]

Refco's internal records concerning repo and reverse repo transactions, primarily the Repo Risk Analysis Report used to identify customers for confirmation, contained information about the collateral used to secure the transaction and provided the primary basis for GT's analysis of credit risk.  In certain audit periods, GT also reviewed RPTR03, another internal Refco report indicating whether the repo balances had been repaid.[453]  Finally, during certain audit periods, GT also conducted a review of the credit files of customers with significant debit balances arising from repos or reverse repos.  The purpose of the credit file review was apparently to provide additional assurance and due diligence concerning credit risks posed by customer debit balances.[454]

### (iv)    *Review of Repo and Reverse Repo Transactions and Time Deposits*

The use of transactions presented in Refco's books and records as "reverse repo" and time deposit transactions in customer accounts at RCM was a major part of the accounting fraud perpetrated by Refco's management.  The Round Trip Loans with Refco customers during the

---

[451] *See, e.g.*, Refco Group Ltd., LLC Form 10-K for the fiscal year ended February 28, 2005 at page F-12, filed with the SEC dated July 1, 2005, available at http://www.sec.gov/Archives/edgar/data/1305464/000104746905018583/a2159496z10-k.htm, noting that "It is the Group's policy to take possession of securities purchased under agreements to resell."

[452] *See* GT SEC 0005928 (Memorandum concerning Credit Risk Analysis – Debit Balances, Repo/Reverse Repo & Time Deposits from February 28, 2005 audit of Refco Capital Markets, Ltd.).

[453] *See, e.g.*, GT SEC 0018853-59 (workpapers from 5/31/05 review of RCM relating to Customer Debit Balances, Time Deposits, and Repos).

[454] *See* GT SEC 0056453 (workpaper from 2/28/05 audit of RCM relating to Credit File Testwork).

periods audited by GT, such as Liberty Corner, Delta Flyer, Beckenham Trading, and others, were accomplished at RCM by recording the cash loan as a reverse repo or time deposit in the Round Trip Loan Participant's customer account.

In reality, however, these were *not* "reverse repo" transactions or "time deposits." The hallmark of both transactions, according to Refco's accounting policies, is collateralization by the counterparty's security positions.[455] The transactions at issue, as explained below, consistently lacked collateral. Nonetheless, GT appears to have accepted Refco management's characterization of these transactions in its books and records as reverse repos and time deposits and failed to perform appropriate audit steps. GT never questioned management's characterization of these transactions in the face of contradicting evidence. GT encountered significant clues of the Round Trip Loan accounting fraud in its review of reverse repo transactions and time deposits at RCM.

> **(a)    *Purported Reverse Repo Transactions /Time Deposits Reviewed in Audit of February 28, 2003 Financial Statements***

During its 2003 year-end audit of RCM, GT noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two customers, Liberty Corner and Delta Flyer as follows:

| Customer Name | Trade Date | Maturity Date | Amount |
|---------------|------------|---------------|--------|
| Liberty Corner | 2/21/03 | 3/4/03 | $500,000,000.00 |
| Delta Flyer | 2/21/03 | 3/4/03 | $150,000,000.00 |

---

[455] *See, e.g.,* n.440 and n.451, *supra.*

As the "trade date" and "maturity date" indicate, these transactions were both timed to span the end of Refco's fiscal year (February 28, 2003) and to be essentially reversed after the close of Refco's fiscal year.

On April 16, 2003, GT sent confirmation requests to Liberty Corner[456] and Delta Flyer.[457] Those confirmations requests included a copy of the Repo Risk Analysis Report for the account showing the trade and maturity date, collateral amount, accrued interest, and amount of reverse repo. The confirmation requests were signed by the recipients and returned to GT, indicating that the statements were accurate. Although GT performed additional credit risk testing on other RCM customer accounts, the Liberty Corner and Delta Flyer accounts were not selected in 2003 for additional testing, perhaps because they had been repaid by the time of audit fieldwork. In any event, GT did not inquire into the circumstances of these transactions.

### (b) Purported Reverse Repo / Time Deposit Reviewed in Audit of February 29, 2004 Financial Statements

During its audit of RCM for the following fiscal year, ended February 29, 2004, GT again noted at least one large, period-end, round-dollar transaction characterized as a reverse repo.[458] That transaction was with Liberty Corner on February 20, 2004 in the amount of $720 million.

As with the previous year, GT sent a request to Liberty Corner to confirm this account balance. The confirmation request included a page from the Liberty Corner account statement showing just the trade date and the amount of the so-called "reverse repo" or "time deposit."[459] Liberty Corner signed and returned the confirmation request. This year, however, GT took the

---

[456] See GT SEC 0016260-61.

[457] See GT SEC 0016280-81.

[458] See GT SEC 0003607 (Repo Risk Analysis Report (RPT551) for Liberty Corner as of 2/27/04).

[459] See GT SEC 0061712-14. On the account statement, the transaction was called a time deposit.

additional step of reviewing the potential credit risk of this transaction.  GT noted that the entire amount of Liberty Corner's debit balance - $720,000,000 - was at risk, meaning that no collateral secured it.[460]  However, apparently because by the time GT reviewed the account the balance had been repaid, GT did not identify the account as a credit risk.[461]  GT apparently either did not recognize or ignored the fact that reverse repo transactions and time deposits *should* be secured by collateral.

**(c)    *Purported Reverse Repos / Time Deposits Reviewed in Re-Audit of February 28, 2002 Financial Statements***

Shortly after completing its audit of Refco's February 28, 2004 financial statements, GT conducted a re-audit of Refco's February 28, 2002 financial statements.  GT reviewed AA's workpapers in connection with the re-audit and generally reviewed the same information that had been available to AA.  GT noted that the following reverse repo transactions or time deposits occurred at the end of the audit period:[462]

| Customer Name | Trade Date | Maturity Date | Amount |
|---|---|---|---|
| Liberty Corner | 2/25/02 | 3/4/02 | $325,000,000.00 |
| Delta Flyer | 2/25/02 | 3/4/02 | $175,000,000.00 |
| Beckenham | 2/25/02 | 3/4/02 | $125,000,000.00 |

---

[460] *See* GT SEC 0003380-82 (workpaper from 2/28/04 audit of Refco Capital Markets titled "Credit Risk Analysis – Time Deposits, reflecting a net debit exposure as of 2/27/04 in Liberty Corner's account of $720 million).

[461] *Id*.

[462] *See* GT SEC 0017198 (Funding Product Accrued Interest Report (RPT610) reflecting, in succession, the receivables from Liberty Corner, Delta Flyer, and Beckenham).

GT reviewed summary account statements for these three customers, reflecting the debit balances shown above.[463]  Those account statements showed GT that these debit balances had been extended without collateral.[464]  GT again saw records of large, round-dollar, reporting period end reverse repo transactions or time deposits.  Still, it appears that for the re-audit GT did little more with this information than had been done previously in that it merely requested confirmation of the balances as of February 28, 2002.[465]

> **(d)    Purported Reverse Repos / Time Deposits Included in Review of November 30, 2004 Financial Statements**

During its review of the November 2004 financial statements of RCM, GT was presented with evidence relating to reverse repos that should have prompted it to ask serious questions of its client.[466]  As with prior audit periods, GT received information about repos and reverse repos pending as of the date of the financial statements being reviewed.  Once again, GT saw evidence

---

[463] *See* GT SEC 0017514-5 (Liberty Corner); GT SEC 0072645-6 (Beckenham Trading); GT SEC 0072639 – 40 (Delta Flyer).

[464] For instance, the customer account statements referenced in n.463, *supra*, reflect no securities or other assets securing the debit balances.

[465] *See* GT SEC 0003861 – 63 (memorandum dated August 12, 2004 re: "Repo's and Reverse Repo's confirmation sampling" to Refco Capital Markets 2/28/02 Audit File from GT Auditor Jennifer Zhang).

[466] GT's interim reviews of Refco's financial statements were not audits.  These reviews were to be conducted in accordance with standards set forth by the United States Public Company Accounting Oversight Board ("PCAOB").  The objective of the interim review was to "provide a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with [GAAP]."  The reviews were to consist "principally of performing analytical procedures and making inquiries of persons responsible for financial and accounting matters."  The procedures to be performed in connection with the reviews were "substantially less" than those in an audit, and were not intended to result in issuance of an opinion on the financial statements.  GT SEC 0143033.  GT, however, noted in its workpapers for the audit of fiscal year ended February 28, 2005 that its review procedures had tended to be more substantive than analytical in order to better address the risk of material misstatement. *See* GT E SEC 20003221.0003.  Even though these reviews were not audits, they presented GT with red flags that should have prompted further action, which in turn could have led to discovery of the fraud.

of large, period-end, round-dollar transactions purported to be reverse repo transactions or time deposits occurring in customer accounts at RCM, as follows:[467]

| Customer Name | Trade Date | Maturity Date | Amount |
|---|---|---|---|
| Liberty Corner | 11/26/04 | 12/3/04 | $545,000,000.00 |
| Refco Group Holdings, Inc. | 11/26/04 | 12/3/04 | $545,000,000.00 |

Because this information arose in the context of a review, rather than an audit, GT did not seek to confirm the accounts with the customers. However, GT did conduct a credit risk analysis as it had in prior audit and review periods. As before, GT knew that the purported reverse repo with Liberty Corner was unsecured.[468] When GT inquired about this transaction, it was apparently told by RCM's Richard Outridge that "there had been a reporting error on recording of the $545 million" and that the "amount had been adjusted."[469] That representation by Refco was apparently sufficient to prevent any further inquiry by GT into this transaction. GT, again, did not question the characterization of the unsecured transaction as a reverse repo or time deposit.

Significantly, however, RGHI had also entered into a purported reverse repo transaction or time deposit with RCM for exactly the same amount and covering exactly the same dates as Liberty Corner.[470] In performing its review of Refco's November 2004 financial statements, GT

---

[467] *See* GT SEC 0002001, at App. D-14 (page from Funding Product Accrued Interest Report (RPT610) showing $545 million receivables from Liberty Corner and RGHI).

[468] *See* GT SEC 0075018 (workpaper spreadsheet titled "Refco Capital Markets Ltd., LLC Reverse Repo / Repo Customer Analysis – Summary of Repo Analysis Report (RPT551)").

[469] *See* GT SEC 0075031, at App. D-15 (workpaper spreadsheet document titled "Refco Capital Markets LTD Credit Risk Analysis – Time Deposits").

[470] *See* GT SEC 0002001, at App. D-14.

even obtained a copy of Refco's "Accrued Interest Report" (or "RPT610") that displayed these two similar transactions *on two consecutive lines*.[471]  The only apparent difference between the transactions on this form is the interest rate: Liberty Corner was being charged 2.00%, while RGHI was being charged 2.75%.  GT should have noted the striking similarities between these two transactions, which transactions are practically direct evidence of the fraud that occurred in November 2004 involving a $545 million loan from Liberty Corner to RGHI used to pay down RGHI's receivable in its RCM account.[472]  Moreover, it does not appear that GT questioned why Refco entered into a $545 million reverse repo with an affiliated party or scrutinized the circumstances of that transaction.  Significantly, it also does not appear that GT questioned why — if RGHI had indeed paid down its debt to Refco as GT had been told — Refco appeared to be extending additional unsecured loans or advances to RGHI in such massive amounts.  Finally, it does not appear that GT followed up on this red flag to review RGHI's account at RCM, which would have revealed not only the true amount of RGHI's debt to Refco, but also the fraud used by Refco management to conceal it.

         *(e)*       ***Pattern of Purported Reverse Repos / Time Deposits Reviewed in Financial Statement Audits and Reviews***

In every audit and review that it conducted of Refco, GT received information that RCM was engaging in large period-end, unsecured credit transactions, purported "reverse repo" transactions or time "deposits," with Liberty Corner as follows:

---

[471] *See id.*

[472] *See*, *supra*, Section IV.D.2.a(iv)(d).

| Audit / Review Period | Trade Date | Maturity Date | Amount |
|---|---|---|---|
| February 28, 2002 | 2/25/02 | 3/4/02 | $325,000,000.00[473] |
| February 28, 2003 | 2/21/03 | 3/4/03 | $500,000,000.00[474] |
| February 29, 2004 | 2/20/04 | 3/04/04 | $720,000,000.00[475] |
| May 31, 2004 | [see footnote 476] | [see footnote 476] | $700,000,000.00[476] |
| August 31, 2004 | 8/25/04 | 9/7/04 | $485,000,000.00[477] |
| November 30, 2004 | 11/26/04 | 12/3/04 | $545,000,000.00[478] |
| February 28, 2005 | 2/23/05 | 3/8/05 | $345,000,000.00[479] |
| May 31, 2005 | 5/24/05 | 6/6/05 | $450,000,000.00[480] |
| August 31, 2005 | 8/26/05 | 9/6/05 | $420,000,000.00[481] |

---

[473] GT SEC 0072637 (Funding Product Accrued Interest Report (RPT610) for 2/28/02).

[474] GT SEC 0016260-61 (April 16, 2003 confirmation request to Liberty Corner and Repo Risk Analysis Report (RPT551) for 2/28/03).

[475] GT SEC 0003607 (Repo Risk Analysis Report (RPT551) for 2/27/04).

[476] GT SEC 0077662, at App. D-16 ("Credit Risk Analysis - Time Deposits" workpaper in Refco Capital Markets Ltd. 5/31/04 review file). GT's workpapers for the May 2004 review do not appear to contain direct evidence of the "trade" or "maturity" dates of the transaction with Liberty Corner (such as that found in RPT551 or RPT610). However, in reviewing the credit risk associated with the debit balance, GT was told by Richard Outridge, CFO of RCM, that "Liberty Capital repaid their balance in full subsequent to 5/31/04. The $700 million was repaid in June of 2004." *Id.*

[477] GT SEC 0019333  (Repo Risk Analysis Report (RPT551) for 8/31/04).

[478] GT SEC 0002001, at App. D-14 (Funding Product Accrued Interest Report (RPT610) for 11/30/04).

[479] GT SEC 0001944 (Repo Risk Analysis Report (RPT551) for 2/28/05).

[480] GT SEC 0000887 (Funding Product Accrued Interest Report (RPT610) for 5/31/05).

[481] GT SEC 0073514 (Funding Product Accrued Interest Report (RPT610) for 8/31/05).

GT also noted similar transactions with other customers, including Delta Flyer, Beckenham Trading, and RGHI. In each case, GT apparently understood that the transactions, represented by management as reverse repo transactions, were in fact unsecured loans of hundreds of millions of dollars rather than collateralized reverse repo transactions. Yet, in each case, GT declined to investigate further based on the information — often merely a representation from management — that the unsecured balance had been repaid.[482] Moreover, despite being engaged for years as Refco's auditors, GT apparently never noted the pattern and questioned why Refco entered into these uncollateralized transactions with Liberty Corner at the end of each and every reporting period. Nor did GT apparently ever question why Refco was characterizing these transactions as reverse repos or time deposits when they were not collateralized.

### (v)    Customer Credit File Review

In addition to the procedures described above concerning testing of credit risk, during its audit of Refco's February 2005 financial statements, GT tested credit files of certain customers. Liberty Corner's account was selected for testing and GT obtained the customer credit file for Liberty Corner from RCM's credit department. GT noted that Liberty Corner's "customer credit file does not mention any opening of accounts at RCM."[483] GT took additional steps to

---

[482] For instance, in connection with the $700 million receivable in Liberty Corner's RCM account as of May 31, 2004, GT noted that "P/D/W Rich Outridge, Liberty Capital repaid their balance in full subsequent to 5/31/04. The $700 million was repaid in June 2004." GT SEC 0077662, at App. D-16. Again during the 2005 fiscal year-end audit, when Liberty Corner's account showed a debit balance of $345 million, GT noted that "Per discussion with Richard Outridge, CFO, as of 4/22/05 the total equity balance is zero. All monies due to Refco were subsequently paid back." GT SEC 0005940 at 5943, at App. D-17.

[483] GT SEC 0056453-54 ("Credit File Testwork" workpaper from 2/28/05 audit of RCM).

determine that "Liberty Corner Capital opened up an account with Refco Securities," and, based on this conclusion, declined to investigate the matter further. [484]

Yet, there is no indication in the audit workpapers that GT itself reviewed Liberty Corner's credit file with Refco Securities or otherwise determined whether Liberty Corner could repay hundreds of millions of dollars in unsecured loans. In fact, an additional indication of the irregularity of these loans is that Liberty Corner was not worthy of credit in the amount of hundreds of millions of dollars. Liberty Corner was owned entirely by an individual (Terrence Pigott), had assets of only a few hundred thousand dollars, and was not regularly engaged in the business of securities trading. [485]

In summary, GT failed to note the significance in the recurring pattern of purported reverse repo transactions or time deposits with customers. GT also failed to exercise appropriate professional skepticism with regard to Refco management's explanation for these transactions, particularly since GT knew that Refco management posed significant financial statement risks and these types of transactions merited additional skepticism and scrutiny under its own internal guidelines. GT also seems to have never questioned why Refco was recording transactions that essentially amounted to unsecured loans as "time deposits" or "reverse repos" in its books and records. Finally, and perhaps most significantly, GT appears to have simply overlooked an obvious red flag in the form of the November 2004 near-identical reverse repo transactions with Liberty Corner and RGHI. GT's treatment of that transaction and the others described above did

---

[484] *Id.*

[485] Pigott Transcript, pp. 7, 53, 55.

not exhibit the crucial "questioning mind and critical assessment of audit evidence" required of an auditor.[486]

### c.    GT Generally Exhibited a Lack of Skepticism and Relied too Heavily on "Management's Integrity"

Despite having identified significant risk areas in the Refco engagement, in some instances GT appears to have ignored or dismissed those risks.  For instance, GT understood that Bennett could materially impact the accuracy of financial statements by, for example, withdrawing funds from the company.  Rather than performing audit steps designed to detect top-level accounting fraud of the very sort that was occurring, GT dismissed the possibility that Bennett would engage in such conduct, noting that "based on conversations with Robert Trosten, Joe Mazurek Chief Credit Officer, and in-house legal counsel, it is extremely unlikely that Phil [Bennett] would do anything like this."[487]  GT went on further to note that "it has been Mark Ramler's experience that Phil [Bennett] is not going to put the firm's capital at risk if good business sense dictates not to."[488]

It therefore appears that GT dismissed a critical risk factor of which it was well aware - and that played a key role in the ongoing accounting fraud.  GT appears not to have performed any audit procedures designed to mitigate this perceived risk.  GT's reasons for dismissing this perceived risk are not evident beyond the personal feelings of the audit partner and the representations of Refco's insiders.  Criticizing GT's apparent reliance on such evidence, which included the opinion of Trosten, one of Bennett's co-defendants in the criminal case, is not

---

[486] AU § 230.07; SAS 99.

[487] GT SEC 0032688, at App. D-18; GT SEC 0069068 (identical pages from "Developing the Audit Plan" portions of GT Audit Programs for Refco Group Ltd. LLC and Subsidiaries and Refco Capital Markets Ltd. and Subsidiaries, dated 2/28/2002).

[488] *Id.*

purely the benefit of hindsight.  As noted above, Ramler had previously identified Refco's control by a small group of insiders as a significant control risk, including during his time auditing Refco while with AA.  Ramler's reliance on that same group of insiders to dispel concerns about Bennett indicates a lack of skepticism and care in the face of a known risk.

Similarly, a preliminary audit planning step for RGL was to "inquire of the audit committee or its chairman regarding . . . awareness of fraud or suspected fraud."[489]  Because Refco did not have an audit committee at that time, Ramler could not make this inquiry.  Instead, he apparently spoke with Trosten and Bennett, who, not surprisingly, assured GT that they were unaware of any fraud.  Furthermore, they assured GT that any fraud would likely be committed by their customers or independent brokers.  GT should have exercised more diligence and skepticism than inquiring concerning potential fraud with the same company insiders who presented a risk of fraud.

### E.    EVIDENCE SUGGESTING GT'S ACTUAL KNOWLEDGE OF FRAUD

There are some documents suggesting that Ramler may have had some knowledge of the relationship among the purported reverse repo transactions, the BAWAG debit balances, and the fraud occurring at Refco.  One such document, in which Ramler suggested that the financial disclosure statements reflect that the BAWAG debit balances were "repaid shortly after each year end" is discussed above.  In addition, an undated note — apparently handwritten by Ramler and located in his desk file — contained the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC."[490]  Next to the name of Liberty Corner appear the words "nature transaction," and below

---

[489] GT SEC 0031571 ("Preliminary Audit Planning" Paper Explorer File for Refco Group Ltd. LLC and Subsidiaries period ending 2/28/03).

[490] GT SEC 0130713, at App. D-19.

it are the words "clean-up of interco accounts."[491]  During the quarter ended May 31, 2005, Refco did in fact extend to Liberty Corner a $450 million "loan" characterized on its books as a "reverse repo."

Ramler's reference to "clean-up of interco accounts" is particularly noteworthy because this is essentially the same phrase used in documents produced by BAWAG in connection with its providing Refco with period-end Round Trip Loans.[492]  It is also significant because Refco used the $450 million Liberty Corner loan to "clean up" its intercompany accounts.  That is a connection Ramler would not likely draw unless he had actual knowledge of what was happening.

As discussed above, GT noted repeatedly that Refco extended unsecured credit to certain customers in massive amounts, and observed that Refco recorded these transactions as "reverse repos" or "time deposits" in its books and records.  Yet, GT was aware that true reverse repo transactions and time deposits were, by definition, collateralized by a customer's security positions.  Whether GT *actually* recognized that Refco was mischaracterizing the nature of these transactions in its books and records requires additional investigation, including depositions of Ramler, other GT personnel, and Refco employees.  If GT did in fact realize that Refco was mischaracterizing these transactions, it could be subject to liability for aiding and abetting Refco's fraud.

Finally, records of internal communications within GT's management reflect a keen concern about the risks posed by the Refco engagement in general and Refco management in particular.  Specifically, GT appears to have been concerned as late as December 2004 that

---

[491] *Id.*

[492] BAWAG 001305 ("Year-End Planning - Schedule of Events").

Refco did not have adequate controls in place, had poor financial oversight, and was moving too quickly towards an IPO for GT's comfort. GT appears further to have had concerns about its own liability risks arising from the Refco engagement.[493] This, too, requires further investigation through the questioning of GT personnel.

### F. CONCLUSIONS: ANALYSIS OF POTENTIAL CLAIMS AGAINST THE AUDITING PROFESSIONALS

#### 1. Negligence and Professional Malpractice

Under New York law, "a professional's failure to perform his job in accordance with the standards required of one in his field states a claim in tort or malpractice," a form of negligence.[494] When an auditor negligently performs its duties, its client has a cause of action against the auditor.[495] Under the Bankruptcy Code, this claim is the property of the estate to assert.[496] To establish a claim for professional malpractice by the auditors, the estate must show that: (1) the auditors owed a duty to the audit client; (2) the auditors breached that duty; (3) there is a "a reasonably close causal connection" between the breach of duty and the injury; and (4) "actual loss, harm, or damage."[497]

---

[493] Notes of a conversation between Ramler and an unidentified member of GT's Professional Standards Group that appear to date from December 2004 suggest that the risks of the Refco engagement were well-understood by GT and other professionals. The note appears to relate to Refco's response to comments from the SEC. *See* GT EX 001976, at App. D-20 (handwritten notes on page of Diary and Work Record for December 21, 2004). The note states "Atty called — also this AM — Refco makes Firm uncomfortable . . . issue is sig. def. . . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to state, apparently concerning Refco and its push to go public, "They are moving very fast - too fast for comfort . . . what to do - we would be sued." Because the Examiner did not interview any GT employees, the meaning of this note is unclear. The tone and apparent subject matter of the note, however, strongly suggest urgent concern within GT about the risks posed by Refco's lack of controls and desire to quickly conduct an IPO.

[494] *Bloor v. Dansker (In re Investors Funding Corp. of New York Sec. Litig.)*, 566 F. Supp. 193, 201 (S.D.N.Y. 1983). *See also* App. A, Sec. III.A.

[495] *See* App. A, Sec. III.A.

[496] *Id.*

[497] *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 319 B.R. 782, 790 (Bankr. E.D.N.Y. 2005) (finding claim for professional malpractice by the auditor withstands motion to dismiss based on alleged breaches of

*(footnote continued on next page)*

An auditor owes its client a duty to "use the skill and due professional care and to exercise good faith and to observe generally accepted auditing standards and professional guidelines, with the appropriate reasonable, honest judgment that a reasonably prudent and skillful auditor would use under the same or similar circumstances."[498] An established means for auditors to fulfill this duty is to conduct their audits in accordance with GAAS, the standards of practice for auditors.[499] While proof of a departure from the standards does not necessarily establish negligence *per se*, it does require the auditor to substantiate any departure from the standards.[500]

### a.     AA and GT Owed a Duty to Refco

As audit professionals engaged by Refco to perform audits in compliance with GAAS, AA and GT had legal duties to conduct the audits of Refco financial statements by undertaking "to use skill and due professional care and to exercise good faith and to observe generally accepted auditing standards and professional guidelines, with the appropriate reasonable, honest judgment that a reasonably skillful and prudent auditor would use under the same or similar circumstances."[501] The engagement letters for each obligated them to conduct their audits of Refco in accordance with auditing standards generally acceptable in the United States (US GAAS). The audits were to involve examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and

---

*(footnote continued from previous page)*

professional standards in conducting audit).  *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 299 (2d Cir. 1997).

[498] *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 538 (S.D.N.Y. 1990).

[499] *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 811 (1984).

[500] *See* App. A, Sec. III.B.1.

[501] *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 538 (S.D.N.Y. 1990).

significant judgments and estimates made by management, as well as evaluating the overall financial statement presentation.[502]  Each was responsible for obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed.[503]  Each committed to communicating significant deficiencies or material weaknesses in internal control coming to their attention during the audits.[504]

### b.    AA and GT Breached Their Duty of Professional Care

As an initial matter, based on the documents, the Examiner concludes that there is sufficient evidence to state a claim that AA and GT breached their respective duties of professional care by failing to conduct audits of Refco entities, namely RGL, RCM, and RCC, in accordance with GAAS.  With respect to GT, the Examiner notes particularly its failure to conduct its review of related party transactions in compliance with GAAS during the fiscal year 2005 audit, despite entering into a consent decree with the SEC involving similar problems in auditing related party transactions.  The documentary evidence supports a claim that both AA and GT failed to:  (1) exercise due professional care in the planning and performance of the audits and the preparation of auditor's reports;[505] (2) obtain sufficient competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for opinions regarding the financial statements under the audits;[506] and (3) satisfy themselves that

---

[502] *See, e.g.,* AAREF 00010141 (AA 2001 Audit Engagement Letter); GT SEC 0113599 (Engagement letter dated March 14, 2003 for audits of consolidated financial statements of Refco Group Ltd. LLC and Subsidiaries as of February 28, 2003 from Ramler to Trosten**).**

[503] *See id.*

[504] *Id.*

[505] AU §§ 410, 431, 500; *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 247 B.R. 341, 363 (Bankr. S.D.N.Y. 2000), *rev'd in part on other grounds*, 311 B.R. 350 (S.D.N.Y. 2004), *vacated on other grounds*, 318 B.R. 761 (S.D.N.Y. 2004).

[506] AU § 326; *In re CBI Holding Co., Inc.*, 247 B.R. at 363.

financial statement disclosures of related parties were reasonably adequate with respect, at least, to the nature and extent of related party transactions.[507]

The failure to comply with GAAS is evidenced by the auditors' specific acts, or failures to act, in breach of the duty to Refco to adequately plan for the audit and testing of related party transactions year after year. Although they identified significant risks associated with related party transactions and management incentives to override accounting controls, the auditors did virtually nothing to address them. Moreover, when GT did devise procedures to address the known risks from related party transactions, it failed to follow them.

The documentary evidence supports a claim that AA and GT breached their respective duty of professional care to Refco by failing to exercise the professional skepticism expected of a reasonable auditor throughout the audit process, most glaringly in relation to known risks of related party transactions. In exercising professional skepticism, the auditor "neither assumes that management is dishonest nor assumes unquestioned honesty"[508] and "should not be satisfied with less than persuasive evidence because of a belief that management is honest."[509] As detailed through the Examiner's Report, both AA and GT essentially accepted without question management's representations regarding the nature and extent of related party transactions, despite having identified related party transactions as a very significant audit risk.

GAAS required the auditors to obtain competent evidential matter to support the financial statements on which each opined. But the Examiner found that with respect to the audit of related party transactions, the auditors gathered little to no evidence aside from the financial statements provided by Refco along with representations by management, while ignoring "red

---

[507] AU § 334.11.

[508] AU § 230.09; SAS 82.

flags" pointing to the fraud.  Instead, the auditors were obligated to adequately verify, corroborate, or confirm management's representations.[510]

AA's and GT's failure to conduct audits of Refco in conformance with professional auditing standards and in seeming disregard of the impact of related party transactions are the same departures from auditing standards courts have recognized as breaching an auditor's professional duty of care, including, without limitation, the failure to: (1) exercise the requisite skepticism throughout the auditing process;[511] (2) gather competent evidential matter to support Refco's financial statements;[512] (3) adequately verify Refco's accounts receivable;[513] (4) adequately verify, corroborate, or confirm representations of Refco's management.[514]

### c.      Statute of Limitations for Professional Negligence

The statute of limitations for professional auditor malpractice in New York is three years, and generally begins to run when the auditor delivers the negligently prepared audit report to the client.[515]  Under the "continuous representation doctrine," the limitations period is extended on a malpractice claim against an auditor through the entire period of consecutive audits the auditor

---

*(footnote continued from previous page)*

[509] *Id.*

[510] AU § 334.09; *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 278 B.R. 28, 33 (Bankr. E.D.N.Y. 2002) (allegation auditor failed to adequately verify, corroborate, or confirm management representations on alleged growth of accounts receivable one of several alleged departures from professional standards defeating motion to dismiss).

[511] *See In re CBI Holding Co., Inc.*, 247 B.R. at 363.

[512] *See id.; In re Sharp Int'l Corp.*, 278 B.R. at 34-35.

[513] *See In re Sharp Int'l Corp.*, 278 B.R. at 34-35.

[514] *See id.*

[515] *See* App. A, Sec. III.D.

performed if it is found that the consecutive audits constitute continuous service; a question of fact for the fact finder.[516]

### d.    Examiner's Conclusion Concerning Negligence

Based on the Examiner's review of the relevant professional and legal standards, their application under common law, and GT's failure to conduct its audits and reviews of Refco's financial statements in accordance with established professional auditing standards as detailed by this Report, the Examiner concludes, subject to applicable defenses, that a cause of action against GT for professional malpractice would withstand a motion to dismiss. GT delivered its audit reports within the three years prior to the petition date. Accordingly, a claim for professional malpractice against GT as to any audit reports it prepared is not barred by the statute of limitations until the later of three years from June, 2005 or two years from the date the statute of limitations is tolled under Section 108 of the Bankruptcy Code.

AA delivered its last audit report in May 2002, over three years before the filing of Refco's Petitions. A professional malpractice claim therefore may be barred by the applicable statute of limitations.[517]

### 2.    Aiding and Abetting Breach of Fiduciary Duty/Fraud

Under New York law, a corporation may sue a third party for aiding and abetting officers' and directors' breaches of fiduciary duty or aiding and abetting fraud.[518] The elements of these two claims are very similar. A claim for aiding and abetting breach of fiduciary duty

---

[516] *Id.*

[517] "Fraudulent concealment" can act to extend the statute of limitations such that it is tolled while facts that the auditor was under an affirmative obligation to disclose are concealed from the client. *See* App. A, Sec. III.D. However, whether New York law continues to recognize fraudulent concealment as a means of tolling the statute of limitations for malpractice claims against auditors is an open question. Moreover, to invoke fraudulent concealment requires alleging facts sufficient to show that the auditor deliberately concealed facts underlying the claim.

[518] *See* App. A, Sec. IV.A. and cases cited therein.

requires a showing of: (1) the existence of a breach by a fiduciary of a duty owed to the plaintiff;

(2) knowing inducement or participation in the breach by the defendant; and (3) damages

suffered by the plaintiff.[519]  The elements of a claim for aiding and abetting fraud are:

(1) existence of a fraud; (2) the defendant's knowledge of the fraud; (3) provision by the

defendant of substantial assistance to advance the fraud's commission; and (4) damages suffered

by the plaintiff.[520]  Under the Bankruptcy Code, these claims are property of the estate.[521]

### a.    The Requirement of "Actual Knowledge"

Both aiding and abetting breach of fiduciary duty and aiding and abetting fraud require

proof of "actual knowledge" under New York law.[522]  To allege actual knowledge, a plaintiff

must plead "specific facts that would give rise to an inference that [the auditor] actually knew of

[the debtor's] allegedly fraudulent activities."[523]  Most often, this is accomplished by the use of

the auditor's internal documents showing the auditor recognized the particular breach of

fiduciary duty, or the fraud.[524]  Allegations an auditor "should have known," or had access to the

client's records revealing the breach or fraud, do not satisfy the actual knowledge requirement.[525]

---

[519] *See id.*

[520] *See id.*

[521] *See id.*

[522] *See Kolbeck v. Lit America, Inc.*, 939 F. Supp. 240, 245-249 (S.D.N.Y. 1996) (discussing and harmonizing extensive case law substantiating the requirement of actual knowledge versus reckless disregard or willful blindness, and granting motion to dismiss aiding and abetting claim for failure to specifically allege facts demonstrating actual knowledge).  *But see Cromer Fin. Ltd. v. Berger*, No. 00 Civ.2284 DLC, 2003 WL 21436164, *9 (S.D.N.Y. June 23, 2003) ("[T]here is no reason to believe that New York law would not accept willful blindness as a substitute for actual knowledge in connection with aiding and abetting claims.").

[523] *Vtech Holdings Ltd. v. Pricewaterhouse Coopers LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004).

[524] *Ryan v. Hunton & Williams*, 99-CV-5938, 2000 U.S. Dist. LEXIS 13750, *29 (E.D.N.Y. Sept. 20, 2000).

[525] *See Kolbeck*, 939 F. Supp. at 247 (actual knowledge requirement is logically consistent with other elements of tort, such as substantial assistance or failure to act).

> **(i)** **_Further Investigation Is Warranted into the Actual Knowledge Held by GT of the Breach of Fiduciary Duty and Fraud_**

Documents reviewed by the Examiner suggest that Ramler may have had some knowledge of the relationship among the reverse repo transactions, the BAWAG debit balances, and the fraud occurring at Refco, including, without limitation, documents showing:

- Requests by Refco in the 2003 audit to provide documents demonstrating the payment of related party receivables that were apparently never obtained, and never again requested;

- GT's knowledge that BAWAG balances were repaid each year shortly after fiscal year end;

- Hand written notes from Ramler detailing a Liberty Corner transaction and tying it to inter-company account "clean-up;"

- GT reviewing and accepting as "reverse repos" transactions that were not reverse repos, and that did not fit GT's or Refco's own definitions of "reverse repos;" and

- GT's internally expressed significant concerns with its own potential auditor liability as Refco moved toward its IPO.

Pursuant to the protocol with the USAO, the Examiner did not interview certain former Refco employees and officers, Ramler, or other GT personnel involved in the Refco audits. While the Examiner believes it is premature to conclude at this point that actual knowledge of the fraud may be sufficiently alleged as to GT, the Examiner is of the opinion that further investigation is warranted.

> **(ii)** **_Further Investigation Is Warranted into the Actual Knowledge of the Breach of Fiduciary Duty and Fraud Held by AA_**

As explained below, the relevant statute of limitations for _monetary_ damage claims against AA for aiding and abetting a breach of fiduciary duty has run, barring such claim. A claim for aiding and abetting breach of fiduciary duty seeking _equitable_ remedies is not barred

by the statue of limitations.  Such a claim could result in restitution. However, questions remain as to AA's actual knowledge of the fraud.

Beyond the duration, seriousness and nature of the fraud, and AA's repeated failure to act upon "red flags" displaying aspects of the fraud, the Examiner did not find evidence showing AA's actual knowledge of the fraud.  Ramler and other key witnesses could not be interviewed. Further investigation involving witnesses relevant to GT should also include inquiry into the actual knowledge of AA.

### b.    The Requirement of Participation or Substantial Assistance

To state a claim for aiding and abetting the breach of a fiduciary duty, a plaintiff must allege facts showing the auditor participated in the fraud, while a claim of aiding and abetting a fraud requires factual allegations that the auditor provided substantial assistance to the fraud.[526] The elements of either claim may be satisfied by alleging facts showing the auditor affirmatively acted to assist or helped conceal the known breach of fiduciary duty or fraud.[527]

---

[526] *See* App. A, Sec. IV.C.

[527] *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992)).  *See also Ross v. Patrusky, Mintz & Semel*, No. 90 Civ. 1356 (SWK), 1997 WL 214957, *3, *14 (S.D.N.Y. Apr. 29, 1997) (auditor's internal memoranda noting deficiencies in the client's statements and showing the auditor issued an unqualified audit shortly thereafter established auditor knowingly concealed management's illegal acts).

Alternatively, the participation element (for breach of fiduciary duty) or substantial assistance element (for fraud) may be satisfied by alleging facts showing the auditor knew of the conduct and failed to act.  *Montreal Pension*, 446 F. Supp. 2d at 201; *see also, Ross*, 1997 WL 214957 at *15 (pleading that an auditor concealed adverse information about the client, permitted management to breach its fiduciary duty, while agreeing to conceal management's wrongdoing states a claim for aiding and abetting fraud sufficient to defeat a motion to dismiss). But, alleging facts showing a failure to act requires additional allegations showing a fiduciary duty between the auditor and the plaintiff directly, *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996); *see also* App. A, Sec. IV, versus that between the violator and the plaintiff.  New York law is arguably unsettled as to whether an auditor is a fiduciary to its client, although most recent authority does not recognize an auditor-client fiduciary relationship.  Thus, whether a failure to act can support an aiding and abetting claim against AA and/or GT may depend upon whether they are found to be fiduciaries of Refco.  *See* App. A, Sec. IV.C. (The Requirement of Substantial Assistance).

If AA or GT had actual knowledge of the Refco fraud, their issuance of unqualified audit opinions may be sufficient to support a claim for aiding and abetting the breach of fiduciary duty or fraud.[528]

### c.    The Statutes of Limitations for Aiding and Abetting Claims

#### (i)    *Aiding and Abetting Breach of Fiduciary Duty*

The statute of limitations for bringing a claim for aiding and abetting a breach of fiduciary duty is dependant on the relief sought, with a three year limitations period applying to claims for damages and a six year limitations period for claims seeking equitable remedies.[529] As with a claim for professional malpractice, the doctrine of continuing representation applies to claims for breaches of fiduciary duty and may toll the statute of limitations for claims against auditors performing consecutive audits.[530]

#### (ii)    *Aiding and Abetting Fraud*

The statute of limitations for a claim against an auditor for aiding and abetting fraud is the greater of (1) six years from the date the cause of action accrued or (2) two years from the date the client discovered or should have reasonably discovered the fraud.[531]  Whether a plaintiff should have discovered the fraud is a mixed question of law and fact.  The test of discovery is objective — a determination of when the circumstances were such that a person of ordinary intelligence would recognize they have been defrauded.[532]

---

[528] *See Ross*, 1997 WL 214957, at *3, *14.

[529] *See* App. A, Sec. IV.E.

[530] *See Williamson v. PricewaterhouseCoopers LLP*, 817 N.Y.S.2d 61, 64 (N.Y. App. Div. 2006); *Transp. Workers Union of Am. Local 100 AFL-CIO v. Schwartz*, 821 N.Y.S.2d 53, 56 (N.Y. App. Div. 2006).

[531] *See* App. A, Sec. IV.

[532] *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983); *Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir. 1977) ("[A]lthough a plaintiff may not shut his eyes to facts which call for investigation, mere suspicion will not suffice as a ground for imputing knowledge of the fraud.").

### d.     The Examiner's Conclusion Regarding a Claim for Aiding and Abetting Breach of Fiduciary Duty

Because AA delivered its last audit report in May 2002, over three years before the

Petition Date, a claim for aiding and abetting breach of a fiduciary duty for *monetary* damages is

barred by the applicable statute of limitations.  However, claims for *equitable* remedies including

restitution remain timely under a six year statute of limitations.  Moreover, should a fact finder

determine that AA's consecutive audit engagements from fiscal 1998 through fiscal year 2002

were continuous representation of Refco, the statute of limitations will be tolled for the 1998 and

later audits until the final audit report delivery date in or about May 2002.

A claim for aiding and abetting breach of fiduciary duty remains timely with respect to

GT's audits for fiscal years 2003 through 2005 both for *monetary* damages and *equitable*

remedies.

### e.     The Examiner's Conclusion Regarding a Claim for Aiding and Abetting Fraud

Based upon the applicable legal standards, the materials available for review, and the

limitations imposed upon the Examiner's investigation of GT's audits of Refco, the Examiner

cannot fully assess the viability of an aiding and abetting claim against GT.  It is the Examiner's

opinion that further investigation is warranted to determine whether evidence exists to support

factual allegations of actual knowledge of the fraud by GT and/or AA and to determine the

viability of an action against the auditors for aiding and abetting the fraud.

## V.     REFCO'S TAX ACCOUNTANTS

### A.     ERNST & YOUNG LLP

#### 1.     Introduction and Overview of Investigation

E&Y prepared tax returns for Refco and RGHI from approximately 1991 through the

2002 tax year.  E&Y also provided Refco with tax advice during and after that time.  The

Examiner concludes that E&Y gained substantial knowledge that Refco engaged in financial statement manipulation during the course of its engagement.

### a.      Document Review

The Examiner had access to and selectively searched approximately 37,000 pages of documents that E&Y produced to the SEC and to the Creditors Committee.  E&Y, through its counsel, informed the Examiner that E&Y had additional documents in its possession pertaining to E&Y's work for Refco.  E&Y produced some of these documents directly to the Examiner and gave the Examiner an index of the remaining documents.  E&Y asked the Examiner to review the index and agreed to produce to the Examiner specific items on the index if the Examiner requested them.  The Examiner did request a small number of items from the index, which E&Y promptly produced.

### b.      Interviews

The Examiner interviewed two current E&Y tax partners — Kurt Neidhardt ("Neidhardt") and Michael Meisler ("Meisler") — and one former E&Y tax partner — Steven Cappel ("Cappel").  Neidhardt has been with E&Y for 22 years and is now the head of E&Y's Financial Services tax practice.  Neidhardt was the lead partner for the Refco engagement, had the most contact with Refco, and worked consistently on all facets of the Refco engagement from 1993 until E&Y's decision to resign from the Refco engagement in late 2003.  Cappel is a former E&Y tax partner who handled the day-to-day management of the Refco engagement from about 2000 until mid-2002.  Meisler is a partner in E&Y's New York Financial Services office who assumed responsibility for the day-to-day management of the Refco engagement in mid-2002.  These persons were the three E&Y personnel who clearly had the most significant involvement with E&Y's Refco engagement.  E&Y's counsel cooperated with the Examiner and agreed to make the aforementioned witnesses available consensually and represented the witnesses in their

interviews.[533]  E&Y's counsel declined the Examiner's request to have the interviews

transcribed.  The interviews were not taken under oath.  The Litigation Trustee's counsel

participated in each of the interviews with E&Y's consent.

Counsel for the Examiner found all three witnesses to be reasonably forthcoming and

generally cooperative.  The witnesses generally made an effort to answer questions rather than

simply claiming memory lapse.  There were some exceptions, however.  For example, when

Neidhardt was presented with several documents that showed that he had concerns about the

Refco engagement, Neidhardt offered little explanation of the documents or his thought process

in connection with them.

### 2.    Background Facts

#### a.    History of E&Y's Engagement with Refco

E&Y began working for Refco around 1991.  E&Y understood that its client was RGHI

and all of the subsidiaries below it, including RGL and Refco, Inc.  Initially, Refco retained E&Y

simply to review tax returns and answer tax questions.  In 1993 or 1994, E&Y began preparing

tax returns and later helped with IRS tax audits as well as audits by state and local tax

authorities.  E&Y prepared tax returns for RGL and its subsidiaries and affiliates, including

RGHI, through the tax year 2002.[534]

In addition, E&Y provided tax consulting and advice on an "as needed basis" with

respect to various transactions involving Refco, including corporate restructurings among the

various Refco entities, proposed sales and acquisitions of Refco interests, and potential third-

party investments involving Refco.  As discussed in more detail below, the most significant

---

[533] The Examiner determined that additional interviews of other E&Y personnel were unlikely to yield information different from that which had been obtained from Neidhardt, Meisler and Cappel.

[534] January 16, 2007 interview of Kurt Neidhardt ("Neidhardt interview").

transactions/issues on which E&Y worked include:  (i) RGHI's 1997 conversion to an S corporation and the myriad tax ramifications flowing there from (including efforts to avoid "busting" the S election or triggering Built-in-Gain tax); (ii) planning beginning in 1997 to take advantage of the Niederhoffer Loss; (iii) BAWAG's 1999 acquisition of a 10% interest in RGL; (iv) the 2001 conversion of RGL subsidiary Refco, Inc. from a C corporation to an LLC; (v) structuring and analyzing the tax consequences of plans for profits-only interests in RGL for certain Refco executives; (vi) 2001/2002 proposed acquisition by BAWAG of a controlling interest in RGL while minimizing or avoiding tax consequences to RGHI; and (vii) 2002 proposed BAWAG investment of hundreds of millions of dollars in RGL in three installments in exchange for BAWAG's right to "participate" in the proceeds of a sale of Refco.

Beginning in at least 1995, Neidhardt was the engagement partner for Refco and Refco was considered "his client."  From about 1995 to 2000, Neidhardt handled the day-to-day responsibility for the client.[535]  In 2000, Cappel assumed day-to-day responsibility.  Cappel stopped working on the Refco engagement in mid-2002,[536] and, thereafter, Meisler assumed day-to-day responsibility for the client.  Throughout this time period, Neidhardt remained involved as a senior advisor and handled IRS audits of the client.[537]

Silverman and later Trosten were Neidhardt's principal contacts at Refco, although Neidhardt had periodic meetings with Bennett.  Cappel and Meisler dealt almost exclusively with Trosten.

Neidhardt decided in November or December 2003 that E&Y should resign from its engagement with Refco.  Following this decision, E&Y did not prepare Refco's 2003 tax returns

---

[535] Neidhardt interview.

[536] February 26, 2007 interview of Steven Cappel ("Cappel interview").  Cappel left E&Y in October 2003.  *Id.*

and Neidhardt says that E&Y stopped providing Refco with tax advice.  Nevertheless, E&Y appears to have continued to work for Refco on at least tax audits through as late as December 2004, several months after the LBO.

Records indicate that Refco paid E&Y $4,993,887[538] between December 28, 2000 and June 21, 2005.  In addition, Neidhardt stated that Refco paid E&Y approximately $750,000 in fees for tax return preparation and tax consulting work in 2000.

### b.    Genesis of the RGHI Receivable

The genesis of the RGHI Receivable appears to be as follows:  In the mid to late 1990s, and especially in 1997, certain Refco customers sustained trading losses.  These customers had been trading on margin (*i.e.*, RGL or its subsidiaries had extended these customers credit to trade),[539] and when the customers lost tens of millions of dollars in trading, they were unable to fully repay RGL the credit that RGL had extended.  RGL was forced to settle the customers' positions with the trading exchanges (*i.e.*, pay the full amount owed by the customers to the trading exchanges) and RGL was left with receivables owed to it by the trading customers who had sustained the trading losses.  Rather than "writing off" the entirety of these losses on the books of RGL at the time the customer was unable to meet its margin call,[540] RGL "sold"[541]

---

*(footnote continued from previous page)*

[537] Neidhardt interview.

[538] This amount was discerned from checks and wire transfers.  However, the Examiner has not been able to determine whether all checks and wire transfers from Refco to E&Y were payments of professional fees.

[539] To be precise, the RGHI Receivable actually reflected amounts owed by RGHI or one of its subsidiaries (*e.g.*, Wells, Ltd.) to RGL or one of its subsidiaries (*e.g.*, RCM).  For the sake of simplicity, the above description refers to amounts owed by RGHI to RGL.

[540] According to Neidhardt, in some cases, a portion of the loss may have been written off on RGL's books at the time of the loss.  For example, according to Neidhardt, approximately $30 million of the Niederhoffer Loss was written off in 1997.  Neidhardt interview.

[541] The Examiner has reviewed only one document evidencing a "sale" of a receivable from subsidiary to parent — an assignment agreement dated October 28, 1997 that purports to assign Refco, Inc.'s claims against Niederhoffer to Wells, Ltd.  *See* App. D-10.  Although E&Y repeatedly described these transactions as "sales" of receivables, E&Y

*(footnote continued on next page)*

these customer receivables to RGHI "for face value" even though the receivables were worth

perhaps pennies on the dollar. E&Y's understanding was that in most cases, instead of paying

cash for the receivables it "purchased," RGHI "paid" RGL for the customer receivables with

notes.[542]  Thus, after the "sale" of the receivables by RGL to RGHI, the books of RGL showed a

receivable owed by RGHI to RGL (*i.e.*, the RGHI Receivable) in the full (or nearly full) amount

of the receivable that had been owed by the customer to RGL, and ***RGL's books did not show a***

***loss*** stemming from the trading customer's bad receivable.  Neidhardt explained in documents

that RGHI would "then write it [the losses] off on its [RGHI's] books."[543]

        The receivable that arose in this manner, however, lacked the traditional indicia of a bona

fide debt.  The Examiner found no evidence that this inter-company debt was evidenced by a

written instrument, such as a note or written guarantee, as would be expected with a legitimate

debt of this magnitude.  There is no evidence of any agreed upon terms of repayment for the

inter-company debt, nor any evidence that RGHI made payments — periodic or otherwise — to

pay down the debt during the time period E&Y was engaged.  Indeed, the evidence shows that

RGHI lacked the intention and the financial ability to repay this debt unless and until all or part

of Refco was sold.[544]  Although interest accrued on the RGHI Receivable, RGHI apparently

---

*(footnote continued from previous page)*

also described the transactions as "guarantees" by RGHI of its subsidiaries' losses.  Neidhardt interview.  The Examiner found no documents evidencing a written guarantee of this nature.  *See* EY-REF-023416 (Dec. 30, 1998 Neidhardt e-mail, suggesting that "guarantee" was unwritten).

[542] *See* EY-REF-005815, at App. D-21 (Oct. 6, 1998 Neidhardt e-mail).  RGHI may have paid Refco, Inc. cash for a portion of the Niederhoffer receivable.  The cash for this payment, however, apparently was loaned to RGHI by RCM.  Neidhardt interview; *see also* EY-REF 000153 (Nov. 6, 1997 memo of Neidhardt discussing Niederhoffer Loss and containing handwritten note saying, "Did RCM advance funds."); EY-REF 000095.

[543] EY-REF-005815, at App. D-21 (Oct. 6, 1998).  Neidhardt confirmed in his interview that "its" referred to RGHI's books.

[544] *See* EY-REF-004941, at App. D-22.

made no cash interest payments. Instead, accrued interest was simply added to the growing RGHI Receivable balance.[545]

Although the RGHI Receivable initially was comprised of customer bad debts sold or transferred from RGL to RGHI, over time other items were added to the RGHI Receivable, including, among other things, certain expenses of RGL that were paid for by RGL in the first instance but then transferred to RGHI and added to the receivable balance.[546]

### c.    E&Y's Knowledge of Inter-Company Receivable Comprised of Bad Debts Sold or Transferred by RGL to RGHI

As of October 8, 1998, Neidhardt was aware of an inter-company receivable of approximately $200 million. Neidhardt said that his knowledge of the inter-company receivable was derived from Refco's audited financial statements.[547] Documents indicate that Neidhardt understood that the receivable had come into existence before 1997 as a result of RGHI buying "bad debt receivables" for full face value, and that the receivable had been sitting on the books of RGL accruing interest "for years" while a corresponding payable grew on RGHI's books.[548]

---

[545] There is some evidence that Neidhardt believes that RGHI made cash interest payments. *See* EY-REF-004428, at App. D-23 (June 25, 2002 e-mail of Neidhardt: "Re the $750m payable that RGHI has to the operating company RGL- Each year RGHI receives a distribution of earnings for its pro rata share ( these earnings would include accrued interest income on their payable). RGHI uses this cash to pay down the interest on their payable so that the receivable on RGL's books is a performing asset from RGL's standpoint. I had not known that the cash was ploughed back in."). The Examiner found no evidence to corroborate the statement in Neidhardt's e-mail and found substantial evidence to the contrary.

[546] *See, e.g.,* EY-REF-004463-64.

[547] Neidhardt interview.

[548] EY-REF-024453, at App. D-24 (Oct. 8, 1998); EY-REF-004969 (Aug. 13, 1999); EY-REF-005815, at App. D-21 (Oct. 6, 1998) ("The S Corp and the partnership used to be a 20 sub consolidated C corporation which filed a consolidated return. First the entire thing converted to an S Corp. Then most of the Qsubs converted to wholly owned LLC status and then became one big partnership when a new investor was admitted. Back when they were all part of the same consolidated return if Sub 1 (now part of the partnership) had a bad receivable then Parent (now part of the S Corp) would buy it for full face value and then write it off on its books. The Parent always gave a note to the sub and these amounts have sat on the subs books accruing interest for years while an equal payable grows on the Parent's books.").

Neidhardt said that he was unsure regarding the specific components of the RGHI Receivable.[549]  However, E&Y knew by as early as November 6, 1997 that at least one Refco entity — Refco, Inc. — had "sold" a receivable (comprised of bad debts stemming from trading losses suffered by a customer called Niederhoffer)[550] to RGHI for approximately $70 million.[551]  In addition, numerous E&Y documents discuss the "Wells losses," which appear to pertain to losses of approximately $50 million on Russian securities involving Wells, Ltd., a wholly-owned subsidiary of RGHI, and RCM.[552]  Documents indicate that E&Y understood these losses to have formed part of the RGHI Receivable.[553]

In sum, although E&Y knew the source of some of the bad debts that made up the RGHI Receivable, it is not clear that E&Y fully understood and could identify all of the precise components of the RGHI Receivable.[554]

### d.    Niederhoffer Loss

One component of the RGHI Receivable with which E&Y was very familiar was the so-called "Niederhoffer Loss" or "N Loss."  In October of 1997, Niederhoffer — a Refco, Inc. customer comprised of several hedge funds that had been trading on margin — sustained huge losses in its trading accounts and was unable to repay Refco, Inc. approximately $97 million it

---

[549] Neidhardt interview.

[550] Neidhardt was asked in his interview whether the $200 million receivable balance of which he was aware included the Niederhoffer Loss.  Neidhardt said he was not sure but that it might not.  Neidhardt interview.

[551] EY-REF 000153 (Nov. 6, 1997).  *See also* EY-REF 000063 (Nov. 13, 1997).

[552] *See, e.g.*, EY-REF 002118-20, at App. D-25 (Feb. 25, 1999 Neidhardt memo to file regarding Wells Losses); *see also* EY-REF-023387-93.

[553] *See, e.g.*, EY-REF 002118-20, at App. D-25 (Feb. 25, 1999 Neidhardt memo to file regarding Wells Losses); *see also* EY-REF-023387-93.

[554] As of January 28, 1997, E&Y knew about at least $59.5 million in bad debt deductions claimed by Refco entities on amended 1994 federal tax returns, the bulk of which was attributable to losses sustained by Trade and Marine Investments, Ltd. ("Trade & Marine").  *See* EY-REF 002978.  It is not clear from E&Y's documents whether these losses were a part of the RGHI Receivable.

had borrowed from Refco, Inc.  Shortly after the losses were sustained, RGHI's wholly-owned subsidiary, Wells, Ltd., purchased from Refco, Inc. approximately $71 million of the $97 million debt that Niederhoffer owed Refco, Inc.[555]  Neidhardt said that the remainder of the loss was recognized at the time.[556]  The remaining $71 million debt from Niederhoffer was "sold" to RGHI at "face value" — *i.e.*, $71 million — a price that vastly exceeded fair market value.[557]

According to Neidhardt, the transfer of the N Loss receivable to RGHI had no effect for tax purposes, although it is not clear what he meant by this statement.  Neidhardt explained that the loss could be carried forward unless the debt was deemed uncollectible/worthless.  Neidhardt also explained that until the N Loss was completely worthless, or until part was impaired and a loss was taken on the books, it could not be deducted.  Neidhardt also stated that if this loss became worthless at RGHI, the deduction would revert back to a loss on Refco, Inc.'s books.[558]

---

[555] Neidhardt interview.  The only document evidencing this "sale" appears to be an "Assignment Agreement" dated October 28, 1997 purporting to assign and sell Refco, Inc.'s claims against Niederhoffer to Wells, Ltd.  *See* App. D-10.

[556] Neidhardt interview.

[557] Refco and E&Y fully understood that the fair market value of the Niederhoffer receivable that Refco, Inc. sold to RGHI was substantially less than the "face value" of the receivable.  Neidhardt interview.  Some of E&Y's records say that, for tax purposes, E&Y treated the lower fair market value of the Niederhoffer receivable as the value of the asset and the remainder that RGHI "paid" as a capital contribution.  *See* EY-REF 000192 (Dec. 8, 1997 memo to Neidhardt stating that N Loss receivable was treated this way).  *See also* EY-REF-023634 (Mar. 21, 2002 memo to Refco tax files, at footnote 1, stating that all of the bad debts comprising the RGHI Receivable were treated this way).  It is not clear whether these records are accurate, and Neidhardt was not sure whether the sales of receivables were treated in this manner.  Neidhardt interview.

As Neidhardt explained the tax treatment of the N Loss further during his interview, he cast doubt on whether E&Y treated a portion of the amount "paid" by RGHI as a capital contribution.  Neidhardt said that E&Y treated the amount in excess of fair market value "not as equity" (*i.e.*, not as a capital contribution) so it was permissible for RGL to accrue interest income on the receivable.  Neidhardt also said that even if it was a promised capital contribution, it might be permissible to accrue interest on the obligation.  Neidhardt interview.  Cappel did not know one way or the other whether it would be permissible to accrue interest on a promised capital contribution of this sort.  Cappel interview.

[558] Neidhardt interview.  *See also* REFCO-HC-0299683.  Neidhardt stated that § 267(f) of the tax code provides that when a "legal sale" (an actual sale) occurs between related parties in which a receivable is sold at face value by a sub to the parent, the tax loss must be deferred until the receivable is worthless.  In the case of Refco, when the receivable became worthless at the parent (RGHI), it would be reflected as a loss at Refco, Inc.  Neidhardt further said that if no legal sale occurred, the movement of the receivable from sub to the parent would be considered a

*(footnote continued on next page)*

-177-

According to Neidhardt, Refco told E&Y every year that the debt was not worthless for various reasons, including a pending lawsuit filed by Niederhoffer in which Niederhoffer claimed he might be able to recover some funds and pay back Refco.[559]

Neidhardt stated in his interview that he does not know why the N Loss receivable was moved to RGHI. He stated, however, that the movement of the receivable by Refco was not done for purposes of obtaining favorable tax treatment. Documents suggest that at one time, a stated objective was to move the N Loss to RGHI's tax return.[560]

### e.    E&Y's Early Understanding of Refco's Objective of Selling the Company as a Whole

E&Y understood since before RGHI's conversion to an S corporation on January 1, 1997 that the goal of Refco's owners was to sell the entire S corporation. Indeed, all of E&Y's tax planning advice was apparently based upon Refco's representation that no sales of separate entities would occur since the goal was to sell the entire S corporation in the future.[561] E&Y understood that the RGHI Receivable would probably get paid upon a sale of the entire company.[562]

---

*(footnote continued from previous page)*

capital contribution by the parent to the sub in the amount of the sale price of the receivable in excess of fair market value. Neidhardt interview.

[559] Neidhardt interview.

[560] EY-REF 000153 (Nov. 6, 1997); EY-REF 002622 (objective in 1997 was to include the N Loss "in the [RGHI tax] return."). E&Y did a significant amount of work with respect to the N Loss. *See, e.g.*, EY-REF 000063; EY-REF 000199; EY-REF 000081; EY-REF-007021 (memoranda and materials dealing with N Loss tax planning).

[561] *See, e.g.*, EY-REF 001199 (May 27, 1999 Neidhardt memo to file, noting that "the goal was to sell the entire S Corp. in the future"); EY-REF 000420 (May 5, 1999 Neidhardt memo, at p.2, stating: "This is why we anticipated selling the entire RGHI entity as opposed to individual pieces or asset sales when we adopted S [corporation] status [on Jan. 1, 1997].").

[562] EY-REF 002123 (handwritten notes on Jan. 4, 1999 Neidhardt e-mail stating, "Will RCM get paid? Yes. probably upon sale of the company or right around then.").

### f.    BAWAG's Acquisition in 1999 of a 10% Interest in RGL

E&Y provided tax advice in connection with structuring the 1999 BAWAG purchase of an interest in RGL.  In particular, E&Y advised Refco on how to avoid the IRS viewing BAWAG's acquisition of  a 10% interest in RGL as a "disguised sale" of part of RGHI's interest in RGL, which would trigger RGHI's liability for so-called Built-in-Gain taxes.[563]  In addition, E&Y advised Refco to insert into the RGL limited liability company agreement provisions that would reduce tax liability on interest income associated with the RGHI Receivable.[564]  Finally, E&Y provided verbal and written comments and suggestions to Mayer Brown regarding deal documents that Mayer Brown drafted.[565]  An E&Y memo to the file shows that E&Y disagreed with representations contained in Mayer Brown's draft deal documents that stated that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been paid.[566]  Neidhardt stated in his interview that E&Y

---

[563] *See, e.g.,* EY-REF-007711 (May 5, 1999 memo discussing disguised sale issue).  The conversion of RGHI from a C corporation to an S corporation on January 1, 1997 began a 10-year period during which any gain realized by RGHI from a disposition of all or part of its interest in RGL would be subject to a corporate-level tax at the level of RGHI — but only to the extent of any appreciation in value of RGHI's interest in RGL between the time of RGHI's acquisition of the asset and January 1, 1997 (so-called "Built-in-Gain" or "BIG").  A sale of RGHI's interest or any part thereof before January 1, 2007, therefore, could cause RGHI to recognize and pay corporation-level tax on a ratable portion of any Built-in-Gain.  While the documents reviewed did not indicate whether a calculation was ever done to determine whether there was BIG in RGHI's interest in RGL, E&Y was very concerned about any BIG that would be taxable to RGHI in any proposed sale of RGHI's interest in RGL.

[564] *See* EY-REF-005897.

[565] *See, e.g.,* EY-REF-005701 (Jan. 28, 1999 letter conveying comments to LLC agreement); EY-REF-024389 (notes of Feb. 5, 1999 conference call with Mayer Brown).  *See also* EY-REF-024274; EY-REF-006050; EY-REF 001129.

[566] *See* EY-REF-005863, at App. D-26 (Feb. 9, 1999 Neidhardt memo to file stating: "*I communicated to Steve Rossi today that we did not agree with the representations in the loan, pledge, and purchase agreements which stated that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns and withholding taxes had been filed/paid.  I also told him that if asked by Mayer Brown or BAWAG we would need to express our views.*  This approach was confirmed by Paul Bader and Elliott Tannenbaum.  On February 10th, Jim Barry of Mayer Brown asked it [*sic*] I was okay with Section 2.16 of the agreement regarding taxes.  Richard Stern and Jake Blank were on the call.  I told Jim that we were not making any representations regarding that Section and that I had discussed the above with Rossi.  *I also told him that there may very well be material tax issues and that he should discuss these with the client and with Joe Collins who is already aware of some of them.  I did not have permission to give details of the exposures.*  Steve Rossi then instructed me to refer Jim to him if he

*(footnote continued on next page)*

only disagreed with the representations regarding tax liability issues, not representations

regarding financial statement issues. However, this memo could also be interpreted as reflecting

E&Y's disagreement with the representation that there were no undisclosed liabilities on the

audited RGL financial statements, notwithstanding Neidhardt's statement to the contrary. The

representation regarding undisclosed liabilities in Section 2.12 of the Purchase Agreement was

arguably false because the financial statements did not disclose the extent of the related-party

receivables.

### g.    Issues in 2000 and 2001 over Allocation of Refco Expenses

E&Y knew that Refco had a practice of allocating vaguely described expenses — often

dealing with computer expenses — to RGHI, but having RGL actually pay the expense and then

adding those expenses to the RGHI Receivable. Refco justified this practice by pointing to a

RGHI Board of Directors resolution that authorized RGHI to guarantee and be responsible for

certain historical and continuing expenses incurred ostensibly for the benefit of RGHI.[567] Refco

also justified this practice by claiming that these expenses were "erroneously" paid by RGL, but

were reclassified upon discovery of the error, resulting in these expenses being added to the

RGHI Receivable.[568] E&Y apparently accepted Refco's explanation.

---

*(footnote continued from previous page)*

should inquire again and that Steve would give him a full description of the issues.") (emphasis added). *See* EY-REF-005624-25; EY-REF-007743-66.

[567] *See* EY-REF-004463-64 (Oct. 10, 2000 letter from Trosten attaching May 12, 1999 Board Resolution).

[568] *See id. See also* EY-REF-006430 (Sept. 28, 2000); EY-REF-006428; EY-REF-006429; EY-REF-024088; EY-REF-024472; EY-REF-006416 (computer expense); EY-REF-006414 (explanation of booking accounting of expenses); EY-REF-005202; EY-REF 001748.

h.    **E&Y Learns of an Inter-Company Receivable in an Amount Hundreds of Millions of Dollars in Excess of the Amount Reflected in Refco's Audited Financial Statements**

While working on Refco's tax returns in approximately September 2001, Cappel discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements.  Cappel explained that he learned of this by looking at Schedule L of a 2000 RGL draft tax return (which contains a calendar year-end balance sheet) and comparing it to an audited RGL financial statement dated February 28, 2001.  He noticed that one classification of RGL's assets (receivables owed to RGL) reflected on the Schedule L calendar year-end balance sheet was about $500 million greater than the balance reflected on the audited financial statement.[569]

Sometime after noticing the difference between the fiscal year-end asset receivable balance and the calendar year-end asset receivable balance, Cappel believes that he requested monthly tax trial balances to ensure that he had the correct year-end numbers.  He believes E&Y received the monthly tax trial balances, and they correctly tied into the calendar year-end balance.[570]

Neidhardt says that he did not learn about the large receivable in the $700 to $900 million range until Cappel informed him.[571]  Neidhardt was surprised when he learned about the large receivable and until he learned of it, he had thought that the receivable was in the $200 million

---

[569] In his interview, Neidhardt said that he thought Cappel had discovered the large receivable balance when Cappel was examining mid-year trial balances in connection with the proposed BAWAG transaction.  Neidhardt does not know the date of this, but thought it was prior to September 2001.  Neidhardt interview.

[570] Cappel interview.

[571] Neidhardt discussed a $700 million RGHI liability with Trosten on January 3, 2000.  *See* EY-REF-004958 (Jan. 3, 2000 Neidhardt memo documenting discussion with Trosten).  However, when shown the document memorializing this conversation, Neidhardt said it did not reflect his knowledge of a receivable in the amount of $700 million but rather it was just a "hypothetical" that Trosten was throwing around.  Neidhardt said that Trosten

*(footnote continued on next page)*

range based on what the financial statements reported.  Neidhardt said that after learning about

the receivable, he spoke to Trosten and conveyed his surprise that the receivable was larger than

what the financial statements disclosed.  According to Neidhardt, Trosten said, "You knew about

it.  You saw the interest income and expense."[572]

Neidhardt said that E&Y tried to track the source of the large receivable but was unable

to do so because Refco never provided E&Y detailed information regarding the receivable

buildup.  He also said that there were significant other receivables and interest expenses from

Refco's day-to-day activities on Refco's books.  Neidhardt never made detailed inquiry

concerning the collectability of the RGHI Receivable.[573]

Although there are indications in the documents that E&Y understood the receivable to

be in an amount anywhere from $720 million to over $1 billion,[574] it appears that E&Y

ultimately determined that the receivable was $750 million as of spring 2002.[575]

### i.    E&Y's Knowledge that the RGHI Receivable Was a Sham Calculated to Improve the Financial Appearance of RGL

As recounted in their interviews, E&Y personnel had different understandings about the

purpose of the RGHI Receivable.  Neidhardt stated that he viewed the assumption of the

---

*(footnote continued from previous page)*

threw around hypotheticals with regularity so he did not think anything of this particular hypothetical.  Neidhardt interview.

[572] Neidhardt interview.

[573] Neidhardt interview.

[574] For example, e-mails in August 2001, EY-REF-004941-44, at App. D-22, speak of a "hypothetical" scenario involving a "$900 receivable" owed by "S Corp" (presumably RGHI) to "LLC" (presumably RGL).  *See also* EY-REF-025950 dated Aug. 8, 2001 ("S Corp owes $900 to LLC");  Nov. 7, 2001 e-mail from Cappel to Stern mentioning that $900 million "utilized to pay down the RGHI payable to RGL." EY-REF-025655; EY-REF-004922 dated 9/13/01 ("Please assume that RGHI has nothing in it but a liability to RGL of $1,072 mm.").  Cappel, however, said that these documents reflected hypotheticals that Trosten posited and did not reflect Cappel's understanding of the precise amount of the RGHI Receivable.  Cappel interview.

[575] A draft memo dated February 28, 2002, EY-REF-023764-70, refers to the RGHI receivable as $750 million.

receivable by RGHI as the "guaranteeing" of a subsidiary's losses by the parent company. Meisler thought that the purpose of the receivable was to ensure that only RGHI, not BAWAG, would be responsible for historical losses suffered by RGL prior to BAWAG's admission in 1999 as an owner of RGL.  Cappel said he never learned of the purpose of the receivable.

Notwithstanding the foregoing, there is evidence that E&Y understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL.  In an e-mail dated August 8, 2001, Cappel observed that a write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were protected by RGHI.[576]  In the same e-mail, Cappel stated that RGHI was basically insolvent, did not have the cash to pay down the receivable, nor did it have the inclination to do so.[577]  This e-mail supports the conclusion that, as of August 2001, E&Y knew that the RGHI Receivable was being maintained, not because it was a legitimate debt or that RGHI had intentions of paying it off, but rather because elimination of the receivable would destroy RGL's appearance of profitability.[578]  When asked during his

---

[576] *See* EY-REF-004941, at App. D-22 (Aug. 9, 2001 e-mail of Cappel) ("[A]re you suggesting that they simply liquidate S Corp immediately, while it is, basically, insolvent?  I think that would create an issue because the write down of the receivable in LLC would kill LLC's earnings, which are carefully protected and buffered by the S Corp.").

[577] *See* EY-REF-004941, at App. D-22 (Aug. 9, 2001 e-mail of Cappel) ("But Refco doesn't want to be left with S Corp, which would be nothing but a big liability.  ***They also do not have the cash, absent a sale, to pay down that $900; nor do they have the inclination to do so if they get the cash***.  They're simply hoping for a buyer who will solve all their problems, and fulfill all their dreams.") (emphasis added); *id.* ("it [RGHI] is basically insolvent").  *See also* EY-REF-004969 (Aug. 13, 1999 e-mail of Neidhardt) ("THERE ARE SIGNIFICANT LIABILITIES WITHIN RGL AND RGHI.  RGL PRESENTLY HAS A $200M RECEIVABLE FROM RGHI.  RGHI HAS VERY LITTLE OF VALUE OTHER THAN ITS INVESTMENT IN RGL.") (emphasis in original); EY-REF-005809 (undated handwritten notes of Neidhardt reading, "receivables from RGHI ---> who knows how good.").  Neidhardt indicated in his interview and in correspondence that he believed that RGHI's shareholders could pay off the RGHI Receivable by borrowing the necessary funds.  *See* EY-REF-024453, at App. D-24; EY-REF 001998 (undated handwritten notes of Neidhardt regarding a proposed acquisition of RGL by BAWAG reading, "This proves that RGHI has ability to satisfy the receivable because it was able to have someone assume the receivable to acquire a piece of the company.  RGL is valuable based on what Bawag is willing to put in.").  In addition, E&Y received from Refco yearly written representations that the RGHI Receivable was a valid, enforceable legal obligation.  *See, e.g.*, EY-REF-018800 (July 17, 2002); EY-REF-004566 (Nov. 7, 2002).

[578] Another e-mail arguably could support a similar conclusion.  In an e-mail dated October 10, 1998, before E&Y discovered the true amount of the receivable, Neidhardt appears to explain that it is possible (though unlikely) that

*(footnote continued on next page)*

interview what he meant by the statements in his August 8, 2001 e-mail, Cappel said he did not

know what he meant and emphasized that he thought that the e-mail merely reflected a set of

hypothetical facts posited by Trosten.

In sum, there is evidence supporting the conclusion that E&Y knew that the RGHI

Receivable was not a bona fide debt, but rather was a sham, based on the following:

- E&Y apparently never saw a written agreement evidencing the debt, never knew the terms and conditions of the debt or its repayment schedule,[579] and never knew of any valuable consideration for the debt (and, indeed, knew that the consideration was worth little, and questioned whether or not it was worthless);

- E&Y never received a requested confirmation directly from Refco's counsel that the debt was valid (discussed *infra*);

- During the E&Y engagement, RGHI appears to have never made a payment, periodic or otherwise, to service or pay down the debt (except for the sham Round Trip Loans);

- RGHI did not make interest payments in cash and instead simply added accrued interest to the outstanding receivable balance;

- RGHI never expressed an intention to repay the debt and instead indicated that it did not intend to repay the debt unless the entire company was sold;

- RGHI was unable to repay the debt and was "basically insolvent;"

- RGL and its subsidiaries might have been insolvent absent the receivable balance on their books;

- E&Y knew that a purpose of the receivable was to improve the appearance of RGL's earnings by transferring losses to RGHI; and

---

*(footnote continued from previous page)*

the entities below RGHI to which RGHI owes the receivable would be insolvent without the receivable as an asset. Neidhardt states: "RGHI has a large ($200m) payable to its first tier sub RGL on its books. RGL's audited financial statements show this receivable and interest is accrued on it. The receivable was generated by the Parent promising to pay full face value for receivables and other instruments which the sub had owned and which became worthless or devalued in exchange for those instruments. The bulk of those receivables have been written off for tax purposes in prior years. *It is unlikely but unclear whether the entities below RGHI would be insolvent without this receivable on a fair market value basis.* RGHI does not have significant assets with which to pay off this receivable other than its ownership of the entities below. The shareholders of RGHI could likely fund the amount." EY-REF-024453, at App. D-24 (emphasis added).

[579] Neidhardt interview.

-184-

- E&Y knew that a purpose of the receivable was to inflate the net worth of RGL by moving losses that should have been taken by RGL.

### j.    E&Y Learns of at Least Part of the Round Trip Loan Transactions

Shortly after he confirmed the existence of a large receivable in the $700 million range in September 2001, Cappel asked Trosten why there was a difference between the February and December totals for inter-company receivables.  Trosten explained to Cappel that Refco utilized the Round Trip Loan transactions at fiscal year end and, for that reason, the inter-company receivable balances did not appear on RGL's financial statements.  Trosten explained that the transactions were undertaken simply to "clean up" the balance sheet at each fiscal year end.[580]

Neidhardt said that he learned about the Round Trip Loans at the same time he learned of the large receivable of $700 to $900 million (approximately September 2001).  He learned about the Round Trip Loans from either Cappel or Meisler, but not from anyone at Refco.  Neidhardt was surprised when he learned about the Round Trip Loans.  Neidhardt viewed this as a legal transaction that only had implications if it was not disclosed.[581]

Meisler said that he thought that Refco's auditors knew about the RGHI Receivable and its year end pay down and he assumed that the auditors did not report them on the audited financial statements for good reasons that the auditors must have determined.  Cappel had a similar view about the auditors' lack of disclosure of the RGHI Receivable and Round Trip Loans on the audited financials.  Meisler and Cappel were both of the view that it was not

---

[580] Cappel interview.

[581] Neidhardt interview.

E&Y's job to second guess the decisions of a Big Five accounting firm such as Arthur Andersen.[582]

E&Y says it does not believe it had a duty to disclose its knowledge of the Round Trip Loans. E&Y claimed it never had discussions with Refco's auditors or law firms about either the Round Trip Loans or the RGHI Receivable.[583]

The evidence is mixed as to whether E&Y knew the details of all portions of the Round Trip Loans. E&Y admits that by no later than February 28, 2002, it knew in general terms about the second part of the Round Trip Loan scheme — namely, RGHI borrowing funds from a third party to pay down the RGHI Receivable in late February, and the subsequent reversal of the transaction in early March.[584] The Examiner found no evidence that E&Y knew the identities of the third parties lending funds to RGHI (other than BAWAG) or that the third parties (other than BAWAG) were not financial institutions.[585]

The Examiner found no direct evidence that E&Y was aware of the first part of the Round Trip Loan scheme — namely, that RCM loaned funds to a third party who in turn loaned the funds to RGHI. Neidhardt, Meisler and Cappel each denied knowledge of this part of the Round Trip Loan scheme.

The Examiner found some documents suggesting that E&Y was aware of the first part of the Round Trip Loans. For example, several documents refer to "circular flows of cash" in the

---

[582] January 17, 2007 interview of Michael Meisler ("Meisler interview"); Cappel interview.

[583] Neidhardt interview; Cappel interview; Meisler interview.

[584] See, e.g., EY-REF-025104, at App. D-27, and subsequent drafts, all describing the second part of the Round Trip Loan scheme. See also EY-REF-004768 (undated but describing Round Trip Loan scheme in general terms) and EY-REF-004841 (Feb. 27, 2002 e-mail referring to "debt pay down and borrowback").

[585] The Examiner did not find any E&Y documents identifying any of the Round Trip Loan Participants. Cappel and Meisler said they had no idea who the Round Trip Loan Participants were. Cappel interview; Meisler interview. Neidhardt said he thought the Round Trip Loan lender was BAWAG only. Neidhardt interview.

context of discussions of pay down of the receivable at fiscal year end.[586]  These documents could be interpreted as reflecting E&Y's knowledge of a circular flow of cash from RCM to a third party lender to RGHI to RGL (the parent of RCM), and a reversal of the transaction. However, this interpretation would be contrary to the explanation offered by Neidhardt, who said that "circular flow of cash" is a term of art that simply means that cash goes somewhere and then comes back, such that the transaction may be ignored for tax purposes.[587]

In addition, the Examiner reviewed handwritten notes of Cappel dated March 4, 2002, which contain the phrases "borrowed cash from RGL," "third party customer," and "Niederhoffer."[588]  These notes could be interpreted as reflecting knowledge of the third party customer borrowing funds from RGL to in turn loan to RGHI as part of the Round Trip Loan scheme designed to hide the RGHI Receivable, which was partly composed of the Niederhoffer Loss.  In his interview, Cappel could not explain the context for these statements.  He did not think, however, that these notes could or should be interpreted as meaning that a third party borrowed money from RGL and denied that these notes could indicate that Cappel had knowledge that RGL or RCM loaned money to the third party as part of the first leg of the Round Trip Loans.  Although he admitted that he was speculating about the meaning of his own notes, Cappel said he thought that "borrowed cash from RGL" more likely referred to the first

---

[586] *See* EY-REF 001834 (Nov. 11, 2002 Neidhardt e-mail stating: "Finally, I explained that to have this treatment we would need to treat any 'paydowns' of the receivable at 2/28 as circular flows of cash.  Rob confirmed that the funds are down at RGL for less than a few days and that there is no written instrument, agreement, or anything that would treat the flow of funds back up to RGHI as a debt obligation.  As a result pull out the ruling but I believe that we probably have a pretty good tax return position to treat this as 'no basis debt.'  It truly is a circular flow of funds in substance.").  *See also* EY-REF-000153 (Nov. 6, 1997 memo re N Loss, handwritten note stating "Did RCM advance funds.  Circular flow of cash".  The context of the memo suggests that this refers to RCM advancing funds to RGHI to pay cash to Refco, Inc. for the Niederhoffer receivable — a "circular flow of cash" that more closely resembles the Round Trip Loans' flow of funds); *but see* EY-REF-004207 (appearing to describe "circular flow of cash" as follows: "interest expense accrues . . . cash distributed . . . interest paid down . . . debt to RGL increases.").

[587] Neidhardt interview.

[588] EY-REF-004815.

step of the unwinding of the Round Trip Loans (*i.e.*, "borrowing" really meant reinstating of the loan receivable from RGL to RGHI).[589]

The Examiner found no direct evidence that E&Y was aware that RGL guaranteed RGHI's obligation to the third party lender and agreed to indemnify the third party lender in connection with the Round Trip Loans.  Neidhardt, Cappel, and Meisler each denied knowledge of this aspect of the transaction.[590]

### k.    2001-2002 Work on Devising a Tax Advantageous Transaction to Sell Part or All of Refco

In the mid-2001 through mid-20002 time frame, E&Y performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party.  During the second half of 2001, Trosten began asking E&Y — particularly Cappel — to devise tax advantageous strategies for a potential sale or partial sale of Refco.[591] According to Cappel, Trosten's goal, which Cappel believed was wholly unrealistic, was to find a way to effect a tax free sale of all or part of Refco.  In that effort, Trosten routinely called Cappel and presented "hypothetical" sets of facts which Trosten asked Cappel to assume in devising a deal structure.  These "hypotheticals" typically assumed the existence of a receivable owed by RGHI to RGL in the amount of $720 million to over $1 billion.[592]

---

[589] Cappel interview.

[590] Although the Examiner found a document referring to "Refco's guarantees and pay down of receivable at year-end," EY-REF 000334, at App. D-28, Neidhardt said that "Refco's guarantees" referred to his view that the RGHI Receivable reflected *RGHI's* commitment to guarantee the losses of its subsidiary RGL.  Neidhardt interview.

[591] The subject of a sale of a controlling interest in Refco had come up previously.  *See, e.g.*, EY-REF 001941 (Aug. 20, 1999 memo regarding potential sale of 51% of RGHI); EY-REF-004961 (Sept. 1, 1999 Lowry e-mail considering tax consequences of the inter-company receivables in a proposed sale).

[592] *See* EY-REF-002590 E&Y memo dated Aug. 8, 2001 ("S Corp owes $900 to LLC"); EY-REF-025655 Nov. 7, 2001 Cappel e-mail mentioning that $900 million "utilized to pay down the RGHI payable to RGL"; EY-REF-004922 Sept. 13, 2001 Cappel e-mail ("Please assume that RGHI has nothing in it but a liability to RGL of $1,072 mm.").

E&Y had three principal concerns in structuring any transaction. E&Y's first concern was to establish, if possible, a high tax basis in RGHI's interest in RGL in order to minimize RGHI's gain on sale that would be taxed.[593] Second, E&Y was very concerned about any Built-in-Gain that would be taxable to RGHI in any proposed sale of RGHI's interest in RGL (or in any structure that, although not denominated a sale, the IRS determined was a "disguised sale" and recharacterized as a sale for tax purposes).[594] Third, E&Y was concerned with avoiding any partial sale of RGHI, which would terminate RGHI's S election.[595]

E&Y proposed several alternative structures for a transaction in an effort to minimize the tax consequences to RGHI of a deal with BAWAG. The principal structure E&Y suggested contemplated RGL distributing the RGHI Receivable to RGHI in partial redemption of RGHI's interest in RGL followed by BAWAG contributing a total of approximately $750 million in cash, notes or subscription receivables in two or three installments in exchange for an additional 40.8% member interest in RGL.[596]

By spring of 2002, it appears that Refco was forging ahead with a deal with BAWAG, but may have been generally taking into account E&Y's advice regarding tax structuring in certain respects.[597] For example, on February 14, 2002, Refco sent E&Y a draft agreement prepared by Mayer Brown that, as drafted, contemplated an actual sale to BAWAG of RGHI

---

[593] *See* EY-REF-025628; EY-REF-025543.

[594] *See, e.g.,* EY-REF-004904.

[595] *See, e.g.*, EY-REF 000335 (Mar. 14, 2002 Neidhardt e-mail).

[596] *See, e.g.*, EY-REF-004904 (Oct. 11, 2001 Stern memo to file); EY-REF-025204 (Apr. 25, 2002 Meisler e-mail). Other drafts of this and a related memo include: EY-REF-026284 (Sept. 24, 2001); EY-REF-004858 (Feb. 18, 2002); EY-REF-023774 (Feb. 21, 2002); EY-REF-010198 (Feb. 25, 2002); EY-REF-023764 (Feb. 28, 2002); EY-REF-023680 (March 8, 2002); EY-REF-024969 (March 11, 2002); EY-REF-023670 (March 12, 2002); EY-REF 001890 (March 13, 2002); EY-REF-025273 (March 14, 2002); EY-REF-025740 (March 20, 2002); EY-REF 001906 (March 22, 2002); EY-REF 001947 (Apr. 8, 2002).

[597] *See, e.g.*, EY-REF 000293 (May 8, 2002 Neidhardt letter providing advice regarding structure of BAWAG transaction).

stock — a structure that would not be advantageous from a tax standpoint.[598]  E&Y appears to have told Refco about this, and Refco ultimately followed E&Y's advice and formulated the transaction using the so-called Proceeds Participation Agreement.[599]

## l.    Proceeds Participation Agreement

In July 2002, RGL and DFI (an affiliate of BAWAG) entered into a Proceeds Participation Agreement ("PPA") pursuant to which DFI was to make three payments to RGL in exchange for the right to participate in the proceeds of a future sale of RGL.  The payments were originally scheduled to be made on February 28, 2003, February 28, 2004 and February 28, 2005.  However, the February 28, 2004 payment was accelerated to November 2003.

On June 6, 2002, Trosten spoke to Neidhardt about the PPA.  Trosten said that Refco viewed the transaction as essentially an "option" to acquire an interest in RGL — a non-event or "a nothing" for tax purposes — and would not need to be disclosed or dealt with in the tax returns.[600]  On December 30, 2002, Refco finally allowed E&Y to view a copy of the PPA, although Refco would not allow E&Y to make a copy of it.[601]  E&Y reviewed it and felt that the PPA resulted in an acquisition of an ownership interest in RGL by BAWAG and needed to be

---

[598] EY-REF 000296 (Feb. 11, 2002 Mayer Brown Draft Purchase Agreement).  E&Y insists that it did not communicate with Mayer Brown regarding this draft.  Cappel interview.

[599] EY-REF 000296 (Feb. 11, 2002 Mayer Brown Draft Purchase Agreement); EY-REF 000292 (May 21, 2002 Neidhardt e-mail stating that he has advised Trosten against documenting the BAWAG deal as a "sale transaction" and indicating that Trosten said he understood Neidhardt's advice and would try to modify the deal documents accordingly); EY-REF-005212 (June 6, 2002 Neidhardt e-mail noting that Refco did follow E&Y's advice on the BAWAG deal in that "they did significantly change their deal from originally having RGHI sell shares to B[AWAG] which would have been a disaster and they did make sure cash comes directly to RGL for additional shares").

[600] EY-REF-005212 (June 6, 2002 Neidhardt e-mail).

[601] EY-REF-022655 (Dec. 30, 2002 Neidhardt e-mail); Neidhardt interview.

treated that way for purposes of the 2003 tax returns.[602]  E&Y decided to resign from the Refco

account, however, before preparing Refco's 2003 tax returns.

### m.    Amendment of Refco, Inc.'s 1997 Tax Return

E&Y claims that in September 2002, during an IRS audit of tax years including 1997,

E&Y learned for the first time from Refco that the N Loss was completely uncollectible from

Niederhoffer because there had been a settlement and release in 1997 between Niederhoffer and

Refco, Inc. pertaining to the losses.  Thus, E&Y had to amend the 1997 tax returns.  E&Y does

not recall whether it amended subsequent returns.  This discovery that the N Loss should have

been deducted in full in 1997 coincided with the IRS's disallowance of certain other deductions

as a result of the IRS's audit of Refco's 1997 tax returns.  Thus, the amendment of the 1997

return to deduct the full N Loss had the benefit of allowing Refco to replace the other deductions

that had been disallowed by the IRS as a part of its audit of the 1997 returns.[603]

Documents indicate that E&Y was planning to amend the 1997 Refco, Inc. tax return

much sooner than September 2002, and that E&Y was aware of a settlement with Niederhoffer

well before the September 2002 IRS tax audit.[604]

### n.    E&Y's Concerns Over the Refco Engagement and E&Y's Own Potential Liability

Beginning in as early as 1997 and continuing throughout E&Y's engagement with Refco,

E&Y expressed significant concerns internally at E&Y regarding positions taken by Refco,

---

[602] Neidhardt interview; Meisler interview.

[603] Neidhardt interview; Cappel interview

[604] *See, e.g.*, EY-REF-007004 (Aug. 7, 2000 e-mail of Neidhardt stating, "[Refco,] Inc intends to amend its 1997 tax return for the entire $97m which will create a $97m net operating loss ("NOL") on that return."); EY-REF-004946 (Aug. 8, 2001 e-mail of Cappel stating, in the context of discussing tax basis of RGL in connection with a proposed sale: "If the 1997 tax return for R, Inc. is amended to take a substantially larger deduction in that year . . ."); EY-REF-009112-13 (handwritten notes of Cappel dated Dec. 3, 2001 reading: "Niederhoffer Bad Debt . . . Client signed waiver following day settling debt for total assets of various Niederhoffer Funds").

disclosure of information by Refco to its auditors and others, the potential for fraud by Refco, and potential E&Y liability arising out of E&Y's involvement with Refco. Throughout this time period, E&Y did little or nothing to address these significant concerns and simply continued to work for Refco.

For example, in November 1997, Neidhardt was concerned about Refco's handling of the N Loss, which Neidhardt thought was "unusual."[605] Documents also suggest that Neidhardt had serious concerns over the auditor's accounting treatment of the obligation from RGHI to RGL arising out of the N Loss as a receivable rather than as equity.[606] A memo reflects that, in light of Neidhardt's concerns, on November 11, 1997, Neidhardt met with Jerry Goldman, who was the head of E&Y's Financial Services Department, to discuss AA's accounting treatment of the N Loss as a sale for face value and whether E&Y could be viewed as somehow being "an accessory to some type of fraud." Goldman informed Neidhardt that so long as E&Y never gave Refco any accounting advice and prepared Refco's tax returns correctly, E&Y should not have a concern from a firm risk standpoint.[607] Following this meeting, Neidhardt still had questions regarding the N Loss receivables — in particular whether they were "real receivables" that could be "sold" to RGHI.[608] Neidhardt's concerns regarding whether the receivable should be

---

[605] Neidhardt interview.

[606] EY-REF-005815, at App. D-21 (Oct. 6, 1998).

[607] Neidhardt wrote a note to memorialize his conversation with Goldman. It read: "Discussed with J. Goldman entire Refco Inc situation from a firm risk standpoint re Arthur Andersen's treatment of N loss as a sale for face and whether we could be viewed as somehow being an accessory to some type of fraud. JG felt that as long as we never give them any accounting advice and our tax returns are prepared correctly we should not have a concern." EY-REF 000080, at App. D-29. Counsel for the Examiner asked Neidhardt in his interview what he meant by "some type of fraud," but Neidhardt said he did not recall to what this statement referred. Neidhardt interview.

[608] EY-REF 000081 (referencing a memo that would address "whether these are real receivables which can be sold").

characterized as debt or equity remained as of October of 1998.[609]  Despite these continuing

serious concerns, Neidhardt did not speak to Refco's auditors or take any other measures to

address these concerns.[610]

Neidhardt's concerns over the Refco engagement remained.  In January of 2001,

documents indicate that Neidhardt felt a new engagement letter was warranted.  The new

engagement letter contemplated having Refco provide E&Y with additional information and

representations to E&Y in connection with the preparation of Refco's tax returns.[611]  As a result

of this new engagement letter, in connection with preparing Refco's tax returns, in the years

2001 through 2003, E&Y sent a letter to Refco management asking Refco to provide, *inter alia*:

(a) a representation "per [Refco's] legal counsel" that the inter-company payable from RGHI to

RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to

RGHI per a "5/12/99 Certification and Assumption by RGHI;" and (c) an analysis of inter-

company accounts.[612]  E&Y *never* received a representation directly from Refco's legal counsel

that the inter-company payable was a legally enforceable obligation.  E&Y did receive a

representation from Trosten to that effect, which E&Y says is all that it requested.  E&Y

---

[609] EY-REF-005815, at App. D-21 (Oct. 6, 1998) ("I probably need to make sure this is real indebtedness and not equity?  However, the audited financials from Andersen treat the amount as a receivable on the balance sheet of Sub1.").

Other documents from December 1998 support the conclusion that E&Y was seriously concerned over Refco's accounting treatment with respect to certain receivables arising from bad debts.  In a December 15, 1998 fax, Steve Rossi of Refco appears to ask for accounting advice from Neidhardt.  Notes attached to this document suggest that Neidhardt consulted with Michael Frank, a lawyer in E&Y's General Counsel's office; Mike Kelley, the number two person in the Financial Services Department; Jerry Goldman, the head of the Financial Services Department; and Ron Friedman of the Tax Quality Department.  The notes state, "Ron Friedman - Thinks we need to get them to tell Andersen."  *See* EY-REF 000563-66.  Neidhardt stated in his interview that these notes merely meant that E&Y should tell Refco to consult with its auditing firm regarding accounting questions, not that E&Y felt there was anything in particular that Refco should tell AA.

[610] Neidhardt interview.

[611] EY-REF-007990; EY-REF-006256.

[612] *See, e.g.,* EY-REF-018800-08; EY-REF-006227-28.

accepted that representation without demanding anything further.[613]  In addition, the Examiner

found no evidence that E&Y received a "schedule of expenses" or "analysis of inter-company

accounts," and E&Y apparently took no action and continued to prepare Refco's tax returns

despite management having ignored E&Y's requests.[614]

Neidhardt was also concerned over the lack of disclosure of the RGHI Receivable and

Round Trip Loans in Refco's financial statements.  In March 2002, Neidhardt discussed this

issue with Tom McGrath, who was the head of the audit side of E&Y's New York office.  At the

time, E&Y was helping to structure a transaction with BAWAG in a tax advantageous manner.

McGrath felt that there was nothing to be concerned about with respect to E&Y's tax work on

the BAWAG transaction.[615]  Neidhardt discussed this issue with Bennett but did not inquire

further into the Round Trip Loan transactions and took no action as a result of this discussion.

Significantly, E&Y did not discuss this issue with Refco's auditors (nor even request permission

to speak with Refco's auditors) and did not discontinue its work on Refco's tax returns.[616]

On July 8, 2002, Neidhardt met with Mike Kelley to discuss mounting concerns with the

Refco engagement.  Kelley, who is now retired, was in 2002 the number two partner in E&Y's

tax department and was someone with whom Neidhardt would consult on important and difficult

---

[613] Neidhardt interview; *see, e.g.*, EY-REF-004566-67; EY-REF-006192-93.

[614] Neidhardt interview; Cappel interview.

[615] Neidhardt wrote a note dated March 7, 2002, memorializing his discussion with McGrath.  It read: "Discussed financial statement issues with Tom McGrath re Refco's guarantees and pay down of receivable at year-end.  He did not see an issue with our tax work on this Bawag transaction.  ***Sanity check***."  EY-REF-000334 (emphasis added).  During his interview, Neidhardt offered little explanation regarding this note but stated that the "guarantees" to which he refers in this note are RGHI's guarantees of the losses of RGHI's subs.  Neidhardt interview.

[616] *See also* EY-REF 000288 (undated handwritten notes of Neidhardt that include the following: "$235M . . . $750M . . . What is?" [suggesting that Neidhardt questioned the difference between the actual inter-company receivable and the inter-company receivable reflected on the 2000 audited financials] followed by the statements "Does AA know?" and "is running [illegible] around good acctg?").

issues.[617]  During the meeting, Neidhardt explained that E&Y had relatively recently learned that RGHI (which E&Y knew was unaudited) owed RGL a payable of $750 million, that RGL's audited financial statements reflected an inter-company receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable balance just before fiscal year end and reinstate it just after so that only $225 million would be reflected on RGL's audited financial statement.  Kelley's view was that these transactions were really financial statement disclosure issues rather than tax return issues.  Still, Kelley asked Neidhardt if he was aware of any lies by Refco to E&Y (Neidhardt was not) and recommended a background check on Bennett and Grant, which was done.  The background checks revealed nothing suspicious.[618]  Despite these concerns, E&Y did not push for any contact with Refco's auditors and did not discontinue its tax work.

On January 16, 2003, Neidhardt met with Kelley again to discuss concerns over Refco. During the meeting, Neidhardt again described the history of the RGHI Receivable and how it was used to book losses above the audited entity.  Neidhardt also described a proposed transaction (*i.e.*, apparently the PPA) that would be "hidden" from the IRS (in that it would not

---

[617] Neidhardt interview.

[618] Neidhardt documented the July 8, 2002 meeting over 3 months later in an October 17, 2002 e-mail to file.  EY-REF 000287, at App. D-30.  (Neidhardt stated in his interview that it was his routine practice to type up his notes on meetings and other matters periodically at some point in time after the fact.)  In the e-mail, Neidhardt says, "*I had some concern around the fact that we had recently learned that RGHI (unaudited holding company) had a $750m payable to RGL (audited operating company)*.  We had not known this because RGL's financials had historically shown only about $225 of intercompany receivable.  We had recently learned that RGHI would borrow money at year end and pay down the receivable followed by a distribution back from RGL which would then pay off the loan."  (Emphasis added).  Neidhardt seems to indicate that his concern was not over the unusual nature of the transaction, but rather that perhaps BAWAG did not know about it (Bennett assured Neidhardt that BAWAG was aware).  The e-mail also alludes to Neidhardt's concern over the IRS becoming aware of unspecified issues involving the Bermuda company "where the bigger issues reside."  (Neidhardt explained in his interview that the issue was that the IRS might take the position that RCM should be filing a U.S. tax return).  Apparently as a result of these concerns, Neidhardt and Kelley "*concluded that there was no need to contact legal at this time* but that [they] should have Larry Bastocky run an investigation on both Phil Bennet and the other shareholder Tone Grant to see if there was any evidence that they may not be acting truthfully eg some prior problem.  [They] did this and Larry came back with a clean bill of health on both these people."  (Emphasis added).

be disclosed on the tax return) involving DFI, in which DFI would pay down the receivable at

fiscal year end in a manner that would hide the inter-company nature of the receivable and

improve the balance sheet without disclosing why the balance sheet improved. Kelley thought

E&Y had nothing to be concerned about from a non-tax standpoint so long as they got the tax

returns correct. Kelley and Neidhardt were in agreement on this analysis and agreed that E&Y

would continue to do tax work for Refco.[619] Again, E&Y did not request further information

from Refco or its auditors.

### o. E&Y's Decision to Resign

Neidhardt said that E&Y resigned from the Refco engagement in November or December

of 2003, but that he had started thinking about resigning in late spring or early fall of 2003.[620]

Neidhardt explained that E&Y resigned from the engagement for three main reasons, each of

which reflected a concern over the credibility and reliability of Refco and its records. These

---

[619] EY-REF-022645, at App. D-31. The e-mail, dated June 4, 2003 (***nearly 5 months after the meeting***) reads: "Met with Mike Kelley on January 16 to discuss Refco again. Gave Mike the background of the entire saga including Trade and Marine and Niederhoffer. Discussed how they have booked roughly $500m of losses at RGHI (above the audited entity) based on the fact that RGHI guarantees the losses of the subs and how this has created a large receivable from RGHI to RGL. Went through how the DFI transaction would bring in new money which would effectively eliminate these receivables right at year end on the audited financial statements so that the balance sheet would improve by replacing intercompany receivables with new outside money. This would not be disclosed on the tax return if we technically got comfortable that DFI's investment was not a partnership interest. In addition, it would correspond with their book treatment which might not disclose how and why the balance sheet improved. We discussed whether this gave us any cause for concern from a nontax standpoint. Mike believed that it was our responsibility to get the tax return right and accurate and that there were very good tax reasons for taking the positions we were taking and that we should be appropriately aggressive from a tax standpoint. This was true because there were significant tax issues around a disguised sale if we highlighted this transaction. I agreed with this conclusion and we agreed that we could continue doing tax work on this client. **Redacted**" (Redaction and emphasis in original).

[620] Although Neidhardt said that E&Y resigned from the Refco engagement, Levine Jacobs stated that Refco told Levine Jacobs that Refco had fired E&Y. *See* Levine Jacobs section of Report. The Examiner has not seen an actual resignation letter, so the exact date and circumstances of E&Y's "resignation" are not known.

reasons were memorialized in a memo that Neidhardt prepared on or about November 10, 2005 at the request of counsel, long after the decision to resign.[621]

First, Neidhardt says he was concerned over Refco's "error" regarding when the Niederhoffer Loss was settled, which necessitated an "embarrassing" amended return. Neidhardt explained that in September 2002 during an IRS tax audit, he learned from Trosten that the loss was uncollectible from Niederhoffer because there had been a settlement and release of Niederhoffer in 1997. Because the loss was entirely uncollectible in 1997, the entire loss should have been deducted in 1997. Neidhardt said he was embarrassed that he had to amend the 1997 return to reflect the entire N Loss.[622]

Second, Neidhardt says he was upset by the way Trosten had handled certain "compensatory options." These options (ostensibly unrelated to the RGHI Receivable and Round Trip Loans) concerned certain options Refco had granted to Trosten. Neidhardt had advised against taking these options for tax purposes, but Neidhardt believes that Trosten ignored his advice, which could have affected certain returns in 2001 or 2002. Simply put, Neidhardt does not believe Trosten was being straight forward with him.[623] Meisler confirmed this account, saying that Neidhardt told him "I just don't trust these guys."[624]

Finally, Neidhardt was concerned over Refco's lack of disclosure and secrecy over a so-called "BAWAG option" or PPA. Neidhardt did not fully understand the BAWAG option and was not sure whether this transaction actually was an option or, instead, was an actual sale of an interest in Refco (for purposes of tax return preparation).

---

[621] EY-REF 003278-79, at App. D-32 (Nov. 10, 2005 Neidhardt memo). Neidhardt noted that the first reference in the memo to 2003 should be 2002.

[622] Neidhardt interview; EY-REF 003278-79, at App. D-32.

[623] Neidhardt interview; EY-REF 003278-79, at App. D-32.

In November 2003, Neidhardt met personally with Bennett to discuss these concerns and requested a meeting with Refco's then auditor, GT.  This was the first time Neidhardt had ever requested a meeting with Refco's auditors.  E&Y says it resigned after Bennett refused to allow E&Y to meet with GT.[625]

The Examiner found some evidence to corroborate Neidhardt's explanation regarding E&Y's decision to resign.  For example, some documents indicate Refco was highly secretive about the N Loss settlement and release and that discovery of the N Loss release was the final basis for amending the 1997 tax returns.[626]  Likewise, some documents appear to confirm Neidhardt's statement that Refco was secretive about the PPA.[627]

Despite the evidence corroborating parts of Neidhardt's explanation, the Examiner was surprised that Neidhardt did not state that the RGHI Receivable and Round Trip Loans at least partially motivated E&Y to resign.[628]  The Examiner found ample evidence to support the conclusion that E&Y's decision to resign was also motivated in large part by its concerns over its

---

*(footnote continued from previous page)*

[624] Meisler interview.

[625] Neidhardt interview; EY-REF 003278, at App. D-32 (Nov. 10, 2005 Neidhardt memo).

[626] *See, e.g.*, EY-REF-004276-77 (handwritten notes of Meisler dated Nov. 4, 2002 saying, "existence of settlements is a change in facts warranting amending return to get to right answer"); EY-REF-006190 (Nov. 22, 2002 e-mail of Neidhardt proposing explanation for amended return); EY-REF-022679 and EY-REF-022699 (documents reflecting Refco's secrecy regarding confidential N Loss settlement).

[627] *See, e.g.*, EY-REF-022655-57 (confirming that Neidhardt was not allowed to copy the BAWAG Agreement); EY-REF-005212-13 (stating that E&Y will need to look at the deal documents further before filing 2003 return).

[628] It should be noted, however, that Meisler indicated that Neidhardt was concerned about the receivable.  More particularly, Meisler understood that Neidhardt wanted to ensure that the auditors knew about the receivable (although it is unclear whether Meisler was referring to the large RGHI Receivable owed to RGL or the portion of the receivable attributable to the N loss, which is discussed in the resignation memo).  Neidhardt wanted to have a meeting with Refco's outside auditors.  When asked during the interview, however, Meisler stated that he (Meisler) had no reason to think the auditors did not already know about the receivable.  Meisler interview.

own potential liability for aiding and abetting a fraud as a result of its knowledge of the RGHI Receivable, the Round Trip Loans, and their financial statement implications.[629]

Moreover, the Examiner found evidence that is inconsistent with parts of E&Y's explanation of its decision to resign. In particular, there is evidence that suggests that E&Y learned of the Niederhoffer settlement and a "waiver" (though E&Y says not the release) sooner than September 2002.[630] In addition, although Neidhardt said he was disturbed by Trosten's handling of certain "compensatory options," there appear to be no contemporaneous documents among those the Examiner reviewed that deal with this issue that Neidhardt says he found troubling.[631]

### p.    Services After Decision to Resign

Following E&Y's decision to resign in late 2003, E&Y finished up work on open tax matters (basically IRS audits) from prior years (*i.e.*, 2002 and prior) but, according to Neidhardt, did not perform any new work for Refco.[632] E&Y did help on a New York sales tax issue and wrapped up a New York state and city audit examination, and there is evidence that this work may have continued through at least December 2004.[633] Neidhardt never spoke with Refco's

---

[629] *See, e.g.*, EY-REF 000287, at App. D-30; EY-REF-022645, at App. D-31; EY-REF-004199-200; EY-REF 000334, at App. D-28.

[630] *See, e.g.*, EY-REF-007004; EY-REF-004946; EY-REF-009112-13.

[631] It appears that E&Y was concerned over its relationship with Refco long after it says it decided to resign, as indicated by an e-mail exchange in October of 2005. On October 7, 2005, Rory Alex, an E&Y accountant who does not appear to have worked on the Refco engagement previously, wrote Neidhardt and Meisler: "We have an opportunity to work for Refco Group Ltd. at 200 Liberty Street, NY, NY DUNS # 130878804 and wanted to see if they were related to your entity REFCO OVERSEAS LTD. There is a time sensitive nature to our retention, your prompt reply is much appreciated." In response to this e-mail, Neidhardt wrote to Meisler on October 8, 2005: "I left him [Rory Alex] a message too.we need to be very careful here.I left him all my numbers..amything [*sic*] we tell him must be strictly confidential.I may have Nancy Altobello shut him down.find out the nature of the work and tell him you will get back to him." EY-REF-004199-200.

[632] Neidhardt interview; EY-REF 003278-79, at App. D-32 (Nov. 10, 2005 Neidhardt memo).

[633] *See, e.g.*, EY-REF-031908 (E&Y spreadsheet that appears to contain metadata suggesting that it was created or accessed on December 15, 2004).

subsequent tax accountants, Levine Jacobs.  Although E&Y had begun work on the 2003 tax returns, it ceased working on them and Levine Jacobs ultimately prepared the 2003 returns. E&Y says it may have transferred some of its work papers to Levine Jacobs, and one of E&Y's accountants (Yoav Citron) may have communicated with Levine Jacobs regarding ministerial matters, but there is nothing to suggest that E&Y told Levine Jacobs (or anyone else) about its decision to resign or its concerns with Refco.[634]

### q.    Communications (or Lack Thereof) with Other Refco Professionals

Neidhardt, Cappel, and Meisler each said that he did not communicate with other professionals — including AA, GT, KPMG, PwC, or Mayer Brown — regarding the RGHI Receivable or Round Trip Loans.[635]  E&Y maintains that an accountant has a duty of confidentiality under both CPA rules and federal statutes and regulations prohibiting the disclosure of client tax information absent client consent.  E&Y maintains that these rules apply to both preparation of tax returns as well as provision of tax advice.  E&Y also maintains that these rules prohibited E&Y from speaking with auditing firms working on Refco matters.  E&Y claims that it never obtained information directly from Refco's auditors and that all information was obtained through Refco.  E&Y never asked Refco for permission to speak with Refco's auditors until just before E&Y decided to resign.[636]

### r.    E&Y's Tax Treatment of Receivable and Round Trip Loans

E&Y maintains that the large RGHI Receivable really made no difference from a tax standpoint.  E&Y treated the RGHI Receivable as a bona fide debt and explained that its main

---

[634] Neidhardt interview; Meisler interview.

[635] However, there is evidence from which it could be inferred that E&Y communicated with Mayer Brown regarding the RGHI Receivable.  *See* Mayer Brown Section of this Report.

[636] Neidhardt interview; Meisler interview; Cappel interview.

tax effect was interest income and expense.  That is, RGHI deducted interest expense associated with the RGHI Receivable on its tax returns and RGL reported as income on its tax returns interest income accrued by RGL associated with the RGHI Receivable.  However, E&Y also said that prior to BAWAG's acquisition of a 10% interest in RGL in 1999, the existence of the RGHI Receivable made no difference from a tax perspective because the interest income and interest expense amounts all flowed through to RGHI (which wholly owned RGL) and offset each other.  After BAWAG's entry, the only concern from a tax perspective, according to E&Y, was to ensure the proper allocation of the RGHI Receivable and associated interest income and expense between BAWAG and RGHI.  E&Y did not make any adjustments to the allocation Refco instructed E&Y to use, however, because Refco did not give E&Y anything to suggest that the allocations did not already properly line up with RGHI.[637]

The three E&Y witnesses all claimed that they viewed the Round Trip Loans as non-events for tax purposes.  Because they considered these transactions as "circular flows of cash" during the tax year, they concluded that the loans had no impact on the final trial balance numbers and therefore had no effect from a tax standpoint.  Accordingly, E&Y ignored the Round Trip Loans for purposes of preparing tax returns.[638]  At his interview, Neidhardt did not take a meaningful position on how the Round Trip Loans should be treated if the entire transaction was a sham and without any business purpose.  He said that the interest on the books

---

[637] Neidhardt interview; Meisler interview.  *See* EY-REF 001831-32, ¶ 3 (memo analyzing the investment interest expense/investment interest income offset in relation to the receivable).

[638] Neidhardt interview; Meisler interview.

was real and only two weeks of interest was directly attributable to the Round Trip Loan transactions.[639]

### 3.    Conclusions: Analysis of Potential Claims Against E&Y

As discussed below, the Examiner concludes that, based on the evidence reviewed to date and summarized above, and subject to overcoming the potential defenses available to E&Y, there is sufficient evidence to (a) state a claim upon which relief may be granted for professional malpractice; and (b) state a claim upon which relief may be granted for aiding and abetting a fraud and/or breach of fiduciary duty.  The Examiner concludes that the Refco estate could not state a claim upon which relief may be granted for fraud, negligent misrepresentation, and breach of fiduciary duty.

#### a.    Professional Malpractice

The Examiner concludes that there is evidence sufficient to state a claim upon which relief may be granted for professional malpractice.  The legal standards for professional malpractice related to accountants are discussed in substantial detail in Appendix A.  Briefly, the elements of a professional malpractice claim are (1) a duty, (2) breach of duty, (3) "a reasonably close causal connection" between the breach of duty and injury, and (4) "actual loss, harm, or damage."[640]

A tax accountant owes his client a duty to perform within the standards of practice of his profession.[641]  An accountant's good faith compliance with generally accepted accounting

---

[639] Neidhardt also stated in his interview that there would be tax implications if Refco were insolvent.  Neidhardt interview.

[640] *See Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 299 (2d Cir. 1997).  In addition, a tax accountant's conduct "does not give rise to a malpractice claim unless that conduct is alleged to have negatively impacted on the professional service rendered." *Block v. Razorfish, Inc.*, 121 F. Supp. 2d 401, 403 (S.D.N.Y. 2000).

[641] *See, e.g., Carroll v. LeBoeuf, Lamb, Green & MacRae, LLP*, 392 F. Supp. 2d 621, 625 (S.D.N.Y. 2005).

principles discharges the accountant's obligation to act with reasonable care.[642]   Although a tax accountant is not under a duty to verify the accuracy of all information furnished by its client, a tax accountant nevertheless has a duty to undertake a sufficient inquiry to satisfy itself that the information provided and positions taken by the taxpayer are reasonable.[643]   Indeed, a tax accountant preparing tax returns "cannot ignore the implications of information furnished to the preparer or actually known by the preparer . . . [and] must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete."[644]   Where it is apparent that information provided by a taxpayer is incorrect or incomplete, it is negligent for a tax preparer not to seek additional information.[645]

In this case, Refco's estate could allege that E&Y was negligent because it failed to make an adequate inquiry with its client to determine whether information furnished and positions taken by the client were reasonable.   Specifically, E&Y failed to make an adequate inquiry to satisfy its duty with respect to the following:

- <u>Bad Debts</u> - E&Y did not take sufficient steps to determine whether the bad debts that had been sold to RGHI were, in fact, completely worthless.

---

[642] *In re Sharp Int'l. Corp.*, 278 B.R. 28 (Bankr. E.D.N.Y. 2002).

[643] *See Carroll*, 392 F. Supp. 2d at 626 (rejecting accounting firm's contention that it had no duty to look beyond the materials it was provided by client); *Schneider v. United States*, 257 F. Supp. 2d 1154, 1161 (S.D. Ind. 2003) (holding that tax preparer generally may rely in good faith without verification of information provided by taxpayer, but must make reasonable inquires if the information provided appears to be incorrect).  *See also* Rule 201(D) of the AICPA Code of Professional Conduct (accountants shall "[o]btain sufficient relevant data to afford a reasonable basis for conclusions and recommendations in relation to any professional services rendered.").

[644] Treas. Reg. § 1.6694-1(e)(1).   A tax preparer may be liable under 26 U.S.C. § 6694(a) for civil penalties if the preparer "negligently fails to inquire into information given him by the taxpayer and use of such information results in filing of a return that violates a rule or regulation."  *Sansom v. United States*, 703 F. Supp. 1505, 1510 (N.D. Fla. 1988).  *See also Brockhouse v. United States*, 749 F.2d 1248, 1252-53 (7th Cir. 1984) (finding tax preparer (1) negligent in failing to inquire about whether any interest payments paid by corporation were paid to taxpayer, and (2) liable for civil penalties under 26 U.S.C. § 6694(a) where tax preparer relied solely on information supplied by taxpayer indicating that taxpayer had not received any interest income on loans made to corporation, but tax preparer knew that taxpayer had made loans to corporation and that the corporation had made interest payments).

[645] *Brockhouse*, 749 F.2d at 1252.

- <u>RGHI Receivable</u> - E&Y did not take sufficient steps to determine whether the RGHI Receivable was a bona fide debt upon which interest could accrue. Despite harboring doubts over whether the RGHI Receivable could properly be characterized as a debt, E&Y never inquired further with the client or requested permission from the client to speak with Refco's auditors (until Neidhardt's belated November 2003 request to meet with GT). In addition, although E&Y asked for representations from Refco's legal counsel that the inter-company payable from RGHI to RGL was a legally enforceable obligation, E&Y never received a direct representation and, instead of following up, relied on the representation of Refco management. E&Y also never asked for or received written agreements documenting these huge debts. Finally, despite suspecting, if not knowing, that RGHI was insolvent and unable to repay the RGHI Receivable, E&Y failed to inquire further regarding the collectability of the debt.

- <u>Interest Income</u> - E&Y never inquired to determine whether interest on the RGHI Receivable was ever paid in cash or whether the accrued interest was simply added to the receivable balance.

- <u>Expense Allocation Manipulation</u> - E&Y asked Refco for a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI," but never received one and never followed up.

- <u>Analysis of Inter-Company Accounts</u> - E&Y requested an analysis of inter-company accounts, but never received one and never followed up.

- <u>Round Trip Loans</u> - E&Y never inquired to determine whether the Round Trip Loans were sham transactions devoid of a legitimate business purpose.

Had E&Y conducted a sufficient inquiry, it would have determined that the information provided and positions taken by Refco were not reasonable, would not have reported the inaccurate information on Refco's tax returns, and would have thereby prevented the dissemination of the unreasonable and inaccurate information in the tax returns. However, as a direct and proximate result of E&Y's failure to sufficiently inquire regarding the aforementioned information, incorrect information was disseminated, contributing to the fraud that ultimately caused Refco's bankruptcy.[646]

---

[646] E&Y may argue that it was under no duty to inquire regarding the reasonableness of information provided by the taxpayer since its engagement letters disclaimed responsibility for any inaccuracies in information provided by Refco. *See, e.g.*, EY-REF-006258-66; EY-REF 001717-20; EY-REF-010131-35; EY-REF-006207-09. The

*(footnote continued on next page)*

In conclusion, the Examiner notes that he did not retain an expert tax accountant to determine independently whether E&Y acted in a reasonable manner and complied with generally accepted standards governing the conduct of tax accountants.  The Examiner used experts retained by others in order to avoid added expense to Refco's estate.  The Examiner did not view the retention of an expert as absolutely necessary for purposes of reaching the conclusions expressed herein.  The Examiner notes, however, that an expert tax accountant, who may be necessary to prove a claim of professional malpractice,[647] may determine that there were other ways in which E&Y was negligent that are not discussed in this Report.[648]

### b.    Aiding and Abetting Fraud/Aiding and Abetting a Breach of Fiduciary Duty

The Examiner concludes that, based on the evidence reviewed to date and summarized above, there is sufficient evidence to state a claim upon which relief may be granted for aiding and abetting a fraud and/or breach of fiduciary duty.  As discussed in greater detail in Appendix A, the elements of a claim for aiding and abetting fraud are (1) existence of fraud, (2) the

---

*(footnote continued from previous page)*

Examiner concludes, however, that these contractual disclaimers likely would not trump the standard of care imposed on E&Y by law in these circumstances.

    E&Y may also argue that, assuming it had a duty to inquire further, the alleged failure to undertake the aforementioned inquiries did not proximately cause damages to Refco.  In this regard, E&Y may argue that damages that proximately flow from a tax preparer's negligence are limited to overpayment of taxes by the taxpayer or penalties assessed by the IRS against the taxpayer for underpayment of taxes or erroneous tax returns.  Here, E&Y may argue that the negligence alleged did not result in the overpayment of taxes by Refco (or penalties assessed against Refco) because Refco's predecessor-in-interest for whom E&Y prepared tax returns — RGL — was treated as a partnership for tax purposes; thus, its partners paid taxes, not RGL.  E&Y may argue that, for this reason, Refco suffered no damages as a proximate result of E&Y's alleged negligence and, therefore, has no claim against E&Y.

[647] Unless the fact-finder has a sufficient basis for judging the adequacy of the accountant's conduct, "expert testimony will be necessary to establish that the [accountant] breached a standard of professional care and skill." *Board of Trustees of the Teamsters Local 918 Pension Fund v. Freeburg & Freeburg, C.P.A.*, No. 98CV4895(SJ), 1999 WL 803895, at *6 (E.D.N.Y. Sept. 28, 1999).

[648] In its engagement letters, E&Y purported to limit its liability for damages arising out of its services provided to Refco to an amount no greater than the fees it received.  *See, e.g.,* EY-REF-006207.  New York law generally enforces contractual limitations of liability with respect to negligence, but does not enforce them with respect to

*(footnote continued on next page)*

defendant's knowledge of the fraud, (3) provision by the defendant of substantial assistance to advance the fraud's commission, and (4) damages.[649]  The elements of a claim for aiding and abetting a breach of fiduciary duty are (1) a breach by a fiduciary of obligations owed to the plaintiff, (2) knowing inducement or participation in the breach by the defendant, and (3) damages.[650]  The substantial assistance and participation elements may be satisfied by showing that the defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so," allows the wrongdoing to proceed.[651]

The Examiner assumes for purposes of this analysis that a fraud and breach of fiduciary duty by one or more of the officers of Refco can be established.  The Examiner addresses the knowledge and participation elements in turn below.

### (i)  Knowledge

The Examiner concludes that there is sufficient evidence to permit Refco's estate to allege that E&Y had actual knowledge of a fraud and breach of fiduciary duty.  As detailed above, there is considerable evidence that:

- as early as September of 2001, E&Y understood the RGHI Receivable to be approximately $720 million to $900 million, while E&Y knew that Refco's February 28, 2001 audited financial statements disclosed an inter-company receivable balance of only approximately $219 million;

- E&Y knew that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value;

---

*(footnote continued from previous page)*

gross negligence or intentional misconduct.  *See, e.g., Am. Tissue, Inc. v. Donaldson, Luftkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 99 (S.D.N.Y. 2004).

[649] *Wright v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000).

[650] *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 49-50 (2d Cir. 2005).

[651] *See* App. A, IV.C.

- as early as February 28, 2002, E&Y knew in general terms about the second part of the Round Trip Loan scheme — namely, RGHI borrowing funds from a third party to pay down the RGHI Receivable in late February and that portion of the transaction being reversed in early March;

- by no later than September, 2002, E&Y knew that the entire Niederhoffer Loss was uncollectible because the debt had been settled and released in 1997;

- E&Y knew that RGHI lacked the ability to pay off the RGHI Receivable;

- E&Y knew that Bennett's objective was to sell the entire company and that RGHI did not intend to pay off the RGHI Receivable unless and until the company was sold;

- E&Y knew that at least one purpose of the RGHI Receivable was to make RGL appear more financially sound by transferring RGL losses and expenses to RGHI (or, stated differently, Refco's officers were intentionally manipulating Refco's balance sheet for the purpose of bolstering the financial appearance of the company); and

- E&Y knew that at least one purpose of the Round Trip Loans was to improve Refco's balance sheet on its financial statements by concealing the fact that the RGHI Receivable was a related-party transaction and was uncollectible.

Indeed, E&Y ***admits*** that it knew the first four items above.

Although the Examiner has found less supporting evidence, the Examiner concludes that there is sufficient evidence to afford a good faith basis to allege:

- E&Y knew about the first part of the Round Trip Loan scheme — namely, that RCM loaned funds to a third party who in turn loaned the funds to RGHI.

It should be noted, however, that the Examiner concludes that a court would not necessarily require Refco's estate to prove that E&Y had actual knowledge of every last detail of the Round Trip Loans in order to establish liability. Indeed, the Examiner concludes that a lack of knowledge of the details of the original source of funds described in the last bullet point above likely would not be fatal to a claim for aiding and abetting given that E&Y knew that one purpose of the Round Trip Loans was to improve Refco's balance sheet and its financial statement.

### (ii)    Substantial Assistance/Participation

### (a)    Substantial Assistance or Helping to Conceal

With respect to the substantial assistance/participation element, although it is a close call, the Examiner concludes that there is sufficient evidence to afford a good faith basis to allege that E&Y "substantially assisted" or "helped conceal" the fraud and breach of fiduciary duty.

> ### (1)    Preparing Tax Returns that Reported Inaccurate or False Interest Income Associated with a Sham Receivable

First, E&Y "substantially assisted" the fraud/breach of fiduciary duty of Refco's officers by preparing and filing tax returns that E&Y knew were inaccurate or false; and that E&Y must have known that Refco was likely to present to lenders, potential investors, underwriters, and other third parties in connection with Bennett's continuous efforts to get financing and to sell the company. That is, E&Y knew that the RGL tax returns reflected interest income associated with the RGHI Receivable that E&Y knew was entirely or partially inaccurate.

There is evidence suggesting that E&Y knew that the entire RGHI Receivable was a sham transaction[652] and was not a bona fide debt on which interest income could properly accrue for tax purposes.[653] For example, E&Y expressed doubts from as early as 1997 whether RGL's

---

[652] *See In re Richard*, 2005-05XX, 2005 WL 3670919, at *6 (N.Y. Sup. Ct. Nov. 17, 2005). For tax purposes, a "sham transaction" is considered to be a transaction that "has no business purpose or economic effect other than the creation of tax deductions" or the creation of "income tax losses." *United States v. Atkins*, 869 F.2d 135, 139-140 (2d Cir. 1989) (internal quotations omitted).

[653] A "bona fide debt" is defined as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." 26 C.F.R. § 1.166-1(c); *see also Hynard v. Internal Revenue Service*, 233 F. Supp. 2d 502, 507 (S.D.N.Y. 2002) (holding that a "debtor-creditor relationship contemplates that the taxpayer has made a loan," and that the "inquiry is whether the parties actually intended and regarded the transaction as a loan"). In determining whether a debtor-creditor relationship exists as part of the bona fide debt analysis, courts must determine whether the taxpayer-creditor had a reasonable expectation of repayment, and often consider whether intent existed to repay funds transferred by a taxpayer to another entity. *Meier v. Commissioner of Internal Revenue*, 2003 WL 1700083 (U.S.Tax Ct.), 85 T.C.M. (CCH) 1097 (2003); *Haynard*, 233 F. Supp. 2d at 507. Significantly, "[a]dvances between a parent corporation and a subsidiary or other affiliate are subject to particular scrutiny 'because the control element suggests the opportunity to contrive a fictional debt.'" *In*

*(footnote continued on next page)*

customers' bad debts that RGL had assigned or sold to RGHI could accurately be accounted for as a receivable balance/debt obligation.  In addition, E&Y claims it never knew the business purpose of the receivable but admits that it was not motivated by tax considerations — which supports the inference that E&Y knew the debt was created for an improper purpose.  Moreover, E&Y suspected or knew that RGHI was insolvent, had no assets other than its ownership of RGL, lacked the ability to pay the receivable, and had no intention of paying the receivable absent a sale of the company facilitated by a fraudulent scheme to deceptively bolster the financial appearance of the company.  Despite its suspicions or knowledge that RGHI was insolvent, E&Y did virtually nothing to confirm the validity of the debt or RGHI's ability to pay it.  Moreover, at least during part of its engagement, E&Y understood that RGHI was not making cash payments to RGL for the interest payments on the debt but rather was simply adding the interest payments to the receivable balance.  Based on the foregoing, there is sufficient evidence for Refco's estate to claim that E&Y knew that the RGHI Receivable was a sham transaction that allowed RGHI to deduct interest expense, gave a misleading view of Refco's assets and income, and was an uncollectible debt.

Assuming that the RGHI Receivable was created for an improper purpose and was uncollectible, it was inaccurate and false to include on RGL's tax returns interest income associated with these receivable balances.  Inclusion of the interest income had the effect of inflating the net income reported on RGL's tax returns.  By preparing these inaccurate returns, which E&Y must have known Refco would show to third parties such as banks and investors,

---

*(footnote continued from previous page)*

*re Uneco*, 532 F.2d 1204, 1207 (8th Cir. 1976) (quoting *Cuyuna Realty Co. v. United States*, 382 F.2d 298, 300-01 (Ct. Cl. 1967)).

E&Y substantially assisted the Refco officers' fraudulent scheme of deceptively portraying the financial health of the company.

There is also evidence that E&Y knew by no later than September 2002 that at least the portion of the RGHI Receivable balance attributable to the Niederhoffer Loss was erroneously treated as a receivable and could not properly accrue interest income. Specifically, by as early as November 2000 and by no later than September 2002, E&Y knew that the entire Niederhoffer Loss was uncollectible because it had been settled and released in 1997. The fact that the claim against Niederhoffer was settled and released in 1997 meant that the entire N Loss should have been recognized as a loss and "written off" in 1997, and the tax deduction for this loss should have been taken in 1997 rather than the receivable being sold or transferred to RGHI and added to the RGHI Receivable. Upon learning that the N Loss had been settled in 1997, E&Y should have amended the 1997 Refco, Inc. tax return and each subsequent year's tax return to reflect the absence of a receivable, in an amount corresponding to the N Loss, from RGHI to Refco, Inc. and the corresponding absence of interest income associated with this improper receivable balance.[654] Although E&Y claims it did amend the 1997 tax return, it does not know whether it amended subsequent returns,[655] and the Examiner did not review any evidence indicating that E&Y did amend subsequent returns. If it did not amend subsequent returns (and inform those who might have reviewed the inaccurate unamended returns about the amended returns), E&Y

---

[654] *See* 26 C.F.R. § 1.451-1(a) (stating that "[i]f a taxpayer ascertains that an item should have been included in gross income in a prior taxable year, he should, if within the period of limitation, file an amended return and pay any additional tax due."); 26 C.F.R. § 1.461-1(a)(3) (stating that "[i]f a taxpayer ascertains that a liability was improperly taken into account in a prior taxable year, the taxpayer should, if within the period of limitation, file an amended return and pay any additional tax due").

[655] Neidhardt interview; Cappel interview.

contributed to the perpetuation of the fraudulent and deceptive overstatement of Refco's income — a portion of which was attributable to interest income.[656]

Moreover, Refco's estate could allege that E&Y's failure to amend the returns once E&Y learned of the LBO and a possible future IPO was even more glaring and damaging to the estate.[657] E&Y clearly knew that in connection with an LBO or IPO, third parties — such as investors, underwriters, and banks — likely would rely upon the inaccurate tax returns E&Y had prepared. Although E&Y says it decided to resign from its engagement with Refco in late 2003, E&Y committed to continue working on open IRS audits and did, in fact, continue working for Refco throughout 2004 and perhaps later.[658] E&Y should have amended the tax returns at least while it continued to work for Refco.

> (2) *Preparing Tax Returns that E&Y Knew Contained Erroneous Information Regarding RGL's Net Worth*

Similarly, there is sufficient evidence for Refco's estate to claim that E&Y "substantially assisted" the fraud/breach of fiduciary duty of Refco's officers by preparing and filing tax returns that E&Y knew contained false and inflated information regarding RGL's net worth. E&Y knew that the RGL tax return balance sheets (Schedule L) included as assets the receivable balances from RGHI that reflected losses that the books of RGL should have recognized. Thus, these Schedules showed an erroneous and inflated net worth for RGL. Again, E&Y must have known that Refco would present these inaccurate tax returns to lenders, potential investors, underwriters, and other third parties in connection with Bennett's plan to sell the company.

---

[656] *See, e.g.,* EY-REF-015045-56, at p. 49.

[657] Bennett mentioned to Neidhardt the possibility of a future IPO in March 2002. *See* EY-REF 000335.

[658] The IRS audit period for tax years 1997 through 1999 did not expire until September 2004 at the earliest. *See* EY-REF-023376.

>    *(3)*    *E&Y's Possible Responses to Allegations*
>            *That It Substantially Assisted or Helped*
>            *Conceal the Fraud/Breach of Fiduciary*
>            *Duty*

E&Y may assert significant counter-arguments to the foregoing theories of liability. Most significantly, E&Y may argue that it cannot be viewed as having helped conceal the fraud since, E&Y may claim, it did disclose the existence of large inter-company receivable balances on Schedule L of the tax returns that it prepared. Indeed, Cappel himself says he discovered the huge inter-company receivable balance simply by looking at Schedule L on the tax returns that E&Y prepared.[659] E&Y may argue that anyone else who had bothered to look (including banks, investors, underwriters, or other Refco professionals) could have seen these large inter-company receivable balances as well.

In addition, E&Y may argue that Refco could have proceeded and sometimes did proceed with transactions absent E&Y's tax advice and E&Y's preparation of tax returns. In other words, E&Y may argue that its tax work was not necessary to Refco's undertaking of the actions that constituted the fraud. E&Y may further argue that even if Refco followed E&Y's tax advice, E&Y merely saved RGL and/or RGHI money (by lowering tax liability), but did not facilitate any particular fraudulent transaction.

On balance, however, the Examiner concludes that the foregoing counter-arguments likely would not preclude Refco's estate from stating a claim because these arguments, even if accepted, do not negate the allegation that E&Y substantially assisted the fraud. Accordingly, while it is a close call, the Examiner concludes that the Refco estate could state a claim upon which relief may be granted.

---

[659] *See, e.g.,* EY-REF-029227-494, at p. 370-466.

### (b)    Failing to Act When Required to Do So

A defendant also may be found to have participated in a fraud or breach of fiduciary duty "by failing to act when required to do so," thereby allowing the wrongdoing to proceed.[660]  The Examiner concludes that Refco's estate could allege that E&Y was duty-bound to report the wrongdoing of which it was aware to BAWAG after it acquired a minority ownership interest in RGL in 1999, and to THL after it acquired a majority ownership interest in RGL in 2004; and, that by failing to do so, E&Y allowed the wrongdoing to proceed.  While the general rule is that a tax accountant is not a fiduciary with respect to its client, and therefore has no duty to report wrongdoing, the Examiner concludes that Refco's estate could credibly argue that E&Y had a duty to report wrongdoing to other owners of E&Y's client, including BAWAG[661] and THL.[662]  Indeed, Neidhardt himself recognized this duty, as evidenced by his repeated expressions of concern over whether BAWAG was fully aware of the RGHI Receivable and its periodic pay

---

[660] *Pension Comm. of the Univ. of Montreal Pension Plan*, 2006 U.S. Dist. LEXIS 49954 at *101.

[661] Admittedly, it has since been learned that BAWAG was a co-conspirator with Bennett in connection with the fraud.  However, the Examiner assumes that E&Y did not know at the time it learned of wrongdoing at Refco that BAWAG was actually assisting with the scheme.

[662] *See, e.g.*, *White v. Guarente*, 43 N.Y.2d 356, 361-62, 372 N.E.2d 315, 318-19, 401 N.Y.S.2d 474, 477-78 (1977). In *White*, the court held that (1) a negligence claim could be brought by limited partners against accountants retained by a limited partnership to perform auditing and tax preparation services for failing to notify limited partners that general partners were improperly withdrawing funds from the partnership's capital account, and (2) where the services of an accountant were not extended to a "faceless or unresolved class of persons," but rather to a known group, marked by a definable limit, it is proper to apply a duty of care to those not in explicit privity with an accountant where the accountant was aware that a party would rely on or make use of the tax returns prepared by the accountant.  The court reasoned that the accountant must have been aware that the limited partners would rely on or make use of the audit and tax returns.  *Id*. at 361-62, 372 N.E.2d at 318-19, 401 N.Y.S.2d at 477-78.  Although subsequent case law has somewhat narrowed the principle that a relationship approaching privity between an accountant and a third party can give rise to a duty of care owed by the accountant to the third party, *White* still remains good law.  *Compare, e.g.*, *Sanitoy, Inc. v. Shapiro*, 705 F. Supp. 152, 155 (S.D.N.Y. 1989) (distinguishing the relationship of a buyer and seller from a relationship approaching privity between an accountant and limited partners in *White*); *with Goldner v. Kemper Ins. Co.*, 125 A.D.2d 954, 954, 510 N.Y.S.2d 44, 45 (1986) (holding that although the facts of *White* were inapposite to the case before the court, privity may extend to those not in privity so long as those not in privity can qualify as members of a limited class who were expected to rely on the information provided those in privity).

down/reinstatement.[663]  Here, a court may conclude that E&Y was duty-bound to disclose the

fraud to BAWAG and THL,[664] but failed to do so and therefore allowed the fraud to continue.

E&Y may assert significant counter-arguments to the foregoing theory.  First, E&Y may

argue that, rather than being duty-bound to report client wrongdoing to third parties such as

BAWAG and THL, E&Y was prohibited from disclosing to anyone information it learned in the

course of serving as Refco's tax preparation firm.  According to E&Y, 26 U.S.C. § 7216(a)

imposes criminal penalties upon a tax preparer if it discloses confidential client tax information

without client consent.[665]

---

[663] *See, e.g.,* EY-REF 000335; EY-REF 000287, at App. D-30.

[664] Although E&Y says it decided to resign from the Refco engagement in late 2003, there is evidence that E&Y continued to perform work for Refco throughout 2004 and therefore any disclosure duty it had arguably continued. *See, e.g.*, EY-REF-031908.

[665] 26 U.S.C. § 7216(a):

> Any person who is engaged in the business of preparing, or providing services in connection with the preparation of, returns of the tax imposed by chapter 1, or any person who for compensation prepares any such return for any other person, and who knowingly or recklessly (1) discloses any information furnished to him for, or in connection with, the preparation of any such return, or (2) uses any such information for any purpose other than to prepare, or assist in preparing, any such return, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

26 C.F.R. § 301.7216-1 also provides, in part:

> any tax return preparer...who on or after January 1, 1972, discloses or uses any tax return information (as described in paragraph (b)(3) of this section) other than for the specific purpose of preparing, assisting in preparing, or obtaining or providing services in connection with the preparation of, any tax return of the taxpayer by or for whom the information was made available to a tax return preparer, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

In addition, New York's rules governing the professional conduct of accountants provide that "[u]nprofessional conduct shall also include revealing of personally identifiable facts, data or information obtained in a professional capacity without the prior consent of the client."  8 N.Y.C.R.R. § 29.10(c).  To the extent that this rule applies here, E&Y could and should have sought permission from Refco to disclose information to third parties and resigned if permission was not granted.

The Examiner concludes that this argument likely would not defeat the Refco estate's claim at the Rule 12(b)(6) stage.  The scope of the duty established by 26 U.S.C. § 7216(a) is not well defined, and because the statute imposes criminal penalties, the Examiner believes that a court would strictly construe the statute and narrowly limit the duty of non-disclosure to "information furnished by a taxpayer for, or in connection with, the ***preparation of a tax return***."[666]  The Examiner concludes that a reasonable argument exists that E&Y acquired knowledge of the wrongdoing from information that Refco provided, not in connection with the preparation of a tax return, but rather in connection with the provision of general transactional tax advice.  In addition, the narrow duty of 26 U.S.C. § 7216(a) may not have prohibited E&Y's disclosure of wrongdoing to partial owners and controlling owners of E&Y's client such as BAWAG and THL.

Moreover, it is not clear that 26 U.S.C. § 7216(a) would prohibit E&Y from communicating with other professionals who were representing Refco on the very same matters that E&Y worked on for Refco.  For instance, in spring 2002, both E&Y and Mayer Brown were working for Refco in connection with efforts to sell a portion of Refco (and may have been communicating directly on such matter).  In this context, where two professionals are effectively jointly representing Refco, it is not clear that 26 U.S.C. § 7216(a) would prohibit communication between the two.

Even if E&Y's view of 26 U.S.C. § 7216(a) were correct, nothing prohibited E&Y from seeking consent from Refco to speak with third parties regarding Refco's tax information.  Yet, E&Y never sought permission to speak to any third party until it requested a direct meeting with Refco's auditors in November 2003.  Moreover, if Refco withheld the requested consent, E&Y

---

[666] 26 U.S.C. § 7216(a) (emphasis added).

was free (and perhaps duty-bound) to resign from the engagement rather than continue to hide the fraud of which it was aware.  Simply put, the Examiner is not persuaded that a court will agree with E&Y's position that it had no choice but to sit on its hands and remain silent for years about the ongoing fraud of which it was aware.

### c.    Statute of Limitations Considerations

The statute of limitations for professional malpractice in New York is three years. The date for the start of the running of the statute depends on the type of services provided.[667]  The statute of limitations for bringing a claim for aiding and abetting a breach of fiduciary duty is dependant on the relief sought, with a three year limitations period applying to claims for damages and a six year limitations period for claims seeking equitable remedies.[668]  The statute of limitations for a claim against an accountant for aiding and abetting fraud is the greater of (1) six years from the date the cause of action accrued or (2) two years from the date the client discovered or should have reasonably discovered the fraud.[669]  The limitations period may be extended on each of these claims against an accountant under the doctrines of continuous representation and fraudulent concealment, both of which involve questions of fact for the fact finder.[670]

---

[667] *See* App. A, Sec. III.D; *Bastys v. Rothschild*, 2000 WL 1810107, *50 (S.D.N.Y. 2000).  *See Ackerman v. Price Waterhouse*, 84 N.Y.2d 535, 541 (N.Y. 1994) ("claim accrues upon the client's receipt of the accountant's work product"); *Gould v. Berk & Michaels, P.C.,* 1990 WL 41706 (S.D.N.Y. 1990) (where claim involves purchase of investment in limited partnership or other tax shelter, injury occurs at time of purchase and commences the running of the limitations period).

[668] *See* App. A, Sec. IV.E. Professional fees may be recoverable as equitable damages. *See id.*

[669] *See id.* Whether a plaintiff should have discovered the fraud is a mixed question of law and fact. The test of discovery is objective – a determination of when the circumstances were such that a person of ordinary intelligence would recognize they have been defrauded. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983); *Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir. 1977) ("[A]lthough a plaintiff may not shut his eyes to facts which call for investigation, mere suspicion will not suffice as a ground for imputing knowledge of the fraud.").

[670] *See* App. A, Sec. IV.E.  *See Williamson v. PricewaterhouseCoopers LLP*, 817 N.Y.S.2d 61, 64 (N.Y. App. Div. 2006); *Transp. Workers Union of Am. Local 100 AFL-CIO v. Schwartz*, 821 N.Y.S.2d 53, 56 (N.Y. App. Div. 2006).

E&Y delivered a variety of tax services to Refco, including preparation of tax returns and consultation services. The last tax return prepared by E&Y was prepared in 2003 for the 2002 calendar year. E&Y appears to have continued to provide various tax related services through the end of 2004.[671]  Many of E&Y's acts and omissions which form the factual bases for the claims discussed above, such as the failure to amend various tax returns known by E&Y to contain false information, appear to have occurred within two years prior to the Petition Date.  Accordingly, Refco's estate may argue that the claims discussed above are not barred by the respective statutes of limitation until the later of the running of the applicable limitations period as outlined above, the date of the services complained of or two years from the date the statute of limitations is tolled under Section 108 of the Bankruptcy Code.

### d.      Fraud, Negligent Misrepresentation, or Breach of Fiduciary Duty

The Examiner concludes that there is insufficient evidence to allow the Refco estate to state a claim upon which relief could be granted for fraud, negligent misrepresentation, or breach of fiduciary duty.

### B.    LEVINE, JACOBS & COMPANY, L.L.C.

### 1.      Introduction and Background

Levine Jacobs is a small accounting firm that prepared the 2003 state and federal tax returns for RGL and RGHI.[672]  In 2005, Levine Jacobs prepared the 2004 state and federal tax returns for RGHI, but was not engaged to prepare the 2004 tax returns for RGL.[673]  Levine

---

[671] As noted above, E&Y stated that it resigned from its representation of Refco in late 2003; however, it appears that E&Y continued to provide various services through at least December 2004.

[672] *See* LJC 04000.

[673] *See* LJC 03247.

Jacobs conducted no audit work for Refco and no work with respect to Refco's financial statements.

### 2.    Additional Factual Background

#### a.    The Examiner's Investigation of Levine, Jacobs & Company, L.L.C.

The Examiner reviewed and analyzed all of the documents Levine Jacobs produced to government agencies, which consisted of over 25,000 pages. The Examiner also conducted interviews of the key Levine Jacobs partners who worked on the Refco engagement, namely, Richard Hoffman, Timothy Shore, and Robert Blackwell. The witnesses fully cooperated with the Examiner in scheduling the interviews without the need for subpoenas. During the interviews, the Levine Jacobs witnesses provided full, forthcoming answers to questions in a group setting in the presence of their attorney.[674] Counsel for the Examiner found these witnesses to be credible. Through both the documents and interviews, the Examiner believes that he gained access to the necessary information to reach his conclusions regarding Levine Jacobs.

The Examiner found no documents that show Levine Jacobs had actual knowledge of the following: (1) RGHI owed RGL a large receivable comprised of bad debts that had been transferred from RGL to RGHI; (2) the RGHI Receivable was paid down at fiscal year end or quarterly to avoid its disclosure on audited financial statements; (3) RCM loaned funds to third parties, who, in turn, loaned funds to RGHI, who then paid down the receivable; or (4) these loan transactions later were reversed. The Examiner also did not find evidence that Levine Jacobs should have discovered the Round Trip Loan scheme, although the Examiner located a few

---

[674] Levine Jacobs consented to the transcription of the interviews. The interviews were not taken under oath. For purposes of this Report, the transcript will be referred to as the 2/6/07 Levine Jacobs Interview Transcript.

documents that possibly should have caused Levine Jacobs to question Refco about certain transactions.  Likewise, the Examiner did not locate evidence that Levine Jacobs either willfully ignored documents that arguably could have raised questions, or intentionally did not confront Refco about such evidence.  The witness interviews, during which numerous documents were discussed, confirmed the Examiner's findings.

> **b.     Background of Levine Jacobs and the Refco Engagement**

Levine Jacobs is a small, full service accounting firm with approximately twenty-five employees based in Livingston, New Jersey.  It maintains a general tax practice, and has several specialty areas, including one niche comprising 2-3% of its total practice involving the preparation of tax returns for large companies that otherwise would employ a large accounting firm.[675]

In 2004, RGL[676] engaged Levine Jacobs to prepare 2003 federal and state tax returns for RGHI; RGL; Refco Group Holdings, LLC; Refco Europe Ltd., LLC; Refco Futures Holdings, Inc.; and Refco Securities, LLC.[677]  Most of Refco's other subsidiaries were rolled into the tax returns of the foregoing entities, and were considered disregarded entities for tax return purposes.[678]  In 2004, Levine Jacobs also assisted Refco on an Illinois sales tax audit and a

---

[675] *See* 2/6/07 Levine Jacobs Interview Transcript at 17:7-20:21; 36:20-23.

[676] Levine Jacobs understood that it was hired because Refco fired E&Y due to (1) cost concerns, and (2) E&Y's purported lack of diligence in timely filing returns.  *Id*. at 42:8-43:5; 61:17-62:4.  *See* LJC 04000.

[677] Levine Jacobs' former associate, Zahava Meister, who married Trosten, first introduced Trosten and Refco to Levine Jacobs.  As a result of this introduction, Levine Jacobs began preparing Trosten's individual tax returns in 2000 (which it still did as of the time of the interviews).  *See* 2/6/07 Levine Jacobs Interview Transcript at 37:9-17; 46:21-47:6.  Prior to the Refco tax return engagement beginning in 2004, Levine Jacobs also maintained other connections with Refco, including Levine Jacobs' preparation of the 2002 tax return for RJP Services, LLC, a company with ties to Refco that leased a corporate jet.  *Id*. at 46:8-20.  In addition, in 2002 Refco contacted Levine Jacobs about preparing a valuation of RGL as of November 30, 2001 for purposes of establishing a non-qualified deferred compensation plan.  Levine Jacobs explained that it lacked capability to perform this work and, therefore, recommended another small accounting firm to Refco for this matter.  *Id*. at 44:3-21; *see also* LJC 03196.

[678] *See* 2/6/07 Levine Jacobs Interview Transcript at 58:17-59:17.

similar audit for the city of Chicago.[679]  Levine Jacobs filed the federal returns in approximately September 2004.[680]

When Levine Jacobs started its tax preparation work in 2004, E&Y provided Levine Jacobs with Fast-Tax locator numbers[681] at Refco's request so that Levine Jacobs could review information related to the Refco returns.[682]  Levine Jacobs could view Refco's prior returns through 2001 using the Fast-Tax locator numbers.[683]  However, Levine Jacobs could not view anything else with the Fast-Tax locator numbers, including E&Y's work papers.[684]  Other than the Fast-Tax locator numbers, E&Y only provided apportionment calculations and net operating loss calculations to Levine Jacobs.[685]  Levine Jacobs did not have any substantive conversations with E&Y personnel related to Refco or Refco's tax returns.[686]  In fact, Levine Jacobs' standard practice when taking over accounting work and obtaining tax related information was to speak with the client rather than a prior accounting firm.[687]

In 2005, Levine Jacobs' engagement continued.  RGHI retained Levine Jacobs to prepare 2004 federal and state tax returns for RGHI and Refco Securities, LLC.[688]  However, PwC was retained to prepare RGL's 2004 federal return.[689]  Nonetheless, until the formal engagement

---

[679] *Id*. at 60:3-14.

[680] *Id*. at 61:2-7.

[681] Fast-Tax is a complex web-based program that a number of accounting firms use to assist in the preparation of tax returns.  A locator number allows a tax preparer to access tax return information.  *Id*. at 62:25-63:2.

[682] *See* 2/6/07 Levine Jacobs Interview Transcript at 62:12-63:17.

[683] *Id*. at 63:18-64:4.

[684] *Id*. at 63:18-64:7.

[685] *Id*. at 65:3-66:3.

[686] *Id*. at 66:4-67:1

[687] *Id*. at 66:14-67:1; 69:23-70:2.

[688] *See* LJC 03247; 2/6/07 Levine Jacobs Interview Transcript at 70:18-24; 73:6-15.

[689] *Id*. at 70:25-71:12.

letter with Levine Jacobs was executed in July 2005, Levine Jacobs performed substantial work

on the RGL federal return during the first half of 2005 anticipating that it would be engaged to

complete the return.[690]  Ultimately, at the request of Refco, Levine Jacobs transferred its work to

PwC.[691]  Refco paid Levine Jacobs for the work it performed on the RGL return.[692]  As for the

other returns Levine Jacobs was retained to prepare, Levine Jacobs filed the federal returns in

approximately September 2005.[693]

        Throughout this engagement, Levine Jacobs performed no auditing work, did not prepare

or edit any financial statements, and, with the exception of the Illinois and Chicago sales tax

audits, simply prepared tax returns and provided limited tax consulting advice regarding

transactions.[694]  In addition, during the course of the engagement, Levine Jacobs never spoke

with any of the other professionals providing services to Refco, with the exception of very

limited communications with E&Y and/or PwC related solely to the transfer of Fast-Tax locator

numbers or the transfer of other tax materials.[695]  Levine Jacobs did not have conversations with

E&Y or PwC related to anything of substance concerning Refco.[696]  Over the course of Levine

---

[690] Id. at 71:4-72:7.

[691] Id. at 71:4-12; 72:22-73:1.

[692] Id. at 73:2-5.

[693] Id. at 77:10-13.  Levine Jacobs filed the state tax returns shortly after Refco filed for bankruptcy.  Id. at 77:10-17.

[694] Levine Jacobs' engagement letters contained no limitations of liability or indemnification provision.  However, the 2005 engagement letter, signed by Bennett, stated that Refco would provide information relating to the returns and Levine Jacobs would "not verify or audit this information."  See LJC 03247.

[695] See LJC 03247; 2/6/07 Levine Jacobs Interview Transcript at 84:17-85:8; 85:14-88:4.  As to contacts with Refco personnel, during Levine Jacobs' two year engagement, Levine Jacobs' primary contact at Refco was Silverman.  Id. at 49:16-21.  In addition to Silverman, however, Levine Jacobs worked with Trosten and Sean Galvin on certain occasions.  Id. at 49:16-25; 50:13-51:3.  Levine Jacobs also had limited conversations with Bennett, including two meetings and two or three phone conversations.  Id. at 51:4-53:5.

[696] 2/6/07 Levine Jacobs Interview Transcript at 62:12-63:17; 66:4-13; 86:7-89:4.

Jacobs' two year engagement with Refco, Levine Jacobs estimates that it generated

approximately $300,000 in fees.[697]

### c.     Levine Jacobs' Tax Return Preparation Work

For purposes of preparing the tax returns, Levine Jacobs' work depended heavily on tax

trial balances prepared by Refco for various Refco entities.  Levine Jacobs summarized the

information on the tax trial balances into its own spreadsheets, and used the information

contained on these spreadsheets to complete the tax returns.[698]  Levine Jacobs rarely made

adjustments to the tax trial balances.  Occasionally for tax return "presentation" purposes, Levine

Jacobs would present and classify multiple related trial balance entries as a single tax return line

item.[699]

The tax trial balances contained numerous entries, including asset line items for "Due

from Affiliates" and "Loans Receivable."  Similarly, the liabilities section of the tax trial

balances contained line items for "Due to Affiliates" and "Loans Payable."  Tax trial balances for

---

[697] *Id*. at 82:20-23.  Providing further corroboration, a Levine Jacobs "Summary of Tax & Fee Wire Transfers" shows fee payments to Levine Jacobs from Refco, exclusive of funds transferred to Levine Jacobs to pay Refco taxes, from February 20, 2004 through January 4, 2005 (approximately one half of the engagement) of $157,850. *See* LJC 7409 - LJC 7410.

[698] *See* 2/6/07 Levine Jacobs Interview Transcript at 92:2-95:4.

[699] *Id*. at 99:4-100:14.  In addition, in rare circumstances, Levine Jacobs would make substantive adjustments to a trial balance line item for purposes of reporting it on a tax return.  For example, it made adjustments to certain items Refco initially classified as bad debt expenses on tax trial balances.  More specifically, Levine Jacobs explained that before taking a bad debt expense deduction, Levine Jacobs wanted to ensure that the debt was uncollectible.  On occasion, Levine Jacobs would ask whether a particular bad debt expense referenced on a trial balance was uncollectible.  Refco then would inform Levine Jacobs if the item constituted a bad debt for tax purposes.  At times, Refco chose to not treat certain bad debt expenses on the trial balances as bad debts on tax returns.  *Id*. at 100:15-102:24; 144:1-145:13.

For these bad debt expenses, the Examiner did not find evidence that Levine Jacobs made adjustments to bad debts related to the receivable scheme.  In one particular spreadsheet prepared by Levine Jacobs, Levine Jacobs questioned whether it should classify a RGHI bad debt expense of $19.9 million as a true bad debt expense for tax purposes.  *See* LJ0000007358 - LJ0000007359.  Levine Jacobs approached Refco about this entry, and asked whether this expense should be recognized as a bad debt under IRS rules.  Silverman decided this item did not constitute a bad debt for tax purposes, and, therefore, Levine Jacobs did not reference this expense for tax purposes.  *See* 2/6/07 Levine Jacobs Interview Transcript at 110:4-112:6; 144:1-145:13.  No other documents located by the

*(footnote continued on next page)*

RGHI and RGL showed extremely large monthly fluctuations in these various line items.[700]

However, Levine Jacobs witnesses stated that they focused on, and only saw, the tax balance

column (in addition to columns for the line item number, line item description, preliminary

balance amount, and tax adjustment amount) and did not see the monthly balances on the

computer screen.[701]  Levine Jacobs witnesses indicated that Levine Jacobs generally did not

concern itself with the balances in other columns, and would not be concerned with any

fluctuations, even if they had noticed them, because the tax return focused on end-of-tax-period

final numbers and not balance sheet items.[702]  Moreover, Levine Jacobs explained that the

calendar year end numbers accounted for these other monthly entries.  Accordingly, Levine

Jacobs saw no need to consider the large fluctuations.[703]

     As with the fluctuations in the line items for amounts due to and from affiliates, the trial

balances also contained various interest receivable and payable line items, which often showed

numbers in the tens of millions of dollars.  Levine Jacobs witnesses said that they did not view it

as unusual for certain Refco entities to have large interest expenses or interest income (or

fluctuations in those amounts) considering the nature of Refco's business.  Levine Jacobs

understood that certain Refco entities regularly would pay interest on customer account balances,

---

*(footnote continued from previous page)*

Examiner show that Levine Jacobs believed this particular bad debt expense, or any other bad debt expense, was part of the uncollectible receivable owed by RGHI to RGL.

[700] *See* LJ0000007878; LJ0000009800.

[701] *See* 2/6/07 Levine Jacobs Interview Transcript at 117:2-124:12.  When Levine Jacobs received tax trial balances from Refco, it received them in an Excel spreadsheet format with only these 4-5 columns viewable on the computer screen.  The spreadsheets often had numerous additional columns, including monthly balances or monthly transaction activity entries.  However, Levine Jacobs witnesses stated they did not view these additional columns because they were hidden.  Although Levine Jacobs easily could open these hidden cells, the witnesses said they rarely did.  *Id.*

[702] *Id.* at 117:2-124:12; 129:15-130:7; 157:4-160:9; 162:7-21.

[703] *Id.*

receive interest from customers resulting from margin trades, or execute transactions involving financial instruments that generated interest income or expense.[704]

Although Levine Jacobs frequently communicated with Refco to obtain clarification of particular tax balance entries, Levine Jacobs did not question the accuracy of any figures contained in trial balances.[705]  Similarly, it did not confirm the accuracy of the figures by auditing or examining Refco's books.  Due to Refco's size, Levine Jacobs presumed that Refco's own accounting staff and auditors performed competent work, and assumed Refco provided accurate numbers.[706]

During the interviews, Levine Jacobs personnel explained that ultimately Refco maintained responsibility for the tax treatment of certain items.  Levine Jacobs simply explained the tax rules to Refco.[707]  Before filing any of the returns, Levine Jacobs would circulate the returns to Silverman at Refco for comments.  Levine Jacobs would not file any of the returns until Refco approved them.[708]

### d.    The RGHI Receivable and Round Trip Loans

Levine Jacobs denied having knowledge of the RGHI Receivable.  Although Levine Jacobs knew that trial balances contained line items for "due to/from affiliates" or "loans payable/receivable," Levine Jacobs did not know the specifics of the transactions comprising

---

[704] *Id*. at 128:12-15; 146:22-149:8; 179:20-180:3.

[705] *Id*. at 104:10-23.

[706] *Id*. at 104:10-105:8.

[707] *Id*. at 104:3-19.

[708] *Id*. at 96:1-8.

these entries, did not know who any of the affiliates were, and did not know who was involved with any affiliate loans.[709]

Levine Jacobs explained that it did not need additional details from Refco for these line items, because they would not affect the income on the tax returns. Levine Jacobs witnesses stated they believed that these items represented balance sheet items that had no bearing on taxes.[710] Moreover, as discussed above, Levine Jacobs only was concerned with tax year end numbers, not monthly balances. Indeed, Levine Jacobs stated that it did not even see the large fluctuations in the due to affiliates and due from affiliates categories or the monthly interest fluctuations, because the monthly columns did not appear on their computer screens when a user opened the tax trial balance document.[711]

None of the previously-referenced large numbers or fluctuations prompted Levine Jacobs to inquire further.[712] Levine Jacobs also denies having any understanding of the purpose of the due to/from affiliate transactions, or that these entries reflected in part uncollectible bad debts that were transferred from RGL to RGHI.[713]

Levine Jacobs also denied it knew that the RGHI Receivable was paid down at fiscal year end (or quarter end).[714] Levine Jacobs further denied having knowledge of the Round Trip Loan scheme, and denied knowing that RCM loaned funds to third parties to lend to RGHI to pay down the receivable.[715] Levine Jacobs witnesses also stated that the pay-down of the RGHI

---

[709] *Id*. at 126:18-127:16; 133:5-134:21; 135:7-136:6.

[710] *Id*. at 129:15-130:7.

[711] *Id*. at 117:2-124:12; 129:15-130:7; 157:4-160:9; 162:7-21.

[712] *Id*. at 130:14-131:7.

[713] *Id*. at 131:12-132:1.

[714] *Id*. at 139:7-140:16.

[715] *Id*. at 182:8-183:7; 184:22-185:4.

Receivable and Round Trip Loans should not affect tax liability and, therefore, were irrelevant for tax preparation purposes.[716]

The documents reviewed by the Examiner do not contradict Levine Jacobs' denial of actual knowledge of the RGHI Receivable and the Round Trip Loans.  The Examiner found no internal communications among Levine Jacobs personnel or external communications between Levine Jacobs and Refco in which the RGHI Receivable or Round Trip Loans were discussed, or any documents suggesting that Levine Jacobs might have known about the RGHI Receivable and the purpose behind it.

Several documents, however, including tax trial balances, could have raised red flags for Levine Jacobs.  While not sufficient by themselves to establish constructive knowledge, the documents discussed below contained entries that could have aroused concerns and could have led to inquiries revealing aspects of the receivable scheme.

### (i)    *Tax Trial Balances*

First, the tax trial balances, if fully reviewed, would have shown that an extremely large loan receivable existed at times.  Had Levine Jacobs fully opened the trial balances, which it claims not to have done, it would have seen the enormous fluctuations in the amounts due to/from affiliates and the interest receivable/payable line items.  These trial balances constitute some evidence of the existence of a large receivable owing from RGHI to RGL and interest income/expense generated by the receivable.

### (ii)    *Spreadsheet Concerning Gain on Sale*

Second, the Examiner located a spreadsheet concerning the gain on the sale of RGHI's interest in RGL as part of the LBO.  The spreadsheet, which relates to a tax basis calculation,

---

[716] *Id.* at 138:2-25.

specifically mentions certain sources of the bad debts giving rise to the RGHI Receivable.[717]

According to Levine Jacobs, Silverman prepared the spreadsheet (and other similar versions) in

September 2005 as a result of a Levine Jacobs inquiry for more information about a single

number on a year 2004 tax trial balance reflecting the gain on sale.[718]  Levine Jacobs explained

that the spreadsheet shows the amount that was paid to all other persons and entities from sale

proceeds, and, accounting for RGHI's basis in RGL, the net gain on the sale of RGHI's interest

in RGL.[719]

     Because this document references the Asian receivable and Niederhoffer (and a

guaranteed payment by RGHI for the benefit of RGL presumably related to the uncollectible

Niederhoffer balance), Levine Jacobs might have been prompted to ask what certain entries

represented.  Levine Jacobs denies knowing that one of the bad debts precipitating the receivable

scheme resulted from Niederhoffer, and denies knowing about the Asian receivables.[720]  It also

says it did not ask Refco any questions about these entries.[721]

     The spreadsheet also references a payment to BAWAG of $757 million.  Levine Jacobs

says it asked Refco why BAWAG received more money than any other person or entity because

BAWAG was only a minority owner.[722]  According to Levine Jacobs, after Silverman spoke with

Bennett, Silverman told Levine Jacobs that BAWAG received this amount because BAWAG

---

[717] *See* LJ0000008268.  This spreadsheet contains entries for "additional basis for other payments by RGHI for benefit of Refco Group Ltd." and references additional payments made by RGHI, including entries for "BAWAG (paid from Chase A/C) [$757 million]," "Asian Receivables [$395.6 million]," "Funds sent to RGL Re: Niederhoffer (RGHI Guarantee f/b/o RGL) [$44 million]," and "Due from Affiliates — ROL (RGHI Guarantee f/b/o RGL) [$1.4 million ]."  *Id.* at LJ0000008271.

[718] *See* 2/6/07 Levine Jacobs Interview Transcript at 186:9-187:6.

[719] *Id.* at 188:24-189:17.

[720] *Id.* at 136:7-137:25.

[721] *Id.* at 191:8-15.

[722] *Id.* at 191:13-15.

was the largest minority owner in RGL, was holding up the THL sale, and, therefore, demanded a premium.[723]

Levine Jacobs stated that despite the various entries related to the Asian receivables, Niederhoffer, BAWAG, and others, it ultimately was concerned only with the final number for tax purposes — the net gain on the sale of RGHI's interest in RGL.[724]  As with the trial balances, arguably Levine Jacobs should have inquired further to better understand the Niederhoffer Loss and the Asian receivables, especially since Levine Jacobs had requested that Refco prepare this spreadsheet.

### (iii)    E-mails Concerning $462 Million Expense

Finally, the Examiner located an e-mail dated July 23, 2004 from Blackwell to Silverman asking for additional information related to a $462 million expense.[725]  Despite follow-up e-mails from Levine Jacobs dated August 13, 2004 and August 18, 2004, Refco never provided any clarification of the $462 million expense.[726]  Levine Jacobs explained during the interview that it simply posed the question about the expense to Refco due to the large size of the particular expense.  Receiving no response, Levine Jacobs left the item categorized as an "accrued

---

[723] *Id.* at 191:19-25.

[724] *Id.* at 192:15-193:15; 194:7-15.

[725] The e-mail states in part:

> There is also accrued expenses [for RGHI] for $462,816,396 which seems large compared to the other liability items and I was wondering if I can break this down further . . . These items will surly [sic] create a question if I am not more specific as to what they really are.  Can you clarify these items for me?

*See* LJ0000017125.

[726] *See* LJ0000017126, LJ0000017641.

expense" for tax purposes.[727]  Levine Jacobs says it made no assumption as to what this accrued expense would have included.[728]

Had Levine Jacobs pursued this issue further, it might have learned information that could have revealed the existence of a large receivable or large accrued interest amounts.  Again, (1) since Levine Jacobs raised questions about this large expense, it should have pursued the matter further when Refco failed to respond, and (2) Levine Jacobs raised questions about this expense but did not do the same with often larger numbers referenced in the tax trial balances.

Notwithstanding the foregoing documents, the limited scope and duration of the engagement, and Levine Jacobs' inexperience preparing tax returns for businesses the size of Refco's, may further support Levine Jacobs' explanations concerning the lack of inquiry and failure to obtain additional information.  The Examiner concludes there is insufficient evidence to show that Levine Jacobs knew or should have known of the receivable scheme or aided and abetted members of Refco's management who participated in that scheme.[729]  Similarly, the Examiner found no evidence suggesting that Levine Jacobs knowingly ignored signs that Refco engaged in the receivable scheme or Round Trip Loans.

### 3.   Conclusions: Analysis of Potential Claims Against Levine Jacobs

Based on the evidence reviewed and the resources made available to him, the Examiner concludes that there is not sufficient evidence to state a claim that Levine Jacobs committed malpractice by negligently preparing tax returns.  The legal standards for professional negligence

---

[727] See 2/6/07 Levine Jacobs Interview Transcript at 179:11-19.

[728] Id. at 180:15-24.

[729] By contrast, E&Y was Refco's tax accounting firm for many years.  E&Y had actual knowledge of the RGHI Receivable and the fact that Refco was manipulating its financial statements to hide the RGHI Receivable and to remove bad debts from Refco.  E&Y also played an active role in advising Refco how to structure certain financial transactions.  See Section V.A.

related to accountants are discussed in substantial detail in Appendix A.  The evidence available

to the Examiner does not establish that Levine Jacobs failed to follow generally accepted

professional accounting standards when preparing the returns.

Similarly, the Examiner did not find evidence establishing that Levine Jacobs had actual

knowledge of the fraudulent scheme.  Having carefully considered the evidence available, the

Examiner also concludes that the Refco estate likely could not state a claim against Levine

Jacobs for aiding and abetting fraud and breach of fiduciary duty, fraud, negligent

misrepresentation, or breach of fiduciary duty.

## VI.    REFCO'S ATTORNEYS

### A.    MAYER, BROWN, ROWE & MAW LLP

#### 1.    Introduction

Mayer Brown began representing Refco in early 1994, when Collins moved to Mayer

Brown from his prior law firm and brought Refco with him as a client.  Thereafter, and until the

LBO was consummated in early August 2004, Mayer Brown was Refco's primary law firm, and

Collins was Refco's primary outside attorney.  Mayer Brown performed a substantial amount of

work for Refco, billing Refco approximately $5 million annually.[730]

#### a.    Document Review

The Examiner was given access to over a million of pages of documents pertaining to

Mayer Brown's representation of Refco.  These documents included:

- Documents provided by Mayer Brown to the SEC and to counsel for the Creditors
  Committee.

---

[730] The Examiner received a summary of payments made by Refco to certain professionals for the period beginning January 1, 1998 and ending October 7, 2005 for payments made by check, and for the period beginning January 1, 2000 and ending October 7, 2005 for payments made by wire transfer.  This summary reflected that Mayer Brown received a total of $23,979,915 during that time frame.

- Documents provided to counsel for the Litigation Trustee for sharing with and review by the Examiner.[731]

- Documents from the files of the Refco Debtors that were compiled by the Debtors' counsel and placed in a database to which the Examiner was given access.

- Documents produced by various Round Trip Loan Participants to the SEC, to counsel for the Creditors Committee, or directly to the Examiner.

- Documents produced to the Examiner by THL and Weil Gotshal.

- Other documents produced to counsel for the Creditors Committee to which the Examiner was given access.

The Examiner focused his investigation and his document review on the following particular areas:

- Mayer Brown's involvement in the Round Trip Loans.

- Mayer Brown's involvement in transactions between Refco and BAWAG, whereby BAWAG and related parties acquired debt and equity interests in Refco for which they were paid out of the proceeds of the LBO.

- Mayer Brown's involvement in other transactions which might bear upon Mayer Brown's knowledge of the existence and size of the RGHI Receivable and the purpose and intent of the Round Trip Loans to mask that receivable.

- Mayer Brown's involvement in the LBO transaction and the registration of the Senior Subordinated Notes.

- Mayer Brown's involvement in Refco's IPO.

### b.     Witness Interviews

The Examiner interviewed several current or former Mayer Brown attorneys who performed legal services for Refco:

- Joseph Collins ("Collins") — current partner who was responsible for Mayer Brown's representation of Refco.  Collins was Mayer Brown's primary contact with Refco, and had been throughout Mayer Brown's representation of Refco.

---

[731] Mayer Brown last produced documents on or about March 7, 2007, several weeks after the last Mayer Brown interview.

The approximately $3-5 million annually billed to Refco constituted about half of the billings for which Collins was responsible as billing partner. As billing partner, he was responsible for and did review the detailed billings for services rendered to Refco on a monthly basis. Accordingly, Collins was aware of the work that everyone at Mayer Brown performed for Refco.[732]

- Robert Monk ("Monk") — a former associate located in Chicago who left Mayer Brown in about February 2001, and was involved in several Round Trip Loans that took place in February 2000 and February 2001.

- Andrea Henneman ("Henneman") — a former associate located in New York who was identified in an e-mail sent by Monk as he left Mayer Brown in February 2001 as the person who would be taking his place in a then-pending Round Trip Loan transaction, and who performed legal services in connection with several other Refco transactions prior to her departure from Mayer Brown in about April 2001.

- Paul Koury ("Koury") — a former associate who was involved in a substantial number of Round Trip Loan transactions that took place from a time after Monk left through May 2005, and who also performed legal services in connection with several other Refco transactions prior to his departure in May 2005.

- Ross Pazzol ("Pazzol") — a current "of counsel" attorney with Mayer Brown who was identified in an e-mail sent by Koury as he left Mayer Brown in May 2005 as one of the persons who could be contacted in connection with a then-pending Round Trip Loan transaction, and who also performed legal services in connection with several other Refco transactions.

- Peter Schultz ("Schultz") — a current associate who was also identified in the e-mail sent by Koury as he left Mayer Brown in May 2005 as one of the persons who could be contacted in connection with a then-pending Round Trip Loan transaction, and who also performed legal services in connection with several other Refco transactions.

Each of these persons voluntarily appeared for an interview conducted by the Examiner or his counsel. Mayer Brown cooperated with the Examiner in facilitating these interviews. The witnesses were represented by individual counsel, and counsel for Mayer Brown was also

---

[732] Collins also stated in his interview that he usually sent to Refco on a monthly basis a "summary" bill that summarized the detailed daily entries of attorneys and paraprofessionals who worked on Refco matters into short narratives. Collins stated that he was responsible for the preparation of such summary monthly bills, and he either prepared them himself by dictating the summaries, or had them prepared by his assistant. He reviewed the summary bills before they were sent to Refco.

present.  The witnesses and Mayer Brown objected to the presence of a court reporter, and, therefore, the interviews were not transcribed.

Although the witnesses were able to provide general background information, the witnesses all said that they had little or no recollection of the specific events about which the Examiner questioned them.  In virtually every case, the witnesses claimed that their recollections were not refreshed by being shown documents they had created or previously seen.  Therefore, they offered very little additional evidence concerning these events, and the Examiner has based his conclusions largely on the documents.  As a result, facts described herein are derived substantially from Mayer Brown time records and documents that were created or amassed by Mayer Brown or others with whom Mayer Brown interacted.

### 2.      Factual Conclusions

The Examiner concludes that there is significant evidence that Mayer Brown:

- assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements;

- failed to disclose material matters in connection with the LBO, the IPO, and related transactions; and

- failed to disclose its knowledge of the RGHI Receivable and Round Trip Loan scheme to persons at Refco independent of Bennett — including, after the LBO, THL personnel and, after January 2005, Refco's independent outside directors.

### a.      Evidence that Mayer Brown Knew that the Round Trip Loans Were Used to Manipulate Refco's Financial Statements

The Examiner concludes that there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors.  The Examiner has not located direct evidence that Mayer Brown knew

that the Round Trip Loans were used to manipulate Refco's financial statements. Mayer Brown attorneys deny any such knowledge and claim to have virtually no recollection of the Round Trip Loan transactions.[733] However, as explained below, the circumstantial evidence, taken as a whole, is sufficient to support the conclusion that Mayer Brown had such knowledge. Specifically, the evidence establishes the following:

- Over a five year period Mayer Brown drafted virtually all of the Round Trip Loan documents with respect to seventeen transactions.

- Mayer Brown negotiated terms with Round Trip Loan Participants or their attorneys.

- Mayer Brown knew that the Round Trip Loans involved the lending of typically hundreds of millions of dollars by Refco, for a period of only several days, through the Round Trip Loan Participants to RGHI, an entity that was controlled by Bennett and controlled Refco.

- Mayer Brown knew that these massive loans were risk free to the Round Trip Loan Participants, and was not aware of any business purpose for the transactions.

- Mayer Brown drafted guarantees and indemnifications made by RGL in favor of the Round Trip Loan Participants, guaranteeing RGHI's repayment obligations, and Mayer Brown knew that Bennett signed virtually all of the guarantees and indemnities on behalf of RGL and the loan documents on behalf of RGHI.

- Mayer Brown knew the nature of the Round Trip Loan transactions from both the deal documents and correspondence from the Round Trip Loan Participants.

- Mayer Brown knew that, prior to the LBO, Refco was required to submit audited financial statements to lenders on a yearly basis and, after the LBO, on a quarterly basis to lenders and the SEC.

- Mayer Brown performed legal services in connection with loans whose covenants were violated by the Round Trip Loans.

- Mayer Brown knew that the Round Trip Loans straddled Refco's financial reporting periods and occurred only at those times (with one exception).

---

[733] Mayer Brown distinguished Round Trip Loans from back-to-back loans, the latter involving only the loans and transactions and not financial statement manipulation.

- Mayer Brown knew no later than early June 2002 that RGHI owed an intercompany debt to RGL of at least $350 million.

In addition, although Mayer Brown denies it, there is sufficient evidence to allege that Mayer Brown knew the full extent of the RGHI Receivable, as evidenced by:

- correspondence of Bennett and Trosten;

- work on tax issues in connection with the 1999 BAWAG transaction;

- work on the PPA agreement; and

- work in connection with other transactions pertaining to Refco "bad debts," including the Asian receivables, Niederhoffer Loss, Wells, the $43 million arbitration award, and Trade & Marine.

Finally, Mayer Brown understood that Refco's senior executives had incentives to manipulate Refco's financial statements. This evidence is addressed below.

### (i)     Mayer Brown's Repeated Substantive Involvement in the Round Trip Loan Transactions

Seventeen times over a five year period from 2000 to 2005, Mayer Brown attorneys Collins, and Monk or Koury, were involved in every facet of the Round Trip Loan transactions.[734] Mayer Brown negotiated the terms of and drafted virtually all of the Round Trip

---

[734] As discussed in Section III.B., there also were transactions in February-March 1998 and February-March 1999 (the "WTLs"). Mayer Brown was involved in the resolution of claims that Refco had against entities involved in the WTLs, described as follows:

a.  MLC — Beginning in about December 1997, Collins and Henneman were involved in a transaction whereby preferred stock in a Refco-related entity was sold to MLC in several installments. *See* the following Mayer Brown time record(s): MBRM-EX 00051934, 38-40, 42, 49, 51. *See* the document(s) with the following beginning document number(s) or number range(s): MBRM-EX 00123008-53; REFCO-HC-0036764-86; MBRM-EX 00007153.

b.  Tradewinds entities — Beginning in about August 1998, Mayer Brown began engaging in discussions with Tradewinds as to claims of Refco: *See* the following Mayer Brown time record(s): MBRM-EX 00051944, 46, 48-56, 66. *See* the document(s) with the following beginning document number(s) or number range(s): MB00041957-58; MBRM-EX 00037178-79; MB00032438-39; MBRM-EX 00007244-50; MB02010668-69.

c.  Bribank and GlobeInvest — Between August 1998 through January 1999, Mayer Brown dealt with resolving Refco's claims against Bribank and GlobeInvest through Refco's acquisition of stock in Bribank. *See* the folllowing Mayer Brown time records: MBRM-EX 00051945-48, 50-56. *See* the document(s) with the following beginning document number(s) or number range(s): MB00031784; MB00031785-86; MB00031788-89;

*(footnote continued on next page)*

Loan documents; transmitted those documents to Refco and the Round Trip Loan Participants; and retained custody of and distributed the executed copies of those Round Trip Loans. At least in the first few years, Mayer Brown implemented changes to the documentation requested by Round Trip Loan Participants and marked the notes to RCM as satisfied on the maturity of the Round Trip Loans.

The first Round Trip Loan transactions that Mayer Brown worked on were in February and March 2000. Specifically, Collins and Monk documented and participated in three Round Trip Loan Transactions involving a total of $310 million. Mayer Brown's involvement appears to have begun on February 1, 2000, when Weaver of Refco discussed with Collins a transaction involving "back-to-back" loans — the first one from RCM to CIM Ventures, and the second from CIM Ventures to RGHI.[735] Collins' notes dated February 1, 2000, indicate that he was advised by Weaver of the following facts regarding the loans: (i) there would be loans from RCM to CIM Ventures and from CIM Ventures to RGHI; (ii) the principal amount of the loans would be $150 million; (iii) there would be a right of offset; (iv) there would be a 15 basis point spread between the two loans; (v) the term of the loans would be one month from February 15 to March 15; and (vi) there would be an indemnity letter.[736]

During the next few weeks, Collins and Monk prepared, edited, and reviewed Round Trip Loan transaction documents pertaining to CIM Ventures, including loan documents, a guarantee

---

*(footnote continued from previous page)*

MB00031791-92; MB00031793; MBRM-EX 00037174; MB00031797-99; MB00031849-50; MB00031808-09; MB00031853-54.

    d.  EMF, Ltd — in October 1998, Collins and Mayer Brown dealt with issues related to EMF, Ltd, consulting with Refco on "EMF Fund restructuring" and "EMF Fund management fee."  *See* the following Mayer Brown time record(s): MBRM-EX 00051952.

[735] *See* the following Mayer Brown time record(s):  MBRM-EX 00052900.

by RGL of RGHI's repayment obligation to CIM Ventures, and an indemnification agreement by RGL in favor of CIM Ventures. Monk had a number of conversations with Weaver and with Ricketts of CIM Ventures, and sent copies of the documents to Ricketts for review and execution.[737] Monk sent execution copies of documents to Refco and RGHI, and upon receiving the executed documents from Refco and RGHI, Monk was in possession of RCM loan documents, RGHI loan documents, and an RGL guarantee (of RGHI's obligation) and indemnity in favor of CIM Ventures — all signed by Bennett on behalf of RCM, RGHI, and RGL.[738]

---

*(footnote continued from previous page)*

[736] *See* MB02328934, at App. D-33. The Examiner did not locate this document until after Collins' interview and was unable to question him about it.

[737] *See* the following Mayer Brown time record(s): MBRM-EX 00052900-02, 947. *See* the document(s) with the following beginning document number(s) or number range(s): IM-SEC-007529-64; MBRM-EX 00106122-23; IM-SEC-007581-619; MB0235172; MB02328658-59.

[738] *See* March 9, 2000 letter from Monk to Ricketts transmitting executed originals of the RTL agreements, the indemnification and the guaranty: MB02327415; IM-SEC 007327-65, at App. D-2.

As to other RTLs where Mayer Brown was in possession of, and circulated, executed copies of documents, including documents signed by Bennett on behalf of RGHI and RGL, *see* the document(s) with the following beginning document number(s) or number range(s):

a.  CIM 2000 - RCM Agreement: MB02325075-91; RCM Note: MB02325074; RGHI Agreement: MB02325092-108; RGHI Note: MB02325109; Indemnity: MB02325186-87; Guaranty: MB02325188-89; Cover Correspondence: MB02327415.

b.  EMF Core 2000 - RCM Agreement: MB02046178-94; RCM Note: MB02046176; RGHI Agreement: MB02046195-211; RGHI Note: MB02046177; Indemnity: MB02046212-13; Guaranty: MB02046214-15; Cover Correspondence: MB02046165-75.

c.  CS Land 2000 - RCM Agreement: MB02046219-35; RCM Note: MB02046018; RGHI Agreement: MB02046236-52; RGHI Note: MB02046217; Indemnity: MB02046253-54; Guaranty: MB02046255-56; Cover Correspondence: MB02046013-14.

d.  CIM 2001 - RCM Agreement: MB02035285-301; RCM Note: MB02035283; RGHI Agreement: MB02035302-18; RGHI Note: MB02339726; Indemnity: MB02339880-81; Guaranty: MB02339866-70; Cover Correspondence: MB02035282, MB02035284.

e.  LC 2003 - RCM Agreement: MB02293285-99; RCM Note: MB02293301; RGHI Agreement: MB02293270-84; RGHI Note: MB02293300; Indemnity: MB02293239; Guaranty: MB02293237-38; Cover Correspondence: MB00135.

f.  Delta Flyer 2003 - RCM Agreement: MB02293337-51; RCM Note: MB02293352; RGHI Agreement: MB02293353-67; RGHI Note: MB02293312; Indemnity: MB02293328; Guaranty: MB02293326-27; Cover Correspondence: MB00034.

Mayer Brown also drafted Round Trip Loan documents for CS Land and EMF Core Fund in February 2000, performing essentially the same work it did with respect to the CIM Ventures deal documents.[739]  In addition, Collins talked with Maggio of Refco and Monk regarding an issue of enforceability that had been raised by CS Land.[740]

CIM Ventures sent executed copies of the Round Trip Loan documents to Monk with a transmittal letter that provided a succinct description of how the $150 million Round Trip Loan would flow from RCM to CIM Ventures to RGHI, and back, with a positive interest spread being paid to CIM Ventures for engaging in the transaction.  In pertinent part, Ricketts advised Monk as follows:

> It is planned that RCM will deposit the loan proceeds in CIM's account (No. 6800-10101) at RCM on February 25, 2000. CIM will then fax a letter to RCM instructing them to move the funds to RGHI with a 15 basis point uplift in the interest rate. RCM then will withdraw the funds from CIM's account and deposit them in RGHI's account, thereby completing the back-to-back loan transaction. The steps will be reversed on March 9, 2000. RCM will then transfer the CIM spread on the transaction to its Royal Bank of Canada account in the Cayman Islands.[741]

This e-mail indicated that no later than February 2000, Mayer Brown understood the nature of the Round Trip Loan transactions.  This e-mail also indicated to Mayer Brown that RCM would be the source of the interest spread to CIM Ventures.  Mayer Brown claims, however, that it had no idea what RGHI used the loan proceeds for and that it did not know that RGHI used the funds to pay down its debt to Refco.

---

[739] *See* the following Mayer Brown time record(s): MBRM-EX 00052902, 48-50.  *See* documents with the following beginning document numbers or number ranges: MB02332749-50; MBRM-EX 00106360-61; MB02332815; MB02332803; MB02046013-14; MB02046020-21; EMFFP03831-66, MB02046176-215, C 05556-616.

[740] *See* the following Mayer Brown time record(s): MBRM-EX 00052902. *See* documents with the following beginning document numbers or number ranges: C 00465; C 00468; C 00378.

[741] *See* MB02325177, at App. D-34.

After the February/March 2000 Round Trip Loans matured, Monk wrote to each of the Round Trip Loan Participants, transmitting to them the original promissory notes which they had signed in connection with their loans from RCM. Monk also played an active role in the transactions when he endorsed the notes as "paid in full" as the authorized agent of RCM.[742]

Mayer Brown handled Round Trip Loan transactions *an additional 14 times over the next four years*, with each transaction following the same basic format described above.[743] Each time, Mayer Brown drafted (and sometimes negotiated) deal documents, including loan agreements, guarantees, and indemnifications. Every time, Bennett signed the loan documents on behalf of his company, RGHI, and Bennett also signed the guarantees and indemnities on behalf of RGL — except for one time when Collins apparently modified the documents for Trosten to sign the guarantee and indemnity rather than Bennett.[744] Weaver or Maggio signed the RCM loan documents.

Mayer Brown also continued to communicate with the Round Trip Loan participants and their lawyers.[745] For example, on February 19, 2001, CIM Ventures sent Collins a letter almost identical to one it had sent the previous year, again explaining precisely how the Round Trip Loans would work, including that RCM would pay the interest spread directly to CIM Ventures. This letter read:

---

[742] *See* the following Mayer Brown time record(s): MBRM-EX 00052902. *See* documents with the following beginning document numbers or number ranges: MB02046017-18; MB02046175-76; MB02327415; MB02325109; IM-SEC 007313-14.

[743] The document numbers of these RTLs, as well as all other RTLs, are set forth in the section of this Report that describes the RTLs. *See* Section III.B.

[744] *See* MB02035648-49, at App. D-35; MB02035650-51, at App. D-36.

[745] *See* the following Mayer Brown time record(s): MBRM-EX 00052904-06; MBRM-EX 00052094; MBRM-EX 00051990-91. *See* the document(s) with the following beginning document number(s) or number range(s): MBRM-EX 00006540; IM-SEC-000877-951; IM-SEC-006369-70; IM-SEC-003894-97.

It is planned that RCM will deposit the loan proceeds in CIM's account (No. 6800-10101) at RCM on February 23, 2001. CIM will then fax a letter to RCM instructing them to move the funds to RGHI with a 15 basis point uplift in the interest rate. RCM will then withdraw the funds from CIM's account and deposit the funds to RGHI's account, thereby completing the back-to-back loan transaction. The steps will be reversed on March 6, 2001. RCM will transfer the CIM spread on the transaction to CIM's Royal Bank of Canada account (Acct. No. 2003895) in the Cayman Islands. The account details, are the same as used for the back-to-back loan done in 2000.[746]

The Round Trip Loan Participants changed over time, with some participants backing out, necessitating redrafts and renegotiations of the documents.[747] The dollar values of the Round Trip Loans also increased in amount, soaring to as much as $720 million for one Round Trip Loan in February/March 2004.[748] As detailed completely in the chart in Section III.B.,

---

[746] *See* MB02339720, at App. D-37. Prior to this letter, Monk had advised Ricketts that he was leaving Mayer Brown, IM-SEC-006366; MB02339994; MB02339995, and had provided instructions for the handling of the matter in a voice message, which Collins acknowledged in his interview bore his (Collins') handwriting. MB02339251. Consistent with these instructions, when the RTL was unwound in early March, 2001, the original executed note for the loan from RCM to CIM Ventures marked "Paid in full," was sent to Ricketts, with a copy to Collins. IM-SEC-006288; MB02339722.

[747] *See, e.g.,* the following documents that bear handwritten changes acknowledged by Collins to be in his handwriting: MB02035673-89; MB02035690-706, at App. D-38. *See also* the guaranty and indemnity discussed above. MB02035648-49, at App. D-35, and MB02035650-51, at App. D-36. *See also* a handwritten note that appears to be in Collins' handwriting, dated February 12, 2002, which reflects a conversation with Weaver in which Weaver conveyed the following information to Collins about the February 2002 RTLs: (i) there would be two loans - one to Delta Flyer for $175 million and one to Liberty Corner for $325 million; (ii) RCM would lend, and RGHI would borrow; (iii) the terms of the loans would be from February 25, 2002 through March 4, 2002; (iv) there would be an interest spread of 1% (or 100 basis points) between the two loans; and (v) there would be a "Group Guarantee" and a right of offset. MB02037574.

[748] For the RTLs in February 2001, 2002 and 2003, *see* the following Mayer Brown time records and documents:

a. February 2001 - *see* the following Mayer Brown time record(s): MBRM-EX 00051990-91; MBRM-EX 00049285. *See* the document(s) with the following beginning document number(s) or number range(s): MB00458-59; EMFFP03831-66; DFF00200-08; MB02035673-706, at App. D-38; EMFFP03907-08; EMFFP03870; MB02035652.

b. February 2002 - *see* the following Mayer Brown time record(s): MBRM-EX 00049291; MBRM-EX 00052003-04; MBRM-EX 00052907; MBRM-EX 00052110. *See* the document(s) with the following beginning document number(s) or number range(s): MB00003632-34; REFCO-E-010474556; MBRM-EX 00134498-500; LC-SEC-EM-001610388-89; EMFFP04003-7; EMFFP03991; IM-SEC-005405-07; IM-SEC-005462; IM-SEC-006247-87; MB00040743-97; MB00045479-95; IM-SEC 001409, at App. D-3.

c. February 2003 - *see* the following Mayer Brown time record(s): MBRM-EX 00052013; MBRM-EX 00049294; MBRM-EX 00052014; MBRM-EX 00052114. *See* the document(s) with the following beginning

*(footnote continued on next page)*

*supra*, these loan transactions involved six different Round Trip Loan Participants spanning five

years ranging in amounts from $50 million to $720 million.  In addition, the frequency of the

Round Trip Loan transactions increased. The Round Trip Loans always straddled the end of

***every*** financial reporting period and ***never*** occurred at any other time with the exception of the

December 2004 Round Trip Loan.  The loans took place every February/March through 2004,

and then increased in frequency to every quarter-end beginning May/June 2004 when Refco

began having to report quarterly, including immediately before and after the closing of the LBO

and after the filing of the S-1 for the IPO with the SEC.[749]  The last Round Trip Loan transaction

---

*(footnote continued from previous page)*

document number(s) or number range(s): WEAVER-00025-28; WEAVER-00040-54; EMFFP03945-56; DFF00220-55; LC-USAO-000037-72; MBRM-EX 00135916.

In February/March 2004, two Round Trip Loan Transactions were planned in the total amount $700 million (Liberty Corner for $500 million, and Delta Flyer for $200 million).  Delta Flyer declined to engage in another Round Trip Loan transaction, and the final amount of the Liberty Corner Round Trip Loan transaction was $720 million.  This transaction was particularly significant because Delta Flyer's decision not to participate required several iterations of document drafts in which differing loan numbers were used ($500 million, to $700 million, to $720 million), resulting in a very substantial purported loan to one customer.  At the same time, as discussed below, Mayer Brown was representing Refco in connection with the beginnings of the THL acquisition transaction that later became the LBO.  *See* the following Mayer Brown time record(s): MBRM-EX 00052024.  *See* the document(s) with the following beginning document number(s) or number range(s): MBRM-EX 00093269-335; MBRM-EX 00093370-437; LC-SEC-EM 000016857; LC-SEC-EM-000013143.

[749] For the RTLs starting in May 2004, and continuing through May 2005, *see* the following Mayer Brown time records and documents:

a.  May 2004 - *See* the following Mayer Brown time record(s): MBRM-EX 00052026.  *See* the document(s) with the following beginning document number(s) or number range(s): MBRM-EX 00093617-51; LC-SEC EM-000156943-44; REFCO-HC-0533886; LC-SEC-EM-000061640-41; LC-SEC-EM-000053095-96; LC-USAO-000139-56; MB02293240-54.

b.  August 2004 - *See* the following Mayer Brown time record(s): MBRM-EX 00052027.  *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-HC-0533697; MB00237-68; REFCO-E-002996175; LC-USAO 000157-87.

c.  November 2004 - *See* the following Mayer Brown time record(s): MBRM-EX 00052028. *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-E-2994699; LC-USAO 000188-218.

d.  December 2004 - *See* the following Mayer Brown time record(s): MBRM-EX 00052029.  *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-HC-0533792; MB00302-34; REFCO-HC-0533823, at App. D-39; LC-USAO-000221-51.

*(footnote continued on next page)*

in the amount of $420 million was completed in August/September 2005, only days after Refco had completed its IPO.[750]

In his interview, Collins claimed that he did not know Koury was continuing to prepare documents for Round Trip Loan transactions. The Examiner concludes that there is evidence tending to establish that Collins knew that Koury was preparing such documents; the Round Trip Loan transactions were described in summary fashion in the monthly billing statements Collins prepared and/or reviewed, and sent to Refco.[751]

In light of the extensive involvement of the Mayer Brown attorneys in drafting deal documents involving vast sums of money seventeen times over a period of five years, it is highly unlikely that those attorneys would have so little recollection regarding these transactions. The Examiner has serious questions about the credibility of at least one attorney who claimed to have virtually no recollection of these transactions.

### (ii)    Mayer Brown's Knowledge of Refco's Accounting Periods and the Need for Audited Financial Statements

Mayer Brown knew that the Round Trip Loans straddled a several week period at the end of one Refco financial reporting period and the beginning of the next financial reporting period

---

*(footnote continued from previous page)*

e.  February 2005 - *See* the following Mayer Brown time record(s): MBRM-EX 00052029. *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-HC-0533833; MB00335-68; REFCO-HC-0533828; MB00402-05; LC-USAO-000269-309.

f.  May 2005 - Koury apparently did not bill any time for this RTL. *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-HC-0533829; MBRM-EX 00052119; REFCO-HC-0533882-83, at App. D-39; MB00369-401; REFCO-0002-000118-30, 000132-44, 000147-49; REFCO-HC-0533908, 0533922.

[750] *See* documents with the following beginning document numbers or number ranges: REFCO-HC-0533888; LC-SEC-000380; REFCO-0002-000085-113. It appears that for this RTL, Maggio at Refco made use of the loan documents that Koury had prepared for the May/June 2005 RTL, merely changing the dates and the amounts of the RTLs.

— both the February fiscal year end accounting periods, and, when Refco became a "public" reporting company, the fiscal quarter end accounting periods. Mayer Brown also knew that Refco required audited financial statements for use in connection with its business operations, and that these financial statements would, among other things, be provided to, and relied upon by, Refco's lenders in connection with loans and lines of credit totaling hundreds of millions of dollars.

For example, Collins and Mayer Brown received multiple requests for letters to be sent to Refco's auditors in connection with an examination of Refco's financial statements at the end of February, for the year then ended, and, after Refco's LBO, for accounting reviews at the end of each financial reporting quarter.[752] In addition, throughout the course of its representation of Refco, Mayer Brown prepared responses to various requests it received for audit letter responses from Refco.[753] Collins sometimes spoke to Bennett, Trosten and other Refco representatives in connection with preparing audit letter responses, and, on at least two occasions, reviewed and

---

*(footnote continued from previous page)*

[751] *See* documents with the following beginning document numbers or number ranges: REFCO-E-008057891-908; REFCO-E-008209041-55, at App. D-40; REFCO-E-001351682-700; REFCO-E-008165527-40; REFCO-E-001311424-38.

[752] *See* documents with the following beginning document numbers or number ranges, which provide a representative view of Mayer Brown's and Collins' knowledge of Refco's financial reporting periods: REFCO-E-017238614; REFCO-E-017238136-37; REFCO-E-008643170; REFCO-E-008642677; REFCO-E-002414297; REFCO-0008-177233; REFCO-E-009640529; REFCO-E-002162864; REFCO-E-002242865; REFCO-E-001817868; REFCO-E-002227418; REFCO-E-002040574-75; REFCO-E-001997821; REFCO-E-017263582.

[753] *See* the following Mayer Brown time record(s) which provide a representative view of Mayer Brown's and Collins' involvement in the preparation of audit responses: MBRM-EX 00048952, 9058, 9064, 9068, 9078, 9095, 9101-108, 9259, 9272-273, 9276, 9286, 9292; MBRM-EX 00050236; MBRM-EX 000512006; MBRM-EX 00163247, 254-55. *See also* the document(s) with the following beginning document number(s) or number ranges(s): GT-SEC-0113629; MB00007740; MB00014954; MB00016456; MB00016461; MB00017014; MB00032014; MB00032336; MB00032362; MB00043780; MB02030339; MBRM-EX 00003762; MBRM-EX 00036245; MBRM-EX 00036247; MBRM-EX 00036249; MBRM-EX 00036499; MBRM-EX 00036506; MBRM-EX 00036521; MBRM-EX 00036524; REFCO-0008-218157; REFCO-E-001817868; REFCO-E-001997821; REFCO-E-002216213.

commented upon one or more footnotes to be placed in Refco's financial statements.[754] In

addition, Mayer Brown occasionally reviewed or referred to Refco's audited financial statements

and sent copies of those statements to others.[755]

Mayer Brown also knew that Refco needed audited financial statements to satisfy the

financial covenants contained in the senior note and loan agreements entered into by Refco to

obtain hundreds of millions of dollar of financing.  Mayer Brown represented Refco in those

financings;[756] and maintained execution copies of the operative documents pertaining to those

financings.[757] The operative documents, which Mayer Brown drafted, contained provisions

requiring Refco to furnish the lenders with audited financial statements within a certain period

after the close of its fiscal year.[758]

> ### (iii)    Mayer Brown's Knowledge that the Round Trip Loans Had No Apparent Business Purpose and May Have Violated Loan Covenants

The Mayer Brown witnesses stated in their interviews that they did not know the business

purpose for the Round Trip Loan transactions, did not think at the time of the transactions about

---

[754] *See* the following Mayer Brown time record(s): MBRM-EX 00049095; MBRM-EX 00049321.

[755] *See* the following Mayer Brown time record(s): MBRM-EX 00049321. *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-HC-0037397; MB00014981.

[756] *See* the following Mayer Brown time record(s): MBRM-EX 00049111-12, 115-117, 119; MBRM-EX 00050354-56, 58-62, 65-69.  *See* the document(s) with the following beginning document number(s) or number range(s): MB00034613; MB00041745; MBRM-EX 00018499; MBRM-EX 00110678.

[757] *See, e.g.*, RGL Composite Conformed Copy of Note Agreements, dated December 18, 1996, Relating to $68,000,000 7.18% Series A Senior Notes Due December 18, 2004 and $14,000,000 7.42% Series B Senior Notes Due December 18, 2006, MB02002976-3060; Composite Execution Copy of RGL Note Agreement, dated as of November 30, 1999, Relating to $70,000,000 8.85% Senior Notes due November 30, 2007, MB02002821-2930; Composite Conformed Copy of Note Agreement, dated as of October 15, 2002 Relating to $100,000,000 5.99% Series A Senior Notes Due October 15, 2007 and $122,500,000 6.60% Series B Senior Notes Due October 15, 2009, MB02002603-2718; Composite Execution Copy RGL Note Agreement, dated as of June 29, 2000, Relating to $111,000,000 9.18% Senior Notes Due June 29, 2005, MB02002443-2601, at App. D-41; Execution Copy of RGL $339,500,000 Revolving Credit Agreement, dated as of June 23, 2003, MB02003172-3295, at App. D-42.

[758] *Id.* These requirements are generally set forth in the section of the Note or Loan Agreements titled "Reports and Rights of Inspection," or, as to the $339,500,000 Revolving Credit Agreement, dated as of June 23, 2003, Section 5.01 titled "Financial Statements."

what their business purpose might be, did not ask anyone at Refco about the business purpose of these transactions, and did not believe they had a responsibility to do so. In their interviews, none of the witnesses could articulate an apparent business purpose for the Round Trip Loans.[759]

The fact is that the Round Trip Loans had no legitimate business purpose, as the features of the transactions indicate. These were uncollateralized short-term, back-to-back loans involving the lending of hundreds of millions of dollars by one Refco entity through a third party to another Refco entity, with guarantees and indemnities by RGL to eliminate any risk to the third party. Thus, the transactions appeared to lack any economic substance. Indeed, rather than having any apparent business purpose, the transactions appear suspicious on their face.

Other circumstantial evidence suggests that Mayer Brown understood that the Round Trip Loans lacked any economic substance or business purpose. For every Round Trip Loan transaction except one (the February 2001 Delta Flyer RTL), Bennett signed on behalf of RGL both guarantees of RGHI's obligations and indemnifications in favor of the Round Trip Loan Participants.[760] In many instances, Mayer Brown had executed copies of the documents showing the dual role of Bennett in obligating RGHI to repay the loan and at the same time using a Refco entity to guarantee that obligation.

In addition, Mayer Brown was aware from its representation of Refco in connection with Refco's bank financings that the operative loan documents contained covenants prohibiting Refco from incurring additional indebtedness beyond certain limits and, in some cases,

---

[759] Collins stated that although he had not thought about the potential purpose of the Round Trip Loans at any time prior to Refco's bankruptcy, thereafter he speculated that there could have been a number of legitimate business purposes for such transactions, including generating short term funds for some unspecified purpose or accomplishing some unspecified tax objective.

[760] Trosten signed the RGL documents for the Delta Flyer February 2001 RTL. Collins apparently made the modifications to the guaranty and indemnity documents for this transaction. DF00202-03; DF00204-05; MB02035645; MB0203560; MB02035648-49, at App. D-35; MB02035650-51, at App. D-36.

specifically prohibiting Refco from becoming liable on a guarantee.[761]  "Indebtedness," as defined in the loan documents, included guaranteeing a third party's debts.  Despite its knowledge of these loan covenants, Mayer Brown prepared the guarantees for large amounts of money in violation of the loan covenants. Mayer Brown thereby assisted in transactions that violated loan covenants in financing documents it had drafted.  Furthermore, Mayer Brown's willingness to assist in structuring these transactions without inquiry as to purpose suggests that Mayer Brown believed and knew full well that the Round Trip Loan transactions and guarantees lacked any real economic substance and, hence, any legitimate business purpose.

### (iv)    Mayer Brown's Knowledge that RGHI Owed a Large Receivable to RGL

All Mayer Brown witnesses, except Collins and Schultz, denied knowing that there was a receivable owing from RGHI to Refco.  As discussed below, Schultz, while claiming no recollection of any such receivable, did acknowledge, when shown certain documents which he had drafted, that he must have known that RGHI owed debts of at least $350 million.

While Collins did not deny knowing that there was a receivable in some amount owing from RGHI to Refco, he did deny knowing the size or extent of it, and further stated that he never asked Refco management about the size of the RGHI Receivable.  As also discussed below, documents prepared by Mayer Brown in connection with the PPA reflect that Mayer Brown knew no later than June 11, 2002 that RGHI owed an intercompany debt to Refco in the amount of not less than $350 million.

The Examiner looked at the four categories listed below to determine if there was evidence that Mayer Brown knew the full extent of the RGHI Receivable:

---

[761] See MB02002976, Sections 5.10, 5.14, 5.16; MB02002821, Sections 5.10, 5.14, 5.16; MB02002603, Sections 5.10, 5.14, 5.16; MB02002443, at App. D-41, Sections 5.10, 5.14, 5.16; MB02003172, Sections 6.01, 6.05,

*(footnote continued on next page)*

- correspondence of Bennett and Trosten;

- work on tax issues in connection with the 1999 BAWAG transaction;

- work on the PPA; and

- work in connection with other transactions pertaining to Refco "bad debts," including the Asian receivables, Niederhoffer Loss, Wells, the $43 million arbitration award, and Trade & Marine

The results of this review are summarized below.

### (a)    Correspondence of Bennett and Trosten

Some communications involving Bennett and Trosten support the inference that Mayer Brown knew more about the RGHI Receivable than Mayer Brown admits.

For example, a letter from Bennett on which Collins wrote some notes evidences Collins' knowledge of the receivable.  After the closing of the amended and restated BAWAG transaction in May 1999,[762] Collins and other attorneys at Mayer Brown were involved in communications and meetings with respect to attempts to obtain a position statement from the New York Federal Reserve Board office ("NYFRB") as to the requirements of the federal Bank Holding Company Act.  As this process continued, in a letter dated October 15, 1999, Bennett wrote to Collins to provide additional arguments to be used with the NYFRB to support the transaction, including the apparent net worth of RGHI.[763]  In arguing that RGHI has substantial value, Bennett stated, in part: "Given the fact that it is not an operating company, Refco Group Holdings capital (*i.e.*, net worth) is represented by the value of its investment in Refco Group Limited."  This statement is bracketed in handwriting, and in the margin immediately next to this statement in this Mayer

---

*(footnote continued from previous page)*

at App. D-42; MB02056716, Sections 4.03, 4.07.

[762] *See* MB00000478-880.

[763] MB02071243-58, at App. D-43.

Brown document is the comment "***Minus Loans to RGH***." (emphasis added). This handwriting appears to be consistent with the handwriting which Collins acknowledged to be his own.[764]

There is also a time entry by Collins on October 19, 1999 reflecting that he "reviewed PRB materials on RGHI," and on October 21, 1999 that he "[talked with] PRB re status of FRBNY review."[765]   Attached to this document is an unaudited balance sheet for RGL as of May 31, 1999, and a copy of RGL's consolidated and audited financial statements for the fiscal year ended February 28, 1999.  The audited financial statements disclose, in Footnote 7, entitled "Related Party Transactions," that at year end (*i.e.*, February 28, 1999), there were outstanding loans receivable from related parties of $252 million.[766]

Several other letters from Trosten to E&Y also suggest that Mayer Brown knew about the receivable.  Trosten indicated in several letters to E&Y that he had consulted "counsel" who had confirmed that the inter-company balances between RGHI and RGL were valid, legally enforceable debts.[767]

### (b)    Work on Tax Issues in Connection with the 1999 BAWAG Transaction

There is evidence that Mayer Brown may have learned details about the RGHI Receivable in connection with its work on the 1999 BAWAG transaction.

Mayer Brown did a significant amount of work to facilitate BAWAG's acquisition of a 10% share of RGL in 1999.  Collins' involvement in this transaction began in December 1998,

---

[764] The Examiner did not find this Mayer Brown-produced document until after Collins' interview and, therefore, could not question him about this document.

[765] *See* the following Mayer Brown time record(s): MBRM-EX 00052771.

[766] As noted elsewhere in this Report, this number, while substantial, is actually much lower than the actual amount of the related party receivable owing from RGHI before and after the WTL transactions engaged in by Refco and RGHI at the end of February 1999.

[767] *See, e.g.,* EY-REF-004566-67; EY-REF-006192-93.

when Collins first talked with Bennett regarding the outline of the transaction, and then worked on the transaction with other Mayer Brown attorneys.[768]  Collins and other attorneys at Mayer Brown recorded time to this matter on an almost daily basis through and after the closing of the restated and amended BAWAG transaction in May 1999.[769]  Refco was concerned about incurring unnecessary tax liability in connection with BAWAG's acquisition of an interest in RGL.  Accordingly, as described below, a number of Mayer Brown time entries reflect that tax issues were a material concern with respect to the structuring of this BAWAG transaction.

Because of the significant tax issues involved, E&Y provided substantial assistance in structuring the transaction in such a way as to minimize tax consequences.  Indeed, E&Y, like Mayer Brown, performed a substantial amount of work on this transaction during the first half of 1999.[770]

At the time that E&Y was working on the 1999 BAWAG transaction, E&Y: (i) knew that RGHI owed RGL a large receivable that was comprised of bad customer debts that had been transferred from RGL to RGHI rather than RGL taking the loss; (ii) had serious questions about AA's accounting for this receivable as an asset of RGL; (iii) had questions about whether RGL would be solvent without the receivable as an asset on its books; and (iv) knew that RGHI likely was unable to pay the debt.[771]

Mayer Brown and E&Y were working on tax issues in connection with the BAWAG transaction at approximately the same time and often in response to work by the other.  For example, in January, E&Y was working on tax issues in connection with the transaction.  At

---

[768] *See* the following Mayer Brown time record(s): MBRM-EX 00052735.  *See* the document(s) with the following beginning document number(s) or number range(s): MB00028631; MB00028660.

[769] *See*, generally, the following Mayer Brown time record(s): MBRM-EX 00052735-69.

[770] *See* discussion in E&Y section of this Report.

about that time, Collins talked with Bennett regarding "tax structural issues" as to the BAWAG transaction;[772] and handwritten notes, apparently prepared by Collins, reflect that on January 14, 1999 he participated in a telephone call with Rossi, Neidhardt of E&Y, and several other persons, during which the subject of RCM's tax status and potential tax exposure were discussed.[773]  Similarly, on January 19, 1999, Neidhardt wrote to Rossi at Refco regarding tax issues pertaining to the BAWAG transaction.[774]  On that same day, Collins talked to Mayer Brown attorney Barry regarding tax issues on LLC mergers.  Three days later, Collins reviewed and revised a tax memorandum, and talked with Rossi regarding an E&Y memorandum on the LLC agreement.[775]

During this time period, E&Y communicated directly with Mayer Brown regarding the 1999 BAWAG transaction on several occasions.  On January 28, 1999, Neidhardt sent a memorandum to Henneman providing comments on the Refco/BAWAG deal documents that Mayer Brown had drafted.[776]  On February 5, 1999, Neidhardt participated in a conference call with several other E&Y accountants and Mayer Brown lawyers.  According to handwritten notes on the typed draft notes of this call, Collins, Henneman, and Barry also participated, although neither Collins nor Henneman recall participating.[777]  According to these notes, the participants discussed, among other things, the potential Refco parties to the BAWAG transaction, including

---

*(footnote continued from previous page)*

[771] *Id.*

[772] *See* the following Mayer Brown time record(s): MBRM-EX 00052736.

[773] MB02037615.  This document was not produced by Mayer Brown until on or about March 7, 2007, several weeks after the Collins interview.

[774] REFCO-0010-000537.

[775] *See* the following Mayer Brown time record(s): MBRM-EX 00052737-38.

[776] EY-REF-005698.

[777] EY-REF-024389-93.

"Bermuda" — whose business is described in the notes of the call as "intercompany loans and receivables."

On February 9, 1999, Neidhardt prepared a memorandum to the Refco files memorializing his communication with Rossi and telephone conversation with Barry. The memo said that Neidhardt had advised both Refco and Mayer Brown that E&Y did not agree with the representation in the BAWAG deal documents that there were no undisclosed liabilities on the audited RGL financial statements and that there were no undisclosed material tax issues. The memo also indicated that E&Y believed there might be material tax issues that should be discussed with Collins "who is already aware of some of them."[778]

### (c)     Work in Connection with the Proceeds Participation Agreement

There is evidence that Mayer Brown learned details about at least part of the RGHI Receivable in connection with its work on the PPA transaction. Mayer Brown performed a substantial amount of work on a regular basis in connection with the PPA transaction, in which the RGHI Receivable was a critical factor in the structuring of the deal.[779] E&Y likewise performed significant work on this transaction and the RGHI Receivable was central to E&Y's analysis of the deal.

On or about February 11, 2002 (the day before Collins and Koury worked on Round Trip Loan documents for three Round Trip Loan Participants),[780] Schultz prepared a memorandum pertaining to the potential sale of a portion of RGHI's membership shares in RGL, attaching a

---

[778] EY-REF-005863, at App. D-26.

[779] *See*, generally, the following Mayer Brown time record(s): MBRM-EX 00052777-79; MBRM-EX 00163211-27.

[780] *See* the following Mayer Brown time record(s): MBRM-EX 00052003.

draft of a purchase agreement.[781]  In this memorandum, Schultz described a transaction whereby RGHI would sell 51% of its voting membership shares in RGL, and the purchaser would pay $700 million ($350 million to be paid by the assumption of liabilities of RGHI and the remainder by cash).  At his interview, Schultz could not recall from whom he received this information, but did acknowledge preparing the memorandum, and did concede that he must have known that RGHI had liabilities of at least $350 million.  Moreover, as discussed below, based upon documents later drafted by Mayer Brown in connection with this transaction, it is clear that Mayer Brown knew, no later than June 11, 2002, that RGHI owed an inter-company debt to RGL of not less than $350 million.[782]

The draft of the purchase agreement accompanying this memorandum reflects that a portion of the purchase price for 51% of the membership shares of RGL held by RGHI would consist of the "assumption of $350,000,000 of the liabilities of Holdings [RGHI]."[783]  This draft agreement, which was the third version of the document, and contained some changes from an earlier version dated February 6, 2002, also contained an acknowledgement that the parties thereto (RGL, RGHI and an unnamed purchaser) agreed that the "Company's [RGL's] board of managers shall endeavor to sell ownership of the Company or its assets."[784]  It appears also, therefore, that no later than February 6, 2002, Mayer Brown knew that the ultimate goal of the "managers" of RGL (Bennett and other senior executives) was to sell RGL.

Before Schultz had prepared the February 11 memorandum, Collins had discussed the terms for the purchase with Trosten and Bennett and had reviewed and revised prior drafts of the

---

[781] MB02376667, at App. D-44, MB00043814-45.

[782] MBRM-EX 00066153-57, at App. D-45.

[783] MB00043814-45.

[784] *Id.*

purchase agreement.[785]  One of the structures for the transaction that E&Y had developed and that Trosten was considering involved RGL distributing the approximately $720 million receivable to RGHI in partial redemption of RGHI's interest in RGL, followed by BAWAG contributing an additional $370 million in cash and a note for $350 million (for a total of $720 million) in exchange for an additional 40.8% member interest in RGL.[786]  Mayer Brown may have learned the full extent of the RGHI Receivable during these discussions concerning the structure of the deal.

E&Y worked on this transaction, and received and reviewed the purchase agreement drafted by Mayer Brown, expressed its concern to Trosten that the form of that agreement reflected an actual sale which might have adverse tax consequences, and advised Trosten to change the form of the agreement.[787]  Indeed, after Cappel of E&Y had apparently convinced Trosten that the proposed structure of the deal had some adverse tax implications, Cappel commented to others at E&Y that Trosten wanted them to draft language to correct the problem. Cappell says he told Trosten that E&Y would not do that, but that he (Cappel) wanted to give him "something he could conceivably provide to Mayer Brown for translation into the actual language."[788]

---

[785] See the following Mayer Brown time record(s): MBRM-EX 00049351; MBRM-EX 00052778.  Earlier, in November 1999 (a few months after the May 1999 BAWAG transaction) Collins had also discussed a "possible restructuring" with Bennett, reviewed a memo from Bennett on a proposed option, and drafted a memo regarding same. See the following Mayer Brown time record(s): MBRM-EX 00049348.  The Bennett memo described a transaction whereby an option would be issued to acquire 51% of RGHI's shares for the "assumption of 51% of the liabilities of RGHI existing as of the exercise date," and an additional cash amount equal to 50% of the value of RGL as of the exercise date minus the amount of the liabilities assumed.  See MB02071240-41.  The Collins memo was titled "Refco/BAWAG; Next Chapter," and mentioned a newly created company to be owned by Bennett (40%), Grant (40%), and Chris Sugrue (20%).  See MB02071239.

[786] See EY-REF-004904.

[787] See E&Y handwritten comments on Purchase Agreement drafted by Mayer Brown.  EY-REF 000296-317.

[788] EY-REF-023773.  See also Neidhardt memo to Trosten, dated April 29, 2002, setting forth various alternatives for restructuring a new investment by BAWAG in RGL, and specifically referring to an RGHI debt balance with RGL of $750 million.  REFCO-0010-000540-53, at App. D-46.

Refco and Mayer Brown apparently heeded some of the admonitions of E&Y to change the structure of the deal, as it finally changed from a "Purchase Agreement" to a "Proceeds Participation Agreement" at or about the end of May 2002 — after a number of conversations between and among Collins, Schultz, Trosten, and Bennett.[789]

On June 11, 2002, Mayer Brown revised some of the documents pertaining to the PPA, including a "Letter Agreement" to be signed by RGL, RGHI, BOI, and the still unidentified purchaser, whereby the "Company" [RGL] agreed that "$350 million of the Purchase Price for the Participation right shall be used or caused to be used for the retirement of intercompany debt of Refco Group Holdings, Inc."[790]  Mayer Brown time records reflect that on this date, Collins, among other things, talked with Bennett regarding status and open issues, revised documents, and on the next day, talked with Bennett about a price adjustment and revised the purchase agreement in respect of credits to the purchase price.[791]  It is possible, therefore, that Collins was the author of this inserted language.  When the PPA closed on July 12, 2002, the final "Letter Agreement" between and among the parties contained virtually identical language.[792]

> **(d)** **_Mayer Brown's Involvement in Other Transactions Pertaining to Refco "Bad Debts" and/or the Intercompany Receivable_**

Mayer Brown provided legal services to Refco in connection with other transactions in which "bad debts" incurred by Refco were involved.  In some of those cases, bad debts were assigned to RGHI or other related entities.

---

[789] _See_ the following Mayer Brown time record(s): MBRM-EX 00163217, 18.

[790] MBRM-EX 00066153-57, at App. D-45.

[791] _See_ the following Mayer Brown time record(s): MBRM-EX 00163222.

[792] MB02069381-87, Section 11.1, at App. D-47.

###### (1)    *The Asian Debt Receivables*

According to the Superseding Indictment, in or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis. When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds from within the unregulated segments of its business. By the end of May 1997, these losses totaled more than $310 million.[793]

The Refco customers involved in this Asian market crisis included: Repco Holdings, Inc. ("Repco"); Devonshire Investment Management, Ltd., and Devonshire Strategic Holdings (collectively, "Devonshire"); and East Client Services Limited ("East Client"). Repco's debt balance as of January 31, 1998 was approximately $139 million, and the debt balance of East Client as of January 31, 1998 was approximately $21.2 million.[794]

Mayer Brown attorneys were involved in the resolution of Refco's claims against these entities. For example, between approximately April 21, 1998 and July 1, 1998, Collins, Henneman, and other attorneys at Mayer Brown worked on a deal whereby indebtedness owed by Devonshire as of February 28, 1998 would be converted into stock in Devonshire to be held by East Client, which was controlled by Refco.[795] However, the amount of the debts then owed by Repco and East Client-Devonshire are not overtly stated in the various documents. Although

---

[793] Superseding Indictment, ¶ 11.

[794] FTI Consulting Schedule 4. By January 1998, Devonshire had either changed its name to or merged with East Client.

[795] *See* the following Mayer Brown time record(s): MBRM-EX 00049259-61; MBRM-EX 00051939-42. *See* the document(s) with the following beginning document number(s) or number range(s): MB00031439-48; MBRM-EX 00006622-88; MB00031501-39; MBRM-EX 00142198-236; MBRM-EX 00142150; MBRM-EX 00006136; MBRM-EX 0006151.

this debt became part of the RGHI Receivable, the Examiner found no evidence that Mayer Brown knew that this loss became part of the receivable.

(2)     The "Niederhoffer" and "Wells" Debts

At the end of October 1997, several months after the Asian market crisis, an individual named Victor Niederhoffer and several funds which he controlled lost more than $90 million in a series of transactions on the CME.

Beginning on or about October 28, 1997, Refco entered into settlements with Niederhoffer that were documented and negotiated by Mayer Brown, primarily by Collins. Thereafter, various Mayer Brown attorneys, including litigators, continued to be involved in the so-called "N Transaction" for many months and years.[796]

Following Niederhoffer's losses, Refco, with the assistance of E&Y and Mayer Brown, took immediate action to convert this loss into a receivable owed from a purportedly solvent entity (RGHI), both by entering into settlements with Niederhoffer to have his funds liquidate their assets and turn them over to Refco in return for a release of liability, and by contemporaneously assigning the "rights" to receive those asset payments and other unspecified "claims."[797]

Mayer Brown worked on multiple drafts of this assignment. One version was between Refco, Inc. as Assignor, and RCM as Assignee, and purports to assign ". . . certain rights of the Assignor to Payments from the [Niederhoffer] Accounts in exchange for the transfer from the Assignee to the Assignor of an amount up to $_____ (to be paid to the Assignor in

---

[796] *See* the following Mayer Brown time record(s): MBRM-EX 00052693-712.

[797] *See* the following Mayer Brown time record(s): MBRM-EX 00049038-39. *See* the document(s) with the following beginning document number(s) or number range(s): MB02057884-87, at App. D-48; MB02065548; MB02057831-36.

immediately available funds on the date hereof) . . ."[798]  Another version contains the same description of what is being assigned, but specifies $71 million as the amount to be transferred, and is between Refco, Inc. as Assignor and Wells Limited (a wholly-owned subsidiary of RGHI) as Assignee.[799]

      After the initial flurry of activity to assign the Niederhoffer claims, Refco, with the assistance of Mayer Brown, dealt with investigations initiated by the various commodities regulators into the Niederhoffer Loss and how Refco was handling and accounting for that loss.[800]  In connection with these efforts, Collins reviewed Refco's financial statements and revised footnotes to financial statements being delivered to the regulators.[801]  He also reviewed tax issues, correspondence as to IRS claims, and a tax settlement.[802]

      At the same time that Mayer Brown and Refco were dealing with the regulators, E&Y began to deal with tax issues related to the Niederhoffer Loss, including bad debt losses and write-offs that could be taken or attributed to these losses (including a determination of which Refco entities would be entitled to claim the losses).  E&Y had serious concerns about AA's accounting treatment for the Niederhoffer bad debt losses, and struggled with how they should be dealt with both from a tax and an accounting perspective.[803]  Moreover, as time went on, Mayer Brown became involved in these and related issues, including discussing with Bennett

---

[798] *See* MBRM-EX 00043716-18.

[799] *See* 10/28/1997 assignment by Refco, Inc. of its rights to payments from Niederhoffer accounts to Wells, Ltd, which Bennett signs on behalf of Wells.  *See* App. D-10.

[800] *See* the following Mayer Brown time record(s): MBRM-EX 00049039, 101, 319-323, 326; MBRM-EX 00052702. *See* the document(s) with the following beginning document number(s) or number range(s): MB02061666; MBRM-EX 00013530; MB02061322; MB02059721.

[801] *See* the following Mayer Brown time record(s): MBRM-EX 00049321-22.

[802] *See* the following Mayer Brown time record(s): MBRM-EX 00049319, 22.

[803] *See* the following documents from or to E&Y pertaining to this transaction: EY-REF 000081; EY-REF 000150; EY-REF 000080, at App. D-29; EY-REF-009115; EY-REF 002346; REFCO-HC-0036140; REFCO-0010-004530.

and others at Refco the following subjects relating to the Niederhoffer Loss: (i) bad debt write off issues; (ii) bad debt analysis; (iii) background arguments for bad debt treatment; (iv) reviewing and revising a memorandum to be sent to E&Y; (v) treatment of receivables; and (vi) impact of accounting reclassifications.[804]

The close relationship between and among the Niederhoffer losses, E&Y, Mayer Brown, Refco, RGHI and Wells is illustrated by activity in early March 1999. Mayer Brown's March 8, 1999 time entries for the Niederhoffer matter reflect that Collins talked to an unidentified person with the initials "TS" regarding "bad debt analysis."[805] On the same day, Neidhardt transmitted to Rossi several memoranda regarding the plan for RGHI to assume a bad receivable obligation from Wells to RCM.[806] In that memorandum, Neidhardt stated: "RCM will not write this receivable off on its separate audited income statement on the theory that this receivable will be satisfied by the S corp [RGHI] at some point, perhaps upon a sale of the business." He advises that RGHI should legally assume the Wells liability to RCM, "thereby making Wells solvent."

Several days later, on March 12, 1999, Collins recorded time to the Niederhoffer matter for a telephone conversation with "SR" [Rossi] regarding background arguments for bad debt treatment.[807] On March 15, 1999, Lowry at E&Y sent a letter to Silverman at Refco pertaining to the need for a form for Wells to change its status so that its gains and losses would be included in the "S Corp's" [RGHI's] tax return.[808] The next day, on March 16, 1999, Collins recorded

---

[804] *See* the following Mayer Brown time record(s): MBRM-EX 00049326-27, 29.

[805] *See* the following Mayer Brown time record(s): MBRM-EX 00049327.

[806] *See* EY-REF-023387-93.

[807] *See* the following Mayer Brown time record(s): MBRM-EX 00049327.

[808] EY-REF-005121.

time to the Niederhoffer matter for reviewing and revising a memorandum to be sent to E&Y.[809] Because Mayer Brown and E&Y were working in tandem on these issues, it could be inferred that Mayer Brown was aware of the matters contained in the memoranda E&Y sent to Refco.

(3)    *The $43 Million Adverse Arbitration Award*

There is evidence that Mayer Brown knew of and participated in Refco's efforts to transfer losses from one Refco entity to another in connection with Mayer Brown's work on an adverse arbitration award.

At some point in 2001, an adverse arbitration award was entered against Refco subsidiary Refco, LLC. In an effort to avoid having to create a reserve for that award which would affect the earnings of Refco, LLC, Trosten sought to convince the CFTC to allow the charge for that award to be assumed by RGL. In December 2001, the CFTC rejected that position, advising Refco's then-auditors, AA, that GAAP would not allow a charge for that award to be assumed by the parent (RGL) without the consent of the claimants.[810]

Refco sought Mayer Brown's assistance in persuading the CFTC that Refco's position was defensible. Collins had Koury research the issue, but Koury found no legal support for the position.[811] Thereafter, in late December and early January, Collins and Koury sent various draft opinions to Bennett, Refco's General Counsel Dennis Klejna ("Klejna"), and Trosten regarding the ability of RGL to assume liabilities for arbitration awards so as to keep them from being charges to earnings of Refco, LLC. This process culminated in an opinion letter to be sent to the

---

[809] *See* the following Mayer Brown time record(s): MBRM-EX 00049327.

[810] *See* AAREFLN-000196.

[811] On the early morning of December 27, 2001, at 2:57 a.m. after a full day of research, Koury sent a draft opinion to Collins seeking to support RGL's assumption of liability pertaining to arbitration awards, commenting that he was disappointed in the quality of research he found to support such a position. *See* MB00045612. In his interview, Koury stated that he did not recall conducting such research or writing such memorandum.

CFTC stating, basically, that RGL could assume the liabilities without the consent of the claimant, but the claimant would retain a claim against Refco, LLC as well as RGL.[812]

### (4)     The "Trade & Marine" Bad Debt

Mayer Brown may have also learned of Refco's transfer of losses from Refco to RGHI in connection with its work on the Trade & Marine losses.  The evidence of Mayer Brown's knowledge is a couple of nondescript time entries that relate to Trade & Marine.  Trade & Marine was a Refco customer that suffered losses resulting in bad debt losses for Refco in 1994 ($38 million) and 1996 ($18 million).[813]  In December 1999, there was substantial activity involving E&Y, Refco, and Mayer Brown as to a continuing inquiry by the IRS as to the Trade & Marine bad debt deductions by RGHI.

On December 3, 1999, Neidhardt wrote to Bennett regarding an IRS request for substantiation of a bad debt deduction taken on RGHI's tax return for FYE February 28, 1994.  He asked for information including: the balance owed by Trade & Marine on February 28, 1994; efforts Refco had made to collect; and why the receivable was determined to be worthless on February 28, 1994.  He commented that it appeared RGHI purchased $38 million of the Trade & Marine receivable for $38 million in February 1994 immediately prior to writing it off.  He asked Bennett to verify that fact, and whether there was any chance that the purchased receivable was not worthless, or was actually worth $38 million.  He also asked whether Refco could take the

---

[812] See the document(s) with the following beginning document number(s) or number range(s): MB00045600-607, 625-26, 633-37.

[813] REFCO-0010-000454.  On November 14, 1996, Bennett, in response to a request from Neidhardt for information as to these losses, twice proposed to have "Refco's counsel to supplement this background information with details of the account activity in question" and to "compile the background documentation which would then be available to the extent further review is needed."  REFCO-0010-005587-88.  Refco's main counsel at that time (1996) was Mayer Brown and Collins; however, the Examiner has not found documents indicating that Mayer Brown compiled such information at that time.

position that RGHI guaranteed the losses of the Refco subsidiary involved (Refco F/X, which later became RCM).[814]

At nearly the same time that Neidhardt and Bennett were discussing the Trade & Marine situation, Collins had discussions with Trosten regarding the Trade & Marine debt and account.[815]  The Examiner has not located any evidence other than these time entries to indicate that Mayer Brown was involved in providing such information.  Thereafter, Trosten apparently provided some of the information Neidhardt had sought, because on December 22, 1999, Neidhardt wrote to Trosten advising that he received answers to several of his questions regarding the Trade & Marine bad debt (including the question of RGHI guaranteeing the losses of RCM), but that he needed more information before he met with the IRS agent inquiring into the matter.[816]

### (v)     Mayer Brown Understood that Refco's Executives Had Incentives to Manipulate Refco's Financial Statements

Mayer Brown was aware of several facts that might provide incentive for Refco's management to manipulate Refco's financial appearance.

Beginning September 4, 2003, Collins began to provide services to Refco in connection with an effort by Bennett to sell equity interests in Refco that culminated in the LBO.[817]  Mayer Brown also became aware in the October/December 2003 time-frame of Bennett's desire to

---

[814] REFCO-0010-005575-76.

[815] *See* the following Mayer Brown time record(s): MBRM-EX 00049275.

[816] REFCO-0010-005573-74.  Although the Examiner has not located any additional direct evidence of Mayer Brown's further involvement with the Trade & Marine matter, there are several Collins time entries pertaining to an unidentified IRS audit, which could be the Trade & Marine audit.  Specifically, in March 2003, Collins had conversations with several persons, including Bennett, pertaining to the "IRS audit request" and "issues for IRS audit."  *See* the following Mayer Brown time record(s): MBRM-EX 00163234-35; MBRM-EX 00049107.  In October 2003, Collins spoke with Trosten regarding settlement documents needed for the IRS audit.  *See* the following Mayer Brown time record(s): MBRM-EX 00049081.  Collins stated that the only IRS audit he recalled working on dealt with Refco principal Thomas Dittmer.

undertake an IPO when Collins began to have discussions with Credit Suisse First Boston ("CSFB"), began to embark on "Project Royce" [the THL transaction], and began to e-mail various people regarding due diligence materials and prepare drafts of a purchase agreement.[818]

Mayer Brown was aware of a profits participation plan for certain key Refco executives, because it had drafted changes to the RGL LLC agreement which embodied the plan.[819]  E&Y worked closely with Mayer Brown on this transaction.  E&Y received and reviewed the agreement drafted by Mayer Brown and provided its comments to Mayer Brown.[820]

This plan was implemented on January 1, 2002, and provided certain Refco executives with profit-only equity interests in RGL.  Under the plan, the senior executives of Refco would be compensated based upon the annual net profits of Refco, and would also receive a substantial bonus if Refco were sold for more than a certain price.

---

*(footnote continued from previous page)*

[817] *See* the following Mayer Brown time record(s): MBRM-EX 00163237.

[818] *See*, generally, the following Mayer Brown time record(s): MBRM-EX 00163238-40; MBRM-EX 00049849-50.

[819] The time records of Mayer Brown indicate that Collins and Mayer Brown became involved in the profits interest matter in early October 2001.  At that time, Collins had several discussions with Trosten regarding profit based units and a related plan, reviewed an E&Y memorandum on a profits participation plan, and had discussions with other Mayer Brown attorneys regarding same.  *See* the following Mayer Brown time record(s): MBRM-EX 00163195-96, 198-99.  The memorandum referred to is likely a memorandum prepared by Cappel on May 16, 2001 and sent to Trosten, which, presumably, was forwarded by Trosten to Collins.  In Cappel's memorandum, he outlined a step plan for issuance of profits-only interests to certain RGL executives which were recommended to be implemented by RGL's attorneys.  EY-REF-023419-26.  The draft LLC agreement attached to the memorandum contains a page describing members which differs from later versions and the execution versions of the LLC agreement, in that this version describes all Members (not just "Voting" and "Non-Voting") and provides for the identification of the "Profits Membership Shares" held by particular persons.  MB02071712-45.

On about September 9, 2003, Trosten provided signature pages for each of the profits members in response to a request from Meisler at E&Y.  EY-REF-004335-42, at App. D-50.  The Examiner located a copy of this same document, in the Mayer Brown provided documents, with a generic signature page to be signed by each profits member, and with specific pages for each of the profits members containing information pertaining to each of their specific profits interests.  By way of example, this document describes Trosten's profits interest as being 16.44736842 Profits Membership Shares, and Bennett's interest as being 24.67105263 Profits Membership Shares.  MB02072959-95, at App. D-49.

[820] *See* Second Amended and Restated LLC agreement of RGL, revised by E&Y on December 3, 2001.  MB02071665.  *See also* the following Mayer Brown time records which reflect that Mayer Brown attorneys (Collins, Schultz, and Barry) participated in conference calls with E&Y regarding markups to the amended LLC agreement: MBRM-EX 00163200-201, 203.

The foregoing evidences Mayer Brown's knowledge and appreciation that Bennett, Trosten, and other participants with profit interests had ample incentive to maximize the annual profits of Refco, and to maximize the purchase price of any sale of Refco.

### b. Mayer Brown's Involvement in the LBO and IPO

#### (i) Mayer Brown's Involvement in the LBO and Related BAWAG Transaction

Mayer Brown represented Refco and RGHI in connection with the LBO and was deeply involved in the LBO and the related BAWAG transaction. It negotiated the agreement with THL, handled the Refco side of THL's due diligence, and drafted the related BAWAG agreement. As explained in detail below, in the course of its work in connection with the LBO, Mayer Brown appears to have failed to disclose key information to THL, and misrepresented other material matters, all of which allowed the LBO, and later the IPO, to go forward.

#### (a) Mayer Brown's Apparent Failure to Disclose Material Information to THL's Attorneys During Due Diligence

Collins was integrally involved in the LBO due diligence process. He reviewed due diligence and corporate documents to be provided to THL and its counsel, Weil, met frequently with Weil attorneys, had numerous conferences with Bennett and Trosten, and had numerous conferences with other Mayer Brown attorneys.[821] Jay Tabor ("Tabor"), the attorney at Weil primarily responsible for conducting the due diligence on behalf THL, stated in his interview that

---

[821] *See* the following Mayer Brown time record(s): MBRM-EX 00048951-59; MBRM-EX 00049849-50, 52, 55, 58-63, 65-66, 68, 70, 72-74, 77, 80-82, 902-904, 913, 919, 927, 929-931. *See* the document(s) with the following beginning document number(s) or number range(s): MB02012622; MB02220533; MB02223353-62; MB02377755-59; MB02377769; MWE0003256; MWE0003404; PWC-407727; PWC-407767; PWC-407811; REFCO-0001-002287; REFCO-0005-072139; REFCO-0008-120749; REFCO-E-001404655; THL/SEC-00089509-45; THL-SEC-00001236; WGM-L-0016233.

Collins and Mayer Brown played a very substantial role in connection with the due diligence

information provided by Refco prior to the LBO.[822]

In the course of this due diligence process, according to Tabor, Mayer Brown represented

to Weil that there were no transactions or dealings between Refco and RGHI. Specifically, Weil

asked Refco to confirm that there were no transactions between RGHI and Refco except for a

$16 million inter-company debt that was being paid as part of the deal.[823]  According to Tabor,

Collins so confirmed.  Tabor's notes from a telephone call with Collins read:

> Joe [Collins] confirms that company [Refco] is not a payee of
> "debt" other than customer receivables arising in the ordinary
> course of business.  Receivables on balance sheet from customers
> in ordinary course.  Company has gone through with
> accountants.[824]

Scott Schoen of THL likewise said that THL received written and oral representations from

Bennett and Mayer Brown that RGHI was not engaging in any undisclosed related-party

transactions.[825]  The representations in the Equity Purchase and Merger Agreement, a document

negotiated and reviewed by Mayer Brown, also stated that there were no undisclosed inter-

company loans between Refco and RGHI, and specifically required that Refco not assume or

---

[822] Tabor Interview, 38-39, 71, 144, 149-50, 155-56, 244-45.

[823] *Id.*, pp. 62-63, 82-83, 145, 250, 263-65.  *See also* MB02377755-59 (Memorandum from Collins to Tabor, dated May 6, 2004, transmitting assignment of $16 million inter-company subordinated debt, and not mentioning any other inter-company debt); MB02223353-62 (Memorandum from Collins to Tabor, dated May 11, 2004, transmitting $16 million Subordinated Loan Agreement, and not mentioning any other inter-company debt); and MB02377769 (Memorandum from Collins to Tabor, dated May 6, 2004, stating that Mayer Brown had been "advised by Refco that there are no significant indemnification obligations that have not been disclosed already," and not mentioning any of the indemnification agreements provided by RGL in connection with the Round Trip Loans).

[824] *Id.*, pp. 145, 250; Tabor handwritten notes, WGM-L 0021769.

[825] Schoen Attorney Proffer, p. 12.

guarantee any indebtedness in excess of $5 million.[826]  Tabor stated that knowledge of any loans between Refco and one of its shareholders (*i.e.*, RGHI) was clearly material to THL's decision to proceed with the acquisition.[827]

At the same time that Mayer Brown was apparently making representations during the LBO due diligence that there were no undisclosed Refco-RGHI transactions, Koury was preparing documents for the $700 million Round Trip Loan involving Refco, Liberty Corner, and RGHI.[828]  This $700 million Round Trip Loan then went forward on another day during which Koury and Collins were furnishing due diligence materials to Weil, and was unwound on the day before the closing of the THL-Refco transaction.[829]

> **(b)    Mayer Brown's Apparent Failure to Disclose the PPA and the Executives' Profits-Only Interests**

As previously mentioned, in late 2001, Mayer Brown drafted a Refco executive compensation plan, which became effective January 1, 2002, that provided profits-only equity interests to certain key Refco executives.  In addition, from and after April 2004, and during the same time-frame that Collins was involved in due diligence in connection with the LBO, Collins and Mayer Brown were also involved in a transaction which ultimately resulted in the acquisition by RGHI of the rights of BAWAG affiliate DF Capital under the PPA, to be paid for by using a part of the proceeds of the LBO distributed to RGHI.  The topics that Collins discussed with Bennett and others in connection with this transaction included: debt financing and financials;

---

[826] *See* Equity Merger and Purchase Agreement, Sec. 3.9(a) - accuracy of financial statement; Sec. 3.9(c) - absence of any undisclosed debts or obligations; Sec. 3.10 - absence of any undisclosed liabilities; Sec. 5.1(d) - covenant not to assume or guarantee any indebtedness exceeding $5 million.  WGM-L 0017759-823, at App. D-51.

[827] Tabor Interview, 264-65.

[828] *See* the following Mayer Brown time record(s): MBRM-EX 00052026. *See* the document(s) with the following beginning document number(s) or number range(s): MBRM-EX 00093617-51.

[829] *See* the following Mayer Brown time record(s): MBRM-EX 00048955-56; MBRM-EX 00049868, 81. *See* the document(s) with the following beginning document number(s) or number range(s): MBRM-EX 00093617-51.

debt structure and disclosures; a stock purchase agreement between RGHI and DF Capital; the

purchase price to be paid for the stock of DF Capital; cash payments due to certain individuals;

redemption agreements; and the funds flow describing how the proceeds paid to RGHI under the

LBO would be distributed to BAWAG and others, with a recognition that amounts already held

by BAWAG would be applied to the purchase price.[830]

In the course of the LBO due diligence process, according to Tabor, Mayer Brown failed

to disclose the existence of either the PPA or the profits-only interests, even though Weil had

specifically requested all documents regarding the existence of all equity interests in Refco.

Tabor confirmed in his interview that Weil asked for this information and that this information

was material to THL's decision with respect to the LBO.[831]  Tabor stated:   "Anything that would

lead me to believe there were other equity interests outstanding at Refco Group, Limited would

have been one of the most important things that we would look at in our diligence process."[832]

---

[830] *See* the following Mayer Brown time record(s): MBRM-EX 00048951-55, 57-59; MBRM-EX 00049854, 55, 60, 61, 68, 72, 74, 77, 902, 912-913, 916, 919, 925, 927, 929-31. *See* the document(s) with the following beginning document number(s) or number range(s): MB02030339; MWE0000541-52; MWE0002862; MWE0003404; MWE0003454-84; MWE0003962-84; MWE0007729; MWE0007730; MWE0007731; PWC-407767; PWC-407811; REFCO-0001-002287; REFCO-0008-117417-74, at App. D-52; REFCO-0008-118210; REFCO-0008-118235; REFCO-0008-120749; REFCO-E-001393560; REFCO-E-001393612; REFCO-E-001404655; REFCO-E-001415555; REFCO-E-001420209; REFCO-E-002517492; REFCO-E-008061444; REFCO-E-008061884; REFCO-E-008061934; REFCO-E-008071326; REFCO-E-008220347; REFCO-E-008221755, at App. D-53; REFCO-E-008221815; REFCO-E-008224842; REFCO-E-008225406; REFCO-E-008225542; REFCO-E-008226374; REFCO-E-008237525; THL/UCC-00012707; WGM-L-0016233.

[831] Tabor Interview, 122, 126, 203.  *See also* MB02012622 (Memorandum from Collins to Tabor, dated May 6, 2004, stating, in part, "Refco Group does not sponsor a defined benefit plan, nor does it have any plans which permit employees to invest in its stock," and not mentioning the profits memberships in RGL of Refco's senior executives).

[832] *Id.*, p. 203.  *See also id.* at 101-02.

Moreover, in July 2005, prior to the finalization of the IPO in August 2005, Mayer Brown, through several attorneys in its New York office, were representing Trosten at his testimony before the NASD in a securities arbitration case when he specifically described the profits interest that he had in Refco prior to the LBO and the amount he had been paid for that interest from the proceeds of the LBO.  During the course of that testimony, Trosten stated that he had a profits participation interest in RGL, which meant that he would receive a percentage of net earnings of RGL as his income.  He also stated that his interest included a "strike price" value of $900 million, meaning that if RGL were sold for more than $900 million, he would receive an additional payment.  He stated that as a result of the LBO closing, he received approximately $45 million.  The Examiner found no evidence to indicate that Mayer Brown brought Trosten's testimony to the attention of THL, Weil or anyone else, including the SEC.

*(footnote continued on next page)*

In addition, the existence of the profits only interests and the PPA were not initially or completely disclosed to the SEC in connection with the IPO.

> **(c)**      ***Mayer Brown's Apparent Failure to Disclose that the $500 Million "Cash" Payment Was Not All Cash***

Tabor stated that it had been represented to Weil and THL that Refco had $500 million in cash that it wanted to get credit for as an increase in the purchase price in the LBO or take out of the company. THL declined to increase the purchase price and agreed that this cash could be taken out at closing, so long as it was isolated in a bank account and not used by the business between the signing of the contract and the closing.[833]

Documents transmitted and received by Mayer Brown in connection with the RGHI-DF Capital stock purchase agreement, which provided for the acquisition of DF Capital's rights under the PPA, indicate that Collins and Mayer Brown knew that the purported "cash" balance that Refco was required to maintain in an account with BAWAG pursuant to Section 5.9 of the Equity Purchase and Merger Agreement actually contained only $110 million in cash, and that the remaining amount of purported "cash" actually consisted of a "credit" resulting from an intentional overdraft in an account held by RGHI at BAWAG that would be repaid to BAWAG from the proceeds of the LBO.[834] However, the Examiner found no evidence that Mayer Brown or anyone associated with Refco or BAWAG ever disclosed these facts to Weil or THL.

---

*(footnote continued from previous page)*

*See* Testimony of Trosten in the arbitration case of McElwreath v. Refco Securities, LLC and RGL, given on July 14, 2005, pp. 541-42, at App. D-54.

[833] Tabor Interview, 84-85; 230-31.

[834] *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-E-001393612; REFCO-E-001393560; REFCO-E-008221815; REFCO-E-008221755, at App. D-53; REFCO-E-008061444; REFCO-0008-117417-74, at App. D-52.

### (d)    Misrepresentations or Omissions in the Offering Circular

After the signing of the LBO definitive agreement between THL and Refco in early June, Collins remained involved in the sale process, which was consummated in early August 2004. The transaction was funded in part by the sale of the Senior Subordinated Notes and by an $800 million loan from a syndicate of banks and other financial institutions.  In connection with that process, Collins continued to participate in conferences with various persons, including Bennett and Trosten and representatives from THL and Weil, worked on an amendment to the definitive agreement between THL and Refco, worked on the schedules for the purchase agreement, reviewed and revised various operative agreements, and reviewed, revised and reviewed revisions to the offering circular to be submitted in connection with the exchange of the privately purchased notes for publicly traded notes.[835]

While Collins was in the midst of this activity, on June 21, 2004, he sent Mayer Brown's summary billing statement for services rendered in May 2004 to Refco, which describes, in part, "revision to liberty loan documents," an apparent reference to the $700 million Liberty Corner Round Trip Loan on May 27, 2004.[836]

The final Confidential Offering Circular in connection with the issuance of the Senior Subordinated Notes was completed on or about July 22, 2004 (the "Offering Circular"), and Mayer Brown was described therein as having represented RGL.[837]

---

[835] See, e.g., the following Mayer Brown time record(s): MBRM-EX 00048957-59; MBRM-EX 00049902-04, 13, 19, 27, 29-31. See the document(s) with the following beginning document number(s) or number range(s): MWE0002862; MWE0003256; PWC-407767; PWC-407811; REFCO-E-001404655; REFCO-E-008220347; REFCO-E-008225542; WGM-L-0016233.

[836] REFCO-E-008057891-903.

[837] See WGM-L 0014497-730 in general, and p. 172 thereof for Mayer Brown listing as counsel.  WGM-L 0014675.

The LBO closed on August 5, 2004.[838]  On that date, Mayer Brown issued a legal opinion to CSFB in which it acknowledged that it had acted as counsel for RGL in connection with the sale of the Senior Subordinated Notes and had acted as counsel for RGL in connection with the matters described in the Offering Circular under the caption "Business — Legal Proceedings — SEC Investigation."  In the legal opinion, Mayer Brown also acknowledged that it had examined various documents and participated in conferences with representatives of RGL and its accountants, and with representatives of CSFB and its counsel, at which times the contents of the Offering Circular and related matters were discussed.  Mayer Brown advised that no facts had come to its attention that caused Mayer Brown to believe that the statements contained in the Offering Circular under that captioned matter as of the date of the opinion contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements in the Offering Circular not misleading.[839]

The Offering Circular was false and misleading, however, because it did not, among other things, contain any disclosure of the Round Trip Loans.  The Offering Circular stated that $105 million owed from RGHI as of February 28, 2003 had been received by February 29, 2004.  It did not disclose that at February 29, 2004, RGL had an outstanding guaranty (prepared by Mayer Brown) to a Round Trip Loan Participant for the $720 million Round Trip Loan that would come due a week later.  The Offering Circular did not disclose that the repayment of that $720 million would result in an increase in Refco's receivable from RGHI in like amount.  There is legal authority to support the argument that Mayer Brown had a duty to advise Refco and

---

[838] *See* Index to THL-Refco Acquisition Transaction.  WGM-L 017745-57.

[839] WGM-L 0016233-34.  *See also* MB02012021-22 (draft of letter bearing handwritten notation "JPC: 7/19/04").

Weil, who was also counsel in connection with the Offering Circular, of any inaccuracies in the Offering Circular.[840]

### (ii)    Mayer Brown's Involvement in the Notes Exchange Offer and the IPO

After the closing of the LBO, Refco began the process to register the Senior Subordinated Notes so that they could become publicly traded, and also began preparing a prospectus that would lead to an IPO.  Mayer Brown had some involvement in both processes, and, along with Weil, was listed as counsel for Refco in the disclosure document pertaining to the IPO (the so-called "S-1").[841]

In October 2004, Collins talked with Klejna and Bennett regarding unspecified disclosure issues before the initial disclosure document pertaining to the notes registration (the so-called "S-4") was filed with the SEC.[842]

Thereafter, the SEC provided comments to the initial S-4 and S-1 filings and Weil responded thereto on behalf of Refco and filed the amended S-4 and S-1.  Mayer Brown received and presumably reviewed[843] the SEC's comments, Weil's responses, the SEC's replies, and the amended S-1s.[844]

---

[840] See Nat'l Enter. Corp. v. Dechert, Price & Rhoads, 246 A.D.2d 481, 667 N.Y.S.2d 745, 746 (1998).

[841] Prospectus WGM-R 0010289-505, and WGM-R 0010432.

[842] See the following Mayer Brown time record(s): MBRM-EX 00163247.

[843] See the following Mayer Brown time record(s): MBRM-EX 00163252.

[844] See, e.g., the following representative e-mails sent by Barbra Broudy of Weil to an e-mail distribution list that included Collins, transmitting copies of, inter alia, Diligence and Drafting Agendas, drafts of the Refco S-1 and amendments thereto, SEC comments to the Refco S-4 and amendments to the S-4, SEC comments to the Refco S-1 and amendments to the S-1, and responses to the SEC comments: REFCO-E-008203166; REFCO-E-008201321; REFCO-E-008201043; REFCO-E-008199899; REFCO-E-008197514-15; REFCO-E-008197243; MB02181544-45; THL/SEC 00093865-66; REFCO-E-008157208; REFCO-E-008145345-46; REFCO-E-008142174; REFCO-E-008140390; WGM-R E175811-13; REFCO-E-008125998; REFCO-E-006854476; REFCO-E-006854081; REFCO-E-006853725; REFCO-E-006853395; REFCO-E-008108395; REFCO-E-006852354-55; REFCO-E-006869613; REFCO-E-006851371-72; REFCO-E-006850174-75; REFCO-E-006849007-08; REFCO-E-006848108-09; REFCO-E-008946896; REFCO-E-006847209-10; REFCO-E-006846783-84.

During this time frame, Collins talked with both Bennett and Grant regarding due diligence meetings and concerns, prepared for and attended a due diligence meeting pertaining to the Senior Subordinated Notes, and reviewed a note purchase agreement.[845]

Also during this time frame, at least through May 2005, Koury continued to prepare the documents for the Round Trip Loan transactions ($485 million in August 2004;[846] $545 million in November 2004;[847] $550 million in December 2004;[848] $345 million in February 2005;[849] and $450 million in May 2005[850]) at times sending copies to Collins.[851] Collins also continued to send Mayer Brown's monthly summary bills to Refco, which, as to the months in which the Round Trip Loans were prepared by Koury, each generally described "preparation of Liberty loan documents," and one of which (for August 2004, and sent after the closing of the LBO) described "preparation of loan agreement, indemnification and guaranty for Liberty Corner."[852] Collins also continued to receive and respond to periodic requests for audit response letters —

---

[845] *See* the following Mayer Brown time record(s): MBRM-EX 00049109.

[846] *See* the following Mayer Brown time record(s): MBRM-EX 00052027. *See* the document(s) with the following beginning document number(s) or number range(s): MB00237-68; REFCO-E-002996175; REFCO-HC-0533697.

[847] *See* the following Mayer Brown time record(s): MBRM-EX 00052028. *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-E-2994699.

[848] *See* the following Mayer Brown time record(s): MBRM-EX 00052029. *See* the document(s) with the following beginning document number(s) or number range(s): LC-USAO-000220-51; MB00302-34; REFCO-HC-0533792; REFCO-HC-0533823.

[849] *See* the following Mayer Brown time record(s): MBRM-EX 00052029. *See* the document(s) with the following beginning document number(s) or number range(s): LC-USAO-000269-309; MB00335-68; REFCO-HC-0533833.

[850] *See* the document(s) with the following beginning document number(s) or number range(s): MB00369-401; REFCO-HC-0533829; REFCO-HC-0533882-83, at App. D-39.

[851] *See, e.g.,* REFCO-HC-0533882, at App. D-39.

[852] *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-E-008057891-908; REFCO-E-008209041-55, at App. D-40; REFCO-E-001351682-700; REFCO-E-008165527-40; REFCO-E-001311424-38.

keyed to Refco's fiscal quarters that ended in the same months as the Round Trip Loan transactions.[853]

In early August 2005, Mayer Brown associate Ware worked on the auditor update for the S-1, completed and circulated the auditor update for the S-1, and prepared the auditor update for the "462(b)" [presumably in connection with the S-1].[854] Collins then reviewed the "opinion," apparently meaning the opinion that had been prepared by Ware.[855]

The IPO was completed on August 16, 2005, after the final Prospectus dated August 10, 2005 was issued in which Mayer Brown and Weil each was described as having represented Refco, Inc. in connection therewith.

On August 16, 2005, Mayer Brown issued an opinion letter to CSFB in connection with the S-1 that made limited representations almost identical to those it had made on August 5, 2004 in connection with the Offering Circular.[856] Even though the Prospectus was misleading in substantially the same manner as the prior Offering Circular, Mayer Brown apparently made no effort to correct those misrepresentations or inform Refco or Weil of them, although arguably having a duty to do so.[857]

---

[853] *See* the following Mayer Brown time record(s): MBRM-EX 00049083, 108; MBRM-EX 00049903; MBRM-EX 00163246, 47, 53-55, 57, 59-60. *See* the document(s) with the following beginning document number(s) or number range(s): GT-SEC-0082110; MBRM-EX 00003762; MBRM-EX 00063243; REFCO-0008-218157; REFCO-E-002029320; REFCO-E-002216213; REFCO-E-008612971.

[854] *See* the following Mayer Brown time record(s): MBRM-EX 00163259-60.

[855] *See* the following Mayer Brown time record(s): MBRM-EX 00049938.

[856] WGM-R-0011142-43. *See also* MB02221982-83 (draft of letter adding phrase "with the staff of the Securities and Exchange Commission" among other changes to prior draft).

[857] *See Dechert,* 246 A.D.2d 481, 667 N.Y.S.2d 745.

Two days after the closing of the IPO, the form of the Round Trip Loan documents that were prepared by Koury for use with the May 2005 Round Trip Loan were used by Maggio to engage in a $420 million Round Trip Loan transaction.[858]

Mayer Brown continued to represent Refco at least through October 6, 2005.  On that date, Ware sent a Status Report regarding pending litigation to Klejna, and Collins sent an audit response letter to GT pertaining to the quarterly period ended August 31, 2005.[859]

### 3.    Conclusions: Analysis of Potential Claims Against Mayer Brown

The Examiner concludes that there is sufficient evidence to allow the Refco estate to state a claim upon which relief may be granted for legal malpractice, aiding and abetting the breach of fiduciary duty, and aiding and abetting fraud.  On March 22, 2007, counsel for Mayer Brown made a written submission to the Examiner on a confidential basis to set forth Mayer Brown's position on various areas of questioning during the interviews, along with three expert affidavits. The Examiner considered this submission in reaching his conclusions.

### a.    Legal Malpractice

As discussed in more depth in Appendix A, to establish a claim for legal malpractice in New York,[860] the plaintiff must allege and prove that (1) the defendant failed to exercise the care, skill, and diligence commonly possessed and exercised by a member of the legal profession; (2) the defendant's negligence was a proximate cause of the loss sustained; (3) the plaintiff

---

[858] *See* the document(s) with the following beginning document number(s) or number range(s): REFCO-HC-0533888; REFCO-0002-000085-113.

[859] REFCO-E-002029320; REFCO-E-002216213.

[860] While an attorney may face liability under a number of theories, New York courts typically view claims for breach of fiduciary duty and breach of contract as duplicative of legal malpractice claims.  *See, e.g., Flutie Bros. LLC v. Hayes,* No. 04 Civ. 4187(DAB), 2006 WL 1379594, at *7-*8 (S.D.N.Y. May 18, 2006); *Amadasu v. Ngati,* No. 05CV2585(JFB)(LB), 2006 WL 842456, *9 (E.D.N.Y. Mar. 27, 2006); *InKine Pharm. Co. Inc. v. Coleman,* 759 N.Y.S.2d 62, 63 (N.Y. App. Div. 2003).  For ease of reference, therefore, this claim will be described as "legal malpractice."

incurred actual damages as a result of the defendant's actions or inaction; and (4) that but for the defendant's negligence, the plaintiff would have prevailed in the underlying action or would not have sustained damages.[861]

While the definition and scope of a lawyer's "professional duty" may vary from situation to situation, New York courts often look to the New York Code of Professional Responsibility (the "CPR") and the accompanying Cannons, Ethical Considerations, and Disciplinary Rules ("DRs") to articulate the standard of care for purposes of a legal malpractice claim. Violation of a Disciplinary Rule does not itself constitute malpractice *per se* or create a presumption of malpractice, but "conduct constituting a violation of a disciplinary rule may also constitute evidence of malpractice."[862]

As explained below, there is sufficient evidence to allege that Mayer Brown breached its duties established by common law and by New York DR7-102(a) and DR5-109.

### (i) DR7-102(a)

New York DR7-102(a) prohibits a lawyer from assisting a client with conduct the lawyer knows or should have known to be fraudulent. It states, in pertinent part:

> In the representation of a client, a lawyer shall not: . . . 3. Conceal or knowingly fail to disclose that which the lawyer is required to reveal . . . 5. Knowingly make a false statement of fact or law . . . 7. Counsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent . . . 8. Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.

---

[861] *Brady v. Bisogno & Meyerson*, 819 N.Y.S.2d 558, 559 (N.Y. App. Div. 2006).

[862] *Swift v. Choe*, 674 N.Y.S.2d 17, 21 (N.Y. App. Div. 1998); *accord William Kaufman Org., Ltd. v. Graham & James LLP*, 269 A.D.2d 171, 173 (N.Y. App. Div. 2000); *GD Searle & Co., Inc. v. Pennie & Edmonds LLP*, No. 602374/00, 2004 WL 3270190, *1 (N.Y. Sup. Ct. Jan. 14, 2004); *cf. Tilton v. Trezza*, No. 005818/2003, 2006 WL 1320738 (N.Y. Sup.), *5 (Mar. 27, 2006) (holding expert may testify about ethical standards in legal malpractice action but may not cite CPR).

Cases interpreting the word "knowingly" in the context of DR7-102(a) and other DRs make clear that the concept of "knowing" encompasses "should have known."[863]

### (a)    Assisting with the Round Trip Loans

There is evidence that Mayer Brown committed malpractice by conduct that, if proven to be true, would violate DR7-102(a) — specifically, assisting Refco with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent.  Mayer Brown admits that:

- It represented Refco for a substantial period of time, ranging from early 1994, when Collins came to Mayer Brown and brought Refco with him as a client, through and including the time that Refco filed for bankruptcy in October 2005.

- Beginning no later than February 2000, and continuing until May 2005, Mayer Brown documented, and on a number of occasions performed other services in connection with, multi-million dollar Round Trip Loan transactions involving two Refco entities (RCM and RGL), the holding company owned by Bennett and others (RGHI), and third-party Round Trip Loan Participants.

In addition, there is sufficient evidence to allege that Mayer Brown knew that these Round Trip Loan transactions:

---

[863] *See, e.g., In re Robert,* 10 A.D.3d 96, 779 N.Y.S.2d 236, 238 (2004) (respondent lawyer *knew or should have known* that a statement made by him was misleading, in violation of DR7-102(a)(4)); *In re Bunting,* 10 A.D.3d 146, 781 N.Y.S.2d 153 (2004) (respondent lawyer *knew or should have known* his testimony was false and misleading in violation of DR1-102(a)(4)).  ASS'N OF THE BAR OF THE CITY OF N.Y., FORMAL OPINION 2002-1, *available at* http://www.nycbar.org/Ethics/eth2002-1.html.  *See also* rationale of *Florida Bar v. Brown,* 790 So.2d 1081 (Fla. 2001):

> Our legal system depends on attorneys who appropriately question requests by clients that should arouse suspicion, and an attorney must not permit his or her judgment to be influenced by the desire to please a client. . . .  Moreover, Brown's failure to fully consider the propriety or legality of Malone's request resulted in the involvement of his law firm in this scheme, jeopardizing the firm and other attorneys.

> By failing to consider the legality of Malone's request, Brown assisted his client in conduct that Brown should have known was criminal or fraudulent, violating rule 4-1.2(d).

790 So.2d at 1088.

- were engaged in at the expense of RCM, which advanced the funds or credits for the Round Trip Loans to the Round Trip Loan Participants, and paid the interest to the Round Trip Loan Participants;

- involved no risk of loss by the Round Trip Loan Participants, and, indeed, essentially guaranteed the Round Trip Loan Participants a positive return on the transactions;

- created the risk of loss to RGL for the non-repayment by RGHI of the loans from the Round Trip Loan Participants to RGHI, and exposed RGL to a contingent liability of as much as $720 million and the risk for any loss or expense suffered by the Round Trip Loan Participants for participating in the Round Trip Loans;

- were engaged in for the benefit of RGHI;

- straddled a several week period at the end of one Refco financial reporting period and the beginning of the next financial reporting period;

- had no apparent business purpose; and

- violated loan covenants.

Finally, although Collins and the other Mayer Brown witnesses denied knowing some or all of the following, the Examiner concludes that there is sufficient evidence to allege that Mayer Brown knew, should have known, or consciously avoided knowing, that:

- there was a substantial receivable owing from RGHI to Refco;

- the purpose of the Round Trip Loan transactions was to temporarily mask portions of the RGHI Receivable and replace those portions with what appeared to be legitimate receivables owing from unrelated third-parties;

- the effect of such masking of the RGHI Receivable would be to materially misstate Refco's financial condition on its audited financial statements; and

- those materially misstated audited financial statements would be presented to, and relied upon, by third parties.

> ### (b)    Failure to Disclose/False Statements in Connection with LBO, IPO, and Related Transactions

Mayer Brown also committed malpractice by conduct that, if proven to be true, would violate DR7-102(a) by failing to disclose material matters and by making affirmative statements

that it knew, or should have known, were untrue.  There is sufficient evidence to allege that

Mayer Brown:

- engaged in the due diligence process with respect to the LBO and was responsible for providing due diligence materials to THL and Weil;

- was asked by THL and Weil to provide due diligence materials and information regarding the existence, or lack of existence, of any dealings between RGHI and Refco;

- failed to disclose to THL and Weil the existence of the multiple multi-million dollar Round Trip Loan transactions for which Mayer Brown had prepared, and was preparing, the documentation;

- was involved in the negotiation and preparation of the definitive agreement between Refco and THL;

- knew that the agreement contained false representations pertaining to, *inter alia*, disclosed liabilities, disclosed debts or obligations, and a covenant not to assume or guarantee any indebtedness in excess of $5 million;

- continued to prepare documentation for multi-hundred million dollar Round Trip Loan transactions that were guaranteed by RGL after the signing of the definitive agreement between THL and Refco, after the closing of the LBO and the resulting change of ownership, during the course of the Senior Subordinated Notes registration transaction, and during the course of the due diligence period leading up to the closing of the IPO;

- failed, after inquiry, to disclose to THL and Weil the existence of "profits only" membership interests held by Bennett, Trosten, and other members of Refco's senior management;

- failed to disclose to THL and Weil the testimony of Trosten, provided prior to the closing of the IPO, and known to Mayer Brown from the presence of two of its attorneys at that testimony, that he (Trosten) had a profits interest in Refco, as well as an interest in the proceeds of the sale of Refco over a "strike price" of $900 million, and that he had received $45 million from the proceeds of the LBO in partial payment for those interests;

- participated in the due diligence process for the registration of the Senior Subordinated Notes and the IPO, and reviewed the various drafts of the operative documents filed with the SEC and the comments thereto by the SEC and the responses thereto by Weil on behalf of Refco; and

- failed to disclose any of the matters described above to any of the independent directors of Refco, or anyone associated with THL.

### *(ii)* *DR5-109*

New York DR5-109 provides, in relevant part:

(b)     If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law that reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization.[864]

Mayer Brown continued to represent Refco in Round Trip Loan transactions at the time of the LBO and IPO. Mayer Brown did not bring the Round Trip Loans to the attention of anyone independent of Bennett — including, after the LBO, THL-related directors or independent directors. This may constitute a violation of DR5-109.

---

[864] DR5-109 continues:

(b) . . . In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include, among others:

(1) asking reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

(c)     If, despite the lawyer's efforts in accordance with DR 5-109 (B), the highest authority that can act on behalf of the organization insists upon action, or a refusal to act, that is clearly a violation of law and is likely to result in a substantial injury to the organization, the lawyer may resign in accordance with DR 2-110.

### (iii)    *Conflict of Interest*

Mayer Brown's conduct in representing parties that have conflicting interests — RGHI and (at least after the LBO) RGL — in contravention of DR5-105, is further evidence of Mayer Brown's malpractice. DR5-105 forbids a lawyer from representing a client if that representation will adversely affect the interests of another current client. The Rule states in part, "[A] lawyer may represent multiple clients if a disinterested lawyer would believe that the lawyer can competently represent the interest of each and if each consents to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved."[865] Subject only to the exception contained in DR5-105(c), the provisions of DR5-105(a) and (b) prohibit undertaking or continuing in multiple representation "if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected" or "if it would be likely to involve the lawyer in representing differing interests." The New York Code defines differing interests as "every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be conflicting, inconsistent, diverse, or other interest."[866]

Mayer Brown's continued representation of both RGL and RGHI in connection with the Round Trip Loans after the LBO constituted a conflict of interest. RGL's interest in the Round Trip Loans were directly at odds with those of RGHI. Indeed, the Round Trip Loans, which included a guarantee by RGL of RGHI's obligations and an indemnity in favor of the Round Trip Loan Participant, placed RGL at risk with no corresponding consideration flowing to RGL. Although RGL and RGHI may have been able to consent to this conflict following full

---

[865] *See* DR5-105(c).

[866] 22 N.Y.C.R.R. § 1200.1(a).

disclosure when Bennett controlled both RGL and RGHI, no such assumption is warranted after the LBO, since THL became the controlling owner of RGL while Bennett remained in control of RGHI.  To the contrary, had Mayer Brown "full[y] disclos[ed] the implications of the simultaneous representation and the advantages and risks involved" to THL, as it was required to do, it seems unlikely that THL would have consented to the simultaneous representation that disadvantaged RGL.  In any event, the Examiner found no evidence of a request for a waiver of any conflict of interest.

> **b.    Aiding and Abetting Breach of Fiduciary Duty/Aiding and Abetting Fraud**

The Examiner concludes that, based on the evidence reviewed to date and summarized above, Refco's estate, more likely than not, could state a claim upon which relief may be granted for aiding and abetting a fraud and/or breach of fiduciary duty.[867]  The elements of these claims are discussed in greater detail in Appendix A.

In this case, the Examiner concludes there is sufficient evidence to allege that Mayer Brown aided and abetted a breach of fiduciary duty and fraud by:

- drafting and sometimes negotiating the transaction documents for the Round Trip Loans while knowing that the Round Trip Loans were part of a scheme to fraudulently bolster Refco's financial appearance to lenders and investors by manipulating Refco's financial statements;

- failing to disclose its knowledge of the RGHI Receivable and Round Trip Loan scheme to persons at Refco independent of Bennett — including, after the LBO, THL personnel and, after January 2005, Refco's independent outside directors — even though Mayer Brown, as a fiduciary, was under a duty to disclose its knowledge;

- drafting loan documents that benefited RGHI, to the detriment of Refco, after the LBO;

---

[867] The Examiner assumes for purposes of this analysis that a fraud and breach of fiduciary duty by one or more of the officers of Refco can be established.

- failing to disclose and making material misrepresentations to Weil, who was counsel to THL, during the LBO; and

- failing to disclose material information during the course of the IPO.

**B.    WEIL, GOTSHAL & MANGES LLP**

      **1.    Introduction and Overview of Investigation**

Weil represented THL, but not Refco, in connection with the LBO which closed August 5, 2004. Weil undertook "legal" due diligence,[868] drafted the Equity Purchase and Merger Agreement and associated LBO documents, [869] and drafted documents in connection with the Senior Subordinated Notes and bank financing for the LBO.[870] Weil was paid $3,765,000 from the proceeds of the LBO.[871]

After the LBO, Weil simultaneously represented THL, Refco, and certain members of Refco's Board of Directors in connection with various matters. The Examiner evaluated these representations by Weil for potential claims by Refco's estate against Weil. Specifically, the Examiner focused on Weil's representation of Refco in connection with its filings with the SEC

---

[868] WGM-L 0011186.

[869] WGM-L 0017759, at App. D-51.

[870] *E.g.,* WGM-L 0002711; WGM-L 0002735; WGM-L 0032319-60; WGM-L 0032368-405; WGM-L 0032445-83; WGM-L 0032484-519; WGM-L 0022421-23; WGM-L 0001800; WGM-L 0002012; WGM-L 0002187. In addition to its diligence, as THL decided to acquire a majority stake in Refco, Weil prepared the operative acquisition documents, beginning with THL's letter of intent to purchase a majority stake in Refco, executed on or about April 19, 2004. WGM-L 0007925, at App. D-55. Weil also drafted the Equity Purchase and Merger Agreement, executed by THL and RGHI on or about June 8, 2004. WGM-L 0017759, at App. D-51. Finally, Weil drafted and negotiated on behalf of THL the documents associated with the closing of the LBO. WGM-L 0018313. In particular, Weil participated in the drafting and negotiation of the Credit Agreement and related agreements pursuant to which New Refco and its affiliates borrowed $800 million. *E.g.,* WGM-L 0002711; WGM-L 0002735; WGM-L 0032319-60; WGM-L 0032368-405; WGM-L 0032484-519. Weil participated in the drafting of the Offering Circular for the Senior Subordinated Notes and coordinated activities with counsel for the notes' underwriters. *E.g.,* WGM-L 0022421-23; WGM-L 0001880; WGM-L 0002012; WGM-L 0002187. For these post-LBO activities, there was a general commonality of interest between THL and Refco in selling the notes and securing the credit for New Refco, with THL acting as the "sponsor" for the financing. WGM-L 0007945; WGM-L 0009782; Interview of James Westra ("Westra Interview"), 157:4-158:16.

[871] WGM-L 0018907.

for approval of Refco's sale of registered notes in April 2005 and its initial public offering of stock in August 2005.

Weil's work for THL does not give rise to claims by the Refco estate against Weil. However, Weil's work for THL is relevant to an analysis of the Refco estate's possible claims against Weil arising out of Weil's work for Refco.  Accordingly, the discussion below includes an overview of Weil's and other professionals' work for THL in connection with the LBO, in addition to a detailed discussion of Weil's engagement by Refco itself.

### a.    Document Review

The Examiner had access to a database of Refco documents maintained by the Debtors' counsel and documents produced to the SEC and to the Creditors Committee by various other individuals and entities mentioned in this Report.  The Examiner conducted targeted searches that allowed him to review the most significant and relevant documents from these databases.

The Examiner also obtained a significant number of documents directly from Weil. Given that Weil had not previously produced its own documents to the SEC or to the Creditors Committee, Weil stated that it had not assembled these documents to be readily available for production.  The Examiner obtained authorization from Refco for Weil to provide potentially privileged documents to the Examiner.[872]  The Examiner and Weil also reached agreement on the protections that documents designated by Weil as confidential and highly confidential would be afforded.[873]  Although efforts were undertaken to avoid duplicative production of documents

---

[872] Pursuant to a November 1, 2006 letter to Weil from Skadden, as counsel for Refco, the Chapter 7 Trustee for Refco LLC, and the RCM Trustee, Weil was authorized to produce to the Examiner certain documents otherwise possibly protected from disclosure because of their privileged nature. Weil, however, did not produce privileged documents related solely to its representation of THL.

[873] The Examiner and Weil entered into a letter agreement dated November 27, 2006, pursuant to which the terms of the April 26, 2006 Protective Order Governing the Production and Use of Confidential Material would apply to materials Weil voluntarily produced to the Examiner as if they were produced in response to a Rule 2004 Subpoena.

already in the Examiner's possession, the volume of responsive Weil materials was substantial[874]

and portions of Weil's files were not electronically searchable and retrievable, thus requiring

Weil to manually review and produce a considerable number of hard copy documents in addition

to the electronic document productions.

Weil was generally cooperative in providing the Examiner with access to documents.

Nevertheless, the Examiner experienced significant delays in obtaining and reviewing documents

from Weil's files as a result of the factors described above.  Given these delays, and owing to the

large volume of Weil documents, Weil continued to produce documents through the final stages

of drafting this Report.  As a result, not all documents produced to the Examiner are referred to

in this Report.

### b.    Interviews

The Examiner interviewed the following Weil attorneys who had the most significant

involvement with Weil's work relating to Refco:

- James Westra ("Westra") - Westra joined Weil in 2002 as a partner in Weil's
  Boston office and became co-head of Weil's private equity group in or around
  September 2005.  Westra was the relationship partner for the THL and Refco
  engagements and had ultimate responsibility for Weil's work in connection with
  THL's acquisition of Refco.  Westra had limited involvement in Weil's work on
  Refco's private note offering, registered note offering, and subsequent IPO, but he
  reviewed documents and was provided updates regarding those transactions.

- Jay Tabor ("Tabor") - Tabor has been a partner in Weil's Dallas office since
  1999.  He focuses his practice on mergers and acquisitions and private equity
  transactions.  Tabor was responsible for the day-to-day management of Weil's
  work in connection with THL's acquisition of Refco.  After the LBO closed,
  Tabor's involvement with the Refco engagement was primarily to manage
  Refco's corporate restructuring in preparation for the IPO and to consult with

---

[874] Weil made available for the Examiner's review in New York approximately 150 boxes of hard copy documents.
In addition, Weil identified over 150 timekeepers who billed time to Refco matters.  From these, the Examiner
prioritized his requests for documents to twenty-one custodians initially, and followed up with seven additional
custodians once the production of responsive files from the initial list of custodians was completed.

other Weil teams regarding the LBO structuring and its description in SEC filings. Tabor reported to Westra in connection with his work on Refco.

- Alexander Lynch ("Lynch") - Lynch has been a partner in Weil's New York office since joining the firm in April 2004. He focuses his practice on equity capital markets transactions. Lynch became involved in the Refco transactions beginning in late 2004 and was responsible for Weil's work in connection with Refco's registered note offering and IPO.

- Barbra Broudy ("Broudy") - Broudy joined Weil's New York office as an associate upon graduating from law school in 2003. Broudy's involvement with Refco began in spring 2004. She had significant involvement in the private note offering, the registered note offering, and the IPO. Broudy appears to have essentially coordinated Weil's due diligence efforts in connection with the registered note offering and IPO. Broudy reported to Lynch.

Weil's counsel cooperated with the Examiner and agreed to make the aforementioned witnesses available consensually. The interviews were transcribed but were not taken under oath. All four Weil witnesses appeared to counsel for the Examiner to be reasonably forthcoming and generally made an effort to answer questions, although there were a number of documents and subjects about which the witnesses had little or no recollection.

### 2. Overview of Weil's Representation of Refco

After the LBO, and upon THL's assumption of control over Refco, Refco engaged Weil to provide some legal services to Refco. Weil coordinated Refco's filings with the SEC in connection with the approval of Refco's sale of registered notes in April 2005 and its initial public offering of stock in August 2005.

According to relevant documents, preliminary planning for the IPO began immediately after the closing of the LBO in August 2004.[875] Weil held an initial meeting to discuss the requirements of the IPO and to begin its legal work in connection with the IPO on or about

---

[875] WGM-R E156852; WGM-R 0032286.

October 19, 2004.[876]  Weil's work in connection with the sale of Refco's registered notes was on

a parallel track with Weil's work in connection with the IPO.[877]  Weil determined to complete its

work and obtain SEC approval for the sale of registered notes, then file its papers and begin the

process to obtain SEC approval for Refco's IPO prospectus immediately thereafter.  In fact, Weil

and Refco gained approval for its Form S-4 on or about April 8, 2005, which was the same day

that Weil filed on behalf of Refco its first draft Form S-1 prospectus in connection with the IPO.

Weil did not serve as Refco's sole outside counsel for the period following the LBO.  In

particular, Mayer Brown continued to act as counsel to Refco in certain matters, including

certain litigation matters,[878] an investigation by the SEC,[879] and Refco's acquisition of Cargill

Investor Services in the summer of 2005.[880]

Weil provided other legal services to Refco in addition to its work in preparing the S-4

registration statement and the S-1 IPO prospectus.  In fall 2004, THL asked Weil to assist

Refco's General Counsel, Dennis Klejna, in addressing matters that would be necessary for the

governance of a public company.[881]  For example, Weil suggested procedures for managing

board meetings and for coordinating the various committees of a board, prepared corporate

governance policies, procedures, and documents for use by Refco in connection with its public

---

[876] *See* WGM-R 0014031-64 (Organizational Materials for an Initial Public Offering for Refco dated October 19, 2004).  Broudy explained in her interview that this was the "kickoff meeting" for the initial public offering.  Interview of Barbra Broudy ("Broudy Interview"), 33:5-10.

[877] Broudy Interview, 14:15-19.

[878] Westra Interview, 201:12-18.

[879] WGM-R E158182.

[880] Westra Interview, 201:9-10.

[881] *Id.*  At least by October 2004, THL was concerned that Klejna was not acting as a true general counsel for Refco.  With his regulatory background, THL believed he did not have the experience necessary to address the issues related to the SEC filings and the demands of a public company generally.  WGM-R E157000, at App. D-56.

filings,[882] and assisted Refco in the preparation of organizing documents for the various committees of Refco's board, including the audit committee and compensation committee.[883] Weil also prepared the employment agreement for Refco's new CFO, Gerald Sherer, in December 2004.[884]

Following the IPO, Weil continued to represent Refco on matters relating to its status as a public company, providing advice on such matters as restrictions on the sale of Refco stock following the IPO and on rules for filing 8K, 10K, and 10Q reports with the SEC.[885] This engagement continued at least through the public disclosure of Refco's round trip lending and receivables scheme in October 2005.

Simultaneously, Weil represented THL and the members of Refco's board who were affiliated with THL. At the time of the LBO, THL was permitted to appoint four members of Refco's management committee, and Weil retained its attorney-client relationship with those members of the board. Weil continued to represent THL and the THL-affiliated members of the Refco board throughout its representation of Refco. Despite the potential for conflict between Refco, THL, and members of Refco's board, the Examiner could not find and Weil could not identify any conflict waivers executed either by Refco or by THL in connection with Weil's simultaneous representation.[886]

In the matters in which Weil was not representing Refco directly, Weil provided oversight of Refco through its representation of THL and the THL-affiliated members of Refco's

---

[882] WGM-R 0013945-48.

[883] WGM-R 0006996-007025; WGM-R 0007975-77.

[884] WGM-R 0017387-90.

[885] WGM-R 0017615-17; WGM-R E000226.

[886] Westra Interview, 158:17-159:4.

board, at least until the IPO closed.  For example, at one point in April 2005, in reviewing a news article discussing a dispute between Refco and another party, THL advised Weil to "make sure Refco was acting appropriately in light of the upcoming IPO."[887]  In another example, Weil was asked to review on behalf of THL the diligence and transaction documents prepared by Mayer Brown on behalf of Refco in connection with Refco's acquisition of Cargill.[888]  For those significant matters where Weil did not represent Refco directly, it appears likely that THL made Weil aware of the matters and that Weil advised THL in connection with Refco's handling of the matters.

### 3.    Background Regarding LBO and Related Matters

#### a.    Division of Labor with Respect to LBO Diligence

Weil represented THL in connection with THL's due diligence and in preparing the documents related to the LBO.  Weil was engaged to conduct "legal" due diligence in connection with the Refco acquisition.[889]  THL engaged KPMG to conduct financial, accounting, and tax diligence.  THL also engaged McKinsey, Marsh, Inc., Mercer Consulting, and Sandler O'Neill to conduct various kinds of diligence.[890]  In addition, it appears that THL satisfied itself with respect to many diligence inquiries without relying on Weil or its other professionals.  THL did not ask Weil generally to coordinate all of the diligence conducted on THL's behalf.[891]  Accordingly, Weil was not privy to all of the information collected by THL or THL's agents during the diligence period.  Weil worked with KPMG on certain tax matters in order to structure

---

[887] WGM-R 0017385-86.

[888] WGM-R 0018178-80; WGM-L 0039385-469; WGM-L 0039470-648.

[889] Interview of Jay Tabor ("Tabor Interview"), 27:20-28:8.

[890] Tabor Interview, 35:22-36:6; WGM-L 0011557-73.

[891] Tabor Interview, 36:7-17.

the acquisition, and Weil was provided copies of draft reports prepared by KPMG in connection

with its diligence on financial, accounting, and tax matters.[892]

### b.    Weil's Initial Diligence in Connection with the LBO

Weil began its principal diligence work for THL in connection with the LBO by

reviewing documents provided by Refco's investment banker, CSFB, in February 2004.[893]  In its

initial review of documents, Weil appears to have learned that the RGL limited liability company

agreement permitted the issuance of "profits membership shares," and Weil apparently accepted

a representation that no such shares were then issued.[894]  Weil also learned that Refco was a

party to the PPA.[895]  Although Weil appears to have recognized the existence of the PPA, it does

not appear to have obtained or requested a copy of it.  Weil notes from February 2004 regarding

the PPA contain the notation "(Get copy of?)."[896]  A generally contemporaneous list of "open

---

[892] WGM-L 0002207.

[893] It is not clear what documents Weil initially requested or CSFB made available for review.  Weil has a generic request list for conducting its legal due diligence, which it then customizes depending on the issues posed by the "target," *i.e.*, the company to be acquired.  Westra Interview, 98:13-99:11; WGM-L 0011206-17.  Among other things, Weil's generic request list includes items such as:

- the Target's LLC agreement, as amended;
- all agreements among the officers or directors of the company relating to indemnity, employment, or compensation;
- all loan agreements or other debt instruments, including any guaranties of indebtedness by other persons;
- agreements governing accounts receivable or other securitization transactions;
- agreements providing for payments or benefits upon consummation of the proposed transaction;
- all federal, state, local, or other tax returns and reports filed for the last three fiscal years;
- all lease agreements relating to real property; and
- a list of all pending or threatened litigation or administrative proceedings.

It is not clear whether Weil used this generic list in this instance.

[894] WGM-L 0010412-13 (notes from due diligence summarizing basic information about Refco).

[895] *Id.*

[896] *Id.*

diligence items" prepared by Weil, dated February 26, 2004, noted the PPA as a "minor point to keep track of."[897]

Following its initial review of documents, Weil asked for additional documents to review. By March 31, 2004, the following material information that Weil had requested — sometimes multiple times — had not been made available:

- "employment agreements or arrangements with key employees;"[898]

- documentation for all of Refco's debt;[899]

- information relating to Refco's current or previous owners: RGHI, Refco Group Holdings, LLC, and BOI, including corporate documentation for such entities;[900]

- any written or oral arrangements among the owners/members of Refco "especially, although not exclusively, in connection with the sale of any part of [Refco];"[901]

- an executed LLC agreement for Refco;[902]

- any agreement with the former managers of Refco, including Thomas Dittmer, William Graham, and Edwin Cox,[903] including the agreement pertaining to Dittmer's "carrier" interest in Refco entitling him to a payout should Refco sell itself or issue shares in a public offering;[904] and

- a copy of "an intercompany debt agreement for $16 million."[905]

In late March, THL directed Weil and KPMG to suspend their diligence activities, indicating its "disappointment" that Refco could not respond to their diligence requests.[906] Weil

---

[897] WGM-L 0011187.

[898] WGM-L 0011186; WGM-L 0011015; WGM-L 0011020.

[899] WGM-L 0011015; WGM-L 0011020.

[900] WGM-L 0011015; WGM-L 0011020.

[901] WGM-L 0011015; WGM-L 0011020.

[902] WGM-L 0011015.

[903] *Id.*

[904] WGM-L 0012477-78 n.1.

[905] WGM-L 0011020.

admitted that it had been "frustrated" by Refco's inability or unwillingness to respond to its requests, and there were numerous open items on Weil's diligence list.[907]

### c.    THL's Letter of Intent and Weil's Continuing Diligence

In early April 2004, despite the lingering gaps in its diligence, THL made a proposal for the purchase of an interest in Refco.  On or about April 19, the parties executed a Letter of Intent in which THL set forth generally the terms under which it would buy its interest, subject, among other things, to addressing diligence items and executing a definitive purchase agreement.[908] The diligence items included:

- information Weil had previously requested relating to RGHI and BOI, the intercompany debt agreement, and discussion of employee matters;[909]

- information relating to "analysis of receivables as of February 28, 2003, November 30, 2003 and February 29, 2004 quantifying amounts due from customers; brokers and dealers; shareholders loans; and other loans, etc;"[910] and

- Refco's tax returns for the years since 1999.[911]

Following execution of the Letter of Intent, Collins of Mayer Brown provided a series of memos to Tabor in May 2004 addressing the outstanding requests and providing additional information.[912]  In his interview with counsel to the Examiner, Tabor stated that Collins told him that there were no agreements or arrangements between Refco and its senior executives, and that Collins and Bennett repeatedly told him that there were no "transactions" between RGHI and

---

*(footnote continued from previous page)*

[906] THL/SEC 00051785; KPMG-THL 0024323, at App. D-57.

[907] Tabor Interview, 132:10-133:13.

[908] WGM-L 0007925-44, at App. D-55.

[909] WGM-L 0007942-43.

[910] WGM-L 0007944.

[911] *Id.*

[912] *E.g.,* WGM-L 0023344-54.

Refco.[913]  These representations were later incorporated into the representations and warranties included in the Equity Purchase and Merger Agreement.[914]

As of May 13, 2004, Weil was still seeking the information it had previously sought related to RGHI and BOI.[915]  Despite its request for information relating to BOI, Weil did not undertake to contact BOI, its parent, or its counsel directly to ask for information.[916]  Instead, Weil concluded it was more efficient simply to deal with Refco and to use Refco and its counsel (Mayer Brown) as an intermediary for collecting all information it needed regarding BAWAG or BOI.[917]

### d.    KPMG's Diligence and Report on Accounting, Financial, and Tax Information

Meanwhile, following execution of the Letter of Intent, KPMG attempted to complete its diligence on financial, accounting, and tax matters.  Weil learned that GT, Refco's auditor, refused to release to KPMG significant audit work papers, which KPMG stated had limited its

---

[913] Tabor Interview, 62:7-63:20 (stating that Weil was told on multiple occasions by Collins, Bennett, through written representations in the purchase agreement, and in response to questionnaires that "there were no transactions, period" between Refco and RGHI); 265:20-24.

[914] In section 3.3 of the Equity Purchase and Merger Agreement, RGHI represented and warranted that Exhibit A to the Agreement set forth "a true, complete and correct list of all of the members of [Refco] immediately preceding the execution and delivery of this Agreement."  Exhibit A listed RGHI and BAWAG, but not any of the executives who had held profits membership interests in Refco.  Similarly, section 3.12 stated, "Except as set forth on Schedule 3.12, since March 1, 2003, no officer . . . of [Refco] has had, either directly or indirectly, a material interest in any contract or agreement to which [Refco] is a party . . .  except for employment contracts entered into on an arm's length basis."  WGM-L 0017777, at App. D-51.  Schedule 3.12 did not list any such interests.  *Id.*  In fact, eight Refco executives were due to receive a total of $106 million as part of that very Agreement.

In section 3.15(vi), Refco represented that it was not bound by any "agreement which contains restrictions with respect to payment of any distribution in respect of any of the Membership Interests," WGM-L 0017780, except as disclosed in the schedules.  No such agreement was listed in the schedules.  WGM-L 0017969-73.  In fact, Refco had entered into the PPA to require the payment to DF Capital of a portion of the proceeds that would otherwise be paid to RGHI.

[915] REFCO-0005-072185-87.  Weil continued to seek information related to the possible "carrier" interest held by Dittmer and any other rights that may vest upon Refco's sale.  *Id.*  The evidence suggests that a meeting was conducted that day that addressed these issues, though the Examiner could not locate documents reflecting the results of that discussion or any information that was passed to Weil relating to these issues.  THL/SEC 00011257.

[916] Tabor Interview, 197:3-198:8.

ability to complete the tasks THL had asked it to address.  In a draft report to THL provided to

Weil, KPMG stated that it could not determine the specific nature and extent of audit procedures

performed by GT because of its limited access to the work papers.[918]  In particular, KPMG stated

in its May 17, 2004 draft report that GT would not make available its work papers documenting

its audit conclusions related to Refco's credit risk loss reserves and the adequacy of such

reserves, even though GT considered Refco's credit risk relating to customer balances to be a

"critical" audit area.[919]  KPMG's report also reflected a discussion in which Trosten stated that

Refco had incurred a loss of $42 million from customers whose positions had suffered reversals

as a result of the 1997 Asian financial crisis and that Refco continued in 2004, some seven years

later, to hold a reserve of the full $42 million for that loss.[920]

KPMG also observed that as of February 28, 2003, "receivables from members, affiliated

parties, and related parties" amounted to $105 million, but that this amount had been received as

of February 29, 2004.[921]  KPMG did not describe in more detail what fell within the $105 million

figure, and the Examiner did not locate any evidence indicating that KPMG, THL, or Weil

investigated this figure.  Similarly, the Examiner did not locate any evidence in which Weil or

THL addressed the potential inconsistency between KPMG's statement as to the related party

---

*(footnote continued from previous page)*

[917] *Id.*

[918] WGM-L 0010268-69.

[919] WGM-L 0010268.

[920] WGM-L 0010233; WGM-L 0012451, at App. D-58.  KPMG also shared with THL its belief that Trosten would not be an effective CFO of a public company, though it did not include this conclusion in its written report. Interview with John Berndsen ("Berndsen Interview"), 31:10-32:15.  THL shared this view, and THL expressed this view to Weil.  WGM-L 0025262, at App. D-59.  Though it was not reflected in the documents between the parties as a condition for closing, THL demanded to Bennett that Trosten be replaced after THL acquired a controlling interest in the company.  Tabor Interview, 189:24-191:4.

[921] WGM-L 0010252.

receivables and Tabor's recollection of Collins' statement that there were no "transactions" between RGHI and Refco.

KPMG's May 21, 2004 "final" draft report reflected its review of Refco's tax returns for the years 2000-2002.[922] The tax returns for 2002 (and for 2003, which apparently were not complete at the time of the LBO diligence) included K-1 returns that appear to reflect that eight of Refco's senior executives held equity positions in Refco for those tax years.[923] John Berndsen of KPMG stated that KPMG reviewed Refco's recent tax returns, but also stated that KPMG was not charged with determining the ownership of Refco.[924] Tabor stated Weil undertook to verify the ownership of equity interests in Refco, but though at least one tax partner was on Weil's LBO team, and though Weil had included tax returns among the items it sought for its legal due diligence, Tabor stated that he believed that no one at Weil had reviewed the tax returns before the Equity Purchase and Merger Agreement was signed or before the LBO closed.[925] The Examiner did not locate any document reflecting Weil's review of Refco's tax returns or its attempt to reconcile the apparent inconsistency between the tax returns and Collins' and Refco's statements that the only owners of Refco were RGHI and BOI.

### e.    THL's Receipt of Inside Information from "Deep Throat"

On or about May 25, 2004, as Weil and Mayer Brown were exchanging drafts of the Equity Purchase and Merger Agreement and related schedules, THL received a call from an employee at Bear Stearns who was an acquaintance of THL senior partner Scott Schoen.[926] The

---

[922] WGM-L 0012462, at App. D-58.

[923] EY-REF 021336-96; LJC 07048-64.

[924] Berndsen Interview, 133:18-23.

[925] Tabor Interview, 49:14-50:17.

[926] KPMG-THL 0024324, at App. D-57; Attorney Proffer of Testimony of Scott Schoen ("Schoen Attorney Proffer"), 2:23-3:3.  The Examiner sought to interview the THL representative most knowledgeable about facts

*(footnote continued on next page)*

Bear Stearns employee (the "Source") informed Schoen that his cousin had learned that THL was considering an investment in Refco.  The Source reported that his cousin had worked at Refco in the 1990s and had told the Source that while he worked there Refco had been "sloughing off" trading losses into a foreign subsidiary, based in the United Kingdom, whose financial statements were not consolidated with Refco's.[927]  Schoen asked the Source the name of his cousin and asked whether the cousin would be willing to speak with THL.  The Source had not been given authority by his cousin to provide his name to THL, though the Source told Schoen he would ask his cousin.[928]  THL made Weil aware of this "tip."[929]

THL also contacted KPMG about the tip, and Berndsen abruptly cut short a trip to Paris to return to Boston to respond to the issue.[930]  Based on Berndsen's recollection, THL did not describe the details of the tip to KPMG, saying only that an insider (to whom KPMG referred to as "Deep Throat") had expressed reservations about the possible investment in Refco.[931]  THL nevertheless asked KPMG how "something like this" may have manifested itself, and further asked KPMG to provide a list of procedures it might perform to address the issue.[932]  KPMG suggested that THL (1) obtain RGHI's financial statements and tax returns and reconcile them to

---

*(footnote continued from previous page)*

relating to THL's receipt of Refco "inside information" in May 2004 regarding Refco's transfer of trading losses to an unconsolidated foreign subsidiary.  Weil and THL offered to make Scott Schoen available to the Examiner for an interview limited to this subject; however, pursuant to its protocol with the USAO, the Examiner did not interview Schoen.  Instead, the Examiner received a proffer of information from Schoen's attorney setting forth his knowledge of the facts surrounding THL's receipt and handling of the Refco inside information.

[927] *Id.* at 4:4-12.  Schoen and THL learned the identity of the Source's cousin and that he had indeed worked for Refco in the 1990s but not for the last few years.  Schoen Attorney Proffer, 5:6-10.  The Source's cousin, a/k/a Deep Throat, refused to speak with THL about the information he had imparted, however.

[928] *Id.* at 4:20-24.

[929] Westra Interview, 68:6-16.

[930] Berndsen interview, 46:16-23.

[931] *Id.* at 38:11-39:12.

[932] *Id.* at 41:3-9.

Refco's financial statements, seeking to "isolate and investigate all items not flowing through from [Refco]";[933] and (2) obtain details of the nature of all inter-company financing arrangements, both on- and off-balance sheet, and understand the controls over inter-company trading and funding transactions on behalf of customers and management of customer/counterparty limits.[934]  In his interview with counsel for the Examiner, Berndsen stated that these procedures would be "likely fairly simple" to address promptly.[935]  The Examiner concludes that these procedures, if implemented, should have detected the fraud.

After receiving the list of proposed additional diligence procedures, Scott Jaeckel of THL e-mailed Berndsen to indicate THL "was told to look for a 'London Overseas Subsidiary' for possible FX trading losses," and asked whether that "made sense" to Berndsen.[936]  Berndsen responded by e-mail that KPMG had seen in its diligence certain financial statements for Refco Europe in 2002, "audited by [GT UK] and presented in accordance UK GAAP (sic).  Presumably such includes London Overseas Subsidiary.  They were also light on the disclosure."[937]  Berndsen followed with an e-mail noting that Refco Overseas Ltd. was consolidated into Refco Europe Ltd., that Refco Europe Ltd.'s assets as of February 29, 2004 were approximately $58 million, and that Refco had not provided any information about the subsidiary.  Berndsen also noted there were "incidents" in the United Kingdom in 2001.[938]  Berndsen offered to discuss the

---

[933] KPMG-THL 0019714-16, at App. D-60.

[934] *Id.*  The Examiner could not locate a copy of the document that was sent to Weil containing KPMG's proposed procedures.  However, lawyers at Weil received THL's response to KPMG's list (WGM-L 0047309), and there are other documents reflecting contemporaneous e-mail communications between THL, KPMG, and Weil that have been redacted for privilege.  WGM-L E028945.

[935] Berndsen Interview, 52:21-53:12.

[936] WGM-L 0047309.

[937] KPMG-THL 0018038.

[938] THL/UCC 00070314.

matter further with THL.[939]   After receiving Berndsen's response, however, THL did not ask KPMG to undertake any of the KPMG additional diligence procedures.[940]  In his interview, Berndsen stated that he was unaware of what more THL did to follow up on the allegation.[941]

Following a conference call in which Westra participated, Lee and Schoen, along with fellow THL senior partner David Harkins, decided to meet with Bennett to address the matter.[942] Bennett met with Lee, Schoen, and Harkins on June 1.[943]  Schoen reported on the meeting to other members of the THL deal team as well as Westra and Tabor on June 2, 2004, noting that the meeting "went very well" and that "Phil was very constructive."[944]  Schoen summarized the discussion regarding the allegations in a June 2 e-mail as follows:

> He says Overseas Ltd. and Royce Paris were unconsolidated subs
> in the 1990's.  In f/x, where they broker as principal (with the
> client behind them with margin), there were some losses in the
> 1990's (less than 10 million dollars) that they ran through those
> subs to offset European taxable income, rather than paying taxes
> thereon [sic] other earnings and generating foreign tax crdits.  [sic]
> Since 1999 for Overseas Ltd and 2000 for Paris, all have been fully
> consolidated in the LLC rather than owned as separate entities by
> the S Corp.[945]

Through his Weil attorney, Schoen stated to the Examiner that based on this meeting, he did not believe at the time anything illegal or inappropriate had been done.

---

[939] *Id.*

[940] Berndsen Interview, 66:6-11; KPMG-THL 024322, at App. D-57.

[941] *Id.* at 79:19-80:17.

[942] THL/UCC 00033266, at App. D-61.

[943] Schoen Attorney Proffer, 9:11-13.

[944] WGM-L 0025237, at App. D-62.

[945] *Id.*  The Examiner notes that THL referred to Refco as "Royce" throughout the LBO diligence period.  The Examiner has assumed in reviewing these documents that the "S Corp" refers to RGHI, which was a corporation organized under subchapter-S of the Internal Revenue Code.  In response to a question from counsel to the Examiner following up on his attorney proffer, Schoen, through his attorney (Weil), stated he could not now recall if Bennett had indicated in this meeting or whether THL otherwise learned whether Bennett had known about this practice at the time it occurred.

Schoen also indicated in his June 2, 2004 e-mail that Bennett would review the next day how "the owners of the S Corp have handled the tax liabilities stemming from Royce," and that Bennett offered to "rep that both historically and going forward the S Corp has had and will have no brokerage accounts with any Royce entities, as further assurance that there are no trades where the losses are being passed away."[946]   THL accepted Bennett's explanation and decided to proceed with execution of the Equity Purchase and Merger Agreement.   Though Weil did not play a direct role in addressing the issues raised by the Source's information, as noted above, THL kept Weil informed about its activities in seeking out Bennett to attempt to resolve the issue.

### f.   Preparation for and the Closing of the LBO and Related Transactions

As the parties reached agreement on the operative documents in advance of execution of the Equity Purchase and Merger Agreement, THL also undertook to understand how RGHI and Bennett would allocate the proceeds of the LBO transaction.[947]   THL noted that Bennett had been unwilling to provide this information previously.[948]   Five days before the Equity Purchase and Merger Agreement was signed, THL met with Bennett to discuss this allocation of proceeds, and THL reported to Weil that Bennett provided a description of how the proceeds of the transaction would be allocated.[949]   Tabor explained in his interview that as lawyer for the deal, Weil was not concerned with the allocation of proceeds received by RGHI other than to address

---

[946] *Id.*

[947] THL/SEC 00002828.

[948] *Id.*

[949] WGM-L 0025241.

the issues specified in the Equity Purchase and Merger Agreement, and he could not recall whether he discussed the allocation issue with THL.[950]

THL and Weil had intended to complete their due diligence before execution of the Equity Purchase and Merger Agreement, given that THL would be largely bound to proceed with the deal once it signed.[951]   However, in connection with the preparation of the offering circular for the Senior Subordinated Notes, counsel for the underwriters — Cravath Swaine & Moore and Davis Polk & Wardwell — sought to conduct additional diligence.[952]   Over the course of this subsequent diligence period, Weil discovered that Refco had failed to keep THL and Weil informed as to certain pending litigation and matters pending before the SEC that Weil and THL believed should have been disclosed.[953]   THL raised the issue with Bennett on June 19 to demand "the kind of open communication and transparency that we need as partners," and addressed these issues to Weil.[954]

The parties executed the Equity Purchase and Merger Agreement on June 8.  Leading up to the closing of the LBO, Weil prepared memoranda describing the steps to be taken at closing and the flow of funds among the various parties to accomplish the tasks required by the contractual agreements.  Among those steps was the purchase by Bennett of Grant's interest in RGHI, a condition that THL had imposed on RGHI in connection with the Equity Purchase and Merger Agreement.[955]   Similarly, the acquisition of BOI's interest in Refco was described in the

---

[950] Tabor Interview, 99:1-14.

[951] Tabor Interview, 184:21-185:3.

[952] WGM-L E023715.

[953] WGM-L 0025262, at App. D-59.

[954] Id.

[955] Tabor Interview, 95:16-96:1.

Equity Purchase and Merger Agreement and in the closing memoranda prepared by Weil.[956]  The

flow of funds memorandum described the flow of funds from THL and the various debt sources

— as explained in the Credit Agreement and in the Senior Subordinated Note Agreement — to

RGHI and Refco.[957]  The flow of funds memorandum also described the payment of $500

million from Refco to RGHI, reflecting $500 million of "free cash" that Refco had identified in

the diligence process and that was to be paid to RGHI as part of the transaction.[958]  Other than as

described above, the funds flow memorandum did not describe how RGHI would apply the

proceeds of the LBO.  The LBO closed on August 5, 2004.

The first recipients of proceeds from RGHI were the eight senior executives who had

profits participation interests in Refco, apparently unbeknownst to THL and Weil.  Documents

reviewed by the Examiner indicate that in 2002, these eight executives were awarded profits

participation interests under the Refco LLC agreement.[959]  In June 2004, following execution of

the Equity Purchase and Merger Agreement, *RGHI*, apparently on behalf of RGL, had proposed

to redeem these profits participation interests by paying the executives a portion of the proceeds

received by RGHI.[960]  The Examiner located letters for seven of the eight executives, though not

one for Trosten.  On the day of the closing of the LBO, after RGHI received its proceeds, it paid

a total of $106,368,980 to these eight executives, including $48,019,300 to Trosten.[961]  Bennett

individually received $25,322,810 as compensation for the redemption of his interest.[962]  The

---

[956] WGM-L 0017796-97.

[957] WGM-R 0007270-90.

[958] Equity Purchase and Merger Agreement, § 5.9, WGM-L 0017795.

[959] JM001 0001, at App. D-63.

[960] *E.g.*, WGM-R 0009698-99.

[961] RGHI-UC 00832.

[962] *Id.*

June 2004 redemption agreements reflected that additional payments would be made to certain of the executives at the end of calendar years 2005 and 2006.[963]  The evidence suggests that Weil was not aware of these redemption agreements at the time.[964]  Tabor stated in his interview that he was not aware of the profits participation interests and had never received any documents relating to such interests, even though Mayer Brown expressly represented that all documents relating to the equity interests had been provided.[965]

Further, on the same day as the LBO, another transaction closed involving BAWAG and its affiliates, DF Capital and Desana Foundation.  Under the PPA, DF Capital had made payments to Refco in 2003 totaling $467 million.[966]  In return, DF Capital received the right to participate in the proceeds of a sale of Refco.  Accordingly, on August 5, 2004, pursuant to documents negotiated by Mayer Brown, on behalf of Refco and RGHI, and McDermott Will, on behalf of BAWAG and its affiliates, RGHI redeemed DF Capital's interest in the PPA by paying to Desana Foundation $566 million.[967]  Finally, RGHI repaid a note in the amount of $85 million issued by RGHI to BAWAG on May 14, 1999, which was the amount paid in 1999 by BAWAG to RGHI for an option to purchase an additional ten percent interest in Refco.

As part of the Equity Purchase and Merger Agreement, and as described in Weil's flow of funds memorandum, Refco was to wire $500 million to RGHI as a dividend before THL's acquisition closed.  Refco was obligated to maintain $500 million in escrow from June 8, 2004

---

[963] *E.g.*, WGM-R 0009698, at App. D-64.

[964] Tabor Interview, 117:17-21.

[965] Tabor Interview, 202:19-203:1.

[966] MWE 0002927-47, at App. D-65.

[967] RGHI-UC 00832.  Thus, BAWAG and its affiliates received $757 million for their equity or proceeds participation interest in the transaction, combining the $566 million paid under the PPA with the $191 million paid pursuant to the Equity Purchase and Merger Agreement.

through the LBO closing.  In fact, $390 million of the $500 million was not held by Refco; rather BAWAG simply overdrafted one of RGHI's accounts for $390 million and credited one of Refco's accounts by that amount.[968]  Thus, on paper it appeared that Refco had a receivable due from BAWAG.  After the LBO, on September 30, 2004, Refco wrote off a $500 million receivable due from BAWAG.[969]  In addition, the wire that was to take place at the LBO closing did not take place.[970]

As noted above, Weil was aware of the existence of the PPA in February 2004 as part of its diligence.  However, the Examiner has not found any evidence to suggest that Weil obtained a copy of the PPA before the closing of the LBO or that Weil or THL was aware of these transactions relating to the PPA that took place on the same day as the LBO.

Finally, documents reviewed by the Examiner reveal that RGHI paid Dittmer $64,577,605 out of the proceeds of the LBO.[971]  Further, these documents also indicate that RGHI paid MLC, described as "Dittmer's entity," $10 million out of the LBO proceeds.[972]  Though evidence suggests that Weil understood that Bennett owed "personal obligations" to Dittmer to make payments upon closing of the LBO,[973] the Examiner has found no documents to suggest that Weil knew of these payments to Dittmer or to MLC.

---

[968] May 2004 Statement for Refco's BAWAG account no. 00151-111-955 and May 2004 statement for RGHI's BAWAG account no. 00153-114-510.  (No Bates number; obtained by FTI from Refco's counsel).

[969] Refco September 2004 Journal Entry Detail.  (No Bates number; furnished by FTI).

[970] MWE 002915-17.

[971] RGHI-UC 00832.

[972] *Id.*

[973] WGM-L 0010152.

### 4.    Refco Engagement of Weil in Connection with Securities Filings and IPO Diligence

After the LBO, Refco engaged Weil to serve as Refco's primary counsel in connection with preparation and filing of Refco's S-4 registration statement and Refco's S-1 prospectus. Weil also managed the closing of the IPO for Refco in August 2005.

### a.    Weil's Diligence on Behalf of Refco in Connection with the S-4 and S-1 Filings

On October 12, 2004, Weil filed the initial Form S-4 for the exchange offer for the Senior Subordinated Notes privately issued under Rule 144A (the "registered notes offering").[974] The SEC review process for the Form S-4 was extensive, involving six amendments and lasting until April 2005. The SEC made over one hundred comments to the initial S-4 filing alone.[975] On April 8, 2005, the date the Form S-4 became effective, Weil filed on behalf of Refco the initial Form S-1 for the IPO.[976] The SEC review process for the Form S-1 lasted until August 10, 2005 and involved five amendments. During these review periods, the SEC inquired into several topics which, if thoroughly addressed, might have led Weil to discover aspects of Refco's fraud. In addition, Weil became aware of instances where Refco had previously withheld material information. In those instances, though, the Examiner could not locate information to suggest that Weil undertook to fully verify subsequent representations relating to these topics.

In preparing the SEC filings, Weil relied on the documents and diligence first compiled in connection with the Offering Circular prepared for the private offering of notes in advance of the LBO. Because the privately placed notes were not registered, SEC disclosure requirements did not apply to the Offering Circular; however, given that a subsequent registered notes offering

---

[974] REFCO-0005-069396-69631.

[975] REFCO-0008-219177-219196.

and IPO were contemplated from the outset, Weil, Mayer Brown, and the banking sponsors'
counsel (Cravath, Swaine & Moore and Davis Polk & Wardwell) undertook to prepare the
Offering Circular with the upcoming registered note offering and IPO in mind.

Weil's due diligence for the registered note offering and IPO was managed by Weil
attorneys based in New York and borrowed heavily from the LBO due diligence conducted by
Weil attorneys principally based in Dallas.  Weil explained that its public offering diligence
focused on obtaining material information required for SEC disclosures, whereas its LBO
diligence was aimed primarily at identifying liabilities of the target company that would affect
the negotiated purchase price.[977]  Importantly, though THL chose to close on the LBO despite
the acknowledged existence of gaps in Weil's and KPMG's due diligence, it does not appear that
Weil undertook to fill any of the gaps in its diligence prior to making public disclosures for the
registered note offering and the IPO.  Weil acknowledged the need for an LBO team member to
be involved in its diligence for the IPO, but only to hand off certain documentation and
information to the IPO team in order to avoid duplication of diligence efforts that had been
undertaken during the LBO process.[978]  The IPO diligence team presumed that the LBO
diligence had been adequate, and their "bring-down" diligence requests related solely to the
period beginning August 5, 2004.[979]  Weil's IPO team requested from Refco relevant materials
not previously made available in connection with the LBO, but it does not appear that Weil

---

*(footnote continued from previous page)*

[976] REFCO-E-001311044-1311263; WGM-R 0018744.

[977] Lynch Interview, 23:2-24:18.

[978] REFCO-E-002148719; Broudy Interview, 49:23-50:19.

[979] REFCO-E-002148721; Broudy Interview, 17:17-18:4.

-303-

undertook to verify that all such materials had been provided, even after Weil learned that there were instances in which Refco had not provided materials previously requested.

In preparation for the registered notes offering and IPO, Weil requested from Refco information regarding organizational documents, accounting and auditing materials (including management letters), financing documents, shareholder matters (including related party transactions), taxation, and other regulatory matters.  Because Weil had previously requested most of these materials during its LBO diligence, Weil's IPO request was for documents "since August 5, 2004" not previously received.  In addition to requesting documents created after the LBO closed, Weil circulated Director and Officer ("D&O") Questionnaires designed to elicit material information required for disclosure under SEC rules.  Weil also coordinated numerous due diligence conference calls among various members of the working group to review Refco's risk management policies, customer profile, businesses, litigation history, internal controls, and regulatory investigations.  Weil reviewed corporate governance guidelines and checked to see that Refco's written charters, policies and codes complied with applicable regulatory standards.[980]  Weil assisted Refco in revising its corporate governance policies and procedures and provided guidance in Refco's dealings with its board members and the creation of its audit committee.[981]

Lawyers at Weil stated in their interviews that their due diligence during the period of time when they worked on the registered notes offering and the IPO focused on uncovering and adequately describing matters required to be disclosed in the S-4 and S-1 filings.  Weil stated that it deferred to the various accountants involved (in particular, GT and PwC) to review and

---

[980] *E.g.*, WGM-R E023353-55.

[981] *E.g.*, WGM-R E166939-40; WGM-R E 023353-55.

verify Refco's financial disclosures, particularly with respect to intercompany and related party transactions.[982]

### b. Weil's Handling of SEC Inquiries Regarding Credit Losses, Customer Receivables, and Receivables from Equity Members

In its review, the SEC commented on several risk factors and requested additional information relating to credit losses and customer receivables. In some instances, rather than provide explanations requested by the SEC, Refco simply changed the disclosure.

For example, the SEC requested in its first round of comments that Refco disclose the amount of any credit losses due to customer defaults.[983] Refco's Amendment No. 1 to the Form S-4 did not address the SEC's request. Instead, it simply disclosed Refco's reserves against receivables.[984] Alexander Lynch, who led the Weil team for the S-4 and S-1 filings, stated that Weil followed up with Refco to ascertain the amount of credit losses due to customer defaults. According to Lynch, William Sexton, Refco's COO, reviewed Refco's customer loss prevention procedures with Weil, PwC, and GT, and represented that the amount of credit losses due to customer defaults was insignificant.[985] When questioned by counsel for the Examiner about why Refco did not provide the actual credit loss amount in the Form S-4 as requested by the SEC, Lynch explained that he understood the relevant number in measuring potential future customer losses to be Refco's reserve against receivables because that number reflected the company's view of the likely customer defaults.[986] When Refco subsequently reported a $15 million write-

---

[982] Lynch Interview, 98:11-99:19.

[983] REFCO-0008-219182 (SEC Comment 27).

[984] *See* Amendment No. 1 to Form S-4 (PwC 044715) at p. 22.

[985] Notes and documents from Weil's files confirm that during due diligence meetings and presentations, considerable attention was devoted to the fact that Refco historically had suffered only minimal losses and write-offs on customer receivables. Lynch Interview, 206:14-207:11.

[986] *Id.*, 207:21-208:10.

off of its reserve for customer receivables for the period ending February 28, 2005, as compared to none during the two previous years,[987] however, there is no evidence that Weil followed up to obtain additional information regarding the write-off.[988]

The SEC also inquired specifically into Refco's disclosure of its receivables from equity members and related parties.[989] The initial Form S-4 noted that receivables from equity members RGHI and BAWAG were included in "receivables from customers" on Refco's consolidated balance sheet and cash flow statement.[990] In response to the SEC's request for a supplemental explanation as to why Refco deemed it appropriate to classify these related party receivables as receivables from customers, Refco added line items to the consolidated balance sheet and cash flow statement to separately disclose $210,223,000 and $280,545,000 as "receivables from equity members" for fiscal years 2004 and 2003, respectively.[991] No supplemental explanation was provided to the SEC relating to these receivables, however, and the Examiner has not located any evidence to suggest Weil inquired as to why Refco had initially classified the related party receivables as receivables from customers.

Note L to the consolidated financial statements included in the Form S-4 indicated that the RGHI receivables were received by February 29, 2004, and that the BAWAG receivables were liquidated shortly after each year-end.[992] Lynch stated that Weil discussed with Refco the

---

[987] *See* Amendment No. 1 to Form S-1 (PwC 269323-517 at 269517) at Schedule 11.

[988] Lynch stated that he did not recall any discussions regarding the write-off and, in his view, the $15 million amount was low relative to the revenues of the company at the time. Lynch Interview, 214:20-23. However, KPMG reported that GT applied a materiality threshold of $10 million in conducting its audit of Refco's consolidated financial statements. *See* WGM-L 0010228-79 at 10269, at App. D-66.

[989] WGM-R 0011859-80 (SEC comment letter dated November 10, 2004) at 11876 (comment 97).

[990] REFCO-0005-069396-69631 at 69581 (Note L).

[991] PwC 044689-951 at pp. F-3, F-6, and F-26.

[992] *Id.* at F-26.

fact that it received the RGHI and BAWAG receivables at the end of February 2004, but generally deferred to GT and PwC to confirm that such payments were, in fact, made and to keep track of whether the transactions were not ongoing.[993]   The Examiner did not locate any information to suggest that Weil itself requested any underlying documentation for the RGHI and BAWAG transactions disclosed in Note L.

c.    **Weil's Handling of SEC Inquiries Regarding Trosten's Resignation**

In its first round of comments to Refco's Form S-4, the SEC requested a discussion of the actions that preceded and followed, and the facts that led up to, Trosten's resignation as Refco's CFO.[994]   Weil learned prior to the closing of the LBO in August 2004 that THL intended to replace Trosten as Refco's CFO.[995]   Weil understood that THL intended for Trosten to have a new role at Refco following the LBO, and that Trosten was informed of his new role by Bennett prior to August 2004.[996]   Trosten made an equity investment in Refco at the time of the LBO, along with other executives, seemingly accepting his demotion.  On September 7, 2004, one month after the LBO closed, Trosten announced his resignation.[997]   Trosten's announcement was unexpected by the Weil attorneys involved in the LBO.[998]   Yet there is no indication that Weil

---

[993] Lynch Interview, 211:21-212:9.

[994] WGM-R 0011859-79 at 11871 (Comment 69).

[995] *See* WGM-L0025262 (June 19, 2004 e-mail from Schoen to Tabor).  Schoen informed Tabor that Bennett intended to have a conversation with Trosten about his "new role" at Refco after THL's acquisition.  THL agreed that Bennett should have this discussion with Trosten before THL agreed to allow Trosten to purchase a "meaningful amount of equity" in Refco as part of the LBO.

[996] *Id.*

[997] WGM-R E156892.

[998] E-mail messages among Weil attorneys involved in the LBO reflect their surprise at Trosten's sudden departure.  Tabor comments that Trosten's resignation was "interesting" considering Trosten invested $2.5 million in the company and "has no right to get his money back unless the company decides to buy him out."  WGM-R E156950 (e-mails between Tabor and Angela Fontana dated Sept. 10, 2004).  Fontana responds: "I have to tell you I was

*(footnote continued on next page)*

sought further explanation for Trosten's resignation either after learning about it on September 7, 2004, or in response to the SEC's request for additional details. Instead, Weil simply responded on behalf of Refco to the SEC's question with a short statement that Trosten's decision to resign was straightforward and there were no significant details surrounding the resignation.[999]

### d. Weil's Handling of SEC Inquiries Regarding LBO Accounting and Transaction Steps Presentation

Two topics that led to numerous discussions among Weil, Refco, and the SEC throughout the review process were accounting for the LBO transactions and the use of the LBO proceeds. After Amendment No. 1 was filed, Weil prepared and submitted to the SEC a "transactions steps presentation," derived largely from the funds flow memorandum prepared by Tabor and the LBO team. Weil also coordinated several conference calls with the SEC to answer additional questions relating to the LBO accounting. As detailed below, Weil documents suggest that representatives from Refco, THL, PwC, GT, and KPMG participated either in conference calls with the SEC, or in conference calls led by Weil in preparation for the SEC calls.

Lynch stated in his interview that he understood the SEC's interest in the LBO to be focused primarily on accounting treatment under EITF 88-16 relating to basis calculations in the context of leveraged buyouts. Broudy's notes from SEC calls suggest that the SEC was interested in more than simply valuation and structure, however, and asked how much of the proceeds went to BAWAG and RGHI.[1000] Similarly, Lynch's notes reflect that, during a January 27, 2005 conference call, the SEC inquired into the use of the LBO proceeds and specifically

---

*(footnote continued from previous page)*

surprised that he invested that much money when I knew he had been told about the CFO thing before he invested so I just assumed he had gotten comfortable with it. *Who knows, maybe he just made enough money in the original buy-out and is rethinking life.*" *Id.* (Emphasis added).

[999] REFCO-E-001711836, Response to SEC.

asked how much of the proceeds ultimately went to Grant and Bennett, and what RGHI did with its portion of the proceeds.[1001]  Clearly, the SEC was interested in knowing how the LBO proceeds had been used, and in greater detail than had been disclosed in Amendment No. 1 to the Form S-4.

In connection with these conversations, Weil's LBO team prepared and its IPO team circulated a presentation illustrating the LBO transaction steps and flow of funds.[1002]  An early draft of the transaction steps presentation reflects some emphasis on the fact that Refco had on its balance sheet $500 million in cash, which would be distributed to RGHI in the LBO.[1003]  The same draft also makes reference to the "mechanics" of how this payment would be made.[1004]  These references were deleted from subsequent drafts of the transaction steps presentation, but the final version included a representation to the SEC on various pages and in an appendix that Refco distributed $500 million to RGHI as a step in the LBO transaction.[1005]  Lynch stated that he did not personally confirm that the funds flowed as represented to the SEC in the transaction steps presentation, but that he confirmed the accuracy of the representations by talking with Tabor and Adam Nelson — two members of Weil's LBO team.[1006]  According to Tabor, Weil never undertook to confirm that the $500 million was, in fact, transferred from Refco to RGHI prior to making its representations to the SEC.[1007]  The funds flow memorandum (and, therefore,

---

*(footnote continued from previous page)*

[1000] WGM-R 0006167.

[1001] WGM-R 0014385.

[1002] *See* Lynch Interview, 151:14-153:6; REFCO-E-001700984-996.

[1003] REFCO-E-001700987.

[1004] REFCO-E-001700992.

[1005] REFCO-E-001671200-12.

[1006] Lynch Interview, 159:13-16.

[1007] Tabor Interview, 235:24-236:4.

the transaction steps presentation) did not fully describe how RGHI used the proceeds of the LBO, despite the SEC's interest in knowing details regarding how the LBO proceeds would be used.

**e.     Weil Learns in Approximately March 2005 that Refco Had Provided False and Misleading Information During the LBO About the Existence of Profits Participation Interests**

While not the subject of any specific SEC comment, in the course of its preparation of Refco's SEC filings, Weil became aware of the profits participation agreement between Refco and certain Refco executives and that RGHI made payments at the closing of the LBO to the executives to redeem their "profits participation interests." Lynch and Broudy both stated that Weil was not informed of any profit sharing arrangements prior to March 2005 (though their recollections vary as to when and how Weil discovered the existence of the profit sharing agreement). Weil previously requested on numerous occasions in connection with the LBO, the registered note offering, and the IPO, all information regarding Refco's agreements with and compensation to its executives.[1008]

On January 10, 2005, Weil received Sexton's responses to his D&O Questionnaire for the Form S-1, which disclosed that he had filed a Schedule K-1 for the calendar years 2002 and 2003 and he had received in 2003 $1,640,497 as "Proceeds from Sale of 'Profits Interest.'"[1009] The K-1 Schedules for Refco's 2002 and 2003 tax returns reflected that eight Refco executives held equity positions for those years. Weil thus would have discovered that eight Refco executives

---

[1008] For example, D&O Questionnaires completed in July 2004 in preparation for the Form S-4 asked for information pertaining to transactions with management. Each individual who completed these questionnaires responded that no such transactions existed. In December 2004, Weil circulated D&O Questionnaires in preparation for the Form S-1 and again asked for information regarding transactions with management. As discussed below, only two of the six individuals who completed these questionnaires ultimately disclosed in their written responses the profit sharing agreement.

[1009] WGM-R 0003352-3, at App. D-67 (Sheet 2 to W. Sexton D&O Questionnaire signed January 10, 2005).

-310-

held partnership interests in Refco in 2002 and 2003 if Weil had followed up on Sexton's disclosure regarding his K-1 by reviewing Refco's tax returns for those years.

Sexton's D&O Questionnaire response further disclosed that, pursuant to a June 18, 2004 letter agreement between Refco and Sexton, Refco agreed to acquire his "outstanding profits participation interest" for a total of $9,043,850, of which $7,060,870 was paid to Sexton upon the closing of the LBO, and the remaining amount would be accelerated in the event of a change of ownership or an IPO.[1010]  Although Broudy and Lynch both emphasized in their interviews the importance of the D&O Questionnaires to their due diligence, neither recalled reviewing Sexton's January 2005 D&O Questionnaire response disclosing his profit sharing arrangement.

According to Lynch and Broudy, Weil learned of the profit sharing agreement sometime around March 2005.  Lynch stated that the profit sharing agreement was first brought to his attention in connection with Sexton's D&O Questionnaire.[1011]  Lynch later admitted that he perhaps learned about the profit sharing arrangement for the first time through a March 17, 2005 e-mail from Scott Jaeckel of THL discussing SEC disclosure issues for the IPO.[1012]  Broudy stated that she first learned of the profit sharing agreement through a phone call from Joseph Murphy, a senior Refco executive, in connection with his D&O Questionnaire.[1013]  Murphy explained that Sexton intended to disclose his profit sharing arrangement as part of a schedule to his D&O Questionnaire responses.[1014]  Weil requested and received copies of Murphy's and Sexton's nearly identical redemption letters, dated June 18, 2004.

---

[1010] WGM-R 0003353, at App. D-67.

[1011] Lynch Interview, 162:1-4.

[1012] WGM-R 0014614; Lynch Interview, 163:16-164:8.

[1013] Broudy Interview, 126:24-127:17.

[1014] *Id.*

On April 5, 2005, Weil filed Amendment No. 5 to the Form S-4, which disclosed the profit sharing agreement for the first time.  After updating the S-4 to disclose Murphy's and Sexton's redemption payments from the profit sharing agreement, Weil was informed by Refco that profit sharing redemption letters existed for Klejna and Maggio.[1015]  On April 6, 2005, Weil filed Amendment No. 6, revising the disclosure to include details for RGHI's redemption of Klejna's and Maggio's[1016] profits participation interests.

In addition to the four executives named in the Amended Form S-4, the Examiner has located profits participation redemption letters for Bennett, Grady, and Mutterer.[1017]  Refco's tax returns suggest that Trosten was also party to the profit sharing agreement.[1018]  Weil apparently was not aware of their participation in the profit sharing agreement, however, and therefore never disclosed their redemption payments in Refco's SEC filings.

Weil thus discovered in March 2005 that several Refco executives had failed to disclose the profit sharing agreement, despite Weil's inquiries throughout the LBO and IPO processes, but that fact evidently did not prompt Weil to verify whether Bennett, Trosten, or any other Refco executives were parties to the profit sharing arrangement.  Neither Lynch nor Broudy recalled specifically requesting a copy of the underlying profit sharing agreement, and neither knew whether a written profit sharing agreement even existed.[1019]  It does not appear that Weil

---

[1015] *Id.* at 144:8-14.

[1016] Maggio received another redemption letter from *Refco* dated July 25, 2005, purportedly revising his redemption agreement to provide for $5,289,040 in additional compensation to be paid either in equal installments on December 31, 2005 and 2006, or upon completion of Refco's IPO.  The Examiner did not locate any evidence to suggest that  Weil was ever informed of the revision, and neither the S-4 nor the S-1 was updated with the new information.  Broudy Interview, 154:19-20.

[1017] REFCO-HC-0037863-64, at App. D-64 (Bennett); REFCO-HC-0021272-73, at App. D-64 (Grady); REFCO-HC-0021193-94, at App. D-64 (Mutterer).

[1018] JM001 0001-02, at App. D-63 (January 8, 2003 Memo describing establishment of profits participation interests); EY-REF 021372-76 (2002 Return); LJC 07063 (2003 Return); PWC 395628-30 (2004 Return).

[1019] Broudy Interview, 132:21-133:2; Lynch Interview, 168:14-169:9.

ever requested, received, or reviewed any documents through which Refco had granted the profits participation interest to its executives, and the Examiner has located no evidence that Weil sought an explanation of why RGHI — and not Refco —redeemed an interest pursuant to an agreement entered into by Refco.[1020]   Moreover, despite Weil's discovery that Bennett and other Refco executives had made material misrepresentations during the LBO process in failing to disclose the profit sharing agreement with Refco, the Examiner has located no evidence that Weil made any effort to determine whether other aspects of the LBO diligence had also been incorrect.

### f.    Weil Learns that Refco Is Resisting Disclosure Regarding Findings About Internal Control Deficiencies

Weil learned during the course of its IPO diligence that Refco had not disclosed during the LBO diligence certain documents that identified internal control deficiencies, and Refco continued to resist disclosure of these deficiencies in the S-1 statement.

During its IPO diligence period, Weil received copies of GT's management letters reporting significant deficiencies in Refco's controls over financial reporting.  On March 21, 2005, Youngjoon Park, Refco's assistant general counsel, faxed to Broudy a draft of the 2004 Management Letter with the note: "Management letter attached.  This letter should NOT be circulated."[1021]   Weil's files contain copies of this fax with Broudy and Lynch's handwritten notes, suggesting there was a conference call to discuss the letter.[1022]   The notes indicate that the company had received a management letter in 2003 that had not been disclosed during the LBO

---

[1020] Broudy Interview, 161:18-162:3.

[1021] WGM-R 0005619 (emphasis in original).

[1022] *Id.*

diligence process. Thus, Weil learned that Refco's management had been less than forthcoming in turning over material documents during the LBO process.[1023]

Indeed, it appears that Weil may have learned that Refco attempted to mislead KPMG. In conducting its accounting diligence for the LBO, KPMG attempted to review management letters but was told that GT did not issue formal management letters as part of its Refco audit.[1024] Refco represented that there were no significant matters relating to internal controls that could have a material effect on Refco's consolidated financial condition.[1025]

In the draft 2004 management letter provided to Weil, GT noted several internal control deficiencies relating to Refco's internal audit and accounting functions.[1026] After discussing the issues raised in the management letter with GT, Weil followed up with Refco, which responded that it was recruiting an Internal Audit Director and that Refco's board had established an Audit Committee to oversee Refco's accounting and financial reporting processes and the auditing of its financial statements. In addition, Refco stated that it was recruiting a Chief Accounting Officer to lead the financial reporting effort, along with Refco's CFO, Controller, and accounting staff, to identify risk areas and fill any gaps within the accounting function.[1027]

---

[1023] Park was not hired until after LBO diligence was completed. Tabor Interview, 220:2-8.

[1024] WGM-L 0010269. KPMG stated in its May 17, 2004 draft diligence report that GT had made certain recommendations to Refco management in connection with its audit, however, and that the same recommendations had been made in prior years, though GT did not make available to KPMG its memoranda relating to the recommendations. *See also* WGM-L 003673-710 at 3706 (KPMG "final" draft report dated May 21,2004).

[1025] *See* WGM-L 0010269.

[1026] Specifically, GT indicated that Refco's engagement of PwC to fill current gaps in accounting and financial reporting was not a sufficient long-term solution. GT pointed out Refco's unsatisfactory audit support, noting that Refco had not been responsive in providing information necessary to complete the audit in a timely and efficient manner. GT further noted that, on occasions, audit requests were only partially completed, generally lacking the detail requested and required for timely completion of the audit. REFCO-E-001478369.

[1027] REFCO-E-001478369.

At some point in March 2005, GT informed THL, who in turn informed Weil, that it would be issuing a management letter for 2005, much like its 2004 management letter, and Weil obtained a copy of the draft 2005 letter.[1028]

E-mail correspondence reflects that Weil and Refco resisted disclosing the significant deficiencies reported by GT, but ultimately acceded to the banking sponsors' insistence that the S-1 include a disclosure regarding the significant deficiencies.[1029]

By July 22, 2005, a draft of the "significant deficiencies" insert for the S-1 had been circulated to GT for comment.[1030]  Amendment No. 4 to the Form S-1, filed on July 25, 2005, disclosed that Refco's auditors reported two significant deficiencies in Refco's internal controls over financial reporting.  According to the auditors, Refco needed to (1) increase finance department resources to prepare timely financial statements compliant with SEC reporting guidelines, and (2) establish formalized procedures for closing Refco's books.  The Form S-1 was amended to disclose the identified deficiencies[1031] and to state that Refco was in the process of hiring additional internal audit and finance personnel and developing formalized closing procedures.[1032]

---

[1028] WGM-R 0000989.

[1029] REFCO-E-001702968-70.

[1030] REFCO-E-002064679.

[1031] PwC 292443 (Amendment No. 4 to Form S-1 at p. 23).

[1032] *See id.*

5.     **Conclusions: Analysis of Potential Claims Against Weil**[1033]

a.     **Legal Malpractice**

As more fully addressed in Appendix A, the elements of a claim for legal malpractice are (1) a breach of a duty of care; (2) causation; and (3) damages.  Although it is a close question, the Examiner concludes that there are facts that could support an allegation that Weil failed to adhere to the standard of care applicable to its representation of Refco in connection with the S-4 and S-1 filings.  The Examiner assumes that if the other elements of a legal malpractice claim are proven, Refco's estate could prove damages.  The evidence supporting a possible malpractice claim is highlighted below.

*(i)*     ***Breach of Duty of Care***

As explained below, there is evidence that Weil failed to adhere to the applicable standard of care by failing to examine properly and confirm the statements made in the S-4 registration statement and the S-1 prospectus.  The standard of care applicable to an attorney representing a company filing public statements in connection with the sale of securities or an exchange offer was announced in the seminal *Escott v. BarChris Constr. Corp.* case,[1034] in which the court held that attorneys involved in preparing registration statements and other securities filings must not rely blindly on the statements of their clients, but instead should conduct "a check of matters easily verifiable" by reference to original written records.[1035]  Arguably this

---

[1033] The Examiner received a confidential letter from Weil dated April 4, 2007 that addresses issues pertaining to potential claims against Weil.  The Examiner has considered Weil's submission in reaching the conclusions set forth in this Report.

[1034] 283 F. Supp. 643 (S.D.N.Y. 1968) (securities investor suit setting forth applicable standard of care of issuers' counsel).

[1035] *Id.* at 690.  Though *BarChris* itself involved a Section 11 action, similar standards appear to apply in common law malpractice cases.  *See Nat'l Enter. Corp. v. Dechert, Price & Rhoads*, 667 N.Y.S.2d 745, 746 (1998) (affirming denial of law firm's summary judgment motion where firm had failed to advise client to disclose material fact in securities filings); *see also FDIC v. O'Melveny & Myers*, 969 F.2d 744, 748-49 (9th Cir. 1992), *rev'd and remanded on other grounds*, 512 U.S. 79 (1994), *prior opinion adopted in haec verba*, 61 F.3d 17 (9th Cir. 1995)

*(footnote continued on next page)*

standard of care required Weil to, at a minimum, (i) confirm statements of Refco's management by undertaking complete due diligence with respect to the S-4 and S-1 filings, including completing the LBO due diligence efforts that were not undertaken or had been initiated but were not completed, rather than simply limiting its diligence to the post-LBO time period; and (ii) upon learning that Refco had misled Weil regarding certain material matters, conduct further investigation with respect to at least those matters and perhaps others.

**(a)    Weil Erroneously Assumed that the LBO Diligence Was Adequate and Failed to Follow Up on the "Deep Throat" Allegations**

Weil arguably breached its duty of care by failing to undertake complete due diligence with respect to the S-4 and S-1 filings.  Although Weil undertook considerable diligence, its diligence placed undue reliance on its LBO diligence efforts, including efforts that had been begun but were not completed.  Weil also failed to follow up on matters, such as the "Deep Throat" allegations, that THL had chosen not to pursue.

Weil's principal error in its post-LBO diligence was in presuming that the LBO diligence had been adequate when Weil knew that, for a variety of reasons, it was inadequate and incomplete.  As previously explained, due diligence for the registered note offering and IPO was managed by Weil attorneys based in New York and borrowed heavily from the LBO due diligence conducted by Weil attorneys principally based in Dallas.[1036]  The IPO diligence team presumed that the LBO diligence had been adequate, and the IPO diligence team's "bring-down"

---

*(footnote continued from previous page)*

(holding that client could state claim against law firm for firm's alleged failure to undertake a reasonable, independent investigation to detect fraud in securities filings).

[1036] Weil also apparently relied on the documents and diligence first compiled by the banking sponsors' counsel (Cravath, Swaine & Moore and Davis Polk & Wardwell) in connection with the Offering Circular prepared for the Senior Subordinated Notes private offering in advance of the LBO.  WGM-L E023715.

diligence requests therefore related solely to the period beginning August 5, 2004.[1037]  Weil

acknowledged the need for an LBO team member to be involved in its diligence for the IPO, but

only to hand off certain documentation and information to the IPO team in order to avoid

duplication of diligence efforts that had been undertaken during the LBO process.[1038]

The assumption by Weil's IPO diligence team that the LBO diligence was adequate was

erroneous.  Weil knew, based on its prior representation of THL in connection with the LBO,

that there were major gaps in the LBO diligence because Refco had not furnished certain

requested materials before THL called off the diligence efforts.  In particular, Weil knew that it

and THL had repeatedly requested the following information that Refco did not furnish:

- "employment agreements or arrangements with key employees;"[1039]

- documentation for all of Refco's debt;[1040]

- corporate information and any written or oral arrangements among the owners/members of Refco "especially, although not exclusively, in connection with the sale of any part of [Refco];"[1041] and

- information relating to "analysis of receivables as of February 28, 2003, November 30, 2003 and February 29, 2004 quantifying amounts due from customers; brokers and dealers; shareholders loans; and other loans, etc." [1042]

In addition, Weil was aware of the "Deep Throat" allegations and KPMG's list of relatively

simple additional diligence steps to investigate those allegations.  THL chose to proceed with the

LBO despite the gaps in diligence and the "Deep Throat" allegations, and THL therefore

---

[1037] REFCO-E-002148721; Broudy Interview, 17:17-18:4.

[1038] REFCO-E-002148719; Broudy Interview, 49:23-50:19.

[1039] WGM-L 0011186; WGM-L 0011015; WGM-L 0011020.

[1040] WGM-L 0011015; WGM-L 0011020.

[1041] WGM-L 0011015; WGM-L 0011020.

[1042] WGM-L 0007944.

apparently instructed Weil and KPMG not to pursue these diligence issues further with respect to the LBO.

Nevertheless, when *Refco* engaged Weil to prepare the S-4 and S-1 filings, Weil assumed a duty to Refco to conduct sufficient diligence to confirm the accuracy of representations in the SEC filings.  Because Weil knew from its prior representation of THL in connection with the LBO that the LBO diligence was not completed, Weil arguably was duty-bound to fill in the information gaps of the prior LBO diligence.  At a minimum, Weil could have obtained the documents previously requested but not furnished by Refco in connection with the LBO diligence.  In addition, Weil could have investigated the "Deep Throat" allegations — perhaps by undertaking the relatively simple diligence steps that KPMG had suggested but which THL chose not to pursue.[1043]  Although such information was relevant to the S-4 and S-1 filings, Weil failed to obtain it.[1044]

> ### (b)  *Weil Failed to Investigate Further upon Learning that Refco Had Provided False and Misleading Information Regarding Senior Executives' Profits Participation Interests in Refco*

By no later than March 2005, Weil learned that Refco had previously provided false and misleading information regarding the existence of Refco executives' profits participation interests in Refco.  As previously explained, in January 2005, in responding to another questionnaire in connection with the S-4, Sexton disclosed that he had received a payment in

---

[1043] Before ceasing further investigation of the "Deep Throat" allegations in favor of closing the LBO, THL learned, and informed Weil, that "Deep Throat's" allegations of Refco "sloughing off" trading losses to a subsidiary were largely true, although Bennett stated that Refco no longer engaged in the practice.  In response to THL's inquiry relating to *Refco Europe*, Bennett offered to represent to THL that *RGHI* had not and would not trade on its own account with Refco as assurance that there were no trades where the losses were being "sloughed off."  WGM-L 0025237, at App. D-62.

[1044] Weil also failed to follow up on obtaining the PPA, which it had identified during the LBO diligence but had never obtained.

connection with the LBO. Weil may not have reviewed Sexton's questionnaire responses in a timely manner or at all. Broudy said that Murphy told her in March 2005 about Sexton's receipt of LBO funds. This revelation led to further questions by Weil, which eventually led to Weil's discovery that, contrary to Refco's prior representations, four Refco executives (Sexton, Murphy, Maggio, and Klejna) had profit participation interests in Refco, that RGHI — not Refco — had redeemed those interests, and that they had received LBO proceeds from RGHI in redemption of those interests. Weil says it asked Klejna whether there were any other executives who received payments out of the LBO proceeds, and Klejna told them "no."

Weil appears to have simply accepted Klejna's representation without further inquiry, despite the fact that during Weil's LBO diligence on behalf of THL, Refco's senior executives and Refco's then-counsel (Mayer Brown) informed Weil and THL that Refco had not issued any profits participation interests under its LLC agreement. Moreover, once it learned that four senior executives had profits participation interests, Weil apparently made no effort to determine whether the two highest executives in the company — Bennett and Trosten — also had profits interests.

Weil had ready access to information that could have led to its discovery of the other profits participation interests. Sexton's questionnaire response referred to money he received for his profits participation interests as noted on his 2002 and 2003 K-1's. Refco's tax returns for 2002 and 2003 disclosed the equity interests of all eight executives. Weil apparently had access to but did not review those portions of the tax returns. Further, Weil apparently did not ask anyone at Refco for the documents relating to the creation of the profits participation interests. Weil also did not ask to review the payments made by RGHI disbursing LBO proceeds.

Finally, despite Weil's discovery that Refco executives had made material misrepresentations during the LBO process in failing to disclose the profit sharing agreement with Refco, the Examiner has located no evidence that Weil made any effort to determine whether other aspects of the LBO diligence had also been incorrect.

> **(c)**     ***Weil Was on Notice that Refco Had Provided False and Misleading Information Regarding the Absence of "Transactions" Between Refco and RGHI and Should Have Investigated this Issue Further***

Weil, as part of its legal due diligence on behalf of THL, asked Refco to provide information relating to its owners — RGHI and BOI.[1045] Weil noted it was still seeking this information at least twice in March, again in early April, and again in May.[1046] According to Tabor, Mayer Brown and Refco's management expressly told Weil during its LBO due diligence process that there were no "transactions" between Refco and RGHI other than those disclosed on the schedules for the Equity Purchase and Merger Agreement.

By March 2005, Weil was on notice that Refco's representation that there were no "transactions" between Refco and RGHI was false. In March 2005, Weil learned that several Refco executives had profit interests in Refco and that RGHI — rather than Refco — redeemed those interests by using money paid to RGHI in the LBO. Weil was thus on notice that RGHI and Refco were involved in an undisclosed "transaction" that effectively disguised these executives' equity interests in Refco by having a related party — RGHI — redeem those interests. This revelation also arguably put Weil on notice that RGHI had assumed an obligation of Refco — *i.e.*, redeeming the executives' interests in Refco. The revelation of an undisclosed

---

[1045] WGM-L 0011015.

[1046] WGM-L 0013612; WGM-L 0011018; WGM-L 0011020; WGM-L 0012051.

"transaction" between Refco and RGHI could have prompted further inquiry by Weil and at least prompted Weil to seek an explanation of why RGHI — and not Refco — was redeeming an interest pursuant to an agreement entered into by Refco.

The above facts are evidence that could support an allegation that Weil did not perform appropriate due diligence in investigating the relationship between Refco and RGHI in preparing Refco's S-4 and S-1 filings. Arguably, Weil had reason to require Bennett to describe with particularity the relationship between RGHI and Refco, and to support his description with documentation. Weil failed to do so.

> ### (d)    Weil Failed to Conduct Sufficient Inquiry with Respect to Trosten's Resignation, Even Though the SEC Requested Further Explanation

Weil learned prior to the closing of the LBO in August 2004 that THL intended to replace Trosten as CFO, that Trosten would have a decreased role in Refco following the LBO, and that Trosten was to be informed of his new role prior to August 2004. Given that Trosten made a substantial equity investment in Refco at the time of the LBO along with other executives, and appeared to be willing to accept his demotion, Trosten's resignation after the LBO was abrupt and unexpected. Yet there is no indication that Weil sought additional details upon learning of Trosten's resignation, even in response to the SEC's inquiry to seek further explanation for Trosten's resignation. Instead, Weil simply responded to the SEC on behalf of Refco with a short statement that Trosten's decision to resign was straightforward and there were no significant details surrounding the resignation.

Weil also learned during its IPO diligence process that Refco had previously entered into a profits participation arrangement with several of its executives pursuant to which they received payments in connection with the LBO. Weil understood that these agreements had existed for some period of time prior to the LBO (the four redemption letters Weil received were all dated

June 18, 2004), but were not disclosed until March 2005. The Examiner located no evidence that

Weil asked Refco about Trosten's receipt of money out of the LBO.[1047] This payment should

have been disclosed in its SEC filings on behalf of Refco.

>    **(e)    "Red Flags" Placed Weil on Notice that Refco's**
>    **Diligence Responses Could Be Inadequate**

Weil's assumption that the LBO diligence was adequate and its reliance on

management's representations in connection with the S-4 and S-1 diligence stands in contrast to

Weil's knowledge of "red flags" that could have caused it to doubt the adequacy of Refco's

responses to various diligence requests. In addition to the incidents described above, Weil was

also aware of the following:

- **Refco Misled KPMG Regarding Internal Control Deficiencies.** Refco represented to KPMG that there were no significant matters relating to internal controls that could have a material effect on Refco's consolidated financial statements.[1048] In the course of its IPO diligence, however, Weil learned that this representation was false. Weil learned in March or April 2005 that GT had apparently issued a "management letter" to Refco in 2003 detailing several internal control deficiencies. Refco did not disclose this "management letter" during the LBO diligence.[1049]

- **Refco's Failure to Keep Weil Informed Regarding Litigation.** Over the course of the diligence period in connection with the offering circular for the Senior Subordinated Notes, Weil discovered that Refco had failed to keep THL and Weil

---

[1047] On July 14, 2005, Trosten testified in an arbitration proceeding (the "McElwreath arbitration") that he received $45 million upon the closing of the LBO. *See* App. D-54. Mayer Brown represented Refco at the arbitration, and it is not clear from the information reviewed by the Examiner whether Weil observed or was aware of Trosten's testimony in the arbitration. It is clear that (1) Trosten's testimony in the McElwreath arbitration was several weeks before the S-1 was completed in August 2005; (2) Weil was aware of and even had some involvement with Mayer Brown in the McElwreath arbitration in connection with a subpoena to THL witnesses, WGM-L E091960-61, WGM-L 3091974, WGM-L 3091998; and (3) Westra could not affirmatively recall whether he learned of Trosten's $45 million payment from THL personnel before or after the IPO closed. Westra Interview, 51:23-52:6.

[1048] *See* WGM-L 0010269.

[1049] WGM-R 0005619; WGM-R 0000996. *See generally* WGM-L 0010269; WGM-L 003673-710; REFCO-E-001478369.

informed as to certain pending litigation and matters pending before the SEC that Weil and THL believed should have been disclosed.[1050]

- <u>Refco's "Non-Response" to SEC's Inquiry Regarding Losses and Receivables</u>. In its review of Refco's SEC filings, the SEC commented on several risk factors and requested additional information relating to credit losses and customer receivables. Rather than provide explanations requested by the SEC or conduct appropriate inquiry, Refco simply changed the disclosure.

These "red flags" could have prompted Weil to question Refco's responsiveness to other diligence requests.

### (ii)     Causation

Refco's estate can argue that if Weil had (i) pressed Refco to produce all documents that had not been furnished in the LBO diligence, (ii) implemented the procedures suggested by KPMG following the "Deep Throat" allegations, especially in view of the fact that Weil had learned that misrepresentations had been made during the LBO, (iii) reviewed all documents pertaining to the Refco executives' profit interests, including agreements and tax returns, (iv) pressed Refco for evidence of transactions and agreements between Refco and RGHI, including the transaction by which RGHI redeemed the executives' Refco interests, and (v) obtained and analyzed the PPA, then Weil might have uncovered the relationship between Refco and RGHI and the fraudulent scheme. Had Weil discovered the fraud, it is likely that Refco would have delayed its entry into public capital markets. This would have allowed Refco to have better weathered the announcement of the RGHI Receivable and the related fraudulent activity and, potentially, avoided bankruptcy.

### b.     Aiding and Abetting

Based on the information the Examiner reviewed and as described above, the Examiner concludes there is not sufficient evidence to suggest that Weil had actual knowledge of any fraud

---

[1050] WGM-L 0025262, at App. D-59.

or breaches of fiduciary duties owed to Refco.  Given the apparent absence of Weil's actual knowledge of the various fraudulent schemes established by Refco's executives, the Examiner concludes that Refco's estate likely could not state a claim against Weil for aiding and abetting either fraud or a breach of fiduciary duty.

## VII.    $82.2 MILLION DIVIDEND IN CONNECTION WITH THE IPO

### A.    INTRODUCTION AND SUMMARY

#### 1.    Scope of Investigation

On August 18, 2005, Refco Inc. paid an aggregate dividend of $82,203,000 to its pre-IPO shareholders.  The Examiner investigated the events surrounding the declaration and payment of the dividend in order to determine whether the Refco estate could state claims to recover those payments or damages.  The Examiner's counsel conducted numerous targeted searches of documents supplied by THL, KPMG, Refco, Murray, Devine & Company, Inc. ("Murray Devine"), GT, Weil, and others that resulted in a review of significant and relevant documents related to the dividend payment.  In addition to the review of documents, the Examiner's counsel interviewed Daniel M. DiDomenico ("DiDomenico"), the Murray Devine Vice President who wrote and oversaw the August 10, 2005 solvency opinion which was used as support for the declaration of the dividend.

#### 2.    Summary of Facts

On August 10, 2005, the Refco Board of Directors resolved to declare and pay a dividend and established a Dividend Committee, comprised of Bennett and Schoen, to determine the aggregate and per share amount of the dividend, as well as the payment date.  The dividend was to be paid from proceeds received by Refco from the exercise by the underwriters of their option to purchase additional shares ("optional securities") of common stock (the "underwriters' option").  On August 16, 2005, the IPO closing occurred with respect to both the 26,500,000

firm securities as well as the 3,975,000 optional securities.  Each closed at a price of $22.00 per

share to investors.  Allowing for $1.32 per share in underwriting discounts and commissions, the

exercise of the underwriters' option to purchase the optional securities generated $82,203,000.

On the same date, the Dividend Committee authorized payment of an aggregate dividend in the

same amount, $82,203,000, to shareholders of record as of August 10, 2005.  On August 18,

2005, Refco paid the dividend.[1051]

### B.    SUMMARY OF FINDINGS AND CONCLUSIONS

Recovery of the dividend payments and damages is possible under a number of theories,

each of which is discussed below.  Broadly speaking, recovery may be pursued by characterizing

the dividend as: (1) an improper distribution in violation of Delaware General Corporation Law

("DGCL");[1052] (2) an improper distribution in violation of the directors' fiduciary duties of care

and loyalty; (3) an avoidable fraudulent conveyance under the Bankruptcy Code and New York

Debtor and Creditor Law; or (4) an avoidable preferential transfer under the Bankruptcy Code.

The DGCL and fiduciary duty claims provide for recovery from the directors, while the

fraudulent conveyance and preferential transfer claims provide for recovery from the recipients

of the funds.

### C.    FACTUAL BACKGROUND RELEVANT TO DECLARATION OF THE DIVIDEND

#### 1.    Solvency Opinion

The first evidence of the dividend is found in Amendment No. 4 to the S-1 statement

filed with the SEC on July 25, 2005.  That same day, in an e-mail from Jaeckel of THL to Sherer

of Refco and George Taylor of THL ("Taylor"), Jaeckel stated that he and Bennett had "decided

---

[1051] *See* Refco Inc. SEC Form 8-K dated August 19, 2005.

[1052] Delaware General Corporation Law applies because Refco was incorporated in Delaware.

to explore getting a solvency opinion related to the dividend as good form for our board of directors" and that he had asked Dennis Murray, President of Murray Devine, for a proposal.[1053]

Documents reviewed by the Examiner's counsel show that work on the solvency opinion began shortly thereafter. A July 26, 2005 "Refco Solvency Information Request" from DiDomenico to Jaeckel requested that various pieces of information related to Refco be forwarded in order to facilitate Murray Devine's due diligence with respect to the solvency opinion.[1054] Among the requested information were copies of Refco's most recent Form S-1, financial projections and forecasts, and Refco's audited financial statements. In addition to the review of these documents and others, Murray Devine conducted interviews of company officials to determine the reasonableness of financial projections and to satisfy other queries related to contingent liabilities and the existence of pending litigation.

On August 5, 2005, Murray Devine submitted an engagement letter to provide valuation services in connection with the dividend.[1055] According to the engagement letter, Refco requested that Murray Devine render an opinion with respect to the solvency of Refco, on a consolidated basis, after giving effect to Refco's use of proceeds from the IPO to redeem $210 million aggregate principal amount of the existing Senior Subordinated Notes, pay pre-IPO shareholders a dividend, and for other general corporate purposes. DiDomenico stated that though all of the procedures highlighted in the solvency opinion were performed, they were not necessarily performed in conjunction with the August 10, 2005 solvency opinion. He explained that Murray Devine had done previous valuations, as well as a 2004 solvency opinion, for Refco

---

[1053] THL SEC 00004833, E-mail from Jaeckel to Sherer and Taylor (July 25, 2005).

[1054] THL SEC 00035137-38, at App. D-68, Memorandum from DiDomenico to Jaeckel re "Refco Solvency Information Request" (July 26, 2005).

[1055] WGM-R 0004768-72, Letter from Murray Devine to Board of Directors of Refco, Inc. (August 5, 2005).

and, therefore, much of the work for the August 10, 2005 opinion had been completed in connection with those engagements. He described the August 10, 2005 solvency opinion as an "update" of the prior work. Murray Devine's fee for professional services related to the engagement was $50,000 plus $250 in expenses.[1056]

On August 10, 2005, Bennett and Sherer on behalf of Refco provided Murray Devine with a letter certifying that the management representations (*e.g.*, financial position, cash flows, balance sheets, and accounting practices), which Refco had made to Murray Devine for its solvency determination, were "true and correct in all material respects."[1057] In the letter, Refco acknowledged its responsibility for the fair presentation of the financial statements and stated that based upon its own review of the IPO, dividend payment, operating results, and related debt of the company, nothing "would cause us to believe that the Company, on a consolidated basis, would not be solvent." When interviewed, DiDomenico explained that he drafted the letter of representations. In what he described as typical practice, after Refco was given an opportunity to make changes, the representation letter was put on Refco letterhead. He could not recall what changes, if any, were made, but noted that all of the included representations were standard. DiDomenico further explained that when engaged to do a valuation or solvency analysis, Murray Devine regularly drafted representation letters to assure itself that all necessary representations were included. He added that without such representations, Murray Devine would not give an opinion.

---

[1056] REFCO-E-001487065, Murray Devine Invoice #05-0803 (August 16, 2005).

[1057] WGM-R 0011571-75, at App. D-69, Letter from Refco, Inc. to Murray Devine (August 10, 2005).

Murray Devine provided Refco with its solvency opinion letter dated as of August 10, 2005.[1058] In its solvency opinion letter, Murray Devine concluded that "after giving effect to the Transactions" [defined as the dividend, the reincorporation, and the IPO]:

- The aggregate value of the assets of the company at fair value and present fair saleable value exceeds its total liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities) as they become absolute and matured in the normal course of business;

- The Company has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities) as they become absolute and matured in the normal course of business;

- The Company does not have an unreasonably small amount of capital with which to conduct business; and

- Immediately after giving effect to the Dividend, the excess of the aggregate value of the assets of the Company, at fair value and present fair saleable value, over the Company's "liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities), is equal to or exceeds the amount of the Stated Capital of the Company."[1059]

When interviewed, DiDomenico stated that he drafted the opinion and explained the process by which the opinion was created. According to DiDomenico, in forming the opinion, Murray Devine relied upon Refco's audited consolidated financial statements, which had been provided by THL. DiDomenico stated that nothing in the provided information gave him cause for concern about Refco's financial condition and that he neither was aware of Refco's alleged practice of shifting debt nor of a $430 million related party receivable that the company publicly disclosed on October 10, 2005, just two months after Murray Devine rendered its August 10, 2005 solvency opinion.[1060] DiDomenico was questioned regarding his review of receivables. In response, he stated that his analysis was premised upon Refco as a going concern and that, as a

---

[1058] WGM-R 0011556-65, at App. D-70, Letter from Murray Devine to the Board of Directors of Refco, Inc.

[1059] WGM-R 0011559-60, at App. D-70.

result, he did not look at individual items on the balance sheet and did not check the creditworthiness of receivables. DiDomenico stated that Murray Devine does not have the expertise to audit the receivables and that it relied upon Refco's auditors.

## 2.    Declaration of Dividend

On August 10, 2005, the Refco Board of Directors resolved to declare and pay a dividend to pre-IPO shareholders.[1061]   According to the Board's resolution, it had "discussed" and "determined" that "after giving effect to the Reorganization, the Offering and the exercise of the Underwriters' Option, there will be sufficient surplus . . . to permit payment of the Dividend." The Board determined that the dividend would equal the "net proceeds received from the exercise, if any, by the underwriters in the Offering of their option . . . to purchase up to an additional 3,750,000 shares."   The resolution was signed by each of the Refco Directors: Bennett, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Schoen.  The Board of Directors created a Dividend Committee, comprised of Bennett and Schoen, to determine the aggregate and per share amount of the dividend, as well as its payment date.

On August 11, 2005, CSFB, as representative of the underwriters, confirmed with Refco that on August 16, 2005 the underwriters would exercise the over-allotment option in the amount of 3,975,000 additional shares of common stock.[1062] Referencing the Board's August 10, 2005

---

*(footnote continued from previous page)*

[1060] *See* Press Release, Refco News, Refco Announces Undisclosed Affiliate Transaction (October 10, 2005).

[1061] GT SEC 0045148, Unanimous Written Consent of the Board of Directors of Refco, Inc.

[1062] *See* MB 02067220, letter from Mathew D. Abrusci, Director and Counsel for CSFB, to Sherer.  While the original Board resolution sets forth the number of shares attributable to the underwriters' option as 3,750,000, GT SEC 0045148, Abrusci's letter, MB 02067220, and the Dividend Committee's resolution, GT SEC 0045160, both state 3,975,000 as the number of over-allotment shares. The Examiner did not locate any documents explaining this inconsistency.

declaration of a dividend and the Board's receipt of a "favorable opinion letter" from Murray Devine, the Dividend Committee ratified the precise terms of the dividend on August 16, 2005.[1063]  Accordingly, the Dividend Committee resolved that "an aggregate dividend equal to the net proceeds of the $82,203,000 received from the exercise of the Underwriters' Option be paid"[1064] to the pre-IPO shareholders on August 18, 2005.[1065]

Distribution lists indicate that Bennett and his related entities received approximately $34.6 million (42%); all THL related entities (not including co-investors) received approximately $41.1 million (50%); THL co-investors received $4 million (5%); Board members Leo R. Breitman, Nathan Gantcher, and Ronald L. O'Kelley (collectively "Outside Directors") each received $9,603 (.04%), and other Refco employees and managers received the remainder (2.6%).[1066]  The Examiner's counsel did not locate any information pertaining to whether the other Board members, Lee, Harkins, Jaeckel, and Schoen (collectively "THL Directors"), indirectly received a portion of the dividend.

### 3.    October 10, 2005 Refco Press Release Disavowing Financial Statements

Subsequently, in a press release dated October 10, 2005, Refco announced that it had discovered a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance

---

[1063] *See* GT SEC 0045160-61, Unanimous Written Consent of the Dividend Committee of the Board of Directors of Refco Inc.  "Whereas, the Board received a favorable opinion letter, dated as of the Record Date (a copy of which is attached), from Murray, Devine & Co., a third party valuation firm, which takes into account, among other things, the use of proceeds from the Offering as described in the prospectus and the payment of the Dividend . . . Therefore, Be it Resolved . . . that the Dividend shall be paid . . . ."

[1064] *Id.*

[1065] *See* Refco Inc. SEC Form 8-K dated August 19, 2005.

[1066] *See* PwC 064848, at App. D-71, August 17, 2005 Schedule of greenshoe dividends to be paid to pre-existing shareholders; THL/SEC 00005263, at App. D-72, Refco Proceeds Summary spreadsheet.

sheet as a related party transaction. As a result, Refco announced that "its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."[1067]

When interviewed, DiDomenico was shown the October 2005 Refco Press Release and was asked whether he was aware of Refco's fraudulent reporting practices and whether financial statements provided to him by Refco gave him reason to question the accuracy or reliability of the data included therein. DiDomenico said that he was unaware of any fraudulent activity on behalf of the company or its officers and that had he learned of the fraud at the time, he would have recommended to his principals that no opinion be issued and that the engagement be terminated.

Although DiDomenico declined at his interview to opine regarding whether Refco was in fact solvent at the time of his valuation opinion, he did make clear that Refco's goodwill value would have been substantially impaired by the fraudulent activity. He added that he had never encountered a situation in which he had been asked to value a company that had been the subject of pervasive fraud. He further stated that he was unsure of how to perform a solvency opinion based upon unreliable financial statements. DiDomenico observed that the methodology used in an opinion that would account for the bad receivable would likely require a liquidation analysis, rather than the going concern analysis that was used in Murray Devine's opinion. He also noted that Murray Devine's going concern analysis of Refco did not include an item by item valuation and did not examine inter-company debts. Moreover, Murray Devine's going concern analysis

---

[1067] *See* Press Release, Refco News, Refco Announces Undisclosed Affiliate Transaction (October 10, 2005).

assigned goodwill value, whereas, according to DiDomenico, the more apt liquidation analysis

typically would not reflect goodwill.

### D.    CONCLUSIONS CONCERNING THEORIES OF RECOVERY AGAINST DIRECTORS

Recovery against the directors is possible under theories that the dividend amounted to

(1) an improper distribution in violation of the DGCL or (2) an improper distribution in violation

of the directors' fiduciary duties of care and loyalty.  Based upon the facts as reviewed above and

elsewhere in this Report, the Examiner has concluded that under either theory, sufficient

evidence exists to state a claim against Bennett for recovery of the entire dividend amount.

There is some evidence that the THL Directors may have been negligent, potentially subjecting

them to liability under the DGCL.  Because the Examiner's investigation did not focus upon the

actions or knowledge of the THL Directors, additional investigation would be necessary to

evaluate whether a cause of action alleging either fraud or breach of fiduciary duty by those

directors could succeed.  With respect to the Outside Directors, the Examiner has not discovered

evidence to suggest that these directors are liable.

### 1.    Violation of Delaware Statute 8 Del. C. § 174(a)

Under the DGCL, dividends may be paid only: (1) out of surplus, defined as the excess of

net assets over capital;[1068] or (2) if there is no surplus, out of the combined net profits from the

fiscal year in which the dividend is declared and/or the preceding fiscal year.[1069]  Directors

present and voting in favor of a dividend payment are jointly and severally liable for a willful or

negligent violation of the surplus requirement.[1070]  However, a member of the board "shall be

---

[1068] "Net assets" is defined as the amount by which total assets exceed total liabilities.  8 *Del. C.* § 154.

[1069] 8 *Del. C.* § 170(a).

[1070] *Id.*  "In case of any wilful or negligent violation . . . the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or

*(footnote continued on next page)*

-333-

fully protected [from liability] in relying in good faith" upon the records of the corporation or upon "such information, opinions, reports or statements presented to the corporation" regarding the "existence and amount of surplus."[1071]

A successful claim therefore depends on the ability to show (1) a violation of the surplus requirement, and (2) that the violation was willful or negligent. A dividend payment made while Refco was insolvent is a violation of the surplus requirement.[1072] Although the Examiner did not perform a full solvency analysis, as explained in Section IX.A. the Examiner believes that it is likely that Refco was insolvent during 2004 and 2005. Presuming insolvency, it then must be shown that the violation was willful or negligent, *i.e.*, that the director knew, or was negligent in not knowing, that Refco was insolvent at the time the dividend was paid.[1073] If the director knew

---

*(footnote continued from previous page)*

insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued. Any director who may have been absent when the same was done, or who may have dissented from the act or resolution by which the same was done, may be exonerated from such liability by causing his or her dissent to be entered on the books containing the minutes of the proceedings of the directors at the time the same was done, or immediately after such director has notice of the same."

[1071] 8 *Del. C.* § 172. "A member of the board of directors, or a member of any committee designated by the board of directors, shall be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of its officers or employees, or committees of the board of directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, as to the value and amount of the assets, liabilities and/or net profits of the corporation or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the corporation's stock might properly be purchased or redeemed."

[1072] *See EBS Litig. LLC v. Barclays Global Investors*, 304 F.3d 302, 305 (3d Cir. 2002) ("If the dividend occurred when [the company] was insolvent, or rendered [the company] insolvent, it was illegal under Delaware law, and voidable in bankruptcy.").

[1073] *See Pereira v. Cogan ("Pereira I")*, 2001 WL 243537, at *1 (S.D.N.Y. March 8, 2001) (complaint that alleged that directors "knew or should have known" about the illegality of dividend payments was sufficient to survive motion to dismiss).

or should have known of the corporation's insolvency, he or she is jointly and severally liable for the payments.[1074]

Based on the facts contained in this Report, there is little doubt that Bennett authorized the dividend payment despite being aware of Refco's inaccurate balance sheets and financial statements, which concealed the RGHI Receivable.  Given the assumption that Refco was insolvent, Bennett violated the DGCL and is jointly and severally liable for the declaration and payment of the dividend.

As referenced above, the Examiner has not investigated THL and the directors appointed by THL to determine what information was made available to them in their capacities as Refco directors; nonetheless, there is information available that may support a claim under DGCL Section 174.  First, unlike the Outside Directors who joined the board in January 2005, the THL Directors had been on the Refco board since the LBO in August 2004. Therefore, the THL Directors were in a position to analyze Refco's true financial condition not only through the LBO due diligence process, but also through their fulfillment of their oversight duty as inside directors managing the company.

Second, Lee, Jaeckel, Schoen, and Harkins were made aware of allegations of previous questionable conduct related to Refco's reporting of trading losses.  Specifically, in May 2004, subsequent to the completion of its diligence efforts in connection with the LBO, THL was made aware that a former Refco insider alleged that "all was not well with Refco."[1075]  KPMG provided THL with possible additional due diligence procedures which would address concerns raised by the former insider that in order to avoid tax implications, trading losses had been run

---

[1074] Section 174 provides that "directors who are guilty of 'wilful or negligent violation' of the statutes" shall be jointly and severally liable. *Johnston v. Wolf*, 487 A.2d 1132, 1136 (Del. 1985).

[1075] KPMG-THL 0024324, at App. D-57, "Project Royce – Chronology" (undated).

through two overseas Refco entities that were not consolidated.[1076]  Lee, Schoen, and Harkins met with Bennett for an explanation, rather than undertaking the procedures that likely would have discovered the fraud.[1077]  THL moved ahead with the LBO and did not conduct the additional diligence.  THL also did not implement these procedures during the subsequent IPO due diligence, by which time all four THL Directors were serving on the Refco board and THL was the controlling shareholder.

With respect to the Outside Directors, the Examiner has found no evidence supporting recovery from them of the dividend payment under Section 174.  The Examiner has not discovered evidence suggesting that these directors knew or should have known either of the balance sheet issues or of Refco's insolvency.

In defense of the claim, directors can assert the protection of Section 172, which immunizes against liability directors who in good faith rely upon records of the corporation and other information regarding the existence of a surplus.[1078]  Section 172 requires defendants to prove (1) that the material relied upon "actually determined a surplus existed," and (2) that "it was reasonable for them to rely on that determination."[1079]  The August 10, 2005 Board resolution, which declared the dividend, referred to "discuss[ions]" regarding methods for valuing assets and noted that the Board had "determined" that "there will be a sufficient surplus .

---

[1076] KPMG-THL 0019714-715, at App. D-60, E-mail from Berndsen to Jaeckel (May 28, 2004) (attaching "possible questions for insider" and other diligence procedures to be addressed).

[1077] THL/UCC 00033266, at App. D-61, E-mail from Schoen to Lee, Westra, Harkins, Jaeckel, and Taylor (May 30, 2004) (outlining "consensus" as to how to approach Bennett regarding allegation); WGM-L0025237, E-mail from Schoen to Jaeckel, Taylor, Max Strasburg, Westra, and Tabor (June 2, 2004) (summarizing June 1, 2004 meeting with Bennett).

[1078] *See In re Sheffield Steel Corp.*, 320 B.R. 423, 451 (Bankr. N.D. Okla. 2004) (interpreting Delaware law and noting that Section 172 is an affirmative defense, which "immunizes directors from liability for declaring an otherwise illegal dividend . . . .").

[1079] *Id.*

. . to permit the payment of a [d]ividend."[1080]  The Board also received a "favorable" solvency

opinion from Murray Devine.

## 2.    Breach of Fiduciary Duties of Care and Loyalty

A viable claim to recover the entire dividend amount based on breach of fiduciary duties

exists against Bennett.  Based on the evidence currently available, it is unlikely that a viable

claim could be asserted against the THL Directors for breach of their fiduciary duties of care and

loyalty.  The Examiner has not located evidence that would support a claim against the Outside

Directors.

In order to state a claim against directors for breach of fiduciary duty, a plaintiff must

plead that (1) a fiduciary duty exists, and (2) a breach of that duty has occurred.[1081]  With regard

to the existence of a fiduciary duty, it is settled under Delaware law that, at the point of

insolvency, directors owe a fiduciary duty to, among others, the corporation's creditors.[1082]  The

duty of care essentially requires that directors engage in due diligence prior to decision making:

a trial court will not find a breach of a director's duty of care "unless directors individually and

the board collectively have failed to inform themselves fully and in a deliberate manner before

voting as a board upon a transaction . . . ."[1083]  The duty of loyalty mandates that the "best

interest of the corporation and its shareholders takes precedence over any interest possessed by a

---

[1080] GT SEC 0045148, Unanimous Written Consent of the Board of Directors of Refco, Inc.

[1081] *See Pereira I*, 2001 WL 243537, at *12.

[1082] *See Prod. Res. Group, LLC v. NCT Group, Inc.*, 863 A.2d 772, 790-791 (Del. Ch. 2004) (The fact of insolvency expands the class of those eligible to press fiduciary duty claims to include creditors).  *See also Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, Civ. A. No. 12150, 1991 WL 277613, *34 (Del. Ch. Dec. 30, 1991) (where a corporation is in the zone of insolvency, the board of directors owes its duty not only to the shareholders, but to the corporate enterprise, including the corporation's creditors).

[1083] *Cede & Co. v. Technicolor Inc.*, 634 A.2d 345, 368 (Del. 1994) (citations omitted).

director, officer or controlling shareholder and not shared by the stockholders generally."[1084]
However, self interest alone does not violate the duty of loyalty; there must be evidence of
disloyalty, such as fraud upon the corporation or the board, or abdication of directorial duties.[1085]
Primary examples of director self-interest are (1) when a director appears on both sides of a
transaction, and (2) when a director receives a personal benefit from a transaction "not received
by the shareholders generally."[1086]

    A director's determination of the existence of a surplus and decision to declare and pay a
dividend is generally protected by the business judgment rule.[1087]  Accordingly, in making such a
determination, the Refco directors are afforded the presumption that they "acted on an informed
basis, in good faith and in the honest belief that the action was in the best interests of the
company."[1088]  A claim for recovery of the dividend therefore will have to rebut this presumption
if it is to be successful.  To do so, it must be shown either that (1) the directors were grossly
negligent in causing the payment of the dividend[1089] (thereby breaching their fiduciary duty of
good faith, loyalty, or due care), or (2) the transaction was self-dealing (thereby breaching their
duty of loyalty).[1090]  If the presumption is rebutted, directors will have the burden of showing the

---

[1084] *Id.* (citations omitted).

[1085] *Cede*, 634 A.2d at 363 (citations omitted).

[1086] *Id.*

[1087] *See Gabelli & Co., Inc. v. Liggett Group Inc.*, 479 A.2d 276, 280 (Del. 1984).

[1088] *Smith v. Van Gorkom*, 488 A.2d 858, 872-873 (Del. 1985) ("A director's duty to inform himself in preparation for a decision derives from the fiduciary capacity in which he serves the corporation and its stockholders.").

[1089] *Van Gorkom*, 488 A.2d at 873 ("[G]ross negligence is . . . the proper standard for determining whether a business judgment reached by a board of directors was an informed one.").

[1090] *See Pereira v. Cogan ("Pereira II")*, 294 B.R. 449, 527 (S.D.N.Y. 2003).

"entire fairness" of the transaction. Directors found to have violated their fiduciary duty are jointly and severally liable for the dividend payment.[1091]

The analysis of claims against the Refco directors for breach of fiduciary duties falls along similar lines as the analysis under the DGCL, discussed above. Bennett's determination that a surplus existed and his decision to authorize a dividend payment while knowing of Refco's balance sheet inaccuracies and the undisclosed RGHI Receivable meet the standard of gross negligence and, therefore, do not satisfy a director's duty of good faith, care, and loyalty.

Whether the THL Directors would be found to have violated their fiduciary duties turns on whether they were grossly negligent in not discovering the balance sheet inaccuracies. Section 172 of the DGCL, discussed above, codifies the duty of care, diligence, good faith, and reason necessary for the dividend to conform with applicable standards.[1092]  It is likely that to the extent the THL Directors are shielded by Section 172, they also have fulfilled their fiduciary duties.

E.    **CONCLUSIONS CONCERNING THEORIES OF RECOVERY AGAINST DIVIDEND RECIPIENTS**

1.    **Violation of Federal and State Fraudulent Conveyance Laws**

Recovery of the dividend payments may be pursued against the recipients of the dividend payments under two fraudulent conveyance provisions of the Bankruptcy Code:  11 U.S.C. §§ 544 and 548.  Section 544 authorizes a trustee to "avoid any transfer of an interest of the

---

[1091] *See In re Toy King Distrib., Inc.*, 256 B.R. 1, 168 (Bankr. M.D. Fla. 2000) (Where two or more directors jointly participate in a breach of fiduciary duty, the liability is joint and several.) (citations omitted).  *See also Pereira II*, 294 B.R. at 535 (holding "all" directors liable for dividend payments made in violation of directors' fiduciary duties).

[1092] *See In re Sheffield Steel*, 320 B.R. at 449.

debtor in property . . . that is voidable under applicable law . . . ."[1093]  Recovery pursuant to

Section 544 requires there to be an unsecured creditor that had a claim under state law at the time

the bankruptcy case was filed.  The Examiner assumes for purposes of this Report that New

York law likely will apply,[1094] and recovery could be sought pursuant to a theory that payment of

the dividend constituted an actual fraudulent conveyance, or in the alternative, a constructive

fraudulent conveyance, under the New York Uniform Fraudulent Conveyance Act, codified at,

N.Y. Debt. & Cred. Law (hereinafter "DCL") §§ 270-81.  In most cases, "if a transfer is

fraudulent under New York Debtor Creditor Law, it is also fraudulent under § 548 of the

Bankruptcy Code."[1095]

### a.    Actual Fraudulent Conveyance

DCL § 276 governs actual fraudulent transfers and states: "[e]very conveyance made and

every obligation incurred with actual intent, as distinguished from intent presumed in the law, to

hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and

future creditors."  The federal law, 11 U.S.C. § 548, is substantially similar to New York law,

providing that a trustee may avoid a transfer when the transfer was made "with actual intent to

hinder, delay, or defraud" present or future creditors.[1096]  Factual allegations supporting claims of

intentional fraudulent transfers are scrutinized pursuant to Fed. R. Civ. P. 9(b), "while taking into

---

[1093] 11 U.S.C. § 544(b).  The term "applicable law" refers to non-bankruptcy state law.  *See Hassett v. Far W. Fed. Sav. & Loan Ass'n (In re O.P.M. Leasing Servs., Inc.)*, 40 B.R. 380, 384 (Bankr. S.D.N.Y. 1984), *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984).

[1094] *See* App. A.

[1095] *Geron v. Shulman (In re Manshul Const. Corp.)*, 2000 WL 1228866, *43, n.7 (S.D.N.Y. Aug. 29, 2000).

[1096] 11 U.S.C. § 548(a)(1)(A).

account that the trustee is entitled to some leeway in the areas of scienter and particularity because he has no personal knowledge of the facts."[1097]

Other than as to Bennett, the Examiner has not discovered direct evidence of fraudulent intent on the part of the directors declaring the dividend. However, because direct proof of fraudulent intent is sometimes difficult to obtain, under both federal and New York law, a plaintiff may prove such intent through circumstantial evidence known as "badges of fraud." The badges of fraud include (1) inadequacy of consideration received, (2) the closeness of the relationship between parties to the transfer, (3) that the transferor was rendered insolvent by the conveyance, (4) suspicious timing of the conveyance, (5) use of fictitious parties or secrecy, (6) the transferor's knowledge of a creditor's claim and subsequent inability to pay it, and (7) retention of control of the property by the transferor after the transfer.[1098] To satisfy "fair consideration," the transferee in good faith must either convey property or discharge an antecedent debt of equivalent value to the property transferred.[1099] In addition to the direct evidence of Bennett's fraudulent intent, several of these badges of fraud are present.

First, there was no consideration received in exchange for the payment. Nonetheless, given that a dividend payment rarely is paid in exchange for consideration, lack of consideration

---

[1097] *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 315 (Bankr. S.D.N.Y. 1999) (citations omitted).

[1098] *See Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co., Ltd.*, 375 F. Supp. 2d 257, 268-69 (S.D.N.Y. 2005) (citing *Bulkmatic Transp. Co. Inc. v. Pappas*, No. 99 Civ. 12070(RMB) (JCF), 2001 WL 882039 (S.D.N.Y. May 11, 2001)); *MFS/SUN Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995). *See also Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983).

[1099] DCL § 272: "Fair consideration is given for property, or obligation . . . [w]hen in exchange for such property, or obligation, as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt is satisfied . . . ."

in this context may not weigh heavily in favor of fraudulent intent.[1100]  Further, recipients of the dividend also could assert the less compelling argument that if the dividend was lawfully declared under Delaware law, a contract debt was created[1101] and therefore payment of the dividend was fair consideration for release of an antecedent debt.  If the dividend was lawfully declared such that there was an antecedent debt, then the payment is still potentially recoverable as an avoidable preferential transfer under § 547 of the Bankruptcy Code.[1102]  In one of the few cases to examine this issue, the court found that even if the declaration of a dividend had formed a contract, insolvency would have prohibited performance and would have rendered any dividends paid subject to recovery by the estate.[1103]

Second, with regard to the closeness of the relationship between the parties to the transaction, over ninety percent of the proceeds of the dividend payment went to either directors

---

[1100] *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 384 (S.D.N.Y. 2003) (finding lack of consideration to be irrelevant as a badge of fraud in the context of a dividend payment reasoning "[o]f course, no consideration was paid for the dividends . . . but this is always the case in a dividends situation . . . .").

[1101] *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1175 (Del. 1988).  However, if the dividend is unlawful under Delaware law, it does not qualify as an "antecedent debt."  *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Inv. P'ship (In re Color Tile, Inc.)*, 2000 WL 152129, *5 (D. Del. Feb. 9, 2000).

[1102] *See* App. B.  A transfer can be avoided if it was made: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) while the debtor was insolvent; (4) on or within ninety days before the bankruptcy petition date, or between ninety days and one year if the transfer was made to an insider; and (5) where the transferee received more than it would have in a liquidation under Chapter 7.  Here, if the declaration of the dividend created a contractual debt obligation, the transferees could become creditors for purposes of that transaction, satisfying the first element.  Because the debt was created on August 10, 2005 and satisfied through payment on August 18, 2005, it may be an antecedent debt in satisfaction of the second element.  With respect to solvency, under 11 U.S.C. § 547(f), there is a presumption of insolvency for the ninety day period preceding the filing of the petition for bankruptcy.  Because the dividend was declared and paid within ninety days of October 17, 2005, the date on which Refco filed for bankruptcy, the third and fourth elements are satisfied.  With respect to the final element, in light of the relevant facts in this case, the recipients of the dividend received more than they would have received in a Chapter 7.

[1103] *See Trace II*, 289 B.R. at 561.  Moreover, when a transfer on account of an antecedent debt is made to an insider while the transferor is insolvent, the insider does not meet the "good faith" requirement of  DCL § 272, and thus there is no fair consideration for the transfer.  *See Farm Stores, Inc. v. School Feeding Corp.*, 477 N.Y.S.2d 374, 378 (N.Y. App. Div. 1984), *aff'd*, 479 N.E.2d 222 (N.Y. 1985).  Good faith is not required, however, if the transfer is on account of an antecedent debt in an arms-length transaction with an outsider.  *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005).

themselves or to entities related to the directors.  Although the Examiner's investigation did not

trace the proceeds beyond the original recipients of the payment, Refco's estate could argue that

given the close nexus between the directors who approved the dividend payment and the

individuals and entities who received it, the "closeness of the relationship" prong is met here.[1104]

In turn, the recipients might argue that given that all shareholders received a proportionate share

of the dividend, no fraudulent intent can be inferred.[1105]

Section 548 of the Bankruptcy Code and Section 278 of DCL provide transferees with a

defense to the avoidance of an actual fraudulent conveyance for property taken for fair value and

in good faith.[1106]  First, as discussed above, no value was given in exchange for the dividend

payment.  Putting aside the issue of consideration, Bennett cannot argue that he received the

dividend payment in good faith.  With respect to the THL affiliates that received the payment, it

may be that the THL Directors' knowledge or lack of knowledge with respect to the fraud fairly

can be imputed to the affiliates, and it is thus undetermined whether the affiliates have a viable

good faith defense.

### b.      Constructive Fraudulent Conveyance

A claim for avoidance of a constructive fraudulent conveyance is governed by DCL

§ 273 in state law and Section 548(a)(1)(B) of the Bankruptcy Code.  Unlike actual fraud,

constructive fraud does not have a scienter requirement.  In order to show constructive fraud

---

[1104] *See State v. First Investors Corp.*, 592 N.Y.S.2d 561, 569 (N.Y. Sup. Ct. 1992) (finding actual intent to defraud where, among other factors, almost two-thirds of dividend went to two of the three directors).

[1105] *See Lippe*, 249 F. Supp. 2d at 384 (noting that because there is always a close relationship between the company paying a dividend and the shareholders receiving the payment, such closeness is not necessarily a badge of fraud).

[1106] 11 U.S.C. § 548(c) provides in part, "a transferee or obligee of [a fraudulent] transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." DCL § 278 provides in relevant part, "Where a conveyance or obligation is fraudulent as to a creditor, such creditor

*(footnote continued on next page)*

under DCL § 273, a plaintiff must show: (1) the debtor transferred an interest in property; (2) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer;[1107] and (3) the debtor received less than a reasonably equivalent value in exchange for such transfer ("fair consideration").[1108]  Lack of fair consideration creates a presumption of insolvency and shifts the burden to the transferees to prove solvency.[1109]

A claim under Section 548 of the Bankruptcy Code is similar to one under DCL § 273 except with respect to the burden of proving good faith.  While New York law burdens the party seeking recovery with showing a lack of good faith on the part of the transferee, federal law burdens the transferee with showing the presence of good faith.[1110]

Assuming that Refco was insolvent when it paid the dividend, the case for a constructive fraudulent conveyance claim will rely on evidence that shows that the dividend was paid without consideration from shareholders who did not receive it in good faith.  Regardless of where the burden of showing good faith lies, the relevant factual analysis is the same as discussed with regard to actual fraudulent conveyance and yields the same outcome as outlined above.  Accordingly, although recipients of the dividend could argue that payment of the dividend created an antecedent debt, likely it will be found that fair value was not given for the dividend.

---

*(footnote continued from previous page)*

. . . may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase . . . [h]ave the conveyance set aside . . . ." (emphasis added).

[1107] Other tests for insolvency under this statute include: (1) as a result of the transfer, the transferor is left with unreasonably small capital to conduct its business (§ 274); and (2) as a result of the transfer, the transferor intends or believes that it will incur debt beyond its ability to pay (§ 275).   *A.J. Heel Stone, L.L.C. v. Evisu Int'l, S.R.L.*, No. 03 Civ. 1097(DAB), 2006 WL 1458292, at *3 (S.D.N.Y. May 25, 2006) (summarizing solvency tests found in DCL).

[1108] *See Trace I*, 287 B.R. at 107 (citations omitted).

[1109] *See In re The Cassandra Group*, 338 B.R. at 597.

[1110] *See* 11 U.S.C. § 548(c).

## VIII.   OTHER PROFESSIONALS

### A.   MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP

The Examiner preliminarily considered investigating potential claims of Refco's estate against McDermott Will.  The Examiner reviewed Refco's documents made available by the Debtors' counsel on its online database and documents made available by the Creditors Committee's counsel on its online database in connection with his preliminary evaluation of possible claims.  However, after reviewing documents to determine the extent of McDermott Will's involvement with Refco, the Examiner determined that it was not appropriate to invest significant additional time to conduct a thorough investigation of potential claims against McDermott Will.

First, it appears that McDermott Will performed very little work for Refco.  During the period 1998 through 1999, it appears that McDermott Will did some minor legal work for Refco. Schedules of Refco's accrued expenses show that Refco owed McDermott Will $2,000.00 in October 1998 and $10,000.00 in September 1999 for legal services rendered.[1111]  In addition, in response to audit letter requests from Refco, McDermott Will acknowledged representation of Refco in 1998 and 1999 but stated that it had not represented Refco in any matters that would need to be disclosed as part of the audits.[1112]  Based on the information known to the Examiner, McDermott Will appears to have engaged in only limited representation of Refco and to have received a minimal amount of attorneys' fees from Refco more than six years ago.

McDermott Will represented BAWAG in connection with transactions between BAWAG, Refco, and RGHI in 1999 and again during the years 2002-2004.  McDermott Will

---

[1111] REFCO-E-017238683 at Tab C, 1; REFCO-E-017254824 at Tab C, 2.

[1112] REFCO-HC-0545086 at Tab C, 3; REFCO-HC-0545036 at Tab C, 4.

represented BOI in connection with the LBO. McDermott Will also represented BAWAG and

its affiliates DF Capital, Desana Foundation, and Alinea Holding GmbH ("Alinea Holding").

McDermott Will provided general corporate representation and assisted BAWAG and its

affiliates in connection with the drafting and closing of the PPA between Refco and DF Capital

on July 12, 2002.[1113] McDermott Will also represented BAWAG, DF Capital, Alinea Holding,

and Desana Foundation in connection with the acquisition of DF Capital's stock.[1114] Pursuant to

the series of agreements effecting this acquisition, McDermott Will was paid $465,000 from the

LBO proceeds in August 2004.[1115]

    Even if claims could otherwise be asserted by Refco's estate against McDermott Will

based on its representation of BAWAG in connection with these transactions, the Examiner

concludes that Refco's estate, through its settlement with BAWAG, has released McDermott

Will in its capacity as BAWAG's counsel. As part of Refco's estate's settlement with BAWAG,

Refco agreed to:

> forever release, acquit, and discharge the BAWAG Entities and the
> BAWAG Shareholders and any of their current officers and
> directors . . ., advisors, attorneys, and representatives . . . from and
> against any and all claims or actions belonging to Refco, their
> current officers and directors, or the Debtors' bankruptcy estates,
> whether direct, derivative, or otherwise . . ., including, but not
> limited to . . . (ii) all claims that could have been asserted in the
> Adversary Proceeding or any other claim that could have been
> brought by or on behalf of Refco or the Committee . . . .[1116]

    Accordingly, the Examiner concluded that he would not conduct further investigation of

possible claims against McDermott Will.

---

[1113] REFCO-E-002513986 at Tab C, 12; REFCO-0005-000843 at Tab C, 13; REFCO-0005-000893 at Tab C, 14.

[1114] REFCO-E-001391794 at Tab C, 17; REFCO-E-001392117 at Tab C, 18.

[1115] REFCO-0008-151662 at Tab C, 20.

B.    **KPMG LLP**

1.    **Introduction**

During the initial phase of this investigation, the Examiner's counsel reviewed documents to identify the scope of services that KPMG performed for Refco and its related entities.  The purpose of this preliminary review was to determine the threshold issue of whether the likely value of any potential claims that Refco's estate could pursue against KPMG supported incurring fees and costs associated with conducting a thorough investigation of KPMG.  In particular, the document review focused on whether (1) KPMG performed services for Refco that had a discernible nexus to the fraudulent activity in this case, and (2) whether KPMG had a relationship with Refco creating duties, the breach of which could give rise to a claim brought on behalf of Refco's estate against KPMG.

Based on that review, the Examiner has determined that with respect to this investigation, KPMG's Refco-related engagements fall into one or more of the following:  (1) engagements with Refco to provide services outside the three-year statute of limitations period for professional malpractice claims;[1117] (2) engagements with Refco to provide services not relevant to the alleged fraudulent conduct at issue in this case; and (3) engagements with THL that do not create a duty to Refco and, therefore, likely do not give rise to causes of action on behalf of the estate.

In light of the results of the review by the Examiner's counsel, the Examiner concluded that further investigation of KPMG was unwarranted.  Notwithstanding the above, the KPMG-related document review did reveal certain engagements that bear describing here.

---

*(footnote continued from previous page)*

[1116] Stipulation and Order of Settlement dated June 2, 2006, section 4(a), as approved by Order Approving and Clarifying Stipulation and Order of Settlement and Resolving Certain Objections [July 6, 2006; Docket # 2348].

[1117] The statute of limitations for professional malpractice in New York is three years. N.Y. C.P.L.R. § 214(6).

### 2.    Tax Related Engagements

It appears that KPMG performed tax consulting work concerning Refco in 2004 and 2005. Specifically, KPMG's services involved analysis of the tax implications of various corporate transactions and structures following the LBO and in conjunction with the IPO. It is unclear, however, whether THL or Refco was the client during this time period, for although RGL was billed for the work, and RCC paid the invoices, the client number on many of the invoices matches that used on KPMG's invoices to THL for due diligence work related to the LBO. It is also unclear whether the tax work done in conjunction with the IPO was a continuation of a prior engagement or whether KPMG had been engaged separately for the tax work. Despite the lack of clarity, because the substance of the engagement dealt with tax matters unrelated to the fraud at issue in this case, the Examiner has determined that further investigation is not necessary.

### 3.    Engagements with Refco Entities

The following KPMG engagements with Refco entities fall outside of the three-year statute of limitations for professional malpractice claims and/or do not implicate the alleged fraudulent conduct at issue in this case:

- In December 1998 KPMG was engaged to become the "contract manager of the IT function at Refco and [to] take control of the day to day operations."[1118]

- At some point in either 1998 or early 1999, Refco engaged KPMG to complete an evaluation of preparedness for Y2K compliance.[1119]

---

[1118] REFCO-HC-0324240, Memorandum from Refco Group Ltd, Executive Committee to Refco Employees and Associates (December 14, 1998).

[1119] No engagement letter for this project was found; however, an invoice from May 6, 1999 indicated that a Y2K Program Management Office had been established, as stated in KPMG's "amendment proposal letter dated February 12, 1999." *See* REFCO-HC-0555520, Invoice from KPMG to Stephen F. Rossi, Senior Vice President-Group Administration, Refco Group, Ltd. (May 6, 1999).

- Several annual reports (found in the THL folders) produced by KPMG for Refco Investment Services Pte Ltd. ("RIS") indicate that KPMG Singapore reviewed the financial statements of RIS for the fiscal years 1999, 2001, 2002, and 2003. [The report for fiscal year 2000 was not among them.] KPMG Singapore also served as independent auditor for Refco (Singapore) Pte Ltd.

- RGL "and subsidiaries" engaged KPMG for an "MLC Project" which involved a "Financial Statement Audit."[1120] The matter opened on July 1, 1999 and closed on May 3, 2000.

- RGL engaged KPMG to perform an "Investigation," described by the Conflict and Independence Search Report as a "Forensic in the Audit."[1121] The matter opened on July 1, 1999 and closed on April 5, 2000.

- RGL engaged KPMG for a matter related to "Now Financial LLC" involving a "Financial Statement Audit."[1122] The matter opened on August 26, 1999 and closed on December 4, 1999.

- RGL "and subsidiaries" engaged KPMG for a "Special Project" related to a "Risk Assessment."[1123] The matter opened on November 29, 1999 and closed on May 3, 2000.

### 4.  THL Engagements

THL engaged KPMG for various due diligence efforts related to the LBO. For a discussion of these matters, see Section VI.B. of this Report.

### 5.  Conclusion

After a preliminary review of documents that identified KPMG engagements, the Examiner concluded that further investigation of KPMG was unwarranted for the reasons stated above.

---

[1120] *See* KPMG-THL 0019223-228, KPMG Conflict and Independence Search Report regarding Refco Group (February 12, 2004).

[1121] *Id.*

[1122] *Id.*

[1123] *Id.*

## C.    PRICEWATERHOUSECOOPERS, LLP

The Examiner included PricewaterhouseCoopers, LLP ("PwC") as part of his initial investigation. Review of PwC's activities also was significant to evaluating the roles of the other professionals, especially in relation to the LBO and IPO.

During the initial stages of the investigation, however, it came to the Examiner's attention that the Examiner's counsel, MLA, had one open matter on behalf of PwC being handled by MLA's Denver, Colorado office related to a government contract. This other legal work did not relate to Refco, the Refco Examination, or the Refco Bankruptcy Cases. The MLA partner in charge of this file did not work on the Refco Examination. Nonetheless, the Examiner brought this issue to the attention of the Court, and consulted with counsel for the U.S. Trustee, counsel for the Debtors, counsel for the Creditors Committee, and counsel for the RCM Trustee. Based on those consultations, the Examiner decided to discontinue any investigation of possible claims against PwC. Upon disclosure to the Court of the Examiner's recommendation, the Court did not direct the Examiner to continue his investigation.

## IX.    MISCELLANEOUS CONSIDERATIONS

### A.    ISSUES CONCERNING REFCO'S SOLVENCY OR INSOLVENCY

Some of the potential claims investigated by the Examiner and referred to in this Report are affected by whether Refco was solvent or insolvent at various points in time. The Court requested that the Examiner not retain additional consultants unless it was absolutely necessary to do so and, instead, to rely on the work done by consultants already retained by other parties in interest in the Bankruptcy Cases. The Examiner has done this. Therefore, the Examiner has not conducted a full-fledged solvency analysis but has utilized the solvency work done by the consultants referred to in this section of the Report, as well as other information reviewed by the Examiner and his counsel, to reach the Examiner's conclusions on solvency. While it is not

entirely free from doubt, the Examiner believes, based upon his review, that a court would likely find Refco was insolvent, on a consolidated basis. Based on work done by others, some of which was preliminary in nature, the Examiner is assuming for purposes of this Report that Refco was insolvent at all points after the LBO which closed in early August of 2004 until the filing of the Bankruptcy Cases in October of 2005. The Examiner will summarize below what he did to gain comfort in this assumption.

There were at least four consultants who did some work relevant to the solvency issue. They are: (1) FTI Consulting, Inc. ("FTI") retained by the Creditors Committee; (2) Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") retained by the Creditors Committee; (3) Goldin Associates, LLC ("Goldin") retained by the Debtors; and (4) Murray Devine retained by Refco's board of directors in connection with the IPO dividend.

**FTI Consulting**

FTI was retained to express an opinion with respect to the solvency of Refco, on a consolidated basis, in connection with the Creditors Committee's litigation against BAWAG. M. Freddie Reiss of FTI filed a declaration with the Court in support of the Creditors Committee's request for temporary injunctive relief against BAWAG (the "Reiss Declaration").

Specifically, Reiss concluded as follows:

1.  As a result of a series of transactions (the "Leveraged Recapitalization") involving THL Refco Acquisition Partners ("THL"), on August 5, 2004, RGL was left with unreasonably small capital.

2.  As a result of the Leveraged Recapitalization, on August 5, 2004, RGL was insolvent or rendered insolvent.

3.  Pursuant to RGL's filed financial statements, RGL had approximately $431,000,000.00 of <u>tangible</u> net book equity as of February 29, 2004, and <u>negative</u> $1.2 billion of

<u>tangible</u> net book equity as of August 5, 2004 after the Leveraged Recapitalization.[1124]

Reiss defined insolvency as "…when the present saleable value of one's assets is less than the amount that will be required to pay one's probable liabilities on existing debts as they become absolute and matured."[1125]

Reiss essentially concluded that Refco, on a consolidated basis, was insolvent at the time of the LBO.  Reiss concluded that, if proper disclosure had been made at the time of the LBO, the consequences that were eventually visited upon Refco in October of 2005, or consequences very close to them, would have occurred at the time of the LBO.  As a result, Reiss concluded that Refco's good will was impaired and that the elimination of good will from Refco's balance sheet would render the company insolvent.  He also concluded that certain other intangible assets on Refco's balance sheet would have been impaired.

Reiss further stated in his declaration as follows:

> "It is my belief that if RGL had made the appropriate financial and non financial disclosure to the public regarding the true status of its operations and its financial statements as of August 5, 2004, RGL would have suffered similar financial distress that it suffered in the wake of the October 10, 2005 press release, and would as a result, have been rendered under capitalized and insolvent as of August 5, 2004. …RGL's financial condition improved between the time of the Leveraged Recapitalization and the October 10, 2005 announcement…consequently, it stands to reason that if RGL  was unable to survive the disclosures of this uncollectible receivable after the IPO…it certainly would not have been able to withstand the same announcement after the closing of the Leveraged Recapitalization when it had even higher leverage."[1126]

---

[1124] *See* Pages 1-2 of the Reiss Declaration.  (Emphasis in original).

[1125] *See* Page 21 of Reiss Declaration.

[1126] *See* Pages 15-16 of Reiss Declaration.

While the FTI solvency analysis was preliminary in nature and was used for the purpose of supporting temporary injunctive relief against BAWAG, the Examiner believes the approach taken by FTI is valid with respect to a solvency analysis at all times in 2004 and 2005.

**Houlihan**

Houlihan was retained by the conflicts counsel for the Creditors Committee to examine solvency issues in connection with the analysis of possible claims against underwriters, banks, or others arising out of the IPO process.  Its work in that regard was preliminary in nature and focused on specific parts of Refco.  Houlihan also performed, and filed with the Court as a part of the confirmation process, a liquidation analysis of Refco both on a consolidated and individual Refco entity basis.

The liquidation analysis prepared by Houlihan was helpful to the Examiner.  It analyzed, for plan confirmation purposes, whether Refco, on both a consolidated and individual entity basis, was solvent or insolvent and concluded that Refco was insolvent.  While the Examiner did not meet with Houlihan to discuss the liquidation analysis, he did have access to the analysis as filed with the Court and the Houlihan representative's testimony before the Court during the confirmation process.

**Goldin**

Goldin was retained by the Debtors and provided restructuring and financial consulting assistance.  Prior to the parties arriving at a consensual plan that provided, for plan purposes, the equivalent of a substantive consolidation that rendered a full fledged solvency analysis unnecessary, Goldin did some preliminary work on solvency.  The Examiner met with representatives of Goldin to discuss its work and considered its analysis and conclusions, which

were preliminary in nature but not inconsistent with the assumption of insolvency that the Examiner is making.

### **Murray Devine**

In connection with the approximately $82.2 million dividend authorized by Refco's board of directors and paid at the time of the IPO, Murray Devine was retained to provide a solvency opinion to the board of directors. Murray Devine provided such an opinion based upon an analysis it had previously conducted for Refco and an update of that analysis at the time of the IPO.[1127]

However, Murray Devine's conclusion of solvency was based in large part on Refco management representations and the audited financial statements which were false and rendered unreliable by Refco's public announcement in October of 2005 with respect to the undisclosed RGHI Receivable. At the interview of the Murray Devine person responsible for the solvency opinion, he stated that if he had known of those irregularities at the time of the solvency opinion he would have recommended to Murray Devine that it not issue an opinion and withdraw from the engagement. He also stated that if Murray Devine did go forward and perform a solvency opinion under those circumstances it would likely use a liquidation value approach as opposed to the going concern approach which was used in the Murray Devine solvency opinion.

Based on the foregoing, the Examiner does not believe that the Murray Devine solvency opinion in connection with the IPO dividend could be the basis for finding that Refco was solvent in August of 2005.

---

[1127] *See* Section VII of this Report.

**Conclusion**

It is the Examiner's belief that the potential consequences to a company like Refco from the public disclosure made in October of 2005 would likely have been greater after it registered the Senior Subordinated Notes with the SEC and after the completion of its IPO in August of 2005, than before the registration and IPO.  In other words, the public aspects of the registration of the notes and the IPO made it more difficult for Refco to recover from revelations of improprieties than it would have been while it was a private company without registered debt or having engaged in a public offering.  Accordingly, while Refco's financial condition may have improved in some respects from the date of the LBO until the Petition Date, the Examiner believes it is more likely than not that a court would find that Refco was insolvent at all times between the closing of its LBO in August of 2004 and the filing of the bankruptcy petitions in October of 2005, including at the time of the closing of its IPO in August of 2005.

Based on the foregoing, it is the Examiner's conclusion that a court would likely find Refco was insolvent and with unreasonably small capital to conduct its business at all points from the closing of the LBO in August of 2004 until the filing of the bankruptcy petitions in October of 2005.  This conclusion is solely that of the Examiner and does not express the opinion of any of the consultants the Examiner met with or represent their work product that was reviewed by the Examiner.

**B.    PREFERENTIAL TRANSFERS**

Several of the professionals who were subjects of the Examination, including GT, Mayer Brown, Weil, Levine Jacobs, and KPMG, received, or are believed to have received, payments of

professional fees or other monies on or within ninety (90) days prior to the Petition Date.[1128]
These payments, commonly referred to as "preferences," may be subject to avoidance on behalf
of, and recovery by, the Debtors' bankruptcy estates.[1129]   The Examiner has not investigated or
analyzed potential defenses each professional might assert to the avoidance of a payment for
professional fees.[1130]

   To establish a *prima facie* case for avoidance of each preferential payment, a
representative of the Debtors' estates must show that each payment was made:  (i) to the
professional, as a creditor of the Debtors; (ii) for or on account of an antecedent debt; (iii) while
the Debtors were insolvent;[1131] (iv) on or within ninety (90) days prior to the petition date; and
(v) that the transfer enabled the professional to receive more than it would have received had the
Debtors liquidated through a chapter 7.

### C.   DAMAGES

   Once liability for a tort claim is established, the measure of damages is the actual loss
suffered by the plaintiff as a direct result of the defendant's wrong.[1132]   A plaintiff may recover
damages caused by a professional's negligence, including: (1) fees paid to the negligent
professional itself,[1133] as well as, in some cases, fees paid to a new professional whose services

---

[1128] According to the Statement of Financial Affairs of Refco Capital, LLC, these amounts total at least: (1) GT -
$1,045,793.00; (2) Levine Jacobs - $55,545.00 (3) Mayer Brown - $1,629,866.68; (4) Weil - $842,723.16; and
(5) KPMG - $18,570.00.

[1129] *See* 11 U.S.C. §§ 547 & 550; App. B.  This Report has previously discussed preferential transfers with respect to
the $82.2 million dividend.

[1130] *See* 11 U.S.C. § 547(c).

[1131] Insolvency is presumed for the ninety (90) day period prior to the Petition Date.  11 U.S.C. § 547(f).

[1132] *Vogt v. Abish*, 663 F. Supp. 321, 324 (S.D.N.Y. 1987); *Gouiran Holdings, Inc. v. DeSantis, Prinzi, Springer,
Keifer & Shall (In re Gouiran Holdings, Inc.)*, 165 B.R. 104, 106 (E.D.N.Y. 1994).

[1133] *Stanley L. Bloch, Inc. v. Klein*, 258 N.Y.S.2d 501, 507-8 (N.Y. Sup. Ct. 1965); *Wechsler v. Squadron, Ellenoff,
Plesent & Sheinfeld, LLP*, 212 B.R. 34, 42 (S.D.N.Y. 1997), *appeal after remand at* 994 F. Supp. 202 (S.D.N.Y.
1998).

were necessitated by the prior, negligently rendered services;[1134] (2) funds lost to

misappropriation or embezzlement attributable to negligently rendered auditing services,[1135] and,

possibly, legal malpractice;[1136] and (3) a company's increased insolvency,[1137] financial decline,

and costs of bankruptcy.[1138]   As to the third category of damages, negligent issuance of an

unqualified audit opinion with respect to financial statements that falsely represent a company's

solvency may damage a company by causing it to delay filing for bankruptcy or taking other

appropriate corrective action.[1139]   Further, injury to a company's reputation, creditworthiness,

and going-concern value may adequately measure damages caused by delay in filing for

bankruptcy or taking other corrective action.[1140]

Damage calculations in these Bankruptcy Cases would be very complex, and require

extensive fact discovery on damage issues and retention of financial damage experts.[1141]   Such

---

[1134] *Bloch*, 258 N.Y.S.2d at 507-08.

[1135] *See Gouiran Holdings*, 165 B.R. at 107; *Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300, 309 (Neb. 1984).

[1136] *See Wechsler*, 212 B.R. at 42.

[1137] New York courts have historically viewed "deepening insolvency" as nothing more than a measure of damages once liability is established on an underlying tort.  *See Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 383 F. Supp. 2d 587, 601-02 (S.D.N.Y. 2005) (acknowledging compensability for deepening a corporation's insolvency where underlying claim for breach of fiduciary duty, or aiding and abetting thereof, is established). The concept of "deepening insolvency" as an independent tort is no longer viable in many jurisdictions. *See Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 842 (Bankr. D. Del. 2006); *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 204-07 (Del. Ch. 2006).

[1138] *See Plan Comm. v. PricewaterhouseCoopers, LLP*, 335 B.R. 234, 249-50 (D.D.C. 2005); *Allard v. Arthur Anderson & Co. (USA)*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996); *Gouiran Holdings*, 165 B.R. at 107; *Wechsler*, 212 B.R. at 42 (increased obligations to investors incurred by the debtor that the debtor had no hope of repaying).

[1139] *See, e.g.*, *River Oaks Furniture, Inc. v. BDO Seidman (In re River Oaks Furniture, Inc.)*, 276 B.R. 507, 531-39 (Bankr. N.D. Miss. 2001) (damages are fact-specific).

[1140] *See Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 247 B.R. 341, 363 (Bankr. S.D.N.Y. 2000), *rev'd in part on other grounds*, 311 B.R. 350 (S.D.N.Y. 2004), *vacated on other grounds*, 318 B.R. 761 (S.D.N.Y. 2004); *Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. 962, 986 (E.D.N.Y. 1988), *vacated in part on other grounds*, *In re Crazy Eddie Sec. Litig.*, 714 F. Supp. 1285 (E.D.N.Y. 1989).

[1141] *See, e.g.*, *River Oaks Furniture*, 276 B.R. at 531-39.

endeavors are beyond the scope of this Report.  However, the Examiner believes significant

damages likely would be recoverable for each of the claims the Examiner has concluded exist.

### D.    APPLICABILITY OF THE *WAGONER* RULE AND DOCTRINE OF *IN PARI DELICTO* TO POTENTIAL CLAIMS AGAINST REFCO'S PROFESSIONALS

If the potential claims identified by the Examiner in this Report are brought against the

various Refco professionals, it is likely that the Refco professionals will assert the *Wagoner*

rule[1142] and/or the doctrine of *in pari delicto*[1143] as a defense to those claims.[1144]  As described in

more detail in Appendix C, the *Wagoner* rule may preclude a bankruptcy trustee from asserting

claims on behalf of the company against third parties for injuries that arise out of wrongful acts

or misconduct committed by the company's controlling managers.

Here, because Bennett and other individuals appear to have orchestrated the fraudulent

manipulation of Refco's financial statements, in part in order to hide uncollectible Refco losses,

Refco's prepetition professionals likely will argue that the acts of Bennett and others are properly

imputed to Refco and thus, Refco itself engaged in the fraud.  Refco's prepetition professionals

may then argue that, under the *Wagoner* rule, Refco (through a trustee acting on its behalf)

cannot recover for injuries arising out of its own fraud.

There are, however, two possible exceptions to the *Wagoner* rule — the "adverse

interest" exception and the "innocent decision maker" exception — for which supporting facts

---

[1142] The *Wagoner* rule was established by the U.S. Court of Appeals for the Second Circuit in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991).

[1143] *Baena v. KPMG LLP*, 453 F.3d 1, 6 (1st Cir. 2006).

[1144] The doctrine of *in pari delicto* is an affirmative defense substantially similar to the *Wagoner* rule.  For convenience, the concept will generally be referred to herein as the *Wagoner* rule. Both doctrines are based on the principle that the law will not help one wrongdoer recover from another and apply the same standards; also, under New York law, which for purposes of this Report the Examiner has assumed will likely govern, the *Wagoner* rule applies. Despite the similarity of underlying concepts, the *Wagoner* rule and the doctrine of *in pari delicto* are separate and distinct doctrines; the first deals with standing and the second is an equitable, affirmative defense similar to the "unclean hands" doctrine. *See Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 381 n.51 (Bankr. S.D.N.Y. 2005); App. C.

may be alleged to defeat a Rule 12 motion by the Refco professionals asserting a defense based on the *Wagoner* rule.

### 1.    Adverse Interest Exception

Under the "adverse interest" exception, the *Wagoner* rule does not bar claims against third parties where it can be established that the company's controlling managers' misconduct was undertaken solely to defraud the company.  Under such circumstances, the controlling managers' interests are adverse to those of the company and the managers' fraudulent conduct will not be imputed to the company.  If the fraudulent conduct is not imputed to the company, the *Wagoner* rule will not apply, because the trustee is no longer bringing claims on behalf of a company which engaged in the fraud.[1145]

For the adverse interest exception to apply, however, it must be established, and the complaint must allege, that the managers' fraudulent actions were done entirely for their own or another's purpose, with no benefit to the company.[1146]  Generally, the exception does not apply if the managers' misconduct results in any benefit to the company, even if unintended, or if the primary motivation for the fraud is contrary to the company's interest.[1147]  In other words, it must be shown that the managers totally abandoned the company's interests in favor of their own

---

[1145] *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985); *see also In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) (the act of the agent will not be charged to the corporation if the agent is actually "committing a fraud for his own benefit"); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (allegations that bank was adversely dominated by corrupt management who acted in their own interest and not in the interest of the bank were sufficient at the pleading stage to trigger the adverse interest exception); *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997); *In re CBI Holding Co.*, 247 B.R. 341, 365 (Bankr. S.D.N.Y. 2000); *Sec. Investor Protection Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 650 (S.D.N.Y. 1999).

[1146] *Center*, 488 N.E.2d at 830; *accord Bennett Funding*, 336 F.3d at 100; *Wight*, 219 F.3d at 87; *Mediators*, 105 F.3d at 827; *BDO Seidman*, 49 F. Supp. 2d at 650; *CEPA Consulting, Ltd. v. King Main Hurdman (In re Wedtech Sec. Litig.)*, 138 B.R. 5, 9 (S.D.N.Y. 1992).

[1147] *BDO Seidman*, 49 F. Supp. 2d at 650 (citing *Oppenheimer-Palmieri Fund, L.P. v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.)*, 802 F. Supp. 804, 817 (E.D.N.Y. 1992)).

interests.[1148]  A typical example of adverse conduct engaged in solely for the benefit of the

managers is looting.[1149]  Where managers enlist the assistance of third parties in order to

structure sham transactions that perpetuate a false impression of corporate solvency, thereby

enabling management to raise additional capital in order to keep the company afloat while they

loot it, the managers act adversely to the company.[1150]

    The Examiner concludes that the facts and circumstances surrounding the fraud described

in this Report provide support for the application of the adverse interest exception.  The

Examiner's investigation has revealed that Bennett, and members of Refco's senior management

acting under Bennett's authority and direction, appear to have engaged in the Round Trip Loans

and related fraudulent manipulation of Refco's financial statements for the sole purpose of

hiding the RGHI Receivable.  The purpose for these sham transactions was to conceal Refco's

true financial condition so that Refco could be sold at an artificially inflated price during the

2004 LBO and subsequent IPO in 2005.  Had the fraud not occurred and Refco's true financial

condition been known, the LBO and IPO likely would not have taken place.  The only

beneficiaries of Refco's fraudulently inflated sale price were RGHI and its shareholders, as well

as the senior executives who had profit interests.

    In addition, the Round Trip Loans did not serve any legitimate business purpose for

Refco and did not result in any benefit to Refco.  In each of the loans, Refco paid a third party

sums (in the form of interest) solely for their assistance in hiding the RGHI Receivable.

Moreover, Refco assumed legal liability when RGL agreed to guarantee the loans to RGHI and

---

[1148] *Center*, 488 N.E.2d at 830.

[1149] *Baena v. KPMG LLP*, 453 F.3d 1, 8 (1st Cir. 2006) ("'Adverse interest' in the context of imputation means that
the manager is motivated by a desire to serve himself or a third party, and not the company, the classic example
being looting.") (citation omitted).

to indemnify the third party loan participants for any claims arising out of their participation in the sham transactions. Again, RGL's assumption of these liabilities had no conceivable benefit for Refco. In short, in perpetuating the fraudulent loans, Refco's senior management appear to have totally abandoned the interest of Refco in favor of Bennett's and their personal interests in an inflated sale price for the company and, as such, the Examiner believes there are sufficient facts to allege the applicability of the adverse interest exception and preclude a Rule 12 dismissal of claims against Refco's prepetition professionals on *Wagoner* rule grounds.[1151]

## 2.    Innocent Decision Maker Exception

Another exception to the *Wagoner* rule is the "innocent decision maker" exception.[1152] Under that exception, the *Wagoner* rule does not apply in situations where the company had an innocent officer or director who could have stopped the fraudulent conduct if he had been aware of it.[1153]

---

*(footnote continued from previous page)*

[1150] *See In re Parmalat Sec. Litig.*, No. 04 MD 1653(LAK), 2007 WL 656845, *3 (Feb. 28, 2007).

[1151] *See Oppenheimer-Palmieri Fund, L.P. v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.)*, 802 F. Supp. 804, 818 (E.D.N.Y. 1992) (noting that transactions designed to inflate the sale of a company and facilitate a public offering are "not inconsistent with an abandonment by [insiders] of the corporation's interest").

[1152] Some trial courts in the Second Circuit have recognized the innocent decision maker exception to the *Wagoner* rule. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80 F. Supp. 2d 129, 136 (S.D.N.Y. 1999); *Sec. Investor Protection Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 651 (S.D.N.Y. 1999); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 (S.D.N.Y. 1997); *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1, 24 (E.D.N.Y. 2006); *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 319 B.R. 782, 788 (E.D.N.Y. 2005); and *O'Neil v. New England Rd. Inc. (In re Neri Bros. Constr. Corp.)*, 323 B.R. 540, 543 (Bankr. D.Conn. 2005). Nevertheless, the current legal status of that exception in the Second Circuit remains unclear, as some trial courts in the Second Circuit have declined to recognize the exception, and "[t]he Second Circuit has expressly declined to approve or disapprove the . . . exception." *Am. Tissue, Inc. v. Arthur Andersen L.L.P.*, No. 02 Civ. 7751 (SAS), 2005 WL 712201, *2 & n.16 (S.D.N.Y. Mar. 28, 2005) (citation omitted); *see Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette, Sec. Corp.*, 233 F.R.D. 327, 330 (S.D.N.Y. 2005); *In re CBI Holding Co., Inc.*, 311 B.R. 350, 372 (S.D.N.Y. 2004), *vacated in part*, 318 B.R. 761 (S.D.N.Y. 2004) (declining to adopt the exception), *appeal pending at*, *In re CBI Holding Co. (Bankr. Servs., Inc. v. Ernst & Young)*, Docket No. 04-5972 (2d Cir.) (04-6300, cross appeal); *see also Baena v. KPMG LLP*, 453 F.3d 1, 8-9 (1st Cir. 2006).

[1153] *Bennett Funding*, 336 F.3d 94, 101 (2d Cir. 2003); *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 651 (S.D.N.Y. 1999) (exception did not apply where complaint failed to allege existence of an innocent decision maker who could have stopped the unlawful conduct); *Wechsler*, 212 B.R. at 36 (to survive an assertion of

*(footnote continued on next page)*

The Examiner concludes that there are facts sufficient to support the application of the innocent decision maker exception.  Following the August 2004 LBO, four THL personnel joined Refco's Board of Directors.  In January 2005, three independent directors joined the Board.  The Examiner did not locate evidence that any of the THL or independent directors had actual knowledge of the fraud used to hide Refco's true financial condition.  In addition, the Examiner did not find evidence to suggest that these directors would not have promptly put a stop to the fraudulent activity if they had been made aware of it.  Immediately after the Board of Directors and its Audit Committee were alerted to the fraud in October 2005, they commenced an internal investigation, with the assistance of professionals, and subsequently publicly announced the discovery, removed Bennett from his positions of power, and took steps designed to remedy the malfeasance.  Under these circumstances, the Examiner concludes sufficient facts exist, at least from the time of the LBO in August 2004, to allege the applicability of the innocent decision maker exception and preclude a Rule 12 dismissal of claims against Refco's prepetition professionals on *Wagoner* rule grounds.

### 3.    Sole Actor Exception

The adverse interest and innocent decision maker exceptions are themselves subject to the sole actor rule, which provides that where the principal and agent are one and the same, the agent's knowledge is imputed to the principal because the agent is the principal.[1154] The sole actor rule may also be applied where the agent, even if not the sole decision maker or director,

---

*(footnote continued from previous page)*

imputation under the *Wagoner* rule, a complaint must include both an allegation that an innocent insider existed and an explanation of "how he could and would have brought the fraud to an end").

[1154] *See* App. C.

nevertheless controls and dominates the corporation to the exclusion of the other managers'
ability to exercise power.

The Examiner concludes that there is sufficient evidence to allege that from the time of
the LBO in August 2004, at the latest, the THL Directors were decision makers with the ability
to exercise real power sufficient to defeat the application of the sole actor rule. The Examiner
concludes that for the time period prior to the LBO, a question of fact exists as to whether the
sole actor rule could be applied based on an argument that Bennett, and the other insiders
complicit in the fraud, exercised control over Refco.

July 11, 2007

Respectfully submitted,

/s/ Charles E. Campbell
Charles E. Campbell (CEC 6100)
Robert A. Bartlett (RAB 0550)
MCKENNA LONG & ALDRIDGE LLP
Suite 5300, 303 Peachtree Street, NE
Atlanta, GA 30308
Telephone:  (404) 527-4000
Facsimile:  (404) 527-4198
*Counsel to the Examiner*

/s/ Joshua R. Hochberg
Joshua R. Hochberg (JRH 9440)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, D.C.  20006
(202) 496-7500
*Court Appointed Examiner*

**EXHIBIT 1**

**GLOSSARY**

AA - Arthur Andersen LLP, Refco's outside auditors from the late 1980's to 2002

BAWAG - BAWAG P.S.K. Bank für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft

Beckenham Trading - Beckenham Trading Company, Inc., a Round Trip Loan Participant

Bennett - Phillip R. Bennett, former President and CEO of Refco Inc., and majority or sole owner of RGHI at all times relevant to this Report

BOI - BAWAG Overseas, Inc.

BriBank - Bulgarian-Russian Investment Bank, a Round Trip Loan Participant

Broudy - Barbra Broudy, associate at Weil involved in coordination of IPO due diligence

Cappel - Steven Cappel, E&Y tax partner, relationship partner from approximately 2000 until mid 2002

CFTC - Commodities Futures Trading Commission

CIM Ventures - CIM Ventures, Inc., a subsidiary of Ingram Micro, Inc. and a Round Trip Loan Participant

CME - Chicago Mercantile Exchange

Coast - Coast Asset Management, L.P.

Collins - Joseph P. Collins, engagement partner at Mayer Brown from 1994 to the Petition Date

Creditors Committee - Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases

CS Land - CS Land Management LLC, an entity related to Coast -and a Round Trip Loan Participant

Debtors - Refco Inc. and its affiliated debtors in the Bankruptcy Cases

Delta Flyer - Delta Flyer Fund, LLC, a Round Trip Loan Participant

DiDomenico - Daniel M. DiDomenico, Vice-President of Murray Devine who wrote and oversaw solvency opinion in connection with the declaration of the $82.2 million dividend

E&Y - Ernst & Young LLP, Refco's tax accountant from the early 1990s to at least 2004

EMF - EMF, Ltd., an entity related to EMF Financial, EMF Core Fund and Delta Flyer, a Round Trip Loan Participant

EMF Core Fund - EMF Core Fund Limited, a Round Trip Loan Participant

EMF Financial - EMF Financial Products, LLC, Round Trip Loan Participant

EMF/Delta Entities - EMF Financial Products, LLC, EMF, Ltd., EMF Core Fund Limited, Delta Flyer Fund, LLC, Round Trip Loan Participants

Flanagan - Eric Flanagan, President of EMF Financial

FTI - FTI Consulting, Inc., financial consultant to the Debtors

Goldin - Goldin Associates, LLC, the Debtors' restructuring firm

Grant - Tone N. Grant, former Refco executive, and, prior to the LBO, co-owner of RGHI

GT - Grant Thornton LLP, Refco's outside auditors from 2002 to the Petition Date

Harkins - David Harkins, senior partner with THL

Henneman - Andrea Henneman, associate with Mayer Brown until approximately April 2001, involved with Round Trip Loans

Houlihan - Houlihan Lokey Howard & Zukin Capital, Inc., financial advisor to the Creditors Committee

Ingram Micro - Ingram Micro, Inc., a worldwide distributor of information technology products based in Santa Ana, California, a Round Trip Loan Participant

Jaeckel - Scott Jaeckel, senior partner with THL

Klejna - Dennis Klejna, General Counsel to Refco

KMPG - KPMG LLP, LBO due diligence advisor to THL

Koury - Paul Koury, associate with Mayer Brown until approximately May 2005, involved with Round Trip Loans

Kreiger - Andrew Krieger, founder of Beckenham Trading

LCPMF - Liberty Corner Patriot Master Fund, Ltd., a proposed Round Trip Loan Participant

Levine Jacobs - Levine Jacobs & Company, L.L.C., Refco's tax accounts from approximately 2004 to 2005

Liberty Corner - Liberty Corner Capital Strategies, LLC, a Round Trip Loan Participant

Lynch - Alexander Lynch, partner at Weil responsible for Weil's work in connection with Refco's registered note offering and IPO

Madden - Thomas Madden, former CFO of Ingram Micro, Round Trip Loan Participant

Maggio - Santo Maggio, Refco executive

Mascio - Nick Mascio, Refco executive

Mayer Brown - Mayer, Brown, Rowe & Maw LLP, Refco's main outside counsel from 1994 until the Petition Date

McCarthy - Peter McCarthy, Refco executive

McDermott Will - McDermott Will & Emery LLP, counsel for BAWAG and Refco

Meisler - Michael Meisler, E&Y tax partner who assumed responsibility for the day-to-day management of the Refco engagement in mid-2002

Messina - Vincent Messina, Chief Technology Officer of EMF Financial

MLA - McKenna Long & Aldridge LLP, counsel to the Examiner

MLC - MLC International Corp. and MLC Emerging Markets HSE-Cox

Monk - Robert A. Monk, former Mayer Brown associate involved with Round Trip Loans

Murray Devine - Murray, Devine & Company, Inc., valuation company that provided a solvency opinion to Refco in connection with the declaration of the $82.2 million dividend

Neidhardt - Kurt Neidhardt, E&Y tax partner who was the lead partner for the Refco engagement from 1993 until E&Y's decision to resign in late 2003

New Refco - New Refco Group Ltd., LLC

Niederhoffer - Victor Niederhoffer and his investment companies, who lost more than $90 million on investments placed through Refco, Inc. in 1997

Pazzol - Ross Pazzol, of counsel to Mayer Brown, involved with Round Trip Loans

Petitt - Christopher Petitt, Coast's former CFO and former Executive Vice President of CS Land

Pigott - William T. Pigott, owner of Liberty Corner

PwC - PricewaterhouseCoopers, one of Refco's tax accountants

Ramler - Mark Ramler, lead partner on the Refco engagement first at AA then GT

RCM - Refco Capital Markets Ltd.

Refco - Refco Inc. and its affiliated debtors

Refco Group - Refco Group Ltd., LLC

Repco - Repco Holdings, Inc.

RGF - Refco Global Finance, a subsidiary of RCM

RGHI - Refco Group Holdings, Inc., parent company of Refco Inc., wholly-owned by Bennett from the LBO forward

RGHL - Refco Group Holdings, LLC

RGL - Refco Group, Ltd., LLC, f/k/a Refco Group Ltd., Inc.

Ricketts - James Ricketts, corporate treasurer of Ingram Micro

RSL - Refco Securities Ltd.

Schoen - Scott Schoen, senior partner with THL

Schultz - Peter Schultz, associate with Mayer Brown involved with Round Trip Loans

SEC - Securities and Exchange Commission

Sexton - William Sexton, Refco's COO

Sherer - Gerald Sherer, Refco CFO who replaced Trosten

Schneider - Dara Schneider (Moore), audit manager at AA

Silverman - Phillip Silverman, Refco executive

Tabor - Jay Tabor, attorney at Weil responsible for THL's legal due diligence in connection with the LBO

Taylor - George Taylor of THL

THL - THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., and its affiliates and co-investors

Tindale - H. Whitney Tindale, CFO of EMF Financial

Trosten - Robert C. Trosten, CFO of Refco until September 2004

U.S. Trustee - Office of the United States Trustee for the Southern District of New York

USAO - United States Attorney's Office for the Southern District of New York

Weaver - David Weaver, Refco executive

Westra - James Westra, relationship partner at Weil for the THL and Refco engagements

Weil - Weil, Gotshal & Manges LLP, counsel to THL during the LBO and counsel to Refco Inc. for the registration of the Senior Subordinated Notes and the IPO

Wells - Wells, Ltd., a wholly owned subsidiary of RGHI

**EXHIBIT 2**

**PRIVATE PARTIES WHOSE DOCUMENTS ARE
REFERRED TO IN THE REPORT**

Alix Partners
Arthur Andersen LLP
BAWAG
Beckenham Trading Company
Coast Asset Management
Deerhurst Management Co., Inc.
EMF Financial Products/Delta Flyer Fund
Ernst & Young LLP
FTI Consulting, Inc.
Grant Thornton LLP
Ingram Micro

KPMG LLP
Levine Jacobs & Company, L.L.C.
Liberty Corner (various entities)
Mayer, Brown, Rowe & Maw LLP
NorthBridge Capital Management, Inc.
PricewaterhouseCoopers
Refco Group Holdings Inc.
T.H. Lee/ Thomas H. Lee Partners
The Refco Debtors
Weil, Gotshal & Manges LLP

- Exhibit 2 -

**EXHIBIT 3**

**WITNESSES INTERVIEWED
BY THE EXAMINER AND HIS COUNSEL**

| COMPANY | WITNESS |
|---|---|
| AA | Jason Blumkin |
| | William Denehey |
| | Brian Falahee |
| | Melissa Kesh |
| | Dara Moore |
| | Amy Lynn Murphy |
| | |
| Beckham Trading Company | Andrew Kreiger |
| | |
| E&Y | Steven Cappel |
| | Michael Meisler |
| | Kurt Neidhardt |
| | |
| EMF Financial Products, LLC | H. Whitney Tindale |
| | |
| Ingram Micro | Thomas Madden |
| | James Ricketts |
| | |
| KMPG | John Berndsen |
| | |
| Levine Jacobs | Robert Blackwell |
| | Richard Hoffman |
| | Timothy Shore |
| | |
| Liberty Corner | Mike Lisi |
| | William T. Pigott |
| | Miriam Yoshida |
| | |
| Mayer Brown | Joseph Collins |
| | Andrea Henneman |
| | Paul Koury |
| | Robert Monk |
| | Ross Pazzol |
| | Peter G. Schultz |
| | |
| Murray Devine | Ralph Colucci |
| | Daniel DiDomenico |
| | |
| THL | Scott Schoen (by proffer) |

| COMPANY | WITNESS |
|---------|---------|
| Weil | Barbra Broudy |
|  | Alex Lynch |
|  | Jay Tabor |
|  | James Westra |

# APPENDIX A

## THE LAW RELATING TO PROFESSIONAL LIABILITY

## I.    INTRODUCTION

This Appendix A sets forth legal standards that inform the Examiner's conclusions in the Report regarding professionals, including auditors, attorneys, and accountants.  Part II discusses choice of law issues.  Part III discusses malpractice/professional negligence.  Part IV discusses liability for aiding and abetting fraud and breaches of fiduciary duty.  Finally, Part V discusses contractual defenses.

## II.    CHOICE OF LAW

Assuming claims against Refco's prepetition professionals are brought in New York state or federal courts, the Examiner assumes, without deciding, that New York choice of law rules likely will apply.[1]    In tort cases, the New York Court of Appeals has applied two different choice of law analyses.  The first, reflecting the recent trend,[2] endorses the "interest analysis" approach,[3] under which "a court looks to the policies behind [the] states' laws and thereby determines which state has a 'superior interest' in having its law applied to the issue before it."[4]

---

[1] Where a federal court sits in diversity, it applies the forum state's choice of law rules.  *See, e.g., Klaxon v. Stentor Elec. Mfg., Inc.*, 313 U.S. 487, 496 (1941); *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997); *In re OPM Leasing Servs., Inc.*, 40 B.R. 380, 391-92 (Bankr. S.D.N.Y. 1984), *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984).  If the claims are brought in the courts of a different state, the choice of law analysis may be different.

[2] *See Globalnet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, No. 03 Civ.0733 RWS, 2004 WL 1632594, *3 (S.D.N.Y. July 22, 2004); *OPM Leasing*, 40 B.R. at 392.

[3] *See, e.g., Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985); *Towley v. King Arthur Rings, Inc.*, 40 N.Y.2d 129 (1976); *Globalnet Fin.*, 2004 WL 1632594, at *3.

[4] *OPM Leasing*, 40 B.R. at 392 (citing *Rosenthal v. Warren*, 475 F.2d 438, 442 (2d Cir. 1973)).  The only significant considerations are the parties' domiciles and the location of the tort.  *See Schultz*, 65 N.Y.2d at 197; *Globalnet Fin.*, 2004 WL 1632594, at *3.  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greater interest in regulating behavior within its borders."  *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *accord Nw. Mut. Life Ins. Co. v. Wender*, 940 F. Supp. 62, 66 (S.D.N.Y. 1996); *Chase Manhattan Bank v. New Hampshire Ins. Co.*, 749 N.Y.S.2d 632, 634-35 (N.Y. Sup. Ct. 2002).

The second test adopts the "center of gravity" or "grouping of contacts" approach.[5]  This approach, derived from the corresponding analysis in the contract context,[6] directs the court to give controlling effect to the law of the jurisdiction that has the greatest concern with the issue raised in the litigation by virtue of its relationship or contact with the occurrence or the parties.[7]

In contract cases, New York choice of law principles require application of the "center of gravity" or "grouping of contacts" analysis to contract claims.[8]  Under this analysis, courts "consider a 'spectrum of significant contacts,' beyond the prior standard of the law of the place where the contract was made or was to be performed."[9]  New York courts apply the law of the state that ultimately proves to be the "center of gravity" of the particular contract dispute.

Under any of the tests discussed above, the Examiner assumes, without deciding, that New York law likely will generally apply.[10]

---

[5] *See, e.g., RCA Corp. v. Tucker*, 696 F. Supp. 845, 854-55 (E.D.N.Y. 1988); *Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 700 (N.Y. 1978); *Babcock v. Jackson*, 12 N.Y.2d 473, 479 (N.Y. 1963).

[6] *See Babcock*, 12 N.Y.2d at 481.

[7] *See OPM Leasing*, 40 B.R. at 392; *Babcock*, 12 N.Y.2d at 481.  The court will consider such factors as "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, . . . place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *RCA Corp.*, 696 F. Supp. at 855 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1969)).

[8] *See, e.g., Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 266 (1993); *Auten v. Auten*, 308 N.Y. 155, 160 (1954); *Globalnet Fin.*, 2004 WL 1632594 at *3.

[9] *Globalnet Fin.*, 2004 WL 1632594, at *3 (quoting *Allstate*, 81 N.Y.2d at 225-26); *accord Auten*, 308 N.Y. at 161. Among the factors for consideration are "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties."  *Allstate*, 81 N.Y.2d at 227.

[10] However, New York choice of law rules recognize the "internal affairs doctrine," which provides matters relating to the internal affairs of a corporation are decided in accordance with the law of the state of incorporation.  Thus, claims for breach of fiduciary duty may be governed by the law of the state of incorporation.  *See BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999) (citing *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980)).  Claims for aiding an abetting a breach of fiduciary duty may or may not be governed by the law of the state of incorporation.  *Compare Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 306 n.16 (S.D.N.Y. 1998) ("[U]nder New York's choice of law rules, the law of the state of incorporation controls a breach of fiduciary duty claim while New York law controls the plaintiff's claim for aiding and abetting the breach of fiduciary duty because the acts giving rise to the claim took place, in significant part, in New York."); *Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) ("The same choice-of-law analysis would not seem to apply to plaintiff's remaining claims for aiding and abetting the breach of fiduciary duty and tortious interference with

*(footnote continued on next page)*

- Appendix A, p. 2 -

## III.    MALPRACTICE/PROFESSIONAL NEGLIGENCE

### A.    INTRODUCTION

Under New York law, "a professional's failure to perform his job in accordance with the standards required of one in his field states a claim in tort or malpractice."[11]  Professional malpractice is a form of negligence.[12]  When a professional negligently performs its duties, its client has a cause of action against the professional.[13]  Upon the client's filing for bankruptcy, the claim becomes property of the estate.[14]  The elements of a claim for professional negligence are: (1) a duty owed to the plaintiff, (2) a breach of that duty, (3) "a reasonably close causal connection" between the breach of duty and the injury, and (4) "actual loss, harm, or damage."[15]

### B.    DISTINCTIONS BETWEEN THE STANDARDS OF CARE APPLICABLE TO AUDITORS, ATTORNEYS, AND ACCOUNTANTS

#### 1.    Auditors

An auditor owes its client a duty to "use skill and due professional care and to exercise good faith and to observe generally accepted auditing standards and professional guidelines, with the appropriate reasonable, honest judgment that a reasonably skillful and prudent auditor would

---

*(footnote continued from previous page)*

contract.  These two claims are not directed against the administrators in their capacity as officers or directors . . . but rather as independent actors."), *with Lou v. Belzberg*, 728 F. Supp. 1010, 1023 (S.D.N.Y. 1990) (citing *Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006 (S.D.N.Y. 1984), *aff'd*, 846 F.2d 845 (1988).  *See also BBS*, 60 F. Supp. 2d at 129; *Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. 962, 986 (E.D.N.Y. 1988) ("Since Delaware law will determine whether the individual defendants breached their fiduciary obligations . . . Delaware law should determine whether third-party defendants conspired with them to assist in that breach."), *vacated in part on other grounds sub nom.*, *In re Crazy Eddie Sec. Litig.*, 714 F. Supp. 1285 (E.D.N.Y. 1989).

[11]  *Bloor v. Dansker (In re Investors Funding Corp. of New York Sec. Litig.)*, 566 F. Supp. 193, 201 (S.D.N.Y. 1983).

[12]  *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 15 (2d Cir. 2000).

[13]  *See Ultramares Corp. v. Touche*, 174 N.E. 441, 448 (N.Y. 1931).

[14]  *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 319 B.R. 782, 790 (Bankr. E.D.N.Y. 2005).

[15]  *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 299 (2d Cir. 1997); *accord Brady v. Bisogno & Meyerson*, 819 N.Y.S.2d 558, 559 (N.Y. App. Div. 2006).

use under the same or similar circumstances."[16]  By performing an audit, an auditor does not

guarantee the correctness of every account, and innocent mistakes do not necessarily give rise to

liability.[17]

Generally Accepted Auditing Standards ("GAAS") are widely accepted as the standards

of practice for auditors.[18]  The American Institute of Certified Public Accountants ("AICPA")

also issues pronouncements called Statements on Auditing Standards ("Statements"), which

amplify, modify, and interpret GAAS.[19]  Proof of deviation from GAAS does not establish

negligence per se, but it does shift a trial burden to the auditor to explain the deviation.[20]

Conversely, by proving its compliance with GAAS, an auditor-defendant absolves itself of

liability.[21]  The ultimate burden of proof lies always with the plaintiff.[22]

---

[16] *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 538 (S.D.N.Y. 1990).

[17] *Id.*

[18] *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 811 (1984).

[19] The Statements have been codified in a volume of professional standards, referred to as auditing interpretations, which are cited with the prefix AU.

[20] *Mishkin*, 744 F. Supp. at 537-38.  The following are examples of violations of auditing standards that, in various aggregations, support a claim that an auditor has breached its duty of care: (1) failure to exercise the requisite skepticism throughout the auditing process; (2) failure to gather competent evidential matter to support financial statements; (3) failure to adequately verify the client's accounts receivable; (4) failure to adequately verify, corroborate, or confirm the client's representations; (5) failure to investigate whether the values assigned to assets are correct; (6) failure to gain adequate understanding of the client's internal control structure; (7) failure to utilize an approach that relies more on the auditor's independent testing and less on the client's internal control structure; (8) adjusting audit procedures based on results found in the audit; (9) inadequate supervision and staffing of the audit by management; (10) inadequate time spent on the audit; and (11) failure to discuss the audit with appropriate members of the client's management.  *See id.* at 539; *Togut v. Arthur Anderson & Co. (In re Mid-Atl. Fund, Inc.)*, 39 B.R. 88, 90 (S.D.N.Y. 1984); *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 278 B.R. 28, 35 (Bankr. E.D.N.Y. 2002); *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 247 B.R. 341, 363 (Bankr. S.D.N.Y. 2000), *rev'd in part on other grounds*, 311 B.R. 350 (S.D.N.Y. 2004), *vacated on other grounds*, 318 B.R. 761 (S.D.N.Y. 2004), *appeal pending at, In re CBI Holding Co. (Bankr. Servs., Inc. v. Ernst & Young)*, Docket No. 04-5972 (2d Cir.) (04-6300, cross appeal).  This list is not exclusive.

[21] *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994); *In re Sharp Int'l Corp.*, 278 B.R. at 3.

[22] *Mishkin*, 744 F. Supp. at 538.

2.    **Attorneys**

To establish an attorney's negligence, a plaintiff must show the attorney "'failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community.'"[23]  Attorneys are not liable for honest mistakes of judgment where a proper course of action is open to reasonable doubt, and the selection of one of multiple reasonable options does not constitute malpractice.[24]  However, an attorney undertaking a task in a specialized area of the law must exercise the degree of skill and knowledge possessed by attorneys who practice in that specialty.[25]  "An important duty of securities counsel is to make a "'reasonable, independent investigation to detect and correct false or misleading materials.'"[26]

The New York Code of Professional Responsibility ("CPR") contain Canons, Ethical Considerations, and Disciplinary Rules ("DR" or in the plural "DRs").  The DRs are mandatory and represent "the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action."[27]  Although violation of the CPR does not necessarily give rise to civil liability, courts have held "conduct constituting a violation of a disciplinary rule may also constitute evidence of malpractice."[28]  DRs 7-102(A) and (B) are relevant where an attorney has

---

[23] *See Nobile v. Schwartz*, 265 F. Supp. 2d 282, 288 (S.D.N.Y. 2003) (quoting *Hwang v. Bierman*, 614 N.Y.S.2d 51, 52 (N.Y. App. Div. 1994)).

[24] *Grago v. Robertson*, 370 N.Y.S.2d 255, 258 (N.Y. App. Div. 1975).

[25] *See, e.g.*, *Wahl v. Foreman*, 398 F. Supp. 526, 538 (S.D.N.Y. 1975).  This requirement is expressed in the Disciplinary Rules of the New York Code of Professional Responsibility ("CPR"), which provide that a lawyer shall not "[h]andle a legal matter which, the lawyer knows or should know that he or she is not competent to handle, without associating with a lawyer who is competent to handle it."

[26] *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 749 (9th Cir. 1992), *rev'd and remanded on other grounds*, 512 U.S. 79 (1994), *prior opinion adopted in haec verba*, 61 F.3d 17 (9th Cir. 1995) (quoting *Felts v. Nat'l Account Sys. Ass'n, Inc.*, 469 F. Supp. 54, 67 (N.D. Miss. 1978)); *cf. Escott v. Barchris Constr. Corp.*, 283 F. Supp. 643, 690 (S.D.N.Y. 1968).

[27] *See* Preliminary Statement, New York CPR.

[28] *Swift v. Choe*, 674 N.Y.S.2d 17, 21 (N.Y. App. Div. 1998); *accord William Kaufman Org., Ltd. v. Graham & James LLP*, 269 A.D.2d 171, 173 (N.Y. App. Div. 2000); *GD Searle & Co., Inc. v. Pennie & Edmonds LLP*, No. 602374/00, *1 (N.Y. Sup. Ct. Jan. 14, 2004); *cf. Tilton v. Trezza*, No. 005818/2003, 2006 WL 1320738 (N.Y. Sup.),

*(footnote continued on next page)*

- Appendix A, p. 5 -

knowledge that a client intends to use false statements of fact or law in a transaction for an improper purpose.  DR7-102 states, in pertinent part:

> In the representation of a client, a lawyer shall not: . . .  3. Conceal or knowingly fail to disclose that which the lawyer is required to reveal . . . 5. Knowingly make a false statement of fact or law . . . 7. Counsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent . . . 8. Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.[29]

An attorney is more than a mere scrivener.[30]  "'In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or crowbar.'"[31]  An attorney may not blindly execute his client's wishes without any regard for the propriety of his conduct.[32]  "Our legal system depends on attorneys who appropriately question requests by clients that should arouse suspicion, and an attorney must not permit his or her judgment to be influenced by the desire to please a client."[33]

---

*(footnote continued from previous page)*

*5 (Mar. 27, 2006) (holding expert may testify about ethical standards in legal malpractice action but may not cite CPR).

[29] *See* DR7-102(a)(3),(5),(7),(8).  Similarly, Model Rule of Professional Responsibility 4.1 provides, "In the course of representing a client, a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6."

[30] *See SEC v. Frank*, 388 F.2d 486, 489 (2d Cir. 1968); *Haines v. Gen. Motors Corp.*, 603 F. Supp. 471, 479 (S.D. Ohio 1983); *In re Oliver*, 323 B.R. 769, 774 (Bankr. M.D. Ala. 2005).

[31] *Frank*, 388 F.2d at 489 (citing *United States v. Benjamin*, 328 F.2d 854, 863 (2d Cir. 1964), *cert. denied* 377 U.S. 953).  "A lawyer has no privilege to assist in circulating a statement with regard to securities which he knows to be false simply because his client furnished it to him . . . . [A] lawyer, no more than others, can escape liability by closing his eyes to what he saw and could readily understand." *Id.*

[32] *See* DR 7-102; *Florida Bar v. Brown*, 790 So. 2d 1081, 1087-88 (Fla. 2001).

[33] *Brown*, 790 So. 2d at 1088; Ass'n of the Bar of the City of N.Y., Formal Opinion 2002-1, *available at* http://www.nycbar.org/Ethics/eth2002-1.html.

3.    **Accountants**

The practice and ethical rules promulgated by the AICPA provide the professional standards applicable to accountants.[34]  An accountant owes his client a duty to perform within the accepted standards of practice of his profession.[35]  Generally Accepted Accounting Principles ("GAAP"), promulgated by the AICPA, generally embody the substantive standards.[36]  In general, an accountant's good faith compliance with GAAP discharges the accountant's obligation to act with reasonable care.[37]  An accountant's conduct "does not give rise to a malpractice claim unless that conduct is alleged to have negatively impacted on the professional services rendered."[38]  Unless the fact-finder has a sufficient basis for judging the adequacy of the accountant's conduct, "expert testimony will be necessary to establish that the [accountant] breached a standard of professional care."[39]

C.    **CAUSATION AND DAMAGES**

While the substantive duties owed by auditors, attorneys, and accountants may differ, in all cases a plaintiff must prove the professional's negligence caused it to suffer damages in order to prevail on a claim for professional negligence.  This requires showing both loss causation and

---

[34] Generally, the AICPA Code of Professional Conduct provides that "[m]embers should accept the obligation to act in a way that will serve the public interest, honor the public trust, and demonstrate commitment to professionalism." AICPA Code of Professional Conduct, Art. II § 53.

[35] Rule 201(D) of the AICPA Code of Professional Conduct provides that accountants shall "[o]btain sufficient relevant data to afford a reasonable basis for conclusions and recommendations in relation to any professional services rendered."  *See Friedman v. Anderson*, 803 N.Y.S.2d 514, 514 (N.Y. App. Div. 2005) (citing source of accountant's duty to perform within scope of accepted standards).

[36] *Cumis Ins. Soc'y Inc. v. Tooke*, 739 N.Y.S.2d 489, 493 (N.Y. App. Div. 2002).

[37] *In re Sharp Int'l Corp.*, 278 B.R. at 33.

[38] *Block v. Razorfish, Inc.*, 121 F. Supp. 2d 401, 403 (S.D.N.Y. 2000).

[39] *Bd. of Trs. of the Teamsters Local 918 Pension Fund v. Freeburg & Freeburg, C.P.A.*, No. 98CV4895(SJ), 1999 WL 803895, at *6 (E.D.N.Y. Sept. 28, 1999).

transaction causation.[40]  Loss causation is analogous to proximate cause; a plaintiff need only

show the damage suffered was a foreseeable result of the defendant's negligence to establish loss

causation.[41]  Transaction causation is a higher standard and is most closely analogous to

reliance.[42]  To establish transaction causation, a plaintiff must prove "the violations in question

caused the [plaintiff] to engage in the transaction in question."[43]

    In order to show the professional's negligence caused its damages, a plaintiff must show

that, had the professional's services been performed in a non-negligent manner, the plaintiff

would have taken steps to avoid the injury alleged or would have abstained from entering into

the transactions that caused the injury.[44]  A plaintiff must show actual, rather than speculative,

damages.[45]  For example, a plaintiff may recover damages for fees paid for services that did not

provide any value to the client, increased liability caused by the defendant's deficient services,

and funds lost to misappropriation and embezzlement.[46]

    The question of causation is premised on the objective, "reasonable person" standard.

The U.S. Court of Appeals for the Second Circuit has defined this standard by holding, "[I]t is

enough [for a plaintiff] to introduce evidence from which reasonable persons may conclude that

---

[40] *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000) (applying New York law).

[41] *Id.*

[42] *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 n.1 (2d Cir. 2007); *Currie v. Cayman Res. Corp.*, 835 F.2d 780, 785 (11th Cir. 1988).

[43] *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1974), *overruled on other grounds by Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1101 n.9 (1991); *accord Togut v. Arthur Anderson & Co. (In re Mid-Atl. Fund, Inc.)*, 39 B.R. 88, 90 (S.D.N.Y. 1984).

[44] *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80 F. Supp. 2d 129, 139 (S.D.N.Y. 1999); *D.D. Hamilton Textiles, Inc. v. Estate of Mate*, 703 N.Y.S.2d 451, 453 (N.Y. App. Div. 2000).

[45] *See Ehlinger v. Ruberti, Girvin & Ferlazzo, PC*, 758 N.Y.S.2d 195, 196 (N.Y. App. Div. 2003).

[46] *See Allard v. Arthur Anderson & Co. (USA)*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996); *Gouiran Holdings, Inc. v. DeSantis, Prinzi, Springer, Keifer & Shall (In re Gouiran Holdings, Inc.)*, 165 B.R. 104, 106 (E.D.N.Y. 1994); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*, 212 B.R. 34, 42 (S.D.N.Y. 1997), *appeal after remand at*, 994 F. Supp. 202 (S.D.N.Y. 1998); *Stanley L. Bloch, Inc. v. Klein*, 258 N.Y.S.2d 501, 508 (N.Y. Sup. Ct. 1965).

it is more probable that the event was caused by the defendant than ... not."[47]  So long as the professional's negligence was a proximate cause of the injury, causation may be established even though others' mistakes also contributed to the injury.[48]

### D.    DEFENSES TO CLAIMS FOR MALPRACTICE

Several potential defenses are commonly asserted by auditors, attorneys, and accountants charged with professional negligence, including the running of the statute of limitations and the doctrine of comparative negligence.[49]  Each of these defenses is addressed in this subsection.

The statute of limitations for bringing a claim for professional malpractice under New York law is three years.[50]  In the absence of fraud, a malpractice action "accrues when an injury occurs, even if the aggrieved party is ignorant of the wrong or injury."[51]

In some cases, the limitations period may be extended by the "continuous representation doctrine"[52] where the parties have a continuous, ongoing relationship in which the defendant professional provides services related to the transaction which is the subject of the malpractice claim.[53]  The doctrine does not apply solely by virtue of the continuation of a general,

---

[47] *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004) (quoting W. Page Keeton et al., PROSSER AND KEETON ON TORTS § 32 (5th ed. 1984)).

[48] *Skinner v. Stone, Raskin & Israel*, 724 F.2d 264, 265-66 (2d Cir. 1983).

[49] *See* N.Y. C.P.L.R. § 214(6) (statute of limitations); *Caiati v. Kimel Funding Corp.*, 546 N.Y.S.2d 877, 878 (N.Y. App. Div. 1989) (comparative negligence).  The *Wagoner* rule, another common defense, is discussed in Section IX.D. of this Report and in App. C.

[50] N.Y. C.P.L.R. § 214(6).

[51] *Ackerman v. Price Waterhouse*, 84 N.Y.2d 535, 541 (N.Y. 1994); *accord Williamson v. PricewaterhouseCoopers, LLP*, 817 N.Y.S.2d 61, 63 (N.Y. App. Div. 2006); *Levin v. PricewaterhouseCoopers, LLP*, 754 N.Y.S.2d 541, 541 (N.Y. App. Div. 2003); *Bastys v. Rothschild*, No. 97 Civ. 5154 CMGAY, 2000 WL 1810107, *50 (S.D.N.Y. Nov. 21, 2000); *Glamm v. Allen,* 57 N.Y.2d 87, 93 (N.Y. 1982).

[52] *See Williamson*, 817 N.Y.S.2d at 64; *Kearney v. Firley, Moran, Freer & Eassa, P.C.*, 651 N.Y.S.2d 781, 781 (N.Y. App. Div. 1996).

[53] *Mitschele v. Schultz*, 826 N.Y.S.2d 14, 18 (N.Y. App. Div. 2006); *see also Bastys*, 2000 WL 1810107 at *51 (statute of limitations tolled only when accountant "continues to perform services for the plaintiff that relate to the specific matter in dispute, not merely the continuation of a professional relationship"); *Ashmead v. Groper*, 673

*(footnote continued on next page)*

professional relationship; its application requires that a professional render the same or related services after the alleged malpractice.[54]

A plaintiff may also seek to extend the limitations period under a theory of fraudulent concealment, which is synonymous with equitable estoppel under New York law.[55]  A plaintiff can assert fraudulent concealment when the defendant either affirmatively makes a false statement the plaintiff relies upon in not filing a complaint or when the defendant deliberately conceals facts underlying a claim it is under a duty to disclose.[56]  A plaintiff may only toll the statute of limitations if it has no notice of the facts underlying its claims.[57]  Whether fraudulent concealment can be used to toll the statute of limitations on a claim against a non-medical professional under New York law is unclear.[58]  Assuming a plaintiff may toll the statute of limitations based on fraudulent concealment, the plaintiff will have to demonstrate it commenced

---

*(footnote continued from previous page)*

N.Y.S.2d 779, 779 (N.Y. App. Div. 1998) ("It is established law that a professional's failure to take action or provide services necessary to protect a patient or client's interests cannot of itself constitute a course of treatment or representation."); *Kearney*, 651 N.Y.S.2d at 781 (doctrine not applicable where no continuity of services with respect to a specific tax condition) (citing *Goulding v. Solomon*, 475 N.Y.S.2d 723, 725 (N.Y. Civ. Ct. 1984)).

[54] *Mitschele*, 826 N.Y.2d at 18 (citing *Muller v. Sturman*, 437 N.Y.S.2d 205 (N.Y. App. Div. 1981)).  In the auditor context, for example, where the same firm performs annual audits for a client and the court finds (1) the auditor made the same errors year after year and (2) those errors resulted in miscalculations the auditor relied upon in performing the subsequent audit(s), the plaintiff can seek recovery for all of the negligent audits so long as the final audit fell within the statutory period.  *Williamson*, 817 N.Y.S.2d at 64; *see also Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 242 (S.D.N.Y. 1987).

[55] *In re Fischer*, 308 B.R. 631, 656 (Bankr. E.D.N.Y. 2004).  Equitable estoppel is sometimes used interchangeably with the term "equitable tolling" in New York case law, although federal courts distinguish between the two. *Coleman & Co. Sec. Inc. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288, 299 (S.D.N.Y. 2002).

[56] *Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 444 (S.D.N.Y. 2006).

[57] *See O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 231 (S.D.N.Y. 1989) ("Plaintiffs must make 'distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been before made.'") (quoting *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir. 1961), *cert. denied*, 368 U.S. 821 (1961)); *see also Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006) (stating fraudulent concealment must be pled with particularity and is invoked sparingly).

[58] *Compare Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 375 (S.D.N.Y. 2004) ("New York courts have rejected the proposition that fraudulent concealment tolls the statute of limitations in non-medical malpractice

*(footnote continued on next page)*

its suit within a reasonable time after the fraud "ceased to be operational" and show affirmative acts of fraud in addition to the original alleged malpractice.[59]

Comparative negligence may also be asserted as a partial defense to a claim for professional malpractice.[60]  New York is a comparative negligence state. Therefore, to the extent a plaintiff is culpable along with the defendant, the plaintiff's recovery will be diminished.[61]

## IV.    AIDING AND ABETTING FRAUD/AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### A.    INTRODUCTION

Under New York law, a corporation may sue a third party for aiding and abetting officers' and directors' breaches of fiduciary duty.[62]  The elements of a claim for aiding and abetting breach of fiduciary duty are:  (1) the existence of a breach by a fiduciary of a duty owed to the plaintiff,[63] (2) knowing inducement or participation in the breach by the defendant, and

---

*(footnote continued from previous page)*

cases."), *with Tenamee*, 438 F. Supp. 2d at 444 (recognizing the availability of fraudulent concealment to toll the statute of limitations in an attorney malpractice claim).

[59] *Tenamee*, 438 F. Supp. 2d at 445; *accord Kremen v. Brower*, 793 N.Y.S.2d 3, 3 (N.Y. App. Div. 2005) ("There can be no fraudulent concealment based on the same act that forms the basis of the negligence claim.").

[60] N.Y. C.P.L.R. § 214(6); *see also Caiati v. Kimel Funding Corp.*, 546 N.Y.S.2d 877, 878 (N.Y. App. Div. 1989); *Cicorelli v. Capobianco*, 453 N.Y.S.2d 21, 21 (N.Y. App. Div. 1982).

[61] N.Y. C.P.L.R. § 214(6).

[62] *See Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006, 1015 (S.D.N.Y. 1984); *Granite Corp. v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318, 328 (Bankr. S.D.N.Y. 1996).

[63] The fiduciary duties owed by directors of a Delaware corporation are due care and loyalty.  *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1994).  The duty of care requires that a director inform himself of material information prior to making a decision so that the decision constitutes a reasonably informed business judgment.  *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985).  The duty of loyalty "requires an undivided and unselfish loyalty to the corporation [and] demands that there shall be no conflict between duty and self-interest."  *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).  Within the duty of loyalty lies a subsidiary duty of good faith, the violation of which establishes a breach of the duty of loyalty.  *Stone*, 911 A.2d at 370.  The duty of good faith requires honesty in purpose and genuine care for corporate constituents.  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 753 (Del. Ch. 2005).

(3) damages suffered by the plaintiff.[64]  A corporation also has standing under New York law to bring a claim for aiding and abetting fraud.[65]  The elements of a claim for aiding and abetting fraud are: (1) existence of a fraud,[66] (2) the defendant's knowledge of the fraud, (3) provision by the defendant of substantial assistance to advance the fraud's commission, and (4) damages suffered by the plaintiff.[67]  A plaintiff alleging a claim for aiding and abetting fraud must plead the elements of fraud with the "particularity necessary to survive the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."[68]  Upon a corporation's filing for bankruptcy, these claims become property of the estate.[69]

These two claims parallel each other in several respects.  First, both require that the defendant have actual knowledge of the wrongdoing.[70]  Second, the conduct element of each claim ("substantial assistance" and "knowing inducement or participation") may be satisfied by showing the defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so" allows the wrongdoing to proceed.[71]  Third, both claims require that the aiding

---

[64] *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 49-50 (2d Cir. 2005); *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (N.Y. App. Div. 2003).

[65] *See Ross v. Patrusky, Mintz & Semel*, No. 90 Civ. 1356 (SWK), 1997 WL 214957, *15 (S.D.N.Y. Apr. 29, 1997).

[66] The elements of a claim for common law fraud are a representation of a material fact, falsity, scienter, reliance, and injury.  *Kline v. Taukpoint Realty Corp.*, 302 A.D.2d 433, 433 (N.Y. App. Div. 2003) (citation omitted).

[67] *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000).

[68] *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006).

[69] *See Granite Corp. v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318, 328 (Bankr. S.D.N.Y. 1996).

[70] *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006).

[71] *Id.* (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992)); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996).

and abetting defendant itself proximately cause the harm suffered as a result of the primary violator's wrongdoing.[72]

## B.  THE MAJORITY VIEW REQUIREMENT OF ACTUAL KNOWLEDGE

The "overwhelming weight of authority" requires actual knowledge to establish liability for aiding and abetting.[73]  Willful blindness, or conscious avoidance of facts, describes a greater degree of knowledge than constructive knowledge or recklessness and is a well-established substitute for actual knowledge in the criminal context.[74]  "[T]here is no reason to believe that New York law would not accept willful blindness as a substitute for actual knowledge in connection with aiding and abetting claims."[75]  The burden of proving actual knowledge is borne by the plaintiff.[76]

To allege actual knowledge through circumstantial evidence, a plaintiff must plead "specific facts that would give rise to an inference that [the auditor] actually knew of [the debtor's] allegedly fraudulent activities."[77]  Averring that a defendant should have known of the

---

[72] *See Montreal Pension*, 446 F. Supp. 2d at 201-02 (addressing aiding and abetting both breach of fiduciary duty and fraud); *McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343, 359 (S.D.N.Y. 2002) (addressing aiding and abetting fraud); *Kolbeck*, 939 F. Supp. at 249 (addressing aiding and abetting breach of fiduciary duty).

[73] *Montreal Pension*, 446 F. Supp. 2d at 202 n.279 (citing numerous cases); *accord Lerner v. Fleet Bank N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).

[74] *Cromer Fin. Ltd. v. Berger*, No. 00 Civ.2284 DLC, 2003 WL 21436164, *9 (S.D.N.Y. June 23, 2003).

[75] *Id.*; *but see Montreal Pension*, 446 F. Supp. 2d at 202 n.279 ("actual knowledge is required, rather than a lower standard such as recklessness or willful blindness").

[76] *See Ascot Fund Ltd. v. UBS PaineWebber, Inc.*, 814 N.Y.S.2d 36, 36-37 (N.Y. App. Div. 2006).

[77] *Vtech Holdings Ltd. v. Pricewaterhouse Coopers LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004); *accord Wight*, 219 F.3d at 92.  For example, in *Wight*, the court found a plaintiff liquidator pled actual knowledge of a fraud by offering deposition testimony from a bank's officer that funds were being moved among "shell companies," there was no legitimate business purpose for the cycling of money, he suspected the money may have been moved to launder money, and that the bank had been paid larger fees than other clients.  *Id.*  A plaintiff may show an auditor had actual knowledge of wrongdoing by producing an auditor's internal documents recognizing and identifying the wrongdoing.  *Ryan v. Hunton & Williams*, 99-CV-5938, 2000 U.S. Dist. LEXIS 13750, *29 (E.D.N.Y. Sept. 20, 2000); *Ross v. Patrusky, Mintz & Semel*, No. 90 Civ. 1356 (SWK), 1997 WL 214957, *15 (S.D.N.Y. Apr. 29, 1997); *Bloor v. Dansker (In re Investors Funding Corp. of N.Y. Sec. Litig.)*, 523 F. Supp. 533, 542 n.2 (S.D.N.Y. 1980); *Lavin v. Kaufman, Greenhut, Lebowitz & Forman*, 640 N.Y.S.2d 57, 58 (N.Y. App. Div. 1996); *Nate B. & Frances Spingold Found. v. Wallin, Simon, Black & Co.*, 585 N.Y.S.2d 416, 417 (N.Y. App. Div. 1992).  However, merely

*(footnote continued on next page)*

wrongdoing alleges only constructive knowledge.[78]  Ordinary economic motive, such as for

payment of fees in exchange for work performed, is insufficient evidence of motive to aid in the

fraud.[79]

### C.    THE REQUIREMENT OF PARTICIPATION OR SUBSTANTIAL ASSISTANCE

A plaintiff must also prove participation (for breach of fiduciary duty) or substantial

assistance (for fraud).[80]  Whether particular conduct constitutes substantial assistance or

participation is best viewed in the context of causation; an aider and abettor provides substantial

assistance to a fraud or participates in a breach of fiduciary duty when it proximately causes the

harm of which the plaintiff complains.[81]  This requirement may be satisfied by showing the

defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do

so" allows the wrongdoing to proceed;[82] "[w]hen a plaintiff adequately pleads such assistance,

concealment, or failure to act, she fulfills both the 'substantial assistance' element of the fraud-

based claim and the 'participation' element of the breach of fiduciary duty-based claim."[83]

---

*(footnote continued from previous page)*

alleging a client committed a fraud and the client's auditor had access to the client's records, from which the existence of the fraud could have been discovered, is not enough to show the auditor had actual knowledge sufficient to state a claim for aiding and abetting fraud.  *Vtech Holdings*, 348 F. Supp. 2d at 269.  Similarly, alleging an auditor relied on fraudulent monthly account statements given to it by the client in issuing an unqualified audit report, without alleging specific wrongful conduct by the auditor, is not enough to show the auditor had actual knowledge sufficient to state a claim for aiding and abetting either breach of fiduciary duty or fraud.  *Cromer Fin.*, 137 F. Supp. 2d at 494-95.

[78] *Vtech Holdings*, 348 F. Supp. 2d at 269.

[79] *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 127-28 (S.D.N.Y. 1997).

[80] *Wight*, 219 F.3d at 91.

[81] *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004); *Primavera*, 173 F.R.D. at 126 ("The substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated.").

[82] *Montreal Pension*, 446 F. Supp. 2d at 201 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992)).

[83] *Id.*

Liability by virtue of failure to act, however, attaches only when the defendant itself owes a duty to the plaintiff, "that the primary violator owes a fiduciary duty to the plaintiff is not enough."[84]  "Absent a duty to act, the only action prescribed is not to 'affirmatively assist' or to 'help conceal,' which is another form of assistance and is likewise affirmative in nature."[85] Attorneys, of course, do owe their clients fiduciary duties, including the "duty to deal fairly, honestly, and with undivided loyalty."[86]

An attorney who facilitates or closes a transaction with actual knowledge of the transaction's improper purpose may substantially assist in the achievement of that improper purpose sufficient to sustain an aiding and abetting claim.[87]  With respect to auditors, pleading that an auditor concealed adverse information about the client, permitted management to loot the client, and agreed to conceal management's wrongdoing states a claim for aiding and abetting fraud sufficient to survive a motion to dismiss.[88]

---

[84] *Kolbeck*, 939 F. Supp. at 247; *accord Ryan*, 2000 U.S. Dist. LEXIS 13750, at *29.

[85] *In re Sharp Int'l*, 403 F.3d at 52.

[86] *Lightman v. Flaum*, 761 N.E.2d 1027, 1032 (N.Y. 2001) (quoting *In re Cooperman*, 633 N.E.2d 1069, 1071 (N.Y. 1994)).  In limited circumstances, an auditor or accountant may be a fiduciary to its client under New York law.  *See Ross v. Patrusky, Mintz & Semel*, No. 90 Civ. 1356, 1997 WL 214957, at *14 (S.D.N.Y. Apr. 29, 1997); *Bloor*, 523 F. Supp. at 542 n.2; *Lavin*, 640 N.Y.S.2d at 58; *Spingold Found.*, 585 N.Y.S.2d at 417.

[87] *See Phifer v. Home Savers Consulting Corp.*, No. 06 CV 3841(JG), 2007 WL 295605, *5 (E.D.N.Y. Jan. 30, 2007); *Banks v. Consumer Home Mortgage, Inc.*, No. 01-CV-8508 (ILG), 2003 WL 21251584, *11 (E.D.N.Y. Mar. 28, 2003) ("where the aider and abettor allegedly was aware that he would be enlisted by the principal fraudfeasors to deceive the victims and he knowingly did assist, his liability may be established.  The allegations that [the attorney] served as the attorney to an alleged fraudfeasor and facilitated the commission of the purported fraud at the closing are sufficient to state a claim for aiding and abetting.") (citations omitted); *Vaughn v. Consumer Home Mortgage, Inc.*, No. 01-CV-7937(ILG), 2003 WL 21241669, *6-*7 (E.D.N.Y. Mar. 23, 2003); *Cohen v. Goodfriend*, 665 F. Supp. 152, 157-58 (E.D.N.Y. 1987) (denying defendant-attorney's motion to dismiss claim for aiding and abetting fraud where the defendant "actively associated himself with and participated in the Partnership's activities including its formation and the offering and sale of partnership interests as something he tried, by his actions, to make succeed."); *see also Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999 (S.D.N.Y. 1991) (holding allegation that lender knew directors' approval of LBO constituted breach of fiduciary duty to company and provided bridge loans to company knowing the proceeds of the loans were being used to purchase the stock of the target and provided no benefit to the company sufficient to state claim for aiding and abetting breach of fiduciary duty).

[88] *See Ross*, 1997 WL 214957, *15; *Kolbeck*, 939 F. Supp. at 249.

### D.    CAUSATION AND DAMAGES

Claims for both aiding and abetting fraud and aiding and abetting breach of fiduciary duty require a showing of proximate cause.[89]  Proximate cause requires a showing of both loss causation and transaction causation.[90]  The plaintiff's injury must be proximately caused by the actions of the aider and abettor itself.[91]  "But-for" causation is insufficient.[92]

Among other types of damages, a plaintiff may recover fees paid to its professionals. Although money damages are generally legal in nature, they are "equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper profits.'"[93]  Unjust enrichment gives rise to the equitable remedy of restitution.[94]  To obtain restitution under an unjust enrichment theory, a plaintiff must show (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) it would be unjust not to compensate the plaintiff under the circumstances.[95]  A professional may be unjustly enriched by payment of a fee when the services rendered in

---

[89] *Montreal Pension*, 446 F. Supp. 2d at 201-02.

[90] *Ram Inv. Assocs. v. Citizens Fidelity Bank & Trust Co.*, 91 Civ. 3617, 1992 U.S. Dist. LEXIS 13695, *8 (S.D.N.Y. Sept. 10, 1992).

[91] *Montreal Pension*, 446 F. Supp. 2d at 201-02.

[92] *Kolbeck*, 939 F. Supp. at 249.  The causation principles with respect to malpractice/professional negligence claims discussed above in Part III.C. of this Appendix also apply to claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty.

[93] *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (quoting *Tull v. U.S.*, 481 U.S. 412, 424 (1987)).

[94] *See In re Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319, 342 n.109 (S.D.N.Y. 2005).  Because unjust enrichment is an equitable doctrine, "'principles of equity mandate consideration of the totality of the circumstances'" in determining whether restitution is warranted.  *Newbro v. Freed*, 409 F. Supp. 2d 386, 398 (S.D.N.Y. 2006) (quoting *Lake Minnewaska Mountain Houses, Inc. v. Rekis*, 259 A.D.2d 797, 799 (N.Y. App. Div. 1999)).  "A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties.  It is a conclusion reached through the application of principles of equity."  *Sharp v. Kosmalski*, 40 N.Y.2d 119, 123 (N.Y. 1976).

[95] *Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp. 2d 177, 184 (S.D.N.Y. 2000).

exchange for the fee are worthless,[96] or when fees are paid as compensation for defrauding a debtor in cooperation with management.[97]

### E.    THE STATUTE OF LIMITATIONS FOR AIDING AND ABETTING CLAIMS

The statute of limitations for bringing a claim for aiding and abetting a breach of fiduciary duty is three years where a plaintiff seeks monetary relief and six years where a plaintiff seeks equitable relief.[98]  The doctrine of continuing representation applies to claims for aiding and abetting breaches of fiduciary duty and can toll the running of the statute of limitations when the defendant is a professional.[99]

The statute of limitations for aiding and abetting fraud is the greater of (1) six years from the date the cause of action accrued or (2) two years from the date the plaintiff discovered or should have discovered the fraud.[100]  The test for whether a plaintiff should have discovered the fraud is an objective one,[101] and is a mixed question of law and fact.[102]  "[A]lthough a plaintiff may not shut his eyes to facts which call for investigation, mere suspicion will not suffice as a

---

[96] See *Cindy Royce Creations, Inc. v. Simmons*, No. 92 Civ. 9404 (RPP), 1993 WL 288291, *6 (S.D.N.Y. July 28, 1993) (dismissing claim for unjust enrichment against law firm on grounds of *forum non conveniens*).  Whether services rendered are worthless is a question of fact.  *Id.*

[97] *See Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 190 B.R. 515, 530 n.7 (S.D.N.Y. 1995) ("On plaintiff's theory, [the accounting firm] was paid for assisting in defrauding the debtor.  If, contrary to the facts alleged, the debtor had sufficiently clean hands to invoke the aid of equity, an unjust enrichment claim would lie.").

[98] *Ram Inv. Assocs.*, 1992 U.S. Dist. LEXIS 13695, at *13 (holding statute of limitations for aiding and abetting a breach of fiduciary duty is same as that for breach of fiduciary duty); *Carlingford Ctr. Point Assocs. v. MR Realty Assocs., L.P.*, 772 N.Y.S.2d 273, 274 (N.Y. App. Div. 2004).

[99] *See Williamson v. PricewaterhouseCoopers LLP*, 817 N.Y.S.2d 61, 64 (N.Y. App. Div. 2006); *Transp. Workers Union of Am. Local 100 AFL-CIO v. Schwartz*, 821 N.Y.S.2d 53, 56 (N.Y. App. Div. 2006).

[100] N.Y. C.P.L.R. § 213(8) (statute of limitations for fraud); *Wolff v. UBS PaineWebber, Inc.*, 01 Civ. 4039, 2004 U.S. Dist. LEXIS 8305, *3 (S.D.N.Y. May 12, 2004) (statute of limitations for aiding and abetting fraud same as that for fraud).

[101] *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983).

[102] *Erbe v. Lincoln Rochester Trust Co.*, 144 N.E.2d 78, 80 (N.Y. 1957).

ground for imputing knowledge of the fraud."[103]   A defendant's concealment of facts giving

notice of the fraud can also prevent the statute of limitations from running.[104]

## V.     CONTRACTUAL AFFIRMATIVE DEFENSES AVAILABLE TO ACCOUNTING PROFESSIONALS

New York law permits contractual indemnification among parties to absolve one party of

liability for ordinary negligence.[105]   However, contractual indemnification cannot absolve a party

of liability arising from gross negligence or willful misconduct.[106]   New York law also permits

parties to limit by contract the amount of damages a plaintiff may recover.   These limitation

clauses are treated in the same manner as exculpatory clauses in general: clauses limiting the

amount and type of damages recoverable from an accounting professional will be upheld in the

absence of willful misconduct or gross negligence.[107]   Contractual disclaimers of fiduciary duty

are also effective and permitted in New York.[108]

---

[103] *Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir. 1977).

[104] *See K&E Trading & Shipping, Inc. v. Radmar Trading Corp.*, 570 N.Y.S.2d 557, 558-59 (N.Y. App. Div. 1991).

[105] *See Am. Tissue, Inc. v. Donaldson, Luftkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 99 (S.D.N.Y. 2004); *Colaghi, U.S.A., Ltd. v. Jewelers Prot. Servs. Ltd.*, 81 N.Y.2d 821, 823 (N.Y. 1993); *Sommer v. Fed. Sig. Corp.*, 79 N.Y.2d 540, 554 (N.Y. 1992).

[106] *Am. Tissue*, 351 F. Supp. 2d at 99 (stating this type of indemnification is void as against public policy).

[107] *Sommer*, 79 N.Y.2d at 554.

[108] *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998); *Seippel v. Jenkens & Gilchrist, PC*, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004).

# APPENDIX B

## THE LAW RELATING TO AVOIDANCE ACTIONS

## I.    INTRODUCTION

This Appendix B sets forth legal standards that inform the Examiner's conclusions in the Report regarding avoidance actions and solvency determinations.  Part II discusses avoidance of preferential transfers under 11 U.S.C. § 547. Part III discusses avoidance of fraudulent transfers under applicable state and federal law.  Finally, Part IV discusses solvency determinations.

## II.    PREFERENTIAL TRANSFERS

### A.    ELEMENTS OF A PREFERENTIAL TRANSFER

Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended and supplemented, the "Bankruptcy Code") provides for the avoidance and recovery of preferential transfers.[1]  The purpose of the Bankruptcy Code's preferential transfer provisions is to "promote the Code's policy of preserving a financially distressed debtor's estate so that the debtor's assets may be fairly distributed amongst all creditors, not merely those who are favored."[2]  Section 547(b) provides a trustee or debtor may avoid a transfer of an interest of the debtor in property that is made: (1) to or for the benefit of a creditor; (2) for or on an account of an antecedent debt; (3) while the debtor was insolvent;[3] (4) on or within ninety days before the petition date, or between ninety days and one year if the transfer was made to an insider; (5) where the transferee received more than it would have in a liquidation under chapter 7.[4]

---

[1] *See* 11 U.S.C. §§ 547 & 550.

[2] *DeRosa v. Buildex Inc. (In re F&S Cent. Mfg. Corp.)*, 53 B.R. 842, 846 (Bankr. E.D.N.Y. 1985).

[3] A presumption of insolvency exists for the ninety day period preceding the filing of the petition.  11 U.S.C. § 547(f).

[4] 11 U.S.C. § 547(b).

**B.     POTENTIAL DEFENSES TO AVOIDANCE OF A PREFERENTIAL TRANSFER**

Section 547(c) of the Bankruptcy Code sets forth various affirmative defenses to avoidance of a preferential transfer.  Commonly used defenses are the contemporaneous exchange for new value defense,[5] the ordinary course of business defense,[6] and the new value defense.[7]  Once the trustee or debtor carries its burden of establishing a *prima facie* case for avoidance of a preferential transfer under § 547(b),[8] the defendant bears the burden of establishing a defense under § 547(c).[9]

The contemporaneous exchange for new value defense provides an otherwise preferential transfer may not be avoided to the extent the transfer was for new value given to the debtor in what was intended to be, and in fact was, a contemporaneous exchange.[10]  "Contemporaneous new value exchanges are not preferential because they encourage creditors to deal with troubled debtors *and* because other creditors are not adversely affected if the debtor's estate receives new value."[11]  That the exchange of value be contemporaneous requires that the payment not be on account of an antecedent debt.[12]  New value is defined as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation

---

[5] *See* 11 U.S.C. § 547(c)(1).

[6] *See* 11 U.S.C. § 547(c)(2).

[7] *See* 11 U.S.C. § 547(c)(4).

[8] The trustee bears the burden of proving the avoidability of a transfer.  11 U.S.C. § 547(g).

[9] 11 U.S.C. § 547(g).

[10] 11 U.S.C. § 547(c)(1); *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks USA, Inc.)*, 338 B.R. 194, 204 (Bankr. S.D.N.Y. 2005).

[11] *Jones Truck Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 326 (8th Cir. 1997) (emphasis in original).

substituted for an existing obligation."[13]  Forbearance does not constitute new value.[14]  The value given to the debtor need not necessarily be provided by the preference defendant, it may be provided by a third party.[15]

The ordinary course of business defense provides an otherwise preferential transfer may not be avoided to the extent it was: (1) in payment of a debt incurred in the ordinary course of business between the debtor and defendant; and (2) the transfer was made (i) in the ordinary course of business between the debtor and defendant, or (ii) according to ordinary business terms.[16]  "[T]he policies underlying the ordinary [course of] business exception are two-fold: (1) to encourage creditors to continue dealing with troubled debtors; and (2) to promote equality of distribution."[17]

The new value defense provides an otherwise preferential transfer may not be avoided to the extent the defendant gave new value to or for the benefit of the debtor that was not secured by an otherwise unavoidable security interest and on account of which the debtor did not make an otherwise unavoidable transfer.[18]  The basic elements of the defense are that: (1) the debtor received new value after the transfer; and (2) the new value remained unpaid.[19]  This defense

---

*(footnote continued from previous page)*

[12] *Sapir v. Keener Lumber Co. (In re Ajayem Lumber Corp.)*, 143 B.R. 347, 352 (Bankr. S.D.N.Y. 1992).

[13] 11 U.S.C. § 547(a)(2).

[14] *360networks*, 338 B.R. at 205.

[15] *Id*.

[16] 11 U.S.C. § 547(c)(2).  Whether a transfer is made according to ordinary business terms is measured objectively. *Kaplla v. Media Buying, Inc. (In re Ameri P.O.S. Inc.)*, Bankr. No. 04-24429-BKC-RBR-A, Adv. No. 06-1077-BKC-RBR-A, 2006 WL 3231274, *4 (Bankr. S.D. Fla. Oct. 24, 2006).

[17] *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 527 (8th Cir. 2002).

[18] 11 U.S.C. § 547(c)(4).

[19] *See Savage & Assocs., P.C. v. Level(3) Commc'ns (In re Teligent, Inc.)*, 315 B.R. 308, 314 (Bankr. S.D.N.Y. 2004).

"recognizes that the 'new value' effectively repays the earlier preference, and offsets the harm to the debtor's other creditors."[20]

## III.     **FRAUDULENT CONVEYANCES**

Sections 544 and 548 of the Bankruptcy Code provide for a trustee's avoidance of fraudulent conveyances.[21]  Section 544 makes state fraudulent conveyance law applicable in bankruptcy cases.[22]  Section 548 is a substantive federal law providing standards under which a conveyance may be avoided.  Under New York law, fraudulent conveyances are governed by the New York Uniform Fraudulent Conveyance Act[23] (hereinafter "DCL").  Because the provisions of the DCL governing avoidance of fraudulent conveyances are substantially similar to those of the Bankruptcy Code,[24] this Appendix discusses federal law and New York law together, pointing out relevant differences where they exist.[25]

---

[20] *Id.* at 315.

[21] *See* 11 U.S.C. §§ 544 & 548.

[22] Section 544 authorizes a trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law[.]" 11 U.S.C. § 544(b).  The term "applicable law" refers to non-bankruptcy state law.  *See Hassett v. Far W. Fed. Sav. & Loan Ass'n (In re O.P.M. Leasing Servs., Inc.)*, 40 B.R. 380, 384 (Bankr. S.D.N.Y. 1984), *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984).  In order for a trustee to avoid a conveyance under § 544(b), there must exist an unsecured creditor that actually had a claim under state law at the time the bankruptcy case was filed.  *Official Comm. of Asbestos Claimants of GI Holding, Inc. v. Heyman*, 277 B.R. 20, 29 (S.D.N.Y. 2002).

[23] N.Y. Debt. & Cred. Law §§ 270-81.

[24] "There is no dispute that if a transfer is fraudulent under the DCL, it is also fraudulent under Section 548 of the Bankruptcy Code."  *Geron v. Shulman (In re Manshul Constr. Corp.)*, 2000 WL 1228866, *43, n.7 (S.D.N.Y. Aug. 30, 2000) (citing *In re Schwartz*, 58 B.R. 923, 926 n.2 (Bankr. S.D.N.Y. 1986)).

[25] For example, the DCL provides for avoidance of transfers made within six years of the commencement of the avoidance action, CPLR § 213(8), while the fraudulent transfer provisions of the Bankruptcy Code provide for the avoidance of both actual and constructive fraudulent conveyances made within one year of the petition date, *see* 11 U.S.C. § 548.  (The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended 11 U.S.C. § 548 so that it now provides for the avoidance of fraudulent conveyances made within two years of the petition date.  However, this provision of BAPCPA did not take effect until April 20, 2006.  Because Refco filed its petition on October 17, 2005, before the effective date of the amendment, the fraudulent conveyance claims in Refco's Bankruptcy Cases are governed by the older, one year rule.)

A.    ACTUAL FRAUDULENT CONVEYANCES

DCL § 276 governs actual fraudulent conveyances under New York law and states "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in the law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  To prevail under § 276, a plaintiff must show: "(1) the thing transferred has value out of which the creditor could have realized a portion of its claim; (2) that this thing was transferred or disposed of by the debtor; and (3) that the transfer was done with the actual intent to defraud."[26]  Section 548(a)(1)(A) of the Bankruptcy Code provides a trustee may avoid a transfer when the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation incurred, indebted . . . ."[27]

Actual intent to hinder, delay, or defraud must be pled with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.[28]  Actual intent is a question of fact[29] and must be established by the party seeking to set aside the conveyance through clear and convincing evidence.[30]

---

[26] *Kittay v. Flutie N.Y. Corp. (In re Flutie N.Y. Corp.)*, 310 B.R. 31, 56 (Bankr. S.D.N.Y. 2004) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994)).

[27] 11 U.S.C. § 548(a)(1)(A).

[28] Fed. R. Bankr. P. 7009(b); *A.J. Heel Stone, L.L.C. v. Evisu Int'l, S.R.L.*, No. 03 Civ. 1097(DAB), 2006 WL 1458292, at *3 (S.D.N.Y. May 25, 2006); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 106 (S.D.N.Y. 2004).

[29] *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994).

[30] *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126 (N.Y. App. Div. 1986).

Because direct proof of actual fraudulent intent is difficult to obtain, a plaintiff may prove fraudulent intent through circumstantial evidence known as "badges of fraud."[31]  The badges of fraud include, but are not limited to:  (1) inadequacy of consideration received; (2) the closeness of the relationship between parties to the transfer; (3) that the transferor was rendered insolvent by the conveyance; (4) suspicious timing of the conveyance; (5) use of fictitious parties or secrecy; (6) the transferor's knowledge of a creditor's claim and subsequent inability to pay it; and (7) retention of control of the property by the transferor after the transfer.[32]  "Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference."[33]

So long as a conveyance is made with the actual intent to defraud, the transfer is fraudulent under the law regardless of whether the transferee paid fair consideration[34] and regardless of the transferor's state of solvency.[35]  However, it is a defense to avoidance under both the DCL and the Bankruptcy Code if the transferee establishes both payment of fair consideration *and* lack of knowledge of the fraud, or good faith, at the time of the conveyance.[36]

---

[31] *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983); *Marine Midland*, 120 A.D.2d at 128.

[32] *See Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 268-69 (S.D.N.Y. 2005) (citing *Bulkmatic Transp. Co. v. Pappas*, No. 99 Civ. 12070(RMB)(JCF), 2001 WL 882039 (S.D.N.Y. May 11, 2001)); *MFS/SUN Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995).

[33] *Van Dusen*, 910 F. Supp. at 935.

[34] *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995) ("*HBE Leasing I*"); *Van Dusen*, 910 F. Supp. at 934.

[35] *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1, 38 (Bankr. E.D.N.Y. 2006).

[36] Although the Bankruptcy Code and DCL use different terminology in describing this defense, the substantive elements of the defense are the same under both bodies of law.  Section 548(c) of the Bankruptcy Code states "[A] transferee or obligee of [a fraudulent] transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  Good faith means "viewed objectively, the transferee neither knew nor should have known of the fraudulent nature of the transfer."  *Maddalena v. Maddalena*, 176 B.R. 551, 555 (Bankr. C.D. Cal. 1995).  Likewise, DCL § 278(1) states "[w]here a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has

*(footnote continued on next page)*

### B.    CONSTRUCTIVE FRAUDULENT CONVEYANCES

Under both the DCL and the Bankruptcy Code, a plaintiff must establish two basic elements to avoid a constructive fraudulent conveyance: (1) an unfair exchange; and (2) failure of one of three solvency tests.  In order to state a claim for constructive fraudulent conveyance under the DCL, a plaintiff must allege a conveyance was made: (1) without fair consideration; and (2) the transferor (i) was insolvent at the time of the conveyance or rendered insolvent thereby, (ii) was left with unreasonably small capital to conduct its business as a result of the transfer, or (iii) intended or believed it would incur debt beyond its ability to repay as a result of the transfer.[37]  Under the Bankruptcy Code, a trustee may avoid a transfer in which the debtor: (1) received less than reasonably equivalent value; and (2) (i) was insolvent at the time of the transfer or was rendered insolvent thereby, (ii) was engaged or was about to engage in business or a transaction for which the debtor was left with unreasonably small capital after the transfer, or (iii) intended to incur or believed it would incur debts beyond its ability to repay.[38]

### 1.    Unfair Exchange

The DCL treats the unfair exchange element of a constructive fraudulent conveyance as involving a conveyance made without "fair consideration," while the Bankruptcy Code treats the unfair exchange element of a constructive fraudulent conveyance as involving a conveyance made for "less than reasonably equivalent value."  Both concepts involve factual determinations

---

*(footnote continued from previous page)*

derived title immediately or mediately from such a purchaser, (a) [h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or (b) [d]isregard the conveyance and attach or levy execution upon the property conveyed."

[37] *A.J. Heel Stone*, 2006 WL 1458292, at *3 n.3 (summarizing the solvency tests found in DCL §§ 273-275).

[38] 11 U.S.C. § 548(a)(1)(B).

specific to the circumstances of each case.[39]  The party seeking to set aside the conveyance bears

the burden of proof in showing lack of fair consideration or reasonably equivalent value.[40]  In

determining whether there has been an unfair exchange, courts compare the value of that which

was given to the value of that which was received, although a debtor "need not collect a dollar-

for-dollar equivalent . . . ."[41]

While, under the Bankruptcy Code, reasonably equivalent value does not contain a good

faith component,[42] the U.S. Court of Appeals for the Second Circuit, in seeking to define fair

consideration under the DCL, stated the recipient of a transfer must "either (a) convey property

in exchange or (b) discharge an antecedent debt in exchange; *and* (2) such exchange must be a

'fair equivalent' of the property received; *and* (3) such exchange must be 'in good faith.'"[43]  This

distinction between the Bankruptcy Code and the DCL is important in the context of transfers to

insiders on account of antecedent debts.[44]  The good faith required under DCL § 272 is that of

the transferee,[45] and when a transfer on account of an antecedent debt is made to an insider while

the transferor is insolvent, the insider does not meet the "good faith" requirement of DCL § 272

and there can be no fair consideration for the transfer.[46]  If a transfer on account of an antecedent

---

[39] *See United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994); *Am. Tissue*, 351 F. Supp. 2d at 106.  "What constitutes fair consideration under [DCL § 272] must be determined upon the facts and circumstances of each particular case."  *Orbach v. Pappa*, 482 F. Supp. 117, 119 (S.D.N.Y. 1979).

[40] *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997); *McCombs*, 30 F.3d at 323.

[41] *See Barber*, 129 F.3d at 387; *Butler Aviation Int'l Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125-26 (5th Cir. 1993).

[42] *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 106-07 (Bankr. S.D.N.Y. 1999).

[43] *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058-59 (2d Cir. 1995) ("*HBE Leasing II*") (emphasis in original).

[44] *Farm Stores, Inc. v. School Feeding Corp.*, 477 N.Y.S.2d 374, 378 (N.Y. App. Div. 1984), *aff'd*, 479 N.E.2d 222 (N.Y. 1985).

[45] *HBE Leasing II*, 61 F.3d at 1059 n.5.

[46] *Farm Stores*, 477 N.Y.S.2d at 378.

debt is made in an arms-length transaction with an outsider, however, the transfer may be in good faith.[47]

### 2.    Failure of a Solvency Test

The second requirement to set aside a conveyance under both the DCL and the Bankruptcy Code is failure of a solvency test.  Under the DCL, a plaintiff must satisfy one of the solvency tests found in DCL §§ 273-75.[48]  Under DCL § 273, a conveyance is fraudulent if made for less than fair consideration and the transferor is insolvent at the time of the conveyance or is rendered insolvent by it.  "A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."[49]  Under DCL § 275, a conveyance for less than fair consideration is fraudulent even though the transferor's assets exceed its liabilities if, at the time of the transfer, the transferor "intends or believes" it will be unable to pay its debts as they mature; this is a forward looking test referred to as equitable insolvency.[50]  Finally, under DCL § 274, a conveyance for less than fair consideration is fraudulent if it leaves the transferor with unreasonably small working capital.  This is a financial condition short of equitable insolvency and applies where the transferor is left "technically solvent but doomed to fail."[51]

The Bankruptcy Code's solvency tests parallel those found in the DCL.  Under 11 U.S.C. §548(a)(1)(B), a conveyance is fraudulent if made for less than reasonably equivalent value and

---

[47] *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005).

[48] Under the DCL, once a plaintiff meets its burden on the issue of fair consideration, a presumption of insolvency arises and the burden of proving solvency shifts to the defendant.  *ACLI Gov't Sec., Inc. v. Rhoades*, 653 F. Supp. 1388, 1393 (S.D.N.Y. 1987); *Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*, 338 B.R. 583, 597 (Bankr. S.D.N.Y. 2006).

[49] DCL § 271(1).

[50] *MFS/SUN*, 910 F. Supp. at 943.

[51] *Id.* at 944.

the transferor: (1) was insolvent at the time of the transfer or was rendered insolvent thereby; (2) was engaged or was about to engage in business or a transaction for which the debtor was left with unreasonably small capital after the transfer; or (3) intended to incur or believed it would incur debts beyond its ability to repay.[52]

## IV.    <u>SOLVENCY DETERMINATIONS</u>

The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of [] property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors…."[53]  Bankruptcy courts generally apply a traditional balance sheet test when determining whether a company is insolvent as defined by the Bankruptcy Code.[54]  Solvency determinations are issues of fact, and a court has broad discretion in considering evidence.[55] "The matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject.  Because the value of property varies with times and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in §101(32) by the most appropriate means."[56]

---

[52] 11 U.S.C. § 548(a)(1)(B).

[53] 11 U.S.C. § 101(32).  DCL § 271 provides in relevant part: "A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."  In *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165 (Bankr. S.D.N.Y. 1998), the court noted that "there is no accepted test for determining insolvency under the DCL," 220 B.R. at 172, and that New York courts generally do not draw a distinction between DCL § 271 and insolvency as defined under the Bankruptcy Code.  220 B.R. at 173 (citing *U.S. v. 58th St. Plaza Theater, Inc.*, 287 F. Supp. 475, 497 (S.D.N.Y 1968)).  One court, however, has described this test, adopted from the UFCA, as an equitable test based on an ability to pay debts as they come due.  *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315 (Bankr. C.D. Cal. 1995).

[54] *Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.)*, 144 B.R. 663, 666 (Bankr. S.D.N.Y. 1992).

[55] *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996).

[56] *Id*. at 38.

A company, or its assets, should be valued as of the time of the transfer in question.[57]  It is, however, appropriate for a court to use "current awareness" of prior facts (facts discovered after the transaction) to adjust solvency analyses.[58]  A court may consider evidence uncovered after a company files for bankruptcy in determining the value of a debtor's assets at the time of the transaction in question.[59]  The subsequent discovery of fraudulent acts by management, including the existence of false receivables and illegal transfers, must be taken into account in determining solvency as of the relevant date.[60]  Contingent liabilities are also included in a solvency determination.[61]

"Courts often utilize the well-established bankruptcy principles of 'retrojection' and 'projection,' which provide for the use of evidence of insolvency on a date before and after the [transfer] date as competent evidence of the debtor's insolvency on the [transfer] date."[62]  Courts "may consider evidence uncovered after the advent of bankruptcy to determine the value of the debtor's assets at the time the alleged insolvency occurred.  Alleged credits and creative accounting that have the effect of grossly overstating a company's financial condition cannot be the basis of a court's solvency analysis."[63]  "The discovery of ongoing fraudulent acts by [the debtor's] officers and its resulting impact on the company's balance sheet clearly question the appropriateness of treating [the debtor] as a going concern."[64]  In these situations, goodwill

---

[57] *Coated Sales*, 144 B.R. at 667; *In re Le Café Crème, Ltd.*, 244 B.R. 221, 242 (Bankr. S.D.N.Y. 2000).

[58] *See Coated Sales*, 144 B.R. at 668.

[59] *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 111 (Bankr. S.D.N.Y. 1999).

[60] *Coated Sales*, 144 B.R. at 668.

[61] *In re W.R. Grace & Co.*, 281 B.R. 852, 854 (Bankr. D. Del. 2002).

[62] *Coated Sales*, 144 B.R. at 666.

[63] 247 B.R. at 111 (internal quotations omitted).

[64] 144 B.R. at 668.

carried on a debtor's books should not be included as an asset in the solvency determination, because, among other reasons, it cannot be liquidated to satisfy claims of creditors.[65]

The value of a company's assets is dependent on whether the company is to be valued as a going concern or on its deathbed.[66] Ordinarily, fair value should be determined based on a going concern valuation.[67] "Fair value" in the context of a going concern valuation, as the term is used in the definition of "insolvent" in the Bankruptcy Code, is determined by the "fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."[68] Put another way: "Fair value is not synonymous with a forced sale or the value of a continuing unhampered business. Rather it refers to: The amount of money that the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonable prudent and diligent businessman with his interests in mind, especially a proper concern for the payment of his debts."[69] In contrast to liquidation value, "[f]air market value presumes that all relevant information is known by seller and buyer. It follows, that a party purchasing assets at the time of the alleged . . . transfer would be aware of all relevant factors, which would include knowledge

---

[65] *Bay Plastics*, 187 B.R. at 330; *Coated Sales*, 144 B.R. at 672.

[66] A company's own "book value" of its assets may be evidence of market value; however, it is not conclusive because book values are historical rather than market-based. *Roblin Indus.*, 78 F.3d at 36. In valuing assets for purposes of determining insolvency, the book value of assets must be updated to determine their current market value. *Bay Plastics*, 187 B.R. at 330. Although not the exclusive or dispositive method, whenever possible valuation should be based on appraisals and expert testimony. 78 F.3d at 38.

[67] *Gilman v. Scientific Research Products, Inc. of Delaware (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 556 (10th Cir. 1995).

[68] *Roblin Indus.*, 78 F.3d at 35.

[69] *Coated Sales*, 144 B.R. at 667.

of a massive business-wide fraud . . .; otherwise, that party would be the victim of fraud.  In sum, fair market value entails a hypothetical sale, not a hypothetical company."[70]

Where a company is on its deathbed, however, the value assigned to its assets is that which could be obtained in a liquidation sale.[71]  "It is well–settled that if a company is only nominally extant, to treat it as a going concern would be misleading and would fictionalize the company's true financial condition.  Liquidation value is appropriate if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic."[72]  While "a business need not be thriving to receive a going concern value. . . . [I]t must have had a realistic capacity to [continue to operate]; a going concern valuation is appropriate only if it is believed that the enterprise will continue as a going concern."[73]  "'Deathbed' indications include ongoing fraud, struggling to stay in business before fraud is discovered, fraud used in an attempt to alleviate cash flow problems, and an inability to reorganize post-bankruptcy."[74] The difference between going concern valuation and deathbed valuation is that the former involves a reasonable time frame for a hypothetical liquidation, while the latter does not.[75]

---

[70] *Id.* at 668.

[71] *Id.* at 667.

[72] *In re Mama D'Angelo*, 55 F.3d at 555-56 (internal quotations and citations omitted).

[73] *Id.* at 556.

[74] *Adler, Coleman*, 247 B.R. at 111*; Coated Sales*, 144 B.R. at 667-68.

[75] *Adler, Coleman*, 247 B.R. at 111.

## APPENDIX C

## THE LAW RELATING TO THE *WAGONER* RULE

## I.    <u>INTRODUCTION</u>

This Appendix C discusses a potential significant defense[1] to claims against third parties

on behalf of a debtor's estate: the *Wagoner* rule.[2]

## II.    <u>THE *WAGONER* RULE</u>

The *Wagoner* rule was established by the U.S. Court of Appeals for the Second Circuit in

*Shearson Lehman Hutton, Inc. v. Wagoner*.[3]  The *Wagoner* rule states "[a] claim against a third

party for defrauding a corporation with the cooperation of management accrues to creditors, not

to the guilty corporation."[4]  Because a trustee may only bring claims the debtor itself could have

---

[1] The applicability of affirmative defenses is a matter of state law.  *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 748-49 (9th Cir. 1992), *rev'd and remanded on other grounds*, 512 U.S. 79 (1994), *prior opinion adopted in haec verba*, 61 F.3d 17 (9th Cir. 1995); *Breeden v. Kilpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94, 100 (2d Cir. 2003); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000).

[2] The doctrine of *in pari delicto* is an affirmative defense related to the *Wagoner* rule.  For convenience, the concept will generally be referred to herein as the *Wagoner* rule, because both doctrines are based on the principle that the law will not help one wrongdoer recover from another, and apply the same standards; also, under New York law, which for purposes of this Report the Examiner has assumed will likely govern, the *Wagoner* rule applies. It is noted, however, that most courts view the *Wagoner* rule and the doctrine of *in pari delicto* as separate and distinct doctrines because the first deals with standing and the second is an equitable, affirmative defense similar to the "unclean hands" doctrine. *See Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 381 n.51 (Bankr. S.D.N.Y. 2005) ("It is important to note . . . that the *Wagoner* Rule . . . is one of standing, and *in pari delicto* is not one of standing but rather an equitable defense applicable in some cases where the plaintiff has standing.  The two separate concepts should not be confused.") (citation omitted); *Official Comm. of Unsecured Creditors v. R. F. Lafferty & Co., Inc.*, 267 F.3d 340, 346 (3d Cir. 2001). However, other courts have taken the position that the *Wagoner* rule merely represents the Second Circuit's decision to treat the doctrine of *in pari delicto* as a question of standing rather than an affirmative defense. *See, e.g., Baena v. KPMG LLP*, 389 F. Supp. 2d 112, 118 (D. Mass. 2005) ("While some courts assess the doctrine of *in pari delicto* as an equitable defense, the Second Circuit and courts in the First Circuit have viewed it as a standing issue.") (citation omitted). Whether treated as bar to standing raised through a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction or as an affirmative defense raised through a motion under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, the questions remain the same: (1) can the wrongful acts by members of a company's management be imputed to the company and (2) do the exceptions to the *Wagoner* rule apply such that claims on behalf of a company against the third party professionals may be maintained?

[3] 944 F.2d 114 (2d Cir. 1991).

[4] *Id.*; *see also Am. Tissue, Inc. v. Arthur Andersen*, 275 F. Supp. 2d 398, 404 (S.D.N.Y. 2003) (debtor-in-possession lacks standing to sue third parties for defrauding debtor if principals participated in misconduct).  Similarly, *in pari delicto*, "which literally means 'in equal fault,' is a doctrine commonly applied in tort cases to prevent a deliberate

*(footnote continued on next page)*

brought prepetition,[5] and because the acts of agents are typically imputed to the principal,[6] misconduct by the debtor's controlling managers may bar recovery on behalf of the estate under the *Wagoner* rule.  The *Wagoner* rule thus provides that neither a trustee nor any other representative of a debtor's estate has "standing under New York law to seek recovery on behalf of a debtor company against third-parties for injuries incurred by the misconduct of the debtor's controlling managers."[7]

## III.     EXCEPTIONS TO THE *WAGONER* RULE

Even if claims against third parties on behalf of a debtor's estate fall within the scope of the *Wagoner* rule, one of two exceptions may apply: namely, the "adverse interest" exception and the "innocent insider" or "innocent decisionmaker" exception.  In addition, an exception to the two exceptions, known as the "sole actor" rule, may apply.

### A.     THE ADVERSE INTEREST EXCEPTION

The *Wagoner* rule will not apply if the estate's representative can show that the members of the debtor's management who engaged in misconduct were not acting as agents of the company.  This exception has become known as the "adverse interest" exception.

New York agency law generally recognizes an exception to the doctrine of imputation "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that

---

*(footnote continued from previous page)*

wrongdoer from recovering from a co-conspirator or accomplice."  *Baena v. KPMG LLP*, 453 F.3d 1, 6 (1st Cir. 2006) (internal citation omitted).

[5] A trustee bringing a claim that accrued to the estate under 11 U.S.C. § 541 is subject to the same defenses to which the debtor would have been subject had the debtor brought the claim prepetition, including the *Wagoner* rule.  *See R.F. Lafferty*, 267 F.3d at 355-56.  The *Wagoner* rule does not apply to non § 541 claims.  *See CEPA Consulting, Ltd. v. King Main Hurdman (In re Wedtech Sec. Litig.)*, 138 B.R. 5, 9 n.1 (S.D.N.Y. 1992).

[6] *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985).

[7] *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003).

of a third person. . . ."[8]  The rationale underlying the exception is that, typically, an agent is

presumed to have disclosed his knowledge to his principal; however, where the agent engages in

a scheme to defraud his principal, imputation of the agent's knowledge is not warranted because

the agent "cannot be presumed to have disclosed that which would expose and defeat his

fraudulent purpose."[9]

In order for the adverse interest exception to apply, "the agent must have totally

abandoned his principal's interests and be acting entirely for his own or another's purposes.  It

cannot be invoked merely because he has a conflict of interest or because he is not acting

primarily for his principal."[10]  "Thus, the exception does not apply when the agent acts both for

himself and for the principal, though the primary motivation for the acts is inimical to the

principal."[11]  The adverse interest exception may apply where an agent loots the company[12] or

uses company funds to satisfy personal obligations.[13]

While courts generally use language requiring that the agent totally abandon his

principal's interests and act entirely for his own or another's benefit, few courts have discussed

how such a determination should be made.  In *Wedtech*, the court held the pertinent question is

whether the misconduct or fraud was of "short term benefit or detriment to the corporation," not

---

[8] *Center*, 488 N.E.2d at 829 (citations omitted).

[9] *Id.  See also Wight*, 219 F.3d at 87; *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997); *Sec. Investor Protection Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 650 (S.D.N.Y. 1999).

[10] *Center*, 488 N.E.2d at 830; *accord Bennett Funding*, 336 F.3d at 100; *Wight*, 219 F.3d at 87; *Mediators*, 105 F.3d at 827; *BDO Seidman*, 49 F. Supp. 2d at 650; *Wedtech Sec. Litig.*, 138 B.R. at 9.

[11] *BDO Seidman*, 49 F. Supp. 2d at 650 (citing *Oppenheimer-Palmieri Fund, L.P. v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.)*, 802 F. Supp. 804, 817 (E.D.N.Y. 1992)).

[12] *Adelphia Commc'ns*, 330 B.R. at 381 n.52 ("By any standard, theft from a corporation by insiders is self dealing by the insiders and not in any sense in the interest of the entity. The insiders' actions and knowledge in engaging in such conduct therefore cannot be imputed to the company.").

[13] *See Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1, 24 (Bankr. E.D.N.Y. 2006).

whether there was "any detriment to the corporation resulting from the unmasking of the fraud."[14]  The court declined to determine whether benefit to the debtor should be measured objectively, by determining whether the debtor's value had increased as a result of the fraud, or subjectively, by determining the motivation of the wrongdoers.[15]

Another court considered the possibility that, where the short-term benefit to the company is merely a by-product of the bad actor's attempt to increase his fraudulent gains, it does not defeat the adverse interest exception.[16]  In *Crazy Eddie*, the court denied summary judgment to the debtor's former auditor on its *in pari delicto* defense because the court determined that, while a jury may be persuaded that the insiders acted partially in the debtor's interest, "the evidence now before the court is certainly susceptible of the interpretation that any short term benefit to [the debtor] was intended to redound to the advantage of only the [insiders] and their conspirators."[17]  The court reasoned, "[t]he fact that some of the embezzled money was put back into the corporation to help inflate sales and facilitate public offerings is not inconsistent with an abandonment by the [insiders] of the corporation's interest."[18]

It should also be noted that whether the bad actors have "totally abandoned" the company's interests, such that the debtor's estate may invoke the adverse interest exception, may

---

[14] 138 B.R. at 9 (citations omitted).

[15] *Id.*

[16] *See Crazy Eddie*, 802 F. Supp. at 818; *but see Baena*, 389 F. Supp. 2d at 119 (while looting a company probably constitutes a bad act totally adverse to the company's interests and warrants imposition of adverse interest exception, allegations that wrongdoers artificially inflated the company's revenues and earnings, or otherwise fraudulently increased the value of the company, would not warrant application of adverse interest exception).  "A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance and the company is still civilly and criminally liable.  Nor does it matter that the implicated managers *also* may have seen benefits to themselves – that alone does not make their interests adverse."  *Baena*, 453 F.3d at 7-8 (internal citations omitted).

[17] *Crazy Eddie*, 802 F. Supp. at 818 (citation omitted).

[18] *Id.*

be determined separately for each fraudulent scheme upon which the estate seeks recovery from third parties.[19]

### B.    THE INNOCENT INSIDER EXCEPTION

Another possible exception to the *Wagoner* rule is the "innocent insider," or "innocent decisionmaker," exception. While some trial courts in the Second Circuit have recognized this exception, others have expressly declined to do so.[20] Indeed, the District Court for the Southern District of New York has referred to the innocent insider exception as "controversial" and noted that "[t]he Second Circuit has expressly declined to approve or disapprove the 'innocent insider' exception."[21]

Two factors must be met for the innocent insider exception to apply. First, it must be shown that there existed within management a decision maker innocent and ignorant of the misconduct. Second, it must be shown that this innocent insider had the power to stop the misconduct and would have done so given knowledge of the wrongdoing.[22] As explained by one court:

---

[19] "[I]f the malfeasor has engaged in more than one scheme, it is possible to find that certain schemes inured to the benefit of the corporation but that others did not." *Bennett Funding*, 336 F.3d at 100 (citing *Wight*, 219 F.3d at 89).

[20] *Compare* cases recognizing exception: *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80 F. Supp. 2d 129, 136 (S.D.N.Y. 1999); *BDO Seidman*, 49 F. Supp. 2d at 651; *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 (S.D.N.Y. 1997); *Monahan Ford*, 340 B.R. at 24; *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 319 B.R. 782, 788 (E.D.N.Y. 2005), and *O'Neil v. New England Rd. Inc. (In re Neri Bros. Constr. Corp.)*, 323 B.R. 540, 543 (Bankr. D.Conn. 2005), *with* cases declining to adopt the innocent insider exception: *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette, Sec. Corp.*, 233 F.R.D. 327, 330 (S.D.N.Y. 2005); *In re CBI Holding Co., Inc.*, 311 B.R. 350, 372 (S.D.N.Y. 2004), *vacated in part*, 318 B.R. 761 (S.D.N.Y. 2004) (declining to adopt the exception), *appeal pending at, In re CBI Holding Co. (Bankr. Servs., Inc. v. Ernst & Young)*, Docket No. 04-5972 (2d Cir.) (04-6300, cross appeal); *Baena*, 453 F.3d at 8-9.

[21] *Am. Tissue, Inc. v. Arthur Andersen L.L.P.*, No. 02 Civ. 7751 (SAS), 2005 WL 712201, *2 & n.16 (S.D.N.Y. Mar. 28, 2005) (citation omitted).

[22] *Bennett Funding*, 336 F.3d 94, 101 (2d Cir. 2003); *Am. Tissue*, 2005 WL 712201, at *3 (trustee cannot create standing to sue on behalf of debtor through the innocent insider exception where allegedly innocent insider is effectively in retirement and largely served as a mere "figurehead" for the company at the time of the fraudulent activities); *Wechsler*, 212 B.R. at 36 (holding to survive an assertion of imputation under the *Wagoner* rule, a

*(footnote continued on next page)*

> [The debtor's] mere unsubstantiated speculation that [the innocent insider] could and would have stopped the fraud if he had known about it is not sufficient to establish the applicability of the 'innocent insider' exception.  As the Second Circuit has emphasized, 'the *Wagoner* rule [cannot be] defeated by a would-a, could-a, should-a test.'  To apply the 'innocent insider' exception in this case would perversely reward [the debtor] for having selected a chairman who played almost no role in policing the activities of the corporation.[23]

To satisfy the innocent insider exception, there must exist someone involved in the company's management who lacked knowledge of the fraud and, given such knowledge, would have had the power to put an end to it.[24]  For example, in *In re Sharp Int'l Corp.*, a trustee brought a claim against Sharp's auditor, alleging the auditor's negligence in performing deficient audits allowed management to loot Sharp.[25]  The auditor brought a motion for summary judgment arguing the wrongdoing of Sharp's management should be imputed to Sharp and bar a claim on behalf of the estate.[26]  In denying the auditor's motion, the court held the crucial fact was that, although the controlling family that managed and ran the day-to-day operations of Sharp (the "Spitzes") looted more than $43 million from it, the Spitzes had sold 13% of Sharp's stock to an innocent party, Bohorodzaner, Inc., and executed a shareholder agreement with it. Under the shareholder agreement, Bohorodzaner, Inc. was given a seat on Sharp's board (assumed by that company's namesake) and given the power to veto major corporate transactions, rights which could not be removed.  The trustee alleged that, had the other directors

---

*(footnote continued from previous page)*

complaint must include both an allegation that an innocent insider existed and an explanation of "how he could and would have brought the fraud to an end").

[23] *Am. Tissue*, 2005 WL 712201, at *3 (citations omitted); *accord Wallach v. McDermott, Will & Emery (In re Promedicus Health Group, LLP)*, Bankr. No. 03-10102K, Adv. No. 02-1023K, 2006 WL 3848736, *1 (Bankr. W.D.N.Y. Dec. 15, 2006).

[24] *See Sharp Int'l*, 319 B.R. at 789.

[25] *Id.*

not concealed their looting, Bohorodzaner could have commenced a derivative action against them to stop the improprieties.[27]  The court declined to dismiss the trustee's claim because the trustee sufficiently alleged facts that could support the innocent insider exception.[28]  The court stated "[m]ost telling of all is Bernard Spitz's testimony that he and his brothers regarded Bohorodzaner as capable of putting a stop to the fraud and therefore took pains to conceal it from him.  The fact that the Spitz's efforts were successful does not mandate imputation of that fraud to Sharp."[29]

### C.    THE SOLE ACTOR EXCEPTION TO THE ADVERSE INTEREST EXCEPTION AND THE INNOCENT INSIDER EXCEPTION

"[W]here the principal and agent are one and the same, the adverse interest exception is itself subject to an exception styled the 'sole actor' rule."[30]  The sole actor rule "imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal.'"[31]

In addition to applying the sole actor rule where the principal and agent are one and the same, courts have applied it "to cases in which the agent 'dominated' the corporation."[32]  For

---

*(footnote continued from previous page)*

[26] *Id*.

[27] *Id*.

[28] *Id.* at 790.

[29] *Id*.

[30] *Mediators*, 105 F.3d at 827 (citation omitted).

[31] *Bennett Funding*, 336 F.3d at 100 (citation omitted); *accord R.F. Lafferty*, 267 F.3d at 359 (if agent and principal are one and the same, "then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests") (citation omitted).

[32] *R.F. Lafferty*, 267 F.3d at 359-60; *accord In re Parmalat Sec. Litig.*, Nos. 05 Civ. 9934, 06 Civ. 0704, 2007 WL 634082, *5 (S.D.N.Y. Feb. 28, 2007); *Official Comm. of Unsecured Creditors of Grumman Olson Indus., Inc. v. McConnel (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411, 425 (Bankr. S.D.N.Y. 2005) (adverse interest exception "does not apply if the wrongdoing agent is the corporation's sole shareholder or where all of the corporation's management participate in the wrongdoing") (citations omitted).

instance, in *In re Verestar*,[33] the sole shareholder allegedly totally controlled and subverted the board of directors. The court found the actions of the sole shareholder would be imputed to the company despite the existence of other innocent directors because the other directors exercised no real authority within the company.[34] Similarly, in *Bennett Funding*,[35] the debtor was closely-held and run by the family members who allegedly engaged in the wrongdoing. While there were independent directors and officers, the wrongdoers within management fired one such officer and director for asking questions that could have uncovered the fraud and, without the board's approval or involvement, fired an outside auditor who refused to issue a clean opinion to the company.[36] The court determined that such control by the wrongdoers of the company required a finding that the trustee lacked standing to sue despite the fact that the bad actor was not the sole, or even principal, owner of the company.[37] The sole actor exception negates the innocent insider exception because the sole shareholder generally has the power to remove management at will, thereby negating the innocent insider's ability to put a stop to the wrongdoing.[38]

---

[33] *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006).

[34] *R.F. Lafferty*, 267 F.3d at 480.

[35] 336 F.3d 94.

[36] *Id.* at 98.

[37] *Id.* at 101-02.

[38] *See, e.g.*, *In re Crown Vantage, Inc.*, No. 02-3836 MMC, 2003 WL 25257821, *9-*10 (N.D. Cal. Sept. 25, 2003), *aff'd Crown Paper Liquidating Trust v. PricewaterhouseCoopers LLP*, 198 Fed. Appx. 597 (9th Cir. 2006), *cert. denied* No. 06-870, 2007 WL 559904 (Feb. 26, 2007) (dismissing, under doctrine of *in pari delicto*, claims based on conduct occurring while bad actor was plaintiff's sole shareholder but declining to dismiss claims based on conduct occurring when bad actor was no longer sole shareholder).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :

UNITED STATES OF AMERICA       :

                                   :

     -v-                   :    **INDICTMENT**

                                   :

JOSEPH P. COLLINS,         :    07 Cr.

                                   :

              Defendant.    :

                                   :
------------------------------------x

## COUNT ONE

**(Conspiracy To Commit Securities Fraud, Wire Fraud, Bank Fraud, And Money Laundering, To Make False Filings With The SEC, And To Make Material Misstatements To Auditors)**

      The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

      1.  At certain times relevant to this Indictment, Refco, Inc. was a Delaware corporation with its principal place of business in New York, New York.  Starting from at least the mid-1990s, the business of Refco, Inc. and its predecessor entities included providing execution and clearing services for exchange-traded derivatives and providing prime brokerage services in the fixed income and foreign exchange markets. Refco, Inc. held its initial public offering ("IPO") of common stock on or about August 10, 2005.  Prior to on or about August 10, 2005, Refco, Inc.'s predecessor entities were privately held. Refco, Inc. and its predecessor entities are referred to herein collectively as "Refco."

2.  At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately held Delaware corporation that held a substantial ownership interest in Refco.

3.  At all times relevant to this Indictment, Refco was represented by a large, well-known law firm (the "Law Firm").  At all times relevant to this Indictment, the Law Firm maintained offices throughout the United States and the world, including New York, New York.

4.  At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, was a partner at the Law Firm.  At all times relevant to this Indictment, COLLINS served as the principal outside counsel to Refco and RGHI and, indeed, brought Refco with him as a client when he joined the Law Firm in 1994. As such, COLLINS worked closely with executives and officers of both companies, providing them with legal advice and services with regard to a wide range of matters.  At all times relevant to this Indictment, Refco was the most significant client of JOSEPH P. COLLINS, the defendant, and he billed more time to matters for Refco than he did to matters for any other client and generated more fees for the Law Firm through his work for Refco than he did through any other client.  From in or about 1997 through in or about 2005, COLLINS's relationship with Refco resulted in at least approximately $40 million in fees being invoiced by the Law Firm to Refco.

2

5.  At certain times relevant to this Indictment, Phillip R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco. At certain times relevant to this Indictment, Bennett also owned between 24.5 percent to 100 percent of RGHI and served as President and Chief Executive Officer of RGHI.  As a result of his ownership interest in RGHI, at all times relevant to this Indictment, Bennett also had a substantial indirect ownership interest in Refco.

6.  At certain times relevant to this Indictment, Robert C. Trosten, a coconspirator not named as a defendant herein, held senior management positions at Refco.  Among other positions, Trosten was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004.

7.  At certain times relevant to this Indictment, Tone N. Grant, a coconspirator not named as a defendant herein, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, Grant was the President of Refco.  At certain times relevant to this Indictment, Grant also had a direct ownership interest in RGHI.  As a result of his ownership interest in RGHI, at certain times relevant to this Indictment, Grant held a significant indirect ownership interest in Refco.

8.  At all times relevant to this Indictment, Bank Für
Arbeit Und Wirtschaft Und Österreichische Postparkasse
Aktiengesellschaft was the fourth largest bank in Austria.  At
various times relevant to this Indictment, it indirectly held a
substantial ownership interest in Refco and made investments in
Refco through affiliates it controlled. The bank and its various
subsidiaries and affiliates are referred to collectively herein
as "BAWAG".

## THE SCHEME TO DEFRAUD

9.  From at least as early as in or about 1997 through
in or about October 2005, JOSEPH P. COLLINS, the defendant,
together with Phillip R. Bennett, Robert C. Trosten, Tone N.
Grant, and others known and unknown, schemed to hide the true
financial health and economic structure of Refco, including the
existence of a large debt owed to Refco by RGHI and the full
extent of BAWAG's economic interest in Refco, from Refco's banks,
counterparties, auditors, investors and potential investors.  In
furtherance of this scheme, COLLINS, Bennett, Trosten, Grant, and
others known and unknown, made and caused to be made false and
fraudulent statements to Refco's banks, counterparties, auditors,
investors, and potential investors, and made and caused to be
made false public filings with the United States Securities and
Exchange Commission ("SEC").

4

10.   JOSEPH P. COLLINS, the defendant, as Refco's
principal outside counsel, actively participated in this scheme
to hide the true financial health of Refco and to conceal BAWAG's
economic interest in Refco.  Acting hand-in-hand with Bennett,
COLLINS made affirmative misrepresentations, material omissions,
and told deceptive half-truths, all to assist Bennett's scheme to
steal more than $2.4 billion from potential investors and
lenders.  These misrepresentations, omissions, and half-truths --
as well as misrepresentations, omissions, and half-truths told by
coconspirators that COLLINS confirmed and furthered -- were
believed by Refco's investors and lenders in part because
COLLINS's status as a partner with a well-known law firm and as
Refco's long-time counsel gave them confidence that such
representations were truthful, accurate, and complete.
Furthermore, COLLINS documented and caused to be documented
transactions that concealed the existence of the large, material
debt owed to Refco by RGHI.  COLLINS's and the Law Firm's role in
documenting these fraudulent transactions helped third parties
gain comfort in participating in them.  Furthermore, in meetings,
telephone calls, and correspondence, COLLINS lied about this debt
and the existence of these and other transactions -- as well as
other matters relating to Refco's financial health -- to Refco's
banks, investors, potential investors, and their advisers.
COLLINS also knowingly negotiated and drafted fraudulent

agreements and public filings that resulted in the investment of more than $2.4 billion in Refco by banks, investors, and the public.  COLLINS also schemed with Bennett to conceal from potential investors the size of the investment BAWAG had made in Refco.  As a result of COLLINS's lies on behalf of Refco, COLLINS and Bennett were able to achieve the ultimate objective of the scheme, that is, obtaining, through fraud: the sale of approximately 57 percent of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to private investors in 2004; the acquisition of approximately $800 million of bank financing in 2004; and the August 2005 IPO of stock in Refco, in which the public purchased approximately $583 million of Refco common stock.

## Origins Of Refco's Financial Problems

11.  In or about the mid-1990s, Refco was wholly owned by RGHI.  As of in or about early 1997, RGHI owed Refco at least approximately $106 million.  Starting later in or about 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business.  In response to these losses, at various times between in or about May 1997 and in or about October 2005, Refco transferred losses from Refco to RGHI in an effort to hide Refco's true liabilities and thereby seek, among other things, to defraud potential purchasers into buying the firm at a price that

6

would pay off the accumulated debt and ensure a profit to Refco's owners. This practice resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion, which was carried on Refco's books as a receivable from RGHI (the "RGHI Receivable").

12. For example, in or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1") lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME"). When Customer 1 could not cover his margin requirements, Refco was ultimately forced to use customer funds taken from the unregulated segments of Refco's business to cover the loss.

13. Recognizing that public acknowledgment of the actual loss amount would threaten Refco's continued existence, Refco falsely represented to the public that Refco had not sustained significant losses as a result of Customer 1's losses when in fact it had lost in excess of $90 million. In fact, with the assistance and knowledge of JOSEPH P. COLLINS, the defendant, Refco had assumed at least $71 million of debt owed by Customer 1 from the trading losses. Refco then transferred that debt to RGHI, thereby making it appear on Refco's books as a $71 million receivable from RGHI.

14.  At all times relevant to this Indictment, JOSEPH
P. COLLINS, the defendant, knew that Refco had sustained
significant losses in connection with the trading activities of
its customers; knew that senior Refco management and others known
and unknown had lied to the public and others about Refco having
sustained such losses; and knew that such losses were transferred
from Refco to RGHI.

### BAWAG Invests In Refco

15.  By the end of 1998, significant customer and other
losses sustained by Refco placed Refco in a precarious financial
condition and caused Refco management to seek an infusion of
capital from BAWAG, a long-time Refco customer. In a transaction
that closed in or about 1999 and that JOSEPH P. COLLINS, the
defendant, and others negotiated and documented, BAWAG purchased
a ten percent ownership interest in Refco for approximately $95
million and lent Refco approximately $85 million of additional
capital in return for an additional ten percent economic interest
in Refco.

16.  At all times relevant to this Indictment,
JOSEPH P. COLLINS, the defendant, knew that, even with the
infusion of capital provided by BAWAG in 1999, RGHI continued to
owe Refco hundreds of millions of dollars. Indeed, in or about
1999, COLLINS received information that RGHI owed Refco at least
approximately $252 million.

## Hiding The RGHI Receivable

17.   Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis with a fiscal year-end on the last day of February, as JOSEPH P. COLLINS, the defendant, knew.  Among the items the auditors examined each year were "related party transactions" and, in particular, transactions between and among Refco and members of Refco's management and owners.  As COLLINS also knew, Refco and RGHI were related parties.

18.   In order to hide the size of the large and growing RGHI Receivable from, among others, Refco's auditors, Refco carried out a series of transactions in order temporarily to pay down all or part of the RGHI Receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Refco.  The transactions were carried out in order to hide the existence of the related party RGHI Receivable and the underlying causes of its existence from Refco's auditors, banks, investors, potential investors, and others.

19.   In or about 1998 and 1999, these transactions were undocumented.  However, beginning in or about 2000, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm working at his direction, were responsible for drafting the legal

9

documents that effectuated the transactions that Refco used to
pay down, temporarily, all or part of the RGHI Receivable over
Refco's fiscal year-ends and replace it with a receivable from
one or more other entities not related to Refco (the "Round Trip
Loan Transactions").  In summary, these year-end transactions
were carried out in the following approximate amounts during the
2000 to 2003 period:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Feb. 2000 | $310 million |
| Feb. 2001 | $450 million |
| Feb. 2002 | $625 million |
| Feb. 2003 | $650 million |

        20.  These transactions followed a standard pattern.
For example, in or about 2000, JOSEPH P. COLLINS, the defendant,
along with senior Refco management and other attorneys at the Law
Firm who were working at COLLINS's direction, caused the
following transactions to occur with several customers for the
purpose of paying down a portion of the RGHI Receivable over the
February 2000 year-end.  Three different customers (collectively,
the "Three Customers") lent a total of approximately $310 million
to RGHI, which RGHI then used to pay down its obligation to
Refco.  At the same time, Refco lent to the Three Customers
approximately $310 million.  As a result, it appeared on Refco's
books and records that Refco had approximately $310 million in
receivables from the Three Customers, and the debt from RGHI

10

appeared to be reduced by approximately $310 million.  In or
about March 2000, the transactions were reversed, with Refco
lending approximately $310 million back to RGHI (thus increasing
the amount owed by RGHI to Refco by $310 million), which RGHI
then used to pay back the Three Customers the full amount of the
loan.  To ensure a profit for the Three Customers, the interest
rate that RGHI paid to the Three Customers was higher than the
interest rate that the Three Customers paid to Refco.  Each of
the transactions with the customers was memorialized in loan
agreements, prepared by the Law Firm's attorneys at COLLINS's
direction, between Refco, RGHI and the Three Customers, similar
to the agreements that follow:

     a.    On or about February 25, 2000, through a loan
document prepared at COLLINS's direction, Refco Capital Markets,
Ltd., a Bermuda corporation controlled by Refco, loaned Customer
2, one of the Three Customers, approximately $150 million.  The
loan was to be repaid on March 9, 2000.

     b.    On or about the same day, February 25, 2000,
through a loan document prepared by COLLINS and another Law Firm
attorney, Customer 2 loaned approximately $150 million to RGHI.
The repayment date was on or about March 9, 2000.  The loan
agreement for this loan was executed by Phillip R. Bennett on
behalf of RGHI.  The interest rate on this loan was 15 basis
points higher than the interest rate on the loan from Refco

Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

c.    On or about the same day, Phillip R. Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.  The letter of guaranty signed by Bennett was prepared by a Law Firm attorney.

d.    On or about the same day, Phillip R. Bennett signed a letter of indemnity to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that Refco Group, Ltd. would defend and indemnify Customer 2 against any claims brought against Customer 2, or with respect to any loss suffered by Customer 2, as a result of Customer 2's loan to RGHI.  The letter of indemnity signed by Bennett was prepared by COLLINS and another Law Firm attorney.

21.  At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that Refco's fiscal year ended the last day of February, and that the fiscal year-end Round Trip Loan Transactions described above had the effect of paying down, temporarily, all or part of a large receivable owed to Refco by RGHI.

22.  In addition to the customer Round Trip Loan Transactions, Refco also engaged in undocumented year-end

12

transactions with BAWAG, in which BAWAG lent hundreds of millions
of dollars to RGHI, which it then used to pay down its obligation
to Refco (the "BAWAG Round Trip Loan Transactions").  At the same
time, Refco lent to BAWAG a large amount of money.  As a result,
it appeared on Refco's books and records that Refco had hundreds
of millions of dollars in receivables from BAWAG, while the RGHI
Receivable appeared to be reduced.  After Refco's fiscal year-
end, the transactions were reversed.  In summary, these BAWAG
Round Trip Loan Transactions were carried out in the following
approximate amounts during the 2000 to 2004 period:

| Date | Approximate BAWAG Round Trip Loans to RGHI |
|------|--------------------------------------------|
| Feb. 2000 | $300 million |
| Feb. 2001 | $300 million |
| Feb. 2002 | $300 million |
| Feb. 2003 | $250 million |
| Feb. 2004 | $250 million |

### BAWAG Invests Further in Refco

23.  Because Refco continued to falter financially,
Refco management sought additional infusions of capital, turning
again to BAWAG for assistance.  To that end, in or about July
2002, Refco, with the assistance of JOSEPH P. COLLINS, the
defendant, entered into an agreement with BAWAG whereby BAWAG
agreed to provide Refco with the needed capital infusions in
exchange for the right to receive proceeds of a future sale of

Refco.  Specifically, under the terms of the agreement (called the "Proceeds Participation Agreement" or "PPA"), BAWAG promised to make capital contributions to Refco at or about Refco's fiscal year-ends in 2003, 2004, and 2005 in exchange for a percentage of any proceeds paid in connection with a sale or public offering of Refco (identified in the agreement as the "Participation Right"). The percentage of proceeds BAWAG was entitled to under the terms of the PPA increased with each periodic contribution of capital. Alternatively, the PPA gave BAWAG the right to convert the Participation Right into ownership shares of Refco upon making the payments to Refco as specified in the PPA.  The agreement also contemplated that RGHI would guarantee Refco's performance under the terms of the PPA and otherwise secure the Participation Right.  Under the terms of the PPA and related agreements, as COLLINS well knew, Refco agreed to use $350 million of the purchase price for the Participation Right to pay down the ballooning debt owed to Refco by RGHI. In accordance with the terms of the PPA, BAWAG made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2 percent of the proceeds of the sale of Refco and, together with BAWAG's existing economic interest in 20 percent of Refco, possessed the economic rights to approximately 47 percent of the proceeds of the sale of Refco.

24. Having negotiated, drafted, and caused to be drafted the PPA, JOSEPH P. COLLINS, the defendant, was familiar with all of the terms of the PPA, including the economic interest BAWAG had in Refco through the right conferred upon BAWAG to participate in the proceeds of a sale or public offering of Refco -- or convert its Participation Right into ownership shares of Refco -- as well as RGHI's role guaranteeing Refco's performance and securing BAWAG's Participation Right under the PPA. COLLINS was also aware that the PPA required Refco to execute amended corporate documentation to reflect the existence of the PPA and that incorporated certain terms of the PPA.

25. Indeed, as contemplated by the PPA, JOSEPH P. COLLINS, the defendant, drafted and caused to be drafted, simultaneously with the drafting of the PPA, the two agreements through which RGHI, a party related to Refco, agreed to guarantee the performance of Refco under the PPA and to secure BAWAG's Participation Right. As part of the drafting of the PPA, the Law Firm's attorneys also prepared amended corporate documentation for Refco that reflected the existence of the PPA and incorporated into the governance of Refco some of its terms.

26. As set forth in paragraph 23 above, under the terms of the PPA, BAWAG made two contributions to Refco totaling approximately $467,480,000. At the time of the payments, under the terms of the PPA, BAWAG had the right to convert this

15

Participation Right into ownership shares in Refco.  Also as a
result of the payments, Refco and BAWAG executed Refco's amended
corporate documentation that had been prepared as part of the
PPA.  As set forth in paragraph 32 below, COLLINS helped conceal
this amended corporate documentation from potential investors in
Refco, thereby hiding the terms of the PPA from them.

      27.  As further set forth in paragraphs 32, 36, 37, 39
and 41 below, JOSEPH P. COLLINS, the defendant, schemed generally
with Phillip R. Bennett to conceal the existence of the terms of
the PPA from potential investors in Refco because COLLINS and
Bennett knew such terms were material to potential investors.
Through affirmative misrepresentations and omissions, COLLINS and
others concealed from Refco's potential investors: (1) the terms
of the Participation Right conferred upon BAWAG under the PPA and
the resulting obligation Refco would have to BAWAG upon the sale
or public offering of Refco; (2) the role that RGHI, a related
party to Refco, played in guaranteeing and securing BAWAG's
Participation Right; (3) BAWAG's ability to convert its
Participation Right into ownership shares in Refco; (4) the
existence of at least $350 million in related party debt owed
from RGHI to Refco in or about 2002, less than half of which was
disclosed in Refco's audited 2002 financial statements; and (5)
that Refco required an infusion of more than $450 million in cash
from BAWAG to conduct its business.

**The Fraudulent Leveraged Buyout Transaction**

28.  As contemplated by the PPA, Refco management made efforts to sell Refco soon after the PPA was executed.  In or about 2003, Refco hired an investment bank ("Investment Bank A") to assist in selling the Company.  Refco asked Investment Bank A to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After these initial efforts to sell Refco failed, Refco directed Investment Bank A to look for other purchasers for the company with the understanding that it would later hold an IPO.

29.  In or about 2003, Refco, assisted by JOSEPH P. COLLINS, the defendant, began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout (the "LBO") was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $507 million in cash; simultaneously, Refco sold approximately $600 million in notes and obtained approximately $800 million in financing from a syndicate of banks.  When the transaction was completed, RGHI was left with a 43 percent ownership interest in Refco.

17

30.    In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm represented both Refco and RGHI.    In relation to this representation, COLLINS drafted and negotiated representations that appeared in documents and correspondence provided to Thomas H. Lee Partners and discussed the transaction with persons representing Thomas H. Lee Partners.    In such documents, correspondence, and discussions, COLLINS made representations relating to the financial condition of Refco, among other matters, that COLLINS knew to be false and misleading and omitted information necessary to make his statements concerning the same not misleading.    For example, among other things, COLLINS concealed from Thomas H. Lee Partners the existence of the terms of the PPA.

31.    In connection with the LBO transaction, Phillip R. Bennett, through RGHI, purchased from BAWAG the Participation Right that BAWAG had previously obtained in connection with the PPA.    Bennett acquired the Participation Right by purchasing all of the stock of the BAWAG entity that owned the Participation Right.    According to agreements drafted, and terms negotiated by, JOSEPH P. COLLINS, the defendant, the purchase price for this acquisition was approximately $676 million.    The purchase price was paid partly out of proceeds of the LBO transaction paid to RGHI.

18

**Lies To Thomas H. Lee Partners**

**Lies about the PPA and payments to BAWAG**

32.   In connection with the negotiations with Thomas H.
Lee Partners, by no later than in or about March 2004, JOSEPH P.
COLLINS, the defendant, and Phillip R. Bennett, in addition to
agreeing to conceal from Thomas H. Lee Partners the terms of the
PPA, also agreed to conceal that Bennett, through RGHI, was
planning to pay approximately $676 million to purchase the
Participation Right from BAWAG, including using approximately
$566 million from the proceeds of the LBO transaction.
Accordingly, Bennett and COLLINS both took affirmative steps to
conceal the existence of the terms of the PPA and of the
agreements relating to RGHI's acquisition of the Participation
Right for the stated reason that investors would pay less money
for Refco if they were aware of such terms.  Such steps included,
but were not limited to, Bennett and COLLINS making false
representations directly to Thomas H. Lee Partners, and COLLINS
himself specifically directing others not to disclose information
relating to RGHI's buyout of the Participation Right from BAWAG.
Furthermore, when asked by Thomas H. Lee Partners to further
amend the corporate documentation for Refco, COLLINS prepared new
amended corporate documentation that fraudulently concealed the
fact that previous corporate documentation had been executed by

19

BAWAG and Refco as part of the PPA, as set forth in paragraph 26 above.

33.    JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett made similar misrepresentations to Thomas H. Lee Partners that misled Thomas H. Lee Partners about the amount of money that BAWAG was to receive at the closing of the LBO transaction. Specifically, COLLINS and Bennett represented that BAWAG was receiving many hundreds of millions of dollars less than the approximately $952 million that BAWAG was to receive for its various interests in Refco and the approximately $390 million that BAWAG was to receive as repayment of the overdraft discussed in paragraph 37 below.

### Lies about related party debt and related party transactions

34.    JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, and others also made affirmative representations and drafted and negotiated contract terms that misled Thomas H. Lee Partners and its representatives to believe that RGHI owed Refco no more than approximately $108 million, all of which amount COLLINS and Bennett knowingly and falsely represented to Thomas H. Lee Partners would be repaid by the time the LBO transaction closed.  In fact, by the time the LBO transaction closed, COLLINS knew that RGHI actually owed Refco at least $1 billion (which had been hidden from Refco's auditors through the Round Trip Loan Transactions), and that even after the LBO, RGHI would continue

20

to owe Refco at least $300 million.  Accordingly, COLLINS
continued to help Bennett conceal the existence of this related
party debt by documenting and causing to be documented year-end
and quarter-end Round Trip Loan Transactions similar to those
described above in the following approximate amounts at the same
time that COLLINS was negotiating the terms of the LBO
transaction:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Feb. 2004 | $720 million |
| May 2004 | $700 million |

35.  In connection with the LBO transaction, Refco
caused its audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  As
JOSEPH P. COLLINS, the defendant, well knew, those audited
financial statements were false and misleading in that they,
among other things, hid the size of the related party RGHI
Receivable, which at the end of January 2004 was, but for the
Round Trip Loan Transactions, at least $1 billion, whereas the
financial statements falsely and misleadingly reported that there
was no related party debt, and that the "$105 million due from
related parties, included in loans receivable at February 28,
2003, was received by February 29, 2004."

36.  As part of the LBO, Thomas H. Lee Partners made
numerous inquiries to JOSEPH P. COLLINS, the defendant, and

Phillip R. Bennett, about the existence of related party transactions involving Refco.  COLLINS and others made representations and drafted documents (or caused other Law Firm attorneys to draft documents), and negotiated contract terms that concealed from Thomas H. Lee Partners and its representatives the following related party transactions, among others, which Thomas H. Lee Partners and its representatives asked be disclosed:

        a.    The Round Trip Loan Transactions, which included documented loans made simultaneously by Refco to customers and by the same customers to RGHI at Refco's fiscal year-end and quarter-ends that, taken together, effectuated a related party transaction between Refco and RGHI;

        b.    The guarantees from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to guarantee the repayment of hundreds of millions of dollars in loans that customers made to RGHI, a related party, in connection with the Round Trip Loan Transactions;

        c.    The indemnification agreements from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to indemnify customers making loans to RGHI, a related party, against claims made against them, or losses suffered by them, in connection with such loans;

22

       d.    Payments made by RGHI to Refco in connection with the Round Trip Loan Transactions in order to pay down, temporarily, the receivable owed to Refco by RGHI; and

       e.    The agreements through which RGHI agreed to guarantee the performance of Refco under the terms of the PPA and to secure BAWAG's right to participate in the proceeds of the future sale of Refco under the same agreement.

### Lies about $500 million in working capital at Refco

       37.    JOSEPH P. COLLINS, the defendant, and others also drafted and negotiated contract terms that misled Thomas H. Lee Partners and its representatives into believing that Refco possessed approximately $500 million in excess working capital.

       a.    Under contract terms that COLLINS negotiated, Refco was required to deposit $500 million in working capital it purportedly possessed into a segregated account at BAWAG until the LBO transaction closed, at which time the money was to be distributed to Bennett's company, RGHI.

       b.    In reality, as COLLINS well knew, the segregated account established at BAWAG for purposes of holding the $500 million was not working capital, but was funded by, among other sums, an overdraft from BAWAG totaling approximately $390 million.

       c.    At closing, COLLINS furthered this misrepresentation by approving closing documents that falsely

reported that the $500 million in purportedly excess working capital would be transferred to an RGHI account at a bank other than BAWAG, when in fact, as COLLINS well knew, the $500 million was going to remain at BAWAG and be used, in part, to repay the $390 million overdraft.  COLLINS knew that if the true nature of these payments had been disclosed, Thomas H. Lee Partners would have learned of the existence of the terms of the PPA, the large capital infusions Refco received under the terms of the PPA, the large payments being made to BAWAG, and that $390 million of the $500 million that had been represented to Thomas H. Lee Partners as excess working capital and profits of Refco was in fact money borrowed from BAWAG.

### Lies To The Bank Syndicate

38.  At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $800 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco's borrowing from a bank syndicate.

39.  In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten, and others known and unknown caused the following false and misleading information to be provided to the bank syndicate, including HSBC Bank USA, N.A., that was raising the approximately

24

$800 million in loans for Refco as part of the LBO transaction and its representatives:

a.    Contract documents relating to the LBO transaction that failed to disclose the guaranty and indemnity agreements that Bennett entered into in connection with the Round Trip Loan Transactions;

b.    Refco's audited financial statements for the fiscal year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 35;

c.    Representations that Refco had not suffered significant historical customer losses; and

d.    Omissions relating to the terms of the PPA and the planned payment of $952 million to BAWAG in connection with the LBO transaction.

### Lies To The Note Purchasers

40.    At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $600 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco selling 9% Senior Subordinated Notes due 2012 to private investors (the "LBO Notes").

41.    In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten, and others known and unknown caused the following false and

misleading information to be provided to the underwriters and purchasers of the LBO Notes and their advisers:

   a.   Contract documents relating to the LBO transaction that failed to disclose the guaranty and indemnity agreements that Bennett entered into in connection with the Round Trip Loan Transactions;

   b.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 35;

   c.   Representations that Refco did not suffer significant historical customer losses; and

   d.   Omissions relating to the terms of the PPA and the planned payment of $952 million to BAWAG in connection with the LBO transaction.

### RGHI's Continued Debt To Refco After The LBO

   42.   RGHI used the proceeds of the fraudulent LBO transaction in part to pay down a portion of the approximately more than $1 billion RGHI owed to Refco at the time of the transaction.  Even after the proceeds were applied in this manner, however, RGHI continued to owe Refco a substantial sum. Indeed, after the transaction proceeds were applied, RGHI owed Refco more than at least approximately $300 million, as JOSEPH P. COLLINS, the defendant, well knew.

## **Securities Fraud in Connection with the Fraudulent Leveraged Buyout Transaction**

43.   The LBO transaction included Refco raising approximately $600 million through the sale of the LBO Notes. The LBO Notes were sold privately pursuant to an offering circular, which provided prospective purchasers of the LBO Notes material information about Refco's business and finances.   Refco completed the sale of the LBO Notes in or about August 2004.

44.   JOSEPH P. COLLINS, the defendant, advised Refco in connection with the sale of the LBO Notes.   To that end, COLLINS participated in the drafting of the offering circular that was provided to prospective purchasers of the LBO Notes.

45.   Specifically, JOSEPH P. COLLINS, the defendant, participated in drafting two sections of the offering circular entitled "Risk Factors" and "Certain Relationships and Related Transactions," among other sections.

46.   The "Risk Factors" section purported to warn potential investors about myriad risks relating to Refco's business, including, among other things: indebtedness and cash flow needs; credit risks; and conflicts of interest on the part of controlling members of Refco, including Bennett.

47.   As JOSEPH P. COLLINS, the defendant, well knew, the "Risk Factors" section of the offering circular contained material misstatements and omissions.   COLLINS was aware at the time that he participated in the drafting of the offering

27

circular that, after the LBO transaction occurred, hundreds of
millions of dollars would still be owed to Refco by RGHI, which
at that time would be solely owned and controlled by Bennett,
Refco's Chief Executive Officer.  Furthermore, COLLINS knew that
Refco, in connection with the quarter-end and year-end Round Trip
Loan Transactions, periodically assumed hundreds of millions of
dollars in obligations by guaranteeing and indemnifying the
performance of RGHI (and ultimately Bennett) with respect to
loans extended to RGHI by Refco customers.  The offering circular
was materially misleading and omissive, as COLLINS knew, because
it failed to disclose risks posed to Refco's business by: (1)
Refco being owed hundreds of millions of dollars by a related
party, RGHI, that was solely owned and operated by Bennett; and
(2) Refco periodically incurring hundreds of millions of dollars
in obligations guaranteeing and indemnifying the performance of a
related party, RGHI, that was solely owned and operated by
Bennett.

    48.  The "Certain Relationships and Related
Transactions" section of the offering circular included a
discussion of various agreements and documents relating to the
LBO transaction.  Specifically, that section disclosed, among
other things: various ownership interests and rights in Refco
that would exist after the LBO was completed; the existence of a
management agreement between Refco and an affiliate of Thomas H.

Lee Partners pursuant to which Refco would pay the affiliate for
consulting services and indemnify the same; and an agreement that
would entitle management, after the close of the LBO transaction,
to receive ownership interests in Refco.

49.    As JOSEPH P. COLLINS, the defendant, well knew,
the "Certain Relationships and Related Transactions" section of
the offering circular contained material misstatements and
omissions.  COLLINS was aware at the time that he participated in
the drafting of the offering circular that, after the LBO
transaction occurred, hundreds of millions of dollars would still
be owed to Refco by RGHI, which at that time would be solely
owned and controlled by Phillip R. Bennett, Refco's Chief
Executive Officer.  Furthermore, COLLINS knew that Refco, in
connection with the quarter-end and year-end Round Trip Loan
Transactions, regularly loaned hundreds of millions of dollars to
third parties that, in turn, were obligated to loan equal amounts
simultaneously to RGHI, an entity controlled by Bennett.
Finally, COLLINS knew that Refco, again in connection with the
Round Trip Loan Transactions, periodically assumed hundreds of
millions of dollars in obligations by guaranteeing and
indemnifying the performance of RGHI (and ultimately Bennett)
with respect to loans extended to RGHI by Refco customers.  As
COLLINS well knew, RGHI's indebtedness to Refco, the loan
transactions that involved Refco's loaning hundreds of millions

of dollars through third party customers, and the
indemnifications and guaranties that Refco extended with regard
to RGHI's performance in relation to those loans were all related
party transactions.  As COLLINS understood, they were related
party transactions both because RGHI and Refco were related
parties through RGHI's ownership interest in Refco and also
because Bennett was simultaneously an officer of Refco and an
owner-officer of RGHI.  COLLINS knew that these related party
transactions ought to have been disclosed in the "Certain
Relationships and Related Transactions" section and yet omitted
them from that section when participating in its drafting.

### Refco Plans to Offer Notes Publicly and Take Refco Public

50.  At all times during the negotiations relating to
the LBO transaction, JOSEPH P. COLLINS, the defendant, understood
that Refco planned to register approximately $600 million of
senior subordinated notes under the Securities Act of 1933
("Securities Act") and to offer to exchange them for the LBO
Notes issued at the time of the LBO transaction.  The
registration of notes permitted them to be traded publicly.
Refco registered the notes under the Securities Act (the
"Registered Notes") on or about April 6, 2005, pursuant to a Form
S-4 registration statement filed with the SEC.

51.  At all times during negotiations of the LBO
transactions, JOSEPH P. COLLINS, the defendant, also understood

that Phillip R. Bennett and others intended to sell a portion of Refco to the public through an IPO of stock sometime after the LBO transaction closed.  The IPO occurred on or about August 10, 2005.

52.  During the entire period after the close of the LBO transaction and while efforts were being made to register the Registered Notes and to accomplish Refco's IPO, Refco's finances continued to be manipulated through quarter-end and year-end Round Trip Loan Transactions designed to hide the existence and size of the RGHI Receivable from Refco's auditors and investors. JOSEPH P. COLLINS, the defendant, continued to be responsible for drafting, or causing to be drafted, the documents that effectuated the transactions. COLLINS, along with other Law Firm attorneys acting at COLLINS's direction, drafted documents for the quarter- and year-end Round Trip Loan Transactions, similar to those described above, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Aug. 2004 | $485 million |
| Nov. 2004 | $545 million |
| Feb. 2005 | $345 million |
| May 2005 | $450 million |

53.  In addition, in February 2005, Refco engaged in an additional BAWAG Round Trip Loan Transaction in the amount of approximately $250 million.

54.   From in or about 2000 until in or about October
2005, JOSEPH P. COLLINS, the defendant, drafted and caused to be
drafted documents for at least 17 separate Round Trip Loan
Transactions -- effecting loans from Refco to RGHI, through third
party customers, of more than approximately $5.5 billion -- each
of which concealed the existence of the large related party debt
owed from RGHI to Refco from Refco's investors, potential
investors, banks, and auditors.

### Refco's Public Filings And Publicly Traded Securities

55.   In connection with the upcoming IPO, Refco filed
registration statements on Forms S-4 and S-1 with the SEC on or
about April 6, 2005, and August 8, 2005, respectively.  Each form
required the disclosure of, among other things: (a) certain
transactions between Refco and its management and (b) certain
debts owed directly or indirectly by any executive officer of
Refco to Refco.  These disclosures were required in order to
apprise investors of, among other things, potential conflicts of
interest by management.

56.   The Form S-4 registration statement was based on
the offering circular that JOSEPH P. COLLINS, the defendant,
helped draft in connection with Refco's sale of the LBO Notes in
or about August 2004.  The Form S-4 registration statement, like
the offering circular, contained sections entitled "Risk Factors"
and "Certain Relationships and Related Transactions."  The Form

S-4 registration statement likewise contained the material

misstatements and omissions included in the offering circular, as

described in paragraphs 47 and 49 above.  In addition to those

material misstatements and omissions, the Form S-4 registration

statement also contained Refco's audited financial statements,

which likewise failed to reflect any of the related party

transactions described above, including the debt owed to Refco

from RGHI.

57.   JOSEPH P. COLLINS, the defendant, also

participated in the drafting of Form S-1 registration statement.

Among other sections, COLLINS helped draft the section entitled

"Risk Factors."  Refco was required in this section to discuss

the most significant factors that might make an investment in

Refco common stock speculative or risky.  As COLLINS well knew,

this section of the Form S-1 registration statement contained

material misstatements and omissions because it failed to

disclose that: (1) Refco was owed hundreds of millions of dollars

by a related party, RGHI, that was solely owned and operated by

Bennett; and (2) as part of the Round Trip Loan Transactions,

Refco periodically incurred hundreds of millions of dollars in

obligations guaranteeing and indemnifying the performance of a

related party, RGHI, that was solely owned and operated by

Bennett.  Despite his participation in the drafting of the "Risk

Factors" section, COLLINS did not include these significant

33

undisclosed additional risk factors.  In addition to those
material misstatements and omissions, the Form S-1 registration
statement also contained Refco's audited financial statements,
which likewise failed to reflect any of the related party
transactions, including the debt owed to Refco from RGHI.

### Refco's August 2005 IPO

58.  On or about August 10, 2005, the public bought
approximately $583 million of Refco's common stock.  Following
the IPO, Refco's common stock was listed on the New York Stock
Exchange under the ticker symbol "RFX."

### End Of Quarter Round Trip Loan Transaction In August 2005

59.  In or about late August 2005, after the completion
of its IPO, Refco engaged in a final Round Trip Loan Transaction
in the amount of approximately $420 million with a Refco customer
that temporarily transformed all or part of the RGHI Receivable
into a receivable from that customer.  On or about August 31,
2005, after the end of Refco's second quarter, the approximately
$420 million Round Trip Loan Transaction was reversed.

### Refco's Public Disclosure Of Related Party Debt

60.  In or about early October 2005, an employee of
Refco who was not a coconspirator discovered that a receivable
from RGHI of approximately $430 million existed on Refco's books.
This discovery was brought to the attention of the audit
committee of Refco's board of directors, which demanded repayment

34

of the debt by Phillip R. Bennett.  Bennett repaid Refco

approximately $430 million on or about October 10, 2005, having

received an emergency loan in that approximate amount from BAWAG.

61.  On or about October 10, 2005, Refco issued a press

release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company
> believes that the receivable was the result of the
> assumption by an entity controlled by Mr. Bennett
> of certain historical obligations owed by
> unrelated third parties to the Company, which may
> have been uncollectible. The Company believes that
> all customer funds on deposit are unaffected by
> these activities. Independent counsel and forensic
> auditors have been retained to assist the Audit
> Committee in an investigation of these matters.

62.  Following Refco's announcement, the market price

of Refco stock plummeted, resulting in an aggregate decline in

shareholder value and market capitalization of more than

approximately $1 billion.

63.  On or about October 17, 2005, Refco, Inc. and

twenty-three of its subsidiaries or affiliates filed a petition

in bankruptcy in the United States Bankruptcy Court for the

Southern District of New York.  Refco's common stock was

subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

64.    From at least as early as in or about 1997 up to
in or about October 2005, in the Southern District of New York
and elsewhere, JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, Robert C. Trosten, Tone N. Grant, and others known and
unknown unlawfully, willfully, and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit offenses against the United States, namely: (a) to commit
fraud in connection with the purchase and sale of securities
issued by Refco, in violation of Sections 78j(b) and 78ff of
Title 15, United States Code, and Section 240.10b-5 of Title 17,
Code of Federal Regulations; (b) to make and cause to be made
false and misleading statements of material fact in reports and
documents required to be filed with the SEC under the Securities
Exchange Act of 1934 (the "Exchange Act"), and the rules and
regulations promulgated thereunder, in violation of Title 15,
United States Code, Sections 78o(d) and 78ff; (c) to make and
cause to be made false statements in a registration statement
filed under the Securities Act, in violation of Title 15, United
States Code, Section 77x; (d) to commit wire fraud, in violation
of Section 1343 of Title 18, United States Code; (e) to make and
cause to be made false statements and omissions to Refco's
auditors, in violation of Title 15, United States Code, Sections

78m and 78ff, and Title 17, Code of Federal Regulations, Section
240.13b2-2; (f) to commit bank fraud, in violation of Section
1344 of Title 18, United States Code; and (g) to commit money
laundering, in violation of Section 1957(a) of Title 18, United
States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

65.   It was a part and object of the conspiracy that
JOSEPH P. COLLINS, the defendant, and others known and unknown
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons and
entities, in connection with the purchase and sale of notes

37

issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

66.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings – Securities Act

67.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## Wire Fraud

68.   It was further a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

69.   It was further a part and object of the conspiracy that Phillip R. Bennett, being an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, and with the assistance of JOSEPH P. COLLINS, the defendant, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to

accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be made under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

### Bank Fraud

70.   It was further a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

71.   It was further a part and object of the conspiracy that certain members of Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully

and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

72. Among the means and methods by which JOSEPH P. COLLINS, the defendant, and his coconspirators would and did carry out the conspiracy were the following:

a.    Refco management, with the full knowledge of JOSEPH P. COLLINS, the defendant, misrepresented to the public the size of customer losses for which Refco was responsible.

b.    Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, transferred losses incurred by Refco to Bennett's company, RGHI.

c.    JOSEPH P. COLLINS, the defendant, helped Refco management conceal the size and related party nature of debt owed by RGHI to Refco by effectuating Round Trip Loan Transactions on behalf of Refco over fiscal year-end and fiscal quarter-end periods to move the RGHI Receivable to one or more Refco customers.

d.    Phillip R. Bennett, with the assistance of
JOSEPH P. COLLINS, the defendant, caused Refco to file materially
false and fraudulent statements with the SEC.

e.    Phillip R. Bennett, with the assistance of
JOSEPH P. COLLINS, the defendant, helped Refco management make
and cause to be made material false statements and omissions to
Refco's auditors.

f.    JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, and their coconspirators concealed from Thomas H. Lee
Partners and its representatives the size of the related party
debt owed to Refco by RGHI, associated related party
transactions, and the terms of Refco's relationship with, and
obligations to, BAWAG;

g.    JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, Robert C. Trosten and their coconspirators, used
facilities of interstate commerce, including the use of
interstate telephone calls, email, and interstate wire transfers,
in furtherance of the objects of the conspiracy.

**Overt Acts**

73.    In furtherance of the conspiracy and to effect the
illegal objects thereof, the following acts, among others, were
committed in the Southern District of New York and elsewhere:

a.    In or about 1997, Refco management, with the
full knowledge of JOSEPH P. COLLINS, the defendant,

misrepresented to the public the size of customer losses for which Refco was responsible.

       b.  On or about February 26, 2001, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett executed a guaranty letter on behalf of Refco that JOSEPH P. COLLINS, the defendant, prepared regarding an approximately $200 million loan from a Refco customer to RGHI.

       c.  On or about February 26, 2001, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett executed an indemnity letter on behalf of Refco that JOSEPH P. COLLINS, the defendant, prepared regarding an approximately $200 million loan from a Refco customer to RGHI.

       d.  On or about February 20, 2004, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed a guaranty letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $720 million loan from a Refco customer to RGHI.

       e.  On or about February 20, 2004, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $720 million loan from a Refco customer to RGHI.

f.    By no later than in or about March 2004,
JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett, agreed
to conceal the terms of the PPA from Thomas H. Lee Partners and
to conceal RGHI's approximately $676 million buy out of BAWAG's
right to participate in a sale of Refco under the terms of that
agreement.

g.    During a telephone conference in or about
March 2004, JOSEPH P. COLLINS, the defendant, misled a
representative of Thomas H. Lee Partners about the nature and
size of the receivables owed to Refco by related parties at the
time the LBO transaction was being negotiated.

h.    During a telephone conference in or about
March 2004, JOSEPH P. COLLINS, the defendant, concealed from a
representative of Thomas H. Lee Partners the role of Phillip R.
Bennett in guaranteeing and indemnifying loans made by third
parties to RGHI in connection with period-end and year-end Round
Trip Loan Transactions.

i.    In or about April 2004, JOSEPH P. COLLINS,
the defendant, and Phillip R. Bennett met with representatives of
Thomas H. Lee Partners in New York, New York and made
misrepresentations relating to the financial condition of Refco
to those representatives.

j.    On or about April 13, 2004, JOSEPH P. COLLINS
caused an email to be sent from the Chicago, Illinois offices of

44

the Law Firm to New York, New York attaching a document
containing misrepresentations relating to the financial condition
of Refco.

k.    On or about May 6, 2004, JOSEPH P. COLLINS,
the defendant, caused two emails to be sent from the New York,
New York offices of the Law Firm to a representative of Thomas H.
Lee Partners located in Texas that concealed the existence of the
terms of various agreements, including agreements concerning
related party transactions, the disclosure of which was requested
by Thomas H. Lee Partners.

l.    In or about June 2004, JOSEPH P. COLLINS, the
defendant, directed others not to disclose RGHI's planned
approximately $676 million buyout from BAWAG of its Participation
Right under the PPA.

m.    On or about June 7, 2004, JOSEPH P. COLLINS,
the defendant, caused an email to be sent from the New York, New
York office of the Law Firm to representatives of Thomas H. Lee
Partners in Texas that concealed the existence of the terms of
various agreements, including agreements concerning related party
transactions, the disclosure of which was requested by Thomas H.
Lee Partners.

n.    On or about February 23, 2005, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett signed a guaranty letter on behalf of Refco that was

45

prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

        o.   On or about February 23, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

        p.   On or about May 25, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed a guaranty letter on behalf of Refco that was drafted or caused to be drafted by JOSEPH P. COLLINS, the defendant, regarding an approximately $450 million loan from a Refco customer to RGHI.

        q.   On or about May 25, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was drafted or caused to be drafted by JOSEPH P. COLLINS, the defendant, regarding an approximately $450 million loan from a Refco customer to RGHI.

        (Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

74.  The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

75.  From at least as early as in or about 1997 through in or about 2004, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

> (Title 15, United States Code, Sections 78j(b) and 78ff; Title
> 17, Code of Federal Regulations, Section 240.10b-5; and
> Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The Grand Jury further charges:

76.    The allegations contained in paragraphs 1 through

63, 72 and 73 of this Indictment are repeated and realleged as if

fully set forth herein.

77.    From at least as early as in or about 1997 through

in or about October 2005, in the Southern District of New York

and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully,

willfully, and knowingly, directly and indirectly, by the use of

means and instrumentalities of interstate commerce, the mails,

and the facilities of national securities exchanges, did use and

employ, in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing devices, schemes, and artifices to defraud; (b)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of

business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR

### (False Filing With The SEC – Exchange Act)

The Grand Jury further charges:

78. The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

79. On or about July 19, 2005, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly made and caused to be made statements in a report and document required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLLINS and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., Refco's annual report on Form 10-K.

(Title 15, United States Code, Sections 78o(d) and 78ff; Title 17, Code of Federal Regulations, Section 240.15d-2; and Title 18, United States Code, Section 2.)

## COUNTS FIVE AND SIX

### (False Filing With The SEC – Securities Act)

The Grand Jury further charges:

80.  The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

81.  On or about the dates specified below, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, COLLINS and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|-----------------|------|
| FIVE  | April 6, 2005   | S-4  |
| SIX   | August 8, 2005  | S-1  |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

50

**COUNTS SEVEN THROUGH TEN**

**(Wire Fraud)**

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

83.  On or about the dates set forth below, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

| Count | Approximate Date | Wire Communication |
|-------|------------------|--------------------|
| SEVEN | April 13, 2004 | Email from Chicago, Illinois office of the Law Firm to New York, New York attaching clean and marked versions of April 13, 2004 letter to Phillip R. Bennett from Thomas H. Lee Partners |
| EIGHT | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning indemnifications |
| NINE | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning material contracts |

51

| Count | Approximate Date | Wire Communication |
|-------|-----------------|--------------------|
| TEN | June 7, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas and representatives of the bank syndicate and LBO Note purchasers |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT ELEVEN

### (Bank Fraud)

The Grand Jury further charges:

84.   The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

85.   On or about August 5, 2004, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC Bank USA, N.A., and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC Bank USA, N.A., whose deposits were insured by the Federal Deposit Insurance

Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

### FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE THROUGH TEN

86. As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five and Six of this Indictment; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine and Ten of this Indictment, JOSEPH P. COLLINS, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to at least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses.

**FORFEITURE ALLEGATION WITH RESPECT TO
COUNTS ONE AND ELEVEN**

87.  As a result of committing one or more of the
foregoing bank fraud offenses, in violation of Title 18, United
States Code, Section 1344, as alleged in Counts One and Eleven of
this Indictment, JOSEPH P. COLLINS, the defendant shall forfeit
to the United States pursuant to Title 18, United States Code,
Section 982, any property constituting or derived from the
proceeds obtained directly or indirectly as a result of the bank
fraud offenses, including but not limited to at least $800
million in United States currency, representing the amount of
proceeds obtained as a result of the charged bank fraud offenses.

**SUBSTITUTE ASSETS PROVISION**

88.  If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

(i)  cannot be located upon the exercise of due
diligence;

(ii)  has been transferred or sold to, or
deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of
the court;

(iv)  has been substantially diminished in value;
or

(v)  has been commingled with other property which
cannot be divided without difficulty;

54

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982 and Title 21, United States Code,

Section 853(p), to seek forfeiture of any other property of said

defendant up to the value of the forfeitable property described

above.

    (Title 18, United States Code, Sections 371, 981, 982, 1343,
    1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d),
    78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5,
    240.15d-2; Title 21, United States, Section 853(p); and Title 28,
            United States Code, Section 2461.)


_____

FOREPERSON

                              _Michael J. Garcia_
                              MICHAEL J. GARCIA
                              United States Attorney

55

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

THOMAS H. LEE EQUITY FUND V, L.P.,            :      Index No. 602774/07
THOMAS H. LEE PARALLEL FUND V, L.P. and       :
THOMAS H. LEE EQUITY (CAYMAN) FUND V, L.P.    :
                                              :      COMPLAINT
                        Plaintiffs,           :
                                              :
        - against -                           :
                                              :
GRANT THORNTON LLP,                           :
                                              :
                        Defendant.            :

------------------------------------------------------------x

FILED
AUG 16 2007
NEW YORK
COUNTY CLERK'S OFFICE

        Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V,

L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds" or

"Plaintiffs"), by and through their undersigned counsel, for their complaint against Grant

Thornton LLP ("Grant Thornton" or "Defendant"), allege on information and belief, except as to

those allegations describing their own actions, as follows:

                                    INTRODUCTION

        1.      This is an action for aiding and abetting fraud, misrepresentation and

professional malpractice brought by the THL Funds against Grant Thornton, in its capacity as the

former, purportedly independent auditor of Refco Inc. and certain of its predecessors,

subsidiaries and affiliates (collectively, unless reference is made to a specific entity, "Refco" or

the "Company"). The claims set forth herein are the result of Grant Thornton's material

misrepresentations and omissions to the THL Funds regarding, among other things, the absence

of certain related-party transactions, substantial bad debts and other significant risks of fraud at

Refco, as well as the completeness and accuracy of Refco's historical financial statements.

Grant Thornton's improper conduct discussed herein induced the THL Funds to invest more than

$450 million in Refco Group Ltd., LLC ("Refco Group"), the predecessor of the public

company, in August 2004 (the "August 2004 Acquisition").

2.    In June 2004, the THL Funds agreed to invest approximately $452 million

in Refco, then one of the nation's leading independent providers of execution and clearing

services for exchange traded derivatives. The investment was consummated approximately two

months later, in August 2004. The THL Funds made this investment only after the completion of

an extensive due diligence process, undertaken with the help of the THL Funds' affiliates and

numerous professional advisors over the course of more than ten months. As an integral part of

these efforts, the THL Funds engaged KPMG LLP ("KPMG") to conduct accounting due

diligence (including by meeting with Grant Thornton and obtaining, reading, commenting on and

making inquiries regarding Refco's audited financial statements for the fiscal years ended

February 28, 2002, February 28, 2003 and February 29, 2004) and assist the THL Funds in

assessing the risks of the proposed investment. Based in large part on the information provided

by Grant Thornton, the THL Funds, through the work of KPMG and their other advisors,

obtained sufficient comfort regarding Refco's financial condition and risk profile that they

determined to proceed with the investment.

3.    But despite the duty it had assumed to the THL Funds via its knowing

provision of financial information and risk assessments central to the THL Funds' investment

decision, as well as its professional obligations to Refco, Grant Thornton knowingly and/or with

gross negligence failed to alert the THL Funds to the existence of: (i) significant historical

related-party transactions; (ii) suspicious, recurring "reverse repurchase" (or "reverse repo")

transactions with third-parties that straddled the close of Refco's reporting periods and that did

not appear to serve any legitimate business purpose; or (iii) its long-standing concerns regarding

the potential for fraud at Refco, including a weak internal controls. These material and knowing omissions, much like the clean and unqualified audit opinions Grant Thornton issued with respect to Refco's fiscal 2003 and 2004 financial statements, kept hidden the fraudulent scheme then being perpetrated by Phillip Bennett ("Bennett"), Refco's former Chairman, President and Chief Executive Officer, and various others to hide worthless receivables and misrepresent Refco's true financial condition – which fraud ultimately led to the THL Funds losing hundred of millions of dollars. Indeed, the August 2004 Acquisition would not have occurred but for Grant Thornton's misrepresentations and omissions in its discussions with the THL Funds and their advisors.

4.     These misrepresentations and omissions continued even after the closing of the August 2004 Acquisition, when Grant Thornton assisted Refco in complying with an express condition of the Equity Purchase and Merger Agreement (the "Purchase Agreement") requiring Securities and Exchange Commission ("SEC") Regulation S-X compliant audited financial statements for fiscal years 2002 through 2004. Because Refco did not have Regulation S-X compliant audited financial statements for the fiscal year ended February 28, 2002, Grant Thornton – aware of the Purchase Agreement condition and in an effort to facilitate and induce the THL Funds' investment – undertook a re-audit of those financial statements. Grant Thornton ultimately completed this re-audit in or around October 2004, which, like its predecessor audits, again resulted in its issuance of an unqualified audit report on financial statements that failed to disclose the extent and nature of the Company's significant related-party transactions.

5.     Grant Thornton's misrepresentations and omissions, discussed in detail herein, render Grant Thornton liable to the THL Funds. As Refco's independent auditor, Grant Thornton was tasked – both specifically with respect to its Refco engagement and more generally

with respect to its obligations as an auditing professional – with examining and attesting to the accuracy and completeness of the Company's financial statements and disclosures. To that end, Grant Thornton, as compared to the THL Funds, was in the unique position of having years of knowledge and experience with Refco, as well as unfettered access to Company information, and subject to the exceedingly stringent professional obligations attendant to the conduct of an audit. Had Grant Thornton performed its audits in accordance with governing professional standards, it undoubtedly would have uncovered Bennett's fraudulent scheme. Grant Thornton, however, did no such thing.

6.    Grant Thornton's failure to uncover and/or disclose the ongoing fraud, or at least alert the THL Funds to its possibility, is even more egregious in light of the specific concerns raised by the Grant Thornton engagement partner on the audit, Mark Ramler ("Ramler"), who had been involved in the audits of Refco's financial statements in various capacities for over twenty years (more than a decade as the audit engagement partner). Ramler's (and, therefore, Grant Thornton's) extensive knowledge of and familiarity with Refco and its senior management caused him to categorize the Company (during his tenure with both Arthur Andersen LLP ("AA"), Refco's predecessor auditor through the fiscal 2002 audit, and Grant Thornton) as a "high-risk" client. Ramler believed – but never disclosed to the THL Funds or their advisors – that Refco:

    (a)    engaged in significant related-party transactions that constituted substantial obligations to the Company and required appropriate accounting and disclosure;

    (b)    lacked adequate internal controls;

    (c)    engaged in loan transactions with various third-parties, including Liberty Corner Capital Strategies, LLC ("Liberty Corner") and Delta Flyer, Inc. ("Delta Flyer"), that straddled the close of the Company's fiscal years 2003 and 2004, appeared to have no business purpose, and were not

11.    In this action, the THL Funds seek to recover from Grant Thornton the financial loss that they and their affiliates suffered, which loss could have been averted had it not been for Grant Thornton's knowing and/or grossly negligent misrepresentations and omissions to the THL Funds and their advisors regarding the accuracy and completeness of the Company's financial statements.  The THL Funds seek to hold Grant Thornton liable for the significant damage caused to them and their affiliates as a result of the actionable conduct described herein.

## JURISDICTION AND VENUE

12.    Jurisdiction is proper pursuant to CPLR §§ 301 and 302.  Defendant possesses sufficient minimum contacts with the state of New York to render the exercise of jurisdiction by a New York court permissible under traditional notions of fair play and substantial justice.  Although Defendant's principal place of business is in Illinois, Defendant maintains a presence and transacts business, including with respect to the auditing work, meetings and communications at issue in this action, in the state of New York.

13.    Venue is proper in this County under CPLR § 503, as none of the parties maintain their principal office in the state of New York.

## PARTIES

14.    Plaintiff Thomas H. Lee Equity Fund V, L.P. is a Delaware limited partnership.

15.    Plaintiff Thomas H. Lee Parallel Fund V, L.P. is a Delaware limited partnership.

16.    Plaintiff Thomas H. Lee Equity (Cayman) Fund V, L.P. is a Cayman Islands limited partnership.

17.    Defendant Grant Thornton, headquartered in Chicago, Illinois, is the United States member firm of Grant Thornton International and the fifth largest United States accounting firm. Grant Thornton served as Refco's outside auditor at all relevant times since March 2003, when it succeeded AA in that capacity. Grant Thornton provided auditing and accounting services to Refco prior to and in connection with the August 2004 Acquisition, including the issuance of clean and unqualified audit opinions on Refco's consolidated financial statements for the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004.

## FACTUAL BACKGROUND

18.    Until the revelation of the fraud perpetrated by Bennett and his co-conspirators, Refco had been a leading provider of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets. However, Grant Thornton's failure to adhere to the professional standards required of it, as well as Grant Thornton's failure to inform the THL Funds of its significant concerns regarding Refco, allowed Bennett's scheme to continue undiscovered. Wholly unaware of the fraud, and in reliance on the financial statements audited by Grant Thornton and Grant Thornton's direct representations and withholding of material facts relating thereto, the THL Funds, to their detriment, invested more than $450 million in the Company in August 2004.

### The Fraudulent Scheme Of Bennett And His Co-Conspirators

19.    According to the latest superseding indictment issued by a grand jury sitting in the United States District Court for the Southern District of New York (the "Indictment"), starting in the late 1990s, Bennett and certain other former Refco officers and shareholders schemed to hide the true financial health of Refco from investors, lenders,

regulators and the public. Bennett and his co-conspirators did so in order to sell the Company, in whole or in part, for their own benefit. As detailed therein, their conduct included orchestrating a series of sham loan transactions (which have come to be referred to as the "round-trip loans"), designed to hide customer and proprietary trading losses and otherwise mask Refco's true financial condition. These transactions rendered Refco's financial statements for the relevant periods materially false and misleading.

20.       According to the Indictment, in the 1990s Refco directly and indirectly incurred a series of substantial trading losses. In addition to proprietary trading losses, certain Refco customers to which Refco had extended credit incurred hundreds of millions of dollars of losses in their Refco accounts. These losses collectively were material to Refco's reported results of operations. Accordingly, when the customers could not repay the loans that Refco had extended, rather than disclosing these proprietary and customer trading losses, and writing them off as required, Bennett embarked on a fraudulent scheme to hide them and thereby mask Refco's true financial condition.

21.       The first step in the fraudulent scheme involved removing these uncollectible receivables from Refco's books by transferring them to RGHI – which was not consolidated with the other Refco entities – thereby creating a large receivable that RGHI owed to Refco and that at times totaled more than $1 billion (the "RGHI Receivable"). This receivable was composed of debit balances in three Refco accounts: RGHI's accounts at Refco Capital Markets, Ltd. ("RCM") and at Refco Capital Corporation (later, Refco Capital LLC) ("RCC"), and the RCM account of Refco Global Finance ("RGF").

22.       The first sham transactions orchestrated by Bennett occurred in 1998 and 1999 and entailed a series of loans from unaffiliated third parties to RGHI in late February of

each year immediately before the end of Refco's fiscal year, with the loans being repaid shortly after the close of the period. Bennett and his co-conspirators also caused Refco to engage in undocumented yearly transactions from February 2000 through February 2005 with an Austrian bank, BAWAG P.S.K. Bank für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG"), the former 10% owner of Refco, that were used to pay down the RGHI Receivable at the end of Refco's fiscal year.

23.    In February 2000, Bennett also began to orchestrate a series of round-trip loan transactions with unrelated entities to hide the RGHI Receivable. Ultimately, Refco engaged in 17 sham round-trip loan transactions over a period of more than four years – not a single one of which was accurately identified and reported by Grant Thornton to the THL Funds or their advisors. Each of these 17 sham round-trip loan transactions followed a similar pattern. A Refco entity, generally RCM, would make a loan to an unaffiliated customer. Simultaneously, the customer would make a loan in the same amount to RGHI, which funds RGHI would use to pay down its obligation to Refco. Refco Group unconditionally and absolutely guaranteed the prompt and complete performance of all of RGHI's obligations and liabilities under the loan agreement, including repayment. As a result of these "loans," Refco's financial statements did not reflect related-party transactions from RGHI, but instead reflected receivables in those amounts from third-parties unaffiliated with Refco, Bennett or RGHI. In addition, Refco's financial statements never revealed the existence of the related-party guarantee by Refco of RGHI's obligations.

24.    To enable the customers to profit from this arrangement, the interest rate that RGHI paid the customers for their "loans" was between 15 and 100 basis points higher than the interest rate that the customers paid Refco on the Refco "loans." The net profit made by the

customers on each transaction ranged from $1,500 to almost $200,000, depending on the amount loaned, the interest spread and the duration of the transaction. Although characterized as loans, generally no funds were actually transferred other than the customer's profit from the interest spread.

25.     A few days after the end of each Refco financial reporting period, the transactions were unwound. Refco would lend the money back to RGHI (thus increasing the amount owed by RGHI to Refco), which RGHI then used to pay back the unrelated customer the full amount of the loan.

26.     Not only were these loans unwound within days of the end of Refco's financial reporting period, but in each instance, the third-party customer was insulated from any economic risk, given Refco Group's unconditional and absolute guarantee of all of RGHI's obligations and liabilities to the customer under the loan documents, including the obligation to pay principal and interest. In addition, Refco Group agreed to defend, indemnify and hold harmless the third-party customer from and against, among other things, any claims, losses or liabilities imposed upon or suffered by the customer as a result of any claim of a third-party arising out of or based on the loan transactions. Bennett stood on both sides of each transaction: on behalf of RGHI, he signed the documentation for each loan to RGHI, and on behalf of Refco Group, with one exception, he also signed the guarantees and indemnities. The corresponding RCM loans to the customer were generally executed by Santo Maggio, the former President and CEO of Refco Securities, LLC ("RSL") and the former President of RCM, although Bennett executed one, and several were executed by another Refco executive.

27.     These round-trip loans were essentially sham transactions with absolutely no risk to the third-party. They thus lacked economic substance and were undertaken by Bennett

and his co-conspirators solely in furtherance of an illegal scheme to defraud investors, financial institutions, regulators and the public so that they could eventually reap millions of dollars from the sale of all or part of Refco. As detailed in the Indictment, Bennett caused the reduction of the RGHI Receivable in this manner at every fiscal year-end from at least February 28, 1998 and at every fiscal quarter-end from May 2004 through August 2005. At the end of each annual reporting period, first AA and later Grant Thornton audited Refco's books and issued clean and unqualified audit opinions on financial statements that did not disclose the round-trip loans or the full extent of the RGHI Receivable.

28.    As a result, the Refco financial statements, audited by AA and then Grant Thornton, were materially false and misleading and did not fully and fairly, accurately, completely or truthfully represent the Company's financial condition. The round-trip loans and the RGHI Receivable were related-party transactions and material contracts and, because of the Refco guarantees, obligations of Refco, both of which were required to be disclosed (including to the THL Funds and their advisors in connection with the August 2004 Acquisition), but were not. As discussed at length below, sufficient information was available to Grant Thornton as to the means by which the fraud was perpetrated, which Grant Thornton willfully ignored and/or was grossly negligent in failing to discover and disclose.

**Grant Thornton's Refco Engagement**

29.    Beginning in the late 1980s and continuing through the audit of Refco's consolidated financial statements for the fiscal year ended February 28, 2002, AA served as the Company's independent auditor. During the final ten years of AA's tenure, Ramler served as the engagement partner on the Refco audit team (after serving in more junior capacities since the 1980s), with various other individuals performing the roles of audit manager, audit senior and staff auditors. When AA ceased functioning as an auditing firm in mid-2002, Ramler joined the

New York office of Grant Thornton as a partner. Later that year, Ramler proposed Refco to Grant Thornton as a prospective client. Grant Thornton accepted the engagement in March 2003 with Ramler continuing to serve as the engagement partner.

30. Based on his lengthy tenure overseeing the Refco audits, Ramler was knowledgeable regarding Refco's business and the relationships between its various entities. Ramler believed he had such a close relationship with the Company that management would not have engaged in any transactions without first seeking his thoughts and advice. Ramler further acknowledged that Bennett and other members of Refco's senior management called him on an almost daily basis to discuss transactions and business issues.

31. This extensive and intimate knowledge led Ramler, while at both AA and Grant Thornton, to categorize Refco as a "high-risk client," in part because it engaged in significant and complex related-party transactions. As Ramler explained in an April 11, 2005 memorandum to the Grant Thornton files: "[T]he risk of fraud has to be seriously considered with the LBO and the potential IPO. The IPO price will be based on a multiple of proforma earnings so there is a considerable gain to shareholders in overstating earnings in presenting the most favorable financial picture." Ramler, however, never once informed the THL Funds or their advisors – including KPMG, which (as Grant Thornton was aware) had been retained specifically to assess the risks of the THL Funds' proposed investment -- of any of these concerns.

32. Grant Thornton conducted financial statement audits for Refco's fiscal years ended February 28, 2003, February 29, 2004 and February 28, 2005. At first, Grant Thornton's audits included Refco and the stand-alone financial statements of its subsidiaries

RCC and RCM.[1]  Grant Thornton never conducted audits of RGF, a third Refco subsidiary involved in Bennett's financial statement manipulations, and no longer separately audited RCC when it conducted its financial statement audit for the fiscal year ended February 28, 2005.

33.    Grant Thornton was paid a total of $9,279,568 in professional fees for the financial statement audit and review services it provided to Refco during the years 2003 through 2005.

### Grant Thornton's Integral Role In The August 2004 Acquisition

34.    In October 2003, Credit Suisse First Boston LLC ("CSFB") issued a Confidential Information Memorandum in connection with the potential sale of Refco.  CSFB characterized Refco as "a unique financial services firm and the largest derivatives clearing firm in the world."

35.    Following a period of negotiations, on November 4, 2003, Thomas H. Lee Partners, L.P. ("THL Partners"), an affiliate of the THL Funds, executed a confidentiality agreement for "consideration of the possible acquisition" of Refco, and on November 23, 2003, THL Partners, on behalf of the THL Funds, submitted an initial bid for the Company.  On February 6, 2004, after multiple meetings with Refco management and CSFB, THL Partners submitted a revised bid for the Company and was invited to commence due diligence for a potential acquisition.

36.    Because Refco's financial statements and risk profile were integral to the THL Funds' investment decision, the THL Funds retained KPMG, among others, to assist in their diligence efforts.[2]  As Grant Thornton was keenly aware, KPMG was specifically tasked by

---

[1] Another accounting firm, Goldstein Golub Kessler, LLP, audited RSL.

[2] The THL Funds also engaged Weil, Gotshal & Manges LLP to perform legal and regulatory due diligence, and McKinsey & Company to conduct customer surveys across Refco's business lines and to analyze and forecast

the THL Funds to conduct a detailed assessment of the Company's financial reporting for the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004, and the risks of the proposed investment. As part of their duties, KPMG principally: (a) analyzed Refco's quality of earnings, including non-recurring and normalizing items; (b) determined whether there were any unusual and aggressive applications of accounting policies; and (c) assessed the quality of the Company's assets, including the credit risk attendant to Refco's customer receivables, and the completeness of its reported liabilities.

37.     In the course of the diligence process, the THL Funds and their advisors, including KPMG, were provided with, among other things, audited financial statements for Refco for the periods set forth above – with respect to which both A.A. (for 2002) and Grant Thornton (for 2003-04) issued clean and unqualified audit opinions. These financial statements, which Grant Thornton knew were of the utmost importance to the THL Funds' investment decision, purported to present fairly in all material respects the consolidated financial position and operating results of the Company, and (as discussed below (see infra, ¶¶ 71-79)) were represented by Grant Thornton, among others, to be complete, correct and accurate reflections of Refco's financial position, including as to the value and nature of all receivables and the proper treatment of all related-party transactions.

38.     KPMG also reviewed certain audit work papers that Grant Thornton prepared in connection with its audits of Refco's consolidated financial statements for the fiscal years ended February 28, 2003 and February 29, 2004. The materials provided to KPMG by Grant Thornton included the following:

---

industry growth. Sandler O'Neill & Partners, a well-known investment firm specializing in financial services companies, analyzed Refco's position within the market, Marsh & McLennan assessed risk management and the adequacy of insurance, and Mercer Human Resource Consulting reviewed human resource issues.

(a)  Refco Group consolidation schedules as of February 28, 2003 and
February 29, 2004;

(b)  audited financial statements as of February 28, 2003 and February 29,
2004 for certain Refco subsidiaries;

(c)  audit confirmations for, among other things, cash and bank balances,
margin balances and receivable balances at fiscal year-end; and

(d)  other work papers relating to Refco's year-end regulatory filings with the
SEC and CFTC.

39.    Following the completion of the THL Funds' due diligence efforts, on
August 5, 2004, the August 2004 Acquisition closed and the THL Funds acquired from RGHI
roughly a majority of the equity interests in Refco for approximately $452 million in cash.
During the course of the transaction, and at the time of the closing, the THL Funds were not
aware of, and could not with reasonable diligence have learned of, the fraudulent scheme. The
THL Funds relied to their detriment on the accuracy and integrity of the representations and
other information provided directly to them and their advisors by Grant Thornton in deciding
whether to proceed with the August 2004 Acquisition. Had truthful and complete information
been provided by Grant Thornton, or had Grant Thornton, at the very least, alerted the THL
Funds or their advisors to what it knew to be suspicious, recurring transactions straddling the
close of Refco's reporting periods (and through which the fraud was effected) or its significant
concerns regarding the potential for fraud at Refco – especially considering the importance
placed by the THL Funds on the Company's financial statements and condition in determining
whether to proceed with the investment – the THL Funds could have averted their loss.

**Grant Thornton's Fraudulent And/Or Grossly Negligent Refco Audits**

40.    As the Company's purportedly independent auditor, Grant Thornton had
unfettered access to internal Company documents and financial statements from which the
fraudulent scheme was, or, if not for Grant Thornton's gross negligence, should have been,

evident or detectable. However, none of this information, much less Grant Thornton's significant concerns regarding the potential for fraud at Refco, was reflected in the Company's financial statements or otherwise disclosed by Grant Thornton to the THL Funds or their advisors, who (as Grant Thornton was aware) were specifically assessing the risks of the contemplated investment.

### Professional Standards Governing Auditors

41.      Auditors are obligated to plan and perform their respective audits in accordance with Generally Accepted Auditing Standards ("GAAS"), and to adhere to the ethical requirements of the accounting profession, including the American Institute of Certified Public Accountants (the "AICPA") Code of Professional Conduct, Rule 202, requiring compliance with GAAS. The AICPA's Auditing Standards Board issues pronouncements, known as Statements on Auditing Standards ("SAS"), that amplify, modify and interpret the general, fieldwork and reporting standards that govern the practice. The SAS have been codified in a volume of professional standards, referred to as auditing interpretations, which are cited as "AU." When conducting an audit, the auditor must consider the SAS and justify any departures therefrom.

42.      The goal of a financial statement audit by an independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, the financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. To achieve this objective, the auditor "has the responsibility to plan and perform the audit to obtain reasonable assurances about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02.

43.      An independent auditor is required to plan and perform his or her work with due professional care. Due professional care requires the auditor to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of

NY1-1506787GRW@N70H.DOC\77336.0061                          17

audit evidence. The auditor should use the knowledge, skill and ability called for by the accounting profession to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. "Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit process, professional skepticism should be exercised throughout the audit process." AU § 230.08, SAS 82. In exercising professional skepticism, the auditor "neither assumes that management is dishonest nor assumes unquestioned honesty" and "should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU § 230.09, SAS 82.

44.     AU § 339, titled "Audit Documentation," provides that information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions reached concerning significant matters. Accordingly, the work papers should contain, among other things, documentation sufficient to show that the audit evidence obtained, the auditing procedures applied, and the testing performed have provided sufficient competent evidential matter to afford a reasonable basis for an opinion. Likewise, SAS 31, titled "Evidential Matter," provides that an opinion on financial statements is not warranted without adequate attention to underlying accounting data (i.e., the auditor bears an obligation to obtain sufficient and competent audit evidence to afford a reasonable basis for an unqualified audit opinion). This obligation requires more than blind reliance on management, as SAS 1, titled "Due Professional Care in the Performance of Work," explicitly states that an auditor should not be satisfied with less than persuasive evidence simply because of a belief that management is honest.

45.     AU § 334, titled "Related Parties," sets forth the requirements for auditing related-party transactions, including the requirement that the auditor "[r]eview accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." The procedures identified should provide reasonable assurance that identified related-party transactions do not contain misstatements that, when aggregated with misstatements in other balances or classes of transactions, could be material to the financial statements taken as a whole. As in examining other material account balances, the auditor needs to consider the audit risk posed by related-party transactions and then design and apply substantive tests to evaluate management's assertions. "The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be." AU § 9334.19. For each material related-party transaction (or aggregation of similar transactions) requiring disclosure, and in order to assess the adequacy of that disclosure, the auditor should consider whether he or she has obtained sufficient competent evidentiary matter to understand the relationship of the parties and the effects of the transaction on the financial statements.

46.     AU § 316, titled "Consideration of Fraud in a Financial Statement Audit," based on SAS 82 (replaced in October 2002 by SAS 99), establishes an auditor's underlying responsibility to obtain reasonable assurance as to whether the financial statements are free of material misstatement.

(a)     SAS 82, in effect prior to October 2002, required an auditor to specifically assess the risk of material misstatement due to fraud.

(b)     SAS 99, which replaced SAS 82 for audit periods ending on or after December 15, 2002, expands the necessary risk assessment and requires discussion or

"brainstorming" among audit engagement personnel regarding the risks of material misstatement due to fraud. SAS 99 cautions practitioners that management is in a unique position to perpetrate fraud because of its ability to directly or indirectly manipulate accounting records and prepare fraudulent financial statements by overriding established controls that otherwise appear to be operating effectively. Grant Thornton itself has described its SAS 99 obligations as follows:

> SAS 99, *Consideration of Fraud in a Financial Statement Audit*, requires us to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.
>
> Inquiries of management relating to fraud:
>
> — Are you aware of any instance of fraud or suspected fraud with respect to the Company?
>
> — What are your views about the risks of fraud with respect to the Company?
>
> — Where/in which areas do you believe that fraud could occur?
>
> — What is your assessments [sic] of the controls in place to prevent and/or detect fraud?

47.     As explained in greater detail below, Grant Thornton failed to follow and comply with many of the foregoing provisions and interpretations, among others, and failed to adhere to its own acknowledged obligations during its tenure as the Company's auditor and in connection with its discussions with the THL Funds and their advisors prior to August 2004 Acquisition.

*Grant Thornton Failed To Properly Audit Refco's Related-Party Transactions*

48.     As discussed above (see supra, ¶ 31), Grant Thornton, and AA before it, had characterized Refco as a "high-risk client." In fact, Grant Thornton was aware that Refco engaged in substantial and complex related-party transactions, and was also aware of the risks inherent in transactions of that nature, yet it failed to audit those transactions in accordance with

GAAS or appropriately require the disclosure of their existence. As also discussed above (see supra, e.g., ¶ 45), GAAS requires auditors to pay significant attention to related-party transactions due to the inherent conflicts of interest. In addition:

    (a)    SFAS No. 57, titled "Related Party Disclosures," requires that all related-party transactions be disclosed in the company's financial reports, including the nature of the relationship and a description of the transaction (including the amount in question).

    (b)    SFAS No. 57 warns that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis." Similarly, AU § 9334, titled "Related Parties: Auditing Interpretations of Section 334," states at paragraph 18: "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." AU § 334, titled "Related Parties," provides that independent auditors should be particularly aware of transactions that can be designed or manipulated to obscure related-party transactions.

Notwithstanding these obligations, Grant Thornton did nothing.

49.    In the course of conducting its Refco audits, Grant Thornton came across numerous "red flags" pointing to a fraudulent scheme involving the round-trip loans, but it failed to act on those "red flags," as was its obligation. Indeed, Grant Thornton chose not to even identify any of its concerns for the THL Funds and their advisors, which, had they done so, would have alerted the THL Funds and their advisors to the need for additional investigation, if not enabled them to avoid the investment altogether.

### Grant Thornton Was Aware That Refco Engaged In, But Failed to Disclose Significant Related-Party Transactions

50.    During his tenure at AA, Ramler became familiar with issues concerning Refco's related-party transactions. In fact, when Ramler proposed Refco to Grant Thornton as a client and completed Grant Thornton's new client evaluation form, Ramler indicated that Refco engaged in significant related-party transactions with certain related parties that either had not

been audited or had been audited by firms other than AA. Ramler also brought to Grant

Thornton's attention the existence of material related-party receivables between Refco Group

and RGHI (which entity Ramler described as a shell with no operations other than this

relationship) – totaling approximately $170 million as of February 28, 2002 – and his belief that

related-party transactions between the two entities created a high risk of material misstatement.

51.     In addition, Ramler brought to Grant Thornton's attention the fact that

BAWAG, the former 10% owner of Refco Group prior to the August 2004 Acquisition, was a

related-party with which Refco similarly engaged in substantial related-party transactions.

52.     RGHI and BAWAG were not merely related-parties – they were related-

parties that were <u>not</u> audited by Grant Thornton and, accordingly, should have been viewed by

Grant Thornton with greater skepticism.  In such circumstances, Grant Thornton was obligated to

implement additional audit procedures in order to obtain independent verification of the nature of

the subject transactions.  Specifically, AU § 334 requires that in auditing related-party

transactions, the auditor "[r]eview accounting records for large, unusual, or nonrecurring

transactions or balances, paying particular attention to transactions recognized at or near the end

of the reporting period."  In addition, AU § 9334.19 provides that "[t]he higher the auditor's

assessment of risk regarding related party transactions, the more extensive or effective the audit

tests should be."

53.     But despite its knowledge of related-party transactions between Refco

Group, on the one hand, and both RGHI and BAWAG, on the other hand – again, entities that

were not audited by Grant Thornton – and even after assessing the existence of these transactions

as a "high-risk" factor, Grant Thornton failed to implement <u>any</u> procedures to bring about the

disclosure of the following 17 sham round-trip loan transactions that Refco engaged in with

unrelated entities to hide the RGHI Receivable and mask Refco's true financial condition

(including from the THL Funds and their advisors). Each of these transactions was structured as

described in ¶¶ 19-28, above, and timed to coincide with Refco's February fiscal year-ends and,

beginning in May 2004, Refco's quarter-ends:

(a) On or about February 25, 2000, Refco engaged in a $150 million sham loan transaction with CIM Ventures, Inc. ("CIM Ventures"), an Ingram Micro, Inc. ("Ingram") subsidiary, which transaction was unwound on March 9, 2000.

(b) Also on February 25, 2000, Refco engaged in a $110 million sham round-trip loan transaction with CS Land Management, LLC ("CS Land") that was unwound on March 3, 2000.

(c) Also on February 25, 2000, Refco engaged in a $50 million sham round-trip loan transaction with EMF Core Fund ("EMF") that was unwound on March 3, 2000.

(d) On February 23, 2001, Refco engaged in a $250 million sham round-trip loan transaction with CIM Ventures that was unwound on March 6, 2001.

(e) On February 26, 2001, Refco engaged in a $200 million round-trip loan transaction with Delta Flyer that was unwound on March 2, 2001.

(f) On February 25, 2002, Refco engaged in a $175 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2002.

(g) Also on February 25, 2002, Refco engaged in a $125 million round-trip loan transaction with Beckenham Trading Company, Inc. ("Beckenham") that was unwound on March 4, 2002.

(h) Also on February 25, 2002, Refco engaged in a $325 million round-trip loan transaction with Liberty Corner that was unwound on March 4, 2002. This was the first of ten such round-trip loan transactions that Refco undertook with Liberty Corner.

(i) On February 21, 2003, Refco engaged in a $150 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2003.

(j) Also on or about February 21, 2003, Refco engaged in a $500 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2003.

(k) On February 20, 2004, Refco engaged in a $720 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2004.

(l) On May 27, 2004, Refco engaged in a $700 million round-trip loan transaction with Liberty Corner that was unwound on June 7, 2004. This transaction occurred simultaneously with the drafting and negotiating of the Purchase Agreement for the August 2004 Acquisition, which was executed on June 8, 2004.

(m) On August 25, 2004, Refco engaged in a $485 million round-trip loan transaction with Liberty Corner that was unwound on September 7, 2004.

(n) On November 26, 2004, Refco engaged in a $545 million round-trip loan transaction with Liberty Corner that was unwound on December 3, 2004.

(o) On December 30, 2004, Refco engaged in a $550 million round-trip loan transaction with Liberty Corner that was unwound on or about January 5, 2005.

(p) On February 23, 2005, Refco engaged in a $345 million round-trip loan transaction with Liberty Corner that was unwound on March 8, 2005.

(q) On May 25, 2005, Refco engaged in a $450 million round-trip loan transaction with Liberty Corner that was unwound on or about June 6, 2005. This transaction occurred as Refco was preparing for its initial public offering of common stock (the "IPO").

54.    That Grant Thornton knew about at least some of these transactions, including their purpose, is evident from Ramler's handwritten notes, which connect the words "Liberty Corner Capital Strategy Fund LLC" with "$450 million . . . contract loan," clearly referring to the May 25, 2005 round-trip loan transaction referred to above. Underneath the reference to Liberty Corner is the phrase "clean up of interco accounts," which is a description of the transaction's purpose that Ramler only could have written if he was aware that these period end transactions were being used to hide related-party receivables.

55.    Furthermore, in connection with its fiscal 2003 audit of RCM, Grant Thornton was aware of both the February 21, 2003 Liberty Corner and Delta Flyer "reverse repo" transactions, in the amounts of $500 million and $150 million, respectively. As Grant

NY1:\1506787\04\W6\NT60\.DOC\77356.0064                    24

Thornton discovered in the course of that audit, the "trade date" and "maturity date" associated with each transaction – February 21, 2003 and March 4, 2003 – made clear that the transactions straddled the end of Refco's fiscal year, taking effect before year-end and being reversed immediately after the close. Although Grant Thornton performed additional credit risk testing on other RCM customer accounts, the Liberty Corner and Delta Flyer accounts were not selected for additional testing. Instead, and despite the suspicious nature of the transactions, Grant Thornton merely sent confirmation requests to Liberty Corner and Delta Flyer, with no further inquiry into the underlying circumstances.

56.    Grant Thornton discovered another such transaction in connection with its fiscal 2004 audit of RCM – this time another "reverse repo" transaction with Liberty Corner on February 20, 2004 in the amount of $720 million. Again, Grant Thornton sent a confirmation request to Liberty Corner, but this time also undertook an assessment of the potential credit risk associated with the debit balance created by the transaction. Following this assessment, Grant Thornton concluded that the entire $720 million debit balance had no collateral securing it, as is generally required for a "reverse repo" transaction. And, of course, Liberty Corner had no ability to repay its debit balance. Nevertheless, Grant Thornton did not identify Liberty Corner's RCM account as a credit risk, require the disclosure of the debit balance or the "reverse repo" transaction in Refco's audited financial statements for fiscal 2004, or alert the THL Funds to their existence. This was particularly egregious, as Grant Thornton understood from its meetings with KPMG (see, e.g., supra, ¶¶ 36-39, infra, ¶¶ 68-73) that the THL Funds were specifically assessing Refco's risk profile with respect to counter-party credit risk.

57.    Grant Thornton also learned of a November 26, 2004 Liberty Corner transaction, in the amount of $545 million, as well as an RGHI "reverse repo" on the same day in

the same amount, in the course of its interim review of Refco's November 2004 financial statements, the only difference between these two transactions being the interest rate (Liberty Corner was being charged 2.00%, while RGHI was being charged 2.75%). Because these transactions were discovered in connection with a review, as opposed to an audit, Grant Thornton did not send confirmation requests to Liberty Corner or RGHI. But Grant Thornton did conduct a credit risk analysis, which showed the Liberty Corner loan to be unsecured. When Grant Thornton asked management about this transaction, Richard Outridge of RCM stated that "there had been an [sic] reporting error on recording of the $545 million" and that the "[a]mount had been adjusted." It appears that Grant Thornton – despite its professional obligations as an auditor, including those referenced above (see supra, ¶¶ 41-47) – blindly accepted this explanation and did not further question or investigate the transaction or the possibility of an internal control weakness that would have allowed such an error to find its way into the Company's financial statements. Moreover, and even more troubling, it appears that Grant Thornton made no effort to scrutinize the related-party transaction with RGHI or to understand why Refco entered into that transaction in the first place.

58.    In addition, in or around the Spring of 2004, when Grant Thornton performed its re-audit of Refco's fiscal year ended February 28, 2002 – as discussed below (see infra, ¶¶ 78-79), for purposes of obtaining fiscal 2002 financial statements that complied with SEC Regulation S-X – Grant Thornton, based on its review of AA's original work papers, discovered three more of the "reverse repo" transactions referenced above, all straddling the fiscal year-end, with a "trade date" of February 25, 2002 and a "maturity date" of March 4, 2002 (namely, transactions with Liberty Corner ($325 million), Delta Flyer ($175 million) and Beckenham ($125 million)). Grant Thornton also discovered that the transactions, despite being

characterized by Refco as "reverse repos," similarly were not secured with the required

collateral. Again, Grant Thornton did nothing more than send confirmation requests to Liberty

Corner, Delta Flyer and Beckenham.

59.    Remarkably, even though Grant Thornton was aware that (i) Refco

participated in related-party transactions with RGHI and BAWAG; (ii) Refco was owed a very

large receivable from RGHI; (iii) the receivable had existed for a lengthy period of time; and (iv)

the receivable was unsecured – and despite Grant Thornton's knowledge of the round-trip loans

designed to hide the RGHI Receivable, which were mischaracterized as "reverse repos" given

the absence of underlying collateral – Grant Thornton did nothing to investigate these suspicious,

recurring transactions, did not require their disclosure in Refco's audited financial statements,

and never informed the THL Funds or their advisors that such questionable transactions were

occurring with alarming frequency and regularity.

60.    Grant Thornton was required by GAAS to investigate and obtain

supporting evidentiary documentation for the assertions made by the Company in its financial

statements and could not merely take the word of the Company's management about the

accuracy of those statements. Grant Thornton plainly failed in this regard.

*Grant Thornton Knew That Related-Party Transactions Presented*
*A High Risk Of Misstatement And Should Have Implemented*
*Procedures Aimed At Identifying Them*

61.    A 2004 SEC enforcement action against Grant Thornton made the risks

associated with related-party transactions even more apparent to the firm. In that action, the SEC

alleged that Grant Thornton permitted its audit client MCA Financial Corporation ("MCA") to

conceal material related-party transactions, of which Grant Thornton's auditors were allegedly

aware, in connection with MCA's SEC filings and public debt offerings. The SEC claimed that

Grant Thornton did not adequately plan the audit, act with sufficient skepticism in conducting

the audit, or obtain enough evidence to support its conclusions. Grant Thornton settled the administrative proceeding in exchange for its payment of a fine and its agreement to provide fraud detection training to its audit staff.

62.    As a consequence of this SEC proceeding, Grant Thornton should have been even more skeptical of, and sensitive to the risks associated with, related-party transactions. Instead, Grant Thornton's examination of the related-party receivable from RGHI was wholly ineffective, and Grant Thornton failed to implement procedures for identifying and ensuring the disclosure of that and other significant related-party transactions, such as:

(a)    obtaining the names of all related parties by either requesting the names from management personnel, reviewing Refco's filings with the SEC and other regulatory agencies or identifying guarantors for large receivables;

(b)    determining the trustworthiness of related-party transactions by assessing the extent and nature of the transactions, confirming the amounts and terms of the transactions and evaluating the probability of repayment of uncollected balances; and/or

(c)    reviewing Refco's accounting processes for the large and unusual transactions that were taking place at the end of each reporting period.

63.    In connection with Grant Thornton's audit for the fiscal year ended February 28, 2003, Ramler asked for and obtained, on April 28, 2003, a letter from Bennett representing that RGHI's shareholders intended to reduce the amount of the RGHI Receivable by at least $35 million per year, resulting in full payment by February 28, 2006. But Grant Thornton – despite its knowledge of the RGHI Receivable, the round-trip loans that straddled Refco's fiscal year-ends, and the purpose of those transactions to "clean up" Refco's inter-company accounts – appears to have made no effort to: (i) audit the actual amount of the RGHI Receivable; or (ii) determine if payments were actually being made by RGHI to reduce this debt.

64.    Grant Thornton's conduct also was deficient with respect to its auditing of related-party transactions with BAWAG. Grant Thornton had identified unsecured debit

balances, which would indicate unsecured loans to customers, as a risk area for Refco and

consistently obtained sufficient information to identify a large recurring debit balance in

BAWAG's RCM account as of Refco's fiscal year-ends. Although Grant Thornton had adopted

certain procedures applicable to related-party receivables and other related-party transactions –

such as an assessment of the transaction to verify its business purpose – Grant Thornton failed to

perform any of its own procedures with respect to these recurring debit balances (which, as later

revealed, represented BAWAG funds used by RGHI to effect the fraud), and failed to require

their disclosure or their nature or purpose in either Refco's fiscal 2003 or 2004 consolidated

financial statements.

66.    65.    Grant Thornton's failure to implement procedures for identifying and

ensuring appropriate disclosure of Refco's related-party transactions, and its failure to follow

proper audit procedures regarding the existence and amount of the receivable and the terms on

which it would be repaid, all in violation of GAAS, allowed Bennett to implement his scheme to

offload uncollectible receivables to RGHI while hiding such related-party transactions from the

THL Funds and their advisors and, later, the investing public.

*Grant Thornton Ignored Significant "Red Flags"*
*Indicative Of The Continuing Fraudulent Scheme*

66.    Grant Thornton willfully ignored and/or with gross negligence failed to act

upon (much less alert the THL Funds and their advisors to) numerous "red flags" in connection

with its Refco audit work identified as "fraud risk factors" in AU § 316, including:

(a)    "significant related-party transactions," in light of Grant Thornton's
awareness (and acceptance of the Company's non-disclosure) of the RGHI
Receivable and the hundreds of millions of dollars of loans that appeared
on the Company's books just after the beginning of each accounting
period and then disappeared just before the close of that period;

(b)    "journal entries used on a recurring basis . . . [that were] subject to the
entity's internal controls," including the repeated journal entries made at

every quarter-end and year-end over a period of several years to reflect loans being made to third-parties to conceal the related-party loans to RGHI, which were then reversed following the close; and

(c)     "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate," in that the Company's allowance for bad debts was dependent on significant and sensitive assumptions, such as its customers' financial condition, the likelihood of payment on receivables and the value of the underlying securities, of which the slightest change would materially alter the Company's financial results.

67.     Despite Grant Thornton's knowledge of and failure to implement appropriate audit procedures regarding the Company's significant related-party transactions, Grant Thornton, throughout the relevant period, continued to issue clean and unqualified audit opinions. By doing so, Grant Thornton wrongly signified to creditors and investors, including the THL Funds and their advisors, that it had determined, as a result of properly conducted audit procedures, that the Company's financial statements were prepared in accordance with GAAP and did not contain materially untrue statements or material omissions.

**Grant Thornton's Misrepresentations And Omissions To The THL Funds And False Or Grossly Negligent Re-Audit Of Refco's Fiscal 2002 Financial Statements**

68.     Throughout the THL Funds' due diligence in connection with the August 2004 Acquisition, Grant Thornton knowingly and/or with gross negligence made material misrepresentations to the THL Funds, their affiliates and advisors as to Refco's true financial condition, and provided clean and unqualified audit opinions for false and materially misleading financial statements, all of which induced the THL Funds to consummate the August 2004 Acquisition. Among other things, Grant Thornton nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of millions of dollars of customer losses and obligations. And, Grant Thornton failed to make such disclosure

notwithstanding its knowledge of, or grossly negligent failure to identify, information directly to

the contrary (including the round-trip loan transactions designed to mask the RGHI Receivable),

not to mention its significant concerns regarding the existence of related-party transactions.

       69.     There were several meetings between Grant Thornton and the THL Funds

or their advisors during which the misrepresentations were made. For instance, representatives

of KPMG, including John Berndsen and Ram Menon, acting on behalf of the THL Funds, met

with representatives of Grant Thornton, including Ramler, on or about February 19, 2004, at

Grant Thornton's New York City offices to discuss Grant Thornton's audit of Refco's

consolidated financial statements for the fiscal year ended February 28, 2003, as well as certain

of the firm's associated audit work papers. KPMG representatives met again with Ramler and

other Grant Thornton employees in New York City on or about May 7, 2004 to discuss Grant

Thornton's audit of Refco's consolidated financial statements for the fiscal year ended February

29, 2004, as well as certain of the firm's associated work papers -- which audit Grant Thornton

undertook after having already met with KPMG, and thus, armed with the knowledge that the

THL Funds were contemplating a significant investment in Refco.

       70.     At both the February and May 2004 meetings, Grant Thornton knew that

the THL Funds and their affiliates and advisors were relying on Grant Thornton's representations

in determining whether to proceed with the August 2004 Acquisition. By letters to Scott Schoen

of THL Partners dated February 16, 2004 and May 4, 2004, Grant Thornton confirmed:

> In connection with the proposed acquisition of Refco Group Ltd., LLC
> (the "Company") by Thomas H. Lee Partners, L.P. ("TH Lee Partners")
> and TH Lee Partners investigation of the financial affairs of the Company,
> the Company has requested that we allow KPMG LLP, who has been
> engaged by TH Lee Partners, access to our workpapers prepared in
> connection with our audit[s] of the February 28, 2003 [and February 29,
> 2004] consolidated financial statements of the Company. We have
> received authorization from management of the Company to allow KPMG

LLP access to certain workpapers prepared in the course of the audit[s] and to respond to questions related to those workpapers, upon your acceptance of this letter.[3]

71.    Specifically in that context, Grant Thornton, through Ramler and other Grant Thornton employees present at the February and May 2004 meetings, discussed Refco's audited financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, but either purposefully or with gross negligence withheld from KPMG the material information it possessed regarding:  (i) Refco's significant related-party transactions, including their existence and the appropriateness of their accounting and disclosure (or lack thereof); (ii) the suspicious, recurring, uncollateralized "reverse repo" transactions that straddled the close of Refco's fiscal year-ends (and certain interim periods), that did not appear to serve any legitimate business purpose, and that were "repaid shortly after each year-end;" or (iii) its long-standing concerns regarding the potential for fraud at Refco.

72.    In addition to these glaring, material omissions, Grant Thornton also made the following representations to KPMG, among others, which Grant Thornton knew at the time to be false:

(a)    the audits did not identify any material unusual, extraordinary and non-recurring income and expense items;

(b)    there were no significant issues with respect to Refco's IT control environment; and

---

[3] Grant Thornton's knowledge of the reliance being placed on its audit work for purposes of the August 2004 Acquisition is also made clear in the firm's July 2004 correspondence with Refco's senior lenders, CSFB, Banc of America and Deutsche Bank, in connection with the issuance of $600 million in senior notes in that transaction: "We have audited the consolidated balance sheets of Refco Group Ltd., LLC and its subsidiaries . . . as of February 29, 2004 and February 28, 2003, and the consolidated statements of income, members' equity, and cash flows for each of the years then ended included in the offering circular, (the 'Offering Circular') for the issuance of $600,000,000 of 9% Senior Subordinated Notes Due 2012 . . . dated July 22, 2004. . . . In our opinion, the consolidated financial statements audited by us and included in the Offering Circular comply as to form in all material respects with accounting requirements of the Act and the related published rules and regulations adopted by the SEC. . . ."

(c)    there were no outstanding accounting or reporting issues or disagreements with Refco's management.

73.    Ramler also made clear to KPMG, during both the February and May 2004 meetings, that Grant Thornton identified Refco's credit risk as the critical audit area and, accordingly, Grant Thornton focused on Refco's receivables from customers. Ramler also stated that reserves were held by Refco for material potential losses.

74.    In addition, the Purchase Agreement for the August 2004 Acquisition contained several representations and covenants relating to the accuracy of Refco's financial statements, as well as ultimately false disclosures regarding the Company's financial health of which Grant Thornton would or, if not for its gross negligence, should have been aware, including:

(a)    Section 3.9 Financial Statements, pursuant to which Refco furnished purportedly "true, complete and accurate copies" of its audited financial statements for fiscal years 2002-04, which "present fairly in all material respects the financial position . . . of [Refco] and its subsidiaries . . . and . . . are in conformity with . . . GAAP. . . . [Refco's] books and records . . . have been maintained in all material respects in accordance with applicable accounting requirements, reflect only bona fide transactions [and] are complete and correct. . . . [Refco] maintains systems of internal accounting controls sufficient to provide commercially reasonable assurances that all assets and transactions are accounted for in accordance with GAAP. . . . [N]either [Refco] nor any of the Subsidiaries . . . has any [undisclosed] debt, guaranty, liability, claim or obligation of any nature;"

(b)    Section 3.10 Absence of Undisclosed Liabilities, pursuant to which there were "[n]o material undisclosed liabilities;" and

(c)    Section 3.12 Interests of Officers and Directors, pursuant to which, and except as separately disclosed, "no officer, manager, director or member of [Refco] . . . has had . . . a material interest in any contract or agreement to which [Refco] . . . is a party."

75.    Many, if not all, of the foregoing representations and/or attestations were reiterated by Grant Thornton during telephone conferences or in regular e-mail correspondence

with the THL Funds and their advisors, including KPMG, between February 2004 and the closing of the August 2004 Acquisition.

76.    Grant Thornton's involvement in the August 2004 Acquisition, however, did not end there, as Grant Thornton was, among other things, directly involved in the discussions and ultimate determination regarding the structure of the transaction. In fact, by late July 2004, Grant Thornton had billed Refco a total of $1.2 million for fees incurred specifically in connection with the August 2004 Acquisition – namely, for: (i) "Accounting and other work related to the transaction;" (ii) "Quarterly reviews;" (iii) "Revised audited financial statements;" (iv) "Comfort letters;" (v) "Review of Offering Circular;" and (vi) "Review of valuations of intangibles."

77.    For the many reasons discussed above (see supra, ¶¶ 40-67), Grant Thornton knew, or was grossly negligent in not knowing, of the falsity of its representations to the THL Funds and their advisors and the consolidated financial statements with respect to which it had issued clean and unqualified audit opinions. As also discussed above, Grant Thornton failed to even apprise the THL Funds or their advisors of the firm's concerns regarding the potential for fraud at Refco – which, at the very least, would have enabled the THL Funds and their advisors to ask more targeted questions or undertake additional analysis or investigation. The THL Funds, which understandably placed a great deal of emphasis on Refco's financial reporting in determining whether to proceed with the investment, reasonably and in good faith relied on Grant Thornton's direct representations regarding the accuracy of Refco's financial statements, the procedures Grant Thornton employed and the conclusions it reached during the course of its audits.

78.    Moreover, the foregoing misrepresentations and omissions continued even after the August 2004 Acquisition.  As a condition to the closing of that transaction, Refco required SEC Regulation S-X compliant audited financial statements for the three years prior to fiscal year-end February 29, 2004.  As of August 2004, however, Refco did not have available audited financial statements for the fiscal year ended February 28, 2002 that complied with SEC Regulation S-X.  Accordingly, in addition to auditing Refco's financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, Grant Thornton undertook a re-audit of Refco's consolidated financial statements for fiscal year 2002.  The delivery of these audited (and Regulation S-X compliant) financial statements was made an express closing condition to the August 2004 Acquisition.  Section 5.10 of the Purchase Agreement specifically provided in this regard as follows:

> Section 5.10  2002 Financials.  The Company will use reasonable efforts to attempt to obtain and deliver to the Buyer prior to the Closing (but in any event, no later than sixty (60) days following the Closing) audited financial statements meeting the requirements of Regulation S-X promulgated by the SEC for financial statements included in filings of registration statements under the Securities Act of 1933, as amended, with respect to the Company's fiscal year ended February 28, 2002, which audited financial statements will be consistent with the financial statements covering such periods that previously have been delivered to the Buyer, except as such financial statements may be restated to reflect depreciation of intangible assets as required pursuant to Financial Accounting Standard 141.

79.    Between April and October 2004, Grant Thornton worked to complete the re-audit of Refco's consolidated financial statements for fiscal year 2002 in accordance with the terms of the Purchase Agreement and in an effort to facilitate and induce the THL Funds' investment, updating the THL Funds regularly on the firm's progress (including telephonic updates by Ramler to THL Partners).  Grant Thornton eventually completed the audit on or about October 8, 2004, again issuing a clean and unqualified opinion with respect to the Company's

consolidated financial statements, which financial statements again failed to disclose Bennett's

fraudulent scheme or the component transactions Grant Thornton had learned of, but chose not to

scrutinize or disclose, in the course of this very audit (see supra, ¶ 58).

### The Fraud Continues As The Company Prepares To Go Public

80.    The fraudulent scheme described above continued after the closing of the

August 2004 Acquisition.  As Refco commenced preparation for the IPO, Bennett and his co-

conspirators continued to hide the existence of hundreds of millions of dollars of related-party

transactions.  Again, the THL Funds and their advisors were not aware, and could not with

reasonable diligence have learned, of these fraudulent activities, which had been designed to

induce the THL Funds to proceed with the August 2004 Acquisition.

81.    Refco's Form S-1/A prospectus for the IPO, filed with the SEC on August

8, 2005, contained the following disclosure regarding Grant Thornton:

> Experts . . . The New Refco consolidated balance sheet as of 2/28/05 and
> the related consolidated statements of income, changes in members' equity
> and cash flows for the period 8/6/04-2/28/05 as well as the Refco Group
> consolidated balance sheet as of 2/29/04 and the related consolidated
> statements of income, changes in members' equity and cash flows for the
> period 3/1/04-8/5/04 and for the years ended 2/29/04 and 2/28/03 and
> schedules included in this prospectus and elsewhere in this Registration
> Statement have been audited by Grant Thornton LLP, independent
> registered public accountants, as stated in their reports with respect
> thereto, and is included herein in reliance upon the authority of said firm
> as experts in accounting and auditing.

82.    Shortly thereafter, on or about August 16, 2005, Refco completed its IPO,

pursuant to which underwriters sold 26,500,000 shares of common stock.

### The Fraud Is Revealed

83.    However, less than two months later, in early October 2005, members of

the Board of Directors of Refco Inc. (including the THL Funds' designees) learned for the first

time of the existence of an approximately $430 million obligation that RGHI owed to Refco.

NY1:\1506787\01:W@N70#:DOC\77356 0062                    36

The Audit Committee of the Board of Directors immediately began an internal investigation into Bennett's actions, retaining independent counsel and a forensic accounting firm. The Company also contacted the SEC, the CFTC and other regulatory bodies to report the wrongdoing.

84.    On October 10, 2005, Refco issued a press release announcing Bennett's manipulation of the Company's financial statements. After the Audit Committee consulted with Refco's independent accountants, Refco further announced that the Company's financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005 and May 31, 2005, taken as a whole, should no longer be relied upon. Shortly thereafter, Bennett was arrested and former Refco Chief Financial Officer Robert Trosten ("Trosten") and former Refco executive Tone Grant have since been indicted in connection with the scheme.

85.    After these developments, Refco's stock price declined precipitously and the NYSE ultimately halted trading. On October 17, 2005, Refco and certain of its subsidiaries or affiliates filed for Chapter 11 bankruptcy protection. Refco's common stock has been delisted and the securities purchased by the THL Funds in the August 2004 Acquisition are now worthless.

86.    As a result of Grant Thornton's knowing and/or grossly negligent failure to disclose to the THL Funds or their advisors the fraudulent scheme or the true nature of its underlying transactions – while at the same time issuing clean and unqualified audit opinions with respect to the Company's financial statements and burying its concerns regarding the potential for fraud at Refco and the existence of questionable period end transactions designed to "clean up" inter-company loans – the THL Funds have suffered damages in an amount to be

determined at trial, including, but not limited to, the hundreds of millions of dollars they lost on their equity investment.

### FIRST CLAIM FOR RELIEF
### (Aiding and Abetting Fraud)

87.    The THL Funds repeat and reallege each of the allegations contained in Paragraphs 1 through 86 inclusive, as if fully set forth herein.

88.    As described in detail above, Bennett and his co-conspirators designed and executed a fraudulent scheme to hide worthless receivables and misrepresent Refco's true financial condition, which had the express goal of inducing the August 2004 Acquisition. This conduct constituted a fraud on the THL Funds.

89.    At all relevant times, Grant Thornton was responsible for auditing and certifying Refco's consolidated financial statements in accordance with both GAAS and GAAP. Grant Thornton, however, did not conduct its audits with the requisite degree of skill and care required by an independent auditor. Instead, Grant Thornton knew, at all relevant times, that Bennett – Ramler's long-time client -- was looking to sell a large equity interest in the Company, and that disclosure of the ongoing fraudulent scheme, or even disclosure of its component transactions, would jeopardize Bennett's ability to do so. Thus, Grant Thornton consciously avoided confirming facts or implementing procedures that would have revealed the fraud being perpetrated on the THL Funds. As a result, Grant Thornton failed in its performance of its obligations to Refco and, specifically with respect to the August 2004 Acquisition, the THL Funds.

90.    As described in detail above, Grant Thornton knew of, or willfully ignored, the fraudulent conduct, in whole or in part, described herein. Nevertheless, Grant Thornton issued clean and unqualified audit opinions on the Company's financial statements for

the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004, which opinions (and, in certain respects, the underlying work papers) Grant Thornton knew were being reviewed and relied heavily upon by the THL Funds and their advisors, including KPMG. Based in large part on this information, the THL Funds, through the work of KPMG and their other advisors, determined to proceed with the August 2004 Acquisition. Thus, Grant Thornton substantially assisted the fraud perpetrated on the THL Funds by Bennett and his co-conspirators.

91.    As a direct and proximate result of Grant Thornton's actions, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.

## SECOND CLAIM FOR RELIEF
### (Misrepresentation)

92.    The THL Funds repeat and reallege each of the allegations contained in Paragraphs 1 through 91 inclusive, as if fully set forth herein.

93.    At all relevant times, and by virtue of its knowing provision of financial information and representations to the THL Funds, Grant Thornton was under a duty to act fairly and in good faith and to completely, truthfully and accurately convey and disclose to the THL Funds and their advisors all material information relating to Refco and Refco's financial condition, including the true status of its receivables and the existence and nature of all related-party transactions. Grant Thornton also was under a duty to refrain from providing information that it knew or, if not for its gross negligence, should have known was false or misleading.

94.    Grant Thornton possessed unique and specialized knowledge and expertise with respect to the subject matter of their communications with the THL Funds and their advisors. At all relevant times, Grant Thornton had superior information about Refco and repeatedly vouched for the information it provided concerning the Company's financial

condition, including the existence and nature of related-party transactions, knowing that this information was critical to the THL Funds' determination of whether to proceed with the August 2004 Acquisition. The THL Funds specifically relied on Grant Thornton's expertise and Grant Thornton's representations to the THL Funds were made with full knowledge of the confidence they enjoyed.

95.    Grant Thornton breached its duty to the THL Funds to accurately convey all material information by knowingly and/or negligently making the misrepresentations and/or omissions of material fact described herein. Grant Thornton misrepresented (knowingly and/or in gross negligence) to, or knowingly and/or with gross negligence withheld from, the THL Funds the material facts described herein and made such misrepresentations without any reasonable basis to believe them to be true so as to induce the THL Funds to consummate the August 2004 Acquisition.

96.    At the time of the foregoing misrepresentations and omissions, the THL Funds believed the information directly provided by Grant Thornton to be true and acted reasonably and justifiably in reliance thereon by investing in Refco. If the THL Funds had known of the falsity of the material facts that were represented, or had been aware of the material facts that had been withheld, they would not have consummated the August 2004 Acquisition. At all relevant times, Grant Thornton knew that the THL Funds would rely to their detriment on its material misrepresentations and omissions.

97.    As a direct and proximate result of Grant Thornton's actions, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.

## THIRD CLAIM FOR RELIEF
### (Professional Malpractice)

98.    The THL Funds repeat and reallege each of the allegations contained in Paragraphs 1 through 97 inclusive, as if fully set forth herein.

99.    With respect to Refco's consolidated financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, Grant Thornton sought and accepted a duty to conduct audits in accordance with GAAS.

100.    With respect to Refco's consolidated financial statements for the fiscal year ended February 28, 2002, Grant Thornton sought and accepted a duty to conduct a re-audit in accordance with GAAS.

101.    Grant Thornton was obligated to perform these services in a thorough, proper, skillful and diligent manner.

102.    At all relevant times, Grant Thornton was specifically aware that in auditing Refco's consolidated financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, it was to conduct an audit in accordance with GAAS on which the THL Funds would rely in connection with their evaluation of the August 2004 Acquisition.

103.    Moreover, at all relevant times, and at the direction of Refco and the THL Funds, Grant Thornton also was specifically aware that in re-auditing Refco's consolidated financial statements for the fiscal year ended February 28, 2002, it was to conduct an audit in accordance with GAAS that would render those financial statements SEC Regulation S-X compliant as a condition to the closing of the August 2004 Acquisition. And, Grant Thornton was aware that the THL Funds would not have consummated the August 2004 Acquisition absent the representation in the Purchase Agreement that Refco (with the assistance of Grant

Thornton) would deliver SEC Regulation S-X compliant audited financial statements for the fiscal year ended February 28, 2002.

104.    By issuing clean and unqualified audit opinions for financial statements that failed to disclose the numerous related-party transactions between Refco, RGHI and others during the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004 – which Grant Thornton knew were being reviewed and relied on by the THL Funds – Grant Thornton knowingly and/or with gross negligence failed to perform its services as Refco's independent certified public accountant in a thorough, proper, skillful and diligent manner, and failed to take reasonable steps to ensure that it conducted its audits in accordance with GAAS.

105.    Grant Thornton possessed unique and specialized knowledge and expertise with respect to the audit of Refco's consolidated financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, as well as its re-audit of Refco's consolidated financial statements for the fiscal year ended February 28, 2002. At all relevant times, Grant Thornton had superior information about Refco and repeatedly vouched for the information it provided concerning related-party transactions, knowing that this information was critical to the THL Funds' determination to consummate the August 2004 Acquisition. The THL Funds relied on Grant Thornton's expertise and Grant Thornton's statements were made with full knowledge of the confidence they enjoyed.

106.    As a direct and proximate result of Grant Thornton's actions, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.

WHEREFORE, the THL Funds demand judgment against Grant Thornton as follows:

(a)    awarding damages against Grant Thornton in an amount to be determined at trial, but not less than $245 million, plus interest;

(b)    awarding the costs and disbursements incurred in prosecuting this action, including a reasonable allowance for attorneys' and experts' fees and expenses; and

(c)    granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
August 16, 2007

WEIL, GOTSHAL & MANGES LLP

By: _____
Greg A. Danilow

767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――― x
:
THOMAS H. LEE EQUITY FUND V, L.P.,　　:　　07 Civ. 6767 (GEL)
THOMAS H. LEE PARALLEL FUND V, L.P.,　:
and THOMAS H. LEE EQUITY (CAYMAN)　　:　　FIRST AMENDED COMPLAINT
FUND V, L.P.,　　　　　　　　　　　　　　:
:
　　　　　　　　　　　Plaintiffs,　　　　　　:　　JURY TRIAL DEMANDED
:
　　　　　v.　　　　　　　　　　　　　　　　:
:
MAYER BROWN, ROWE & MAW LLP,　　　　　:
:
　　　　　　　　　　　Defendant.　　　　　　:
―――――――――――――――――――――――――――――― x

　　　　　Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V,

L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds"), by and

through their undersigned counsel, for their first amended complaint against Mayer Brown,

Rowe & Maw LLP ("Mayer Brown"), allege on information and belief, except as to those

allegations describing their own actions, as follows:

　　　　　1.　　　　This is an action brought for violations, alternatively, of the Securities

Exchange Act of 1934 or the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

and for violations of state law, to recover damages that the THL Funds suffered as a result of

repeated material misrepresentations and omissions that Mayer Brown made to them as part of a

scheme to defraud engaged in by Mayer Brown and several other co-conspirators.  Mayer

Brown, one of the largest law firms in the world, represented Refco Group Ltd., LLC, Refco's

former CEO Phillip Bennett ("Bennett"), and Bennett's personal holding company Refco Group

Holdings, Inc. ("RGHI") in connection with the THL Funds' purchase of a majority interest in Refco in 2004 (the "2004 Purchase").[1]

        2.      As set forth below, Mayer Brown senior partner Joseph P. Collins ("Collins") and other Mayer Brown attorneys, in furtherance of a long-running scheme masterminded by Bennett and his co-conspirators and designed (among other things) to conceal Refco's true financial condition and thereby facilitate the ultimate sale of all or part of Refco, repeatedly misled the THL Funds in connection with the 2004 Purchase. In response to the THL Funds' due diligence requests, Mayer Brown misled the THL Funds by both denying the existence of and hiding a series of virtually identical sham related-party transactions – transactions that Mayer Brown negotiated, documented, and facilitated over a five-year period on 17 separate occasions.  These sham transactions, which were in themselves related-party transactions, were designed to defraud potential purchasers (such as the THL Funds), lenders, and potential lenders by concealing the existence of a receivable owed to Refco primarily by RGHI, a company controlled by Bennett that was used to "park" substantial uncollectible debts owed to Refco and Refco's own trading losses and other expenses (the "RGHI Receivable").  In response to the THL Funds' due diligence requests, Mayer Brown also misled the THL Funds by both denying the existence of and hiding numerous corporate guarantees and indemnifications that Refco provided in connection with the sham transactions, each of which also constituted a related-party transaction that should have been disclosed to the THL Funds. ████████

████████████████████████████████████████

████████████████████████████████████████

---

[1]     Refco Group Ltd., LLC, Refco Inc., and their affiliates, subsidiaries, predecessors, and successors are collectively referred to as "Refco" or the "Company," unless reference to a specific Refco entity is made.  RGHI is excluded from this definition of Refco.



      3.      As the prepared remarks by the United States Attorney in connection with the recent indictment[2] filed against Collins make clear, Collins "was not merely a lawyer whose client was committing fraud and who should have caught on – Collins instead played an active and crucial part in perpetrating the Refco fraud."[3]  Moreover, Collins's role in the fraud was "vital because the people he lied to" – particularly the THL Funds – "believed him as a result of his long-standing relationship with [Refco] and his stature within the legal community."[4]

      4.      In this action, the THL Funds seek to recover the losses they have suffered as a result of the scheme and conspiracy in which Mayer Brown, Bennett, and others participated, alternatively under Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, or under 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations

---

[2]    See United States v. Collins, 07 Cr. 1170 (LBS), filed on or about December 18, 2007 (the "Collins Indictment").

[3]    Prepared Remarks Concerning United States v. Joseph Collins by United States Attorney Michael J. Garcia, December 18, 2007.

[4]    Id.

Act (for a conspiracy to violate 18 U.S.C. § 1962(c)), and under a number of state law claims pleaded below.[5]

## JURISDICTION AND VENUE

5.    The Court has jurisdiction over the First and Second Claims for Relief under 15 U.S.C. § 78aa.  The Court has jurisdiction over the Third Claim for Relief under 18 U.S.C. § 1964.  The Court has supplemental jurisdiction over the remaining Claims for Relief under 28 U.S.C. § 1367.

6.    Venue is proper in this Court under 18 U.S.C. § 1965 (a) and 15 U.S.C. § 78aa.

## PARTIES

7.    Plaintiff Thomas H. Lee Equity Fund V, L.P. is a Delaware limited partnership.  Its principal place of business and headquarters is located in Boston, Massachusetts.

8.    Plaintiff Thomas H. Lee Parallel Fund V, L.P. is a Delaware limited partnership.  Its principal place of business and headquarters is located in Boston, Massachusetts.

9.    Plaintiff Thomas H. Lee Equity (Cayman) Fund V, L.P. is a Cayman Islands limited partnership.  Its principal place of business and headquarters is located in Boston, Massachusetts.

10.    Many of the affirmative misrepresentations and omissions by Collins and other lawyers at Mayer Brown, as well as by Bennett and other co-conspirators, were received

---

[5]    Whether the interests in Refco that the THL Funds acquired in the 2004 Purchase were securities involves a mixed question of law and fact.  The economic reality of the THL Funds' investment in Refco was that control of Refco's business affairs and policies, as well as its day-to-day management, was reasonably expected to remain, and in fact remained, with Bennett and Refco's existing management even after the 2004 Purchase.  Should the Court conclude that (a) the interests acquired by the THL Funds in the 2004 Purchase are securities and (b) Mayer Brown can be held liable under Section 10(b) and Rule 10b-5, then the RICO claim should be dismissed without prejudice under 18 U.S.C. § 1964(c) to the extent it overlaps with the THL Funds' securities claims, pending the outcome of the indictment against Collins.

and relied upon by the THL Funds at their headquarters and principal place of business in

Boston, Massachusetts. The loss suffered by the THL Funds as a result of Mayer Brown's

misrepresentations and omissions was suffered in Boston, Massachusetts as well.

11.     Defendant Mayer Brown, Rowe and Maw LLP is among the largest law

firms in the world, with more than 1,500 lawyers operating in 14 major cities worldwide,

including Chicago, New York, and London. According to a footer on its website as of January

16, 2008, Mayer Brown is the combination of two limited liability partnerships, each named

Mayer Brown, Rowe and Maw LLP, one established in the State of Illinois and one in the UK.[6]

The combined Mayer Brown partnership is liable for the wrongful acts and omissions of the

lawyers who performed the work described herein.

12.     The combined Mayer Brown partnership should be treated as a single

entity for purposes of this action because, among other things:

(a)     Mayer Brown's United States and European partners have agreed to share,

and in fact do share, profits and losses. As reported by TheLawyer.com, since 2005, the

European and United States operations of the law firm have had one profit pool.

(b)     Mayer Brown's partners in the United States and Europe exercise joint

control and management over the combined law firm. Mayer Brown reported, in a press

release on its website, that Mayer Brown is "governed by an international management

committee, comprised of representatives from across the firm."

---

[6]     Since this litigation began, Mayer Brown has changed the footer, which now reads: "Mayer Brown is a global legal services organization comprising legal practices that are separate entities." See www.mayerbrown.com (last visited Feb. 14, 2008). But at least up until middle-to-late January 2008, the website stated that Mayer Brown is the combination of two limited liability partnerships, as stated above (See attached Exhibits 2-5).

(c)    Mayer Brown's partners in the United States and Europe contribute property, financial resources, effort, skill, and knowledge to the business of serving the combined firm's clients.

(d)    When the Chicago-based law firm Mayer, Brown & Platt and the London-based law firm Rowe & Maw merged in 2002 to form the firm then known as Mayer, Brown, Rowe & Maw, they declared their intention and agreement to become a single entity. The combined Mayer Brown firm told the public that the two firms would be "combining operations" and "'integrating our practices,'" in order to offer "'seamless, full-service legal capabilities in the most important commercial centers of Europe and North America.'" Furthermore, when the firm changed its name to Mayer Brown in 2007, James D. Holzhauer, the firm's chairman, announced: "'Unifying our brand name to Mayer Brown is a powerful sign of the global firm we have built.'"

(e)    Mayer Brown announces the promotion of partners on a worldwide basis. In a press release issued in October 2007, Mayer Brown announced the "promotion of 27 new partners in the U.S. as part of 43 promotions worldwide." Mayer Brown also announces the demotion of partners on a worldwide basis, informing employees, in a 2007 memorandum, "[a]s one element of a strategic review, Mayer, Brown, Rowe & Maw has decided to restructure our partnership. Forty-five equity partners (approximately 10% of the worldwide total) have been asked either to leave the firm or to accept other positions within the firm."

(f)    Mayer Brown describes itself to the public as a single entity. It describes itself, on the firm's one website and elsewhere, as a "leading global law firm with 1,500 lawyers operating in major cities worldwide." Mayer Brown also describes all its offices

as belonging to the same entity, stating on its website that "Mayer Brown LLP is among the largest law firms in the world with more than 1,500 lawyers in seven U.S. cities (Charlotte, Chicago, Houston, Los Angeles, New York, Palo Alto and Washington), six European cities (Berlin, Brussels, Cologne, Frankfurt, London and Paris) and Hong Kong."[7]

13.    Before Refco's collapse, Mayer Brown had long been Refco's primary outside counsel, handling most of its significant legal matters, including regulatory and compliance issues and important corporate work. Mayer Brown senior partner Collins, at the time of the 2004 Purchase, had worked with Refco for many years, developing a close relationship with Bennett, who had assumed control of Refco in September 1998. Refco was Collins's most significant client, and Mayer Brown invoiced in excess of $40 million from Refco between 1997 and 2005, which amounted to about half the billings for which Collins was responsible.

14.    Indeed, a former Refco employee was quoted in the press as describing Collins as Refco's "go-to-guy," reporting that all important transactions and deals involving the brokerage were first cleared through Collins or one of his colleagues at Mayer Brown. The firm represented Refco in connection with note and loan agreements to obtain hundreds of millions of dollars of financing.

15.    Collins served as billing partner and, according to the Bankruptcy Examiner, was responsible for and did review the detailed billing statements that Mayer Brown issued to Refco on a monthly basis, and thus was aware of the work that each attorney at Mayer Brown performed for Refco. The Examiner concluded that, even for those sham round-trip loan

---

[7] See attached Exhibits 1-6 in support of the allegations in ¶ 12(a)-(f).

transactions that Collins did not handle himself, he was aware of Mayer Brown's work because (among other things) those transactions were described on the monthly billing statements that Collins prepared or reviewed and then sent to Refco.

16.    Mayer Brown was intimately familiar with Refco's business, finances, operations, and corporate structure. Mayer Brown presented itself as an expert on all things Refco, and it was understood that Mayer Brown had a particularly close and special relationship with both Bennett and Refco that far exceeded a typical attorney-client relationship. Both Bennett and Collins fostered this perception, not only in their dealings with the THL Funds, but throughout the markets in which Refco operated. Furthermore, Collins used Mayer Brown's reputation as one of the world's largest and most prestigious law firms to further his and Bennett's fraudulent goals. Given its long history of representing Refco, Mayer Brown had superior information about Refco at all relevant times and repeatedly vouched for the information it (along with its Refco-affiliated clients) provided concerning Refco and Refco's transactions, including the related-party transactions, knowing that this information was critical to the THL Funds' willingness to consummate the 2004 Purchase.

## FACTUAL BACKGROUND

17.    Until the fraud perpetrated by Bennett and his co-conspirators was revealed, Refco had been a leading provider of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets.

## The Fraudulent Scheme of Bennett, Mayer Brown and the Other Conspirators

18.    According to the latest indictment filed against Bennett, Trosten, and

Grant (the "Bennett Indictment")[8] – to which Bennett pleaded guilty on February 15, 2008 –

beginning as early as 1997, Bennett and his co-conspirators concocted and implemented a

scheme that continued for many years to manipulate Refco's books and records so that Refco

appeared to be more profitable and financially stable than it was.  In October 1997, Refco

customer Victor Niederhoffer and several funds under his control lost in excess of $90 million

using Refco margin loans.  Instead of Refco writing off the uncollectible portion of this debt as a

loss, Bennett and his co-conspirators hid the debt in an RGHI subsidiary – Wells Limited –

through a series of settlements and assignments.  By these transactions, Refco released

Niederhoffer from the remaining debt, and the RGHI subsidiary in effect assumed the remaining

Niederhoffer debt to Refco, which later became part of the RGHI Receivable discussed below.

At least some of the documents for these transactions – including the settlement documents –

were negotiated and prepared by Mayer Brown lawyers, including Collins.  Accordingly, Mayer

Brown knew that Refco had sustained significant losses as a result of Niederhoffer's trading

activity, and that Refco was disguising these losses by shifting them to RGHI.

19.    Refco customers to which Refco had extended credit incurred hundreds of

millions of dollars of losses in their Refco accounts in the 1990s.  Also during that time period,

Refco directly and indirectly incurred a series of substantial trading losses.  When the customers

could not repay the loans that Refco had extended or when Refco lost money through its

proprietary trading, Refco did not disclose the losses and write them off as required.  Instead,

Bennett and his co-conspirators embarked on a fraudulent scheme to hide the losses and thereby

mask Refco's true financial condition.

---

[8]    See U.S. v. Bennett, et al., S3 05 Cr. 1192 (NRB), filed on or about January 16, 2007.

20.     As described below, Mayer Brown participated directly with, and provided material assistance to, Bennett and his co-conspirators in helping them execute the fraudulent scheme to hide Refco's losses.  Starting no later than 1997, according to the Examiner, Collins and other Mayer Brown attorneys participated directly with and provided material assistance to Bennett and the other co-conspirators on transactions to conceal the uncollectible debts incurred by Refco from lenders, potential investors, and others.  Thus, Mayer Brown knew that Refco had sustained significant losses, that Refco was using RGHI to hide these losses, and that Refco was engaging in transactions that had no legitimate business purpose, but were instead intended to manipulate the Company's financial statements.  These losses later became part of the RGHI Receivable.

**The Sham Round-Trip Loan Transactions**

21.     Beginning in 2000, Bennett and his co-conspirators engineered a series of sham round-trip loan transactions intended to hide the losses suffered by Refco and its customers. The first step in this fraudulent scheme involved transferring these uncollectible receivables to RGHI, thereby increasing the RGHI Receivable. The RGHI Receivable consisted of debit balances in three sets of Refco accounts:  (i) RGHI's accounts at Refco Capital Markets, Ltd. ("RCM"), (ii) RGHI's accounts at Refco Capital Corporation (later, Refco Capital LLC) ("RCC"), and (iii) Refco Global Finance's ("RGF") accounts at RCM.  According to the Refco Bankruptcy Examiner, from 2000 to 2005, Mayer Brown attorneys (including Collins) were involved in, and provided material assistance for, 17 of these sham round-trip loan transactions, all but one of which straddled Refco's fiscal year-end or quarter-end, and all of which were designed to conceal the RGHI Receivable from others reviewing Refco's financial statements.[9]

---

[9]     Even before the co-conspirators started using the sham round-trip loan transactions, they were manipulating Refco's financial statements.  Specifically, in February 1998, Refco and RGHI engaged in a

22.     As a key means of hiding the RGHI Receivable from financial institutions, investors, and potential purchasers of Refco, Bennett and his co-conspirators directed that the RGHI Receivable be temporarily transferred – immediately before the end of each Refco financial reporting period – to one or more unaffiliated third parties in a series of sham loan transactions.  These transactions gave Refco the appearance of having a legitimate receivable from a third party on its books, rather than an uncollectible debt parked in a related entity, RGHI.  Then, immediately after the end of each reporting period, the Receivable was rebooked to RGHI, and the unaffiliated entities were compensated for their role in the scheme.  Bennett and his co-conspirators, with Mayer Brown's active involvement, caused Refco to engage in these sham loan transactions at every fiscal year-end from at least February 2000 and, when financial reporting periods changed, at every fiscal quarter-end from May 2004 through August 2005.

23.     These sham transactions rendered Refco's financial statements and books and records materially false and misleading.  These transactions constituted related-party arrangements of Refco which Mayer Brown knew were required to be disclosed to the THL Funds in connection with the 2004 Purchase, but were not.  As explained further below, each transaction also involved a guarantee and indemnification by Refco, which Mayer Brown knew provided an additional required basis for the transactions to be disclosed to the THL Funds, but again, they were not disclosed.

---

series of wire-transfer "loans" with the following unrelated third parties:  Tradewinds Debt Strategies Fund, Tradewinds Emerging Debt Fund, and MLC Emerging Markets HSE-Cox ("MLC").  Refco and RGHI again engaged in these wire-transfer "loans" in February 1999 with the following unrelated third parties:  the Bulgarian-Russian Investment Bank ("BriBank"), GlobeInvest Corp. (an entity related to BriBank), EMF Ltd., and MLC.  These transactions, however, were not booked as loans; rather, they were booked as "repo" transactions with "repo termination dates" in early March of the relevant year.  The wire-transfer "loans" were an early method of hiding the RGHI Receivable so that it temporarily disappeared from Refco's books, replaced by an apparently valid receivable from a third party unrelated to Refco or RGHI.  Each of these repo transactions was accomplished, and furthered by, the use of interstate or foreign wires.

24.    These transactions lacked economic substance and were undertaken by Bennett and his co-conspirators solely in furtherance of an illegal scheme to defraud investors, financial institutions, regulators and the public so that the conspirators could eventually reap millions of dollars from the sale of all or part of Refco. Mayer Brown knew as early as 2001 that Refco insiders wanted to cash out some or all of their interests in the Company and thus had a powerful incentive to manipulate Refco's financial records to make the Company more attractive to potential purchasers.

25.    Each of the 17 sham round-trip loan transactions followed a similar pattern. A Refco entity, generally RCM, would make a loan to an unaffiliated customer. Simultaneously, the customer would make a loan in the same amount to RGHI, and RGHI would use the funds to pay down its obligation to Refco. Refco unconditionally and absolutely guaranteed the prompt and complete performance of all of RGHI's obligations and liabilities under the loan agreement, including repayment. Each of these transactions was accomplished, and furthered by, the use of interstate or foreign wires. As a result of these "loans," Refco's period-end financial statements did not reflect related-party transactions from RGHI, but instead reflected receivables in those amounts from third parties unaffiliated with Refco, Bennett, or RGHI. In addition, Refco's financial statements never revealed the existence of the related-party guarantee by Refco of RGHI's obligations created pursuant to the documents drafted by Mayer Brown.

26.    To enable the customers to profit from this arrangement, the interest rate that RGHI paid the customers for their "loans" was between 15 and 100 basis points higher than the interest rate that the customers paid Refco on the Refco "loans." According to the Examiner, the net profit made by the customers on each transaction ranged from $1,500 to almost $200,000,

depending on the amount loaned, the interest spread, and the duration of the transaction. Although characterized as loans, in most of these transactions no funds were actually transferred, other than the customer's profit from the interest spread.

27.    A few days after the end of each Refco financial reporting period, the transactions were unwound. Refco would lend the money back to RGHI (thus increasing the amount owed by RGHI to Refco), and RGHI would then use the money to pay back the unrelated customer the full amount of the loan. Bennett stood on both sides of each transaction: on behalf of RGHI, he signed the documentation for each loan to RGHI and, with one exception, he also signed the guarantees and indemnities on behalf of Refco. The corresponding RCM loans to the customer were generally executed by Santo Maggio, but Bennett executed one, and several were executed by another Refco executive. (Maggio, like Bennett, pleaded guilty to criminal charges in connection with his role in the Refco scheme).

28.    Not only were these loans unwound within days of the end of Refco's financial reporting period, but in each instance the third-party customer was insulated from all economic risk: Refco unconditionally and absolutely guaranteed all of RGHI's obligations and liabilities to the customer under the loan documents, including the obligation to pay principal and interest. This guarantee itself constituted a related-party transaction of Refco and was required to be disclosed to the THL Funds.

████In addition, Refco agreed to defend, indemnify, and hold harmless the third-party customer from and against, among other things, any claims, losses, or liabilities imposed upon or suffered by the customer as a result of any claim of a third party arising out of or based on the loan transactions. ████████████████████

████████████████████████████████████



Each indemnification itself constituted a related-party transaction and a material contract of Refco and was required to be disclosed to the THL Funds.

30.    Mayer Brown fully understood the true nature of these fraudulent "loans" and the means by which they were accomplished at least as far back as February 2000. Specifically, before one of the first documented sham loan transactions – a February 25, 2000 sham round-trip loan with an entity called CIM Ventures, Inc. ("CIM Ventures") – CIM Ventures sent a letter to Mayer Brown confirming exactly how the transaction was to proceed:

> It is planned that RCM will deposit the loan proceeds in CIM's account (No. 6800-10101) at RCM on February 25, 2000. CIM will then fax a letter to RCM instructing them to move the funds to RGHI with a 15 basis point uplift in the interest rate. RCM then will withdraw the funds from CIM's account and deposit them in RGHI's account, thereby completing the back-to-back loan transaction. The steps will be reversed on March 9, 2000. RCM will then transfer the CIM spread on the transaction to its Royal Bank of Canada account in the Cayman Islands.

As discussed in more detail below, Refco entered into another sham round-trip loan with CIM Ventures on February 23, 2001. Before that transaction, CIM Ventures sent a nearly identical letter (apart from changes in dates and interest rate) to Collins confirming the details and mechanics of the transaction.

31.     Between 2000 and 2005 – which included the period during which the THL Funds conducted due diligence and completed the 2004 Purchase – Mayer Brown was involved in multiple facets of the 17 sham round-trip loan transactions that Bennett orchestrated to hide the RGHI Receivable and misrepresent Refco's true financial condition.  Mayer Brown partners and associates created and shaped the underlying documentation, negotiated the terms of the loan documents with the loan participants or their counsel, transmitted the documents to Refco and to the loan participants, and retained and distributed copies of the executed loan documents.  On at least two separate occasions, Mayer Brown sent the loan participants confirmations that the loans had been unwound, endorsing the promissory notes as "paid in full." The work performed by these Mayer Brown attorneys was undertaken in the ordinary course of their employment at Mayer Brown and in furtherance of Mayer Brown's business.

32.     The following summarizes the 17 sham round-trip loan transactions that Refco engaged in with unrelated entities to hide the RGHI Receivable and thereby mask Refco's true financial condition from financial institution lenders, regulators, potential investors (such as the THL Funds) and the public, and illustrates the material assistance that Mayer Brown provided in connection therewith.  Each of these transactions was structured as described in ¶¶ 21-29, above:

(a)     On or about February 25, 2000, Bennett, Refco Chief Financial Officer Rob Trosten ("Trosten") and/or Refco Executive Vice President Santo Maggio ("Maggio") caused Refco to engage in a $150 million sham loan transaction with CIM Ventures, an Ingram Micro, Inc. ("Ingram") subsidiary, which was unwound on March 9, 2000.  Collins was involved from the inception of these transactions.  The Examiner's Report refers to a conversation between a Refco executive and Collins concerning the

structure of the loan transaction, after which Mayer Brown lawyers (including Collins)

prepared, edited, and reviewed the transactional documents, including the guarantee and

indemnification provided by Refco. Mayer Brown lawyers also communicated directly

with representatives of CIM Ventures as well as Refco executives about the loans. For

example, Mayer Brown sent to Ingram's corporate treasurer on February 4, 2000 drafts of

the loan agreements and an indemnity letter from RGHI, prepared and forwarded to

Ingram on February 11, 2000 revised drafts reflecting Ingram's comments,

communicated with Ingram and Refco concerning the transaction and, in connection with

the unwinding of the loans, transmitted the original promissory note that the customer

had signed, which the Mayer Brown lawyer endorsed as "paid in full" as the authorized

agent of RCM. Mayer Brown plainly understood the mechanics of the transaction – on

February 22, 2000, CIM Ventures sent the Mayer Brown lawyer a letter summarizing and

detailing how the transaction was to work, including that RCM would be paying the

interest spread on the transactions. Mayer Brown lawyers sent and received execution

copies of the documents and thus understood that Bennett was signing on behalf of both

RGHI and the Refco entities. At the time of his involvement in these transactions,

Collins had been aware for seven months that RGHI owed money to Refco, including

amounts arising from the uncollectible Niederhoffer debt.

> (b)　　On February 25, 2000, Bennett, Trosten and/or Maggio caused

Refco to engage in a $110 million sham round-trip loan transaction with CS Land

Management, LLC ("CS Land") that was unwound on March 3, 2000. The same Mayer

Brown lawyer again handled the transaction documents, sending drafts to the customer

and its counsel on February 24, 2000 and the final executed versions four days later.

According to the Examiner's Report, on February 23, 2000, Collins discussed with Maggio and a Mayer Brown colleague how to respond to CS Land's request for an enforceability opinion. As with the CIM Ventures round-trip transaction, after the close of Refco's reporting period, the same Mayer Brown lawyer sent CS Land a copy of its note payable to RCM which he had endorsed as "Paid in Full – March 3, 2000."

(c)      On February 25, 2000, Bennett, Trosten and/or Maggio caused Refco to engage in a $50 million sham round-trip loan transaction with EMF Core Fund ("EMF") that was unwound on March 3, 2000. The transactional documents were handled by the same Mayer Brown lawyer.

(d)      On February 23, 2001, Bennett, Trosten and/or Maggio caused Refco to engage in a $250 million sham round-trip loan transaction with CIM Ventures that was unwound on March 6, 2001. Once again, the same Mayer Brown lawyer handled the transactional documents and negotiated terms with the customer's outside counsel. After the transaction was unwound, Collins was copied on the transmittal of the original promissory note to CIM Ventures marked "paid in full."

(e)      On February 26, 2001, Bennett, Trosten and/or Maggio caused Refco to engage in a $200 million round-trip loan transaction with Delta Flyer, Inc. ("Delta Flyer") that was unwound on March 2, 2001. Mayer Brown associate Paul Koury, who would subsequently be involved in Mayer Brown's representation of Refco in connection with the 2004 Purchase, negotiated and handled the transactional documents. Trosten executed the guaranty and indemnity on behalf of RGL.

(f)      On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $175 million round-trip loan transaction with Delta Flyer that was

unwound on March 4, 2002. Koury handled the documentation and sent the final executed documents to Delta Flyer on February 26, 2002.

(g)    On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $125 million round-trip loan transaction with Beckenham Trading Company, Inc. ("Beckenham") that was unwound on March 4, 2002. Mayer Brown's Koury drafted and handled the transactional documents and forwarded them to Beckenham for its review and execution using the interstate wires or mails. This transaction was originally to be with CIM Ventures, but CIM Ventures pulled out, explaining to Refco in an email that the "Enron debacle is putting pressure in the SEC to increase the level of financial disclosure by large companies." Collins was aware that CIM Ventures had been preparing to engage in another round-trip loan transaction, having received a mark-up of the 2001 documents (reflecting the new dates and interest rates).

(h)    On February 25, 2002, Bennett, Trosten and/or Maggio caused Refco to engage in a $325 million round-trip loan transaction with Liberty Corner that was unwound on March 4, 2002. This was the first of ten such round-trip loan transactions that Refco undertook with Liberty Corner. Maggio and another Refco employee approached Liberty Corner in early February 2002 about a round-trip loan transaction and directed Liberty Corner to Koury. Koury handled the documentation, emailing drafts to Liberty Corner on February 14, 2002. The documentation finally agreed upon for this transaction was used as a model for the subsequent Liberty Corner round-trip loans, most of which Koury drafted. Although Koury was the principal Mayer Brown attorney on these transactions, Collins knew of Koury's work on the round-trip

loan transactions – for example: (i) on September 27, 2004, Collins sent Refco a bill for work performed during August 2004 which included "preparation of loan agreement, indemnification and guaranty for Liberty Corner," and (ii) Collins was copied on a May 20, 2005 Koury email to Maggio attaching "documents for use in connection with the loans for" Liberty Corner. The email's text included a brief list of the loan documents and the existence of the guaranty and indemnity letter as well.

(i)     On February 21, 2003, Bennett, Trosten and/or Maggio caused Refco to engage in a $150 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2003. Koury again drafted the loan documents.

(j)     On or about February 21, 2003, Bennett, Trosten and/or Maggio caused Refco to engage in a $500 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2003. Mayer Brown drafted the loan documents.

(k)     On February 20, 2004, Bennett, Trosten and/or Maggio caused Refco to engage in a $720 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2004. Mayer Brown handled the loan documents. This sham round-trip loan transaction was particularly significant because the loans were initially planned to be split between Delta Flyer ($200 million) and Liberty Corner ($500 million). But when Delta Flyer refused to engage in another such transaction, Mayer Brown and Refco were required to redraft the documents so that a single Liberty Corner round-trip loan transaction could be completed for $720 million. This last-minute change plainly illustrated Refco's need to complete a round-trip loan transaction at this particular time, which was the close of Refco's 2004 fiscal year. The round-trip loan necessarily

impacted Refco's financial statements at the exact time when the THL Funds were conducting due diligence.

(l)    On May 27, 2004, Bennett, Trosten and/or Maggio caused Refco to engage in a $700 million round-trip loan transaction with Liberty Corner that was unwound on June 7, 2004. This transaction, which was handled by Koury, occurred simultaneously with the drafting and negotiating of the Equity Purchase and Merger Agreement (the "Agreement") for the 2004 Purchase by the THL Funds, which was executed on June 8, 2004. At the same time that Mayer Brown was handling this transaction, and during the ten-day period that this transaction was in place, Koury sent WGM draft disclosure schedules that failed to disclose this $700 million round-trip loan transaction. And other Mayer Brown attorneys sent to WGM drafts of the Agreement containing representations that no undisclosed related-party transactions or arrangements existed between Refco and RGHI. These representations were false and misleading. In fact, the very loan transactions that Koury was handling were themselves related-party transactions and rendered the draft schedules he was sending WGM false and misleading. From this point forward, the round-trip loan transactions increased in frequency to every quarter end as Refco prepared for the 2004 Purchase and its obligations thereafter. Yet, despite this obvious sign that these transactions were undertaken only to manipulate Refco's financial condition, Mayer Brown continued to work on these transactions.

(m)    On August 25, 2004, Bennett and/or Maggio caused Refco to engage in a $485 million round-trip loan transaction with Liberty Corner that was unwound on September 7, 2004. Mayer Brown handled the loan documents.

(n)    On November 26, 2004, Bennett and/or Maggio caused Refco to engage in a $545 million round-trip loan transaction with Liberty Corner that was unwound on December 3, 2004.  Mayer Brown handled the loan documents.

(o)    On December 30, 2004, Bennett and/or Maggio caused Refco to engage in a $550 million round-trip loan transaction with Liberty Corner that was unwound on or about January 5, 2005.  Mayer Brown handled the loan documents.  This was the only round-trip loan that did not straddle the end of a Refco financial reporting period.

(p)    On February 23, 2005, Bennett and/or Maggio caused Refco to engage in a $345 million round-trip loan transaction with Liberty Corner that was unwound on March 8, 2005.  Mayer Brown handled the loan documents.

(q)    On May 25, 2005, Bennett and/or Maggio caused Refco to engage in a $450 million round-trip loan transaction with Liberty Corner that was unwound on or about June 6, 2005.  This transaction occurred as Refco was preparing for the Initial Public Offering of common stock (the "IPO").  Koury handled the loan documents, and Collins received copies of the documents on May 20, 2005.

33.    Each of the foregoing transactions involved, and was furthered by, the use of interstate or foreign wires, if not also the use of interstate or foreign mail, in order to transmit draft and final loan documentation, transmit comments on loan documentation, transfer funds, and communicate about the transactions.

34.    The round-trip loan transactions that Mayer Brown worked on rendered Refco's financial statements – including those presented to the THL Funds in connection with the diligence process in the course of the 2004 Purchase – materially false and misleading and

were designed to and did provide a distorted picture of Refco's financial health. Mayer Brown

knew that these financial statements not only would be provided to prospective purchasers of

Refco, such as the THL Funds, but also to financial institutions that lent money to Refco and that

required, as part of the underlying credit agreements, that Refco furnish them with accurate,

audited financial statements. Mayer Brown represented Refco in connection with its largest

financial institution financings and negotiated the credit agreements on behalf of Refco.

According to the Examiner, many of these credit agreements contained covenants that prohibited

Refco from incurring additional indebtedness beyond certain levels and, in some cases, from

becoming liable as a guarantor. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Mayer Brown, nevertheless, worked on the sham round-trip

loan transactions that violated the very loan covenants it had negotiated with these financial

institutions, and did not disclose the sham transactions to Refco's lenders. And thereafter, Mayer

Brown never disclosed to THL that, as a result of sham transactions Mayer Brown had

documented, Refco had repeatedly violated covenants in its credit agreements.

35.    Based on its extensive work for Refco and its conduct and actions

described above, Mayer Brown understood that the round-trip loan transactions, for which it

provided material assistance, substantially affected Refco's financial statements, could not be

10 ███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

legitimate business transactions, were undisclosed related-party transactions, and that failure to disclose them misled lenders, prospective purchasers, and the investing public. Mayer Brown's knowledge is established because, among other things, Mayer Brown:

      (a)      negotiated and drafted virtually all the documentation for the 17 round-trip loan transactions and understood that each entailed the short-term lending of hundreds of millions of dollars to customers which had absolutely no risk of loss because they were backstopped by a Refco corporate guarantee and indemnification (yet the customer nevertheless received interest on those loans) and entailed borrowings by an entity (RGHI) that had no real operations or assets other than its investment in Refco;

      (b)      knew that these round-trip loans, with one exception, were undertaken only at times that straddled Refco's financial reporting periods, and knew that these loans changed from being made annually to being made quarterly in anticipation of the 2004 Purchase and related transactions which required Refco to supply certain quarterly information.  Indeed, according to the Examiner, Mayer Brown was aware of Refco's financial reporting periods and Refco's need for audited financial statements for use in its business operations, including as required by its lenders pursuant to loan and financing documents that Mayer Brown itself had drafted;

      (c)      understood that these transactions caused the RGHI related-party receivable to be removed from Refco's books and records at the time when financial statements were being prepared and then to reappear immediately thereafter, only to disappear yet again at the time of the next annual audit or quarterly statement;

(d)     knew that these were not arm's-length transactions, given Bennett's involvement on both sides, signing (in all but one instance) the guarantee and indemnification on behalf of Refco and the loan documents on behalf of RGHI;

(e)     knew that RGHI owed significant amounts to Refco. According to the Examiner, in October 1999, Bennett asked Collins for assistance in developing arguments that could be used to demonstrate to the Federal Reserve Bank of New York that RGHI had substantial net worth, equal to "the value of its investment" in Refco. The Examiner found a copy of this letter produced by Mayer Brown with this statement bracketed and – in handwriting consistent with that which Collins has acknowledged to be his own – the comment: "minus loans to RGH[I]," thus demonstrating Collins's awareness of RGHI's corresponding obligations to Refco;

(f)     knew that these transactions lacked any proper business purpose. Mayer Brown witnesses interviewed by the Examiner stated that they were not aware of any business purpose for these transactions at the time they prepared the documentation, nor could they articulate one when interviewed long after Refco's bankruptcy. The Examiner found that not a single Mayer Brown lawyer ever asked anyone at Refco about the business purpose of these transactions; and

(g)     knew that these transactions caused Refco to violate the Company's loan covenants (contained in documents Mayer Brown itself had drafted) by including corporate guarantees of all of RGHI's obligations in connection with the sham round-trip loans.

36.     Given this knowledge possessed by Mayer Brown, the Bankruptcy Examiner concluded that "evidence" existed "showing that Mayer Brown knew that the Round-

Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to bolster Refco's financial appearance to lenders and investors."

37.    Finally, Mayer Brown understood that the loans by which RGHI temporarily paid down its debt, the Refco corporate guarantees of the customer loans to RGHI, the indemnification of the customer for any losses arising from the transactions, and the subsequent reassumption of the debt by RGHI each separately constituted a related-party transaction that needed to be disclosed to the THL Funds, but was not. Mayer Brown further understood that Refco's guarantee and indemnification in favor of the customer also each separately constituted a material contract of Refco, which needed to be disclosed to the THL Funds, but was not. Thus, even had Mayer Brown not known (as it did) how Bennett and the other co-conspirators were using the RGHI loan proceeds, it knew that each of these related-party transactions and guarantee and indemnification obligations had to be disclosed to the THL Funds, but was not.

**The THL Funds' Due Diligence**

38.    In or about the fall of 2003, the THL Funds began to explore the possibility of purchasing an interest in Refco. In connection with this potential purchase, the THL Funds conducted exhaustive due diligence, with the assistance of their affiliates and numerous professional advisors, for more than eight months. Thomas H. Lee Partners L.P. ("THL Partners") personnel performed intensive due diligence for this investment, including dozens of meetings and conference calls with Refco management and outside advisors. Senior partners of THL Partners led this effort.

39.    In addition to dedicating personnel from THL Partners, a number of professional advisors were retained. KPMG LLP was engaged to conduct accounting due

diligence, including an assessment of Refco's financial statements and a review of certain work papers of Grant Thornton, Refco's independent public accountants, and to perform information technology-related diligence. WGM was engaged to perform legal diligence and to analyze Refco's litigation and regulatory enforcement history, and McKinsey & Company was hired to conduct customer surveys across Refco's business lines and to analyze and forecast industry growth. Sandler O'Neill, an investment firm specializing in financial services companies, analyzed Refco's position within the market, Marsh & McLennan assessed risk management and the adequacy of insurance, and Mercer Human Resource Consulting reviewed human resource issues. And an investigative agency was engaged to explore the backgrounds of Bennett and certain other members of Refco's senior management so that they could be assured of their integrity and honesty. The diligence took some eight months. In performing that diligence, the THL Funds and their advisors relied substantially on the several years of Refco audited financial statements that Bennett and Trosten caused to be provided to them. These financial statements were materially false and misleading as a result of the fraudulent schemes perpetrated by Bennett and his co-conspirators as described above.

40.     The economic reality of the THL Funds' investment in Refco was that control of Refco's business affairs and policies, as well as its day-to-day management, was reasonably expected to remain, and in fact remained, with Bennett and Refco's existing management even after the 2004 Purchase, in part because Bennett and existing management purportedly had the specialized knowledge and expertise to operate Refco profitably in the highly specialized fixed income, foreign currency, and exchange-traded derivatives markets.

41.     Mayer Brown represented Refco Group, RGHI, and Bennett in connection with the 2004 Purchase. Among other things, Mayer Brown handled the drafting and negotiating

of the transactional documents and played a central role in the extensive diligence process

undertaken by the THL Funds, providing information directly to the THL Funds and their

advisors and coordinating access to documents and information being provided by Refco and its

affiliates as well as Bennett.  At the direction of, and in coordination with Bennett and Trosten,

Mayer Brown attorneys communicated frequently with the THL Funds' counsel regarding the

diligence process for the 2004 Purchase over interstate wires.

42.    During the due diligence process, Mayer Brown and Collins understood

that they would be providing information to the THL Funds upon which the THL Funds would

rely in deciding whether to proceed with the 2004 Purchase.  In this capacity, Mayer Brown

would not be serving merely as a conduit for information from Refco management and Bennett,

but would be drawing on its own extensive knowledge and information built up over the many

years that Collins and his Mayer Brown colleagues had been working with Refco.

43.    Consistent with these understandings, Mayer Brown attorneys had

extensive direct contact with the THL Funds and their representatives.  For example, Collins

attended two face-to-face meetings with representatives of the THL Funds and WGM lawyers in

April 2004 in connection with preparation of the Letter of Intent.  And Collins and other Mayer

Brown attorneys participated regularly in conference calls and engaged in email communications

employing the interstate wires on an almost daily basis as the 2004 Purchase neared closing.

**The THL Funds' Focus on Related-Party Transactions**

44.    Of critical importance to the THL Funds during the diligence process was

to identify and eliminate any related-party transactions and arrangements, in particular dealings

between Refco and its senior management (and their affiliates), which necessarily included

RGHI.  Despite the THL Funds' repeated requests for information concerning all dealings

between Refco and any related-party, including RGHI and Bennett, and despite the THL Funds'

insistence that any related-party obligations be eliminated by the closing of the 2004 Purchase (which Mayer Brown knew Bennett had agreed to do), Mayer Brown – throughout the diligence period and even after the 2004 Purchase – participated in and furthered the scheme of Bennett and the other co-conspirators. Mayer Brown did so by continuing to negotiate, coordinate, and provide material assistance on additional sham round-trip loan transactions (each of which was a related-party transaction and included indemnifications), all the while concealing those transactions from the THL Funds and assuring the THL Funds and their representatives that no undisclosed related-party transactions, indemnifications, or material contracts existed.

45. Early in the diligence process, Refco disclosed to the THL Funds that RGHI owed Refco approximately $108 million as a result of a loan made to RGHI by Refco. The THL Funds insisted that this loan be paid off before closing. At no time did Refco or Mayer Brown disclose the RGHI Receivable or any of the round-trip loan transactions described above.[11] Refco and Bennett, with Mayer Brown's knowledge, agreed that the $108 million loan would be repaid, and it was.

46. Bennett and the THL Funds addressed this matter during a face-to-face meeting held in New York City in April 2004. Collins attended this meeting, and represented Refco, RGHI, and Bennett in the subsequent drafting of the Letter of Intent, including the provision requiring the $108 million to be paid off before closing and the provision that no related-party transactions would remain at closing. This meeting followed another negotiating session attended by Collins, Bennett, WGM partners and representatives of the THL Funds.

47. Mayer Brown and Collins at all times knew the importance that the THL Funds placed on identifying and eliminating related-party transactions. The Letter of Intent,

---

[11] References in this Complaint to the RGHI Receivable and to related-party transactions between RGHI and Refco do not include this $108 million shareholder loan.

which Mayer Brown negotiated on behalf of the sellers, specifically provided that the acquisition

proposal contained therein was "based ... on the following assumptions and understandings . . .

any existing shareholder loans will be terminated prior to Closing and funded with cash

otherwise payable to the Sellers, and all existing agreements, contracts or arrangements between

the Company and the Sellers or their affiliates will be terminated (other than employment

obligations to [Bennett] and indemnification obligations owed to the Sellers in their capacities as

directors or officers of the Company) . . . ."  Collins reviewed and provided comments on drafts

of the Letter of Intent and negotiated its terms.

48.    In addition to requesting information and documentation concerning all

related-party transactions or arrangements, particularly those involving RGHI and Bennett, the

THL Funds also requested, from the very outset of the diligence process, copies of all material

contracts to which Refco was a party and any agreements under which Refco had incurred

indemnification obligations to others.  The request for all material contracts, furthermore, was

not limited to "still-open" or "still-operative" contracts.  But although the round-trip loan

transactions both constituted material contracts and contained Refco indemnification obligations,

not a single document relating to those transactions was ever provided.

49.    Indeed, at precisely the same time the THL Funds were finalizing the

negotiations of the purchase agreement for the 2004 Purchase, Mayer Brown materially assisted

in the second largest sham round-trip loan transaction – for $700 million.  And in March 2004,

almost at the same time as the largest sham round-trip loan transaction – for $720 million – was

being unwound, with the RGHI Receivable to be rebooked to RGHI, Collins falsely informed a

representative of the THL Funds that Bennett had confirmed that no undisclosed related-party

transactions existed.  Moreover, the very Mayer Brown associate who worked on most of the

sham round-trip loan transactions – including the $700 million transaction – transmitted

disclosure schedules to the THL Funds stating that no undisclosed related-party transactions

existed at the same time that one of these sham round-trip loan transactions was being

completed. The disclosure schedules were also false and misleading because they did not

disclose the existence of the related-party indemnifications and guarantees that accompanied the

sham round-trip loan transactions. Those indemnifications and guarantees were material

contracts that remained in effect long after the 2004 Purchase closed.

**Bennett and His Co-Conspirators Repeatedly Deceive the THL Funds**

50.    Bennett and his co-conspirators, including Trosten and Maggio,

intentionally and deliberately concealed the existence of the sham round-trip loan transactions

from the THL Funds and provided materially false and misleading information regarding Refco's

financial condition and the accuracy of Refco's financial statements. Bennett and his co-

conspirators did so to induce the THL Funds to purchase a majority interest in Refco.

51.    In connection with the 2004 Purchase, Bennett, Trosten and Maggio, with

the knowledge of Mayer Brown, made repeated false and misleading statements to the THL

Funds and omitted to state material facts, including the following:

a.    During the diligence process, Bennett and Trosten caused Refco's

audited financial statements to be provided to the THL Funds. Those audited financial

statements were false and misleading because, among other things, they failed to disclose

or take into account the true nature of the RGHI Receivable, the sham round-trip loan

transactions which Bennett and the other co-conspirators were orchestrating and on

which Mayer Brown was providing material assistance, and the guarantees and

indemnification obligations incurred by Refco in connection therewith.

      b.     On or about July 9, 2004, Bennett executed and transmitted to the THL Funds an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect material interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates or another entity which had been the subject of a guarantee by Refco. These representations were false because they did not disclose or account for the existence of the sham round-trip loan transactions or the RGHI Receivable. In addition, Bennett falsely certified that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Bennett knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed or taken into account in the Circular. He further agreed that he would notify the THL Funds of any misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them. Bennett never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

      c.     On or about July 2, 2004, Trosten executed and transmitted to the THL Funds an officer's questionnaire in which he falsely certified, among other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Trosten knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed or taken into account in the Circular. He further agreed that he would notify the THL Funds of any

misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them. Trosten never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

d.    On or about July 6, 2004, Maggio provided the THL Funds with an officer's questionnaire in which he falsely certified, among other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the [Bond] Offering Circular provided to you or which you believe may be accurately stated therein," even though Maggio knew that the sham round-trip loan transactions and the RGHI Receivable had not been disclosed in the Circular. He further agreed that he would notify the THL Funds of any misstatement or omission of material fact contained in those materials as soon as practicable after reviewing them. Maggio never disclosed the information that was being withheld from the THL Funds concerning the RGHI Receivable or the sham loan transactions.

e.    On or about March 30, 2004, Bennett told WGM partner Jay Tabor, during a conference call in which Trosten also participated, that no contracts or arrangements existed between Refco and Bennett, RGHI or his affiliates other than regarding his compensation arrangements, which was false – and which both Bennett and Trosten knew was false – because it intentionally ignored the RGHI Receivable and the round-trip loan transactions.

## Mayer Brown's Repeated Lies to the THL Funds

52.    At all times relevant to the 2004 Purchase, Mayer Brown knew that Refco had engaged in, and was engaging in, numerous sham round-trip loan transactions with RGHI and that these arrangements represented material corporate contracts that imposed significant

obligations upon Refco, including corporate guarantees of RGHI's obligations and indemnification obligations to the counterparties. Mayer Brown knew that the sham round-trip loan transactions: (a) were themselves related-party transactions, (b) covered up other related-party transactions, (c) did not reflect arm's-length bargaining, and (d) needed to be disclosed. Nevertheless, Mayer Brown did not disclose these material transactions to the THL Funds and made or joined in representations to the contrary.

53.    During a telephone conference on due diligence issues in March 2004, Collins represented to WGM partner Jay Tabor that he had confirmed with Bennett that, other than Bennett's compensation arrangements, no other undisclosed contracts or arrangements existed between Refco and Bennett, RGHI or other affiliates. As Collins knew at the time, this statement was false. Nothing Bennett said to Collins could erase the fact that Mayer Brown knew about and directly participated in contracts and arrangements between Refco and RGHI and that Mayer Brown knew those transactions had not been disclosed.

54.    During a telephone conference on due diligence issues in March 2004, Collins "confirmed" to WGM partner Tabor that all of Refco's receivables listed on Refco's balance sheet were "from customers in ordinary course. Company has gone through with accountants." Collins knew this statement was false because neither the RGHI Receivable nor the receivables arising from the sham loan transactions arose from customers in the ordinary course of Refco's business and they rendered Refco's balance sheet false and misleading.

55.    On May 6, 2004, in response to the THL Funds' repeated requests for all material contracts, Collins sent by email a memorandum, addressed to WGM, stating that: "[w]e were advised by Refco Management that all material contracts were either in the Data Room or

are being produced in response to the requests in Exhibit C to the Letter of Intent."[12] As Collins

knew, this statement was false because not one of the documents relating to the sham round-trip

loan transactions was included in the data room, produced in response to the Letter of Intent, or

otherwise disclosed to the THL Funds.

56.     In a second memorandum emailed to WGM, also dated May 6, 2004,

Collins represented that "[w]e have been advised by Refco that there are no significant

indemnification obligations which have not been disclosed already." Collins knew that this

statement was false because each sham round-trip loan transaction contained indemnification

obligations on the part of Refco, but none of these transactions had been disclosed to the THL

Funds or their representatives.

**The Proceeds Participation Agreement and the Counterfeit LLC Agreement**

57.     Mayer Brown and Collins made additional material misrepresentations

and omissions to further conceal the true financial condition of Refco and to facilitate the

Company's sale to the THL Funds. Specifically, Mayer Brown and Collins, acting in concert

with Bennett and others, refused to reveal to the THL Funds, or their representatives, the

existence of the PPA, a related letter agreement (the "Letter Agreement"), and those agreements'

underlying terms. The PPA and the Letter Agreement fell squarely within the THL Funds'

diligence requests and should have been disclosed to the THL Funds and their representatives

during the diligence process. Moreover, not only did Mayer Brown conceal the existence of

these documents, but it also went much further: ███████████████████████████████

---

[12]     Exhibit C to the April 2004 Letter of Intent requested the following documents: "Please also
supply any documents relating to arrangements among the owners and affiliates of Refco Group, Ltd.,
LLC – please include items such as, but not limited to, shareholders/interestholders agreements, voting
arrangements and any other arrangements that may be applicable or otherwise relevant in connection with
a sale of any part of Refco Group Ltd., LLC or its owners or affiliates."

████████████████████████████████████

████████████████████████

58.    Under the PPA, entered into on July 12, 2002 between Refco and

BAWAG[13] affiliate DF Capital, DF Capital agreed to provide Refco with payments totaling

approximately $467 million.  In the related Letter Agreement, entered into that same day with

the stated objective "to affect a 'Sale of the Company [Refco]'" prior to February 28, 2005,[14]

Refco agreed to use $350 million of that payment "for the retirement of inter-company debt of

[RGHI]" – i.e., to pay down the RGHI Receivable.  For its part, DF Capital received the right to

participate in the proceeds of any "company sale" as if it actually owned voting membership

shares of Refco.  In addition, DF Capital had the ability to exchange its participation right on

each payment date for the equivalent number of Refco membership shares.  According to the

Examiner's Report and the Collins Indictment, Collins and other attorneys at Mayer Brown

negotiated and drafted the PPA and the related Letter Agreement.  Thus, Mayer Brown was not

only aware of their existence, but it was also intimately familiar with the terms of both the PPA

and the Letter Agreement.

59.    The PPA further provided that Refco would indemnify DF Capital, its

affiliates, and their respective officers, directors, employees, controlling persons, agents and

representatives against any claim by a third party arising from any material inaccuracy in any

representation, or the material breach of, or failure duly to perform or observe, any material

---

[13]    "BAWAG" is Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft, which held an ownership interest in Refco through an entity called BAWAG Overseas Inc.  The bank and its subsidiary BAWAG Overseas are collectively referred to as "BAWAG."

[14]

████████████████████████████████████████

████████████████████████████████████████

warranty, covenant, or other agreement made by Refco in the PPA. RGHI also guaranteed

Refco's obligations under the agreement and, according to the Examiner, was to secure DF

Capital's participation right pursuant to a corresponding Security and Pledge Agreement.

60.     The PPA, the Letter Agreement, and the Security and Pledge Agreement

were material contracts and related-party transactions between and among Refco, RGHI, and

BAWAG (which owned DF Capital), and were thus required to be disclosed to the THL Funds

during the diligence process for the 2004 Purchase because these agreements:

(a)     required Refco to indemnify DF Capital against any loss incurred arising out of any third-party claim in which DF Capital was named as a party;

(b)     provided that approximately $350 million of the purchase price would retire inter-company obligations of RGHI;

(c)     contained provisions under which RGHI secured DF Capital's participation right and guaranteed Refco's performance;

(d)     set forth the intent of various parties (Refco, RGHI, BAWAG, and DF Capital) to "affect a sale of" Refco and established certain guidelines and parameters of any such transaction;

(e)     called for Bennett to remain as CEO pursuant to a Management Agreement (the existence of which itself was never disclosed);

(f)     gave BAWAG (through DF Capital) the ability to obtain a larger ownership stake in Refco;

(g)     contained covenants about how the business was to be managed and operated; and

(h)     gave DF Capital a veto right with respect to a Company sale.

61.     Mayer Brown not only never disclosed the existence of the PPA but it also

took affirmative steps to conceal the PPA from the THL Funds and their representatives. Indeed,

in an especially egregious example of Mayer Brown's efforts to hide the PPA, Collins and Mayer

Brown created and provided to the THL Funds a counterfeit corporate agreement during the

diligence process. More specifically, early in the diligence process, WGM saw an unexecuted

copy of a Refco Group LLC Agreement in the data room. This unexecuted LLC Agreement

listed three entities – RGHI, BAWAG Overseas, and Refco Group Holdings LLC – as owning

membership shares in Refco, and contained a reference to DF Capital and the PPA.

   62. WGM immediately asked Refco for further information about Refco's

capital structure and for a copy of the executed, operative LLC Agreement. In response, the

THL Funds were told that the LLC Agreement needed to be updated and that Collins would

prepare the new agreement.



   64. On or about June 2, 2004, Collins's assistant sent via email (over the

interstate wires) to Tabor and other WGM lawyers a memo from Collins in which Collins stated

that he was attaching the "Fourth Amended and Restated Limited Liability Company Agreement

of Refco Group, Ltd., LLC." The attached document bore an execution date as of January 1,

2003 ███████████████████████████. Collins represented this

document to be the genuine, operative Fourth LLC Agreement, but it was, instead, the

counterfeit Fourth LLC Agreement that Mayer Brown had manufactured. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

65.    The PPA should have been disclosed because it was called for by several

due diligence requests from the THL Funds. For example, the THL Funds asked whether Refco

had any obligation to make payments to any party in connection with the 2004 Purchase. The

PPA fell squarely within this request because it required Refco to make payments to DF Capital

upon the sale of Refco, yet neither Collins, nor anyone else at Mayer Brown, disclosed the PPA

to the THL Funds as required. In addition, as detailed more fully above, the THL Funds asked

numerous questions during diligence that were aimed at identifying all related-party transactions

and any indemnification obligations and material contracts. Nevertheless, Mayer Brown never

disclosed to the THL Funds that the PPA existed, even though they knew full well that the PPA

was itself a related-party transaction and included Refco indemnification obligations and was a

material contract.

66.    Moreover, to further conceal the PPA and Letter Agreement from the THL

Funds, Collins made numerous direct misrepresentations to representatives of the THL Funds

during the diligence process:

(a)    Collins knowingly misrepresented to the THL Funds that there were no
material contracts or arrangements between Refco and Bennett or his
affiliates (including RGHI), other than Bennett's compensation
arrangements (see ¶¶ 52-56). These representations were false and
misleading, and Collins knew it, because the PPA was a material contract
between Refco, Bennett, and RGHI;

(b)    On or about May 6, 2004, Collins represented to WGM that "[w]e have
been advised by Refco that there are no significant indemnification
obligations which have not been disclosed already." This too was a
knowing misrepresentation because, and as described above in ¶¶ 58-60
and ¶ 65, Collins was aware that the PPA contained significant

indemnification obligations that had not been disclosed to the THL Funds; and

(c)    Also on or about May 6, 2004, Collins knowingly misrepresented to WGM that "all material contracts were either in the Data Room or are being produced in response to the requests in Exhibit C to the Letter of Intent." The PPA, however, was not in the data room, nor was it ever produced in response to the THL Funds' diligence requests.

67.    

### The False and Misleading Equity Purchase Agreement

68.    In addition, Mayer Brown hid the sham round-trip loan transactions, the RGHI Receivable, and the PPA from the THL Funds in other ways, in particular by negotiating and preparing documents that contained representations that they knew to be false and misleading.

69.    Given the importance of related-party transactions to the THL Funds, they negotiated for, and obtained from the sellers, a series of contractual representations in the Equity Purchase Agreement, executed on June 8, 2004, that Refco's financial statements were accurate and that there were no related-party transactions. These representations were critical to the THL Funds' decision to proceed with the transaction. Mayer Brown handled the negotiating and drafting of the Agreement for Refco, RGHI, and Bennett.

70.    Although fully aware of the sham round-trip loan transactions they had drafted, their materiality and impact on Refco's financial statements, as well as the fact that the sham round-trip loans constituted related-party transactions, Mayer Brown and Collins negotiated, drafted, and reviewed the Agreement, which contained the following representations and warranties, among others:

(a)    That Refco's books and records had been maintained in accordance with applicable accounting requirements, reflected only bona fide transactions, and were complete and correct;

(b)    That Refco's financial statements "present fairly in all material respects the consolidated financial position, results of operations and cash flows" and "are in conformity with" GAAP;

(c)    That, except for certain operating guarantees of obligations of subsidiaries made in the ordinary course of business, Refco did not have any undisclosed debt, guaranty, liability, claim or obligation of any nature;

(d)    That, except as disclosed on Schedule 3.10, Refco did not have any liabilities or obligations that should have been shown on a balance sheet;

(e)    That, except as disclosed on Schedule 3.12, "since March 1, 2003, no officer, manager, director or member of the Company or any Subsidiary, or any Affiliate of any such officer, director, member or other equity holder has had, either directly or indirectly, a material interest in any contract or agreement to which the Company or any Subsidiary is a party or by which any of their properties or assets may be bound or affected except for employment contracts entered into on an arm's length basis"; and

(f)    That, except as set forth on Schedule 3.15, Refco was not a party to or bound by any agreement or indenture with any third party imposing a Lien on any of the Company's or any Subsidiary's assets or relating to the incurrence, assumption or guarantee of any indebtedness for borrowed money, except for indebtedness for borrowed money for an amount less than $1,000,000.

The disclosure schedules accompanying the Agreement – including Schedules 3.10, 3.12 and 3.15 – did not disclose any of the sham loan transactions or their impact on Refco's financial statements, even though such disclosure was plainly required by the Agreement.

71.    From the very outset of the negotiations, Mayer Brown misled the THL
Funds; in fact, Mayer Brown negotiated and prepared the first draft of the Agreement which
contained a representation that stated no officer (or any affiliate thereof) "has had, directly or
indirectly, a material interest in any contract or agreement to which the Company … is a party or
by which any of their properties or assets may be bound or affected, except for contracts entered
into on an arm's-length basis and on terms and conditions customary in the market." Mayer
Brown knew that these representations were false because they had drafted and negotiated the
round trip transactions in which Refco was a party and RGHI, a Bennett affiliate, had a material
interest.

72.    In connection with the Agreement, at the direction of Bennett, Mayer
Brown used the interstate wires, transmitting numerous drafts of the Agreements containing false
and misleading representations to the THL Funds and their representatives, including on the
following dates:

(a)    On May 7, 2004 at 9:02 p.m., a Mayer Brown partner circulated a
revised draft of the Agreement by email to multiple WGM attorneys as well as to 8 other
Mayer Brown attorneys, including Collins, reflecting Mayer Brown's comments on the
draft previously sent by WGM;

(b)    On May 25, 2004 at 11:19 a.m., a Mayer Brown partner circulated
another mark-up of the Agreement draft by email to multiple WGM attorneys with copies
to Bennett, Trosten, and 15 other Mayer Brown attorneys, including Collins and Koury;

(c)    On May 25, 2004 at 4:40 p.m., a Mayer Brown partner distributed
additional comments on the draft Agreement to multiple WGM attorneys with copies to
Bennett, Trosten and 15 other Mayer Brown attorneys, including Collins and Koury; and

(d)    On May 30, 2004 at 8:56 p.m., a Mayer Brown partner circulated an updated draft of the Agreement to multiple WGM attorneys, Bennett, Trosten and 17 other Mayer Brown attorneys, including Collins and Koury stemming from a telephone conference earlier that day.

73.    Similarly, the final Refco Disclosure Schedules, prepared by Refco and Mayer Brown, that accompanied the executed copy of the Agreement did not disclose the sham round-trip loan transactions, although the schedules were sent to the THL Funds by Koury, the very same Mayer Brown associate who was then handling the round-trip loan transactions. Indeed, the final version of Schedule 3.12, which was supposed to list all related-party transactions and arrangements, contained only the single word "none."

74.    While drafting the Disclosure Schedules at the direction of Bennett, Mayer Brown used the interstate wires, transmitting numerous drafts of the Schedules – none of which accurately disclosed the RGHI Receivable or the sham loan transactions – to the THL Funds by email, including Disclosure Schedules that were transmitted to the THL Funds on the following dates that did not include any mention of the round-trip loan transactions:

(a)    On May 25, 2004 at 9:42 p.m., Paul Koury sent an email attaching Mayer Brown's initial draft of the Disclosure Schedules to multiple WGM attorneys as well as to Bennett, Trosten and 16 other Mayer Brown attorneys, including Collins, stating: "Attached please find our initial draft of the Schedules to the Equity Purchase Agreement. Please note that these Schedules are being delivered simultaneously to our client and internally at MBR&M for reviewed [sic] and are therefore subject to further comment";

(b)    On May 28, 2004 at 8:45 a.m., Paul Koury sent an email attaching another draft of the Disclosure Schedules to multiple WGM attorneys as well as to Bennett, Trosten and 16 other Mayer Brown attorneys, including Collins;

(c)    On June 2, 2004 at 9:32 p.m., Paul Koury sent an email attaching another draft of the disclosure schedules to multiple WGM lawyers, as well as to Bennett, Trosten, 16 other Mayer Brown attorneys, including Collins, as well as counsel for the lenders negotiating the Credit Agreement ("Secured Lenders") and the initial purchasers of the Rule 144A bonds to be issued in connection with the 2004 Purchase ("Initial Purchasers");

(d)    On June 4, 2004 at 11:15 p.m., Paul Koury distributed an updated draft of the Disclosure Schedules by email to multiple WGM attorneys as well as to Bennett, Trosten and 17 other Mayer Brown attorneys, including Collins, as well as counsel for the Secured Lenders and Initial Purchasers;

(e)    On June 7, 2004 at 5:23 p.m., Paul Koury circulated an updated draft of the Disclosure Schedules by email to multiple WGM attorneys as well as to Bennett, Trosten and 17 other Mayer Brown attorneys, including Collins, as well as counsel for the Secured Lenders and Initial Purchasers;

(f)    On June 8, 2004 at 9:42 a.m., Paul Koury distributed revised "Final Schedules" by email to multiple WGM attorneys as well as other Mayer Brown attorneys; and

(g)    On June 8, 2004 at 12:16 p.m., Paul Koury sent a Dallas-based WGM associate another version of the Final Disclosure Schedules by email.

75.    At no time after the execution of the Purchase Agreement did Mayer Brown reveal the related-party transaction it was continuing to document for Refco.  Collins was unquestionably aware of this work that Koury was performing.  According to the Examiner, on June 21, 2004, he sent the firm's summary billing statement for services rendered in May 2004 to Refco, which included a reference to "revision to liberty loan documents."

**The False and Misleading Offering Circular**

76.    Attorneys from Mayer Brown played a substantial role in drafting the Offering Circular for the bond offering that raised $600 million in connection with the THL Funds' financing of the 2004 Purchase.  Mayer Brown participated in the drafting of the various closing sections of the Offering Circular and participated in drafting sessions at which the disclosures contained in the Offering Circular were discussed and prepared.  Mayer Brown is also listed in the Offering Circular as counsel to Refco.  Mayer Brown was aware that the Offering Circular included customary related party transaction and management sections which were intended to include disclosure regarding transactions between Refco, its named executive officers and their respective affiliates.  In addition, Mayer Brown was involved in the diligence conducted by the initial purchasers and other participants in the offering process and was aware that the diligence materials provided to the THL Funds and their representatives were shared with the initial purchasers and their counsel.

77.    The sham round-trip loan transactions described above rendered portions of the Offering Circular false and misleading, both because they were not disclosed in the Offering Circular and because they were employed to manipulate the financial statements contained in the Offering Circular.  But during the preparation of the Offering Circular Mayer Brown never disclosed to the THL Funds, the initial purchasers or their counsel the sham round-trip transactions in which it had materially assisted, or otherwise that Mayer Brown possessed

knowledge and information to the effect that the Offering Circular was false and misleading. By remaining silent throughout the drafting of the Offering Circular, Mayer Brown misled the THL Funds, and other investors.

**The 2004 Purchase Closes**

78.     Following completion of the THL Funds' due diligence efforts, on August 5, 2004, the 2004 Purchase closed and the THL Funds acquired from RGHI approximately a majority of the equity interests in Refco, for approximately $452 million in cash.

79.     During the course of the transaction, and at the time of the closing, the THL Funds were not aware of, and could not with reasonable diligence have learned of, the fraudulent actions of Bennett, Mayer Brown, and others. The THL Funds relied to their detriment on the accuracy and integrity of the representations and other information provided directly to them by Mayer Brown and Collins during the due diligence process in electing whether to proceed with the 2004 Purchase and invest $452 million in Refco. Had truthful and complete information been provided by Mayer Brown, the THL Funds would not have proceeded with the 2004 Purchase.[15]

80.     Mayer Brown's deception continued after the 2004 Purchase closed. Mayer Brown was involved in both the spring 2005 registered Exchange Offer relating to the

---

[15]     At the same time that the 2004 Purchase closed, Refco also entered into a Credit Agreement with the Secured Lenders, for which Bank of America, N.A. acted as the Administrative Agent. Bennett and his co-conspirators provided or caused to be provided to the Secured Lenders or their representatives the same or substantially similar false Refco financial information as was provided to the THL Funds (including at a "lenders presentation" in July 2004). They also gave false assurances to the Secured Lenders and their representatives, similar to those given to the THL Funds, that Refco's current and historical financial statements fairly presented Refco's financial condition (including in the Credit Agreement itself). Had these Secured Lenders known of Refco's true financial condition, they would not have loaned hundreds of millions of dollars to Refco. Because the Secured Lenders did not know the truth, however, they extended credit to Refco.

bonds issued in connection with the 2004 Purchase and Refco's August 2005 IPO. Mayer

Brown was aware that the offering materials for these securities included related party

transaction and management sections which were intended to include disclosure regarding

transactions between Refco, its named executive officers and their respective affiliates, and that

these sections did not fully or accurately disclose such transactions.

81.    Although Mayer Brown continued to work on sham round-trip loan

transactions after the 2004 Purchase, at no time did Mayer Brown:  (a) disclose the existence of

the RGHI Receivable or the sham round-trip loan transactions, or (b) advise the THL Funds,

Refco's new Board of Directors, or the purchasers of Refco bonds or stock that the above-

referenced offering materials were false and misleading because they did not disclose, or take

into account, the existence of the very sham round-trip loan transactions Mayer Brown was

documenting for Refco.

82.    Rather, Mayer Brown continued to conceal the sham round-trip loan

transactions following the 2004 Purchase, remaining silent throughout this time period and

allowing Refco to file with the Securities and Exchange Commission ("SEC") and otherwise

publicly disseminate what Mayer Brown knew to be false and misleading offering materials. By

remaining silent throughout the drafting and dissemination of these offering materials, Mayer

Brown misled the THL Funds, the investors in Refco, and others.

**The Fraud is Revealed**

83.    In early October 2005, members of the new Refco Board of Directors

(including the THL Funds' designees) learned for the first time of the existence of an

approximately $430 million obligation that RGHI owed to Refco. The Audit Committee of the

Board of Directors immediately began an internal investigation into Bennett's actions, retaining

independent counsel and a forensic accounting firm. The Company also contacted the SEC,

CFTC, and other regulatory bodies to report the wrongdoing.  Although Mayer Brown was

counsel to the Company, Mayer Brown concealed from its client what it knew about the sham

loan transactions and the related-party transactions.

84.     On October 10, 2005, Refco issued a press release announcing Bennett's

manipulation of the Company's financial statements.  After the Audit Committee consulted

Refco's independent accountants, Refco further announced that the Company's financial

statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28,

2004, February 28, 2005 and May 31, 2005, taken as a whole, should no longer be relied upon.

Shortly thereafter, Bennett was arrested and has since been indicted, along with Trosten and

former Refco executive Tone Grant, in connection with the scheme.  Bennett pleaded guilty on

February 15, 2008.

85.     After these developments, Refco's stock price declined precipitously and

the NYSE ultimately halted trading.  On October 17, 2005, Refco and certain of its subsidiaries

or affiliates filed for Chapter 11 bankruptcy protection.  Refco's common stock has been delisted

and the equity interests acquired by the THL Funds in the 2004 Purchase are now worthless.  As

a result of Mayer Brown's actions, the THL Funds have suffered actual damages in an amount to

be determined at trial, including, but not limited to, the $245 million dollars they have already

lost on the 2004 Purchase.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

86.     The THL Funds repeat and reallege each of the allegations contained in

paragraphs 1 through 85 inclusive, as if fully set forth herein.

87.     Mayer Brown carried out, by use of instrumentalities of interstate

commerce and/or of the mails, a plan, scheme and course of conduct, pursuant to which it

intended (among other things) to deceive the THL Funds in connection with the THL Funds' purchase of Refco securities. In furtherance of this plan, scheme and course of conduct, Mayer Brown took the actions described at length above.

88. By its involvement in creating and concealing the RGHI Receivable, including through its work on the sham round-trip loan transactions, Mayer Brown employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit in order (among other things) to defraud and mislead the THL Funds as to Refco's true financial condition and thereby induce the THL Funds to purchase Refco securities in the 2004 Purchase at an artificially inflated price. As a component thereof, Mayer Brown also made repeated false statements of material facts and omissions of material facts to the THL Funds, including about the existence of related-party transactions, indemnification obligations and material contracts as well as about the authenticity of the counterfeit Fourth LLC Agreement, knowing these statements and omissions were material to the THL Funds' decision to purchase Refco securities.

89. Mayer Brown engaged in the conduct described above knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon the THL Funds.

90. The THL Funds reasonably and justifiably relied on the integrity of the financial and business information provided by Mayer Brown and – to their detriment – entered into the 2004 Purchase, investing $452 million in Refco. If the THL Funds had known of the falsity of the material facts represented to them or of the information intentionally withheld from them, or had the fraudulent conduct engaged in by Mayer Brown not occurred, they would not have proceeded with the 2004 Purchase.

91.    Upon the disclosure of the true facts which had been misrepresented or concealed as alleged herein, Refco's stock price declined precipitously, losing over $1 billion in market capitalization.

92.    By virtue of the foregoing, Mayer Brown knowingly or recklessly violated, and is liable as a primary violator under Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) promulgated thereunder in that it employed devices, schemes and artifices to defraud and engaged in practices and a course of business that operated as a fraud or deceit upon the THL Funds.  Indeed, the inevitable consequence of the sham round-trip loan transactions on which Mayer Brown worked – transactions that did not involve the sale of goods or services or even, in most cases, the transfer of funds other than the net interest payoffs to the third parties in the transactions – was to manipulate Refco's financial statements and the appearance of its financial health to outsiders such as the THL Funds, which relied directly and expressly on the accuracy of the financial information they were provided in making the 2004 Purchase.

93.    As a direct and proximate result of the wrongful conduct of Mayer Brown, the THL Funds have suffered actual economic loss, incurring monetary damages in connection with the 2004 Purchase in an amount to be determined at trial, but that is in excess of $245 million, plus interest.

## SECOND CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

94.    The THL Funds repeat and reallege each of the allegations contained in paragraphs 1 through 85 inclusive, as if fully set forth herein.

95.    Mayer Brown made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by use of instrumentalities of interstate commerce and/or of the mails, in order to allow Refco securities to be sold to the THL Funds in the 2004 Purchase at an artificially inflated price.

96.    Mayer Brown knowingly or recklessly made false and misleading statements of material fact or omitted to state material facts which it knew, or was reckless in failing to know, were false and misleading or were rendered misleading and inaccurate by the failure to disclose material information or provided, prepared or directed the provision of information during the due diligence process that was materially false or misleading and failed to disclose material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in order to defraud and mislead the THL Funds as to Refco's true financial condition and thereby induce the THL Funds to purchase Refco securities at an inflated price.

97.    Mayer Brown knew and intended that the THL Funds would rely, and had a right to rely, on the repeated statements of material facts and omission of material facts, and false statements provided in the course of the diligence process, and knew that they were material and essential to the THL Funds' decision to make the investment. Mayer Brown knew based on the material assistance it provided in connection with the sham round-trip loan transactions, its involvement in drafting the counterfeit Fourth LLC Agreement, and its access to Refco information that the information Mayer Brown provided to the THL Funds for their guidance and benefit in connection with the 2004 Purchase was materially false and misleading.

98.    Mayer Brown engaged in the conduct described above knowingly or intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon the THL Funds.

99.    When the foregoing representations were made, and the misleading financial statements and information provided, the THL Funds believed them to be true and complete in all material respects, and acted reasonably and justifiably in reliance thereon and – to their detriment – entered into the 2004 Purchase, investing $452 million in Refco.  If the THL Funds had known of the falsity of the material facts represented to them or of the information intentionally withheld from them, or had the fraudulent conduct engaged in by Mayer Brown not occurred, they would not have so acted.

100.    Upon the disclosure of the true facts which had been misrepresented or concealed as alleged herein, Refco's stock price declined precipitously, losing over $1 billion in market capitalization.

101.    By virtue of the foregoing, Mayer Brown knowingly or recklessly violated, and is liable as a primary violator under, Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that it made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading.

102.    As a direct and proximate result of the wrongful conduct of Mayer Brown, the THL Funds have suffered actual economic loss, incurring monetary damages in connection with the 2004 Purchase in an amount to be determined at trial, but that is in excess of $245 million, plus interest.

### THIRD CLAIM FOR RELIEF
### (RICO – Conspiracy to violate 18 U.S.C. §1962(c),
### in violation of 18 U.S.C. §1962(d))

103.    The THL Funds repeat and reallege each of the allegations contained in paragraphs 1 though 85 inclusive, as if fully set forth herein.

104.    At all times relevant to this Complaint, Refco was an "enterprise" within the meaning of 18 U.S.C. §1961(4), as it was a Delaware corporation or Delaware limited liability company with its headquarters in New York City, New York. Refco provided execution and clearing services for exchange-traded derivatives to customers throughout and outside the United States, provided brokerage services in the fixed income and foreign exchange markets for customers throughout and outside the United States, and engaged in trading on its own behalf in the securities and instruments of or offered by entities throughout and outside the United States. As a result of these and other business activities of Refco, at all times relevant to this Complaint, Refco engaged in interstate and foreign commerce and its activities affected interstate and foreign commerce.

105.    At all times relevant to this Complaint, Bennett, Trosten and Maggio (the "Refco Operators") were "persons" within the meaning of 18 U.S.C. §1961(3) as they were individuals capable of holding a legal or beneficial interest in property. As alleged in greater detail in the preceding paragraphs, each Refco Operator was (a) employed by and associated with Refco and (b) conducted and participated in the conduct of Refco's affairs. For example, and without limiting the other allegations in this Complaint of their employment by, association with, and participation in the conduct of Refco:

(a)    At all times relevant to this Complaint, Bennett was the President and Chief Executive Officer of Refco and had a substantial indirect ownership interest in Refco. Through his formal positions with Refco and otherwise, Bennett was involved in

managing Refco's affairs, including being directly involved in the sham round-trip loan

transactions used to conceal the RGHI Receivable and in making false representations to

the THL Funds about the related-party transactions between RGHI and Refco as well as

the financial commitments and condition of Refco.

(b)  Trosten held positions at Refco from the 1990s through August 2004,

including serving as Chief Financial Officer of Refco from in or about May 2001 until in

or about August 2004.  Through his formal positions with Refco and otherwise, Trosten

was involved in managing Refco's affairs, including being directly involved in the sham

round-trip loan transactions used to conceal the RGHI Receivable and in making false

representations to the THL Funds about the related-party transactions between RGHI and

Refco as well as the financial commitments and condition of Refco.

(c)  At all times relevant to this Complaint, Maggio was a Senior Vice

President of Refco and the President and Chief Executive Officer of Refco's

broker/dealer subsidiary, Refco Securities, LLC.  Maggio also was President of another

Refco subsidiary, RCM, from 2001 until in or about October 2005.  Through his formal

positions with Refco and otherwise, Maggio was involved in managing Refco's affairs,

including being directly involved in the sham round-trip loan transactions used to conceal

the RGHI Receivable and in making false representations to the THL Funds about the

related-party transactions between RGHI and Refco.

106.    As alleged in greater detail in the preceding paragraphs and as set forth in

the Bennett Indictment, each Refco Operator conducted and participated in the conduct of

Refco's affairs through racketeering activities – namely, wire fraud in violation of 18 U.S.C.

§1343, mail fraud in violation of 18 U.S.C. §1341, financial institutions fraud in violation of 18

U.S.C. §1344, and money laundering in violation of 18 U.S.C. § 1957.  For example, and without limiting the other allegations in this Complaint of the Refco Operators' racketeering activities:

(a)  The Refco Operators were involved in conceiving, negotiating, and effectuating and directing others to effectuate the sham round-trip loan transactions for the purposes of concealing the RGHI Receivable from regulators[16] and financial institutions and so that Refco's financial statements, which the Refco Operators and their co-conspirators used to induce third parties such as the THL Funds to invest in Refco, would disguise the RGHI Receivable and Refco's true financial condition.  These transactions were furthered by the use of the interstate and/or foreign wires, if not also the interstate and/or foreign mail, as documents relating to the transactions were communicated to the various participants through at least the interstate and/or foreign wires, if not also the interstate and/or foreign mail.

(b)  The Refco Operators transmitted or caused others to transmit the materially false financial statements that did not accurately reflect the RGHI Receivable and Refco's true financial condition (because of, among other things, the sham round-trip loan transactions) to third parties, including one or more financial institutions that loaned money to Refco and potential investors such as the THL Funds, through at least the interstate wires, if not also the interstate mail.

---

[16]    Even before it became a publicly traded company, Refco (including its subsidiaries) was subject to extensive regulation by federal and state agencies and by self-regulatory organizations.  Among the applicable regulations were ones imposing capital requirements and financial reporting requirements. The Refco Operators did not disclose Refco's true financial condition to these regulating agencies and organizations, just as they did not disclose the same to the THL Funds.

(c)  The Refco Operators transmitted or caused others to transmit through the interstate wires materially false information about the financial condition of Refco, Refco's related-party transactions, and the RGHI Receivable to the THL Funds or their representatives to induce the THL Funds to invest in Refco.  They caused Refco's materially false financial statements to be transmitted to the THL Funds knowing that those statements did not accurately reflect (among other things) Refco's financial condition or the RGHI Receivable.

(d)  Each Refco Operator transmitted or caused to be transmitted to the THL Funds through the interstate wires an officer's questionnaire in which he falsely represented that he was not aware of any material fact concerning Refco's business and operations that was not accurately disclosed in specified offering materials while knowing that those materials did not accurately disclose (among other things) the RGHI Receivable or the related-party transactions in which Refco was involved.

(e)  As set forth in the Bennett Indictment, Bennett and Trosten engaged or caused others to engage in the wire fraud, financial institution fraud and money laundering activities alleged therein.

107.    As alleged in greater detail in the preceding paragraphs, the foregoing racketeering activities by the Refco Operators constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  For example, and without limiting the other allegations in this Complaint of the Refco Operators' pattern of racketeering activities:

(a)  The wire, mail, and financial institution fraud of the Refco Operators alleged in the preceding paragraphs involved multiple acts of racketeering activity within the past ten years.

(b)  The wire, mail, and financial institution fraud of the Refco Operators alleged in the preceding paragraphs began as early as February 1998 and continued through at least October 2005.

(c)  These acts of racketeering were the regular way of operating Refco by the Refco Operators.  On an annual basis from February 2000 through February 2005, and on a quarterly basis from May 2004 through August 2005, the Refco Operators engaged in the sham round-trip loan transactions for the purpose of concealing the RGHI Receivable and the true financial condition of Refco from others, including at various times the THL Funds, regulators, financial institutions, and the investing public.  The Refco Operators also regularly and repeatedly made and caused to be made false statements to the THL Funds or their representatives about Refco's financial condition and the existence and size of the RGHI Receivable.

(d)  The very nature of these acts of racketeering implied a threat of continued criminal activity.  The Refco Operators were regularly engaged in making or causing others to make false statements about Refco's financial condition and the size of the RGHI Receivable starting as early as 1998 and continuing through the discovery of their fraud in October 2005, and these false statements would have continued had it not been for their discovery by someone outside the Refco Operators' conspiracy in October 2005.

(e)  There were a number of participants in the Refco Operators' fraudulent schemes, including not only the Refco Operators, but also (without limitation) other Refco employees, Mayer Brown, BAWAG, and the third parties who engaged in sham round-trip and "repo" transactions with Refco and RGHI.

(f)  There were a substantial number of victims of the Refco Operators' fraudulent schemes.  In addition to the THL Funds, other victims include the Secured Lenders, other financial institutions that lent money to Refco, the investors who purchased Refco's debt securities, and the investing public who purchased Refco's equity securities.[17]

108.    In summary, the Refco Operators conducted and participated in the conduct of Refco's affairs through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c).

109.    At all times relevant to this Complaint, Mayer Brown was a "person" within the meaning of 18 U.S.C. § 1961(3) as it was an entity capable of holding a legal or beneficial interest in property.

110.    As alleged in greater detail in the preceding paragraphs, Mayer Brown conspired with the Refco Operators to violate 18 U.S.C. §1962(c), all in violation of 18 U.S.C. § 1962(d).  For example, and without limiting the other allegations in this Complaint of Mayer Brown's conspiracy with the Refco Operators, in violation of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c):

(a)  Mayer Brown negotiated, participated in, and/or coordinated 17 sham round-trip loan transactions, knowing that they did not have a legitimate business purpose, lacked economic substance, and were used to move the RGHI Receivable off of Refco's financial statements at the end of financial reporting periods.

(b)  In connection with the 2004 Purchase, Mayer Brown made material false representations, facilitated material false representations to be made, and failed to

---

[17]    In its bankruptcy petition, Refco identified its 50 largest unsecured creditors and the debt owed to them.  The smallest debt to qualify for this list was still over $10 million (attached hereto as Exhibit 7).

disclose material truthful information to the THL Funds and their representatives about Refco's related-party transactions (including the existence of the sham round-trip loan transactions), Refco's material contracts and Refco's indemnification obligations. Mayer Brown knew these misrepresentations were false and the THL Funds relied on the representations to be true in deciding to effect the 2004 Purchase.

(c)  In connection with the 2004 Purchase, Mayer Brown drafted and negotiated documents that contained false representations about Refco's related-party transactions (including the existence of the sham round-trip loan transactions), Refco's material contracts and Refco's indemnification obligations. Mayer Brown knew the representations were false and the THL Funds relied on those representations to be true in deciding to invest in Refco.

(d)  In fact, during the period of due diligence for the 2004 Purchase, Mayer Brown was handling a $700 million round-trip loan transaction to take place at the end of Refco's next financial reporting period (May 2004). This transaction was conducted to conceal the RGHI Receivable and Refco's true financial position from the THL Funds and others. Mayer Brown never disclosed this transaction or the other round-trip loan transactions to the THL Funds or their representatives during the due diligence process.

(e)  Mayer Brown event went so far as to manufacture a counterfeit Fourth LLC Agreement, transmitted that counterfeit to the THL Funds over the interstate wires, and falsely represented to the THL Funds that the counterfeit was the genuine Fourth LLC Agreement. Mayer Brown undertook those actions and misrepresentations to

mislead the THL Funds as to Refco's financial condition, its ownership structure, and its related-party transactions.

111.    As alleged in greater detail in the preceding paragraphs, through its participation in and facilitation of the racketeering activities of the Refco Operators, Mayer Brown intended to further, agreed to further, and in fact did further the fraudulent schemes of the Refco Operators and was aware of the existence, if not the very identity, of the other participants in the fraudulent schemes and conspiracy.  Mayer Brown's false and misleading statements and omissions to the THL Funds were part of, and undertaken in furtherance of, a common scheme, plan and agreement with Bennett and his other co-conspirators to induce (a) the THL Funds to complete the 2004 Purchase (and at a grossly inflated price), (b) financial institutions to lend money to Refco, and (c) other third parties to invest in Refco, as well as to mislead governmental and exchange regulators as to Refco's financial health and compliance with regulatory and capital requirements.  Among the tortious and wrongful conduct of Mayer Brown in furtherance of this conspiracy were Mayer Brown's active involvement in the sham round-trip loan transactions, Collins's false statements and deceptions relating to the sham round-trip loan transactions, and Collins's manufacturing of the counterfeit Fourth LLC Agreement, which he falsely represented to the THL Funds to be the genuine Fourth LLC Agreement.

112.    As alleged in greater detail in the preceding paragraphs, the THL Funds were directly injured in their business and property by reason of the violations of 18 U.S.C. § 1962 set forth above, and therefore are entitled under 18 U.S.C. § 1964(c) to damages in an amount to be determined, but that exceed $245 million, trebled, plus interest and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Fraud)

113.    The THL Funds repeat and reallege each of the allegations contained in paragraphs 1 through 85 inclusive, as if fully set forth herein.

114.    As alleged in greater detail in the preceding paragraphs, Mayer Brown knowingly made untrue statements of material fact and/or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading and provided material false information to the THL Funds.  For example, Mayer Brown knowingly failed to disclose to the THL Funds, despite repeated requests for such information, the existence of, and the documentation relating to, the sham round-trip loan transactions and the underlying RGHI Receivable (among other things).  Having elected to speak, Mayer Brown had a duty to tell the truth.  Also as alleged in greater detail in the preceding paragraphs, Mayer Brown made numerous false and material statements about Refco to the THL Funds and their representatives (which includes providing the THL Funds with a counterfeit Fourth LLC Agreement and representing it to be the genuine Fourth LLC Agreement).

115.    As alleged in greater detail in the preceding paragraphs, Mayer Brown acted intentionally with respect to these matters.  Mayer Brown intended that the THL Funds rely on its statements as being both truthful and complete.  Mayer Brown knew that its statements and omissions were material and essential to the THL Funds' decision to proceed to close the 2004 Purchase.  Mayer Brown made its false statements, or omitted to disclose requested information, for the purpose of inducing the THL Funds to effect the 2004 Purchase.

116.    At the time the foregoing statements were made and information was provided, the THL Funds believed them to be true and complete, and the THL Funds acted

reasonably and justifiably in reliance thereon to their detriment by entering into the

2004 Purchase. If the THL Funds had known of the falsity of the material facts provided by

Mayer Brown, of the information Mayer Brown intentionally withheld despite requests for the

information from the THL Funds or their representatives, or of Refco's true financial condition,

the THL Funds would not have so acted.

117.    As alleged in greater detail in the preceding paragraphs, Mayer Brown's

false and misleading statements and omissions to the THL Funds were part of, and undertaken in

furtherance of, a common scheme, plan and agreement with Bennett and his other co-

conspirators to (among other things) induce the THL Funds to complete the 2004 Purchase, and

to do so at a grossly inflated price. Among the tortious and wrongful conduct of Mayer Brown

in furtherance of this conspiracy were Mayer Brown's active involvement in the sham round-trip

loan transactions, Collins's false statements and deceptions relating to the sham round-trip loan

transactions, and Collins's manufacturing of the counterfeit Fourth LLC Agreement, which he

falsely represented to the THL Funds to be the genuine Fourth LLC Agreement. Mayer Brown

is therefore responsible for all of the tortious and wrongful conduct of the conspirators in

furtherance of their common scheme, plan and agreement.

118.    Mayer Brown's conduct caused the THL Funds actual injury, was

wrongful, without justification or excuse, and contrary to generally accepted standards of

morality. These acts and omissions were committed intentionally by Mayer Brown with actual

malice, and with reckless, wanton, and willful disregard of the THL Funds' rights, representing

inequitable and unjustifiable conduct against which the public needs protection from similar acts.

119.    As a direct and proximate result of the fraud and deceit engaged in by

Mayer Brown and its co-conspirators, and the THL Funds' justifiable reliance thereon, the THL

Funds have suffered monetary damages in an amount to be determined at trial, but that is in excess of $245 million, plus interest.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

120.    The THL Funds repeat and reallege each of the allegations contained in paragraphs 1 through 84 and 114 through 119 inclusive, as if fully set forth herein.

121.    At all relevant times, Mayer Brown possessed a duty to act with due care, competence, fairly and in good faith toward the THL Funds in connection with its communications with the THL Funds and to completely, truthfully and accurately convey to the THL Funds and their representatives material information and facts relating to Refco as requested, including the existence of related-party transactions, indemnification obligations, material contracts, the PPA, the Letter Agreement, and the genuine Fourth LLC Agreement. Having undertaken to provide the THL Funds with material information about such matters, Mayer Brown had a duty to provide complete and truthful information and refrain from providing information it knew, or should have known, was false or misleading.

122.    As alleged in greater detail in the preceding paragraphs, Mayer Brown, acting in the course of its business in connection with its work on the 2004 Purchase (for which Mayer Brown was compensated and thereby possessed a pecuniary interest), provided the THL Funds with false and misleading information for the guidance and benefit of the THL Funds and failed to disclose to the THL Funds material information requested by the THL Funds or their representatives, all for the purpose of inducing the THL Funds to consummate the 2004 Purchase. Mayer Brown failed to exercise reasonable care or competence in obtaining and communicating information to the THL Funds and in connection with their dealings with the THL Funds and their representatives.

123.    Mayer Brown's false and misleading statements were addressed directly to the THL Funds and their representatives, and were made without any disclaimers, assertions of privilege or other limitations. Mayer Brown was aware that the information it provided directly to the THL Funds and their representatives in the course of the transaction would be used by the THL Funds for the particular purpose of deciding whether to proceed with the 2004 Purchase, and that the THL Funds did in fact rely upon the oral and written representations described above in deciding to consummate the 2004 Purchase. The work performed by Collins, Koury, and others at Mayer Brown, including on the sham round-trip loan transactions, was within the scope and sphere of their authority as Mayer Brown lawyers and was in furtherance of Mayer Brown's business interests, and each had a duty to act upon and accurately report and disclose the information acquired during this work.

124.    Mayer Brown's materially false statements and omissions were made with full knowledge of the reliance the THL Funds placed on its expertise and intimate knowledge of Refco and Refco's business dealings. Mayer Brown was at all times aware that the information it provided and the representations it made to the THL Funds and their representatives would be relied upon and employed by the THL Funds in deciding to proceed with the 2004 Purchase. By communicating with representatives of the THL Funds and directly addressing correspondence and memoranda to them, Mayer Brown engaged in conduct which evinced its awareness and understanding that the THL Funds would rely on the information Mayer Brown provided to them. Mayer Brown at all times was aware of the material nature of such information and the importance the THL Funds placed on, for example, identifying all Refco related-party transactions and arrangements involving Bennett-affiliated entities – such as RGHI eliminating all related-party debts – and understanding Refco's true financial condition.

125.    Refco and RGHI, through Bennett, Trosten, and others, knew and expected that Mayer Brown would communicate with the THL Funds throughout the diligence process, and specifically, that Mayer Brown would provide the THL Funds with false and misleading information regarding the existence of related-party transactions, material contracts, and Refco's indemnification obligations.  Refco, RGHI, and Bennett expected and anticipated that Mayer Brown would make representations and provide information to the THL Funds on Refco's behalf and doing so was very much within the intended scope of Mayer Brown's services to its clients.  Refco, RGHI, and Bennett were aware and fully intended that the THL Funds would rely upon the representations made, and information provided, by Mayer Brown as being accurate and complete in deciding whether to proceed with their investments in Refco.

126.    Mayer Brown's clients had no reasonable expectation of confidentiality regarding the existence of the sham round-trip loan transactions given that the documents were provided to and executed by unaffiliated third parties, and therefore could not be protected from disclosure as privileged communications.  Mayer Brown never advised the THL Funds that it was precluded from providing complete and accurate information concerning related-party transactions, material contracts, or indemnification obligations because of the attorney-client privilege or other confidentiality obligation to its clients.  Mayer Brown's clients also had no reasonable expectations of confidentiality regarding the existence of the Fourth LLC Agreement, which also involved third-party signatories.  Moreover, even if they had such an expectation, that would not excuse Mayer Brown's wrongful conduct in manufacturing and transmitting to the THL Funds a counterfeit Fourth LLC Agreement.

127.    Mayer Brown's false and misleading representations caused the THL Funds to suffer pecuniary loss.  These representations by Mayer Brown were intended to, and did

in fact, influence the THL Funds' decision to proceed with the 2004 Purchase and thereby substantially affected the rights of the THL Funds. The THL Funds justifiably and reasonably relied upon the information and representations given by Mayer Brown as being accurate and complete, and as a result of such reliance, suffered pecuniary injury. If the THL Funds had known of the falsity of the material facts that were represented, or were aware of the information withheld from them, they would not have so completed the 2004 Purchase.

128.    As alleged in greater detail in the preceding paragraphs, Mayer Brown's false and misleading statements and omissions to the THL Funds were part of, and undertaken in furtherance of, a common scheme, plan and agreement with Bennett and his other co-conspirators to (among other things) induce the THL Funds to complete the 2004 Purchase, and to do so at a grossly inflated price. Among the tortious and wrongful conduct of Mayer Brown in furtherance of this conspiracy were Mayer Brown's active involvement in the sham round-trip loan transactions, Collins's false statements and deceptions relating to the sham round-trip loan transactions, and Collins's manufacturing of the counterfeit Fourth LLC Agreement, which he falsely represented to the THL Funds to be the genuine Fourth LLC Agreement. Mayer Brown is therefore responsible for all of the tortious and wrongful conduct of the conspirators in furtherance of their common scheme, plan and agreement.

129.    As a direct and proximate result of the conduct of Mayer Brown and its co-conspirators, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.

130.    WHEREFORE, the THL Funds demand judgment against Mayer Brown as follows:

(a)    On the First, Second, Fourth and Fifth Claims for Relief, awarding the THL Funds damages against Mayer Brown in an amount not less than $245 million, plus interest, to be determined at trial;

(b)    on the Third Claim for Relief, awarding the THL Funds damages against Mayer Brown in an amount not less than $245 million, trebled, plus interest and attorneys' fees, to be determined at trial;

(c)    on the Fourth Claim for Relief, awarding the THL Funds exemplary damages against Mayer Brown in an amount to be determined at trial;

(d)    awarding the THL Funds the costs and disbursements incurred in prosecuting this action, including a reasonable allowance for the fees and expenses of their attorneys and experts; and

(e)    granting such other and further legal and equitable relief as the Court may deem just and proper in these circumstances.

The THL Funds demand trial by jury of any and all issues so triable.

Dated:    New York, New York        WEIL, GOTSHAL & MANGES LLP
          February 20, 2008


                                   By:    _Greg Dal_
                                          Greg A. Danilow (GD-1621)

                                   Paul Dutka (PD-2568)
                                   Christopher R.J. Pace (CP-0001)
                                   Seth Goodchild (SG-2296)
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   (212) 310-8000

                                   KELLOGG, HUBER, HANSEN, TODD,
                                   EVANS & FIGEL, P.L.L.C
                                   Mark C. Hansen
                                   Rebecca A. Benyon
                                   James M. Webster, III

                                   1615 M Street, N.W., Suite 400
                                   Washington, D.C. 20036
                                   (202) 326-7900

                                   *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February 2008, I sent the foregoing
**FIRST AMENDED COMPLAINT** to the counsel listed below via certified and
electronic mail.

| | |
|---|---|
| John K. Villa | Joel M. Cohen |
| George A. Borden | Anthony M. Candido |
| Thomas G. Ward | Timothy Casey |
| WILLIAMS & CONNOLLY LLP | CLIFFORD CHANCE US LLP |
| 725 Twelfth Street, NW | 31 West 52nd Street |
| Washington, D.C. 20005 | New York, NY 10019 |
| Tel.: (202) 434-5000 | Tel.: (212) 878-8000 |
| Fax: (202) 434-5029 | Fax: (212) 878-8375 |
| | |
| *Attorneys for Defendant Mayer Brown LLP* | *Attorneys for Defendant Mayer Brown UK LLP* |

Scott D. Woller

# Exhibit 1


**Best Practices in Managing Electronic Disclosure**
Addressing the industry's most challenging issues
Wolters Kluwer


**TheLawyer.com**

09 Nov 2007

Subscribe to
The Lawyer

Login/Register | My Account | About Us | Contact Us | ADVERTISE

Visitor **Register Now** | News | Jobs | CPD/Events | Directories | Surveys | Students

## Surveys

Hot 100
Global 100
UK 100
Euro 100
Rising 50
Career Report

2005 | 2006

# THE NEW ORDER
# THE UK 100 2006



Advertisements

**Mayer Brown Rowe & Maw**

| | |
|---|---|
| UK/global turnover: | £83m/£559m |
| UK/global PEP: | £480,000/£546,000 |
| UK/global revenue per lawyer: | £354,000/£365,000 |
| UK revenue per partner/equity partner: | £900,000/£1.5m |
| Global revenue per equity partner: | £1.3m |
| UK/global number of equity partners: | 55/431 |
| UK/global number of partners: | 96/555 |
| UK/global number of lawyers: | 234/1,534 |
| UK number of staff: | 537 |
| UK/global leverage ratio: | 3.3/2.6 |

CORPORATE AND litigation remain the two biggest practices at Mayer Brown Rowe & Maw, accounting for 60 per cent of London turnover. Among the firm's high-profile instructions were advising Persimmon on its recommended offer for UK housebuilder Westbury and acting for the Football Association on its employment tribunal with ex-secretary Faria Alam.

The firm also underwent an aggressive recruitment campaign to take on four new partners in the last financial year.

Since 2005 the UK and US operations of the firm have had one profit pool, although the firm remains a combination of two limited-liability partnerships (LLP), one in Illinois and the other in England.

The change to the profit pool, a legacy of the 2002 merger between Rowe & Maw and Mayer Brown & Platt, also saw the UK arm move away from a modified lockstep to a merit-based system of partner compensation.

he Lawyer Group is a division of Centaur Media plc 2007
heLawyer.com was built by Sift Group Ltd.


entaur Media plc
egistered No 4948078 England.
egistered Office St. Giles House, 50 Poland Street, London W1F 7AX

# Exhibit 2

# MAYER · BROWN

OVERVIEW | INDUSTRIES & PRACTICES | LAWYERS | OFFICES | NEWS | PUBLICATIONS | EVENTS | CAREERS

Print this page

**Search**

---PRESS RELEASE---

**Mayer, Brown & Platt, UK's Rowe & Maw Combine, Creating World's 10th Largest Law Firm**

28 January 2002, Chicago - The law firms Mayer, Brown & Platt and Rowe & Maw announced today they are combining operations as Mayer, Brown, Rowe & Maw.

The combination is the first union of a top-ten US firm with a leading UK firm. Mayer, Brown & Platt was listed as one of the top ten North American firms in 2001 by *Chambers & Partners*. Rowe & Maw was nominated by *Chambers & Partners* as the "UK Law Firm of the Year in 2000." The merger thus brings together firms preeminent on both sides of the Atlantic, even as it gives Mayer, Brown, Rowe & Maw a London presence unmatched in size by any US law firm.

Both Mayer, Brown & Platt and Rowe & Maw are commercial firms with highly-regarded business law practices. The firms share numerous clients, including Bank of America, Aon, Ernst & Young and GE Power Systems.

The new firm is the tenth largest in the world. It has 1300 attorneys, nearly $700 million in annual revenues, and 13 offices in the United States, UK, Germany, Paris and Brussels. Mayer, Brown, Rowe & Maw also has two representative offices in China.

"Rowe & Maw is aggressive, innovative, and well-managed. We respect them and we like them. That's essential to integrating our practices successfully," Mayer, Brown, Rowe & Maw Chairman Ty Fahner said.

Stuart James, Senior Partner in Mayer, Brown, Rowe & Maw's London office, said, "In one leap, we have created a law firm with sufficient scale to perform the most complex transactions globally. Equally important, the cultural and professional capability fit of the combined firm provides all of our clients with focused, cross-sector expertise."

"London is essential," Fahner said. "Its importance to the practice of law in the 21st Century cannot be overstated. No American law firm has a presence there that is comparable to ours. We offer seamless, full-service legal capabilities in the most important commercial centers of Europe and North America."

The combination with Rowe & Maw is Mayer, Brown & Platt's third step in its European expansion. In January 2001, the firm combined with Lambert & Lee in Paris. Mayer, Brown & Platt greatly strengthened its German presence in April, when the Frankfurt partners of Gaedertz joined the firm.

"Our clients have become more international. So have we," Mayer, Brown, Rowe & Maw's Managing Partner Debora de Hoyos said in Chicago. "This combination better serves our clients."

 Rowe & Maw has grown dramatically in recent years. Its revenues have increased by almost 40 percent since 1998. In 1999, Legal 500 declared its corporate practice "the envy of its many competitors." In addition to being nominated UK law firm of the year in 2000 by Chambers & Partners, Rowe & Maw was ranked the "No. 1 Corporate Team" for its market size in 2001.

NEWS

Archive
▶ In The News
▶ Press Releases



Mayer, Brown & Platt consistently ranks among the premier law firms of the United States. It offers more than 45 specialized practice areas. Mayer Brown is internationally recognized for its work in corporate, banking, securitization, tax and litigation, as well as for its noted national appellate practice.

Mayer, Brown, Rowe & Maw is governed by an international management committee, comprised of representatives from across the firm. The firm has 300 attorneys in the UK and Continental Europe, 550 in Chicago, 175 in New York City, over 100 in Washington, DC, 75 in California, and another 100 in Charlotte and Houston.

Conversations between the two firms began in the Spring of 2001. The combination was approved on Friday, January 25 and becomes effective on February 1, 2002.

---

ack to top

© Copyright 2007 - Mayer Brown LLP and/or Mayer Brown International LLP

Mayer Brown is a combination of two limited liability partnerships, one named Mayer Brown LLP, established in Illinois, USA, and one named Mayer Brown International LLP, incorporated in England.

Except where noted on their respective biographies. the lawyers of our practice are not certified by the Texas Board of Legal Specialization or by the authority of their respective practice jurisdictions.

Disclaimer | Privacy Policy | Terms of Use | Attorney Advertising | Spam Policy | Regulatory Information | Contact Webmaster

# Exhibit 3

# MAYER · BROWN

OVERVIEW | INDUSTRIES & PRACTICES | LAWYERS | OFFICES | NEWS | PUBLICATIONS | EVENTS | CAREERS

Print this page                                                                    Search

—————— PRESS RELEASE ——————

**Mayer, Brown, Rowe & Maw Announces Name Change**

August 23, 2007 - Mayer, Brown, Rowe & Maw LLP, one of the leading international law firms, announced today that effective September 1, 2007 the firm will be known globally as Mayer Brown.

Commented James D. Holzhauer, the firm's Chairman, "Unifying our brand name to Mayer Brown is a powerful sign of the global firm we have built, and will serve to communicate our strength as a leader in the legal industry." He continued, "We will continue to build on our quality and capability to serve clients across all geographies. Becoming Mayer Brown is part of that vision. We also believe the change will make our name easier to use and more memorable to our clients."

Added Vice Chairman Kenneth S. Geller, "Our name will change to reflect how the market - as well as our own staff - has traditionally referred to us. But our focus on client service and client relationships will not change, nor will our unique platform which allows us to provide the highest caliber of service to clients wherever they may be."

The firm's unique transatlantic footprint, which includes substantial depth of practice in the U.S., through seven offices, and in Europe through a further six, is enhanced by a growing presence in Hong Kong.

Additionally the firm has three independent alliances, giving clients access to on the ground capability in Italy, Spain and Eastern Europe through relationships with Italian law firm Tonucci & Partners and Madrid headquartered Ramón & Cajal and into Mexico through the longstanding alliance the firm enjoys with Jáuregui, Navarrete y Nader. The firm also has a trade consulting office in Beijing.

Vice Chairman Paul Maher discussed the strategy behind the decision: "Our growth has been focused and strategic, aimed at building a firm with a consistent culture, level of service and commitment to our clients. By adapting to become simply Mayer Brown, we see an opportunity to build a stronger and more defined brand in a fiercely competitive market."

**Further information:**
Doug Kramer
Director of Global Communications
+1 312 701 8290

Will Hulbert
Head of Marketing Communications
+44 (0)20 7782 8804

NEWS

Archive
▸ In The News
▸ Press Releases

Related Lawyers
Holzhauer, James D.
Geller, Kenneth S.
Maher, Paul

————————————————————————————

ck to top

© Copyright 2007 - Mayer Brown LLP and/or Mayer Brown International LLP

Mayer Brown is a combination of two limited liability partnerships, one named Mayer Brown LLP, established in Illinois, USA, and one named Mayer Brown International LLP, incorporated in England.

Except where noted on their respective biographies, the lawyers of our practice are not certified by the Texas Board of Legal Specialization

or by the authority of their respective practice jurisdictions

Disclaimer | Privacy Policy | Terms of Use | Attorney Advertising | Spam Policy | Regulatory Information | Contact Webmaster

# Exhibit 4

# M A Y E R · B R O W N

Search

OVERVIEW | INDUSTRIES & PRACTICES | LAWYERS | OFFICES | NEWS | PUBLICATIONS | EVENTS | CAREERS

Mayer Brown is a leading global law firm with 1,500 lawyers operating in major cities worldwide. We deliver timely, innovative and practical solutions to transactional, dispute resolution and regulatory challenges. Mayer Brown is known for its intellectual depth and industry insight, applied to the unique needs of each client.



**RECENT HEADLINES**

Mayer Brown Favorably Rated by Summer Associates
*Washington, DC Office Ranked No. 1 and Chicago Office No. 5 in American Lawyer Survey* Read >>

Mayer Brown Appoints 16 New Partners Across Europe Read >>

Mayer Brown Promotes 27 to Partner in U.S. Offices - U.S. partner promotions part of 43 appointments worldwide - Read >>

Houston Mayer Brown Attorney Highlighted in *Texas Lawyer's* "Go-To Guide" Read >>

Mayer Brown Appoints Environment Partner Michael Hutchinson Read >>

Mayer Brown assists TeliaSonera International Carrier with the sale of part of its UK fibre optic network Read >>

Mayer Brown Scores International Trade Victory Read >>

**MAYER BROWN HIGHLIGHTS**

Effective September 1, 2007, Mayer, Brown, Rowe & Maw LLP has unified its brand name and will be known globally as **Mayer Brown**. The change reflects the firm's global scope as we continue to build on the strength of our well-recognized transatlantic platform, with offices in major business centers such as New York, London, Chicago, Paris, Washington, Frankfurt and Hong Kong.

Mayer Brown is best known for its ability to deliver smart, insightful work on complex matters and its business-minded, results-oriented approach. The firm's growth is focused on continuing to attract and retain the best legal talent – and on providing clients with high quality, responsive service.

Becoming known as Mayer Brown around the world reflects the position of the firm as a global leader. The change also makes the firm's name easier to use and more memorable.  Read >>

:k to top

© Copyright 2007 - Mayer Brown LLP and/or Mayer Brown International LLP

Mayer Brown is a combination of two limited liability partnerships, one named Mayer Brown LLP, established in Illinois, USA, and one named Mayer Brown International LLP, incorporated in England.

Except where noted on their respective biographies, the lawyers of our practice are not certified by the Texas Board of Legal Specialization or by the authority of their respective practice jurisdictions.

Disclaimer | Privacy Policy | Terms of Use | Attorney Advertising | Spam Policy | Regulatory Information | Contact Webmaster

# Exhibit 5

# MAYER·BROWN

OVERVIEW | INDUSTRIES & PRACTICES | LAWYERS | OFFICES | NEWS | PUBLICATIONS | EVENTS | CAREERS

Search

———————— PRESS RELEASE ————————

**Mayer Brown Promotes 27 to Partner in U.S. Offices - U.S. partner promotions part of 43 appointments worldwide -**

October 29, 2007 - Mayer Brown LLP, a leading international law firm, announced the promotion of 27 new partners in the U.S. as part of 43 promotions worldwide. The appointments take effect on January 1, 2008.

"The promotions recognize the exceptional work and client service of these attorneys, and underscore the firm's continued growth and global success," said James D. Holzhauer, chairman of Mayer Brown. "We are confident that the new members of our partnership will continue to make invaluable contributions to both our clients and the firm."

"The partners and I congratulate each of our colleagues on this outstanding career achievement," commented Kenneth S. Geller, vice chairman of the firm. "The exceptional ability and dedication they demonstrated to earn their new position will serve them well throughout their legal careers."

The partner promotions in the U.S. are as follows:

## CHICAGO

### Gianluca Bacchiocchi, Finance
Mr. Bacchiocchi represents issuers, underwriters and swap counterparties in public and private issuances of asset-backed securities, principally backed by either mortgage, construction loan or equipment contract receivables. He also represents underwriters in private issuances of future-flow backed securities and project bond financings, and lenders in international debt restructurings and general secured and unsecured lending arrangements. Mr. Bacchiocchi received his J.D. from New York University School of Law in 1998.

### Debra Bogo-Ernst, Litigation
Ms. Bogo-Ernst has represented both national and multi-national corporations in complex litigation, including such matters as product liability litigation, class action litigation, consumer fraud, litigation related to direct-to-consumer advertising and marketing of prescription drugs, qui tam litigation, contract disputes, insurance disputes, Equal Credit Opportunity Act claims, Truth-In-Lending Act claims, non-competition litigation and preferred agent claims. She joined the firm in 2000 after graduating magna cum laude from the University of Illinois College of Law.

### Kevin Desharnais, Environmental
Mr. Desharnais specializes in environmental law covering all media, including air, land, water, wetlands and noise matters. He is also experienced in the negotiating and drafting of environmental provisions in corporate and real estate transactions, including mergers, stock purchases, securitizations, debt offerings and credit transactions. Mr. Desharnais graduated from Pace Law School in 1992 with an Environmental Law Certificate.

### Christian Fabian, Corporate
Mr. Fabian specializes in mergers, acquisitions and securities law matters. His corporate practice includes representing purchasers and sellers of domestic and international businesses in public and private mergers, tender offers and other

NEWS

| Archive |
| ▸ In The News |
| ▸ Press Releases |

Related Lawyers

Bacchiocchi, Gianluca G.

Barrage, Rafic H.

Biskamp, Mark S.

Bogo-Ernst, Debra

De, Rajesh

Desharnais, Kevin

Fabian, Christian W.

Gonzalez, Ricardo M.

Kane, Stephen J.

Kugler, Andrew T.

Labat, Germain D.

Luber, Zachary A.

Lynch, Jamison E.

Mann, William M.

Mascia, Michael C.

Noll, Lauren R.

O'Keefe, Lisa

Parkinson, James T.

Pershkow, Amy Ward

Reuling, Nicole M.

Richbourg, Luke

Ruback, Gregory D.

Scott, Sean T.

Seliga, Joseph

Trauman, Brian P.

Wheeler, Reb D.

Tauber, Andrew

business combinations and representing public and private companies in joint ventures, corporate governance matters and securities law compliance. Mr. Fabian also represents issuers and underwriters in public offerings of equity and debt securities, as well as issuers and initial purchasers in Rule 144A transactions, including high yield debt and convertible debt. He has worked with clients in a several industries, including telecommunications, automotive, healthcare and technology. Mr. Fabian is a graduate of the University of Detroit Mercy School of Law.

### Stephen Kane, Litigation
As a member of Mayer Brown's Supreme Court and Appellate Practice Group, Steve has written numerous briefs in the United States Supreme Court and in the lower federal and state appellate courts. He has argued appeals before the United States Courts of Appeals for the Seventh and D.C. Circuits as well as the Illinois Appellate Court. Mr. Kane also has a great deal of expertise in the trial courts, where he focuses on brief-writing and counseling clients on case strategy. His areas of expertise include class actions, consumer fraud, employment discrimination, products liability, and securities fraud. Mr. Kane graduated magna cum laude from Georgetown University Law Center, where he was elected to the Order of the Coif and served as an editor of the Georgetown Law Journal. Following graduation, he clerked for Judge Frank J. Magill of the United States Court of Appeals for the Eighth Circuit.

### Zachary Luber, Corporate
Mr. Luber graduated from Northwestern University School of Law cum laude and joined Mayer Brown in 2000, where he specializes in stock and asset acquisitions and sales, mergers and tender offers, venture capital and private equity investments, corporate governance matters and general corporate representation. He has represented publicly traded and privately held clients in a variety of industries.

### Jamison Lynch, Intellectual Property
Mr. Lynch's practice is concentrated on pharmaceutical patent matters with particular emphasis on litigation, counseling and portfolio management under the Hatch-Waxman Act. He has participated in numerous Hatch-Waxman patent litigations and client counseling matters for a diverse range of drug products including antibiotics, anti-depressants, proton-pump inhibitors, muscle relaxants and hormone replacement therapy. Additionally, he has advised clients on patent portfolio matters such as life cycle management and portfolio review associated with the purchase or license of patent rights. Mr. Lynch graduated from the University of Wisconsin Law School, cum laude, in 1998.

### Lauren Frank Noll, Litigation
Ms. Noll's expertise is in complex commercial and class action litigation involving breach of contract, fraud, breach of fiduciary duty, accountant malpractice, business torts, telecommunications and securities laws. She is also experienced in all aspects of civil litigation, including dispositive motions, discovery issues and depositions. Ms. Noll has written numerous briefs in the federal and state appellate courts and argued before the United States Court of Appeals for the Seventh Circuit. She graduated from the University of Illinois College of Law, magna cum laude, in 2000.

### Lisa O'Keefe, Real Estate
Ms. O'Keefe primarily represents buyers, sellers, borrowers, lenders, tenants and landlords in connection with the sale, financing and leasing of commercial real estate. She has more than ten years of legal experience and graduated from Loyola Law School in 1991.

### Sean Scott, Bankruptcy
Mr. Scott specializes in advising individual institutional lenders and lender syndicates n all types of distressed situations, including out-of-court restructurings and in-court bankruptcy proceedings. He also regularly counsels financial institutions in structuring complex debt and securitization transactions. Mr. Scott has represented a variety of corporate and hedge fund clients in successful asset acquisitions from distressed or bankrupt entities. He graduated magna cum laude from the University of Notre Dame Law School in 2000.

**Joseph Seliga, Government & Global Trade**

Mr. Seliga specializes in state and local government law, representing public sector and private sector clients in a wide array of transactional, legislative and regulatory matters with particular emphasis on complex government transactions and infrastructure matters. He was integrally involved in Mayer Brown's representation of the City of Chicago on the $1.83 billion concession and lease of the Chicago Skyway Toll Bridge from the early planning stages of the transaction through closing. Mr. Seliga also advised the Indiana Finance Authority on the $3.8 billion concession and lease of the Indiana Toll Road and the City of Chicago on the $563 million concession and lease of the over 9,000 space Chicago downtown underground parking garage system. He is currently advising the Northwest Parkway Public Highway Authority with respect to its recently signed $603 million concession and lease transaction related to the Northwest Parkway toll road outside of Denver, Colorado. In addition, he has represented private entities with respect to proposed transactions related to the Illinois Lottery and Indiana Lottery. Mr. Seliga graduated from Northwestern University School of Law, cum laude, in 2000.

## CHARLOTTE

**Michael Mascia, Finance**

Mr. Mascia specializes in securitization and other structured financial products, including commercial paper conduit transactions, term securitizations, CDOs, and CLOs. He regularly represents underwriters, conduits, commercial banks, issuers and other finance companies in the securitization of private equity capital commitments, student loans, auto loans and leases, middle market corporate loans, trade receivables, intellectual property receivables, equipment leases, residential mortgages, and other esoteric assets; and underwriters, issuers and collateral managers in corporate CLOs. Mr. Mascia graduated from the University of North Carolina Law School in 1998.

**Gregory Ruback, Charlotte**

Mr. Ruback specializes in general leveraged lending transactions, and has additional experience in structured finance matters. He represents lead banks and agents in bi-ateral and syndicated acquisition and working capital financings. Mr. Ruback has significant experience with senior secured credit facilities, first and second lien facilities, bridge (and takeout) facilities, mezzanine financings and asset based loan facilities. His experience includes transactions involving loan parties and/or collateral located in foreign jurisdictions, including the United Kingdom, Germany, the Netherlands, Canada, Mexico, the Dominican Republic, Costa Rica, Japan and Taiwan. Mr. Ruback's structured finance experience includes representation of financial institutions in synthetic, leveraged and cross-border leasing transactions and collateral debt obligation financings. Mr. Ruback is a 1999 graduate of Fordham University School of Law.

## HOUSTON

**Mark Biskamp, Real Estate**

Mr. Biskamp practices in the areas of real estate, finance, and business law. His real estate practice includes acquisitions, sales, leasing, development, and financing of income producing properties nationally and internationally; representation of developers, pension funds, and other institutional investors; and corporate real estate services involving acquisitions, sales, and construction of plant and facilities. Mr. Biskamp's finance practice includes the national representation of banks and other financial services companies in construction, mezzanine, and permanent financing. His business practice includes assisting companies with joint ventures, day-to-day business transactions, and general operational matters. Mr. Biskamp graduated from Southern Methodist University Dedman School of Law in 1982.

## LOS ANGELES

**Ricardo Gonzalez, Corporate**

Mr. Gonzalez represents issuers and underwriters in connection with public and private offerings of debt, equity, convertible and hybrid securities by U.S., European (particularly Spanish), Latin American and Asian issuers. His practice has particular emphasis on cross-border securities offerings and M&A transactions. Prior to joining Mayer Brown's Los Angeles office, Mr. Gonzalez practiced in the New York, London, Hong Kong and Madrid offices of another leading international law firm. He also regularly advises clients on 1934 Act reporting, corporate governance and other general corporate matters. Mr. Gonzalez graduated from the New York University School of Law in 1998.

### Andrew Kugler, Government & Global Trade

Mr. Kugler specializes in representing clients before federal, state and local governments and agencies. His expertise includes ballot initiatives, legislative strategies, public information campaigns, government investigations, campaign finance laws, and nonprofit advice. Mr. Kugler has testified before state legislatures and regulatory bodies, advised companies seeking to procure government contracts and licenses, and successfully defended a government entity in ballot measure litigation. He graduated from Columbia University Law School in 1997.

### Germain Labat, Litigation

Mr. Labat advises and represents parties in civil litigation including jury and bench trials before federal and state courts, and in arbitrations, in matters involving complex commercial, business and securities litigation. He graduated cum laude from Boston College Law School in 1999.

## NEW YORK

### Luke Richbourg, Finance

Mr. Richbourg's practice focuses on debt and equity securities, private equity, corporate finance and project finance transactions. Mr. Richbourg is fluent in Spanish and Portuguese and specializes in on transactions in the United States and Latin America, particularly Brazil and the Caribbean. Mr. Richbourg has wide experience with private placements and off-shore offerings of securities, including high yield bonds, and medium term notes. He has represented banks, borrowers and private equity sponsors in a variety of finance and restructuring transactions, including recent matters in Argentina, Brazil, Mexico, Peru and Spain. Mr. Richbourg is a graduate of Cornell Law School, where he served as Managing Editor of the Cornell Law Review.

### Brian Trauman, Tax Controversy

Mr. Trauman concentrates in the area of tax controversies, with emphasis on transfer pricing and related international tax matters. He represents clients at all stages of the controversy process, including domestic and foreign audits and administrative appeals, competent authority and APA negotiations, alternative dispute resolution proceedings and, where necessary, in the federal court system. Clients include large multinational companies, with particular emphasis on the automotive industry. Before joining Mayer Brown in 2002, he was a law clerk to U.S. Tax Court Judge L. Paige Marvel. Mr. Trauman graduated from the University of Florida, Levin College of Law in 1999 with honors, and from New York University School of Law with an L.L.M. in Taxation in 2000.

### Reb Wheeler, Corporate

Mr. Wheeler represents U.S. and international companies and investors in connection with a wide range of transactions and other matters. His transactional experience includes mergers, stock and asset acquisitions and divestitures, leveraged buyouts, joint ventures, licensing arrangements, restructurings, venture and later-stage equity financings and debt securities offerings. Mr. Wheeler graduated from the George Washington University Law School in 1999.

## WASHINGTON, D.C.

### Rafic Barrage, Tax Transactions

Mr. Barrage specializes in international taxation, tax planning, tax transactions, tax

controversies and government relations. He graduated from Mercer University, Walter F. George School of Law in 1998.

**Rajesh De, Litigation**
Mr. De focuses on appellate litigation, public policy, and internal corporate investigations. He advises clients on legislative and regulatory matters, and specializes in Congressional oversight and investigations. He has particular expertise in national security matters. Mr. De graduated magna cum laude from Harvard Law School in 1999.

**William Mann, Litigation**
Mr. Mann's practice focuses on securities enforcement and regulatory matters, including internal corporate investigations and securities regulatory investigations, examinations and actions. He represents broker-dealers, investment companies, investment advisers, corporations, corporate officers and directors, and other individuals before the U.S. Securities and Exchange Commission, the Department of Justice, securities self-regulatory organizations and state authorities. Mr. Mann also represents clients in litigation, arbitration, criminal grand jury investigations and other white-collar criminal matters involving the securities laws. He graduated from the University of Virginia School of Law in 1999.

**James Parkinson, Litigation**
Mr. Parkinson litigates criminal defense matters for corporations and individual defendants. He conducts corporate internal investigations and provides compliance counseling associated with these investigations. Mr. Parkinson focuses on the Foreign Corrupt Practices Act (FCPA) enforcement defense and compliance counseling, business and environmental crimes. He graduated magna cum laude from American University - Washington College of law in 1999.

**Amy Pershkow, Financial Services**
Ms. Pershkow's practice focuses on investment companies, investment advisers and financial institutions. She assists clients with a wide variety of investment management matters, including: the formation, registration, ongoing operation, compliance and reorganization of investment companies and investment advisers; preparation of exemptive applications, "no-action" letters, registration statements and forms, proxy statements, compliance procedures, corporate documents and other regulatory and business filings and documents. Ms. Pershkow is a 1999 graduate of The Catholic University of America, Columbus School of Law.

**Nicole Reuling, Tax Controversy**
Ms. Reuling represents clients in administrative proceedings and litigation in complex tax matters. Before joining Mayer Brown, Ms. Reuling was a Trial Attorney with the Tax Division, U.S. Department of Justice. She was the second chair on one of the Tax Division's most prominent cases in recent years, Long-Term Capital Holdings v. United States. She was also a member of the trial team of Dow Chemical Co. & Subsidiaries v. United States. In addition, she was involved in multiple trials and many more cases that were resolved on dispositive motions or through settlement. At Mayer Brown, she is a member of the trial team for Consolidated Edison Co. of New York v. United States, currently pending in the Court of Federal Claims. Ms. Reuling focuses on complex tax matters with the potential to be litigated. She also represents third parties in responding to subpoenas issued by the Tax Division. Ms. Reuling graduated from Harvard Law School in 2000.

**Andrew Tauber, Litigation**
Mr. Tauber focuses on appellate litigation. He represents clients in matters involving defamation, product liability, federal preemption, and attorney-client privilege, as well as a wide variety of other issues. Mr. Tauber, together with several colleagues, represented the petitioners in *Fernandez-Vargas v. Gonzales*, 126 S. Ct. 2422 (2006), and *Penry v. Johnson*, 532 U.S. 782 (2001). Mr. Tauber is a co-author of the upcoming treatise, *Mayer Brown on Federal Appellate Practice*. He has a Ph.D. from M.I.T., and graduated from Yale Law School in 1999.

*Mayer Brown LLP is among the largest law firms in the world with more than 1,500 lawyers in seven U.S. cities (Charlotte, Chicago, Houston, Los Angeles, New York,*

*Palo Alto and Washington), six European cities (Berlin, Brussels, Cologne, Frankfurt, London and Paris) and Hong Kong. Additionally, Mayer Brown is currently in the process of establishing its first South American office in São Paulo, Brazil.*

Back to top

© Copyright 2007 - Mayer Brown LLP and/or Mayer Brown International LLP

Mayer Brown is a combination of two limited liability partnerships, one named Mayer Brown LLP, established in Illinois, USA, and one named Mayer Brown International LLP, incorporated in England.

Except where noted on their respective biographies, the lawyers of our practice are not certified by the Texas Board of Legal Specialization or by the authority of their respective practice jurisdictions.

Disclaimer | Privacy Policy | Terms of Use | Attorney Advertising | Spam Policy | Regulatory Information | Contact Webmaster

# Exhibit 6



# THE WALL STREET JOURNAL.
ONLINE

## lore on the Mayer Brown Departures

osted By Ashby Jones On March 2, 2007 @ 6:10 pm In Lawyers & Law Firms | Comments Disabled

We reported earlier on the news that Mayer Brown is either cutting loose or demoting 45 partners. We caught up with the chairman-to-be James Holzhauer on Friday afternoon, who answered a bunch of our questions.

Holzhauer said the cuts were made to increase the firm's "leverage," which reflects the ratio of partners to associates, in an effort to boost profits per partner. He said gross revenue for 2006 was about $1.1 billion, and that profits-per-partner topped $1 million for the first time in the firm's history. But the numbers weren't good enough compared with profits per partner at other firms. "We want to drive our stock price up," he said.

According to American Lawyer's 2006 survey, which reported 2005 numbers, Mayer Brown placed eighth in gross revenues with $980 million. But the firm finished 51st in profits-per-partner, at $955,000.

Holzhauer said that the 45 individuals has been notified, but that their identities had not yet been divulged to the rest of the firm. About half have been asked to leave, and half have been asked to continue at the firm but not at partner status. Mr. Holzhauer said 42 of the 45 lawyers work in U.S. offices and added that the firm tried to cut from across practice areas. (He didn't specify the practice areas that were hit hardest.) He says no associates will be asked to leave as part of the restructuring.

A memo to associates and counsel put out by the firm read as follows:

*Mayer, Brown, Rowe & Maw LLP is a leading global law firm, with nearly 1,500 highly talented and respected lawyers, distinctively strong practices and a passion for providing clients with the highest quality legal counsel. t is also an extremely successful business. Our 2006 operating performance shows that the firm is not only wealthy, but growing strongly, with top-line revenue of $1.1 billion, an increase of 11 percent over 2005 and 19 percent over 2004. Total profits for 2006 also reached an all-time high for the firm. American Lawyer will report that the firm's profits per equity partner for 2006 will exceed $1 million.*

*n today's competitive legal market, Mayer, Brown, Rowe & Maw cannot rest on its achievements, but must ontinually work to make sure it is in the best position to achieve its strategic objectives and that it is properly staffed to serve its clients' needs most efficiently.*

*s one element of a strategic review, Mayer, Brown, Rowe & Maw has decided to restructure our partnership. orty-five equity partners (approximately 10% of the worldwide total) have been asked either to leave the firm r to accept other positions within the firm. The affected partners are fine lawyers who have made significant ontributions to the firm and our clients. The firm will provide fair and ample transition and placement support o each one of them.*

*his has been a difficult but necessary adjustment designed to enhance our position among the world's leading w firms. In an increasingly competitive and consolidating legal market, it is imperative that our firm be among he best managed in the industry. Being a partnership need not be antithetical to being a well-run business. ther large law firms that have undertaken similar restructuring actions over the past years have achieved gnificantly improved health and competitive position.*

*ayer, Brown, Rowe & Maw is committed to offering clients unparalleled legal counsel and service, and tracting and retaining top legal talent. That will never change. We are confident that the actions we have ken will enhance the firm's health and success for many years and many generations of lawyers and clients to me.*

---

cle printed from Law Blog - WSJ.com: **http://blogs.wsj.com/law**

URL to article: **http://blogs.wsj.com/law/2007/03/02/more-on-the-mayer-brown-departures/**

Exhibit 7

| United States Bankruptcy Court<br>Southern District of New York | **VOLUNTARY PETITION** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br><br>Refco Inc. | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br><br>20-2537426 | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>One World Financial Center<br>200 Liberty Street, Tower A<br>New York, New York 10281 | Street Address of Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business:<br><br>New York, New York | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor<br>(if different from street address): | Mailing Address of Joint Debtor<br>(if different from street address): |
| Location of Principal Assets of Business Debtor<br>(if different from addresses listed above) | |

### INFORMATION REGARDING DEBTOR (Check the Applicable Boxes)

Venue (Check any applicable box)
☒ Debtor has been domiciled or has had a residence, principal place of business or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | | **Chapter or Section of Bankruptcy Code Under Which the Petition is Filed** (Check one box) |
|---|---|---|
| ☐ Individual | ☐ Railroad | ☐ Chapter 7   ☒ Chapter 11   ☐ Chapter 13 |
| ☒ Corporation | ☐ Stockbroker | ☐ Chapter 9   ☐ Chapter 12 |
| ☒ Partnership | ☐ Commodity Broker | ☐ Sec. 304-Case ancillary to foreign proceeding |
| ☐ Other _____ | | |

| **Nature of Debts** (Check one box) | **Filing Fee** (Check one box) |
|---|---|
| ☐ Consumer/Non-Business   ☒ Business | ☒ Full Filing Fee attached. |
| | ☐ Filing Fee to be paid in installments (Applicable to individuals only) |
| **Chapter 11 Small Business** (Check all boxes that apply) | Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3. |
| ☐ Debtor is a small business as defined in 11 U.S.C. § 101. | |
| ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e). (optional) | |

| Statistical/Administrative Information (Estimates only) | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors | |

| Estimated Number of Creditors<br>(consolidated with affiliates) | 1-15<br>☐ | 16-49<br>☐ | 50-99<br>☐ | 100-199<br>☐ | 200-999<br>☐ | 1,000-over<br>☒ | |
|---|---|---|---|---|---|---|---|

| Estimated Assets (consolidated with affiliates) | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000<br>☐ | $50,001 to<br>$100,000<br>☐ | $100,001 to<br>$500,000<br>☐ | $500,001 to<br>$1 million<br>☐ | $1,000,001 to<br>$10 million<br>☐ | $10,000,001 to<br>$50 million<br>☐ | $50,000,001 to<br>$100 million<br>☐ | More than<br>$100 million<br>☒ |

| Estimated Debts (consolidated with affiliates) | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000<br>☐ | $50,001 to<br>$100,000<br>☐ | $100,001 to<br>$500,000<br>☐ | $500,001 to<br>$1 million<br>☐ | $1,000,001 to<br>$10 million<br>☐ | $10,000,001 to<br>$50 million<br>☐ | $50,000,001 to<br>$100 million<br>☐ | More than<br>$100 million<br>☒ |

| **Voluntary Petition** *(This page must be completed and filed in every case)* | **Name of Debtor(s):** Refco Inc. | | **Form B1, Page 2** |
|---|---|---|---|

| **Prior Bankruptcy Case Filed Within Last 6 Years** (If more than one, attach additional sheet) | | |
|---|---|---|
| Location Where Filed: **None** | Case Number: **N/A** | Date Filed: **N/A** |

| **Pending Bankruptcy Case Filed by Any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: **See Annex A** | Case Number: **As Assigned** | Date Filed: **Same** |
| District: **Southern District of New York** | Relationship: **Affiliate** | Judge: **As Assigned** |

## SIGNATURES

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

_____
Date

### Exhibit A
(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☒ Exhibit A is attached and made a part of this petition.

### Exhibit B
(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____
Signature of Attorney for Debtor(s)          Date

### Exhibit C
Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.
☒ No

### Signature of Attorney

X /s/ J. Gregory Milmoe
Signature of Attorney for Debtor(s)

J. Gregory Milmoe
Printed Name of Attorney for Debtor(s)

Skadden, Arps, Slate, Meagher & Flom LLP
Firm Name

Four Times Square
New York, New York 10036
Address

(212) 735-3000
Telephone Number

October 17, 2005
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

DENNIS A. KLEJHA
Printed Name of Authorized Individual

Executive Vice President + General Counsel
Refco, Inc.
Title of Authorized Individual

October 17, 2005
Date

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                      :

| | |
|---|---|
| In re: | Chapter 11 |
| Refco Inc., <u>et al.</u>, | Case No. 05 – _____ (___) |
|           Debtors. | (Jointly Administered) |

----------------------------------------------------------------x

## <u>EXHIBIT A TO VOLUNTARY PETITION</u>

1.      If any of Debtor's securities are registered under section 12 of the Securities and Exchange Act of 1934, the SEC file number is 333-123969.

2.      The following financial data is the latest available information and refers to the Debtor's condition on February 28, 2005[12]:

| | | |
|---|---|---|
| a. | Total assets* | $48,765,349,000 |
| b. | Total liabilities* | $48,599,748,000 |

---

[1] Source: Prospectus filed pursuant to Rule 424(b)(1) on August 11, 2005; SEC File Number: 333-123969

[2] NOTE: Refco Inc. determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon.

\*    The estimated assets and liabilities indicated herein are estimated on a consolidated basis for Refco Inc. and its affiliates.

1

|   |   | | Approximate No. of Holders |
|---|---|---|---|
| c. | | | |
| | Term Loan Facility as of May 31, 2005[3] | $644,000,000 | |
| | 9% Senior Subordinated Notes Due 2012[4] | $600,000,000 | Unknown |
| | | | |
| | | | |

|   |   | Number of Shares | Approximate Number of Holders |
|---|---|---|---|
| d. | Number of shares of preferred stock as of August 10, 2005 | 0 | 0 |
| e. | Number of shares of common stock outstanding as of August 10, 2005[5] | 127,500,000 | Unknown |

3.    Brief description of the Debtor's business:

Refco Inc. and its affiliates constitute a diversified financial services organization with operations in 14 countries and a global institutional and retail client base. Refco Inc.'s worldwide subsidiaries are members of principal U.S. and international exchanges, and are among the most active members of futures exchanges in Chicago, New York, London, Paris and Singapore. In addition to its futures brokerage activities, Refco Inc. and its affiliates are major brokers of cash market products, including foreign exchange, foreign exchange options, government securities, domestic and international equities, emerging market debt, and OTC financial and commodity products.

---

[3] Source: Prospectus filed pursuant to Rule 424(b)(1) on August 11, 2005; SEC File Number: 333-123969

[4] Source: Prospectus filed pursuant to Rule 424(b)(1) on August 11, 2005; SEC File Number: 333-123969

[5] Source: Prospectus filed pursuant to Rule 424(b)(1) on August 11, 2005; SEC File Number: 333-123969

2

4.    The following chart sets forth a list of the names of any person known by the Debtor to own, control, or hold, directly or indirectly, with power to vote, 5% or more of the voting securities of the Debtor, as of August 10, 2005[6]:

| Name and Address | Shares Beneficially Owned | Percentage |
|---|---|---|
| Refco Group Holdings, Inc.[7]<br>c/o Refco Group Ltd., LLC<br>200 Liberty Street, Tower A<br>New York NY 10281 | 43,052,000 | 33.8 % |
| Thomas H. Lee Equity Fund V, L.P.[8]<br>c/o Thomas H Lee Partners<br>100 Federal Street, 35th floor<br>Boston, MA 02110 | 38,265,000 | 30.0 % |
| Thomas H. Lee Parallel Fund V, L.P[9]<br>c/o Thomas H Lee Partners<br>100 Federal Street, 35th floor<br>Boston, MA 02110 | 9,928,000 | 7.8 % |

---

[6] Source: Prospectus filed pursuant to Rule 424(b)(1) on August 11, 2005; SEC File Number: 333-123969

[7] Phillip Bennett directly and indirectly through each of Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust holds 43,052,000 shares (33.8%).

[8] Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P.  David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co-President, respectively, of Thomas H. Lee Partners, L.P.  Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own the shares of common stock held of record by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.  Each of these individuals disclaims beneficial ownership of such shares of common stock except to the extent of their pecuniary interest therein.

[9] Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P.  David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co-President, respectively, of Thomas H. Lee Partners, L.P.  Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own the shares of common stock held of record by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.  Each of these individuals disclaims beneficial ownership of such shares of common stock except to the extent of their pecuniary interest therein.

3

## LIST OF AFFILIATES

On the date hereof, each of the affiliated entities listed below (including the debtor in this Chapter 11 case) filed in this Court a petition for relief under Chapter 11 of title 11 of the United States Code. Contemporaneously with the filing of these petitions, these entities filed a motion requesting that the Court administratively consolidate for procedural purposes only and jointly administer their Chapter 11 cases.

1.    Refco Inc.
2.    Bersec International LLC
3.    Kroeck & Associates, LLC
4.    Marshall Metals LLC
5.    New Refco Group Ltd., LLC
6.    Refco Administration LLC
7.    Refco Capital LLC
8     Refco Capital Holdings LLC
9.    Refco Capital Management LLC
10.   Refco Capital Markets, LTD
11.   Refco Capital Trading LLC
12.   Refco Finance Inc.
13.   Refco Financial LLC
14.   Refco Fixed Assets Management LLC
15.   Refco F/X Associates LLC
16.   Refco Global Capital Management LLC
17.   Refco Global Finance Ltd.
18.   Refco Global Futures LLC
19.   Refco Global Holdings LLC
20.   Refco Group Ltd., LLC
21.   Refco Information Services LLC
22.   Refco Mortgage Securities, LLC
23.   Refco Regulated Companies LLC
24.   Summit Management LLC

**CERTIFICATE OF DENNIS KLEJNA TO RESOLUTIONS
ADOPTED BY THE BOARD OF DIRECTORS OF REFCO INC.**

I, the undersigned, being the Authorized Signatory of Refco Inc. (the "Company"), do hereby certify that the Board of Directors of the Company duly adopted the following resolutions at a meeting held on October 17, 2005 and that such resolutions have not been repealed or amended and remain in full force and effect:

RESOLVED that in the judgment of the Board of Directors it is desirable and in the best interests of the Company, its creditors, shareholders and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in which the authority to operate as a debtor-in-possession will be sought, and the filing of such petitions is authorized hereby; and it is further

RESOLVED that the officers of the Company or any one of them (collectively, the "Officers"), be and each hereby is, authorized and directed on behalf of the Company to execute and verify a petition in the name of the Company under chapter 11 of the Bankruptcy Code and to cause the same to be filed in a United States Bankruptcy Court in such form and at such time as the Officer executing said petition on behalf of the Company shall determine; and it is further

RESOLVED that the Officers, or any one of them be, and each hereby is, authorized, directed and empowered, on behalf of and in the name of the Company, to execute, verify and/or file, or cause to be filed and/or executed or verified (or direct others to do so on their behalf as provided herein) all necessary documents, including, without limitation, all petitions, affidavits, schedules, motions, lists, applications, pleadings and other papers, and in that connection to employ and retain all assistance by legal counsel, accountants or other professionals and to take any and all action which they deem necessary and proper in connection with the chapter 11 case, with a view to the successful prosecution of such case; and it is further

RESOLVED that the Company, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code be, and hereby

is, authorized to grant any guarantees, pledges, mortgages, and other security interests as necessary to obtain use of cash collateral or debtor-in-possession financing; and it is further

RESOLVED that the Officers be, and each of them hereby is, authorized to execute and deliver for and on behalf of the Company, as debtor and debtor-in-possession, such agreements, instruments and any and all other documents and amendments necessary or appropriate to facilitate the transactions contemplated by the foregoing resolutions, including, without limitation, any credit agreement, promissory note, letter of credit application, guarantee, mortgage, or other security instrument, containing such provisions, terms, conditions, covenants, warranties and representations as may be deemed necessary or appropriate by the Officers, or any of them so acting; and it is further

RESOLVED that the Officers be, and each of them hereby is, authorized and empowered for and in the name and on behalf of the Company to amend, supplement or otherwise modify from time to time the terms of any documents, certificates, instruments, agreements or other writings referred to in the foregoing resolutions; and it is further

RESOLVED that the Officers be, and each of them hereby is, authorized, in the name and on behalf of the Company, to take or cause to be taken any and all such further action and to execute and deliver or cause to be executed or delivered all such further agreements, documents, certificates and undertakings, and to incur all such fees and expenses as in their judgment shall be necessary, appropriate or advisable to effectuate the purpose and intent of any and all of the foregoing resolutions; and it is further

2

RESOLVED that all acts lawfully done or actions lawfully taken by any Officer to seek relief on behalf of the Company under chapter 11 of the Bankruptcy Code, or in connection with the chapter 11 case, or any matter related thereto, be, and hereby are, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company.

IN WITNESS WHEREOF, I have executed this Certificate as of October 14, 2005.

Name: Dennis Klejna

Title: *Authorized Signatory*

## CONSOLIDATED LIST OF CREDITORS HOLDING
## THE FIFTY LARGEST UNSECURED CLAIMS

Following is a consolidated list of creditors holding the 50 largest unsecured claims against Refco Inc and certain of its subsidiaries and affiliates (collectively, the "Debtors"), as of approximately October 13-18, 2005. The list has been prepared on a consolidated basis, based upon the books and records of the Debtors that have contemporaneously commenced chapter 11 cases in this Court. The Debtors used estimates for market values for securities and currencies and related company offsets. The Debtors believe to the best of their knowledge that this list is representative of the 50 largest creditors in each of the affiliated cases. The information presented in the list shall not constitute an admission by, nor is it binding on, the Debtors.

The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101 or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.[1]

| | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors' Account | Nature of Claim | Contingent, Unliquidated, and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 1. | Bawag International Finance BAWAG P.S.K. Bank fur Arbeit und Wirtschaft und Osterreichische Postsparkasse Aktiengesellschaft Sietzergasse 2-4 A-1010 Vienna, Austria P: +43/1/534 53/31210 F: +43/1/534 53/ 2284 | Unknown | Unknown | Unknown | 451,158,506 |
| 2. | Wells Fargo Corporate Trust Services Mac N9303-120 Sixth & Marquette Minneapolis, MN 55497 P: 612-316-47727 | Julie J. Becker | Bond Debt | Unknown | $390,000,000 |

---

1 The Debtors have not yet identified which of the 50 largest unsecured claims, if any, are contingent, unliquidated, disputed and/or subject to setoff. The Debtors reserve the right to identify any of the 50 largest unsecured claims in their Schedules as contingent, unliquidated, disputed and/or subject to setoff, as appropriate. In addition, the following amounts may represent an obligation to return securities or currency (domestic or foreign). These amounts represent historical numbers that may vary significantly as the market value for such securities and foreign currency changes. Finally, these amounts may be gross amounts, and do not include credits that may exist at other affiliated non-debtors.

|  | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors' Account | Nature of Claim | Contingent Unliquidated and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 3. | VR Global Partners, LP<br>Avora Business Park<br>77 SADOVNICHESKAYA NAB.<br>BLDG.1<br>Moscow, Russia 115035 | Unknown | Unknown | Unknown | 380,149,056 |
| 4. | Rogers Raw Materials Fund<br>C/O BEELAND MANAGEMENT<br>141 WEST JACKSON BLVD STE:1340<br>CHICAGO, IL 60604<br>P: (312) 264 - 4375<br>Fax is broker specific | Unknown | Unknown | Unknown | 287,436,182 |
| 5. | Bancafe International Bank Ltd<br>Columbia Office:<br>Carrera 11 82-76<br>Segundo 2<br>Bogotá, Colombia<br>P: 636-4349<br><br>Miami Office:<br>801 Brickell Ave. Ph1<br>Miami, Fl 33131<br>P: 305-372-9909<br>F: 305-372-1797 | Unknown | Unknown | Unknown | 176,006,738 |
| 6. | Markwood Investments<br>Via Lovanio,<br>#19 00198<br>Rome, Italy | Unknown | Unknown | Unknown | 110,056,725 |
| 7. | Capital Management Select Fund<br>Lynford Manor, Lynford Cay<br>Nassau, BF | Unknown | Unknown | Unknown | 109,009,282 |
| 8. | Leuthold Funds Inc<br>Leuthold Industrial Metals, LP<br>100 North 6th Street<br>Suite 412A,<br>Minneapolis, MN, 55403<br>P: 612-332-9141<br>F: 612-332-0797<br>Attn: David Cragg | Unknown | Unknown | Unknown | 107,264,868 |

2

| | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors' Account | Nature of Claim | Contingent Unliquidated and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 9. | Rietumu Banka<br>JSC Rietumu Banka<br>Reg. No. 40003074497<br>VAT No. LV40003074497<br>54 Brivibas str<br>Riga, LV-1011<br>LATVIA<br>P: +371-7025555<br>F: +371-7025588 | Unknown | Unknown | Unknown | 100,860,048 |
| 10. | Cosmorex Ltd<br>CP 8057<br>28080 Madrid, Spain<br>P: +34-607-745-555<br>F: +34-667-706-622 | Unknown | Unknown | Unknown | 91,393,820 |
| 11. | BCO Hipotecario Inv. Turistic<br>(Fidelicomiso Federal Forex Invest)<br>Av Venezuela<br>Torre Cremerca, Piso 2<br>Ofici B2 El Rosal<br>Caracas, VE | Unknown | Unknown | Unknown | 85,807,030 |
| 12. | VR ARGENTINA RECOVERY FUND<br>Avrora Business Park<br>77 Sadovnicheskayanab BLDG 1.<br>Moscow, 115035<br>Russia, RS | Unknown | Unknown | Unknown | 77,710,311 |
| 13. | Rogers International Raw Materials<br>c/o Beeland Management<br>141 West Jackson Blvd.Ste:1340<br>Chicago IL 60604<br>P: (312) 264 - 4375<br>Fax is broker specific | Unknown | Unknown | Unknown | 75,213,814 |
| 14. | Creative Finance Limited; Marcy Building, Purcell Estate, P.O. Box 2416 Road Town BVI | Unknown | Unknown | Unknown | 65,111,071 |
| 15. | Cargill<br>PO Box 9300<br>Minneapolis, MN<br>55440-9300<br>P: (952) 742-7575<br>F: (952) 742-7393 | Unknown | Unknown | Unknown | 67,000,000 |

3

| | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors Account | Nature of Claim | Contingent Unliquidated and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 16. | JWH Global Trust<br>c/o Refco Commodity Management Inc.<br>One World Financial Center<br>200 West Liberty St., 22nd Floor<br>New York, NY 10281p | Unknown | Unknown | Unknown | 50,576,912 |
| 17. | RB Securities Limited<br>54 Brivibas Street<br>LV-1011<br>Riga, Lativa<br>P: + 371 702-52-84<br>F: + 371 702-52-26 | Unknown | Unknown | Unknown | 50,661,064 |
| 18. | PREMIER TRUST CUSTODY<br>ABRAHAM DE VEERSTRAAT 7-A,<br>CURACAO, NETHERLANDS<br>ANTILLES | Unknown | Unknown | Unknown | 49,365,415 |
| 19. | London & Amsterdam Trust Company<br>PO Box 10459 APO<br>3Floor<br>Century Yard<br>Cricket Square, Elgin Ave.<br>Grand Cayman, Cayman Island | Unknown | Unknown | Unknown | 47,560,980 |
| 20. | STILTON INTERNATIONAL<br>HOLDINGS, TRIDENT CHAMBERS,<br>WICKHAMS CAY, P.O.BOX 146,<br>ROAD TOWN, BRITISH VIRGIN<br>ISLANDS | Unknown | Unknown | Unknown | 46,820,415 |
| 21. | Refco Advantage Multi-Manager Fund<br>Futures Series<br>c/o Refco Alternative Investments<br>Group<br>One World Financial Center<br>200 West Liberty St., 22nd Floor<br>New York, NY 10281 | Unknown | Unknown | Unknown | 41,713,723 |
| 22. | BANESCO NY<br>BANESCO BANCO UNIVERSAL<br>C.A., AV URDANETA, ESQUINA EL<br>CHORRE, TORRE UNIBANCA,<br>CARACAS VENEZUELA | Unknown | Unknown | Unknown | 39,596,609 |
| 23. | Josefina Franco Sillier<br>Carretera Mexico-Toluca No. 4000<br>Col. Cuajimalpa<br>D.R. 0500 Mexico | Unknown | Unknown | Unknown | 32,862,419 |

4

| | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors' Account | Nature of Claim | Contingent, Unliquidated and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 24. | Rovida London & Amsterdam Trust Company PO Box 10459 APO 3RD FL. Century Yard Cricket Sq. | Unknown | Unknown | Unknown | 32,831,461 |
| 25. | Caja S.A. Sarmiento 299 1 Subsuelo (1353) Buenos Aires, Argentina P: (54 11) 4317-8900 F: (54 11) 4317-8909 | Unknown | Unknown | Unknown | 30,950,115 |
| 26. | Global Management Worldwide Trident Corp. Service Floor 1 Kings Court Bay St. PO Box 3944 Nassau, Bahamas | Unknown | Unknown | Unknown | 28,976,612. |
| 27. | Abadi & Co. Securities 375 Park Avenue Suite 3301 New York, NY 10152 P: (212) 319 - 4135 | Unknown | Unknown | Unknown | 28,046,904 |
| 28. | Refco Winton Diversified Futures Fund, c/o Refco Global Finance One World Financial Center 200 West Liberty street, 22nd Floor New York, NY 10281 | Unknown | Unknown | Unknown | 27,226,697 |
| 29. | Pioneer Futures, Inc. One North End Ave. Suite 1251 New York, NY 10282 | Unknown | Unknown | Unknown | 25,932,000 |
| 30. | Daichi Commodities CO., LTD.; 10-10 Shinsen, Cho, Shibuya-Ku Tokyo, 150-0045 | Unknown | Unknown | Unknown | 24,894,833 |
| 31. | GS Jenkins Portfolio LLC. c/o Refco Capital Markets One World Financial Center 200 West Liberty street, 22nd Floor New York, NY 10281 | Unknown | Unknown | Unknown | 24,631,959 |

| | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors' Account | Nature of Claim | Contingent Unliquidated and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 32. | Winchester Preservation<br>c/o Joseph D. Freney<br>Christiana Bank & Trust Co.<br>3801 Kennett Pike, Suite 200<br>Greenville, DE 19807 | Unknown | Unknown | Unknown | 23,349,765 |
| 33. | BANCO AGRI<br><br>BANCO AGRICOLA (PANAMA) S.A,<br>EDIFICIO GLOBAL BANK<br>#17,LOCAL F, CALLE 50 PANAMA,<br>PA<br><br>BANCO AGRICOLA, S.A, IRA.<br>CAKKE PTE. Y 67 AV.NORTE,<br>FINAL BLVD CONSTITUCION #100,<br>SAN SALVADOR, ES | Unknown | Unknown | Unknown | 22,314,386 |
| 34. | Peak Partners Offshore Master Fund Limited<br>PO Box 2199 GT<br>Grand Pavilion Commercial Center<br>802 West Bay Road<br>Grand Cayman, Cayman Islands | Unknown | Unknown | Unknown | 22,205,344 |
| 35. | Arbat Equity Arbitrage Fund<br>Trident Corporate Services<br>1st Floor Kings Court<br>Bay Street<br>PO Box N3944<br>Nassau Bahamas, Nassau | Unknown | Unknown | Unknown | 19,106,989 |
| 36. | Renaissance Securities (Cyprus) Ltd.<br>2-4 Arch Makarios 111 Avenue<br>Capital Center, 9th Floor<br>1505 Nicosia<br>Cyprus | Unknown | Unknown | Unknown | 17,820,709 |
| 37. | AQR Absolute Return<br>c/o Caledonian Bank & Trust LTD<br>PO Box 1043 GT<br>Caledonian House, Grand Cayman<br>Cayman Islands | Unknown | Unknown | Unknown | 17,482,100 |
| 38. | Geshoa Fund<br>CORPORATE CENTER<br>WEST BAY ROAD<br>PO BOX 31106 SMB<br>GRAND CAYMAN | Unknown | Unknown | Unknown | 17,319,494 |

| | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors Account | Nature of Claim | Contingent Unliquidated and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 39. | RK Consulting<br>7, Kountouriotou Street<br>14563 Kifissia<br>Greece | Unknown | Unknown | Unknown | $14,074,345 |
| 40. | VR Capital Group Ltd.<br>AVRORA BUSINESS PARK<br>CALENDONIAN HOUSE MARY STREET<br>NAB 77 BLDG 1<br>MOSCOW RUSSIA 115035<br>P: +358 600 41 902 | Unknown | Unknown | Unknown | 13,690,549 |
| 41. | GTC Bank, INC.<br>CALLE 55 ESTE<br>TORRE WORLD TRADE CENTER<br>PISO 7<br>PANAMA<br>GUATEMALA<br>P: ( 507 ) 265-7371<br>F: 265-7396 | Unknown | Unknown | Unknown | 12,971,439 |
| 42. | Inversiones Concambi<br>C/O AEROCAV 1029 P.O. BOX 02-5304<br>MIAMI, FL 33102 | Unknown | Unknown | Unknown | 12,799,137 |
| 43. | Miura Financial Services<br>AV. FRANCISCO DE MIRANDA<br>TORRE LA<br>PRIMERA PISO 3<br>CARACAS VE | Unknown | Unknown | Unknown | 12,150,213 |
| 44. | NKB Investments LTD<br>199 ARCH .MAKARIOS AVE<br>196 Makarios III Avenue, Ariel Corner<br>3rd Floor, Office 301 3030 Limassol | Unknown | Unknown | Unknown | 11,699,430 |
| 45. | Tokyo Forex Financial Inc, Shinjyuku<br>Oak Tower, 35th Floor, 6-8-1<br>Nishishinjyuku, Shinjyuku-Ku, Tokyo | Unknown | Unknown | Unknown | 11,689,354 |
| 46. | Birmingham Merchant S.A.<br>AV. ARGENTINA 4793<br>PISO 3<br>CALLAO PERU | Unknown | Unknown | Unknown | 11,215,413 |

| | Name, Address, Phone and Fax No. of Creditor | Person(s) Familiar with Debtors' Account | Nature of Claim | Contingent Unliquidated and/or Disputed | Approximate Amount of Claim |
|---|---|---|---|---|---|
| 47. | BAC International<br>CALLE 43 QNQUILLO DE LAGUAR<br>PANAMA<br>P: (507) 265-8289<br>F: 507-205-4031 | Unknown | Unknown | Unknown | 10,906,506 |
| 48. | Total Bank<br>CALLE GUAICAIPURO ENTRE<br>AV.PRINCIPAL DE<br>IAS MERCEDES<br>TORRE ALIANZA PISO 9<br>EL ROSAL<br>CAACAS,- VE<br>P: (0212) 264.72.54 / 49.42<br>F: (0212) 266.58.12 | Unknown | Unknown | Unknown | 10,657,732 |
| 49. | Reserve Invest(Cypress) Limited<br>MAXIMOS PLAZA<br>3301 BLOCK 3<br>3035 LIMASSOL<br>CYPRUS CY | Unknown | Unknown | Unknown | 10,499,733 |
| 50. | Refco Commodity Futures Fund<br>c/o Refco Alternative Investments<br>Group<br>One World Financial Center<br>200 Liberty Street, 22nd Floor<br>New York, New York  10281<br>P: 877 538 8820<br>F: 877 229 0005 | Unknown | Unknown | Unknown | 10,166,045 |

I, Gerald M. Sherer of Refco Inc., declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my knowledge, information, and belief.

By:   /s/ Gerald M. Sherer
Name:  Gerald M. Sherer
Title: Executive Vice President and
Chief Financial Officer of Refco Inc.

9

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - -x
                                :
        In re                   :      Chapter 11
                                :
Refco Inc, et al.,              :      Case No. 05-
                                :
                Debtors.        :      (Jointly Administered)
                                :
- - - - - - - - - - - - - - - - - - - - - -x
```

## CORPORATE OWNERSHIP STATEMENT

In accordance with Rule 1007(a)(1) of the Federal Rules of Bankruptcy Procedure, the Debtors hereby states that the following corporations directly or indirectly own 10% or more of the equity interests of Refco Inc.:

- Refco Group Holdings, Inc.[1]
- Thomas H. Lee Equity Fund V, L.P.[2]
- Thomas H. Lee Parallel Fund V, L.P[3]

Refco Inc. owns all of the outstanding membership interests in New Refco Group Ltd., LLC.

New Refco Group, Ltd., LLC owns all of the outstanding membership interests in Refco Group Ltd., LLC.

---

[1]  Phillip Bennett directly and indirectly through each of Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust holds 43,052,000 shares (33.8%).

[2]  Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co-President, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own the shares of common stock held of record by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.

[3]  Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co-President, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own the shares of common stock held of record by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.

Refco Group Ltd., LLC owns all of the outstanding membership interests in Bersec International, LLC, Summit Management, LLC, Kroeck & Associates, LLC, Refco Global Capital Management, LLC, Marshall Metals, LLC, Refco Fixed Assets Management, LLC, Refco Mortgage Securities, LLC, Refco Regulated Companies, LLC, and Refco Capital Holdings LLC, and all of the outstanding capital stock of Refco Finance Inc.

Refco Regulated Companies, LLC owns all of the outstanding membership interests in Refco Global Futures, LLC.

Refco Global Futures, LLC owns all of the outstanding membership interests in Refco Global Holdings, LLC, and all of the capital stock in Refco Canada Finance Inc.

Refco Capital Holdings, LLC owns all of the outstanding membership interests in Refco Capital Management, LLC, Refco F/X Associates, LLC, Refco Administration, LLC, Refco Financial LLC, Refco Capital Trading, LLC and Refco Information Services, LLC and all of the outstanding shares in Refco Capital Markets, Ltd.

Refco Capital Management, LLC owns all of the outstanding membership interests in Refco Capital LLC and Refco Global Finance Ltd.

I, the undersigned officer of Refco Inc., one of the companies named as a debtor in the above-captioned cases, declare under penalty of perjury, that I have read the foregoing list and that it is true and correct as of the date referenced therein, to the best of my knowledge, information, and belief.

Dated: October 17, 2005          Signature: _____

          Name:    Dennis Klejna

          Title:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARC S. KIRSCHNER,
as Trustee of the Refco Litigation Trust,

        07 MDL No. 1902 (GEL)

        Plaintiff,

        Case No. 07 Civ. 11604
        (GEL)

        -vs-

GRANT THORNTON LLP, MAYER BROWN,
ROWE & MAW, LLP, ERNST & YOUNG U.S.
LLP, PRICEWATERHOUSECOOPERS LLP,
CREDIT SUISSE SECURITIES (USA) LLC (f/k/a
CREDIT SUISSE FIRST BOSTON LLC), BANK
OF AMERICA SECURITIES LLC, DEUTSCHE
BANK SECURITIES INC., PHILLIP R.
BENNETT, SANTO C. MAGGIO, ROBERT C.
TROSTEN, TONE N. GRANT, REFCO GROUP
HOLDINGS, INC., LIBERTY CORNER
CAPITAL STRATEGIES, LLC, WILLIAM T.
PIGOTT, EMF FINANCIAL PRODUCTS LLC,
EMF CORE FUND, LTD., DELTA FLYER
FUND, LLC, ERIC M. FLANAGAN, INGRAM
MICRO, INC., CIM VENTURES, INC.,
BECKENHAM TRADING CO. INC., ANDREW
KRIEGER, COAST ASSET MANAGEMENT,
LLC (f/k/a/ COAST ASSET MANAGEMENT
LP), CS LAND MANAGEMENT, LLC, and
CHRISTOPHER PETTIT,

        Defendants.

## DECLARATION OF DAVID R. KESSARAM

I, DAVID ROBERT KESSARAM, declares pursuant to 28 U.S.C. § 1746 as follows:

1.    I am a barrister and attorney and a partner in the Bermuda law firm of Cox Hallett
Wilkinson.  I was called to the Bar of England and Wales on 28th July 1977 and to
the Bermuda Bar on 27th March 1978.  Since my call to bar in Bermuda I have
been in private practice continuously up to the present time. In the last twenty
years of my practice as a lawyer in Bermuda I have been involved mainly in

matters of commercial and corporate litigation. A significant part of my practice has been advisory and advocacy work in the realm of corporate insolvency. I have been deposed and have testified in proceedings in a United States Federal District Court as an expert witness on Bermuda's corporate insolvency law.

2.    I have been asked by Marc Kirschner as Trustee of the Refco Litigation Trust to consider the duties under Bermuda law of the directors of a Bermuda incorporated company in circumstances where the company is insolvent or nearing insolvency.

3.    Bermuda is a self-governing dependent territory of Great Britain. The Companies Act 1981 was passed by the Bermuda legislature on 16th July 1981 and came into operation on 1st July 1983.

4.    In addition to acts passed by the Bermuda legislature, Bermuda law is also found in the decisions of Bermuda courts. Part of Bermuda's English common law heritage is the doctrine of *stare decisis* (binding precedent). In accordance with this doctrine the decisions of higher courts (in cases in which the material facts are the same) bind lower courts. The highest court of appeal is the Judicial Committee of the Privy Council in London. Its decisions are binding on all lower courts in Bermuda.

5.    In considering and declaring the common law of Bermuda, Bermuda courts also rely on decisions of United Kingdom courts. Although not binding in strict legal theory (they are technically of persuasive value only), the decisions of the various divisions of the High Court of England and Wales and the House of Lords are invariably followed by Bermuda judges.

6.    As a general principle, the duties of a director are owed to the company of which he is a director. This is understood to mean that his duties are owed to all the shareholders of the company (since it is they who have the ultimate economic interest in the company); and it is to their interests that the director must have regard.

7.    However, when a company is insolvent or in the zone of insolvency, although his duties are still owed to the company, the company's interests are treated as being the interests of its creditors and it is to their interests that the director must have regard in exercising his powers and duties. This was made clear most recently in

2

the English case of <u>Williams v Farrow</u> (2008) All ER 328 where the judge in that case (Robin Knowles QC ) said:

> "*Among the fiduciary duties owed by a director of a limited company are (so far as relevant, and shortly stated) a duty to act bona fide in the best interests of the company, a duty to act for a proper purpose, and a duty not to act for personal interest conflicting with the interests of the company. Where a company is insolvent, or in a parlous financial state such that it is the creditors' interests that are at risk, the director's fiduciary duties extend to a duty to have regard to the interests of the creditors of the company (see Kinsela v Russell Kinsela Pty Ltd (1986) 4 NSWLR 722 at 730 and 733 (Street CJ), West Mercia Safetywear Ltd v Dodd (1988) BCLC 250 at 252f - 253c (Dillon LJ), and Facia Footwear Ltd v Hinchliffe (1998) 1 BCLC 218 at 227g - 228g (Scott VC)).*"

8.    In an oft-quoted speech from the judgment in <u>Kinsela v Russell Kinsela Pty Ltd.</u> (an Australian case, but treated as stating the principle of English law concerning the duty of a director of a company in danger of insolvency) Street CJ stated:

> "*In a solvent company the proprietary interests of the shareholders entitle them as a general body to be regarded as the company when questions of the duty of directors arise. If, as a general body, they authorise or ratify a particular action of the directors, there can be no challenge to the validity of what the directors have done. But where a company is insolvent the interests of the creditors intrude. They become prospectively entitled through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration.*"

9.    This passage was cited with approval in <u>West Mercia Safetywear Ltd. v Dodd</u> (1988) BCLC 250 by Dillon LJ, a decision of the UK Court of Appeal.

10.     I have attached true and correct copies of the decisions in <u>Williams v Farrow</u> (2008) All ER 328 and <u>West Mercia Safetywear Ltd. v Dodd</u> (1988) BCLC 250 hereto.

11.     I am not aware of any cases decided in a Bermuda court dealing with this point. However, it is my firm view that a Bermuda court would treat the statement of principle quoted above as being reflective of Bermuda law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 27, 2008
Hamilton, Bermuda.

David R. Kessaram

4

# EXHIBIT 1

1 of 77 DOCUMENTS

Williams v Farrow and another

CHANCERY DIVISION

JUDGMENT APPROVED BY THE COURT FOR HANDING DOWN (SUBJECT TO EDITORIAL CORRECTIONS)

*[2008] All ER (D) 328 (Feb), (Approved judgment)*

**HEARING-DATES: 22 FEBRUARY 2008**

22 FEBRUARY 2008

**CATCHWORDS:**

Company - Director - Duty - Fiduciary duty - Company formed to bring proceedings - Company advised proceedings having strong likelihood of success - Company succeeding before High Court and Court of Appeal - Payments being made by litigation opponents on strength of Court of Appeal decision - Company making payments to directors - House of Lords overturning decision and awarding costs against company - Company insolvent - Whether payments made by company to directors in breach of directors' duties

**HEADNOTE:**

This case digest has been summarised by LexisNexis UK editors.

The respondents were husband and wife. The husband purchased a lordship and by so doing acquired Newton Common (the common) in Newbury. For many years local residents had used the common for vehicle access to their homes. The respondents decided, having regard to the Court of Appeal authority in Hanning v Top Deck Travel Group Ltd (1993) 68 P & CR 14, that they were entitled to charge for that access. To minimise any publicity in the necessary legal proceedings, they formed a limited company and transferred the common to it without consideration. The company later executed a declaration of trust in which it declared that it held the common for the wife and would manage the common on her behalf. It then began proceedings against the residents. The funding was largely through a conditional fee agreement. The company was successful at first instance and in the Court of Appeal. New legislation (s 68 of the Countryside and Rights of Way Act 2002) had been introduced, which enabled the creation of statutory easements, in certain circumstances and on payment of a compensation sum. The time limits in the section were such that some residents had to decide to use the section and pay compensation prior to the outcome of any appeal to the House of Lords. At that time the company's balance sheet indicated that it was insolvent. The residents therefore attempted (but failed) to impose a trust or grant a freezing injunction to preserve any compensation funds paid prior to the appeal (see [2003] All ER (D) 38 (Sep)). In April 2004 the House of Lords allowed the residents' appeal and overturned the Hanning case (see [2004] 2 All ER 305). The residents were awarded their costs of the proceedings. The company was unable to pay the costs and a winding up order was made in July 2004. The liquidator of the company applied for an order under s 212 of the Insolvency Act 1986 that the respondents pay, restore or account for certain sums, totalling approximately £ 100,000 which the liquidator alleged had been paid to them for their benefit. The payments said to have been made to the respondents personally concerned compensation payments from residents seeking rights under s 68 of the 2002 Act. All but one of the payments preceded the decision of the House of Lords. Many had been made from the client account of the solicitors acting in the action.

The liquidator accepted that the second respondent was the beneficial owner of the common. He referred to the expenses for which the company would be entitled to credit in any accounting. He relied on s 31 of the Trustee Act 2000 as founding the company's entitlement as trustee to be reimbursed from trust funds expenses properly incurred by the company when acting on behalf of the trust. He contended that there was a risk from the outset of the litigation of losing, which rendered the payments illegitimate at the time they were made.

The application would be refused.

[2008] All ER (D) 328 (Feb), (Approved judgment)

As a general proposition, directors of a limited company in litigation were obliged to have regard to the ability of the company to meet its possible obligations in costs in the event that costs were awarded against the company. All cases depended on their particular circumstances, but the incorporation of a limited company to institute speculative litigation on a business model that would allow those incorporating it to enjoy fruits of success but leave the company without any means to meet a liability in costs if it lost, could leave directors (and sometimes others) at personal risk.

The instant case was far from such a case, and involved no breach of fiduciary duty. The company was not formed in an attempt to use its limited liability status as a form of protection from adverse costs. With existing Court of Appeal authority in its favour, and positive advice from its lawyers, the company had the strongest possible objective grounds to expect success. The payments were of sums for which the company was obliged to account to the second respondent. The failure to cause the company to hold sums back from the payments was not improperly motivated. The solicitors acting in the proceedings had given the respondents to understand that they were content with the payments being made, had made no suggestion that it was appropriate for sums to be held back in respect of possible adverse costs, and indeed had effected the payments themselves. The payment made after the House of Lords' decision had been made by the solicitors to deal with an urgent decision and would not be considered differently.

## INTRODUCTION:

This is the first approved version handed down by the court. An edited official transcript or report will follow.

## COUNSEL:

Niall McCulloch for the applicant; The first respondent appeared in person; The second respondent did not appear and was not represented.

## PANEL: ROBIN KNOWLES QC

## JUDGMENT-1:

### THE COMMON AND THE COMPANY

1. Newtown Common ("the Common") is in Newbury. Lord Scott records its having been owned by successive Earls of Carnarvon from early in the 19th century ([2004] UKHL 14 at [14]; [2004] 2AC 519 at 534). By late 1998 it was owned by Mrs Farrow, the second Respondent. The first Respondent, Mr Farrow, purchased a lordship and the Common came with it "by accident" as he put it.

2. For many years local residents had taken it for granted that they were entitled to free access by vehicle across the Common to their residential properties.

3. Mr and Mrs Farrow learned of an apparent opportunity to make money from the Common. Even though for many years local residents had taken free access for granted, the decision in the Court of Appeal in Harming v Top Deck Travel Group Ltd (1993) 68 P&CR 14 was understood to mean that they had acquired no easement. Where people owning properties abutting the Common had no private right of way for vehicles across it, a charge could be made for the use of the Common in that way.

4. Perhaps inevitably local residents were deeply upset about the idea. Mr Farrow described some as aggressive. If the plan to make money from the Common was to proceed it became clear that legal proceedings would be necessary. These would seek declarations that people owning properties abutting the Common had no private right of way for vehicles across it.

5. Legal proceedings would attract increased press attention, reasoned Mr and Mrs Farrow. Mrs Farrow did not want to be involved in publicity. It was for this reason that they decided to use a company. On 21 October 1998 Bakewell Management Limited ("the Company") was incorporated. It had two issued shares and Mrs Farrow held both of them. Its three directors were Mrs Farrow, her husband Mr Farrow and a Mr JF Moffett. Mr Farrow resigned as a director on 26 June 2003, but generally accepted that he remained a director in all but name after that.

6. On 27 November 1998 Mrs Farrow transferred the Common to the Company. The transfer was for no money or other consideration. The Company later executed a declaration of trust in which it declared that it held the Common for Mrs Farrow and would do so for as long as she should direct, and would manage the Common on her behalf.

[2008] All ER (D) 328 (Feb), (Approved judgment)

The Proceedings

7. The Company began proceedings. At first instance, on 21 March 2002 before Park J and on its summary judgment application, the Company obtained the declarations it sought (save in the case of a few individuals).

8. There was an appeal against the decision of Park J to the Court of Appeal. The Company was again successful before the Court of Appeal (Ward and Arden LJJ and Sullivan J), on 30 January 2003 ([2003] EWCA Civ 23; [2003] 1 WLR 1429). The Company's success was convincing. The decision was unanimous. Ward and Arden LJJ not only held themselves bound by Hanning but expressed the view that they would anyway have come to the same conclusion. The Court of Appeal refused permission to appeal to the House of Lords.

9. However on 6 May 2003 the House of Lords itself gave leave to appeal.

10. New legislation - section 68 of the Countryside and Rights of Way Act 2002 -had in the meantime been introduced by Parliament ("prompted by the Court of Appeal decision in Hanning's case": [2004] UKHL 14 at [21]; [2004] 2 AC 519 at 535). This enabled the creation of statutory easements, in certain circumstances and on payment of a compensation sum. Counsel for the residents was later to submit to the House of Lords that the legislation assumed the principle in Hanning, even though it did not enact it ([2004] 2AC 519 at 531).

11. There were time limits under section 68 such that some residents needed to decide whether to use the section, and pay compensation, before they knew the result of the proposed appeal. The residents became concerned that the Company's then financial condition ("insolvent on a balance sheet basis, with a net deficit of £ 4,067 as at 31 October 2001") would mean that it was unable to repay compensation payments should the appeal be won. On 5 September 2003 Rimer J ([2003] EWHC 2289 (Ch)) declined an application by residents to "impose" a trust or grant a freezing injunction against the Company requiring the Company to hold any compensation payments made to it until the outcome of the appeal to the House of Lords was known

12. Rimer J said that he could identify no jurisdiction to "impose" on the Company the type of trust proposed, that he was far from persuaded that the residents had a good arguable case for recovery if the residents succeeded in the House of Lords, and that the freezing order jurisdiction was not developed as a means of giving a claimant security for his claim. Rimer J noted that Counsel for the residents accepted that there was "no evidence of any risk of impropriety by [the Company] in the manner in which it may deal with any money paid to it". He also observed in his judgment:

"As Counsel for [the Company] submits with some force, nor can I be satisfied that [the residents] have a good arguable case for success in the House of Lords, since the giving of leave to appeal carries with it no implication that the appeal is likely to succeed."

13. The appeal to the House of Lords was heard on 25 and 26 February 2004. The unanimous decision of the House of Lords (Lords Bingham, Hope, Scott and Walker and Baroness Hale) was given on 1 April 2004 ([2004] UKHL 14; [2004] 2 AC 519).

14. The Company lost. Hanning was overruled (as wrongly decided, although its result on its quite different facts could be seen as correct: [2004] UKHL 14 at [3] and [59]; [2004] 2 AC 519 at 531 per Lord Hope). So too another decision of the Court of Appeal (Massey v Boulden [2003] 1 WLR 1792) was held wrongly decided. A number of other rulings in reliance on Hanning made in other cases were also overruled ([2004] UKHL 14 at [47]; [2004] 2 AC 519 at 545). The reversal effected by the decision of the House of Lords was a substantial one - as Lord Walker observed "... this House should not readily conclude that the decision of the Court of Appeal in Hanning's case was mistaken, especially as it has been followed, not only by the Court of Appeal in this case, but also on other occasions" ([2004]) UKHL 14 at [59]; [2004] 2 AC 519 at 548).

15. The House of Lords ordered the Company to pay the legal costs of the proceedings. These the Company were unable to pay. A petition for its compulsory winding up was presented on 28 May 2004 and a winding up order was made on 7 July 2004.

16. At no point in the proceedings does it appear, from the material before me, that an application for security for costs was made by the residents.

The payments

17. On the trial of this application the liquidator of the Company ("the Liquidator") contends that Mr and Mrs Farrow acted in breach of fiduciary duty, owed to the Company as directors, in causing or allowing certain sums of money

[2008] All ER (D) 328 (Feb), (Approved judgment)

to be paid to them or for their benefit. The Liquidator seeks an order under section 212 of the Insolvency Act 1986 that Mr and Mrs Farrow repay, restore or account for these sums. The Liquidator asks in the alternative that Mr and Mrs Farrow make such contribution as the court thinks in respect of their alleged misfeasance or breach of fiduciary duty. I should record here that the Liquidator originally advanced various other claims but these were not in the event pursued at trial.

18. The payments said to have been made to Mr and Mrs Farrow personally were made over the period 22 May 2003 to 28 January 2004. The payments said to have been made for their benefit comprise four payments to Peter Whatmore over the period 8 August 2001 to 11 September 2003 and in connection with Mr and Mrs Farrow's home, and one payment (of £ 4000) to Goodwille & Cochran on 29 April 2004 and in connection with rates owed by Mr Farrow. As will be seen, all but one payment preceded the decision of the House of Lords. The total of all the payments is £ 102,822.17.

19. Many of the payments were made from the client account of the solicitors acting in the proceedings. It was in that client account that payments in respect of the Common (whether for using the common where there was no question of an existing right of way, or as compensation under section 68) were being collected. The solicitor responsible, Mr Donald Gray of Darwin Gray said this in an email of 6 December 2007 to Mr Farrow and shown to the Court:

"You have asked me to confirm the basis on which payments were made from our client account arising out of easements granted by [the Company] or consequent on applications under section 68 of the Countryside and Rights of Way Act. I had been told at an early stage of our instructions that [the Company] held [the Common] on trust for [Mrs Farrow] and you let me have a copy of the relevant trust deed.

I met and spoke to [Mrs Farrow] and you on a number of occasions regarding those payments. I understood that [the Company] was not beneficially entitled to the payments and therefore during the time I had conduct of the litigation it was proper to make those payments direct to [Mrs Farrow] or as she directed."

20. Mr Farrow has appeared in person on this trial. Mrs Farrow is very seriously ill and did not attend, and nor was she represented. Some of the points Mr Farrow made he made on behalf of his wife as well as himself. Mr Farrow took part in the trial with dignity, courtesy and concision. Mr Farrow told me that he had received pro bono assistance from a member of the Bar to assist him in formulating his submissions. The Liquidator was represented by Mr Niall McCulloch of Counsel. At every point Mr McCulloch was mindful of the obligations on Counsel when appearing against litigants in person. He could not have been fairer, without any loss of rigour or persuasiveness in his presentation of his client's case. I am grateful to both Mr Farrow and Mr McCulloch for their assistance.

Directors' fiduciary duties

21. Among the fiduciary duties owed by a director of a limited company are (so far as relevant, and shortly stated) a duty to act bona fide in the best interests of the company, a duty to act for a proper purpose, and a duty not to act for personal interest conflicting with the interests of the company. Where a company is insolvent, or in a parlous financial state such that it is the creditors' interests that are at risk, the director's fiduciary duties extend to a duty to have regard to the interests of the creditors of the company (see Kinsela v Russell Kinsela Pty Ltd (1986) 4 NSWLR 722 at 730 and 733 (Street CJ), West Mercia Safetywear Ltd v Dodd [1988] BCLC 250 at 252f-253c (Dillon LJ), and Facia Footwear Ltd v Hinchliffe [1998] 1 BCLC 218 at 227g-228g (Scott VC)).

22. The Company had no business other than its trusteeship of the Common and the conduct of the proceedings concerning the Common. The materials, and evidence, before me are neither complete nor clear but it seems probable, and I find, that the sums received by the Company and from which the payments were made were sums earned from the Common. On the Liquidator's own case Mrs Farrow was the beneficial owner of the Common. The Company was therefore liable to account to her for sums earned from the Common.

23. Given this, the Liquidator's claim is ill-directed if directed to the sums being paid to Mrs Farrow or for her benefit. Recognising this, the Liquidator through Mr McCulloch focussed on the expenses for which the Company would be entitled to credit in any accounting. He relied on section 31 of the Trustee Act 2000 as founding the Company's entitlement as trustee to be reimbursed from trust funds expenses properly incurred by the Company when acting on behalf of the trust.

24. Of course the Company had no positive obligation to retain sums for these expenses; it was open to it to account gross and then receive payment of its expenses at a later point. But the Liquidator's point is that by not causing the

[2008] All ER (D) 328 (Feb), (Approved judgment)

Company to retain sums the Company risked losing the opportunity of being paid them given the Company's financial state. On behalf of the Liquidator Mr McCulloch submits:

"The effect of the ... payments was ... to (i) prevent the Company from reimbursing itself for expenses, including the order for costs made against the Company in the litigation; (ii) put assets beyond the reach of the Company's creditors, including the successful appellants in the House of Lords; (iii) enable [Mr and Mrs Farrow] to take the benefit of the trust, without taking the burden - [they] applied the gross income from the Common for their own benefit without paying the costs of administering the trust i.e. by paying the creditors of the Company and/or reimbursing the Company for expenses."

25. The submission refers to putting assets beyond the reach of the Company's creditors. This is put as one of the effects of the payments, which in the events that happened it was. But for the avoidance of doubt I record that, having heard Mr Farrow, I am quite satisfied that it was no part of his or Mrs Farrow's intention or motive when these payments were made, to put assets beyond the reach of the Company's creditors. Mr McCulloch very properly emphasised that it was no part of the Liquidator's case that the payments were deliberate acts to defraud creditors; that this was a case where the Liquidator alleged that the directors had not directed their minds to the interests of the Company rather than had deliberately acted against its interests or those of its creditors.

Providing for the risk of losing the proceedings

26. The only defined or quantified expenses of the Company to which the Liquidator refers are the Company's own legal costs of the proceedings and the costs it was ordered to pay in the proceedings (paragraph 5 of the Originating Application). The Company did not incur any liability for costs until the decision of the House of Lords. As the Liquidator points out that decision was also fatal to its business (such as it was). The Liquidator however urges that Mr and Mrs Farrow "must have known from the beginning [of proceedings] that there was a risk of an adverse costs order, and after the House of Lords had granted permission to appeal, that the risk was substantially increased." (paragraph 11 of Mr Locke's witness statement of 28 June 2006). Mr McCulloch submitted that as soon as litigation was entered into there was always a risk of losing ultimately; that throughout the Company incurs its own costs and risks adverse costs. This, submits Mr McCulloch for the Liquidator, is the context that makes illegitimate the making of the payments at the time they were made.

27. Mr Farrow accepted in cross examination that he (and his wife) took no steps to guard against the risk of losing the proceedings and the attendant financial implications for the Company. He also frankly accepted that when the payments were made he and his wife did not make any distinction between what was in the interests of the Company and what was in their personal interests. Mr and Mrs Farrow simply did not think the proceedings would be lost, to the point of assuming that they were bound to be won by the Company. Once the House of Lords had given leave to appeal, Mr Farrow acknowledged that he must have recognised losing as a possibility, but not more.

28. I asked Mr Locke, who gave evidence for the Liquidator in support of the application, what his or the Liquidator's investigations had revealed about advice given to the Company by its solicitors on prospects of success in the proceedings. Mr Locke said that he had read such advice but could not recall its contents. I am quite satisfied on the evidence of Mr Farrow, and against the background of authority to which I have referred, that it was very positive indeed.

29. The Company's own costs of the proceedings were largely resourced by using a conditional fee agreement with its own legal team. To that extent the Company did not have to concern itself with the question of its own legal costs if it lost the proceedings, because it would have no liability for those costs. The material and evidence on this is neither complete nor clear, but it does appear that the conditional fee arrangements did not cover all aspects of the Company's costs, and indeed solicitors originally retained by the Company (Oury Clark) appear to have lodged a proof of debt for around £ 40,000. There were some issues about the work done, and the Company in the event changed solicitors. I am satisfied on the evidence of Mr Farrow, which was largely unchallenged in this respect, that at the time this was not a sum that the firm was expecting the Company to pay.

30. Of course the conditional fee agreement did not protect the Company from the adverse costs that it was ordered to pay when it lost in the House of Lords. It is possible to see a basis for the contention that Mr and Mrs Farrow failed to have regard to the interests of its opponents in the proceedings should they become creditors of the Company. The accounts of the Company show it to have been in a financial state such that it was the interests of creditors that were at risk.

31. As a general proposition directors of a limited company in litigation are, in my view, obliged to have regard to the ability of the company to meet its possible obligations in costs in the event that costs are awarded against the com-

[2008] All ER (D) 328 (Feb), (Approved judgment)

pany. All cases depend on their particular circumstances, but the incorporation of a limited company to institute speculative litigation on a business model that would allow those incorporating it to enjoy fruits of success but leave the company without any means to meet a liability in costs if it lost, could in my view leave directors (and sometimes others) at personal risk.

32. The present case is far from such a case. Having regard to the following matters I cannot conclude that Mr and Mrs Farrow were in breach of their fiduciary duties as directors:

a. The Company was not created in an attempt to use its limited liability status as a form of protection from adverse costs.

b. With existing Court of Appeal authority in its favour, and very positive advice from its lawyers, the Company had the strongest possible objective grounds to expect success.

c. The payments were of sums for which the Company was obliged to account to Mrs Farrow.

d. The failure to cause the Company to hold sums back from the payments was not improperly motivated.

e. The solicitors acting in the proceedings gave Mr and Mrs Farrow to understand that they were content with the payments being made, made no suggestion that it was appropriate for sums to be held back in respect of possible adverse costs, and indeed effected the payments themselves.

33. My conclusion is that the present case is a case in which an absence of consideration by directors of an insolvent company of the question of adverse costs, or provision for the possibility of adverse costs, does not give rise to a breach of fiduciary duty on their part.

34. One of the payments, the payment of £ 4000 on 29 April 2004 to Goodwille & Cochran, was made after the Company had lost the proceedings and knew that it was liable for costs. I have considered closely whether I should take a different approach in relation to this payment. In the particular circumstances of this case I have concluded that I should not. On the limited evidence I have heard it was paid, again by the solicitors themselves, to deal with an urgent issue requiring an urgent decision. Points a, c, d and e listed at paragraph 32 still applied.

35. It may fairly be said that Mr and Mrs Farrow have narrowly escaped liability. It also seems to me that much of what has led to the current situation has been caused by:

a. the use of the Company as a vehicle to hold the Common without full consequential arrangements and responsibilities being worked out and implemented;

b. the apparent readiness of the solicitors for the Company and Mr and Mrs Farrow to act as bankers to the Company;

c. the embarking by the Company on complex litigation without careful consideration of how adverse costs would be met if the Company lost (however confident the Company might be of winning);

d. the absence of a full appreciation on the part of those involved in the decision to form and use the Company of the need to understand that although the liability of a limited company is limited, one corollary is that its directors have significant fiduciary duties.

Mr and Mrs Farrow and the residents

36. The course, and nature, of the proceedings have clearly caused deep and strong feelings. Recognising this, time and again Mr Farrow emphasised that he wished the whole endeavour of trying to exploit the Common commercially had not been attempted. He also suggested, no doubt with some cause, that the objective behind the current application is to make him and his wife bankrupt.

37. When the Company was wound up, the Common was sold. It realised £ 267,730.98 after costs and after redemption of a mortgage. Although Mrs Farrow was the beneficial owner of the Common, Mr and Mrs Farrow made that sum available to the Liquidator for the benefit of the creditors of the Company.

38. They were under no obligation to do so. Mr Locke, who assists the Liquidator in the liquidation, did not see it this way because he said in evidence that he thought the trust was a sham. But that view cannot stand with the Liquidator's acceptance of the validity of the trust for the purpose of the trial of this application.

[2008] All ER (D) 328 (Feb), (Approved judgment)

39. The net proceeds have been reduced by a Capital Gains Tax payment of £ 122,000, the basis of which is disputed between Mr Locke and Mr Farrow, but which still leaves almost £ 150,000 for the insolvent estate. That is, of course, more than the total sum claimed on this application.

40. The Liquidator produced a calculation of £ 610,286 as "the estimated amount required to pay the costs, debts and interest of the liquidation in full". This calculation cannot be accepted uncritically. Its main component is a figure of £ 373,814.00 (increased substantially further by an item for "interest at 8%"). This figure is taken from a proof of debt for £ 181,814 for legal costs and £ 192,000 for "payments made by NCRA members under section 68 CROW Act 2000 and now repayable due to outcome of House of Lords case ...". However the Liquidator was not able to refer me to any document showing that the former figure has been subject to any assessment. And the latter figure takes no account of the question whether there is any right of repayment, a question considered by Rimer J when the freezing order was sought from him and refused by him.

41. I express the hope that Mr and Mrs Farrow and the residents will treat this trial as the end of their engagements with the Courts. I hope that the Liquidator will assist. Mr Locke volunteered that he specialises in "cases of very large difficulty and extreme creditor concern". This case should not be in that category, and the longer it is seen as in that category the less satisfaction there will be for anyone.

Conclusion

42. In my judgment the application should be dismissed.

SOLICITORS:

Freeth Cartwright LLP.


[2008] All ER (D) 328 (Feb), (Approved judgment)

# EXHIBIT 2

# BUTTERWORTHS
# COMPANY LAW
# CASES
# 1988

EDITOR
D D PRENTICE MA, LLB, JD
*Barrister, Fellow of Pembroke College, Oxford*

ASSISTANT EDITOR
MARY STOKES MA, BCL, LLM
*Fellow of Brasenose College, Oxford*

LONDON
BUTTERWORTHS

# West Mercia Safetywear Ltd (in liq) v Dodd and another

COURT OF APPEAL, CIVIL DIVISION
DILLON, CROOM-JOHNSON LJJ, AND CAULFIELD J
19 NOVEMBER 1987

*Misfeasance – Director making a transfer by way of fraudulent preference –*
*Company known to be insolvent – Whether director in breach of duty –*
*Companies Act 1948, s 333 (Insolvency Act 1986, s 212(1)).*

West Mercia Safetywear Ltd (West Mercia) was a wholly-owned subsidiary of
A J Dodd & Co Ltd (Dodd). D was a director of both companies. Both
companies banked with the same bank. Dodd's overdraft at the bank was
guaranteed personally by D. In May 1984 West Mercia owed Dodd about
£30,000. At this time both companies were in financial difficulties and an
accountant told D that the companies' bank accounts were not to be operated.
On 21 May D transferred £4,000 from the West Mercia account to the Dodd
account. In June both companies went into liquidation. The liquidator of West
Mercia applied for a declaration that D was guilty of misfeasance and breach
of trust and that he be ordered to repay the £4,000 transferred from West
Mercia to Dodd. The judge held that although D had acted improperly he had
not breached any duty to West Mercia because the transfer of £4,000 was
payment in part of a debt owed by West Mercia to Dodd and was not therefore
a misapplication of West Mercia's assets. The liquidator appealed.

**Held** – Once a company was insolvent the interests of the creditors overrode
those of the shareholders since the company's assets belonged in a practical
sense to the creditors who could displace the power of the shareholders or
directors to deal with them. Since West Mercia was known by D to be insolvent
when he caused £4,000 to be transferred from its account to Dodd and the
transfer was a fraudulent preference made solely to relieve D of personal
liability under his guarantee in disregard of the interests of the general creditors
of West Mercia, D had breached his duty. Accordingly, the appeal would be
allowed and the declaration sought made and D ordered to repay the £4,000
with interest. The order would be made subject to a direction that in the
distribution of the assets of West Mercia to unsecured creditors the debt due
from West Mercia to Dodd was to be notionally increased by £4,000 as if there
had been no fraudulent preference, and any dividend attributable to that sum
was to be recouped to D rather than Dodd.

**Cases referred to in judgments**
*Kinsela v Russell Kinsela Pty Ltd (in liq)* (1986) 4 NSWLR 722, NSW CA.
*Leeds and Hanley Theatres of Varieties Ltd, Re* [1904] 2 Ch 45.
*Multinational Gas and Petrochemical Co v Multinational Gas and Petro-*
*  chemical Services Ltd* [1983] BCLC 461, [1983] 2 All ER 563, [1983] Ch 258,
  [1983] 3 WLR 492, CA.
*Washington Diamond Mining Co, Re* [1893] 3 Ch 95, CA.

*td (in liq) v*

*...r*

*a*

*...*

*b*

*fraudulent preference –*
*...r in breach of duty –*
*(1)).*

*...ly-owned subsidiary of*  *c*
*...both companies. Both*
*...rdraft at the bank was*
*...rcia owed Dodd about*
*...cial difficulties and an*
*...were not to be operated.*
*...a account to the Dodd*  *d*
*...The liquidator of West*
*...misfeasance and breach*
*...transferred from West*
*...cted improperly he had*
*...transfer of £4,000 was*  *e*
*...d and was not therefore*
*...r appealed.*

*...the creditors overrode*
*...belonged in a practical*
*...f the shareholders and*  *f*
*...wn by D to be insolvent*
*...ount to Dodd and the*
*...relieve D of personal*
*...of the general creditors*
*...y, the appeal would be*  *g*
*...ted to repay the £4,000*
*...a direction that in the*
*...creditors the debt due*
*...ed by £4,000 as if there*
*...ttributable to that sum*  *h*

*...R 722, NSW CA.*
*...Ch. 45.*
*...ional Gas and Petro-*
*...R 563, [1983] Ch 258,*  *i*
*...CA*

[1988] BCLC 250

**Appeal**

*a*  Nigel Halls, the liquidator of the property of West Mercia Safetywear Ltd, appealed against the judgment of his Honour Judge Roy Ward QC given in the Worcester County Court on 29 April 1987 dismissing an application by the liquidator for (1) a declaration that the first respondent, Albert James Dodd, a director of the company, was guilty of misfeasance and breach of trust in relation to the company in obtaining and transferring the sum of £4,000 to the *b*  overdrawn account of a company called A J Dodd & Co Ltd of which he was also a director, and (2) an order for the repayment of that sum and interest. The second respondent, Peter Prescott, a co-director of West Mercia, did not take part in the appeal. The facts are set out in the judgment of Dillon LJ.

*Mark Phillips* for the liquidator.
*c*  *Timothy A Jones* for Mr Dodd.

**DILLON LJ.** This is an appeal from a decision of his Honour Judge Roy Ward QC given in the Worcester County Court on 19 April 1987. The question he *d*  had to decide was a question concerning fraudulent preference and misfeasance arising in relation to the liquidation of a company called West Mercia Safetywear Ltd. The present appellant is the liquidator of that company. The respondent to the appeal is a Mr Albert James Dodd, who was at the material time a director of that company.

There is another company involved of which Mr Dodd was also a director, *e*  called A J Dodd & Co Ltd. The West Mercia company was, on the affidavits, a wholly-owned subsidiary of the Dodd company.

Both companies banked with Lloyds Bank. The account of the West Mercia company was in credit. The account of the Dodd company was very considerably overdrawn. The bank had a charge to secure the account of the Dodd *f*  company on the book debts of the Dodd company, and it also had a guarantee of the Dodd company's account from Mr Dodd himself. The book debts of the Dodd company included a debt which in early May 1984, the relevant time, amounted to about £30,000 due to the Dodd company from the West Mercia company.

In May 1984 both the West Mercia company and the Dodd company were *g*  in financial difficulties and, as Judge Ward found, insolvent. The directors, including Mr Dodd, called in an accountant, Mr Nigel Halls, to advise them and to take any necessary steps towards the liquidation of the companies. Mr Halls subsequently became liquidator of both companies when they were put into liquidation, and he is indeed the present appellant.

The evidence clearly establishes that Mr Halls explained very clearly to Mr *h*  Dodd and his co-director of the West Mercia company, a Mr Prescott, with whom this appeal is not concerned, that the company bank accounts of the West Mercia company were not thereafter to be operated. The judge says, and I entirely agree:

*i*      'I cannot believe that the directors thought that, whilst cheques were not to be drawn on either account, *transfers* of money between accounts would be permissible.'

[1988] BCLC 250

The necessary steps were taken to put both companies into creditors' voluntary liquidation, and the requisite meetings to that end were held on 4 June 1984. In the meantime, however, on 21 May 1984 Mr Dodd instructed Lloyds Bank to transfer £4,000, which had just been paid in by a debtor to the West Mercia company's account, to the overdrawn account of the Dodd company. The plain and obvious intention of that was to reduce the overdraft of the Dodd company which Mr Dodd had personally guaranteed.

The liquidations proceeded. The bank refused to repay the £4,000. The Dodd company had no other assets available to repay the £4,000. Accordingly in due course, by a notice of motion issued on 30 January 1985, the liquidator of the West Mercia company applied in the Worcester County Court for a declaration that Mr Dodd was guilty of misfeasance and breach of trust in relation to the West Mercia company in obtaining and transferring the £4,000 to the Dodd company on 21 May 1984. The notice of motion asked also for an order for repayment of that sum with interest at 12% per anuum from 21 May 1984.

To my mind it is quite clear that there was a fraudulent preference of the Dodd company. It follows that there was misfeasance on the part of Mr Dodd as a director who owed a fiduciary duty to the West Mercia company in making that transfer by way of fraudulent preference: see the decision of this court in *Re Washington Diamond Mining Co* [1893] 3 Ch 95 esp at 115 per Kay LJ.

The judge nevertheless felt that, although Mr Dodd had acted improperly, he had not misapplied any assets of the West Mercia company because he had used the assets merely to pay in part a debt owed by the West Mercia company to the Dodd company. He therefore concluded that he could not see that Mr Dodd had been in breach of any duty of care, fiduciary or otherwise, to the West Mercia company or in relation to that company. On that ground he held that the proceedings were misconceived. In reaching that conclusion he relied in particular on some comments I had made in the case of *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] BCLC 461, [1983] 2 All ER 563, [1983] Ch 258. The *Multinational* case was, however, a wholly different case from the present. In the present case the West Mercia company was at the relevant time insolvent to the knowledge of the directors. They had been expressly told not to deal with the company's bank account, and Mr Dodd had, in fraud of the creditors of the company, made the transfer to the Dodd company's account for his own sole benefit in relieving his own personal liability under his guarantee. In the *Multinational* case, at the time of the transaction which was in question, the company concerned was amply solvent, and what the directors had done at the bidding of the shareholders had merely been to make a business decision in good faith, and act on that decision. It subsequently turned out to be a bad decision, but the position had to be decided on the facts at the earlier stage where the company was amply solvent and the parties were acting in good faith.

We have been referred to quite a number of authorities on this topic. For my part I find helpful, and would approve, the statement of Street CJ in *Kinsela v Russell Kinsela Pty Ltd (in liq)* (1986) 4 NSWLR 722 at 730, where he said:

'In a solvent company the proprietary interests of the shareholders entitle them as a general body to be regarded as the company when questions of the duty of directors arise. If, as a general body, they authorise or ratify a particular action of the directors, there can be no

mpanies into creditors' vol-
that end were held on 4 June
Mr Dodd instructed Lloyds
in by a debtor to the West
ount of the Dodd company.
reduce the overdraft of the
uaranteed.

repay the £4,000. The Dodd
£4,000. Accordingly in due
1985, the liquidator of the
nty Court for a declaration
ch of trust in relation to the
ing the £4,000 to the Dodd
asked also for an order for
ium from 21 May 1984.
raudulent preference of the
art on the part of Mr Dodd
Mercia company in making
he decision of this court in
esp at 115 per Kay LJ.
odd had acted improperly,
a company because he had
the West Mercia company
he could not see that Mr
ary or otherwise, to the
On that ground he held
that conclusion he relied
ase of *Multinational Gas*
trochemical Services Ltd
. The *Multinational* case
ent. In the present case the
ent to the knowledge of
deal with the company's
or his own sole benefit in
ate. In the *Multinational*
question, the company
had done at the bidding
decision in good faith,
a bad decision, but
later stage where the
n good faith.
us on this topic. For
f street CJ in *Kinsela*
o, where he said:

of the shareholders
company when
eneral body, they
there can be no

challenge to the validity of what the directors have done. But where a company is insolvent the interests of the creditors intrude. They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration.'

In the present case, therefore, in my judgment Mr Dodd was guilty of breach of duty when, for his own purposes, he caused the £4,000 to be transferred in disregard of the interests of the general creditors of this insolvent company. Therefore the declaration sought in the notice of motion ought to be made as against Mr Dodd.

The question then remains: what financial relief ought to be granted against him? Prima facie the relief to be granted where money of the company has been misapplied by a director for his own ends is an order that he repay that money with interest, as in *Re Washington Diamond Mining Co*. The section in question, however, s 333 of the Companies Act 1948, provides that the court may order the delinquent director to repay or restore the money, with interest at such rate as the court thinks fit, or to contribute such sum to the assets of the company by way of compensation in respect of the misapplication as the court thinks fit. The court has a discretion over the matter of relief, and it is permissible for the delinquent director to submit that the wind should be tempered because, for instance, full repayment would produce a windfall to third parties, or, alternatively, because it would involve money going round in a circle or passing through the hands of someone else whose position is equally tainted.

In the present case counsel for Mr Dodd (Mr Jones) has taken a much bolder course. He has submitted that, on the facts of this case, the misapplication of £4,000 of the company's money for Mr Dodd's own benefit has not caused any loss either to the company or, through the company and its liquidator, to any of the creditors of the company. In the course of the trial in the court below, the liquidator put in evidence various documents, including an estimated statement of affairs of the West Mercia company as at 14 May, 1984, which was just before the transfer of the £4,000, with an accompanying deficiency account and list of preferential and unsecured creditors. These were essentially the statements prepared with a view to the liquidation of the company, probably by the liquidator himself on the information supplied by the directors, and adopted by the directors for placing before the creditors at the statutory creditors' meeting.

These were necessarily and properly put in evidence to show that the West Mercia company was indeed insolvent to the knowledge of the directors at the time Mr Dodd made the transfer of the £4,000. The liquidator did not put in evidence anything as to the actual realisation in the liquidation, and counsel for Mr Dodd accordingly submitted that, on the basis of these estimated figures, an adjustment could be made to exclude the Dodd company from receipt of any dividend until the £4,000 paid to it had been recouped and, if that was done, it would follow that there was nothing needed to be provided for the liquidator by Mr Dodd in respect of the £4,000.

The basis of the calculation is this. The estimated total assets of the West Mercia company are shown at 14 May, 1984 as £8,018, the preferential creditors are then given as £2,696, leaving a balance after payment of the preferential creditors of £5,322. Counsel for Mr Dodd submits that that represents the sum available for payment of the general creditors because, even if £4,000 was in fact then wrongly paid out, that left £1,322 of realisations and, if £4,000 were to be repaid now, albeit without interest, that would bring the fund up to £5,322. It is then said that of that only between one-sixth and one-seventh is attributable to unsecured creditors other than the Dodd company, which makes out of £5,322 a sum somewhere in the region of £650 or £750 which is sufficiently franked by the £1,322 of uncommitted assets.

Of course, an estimated statement of affairs made over three years ago is wholly unreliable as a basis for considering the actual position in the company. Counsel for Mr Dodd did not pursue further inquiry into the actual realisations and payments of the liquidator, but the liquidator did point out in evidence that the statement of affairs made no provision for the costs and expenses of the winding up. Those costs and expenses of course rank ahead of any payment to the unsecured creditors. They would include all the necessary expenses of realisation, including the liquidator's own remuneration, and they would include the costs of litigation. It is not open to Mr Dodd to assert that these proceedings were not properly brought by the liquidator. They plainly were, since there had been a blatant fraudulent preference and misfeasance. Accordingly, all the expenses that the liquidator has incurred in this litigation and does not recover from Mr Dodd himself would have to be met out of the actual cash assets of the company, and it seems therefore in the highest degree unlikely that the £1,322 supposed estimated surplus assets, if indeed realised, would be sufficient to meet the needs for dividends to the unsecured creditors, other than the Dodd company, and payment of the expenses of the liquidation.

I take the view, notwithstanding that the judge accepted the submission of counsel for Mr Dodd that no loss to any creditor had been shown, that counsel, on whose client the onus lay, has failed to establish that there is no loss to be met by his client. Indeed, it would be surprising if there were no loss where there was such a blatant misfeasance.

The calculations of counsel for Mr Dodd follow the line which was adopted by Buckley J in the case of *Re Leeds and Hanley Theatres of Varieties Ltd* [1904] 2 Ch 45. But that was a very much simpler case, because in that case there were only two companies involved and not a further individual. It was a working out of the liabilities between the two companies, both in liquidation, where one was the creditor of the other for a sum due on debentures, and the other was the creditor of the one for the balance of a sum ordered to be paid for misfeasance. The court was concerned with the way round that should be dealt with as a matter of accounting between the two companies, and there was no question of money being sought from a third party to make good the loss from the misfeasance.

What Buckley J was seeking to do, as I follow his judgment, in the *Leeds and Hanley Theatres of Varieties* case was to apply the fair method of administration, what he called 'proper administration', in the circumstances of that particular case; not to lay down a course of administration to be followed through thick and thin in cases where the circumstances are not the same.

In the present case, if the whole amount of the £4,000 and interest is recouped

to the liqu
of any ot
of the We
would be
receive a
preference
but it wo
Dodd cor
be impos
creditors
liquidatio

In my j
is to orde
distributi
the debt
taken as
had not
the extra
recouped
I see it, is

Accord
judge, m
for paym
I have in

CROOM

CAULFI

*Appeal a*

Solicitor
liquidatc

**[1988] BCLC**

*(left column partially obscured)*

tal assets of the West
: preferential creditors
nt of the preferential *a*
at represents the sum
even if £4,000 was in
s and, if £4,000 were
ring the fund up to
h and one-seventh is *b*
mpany, which makes
o which is sufficiently

er three years ago is
tion in the company.
ne actual realisations *c*
oint out in evidence
sts and expenses of
ead of any payment
cessary expenses of
n, and they would
to assert that these *d*
They plainly were,
isfeasance. Accord-
this litigation and
net out of the actual
hest degree unlikely *e*
l realised, would be
reditors, other than
uidation.

l the submission of
nown, that counsel,
ere is no loss to be *f*
vere no loss where

which was adopted
s of *Varieties Ltd*
cause in that case *g*
ndividual. It was a
oth in liquidation,
ebentures, and the
rdered to be paid
nd that should be *h*
npanies, and there
to make good the

ent, in the *Leeds*
method of admin-
umstances of that
n to be followed *i*
not the same.
terest is recouped

to the liquidator by Mr Dodd and is distributed by the liquidator after payment of any outstanding expenses pro rata among the unsecured general creditors of the West Mercia company, including the preference of the £4,000, the result would be that the unsecured creditors of the West Mercia company would receive a larger dividend than they would have received if the fraudulent preference exercise had never happened. That would be unfair to Mr Dodd, but it would also be most unfair to the unsecured creditors, other than the Dodd company, if for the exoneration of Mr Dodd an arbitrary figure were to be imposed from the statement of affairs without regard to what the unsecured creditors should actually receive after the payment of the actual expenses of liquidation properly chargeable in the liquidation.

In my judgment the appropriate course of administration in the present case is to order Mr Dodd to repay the £4,000 with interest and to direct that in the distribution of the assets of the West Mercia company to unsecured creditors the debt due from the West Mercia company to the Dodd company is to be taken as notionally increased by £4,000 to what it would have been if there had not been a fraudulent preference, and then any dividend attributable to the extra £4,000 thus added back to the debt of the Dodd company is to be recouped to Mr Dodd rather than being paid to the Dodd company. That, as I see it, is a rough and ready way of achieving justice on both sides.

Accordingly, for my part I would allow the appeal, set aside the order of the judge, make the declaration sought in the notice of motion, and make the order for payment of the £4,000 and interest with the administrative directions which I have indicated.

**CROOM-JOHNSON LJ.** I agree.

**CAULFIELD J.** I agree.

*Appeal allowed.*

Solicitors: *Penningtons Ward Bowie*, agents for *Flint Hand*, Gloucester (for the liquidator); *Alexander & Co*, Worcester (for Mr Dodd).

Azza Abdullah    Barrister.

July 12, 2002

DF Capital Inc.
CT Trust Center
1209 Orange Street
Wilmington, DE 19801

Re: Letter Agreement

Ladies and Gentlemen:

Reference is made to: (1) the Proceeds Participation Agreement dated as of July 12, 2002 (the "Agreement") between Refco Group Ltd., LLC, a Delaware limited liability company (the "Company"), and DF Capital Inc., a Delaware corporation, ("DFI"); and (2) the Second Amended and Restated Limited Liability Company Agreement of the Company (the "LLC Agreement"). This letter agreement, dated July 12, 2002 (the "Letter Agreement"), sets forth the further agreements of the parties to the Agreement and the Voting Members of the LLC Agreement. All capitalized terms used and not otherwise defined herein have the meanings assigned thereto in the Agreement or the LLC Agreement.

In consideration of the mutual representations, covenants and agreements made between the parties hereto in connection with the Agreement and the LLC Agreement, and intending to be legally bound hereby, the parties hereto have agreed as follows:

1.1.    The objective target and intention of all parties to this Letter Agreement is to effect a "Sale of the Company". The phrase "Sale of the Company" means the sale of the Membership Shares of the Company or its assets, including without limitation by means of the following actions: (a) the sale of the ownership of the Company, or the sale of all Shares of all Holding Companies of the Company or (b) the sale of all or substantially all of the assets of the Company including without limitation by means of any of the following actions: (i) sale of the Membership Shares of the Company to the public pursuant to a registration statement under the Securities Act of 1933, as amended (the "Securities Act") or to a third party in a transaction exempt from the registration requirements of the Securities Act; (ii) the merger or consolidation of the Company; or (iii) the sale of the Membership interests of the Company. The parties to this Letter Agreement, in particular the management of the Company as so directed by the Company, will use their reasonable best efforts to consummate such a transaction prior to February 28, 2005.

2.1.    The Company shall keep all parties to this Letter Agreement fully informed as to any developments, progress, and circumstances on the project outlined in Section 1 above immediately after it having occurred or being achieved, including providing relevant information on any offer received by the Company and any related negotiations.

3.1.    The minimum target price for a Sale of the Company (including a sale of all its outstanding Membership Shares) shall be its fair market value.

12966427.3 071102 1221C 98511025



( MB02069381

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

DF Overseas Inc.
Page 2
July 12, 2002

4.1.   A Sale of the Company (including a sale of all its outstanding Membership Shares) shall be structured in a manner so as to be most tax-efficient and provide the most attractive financial opportunities to all the parties.

5.1.   (a)   A Sale of the Company (including a sale of all or substantially all of its outstanding Membership Shares) shall be undertaken only with the consent of all the parties to this Letter Agreement; such consent shall not be unreasonably withheld by any party.

(b)   DFI, and after the February 28, 2005 Refco Group Holdings, Inc., is entitled to withhold its consent, regardless of other reasons, if the purchase price for the Sale of the Company (including a sale of all or substantially all of its outstanding Membership Shares) is less than $1,650,000,000; such amount shall be adjusted ratably upward or downward (as the case may be) in accordance with the method of determination of the Purchase Price (and accordingly the minimum sale price) described in Section 1.01(c) of the Agreement to the extent that the net income of the Company for the fiscal year ending February 28, 2003 is less than or greater than $132,000,000.

6.1.   In the event that a Sale of the Company (including a sale of all or substantially all of its Membership Shares) has not been effected prior to February 28, 2005 and DFI (after having exercised its right to receive Membership Shares pursuant to Section 1.01(b) of the Agreement) decides after February 28, 2005 to effect a Sale of the Company or a sale of all its Membership Shares to a Third Party Buyer (other than the Company, any other Member, or any affiliate of DFI) at a price and on sales terms according to Sections 3, 4, and 5(b) above, DFI shall have the right to require the other Members to sell to the Third Party Buyer, together with DFI and the Company, all their Membership Shares or for the same price (pro rata) and upon the same terms and conditions as are applicable to DFI. The right to require the other Members to participate in any proposed Sale of the Company or the Membership Shares held by DFI in accordance with the immediately preceding sentence shall be exercised by DFI by delivery of a written notice to the other Members (the "Drag Along Notice") on or prior to the date which is at least thirty (30) days prior to the date that the proposed transaction is scheduled to close. The Drag Along Notice shall set forth (i) the time and place of the closing of the proposed transaction and (ii) the expected consideration to be paid at such closing. The other Members are obliged to consent to the Sale of the Company or the Membership Shares of DFI and the other Members to the Third Party Buyer and to sell all their Membership Shares on the conditions set forth in this Section to the Third Party Buyer. In accordance with such sale of the Company, each Member agrees to represent that it or he owns good title to the Membership Shares free and clear of any lien.

7.1.   In Section 1.04 of the Agreement the Company has agreed to make the additional discount payment unless the Company is sold or DFI exchanges its Participation Rights for Membership Shares according to Section 1.01 (b) of the Agreement before February 28, 2006. However after February 28, 2006, in the event that DFI has not converted its Participation Rights

12966427.3 071102 1221C 98511025



MB02069382

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

DF Overseas Inc.
Page 3
July 12, 2002

into Membership Shares, then the Company, Refco Group Holdings Inc. and DFI will agree to restructure any subsequent (due in 2007 and beyond) Additional Discount Payments to avoid any adverse tax consequences experienced by the Company or Refco Group Holdings Inc. with respect to such payments.

8.1.   Concerning Section 2.02.(b) of the Agreement, DFI will be regarded as a member in respect of Sections 1.01.(c), second paragraph and Section 1.04. of the Agreement.

9.1.   In the event that a Member transfers any of its Membership Shares in accordance with Section 18(b) of the Amended and Restated Limited Liability Company Agreement of the Company to an affiliate or a Family Member of such Member, the assignee must execute and agree to be bound by the provisions of this Letter Agreement.

10.1.   The Members which are parties hereto agree to vote any Membership Shares held by it so as to effectuate Section 2.04 of the Agreement.  In the event Mr. Phillip R. Bennett cannot serve as CEO of the Company at any time, Holdings and BAWAG Overseas Inc. shall designate a successor, and Holdings agrees to vote for such designee as Mr. Bennett's successor. If Holdings and BAWAG Overseas Inc. cannot agree on a designated successor within 30 days, Holdings has the right to designate such successor at all times prior to the Third Payment Date and BAWAG Overseas Inc. has the right to designate such successor at all times on and after the Third Payment Date.  The designation of a successor in each instance shall be subject to the consent of the other party, such consent not to be unreasonably withheld.

11.1.   The Company agrees that $350 million of the Purchase Price for the Participation Right shall be used or caused to be used for the retirement of inter-company debt of Refco Group Holdings, Inc.

12.1.   Refco Group Holdings Inc. shall not, and shall cause each of its principals not to, sell any of the Voting Membership Shares held by it or him, except (a) to DFI, (b) in a Sale of the Company, or (c) to a Family Member.

13.1.   Holdings shall not vote any of the Voting Membership Shares held by it to permit the Company to issue any new Voting Membership Shares, except as provided in the Agreement section 1.01.b).

14.1.   The Members of Refco Group Ltd., LLC agree

14.1   that the existing Limited Liability Company Agreement of the Company (a) shall be amended pursuant to Section 12.01. of the Agreement immediately following the signing of this Letter Agreement, (b) immediately following the First Payment Date will be amended in the form attached as Schedule 5.04 to the Agreement and (c) shall otherwise be further amended only by unanimous decision of all Members of the Company.

12966427.3 071102 1221C 98511025

MB02069383

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

DF Overseas Inc.
Page 4
July 12, 2002

14.2    in respect of Members eligible to vote, to vote their respective Voting Membership Shares of the Company in favour of the amendment to (a) above and to vote all of the Voting Membership Shares of the Company in favour of the amendment pursuant to (b) above and not to vote such Shares for any other amendment pursuant to (c) above.

15.1.    <u>Indemnification of DFI</u>. Refco Group Holdings Inc. agrees to indemnify each of DFI Indemnified Parties against, and agrees to hold each of them harmless from, any and all Losses incurred or suffered by them relating to or arising out of or in connection with any third-party claim in which DFI or a DFI Indemnified Party is named as a party, arising out of any material inaccuracy in any representation or the material breach of, or failure duly to perform or observe, any material warranty, covenant, or other agreement made by the Company in the Agreement. For purposes of the foregoing, "DFI Indemnified Parties" shall mean DFI and each of its Affiliates and their respective officers, directors, employees, controlling persons, agents and representatives.

15.2.    <u>Limitations on Indemnification</u>.    Notwithstanding anything contained in this Section 15 to the contrary, the following limitations shall apply as to any indemnification hereunder. DFI shall have no recourse for indemnification on account of any Losses unless the claim therefor shall have been made on or before the date which is twenty-four (24) months after the date of the Third Payment Date. No indemnity dispute shall affect nor excuse the obligation of DFI to acquire the Participation Right at each Payment Date as provided in the Agreement.

15.3. <u>Procedure for Satisfaction of Indemnity Claims</u>. The obligations and liabilities of Refco Group Holdings Inc. as an indemnifying party hereunder shall be subject to the following terms and conditions:

(a)    The party hereto who is responsible for indemnifying another Person against any matter pursuant to this Letter Agreement is referred to as the "Indemnifying Party" and the Person claiming indemnity is referred to as the "Indemnified Party." Any claim for indemnification made pursuant to this Section 15 is sometimes referred to as an "Indemnity Claim."

(b)    The Indemnified Party shall give prompt written notice to the Indemnifying Party of any Indemnity Claim after learning of the existence thereof; provided, however, that the failure to provide such prompt notice shall in no event impair the rights of the Indemnified Party or limit the obligations of the Indemnifying Party hereunder except to the extent that such failure has a material adverse effect on the ability of the Indemnifying Party adequately to defend such claim. Such notice of the Indemnity Claim shall state the nature and basis of said Indemnity Claim and the amount thereof, to the extent known.

12966427.3 071102 1221C 98511025

MB02069384



CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

DF Overseas Inc.
Page 5
July 12, 2002

(c)     The Indemnifying Party shall be entitled to contest and to assume the defense of the claim at the Indemnifying Party's expense, and further provided that it utilizes reputable counsel reasonably satisfactory to the Indemnified Party. Should the Indemnifying Party give notice to the Indemnified Party of the Indemnifying Party's election to assume the contest or defense as aforesaid, then the Indemnifying Party shall be obligated promptly to defend such claim. The Indemnified Party shall, at the Indemnifying Party's expense, make available to the Indemnifying Party and its attorneys, accountants or other duly designated agents all books and records of the Indemnified Party relating to any such action, suit or proceeding, and the parties hereto agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate contest or defense of any such action, suit or proceeding. The Indemnified Party shall be entitled, with counsel selected by the Indemnified Party, to participate in (but not to control), at its own expense, the defense of any claim or litigation which the Indemnifying Party has, in accordance with the provisions of this subsection (c), elected to defend, and to be kept fully informed of the status thereof at all stages, including the right to receive, at the Indemnifying Party's expense, copies of all pleadings and other material papers in connection with such claim or litigation.

(d)     The Indemnifying Party shall not settle any Third Party Claim without the consent of the Indemnified Party, which consent shall not be unreasonably withheld.

(e)     If the defense of a Third Party Claim is not assumed by the Indemnifying Party as provided in subsection (c) above, then the Indemnified Party may (to the extent that the Indemnified Party determines to do so in its sole discretion) conduct any such proceeding as it deems appropriate, and may take whatever action it deems necessary or appropriate to resolve or settle such claim or dispute. The Indemnifying Party shall pay promptly upon receipt invoices submitted by the Indemnifying Party in connection with its defense of a Third Party Claim. The Indemnifying Party shall nevertheless, at its own expense, make available to the Indemnified Party and its attorneys and accountants all books and records of the Indemnifying Party relating to such proceedings or litigation, and shall render to the Indemnified Party such assistance as may be reasonably requested by the Indemnified Party.

15.4.    The Indemnifying Party shall be entitled, with counsel selected by it, to participate in (but not to control), at its own expense, the defense of any claim or litigation which the Indemnifying Party has not elected to defend in accordance with the provisions of subsection (c) above.

12966427.3 071102 1221C  98511025

MB02069385



CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

DF Overseas Inc.
Page 6
July 12, 2002

Sincerely,

REFCO GROUP LTD., LLC

By: _____
Name: _____PHILLIP BENNETT_____
Title: _____CEO._____

REFCO GROUP HOLDINGS LLC

By: _____
Name: _____PHILLIP BENNETT_____
Title: _____CEO_____

REFCO GROUP HOLDINGS, INC.

By: _____
Name: _____PHILLIP BENNETT_____
Title: _____CEO._____

12966427.3 071102 1221C 98511025

MB02069386

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

DF Overseas Inc.
Page 7
July 12, 2002


Agreed:

DF CAPITAL INC.

By: _____

Name: _____

Title: _____



BAWAG OVERSEAS, INC.

By: _____

Name: _____

Title: _____



12966427.3 071102 1221C 98511025

**MB02069387**

CONFIDENTIAL TREATMENT
REQUESTED BY
WILLIAMS AND CONNOLLY LLP

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN re REFCO INC., LITIGATION                    MDL Docket No. _____

## MOVING DEFENDANTS' MOTION FOR TRANSFER OF ACTION TO THE SOUTHERN DISTRICT OF NEW YORK PURSUANT TO 28 U.S.C. § 1407

Credit Suisse Securities (USA) LLC (formerly Credit Suisse First Boston LLC), Banc of America Securities LLC, Deutsche Bank Securities Inc., Grant Thornton LLP ("Grant Thronton"), Mayer Brown LLP ("Mayer Brown"), Mayer Brown International LLP ("Mayer Brown UK")[1], and PricewaterhouseCoopers LLP  (collectively, the "Moving Defendants"), respectively submit this motion, pursuant to 28 U.S.C. § 1407, to transfer *Kirschner v. Grant Thornton, et. al.*, 07 Civ. ___ (N.D. Ill. 2007) (the "Illinois Action"), for coordination for pretrial purposes to the United States District Court for the Southern District of New York.

Transfer and coordination pursuant to Section 1407 are warranted for the reasons set forth in the Moving Defendants' accompanying Memorandum of Law in support of this Motion.

---

[1] The defendant alleged in the Complaint to be "Mayer, Brown, Rowe & Maw LLP" is actually two limited liability partnerships both formerly named "Mayer, Brown, Rowe & Maw LLP" – one established in Illinois and the other incorporated in England and Wales.  Effective September 1, 2007, the two entities were renamed. "Mayer Brown LLP" is the new name of the Illinois limited liability partnership, and "Mayer Brown International LLP" is the new name of the UK limited liability partnership.

Dated:  New York, New York
       September 19, 2007

Respectfully submitted,

WILMER CUTLER PICKERING
  HALE AND DORR LLP

By:_____
    Robert B. McCaw
    Philip D. Anker
    Lori A. Martin
    John V.H. Pierce
    Dawn M. Wilson
    Michael L. Feinberg
    Ross E. Firsenbaum

    399 Park Avenue
    New York, New York 10022
    Tel.: (212)-230-8800
    Fax: (212)-230-8888

    *Attorneys for Defendants Credit Suisse
    Securities (USA) LLC (formerly Credit
    Suisse First Boston LC), Banc of America
    Securities LLC, and Deutsche Bank
    Securities Inc.*

Dated:  New York, New York
        September 19, 2007

                        WINSTON & STRAWN LLP

                        By: _____
                            David E. Mollón

                        200 Park Avenue
                        New York, New York 10166-4193
                        Tel.: (212)-294-6700
                        Fax: (212)-294-4700

                        Of Counsel:
                        Bradley E. Lerman
                        Linda T. Coberly
                        Catherine W. Joyce

                        35 West Wacker Drive
                        Chicago, Illinois  60601
                        Tel.: (312)-558-5600
                        Fax: (312)-558-5700

                        *Attorneys for Defendant*
                        *Grant Thornton LLP*

Dated:  Washington, D.C.
        September 19, 2007

WILLIAMS & CONNOLLY LLP

By: _____
     John K. Villa
     Michael S. Sundermeyer
     Craig D. Singer
     Thomas G. Ward

     725 Twelfth Street, N.W.
     Washington, D.C.  20005
     Tel.:  (202) 434-5000
     Fax:  (202) 434-5029

     *Attorneys for Defendant Mayer Brown LLP*

Dated:  New York, New York
        September 19, 2007

CLIFFORD CHANCE US LLP

By: _Anthony M Candido ^{up}/_{igc}_

Anthony M. Candido
Joel M. Cohen

31 West 52nd Street
New York, New York
Tel.:  (212)-878-8000
Fax:   (212)-878-8375

*Attorneys for Defendant*
*Mayer Brown International LLP*

Dated:  New York, New York
        September 19, 2007

ORRICK HERRINGTON &
    SUTCLIFFE LLP

By: _____
    James J. Capra, Jr.
    James P. Cusick

666 Fifth Avenue
New York, New York  10103-0001
Tel.: (212)-506-5000
Fax: (212)-506-5151

*Attorneys for Defendant*
*PricewaterhouseCoopers LLP*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/11/07

| | |
|---|---|
| This Document Relates To:<br><br>In re REFCO, INC. SECURITIES LITIGATION | §<br>§<br>§<br>§ 05 Civ. 8626 (GEL)<br>§<br>§<br>§<br>§ |
| AMERICAN FINANCIAL INTERNATIONAL<br>GROUP- ASIA, LLC, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>PHILLIP R. BENNETT, et al.,<br><br>Defendants. | §<br>§<br>§<br>§ 05 Civ. 8988 (GEL)<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |
| THOMAS H. LEE EQUITY FUND V, L.P., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>PHILLIP R. BENNETT, et al.,<br><br>Defendants. | §<br>§<br>§<br>§ 05 Civ. 9608 (GEL)<br>§<br>§<br>§<br>§<br>§<br>§ |

[Caption continued on next page]

# DEPOSITION PROTOCOL ORDER

|  | § |  |
| --- | --- | --- |
| In re REFCO CAPITAL MARKETS, LTD. BROKERAGE CUSTOMER SECURITIES LITIGATION | § § § § § § | 06 Civ. 643 (GEL) |
| THOMAS H. LEE EQUITY FUND V, L.P., et al.,<br><br>Plaintiffs,<br><br>**vs.**<br><br>MAYER BROWN ROWE & MAW LLP, et al.,<br><br>Defendants. | § § § § § § § § § § § | 07 Civ. 6767 (GEL) |
| THOMAS H. LEE EQUITY FUND V, L.P., et al.,<br><br>Plaintiffs,<br><br>**vs.**<br><br>GRANT THORNTON LLP,<br><br>Defendants. | § § § § § § § § § § § § | 07 Civ. 8663 (GEL) |
| AXIS REINSURANCE COMPANY,<br><br>Plaintiffs,<br><br>**vs.**<br><br>PHILLIP R. BENNETT, et al.,<br><br>Defendants. | § § § § § § § § § § § | 07 Civ. 7924 (GEL) |

[Caption continued on next page]

| | | |
|---|---|---|
| In re REFCO, INC. | § § § § § | 07 Civ. 9420 (GEL) |

| | | |
|---|---|---|
| VR GLOBAL PARTNERS, L.P., et al., | § § § § | |
| Plaintiffs, | § | 07 Civ. 8686 (GEL) |
| vs. | § § | |
| PHILLIP R. BENNETT, et al., | § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| CAPITAL MANAGEMENT SELECT FUND LTD., et al., | § § § | |
| Plaintiffs, | § § | 07 Civ. 8688 (GEL) |
| vs. | § § | |
| PHILLIP R. BENNETT, et al., | § § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| MARC S. KIRSCHNER, as Trustee of the Refco Litigation Trust, | § § § | |
| Plaintiffs, | § § | 07 Civ. 7074 (GEL) |
| vs. | § § | |
| THOMAS H. LEE PARTNERS, L.P., et al., | § § § | |
| Defendants. | § § | |

[Caption continued on next page]

| | § | |
| MARC S. KIRSCHNER, as Trustee of the Refco Private Action Trust, | § § § | |
| | § | 07 Civ. 8165 (GEL) |
| Plaintiffs, | § § | |
| vs. | § § | |
| PHILLIP R. BENNETT, et al., | § § | |
| Defendants. | § § § | |
| MARC S. KIRSCHNER, as Trustee of the Refco Litigation Trust, | § § § | |
| | § | 07 Civ. 9238 (GEL) |
| Plaintiffs, | § § | |
| vs. | § § | |
| THOMAS HACKL, et al., | § § § | |
| Defendants. | § § § | |

This Deposition Protocol Order shall govern all oral depositions of fact witnesses, except as specifically provided herein, taken in the following cases: (a) the consolidated securities class action, *In re Refco, Inc. Securities Litigation*, No. 05 Civ. 8626 (S.D.N.Y) (the "*Securities Class Action*"); (b) *American Financial International Group-Asia, L.L.C. v. Refco, Inc. et. al.*, No. 05 Civ. 8988 (S.D.N.Y) (the "*AFG Action*"); (c) *Thomas H. Lee Equity Fund V, L.P. et al., v. Bennett et al.*, No. 05 Civ. 9608 (S.D.N.Y) (the "*THL/Bennett Action*"); (d) *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ. 643 (S.D.N.Y) (the "*Customer Class Action*"); (e) *Thomas H. Lee Equity Fund V, L.P. et al., v. Mayer, Brown, Rowe & Maw L.L.P.*, No. 07 Civ. 6767 (S.D.N.Y) (the "*THL/MB Action*"); (f) *Thomas H. Lee Equity Fund V, L.P. et al., v. Grant Thornton, LLP*, No. 07 Civ. 8663 (S.D.N.Y) (the "*THL/GT Action*"); (g) *Axis Reinsurance Co. v. Bennett et al.*, 07 Civ. 7924 and 07 Civ. 9420 (S.D.N.Y) (the "*Axis Action*"); (h) *VR Global Partners v. Bennett, et al.*, 07 Civ. 8686 (S.D.N.Y) (the "*VR Action*"); (i) *Capital Management v. Bennett, et al.*, 07 Civ. 8688 (S.D.N.Y) (the "CAP Action"); (j) *Kirschner v. Thomas H. Lee Partners, L.P. et al.*, 07 Civ. 7074 (S.D.N.Y) (the "*Kirschner/THL Action*"); (k) *Kirschner v. Bennett et al.*, No. 07 Civ. 8165 (S.D.N.Y) (the "*Kirschner/Bennett Action*"); (l) *Kirschner v. Hackl, et al.*, No. 07 Civ. 9238 (S.D.N.Y) (the "*Kirschner/Hackl Action*"); (m) *Kirschner v. Grant Thornton LLP et al.*, No. 07 Civ. 5306 (N.D. Ill.) (the "*Illinois Action*") (collectively, the "Refco-Related Actions"); (n) actions consolidated into or coordinated with the Refco-Related Actions; and (o) other actions whose parties voluntarily participate in the oral depositions of fact witnesses provided for in this Order.

## I.    PARTIES SUBJECT TO THE DEPOSITION PROTOCOL

This Order will govern the parties listed below, all consolidated or coordinated parties, and parties added to this litigation after the date of this Order. The identification of a party to the

Deposition Protocol Order is without prejudice to the issue of whether the PSLRA or any other

stay applies to that party, and is without prejudice to any defense that may be asserted by such

party, including, without limitation, defenses based on or covered by Rules 8(c)(1), 12(b)(2),

12(b)(3), 12(b)(4), 12(b)(5), or 12(b)(6) of the Federal Rules of Civil Procedure or their state law

equivalents or any arbitration rights that may be asserted by such party.

    **A.**    **Plaintiffs**

        1.    Those named at ¶¶ 17-19 of the Second Amended Consolidated Class Action Complaint in the *Securities Class Action* (the *"Securities Class Action* Plaintiffs");

        2.    Those named at ¶ 13 of the Consolidated Amended Class Action Complaint in the Customer Class Action (the "Customer Class Action Plaintiffs") and any amendments thereto;

        3.    Those named at ¶¶ 28-30 of the Amended Class Action Complaint in the *AFG Action* (the "AFG Plaintiffs");

        4.    Those named at ¶¶ 31-33 of the Complaint in the *CAP Action* ("CAP Plaintiffs");

        5.    Those named at ¶ 49 of the Complaint in the *VR Action* ("VR Plaintiffs");

        6.    Marc S. Kirschner (the "Trustee"), as Trustee of the Refco Litigation Trust and Private Actions Trust, in the *Kirschner/THL Action*, *Kirschner/Bennett Action, Kirschner/Hackl Action*, and the *Illinois Action* (collectively, the "Trustee Actions"), whose participation is subject to and without prejudice to the Trustee's motions to remand certain cases to state court; and

7.  Named plaintiffs in actions consolidated or coordinated with any of the Refco-Related Actions;

8.  Any plaintiffs who have commenced litigation in any state court who have not been consolidated into or coordinated with the Refco-Related Actions and who either agree or are otherwise compelled to conduct their deposition discovery in concert with the Refco-Related Actions.

**B.    Bennett Entity Defendants**

1.  Refco Group Holdings, Inc., and the Phillip R. Bennett Three Year Annuity Trust as defined in the Second Amended Consolidated Class Action Complaint in the *Securities Class Action* at ¶¶ 31-32.

**C.    Refco Officer and Employee Defendants**

1.  Phillip R. Bennett, Gerald M. Sherer, William M. Sexton, Santo C. Maggio, Joseph J. Murphy, Phillip Silverman, Dennis Klejna, Robert Trosten, and Tone Grant.

**D.    The Fund Defendants**

1.  Liberty Corner Capital Strategies and William T. Pigott, as defined in the Complaint in the *Illinois Action* at ¶ 50;

2.  EMF Financial Products, LLC, Eric M. Flanagan and Delta Flyer, as defined in the Complaint in the *Illinois Action* at ¶ 51;

3.  Ingram Micro, Inc., as defined in the Complaint in the *Illinois Action* at ¶ 52;

4.  Beckenham Trading Co., Inc. and Andrew Krieger, as defined in the Complaint in the *Illinois Action* at ¶ 53; and,

- 3 -

5.     Coast Asset Management, LLC and Christopher Petitt, as defined in the Complaint in the *Illinois Action* at ¶ 54.

**E.     BAWAG Defendants**

1.     BAWAG as defined in the First Amended Consolidated Class Action Complaint in the *Securities Class Action* at ¶¶ 72-77;

2.     Thomas Hackl as defined in the Complaint in the *Kirschner/Hackl Action* at ¶ 23;

3.     Clarnet Properties S.A. as defined in the Complaint in the *Kirschner/Hackl Action* at ¶ 24;

4.     Acies Asset Management S.A. as defined in the Complaint in the *Kirschner/Hackl Action* at ¶ 25; and,

5.     W.P.M. S.A. as defined in the Complaint in the *Kirschner/Hackl Action* at ¶ 26.

**F.     Audit Committee Defendants**

1.     The Audit Committee Defendants as defined in the Second Amended Consolidated Class Action Complaint in the *Securities Class Action* at ¶¶ 43-45.

**G.     THL Parties**

1.     The THL Parties as defined in the Second Amended Consolidated Class Action Complaint in the *Securities Class Action* at ¶¶ 47-53, in the Complaint in the *Kirschner/THL Action* at ¶¶ 13-15, in the Complaint in the *THL/MB Action* at ¶¶ 45-47, in the Complaint in the *THL/GT Action* at ¶¶ 14-16, and in the Complaint in the *THL/Bennett Action* at ¶¶ 12-14.

### H.     The Professional Defendants

1.     Mayer Brown LLP, including Joseph Collins, as defined in the Complaint in the Kirschner/Bennett Action at ¶ 13 and in the Complaint in the *Illinois Action* at ¶ 41.

2.     Mayer Brown International LLP, a limited liability partnership incorporated in England and Wales

3.     Grant Thornton LLP as defined in the Second Amended Consolidated Class Action Complaint in the *Securities Class Action* at ¶ 55, in the Complaint in the Kirschner/Bennett Action at ¶ 14, and in the Complaint in the *Illinois Action* at ¶ 42.

4.     Ernst & Young U.S. LLP ("E&Y") as defined in the Complaint in the Kirschner/Bennett Action at ¶ 15 and in the Complaint in the *Illinois Action* at ¶ 43, whose participation is without prejudice to any rights to arbitration.

5.     PricewaterhouseCooopers LLP ("PwC")as defined in the Complaint in the *Illinois Action* at ¶ 44.

### I.     The Underwriter Defendants

1.     The Underwriter Defendants as defined in the Second Amended Consolidated Class Action Complaint in the Securities Class Action at ¶¶ 59-73, and in the Complaint in the Illinois Action at ¶¶ 45-47

### J.     The Insurance Carrier Parties

1.     Those named at ¶ 16 of the Complaint in the Axis Action ("Axis Plaintiffs").

## II. TIME PERIOD FOR DEPOSITIONS

Depositions will begin on January 15, 2008, and end on November 30, 2008, on the basis of only one deposition per deponent, including parties and non-parties. If the documents of the Refco Debtors and their affiliates in the possession of the Trustee (the "Refco Documents") are relevant to either the examination or defense of a deponent, the deposition shall not be scheduled less than 30 days after the production of the Refco Documents is substantially complete.

The Fund Defendants and their parents, subsidiaries, affiliates, directors, officers, agents, employees, former employees, representatives, successors or assigns shall not be deposed until, at the earliest, 60 days after the Judicial Panel on Multidistrict Litigation enters its decision on whether to transfer the Illinois Action to the United States District Court for the Southern District of New York.

Each of the Fund Defendants, E&Y, and PwC shall have the right to receive documents previously produced by any party in any action subject to this Order, and such documents shall be produced within seven business days of the making of a written request by those defendants. Upon the lifting of the litigation stay currently in place in the *Axis Action*, or upon application to the Court for good cause shown, the Insurance Carrier Parties shall have the right to receive documents previously produced by any party in any action subject to this Order, and such documents shall be produced within seven business days of the making of a written request by the Insurance Carrier Parties.

## III. DEPOSITION LIMITATIONS

A. There shall be 100 total depositions. Any party to this Deposition Protocol may seek additional deposition time from the Court for good cause shown.

- 6 -

**B.**   Total questioning at each deposition shall presumptively last no more than two days, subject to the following exceptions: (i) Plaintiffs, collectively and Defendants (defined as those persons/entities identified in Section I.B-I.I), collectively, shall each have the right to designate 10 depositions which can last more than two days, and (ii) all parties retain the right to ask the Court for relief from this provision, for good cause shown.[1]

**C.**   Only one deposition shall be taken on any one day, subject to consensual adjustment by the scheduling committees (as defined in Section V) or by the Court at a future date. With respect to any deposition noticed under Rule 30(b)(6), the party producing the witness in response to such a notice shall, no later than five business days prior to the deposition date, advise the other parties of the identity of the witness. In the event that the deposing party believes that such 30(b)(6) witness should be subject to examination in a second deposition, the deposing party shall so inform the producing party prior to the commencement of the Rule 30(b)(6) deposition, and the parties shall confer in good faith. Nothing in this Protocol shall determine whether such a witness may, or may not, be deposed more than once.

## IV.   ALLOCATION OF DEPOSITION TIME

The allocation of deposition time for any witness shall be agreed to by the scheduling committees. In the event the scheduling committees are unable to resolve a disagreement regarding the allocation of time for a particular witness, the issue will be presented to the Court for resolution. Nothing in this paragraph shall preclude any party from applying to Judge Lynch for relief from or a modification of a decision of the scheduling committees applicable to that party's witnesses. The parties reserve their rights to seek an overall allocation of deposition time at a later date.

## V.   SCHEDULING OF DEPOSITIONS

Plaintiffs and defendants will each create a scheduling committee of no more than seven members to oversee the selection and scheduling of all depositions. Every two weeks, the committees will exchange the names of persons that each proposes for deposition and the amount

---

[1]   Subject to Section IX.E of this Order, the Insurance Carrier Parties in the *Axis Action* may seek leave of this Court to lift the stay in that action, on an as-needed basis, to permit the Insurance Carrier Parties to participate in specific depositions noticed by another party to this Order.

- 7 -

of time that such side anticipates it will need for the witness. Within five days thereafter, each scheduling committee will notify the other of the amount of deposition time needed for the deponents nominated by the other committee. The committees will contact counsel for the witness (or the witness if counsel has not been identified) to arrange a date for the deposition at least 30 days but not more than 60 days thereafter.

The scheduling committees will confer and schedule all foreign-based discovery for parties and non-parties. All parties understand that flexibility will be necessary to schedule the depositions of witnesses located outside the United States. All foreign-based depositions must be completed within the time period set forth in Section II, and the limitations specified in Sections II and III shall apply to all depositions of witnesses located outside the United States.

The Master Deposition Schedule shall be updated with all changes made as soon as scheduled, and posted to a website. The Master Deposition Schedule shall set forth the deponent's name, affiliation, location of and anticipated length (number of days) of the deposition, the initial examiner, whether it will be videotaped, and, to the extent possible, the identity of other examining counsel and the time allocation for each examiner. Plaintiffs and defendants will each appoint a representative to share responsibility for posting the Master Deposition Schedule as it is agreed upon and all changes made.

## VI.   NOTICING OF DEPOSITIONS

### A.   Timing

In lieu of the notice provisions of the Federal Rules of Civil Procedure, the parties shall provide deposition notices through the Master Deposition Schedule.

Depositions for which notices were served prior to November 16, 2007 shall be exempted from the notice requirement herein.

- 8 -

## B.    Rule on Postponements for Depositions

Once a deposition has been posted on the Master Schedule, it shall not be taken off calendar, postponed, or rescheduled, except by agreement of the scheduling committees, or by leave of Court for good cause.  Postponements will be posted on the Master Deposition Schedule as soon as possible.

## VII.    PREDESIGNATION OF GENERAL CONTENT AND DOCUMENTS

Not later than four business days before a deposition all parties intending to examine a deponent may (1) serve via website a non-binding description of the documents (by Bates number) that counsel anticipates using or referring to during the deposition, and (2) upload to a file transfer protocol ("FTP") site images in an electronic format of each document that counsel anticipates using or referring to in the deposition in accordance with the protocol attached hereto as Exhibit A (the "FTP Protocol").

Nothing herein shall prevent any party from using any document of its choosing at a deposition or require it to disclose in advance any document it intends to use at a deposition, provided that any counsel who does not predesignate documents brings sufficient paper copies of such documents to the deposition so that all counsel present may have a copy.

A set of core documents, including relevant SEC filings, bankruptcy-examiner reports and other documents, will be agreed upon by the scheduling committees, marked for identification purposes, maintained in .pdf format by the court-reporter service and made available on request on DVD at each deposition site.

## VIII.  NUMBERING OF DEPOSITION EXHIBITS

Each document marked for identification at the depositions shall be numbered with a new exhibit number.  The scheduling committees will circulate a master exhibit list periodically to all counsel.

Exhibit numbers will be assigned by the court-reporter service sequentially regardless of what party introduces the exhibit.  To the extent possible, numbering of exhibits at each successive deposition will pick up where the numbering at the preceding deposition ended.

Counsel will make their best efforts to use the previously marked exhibit number in subsequent depositions.

The index of exhibits annexed to each deposition transcript shall contain the document-production (Bates) number, the number for each exhibit marked for identification at the deposition, and each exhibit referred to in the deposition.

The deposition reporter shall be responsible for ensuring that the original of all deposition transcripts, including exhibits, is placed on a website.

## IX.  CONDUCT OF DEPOSITIONS

### A.    Daily Schedule

A deposition day shall presumptively consist of a maximum of seven hours of testimony. Unless otherwise agreed, depositions shall presumptively start at 9:00 am.  Where necessary to avoid returning on a subsequent day, the parties and the deponent shall attempt to complete the deposition by extending the adjournment for up to one hour, or longer upon agreement.

### B.    Holidays

No depositions may be scheduled on the dates of in-person Court hearings, or on national or religious holidays.  For the purposes of this protocol such holidays are: the two-week period

beginning on the Monday before Christmas, Martin Luther King's Birthday, President's Day,

Good Friday and Easter Monday, Passover (2 days), Memorial Day, Independence Day, Labor

Day, Rosh Hashanah (2 days), Yom Kippur (2 days), Columbus Day, Veterans Day, and

Thanksgiving (Wednesday, Thursday and Friday).

### C.    Conduct of Counsel at Depositions

Counsel recognizes that the magnitude and complexity of this litigation require that all

parties use every effort to strictly adhere to the established rules of evidence and procedure.

Consequently, all counsel shall refrain from making speaking objections, which are designed to

suggest an answer to the witness or delay the deposition.

The objection of one counsel to a question need not be repeated by another counsel to

preserve that objection on behalf of such other counsel.  Any objection to the form of a question

shall be deemed to have been made (a) on behalf of all other parties, and (b) on all grounds for a

form objection.  The only objections permitted during the depositions will be to the form of a

question or to the responsiveness of an answer, and, regardless of the provisions in Fed. R. Civ.

P. 32(d) (3), no other objection is waived by failure to assert it during the deposition.  Objections

shall be stated precisely.  "Objection, Form" or "Objection, Responsiveness" will be sufficient.

Nothing shall preclude counsel from seeking a protective order from the Court where

counsel has a reasonable, good-faith belief that the witness is being questioned on wholly

irrelevant matters or in an otherwise abusive manner.  In that event, counsel shall cooperate in

deferring answers to these questions until later in the deposition to permit counsel to contact the

Court.

Counsel shall not instruct witnesses not to answer questions, except to preserve a

privilege, to enforce a limitation directed by the court, or to present a motion under Rule

30(d)(4). There will be no conferences between deponents and their counsel when a question is pending except for the purpose of determining whether a privilege or claim of confidentiality should be asserted. If a privilege is claimed, the witness will nevertheless answer questions relevant to the existence, extent or waiver of the privilege, such as, the date of the communication, who made the statement, who was present other than counsel, and others to whom the communication was made known.

### D.     Deposition Questionnaire

To the extent possible, each deponent will complete a background questionnaire, to be agreed on by counsel, which will be posted to the FTP site at least two business days before the start of the deposition. In lieu of the questionnaire the deponent may provide an updated copy of his or her Curriculum Vitae. The questionnaire or CV will be attached to the deposition transcript as record testimony. At the start of the deposition, the witness may be asked to review the questionnaire or CV to confirm that it is accurate.

### E.     Completion and Reopening of Depositions

Except by unanimous agreement of the scheduling committees and consent of the relevant party or non-party or, where there is no agreement or consent, upon court order for good cause, the deposition of any witness shall be taken only once.

### F.     Length of Depositions

The court-reporter service shall maintain a total running time for actual deposition testimony to record how much time is taken in each deposition by each party.

### G.     Remote-Access Protocol

At the outset of the deposition, on the record, all counsel, both at the site and by remote access, shall identify themselves and whom they represent. Only those present on-site shall be

- 12 -

permitted to examine the deponent. In the rare event that counsel participating by remote access believes that an objection not already made must be made on the record, counsel shall identify himself or herself, the party represented, and state the objection precisely.

### H.    Place of Depositions

Depositions will be held in New York City (unless otherwise agreed to by the scheduling committees), except for depositions of foreign parties, which reserve their position to present their witnesses abroad. If a non-party deponent resides in a location outside of the metropolitan area in which the deposition is held, the parties participating in the examination of the deponent will pay the reasonable travel and living expenses of the deponent incurred to attend the deposition. If the non-party deponent is unwilling to travel, the location of the deposition will be set in accordance with Fed. R. Civ. P. 45. The parties will make a good-faith effort to have all current and former employees voluntarily appear for depositions in New York City (except for foreign-based parties).

### I.    Notice of Intent to Attend a Deposition

For planning purposes, not fewer than seven days before the deposition date, parties intending to attend the deposition shall notify the respective scheduling committees, which will post a list of the number of expected attendees from each party on the website within four days of the deposition. For scheduling and security purposes, parties will supply the respective scheduling committees with a master list (updated as necessary) of the names of lawyers, staff, consultants, and other attendees for each deposition site.

### J.    Court Reporters

The scheduling committees will contract for court-reporting and video services to cover the deposition sites in New York City. The court-reporting and video services will also provide

- 13 -

remote access, secure real-time video streaming and LiveNote, as well as speaker-phone
capability (to be used for conferences with the Court) for all depositions, and maintain one set of
Core Documents. The court-reporting service will transcribe all conference calls with the Court
from the deposition site as part of the deposition transcript for that day.

## X.      COSTS

The parties will enter into a cost-sharing agreement. Such agreement shall include a
provision that any party dismissed from any action subject to this Order, as a result of settlement
or otherwise, shall no longer have any cost-sharing obligations.

## XI.     STANDARD STIPULATION

The following stipulation will apply to all depositions taken in these actions and shall be
included in each transcript by the court reporter:

> Upon completion of the transcription of today's session, the original
> transcript shall be sent to counsel for the witness by the court reporter. Counsel
> shall promptly forward it to the witness for review, correction, and signature
> under penalty of perjury. The witness shall have 30 days from the day of receipt
> within which to review, make any correction, sign the deposition transcript under
> penalty of perjury, and return it to counsel. The witness's counsel shall then
> forward the original transcript plus corrections to the court reporter, who will
> promptly notify all counsel of its receipt and any changes to testimony made by
> the witness.

> If the witness is not represented by counsel the original transcript will be
> sent to the witness by the court reporter. After review, correction, and signature
> within 30 days from the date of receipt, the witness shall return the original
> transcript to the court reporter, who will notify all counsel of its receipt and any
> changes to testimony by the witness.

> The court reporter will deposit the original transcript on a website. If, for
> any reason, the original is lost, misplaced, not returned, not signed, or unavailable,
> a certified copy may be used in its place for all purposes. The court reporter is
> otherwise relieved of any statutory duties.

## XII.   REPORTS TO THE COURT

Once depositions begin, the scheduling committees will collectively report to the Court on a periodic basis in writing, and during a hearing, as to the progress of the deposition process. The first written report will be filed by *April 30*, 2008, and a hearing scheduled as soon thereafter at the Court's convenience.

The parties - believing that professionalism, civility and discretion will be exercised, thus greatly reducing the need for repeated rulings - request that the Court resolve all disputes concerning discovery taken under this protocol. In the event that discovery disputes arise during depositions that require Court intervention, the parties will contact the Court. If the Court is unavailable, the deposition will continue as to matters not in dispute.

## XIII.  CONFIDENTIALITY PROVISIONS

A confidentiality order governing the use of documents at and testimony taken at all depositions will be submitted to the Court.

All references in this Deposition Protocol Order to the "Court" (including those at Sections II, III, VI.B, IX.B, IX.C, IX.E, IX.J, and XII) refer only to the United States District Court for the Southern District of New York and any disputes concerning discovery taken under this protocol shall be decided solely by the United States District Court for the Southern District of New York.

## XIV.  OTHER ISSUES

All parties listed in § I, supra, agree that this deposition protocol, and the fact that the parties may enter into a confidentiality agreement and electronic service agreement governing the Refco-Related Actions, will not be used by any party to argue that any of the claims asserted in the above-referenced actions are preempted pursuant to the Securities Litigation Uniform Standards Act ("SLUSA"). Nothing in this paragraph will preclude any party from asserting that

- 15 -

any of the claims in the above-referenced actions are preempted by SLUSA on any other

grounds.

This Deposition Protocol Order may be modified by the unanimous agreement of the

scheduling committees or by Court order for good cause shown.

SO ORDERED this 10th day of December, 2007.

GERARD E. LYNCH
UNITED STATES DISTRICT JUDGE

- 16 -