**PORTIONS TO BE FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO, INC. SECURITIES LITIGATION | 07 MDL No. 1902 (GEL) |
| | ECF FILED |
| | ORAL ARGUMENT REQUESTED |
| GEORGE L. MILLER, Chapter 7 Trustee for the Estate of Suffolk LLC, | |
| Plaintiff, | |
| v. | |
| CSFB, LAB MORGAN CORPORATION, ML IBK POSITIONS, INC., | Index No. 09 Civ. 2885 (GEL) Index No. 09 Civ. 2920 (GEL) Index No. 09 Civ. 2922 (GEL) |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE BANK DEFENDANTS' MOTION
TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL ALLEGATIONS .....................................................................................................5

    I.      Refco and PlusFunds Insiders Created Suffolk to Purchase Equity Interests in
PlusFunds as Part of an Ongoing Fraud at Refco .....................................................6

    II.     After the Refco Trustee Initiates the Suffolk Bankruptcy Proceedings, the Suffolk
Trustee Seeks Recovery on Behalf of Refco ........................................................10

ARGUMENT ..........................................................................................................................12

    I.      Plaintiff Lacks Standing to Assert Fraudulent Transfer and Unjust Enrichment
Claims on Behalf of Suffolk to Benefit its Only Purported Creditor, Refco
Capital ...................................................................................................................12

          A.      The *Wagoner* Rule Denies Plaintiff Standing to Assert State-Law
Claims. .................................................................................................12

          B.      Plaintiff Lacks Standing to Assert Avoidance Claims That Will Not
Benefit a Good-Faith Creditor of Suffolk's Estate ...................................16

    II.     The Fraudulent Transfer Claims in Counts 1-3 of the Complaint Should be
Dismissed Because the Transferred Funds Were Not Property of Suffolk, a Mere
Conduit Through Which Refco Capital Transferred the Funds to the Bank
Defendants ............................................................................................................20

    III.    Plaintiff's Fraudulent Transfer Claims in Counts 1 and 3 Should be Dismissed
Because the Transferred Funds Constitute Unavoidable Settlement Payments or
Transfers Made in Connection with a Securities Contract by a Financial
Institution ..............................................................................................................25

          A.      Suffolk's Purchases of PlusFunds Securities Were Settlement Payments or
Transfers in Connection with a Securities Contract ..................................26

          B.      The Settlement Payments Were Made By a Financial Institution ............30

    IV.    Plaintiff's Intentional Fraudulent Transfer Claims in Counts 2 and 3 Should be
Dismissed Because They Fail to Satisfy the Heightened Pleading Requirements
Set Forth in Federal Rule of Civil Procedure 9(b). ................................................32

          A.      Plaintiff's State Law Claim Fails Because He Has Not Adequately Alleged
the Bank Defendants' Fraudulent Intent ...................................................33

- i -

B.      Plaintiff Fails to Adequately Allege an Intentional Fraudulent Conveyance Pursuant to New York Law and the Bankruptcy Code Because He Inadequately Alleges Suffolk's Fraudulent Intent ....................................35

V.      Plaintiff's Unjust Enrichment Claim Fails ...........................................................36

A.      The Bankruptcy Code Preempts Plaintiff's Unjust Enrichment Claim .....36

B.      Plaintiff's Unjust Enrichment Claim Fails Because It Is Based on the Existence of a Valid and Enforceable Written Contract...........................39

C.      Plaintiff's Unjust Enrichment Claim Fails Because Plaintiff Has an Adequate Remedy at Law.......................................................................40

D.      Plaintiff's Unjust Enrichment Claim Should be Denied as a Matter of Equity...................................................................................................41

VI.     Plaintiff's Claims Should be Dismissed Because He Has Not Served the Bank Defendants with the Summons and Complaint in Accordance with Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 ................42

VII.    Plaintiff Should Not be Granted Leave to Replead ...............................................42

CONCLUSION.....................................................................................................................43

**<u>TABLE OF AUTHORITIES</u>**

<u>Federal Cases</u>

*Adelphia Recovery Trust v. Bank of America, N.A.*,
  390 B.R. 80 (S.D.N.Y. 2008)............................................................. 16, 17

*American Tissue Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  351 F. Supp.2d 79 (S.D.N.Y. 2004)................................................... 25, 29

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*,
  373 B.R. 262 (Bankr. S.D.N.Y. 2007)...................................................... 33

*Apace Commc'ns, Ltd. v. Burke*,
  522 F. Supp. 2d 509 (W.D.N.Y. 2007) ............................................... 32, 34

*Ashcroft v. Iqbal*,
  No. 07-1015, 556 U.S. __, slip. op. at 14 (May 18, 2009) ........... 5, 28, 33

*Balaber-Strauss v. Town of Harrison (In re Murphy)*,
  331 B.R. 107 (Bankr. S.D.N.Y. 2005)...................................................... 17

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*,
  396 B.R. 810 (Bankr. S.D.N.Y. 2008)...................................................... 33

*Begier v. I.R.S.*,
  469 U.S. 53 (1990)................................................................................. 20

*Bessette v. Avco Fin. Servs., Inc.*,
  230 F.3d 439 (1st Cir. 2000)................................................................... 38

*Bongat v. Fairview Nursing Care Ctr., Inc.*,
  341 F. Supp. 2d 181 (E.D.N.Y. 2004) .................................................... 40

*Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Adver. (In re Bank of New England Corp.)*,
  165 B.R. 972 (Bankr. D. Mass. 1994) .................................................... 23

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*,
  366 B.R. 318 (Bankr. D. Del. 2007) ........................................... 28, 29, 31

*Brass v. Am. Film Techs., Inc.*,
  987 F.2d 142 (2d Cir. 1993)..................................................................... 6

*Cadle Co. v. Mangan (In re Flanagan)*,
  503 F.3d 171 (2d Cir. 2007)................................................................... 23

*City of Springfield v. Ostrander (In re Lan Tamers, Inc.)*,
  329 F.3d 204 (1st Cir. 2003).................................................................. 22

*Connecticut v. Novak (In re Cmty. Assocs., Inc.)*,
  173 B.R. 824 (D. Conn. 1994) ............................................... 22

*Contemporary Indus. Corp. v. Frost*,
  564 F.3d 981 (8th Cir. 2009) ...................................... passim

*Cox v. Zale Del., Inc.*,
  242 B.R. 444 (N.D. Ill. 1999) ............................................. 38

*Dahar v. Jackson (In re Jackson)*,
  318 B.R. 5 (Bankr. D.N.H. 2004) ...................................... 15

*Diamante v. Solomon & Solomon, P.C.*,
  No. 99 Civ. 1339, 2001 WL 1217226 (N.D.N.Y. Sept. 18, 2001) ............................ 38

*Enron Corp. v. Int'l Finance Corp. (In re Enron Corp.)*,
  341 B.R. 451 (Bankr. S.D.N.Y. 2006) ................................... 31

*Enron Energy Services, Inc. v. Columbia Gas Transmission Corp. (In re Enron Corp.)*,
  No. 05-01087, 2006 WL 2400082 (Bankr. S.D.N.Y. June 15, 2006) ...................... 41

*Gade v. National Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992) .......................................................... 37

*Giddens v. D.H. Blair & Co., Inc. (In re A.R. Baron & Co., Inc.)*,
  280 B.R. 794 (Bankr. S.D.N.Y. 2002) ................................... 14

*Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*,
  188 B.R. 125 (D. Vt. 1995) ............................................... 23

*Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*,
  97 F.3d 22 (2d Cir. 1996) ................................................ 23

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989) .......................................................... 40

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
  17 F. Supp. 2d 275 (S.D.N.Y. 1998) ............................... 13, 40

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
  310 B.R. 500 (Bankr. S.D.N.Y. 2002) ................................... 33

*Harris v. Huff (In re Huff)*,
  160 B.R. 256 (Bankr. M.D. Ga. 1993) ............................... 15, 17

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .......................................................... 37

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995).........................................................5, 13, 14

*HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.*,
  No. 07 Civ. 553A, 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009)...........................18

*In re Best Prods. Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994).................................................18

*In re Crude Oil Commodity Litig.*,
  No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007)........................34

*In re Eerie World Entm't, L.L.C.*,
  No. 00-13708, 2006 WL 1288578 (Bankr. S.D.N.Y. Apr. 28, 2006)....................23

*In re Joliet-Will County Cmty. Action Agency*,
  847 F.2d 430 (7th Cir. 1988) ......................................................22

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
  586 F. Supp. 2d 172 (S.D.N.Y. 2008).................................................5

*In re United Milk Prods. Co.*,
  261 F. Supp. 766 (N.D. Ill. 1966) ..................................................22

*Int'l Shoe Co. v. Pinkus*,
  278 U.S. 261 (1929)................................................................38

*Join-In Int'l (U.S.A.) Ltd. v. New York Wholesale Distribs. Corp. (In re Join-In Int'l (U.S.A.) Ltd.)*,
  56 B.R. 555 (Bankr. S.D.N.Y. 1986) ................................................17

*Jonas v. Resolution Trust Corp. (In re Comark)*,
  971 F.2d 322 (9th Cir. 1992) ...................................................27, 28

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
  913 F.2d 846 (10th Cir. 1991) .............................................26, 28, 31

*Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*,
  374 B.R. 333 (Bankr. S.D. Fla. 2007) ..............................................23

*Kidz Cloz, Inc. v. Officially for Kids, Inc.*,
  320 F. Supp. 2d 164 (S.D.N.Y. 2004)................................................41

*Kirschner v. Grant Thornton LLP*,
  No. 07 Civ. 11604, 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009)...................passim

*Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*,
  277 B.R. 181, 206 (Bankr. S.D.N.Y. 2002) ..........................................15

*Lamie v. United States Trustee,*
   540 U.S. 526 (2004) ................................................................................................ 27

*Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.),*
   324 B.R. 575 (Bankr. W.D. Pa. 2005) ................................................................ 28, 31

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),*
   181 F.3d 505 (3d Cir. 1999) ........................................................................ 26, 30, 31

*Mediators Inc. v. Manney (In re Mediators, Inc.),*
   105 F.3d 822 (2d Cir. 1997) ................................................................................... 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,*
   No. 91 Civ. 2923, 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ............................... 34

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.),*
   376 B.R. 390 (Bankr. S.D.N.Y. 2007) .................................................................... 15

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),*
   361 B.R. 369 (Bankr. S.D.N.Y. 2007) ........................................................ 32, 33, 36

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.),*
   813 F.2d 1177 (11th Cir. 1987) ............................................................................. 21

*Northen v. Centennial Healthcare Corp. (In re Oxford Health Investors, LLC.),*
   No. 00-80676C-7D, 2002 WL 31031631 (Bankr. M.D.N.C. Sept. 3, 2002) ............ 23

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
   322 F.3d 147 (2d Cir. 2003) ................................................................................... 13

*Official Comm. Of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia
   Natural Gas Sys. Inc. (In re Columbia Gas Sys. Inc.),*
   997 F.2d 1039 (3d Cir. 1993) ................................................................................. 22

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Delaware Inc. v. Fleet Retail
   Fin. Group (In re Hechinger Inv. Co. of Delaware),*
   274 B.R. 71 (D. Del. 2002) ..................................................................................... 38

*Official Comm. of Unsecured Creditors of National Forge Co. v. Clark (In re National Forge
   Co.),*
   344 B.R. 340 (W.D. Pa. 2006) .......................................................................... 25, 28

*Official Comm. of Unsecured Creditors of The IT Group, Inc. v. Acres of Diamonds, L.P. (In re
   The IT Group, Inc.),*
   359 B.R. 97 (Bankr. D. Del. 2006) .......................................................................... 28

*Pereira v. BMA Ltd. P'ship (In re Trace Int'l Holdings, Inc.),*
   289 B.R. 548 (Bankr. S.D.N.Y. 2003) .................................................................... 32

*Pereira v. First N. Am. Nat'l Bank,*
  223 B.R. 28 (D. Ga. 1998) ................................................................................ 38

*Pertuso v. Ford Motor Credit Co.,*
  233 F.3d 417 (6th Cir. 2000) ........................................................................... 38

*Picard v. Taylor (In re Park S. Secs., LLC),*
  326 B.R. 505 (Bankr. S.D.N.Y. 2005) ............................................................. 33

*QSI Holdings, Inc. v. Alford,*
  382 B.R. 731 (W.D. Mich. 2007) ................................................................ 18, 28

*R.B. Ventures, Ltd. v. Shane,*
  112 F.3d 54 (2d Cir. 1997) ............................................................................... 40

*Reyes v. FCC Nat'l Bank (In re Reyes),*
  238 B.R. 507 (Bankr. D.R.I. 1999) .................................................................. 38

*Rubin v. Mfrs. Hanover Trust Co.,*
  661 F.2d 979 (2d Cir. 1981) ............................................................................. 19

*Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp).,*
  874 F.2d 88 (2d Cir. 1989) ............................................................................... 21

*Savage & Assocs., P.C. v. Williams Commc'ns (In re Teligent Services, Inc.),*
  372 B.R. 594 (S.D.N.Y. 2007) ......................................................................... 42

