David J. Molton (DM-1106)
Andrew Dash (AD-7913)
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800

Leo R. Beus *pro hac vice*
Dennis K. Blackhurst *pro hac vice*
**BEUS GILBERT PLLC**
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona 85251
Telephone: (480) 429-3000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re REFCO INC. SECURITIES LITIGATION : Case No. 07-md-1902 (GEL)

---

This Document Relates to:

---

KENNETH M. KRYS, *et al.*,

Plaintiffs,

-against-

CHRISTOPHER SUGRUE, *et al.*,

Defendants.

Case No. 08-cv-3065 (GEL)
Case No. 08-cv-3086 (GEL)

ECF Case

**PLAINTIFFS' OMNIBUS SURREPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO MOTIONS TO DISMISS**

ORAL ARGUMENT REQUESTED

---

KENNETH M. KRYS, *et al.*,

Plaintiffs,

-against-

ROBERT AARON, *et al.*,

Defendants.

Case No. 08-cv-7416 (GEL)

ECF Case

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................................ ii

ARGUMENT ...............................................................................................................................1

    1.    *Kirschner* Is Factually Distinguishable From The Instant Case ..............................1

    2.    The Purported Existence Of Any "Corporate Benefit" From The Insiders' Misconduct Does Not Work A *Per Se* Bar Of The "Adverse Interest" Exception ............................................................................3

    3.    The Purported "Corporate Benefit" Cited By Defendants Is Legally Irrelevant To The Application Of The "Adverse Interest" Exception ..................................................................................................................5

CONCLUSION ..........................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allen v. Wright*,
  468 U.S. 737 (1984) ............................................................................................................ 7

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004) .................................................................................... 7

*Bankr. Servs., Inc., v. Ernst & Young. (In re CBI Holding Co.)*,
  529 F.3d 432 (2d Cir. 2008),
  *cert. denied*, 129 S. Ct. 1998 (2009) ......................................................................... 4, 5, 6, 9

*CEPA Consulting, Inc. v. Hurdman (In re Wedtech Sec. Litig.)*,
  138 B.R. 5 (S.D.N.Y. 1992) ................................................................................................. 4

*Cobalt Multifamily Investors I, LLC v. Shapiro*,
  No. 06 Civ. 6468, 2008 WL 833237 (S.D.N.Y. Mar. 28, 2008) ...................................... 3, 4

*Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co.)*,
  318 B.R. 761 (S.D.N.Y. 2004) ............................................................................................. 4

*Kirschner v. Grant Thornton LLP*,
  No. 07 Civ. 11604 (GEL), 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009) .......................... *passim*

*Oppenheimer-Palmieri Fund, L.P. v. Peat Marwick Main & Co.*
  *(In re Crazy Eddie Sec. Litig.)*,
  802 F. Supp. 804 (E.D.N.Y. 1992) ............................................................................... 4, 5, 6

*Simmons v. Kelly*,
  No. 06 Civ. 6183, 2009 WL 857410, at *6 (S.D.N.Y. Mar. 31, 2009) ................................. 8

**State Cases**

*Bullmore v. Ernst & Young Cayman Islands*,
  20 Misc. 3d 667, 861 N.Y.S.2d 578 (Sup. Ct. N.Y. Cty. 2008) ........................................... 7

*Capital Wireless Corp. v. Deloitte & Touche*,
  216 A.D.2d 663, 627 N.Y.S.2d 794 (3d Dep't 1995) ........................................................ 4, 5, 6

**Statutes and Rules**

17 C.F.R. § 1.25(a) (Apr. 1, 2003) ............................................................................................ 6

Plaintiffs Kenneth M. Krys and Christopher Stride, as Joint Official Liquidators of the SPhinX Funds and as assignees of claims assigned by SPhinX investors, and James P. Sinclair, as Trustee of the SPhinX Trust (collectively, "Plaintiffs"), pursuant to the order of this Court dated June 22, 2009, respectfully submit this surreply memorandum of law in further opposition to certain motions to dismiss currently pending in the above-captioned consolidated actions. Plaintiffs address herein the arguments of certain Defendants regarding *Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604 (GEL), 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009).

