## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re REFCO, INC. SECURITIES LITIGATION | 07 MDL No. 1902 (GEL)<br><br>ECF FILED<br>ORAL ARGUMENT REQUESTED |
| GEORGE L. MILLER, Chapter 7 Trustee for the Estate of Suffolk LLC,<br><br>       Plaintiff,<br><br>   v.<br><br>CSFB,<br>LAB MORGAN CORPORATION,<br>ML IBK POSITIONS, INC.,<br><br>       Defendants. | Index No. 09 Civ. 2885 (GEL)<br>Index No. 09 Civ. 2920 (GEL)<br>Index No. 09 Civ. 2922 (GEL) |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF THE BANK DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I.     PLAINTIFF LACKS STANDING TO ASSERT ANY OF HIS CLAIMS ....................... 3

     A.     Plaintiff Lacks Standing to Assert His Fraudulent Transfer Claims Because There is no Legitimate Creditor That Would Benefit From Any Recovery in This Action ................................................................................................ 3

          1.     The Entities Other Than Refco And SPhinX on Schedules E And F Are Not Legitimate Creditors Because They Have Not Filed Proofs of Claim ...... 4

          2.     Refco is Not a Legitimate Creditor Because, by Plaintiff's Own Admission, it Devised The Alleged Fraud Underlying The Loans at Issue ..... 5

          3.     Plaintiff Has Not Alleged a Basis by Which SPhinX Could be a Legitimate Creditor And Cannot do so ........................................................ 8

     B.     Plaintiff Lacks Standing to Bring State Law Fraudulent Transfer Claims Under Section 544 Due to The Absence of a "Triggering" Creditor ................... 10

     C.     Plaintiff's State-Law Claims Are Barred by The *Wagoner* Rule .......................... 11

II.     PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE THE TRANSFERRED FUNDS WERE NEVER SUFFOLK'S PROPERTY .......................... 13

III.     THE BANK DEFENDANTS' SECTION 546(E) DEFENSE BARS COUNTS 1 AND 3 OF THE COMPLAINT ............................................................................... 17

     A.     The Bank Defendants' Section 546(e) Defense is Ripe For Adjudication on a Motion to Dismiss ................................................................................................ 17

     B.     The Safe-Harbor of Section 546(e) Protects Private Transactions, Including The PlusFunds Tender Offer .................................................................................. 18

     C.     Section 546(e) Does Not Require That The PlusFunds Tender Offer Was "Commonly Used in The Securities Trade," But Even if it Did, The PlusFunds Tender Offer Meets That Standard .................................................... 20

     D.     The Safe-Harbor of Section 546(e) Applies When a Financial Institution Serves as a Conduit ................................................................................................ 22

IV.     RULE 9(B) BARS PLAINTIFF'S INTENTIONAL FRAUDULENT TRANSFER CLAIMS ............................................................................................ 24

V.      PLAINTIFF'S UNJUST ENRICHMENT CLAIM FAILS AS A MATTER OF LAW ...26

VI.     PLAINTIFF SHOULD NOT BE GRANTED LEAVE TO REPLEAD ...........................26

CONCLUSION..............................................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Adelphia Recovery Trust v. Bank of Am., N.A.,*
390 B.R. 80 (S.D.N.Y. 2008)................................................................................3

*Ashcroft v. Iqbal,*
__ U.S. __, 129 S. Ct. 1937 (2009).....................................................................24

*Barnhart v. Thomas,*
540 U.S. 20 (2003)............................................................................................20

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC),*
396 B.R. 810 (Bankr. S.D.N.Y. 2008)...............................................................25

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................................................24

*Bona v. Barasch,*
No. 01 Civ. 2289, 2003 WL 1395932 (S.D.N.Y. Mar. 20, 2003) ................4

*Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Adver. (In re Bank of New England Corp.),*
165 B.R. 972 (Bankr. D. Mass. 1994) .............................................................17

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.),*
366 B.R. 318 (Bankr. D. Del. 2007).............................................................18, 24

*Brass v. Am. Film Techs., Inc.,*
987 F.2d 142 (2d Cir. 1993)................................................................................9

*Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.),*
336 F.3d 94 (2d Cir. 2003)................................................................................12

*City of Springfield v. Ostrander (In re Lan Tamers, Inc.),*
329 F.3d 204 (1st Cir. 2003).............................................................................16

*Connecticut v. Novak (In re Cmty. Assocs.),*
173 B.R. 824 (D. Conn. 1994)..........................................................................17

*Contemporary Indus. Corp. v. Frost,*
564 F.3d 981 (8th Cir. 2009) .........................................................18, 19, 21, 22, 24

*Day v. Moscow,*
955 F.2d 807 (2d Cir. 1992)..............................................................................18

- iii -

*Enron Corp. v. Bear, Stearns, Int'l Ltd. (In re Enron Corp.)*,
   323 B.R. 857 (Bankr. S.D.N.Y. 2005).................................................................18

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
   341 B.R. 451 (Bankr. S.D.N.Y. 2006)............................................................17, 22

*Ghartey v. St. John's Queens Hosp.*,
   869 F.2d 160 (2d Cir. 1989)...........................................................................18

*Green v. Maraio*,
   722 F.2d 1013 (2d Cir. 1983).........................................................................18

*HSBC Bank USA, Nat'l Assoc. v. Adelphia Commc'ns Corp.*,
   No. 07 Civ. 553A, 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009)..........................6, 11

*Harris v. Huff (In re Huff)*,
   160 B.R. 256 (Bankr. M.D. Ga. 1993).............................................................11

*In re Allou Distribs.*,
   392 B.R. 24 (Bankr. E.D.N.Y. 2008)...............................................................10

*In re Best Prods. Co.*,
   168 B.R. 35 (Bankr. S.D.N.Y. 1994)...............................................................11

*In re Gutpelet*,
   137 F.3d 748 (3d Cir. 1998)..........................................................................17

*In re Haefner*,
   345 B.R. 588 (Bankr. N.D. Ohio 2006)..............................................................5

*In re Johns-Manville Corp.*,
   53 B.R. 346 (Bankr. S.D.N.Y. 1985).................................................................5

*In re Joliet-Will County Cmty. Action Agency*,
   847 F.2d 430 (7th Cir. 1988).........................................................................17

*In re Kaiser Steel Corp.*,
   952 F.2d 1230 (10th Cir. 1991).......................................................................23

*In re Mediators, Inc.*,
   105 F.3d 822 (2d Cir. 1997)..........................................................................12

*In re United Milk Prods. Co.*,
   261 F. Supp. 766 (N.D. Ill. 1966)....................................................................17

*Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,*
  186 F.3d 210 (2d Cir. 1999) ........................................................................20

*Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.),*
  374 B.R. 333 (Bankr. S.D. Fla. 2007) ........................................................17

*Kipperman v. Circle Trust F.B.O. (In re Grafton Partners),*
  321 B.R. 527 (B.A.P. 9th Cir. 2005) ..........................................................19

*Kirschner v. Bennett,*
  No. 07 Civ. 8165, 2009 WL 2601375 (S.D.N.Y. Aug. 25, 2009) ...............25

*Kirschner v. Grant Thornton LLP,*
  No. 07 Civ. 11604, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009).........12, 26

*Lamie v. United States Tr.,*
  540 U.S. 526 (2004) ...................................................................................19

*Lippe v. Bairnco Corp.,*
  225 B.R. 846 (S.D.N.Y. 1998) ...................................................................10

*Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.),*
  324 B.R. 575 (Bankr. W.D. Pa. 2005) ..................................................18, 24

*Loveman v. Lauder,*
  484 F. Supp. 2d 259 (S.D.N.Y. 2007)...........................................................4

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),*
  181 F.3d 505 (3d Cir. 1999)........................................................................23

*Mattel, Inc. v. Barbie-Club.com,*
  310 F.3d 293 (2d Cir. 2002)........................................................................23

*Nisselson v. Empyrean Investment Fund, L.P. (In re MarketXT Holdings Corp.),*
  376 B.R. 390 (Bankr. S.D.N.Y. 2007) .................................……………. 11

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),*
  361 B.R. 369 (Bankr. S.D.N.Y. 2007).........................................................24

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.),*
  813 F.2d 1177 (11th Cir. 1987) .............................................................13, 17

*Norris v. Grosvenor Mktg. Ltd.,*
  803 F.2d 1281 (2d Cir. 1986).........................................................................9

*Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v.*
*Columbia Gas Sys. (In re Columbia Gas Sys.),*
 997 F.2d 1039 (3d Cir. 1993)............................................................................16

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group*
*(In re Hechinger Inv. Co.),*
 274 B.R. 71 (D. Del. 2002)..............................................................................18

