**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                         :

In re REFCO INC. SECURITIES LITIGATION  :     Case No. 07-md-1902 (JSR)
                         :
-------------------------------------------------------------X

This Document Relates to:

-------------------------------------------------------------X

KENNETH M. KRYS, et al.,        :     Case No. 08-cv-3065 (JSR)
                         :     Case No. 08-cv-3086 (JSR)
Plaintiffs,     :

                         :
       -against-          :
                         :
CHRISTOPHER SUGRUE, et al.,    :

                         :
           Defendants.    :
-------------------------------------------------------------X
KENNETH M. KRYS, et al.,        :     Case No. 08-cv-7416 (JSR)
                         :
Plaintiffs,     :

                         :        REPORT AND
       -against-          :     RECOMMENDATION
                         :     OF THE SPECIAL MASTER
ROBERT AARON, et al.,          :     ON THE OMNIBUS ISSUE OF
                         :        STANDING
           Defendants.    :
-------------------------------------------------------------X
KENNETH M. KRYS, et al.,        :     Case No. 08-cv-8267 (JSR)
                         :
Plaintiffs,     :

                         :
       -against-          :
                         :
RICHARD BUTT,         :

                         :
           Defendant.    :
-------------------------------------------------------------X

Daniel J. Capra, Special Master

In this sprawling set of actions, Plaintiffs bring suit against more than 50 defendants. In Plaintiffs' words, the actions are brought to recover (i) $263 million plus interest in damages suffered by the SPhinX family of hedge funds; (ii) the lost business enterprise value and deepening insolvency damages suffered by SPhinX's investment manager, PlusFunds Group, Inc., ("PlusFunds") and (iii) damages suffered by the Assignors, a group comprised of SPhinX investors. The gravamen of the complaint is that SPhinX's cash "was diverted from protected, customer segregated accounts to unprotected offshore accounts, where those assets were ultimately lost in the Refco scandal." (Sugrue Amended Complaint ¶1). [1]

Most of the defendants in these actions have moved to dismiss the respective complaints lodged against them. This Report and Recommendation covers one of the so-called "omnibus issues": grounds for dismissal that have been raised by, and are pertinent to, the merits of all (or in some cases almost all) the Motions to Dismiss.[2] The omnibus issues are as follows:

1. Do the Plaintiffs have standing to bring their respective claims?

2. Have the Plaintiffs adequately pleaded a "primary violation"?

3. Have the Plaintiffs adequately pleaded causes of action— brought against most of the Defendants — for aiding and abetting fraud?

4. Are these actions barred by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA")?

5. Are the Plaintiffs barred by the *Wagoner/ in pari delicto* doctrine because they stand in the shoes of wrongdoers?

This Report and Recommendation covers the first of the omnibus questions, that of

---

[1] As the caption indicates, the Plaintiffs brought three actions that are now consolidated in this MDL. The reasons for plaintiffs' bringing three separate action are not relevant to this R and R. References to the complaints throughout will be to the defendant first named, i.e., the Sugrue Amended Complaint ("SAC") the Aaron Amended Complaint ("AAC") and the Butt Amended Complaint ("BAC").

[2] There has been significant briefing, and some oral argument, on claims to dismiss that are particular to one or a few defendants — for example, defendants Owens and Kavanaugh. For efficiency purposes, the parties and the Special Master have agreed to focus first on the omnibus issues. If and to the extent that Plaintiffs' causes of action survive the motions to dismiss on omnibus questions, the Special Master will proceed expeditiously to decide the defendant-specific issues.

Plaintiffs' standing. The Report will first set forth the parties and the basic allegations of the Complaints. Then it will proceed to the standing questions.[3]

At the outset, however, it must be emphasized that analysis of the claims herein is made somewhat more difficult because the Plaintiffs' conception of their causes of action has been malleable. Reading the first paragraph of the Amended Complaints, it appears that the claims hinge upon the fact that SPhinX funds were improperly transferred from segregated accounts at Refco LLC to unsegregated accounts at Refco Capital Markets, Ltd. ("RCM"). For ease of reference, the alleged wrong related to the transfer of SPhinX funds to RCM will be referred to as the "SPhinX fraud."

But in other parts of the Complaints — and at many times in the oral arguments — Plaintiffs shift to a claim about what can be called "the Refco fraud." This part of the complaint emphasizes Round-Trip loans, the Refco hidden receivables, the fraudulent LBO and IPO, and the funding of Refco interests by looting the accounts at RCM.[4] Much of this Report and Recommendation consists of an attempt to sort out and pin down the claims and contentions presented by the Plaintiffs

## I. Introduction

### *The Parties*

These actions involve three sets of claimants:

1. The SPhinX family of funds ('SPhinX"), organized under Cayman Islands law, entered into voluntary liquidation after the fall of Refco. Plaintiffs Kenneth M. Krys and Christopher Stride are their Joint Official Liquidators.

2. Plaintiff James P. Sinclair is the Trustee of the SPhinX Trust. The SPhinX Trust is the assignee of claims from the estate of PlusFunds. PlusFunds created SPhinX and served as its investment manager.

3. Messrs. Krys and Stride are also pursuing claims that have been assigned to them by

---

[3] As noted above, Defendants have moved to dismiss on the grounds of *in pari delicto* and the *Wagoner* doctrine. This are often referred to as standing arguments, but they will be taken up in a later R and R.

[4] The facts surrounding what will be called "the Refco fraud" have been recounted in a number of opinions by Judge Lynch. See, e.g., *Kirschner v. Grant Thornton,* 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009). To the extent necessary for background on the instant motions, familiarity with the financial schemes of Refco is presumed.

sixteen entities that were SPhinX Funds investors. These claims will be referred to as "Investors' claims" or "Assignors' claims."

More than 50 defendants have been sued. Some of these defendants were directly involved in the management or administration of PlusFunds or SPhinX and allegedly caused, assisted or covered up the wrongful transfer of SPhinX funds to RCM. Others were allegedly involved in some aspect of the Refco fraud, be it Round Trip Loans, the Refco IPO, or some other act of Refco that was designed to allow Refco insiders to profit at the expense of its customers. The defendants, and the allegations as to each of them that are pertinent to the omnibus issues, will be set forth as the story is told.

### The Allegations:

Most of the following allegations are drawn from the Sugrue Amended Complaint and from Judge Lynch's discussion in *Krys v. Sugrue et al.,* 2008 WL 4700920 (S.D.N.Y) (denying motions to remand the actions to state court).[5]

1. PlusFunds entered into an exclusive licensing contract with Standard & Poor's to create and market investment products designed to achieve returns consistent with the S&P Hedge Fund Index. Plus Funds created the SPhinX Funds in 2002. The SPhinX Funds were a platform of funds organized as Cayman Islands Exempted Segregated Portfolio Companies ("SPCs") and designed to track the performance of the Standard & Poor's Hedge Fund Index. (SAC ¶2). The purpose of the SPCs was to preserve and protect assets invested in any one portfolio from cross-liability in the event of the insolvency of other segregated portfolios or of the custodian or prime broker. Retaining customer-segregated assets in SPCs was essential to the structure of the SPhinX funds. (SAC ¶3). PlusFunds hired Refco Alternative Investments ("RAI") to oversee Refco-related investments for SPhinX.

2. Initially, the SPhinX Funds were successful. (SAC ¶ 4). But Refco LLC was the prime broker for many of the SPhinX Funds, including the SPhinX Managed Futures Fund ("SMFF"). (SAC. ¶¶ 144-48). Through the acts of certain Refco, PlusFunds, and SPhinX agents and fiduciaries, hundreds of millions of dollars in excess cash belonging to SMFF was diverted from the customer-segregated accounts at Refco LLC to the accounts of RCM, an unregulated offshore Refco

---

[5] Plaintiffs have proffered a second amended complaint in each of these actions. Leave has not been granted to amend the First Amended Complaints that are before the court. But the Second Amended Complaints may be relevant in assessing whether to grant leave to amend if the motions to dismiss are granted. *See, e.g., Kropelnicki v. Siegel* 290 F.3d 118, 130-131 (2d Cir. 2002) (court considers proposed amended complaint in deciding whether leave to amend should have been granted).

affiliate ("RCM"). (SAC ¶5).[6] Once the cash was at RCM, it was commingled for use in fraudulent activities designed to conceal Refco's losses, bolster Refco's financial statements, and enrich individuals. (SAC ¶¶ 5-7). SPhinX and PlusFunds agents, including Robert Aaron, director of the SPhinX Funds and part owner of Derivative Portfolio Management ("DPM") (AAC ¶ 38), and Christopher Sugrue, officer and director of PlusFunds and a founder of the SPhinX Funds (SAC ¶ 38), agreed to expose SMFF cash by having it transferred from Refco LLC to RCM.[7] Their motivations were, in the case of Aaron, lucrative profits for DPM (AAC ¶¶ 134, 250-52), and for Sugrue and others such as defendants Owens and Kavanagh, quid pro quo payoffs from Refco that involved "loans" to certain entities — the Suffolk entities — that they controlled. (SAC ¶¶ 9-10). Other defendants involved in the alleged scheme to transfer SMFF cash to RCM include RAI and Butt (who served as president of RAI and director of at least one of the SPhinX funds). (BAC ¶¶ 9, 93, 97).

3. On October 10, 2005, Refco's schemes were revealed in the announcement that Refco had "discovered" a $430 million receivable owed to it by an entity — Refco Group Holdings, Inc. ("RGHI") — owned by Refco's CEO Phillip R. Bennett . (SAC ¶11). At that time RCM held approximately $312 million of SMFF's cash. (SAC ¶ 11.) Before RCM and dozens of Refco subsidiaries and affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York (id.), Sugrue demanded that RCM return the $312 million of SMFF excess cash (SAC ¶ 12). RCM returned the money, but two months later RCM's Official Committee of Unsecured Creditors commenced an adversary proceeding against SMFF (the "Preference Action"), to recover the $312 million as a preferential transfer from RCM's estate. (SAC ¶ 12). SPhinX subsequently settled the Preference Action; in that settlement, SMFF relinquished $263 million of the $312 million and released certain claims against the Refco estate with respect to those funds. (SAC ¶ 14). Certain SPhinX Plaintiffs objected to and appealed from the Bankruptcy Court's approval of the settlement, arguing — unsuccessfully — that it was a sweetheart deal that was the product of insider collusion and fraud. *See In re Refco Inc.*, 06 Civ. 5435 et al., 2006 WL 3409088, at *1 (S.D.N.Y. Nov.16, 2006), *aff'd* 505 F.3d 109, 113 (2d Cir.2007) (upholding the settlement).

