# EXHIBIT A

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
 3  ---------------------------------------x
    In re REFCO, INC. SECURITIES
 4  LITIGATION          07-MDL-1902
 5  ---------------------------------------x
    This Document Relates To:
 6
    In re REFCO, INC. SECURITIES
 7  LITIGATION                   05 Civ. 8626
                                    (GEL)
 8
    ---------------------------------------x
 9
    And All Other Cases Subject to Deposition
10  Protocol Order
11  ---------------------------------------x
12                   VOLUME 1
13
                          December 14, 2009
14                        9:39 a.m.
15
16       Videotaped deposition of SANTO C. MAGGIO,
17  pursuant to notice, at the offices of White &
18  Case LLP, 1155 Avenue of the Americas, New York,
19  New York, before Eric J. Finz, a Shorthand
20  Reporter and Notary Public within and for the
21  State of New York.
22
23
24
25
```

1                SANTO C. MAGGIO

2  flow problems.

3       A.    The first instance was

4  sometime in the late '80s, when I was

5  asking the firm to do a dividend

6  retransaction, where I needed a

7  short-term borrowing of several million

8  dollars, I forget exactly how much.  And

9  Bill Karsh told me that Refco lost its

10 cattle feeding operations, I didn't quite

11 understand what that meant.  But what he

12 told me was that it lost use of the

13 customer funds in its cattle feeding

14 operation, and lost use of the inventory

15 that it was pledging for its cattle

16 feeding operations.  And so that Refco

17 did not have the cash and was scrounging

18 around for cash to supplement the funds

19 it was using to fund its operations.

20      Q.    Did you ever come to an

21 understanding as to what the cattle

22 feeding operations were?

23      A.    No.  I've heard jokes about

24 it, but I didn't quite understand it.

25      Q.    Were there other incidents

1                SANTO C. MAGGIO

2  prior to 1997 that led you to believe

3  that Refco was experiencing cash flow

4  problems?

5       A.   Yes.

6       Q.   Could you just generally

7  describe those for me.  You don't have to

8  get into great detail.

9       A.   In 1991, '92, the firm, Phil

10 Bennett asked me if I could make --

11 arrange with Refco, Inc., which was

12 affiliate to Refco Securities, a

13 transaction where we can utilize some of

14 Refco, Inc.'s customer funds, seg funds,

15 to the tune of $25 million.  Myself and

16 Ray Lacy arranged a situation where we

17 siphoned off $25 million of the customer

18 seg funds, and I moved that money up to a

19 fund called Refco Capital, which at that

20 time was the treasury and banking arm of

21 Refco Group.

22      Q.   What are customer seg funds?

23      A.   Broker/dealers and FCMs are

24 required by SEC and CFTC rules to lock up

25 a certain portion, if not all of the

1          SANTO C. MAGGIO

2  funds that customers put on deposit.  In

3  a bank that is basically labelled

4  customer seg funds, for the sole use of

5  Refco, Inc.'s or Refco Securities'

6  customers.  The bottom line is that the

7  broker/dealer or FCM is not allowed to

8  touch those monies or is not allowed to

9  commingle those monies with its own

10 capital.

11      Q.    So it was wrong for Refco to

12 siphon off the $25 million of customer

13 seg funds to use for its own purposes?

14      A.    Yes.

15      Q.    Did that happen on more than

16 one occasion, where Refco would tap into

17 customer segregated funds?

18      A.    Yes.

19      Q.    For its own purposes?

20      A.    Yes.

21      Q.    And there were times even

22 prior to 1997 that Refco did not generate

23 sufficient fees from its brokerage

24 activities or its proprietary trading to

25 cover its day-to-day operations?

1                SANTO C. MAGGIO

2   you know, pension funds and cities, were

3   depositing monies at RCC, which was

4   utilized, which the company was utilizing

5   to fund its operations.  So that was

6   happening very late '80s.

7        Q.    It was not unusual for Refco

8   to siphon off or tap into customer assets

9   in order to fund its operations?

10             MR. RIEMAN:   Objection to

11       form.

12       A.    Define unusual, please.

13       Q.    How frequently did that occur?

14       A.    All the time.

15       Q.    Did Refco ever arrange to

16  transfer customer funds that were in

17  segregation into nonsegregated accounts

18  so that it could use them for its own

19  purposes?

20       A.    I don't quite understand that

21  question, sir.

22       Q.    Did Refco ever take money

23  directly out of segregated funds,

24  customer segregated funds, in order to

25  use for its own purposes?

                SANTO C. MAGGIO

             MS. RENDON:  Objection to
    form.
    A.    I mentioned with the FCM that
we took $25 million out of the segregated
accounts and sent it to Refco Capital
Corp.
    Q.    Did you take that money
directly out of the segregated account or
did you have to transfer it somewhere
first before you could use it?
    A.    We transferred it to Refco
Capital.
    Q.    Refco Capital Corporation or
Refco Capital Markets?
    A.    Actually Refco Capital Corp.
    Q.    And what was Refco Capital
Corporation?
    A.    It was a nonregulated entity
in Refco that handled the treasury and
financing and banking arms or cash
management arms -- cash management for
Refco Group in the entire '90s and early
2000s.
    Q.    Did Refco Capital Corp. serve