**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                              :

In re REFCO INC. SECURITIES LITIGATION   :     Case No. 07-md-1902 (JSR)
                              :
-------------------------------------------------------------X

This Document Relates to:

-------------------------------------------------------------X
KENNETH M. KRYS, et al.,          :     Case No. 08-cv-3065 (JSR)
                              :     Case No. 08-cv-3086 (JSR)
Plaintiffs,      :
                              :
     -against-            :
                              :
CHRISTOPHER SUGRUE, et al.,     :
                              :
             Defendants.   :
-------------------------------------------------------------X
KENNETH M. KRYS, et al.,          :     Case No. 08-cv-7416 (JSR)
                              :
Plaintiffs,      :
                              :       REPORT AND
     -against-           :     RECOMMENDATION
                              :    OF THE SPECIAL MASTER
ROBERT AARON, et al.,           :   ON THE OMNIBUS ISSUE OF
                              :    PRIMARY VIOLATIONS
            Defendants.   :       BY REFCO
-------------------------------------------------------------X
KENNETH M. KRYS, et al.,          :     Case No. 08-cv-8267 (JSR)
                              :
Plaintiffs,      :
                              :
     -against-           :
                              :
RICHARD BUTT,          :
                              :
            Defendant.   :
-------------------------------------------------------------X

Daniel J. Capra, Special Master

Plaintiffs bring these actions to recover recover (i) $263 million plus interest in damages suffered by the SPhinX family of hedge funds; (ii) the lost business enterprise value and deepening insolvency damages suffered by SPhinX's investment manager, PlusFunds Group, Inc., ("PlusFunds") and (iii) damages suffered by the Assignors, a group comprised of SPhinX investors. The gravamen of the complaint is that SPhinX's cash "was diverted from protected, customer segregated accounts to unprotected offshore accounts, where those assets were ultimately lost in the Refco scandal." (Sugrue Amended Complaint ¶1).[1]

Most of the defendants in these actions have moved to dismiss the respective complaints lodged against them. This Report and Recommendation covers one of the so-called "omnibus issues": grounds for dismissal that have been raised by, and are pertinent to, the merits of all (or in some cases almost all) the Motions to Dismiss.[2]  The omnibus issues are as follows:

1. Do the Plaintiffs have standing to bring their respective claims?

2. If so, have the Plaintiffs adequately pleaded a "primary violation" by Refco?

3. If so, have the Plaintiffs adequately pleaded causes of action— brought against most of the Defendants — for aiding and abetting one or more of the primary violations?

4. Are these actions barred by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA")?

5. Are the Plaintiffs barred by the *Wagoner/ in pari delicto* doctrine because they stand in the shoes of wrongdoers?

This Report and Recommendation covers the second of the omnibus questions — whether

---

[1] As the caption indicates, the Plaintiffs brought three actions that are now consolidated in this MDL. The reasons for Plaintiffs bringing three separate action are not relevant to this Report and Recommendation. References to the complaints throughout will be to the defendant first named, i.e., the Sugrue Amended Complaint ("SAC")  the Aaron Amended Complaint ("AAC") and the Butt Amended Complaint ("BAC").

[2] There has been significant briefing, and some oral argument, on claims to dismiss that are particular to one or a few defendants. For efficiency purposes, the parties and the Special Master have agreed to focus first on the omnibus issues. If and to the extent that the Plaintiffs' causes of action survive the motions to dismiss on omnibus questions, the Special Master will proceed expeditiously to decide the defendant-specific issues.

the Plaintiffs have adequately pleaded a primary violation by Refco.[3]

The previous Report and Recommendation, dated February 3, 2010, provided recommendations on the standing question. Those recommendations were:

1. All claims of the Investors should be dismissed with prejudice.

2. The motions to dismiss the claims of PlusFunds (on grounds of standing) that arise from the "SPhinX fraud" — discussed in this Report infra — should be denied.

3. All claims of SPhinX funds other than those brought by SPhinX Managed Futures Fund ("SMFF") should be dismissed with prejudice.

4. All claims of SMFF and PlusFunds that arise from the "Refco fraud" — discussed in this Report infra — should be dismissed without prejudice and subject to reconsideration should it finally be determined that the Refco Trustee is barred by the *Wagoner* doctrine from bringing the claims of Refco Capital Markets, Ltd. ("RCM").

For purposes of this Report and Recommendation, however, I will assume that all Plaintiffs have standing to bring all the claims presented.[4]

The Plaintiffs have asserted a number of primary violations by actors other than Refco. For example, Count VIII of the Sugrue Amended Complaint is a claim for fraud against PwC and Mari Farris. And Counts VIII and X of the Aaron Amended Complaint allege primary violations against Aaron, Castranova and the DPM defendants. The parties in their omnibus submissions generally do

---

[3] References to "Refco" include Refco Group Ltd. LLC and all of its affiliated entities, including Refco LLC, Refco Capital Markets ("RCM") and Refco Alternative Investments LLC ("RAI").

[4] I make this assumption for three reasons. First, many of the questions of primary violation are not dependent on standing because defendants concede that at least SMFF has standing to sue on its claims that its cash was taken from a segregated account at Refco LLC and deposited in an unsegregated account at RCM. For those claims, the assumption that the other plaintiffs have standing will not affect the decision on whether a claim of a primary violation has been adequately pleaded. Second, as to claims for damage from the Refco fraud, it makes sense to proceed to the question of primary violation even if the recommendation on standing is upheld, because that recommendation was to dismiss without prejudice; Defendants argue that many of the Plaintiffs' claims should be dismissed *with prejudice* for failure to plead a primary violation by Refco, and this Report and Recommendation addresses that question. Third, if the Defendants are successful on *any one* of the five omnibus questions, then at least most if not all of the claims should be dismissed. It therefore makes sense to consider each of the omnibus questions independently.

not raise these individualized primary wrong allegations as part of the omnibus questions to be decided at this point. Accordingly, this Report and Recommendation focuses on whether the Plaintiffs have adequately alleged primary wrongs by any Refco entity or individuals acting on behalf of Refco. Claims for primary wrongs against specific defendants will be reviewed in later reports.

## I. Introduction

### *The Parties*

These actions involve three sets of claimants:

1. The SPhinX family of funds ('SPhinX"), organized under Cayman Islands law, entered into voluntary liquidation after the fall of Refco.[5] Plaintiffs Kenneth M. Krys and Christopher Stride are their Joint Official Liquidators.

2. Plaintiff James P. Sinclair is the Trustee of the SPhinX Trust. The SPhinX Trust is the assignee of claims from the estate of PlusFunds. PlusFunds created SPhinX and served as its investment manager.

3. Messrs. Krys and Stride are also pursuing claims that have been assigned to them by sixteen entities that were SPhinX Funds investors. These claims will be referred to as "Investors' claims" or "Assignors' claims."[6]

More than 50 defendants have been sued. Some of these defendants were directly involved in the management or administration of PlusFunds or SPhinX and allegedly caused, assisted or covered up the wrongful transfer of SPhinX cash from a segregated account at Refco LLC to an unsegregated account at RCM. Others were allegedly involved in some aspect of the "Refco fraud,"[7] be it Round Trip Loans, the Refco IPO, or some other act of Refco that was designed to allow Refco

---

[5] References to "Refco" include all the Refco-related entities discussed in this R and R. Where the facts relate to a particular Refco entity, the entity is specifically addressed.

[6] The claimants represented by the JOL's and Trustee in this case are for convenience referred to collectively as "Plaintiffs." References to "SPhinX" and "PlusFunds" are intended to mean the JOL or Trustee bringing claims on behalf of those entities.

[7] The facts surrounding what will be called "the Refco fraud" have been recounted in a number of opinions by Judge Lynch. See, e.g., *Kirschner v. Grant Thornton,* 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009). To the extent necessary for background on the instant motions, familiarity with the financial schemes of Refco is presumed.

insiders to profit at the expense of its customers.

### The Allegations:

The Report and Recommendation on Standing contained a detailed account of the allegations and pertinent facts. That account is restated here for convenience of the reader.[8]

1. The SPhinX Funds were a platform of funds organized as Cayman Islands Exempted Segregated Portfolio Companies ("SPCs") and designed to track the performance of the Standard & Poor's Hedge Fund Index. (SAC ¶2). Retaining customer-segregated assets in SPCs was essential to the structure of the SPhinX funds. (SAC ¶3). PlusFunds hired Refco Alternative Investments ("RAI") to oversee Refco-related investments for SPhinX.

2. Through the acts of certain Refco, PlusFunds, and SPhinX agents and fiduciaries, hundreds of millions of dollars in excess cash belonging to SMFF was diverted from the customer-segregated accounts at Refco LLC to the accounts of RCM, an unregulated offshore Refco affiliate ("RCM"). (SAC ¶5).[9] Once the cash was at RCM, it was commingled for use in activities designed to conceal Refco's losses, bolster Refco's financial statements, and enrich individuals. (SAC ¶¶ 5-7). SPhinX and PlusFunds agents, including Robert Aaron, a director of the SPhinX Funds and part owner of Derivative Portfolio Management ("DPM") (AAC ¶ 38), and Christopher Sugrue, officer and director of PlusFunds and a founder of the SPhinX Funds (SAC ¶ 38), agreed to expose SMFF cash by having it transferred from Refco LLC to RCM. Their motivations were, in the case of Aaron, lucrative profits for DPM (AAC ¶¶ 134, 250-52), and for Sugrue and others such as defendants Owens and Kavanagh, quid pro quo payoffs from Refco that involved "loans" to certain entities — the Suffolk entities — that they controlled. (SAC ¶¶ 9-10). Other defendants involved in the alleged scheme to transfer SMFF cash to RCM include RAI and Butt (who served as president of RAI and director of at least one of the SPhinX funds). (BAC ¶¶ 9, 93, 97).

3. On October 10, 2005, Refco's schemes were revealed in the announcement that Refco had "discovered" a $430 million receivable owed to it by an entity — Refco Group Holdings, Inc. ("RGHI") — owned by Refco's CEO Phillip R. Bennett. (SAC ¶11). At that time RCM held approximately $312 million of SMFF's cash. (SAC ¶ 11.) Before RCM and dozens of Refco subsidiaries and affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York, Sugrue demanded that RCM return the $312 million of

---

[8] That account was largely taken from Judge Lynch's discussion in *Krys v. Sugrue et al.*, 2008 WL 4700920 (S.D.N.Y.).

[9] The only assets deposited at RCM were SMFF cash that constituted "excess margin," defined by RCM as the amount of a customer's assets that exceeded the amount that Refco had determined was necessary to cover margin. SAC ¶ 192-93.

SMFF excess cash (SAC ¶ 12). RCM returned the money, but two months later RCM's Official Committee of Unsecured Creditors commenced an adversary proceeding against SMFF (the "Preference Action"), to recover the $312 million as a preferential transfer from RCM's estate. (SAC ¶ 12). SPhinX subsequently settled the Preference Action; in that settlement, SMFF relinquished $263 million of the $312 million and released certain claims against the Refco estate with respect to those funds. (SAC ¶ 14).

4. The Preference Action triggered a flood of redemptions by SPhinX investors and, in turn, a sharp decline in PlusFunds' revenues. (SAC ¶ 13). On March 6, 2006, PlusFunds filed a Chapter 11 bankruptcy petition in the Southern District of New York. (Id.). Meanwhile, on June 30, 2006, SPhinX entered into liquidation proceedings in the Cayman Islands. (SAC ¶ 35).

5. Plaintiffs' Complaint in *Sugrue* goes well beyond the basic claim that SPhinX cash was siphoned off into an unprotected account, and that a number of defendants covered up that fact — what this Report and Recommendation refers to as "the SPhinX fraud."[10] It also describes, and seeks damages for, what the Report and Recommendation refers to as "the Refco fraud."— a scheme to conceal massive losses from Refco's books and to enrich insiders. A central part of the Refco fraud was to divert assets from unprotected accounts at RCM to fund Refco's fraudulent schemes and line the pockets of the insiders. (SAC ¶ 200). Another part of the Refco fraud was to hide the losses on the books by engaging in a series of round trip loans ("RTLs"). The RTLs purported to be legitimate loan transactions, but only served temporarily to pay down the massive losses that were parked at RGHI (SAC ¶¶ 203-206, 221-225). A further part of the Refco fraud was to conduct a fraudulent LBO and IPO, allowing insiders to cash out, and thereby leaving Refco (and specifically RCM) insolvent. (SAC ¶ ¶ 207, 209-210).

## II. Legal Standard on Motion to Dismiss

The legal standard for evaluating a pleading on a motion to dismiss is as follows:

1) The Plaintiff need not establish that he will ultimately prevail. The question is whether the Plaintiff is entitled to obtain discovery and offer evidence to support his claim. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 476 (2d Cir. 2006).

