document that the Suffolk Insiders and Suffolk's professionals controlled the proceeds of the Suffolk Loans.

130. Gibson Dunn, along with the Bank of New York, the depository for the Tender Amounts, tracked the shares surrendered by and funds to be disbursed to the Defendants. Gibson Dunn submitted the draw requests to Mayer Brown and/or Bennett pursuant to the loan documents.

131. On or about June 2, 2005 Suffolk extended the redemption period for the PlusFunds Tender Offer to allow for additional shareholders to return their Letters of Transmittal.

**The Plundering of the Suffolk Loan Proceeds**

132. As intended by the fraud created by the Suffolk Insiders, the entire transaction inured solely to the Suffolk Insiders' — and Defendants' — benefit. Specifically, the proceeds of the Phase II Loans were ultimately paid to and used by Sugrue, Kavanagh and Owens for their personal benefit.

133. The proceeds of the Phase II Loan in the amount of $11,350,000 to KAV were used by Kavanagh to purchase a yacht and for distributions directly to Kavanagh and a relative.

134. The proceeds of the Phase II Loan in the amount of $19,250,000 to MKK were paid by MKK to a foreign entity that is believed to also be controlled by the Suffolk Insiders.[9]

135. The proceeds of the Phase II Loan in the amount of $19,400,000 to SUG were withdrawn by Sugrue or used to pay his debts over the months between the PlusFunds Tender Offer and the bankruptcy filing of Refco.

---

[9] The majority of the loan proceeds were paid to the Daretto Foundation.

916691-2

136. The Offer to Purchase disclosed that Kavanagh, MKK and Sugrue "informed the purchaser that [they] [do] not intend to tender any of [their] shares in the Offers." It was not disclosed in the Offer to Purchase that Sugrue, Kavanagh and Owens, as a member of MKK, were intending to use loan proceeds, secured by their shares in PlusFunds for personal benefit.

137. The Suffolk Insiders would not have been able to obtain the Phase II Loans, and as a result the use of the proceeds for personal gain, without the PlusFunds Tender Offer and related Phase I Loans.

**The Suffolk Insiders Acted to Benefit Only Themselves**

138. Although the Suffolk Insiders planned to control PlusFunds, this transaction did not inure to the benefit of any of Suffolk's creditors, including Refco Capital.

139. It is clear by reviewing the documentation surrounding the Suffolk Loans and the PlusFunds Tender Offer that no one at Refco, with the exception of Bennett and his co-conspirator Maggio, was aware that the Suffolk Loans and the PlusFunds Tender Offer were made as a result of the Suffolk Insiders knowledge of the Refco Fraud. It is clear that Suffolk was not a conduit for Refco Capital or any other Refco entity to obtain the shares of PlusFunds. In fact, Refco Capital never came to possess the shares of PlusFunds or any other interest as a result of the overall transaction; instead, it sent out cash to the Suffolk Insiders and the Defendants and received in exchange a promise to repay loans that never had any prospect of materializing. While the independent members of Refco's Audit Committee, Refco's CFO, Refco's General Counsel, and other directors, were intentionally misled to believe the transactions had commercial value, Bennett and the Suffolk Insiders knew that the loans would never be repaid.

29

140. In August 2004, Refco was communicating with its attorneys regarding the potential acquisition of PlusFunds and related change of control provisions in the license agreement between PlusFunds and Standard and Poors.

141. Internal communications reflect that Refco contemplated the purchase of the controlling interests of PlusFunds and did undertake due diligence regarding the purchase of PlusFunds in 2004.  The final Suffolk Loan agreements and certain internal communications were clear that in the end Refco opted not to purchase any shares of PlusFunds.

142. To the contrary, Bennett determined to fund the purchase by Suffolk through Refco Capital and form a transaction that benefited only the Suffolk Insiders under the guise of operating as a traditional lender.

143. On information and belief, with the exception of Bennett, Refco Capital expected, based on the representations of Sugrue and the other Suffolk Insiders, that the value in PlusFunds would increase from the date of the PlusFunds Tender Offer to the maturity date of the Suffolk Loans, PlusFunds would be recapitalized, PlusFunds's relationship with critical partners would be strengthened and Refco Capital would be paid under the terms of the Suffolk Loans when PlusFunds was sold by the Suffolk Insiders to a third party.

