UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
In re REFCO, INC. SECURITIES LITIGATION :   07 MDL No. 1902 (JSR)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
This document applies to:                     :
                                                        :
In re REFCO, INC. SECURITIES LITIGATION :   05 Civ. 8626 (JSR)
                                                        :
                                                        :   <u>Redacted Version</u>
                                                        :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO
<u>LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant Grant Thornton LLP*

## TABLE OF CONTENTS

PAGES

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND .............................................................................................3

ARGUMENT ......................................................................................................................7

POINT I  Individual issues of reliance preclude class certification, at least
in respect to the claims under Section 10(b). .................................................8

A. Lead Plaintiffs are not entitled to a "fraud on the market" presumption. .........................9

1. The market for Refco's bonds was not efficient. ......................................................9

a. Causal Relationship Between News and Price Movement (Pl. Mem. 26) ...............11

b. Trading Volume and Liquidity (Pl. Mem. 21) .........................................................13

c. Analyst Coverage (Pl. Mem. 22) ..............................................................................14

d. Market Makers and Arbitrageurs (Pl. Mem. 24) ......................................................15

e. Autocorrelation (Pl. Mem. 30) ..................................................................................17

f. Bid/Ask Spread (Pl. Mem. 28) ..................................................................................19

g. Institutional Ownership (Pl. Mem. 30) .....................................................................20

2. The market for Refco's stocks during the IPO quiet period was not efficient. ...........21

B. Lead Plaintiffs are not entitled to a "fraud created the market" presumption.................23

C. Affiliated Ute does not apply here, as this is not an omissions case.................................24

POINT II  The proposed class definition is fatally overbroad...................................................26

A. The class period improperly includes purchasers who sold
their securities before Refco's October 10, 2005 announcement. ...................................26

B. The class definition improperly includes purchasers who bought their
securities after the October 10, 2005 disclosure. ............................................................28

POINT III  Lead Plaintiffs are inadequate representatives of the class  and their claims are
atypical .....................................................................................................................30

A. Lead Plaintiffs are not adequate or typical class representatives in light of their
decision to buy more Refco securities after the truth about Refco was revealed. ..........30

B. Lead Plaintiffs are atypical and inadequate because they had unique access to
information and relied on factors other than the alleged misrepresentations. ...............33

C. PIMCO is an inadequate class representative because it has not demonstrated it
will adequately represent the interests of the absent class members. ...........................37

CONCLUSION ................................................................................................................39

NY:1289646.1

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGES**

*Abdul-Malik v. Coombe,*
  No. 96-CV-1021 (DLC), 1996 U.S. Dist. Lexis 18203, at *6 (S.D.N.Y.
  Dec. 6, 1996)........................................................................................................ 36

*Affiliated Ute Citizens v. United States,*
  406 U.S. 128 (1972)............................................................................................ 2

  406 U.S. at 128.................................................................................................... 8

  406 U.S. at 153.................................................................................................... 24

  406 U.S. at 153-54 ............................................................................................. 25

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591, 614 (1997).................................................................................... 7

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.,*
  222 F.3d 52, 59 (2d Cir. 2000)........................................................................... 30

  222 F.3d at 61 .................................................................................................... 37

*Basic, Inc. v. Levinson,*
  485 U.S. 224, 243 (1988).................................................................................... 8

  485 U.S. at 241-49 ............................................................................................. 8

  485 U.S. at 247.................................................................................................... 9

  485 U.S. at 241.................................................................................................... 9

  485 U.S. at 241.................................................................................................... 10

  485 U.S. at 247.................................................................................................... 13

  485 U.S. at 241.................................................................................................... 21

*Beck v. Status Game Corp.,*
  No. 89-civ-2923 (DNE), 1995 WL 422067, at *4 (S.D.N.Y. July 14,
  1995) .................................................................................................................. 33

  1995 WL 422067, at *4 ...................................................................................... 33

*Bruhl v. Price WaterhouseCoopers Intern.,*
  257 F.R.D. 684, 696 (S.D. Fla. 2008)................................................................ 25

*Cammer v. Bloom,*
  711 F. Supp. 1264, 1285-87 (D.N.J. 1989)........................................................ 11

  711 F. Supp. at 1287 .......................................................................................... 11

  711 F. Supp. at 1286, 1293 ................................................................................ 13

  711 F. Supp. at 1286 .......................................................................................... 14

| CASES | PAGES |
|---|---|
| 711 F. Supp. at 1286-87 ................................................................. | 16 |
| 711 F. Supp. at 1293 ...................................................................... | 17 |
| *Daniels v. City of New York,* | |
| 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ......................................... | 36 |
| *Dura Pharmaceuticals, Inc. v. Broudo,* | |
| 544 U.S. 336, 345-46 (2005) ........................................................ | 26 |
| 544 U.S. at 342 ............................................................................... | 27 |
| *Dura,* 544 U.S. at 342 .................................................................. | 28 |
| *Dura-Bilt Corp. v. Chase Manhattan Corp.,* | |
| 89 F.R.D. 87, 99-100 (S.D.N.Y. 1981) ........................................ | 36 |
| *Eckstein v. Balcor Film Investors,* | |
| 8 F.3d 1121, 1130 (7th Cir.1993) ................................................ | 23 |
| *Freeman v. Laventhol & Horwath,* | |
| 915 F.2d 193, 198 (6th Cir. 1990) ............................................... | 9 |
| *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith,* | |
| 903 F.2d 176, 180 (2d Cir. 1990) ................................................. | 30 |
| *Greenspan v. Brassler,* | |
| 78 F.R.D. 130, 132 (S.D.N.Y. 1978) ........................................... | 31 |
| *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.,* | |
| 936 F.2d 759, 761 (2d Cir. 1991) ................................................. | 31 |
| *In re Arakis Energy Corp. Securities Litigation,* | |
| No. 95-CV-3431, 1999 WL 1021819, at *5-6 (E.D.N.Y. Apr. 27, 1999) ............................................................................................. | 25 |
| *In re Baldwin-United Corp. Litigation,* | |
| 122 F.R.D. 424, 428 (S.D.N.Y. 1986) ......................................... | 36 |
| *In re Enron Corp. Sec., Deriv. & ERISA Litigation,* | |
| No. MDL-1446, 2005 WL 3704688, at *6 n. 28 (S.D. Tex. Dec. 5, 2005) ............................................................................................. | 10 |
| *In re Flag Telecom Holdings, Ltd.,* | |
| 574 F.3d 29, 36 (2d Cir. 2009) .................................................... | 27 |
| 574 F.3d at 40, 41 ......................................................................... | 27 |
| 574 F.3d at 40 ............................................................................... | 29 |
| *In re HealthSouth Corp. Securities Litigation,* | |
| 261 F.R.D. 616, 645 (N.D. Ala. 2009) ........................................ | 25 |
| *In re Independent Energy Holdings PLC Securities Litigation,* | |
| 210 F.R.D. 476, 480-83 (S.D.N.Y. 2002) ................................... | 30 |

| CASES | PAGES |
|---|---|
| 210 F.R.D. at 482 ................................................................................... | 33 |
| *In re Initial Public Offering Securities Litig*ation, | |
| 471 F.3d 24, 43 ("*IPO*") (2d Cir. 2006)............................................. | 5 |
| 471 F.3d at 27 ...................................................................................... | 8 |
| 471 F.3d at 42 ...................................................................................... | 8 |
| 471 F.3d at 42-43 ................................................................................. | 21 |
| 471 F.3d at 43 ...................................................................................... | 22 |
| 471 F.3d at 42 ...................................................................................... | 25 |
| *In re Livent, Inc. Noteholders Securities Litigation* | |
| 211 F.R.D. 219, 222-23 (S.D.N.Y. 2002) ........................................... | 10 |
| 211 F.R.D. at 223 ................................................................................. | 25 |
| *In re Merrill Lynch Tyco Research Securities Litigation* | |
| Civ. 4080, 2004 WL 305809, at *2-3 (S.D.N.Y. Feb. 18, 2004)...................... | 29 |
| *In re Oxford Health Plans, Inc. Securities Litigation,* | |
| 191 F.R.D. 369, 374-76 (S.D.N.Y. 2000)........................................... | 36 |
| *In re Parmalat Securities Litigation,* | |
| No. 04-cv-0030, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008)............ | 24 |
| *In re Refco Inc. Secsurities Litigation,* | |
| 503 F. Supp. 2d 611, 636-37 (S.D.N.Y. 2007) ................................. | 7 |
| *In re Refco Inc. Securities Litigation,* | |
| 609 F. Supp. 2d 304, 318 (S.D.N.Y. 2009)........................................ | 23 |
| 609 F. Supp. 2d at 318 ......................................................................... | 24 |
| *In re Rhone-Poulenc Rorer Inc.,* | |
| 51 F.3d 1293, 1298-99 (7th Cir. 1995) .............................................. | 1 |
| *In re Salomon Analyst Metromedia Litigation,* | |
| 544 F.3d 474, 481 (2d Cir. 2008).......................................................... | 29 |
| *In re Towers Fin. Corp. Noteholders Litigation,* | |
| No. 93 Civ. 0810, 1995 WL 571888, at *22 (S.D.N.Y. Sept. 20, 1995) .......... | 23 |
| *In re Veeco Instruments Inc. Securities Litigation,* | |
| 233 F.R.D. 330, 333-34 (S.D.N.Y. 2005)............................................ | 27 |
| *In re Vivendi Inc. SecSecurities Litigation,* | |
| 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009)......................................... | 27 |
| *In re Vivendi Universal, S.A. Securities Litigation,* | |
| 242 F.R.D. 76, 84-90 (S.D.N.Y. 2007)................................................ | 36 |

NY:1289646.1

**CASES**               **PAGES**

*Kirkpatrick v. J.C. Bradford & Co.*,
 827 F.2d 718, 724 (11th Cir. 1987) ................................ 25

*Kovaleff v. Piano*,
 142 F.R.D. 406, 408 (S.D.N.Y. 1992) ............................ 31

