**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
_____
                                   :
In re REFCO, INC. SECURITIES       :      07 MDL No. 1902 (JSR)
LITIGATION                         :
                                   :
                                   :
_____:
GEORGE L. MILLER, Chapter 7 Trustee :
for the Estate of Suffolk LLC,     :
                                   :
Plaintiff,                         :
                                   :
v.                                 :      REPORT AND RECOMMENDATION
                                   :      OF THE SPECIAL MASTER ON THE
PF SALECO LLC, GRYPHON             :      MOTION TO DISMISS THE AMENDED
        HOLDINGS II, LLLP, GRYPHON :      COMPLAINT
        HOLDINGS L.P., SMS         :
        SECURITIES AG, BRUCE       :
        RAUNER, CHARLES DILL,      :
        DONALD ROSENFELD,          :
        MICHAEL DONAHUE, B.        :
        DOUGLAS MORRISS, JOHN S.   :
        WEHRLE, HF INVESTMENTS AG,:
        AND PF REPRESENTATIVES LLC:      09-cv-02866-JSR
TERENCE WILLIAMS                   :      09-cv-02867-JSR
WARNE WORLDWIDE                    :      09-cv-02868-JSR
BRERA CAPITAL PARTNERS, LLC        :      09-cv-02870-JSR
ADAM N. LYLE                       :      09-cv-02871-JSR
ALLENE CHUNG                       :      09-cv-02872-JSR
ANDREW B. DOUGLASS                 :      09-cv-02873-JSR
ANDRE PEROLD                       :      09-cv-02874-JSR
ANDREW MOLLOY                      :      09-cv-02875-JSR
BRADD KATA                         :      09-cv-02876-JSR
CAROLE SCHEIDT NYSTROM, TTE        :      09-cv-02877-JSR
MILESTONE VENTURE PARTNERS         :      09-cv-02878-JSR
CHARLES B. HINTZ                   :      09-cv-02879-JSR
CHRISTIAN FABER                    :          09-cv-02880-JSR
CHRISTOPHER ROSE                   :      09-cv-02881-JSR
CHRISTOPHER SUAN                   :      09-cv-02882-JSR
CHRISTOPHER WELCH                  :      09-cv-02883-JSR
CONNIE HSU                         :      09-cv-02884-JSR
CSFB, A/K/A CREDIT SUISSE FIRST    :
        BOSTON NEXT FUND, INC.     :      09-cv-02885 JSR
DANIEL LEHMANN                     :      09-cv-02886-JSR
```

| | | |
|---|---|---|
| DAVID CODY | : | 09-cv-02887-JSR |
| THE SUAN FAMILY IRREVOCABLE | : | |
|     CHILDREN'S TRUST | : | 09-cv-02888-JSR |
| CAPGEMINI U.S., LLC | : | 09-cv-02889-JSR |
| DAVID DONNINI | : | 09-cv-02890-JSR |
| DAVID SALLE | : | 09-cv-02891-JSR |
| DIEGO WINEGARDNER | : | 09-cv-02892-JSR |
| DON MURPHY | : | 09-cv-02893-JSR |
| EDGAR D. JR. JANNOTTA | : | 09-cv-02894-JSR |
| EDWARD J. KATA | : | 09-cv-02895-JSR |
| EDWARD J. KATA AND | : | |
|     LORRAINE KATA | : | 09-cv-02896-JSR |
| MILESTONE VENTURE PARTNERS | : | 09-cv-02897-JSR |
| DONALD J. EDWARDS | : | 09-cv-02898-JSR |
| FREDERICK W. GLUCK | : | 09-cv-02899-JSR |
| FREDERICK W. GLUCK JR. | : | 09-cv-02900-JSR |
| GLENN KATA | : | 09-cv-02901-JSR |
| GREG PAPPAJOHN AND SUSAN | : | |
|     GLUCK | : | 09-cv-02902-JSR |
| GREG PAPPAJOHN | : | 09-cv-02903-JSR |
| GREGG KATA | : | 09-cv-02904-JSR |
| HARRY DAVID PRECHEUR | : | 09-cv-02905-JSR |
| HARRY SHAW | : | 09-cv-02906-JSR |
| HUGH ALLEN | : | 09-cv-02907-JSR |
| ILO LIU | : | 09-cv-02908-JSR |
| INNOVATION INVESTMENTS, LLC | : | 09-cv-02909-JSR |
| JAMES LYNCH | : | 09-cv-02910-JSR |
| JAMES MURRAY, III | : | 09-cv-02911-JSR |
| JAYME COLTER | : | 09-cv-02912-JSR |
| JEFFREY & JILL WEISS | : | 09-cv-02913-JSR |
| JENNIFER KNIGHT | : | 09-cv-02914-JSR |
| JOEL PRESS | : | 09-cv-02915-JSR |
| JOHN E.KORETZ | : | 09-cv-02916-JSR |
| JOSHUA MAILMAN | : | 09-cv-02917-JSR |
| TRUST UAD 12/29/86 FBO | : | |
|     TARAN J. DAVIS | : | 09-cv-02918-JSR |
| KINGDON ASSOCIATES, KINGDON | : | |
|     PARTNERS, M. KINGDON | : | |
|     OFFSHORE NV, KINGDON | : | |
|     FAMILY PARTNERSHIP | : | 09-cv-02919-JSR |
| LAB MORGAN CORPORATION | : | 09-cv-02920-JSR |
| LISA GLUCK | : | 09-cv-02921-JSR |
| ML IBK POSITIONS, INC. | : | 09-cv-02922-JSR |
| MURRAY CAPITAL | : | 09-cv-02923-JSR |
| NICOLAS J.WILLIAMS | : | 09-cv-02924-JSR |
| ODS HOLDINGS, LTD. | : | 09-cv-02925-JSR |

| | | |
|---|---|---|
| PHILIP A.CANFIELD | : | 09-cv-02926-JSR |
| PROFIT-SHARING PLAN | : | |
|     FBO SUZANNE LEHMANN | : | 09-cv-02927-JSR |
| RANDALL YANKER TTEE | : | 09-cv-02928-JSR |
| RANDALL YANKER | : | 09-cv-02929-JSR |
| ROBERT HILL | : | 09-cv-02930-JSR |
| ROBERT SUAN | : | 09-cv-02931-JSR |
| RODNEY YANKER | : | 09-cv-02932-JSR |
| RONALD W. FARMER | : | 09-cv-02933-JSR |
| SCOTT KATA | : | 09-cv-02934-JSR |
| STEPHEN FREIDHEIM | : | 09-cv-02935-JSR |
| STEVE SHULMAN | : | 09-cv-02936 JSR |
| SUSAN HAERY STAISIL | : | 09-cv-02937-JSR |
| TARAN J. DAVIES | : | 09-cv-02938-JSR |
| CALPURNIA CAPITAL | : | |
|     PARTNERS, L.L.C. | : | 09-cv-02939-JSR |
| CHRISTOPHER SUGRUE | : | 09-cv-02940-JSR |
| CLIFF DESOUZZA | : | 09-cv-02941-JSR |
| ULF HJELM | : | 09-cv-02942-JSR |
| KOCH VENTURES, INC. | : | 09-cv-02943-GEL |
| PEACHTREE EQUITY PARTNERS, L.P. | : | 09-cv-02944-JSR |
| TODD KATA | : | 09-cv-02945-JSR |
| VINCENT J. HEMMER | : | 09-cv-02946-JSR |
| WALTER NOEL, JR | : | 09-cv-02947-JSR |
| WILLIAM KESSINGER | : | 09-cv-02948-JSR |
| CAMERON HIGHLANDS | : | 09-cv-02949-JSR |
| CAPITAL STRUCTURE ARBITRAGE | : | 09-cv-02950-JSR |
| DAVID BROWN | : | 09-cv-02951-JSR |
| EXCOLATOR | : | 09-cv-02952-JSR |
| GAD CORP. | : | 09-cv-02953-JSR |
| GREENVIEW INVESTMENTS, INC. | : | 09-cv-02954-JSR |
| HATEM EL NASER | : | 09-cv-02955-JSR |
| KENNETH SHEN | : | 09-cv-02956-JSR |
| SENECA, INC. | : | 09-cv-02957-JSR |
| SUMMERLAND LTD. | : | 09-cv-02958-JSR |
| | : | |
| Defendants. | : | |

_____:

Daniel J. Capra, Special Master

