**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO, INC. SECURITIES LITIGATION | 07 MDL No. 1902 (JSR)<br><br>ECF FILED<br>ORAL ARGUMENT REQUESTED |
| GEORGE L. MILLER, Chapter 7 Trustee for the Estate of Suffolk LLC,<br><br>            Plaintiff,<br><br>      v.<br>PF SALECO LLC, ET AL,<br><br>            Defendants. | Master Index No. 09 Civ. 2866 (JSR)<br><br>No. 09 Civ. 2885 (JSR)<br>No. 09 Civ. 2920 (JSR)<br>No. 09 Civ. 2922 (JSR) |

**LIMITED OBJECTION OF
CREDIT SUISSE FIRST BOSTON NEXT FUND, INC., LAB MORGAN
CORPORATION, AND ML IBK POSITIONS, INC.
TO THE REPORT AND RECOMMENDATION OF THE SPECIAL MASTER ON THE
MOTION TO DISMISS THE AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL ALLEGATIONS ......................................................................................................3

ARGUMENT.................................................................................................................................6

      A.      Suffolk Did Not Control The Funds At Issue. ...........................................8

      B.      The Amended Complaint's "Blackmail" Allegations Fail to Demonstrate That Suffolk Controlled the Funds At Issue..................................................................10

CONCLUSION............................................................................................................................14

## TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
　　129 S. Ct. 1937 (2009) .................................................................................................11

*Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Adver. (In re Bank of New England Corp.)*,
　　165 B.R. 972 (Bankr. D. Mass. 1994) ...........................................................................7

*Cadle Co. v. Mangan (In re Flanagan)*,
　　503 F.3d 171 (2d Cir. 2007) .........................................................................................12

*City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*,
　　329 F.3d 204 (1st Cir. 2003) ..............................................................................7, 13, 14

*Connecticut v. Novak (In re Cmty. Assocs.)*,
　　173 B.R. 824 (D. Conn. 1994) .......................................................................................7

*Cooper v. Centar Invs. (Asia) Ltd. (In re Trigem America Corp.)*,
　　431 B.R 855 (Bankr. C.D. Cal. 2010) .........................................................................12

*Glinka v. Bank of Vermont (In re Kelton Motors)*,
　　97 F.3d 22 (2d Cir. 1996) .............................................................................................12

*In re Joliet-Will Cnty. Cmty. Action Agency*,
　　847 F.2d 430 (7th Cir. 1988) .........................................................................................7

*In re M.W. Sewall & Co.*,
　　431 B.R. 526 (Bankr. D. Me. 2010) .......................................................................13, 14

*In re Scanlon*,
　　239 F.3d 1195 (11th Cir. 2001) ...................................................................................14

*In re United Milk Prods. Co.*,
　　261 F. Supp. 766 (N.D. Ill. 1966) ..................................................................................7

*Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*,
　　374 B.R. 333 (Bankr. S.D. Fla. 2007) .........................................................................11

*Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.)*,
　　207 B.R. 391 (Bankr. E.D.N.Y. 1997) ...................................................................12, 13

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
　　813 F.2d 1177 (11th Cir. 1987) ................................................................................7, 14

*Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys. (In re Columbia Gas Sys.)*,
    997 F.2d 1039 (3d Cir. 1993) ........................................................................................... 7

*Shipley Co. v. Darr (In re Tap, Inc.)*,
    52 B.R. 271 (Bankr. D. Mass. 1985) ................................................................................ 7

*Stevenson v. J.C. Bradford & Co. (In re Cannon)*,
    277 F.3d 838 (6th Cir. 2002) ............................................................................................ 6

*T&B Scottdale Contractors, Inc. v. United States*,
    866 F.2d 1372 (11th Cir. 1989) ........................................................................................ 7

*Yonkers Bd. of Educ. v. Richmond Children's Ctr., Inc.*,
    58 B.R. 980 (S.D.N.Y. 1986) ............................................................................................ 7

## STATUTES

11 U.S.C. § 548 ........................................................................................................... 6, 12, 14

11 U.S.C. § 550(a) ................................................................................................................ 14

Defendants Credit Suisse First Boston Next Fund, Inc. (incorrectly named as "CSFB a/k/a Credit Suisse First Boston Next Fund, Inc."), Lab Morgan Corporation, and ML IBK Positions, Inc. (the "Bank Defendants") respectfully submit this limited objection to the August 26, 2010 Report and Recommendation of the Special Master on the Motion to Dismiss the Amended Complaint (the "Second R&R") in *Miller v. PF Saleco LLC, et al.*, No. 09 Civ. 2866 (the "*Miller* Actions").

