**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO, INC. SECURITIES LITIGATION | 07 MDL No. 1902 (JSR)<br><br>ECF FILED<br>ORAL ARGUMENT REQUESTED |
| GEORGE L. MILLER, Chapter 7 Trustee for the Estate of Suffolk LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>PF SALECO LLC, ET AL,<br><br>        Defendants. | Master Index No. 09 Civ. 2866 (JSR)<br><br>No. 09 Civ. 2885 (JSR)<br>No. 09 Civ. 2920 (JSR)<br>No. 09 Civ. 2922 (JSR) |

**RESPONSE OF
CREDIT SUISSE FIRST BOSTON NEXT FUND, INC., LAB MORGAN
CORPORATION, AND ML IBK POSITIONS, INC.
TO PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF
THE SPECIAL MASTER AS TO BANK DEFENDANTS' MOTION TO DISMISS
THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL ALLEGATIONS ............................................................................................2

ARGUMENT ....................................................................................................................6

I.      The Special Master Correctly Concluded That Plaintiff Lacks Standing Because He Does Not Seek Recovery On Behalf Of A Legitimate Creditor. ...................................................6

         A.      The Court Has Jurisdiction To Determine Whether Plaintiff Has Standing...........7

         B.      As The Court Has Already Concluded, Refco Is Not A Legitimate Creditor. ........9

         C.      Plaintiff Has Not Alleged Adequately The Existence Of Any Other Legitimate Creditors.....................................................................................................................13

II.      The Special Master Correctly Concluded That Plaintiff Has Not Alleged Adequately That Suffolk Acted With Intent To Defraud Any Creditor.......................................................16

CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    390 B.R. 80 (S.D.N.Y. 2008), *aff'd*, No. 09-0039-cv, 2010 WL 2094028, (2d Cir.
    May 26, 2010) ............................................................................................................6, 8

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ............................................................................................2

*Bondi v. Bank of Am. (In re Parmalat Secs. Litig.)*,
    412 F. Supp. 2d 392 (S.D.N.Y. 2006) ...................................................................13

*Environmental Def. v. U.S. E.P.A.*,
    369 F.3d 193 (2d Cir. 2004) ....................................................................................9

*Harris v. Huff (In re Huff)*,
    160 B.R. 256 (Bankr. M.D. Ga. 1993) ..................................................................12

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) ....................................................................................2

*HSBC Bank U.S.A. v. Adelphia Commc'ns Corp.*,
    No. 07-CV-553A, 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009) .........................10

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ...............12

*In re New York Med. Grp., P.C.*,
    265 B.R. 408 (Bankr. S.D.N.Y. 2001) ....................................................................8

*In re Touloumis*,
    170 B.R. 825 (Bankr. S.D.N.Y. 1994) ....................................................................8

*Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Grp., Inc.)*,
    335 B.R. 77 (Bankr. D. Del. 2005) ..........................................................................9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................8

*Mediators, Inc. v. Manney (In re Mediators, Inc.)*,
    105 F.3d 822 (2d Cir. 1997) ..................................................................................13

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ..................................................................16

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*,
  226 F.3d 237 (3d Cir. 2000).............................................................................17

*Optimum Shipping & Trading S.A. v. Prestige Marine Servs. PTE*,
  No. 08 Civ. 9533, 2010 WL 3469542 (S.D.N.Y. Aug. 24, 2010) ......................................7

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
  403 F.3d 43 (2d Cir. 2005)............................................................................16, 18

*Shields v. Citytrust Bancorp. Inc.*,
  25 F.3d 1124 (2d Cir. 1994)..............................................................................18

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*,
  337 B.R. 791 (Bankr. S.D.N.Y. 2005)...................................................................18

*Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.)*,
  735 F.2d 740 (2d Cir. 1984)...............................................................................6

*Wight v. BankAmerica Corp.*,
  219 F.3d 79 (2d Cir. 2000)................................................................................13

## STATUTES

11 U.S.C. § 548(a)(1)..................................................................................1, 16, 17

11 U.S.C. § 704(a)(4)........................................................................................14

28 U.S.C. § 157(a) .............................................................................................7

28 U.S.C. § 157(b)(1) .........................................................................................7

28 U.S.C. § 1334(b) ...........................................................................................7

## OTHER AUTHORITIES

5 *Collier on Bankruptcy*, 548.01 (15th ed. rev. 2009) ...................................................17

The Bank Defendants[1] respectfully submit this response to Plaintiff's Objections to the Report and Recommendation of the Special Master as to the Bank Defendants' Motion to Dismiss the Amended Complaint, dated September 7, 2010, (the "Objections") in the *Miller* Actions.

## PRELIMINARY STATEMENT

This Court dismissed Plaintiff's original complaint in this action, with leave to replead, after adopting in full the Special Master's first Report and Recommendation (the "First R&R"). In the First R&R, the Special Master concluded that the complaint should be dismissed on multiple grounds, including that (a) Plaintiff lacked standing to assert a fraudulent transfer claim against the Bank Defendants because he did not identify a legitimate creditor on whose behalf he seeks recovery and (b) Plaintiff failed to state a claim under Section 548(a)(1) of the Bankruptcy Code because he did not adequately plead that Suffolk intended to defraud a creditor. The Court found itself "in complete agreement with Special Master Capra's thorough and well-reasoned Report and Recommendation," and noted, indeed, that "a significant argument might have been made that [Plaintiff's intentional fraudulent transfer claim] should also have been dismissed *with prejudice*." Dismissal Order at 2 (emphasis added). Having nonetheless been given an opportunity to replead, the only question now is whether Plaintiff has cured the fatal defects in the original complaint.

