**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X
                                                             :
In re REFCO INC. SECURITIES LITIGATION   : Case No. 07-md-1902 (JSR)
                                                             :
------------------------------------------------------------ X

                This Document Relates To:

------------------------------------------------------------ X
KENNETH M. KRYS, *et al.*,                  :
                                                             :
                                                             : Case No. 08-cv-3065 (JSR)
                                        Plaintiffs, : Case No. 08-cv-3086 (JSR)
                                                             :
              -against-                                 :
                                                             :
CHRISTOPHER SUGRUE, *et al.*,             :
                                                             :
                                   Defendants. :
------------------------------------------------------------ X
KENNETH M. KRYS, *et al.*,                  :
                                                             :
                                        Plaintiffs, : Case No. 08-cv-7416 (JSR)
                                                             :
              -against-                                 :
                                                             :
ROBERT AARON, *et al.*,                      :
                                                             :
                                   Defendants. :
------------------------------------------------------------ X
KENNETH M. KRYS, *et al.*,                  : Case No. 08-cv-8267 (JSR)
                                                             :
                                        Plaintiffs, :
                                                             :
              -against-                                 :
                                                             :
RICHARD BUTT,                                       :
                                                             :
                                     Defendant. :
------------------------------------------------------------ X

# DECLARATION OF KENNETH W. MCGRAW

1. I make the following declaration upon my own personal knowledge and belief and upon my review of the facts and allegations presented to me concerning the matters set forth herein. I reserve the right to modify the opinions and conclusions stated herein as additional facts are called to my attention.

2. I have 50 years of experience in the financial industry, including work as an investment banker, consultant and expert witness. I am a managing director of CFC Capital LLC and a senior consultant to Charles River Associates. I have served as the managing director of Patricof & Co. Capital Corp., a venture capital and private equity firm; directed the finance department of Robert Garrett & Sons, an investment banking house; and acted as assistant to the financial vice president of Baltimore Gas & Electric Company. I have advised companies and provided expert testimony in numerous complex transactions and disputes. Subjects have included business and securities valuation, solvency, executive compensation, and investment banking practices. I have testified and advised counsel in numerous matters involving investment advisors. I advised counsel in the Adelphia criminal matter regarding executive compensation, borrowing practices, and the defendants' ability to repay amounts borrowed. I have a B.A. in chemistry and MLA in philosophy and literature from Johns Hopkins University and an M.B.A. in finance from Harvard University. My curriculum vitae is attached hereto as Exhibit A.

3. I have been retained by counsel for Kenneth Krys and Margot MacInnis, the Joint Official Liquidators ("JOLs") of the SPhinX Funds, and The Harbour Trust Co. Ltd., the Trustee of the SPhinX Trust, to render expert testimony in connection with pending matters in the Refco Multi-District Litigation in the United States District Court for the Southern District of New

York before the Honorable Jed S. Rakoff.  I understand that the JOLs and the Trustee are plaintiffs in matters captioned *Krys v. Sugrue*, Nos. 08-cv-3065 (JSR), 08-cv-3086 (JSR); *Krys v. Aaron*, No. 08-cv-7416 (JSR); *Krys v. Butt*, No. 08-cv-8267 (JSR); and *Krys v. Deutsche Bank Securities Inc.*, No. 10-cv-3594 (JSR).

4. In connection with my engagement, I have reviewed the Amended Complaint in the *Krys v. Sugrue* matter and the December 6, 2010 Report and Recommendation of the Special Master on the Omnibus Issue of *In Pari Delicto* and *Wagoner* (the "R&R").

5. In addition, I have reviewed the following documents:

- Amended Complaint, *Krys v. Aaron*.
- Excerpts from the transcript of deposition testimony by Santo Maggio: (i) December 14, 2009, pp. 70-73; (ii) December 16, 2009, pp. 1127-36; (iii) January 6, 2010, pp. 1393-1403.
- Excerpts from Complaint, *Krys v. Deutsche Bank*.
- Standby Credit Facility Agreement between PlusFunds, Inc. and Refco Capital LLC, dated April 13, 2005 (SPX-001832-1872).
- Offering Memorandum for SPhinX Ltd., dated May 2004 (SK 4410-4483).
- Excerpts from the transcript of deposition testimony by Vera Kraker, Aug. 12, 2009, pp. 57-67, 72-84, 117-29, 144-52.
- E-mail correspondence from Gabriel Bousbib to Bella Brenner, Sept. 10, 2004 (PLF-NYS01-00850960-61).
- E-mail correspondence from David Henritze to Gabriel Bousbib, Aug. 20, 2004 (PLF-DW-0011092-94).

