**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| IN RE: REFCO INC. SECURITIES LITIGATION | : | Case No. 07 MDL 1902 (JSR) |
| | : | |
| | : | |
| THOMAS H. LEE EQUITY FUND V, L.P., | : | |
| THOMAS H. LEE PARALLEL FUND V, L.P., | : | |
| and THOMAS H. LEE EQUITY (CAYMAN) | : | |
| FUND V, L.P., | : | |
| | : | |
| Plaintiffs/Counterclaim Defendants, | : | Case No. 07 Civ. 8663 (JSR) |
| | : | |
| v. | : | |
| | : | |
| GRANT THORNTON LLP, | : | |
| | : | |
| Defendant/Counterclaim Plaintiff. | : | |
| | : | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## THL'S MOTION FOR SUMMARY JUDGMENT
## <u>ON GRANT THORNTON'S COUNTERCLAIMS</u>

KELLOGG, HUBER, HANSEN, TODD,
 EVANS & FIGEL, P.L.L.C.
 1615 M Street, N.W., Suite 400
 Washington, DC  20036
 (202) 326-7900

WEIL GOTSHAL & MANGES LLP
 767 Fifth Avenue
 New York, NY  10153
 (212) 310-8000

*Attorneys for Thomas H. Lee Equity Fund V, L.P.,*
*Thomas H. Lee Parallel Fund V, L.P., and*
*Thomas H. Lee Equity (Cayman) Fund V, L.P.*

January 14, 2011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

I.    GT HAS NO CLAIM FOR AIDING AND ABETTING FRAUD ................................... 1

    A.    THL Did Not Substantially Assist Any Fraud on GT............................................ 1

    B.    THL Did Not Know or Consciously Avoid Knowing About Any
        Fraud on GT ........................................................................................................ 5

    C.    There Is No Evidence that THL Caused Damage to GT ....................................... 8

II.   THL IS ENTITLED TO SUMMARY JUDGMENT ON
      CONTRIBUTION ......................................................................................................... 10

CONCLUSION ................................................................................................................. 10

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anwar v. Fairfield Greenwich, Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3341636,
 at *55 (S.D.N.Y. Aug. 18, 2010) ........................................7

*Castro v. County of Nassau*, --- F. Supp. 2d ---, No. 08-CV-0297 (JFB)(ETB),
 2010 WL 3713185, at *22 (E.D.N.Y. Sept. 13, 2010)......................10

*Central Trust Co., Rochester v. Goldman*, 417 N.Y.S.2d 359 (App. Div. 1979)...........9

*Coopers & Lybrand v. Levitt*, 384 N.Y.S.2d 804 (App. Div. 1976):

 384 N.Y.S.2d at 806.................................................9

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001):

 137 F. Supp. 2d at 470 ..........................................1, 2, 3
 137 F. Supp. 2d at 472 ...........................................3, 4

*Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2003 WL 21436164, at *9
 (S.D.N.Y. June 23, 2003)..............................................7

*Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305 (2d Cir. 1986) .......................9

 792 F.2d at 309 ...................................................9

*Gonzales v. Armac Indus., Ltd.*, 81 N.Y.2d 1, 5 (1993)............................10

*JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005) ..........4

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006) ......................7

*Nathel v. Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008) .......................7

*National Union Fire Ins. Co. v. Califinvest*, No. 90 Civ. 2476 (LLS), 1991 WL
 12361, at *3 (S.D.N.Y. Jan. 28, 1991)................................5

*Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95 Civ. 5399 (JSR),
 1998 WL 651076, at *2 (S.D.N.Y. Sept. 23, 1998)......................7

*Primavera Familienstifung v. Askin* 130 F. Supp. 2d 450, 466, 511-12 (S.D.N.Y.),
 *amended on recon. in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001) ...................4

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir.), *opinion amended*,
    Nos. 77-7104 & 77-7124, 1978 WL 4098 (2d Cir. May 22, 1978) ....................................4

