UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re REFCO, INC. Securities Litigation | ) | 07 MDL 1902 (JSR) |
| This document applies to: | ) | **ECF CASE** |
| MARC S. KIRSCHNER, As Trustee of the Refco Private Actions Trust, | ) | 07 Civ. 8165 (JSR) |
| Plaintiff, | ) | |
| -vs- | ) | |
| PHILLIP R. BENNETT, SANTO C. MAGGIO, ROBERT C. TROSTEN, MAYER, BROWN LLP, MAYER BROWN INTERNATIONAL LLP, and GRANT THORNTON LLP, | ) | |
| Defendants. | ) | |
| GRANT THORNTON LLP | ) | |
| Defendant/Third-Party Plaintiff | ) | |
| -vs- | ) | |
| THOMAS H. LEE EQUITY FUND V, L.P.; THOMAS H. LEE PARALLEL FUND V, L.P., THOMAS H. LEE EQUITY (CAYMAN) FUND V, L.P., THOMAS H. LEE; DAVID V. HARKINS; SCOTT L. JAECKEL; and SCOTT A SCHOEN, | ) | |
| Third-Party Defendants. | ) | |

**GRANT THORNTON LLP'S RESPONSE TO TH LEE DEFENDANTS'**
**MOTION TO DISMISS THE THIRD-PARTY COMPLAINT FOR CONTRIBUTION**

<div style="margin-left: 50%;">

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Grant Thornton LLP*

</div>

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND .....................................................................................................................3

ARGUMENT ...........................................................................................................................6

    I.    The Complaint adequately pleads TH Lee's knowledge of the fraud ..........................6

    II.    The Complaint adequately pleads TH Lee's substantial assistance............................11

CONCLUSION......................................................................................................................14

# TABLE OF AUTHORITIES

**CASES** — **PAGE**

*ABF Cap. Mgmt. v. Askin Cap. Mgmt.*,
957 F. Supp. 1308 (S.D.N.Y. 1997) .............................................. 7

957 F. Supp. at 1328 ..................................................... 14

*Deephaven Priv. Placement Trading Ltd. v. Grant Thornton & Co.*,
454 F.3d 1168 (10th Cir. 2006) ...................................................... 13

*Fraternity Fund Ltd v. Beacon Hill Asset Mgmt.*,
479 F. Supp. 2d 349 (S.D.N.Y. 2007) .............................................. 10

*In re Priceline.com Sec. Litig.*,
342 F. Supp. 2d 33 (D. Conn. 2004) .............................................. 8

*In re Refco Sec. Litig.*,
--- F. Supp. 2d ---, 2010 WL 5129073 (S.D.N.Y. 2010) ................................. 4

*Kirschner v. Bennett*,
648 F. Supp. 2d 525 (S.D.N.Y. 2009) .............................................. 3

648 F. Supp. 2d at 534-44 .............................................. 3

648 F. Supp. 2d at 544 .............................................. 6, 7, 11

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006) .............................................. 11

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495 (S.D.N.Y. 2009) .............................................. 11

*Primavera Familienstifung v. Askin*,
130 F. Supp. 2d 450 (S.D.N.Y. 2001) .............................................. 7

130 F. Supp. 2d at 511 .............................................. 11, 14

**PRELIMINARY STATEMENT**

After the 2004 leveraged buy-out, TH Lee was far closer to the wrongdoing by Refco and its affiliates than Grant Thornton ever was. TH Lee was a Refco insider, serving alongside the fraud's primary masterminds, while Grant Thornton was the outside auditor and the fraud's primary target. TH Lee had control over all aspects of Refco's management every day of the year, while Grant Thornton spent a limited period of time each year performing tests and sampling procedures on financial statements prepared by management at the end of each reporting period. Although Judge Rakoff has confirmed that the customers' aiding and abetting claims against Grant Thornton may proceed beyond a motion to dismiss (*see* Report & Recommendation dated June 3, 2010 ("PAT R&R"), adopted Dec. 14, 2010), Grant Thornton disagrees with that result and, at the appropriate time, will demonstrate the flaws in the customers' claims. But if the allegations here are sufficient to state a claim against Grant Thornton, they are certainly sufficient to state a claim for contribution against TH Lee.

