UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: REFCO INC. SECURITIES LITIGATION | Case No. 07 MDL 1902 (JSR) |
| THOMAS H. LEE EQUITY FUND V, L.P., THOMAS H. LEE PARALLEL FUND V, L.P., and THOMAS H. LEE EQUITY (CAYMAN) FUND V, L.P., | **Electronically filed** |
| Plaintiffs/Counterclaim Defendants, | Case No. 07 Civ. 8663 (JSR) |
| v. | |
| GRANT THORNTON LLP, | |
| Defendant/Counterclaim Plaintiff. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE UNTIMELY DISCLOSED EXPERT OPINION OF PETER KAUFMAN**

KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, DC  20036
202-326-7900 (phone)
202-326-7999 (fax)

*Attorneys for Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................................... ii

BACKGROUND .............................................................................................................................1

ARGUMENT ...................................................................................................................................6

I.   Mr. Kaufman's Report, Which Was Served More Than 14 Months After the Court's Deadline for Expert Reports, Is Untimely .........................................................6

II.  GT Has No Substantial Justification for Submitting This Untimely Opinion ..................................................................................................................................7

III. THL Would Be Severely Prejudiced by the Untimely Expert Opinion, and GT Should Be Estopped from Arguing Otherwise .............................................................9

CONCLUSION ..............................................................................................................................10

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 418
 (W.D.N.Y. Apr. 14, 2005) .......................................................................................................10

*Hotaling v. A.B. Leach & Co.*, 159 N.E. 870 (N.Y. 1928) ..............................................................4

*Lopez v. Louoro*, No. 01 CIV. 2490, 2002 WL 31682398, at *3
 (S.D.N.Y. Nov. 27, 2002) .........................................................................................................9

*Nippo Corp./Int'l Bridge Corp. v. AMEC Earth & Envtl., Inc.*, No. 09-CV-0956,
 2011 WL 1196922, at *4 (E.D. Pa. Mar. 30, 2011) ..................................................................7

*Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95 CIV. 5399,
 1998 WL 804712, at *1 (S.D.N.Y. Nov. 12, 1998) .........................................................7, 9, 10

*Wald v. Costco Wholesale Corp.*, No. 03 Civ. 6308, 2005 WL 425864, at *5
 (S.D.N.Y. Feb. 22, 2005) ..........................................................................................................7

**Rules:**

Fed. R. Civ. P. 26(a) ....................................................................................................................6, 7

Fed. R. Civ. P. 26(a)(2) ...................................................................................................................1

Fed. R. Civ. P. 37(c) ....................................................................................................................1, 7

Fed. R. Civ. P. 37(c)(1) ...................................................................................................................6

Fed. R. Evid. 701 .........................................................................................................................5, 7

Fed. R. Evid. 702 .............................................................................................................................7

THL moves to strike the untimely disclosed expert opinion of Peter S. Kaufman. On August 8, 2011, the date the parties exchanged updated pretrial witness lists, Grant Thornton LLP ("GT") identified for the first time a new expert witness, Mr. Kaufman, and also served his 24-page expert report. GT served this report less than five weeks before trial and over a year after the Court's deadline for expert reports. GT did not seek leave from the Court to file this untimely report. The report sets forth an entirely new theory, not raised in any prior expert report, that GT should not be responsible for the full amount of THL's damages because THL and the Refco Board should have taken additional steps to restructure Refco after discovering and disclosing the fraud in October 2005. Kaufman Rep. at 24 (Walker Decl., Ex. 1).

The untimely disclosure of Mr. Kaufman and his opinions violates the Court's scheduling order and Federal Rule of Civil Procedure 26(a)(2). The report is based entirely on facts that were available to GT prior to the June 2010 deadline for expert reports. GT cannot meet its burden to show substantial justification for its untimely disclosure; nor can GT show that such disclosure on the eve of trial is harmless. Accordingly, the Court should strike the untimely report under Rule 37(c) and preclude Mr. Kaufman from testifying at trial.

