**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------

IN RE REFCO INC. SECURITIES LITIGATION

:
:
:
:

CASE NO. 07-MD-1902 (JSR)

----------------------------------------------------------------

This document relates to:

----------------------------------------------------------------

KENNETH M. KRYS, *ET AL.,*

                  Plaintiffs,

       -against-

CHRISTOPHER SUGRUE, *ET AL.*

                Defendants.

:
:
:
:
:
:
:
:
:
:
:

CASE NO. 08-CV-3086 (JSR)

----------------------------------------------------------------

## RESPONSE TO PLAINTIFFS' LIMITED OBJECTION
## TO THE REPORT & RECOMMENDATION CONCERNING
## GRANT THORNTON LLP AND MARK RAMLER

WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Ph: 312-558-5600
Fax: 312-558-5700

200 Park Avenue
New York, New York 10166
Ph: 212-294-6700
Fax: 212-294-4700

*Attorneys for Defendants*
*Grant Thornton LLP and Mark Ramler*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT .................................................................... 1

BACKGROUND ............................................................................................ 4

ARGUMENT .................................................................................................. 6

    I.    Consistent with this Court's prior rulings, the Special Master properly
        held that Plaintiffs failed to plead the knowledge required for aiding
        and abetting conversion ......................................................................... 6

    II.   Plaintiffs have not raised any serious objection to the Special Master's
        recommendation to dismiss the fiduciary-duty-based claim .............................. 12

    III.  Consistent with this Court's prior rulings, the Special Master properly
        concluded that Plaintiffs cannot sue for deposits made before
        Grant Thornton's first Refco audit opinion ........................................... 14

    IV.  Plaintiffs have never alleged—and cannot now argue—that their claims
        against Mark Ramler are based on audit opinions issued by any firm
        other than Grant Thornton .................................................................... 16

CONCLUSION ............................................................................................... 18

# TABLE OF AUTHORITIES

**CASES**                                                  **PAGE**

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ............................................................................. 9

*Capital Mgmt. Select Fund Ltd. v. Bennett,*
No. 08-6166-cv (L), ___ F.3d ___, 2012 WL 48169 (2d Cir. Jan. 10, 2012) ............... 7
2012 WL 48169, at *3-*4 ...................................................................... 10
2012 WL 48169 at *9 ............................................................................ 8

*In re Sharp Int'l Corp.,*
403 F.3d 43 (2d Cir. 2005) .................................................................... 6

*Kolbeck v. LIT Am., Inc.,*
939 F. Supp. 240 (S.D.N.Y. 1996) ........................................................ 6

*MLSMK Inv. Co. v. JP Morgan Chase & Co,*
737 F. Supp. 2d 137 (S.D.N.Y. 2010) ................................................... 6

*United States v. Wolfson,*
642 F.3d 293, 295 (2d Cir. 2011) ......................................................... 12

## PRELIMINARY STATEMENT

Plaintiffs' Limited Objection is nothing more than a rehash of arguments that this Court has already rejected.  Grant Thornton and Mark Ramler made the same basic arguments in support of their motion to dismiss as PwC and Mari Ferris did.  The Special Master accepted some of these arguments and rejected others, allowing Plaintiffs to proceed with a single claim for aiding and abetting the Refco fraud.  The Court has already approved this approach, adopting the PwC R&R in its entirety.  The same reasoning and result should apply here.  As the Special Master explained, the conclusions in the current R&R were "essentially determined" by previous R&Rs and *de novo* rulings by this Court.  *See* R&R on Mot. to Dismiss by Grant Thornton LLP and Mark Ramler ("GT R&R") at 2-3 (listing the relevant rulings and resulting principles of pleading).  Plaintiffs' objections on the two remaining claims are futile—and an utter waste of time.

In fact, the lack of merit in Plaintiffs' arguments is even more obvious in light of recent developments in the Second Circuit.  On January 10, 2012, the Second Circuit issued a decision rejecting claims brought by another set of Refco customers—those who had used RCM as their broker for trading in securities.  As discussed further below, the Court's analysis sheds light on RCM's business in a way that will necessarily impact ***all*** customer claims, whether they relate to foreign exchange ("FX") trading or securities.  It also prevents these Plaintiffs from demonizing RCM's practice of "upstreaming" customer assets.  As the new decision explains, the practice of hypothecation or "upstreaming" is common in the industry, and it was disclosed unambiguously in RCM's customer agreements.  From the perspective of RCM's customers, then, this practice was neither deceptive nor improper.  If these Plaintiffs hope to state a claim based on upstreaming, they must show that ***SPhinX's*** assets at RCM were entitled to different treatment than ***other*** customers' assets—and that Grant Thornton and Mark Ramler actually knew it.

