UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
In re REFCO INC. SECURITIES LITIGATION    :     Case No. 07-md-1902 (JSR)
                                                                 :
-----------------------------------------------------------------X

        This Document Relates to:

-----------------------------------------------------------------X
KENNETH M. KRYS, et al.,                          :     Case No. 08-cv-3065 (JSR)
                                                                 :     Case No. 08-cv-3086 (JSR)
Plaintiffs,                                                   :
                                                                 :     REPORT AND
        -against-                              :     RECOMMENDATION
                                                                 :     OF THE SPECIAL MASTER
CHRISTOPHER SUGRUE, et al.,               :     ON MOTIONS TO DISMISS
                                                                 :     BROUGHT BY THE
        Defendants.                           :     THE INGRAM
                                                                 :     DEFENDANTS AND THE
                                                                 :     LIBERTY CORNER
                                                                 :     DEFENDANTS
                                                                 :
-----------------------------------------------------------------X

Daniel J. Capra, Special Master

**I. Introduction**

     Certain Defendants that participated in loan transactions used by Refco used to hide the Refco Fraud move to dismiss two Counts of the the Plaintiffs' First Amended Complaint ("FAC")—the only counts directed against them. The Counts allege aiding and abetting fraud (Count XXIII); and aiding and abetting breach of fiduciary duty (Count XXIV).[1]

     **A. The Defendants**

---

[1] The Special Master has previously issued many R and R's in the Refco matter. Some of these R and R's will be referred to herein. Abbreviations used in the prior R and R's will be used herein. Familiarity with all of the R and R's — and with Judge Rakoff's orders reviewing them — is presumed.

The Defendants before the Special Master on these motions are 1) Ingram Micro, Inc. and its subsidiary CIM Ventures, Inc. (collectively "the Ingram Defendants"); and 2) Liberty Corner Capital Strategies LLC ("Liberty Corner") and William T. Pigott, the sole owner of Liberty Corner (collectively the "Liberty Corner Defendants").

Other defendants are charged in Counts XXIII and XXIV, but are not before the Special Master on this motion. Specifically:

- BAWAG and the EMF Defendants have been dismissed with prejudice because they settled with the Refco Trustee. See Report and Recommendation dated April 19, 2010, affirmed by Judge Rakoff.

- The Coast Management set of Round Trip Loan defendants — Coast Asset Management, LLC, Christopher Pettit and CS Land Management, LLC — have settled with the Plaintiffs and so there is no motion to dismiss before the Court with respect to those defendants. *See* email from Plaintiffs' counsel to the Special Master dated November 30, 2010.

- Beckenham Trading Co., Inc., and Andrew Krieger, have answered the Complaint but have not filed a motion to dismiss. See Plaintiffs' Letter Brief to the Special Master dated November 5, 2010, at 14, n.6. Accordingly there is no motion before the Court with respect to those defendants.

That leaves the Ingram Defendants and the Liberty Corner Defendants, who will collectively be referred to as "Defendants" or "Loan Defendants" herein.

### B. The Basic Claims Against the Defendants

These Defendants, among others, are referred to in the FAC as the "Round-Trip Loan" or "RTL Participants." The Plaintiffs allege that Refco engaged in "round-trip loan" transactions with third parties, which served to hide the RGHI Receivable. According to the FAC, the round-trip loans worked as follows:

> In each of these RTL transactions, a Refco entity extended a loan to an unaffiliated third party [including the Defendants here], which in turn extended a loan to RGHI. RGHI used the loan to pay down the RGHI Receivable just before the end of the [Refco] reporting period so that Refco's financials appeared to show the satisfaction of the RGHI Receivable. Days after the end of the reporting period, the RTL's were unwound, and the RGHI Receivable reappeared on Refco's books.

FAC ¶ 8

For agreeing to participate in these loan transactions, the third parties "received payment of

the 'spread' between the interest rates of the two 'loans'." Id. at ¶235. The Plaintiffs allege that Piggott received at least $1.1 million for participating in the RTL scheme. Id. Interestingly, the Plaintiffs do not mention the amount of profits received by Ingram. But according to the Bankruptcy Examiner's Report, Ingram made a net profit of less than $20,000 for its two loan transactions.[2]

The Defendants contest the appellation "round-trip loans." They would prefer the term "back-to-back" loans as they strenuously dispute that they had knowledge of the so-called "third leg" of the loan transactions, i.e., the pay-down (and subsequent unwinding of that pay-down) between RGHI and Refco. As the term "round-trip loans" has been used throughout this litigation, it will be used in this R and R, but as a label only and not as a judgment that the loans were improper.

The gravamen of the Plaintiffs'[3] claims in Counts XXIII and XXIV is that the Defendants, by participating in the round-trip loan transactions, allowed Refco to present a false financial picture — a picture on which SphinX and PlusFunds reasonably relied by reviewing false financial statements issued by Refco. FAC ¶¶ 1324-25, 1331.[4] The Plaintiffs do not allege that the Defendants had anything to do with the SphinX Fraud, i.e., the transfer of SMFF cash from protected accounts at Refco LLC to unprotected accounts at RCM. See Standing R and R at 29. Nor do the Plaintiffs allege that the Defendants took any part in the preparation or dissemination of the fraudulent financial statements on which SphinX/PlusFunds detrimentally relied. Rather the allegation is that the Defendants engaged in transactions that allowed Refco (and various other third-party defendants such as Grant Thornton and Mayer Brown) to falsely state that the RGHI Receivable had been paid down when in fact it had not.

**C. Summary of Recommendations**

---

[2] The Plaintiffs rely on the Bankruptcy Examiner's Report throughout the FAC, and accordingly it may be considered in reviewing the motions to dismiss. *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir. 2000) (on a motion to dismiss, a court may consider any document incorporated into a complaint by reference, and any document on which the plaintiff "relied in bringing the suit").

