UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                           :
In re REFCO, INC. SECURITIES LITIGATION  :    07 MDL 1902 (JSR)
                                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                           :
KENNETH M. KRYS, *et al.*,                             :
                                                           :    08 Civ. 3065 (JSR)
                            Plaintiffs,    :    08 Civ. 3086 (JSR)
           v.                                   :
                                                           :    **DECLARATION OF**
CHRISTOPHER SUGRUE, *et al.*,              :    **KEVIN H. MARINO**
                                                           :
                          Defendants.    :
                                                           :
                                                           :    **FILED ELECTRONICALLY**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       KEVIN H. MARINO, of full age, hereby declares, pursuant to 28 U.S.C. § 1746(2), as follows:

       1.    I am an attorney at law of the bar of this Court and a member of the law firm Marino, Tortorella & Boyle, P.C., attorneys for defendants Liberty Corner Capital Strategies, LLC and William T. Pigott (collectively, "Liberty Corner"). I respectfully submit this Declaration in support of Liberty Corner's Response to the SPhinX Plaintiffs' Objection To The Report And Recommendation Of The Special Master That The Amended Complaint Be Dismissed With Prejudice.

       2.    Annexed hereto as Exhibit A is a true and correct copy of an excerpt of the testimony of Santo C. Maggio ("Maggio") given in United States v. Collins, 07 Cr. 1170 (LBS), on June 2, 2009. Special Master Capra considered that testimony in this matter, as reflected on pages 138 through 140 of the April 16, 2010 oral argument transcript.

3. Annexed hereto as Exhibit B are true and correct copies of excerpts of Maggio's deposition testimony in <u>In re Refco, Inc. Securities Litigation</u>, 07 MDL 1902 (JSR) on December 15 and 16, 2009.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746(2), that the foregoing is true and correct.

Executed on:  March 2, 2012  
Chatham, New Jersey

Respectfully submitted,

MARINO, TORTORELLA & BOYLE, P.C.

By: _____  
Kevin H. Marino  
437 Southern Boulevard  
Chatham, New Jersey 07928-1488  
(973) 824-9300  
kmarino@khmarino.com  
*Attorneys for Defendants*  
*Liberty Corner Capital Strategies, LLC and*  
*William T. Pigott*

# EXHIBIT A

Page 2184

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,	New York, N.Y.

      v.	07 CR 1170

JOSEPH P. COLLINS,

      Defendant.

------------------------------x

June 2, 2009
10:00 a.m.

Before:

      HON. LEONARD B. SAND,

           District Judge

APPEARANCES

LEV L. DASSIN
    Acting United States Attorney for the
    Southern District of New York
BY: CHRISTOPHER GARCIA
    NICHOLAS S. GOLDIN
    Assistant United States Attorneys

COOLEY GODWARD KRONISH LLP
    Attorneys for Defendant
BY: WILLIAM J. SCHWARTZ
    JONATHAN P. BACH
    DANIEL M. HIBSHOOSH
    REED A. SMITH

SOUTHERN DISTRICT REPORTERS, P.C.

## Page 2273

1  Q. Why not?
2  A. Again, I believe that -- I believe Joe wouldn't have
3  questioned what the documents were, and I believe that he
4  wouldn't have said anything.
5  Q. And why not, Mr. Maggio?
6  A. Again, because of my prior -- my prior workings with
7  Mr. Collins.
8  Q. Mr. Maggio, during the course of the time you were doing
9  round robin transactions, were you asked by customers about the
10 purpose?
11 A. Yes.
12 Q. Did you lie to them about the purpose?
13 A. Yes.
14 Q. And why did you lie to them about the purpose?
15 A. If you tell them the truth, you told them it was a -- you
16 told them that the reason why was to hide a receivable, they
17 would know that there was a -- that there's a potential problem
18 at Refco. So we basically told them that it was what they call
19 a balance sheet transaction, which, you know, structured
20 properly is -- was industry practice.
21 Q. When you say "structured properly," you mean involving
22 nonconsolidating entities?
23 A. That's correct.
24 Q. Now, was RGHI a consolidating entity?
25 A. No.
          SOUTHERN DISTRICT REPORTERS, P.C.

## Page 2274

1  Q. Was Mr. Bennett aware of Mayer Brown's involvement?
2  A. Yes.
3  Q. Over the years that you worked with Mr. Bennett, did he
4  direct you to -- did he direct you to lie to people about the
5  balance that existed between RGHI and Refco?
6  A. Yes.
7  Q. Did he direct you to lie about various frauds that occurred
8  at Refco?
9  A. Yes.
10 Q. Did he ever direct you to conceal the true balance of the
11 receivable from RGHI to Refco from Mr. Collins?
12 A. No.
13 Q. Did he ever direct you to conceal any fraud from
14 Mr. Collins?
15 A. No.
16 Q. In fact, what did he tell you?
17 A. That I -- I could feel comfortable talking to Mr. Collins.
18 Q. So starting in 2000, Mr. Maggio, how did the process of
19 documenting the round robins start?
20 A. Mr. Garcia, do you mean how did the drafting start, how --
21 Q. Yes. How is the -- in the process initiated, what was the
22 very first step that you took?
23 A. Mr. Weaver came to me and said that Ingram Micro was
24 looking for documentation. I told David that I understand his
25 concerns. Why don't you go to Joe at Mayer Brown and see if
          SOUTHERN DISTRICT REPORTERS, P.C.

## Page 2275

1  you can construct documentation, all right, with these
2  characteristics. And I gave David a list of the
3  characteristics that we need. RGHI borrowed from customer.
4  Customer borrowed from RCM to make certain that their
5  indemnifications and guarantees so that we could always protect
6  the customer. David went to --
7  Q. Who is David -- just if I could interrupt, Mr. Maggio, who
8  was David Weaver again?
9  A. David Weaver was the controller for Refco Capital Markets,
10 so he was the chief accountant from Refco Capital Markets.
11 Q. Was Mr. Weaver aware that the receivable balance, the
12 amount that RGHI owed to Refco was greater than reported in
13 financial statements?
14 A. Yes.
15 Q. Why did you have Mr. Weaver initiate contact with Mayer
16 Brown than do it yourself?
17 A. One, David would -- David knew about the receivable, and he
18 knew -- knew the transaction from the prior years that we did
19 it on the computer system. Two, I was trying to get David to
20 take a little bit more responsibility, take that responsibility
21 off my hands.
22 Q. Were documents drafted, Mr. Maggio?
23 A. Yes, sir.
24 Q. And did you review them?
25 A. Yes.
          SOUTHERN DISTRICT REPORTERS, P.C.

