**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
                                                                :
In re REFCO INC. SECURITIES LITIGATION    :    Case No. 07-md-1902 (JSR)
                                                                :
----------------------------------------------------------------X

        This Document Relates to:

----------------------------------------------------------------X
KENNETH M. KRYS, et al.,                           :    Case No. 11-cv-1486 (JSR)
                                                                :
Plaintiffs,                                                     :
                                                                :    REPORT AND
        -against-                               :    RECOMMENDATION
                                                                :    OF THE SPECIAL MASTER
SCHULTE ROTH & ZABEL LLP,               :    ON MOTION TO DISMISS
                                                                :
        Defendant.                              :
                                                                :
----------------------------------------------------------------X

Daniel J. Capra, Special Master

      Defendant, the law firm Schulte Roth & Zabel LLP ("Schulte Roth") moves to dismiss the Plaintiffs' complaint for a single count of malpractice. Schulte Roth acted as legal counsel to the SPhinX funds — including SMFF, the entity that placed excess cash at Refco LLC. That cash was swept into an unprotected account at Refco Capital Markets, Ltd. ("RCM"), where it was allegedly used to fund the Refco Fraud. SPhinX ended up losing much of that excess cash and, moreover, was precluded from participating in the Refco bankruptcy proceedings.[1] The Plaintiffs claim that Schulte Roth 1) gave deficient legal advice in connection with the organization of the SPhinX funds; 2) failed to provide adequate advice regarding redemption requests of SPhinX investors after the Refco fraud was discovered; and 3) operated under conflicts of interest.

      For the reasons expressed below, the Special Master recommends that the motion to dismiss be granted in part and denied in part.

---

[1]The Special Master has previously issued many R and R's in the Refco matter. Some of these R and R's will be referred to herein. Abbreviations used in the prior R and R's will be used herein. Familiarity with all of the R and R's — and with Judge Rakoff's orders reviewing them — is presumed.

*I. The Plaintiffs in this Action*

Because the identity and status of the Plaintiffs in this action has some relevance to the viability of some of the claims, the Plaintiffs will be briefly described here.

There are two sets of claimants:

1. The SPhinX family of funds, organized under Cayman Islands law, entered into voluntary liquidation after the fall of Refco. Plaintiffs Kenneth M. Krys and Margot MacInnis are their Joint Official Liquidators.[2] Besides asserting damages for injuries suffered by the SPhinX Funds, Plaintiffs Krys and MacInnis also bring claims that were assigned to them by thirteen investors in the SPhinX Funds (the "Assignors").

2. Plaintiff The Harbor Trust Co. Ltd. is the Trustee of the SPhinX Trust.[3] The SPhinX Trust is the assignee of claims from the estate of PlusFunds. PlusFunds created SPhinX and served as its investment manager.

But while the Harbor Trust Co. Ltd. is *named* in the caption as a plaintiff (and in the summons) nothing in the Complaint argues for a claim for relief for losses suffered by PlusFunds. See, e.g., Complaint ¶ 1 ("This is an action to recover damages suffered by the SPhinX family of hedge funds arising from deficient legal advice rendered by SRZ."); ¶ 117 (referring only to "damages suffered by SPhinX"). The Harbor Trust Co. Ltd. is not so much as mentioned in the description of the parties to the action. See Complaint pp. 5-7. The deficiency in the Complaint regarding the Harbor Trust Co. Ltd. was raised by Schulte Roth in its opening brief. See Brief in Support of Motion to Dismiss at 3. The Plaintiffs' brief does not address this deficiency.

---

[2] On November 10, 2009, pursuant to an Order of the Grand Court of the Cayman Islands, Margot MacInnis was appointed as successor to Christopher Stride, as Joint Official Liquidator of the SPhinX funds.

[3] On November 24, 2009, Kenneth M. Krys was appointed as successor to James P. Sinclair, as Trustee of the SPhinX Trust, by the Advisory Board created by the PlusFunds Plan. Effective May 1, 2010, by a resolution of the Advisory Board dated March 31, 2010, Peter Andersen of The Harbour Trust Co. Ltd. was appointed as successor Trustee of the SPhinX Trust, in place of Kenneth M. Krys. Subsequently, effective May 1, 2010, by a resolution of the Advisory Board dated June 3, 2010, and superseding the resolution of March 31, 2010, The Harbour Trust Co. Ltd. was appointed successor Trustee for the SPhinX Trust, in place of Kenneth M. Krys. By order of Special Master Ronald Hedges, dated June 17, 2010, the substitution of Margot MacInnis, as Joint Official Liquidator and assignee of claims assigned by certain SPhinX funds investors, in place of Christopher Stride, and the substitution of The Harbour Trust Co. Ltd., as SPhinX Trustee, were effectuated.

