DLA PIPER LLP (US)
300 Campus Drive, Suite 100
Florham Park, NJ 07932-1039
Telephone No.: 973.520.2561
Fax No.: 973.520.2581
Attorneys for Defendants
  *Derivative Portfolio Management LLC;*
  *Derivative Portfolio Management, Ltd.;*
  *DPM-Mellon, LLC; DPM-Mellon, Ltd.;*
  *and Guy Castranova*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
IN RE: REFCO SECURITIES LITIGATION    :   07 MDL 1902 (JSR)
                                                            :
------------------------------------------------------------X

------------------------------------------------------------X
                                                            :
KENNETH M. KRYS, *et al.*                       :   08 Civ. 7416 (JSR)
                                                            :
                        Plaintiffs,                    :
                                                            :
    -against-                                          :
                                                            :
                                                            :
                                                            :
ROBERT AARON, *et al.*,                       :
                                                            :
                        Defendants.                 :
------------------------------------------------------------X

### SECOND SUPPLEMENTAL DECLARATION OF B. JOHN PENDLETON, JR. IN FURTHER OPPOSITION TO THIRD PARTY DEFENDANT'S MOTION TO DISMISS

**B. JOHN PENDLETON, JR.**, an attorney-at-law in the State of New Jersey, admitted *pro hac vice* in the United States District Court for the

Southern District of New York, and a member of the law firm of DLA Piper LLP (US), hereby declares as follows:

1. Attached hereto as Exhibit A is a true copy of excerpted portions of the rough draft transcript of the deposition of Brian Owens taken in this matter on April 18 and 19, 2012.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 20, 2012.

By:     <u>s/ B. John Pendleton, Jr.</u>
**DLA PIPER LLP (US)**
B. John Pendleton, Jr.
300 Campus Drive, Suite 100
Florham Park, NJ 07932-1039
*Attorneys for Defendants Derivative Portfolio Management LLC; Derivative Portfolio Management, Ltd.; DPM-Mellon, LLC; DPM-Mellon, Ltd.; and Guy Castranova*

# Exhibit A

Draft Transcript of Brian Owens.txt

Uncorrected draft transcript

1
2      VIDEOGRAPHER:  Good morning.  This is the
3  beginning of tape one, Volume I, in the video deposition of
4  Mr. Brian Owens.  This is being held at the offices of
5  William Fry in Fitzwilton house, Wilton Street, Dublin 2,
6  here in the Republic of Ireland.
7      This is being taken on 18 April 2012 at 9.07 am as
8  indicated on the video screen.  This deposition is being
9  taken in the matter of Refco/SPhinx Kenneth Krys et al
10  versus Christopher Sugrue et al.
11      The case number is 07MD1902 (JSR) being heard
12  before the United States District Court for the southern
13  district of New York.
14      The court reporter here today is Leanne Shipp of
15  Merrill Legal Solutions, as is myself, the videographer,
16  David Ross, also here of Merrill Legal Solutions.  Would all
17  of counsel introduce themselves please?
18      MR. BEUS:  Leo Beus and Lee Andelin on behalf of
19  the plaintiff.
20      MR. KARLAN:  Mitchell Carr on behalf of the
21  witness.
22      VIDEOGRAPHER:  And would the court reporter please
23  swear in the witness.
24      (witness sworn).
25

1

Draft Transcript of Brian Owens.txt
11    Q.   Do you recall what your response was?
12    A.   Yes.
13    Q.   What was it?
14    A.   "Let me ask Gibson Dunn."
15    Q.   And what did Gibson Dunn -- after you talked
16 to Gibson Dunn, what did you tell Mr. Aliprandi?
17    A.   Gibson Dunn --
18    MR. KARLAN:  Listen to the question he's asked
19 you.  After you spoke to Gibson Dunn, what did you tell
20 Mr. Aliprandi?
21    A.   I didn't tell Mr. Aliprandi anything.
22    MR. KARLAN:  Okay.
23 BY MR. BEUS
24    Q.   What position did you take as to whether or
25 not there needed to be any disclosure?