*Sedona Corp. v. Landenburg Thalmann & Co., Inc.,*
  No 03 Civ. 3120, 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ....................... 34

*Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.),*
  403 F.3d 43 (2d Cir. 2005) ......................................................................... 32, 35

*Shaw v. Delta Air Lines, Inc.,*
  463 U.S. 85 (1983) ........................................................................................... 37

*Shearson Lehman Hutton, Inc. v. Wagoner,*
  944 F.2d 114 (2d Cir. 1991) ....................................................................... 13, 14

*Shipley Co. v. Darr (In re Tap, Inc.),*
  52 B.R. 271 (Bankr. D. Mass. 1985) ............................................................... 22

*Smith v. Am. Founders Fin., Corp.,*
  365 B.R. 647 (S.D. Tex. 2007) ................................................................... 15, 16

*Sofi Calssic S.A. de C.V. v. Hurowitz,*
  444 F. Supp. 2d 231 (S.D.N.Y. 2006) .............................................................. 32

*Stevenson v. Bank of New York Co., Inc.*,
   No. 06 Civ. 04268, 2009 WL 919442 (S.D.N.Y. Mar. 26, 2009) ..................................... 39, 41

*Stevenson v. J.C. Bradford & Co. (In re Cannon)*,
   277 F.3d 838 (6th Cir. 2002) ....................................................................................... 20

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ....................................................................................... 34

*T&B Scottdale Contractors, Inc. v. United States*,
   866 F.2d 1372 (11th Cir. 1989) ................................................................................... 23

*Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*,
   313 B.R. 46 (Bankr. S.D.N.Y. 2004) ............................................................................. 6

*United States v. Whiting Pools, Inc.*,
   462 U.S. 198 (1983) ...................................................................................................... 22

*Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*,
   735 F.2d 740 (2d Cir. 1984) ......................................................................................... 16

*Whiteford Plastics Co. v. Chase Nat'l Bank*,
   179 F.2d 582 (2d Cir. 1950) ......................................................................................... 16

*Wynder v. McMahon*,
   360 F.3d 73 (2d Cir. 2004) ........................................................................................... 34

*Yonkers Bd. of Educ. v. Richmond Children's Ctr., Inc.*,
   58 B.R. 980 (S.D.N.Y. 1986) ........................................................................................ 22

*Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.)*,
   178 B.R. 938 (Bankr. S.D.N.Y. 1995) .......................................................................... 15

State Cases

*Clark-Fitzpatrick, Inc. v. Long Island Railroad Co.*,
   70 N.Y.2d 382 (N.Y. 1987) .......................................................................................... 39

*Goldman v. Metropolitan Life Insurance Company*,
   5 N.Y.3d 561 (N.Y. 2005) ............................................................................................ 39


Constitutions

U.S. Const. Art. I, § 8, cl. 4 .............................................................................................. 37

U.S. Const. Art. VI, § 2 ..................................................................................................... 37

<u>Federal Statutes</u>

11 U.S.C. § 101(22) ................................................................................................ 31

11 U.S.C. § 544(b) ................................................................................................. 15

11 U.S.C. § 546(a) ................................................................................................. 18

11 U.S.C. § 546(e) ........................................................................................... passim

11 U.S.C. § 548 ......................................................................................... 19, 21, 39

11 U.S.C. § 548(a)(1)(A) ........................................................................ 20, 25, 35, 39

11 U.S.C. § 548(a)(1)(B) ................................................................................. 20, 39

11 U.S.C. § 550 ..................................................................................................... 39

11 U.S.C. § 550(a) .......................................................................................... 30, 39

11 U.S.C. § 741(8) ............................................................................................... 26

<u>State Statutes</u>

N.Y. DEBTOR AND CREDITOR LAW § 273 (2005) ............................................. 17

N.Y. DEBTOR AND CREDITOR LAW § 276 (2005) ....................................... 35, 36

<u>Federal Rules</u>

Fed. R. Civ. P. 4 ................................................................................................... 42

Fed. R. Civ. P. 4(m) .............................................................................................. 42

Fed. R. Bankr. P. 7004(e) .................................................................................... 42

<u>Other Authorities</u>

5 *Collier on Bankruptcy*, ¶ 546.06[2] (15th ed. rev. 2009) ...................................... 29

Defendants Credit Suisse First Boston Next Fund, Inc. (incorrectly named as CSFB and herein referred to as "Credit Suisse"), Lab Morgan Corporation ("Lab Morgan"), and ML IBK Positions, Inc. ("Merrill Lynch") (collectively, the "Bank Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(5), and 12(b)(6), to dismiss the complaints filed by plaintiff George L. Miller, as the Chapter 7 Trustee for the estate of Suffolk LLC ("Plaintiff" or "Trustee").[1]

## PRELIMINARY STATEMENT

Plaintiff has filed essentially the same bare-bones complaint in at least 93 actions against former equity holders, including the Bank Defendants, in an investment advisor named PlusFunds Group Inc. ("PlusFunds"). (Declaration of Ross E. Firsenbaum, dated June 8, 2009 ("Firsenbaum Decl.") Ex. A ¶ 1.) In his complaints against the Bank Defendants, he seeks to recover more than $27 million allegedly transferred from Suffolk LLC ("Suffolk") to the Bank Defendants in exchange for the Bank Defendants' stock in PlusFunds. (Compl. ¶ 1.)

To recover these funds, Plaintiff invokes the equitable doctrine of unjust enrichment and bankruptcy causes of action intended to protect a debtor's creditors. (Compl. ¶¶ 4, 48-81.) But the Complaint itself details the inequitable nature of his claims and the absence of legitimate creditors with any grounds to complain about the transactions at issue. Most notably, Plaintiff states that he seeks recovery from the Bank Defendants for the benefit of "Marc S. Kirschner, as Court-approved Trustee for the Refco Litigation Trust and representative of the estate of Refco Capital, Suffolk's only known non-contingent, liquidated creditor" ("Refco Trustee"). (Compl. ¶ 11.) The Refco Trustee is the very party whom this Court recently concluded lacked standing to

---

[1] Plaintiff filed three separate complaints against Credit Suisse, Lab Morgan, and Merrill Lynch. Each of the complaints is substantially identical in form and substance. Unless otherwise indicated, references to the "Complaint" herein shall refer to all three complaints.

assert claims directly arising out of the same scheme at Refco that also forms the basis for this action, because "Refco participated in, and . . . benefitted from, the very fraudulent acts on which the [Refco] Trustee [sought] to sue." *Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604, 2009 WL 996417, at *10 (S.D.N.Y. Apr. 14, 2009).

So, too, the predicate to Plaintiff's claims is that the PlusFunds shares were allegedly not worth the amount paid by Suffolk to the Bank Defendants to acquire them. (Compl. ¶ 1.) But the very reason why the PlusFunds shares were supposedly not worth as much is because Refco – the only purported creditor of Suffolk who would benefit from any recovery in this action – was engaged in fraud allegedly in tandem with insiders at PlusFunds, and SPhinX (a family of hedge funds managed by PlusFunds), and created Suffolk to perpetuate that fraud. (Compl. ¶¶ 15-17, 30.)

At its core, this action is thus the Refco Trustee's attempt to get a second bite at the apple. Less than two months ago, this Court denied the Refco Trustee standing to assert claims against third parties – including affiliates of two of the Bank Defendants – because Refco participated in, and benefited from, the acts on which he sought to sue. Now the Suffolk Trustee seeks to recover from the Bank Defendants on behalf of Refco, even though Suffolk and Refco participated in, and benefited from, the very fraudulent acts on which Suffolk sues. In short, the Refco Trustee seeks to recover from the Bank Defendants indirectly through the back door, after this Court just held that he was not entitled to relief directly through the front door.

This he cannot do. The Complaint fails to state a claim and should be dismissed for at least six reasons. *First*, Plaintiff lacks standing. Plaintiff's New York, state law claims in counts 3 and 4 are barred by the "*Wagoner* Rule" under which, as this Court recently articulated, "a bankruptcy trustee lacks standing to seek recovery on behalf of a debtor company against third-

parties for injuries incurred by the misconduct of the debtor's controlling managers." *Kirschner*, 2009 WL 996417, at *5. Plaintiff's claims fail for the same reasons that this Court rejected the Refco Trustee's claims – Suffolk was wholly-owned and controlled by admitted conspirators in the Refco fraud and Plaintiff seeks recovery for losses arising from Suffolk's own misconduct. *Wagoner* is particularly applicable here because Plaintiff seeks to recover funds on behalf of an entity controlled by alleged wrongdoers, and for the benefit of a single creditor – Refco – another entity wholly-owned and controlled by alleged wrongdoers that this Court has already concluded lacks standing to assert its own state-law claims. Similarly, Plaintiff lacks standing to assert his avoidance claims under the Bankruptcy Code in counts 1-3 because no good-faith creditor – only Refco, the orchestrator of the fraudulent scheme – stands to benefit.

*Second*, Plaintiff's fraudulent transfer claims in counts 1-3 are deficient because they seek to recover funds that were never the property of Suffolk. By the Complaint's own allegations, Suffolk was created for the very purpose of serving as a pass-through-entity, or conduit, for Refco to purchase shares of PlusFunds from (among others) the Bank Defendants. (Compl. ¶¶ 8, 30.) The transferred funds never belonged to Suffolk and, therefore, are not recoverable by Plaintiff.

*Third*, Plaintiff's fraudulent transfer claims in counts 1 and 3 are barred by Section 546(e) of title 11 of the United States Code (the "Bankruptcy Code"). The payments the Bank Defendants received in exchange for the PlusFunds shares they tendered to Suffolk were "settlement payments" and "transfer[s] made . . . in connection with a securities contract" by a "financial institution," the Bank of New York (as escrow agent for the funds disbursed by Refco), to complete a securities transaction. Accordingly, Plaintiff "may not avoid" those payments. *See* 11 U.S.C. § 546(e).

*Fourth*, Plaintiff's intentional fraudulent transfer claims in counts 2 and 3 fail to satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Federal Rules"). Plaintiff's entirely conclusory allegation that the Bank Defendants had the actual intent to defraud Suffolk's creditors cannot support an intentional fraudulent transfer claim under New York's Debtor and Creditor Law incorporated under Section 544(b) of the Bankruptcy Code. Moreover, Plaintiff's equally conclusory allegation that Suffolk had the actual intent to defraud its creditors is not pled with any particularity. Indeed, the Complaint acknowledges that Suffolk's only creditor was Refco and, surely, Refco could not have been defrauded since, according to the Trustee himself, Refco colluded with Suffolk to devise the scheme to buyout the PlusFunds shares from the Bank Defendants (and PlusFunds' other third-party shareholders) in order to foster the ongoing fraud at Refco. Thus, Plaintiff's allegations do not, and cannot, sustain an intentional fraudulent transfer claim under either state law or Section 548 of the Bankruptcy Code.

*Fifth*, Plaintiff's unjust enrichment claim also fails for four reasons. As a threshold matter, the claim is preempted by the Bankruptcy Code because it is based on the same alleged conduct – the transfer of funds to the Bank Defendants – that is governed by the Code's fraudulent conveyance provisions and for which the Code provides exclusive remedies. Next, irrespective of preemption, Plaintiff's claim is deficient because the rights of Suffolk and the Bank Defendants were defined by a written contract, and unjust enrichment is not a valid of cause of action in such an instance. Further, the equitable remedy of unjust enrichment is unjustified here because Plaintiff brings this action on behalf of an entity wholly-owned and controlled by admitted wrongdoers (Suffolk), and for the sole benefit of another entity also

wholly-owned and controlled by admitted wrongdoers (Refco).  Finally, unjust enrichment does not apply where there is an adequate remedy at law.

*Sixth*, Plaintiff has improperly served the Bank Defendants with the summons and Complaint.  Plaintiff attempted service of the Bank Defendants by first-class mail more than ten days after obtaining a summons, in violation of both the Federal Rules and the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and has outright failed to serve one of the Bank Defendants.

There is simply no legal or equitable basis for Plaintiff's claims against the Bank Defendants, and granting Plaintiff leave to replead would be futile.  The Court should dismiss the Complaint with prejudice.

## FACTUAL ALLEGATIONS

The following is a recitation of relevant facts as alleged in the Complaint.  Although the Court generally must accept as true, for purposes of this motion, all well-pleaded factual allegations, it is not bound by conclusory assertions that are contradicted by more specific allegations in the Complaint or the documents incorporated therein.  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1086 (2d Cir. 1995).  Nor must the Court accept the truth of legal conclusions masquerading as factual allegations.  *See Ashcroft v. Iqbal*, No. 07-1015, 556 U.S. __, slip. op. at 14 (May 18, 2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement") (internal citation and quotation omitted); *see also In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.,* 586 F. Supp. 2d 172, 177-78 (S.D.N.Y. 2008).