## ARGUMENT

Plaintiffs have standing to bring their claims, notwithstanding Defendants' arguments that the *Wagoner* rule applies. This Court's *Kirschner* opinion compels no different conclusion. *First*, the *Kirschner* decision – which was based on complaint allegations detailing enormous benefits inuring to *Refco* a result of its insiders' fraud – is inapposite to the SPhinX actions, where the wrongdoers' actions did not benefit, and in fact irredeemably harmed, SPhinX. *Second*, Defendants' position that the mere existence of *any* perceived corporate benefit resulting from insider misfeasance operates as a bar to the application of the "adverse interest" exception to the *Wagoner* rule misreads *Kirschner* and the law upon which it relies. *Third*, even if the existence of any such benefit did bar the "adverse interest" exception (and it does not), that bar would not apply here because any "benefits" inuring to SPhinX were, under the applicable legal standards, illusory, attenuated from the subject misfeasance or otherwise irrelevant.

1. *Kirschner* **Is Factually Distinguishable From The Instant Case**

As this Court noted, "[t]he [Kirschner] complaint is saturated by allegations that Refco received substantial benefits from the insiders' wrongdoing." *Kirschner*, at \*6. *Kirschner* is distinguishable from, and inapplicable to, the instant case on this basis alone.

In *Kirschner*, this Court found that the Trustee had alleged that "the improper round-trip

loans and the misappropriation of customer assets at RCM were designed to, and did, in fact, buttress Refco's organization . . . . [T]he insiders' conduct enabled the false reporting of the company's steady growth, which in turn, attracted and retained capital from investors in the LBO and the IPO." *Id*. at *6. In light of these allegations, the adverse interest exception could not apply in *Kirschner* because:

> The fate of the insiders far from being at odds with the interests of Refco *qua* Refco – . . . remained aligned with those of the corporate entity. However reprehensible the conduct of the insiders . . . [t]he fraud here produced an influx of cash to the company, not an outflow, and the benefit procured by the insiders came at the expense of the securities purchasers, not of Refco itself.

*Id*. at *9.

This Court thus noted that "the gravamen of the Trustee's allegations is not that the subject insiders stole assets *from* Refco, but rather that the insiders' fraudulent scheme was to steal *for* Refco." *Id*. at *6. Here, by contrast, the Amended Complaints allege that the insiders *acted adversely to the interests of SPhinX and PlusFunds* – allowing SMFF cash wrongfully to be appropriated, misused and put at risk *for Refco's benefit*, resulting in no benefit to SPhinX or PlusFunds. *See* Am. Sugrue Compl. ¶¶ 21, 38-40, 173, 197-98; Am. Aaron Compl. ¶¶ 5, 33-43, 129, 133, 135-36, 157-58, 250. The Amended Complaints further allege that the insiders were acting entirely in their own interests when they allowed SMFF excess cash to be moved to RCM, where it was commingled with RCM's own cash, in direct contravention of the segregation requirements of SPhinX's offering memoranda, account opening documents, and CFTC regulations. *See* Am. Sugrue Compl. ¶¶ 5, 38-40, 177-78; Am. Aaron Compl. ¶¶ 4, 134, 250, 338. Simply put, SMFF cash was looted to benefit Refco. The detailed allegations in the Amended Complaints would have to be wholly disregarded to conclude that this improper transfer and commingling of SPhinX cash was done to benefit, or in fact benefited, SPhinX in

2

any manner. The Amended Complaints are bereft of the allegations of "substantial corporate benefit" that characterized the *Kirschner* complaint and precluded application of the "adverse interest" exception to the Refco Trustee's claims.[1]

## 2. The Purported Existence Of Any "Corporate Benefit" From The Insiders' Misconduct Does Not Work A *Per Se* Bar Of The "Adverse Interest" Exception

As this Court recognized, the "adverse-interest" exception to the *Wagoner* rule requires the unfaithful insiders to have "totally abandoned" the interests of the corporation. *Kirschner*, at *6. Defendants appear to claim that the existence of *any* purported short-term benefit accruing to SPhinX – even one not springing directly and proximately from the insiders' misconduct – precludes a finding that the insiders "totally abandoned" the interests of the corporation, thus barring application of the "adverse interest" exception. *See*, *e.g.*, Defendants' Omnibus Reply Mem. at 11-13. Defendants misread both *Kirschner* and the New York law upon which it relies.