*Pani v. Empire Blue Cross Blue Shield,*
 152 F.3d 67 (2d Cir. 1998)..............................................................................18

*QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.),*
 571 F.3d 545 (6th Cir. 2009) ....................................................18, 19, 21, 22, 23, 24

*Reiter v. Sonotone Corp.,*
 442 U.S. 330 (1979)........................................................................................23

*Symbol Tech., Inc. v. Deloitte & Touche, LLP,*
 No. 0033150/2006, 2008 WL 4103244 (N.Y. Sup. Ct. Jun. 16, 2008) ....................12

*T&B Scottsdale Contractors, Inc. v. United States,*
 866 F.2d 1372 (11th Cir. 1989) ......................................................................17

*United States v. Kerley,*
 416 F.3d 176 (2d Cir. 2005)............................................................................20

*Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.),*
 735 F.2d 740 (2d Cir. 1984)..............................................................................3

*Whiteford Plastics Co. v. Chase Nat'l Bank,*
 179 F.2d 582 (2d Cir. 1950).............................................................................3

*Zois v. Cooper,*
 268 B.R. 890 (S.D.N.Y. 2001).........................................................................9

## STATUTES AND RULES

11 U.S.C. § 101(51A) ..................................................................................19, 20

11 U.S.C. § 544(b) ......................................................................................10, 13

11 U.S.C. § 546(e) ......................................................................................19, 23

11 U.S.C. § 548(a) ......................................................................................13, 24

Fed. R. Bankr. P. 3002(a) ...............................................................................5

Fed. R. Civ. P. 8(a) ..................................................................................24

Fed. R. Civ. P. 9(b) ..................................................................................24

N.Y. DEBTOR AND CREDITOR LAW § 276 (2005) ...............................24

## OTHER AUTHORITIES

5 Collier on Bankruptcy ¶ 546.06[2] (15th ed. rev. 2009) ....................................19, 23

## INTRODUCTION

Plaintiff devotes the entire 48 pages of his opposition memorandum ("Opposition" or "Pl. Opp.") attempting to explain the unexplainable: why he is entitled to assert claims on behalf of Suffolk – an entity wholly owned and controlled by wrongdoers – for the benefit of Refco – another entity wholly owned and controlled by wrongdoers.[1] The Opposition ignores applicable caselaw, as well as the critical facts alleged by Plaintiff himself. The Complaint should be dismissed:

*First*, Plaintiff lacks standing. The Complaint fails to allege the existence of either a legitimate creditor who would benefit from any recovery in this action – a *sine qua non* for any fraudulent transfer claim, whether brought under state or federal law – or a "triggering creditor" which would also be required under Section 544 of the Bankruptcy Code for his state-law fraudulent transfer claims. Plaintiff belatedly attempts to cure this fatal defect by listing in his Opposition supposed claimants other than Refco who, he argues, are legitimate creditors of Suffolk conferring standing upon him. But none of these additional claimants – who appear nowhere in the Complaint – could benefit from any recovery in this action because they either have not filed proofs of claim in Suffolk's bankruptcy proceeding or their claims already have been rejected by other courts. Moreover, Plaintiff also lacks standing to prosecute his state-law fraudulent transfer claims under the *Wagoner* doctrine because the only alleged creditor on whose behalf the Complaint suggests Plaintiff is suing – Refco – was itself totally dominated by participants in the same alleged misconduct of which Plaintiff complains and has, accordingly, already been held by this Court to be barred by *Wagoner* from bringing its own, direct claims.

---

[1] Capitalized terms have the same meaning as they do in the Bank Defendants' Memorandum of Law in Support of the Bank Defendants' Motion to Dismiss the Complaint, dated June 8, 2009 ("Opening Memorandum" or "Banks Br.").

*Second*, Plaintiff's fraudulent transfer claims fail because, by Plaintiff's own admission in the Complaint (and elsewhere), the funds he seeks to recover were Refco's money – not property of Suffolk's bankruptcy estate. Despite Plaintiff's improper attempt to rewrite his Complaint in his Opposition, the Complaint alleges that "Suffolk was created [by Refco] to facilitate the purchase of PlusFunds in the PlusFunds Tender Offer," (Compl. ¶ 30), and that Refco, in fact, transferred those funds to Suffolk, which in turn transferred the funds to the Bank Defendants *on the very same day*. Accordingly, Suffolk was a "mere conduit."

*Third*, Section 546(e) of the Bankruptcy Code bars Plaintiff's fraudulent transfer claims in counts 1 and 3. According to the four corners of the Complaint and documents incorporated therein, the transfers at issue were "settlement payments" by or to a "financial institution." Plaintiff alleges that the transaction at issue was a tender offer (the "PlusFunds Tender Offer") to purchase outstanding PlusFunds securities from PlusFunds interest holders, and the documents he references in his Complaint make clear that Bank of New York served as an intermediary through which the PlusFunds Tender Offer was consummated. Yet, Plaintiff asks the Court to ignore the plain language of Section 546(e) and disregard two decisions directly on point issued this year by federal courts of appeals holding that the sale and purchase of privately held securities through a financial institution acting as an intermediary meets the requirements of Section 546(e). As the Sixth and Eighth Circuits have concluded, the plain language of Section 546(e) protects such transactions, including the PlusFunds Tender Offer at issue here.

*Fourth*, Plaintiff fails to plead with particularity his actual fraudulent transfer claims, as he is required to do under Rule 9(b) of the Federal Rules of Civil Procedure. He has not, and cannot, allege that Suffolk acted with the intent to defraud a creditor – an indispensable element of a fraudulent transfer claim – because, by his own admission, the Suffolk insiders colluded

with principals of the very "creditors" he now identifies – Refco and SPhinX – to engage in the fraudulent scheme underlying the Suffolk loans and the PlusFunds Tender Offer.

*Fifth*, Plaintiff effectively concedes that his unjust enrichment claim should be dismissed. He offers no response to the argument that his claim is preempted by the Bankruptcy Code or to the Bank Defendants' alternate bases for why the claim should be dismissed.

## ARGUMENT

## I. PLAINTIFF LACKS STANDING TO ASSERT ANY OF HIS CLAIMS

### A. Plaintiff Lacks Standing to Assert His Fraudulent Transfer Claims Because There is no Legitimate Creditor That Would Benefit From Any Recovery in This Action

Plaintiff does not dispute that, under settled law, he lacks standing to bring his fraudulent transfer claims unless a legitimate creditor of Suffolk would benefit from the avoidance and recovery of the transferred property. *See Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*, 735 F.2d 740, 742-43 (2d Cir. 1984) (debtor had the right to avoid unperfected security interest only to the extent that such avoidance would benefit third-party creditors); *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 94-95, 100 (S.D.N.Y. 2008) (dismissing fraudulent transfer claims under §§ 544 and 548 of the Bankruptcy Code for lack of standing because avoidance would not benefit legitimate creditors ).[2] Instead, Plaintiff argues that three purported groups of creditors – a handful of third parties, Refco, and SPhinX – would benefit from a recovery on Plaintiff's claims. But Plaintiff identified only one of the three

---

[2] Plaintiff's attempt to distinguish *Adelphia*, and *Vintero*'s predecessor in the Second Circuit, *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582 (2d Cir. 1950), on the basis that those cases dealt with paid creditors is without merit. (Pl. Opp. at 14 & n.11.) That the creditors in those cases had already been paid was the reason they would not benefit from any recovery. But, whatever the reason no legitimate creditor could benefit – because there never were any or because there once were some, but they have already been paid – these cases squarely hold that no fraudulent transfer claim can lie if no creditor stands to gain. *See Whiteford*, 179 F.2d at 584; *Adelphia*, 390 B.R. at 94 ("the Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question").

sets of claimants – Refco – in his Complaint, and it is black letter law that a plaintiff cannot re-write his complaint in his opposition to a motion to dismiss. *See, e.g., Loveman v. Lauder*, 484 F. Supp. 2d 259, 266 (S.D.N.Y. 2007) (rejecting plaintiff's "post hoc attempt to rewrite the complaint" and to "ignore[] [its] own allegations"); *Bona v. Barasch*, No. 01 Civ. 2289, 2003 WL 1395932, at *19 (S.D.N.Y. Mar. 20, 2003) ("the court will not address [plaintiffs'] second argument, which amounts to an attempt by plaintiffs to rewrite the complaint . . . in their opposition papers").[3]   In any event, none of the three groups of supposed claimants identified by Plaintiff is a legitimate creditor of Suffolk that could benefit from a recovery in this action.