---

[6] The only assets deposited at RCM were SMFF cash that constituted "excess margin," defined by RCM as the amount of a customer's assets that exceeded the amount that Refco had determined was necessary to cover margin. SAC ¶ 192-93.

[7] One of the acts alleged to be central to the wrongful transfer of SMFF funds was Aaron's signing of a document, dated July 31, 2002, authorizing the movement of SMFF assets between Refco LLC and RCM. See SAC ¶ 348. Plaintiffs now concede that the so-called "Aaron letter" does not authorize the transfer of excess cash to RCM. See Plaintiffs' Memorandum in Opposition to Motion to Dismiss by DPM Defendants at 27. Plaintiffs' concession on this point does not affect the *standing* argument however, as Plaintiffs still assert that Aaron failed to assure the segregation of SMFF's assets.

4. The Preference Action triggered a flood of redemptions by SPhinX investors and, in turn, a sharp decline in PlusFunds' revenues. (SAC ¶ 13). On March 6, 2006, PlusFunds filed a Chapter 11 bankruptcy petition in the Southern District of New York. (SAC ¶ 13) The PlusFunds Chapter 11 plan ("the PlusFunds Plan" or "the Plan"), which was approved by the Bankruptcy Court on August 7, 2007, provided for the establishment of two different post-confirmation trusts, each with its own Trustee and governing trust agreement: (1) the General Trust, which was vested with the Retained Assets for the benefit of Holders of Allowed General Unsecured Claims other than the SPhinX Funds; and (2) the SPhinX Trust, administered by James Sinclair, which provided that, in exchange for $4 million, certain claims of the PlusFunds Debtors' bankruptcy estate would be assigned to the SPhinX Trust (SAC ¶ 37). The beneficiaries of the SPhinX Trust are the SPhinX Funds.

5. Meanwhile, on June 30, 2006, SPhinX entered into liquidation proceedings in the Cayman Islands. (SAC ¶ 35). The Grand Court of the Cayman Islands appointed Kenneth Krys and Christopher Stride the Joint Official Liquidators ("JOLs") of the SPhinX Funds. Under Cayman law, the JOLs stepped into the shoes of SPhinX and assumed the power "to bring or defend any action, suit, prosecution or other legal proceedings, whether civil or criminal, in the name and on behalf of the company." Cayman Companies Law § 109(a). Accordingly, the SPhinX JOLs are the beneficiaries of the SPhinX Trust established by the PlusFunds Plan.

6. As stated above, the central point of the complaints is that excess cash in the accounts at SMFF were protected by an obligation of Refco LLC to place that cash in a segregated account. (SAC ¶1). When those protected assets were transferred to RCM, they lost the protection of segregation, and thus were subject to loss upon the fall of Refco. Id. Thus, if the cash had remained in a segregated account, it would, in major part, have been saved from the Refco disaster — Refco's demise would have been largely irrelevant.[8]

7. Plaintiffs' Complaint in *Sugrue* goes well beyond the basic claim that SPhinX cash was siphoned off into an unprotected account — what this Report and Recommendation refers to as "the SPhinX fraud." It also describes, and seeks damages for, what the Report and Recommendation refers to as "the Refco fraud." Briefly summarized, the complaints recount the following aspects of the Refco fraud.

a. Refco was involved in a fraudulent scheme to conceal massive losses from Refco's books

---

[8] Even in segregated accounts, the cash would have been exposed during the time necessary to clear transactions — but the loss to SPhinX would, according to Plaintiffs, have been significantly less if the cash had remained in the segregated account at Refco LLC. See Transcript of Oral Argument on DPM Motion to Dismiss, 1/15/2010, pp. 240-1, referring to "open jaw" risk or "counterparty risk" — whereby money in a segregated account is subject to a short-term risk that one of the parties to a transaction will not be able to complete the transaction. The counterparty risk is distinct from, and definitely less serious than, the long-term risk that would occur to the funds when placed in a nonsegregated account.

and to enrich insiders. A central part of the fraud was to divert assets from unprotected accounts at RCM to fund Refco's fraudulent schemes and line the pockets of the insiders. (SAC ¶ 200).

b. Refco and a number of the defendants conspired to hide the losses on the books by engaging in a series of round trip loans ("RTLs"). The RTLs purported to be legitimate loan transactions, but only served temporarily to pay down the massive losses that were parked at RGHI (SAC ¶¶ 203-206, 221-225).

c. Having maintained the illusion of insolvency, Refco borrowed money to fund an August 2004 LBO, which enriched Refco's insiders and left RCM insolvent to repay SMFF, from whose accounts assets had been stolen to fund Refco's business and dividends paid to Refco's coconspirators in the LBO. (SAC ¶ 207).

d. The LBO was followed up by an IPO that further impaired Refco's assets and allowed corrupt insiders to cash out. (SAC ¶¶ 209-210).

8. Plaintiffs' Complaint also recounts the machinations involved in the "Suffolk Transactions." The basic allegations are as follows:

a. Defendants Sugrue, Kavanagh and Owens were responsible for SPhinX's relationship with Refco and for the diversion of SMFF cash to RCM. In 2004, certain innocents at PlusFunds began to question whether to continue placing SMFF cash with Refco; these innocents were unaware that the cash was placed in an unsegregated account. SAC ¶¶ 288-93.    In order to 1) buy off the innocents and 2) pay off Sugrue, Kavanagh and Owens, Refco extended about $200 millions in loans to the Suffolk entities, which were controlled by these defendants. (SAC ¶¶ 281-282). The Suffolk loans were funded with cash from RCM, at least some of which was cash from SMFF that had been diverted from the segregated account at Refco LLC. (SAC ¶298). The Suffolk loans were sham transactions designed to allow Refco to gain control of PlusFunds without innocents at PlusFunds knowing that Refco was involved.(SAC ¶ 303). Certain defendants actively worked to conceal Refco's role in the purchase by the shares of PlusFunds by the Suffolk entities. (SAC ¶¶ 310-325).

b. When the facts about the Suffolk transactions were disclosed to innocent members of PlusFunds' board and management, they were furious. The extension of millions of dollars of loans from a service provider, Refco, to certain PlusFunds insiders constituted self-dealing, and transferred effective control of PlusFunds to Refco.SAC ¶ 328. Efforts were made, after the discovery, to oust Sugrue, Owens and Kavanagh from PlusFunds' Board; but negotiations to remove them failed and the innocents ended up resigning because of the wrongdoing by Sugrue, Owens and Kavanagh. SAC ¶ 330.

### *Relevance of the Refco Fraud*

If the basic injury alleged by the Plaintiffs is that SMFF cash was taken out of segregated

accounts at Refco LLC and transferred to unsegregated accounts at RCM, one might wonder how the Refco fraud is even relevant in this action — because, as stated above, if the cash had remained at Refco LLC it would have remained, in large part, protected from the Refco fraud. But Plaintiffs argue that all aspects of the Refco fraud are relevant and indeed critical because if the true situation at Refco had been known, SPhinX and PlusFunds would never have dealt with Refco — and so SMFF cash would never even have been at Refco LLC, much less RCM. So, for example, the claim against Grant Thornton is that it issued inaccurate audit opinions about Refco, and that innocent decisionmakers at SPhinX and PlusFunds relied on those audit opinions "in determining whether to allow and to continue to allow SPhinX assets to be deposited at Refco." (SAC ¶ 722-723). And the RTL defendants are on the hook — even though they had nothing to do with the SMFF cash accounts at Refco LLC or RCM — because their conduct propped up Refco. Plaintiffs are arguing that if not for the fact that the Round Trip Loans concealed Refco's true financial situation, SPhinX and PlusFunds would never have done, or would not have continued to do, business with Refco. (SAC ¶ 1024).

Defendants claim that the Plaintiffs' opposition to the motions to dismiss "is at war with itself" in that it is internally inconsistent in complaining about both the Refco fraud and the SPhinX fraud. But this is not true. In essence, Plaintiffs are arguing that they suffered two separate harms (causing one set of damages). And either of these harms was sufficient to cause the damages alleged. Put colloquially, Plaintiffs were "shot" by the improper transfer of cash to RCM (including the continuing concealment of that transfer by buying off innocents through the Suffolk Transactions), and "knifed" by the perpetrators of the Refco fraud.

The problem is not that Plaintiffs are articulating alternative theories for harm. The problem is that when Defendants pose an argument against one theory, Plaintiffs sometimes respond that the argument misses the mark because "we are proceeding under a different theory" — and Plaintiffs then give the same response to arguments addressed to the other theory. Assuming arguendo that these alternative causation theories are both viable, it is important to ensure that the Plaintiffs do not jump back and forth from one to another theory in defending against the motions to dismiss. Each theory needs to be addressed on its own merits.

## II. Legal Standard on Motion to Dismiss

The legal standard for evaluating a pleading on a motion to dismiss is as follows:

1) The Plaintiff need not establish that he will ultimately prevail. The question is whether the Plaintiff is entitled to obtain discovery and offer evidence to support his claim. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 476 (2d Cir. 2006).

2) "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949, quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570

(2007). If the Plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* 550 U.S. at 547.

3) Claims of fraud must be "stated with particularity." Fed. R. Civ. P. 9(b)."The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). The Plaintiff must specifically describe the acts or statements alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent. The Second Circuit has found that an inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

4) Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."

## *II. Omnibus Issue of Standing*

As noted above, there are three sets of claimants in this action — the SPhinX "family" of funds, SPhinX investors, and PlusFunds.[9]  Defendants argue that most of these claimants lack standing because they were not directly harmed.