2) "To survive a motion to dismiss, a complaint must contain sufficient factual

---

[10] As discussed in the Report and Recommendation on Standing, the "Suffolk Transactions" are part of the SPhinX fraud, as they were allegedly sham transactions designed to allow Refco to gain control of PlusFunds and hide the fact that the SMFF cash was unprotected, without innocents at PlusFunds knowing that Refco was involved.(SAC ¶ 303). Certain defendants actively worked to conceal Refco's role in the purchase of the shares of PlusFunds by the Suffolk entities. (SAC ¶¶ 310-325).

matter, accepted as true, 'to state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). If the Plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* 550 U.S. at 547.

3) Claims sounding in fraud must be "stated with particularity." Fed. R. Civ. P. 9(b)."The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). The Plaintiff must specifically describe the acts or statements alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent. The Second Circuit has found that an inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

4) Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." But while the rule allows general averments of intent, knowledge, and other mental conditions, "it nevertheless requires a plaintiff to allege facts that give rise to a 'strong inference' of the defendant's culpable state of mind. This may be done by alleging facts that the defendant had both motive and opportunity to commit or assist fraud, or facts that constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness." *In re Parmalat Securities Litigation,* 501 F.Supp.2d 560, 573 (S.D.N.Y.2007) (quoting *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.,* 479 F.Supp.2d 349, 359-60 (S.D.N.Y.2007).

## III. Omnibus Issues of Primary Violation by Refco

The Plaintiffs assert three primary wrongs by Refco: fraud, breach of fiduciary duty, and conversion. This Report assesses whether the Plaintiffs have adequately pleaded these primary wrongs. This inquiry is of course important because if there is no primary wrong, there can be no aiding and abetting, and many of the defendants are in this litigation solely on grounds of aiding and abetting the alleged primary wrongs of Refco.

The centerpiece of most of the claims for primary violations is the allegation that the Plaintiffs had a right to have SMFF excess cash in the account at Refco LLC "segregated" — meaning that it would be protected from any bankruptcy at Refco. Plaintiffs aver that the transfer of SMFF cash from the account at Refco LLC to the account at RCM was unauthorized — and also wrongful, because RCM was unregulated and the assets were commingled with other accounts, losing their segregation protection.

If the segregation claim is not plausible, then many of the primary violation allegations will fail as well. Accordingly, this Report first evaluates the Plaintiffs' allegations— and the Defendants'

contentions — with respect to the right to segregation. Then each of the omnibus primary wrongs will be addressed in turn.

## A. The Right to Segregation

To support their claim of segregation, Plaintiffs rely on the account opening agreement with Refco LLC, which provides that the property in the account "shall be segregated as required by the Commodity Exchange Act and by the rules of the Commodity Futures Trading Commission." SAC ¶ 124.[11] Attached to that document is a "Risk Disclosure Statement for Securities Futures Contracts" providing in part that if securities futures positions are carried in a futures account, "they must be segregated from the brokerage firm's own funds and cannot be borrowed or otherwise used for the firm's own purposes. If the funds are deposited with another entity * * * that entity must acknowledge that the funds belong to customers and cannot be used to satisfy the firm's debts." The attachment also states that "customers with funds in segregation receive priority in bankruptcy proceedings." SAC ¶ 125.

The Plaintiffs, in arguing for a right of segregation, also rely on the SPhinX Funds' offering and marketing materials, SMFF's Articles of Association, and marketing materials provided by PlusFunds to potential investors. SAC ¶¶ 113-123. These documents are of limited utility in establishing a right to segregation in the Refco LLC account, however, because Refco was not a party to any of these materials. SAC ¶ 147 notes that an agreement involving Refco, SPhinX and PlusFunds provided that Refco investment vehicles would invest "per the terms of the SPhinX offering memorandum." But this is not an agreement on *Refco's* part to maintain *SPhinX* funds in a segregated account. At most this evidence is somewhat supportive of the premise that 1) SMFF had an intent to maintain a segregated account and so it is more likely that it would have required any account it entered into to include a segregation guarantee, and 2) Refco knew SMFF's intent.

The actual account opening agreement on its face establishes a right of segregation. But the Defendants interpose four separate arguments for why the account opening agreement fails to establish the right to segregation alleged by the Plaintiffs. I proceed to those four arguments:

## 1. No Right to Segregation at RCM.

First, Defendants contend that the account opening document at most guaranteed segregation of the cash *while it remained in the Refco LLC account* — and that once the cash was transferred out

---

[11] Section 4d of the Commodities Exchange Act prohibits the commingling of customer funds with the funds of a future commissions merchant — like Refco LLC. 7 U.S.C. § 6(d)(a)(1). The CFTC regulations implementing the Commodities Exchange Act contain among other things strict segregation requirements for customer funds (17 C.F.R. § 1.20) and provide that customer funds may not be invested "in obligations of an entity affiliated with the futures commission merchant." 17 C.F.R. § 1.25(b)(6).

of the account, Refco made no guarantees of segregation. This assertion ignores the language in the account opening agreement, which states that the funds "must be segregated from the brokerage firm's own funds" and, if deposited with another entity, "that entity must acknowledge that the funds belong to customers and cannot be used to satisfy the firm's debts." Thus the account opening document, fairly read, prohibits a transfer that would impair the right to segregation. That RCM made no guarantees of segregation is beside the point.[12]

### 2. Authorized Transfer

The Defendants' second argument against a right of segregation is more substantial. They contend that, according to the Plaintiffs' own complaint, the transfers were effected with the express permission of SPhinX and PlusFunds management. So in the Defendants' view there was no violation of any right to segregation because the accounts *were* segregated at Refco LLC and the transfer to unsegregated accounts at RCM effected a waiver of the right.

It is true that SAC ¶5 states that "certain SPhinX and PlusFunds agents/fiduciaries" allowed SMFF excess cash to be diverted from protected accounts at Refco LLC to unprotected accounts at RCM. But the Plaintiffs contend that such permission was unauthorized, and that the agents were acting adversely to SPhinX and PlusFunds and "for their own exclusive interests." Id.[13] Defendants respond that if a corrupt insider acted without authorization, then the cause of action for a violation of the segregation right runs against the corrupt insider, not against Refco (as Refco would have relied on apparent authority to make the transfers). But the complaints can fairly be read to aver that the insiders who authorized the transfers to RCM were not acting on their own but rather with the knowledge of and in concert with Refco.

For example, Plaintiffs allege that there was never an account agreement with respect to SMFF excess cash deposited at RCM. SAC ¶ 195. While it is not crystal-clear from the Complaint,

---

[12] At most, the Defendants have raised a possible ambiguity about the meaning of a contractual provision in the account opening document. And the meaning of an ambiguous contract term should not be decided even on a motion for summary judgment, much less on a motion to dismiss. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990). ("Summary judgment normally is inappropriate when a contractual term is ambiguous because a triable issue of fact exists as to its interpretation."); *CBS, Inc. v. ,* 108 F.R.D.14, 24 (S.D.N.Y. 1985) (claim that plaintiff mischaracterized the documents on which he relied raises a factual question that should be resolved at trial or on summary judgment).

[13] The Aaron and Butt complaints contain the same assertions in their ¶ 5.

9

the inference is that the absence of account-opening documents is probative of suspicious activity.[14]

More importantly, the Sugrue Amended Complaint contains a number of direct allegations concerning Refco's part in the transfer from Refco LLC to RCM include the following:

> RAI, a Refco affiliate, executed trades for SphinX, was aware of the right to segregation, and was aware of and involved in the transfers to RCM. SAC ¶¶ 155-156.

> RAI shared office space with Refco LLC and RCM, and Refco personnel often acted on behalf of a number of Refco entities. SAC ¶ 157.

> RAI solicited and distributed investments in the SPhinX funds and SPhinX relied on RAI to monitor, direct and authorize transfers of assets. SAC ¶ 159.

> Refco needed ready access to cash to keep itself afloat and to allow Refco insiders to cash out (SAC ¶ 170), and the cash had to be at RCM because it was unregulated. SAC ¶ 173.

> The transfer to RCM was done to accommodate Refco and its cash needs. SAC ¶ 178.

> The Suffolk transactions were designed to keep PlusFunds innocents from finding out that the transfers to RCM left the excess cash unprotected. SAC ¶¶ 295-303. The PlusFunds insiders who benefited from the transaction — Sugrue, Kavanagh and Owens — had close associations with Refco. ¶¶ 281-282.

While these assertions should have been set forth in a more direct and organized fashion, collectively they provide a plausible case of Refco's knowledge of — as well as participation in or engineering of — a scheme to transfer SMFF excess cash from protected accounts at Refco LLC to unprotected accounts at RCM. Consequently, the Defendants' argument that Refco committed no misconduct in the transfer of SMFF cash, and could rely on the apparent authority of PlusFunds insiders to authorize the transfer, should fail, at least at this preliminary stage.

### 3. The Margin Annex

The Defendants' third argument against the segregation right is that the "so-called 'Margin

---

[14] In a proposed Second Amended Complaint, ¶ 199, Plaintiffs allege that the accounts were set up at the request and on the initiative of Refco itself, "per Sandy Maggio," REFCO-E-009037054-55. Maggio was a Refco insider who has pled guilty to fraud. The allegations of a proposed amended complaint may be considered in assessing whether to grant leave to amend if the motions to dismiss are granted. *See, e.g., Kropelnicki v. Siegel* 290 F.3d 118, 130-131 (2d Cir. 2002) (court considers proposed amended complaint in deciding whether leave to amend should have been granted).

Annex' in SMFF's RCM account opening document * * * contains precisely the same language as the Margin Annex that Judge Lynch concluded allowed RCM to 'us[e] customer assets for loans to unaffiliated companies.'"[15] The reference is to Judge Lynch's opinion in the Private Action Trust case. *Kirschner v. Bennett,* 648 F.Supp.2d 525 (S.D.N.Y. 2009). In that case, Judge Lynch relied on the Margin Annex that was part of the agreement between RCM and holders of the FX accounts. The Margin Annex provided that RCM could "loan, pledge, hypothecate or otherwise use or dispose of [all of a customer's] cash, securities, and other property free from any claim or right, until settlement in full of all [outstanding margin loans]." Judge Lynch reasoned that so long as a margin was outstanding, RCM could essentially do what it wanted with the funds in the FX accounts — so there could be no primary violation for fraud, breach of fiduciary duty or conversion, at least under the complaint as initially pleaded.[16]

But the Defendants' premise — that the SMFF cash account was subject to a Margin Annex provision that waived the right to segregation — is flawed for at least three reasons. First, in the Private Action Trust case the FX accounts were *never* intended to be segregated, whereas the intent to segregate the SMFF funds — and the right to have them segregated — is sufficiently apparent from the account opening document with Refco LLC to withstand a motion to dismiss. Second, the Margin Annex by its terms applies to cash treated as margin, whereas the claims in this case concern *excess* margin cash.

Third, and most important:  assuming there was a right to segregation for the SMFF excess cash at Refco LLC, the execution of the Margin Annex is not sufficient to indicate that SMFF gave up its right to segregation when the cash was transferred to RCM. The requirements for a legitimate customer election to waive segregation are set forth at 17 C.F.R. § 1.68. The execution of the Margin Annex clearly fails those requirements. For example, the regulation requires that the customer acknowledge and agree that its funds will not be entitled to priority under the Bankruptcy Code. 17 C.F.R. § 1.68(a)(4)(iii)(C). The Margin Annex makes no mention of any priority in Bankruptcy. Moreover, the waiver of segregation must be made in a written agreement between the futures commission merchant and the customer. 17 C.F.R. § 1.68(a)(4). As applied to this case, the necessary written agreement would have to be between SMFF and Refco LLC (the futures commission merchant for the segregated account). But the Margin Annex was between SMFF and RCM. Virtually none of the detailed requirements in the regulation are satisfied by the execution of the Margin Annex.

In sum, the Margin Annex agreement does not dispose of the Plaintiffs' segregation claim. The most that can be said is that the terms of the Margin Annex are ambiguous. And the meaning of an ambiguous contract is a question of fact. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990).

---

[15] Supplemental Submission to the Special Master, December 1, 2009 at 7.

[16] Judge Lynch gave leave to amend, and a Motion to Dismiss the amended complaint is now before the Special Master.

### 4. Preclusive Effect of Judge Drain's Order in the Refco Bankruptcy Proceeding

The fourth argument propounded by the Defendants against the segregation claim is that Judge Drain, in the Refco Bankruptcy proceeding, determined that PlusFunds had no contractual right to segregation. This is a question of issue preclusion.