144. Maggio testified in his deposition related to the Refco Multi-District Litigation that he and certain other Refco Insiders knew that the value of the PlusFunds Shares were worth far less than the Suffolk Loans.  However, the knowledge that the Suffolk Insiders had no ability or intent to repay Refco Capital for the Suffolk Loans was hidden from the independent members of Refco's Audit Committee, CFO, General Counsel, and innocent directors.

145. Further, these innocent decision makers believed that the Suffolk Loans were low risk and adequately collateralized by the PlusFunds shares based on representations made by the Suffolk Insiders.

146. An internal memo dated September 6, 2005 by Refco's accounting department documented a review of the Suffolk Loans under accounting literature regarding special instances of consolidation.[10] The conclusion was that Refco Capital had "no contractual ownership or other monetary interest in Suffolk unless and until a point in time at which Suffolk were to default on the terms of the loan agreement" and consolidation of the two entities for financial statement purposes was not necessary. It is noted in this memo that the value paid by Suffolk is "arm's length and conservative."

147. In early 2005 Refco Capital tried to syndicate the Suffolk Loans.

148. According to the Offer to Purchase, following the PlusFunds Tender Offer the Suffolk Insiders had "the ability to direct the appointment of all members of the PlusFunds Board" and had "the power to control the vote regarding the fundamental corporate transactions, subject to only certain restrictions contained in the [PlusFunds] Charter and Stockholders' Agreement."

149. The Suffolk Insiders also had "management discretion with respect to the future conduct of the business" of PlusFunds.

**Resulting Damage to Suffolk and its Creditors**

150. At the time the Suffolk Loans were made, the Suffolk Entities had insufficient funds or means to perform under the terms of the loans.

---

[10] The analysis was performed under FIN 46R. FIN 46R requires consolidation, for financial statement purposes, of entities that would not otherwise be consolidated if certain attributes exist with respect to transactions/relationships between the entities (one entity is a Variable Interest Entity of the other).

916691-2

151. After the PlusFunds Tender Offer, Suffolk's principal assets were the PlusFunds Shares, which it purchased in the PlusFunds Tender Offer and which had value significantly less than the Tender Amounts.

152. After the PlusFunds Tender Offer Suffolk was left with debts to Refco Capital in the amount of approximately $158 million[11], which was in excess of the value of the PlusFunds Shares Suffolk acquired.

153. Suffolk was left with no means to repay Refco Capital or its other creditors.

154. As Suffolk had no assets of its own and funded the PlusFunds Tender Offer with money it borrowed from Refco Capital, Suffolk rendered itself insolvent by purchasing the PlusFunds shares for far more than those shares were worth.

155. No benefit was imparted on Suffolk or the other Suffolk Entities as a result of the PlusFunds Tender Offer. Instead, all of the funds received from Refco Capital were distributed to the Defendants and the Suffolk Insiders. As previously described, the shares Suffolk and the Suffolk Entities received in exchange were worthless or worth only a fraction of the price paid and Refco Capital's collateral was correspondingly worthless. Accordingly, the only entities that received a benefit from the Suffolk Transactions were the Suffolk Insiders and the Defendants, who received a windfall on their shares.

156. Upon information and belief, the conveyance of the inflated Tender Amount by Suffolk to the Defendants was not supported by any legitimate business purpose.

157. The Suffolk Insiders intended to use the proceeds of the Suffolk Loans for their personal benefit.

---

[11] The remainder of the $208 million was owed to Refco Capital by the other three Suffolk Entities.

**Harm to the Suffolk Creditors**

158. The Suffolk Insiders formed Suffolk and the related entities with a latent inability to pay their creditors. From the period of their formation, Suffolk and its related entities were incurring debts that they could not satisfy.

159. The conveyance of the Tender Amounts by Suffolk to the Defendants vitiated essentially all of the assets of Suffolk available to creditors by stripping Suffolk of virtually all property available for execution and distribution. Specifically, Suffolk was changed by the Fraudulent Transfers from an entity with no assets to an entity with significant negative equity.

160. Even after the Refco Fraud was revealed, the Suffolk Insiders initiated the final draws under the Suffolk Loans to acquire the PlusFunds Shares. The Suffolk Insiders had no intent to repay Refco Capital for the proceeds of the Suffolk Loans, nor did they have any ability to do so. The Suffolk Loans could never be repaid to Refco Capital and the Suffolk Insiders knew that there was no prospect of repayment at the time of executing the Suffolk Loans' documentation.