*Landry v. Price Waterhouse Chartered Accountants*,
 123 F.R.D. 474, 476 (S.D.N.Y. 1989) ............................ 30

 123 F.R.D. at 476 ........................................................ 33

 123 F.R.D. at 475-76 .................................................. 33

 123 F.R.D. at 475-76 .................................................. 35

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161, 172 (2d Cir. 2005) ................................. 26

 396 F.3d 161, 173 (2d Cir. 2005) ................................. 29

*Moore v. PaineWebber, Inc.*,
 306 F.3d 1247, 1253 (2d Cir. 2002) ............................... 8

*Ockerman v. May Zima & Co.*,
 27 F.3d 1151, 1159-60 (6th Cir.1994) ......................... 23

*Robinson v. Metro-North Commuter R.R.*,
 267 F.3d 147 (2d Cir. 2001) ........................................ 36

*Rocco v. Nam Tai Electronics, Inc.*,
 245 F.R.D. 131, 135-36 (S.D.N.Y. 2007) ..................... 31

 245 F.R.D. at 136 ....................................................... 32

*Rolex Employees Retirement Trust v. Mentor Graphics Corp.*,
 136 F.R.D. 658, 664 (D. Ore. 1991) ............................. 31

 136 F.R.D. at 664 ....................................................... 31

 136 F.R.D. at 664 ....................................................... 32

*Ross v. Bank South, N.A.*,
 885 F.2d 723, 729 (11th Cir. 1989) ............................. 23

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
 552 U.S. 148, 159 (2008) .............................................. 8

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
 546 F.3d 196, 204 & n. 11 (2d Cir. 2007) ("*Teamsters II*") ............ 11

 531 F.3d at 208 n.15 ................................................... 12

 531 F.3d at 206 n.12 ................................................... 15

 531 F.3d at 207 .......................................................... 16

NY:1289646.1

**CASES**                                 **PAGES**

*Trief v. Dun & Bradstreet Corp.*,
   144 F.R.D. 193, 200-01 (S.D.N.Y. 1992) .......................................................... 36


**STATUTES**                           **PAGES**

15 U.S.C. §77(d)(2) ..................................................................................... 4

15 U.S.C. § 77k(e) ...................................................................................... 27


**OTHER AUTHORITIES**         **PAGES**

Fed. R. Civ. P. 23, *et seq.* ........................................................................ *passim*

Rule 10b-5 ................................................................................................ 6

Rule 144A ................................................................................................ 4

NY:1289646.1

## PRELIMINARY STATEMENT

This is not a typical securities fraud class action, and it does not present a typical fact pattern for class certification.  The proposed class includes a hodge-podge of securities holders and claims, many of which would be singularly unsuitable for class treatment even as part of a narrowly defined class.  But the class here is anything but narrowly defined.  The plaintiffs propose to litigate *all* these claims through a *single* class, obviously in the hopes of magnifying the potential exposure for use as a lever in settlement negotiations.  *See generally In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1298-99 (7th Cir. 1995).  The arguments and proof contained in the pending motion do not come close to explaining why these claims should or even could be litigated to judgment on a class-wide basis.

According to Lead Plaintiffs, Refco's fraud enabled the company to raise capital from both the debt and equity markets through complex issuances and exchanges of registered and unregistered bonds, a leveraged buy-out, and a "lucrative initial public offering" ("IPO").  Sec. Am. Compl. ¶¶ 6-8.  Then, a "mere forty-two trading days after Refco's IPO," the company "publicly disclosed the existence of a multi-hundred million dollar uncollectible receivable that had previously been concealed" and disclaimed the financial statements that had been "integral to the IPO offering documents … just weeks earlier."  *Id*. ¶ 9.  Thus, by Lead Plaintiffs' own account, the proposed fifteen-month class period spans a time of tremendous change in Refco's capital structure.

As a result, the proposed class encompasses securities holders who bought a jumble of different securities, each of which was traded for only a portion of the class period.  It includes those who bought *unregistered* bonds—issued to and traded privately by a small number of qualified institutional buyers—as well as those who bought *registered* bonds that became available on the public markets only after a so-called *Exxon Capital* exchange midway through

the class period.  It includes stock purchased during the post-IPO "quiet period"—when no new information about Refco was made available—as well as stock purchased during the thirteen trading days between the end of the quiet period and Refco's ultimate collapse.  It includes securities purchased before Refco's October 10, 2005 announcement disclosing the hidden uncollectible receivable—as well as securities purchased well after that, when any artificial price inflation from misstatements about Refco's financial condition had already been removed from the market price.  And it includes securities sold at various points *during* Refco's collapse—as well as securities sold *before* the collapse, at a fully inflated price that would have protected the seller from any fraud-related injury.

In several different respects, Lead Plaintiffs' motion to certify this broadly defined class falls short of Rule 23.  First, for the claims under Section 10(b), the essential element of reliance will require individualized proof and will overwhelm any common issues.  For most of the securities in the proposed class, there is no possible presumption of reliance based on market efficiency.  Nor can Lead Plaintiffs invoke a "fraud created the market" presumption, which rests on a flawed theory never adopted in this Circuit.  And, at least with respect to defendant Grant Thornton LLP ("Grant Thornton"), Lead Plaintiffs cannot characterize their claims as based on a "material omission" for purposes of *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  Grant Thornton is sued here based upon its affirmative statements in a handful of audit opinions.  Lead Plaintiffs may not avoid the essential element of reliance for their Section 10(b) claims through sleight-of-hand, recasting these alleged misstatements as material omissions.

Second, the class proposed in Lead Plaintiffs' motion is fatally overbroad.  It includes at least two sets of securities holders who cannot possibly state *any* claim against Grant Thornton, in view of well-established principles of loss causation.  The proposed class includes those who

- 2 -

*sold their securities before* Refco's October 10, 2005 announcement.  Because these securities holders sold at a time when the price of their securities was still artificially inflated, they could not possibly have been injured by the alleged fraud.  The class also includes those who *bought their securities after* the announcement, and who therefore could not possibly have been deceived by Grant Thornton's historical audit opinions.  In view of this overbreadth, the class as proposed by Lead Plaintiffs cannot be certified.

Third, neither of the Lead Plaintiffs meets the typicality and adequacy requirements to serve as the representative of a certified class.  Both face unique defenses, including the fact that both are highly sophisticated investors and both bought *more* Refco securities *after learning about the Refco fraud.*  These facts give Grant Thornton the basis for unique defenses relating to these two plaintiffs in particular, casting doubt on whether they actually relied on the alleged misstatements or even on the integrity of the market price, and raising a question whether the content of those alleged misstatements was material to their investment decisions in the first place.  And for the Lead Plaintiff who purports to represent the claims of Refco bondholders, discovery has revealed a striking lack of knowledge and involvement relating to this lawsuit— facts that cast in question its suitability to represent the claims of absent class members.  For these reasons as well, Lead Plaintiffs' motion for class certification should be denied.

## FACTUAL BACKGROUND

Refco's fraud began in the late 1990s, when its managers conspired to hide hundreds of millions of dollars in trading losses by transferring them off Refco's books and converting them into a receivable owed by Refco Group Holdings, Inc. ("RGHI"), an entity owned by Refco CEO Phil Bennett (and, for a portion of the relevant period, his predecessor Tone Grant).  A large receivable owed by RGHI (a related party) would have had to be disclosed in Refco's financial statements, so Refco's senior management deliberately concealed it through a series of

- 3 -

transactions with certain Refco customers.  These transactions were initiated before the end of

each financial reporting period, thereby removing the related party receivable from Refco's

financials at period end.  As Refco's officers have admitted, a central purpose of this scheme was

to hide the disguised RGHI receivable from Refco's outside auditor.

Grant Thornton was retained by Refco in 2003 to audit its fiscal year 2003 financial

statements.  Later, Grant Thornton audited Refco's financial statements for the fiscal years ended

2004 and 2005.  In connection with each of these audits, Grant Thornton issued an audit opinion

indicating that its audit had been conducted in accordance with generally accepted auditing

standards and that, in Grant Thornton's opinion, Refco's financial statements fairly presented the

company's financial condition in all material respects.  Sec. Am. Compl. ¶¶ 122, 207.

In August 2004, Refco effected a leveraged buy-out transaction ("LBO") with Thomas H.

Lee Partners, L.P. and certain of its affiliates ("TH Lee").  After the LBO, Bennett owned

approximately 43% of Refco and TH Lee owned approximately 57%.  As part of the LBO, TH

Lee invested $507 million in Refco.  In addition, Refco obtained over $1.4 billion in financing,

including loans totaling over $800 million and the issuance of $600 million of 9% Senior

Subordinated Notes due 2012, pursuant to a 144A offering circular in what is commonly known

as an *Exxon Capital* exchange.  The notes were issued in a private placement that was exempt

from registration under Rule 144A of the Securities Act ("Unregistered Bonds") (*see* 15 U.S.C.

§77(d)(2)) and, by their terms, were tradeable only among qualified institutional buyers

("QIBs").  Approximately eight months later, in April 2005, a registration statement went

effective that provided for the exchange of the Unregistered Bonds for registered bonds with the

same terms ("Registered Bonds"), except that the Registered Bonds were freely tradeable.  This

exchange took place on or about May 11, 2005.

- 4 -

In August 2005, Refco proceeded with an IPO, issuing 26.5 million shares of stock (and an additional 3,975,000 shares to cover over-allotment of shares) pursuant to a Form S-1 registration statement.  After the IPO, Bennett owned 33.8% of Refco, TH Lee owned 39.4%, and the public owned the remaining 26.8%.