    This is a report and recommendation to Hon. Jed S. Rakoff concerning motions brought by

the Defendants to dismiss the Amended Complaint filed against each by George Miller as Trustee for the Estate of Suffolk LLC ("Suffolk").  The Amended Complaint ("AC") seeks to avoid allegedly fraudulent transfers of cash made to the  Defendants in exchange for shares of PlusFunds Group, Inc. ("PlusFunds"). According to the Amended Complaint the PlusFunds shares were worth far less than the amount paid by Suffolk for those shares. See, e.g., AC ¶ 44. The purchase of the PlusFunds shares was funded by a loan made to Suffolk by Refco Capital LLC . AC ¶ 36.[1]

## I. Background — The Initial Complaint in this Action

The initial complaint in this action contained four counts:[2]

• Count I alleged a constructive fraudulent transfer and sought avoidance under Sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

• Count II alleged actual fraudulent transfer and sought avoidance under Sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

• Count III sought avoidance under  Section 544(b) of the Bankruptcy Code and New York Debtor Creditor Law §270 et. seq.

• Count IV sought recovery for unjust enrichment.

In a Report and Recommendation dated November 13, 2009 (the "prior Report and Recommendation"), the Special Master recommended that Counts I, III and IV be dismissed with prejudice, and that Count II, for actual fraudulent transfer, be dismissed with leave to amend. In an order dated January 11, 2010, Judge Rakoff, after de novo review, stated that he was in "complete agreement" with the Special Master and adopted the Report and Recommendation in full. Familiarity with the prior Report and Recommendation, and the factual background set forth therein, is assumed.[3]

---

[1] The facts surrounding the fall of Refco have been recounted in a number of opinions by Judge Lynch as well as in a number of R and R's by the Special Master.  See, e.g., *Kirschner v. Grant Thornton,* 2009 WL 996417 (S.D.N.Y.).  To the extent necessary for background on the instant motions, familiarity with the financial schemes of Refco is presumed.

[2] The initial complaint was served against the defendants here in a large number of individual and essentially identical actions. The actions have at this point been consolidated for ease of administration.

[3] All shorthand terms used in the prior Report and Recommendation — e.g., "Refco", "SPhinX" etc. — are incorporated herein by reference.

In recommending leave to amend the actual fraudulent transfer Count, the Special Master stated that  the Plaintiff should fortify the Complaint in three respects:

> • the Plaintiff needed to provide more in the Complaint to raise a plausible inference that a legitimate creditor exists to confer standing on the Trustee;
>
> • the Plaintiff needed to provide more information about the purchase of the PlusFunds shares, the operation of the Credit Agreement, and the working relationship between Refco and Suffolk to establish that the funds were controlled by Suffolk and so became property of the Suffolk Estate; and
>
> • the Plaintiff should provide more explicit and specific factual assertions concerning the Suffolk transactions — defined as the entire scheme, from obtaining the loans from Refco to the purchase of PlusFunds shares —  to create a stronger inference that Suffolk had the intent to defraud a creditor.

In his order, Judge Rakoff provided the following comment on the Plaintiff's fraudulent conveyance claim:

> The Court adds only that, while a significant argument might have been made that Count II should also have been dismissed with prejudice, defendants, in response to plaintiff's objections, expressly disclaimed any objections to the Special Master's recommendation in this regard * * * .

## II. New Allegations in the Amended Complaint

One of the problems with the original Complaint was that it made no attempt to explain *why* Refco would loan money to Suffolk to purchase the shares of PlusFunds at an inflated price. The Complaint simply described the transactions that led to the purchase of the PlusFunds shares, and averred that the benefit inured to the allegedly corrupt Suffolk insiders, Christopher Sugrue, Mark Kavanagh, and Brian Owens. The Amended Complaint adds new allegations in an attempt to explain why Refco would fund the Suffolk loans.[4] Specifically, the Amended Complaint alleges that Sugrue became aware of the fraud that was being perpetrated by Phillip Bennett, the CEO of one or more of the Refco companies. (AC ¶ 1). Sugrue, Owens and Kavanagh essentially blackmailed Bennett by requiring him to use Refco funds to buy the outstanding shares of PlusFunds for the benefit of Suffolk. (AC ¶34). The Plaintiff now contends that there was no business purpose for Refco loaning the money to Suffolk — the only purpose was to buy the silence of Sugrue, Owens and Kavanagh.

---

[4] The Amended Complaint contains some other new allegations as well, and they will be discussed where pertinent to the legal analysis in Part III, below.

The new allegations have to be analyzed in the context of the Suffolk loans.[5] Suffolk and its related entities received four loans from Refco. The Phase I loan — in the amount of $158 million from Refco Capital to Suffolk — was used to purchase outstanding shares of PlusFunds, at inflated prices, from the Defendants herein. AC ¶¶ 57-59. The remaining loans, referred to as the Phase II loans, were not used for the PlusFunds tender offer. Rather, these funds — in the amount of about $43 million — were "diverted to the Suffolk Insiders, or to third parties for the benefit of the Suffolk Insiders." AC ¶60.