## PRELIMINARY STATEMENT

The Bank Defendants certainly have no objection to the Special Master's recommendation in the Second R&R that the Court grant the Bank Defendants' motion to dismiss the Amended Complaint with prejudice. The Bank Defendants agree that the Amended Complaint should be dismissed on at least two independent grounds: the Amended Complaint (i) fails to identify a legitimate creditor of Suffolk LLC ("Suffolk") on whose behalf Plaintiff George L. Miller ("Plaintiff"), as Chapter 7 Trustee for the bankruptcy estate of Suffolk, has standing to bring this fraudulent-transfer action, and (ii) does not allege any facts suggesting that Suffolk made the challenged transfers with the requisite intent to defraud any such creditor. Second R&R at 7-14, 22.

The Bank Defendants file this limited objection, out of an abundance of caution, in the event this Court were to decline to adopt the Second R&R's recommendation to dismiss the Amended Complaint on either (or both) of those two grounds. The Bank Defendants respectfully submit that the Amended Complaint should be dismissed for a third, independent reason, which the Bank Defendants also advanced to the Special Master, but the Second R&R did not embrace: that Suffolk was a mere conduit for the transfer of Refco funds to the Bank Defendants, and thus Plaintiff may not recover those funds for Suffolk's bankruptcy estate because they were never Suffolk's property in the first place.

As the Court will recall, before filing the Amended Complaint, Plaintiff initially filed a four-count complaint ("Complaint"). The Special Master issued a Report and Recommendation ("First

R&R") recommending dismissal of three counts in the Complaint with prejudice and dismissal of the fourth – Count II (the intentional fraudulent transfer claim asserted here) – without prejudice. First R&R at 2-3.  The Court adopted the First R&R, finding itself "in complete agreement with Special Master Capra's thorough and well-reasoned Report and Recommendation," and noting, indeed, that "a significant argument might have been made that Count II should also have been dismissed *with prejudice*."  *Miller v. CSFB*, No. 09 Civ. 2885 (S.D.N.Y. Jan. 12, 2010) ("Dismissal Order") at 2 (emphasis added).

The First R&R recommended dismissal of the original Complaint on, among other grounds, the ground that Suffolk was a mere conduit and, as noted, the Court adopted the First R&R in its entirety in its Dismissal Order.  The Bank Defendants submit that the Amended Complaint fails to cure the deficiencies that led to dismissal of the original Complaint on conduit grounds.  The allegations in the Amended Complaint, like those in the initial Complaint, demonstrate that Refco – not Suffolk – controlled the funds at issue:  Suffolk was formed for the specific purpose of serving as a middleman between Refco and the Bank Defendants in the transaction at issue; Refco obligated Suffolk to use the funds "loaned" to it by Refco solely to purchase PlusFunds shares from the Bank Defendants; and the funds at issue were deposited by Refco into an escrow account with The Bank of New York (the escrow agent for the transaction ("BONY")) and transferred, with Refco's authorization, to the Bank Defendants on the very same day.  Indeed, the new allegations in the Amended Complaint simply underscore that it was Refco's – not Suffolk's – money that was paid to the Bank Defendants and that Refco – not Suffolk – controlled whether the funds would be distributed, and to whom.

The Second R&R concludes, however, that the Amended Complaint's new allegations regarding a supposed "blackmail scenario" – by which the Suffolk Insiders allegedly "coerced" Refco CEO Phillip Bennett to cause Refco to make the "loan" to Suffolk under threat that otherwise

- 2 -

they would expose the Refco fraud – demonstrate that Suffolk was not a mere conduit, but rather in control of the funds Refco "loaned" Suffolk to purchase the PlusFunds shares.  Second R&R at 14-16, 22.  The Bank Defendants respectfully submit that any allegations concerning the "blackmail scenario" – even if they were plausible (and the Court already has stated they are not)[1] – fail to cure the original Complaint's deficiencies.  The fundamental legal question regarding whether a debtor is a mere conduit is whether the debtor had discretion over how to use the funds at issue, and the Amended Complaint, like the initial Complaint, makes plain that Suffolk had no such discretion.

Nothing in the Amended Complaint renders Plaintiffs' theory that Suffolk controlled the funds at issue more plausible now than it was earlier this year.  Accordingly, in addition to dismissing Count II with prejudice for the two reasons recommended by the Special Master in the Second R&R, in the event the Court addresses the issue, it should also dismiss Count II with prejudice on the independent ground that Suffolk was a conduit.