He has not. As the Special Master correctly concludes in the Report and Recommendation dated August 26, 2010 (the "Second R&R"), Plaintiff has failed to add any new allegations in the Amended Complaint sufficient to overcome the deficiencies in the original

---

[1] All capitalized terms have the same meaning as in the Bank Defendants' Limited Objection to the Second R&R, dated September 7, 2010 ("Limited Objection"), unless otherwise defined in this memorandum.

complaint.  In accordance with the Second R&R, the Amended Complaint should be dismissed, this time with prejudice.

## FACTUAL ALLEGATIONS

The following is a recitation of relevant facts as alleged in the Amended Complaint. Although the Court generally must accept as true, for purposes of this motion, all well-pleaded factual allegations, it is not of course bound by conclusory assertions that are contradicted by more specific allegations in the Amended Complaint or the documents incorporated therein.  *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1086 (2d Cir. 1995).  Nor must the Court accept the truth of legal conclusions masquerading as factual allegations.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Plaintiff alleges that the Bank Defendants sold their equity interests in PlusFunds to Suffolk pursuant to Stock Purchase Agreements between the Bank Defendants and Suffolk.  Am. Compl. ¶¶ 87-89, Schedule A.  Suffolk's purchase of the Bank Defendants' PlusFunds stock constituted three of some 92 similar transactions by which Suffolk, as part of a tender offer, bought-out all remaining equity interests in PlusFunds from the company's minority shareholders at the same, allegedly inflated price ("Tender Offer").  *Id.* ¶¶ 37, 87-89.  Suffolk funded the Tender Offer through an alleged "loan" totaling approximately $158 million (the "Phase I Loan") that it received from Refco Capital LLC, a Refco affiliate.  *Id.* ¶¶ 57, 70.

The Phase I Loan was part of a broader historical relationship between Refco and one of Suffolk's principals, Christopher Sugrue.  *Id.* ¶ 25.  Part of this relationship consisted of Sugrue's agreement to use Refco as PlusFunds' broker-dealer, which "made hundreds of millions of dollars of cash available to [RCM, another Refco entity]" to obscure the ongoing fraud at Refco by propping up Refco's apparent financial condition.  *Id.* ¶¶ 32, 41.  As he did in his original complaint, Plaintiff alleges that, to ensure that PlusFunds would continue to hold its assets at

- 2 -

Refco, Refco and the Suffolk Insiders designed a transaction by which Refco would fund the buyout of PlusFunds management and other PlusFunds shareholders, and, in exchange, compensate the Suffolk Insiders for assisting with the acquisition (including by financing the purchase of PlusFunds shares held by those Suffolk Insiders at the same inflated price).  *Id.* ¶¶  1, 24, 28, 30-32, 35, 53, 67, 69.

    To implement this transaction, a new entity, Suffolk, was created to serve as a middleman for the acquisition in order to conceal Refco's role from the public.  *Id.* ¶¶ 34, 36, 40, 49, 53.  Refco and the Suffolk Insiders decided to make the transaction appear as a "loan" by Refco to Suffolk, "under the guise of operating as a traditional lender," rather than as an acquisition directly by Refco to avoid "implicating disclosure requirements."  *Id.* ¶¶ 35, 142.

    The transaction was documented by the same credit agreement ("Credit Agreement") referenced in the original complaint.  *Id.* ¶ 36.  According to the Credit Agreement, Refco "loaned" the necessary monies to Suffolk to fund the purchase of the PlusFunds shares.  Am. Compl. ¶ 36.  Indeed, the Credit Agreement *required* Suffolk to use the funds solely to acquire the PlusFunds shares, and prohibited Suffolk from conducting any other business.  *Id.* ¶ 36; Firsenbaum Decl. Ex. C §§ 7.1.6, 7.2.1.  In accordance with the Credit Agreement, on June 7, 2005, Suffolk submitted a borrowing request to Refco's counsel seeking to transfer approximately $70.1 million to the Bank Defendants and other PlusFunds shareholders to acquire the PlusFunds shares.  Am. Compl. ¶¶ 59, 70, 75, 130; Firsenbaum Decl. Ex. E. Following review by Refco's counsel with Bennett, Refco approved the transfer.  Am. Compl. ¶¶ 59, 70, 75, 130; Firsenbaum Decl. Ex. F.

    The Credit Agreement granted Refco a security interest in the PlusFunds shares and afforded Refco a call option that would entitle Refco to the shares if Suffolk defaulted.  Am.

Compl. ¶¶ 36, 57; Firsenbaum Decl. Ex. C at §§ 2.3, 5.1.5, 5.1.8, 5.2.4, 8.4.1.  At the time the parties executed the Credit Agreement, they understood that Suffolk could never, and would never, "repay" the "loan" to Refco; rather, Refco would inevitably acquire the shares.  Am Compl. ¶¶ 35-36, 43-44, 46-47, 139, 144, 160-61.  The parties thus understood that Suffolk would purchase the PlusFunds shares with Refco's money and without any risk to Suffolk.  *Id.* ¶ 38.