2

- E-mail correspondence from Christopher Aliprandi to Chris Rose and Tia Urban, Oct. 14, 2004 (PLF-NYS01-00566372).

- E-mail correspondence from Gabriel Bousbib to Thomas Hackl, Nov. 11, 2004 (GB 0322).

6. I am informed that the Special Master issued a Report and Recommendation in which he concluded that the only SPhinX entity with standing in this litigation is SPhinX Managed Futures Fund SPC ("SMFF"). I am further informed that Judge Rakoff adopted this finding of the Special Master and that, as a result, SMFF is the only relevant SPhinX entity for purposes of this analysis.

7. I was asked in particular to focus on pages 22-25 of the R&R, in which the Special Master concludes that SPhinX and PlusFunds received various "benefits" from transactions, wrongdoing or relationships with Refco. Specifically, the Special Master concludes that each of the following transactions or relationships provided a "benefit" to SPhinX and PlusFunds:

- "[B]eginning in December 2003, RCM paid interest on the SMFF funds that were transferred from Refco LLC. SAC ¶ 198." R&R at 23.

- "Refco provided SPhinX $70 million in investment capital to 'seed' the Managed Futures Index. SAC ¶ 140." R&R at 24.

- "In April 2005 Refco extended a $25 million credit facility to PlusFunds to provide SPhinX investors interim secondary market liquidity. SAC ¶ 304." R&R at 24.

- "Refco worked to obtain investors for the SPhinX Funds (SAC ¶ 144) and agreed to market investments in SPhinX and SMFF. (SAC ¶ 159). Refco established investment vehicle funds that incorporated the SPhinX mark in order to promote investment in SPhinX. (SAC ¶ 146). Refco Alternative Investments ("RAI") created, marketed, and

3

managed these investment vehicle funds. (SAC ¶¶ 158, 1034). As of October 2005 at least $100 million of the assets in the SPhinX Funds had been invested through RAI-managed funds. SAC ¶ 1042)."

8. I have been asked to offer an opinion on whether these transactions or relationships benefited SPhinX, its investors or PlusFunds. It is my opinion that none of these transactions was beneficial to SPhinX, its investors or PlusFunds or, to the extent any of these transactions provided a benefit to any of these persons, such benefit was not a result of alleged fraudulent acts by SPhinX or PlusFunds agents.

**Benefit and Harm**

9. In the financial industry, the "benefit" of any transaction is not always the nominal dollar amount of the transaction. The "benefit" of the transaction is the value of any consideration provided to the company minus what the company gives up in the transaction – in other words the transaction's opportunity cost.

10. Thus, conveying a service or an asset in exchange for inadequate consideration would not be considered a benefit but a loss. The receipt of inadequate compensation for an asset would be considered a harm or a detriment to the company.

11. For example, consider the following scenario. I am an employee of Company ABC. My friend owns Company XYZ, a window-washing business, which has just had its vehicle break down and cannot afford to buy a new one at the market rate. I transfer Company ABC's brand-new Mercedes car to Company XYZ in exchange for five dollars. After driving the car for a while, my friend decides to retire and sells the car for $40,000. He gives me a cut of the proceeds, which I pocket for myself, as a token of gratitude for providing the Mercedes at well below the market price. He also gives three of my fellow employees at

Company ABC a cut of the proceeds to induce them not to tell Company ABC's board of directors about the collusive transaction. It cannot fairly be said that Company ABC has "benefited" from the transaction. The company suffered a substantial loss, despite the fact that it received five dollars from the transaction. The economic reality of the transaction is that the company has been looted by disloyal employees.