*Shindler v. Lamb*, 211 N.Y.S.2d 762 (Sup. Ct. 1959), *aff'd*, 200 N.Y.S.2d 346
    (App. Div. 1960), *aff'd*, 172 N.E.2d 79 (1961) ....................................................9

*Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP*, 586 F. Supp. 2d 119,
    131 (S.D.N.Y. 2008) ..................................................................................8

*Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, No. 07 Civ.
    6915 (DLC), 2010 WL 3199861, at *13 (S.D.N.Y. Aug. 11, 2010) .................................9

*Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891 (S.D.N.Y. 1990) ...................................9

    739 F. Supp. at 896 ....................................................................................9

*Westport Marina, Inc. v. Boulay*, --- F. Supp. 2d ---, Civil Action No. 06-CV-
    5569, 2010 WL 1223238 (E.D.N.Y. Mar. 24, 2010) ............................................9

## STATUTES AND RULES

15 U.S.C. § 78u-4(f)(7)(A) .............................................................................10

N.Y. Gen. Oblig. Law § 15-108(c) .....................................................................10

Fed. R. Civ. P. 56.1 .............................................................................4, 6, 10

## OTHER AUTHORITIES

Report and Recommendation of the Special Master, *Kirschner v. Bennett*,
    No. 07 Civ. 8165 (JSR) (S.D.N.Y. filed June 3, 2010):

        pp. 31-32 ....................................................................................8
        p. 34 ............................................................................................2

Grant Thornton ("GT") has dropped all of its Counterclaims against THL, except for its claim for aiding and abetting fraud.  That claim fails, however, because GT has no evidence that THL substantially assisted Refco when Refco allegedly induced GT to issue false audit opinions by falsifying Refco's financial statements through the RGHI Receivable and the Round-Trip Loans ("RTLs").  Nor is there evidence that THL knew about the RGHI Receivable or the RTLs. GT also has failed to submit any evidence that anything THL did caused GT damages.  Finally, the Court should reject GT's attempt to save for another day its contribution claim; GT should not be permitted to later relitigate its flawed claims against THL in the guise of a contribution action.

## I.      GT HAS NO CLAIM FOR AIDING AND ABETTING FRAUD

### A.      THL Did Not Substantially Assist Any Fraud on GT

GT has abandoned the theory of substantial assistance it asserted in its Counterclaim.[1] Instead, GT asserts a brand new theory – that THL substantially assisted the fraud on GT by allegedly helping Refco with its IPO.  *See* Opp. 14-17 (Dkt. No. 120).  This new theory fares no better than the old one.  To show substantial assistance, GT must prove that THL affirmatively assisted, helped conceal, or, by virtue of failing to act when required to do so, enabled the alleged fraud *on GT* to proceed.  *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).  THL's activities relating to Refco's IPO pass none of these tests.

**1.**      GT does not allege that THL provided *any* assistance to the fraud that GT claims Refco perpetrated against GT.  GT claims that Refco defrauded it during its audits by hiding the

---

[1] GT's Counterclaim alleged that THL aided and abetted Refco's alleged fraud on GT by (1) failing to tell GT about it; (2) being vicariously responsible for certain allegedly false statements by Refco; and (3) having four THL-appointed Refco directors sign Refco's IPO registration statement.  *See* Countercl. ¶¶ 163-167 (Dkt. No. 30).  GT does not press any of these arguments in its brief and so has abandoned them.

RGHI Receivable and the RTLs from GT, thereby inducing GT to issue false audit opinions.  *See* Countercl. ¶¶ 160-161.  But GT does not argue that THL played *any role at all* in helping Refco defraud GT in connection with its audits.  GT nowhere argues that THL "affirmatively assisted" Refco when it created the RGHI Receivable or the RTLs.  Nor does GT argue that THL "helped conceal" these transactions from GT.  GT likewise does not contest THL's argument in its opening brief that THL's alleged failure to "disclose" the fraud to GT cannot constitute substantial assistance because THL owed GT no duty to disclose.  *See* Mem. 8-13.[2]  As a matter of law, therefore, GT cannot prove (as it must) that THL affirmatively assisted, helped conceal, or failed to disclose the alleged RTL fraud on GT.  *See Cromer*, 137 F. Supp. 2d at 470.