This case is yet another in the litigation arising out of a scheme by Refco to conceal a large related-party receivable by removing it from the company's books at the end of each financial reporting period. Plaintiff Marc Kirschner, Trustee of the Private Actions Trust, alleges that Refco's insiders financed this scheme and kept the enterprise in business by perpetrating a related fraud on the customers of operating subsidiary Refco Capital Markets, Ltd. ("RCM"). As TH Lee acknowledges, "[t]he Trustee's theory is that, in order to operate, Refco needed to siphon customer funds from RCM which it could not pay back, rendering RCM 'hopelessly insolvent.'" TH Lee Mot to Dismiss. at 1. According to the Trustee, then, RCM committed fraud by continuing to accept deposits without disclosing that it upstreamed such deposits to support Refco's operations at a time when Refco was unable to pay them back. PAT R&R at 11.

The same analysis that kept Grant Thornton in this case also supports Grant Thornton's claim for contribution against TH Lee.  The Trustee pleaded Grant Thornton's knowledge of the fraud against RCM's customers by alleging that Grant Thornton "had a complete picture of the finances, operations and business of both RCM and the other Refco entities and had access to all material information concerning the transfers of [the] Customer assets." PAT R&R at 33 (quoting PAT Am. Compl. ¶ 203).   TH Lee, however, had even greater access.  As discussed below, Grant Thornton's third-party complaint makes specific allegations about what TH Lee knew and when.  Further, as the Special Master recently observed, "if your representatives have control over a corporation, it is logical to assume that you will find the skeletons in the closet." Report & Recommendation dated April 10, 2011 ("Counterclaim R&R") at 8.  Such skeletons would surely include the (alleged) fact that the enterprise's very survival depended on its continued acceptance of customer deposits at a time when Refco and RCM were (allegedly) hopelessly insolvent.  And in respect to Refco's alleged inability to repay its debts—which would inevitably encompass the intercompany debts it owed to RCM—the Special Master has already concluded that there is "at the very least" a jury question on whether THL knew about or consciously disregarded the broader Refco fraud.  *Id*.  There is also "at the very least" a jury question with respect to TH Lee's knowledge here.

For similar reasons, the allegations of substantial assistance against TH Lee are at least as strong as—if not stronger than—the allegations that the Court already found sufficient as to Grant Thornton.  According to the Special Master, the Trustee pleaded substantial assistance by pointing to Grant Thornton's audits and unqualified audit opinions on RCM's allegedly misleading financial statements.  PAT R&R at 36-38. Yet those same financial statements were *actually prepared by* the management of Refco itself, under the admitted control of TH Lee.

Again, under the reasoning already adopted by the Special Master and the Court in this case and in the lawsuit by TH Lee, Grant Thornton's claim for contribution against TH Lee is more than sufficient to survive a motion to dismiss.

## BACKGROUND

*Procedural History*.  The Trustee filed his initial complaint in New York state court, alleging claims on behalf of a group of RCM customers who had engaged in foreign exchange ("FX") transactions with RCM as their broker.  He asserted claims against Grant Thornton for aiding and abetting a breach of fiduciary duty, aiding and abetting fraud, and aiding and abetting conversion.  He asserted similar claims against Mayer Brown LLP, which served as Refco's outside counsel, and against Ernst & Young LLP, which provided tax services for Refco.  The Trustee claimed that RCM misappropriated, improperly transferred, and improperly used the assets the FX customers deposited with RCM, and that the FX customers lost those assets after Refco disclosed its fraud—a disclosure that was followed by the arrest of CEO Phil Bennett, a crisis of confidence, and, later, a run on the bank.  *See Kirschner v. Bennett*, 648 F. Supp. 2d 525, 529-31 (S.D.N.Y. 2009).  After removal, Judge Lynch dismissed the complaint without prejudice, concluding that the Trustee failed to allege the primary violations of fraud, breach of fiduciary duty, or conversion.  *Id.* at 534-44.