## BACKGROUND

THL was the victim of a massive fraud committed by Refco with the knowledge and substantial assistance of its auditor, GT. Refco transferred huge losses off its books to a related party. GT issued unqualified audit opinions on Refco's financial statements even though it knew or consciously avoided knowing that they were false. SF ¶¶ 299-310; *see* R&R at 2.[1] In reliance on GT's false unqualified opinions, in August 2004, THL paid approximately $500 million for a 57% interest in Refco and continued to hold and manage that investment. SF ¶¶ 535, 580.

---

[1] THL's Response to GT's Rule 56.1 Statement (Dec. 17, 2010) ("SF"); Report & Recommendation of the Special Master on GT's Mot. for Summ. J. (Mar. 28, 2011), ECF 214 ("R&R").

In October 2005, Refco's new controller discovered the fraud, and it was reported to Refco's Board (including members appointed by THL). SF ¶ 600; R&R at 4. On October 10, 2005, at the Board's direction, Refco disclosed the fraud to the public. R&R at 4. In the days following this disclosure, counterparties ceased doing business with Refco, and customers called to redeem their funds from their accounts held at Refco. SF ¶¶ 605-607. Refco paid out about one billion dollars in return of customer capital. SF ¶ 608. By the end of the day on October 12, 2005, Refco had run out of cash to meet customer demands. *Id.* On October 17, 2005, Refco declared bankruptcy, and THL lost its remaining investment. SF ¶ 609; R&R at 4.

THL sued GT for (among other things) fraud and aiding and abetting fraud. The circumstances surrounding Refco's collapse and the run on the bank were the subject of extensive discovery. For example, at a deposition in September 2009 – almost a year *before* expert reports were due – Scott Schoen, vice-chairman of THL, testified about the discovery of the fraud and the Refco Board's investigation; its firing of the CEO and installation of new management; its public disclosure of the fraud; the run on the bank that resulted from such disclosure; its attempt to deal with regulators, customers, and counterparties; its attempt to stem the tide of withdrawals; and the ultimate collapse and bankruptcy of Refco. *See* Schoen Tr. 598-608, 619-20, 773-75, 788-89, 893-900, 906-08 (Ex. 2). These are the very facts on which Mr. Kaufman bases his new expert opinion, and they were available in 2009, well before the deadline for filing expert reports in June 2010. *See* ECF 68, App. A (Court's scheduling order).

At this same deposition in 2009, Mr. Schoen was asked his opinion about whether, based on his knowledge of Refco's business, the same run on the bank and collapse would have occurred at any time the fraud had been disclosed. Mr. Schoen testified:

> I said, yes, it's my opinion that the disclosure of a related party transaction of that size, that had not been disclosed in the financing of the company, in the operations of the company, combined with the other actions we took, for example, removing Mr. Bennett and Mr.

2

> Maggio from their executive positions and putting in interim management, would have led to the same crisis of confidence. If the exact same events that then occurred the following day, aside from the stock market not opening since in your hypothetical the company is not public, but if the same events had otherwise occurred the following day, I think it would likely have still led to a stampede of customers and a stampede of counterparties running away from the business, which would have collapsed the business.

Ex. 2, at 897-98. Similarly, Santo Maggio, a senior Refco executive, testified at his December 2009 deposition that, had Refco's true losses been disclosed, "it would have scared off all our lenders, it would have scared off our counterparties, they would have stopped dealing business with us. Customers would have pulled out, there would have been a run on the bank. And most likely Refco would have went bankrupt." Maggio Tr. at 90-91 (Ex. 3). He further testified that he "knew the company wasn't worth anything [at the time of the LBO]. . . . I believe it was worth far less than what it would cost us to get out of the hole, yes." *Id.* at 219-20.