1

The Special Master looked at precisely that issue, and he found that Plaintiffs had not carried their burden.   He began by recognizing (as before) that Plaintiffs have not alleged any involvement by the Grant Thornton Defendants in the allegedly unauthorized transfers from Refco LLC to RCM.   For these Defendants, the conversion claim focuses on what happened to SPhinX's assets from RCM onward.   The question is whether these Defendants knew the RCM customer agreement "did not apply in the same way to the [SPhinX] assets" at RCM "as it would to the FX deposits."  GT R&R at 19.  Based on the allegations here, the answer is no.  The issue of protections on SPhinX's assets at RCM is "murky" and depends on various SPhinX-specific facts, including SPhinX's account-opening agreement at Refco LLC and "other factors well beyond the knowledge" of GT/Ramler.  *Id*.  (quoting previous R&Rs).  The complaint does not allege that Grant Thornton and Mark Ramler knew all these "intricacies."  *Id*.   This is precisely the approach this Court adopted in the PwC R&R three months ago, and it applies here as well.

For their claim of aiding and abetting breach of fiduciary duty, Plaintiffs reach back even farther—defying decisions by this Court that date back nearly a year.  They argue that these Defendants knew about SPhinX's "right of segregation" at Refco LLC and about the transfers of SPhinX cash "from segregated accounts into accounts at RCM."  Pls. Obj. at 17-18.  But again, even if that were true (and it is not), ***those*** transfers are not the basis for any claim against these Defendants.  The claims against Grant Thornton and Mark Ramler are based on the so-called "Refco fraud"—the theory that they "help[ed] Refco conceal losses and misstate its financial records" through both the RGHI receivable fraud and Refco's upstreaming of customer assets.  Pl. Omnibus Opp. to Mots. to Dismiss at 23 (filed Mar. 16, 2009).  Under this Court's prior rulings, the fiduciary-duty-based claim can proceed against the "Refco fraud" defendants only if Refco and

SPhinX had a "relationship of trust and confidence."  GT R&R at 18.  There is no allegation that these Defendants knew about any such "relationship."  *Id*.

Plaintiffs ignore this completely.  They do not even mention the Special Master's reasoning, much less offer some basis to set it aside.  Instead, they resort to a blatant mischaracterization of prior decisions.  They say "this Court ha[s] already held" that they can proceed with their fiduciary-duty-based claims based simply on SPhinX's alleged "right to segregation."  Pls. Obj. at 17.  In fact, the opposite is true;  this Court has specifically held that the fiduciary duty claim against these Defendants ***cannot*** proceed on that basis.

Plaintiffs' objection on the issue of causation and damages is equally baseless.  The Special Master properly held that Plaintiffs' fraud claim is limited to new deposits made after the Defendants' first alleged act of substantial assistance—the issuance of Grant Thornton's first Refco audit opinion.  This analysis is drawn nearly verbatim from the PwC R&R (which this Court has already adopted) and reflects the very same analysis this Court adopted in the Private Actions Trust case in 2010.  Plaintiffs do not offer any reason for a different result here.

The remaining argument in the Limited Objection is new—entirely new, in fact, since the case left the Special Master.  According to Plaintiffs, the damages available against Mark Ramler should not be subject to the same limitation because he was involved in auditing Refco well before Grant Thornton came on the scene.  Effectively, Plaintiffs are attempting to expand their claim against Mr. Ramler to include audit opinions issued by Arthur Andersen LLP.

It is far, far too late for such an argument.   Plaintiffs did not assert this theory before the Special Master, and they did not include it in any of their complaints.  To the contrary, Plaintiffs' claims against Mr. Ramler have always been limited to the audit opinions issued by Grant

Thornton.  Arthur Andersen LLP is not a defendant, and its audit opinions have never been at issue.  Plaintiffs cannot avoid the Special Master's recommendation by changing their theory now.

The pleading stage of this litigation is finally coming to a close—and it has been a tremendous undertaking, given the breadth of the complaint, the staggering number of defendants, and the "malleable" nature of Plaintiffs' claims.  Standing R&R at 3, *adopted* May 31, 2010.   At this point, Plaintiffs' insistence on repeating old arguments (and asserting entirely new ones after the fact) is an unfortunate waste of resources.   Defendants ask that the Court adopt the Special Master's recommendations and allow the parties to move forward on the single claim that remains.