[3] As recounted in a number of prior opinions, the named Plaintiffs have been appointed by the Cayman Court to bring claims on behalf of SPhinX and PlusFunds. Prior rulings by Judge Rakoff have narrowed the claims for damages to those incurred by SMFF and PlusFunds. *See generally* the Standing R and R dated February 3, 2010, and affirmed by Judge Rakoff in Orders dated March 31, 2010 and May 3, 2011.

[4] The facts pertinent to these motions have been recounted in a number of opinions by Judge Lynch (*see, e.g.*, *Kirschner v. Grant Thornton,* 2009 WL 996417 (S.D.N.Y. 2009)) and in a number of R and R's by the Special Master. To the extent necessary for background on the instant motion, familiarity with the financial schemes of Refco is assumed.

For the reasons stated below, the Special Master recommends that all of the Plaintiffs' claims against these Defendants be dismissed in their entirety with prejudice.

The above recommendation is controlled in some respects by the findings and recommendations made in the following R and R's:

• The Primary Wrongs R and R, dated March 1, 2010 and affirmed and adopted by Judge Rakoff by order dated May 3, 2011.

• The Private Actions Trust R and R, dated June 3, 2010, affirmed and adopted by Judge Rakoff by order dated June 3, 2010.

• The PwC R and R, dated August 9, 2011 and affirmed and adopted by Judge Rakoff by order dated October 24, 2011.

• The Deutsche Bank R and R, dated November 1, 2011, and *sub judice* with Judge Rakoff.

• The Bank Defendants R and R, dated December 8, 2011, and *sub judice* with Judge Rakoff.

• The Grant Thornton R and R, dated December 16, 2011, and *sub judice* with Judge Rakoff.

• The Mayer Brown R and R, dated January 17, 2012, and *sub judice* with Judge Rakoff.

***To summarize, these R and R's have established the following principles that are pertinent to the disposition of the instant motions to dismiss:***

1. The Plaintiffs have adequately pled the primary wrongs of fraud, and breach of fiduciary duty based on a relationship of trust and confidence.

2. A financial adviser or accountant servicing Refco would not by that fact have known that Refco was breaching a fiduciary duty owed to SPhinX/PlusFunds, as it would have no reason to know of the relationship of trust and confidence.

3. A question of fact exists as to whether a financial adviser or accountant servicing Refco would have known about some aspect of the Refco Fraud.

4. A question of fact exists as to whether a financial adviser or accountant with responsibility for preparing public statements of Refco's financial condition would have substantially assisted the Refco Fraud.

5. The Plaintiffs have alleged sufficient facts to indicate that SPhinX/PlusFunds reasonably

4

relied on the misleading public statements about Refco's financial condition.

## II. Standards for Reviewing the Plaintiff's Allegations on a Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007) (quoting Fed.R.Civ.P. 8(a)(2)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 668 (2009) (quoting *Twombly,* 550 U.S. at 570). The requirement of "factual matter" means that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting *Twombly*, 550 U.S. at 557). If the factual allegations rise only to the level of the "mere possibility of misconduct," the complaint should be dismissed. *Starr v. Sony BMG Music Entn't,* 592 F.3d 314, 321 (2d Cir.2010).

For all counts sounding in fraud — in this case, both Counts XXIII and XXIV — the allegations must be evaluated more closely because Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). The heightened pleading standard contained in Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) permits "[m]alice, intent, [and] knowledge," to be averred generally. Fed.R.Civ.P. 9(b). However, because courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations [,] ... plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks and citation omitted). The requisite strong inference of fraud may be established by alleging either "(a) that defendants had the motive and opportunity to commit fraud, or (b) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir.2009). The Plaintiffs must specifically describe the acts or statements alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

The particularity requirement applies not only to fraud claims but also to all claims sounding in fraud, including the claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty in this case. *See, e.g., Henneberry v. Sumitomo Corp. of America,* 415 F.Supp.2d 423, 464 (S.D.N.Y. 2006) ("Rule 9(b)'s heightened pleading standards apply to breach of fiduciary claims where the breach is premised on the [underlying wrongdoer's] fraudulent conduct.").

**III. Preliminary Question as to the Ingram Defendants — The Statute of Limitations**

The Ingram Defendants contend that both Counts against them should be dismissed as untimely. According to the FAC, Ingram's last allegedly wrongful act was completed on March 6, 2001, when the second of its two round-trip loan transactions was unwound. FAC ¶1016. The Plaintiffs filed the Complaint on March 5, 2008.

The statute of limitations for fraud and for aiding and abetting fraud in New York is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). A cause of action for breach or aiding and abetting breach of fiduciary duty — if it sounds in fraud — is governed by the six-year statute of limitations as well. *See, e.g., IDT Corp. v Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139, 879 N.Y.S.2d 355 (2009) ("where an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213(8).").

The statutory period begins to run when the cause of action accrues. Id. If the cause of action accrued when the second Ingram loan transaction was unwound, then the Plaintiffs' action would be untimely unless they could show either that they are 1) within the discovery rule, or 2) within the protection of equitable tolling. It is apparent that neither of these exceptions to the basic limitation period are applicable in this case.