## Page 2276

1  Q. Showing you what's been marked for identification purposes
2  as Government Exhibits 2000.1(a) through (f). Do you recognize
3  these documents, Mr. Maggio?
4  A. Yes, sir.
5  Q. What is this collection of documents?
6  A. Excuse me?
7  Q. What is this collection of documents?
8  A. This is the collection of documents that we did with CIM
9  Ventures, which is the -- which is a subsidiary of Ingram
10 Micro, and it represents the loan agreements between Refco
11 Capital Markets, Refco Group, Limited and Refco Group Holdings,
12 Inc. -- excuse me, I'm sorry. Between Refco Capital Markets
13 and the customer and Refco Group Holdings Inc. and the
14 indemnifications and guarantees from Refco Group, Limited to
15 the client.
16      MR. GARCIA: The government offers 2000.1(a) through
17 (f).
18      MR. BACH: No objection.
19      THE COURT: Received.
20      (Government's Exhibits 2000.1(a) through (f) received
21 in evidence)
22 BY MR. GARCIA:
23 Q. Mr. Maggio, just briefly, who signed these documents on
24 behalf of Refco Capital Markets?
25 A. Excuse me, sir? Phil Bennett.
          SOUTHERN DISTRICT REPORTERS, P.C.

# EXHIBIT B

# In The Matter Of:

*In re:* REFCO, INC. SECURITIES LITIGATION

---

SANTO C. MAGGIO
*December 15, 2009*

---

# MERRILL CORPORATION

*25 West 45th Street - Suite 900*

*New York, NY 10036*

PH: 212-557-7400 / FAX: 212-692-9171

MAGGIO, SANTO C. - Vol. 2

Page 608

SANTO C. MAGGIO

```
13:52:06  2   while you were testifying at Mr. Collins'
13:52:08  3   trial was truthful; is that also correct?
13:52:10  4       A.  Yes.
13:52:11  5       Q.  And you understood that you
13:52:13  6   were under oath when you gave such
13:52:15  7   testimony; correct?
13:52:16  8       A.  Yes.
13:52:16  9       Q.  And you understand that you're
13:52:18 10   under oath today as well; correct?
13:52:20 11       A.  Yes.
13:52:20 12       Q.  Now, on June 2nd of this year,
13:52:27 13   2009, do you recall testifying as
13:52:29 14   follows: And now, Mr. Maggio, were there
13:52:32 15   any indemnifications or guarantees in
13:52:35 16   document form related to the round robins
13:52:39 17   that occurred prior to 2000?
13:52:42 18           "Answer: No.
13:52:42 19           "Question: Why institute a
13:52:44 20   practice of guarantees and indemnities in
13:52:47 21   2000?
13:52:48 22           "Answer: We always gave the
13:52:49 23   impression to the customers who did the
13:52:51 24   transaction prior to 2000 that Refco
13:52:55 25   Group Holdings, Inc. was a consolidating
```

Page 609

SANTO C. MAGGIO

```
13:52:57  2   entity within Refco Group.  So when you
13:53:00  3   give that impression, the customer
13:53:02  4   already says okay, I have two Refco
13:53:04  5   entities under Refco Group.  If anything
13:53:07  6   happens with one, alongside the loan,
13:53:09  7   they could net all the transactions.
13:53:12  8           "That wasn't the case in 2000,
13:53:13  9   we had one customer who wanted to know
13:53:15 10   who Refco Group Holdings were, and I
13:53:18 11   believe we told him.  And he wanted to
13:53:20 12   document to make certain that his company
13:53:22 13   was protected in case RGHI did not repay
13:53:25 14   its loan.  Hence we decided to come up
13:53:27 15   with documentation."
13:53:29 16           Do you recall that testimony,
13:53:31 17   sir?
13:53:31 18           MR. RIEMAN: Objection.
13:53:31 19       A.  Yes.
13:53:32 20       Q.  Was it truthful testimony?
13:53:34 21       A.  Yes.
13:53:34 22       Q.  And I believe you testified
13:53:36 23   yesterday, maybe earlier today, but I
13:53:38 24   believe it was yesterday that the
13:53:39 25   customer who wanted to know who Refco
```

Page 610

SANTO C. MAGGIO

```
13:53:43  2   Group Holdings were, and I believe we
13:53:46  3   told him, was somebody affiliated with
13:53:50  4   Ingram Micro; is that correct?
13:53:51  5       A.  Yes.
13:53:52  6       Q.  I believe you testified that
13:53:53  7   one of the funds associated with
13:53:55  8   Mr. Flanagan engaged in one of these
13:53:58  9   so-called round robin loans prior to
13:54:00 10   2000.  Is that also correct?
13:54:01 11       A.  Yes.
13:54:02 12       Q.  And is it fair to say that he
13:54:04 13   was one of the parties that had the
13:54:05 14   impression that was given to customers
13:54:07 15   who did the transaction prior to 2000
13:54:10 16   that Refco Group Holdings, Inc. was a
13:54:12 17   consolidating entity within Refco Group?
13:54:16 18           MR. MILLS: Objection.
13:54:20 19           MS. GUMMER: Objection to
13:54:21 20   form.
13:54:21 21       A.  That I don't know.
13:54:23 22       Q.  Do you have any reason to
13:54:24 23   believe he was not given that impression?
13:54:26 24       A.  No.
13:54:26 25       Q.  In fact it's fair to say he
```

Page 611

SANTO C. MAGGIO

```
13:54:28  2   likely was given that impression;
13:54:30  3   correct?
13:54:30  4           MR. RIEMAN: Objection.
13:54:31  5           MR. MILLS: Objection.
13:54:32  6       A.  I can't say that.
13:54:32  7       Q.  Do you recall further
13:54:34  8   testifying at Mr. Collins' criminal trial
13:54:38  9   proceeding as follows, and now I'm
13:54:40 10   reading from page 2273:
13:54:43 11           "Question: Mr. Maggio, during
13:54:45 12   the course of the time you were doing
13:54:46 13   round robin transactions, were you asked
13:54:49 14   by customers about the purpose?
13:54:52 15           "Answer: Yes.
13:54:52 16           "Question: Did you lie to
13:54:54 17   them about the purpose?
13:54:55 18           "Answer: Yes.
13:54:56 19           "Question: And why did you
13:54:57 20   lie to them about the purpose?
13:55:00 21           "Answer: If you tell them the
13:55:01 22   truth, you told them that it was -- you
13:55:03 23   told them that the reason why was to hide
13:55:05 24   a receivable, they would know that there
13:55:07 25   was a -- that there is a potential
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 612

SANTO C. MAGGIO