> *Accordingly, because no damages are claimed on behalf of PlusFunds, and the Plaintiffs have waived any argument to the contrary, Schulte Roth's motion to dismiss with prejudice any claims by Harbor Trust Co. Ltd. should be granted.*

**II. Summary of the Plaintiffs' Allegations**

The Plaintiffs do not allege that Schulte Roth had anything to do with the SPhinX Fraud or the Refco Fraud. Rather, the allegations are, essentially, two:

> *Disparity Between Offering Memoranda and Articles of Association Regarding Formula for Redemption of SPhinX Shares Upon Liquidation.*

Schulte Roth "drafted or participated in the drafting" of SPhinX's offering memoranda. Complaint ¶72. In pertinent part the memoranda provided that, upon liquidation, investors would be paid in proportion to the shares of the relevant class of shares held by a shareholder — and that the common shares "have equal entitlement to share in the profits of the company based on their respective NAV per class of share." Id. at ¶ 74. The Plaintiffs contend that this provision in the offering memoranda is in conflict with the articles of association, "prepared and drafted in consultation with" Schulte Roth. Id. at ¶ 75. The relevant provision of the articles of association — the provision governing the valuation of shares in liquidation — provides that payment will be made to investors solely in proportion to the number of shares of the relevant class held, period. No reference is made to NAV in the liquidation provision of the articles of association. Id.  The Plaintiffs argue that Schulte Roth's "failure to ensure that the offering memoranda were consistent with the articles of association has imposed great uncertainty and multiplied the costs of administering the liquidation of the SPhinX Funds." Plaintiffs' Brief at 6.

Besides these damages regarding the liquidation, the Plaintiffs also claim that the Assignors were injured by relying on the offering memoranda, and by having the increased expenses of liquidation passed onto them. Plaintiffs' Brief at 23-24; Complaint ¶ 79. The viability of the Assignors' claims will be discussed below.

> *Failure to Advise That Redemption of Shares at Full NAV Would Have the Effect of Disentitling SPhinX from Filing Claims in the Refco Bankruptcy Proceeding*

As is well known by all that follow these MDL proceedings, when the Refco Fraud was disclosed, Sugrue demanded from RCM, and received, $312 million for SPhinX; and the Refco Estate eventually brought a preference action to claw back that money. Complaint ¶¶ 8-12. By the time the preference action was brought, SPhinX had honored the redemption requests of its investors at full NAV; consequently, SPhinX didn't have the money to return to RCM in full. Id. at ¶ 13. The Complaint contains general allegations about Schulte Roth's failure to give SPhinX and PlusFunds any advice on how to handle the redemptions. But the critical failure, according to the Complaint and to Plaintiffs' brief and oral argument, is that Schulte Roth failed to inform SPhinX and PlusFunds of a particular provision of the Bankruptcy Code. Id. at ¶ 107; Brief in Opposition at 7-8;

3

Transcript of Oral Argument at 124.

11 U.S.C. § 502(d) provides that if a party receives a voidable preference, the bankruptcy court "shall disallow any claim of [the party receiving the preference] * * * unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable * * * ." The Plaintiffs allege that because SPhinX honored redemptions at full NAV, it was unable to pay all of the $312 million that RCM sought to claw back. Complaint ¶¶ 13, 14. The Plaintiffs contend that if Schulte Roth had warned SPhinX/PlusFunds of the existence of Bankruptcy Code Section 502(d), the SPhinX Funds would not have honored redemptions at full NAV and would not have lost all of the $263 million that the Refco Estate clawed back in the settlement of the preference action. Id. at ¶ 107. This prong of the Plaintiffs' claim essentially seeks the difference between what SPhinX would have recovered if permitted to take part in the Refco bankruptcy proceeding, less the amount— approximately $49 million — that SPhinX was allowed to keep in the settlement of the preference action.

### *Conflicts of Interest*

The Plaintiffs seek to bolster their claims regarding the redemptions by allegations that Schulte Roth was operating under two conflicts of interest, specifically: 1) that Schulte Roth represented SPhinX and PlusFunds simultaneously; and 2) that Schulte Roth represented certain Refco-related entities with assets invested in SPhinX. The relevance of these allegations will be discussed below.

## II. Standards for Reviewing the Plaintiff's Allegations on a Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007) (quoting Fed.R.Civ.P. 8(a)(2)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 668 (2009) (quoting *Twombly,* 550 U.S. at 570). The requirement of "factual matter" means that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting *Twombly*, 550 U.S. at 557). If the factual allegations rise only to the level of the "mere possibility of misconduct," the complaint should be dismissed. *Starr v. Sony BMG Music Entn't,* 592 F.3d 314, 321 (2d Cir.2010).

As the Plaintiffs' malpractice claim does not sound in fraud, the particularity requirements

of Fed.R.Civ.P. 9(b) are inapplicable.

### III. Analysis of the Plaintiffs' Claims.

"In a diversity action based on attorney malpractice, state substantive law, here that of New York, applies." *Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir.2009) (internal citation and quotation marks omitted). In order to state a claim for legal malpractice under New York law, a plaintiff must allege "that an attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession" and that "the attorney's breach of this professional duty caused the plaintiff's actual damages." *McCoy v Feinman*, 99 N.Y.2d 295, 302, 755 N.Y.S.2d 693 (2002) (internal citations and quotations omitted). This Report will consider the Plaintiffs' various claims independently in light of that standard.

### A. The Alleged Discrepancy Between the Offering Memoranda and the Articles of Association.

The Plaintiffs claim that Schulte Roth was negligent in preparing the offering memoranda and the articles of association inconsistently: specifically, that the offering memoranda provide that distributions will be calculated based on NAV of the investors' shares, while the articles of association provide for distributions based on the number of shares held, regardless of NAV. Schulte Roth does not dispute the allegation that drafting an inconsistency concerning valuation of shares on redemption would be conduct below the ordinary reasonable skill commonly possessed by a member of the legal profession. Rather, Schulte Roth claims that 1) the provisions are not actually inconsistent, and 2) assuming an inconsistency, the Plaintiffs have not alleged that it proximately caused any damages. These arguments are taken in turn.