                                                    233

Uncorrected draft transcript
1     A.   I forwarded Mr. Aliprandi a written response
2  I had received from Gibson Dunn.
3     Q.   Which basically said?
4     A.   There was no related party transaction.
5     Q.   Okay.  And you relied on Gibson Dunn?
6     A.   I relied on the advice, yes.
7     Q.   Okay.
8     A.   Would you mind terribly when it's convenient
9  to you that we have a break for two minutes?
10    MR. BEUS:  If you need a break, I'll give you
11 a break.
12    A.   Okay, thank you.
13    VIDEOGRAPHER:  Going off the record at 4:20 p.m.
                        Page 215

Draft Transcript of Brian Owens.txt

14  in the videotaped deposition of Mr. Brian Owens.
15                    (Break taken.)
16          VIDEOGRAPHER:  And we're back to the record at
17  4:26 p.m. as indicated on the video screen.
18  BY MR. BEUS
19          Q.  Did you ever yourself disclose Refco's role
20  as the Suffolk lender to PlusFunds' management or any member
21  of the SPhinx Board of Directors at any time before June of
22  2005?
23          A.  Before what date?
24          Q.  June of 2005.
25          A.  I did.

                                                        234

            Uncorrected draft transcript
1           Q.  To who?
2           A.  To the PlusFunds' management certainly.
3           Q.  Who?
4           A.  Each of those persons who received a tender
5   offer, which would have been McMahon, Aaronson, Ewing, Rose,
6   Staisil and Aliprandi.
7           Q.  Did you do that in writing?
8           A.  No, I physically gave -- I physically gave
9   Aliprandi, Rose, Staisil, Ewing and Aaronson -- sorry,
10  strike that, and McMahon the tender offer and Aaronson,
11  I believe, I left on his desk.
12          Q.  Any discussion with any of those people when
13  you gave them the tender offer?
14          A.  I should add I also told -- prior to June
15  '05, I would have told Andrew Feighery.

                    Page 216

```
                  Draft Transcript of Brian Owens.txt
16        Q.   Did you --
17        A.   To you --
18        Q.   Did you tell any -- did you provide in
19   writing a disclosure that Refco was the lender to McMahon,
20   Aaronson, Ewing, Rose, Staisil, Aliprandi or Feighery?
21        A.   The lender of the Suffolk loans?
22        Q.   Of the Suffolk loans.
23        A.   Yes.  Feighery received -- he had copies of
24   MKK documentation, which needed to be signed in connection
25   with the tender offer, which was conducted in May.

                                                              235


                     Uncorrected draft transcript
1         Q.   Okay.  Other than what's in the tender offer,
2    do you have any recollection of the discussion with any of
3    these folks:  McMahon, Aaronson, Ewing, Rose, Staisil,
4    Aliprandi or Feighery?
5         A.   About?
6         Q.   About the fact that Refco was the lender on
7    the Suffolk loans?
8         MS. FEINSTEIN:  Prior to --
9         A.   Prior to 30 June?
10   BY MR. BEUS
11        Q.   Prior to 30 June.
12        A.   I had several conversations with Feighery
13   about it, but not the others.
14        Q.   Okay.  And where was Feighery at the time?
15        A.   Feighery typically was in Dublin.
16        Q.   All right.  And who did Feighery work for?
17        A.   He was a sole practitioner practicing under
18   the style of CGC Associates.
                           Page 217
```

Draft Transcript of Brian Owens.txt

19    Q.    Did he do work for Mr. Kavanagh?
20    A.    No.
21    Q.    Did he do work for anybody related to
22 Suffolk?
23    A.    Suffolk LLC?  Yes, he did.  He was the
24 reporting accountant for MKK Ltd.
25    Q.    Is there a privilege, an accountant/client

                                                          236


                Uncorrected draft transcript
1  privilege in Ireland?
2     A.    I'm not qualified to answer that.  I don't
3  know.
4     Q.    When did Feighery resign from the SPhinx
5  board?
6     A.    When did he resign from the SPhinx board?
7  I don't know that.
8     Q.    Let me show you Exhibit 6343.  I apologize,
9  guys, this has been marked before.  It should have had an
10 exhibit number on it.  This is --
11    MS. FEINSTEIN:  I think it's 6342?
12    A.    This is 6343.  You said 6344?
13    MR. BEUS:  6342 is FAS 57.
14    A.    And you said you were --
15    MR. BEUS:  6341 is UBS.  I passed away --
16    MS. FEINSTEIN:  Oh I'm sorry.
17    MR. KARLAN:  So, what are we marking now?
18    MR. BEUS:  We're marking the Suffolk --
19    A.    Mr. Beus handed --
20    MR. KARLAN:  Hang on.