**I.      Refco and PlusFunds Insiders Created Suffolk to Purchase Equity Interests in PlusFunds as Part of an Ongoing Fraud at Refco.**

Plaintiff alleges that the Bank Defendants sold between 20,550.38 and 30,825.57 shares of PlusFunds stock to Suffolk for aggregate purchase prices ranging from $7,582,268.20 to $11,373,402.30, pursuant to Stock Purchase Agreements between the Bank Defendants and Suffolk ("Stock Purchase Agreements").  (Compl. ¶ 1.)  Suffolk's purchase of PlusFunds stock from the Bank Defendants constituted three of some 93 similar transactions by which Suffolk, as part of a tender offer, bought-out all remaining equity interests in PlusFunds from the company's minority shareholders (the "PlusFunds Tender Offer").  (Firsenbaum Decl. Ex. A ¶ 1.)[2]  Suffolk funded the PlusFunds Tender Offer through loans totaling approximately $204 million (the "Suffolk Loans") that it received from Refco Capital LLC ("Refco Capital"), a Refco affiliate.  (Compl. ¶ 8.)  Plaintiff alleges that corrupt Refco insiders made these Suffolk Loans as part of their ongoing fraudulent scheme at Refco.  (Compl. ¶¶ 8, 15-17.)

The Complaint references the allegations contained in a separate complaint (the "SPhinX Complaint") brought by, among others, a bankruptcy trustee standing in the shoes of PlusFunds ("SPhinX Trustee").  (Compl. ¶¶ 15-17.)[3]  According to the SPhinX Trustee, Refco Capital provided the Suffolk Loans to Suffolk to benefit the Suffolk insiders Christopher Sugrue, Mark Kavanagh, and Brian Owens (collectively, the "Suffolk Insiders") by permitting them to acquire

_____

[2]  The complaint in one of the 93 actions filed by Plaintiff now pending in the Refco MDL, *Miller v. PF Saleco LLC et al*, No. 09 Civ. 02866 (S.D.N.Y.) (GEL), alleges that funds were transferred to the defendants pursuant to a separate PlusFunds Membership Interest Purchase Agreement.

[3]  When testing a complaint's sufficiency, the Court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, [] matters of which judicial notice may be taken, or [] documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citation omitted).  Plaintiff references the allegations asserted by "the Joint Liquidators of the SPhinX Funds" in "actions pending in the Refco Multi-District Litigation."  (Compl. ¶ 17.)  Accordingly, this Court may consider the Joint Liquidators' allegations in the Amended Complaint, dated October 10, 2008, in *Krys v. Sugrue*, No. 08 Civ. 3086 (S.D.N.Y.) (GEL) ("SPhinX Complaint") when adjudicating this motion.  *See id.*  Likewise, because the Complaint refers to the Suffolk bankruptcy proceedings, the Court may take judicial notice of pleadings and transcripts from those proceedings.  *See Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 59 (Bankr. S.D.N.Y. 2004).

all outstanding shares in PlusFunds.  (SPhinX Compl. ¶¶ 310-25.)  The SPhinX Complaint

alleges that the fraudulent purpose of the Suffolk Loans was to pay off the Suffolk Insiders in

exchange for their alleged complicity in the ongoing fraud at Refco.  (*See id.*)   In particular, the

Suffolk Loans allowed the corrupt Suffolk Insiders to buy out the ownership interests of alleged

"innocent" directors at PlusFunds and other third-party shareholders of PlusFunds, such as the

Bank Defendants, and thereby to prevent those third parties from exposing Refco's fraudulent

use of customer assets managed by PlusFunds and deposited with Refco.  (SPhinX Compl. ¶¶

282, 295.)[4]  In return, the Suffolk Insiders agreed not to disclose their awareness of the ongoing

fraud at Refco.  (SPhinX Compl. ¶¶ 282, 308.)

Not surprisingly, therefore, Refco Capital structured the Suffolk Loans so that Suffolk

had to use the proceeds to acquire the PlusFunds shares.  (Compl. ¶ 1; SPhinX Compl. ¶¶ 298-

302; *see also* Firsenbaum Decl. Ex. B at 1, §§ 2.3, 5.2.4, 7.1.6 ("████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████") (emphasis added).)  Suffolk secured the loans by

pledging to Refco Capital all of the equity in PlusFunds that Suffolk bought with the loan

---

[4] According to the SPhinX Complaint, PlusFunds' CEO and President, Gabriel Bousbib, became concerned that SPhinX cash held by Refco was not earning sufficient interest.  (SPhinX Compl. ¶ 283.)  Bousbib allegedly believed that the SPhinX cash could earn greater interest if SPhinX moved the funds out of Refco to a different custodian.  (SPhinX Compl. ¶ 288.)  Accordingly, Bousbib instructed PlusFunds' agents to conduct a market analysis to determine what fees were appropriate for the services and transactions provided by Refco and approached Refco to renegotiate the interest rate on the SPhinX cash held at Refco.  (SPhinX Compl. ¶ 284.)  Following his investigation and discussions with Refco, Bousbib prepared a formal proposal for the PlusFunds Board of Directors, which provided that the cash would be removed from Refco.  (SPhinX Compl. ¶¶ 288-90.)   The Suffolk Insiders opposed the proposal and concluded that Bousbib had to be removed from PlusFunds.  (SPhinX Compl. ¶¶ 290-92.)  To this end, the Suffolk Loans financed the purchase of Bousbib's interest in PlusFunds (as well as those of other PlusFunds stakeholders, including the Bank Defendants).  (SPhinX Compl. ¶ 295.)

proceeds.  (Firsenbaum Decl. Ex. B § 5.1.5.)  The Suffolk Insiders could not use the loan

proceeds for any other purpose.  (*Id.* at 1, §§ 2.3, 5.2.4, 7.1.6.)[5]

The Credit Agreement made clear that Suffolk would serve as the middleman between

Refco Capital and the PlusFunds interest holders (including the Bank Defendants).  (*See* Compl.

¶ 31; Firsenbaum Decl. Ex. B § 2.3, 5.2.4.)  Under the terms of the Credit Agreement, and to

ensure that the funds were used for their intended purpose, Suffolk was required to submit a

"Borrowing Request" to Refco Capital each time it wished to draw funds from the facility to

purchase PlusFunds securities from a third party.  (Firsenbaum Decl. Ex. B § 2.3.)  The Credit

Agreement provided that Refco Capital would "████████████████████████████████████

████████████████████████████████████████████████████████████████████████████"

(*Id.*)  The Credit Agreement designated the Bank of New York ("BONY") as the Escrow Agent.

(*See id.* § 1.1 (definition of "Escrow Agent").)  The Escrow Agreement required both Suffolk

and Refco to submit a "joint written request" to approve the disbursement of funds from the

escrow account at BONY to ensure that the funds were used only for the purpose Refco

intended: the purchase of the shares of PlusFunds stock held by third parties.  (*See* Firsenbaum

Decl. Ex. G § 5(a).)

In accordance with the Credit Agreement, Refco Capital disbursed the loan proceeds into

the escrow account at BONY.  (*See* Firsenbaum Decl. Ex. G at Recitals A-C, ¶¶ 1-2; Ex. H.)

BONY, serving as the Escrow Agent, in turn, transferred the funds to the Bank Defendants and

other PlusFunds shareholders.  (*See* Firsenbaum Decl. Ex. C § 10 ("████████████████████

_____

[5] Consistent with the Credit Agreement, the Stock Purchase Agreements confirmed that Suffolk had no
discretion to use the Suffolk Loans for any other purpose.  (*See* Firsenbaum Decl. Ex. C § 8 ("████████████
████████████████████████████████████████████████████████████████████████████████████████
████████").)

- 8 -

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ ”); Ex. G at ¶ 5; Exs. I-K at cover page, 1, ¶¶ 2, 4, 8, 12; *see also* Exs.

L, S.)

Prior to the Suffolk Loans, Suffolk apparently did not even exist.  (Compl. ¶¶ 25;

Firsenbaum Decl. Ex. B § 7.2.1 (prohibiting Suffolk from engaging in any business other than

acquiring the PlusFunds shares).)  Suffolk was created for the very purpose of carrying out these

series of transactions.  (Compl. ¶ 30; Firsenbaum Decl. Ex. B at 1 (“██████████████████

████████████████████████████████████████████ ” shares of PlusFunds); Ex. C at § 2

(“██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ”).)  Suffolk

was “thinly capitalized and had only a nominal amount of equity.” (Compl. ¶ 31.)  In fact, it “had

no assets of its own” (Compl. ¶ 34; Firsenbaum Decl. Ex. B § 6.5 (Suffolk representation that it

had no assets or liabilities other than the PlusFunds contracts)) other than its right to request the

Suffolk Loans from Refco Capital pursuant to the Credit Agreement to purchase the PlusFunds

stock.  (Compl. ¶ 31.)  Indeed, the Refco Trustee has acknowledged that Suffolk was created to

facilitate the PlusFunds Tender Offer as part of the ongoing fraudulent scheme at Refco:

“Sugrue created Suffolk-SUG in connection with a scheme by which Refco Capital, an indirect

subsidiary of Refco Inc. . . . issued a series of loans totaling more than $200 million to finance

the purchase of the outstanding equity of PlusFunds . . .”  (Firsenbaum Decl. Ex. E ¶ 1.)

Refco’s plan behind the Suffolk Loans was for Refco itself to acquire PlusFunds.  The

Refco Trustee has already conceded that insiders at Refco and the Suffolk Insiders entered into

these transactions expecting that Suffolk would default on the Suffolk Loans and that Refco

would take control of PlusFunds:

> It's our understanding, Your Honor, that this relationship was put into place by Phillip Bennet [sic], who was the CEO of Refco at the time, with the intent that when the loans came due and payable in March of 2009 . . . , the Suffolk entities would default on these loans and Refco would realize on the collateral, which was the stock that was being held . . ..  And by virtue of that series of transactions would actually end up owning Plus Funds.

(*See* Firsenbaum Decl. Ex. F at 6:25-7:7.)[6]  The Credit Agreement confirmed that the ultimate purpose of the loans was for Refco to buy out PlusFunds.  It granted Refco call rights "█ ███████████████████████████████████████████████████████████████ "

(Firsenbaum Decl. Ex. B § 8.4.1; *see also* Firsenbaum Decl. Ex. C at REFCO-E-001246894

("██████████████████████████████████████████████████████████████████████

█").)  In this regard, Refco evidently thought the PlusFunds stock to be acquired was worth as much as – indeed more than – the purchase price it financed.  The Credit Agreement included a condition that "███████████████████████████████████████████████████ ", the stock acquired through the Suffolk Loans.  (Firsenbaum Decl. Ex. D at 1.)

## II.     After the Refco Trustee Initiates the Suffolk Bankruptcy Proceedings, the Suffolk Trustee Seeks Recovery on Behalf of Refco.

The chain of events that led to the Suffolk bankruptcy filing and the commencement of this and the related actions seeking to undo the PlusFunds Tender Offer began with Refco's own collapse.  On October 17, 2005 – approximately four months after Suffolk purchased PlusFunds securities from the Bank Defendants, and seven days after the public disclosure of the ongoing fraud at Refco – Refco Capital and certain of its direct and indirect affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York.  (Compl. ¶ 9.)   Shortly thereafter, the official

---

[6] Phillip Bennett has pled guilty to criminal conspiracy and fraud, and been sentenced to 16 years in prison, in connection with the Refco fraud.  (SPhinX Compl. ¶ 41.)

committee of unsecured creditors of a Refco Capital affiliate – RCM – commenced an adversary proceeding against SPhinX to recover $312 million that SPhinX had maintained on deposit at Refco until shortly before it filed for bankruptcy as a preferential transfer. (SPhinX Compl. ¶ 12.) In connection with that suit, the bankruptcy court entered an order freezing $312 million allegedly belonging to one of the SPhinX Funds. (*Id.*) This order, along with Refco's bankruptcy, purportedly caused "a flood of redemptions by SPhinX's investors" which, in turn, "caused a sharp decline in PlusFunds' revenues" (since PlusFunds' sole business was to manage SPhinX) and led PlusFunds itself to seek Chapter 11 bankruptcy protection. (SPhinX Compl. ¶¶ 12-13; *see* Compl. ¶ 10.)

Refco – Suffolk's only purported creditor – then placed Suffolk into bankruptcy. On March 16, 2007, Marc S. Kirschner, "as Court-approved Trustee for the Refco Litigation Trust and representative of the estate of Refco Capital, Suffolk's only known non-contingent, liquidated creditor", filed an involuntary petition for relief against Suffolk in the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court") under Chapter 7 of the Bankruptcy Code. (Compl. ¶ 11.) The Refco Trustee commenced proceedings against Suffolk so its Trustee could sue for Refco's benefit – indeed, "with the expectation that the Suffolk family of entities [would] have substantial claims against third parties for fraudulent transfers and fraudulent conveyances." (*See* Firsenbaum Decl. Ex. F at 9:21-24.) In the Refco Trustee's own words, he "decided that the only way to realize on [Refco's] loan to the Suffolk entities . . . was to petition these entities involuntarily . . .." (*See id*. at 9:7-12.) Indeed, the Refco Trustee represented to the Delaware Bankruptcy Court that Refco had created Suffolk for the sole purpose of purchasing outstanding PlusFunds shares for Refco's benefit and that Refco Capital was Suffolk's only creditor. (*See id.* at 9:13-20 ("The Suffolk entities we understand are

single purpose entities created for the sole purpose of acquiring Plus Funds stock. Their assets

consist of Plus Funds stock, and their liabilities are an obligation owing to the Refco entities . . .