As *Kirschner* notes, "[a]t least one court in this district has found that, under New York law, 'where a corporation benefits to *any* extent from the fraudulent acts of its agents, the agents cannot be said to have 'totally abandoned' the interests of the corporation.'" *Kirschner*, at *6 (citing *Cobalt Multifamily Investors I, LLC v. Shapiro*, No. 06 Civ. 6468, 2008 WL 833237, at *4 n.10 (S.D.N.Y. Mar. 28, 2008)). But *Cobalt* – which, in any event, is not binding precedent –

---

[1] *Kirschner* is likewise (and critically) distinguishable in light of the genesis of the injury that the Refco Trustee alleged Refco to have suffered. As this Court noted, "the crux of the Trustee's theory is that RCM, RGL, and Refco, Inc. were injured by an 'imprudent' LBO & IPO," transactions made possible by fraudulently obtained corporate financing. *Kirschner*, at *8. However substantial Refco's injuries were, they were incidental to the massive capital infusion resulting from the Refco insiders' fraud – financing that this Court found to be *a substantial benefit* to Refco. *See id.* at *6 and *9. By contrast, the injuries alleged by Plaintiffs here are not the incidental by-product of some otherwise beneficial corporate action. SPhinX lost $263 million that was intentionally and wrongfully diverted to fund Refco's fraud and enrich Refco's insiders and certain culpable SPhinX and PlusFunds insiders who cooperated and were paid off for doing so. *See* Am. Sugrue Compl. ¶¶ 1, 5-9; 19, 173-200, 281-82, 309, 342; Am. Aaron Compl. ¶¶ 7, 9, 166, 194-96, 200, 226. For its part, PlusFunds was driven into insolvency and suffered direct and material damages including lost profits and lost enterprise value. *See* Am. Sugrue Compl. ¶¶ 12-13, 16, 17-18; Am. Aaron Compl. ¶¶ 13, 17. The corporate harm suffered by SPhinX and PlusFunds stands in stark contrast to the benefit to Refco, further underscoring that the instant cases are fundamentally different from *Kirschner*.

is on shaky footing. The authority on which *Cobalt* premises its conclusion (that the existence of *any* benefit to the corporation forecloses a finding of the requisite "total abandonment") is *Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co.)*, 318 B.R. 761 (S.D.N.Y. 2004) ("*CBI I*"). Significantly, the Second Circuit reversed *CBI I* on its "adverse interest" determination, making *CBI I* unsound authority for the proposition for which it is cited by *Cobalt*. *See* 529 F.3d 432, 448 (2d Cir. 2008) ("*CBI II*") (reversing district court's determination that plaintiff did not fall within the "adverse interest" exception and thus lacked standing to sue third-party accounting firm), *cert. denied*, 129 S. Ct. 1998 (2009).[2] The *CBI II* court held that, in determining whether the adverse interest applies, the proper inquiry looks to the intent of the wrongdoers. *See* 529 F.3d at 451.

Moreover, to the extent that *Cobalt* holds that the existence of *any* corporate benefit is a *per se* bar to a "total abandonment" determination, it is in conflict with case law in this Circuit and in New York state. *See, e.g.*, *CEPA Consulting, Inc. v. Hurdman (In re Wedtech Sec. Litig.)*, 138 B.R. 5, 9 (S.D.N.Y. 1992) (declining to find "adverse interest" exception inapplicable, notwithstanding insiders' testimony that misconduct was intended in part to benefit corporation); *Oppenheimer-Palmieri Fund, L.P. v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.)*, 802 F. Supp. 804, 818 (E.D.N.Y. 1992) ("The fact that some of the embezzled money was put back into the corporation to help inflate sales and facilitate public offerings is not inconsistent with an abandonment by . . . [m]anagement of the corporation's interest."); *Capital Wireless Corp. v. Deloitte & Touche*, 216 A.D.2d 663, 666, 627 N.Y.S.2d 794, 797 (3d Dep't 1995)