1.   ***The Entities Other Than Refco and SPhinX on Schedules E And F Are Not Legitimate Creditors Because They Have Not Filed Proofs of Claim***

Plaintiff points to a small number of "potential" or "purported" creditors of Suffolk:  the Internal Revenue Service, the Securities and Exchange Commission, the Gibson Dunn law firm, the Corporation Services Company, and a few others.  (Pl. Opp. at 10.)  While telling, Plaintiff's use of the qualifiers – "potential" and "purported" – masks the reality.  Plaintiff notes that he filed Schedules in Suffolk's bankruptcy case listing these "potential" and "purported" creditors, but he fails to disclose that he did not specify a penny supposedly owed by Suffolk to any of the "potential" and "purported" claimants or that he listed most of them as holding claims that were at best "contingent," "unliquidated," and "disputed."  (Anker Decl. Ex. C; Ex. D.)  In any event, none of these "potential" or "purported" creditors filed a proof of claim in Suffolk's bankruptcy

---

[3] Similarly, Plaintiff has belatedly attempted to remedy the flaws in his claims in a related case that is also part of the Refco MDL.  In *Miller v. Advent Software, Inc.*, 09 Civ. 2869 (GEL), two days after filing his memorandum of law in support of his response to Advent's motion to dismiss, Plaintiff filed a "corrected" memorandum, alleging for the first time the existence of creditors of Suffolk other than Refco.  (Declaration of Philip D. Anker, dated Sept. 2, 2009 ("Anker Decl.") Ex. A at 10; Ex. B at 10 n.2.)

case. (Anker Decl. Ex. E.)[4] To share in a distribution of estate assets in a chapter 7 bankruptcy case, like Suffolk's, an unsecured creditor must file a proof of claim. Fed. R. Bankr. P. 3002(a) ("An unsecured creditor or equity security holder must file a proof of claim or interest for the claim or interest to be allowed . . ."); *In re Haefner*, 345 B.R. 588, 589 n.1 (Bankr. N.D. Ohio 2006) ("To share in a distribution of estate assets, an unsecured creditor must file a proof of claim"); *see In re Johns-Manville Corp.*, 53 B.R. 346, 354 (Bankr. S.D.N.Y. 1985) ("the only appropriate way to assert a claim against a debtor's estate is through the timely filing of a properly executed proof of claim."). Having failed to do so by the applicable deadline, none of these entities can benefit from any recovery in this case, and, accordingly, none confers standing upon Plaintiff.[5]

### 2. *Refco is Not a Legitimate Creditor Because, by Plaintiff's Own Admission, it Devised The Alleged Fraud Underlying The Loans at Issue*

Plaintiff next attempts to cast Refco as a legitimate creditor. (Pl. Opp. at 13-17.) But that attempt is futile because Refco colluded with Suffolk to orchestrate the purchase of the PlusFunds securities at issue in this action. (Banks Br. at 16-19.) Plaintiff admitted as much in his Complaint, (Compl. ¶ 30 ("Suffolk was created [by Refco] to facilitate the purchase of PlusFunds in the PlusFunds Tender Offer"); Compl. ¶ 34 ("Suffolk had no assets of its own and

---

[4] The claims register cited by Plaintiff also lists proofs of claim filed by Gabriel Bousbib and Gonyx Capital, LLC (claim nos. 4 and 5) in the Suffolk bankruptcy proceeding. (Anker Decl. Ex. E.) But Plaintiff does not, and cannot, rely upon these claims as sufficient to grant him standing, because they were the subject of the adversary proceeding *Bousbib et al. v. George L. Miller, as Chapter 7 Trustee of the Estate of Suffolk, LLC*, Adv. No. 08-50610 (Bankr. D. Del.), were subsequently settled, and were released. Thus, these claimants no longer have a claim against Suffolk's estate and cannot benefit from any recovery. (Anker Decl. Ex. F.)

[5] The obligation of Suffolk's creditors to file a proof of claim in order to share in any distributions from Suffolk's estate arose on June 28, 2007, when the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") entered its Notice That There Are Assets From Which a Dividend Might Possibly be Paid to Creditors (the "Bar Date Order"). (Anker Decl. Ex. G.) The Bar Date Order warned that "[i]n order to share in any distribution, a creditor must file a proof of claim with the Clerk of the Bankruptcy Court. Claims must be filed on or before 9/28/07." (*Id.*) The Clerk of the Bankruptcy Court served the Bar Date Order upon each of the creditors that Plaintiff claims has an interest in any recovery from the Bank Defendants. (*Id.*)

funded the PlusFunds Tender Offer with money it borrowed from (and owed to) Refco")), and he admits it again in his Opposition (Pl. Opp. at 4 ("The loan documents provided that the proceeds of the loan were to be used to fund the Tender Offer to ensure that the loan would be secured by the tendered PlusFunds shares").)  These admissions are fatal to Plaintiff's claims.

Plaintiff's only response is to argue that the Refco insiders who directed the transaction may have been acting out of legitimate, not fraudulent, motives.  (*See* Pl. Opp. at 13 ("Though others have alleged that certain Refco insiders had a nefarious intent in regard to the PlusFunds Tender Offer, the Trustee did not plead or adopt those allegations . . .").)  Those insiders' intent, however, is not relevant to whether Plaintiff has standing to bring a fraudulent transfer claim.  A bankruptcy trustee may sue to recover allegedly fraudulent transfers only if a creditor of the debtor could do so outside of bankruptcy, and Refco plainly could not since it ratified – indeed, orchestrated – the very transfer at issue.  *See, e.g., HSBC Bank USA, Nat'l Assoc. v. Adelphia Commc'ns Corp.*, No. 07 Civ. 553A, 2009 WL 385474, at *7 (W.D.N.Y. Feb. 12, 2009) ("Adelphia ratified the very transactions . . . that Adelphia and the Committee now contend should be avoided as fraudulent transfers.").[6]

Moreover, even if the Refco insiders' intent were relevant, Plaintiff has admitted their complicity in the fraud:

---

[6] Plaintiff argues that Refco could not have ratified the PlusFunds Tender Offer – even though it directed the transaction – because it supposedly did not enter into an express agreement to do so.  (Pl. Opp. at 15.)  In fact, the Complaint acknowledges just the opposite: that Refco entered into a credit agreement in which it "loaned" money to Suffolk for the express purpose of having Suffolk use the proceeds to consummate the PlusFunds Tender Offer.  (Compl. ¶¶ 8, 30; Declaration of Ross E. Firsenbaum in Support of the Bank Defendants' Motion to Dismiss the Complaint, dated June 8, 2009 ("Firsenbaum Decl.") Ex. B at §§ 2.3, 5.2.4, 7.1.6) (requiring Suffolk to apply the proceeds of the "loans" from Refco Capital *solely* to consummate acquisitions of equity interests in PlusFunds).)  In any event, the case law rejects Plaintiff's argument.  *See, e.g., Adelphia*, 2009 WL 385474, at *6 (holding that ratification can occur without an express agreement; ratification "is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding" and "may be express or implied [,] may result from silence or inaction" or from "[a]ccepting the benefits of a transaction.") (internal citation omitted).

> ***Refco*** insiders and directors created Suffolk, then made a loan in
> excess of $200 million to Suffolk, and then caused Suffolk to
> purchase shares of another entity owned in large part by certain
> of the insiders and directors of Refco at an inflated price. The
> overall net effect is that certain Refco insiders and directors, who
> also owned shares of PlusFunds, used Refco's money to the
> detriment of other Refco shareholders and creditors who did not
> own shares in PlusFunds. ***Simply stated, the Refco-insiders
> devised a scheme to move in excess of $200 million out of Refco
> within seven months of its bankruptcy.***

(Anker Decl. Ex. A at 9 (emphasis added).)[7]

Even more important – after all, the question is whether Refco could directly outside of

bankruptcy avoid the transfer and, therefore, whether Plaintiff, as Suffolk's bankruptcy trustee,

can do so derivatively in bankruptcy – Refco's own trustee has admitted that the Refco insiders

orchestrated the PlusFunds Tender Offer as part of their own fraudulent scheme:

> It's our understanding, Your Honor, that this relationship was put
> into place by Phillip Bennet [sic], who was the CEO of Refco at
> the time, with the intent that when the loans came due and payable
> in March of 2009 . . . the Suffolk entities would default on these
> loans and Refco would realize on the collateral, which was the
> stock that was being held . . . . And by virtue of that series of
> transactions would actually end up owning PlusFunds.

(Firsenbaum Decl. Ex. F at 6:25-7:7.)[8]

---

[7] Recognizing how damning that admission was, Plaintiff later filed a "corrected" brief in which he removed all references to Refco having devised the fraudulent scheme behind the loans at issue in this matter and replaced them with references to Suffolk. (Anker Decl. Ex. B at 9.) But, the genie cannot be put back in the bottle, where, as here, the Complaint in this very action makes clear that Refco principals directed the entire transaction that Plaintiff claims was a fraudulent transfer. (Compl. ¶¶ 8, 30-34.)