As the Supreme Court has noted, the standing inquiry is essentially "a jurisdictional prerequisite to a federal court's deliberations." *Hodel v. Irving,* 481 U.S. 704, 711 (1987). On a motion to dismiss, "'it is the burden of the party [asserting standing to sue] * * * clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). But in evaluating a motion to dismiss on grounds of standing, a district court must "accept all material allegations of the complaint, and must construe the complaint in favor of the moving party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975).

The standing arguments will be broken out for each set of challenged claimants.

### *A. Investors*

---

[9] For ease of reference, the standing arguments will be addressed in terms of the original claimants who allegedly suffered the damages. For example, the claims for damages allegedly suffered by the Investors will be referred to as the "Investors' claims" even though those claims are now brought by the JOLs. Obviously, if the Investors have no standing to bring their own claims, the JOLs have no standing to bring them either.

Defendants argue that the Investors have no standing because their losses are derivative of any loss suffered by SPhinX. They rely on case law prohibiting suits by those with derivative losses in various contexts. For example, creditors have been held to lack standing to sue for harm to a debtor that renders the debtor unable to pay the creditor back. *Jackson Nat'l Life Ins. Co. v. Ligator,* 949 F. Supp. 200, 204 (S.D.N.Y. 1996) (plaintiff that financed corporation's purchase of assets cannot sue sellers for fraudulently inflating sale price because plaintiff's injury "arises only from the alleged wrongdoing by the defendants that left the [corporation] without the wherewithal to repay the financing provided by [plaintiff]").[10] *See also Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258 (1992) (holding indirectly-injured customers of directly-injured bankrupt securities brokers lacked standing to sue for stock manipulation under RICO); *Manson v. Stacescu,* 11 F.3d 1127, 1130-31 (2d Cir.1993) (holding that plaintiff "does not have standing in his capacity as a creditor, shareholder, or employee of a corporation to assert a RICO claim for injuries that are derivative of those sustained by that corporation"); *Bartang Bank & Trust Co. v. Caiola,* 2006 WL 2708453, at *5 (S.D.N.Y. Sept. 18, 2006) ("investors in holding companies lack[] standing to bring claims pursuant to transactions the holding companies had made").

Plaintiffs contend that the Investors *were* directly injured because they were given and relied on assertions in the SPhinX marketing materials and Offering Memoranda. "These materials discussed, in detail, the nature of the funds, the customer-segregation requirements, and other controls and protections designed to safeguard SPhinX investors' assets." (SAC ¶¶ 129, 130). Plaintiffs rely on case law such as *City of New York v. Smokes-Spirits.Com, Inc.,* 541 F.3d 425, 443-44 (2d Cir. 2008) (holding plaintiff has standing to bring claims where plaintiff is "alleged to be the target of the scheme" and noting that "[t]he fact that [other parties] may also have been

---

[10]Defendants make much of in *In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007), in which the court held that the Investors were not "parties in interest" within the meaning of §1109(b) of the Bankruptcy Code, and therefore could not complain in the Refco bankruptcy proceeding about the Preference Settlement agreed to by SPhinX. But *In re Refco* is not controlling on the question of the Investors' standing in this case. The *Refco* court was careful to cabin its opinion within the context of a bankruptcy proceeding and the statutory language of §1109(b). For example, the court noted that "the Code's goal of a speedy and efficient reorganization" cut against allowing the Investors to claim that the Preference Settlement was a sweetheart deal rife with conflicts of interest: "This litany of wrongs allegedly wrought by the officers and directors of SPhinX upon Investors is fodder for a lengthy trial itself. It surely would have caused a substantial delay in the Refco bankruptcy proceeding." Id. at 119. There is no similar concern for streamlining in the instant proceeding. Moreover, the court noted that "although they are not parties in interest entitled to object to the Settlement and conduct discovery, Investors may still have remedies for fraud perpetrated by their fiduciaries." Consequently, *Refco* is not dispositive of the Investors' standing in this case.

targeted by defendants' schemes does not change the result.").[11]

But even if they were "targeted," the Investors' claims must be dismissed for lack of standing because the loss that they are complaining about is a part of *the very same loss* asserted by SPhinX — 1) the loss of excess cash from the SMFF account (to the extent any Investors' money was in that account) after it was transferred to RCM and commingled; and 2) a loss in the value of the business enterprise in which they invested.[12] If SPhinX is fully compensated for its loss, and the Investors are fully compensated for theirs, there will be a double recovery. Despite Plaintiffs' best efforts to argue otherwise, the Investors' loss cannot be separated from that of SPhinX.[13] Because "directly-injured victims can generally be counted on to vindicate the law," *Holmes*, 503 U.S. at 269, the "standing" requirement "serves the interests of judicial economy by allowing courts to determine ... one damage award that will restore" both directly and indirectly-injured tort victims, *Manson*, 11 F.3d at 1132, and "obviates the risk of multiple recoveries" against one defendant for the same misconduct. *Holmes,* 503 U.S. at 269. Whether it is styled as a "standing" rule or as a substantive bar on double recoveries, the result in this case is the same: the Investors claims must be dismissed because their claim for damages is encompassed within SPhinX's claims.

Notably, *Smokes-Spirits* — on which Plaintiffs rely for their argument that Investors have standing — was recently reversed by the Supreme Court, *sub nom. Hemi Group, LLC v. City of New York, N.Y.*, 2010 WL 246151 (Jan. 25, 2010), for the very reason that the claims asserted by the City were derivative. The City alleged that the internet cigarette retailers were required by law to report sales to the State so that the State could collect tax from the purchasers. The State by agreement shared the information with the City, and the City used the information to collect taxes on its own. The Court plurality found that the defendant's failure to comply with its obligation to disclose sales to the State was an injury to the State — and the City was injured only because the state was. The

---

[11] As discussed below in text, the Second Circuit opinion in *Smokes-Spirits.Com* was reversed by the Supreme Court in January 2010.

[12] The Complaints are vague about what damages the Investors actually suffered. See, e.g., SAC ¶ 18 ("The Assignors, including SPhinX investors damaged by Defendants, have assigned claims to the JOLs to be pursued in this litigation to benefit the SPhinX Estate."); SAC ¶ 1 (referring to damages "arising from" the diversion of SPhinX cash from segregated accounts to unsegregated accounts). At any rate, it is clear that whatever damages were suffered by the Investors is derivative of — and part of — the damages claimed by SPhinX.

[13] Plaintiffs rely heavily on the Second Circuit's statement in *In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007), where the court noted that "although they are not parties in interest entitled to object to the Settlement and conduct discovery, Investors may still have remedies for fraud perpetrated by their fiduciaries." But the *Refco* court did not have before it the question of whether the Investors, together with SPhinX, were seeking a double recovery. Moreover, the context of the case was a determination of bankruptcy jurisdiction over the claims, not standing.

Court also noted that the State would have sufficient incentive to sue for damages from the defendant's conduct, so it was unnecessary to grant standing to a party whose injury was derivative.[14]

Judge Preska's decision in *Jackson Nat. Life Ins. Co. v. Ligator*, 949 F.Supp.200 (S.D.N.Y.,1996) is particularly instructive on the relationship between the "standing" rule and the concern over double recovery. Jackson acquired \$33.3 million of debt and equity in two entities (IPM and HIG) in order to finance the purchase of business entities controlled by the defendants. The plaintiffs sued defendants for fraudulent misrepresentations and omissions that artificially inflated the value of the acquired entities. Judge Preska dismissed plaintiffs' claims for lack of standing, finding that plaintiffs' injuries were not "separate and distinct" from the direct injuries suffered by IPM and HIG in acquiring the entities. Id. at 205-06. Judge Preska commented as follows on the risk of double recovery:

> From the outset of this action, I have been concerned about the prospective dangers of a "double recovery." As I stated in my January 19, 1996 oral decision:
>
>> Jackson National loaned IPM approximately \$33 million to purchase the IPM entities. Both parties now claim that they were injured because the \$41 million purchase price was inflated by Ligator's alleged misrepresentation and fraud. Both

---

[14] It bears noting that most of the arguments about standing in the cases are also cast as arguments about probable cause. The cases cited in this Report and Recommendation often blur, or equate, the two concepts — so that the term "derivative" means "no standing" and "no probable cause." For example, in *Bank of America Corp. v. Lemgruber*, 385 F.Supp.2d 200 (S.D.N.Y.2005), the court equated probable cause and standing in the following passage:

Courts in this Circuit have consistently found "injuries that are wholly derivative of harm suffered by a third party" to be "too remote" to establish the proximate causation necessary for a plaintiff to have standing to sue in tort. *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 236, 242 (2d Cir.1999) (holding that derivatively-injured plaintiffs lacked standing to sue for fraud under New York law); Paris Partners, L.P., v. Russo, No. 94 Civ. 5684, 1995 WL 746585, at *5 (S.D.N.Y. Dec.14, 1995) (holding plaintiff partnership which advanced money to its subsidiary to do business with third-party corporation that became insolvent due to defendants' fraud had suffered only a derivative injury and thus did not have standing to sue under RICO).

Id at 217.

Similarly, in *Hemi, supra,* the petition for certiorari raised the question whether the City had standing if the harm was derivative. The *Hemi* plurality essentially found the harm "derivative" and concluded that the City could not establish probable cause. So, the concepts are, if not interchangeable, at the very least substantially similar.

> parties' claims are supported by the same legal theories. Both refer to the same
> property, namely the stock and assets of the IPM entities, and both seek to rectify or
> recoup the alleged overpayment. It is a distinction without a difference to argue, as
> plaintiff does ... that "Jackson's property interest in this action concerns its own
> injuries, not IPM's or H.I.G.s. [sic]"

As I pointed out then, and as plaintiffs conceded, if plaintiffs and IPM and HIG were both
to prevail in their respective actions, the result would be duplicative awards. * * * Numerous
courts, including the United States Supreme Court and the Court of Appeals for the Second
Circuit, have recognized that the type of secondary standing claimed by Jackson National
here is disfavored precisely because it can lead to double recovery, as well as because the
necessary causal link between the actions of the primary violator and the party claiming
injury is too remote. [Citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258
(1992), and *Manson v. Stacescu*, 11 F.3d 1127 (2d Cir.1993)].