#### *Judge Drain's Order*

The background on Judge Drain's ruling is critical. In the Refco bankruptcy proceeding the Debtor parties were, on the one hand, Refco, Inc. and 23 Refco, Inc. affiliated entities, and, standing in the shoes of the Debtors, the Refco Plan Administrator and the RCM Plan Administrator, Mr. Kirschner. The relevant claimant party was PlusFunds. PlusFunds chose to withdraw from its Amended Claim in the Refco bankruptcy proceedings all of its tort-related claims, leaving a breach of contract claim to be adjudicated by the Bankruptcy Court.[17] The PlusFunds debtor subsequently transferred all of its tort-related claims to the SPhinX Trust; this transfer was approved by the Bankruptcy Court.[18]

Judge Drain found that PlusFunds had not made a prima facie showing of a contract to segregate the SPhinX Funds.[19] PlusFunds' claim was based on the alleged existence of certain oral

---

[17] See Motion For Order Approving Withdrawal of Debtor's Tort-Related Claims Against Refco Debtors, Case No. 06-10402, Bankr. S.D.N.Y. (Peck, J.), January 24, 2007, Docket No. 389 at 12 ("The Debtor, in the exercise of its business judgment, has determined for strategic reasons, including to presently avoid the expense and uncertainty of litigation, to withdraw from the Amended Claim the claims sounding in fraud, breach of fiduciary duty and negligent misrepresentation, leaving the Amended Claim to be based solely on the breach of contract claim."); see also Order Authorizing Withdrawal of Debtor's Tort-Related Claims Against Refco Debtors, Case No. 06-10402, Bankr. S.D.N.Y. (Peck, J.), February 2, 2007, Docket No. 401 ("[T]he Debtor is authorized to withdraw from its Amended Claim against the Refco debtors the tort-related claims, the claims sounding in fraud, breach of fiduciary duty and negligent misrepresentation.").

[18] See Order (I) Confirming The Debtor's Fifth Amended Plan Of Liquidation, Dated June 28, 2007, Under Bankruptcy Code Section 1129 and Bankruptcy Rule 3020; (II) Approving Settlements In Connection Therewith; and (III) Granting Related Relief, Case No. 06-10402, Bankr. S.D.N.Y. (Peck, J.), August 7, 2007, Docket No. 515, at 8 ("[T]he Plan will be implemented through funding to be provided by the SPhinX Funds in exchange for which the causes of action shall vest in the SPhinX Trust.")

[19] See Order Granting The Plan Administrators' Motions for Summary Judgment on Proofs of Claim of PlusFunds Group, Inc., Case No. 05-60006, Bankr. S.D.N.Y. (Drain, J.), July 20, 2007, Docket No. 5600 at C. ("Drain Order").

contracts between PlusFunds and Refco. In its proof of claim, PlusFunds asserted the following:

> PlusFunds bargained for, and obtained, RCM's agreement that the SPhinX Funds' assets held at RCM would be maintained within an account structure that respected and protected the limited liability nature of the segregated portfolio structure of SPhinX Funds. As part of the agreements with PlusFunds, RCM and Refco, LLC, the latter two entities undertook the overarching obligation to safeguard the assets entrusted to them by PlusFunds.

> \* \* \*

> Upon information and belief, PlusFunds' Management agreed with Refco that Refco would take such steps as were necessary to ensure that the Segregated Portfolios would never be put at risk of being liable for one another's obligations, regardless of to whom or in what context those obligations might arise.

> Through agreements that were reached over time, based on the parties' understanding and conduct, including conversations between PlusFunds' Management and one or more Refco representative [sic], and portions of which were reflected in various documents, Refco promised to take whatever steps were necessary to ensure that the assets of Segregated Portfolio "A" would not be put at risk for liabilities of Segregated Portfolio "B."[20]

PlusFunds also alleged the existence of a written contract between PlusFunds and Refco: "A February 23, 2004 letter agreement between RCM and PlusFunds memorialized this agreement with respect to SPhinX Plus, Ltd. ...." [21]

As an alternative theory, PlusFunds alleged that it was a third-party beneficiary of a letter agreement dated January 1, 2004 containing the following language:

> Notwithstanding anything to the contrary set forth in the Account Documentation any amounts owed or liabilities incurred by any Segregated Portfolio may be satisfied solely from the assets of that respective Segregated Portfolio.... [I]n no event shall Refco have recourse against any assets of any preson or entity (including, without limitation, any person or entity whose account is under the management of [PlusFunds] ...) other than assets of the respective Segregated Portfolio, [or] ... any assets of [PlusFunds] or ... any affiliate of

---

[20] Addendum to Second Amended Proof of Claim of PlusFunds Group, Inc., No. 05-60006, at 5-6 (Bankr. S.D.N.Y. Feb. 20, 2007).

[21] Id. at 6.

[PlusFunds].[22]

The letters of January 1, 2004 and February 23, 2004 are referred to as "ring-fencing letters."

The Refco Estate moved for summary judgment on the basis that (1) these ring-fencing letters provided only for non-recourse by Refco with respect to each portfolio of the SPhinX Funds and did not promise that assets deposited at RCM would be segregated, and (2) PlusFunds had not put forth sufficient evidence of an oral contract that would augment the ring-fencing letters.[23] In response, the PlusFunds Estate argued that Christopher Rose, the former CEO of PlusFunds, understood based on representations by other PlusFunds and/or Refco employees that there was an oral contract or understanding that segregation would be provided in addition to the non-recourse promised in the ring-fencing letters.[24]

On the Refco Estate's summary judgment motion, Judge Drain held first that "[t]here is no genuine dispute of material fact that PlusFunds has not made a prima facie showing of the formation of a contract to segregate the other assets of RCM cash or other consideration paid by SPhinX or the SPhinX Funds to Refco, LLC and held there or otherwise transferred to RCM, or to hold such cash in trust."[25] This holding was based on a finding that PlusFunds had not put forth sufficient evidence of the alleged oral contract between Refco and PlusFunds either as a direct party or as a third-party beneficiary.[26] Judge Drain then held that "[t]here is no genuine dispute of material fact, that PlusFunds had not made a prima facie showing of breach of the contract that was formed, i.e., a contract not to satisfy from the assets of one SPhinX Fund or from PlusFunds the liabilities or

---

[22] Id. at 8.

[23] See RCM Trustee's Memorandum of Law in Support of Motion for Summary Judgment on Proof of Claim of PlusFunds Group, Inc., No. 05-60006 (RDD) (Bankr. S.D.N.Y. Mar. 15, 2007).

[24] See PlusFunds Group Inc.'s Opposition to the RCM Trustee's Motion for Summary Judgment to Disallow Its Second Amended Proof of Claim, No. 05-60006, at 7-9 (Bankr. S.D.N.Y. Mar. 26, 2007).

[25] Drain Order at 2.

[26] See id. at Ex. A, p. 7 ("And I had not seen any evidence, or the suggestion of evidence for that matter, that there was any agreement to which PlusFunds would be either a party or a third-party beneficiary - that would go beyond that 'nonrecourse' agreement." ; see also id. at Ex. A, pp. 10-11 ("Therefore, on this issue as to whether there was any other agreement other than the nonrecourse agreement that I've quoted, the January 1, 2002 written agreement, there's no factual basis alleged beyond a mere conclusory statement by Mr. Rose in his declaration, which is contradicted by the declarant's own deposition.").

obligations of another."[27]   Judge Drain's ruling on this issue was based on his findings that the written contracts at issue — the ring-fencing letters — promised only nonrecourse across portfolios and did not promise that funds would be held in segregation, and that this promise was not breached by RCM's commingling of funds within its accounts or by the Refco Estate's bringing a preference action against SPhinX. [28]   Thus, Judge Drain did not rule upon or consider the Refco LLC account opening document with SMFF,  or the CFTC regulations, that Plaintiffs now contend gave rise to a segregation requirement breached by Refco.

Given this background, there are two preclusion-related questions:

a. Is PlusFunds precluded from arguing that  Refco LLC guaranteed, in the account opening document,  that SMFF excess cash would be segregated?

b. If PlusFunds is precluded, are other plaintiffs in privity with PlusFunds,  and so precluded as well?

### a. Is PlusFunds Precluded by Judge Drain's Summary Judgment Order?

Plaintiffs argue that PlusFunds is not precluded from relying on a right to segregation in this action for two reasons: 1) The claims in this case lie in tort and PlusFunds withdrew its tort claims from the Refco bankruptcy proceeding; and 2) Judge Drain never ruled upon the meaning and enforceability of the account opening document between Refco LLC and SMFF, and its incorporation of CFTC regulations.

### i. Tort Claims Not Precluded?

It is true that PlusFunds is bringing tort and not contract claims in this action. But the gravamen of the tort claims is that the Defendants committed wrongdoing by diverting "SPhinX's cash from protected, customer segregated accounts to unprotected offshore accounts." If SPhinX had no *contractual* right to segregation, then there is no tort cause of action for diverting money from the accounts at Refco LLC to RCM. Thus, the factual issue on which the tort claims depend is whether there was a right to segregation. *See Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1286 (2d Cir. 1986) ("The fact that plaintiffs base their claims on new legal theories does not shield them from the

---

[27] See id. at 2.

[28] See id. at Ex. A, pp. 6-7 ("The proof of claim to my mind in its own terms alludes to no more than an agreement that 'respected and protected the limited liability nature of the segregated portfolio structure of SPhinX Funds.'"); id. at Ex. A, p. 11 ("I do not believe that the RCM Committee's bringing the complaint against the individual SPhinX Funds for the avoidance and disgorgement of preferences that they each received would violate the nonrecourse language of the January 1, 2004 agreement that I've quoted.").

doctrine of collateral estoppel as liability is premised on the same issue in both proceedings.")
(emphasis added). *See also O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429
N.E.2d 1158 (1981) (where property owner failed to sustain a prior suit for de facto appropriation
of his property, he was barred from arguing trespass in a subsequent action).

The tort claims pursued by PlusFunds are, by Plaintiffs' own admission, grounded in the right
to have the SMFF assets free from commingling. Thus, if Judge Drain did in fact find broadly that
there was no contractual right to segregation— a matter discussed below — the tort claims based on
diverting funds from a segregated account would be precluded as well.

But a finding of preclusion of the tort claims related to the right to segregated funds is
dependent on Judge Drain having found that there was no right to a segregated account at Refco
LLC. It is to that question I now turn.

### ii. Preclusion of Claim Based on a Contractual Right to Segregation?

As discussed above, Plaintiffs argue that Judge Drain did not decide the precise argument that
they are raising in this case: that the SMFF account opening document at Refco LLC — and its
incorporation of CFTC regulations— required that SMFF excess cash be maintained in a segregated
account. Defendants do not seriously dispute that the Refco LLC account opening document with
SMFF was not raised or argued before Judge Drain. They claim, however, that Judge Drain's
determination is preclusive because he held that PlusFunds failed to show "the formation of a
contract to segregate" SPhinX assets at any Refco entity.

But fairly read, Judge Drain's ruling was that *the agreements presented* by PlusFunds on the
contract question were insufficient to prove a right to segregation. The evidence presented was of
an oral understanding and ring-fencing agreements.  Judge Drain's ruling that this evidence failed
to show a right to segregation at RCM is certainly entitled to preclusive effect. But it should not
preclude litigation on whether there was a right to segregation based on a different contract.
Preclusion of that question is not justified because the Defendants, who are the parties seeking
preclusion, have the burden to demonstrate that the issue "was actually decided in the first
proceeding." *Dowling v. United States*, 493 U.S. 342, 350 (1990). The Defendants must show "with
clarity and certainty what was determined by the prior judgment." *Jones v. City of Alton, Ill.*, 757
F.2d 878, 885 (7th Cir. 1985).

The Defendants have failed to show with clarity that Judge Drain decided the issue in this
case: whether the Refco LLC - SMFF account opening document established a right to segregation.
Nor could they, because no evidence was presented to Judge Drain on that point. *See United Indus.
Workers v. Gov't of the Virgin Islands*, 987 F.2d 162, 169 (3d Cir. 1993) (issue preclusion
inapplicable where previous action dealt with different version of agreement with different operative
language and thus did not address "identical issue");

The parties have speculated on why PlusFunds did not raise the Refco LLC account opening

document as a basis for a right to segregation in the proceedings before Judge Drain. Plaintiffs theorized that PlusFunds could not do so because PlusFunds was not a party to the contract — SMFF was.[29] Defendants theorize that "[i]t is far more plausible that PlusFunds did not argue that the Refco LLC account opening document evidenced a segregation agreement controlling on RCM — a separate and distinct Refco entity — because nothing in its terms prohibited the transfer, at SMFF's request, of funds from Refco LLC to RCM or required that the funds be segregated at RCM."[30] But this argument ignores the fact that the Plaintiffs have consistently argued that the transfers to RCM were unauthorized, and under that theory there *would* be a violation of the right to segregation when the assets were commingled at RCM. It would not matter that there was no right to segregation at RCM.

In any case, the reason for PlusFunds' failure to raise the account opening document is not relevant to issue preclusion — that doctrine is based on what precise issue *was actually decided* in the prior litigation. Assuming that the account opening document could have been raised before Judge Drain and was not, the failure to raise it would in some circumstances give rise to claim preclusion or res judicata. But the Defendants specifically do not rely on claim preclusion here. Nor could they, because claim preclusion requires an identity of parties. *Channer v. Department of Homeland Sec.*, 527 F.3d 275, 279 (2d Cir. 2008) (res judicata "provides that a final judgment on the merits bars a subsequent action between the same parties over the same cause of action"). The end result is that Judge Drain never ruled on the precise issue in this case.