161. Additionally, even if Suffolk defaulted completely on the Suffolk Loans, the Suffolk Loans were virtually non-recourse to the Suffolk Insiders, such that Refco Capital's only remedy would be to take the PlusFunds Shares — shares that were, as stated supra, completely overvalued — in accordance with the scheme hatched by the Suffolk Insiders.

162. As of the date of this Amended Complaint, the following proofs of claim have been filed in the Suffolk bankruptcy in the United States Bankruptcy Court for the District of Delaware:

a)    Refco Capital LLC c/o Mark S. Kirschner Litigation Trustee

b)      Department of the Treasury, Internal Revenue Service

c)      James P. Sinclair, Sphinx Trust Liquidating Trustee

d)      JOLs of Sphinx Managed Futures fund SPC, et al, c/o Kenneth M. Kryss, Managing Director

163. Currently each of the proofs of claim is prima facie valid, as none have yet been objected to by the Trustee in the Chapter 7 case.

164. Suffolk has additional creditors, including, but not limited to the Delaware Department of State, Division of Corporations, and Suffolk's registered agent, each which has claims against each of the Suffolk entities for tax and/or filing liabilities.

165. The insolvency of Suffolk is a direct result of the Fraudulent Transfers.

166. The PlusFunds Tender Offer, when taken as a whole, was part of an ongoing scheme to defraud creditors of Suffolk, specifically Refco Capital, by the Suffolk Insiders by leaving Suffolk and the other Suffolk Entities without any value with which to repay its creditors.

167. As the PlusFunds Shares held by Suffolk after the Tender Offer were worth far less than the amount paid, Suffolk was left with no means of repaying the Suffolk Loans and Refco Capital was left with worthless loans and collateral.

168. At all relevant times, the Suffolk Insiders had actual knowledge regarding the unlawful nature of the Fraudulent Transfers.

169. The Fraudulent Transfers of Suffolk's property to the Defendants are avoidable as a fraudulent transfers and are recoverable by the Chapter 7 Trustee.

## COUNT I
## AVOIDANCE OF THE CONSTRUCTIVE FRAUDULENT TRANSFERS <u>PURSUANT TO SECTIONS 548(a)(1)(B) & 550 OF THE BANKRUPTCY CODE</u>

### [Dismissed With Prejudice]

34

916691-2

## COUNT II
## AVOIDANCE OF THE ACTUAL FRAUDULENT TRANSFERS
## PURSUANT TO SECTIONS 548(a)(1)(A) OF THE BANKRUPTCY CODE

170. The Chapter 7 Trustee repeats and realleges the preceding paragraphs as if set forth fully herein.

171. The Fraudulent Transfers were made within two (2) years prior to the date of the filing of Suffolk petition for Chapter 7 relief and constituted a transfer of interests in property of Suffolk.

172. At all times relevant during the Fraudulent Transfers, the Suffolk Insiders acted with actual intent to hinder, delay or defraud present and/or future creditors of Suffolk as a result of the Fraudulent Transfers.

173. The Suffolk Insiders proliferated a fraudulent scheme to benefit themselves, and consequently the Defendants- who received a per share price that was well in excess of the actual market value of the PlusFunds Shares.

174. Specifically, the consideration transferred by Suffolk to the Defendants was far in excess of the nominal value of the PlusFunds Shares Suffolk received from the Defendants.

175. The Suffolk Insiders withheld or misrepresented significant information in the Offer to Purchase that was sent to the Defendants.

176. The Suffolk Insiders withheld or misrepresented significant information concerning the Fraudulent Transfers in their communications to Refco Capital, by concealing the inadequacy of value to be received by Suffolk, and in failing to disclose the true purpose of the transaction.

916691-2

177. The Fraudulent Transfers depleted substantially all of Suffolk's assets, causing Suffolk to assume a loan of more than $200 million, the proceeds of which were either immediately embezzled by the Suffolk Insiders or immediately used to purchase PlusFunds shares at inflated prices and in exchange for which Suffolk received little or no consideration.

178. The Fraudulent Transfers comprised part of an overarching fraudulent scheme, by which the Suffolk Insiders caused PlusFunds to come under the control of the Suffolk Insiders, so that they could personally benefit from their knowledge that Bennett was improperly using the assets of RCM, including the assets entrusted to PlusFunds, to cover-up the Refco Fraud Bennett was perpetrating.