The first 40 days after the IPO were what is commonly known as a "quiet period." During a quiet period, "analysts cannot report concerning securities in an IPO."  *In re Initial Public Offering Secs. Litig.*, 471 F.3d 24, 43 ("*IPO*") (2d Cir. 2006) (citing 17 C.F.R. §§ 230.174(d), 242.101(b)(1)).  Refco did not release any new information into the market during that time, nor have Lead Plaintiffs identified any widely disseminated third-party analyst reports during that period that broke the silence and impacted the price of Refco securities. Accordingly, while Refco's stock price did fluctuate during that period, those fluctuations did not reflect any changes in the public information available about Refco.

On October 10, 2005—only 13 trading days after the end of the quiet period—Refco's fraud was revealed.  The company disclosed that "it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million," that "Bennett totally repaid the receivable in cash," and that Bennett and senior officer Santo Maggio had both been placed on leave.  In that same press release, Refco announced that "its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004 [*sic*], February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon." Sec. Am. Compl. ¶ 234 (emphasis omitted).

Additional bad news for Refco followed, and the price of its securities continued to fall. In particular, Bennett was arrested, trading on Refco's stock was halted, and there was a "run on the bank" by Refco's brokerage customers, prompting Refco to issue a moratorium preventing withdrawals from accounts at its principal offshore brokerage subsidiary. *Id*. ¶¶ 240-41, 243. Suffering a liquidity crisis, and with its future in doubt, Refco filed for bankruptcy protection on October 17, 2005. *Id*. ¶ 244.

After an extensive investigation, the U.S. Attorney brought criminal charges against the masterminds of the Refco fraud. Bennett, Maggio, and former CFO Robert Trosten all pleaded guilty to criminal charges, including charges predicated on concealing the truth from Grant Thornton. In their colloquies, all three openly admitted to an agreement to conceal the truth from Refco's auditors. Later, a federal jury convicted Tone Grant on a charge of conspiracy, one predicate act of which was lying to Grant Thornton. Both Trosten and Maggio—the only of the key Refco insiders who have given deposition testimony in the Refco MDL—admitted in their depositions that they lied to Refco's auditors. As the insiders have admitted, deceiving Grant Thornton was a primary purpose—if not the main purpose—of the end-of-period loan scheme.

This action asserts claims against Grant Thornton under Section 10(b) and Rule 10b-5 on behalf of all persons and entities who purchased or otherwise acquired Refco bonds or common stock between July 1, 2004 and October 17, 2005. *Id*. p. 1, ¶ 747  In addition, putative class members who held common stock assert claims against Grant Thornton under Section 11 based on a stock registration statement, and putative class members who held registered bonds assert claims under Section 11 based on a bond registration statement. *Id*. ¶¶ 349, 377.  On Grant Thornton's motion, this court dismissed all Section 11 claims brought on behalf of those who acquired registered bonds in the *Exxon Capital* exchange itself, thus limiting the Section 11 bond

- 6 -

claim to aftermarket purchasers.  *See In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 636-37 (S.D.N.Y. 2007).

By Order dated February 8, 2006, RH Capital Associates LLC ("RH Capital") and Pacific Investment Management Company LLC ("PIMCO") (collectively, "Lead Plaintiffs") were appointed to serve as Lead Plaintiffs in this action.  Pl. Mem. 1 and n.1.  RH Capital is an investment firm that manages in excess of $600 million in assets.  Sec. Am. Compl. ¶ 17. PIMCO is an investment manager and advisor for numerous institutional and individual clients worldwide and is "one of the world's leading fixed-income institutional money managers, currently managing over $600 billion in assets." *Id*. ¶ 18.  RH Capital primarily purchased Refco stock, while PIMCO was an investor in Refco's bonds.  Pl. Mem. 6.

Lead Plaintiffs now seek to certify a class that includes all persons and entities who purchased or otherwise acquired Refco's 9% Senior Subordinated Notes due 2012 or its common stock during the period from July 1, 2004 through and including October 17, 2005 and who were damaged thereby, with certain exclusions.  *Id*. at 1.  Lead Plaintiffs have not proposed any subclasses but rather are seeking a single, undivided class for the entire period.

## **ARGUMENT**

In moving for class certification, Lead Plaintiffs bear a substantial burden.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  They must satisfy all the requirements of Rule 23(a), proving that: (1) the members of the proposed class are so numerous that joinder would be impracticable; (2) there are common questions of law and fact; (3) the claims and defenses of the representatives are typical of the proposed class; and (4) the proposed representatives will fairly and adequately protect the interests of the class.  Fed. R. Civ. P.  23(a). They must also prove that common questions of law or fact predominate over individual questions and that a class action is a superior means of resolving the claims of the alleged class.

- 7 -

Fed. R. Civ. P.  23(b)(3); Pl. Mem. 2, 9.  Each of the above requirements of Rule 23 must be met by more than just "some showing."  *IPO*, 471 F.3d at 27.  Here, Lead Plaintiffs have not, and cannot, satisfy this burden.

## POINT I

### Individual issues of reliance preclude class certification, at least in respect to the claims under Section 10(b).

Given the unique facts of this case and the complicated lifespan of Refco's various securities, Lead Plaintiffs have not established any means of proving the essential element of reliance for the proposed class on a class-wide basis.  That alone is enough to defeat Lead Plaintiffs' effort to prove predominance and commonality for any claim under Section 10(b).

Reliance is an essential element of a Section 10(b) claim, and Lead Plaintiffs bear the burden of proof.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988); *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  To prove reliance in securities fraud cases without a class-wide presumption of reliance is difficult, if not impossible. *IPO*, 471 F.3d at 42 ("[E]stablishing reliance individually by members of the class would defeat the [predominance] requirement of Rule 23" because individual issues would necessarily become the focus of the litigation); *see also Basic*, 485 U.S. at 241-49; *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (affirming denial of class certification in oral misrepresentation context because individual issues of reliance meant that common issues did not predominate).

Lead Plaintiffs concede that they are required to establish reliance with respect to their Section 10(b) claim.  Pl. Mem. 17.  They contend, however, that they are entitled to a class-wide presumption of reliance under one of three separate doctrines: (i) a fraud-on-the-market theory; (ii) a fraud-*created*-the-market theory; and (iii) principles from *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  Pl. Mem. 17.  Lead Plaintiffs are wrong on all three points.  As

- 8 -

discussed below, they have failed to establish that they are entitled to a class-wide presumption of reliance as to Grant Thornton under *any* theory.

  A.     **Lead Plaintiffs are not entitled to a "fraud on the market" presumption.**

A plaintiff can, in limited circumstances, satisfy the reliance element by raising a rebuttable presumption of reliance based on what is commonly known as the "fraud-on-the-market" doctrine. *Basic*, 485 U.S. at 247.  This presumption rests on the notion that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."  *Id*. at 241 (internal quotation marks omitted).  The fraud-on-the-market presumption is not automatic:  a court will only "presume reliance when it is logical to do so."  *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir. 1990) (quoting *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1263 (S.D.N.Y. 1984)).

The fraud-on-the-market theory cannot possibly support certification of Lead Plaintiffs' proposed class.  Although their brief discusses ten factors that (they claim) would support a finding of market efficiency, most of them—including the factors that the case law finds most important—actually support the opposite conclusion, at least for significant portions of the proposed class.

  1.     **The market for Refco's bonds was not efficient.**

The market for Refco's Unregistered Bonds was not an open market at all.  Rather, it consisted entirely of institutional investors who negotiated their own purchases privately and could trade only with one another.  Sec. Am. Compl. ¶¶ 108-09, 112; Deposition of Chad Coffman, March 26, 2010 ("Coffman Dep.") 66:16-67:3; *see also* Offering Circular, cover page and pp. ii, 106 (Declaration of Beth A. Tagliamonti in Opposition to Lead Plaintiffs' Motion for Class Certification ("Tagliamonti Decl."), Exs. A and D).  As such, this market was inherently

- 9 -

inefficient.  Expert Rebuttal Report of Professor Christopher M. James ("James Rebuttal") ¶¶ 8-9 (Tagliamonti Decl., Ex. C); *accord In re Enron Corp. Sec., Deriv. & ERISA Litig.*, No. MDL-1446, 2005 WL 3704688, at *6 n.28 (S.D. Tex. Dec. 5, 2005) (noting that plaintiffs "would have an uphill battle to establish presumptive reliance" on a fraud-on-the-market theory where, among other things, the "offering memoranda prominently indicate that these notes were intended to be private offerings to QIBS.").  Indeed, by its terms, *Basic v. Levinson* would preclude any presumption of reliance for securities holders who purchased Unregistered Bonds, as the market for those bonds was, by definition, far from "open and developed."  485 U.S. at 241.

Nor have Lead Plaintiffs shown market efficiency for the *Registered* Bonds.  *See*, *e.g.*, James Rebuttal ¶¶ 7, 9, 16 (Tagliamonti Decl., Ex. C).  Even after the *Exxon Capital* exchange led to the issuance of bonds that were freely tradeable, they were still "not widely held" and were "not traded on any public exchange" but were rather "bought and sold" principally by institutional investors.  *In re Livent, Inc. Noteholders Sec. Litig.* 211 F.R.D. 219, 222-23 (S.D.N.Y. 2002).

The analysis provided by Lead Plaintiffs and their expert Chad Coffman cannot overcome these problems and, indeed, does not even acknowledge the separate inefficiencies that characterized Refco's Registered and Unregistered Bonds.  Coffman's conclusions with regard to market efficiency consider Refco's bonds all together.  In other words, Coffman analyzes the market for Refco's bonds from August 5, 2004 to October 7, 2005 without distinction.  This is wholly inappropriate;  the market conditions for Unregistered Bonds differed significantly from those for Registered Bonds because, among other things, the Unregistered Bonds were not freely tradeable.[1]  Coffman Dep. at 66:16-67:3; *see also* James Rebuttal ¶¶ 8, 16, 20-24 (explaining

---

[1] Given the absurdity of his combined analysis of Refco's bonds, it is not surprising that this is Coffman's first written opinion on market efficiency for bonds.  Coffman Dep. at  56:2-57:6 (Tagliamonti Decl., Ex. D).