The remainder of this Report and Recommendation will determine whether the new allegations about coercing Bennett to use Refco assets to fund the Suffolk loans — called hereafter "the blackmail scenario"— are sufficient to shore up the deficiencies found in the original Complaint. In making this assessment, it should be noted at the outset that the allegations surrounding the Phase II loans are of little if any assistance to the Plaintiff. By the terms of the Amended Complaint, the monies from the Phase II loans went to Sugrue, Owens and Kavanagh to buy their silence. The Suffolk Insiders are not defendants in this action.[6] In this action, the Plaintiff needs to show not that the Phase II disbursements were fraudulent, but that the Phase I disbursements were.

## III. Pleading Requirements for the Fraudulent Conveyance Claim

The Plaintiff seeks relief under Section 548(a)(1)(A) of the Bankruptcy Code, which provides in pertinent part as follows:

(a)(1)  The trustee may avoid any transfer * * * of an interest of the debtor in property * * * that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer * * * with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

---

[5] The Special Master received a request to file an amicus brief from counsel for Owens and Kavanagh. The request contained an assertion that the parties had consented to the filing. The amicus brief turned out to be a disputation of many of the factual assertions in the Amended Complaint — especially the allegations regarding 1) the blackmail scenario and 2) the value of PlusFunds shares. The Plaintiff objected to the Special Master's consideration of the submission by Owens and Kavanagh, arguing among other things that its factual contentions were not properly considered on a motion to dismiss. In preparing this Report  and Recommendation, the Special Master did not rely on any of the assertions in the Owens and Kavanagh brief.

[6] Owens and Kavanagh settled with the Suffolk Estate, and two default judgments have been entered by the Delaware Bankruptcy Court against Sugrue. AC at 16, n.5.

In order to survive a motion to dismiss,  the Plaintiff must adequately plead the following:

1. There is *a  legitimate creditor* of the Estate who would benefit from the claim.

2. The transferred funds must have been property of Suffolk's Estate — put another way, Suffolk cannot have been a *mere conduit* for Refco's purchase of PlusFunds shares.

3. The purchase of PlusFunds must have been done with *the intent to defraud a creditor*.

Each of these requirements will be discussed in turn.[7]

### A. Legitimate Creditor

The Plaintiff must have standing to bring the avoidance claims in this case. The Second Circuit has stated that a bankruptcy trustee's standing

> coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own.

*Shearson Lehman Hutton Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir. 1991). A bankruptcy trustee has the burden of establishing his standing. *Young v. Paramount Commc'ns, Inc. (In re Wingspread Corp.),* 178 B.R. 938, 945 (Bankr.S.D.N.Y.1995).

The avoidance power of a trustee depends on whether there is a legitimate creditor to take advantage of the recovery.  See 11 U.S.C. § 544(b)(1) ("the trustee may avoid any transfer of an interest of the debtor in property * * * that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title"). "[I]t is well settled in the Second Circuit, that avoiding powers may be exercised by a debtor in possession only for the benefit of creditors, and not for the benefit of the debtor itself." *In re Liggett*, 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990).[8] "In order for a trustee to maintain an action for avoidance of a fraudulent

---

[7] The legal standards for a motion to dismiss were set forth in the prior Report and Recommendation and are incorporated herein by reference.

[8] When a trustee establishes the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer "not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate."*Silverman v. Sound Around, Inc. (In re Allou Distribs.)*, 392 B.R. 24 (Bankr. E.D.N.Y. 2008). The amount of the triggering creditor's interest is

conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law." *In re Wingspread Corp.*, supra, 178 B.R. at 945. While the Plaintiff is not required to identify specifically the triggering creditor, *In re Leonard,* 125 F.3d 543, 544 (7th Cir. 1997), the Plaintiff must provide facts from which it can be plausibly concluded that there is at least one legitimate creditor of the estate.

In the previous Report and Recommendation, the Special Master rejected the Plaintiff's contention that he had adequately pled the existence of a legitimate creditor. This section considers whether any of the Plaintiff's new allegations cure that inadequacy. The candidates for triggering creditor are: 1) Refco; 2) SPhinX/PlusFunds; and 3) the Internal Revenue Service, which filed a claim against the Estate shortly after the original Complaint was dismissed.

### *1. Proper Forum*

At the outset, the Plaintiff argues that this court "is not the appropriate venue for the determination of whether or not Refco or any of the other creditors of Suffolk, alleged in the Amended Complaint, is a legitimate creditor." According to the Plaintiff, the determination of the validity of a claim against the Estate is *exclusively* the province of the Bankruptcy Court. The Plaintiff notes that Refco, the I.R.S. and the trustees for the Estates of SPhinX and PlusFunds have filed proofs of claim in the Suffolk Bankruptcy Case, and that the Delaware Bankruptcy Court "has yet to determine whether these claims will be allowed or disallowed."[9]

The Plaintiff's argument that the validity of a claim can only be determined in the Bankruptcy Court must be rejected for at least five reasons:

    1. As stated above, the Trustee's *standing* is dependent on the existence of a legitimate creditor. And it is axiomatic that a federal court has jurisdiction to determine its own standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992).

    2. Plaintiff cites no case law for the proposition that the Bankruptcy Court has

---

irrelevant.  COLLIER ON BANKRUPTCY  ¶ 544.09[5] (16th ed. rev. 2010) (a single triggering creditor provides a trustee with standing, and that standing is "not dependent at all upon the size of that creditor's claim against the debtor" because "an entire transfer can be set aside even though the creditor's claim is nominal.").


[9] Plaintiff's Memorandum in Opposition to the Motion to Dismiss at 15-16. The implication that the Bankruptcy Court is actually going to determine the validity of claims by Refco, SPhinX, the I.R.S. et al is belied by the Plaintiff's assertion in the Amended Complaint that the Suffolk Bankruptcy Case "is in its closing stages" and that the primary action remaining relates to collecting on the default judgments entered against Sugrue. AC ¶15.