## FACTUAL ALLEGATIONS

Plaintiff alleges that the Bank Defendants sold their equity interests in PlusFunds to Suffolk pursuant to Stock Purchase Agreements between the Bank Defendants and Suffolk.  Am. Compl. ¶¶ 87-89, Schedule A.[2]  Suffolk's purchase of that PlusFunds stock from the Bank Defendants constituted three of some 92 similar transactions by which Suffolk, as part of a tender offer, bought-out all remaining equity interests in PlusFunds from the company's minority shareholders at the

---

[1] During oral argument on Plaintiff's objection to the First R&R, Plaintiff made the same argument; this Court responded that it was "unlikely" that "Refco would have been a victim" in the series of transactions at issue.  Declaration of Ross E. Firsenbaum, dated September 7, 2010 ("Firsenbaum Decl.") Ex. A at 11-12.  Indeed, Plaintiff's theory contrasts with assertions by the Refco Litigation Trustee, who stands in the shoes of Refco and filed the Suffolk bankruptcy; he has admitted that the relationship and "loan" between Refco and Suffolk here were "put into place by Phillip Bennet [sic]", Firsenbaum Decl. Ex. B at 6:25-7:7, and not by the Suffolk Insiders.

[2] The following is a recitation of facts as alleged in the Amended Complaint.  The Bank Defendants do not concede the accuracy of these allegations, but acknowledge that the Court generally must accept as true, for purposes of this motion, all well-pleaded factual allegations.

same, allegedly inflated price ("Tender Offer").  *Id.* ¶¶ 37, 87-89.  Suffolk funded the Tender Offer through an alleged "loan" totaling approximately $158 million (the "Phase I Loan") that it received from Refco Capital LLC, a Refco affiliate.  *Id.* ¶¶ 57, 70.

The Phase I Loan was part of a broader historical relationship of fraudulent activity between Refco and one of Suffolk's principals, Christopher Sugrue.  *Id.* ¶ 25.  Part of this relationship consisted of Sugrue's agreement to use Refco as PlusFunds' broker-dealer, which "made hundreds of millions of dollars of cash available to [RCM, another Refco entity]" to obscure the ongoing fraud at Refco by propping up Refco's apparent financial condition.  *Id.* ¶¶ 32, 41.

As he did in his initial Complaint, Plaintiff alleges that, to ensure that PlusFunds would continue to hold its assets at Refco, Refco and the Suffolk Insiders[3] designed a transaction by which Refco would buy out PlusFunds management and other PlusFunds shareholders, and, in exchange, compensate the Suffolk Insiders for assisting with the acquisition (including by financing the purchase of PlusFunds shares held by those Suffolk Insiders at the same inflated price).  *Id.* ¶¶ 1, 24, 28, 30-32, 35, 53, 67, 69.  The Amended Complaint alleges that the Suffolk Insiders "coerced" Refco's CEO, Phillip Bennett, to agree to the transaction to ensure their silence regarding the ongoing fraud at Refco.  *Id.* ¶¶ 34-36, 43, 48-49.  As part of this transaction, Suffolk was created for the specific purpose of conducting the buyout, and to serve as a middleman for the acquisition in order to conceal Refco's role from the public.  *Id.* ¶¶ 34, 36, 40, 49, 53.  Refco and the Suffolk Insiders decided to make the transaction appear as a "loan" "under the guise of operating as a traditional lender" rather than an acquisition directly by Refco to avoid "implicating disclosure requirements."  *Id.* ¶¶ 35, 142.

---

[3] The term "Suffolk Insiders" refers to PlusFunds officers and shareholders Sugrue, Brian Owens, and Mark Kavanagh.  Am. Compl. ¶ 24.

The transaction was documented by the same credit agreement dated March 29, 2005 ("Credit Agreement") referenced in the initial Complaint. *Id.* ¶ 36. According to the Credit Agreement, Refco "loaned" money to Suffolk to purchase PlusFunds shares, and received a security interest in the shares. Am. Compl. ¶ 36; Firsenbaum Decl. Ex. C § 5.1.5. The Credit Agreement also afforded Refco a call option that entitled Refco to the PlusFunds shares if Suffolk defaulted. Am. Compl. ¶¶ 36, 57; Firsenbaum Decl. Ex. C at §§ 2.3, 5.1.5, 5.1.8, 5.2.4, 8.4.1. At the time the parties executed the Credit Agreement, they understood that Suffolk could never, and would never, "repay" the "loaned" funds to Refco; rather, Refco would inevitably acquire the shares. Am Compl. ¶¶ 35-36, 43-44, 46-47, 139, 144, 160-61. Indeed, the parties understood that Suffolk would purchase the PlusFunds shares with Refco's money and without any risk to Suffolk. *Id.* ¶ 38.