The Amended Complaint alleges that the Suffolk Insiders "coerced" Refco's CEO, Phillip Bennett, to agree to the transaction to ensure their silence regarding the ongoing fraud at Refco.  *Id.* ¶¶ 34-36, 43, 48-49.  It alleges that the "only" persons at Refco who knew that the "loan" transaction resulted from the Suffolk Insiders' knowledge of the Refco fraud were Bennett, and another Refco senior executive and co-conspirator, Santo Maggio.  *Id.* ¶ 25 & n.4, 139.  However, Refco's allegedly "innocent decision makers" – including Refco's CFO, its General Counsel, members of its accounting department, the independent members of its Audit Committee, and its other directors – were also involved in the review and approval of Refco's "loan" to Suffolk to acquire the PlusFunds shares.  *Id.* ¶¶ 128, 139, 143-46.

Just as the original complaint alleged, the Amended Complaint makes clear that at the time Suffolk entered into the Credit Agreement, Suffolk was a mere shell with insufficient funds or means to perform under the terms of the "loan."  Am. Compl. ¶¶ 56, 150, 154, 158.  Suffolk had no employees or activities, and "had no assets whatsoever" at any time prior to its acquisition of PlusFunds shares.  *Id.* ¶ 56.  Thus, by the original complaint's, and now the Amended Complaint's, own allegations, the Tender Offer did not deplete any assets that would otherwise have been available to pay any purported creditors of Suffolk.  On the contrary, there were no such assets, no such creditors, and indeed, no Suffolk, before the transactions.

The Amended Complaint also restates the allegations in the original complaint regarding the chain of events that led to the Suffolk bankruptcy filing and the commencement of this action, beginning with Refco's own collapse.  On October 17, 2005 – four months after Suffolk purchased the PlusFunds securities from the Bank Defendants, and seven days after the public disclosure of the ongoing fraud at Refco – Refco and certain of its direct and indirect affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  *Id.* ¶¶ 16-18.

On March 16, 2007, Refco – Suffolk's only purported creditor at the time –  placed Suffolk into bankruptcy.  *Id.* ¶¶ 18-19.  According to the Refco Litigation Trustee, he commenced these proceedings against Suffolk so that Suffolk could sue for Refco's benefit – indeed, "with the expectation that the Suffolk family of entities [would] have substantial claims against third parties for fraudulent transfers and fraudulent conveyances."  *See* Firsenbaum Decl. Ex. B at 9:21-24.  In the Refco Litigation Trustee's own words, he "decided that the only way to realize on [Refco's] loan to the Suffolk entities . . . was to petition these entities involuntarily . . . ."  *Id.* at 9:7-12.  The Refco Litigation Trustee represented to the Delaware Bankruptcy Court that Refco had created Suffolk for the sole purpose of purchasing the PlusFunds shares for Refco's benefit and that Refco Capital was Suffolk's only creditor.  *Id.* at 9:13-20 ("The Suffolk entities we understand are single purpose entities created for the sole purpose of acquiring Plus Funds stock.  Their assets consist of Plus Funds stock, and their liabilities are an obligation owing to the Refco entities . . . We believe that's [sic] the entirety of their liabilities are the liabilities owing to Refco – to Refco Capital, LLC, pursuant to those credit agreements.").  Moreover, the Refco Litigation Trustee has conceded that Refco's Chief Executive Officer, Phillip Bennett, orchestrated the transaction at issue so Refco could acquire PlusFunds:

> It's our understanding, Your Honor, that this relationship was put into place by Phillip Bennet [sic], who was the CEO of Refco at the time,

> with the intent that when the loans came due and payable in March of
> 2009 . . . , the Suffolk entities would default on these loans and Refco
> would realize on the collateral, which was the stock that was being held
> . . . .  And by virtue of that series of transactions would actually end up
> owning Plus Funds.

*See id.* at 6:25-7:7.

Nearly two years after Refco put Suffolk into bankruptcy, Plaintiff filed the original

complaint in this action alleging that Refco was "Suffolk's only known non-contingent,

liquidated creditor."  Compl. ¶ 11.  After the Special Master in the First R&R, and then the Court

in the Dismissal Order, concluded that Refco was not a legitimate creditor on whose behalf

Plaintiff could recover, Plaintiff now alleges in the Amended Complaint, without any factual

basis other than that they have filed proofs of claim in the Suffolk bankruptcy, that the IRS,

SPhinX Trustee, and SPhinX JOLs are also purported creditors on which he can base his

standing.  Am Compl. ¶¶ 162-63.

## **ARGUMENT**

### I.    **The Special Master Correctly Concluded That Plaintiff Lacks Standing Because He Does Not Seek Recovery On Behalf Of A Legitimate Creditor.**

As the Court concluded by adopting the First R&R in its entirety, it is well-settled in the

Second Circuit that "[t]he avoidance power of a trustee depends on whether there is a legitimate

creditor to take advantage of the recovery."  Dismissal Order at 1-2; First R&R at 13; *see* Second

R&R at 7.  Thus, Plaintiff, as trustee of the Suffolk bankruptcy estate, lacks standing to assert a

fraudulent transfer claim to avoid the payments to the Bank Defendants unless there is a

legitimate creditor of Suffolk that would benefit from the avoidance and recovery of the

transferred funds.  *See Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero*

*Corp.)*, 735 F.2d 740, 742-43 (2d Cir. 1984); *e.g.*, *Adelphia Recovery Trust v. Bank of Am., N.A.*,

390 B.R. 80, 94-95, 100 (S.D.N.Y. 2008) (dismissing fraudulent transfer claims under § 548

because avoidance would not benefit legitimate creditors), *aff'd*, No. 09-0039-cv, 2010 WL 2094028, (2d Cir. May 26, 2010).  As the Special Master correctly concludes in the Second R&R, the Amended Complaint fails, once again, to allege the existence of any such creditor.