12. To give another example, suppose you have a balance in a bank account that is FDIC insured and earns 5% interest. Your bank transfers your balance to a new account that also pays 5% interest and is identical in every way, except that it is not insured. Do you "benefit" from the transfer? No, you have lost the insurance on your balance and have gained nothing in return. This is true even though you nominally earn interest in the new account.

13. Now assume the facts as stated in the previous paragraph, except that interest in the new account is only 3%. Do you benefit from the transfer? Here it is doubly clear that you do not benefit. Not only have you lost the insurance on your balance; you have also lost 2% in interest and gained nothing in return. Again, this is true even though you nominally earn 3% interest in the new account. No rational actor would agree to such a transfer. If someone else purports to authorize such a transfer in your name, it is impossible to believe that such person is acting for your benefit. It is only plausible that such person is acting out of some selfish motive – perhaps he gets a kickback or has a personal relationship with someone at the bank.

14. Now let us add another wrinkle to our scenario. Suppose that the next time you stop by the local branch of the bank, the manager gives you a free toaster to show the bank's appreciation for your being a longtime customer. Now do you benefit from the transfer? No, because the toaster is gratuitous and is not part of the transaction that sent your balance to an

uninsured account. You could have kept your money in the insured account and still received the toaster.

15. Now suppose that the bank issues you a home-equity line of credit at 10% interest, the same rate it offers to other customers of similar credit risk. You pay a monthly fee for the line of credit but never draw on it. Now do you benefit from the cash transfer described above? The answer is still no. The line of credit is a stand-alone transaction with consideration from both parties and is not part of the transaction that sent your money to an uninsured account. The line of credit, if you actually needed it, could have been obtained on comparable terms from the same bank or a different bank while keeping your cash balance in an insured account.

16. Now suppose that the balances in your cash accounts at the bank are more than sufficient for your current and foreseeable future cash-flow needs. Further suppose that, as a condition for providing the line of credit, the bank requires that you do all your banking with that bank. However, unbeknownst to you, the bank is insolvent and can satisfy its obligations, if at all, only by taking from your cash balances. Do you benefit from either the cash transfer or the line of credit? Clearly you do not. The line of credit still is not part of the transaction that sent your cash to an uninsured account, and if you had known the truth you could have obtained a line of credit from a solvent bank if the need were to arise. If someone knowing the truth purports to enter into such a transaction on your behalf, it is impossible to believe that such person is acting for your benefit. It is only plausible that such person is acting out of some selfish motive – perhaps he gets a kickback or has a personal relationship with someone at the bank.

17. I now turn to the R&R's specific assertions of "benefit" to SMFF, its investors and PlusFunds.

**Interest on cash deposited with RCM**

18. It is my opinion that the purported interest accrued on SMFF on cash deposited with RCM cannot be considered a benefit to SMFF, its investors or PlusFunds.

19. The facts, as I understand them, are as follows. According to the Amended Complaint, certain culpable SPhinX and/or PlusFunds insiders agreed to or allowed the movement of SMFF's cash from customer-segregated accounts at Refco LLC to non-segregated accounts at RCM beginning in late 2002. *See* Amended Complaint ¶¶ 1, 5-6, 192-96. Plaintiffs allege that this movement was improper and a breach of the duties of Refco and other parties involved in the movement of the cash. Plaintiffs allege that deposits received interest while at Refco LLC. The movement of the cash out of Refco LLC to non-segregated accounts subjected the SMFF cash to additional risk of loss.

20. The additional risk to which the cash was exposed in non-segregated accounts was substantial. While in customer-segregated accounts at Refco LLC, the cash was protected from Refco's insolvency and the claims of Refco's creditors. It could not be commingled with Refco's own assets or be used by Refco to fund its business. The cash would have had priority status in bankruptcy proceedings. Once the cash was transferred to non-segregated accounts, it was commingled with RCM's own assets and upstreamed to fund the activities of other Refco entities, with no assurance of return. The cash lost its protection against Refco's insolvency and priority in bankruptcy, and was thus totally exposed to the claims of Refco's creditors.