      **2.**     GT's theory of substantial assistance is that THL assisted with Refco's IPO.  But this theory is fundamentally flawed:  Assisting the IPO is not assisting the alleged fraud *on GT*.  GT claims it was defrauded because Refco concealed the RGHI Receivable and RTLs from GT in order to induce GT to issue clean audit opinions.  Nothing THL allegedly did in connection with the IPO had anything to do with GT's audits, let alone the RGHI Receivable or the RTLs.  The IPO did not hide the RGHI Receivable or the RTLs from GT.  Any involvement THL had with the IPO therefore could not have assisted the fraud *on GT*.  GT nowhere explains how the IPO assisted the fraud against it, which is fatal to its claim.

      **3.**     Nor can GT show that THL's assistance was "substantial."  Whether assistance is "substantial" is measured by whether THL's action "proximately caused" the harm on which the primary liability is predicated.  *Cromer*, 137 F. Supp. 2d at 470; *see* June 3 Report at 34 (Hetherington Decl. Ex. 59 (Dkt. No. 108)).  "But for" causation is not enough for substantial assistance; GT must show that its injury was the "direct or reasonably foreseeable result" of

---

[2] Citations to "Mem." are to THL's Memorandum of Law in Support of THL's Motion for Summary Judgment on Grant Thornton's Counterclaims (Dkt. No. 102).

THL's alleged involvement with the IPO.  *Cromer*, 137 F. Supp. 2d at 470.  GT cannot make this showing.  Any work by THL on the IPO did not proximately cause any harm to GT.  GT alleges that it was harmed because Refco hid the RGHI Receivable and RTLs from GT, which caused it to issue false audit opinions, which caused it to be sued when the truth came out.  But GT does not allege that THL did anything to cause it to issue its clean audit opinions.  The allegation that THL worked on the IPO cannot save this claim because, under GT's own theory of the case (which THL disputes), it was the RGHI Receivable and RTL fraud, not the IPO, that allegedly induced GT to issue false audit opinions.  GT issued its audit opinions well before the IPO; and they were false because of the RGHI Receivable and RTLs, not because of the subsequent IPO. SF ¶¶ 3-20, 82, 89, 97.[3]  GT has adduced no evidence that THL's work on the IPO proximately caused GT to issue its opinions, caused the opinions to be false, or caused GT's harm.

GT's argument amounts to nothing more than that, "but for" the IPO, the Refco insiders would not have been able to extract "ill-gotten gains."  Opp. 14-15.[4]  But the allegedly "ill-gotten" gains to which GT refers are not funds that Refco obtained *from GT*.  In any case, such "but for" causation is legally insufficient to establish that the assistance was "substantial."  In *Cromer*, the Court rejected a similar claim.  There, plaintiffs argued that a clearing broker failed to enforce margin requirements against a fraudster securities trader and that the fraud "could not have functioned but for the extension of credit and margin violations."  137 F. Supp. 2d at 472. The Court found such allegations insufficient because, even though "the Ponzi scheme may only

_____

[3] Citations to "SF" are to THL's Rule 56.1 Statement in Support of THL's Motion for Summary Judgment (Dkt. No. 104).  Citations to "Add." are to GT's Rule 56.1 Statement of Additional Facts and THL's Responses, filed concurrently with this Reply.