The Trustee then filed his First Amended Complaint, again alleging that Grant Thornton and Mayer Brown (but not Ernst & Young) aided and abetted Refco's fraud, conversion, and breach of fiduciary duty.  He also included a new allegation of fraudulent inducement.  On a motion to dismiss, the Special Master ruled that the Trustee again failed to allege the underlying wrongs of breach of fiduciary duty, fraud, and conversion.  PAT R&R at 41.  But the Special Master recommended that the case proceed on the theory that RCM fraudulently induced

customers to make deposits after the leveraged buy-out ("LBO") by failing to disclose RCM's (alleged) "hopeless insolvency" and the (alleged) fact that RCM would not be able to collect on loans of customer assets that it had extended to Refco and its other affiliates. *Id.* at 14. The Special Master also concluded that for purposes of a motion to dismiss, the complaint adequately alleged that Grant Thornton knew about and substantially assisted this supposed wrongdoing. As to Mayer Brown, the Special Master concluded that its "extensive involvement in all things Refco" supported the inference of its knowledge of "RCM's propensity to siphon assets to fund Refco's operations." *Id.* at 32. But according to the Special Master, none of the services Mayer Brown provided as RCM's outside legal advisor rose to the level of "substantial assistance." *Id.* at 35-36. Judge Rakoff adopted this R&R in its entirety. *In re Refco Sec. Litig.*, --- F. Supp. 2d ---, 2010 WL 5129073, at *1 (S.D.N.Y. 2010).

   ***Grant Thornton's Third Party Complaint for Contribution.*** After the Trustee's limited claim was allowed to proceed, Grant Thornton filed its Third Party Complaint ("Complaint") against the TH Lee Defendants, seeking their contribution for any liability it might face in this lawsuit.[1] The Complaint focuses on TH Lee's admitted control over Refco after the LBO—during the very same period when Grant Thornton allegedly aided and abetted Refco's fraud against the FX customers. *See, e.g.,* Compl. ¶¶ 33, 37-48.

   The LBO gave TH Lee "the ability to control all aspects of [Refco's] business." *Id.* ¶ 38 (quoting Offering Circular). TH Lee acquired 57% of Refco in the LBO and gained significant veto powers and control of Refco's board, appointing seven of its eight members, including four who were TH Lee executives. *Id.* ¶¶ 37-39. TH Lee insiders took on the key positions of

---

[1] The TH Lee Defendants include six TH-Lee-affiliated entities (including both the funds that actually invested in Refco and the management company engaged to provide Refco with management services), as well as four TH Lee insiders.

4

President, Secretary and Treasurer of Refco, and TH Lee affiliate and Third-Party Defendant TH Lee Management V was appointed to serve in an oversight and management role of Refco, in exchange for tens of millions of dollars in fees.  *Id.* ¶¶ 41, 43.  All told, TH Lee entities received at least $33.128 million in management fees, plus a $12.872 million lump sum payment when Refco went public in August 2005.  *Id.* ¶ 46.  Beyond the fees, of course, TH Lee's primary motivation was the lucrative payout it would receive when it took Refco public.  *Id.* ¶¶ 60-61.

   Further, the Complaint alleges that even before the LBO, as part of TH Lee's extensive due diligence—which TH Lee admits delved into "every aspect of Refco's business" including the "financials, . . . the accounting . . . the audits, [and] the management"—TH Lee actually received specific and critical information about the problems at Refco.  *Id.* ¶¶ 20-21, 25.  This information included (1) warning signs of financial irregularities set forth in a KPMG due diligence report, which one TH Lee insider described as "awful" and another said was "the scariest" accounting report he had ever seen; (2) information about a payment of $500 million in cash that was to be extracted after the closing of the LBO—a payment for which TH Lee was never able to identify the source; and (3) a confidential tip from a Refco insider (the "Deep Throat Tip") that Refco had a history of improperly covering trading losses by transferring them off the books using another entity.  *Id.* ¶¶ 24-26.  TH Lee ignored each of these pieces of information, probed no further, declined to take the additional steps its advisors recommended to investigate, and instead continued with the LBO, which closed on August 5, 2004.  *Id.* ¶¶ 32-33.

   Further, the Complaint alleges that after the LBO, TH Lee learned a series of additional facts relating to Refco's reliance on assets upstreamed from RCM customers.  Among other things, TH Lee learned that (i) some portion of Refco's balance sheet cash was actually made up of cash upstreamed from Refco/RCM customers (*id.* ¶¶ 53, 56); and (ii) TH Lee was using those

5

customer funds to pay for an expensive and ill-advised acquisition of Cargill Investment Services, which would bring it yet more RCM customers (*id.* ¶ 56). Still, despite these problems, TH Lee's representatives on Refco's Board voted to approve the Cargill acquisition, all the while continuing Refco's business as usual and pushing the company forward to an initial public offering. *Id.* ¶¶ 56-61.