Despite the fact that Refco's collapse and the run on the bank were discussed extensively during fact discovery, GT submitted no timely expert opinion regarding the Refco Board's actions during the collapse or regarding Refco's value by the Court's June 4, 2010 deadline for expert reports. *See* ECF 68, App. A (Court's scheduling order). To the contrary, when GT moved for summary judgment in November 2010, GT *conceded* that Refco's "collapse was caused by a fraud perpetuated by the company's top officers designed to create a falsely positive picture of Refco's financial condition." GT's Rule 56.1 Statement ¶ 2 (Nov. 12, 2010).

GT's choice not to submit an expert report on the collapse of Refco was no accident. Instead, GT made a tactical decision not to submit such an expert opinion so that it could argue at summary judgment that THL had failed as a matter of law to establish damages. GT argued that the only proper measure of damages was the difference between the purchase price and the "actual" value of Refco (minus the fraud) on the date of investment (called "date-of-investment damages"). R&R at 5. GT argued that THL was required to submit expert opinion on that

3

measure and had failed to do so. *Id.* In response, THL argued that (1) where, as here, an investor is induced to buy and hold its investment, its damages are measured by the difference between the purchase price and the value of the investment after revelation of the fraud, *see Hotaling v. A.B. Leach & Co.*, 159 N.E. 870 (N.Y. 1928), and alternatively (2) THL could establish date-of-investment damages through the lay opinion testimony reflected in Mr. Schoen's September 2009 deposition. R&R at 6-7, 10. As a fallback, THL argued that, if the Special Master agreed with GT, THL should be permitted to supplement the opinion of its damages expert with date-of-investment damages. *Id.* at 9. GT objected strenuously to THL's request to supplement its expert opinion; it argued that such supplemental opinion should be excluded as severely prejudicial to GT. *Id.* at 9-10. At oral argument, GT's counsel stated:

> The prejudice is kind of staggering when you think about it. There is a reason why we have rules and deadlines for this sort of thing. We spent a great deal of money looking at their expert. They proffered a damages expert. . . . We proffered a rebuttal expert. We hired and paid an expert. . . . We spent a tremendous amount of money deposing the guy, we put in our own damages expert, we spent months doing this. Months. . . . So we had extensive proceedings, extensive efforts – there was a time to do this, and it has passed. We are at the point of summary judgment now.

Tr. 187-88, 190-91 (Feb. 17, 2011) (Ex. 4).

On March 28, 2011, the Special Master rejected GT's damages argument for two independent reasons. First, the Special Master held that, under New York law, THL is entitled to all damages proximately caused by the Refco fraud, including all damages from the loss of THL's investment in the collapse of Refco, citing *Hotaling*. *See* R&R 7-8 & n.10. The Special Master relied on GT's concession that Refco's collapse was caused by the fraud. *See id.* at 8 (citing GT's Rule 56.1 Statement ¶ 2). The Special Master concluded that "[i]t was that fraud – and the reliance on GT statements that failed to set forth the fraud – that caused whatever damage from both purchasing and retaining the investment that THL can prove." *Id.* The Special Master therefore rejected GT's argument that THL was limited to date-of-investment damages.

4

Second, the Special Master held that, even if THL were required to prove date-of-investment damages, it could do so through Mr. Schoen's lay opinion under Federal Rule of Evidence 701. *See id.* at 10-11. The Special Master concluded that Mr. Schoen was qualified to present such lay opinion testimony based on his role in THL's due diligence on Refco and as a THL-appointed director on Refco's Board after the investment. *See id.*

Importantly, in its objections to the R&R, GT did not challenge the Special Master's characterization of GT's concession on causation and instead merely objected to the Special Master's two alternative holdings discussed above. On May 31, 2011, this Court denied GT's summary judgment motion "essentially for the reasons stated in" the R&R. ECF No. 241, at 1. The Court did, however, permit GT to re-depose Mr. Schoen on his lay opinion. *Id.* at 1-2. Mr. Schoen was re-deposed on June 9, 2011, and he elaborated on the same testimony he had given in September 2009 that the run on the bank that occurred in October 2005 would have occurred in August 2004 if the fraud had been disclosed then, rendering Refco worthless. *See* Ex. 2, at 1422-25, 1426-28, 1429-30, 1464, 1469-70.