## BACKGROUND

Plaintiffs devote more than ten pages to a discussion of "Background" that has nothing to do with the claims that are the subject of their Limited Objection.  In particular, their discussion of the RGHI Receivable, the so-called "round trip loan scheme," Refco's non-disclosure of its loans to the Suffolk entities, and the alleged fraud against TH Lee is entirely gratuitous.  The only claims at issue in Plaintiffs' Limited Objection have to do with an alleged relationship of trust and confidence between SPhinX and Refco and with the upstreaming of SPhinX assets from RCM.  Plaintiffs do not argue—nor could they—that the allegations relating to any of these other topics could possibly support these specific claims.

Their discussion is also misleading, as it tells a story that has, in many respects, already been disproven in discovery and other proceedings.  For example, while Plaintiffs claim that Mark Ramler "conceived" the so-called "round-trip loan" scheme (Pl. Obj. at 3-4), they neglect to mention the criminal convictions that now undermine that theory.  This was a fraud ***against*** Refco's auditors, not ***by*** them.   The true wrongdoers at Refco have either confessed to or been found guilty of criminal charges predicated on hiding the truth from Refco's outside auditors.  And

in the process, Refco senior executives Phil Bennett, Santo Maggio, and Robert Trosten have all openly admitted to an agreement to keep the auditors in the dark.

The Amended Complaint asserts three claims against Grant Thornton and Mark Ramler: Count XVII for Aiding and Abetting Fraud, Count XVIII for Aiding and Abetting Breach of Fiduciary Duty, and Count XIX for Aiding and Abetting Conversion.  This Court has already dismissed the claims asserted on behalf of SPhinX's investors for lack of standing, and it has concluded that the SPhinX Managed Futures Fund ("SMFF") is the only SPhinX fund with any legitimate claim.  This Court has also defined and narrowed the primary violations that underlie each of these claims.

The current R&R addresses whether Plaintiffs have adequately stated a claim against Grant Thornton and Mark Ramler in particular.  The Special Master recommends allowing Plaintiffs to proceed with their claim under Count XVII (GT R&R at 5-17), and these Defendants have not objected to that outcome, at least for purposes of pleading.  *See* Statement by Grant Thornton LLP and Mark Ramler (filed Jan. 10, 2012).   As for the other two claims, the Special Master recommends dismissal with prejudice.  GT R&R at 17-19.  Those are the claims that are the subject of Plaintiffs' Limited Objection.  But while the recommendations here relate uniquely to these Defendants, the analysis underlying the recommendations is already well established as law of the case.  As discussed further below, nearly all of the conclusions in the current R&R flow directly from conclusions that this Court has already adopted.  We will recount each of those at the appropriate point below.

**ARGUMENT**

**I.     Consistent with this Court's prior rulings, the Special Master properly held that Plaintiffs failed to plead the knowledge required for aiding and abetting conversion.**

For the claim of aiding and abetting conversion, the Special Master's analysis faithfully follows the conclusions in a series of prior rulings.  Plaintiffs' theory is that these Defendants aided Refco in "converting" SPhinX's assets after they were transferred to RCM—upstreaming them and using them as a source of financing in Refco's operations.  *See* GT R&R at 19; Pl. Obj. at 1 ("Refco converted those assets by upstreaming them for its own purposes").  In short, this claim is really about the "upstreaming."  But as this Court has repeatedly held, it is not enough to allege that these Defendants knew the upstreaming ***happened***.  The question is whether they knew the upstreaming was ***wrongful***.  PwC R&R at 25-26, *adopted* Oct. 25, 2011; *cf.* Butt R&R at 12, *adopted* Mar. 29, 2011 (appeal pending); *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005) (plaintiff must allege "actual knowledge of the breach of duty"); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996) (claim requires knowledge of both the primary violator's status as a fiduciary and the fact that its conduct contravened its fiduciary duty); *see also MLSMK Inv. Co. v. JP Morgan Chase & Co*, 737 F. Supp. 2d 137, 144-45 (S.D.N.Y. 2010) (same).   Even after two attempts to amend, Plaintiffs' knowledge allegations are not enough.  GT R&R at 19.

In fact, from the perspective of most RCM customers, the practice of upstreaming was not "wrongful" at all.  Plaintiffs' Limited Objection states again and again that RCM customer assets were "looted" (at  9, 13) or "diverted" (at 2), and it spends a great deal of time complaining about the practice of upstreaming generally (at 2-3, 9-10).  But for both the FX and securities accounts at RCM, an agreement called the "Margin Annex" ***explicitly authorized*** Refco to use the customers' assets.  *See* PwC R&R at 25-26, *adopted* Oct. 25, 2011; Primary Violations R&R at 10-11, *adopted* May 3, 2011; Private Actions Trust R&R at 23-29, *adopted* Dec. 13, 2010.