As to the discovery rule, it is triggered from the time that the Plaintiffs could have discovered the fraud with reasonable diligence. *Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 460 (S.D.N.Y.2009). "Once plaintiff has notice of the fraud, he is charged with whatever knowledge an inquiry would have revealed." *Foxley v. Sotheby's Inc.*, 893 F.Supp. 1224, 1231 (S.D.N.Y.1995); *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 229 (S.D.N.Y.1997) (noting that the discovery date is triggered when the plaintiffs are "capable of perceiving the general fraudulent scheme based on the information available to them"). The Plaintiffs argue that they did not receive notice of the Refco Fraud until the Bankruptcy Examiner issued his report on July 11, 2007. But this argument is specious in light of the Plaintiffs' continual trumpeting of the constant monitoring of Refco by SphinX and PlusFunds innocent insiders. See, e.g., FAC ¶ 189. Indeed the monitoring of Refco is the lynchpin of the Plaintiffs' reasonable reliance claims in this MDL. It follows that the constant oversight alleged in the Plaintiffs' Complaint would have led SphinX/PlusFunds to become aware of the Refco Fraud in October, 2005, when the RGHI Receivable was publicly disclosed. Indeed if there was no basic awareness of fraud at that point, why would Sugrue have stormed into RCM and demanded disgorgement of the SMFF cash immediately after the announcement? So, because the Complaint was filed more than two years after SphinX/PlusFunds discovered or reasonably could have discovered the Refco Fraud, the claims against the Ingram Defendants are untimely under the discovery rule.

Nor does equitable tolling apply. Equitable tolling applies only if a plaintiff alleges that a defendant fraudulently concealed the wrong to the plaintiff by specifically directing

misrepresentations to the plaintiff — otherwise every claim of fraud would by definition be subject to equitable tolling. *See Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 461, n.12 (S.D.N.Y.2009) ("Plaintiffs fail to specify how the Defendants concealed their fraud from the Plaintiffs *directly*; Plaintiffs merely contend that KPMG provided a false and incomplete response to a Senate Subcommittee subpoena in 2003 and that a Deutsche Bank official falsely testified to a Senate Subcommittee in 2003.") (emphasis added). Here there is no allegation that the Ingram Defendants made any statement at all to SphinX/PlusFunds. Nor could there be, as all of the Ingram Defendants' actions alleged in the FAC preceded the very existence of SphinX and PlusFunds.

Yet the Plaintiffs claims *are* timely, even without resort to the discovery rule or equitable tolling. This is because they sued well within six years of the time the cause of action *accrued.* In *IDT Corp. v Morgan Stanley Dean Witter & Co.,* 12 N.Y.3d 132, 140, 879 N.Y.S.2d 355 (2009), the New York Court of Appeals determined that a tort claim accrues

> as soon as "the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint" (*Kronos, Inc. v AVX Corp*., 81 NY2d 90, 94 [1993]). As with other torts in which damage is an essential element, the claim "is not enforceable until damages are sustained" (id. at 94). To determine timeliness, we consider whether plaintiff's complaint must, as a matter of law, be read to allege damages suffered so early as to render the claim time-barred.

In this case, SMFF did not suffer damage until SphinX gave back to the Refco Estate $263 million of the amount that Sugrue demanded and obtained from Refco. Before that point, SMFF had been made whole for the amount it had on deposit at Refco. SMFF returned the $263 million as settlement of the preference action on April 26, 2006. FAC ¶ 14   As to PlusFunds, the damage occurred when, after the Refco Fraud was disclosed, "redemptions from the SPhinX Funds and the resulting drop in AUM caused a sharp decline in PlusFunds' revenues, leading to PlusFunds' Chapter 11 bankruptcy petition in the Southern District of New York on March 6, 2006." FAC ¶13. Thus, the accrual dates for both SMFF and PlusFunds (both in 2006) indicate that the Plaintiffs' filing (in 2008) is well within the six-year period both for fraud actions and for breach of fiduciary actions grounded in fraud.[5]

***Accordingly, the Plaintiffs' claims against the Ingram Defendants should not be dismissed as untimely under the New York statute of limitations.***


**IV. Review of Counts in the Complaint**


**A. Count XXIII: Aiding and Abetting Fraud**

---

[5] Even if the breach of fiduciary claim is covered by a three-year statute of limitations, as Ingram argues, the claims in Count XXIV are timely given the accrual dates discussed in text.

In this Count, the Plaintiffs claim that the Refco insiders "committed fraud in connection with the misrepresentation of Refco's financial condition." FAC ¶ 1321. The Plaintiffs plead a financial statement fraud, specifically that Refco (and these Defendants) "understood that Refco's financial statements were fraudulent and that investors and customers would rely on Refco's condition in deciding whether to do business with Refco." Id at ¶ 1327. With regard to SphinX/PlusFunds specifically, the Plaintiffs allege that those entities "received and reasonably relied on Refco's financial statements." Id. at ¶ 1325.

It is uncontested that these Defendants did not review, contribute to, or help prepare or disseminate any of Refco's financial statements. The Plaintiffs claim, however, that these Defendants are liable for aiding and abetting the misrepresentations in the financial statements because they "knew and understood that the purpose of the RTLs was to manipulate Refco's financial statements." Id. at ¶ 1323

To establish a claim of aiding and abetting fraud under New York law, a plaintiff must allege (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong. *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983). Part of the substantial assistance/proximate cause requirement is that the plaintiff reasonably relied on the fraudulent statements. *Thomas H. Lee Equity Fund V, L.P. v. GT, LLP,* 586 F.Supp.2d 119, 133 (S.D.N.Y.2008). Each of these elements will be discussed below.

### *1. Primary Wrong:*

In the Primary Wrongs R and R at 42, the Special Master, in evaluating the Plaintiffs' allegations in the FAC, concluded that the Plaintiffs "have sufficiently alleged that Refco committed the primary wrong of fraud with regard to the Refco Fraud." The false financial statements on which the Plaintiffs allegedly relied were without question issued by Refco. So the Plaintiffs have satisfied the first element of their stated claim for aiding and abetting the Refco Fraud.

### *2. Knowledge:*

To be liable on an aiding and abetting claim, the defendant must have had knowledge of the underlying wrongful conduct — a standard that is not satisfied by a mere allegation of constructive knowledge. *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law . . . has not adopted a constructive knowledge standard for imposing aiding and abetting liability").