```
13:55:09  2   problem at Refco. So we basically told
13:55:11  3   them that it was what they called a
13:55:14  4   balance sheet transaction which, you
13:55:17  5   know, structured properly is, was,
13:55:19  6   industry practice."
13:55:20  7       Do you recall that testimony?
13:55:21  8   A.  Yes.
13:55:22  9   Q.  And was it truthful testimony?
13:55:23 10   A.  Yes.
13:55:24 11   Q.  And so it was true that if a
13:55:25 12   customer were to inquire as to the
13:55:28 13   purpose of one of these so-called round
13:55:32 14   robin transactions, that they were lied
13:55:33 15   to?
13:55:33 16       MR. RAND: Objection.
13:55:34 17       MR. MILLS: Objection.
13:55:35 18   A.  If a customer asked, yes.
13:55:37 19   Q.  And the reason why was because
13:55:39 20   Refco wanted to mask the existence of the
13:55:41 21   RGHI receivable from the customers who
13:55:44 22   were engaging in these transactions;
13:55:46 23   correct?
13:55:46 24       MR. RAND: Objection.
13:55:47 25   A.  Yes.
```

Page 613

SANTO C. MAGGIO

```
13:55:47  2   Q.  And that's because you didn't
13:55:49  3   want it to be widely understood that the
13:55:52  4   RGHI receivable existed; correct?
13:55:55  5   A.  Yes.
13:56:02  6   Q.  Now, I believe you testified
13:56:03  7   yesterday that you spoke to Mr. Flanagan
13:56:06  8   a few times; is that correct?
13:56:09  9   A.  Give me the context of what I
13:56:14 10   said, of what the question was.
13:56:15 11   Q.  Okay. I'll just ask it a
13:56:17 12   different way. All right?
13:56:18 13   A.  Okay.
13:56:19 14   Q.  All right. Do you personally
13:56:21 15   know Mr. Flanagan?
13:56:23 16   A.  Yes.
13:56:23 17   Q.  How many times have you spoken
13:56:24 18   to him?
13:56:25 19   A.  Many.
13:56:26 20   Q.  And you said that it was Peter
13:56:28 21   McCarthy, though, who spoke to
13:56:30 22   Mr. Flanagan about these so-called round
13:56:33 23   robin loans; correct?
13:56:33 24   A.  Yes.
13:56:34 25   Q.  And that you did not speak
```

Page 614

SANTO C. MAGGIO

```
13:56:35  2   substantively to Mr. Flanagan about those
13:56:38  3   loans; correct?
13:56:38  4   A.  Yes.
13:56:39  5   Q.  That it was Mr. McCarthy who
13:56:41  6   spoke to Mr. Flanagan; correct?
13:56:42  7   A.  Yes.
13:56:43  8   Q.  And you did not discuss the
13:56:48  9   substance of these so-called round robin
13:56:51 10   loans with anybody else associated with
13:56:54 11   Delta Flyer or EMF Financial Products;
13:56:58 12   correct?
13:56:58 13   A.  Correct.
13:56:58 14   Q.  Now, you indicated in your
13:57:03 15   prior testimony that these so-called
13:57:05 16   round trip loans or round robin loans
13:57:07 17   were used to mask the RGHI receivable;
13:57:10 18   correct?
13:57:11 19   A.  Yes.
13:57:12 20   Q.  And that was only true, these
13:57:15 21   so-called round trip loans or round robin
13:57:19 22   loans could only mask the RGHI receivable
13:57:21 23   if you took all of them together;
13:57:24 24   correct?
13:57:28 25   A.  Could you explain that?
```

Page 615

SANTO C. MAGGIO

```
13:57:29  2   Q.  Sure, let me be clearer.
13:57:31  3       Up until 2004, prior to 2004,
13:57:35  4   the RGHI receivable could only be masked
13:57:37  5   by these so-called round trip loans if
13:57:40  6   you combined all of them together;
13:57:42  7   correct? In other words, one so-called
13:57:45  8   loan would not have been sufficient in
13:57:47  9   size to mask the RGHI receivable;
13:57:50 10   correct?
13:57:51 11       MR. MILLS: Objection.
13:57:52 12   A.  I don't understand the
13:57:52 13   question.
13:57:53 14   Q.  Let me break it down.
13:57:54 15   A.  Okay.
13:57:55 16   Q.  The RGHI receivable was
13:57:58 17   growing in size; correct?
13:57:59 18   A.  Yes.
13:57:59 19   Q.  In order to mask it in any
13:58:02 20   year from prior to 2000 up until 2004, it
13:58:06 21   took a number of these so-called round
13:58:08 22   trip loans to have enough loans to mask
13:58:11 23   the so-called or to mask the RGHI
13:58:13 24   receivable; correct?
13:58:15 25       MR. MILLS: Objection.
```

36 (Pages 612 to 615)

# In The Matter Of:

*In re:  REFCO, INC. SECURITIES LITIGATION*

---

SANTO C. MAGGIO
*December 16, 2009*

---

# MERRILL CORPORATION
25 West 45th Street - Suite 900
New York, NY 10036
*PH: 212-557-7400 / FAX: 212-692-9171*

MAGGIO, SANTO C. - Vol. 3

Page 896

```
09:55:55  1
09:55:57  2    an agent and a principal.
09:55:57  3         Q.   Right.
09:55:59  4         A.   A principal is where you buy
09:56:01  5    the securities from Daiwa in your name
09:56:02  6    and then you sell it to someone in your
09:56:05  7    name.  That's doing a transaction in
09:56:06  8    principal.
09:56:09  9              Transaction as agent is Daiwa
09:56:13 10    or someone sells to CSFB and they get a
09:56:13 11    fee for doing that.
09:56:16 12         Q.   Understood.  And if Mr. Pigott
09:56:19 13    bought the securities from Daiwa, that
09:56:21 14    would not be an agency transaction, that
09:56:22 15    would be a principal transaction;
09:56:23 16    correct?
09:56:23 17         A.   Yes.
09:56:26 18         Q.   And that would not -- in that
09:56:29 19    circumstance, the NASD markup rule that
09:56:30 20    you referred to the other day wouldn't
09:56:33 21    have any applicability whatsoever;
09:56:33 22    correct?
09:56:34 23         A.   I disagree.
09:56:36 24         Q.   You'd agree with me, sir, that
         25    the NASD markup rule has no impact on a
```

Page 897