#### *1. No Inconsistency*

Both the articles and the offering memoranda contain a sentence providing that in the event of liquidation, assets would be paid out "in proportion to the number of shares" of the relevant class of shares held by a shareholder. Complaint ¶¶ 75-76. The alleged inconsistency is that the offering memoranda contain a sentence that the liquidation provision of the articles of association does not have — that "[t]he Common Shares have equal entitlement to share in the profits of the Company based on their respective NAV per class of share." The Plaintiffs argue that the articles can be construed to provide — by way of omission — that NAV is irrelevant to redemption and that assets are to be distributed based solely on the number of shares.

Schulte Roth does not see this as inconsistent at all. It seeks to explain that the Plaintiffs are confusing the "numerator" (the dollar amount of assets to be distributed) with the "denominator" (the number of shares held), and that NAV valuation is the only possible numerator. But this explanation is hardly self-evident; it requires several analytical steps that an investor may well not

take, and that even if taken hardly belie the Plaintiff's assertion that there is at least an ambiguity in the drafting.
If NAV valuation is the only possible numerator, then why is it included in one provision but not the other?

Schulte Roth argues in the alternative that there are various other provisions of the articles of association "that plainly provide that the valuation of each class of shares is determined by reference to the NAV of the class." Defendant's Brief in Support at 12. But the problem with *that* argument is that none of the provisions cited by Schulte Roth concern distribution of assets *upon liquidation.* Rather they deal with the valuation of shares being redeemed in the ordinary course or under compulsory redemption. The only provision in the articles that deals specifically with the method of distributing assets upon liquidation is the provision cited by the Plaintiffs in the Complaint — the one that does not specifically mandate a NAV valuation. Indeed it can fairly be argued that by including references to NAV valuation in a number of other articles, but not in the article specifically dealing with liquidation, there is an intent to have a different valuation for distribution of assets upon liquidation.

The bottom line is that the Plaintiffs have, at least, raised a question of fact as to whether the provision in the offering memoranda on liquidation is materially inconsistent with the corresponding provision in the articles of association. Schulte Roth's argument about numerators and denominators does not come close to establishing that there is no inconsistency between the provisions as a matter of law. It is basically an argument that an apparent ambiguity can be reconciled by a plausible but not indisputable analysis. And Schulte Roth's argument about consistency is at any rate undermined by the specific use of NAV valuation in other provisions in the articles. In the Aaron R and R, at p. 20, n. 15, adopted by Judge Rakoff, the Special Master noted that

> "[t]he meaning of an ambiguous term should not be decided even on a motion for summary judgment, much less on a motion to dismiss. *See, e.g., Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990) ("Summary judgment normally is inappropriate when a contractual term is ambiguous because a triable issue of fact exists as to its interpretation."); *CBS, Inc. v. Hearn,* 108 F.R.D.14, 24 (S.D.N.Y. 1985) (claim that plaintiff mischaracterized the documents on which he relied raises a factual question that should be resolved at trial or on summary judgment)."

So it is here. Accordingly, the Plaintiffs have sufficiently alleged that Schulte Roth was negligent in drafting conflicting provisions regarding redemption of shares in the offering memoranda and articles of association.

### *2. No Proximate Cause*

Schulte Roth contends that the Plaintiffs have not specifically explained how the alleged inconsistency between the offering memoranda and the articles of association has caused them any damages. But the Plaintiffs have specifically alleged that the contradictory language "has led to

6

contested hearings in SPhinX's Cayman Islands liquidation proceedings regarding the valuation of investors' interests in the Funds;" and because of the inconsistency "the JOL's have incurred substantial costs in analyzing investor claims and administering the SPhinX estate in liquidation." Complaint ¶78. It is plausible to believe that if one investor is claiming a recovery on the basis of NAV and another claiming recovery on the basis of number of shares or some other basis, that conflict will take some time, effort, and resources to resolve — and that it will complicate the work of the JOL's in administering the estate.[4] These allegations are specific enough, and plausible enough, to establish a question of fact as to proximate cause — especially because "proximate causation generally remains an issue of fact for the jury." *Am. Tissue v. Donaldson, Lufkin & Genrette Secs. Corp.,* 351 F.Supp.2d 79, 91 (S.D.N.Y. 2004). Moreover, it is well-established that fees and expenses necessitated by a lawyer's act of negligence are recoverable in an action for legal malpractice. *See, e.g., Rudolph v. Shayne, Dachs, Stanisci, Corker & Sauer,* 8 N.Y.3d 438, 835 N.Y.S.2d 534, 537 (2007) (damages from legal malpractice "may include litigation expenses incurred in an attempt to avoid, minimize, or reduce the damage caused by the attorney's wrongful conduct") (citation and internal quotation marks omitted); *National Enters. Corp. v Dechert Price & Rhoads*, 246 A.D.2d 481, 667 N.Y.S.2d 745 (1st Dept. 1998) (summary judgment in favor of law firm denied where law firm's failure to disclose information in a registration statement allegedly caused the client to incur fees in defending against a securities class action).