                      Page 218

DRAFT of Brian Owens Vol 2.txt

Uncorrected Draft Transcript

1
2  (DRAFT) Deposition of Brian Owens Volume II.
3
4  VIDEOGRAPHER: Good morning. This is the
5  beginning of tape one, Volume II in the continuation of the
6  video deposition of Mr. Brian Owens. We are here on the
7  record at 9:05 a.m. as indicated on the video screen and
8  that's April 19, 2012. The witness is sworn.
9  BY MR. ANDELIN
10     Q.  Okay, Mr. Owens, my name is Lee Andelin and
11  I represent the plaintiffs. Do you understand that you're
12  still under oath?
13     A.  I do.
14     Q.  Based on a conversation that we had yesterday
15  with the Special Master, I'd like to go over a couple things
16  that we went over yesterday and see if we can get answers to
17  some of those questions. Who's paying for your defense in
18  this action?
19     MR. KARLAN: Pardon me, Mr. Andelin, I believe
20  what the Special Master said was that you and I were to
21  sculpt, which I wrote to you this morning, so at the first
22  break let's go over the questions.
23     MR. ANDELIN: All right.
24     VIDEOGRAPHER: Excuse me, there's a very strong
25  mobile phone signal coming through. Most likely to be down

1

```
                    DRAFT of Brian Owens Vol 2.txt
18    for PlusFunds.
19          Q.   Okay.
20          A.   When that conversation concluded, the
21    conversation between Andrew Feighery and myself, Martin
22    Grennell looked to me and said, "How much of the action are
23    you getting?"
24          Q.   And what -- did you answer him?
25          A.   Yes.

                                                           261



                  Uncorrected Draft Transcript
1           Q.   What did you say?
2           A.   I said, "Nothing".
3           Q.   Okay.  Where were you when this conversation
4     was taking place?
5           A.   At a hotel near Dublin aeromedical.
6           Q.   And (inaudible)?
7           A.   Yes.
8           Q.   And you called Mr. Feighery on your cell
9     phone?
10          A.   Yes.
11          Q.   And have those cell phone bills and records
12    (overspeaking)?
13          A.   Yes (overspeaking).
14          Q.   And have you reviewed (overspeaking)?
15          A.   I believe so.
16          Q.   And is this call reflect odd there?
17          A.   Yes.
18          Q.   .
19          Q.   And the month here is January now 2005?
20          A.   2005; correct.
                         Page 241
```

DRAFT of Brian Owens Vol 2.txt

21     Q.   Okay.  After the conversation in January
22  2005, do you know whether Mr. Feighery had access to
23  additional confirmation concerning what was going on with
24  respect to the Suffolk loans?
25     A.   Yes.

                                                        262

Uncorrected Draft Transcript
1      Q.   Can you describe that, please?
2      A.   In March of 2000 -- in late March 2005 or
3   second half of March 2005, MKK had to execute certain
4   documentation in connection with the Suffolk loans.  The
5   directors and secretary of MKK had to execute this
6   documentation.  And the secretary of MKK Ltd is an Irish
7   corporate entity called charter house secretarial company,
8   which company was at that time owned by Andrew Feighery and
9   Andrew Feighery was asked by myself to execute a certain --
10  certain resolutions on behalf -- in his facility as an
11  officer or a director of charter house, who was the
12  secretary of MKK Ltd.
13     Q.   Okay, so is it correct that the aspect of the
14  Suffolk loans that involved MKK Ltd required some formal
15  documentation of the governing body of MKK Ltd?
16     A.   Yes.
17     Q.   And Mr. Feighery had to sign those papers?
18     A.   Yes.
19     Q.   Okay.  And how did he learn that you wished
20  him to do that?
21     A.   I telephoned him in the first instance.
22     Q.   Okay.  And for a change we actually have the