We believe that's [sic] the entirety of their liabilities are the liabilities owing to Refco – to Refco

Capital, LLC, pursuant to those credit agreements.").)

At its core, this action is thus the Refco Trustee's attempt to get a second bite at the

apple. Less than two months ago, this Court denied the Refco Trustee standing to assert claims

against third parties – including affiliates of two of the Bank Defendants – because Refco

participated in, and benefited from, the acts on which he sought to sue. Now the Suffolk Trustee

seeks to recover from the Bank Defendants on behalf of Refco, even though Suffolk and Refco

participated in, and benefited from, the very fraudulent acts on which Suffolk sues. In short, the

Refco Trustee seeks to recover from the Bank Defendants indirectly through the back door, after

this Court just held that he was not entitled to relief directly through the front door.

## ARGUMENT

The Complaint should be dismissed for at least six independent reasons. They are

addressed in turn below.

## I. PLAINTIFF LACKS STANDING TO ASSERT FRAUDULENT TRANSFER AND UNJUST ENRICHMENT CLAIMS ON BEHALF OF SUFFOLK TO BENEFIT ITS ONLY PURPORTED CREDITOR, REFCO CAPITAL.

### A. The *Wagoner* Rule Denies Plaintiff Standing to Assert State-Law Claims.

New York law governs, and bars, Plaintiff's state law claims.[7] As this Court recognized

less than two months ago, the *Wagoner* Rule – a well-established rule of standing under New

York state law – provides that a bankruptcy trustee may only "assert claims held by the bankrupt

---

[7] Plaintiff acknowledges that New York provides the governing law for his state law claims. (Compl. ¶¶ 64, 71.) He brings his state law fraudulent transfer claims "pursuant to . . . NY DCL § 270 et seq." (Compl. ¶ 64.) This is consistent with Section 9.11 of the Credit Agreement, which provides that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Firsenbaum Decl. Ex. B § 9.11.)

corporation itself," and lacks standing to assert a "claim against a third party for defrauding a corporation with the cooperation of management" on behalf of "the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118, 120 (2d Cir. 1991); *Kirschner*, 2009 WL 996417, at *5. The rule derives from the "fundamental principal of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Kirschner*, 2009 WL 996417, at *5. Where a complaint's allegations demonstrate that a plaintiff lacks standing to sue under the *Wagoner* Rule, the complaint should be dismissed. *Wagoner*, 944 F.2d at 117 ("[Standing] is a threshold issue in all cases"); *Kirschner*, 2009 WL 996417, at *5-10 (granting motions to dismiss).[8]

In *Kirschner*, the confirmed Chapter 11 plan of Refco Inc. and various subsidiaries and affiliates ("Refco Debtors") provided for the appointment of the Refco Trustee, and transferred any claims and causes of action held by the Refco Debtors' bankruptcy estates to the Refco Trustee to pursue on behalf of those estates and the Refco Debtors. *Kirschner*, 2009 WL 996417, at *4. Thereafter, the Refco Trustee brought a lawsuit asserting state-law causes of action against various professionals and advisors for their alleged roles in perpetrating a fraudulent scheme to conceal Refco's uncollectible debts and misappropriation of customer assets. *Id.* at *1. The scheme, however, was engineered and principally carried out by Refco's senior management and actually served to benefit Refco. *Id.* at *1, 9. The court noted that the "complaint [wa]s saturated by allegations that Refco received substantial benefits from the insiders' alleged wrongdoing" and that "the burden of the insiders' fraud was not borne by Refco or its then-current shareholders who were themselves the insiders-but rather by outside parties,

---

[8]  *See also Mediators Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 826-27 (2d Cir. 1997) (affirming dismissal of claims on motion to dismiss); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1096 (2d Cir. 1995) (same); *cf Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 164 (2d Cir. 2003); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 308-10 (S.D.N.Y. 1998).

including Refco's customers, creditors, and third parties . . ." *Id.* at *6. Accordingly, the Court held that the Refco Trustee lacked standing. *Id.* at *10.

Here, dismissal of Plaintiff's state law claims for lack of standing pursuant to *Wagoner* is proper for the same reason the Court held that the Refco Trustee lacked standing and dismissed his claims. Plaintiff brings suit against innocent third parties on behalf of Suffolk even though Suffolk, through its own management and controlling shareholders, was admittedly complicit in the alleged wrongdoing. *See, e.g.*, *Wagoner*, 944 F.2d at 120. Thus, Plaintiff seeks to "recover for a wrong undertaken by the debtor itself." *Kirschner*, 2009 WL 996417, at *1. Like the Refco Trustee, who sought relief on behalf of a company that was wholly-owned and controlled by wrongdoers, Plaintiff seeks recovery on behalf of a company that he concedes was owned and controlled by wrongdoers. (Compl. ¶ 7; SPhinX Compl. ¶¶ 310-25, 356-407.)[9]

At minimum, Plaintiff's unjust enrichment claim falls squarely within the prohibitions of the *Wagoner* Rule. *See Hirsch*, 72 F.3d at 1092 (acknowledging that unjust enrichment claims are subject to the *Wagoner* rule); *Giddens v. D.H. Blair & Co., Inc. (In re A.R. Baron & Co., Inc.)*, 280 B.R. 794, 798-800 (Bankr. S.D.N.Y. 2002) (dismissing trustee's unjust enrichment claim for lack of standing where facts alleged implicated debtor's management in alleged fraud). This is a run-of-the-mill state law tort claim brought by a bankruptcy trustee standing in the shoes of the debtor. *See id.* Accordingly, Plaintiff lacks standing to assert the claim against the Bank Defendants.

The *Wagoner* Rule should also apply with equal force to Plaintiff's state law fraudulent transfer claims. To be sure, some courts have concluded that the *Wagoner* Rule did not bar avoidance claims in cases where legitimate third party creditors stood to gain from any recovery

---

[9] One of Suffolk's shareholders and directors, Christopher Sugrue, has apparently fled the United States and resides in Angola. (SPhinX Compl. ¶ 38.)

by the debtor or trustee. *See, e.g., Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) (citing cases). But there are no such creditors of Suffolk, and that is fatal to Plaintiff's state law fraudulent transfer claims in this case.

When a bankruptcy trustee brings an avoidance claim under state law pursuant to Section 544(b) of the Bankruptcy Code, the trustee may only avoid the transfer to the extent that the transfer "is voidable under applicable law by a *creditor*." 11 U.S.C. § 544(b) (emphasis added). Thus, the trustee "stands in the 'overshoes' of the creditor[]" under Section 544(b), *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 206-07 (Bankr. S.D.N.Y. 2002), and has no greater rights than the creditor would have outside bankruptcy to recover the transfer from the defendant. *See Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995). "[T]he rights of the parties are to be determined . . . [under] the laws of the state in which the right of action may arise," and "if, for any reason arising under the laws of the state, the action could not be maintained by the creditor, the same disability will bar the trustee." *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5, 26 & n.18 (Bankr. D.N.H. 2004) (quoted citation omitted); *see also In re Wingspread*, 178 B.R. at 945 ("rights of the trustee to avoid a transfer [under § 544(b)] are completely derivative of those of an actual unsecured creditor"); *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 659 (S.D. Tex. 2007) ("If the creditor is estopped or barred from recovery, so is the trustee."); *accord Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993).

Here, Plaintiff brings suit under § 544(b) standing in the shoes of Refco, Suffolk's only alleged non-contingent liquidated creditor. (Compl. ¶ 11.) And this Court has already held that Refco lacks standing under *Wagoner* to assert state-law claims seeking recovery from innocent

third parties because Refco "participated in, and . . . benefitted from, the very fraudulent acts." *Kirschner*, 2009 WL 996417, at *10. It would be a bizarre and inequitable result to allow the trustee for Suffolk – an entity wholly owned and controlled by admitted wrongdoers – to recover funds from the Bank Defendants for the indirect benefit of Refco – another entity wholly owned and controlled by admitted wrongdoers – where Refco is barred by its own wrongdoing from recovering those funds from the Bank Defendants directly.[10] Accordingly, because Refco is "barred from recovery" under *Wagoner*, "so is the trustee" Plaintiff, standing in Refco's shoes. *Smith*, 365 B.R. at 659.

**B.      Plaintiff Lacks Standing to Assert Avoidance Claims That Will Not Benefit a Good-Faith Creditor of Suffolk's Estate.**

For similar reasons, Plaintiff lacks standing to assert any of his purported avoidance claims under both federal and state law because no legitimate creditor can benefit from any recovery. It is well settled in the Second Circuit that a bankruptcy trustee lacks standing to bring avoidance actions under either Section 544 or 548 of the Bankruptcy Code where no benefit will accrue to legitimate creditors of the debtor. *See Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582, 584 (2d Cir. 1950) ("It would be [a] mockery of justice to say that the alleged bankruptcy may claim through and in the right of creditors whose debts have been paid and discharged; that he may avoid a transaction, valid as to himself but voidable as to creditors, in the right of non-existing creditors." (internal quotation omitted)); *Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*, 735 F.2d 740, 742-43 (2d Cir. 1984) (holding that

---

[10] Indeed, Plaintiff's previous recovery in a fraudulent conveyance action against PlusFunds' former CEO Gabriel Bousbib highlights how any recovery here would (unjustly) inure to the benefit of the Refco Trustee. As described below, Plaintiff sought to avoid a transfer of $1.7 million made to purchase PlusFunds shares from Bousbib. *See, infra*, at 29. Plaintiff and Bousbib settled the dispute before Bousbib's motion for summary judgment was fully briefed. (Firsenbaum Decl. Ex. T at 6 n.2.) The Stipulation of Settlement filed with the Bankruptcy Court provided that the Settlement Amount ($900,000) "is to be divided between the Suffolk Trustee and the Refco [Litigation] Trustee in accordance with an agreement between the respective trustees." (*Id.*) (The "agreement between the respective trustees" does not appear to be publicly available.) Thus, Plaintiff's recovery went, at least in part, directly to Refco, the very architect of the fraud of which Plaintiff complains in this case.

debtor had the right to avoid unperfected security interest only to the extent that such avoidance benefited third-party creditors); *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 95 (S.D.N.Y. 2008) (dismissing fraudulent transfer claims under §§ 544(b) and 548 for lack of standing because avoidance would not benefit legitimate creditors).[11]

The same principle applies under New York state law. *See Adelphia*, 390 B.R. at 92 & n. 16 (noting that a fraudulent conveyance action may be maintained under New York law "only by, and thus only for the benefit of, an unpaid creditor of the debtor that made the transfer or incurred the obligation sought to be avoided"); *In re Murphy*, 331 B.R. at 124 ("The purpose of fraudulent conveyance law, *whether state or federal*, and of Section 548 is to prevent harm to creditors by a transfer of property from the debtor.") (emphasis added); *see also* N.Y. DEBTOR AND CREDITOR LAW § 273 (2005) ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent *as to creditors* without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.") (emphasis added).

It is also well established that a transfer cannot be avoided to benefit a creditor that took part in the fraudulent conveyance. Fraudulent transfer law is designed to prevent a debtor from secretly transferring its assets to third parties in fraud of innocent creditors who expected to look to those assets for repayment of their claims. Where, as here, a creditor colludes with the debtor to transfer such assets, the creditor is not defrauded by the transfer, and fraudulent transfer law may not be invoked for that creditor's benefit. Thus, courts have held that a trustee may not bring a fraudulent transfer claim where avoidance of the transfer would benefit only creditors

---

[11] *See also, e.g., Balaber-Strauss v. Town of Harrison (In re Murphy)*, 331 B.R. 107, 126 (Bankr. S.D.N.Y. 2005) (holding that trustee has the right to avoid a fraudulent transfer only to the extent necessary to satisfy the claims of creditors); *Join-In Int'l (U.S.A.) Ltd. v. New York Wholesale Distribs. Corp. (In re Join-In (U.S.A.) Ltd.)*, 56 B.R. 555, 561 (Bankr. S.D.N.Y. 1986) ("If the recovery of the alleged fraudulent conveyance [under Sections 544 and 548] will solely benefit the debtor it will not be permitted to maintain the proceeding.").

who knowingly agreed to the transfer. *See, e.g.*, *Huff*, 160 B.R. 259, 261 (dismissing § 544(b) claim that would benefit only a creditor that consented to transfer); *HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.*, No. 07 Civ. 553A, 2009 WL 385474, at *6-7 (W.D.N.Y. Feb. 12, 2009) (affirming dismissal of fraudulent transfer claims under §§ 544(b) and 548 because "Adelphia ratified the very transactions . . . that Adelphia and the Committee now contend should be avoided"); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance.").[12]