---

[2] The *CBI II* court found that the bankruptcy court's determination that the company's management had "totally abandoned" the company's interest through various acts of accounting fraud not clearly erroneous, rejecting the conclusion of the district court (acting in an appellate capacity) that "the record contains some evidence that various corporate purposes were served by the managers' acts of fraud, at least some of which were distinct from [securing a bonus for the company's president]." 529 F.3d at 452 (internal citation and quotation marks omitted). The *CBI II* court found that the purported corporate benefits of the insiders' accounting fraud (*inter alia*, maintaining a veneer of profitability and keeping creditors at bay) "illusory" and no bar to the application of the "adverse interest" exception. *Id.* at 453.

(finding an issue for trial in applying the "adverse interest" exception where, although the "fraud generated much needed financing for plaintiff and forestalled its bankruptcy," the wrongdoer might still have totally abandoned the company's interest); *see also CBI II*, 529 F.3d at 451-52 (citing *Oppenheimer-Palmieri* and *Capital Wireless* in reviewing "total abandonment" determination).

Defendants would have this Court believe that *any* perceived corporate benefit whatsoever arising from or in any way connected to Refco, *de minimis*, inadvertent, attenuated or otherwise, precludes application of the "adverse interest" exception. That strained reading of the law is inconsistent with *Kirschner*, applicable New York law, and common sense, and should not govern here.

3. **The Purported "Corporate Benefit" Cited By Defendants Is Legally Irrelevant To The Application Of The "Adverse Interest" Exception**

Even if the law were as rigid as Defendants claim, the "corporate benefit" cited by the Defendants – which would be *de minimis* at best if it were not in fact illusory or unrelated to and attenuated from the misconduct giving rise to Plaintiffs' injuries – is insufficient as a matter of law to prevent the application of the "adverse interest" exception.

While the Amended Complaints allege that SPhinX/PlusFunds received no benefit from the movement of excess cash to RCM and that such movement was intended solely to benefit Refco (and provide benefits to certain SPhinX, PlusFunds and Refco insiders), *see* Am. Sugrue Compl. ¶¶ 21, 38-40, 173, 197-98, 372, 376, 405, Am. Aaron Compl. ¶¶ 5, 33-43, 129, 133, 135-36, 160, 165, Defendants persist in arguing that SPhinX benefited (if inadvertently) from its

5

insiders' misconduct.³ But the Second Circuit last year recognized that not every "benefit" arising from insider misconduct "furthers the interest of the company" such as to operate as a bar to the "adverse interest" exception. *See CBI II*, 529 F.3d at 451, 453 (finding purported corporate benefits, including earnings inflation, "illusory" in affirming lower court's "total abandonment" determination) (collecting cases); *see also Oppenheimer-Palmieri Fund,* 802 F. Supp. at 818 (putting embezzled funds into corporation to help inflate sales and facilitate public offerings not inconsistent with abandonment of corporation's interest for purposes of "adverse interest" determination); *Capital Wireless*, 216 A.D.2d at 666, 627 N.Y.S.2d at 797 (3d Dep't 1995) (possible finding of "total abandonment" of corporation's interest not precluded by fact that fraud generated much-needed financing for corporation and forestalled its bankruptcy).