[8] Moreover, in their proofs of claim – the same documents Plaintiff acknowledges in his Opposition are "publicly available" (Pl. Opp. at 10) and thus can be relied upon by the Court when adjudicating a motion to dismiss – the only other "creditors" that filed proofs of claim in the Suffolk bankruptcy, the SPhinX claimants, agreed:

> The SPhinX Trustee believes that the Suffolk Transactions were in fact a
> ***disguised acquisition of PlusFunds by Refco***. Upon information and belief, the
> true nature of the Suffolk Transactions was concealed by those involved, as well
> as by their legal counsel . . . The SPhinX Trustee believes that [Suffolk insiders]
> received substantial payments in relation to the Suffolk Transactions to
> compensate them for their participation in the various ***Refco schemes*** to defraud
> investors and creditors [and to] ***acquire PlusFunds*** . . .

Having consented to – indeed directed – the transfer of its money to fund the PlusFunds Tender Offer, Refco could not now avoid that transfer.  (Banks Br. at 17-19.)  Accordingly, the Trustee cannot base his standing on any supposed right of Refco to avoid the stock purchases at issue.

### 3. *Plaintiff Has Not Alleged a Basis by Which SPhinX Could be a Legitimate Creditor And Cannot do so*

Finally, Plaintiff argues that SPhinX is a legitimate creditor who could benefit from a recovery in this action.  (Pl. Opp. at 10-11.)[9]  But Plaintiff fails to allege in the Complaint – or even state in his Opposition – the basis for SPhinX's purported claim against Suffolk.  Plaintiff has not alleged or otherwise identified any services that SPhinX performed for Suffolk, or any money that SPhinX loaned to Suffolk, that would make SPhinX a creditor of Suffolk.

In any event, SPhinX cannot serve as a legitimate creditor conferring standing on Plaintiff for three reasons.  First, in litigation involving a SPhinX affiliate, another court in this district has already rejected the factual predicate for the proofs of claim filed by SPhinX's representatives in the Suffolk bankruptcy case.  Here, the SPhinX Proofs of Claim assert claims against Suffolk's estate on the ground that SPhinX had a purported right to have its cash held in customer segregated accounts at Refco LLC (rather than unsegregated accounts at RCM) and that its cash was improperly transferred to Refco LLC and eventually used to effectuate the allegedly fraudulent transfers at issue in this case.  (Anker Decl. Ex. H ¶¶ 11-14; Ex. I ¶¶ 10-13.)  But Judge Drain, who presided over the Refco bankruptcy proceedings, has already determined,

---

(Anker Decl. Ex. H ¶¶ 13-14 (emphasis added); *see* Anker Decl. Ex. I ¶¶ 11-14.)

[9] The term "SPhinX" refers to the family of Cayman Islands hedge funds referenced in the two proofs of claim filed by SPhinX representatives in Suffolk's bankruptcy case.  (Anker Decl. Exs. H-I.)  Claim number 1 was filed by James P. Sinclair, the SPhinX Liquidating Trustee, for the benefit of the Joint Official Liquidators of SPhinX Managed Futures Fund, SPC.  Claim number 2 was filed by the Joint Official Liquidators of SPhinX Managed Futures Fund, SPC.  Claim numbers 1 and 2 are referred to hereafter collectively as the "SPhinX Proofs of Claim."

in a final and binding judgment, that "there is no underlying factual basis" for the contention that "there was [] an agreement in which the SPhinX Funds' account assets were agreed to be held in segregated accounts or in trust" at Refco, undermining an essential element of SPhinX's claim against Suffolk's estate. (Anker Decl. Ex. J.) Indeed, Judge Drain was emphatic on this point, terming the contention by SPhinX's affiliate, PlusFunds, that there was such an agreement a "loser." (Anker Decl. Ex. K at 60:20-21.)[10] Thus, SPhinX is left without a valid claim and is thus not a legitimate creditor that can confer upon Plaintiff standing to bring this action.

Second, Plaintiff cannot recover for the benefit of SPhinX for the same reason he cannot recover for the benefit of Refco. Plaintiff incorporates in his Complaint allegations that SPhinX insiders, working with Refco insiders, orchestrated the very transaction Plaintiff seeks to avoid. (Compl. ¶ 17.)[11] And the SPhinX claimants themselves concede that SPhinX's own directors and officers knowingly allowed "SPhinX cash" to be used "to fuel the Refco scheme." (*See, e.g.,* SPhinX Compl. ¶¶ 1, 9-10, 38-40, 82, 177.) Indeed, in the SPhinX Proofs of Claim – the very documents upon which Plaintiff relies to assert that SPhinX is a legitimate creditor – the SPhinX claimants assert that SPhinX's owners and directors "received substantial payments in

_____

[10] Judge Drain's ruling is binding on SPhinX. (Anker Decl. Ex. J.) Having determined that Refco could properly transfer SPhinX account assets from segregated accounts at Refco LLC to commingled accounts at RCM, Judge Drain entered judgment disallowing the claim of PlusFunds – the entity that created SPhinX and served as SPhinX's exclusive investment advisor – in its entirety. That judgment subsequently became final and non-appealable as part of a settlement between PlusFunds and Refco. (Anker Decl. Ex. L at 7.) Thus, PlusFunds and its privities, including SPhinX, may not bring a collateral attack on that decision. Rather, they are collaterally estopped from relitigating the "loser" claim that Refco agreed to maintain SPhinX account assets in segregated accounts. *See, e.g.*, *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986); *Zois v. Cooper*, 268 B.R. 890, 894 (S.D.N.Y. 2001) (collateral estoppel bars appellant from contesting an issue conclusively established in a prior proceeding involving a party with whom appellant's interests "were perfectly aligned"), *aff'd*, 73 Fed. Appx. 509 (2d Cir. 2003).

[11] While Plaintiff seeks in his Opposition to distance himself from the SPhinX claimants' own allegations (Pl. Opp. at 14), Plaintiffs' Complaint (Compl. ¶ 17) tells a different story, describing the SPhinX Plaintiffs' allegations as "highly relevant" to the instant action. Accordingly, the Court may consider the SPhinX Complaint on this motion to dismiss, as it has been incorporated by reference in Plaintiff's Complaint, or, at the very least constitutes a document "of which [Plaintiff] had knowledge and relied upon in bringing suit." *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

relation to the Suffolk Transactions to compensate them for their participation in the various Refco schemes to defraud investors and creditors [and to] acquire PlusFunds . . ." (Anker Decl. Ex. H ¶ 14; Ex. I ¶ 13.)

Third, SPhinX has brought its own suit against a multitude of parties, including the Bank Defendants, based on the very same loans at issue in this matter. (*Compare* SPhinX Compl. ¶¶ 5-6, 297-309, 366, 382 *with* Anker Decl. Ex. H ¶¶ 11-14; Ex. I ¶¶ 10-14.) Either SPhinX will prevail in that action and recover for harm it allegedly suffered in connection with the Suffolk loans (in which case it would not be entitled to double recovery in this action), or SPhinX will not recover in that action, in which case SPhinX should not be entitled to recover through the back door what it was unable to recover through the front door.

    **B.**    **Plaintiff Lacks Standing to Bring State Law Fraudulent Transfer Claims Under Section 544 Due to The Absence of a "Triggering" Creditor**

Plaintiff also lacks standing to bring his state law fraudulent transfer claims under Section 544(b) of the Bankruptcy Code because he fails to allege the existence of a creditor that satisfies the elements of Section 544(b). Section 544(b) permits a trustee to exercise "whatever rights of avoidance any creditor holding an unsecured allowable claim could have exercised on his own behalf under applicable state or federal law." *Lippe v. Bairnco Corp.*, 225 B.R. 846, 852 (S.D.N.Y. 1998) (internal citation omitted). Thus, "in order to maintain an avoidance action under § 544(b), a trustee must demonstrate the existence of a so-called 'golden' or 'triggering' creditor: (1) an unsecured creditor, (2) who holds an allowable unsecured claim under section 502, and (3) who could avoid the transfers at issue under applicable (i.e., state) law." *In re Allou Distribs.*, 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008) (internal citation omitted); *see* 11 U.S.C. § 544(b)(1).