Id. at 204.[15]

In their brief in opposition to Robert Aaron's motion to dismiss, the Plaintiffs attempt to
argue that the Investors' alleged injuries are separate and distinct from those of SPhinX — by
stepping away from any implication that the Investors' interests were tied to the business value of
SPhinX:

> The success, or failure, of the investments made by the individual investors in no way turned
> on the value of SPhinX. Regardless of whether the value of the SPhinX entity skyrocketed
> or plummeted, the value of the investments made by the assignors would be unaffected. In
> other words, the value of the investments made by these assignors (absent the wrongdoing
> of Aaron and his co-Defendants) would have turned solely on the investment wisdom of the
> portfolio manager investing the funds, and not on the value of the SPhinX entities.

But this argument does not improve the Investors' case with respect to standing. While it is not
crystal clear, Plaintiffs seem to be claiming that the Investors' claims would not have been tied to
the health of SPhinX because their investment was supposed to be in the segregated account that
SMFF had at Refco LLC. See also SAC ¶ 1354 (referring to the Investors' contractual expectation
that their investment would be placed in a segregated account). But SMFF is making the same
"segregation" argument and is seeking the same recovery — for the excess cash at RCM that was
misappropriated. See SAC ¶ 1 ("This is an action to recover (i) $263 million plus interest in damages
suffered by the SPhinX family of hedge funds . . ."). That is the classic double recovery that the

---

[15] *Banker's Trust Co. v. Rhoades*, 859 F.2d 1096, 1100-01 (2d Cir.1988), provides a
useful comparison with the facts of *Ligator* and the instant case. In *Banker's Trust* a creditor was
awarded standing because he had been "directly injured in having to defend against frivolous
suits"— that was an injury separate and apart from the loss of the money that was leant to the
directly-injured entity.

standing doctrine works to avoid. See *In re Van Dresser Corp.,* 128 F.3d 945, 949 (6th Cir. 1997) (creditor in bankruptcy cannot sue for damages resulting from the harm to the bankrupt corporation: "The defendants here allegedly took a finite amount of money * * * [and] they cannot be required to repay the principal amount of $2.7 million more than once.").

It is true that SPhinX is seeking damages that would appear to be *greater* than the damages sought by the Investors. For example, the Investors cannot lay claim to the entirety of the excess cash transferred from the Refco LLC account, whereas SMFF can.[16]   And SPhinX is also seeking damages other than the loss of cash. See SAC ¶ 16 (claiming damages from misappropriation of other SPhinX funds, fees paid to agents, lost income, etc.).[17] But the fact that SPhinX is seeking damages additional to those sought by the Investors cannot, of course give "standing" to the Investors. The bottom line is that the damages sought by the Investors are *part* of the recovery sought by SPhinX. So the risk of double recovery applies to all of the damages sought by the Investors.

With respect to the contract-based counts in the Aaron Complaint, Plaintiffs allege that the investors were intended third-party beneficiaries of the Service Agreement between DPM and SPhinX, and accordingly have standing to pursue those counts. AAC ¶ 300. But this conclusory statement does not provide standing. Plaintiffs do not contend that any version of the Service Agreement even mentions the Investors, much less identifies them as having rights to enforce the agreement. To create a third-party right to enforce a contract under New York law, the language of the contract must "clearly evidence" an intent to permit enforcement by the third party. *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 45, 485 N.E.2d 208, 495 N.Y.S.2d 1 (1985).[18] Plaintiffs cite nothing in the Service Agreement that would indicate any intent to permit enforcement by the Investors, and a review of the Service Agreement indicates no such expression of intent. Therefore, the Investors' claims cannot derive standing for the contract-based claims by

---

[16] In fact it is not clear that the Investors can lay claim to the loss of *any* of the excess cash because there is no specific allegation in the Complaints that the Investors' money was in the SMFF account.

[17] As stated above, it is unclear whether the Investors are seeking damages from the loss of segregation, or damage from the harm to the business enterprise, or both. But in any case it makes no difference, because whatever they are seeking, SPhinX is seeking as well.

[18] Paragraph 20 of Service Agreement has a governing law provision requiring construction in accordance with New York law. See Pendleton Decl. Ex. 3, 2003 Service Agreement. The Plaintiffs rely on the Service Agreement in the Aaron Complaint and accordingly it may be considered on a motion to dismiss. *Yak v. Brussels Lambert,* 252 F.3d 127 (2d Cir. 2001) (document referred to in the complaint and in the possession of the plaintiff may be considered on a motion to dismiss). Moreover, in oral argument Plaintiffs' counsel conceded that the Service Agreement may be considered in evaluating the motions to dismiss. Transcript of Oral Argument on DPM Motion to Dismiss, January 15, 2010 at 94 ("And I don't care if you look at the service agreement either.").

way of the Service Agreement.

Count 26 of the Sugrue Amended Complaint, for interference with contract/prospective contract alleges that each Investor entered into a contract with SPhinX regarding the handling of their invested cash, and also that SPhinX made contractual representations to the Investors by way of Offering Memoranda, marketing and promotional materials and financial statements. (SAC ¶ 1353). ¶ 1354 avers that the specified defendants interfered with the performance of each of those investor contracts, causing their breach by allowing SPhinX cash to be moved to RCM whereupon it was drawn into the Refco fraud. This Count, at first glance, would arguably satisfy standing requirements because the Investors are arguing that they had their own independent contractual rights breached. Certainly the Investors, on these allegations, would have standing to bring a breach of contract action against SPhinX. But it does not follow that the Investors can bring a *tort* action against third parties when, once again, SPhinX is seeking the same recovery for the exact same damages. If the defendants interfered with the contract, the damages are that the Investors' money that went into SMFF was improperly transferred to an unsegregated account at RCM. That is what SMFF itself is arguing. The Investors want some of that cash back; SMFF wants all of it. To grant standing to the Investors' would raise the risk of double recovery that Judge Preska, in *Ligator, supra,* cautioned against. Surely Judge Preska would not have found standing if the buying corporation and the investor in that case had added a count against the seller for intentionally interfering with the contract between the corporation and the investor. Such an effort to plead one's way out of a standing limitation cannot be successful. Accordingly, the Investors' claims in Count 26 of the Sugrue Complaint should also be dismissed for lack of standing.

### *Recommendation*

The Special Master recommends that the claims brought by Krys and Stride as assignees of claims of SPhinX investors be dismissed for lack of standing, because those claims seek damages that are also sought by SPhinX and are derivative of any damages suffered by SPhinX. Specifically, the following counts should be dismissed with respect to Investors' claims:

- In the *Sugrue* Complaint — Counts 1, 3 and 26.

- In the *Aaron* Complaint — Counts 1,[19] 2, 5, 6, 7, 8, 9, 10.

None of the other counts in any of the three Complaints specifically mentions the Investors as having been injured by the acts alleged in those Counts.[20] To the extent that those other Counts

---

[19] With respect to Count 1 of the Aaron Complaint, DPM has not moved to dismiss, but the other defendants have so moved on the ground that they were not signatories to any contract.

[20] Butt argues in his papers that the Investors lack standing. None of the counts of the Butt Complaint alleges any damages suffered by the Investors. But assuming Plaintiffs intend to make

could be read to seek damages on the Investors' claims, those counts should be dismissed as to the Investors' claims as well.

Further, all of the claims brought by the Investors should be dismissed *with prejudice.* The JOL cannot assert a set of facts that would provide standing for the Investors' claims, because those claims are by nature derivative of those brought by SMFF.

### B. PlusFunds

In contrast to the claims of the Investors, the claims for PlusFunds allege an injury that is separate and distinct from that of SPhinX. Plus Funds is claiming that among other things it lost business enterprise value from the demise of SPhinX at the hands of various defendants. See, e.g., SAC ¶ 17. That separate loss is comparable to the loss found sufficient for standing in *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 104-105 (2d Cir. 1993), in which plaintiffs were horseowners alleging that the purchasers of a raceway made fraudulent statements regarding their intent to keep the raceway operational. The district court argued that the horse owners did not have standing because they were not claiming any injury distinct from financial loss of the Town that issued bonds assisting the defendants to buy the raceway. But the court disagreed. It was true, of course, that the horseowners, like the Town, were both injured because the track was not operational. But the horseowners were "suing for injuries that were a direct and inevitable result of defendants' conduct and must have been anticipated by the defendants" because "plaintiffs were an integral and inseparable part of Roosevelt Raceway" and "[a]n injury to the Raceway was inevitably an injury to them." Also, the horseowners had made expenditures independent from the Town, in reliance on the racetrack being a going concern.

Like the plaintiffs in *Standardbred,* PlusFunds was an "integral and inseparable part" of the SPhinX plan of segregated investment funds, and an injury to the SPhinX funds was "inevitably" an injury to PlusFunds. And PlusFunds is not claiming the same damages as SPhinX. Rather, it claims lost business enterprise value, distinct from the loss of the funds in SMFF. (SAC ¶ 1). PlusFunds also claims — throughout the complaints — independent duties owed to it by the various defendants. See, e.g., SAC ¶¶ 1090, 1103, 1187; AAC ¶¶ 336, 348 et. seq. (alleging independent duties to SPhinX and PlusFunds).

It is true that the commercial viability of PlusFunds was heavily dependent on SPhinX — as SPhinX went, so went Plus Funds. But financial interdependence between two parties cannot automatically mean that only one has standing when they both collapse. If a wrongdoer targets both parties, and thereby destroys the business value of both, then both have standing to sue for their

---

such allegations, the JOL's would not have standing to bring them because, as discussed above, the claims are duplicative of those brought by SPhinX.

*separate* damages. Any other result would confuse the terms "derivative" and "interdependent" and would give a wrongdoer a windfall.

At the very least, PlusFunds has standing for the Counts in the Aaron and Butt Complaints, as those Defendants have never claimed that PlusFunds lacks standing to bring those claims. In any case, the claims involve damages arising from a contractual relationship to which PlusFunds was assertedly a party and/or fiduciary duties owed directly to PlusFunds, and as to which PlusFunds suffered independent damages.