Accordingly, the Defendants' claim that PlusFunds is precluded from arguing that the Refco LLC-SMFF account opening agreement established a right to segregation should be rejected.

### b. Assuming PlusFunds is Precluded From Claiming Segregation, Were the Other Plaintiffs in Privity With PlusFunds?

Assuming arguendo that PlusFunds is barred by issue preclusion from asserting a right to segregated funds, the other Plaintiffs — who were not parties in the Refco bankruptcy proceeding — would still be free to assert that right unless they were *in privity* with PlusFunds.[31]   In general, privity is defined as a "mutual or successive relationship to the same rights of property." *Litchfield v. Goodnow*, 123 U.S. 549, 550-51(1887). However, neither the Second Circuit nor New York requires literal privity for preclusive effect. *See Alpert's Newspaper Delivery v. New York Times*, 876 F.2d 266, 270 (2d Cir. 1989) (no "bright line" rule as to what constitutes privity exists);

---

[29] Nov. 18, 2009 Hr'g Tr. at 194:9-22.

[30] Supplemental Brief on Effect of Judge Drain's Ruling Disallowing PlusFunds' Claims at 5.

[31] Of course, if the Report and Recommendation on standing is adopted, the only other Plaintiff remaining would be SMFF.

*Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*, 572 F.3d 93 (2d Cir. 2009) (preclusion rules in New York are substantially similar to those applied in Second Circuit).

To determine privity, the courts look at the totality of the circumstances between the party's and non-party's relationship, which includes both, (1) the mutuality of interests between the parties and, (2) the quality of representation of the non-party's interests in the previously decided litigation. *Amalgamated Sugar v. NL Industries*, 825 F.2d 634, 640 (2d Cir. 1987); *Cowan v. Ernest Codelia, P.C.*, 149 F. Supp.2d 67, 77 (S.D.N.Y. 2001) ("New York courts permit flexible consideration" of the circumstances to determine if the relationship between the original party and the non-party establishes "a functional representation such that the nonparty may be thought to have had a vicarious day in court."). *See also Carlin v. Gold Hawk Joint Venture*, 778 F. Supp. 686 (S.D.N.Y 1991) (privity found between a joint venture entity and four individuals who composed the entity itself but were not named parties to the previous litigation); *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir. 1997) (preclusion applies to "those who control an action although not formal parties to it"). Representation by the same attorney, "is of singular significance." *Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 278, 317 N.Y.S.2d 315, 265 N.E.2d 739 (1970). See also *Pharr v. Evergreen Garden, Inc.*, 123 Fed. Appx. 420 (2d. Cir. 2005)(current tenants were in privity with former tenants; representation by the same attorney was critical to that determination).

This case presents a close question on privity. In the bankruptcy proceeding there was obviously some commonality of interest between PlusFunds and the other parties represented by the JOL's in this action. If PlusFunds had been successful, the other parties would have benefitted. Moreover, PlusFunds had significant control over SPhinX. SAC ¶2. By the time of the summary judgment order dismissing the PlusFunds claim, SPhinX had agreed to purchase an economic interest in PlusFunds' claim against the Refco debtors.[32]

On the other hand, the SPhinX Funds and PlusFunds never had common ownership and never shared board members or officers. The corporations were separate entities. PlusFunds entered into bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York on March 6, 2006, and the SPhinX Funds entered into entirely separate liquidation proceedings in the Cayman Islands on June 30, 2006. The PlusFunds estate's Second Amended Proof of Claim was filed on 20 February 2007 and was finally adjudicated on July 20, 2007 — after the SPhinX Funds and PlusFunds had parted ways.[33] Moreover, to the extent having the same counsel is important, counsel for the JOL's in this action is different from counsel for PlusFunds in the proceedings before Judge Drain.

---

[32] Term Sheet for PlusFunds' Asset Sale to the SPhinX Funds, dated April 26, 2007. The bankruptcy plan incorporating the Term Sheet was not, however, confirmed by the bankruptcy court until a few weeks after Judge Drain's summary judgment order was entered.

[33] See Order Granting the Plan Administrators' Motions for Summary Judgment on Proofs of Claims of PlusFunds Group, Inc., No. 05-60006 (RDD) (Bankr. S.D.N.Y. July 20, 2007).

While the question is close, the stronger case is for a finding that there is no privity between PlusFunds and the other Plaintiffs.[34] This is especially so because PlusFunds never raised what appears to be the strongest case for a right to segregation for the SMFF cash: the Refco LLC-SMFF account opening agreement. The flexible concept of privity is dependent on adequate representation, and the inability (or failure) to raise the account opening document as a ground for segregation raises some question about adequate representation. Under these circumstances, it is difficult to say that other claimants had a "vicarious day in court" by way of PlusFunds. *Cowan v. Ernest Codelia, P.C.*, 149 F. Supp.2d 67, 77 (S.D.N.Y. 2001).[35] Under applicable law, the question is whether "preclusion, with its severe consequences, would be fair under the particular circumstances" and "[d]oubts should be resolved against imposing preclusion to ensure that the party to be bound can be considered to have had a full and fair opportunity to litigate." *Buechel v. Bain*, 97 N.Y.2d 295, 304-05, 740 N.Y.S.2d 252, 766 N.E.2d 914 (2001). Thus, the burden of showing privity is on the Defendants, and as the question is close, they have not satisfied their burden in this case.

It can be argued that privity between PlusFunds and SPhinX should be found in light of Judge Rakoff's Order dated January 20, 2010, in which Judge Rakoff enforced a forum selection clause entered into by PwC Cayman and SPhinX. Plaintiffs in that matter argued that PlusFunds could not be bound by the forum selection clause because it was not a signatory to the agreement. Judge Rakoff responded to this argument as follows:

> The Court finds unavailing plaintiffs' arguments that PlusFunds, and thus its successor, plaintiff Sinclair, is not bound by the forum selection clause at issue. Plaintiffs' own allegations in the amended complaint belie their argument that they are not bound by the engagement letters — one of which was signed by the PlusFunds Chief Financial Officer — which, according to the complaint, "memorializ[ed] [PwC Cayman's] agreements with SPhinX and PlusFunds." Am. Compl. ¶¶ 611, 612. Independently, moreover, the two entities are bound by the forum selection clause under the so-called "closely related" test that is the law of a number of other circuits, has been frequently applied by the district courts in this circuit, see R&R ¶ 50–51 (citing cases), and was recently cited with approval by the Second Circuit in *Aguas Lenders Recovery Group LLC v. Suez S.A.*, 585 F.3d 696, 701 (2d Cir. 2009). As the Report and Recommendation recounts, the allegations of the complaint

---

[34] Of course, under any concept of privity, there is a juridical connection between PlusFunds and the JOL of the PlusFunds estate that warrants a finding of privity, should Judge Drain's order be found preclusive on the question of segregation.

[35] Defendants' reliance on *Hunt v. Enzo Biochem, Inc.*, 2009 WL 1683990 (S.D.N.Y. June 15) is misplaced. Privity was found in that case because the party and non-party had entered into a litigation agreement designed to allow the non-party to benefit from a successful outcome for the party. Judge Scheindlin held that "[i]t would simply be unfair to allow Glaser, Lewicki, Cavanagh, and Pope to take a 'second bite at the apple' when they intended to use res judicata to their advantage had the Glaser Action gone their way." No such strategizing or unfairness is presented in this case.

themselves establish the close relationship that existed between SPhinX and PlusFunds.

Yet it does not inevitably follow that entities that are "closely related" for forum selection clause purposes are in privity for purposes of issue preclusion. As the Second Circuit recognized in *Aguas Lenders*, the "closely related" test was developed for and applied in the particular context of determining whether a party is bound by a contract even if it was a non-signatory. 585 F.3d at 701 ("Successorship doctrine prevents parties to contracts from using evasive, formalistic means lacking economic substance to escape contractual obligations."). Applying that doctrine to a forum selection clause is less drastic than applying the same standards to issue preclusion. A party found in privity is barred from ever litigating an issue even though it was not a party to the action; a party found to be "closely related" simply has to litigate the issue in a different jurisdiction. Moreover, mandatory forum selection clauses are given broad enforcement.[36] In contrast, as stated above, the severe consequences of preclusion are imposed only with caution. And as noted above, the standards for privity include considerations that are not employed under the law of successorship to contracts — including the quality of representation of the non-party's interests in the previously decided litigation and the identity of counsel.

Therefore, I recommend that the court not find the privity that is necessary to bind the Plaintiffs other than the PlusFunds JOL to the adverse determination by Judge Drain. Of course, the court need not reach the privity question if it finds, as I recommend *supra*, that issue preclusion should not apply against *any* of the Plaintiffs because Judge Drain did not decide the precise issue of whether the Refco LLC-SMFF account opening document created a right of segregation.

### Conclusion on Right to Segregation

For all the reasons stated above, I recommend that the motions to dismiss be denied insofar as they are based on the assertion that 1) there was no right to segregation of the SMFF excess cash in the accounts at Refco LLC, 2) that was violated when the cash was transferred to RCM.

The remainder of this report on omnibus primary violations will assume that Refco

---

[36] *See Aguas Lenders,* 585 F.3d at 699:

The enforcement of forum selection clauses in international disputes is governed by *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). *M/S Bremen* noted the important role of forum selection and choice of law clauses in eliminating uncertainty in international commerce and held that such clauses are entitled to a presumption of enforceability, unless "enforcement would be unreasonable and unjust, or ... the clause was invalid for such reasons as fraud or overreaching." *M/S Bremen,* 407 U.S. at 15, 92 S.Ct. 1907. Thus, where parties contract to a so-called mandatory forum selection clause, in which they agree in advance on a forum that is exclusive of all others, the choice of forum is accorded the *M/S Bremen* presumption of enforceability.

guaranteed that SMFF cash would be segregated at Refco LLC, and that the transfers to the unregulated accounts at RCM were unauthorized.

### B. Fraud[37]

As described in the previous Report and Recommendation on standing, the Complaints allege a "SPhinX fraud" and a "Refco fraud." The SPhinX fraud involves the allegedly wrongful transfer of SMFF cash from Refco LLC to RCM, as well as attempts to cover up the fact that the assets were sent to and maintained in an unprotected account. The Refco fraud involves upstreaming assets in accounts from RCM to fund Refco and its wrongful acts; Round Trip Loans; and a fraudulent LBO and IPO.

To prove fraudulent misrepresentation under New York law, a plaintiff must show that:(1) the defendant made a material false statement, (2) the defendant intended to defraud the defendant thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance. *Blank v. Baronowski,* 959 F.Supp.172, 177 (S.D.N.Y.1997). Where the fraud is based on alleged misrepresentations, the complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001), quoting *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

A plaintiff pleading fraud based on deceptive conduct "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on [plaintiffs]." *In re Parmalat Sec. Litig.,* 383 F.Supp.2d 616, 622 (S.D.N.Y.2006).

An action for breach of contract may not be converted into one for fraud merely by alleging that the contracting party never intended to meet its contractual obligations. That would allow a plaintiff to plead two independent claims, and obtain unjustified recovery, for the same conduct. *GSGSB, Inc. v. New York Yankees,* 862 F.Supp. 1160, 1177 (S.D.N.Y.1994). To plead fraud for claims arising from contractual relations, a plaintiff must : (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation or act collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996). *See also Hargrave v. Oki Nursery,* Inc., 636 F.2d 897, 898-99 (2d Cir.1980) ("If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort."). *See*

---

[37] This Report and Recommendation considers whether the Plaintiffs have alleged a fraud by Refco. As noted above, other claims against individual defendants for fraud will be considered in subsequent reports on individual motions to dismiss.

*generally Papa's-June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1162 (S.D.N.Y.1996) (dismissing fraud claim where it was not "sufficiently distinct from the breach of contract claim"; noting that the complaint "merely append[ed] allegations about [defendant's] state of mind to the claim for breach of contract").

### 1. Fraud Standards as Applied to the SPhinX Fraud

The only Count alleging fraud by Refco is Count XIII of the Sugrue  Amended Complaint — brought against the Refco insiders Bennett, Maggio, Tone Grant and Trosten. Hackl is also included in this Count as one acting "in concert" with these insiders.[38]

The Defendants' arguments that the Plaintiffs have failed to plead a fraud on Refco's part with regard to the SPhinX fraud are directed mainly to the contention that the transfer of cash to RCM was not wrongful in the first place. These arguments have been addressed in the section on the Plaintiffs' right to segregation, supra.

Various defendants argue that even assuming a right to segregation, the Plaintiffs have not pleaded the SPhinX fraud with sufficient particularity. Curiously, the Plaintiffs' responsive brief on primary violations, in the section on fraud, focuses exclusively on the Refco fraud. Worse still, Count XIII contains no allegations at all about the violation of segregation and wrongful transfer to RCM. Other than an allegation about an attempted cover-up (discussed below), Count XIII is all about the Refco fraud.