179. The Suffolk Insiders used their knowledge of the Refco Fraud to extort Bennett to obligate Refco to enter into the Suffolk Loan and to participate in the Suffolk Fraud, to the detriment of Suffolk and its creditors, including Refco. The Suffolk Insiders perpetrated this extortion for their own personal benefit, and without any intended, or realized, benefit to the Suffolk Entities.

180. The Suffolk Insiders, who were shareholders of PlusFunds, caused Suffolk to enter into the Fraudulent Transfers to benefit themselves and the Defendants to the detriment Suffolk's creditors.

181. The Stock Purchase Agreements and Suffolk Loans, when taken as a whole, can only be described as a "cashing out" scheme for the exclusive benefit of the Suffolk Insiders, with no benefit to Suffolk, the Suffolk Entities or the creditors of the Suffolk Entities.

182. The Defendants acted with knowledge, conscious disregard, or in willful ignorance of the Suffolk Insiders' fraudulent purpose and knew the Tender Amounts were grossly in excess of the value of the PlusFunds Shares.

916691-2

183. Accordingly, the Fraudulent Transfers are avoidable transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT III
### AVOIDANCE OF THE FRAUDULENT TRANSFERS PURSUANT TO SECTION 544(B) OF THE BANKRUPTCY CODE AND NY DCL SECTION 270 ET SEQ.

### [Dismissed with Prejudice]

## COUNT IV
### [PLEADED IN THE ALTERNATIVE]
### UNJUST ENRICHMENT

### [Dismissed with Prejudice]

## COUNT V
### RECOVERY OF THE ACTUAL FRAUDULENT TRANSFERS PURSUANT TO SECTION 550 OF THE BANKRUPTCY CODE

184. The Chapter 7 Trustee repeats and realleges the preceding paragraphs as if set forth fully herein.

185. The Fraudulent Transfers are avoidable transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

186. The Defendants were the initial transferees of the Fraudulent Transfers or the entities for whose benefit such transfer was made, or the immediate or mediate transferee of such initial transfer.

187. Any Defendants who were the immediate or mediate transferee did not take for value, in good faith, and without the knowledge of the voidability of the Fraudulent Transfer.

188. Accordingly, the Chapter 7 Trustee may recover, for the benefit of Suffolk's estate, the Fraudulent Transfers from the Defendants pursuant to section 550 of the Bankruptcy Code

## **REQUEST FOR RELIEF**

**WHEREFORE**, the Chapter 7 Trustee requests that the Court enter judgment:

    (i)    avoiding the Fraudulent Transfers as fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code;

    (ii)    decreeing that Defendants shall pay to the Chapter 7 Trustee on behalf of the estate of Suffolk, the full amount of their respective Fraudulent Transfer received and as set forth on **Schedule A** to this Amended Complaint, with lawful pre- and post-judgment interest and costs of this action, including costs and reasonable attorneys' fees incurred in connection with the investigation and prosecution of the instant action;

    (iii)    requiring Defendants to pay to the Chapter 7 Trustee all reasonable attorney's fees and costs incurred by the Chapter 7 Trustee in this action; and

    (iv)    granting such other and further relief, at law or in equity, that the Court may deem just.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

916691-2

Dated:   March 5, 2010

Thomas J. Fleming (TF 4423)
Andrea Fischer (AF 2591)
Melanie Sacks (MS 7896)
Olshan Grundman Frome Rosenzweig &
Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022

*Proposed Special Litigation Counsel to George
L. Miller, Chapter 7 Trustee of Suffolk LLC for
all cases except Credit Suisse First Boston (09-
cv-02885 JSR) and Steve Shulman (09-cv-
02936 JSR).*

Dimitri L. Karapelou (DK 1936)

and

Albert A. Ciardi, III
Carl Singley
Ciardi Ciardi & Astin, P.C.
One Commerce Square
2005 Market Street, Suite 1930
Philadelphia, PA 19103
Telephone:  (215) 557-3550
Facsimile: (215) 557-3551