Coffman's "fundamental error" in not separately analyzing the bond market for two distinct periods, distinguished by the May 11, 2005 exchange date when the Unregistered Bonds were exchanged for Registered Bonds) (Tagliamonti Decl., Exs. C and D).

The Second Circuit has considered a variety of factors in determining whether a securities market is efficient.  *See*, *e.g.*, *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 and n.11 (2d Cir. 2007) ("*Teamsters II*") (analyzing district court's application of factors set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989)).  Lead Plaintiffs have not carried their burden of showing that these factors support a finding of market efficiency for any of Refco's bonds—either Registered or Unregistered.

> a. ***Causal Relationship Between News and Price Movement*** (Pl. Mem. 26)

In an efficient market, the release of material information alters a security's price almost immediately.  *Unger*, 401 F.3d 316, 324 (5th Cir. 2005); *see also Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887, at *7 (S.D.N.Y. Aug. 1, 2006) ("*Teamsters I*") (noting that in an efficient market, a security's price remains stable in the absence of news and quickly changes as the market receives unexpected information), *aff'd*, *Teamsters II*, 546 F.3d 196 (2d Cir. 2007).  The link between disclosure of a company's material misstatements and its stock price can be established by demonstrating "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response to the stock price."  *Cammer*, 711 F. Supp. at 1287. As Lead Plaintiffs admit, the Second Circuit considers this the most important factor relating to market efficiency.  Pl. Mem. 26, citing *Teamsters II*, 546 F.3d at 207.

The mere fact that the market for Refco bonds moved in response to the October 10, 2005 disclosure does not prove that the market was efficient in the first place.  Mr. Coffman's event study purports to show that "the market value of Refco Stock and Refco [Bonds] both declined in

- 11 -

a statistically significant manner upon the revelation of the misstatements and omissions."
Coffman Report ¶ 9 (Declaration of James J. Sabella in Support of Lead Plaintiffs' Motion for
Class Certification ("Sabella Decl."), Ex. E); *see* Pl. Mem. 26-27.  But this study is unreliable
and unsound;  the Refco bond market was not sufficiently efficient to permit a meaningful event
study to be conducted.  As Dr. James explained in his deposition, the "inference one would draw
from that event study is what's problematic when you don't have conditions consistent with
market efficiency."  Deposition of Christopher M. James, April 14, 2010 ("James Dep."), at
253:20-254:10; James Rebuttal ¶ p. 5, n.6 (Tagliamonti Decl., Exs. C and E); *Teamsters II*, 546
F.3d at 208 n.15.  The bond price's movement during the week of October 10, 2005 was, in fact,
a marked *overreaction*.  Expert Report of Professor Christopher M. James ("James Report") ¶¶
81-86 (Tagliamonti Decl., Ex. B).

      Rather than conducting an event study of the bond price's responsiveness to different
announcements over the course of the class period, Mr. Coffman focused exclusively on the
week of October 10, 2005 to determine the bond market's reaction to new information.  In his
view, the news released during this week was the "only new firm-specific information released
during the Class Period that would materially change the market's perception of Refco's
creditworthiness."  Coffman Report ¶¶ 91-95 (Sabella Decl., Ex. E); Pl. Mem. 27.

      This analysis is impossibly circular.  Lead Plaintiffs cannot prove that the bond market's
reaction during the week of October 10 was, in fact, a rational market response to new
information if they have looked no further than that price reaction itself.  Moreover, efficiency at
the end of the class period does not prove efficiency at the beginning, or at any other moment
when the class members were *acquiring* their bonds.  It is the moment of *acquisition* that is
critical here.  The presumption of *reliance* works by enabling class members to prove reliance by

claiming that the market price necessarily reflected all publicly available material information when they *bought* their securities.  *Basic*, 485 U.S. at 247.  A showing of efficiency during one week in October 2005 does nothing to show efficiency for Registered Bonds months earlier. And it certainly does not show efficiency for Unregistered Bonds, which traded during a different period and under very different conditions.

In any event, Coffman's assumption that there were no other material announcements during the entire class period (Pl. Mem. 27) cannot be squared with the record.  Credit agency reports during the class period discussed other events involving Refco, including the Cargill acquisition and the IPO.  Rebuttal Report of Chad Coffman ("Coffman Rebuttal") ¶ 25 ("…(creditworthiness) is specifically addressed by credit rating agency reports….") (Tagliamonti Decl., Ex. F); Tagliamonti Decl., Ex. G. ██████████████████████████ ███████████████████████████████████████████████████ Tagliamonti Decl., Ex. H.  Coffman's failure to analyze the market's movements in respect to these events is inexplicable and undermines his entire approach.  Thus, with respect to this very important efficiency factor, Lead Plaintiffs' proof falls dramatically short.

> **b.** ***Trading Volume and Liquidity*** **(Pl. Mem. 21)**

Another critical factor for efficiency is a large weekly trading volume.  To support a finding of efficiency, Lead Plaintiffs must show a trading volume of between 1-2% of the outstanding securities each week.  *Cammer*, 711 F. Supp. at 1286, 1293.  Courts have relied on experts to calculate the average weekly trading volume.  *See, e.g.*, *Teamsters I*, 2006 WL 2161887, at *10.

The trading volume for Refco's bonds falls short of this threshold and was, in fact, quite sporadic—showing a low level of liquidity.  According to Mr. Coffman's *TRACE* data,[2] there was *no* trading volume in Refco's Unregistered Bonds on 88 days (or 46.07%) of the class period before the Unregistered Bond exchange date, nor is there any record of trading volume in Refco's Registered Bonds on 59 days (or 56.19%) of the class period after the exchange date. James Rebuttal ¶ 39 (Tagliamonti Decl., Ex. C).  Further, as Dr. James explained, Coffman's average trading volume figure of 1.97% requires averaging the weekly trading volume for the Unregistered Bonds (between August 5, 2004 and the exchange date of May 11, 2005) with the weekly trading volume of the Registered Bonds during a different period (May 11, 2005 to October 7, 2005).  *Id.* ¶ 43.  In fact, the trading volume percentage for the Unregistered Bonds (on the far less open and more informal private QIB market) happened to be higher than the trading volume percentage that persisted after those bonds were exchanged for Registered Bonds.  When the average weekly trading volume for the *Registered* Bonds is considered alone (i.e., for the period leading up to the October 10 disclosure), it falls well short of the 1-2% threshold—at only 0.78%, when calculated using all publicly available transaction data from the Securities Industry and Financial Markets Association (*SIFMA*) as provided by Coffman.  Given this low trading volume, this factor strongly militates against a finding of market efficiency.

### c.    *Analyst Coverage* (Pl. Mem. 22)

In considering efficiency, courts often look to whether a significant number of securities analysts followed and reported on a company's securities during the class period.  *Cammer*, 711 F. Supp. at 1286.  For consideration under this factor, however, the analyst reports must report

---

[2] Bonds covered by the National Association of Securities Dealers' Trade Reporting and Compliance Engine ("*TRACE*"), such as the Refco bonds, are required to report trades to a centralized database, from which *TRACE* data is derived.

on the particular security at issue, not on the issuer in general.  *See Teamsters I*, 2006 WL
2161887, at *10.

Lead Plaintiffs admit that there were *no* securities analyst reports on Refco until very late
in the class period—and then, the coverage was limited to Refco stock.  Pl. Mem. 22-23
("[T]here was no analyst coverage of Refco prior to the IPO …. [A]nalysts began to cover
*Refco['s Stock]* immediately upon the conclusion of the [40-day post-IPO] Quiet Period.")
(emphasis added).  They suggest, however, that the existence of credit agency reports suffices as
relevant "analyst" coverage.  *Id*.  Not so.  Credit agency reports do not provide the type of
information typically covered by securities analysts because only the latter follow the security
closely, "directly relate information to buyers, and engage in the act of selling."  *See Teamsters
II*, 546 F.3d at 206 n.12 (identifying reasons why a district court may conclude that ratings
agencies less directly impact the price of bonds in comparison to equity analysts who follow a
stock); *Krogman v. Sterritt*, 202 F.R.D. 467, 475 (N.D. Tex. 2001) (coverage by one independent
analyst and Moody's was insufficient to cause this factor to weigh in favor of market efficiency).
Further, there is a "qualitative difference between analyst reports for … fixed-income securities
such as bonds, and rating agency reports for bonds."  James Dep. at 268:23-269:2 (Tagliamonti
Decl., Ex. E).  And the analyst reports on Refco's stock did not "evaluate investment in Refco's
bonds."  James Rebuttal ¶ 54 (Tagliamonti Decl., Ex. C).  Dr. James "did not find any analyst
coverage for Refco's bonds in the time period between August 5, 2004 and October 7, 2005."
*Id*.  This factor thus tends to show that the market for Refco's bonds was inefficient.

### d.    *Market Makers and Arbitrageurs* (Pl. Mem. 24)

The presence of market makers and arbitrageurs may be further evidence of an efficient
market.  *Cammer*, 711 F. Supp. at 1286-87.  A market maker is someone "who helps establish a
market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a

- 15 -

security and the price a seller will sell a security), and who stands ready to buy or sell at these publicly quoted prices." *Teamsters I*, 2006 WL 2161887, at *7 (internal quotations omitted). Arbitrageurs are "professional investors who exploit price differences in different markets by buying and selling identical securities in those markets." *Id*. (internal quotations omitted).  In an efficient market, an ordinary investor cannot make money trading on publicly available information because the market will have already incorporated the information through the actions of the arbitrageurs. *Id*.