*exclusive* jurisdiction to determine the validity of a claim against the estate. Each of the cases cited in its brief stands for the unremarkable proposition that Bankruptcy Courts have jurisdiction to determine such claims. None stand for the proposition that the jurisdiction is exclusive. *Rudd v. Laughlin*, 866 F.2d 1040 (8th Cir. 1989), cited by the Plaintiff for the proposition that Bankruptcy courts have jurisdiction to review claim validity, does not hold that there is exclusive jurisdiction. It simply holds that the Bankruptcy Court had jurisdiction to convert a chapter 13 to a chapter 7 case. *In re Mark Jay Kaufman,* 78 B.R. 309, 311 (Bankr. N.D. Fla. 1987), says nothing about exclusivity. In the context of a motion to lift a stay to allow a suit in *state* court, the court stated: "This Court has the 'jurisdiction', 'authority', and 'power' to hear proceedings as to allowance or disallowance of all claims. Title 28 U.S.C. § 157(a)." Significantly, the Court went on to say that it had "discretion to exercise this power or not" and ended up holding that it had no power to conduct a jury trial of a tortious interference claim, and therefore lifted the automatic stay. Finally, *In re Tesmetges*, 87 B.R. 263 (Bkrtcy. E.D.N.Y.,1988), simply says that the bankruptcy court has jurisdiction to rule on the validity of claims against the estate. It doesn't say it is exclusive.

3. The relevant statutory language belies any notion that the Bankruptcy Court has exclusive jurisdiction to decide whether a purported creditor has a valid claim.  28 U.S.C §157(a) provides that each district court "*may* provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C.§157(b)(1) provides that Bankruptcy judges "*may* hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." Nothing in the statute grants exclusive jurisdiction to the Bankruptcy Courts.

4. The Plaintiff's proposition is unworkable. It would mean that this Court would have to assume it had standing based on the filing of a claim in the bankruptcy proceeding, but then would face the possibility of losing standing midway in its proceedings if the Bankruptcy Court ended up denying the claim. Moreover, the Defendants would suffer the inconvenience of having to pursue their defense in two separate litigations — seeking to intervene in the Bankruptcy Court to contest the existence of a creditor, while pursuing other defenses in the district court. That makes no sense — especially as it is the Plaintiff who sought relief in this court in the first place, arguing that it did *not* belong in the Bankruptcy Court . See AC ¶¶ 13-15.[10]

5. Finally, the case law indicates that federal courts do in fact dismiss fraudulent transfer claims based on their own assessment of whether there is a legitimate creditor. *See,*

---

[10] It should also be noted that in arguing against the motion to dismiss the original complaint, the Plaintiff made no contention that the court lacked jurisdiction to determine whether a valid creditor would benefit from this action. Indeed the Plaintiff spent a significant part of its brief arguing the issue of creditor validity to the court.

*e.g., Adelphia Recovery Trust v. Bank of America N.A.,* 390 B.R. 80, 94-95 (S.D.N.Y. 2008) (dismissing fraudulent conveyance claims where no legitimate creditor would be benefitted by the claim) (citing Second Circuit case law).

The Plaintiff relies on *Silverman v. Sound Around, Inc., (In re Allou Distributors, Inc.),* 392 B.R. 24, 30 (Bkrtcy., E.D.N.Y. 2008), in which the court stated the following:

> Thus, a creditor that files proof of an unsecured claim that is not objected to is deemed to have an allowed claim under Section 502 and may qualify as a triggering creditor who "hold[s] an unsecured claim that is allowable under section 502 of this title" in accordance with Section 544. 11 U.S.C. § 544(b)(1).

That passage does not lead to the conclusion that the mere filing of a claim in the bankruptcy proceeding automatically establishes the trustee's standing to pursue a fraudulent conveyance action. First, the *Silverman* court was not presented with any question about the validity of a claim on the merits, but only about its timing. Second, the court simply says that a claim that "is not objected to" "may qualify." It doesn't say that the contest over the validity of a creditor's claim must be made in bankruptcy court, and it doesn't even say that an objection is necessary. Indeed, the *Silverman* court's extensive discussion of the standing requirement (before the quoted passage) would have been unnecessary if standing could be automatically established by the simple expedient of having some party, any party, file a claim in a bankruptcy proceeding.

For all these reasons, the argument that this court is not a proper forum for determining the existence of a valid creditor should be rejected. This Report and Recommendation now proceeds to evaluate whether the Plaintiff has adequately pled the existence of a legitimate creditor who would benefit from the avoidance action.

### 2. Refco as a Legitimate Creditor

In the prior Report and Recommendation, the Special Master found that "Refco is not a legitimate creditor because it was an active party to the fraud alleged in the complaint." Like the original Complaint, the Amended Complaint indicates that the participation in the Suffolk transactions from Refco's side was fraudulent. See, e.g., ¶ 32 (conversion of assets and hiding an intercompany receivable led to the need to fund the Suffolk transactions); ¶ 35 (using a fake loan so that the fraudulent scheme would not implicate disclosure requirements); ¶ 36 (describing fake loans to purchase shares at inflated prices and to pay off Suffolk Insiders); ¶ 41 (awareness of fraud at Refco led to the Suffolk "'loans'").

The Plaintiff does not seek to reargue the prior determination that there was fraud on Refco's side of the transaction, nor could he, given Judge Rakoff's adoption of the prior Report and Recommendation, and the Plaintiff's own extensive allegations in the Amended Complaint to that effect. Rather, the Plaintiff now attempts to distinguish Refco-the-entity from Bennett, the target of the blackmailing effort. In the Plaintiff's view, the fraudster on the Refco side of the transaction was

not Refco but rather Bennett. Under this theory, Bennett benefitted from the Suffolk transactions because they allowed him to prevent the public disclosure of his wrongdoing at Refco — but Refco was a victim because it ended up extending millions of dollars to a thinly capitalized, single purpose entity, for the purchase of shares at wildly inflated prices.

The Plaintiff cites no legal authority for its proposition that the acts of Bennett, the CEO, can be separated from the Refco entity. Such a sweeping proposition is contrary to elementary principles of corporate and agency law. See Restatement of Agency Third §2.04 ("An employer is subject to liability for torts committed by employees while acting in the scope of their employment."); §6.01 (when agent enters into contract with a disclosed principal, the principal and the third party are parties to the contract); §7.03 (principal liable for agent acting within the scope of employment). If the Plaintiff is right, then all of the claims against Refco in this MDL should be immediately dismissed because "Refco" did nothing wrong — Bennett and the other bad guys did. Obviously such a notion is unsupported in the law.

The Plaintiff attempts to distinguish Bennett's frauds that have been properly held attributable to Refco in other actions in this MDL, such as the Private Action Trust case. He argues that those are actions concerning frauds from which Refco-the-entity benefitted, whereas there was no benefit to Refco from the Suffolk transactions. The proposition is that if a corporate agent's acts do not benefit the corporation, then they should not count against the corporate entity. But the Plaintiff's attempt to separate Bennett from Refco on this account is fatally flawed for at least two reasons.