To ensure the funds were used only for the purpose Refco intended, the Credit Agreement *required* Suffolk to use the funds to acquire PlusFunds shares; indeed, it prohibited Suffolk from engaging in any business activity other than acquiring those shares. *Id.* ¶ 36; Firsenbaum Decl. Ex. C §§ 7.1.6, 7.2.1. The Credit Agreement further required Suffolk to submit a "Borrowing Request" to Refco each time it wished to draw funds to purchase PlusFunds shares. Firsenbaum Decl. Ex. C § 2.3. If Refco approved the request, the Credit Agreement provided that Refco would "fund [each] Advance into an escrow account . . . to be established with the Escrow Agent pursuant to an Escrow Agreement for such Advance." *Id.* The Escrow Agreement, in turn, provided that the escrow agent, BONY, would not disburse any funds unless presented with joint written instructions signed by Refco and Suffolk. Am. Compl. ¶ 73; Firsenbaum Decl. Ex. D § 5(a). The Escrow Agreement also provided that if BONY did not timely receive payment instructions signed by Refco, BONY would return the funds to Refco. Firsenbaum Decl. Ex. D § 6(a).

The Amended Complaint includes new allegations confirming that, consistent with the terms of the Credit Agreement, Refco exercised control over the funds. Am. Compl. ¶¶ 59, 70, 75, 130.

Each time additional PlusFunds shares were to be acquired, Suffolk's counsel, Gibson Dunn, submitted a borrowing request to Refco's counsel, Mayer Brown. *Id.* ¶¶ 75, 130. Bennett, with Mayer Brown's assistance, reviewed the requests and determined whether and when the requests would be funded. *Id.* ¶¶ 75, 130. Refco also reviewed the transaction to ensure the shares were valid. *Id.* ¶ 59. In accordance with this procedure, on June 7, 2005, Suffolk submitted a borrowing request to Refco seeking the transfer of $70,118,363.73 to fund the acquisition of PlusFunds shares from, among others, the Bank Defendants. *Id.* ¶ 70; Firsenbaum Decl. Ex. E. Refco approved the transaction, and consistent with the Escrow Agreement, deposited its funds into the escrow account at BONY. Firsenbaum Decl. Ex. D ¶ 2. On the very same day, the Refco funds were transferred by BONY to the Bank Defendants in exchange for the PlusFunds shares. *See* Firsenbaum Decl. Ex. F at SUF001466, SUF001468, SUF001474.

## ARGUMENT

There is no dispute over the governing legal principle set forth in the Second R&R that Plaintiff may not recover the funds at issue if Suffolk was a mere conduit. Second R&R at 14-15; Plaintiff's Memorandum of Law in Opposition to Motion of Defendants [] to Dismiss the Amended Complaint, dated June 3, 2010 ("Opp." or "Opposition Memorandum") at 21-23; First R&R at 19-20. Section 548 of the Bankruptcy Code allows a bankruptcy trustee to recover transfers of property of the debtor, not transfers of property of third parties. 11 U.S.C. § 548(a)(1)(A)-(B) (a trustee may only avoid a "transfer . . . of an interest *of the debtor* in property.") (emphasis added). Thus, if the transfer in question was not of the debtor's property, Plaintiff may not seek to avoid and recover it. *See, e.g.*, *Stevenson v. J.C. Bradford & Co. (In re Cannon),* 277 F.3d 838, 851 (6th Cir. 2002) (dismissing trustee's fraudulent transfer claim to recover funds held in trust by the debtor, because the funds were not part of the debtor's bankruptcy estate and thus not subject to the trustee's avoidance powers).

Accordingly, just as this Court dismissed Plaintiff's intentional fraudulent transfer claim in the initial Complaint (albeit without prejudice), courts have dismissed fraudulent transfer claims where, as here, the trustee seeks to recover funds that passed through the debtor as a mere "conduit" to effect a transfer between third parties. *See City of Springfield v. Ostrander (In re LAN Tamers, Inc.),* 329 F.3d 204, 210 (1st Cir. 2003) (funds collected by debtor service provider were not property of the estate where service provider was required to pass funds to public schools); *Nordberg* v. *Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177, 1179-80 (11th Cir. 1987) ("the debtor corporation was a mere conduit" even though debtor had brief possession of funds transferred to its bank account by a non-debtor, because it did not have "control over the funds" to use them for any purpose other than transferring them to a third party as directed by the nondebtor).[4]