### A.    The Court Has Jurisdiction To Determine Whether Plaintiff Has Standing.

In his Objections, Plaintiff argues, as a threshold matter, that this Court has no authority to determine whether there is a legitimate creditor on which Plaintiff may base his standing, and that the Delaware Bankruptcy Court presiding over Suffolk's bankruptcy case has exclusive jurisdiction over this issue.  Objections at 14-17.  The Court already has held that the original complaint did not allege the existence of a legitimate creditor of Suffolk that could confer standing upon Plaintiff.  Dismissal Order at 2; First R&R at 11-18.  In so holding, the Court of course had to conclude that it had jurisdiction to make such a determination.  Dismissal Order at 2; First R&R at 12-13; *see Optimum Shipping & Trading S.A. v. Prestige Marine Servs. PTE*, No. 08 Civ. 9533, 2010 WL 3469542, at *1 (S.D.N.Y. Aug. 24, 2010) ("subject matter jurisdiction is a threshold determination that the Court is obligated to consider *sua sponte*").  Indeed, Plaintiff never even argued that the Court lacked such jurisdiction during briefing on the Bank Defendants' motion to dismiss the original complaint and in his objection to the First R&R. *See* Second R&R at 9, n. 10.

As the Second R&R correctly concludes, Plaintiff's new, belated argument is baseless. Although the district or bankruptcy court presiding over a debtor's bankruptcy case has jurisdiction over the allowance or disallowance of claims against the bankruptcy estate, that jurisdiction extends to all the district courts in the United States (including this Court) and is, even then, not exclusive.  *See* 28 U.S.C. § 1334(b) ("[T]he *district courts* shall have original *but not exclusive* jurisdiction of all civil proceedings arising under title 11 or arising in or related to a case under title 11.") (emphasis added); *see also id.* § 157(a), (b)(1) (providing that each district

- 7 -

court "*may*" refer cases arising under, arising in, or related to the Bankruptcy Code to the bankruptcy courts and that bankruptcy courts "*may*" hear and determine such cases) (emphasis added); Second R&R at 9.  Indeed, disputed creditor claims against a debtor often proceed to judgment outside of the bankruptcy court administering the debtor's bankruptcy case.  *See, e.g.*, *In re Touloumis*, 170 B.R. 825, 828, 830 (Bankr. S.D.N.Y. 1994) (granting creditor relief from automatic stay to litigate claim against debtor in state court); *In re New York Med. Grp., P.C.*, 265 B.R. 408, 414 (Bankr. S.D.N.Y. 2001) (same).

In any event, a bankruptcy court's jurisdiction to determine the allowance of a claim against the debtor's estate filed in the bankruptcy proceedings does not mean that, when confronted with an action *filed by the debtor's trustee outside the bankruptcy court*, the court presiding over that lawsuit cannot address the fundamental question of the plaintiff's standing. *See, e.g.*, *Adelphia*, 390 B.R. at 94-95, 100 (dismissing fraudulent-transfer claims for lack of standing because they would not benefit legitimate creditors, even though bankruptcy court retained jurisdiction over allowance and disallowance of claims against estate).  As the Special Master notes, "it is axiomatic that a federal court has jurisdiction to determine its own standing." Second R&R at 8 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)).  Here, Plaintiff filed these actions in this Court rather than in the Delaware Bankruptcy Court where the Suffolk bankruptcy case is pending, and has acknowledged this Court's jurisdiction over these actions. Am. Comp. ¶¶ 10-15.  He cannot now complain that this Court is exercising that jurisdiction to assess his standing.

Plaintiff concedes, as he must, that "this Court has the power to determine whether a litigant has standing."  Objections at 16.  But he provides only lip service to this fundamental principle of law.  He contends that this Court's power – indeed responsibility – to assess its own

subject matter jurisdiction is all but meaningless, asserting that that this Court must find that Plaintiff has standing because Refco, SPhinX and the IRS have each filed proofs of claim in the Suffolk bankruptcy proceeding, and "[t]he United States District Court for the Southern District of New York may not adjudicate the validity of claims filed in the Suffolk bankruptcy case." *Id.* at 14-16. But the Court is doing no such thing. The Court's adjudication of this action does not bar Refco or any other purported creditor from pursuing a claim in the Suffolk bankruptcy proceeding. Indeed, none of those purported "creditors" is a party to this action, and none would therefore presumably be barred by collateral estoppel from pursuing their claims in that proceeding even if this Court concludes again that the Plaintiff lacks standing in this action. *See Envtl. Def. v. U.S. E.P.A.*, 369 F.3d 193, 202 (2d Cir. 2004) (collateral estoppel "bars a party from relitigating in a subsequent proceeding an issue of fact or law that was clearly raised in a prior action where *the party to be precluded* . . . had a full and fair opportunity to litigate the issue . . . and a decision on that issue was necessary to support a valid and final judgment on the merits") (emphasis added). In short, this Court is in no way invading the Delaware Bankruptcy Court's jurisdiction. This Court most assuredly has jurisdiction to determine whether the Plaintiff has standing to bring this action, which he voluntarily chose to file in this Court.[2]

**B.      As The Court Has Already Concluded, Refco Is Not A Legitimate Creditor.**

On the merits, Plaintiff primarily seeks to reargue this Court's prior decision that Refco is not a legitimate creditor for whom Plaintiff can bring this action. Objections at 17-19. By