21. For most of 2003, the SMFF cash deposited at RCM earned no interest income; thus, it cannot be said that SMFF took on additional risk by depositing cash at RCM in exchange for a negotiated interest rate. For this period, there was no benefit to SMFF, its investors or PlusFunds from the movement of the cash, and in fact there was a double detriment: additional risk and the loss of interest that would have been earned at Refco LLC. In essence, SMFF paid for the privilege of incurring additional risk at RCM by giving up rights to interest on the cash – an economically irrational transaction from the perspective of SMFF – and without any benefit at all to SMFF, its investors or PlusFunds.

22. From approximately December 2003 until December 2004, RCM purported to credit the SMFF accounts interest at the one-month LIBOR rate minus 35 basis points on cash deposited with RCM. I am informed that this rate was negotiated by PlusFunds agents not alleged to have been involved in any fraud or wrongdoing. Again, it does not appear that this rate was negotiated as an exchange for the maintenance of SMFF cash in unprotected accounts. Thus, in my opinion, the interest rate, even if it had been paid, is not a benefit of fraudulent conduct.

23. Both principal and interest were not actually kept at RCM. According to the pleadings and testimony of Vera Kraker, an RCM employee, available cash was swept daily from RCM to affiliated Refco entities to fund their operations. When SMFF liquidated its accounts at RCM after the disclosure of fraud at Refco, SMFF was only able to retain a portion of its principal and never recovered any of the interest accrued on its RCM accounts. Thus, although RCM purported to accrue interest on SMFF's cash balances at RCM, none of the interest was paid to SMFF. By contrast, SMFF was able to recover substantially all of the SMFF deposits in segregated accounts at Refco LLC, including any accrued interest.

24. It is my opinion that the payment of interest from December 2003 to December 2004 cannot be characterized as a "benefit" to SMFF, its investors or PlusFunds. Because the interest accrued was less than what would have accrued on segregated deposits at Refco LLC, and because none of the accrued interest in RCM accounts was actually paid, the interest accrued on the diverted cash amounts to a negative from the perspective of SMFF because of the lost opportunity cost of interest rates that would have been received from Refco LLC. Again, coupled with the additional risk to deposits held at RCM, this is a double detriment, not a benefit, to SMFF, its investors and PlusFunds and is economically irrational.

25. I am informed that, beginning in approximately December 2004, SPhinX accrued 90% of the 90-day treasury bill rate in interest on SMFF cash at RCM. As alleged in the Amended Complaint, this interest rate was negotiated by PlusFunds' CEO, Gabriel Bousbib, based on assurances that the cash was held in segregation. Thus, Bousbib's ability to negotiate the increased interest rate was compromised by misinformation regarding the segregation of the cash at RCM. Again, none of the accrued interest was actually paid to SMFF or its investors.

26. Even with the increased rate, SMFF still accrued less in interest in RCM accounts than it would have received in segregated accounts at Refco LLC. I have reviewed Plaintiffs' allegations in the *Krys v. Deutsche Bank* matter, which include specific details regarding interest rates purportedly accrued at RCM versus interest rates actually earned at Refco LLC. It appears that, even in 2005, after Bousbib negotiated increased rates, SMFF still was to accrue less in RCM accounts than it would have received from Refco LLC. Even if SMFF had received and actually been paid the same rate at RCM as at Refco LLC, this is still an economically irrational transaction from the perspective of SMFF because it takes on

9

additional risk without any compensation in the form of an increased interest rate. Again, there is no benefit to SMFF, its investors or PlusFunds.

27. Furthermore, the misrepresentation to Bousbib that the SMFF cash was held in segregation undermines the possibility of a benefit to SMFF from holding cash at RCM. The increased rate, though still insufficient and a loss to SMFF, was only offered to keep Bousbib from removing the cash. Again, RCM's increased rate was merely a lesser injury, still coupled with undisclosed additional risk to the assets. Considering the fact that Bousbib appears to have been defrauded in connection with the increased rate, it is my opinion that a below-market rate, coupled with undisclosed additional risk, could not be considered a benefit to SMFF, its investors or PlusFunds.