[4] All of GT's claims of causation are mere "but for" causation and are thus legally insufficient for aiding and abetting.  *See* Opp. 16 ("The IPO could never have happened but for the key role played by TH Lee."), 21-22 ("Had TH Lee not consciously avoided knowledge of the fraud . . . and had it not substantially assisted the fraud by rushing the IPO and pushing for the Greenshoe Dividend, Grant Thornton's injuries could have been avoided.").

have been possible because of [the broker's] actions, or inaction, [the broker's] conduct was not

a proximate cause of the Ponzi scheme." *Id.* Similarly, even if "but for" the IPO the Refco fraud

could not have continued (which THL disputes),[5] the IPO did not proximately cause GT to issue

false audit opinions resulting in its being sued.[6]

It is instructive to compare GT's argument to THL's theory of GT's substantial assistance

to Refco's fraud on THL. THL argues that GT substantially assisted the fraud on THL by

providing false clean audit opinions on which THL reasonably relied in investing in Refco.

There is a direct connection between GT's false assurances of the accuracy of Refco's financials

and the harm to THL. THL invested in Refco in reliance on the false audit opinions. When the

fraud and the falsity of the financial statements that GT had blessed was revealed, Refco

collapsed, causing THL to lose its investment. By contrast, GT did not rely on anything THL did

for the IPO in issuing its clean audit opinions; indeed, it had already issued them.

**4.** GT's IPO theory also fails because *Refco*, not *THL*, conducted the IPO. As set

forth in more detail in THL's Rule 56.1 response, most of the conduct on which GT relies to

argue that *THL* pushed the IPO is conduct by Refco directors who were affiliated with THL.

---

[5] THL respectfully refers the Court to its Rule 56.1 response for THL's rebuttal of the factual allegations that GT claims (at 2-13) support this argument. These factual disputes, however, are legally irrelevant because, even assuming the truth of GT's claims about THL's involvement in the IPO, that involvement was not the proximate cause of GT's injury.

[6] The cases on which GT relies (at 16-17) all involved conduct by the aider and abetter that directly assisted and proximately caused the actual fraud on the plaintiff. In *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 466, 511-12 (S.D.N.Y. 2001), a fund manager falsely represented that securities were valued using objective broker valuations; the broker assisted that fraud by agreeing with the fraudster to change its supposedly objective valuations *86* times. Similarly, in *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978), a broker recommended bad securities and falsely reassured the plaintiff that, if the fraudster was choosing the stocks, they must be satisfactory. In *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005), a lawyer papered the improper period-end transactions used to inflate Global Crossing's earnings. In all of these cases, the alleged assistance directly helped the fraudster in connection with the false statements. By contrast, any work THL did on the IPO did not help Refco allegedly induce GT into issuing (false) audit opinions.

4

Those directors, when acting as directors of Refco, were acting on behalf of Refco, not on behalf of THL.  Their actions cannot legally be ascribed to THL.[7]

**5.**        Finally, GT's claim (at 15-16) that THL "pressed forward" with the IPO despite being aware of "strong indications that the IPO should not go forward" is irrelevant.  GT does not claim any of this information related to the Refco fraud; in fact, GT relies on none of these "indications" to support its claim (discussed below) that THL "knew" about the fraud.[8]

### B.        THL Did Not Know or Consciously Avoid Knowing About Any Fraud on GT

GT does not argue (or adduce evidence) that THL actually knew or consciously avoided knowing about Refco's alleged scheme to induce GT to issue clean audit opinions by hiding from GT the RGHI Receivable and RTLs.  *See* Countercl. ¶¶ 160-161.  GT's only evidence for THL's alleged knowledge or conscious avoidance is information that THL received about *other* alleged misconduct at Refco.  *See* Opp. 18-19.  Such information is insufficient, as a matter of law, to establish knowledge or conscious avoidance of the fraud *on GT*.

Specifically, GT relies *entirely* on a so-called "tip" that THL received in May 2004 from investment banker Louis Friedman.  The undisputed evidence demonstrates that Friedman told THL that his cousin, who used to work for Refco, had passed on to him an allegation that Refco, at some point in the past, had transferred trading losses between two unconsolidated European

---

[7] The only evidence GT cites that THL employees acting in that capacity played any role in the IPO, *see* Add. ¶¶ 124, 126, is insufficient to constitute "substantial" assistance.  *See*, *e.g.*, *National Union Fire Ins. Co. v. Califinvest*, No. 90 Civ. 2476 (LLS), 1991 WL 12361, at *3 (S.D.N.Y. Jan. 28, 1991) (allegation that bond issuer reviewed and approved offering materials was insufficient).