## ARGUMENT

Grant Thornton's Complaint seeks contribution from TH Lee for any liability Grant Thornton ultimately bears to the FX customers. Accordingly, the issue before the Special Master is whether the Complaint's allegations state a claim against TH Lee for aiding and abetting fraudulent inducement against the FX customers. TH Lee has moved to dismiss on the same basic grounds raised in Grant Thornton's own motion to dismiss earlier in this case—arguing a failure to plead knowledge and substantial assistance.[2] Given the facts alleged here and the reasoning in the Special Master's previous R&Rs, the motion to dismiss should be denied.

### I.     The Complaint adequately pleads TH Lee's knowledge of the fraud.

Under the law of this case,[3] the standard for "knowledge" for a claim of aiding and abetting is met by a showing of "conscious avoidance." *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009). This is, admittedly, a difficult standard to meet; the party asserting

---

[2] TH Lee does not contend—nor could it—that its recent settlement with the Trustee and the class of RCM securities customers bars Grant Thornton's claim for contribution. The customer cases settled by the Trustee relate to the claims of RCM customers who traded in *securities*. The instant case, in contrast, involves claims on behalf of RCM customers who traded in the *foreign exchange* ("FX") markets. Consistent with the limits of the Private Securities Litigation Reform Act, the settlement and related order specifically do *not* bar any claim for contribution that does not seek recovery for THL's share of liability to the lead plaintiffs or the members of the settling securities class, "in connection with" the securities class action. Stip. ¶ 4.2(c).

[3] As Grant Thornton has argued previously, it believes that "conscious avoidance" should not be sufficient to support a claim of actual knowledge, as required for aiding and abetting. Without waiving its ability to assert that issue later in this litigation, however, Grant Thornton recognizes the prior rulings in the MDL that have held that "conscious avoidance" *is* sufficient.

6

the claim must show that "it can almost be said that the [other party] actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Id.* (internal quotations omitted).  Further, the Special Master has ruled that in order for an aiding and abetting claim to proceed, "'actual knowledge may . . . be implied from a strong inference of fraudulent intent' and a motive can provide part of that inference." PAT R&R at 33 (*quoting Rosner v. Bank of China*, 528 F. Supp. 2d 419, 426 (S.D.N.Y. 2007).  Allegations of a defendant's "extraordinary" economic motives "are sufficient to infer not only knowledge of fraud, but an intent that the fraud continue." *ABF Cap. Mgmt. v. Askin Cap. Mgmt.*, 957 F. Supp. 1308, 1331 (S.D.N.Y. 1997).  Moreover, in a case involving a "symbiotic fraudulent scheme," it is not necessary for the "scienter requirement [to] be more exacting than that applied to the primary fraud." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 508 (S.D.N.Y. 2001).

      Here, the Special Master concluded that this standard was met by the Trustee's allegations that Grant Thornton "had a complete picture" of Refco's finances, operations, and business, "had access to all material information concerning the transfers of the FX Customer assets," and issued reports indicating that "it knew that RCM was making substantial transfers to affiliates, which were far greater than RCM's profits." PAT R&R at 33.

      If these allegations are sufficient to state a claim against Grant Thornton, then Grant Thornton's allegations must also be sufficient to state a claim against TH Lee.  The Complaint alleges that after the LBO, TH Lee had "control over all aspects of Refco's business . . . including the fact that Refco and RCM continued in business after the LBO and accepted new customer deposits without first publicly disclosing their alleged 'hopeless insolvency.'" Compl. ¶ 48; *see also id.* ¶¶ 37-42 (detailing TH Lee's control).  Further, the Complaint alleges that TH

7

Lee affiliate and Third-Party Defendant Managers V "agreed that it would serve in an oversight and managerial capacity for Refco in return for tens of millions of dollars in fees." *Id*. ¶ 43. TH Lee further knew or consciously avoided knowing that in fiscal 2004 and 2005, RCM's outstanding loans to Refco affiliates far exceeded RCM's revenue, *id*. ¶¶ 52-53, and that the Cargill acquisition was being funded by customer cash rather than new borrowing, *id*. ¶ 58. These allegations are no different from the allegations that carried the Trustee's claim against Grant Thornton past the pleading stage.