On June 13, 2011, the parties exchanged pretrial witness lists. GT included a "placeholder" for an unidentified and previously undisclosed "Restructuring expert." Ex. 5, at 2. GT did not name this expert, provide a report, state what opinion this expert would provide, or even explain what a "restructuring" expert was.

On August 8, 2011 – less than five weeks before trial and over 14 months after expert reports were due – GT identified a new expert, Peter S. Kaufman, on its updated pretrial witness list. On that same day, and without seeking leave from the Court, GT served Mr. Kaufman's report. In this report, Mr. Kaufman explains that he was asked by counsel for GT "to assess the lay opinion of Scott Schoen . . . that the 'run on the bank' that led to the collapse of Refco . . . in October 2005 was inevitable and, had the fraud been discovered in August 2004, that same 'run

5

on the bank' would have occurred." Ex. 1, at 2-3. Based on the facts cited in his report – *all of which were available <u>prior to</u> the June 2010 deadline for expert reports* – Mr. Kaufman opines that a run on the bank was not inevitable and that "the TH Lee-dominated board [of Refco] failed to take certain steps that likely would have prevented a run on the bank." *Id.* at 3. Mr. Kaufman identifies nine steps Refco's Board should have taken (or taken more promptly). *Id.* at 3-4. Mr. Kaufman also opines that THL's "task of avoiding a run on the bank [was] even less onerous in August 2004 than in October 2005." *Id.* at 4. Mr. Kaufman concludes that, while he has not performed "an assessment of what values could have been realized from Refco by a Reasonably Prudent Board," "a significant portion of the damages that TH Lee claims it incurred likely would have been mitigated or eliminated" if Refco's Board took the steps Mr. Kaufman suggests. *Id.* at 24. Moreover, he states that "there was a diminution of several hundred million dollars in value" that he believes "lies at the feet of the Board." *Id.*

Trial is scheduled to begin in less than four weeks on September 12, 2011.

## ARGUMENT

### I. Mr. Kaufman's Report, Which Was Served More Than 14 Months After the Court's Deadline for Expert Reports, Is Untimely

Mr. Kaufman's report, which GT served less than five weeks before trial and without seeking leave from the Court, was submitted more than 14 months after the deadline for submitting expert reports in this case. *See* ECF No. 68, App. A. It therefore is untimely under Rule 26(a) and the Court's scheduling orders. This new expert and his new opinions could and should have been disclosed before the close of expert discovery, and their untimely disclosure and use at trial would severely prejudice THL as it prepares for trial in less than four weeks.

Under these circumstances, GT cannot meet its burden under Rule 37(c) to show that its failure to comply with Rule 26(a) and the Court's scheduling orders is (1) substantially justified or (2) harmless. *See* Fed. R. Civ. P. 37(c)(1). Courts are particularly reluctant to permit a

6

surprise expert where (as here) the party submitting the expert report does not even bother to seek advance permission from the Court. As this Court has held:

> But for plaintiff, without the slightest permission or authority, to add a still further new expert (Dr. Salzberg) is not only highly prejudicial to defendants but also shows a blatant contempt for the Court's orders. Plaintiff's counsel should consider themselves fortunate that the only sanction will be the exclusion of Dr. Salzberg and his report.