The Second Circuit has now analyzed this issue in detail. *See Capital Mgmt. Select Fund Ltd. v. Bennett*, No. 08-6166-cv (L), ___ F.3d ___, 2012 WL 48169 (2d Cir. Jan. 10, 2012) (pet. for reh'g pending on different grounds). The Court's decision explains the practice of "rehypothecation"—where a broker uses or pledges its customers' assets to obtain financing for its own business. *Id*. at * 2-*3. Agreements that allow this practice are common and provide "economic benefits to both parties." *Id*. Although state and federal regulators have placed limitations on this practice, "U.S.-based broker-dealers have satisfied investor demand" for such agreements by giving institutional investors the option of using "unregulated foreign affiliates that are not subject to U.S. margin or rehypothecation restrictions." *Id*. at *3 (citing authorities). At Refco, customers were given the option of using RCM, which "held itself out as . . . an unregulated off-shore broker." *Id*. at *4.

For customers with assets at RCM, then, it would have come as no surprise that RCM was engaged in the practice of hypothecating and "upstreaming" customer assets for use in Refco's own financing. Indeed, that was the gist of the Second Circuit's holding. The customers in the case on appeal had claimed that this upstreaming was improper—that "Refco's corporate officers caused RCM to improperly sell or lend securities and other assets from RCM Customers' trading accounts to various Refco affiliates in order to fund Refco's operations." *Id*. at *4. But the Second Circuit held that the language of RCM's customer agreements precluded this claim as a matter of law. Those agreements "unambiguously warned the RCM Customers that RCM

intended to exercise full rehypothecation rights" over their assets.  *Id*. at *9.  So, from the customers' perspective, the upstreaming of their assets was neither improper nor deceptive.  *Id*.[1]

This new Second Circuit decision underscores the correctness of the Special Master's approach in this case.  Given that RCM customers in general cannot complain about the practice of upstreaming, the Special Master properly focused on whether these Defendants knew that SPhinX's assets at RCM were subject to different requirements.  He asked whether these Defendants knew that "the terms of the Margin Annex (to which they were not privy) did not apply in the same way to the [SPhinX] assets as it would to the FX deposits" or deposits by other RCM customers.  GT R&R at 19.  Under the allegations here, the answer is no.

As the Special Master explained, the issue of whether Refco was authorized to upstream SPhinX cash at RCM "is a murky one based on the Margin Annex, segregation requirements, and other factors well beyond the knowledge" of GT/Ramler.  *Id*. (quoting, *inter alia*, PwC R&R at 28, *adopted* Oct. 25, 2011).  Chief among those "factors" is the SPhinX account opening document at Refco LLC, which allegedly established a right to segregation that may apply even to assets transferred to another entity.  Primary Violations R&R at 8-9, *adopted* May 3, 2011; Pl. Obj. at 17.  Yet there is no allegation that Grant Thornton or Mark Ramler ever saw that particular agreement.  In short, "[t]here is nothing in the Complaint, and nothing about GT/Ramler's role at Refco, that could have caused these Defendants to know the intricacies required for a finding of conversion."  GT R&R at 19.  This analysis not only tracks but **quotes** the PwC R&R, which this Court has already adopted.

---

[1] This applies equally to assets in "excess" of margin requirements.  Earlier in this case, the Special Master accepted Plaintiffs' argument that Margin Annex applies only to cash "treated as margin" and not to "excess cash."  Primary Violations R&R at 11.  But the Second Circuit has rejected that interpretation of the Margin Annex, holding that it warned customers of RCM's intent to use the customers' "excess" as well.  2012 WL 48169 at *9.

Plaintiffs cannot avoid their pleading problems by reversing the parties' burdens.  They complain that "Grant Thornton and Ramler do not even claim to have relied on, or even been aware of, the Margin Annex or the unspecified 'other factors' cited by the Special Master."  Pl. Obj. at 19; *see also id.* at 18 (arguing that these Defendants "do not purport to have known or had any reason to believe" that the transfers to RCM were "authorized").  But the burden of pleading falls on the plaintiffs, not the defendants.  Defendants need not establish that they affirmatively believed the transfers were ***authorized***; instead, Plaintiffs must plead that Defendants knew the transfers were ***unauthorized***.  And Plaintiffs must support that pleading with factual allegations that make their claim "plausible on its face" and raise "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Lacking such factual allegations, Plaintiffs' claim is pure speculation.