As stated in previous Reports and Recommendations, there is dispute in the case law on whether "conscious avoidance" is sufficient for the knowledge prong of an aiding and abetting claim. *Compare Fraternity Fund Ltd.*, 479 F. Supp.2d at 368 (finding it sufficient to plead with particularity conscious avoidance — meaning that it can almost be said that, given the underlying

circumstances, the defendant actually knew of the breach), *with Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC,* 446 F. Supp.2d 163, 202, n. 273 (S.D.N.Y.) (noting that the weight of authority under New York law requires actual knowledge, as distinct from "willful blindness"). The difference, however, between actual knowledge and "it can almost be said that the defendant actually knew" is, to say the least, a narrow one. And any difference is not material in this case.

### *The "Third Leg" of the RTL Transactions*

The Defendants contend that there is nothing inherently suspicious about back-to-back or balance-sheet loans, and that what made the RTL's fraudulent was the "third leg" of the transaction, of which they were not a part. The first two legs of the Round Trip Loan transactions were the loan from the Refco entity to the third party and the loan from the third party to RGHI. The "third leg" of the Round Trip Loan transaction was the pay-down from RGHI to Refco. All three legs then got unwound after the reporting period.

The Plaintiffs do not allege that the Defendants were ever directly made aware of the third leg of the RTL transactions. For example, there is no allegation that Bennett or Maggio told either set of Defendants that the loan they were giving to RGHI was being used to pay down a debt to Refco – much less that RGHI's debt was a hidden receivable. Indeed such direct disclosures would be implausible, because these RTLs were conducted with important *customers* of Refco. Bennett, Maggio and the others would clearly not want to let such customers know about Refco's problems because, as the Plaintiffs aver, "investors and customers would rely on Refco's financial condition in deciding to do business with Refco and entrust assets to Refco's custody." FAC ¶ 1327.

But despite the implausibility of Refco disclosing the third leg of the loans or the true reason for the loans to these Defendants, the Plaintiffs argue that the circumstances of the back-to-back loans themselves are a sufficient indication that the Defendants knew about that the loans were being used to hide Refco's true financial condition. They allege the following in FAC ¶ 1020:

- the loans were suspiciously timed around Refco's reporting periods.

- the loans were not isolated transactions but systematically conducted, increasing in frequency as Refco's LBO and IPO approached.

- the size of the transactions was suspicious, as each was for a specific large dollar amount, which increased over time.

- the loans had no business purpose; they were risk-free; and the Defendants "knew and/or consciously avoided knowing that they had been selected to provide large-figure loans despite the fact that they lacked the financial wherewithal to receive loans of such magnitude on an uncollateralized basis."

9

The Plaintiffs conclude that "[g]iven the sophistication of the RTL Participants, each knew and/or consciously avoided knowing that the RTL's were designed to conceal a significant related party receivable at the end of Refco's reporting and auditing periods." Id. at ¶1021.

There is significant case law, however, establishing that the kind of back-to-back loans at issue in this case are not *per se* fraudulent. For example, Judge Rakoff in *In re Duke Energy Corp. Secs. Litig.,* 282 F.Supp.2d 158, 161 (S.D.N.Y. 2003), stated that "'wash sales' and 'round-trip trading' are not necessarily illegal *per se.*" *See also JP Morgan Chase Bank v. Winnick*, 350 F.Supp.2d 393, 409 (S.D.N.Y.2004) ("disclosing the existence of reciprocal transactions does not amount to disclosure of the underlying fraud"); *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 308 F.Supp.2d 249, 261 (S.D.N.Y.2004) (end-of-the-period swap transactions did not sufficiently indicate of fraud, as "there is nothing inherently wrong with reciprocal transactions").

The Plaintiffs's contentions listed above do not justify straying from the principle that back-to back loans are not fraudulent on their face. The argument, for example, that Refco's guarantee of the loans was somehow indicative of fraud is not plausible. If Ingram or Liberty Corner knew or even suspected that Refco was doing these transactions to hide a giant receivable, why would they think that a guarantee from a bankrupt entity would mean anything at all? The argument that the transactions were made around reporting periods is no different from the arguments made in the cases cited above, in which swaps and other reciprocal transactions were made in and around reporting periods. And so forth.

It is critical to note that the Plaintiffs nowhere allege that the Defendants knew that RGHI was a *Bennett* entity. The Defendants made their loans to a company named Refco Group Holdings, Inc. There is no reason on the face of the matter to conclude that the loan was being made to an entity controlled by Bennett — an entity that he was personally using to park a multimillion dollar receivable. The transaction on its face appeared to involve a balance-sheet transfer among Refco entities. The Plaintiffs do not allege or explain why any third party would care about the reason that one Refco entity was engaging in a balance sheet transaction with another Refco entity — a transaction that was, by the way, prepared and papered by a major law firm. Nor do the Plaintiffs allege, except in the most conclusory fashion, that the Defendants knew about the existence of the RGHI receivable.

The most the Plaintiffs have alleged is that the Defendants were aware of some red flags that might have raised some vague suspicion that Refco might have been up to something in these RTL transactions. At most these are allegations that the Defendants should have known that something was afoot. But that is a pleading of constructive knowledge — not enough for the scienter required for aiding and abetting fraud. *See, e.g., Filler v. Hanvit Bank*, 339 F.Supp.2d 553, 558 (S.D.N.Y.2004) (red flags about impact of false confirmations on financial statements indicate only that the defendants should have known and not that they knew); Id. at 559 ("the allegation that Hanvit was paid money by an entity controlled by L & H Belgium is not helpful, since plaintiffs do not allege that Hanvit knew that the entity was controlled by L & H Belgium. Essentially, plaintiffs argue that the fact that Hanvit received money directly from Belgium supports the contention that all of the defendants actually knew about L & H Belgium's scheme to artificially inflate its financial

10

statements through the activities of L & H Korea. This is constructive knowledge, not actual knowledge."). *See also Ryan v. Hunton & Williams,* 2000 WL 1375265, at *9 ("Allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud."); *Chemtex, LLC v. St. Anthony Enters., Inc.,* 490 F.Supp.2d 536, 547 (S.D.N.Y. 2007) ("New York courts have routinely held that when a defendant is under no independent duty, even alleged ignorance of obvious warning signs will not suffice to adequately allege 'actual knowledge'").