```
09:56:40  1
09:56:41  2    principal transaction of the type that
09:56:43  3    Mr. Pigott was engaged?
09:56:44  4         A.   Absolutely not.
09:56:45  5         Q.   Do you know as we sit here
09:56:48  6    today whether the NASD markup rule
09:56:50  7    applied to Mr. Pigott's transactions?
09:56:51  8         A.   No.
09:56:52  9         Q.   You speculated the other day
09:56:55 10    that Mr. Pigott was doing transactions
09:57:00 11    that were way beyond the 5 percent NASD
09:57:01 12    markup rule.  Do you remember that
09:57:01 13    testimony?
09:57:02 14              MR. HERSHMAN:  Objection as to
09:57:02 15    form.
09:57:03 16         A.   Yes.
09:57:05 17         Q.   But as we sit here right now,
09:57:06 18    you'd agree with me that you're not sure
09:57:09 19    if that rule even applied; correct?
09:57:10 20         A.   That's exactly right.  There
09:57:11 21    is a --
09:57:13 22         Q.   That's my question.  My
09:57:16 23    question is, you told us the other day
09:57:18 24    that his transactions violated a rule
         25    that you don't even know applied; right?
```

Page 898

```
09:57:22  1
09:57:23  2    Am I right or wrong?
09:57:26  3         A.   Excuse me, sir, I never said
09:57:26  4    violated.
09:57:28  5         Q.   Would you like me to read you
09:57:29  6    your testimony?
09:57:30  7         A.   Please, I would appreciate
09:57:56  8    that.
09:57:57  9         Q.   Do you recall being asked
09:58:00 10    these questions and giving these answers:
09:58:02 11              "Question: --
09:58:03 12              MR. HERSHMAN:  What page?
09:58:10 13              MR. MARINO:  I'm at page
09:58:12 14    12:31:04 is the line, and I guess
09:58:14 15    that's 141 of the transcript.
09:58:17 16    That's the time I guess.
09:58:18 17              MR. HERSHMAN:  No, 141 is the
09:58:19 18    page.
09:58:21 19              MR. MARINO:  141 is the page,
09:58:23 20    the time I was giving you is 12:31.
09:58:28 21    So I'm at line 8.  12:30:57.  Do
09:58:29 22    you see that?
09:58:31 23              MR. HERSHMAN:  No.
09:58:31 24         Q.   "Question: Did Refco have a
         25    prior relationship?
```

Page 899

```
09:58:32  1
09:58:33  2              MR. HERSHMAN:  We're there.
09:58:35  3         Q.   "Question: Did Refco have a
09:58:37  4    prior relationship with Mr. Pigott or
09:58:39  5    Liberty Corner?
09:58:40  6              "Answer: I'm sorry, sir,
09:58:41  7    could you repeat that?
09:58:42  8              "Question: Sure.  Did Refco
09:58:44  9    have a prior relationship with Liberty
09:58:45 10    Corner or Mr. Pigott?
09:58:46 11              "Answer: Yes.
09:58:47 12              "Question: And what was that
09:58:47 13    relationship?
09:58:50 14              "Answer: Mr. Pigott was a --
09:58:52 15    Liberty Corner was a customer of Refco.
09:58:55 16    Liberty Corner originally when they
09:58:58 17    started a hedge fund, starting it with
09:58:59 18    Refco's help.
09:59:00 19              "Question: And what do you
09:59:02 20    mean by with Refco's help?
09:59:03 21              "Answer: Well, I believe
09:59:05 22    that -- I believe that's how Mr. Pigott
09:59:06 23    seeded his hedge fund was through an
09:59:09 24    unusual set of circumstances where he
         25    either worked for Daiwa or was
```

18 (Pages 896 to 899)

Page 900

```
09:59:11   1
09:59:13   2       controlling an inventory of securities,
09:59:17   3       mainly mortgages, that Daiwa owned."
09:59:20   4            Let stop there. As we sit
09:59:22   5       here today, you don't know if that's true
09:59:23   6       or false; right?
09:59:23   7       A.   That's correct.
09:59:25   8       Q.   Next. "And he was selling
09:59:28   9       those mortgages or those securities to
09:59:30  10       what we call the street, the street
09:59:31  11       meaning other participants in Wall
09:59:33  12       Street, and the markups on those
09:59:35  13       securities were extremely high, way above
09:59:37  14       a typical, you know, NASD rule, which is
09:59:40  15       the 5 percent or reasonable markup rule.
09:59:42  16       And the spread between what he bought it
09:59:44  17       from Daiwa and what he sold it to the
09:59:47  18       street funded his -- funded his hedge
09:59:48  19       fund."
09:59:51  20            As we sit here today, do you
09:59:51  21       know that to be the case?
09:59:52  22            MR. HERSHMAN: Objection to
09:59:52  23       form.
09:59:54  24       A.   I never said violated.
          25       Q.   As we sit here today, do you
```

Page 901

```
09:59:55   1
09:59:58   2       know what I just read to be the case?
09:59:59   3            MR. HERSHMAN: Objection to
09:59:59   4       form.
10:00:02   5       A.   Sir, he had control --
10:00:04   6       Q.   No. I want you to answer my
10:00:06   7       questions. I just read you your
10:00:09   8       testimony and I'm asking you now if the
10:00:12   9       testimony that you gave under oath, not
10:00:15  10       during your period of admitted lying, but
10:00:18  11       just two days ago, is something that you
10:00:20  12       in fact know to be true.
10:00:22  13            And specifically do you know
10:00:25  14       it to be the truth that Mr. Pigott was
10:00:28  15       selling securities on which the markups
10:00:31  16       were extremely high, way above a typical,
10:00:34  17       you know, NASD rule, which is the 5
10:00:36  18       percent or reasonable markup rule, and
10:00:39  19       the spread between what he bought it from
10:00:41  20       Daiwa and what he sold it to the street
10:00:42  21       funded his hedge fund.
10:00:45  22            Do you, as we sit here today,
10:00:46  23       know that to be the truth?
10:00:47  24            MR. HERSHMAN: Objection to
          25       the form.
```

Page 902