---

*For all the above reasons, Schulte Roth's motion to dismiss the Plaintiffs' claims for damages in fees and expenses caused by the inconsistency between the offering memoranda and the articles of association should be denied.*

**B. Assignors' Claims Based on Inconsistency.**

---

[4] Schulte Roth cites public reports filed by the JOL's as casting "substantial doubt" on the allegation that any time and effort has been taken to rectify problems caused by the inconsistency between the offering memoranda and the articles. But these reports may not be considered on a motion to dismiss, because: 1) they are not referred to or relied on in the Complaint (*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); and 2) to the extent that judicial notice of those reports can be taken, the notice only goes to whether the reports were filed, and not to the truth of the assertions in those reports (*Garber v. Legg Mason, Inc.,* 347 Fed. Appx. 665, 669 (2nd Cir. 2009) (taking judicial notice of press articles and SEC filings but only for the purpose of showing that certain information was "publicly available, not for the truth of the matters asserted therein.")). Accordingly, these JOL Reports have no impact on the Plaintiffs' assertion of proximate cause on this motion.

The Plaintiffs press an independent claim arising from the alleged inconsistency between the offering memoranda and the articles of association. This claim is brought on behalf of the Assignors. But the Assignors' claims should be dismissed with prejudice for at least two reasons.

First, the basic claim for damages is that "the JOLs have incurred significant additional expenses in administering the SPhinX Funds' liquidation due to the discrepancy between the offering memoranda and the articles of association" and those expenses "will be inevitably passed on to the Assignors." Brief in Opposition at 24. This is the classic description of a derivative harm. In the Standing R and R, affirmed by Judge Rakoff, the Special Master found that the Assignors' claims were derivative of those suffered by SMFF. See Standing R and R at 11 ("If SPhinX is fully compensated for its loss, and the Investors are fully compensated for theirs, there will be a double recovery. Despite Plaintiffs' best efforts to argue otherwise, the Investors' loss cannot be separated from that of SPhinX."). The same rationale applies here: the Assignors' claimed injury of loss of their investment is due to any damages suffered by SphinX or to the SphinX Estate.

Even if the claims of the Assignors were not derivative, they have no cause of action for malpractice against Schulte Roth because Schulte Roth was not their lawyer. Malpractice claims against lawyers are limited to those within privity of contract and those relationships "approaching privity." *Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 590 N.Y.S.2d 831, 832 (1992). The Court in *Dewey Ballantine* explained this necessary limitation on liability:

> This Court has long held that before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity. Such a requirement is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability.

Id. Under *Dewey Ballantine,* a relationship "approaches privity" when three requirements are met: "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a *known party* on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement *linking it to the relying party* and evincing its understanding of that reliance." Id. at 384 (emphases added; internal citation omitted). In this case, there is and can be no allegation that Schulte Roth, in drafting the offering memoranda and articles of association, specifically knew about the existence of any of the Assignors; nor are there allegations of any direct contact between Schulte Roth and any of the Assignors. If the Assignors can recover for a negligent misstatement in an offering memorandum or the articles of association, then so can any investor — which raises the prospect of unlimited liability (and increase in the lawyer's fee to the actual client) which the privity doctrine is intended to prevent. *See also Credit Alliance Corp. v Andersen & Co.*, 65 NY2d 536, 493 N.Y.S.2d 435 (1985) (allegations were insufficient to establish a relationship approaching privity between the plaintiffs and defendant accountants; there were no direct dealings between the plaintiffs and defendants, no specific agreement by the defendants to prepare the report for the plaintiffs' use or according to the plaintiffs' requirements, no specific promise to provide the plaintiffs with a copy of the report, and no actual provision of the report to the plaintiffs by the

8

defendants).

Any claim for the Assignors' recovery from Schulte Roth is even weaker than the claim found insufficient by Judge Lynch in *Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP,* 586 F.Supp.2d 119, 127 (S.D.N.Y. 2008). In that case THL sought recovery for accountant malpractice in preparing an audit report, on which THL allegedly relied to invest in Refco. Judge Lynch stated that in the absence of privity, there must be some "linking conduct" between the plaintiff and the professional, and observed that conduct qualifies as "linking conduct" if it is "some form of direct contact between the accountant and the plaintiff, such as face-to-face conversation, the sharing of documents, or other substantive communication between the parties . . . that evinces the accountant's understanding of plaintiff's reliance on his representations." Id. (internal citations and quotations omitted). Judge Lynch found that THL's allegations of linking conduct were insufficient even though the parties had several conversations and discussions. In this case, there is no allegation, nor could there be, that Schulte Roth even had any awareness of the existence of any of the Assignors, much less that it had any contact with any of them.

―――――

*For all the above reasons, the claims brought on behalf of the Assignors should be dismissed with prejudice.*


### C. Failure to Inform SPhinX of the Bankruptcy Code Provision Affecting Participation in Bankruptcy Proceedings.

The parties spend a good deal of time arguing about whether Schulte Roth failed to provide the necessary advice regarding whether SPhinX shares should have been redeemed at full NAV, or whether SPhinX should have adopted another strategy such as suspending redemptions. These arguments are a bit misdirected, however, because the Plaintiff's real complaint is not that Schulte Roth should have told SPhinX "whatever you do, don't honor redemptions at full NAV." The Plaintiffs' do not contest that SPhinX was in a tough position, and that *any* decision it made on redemptions would have been fraught with difficulty. If it redeemed at full NAV it would have much less money in hand and it would probably, under the circumstances, eventually run out of money. If it suspended or forestalled redemptions, there would likely be a "run on the bank" and the funds would likely collapse. See Complaint ¶ 9; Transcript of Oral Argument at 121.