Page 242

```
                    DRAFT of Brian Owens Vol 2.txt
23    bill at hand.  Has this been marked?
24              Okay, so let me show you what has been marked as
25    Exhibit 6386
```

263

```
                    Uncorrected Draft Transcript
1               (Exhibit 6386 marked for identification)
2          Q.   The first page of which is stamped
3     BOMK00320805.  Oh ask you, sir, if you can tell me what this
4     is, please.
5          A.   This is a copy of my cell phone bill dated 20
6     April 2005, covering calls made in the period prior to that
7     time.
8          Q.   Okay.  And would you look, please, at the
9     page that is Bates stamped BOMK00320819?
10         A.   Yes.
11         Q.   Do you see the last call on that page to the
12    United States?
13         A.   No.  That's --
14         Q.   Not to the United States?
15         A.   It indicates that the call is made from my
16    cell phone, which was in the United States.
17         Q.   Okay.
18         A.   Calling the number.
19         Q.   And this call that we're looking at is; am
20    I correct, from -- on March 23, 2005?
21         A.   That's correct.
22         Q.   And do you recognize the number that is
23    called there?
24         A.   That is Andrew Feighery's cell phone number.
25         Q.   Okay.  And would you look at the next page,
                              Page 243
```

DRAFT of Brian Owens Vol 2.txt

264

Uncorrected Draft Transcript

```
1    please?  One, two, three, four, five calls down.  Again, 23
2    March 2005.  This one at 12.13.46.  Do you see that?
3              A.   I do.
4              Q.   And whose telephone number is in a?
5              A.   That's Andrew Feighery's cell phone number.
6              Q.   Thank you very much, sir.
7              Okay, staying with the time period prior to the
8    end of March 2005, did you ever have any conversations with
9    Randall Yanker about the fact that Suffolk -- the buying
10   group -- was in discussions with Refco in the hope of
11   obtaining a loan that it could use to buy shares of
12   PlusFunds stock?
13             A.   I did.
14             Q.   And can you describe those conversations --
15   is that one conversation or more than one?
16             A.   No, I had several conversations with Randy in
17   this time period, and --
18             Q.   Let me ask you this first.  Were they all in
19   person or were some on the phone or --
20             A.   By and large they were -- from recollection,
21   they were in his offices, in approximate earn.
22             Q.   In by city?
23             A.   New York.
24             Q.   And can you approximately tell me where that
25   is?
```

265

DRAFT of Brian Owens Vol 2.txt

Uncorrected Draft Transcript

1    A.   It is a block or two from your offices.

2    Q.   Okay.  In mid-town Manhattan?

3    A.   In mid-town Manhattan.

4    Q.   All right.  Tell me what you recall telling
5 Mr Yanker prior to the end of March 2005 when you were in
6 his office on this subject.

7    A.   Apart from telling him that that the Suffolk
8 Group, as you referred to it, were borrowing monies from
9 Refco for the purchase of Gryphon and Bousbib's interests,
10 I also had shared with him the fact that we would be forth
11 come -- coming forward with a tender offer for series A
12 shareholders, and that we would be hopeful of securing a 25
13 million standby facility for PlusFunds.

14    Q.   Okay.  During all of these conversations
15 you've described prior to the end of March 2005 with
16 Mr Yanker and Mr. Feighery, did either gentleman ever
17 express to you any objection or concern about the fact that
18 money was being borrowed by Refco -- from Refco to buy
19 shares of PlusFunds?

20    A.   No.

21    Q.   Diego Winegardner was on the Board of
22 Directors of PlusFunds during the first quarter of 2005;
23 correct?

24    A.   Correct.

25    Q.   Did you ever discuss with Christopher Sugrue

266

Uncorrected Draft Transcript
1 in 2005 any conversations that he had with Diego Winegardner
Page 245