Here, according to the Plaintiff himself, the only creditor that would benefit from avoidance of the transfers to the Bank Defendants is Refco. (Compl. ¶ 11.) Refco knowingly participated in those transfers. Far from being defrauded by the transfers, Refco formed Suffolk with the Suffolk Insiders for the very purpose of making those transfers, on terms dictated by Refco, so that Refco could buy out the PlusFunds shareholders and thereby continue its own fraudulent scheme. (Firsenbaum Decl. Ex. B §§ 1.1 (definition of "Collateral Value"), 2.1, 6.5, 7.1.6, 7.2.1 (requiring Suffolk to transfer Refco funds solely to purchase PlusFunds shares at Tender Offer price, and requiring Suffolk to represent that it had no assets or liabilities other than the PlusFunds contracts, leaving Refco to look only to the acquired PlusFunds shares for repayment of its "loan").) Accordingly, because Refco purposefully orchestrated the transfers to

---

[12] *See also QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 742 (W.D. Mich. 2007) ("[O]ne of the creditors seeking the benefit of avoidance in fact provided financing for the LBO of [the debtor], and thus would have been fully aware of the financial context of the LBO. This undermines any argument that the equities rest with creditors as opposed to the approximately 170 shareholders" receiving the transferred funds in the LBO)

the Bank Defendants for its own fraudulent gain, Plaintiff cannot use fraudulent transfer law to avoid and recover those transfers from the innocent Bank Defendants for the benefit of Refco.[13]

Indeed, even if the Court were to accept Plaintiff's own theory as true for the purpose of this motion to dismiss, there is no legitimate creditor for whom he can recover. The very premise of Plaintiff's Complaint is that Suffolk did not receive reasonably equivalent value in return for its payments to the Bank Defendants because the PlusFunds shares it purchased from the Bank Defendants were supposedly "worth far less than the amount paid" to the Bank Defendants. (Compl. ¶ 1.) But, if that is right, then Suffolk also did not receive reasonably equivalent value from Refco when it received a $204 million loan from Refco while incurring an obligation both to (1) purchase the very same PlusFunds shares and (2) pay back the $204 million loan in full. (Firsenbaum Decl. Ex. B § 3.1(b) ("█████████████████████ ███████████████████████████████████████████████████████ ████").) In short, under Plaintiff's own theory of the case, Refco's loan to Suffolk was itself a fraudulent conveyance, and Suffolk's supposed debt to Refco can be avoided. *See* 11 U.S.C. § 548 (allowing a trustee to "avoid any . . . *obligation* . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition."); *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 990-91 (2d Cir. 1981) (obligations incurred may be avoided as fraudulent conveyances).

Accordingly, Plaintiff has a complete defense to Refco's claim, and there is no legitimate creditor remaining who could benefit from Plaintiff's recovery against the Bank Defendants.

---

[13] This is especially so, since Plaintiff asserts claims for Refco's benefit that Refco is statutorily barred from bringing itself. According to the Complaint, Refco and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 17, 2005. (Compl. ¶ 9.) Thus, the two-year statute of limitations period for Refco to bring an avoidance action against the Bank Defendants expired on October 17, 2007. *See* 11 U.S.C. § 546(a).

Plaintiff's fraudulent transfer and unjust enrichment action against the Bank Defendants should be dismissed.

## II. THE FRAUDULENT TRANSFER CLAIMS IN COUNTS 1-3 OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE TRANSFERRED FUNDS WERE NOT PROPERTY OF SUFFOLK, A MERE CONDUIT THROUGH WHICH REFCO CAPITAL TRANSFERRED THE FUNDS TO THE BANK DEFENDANTS.

The most fundamental element of any fraudulent transfer claim under either Section 548 or 544(b) of the Bankruptcy Code is that the transfer the trustee seeks to avoid must have been of the *debtor's* property. Plaintiff's fraudulent transfer claims fail as a matter of law because the Trustee seeks to recover funds that were not property of Suffolk, but rather of Refco Capital, which formed Suffolk with the Suffolk Insiders to serve as a mere conduit through which Refco Capital transferred the funds in question to the PlusFunds shareholders, including the Bank Defendants.

The Bankruptcy Code provides that a trustee may only avoid a "transfer . . . of an interest *of the debtor* in property." 11 U.S.C. § 548(a)(1)(A)-(B) (emphasis added); *accord id.* § 544(b)(1). Thus, if the transfer in question was not of the debtor's property, the trustee may not seek to avoid and recover the transfer. *See Begier v. I.R.S.*, 469 U.S. 53, 59 (1990) (holding that "[b]ecause [a] debtor does not own an equitable interest in property he holds in trust for another, that interest is not . . . 'property of the debtor' for purposes of section 547(b)."); *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 851 (6th Cir. 2002) (dismissing Chapter 7 trustee's fraudulent transfer claim to recover funds held in trust by the debtor, because the funds were not part of the bankruptcy estate and thus not subject to the trustee's avoidance powers).

Accordingly, courts have dismissed fraudulent transfer claims where, as here, the trustee seeks to recover funds that passed through the debtor as a mere "conduit" to effect a transfer between third parties. For example, in *Nordberg v. Sanchez* (*In re Chase & Sanborn Corp.*), 813

F.2d 1177 (11th Cir. 1987), the court held that "the debtor corporation was a mere conduit" for a transfer of funds between non-debtors, that accordingly those funds were "not the 'property' of the debtor corporation," and that the "transfer of the funds thus is not subject to avoidance." *Id.* at 1178-79 (dismissing claim under 11 U.S.C. § 548). The Eleventh Circuit explained that the "the funds were not the property of the debtor," even though it had brief possession of funds transferred to its bank account by a non-debtor, because it did not have "control over the funds" to use them for any purpose other than transferring them to a third party as directed by the non-debtor.

This result makes sense and is fair. The purpose of fraudulent transfer law is to prevent an insolvent debtor from depleting its assets to which its creditors look for repayment. *Id.* at 1181. But where the debtor receives funds that it is required to pass on to a third party, those funds are not assets the debtor can use in any event to pay its other creditors, and thus the transfer of those funds does not diminish the assets available to pay creditors. Accordingly, allowing the debtor's trustee to avoid and recover such funds "would confer on the creditors a windfall at the expense of the [] defendants" who received the funds merely passed through the debtor. *Id.* at 1181-82.

Indeed, the Bankruptcy Code provides that property held by the debtor as a mere conduit does not become part of the bankruptcy estate, and thus such property would not be available to pay creditors in the bankruptcy even if it had not been transferred before the bankruptcy. Section 541(d) of the Bankruptcy Code provides that:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11. U.S.C. § 541(d). Under this provision, property to which the trustee holds bare legal title does not become property of the debtor's estate. *Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*, 874 F.2d 88, 93 (2d Cir. 1989) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n.8 (1983)). "[P]roperty is excluded from the estate where the debtor merely receives property in order to deliver it to its intended recipient without any control or ownership over it," and hence serves as a pass-through entity, or "mere conduit." *City of Springfield v. Ostrander (In re Lan Tamers, Inc.)*, 329 F.3d 204, 210 (1st Cir. 2003) (funds collected by debtor service provider were not property of the estate where service provider was required to pass funds to public schools); *see Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Natural Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1061 (3d Cir. 1993) (refunds held by bankrupt natural gas pipeline company were not property of the estate because debtor "act[ed] as a receiving and transmitting agent, or a conduit, for money upstream suppliers owe to overcharged consumers"); *Connecticut v. Novak (In re Cmty. Assocs., Inc.)*, 173 B.R. 824, 830 (D. Conn. 1994) (vans purchased with federal grant for transport of elderly were not property of the debtor's bankruptcy estate); *Yonkers Bd. of Educ. v. Richmond Children's Ctr., Inc.*, 58 B.R. 980, 981-82 (S.D.N.Y. 1986) (funds from state education department paid to debtor but designated as "pass-through" payment for school district were not property of the estate).[14]

The common theme in all of these cases is that a debtor is a pass-through entity, or mere conduit, where it lacks discretion regarding how it may use the property at issue. *See In re Joliet-Will County Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (Posner, J.) (funds

---

[14] *See also Shipley Co. v. Darr (In re Tap, Inc.)*, 52 B.R. 271 (Bankr. D. Mass. 1985) (funds paid by employer to debtor not property of the estate where debtor was a mere conduit for employer's payment of taxes); *In re United Milk Prods. Co.*, 261 F. Supp. 766 (N.D. Ill. 1966) (funds collected by debtor under federal milk marketing orders, and owed to milk producers, were not property of the estate in pre-Code case).

- 22 -

granted by government agencies to debtor not property of the estate where debtor had little discretion regarding use of funds). Thus, if the debtor receives funds under contracts restricting its use of those funds to paying them over to third parties, the funds are not property of the debtor that can be recovered for its bankruptcy estate. *See, e.g.*, *T&B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) ("T&B's contracts with [the debtor] . . . expressly stated the funds were to be used to pay the materialmen," and thus such funds did not "belong to the bankrupt estate"); *Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Adver. (In re Bank of New England Corp.)*, 165 B.R. 972, 978 (Bankr. D. Mass. 1994) (payments by banks to debtor to fund obligations to defined group of creditors were not property of the estate because debtor's use of funds was so restricted that it could not control their use).[15]

Here, Suffolk lacked discretion to use the funds it received from Refco Capital for any purpose other than to purchase the PlusFunds shares from the Bank Defendants and other

---

[15] An analogy to earmarking cases is appropriate. The well-established doctrine of earmarking bars the recovery of an alleged preferential transfer where a new creditor lends money to the debtor for the purpose of paying a pre-existing creditor of the debtor. "In such situations, the loan funds are said to be 'earmarked' and the payment is held not to constitute a voidable preference." *Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 184 (2d Cir. 2007). The earmarking doctrine bars recovery because, "where a third party lends money to a debtor for the purpose of paying a specific creditor, . . . the third party simply is substituted for the original creditor." *Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*, 97 F.3d 22, 25 (2d Cir. 1996). Thus, the earmarked funds were never property of the debtor's bankruptcy estate. *See id.* In determining whether property is subject to the earmarking doctrine, the Second Circuit focuses on whether the debtor had discretion as to how to use the funds it received: "We have held that where a debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that purpose, those funds do not become part of the estate and the transfer cannot be avoided in bankruptcy." *In re Flanagan*, 503 F.3d at 185. Here, Suffolk lacked discretion to use the funds for any purpose other than to purchase PlusFunds shares from PlusFunds' equity holders, including the Bank Defendants. Accordingly, the earmarking doctrine dictates that the payments at issue are unavoidable as a matter of law. In this regard, while the earmarking doctrine has most frequently been applied to bar preference claims, it has also been extended to bar fraudulent transfer claims where, as here, the debtor had no discretion on how to use the funds that were loaned to it. *See Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*, 188 B.R. 125, 128-29 (D. Vt. 1995) (holding that earmarking defense barred fraudulent transfer claim), *aff'd on other grounds*, *Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*, 97 F.3d 22 (2d Cir. 1996); *In re Eerie World Entm't, L.L.C.,* No. 00-13708, 2006 WL 1288578, at *6 (Bankr. S.D.N.Y. Apr. 28, 2006) (acknowledging that earmarking defense could be extended to fraudulent transfer claims); *see also Northen v. Centennial Healthcare Corp. (In re Oxford Health Investors, LLC.)*, No. 00-80676C-7D, 2002 WL 31031631, at *7 (Bankr. M.D.N.C. Sept. 3, 2002) (holding transfers not avoidable as fraudulent transfers under the earmarking doctrine); *Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*, 374 B.R. 333, 342 (Bankr. S.D. Fla. 2007) (conducting earmarking analysis with respect to fraudulent transfer claims).

PlusFunds equity holders.  The Credit Agreement required Suffolk to "████████████████████████ ████████████████████████████████████████████████████ ████████████" (Firsenbaum Decl. Ex. B § 7.1.6 (emphasis added).)  It further prohibited Suffolk from "████████████████████████████████████████" to acquire the PlusFunds shares.  (*Id.* § 7.2.1.)

Indeed, it was Refco's intent that Suffolk would serve as a mere conduit for the buyout of the PlusFunds shareholders.  As Plaintiff acknowledges, "Suffolk was created to facilitate the purchase of PlusFunds in the PlusFunds Tender Offer" (Compl. at ¶ 30), and as the Credit Agreement recites:  "████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████" which will be "████████████████████" (Firsenbaum Decl. Ex. B at 1.) (emphasis added). Moreover, the Refco Trustee has confirmed Suffolk's purpose as a mere middleman:  "Sugrue created Suffolk-SUG in connection with a scheme by which Refco Capital, an indirect subsidiary of Refco Inc. . . . issued a series of loans totaling more than $200 million to finance the purchase of the outstanding equity of PlusFunds . . ."  (Firsenbaum Decl. Ex. E ¶ 1.)

To ensure that the Refco funds were used solely to pay the Bank Defendants and other shareholders for the PlusFunds shares, the Credit Agreement required the Suffolk Loans to be disbursed to an escrow account established with BONY, as escrow agent, only after Suffolk submitted a "Borrowing Request" for an advance of funds.  (*Id.* §§ 2.3, 5.1.5, 5.1.8, 5.2.4.)  The funds could be released by BONY only with the consent of both Refco and Suffolk, and only upon delivery of the purchased PlusFunds shares, which would be pledged to Refco to secure the

loan.  (*Id.*)  The Stock Purchase Agreements likewise provided for the Bank Defendants and

other shareholders to tender their PlusFunds shares to BONY, as the "Depositary" for the Tender

Offer, in exchange for payment from BONY of the purchase price for such shares.  (Firsenbaum

Decl. Exs. I-K at cover page, 1, ¶¶ 2, 4, 8, 12.)