The other "corporate benefits" offered up by Defendants in their attempt to avoid application of the "adverse interest" exception are likewise infirm. Under applicable Second Circuit law, *Wagoner* is inapplicable to claims arising from independent wrongs. *See* Plaintiffs' Omnibus Opposition Mem. at 22-25 (collecting cases). Indeed, as this Court explicitly recognized in *Kirschner*, "the *Wagoner* rule concerns standing," and a plaintiff, to demonstrate

---

³ For example, certain Defendants claim that the incidental accrual of *de minimis* interest on the transferred cash was a "benefit" precluding a determination of the insiders' "total abandonment." *See* Defendants' Omnibus Reply Mem. at 12; Coast Asset Reply Mem. at 9; Aaron Reply Mem. at 3. This argument strains common sense, and ignores Plaintiffs' allegations that the interest was below market (save for the period of December 2002 to late 2003, when no interest was earned at all) and could not possibly have justified the placement of that cash at risk at RCM. *See* Am. Sugrue Compl. ¶¶ 197-98; Am. Aaron Compl. ¶¶ 157-59. Any suggestion that the cash needed to be transferred to unregulated accounts in order to earn interest is patently false. *See* 17 C.F.R. § 1.25(a) (Apr. 1, 2003) (segregated customer funds may be invested in, *inter alia*, U.S. government and municipal securities, certificates of deposit, commercial paper, corporate notes, and money market mutual funds). In any event, it appears that no interest was actually paid, but rather, that any such interest was merely credited to the SMFF accounts at RCM *that were misappropriated by Refco*. Any amount of interest actually credited to SMFF was likewise unprotected and misappropriated by Refco and ultimately lost in the Refco bankruptcy. It is thus spurious to claim, as Defendants do, that SPhinX or PlusFunds benefited from interest "earned" on cash deposited with RCM. The Defendants' theory is likewise belied by Plaintiffs' allegations that the only reason for the marginally increased interest eventually "paid" by Refco was that PlusFunds' innocent agents, including Bousbib, demanded it after the fact – making it fatuous to claim that such interest was a "benefit" of the insiders' wrongdoing. *See* Am. Sugrue Compl. ¶¶ 283-86; Am. Aaron Compl. ¶¶ 201-03, 205. In short, no "benefit" resulted such that a determination of "total abandonment" would be precluded.

"total abandonment," must allege that the corporation was harmed *by the scheme* rather than being one of its beneficiaries. *See Kirschner*, at *7. It is axiomatic that any "corporate benefit" that might otherwise vitiate the standing conferred by redressable harm *must be the result of the actions alleged to have caused that harm*, and not the result of unrelated conduct. *See id.* at *7 (plaintiff "must allege personal injury [to the corporation] fairly traceable to the [insiders'] alleged unlawful conduct [that is] likely to be redressed by the requested relief") (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984) (alteration in original)).[4]

To the extent SPhinX in fact received any of the other "benefits" cited by Defendants – new customers, financing, marketing expertise or the like – such benefits arose generally from SPhinX's commercial relationship with Refco, and *not* from the central elements of the wrongs alleged in the Amended Complaints – the unauthorized transfer and commingling, and ultimate misuse, of SPhinX's cash. The benefit redounding to Refco in *Kirschner* has no parallel here because the alleged "corporate benefits" cited by Defendants (to the extent that they can be found among the allegations of the Amended Complaints at all) are unrelated to the improper transfer and commingling of funds underlying Plaintiffs' claims:

- *"SPhinX Insiders bargained for and received additional benefits for SPhinX and PlusFunds in exchange for the companies' association with Refco," including allegedly agreeing to "provide SPhinX with $70 million in investment capital to*

---

[4] For this reason, *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 93 (S.D.N.Y. 2004) and *Bullmore v. Ernst & Young Cayman Islands*, 20 Misc. 3d 667, 671-72, 861 N.Y.S.2d 578, 582-83 (Sup. Ct. N.Y. Cty. 2008), *see* Defendants' Omnibus Reply Mem. at 13, do not advance Defendants' cause. In *American Tissue*, the debtor brought malpractice claims against a financial advisor for, *inter alia*, inducing it to borrow on unfavorable terms funds that the advisor claimed were necessary for a bond offering planned by the debtor. *See* 351 F. Supp. 2d at 93. This Court observed that the equity infusion resulting from the loans *was* a benefit springing from the alleged misconduct, thus barring application of the "adverse interest" exception. Similarly, in *Bullmore*, the liquidators of a hedge fund sued the fund's investment managers for valuation fraud. The *Bullmore* court found the "adverse interest" exception inapplicable because "the Fund stood to receive some degree of financial benefit *on account of the Investment Manager's alleged wrongdoing*." 20 Misc. 3d at 671-72, 861 N.Y.S.2d at 582 (citing complaint allegations that false reporting of constant and steady growth permitted fund to attract and retain capital from investors and maintain "lifeline of funding" from investment bank) (emphasis supplied). Here, in contrast, the purported "benefits" inuring to SphinX and/or PlusFunds were *wholly unrelated* to the insider misconduct underlying Plaintiffs' claims.