For the same reasons noted *supra*, in Section IA, none of the purported creditors identified by Plaintiff in his Opposition satisfies all three elements of this test. Even if they were specified in the Complaint – and none is – the handful of "potential" or "purported" claimants that Plaintiff points to on the Bankruptcy Schedules could not satisfy the second element because none of them has filed a proof of claim and, thus, none has an allowable unsecured claim under Section 502 of the Bankruptcy Code. *See supra* at 4-5. Moreover, since Refco and SPhinX orchestrated the very transfers at issue, neither can avoid those transfers under state law; thus, they fail to satisfy the third element of the test under Section 544(b) (and the Complaint also fails to specify SPhinX as a claimant on whose behalf the Trustee seeks to recover). *See, e.g., In re Adelphia*, 2009 WL 385474, at *6; *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994); *Harris v. Huff (In re Huff)*, 160 B.R. 256, 259-61 (Bankr. M.D. Ga. 1993); *see also supra* at 5-10.

### C.     Plaintiff's State-Law Claims Are Barred by The *Wagoner* Rule

Plaintiff also lacks standing under the *Wagoner* rule. To be sure, lower courts within the Second Circuit have held that *Wagoner* is inapplicable to fraudulent transfer claims where there are innocent creditors of the debtor who would benefit from a recovery by the debtor's bankruptcy estate. (Pl. Opp. at 8-9.) In each case cited by Plaintiff, the court held that *Wagoner* did not bar avoidance claims brought on behalf of *innocent* creditors. *See, e.g., Nisselson v. Empyrean Investment Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) (avoidance action brought on behalf of innocent creditors not barred by *Wagoner* rule). These decisions make sense because a trustee, such as Plaintiff, asserts fraudulent transfer claims on behalf of creditors rather than the debtor itself. *See id.* Thus, the *debtor's* fraudulent conduct is not imputed to the trustee when the trustee stands in the shoes of innocent creditors.

However, the situation is entirely different where, as here, the trustee stands in the shoes of creditors that were complicit in the alleged fraudulent transfers and hence would themselves be barred by *Wagoner* from asserting claims to avoid those transfers. Here, the Complaint identifies a single supposed creditor – Refco – that this Court has already held is barred under *Wagoner* because of its own misconduct from seeking to recover from the Bank Defendants or other third parties. (Compl. ¶ 11); *see Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604, 2009 WL 1286326, at *1, *10 (S.D.N.Y. Apr. 14, 2009) (dismissing claims by Refco Litigation Trust, standing in the shoes of Refco, under the *Wagoner* rule). And, as noted, the other "potential" or "purported" creditors identified for the first time in Plaintiff's Opposition either never filed a claim in the Suffolk bankruptcy proceeding (the additional claimants listed on the bankruptcy schedules) or were themselves – by their own admission as well as that of the Plaintiff – complicit in the same allegedly fraudulent transfers (the SPhinX claimants). *See supra* at 4-10. Plaintiff lacks standing under *Wagoner* on his state-law fraudulent transfer claims.[12]

---

[12] In any event, Plaintiff's unjust enrichment claim falls squarely within the purview of *Wagoner*. Unlike the fraudulent transfer claims, where Plaintiff stands in the shoes of creditors, Plaintiff stands in the shoes of the *debtor* (Suffolk) on his state-law tort claim for unjust enrichment. *See, e.g., Kirschner*, 2009 WL 1286326, at *1. Thus, as to that claim, Suffolk's allegedly fraudulent conduct is presumptively imputed to Plaintiff. Despite his statements to the contrary (Pl. Opp. at 9), Plaintiff has failed to allege facts sufficient to demonstrate that the narrow "adverse interest" exception to *Wagoner* applies. Here, but for the Suffolk Loans, Suffolk would not have existed at all. (*See* Compl. ¶ 30 ("Suffolk was created to facilitate the purchase of PlusFunds in the PlusFunds Tender Offer.").) The Suffolk insiders cannot be said to have "totally abandoned" Suffolk by accepting a loan, the receipt of which was integral to the very creation of Suffolk. Moreover, the adverse interest exception is inapplicable where, as here, the alleged misconduct was engaged in by the corporation's sole shareholders. (Compl. ¶¶ 7, 23, 38; Pl. Opp. at 4; SPhinX Compl. ¶¶ 372, 386; Firsenbaum Decl. Ex. C at ii; Firsenbaum Decl. Ex. D at 1); *see Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94, 100-01 (2d Cir. 2003) (*citing In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997)); *Symbol Tech., Inc. v. Deloitte & Touche, LLP*, No. 0033150/2006, 2008 WL 4103244, at *6 (N.Y. Sup. Ct. Jun. 16, 2008) (slip op.).

## II. PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE THE TRANSFERRED FUNDS WERE NEVER SUFFOLK'S PROPERTY

Plaintiff does not dispute that, to state a fraudulent transfer claim under either Section 548 or 544(b) of the Bankruptcy Code, the transfer he seeks to avoid must have been of the debtor's property. *See* 11 U.S.C. § 548(a)(1)(A)-(B) (a trustee may avoid a "transfer . . . of an interest *of the debtor* in property") (emphasis added); *accord id.* § 544(b)(1). Nor does Plaintiff deny that a trustee may not avoid a transfer of property where the property passed through the debtor as a "mere conduit" to effect a transfer between third parties because, in such an instance, the debtor could not have used the property in any event to pay its creditors, and thus the transfer of that property did not diminish the assets available to pay those creditors. *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181-82 (11th Cir. 1987). Instead, Plaintiff argues that he is entitled to a recovery because, he says, Suffolk was not a mere conduit.

But, despite all of his protests, Plaintiff concedes all of the key facts demonstrating that Suffolk was, as a matter of law, a mere conduit through which Refco transferred its funds. Critically, notwithstanding Plaintiff's assertion in his Opposition that "at all times, Suffolk was the owner of the funds" (Pl. Opp. 17-18), when responding to another motion to dismiss a virtually identical complaint in another one of the avoidance actions he has brought as part of the Refco MDL, Plaintiff acknowledged that the funds paid by Suffolk to the Bank Defendants were "***Refco's money***." (Anker Decl. Ex. B at 9 ("The overall net effect is that the Suffolk insiders and directors, who also owned shares of PlusFunds, used ***Refco's money*** to the detriment of other Suffolk shareholders and creditors") (emphasis added).)

Plaintiff's Complaint and Opposition are to the same effect in this case. The Complaint alleges that Suffolk did not even exist before the Refco insiders decided to acquire all the outstanding interests in PlusFunds. (Compl. ¶ 30 ("Suffolk was created to facilitate the purchase

of PlusFunds in the PlusFunds Tender Offer".) The Complaint also admits that "Suffolk had no assets of its own and funded the PlusFunds Tender Offer with money it borrowed from (and owed to) Refco" *on the very same day* that it obtained the proceeds from Refco. (*Id.* ¶¶ 1, 8, 29.)[13] And Plaintiff also concedes that the "loan" documents referenced in his Complaint required Suffolk to use Refco's money to purchase the PlusFunds shares. (Pl. Opp. at 4) ("The loan documents provided that the proceeds of the loan were to be used to fund the Tender Offer to ensure that the loan would be secured by the tended PlusFunds shares.") (internal citation omitted).)[14] Thus, there is no dispute that, on the same day Suffolk obtained the funds from Refco, Suffolk used that money to purchase the PlusFunds shares from the tendering Bank Defendants, as it was required by Refco to do. (Compl. ¶¶ 1, 8, 29; Firsenbaum Decl. Exs. H, L & S.) That is the definition of a conduit – no discovery is necessary to confirm this point.

Indeed, Plaintiff effectively admits as much in addressing another argument made by the Bank Defendants: that even if the payments to the Bank Defendants otherwise could be avoided as fraudulent transfers, they are protected from avoidance (other than under Section 548(a)(1))

---

[13] Consistent with Plaintiff's allegations, the loan documents referenced in the Complaint make clear that Refco "loaned" the necessary funds to Suffolk, and Suffolk transferred those funds to the Bank Defendants, on the very same day. (*See* Firsenbaum Decl. Ex. H (June 7, 2005 "Borrowing Request" from Suffolk to Refco requesting a $70,118,363.73 "loan" from Refco pursuant to the Credit Agreement); Firsenbaum Decl. Ex. L (June 7, 2005 letter from Suffolk to Merrill Lynch informing Merrill Lynch that Suffolk accepted its offer to tender its PlusFunds shares and June 7, 2005 transfer of $7,582,268.20 from Suffolk to Merrill Lynch); Firsenbaum Decl. Ex. S (June 7, 2005 wire of $11,373,402.31 from the Bank of New York to Lab Morgan in exchange for Lab Morgan's shares in PlusFunds). Although Plaintiff incorrectly alleges that the transfer of funds from Refco to the Bank Defendants through Suffolk took place on March 29, 2005 rather than on June 7, 2005, the point is the same – Suffolk served as a mere conduit through which Refco transferred the funds at issue to the Bank Defendants on the same day it received them.