### *Recommendation*

Defendants' motions to dismiss PlusFunds claims for lack of standing should be *denied.*

### *C. SPhinX Funds Other Than SMFF*

The gravamen of the Plaintiffs' complaint is that SPhinX and PlusFunds had a right to rely on the fact that excess cash was segregated and thus protected from any losses at Refco. In making these allegations, Plaintiffs refer to the SPhinX "family of hedge funds." SAC ¶1. But in fact it was not the "family" of hedge funds that had the asserted right to segregation from the ills at Refco. It was only SMFF. See SAC ¶5. (wrongdoers "allowed cash belonging to [SMFF], a SPhinX portfolio fund SPC, to be diverted from regulated, protected, customer-segregated accounts to non-regulated offshore accounts where those assets were commingled with monies from non-SPhinX sources and exposed to the risk of the custodian's insolvency.") It was SMFF — and only SMFF — that opened the account and deposited the funds at issue with Refco LLC. (SAC ¶ 124).

Defendants argue, therefore, that the other SPhinX SPC's have no standing because their funds were not diverted into unsegregated accounts, and any loss suffered by those SPC's was only because SMFF's funds were so diverted. Defendants emphasize that each SPC was a separate legal entity. See *In re Refco Inc.*, 505 F.3d 109, 111 n.2 (2d Cir. 2007) ("an SPC is a single legal entity"). Accordingly they claim that the other SPC's must show an injury separate and distinct from SMFF.

At oral argument in this matter, Plaintiffs made an effort to show direct injury by describing how the funds at each of the SPhinX SPCs would funnel cash to SMFF. Counsel for Plaintiffs asserted that "SMFF was the collector of excess cash" for all of the SPhinX funds. (Tr. at 122:13-20). But the assertion in the oral argument is found nowhere in the amended complaints. The Complaints *do* allege that an investor in SPhinX feeder funds could elect to have a portion of the invested proceeds flow into SMFF. *See, e.g.,* BAC ¶60. But that indefinite assertion is a slender reed for standing and is not the same as the assertion in the oral argument that SMFF was the designated

17

collector of excess cash for all the funds.

In any case, even if it is assumed that SMFF swept up the excess cash from the other SPhinX funds, that would still not give the other funds standing. It would only mean that those funds would be suing for the *same loss* as SMFF — just like the Investors — and allowing those funds to sue would raise the spectre of double recovery that the standing doctrine is designed to prevent.[21]

### *Recommendation*

For the reasons discussed above, the claims brought by the SPhinX funds other than SMFF should be dismissed for lack of standing. None of those claims are broken out in any of the Counts — the Counts simply refer to "SPhinX" as being damaged. *See, e.g.,* SAC ¶ 1253. But all references to SPhinX in the claim for relief should narrowed to the claims brought by SMFF.

As discussed above with respect to the Investors, Count 26 of the Sugrue Complaint should also be dismissed with respect to SPhinX funds other than SMFF. While this Count invokes a contractual right, it sounds it tort, and the only damages alleged are those that would have been suffered by SMFF.

Further, the claims brought by the SPhinX funds other than SMFF should be dismissed *with prejudice.* Those funds cannot assert a set of facts that would give them standing, as their claims are by nature derivative of the claims brought by SMFF.

### *D. Standing for Damages Resulting From the Refco Fraud*

Defendants have conceded that SMFF (more specifically, the JOLs suing on behalf of SMFF) has standing to sue for the claimed loss of the excess cash that was deposited at RCM.[22] This concession is certainly reasonable as SMFF is claiming a direct loss as a result of a violation of duties (of maintaining segregation) owed directly to it — those are losses suffered by SMFF. The transfer to RCM did not, by definition, injure RCM, and therefore the SMFF segregation claim is not derivative of loss to Refco and there is no risk of double recovery.

Defendants, however, do contend that SMFF — and PlusFunds and the Investors, for that

---

[21] The cases and legal principles discussed with respect to Investors' lack of standing are fully applicable to the question of standing for funds other than SMFF. See Part II A, supra.

[22] See December 1, 2009 Supplemental Submission to the Special Master at 2: "As an initial matter, all but one of the Plaintiffs — SMFF — lack standing to sue."

matter — lack standing for any claim stemming from what this Report refers to as the "Refco fraud." The argument is that any wrong that was done in the Refco fraud was ultimately a harm to Refco — because the goal of the insiders was to strip assets and cash out in the LBO and IPO. So the argument is that the Plaintiffs' claims are derivative — and no different from the damages suffered by any other creditor of Refco.[23]

If SMFF and PlusFunds have standing to pursue the claims for damages allegedly resulting from the transfer of funds from Refco LLC to RCM, why does it make a difference whether they have standing under their alternative theory, i.e., the Refco fraud? It makes a difference because many of the defendants in this litigation are on the hook *only* because of their alleged participation in the Refco fraud. So if there is no standing to pursue claims for damages arising from the Refco fraud, then these defendants should be dismissed from the action.

Plaintiffs address the claim of "no standing for Refco fraud claims" by invoking their claims under the SPhinX fraud. In their brief in opposition to the Bank Defendants' Motion to Dismiss, Plaintiffs assert that they

"do *not* seek to recover damages resulting from any generalized harm suffered by all of Refco's creditors. Plaintiffs seek to recover damages resulting from the wrongful transfer of SPhinX cash to RCM where it was lost in the Refco scandal and the resulting destruction of their businesses. Plaintiffs' injuries are thus not dependent upon any Refco insiders' looting of cash *from* the corporation. Plaintiffs' cash was lost when segregation protections were removed and the cash became commingled and immediately available *to* Refco for its own corporate purposes. (Emphases in original).[24]

This argument is misdirected because Defendants are not arguing that Plaintiffs — or at least SMFF — have no standing to sue for the excess cash that was taken out of the segregated account and moved to RCM. As stated above, the loss of that cash caused direct damage to SMFF and PlusFunds, and was not a harm to RCM at all.

But the point is that any damages claimed by Plaintiffs must flow from *that* wrong — the transfer to the unsegregated account — and not any damages that might have occurred as a result of the Refco fraud. That is because any claim that Plaintiffs were hurt by Refco insiders cashing out in the IPO, or improperly upstreamed assets from RCM, or Round Trip Loans, etc., would be claims derived from the harm to *Refco* that occurred because of that scheme. It is only because RCM couldn't pay them off that Plaintiffs would have a cause of action under the Refco fraud theory. And RCM was unable to pay because it was stripped and made insolvent by the Refco fraud. Indeed, Plaintiffs all but admit in the passage from their brief set forth above, that their claims under the

---

[23] *See Manson v. Stacescu,* 11 F.3d 1127, 1130-31 (2d Cir.1993) (creditor does not have standing to assert a claim for injuries that are derivative of those sustained by that corporation).

[24] Memorandum in Opposition to Bank Defendants' Motion to Dismiss at 20.

Refco fraud theory *are* derivative — as they foreswear an intent to recover damages from "any generalized harm suffered by all of Refco's creditors."

The Plaintiffs' response then shifts gears, going back to the Refco fraud theory that it had shied away from — as indicated later in the brief in opposition to the Bank Defendants motion to dismiss:

> In any event, Plaintiffs' injuries are distinct. The gravamen of Plaintiffs' claims is that, owing to the Bank Defendants' material assistance and participation in fraudulently disguising Refco's insolvency, the *SPhinX entities* and *PlusFunds* relied upon Refco's false image of solvency and entrusted investor funds to Refco's custody. As a result, $263 million in investor funds were lost, and PlusFunds' business was destroyed. *See* Am. Compl. ¶¶ 1, 16, 518, 1217. These damages are unique to Plaintiffs. (Emphasis in original).[25]

Let us put aside the fact that the "gravamen" of the Complaint, as indicated in SAC ¶ 1, is that SMFF cash was transferred to an unsegregated account at RCM and so left at the mercy of Refco. If the cash had remained in a segregated account, Refco's "false image of solvency" would have been of no matter because the money would have remained protected.

Even if the "gravamen" can change depending on the argument addressed, if Plaintiffs are asserting that their damages claims stem from relying on a false image of solvency in doing business with Refco, their loss is the fact that Refco projected a false image of solvency, *then went bankrupt*. That claim is no different from any other creditor of Refco and is dependent on the harm to Refco that occurred through the Refco fraud.[26]

Plaintiffs argue that SMFF is different from an ordinary creditor because it was specifically targeted by Refco. This response is a shift back to the segregation claim, i.e., the SPhinX fraud. Plaintiffs elaborate as follows:

> Although the looting of Refco harmed SPhinX and PlusFunds, Plaintiffs' injuries are not dependent on any injury to Refco from insiders' looting through the LBO, IPO or otherwise. SPhinX and PlusFunds were damaged when SMFF's cash was deposited and commingled at RCM. See Sugrue Compl. ¶¶ 5-8; Aaron Compl. ¶¶ 5-8. This cash became immediately available to Refco for its own corporate purposes. See id. ¶¶ 7; Aaron Compl. ¶ 7. Not only was this not an injury to Refco, it was a benefit to Refco. Thus, SPhinX's is in no way

---

[25]Memorandum in Opposition to Bank Defendants' Motion to Dismiss at 21.

[26] Plaintiffs argue that Judge Lynch's opinion in *Krys v. Sugrue*, 2008 WL 4700920 (S.D.N.Y.), is dispositive of the question of their standing to claim damages resulting from the *Refco* fraud. But the question in *Krys* was only whether Plaintiffs' claims against BAWAG were "core" bankruptcy matters. Judge Lynch did not decide any question of Plaintiffs' standing — especially for claims arising from the Refco fraud.

derivative of some injury to Refco.[27]

Again, fine, *if the Plaintiffs' claim is not about the Refco fraud.* But the argument cannot shift from one theory to the other to avoid a finding that, as to one of the theories, the Plaintiffs' claims are no different from any other Refco creditor.