Yet a complaint must be construed as a whole. So this leaves me once again to cruise the hefty complaint to determine whether the Plaintiffs have adequately alleged that the  wrongful

---

[38] Count XI alleges fraud against the Gibson Dunn defendants. Judge Rakoff has referred the counts against Gibson, Dunn to arbitration. Despite this referral, any claim against the remaining defendants for aiding and abetting the Gibson, Dunn defendants would require a finding that the Plaintiffs have adequately pleaded a primary wrong by the Gibson, Dunn defendants. I note that none of the aiding abetting claims in any of the complaints appear to allege that the remaining defendants aided and abetted the Gibson, Dunn defendants.  But to the extent any aiding and abetting claim *is* dependent on such a primary wrong,  that wrong is not alleged to be committed by Refco, and so it will be addressed in a subsequent opinion if necessary.

Count VIII alleges fraud against PwC and Ferris but, as indicated above, the omnibus question runs to a primary violation by Refco.

Count III is against Sugrue, Owens and Kavanagh for fraud. That is not a claim against Refco, but it has some relevance to whether the Plaintiffs have alleged a primary wrong against Refco, as will be discussed in text.

transfer of SMFF cash from Refco LLC to RCM was anything more than a breach of contract. One possibility, under New York law as set forth above, is whether anyone made a fraudulent misrepresentation or deceptive act collateral or extraneous to the contract between Refco LLC and SPhinX — and whether the Plaintiffs relied on that misrepresentation or act.

The Amended Complaints allege at least the following misrepresentations and deceptive acts pertinent to the SPhinX fraud:

1. In negotiations in the Fall of 2004, "Hackl told [Plus Funds CEO and President] Bousbib that Refco could not pay higher rates because SPhinX cash at Refco was held in customer-segregated accounts." SAC ¶ 286. Hackl was acting in concert with the Refco insiders. ¶ 1224.   But Plaintiffs have not adequately alleged reliance on this misrepresentation. Indeed in SAC ¶ 288 the Plaintiffs allege that Bousbib was not satisfied with the explanation and continued efforts to move SMFF's cash to another custodian. Plaintiffs' bare assertion in ¶ 1228 that PlusFunds relied on the Hackl statement is contrary to other assertions in the complaint and so is not plausible under *Twombley*. Thus, the Hackl statement does not support a claim for fraud. *See IDT Corp. v. Morgan Stanley Dean Witter*, 12 N.Y.3d 132, 879 N.Y.S.2d 355, 359, 907 N.E.2d 268 (2009) (fraud claim does not lie where plaintiff acted contrary to defendant's attempted influence).

2. The Suffolk loans involved a sham transaction to "eliminate PlusFunds agents who questioned the nature of SPhinX's business relationship with Refco." SAC ¶ 298. This allegation can be fairly read to mean that the Suffolk transactions were an attempt to keep PlusFunds insiders in the dark about the fact that the SMFF excess cash was being placed in an unprotected account.[39]   The Amended Complaint specifically alleges extensive machinations, as well as affirmative misrepresentations, to conceal Refco's role in the Suffolk loans. SAC ¶¶ 315-324. Refco was involved in the plan to purchase PlusFunds in the sham transaction, and the loans were made from a Refco affiliate. SAC ¶¶ 297-301. The Suffolk transactions caused direct injury to PlusFunds and SPhinX because they gave Refco "increased influence over PlusFunds and continued access to SPhinX cash." SAC ¶ 1118. Plaintiffs allege that innocents at PlusFunds relied on statements and actions concealing the true nature of the Suffolk transactions. See SAC ¶ 328 (when the true facts were disclosed, innocents were "furious" and made attempts to remove Sugrue, Kavanagh and Owens). These statements and actions were extraneous to any contractual obligations on Refco's part, because they "misrepresented a present fact" rather than any intent to honor a contract guaranteeing segregation. *Blank v. Baronowski*, 959 F.Supp. at 177.

In a motion to dismiss accompanied by hundreds of pages of documents, defendants Owens

---

[39] It is worth noting that the Bank Defendants, in another action in this MDL, have argued that the Suffolk entities were single-purpose corporations that operated as conduits to allow Refco the necessary cover to purchase PlusFunds. See opinion of the Special Master in *Miller v. CFSB et al.*, November 13, 2009.

and Kavanagh argue that the Plaintiffs' allegations concerning the Suffolk transactions — and particularly whether innocents at PlusFunds were unaware of Refco's involvement and relied on alleged misrepresentations — are without factual basis. Owens and Kavanagh refer the Special Master to a board resolution and minutes of a directors' meeting— neither of which are relied on or integral to the Complaint, and neither of which are competent evidence on a motion to dismiss. *See Teledyne Industries, Inc. v. Eon Corp.*, 373 F.Supp. 191, 195 (S.D.N.Y. 1974) (noting that even summary judgment is inappropriate in an action based on a complex scheme of fraud "where the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions.") (citation omitted). Even if the board resolution and minutes were competent evidence, at most they raise some doubt about whether Plus Funds innocents were fully informed, but it is still plausible to conclude to the contrary.

The particulars of the Owens and Kavanagh motion to dismiss will be addressed in a separate Report and Recommendation. For now it is sufficient to state that those defendants have not presented any competent information that renders Plaintiffs' assertions regarding their reliance on representations and actions about the Suffolk transactions implausible. It should also be emphasized that I have not made a finding that Owens and Kavanagh acted with fraudulent intent. Rather I find that the Plaintiffs sufficiently allege that *Refco* engineered the Suffolk transactions and that those transactions were a sham.

Finally, as set forth on page 10, supra, of this Report, the Plaintiffs have alleged a number of facts and circumstances that make it plausible to believe that Refco wrongfully engineered the transfer of SMFF excess cash from Refco LLC to RCM, and that it did so with fraudulent intent. These allegations satisfy the intent element of Rule 9(b) because they indicate that the defendant "had both motive and opportunity to commit or assist fraud;" and, a number of the allegations "constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness." *In re Parmalat Securities Litigation,* 501 F.Supp.2d 560, 573 (S.D.N.Y.2007). See, e.g., SAC ¶ 173. Moreover, the allegations bearing on Refco's role in the transfers to RCM specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on [plaintiffs]." *In re Parmalat Sec. Litig.*, 383 F.Supp.2d 616, 622 (S.D.N.Y.2006) See, e.g., .SAC ¶¶ 155-156.

In sum, while the Complaints are not a model of clarity or organization, the Plaintiffs have sufficiently pleaded fraud as a primary wrong by Refco with respect to the SPhinX fraud.

### 2. Fraud Standards as Applied to the Refco Fraud[40]

---

[40] The prior Report and Recommendation recommends that causes of action based on the Refco fraud should be dismissed without prejudice for lack of standing. This section remains necessary because: 1) if the Plaintiffs have not sufficiently alleged a primary wrong, certain claims might be dismissed with prejudice; 2) if the Court on review of the R and R finds that Plaintiffs do have standing to sue on the Refco fraud, the Court will have to proceed to whether

Many of the Defendants argue that the Plaintiffs have not pleaded the Refco fraud with the requisite particularity. It seems counterintuitive to find that a fraud has not been sufficiently alleged when the underlying facts are exhaustively detailed in a 300 page complaint, and the principals of the fraud have either pled guilty or been convicted. The purposes of Rule 9(b) are (1) to provide a defendant with fair notice of the claims against him or her; (2) to protect a defendant from harm to reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of "strike suits." *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987). With respect to the *primary actors* of the Refco fraud, none of these goals should require obsessive detailing at this stage of the proceeding.[41]

In any case, the Plaintiffs' allegations include extensive discussion of Refco's losses (SAC ¶¶ 199, 202-03, 217-23, 256, 266, 333, 336); the concealment of losses and expenses in the RGHI Receivable (SAC ¶¶ 202-03, 217-25, 228-29, 256, 266, 333, 336); the inflation of Refco's revenues and financial position (SAC ¶¶ 201-03, 217-27, 256, 266); the Round Trip Loans that concealed the RGHI Receivable (SAC ¶¶ 204, 217, 229-39, 280);[42] the concealed diversion of customer assets (including SPhinX assets) to finance Refco's operations (SAC ¶¶ 199, 205, 217, 229, 241-46, 256, 264, 266); and the looting of Refco customer assets to enrich insiders in the LBO and IPO (SAC ¶¶ 207, 209-10, 247, 253-55, 264-65, 270).

Plaintiffs further allege that Refco insiders made materially false statements to the public in Refco's LBO and IPO public filings (SAC ¶¶ 258-63, 274-79, 333, 336), and that SPhinX and PlusFunds reasonably relied upon those false statements. (SAC ¶¶ 186-190). While not a model of precision, under the circumstances Plaintiffs have sufficiently alleged that Refco committed fraud when engaging in the transactions referred to in this Report as "the Refco fraud."

Plaintiffs must also allege reasonable reliance on Refco's fraudulent acts and statements. The Plaintiffs allege, at various places, that if not for the false picture of financial health, SPhinX would not have placed and held its property in accounts at Refco. See, e.g., SAC ¶ ¶ 173, 1223. Defendants contend that these assertions are conclusory, but, really, what else is there to say? Any rational actor with millions in an account would seek to take protective measures if they were to

---

the Plaintiffs have sufficiently alleged a primary wrong.

[41] Of course a different question is presented with respect to aiding and abetting claims, as will be discussed in a subsequent Report and Recommendation.

[42] The Round Trip Loan defendants argue that they had no reason to believe that those loans were anything other than legitimate business transactions. Assuming that is so, it does not bear on whether *Refco* committed a primary fraud. At most it would mean that Refco engaged in transactions that were a sham, while the Round Trip Loan defendants were innocent dupes. The Plaintiffs have alleged, in detail, the particulars of the Round Trip Loan transactions and have adequately shown at the pleading stage that the transactions were improper attempts to hide the RGHI receivable.

discover that the funds are being held by a company that is underwater. The run on Refco, once the RGHI receivable was disclosed, is testament to that. Accordingly, the Plaintiffs have adequately alleged reasonable reliance on the fraudulent statements and actions of Refco regarding the Refco fraud.[43]

### Conclusion on Claims of Primary Fraud by Refco

The Plaintiffs have adequately alleged that Refco committed fraud as to both the SPhinX fraud and the Refco fraud.

### C. Breach of Fiduciary Duty

The Plaintiffs allege a number of breaches of fiduciary duty on Refco's part as primary wrongs. The New York law on breach of fiduciary duty is broad, vague, and not very helpful in determining whether any particular relationship rises to the level of "fiduciary." It is often stated that a fiduciary relationship "may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 724 N.Y.S.2d 66, 68 (2d Dept 2001). The Restatement provides that a fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement [Second] of Torts § 874, Comment a.

Other general statements include:

● Under New York law, a fiduciary duty arises if "confidence is reposed on one side and there is resulting superiority and influence on the other." *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (internal quotation marks omitted).

● "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed

---

[43] The EMF defendants argue that SPhinX and PlusFunds would not in fact have taken remedial measures because essentially they were in Refco's pocket. See EMF Defendants' Brief in Support of Motion to Dismiss at 3:

> the facts that are alleged demonstrate that SMFF's use of Refco as its custodian and prime broker was an inevitable result of SPhinX and PlusFunds' incestuous relationship with Refco, not the result of a deliberative process.  Given this relationship, the notion that either SPhinX or PlusFunds was capable of "shopping around" to locate the best-qualified broker is disingenuous.

This is an interesting argument, but at best it raises a question of fact as to whether Refco reasonably relied on Refco's fraudulent statements and acts.

by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another." *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-5 (2d Dep't 1976).

● "[A] fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied." *Daly v. Metropolitan Life Ins. Co.*, 4 Misc.3d 887, 782 N.Y.S.2d 530, 535 (Sup.Ct. N.Y. Co. 1992) (internal quotation omitted).

● "[A] conventional business relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must make a showing of special circumstances that could have transformed the parties' business relationship to a fiduciary one such as control by one party of the other for the good of the other." *AHA Sales, Inc. v. Creative Bath Products, Inc.*, 58 A.D.3d 6, 21-22, 867 N.Y.S.2d 169 (2d Dept. 2008).

● In considering whether a fiduciary duty exists, "beyond what may be memorialized in writing, a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Weiner v. Lazard Freres & Co.*, 241 A.D.2d 114, 122, 672 N.Y.S.2d 8 (1st Dep't 1998).

● "Since fiduciary duties rest upon principles of equity and fairness, courts of equity have refrained from defining the precise parameters of the circumstances from which they may arise." *CBS, Inc. v. Ahern*, 108 F.R.D. 14, 24 (S.D.N.Y.1985).

● "The exact limits of what constitutes a fiduciary relationship are impossible of statement." *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Services*, 388 F.Supp.2d 292, 304 (S.D.N.Y. 2005) (citations and internal quotations omitted).