*Counsel for George L. Miller, Chapter 7
Trustee for Suffolk, LLC*

# **SCHEDULE A**

SUFFOLK, LLC DEFENDANT LIST
5692-007

| Case Number | Name | Execution Date of Respective Stock Purchase Agreement | Number of Shares Sold to Suffolk[1] | Price Per Share | Tender Amounts |
|---|---|---|---|---|---|
| 09-cv-02871 | Adam N. Lyle | 05/23/05 | 102.75 | $368.96 | $37,910.40 |
| 09-cv-02870 | Brera Capital Partners, LLC | 05/10/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02875 | Andrew Malloy | 05/26/05 | 205.50 | $368.96 | $75,821.28 |
| 09-cv-02872 | Allene Chung | 05/20/05 | 226.05 | $368.96 | $83,403.40 |
| 09-cv-02874 | Andre Perold | 05/24/05 | 308.26 | $368.96 | $113,735.60 |
| 09-cv-02873 | Andrew B. Douglass | 05/23/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02876 | Bradd Kata | 05/25/05 | 53.12 | $368.96 | $19,599.15 |
| 09-cv-02878 | Milestone Venture Partners | 05/23/05 | 582.40 | $378.96 | $220,706.30 |
| 09-cv-02949 | Cameron Highlands | 05/25/05 | 616.51 | $368.96 | $227,467.52 |
| 09-cv-02950 | Capital Structure Arbitrage Funding, Ltd. | 05/23/05 | 288.01 | $368.96 | $106,264.16 |
| 09-cv-02877 | Carole Scheidt Nystrom, TTE | 05/25/05 | 452.11 | $368.96 | $166,810.50 |
| 09-cv-02879 | Charles B. Hintz | 05/27/05 | 1,027.52 | $368.96 | $379,113.77 |
| 09-cv-02888 | The Suan Family Irrevocable Children's Trust | 05/26/05 | 82.20 | $368.96 | $30,328.51 |
| 09-cv-02880 | Christian Faber | 05/15/05 | 822.02 | $368.96 | $303,292.49 |
| 09-cv-02881 | Christopher Rose | 05/27/05 | 308.26 "Series A" | $368.96 | $273,990.20 |
| | | | 422.88 "Series B" | $378.96 | |

---

[1] Series A shares, unless otherwise noted.

SUFFOLK, LLC DEFENDANT LIST
5692-007

| 09-cv-02882 | Christopher Suan | 05/23/05 | 851.32 | $368.96 | $314,103.02 |
| 09-cv-02883 | Christopher Welch | 06/02/05 | 822.02 | $368.96 | $303,292.49 |
| 09-cv-02884 | Connie Hsu | 05/23/05 | 41.10 | $368.96 | $15,164.25 |
| 09-cv-02885 | CSFB, a/k/a Credit Suisse First Boston Next Fund, Inc. | | 24,660.45 | $368.96 | $9,098,719.63 |
| 09-cv-02886 | Daniel Lehmann | 05/11/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02951 | David Brown | 05/23/05 | 1,233.39 "Series A" | $368.96 | $653,366.17 |
| | | | 523.26 "Series B" | $378.96 | |
| 09-cv-02887 | David Cody | 05/31/05 | 316.06 | $368.96 | $116,613.49 |
| 09-cv-02890 | David Donnini | 05/30/05 | 822.02 | $368.96 | $303,292.49 |
| 09-cv-02891 | David Salle | 05/25/05 | 425.07 | $378.96 | $161,084.52 |
| 09-cv-02892 | Diego Winegardner | 05/15/05 | 2,486.51 | $368.96 | $917,422.72 |
| 09-cv-02898 | Donald J. Edwards | 05/26/05 | 1,027.52 | $368.96 | $379,113.77 |
| 09-cv-02893 | Don Murphy | 05/27/05 | 82.20 | $368.96 | $30,328.51 |
| 09-cv-02894 | Edgar D. Jannotta, Jr. | 05/31/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02895 | Edward J. Kata | 05/25/05 | 822.02 | $368.96 | $303,292.49 |
| 09-cv-02896 | Edward J. Kata and Lorraine Kata | 05/25/05 | 159.37 | $368.96 | $58,801.15 |
| 09-cv-02897 | Milestone Venture Partners | 05/23/05 | 622.97 "Series A" | $368.96 | $450,557.31 |
| | | | 582.40 "Series B" | $378.96 | |
| 09-cv-02889 | Capgemini U.S., LLC | 05/27/05 | 8,688.70 | $368.96 | $3,205,782.75 |
| 09-cv-02952 | Excolator | 05/26/05 | 1,027.52 | $368.96 | $379,113.77 |
| 09-cv-02899 | Frederick W. Gluck | 05/26/05 | 2,011.08 | $368.96 | $742,008.07 |