In respect to Refco's bonds, Lead Plaintiffs have not established the presence of any market markers or arbitrageurs.  Lead Plaintiffs' claim that there were twenty-five market makers who executed trades—five of which (including CSFB and Banc of America Securities) each executed over two dozen trades (Pl. Mem. 25; Coffman Report ¶ 88 and Ex. 15 (Sabella Decl., Ex. E))—is not sufficient to demonstrate market efficiency.  As set forth in *Teamsters I*, where the security is not an equity security, "it makes sense to adopt the general definition of 'market maker' given in the SEC's regulations." *Teamsters I*, 2006 WL 2161887, at *11.  The SEC defines a market maker as "a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers." *Id.*, 2006 WL 2161887, at *10; *see also Teamsters II*, 546 F.3d at 207. Mr. Coffman has not demonstrated that any of the twenty-five so-called market makers meets this definition.  He does not provide any evidence, for example, that any of the so-called "market makers" actually furnished firm bid and offer quotes on request.  As part of the Unregistered Bond offering, only three firms indicated that they would attempt to make a market as

- 16 -

demonstrated by the Confidential Offering Circular.  Coffman Report ¶ 88 (Sabella Decl., Ex.
E); Offering Circular (Tagliamonti Decl., Ex. A).  And even if those three firms ultimately acted
as true market makers (a fact that Mr. Coffman has not demonstrated), they still would not
establish the market maker presence needed to support a finding of market efficiency under
*Cammer*,  711 F. Supp. at 1293 (requiring *five* market makers), *cited in* Coffman Report ¶ 42
(Sabella Decl., Ex. E); James Dep. at 323:5-324:6 (Tagliamonti Decl., Ex. E).

    Lead Plaintiffs argue alternatively that the absence of market makers here is not probative
one way or the other because—at least for Registered Bonds—the daily trading volume was
reported to the public via *TRACE*.  But even if that were a sufficient substitute for the presence
of market makers, it concerns only a portion of the class period.  As Mr. Coffman admitted, no
*TRACE* data was publicly disseminated until after the exchange for Registered Bonds.  Coffman
Dep. at 75:16-77:18 (Tagliamonti Decl., Ex. D).  Furthermore, Refco bonds exhibited a
predictable price pattern that would have allowed ordinary investors to profit—a fact that tends
to disprove the efficiency ordinarily indicated by the presence of market makers.  James Dep. at
275:15-276:3 (Tagliamonti Decl., Ex. E).

    e.     *Autocorrelation* **(Pl. Mem. 30)**

    Lead Plaintiffs argue that a finding of market efficiency for Refco's bonds is supported
here by the absence of "autocorrelation" in the bond prices.  Pl. Mem. 30.  This argument rests
on a basic error in methodology.  When "autocorrelation" is properly measured, it actually
supports a finding of market *in*efficiency in this case.

    "Autocorrelation" describes a phenomenon where future prices can be predicted based on
past experience rather than on any new information entering the market.  Both experts here agree
that in an efficient market, past security prices will not have predictive power over future
security prices.  Coffman Report ¶ 71 (Sabella Decl., Ex. E); James Report ¶¶ 82, 84; James

- 17 -

Rebuttal ¶¶ 49-50 (Tagliamonti Decl., Exs. B and C).  Both experts also agree that when autocorrelation is present, past returns have the ability to predict future returns, which signals an inefficient market.  Coffman Report ¶ 71 (Sabella Decl., Ex. E); James Report ¶¶ 82, 84; James Rebuttal ¶¶ 49-50 (Tagliamonti Decl., Exs. B and C).

Mr. Coffman's conclusion that Refco's bond price movements did not "autocorrelate" is based on a fatally flawed methodology that excluded a full *two-thirds* of the available data points.[3]  James Rebuttal ¶ 49 (Tagliamonti Decl., Ex. C).  Coffman's analysis excludes all returns that were not one-day returns, as well as all non-consecutive one-day returns, and uses a weighted average daily price (as opposed to actual bond prices) to calculate returns.  *Id*.  This improper exclusion of data means that Mr. Coffman tested only a fraction of Refco's bond prices.  *Id*.  Additionally, Mr. Coffman's use of weighted average daily prices improperly smoothes out the variation in Refco's actual bond price returns.  *Id*. ¶¶ 47-48.

Dr. James conducted several autocorrelation analyses of Refco's bonds and reached the opposite result, concluding that the bond price returns did, in fact, correlate (negatively) over time.  James Dep. at 274:11 – 275:14; James Report ¶¶ 58, 81, 84; James Rebuttal ¶¶ 44-46, 52 (Tagliamonti Decl., Exs. B, C and E).  To correct for Mr. Coffman's faulty use of only one-third of the available data points, Dr. James tested for autocorrelation using *all* the weighted average prices calculated by Mr. Coffman between August 5, 2004 and October 7, 2005.  James Rebuttal

---

[3] Notably, Mr. Coffman's original report, served on February 2, 2010, was corrected on March 4, 2010.  *See* Expert Report of Chad Coffman, dated February 2, 2010 ("Coffman Original Report") (Tagliamonti Decl., Ex. I) and Coffman Report (Sabella Decl., Ex. E).  Coffman was forced to issue a corrected report to change the description of his methodology for testing for autocorrelation.  Coffman Dep. at 45:16-46:23 (Tagliamonti Decl., Ex. D).  In his initial report, Coffman indicated that he used the "Durbin-Watson" test for his autocorrelation analysis of Refco's bonds.  Coffman Original Report ¶¶ 72 n.62, 103 (Tagliamonti Decl., Ex. I).  After numerous requests from Grant Thornton's counsel for production of said Durbin-Watson test (*see* Tagliamonti Decl., Ex. J), Coffman instead issued the corrected report, which contained a different description of his autocorrelation methodology.  Coffman Report ¶¶ 72 n.62, 103 (Sabella Decl., Ex. E); Coffman Dep. 45:16-46:23 (Tagliamonti Decl., Ex. D).  For reasons outlined herein, the correction did not salvage Coffman's fundamentally flawed autocorrelation analysis.

¶¶ 44-52 and Ex. 4 (Tagliamonti Decl., Ex. C). This more complete analysis supported a finding of autocorrelation—in other words, a finding that Refco's bond price movements were, in fact, predictable based on their inverse relationship with past experience. *Id*. In addition, Dr. James ran another autocorrelation analysis of the Unregistered Bonds using all available data and the actual return price (rather than weighted average) for each available trade, and he found significant correlation based on that analysis as well. *Id*. ¶¶ 51-52 and Ex. 5. And finally, Dr. James conducted two autocorrelation analyses of the Registered Bonds and found significant negative correlation during the Registered Bond Period. James Report ¶ 84 and Ex. 5; James Rebuttal ¶ 52 and Ex. 6 (Tagliamonti Decl., Exs. B and C).

In short, when all available data and actual return prices are taken into account, autocorrelation analysis suggests that the market for Refco's bonds *was* predicable based on past experience and thus *was not* efficient in terms of its ability to reflect new material information.

### f.     *Bid/Ask Spread* (Pl. Mem. 28)

Courts have also considered a security's bid/ask spread when assessing the efficiency of its market. *Krogman*, F.R.D. 467 at 478. The bid/ask spread is the difference between the price at which investors are willing to buy the security and the price at which current security holders are willing to sell their shares. *Id*. at 478. A large bid/ask spread is indicative of an inefficient market because it suggests that the security is too expensive to trade. *Id*.

Although Mr. Coffman concludes that the bid/ask spread analysis shows market efficiency for Refco's bonds, he also admits that he used limited information from only two of the purported 25 "market makers," compared with a random sample of 100 NYSE, NASDAQ and AMEX stocks. Coffman Report ¶¶ 99-100 (Sabella Decl., Ex. E). This analysis is faulty in two respects. First, it is inappropriate to compare bid-ask spreads of bonds to those of stocks. James Rebuttal ¶ 30 (Tagliamonti Decl., Ex. C). Second, as demonstrated at Mr. Coffman's

- 19 -

deposition, this method is open to wide fluctuations and skewed sampling (Coffman Dep. at 99:11–104:4 (Tagliamonti Decl., Ex. D)) and thus cannot be the basis of a reliable comparison. Accordingly, Lead Plaintiffs have failed to demonstrate that this factor supports a finding of market efficiency for Refco's bonds.

g.    *Institutional Ownership* **(Pl. Mem. 30)**

Finally, at least in the bond context, an analysis of ownership by institutional investors does not indicate market efficiency.  As Dr. James has explained, "institutional investors tend to pursue a buy-and-hold investment strategy.  As a result, they generate a very limited amount of trading activity."  James Report ¶ 67 (Tagliamonti Decl., Ex. B).  Dr. James further noted that institutional ownership is not a one-size-fits-all proposition;  whereas some institutional investors in Refco's bonds may have promoted liquidity, others would have done the opposite.  James Dep. at 262:4-9 (Tagliamonti Decl., Ex. E).  Lead Plaintiffs have failed to show that the QIBs holding the Unregistered Bonds or the institutions holding the Registered Bonds were primarily institutions that promote liquidity.  Thus, they have failed to prove that this factor suggests market efficiency.

*    *    *

As the above discussion shows, Lead Plaintiffs cannot prove market efficiency for either the Unregistered or Registered Bonds.  Lead Plaintiffs have failed to show that any of the factors discussed above supports market efficiency—including the criterion relating to the causal relationship between new information and market price movement, on which the Second Circuit's cases place the most emphasis.  Accordingly, Lead Plaintiffs may not invoke a fraud-on-the-market presumption of reliance, at least with respect to Refco's bonds.

- 20 -

2.        **The market for Refco's stocks during the IPO quiet period was not efficient.**

For Refco stock acquired during the 40-day post-IPO "quiet period," the efficiency analysis is even more straightforward.  The fraud-on-the market presumption requires proof of "an open and developed securities market" in which "the price of a company's stock is determined by the available material information regarding the company and its business." *Basic,* 485 U.S. at 241 (internal quotations and citation omitted).  During a post-IPO quiet period, however, the flow of "material information" is stopped.  Analysts cannot report on the securities issued at the IPO during that time, "thereby precluding the contemporaneous 'significant number of reports by securities analysts' that are a characteristic of an efficient market."  *IPO*, 471 F.3d at 42-43 (citation omitted).