First and most importantly, under the Plaintiff's own allegations, Refco *did* benefit from the Suffolk transactions, in at least two ways:

a) funding the Suffolk transactions allowed Bennett to keep a lid on the fraud at Refco, thus allowing *Refco* to continue as a going concern. Under the terms of the Amended Complaint, if Refco had not funded the Suffolk loans, the Refco fraud would have been made public and the Refco house of cards would have collapsed (as it did later when the fraud *was* made public). Certainly there is corporate benefit in corporate self-preservation.

b) funding the Suffolk transactions allowed Refco to continue to use the millions of dollars of  SPhinX assets that were managed by PlusFunds and held at RCM. AC ¶¶24, 28, 30-32.

Second, it cannot be the law that corporations are absolved of responsibility whenever an agent's acts end up harming the corporate bottom line. If that were so, no suit against Enron or Worldcom could ever have been brought against the entity.[11]

---

[11] The argument would also prove too much for the Plaintiff with respect to other arguments addressed in this Report and Recommendation. For example, the Plaintiff argues that *Suffolk* controlled the funds used for the PlusFunds shares and so was not a conduit. But the disbursements of funds were authorized by wrongdoing PlusFunds Insiders for their own benefit.

Accordingly, the Plaintiff's unsupported argument that Bennett's acts cannot be attributed to Refco must be rejected. And therefore, the following conclusion from the prior Report and Recommendation applies in equal measure to the Amended Complaint:

> Given the reasonable inferences to be drawn from the Plaintiff's own Complaint, it would be wasteful and it would blink reality to allow the action to proceed on the ground that the Plaintiff might be able to prove that Refco is a legitimate creditor of the Suffolk Estate that had nothing to do with the purchase of PlusFunds shares. Therefore, Refco cannot be the triggering creditor, because it was a material participant in the alleged fraudulent transaction. *See HSBC Bank USA, N.A. v. Adelphia Communications Corp.,* 2009 WL 385474, at *6-7 (W.D.N.Y.) (fraudulent transfers not voidable where the benefit would run to a creditor that ratified the transfer).

### 3. SPhinX and PlusFunds

Nothing in the Amended Complaint purports to explain the basis for the claims of SPhinX or PlusFunds as a legitimate creditor of the Suffolk Estate.[12] The Amended Complaint simply states that claims have been filed on their behalf by a trustee and JOLs respectively.

As stated in the earlier Report and Recommendation:

> The mere filing of a claim cannot be enough to establish a legitimate triggering creditor. If that were so, then even claimants who ratified the transfer sought to be avoided, or who were prime actors in the fraud and so could never obtain a remedy, could be deemed triggering creditors providing standing for the Trustee. That is not the law. *Smith v. Am. Founders Fin. Corp.,* 365 B.R. 647, 659 (S.D.Tex. 2007) ("If the creditor is estopped or barred from recovery, so is the trustee.").

The earlier Report and Recommendation invited the Plaintiff to "plead facts indicating that

---

If the Insiders' acts are not attributable to Suffolk, then Suffolk was never in control of those funds and therefore the funds were never property of the Suffolk Estate. The Plaintiff cannot have it both ways.

[12] Paragraph 162 of the Amended Complaint indicates that the SPhinX Trust Liquidating Trustee and the JOLs of SPhinX Managed Future Fund SPC have each filed proofs of claim in the Suffolk Bankruptcy proceeding. The Special Master's experience with other aspects of this MDL indicates that one of those parties might possibly be pursuing a claim on behalf of PlusFunds as well as or instead of SPhinX – the Amended Complaint does not make this point clear. So in an excess of caution, the Report and Recommendation addresses whether PlusFunds is a legitimate creditor. As will be seen below in text, the Plaintiff has not adequately alleged that either SPhinX or PlusFunds is a legitimate creditor in this case.

SPhinX was a victim of fraud with a legitimate claim against the Suffolk Estate." The Plaintiff did not accept the invitation. The Plaintiff's argument that SPhinX and/or PlusFunds are legitimate triggering creditors should therefore be rejected.[13]

### 4. Internal Revenue Service

After the original Complaint in this action was dismissed for, among other things, not sufficiently alleging the existence of a valid triggering creditor, the Internal Revenue Service filed a proof of claim in the Suffolk Bankruptcy proceeding. The Defendants do not contest the fact that the proof of claim was timely filed. *See* 11 U.S.C. § 726(a)(1) (providing that tardily filed *priority* claims will be paid out if "filed on or before the earlier of– (A) the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or (B) the date on which the trustee commences final distribution under this section"). But the Defendants do argue that the I.R.S. claim is simply a placeholder — on its face an unassessed claim for potential tax liability — and that in fact it is not a valid claim because Suffolk has no tax liability. *See* Internal Revenue Service Manual § 25.17.6.8 (unassessed proof of claim is intended to protect the government's interest in case any liability is ultimately determined).

As with the claims of SPhinX and PlusFunds, the Plaintiff makes no attempt to allege any facts that would allow an assessment of the validity of the I.R.S. proof of claim. That failure is enough on its own to find that the Plaintiff cannot rely on the I.R.S. as a triggering creditor. But even if that were not enough, the claim that there is a real debt owed to the I.R.S. is just not plausible under *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  By the terms of the Amended Complaint, Suffolk and its related entities had no business,  "no employees or activities, and were thinly capitalized (if at all)." AC ¶56. Suffolk "had no assets of its own" and the only transactions that Suffolk ever did created no benefit and rendered the Suffolk entities insolvent. AC ¶ 154. Suffolk was left with nothing but worthless shares of PlusFunds. AC ¶ 155.

Given this bleak picture, even the government would not be able to find anything at Suffolk to tax. Because there is no factual allegation that there is or ever was anything of value to tax at

---

[13] It should also be noted that on the merits it is quite unlikely that any claim brought by SPhinX or PlusFunds against Suffolk could have any merit under the terms of the Amended Complaint. According to the Amended Complaint, the shares of PlusFunds were worthless (or nearly so) but that was an independent fact —  not because of any wrongdoing by Suffolk. So PlusFunds cannot allege any harm from Suffolk under the Plaintiff's theory.  As to SPhinX, the claim would have to be that its own money (through RCM) was used to purchase essentially worthless PlusFunds shares. But SPhinX would be estopped from making such a contention, given its 1358- paragraphs-long Amended Complaint in *Krys v. Sugrue* in which it alleges throughout that PlusFunds was a going concern with a business enterprise value of hundreds of millions of dollars. Firsenbaum Decl. Ex. H. at 349:24.

Suffolk, the I.R.S. cannot be considered a debtor with a valid, triggering claim. The Plaintiff's counsel conceded as much at oral argument:

PROF CAPRA: Why would Suffolk owe any taxes at all?