---

[4] *See also, e.g.*, *Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys. (In re Columbia Gas Sys.),* 997 F.2d 1039, 1061 (3d Cir. 1993) (refunds held by bankrupt natural gas pipeline company were not property of the estate because debtor "act[ed] as a receiving and transmitting agent, or a conduit, for money upstream suppliers owe to overcharged consumers") (internal quotations omitted); *T&B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372, 1376 (11th Cir. 1989) ("T&B's contracts with [the debtor] . . . expressly stated the funds were to be used to pay the materialmen," and thus such funds did not "belong to the bankrupt estate"); *In re Joliet-Will Cnty Cmty. Action Agency,* 847 F.2d 430, 432 (7th Cir. 1988) (funds granted by government agencies to debtor not property of the estate where debtor had little discretion regarding use of funds); *Connecticut v. Novak (In re Cmty. Assocs.),* 173 B.R. 824, 830 (D. Conn. 1994) (vans purchased with federal grant for transport of elderly were not property of the debtor's bankruptcy estate); *Yonkers Bd. of Educ. v. Richmond Children's Ctr., Inc.,* 58 B.R. 980, 981-82 (S.D.N.Y. 1986) (funds from state education department paid to debtor but designated as "pass-through" payment for school district were not property of the estate); *Shipley Co. v. Darr (In re Tap, Inc.),* 52 B.R. 271 (Bankr. D. Mass. 1985) (funds paid by employer to debtor not property of the estate where debtor was a mere conduit for employer's payment of taxes); *Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Adver. (In re Bank of New England Corp.),* 165 B.R. 972, 978 (Bankr. D. Mass. 1994) (payments by banks to debtor to fund obligations to defined group of creditors were not property of the estate because debtor's use of funds was so restricted that it could not control their use); *In re United Milk Prods. Co.,* 261 F. Supp. 766 (N.D. Ill. 1966) (funds collected by debtor under federal milk marketing orders and owed to milk producers were not property of the estate).

### A. Suffolk Did Not Control The Funds At Issue.

In dismissing the initial Complaint, the Special Master concluded (and this Court agreed) that Plaintiff's claims failed because, *inter alia*, Suffolk was a mere conduit, i.e., "there [wa]s not enough in the spare allegations of the Complaint to support a plausible conclusion that Suffolk had *real* control over the assets used to purchase PlusFunds shares," and thus, the funds transferred from Refco to the Bank Defendants were not property of Suffolk's bankruptcy estate. Dismissal Order at 1-2; First R&R at 21 (emphasis in original). In reaching this conclusion, the Special Master and the Court identified three key facts alleged in the Complaint evidencing that Suffolk lacked control of the funds at issue, all of which are alleged again in the Amended Complaint.

*First*, Suffolk did not exist prior to this transaction. It was created for the specific purpose of acquiring all the outstanding interests in PlusFunds. First R&R at 20; Am. Compl. ¶ 53 ("Suffolk was established specifically to purchase the PlusFunds Shares."); ¶ 56 ("The Suffolk Entities had no employees or activities, and were thinly capitalized (if at all). On information and belief, prior to the purchase of the ownership interests in PlusFunds, the Suffolk Entities had no assets whatsoever."). Refco prohibited Suffolk from engaging in any other business activity. Am. Compl. ¶ 36; Firsenbaum Decl. Ex. C §§ 7.1.6, 7.2.1.

*Second*, the Credit Agreement governing the transaction at issue and incorporated by reference in the Complaint and the Amended Complaint *required* Suffolk to use the funds "loaned" by Refco solely to purchase the PlusFunds shares. First R&R at 15, 19; Am. Compl. ¶ 36; Firsenbaum Decl. Ex. C at § 7.1.6, 7.2.1 (prohibiting Suffolk from engaging in any business activities other than purchasing PlusFunds shares). The Credit Agreement also granted Refco a call option which Refco could exercise if Suffolk defaulted on the "loan" payments to Refco, something Plaintiff says was inevitable. Am. Compl. ¶ 36*; see also* Firsenbaum Decl. Ex. C §§ 2.3, 5.1.5, 5.1.8, 5.2.4, 8.4.1.