---

[2] For this reason, Plaintiff's reliance on *Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Grp., Inc.)*, 335 B.R. 77, 81, 84 (Bankr. D. Del. 2005), is misguided. *See* Objections at 14. There, the court held that the bankruptcy court had exclusive jurisdiction to determine whether a claim filed in the bankruptcy case it was presiding over was allowable. Here, this Court would not be determining whether a claim in the Suffolk bankruptcy is allowable against the bankruptcy estate by dismissing Plaintiff's fraudulent transfer claim against the Bank Defendants, just as the Court did not do so when it dismissed Plaintiff's original complaint.

adopting the First R&R in its entirety, the Court concluded that "it would be wasteful and it would blink reality to allow the action to proceed on the ground that the Plaintiff might be able to prove that Refco is a legitimate creditor of the Suffolk estate that had nothing to do with the purchase of the PlusFunds shares."  Dismissal Order at 1-2; First R&R at 15.  Based on the original complaint, the Court and the Special Master determined that Refco was "an active party to the fraud alleged in the complaint," and thus Refco was not a legitimate creditor that could confer standing upon Plaintiff.  Dismissal Order at 1-2; First R&R at 14.

As the Special Master notes in the Second R&R, "Plaintiff does not seek to reargue the prior determination that there was fraud on Refco's side of the transaction."  Second R&R at 10. Indeed, just like the original complaint, the Amended Complaint is replete with allegations that Refco participated in and ratified the very transfers that Plaintiff now seeks to recover.  *See HSBC Bank U.S.A. v. Adelphia Commc'ns Corp.*, No. 07-CV-553A, 2009 WL 385474, at *6-7 (W.D.N.Y. Feb. 12, 2009).  Like the original complaint, the Amended Complaint alleges that Refco was intimately involved in structuring and authorizing the transaction.  First R&R at 14-15 (listing key facts supporting dismissal of Complaint); Am. Compl. ¶¶ 53, 56 (Suffolk was created for the purpose of purchasing PlusFunds shares and was thinly capitalized), ¶¶ 55-56 (Suffolk's principal asset was a series of "loans" from Refco, which Suffolk drew upon to facilitate the purchase of the PlusFunds shares); ¶¶ 151-152, 154, 161 (PlusFunds shares were of little or no value), ¶¶ 151-54 (Suffolk rendered itself insolvent by using the Refco funds to purchase the PlusFunds shares), ¶ 36, Firsenbaum Decl. Ex. C §§ § 7.1.6, 7.2.1 & Firsenbaum Decl. Ex. D § 5(a) (Credit Agreement required that the funds from Refco could be used only for the purchase of PlusFunds shares, and could be disbursed only with Refco's permission).  Plaintiff's own allegations are thus consistent with statements by the Refco Litigation Trustee – who filed the

Suffolk bankruptcy case – admitting that "this relationship was put into place by Phillip Bennet [sic] . . . with the intent that . . . the Suffolk entities would default on these loans [a]nd by virtue of that series of transactions [Refco] would actually end up owning Plus Funds."  Firsenbaum Decl. Ex. B at 6:25-7:7.

Plaintiff nonetheless argues that Refco is a legitimate creditor because "Bennett's fraud should not be imputed to Refco."  Objections at 18.  He contends that Bennett's actions were not "within the scope of his employment with Refco," that the Suffolk Insiders effectively blackmailed Bennett to cause Refco to make the "loans" under threat that they otherwise would expose the Refco fraud, and that "Refco did not . . . benefit as a result of the Suffolk Loan transactions."  *Id.* at 4, 17-18; Am. Compl. ¶ 35.  The Special Master correctly rejected these arguments.

*First*, the Special Master appropriately concluded that "Plaintiff's attempt to separate Bennett from Refco . . . is fatally flawed."  Second R&R at 11.  Phillip Bennett was Refco's Chief Executive Officer, and it is black-letter law that a corporation is liable for the acts of its agents taken within the scope of their agency.  *Id.* (citing Restatement of Agency Third §§ 2.04, 6.01, 7.03).  That Bennett may have been acting with fraudulent aims, or that he allegedly concealed information from other Refco officers and directors, does not mean that he was acting outside the scope of his employment with Refco.  Quite the contrary, the Amended Complaint alleges that "Bennett directed Refco Capital to loan monies to Suffolk to purchase the PlusFunds Shares."  Am. Compl. ¶ 49.  Plaintiff fails to explain how Bennett's actions in causing Refco to enter into the Credit Agreement with Suffolk purportedly fell outside the scope of his employment as CEO of Refco.

*Second*, the Special Master correctly concluded that, even under Plaintiff's contention that Bennett's actions cannot be imputed to Refco unless Refco benefitted, "Plaintiff's own allegations" show that "Refco *did* benefit from the Suffolk transactions."  Second R&R at 11 (emphasis in original).  According to Plaintiff's "blackmail theory," Refco's participation in the Phase I Loan enabled Refco to continue to hide its ongoing fraud from the public, providing Refco the obvious benefit of "corporate self-preservation."  *Id.*; Am. Compl. ¶¶ 34, 43, 49. Moreover, funding the Phase I Loan "allowed Refco to continue to use the millions of dollars of SPhinX assets that were managed by PlusFunds and held at RCM."  Second R&R at 11, *citing* Am. Compl. ¶¶ 24, 28, 30-32.