28. Even if the interest were somehow considered a benefit to SMFF, its investors or PlusFunds, the fact that it was negotiated by Bousbib, who is not alleged to have been a wrongdoer, coupled with the fact that Bousbib's efforts to obtain greater interest were *opposed* by the alleged wrongdoers, suggests that the payment of interest was not in any way linked to the fraudulent activity that allegedly occurred and, therefore, cannot be considered a benefit of the fraud.

**Provision of Seed Capital**

29. The Amended Complaint alleges that Refco provided $70 million through an intermediary, Sentinel Bank, to seed the Managed Futures Index. *See* Amended Complaint ¶ 140. I see nothing in the Amended Complaint or the documents I have reviewed suggesting that the seed capital was connected to the movement of SMFF's cash out of segregated accounts to non-segregated accounts at RCM, so there appears to be no corresponding "benefit" to SMFF, its investors or PlusFunds from the movement of that cash.

*The provision of seed capital did not benefit SMFF*

30. As I understand the facts, the SPhinX Funds including SMFF did not, and were not designed to, generate profits for any SPhinX entity. The SPhinX Funds existed solely as investment vehicles. For every dollar received by a SPhinX entity, the entity incurred a corresponding obligation to investing shareholders. Any money that was invested was intended to pass through, either to cover expenses of the portfolio fund or to be returned to investors.

31. In my opinion, the provision of the seed capital investment cannot be characterized as a "benefit" to SMFF for the simple reason that the SMFF was not a profit-generating entity that profited from deposits. Accordingly, SMFF did not benefit or gain based upon the level of assets raised and invested with SMFF.

*The provision of seed capital did not benefit SMFF's investors*

32. It does not appear to me that Refco's provision of seed capital benefited SMFF's investors, none of whom would have been affected in any way by the provision of seed capital or any other investment activity by a separate investor.

*Any benefit to PlusFunds from the provision of seed capital was unrelated to the alleged fraud*

33. I also would not consider the provision of $70 million seed capital to constitute a benefit to PlusFunds. Although PlusFunds earned a fee based upon assets under management, $70 million in the context of a $3 billion family of funds is *de minimus*.

34. Further, the provision of such capital seems more likely to represent a legitimate investment in or the promotion of a legitimate relationship between the Funds and Refco, as opposed to a *quid pro quo* for subjecting hundreds of millions of dollars of free cash to undisclosed risk. Refco received substantial consideration for the provision of seed capital, apart from any fraudulent activity. It received a cash fee of $50,000 annually, in addition to any returns that

11

Refco earned from its investment in SPhinX. The deal thus stands on its own with legitimate consideration from both sides. I have seen no allegation or evidence that Refco required SMFF to move its cash to non-segregated accounts at RCM as a condition for providing seed capital or that the seed capital was otherwise tied to such fraudulent activity.

**Standby Credit Facility**

35. Plaintiffs allege that Refco extended approximately $200 million to three PlusFunds shareholders, Chris Sugrue, Mark Kavanagh and Brian Owens, to finance those shareholders' acquisition of minority shares of PlusFunds stock. The Amended Complaint alleges that as a condition of Refco providing that financing, Sugrue, Kavanagh and Owens caused PlusFunds to enter into a Standby Credit Facility, pursuant to which Refco agreed to provide a $25 million credit facility to PlusFunds.

*The Standby Credit Facility did not benefit SMFF*

36. Based on the allegations of the Amended Complaint, it is my opinion that the Standby Credit Facility cannot reasonably be said to have benefited SMFF. I have reviewed the Standby Credit Facility, and SMFF is not a party to it. The borrower is PlusFunds, not SMFF.

37. Moreover, it also appears from the Amended Complaint that SMFF itself had hundreds of millions of dollars of unencumbered cash. *See* Amended Complaint ¶¶ 11-12, 192. This suggests that SMFF had no need of a credit facility to provide liquidity, and that the Facility was put in place for some other entity or purpose. To the extent SMFF was allocated some of the costs of this facility, which is not alleged in the Amended Complaint, that allocated cost would have been a detriment to SMFF, which would never need to draw on a $25 million credit facility when it had hundreds of millions of dollars of unencumbered cash available.