[8] Although it is legally irrelevant to this motion, GT has failed to present any evidence that any of the so-called "warning signs" it identifies (at 15-16) would have caused "any reasonable business partner" to "put on the brakes."  *See* Add. ¶¶ 62-63, 73, 82, 88-89, 93-96, 102-104, 117.  To the contrary, the uncontroverted evidence shows that none of these "warning signs" related to the RGHI Receivable or the RTLs and that THL and its advisors satisfied themselves that none of these issues necessitated delaying or stopping the IPO.  *See id.*

subsidiaries.  Add. ¶¶ 14-15.  THL investigated the "tip," assured itself that it had no material impact on any of the audited financial statements, and concluded that it was not a cause for concern going forward.  THL determined that the allegation related to an historical incident with no indication that it was a continuing practice; nor could it affect the audited financial statements from 1999 forward because the unconsolidated European subsidiary was now consolidated with Refco's financial statements so any continuing activity would have been identified by the auditors.  Add. ¶ 14.  Refco confirmed to THL that the subsidiary had long since been consolidated and explained that the transaction at issue was done several years previously for tax reasons.  *Id.*[9]

GT's allegations about the inadequacy of THL's investigation of the "tip" are legally insufficient to establish knowledge or conscious avoidance.[10]  GT's argument on knowledge suffers from the same fundamental flaw as its argument on substantial assistance – *the "tip" did not relate to Refco's fraud on GT.*  GT claims that Refco defrauded it by hiding the RGHI Receivable and RTLs to induce GT to issue clean audit opinions.  *See* Countercl. ¶¶ 160-161.  But the tip did not put THL on notice of any fraud on GT; to the contrary, GT has not demonstrated that the tip related to the RGHI Receivable or the sham loans designed to cover it up.  Add. ¶¶ 14-42.  The uncontested evidence shows that the "tip" related to historical transfers of losses in Europe to an unconsolidated subsidiary of Refco that had since been consolidated and therefore could not be the source of any ongoing fraud.  *See* Add. ¶ 14.  This allegation did

---

[9] The fact that THL did not tell GT about the alleged "tip" has no bearing on GT's claim. THL had no reason to do so and no duty to do so.  *See* Mem. 8-13.

[10] GT makes (at 4, 18) a series of bold statements that THL disregarded the "tip."  But, as set forth more fully in THL's Rule 56.1 response, *every single one* of these assertions mischaracterizes the evidence.  *See* Add. ¶¶ 14-38.  The evidence *actually* shows that THL diligently investigated the "tip," followed its advisors' recommendations, and satisfied itself that the matter was not a concern going forward.  *See* Add. ¶ 14.  But this factual dispute is legally irrelevant for the reasons stated in the text.

*not* identify the scheme to transfer losses to RGHI and hide the RGHI Receivable using fraudulent RTLs. *See id.* In fact, the "tipster" testified that, when the actual fraud was revealed in 2005, he did not make any connection between that fraud and the tip he had passed on to THL the previous year. *See id.*[11]

Because the "tip" does not constitute knowledge (or conscious avoidance) of the "particular fraud allegedly perpetrated on" GT – namely, the RTL fraud – GT cannot establish aiding and abetting as a matter of law. In *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006), the Second Circuit held that a bank's knowledge that a lawyer was engaging in one type of improper conduct (overdrawing his attorney fiduciary account) was insufficient to permit an inference that the bank also knew about the related actual fraud at issue (outright looting of client accounts). *See also Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95 Civ. 5399 (JSR), 1998 WL 651076, at *2 (S.D.N.Y. Sept. 23, 1998) (defendant's knowledge that company's "business practices were in some respects suspicious . . . cannot support a reasonable inference that [defendant] knew of, or recklessly disregarded, *the particular fraud allegedly perpetrated on plaintiff*" (emphasis added)). GT completely ignores these cases and this argument set forth in THL's original brief. *See* Mem. 14.[12]

---

[11] Friedman himself obviously did not believe that the so-called "tip" was evidence of fraud; he later tried to persuade the Refco board to let his firm underwrite the IPO. Add. ¶ 14.