TH Lee protests that these allegations constitute nothing more than "constructive knowledge," which is insufficient to state a claim for aiding and abetting. To be sure, Grant Thornton also does not agree that allegations of "access" to information should be sufficient to plead actual knowledge. But if the allegations of Grant Thornton's "access" and its knowledge of the size of RCM's loans to Refco are sufficient to survive a motion to dismiss, as the Court has already held, then the allegations made against TH Lee must be more so. After all, "[t]o expect the same degree of knowledge from an independent auditor [as the insiders] would defy logic." *In re Priceline.com Sec. Litig.*, 342 F. Supp. 2d 33, 58 (D. Conn. 2004).

The Special Master's previous conclusions with respect to defendant Mayer Brown also support the conclusion that the allegations against TH Lee here are sufficient. The Trustee pleaded that Mayer Brown had sufficient knowledge of the fraud against the customers by alleging that Mayer Brown "over[saw] virtually all aspects of Refco's business plan" and had "extensive involvement in all things Refco." PAT R&R at 32. For its part, however, TH Lee not only had "extensive involvement in all things Refco" but also ran, controlled, and managed the Refco enterprise, with the power not only to oversee but to implement all aspects of Refco's business plan. *See, e.g.,* Compl. ¶ 42 (defendant Scott Schoen has admitted that as directors, the

8

TH Lee representatives had obligations "to run the company the best way possible, to oversee and work with management"). Indeed, in a recent Report & Recommendation in the TH Lee matter, the Special Master observed that Scott Schoen, who was "the lead director from TH [Lee] on the Refco board," was "intimately involved with all affairs Refco after the LBO." Report & Recommendation dated March 28, 2011, at 10. TH Lee has thus effectively conceded that it "exercised substantial control over, and had substantial knowledge about, Refco" after the LBO. *Id.* at 26.

Further, the Special Master's previous reliance on Mayer Brown's *motive* as raising an inference of knowledge applies with even greater force to TH Lee. The Special Master reasoned that the "millions of dollars of fees that Mayer Brown received in representing Refco, and the consequent interest in seeing Refco stay afloat," supported an inference that Mayer Brown knew about the underlying fraud, at least for purposes of a motion to dismiss. PAT R&R at 32-33. But whatever fees Mayer Brown was expecting to earn surely pale in comparison to the $232.3 million jackpot TH Lee struck as a result of the IPO. Compl. ¶ 61. If an inference of scienter can be drawn from an outside law firm's expectation of future legal fees (and Grant Thornton does not concede it can), then the inference is even stronger for TH Lee, which expected and was counting on a tremendous profit from its Refco investment.

Taken together, these allegations are more than sufficient at the pleading stage to support the inference that TH Lee knew about the fraud against the RCM customers—a fraud that was allegedly critical to Refco's very survival and that consisted of RCM's continued operation and acceptance of deposits at a time when Refco (allegedly) did not have the financial wherewithal to repay what it owed to RCM. As the Special Master noted just ten days ago, there is a "reasonable inference that if your representatives have control over a corporation, it is logical to

9

assume that you will find skeletons in the closet—especially a skeleton as large as the multimillion dollar related party receivable parked at RGHI and papered over by Round Trip Loans." Counterclaim R&R at 8. To the extent that Refco's survival depended on the use of customer assets accepted at a time when Refco (and, hence, RCM) was hopelessly insolvent—as the Trustee alleges—then that "skeleton" is just as large.

Moreover, the Complaint includes additional, specific allegations about what TH Lee knew—allegations that go above and beyond the allegations made by the Trustee against Grant Thornton and Mayer Brown. These allegations include (1) TH Lee's receipt of the "awful" and "scary" KPMG draft due diligence report, Compl. ¶ 24; (2) its inability to obtain factual support identifying the source of the $500 million in cash to be extracted from Refco upon the closing of the LBO, *id.* ¶ 25; and (3) its receipt of the Deep Throat Tip revealing Refco's practice of hiding trading losses by using other entities to transfer them off of Refco's books, *id.* ¶ 26-32. TH Lee consciously chose not to follow up on any of these concerns and instead proceeded full steam ahead with the LBO, so that it could pursue the profit it hoped to achieve from the deal and yet deny any knowledge of the problems if the day of reckoning ever arrived. This is quintessential "conscious avoidance." *See Fraternity Fund Ltd v. Beacon Hill Asset Mgmt.,* 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007).