*Wald v. Costco Wholesale Corp.*, No. 03 Civ. 6308, 2005 WL 425864, at *5 (S.D.N.Y. Feb. 22, 2005) (Rakoff, J.). GT's failure to seek permission for "the belated addition of a surprise expert witness" is exacerbated by the fact that, "even when the Court set the trial date in this case, [GT's] counsel, whose own schedule was accommodated in the setting of the trial, raised no objection nor apprised the Court of any potential problem relating to a contemplated new expert." *Novomoskovsk Joint Stock Co. "Azot" v. Revson*, No. 95 CIV. 5399, 1998 WL 804712, at *1 (S.D.N.Y. Nov. 12, 1998) (Rakoff, J.) (denying leave to designate a new expert "more than one year after the deadline and less than seven weeks before the scheduled trial"). Accordingly, Mr. Kaufman's report and opinions must be precluded under Rule 37(c). If the Court were to allow this untimely report, "[t]he result would be nothing more than trial by ambush." *Id.* at *1.

## II.   GT Has No Substantial Justification for Submitting This Untimely Opinion

GT justifies its new report as a "rebuttal" to Mr. Schoen's lay opinion, which was originally discussed at his September 2009 deposition and further explored at his deposition on June 9, 2011. This argument is a pretext. A lay opinion is no excuse for untimely disclosure of expert opinion. Rule 26(a) requires pretrial disclosure of *expert* opinion under Federal Rule of Evidence 702. Rule 26(a) does *not* require pretrial disclosure of *lay* opinion under Rule 701. Because there is no disclosure requirement for lay opinion testimony, it makes no sense for a party to claim a "new" lay opinion as a justification for an untimely expert report. *See, e.g.*, *Nippo Corp./Int'l Bridge Corp. v. AMEC Earth & Envtl., Inc.*, No. 09-CV-0956, 2011 WL 1196922, at *4 (E.D. Pa. Mar. 30, 2011) (explaining that "[r]ebuttal reports may not be used to

7

contradict or rebut fact witnesses").

In any event, Mr. Schoen's lay opinion *was not new*. That opinion was originally given in September 2009 – almost a year *before* the deadline for expert reports. Mr. Schoen testified at length at his deposition in September 2009 about his opinion that, if the fraud had been revealed at the time of THL's investment, it would have caused the same "stampede of customers" and "stampede of counterparties running away from the business, which would have collapsed the business." Ex. 2, at 897-98. That is exactly the opinion Mr. Kaufman says he was asked to rebut. GT was present for this testimony and questioned Mr. Schoen after he gave it. While the Court did permit GT to question Mr. Schoen further about that opinion and GT did so in June 2011, that is no excuse for GT's failure to submit a timely expert report. Mr. Schoen had previously given this lay opinion in September 2009, and GT simply failed to submit a timely expert report by the Court's June 2010 deadline.

Even if Mr. Schoen had not given his opinion prior to the deadline for expert reports, the issues of causation and damages were apparent to all parties, and *all of the facts on which Mr. Kaufman now relies were available prior to the deadline*. The parties conducted extensive discovery about the "run on the bank" and the collapse of Refco. GT cannot claim that it was not aware that THL's damages and causation would be an issue at trial. In fact, GT made a tactical decision to try to knock out THL's claim on summary judgment based on its (legally wrong) damages argument. At summary judgment, GT *conceded* causation. *See* R&R at 8. GT now tries to reverse that judicial admission with an entirely new theory that THL could have saved Refco. But, as GT judicially admitted, Refco's collapse was caused not by THL's failure to save it, but by the fraud. In any event, this theory was available to GT before the deadline.

Not only is there no justification for GT submitting this report more than 14 months after the deadline, but there certainly is no justification – much less a substantial one – for GT waiting

8

to submit it until five weeks before trial. As discussed, the facts on which Mr. Kaufman relies were all disclosed during fact discovery, and GT could have submitted the report before the deadline. GT also could have sought leave to submit the untimely report in *December 2010*, during summary judgment briefing, when Mr. Schoen's lay opinion and THL's damages were hotly contested by the parties; or in *March 2011*, after the Special Master issued his R&R; or in *April 2011*, at the same time GT asked this Court for permission to depose Mr. Schoen for a third time[2]; or in *May 2011*, after this Court denied GT's summary judgment motion; or in early *June 2011*, immediately after GT deposed Mr. Schoen again. Instead, GT waited and waited until five weeks before trial to disclose a new expert without even seeking leave from the Court. For these reasons, GT cannot establish *any* justification for its delay, let alone *substantial* justification.