Even now, Plaintiffs do not contend that these Defendants saw the SPhinX-specific documents that supposedly gave SPhinX a unique "right of segregation" even after its assets reached RCM.  Instead, their argument cites three other factual allegations, none of which shows the necessary knowledge.

***Alleged Access to RAI Offering Materials.***  Plaintiffs claim that Grant Thornton "'received and reviewed offering materials for funds created by a Refco-affiliated entity, Refco Alternative Investments ("RAI"), which managed funds that invested exclusively or primarily in SPhinX Funds.'"  Pl. Obj. at 18.  Supposedly, these offering materials indicated that SPhinX intended to keep its funds in segregated accounts.  *Id*. at 9.

But as this Court has already held, these materials "are of limited utility" because they do not show "an agreement on ***Refco's*** part to maintain ***SPhinX*** funds in a segregated account."  Primary Violations R&R at 8, *adopted* May 3, 2011 (emphasis in original).  At most, they are

evidence that SPhinX may have intended to hold the assets in the RAI-created funds in segregated accounts and thus may have asked for a right to segregation—and that RAI knew SPhinX's intent. *Id*. But this is not enough. Allegations about what the Defendants "should have known" are not sufficient to establish knowledge. Butt R&R at 12-13, *adopted* Mar. 28, 2011. And in any case, Grant Thornton did not audit SPhinX or RAI, so there was nothing that required these Defendants "to put everything together" and determine for themselves whether SPhinX was honoring the representations made to its own investors in its own offering documents. *Id.*

**CFTC-Related Work.** Plaintiffs also focus on the allegation that Refco engaged Grant Thornton to perform certain procedures with respect to requirements set out by the Commodity Futures Trading Commission ("CFTC"). Pl. Obj. at 17-18; *see also id.* at 9. But this does not constitute knowledge that any right of segregation existed or was being violated for assets at RCM. Plaintiffs have never alleged that Refco failed to comply with CFTC segregation requirements for the assets that remained in accounts at Refco LLC. Instead, they complain that excess cash was **removed from** those accounts and deposited at RCM, with the consent of Christopher Sugrue and other SPhinX and PlusFunds agents.[2] As Plaintiffs were well aware, RCM did not purport to be subject to regulations by the CFTC; it always held itself out as an offshore broker exempt from such regulations. *See generally Capital Mgmt.* ___ F.3d ___, 2012 WL 48169, at *3-*4.

To be sure, Plaintiffs argue that SPhinX's cash was entitled to segregation even after it was withdrawn from the CFTC-regulated entity (Refco LLC) and deposited at RCM. But this alleged right of segregation is not based on any CFTC requirements that Grant Thornton was charged with

---

[2] Although Plaintiffs now contend that Sugrue and the others were acting adversely and without proper authority, there is no allegation that Grant Thornton and Ramler knew about their alleged wrongdoing. To the contrary, Plaintiffs have conceded that Grant Thornton and Ramler were not involved in it. Pl. Omnibus Opp. to Mots. to Dismiss at 23-24 (filed Mar. 16, 2009) (conceding that the complaint contains "no allegation" that these defendants "cooperated in the wrongdoing" of those responsible for the allegedly wrongful transfers from Refco LLC to RCM).

testing;  it is based on the terms of SPhinX's Refco LLC account opening agreement.  *See* Pl. Obj. at 17; Primary Violations R&R at 8-9 (citing provision in attachment to agreement that pertains to funds "deposited with another entity"), *adopted* May 3, 2011.  Grant Thornton did not perform any compliance work for RCM, and it was never asked to test Refco's compliance with its private customer agreements.  In short, the allegations about CFTC-related work do nothing to support Plaintiffs' claims.

 ***Confirmation of SPhinX Balances at RCM.***  Finally, Plaintiffs point to Grant Thornton's audit work for RCM, which included requesting and receiving routine confirmations of SPhinX's RCM account balances.  Pl. Obj. at 18; *see also id*. at 8.  They contend that these confirmations included a review of SPhinX's account statements at RCM, which allegedly showed an influx of cash from Refco LLC.  On this basis, they say, Grant Thornton "saw the movement of large amounts of cash from Refco accounts that Grant Thornton knew were segregated to Refco [RCM] accounts that it knew were unsegregated."  *Id*.