### *Judge Lynch's Review of the RTL Transactions*

Moreover, the Plaintiffs' case on scienter is in tension with Judge Lynch's review of the RTL Transactions in *In re Refco Securities Litig.,* 503 F.Supp.2d 611, 652 (S.D.N.Y. 2007). In that case Judge Lynch was evaluating whether the plaintiffs had pled scienter as to Refco-based defendants regarding the Refco Fraud. The relevant standard of scienter was *recklessness* — a lower standard than required for aiding and abetting. Judge Lynch stated that the "size of the transactions, their recurrent nature, and their obvious lack of business purpose may not themselves be sufficient to support an inference" of recklessness. Judge Lynch did find scienter sufficiently pled as to certain defendants, but only because of their insider status and consequent access to information about the RTL transactions and the third leg of the loans. In contrast, these Defendants were not insiders; they had no direct access to information about the third leg of the loans; and the allegations in the FAC do not warrant a finding that they either knew about or consciously disregarded the fact that the back-to-back loans were part of a scheme to cover a hidden receivable or to issue fraudulent financial statements. Judge Lynch was thus dubious about whether a party in the Defendants' position would have enough information to support a claim of recklessness. It follows that the Plaintiffs' claim of knowledge or deliberate ignorance is, to say the least, extremely questionable under Judge Lynch's analysis.

### *Santo Maggio Deposition*

The Plaintiffs argue that the deposition testimony of Santo Maggio provides proof that the RTL Defendants knew that the loan transactions were in furtherance of a fraud. Maggio's deposition was taken after the FAC was filed, and the parties have argued extensively about the import of that testimony.[6]

Procedurally, the relevance of Maggio's testimony does not go to whether the Plaintiffs have sufficiently pled scienter in the FAC; it is rather whether, if the Plaintiffs' Complaint is dismissed on scienter grounds, they should be granted leave to amend on the basis of Maggio's testimony. The Special Master finds that Maggio's testimony does not justify leave to amend. Put another way,

---

[6] The Special Master held an extensive oral argument devoted to the Maggio testimony.

leave to amend (an already amended complaint) on the basis of Maggio's testimony would be futile — because Maggio's testimony is a wash. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir. 1995) (leave to amend should be denied where the exercise is futile). It is true that Maggio states his opinion that the RTL Defendants — particularly Pigott — were or must have been aware that the loan transactions were being used to cover up a fraud. But Maggio also states at several points in his deposition that the RTL Defendants were not told about the third leg of the loans, and that he lied to them about the purpose of the transactions. Moreover, he states that the lies were necessary because otherwise these important customers would cease doing business with Refco. *See* Transcript of Oral Argument dated 4/16/2010, at 135. Thus, Maggio's deposition works at cross-purposes — his statement that he lied and his explanation for lying renders his statement about RTL Defendants' awareness implausible.

### *Arguments Particular to Ingram Defendants*

Finally, it must be noted that the allegations of scienter against the Ingram Defendants are especially infirm. Ingram engaged in two loan transactions, in 2001 and 2002. Many of the Plaintiffs' allegations pertinent to scienter are simply not applicable to Ingram. For example, the Plaintiffs allege as red flags that the loans were systematically conducted, increasing in frequency as Refco's LBO and IPO approached. But surely these allegations say nothing about Ingram's knowledge. Nor is it relevant to the case against Ingram that the transactions were suspicious because the amounts increased over time. Finally, the minimal amount of net profit earned by Ingram from participation in the two loans — less than $20,000 — is hardly indicative of motive to aid and abet a major fraud.

The Plaintiffs try to make something out of the so-called "Enron email." FAC ¶¶ 540, 1012. In that email, Ingram withdraws from future participation in any RTL Transaction, stating that "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like" Ingram Micro. This email is not irrelevant, but it is certainly insufficient to take the Plaintiffs over the threshold of scienter required for aiding and abetting — especially given the contrary factors discussed immediately above. At bottom, the email states that Ingram is concerned about SEC disclosure requirements, which is to say the least removed from recognizing that a transaction is fraudulent. Moreover, even if the email shows suspicion about the RTL Transactions, it does not follow that Ingram knew about the fraud at the time of the two loans in which it took part. In the end, it is not enough to aver that Ingram suspected something, especially if that suspicion arose after the facts and after important extrinsic developments. *See Renner v. Chase Manhattan Bank,* 2000 WL 78101, at *12 (S.D.N.Y.) (Although a bank had previously "rejected the transactions on the basis that they were potential vehicles for fraud, there is no factual basis for the assertion that [bank] officials actually knew that the fraud was, in fact, occurring"), *aff'd* 85 Fed. Appx. 782 (2d Cir. 2004).

### *Conclusion on Scienter*

For the foregoing reasons, the Special Master finds that the Plaintiffs have not and cannot allege that the Defendants knew or consciously avoided the fact that the RTL Transactions were were used to pay down and then unwind the pay-down of a hidden receivable owed to Refco by a Bennett-controlled entity.

### 3. *Substantial Assistance:*

"In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated. The Plaintiffs must allege more than but-for causation. They must allege also that their injury was a direct or reasonably foreseeable result of the conduct." *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F.Supp.2d 349, 370-71 (S.D.N.Y. 2007).[7]

The Plaintiffs claim that the RTL Defendants' participation in the loans substantially assisted the Refco Fraud — even though these Defendants did not review, help prepare, or even see the financial statements that the Plaintiffs rely upon for their claims for damages. The Plaintiffs' substantial assistance claim is thus far weaker than those previously reviewed by the Special Master regarding the Refco Fraud. Grant Thornton, PwC, DBSI, Credit Suisse, BAS, and Mayer Brown — all allegedly took part in preparing and reviewing the false financial statements on which SphinX/PlusFunds allegedly relied in doing business with Refco.