```
10:00:47   1
10:00:49   2       A.   I believe that to be the
10:00:49   3       truth.
10:00:50   4       Q.   Do you know it to be the
10:00:50   5       truth?
10:00:51   6       A.   I believe it to be the truth.
10:00:53   7       Q.   Well, we obviously are
10:00:55   8       discussing knowledge, the difference
10:00:56   9       between knowledge and belief.
10:00:58  10            So tell me, how did you come
10:01:01  11       to that belief? Who told you?
10:01:03  12       A.   Peter McCarthy.
10:01:04  13       Q.   You don't have personal
10:01:05  14       knowledge of this; right?
10:01:06  15       A.   No. It came from Peter
10:01:07  16       McCarthy.
10:01:08  17       Q.   Your source of knowledge about
10:01:11  18       the manner in which Mr. Pigott got his
10:01:13  19       hedge fund up and running is Peter
10:01:16  20       McCarthy and exclusively Peter McCarthy;
10:01:18  21       am I right or wrong?
10:01:18  22       A.   Yes.
10:01:20  23       Q.   You never spoke to Mr. Pigott
10:01:21  24       about it; right?
          25       A.   That's correct.
```

Page 903

```
10:01:21   1
10:01:23   2       Q.   You weren't participating in
10:01:25   3       it personally; right?
10:01:27   4       A.   Define participating.
10:01:30   5       Q.   You never sat down and talked
10:01:32   6       to anyone but Peter McCarthy about how
10:01:35   7       Terry Pigott got his hedge fund up and
10:01:35   8       running?
10:01:46   9       A.   That's correct.
10:01:47  10       Q.   When is the last time you
10:01:50  11       talked to Peter McCarthy about how Terry
10:01:54  12       Pigott got Liberty Corner up and running?
10:02:00  13       A.   When Terry Pigott's hedge fund
10:02:01  14       got started.
10:02:01  15       Q.   Years ago?
10:02:02  16       A.   Years ago.
10:02:04  17       Q.   Not since any of this has
10:02:07  18       happened; right? Not since you got into
10:02:08  19       trouble at Refco; right?
10:02:11  20       A.   That's correct. That's
10:02:14  21       correct.
10:02:15  22       Q.   I'm sorry, say again?
10:02:17  23       A.   I was speaking up.
10:02:19  24       Q.   Do you need a drink of water?
          25       A.   No, I'm fine.
```

19 (Pages 900 to 903)

Page 912

```
10:09:04   1
10:09:06   2   have bought those at below market prices.
10:09:07   3   That was my biggest concern. Whether or
10:09:10   4   not Mr. Pigott owned them personally or
10:09:13   5   acted as an agent is totally irrelevant.
10:09:15   6   He could have bought them under market
10:09:17   7   prices and then sold them at the regular
10:09:17   8   price.
10:09:21   9       Q.  Did Mr. McCarthy consult with
10:09:24  10   you before clearing the transactions on
10:09:26  11   Mr. Pigott's securities?
10:09:26  12       A.  Yes.
10:09:28  13       Q.  What did he say to you and
10:09:30  14   what did you say to him?
10:09:33  15       A.  He told me that Mr. Pigott was
10:09:35  16   starting his hedge fund and that the
10:09:37  17   proceeds from these sales, all right,
10:09:40  18   from Daiwa's inventory, this is what he
10:09:44  19   told me, was going to -- was going to
10:09:47  20   seed his hedge fund. And I said how big
10:09:50  21   are these -- how big. He says a lot. I
10:09:52  22   said well, I'm very concerned about this.
10:09:54  23   And I need for you to check with Daiwa to
10:09:58  24   see if it's okay. And I believe he did.
          25       Q.  So the transaction that you
```

Page 913

```
10:10:01   1
10:10:04   2   described the other day basically you'd
10:10:06   3   agree with me that your description the
10:10:08   4   other day cast these as shady
10:10:09   5   transactions; right?
10:10:10   6       MR. HERSHMAN: Objection to
10:10:10   7   form.
10:10:12   8       A.  I never said they were shady.
10:10:14   9       Q.  Okay, let's get to focus on
10:10:16  10   that now. You'd agree with me as we sit
10:10:18  11   here today that the transactions that are
10:10:20  12   referred to in your testimony, the
10:10:22  13   transactions with respect to the sale and
10:10:24  14   the clearing of the sale of the Daiwa
10:10:27  15   Securities, were not shady in any
10:10:28  16   respect; correct?
10:10:29  17       MR. HERSHMAN: Were you done
10:10:30  18   with your previous answer?
10:10:31  19       THE WITNESS: Excuse me?
10:10:32  20       MR. HERSHMAN: Were you
10:10:34  21   finished with your previous answer?
10:10:35  22       THE WITNESS: I'm not sure
10:10:36  23   what the question was.
10:10:37  24       MR. HERSHMAN: If you're not
          25   done with your question before the
```

Page 914

```
10:10:38   1
10:10:40   2   next question is asked, raise your
10:10:42   3   hand or say something so that you
10:10:44   4   can finish your answer. Because I
10:10:46   5   don't want you to --
10:10:47   6       THE WITNESS: Lose my train of
10:10:48   7   thought?
10:10:51   8       MR. HERSHMAN: Yes.
10:10:53   9       Q.  Do you understand the
10:10:54  10   question, you want me to give it back to
10:10:54  11   you?
10:10:56  12       A.  Going back to your original
10:10:58  13   question, I never said these were shady,
10:11:00  14   I said these were unusual. I never used
10:11:03  15   the word shady, I used the word unusual.
10:11:11  16       Q.  Okay. You, Mr. Maggio, were,
10:11:14  17   at the time these transactions were done,
10:11:17  18   engaged in lots of fraudulent conduct;
10:11:19  19   right?
10:11:19  20       A.  Yes.
10:11:22  21       Q.  I mean, the whole thing was
10:11:24  22   basically a fraud; right?
10:11:24  23       A.  Yes.
10:11:25  24       MR. HERSHMAN: Objection as to
          25   form.
```

Page 915

```
10:11:25   1
10:11:28   2       Q.  But these weren't fraudulent
10:11:29   3   transactions; right?
10:11:30   4       A.  I never said they were, sir.
10:11:32   5       Q.  Right. Then they weren't;
10:11:32   6   right?
10:11:34   7       A.  I never said they were. I
10:11:35   8   said they were unusual.
10:11:38   9       Q.  I know you never said they
10:11:40  10   were, now I want you to say they weren't.
10:11:41  11       A.  I don't know that.
10:11:42  12       Q.  You have no basis whatsoever
10:11:44  13   for concluding that there was anything
10:11:46  14   remotely improper about the transactions
10:11:50  15   that Mr. Pigott did to fund Liberty
10:11:52  16   Corner; correct?
10:11:54  17       A.  I disagree.
10:11:56  18       Q.  You disagree.
10:11:59  19       A.  With the word improper. I
10:12:01  20   believe they were improper. I believe
10:12:01  21   they were unusual.
10:12:02  22       Q.  Which is it?
10:12:04  23       A.  Both.
10:12:06  24       Q.  They weren't shady but they
          25   were improper?
```

Page 920