The Plaintiffs' claim is not that SPhinX should have been informed of the dangers on either side of its decision on redemption as a general matter. Rather, the Plaintiffs' claim is that because Schulte Roth did not inform SPhinX of Bankruptcy Code Section 502(d), SPhinX made its decision to redeem at full NAV without a critical component of information — that the output of cash necessary for full redemption would disentitle SPhinX from taking part in the Refco bankruptcy proceeding, due to the risk (recognized by SPhinX) that the money taken out of RCM by Sugrue would be found a voidable preference. The claim comes down to a simple point — Schulte Roth

9

should have told us about the existence of an applicable law, and knowledge of that law was material to our decision on how to handle redemptions, because participation in the Refco bankruptcy could have resulted in a substantial recovery. See Transcript of Oral Argument at 137 (Plaintiff's counsel notes that the crux of the complaint is that SPhinX made the decision on redemption "without any knowledge about [Bankruptcy Code section] 502(d).").

Schulte Roth does not dispute the allegation that misadvice regarding Section 502(d) would be conduct below the ordinary reasonable skill commonly possessed by a member of the legal profession. Rather, Schulte Roth claims that this claim must be dismissed because 1) Schulte Roth gave no advice one way or the other on the subject of redemptions; 2) Schulte Roth had withdrawn from representing SPhinX by the time SPhinX decided to redeem at full NAV; and 3) SPhinX had other counsel — Gibson, Dunn — during the period in question and Gibson Dunn advised SPhinX to redeem at full NAV.  Each of these arguments will be taken in turn.

### *1. No Bad Advice Given*

Schulte Roth notes that the Complaint does not allege that SPhinX received any "incorrect advice" from Schulte Roth regarding redemptions. Brief in Support at 16. The parties agree that Schulte Roth never advised SPhinX to honor redemptions; that SPhinX was aware of the possibility of a clawback of the $312 million Sugrue obtained from RCM; and that SPhinX was concerned "what would happen if SPhinX honored redemptions and SMFF later faced a preference claim." Complaint ¶ 83.

But none of these points of agreement justify dismissing the claim that Schulte Roth *failed* to inform SPhinX about Bankruptcy Code Section 502(d). First, Schulte Roth cites no authority for the proposition that a lawyer must actually give affirmatively bad advice in order to be liable for malpractice. To the contrary, the case law clearly establishes that lawyers can breach their duty to clients for failing to inform them of the existence of a law or legal or factual condition that would have a significant impact on their conduct. *See, e.g., Camardia v. Danziger, Bangser & Weiss,* 167 A.D.2d 152, 152-153, 561 N.Y.S.2d 233 (1st Dept. 1990) ("questions of fact exist as to whether defendants acted reasonably in *failing to advise* the plaintiff of the possibility that a heavily leveraged buyout could be viewed as a fraudulent conveyance under various applicable sections of the Debtor and Creditor Law") (emphasis added); *Summit Rovins & Feldesman v Fonar Corp.*, 213 A.D.2d 201, 202, 623 N.Y.S.2d 245 (2d Dept. 1995) ("an issue of fact exists whether [the law firm] committed malpractice in failing, inter alia, to disclose the likelihood that defendants' offering would not succeed (see, Code of Professional Responsibility EC 7-8), *thereby breaching its fiduciary duty to bring to the client's attention all relevant considerations*.") (emphasis added; internal citations omitted). Cf. *Padilla v. Kentucky,* 130 S.Ct. 1473 (2010) (counsel was deficient for failing to advise defendant that his guilty plea made him subject to automatic deportation).

The law on a lawyer's failure to provide proper advice is summed up by Judge Lumbard in *Spector v. Mermelstein,* 361 F.Supp. 30, 40 (S.D.N.Y. 1972), *affirmed in relevant part,* 485 F.2d 474 (2nd Cir. 1973):

10

> A client is entitled to all the information helpful to his cause within his attorney's command. If an attorney negligently or willfully withholds from his client information material to the client's decision to pursue a given course of action, or to abstain therefrom, then the attorney is liable for the client's losses suffered as a result of action taken without benefit of the undisclosed material facts. Material facts are those which, if known to the client, might well have caused him, acting as a reasonable man, to alter his proposed course of conduct.

In light of all the above, Schulte Roth's argument that it cannot be liable for malpractice because it gave no advice must be rejected.

Moreover, Schulte Roth does not argue that the relevance of Section 502(d) was somehow outside the scope of its representation — nor could it, as the Complaint specifically alleges that SPhinX paid Schulte Roth for researching bankruptcy and redemption issues. Complaint ¶¶ 66, 68. Schulte Roth's own billing records indicate that it worked on redemption questions for SPhinX and had conversations with PlusFunds agents on such questions. Id. at ¶ 88. Thus the Plaintiffs have sufficiently alleged that advice about Section 502(d) was within the scope of the representation.

Finally, Schulte Roth does not argue that knowledge of the existence of Section 502(d) would somehow be irrelevant to the decision on redemption. Indeed it is plausible to believe that the ability to participate in the Refco bankruptcy would have a major impact on the decisionmaking process, as the SPhinX Funds would have been one of the major creditors of the Refco Estate.

Accordingly, the Plaintiffs have raised, at the very least, a fact question as to whether failure to inform SPhinX of the existence of Section 502(d) was an act of legal malpractice. The question remains whether Schulte Roth should be relieved of its liability either because of its withdrawal or because of Gibson Dunn's representation.

### *2. Withdrawal*

The parties agree that Schulte Roth withdrew from representing SPhinX before SPhinX honored any redemptions. Complaint ¶¶ 90, 93. Schulte Roth argues that because it withdrew before SPhinX made the decision to honor redemptions at full NAV, its representation could not have proximately caused any damages to SPhinX. "To establish the elements of proximate cause and actual damages for a claim of legal malpractice, the plaintiff must show that but for the attorney's negligence, what would have been a favorable outcome was an unfavorable outcome." *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F.Supp.2d 203, 209 (S.D.N.Y.2010) (internal citation and quotation marks omitted).