In short, Suffolk was not permitted to retain Refco Capital's loans for its own use, and

therefore the funds transferred from Refco Capital to the Bank Defendants did not constitute

property of Suffolk.  The fraudulent transfer claims should be dismissed.

## III.  PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS IN COUNTS 1 AND 3 SHOULD BE DISMISSED BECAUSE THE TRANSFERRED FUNDS CONSTITUTE UNAVOIDABLE SETTLEMENT PAYMENTS OR TRANSFERS MADE IN CONNECTION WITH A SECURITIES CONTRACT BY A FINANCIAL INSTITUTION.

Even if the transferred funds at issue were property of Suffolk, Plaintiff's fraudulent

transfer claims (except count 2 under Bankruptcy Code § 548(a)(1)(A)) would be deficient as a

matter of law because they are unavoidable (a) settlement payments or transfers in connection

with a securities contract (b) made by a financial institution.  Section 546(e) of the Bankruptcy

Code exempts such payments from avoidance, either as constructive fraudulent transfers under

Section 548(a)(1)(B) or as either intentional or constructive fraudulent transfers under Section

544.[16]  *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 984-88 (8th Cir. 2009).  Specifically,

_____

[16] The plain language of Section 546(e) creates an exception only for intentional fraudulent conveyance claims "asserted under Section 548(a)(1)(A) of this Title."  11 U.S.C. § 546(e).  Section 546(e) does not provide a similar exception for claims asserted pursuant to Section 544 of the Bankruptcy Code, which is the provision by which Plaintiff asserts his state law avoidance claims in this case.  (Compl. Count III.)  On the contrary, Section 546(e), explicitly states that "the trustee may not avoid a transfer" "[n]otwithstanding section [] 544 of this title."  *Id.* Thus, it is well-established that Section 546(e) bars both intentional and constructive fraudulent transfer claims brought under state law pursuant to Section 544 of the Code.  *Contemporary Indus.*, 564 F.3d at 983-84, 989 (holding that 546(e) barred avoidance claims asserted pursuant to Section 544 of the Bankruptcy Code, which incorporates state fraudulent transfer law, and the Nebraska Uniform Fraudulent Transfer Act); *American Tissue Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 108 (S.D.N.Y. 2004) (noting that Section 546(e) explicitly carves out an exception for transfers covered by Section 548(a)(1)(A), but not state-law claims authorized by Section 544); *Official Comm. of Unsecured Creditors of National Forge Co. v. Clark (In re National Forge Co.)*, 344 B.R. 340, 370 (W.D. Pa. 2006) ("Notably, the Committee cites no authority in support of its argument that, for purposes of applying § 546(e), we should treat its 'actual fraud claim' under the Pennsylvania UFTA as the

Section 546(e) provides:

> Notwithstanding sections 544 . . . [or] 548(a)(1)(B) . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section . . . 741 of this title, made by or to a . . . financial institution, . . . or that is a transfer made by or to . . . a financial institution . . . in connection with a securities contract, as defined in section 741(7) . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. 546(e).[17]  As set forth more fully below, BONY's transfers of funds to the Bank Defendants meet both requirements set forth in Section 546(e): (1) the transfers were settlement payments (or transfers made in connection with a securities contract) (2) made by a financial institution.

### A.    Suffolk's Purchases of PlusFunds Securities Were Settlement Payments or Transfers in Connection with a Securities Contract.

BONY's transfer of funds to the Bank Defendants constitutes a "settlement payment." Consistent with the plain language of the Bankruptcy Code, several courts have concluded that Section 546(e) is "extremely broad" and intended to protect from avoidance most transfers of money made to complete a securities transaction.  *Contemporary Indus.*, 564 F.3d at 985 (holding that payments for privately-held shares are settlement payments); *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849-50 (10th Cir. 1991) (holding that payments made to selling shareholders in the course of a leveraged buyout are settlement payments); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 514-15 (3d Cir. 1999) (same); *Jonas*

---

equivalent of an intentional fraud claim brought under § 548(a)(1)(A).  We have similarly been unable to locate any authority in support of this approach and, in fact, basic principles of statutory construction would seem to militate against it." (internal citation and quotation omitted).  Accordingly, Section 546(e) bars Counts One and Three of the Complaints in their entirety.

[17] The Bankruptcy Code defines each of the key terms found in Section 546(e) broadly.  A "settlement payment" means "a preliminary settlement payment, a partial settlement payment, an interim settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  A "financial institution" includes "a Federal reserve bank, or an entity that is a commercial or savings bank . . ."  *Id.* § 101(22)(A).  And a "securities contract" includes "a contract for the purchase [or] sale . . . of a security," including "stock."  *Id.* §§ 101(49), 741(7).

*v. Resolution Trust Corp. (In re Comark)*, 971 F.2d 322, 326 (9th Cir. 1992) (transfer of securities needed to complete a repo transaction was a settlement payment).

Less than two months ago, a United States Court of Appeals reiterated this rule of law in a similar case involving the transfer of shares other than through a public market. In *Contemporary Industries*, prior to the debtor's bankruptcy, the defendants sold their shares in the debtor's privately-held company to an outside investment group as part of the investment group's leveraged buy-out of the debtor. 564 F.3d at 983. The investors obtained loans to cover the purchase price of the shares, and pledged the debtor's assets to the lenders as collateral. *Id.* To facilitate the acquisition, and pursuant to an escrow agreement, the investors deposited funds with a commercial bank, which transferred the funds to the defendants. *Id.* In exchange, the defendants deposited their shares with the same commercial bank. *Id.* Subsequently, in the debtor's bankruptcy proceedings, the official committee of unsecured creditors of the debtor commenced an adversary proceeding against the defendant, alleging that the payments the defendants had received were fraudulent transfers and that the defendants were unjustly enriched. *Id.*

The Eighth Circuit affirmed the lower courts and held that the investors' payments to the equity holders constituted unavoidable "settlement payments." *Id.* at 985-87. The Eight Circuit reasoned that the term "settlement payment" "encompasses most transfers of money or securities made to complete a securities transaction" and the defendants' sale of the debtor's stock was "exactly" such a transaction. *Id.* at 986.[18]

---

[18] As the Eight Circuit noted, some lower courts have overlooked the plain text of Section 546(e) and relied on legislative history in concluding that a settlement payment does not include payments for privately held securities. *Contemporary Indus.*, 564 F.3d at 985-86. Where, as here, statutory language is plain, "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Id.* at 985, *citing Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004).

This conclusion was consistent with, and explicitly approved, the well-established caselaw in other circuits holding that such payments are unavoidable pursuant to Section 546(e). *Id.*; *see, e.g.*, *Kaiser Steel Corp.*, 913 F.2d at 849-50; *In re Comark*, 971 F.2d at 326; *Brandt v. B.A. Capital Co. LP* (*In re Plassein Int'l Corp.*), 366 B.R. 318, 323-25 (Bankr. D. Del. 2007) (debtor's payments through its bank to shareholders were "settlement payments" where debtor was formed for purpose of acquiring stock in privately held company to be funded by loan secured by assets of acquired companies), *aff'd*, 388 B.R. 46 (D. Del. 2008); *QSI Holdings*, 382 B.R. 731, 741 (W.D. Mich. 2007) (payment to shareholders in exchange for tender of shares in private company were settlement payments); *Official Comm. of Unsecured Creditors of The IT Group, Inc. v. Acres of Diamonds, L.P.* (*In re The IT Group, Inc.*), 359 B.R. 97, 101-02 (Bankr. D. Del. 2006) (holding that Section 546(e) applies with equal force to an LBO of a private company).[19]

Under this authority, BONY's transfers of funds to the Bank Defendants were plainly settlement payments. The Complaint alleges that the funds were transferred to the Bank Defendants pursuant to the Stock Purchase Agreements in exchange for shares of PlusFunds tendered in the PlusFunds Tender Offer. (Compl. ¶¶ 1, 8, 29-32; *see also* Firsenbaum Decl. Exs. I-L, S.) Thus, by definition, the transfer was made to complete a securities transaction. The payment of cash to settle the purchase of shares in a tender offer is among the more common within the securities industry and unavoidable as a matter of law.[20] 11 U.S.C. § 546(e); *see*

---

[19] *See also Loranger Mfg. Corp. v. PNC Bank* (*In re Loranger Mfg. Corp.*), 324 B.R. 575, 586 (Bankr. W.D. Pa. 2005) (same); *In re National Forge Co.*, 344 B.R. 340 (same).

[20] Plaintiff's allegation that the transfer "was not a common transaction in the securities trade and industry" (Compl. ¶ 46.) is a bare conclusory allegation to which no deference is due. *See Ashcroft v. Iqbal*, No. 07-1015, 556 U.S. __, slip. op. at 14 (May 18, 2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.").

*Contemporary Indus.*, 564 F.3d at 987-88; *In re Plassein*, 366 B.R. at 323-25.[21]  Indeed, the 2006

amendment to Section 546(e) (effective in bankruptcy cases commenced after December 12,

2006, and thus in this case) expressly extends Section 546(e)'s protection beyond settlement

payments to *any* "transfer made . . . in connection with a securities contract," indisputably

protecting the transfers at issue here.  11 U.S.C. § 546(e); 5 *Collier on Bankruptcy* ¶ 546.06[2] &

n.14 (15th ed. rev. 2009) (noting "expansion of Section 546(e)'s scope result[ing] from [2006]

amendments").

　　　Plaintiff's own recent briefing with respect to Section 546(e) in the Suffolk bankruptcy

proceedings confirms this.  Plaintiff sought to avoid a transfer of $1.7 million that had been made

to purchase PlusFunds shares from another shareholder, former PlusFunds' CEO and President,

Gabriel Bousbib.  These funds were still held in escrow at BONY at the time of Suffolk's

bankruptcy filing ("Escrow Funds").  (Firsenbaum Decl. Ex. M at 6.)  Bousbib moved for

summary judgment, arguing that the Escrow Funds were unavoidable because they constituted

settlement payments pursuant to Section 546(e).  (*Id.* at 7.)

　　　In opposing Bousbib's motion, Plaintiff acknowledged that "the plain language of

Section 546(e) indicates that 'a transfer or [sic] cash or securities made to *complete* a securities

transaction' is a non-avoidable settlement payment."  (*Id.* at 9, *citing In re Resorts*, 181 F.3d at

---

[21]  This Court's holding in *American Tissue Inc. v. DLJ*, 351 F. Supp. 2d 79 (S.D.N.Y. 2004), is not to the contrary.  There, the Court held, on independent grounds, that the plaintiff had adequately alleged a claim for an actual fraudulent conveyance and thus fact issues remained regarding whether the Section 548(a)(1)(A) carveout in Section 546(e) applied to the transfers at issue.  As explained in Section IV, *supra*, Plaintiff has failed to adequately allege a claim for an actual fraudulent conveyance.  Moreover, the facts in *American Tissue* are easily distinguishable from those present here.  There, the debtor transferred funds to DLJ pursuant to a negotiated contract to buy back certain warrants that the debtor had issued to DLJ in a one-off deal between the debtor and a single transferee – DLJ.  *Id.* at 107.  Here, in contrast, Suffolk made a general tender offer to at least 93 of PlusFunds' remaining shareholders, including the Bank Defendants, in a prototypical transaction in the securities markets, which Section 546(e) was designed to promote.  Reversing 93 settled securities transactions (or more) involving hundreds of millions of dollars could threaten disruption to the financial markets, which is why Congress evidently "thought it prudent to extend protection to payments such as these."  *Contemporary Indus.*, 564 F.3d at 987.  Moreover, unlike the present case, *American Tissue* involved the less-expansive, pre-2006 version of Section 546(e).

515) (emphasis in original).  Plaintiff further acknowledged that in the leading Third Circuit

case, *In re Resorts*, the "buyer [had] wired funds to the transfer bank, which then forwarded them

to the seller's broker who paid the seller," and that the Third Circuit held such a transaction was

a settlement payment.  (*Id.* at 10.)  But Plaintiff attempted to distinguish the Escrow Funds from

the transferred funds at issue in *In re Resorts* on the ground that the Escrow Funds had not yet

been transferred to Bousbib, and therefore, the transaction had not been *completed*.  (*Id.*)

Whatever the merits of that distinction might be, here, in contrast, BONY transferred the

funds at issue to the Bank Defendants pre-petition and the securities transactions have

unquestionably been completed.  (Compl. ¶ 76 ("[t]he Defendant has unjustly retained the

benefit of the Fraudulent Transfer"); ¶ 77 ("the conveyance of the Tender Amount by Suffolk to

the Defendant stripped Suffolk of virtually all [of its] assets.").  Indeed, if the funds had not been

transferred to the Bank Defendants, there would be no basis to for the Trustee to seek to recover

those funds from the Bank Defendants.  *See* 11 U.S.C. § 550(a).  Thus, Plaintiff's

acknowledgment that the transaction at issue in *In re Resorts* was a settlement payment amounts

to a concession that the analogous transaction at issue here is entitled to the same protection

under Section 546(e).[22]

### B.  The Settlement Payments Were Made By a Financial Institution.

Suffolk's settlement payments to the Bank Defendants were "made by . . . a financial

institution" – BONY – thus also satisfying the second prong of Section 546(e).  *In re Resorts*,

---

[22] Because the Trustee cannot distinguish *In re Resorts* on its facts, his argument will presumably be that it is not controlling in this Circuit.  But Second Circuit law is not to the contrary, and the Trustee's blatant forum shopping should not be rewarded.  As Plaintiff acknowledges, the Suffolk bankruptcy proceedings are pending in the Delaware Bankruptcy Court.  (Compl. ¶ 23.)  And the Delaware Bankruptcy Court  has already presided over a related fraudulent conveyance action filed by Plaintiff against Mr. Bousbib concerning the Suffolk Loans. (Firsenbaum Decl. Exs. M, T.)  Plaintiff could have filed these actions in bankruptcy or district court in Delaware, the jurisdiction where both Suffolk and PlusFunds were incorporated and where related actions have been filed. (Compl. ¶¶ 25-26; Firsenbaum Decl. Exs. E, N-O.)  While the Court is not obligated to apply Third Circuit precedent, under the circumstances, there is no legal or equitable reason for this Court to reject *In re Resorts*.