'seed' the Managed Futures Index;" to "act as a distributor for SPhinX products trading in the Managed Futures Index;" and to make efforts to "channel investments into the SPhinX Funds," contributing to SPhinX's assets under management. Defendants' Omnibus Reply Mem. at 12-13; *see also* Coast Asset Reply Mem. at 9 (citing seed capital, attempted importation of Refco customers to SPhinX funds, and unspecified "investment and services by Refco"); Aaron Reply Mem. at 3 (citing enhancement of assets under management and facilitation of various transactions and investments); EMF Reply Mem. at 9 (citing seed capital, Refco's promotional services and unspecified investments). Critically, Defendants do not (and cannot) cite *any* complaint allegations demonstrating (much less suggesting) that these "benefits," in whatever form, *arose from or were connected in any way with the improper cash transfers to RCM that form the basis of Plaintiffs' claims*.[5]

- *"[A]s a result of [SPhinX's] relationship with Refco . . . PlusFunds received management and performance fees."* EMF Reply Mem. at 9; *see also* Aaron Mem. at 2 ("PlusFunds insiders continued to provide services to and receive management fees from SphinX"); Coast Asset Reply Mem. at 9 ("SPhinX attempted to import Refco customers into its funds, resulting in improved performance and additional generated fees."). Here again, Defendants fail to demonstrate how the management fees they cite are in any way related to the improper cash transfers to RCM. That the management fees cited by Defendants resulted from a series of agreements entered into between various SPhinX funds and PlusFunds (and not RCM or any other Refco entity) makes any hypothetical linkage between the fees and improper cash transfers all the more tenuous. *See* Am. Sugrue Compl. at ¶¶ 132-38; Am. Aaron Compl. at ¶¶ 86-93 (detailing compensation to PlusFunds under management agreements). In any event, fees that accrued to PlusFunds were of no benefit to SPhinX.

- *"SPhinX's customers relied on Refco's financial statements and based their decision to invest in SPhinX on Refco's apparent financial strength."* Coast Asset Reply Mem. at 9 (citing Am. Sugrue Compl. ¶ 130). Contrary to Coast Asset's claim, paragraph 130 alleges that SPhinX customers relied on representations in offering materials and financial statements not as to Refco's financial strength, but with respect to *customer segregation* and the *safeguarding of assets*, the very representations breached through the improper cash transfers to RCM. *See* Am. Sugrue Compl. ¶¶ 128-29. Far from identifying some kind of "benefit" inuring to SPhinX, Coast Asset only underscores the injury arising from the improper cash transfers to RCM.

- *"PlusFunds insiders sought and obtained a binding promise from all relevant Refco affiliates to hold SPhinX cash in a manner consistent with any applicable segregation requirements."* Aaron Reply Mem. at 2-3. In light of Refco's flagrant disregard of customer-segregation requirements, the notion that a "binding promise" to observe

---

[5] Moreover, even if it were inferable that such benefits were a *quid pro quo* for the transfers – and it is not – Plaintiffs are entitled to the reasonable inference that the alleged benefits were *not* in exchange for the transfers. *See Simmons v. Kelly*, No. 06 Civ. 6183, 2009 WL 857410, at *6 (S.D.N.Y. Mar. 31, 2009) (on motion to dismiss, court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of plaintiff).

8

customer segregation "furthered the corporation's interests" is self-evidently preposterous. *See CBI II*, 529 F.3d at 453 (declining to credit "illusory benefits" in performing "total abandonment" determination).