[14] Indeed, in the SPhinX Proofs of Claim, which Plaintiff relies upon in his Opposition, the SPhinX claimants acknowledge that Suffolk was a mere conduit through which Refco attempted to acquire PlusFunds. (Anker Decl. Ex. H ¶ 13; Ex. I ¶ 12 ("The SPhinX Trustee believes that the Suffolk Transactions were in fact a disguised acquisition of PlusFunds by Refco.").) The SPhinX claimants also describe related entities that were owned and controlled solely by the Suffolk Insiders, created at the same time as Suffolk, and consolidated with Suffolk in its bankruptcy case as "intermediate entities." (Compl. ¶ 14; Anker Dec. Ex. H ¶ 10; Ex. I ¶ 9.) These affiliates, Suffolk SUG LLC, Suffolk KAV LLC and Suffolk MKK LLC, were pass-through entities through which Refco paid the Suffolk Insiders for their involvement in the PlusFunds Tender Offer. (*Id.*)

by the safe harbor provided by Section 546(e) of the Bankruptcy Code. On that point, Plaintiff contends that Section 546(e) does not apply in part because the Bank of New York ("BONY") functioned as a mere "conduit" and therefore the transfers were not made, Plaintiff says, "to" or "by" a financial institution within the meaning of Section 546(e). (Pl. Opp. at 36.) Plaintiff acknowledges that, pursuant to the "widely-adopted 'mere conduit' doctrine," purported transferors or transferees are instead treated as mere conduits unless they had "dominion" over the funds (*id.* at 36 n.30); on this basis, he contends that BONY "served . . . in a conduit capacity in the PlusFunds Tender Offer" because "[u]pon receipt of stock certificates, [it] sent payments from the account of Suffolk to the tendering stockholders who sent the stock certificates." (*Id.* at 34, 36.) But the very same point can be made about Suffolk as well. According to Plaintiff's own Complaint, Suffolk was required to and did pass the funds it received from Refco on to the Bank Defendants and other tendering shareholders on the very same day those funds were "loaned" by Refco. (Compl. ¶¶ 1, 8, 29-34; Firsenbaum Decl. Exs. H, L & S.) The "loan documents" obligated Suffolk to use "the proceeds of the loan" to "fund the Tender Offer." (Pl. Opp. at 4.) Thus, Suffolk had no more dominion and control over the funds than did BONY; both were legally obligated to and did act as intermediaries in a same-day transfer of the funds from Refco to the tendering shareholders.

In light of this, Plaintiff's attempts to distinguish the cases cited by the Bank Defendants fail. In a footnote, Plaintiff seeks to distinguish several cases holding that monies "provided by the government for specific directed use are not property of the grantee" on the ground that "the transfers at issue here . . . have nothing whatsoever to do with government grants." (Pl. Opp. at 24 n.22.) But the question whether transferred funds were or were not property of a particular debtor does not turn on whether the funding source was the government or a private party:

> *In United Milk, the government, through the Department of Agriculture, issued the check to the debtor. In this case, the money passed through the hands of private parties. This is a distinction without a difference.* Columbia's property rights in the refunds should not depend on the government's role, if any, in routing this money to the proper recipient. . . . We see no principled reason for such a distinction.

*Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys. (In re Columbia Gas Sys.)*, 997 F.2d 1039, 1062 (3d Cir. 1993) (emphasis added).

Plaintiff's other contention – that the Bank Defendants must establish that the "loan" made by Refco "was held by Suffolk in an express or constructive trust for Refco Capital" (Pl. Opp. at 22) – is equally misguided. As another Circuit Court has stated:

> *Just as the language of § 541(d)* [(defining property of a debtor's estate)] *does not invariably incorporate state law, it is not always limited to trusts either.* To be sure, since the separation of legal and equitable interests is characteristic of a trust, there will be overlap. In some of the cases discussed above, courts classified the excluded property as the corpus of a trust of some kind. The bankruptcy court here did so as well. And Congress referred to a "constructive trust" in the insurance hypothetical quoted earlier. *This usage may prove confusing, however, because these supposed trusts might lack characteristics of trusts recognized for other purposes under state law. We think it better to avoid the language of trusts and rest our holding more simply on the fact that LAN Tamers, as a mere delivery vehicle, lacked an equitable interest in the reimbursements under the federal program.*

*City of Springfield v. Ostrander (In re Lan Tamers, Inc.)*, 329 F.3d 204, 214 (1st Cir. 2003) (internal citation omitted and emphasis added). Similarly, Judge Posner has made clear that a debtor that acted as a "custodian" or "intermediary," but not technically as a trustee, nevertheless qualifies as a conduit:

> The only question is whether the cash, and the personal property purchased with [the cash], are assets of [the debtor] and therefore within the power of the trustee in bankruptcy, or whether they are the assets of [another]. The answer depends on the terms under which the grants were made. Did they constitute [the debtor] a trustee, *a custodian, or other intermediary, who lacks beneficial*

> *title and is merely an agent for the disbursal of funds belonging to another*?  If so, the funds (and the personal property bought with them) were not assets of the bankrupt estate.

*In re Joliet-Will County Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (emphasis added).[15]  Indeed, Plaintiff's own arguments that BONY was a conduit doom its contentions that Suffolk was not.  BONY was no more a formal trustee than was Suffolk.

## III.  THE BANK DEFENDANTS' SECTION 546(E) DEFENSE BARS COUNTS 1 AND 3 OF THE COMPLAINT

### A.  The Bank Defendants' Section 546(e) Defense is Ripe For Adjudication on a Motion to Dismiss

Plaintiff argues that that the Bank Defendants' affirmative defense under section 546(e) of the Bankruptcy Code "cannot be resolved at the pleading stage."  (Pl. Opp. at 25.)[16]  But once again, the law is to the contrary.  Many courts, including at least one in the Second Circuit, have granted motions to dismiss pursuant to Section 546(e).  *See Enron Corp. v. Int'l Fin. Corp. (In re*

---

[15] Several courts have agreed.  *See In re Chase & Sanborn Corp.*, 813 F.2d at 1181-82 (11th Cir. 1987) (concluding that debtor was a mere conduit without finding that property was held either in an express or constructive trust); *Connecticut v. Novak (In re Cmty. Assocs.)*, 173 B.R. 824, 830 (D. Conn. 1994) (same); *Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Adver. (In re Bank of New England Corp.)*, 165 B.R. 972, 978 (Bankr. D. Mass. 1994) (same); *In re United Milk Prods. Co.*, 261 F. Supp. 766, 768 (N.D. Ill. 1966) (same); *cf T&B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (finding that funds did not belong to debtor without finding that property was held either in an express or constructive trust).  Indeed, in the very case relied upon by the Plaintiff, *Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*, the court concluded that "[t]he dispositive question" "in determining whether property is 'property of the debtor' for fraudulent transfer purposes" "is whether the Debtor had *control* over the subject funds," not whether a formal trust existed.  374 B.R. 333, 338 (Bankr. S.D. Fla. 2007), *citing In re Chase & Sanborn Corp.*, 813 F.2d at 1181-1182 (emphasis in original).  Plaintiffs' other cases are also inapposite.  *See In re Gutpelet*, 137 F.3d 748, 751-52 (3d Cir. 1998) (concluding that funds were property of the estate where trial court found that debtor had exercised control over real estate for five months, had mortgaged the property, and has transferred title to the property); *In re Bankest Capital*, 374 B.R. at 343 (debtor was an active entity; the parties acknowledged that the funds at issue belonged to the debtor; debtor exercised dominion and control over the funds; and no written agreement restricted debtor's use of the funds).

[16] Plaintiff argues that discovery is necessary to resolve whether Section 546(e) applies.  (Pl. Opp. at 25-26.)  Yet, although Plaintiff acknowledges that his cases against the Bank Defendants are tag-along actions coordinated for pre-trial purposes in the Refco MDL, and that they "involve questions of fact common with actions already coordinated" in the Refco MDL (Pl. Opp. at 6), Plaintiff has failed to attend any of the 13 depositions that have taken place in the Refco MDL since he filed his Complaint – and did not accept the Bank Defendants' offer to produce to Plaintiffs the more than two million pages of documents the Bank Defendants have produced to other parties to the MDL.  (Anker Decl. Ex. M).