The law is clear that in a bankruptcy, claims of creditors arising from the insolvency of the debtor  must be resolved in the bankruptcy proceeding, because they are property of the estate. Property of a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The commencement of the case" is the moment the debtor files for bankruptcy. *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir.1987). And it is "well established that the 'interests of the debtor in property' include causes of action." *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988). A debtor's appointed trustee has the exclusive right to assert the debtor's claim. *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright ( In re Educators Group Health Trust )*, 25 F.3d 1281, 1284 (5th Cir.1994). "If, on the other hand, a cause of action belongs *solely* to the estate's creditors, then the trustee has no standing to bring the cause of action." Id. (emphasis added). Any claim under the Refco fraud is for the harm that occurred to Refco because, fundamentally, all of the debtors' claims are simply that "Refco could not pay us back because it was looted and went bankrupt." In contrast, the claim for any unauthorized transfer to an unsegregated account arose at the time of that transfer — before the date of RCM's bankruptcy — and so it is not property of the RCM Estate.[28]

The court in *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 442 (4th Cir. 1999), explained the rationale for denying standing to those claiming loss due to harm to a corporation that led to the corporation's bankruptcy. In *Ruppert,* sureties of the bankrupt corporation challenged the propriety of transactions between that corporation and the defendant — transactions that assertedly led to insolvency. The court declared as follows: :

> It is clear that the trustee should have first crack at challenging the Ruppert/Green Thumb transaction — the trustee's role is to bring suits such as these on behalf of all the creditors. As a general matter "[t]he trustee's single effort eliminates the many wasteful and competitive suits of individual creditors." Koch Ref. v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1342-43 (7th Cir.1987). All creditors, not simply the Sureties, have a stake in exposing any impropriety in the Ruppert/Green Thumb transaction. If Ruppert secured a

---

[27] Plaintiffs' Memorandum of Law in Opposition to the Bank Defendants' Motion to Dismiss at 20.

[28] 15 Collier on Bankruptcy, ¶ 541.04 at 541-22 (15th ed. 2006) ("the critical time as of which the property comprising the estate is to be determined * * * is the date upon which the petition is filed")

transfer of assets by unlawful means, all creditors of Green Thumb would be potentially disadvantaged by it.

To allow selected creditors to artfully plead their way out of bankruptcy court would unravel the bankruptcy process and undermine an ordered distribution of the bankruptcy estate. The goal of bankruptcy is to consolidate the proceeding and avoid piecemeal litigation — a goal that would be sacrificed by permitting the district court to entertain the merits of the Sureties' suit.

Reserving the action for the trustee maintains the integrity of the bankruptcy proceeding and ensures that individual creditors cannot hijack the bankruptcy process. If it were otherwise, there would be "a multijurisdictional rush to judgment whose organizing principle could only be first-come-first-served." *American Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1274 (5th Cir.1983).

Of course, courts are also concerned about the risk of double recovery when a creditor with a derivative claim sues outside the bankruptcy proceeding.  See *In re Van Dresser Corp.,* 128 F.3d 945, 949 (6th Cir. 1997) ("Simply put, the debtors' estates can * * * recover from [the wrongdoer] for [the guarantor] and [the bankrupt corporation's] common damages. Any recovery by the plaintiff would benefit him twice; once as guarantor and again as creditor. Instead, Honigman must recoup whatever portion he can * * * from the bankrupt estates.").

Plaintiffs rely on *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037 (2d Cir. 1986), in which a creditor was permitted to sue for fraudulent statements about the financial health of the corporation — which statements caused the creditor to do business with the corporation that thereafter went into bankruptcy. While *Thropp* has a surface similarity to the instant case, it can be and has been distinguished as a case in which the policy of requiring all creditors' claims due to insolvency to proceed through the bankruptcy estate was not at issue. The court in *Bankers Trust Co. v. Feldesman*, 676 F.Supp. 496, 501 (S.D.N.Y.,1987), expressed the distinction as follows:

In *Cumberland* every creditor who had filed a claim with the bankruptcy court received full payment on their claims prior to the plaintiff's suit. 791 F.2d at 1040. In addition, the bankruptcy trustee had already vindicated the corporation's right to recover misappropriated corporate assets by suing the corporate officers. Id. at 1042. Therefore, plaintiff's recovery did not threaten to disrupt the equitable distribution of the corporation's assets. Here, by contrast, the creditors have not received full payment on their claims * * * . *Cumberland*, therefore, is not controlling.

Plaintiffs also rely on cases holding that a party can sue for a derivative recovery if it is owed a fiduciary duty. *See, e.g., Abrams v. Donati,* 66 N.Y.2d at 953, 498 N.Y.S.2d at 783, 489 N.E.2d 751 ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may

22

derivatively sue but not individually" but "Exceptions to that rule have been recognized when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged."); *Qantel Corp. v. Niemuller*, 771 F.Supp. 1361, 1367 (S.D.N.Y.1991) (plaintiff could bring breach of fiduciary duty claim against president of its indirect subsidiary resulting from decline in value of indirect subsidiary's stock where defendant president also owed separate fiduciary duty to plaintiff) (citing cases).

But this case law is inapposite for at least two reasons. First, none of these cases involve bankruptcy and the rule that property of the estate must be pursued in bankruptcy. See, e.g., *Ruppert Landscaping, supra.* Second, these cases involve fiduciary duties owed to *shareholders and related corporations*, not customers of the primary company.[29] Plaintiffs have not advanced a reason to lift the bar on derivative recovery of the property of the bankruptcy estate whenever a fiduciary duty is extends to someone whose only relationship to the corporation is that of customer. The law is to the contrary: individual debtors of an insolvent corporation have been held to lack standing to assert claims for breach of fiduciary duty that led to the corporate insolvency. See *North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.D.2d 92, 103 (Del. 2007) (individual creditors of an insolvent corporation have no right to assert derivative claims even if grounded in breach of fiduciary duty; those claims remain derivative).[30]

---

[29] See the description of the rule in *Qantel, supra,* at 1367:

It is well established that " '[a]n "action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation" ' through a derivative action." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir.1988). It is also well established that an exception to this rule exists where the defendant owes the plaintiff shareholder a fiduciary duty, and the plaintiff seeks to recover for a breach of that duty that allegedly caused the plaintiff's shares to decline in value, such as the waste of the assets of the plaintiff's subsidiary. In such a case, the plaintiff parent shareholder has standing to recover for that decline in value, despite the fact that the subsidiary corporation may itself have a claim against the defendant for the direct injury to it. See 15 N.Y.Jur.2d, Business Relationships § 1010, at 271-72 (1981) ("A corporation may maintain an action against a director for violation of a duty that he owes to the corporation even where the violation consists of participating in the mismanagement of a subsidiary corporation, thus causing damage to the parent company by the depreciation of its stock held in the subsidiary corporation."). (Some citations omitted).

[30] To be clear, I am not asserting that Plaintiffs have failed to allege a fiduciary duty on the part of Refco or any of the defendants. They have certainly so alleged, and a subsequent opinion will evaluate whether those allegations withstand a motion to dismiss. Rather, the point is that even if plaintiffs have a claim for breach of fiduciary duty, that is not enough to justify an exception to the rule that claims of corporate customers are derivative of corporate harm and are the property of the bankruptcy estate.

23

Finally, Plaintiffs rely on *GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289 (2d Cir.1994), in which a creditor of a defunct corporation was found to have standing to bring a RICO claim alleging that the defendants had stripped the assets from a corporation so that it could not pay on a note held by the plaintiff. The *GICC Capital* court distinguished the prior case of *Manson v. Stacescu*, 11 F.3d 1127 (2d Cir.1993), which held that a plaintiff "does not have standing in his capacity as a creditor, shareholder, or employee of a corporation to assert a RICO claim for injuries that are derivative of those sustained by that corporation." The *GICC* court's distinction was that in *GICC,* the plaintiff-creditor had suffered a direct injury when the corporation was stripped of assets and rendered unable to pay the note. That is less a "distinction" than a conclusion. The *GICC* court does not explain why the creditor's injury was direct while the creditor's injury in *Manson* was derivative. Judge Preska, in *Jackson Nat. Life Ins. Co. v. Ligator,* 949 F.Supp. 200, 205-6 (S.D.N.Y.,1996), noted the difficulty of reconciling the two cases, but resolved them by interpreting *GICC* narrowly:

> While *GICC* does seem to represent something of an intra-circuit split from *Manson*, its facts differ so widely from the present case that it provides no support for the plaintiffs' position. In *GICC,* the primary injured party was TFG, the debtor of the plaintiff, but there was no realistic possibility that TFG would bring suit "for the law's vindication." *Holmes*, 503 U.S. at 273, 112 S.Ct. at 1320. As the Court of Appeals noted, "TFG released [the defendant] from all claims that TFG might have had against [the defendant]. TFG's officers and directors resigned. TFG thus was cast adrift without recourse against" the defendant, its subsidiaries, or controlling persons. *GICC,* 30 F.3d at 291. GICC thus represents the anomalous case *where the primary injured party lacks the ability to sue. Suit by the derivatively injured party may be the only means to an equitable resolution in such a case; significantly, there exists no risk of double recovery.* [31] (Emphasis added).

---

[31] It should also be noted that in *GICC* the looted corporation was not in bankruptcy, and so the policy of requiring claims to proceed through the bankruptcy proceeding was not operative.