● "In the absence of a formal fiduciary relationship, a plaintiff must allege special circumstances or other peculiar facts that effectively transformed the parties' relationship into a fiduciary one. For these reasons, whether a fiduciary relationship exists is fact-specific to the particular action." *American Intern. Group, Inc. v. Greenberg*, 23 Misc.3d 278, 877 N.Y.S.2d 614, 624 (Sup. Ct. N.Y. Co. 2008).

Given these broad and vague perameters and the requirement of a fact-specific inquiry, a claim for breach of fiduciary duty is likely to be fact-dependent and is an unlikely candidate for a motion to dismiss. *Eurycleia Partners v. Seward & Kissel*, 12 N.Y.3d 553, 883 N.Y.S.2d 147, 151, 910 N.E.2d 553 (2009) ("Ascertaining the existence of [a fiduciary] relationship inevitably requires a fact-specific inquiry."); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F.Supp.2d 79, 102 (S.D.N.Y.2004) (motion to dismiss denied where court found it "impossible to say that plaintiff will be unable to prove the existence of a fiduciary relationship" in light of the

trust that a client placed in an investment bank and the bank's involvement in the client's finances and management); *Carter Equipment v. John Deere Industrial Equipment Co.*, 681 F.2d 386, 390 (5th Cir.1982) ("The existence or nonexistence of a fiduciary relationship is a question of fact for the jury.").

Nonetheless, Judge Lynch has dismissed breach of fiduciary claims in this MDL when he found that a contract could not be plausibly read to impose a fiduciary duty on RCM to avoid waste and theft of FX accounts. *Kirschner v. Bennett,* 648 F.Supp.2d 525 (S.D.N.Y. 2009) (the Private Actions Trust case). So allegations of a fiduciary relationship that are belied by a contract or clearly without support in the alleged facts can be rejected as a matter of law.

### 1. Breach of Fiduciary Duty Allegations as Applied to the SPhinX Fraud:

Plaintiffs raise four separate sources of a fiduciary obligation owed by Refco: 1) the contractual obligation to maintain SMFF excess cash in a segregated account; 2) a relationship of trust and confidence, because Refco served as custodian, futures commission merchant and prime broker for the SPhinX funds and exerted substantial influence over PlusFunds and SPhinX; 3) an alleged joint venture with SPhinX and PlusFunds in the creation and promotion of, inter alia, the SPhinX Managed Futures Index Fund; and 4) the duty owed by Refco to its creditors arising from Refco's insolvency. These four arguments will be addressed in turn.

#### a. The Right to Segregation of SMFF Excess Cash

Plaintiffs claim that Refco had a fiduciary duty based on the account opening agreement with Refco LLC that guaranteed that SMFF cash would remain segregated. They seek to distinguish the Private Actions Trust case, where no such segregation was guaranteed. In that case, Judge Lynch held that a broker ordinarily does not owe a fiduciary duty to its customers, but this was in the context of his holding that the scope of the broker's "fiduciary obligation is limited to affairs entrusted to the broker." 648 F.Supp.2d at 534 (quoting *Bissell v. Merrill Lynch & Co.*, 937 F.Supp. 237, 246 (S.D.N.Y.1996)). Plaintiffs argue that because of the segregation guarantee, the "affairs entrusted to the broker" include the obligation to maintain segregation.

Assuming — as we do at this point — that the Plaintiffs have adequately alleged the right to segregation, the question is whether this is enough for a fiduciary duty on Refco's part. Defendants argue that a contractual duty to segregate would not imply any attendant fiduciary duty. *See Global Entm't Inc. v. N.Y. Tel. Co.,* 2000 WL 1672327 at *6 (S.D.N.Y.) ("A fiduciary duty must be separate and beyond any contractual duty."). But as with many of the general statements about fiduciary duty, the contention that a fiduciary obligation cannot be found in a contract can be misleading.[44]

---

[44] Notably Judge Lynch, in refusing to find a fiduciary duty in the Private Action Trust case, relied almost exclusively on the contract with RCM — which provided for the right of RCM to use money in the account if ever there was a margin balance. If a contract can defeat a

Indeed there is plenty of case law finding fiduciary duties that spring directly out of contractual obligations. For example, in *CBS, Inc. v. Ahern*, 108 F.R.D. 14 (S.D.N.Y.,1985), the counterclaim-plaintiff Scholz alleged that CBS contracted to hold royalties for him in "special accounts" for his benefit, agreeing that those royalties would not be subject to any setoff or counterclaim against him. CBS allegedly acted in violation of this agreement by appropriating the royalties. CBS argued that this was nothing but a breach of contract action, but the court disagreed and held that Scholz had properly pleaded a claim for breach of fiduciary duty. The court reasoned as follows:

> While it cannot be gainsaid that a "simple contract" does not create a fiduciary relationship giving rise to special duties, the distinction between contract and fiduciary relations admits of no simple and readily discernible definition. * * * Scholz here has alleged a duty on the part of plaintiff to hold monies belonging to Scholz in a special account for his benefit. These allegations adequately support the imposition of fiduciary duties with respect to the monies. See, e.g., *Teledyne Industries, Inc. v. Eon Corp.*, 373 F.Supp. 191, 199-202 (S.D.N.Y.1974) (court held that a cause of action for breach of fiduciary duty was sufficiently alleged where plaintiff alleged that defendant had a duty to place monies in a "special account," the principal purpose of which was to pay plaintiff).[45] Cf. *Irving Trust Co. v. McKeever*, 44 F.Supp. 842, 845-46 (E.D.N.Y.1942) (defendant who agreed to invest money and property given over by plaintiff was deemed to be a fiduciary). *Compare In re Morales Travel Agency*, 667 F.2d 1069, 1071-72 (1st Cir.1981) (no fiduciary duty created where funds were not required to be segregated for special purposes); *In re Black & Geddes, Inc.*, 35 B.R. 830, 836 (S.D.N.Y.1984) (same). The fact that the agreement allegedly permits no setoffs against the royalties owed also supports a finding of a fiduciary relationship.

108 F.R.D. at 25-26 (some citations omitted). *See also Blank v. Baronowski*, 959 F.Supp. 172, 177 (S.D.N.Y.,1997), where Judge Scheindlin (in a case involving a joint venture) rejected the proposition that a fiduciary duty could never be derived from a contract:

> Defendants also argue that plaintiff's breach of fiduciary duty claim is merely a converted contract claim because defendants' alleged fiduciary duties arise solely from contract. This argument ignores the well-established principle of New York law that where the breach of a contract is also a breach of a fiduciary duty, a plaintiff may assert a claim for both. *See, e. g., Litton Industries. Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1231 (S.D.N.Y.1991) ("[T]ort liability for breach of fiduciary duty may be predicated upon the

---

fiduciary duty, it should follow that a contract can establish one.

[45] The *Ahern* court noted that the *Teledyne* court was applying California law, but that "the common law rules for determining the existence of a fiduciary relationship are the same." 108 F.R.D. at 24, n.20.

precise conduct which also constitutes a breach of contractual obligations"), *rev'd on other grounds*, 967 F.2d 742 (2d Cir.1992); *Meyers v. Waverly Fabrics*, 65 N.Y.2d 75, 80 n. 2, 489 N.Y.S.2d 891, 894 n. 2, 479 N.E.2d 236, 239 n. 2 (1985) (per curiam).

See also *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 672 (S.D.N.Y.1996) (agreement to keep monies in a special account with limitations on use can give rise to fiduciary duty to maintain the account in accordance with the restrictions); *American Intern. Group, Inc. v. Greenberg*, 23 Misc.3d 278, 877 N.Y.S.2d 614 (Sup. Ct. N.Y. Cty. 2008) (motion to dismiss denied where plaintiff alleged that the defendants vowed to keep certain shares in an account for a particular use, and yet used the shares contrary to their promise).

While it is certainly true that a breach of contract is not automatically — or even usually — a breach of fiduciary duty, the above case law establishes that when a party promises some special protection for an account, that party has undertaken a fiduciary duty to make good on the promise. In this case, the right of segregation certainly rises to the level of an important, "special" protection within the meaning of the case law. Accordingly, the Plaintiffs have adequately alleged that Refco, through the account opening document, had a fiduciary duty to maintain the SMFF excess cash in a segregated account — and breached that fiduciary duty by transferring the cash to an unprotected account at RCM.

### b. *Relationship of Trust and Confidence*[46]

The Plaintiffs alternatively argue that Refco had a fiduciary duty because Refco performed functions that established a relationship of trust and confidence with SPhinX and PlusFunds. The Defendants argue that the functions performed by Refco were nothing more than are found in an arm's-length business relationship.[47] But the Plaintiffs' allegations of Refco's role in SPhinX and PlusFunds matters belie that argument. The Plaintiffs allege, among other things:

● Refco was the prime broker and custodial agent for SPhinX and particularly for SMFF. SAC ¶ 159.

● Refco (specifically RAI) exercised discretion over the movement of SPhinX assets between Refco LLC and RCM. SAC ¶ 156.

---

[46] I am proceeding through each of the alleged grounds for a fiduciary duty, in case Judge Rakoff does not accept my recommendation as to any particular ground.

[47] All agree that an arm's-length business relationship does not, without more, establish a fiduciary duty to each other. See, e.g., *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 724 N.Y.S.2d 66, 68 (2d Dept.2001) ("an arms-length business relationship does not give rise to a fiduciary obligation").

● Refco had access to confidential and proprietary SPhinX and PlusFunds data. SAC ¶ 145.

● Refco had "veto rights over the structuring, offering and operation of certain investment vehicles designed to invest in SPhinX and SMFF, and Plus Funds agreed to make its personnel available to assist Refco with product development." SAC ¶ 145.

● Refco was an agent for solicitation and distribution of investments in the SPhinX funds. SAC ¶ 159.

● Refco was given rights to participate in the PlusFunds license to use the Standard & Poor's mark in order to promote Refco's own funds, which were designed to invest in SMFF. SAC ¶ 146.

● Refco had the right, as of April 13, 2005, to appoint a representative to attend the meetings of PlusFunds' board of directors. SAC ¶ 159.

● Refco had superior knowledge about the facts underlying the SPhinX fraud. ¶ 159.

All this looks much more intertwined than an arm's-length business relationship.[48] It describes a relationship in which Refco had a major, indeed dominant role in the business of SPhinX and PlusFunds. The relationship described above can be usefully and favorably compared to the cases that have found sufficient allegations of a relationship of trust and confidence. For example, in *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 799 N.Y.S.2d 170, 176-7, 832 N.E.2d 26 (2005), the issuer of newly offered stock alleged that it had relied on the underwriter's expertise with respect to an IPO; the issuer further alleged that the underwriter failed to disclose a kick-back scheme that gave the underwriter an incentive to advise the issuer to undervalue its stock. The Court of Appeals found that the issuer had properly pleaded an action for breach of fiduciary duty, because its allegations indicated that the parties "created their own relationship of higher trust beyond that which arises from the underwriting agreement alone, which required Goldman Sachs to deal honestly with eToys and disclose its conflict of interest — the alleged profit-sharing arrangement with prospective investors in the IPO."[49]

---

[48] While the individual defendants certainly are not required to maintain a monolithic position, it is nonetheless interesting that while some Defendants argue that the relationship between Refco and the Plaintiffs was nothing more than arm's-length, others argue that the relationship was "incestuous" and that SPhinX and PlusFunds were essentially controlled by Refco. See Brief by EMF Defendants in Support of the Motion to Dismiss at 2.

[49] The Court also emphasized that whether a relationship of trust and confidence exists beyond an ordinary commercial relationship is a "fact-specific determination to be made by the factfinder." Id. at n.5.

31

Defendants seek to distinguish *EBC I* by noting that the underwriter had agreed to take on an *advisory* capacity, and the Plaintiffs in this case do not allege that Refco agreed to be an advisor for SPhinX and PlusFunds. But the point is that the allegations here indicate that Refco took on an influential and superior role that went well beyond the typical arm's-length commercial relationship. Indeed the examples listed above in bullet-point form show a relationship far more intertwined (and, from Refco's perspective, dominant) than that alleged in *EBC I*.

Other cases in which a fiduciary relationship has been found properly alleged — against arguments that there was nothing more than an arm's-length relationship — involve facts that are comparable to, or less compelling, then the facts alleged here. *See, e.g., American Intern. Group, Inc. v. Greenberg*, 23 Misc.3d 278, 290, 877 N.Y.S.2d 614 (Sup. Ct. N.Y. Co. 2008) (observing that courts evaluate " the closeness and ongoing nature of the contacts" and finding sufficient allegation of a fiduciary relationship on the basis of a long-term business relationship from the beginning of the plaintiff's existence);[50] *AHA Sales, Inc. v. Creative Bath Products, Inc.*, 58 A.D.3d 6, 21, 867 N.Y.S.2d 169 (2d Dept.2008) (party who established a "position of dominance" in a business relationship was properly alleged to have a fiduciary duty: "Whether plaintiff was obliged to accept the requirements allegedly imposed by defendants because of defendants' position of dominance or whether plaintiff assumed such obligations voluntarily are questions of fact not properly decided on a motion to dismiss."); *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 672 N.Y.S.2d 8, 14-15 (1st Dept.1998) (fiduciary duty found where plaintiff relied on defendant's expertise, plaintiff imparted confidential information, and defendant was given exclusive rights to provide financing for the plaintiff's transaction). Compare *Global Entertainment, Inc. v. New York Telephone Co.*, 2000 WL 1672327, at *5 (S.D.N.Y.2000) (claim that defendant owed money for calls made to plaintiff's lines; fiduciary duty claim rejected where the only allegations were that the defendant "counted calls, billed callers and collected revenue on Global's behalf," concluding that "these are duties owed pursuant to the contract, not because of any special relationship.")