916873-1

SUFFOLK, LLC DEFENDANT LIST
5692-007

| | | | | | |
|---|---|---|---|---|---|
| 09-cv-02900 | Frederick W. Gluck, Jr. | 05/29/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02953 | GAD Corp | 05/25/05 | 616.51 | $368.96 | $227,467.52 |
| 09-cv-02954 | Greenview Investments, Inc. | 05/24/05 | 1,644.03 "Series A" | $368.96 | $2,017,817.99 |
| | | | 5,324.62 "Series B" | 378.96 | |
| 09-cv-02903 | Greg Pappajohn | 06/01/05 | 202.64 | $368.96 | $74,766.05 |
| 09-cv-02901 | Glenn Kata | 05/25/05 | 53.12 | $368.96 | $19,599.15 |
| 09-cv-02904 | Gregg Kata | 05/25/05 | 53.12 | $368.96 | $19,599.15 |
| 09-cv-02902 | Greg Pappajohn and Susan Gluck | 06/01/05 | 1,644.03 | $368.96 | $606,581.30 |
| 09-cv-02905 | Harry David Precheur | 05/10/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02906 | Harry Shaw | 05/17/05 | 41.10 | $368.96 | $15,164.25 |
| 09-cv-02955 | Hatem El Naser | 05/30/05 | 123.30 | $368.96 | $45,492.76 |
| 09-cv-02907 | Hugh Allen | 05/11/05 | 102.75 "Series A" | $368.96 | $78,182.71 |
| | | | 106.27 "Series B" | $378.96 | |
| 09-cv-02908 | Ilo Liu | 05/16/05 | 63.67 | $368.96 | $23,491.68 |
| 09-cv-02909 | Innovation Investments, LLC | 05/09/05 | 6,165.11 "Series A" 1,027.52 "Series A" 9,302.33 "Series B" | $368.96 $368.96 $378.96 | $6,179,003.72 |
| 09-cv-02910 | James Lynch | 05/20/05 | 41.10 | $368.96 | $15,164.25 |
| 09-cv-02911 | James Murray III | 05/31/05 | 822.02 | $368.96 | $2,895,602.47 |

916873-1

SUFFOLK, LLC DEFENDANT LIST
5692-007

| | | | Series "A"<br>6,840.59<br>Series "B" | | |
|---|---|---|---|---|---|
| | | | | $378.96 | $15,127.36 |
| 09-cv-02912 | Jayme Colter | 05/10/05 | 41 | $368.96 | $15,127.36 |
| 09-cv-02914 | Jennifer Knight | 05/25/05 | 82 | $368.96 | $30,254.72 |
| 09-cv-02913 | Jeffrey & Jill Weiss | 05/26/05 | 123.3 | $368.96 | $45,492.76 |
| 09-cv-02914 | Joel Press | 05/12/05 | 80.96 | $368.96 | $29,871.00 |
| 09-cv-02918 | Trust UAD 12/29/86 FBO Taran J. Davis | 06/06/05 | 205.50 | $368.96 | $75,821.28 |
| 09-cv-02916 | John E. Koretz, Trustee | 05/06/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02917 | Joshua Mailman | 05/10/05 | 1,027.52 | $368.96 | $379,113.77 |
| 09-cv-02920 | Lab Morgan Corporation | 05/24/05 | 30,825.57 | $368.96 | $11,373,402.30 |
| 09-cv-02956 | Kenneth Shen | 05/20/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02921 | Lisa Gluck | 05/26/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02919 | Kingdon Associates, Kingdon Partners, M. Kingdon Offshore NV, | 05/31/05 | 1,150.82<br>986.42<br>5754.10 | $368.96 | $3,032,906.52 |