Accordingly, the Second Circuit has declined to apply a fraud-on-the-market presumption in the immediate aftermath of an IPO.  *Id.*  Indeed, the Southern District of New York has recognized "a rebuttable presumption that the market for securities issued by a company not previously subject to the reporting requirements of the securities laws is *not* efficient during the quiet period."  *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 575 (S.D.N.Y. 2008) (emphasis added).  In *SCOR*, the court concluded that a rebuttable presumption of market *in*efficiency was consistent with the purpose underlying the existence of the quiet period, which was imposed by the SEC due to its doubts about "whether, immediately after completion of an initial public offering, information concerning the issuer will have been disseminated as broadly as information relating to comparable companies having a reporting history under the Exchange Act."  *Id.* at 576 (quoting *Prospectus Delivery for Aftermarket Transactions*, 1988 WL 237444, at *2).  In light of the SEC-imposed quiet period, which was implemented in order to allow a "reasonable time for the secondary market to assimilate available information and to stabilize," the *SCOR* court concluded that during the quiet period, the market for a new security had "likely

- 21 -

not yet become 'efficient' as that term is understood in the fraud-on-the-market context, [because] such a market does not yet 'reflect [ ] all publicly available information.'" *Id.* at 577 (citations omitted).

Against this backdrop, Lead Plaintiffs have not presented any evidence sufficient to show efficiency for Refco's stocks during the quiet period. The fact that Mr. Coffman did not observe a significant abnormal return at the *end* of that period (Coffman Report ¶ 39 and Ex. 7 (Sabella Decl., Ex. E)) does not suggest that the market was efficient *before* that time. Indeed, the return in Refco stock upon the commencement of analyst coverage at the end of the quiet period was of the magnitude one would expect after any IPO. James Dep. at 27:22-29:15 (Tagliamonti Decl., Ex. E). And while Lead Plaintiffs point to their analysis of the *Cammer* factors as proof of efficiency during the quiet period (Pl. Mem. 21 n.56), they do not analyze *any* of those factors (with the exception of the bid-ask spread) specifically with regard to the quiet period. To the contrary, they analyze these factors for Refco's stock during the "Class Period" as a whole and do not conduct any separate analyses for the quiet period itself. *Id.* at 21-31.

Further, the lack of analyst coverage during the quiet period is wholly inconsistent with the notion of market efficiency. Lead Plaintiffs have not offered *any* evidence of analyst coverage occurring during the quiet period. In fact, for the entire 67-day duration of the Class Period for purchasers of Refco stock, Lead Plaintiffs have identified only five analyst reports, all of which were issued in the final 27 days of the Class Period.[4] *See* Coffman Report ¶ 36, Ex. 5 (Sabella Decl., Ex. E). Accordingly, Lead Plaintiffs cannot carry their burden of proving market efficiency with respect to Refco stock acquired during the quiet period.

---

[4] Vinita Juneja, an expert retained by the Stock Underwriters, has located two analyst reports that were issued during Refco's post-IPO quiet period itself. Both reports were issued by Renaissance Capital, and it is unclear whether they were publicly disseminated. The existence of these reports does not change the analysis because they clearly are not "significant" in number. *IPO*, 471 F.3d at 43.

- 22 -

**B.**   **Lead Plaintiffs are not entitled to a "fraud *created* the market" presumption.**

Lead Plaintiffs' alternative argument—that they are entitled to a presumption of reliance for Refco stocks and bonds based on a "fraud-created-the-market" theory—is entirely without merit. The so-called fraud-created-the-market theory presumes reliance if the defendant's fraudulent activity is "so pervasive that it goes to the very existence of the [securities] and the validity of their presence on the market." *Ross v. Bank South, N.A.*, 885 F.2d 723, 729 (11th Cir. 1989). The Second Circuit has never adopted this theory, and the Southern District has recognized its inherent tension with the Supreme Court's decision in *Basic*. *See In re Refco Inc. Secs. Litig.*, 609 F. Supp. 2d 304, 318 (GEL) (S.D.N.Y. 2009); *In re Towers Fin. Corp. Noteholders Litig.*, No. 93 Civ. 0810, 1995 WL 571888, at *22 (S.D.N.Y. Sept. 20, 1995) ("[T]he fraud created the market theory may have been implicitly rejected by the Supreme Court in *Basic, Inc. v. Levinson*, since the Court clearly stated that the presumption of reliance is based on the assumption of an open market."). And both the Sixth and Seventh Circuits have expressly criticized this presumption. *See Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1159-60 (6th Cir. 1994); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1130 (7th Cir. 1993) (rejecting the presumption).

In any event, even if this theory had some currency within the Second Circuit, it still would not apply in this case. Courts that have applied the theory agree that the touchstone of this presumption is "unmarketability"—either *economic* unmarketability (when a security is patently worthless) or *legal* unmarketability (when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security). *See In re Refco Inc. Secs. Litig.*, 609 F. Supp. 2d at 318, citing *Joseph v. Wiles*, 223 F.3d 1155, 1163-66 (10th Cir. 2000) (citing cases). But Lead Plaintiffs have failed to provide any evidence that Refco's stock could not have been sold at any price, that its bonds could not have been offered at any combination of

- 23 -

price and interest rate, or that Refco was prohibited from issuing the securities as a matter of law. *Id*. (citations omitted).  For this reason as well, Lead Plaintiffs are not entitled to a presumption of reliance under this theory.

**C.**    ***Affiliated Ute* does not apply here, as this is not an omissions case.**

With regard to their claims against Grant Thornton, Lead Plaintiffs cannot use an *Affiliated Ute* presumption of reliance to avoid their burden of proof on this critical element.  To invoke *Affiliated Ute*, Lead Plaintiffs must establish that Grant Thornton (i) made an omission and (ii) had a duty to disclose material information.  406 U.S. at 153-54.  The claims against Grant Thornton, however, are not "omissions" claims at all.  Instead, they are based solely on the affirmative statements Grant Thornton made in its audit opinions, which were incorporated into Refco's registration statements and certain other public filings. Sec. Am. Compl. ¶¶ 131, 187, 217, 355, 383.

A plaintiff may not avoid proving the essential element of reliance merely by recasting a misrepresentations claim as a claim for material omissions—a tactic that a plaintiff could use in nearly every case.  There is no "omissions" claim for purposes of *Affiliated Ute* if the supposed omission "served only to 'exacerbate[] the misleading nature of the affirmative statements'" and did not play an independent or interdependent role in the fraud.  *In re Parmalat Sec. Litig.*, No. 04-cv-0030, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008) (citing *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005)).

Lead Plaintiffs' complaint that Grant Thornton "failed to disclose the uncollectible related party receivable" (Pl. Mem. 34) misconstrues the nature and content of an outside auditor's audit opinions.  Audit opinions do not disclose specific financial information; they merely state whether the auditor conducted an audit consistent with generally accepted auditing standards and reached the opinion that the financial statements fairly present the company's

- 24 -

financial position.  The financial statements at issue here were the statements of *Refco*, not Grant Thornton.  To the extent the uncollectible receivable should have been disclosed, it was Refco itself who should have disclosed it.  Lead Plaintiffs have not alleged (nor can they) that Grant Thornton had a "duty to disclose" any information at all (*Affiliated Ute*, 406 U.S. at 153-54), except to the extent that it had a duty to correct what Lead Plaintiffs say were its affirmatively misleading audit opinions.  *See, e.g.,* Sec. Am. Compl. ¶¶ 729, 733, 736, 740, 747, 749.  Thus, because any "omissions" by Grant Thornton in this case are necessarily intertwined with its affirmative allegedly misleading statements, Lead Plaintiffs cannot rely on *Affiliated Ute* to avoid the individual issue of reliance.

*   *   *

For all the reasons discussed above, Lead Plaintiffs are not entitled to presume the element of reliance for the class as they have defined it.  Lead Plaintiffs' passing (and unsupported) suggestion that presumption of reliance is unnecessary simply does not pass muster.  Pl. Mem. 34-35. [5]  Courts have made clear that individual issues of reliance preclude class certification.  *See IPO*, 471 F.3d at 42 ("[E]stablishing reliance individually by members of the class would defeat the requirement of Rule 23 that common questions of law or fact predominate over questions affecting only individual members."); *Livent*, 211 F.R.D. at 223 (denying class certification based on a finding that individual questions of reliance precluded certification); *see also* Fed. R. Civ. P. 23 advisory committee's note (noting that a fraud case

---

[5] The cases cited by Lead Plaintiffs on this point (Pl. Mem. 35 n.9) are all from other jurisdictions and, moreover, do not involve plaintiffs who conducted their own investigations into the securities at issue—as the Lead Plaintiffs did here.  *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724 (11th Cir. 1987) (plaintiffs relied on the recommendations of their individual brokers at defendant brokerage firms); *In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431, 1999 WL 1021819, at *5-6 (E.D.N.Y. Apr. 27, 1999) (no specific discussion about reliance); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 645 (N.D. Ala. 2009) (no evidence that any plaintiff conducted an independent investigation of securities and applying "common fraudulent scheme theory"); *Bruhl v. Price WaterhouseCoopers Int'l.*, 257 F.R.D. 684, 696 (S.D. Fla. 2008) (applying the "common fraudulent scheme theory" to determine that individual issues of reliance would not predominate).

may be unsuited for treatment as a class action if there is material variation in the kinds or degrees of reliance).  As in those cases, the plaintiff-specific issue of reliance in this case will predominate over any common questions of fact or law.  This individualized issue precludes certification of the proposed class, at least in respect to the claim under Section 10(b).

**POINT II**

**The proposed class definition is fatally overbroad.**

Lead Plaintiffs' motion should also be denied because it seeks certification of a proposed class that would include at least two sets of securities holders who cannot possibly state a claim. The class definition encompasses every person and entity who purchased or otherwise acquired Refco securities during the period from July 1, 2004 through and including October 17, 2005. Pl. Mem. 1.  Given this overinclusive definition, litigation of the claims on a class-wide basis would necessarily require the Court to make individualized determinations as to whether particular class members or sets of class members can establish all the elements of their claims.