MR. ROSS: I don't know whether they had any income or not for that quarter.

PROF. CAPRA: I think the complaint pretty much says they had no income. Actually it definitely says they had no income.

MR. ROSS: Well I'm sure that's true. But you know, we've got SPhinX, we've got Refco.

Because the Plaintiff has not alleged that Suffolk had anything to tax, the placeholder claim filed by the I.R.S. does not suffice to establish a legitimate triggering creditor.


### 5. Conclusion on the Existence of a Legitimate Creditor

The Plaintiff has once again failed to plead that there is a legitimate creditor of the Suffolk Estate that would benefit from the fraudulent conveyance claim. Consequently, the Plaintiff lacks standing to pursue the claim and Count II of the Amended Complaint should be dismissed.

The remaining question is whether the dismissal should be *with prejudice*. The Plaintiff has had a second opportunity — after a Report and Recommendation that detailed the defects in the previous Complaint on this subject — and has failed to establish standing. Moreover, it appears that nothing could be added to the pleading that would a) allow the court to divorce Bennett's actions from Refco; b) change SPhinX's claims in its own actions; or c) uncover something for the I.R.S. to tax.  Therefore the Special Master recommends that Count II be dismissed *with prejudice* for lack of standing.

---

On the possibility that the Court could disagree with the above recommendation, this Report and Recommendation will proceed to the other grounds for dismissal asserted by the Defendants.


### B. Suffolk as a Conduit for the Purchase of the PlusFunds Shares.

Even if there is a triggering creditor, the purchase of PlusFunds shares cannot be avoided unless it involved *property of the estate*.  See Section 548(a) (the trustee "may avoid any transfer * * * of an interest of the debtor in property ***.").  Courts have determined that an asset is property of the estate when the debtor had "control" over that property. *See Kapila v. Espirito Santo*

*Bank (In re Bankest Capital Corp.),* 374 B.R. 333, 338 (Bankr. S.D.Fla. 2007) ("The dispositive question is whether the Debtor had control over the subject funds."). Determining "control" requires courts "to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1199 (11th Cir.1988). "Control" has two components:

> first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

*In re Safe-T-Brake of South Florida, Inc.,* 162 B.R. 359, 365 (Bankr.S.D.Fla.1993).

As they did before, the Defendants argue that the transactions for PlusFunds shares did not involve property of Suffolk, because Suffolk was nothing but a conduit for the transaction between Refco and the owners of the PlusFunds shares. They note that under the terms of the Credit Agreement between Refco and Suffolk, Suffolk was permitted to use the proceeds of the Refco loan for only one purpose—to purchase PlusFunds shares.[14]  The Credit Agreement further provides that Suffolk could not engage in "any business activity other than the Transactions" to obtain the PlusFunds shares. Credit Agreement §7.2.1.  Thus, Suffolk was essentially prohibited from doing any business other than buying the PlusFunds shares with the loan given by Refco. Id. §§ 7.2.1-11. The Defendants also note that the funds from Refco were never in Suffolk's custody. Rather, the funds went from Refco to an escrow account at the Bank of New York; it could not be distributed from the escrow account unless BONY received joint written instructions from Refco and Suffolk. Id. §§ 2.3, 5.1.5, 5.1.8, 5.2.4.

The prior Report and Recommendation concluded that the structure of the transactions "make Suffolk look like a paper intermediary." It rejected the Plaintiff's argument that Suffolk had control because it still has custody of the PlusFunds shares, because "by the Plaintiff's own admission, the shares are worthless. Custody over worthless pieces of paper says little or nothing about whether the custodian had control over the transaction." But it also recognized that the allegation that the purchases rendered Suffolk insolvent "is not the ordinary consequence one would expect from a debtor that acted solely as a pass-through." The prior Report and Recommendation also recognized that the Credit Agreement "cuts both ways" because while it ceded many functions to Refco, it also required that the funds could not be disbursed unless *both* Suffolk and Refco signed off on the transaction. Thus the Credit Agreement indicates that Suffolk at least had *some* control over the transaction. The prior Report and Recommendation concluded that because the fraudulent conveyance count needed repleading on the legitimate creditor question, "it makes sense to require repleading as well on the question of whether Suffolk had control over the assets that are the subject of the avoidance claim."

---

[14] See §7.1.6 of the Credit Agreement, Firsenbaum Decl. Ex. B. As discussed in the prior Report and Recommendation, the Credit agreement is referenced in the Plaintiff's complaint and may be considered on these motions to dismiss.

The blackmail scenario alleged in the Amended Complaint lends credence to the Plaintiff's position that Suffolk had the necessary control over the funds used to purchase PlusFunds shares. Assuming the truth of those allegations, the Suffolk Insiders coerced Bennett to engage in the transaction. It is certainly plausible to infer that if they coerced Bennett to extend the loans, they also coerced Bennett to order, on Refco's end, the disbursement of funds pursuant to the Credit Agreement. See AC ¶ 36 (averring that the Suffolk Insiders coerced Bennett to agree that PlusFunds would use the funds to execute a tender offer); AC ¶ 43 (Suffolk Insiders coerced Bennett into agreeing to the transactions for purchase of PlusFunds shares). AC ¶ 49 (as a result of the extortion, "Bennett directed Refco Capital to loan monies to Suffolk to purchase the PlusFunds Shares"); AC ¶¶ 74-77 (all instructions to release funds from the escrow account were signed on the Refco side by Bennett). Thus, while both parties had to approve the disposition, the Amended Complaint, fairly read, sufficiently alleges that the Suffolk Insiders controlled the decisions of both of the relevant parties.

The control cases require the court to evaluate a transaction in its entirety. *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1199 (11th Cir.1988). Part of the "entirety" of the transaction alleged in the Amended Complaint is that the Suffolk Insiders controlled Bennett, who controlled the disbursement of funds on the Refco side. Thus the Plaintiff in the Amended Complaint has sufficiently pled that Suffolk had control over the funds used to purchase the PlusFunds shares from the Defendants. Because of their power over Bennett, the Suffolk Insiders had "first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party." *In re Safe-T-Brake of South Florida, Inc.,* 162 B.R. 359, 365 (Bankr.S.D.Fla.1993).

The Defendants, as stated above, rely in part on the fact that the actual cash used to purchase the PlusFunds shares was never in Suffolk's possession. But that fact cannot be dispositive, when the allegations can plausibly be read to state that Suffolk had the power (actual on the Suffolk side and de facto on the Refco side) to direct the disbursement of the funds at BONY. *Compare In re Scanlon*, 239 F.3d 1195 (11th Cir.2001) (funds in an escrow account were not property of the estate where the debtor could not direct who would receive the funds). A contrary result would mean that a bankruptcy trustee would not be able to avoid transactions where money was stolen out of the debtor's bank account. The Defendants cite no case holding that the debtor must have actual physical custody of property in order to control it. Such a holding would be inconsistent with the basic proposition that control is a functional test that looks at the entire transaction.