- 8 -

*Third*, Refco deposited the necessary funds with BONY, which then transferred the funds to the Bank Defendants, on the very same day. Compl. ¶¶ 1, 8; Am. Compl. ¶¶ 70, 73-77; Firsenbaum Decl. Ex. E (June 7, 2005 "Borrowing Request" from Suffolk to Refco requesting $70,118,363.73); Ex. F (BONY check register evidencing transfers to each of the Bank Defendants on the same day). Indeed, consistent with the Credit Agreement, the funds went from Refco, to BONY, to the Bank Defendants and thus *never even were in the possession of Suffolk. Id.* Furthermore, the Escrow Agreement prohibited BONY from releasing any of the funds unless it received joint written instructions signed by Refco. Am. Compl. ¶ 73; Firsenbaum Decl. Ex. D §§ 5(a), 6(a)). Thus, at all times, Refco retained control over all disbursements of the funds into, or out of, the BONY escrow account.

In addition to re-alleging these same facts which led the Court to dismiss the Complaint, the Amended Complaint alleges *additional* facts confirming that Suffolk was indeed a mere conduit. *First*, Plaintiff alleges that, consistent with the terms of the Credit Agreement, Suffolk sought Refco's authorization to disburse the funds to the Bank Defendants to purchase the PlusFunds shares and thus that Refco – not Suffolk – had the ultimate power to designate which party or parties would receive the funds and to disburse those funds. Am. Compl. ¶ 75 ("[B]orrowing requests, signed by . . . Suffolk . . . were submitted via Suffolk's counsel to Refco's counsel . . . *Refco's counsel reviewed the borrowing requests and confirmed with only Bennett whether the borrowing requests would be funded on the dates requested*.") (emphasis added); *id.* at ¶ 130 ("Gibson Dunn [(Suffolk's counsel)] submitted the draw requests to Mayer Brown [Refco's counsel] and/or Bennett pursuant to the loan documents").

*Second*, the Amended Complaint alleges that the transaction did not benefit Suffolk. Am. Compl. ¶ 58 ("The Suffolk Loans created no benefit to the Suffolk Entities"). Rather, it alleges that the "loans" were designed to keep money managed by PlusFunds at Refco and mask the ongoing

- 9 -

Refco fraud from third parties, thus acknowledging that Refco's interests animated the transaction. *Id.* ¶¶ 32, 35. As the Court held when it adopted the First R&R, the transaction's evident lack of benefit to the debtor is strong circumstantial evidence that the debtor did not have the requisite control over the transaction. First R&R at 19.

*Third*, the Amended Complaint alleges that the transaction at issue was a disguised acquisition of PlusFunds by Refco. Plaintiff himself places the term "loan" in quotation marks when he alleges that Suffolk and Refco entered into a "loan" that was secured by the acquired PlusFunds shares. Am. Compl. ¶ 36. Thus, by Plaintiff's own allegation, this "loan" was a "mechanism to move forward with the fraudulent scheme without implicating disclosure requirements." *Id.* at ¶ 35. In other words, Plaintiff alleges that, rather than directly acquire PlusFunds and disclose the transaction publicly, Refco sought to avoid disclosure requirements by nominally funneling its funds through a shell company – Suffolk – and then parking the PlusFunds shares on Suffolk's books, rather than Refco's, while at all times retaining real control over PlusFunds, since Refco could declare a default and call or foreclose on the PlusFunds shares. *See id.* at ¶¶ 35-38, 142. Indeed, Plaintiff alleges that the Suffolk Insiders obtained the shares "without paying any money out of their own pockets" and "with no real risk" because, after all, it was Refco's money that was transferred to the Bank Defendants and Suffolk could satisfy the loan simply by delivering the shares. *Id.* at ¶ 38.

      **B.    The Amended Complaint's "Blackmail" Allegations Fail to Demonstrate That Suffolk Controlled the Funds At Issue.**

Nevertheless, the Second R&R concludes that the Amended Complaint's new allegations concerning the "blackmail scenario" are sufficient to overcome the original Complaint's deficiencies and demonstrate that Suffolk was not a mere conduit, but rather in control of the funds at issue. Second R&R at 5, 16. The Bank Defendants respectfully submit that these allegations – even if treated as plausible under *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), notwithstanding this

- 10 -

Court's prior characterization of them as anything but (*see* n. 1, *supra*,) – fail to establish that Suffolk had control over the funds at issue.[5]

As discussed above, the relevant question in determining whether a debtor is a mere conduit is whether the debtor controlled the funds that the trustee (Plaintiff here) seeks to recover. *See supra* at 7 & n. 4 (citing cases). The "blackmail scenario" allegations, by contrast, focus on the Suffolk Insiders' alleged "coercion" of Phillip Bennett to cause Refco to enter into the "loan" transaction to acquire the PlusFunds shares from the Bank Defendants. But control of the funds does not turn on which party originated the "loan" transaction – Refco or the Suffolk Insiders – but rather on whether, once that "loan" was made, Suffolk had control over the "loaned" funds at issue.