In any event, Plaintiff's attempt to separate Bennett from other executives at Refco is undermined by the Amended Complaint itself, which alleges that even the allegedly "innocent decision makers" of Refco authorized the transfers to the Bank Defendants that Plaintiff now seeks to avoid.  Am. Compl. ¶¶ 126, 128, 139, 144-46.  Fraudulent transfer law is designed to prevent a debtor from secretly transferring its assets to third parties in fraud of innocent creditors who expected to look to those assets for repayment of their claims.  Here, even Refco's supposedly "innocent" executives or directors never expected to look to the funds transferred to the Bank Defendants for repayment of its loan to Suffolk; on the contrary, Refco made the "loan" to Suffolk for the very purpose of funding those transfers to the Bank Defendants. Plaintiff may not now set aside those transfers as purported fraudulent conveyances for the benefit of Refco when Refco consented to those transfers in the first place.  *See, e.g.*, *Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993) (dismissing fraudulent-transfer claim that would benefit only a creditor that consented to the transfer); *In re Best Prods. Co.*, 168

B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer . . . can be ratified by a creditor who is then estopped from seeking its avoidance."), *aff'd*, 68 F.3d 26 (2d Cir. 1995).[3]

## C.     Plaintiff Has Not Alleged Adequately The Existence Of Any Other Legitimate Creditors.

Plaintiff also contends that Suffolk has two other purported creditors on which he can base his standing – SPhinX and the IRS.  Objections at 19-22.  But the Amended Complaint fails to allege any facts indicating that either has a valid claim against Suffolk, aside from the bare assertion that they have filed proofs of claim in the Suffolk bankruptcy case.  Am. Compl. ¶¶ 162 ("proofs of claim have been filed . . . [by] Refco . . . Internal Revenue Service . . . SphinX Trust Liquidating Trustee [and] JOLs of SPhinX Managed Futures fund"), 163 ("[c]urrently, each of the proofs of claim is prima facie valid, as none have yet been objected to by the Trustee . . .").  As the Special Master and this Court have already held, "[t]he mere filing of a claim cannot be enough to establish a legitimate triggering creditor."  First R&R at 16.  Instead, as the First R&R adopted by this Court made clear, Plaintiff would have to cure the original complaint's defects by "set[ting] forth factual assertions" – beyond the mere filing of a proof of claim – that "provide

_____

[3] Plaintiff's reliance on *Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000), and *Bondi v. Bank of Am. Corp. (In re Parmalat Secs. Litig.)*, 412 F. Supp. 2d 392 (S.D.N.Y. 2006), is misplaced.  Objections at 18-19.  In both cases, the court held that the so-called *Wagoner* rule (under which a bankruptcy trustee standing in the shoes of the debtor lacks standing to bring state law claims based on the debtor's own participation in a fraud) did not bar plaintiffs' aiding and abetting claims because the plaintiffs had adequately pled the adverse interest exception to the *Wagoner* rule.  *See Wight*, 219 F.3d at 86-87; *Bondi*, 412 F. Supp. 2d at 400.  Here, in contrast, Plaintiff brings a fraudulent transfer claim under the Bankruptcy Code – not state law aiding and abetting claims – and according to Plaintiff himself, the *Wagoner* rule (and thus the adverse interest exception) does not apply.  *See* Plaintiff's Mem. of Law in Opposition to the Bank Defendants' Motion to Dismiss the Complaint, dated July 31, 2009, at 8 (arguing that the *Wagoner* rule does not apply to Plaintiff's fraudulent conveyance claims).  In any event, even if the *Wagoner* rule governs here, as discussed above, Plaintiff alleges that the scheme at issue benefitted Refco.  Second R&R at 11.  Thus, the "narrow" adverse interest exception, *see Mediators, Inc. v. Mamney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997), does not apply in any event and Plaintiff lacks standing.

an explanation of why SPhynX [or the IRS] would be a legitimate triggering creditor."  First R&R at 16-17; Second R&R at 12-14.  As the Special Master notes, "[t]he Plaintiff did not accept the invitation."  Second R&R at 13.  Accordingly, the Second R&R properly concludes that the Amended Complaint fails to cure the original Complaint's defects.[4]

Indeed, as the Special Master notes, the record of the Refco MDL and Suffolk bankruptcy proceedings referenced in the Amended Complaint, ¶¶ 12-13, 162-63, highlights the implausibility of Plaintiff's reliance on the purported claims of the IRS and SPhinX.  Second R&R at 13-14 & n.13.  The IRS proof of claim notes that Suffolk has failed to file any tax returns, and thus merely asserts an "unassessed" claim for a "potential liability."  Declaration of Philip D. Anker, dated September 17, 2010 ("Anker Decl.") Ex. A.  The proof of claim further states that it "will be amended" and "adjusted as necessary" "[w]hen the debtor(s) files the return or provides other information as required by law."  *Id.*  The IRS claim is thus simply a placeholder, pending the receipt of information from which the IRS can determine whether, in fact, Suffolk has any tax liability.  Plaintiff has alleged that Suffolk had no assets or business activities and was saddled with losses from the moment it was formed.  In short, Suffolk had no pre-existing liability prior to the transaction at issue and is not alleged to have obtained any income or otherwise to have incurred any tax liability after the transaction at issue.  Thus, the Special Master correctly determined that Plaintiff has failed to allege any facts that could plausibly give rise to a valid claim by the IRS.  Second R&R at 13-14.