38. Finally, it appears from the Amended Complaint that Refco was in fact insolvent no later than the August 2004 LBO, and that Refco affiliates relied upon diverted customer assets, including SMFF's excess cash, to sustain operations. Under this scenario, the Standby Credit Facility was likely worthless because Refco would have been unable to satisfy its obligations under the Facility, or would have relied upon diverted customer assets (including SMFF's excess cash) to satisfy any claim made upon the Facility.

39. Moreover, if the Standby Credit Facility was a condition of financing extended to entities controlled by Sugrue, Kavanagh and Owens, as Plaintiffs allege, such a transaction cannot be said to constitute a benefit to SMFF, particularly not without full disclosure to SMFF's disinterested directors, as SMFF does not appear to have understood, signed off on or approved the transaction.

40. In my experience, a concealed nine-figure loan from a party with whom SMFF does business would have been a conflict of interest that should have been fully disclosed to SMFF's disinterested directors, particularly by Owens, who was a SPhinX director. Participation in such an undisclosed transaction would have subjected SMFF to potential liability and regulatory problems, and cannot be said to benefit SMFF under the circumstances.

*The Standby Credit Facility did not benefit SMFF's investors*

41. It does not appear to me that the Standby Credit Facility benefited any of SMFF's investors, who likely would have objected to such a transaction had it been properly disclosed. Such investors did not stand to gain from additional liquidity in light of the fact that SMFF had substantial excess cash available to satisfy redemption requests. Additionally, if the cost of the facility was passed on to SMFF, this would have unfairly burdened SMFF's investors.

*The Standby Credit Facility did not benefit PlusFunds*

42. It is also my opinion that the Standby Credit Facility cannot be said to have benefited PlusFunds. It is unclear to me why PlusFunds would even have been party to such an agreement. The proper party should have been the particular SPhinX Funds that may have anticipated the need for such a facility. PlusFunds had no obligation to investors and no need for a credit facility.

43. Additionally, PlusFunds was required to pay a standby fee of $125,000 annually (0.50% of the unused amount of the facility). Had PlusFunds drawn on the facility, any borrowings would have been secured and PlusFunds would have paid a fulsome rate of interest to Refco. Moreover, as stated above, Refco was insolvent and likely could not have fulfilled its obligations without looting from customer cash.

44. Thus, it would be irrational to conclude that the Standby Credit Facility served as any sort of benefit to PlusFunds for participation in the fraud – as opposed to a personal payoff to Sugrue, Kavanagh and Owens personally.

**Distribution of Investments in SPhinX**

45. According to the Amended Complaint, Refco and RAI distributed investments in the SPhinX Funds and sponsored investment vehicles designed to promote the SPhinX Funds. I see nothing in the Amended Complaint tying Refco's promotion of SPhinX to the movement of SMFF's excess cash to RCM. Thus, Refco's promotion of SPhinX does not appear to have been anything other than a legitimate relationship.

*Distribution of investments in the SPhinX Funds did not benefit SMFF*

46. As with the provision of the Seed Capital, it does not appear to me that distributing investments in the SPhinX Funds would constitute a benefit to SMFF. Every asset invested

14

in SMFF was exactly offset by an obligation to the investor.  SMFF did not gain anything from additional investors and did not stand to profit or benefit in any way therefrom.

*Distribution of investments in the SPhinX Funds did not benefit SMFF's investors*

47. Similarly, it is my opinion that the promotion of SPhinX by Refco did not advantage SMFF's investors in any way.  No investor stood to gain from investment activity by other, separate investors.

*Any benefit to PlusFunds from the distribution of investments in the SPhinX Funds was not related to the alleged fraud*

48. Although PlusFunds received fees based on assets under management, it does not appear that Refco's distribution of SPhinX was tied to the wrongdoing alleged in this litigation.  Accordingly, it is my opinion that PlusFunds did not benefit from the diversion and misuse of SMFF's cash at RCM.

49. In summary, it is unsurprising to me that there were myriad transactions between SMFF and/or PlusFunds on the one hand and Refco on the other, as these parties historically had relationships and were active in the same or related markets.  Most of these transactions appear to have been legitimate transactions of the type that countless parties regularly enter into at arms length and do not appear to be the fruits of corruption.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on December 23, 2010.