[12] In all of the cases on which GT relies (at 19), there was evidence that the alleged aider and abetter knew about the *actual fraud* at issue, not *other* misconduct. In *Nathel v. Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008), the defendants allegedly knew about the "core of the alleged fraud" because they signed documents representing that they would be carefully selecting sites for oil exploration even though they knew they would not be doing so. In *Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2284 (DLC), 2003 WL 21436164, at *9 (S.D.N.Y. June 23, 2003), there was sufficient evidence that an auditor, in conducting its audits, consciously avoided learning about the actual fraud alleged in the case. In *Anwar v. Fairfield Greenwich, Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3341636, at *55 (S.D.N.Y. Aug. 18, 2010), the defendants consciously avoided knowledge of the Madoff Ponzi scheme that defrauded the plaintiffs. Here,

GT's insufficient allegations of THL's knowledge stand in stark contrast to the evidence of GT's own knowledge of the fraud.  The evidence shows that GT, unlike THL, knew that the RGHI Receivable was greater than disclosed; knew that the RTLs were repeated, short-term, uncollateralized loans improperly described in Refco's financial statements; and knew that money from the RTLs was going to RGHI.  *See* THL's Opp. to GT's Mot. for Summ. J. 14-18 (Dkt. No. 130).  GT's knowledge related directly to the RTL fraud.  The Friedman "tip" did not.

Finally, in order to establish conscious avoidance, GT must show that THL "suspected [the fraud] and realized its probability, but refrained from confirming it in order later to be able to deny knowledge."  June 3 Report at 31-32 (internal quotations omitted).  Again, THL's alleged knowledge about *other* misconduct cannot put it on notice of the alleged RTL fraud on GT.  Moreover, GT cites *no* evidence that the "tip" caused THL to "suspect" that Refco was allegedly defrauding GT through the RGHI Receivable and RTLs.  To the contrary, it is uncontroverted that THL and its advisors were satisfied that the "tip" was not a cause for concern.  *See* Add. ¶¶ 14-15.  GT argues (at 18) that THL *should not* have been satisfied with its investigation.  But that argument is nothing more than a claim that THL was negligent in investigating the tip.  Negligence and constructive knowledge are, as a matter of law, insufficient to establish aiding and abetting.  *See* June 3 Report at 31-32; *see also Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP*, 586 F. Supp. 2d 119, 131 (S.D.N.Y. 2008).

### C.     There Is No Evidence that THL Caused Damage to GT

GT claims (at 22) that it was damaged by being forced to defend litigation arising out of its role in the Refco fraud.  As discussed above, GT cannot prove that any injury to it was

---

by contrast, GT alleges only that THL knew or avoided knowledge about allegations relating to misconduct *other* than the fraud against GT.

proximately caused by THL because THL's alleged conduct in "rushing" the IPO did not foreseeably result in GT issuing false audits. *See supra* Part I.A.3.

In any event, GT cannot recover from THL the legal expenses it has incurred in other lawsuits. First, under the American rule, a party's attorneys' fees and legal expenses are generally not recoverable. *See*, *e.g.*, *Coopers & Lybrand v. Levitt*, 384 N.Y.S.2d 804, 806 (App. Div. 1976). GT asserts (at 20-21) an exception that permits recovery of legal expenses if a party is sued because of another's wrongful act. But that exception applies *only* where the legal expenses are "reasonable and the natural and necessary consequence of the [alleged wrongdoer's] acts." *Id*. GT has made no such showing of proximate causation here.