Once the LBO had been consummated and TH Lee had taken over the company, TH Lee could no longer avoid the relevant knowledge. In fact, the Complaint alleges specifically that TH Lee was *actually aware* of Refco's reliance on cash upstreamed from RCM. Among other things, TH Lee learned that (i) Refco's balance sheet cash included cash upstreamed from RCM customers (Compl. ¶¶ 53, 56); and (ii) TH Lee's acquisition of Cargill depended on those

10

upstreamed customer funds (*id*. ¶ 56).  These allegations go to the heart of what Judge Lynch called the "Customer Fraud."

TH Lee denies any "link" between these allegations and RCM's alleged "hopeless insolvency" (TH Lee Mot. at 9), but that argument misses the point.  The "link" is the alleged insolvency itself.  According to the Trustee, RCM's insolvency was the product of its loans to Refco—loans that were critical to Refco's continued operation and that Refco lacked the financial wherewithal to repay.  TH Lee Mot. at 1 (recounting the "Trustee's theory").  Accordingly, for purposes of the fraudulent inducement claim that is now at issue in this case—and given TH Lee's post-LBO role as the owner and party in control of Refco and its affiliates—allegations about what TH Lee knew with respect to Refco's own alleged "insolvency" and its reliance on customer funds cannot be ignored, at least at the pleading stage.  Those allegations, coupled with the others discussed above, are more than sufficient under the Court's previous orders to raise the inference that TH Lee had the knowledge required for aiding and abetting.

## II.     The Complaint adequately pleads TH Lee's substantial assistance.

Under New York law, substantial assistance exists where a party affirmatively assists, helps conceal, or, by virtue of failing to act when required to do so, enables the underlying harm to proceed.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006); *Kirschner*, 648 F. Supp. 2d at 544.  The "critical test" for substantial assistance is whether the alleged aiding and abetting conduct "made a substantial contribution to the perpetration of the fraud."  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 511 (S.D.N.Y. 2009) (internal quotations omitted).  Thus, "[s]ubstantial assistance can take many forms."  *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001).

The Special Master concluded that the Trustee had pleaded substantial assistance against Grant Thornton by alleging that RCM's financial statements were misstated—in that they did not disclose either that Refco could not pay the intercompany loans extended by RCM or that RCM was, as a result, insolvent—and, accordingly, that Grant Thornton's audit opinions on those financial statements were false. PAT R&R at 37-38. Based on these allegations, the Special Master concluded that a question of fact remained as to "whether an FX Customer, if properly informed through public dissemination of information about an audit that RCM was upstreaming its assets to related entities and given its financial condition, would have seen the red flag and refrained from depositing its funds." *Id.* at 39. In other words, according to the Special Master, the Trustee adequately alleged Grant Thornton's substantial assistance for purposes of a motion to dismiss simply by pointing to Grant Thornton's unqualified audit opinions on RCM's financial statements.

If that is correct—and Grant Thornton does not concede it is—then Grant Thornton's aiding and abetting claim based on allegations of TH Lee's substantial assistance must be allowed to proceed as well. TH Lee was the orchestrator of the LBO, which allegedly "'entirely foreclosed repayment of the amounts owed to RCM's customers, including the FX Customers.'" Compl. ¶ 36 (quoting PAT Am. Compl. ¶ 122). Then, after the LBO, TH Lee took control over Refco's management—the same management that prepared the allegedly false financial statements in the first place. *E.g.*, Compl.¶¶ 42, 56-61. Financial statements are prepared by management and remain management's responsibility; the outside auditor simply audits those statements and issues an opinion concerning whether management prepared the financial statements in accordance with Generally Accepted Accounting Principles. *See* AICPA Statement of Auditing Standard AU § 110.03 ("The financial statements are management's

12

responsibility. The auditor's responsibility is to express an opinion on the financial statements."); *see also Deephaven Priv. Placement Trading Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1174 (10th Cir. 2006) (auditors do not "by virtue of auditing a company's financial statements, somehow make, own or adopt the assertions contained therein. Rather, the end product of an audit is the audit report.") Thus, if the Trustee's claims against Grant Thornton can go forward based its audits of the financial statements, the same must be true for Grant Thornton's claims against the TH Lee Defendants—who had control over and oversaw the management that prepared those financial statements in the first place.[4]