### III.   THL Would Be Severely Prejudiced by the Untimely Expert Opinion, and GT Should Be Estopped from Arguing Otherwise

Nor can GT establish that its introduction now of a brand new expert and theory is harmless. To the contrary, THL would be severely prejudiced. In the few weeks remaining before trial, THL would have to hire its own restructuring expert to evaluate Mr. Kaufman's report and assist counsel in preparing to depose Mr. Kaufman before trial. *Cf. Novomoskovsk*, 1998 WL 804712, at *1 (finding that allowing a new expert disclosed seven weeks before trial would "severely prejudice the defendants, who would be forced to try to find, in the few weeks remaining, a rebuttal expert in [the] area"). THL's new expert would have to review the actions that THL and Refco's Board took after the fraud was discovered and draft an expert report in response to Mr. Kaufman's report. Depositions of both experts would have to take place before trial. *Cf. Lopez v. Louoro*, No. 01 CIV. 2490, 2002 WL 31682398, at *3 (S.D.N.Y. Nov. 27, 2002) (denying leave to file report because, to avoid prejudice, plaintiff would "need an

---

[2] In fact, GT said in its objection to the R&R that, without another deposition of Mr. Schoen, it could not fairly respond to him through a "rebuttal expert." ECF 216, at 4. Yet GT did not ask for permission to submit one. This shows that GT's delay was willful.

opportunity to explore the expert's opinion, including through an expert deposition, if desired"). And, after exploring Mr. Kaufman's opinions at his deposition, THL would have to consider whether to file a *Daubert* motion to limit or outright exclude Mr. Kaufman's testimony at trial. In light of the substantial work to do to prepare for trial, it is unfairly prejudicial to force THL to undertake all this work and expense. In addition, the parties have expended enormous resources litigating damages in this case, and GT has already conceded the causation point it now disputes. *See* R&R at 8. GT cannot invent an entirely new defense five weeks before trial.

Indeed, GT's prior arguments estop it from claiming harmlessness now. GT itself argued, in successfully protesting THL's effort to supplement an *existing, disclosed* expert report nearly five *months* before trial, that it would be "severely" prejudicial to add expert opinions after the expert report deadline. *Id.* at 9-10. At argument, GT's counsel called the prejudice "staggering." Ex. 4, at 187-88. Special Master Capra did not grant THL's request, noting that "[i]t appears that the equities favor GT" but referring THL to Special Master Hedges. R&R at 10. If, as GT argued, it would be severely prejudicial to supplement an existing expert's report nearly five *months* before trial, it is orders of magnitude more prejudicial to add, five *weeks* before trial, a new expert to address a new opinion and new theory in the case. *See, e.g.*, *Novomoskovsk*, 1998 WL 804712, at *1 (denying leave to add a new expert where party waited until seven weeks before trial to seek such leave); *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 418 (W.D.N.Y. Apr. 14, 2005) (same for supplemental expert report when party waited until 48 days before trial to seek such leave).

## CONCLUSION

For the foregoing reasons, the Court should grant THL's motion to strike the untimely disclosed expert opinion of Peter S. Kaufman and preclude Mr. Kaufman from testifying at trial.

Dated: August 17, 2011

Respectfully submitted,

*/s/ Kevin B. Huff*
Mark C. Hansen
Kevin B. Huff (KH-9284)
Rebecca A. Beynon
KELLOGG, HUBER, HANSEN, TODD,
　EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, DC  20036
202-326-7900 (phone)
202-326-7999 (fax)

*Attorneys for Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P.*