 But again, this is not enough to support the inference that Grant Thornton knew that the cash deposited at RCM was still entitled to segregation—or that the "movement" to RCM was wrongful or unauthorized.  *See* Butt R&R at 11-12 ( mere fact of transfer to unsegregated accounts does not show knowledge that transfers were "unauthorized"), *adopted*  Mar. 29, 2011.  In fact, it shows the opposite.  The process of "confirmation" involved asking SPhinX to confirm that it did, in fact, have a particular balance at RCM—an entity that purported to be exempt from regulation. In response, agents of SPhinX confirmed that the account statements were accurate and correct. Having received this reassurance directly from SPhinX, Grant Thornton had no reason to believe that anything was amiss.

Plaintiffs' objection recites other factual allegations too, but only by way of "Background." They do not argue that any of these other allegations demonstrates the knowledge required for aiding and abetting conversion (or breach of fiduciary duty, for that matter). And as discussed above, the limited facts on which they *do* rely do not come close to supporting the necessary inference. The Special Master's recommendation is correct; this Court should adopt it, just as it has the previous recommendations that have followed the same approach.

## II.     Plaintiffs have not raised any serious objection to the Special Master's recommendation to dismiss the fiduciary-duty-based claim.

With respect to the claim for aiding and abetting breach of fiduciary duty, the Special Master's reasoning is equally clear and correct. This Court has held that Plaintiffs have sufficiently alleged "a fiduciary duty, based on a relationship of trust and confidence." GT R&R at 18 (citing Primary Violations R&R at 37, *adopted* May 3, 2011). Plaintiffs have alleged that this duty was breached by Refco's practice of "upstreaming SPhinX assets at RCM and using them to fund Refco operations." *Id*. According to the Special Master, however, Plaintiffs have not alleged that these Defendants knew there was either a fiduciary duty or a breach. *Id*. At most, the complaint includes "sparse allegations" that Grant Thornton knew about the upstreaming of SPhinX cash from RCM. *Id*. But those allegations do not show knowledge of any breach of fiduciary duty. As the Special Master observed, "in ordinary circumstances, the only fiduciary duty of a non-discretionary broker is to effectuate the trades ordered by the customer." *Id*. (citing *United States v. Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011)); *accord* Private Actions Trust R&R at 18-22, *adopted* Dec. 13, 2010 (dismissing FX customer claims on similar basis). Even if SPhinX had a relationship with Refco that was more than "ordinary," there is no allegation that these Defendants knew it.

Plaintiffs do not take issue with this analysis.  In fact, they do not even mention it.  Instead, they argue that the fiduciary-duty-based claim should survive for a different reason—because, they say, Grant Thornton knew about SPhinX's "right to segregation" and the transfers from Refco LLC to RCM.  Pls. Obj. at 17-18.  Citing the Primary Violations R&R, they contend that "[t]he Special Master and this Court have already held that a promise to keep another person's funds segregated creates a fiduciary duty."  *Id*.

This is disingenuous.  Plaintiffs find this "holding" on page 30 of the Primary Violations R&R—under the heading "Breach of Fiduciary Duty Allegations ***as Applied to the SPhinX Fraud***."  (Emphasis added).  But as Plaintiffs have conceded, these Defendants have not been sued in connection with the SPhinX fraud.  *See, e.g.*, Pl. Omnibus Opp. to Mots. to Dismiss at 23-24 (filed Mar. 16, 2009) (conceding that the complaint contains "no allegation" that these defendants "cooperated in the wrongdoing" of those responsible for the allegedly wrongful transfers from Refco LLC to RCM).[3]  For these Defendants, the relevant discussion in the Primary Violations R&R appears seven pages later, under the heading "Breach of Fiduciary Duty Standards ***as Applied to the Refco Fraud***."  Primary Violations R&R at 36-39, *adopted* May 3, 2011 (emphasis added).  There, the R&R specifically concludes that Plaintiffs ***cannot*** proceed against these Defendants on this theory.  As the R&R explains:

---

[3] The Special Master and this Court have both acknowledged this fact repeatedly.  *See, e.g.*, GT R&R at 3 ("The complaint against these Defendants is grounded solely in the Refco Fraud.  The Plaintiffs do not claim that GT or Ramler had anything to do with the unauthorized transfer of SMFF cash from protected accounts at Refco LLC to RCM."); SLUSA R&R at 16-18 (objections pending) (claims against these Defendants are discussed solely in connection with the Refco fraud).  In fact, this is precisely why the claims against Grant Thornton and Ramler were initially dismissed without prejudice for lack of standing, until after the resolution of the appeals concerning the claims against the same Defendants by the Litigation Trustee. *See* Standing R&R at 32-33, *adopted* May 31, 2010 (dismissing claims against these Defendants without prejudice because they depended only on the "Refco fraud").