Under New York law, substantial assistance of a financial statement fraud will, as a general rule, only be found if the defendant has actually participated in preparing or disseminating the financial statements. Thus, in *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F.Supp.2d 349, 371 (S.D.N.Y.2007), Judge Kaplan dismissed an aiding and abetting claim where the defendant was not involved in the preparation or dissemination of the fraudulent statements on which the plaintiffs relied. Judge Kaplan explained as follows:

> [I]n the context of an aiding and abetting claim, where the alleged primary violations consist of misrepresentations in a document, the defendant must be alleged to have given substantial assistance to the making and dissemination of that document. This stems from the relationship between substantial assistance and proximate cause. If plaintiffs were to rely to their detriment on a misstatement, but the alleged aider and abettor did not assist in the making or dissemination of that statement, the plaintiffs, in most situations, could not say that their losses were proximately caused by the aider and abettor's actions.

---

[7] As Judge Kaplan recognized in *Fraternity Fund,* "there is some debate about whether proximate cause and substantial assistance ought to be equated in the aiding and abetting context." Id. But most case law in the Second Circuit requires a showing of proximate cause for an aiding and abetting claim. *See, e.g., Pension Committee of University of Montreal Pension Plan v. Banc of America Securities*, *LLC*, 446 F.Supp.2d 163, 201 (S.D.N.Y. 2006).

*See also Morin v. Trupin*, 711 F.Supp. 97, 113 (S.D.N.Y.1989) ("In the context of aiding and abetting, where the primary violations consist of either misrepresentations in, or omissions from, a document, the substantial assistance must relate to the preparation or dissemination of the document itself. Here, no such substantial assistance can be alleged, since plaintiffs acknowledge that the Ferber defendants had no involvement in the preparation or dissemination of the offending documents.") (citation omitted); *Terrydale Liquidating Trust v. Grandich*, 549 F.Supp. 529, 531 (SDNY 1982) ("Here, where all of the alleged federal violations are based only on the failure to include certain information or the inclusion of misinformation in a press release, the substantial assistance must relate to the press release. Yet there are no facts alleged which show any assistance in the preparation or dissemination of this document. The involvement of SFREI in the sale, which may have facilitated the liquidation and the defeat of the tender offer, is not dispositive of this inquiry; indeed, it may furnish nothing more than an alleged motive to aid the ex-trustees."); *Nathel v. Siegel,* 592 F.Supp.2d 452, 470 (S.D.N.Y. 2008) (where primary wrong involves false documentation, "substantial assistance usually involves assistance in the preparation or dissemination of the documents.").

Judge Kaplan, in *Fraternity Fund,* noted an exception to the basic principle that a defendant is not liable for aiding and abetting a financial statement fraud unless it assisted in the preparation or dissemination of the financial statements. He discussed *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308, 1328 (S.D.N.Y.1997), in which claims were brought by investors against the manager of a hedge fund that made leveraged investments in volatile mortgage-backed securities. The plaintiffs also brought aiding and abetting claims against the broker-dealers who created and sold a substantial portion of the securities in the fund's portfolios. The broker-dealer defendants moved to dismiss the aiding and abetting claim, relying on the general rule stated above — where the primary wrong is a financial statement fraud, substantial assistance must be tied to the preparation or dissemination of the false statements themselves. The *ABF* court held that even though the broker-dealers had not been involved in the preparation or dissemination of false documents, they were engaged in a "highly interdependent scheme in which both parties benefitted from [the hedge fund's] fraudulent activity. In such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient."

In *Fraternity Fund,* Judge Kaplan found that the *ABF* exception to the general rule on aiding and abetting financial statement fraud was not applicable because "plaintiffs have not alleged that Beacon Hill and BAS were in a 'symbiotic' relationship, or that BAS actively played a role in the bad faith determination of CMO values" that was at the heart of the fraud. 479 F.Supp.2d 349, 371, n. 115. In the instant case, there is similarly no showing that these Defendants were so intertwined with Refco that they should be found to have substantially assisted Refco's making of false financial statements. Moreover, unlike the brokers in *ABF,* these Defendants did not sell anything to the Plaintiffs and did not communicate directly with the Plaintiffs — they were much farther removed from the victims of the fraud than the third-party brokers in *ABF*.

The lack of sufficient causal connection to Refcoo's financial statement fraud is particularly evident with respect to the Ingram Defendants, who engaged in only two transactions well before

14

SphinX and PlusFunds even existed. The contention that they should be held to have aided and abetted a financial statement fraud, where the financial statement was issued in 2001 and not relied upon until years later — and where the Ingram Defendants had nothing to do with the preparation and dissemination of that financial statement — stretches the concept of substantial assistance well beyond the breaking point. And even as to the Liberty Corner Defendants — while their participation in the RTL Transactions was more significant and more contemporaneous with SphinX/PlusFunds' alleged reliance — the fact remains that their role was sporadic, and they were not intertwined with Refco to the same extent as the third parties in *ABF;* nor did they (or Ingram) actively play a role in the pay-down and unwinding of the RGHI receivable (i.e., the "Third Leg"), as that transaction was between Refco and RGHI.[8] Nor did they have any relationship whatsoever with the victims of the fraud. Nor did they profit from the defrauded customers, as the brokers did in Refco. Their participation in loan transactions therefore does not rise to the level of the "symbiotic" relationship or direct participation in defrauding the victims that was found in *ABF*.[9]

In sum, the Plaintiffs have not alleged sufficient facts to get out from under the general and well-reasoned rule that substantial assistance of a financial statement fraud requires participation in the preparation or dissemination of the false financial statements on which the Plaintiffs relied.[10]

---

[8] These Defendants are thus distinguishable from Mayer Brown. While Mayer Brown's activity included actions other than preparing and disseminating the false financial statement, Mayer Brown was essentially joined at the hip with Refco — if ever there was a "symbiotic" relationship, the working relationship between Mayer Brown and Refco was it. Moreover, of course, Mayer Brown, unlike these Defendants, *did* assist in the preparation and dissemination of the false financial statements. See Mayer Brown R and R at 9-10.