```
10:26:17  1
10:26:19  2   clarify for you. If you can answer that,
10:26:20  3   that's great.
10:26:20  4      A.  That's fine.
10:26:23  5      Q.  I want to know how someone
10:26:26  6   listening, and I want to include or going
10:26:27  7   back and reading testimony that you've
10:26:29  8   given, how can someone know whether this
10:26:34  9   is the lying Santo Maggio or the truth
10:26:36 10   telling Santo Maggio?
10:26:36 11         MR. HERSHMAN: Objection to
10:26:37 12      the form.
10:26:40 13      A.  I'm not going to be lying now.
10:26:43 14   I have not lied since October of 2005.
10:26:44 15      Q.  Do you remember the last lie
10:26:46 16   you told?
10:26:48 17      A.  Let me finish. It's very
10:26:50 18   simple, I went through this a couple of
10:26:53 19   days ago. I am not going to do anything
10:26:57 20   to screw up what I've done so far. All
10:26:59 21   right, I have truthfully told the United
10:27:01 22   States Government and others, and the
10:27:03 23   others I think I meant the Austrian
10:27:05 24   authorities, what has happened. I've
         25   given substantial assistance. I have not
```

Page 921

```
10:27:07  1
10:27:10  2   misled them. I have not lied to them.
10:27:12  3   Nor have I lied at the trial. Because if
10:27:16  4   I do any of that, anything, even at this
10:27:19  5   deposition, I'm screwed. They will not
10:27:21  6   give me the 5K letter. That's how you
10:27:23  7   can tell that I'm not lying right now.
10:27:25  8      Q.  Well, you don't think they
10:27:29  9   would deprive you of the 5K letter for
10:27:33 10   say misremembering something like how
10:27:36 11   Liberty Corner got its relationship with
10:27:38 12   Refco started; right? You don't think
10:27:40 13   they are going to pull the letter for
10:27:41 14   that; do you?
10:27:41 15         MR. HERSHMAN: Objection to
10:27:41 16      form.
10:27:43 17         MS. MACKINTOSH: Objection to
10:27:43 18      form.
10:27:44 19      A.  I don't understand the
10:27:44 20   question.
10:27:45 21      Q.  You don't think the government
10:27:48 22   is going to deny you a 5K letter because
10:27:50 23   you slip up on a fact or two?
10:27:51 24         MR. RAND: Let the witness
         25      finish the answers.
```

Page 922

```
10:27:52  1
10:27:54  2      A.  There is a difference between
10:27:57  3   slipping up and a lie, sir. The original
10:27:58  4   question is how do I know you're not
10:28:00  5   lying. So I'm answering you and I'll
10:28:01  6   telling you I'm not lying.
10:28:04  7   Misremembering a fact, not knowing a
10:28:06  8   correct year, that's different. That's
10:28:07  9   not lying. You asked me a question about
10:28:07 10   lying.
10:28:11 11      Q.  How about like not knowing say
10:28:18 12   whether Mr. Pigott's sale of the Daiwa
10:28:19 13   Securities was an agency transaction or a
10:28:21 14   principal transaction, you wouldn't --
10:28:24 15   whichever way you came out on that, you
10:28:24 16   wouldn't be lying; right?
10:28:25 17         MR. HERSHMAN: Objection to
10:28:27 18      form.
10:28:29 19      A.  No, I could not.
10:28:30 20      Q.  But when you testified at
10:28:33 21   trial, I take it that you prepared for
10:28:36 22   some time with the United States Attorney
10:28:38 23   who was going to ask you questions;
10:28:39 24   right?
         25      A.  Yes.
```

Page 923

```
10:28:39  1
10:28:41  2      Q.  I mean, I know you cooperated
10:28:44  3   for several hours with all my plaintiff
10:28:48  4   friends around this table, but your prep
10:28:49  5   sessions for the trial was a different
10:28:52  6   story; right? Those were a different
10:28:52  7   story?
10:28:53  8         MR. HERSHMAN: Objection to
10:28:53  9      the form.
10:28:54 10      Q.  Am I right?
10:28:54 11      A.  Yes.
10:28:56 12      Q.  Those were you're going to get
10:28:59 13   on the stand and we're going to ask you
10:29:03 14   these questions, and we expect that
10:29:05 15   you're going to testify consistent with
10:29:07 16   what you've told us; right?
10:29:07 17      A.  Yes.
10:29:09 18      Q.  Did they tell you how to dress
10:29:10 19   for the trial?
10:29:10 20      A.  No.
10:29:12 21      Q.  Did they tell you anything
10:29:14 22   about how to comport yourself on the
10:29:15 23   witness stand?
10:29:15 24      A.  No.
         25      Q.  Did they tell you just to
```

MERRILL LEGAL SOLUTIONS

(800) 325-3376                    www.MerrillCorp.com

Page 924

```
10:29:20  1
10:29:22  2   answer the questions that they asked and
10:29:26  3   not to go outside the confines of the
10:29:27  4   questions?
10:29:29  5       A.   I believe they may have said
10:29:29  6   that.
10:29:31  7       Q.   They gave you some direction
10:29:32  8   on how to proceed; right?
10:29:33  9            MR. HERSHMAN: Objection as to
10:29:35 10   form.
10:29:37 11       Q.   You were being helpful to
10:29:38 12   them; right?
10:29:38 13       A.   Yes.
10:29:40 14       Q.   You had a common goal with
10:29:40 15   them; right?
10:29:41 16            MR. HERSHMAN: Objection to
10:29:41 17   form.
10:29:43 18       A.   No, my goal was just to tell
10:29:45 19   the truth, period. Whatever happened at
10:29:47 20   the trials, happened at the trials.
10:29:48 21       Q.   You had a very good idea of
10:29:50 22   what you wanted to happen at the trial;
10:29:50 23   right?
10:29:51 24            MR. HERSHMAN: Objection to
         25   the form.
```

Page 925