Schulte Roth's withdrawal does not preclude a fact question as to proximate cause, because the alleged act of malpractice, and its effect on SPhinX, was ongoing — its effect went beyond the point of Schulte Roth's withdrawal. The Plaintiffs have plausibly alleged that if SPhinX had known about Section 502(d), it would have added the risk of losing millions of dollars due to the disqualification from the Refco bankruptcy into its decisionmaking — and that such a material

consideration would have led it to change its decision to honor redemptions at full NAV. Given these plausible allegations — and the prior finding above that the Plaintiffs have sufficiently alleged that the failure to inform SPhinX about Section 502(d) fell below standards of reasonableness and violated the law firm's duty to its client — it cannot be dispositive that Schulte Roth withdrew a few days before SPhinX ultimately made its decision. The fact is that the decision was made *without the material information that the lawyer had the duty to provide.* If Schulte Roth is right that withdrawal automatically cuts off all causation, then attorneys could fail to advise clients of their most important rights, then with impunity withdraw and leave their clients to act without knowledge of those rights (but still collect a fee). It is no surprise that Schulte Roth cites no case law to support its proposition that withdrawal is sufficient to cut the chain of causation from an act of malpractice. Indeed the case law is to the contrary. *See, e.g., Hanlin v. Mitchelson,* 794 F.2d 834, 842 (2d Cir. 1986) ("The Code plainly states that 'a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of the client.' N.Y.Jud.Law (App.) Code of Prof.Resp. DR 2-110(A)(2) (McKinney Supp.1986). See also id. at EC 2-32 ("Even when withdrawal is justifiable, a lawyer should protect the welfare of the client ... endeavoring to minimize the possibility of harm."). Whether Mitchelson fulfilled these duties is another open question on this record. In any event, the termination of the attorney-client relationship here, if it occurred, did not necessarily bar the malpractice suit.").

Accordingly, Schulte Roth's withdrawal does not itself justify the motion to dismiss on the alleged act of malpractice regarding the redemptions. The question remains whether Gibson Dunn's representation and advice is sufficient to absolve Schulte Roth of liability as a matter of law.

### *3. Gibson Dunn's Representation*

The Plaintiffs do not dispute that after Schulte Roth resigned, Gibson Dunn continued to advise SPhinX and PlusFunds regarding how to deal with redemption requests. Plaintiffs' Brief at 18.[5] Schulte Roth argues that Gibson Dunn's advice to honor redemption requests at full NAV "further demonstrates that SRZ was not a 'but for' cause of the SPhinX Funds' decision to honor

---

[5] Schulte Roth argues that the Plaintiffs should be bound by their allegations in the Amended Complaint in *Krys v. Sugrue* regarding their reliance on Gibson Dunn's advice on redemptions. Reply Brief at 9. But on a motion to dismiss, the statements in another complaint may be considered under Federal Rule 201 only for the fact they were made — not for the truth of any assertion made therein. *See Word v. Annucci,* 2010 WL 2179954, at *1, n. 2 (S.D.N.Y.) ("The Court takes judicial notice of filings in plaintiff's prior lawsuits" but not for the truth of any assertions). In any case, the Plaintiffs' allegations in this action are not inconsistent with their allegations regarding Gibson Dunn in *Krys v. Sugrue.* The Plaintiffs do not deny that they consulted with Gibson Dunn on the question of redemptions. Their allegations, collectively, are that *both* Gibson Dunn and Schulte Roth failed to properly inform SPhinX of the fact that redemption at full NAV would disentitle SPhinX from participating in the Refco bankruptcy proceeding.

redemptions." But the fact that Gibson Dunn allegedly failed to advise SPhinX about Section 502(d) does not cut the chain of causation from Schulte Roth's failure to give proper advice on the very same subject. Similar arguments have been made throughout this MDL — that one third party who allegedly committed a wrong is not liable because other wrongdoers committed a wrong. The analysis from the Owens and Kavanagh R and R, affirmed and adopted by Judge Rakoff, is applicable here:

> The Defendants essentially argue that other acts cut the chain of causation. Those acts are: 1) improper transfers of excess cash to RCM which were effectuated by others, including Sugrue and Aaron; 2) acts constituting the "Refco fraud" perpetrated by Bennett and others; 3) the decision of the SPhinX board to settle the preference action and return $263 million to the Refco Estate. * * * [W]hen multiple wrongdoers act separately to do a wrong, a plaintiff cannot be barred from pleading proximate cause as to any particular one. The question is whether the injuries were the "natural and probable consequence" of the actions or inactions of a particular defendant. *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1985). * * *
>
> New York law provides that proximate causation is present where it was "reasonably foreseeable" that the damage incurred would follow from the wrongful act. *Id. See also In re Parmalat Sec. Litig.,* 501 F.Supp.2d 560, 580 (S.D.N.Y. 2007) ("It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm."). Indeed, if another wrongdoer's conduct was sufficient in all cases to cut the chain of causation by other actors, there would never be a concept of aiding and abetting liability — that liability, as discussed below, has been held to require a finding of proximate cause, but there could be no proximate cause under the Defendants' theory because of the existence of a primary wrongdoer. For all these reasons, the fact that other wrongdoers also were responsible for the loss of the SMFF cash does not relieve the Defendants from responsibility for their alleged breaches of fiduciary duty.