181 F.3d at 516 (payments made through debtor's bank to shareholders were "settlement payments"); *In re Plassein*, 366 B.R. at 323-25 (same); *In re Loranger*, 324 B.R. at 585-86 (same).  The documents referenced in the Complaint make clear that BONY transferred the funds at issue to the Bank Defendants.  The Credit Agreement indicates that BONY held the funds in escrow for payment to the sellers of PlusFunds securities (including the Bank Defendants).  (Firsenbaum Decl. Ex. B §§ 2.3, 5.2.4.)  Similarly, the Stock Purchase Agreements provided that BONY was "███████████████████████████████████████████████████ ████████████████████████"  (Firsenbaum Decl. Exs. I-K  at cover page, 1, ¶¶ 2, 4, 8, 12.)  Moreover, pursuant to the Stock Purchase Agreements, the Bank Defendants received their payments directly from BONY.  (Firsenbaum Decl. Exs. L, S.)[23]

This fact is dispositive.  It cannot be disputed – the Court can take judicial notice – that BONY, a commercial bank, is a "financial institution" within the meaning of Section 546(e).  *See* 11 U.S.C. § 101(22); *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006) (taking judicial notice that Chase Manhattan Bank was a financial institution for purposes of Section 546(e)).

The instant facts are nearly identical to those in *Contemporary Industries*, where the Eighth Circuit held that Section 546(e) barred the plaintiff's avoidance claims.  *See* 564 F.3d at 983, 985-87.  In both instances, the purchaser set up an escrow account at a commercial bank in connection with the debtor's purchase of privately-held securities from the defendant, deposited funds into the escrow account, and authorized the commercial bank to distribute funds to the defendant in exchange for the securities at issue.  The Eighth Circuit concluded that such a

---

[23]  That BONY was acting as an escrow agent, and did not itself obtain a beneficial interest in the funds, is irrelevant for purposes of Section 546(e).  *See, e.g., In re Resorts*, 181 F.3d at 516.  The plain language of Section 546(e) does not require that the financial institution making the payment be the equitable owner of the funds, as several courts have recognized.  *See id.*; *see also Contemporary Indus.*, 564 F.3d at 986-87; *Kaiser Steel*, 913 F.2d at 847-48, 850; *In re Plassein*, 366 B.R. at 323-25.

transaction was a settlement payment by a financial institution.  This Court should do the same. Section 546(e) bars Plaintiff's fraudulent transfer claims in counts 1 and 3.

## IV.   PLAINTIFF'S INTENTIONAL FRAUDULENT TRANSFER CLAIMS IN COUNTS 2 AND 3 SHOULD BE DISMISSED BECAUSE THEY FAIL TO SATISFY THE HEIGHTENED PLEADING REQUIREMENTS SET FORTH IN FEDERAL RULE OF CIVIL PROCEDURE 9(B).

Plaintiff's intentional fraudulent transfer claims also fail because they were not pled with particularity pursuant to the heightened pleading requirements of Rule 9(b) of the Federal Rules. It is well-established that those requirements apply to intentional (as distinguished from constructive) fraudulent transfer claims.  *See Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (affirming dismissal of intentional fraudulent transfer claims where trustee inadequately alleged fraud with respect to the transaction that it sought to void); *Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp. 2d 509, 518 (W.D.N.Y. 2007) (dismissing fraudulent conveyance claim where plaintiffs failed to allege the underlying fraud with sufficient particularity); *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395-97 (Bankr. S.D.N.Y. 2007) (same).[24]  Although courts take a more liberal view when examining allegations of actual fraud that are pled by a bankruptcy trustee who was not involved in the underlying transaction, the trustee must still plead with some particularity the fraud with respect to the particular transaction it seeks to avoid.  *See In re Sharp*, 403 F.3d at 56.  The Plaintiff here has failed to do so.

---

[24]   *See also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 241 (S.D.N.Y. 2006) (fraudulent conveyance claim subject to Rule 9(b)); *Pereira v. BMA Ltd. P'ship (In re Trace Int'l Holdings, Inc.)*, 289 B.R. 548, 556-57 (Bankr. S.D.N.Y. 2003) (fraudulent conveyance claim under N.Y. Debt. & Cred. Law § 276 subject to Rule 9(b)).

### A. Plaintiff's State Law Claim Fails Because He Has Not Adequately Alleged the Bank Defendants' Fraudulent Intent.

Rule 9(b) requires the dismissal of Plaintiff's intentional fraudulent transfer claim pursuant to N.Y. D.C.L. Section 270 *et seq*. Unlike Section 548 of the Bankruptcy Code, which focuses exclusively on the transferor's intent, several courts have construed Section 276 of New York's Debtor and Creditor Law to require the trustee to allege with particularity both the transferor's *and* the transferee's actual fraudulent intent. *In re MarketXT*, 361 B.R. at 396; *Picard v. Taylor (In re Park S. Sec., LLC.)*, 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005).[25] In any event, as the Supreme Court's recent decision in *Ashcroft v. Iqbal*, No. 07-1015, 556 U.S. __, slip. op. (May 18, 2009), makes clear, even Federal Rule 8 (which imposes less stringent pleading requirements than Rule 9(b)) "asks for more than a sheer possibility that a defendant has acted unlawfully" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclus[ions] . . . , do not suffice [to] . . . unlock the doors of discovery . . . ." *Id.* at 14.

Here, Plaintiff fails to meet Rule 8's pleading requirements, let alone Rule 9(b)'s heightened standard. Plaintiff merely alleges in conclusory fashion that "[a]s was known by Defendant[s] at the time, . . . the PlusFunds Shares were worth far less than the amount paid to Defendant[s] by Suffolk . . ." (Compl. ¶ 1.) But Refco itself apparently believed that the same PlusFunds shares had greater value than the purchase price it financed, since Refco specified that the Suffolk Loans could not exceed 80% of the value of the pledged collateral. (Firsenbaum Decl. Ex. D at 1.) Moreover, Plaintiff's allegations regarding the parties that supposedly acted

---

[25] To be sure, there is contrary authority. *See, e.g., Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 826-27 (Bankr. S.D.N.Y. 2008) (Hardin J.) (citing cases) (holding that only the transferor's intent is relevant under Section 276 of New York's Debtor and Creditor Law ("DCL"). But Judge Hardin recognized that many courts have concluded that Section 276 of the DCL requires proof of both the transferor's and transferee's fraudulent intent. *Id.* at 827 n. 5 (citing *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 276 (Bankr. S.D.N.Y. 2007); *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 396 (Bankr. S.D.N.Y. 2007); *Picard v. Taylor (In re Park S. Secs., LLC)*, 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002)).

with fraudulent intent are, at best, ambiguous.  (*See* Compl. ¶ 44 ("[a]t all relevant times, Defendant *and/or* Suffolk had actual knowledge regarding the unlawful nature of the Fraudulent Transfer"); ¶ 57 ("Defendant acted in willful *ignorance* of Suffolk's fraudulent purpose"); ¶ 70 ("[u]pon information and belief, the Fraudulent Transfer was made with actual intent by Suffolk *and/or* the Defendant to hinder, delay or defraud present and/or future creditors of Suffolk") (emphasis added).)  These allegations do not even identify in conclusory fashion which parties – Suffolk, the Bank Defendants or both – supposedly acted with the intent of defrauding Suffolk's creditors.

Plaintiff also makes the same entirely-conclusory allegation regarding the defendants' knowledge of the value of the PlusFunds shares in each of his 90 complaints against other defendants.  Plaintiff's state law claim against the Bank Defendants cannot survive on such a slim reed.  *See Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) (When "the complaint accuses *all* of the defendants of having violated . . . [a] statutory provision[] . . . a series of 12(b)(6) motions to dismiss would lie to permit each particular defendant to eliminate those causes of action as to which no set of facts has been identified that support a claim against *him*.") (emphasis added); *Burke*, 522 F. Supp. 2d at 517 ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.") (internal citation and quotation omitted).[26]

---

[26] *See also Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (explaining that Rule 9(b) "require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud"); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement"); *Sedona Corp. v. Landenburg Thalmann & Co., Inc.*, No 03 Civ. 3120, 2005 WL 1902780, at *12 (S.D.N.Y. Aug. 9, 2005) (" . . . allegations of . . .  lumped-together accusations of wrongdoing by undifferentiated groups of defendants, is [not] sufficient to satisfy Rule 9(b)"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91

### B. Plaintiff Fails to Adequately Allege an Intentional Fraudulent Conveyance Pursuant to New York Law and the Bankruptcy Code Because He Inadequately Alleges Suffolk's Fraudulent Intent.

Even if the Bank Defendants' intent were irrelevant, Plaintiff's intentional fraudulent transfer claims under the DCL and Bankruptcy Code Section 548 would still be deficient. To establish the requisite fraudulent intent by the transferor (Suffolk), Plaintiff must adequately allege the underlying fraud on which he bases his intentional fraudulent transfer claims with sufficient particularity. *See In re Sharp*, 403 F.3d at 56.

Plaintiff fails to do so. Although Plaintiff incorporates allegations from the SPhinX Complaint regarding the ongoing fraud at Refco, PlusFunds, and SPhinX, and the fraudulent nature of the Suffolk Loans, his allegations include no detail regarding the purported fraud underlying the purchase of PlusFunds securities from the Bank Defendants, or how such a purchase was intended to defraud Suffolk's only creditor, Refco. *See In re Sharp*, 403 F.3d at 56 ("the intentional fraudulent conveyance claims fail[] for the independent reason that Sharp inadequately alleges fraud with respect to the transaction that Sharp seeks to void . . . The fraud alleged in the complaint related to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street.")

Here, Plaintiff does not and cannot plead facts suggesting that any creditor of Suffolk was defrauded. Suffolk was not an operating business entity; it was created for the sole purpose of obtaining PlusFunds equity using the Suffolk Loans. (Compl. ¶¶ 25, 30.) Accordingly, Suffolk's only alleged non-contingent liquidated creditor is the Refco Trustee – the individual who stands in the shoes of the entity (Refco) that, with Suffolk, devised the scheme to buy out the interests of third-parties in PlusFunds. (Compl. ¶¶ 11, 15-17; SPhinX Compl. ¶¶ 310-25.)

Civ. 2923, 1994 WL 88129, at *7 (S.D.N.Y. Mar. 15, 1994) ("Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b).").

Plainly, Refco was not defrauded. On the contrary, the Complaint makes clear that Suffolk was colluding with – not defrauding – Refco. (*See id.*)

This is fatal. Section 548 permits the avoidance only of a transfer made with "*actual intent to hinder, delay, or defraud* any entity to which the debtor was or became . . . *indebted*." 11 U.S.C. § 548(a)(1)(A); *see In re MarketXT*, 361 B.R. at 395 (Section 548 allows a trustee to "avoid transfers of a debtor's interest in property made with actual intent to hinder, delay or defraud *creditors*.") (emphasis added); *see also* N.Y. DEBTOR AND CREDITOR LAW § 276 (2005) ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future *creditors*, is fraudulent as to both present and future *creditors*.") (emphasis added).

Accordingly, the Trustee's intentional fraudulent transfer claims fail.

## V.     PLAINTIFF'S UNJUST ENRICHMENT CLAIM FAILS.

### A.     The Bankruptcy Code Preempts Plaintiff's Unjust Enrichment Claim.

Because Plaintiff pleads avoidance claims under the Bankruptcy Code, Plaintiff's additional, state-law unjust enrichment claim is preempted. Avoidance claims, like those here, that fail to satisfy the requisite standards set forth in the Bankruptcy Code cannot simply be repled under the state law of unjust enrichment. Here, Plaintiff's unjust enrichment claim attempts to accomplish this very feat – he re-labels his avoidance claims based on *the same* alleged conduct as unjust enrichment. Plaintiff's attempt to circumvent the Bankruptcy Code is improper because the transfers on which he bases his state law claim are expressly governed by, and inextricably linked with, federal law.