- *"SPhinX was able to withdraw hundreds of millions of dollars that were delivered to investors."* Aaron Reply Mem. at 3 (citing Am. Aaron Compl. at ¶ 233). The allegation cited by Aaron speaks neither to SPhinX's ability to withdraw funds nor to any actual withdrawal of funds. To the extent that Aaron is referring to Sugrue's post-facto attempt to undo his own wrongdoing by demanding the return of SPhinX's cash from RCM (the majority of which was subsequently returned to the debtor's estate in settlement of an avoidance action, *see id.* ¶¶ 235-36, 240-41), it is entirely unclear how this temporary (and preferential) transfer represented a corporate benefit that would preclude a determination of the "total abandonment" of corporate interest by SPhinX's insiders necessary to defeat application of the "adverse interest" exception.

In short, the "corporate benefits" cited by Defendants are either legally irrelevant or illusory (and, in some cases, imaginary). They are in no way legally sufficient to preclude application of the "adverse interest" exception to the *Wagoner* rule.[6]

Finally, this Court in *Kirschner* found that "the [Refco] insiders' fraudulent scheme was to steal *for* Refco" to "satisfy its substantial working capital needs without having to borrow money," and that "the burden of the [Refco] insiders' fraud" was borne "by outside parties, including Refco's customers [and] creditors," of which SPhinX was one. *Kirschner*, at *6. This Court thus held that the Refco trustee's claims "'accrue[] to [its] creditors,'" including SPhinX. It would be an illogical and unjust result to now apply the same theory in a manner such as to bar SPhinX, one of Refco's largest (former) creditors, from recovering. Put another way, this Court held in *Kirschner* that claims arising from the Refco fraud belong not to Refco but to its creditors. To now hold that the creditors' claims are barred would amount to an absolute denial

---

[6] For all of the foregoing reasons, *Kirschner* has no bearing on Plaintiffs' standing. To the extent, however, that this Court finds it necessary to reach Defendants' arguments in this regard (*see* Defendants' Omnibus Reply Mem. at 13, EMF Reply Mem. at 9-10), *Kirschner* should not foreclose consideration of the insiders' motives in determining whether the insiders "totally abandoned" the company's interest for the purposes of applying the "adverse interest" exception. *See CBI II,* at 451 ("it is important to remember that the 'total abandonment' standard looks principally to the intent of the managers engaged in the conduct") (citation omitted).

of recovery in a massive corporate fraud.[7]

## CONCLUSION

For the reasons stated herein, and for the reasons set forth in Plaintiffs' Omnibus Opposition Memorandum and the individual memoranda of law filed by Plaintiffs in opposition to the Moving Defendants' motions to dismiss the Amended Complaints, Plaintiffs respectfully request that the Moving Defendants' motions to dismiss the Amended Complaints be denied.

Dated:  New York, New York
         July 2, 2009

                                        Respectfully submitted,

                                        **BROWN RUDNICK LLP**

                                        By:    s/ David J. Molton
                                        David J. Molton (DM-1106)
                                        Andrew Dash (AD-7913)
                                        Seven Times Square
                                        New York, New York  10036
                                        Telephone: (212) 209-4800
                                        Facsimile: (212) 209-4801
                                        dmolton@brownrudnick.com
                                        adash@brownrudnick.com

                                               -and-

                                        **BEUS GILBERT PLLC**
                                        Leo R. Beus, *pro hac vice*
                                        Dennis K. Blackhurst, *pro hac vice*
                                        4800 North Scottsdale Road, Suite 6000
                                        Scottsdale, Arizona  85251
                                        Telephone: (480) 429-3000
                                        Facsimile: (480) 429-3100
                                        lbeus@beusgilbert.com
                                        dblackhurst@beusgilbert.com

                                        Attorneys for Plaintiffs

                                                                                     8217056

---

[7] To say that claims may be brought directly by SPhinX's own creditors gives cold comfort.  Such claims face formidable obstacles of privity, reliance, proximate causation, and standing, as argued by Defendants in their papers.