*Enron Corp.)*, 341 B.R. 451, 455 n.3, 459 (Bankr. S.D.N.Y. 2006) (dismissing fraudulent transfer complaint on a motion to dismiss because payment was a "settlement payment" within the meaning of Section 546(e)); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 274 B.R. 71, 88-89 (D. Del. 2002) (same); *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 326 (Bankr. D. Del. 2007) (same), *aff'd*, 388 B.R. 46 (D. Del. 2008); *Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 586 (Bankr. W.D. Pa. 2005) (same); *see also Enron Corp. v. Bear, Stearns, Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 870 (Bankr. S.D.N.Y. 2005) ("[W]here a Rule 12(b)(6) motion raises an affirmative defense that appears on the face of the complaint, the complaint can be dismissed. Whether the safe harbor of section 546 of the Bankruptcy Code is or is not a bar to the avoidance claim is a matter of law that can be determined based on the confirmations and the allegations of the Complaint.").[17]

**B.      The Safe-Harbor of Section 546(e) Protects Private Transactions, Including The PlusFunds Tender Offer**

Plaintiff's principal argument – that Section 546(e) applies only to transactions involving publicly-traded securities – has been rejected by two federal courts of appeals this year.  *See QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550 (6th Cir. 2009) ("nothing in the statutory language indicates that Congress sought to limit [546(e)'s] protection to publicly traded securities"); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986 (8th Cir. 2009) ("Nothing in the relevant statutory language suggests Congress intended to exclude [private] payments from the statutory definition of 'settlement payment' simply because the stock at issue

---

[17] The Second Circuit has confirmed that "[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) . . . if the defense appears on the face of the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *see Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (res judicata); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) (statute of limitations); *Green v. Maraio*, 722 F.2d 1013, 1018-19 (2d Cir. 1983) (qualified immunity).

was privately held").  Plaintiff points to no contrary Circuit level authority.  Instead, he relies

principally on *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners)*, 321 B.R. 527 (B.A.P.

9th Cir. 2005), a Bankruptcy Appellate Panel ("BAP") decision.  Plaintiff acknowledges that the

BAP there reached its decision by "canvassing the legislative history" of Section 546(e) (Pl.

Opp. at 27) rather than by focusing on the plain text of the statute.[18]  But, where the language of

a statute is clear, "the sole function of the courts – at least where the disposition required by the

text is not absurd – is to enforce it according to its terms."  *Lamie v. United States Tr.*, 540 U.S.

526, 534 (2004) (internal citation omitted).[19]  Here, the language of Section 546(e) is clear – it

draws no distinction between publicly and privately-held securities.  Indeed, the words "public

and private" do not even appear in Section 546(e) or in the Bankruptcy Code's definition of

"settlement payment."  *See* 11 U.S.C. § 101(51A).

Accordingly, several courts, including most recently the Eighth Circuit and Sixth Circuit,

as well as lower courts in the Third Circuit (where the Suffolk bankruptcy proceedings are

pending), have rejected the BAP's focus on legislative history, and instead have looked to the

plain wording of the statute.  *See In re QSI*, 571 F.3d at 550; *Contemporary Indus.*, 564, F.3d at

987-88.  As these and the overwhelming majority of courts have concluded, nothing in Section

546(e) or the definition of "settlement payment" distinguishes between transfers to settle

---

[18] 11 U.S.C. § 546(e) provides:

> Notwithstanding section 544 . . . [or] 548(a)(1)(B) of this title, the trustee may
> not avoid a transfer that is a . . . settlement payment, as defined in section 741 of
> this title, made by or to a . . . financial institution . . . or that is a transfer made
> by or to . . . a financial institution . . . in connection with a securities contract, as
> defined in section 741(7) . . . that is made before the commencement of the case,
> except under section 548(a)(1)(A) of this title.

[19] In any event, as noted *infra* at 23, the legislative history, including the most recent amendments to
Section 546(e), militates in favor of an expansive interpretation of Section 546(e) that includes transfers of privately-
held securities.  *See* 5 Collier on Bankruptcy ¶ 546.06[2] & n.14 (15th ed. rev. 2009) (noting "expansion of Section
546(e)'s scope result[ing] from [2006] amendments").

securities transactions on public markets and transfers to settle securities transactions on private markets.  (*See* Banks Br. at 26-29.)

### C. Section 546(e) Does Not Require That The PlusFunds Tender Offer Was "Commonly Used in The Securities Trade," But Even if it Did, The PlusFunds Tender Offer Meets That Standard

Plaintiff's alternative argument that the PlusFunds Tender Offer does not come within the safe harbor of Section 546(e) because it was not a transaction "commonly used in the securities trade" is equally specious.  (Pl. Opp. at 32-34.)  As a threshold matter, Section 546(e) does not impose such a requirement.  Indeed, Section 546(e) does not mention the phrase "commonly used in the securities trade."  To be sure, that phrase appears in Section 101(51A) of the Bankruptcy Code's definition of "settlement payment" as:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade.

11 U.S.C. § 101(51A).  But, as the Second Circuit has explained, "[u]nder the last antecedent rule, 'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'"  *United States v. Kerley*, 416 F.3d 176, 180 (2d Cir. 2005) (*quoting Barnhart v. Thomas,* 540 U.S. 20, 26 (2003); *see also Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,* 186 F.3d 210, 215 (2d Cir. 1999) ("When a modifier is set off from a series of antecedents by a coma, the modifier should be read to apply to each of those antecedents.").  Applying this rule, the phrase "commonly used in the securities trade" in the definition of "settlement payment" modifies only the last antecedent – "any other similar payment" – not each of the prior clauses identifying specific types of payments that come within the defined term.  Indeed, the Sixth and Eighth Circuits have concluded that the term "commonly used in the securities trade" as used in the definition of "settlement payment" is "a catchall phrase intended

to underscore the breadth of the § 546(e) exemption" and not, as Plaintiff argues, a phrase that limits the reach of the prior clauses in the definition of "settlement payment." *See In re QSI*, 571 F.3d at 550; *Contemporary Indus.*, 564, F.3d at 986.

In any event, by Plaintiff's own allegations, the PlusFunds Tender Offer was a transaction "commonly used in the securities trade." Plaintiff recognizes that the PlusFunds Tender Offer amounted to a purchase of all outstanding shares held in PlusFunds. (Pl. Opp. at 3 ("Suffolk, a limited liability corporate entity, purchased stock in a tender offer . . . The Bank Defendants each sold PlusFunds stock to Suffolk as part of the Tender Offer.").) Such a payment of cash for securities in connection with an acquisition occurs with great frequency in the securities markets. *See, e.g., In re QSI*, 571 F.3d at 547-48; *Contemporary Indus.*, 564, F.3d at 987-88; *see also* Banks Br. at 26-29. Nevertheless, Plaintiff suggests that the tender offer is somehow unique because "the Bank Defendants were paid an excessive amount of money relative to the value of the PlusFunds shares as part of a scheme in which the Suffolk Insiders cashed out their interests in the essentially worthless PlusFunds stock by conducting a tender offer for shares at a fraudulently-inflated value." (Pl. Opp. at 33.) But Congress has determined how to deal with such allegations: it exempted from the Section 546(e) safe harbor intentional fraudulent transfer claims pursuant to Section 548(a), but not constructive fraudulent transfer claims. Thus, even if Plaintiff had adequately alleged an intentional fraudulent transfer claim (which he has not), his constructive fraudulent transfer claims would still fail under Section 546(e).

Contrary to Plaintiff's assertion, his allegations do not transform this case into one of "outright illegality." (Pl. Opp. at 33.) In *International Finance*, Judge Gonzalez granted the defendant's motion to dismiss and concluded that prepetition payments the debtor had made to

acquire notes from the defendant constituted settlement payments protected under Section 546(e) even though the debtor claimed that it had paid more than the market value of the securities. *See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 459 (Bankr. S.D.N.Y. 2006). In reaching that conclusion, Judge Gonzalez distinguished his own earlier decisions arising out of the same bankruptcy (Enron) on which Plaintiff now relies:

> In the instant matter, there is no allegation in the Complaint that Enron repurchased or redeemed its own equity or debt obligations prior to maturity. Nor are there any allegations that the different enterprises that were formed . . . should be collapsed into Enron . . . . . Nor are there any allegations of state law violations that would void the underlying securities transaction and render it a nullity. If the securities transaction remains viable, then a payment commonly used in the securities trade for the purchase of securities would be a settlement payment subject to the protection of the safe harbor.

*Id.* at 457-58. Here, Plaintiff's allegations are identical to those present in *International Finance* – namely, that the Bank Defendants sold their PlusFunds securities at a favorable price. (Compl. ¶¶ 3, 33.) Such a transaction most assuredly does not entail "outright illegality." Rather, like the payments in *International Finance* or the payments made to complete any other tender offer, they are settlement payments that fall squarely within Section 546(e)'s safe harbor.