In *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999), the court provides a different explanation of the result in *GICC:*

> In *GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 290 (2d Cir.1994), plaintiff accepted a promissory note from defendants as part of an unrelated settlement. During the negotiation of the terms and issuance of the note the defendants did not disclose that, *at the same time* they were agreeing to cause the corporation to issue the note, they were stripping it of assets, rendering it unable to meet that obligation. The defendants' failure to disclose the stripped-down status of the corporation induced the plaintiff to accept the note in settlement. We stated that because of the timing and magnitude of the note, the plaintiffs had RICO standing. In other words, if the plaintiffs had accepted a promissory note from a corporation that was at that time able to repay the note, and later the defendants stripped the corporation, the injury would have been

In this case, the Trustee of the Refco Litigation Trust ("Refco Trustee") is actively pursuing claims of the RCM Estate. Claims derived from the looting of Refco should therefore be brought in the Refco bankruptcy proceeding.[32]

But Judge Preska's explanation of *GICC* does raise an interesting possibility. What if the Refco Trustee is unable to pursue the claims of the RCM Estate? Judge Lynch has dismissed the Trustee's complaint against most of these same defendants under the so-called *Wagoner* or *in pari delicto* doctrine. *See Kirschner v. Grant Thornton LLP,* 2009 WL 1286326 (S.D.N.Y.2009) (relying on *Shearson Lehman Hutton v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991)).On appeal, the Second Circuit has certified some of the questions on standing to the New York Court of Appeals. *Kirschner v. KPMG LLP*, 590 F.3d 186 (2d Cir. 2009). Assuming Judge Lynch's *Wagoner* ruling is affirmed, a Refco creditor might be able to make a strong argument, under *GICC*, that they now have standing to sue. If the Refco Trustee cannot sue, then there is no risk of double recovery and, as Judge Preska puts it, suit by the derivatively injured party "may be the only means to an equitable resolution in such a case."

The conundrum of creditors who must defer to a Trustee who cannot sue would be solved by dismissing the creditors' claims *without prejudice.* If it is definitively determined that the Refco Trustee cannot bring the claims of RCM, then the creditors should be allowed to revive the claims. There would be no risk of double recovery, no risk of disrupting the bankruptcy proceeding; and if

> indirect because it would have derived wholly from injuries to the corporation. But, when the promissory note was issued, the corporation had already been stripped of enough assets to undermine the possibility of repayment. Thus, because of the defendants' misrepresentations, the plaintiff in *GICC* * * * accepted an over-valued asset, the note, in exchange for the settlement of their litigation claims. The injury was direct because the plaintiff was immediately injured in the process of negotiating the settlement contract with the defendants, rather than as a derivative result of later injuries to a third party namely, the corporation that issued the note.

Id. at 238 (some citations omitted; emphasis in original). This analysis, as applied to the instant case, means that *GICC* supports the claim of standing to sue on the SPhinX fraud but not on the Refco fraud. The SPhinX fraud injury occurred when the cash was transferred to RCM — before the injury to RCM. The Refco fraud injury occurred when RCM could not pay back the cash, and that is the same time — or after the time — RCM was injured.

[32] Plaintiffs argue that they are unable to have their claims pursued in the RCM bankruptcy proceeding because their claims were cashed out in the Preference Settlement. But that is because the Plaintiffs voluntarily released those claims in connection with their settlement of the Preference Action. SAC ¶ 14; *In re Refco LLC,* No. 05-60134 (Bankr. S.D.N.Y. Oct. 10, 2007). Plaintiffs received almost $50 million in exchange for the release. SAC ¶ 14.

the creditors could not sue, there would be a wrong without a remedy.[33]  Judge Preska, in *Ligator* applied this very practice in a case where the corporations that suffered the primary harm were arbitrating the primary claim. Judge Preska held that "Jackson National should await the outcome of the arbitration brought by the directly injured parties." 949 F.Supp. at 206-7. She dismissed the claim of the derivatively injured plaintiff *without prejudice*. *Cf. Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037 (2d Cir. 1986) (allowing creditor's suit to proceed *after* the bankruptcy trustee had already vindicated the interests of the estate).

That "without prejudice" solution is complicated in this case by two factors. First, SMFF and PlusFunds, assuming their allegations are true, are not without a remedy in this case. They *have* standing to bring all the claims arising from the SPhinX fraud.[34] The inclusion of the Refco fraud theory brings these Plaintiffs nothing in terms of additional damages. It only brings them additional defendants. Second, SPhinX has already had its claims related to the Refco bankruptcy resolved, in a sense. In the Preference Settlement, SPhinX released its its claims against the Refco Estate and, in exchange, retained approximately $50 million of the alleged preferential payment of $313 million. So, while creditors without any remedy other than reliance on the Refco fraud might have an argument that equity is in their favor, SMFF and PlusFunds are in a somewhat weaker position to make that argument.

Yet under the circumstances, the fairest result is to dismiss the claims derived from the Refco fraud *without prejudice*. If it is determined that the Refco Trustee cannot bring the claims for the Estate, then the equities of allowing SMFF and PlusFunds to bring the derivative claims based on the Refco fraud can be assessed at that time.[35] While it is true that SMFF and PlusFunds have standing to pursue the SPhinX fraud claims, the fact is that the Refco fraud claims are substantively different and proceed against different defendants. Given the realities of litigation, it may not be the case that the claims derived from the SPhinX fraud will by definition result in an "equitable resolution" (*Ligator, supra)* if the Refco Trustee is barred from suing on the Refco fraud.

---

[33] When the defendants' arguments are juxtaposed, the irony is evident. In this action, they argue that the Plaintiffs have no standing to sue on the basis of the Refco fraud because those actions are to be brought by the Refco Trustee. And in the action brought by the Refco Trustee, they argue that the Trustee has no standing to sue on the basis of the Refco fraud because he stands in the shoes of the wrongdoing corporation.

[34] As discussed above, the Investors and the SPhinX funds other than SMFF do not have standing, but that is not because their claims are derivative of the harm to Refco and therefore are to be brought by the Refco Trustee. Rather it is because the damages are derivative of the harm to *SMFF* — and those claims are, of course, being actively pursued in this proceeding.

[35] Of course the need to revisit the standing issues would be mooted if it is found in the interim that the claims should be dismissed on any of the other grounds pressed by the Defendants.

Moreover, if the Trustee is barred from suing on the Refco fraud, it would be irrational for SMFF and PlusFunds to be disadvantaged — in comparison with other creditors with derivative claims — by the fact that they were allegedly injured *both* derivatively and directly. And while it is true that SPhinX settled in the preference action, this should not necessarily bar SPhinX (much less PlusFunds) from seeking a recovery if the Trustee is barred from suit. The settlement was with the Refco Estate, not the defendants in this action, and nobody argues that SphinX, by settling, was fully compensated for its loss.

### *Recommendation*

For all the reasons discussed above, the Special Master recommends that the claims by SMFF and PlusFunds for damages arising from the Refco fraud be dismissed without prejudice.

### *III. Review of Counts That Seek Damages for the Refco Fraud*

For ease of the court's reference, the Counts in these matters will be divided below according to whether the Plaintiffs'[36] allegations are based solely in the Refco fraud, or whether the allegations concern the transfer of funds from a segregated to an unsegregated account.[37]

Before reviewing the Counts, two points of clarification are necessary in distinguishing between the SPhinX fraud and the Refco fraud:

*First*, those Counts alleging damages from the Suffolk Transactions are related to the *SPhinX fraud*, and not the Refco fraud. This is because Plaintiffs allege that the Suffolk Transactions were specifically intended to, among other things, cover up and further the SPhinX fraud by paying off

---

[36] If the court agrees with the prior recommendations in this R and R, then at this point the "Plaintiffs" will be SMFF and PlusFunds.

[37] Counts 9-12, against the Gibson Dunn defendants, are not considered herein. Judge Rakoff, in an Order dated January 21, 2010, dismissed the Counts against those defendants and ordered that they "be sent to arbitration."

those innocents who were beginning to question the administration of the SMFF cash. (SAC ¶ 295). Moreover, Plaintiffs assert that the Suffolk transactions directly harmed PlusFunds  by putting ownership and control in the hands of Refco and individual wrongdoers.(SAC ¶¶ 307, 328). These allegations seek recovery for  a direct injury and accordingly give standing to sue to both PlusFunds and SMFF.

In contrast, any count that relies upon the diversion of SMMF funds *from* RCM for use by Refco and its insiders invokes the Refco fraud. When RCM cash was diverted, that was an injury to RCM. Any injury to customers of RCM was thus derivative and, as the discussion above indicates, such claims need to be brought in the RCM bankruptcy proceeding.[38]


### A. Counts Involving Only the Refco Fraud, Which Should Be Dismissed for Lack of Standing:

### ● Count 14, Against Bennett, Trosten, Maggio, Tone Grant, Hackl. Klejna and RAI, for Breach of Fiduciary Duty

#### Explanation:[39]

This claim is about the Refco fraud. It refers to duties to "creditors and customers, including SMFF." SAC ¶ 1233. It alleges that SMFF funds were diverted to fund Refco business activities. But the gravamen of the SPhinX fraud, and the only direct injury suffered by SMFF and PlusFunds, arose because the cash was transferred from a segregated account to an unsegregated account. It is true that the *reason* for transferring the funds to RCM was so that they could be used upstream. But, again, the gravamen of the complaint is the transfer to RCM, because if the funds had remained in a segregated account, upstream use would have not been harmful to the Plaintiffs. Most importantly, when RCM cash was diverted, that was an injury to RCM.


### ● Count 21, Aiding and Abetting Breach of Fiduciary Duty, Against Credit Suisse and BofA

---

[38] The Plaintiffs seem to recognize this point in their briefing. As discussed above, in the brief on Omnibus Issues at page 5, Plaintiffs argue that  their claim for damages is not derivative of RCM's because "SPhinX and PlusFunds were damaged when SMFF's cash was deposited and commingled at RCM."

[39] The categorization for many of the accounts is self-evident. Where explanation was thought necessary, it is provided.

*Securities*

*Explanation:*

This claim alleges damages to the Plaintiffs resulting from the LBO and the IPO. That is the essence of the Refco fraud.

● *Count 22, Aiding and Abetting Fraud, Against Credit Suisse and BofA Securities*

*Explanation:*

Again, like Count 22, this Count is all about the LBO and the IPO.

● *Count 23, Aiding and Abetting Fraud, Against BAWAG and RTL Participants*

*Explanation:*

The Round Trip Loans were a part of the Refco fraud. Plaintiffs allege that the goal of the Round Trip Loans was to conceal the RGHI Receivable and thereby allow the Refco insiders the time and opportunity to cash out their interests in Refco through the LBO and IPO. See, e.g., ¶¶ 1019, 1022.  That is a direct harm to Refco and a derivative harm to the Plaintiffs. The Plaintiffs, by relying on the false picture of solvency caused in part by the Round Trip Loans, did business with Refco to their detriment. But so did every other customer. And as discussed above, harms suffered by undifferentiated creditors are to be vindicated, if possible, in the bankruptcy proceeding.