The Complaints assert that Refco, from the beginning of PlusFunds and the SPhinX funds, exercised substantial influence over those entities; that PlusFunds and SPhinX relied on Refco for crucial functions; that Refco was essentially an insider with respect to the business operations of PlusFunds and SPhinX; and that Refco, while knowing the importance of segregation to PlusFunds and SPhinX, did what it could to undermine the right of segregation. These allegations are enough, at the pleading stage, to establish the "special circumstances that could have transformed the parties' business relationship to a fiduciary one." *L. Magarian & Co. v. Timberland Co.*, 245 A.D.2d 69, 70, 665 N.Y.S.2d 413 (1st Dept. 1997).

### c. Joint Venture

---

[50] The *Greenberg* court concluded that factual issues "concerning the precise nature and scope of the relationship and the length of time that it spanned" could not be determined on a motion to dismiss. Id.

The Plaintiffs allege that Refco owed fiduciary duties to SPhinX and PlusFunds due to its role as a joint venturer in the creation and promotion of, among other things, the SPhinX Managed Futures Index Fund. The parties do not dispute that joint venturers have fiduciary duties to each other. *See, e.g., Blank v. Baronowski*, 959 F.Supp. 172, 177 (S.D.N.Y.1997) (joint venture establishes fiduciary duty). But the Defendants argue that the Plaintiffs have not sufficiently alleged that Refco agreed to share losses with SPhinX and PlusFunds, and therefore the arrangement was not a joint venture as a matter of law. Plaintiffs respond in their papers with a factual assertion that "Refco and PlusFunds split management fees in connection with the Refco Funds' investment in SPhinX."[51] They further offer to amend their complaint to add an allegation of an agreement to share losses.

The court in *Cosy Goose Hellas v. Cosy Goose USA. Ltd.* 581 F.Supp.2d 606 (S.D.N.Y.2008), engaged in an extensive and cogent analysis of New York law and concluded that the majority (and better-reasoned) rule is that a plaintiff is required to allege that the parties agreed to share losses in order to establish a joint venture. The court analyzed the New York law of joint ventures in the following passage:

> There are five elements that courts consider when assessing whether a joint venture exists under New York law. A joint venture exists in New York when (1) two or more persons enter into an agreement for profit; (2) the parties intend to be associated as joint venturers; (3) each of the venturers contributes something of value to the venture, such as property, skill, knowledge or effort; (4) each co-venturer has some degree of control over the venture; and (5) the co-venturers agree to some division of profit and loss allocation. See *Dinaco Inc. v. Time Warner, Inc.*, 346 F.3d 64, 67-68 (2d Cir.2003).

> The vast majority of courts hold that in addition to the contributions each party must make to a joint venture, each party must also be subject to "submit to the burden of making good the losses" of the joint venture. *Dinaco, Inc.*, 346 F.3d at 68 (citing *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958)). Numerous New York authorities have emphasized that a putative venturer's loss of anticipated profits from a collaborative business effort is not sufficient to make that individual a joint venturer, see *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983), and that a putative joint venturer who only stands to lose the value of his or her services rendered in connection with the venture does not submit himself or herself to the liabilities and losses of the venture and thus is not considered a joint venturer, *Dinaco, Inc.*, 346 F.3d at 68; *Weinreich v. Sandhaus*, 83 Civ. 3966(CES), 1989 WL 130641 at *3-4 (S.D.N.Y. July 24, 1989) ("also relevant to the inquiry of whether a party 'risked loss' is whether he [or she] also agreed to assume personal responsibility for the potential legal liabilities of the enterprise.").

> There exists, however, a minority of courts in New York that recognize that under certain circumstances a joint venture may be established when a possible co-venturer only

---

[51] Krys Plaintiffs' Brief on Omnibus Issue of Fiduciary Duty at 6, n. 2.

stands to lose the value of his or her services contributed to the joint venture. See *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900 (2d Dep't 1976). These cases reason that when there is no reasonable expectation that the joint venture will suffer losses then the parties need not discuss the allocation of losses, and that in such cases, where there is an absence of an agreement to share losses, the law will imply an agreement to share losses in a manner similar to the parties' agreement to share profits. * * * Such decisions have come under heavy scrutiny and derision from judges of this Court for not being in accord with the elements of a joint venture under New York law. See, e.g., *Yonofsky v. Wernick*, 362 F.Supp. 1005, 1032 n. 76 (S.D.N.Y.1973).

Id. at 618-19 (some citations omitted).

The *Cosy Goose* court concluded that it was "constrained to apply New York's joint venture jurisprudence as developed by the New York Court of Appeals and as interpreted and applied by the Second Circuit." Id. at 624-5. In light of *Cosy Goose* and the cases upon which it relies, it is clear that the Plaintiffs' claim of fiduciary duty based on a joint venture with Refco must be dismissed. As the Plaintiffs concede, they have not alleged that the parties agreed to share in both profits and losses. The question remaining is whether the Plaintiffs should be allowed to amend the complaint to allege a division of profits and losses.

If adding allegations about a joint venture ends up to be the only reason for the complaint to be amended, then leave should not be granted. The Plaintiffs knew the details about the business arrangements that Refco had with SPhinX and PlusFunds at the time of the First Amended Complaint. Moreover, the Plaintiffs' confident assertion in its brief that Refco and PlusFunds "split management fees" would not, even if made part of a new complaint, establish a joint venture. As stated above, an essential part of a joint venture is an agreement of the parties to make good the losses of the enterprise. Sharing the costs of management is not the same as sharing the risk of loss to the enterprise. *See, e.g. Zeising v. Kelly*, 152 F.Supp.2d 335, 349 (S.D.N.Y. 2001) (agreement to pay for services is not an assumption of the risk of loss required for a joint venture). It follows that the Plaintiffs' claim for breach of fiduciary duty by Refco — insofar as it is grounded in a joint venture — should be dismissed with prejudice.

### d. Operating in the Zone of Insolvency

The Plaintiffs argue that Refco had a fiduciary duty to its creditors during the time it was insolvent, which they assert to be at least from the time of the 2004 LBO. SAC ¶¶ 207-208. The Plaintiffs rely upon New York law, which provides that a corporation and its officers and directors, when operating while the corporation is insolvent, owe fiduciary duties to the corporation's creditors. *See Interstate Foods, Inc. v. Lehmann*, 2008 WL 4443850, at *5 (S.D.N.Y.)("Because Interstate functioned as a creditor to Lehmann Meats, Lehmann Meats owed Interstate a fiduciary duty if it became insolvent, as Interstate alleges that it did.").

In the Private Action Trust case, Judge Lynch briefly addressed the Trustee's argument that RCM owed a fiduciary duty to the FX customers during the time it operated while insolvent. He noted that the Trustee alleged that RCM "was insolvent or in the zone of insolvency at all relevant times" (Compl. ¶ 28(g)). Judge Lynch rejected the Trustee's fiduciary duty contention on two grounds: 1) the Trustee presented "no argument that this insolvency establishes a fiduciary relationship;" and 2) "the complaint fails to allege facts in support of the allegation and thus such an approach would not survive a motion to dismiss." 648 F.Supp.2d at 537, n.19.

In the present case, the Plaintiffs specifically argue that "Refco and its agents owed fiduciary duties because Refco was insolvent."[52] However, their *allegations* of insolvency are essentially the same as Judge Lynch found insufficient in the Private Actions Trust case. Both complaints focus on the alleged insolvency caused by the LBO. SAC ¶¶ 266 and 267, which allege the Refco insolvency, are virtually identical to the allegations of insolvency that Judge Lynch found inadequate in the Private Actions Trust case. So Judge Lynch's ruling that the pleading of insolvency was inadequate in the Private Actions Trust case should be controlling here. While it may be true that Judge Lynch's ruling on the inadequacy of the Private Action Trustee's insolvency allegations is not the law of *this* case, the fact that he reviewed essentially the same allegations and found them wanting is reason enough to reject them here. Nor should the Plaintiffs be allowed to amend their complaint to provide more detailed assertions of insolvency. The Plaintiffs have amended once, and have had access to extensive documentation on the subject of Refco's financial condition.

But even if the allegations of insolvency were sufficient, there is an important question of applicable law that requires the rejection of the insolvency theory. The Thomas H. Lee ("THL")defendants argue that because RCM was a Bermuda company, the question of whether it had a duty to creditors while insolvent is determined by Bermuda law. The THL defendants submitted an affidavit of a purported expert on Bermuda law, Mr Woloniecki, in which he states that Bermuda companies do not become fiduciaries of their creditors when operating while insolvent.[53] According to Mr. Woloniecki, a creditor of an insolvent Bermudan company has, for all purposes relevant here, the same status as a creditor of a solvent Bermuda company: it is just a creditor.[54] He further states that the officers, directors, and other fiduciaries of a Bermuda company do not owe fiduciary duties to creditors.[55] Mr. Woloniecki appears to be qualified and neither his qualifications

---

[52] Supplemental Brief Pursuant to Direction of Special Master Capra at 12. The supplemental brief is only one example. The argument is raised by the Plaintiffs, and addressed by the Defendants, in a number of briefs.

[53] Woloniecki Decl. ¶¶ 33-34.

[54] Id. ¶ 37.

[55] Id. ¶¶ 24-25.

nor his assertions have been rebutted by the Plaintiffs.[56] Federal courts regularly accept declarations of foreign law on motions to dismiss. *See, e.g., O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.)*, 383 B.R. 231, 274-76 (Bankr. S.D.N.Y. 2008) (accepting, and agreeing with, an expert report by Mr. Woloniecki on a motion to dismiss). Mr. Woloniecki's affidavit is not only unrebutted; it appears to be a cogent statement of Bermuda law. Therefore, if Bermuda law applies, the Plaintiffs' claim that RCM owed a fiduciary duty when insolvent must be rejected.

The same result (though for a different reason) holds for the Refco entities incorporated in Delaware, such as RGHI. Under Delaware law, a corporation and its officers and directors have a fiduciary duty to creditors when operating while insolvent, but "individual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors." *North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).

The Plaintiffs argue that whether a fiduciary duty exists in this case is a question governed by New York law. But this assertion is contrary to the internal affairs doctrine. If the internal affairs doctrine did not apply to the existence of a fiduciary duty upon insolvency, then the directors and officers of a corporation could not determine what duties they owe and to whom. Different jurisdictions with different rules could impose conflicting duties on the directors and officers of the same corporation. But that is not the law. The state of incorporation controls whether a corporation and its directors and officers have a fiduciary duty to creditors during insolvency. *See, e.g., Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (internal affairs doctrine applies to the determination of whether a fiduciary duty exists, in an insolvency claim brought by individual creditors); *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir.1980) (under New York choice-of-law rules, the law of the state of incorporation controls in adjudicating a corporation's "internal affairs," including liability of directors and officers); *Koury v. Xcellence, Inc.*, 2009 WL 94312, at *7 (S.D.N.Y. Jan. 13, 2009) (same). See also Restatement (Second) of Conflict of Laws § 309, comment c (1971) (in cases involving directors, there is a presumption in favor of applying law of state of incorporation).

For all these reasons, the Plaintiffs' claim that "Refco and its agents owed fiduciary duties because Refco was insolvent" should be rejected.

### 2. Breach of Fiduciary Duty Standards as Applied to the RefcoFraud:

The previous section determined that for claims arising from the SPhinX fraud, the Plaintiffs have adequately pleaded that Refco had a fiduciary duty to the Plaintiffs based upon 1) a duty to segregate the SMFF excess cash, and 2) a relationship of trust and confidence. But the Plaintiffs have not adequately pleaded that Refco had a fiduciary duty based on 1) a joint venture and 2) operating

---

[56] The Plaintiffs had sufficient notice of the experts' submission, as it was served upon them as part of the THL companies' motions to dismiss. See Fed. R.Civ.P. 44.1.

within the zone of insolvency.

Applying the above analysis to claims arising from the *Refco* fraud yields a different result in at least some respects. A discussion of each basis for fiduciary duty follows:

### a. Duty of Segregation

Even if Refco had a duty to keep the SMFF cash in a segregated account, no claim for breach of that duty can be brought in the context of the Refco fraud. That is because there is no causal relationship between the violation of the segregation right and the Plaintiffs' claims for damages under the Refco fraud. With respect to the Refco fraud, the Plaintiffs are arguing that if they had known about Refco's financial condition, SPhinX would not have placed and held its property in accounts at Refco. See, e.g., SAC ¶ 1223. That is, segregation or not, they would simply not have done business with Refco if they had known the truth. These allegations show that the claim for a right of segregation is the gravamen of the *SPhinX* fraud, not the Refco fraud. Accordingly, no claim for breach of fiduciary duty based on segregation can support any claim for damages from the Refco fraud.