916873-1

SUFFOLK, LLC DEFENDANT LIST
5692-007

| | | | | |
|---|---|---|---|---|
| | Kingdon Family Partnership | | 328.81 | | |
| 09-cv-02922 | ML IBK Positions, Inc, | 06/02/05 | 20,550.38 | $368.96 | $7,582,268.20 |
| 09-cv-02923 | Murray Capital | 05/31/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02924 | Nicholas J. Williams | 05/19/05 | 1,027.52 | $368.96 | $379,113.77 |
| 09-cv-02925 | ODS Holdings, Ltd. | 05/27/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02926 | Philip A. Canfield | 05/31/05 | 205.50 | $368.96 | $75,821.28 |
| 09-cv-02927 | Profit-Sharing Plan FBO Suzanne Lehmann | 05/31/05 | 822.02 | $368.96 | $303,292.49 |
| 09-cv-02928 | Randall Yanker TTEE | 05/26/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02929 | Randy Yanker | 05/26/05 | 40.92 | $368.96 | $15,097.84 |
| 09-cv-02930 | Robert Hill | 05/25/05 | 205.50 | $368.96 | $75,821.28 |
| 09-cv-02931 | Robert Suan | 05/24/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02932 | Rodney Yanker | 05/26/05 | 531.82 | $368.96 | $196,220.30 |
| 09-cv-02933 | Ronald W. Farmer | 05/7/05 | 205.5 | $368.96 | $75,821.28 |
| 09-cv-02934 | Scott Kata | 05/25/05 | 53.12 | $368.96 | $19,599.15 |
| 09-cv-02957 | Seneca, Inc. | 05/27/05 | 5,137.59 | $368.96 | $1,895,565.20 |
| 09-cv-02935 | Stephen Freidheim | 05/27/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02936 | Steve Shulman | 05/09/05 | 411.01 Series "A" | $368.96 | $312,730.76 |

916873-1

SUFFOLK, LLC DEFENDANT LIST
5692-007

| Case No. | Name | Date | Shares/Series | | Amount |
|---|---|---|---|---|---|
| 09-cv-02958 | Summerland Ltd. | 05/27/05 | 425.07 Series "B" 4,110.08 | $378.96 | $1,516,455.11 |
| 09-cv-02937 | Susan Haery Staisil | 05/20/05 | 41.10 Series "A" 77.02 Series "B" | $368.96 | $44,351.74 |
| 09-cv-02938 | Taran J. Davies | 06/02/05 | 205.50 | $378.96 | $75,821.28 |
| 09-cv-02867 | Terence Williams | 05/10/05 | 2,055.04 | $368.96 | $758,227.55 |
| 09-cv-02945 | Todd Kata | 05/25/05 | 59.98 | $368.96 | $22,130.22 |
| 09-cv-02942 | Ulf Hjelm | 06/01/05 | 205.50 | $368.96 | $75,821.28 |
| 09-cv-02946 | Vincent J. Hemmer | 05/26/05 | 123.30 | $368.96 | $45,492.76 |
| 09-cv-02944 | Peachtree Equity Partners, LP | 05/27/05 | 20,550.38 | $368.96 | $7,582,268.20 |
| 09-cv-02947 | Walter Noel, Jr. | 05/12/05 | 411.01 | $368.96 | $151,646.24 |
| 09-cv-02868 | Warne Worldwide | 06/02/05 | 205.50 102.75 Both Series "A" | $368.96 | $113,731.92 |
| 09-cv-02948 | William Kessinger | 05/27/05 | 102.75 | $368.96 | $37,910.64 |
| 09-cv-02940 | Christopher Sugrue | -------- | 18,592.52 | $378.96 | $7,045,821.37 |
| 09-cv-02939 | Calpurnia Capital Partners, LLC | -------- | 582.40 | $378.96 | $220,706.30 |
| 09-cv-02943 | Koch Ventures, Inc. | -------- | 10,275.19 | $368.96 | $3,791,134.10 |
| 09-cv-02941 | Cliff Desouzza | -------- | 1,240.83 | $368.96 | $457,816.63 |
| 09-cv-02866 | PF Saleco LLC, Gryphon Holdings II, | 3/29/2005 | 67,795.92 68,372.09 | $378.96 | $48,821,622.09 |

916873-1

SUFFOLK, LLC DEFENDANT LIST
5692-007

| | | |
|---|---|---|
| LLLP, Gryphon Holdings L.P., SMS Securities AG, Bruce Rauner, Charles Dill, Donald Rosenfeld, Michael Donahue, B. Douglas Morriss, John S. Wehrle, HF Investments AG, and PF Representatives LLC | Series "B" 12,330.23 51,375.95 Series "A" 10,275.,20 Series "A" 2,055.03 Series "A" | $368.96 $368.96 $368.96 |