### A.  The class period improperly includes purchasers who *sold their securities before Refco's October 10, 2005 announcement.*

The issue of loss causation is critical to all the claims against Grant Thornton in this case—under both Section 10(b) and Section 11.  "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). For purposes of Section 10(b), a plaintiff must "'specify' each misleading statement" and prove that the defendant's specific statement "caused the loss for which the plaintiff seeks to recover.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (quoting 15 U.S.C. §§78u-4(b)(4)). Similarly, Section 11(e) limits a plaintiff's recovery for a Section 11 violation by providing a defense if the defendant proves that the security's decline in price was caused by something

- 26 -

other than the statement for which the defendant bears liability.  15 U.S.C. § 77k(e).  This

defense is a "mirror image" of the loss causation element in Section 10(b).  *See In re Vivendi*

*Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009) (citing *In re Worldcom*

*Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6-8 (S.D.N.Y. Feb. 17, 2005)).

　　　　As the Supreme Court has held, it is not enough for a securities plaintiff merely to allege

that the price of the security was inflated at the time of purchase.  "[While] an initially inflated

purchase price *might* mean a later loss … it is far from inevitably so."  *Dura*, 544 U.S. at 342; *In*

*re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).  "[I]f, say, the

purchaser sells the shares quickly before the relevant truth begins to leak out, the

misrepresentation will not have led to any loss."  *Dura*, 544 U.S. at 342; *see also Flag Telecom*,

574 F.3d at 41 (excluding in-and-out traders from the certified class because they had not put

forth sufficient evidence to establish loss causation); *In re Veeco Instruments Inc. Sec. Litig.*, 233

F.R.D. 330, 333-34 (S.D.N.Y. 2005) (rejecting would-be lead plaintiff in part because it could

not show loss causation where it sold shares before the initial curative disclosure).

　　　　Under *Dura*, there can be no loss causation for any Refco securities holder who sold its

position before Refco's October 10 announcement—the first announcement that Lead Plaintiffs

contend revealed the relevant "truth."  *See Dura,* 544 U.S. at 342; *see also Flag Telecom*, 574

F.3d at 40.  Any loss suffered on such a sale could not possibly have been caused by any

previous misrepresentation because the market price at the time of the sale still reflected

whatever artificial inflation was introduced by virtue of the fraud.  *Dura*, 544 U.S. at 342.  Lead

Plaintiffs' motion should be denied on this basis—or, at a minimum, the class definition should

be limited to securities holders who still held their securities on October 10, 2005, when the

"relevant" truth came out.

**B.     The class definition improperly includes purchasers who *bought their securities after the October 10, 2005 disclosure.***

Relatedly, the proposed class is overbroad because it includes securities holders who bought their securities *after* the October 10, 2005 disclosure.  As set forth more fully in Grant Thornton's memorandum of law in support of its motion for summary judgment, any material misinformation in Grant Thornton's audit opinions was corrected on October 10, 2005, when Refco issued a press release disclosing, among other things, that Refco's historical audited financials should no longer be relied upon.  GT's Mot. for SJ at 23-25.  After that point, assuming market efficiency, the market price of Refco securities fully reflected the news that the historical financial statements on which Grant Thornton had opined did not, in fact, fairly present Refco's financial position for the relevant periods.  In other words, as to Grant Thornton, the whole "relevant truth" had been revealed.  *Dura*, 544 U.S. at 342.  A securities holder who bought securities *after* that date necessarily paid a price that did not reflect any misinformation connected to Grant Thornton's audit opinions.  Thus any loss suffered on those securities—as Refco's securities prices continued to fall—could not have been "caused" by Grant Thornton.

Following the October 10, 2005 press release, more bad news about Refco came to light and continued to impact the price of Refco securities.  Among other things, the market learned that (i) Refco customers were withdrawing their accounts, (ii) Refco was losing access to capital markets, and (iii) Refco management was losing credibility because of Bennett's arrest, among other things.  Although each new piece of information increased the uncertainty about Refco's future, none corrected any misimpression in the market about the reliability of Refco's historical financial statements or the truth or falsity about Grant Thornton's audit opinions on those financial statements.  Thus, as a matter of law, those announcements (and any losses that followed them) could not have been "caused" by any prior audit opinion by Grant Thornton.  *In*

*re Merrill Lynch Tyco Research Secs. Litig.*, 03 Civ. 4080, 2004 WL 305809, at *2-3 (S.D.N.Y. Feb. 18, 2004) (plaintiff failed to demonstrate a causal relationship because correcting disclosure did not discuss the subject matter of the alleged fraud).

Lead Plaintiffs' contention that the additional corrective disclosures were the "foreseeable" result of Refco's withdrawn financial statements (Coffman Report ¶¶ 129-50 (Sabella Decl., Ex. E)) is insufficient. They fail to show that the compounded news about Bennett's arrest and the "run" on Refco's customer accounts, among other troubling events, fell "within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor." *Lentell*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original); *see also Flag Telecom*, 574 F.3d at 40 (citing *Lentell*). Indeed, if the collapse of Refco's liquidity and the arrest of its CEO were foreseeable consequences of the October 10 announcement, the price adjustment immediately after that announcement would necessarily have taken the risk of such consequences into account. *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 481 (2d Cir. 2008) ("[I]n an efficient market, share prices reflect 'all publicly available information, and, hence, *any* material misrepresentations'") (citing *Basic*, 485 U.S. at 246) (emphasis in original).

On this basis as well, the class proposed in Lead Plaintiffs' motion should not be certified. At a minimum, the class definition should be amended to employ the October 10, 2005 announcement as the cut-off point for the class period. No securities holder who purchased after that announcement may be included in the class.

- 29 -

## POINT III

### Lead Plaintiffs are inadequate representatives of the class
### and their claims are atypical

Class certification is not appropriate where, as here, the class representatives are inadequate and their claims atypical.  *See* Fed. R. Civ. P 23(a)(3) and (4).  In particular, where putative class representatives are subject to unique defenses, they are unable to meet Rule 23(a)'s typicality and adequacy requirements.  *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 903 F.2d 176, 180 (2d Cir. 1990) (stating that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation ... [r]egardless of whether the issue is framed in terms of the typicality of the representative's claims ... or the adequacy of its representation."); *In re Indep. Energy Holdings PLC Secs. Litig.*, 210 F.R.D. 476, 480-83 (S.D.N.Y. 2002).  Further, a unique defense need not be proven meritorious at the class certification stage in order to defeat class certification; the simple fact that the plaintiffs would be required to devote time to rebut these defenses warrants denial of class certification.  *Indep. Energy*, 210 F.R.D. at 481; *Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) (the question at the class certification stage is whether the class representative would be required to devote considerable time to rebutting the defenses to the potential prejudice of absent class members).  Here, for a variety of reasons, neither RH Capital nor PIMCO is typical of class members or adequate to represent the class.

A. **Lead Plaintiffs are not adequate or typical class representatives in light of their decision to buy *more* Refco securities after the truth about Refco was revealed.**

Courts have consistently held that a securities holder that *increases* its holdings in a security after the revelation of an alleged fraud involving that security is subject to a unique

- 30 -

defense that precludes him from serving as a class representative.  *See, e.g., Gary Plastic*, 903 F.2d at 179-80 (affirming district court's denial of class certification where plaintiff continued purchases of CDs despite having notice of, and having investigated, the alleged fraud); *Rocco v. Nam Tai Elecs., Inc.,* 245 F.R.D. 131, 135-36 (S.D.N.Y. 2007) (finding the proposed class representative to be atypical and inadequate because of post-fraud stock purchases he made on the belief that the company's fraudulent problems were behind it and it had a revived "upside potential") (citation omitted); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992); *Greenspan v. Brassler*, 78 F.R.D. 130, 132 (S.D.N.Y. 1978).

Post-disclosure purchases sever the link between the alleged misrepresentations and the relevant investment decisions.  They act to rebut the presumption that the plaintiff relied on the alleged misrepresentations or on the integrity of the market price in making any of his purchases. Further, they cast in doubt whether the misrepresentations were ever "material" to the purchaser—a key issue for claims under both Section 10(b) and Section 11.  *See generally I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (a plaintiff is required to identify materially misleading statements made by a defendant to make out claims under Section 10(b) and Section 11); *see also Greenspan*, 78 F.R.D. at 132 (plaintiffs' purchase of securities after information at issue was disclosed "raises questions concerning the materiality to [plaintiffs] of the market's integrity and defendants' alleged misrepresentations"); *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Ore. 1991) (lead plaintiff's post-disclosure trading raised questions concerning the materiality of the alleged misrepresentations).  Thus, courts commonly refuse to allow post-disclosure purchasers to act as class representatives.  *Greenspan*, 78 F.R.D. at 132; *Rolex*, 136 F.R.D. at 664.

- 31 -

This is precisely the situation here.  Here, *both* Lead Plaintiffs purchased securities after the Refco fraud was revealed.  ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████  Deposition of Robert Horwitz, October 28, 2009 ("Horwitz Dep.") at 196:9-200:20 (Tagliamonti Decl., Ex. K); Tagliamonti Decl., Exs. L and M, at Ex. 3.  Similarly, PIMCO's transaction summary clearly reflects that it too purchased Refco securities very shortly after the disclosure, on October 11, 2005.  *See* Tagliamonti Decl., Ex. M, at Ex. 4, Sched. A.

The fact that the Lead Plaintiffs *increased* their holdings after being placed on notice of the fraud raises a question as to whether they ever actually relied on either the alleged misrepresentations or the integrity of the market price—which would rebut any presumption of reliance.  *Rocco*, 245 F.R.D. at 136 (a "named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, is atypical of the class under Rule 23(a)(3).").  Further, the fact that Lead Plaintiffs bought securities after Refco effectively withdrew its historical audited financial statements gives Grant Thornton a basis to argue that its audit opinions were never "material" to these investors.  *Rolex*, 136 F.R.D. at 664 (denying class certification because lead plaintiff's post-disclosure trading raised "questions concerning the materiality to [that particular plaintiff] of the integrity of the market and the alleged misrepresentations of the defendants in making his decision to trade in the stock [at issue]").  These potential defenses to both the Section 10(b) and Section 11 claims would at least serve to distract from the class action proceeding, if not to bar Lead Plaintiffs' claims altogether.  On this basis, class certification should be denied.