### *Conclusion on Suffolk as Conduit*

The Plaintiff has sufficiently alleged that the cash used to purchase PlusFunds shares was property of the Estate, i.e., that Suffolk had control over the assets and was not simply a conduit. Therefore, the Defendants' argument that Count II should be dismissed because PlusFunds acted only as a conduit should be rejected, and the Amended Complaint should not be dismissed on this ground.

### C. Was the Transaction Fraudulent?

The prior Report and Recommendation questioned whether the Plaintiff pled fraud with the particularity required by Fed. R. Civ. P. 9(b). It found the allegations of fraud to be "spare" but found it unnecessary to determine whether the Complaint failed to meet the Rule 9(b) standards. The Amended Complaint, as discussed above, adds allegations that Bennett was blackmailed into funding, through Refco, the purchase of PlusFunds shares. Those additional allegations require a new assessment of the adequacy of the Plaintiff's allegations of fraud.

The Plaintiffs have clearly alleged fraud with respect to the Phase II loans and disbursements — the Defendants do not argue otherwise. There is no question that structuring payments allowing insiders to cash out, in order to buy their silence, is fraudulent. But as stated above, the fact that the Phase II loans were fraudulent transactions says little if anything about the Phase I loans.

It is not immediately evident that how the Phase I loans tie into the blackmail scenario. Why would paying inflated prices to the Defendants buy the silence of Sugrue, Kavanagh and Owens? One plausible scenario from the allegations is that Sugrue, Kavanagh and Owens wanted control of PlusFunds — so purchasing the shares for them through Phase I could plausibly considered to be part of the consideration  they extorted from Bennett for their silence. See AC ¶37 (the end result of the scheme was that the Suffolk Insiders would "own substantially all of the outstanding ownership interests in PlusFunds, and concomitantly, they would have full control over the PlusFunds assets under management — and the ability to direct where those funds were kept on deposit.").

But if the goal was to own the shares, why would the sale price have to be so much higher than the fair market value? A string of facts in the Amended Complaint leads to an explanation. First, Gabriel Bousbib, who was CEO and a member of the Board of PlusFunds, voiced his displeasure at how PlusFunds was run by Sugrue. See AC ¶ 68. Second, Bousbib (through entities) sold his shares at a price substantially above market value. Third, other insiders sold their shares at essentially the same inflated price. Fourth, the other Defendants sold their shares at essentially that price as well.   So the inference that can be drawn is that Sugrue, Owens and Kavanagh gave Bousbib and other insiders a premium so that they would keep quiet, and the other Defendants got the same premium because otherwise they would have been asking questions about why they didn't get the same sale price. That inference holds together as a plausible explanation for the Phase I loans and specifically why the sale price for the shares was so far above the market price (according to the allegations of the Amended Complaint).

What gives pause is why Sugrue, Kavanagh and Owens would go so far to obtain control of PlusFunds when, according to the Amended Complaint, the shares of PlusFunds were all but worthless. It is not implausible, however, that regardless of the share price, Sugrue, Kavanagh and Owens saw value in having control over the assets under management at PlusFunds, and so included the demand for a tender offer in the "extortion package" for Bennett. It is to be remembered that *Iqbal* and *Twombley* require only that the Plaintiff's theory of the case be plausible, not the most

probable of all alternatives. *See Arista Records LLC v. Doe 3,* 604 F.3d 110, 120-121 (2d Cir. 2010).

Beyond the inferences of fraud that can be derived from the way in which the transactions were structured as consistent with the blackmail scenario, the Plaintiff also argues that he has pleaded "badges of fraud" — circumstantial evidence from which fraud can plausibly be concluded. As set forth in *In re Le Cafe Creme, Ltd.*, 244 B.R. 221, 239 (Bankr.S.D.N.Y.,2000), the following factors have been found to be badges of fraud:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Other relevant (and frankly overlapping) indicia of fraud are: (i) a transfer for no consideration when the transferor and the transferee know of the claims of creditors and know that creditors cannot be paid and (ii) a vast discrepancy between the value of the property transferred and the consideration received for it. *Breeden v. Bennett (In re The Bennett Funding Group, Inc.),* 220 B.R. 743, 755 (Bankr.N.D.N.Y.1997). *See also In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (finding transfer of property to be fraudulent where it was made by a debtor to a family member while the debtor was insolvent; the family relationship and the debtor's financial condition of the debtor indicated badges of fraud).

The allegations in the Amended Complaint do raise some badges of fraud. First, the Defendants concede that the Plaintiffs have sufficiently alleged the first factor, inadequacy of consideration. The second factor — the close relationship among the parties — is not met with many of the Defendants in this action. But the allegation is that the Suffolk Insiders were paying for to shut up the PlusFunds Insiders — with whom they did have a close relationship — and the transactions with all of the other Defendants were a necessary part of covering up the fraudulent transactions with the PlusFunds Insiders; so the Plaintiff has sufficiently alleged the second badge of fraud. The third factor — continued use by the transferor — does not help the Plaintiff, because Suffolk did not retain any control over the money once it was disbursed to pay for the shares. The fourth factor — Suffolk's financial condition before and after the transaction — cuts in favor of the Plaintiff because the allegation is that the transfers rendered Suffolk insolvent. The fifth factor — the cumulative effect of a series of transactions — cuts in favor of the Plaintiff, who alleges that all of the purchases were necessary to accommodate the Suffolk Insiders' goal of obtaining control of PlusFunds. The sixth factor, timing and chronology, largely overlaps the fifth, and at any rate cuts in favor of the Plaintiff, as the Plaintiff alleges a progression of events from the blackmail, to the creation of Suffolk, to the Credit Agreement, to the loans, to the purchases of stock — all with the

18

overarching goal of benefitting Sugrue, Kavanagh and Owens.[15]

There is no magic number of badges that must be found before an inference of fraud can be derived.[16] But the Special Master concludes that the badges of fraud alleged in this case, together with the inferences that can be drawn from the allegations that the Suffolk Insiders blackmailed Bennett into using Refco funds to purchase PlusFunds shares for Suffolk, sufficiently establish that the purchases of shares from the Defendants were conducted with fraudulent intent.[17]

Yet it is not enough, under Section 548, for the debtor to make a transfer with fraudulent intent. Section 548(a)(1)(A) requires the trustee to show that the transfer was made "with actual intent to hinder, delay, or defraud *any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.*" That is, at the time of the transaction, the transferor must have intended to deprive a creditor of property that the creditor could claim in bankruptcy.