Plaintiff's theory is inconsistent with caselaw applying the well-established doctrine of earmarking, which bars the recovery of an alleged preferential transfer where a new creditor lends money to the debtor for the purpose of paying a pre-existing creditor of the debtor. "In such situations, the loan[ed] funds are said to be 'earmarked' and the payment is held not to constitute a voidable preference." *Cadle Co. v. Mangan (In re Flanagan),* 503 F.3d 171,184 (2d Cir. 2007).

---

[5] The Special Master correctly rejected, or at minimum refused to attribute weight to, additional arguments Plaintiff raised in support of his assertion that Suffolk was not a conduit in addition to the "blackmail scenario." Second R&R at 6; Opp. at 21-24. The Special Master appropriately concluded that Suffolk's supposed control over funds other than those transferred to the Bank Defendants are irrelevant because they were the subject of *different* transactions. Second R&R at 6; *Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.),* 374 B.R. 333, 338 (Bankr. S.D. Fla. 2007) ("The dispositive question is whether the Debtor had control *over the subject funds*.") (emphasis added). Likewise, the Special Master correctly did not credit Plaintiff's arguments that Suffolk's purported "operational duties" once Suffolk acquired title to the PlusFunds shares meant that Suffolk was not a conduit because such duties, if they even existed, say nothing about whether Suffolk had control prior to that acquisition over the funds transferred to the Bank Defendants. *See* Am. Compl. ¶ 70; *In re Bankest Capital Corp,* 374 B.R. at 338. Finally, Plaintiff's argument that Suffolk was not a conduit because it is supposedly common for lenders to specify the purposes for which a debtor may use loan proceeds is a contention Plaintiff made to the Court during oral argument on Plaintiff's unsuccessful objection to the First R&R, Firsenbaum Decl. Ex. A at 35, which the Court rejected when it adopted the First R&R in its entirety.

The earmarking doctrine bars recovery because, "where a third party lends money to a debtor for the purpose of paying a specific creditor, . . . the third party simply is substituted for the original creditor." *Glinka v. Bank of Vermont (In re Kelton Motors),* 97 F.3d 22, 25 (2d Cir. 1996). Thus, the earmarked funds were never property of the debtor's bankruptcy estate. *See, e.g.*, *Cooper v. Center Ins. (Asia) Ltd.* (*In re Trigem America Corp.)*, 431 B.R. 855, 864 (Bankr. C.D. Cal. 2010) (holding earmarking doctrine barred trustee's fraudulent conveyance claim, reasoning that a "transfer of an interest of the debtor in property is equally a statutory requirement of an action under §548(a)(1) as it is for preferences . . . In both instances what matters is that in an earmark case there is no diminishment of the estate, and it is that diminishment of assets that would otherwise be available to pay creditors that is at the heart of all avoidance actions.") (internal quotations omitted).

Thus, in the earmarking cases, the courts address the same fundamental question that is at issue here: whether the funds at issue are the property of the debtor or of the new lender. *See, e.g.*, *In re Trigem*, 431 B.R. at 864 ("[T]he bulk of this case comes down to a single, pivotal issue. Was it actually an 'interest of the debtor in property' that was transferred within the meaning of § 548(a)(1), or related law, such that the trustee has the power to now avoid that transfer for benefit of creditors?"). In many of these cases, the party with the initial idea to enter into the transaction at issue was the debtor, not the new lender; often it is the debtor who approaches the new lender to request that the new lender refinance the pre-existing debt. *See, e.g., In re Kelton,* 97 F.3d at 24 ("[Debtor] approached Lydonville Savings Bank . . . to obtain a $3,000,000 loan to repay the Bank of Vermont."); *Musso v. Brooklyn Navy Yard Dev. Corp.* (*In re Westchester Tank Fabricators, Ltd.),* 207 B.R. 391, 395-96 (Bankr. E.D.N.Y. 1997) ("[Debtor's principal] went to family members for the money"). But, even in these cases where the debtor had the initial idea to enter into the transaction, the courts nonetheless concluded that the funds belonged to the creditor, not the debtor, because the debtor did not control the transferred funds – i.e., the debtor could use the funds only

for the purpose permitted by the new lender; to pay off the old debt. *See In re Kelton,* 97 F.3d at 27 (holding checks at issue were not property of the debtor's estate because debtor lacked control over checks); *In re Westchester Tank Fabricators*, 207 B.R. at 398-99 (concluding funds were "earmarked" and thus not property of the debtor's estate).