_____

[4] Plaintiff contends that "none of [the proofs of claims filed in the Suffolk bankruptcy] have been objected to" and thus such claims "are thereby presumptively valid and allowable." Objections at 16.  But Plaintiff, as the Chapter 7 Trustee in the Suffolk bankruptcy case, is the party principally charged with the duty to object to creditor claims, *see* 11 U.S.C. § 704(a)(4), and he explicitly reserves the right to do so later.  Plaintiff's Mem. of Law in Opposition to Bank Defendants' Motion To Dismiss, dated June 3, 2010, at 16.  He can hardly rely on his own failure to so act by now to establish his standing.

As to SPhinX, by its trustee's own allegations, SPhinX insiders worked with Refco insiders to orchestrate the very transactions Plaintiff seeks to avoid.  *See, e.g.*, SPhinX Am. Compl. ¶¶ 1, 9-10, 20, 38-40, 82, 177, 281-82, 304, 324, 390, 392, 395, 402-03, 405-07 (alleging, *inter alia*, that SPhinX directors, including Suffolk Insider Brian Owens, and SPhinX founder and agent Christopher Sugrue, another Suffolk Insider, conspired with Refco to "ensur[e] that SPhinX assets would remain at RCM for Refco's use" "[a]s part of the *quid pro quo* for the Suffolk Loans").  Thus, as a participant in the alleged fraudulent transfer, SPhinX, like Refco, cannot be a legitimate creditor for whom Plaintiff may recover.  Moreover, SPhinX has rejected the very allegations underlying Plaintiff's contention that SPhinX was a purported creditor victimized by a supposed fraudulent transfer.  For example, contrary to Plaintiff's allegations, SPhinX has taken the position in this MDL that the PlusFunds shares Suffolk acquired through the transfers at issue were worth hundreds of millions of dollars.  Anker Decl. Ex. B at 251:16-17 ("At the end of the day, PlusFunds was at $3 billion of assets under management."); Ex. C at 349:24-350:9 ("That's right.  PlusFunds has a business enterprise value of . . . It's several 100 million dollars . . .").)  In short, whatever other injury SPhinX may claim, it is *not* that SPhinX was owed a debt that Suffolk prevented SPhinX from collecting by transferring the funds in exchange for supposedly worthless PlusFunds shares; to the contrary, SPhinX evidently believes Suffolk received substantial value when it received those PlusFunds shares.  Thus, the Special Master correctly reasoned that "SPhinX would be estopped" from contending that its money was used to purchase worthless shares because SPhinX itself alleges that "PlusFunds was a going concern with a business enterprise value of hundreds of millions of dollars."  Second R&R at 13, n.13.

**II.    The Special Master Correctly Concluded That Plaintiff Has Not Alleged Adequately That Suffolk Acted With Intent To Defraud Any Creditor.**

The Special Master appropriately recommends dismissal of the Amended Complaint on a second, independent ground because, like the original complaint, the Amended Complaint fails to satisfy the pleading requirements for an intentional fraudulent transfer claim under Section 548(a)(1)(A) of the Bankruptcy Code, namely, that the debtor made the transfer with intent to defraud its creditors.  Second R&R at 19-21.

In addition to the standing requirement that a creditor of the debtor would benefit from avoidance and recovery of the transfer, Section 548(a)(1)(A) imposes a separate, merits requirement:  that the debtor made the transfer "with actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted."  11 U.S.C. § 548(a)(1)(A).  Plaintiff must both meet the heightened pleading standard of Rule 9(b) of the Federal Rules, and allege adequately that Suffolk acted with actual intent to hinder, delay or defraud *creditors* of Suffolk.  *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) ("As 'actual intent to hinder, delay, or defraud' constitutes fraud, it must be pled with specificity, as required by [Rule] 9(b)") (citations omitted); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 404 (Bankr. S.D.N.Y. 2007) (Section 548 allows a trustee to "avoid transfers of a debtor's interest in property made with actual intent to hinder, delay or defraud *creditors*") (emphasis added).  As the Special Master stated, "the transferor must have intended to deprive a creditor of property that the creditor could claim in bankruptcy."  Second R&R at 19.

The Amended Complaint's own allegations demonstrate that Suffolk lacked any such intent to defraud its creditors.  As the Second R&R correctly concludes, Plaintiff's argument that Suffolk undertook the Tender Offer for the purpose of defrauding Suffolk's creditors simply is

not plausible.  Second R&R at 19-20.  Suffolk did not even exist (and thus did not have any creditors) when Refco and insiders at PlusFunds hatched their supposed scheme to buy out the PlusFunds shareholders.  *E.g.*, Am. Compl. ¶¶ 34-36, 53, 56.  According to the Amended Complaint, Suffolk was created for the very purpose of carrying out a transaction that Refco and the PlusFunds insiders had already decided to undertake.  *Id.*  Thus, the decision to transfer the funds "loaned" by Refco to the PlusFunds shareholders obviously was not animated by any desire to prevent any Suffolk creditor – there was none – from collecting its claim against Suffolk.