_____
Kenneth W. McGraw

# Exhibit A



**CFC Capital LLC**  1155 Avenue of the Americas, 18th Floor, New York, NY 10036

### KENNETH W. MCGRAW
Managing Director

M.B.A. Finance,
Harvard University

MLA Philosophy and Literature,
Johns Hopkins University

B.A. Chemistry,
Johns Hopkins University

Over the past four decades, Mr. McGraw has acquired extensive experience in investment banking and financial consulting.  He has rendered financial advice and service to numerous companies in many industries, and has participated in some of the most notable transactions in history. As a leading expert in providing financial analyses, particularly for liability and damage purposes in complex corporate disputes relating to the value of untraded securities, custom of the trade in investment banking, executive compensation, and solvency, Mr. McGraw is frequently called upon to provide expert testimony.

#### EXPERIENCE

2005–Present    *Senior Consultant,* Charles River Associates

1975–Present    *Managing Director*, CFC Capital LLC

1988–1998       *Managing Director*, Patricof & Co. Capital Corp., an affiliate of Apax Partners.

1963–1974       Alex. Brown & Sons – Robert Garrett & Sons

   Became an allied member of the New York Stock Exchange and directed the corporate finance department of Robert Garrett & Sons.

1960–1963       *Assistant to the Financial Vice President*, Baltimore Gas & Electric Company

   Prepared rate cases and new issues of securities.

1957–1959       *Chemist*, Petroleum Catalyst Laboratory, Davison Chemical Division, W. R. Grace & Co.

#### INVESTMENT BANKING AND VALUATION

Mr. McGraw has broad experience in presenting analyses of business issues and securities valuation. During his career as an investment banker and an expert witness, he has been engaged to analyze hundreds of businesses throughout the U.S. and in other countries.

Some examples:

- RJR Nabisco—He was engaged to advise shareholders as to the value of the various securities offered by competing parties seeking to take RJR Nabisco private and to appear as the expert witness in litigation regarding the transaction.

- BMW—He valued the major European distribution subsidiaries of Bayerishe Motorwerke AG (BMW) in connection with a corporate restructuring.

- Salomon Brothers, Smith Barney Shearson Lehman, and Bear Stearns—He was engaged by these preeminent investment banking firms to defend at trial their professional practices in preparing and rendering fairness opinions.

- He valued for ESOP, litigation, and for recapitalization purposes several of the largest privately owned businesses in the U.S.

- Adelphia and Waste Management—He was engaged to assist the defendants in the recently concluded Adelphia criminal trial and also the former management in the Waste Management litigation.

## MERGERS AND ACQUISITIONS

As an investment banker, Mr. McGraw has advised and assisted domestic and foreign corporations in divestiture, going-private, and acquisition transactions. He has effected the sale of numerous privately held businesses in fields including cellulose fiber, retailing, electrical equipment manufacturing, credit reporting, recycling, railroad car manufacturing, and corrugated box production.

## EXPERT WITNESS AND LITIGATION SUPPORT

Mr. McGraw has been called as an expert witness in many federal and state courts, as well as before the Iran-U.S. Claims Tribunal in the Hague. Among the parties for which he has been called to testify are: Atomic Energy of Canada, Bank America, Brown-Foreman, Dominion Resources, Foremost-McKesson, General Electric, Honeywell, Internal Revenue Service, Marriott, Media General, Mellon Bank, Motorola, Official Committee of Asbestos Claimants, Otis Elevator, Overseas Private Investment Corporation, Peat Marwick, Phelps Dodge, Reader's Digest, and United States Shoe.

## SOLVENCY OPINIONS

Mr. McGraw directed the preparation of analysis of solvency for the benefit of lenders and others in the following major transactions:

Time/Warner merger; creation of The Uniroyal Goodrich Tire Company; leveraged buy-outs of Uniroyal Inc.; Sheller-Globe Corporation; Westin Hotel Company; Lear Siegler Seating Group; Borg Warner Industrial Products, Inc., Kraft Foodservice, Inc., and others.

Mr. McGraw was also engaged for retrospective solvency analysis of Breed Technologies, Kaiser Steel, Merry-Go-Round and others.