Moreover, the exception "'does not apply,' or is at least 'very doubtful,'" where "'both parties were parties in the prior litigation.'" *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, No. 07 Civ. 6915 (DLC), 2010 WL 3199861, at *13 (S.D.N.Y. Aug. 11, 2010) (quoting *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir. 1986)). GT and THL were co-defendants or opposing parties in six of the eight cases for which GT seeks legal expenses, Add. ¶ 162, so GT cannot recover expenses for those cases.[13]

Second, under GT's settlement agreement in the Refco class action, GT is barred from asserting any claims "where the alleged injury" is GT's "actual or threatened liability" to the class or "the cost of defending against claims asserted" in the class action. Add. ¶ 164. GT has now made clear that the only basis for its claim of substantial assistance is THL's alleged work

---

[13] The cases GT cites (at 20) – *Vicinanzo*, *Westport Marina*, *Central Trust*, and *Shindler* – are inapposite because they make clear that legal expenses are recoverable only if the alleged conduct proximately caused the plaintiff's harm. But GT cannot make such a showing. Moreover, in *Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891 (S.D.N.Y. 1990) (cited by GT), the Court ultimately did not decide whether an employer could recover legal expenses. *Vicinanzo*'s suggestion (in *dicta*) that legal expenses might be recoverable "regardless of whether" both parties were parties in the same lawsuit (*id.* at 896) is flatly contrary to the Second Circuit's decision in *Goldberg*. *See Travelers Cas. & Sur.*, 2010 WL 3199861, at *13.

on the IPO; but the IPO is also the basis for the securities class action.  Any claim by GT for expenses incurred in defending the securities class action is barred.

Finally, GT has failed to adduce any actual evidence of its expenses.  GT simply asserts that it "has incurred significant legal fees," but does not cite *any evidence* of the nature or amount of such expenses.  *See* Add. ¶ 165.  That unsupported statement should be disregarded by the Court under Rule 56.1.  Because GT has failed to offer any evidence that it actually has paid any expenses relating to Refco, its aiding-and-abetting claim must be dismissed.

## II.      THL IS ENTITLED TO SUMMARY JUDGMENT ON CONTRIBUTION

THL is also entitled to summary judgment dismissing GT's contribution claim with prejudice.  First, the contribution claim should be dismissed because it must be based on proof that THL is a joint tortfeasor.  *See Castro v. County of Nassau*, --- F. Supp. 2d ---, No. 08-CV-0297 (JFB)(ETB), 2010 WL 3713185, at *22 (E.D.N.Y. Sept. 13, 2010).  Because GT cannot establish that THL committed a tort against GT, GT has no basis for a contribution claim.

Second, as a matter of law, GT is not entitled to any contribution from THL based on cases GT has settled.  *See* 15 U.S.C. § 78u-4(f)(7)(A); N.Y. Gen. Oblig. Law § 15-108(c); *Gonzales v. Armac Indus., Ltd.*, 81 N.Y.2d 1, 5 (1993).  GT ignores this argument and has made no attempt to limit its contribution claim to exclude such damages.

Finally, permitting GT to drop the claim "without prejudice" might allow GT to later *relitigate* its various failed claims against THL in the guise of a subsequent contribution claim.  Permitting such successive litigation would waste judicial resources and greatly prejudice THL.  The contribution claim is legally unsound and should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment on all of GT's Counterclaims against THL and dismiss them with prejudice.

Dated:  January 14, 2011

KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.

By:  _____

        Kevin B. Huff

Mark C. Hansen
Silvija A. Strikis
Kevin B. Huff
1615 M Street, N.W.
Suite 400
Washington, D.C. 20009
Tel. 202-326-7900

WEIL, GOTSHAL & MANGES LLP

Greg A. Danilow (GD-1621)
767 Fifth Avenue
New York, N.Y. 10153
Tel. 212-310-8000

*Attorneys for Thomas H. Lee Equity Fund
V, L.P., Thomas H. Lee Parallel Fund V,
L.P., and Thomas H. Lee Equity (Cayman)
Fund V, L.P.*