Further, as discussed above, TH Lee had an extraordinary motive to allow the fraud to continue. According to the Trustee, had it not been for the fraud against the RCM customers, the initial public offering would not have occurred—thus preventing TH Lee from obtaining the payday that it had anticipated from the beginning of its dealings with Refco. Compl. ¶ 61. Again, if Grant Thornton's audit reports (issued in the ordinary course, for an ordinary fee) can be considered substantial assistance, then given TH Lee's extraordinary motive, any day-to-day transactions in which the TH Lee Defendants participated—including overseeing management, providing management services, approving the Cargill acquisition,[5] continuing Refco in operation, and even signing the S-1—should be considered substantial assistance as well. *See*

---

[4] As the Special Master has noted, there is "at the very least" a question of fact "whether the acts of the insiders appointed by TH Lee are attributable to TH Lee." Counterclaim R&R at 5.

[5] The Special Master previously concluded that the legal services Mayer Brown provided in connection with the Cargill acquisition were not sufficient to constitute substantial assistance. PAT R&R at 35-36. With respect to TH Lee, however, the inquiry is different. According to the Trustee, a certain number of the remaining FX customers became customers of RCM because of fraudulent inducement in connection with (or at the time of) the Cargill acquisition itself. TH Lee specifically provided the votes that enabled the acquisition to proceed. Compl. ¶ 56. Yet TH Lee did so despite concerns about how the transaction was being funded—when in fact it was being funded with customer funds upstreamed from RCM. *Id*. Particularly in light of TH Lee's extraordinary motive (as discussed above), those votes should be considered "substantial assistance," at least at the pleading stage, and at least against the customers from Cargill.

*Primavera*, 130 F. Supp. 2d at 511 ("Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud."); *ABF Cap. Mgmt.*, 957 F. Supp. at 1328 ("strong allegations of motivation and scienter" mean that the "substantial assistance need not be as directly tied" to the actual fraudulent statements).  TH Lee's motive here was not simply the ordinary economic motivation of an outside professional who hopes to continue to earn fees for its services.  Rather, it involved a huge investment and an extraordinary potential payout—and TH Lee's willingness to do anything to make that possible.

## CONCLUSION

Allowing a contribution claim against TH Lee to proceed past the pleading stage would hardly result in a dramatic expansion of aiding and abetting liability, as TH Lee complains.  Indeed, finding that the Complaint states a claim against TH Lee would require a *less* expansive view of aiding and abetting liability than the view already adopted by the Special Master and the Court in respect to the claims against Grant Thornton.  As this case moves forward, the Special Master and the Court will have further opportunities to determine whether there is a genuine issue of fact for trial with respect to the FX customers' claims—and, ultimately, whether Grant Thornton (and TH Lee) should be required to pay damages.  In the meantime, however, the allegations against TH Lee in the Third Party Complaint for Contribution are more than sufficient under the Court's prior rulings to survive a motion to dismiss.  For all these reasons, Grant Thornton respectfully requests that TH Lee's motion to dismiss be denied.

Dated April 20, 2011  
New York, New York

*Of Counsel:*

Margaret Maxwell Zagel  
Tracy W. Berry  
Kenneth Cunningham  
GRANT THORNTON LLP  
175 West Jackson, 20th Floor  
Chicago, Illinois 60604  
Ph: 312-856-0001  
Fax: 312-565-3473

Respectfully submitted,

WINSTON & STRAWN LLP

       /s/ Linda T. Coberly  
By:  Linda T. Coberly

Beth A. Tagliamonti  
(btagliamonti@winston.com)  
Ruth A. Braun (rbraun@winston.com)  
WINSTON & STRAWN LLP  
200 Park Avenue  
Ph: 212-294-6700  
Fax: 212-294-4700

Bruce R. Braun (bbraun@winston.com)  
Catherine W. Joyce (cjoyce@winston.com)  
Linda T. Coberly (lcoberly@winston.com)  
WINSTON & STRAWN LLP  
35 W. Wacker Drive  
Chicago, Illinois 60601  
Ph: 312-558-5600  
Fax: 312-558-5700

*Attorneys for Grant Thornton LLP*