Even if Refco had a duty to keep the SMFF cash in a segregated account, no claim for breach of that duty can be brought in the context of the Refco fraud. That is because there is no causal relationship between the violation of the segregation right and the Plaintiffs' claim for damages under the Refco fraud. With respect to the Refco fraud, the Plaintiffs are arguing that if they had known about Refco's financial condition, SPhinX would not have placed and held its property in accounts at Refco. *See, e.g.,* SAC ¶ 1223. That is, segregation or not, they would simply not have done business with Refco if they had known the truth. These allegations show that the claim for a right of segregation is the gravamen of the *SPhinX* fraud, not the Refco fraud. Accordingly no claim for breach of fiduciary duty based on segregation can support any claim for damages from the Refco fraud.

*Id*. at 37 (emphasis in original).

This ruling is correct and has been the law of this case for nearly a year. Even if it were proper to challenge it at this late date (and it is not), Plaintiffs do not acknowledge its analysis, much less give this Court a reason to set it aside. Plaintiffs have not alleged knowledge of a "right of segregation" (*see supra* Part I), and even if they had, the law of the case prevents Plaintiffs from pressing a fiduciary-duty-based claim against these Defendants on that basis.

## III.   Consistent with this Court's prior rulings, the Special Master properly concluded that Plaintiffs cannot sue for deposits made before Grant Thornton's first Refco audit opinion.

Plaintiffs also object to the Special Master's sensible conclusion about the scope of their claim for aiding and abetting fraud. As a matter of causation, the Special Master concluded that Plaintiffs' claims against these Defendants must be limited to deposits made after their first alleged act of "substantial assistance"—here, Grant Thornton's first Refco audit opinion.[4] GT R&R at 16-17. Previous deposits that were merely "maintained" based on Grant Thornton's audit opinions cannot be the basis of a claim. *Id.*

---

[4] Discovery will presumably reveal when—if at all—Plaintiffs actually received and relied on this audit opinion, which was rendered at a time when Refco was privately held and had limited public disclosure requirements. It is the date of first *reliance* that will ultimately provide the starting date for the claims against these Defendants.

This is a necessary consequence of Plaintiffs' own allegations.  Under Plaintiffs' version of the facts, proper conduct by Grant Thornton would have "exposed" the fraud to the public, after which Refco's customers "would not have entrusted or continued to entrust their assets with Refco."  Am. Compl. ¶ 743.  If these allegations are accepted as true (as they must be, for now), the alleged wrongdoing simply delayed the run-on-the-bank and the loss of any existing deposits.  For that reason, the Special Master concluded that the loss of existing deposits was not "caused" by these Defendants.  GT R&R at 16-17.

This conclusion is based directly on rulings by this Court dating back to 2010.  *See* Private Actions Trust R&R at 17, *adopted* Dec. 13, 2010; PwC R&R at 23, *adopted* Oct. 25, 2011.  In fact, the Special Master drew his discussion nearly verbatim from those previous decisions by way of a block quote, inserting the names of Grant Thornton and Mark Ramler where appropriate.  GT R&R at 16-17.

Plaintiffs do not contend that there is anything unique about these Defendants that warrants a different result.  Rather, they argue that the Special Master and this Court reached the wrong conclusion in 2010 and 2011.  Indeed, their argument parrots the argument in their motion for reconsideration of the order concerning PwC.  *Compare* Pl. Obj. at 19-24 *with* Mot. for Recons. at 16-18 (filed Nov. 8, 2011).[5]  And it depends in significant part on their reading of another R&R adopted earlier in 2011—an ruling of which the Special Master and this Court were presumably aware when they ruled a few months later on PwC's motion to dismiss.  Pl. Obj. at 22-23 (citing TH Lee Summary Judgment R&R, *adopted* May 31, 2011).

---

[5] PwC has explained why the motion should be denied; we will not repeat those arguments here.

In short, the Court has already considered and rejected Plaintiffs' arguments, and there is no reason for a different result here. The Court should adopt the Special Master's recommendation on this issue as well.

**IV.  Plaintiffs have never alleged—and cannot now argue—that their claims against Mark Ramler are based on audit opinions issued by any firm other than Grant Thornton.**

Plaintiffs' argument concerning the scope of the fraud claim against Mark Ramler is the only argument in their Limited Objection that has ***not*** already been rejected—and that is because the argument has never been made before. Plaintiffs contend that their claim against Mr. Ramler should reach back farther than their claim against Grant Thornton, encompassing audit opinions issued at his direction by an entirely different audit firm before ***any*** SPhinX deposits were made. Pl. Obj. at 24. They suggest that they "relied" on those earlier audit opinions as well, so they should be able to proceed against Mr. Ramler based on ***all*** the SPhinX deposits. *Id*.