[9] It should be noted that if the Plaintiffs *have* sufficiently alleged substantial assistance as to these Defendants, they have also adequately alleged reasonable reliance. As discussed in previous R and R's, the Plaintiffs allege that PlusFunds' risk committee kept a "shadow rating" for Refco, reviewed public statements, and calculated guidelines to limit exposure on transactions with Refco. FAC ¶ 189. *See also* Id. at ¶723 ("SPhinX and PlusFunds' innocent decision-makers received and relied on [Refco's] financial statements and Grant Thornton's unqualified audit opinions thereupon in determining whether to allow and continue to allow SPhinX assets to be deposited at Refco and, specifically, RCM.").

[10] The Plaintiffs cite *Aetna Cas. & Sur. Co.,* 219 F.3d 519, 537 (6th Cir. 2000), which does find aiding and abetting without direct participation in the fraudulent statement, but the opinion applies Ohio law, and does not discuss the basic New York rule requiring participation in the preparation or dissemination of the financial statement itself. The Plaintiffs also rely on *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F.Supp.2d 485, 502 (S.D.N.Y.2003), in which substantial assistance was found as to a party that participated in and structured the transactions that enabled Enron to distort its public financial statements. But the court in *UniCredito* devoted only a few sentences to the substantial assistance question, it did not refer to or discuss the basic rule on substantial assistance in financial statement fraud cases, and it did not explain why or whether the defendant's conduct fell outside that rule.

Finally, the Plaintiffs seek to save their claims by adding a short and conclusory assertion that the RTL Defendants were involved in a conspiracy with the Refco Insiders. FAC ¶ 1022. But this adds nothing to their claims against these Defendants. *See generally Filler v. Hanvit Bank,* 339 F.Supp.2d 553, 560 (S.D.N.Y.2004) (where aiding and abetting claim fails for insufficient allegations of knowledge and substantial assistance, conspiracy claim fails for essentially the same reasons).

*Recommendation on Count XXIII:*

*The Claims against the Defendants in Count XXIII should be dismissed with prejudice.*

### B. Count XXIV: Aiding and Abetting Breach of Fiduciary Duty

The Plaintiffs allege that Refco owed and breached fiduciary duties to SphinX and PlusFunds by "diverting RCM customer assets, including SMFF's cash, to fund Refco business, acquisitions, RTLS and fraud." FAC ¶ 1330. They further allege a breach of fiduciary duty to SMFF by "failing to disclose the true financial condition of Refco and RCM and by actively concealing it." Id. at ¶1330. The RTL Participants allegedly "knew about and understood these breaches" and substantially assisted them by "participating in and concealing the Refco fraud." Id. at ¶1331.

Like the similar claims against PwC, DBSI, Credit Suisse and BAS, Grant Thornton, and Mayer Brown, the Plaintiffs' claims for aiding and abetting breach of fiduciary duty should be dismissed because the Plaintiffs have not sufficiently alleged scienter. *See* PwC R and R at 25; DB R and R at 38; Bank Defendants R and R at 9; Grant Thornton R and R at 17-18; Mayer Brown R and R at 12-13. To sum up from those R and R's:

*1. Primary Wrong*: The Primary Wrongs R and R establishes that the Plaintiffs have sufficiently alleged that Refco had a fiduciary duty, based on a relationship of trust and confidence, to refrain from "self-dealing — use of the SMFF excess cash at RCM to fund Refco's various operations." Primary Wrongs R and R at 37. Thus, the Plaintiffs have adequately alleged a breach of fiduciary duty based on a relationship of trust and confidence, by upstreaming SPhinX assets at RCM and using them to fund Refco operations. But that is the *only* fiduciary duty adequately pled in regard to the Refco Fraud. See Primary Wrongs R and R at 42 ("The Plaintiffs have failed to sufficiently allege that Refco owed a fiduciary duty on the basis of a joint venture or operation within the zone of insolvency.").
.

16

***2. Knowledge:*** The Plaintiffs must show not only knowledge of wrongdoing but also that the wrongdoing was a breach of fiduciary duty owed to SPhinX/PlusFunds. *See Chemtex, LLC v. St. Anthony Enterprises, Inc.,* 490 F.Supp.2d 536, 546 (S.D.N.Y. 2007) (plaintiff must allege "knowledge of the violation" of the breach of fiduciary duty by the alleged aider and abetter). The Plaintiffs have not and cannot allege that these Defendants knew that Refco had a relationship of trust and confidence with SPhinX/PlusFunds, much less that any resulting fiduciary duty was being breached by upstreaming the assets from RCM.[11]

The case against these Defendants for aiding and abetting breach of fiduciary duty is in fact far weaker than the similar claims found wanting as to the other defendants. At least as to some of the other defendants, there were factual assertions that they were 1) aware of the existence of SPhinX/PlusFunds, or 2) aware of the upstreaming of assets from RCM, or both. As to these Defendants, neither assertion has been or can be made. It goes without saying that if a defendant does not even know of a company's existence, it cannot know that the company had a relationship of trust and confidence with Refco — especially because, as has often been stated, the general rule is that a nondiscretionary broker does *not* have a fiduciary relationship of trust and confidence with a customer. *See United States v. Wolfson,* 642 F.3d 293, 295 (2nd Cir. 2011) ("we have long held that there is no general fiduciary duty inherent in an ordinary broker/customer relationship") (citation omitted). And it goes without saying that if a defendant does not know how the relationship is being breached, it does not have sufficient knowledge of a breach of fiduciary duty. Yet nowhere in the FAC are there factual allegations to indicate that any of these Defendants were aware that customer assets were being upstreamed. And even if they did know, it has already been established in the previous R and Rs that knowledge about the upstreaming is not the same as knowing that the upstreaming was a violation of a breach of fiduciary duty stemming from a relationship of trust and confidence. As stated in the PwC R and R at 26:

> It must be remembered that the Plaintiffs must allege not only that PwC was aware of the upstreaming but also that PwC knew the upstreaming was wrongful. *See In re Sharp Intern. Corp.,* 403 F.3d 43, 49 (2nd Cir. 2005) (for a claim of aiding and abetting breach of fiduciary duty there must be an allegation that the defendant had "actual knowledge of the breach of duty"). Thus it is not enough to allege facts indicating that PwC knew that assets were being upstreamed out of RCM, because the transfers out of RCM could well have been consistent with Refco's duties to its customers. Indeed Judge Lynch held that at least as to the FX accounts, the upstreaming of the funds out of RCM did not violate any fiduciary duty because the Margin Annex permitted the upstreaming. *See Kirchner v. Bennett*, 648 F. Supp. 2d 525, 535 (S.D.N.Y. 2009). Similarly, the Private Actions Trust R and R, at 22, found that

---

[11] The Plaintiffs' conclusory assertion that the RTL Participants "knew about and understood" the breaches of fiduciary duty cannot be credited under the standards of Rule 9(b), or, for that matter, under Rule 8. *See, e.g., Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292-93 (2d Cir. 2006) (rejecting conclusory allegations that defendant had knowledge of breach); *Krause v. Forex Exch. Market, Inc.,* 356 F.Supp.2d 332, 339 (S.D.N.Y. 2005) (plaintiff must allege factual basis for aider-abetter's knowledge).

the Plaintiffs' allegations about upstreaming the FX deposits out of RCM did not establish a breach of fiduciary duty.  The question then boils down to whether PwC, during the course of its advisory work at Refco, came to know *both*: 1) that assets were being upstreamed from RCM, *and* 2) that Refco had a relationship of trust and confidence with SPhinX/PlusFunds that would bar that self-dealing. In the absence of that second finding, PwC would have no reason to know that the upstreaming was wrongful — indeed it would be completely unfair to hold  PwC  liable for knowing about the bare fact of the upstreaming when two courts in this district have held that the upstreaming was not a wrong in itself.

In the Private Actions Trust R and R at 21-22, the Special Master (affirmed by Judge Rakoff) found that Refco's custody of and waste of the FX customer accounts was *not* a breach of fiduciary duty. The Special Master reasoned that "[a]ny finding of a fiduciary duty to disclose the misuse and non-return of funds must fall short if the Margin Annex says that RCM could use the funds for any purpose." Id. It is true that in the Primary Wrongs R and R at 26-27, the Special Master found that the Margin Annex did not foreclose the Plaintiffs' claim that the excess cash was entitled to a right of segregation. But the narrow distinctions in how the Margin Annex applied or did not apply to funds at a Refco subsidiary were surely not within the knowledge of these Defendants.[12]

Accordingly, the Plaintiffs have not and cannot show that these Defendants knew about Refco's breach of  fiduciary duty based on a relationship of trust and confidence.[13]

*3. Substantial Assistance:* For the reasons stated under Count XXIII, the Plaintiffs have failed to allege substantial assistance of any financial statement fraud. Because the alleged breach of fiduciary duty to SMFF is based on reliance on false financial statements, it follows that the Plaintiffs have failed to allege any substantial assistance to the alleged breach of duty to SMFF claimed in Count XXIV.

Unlike Count XXIII, Count XXIV contains, in addition to a financial statement fraud-based claim,  a further claim of breach regarding diversion of SMFF's cash. As to that breach, there are, to start with, no factual allegations to support a claim of substantial assistance against the Ingram Defendants. The FAC provides no explanation of how two loan transactions in 2000 and 2001 could be sufficiently connected with diversion of SMFF cash that only began to occur more than a year

---

[12] It should be emphasized that the claims against the Ingram Defendants in this Count are especially infirm. Ingram's last loan transaction with Refco occurred in 2001 — before SphinX or PlusFunds even existed, and before there was any indication that RCM was upstreaming *any* assets (much less those of SMFF). Thus Ingram could not possibly have known that Refco was breaching its fiduciary duties to SphinX/PlusFunds.

[13] It should be noted that none of the additional allegations in the Proposed Second Amended Complaint has any bearing on these Defendants' knowledge of any fiduciary duty that Refco owed to SPhinX/PlusFunds. Thus, as determined in prior R and R's, leave to amend the scienter allegations would be futile.

later, and only caused damage to SMFF in 2006.

The case against the Liberty Corner Defendants is somewhat stronger as they were engaging in loan transactions at the same time as the diversion was taking place. It may be plausible to believe that transactions necessary to hide the RGHI Receivable — and keep Refco afloat — substantially assisted (in the sense that they were necessary to provide an opportunity for) the upstreaming that was *also* necessary to keep Refco afloat. But even if that were so, as stated in the previous R and R's, the Plaintiffs' damages would be limited to the loss of assets placed with RCM *after* the date of the misconduct that proximately caused SPhinX/PlusFunds to place funds at Refco. Under the circumstances, these dates need not be parsed out in detail as the FAC is in any case completely deficient in alleging that the Liberty Corner Defendants knew about any fiduciary relationship between Refco and SphinX/PlusFunds that was being breached by upstreaming of assets.

*Recommendation on Count XXIV:*

*The claims against the Defendants in Count XXIV should be dismissed with prejudice.*

**V. Recommendation**

The claims against the Ingram Defendants and the Liberty Corner Defendants in Counts XXIII and XXIV should be dismissed with prejudice.

Daniel J. Capra
Special Master

Dated: February 10, 2012
New York, New York

19