```
10:29:51  1
10:29:52  2       A.   No, sir.
10:29:54  3       Q.   Did they ever tell you how
10:29:57  4   they defined substantial assistance for
10:30:00  5   purposes of determining whether to write
10:30:03  6   a 5K letter under the United States
10:30:05  7   sentencing guidelines?
10:30:05  8       A.   No.
10:30:07  9       Q.   They told you that you had to
10:30:09 10   provide substantial assistance to them;
10:30:10 11   right?
10:30:10 12       A.   Yes.
10:30:11 13       Q.   And they told you that they
10:30:13 14   were going to be the judges of what
10:30:15 15   substantial assistance was; right?
10:30:16 16            MR. HERSHMAN: Objection.
10:30:16 17       A.   Yes.
10:30:18 18       Q.   That was not going to be for
10:30:20 19   you or your lawyer to determine; right?
10:30:21 20       A.   Correct.
10:30:28 21       Q.   What's a consolidating entity?
10:30:30 22       A.   A consolidating entity is an
10:30:38 23   entity that is incorporated into a much
10:30:40 24   larger, let's say holding company. So
         25   for example, Refco Securities
```

Page 926

```
10:30:42  1
10:30:48  2   consolidates to Refco Group Ltd. So what
10:30:50  3   affects the revenue and profitability and
10:30:52  4   what affects the balance sheet of that
10:30:54  5   entity, will affect the balance sheet of
10:30:55  6   the parent company.
10:30:58  7       Q.   Now, let me draw your
10:31:02  8   attention to what you have described as
10:31:04  9   round robin transactions. You know what
10:31:05 10   I'm talking about?
10:31:05 11       A.   Yes, sir.
10:31:07 12       Q.   Okay. Those were the
10:31:11 13   back-to-back loan transactions done
10:31:15 14   between and among various Refco entities
10:31:19 15   and various outside parties, hedge funds
10:31:20 16   and what have you; correct?
10:31:21 17       A.   Yes.
10:31:33 18       Q.   Those transactions were done
10:31:36 19   by you with a specific purpose in mind;
10:31:37 20   right?
10:31:37 21       A.   Yes.
10:31:39 22       Q.   And that purpose was to
10:31:45 23   conceal a large hole, I believe you said,
10:31:49 24   in Refco's financial picture; right?
         25       A.   Yes.
```

Page 927

```
10:31:49  1
10:31:53  2       Q.   You wanted to make Refco
10:31:56  3   appear to be in better financial
10:31:57  4   condition than it was; right?
10:31:57  5       A.   Yes.
10:32:00  6       Q.   And the entities with which
10:32:05  7   you did those transactions were all Refco
10:32:08  8   customers prior to the time when you did
10:32:11  9   those transactions with them; right?
10:32:14 10       A.   I'm just thinking through it.
10:32:16 11       I believe so.
10:32:19 12       Q.   You would have Mr. McCarthy or
10:32:23 13   perhaps others approach Refco customers
10:32:26 14   and propose these back-to-back loan
10:32:27 15   transactions; correct?
10:32:30 16       A.   Yeah, these round trips or
10:32:31 17   whatever you want to call them, yes.
10:32:34 18       Q.   You can call them round
10:32:36 19   robins, I'm calling them back-to-backs,
10:32:38 20   we know what we're talking about; right?
10:32:38 21       A.   Yes, sir.
10:32:40 22       Q.   Now, during that course of
10:32:46 23   time, you were asked by customers about
10:32:49 24   the purpose of those transactions; right?
         25       A.   I was asked by certain
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376                www.MerrillCorp.com

Page 928

```
10:32:51  1
10:32:53  2      customers about the purpose of the
10:32:53  3   transaction, yes.
10:32:54  4      Q.  And you lied to them?
10:32:54  5      A.  Yes.
10:32:56  6      Q.  And you lied to them for a
10:32:58  7   very specific reason; right?
10:32:58  8      A.  Yes.
10:33:00  9      Q.  And that very specific reason
10:33:04 10   was related to the fact that they were
10:33:06 11   Refco's customers; right?
10:33:06 12      A.  Yes.
10:33:11 13      Q.  You didn't want a Refco
10:33:14 14   customer to know about Refco's financial
10:33:16 15   problems; right?
10:33:17 16      A.  Yes.
10:33:20 17      Q.  Because if a Refco customer
10:33:26 18   found out about Refco's problems, you
10:33:28 19   were concerned, am I right, that they
10:33:30 20   might not be Refco customers anymore;
10:33:30 21   right?
10:33:31 22      A.  Yes.
10:33:34 23      Q.  And with no Refco customers,
10:33:36 24   no Refco; right?
         25      A.  Yes.
```

Page 929

```
10:33:37  1
10:33:39  2      Q.  And with no Refco, no millions
10:33:42  3   for Sandy every year; right?
10:33:42  4      A.  Yes.
10:33:46  5      Q.  The ability for Sandy Maggio
10:33:49  6   to steal money through Refco was
10:33:55  7   dependent upon Refco maintaining its
10:33:56  8   customer base; correct?
10:33:57  9          MR. HERSHMAN:  Objection to
10:33:57 10      the form.
10:33:57 11      A.  Yes.
10:34:00 12      Q.  Isn't that why when you went
10:34:04 13   through this business of drawing these
10:34:07 14   customers into the round robin
10:34:09 15   transactions, engaging them or involving
10:34:12 16   them in the round robin transactions, you
10:34:17 17   didn't tell them by the way, we're doing
10:34:19 18   these transactions to hide a big fat
10:34:35 19   receivable?
10:34:36 20          If you would like me to
10:34:38 21   rephrase the question and make it more
10:34:39 22   simple I can do that.
10:34:41 23      A.  Could you do that, sir,
10:34:41 24   please?
         25      Q.  You wanted to maintain the
```

Page 930

```
10:34:42  1
10:34:45  2      customers, we've already established;
10:34:45  3   right?
10:34:45  4      A.  Yes.
10:34:46  5      Q.  Because if you didn't have the
10:34:48  6   customers, Refco would cease to be a
10:34:49  7   going concern; right?
10:34:49  8      A.  Yes.
10:34:52  9      Q.  So you had to be certain that
10:34:56 10   you concealed from the customers the
10:34:58 11   existence of what I'm going to call, if
10:35:01 12   you understand it, the RGHI receivable;
10:35:02 13   is that right?
10:35:02 14      A.  Yes.
10:35:05 15      Q.  Okay.  Now, the RGHI
10:35:09 16   receivable was a receivable in what
10:35:10 17   amount?
10:35:12 18      A.  Depended on the year.  But it
10:35:15 19   got close to, if not a billion dollars or
10:35:16 20   more.
10:35:20 21      Q.  So that was a billion dollars,
10:35:22 22   at the point in time when it was in the
10:35:24 23   neighborhood of a billion dollars, and I
10:35:26 24   guess it ranged from a few hundred
         25   million to a little over a billion;
```