Owens and Kavanagh R and R at 22.

Thus, the fact that two law firms allegedly failed in their duty to advise SPhinX about Section 502(d) would not absolve either one individually. If it did, what would stop Gibson Dunn from arguing that Schulte Roth's failure to inform SPhinX about Section 502(d) relieved *it* of liability for failing to do so? Plaintiffs cannot be worse off by suffering the same wrong from two defendants independently rather than one.

On the question of proximate cause, this case is similar to *Schauer v. Joyce,* 54 N.Y.2d 1, 6-7, 444 N.Y.S.2d 564 (1981). Schauer retained Joyce to represent her in a divorce action. The client obtained a default judgment for alimony payments, but the judgment was vacated, allegedly due to Joyce's negligence. The client discharged Joyce and hired another attorney, Gent. Gent failed to get the default judgment reinstated. In the malpractice action, Joyce filed a third-party complaint against

Gent. The New York Court of Appeals denied the motion to dismiss the third-party complaint, because "both Joyce and Gent may be liable to Mrs. Schauer, if their respective representations were negligent, for at least a portion of the same damages claimed by her." Id. at 7. *See also Lanoce v. Anderson, Banks, Curran & Donoghue,* 259 A.D.2d 965, 966, 704 N.Y.S.2d 756 (4th Dept. 1999) (lawyer who files an untimely claim, and the lawyer who fails to revive it, may be "jointly and severally liable" for the client's damages).

Schulte Roth relies on some cases for the proposition that "a law firm's negligence did not proximately cause an injury to a plaintiff where the defendant firm no longer represented the plaintiff at the time of the events that caused the damage, and the plaintiff had successor counsel who had 'a sufficient opportunity to protect the plaintiff's rights.'" Brief in Support of Motion to Dismiss at 19 (quoting *Perks v. Lauto & Garabedian,* 306 A.D.2d 261, 262, 760 N.Y.S.2d 231 (2d Dept. 2003).[6] But the cases cited by Schulte Roth, including *Perks,* involve situations in which the successor counsel was essentially undertaking a separate representation with ample opportunity to remedy the plaintiff's harm. These cases do not mandate dismissal of the Plaintiffs' claims regarding Section 502(d) and its effect on redemption.

For one thing, this is not a case where one counsel messed up, the plaintiff then got a new counsel, and the new counsel failed to clean up the mess. That is, this is not a case of successor counsel. SPhinX retained *both* Schulte Roth and Gibson Dunn at the same time to advise it on redemptions. The fact that both (allegedly) failed to provide adequate advice makes the proximate cause argument much stronger than in the cases cited by Schulte Roth, in which the actions of the two lawyers are separated in time. Put another way, this case looks more like joint tortfeasors, jointly and severably liable, than it does like the cases cited by Schulte Roth. *See Ravo ex. rel. Ravo v. Rogatnick,* 70 N.Y.2d 305, 309, 520 N.Y.S.2d 533 (1987) ("When two or more tortfeasors act concurrently or in concert to produce a single injury, they may be held jointly and severally liable."). Essentially, SPhinX wanted two opinions on redemption issues — which certainly seems understandable given the gravity and exigency of the situation it faced. The fact that both firms allegedly failed should not, at the pleading stage, benefit Schulte Roth. If it did, clients would be disincentivized from seeking a second opinion, for fear that do so would release one (or both?) lawyers from malpractice liability; and lawyers would be incentivized to be the first to withdraw in a multi-lawyer representation.

Moreover, the case law relied upon by Schulte Roth requires that the plaintiff have a "sufficient opportunity" to have a successor counsel protect the plaintiff's rights. The cases relied

---

[6] The other cases cited for the proposition that a successor counsel's opportunity to protect the client's rights cuts the chain of causation are *Decker v. Nagel Rice LLC,* 2010 WL 2344608, at *5-6 (S.D.N,.Y.); *Katz v. Herzfeld & Rubin, P.C.,* 48 A.D.3d 640, 641, 853 N.Y.S.2d 104 (2d Dept. 2008); *Somma v. Dansker & Aspromonte Assocs.,* 44 A.D3d 376, 377, 843 N.Y.S.2d 577 (1st Dept. 2007); *Ramcharan v. Pariser,* 20 A.D.3d 556, 557, 799 N.Y.S.2d 564 (2d Dept. 2005); and *Golden v. Cascione, Chechanover & Purciglotti,* 286 A.D.2d 281, 281, 729 N.Y.S.2d 140 (1st Dept. 2001).

on by Schulte Roth each involve situations in which the other counsel had weeks or months to rectify the plaintiff's problem, such as by timely filing the plaintiff's action. Thus, in *Perks, supra,* successor counsel had two months to fix the mess; in *Katz* the period was two years; in *Golden,* the plaintiff's claim was viable for nearly 2 ½ years after the defendant was relieved from the representation; and so forth. In this case, the first redemptions at full NAV — which in effect disentitled SPhinX from participating in the Refco bankruptcy proceedings — were made on November 2, 2005, and continued for about five weeks. Complaint ¶¶ 93-94.

Schulte Roth's representation terminated either on October 25, 2005 (when it sent a resignation letter) or on October 31, 2005 (when the parties communicated with each other and explicitly terminated the representation). Complaint ¶ 90. The actual date of withdrawal clearly raises a question of fact. But even if Schulte Roth is correct that the representation was terminated on October 25, the period of time between that termination and the redemption at full NAV is far shorter than the periods found to cut the chain of causation in the cases it cites.