Under the Supremacy Clause of the United States Constitution, state laws that interfere with or are contrary to federal law are preempted. U.S. Const. Art. VI, § 2. "[F]ederal law trumps state law 'where state law stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress.'"  *Contemporary Indus.*, 564 F.3d at 988 (holding

unjust enrichment claim preempted by Section 546(e)) (internal citation omitted).

Congress may preempt state law either explicitly, by including a statement in the

language of a statute expressly displacing state law, *see, e.g., Shaw v. Delta Air Lines, Inc.*, 463

U.S. 85 (1983), or implicitly, by establishing a scheme of federal regulation that is "so pervasive

as to make reasonable the inference that Congress left no room for the States to supplement it."

*Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (plurality) (internal citations

omitted).  "[W]here the federal government, in the exercise of its superior authority in [a

particular] field, has enacted a complete scheme of regulation and has therein provided a

standard for [that field], states cannot, inconsistently with the purposes of Congress, conflict or

interfere with, curtail or complement, the federal law, or enforce additional or auxiliary

regulations."  *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941).  Preemption is especially likely in

areas that traditionally are of national interest and for which there is a need for nationwide

uniformity.  *See, e.g., id.* at 67-68, 72.

The federal character and need for national uniformity of the bankruptcy laws is clear.

Article I of the United States Constitution provides that "The Congress shall have Power . . .  To

establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S.

Const. Art. I, § 8, cl. 4.  Thirty years after Congress passed the first modern national bankruptcy

legislation, the Bankruptcy Act of 1898, the Supreme Court explained the preemptive effect of

that statute:

> In respect of bankruptcies the intention of Congress is plain.  The
> national purpose to establish uniformity necessarily excludes state
> regulation. . . .  Intolerable inconsistencies and confusion would
> result if [state] law be given effect while the national [A]ct is in
> force. . . .  *States may not pass or enforce laws to interfere with or*

> complement the Bankruptcy Act or to provide additional or
> auxiliary regulations.

*Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929) (emphasis added).

The Bankruptcy Code's remedial scheme is intricate and comprehensive, particularly with respect to fraudulent transfers.  Less than two months ago, the Eighth Circuit held that a claim for unjust enrichment is preempted by the Bankruptcy Code where it seeks to recover the same payments that are unavoidable as fraudulent transfers under the Code.  *Contemporary Indus.*, 564 F.3d at 988.  After concluding that the payments at issue could not be avoided under the Bankruptcy Code's fraudulent transfer provisions in light of the exemption provided by Section 546(e), the Eighth Circuit held that the plaintiff's unjust enrichment claim was deficient as well: "[a]llowing recovery on the[] [unjust enrichment] claim[] would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."  *Id.*

This holding is consistent with prior holdings of other Courts of Appeals and at least one district court in the Second Circuit.  *See Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000) (holding that Bankruptcy Code preempted unjust enrichment claim because "federal statutory scheme is so pervasive that Congress clearly intended to 'occupy the field' to the exclusion of state law."); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 426 (6th Cir. 2000) (same); *Diamante v. Solomon & Solomon, P.C.*, No. 99 Civ. 1339, 2001 WL 1217226, at *3 (N.D.N.Y. Sept. 18, 2001) (same).[27]  As these courts have recognized, the Bankruptcy Code already contains both substantive standards for fraudulent transfer claims as well as remedies available to debtors in those cases in which these standards are satisfied.

---

[27]  Other district courts have reached the same conclusion.  *E.g.*, *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Delaware Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Delaware)*, 274 B.R. 71, 95-98 (D. Del. 2002); *Cox v. Zale Del., Inc.*, 242 B.R. 444, 450 (N.D. Ill. 1999); *Pereira v. First N. Am. Nat'l Bank*, 223 B.R. 28, 31-32 (D. Ga. 1998);. *Reyes v. FCC Nat'l Bank (In re Reyes)*, 238 B.R. 507, 513 (Bankr. D.R.I. 1999).

These cases are directly on-point here.  The principal conduct for which Plaintiff seeks

redress under state law – Suffolk's pre-petition transfer of funds to the Bank Defendants – is

expressly addressed by the Bankruptcy Code. 11 U.S.C. §§ 548, 550.  The Bankruptcy Code

provides, subject to the limitations set forth in Section 546, for the avoidance of a transfer made

either with actual intent to hinder, delay, or defraud, 11 U.S.C. § 548(a)(1)(A), or where the

debtor received less than a reasonably equivalent value in exchange for such transfer and one of

several other conditions have been met, *id.* § 548(a)(1)(B).  Plaintiff seeks the recovery as

"unjust enrichment" of the same payments that it seeks to avoid under the Code.  (Compl. ¶ 74)

("The transfer of the valueless PlusFunds Shares by the Defendant in exchange for the Tender

Amount by Suffolk constituted an unjust enrichment").  To ask whether such funds were

improperly transferred is to ask whether there was a fraudulent transfer.  The Bankruptcy Code

more than adequately provides the standards for answering that very question.  Plaintiffs' unjust

enrichment claim is preempted and should be dismissed.

## B.     Plaintiff's Unjust Enrichment Claim Fails Because It Is Based on the Existence of a Valid and Enforceable Written Contract.

Even if Plaintiff's theory of unjust enrichment were not preempted by the Bankruptcy

Code, it would still be deficient as a matter of law.  New York law recognizes the equitable

remedy of unjust enrichment to "create an obligation in the *absence* of an agreement."  *Stevenson*

*v. Bank of New York Co., Inc.*, No. 06 Civ. 04268, 2009 WL 919442, at *9 (S.D.N.Y. Mar. 26,

2009) (citing *Goldman v. Metropolitan Life Insurance Company,* 5 N.Y.3d 561, 571 (N.Y.

2005)) (emphasis added).  Since unjust enrichment is an equitable claim, "[t]he existence of a

valid and enforceable written contract governing a particular subject matter" precludes recovery.

*Clark-Fitzpatrick, Inc. v. Long Island Railroad Co.,* 70 N.Y.2d 382, 388 (N.Y. 1987); *see*

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 312 (S.D.N.Y. 1998)

("The law is clear that the payments made pursuant to the express terms of a contract cannot be recovered via unjust enrichment theory.").

Plaintiff's claim fails here because it is based on the existence of a valid and enforceable written contract. Plaintiff alleges that "the transfer of the [] PlusFunds Shares by [the Bank Defendants] in exchange for the Tender Amount by Suffolk constituted unjust enrichment. (Compl. ¶ 74.) Yet, Plaintiff concedes that the transfer was made "[p]ursuant to the PlusFunds Stock Purchase Agreement[s] by and between [the Bank] Defendant[s] and Suffolk, dated March 29, 2005." (Compl. ¶ 29.) Because the Bank Defendants' sales of the securities, and Suffolk's payment therefore, were governed by the Stock Purchase Agreements, Plaintiff's claim fails as a matter of law. *See Granite Partners, L.P.,* 17 F. Supp. 2d at 311 ("Here, the complaint represents that the transactions . . . were governed by written agreements. Because both the sale of the securities to the Funds and the liquidation of those securities were done pursuant to contracts . . . the unjust enrichment claim may not lie.").

### C.   Plaintiff's Unjust Enrichment Claim Fails Because Plaintiff Has an Adequate Remedy at Law.

It is well settled that unjust enrichment is an equitable doctrine. *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997). Generally, a court will not permit a claim in equity if there is an adequate remedy at law. *See Bongat v. Fairview Nursing Care Ctr., Inc.,* 341 F. Supp. 2d 181, 189 (E.D.N.Y. 2004) (dismissing claim of unjust enrichment under New York law because plaintiff had viable claims at law). If, as Plaintiff alleges, the Bank Defendants were truly "enriched by the Fraudulent Transfer" (Compl. ¶ 73), then Plaintiff has an adequate remedy at law – namely, a cause of action for a fraudulent transfer. *See G*ranfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 49 (1989) (holding that fraudulent transfer claims are legal causes of action). That Plaintiff cannot adequately allege the requisite elements of a fraudulent transfer

claim does not mean that he is entitled to recover on a theory of unjust enrichment – it means that his claim must be dismissed. *See Enron Energy Services, Inc. v. Columbia Gas Transmission Corp. (In re Enron Corp.)*, No. 05-01087, 2006 WL 2400082, at *5 (Bankr. S.D.N.Y. June 15, 2006) (dismissing plaintiff's unjust enrichment claim on the grounds that plaintiff could not avail itself of the Bankruptcy Code's avoidance provisions under Section 549).

**D.      Plaintiff's Unjust Enrichment Claim Should be Denied as a Matter of Equity.**

Finally, Plaintiff's equitable claim of unjust enrichment should also be dismissed because granting Plaintiff relief would be anything but equitable. *See Stevenson*, 2009 WL 919442, at *9 ("To state a viable claim for unjust enrichment, plaintiff must allege facts demonstrating that the defendants benefitted at his expense *and that equity and good conscience require that plaintiffs' receive restitution*.") (emphasis added); *Kidz Cloz, Inc. v. Officially for Kids, Inc.,* 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (same). For the reasons set forth above, the equitable remedy of unjust enrichment is unjustified here, where Plaintiff brings this action on behalf of an entity wholly-owned and controlled by admitted wrongdoers (Suffolk), and for the sole benefit of another entity wholly-owned and controlled by admitted wrongdoers (Refco). The principles of equity and good conscience are not violated where the Bank Defendants did nothing more than receive payments to which they were legally entitled pursuant to a contract with Suffolk - the Stock Purchase Agreements. On the contrary, it would violate the principles of equity and good conscience to allow Plaintiff to recover on behalf of Suffolk and for the benefit of Refco, each of whom caused their own demise, at the expense of third parties, such as the Bank Defendants.

## VI. PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE HE HAS NOT SERVED THE BANK DEFENDANTS WITH THE SUMMONS AND COMPLAINT IN ACCORDANCE WITH FEDERAL RULE OF CIVIL PROCEDURE 4 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 7004.

Finally, Plaintiff has not properly served the Bank Defendants with the summons and Complaint and, therefore, his claims should be dismissed. Plaintiff served the Bank Defendants by first-class mail (Firsenbaum Decl. Exs. P-R) – a method of service that is not permitted by the Federal Rules. *See* Fed. R. Civ. P. 4. Although Rule 7004 of the Bankruptcy Rules permits service by first-class mail, that rule is inapplicable in actions filed in District Court, such as these. Moreover, even if it were applicable, it requires that service be effected within 10 days after issuance of the summons. *See* Fed. R. Bankr. P. 7004(e). Specifically, if service is by mail, the summons and complaint must be mailed within 10 days after the summons is issued. *See id.*

Here, Plaintiff obtained a summons against each of the Bank Defendants on March 13, 2009. He placed each summons in the mail on April 2, eleven days after the 10-day deadline for service had expired. (Firsenbaum Decl. Exs. P-R.) Moreover, the summons directed to Lab Morgan was sent to an address at which neither Lab Morgan nor any affiliate, parent, or subsidiary is located. (Declaration of Michael O'Connor, dated June 3, 2009, ¶ 3.). Accordingly, the Bank Defendants have not properly been served. Plaintiff's claims against the Bank Defendants should be dismissed. *See* Fed. R. Civ. P. 4(m); *Savage & Assocs., P.C. v. Williams Commc'ns (In re Teligent Services, Inc.)*, 372 B.R. 594 (S.D.N.Y. 2007) (estate representative failed to establish "good cause" for not serving recipient of alleged preferential transfers until many months after filing its avoidance complaint).

## VII. PLAINTIFF SHOULD NOT BE GRANTED LEAVE TO REPLEAD.

Plaintiff's claims are deficient as a matter of law, and granting Plaintiff leave to replead his claims would be futile. In *Kirschner*, this Court denied the Refco Trustee's request for leave

to replead because "the Trustee's own complaint, [] both on its face and after close examination, document[ed] in detail how Refco participated in, and [] benefitted from, the very fraudulent acts on which the Trustee [sought] to sue." *Kirschner*, 2009 WL 996417, at *10. Plaintiff's purported claims suffer from the same defect – he seeks recovery on behalf of Suffolk and for the benefit of Refco – two entities who, by the Trustee's own admission, participated in, and benefitted from, the very acts on which Plaintiff purports to base his claims. Moreover, Plaintiff's claims are undermined by the explicit text of the Credit Agreement, the Stock Purchase Agreements, and the Bankruptcy Code. Additional pleading will not lead to a different result.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Dated:    June 8, 2009                              Respectfully Submitted,

                                        WILMER CUTLER PICKERING
                                          HALE AND DORR LLP

                                        By: /s/  Philip D. Anker_____
                                           Philip D. Anker
                                           Joel W. Millar
                                           Ross E. Firsenbaum
                                           Benjamin W. Loveland

                                           399 Park Avenue
                                           New York, New York 10022
                                           Tel.: (212)-230-8800
                                           Fax: (212)-230-8888
                                           *Attorneys for Defendants Credit Suisse*
                                           *First Boston Next Fund, Inc.; Lab Morgan*
                                           *Corporation; and ML IBK*
                                           *Positions, Inc.*