### D. The Safe-Harbor of Section 546(e) Applies When a Financial Institution Serves as a Conduit

Finally, as noted above, Plaintiff argues that Section 546(e) is inapplicable because BONY served as a "conduit," and therefore, the payments at issue were not made "by" or "to" a financial institution. While Plaintiff's premise may be right – that BONY acted as an intermediary – his legal conclusion is wrong. As numerous courts have held, Section 546(e) applies where the payments were made "to" or "by" a financial institution even if that institution functioned, as securities firms often do, as a mere agent through which the principals effected the transaction. *See In re QSI*, 571 F.3d at 551; *Contemporary Indus.*, 564, F.3d at 987-88;

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 516 (3d Cir. 1999); *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240-41 (10th Cir. 1991).

Indeed, less than two months ago, the Sixth Circuit addressed this very point: "In [plaintiffs'] view, the role played by HSBC Bank in this transaction did not satisfy [Section 546(e)] because it never had dominion or control over those funds."  *In re QSI*, 571 F.3d at 550. The Sixth Circuit, like the majority of Courts of Appeals and lower courts, rejected Plaintiff's argument and the Eleventh Circuit decision (*Munford*) on which Plaintiff principally relies:

> In rejecting *Munford*, the Third Circuit found that the plain language of § 546(e) simply does not require a 'financial institution' to have a 'beneficial interest' in the transferred funds. *In re Resorts Int'l, Inc.*, 181 F.3d at 516.  The Eighth Circuit has adopted this view, *Contemporary Indus.*, 564 F.3d at 986-87 (statute does not "expressly require that the financial institution obtain a beneficial interest in the funds"), as do we.  The role played by HSBC Bank in the LBO at issue was sufficient to satisfy the requirement that the transfer was made to a financial institution.

*Id.* at 551.

The Sixth Circuit's rejection of Plaintiff's argument is consistent with Congress' recent amendment of Section 546(e).  In 2006, ten years after the *Munford* decision, Congress extended the scope of Section 546(e)'s protection to include any "transfer made by or to (or for the benefit of) a . . . financial institution . . ., in connection with a securities contract."  *See* 11 U.S.C. § 546(e); *see also* 5 Collier on Bankruptcy ¶ 546.06[2] & n. 14 (15th ed. rev. 2009) (noting "expansion of Section 546(e)'s scope result[ing] from [2006] amendments).[20]  Thus, it should be no surprise that, since 2006, the Sixth and Eighth Circuits, in addition to lower courts, have

---

[20] Congress' use of the disjunctive – a transfer made either by or to "or" for the benefit of a financial institution – evidences that a transfer can be made "by or to" a financial institution even if it was not made "for the benefit of" that institution and still come within the protection of Section 546(e).  *See Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 303 (2d Cir. 2002) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("terms connected by a disjunctive [are] given separate meanings, unless the context dictates otherwise")).

uniformly concluded that transfers made by or to financial institutions in roles such as BONY's

satisfy the plain language of Section 546(e). *See In re QSI*, 571 F.3d at 551; *Contemporary*

*Indus.*, 564, F.3d at 987-88; *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R.

at 325; *In re Loranger*, 324 B.R. at 585-86.

## IV.   RULE 9(B) BARS PLAINTIFF'S INTENTIONAL FRAUDULENT TRANSFER CLAIMS

Plaintiff's assertion that he has satisfied the pleading requirements of Rule 9(b) with

respect to his intentional fraudulent transfer claims is also flawed.  As a threshold matter,

Plaintiff has not even satisfied the lesser requirements of Rule 8(a) as articulated by the Supreme

Court in *Ashcroft v. Iqbal*, requirements that apply to all civil actions in federal court.  *See __*

U.S. __, 129 S. Ct. 1937, 1953 (2009) ("Our decision in *Twombly* expounded the pleading

standard for 'all civil actions'") (internal citation omitted).  To sustain a claim, Plaintiff must

allege – in more than conclusory fashion – that Suffolk was acting to defraud at least one

creditor.  11 U.S.C. § 548(a)(1)(A); *see, e.g.*, *Nisselson v. Softbank AM Corp. (In re MarketXT*

*Holdings Corp.)*,  361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (Section 548 allows a trustee to

"avoid transfers of a debtor's interest in property made with actual intent to hinder, delay or

defraud *creditors*") (emphasis added); N.Y. DEBTOR AND CREDITOR LAW § 276 (2005);

*see also* Banks Br. at 35-36.  Plaintiff's bare assertion in his Complaint that "the Defendant

and/or Suffolk acted with actual intent to hinder, delay or defraud present and/or future creditors

of Suffolk" (Compl. ¶ 56) merely re-states the very text of Section 548(a)(1)(A) and thus fails to

satisfy this standard.  *Iqbal*, __ U.S. at __, 129 S. Ct. at 1949 ("the tenet that a court must accept

as true all of the allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of the elements of the cause of action, supported by mere conclusory

statements, do not suffice."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("a formulaic

recitation of the elements of a cause of action will not do."); *Kirschner v. Bennett*, No. 07 Civ. 8165, 2009 WL 2601375, at *5 (S.D.N.Y. Aug. 25, 2009).

In any event, Plaintiff misses the point. According to the Complaint, Suffolk's only alleged non-contingent, liquidated creditor at the time of the transaction at issue was Refco. (Compl. ¶¶ 11, 34.) But, far from being defrauded, Refco orchestrated the Tender Offer. (*Id.* ¶¶ 8, 11, 30-34.) And, as described above, the additional supposed creditors identified for the first time in Plaintiff's Opposition are either not creditors at all (the "purported" or "potential" claimants) or were themselves active participants in directing the Tender Offer (SPhinX). *See supra* at 4-10.

Finally, Plaintiff also has failed to allege that the Bank Defendants acted with fraudulent intent. His principal response is to argue that he is not required to do so to state a claim under New York fraudulent transfer law. (Pl. Opp. at 43.) But the case on which he relies acknowledges that many courts in this district have concluded just the opposite: that Section 276 of New York's debtor and creditor law requires proof of both the transferor and transferee's fraudulent intent. *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 827 n.5 (Bankr. S.D.N.Y. 2008) (citing cases). And Plaintiff's additional argument – that he has alleged the Bank Defendants' purported fraudulent intent – is also specious. (Pl. Opp. at 44.) Plaintiff has made the same perfunctory and conclusory allegation in each of his 93 complaints, in which he merely states that "Defendant and/or Suffolk" had actual knowledge of the supposed "unlawful nature" of the PlusFunds Tender Offer. (Compl. ¶¶ 44, 70.) Indeed, in his memorandum in opposition to a different defendant's motion to dismiss a nearly identical complaint that is also part of the Refco MDL, Plaintiff concedes that he "has not alleged, and does not allege, any fraud on the part of the

Defendant." (Anker Decl. Ex. B at 1; *see also* Anker Decl. Ex. B. at 8 ("the Trustee is not impugning fraud on [the Defendant]."").)

## V. PLAINTIFF'S UNJUST ENRICHMENT CLAIM FAILS AS A MATTER OF LAW

Plaintiff does not respond at all to most of the Bank Defendants' arguments for dismissal of Plaintiff's claim for unjust enrichment, including that the Bankruptcy Code preempts Plaintiff's claim. The reason, of course, is because Plaintiff has no viable response. This claim as well should be dismissed.

## VI. PLAINTIFF SHOULD NOT BE GRANTED LEAVE TO REPLEAD

As explained in the Bank Defendants' Opening Memorandum, Plaintiff's claims are deficient as a matter of law, and granting Plaintiff leave to replead his claims would be futile. (Banks Br. at 42-43.) This is not a case where the complaint is deficient merely because it provides insufficient detail. Rather, the allegations and documents incorporated in the Complaint demonstrate that Plaintiff has not, and cannot, state a claim as a matter of law. *See Kirschner*, 2009 WL 1286326, at *1, *10 (denying request for leave to replead where complaint demonstrated that the plaintiff sought to recover on behalf of the entity who participated and benefitted from the very acts on which his claims were based). As in *Kirschner*, neither additional pleading nor discovery can remedy the fundamental flaws in Plaintiff's claims.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons set forth in the Bank Defendants' Opening Memorandum, the Complaint should be dismissed with prejudice.

Dated:      September 3, 2009          Respectfully Submitted,

                                       WILMER CUTLER PICKERING
                                          HALE AND DORR LLP

By:  /s/  Philip D. Anker            
        Philip D. Anker
        Joel W. Millar
        Ross E. Firsenbaum
        Benjamin W. Loveland

        399 Park Avenue
        New York, New York 10022
        Tel.:  (212)-230-8800
        Fax:  (212)-230-8888
        *Attorneys for Defendants Credit Suisse First*
        *Boston Next Fund, Inc.; Lab Morgan*
        *Corporation; and ML IBK Positions, Inc.*