● *Count 24, Aiding and Abetting Breach of Fiduciary Duty, Against BAWAG and the RTL Participants*

*Explanation:*

This Count refers to a breach of duty by Refco LLC, and so might be thought to implicate the SPhinX fraud in some way. But ultimately the claims in this Count refer to 1) Refco's false picture of solvency and 2) diversion of assets of RCM's customers to fund the Refco fraud. Accordingly, these claims are derivative and should be dismissed for lack of standing.

● *Count 25, Breach of Fiduciary Duty/Aiding and Abetting, Against THL Defendants*

*Explanation:*

The THL defendants obtained a majority interest in Refco after the LBO transaction in

August 2004. ¶ 1339. Count 25 alleges that these defendants essentially continued the Refco fraud by keeping up the Round Trip Loan scheme and allowing the continued diversion of RCM customer accounts. This Count is, therefore, all about the Refco fraud and Plaintiffs have no standing at this point to bring it.

### B. Counts Solely Alleging Damages From the Unauthorized Transfer of SMFF Excess Cash From Refco LLC to RCM:

● **Count 1, Breach of Fiduciary Duty Against Sugrue, Kavanagh and Owens**

● **Count 2, Aiding and Abetting Breach of Fiduciary Duty Against Sugrue, Kavanagh and Owens**

● **Count 3, Fraud/Misrepresentation Against Sugrue, Kavanagh and Owens**

● **Count 4, Conversion/Aiding and Abetting Conversion Against Sugrue, Kavanagh and Owens**

● **Count 5, Officer/Director Liability Against Sugrue, Kavanagh and Owens**

● **Count 6, Accountant Malpractice Against PwC and Ferris**

● **Count 7, Aiding and Abetting Breach of Fiduciary Duty Against PwC and Ferris**

● **Count 8, Fraud/Misrepresentation Against PwC and Ferris**

● **Count 15, Conversion, Against Bennett, Trosten, Maggio, Tone Grant, Hackl and RAI, for Conversion**

*Explanation:*

The focus of this claim is somewhat unclear. But the Plaintiffs do complain that the SMFF funds "were entrusted to Refco for specific limited purposes." So that assertion looks like it is referring to the transfer to an unsegregated account. Indeed the segregation right would be what makes the transfer *unauthorized. See generally* Judge Lynch's rejection of the conversion claim as to the FX accounts, in which there was no right of segregation. *Kirschner v. Bennett,* 648 F.Supp.2d 525, 543 (S.D.N.Y. 2009).[40] Accordingly, this Count, fairly read, implicates the unauthorized transfer

---

[40] See also Letter Dated November 9, 2009 from Plaintiffs to Special Master addressing Judge Lynch's opinion in *Kirschner v. Bennett* at 2 (noting that the relevant customer agreement

into an unsegregated account; SMFF and PlusFunds therefore have standing to bring it.

● *Count 20, Aiding and Abetting Breach of Fiduciary Duty, Against RAI, RGHI, and Refco Associates Inc.*

● *All Counts in the Aaron and Butts Complaints*

   *Explanation:*

   As discussed above, the defendants in *Aaron* and *Butts* do not challenge the standing of SMFF or PlusFunds. At any rate, all the Counts in those two complaints are based on claims for damages from the SPhinX fraud.

   C. *"Mixed" Counts — Alleging Damages From the Refco Fraud and From the Unauthorized Transfer to RCM:*

● *Count 13, Fraud, Against Bennett, Trosten, Maggio, Tone Grant and Hackl*

   *Explanation:*

   Most of the allegations in this Count relate to the Refco fraud and should be dismissed for lack of standing. But the allegation in ¶ 1224 — that Hackl made misrepresentations that SMFF cash was maintained in customer-segregated accounts, invokes the SPhinX fraud and so SMFF and PlusFunds have standing to bring this claim against Hackl.[41]:

---

between SMFF and Refco LLC differs from those between the FX customers and RCM, precisely because the former contained a segregation obligation and the latter did not).

   [41] The paragraphs cited throughout the review of the Counts are not intended to imply that they are the *only* source of the allegation that Plaintiffs have standing to make. The citations are simply intended to direct the court to an allegation that clearly indicates that the Plaintiffs are, in that Count, alleging damages from an improper transfer of SMFF excess cash to RCM.

● *Count 16, Aiding and Abetting Breach of Fiduciary Duty, Against Bennett, Trosten, Maggio, Tone Grant, Hackl, Klejna, RAI and Chase*

*Explanation:*

As with Count 13, supra, Hackl's alleged direct misrepresentation that SMFF cash was in a segregated account implicates the SPhinX fraud. SAC ¶ 1251.

References to the defendants "failing to disclose the true financial condition of Refco and RCM and by actively concealing it" invoke the Refco fraud, and claims relying on those assertions should be dismissed, without prejudice, for lack of standing. SAC ¶ 1249.

Finally, the allegation against Chase is that it gave substantial assistance to the breaches of fiduciary duty by other defendants "by effecting transfers of SMFF's cash *into and out of* RCM's Chase account." ¶ SAC 1252 (Emphasis added). This allegation implicates the SPhinX fraud in part because it implicates Chase in the *process* of transferring the SMFF cash out of the segregated account at Refco LLC. But references to transfers *out of* the RCM account invoke the Refco fraud, for reasons discussed above.

● *Count 17, Aiding and Abetting Fraud, Against Grant Thornton, Ramler, E&Y, PwC, Ferris, Collins, Best, Koury, and Mayer Brown*

*Explanation:*

All of the allegations in this Count implicate only the Refco fraud, but for one: ¶ 1262 charges that PwC and Ferris gave substantial assistance by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds. Earlier allegations in the Complaint refer directly to the fact that these defendants should have, and did not, uncover the fact that SMFF funds were not (as innocents at SPhinX and PlusFunds thought) maintained in segregated accounts. *See, e.g.*, ¶ 698. Therefore the claim against PwC and Ferris, fairly read, implicates the SPhinX fraud, and PlusFunds and SMFF have standing to bring it.

● *Count 18, Aiding and Abetting Breach of Fiduciary Duty, Against Grant Thornton, Ramler, E&Y, PwC, Collins, and Mayer Brown*

*Explanation:*

All of the allegations in this Count implicate only the Refco fraud, but for one: ¶ 1277 charges that PwC gave substantial assistance to the breach of fiduciary duties of other defendants by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds. Earlier allegations in the Complaint refer directly to the fact that PwC should have, and did not, uncover the

32

fact that SMFF funds were not (as innocents at SPhinX and PlusFunds thought) maintained in segregated accounts. *See, e.g.,* ¶ 698. Therefore the claim against PwC implicates the SPhinX fraud, and PlusFunds and SMFF have standing to bring it.

● *Count 19, Aiding and Abetting Conversion, Against Grant Thornton, E&Y, PwC, Ferris, Collins, Best, Koury, Mayer Brown, RAI and Chase*

*Explanation:*

Most of the allegations in this Count relate to the Refco fraud. The allegations relating to the SPhinX fraud include: 1) ¶ 1288, PwC's audit of the SPhinX and PlusFunds financial statements; ¶ 1290, RAI gave substantial assistance to the transfer of SMFF assets into the RCM account; and ¶ 1291, Chase assisted in the process of transferring the SMFF cash into the commingled account it maintained for RCM.

● *Count 26, Against Sugrue, Kavanagh, Owens, RAI, Mayer Brown, Collins, Best, Koury, Bennett, Hackl, Chase, and RGHI*

*Explanation:*

This Count alleges interference with various contracts entered into by SPhinX and PlusFunds. These claims therefore generally assert a direct injury suffered by SMFF and PlusFunds and they have standing to bring them.[42] A few of the allegations refer to the Refco fraud, and to the extent damages are claimed on these allegations, they should be struck without prejudice for lack of standing. See, e.g., SAC ¶ 1350, referring to harm from "allowing the SPhinX money to be used for the RTL's.

Moreover, the inclusion of Meyer Brown, Collins, Best, Koury and RGHI as defendants in this Count can only be through reliance on the Refco fraud. There is nothing in the Complaint that implicates these defendants in the SPhinX fraud. Accordingly, these defendants should be dismissed without prejudice from the Count.

---

[42] For reasons expressed earlier in this Report and Recommendation, the claims in Count 26 brought by the Investors and SPhinX funds other that SMFF should be dismissed for lack of standing. The claims sound in tort and not contract, and the damages allegedly suffered by those Plaintiffs are derivative of the harm to SMFF.

33

*IV. Recommendations*

In accordance with the Report above, the Special Master recommends the following with respect to the motions to dismiss by the Defendants *with regard to standing*:

1. All claims of the Investors should be *dismissed with prejudice*, because the claims are derivative of those brought by SMFF, and no set of facts can be alleged that would change that determination.

2. The motions to dismiss the claims of PlusFunds that arise from the SPhinX fraud, as defined herein, should be *denied*, because with respect to that fraud PlusFunds is alleging direct injury and damages independent from those of SMFF.[43]

3. All claims of SPhinX funds other than SMFF should be *dismissed with prejudice*, because the claims are derivative of those brought by SMFF, and no set of facts can be alleged that would change that determination.

4. All claims of SMFF and PlusFunds that arise from the Refco fraud, as defined herein, should be *dismissed without prejudice.* Should it finally be determined that the Refco Trustee is barred by the *Wagoner* doctrine from bringing the claims of RCM — and should the claims of SMFF and PlusFunds not be dismissed on other grounds — it is recommended that the Court at that point revisit the question of standing to bring claims derived from the Refco fraud.


Daniel J. Capra
Special Master

Dated: February 3, 2010
New York, New York

---

[43] As discussed above, Defendants concede that SMFF has standing to bring its claims for damages arising from the SPhinX fraud. To the extent there is any doubt, this Report recommends denial of any motion to dismiss claims of SMFF related to the SPhinX fraud.