### b. Relationship of Trust and Confidence

Let us assume, as determined above, that Refco had a fiduciary duty to SPhinX and PlusFunds arising from a relationship of trust and confidence. The question remains whether that duty was breached in a way that caused damages to the Plaintiffs from the *Refco* fraud. One argument could be that the relationship of trust and confidence requires the superior party to keep the reliant party apprised of its financial condition. But plaintiffs cite no case establishing such a duty — other than the "zone of insolvency" cases which, as stated above, are not controlling because insolvency is not adequately pleaded and the internal affairs rule points to law that either recognizes no such duty or grants no relief to individual creditors. The Plaintiffs argue extensively about fiduciary duties, but make no serious attempt to show that Refco had a fiduciary duty *that extended to keeping the Plaintiffs informed about its true financial position.*

But as noted in the standing opinion, part of the Refco fraud is about self-dealing — use of the SMFF excess cash at RCM to fund Refco's various operations.[57] The cases *do* find that a fiduciary duty formed in a relationship of trust and confidence is breached when the superior party engages in self-dealing at the reliant party's expense. *See, e.g., In re Refco Capital Mkts.*, 2007 WL 2694469, at *10 n.8 (S.D.N.Y.) ("It is difficult to imagine that self-dealing loans to insolvent

---

[57] As noted in the standing opinion, the reason that the upstreaming from RCM is part of the Refco fraud is because it was a harm to RCM and therefore SMFF suffered only derivative harm. For purposes of this opinion on primary wrongs, standing is assumed. So it really makes no difference whether the upstreaming is considered part of the "Refco fraud" or the "SPhinX" fraud. The question is whether the Plaintiffs have adequately pleaded a breach of fiduciary duty with respect to the upstreaming of SMFF cash from RCM.

affiliates could be consistent with any fiduciary duty * * * ."); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F.Supp.2d 79, 104 (S.D.N.Y.2004) ("Simply stated, this is the allegation that DLJ lied to ATI to enable itself to self-deal. Breach of fiduciary duty most appropriately captures the nature of this allegation."); *EBC I, INC., v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 832 N.E.2d 26, 799 N.Y.S.2d 170, 176-7 (2005) (fiduciary relationship based on trust and confidence is breached where defendant fails to disclose compensatory arrangements that would have shown a conflict of interest). The Plaintiffs have specifically alleged that Refco breached its fiduciary duty by upstreaming SMFF cash from RCM. See, e.g., ¶¶ 159, 1108, 1235, 1249.

It is true that Judge Lynch held, in the Private Action Trust case, that RCM owed no fiduciary duty to protect the FX accounts from upstreaming for use at Refco. But the Private Action Trust case is distinguishable from this one. In that case, the Plaintiffs relied on the account opening document (including the Margin Annex) and some minor functions performed by Refco such as the presence of a dedicated salesperson and the mailing of account statements. 648 F.Supp.2d at 535 and n. 16. Judge Lynch was not presented with the allegations of intertwinement and dominance that the Plaintiffs have alleged here with respect to Refco.

Thus, the Plaintiffs have adequately alleged that with respect to the Refco fraud, Refco breached a fiduciary duty to SPhinX and PlusFunds, arising from a relationship of trust of confidence.

### c. Joint Venture

For the reasons discussed in the previous section, the Plaintiffs have failed to adequately allege a fiduciary duty on Refco's part on the basis of a joint venture. That claim, rejected as to the SPhinX fraud, is certainly no stronger as applied to the Refco fraud.

### d. Insolvency

For the reasons discussed in the previous section, the Plaintiffs have failed to adequately allege that Refco (or its officers and directors) had a fiduciary duty to the Plaintiffs on the basis of operating while insolvent.

### Conclusion on Fiduciary Duty

*With regard to the SPhinX fraud:*

The motions to dismiss the Counts involving breach of fiduciary duty by Refco on grounds

38

of insufficient showing of a primary violation should be denied insofar as they allege damage from the SPhinX fraud. With respect to the SPhinX fraud, the Plaintiffs have sufficiently alleged a breach of fiduciary duty on two independent bases: 1) the right to segregation; and 2) a relationship of trust and confidence. But the Plaintiffs have not adequately alleged a breach of fiduciary duty on the basis of 1) a joint venture, or 2) operating in the zone of insolvency.

> *With regard to the Refco fraud:*

The motions to dismiss the Counts involving breach of fiduciary duty by Refco on grounds of insufficient showing of a primary violation should be denied insofar as they allege damage from upstreaming assets from RCM.  With respect to these damages, the Plaintiffs have sufficiently alleged the breach of a fiduciary duty on the basis of a relationship of trust and confidence.


### D. Conversion

The Plaintiffs claim conversion of the SMFF excess cash as a primary wrong by Refco. See SAC Counts IV, XV, XIX.

Judge Rakoff has described the requirements for a cause of action for conversion under New York law: "the legal interests that a party bringing a conversion claim must show are either 'legal ownership or an immediate superior right of possession to a specific identifiable thing and ... that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights.'" *Starr Intern. Co., Inc. v. American Intern. Group, Inc.*, 2009 WL 614752, at *2 (S.D.N.Y.2009) (quoting *Fiorenti v. Central Emergency Physicians, PLLC*, 305 A.D.2d 453, 454-55, 762 N.Y.S.2d 402 (2d Dep't 2003)).

*See also Kirschner v. Bennett,* 684 F.Supp.2d 525, 540 (S.D.N.Y. 2009):

> To withstand a motion to dismiss in a conversion claim, a plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Moses v. Martin,* 360 F.Supp.2d 533, 541 (S.D.N.Y.2004) (citation and internal quotation marks omitted).

Defendants claim that the Plaintiffs "have not identified specific property that was converted; indeed, the entire basis of their claim is that their funds were commingled with those of other customers."[58] But this argument must fail for at least two reasons. First, the cash was identifiable when at Refco LLC, and the commingling was *itself* part of the wrongful act of conversion. Funds

---

[58] Omnibus Reply Brief at 23.

in a segregated account[59] are sufficiently identifiable to be the subject of conversion. *CBS, Inc. v. Ahern*, 108 F.R.D. 14,   24 (S.D.N.Y.1985) ("It is well settled that an action will lie for the conversion of money where there is an obligation to...treat in a particular manner the specific money in question.") (quoting 23 N.Y.Jur.2d, Conversion, § 12 (1982)); *Singapore Recycle Centr Pte Ltd. V. Kad Int'l Marketing, Inc.*, 2009 WL 2423333, at *17 (E.D.N.Y.) ("Where money is turned over by a plaintiff to a corporate defendant to be used for a specific purpose for the benefit of the plaintiff but is not used for that purpose, an action for conversion may be maintained."); *Key Bank of New York v. Grossi*, 227 A.D.2d 841, 843-4, 642 N.Y.S.2d 403 (3d Dept.1996) ("Despite the requirement that the proceeds of the sales be treated in a particular manner, which included transmittal of the proceeds to plaintiff within a specified period of time, defendants exercised dominion and control over the proceeds in such a manner that the proceeds were used to pay customers or creditors of Quintro other than plaintiff. Such evidence is sufficient to establish a cause of action for conversion separate and apart from any breach of contract"). The Plaintiffs cannot be required to establish identifiability *after* Refco wrongly took identifiable funds and commingled them.

More importantly, Judge Lynch has found that there is a question of fact regarding the identifiability of funds at *RCM*. In *Kirschner v. Bennett*, 648 F.Supp.2d 525, 541-542 (S.D.N.Y. 2009), the Private Action Trust Case, Judge Lynch held that the Trustee had sufficiently alleged that the FX accounts were identifiable. He noted that funds "may be 'specifically identifiable' despite the fact that they are not alleged to be held in a segregated account." A fortiori, there is a question of fact with respect to the identifiability of the SMFF excess cash which was subject to a segregation guarantee.[60]

Judge Lynch nonetheless dismissed the Private Action Trustee's conversion claim because the Trustee did not explain how RCM exercised *unauthorized* dominion over the FX funds to the exclusion of the owner's rights. Id. He reasoned that the FX Margin Annex agreement authorized RCM to "loan, pledge, hypothecate or otherwise dispose of such cash, securities and other property free from any claim or right, until settlement in full of all Transactions entered into pursuant to the [FX] Agreement." Id. The Trustee did not provide allegations of how the upstreaming of the funds could have been unauthorized in light of the breadth of the language in the Margin Annex.

---

[59] As stated above, the Plaintiffs have adequately alleged that SMFF had a right to have its excess cash segregated in an account at Refco LLC.

[60] It is true that Judge Lynch concluded that the FX funds were identifiable in part because the Trustee could not pursue a cause of action in contract. Id. at 542. But this was only one of his arguments, which he introduced as follows: "Finally, it should be noted that many of the cases in which courts have found that funds deposited in general bank accounts are insufficiently identifiable to support a claim for conversion involve claims for conversion where a breach of contract claim would have been more appropriate." That sentence is not enough to distinguish Judge Lynch's analysis from the present case, especially because the Plaintiffs' claim for identifiability is strengthened here because of the right of segregation.

Judge Lynch's analysis in the Private Actions Trust case on the question of authorization is not controlling here. In this case the relevant exercise of dominion and control is the transfer of SMFF cash from Refco LLC to RCM.

The Defendants argue that the Plaintiffs' complaint is devoid of critical details about what happened to the SPhinX money when it landed at RCM. They contend that copious details must be provided because the Plaintiffs' conversion claim must satisfy the heightened pleading requirements of Rule 9(b). But that is not so. In the Private Actions Trust case, Judge Lynch squarely held that the conversion claim was governed by Rule 8. He noted that "the gravamen of the Trustee's conversion claim is that the FX customers placed assets in their accounts and those assets were taken by RCM for its own benefit and not returned. A showing of pretense or fraud adds nothing to the claim because the defendant need only intend to exercise dominion or control over property in a manner inconsistent with the rights of another" for a conversion to take place." Id at 542, n.23. The same analysis applies to the Plaintiffs' claim for conversion.

The Sugrue Amended Complaint sufficiently alleges what happened to the SMFF excess cash: 1) it was transferred to an unprotected account at RCM, without authorization;[61] and 2) it was upstreamed and used by Refco to, among other things, bankroll the Suffolk transactions.[62] Under the liberal pleading standards of Rule 8, the Plaintiffs have stated a plausible account of "unauthorized dominion" over the SMFF excess cash. And certainly they have alleged that Refco exercised dominion to the exclusion of the Plaintiffs' rights — the cash was supposed to be segregated and then it was gone.

In sum, the Plaintiffs have adequately alleged that Refco committed the primary wrong of conversion.

## IV. Recommendations

In accordance with the Report above, the Special Master recommends the following rulings with respect to the Plaintiffs' allegations of primary violations by Refco:

1. The Plaintiffs have sufficiently alleged that SMFF had a right to have its excess cash segregated in accounts at Refco LLC.

2. The Plaintiffs have sufficiently alleged that the transfer of SMFF excess cash from Refco

---

[61] See, e.g., SAC ¶¶ 5-6, 180, 183, 193, 1130, 1131.

[62] See, e.g., SAC ¶¶ 205, 240-46, 298, 1130.

LLC to RCM was unauthorized and wrongful.

    3. The Plaintiffs have sufficiently alleged that Refco committed the primary wrong of fraud with regard to the SPhinX fraud.

    4. The Plaintiffs have sufficiently alleged that Refco committed the primary wrong of fraud with regard to the Refco fraud.

    5. The Plaintiffs have sufficiently alleged that Refco breached a fiduciary duty owed to SPhinX and PlusFunds through its actions related to the transfer of SMFF excess cash from Refco LLC to RCM. The fiduciary duty is established by the right to segregation and by a relationship of trust and confidence.

    6. The Plaintiffs have sufficiently alleged that Refco breached a fiduciary duty owed to Sphinx and PlusFunds by diverting SMFF excess cash from RCM. This fiduciary duty is established by a relationship of trust and confidence.

    7. The Plaintiffs have failed to sufficiently allege that Refco owed a fiduciary duty on the basis of a joint venture or operation within the zone of insolvency.

    8. The Plaintiffs have sufficiently alleged that Refco converted the SMFF excess cash.

    If these rulings are accepted, they will of course have an effect on the motions to dismiss many of the counts in the Complaints. At this point, however, it does not seem efficient to engage in a count-by-count analysis. Most of the counts affected are aiding and abetting counts, and the effect of these rulings on those counts should await a determination of the validity of the claims for aiding and abetting.

Daniel J. Capra
Special Master

Dated: March 1, 2010
New York, New York

42