**B.** **Lead Plaintiffs are atypical and inadequate because they had unique access to information and relied on factors other than the alleged misrepresentations.**

Courts have similarly declined to certify a class where a proposed class representative has received information, either directly or indirectly, from an officer or director of a company or purchased securities based on non-public information and recommendations from friends and associates. Such facts lead to individualized reliance defenses, which render a Lead Plaintiff atypical and inadequate as a class representative. *Landry*, 123 F.R.D. at 476; *Indep. Energy*, 210 F.R.D. at 482; *Beck v. Status Game Corp.*, No. 89-civ-2923 (DNE), 1995 WL 422067, at *4 (S.D.N.Y. July 14, 1995).

For example, in *Beck*, the plaintiff testified that his decision to purchase stock was influenced by private meetings he had with the Chairman of the Board, President, Chief Executive Officer, and director of the company. The *Beck* court found that these facts rendered plaintiff atypical and subject to the unique defense that he did not rely on public information in purchasing the stock. *Beck*, 1995 WL 422067, at *4. The court further rejected plaintiff's claim that it did not receive inside information, but rather relied on public information, finding that this argument did not alter the fact that his claim was atypical. *Id.* at *4 ("[I]t does not matter whether a unique defense ultimately will prove meritorious because the fact remains that [plaintiff] will 'be required to devote considerable time to rebut' the unique defense."); *see also Landry*, 123 F.R.D. at 475-76 (similarly denying class certification where plaintiffs had access to information from friends, associates, and directors of the company).

Here Lead Plaintiffs are subject to the same unique defenses as the *Beck* plaintiffs.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Horwitz Dep.

at 106:3-107:3; 120:22-121:9; 182:11-184:10; 187:17-188:3 ████████████████

- 33 -

███████████████████████████████████████████████

███████████████████████████████████████ (Tagliamonti Decl., Ex. K).

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ *Id.* at 134:22-135:17; 140:4-141:13;

143:14-144:4; 147:10-150:12. ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████ *Id.* at 151:25-171:17. ████████████████████████████████

██████████████████████████████████████████████████████

████████████████ *Id.* at 135:22-181:25; Tagliamonti Decl., Ex. N.

Moreover, even after the disclosure of the alleged fraud, RH Capital continued to have

conversations with Refco management. ████████████████████████████████

████████████████████████████████████████[6] Horwitz Dep. at 189:21-

191:9 (Tagliamonti Decl., Ex. K). ██████████████████████████████

███████████████████████████████ *Id.* at 194:6-195:20. ████████████████

██████████████████████████████████████████████████ *Id.*

██████████████████████████████████████████████

████████████████████████████████████ *Id.* ██████████████████

██████████████████████████████████████████████████

---

[6] At the time, Scott Schoen also was Co-President of TH Lee—the entity that owned 39.4% of Refco.

████████████████ *Id.* at 192:4-11 ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ *Id.* at 202:16-203:7; Tagliamonti Decl., Ex. O. ████████████

████████████████████████████████████████████████████████████

████████

Similarly, PIMCO had a number of meetings and calls with Refco's management. Deposition of Richard Hofmann, November 6, 2009 ("Hofmann Dep.") at 71:3-72:13 (Tagliamonti Decl., Ex. P). ████████████████████████████████

████████████████████████ (Tagliamonti Decl., Ex. Q); ████████████████

██████████████████████████████████ (Tagliamonti Decl., Ex. R; Hofmann, 99:20-103:6, 112:25-117:20 (Tagliamonti Decl., Ex. P)) ████████████████

████████████████████████████ (Tagliamonti Decl., Exs. H and S; Hofmann Dep. at 128:25-130:21 (Tagliamonti Decl., Ex. P)).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ Hofmann Dep. at 22:8-22 (Tagliamonti Decl., Ex. P); Tagliamonti Decl., Ex. T

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Tagliamonti Decl., Ex. U; Hofmann Dep. at 149:6-154:4 (Tagliamonti Decl., Ex. P) ████████████████████████████

████████████████████████████████████████████

██████████████████████   As is clear from this testimony and documentary evidence, both Lead Plaintiffs had access to and received information directly from Refco officers, directors, and others.  On this basis as well, their motion for class certification should be denied. *See Landry*, 123 F.R.D. at 475-76.

Notably, none of the cases to which Lead Plaintiffs cite support the contrary conclusion. In fact, one of the very cases cited by Lead Plaintiffs specifically acknowledges that atypicality may be established where a plaintiff received nonpublic information from friends and associates. *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84-90 (S.D.N.Y. 2007).  The remaining cases cited by Lead Plaintiffs are inapposite.  Lead Plaintiffs rely on a number of civil rights cases that are simply not analogous.  *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001); *Abdul-Malik v. Coombe*, No. 96-CV-1021 (DLC), 1996 U.S. Dist. Lexis 18203, at *6 (S.D.N.Y. Dec. 6, 1996).  And even among the securities decisions cited, none concern class representatives who purchased securities *after* misstatements were disclosed to them, or relied—as Lead Plaintiffs did here—on direct, non-public communications with the issuer's management in making their investment decisions.  *See, e.g., Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200-01 (S.D.N.Y. 1992);  *Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99-100 (S.D.N.Y. 1981) (concerning varying degrees of access to *public* information);  *In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986) (involving *publicly disseminated* misrepresentations); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 374-76 (S.D.N.Y. 2000) (holding that plaintiffs' unique trading strategy nevertheless relied on the same *public* information as other class members).  In this respect too, Lead Plaintiffs' atypicality makes them poorly suited to serve as class representatives.

**C.     PIMCO is an inadequate class representative because it has not demonstrated it will adequately represent the interests of the absent class members.**

Discovery has also revealed an additional reason to deny Lead Plaintiffs' motion, at least as to any bondholders:  proposed Lead Plaintiff PIMCO—the proposed class representative for bondholders—has not demonstrated knowledge or involvement in this case and thus has not proven its adequacy to represent absent members of the class.  *Baffa*, 222 F.3d at 61 ("[C]lass representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'") (citing *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir.1995)).  The PIMCO employees who worked on the Refco investment were not working at PIMCO at the time of its 30(b)(6) deposition.  Hofmann Dep. at 10:25-11:25 (Tagliamonti Decl., Ex. P).  And there is no evidence to suggest that PIMCO or its counsel attempted to contact any former PIMCO employees who were personally involved in its Refco investment decisions, to take advantage of their experience and knowledge as it prosecutes this action.  *Id*. at 12:2-5.

PIMCO proffered Richard Hofmann as its 30(b)(6) representative for deposition.  *Id*. at 15:13-16:7.  Mr. Hofmann began working at PIMCO six months prior to his deposition and had no personal knowledge of the 30(b)(6) topics aside from what he learned in his review of "internal research emails" and meetings with certain individuals at PIMCO, none of whom worked on Refco.  *Id*. at 7:17-13:23, 22:23-23:7.  In all, Mr. Hofmann spent four to five hours reviewing documents, a "couple of hours" in internal meetings, and about five hours meeting with counsel to prepare for his deposition.  *Id*. at 10:9-24, 14:4-13.  Not only was Mr. Hofmann not familiar with any specifics about PIMCO's investment in Refco aside from what he gleaned in the documents he reviewed, but he also was not familiar with the litigation proceedings;  he

- 37 -

reviewed the complaints within a few weeks prior to his deposition and was not familiar with any other complaints or pleadings in this case.  *Id*. at 30:21-31:10.  Accordingly, the deposition showed that PIMCO had "no interest in, genuine knowledge of, and/or meaningful involvement in this case and is simply the willing pawn of counsel."  *In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 135-136 (Rakoff, J.) (S.D.N.Y. 2008) (concluding that a proposed class representative did not qualify for that role based on its lack of commitment).

Moreover, striking PIMCO as a proposed class representative would not save Lead Plaintiffs' motion.  PIMCO's lack of adequacy leaves the class without a representative bondholder.  While RH Capital did buy Refco's *Unregistered* Bonds before the exchange, it sold those bonds before the exchange and, at the time of Refco's collapse, owned only Refco common stock.  Tagliamonti Decl., Ex. M, at Ex. 3.  Without a class representative for Refco bondholders, there is no basis for certifying a class of bondholders to pursue claims in this litigation.

## <u>CONCLUSION</u>

For the reasons stated above, Lead Plaintiffs have failed to show that the proposed class

meets the requirements for class certification under Rule 23.  Accordingly, their motion for class

certification should be denied.


Dated:  May 21, 2010
      New York, New York

                                     Respectfully submitted,

                                     WINSTON & STRAWN LLP

                                       /s/

*Of Counsel:*
                                     By:  Beth Tagliamonti

Margaret Maxwell Zagel
Tracy W. Berry
Kenneth Cunningham
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
Ph: 312-856-0001
Fax: 312-565-3473

                                     Beth A. Tagliamonti
                                     (btagliamonti@winston.com)
                                     Ruth A. Braun (rbraun@winston.com)
                                     WINSTON & STRAWN LLP
                                     200 Park Avenue
                                     Ph: 212-294-6700
                                     Fax: 212-294-4700

                                     Bruce R. Braun (bbraun@winston.com)
                                     Catherine W. Joyce (cjoyce@winston.com)
                                     Linda T. Coberly (lcoberly@winston.com)
                                     WINSTON & STRAWN LLP
                                     35 W. Wacker Drive
                                     Chicago, Illinois 60601
                                     Ph: 312-558-5600
                                     Fax: 312-558-5700

                                     *Attorneys for Grant Thornton LLP*

NY:1289646.1