The Plaintiff's fraudulent conveyance claim founders on this "creditor" requirement, for two reasons:

1. As stated above, the Suffolk Estate has no legitimate creditors.

2. Even if there were a legitimate creditor — say the I.R.S. — the Plaintiff's own allegations indicate that the Suffolk Insiders' scheme was not conducted with the intent to deprive any such creditor of a claim to the property of the Estate. When the scheme was hatched, Suffolk did not exist. It is not as if Sugrue was thinking, "let's set up Suffolk and blackmail Bennett so he will give money to Suffolk so that we can use it in ways that would deprive the I.R.S. of its claim (which would not

---

[15] The Plaintiff makes much in his Amended Complaint about the alleged fraudulent misstatements in the Offer to Purchase. See AC ¶¶ 90-114. But these allegations are irrelevant. The only parties who could have been defrauded by the Offer to Purchase were those who sold their shares of PlusFunds, i.e., Defendants. The Plaintiff argues that the Offer to Purchase "was furnished to Refco" but as stated above, Refco was a perpetrator, and not a victim, of the alleged fraud.

[16] See 9C Am. Jur. 2d Bankruptcy § 2231 ("A single badge of fraud standing alone is insufficient evidence of an actual fraudulent intent, but several badges of fraud considered together may afford a basis from which such an intent can be presumed. However, the fact that several badges of fraud exist does not mandate such presumption.").

[17] The Defendants concede that it is not necessary under Section 548 for the Plaintiff to allege fraudulent intent on the part of the sellers of the shares. Section 548 focuses on the intent of the debtor-transferor. See 9C Am. Jur. 2d Bankruptcy § 2230 ("The actual intent to hinder, delay, or defraud creditors with which a transfer must be made in order to be avoidable as fraudulent must be that of the debtor-transferor; the transferee's intent is irrelevant.").

exist unless we set up Suffolk)."[18]  It follows that it is not plausible to believe that Suffolk was setting up this transaction for the purpose of defrauding creditors of their claims against Suffolk, which did not exist at the time and could not exist but for the fraudulent transaction itself. *See Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),* 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (act of fraud must result in loss to a creditor).

It is true that Section 548 allows a trustee to avoid claims if there is an intent to defraud an entity that "was or became" a creditor "on or after" the date of the transfer. Thus, an intent to defraud a future creditor can trigger the trustee's avoidance power. But it is one thing to say that future creditors are covered, and another to say that a fraudulent transaction with no intent to harm a creditor becomes voidable simply because the debtor ends up having a creditor. Fraudulent transfer law is designed to protect creditors harmed by the scheme, not to eradicate all fraud.  The Third Circuit, relying on a famous treatise,  recognized this important limitation in *In re Cybergenics Corp.*, 226 F.3d 237, 242 (3rd Cir. 2000), citing to a famous treatise on the subject:

> A preeminent scholar in this area of the law emphasized the creditor focus of fraudulent transfers as he commenced his well-known treatise:
>
>> The fraudulent conveyance, as known in our law, may be roughly defined as an infringement of the creditor's right to realize upon the available assets of his debtor. That, and none other, is the meaning that should attach to the word "fraud," as used in the synonymous term, "conveyance in fraud of creditors." It follows that an appreciation of this form of wrongdoing involves, first of all, a clear understanding of the right which is impaired.

> Glenn, The Law of Fraudulent Conveyances § 1 (1931).

Section 548 requires  that the fraud be done with the intent to harm a creditor's interest, and the Plaintiffs have not and cannot allege such an intent.[19]  *See Kupetz v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 77 B.R. 754, 765 (C.D.Cal.1987) (Section 548(a)(1) requires a showing of an intent to harm the creditors of the company).  *See also* 5 Collier on Bankruptcy ¶548.01 (16th ed. rev. 2010) ("A fraudulent transfer can essentially be defined as an act which has the effect of improperly placing assets beyond the reach of creditors.");  Baird & Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand. L. Rev. 829, 829-30 (1985) (the intent of fraudulent conveyance law is to prevent a debtor from "manipulat[ing] his affairs in order to

---

[18] That scenario is akin to robbing a bank to get money to pay a lawyer to defend you on the bank robbery charge — not a plausible scenario.

[19] Of course the Plaintiffs do argue that Refco was a creditor and the Suffolk scheme was intended to harm Refco. But as stated above, and in the prior Report and Recommendation, Refco is not a legitimate creditor of Suffolk because it took part in the fraudulent transaction.

shortchange his creditors and pocket the difference"). Therefore Count II should be dismissed on the ground that the Plaintiff has made no showing of an intent to defraud a creditor.

### *Conclusion on Fraudulent Transaction*

While the Plaintiff has adequately alleged that the Suffolk Transactions were perpetrated with fraudulent intent, he has not adequately alleged that the scheme was conducted with the intent to defraud a creditor. Therefore Count II should be dismissed. And that dismissal should be *with prejudice* because under the Plaintiff's own allegations the Suffolk scheme could not have been conducted with an intent to defraud any existing or future creditor.

## II. New Count V

The Plaintiff has added a new count to the original Complaint — for recovery of the actual fraudulent transfers pursuant to Section 550 of the Bankruptcy Code. The Plaintiff concedes that Count V is remedial only and stands or falls with Count II.[20] If follows that because Count II should be dismissed with prejudice, Count V should be dismissed with prejudice as well.

---

[20] See Transcript of Oral Argument at 116:

Professor Capra: So if count 2 stands, count 5 stands and if count 2 falls, count 5 falls?

Mr. Ross: Yes.

**IV. Conclusion**

     **1. Count II should be dismissed with prejudice because the Plaintiff has not adequately alleged the existence of a valid creditor, which is necessary for standing.**

     **2. The Plaintiff has adequately alleged that the transactions to be avoided involved property of the Suffolk Estate — so Count II should not be dismissed on the ground that Suffolk was only a conduit.**

     **3. The Plaintiff has adequately alleged that the Suffolk Transactions were conducted with fraudulent intent. But Count II should be dismissed with prejudice because the Plaintiff has not adequately alleged that the transactions were conducted with the intent to defraud a creditor of Suffolk.**

     **4. Because Count II should be dismissed with prejudice, Count V should be dismissed as well, it asserts a remedy that is dependent on voiding a fraudulent transfer.**

                              Daniel J. Capra
                              Special Master

Dated: August 26, 2010
New York, New York

22