So too here, even if Suffolk had the initial idea to "blackmail" Phillip Bennett, the funds at issue were not Suffolk's property because Suffolk did not control the funds. Refco prohibited Suffolk from using the funds "loaned" by Refco for any purpose other than to purchase the PlusFunds shares from the Bank Defendants and funded the money into escrow to make sure that happened. Am. Compl. ¶ 36, 70, 73-77; Firsenbaum Decl. Ex. C §§ 7.1.6, 7.2.1; Firsenbaum Decl. Exs. D-E.

The most recent authority addressing when a debtor is a mere conduit is telling. In *In re M.W. Sewall & Co.*, 431 B.R. 526 (Bankr. D. Me. 2010), the bankruptcy court concluded that the debtor was <u>not</u> a conduit, because, unlike here, the debtor was "free to do with the [money at issue (lottery ticket sale receipts)] whatever it wished." *Id.* at 532. The bankruptcy court in *Sewall* distinguished the facts before it from those before the First Circuit in *LAN Tamers* (discussed *supra,* at 7), in which the Court of Appeals held that the debtor was a conduit, as follows:

> [The monies in LAN Tamers] were <u>held by a third party</u>. They had <u>not been delivered to the debtor</u>, let alone <u>commingled with other funds</u>. Here, there is no such discrete fund to examine; instead the Bureau merely claims special rights in a portion of Sewall's operating account-the balance of which accrued, and fluctuated, with revenues from Sewall's diverse business operations and payment of its myriad expenses.

*Id.* at 532 (emphasis added).

Here, the facts parallel those in *LAN Tamers* and not those in *Sewall*. As in *LAN Tamers*, the funds at issue were held by a third party (BONY), were not delivered to Suffolk, were not comingled with other funds of Suffolk (indeed Suffolk is not alleged to have had any other funds),

- 13 -

and could be used for no purpose other than to purchase the PlusFunds shares. *See supra* at 8-10; *In re LAN Tamers, Inc.,* 329 F.3d at 210; *In re M.W. Sewall*, 431 B.R. at 532-33.[6]

## CONCLUSION

For these reasons, the Bank Defendants respectfully submit that the Court should (a) adopt the Second R&R to the extent it concludes that Count II of the Amended Complaint should be dismissed with prejudice because Plaintiff has not adequately alleged the existence of a valid creditor of Suffolk, or alternatively because Plaintiff has not adequately alleged that the transactions he seeks to avoid were conducted with the intent to defraud any such creditor; (b) adopt the Second R&R to the extent the Second R&R concludes that Count V of the Amended Complaint should be dismissed with prejudice;[7] and (c) in the event the Court reaches the issue, reject the Second R&R to the extent it concludes that Count II should not be dismissed with prejudice because Suffolk was not a conduit.

Dated:   September 7, 2010                              Respectfully Submitted,

                                                   WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP

                                                   By: /s/ Philip D. Anker
                                                         Philip D. Anker

---

[6] Other cases (including those cited in the Second R&R, *see id.* at 14-16) are in accord. *See, e.g.*, *In re Scanlon*, 239 F.3d 1195, 1198 (11th Cir. 2001) (concluding debtor was a conduit because third party "placed the funds in the temporary escrow account 'with the implicit instructions that they were to be used to satisfy the settlement agreement,'" and the debtor "did not have control over the funds that were in the trust account"); *In re Chase & Sanborn Corp.*, 813 F.2d at 1181-82 (concluding debtor was a conduit even where funds were placed in debtor's bank account for two days with no express restrictions on their use).

[7] The Special Master appropriately concludes that Count V of the Amended Complaint should be dismissed with prejudice because Count V seeks a remedy (recovery of a fraudulent transfer) that is dependent on the existence of an avoidable fraudulent transfer – an undisputed proposition among the parties, and with the dismissal of Count II, there will be no remaining Count seeking such avoidance. *See* Second R&R at 21, n. 20; *see also* 11 U.S.C. § 550(a) ("to the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred . . .").

- 15 -

        Joel Millar
        Ross E. Firsenbaum
        Benjamin W. Loveland

        399 Park Avenue
        New York, New York 10022
        Tel.: (212)-230-8800
        Fax: (212)-230-8888

*Attorneys for Defendants Credit Suisse First Boston Next Fund, Inc.; Lab Morgan Corporation; and ML IBK Positions, Inc.*