As the Special Master correctly noted, these facts fail to state a claim for an intentional fraudulent transfer.  A fraudulent transfer occurs when a debtor owes a debt to a creditor, and intending to elude payment, secretly transfers its assets to a third party, thereby denying the creditor the ability to collect its debt from the debtor's assets.  Second R&R at 20 ("The fraudulent conveyance, as known in our law, may be roughly defined as an infringement of the creditor's right to realize upon the available assets of his debtor." (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery* (*In re Cybergenics Corp.*), 226 F.3d 237, 242 (3d Cir. 2000) (quoting Glenn, The Law of Fraudulent Conveyances § 1 (1931)); 5 *Collier on Bankruptcy*, 548.01 (15th ed. rev. 2009) ("A fraudulent transfer can essentially be defined as an act which has the effect of improperly placing assets beyond the reach of creditors").  But Suffolk was a paper company, with no assets, no business activities, and no creditors before entering into the transactions at issue.  It plainly was not undertaking those transactions for the purpose of defrauding creditors from collecting their claims against it.  Accordingly, the Amended Complaint fails to allege fraudulent intent within the meaning of Section 548(a)(1)(A) of the Bankruptcy Code.

Plaintiff sidesteps the Special Master's conclusion in his Objections.  Rather than explain how Suffolk acted with an intent to defraud a creditor, Plaintiff argues that "actual intent to defraud creditors is presumed" because he has pled facts supporting the existence of so-called badges of fraud.  Objections at 24.  But as the very cases Plaintiff relies on make clear, the badges of fraud are mere presumptions that, in the absence of direct allegations evidencing that the debtor did not act with fraudulent intent, *may* give rise to an inference of intent under appropriate circumstances.  *Id.* (citing *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("Actual fraudulent intent . . . *may* be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction [*i.e.*, badges of fraud]."); *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d Cir. 1994)) ("[t]he requisite 'strong inference' of fraud *may* be established . . . by alleging facts that constitutes strong circumstantial evidence of conscious misbehavior and recklessness" (emphasis added)); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) ("[T]he existence of several badges of fraud *can* constitute clear and convincing evidence of actual intent." (emphasis added)).  As the Special Master noted, "several badges of fraud considered together *may* afford a basis from which [fraudulent] intent can be presumed," but "the fact that several badges of fraud exist does not mandate such presumption."  Second R&R at 19 n.16 (quoting 9C Am. Jur. 2d Bankruptcy § 2231).

Here, the Amended Complaint contains direct allegations that defeat any plausible inference that Suffolk made the transfers to the Bank Defendants with intent to defraud its (non-

existent) creditors.  The badges of fraud therefore cannot give rise to an inference of a purported fraudulent intent that the Amended Complaint manifestly demonstrates did not exist.[5]

Finally, Plaintiff contends that the Special Master erred by not considering the "Phase II" loans – funds transferred by Refco to the Suffolk Insiders – in the Second R&R.  Objections at 23.  Plaintiff contends the Phase II loans were made with intent to defraud creditors, and that such intent should suffice to establish that the transfers to the Bank Defendants under the "Phase I" loans were also made with fraudulent intent.  *Id.*  Plaintiff's argument is without merit.  The Phase II loans involved *different* transfers (i.e., not those Plaintiff seeks to avoid in this action) that were made by *different* transferors (i.e., not by the debtor Suffolk here, but by *different* Suffolk Entities) to *different* recipients (the Suffolk Insiders).  Am. Compl. ¶¶ 57, 133-35.  Section 548(a)(1)(A) provides that "[t]he trustee may avoid any *transfer* . . . if the debtor voluntarily or involuntarily – made *such transfer* . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."  11 U.S.C. § 548(a)(1)(A) (emphasis added).  Thus, according to the plain language of the statute, the only relevant question is whether the debtor at issue, Suffolk, made the specific "transfer" of funds Plaintiff seeks to recover here – i.e. the transfer to the Bank Defendants – with the intent to defraud a creditor of Suffolk.  Allegations that *other* entities made *other* transfers in order to defraud their *own*, *separate* creditors simply does not bear on that question.

---

[5] For this reason, the cases on which Plaintiff relies are all fundamentally inapposite. Unlike here, those cases involved situations where the debtor was an operating entity with actual creditors prior to the transfer at issue, and thus the presence of several badges of fraud could, unlike this case, potentially give rise to an inference that the debtor made such transfer with the intent to defeat those creditors in the collection of their claims.  *See* Objections at 24-25 (citing cases).

## <u>CONCLUSION</u>

For these reasons, the Bank Defendants respectfully submit that the Court should adopt the Second R&R to the extent it concludes that Count II of the Amended Complaint should be dismissed with prejudice on grounds that (a) Plaintiff lacks standing because he has not adequately alleged the existence of a legitimate creditor of Suffolk, and/or (b) Plaintiff has not adequately alleged that the transactions he seeks to avoid were conducted with the intent to defraud any such creditor.[6]

Dated:     September 17, 2010                         Respectfully Submitted,

                                                WILMER CUTLER PICKERING
                                                    HALE AND DORR LLP

                                                By: /s/ Philip D. Anker_____
                                                    Philip D. Anker
                                                    Joel Millar
                                                    Ross E. Firsenbaum
                                                    Benjamin W. Loveland

                                                    399 Park Avenue
                                                    New York, New York 10022
                                                    Tel.: (212)-230-8800
                                                    Fax: (212)-230-8888

                                                    *Attorneys for Defendants Credit Suisse
                                                    First Boston Next Fund, Inc.; Lab Morgan
                                                    Corporation; and ML IBK
                                                    Positions, Inc.*

---

[6] The Bank Defendants further request that the Court adopt the Second R&R to the extent the Second R&R concludes that Count V of the Amended Complaint should be dismissed with prejudice.  *See* Second R&R at 21, n. 20; Limited Objection at 14, n.7.