This theory of recovery was never presented to the Special Master. Although Plaintiffs may have invoked the ***knowledge*** Mr. Ramler acquired with his prior firm, they have never before argued that his work on "the audits of Refco's 2002 and prior financial statements" (*id*. at 24)— before Grant Thornton was engaged by Refco—constitutes the "substantial assistance" for the claims against him. As the Special Master explained, "the first act properly alleged" as substantial assistance by ***both*** Grant Thornton and Mark Ramler is the issuance of Grant Thornton's first audit opinion. GT R&R at 17.

This Court has already made clear that it will not consider arguments that were not previously presented to the Special Master. Order dated Oct. 24, 2011 (adopting PwC R&R). Indeed, the "entire purpose" of the Special Master appointments in this MDL "would be for naught if the parties could simply introduce new evidence and raise new arguments to this Court that were not fairly presented first to the Special Masters whenever a party did not like a Special Master's

recommendation." *Id*. at 1-2 n.1.  This Court can and should reject Plaintiffs' argument for this reason alone.

Moreover, this theory is utterly absent from Plaintiffs' Amended Complaint.  Both the structure and content of the Amended Complaint show that the claims against Mr. Ramler and Grant Thornton are coextensive.  Am Compl. at 170 *et seq*. (heading:  "Grant Thornton and Mark Ramler"); *id*. ¶ 1259 (alleging substantial assistance by both of these Defendants by way of audit opinions issued by "Grant Thornton and Mark Ramler").

Plaintiffs have never purported to state a claim based on audit opinions issued by Mr. Ramler's former firm.  They say only that SPhinX and PlusFunds' "innocent decision-makers" relied on audit opinions issued by Grant Thornton in 2003 and later.  *E.g.*, Am. Compl. ¶ 722 (identifying Grant Thornton audit opinions); *id*. ¶ 723 ("SPhinX and PlusFunds' innocent decision-makers received and relied on [Refco's] financial statements and Grant Thornton's unqualified audit opinions thereupon"), *cited in* GT R&R at 15.  There is *no* allegation of reliance on audit opinions issued by Arthur Andersen LLP.  Although the Andersen firm is mentioned in the Amended Complaint, those references are only in the context of explaining the history of Grant Thornton's engagement and the knowledge that Mark Ramler already possessed when he arrived at Grant Thornton.  *E.g.*, Am. Compl. ¶ 738 ("Based on his long experience with Refco, Ramler brought to Grant Thornton his knowledge of at least the following facts: [listing facts]"); *see also, e.g., id.* ¶¶ 727, 736, 737, 739, 741.  Plaintiffs do not identify or refer to a single audit opinion issued by Arthur Andersen, and they do not make any effort to plead any deficiencies in Arthur Andersen's audits.  *Contrast* Am. Compl. ¶¶ 722-799 (allegations regarding Grant Thornton).  In fact, even the objection itself does not mention the Andersen audit opinions as the basis for the claims against Mr. Ramler.  *See* Pl. Obj. at 13 (under the heading "SPhinX and PlusFunds relied to

17

their detriment on Grant Thornton and Ramler's fraudulent audit opinions," referring only to audit opinions issued in 2003 and later by Grant Thornton).

Plaintiffs have already filed one amended complaint and proffered another.  It is far too late—and it would be outrageously unfair—to allow them to expand their claims against Mr. Ramler so dramatically at this late date.  This argument too should be rejected.

## CONCLUSION

As discussed here and in Defendants' previous Statement, this Court should adopt the Special Master's R&R and allow this case to proceed past the pleading stage on the claim for aiding and abetting fraud.  It is time to explore the merits of this claim based on discovery and a complete record.

Dated:  January 27, 2012

*Of Counsel:*

Kenneth Cunningham
Tracy W. Berry
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
Ph: 312-856-0001
Fax: 312-565-3473

WINSTON & STRAWN LLP


_____/s_____
By: Linda T. Coberly
     (lcoberly@winston.com)

Bruce Braun
(bbraun@winston.com)
Catherine W. Joyce
(cjoyce@winston.com)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Ph: 312-558-5600
Fax: 312-558-5700

Beth A. Tagliamonti
(btagliamonti@winston.com)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Ph: 212-294-6700
Fax: 212-294-4700

*Attorneys for Defendants*
*Grant Thornton LLP and Mark Ramler*