Page 931

```
10:35:27  1
10:35:28  2   right?
10:35:28  3      A.  Yes, sir.
10:35:30  4      Q.  That receivable, what was
10:35:35  5   Refco's market cap at that point?
10:35:36  6      A.  What do you mean by market
10:35:37  7   cap?
10:35:39  8      Q.  Tell me how significant,
10:35:41  9   simplify it, how significant was that
10:35:44 10   receivable to Refco's financial picture?
10:35:46 11      A.  At what point in time?
10:35:48 12      Q.  Throughout the entire time.
10:35:49 13          Would you agree with me that
10:35:53 14   it was dramatic the impact that that
10:35:53 15   receivable had?
10:35:55 16      A.  I think I testified that other
10:35:58 17   than enterprise risk the firm was
10:35:58 18   worthless.
10:36:00 19      Q.  I think you may have described
10:36:03 20   the firm in somewhat vulgar terms; am I
10:36:03 21   right?
10:36:06 22      A.  Worthless, that's not a vulgar
10:36:07 23   term.  Oh, yes, you're right, my
10:36:08 24   conversation with Mr. Collins.
         25      Q.  I think you told Mr. Collins
```

26 (Pages 928 to 931)

Page 956

```
11:08:34  1
11:08:39  2         THE VIDEOGRAPHER: Back on the
11:08:40  3     record, 11:08.
11:08:41  4  BY MR. MARINO:
11:08:45  5     Q.  Mr. Maggio, we spoke a little
11:08:48  6  while ago about Peter McCarthy. I just
11:08:51  7  want to be clear. Mr. McCarthy, as far
11:08:54  8  as you know, was not aware of the
11:08:56  9  existence of the RGHI receivable;
11:09:01 10  correct?
11:09:04 11     A.  As far as I know he was not
11:09:05 12  aware.
11:09:09 13     Q.  He testified on October 26th
11:09:12 14  of this year that in February of 2002 you
11:09:15 15  came to him and asked him to determine
11:09:17 16  whether Refco's largest customers,
11:09:19 17  including Liberty Corner, might be
11:09:23 18  interested in doing a year end tax
11:09:25 19  motivated trade with Refco. Is that
11:09:25 20  accurate?
11:09:27 21     A.  No.
11:09:29 22         MR. HERSHMAN: Just a second.
11:09:34 23     October 26th of 2000 --
11:09:37 24         MR. MARINO: '9. October 26,
         25     2009. Mr. McCarthy's testimony.
```

Page 957

```
11:09:40  1
11:09:41  2         MR. HERSHMAN: Okay.
11:09:43  3     Q.  Mr. McCarthy testified that
11:09:46  4  when you came to him and asked him about
11:09:50  5  getting some of Refco's largest customers
11:09:52  6  to engage in these back-to-back
11:09:57  7  transactions, he testified that you asked
11:09:59  8  him to determine whether those customers
11:10:01  9  might be interested in doing a year end
11:10:05 10  tax motivated trade.
11:10:06 11     A.  I do not recall, nor do I
11:10:09 12  believe I ever told Peter McCarthy that
11:10:11 13  it was a tax motivated trade.
11:10:13 14     Q.  Did you tell him or at any
11:10:16 15  time suggest to him that the trade you
11:10:18 16  were referring to was going to be an
11:10:26 17  improper trade?
11:10:26 18     A.  No.
11:10:31 19     Q.  So I just wanted to clear up,
11:10:33 20  when I was asking you before about
11:10:35 21  Mr. McCarthy, he didn't know what he was
11:10:36 22  really effectuating; right?
11:10:37 23     A.  That's correct.
11:10:40 24     Q.  Mr. McCarthy, who was the key
         25  person in terms of engaging the customers
```

Page 958

```
11:10:45  1
11:10:48  2  such as Liberty Corner to do these
11:10:50  3  back-to-back transactions, he himself was
11:10:52  4  unaware of the improper purpose of those
11:10:54  5  transactions; right?
11:10:54  6     A.  That is correct.
11:10:57  7     Q.  He himself believed that those
11:11:00  8  were legitimate transactions; correct?
11:11:02  9     A.  I don't know what he believed.
11:11:04 10     Q.  Well, you wanted him to
11:11:06 11  believe they were legitimate
11:11:06 12  transactions; right?
11:11:06 13     A.  That's correct.
11:11:08 14     Q.  You led him to believe they
11:11:09 15  were legitimate transactions; right?
11:11:10 16     A.  That's correct.
11:11:11 17     Q.  So that when he went out
11:11:13 18  there, it wasn't as though, and I want to
11:11:16 19  just dispel any misimpression, it wasn't
11:11:18 20  that he was going out there with a
11:11:20 21  mission to be part of the concealment, he
11:11:23 22  himself wasn't in on the joke; right?
11:11:31 23     A.  That's correct.
11:11:34 24     Q.  Now, did you believe that the
         25  fact that the deal documents, when I say
```

Page 959

```
11:11:37  1
11:11:39  2  the deal documents I'm talking about the
11:11:42  3  loan documents for these back-to-back
11:11:44  4  loans, did you believe that the fact that
11:11:48  5  they were being created by a very
11:11:52  6  prestigious law firm, being Mayer Brown,
11:11:55  7  would lend credibility to those
11:11:59  8  transactions?
11:12:00  9     A.  No.
11:12:03 10     Q.  Mayer Brown is a major law
11:12:04 11  firm; yes?
11:12:04 12     A.  Yes.
11:12:06 13     Q.  A very, very well regarded law
11:12:08 14  firm; correct?
11:12:09 15     A.  Yes.
11:12:13 16     Q.  Prior to this scenario with
11:12:16 17  Refco, you were unaware of anybody at
11:12:18 18  Mayer Brown ever being accused of
11:12:21 19  participating in a client fraud; right?
11:12:23 20     A.  Yes.
11:12:25 21     Q.  I take it that the reason
11:12:28 22  Refco initially engaged Mayer Brown was
11:12:30 23  because Mayer Brown is a very well
11:12:33 24  regarded, excellent law firm; right?
         25         MR. HERSHMAN: Objection.
```