It should be remembered, as stated above, that proximate cause questions are ordinarily for the jury. In a case where redemption requests had been filed, where SPhinX and PlusFunds were in crisis mode, and where multimillion dollar decisions needed to be made in a hurry, it cannot be said as a matter of law that there was a "sufficient opportunity" to protect SPhinX's interest and thereby absolve Schulte Roth from the consequences of its alleged misconduct.[7]

---

***Accordingly, Schulte Roth's motion to dismiss the claim of malpractice arising from its alleged failure to advise SPhinX about the existence of Bankruptcy Section 502(d) should be denied.***

---

[7] At oral argument, Plaintiffs' counsel stated that SPhinX's response to the first set of redemption requests — from the RAI funds — needed to be made by no later than November 2, 2005. Transcript of Oral Argument at 127. If the Court finds that the Plaintiffs have not sufficiently pleaded that there was a lack of a sufficient opportunity to protect the Plaintiffs' rights and that such allegations are necessary, the Special Master recommends that the Plaintiffs be granted leave to amend their Complaint to include allegations about the need to decide on redemptions quickly. *See Kirschner v. Bennett,* 2009 WL 2601375, at * 15 (S.D.N.Y.) (noting that leave to amend should be liberally granted and that "the Trustee deserves at least one opportunity" to plead with greater specificity). Even without amending the Complaint to include allegations about the November 2 deadline, however, it is plausible to believe that, after disclosure of the Refco Fraud, SPhinX and PlusFunds would be under pressure to decide quickly about what to do regarding redemptions.

15

**D. Conflict of Interest Allegations**

Sprinkled throughout the plaintiffs' papers are allegations that Schulte Roth operated under conflicts of interest while representing SPhinX. The alleged conflicts of interest are two:

**1.** *Representation of SPhinX and PlusFunds.*

There is no dispute that Schulte Roth represented SPhinX and PlusFunds simultaneously. The Plaintiffs argue that this put Schulte Roth in conflict because PlusFunds had an interest in taking in additional assets while SPhinX's fundamental interest was to safeguard the assets it had. This allegation comes to nothing, however, for a number of reasons. First, there is no inconsistency between taking in assets and safeguarding the assets taken in. PlusFunds, as an investment advisor, had a fiduciary duty to protect the assets of the SPhinX investors. *See, e.g., Tannenbaum v. Zeller*, 552 F.2d 402, 416 (2d Cir. 1977) (noting a "fiduciary duty in dealings between a mutual fund and its adviser").  Second, SPhinX as well as PlusFunds had an interest in expanding — SPhinX was hardly in business just to benefit investors, it also wanted to make money, and the more assets under management, the more money. Third, both SPhinX and PlusFunds would have had the same interest in figuring out how redemptions should be handled in a way that would protect the interests of both businesses — thus nothing in any theoretical conflict would have affected the advice to be given regarding redemptions.  Neither SPhinX nor PlusFunds would have wanted to pay off redemptions at full NAV if they had known it would knock them out of the Refco bankruptcy proceedings. Fourth, it is clear that  PlusFunds and SPhinX were joined at the hip. PlusFund created SPhinX (Complaint ¶48) and virtually all of PlusFunds' business was in managing SPhinX. For all these reasons, the Plaintiffs' allegations of conflict of interest from the simultaneous representation of SPhinX and PlusFunds add nothing to the Plaintiffs' malpractice claims.

**2.** *Representation of Refco-Related Entities*

There is no dispute that at the time Schulte Roth advised SPhinX and PlusFunds, it also represented and advised Refco-related entities in connection with the organization and structure of three investment funds sponsored by RAI, "a Refco affiliate seeking to develop an investment management line of business for Refco." Complaint ¶ 70.  Schulte Roth "consulted with representatives of RAI and advised RAI in connection with the organization and structure of its funds, each of which invested a portion of its assets in SPhinX."  Id.

As to the RAI representation, the Plaintiffs make a plausible case that Schulte Roth was operating under a conflict of interest at the time SPhinX was seeking advice about redemptions. Because some RAI funds had assets in SPhinX, those funds would have had an interest in redemption at full NAV — and the Plaintiffs plausibly allege that advice to redeem at full NAV impaired the interest of SPhinX because it disentitled it from participating in the Refco bankruptcy. This conflict would have been more evident, of course,  if Schulte Roth had ever affirmatively advised SPhinX to redeem shares at full NAV.  Nonetheless, it is plausible to believe that a counsel in conflict might fail to provide *any* advice for one client that would directly conflict with the

interests of the other — and that the failure to so advise would itself result from the conflict. *See generally* New York Rules of Professional Conduct, Rule 1.7(a) (prohibiting lawyer from actively representing differing interests in concurrent representation, in the absence of written waiver from all clients).

In the end, though, the conflict allegations regarding RAI do no more than provide some context and possible motivation for Schulte's actions at the time that SPhinX asked for advice on redemptions. The Plaintiffs make no argument that the conflict allegations are sufficient to establish a cause of action on their own.

## IV. Recommendations

1. Any claims brought by the Harbor Trust Co. Ltd. should be dismissed with prejudice.

2. The claims brought on behalf of the Assignors should be dismissed with prejudice.

3. In all other respects, the motion to dismiss should be denied.

Daniel J. Capra
Special Master

Dated: April 9, 2012
New York, New York