UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                   :
In re REFCO, INC. SECURITIES LITIGATION  :  07 MDL No. 1902 (JSR)
                                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                   :
This document relates to:                                          :
                                                                   :  07 Civ. 8165 (JSR)
MARC S. KIRSCHNER,                                                 :
As Trustee of the Refco Private Actions Trust                      :
                                                                   :
                        Plaintiff,                                 :
                                                                   :
                -v-                                                :
                                                                   :
PHILLIP R. BENNETT, SANTO C. MAGGIO,                               :
ROBERT C. TROSTEN, MAYER BROWN,                                    :
LLP, MAYER BROWN INTERNATIONAL                                     :
LLP, and GRANT THORNTON LLP,                                       :
                                                                   :
                        Defendants.                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GRANT THORNTON LLP'S REPLY BRIEF
# SUPPORTING ITS MOTION FOR SUMMARY JUDGMENT

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant Grant Thornton LLP*

**TABLE OF CONTENTS**

I.  Kirschner's "hopeless insolvency" theory has been conclusively debunked, both by the Second Circuit and by the evidence developed in discovery............................2

    A.    The Second Circuit has rejected the theory that RCM assumed a duty or made implied representations merely by accepting customer deposits................2

    B.    On this record, Kirschner cannot invoke the extraordinary duty identified in the *Craigie* cases and in the Court's pleading-stage decision.............5

II. Kirschner cannot prove "substantial assistance" based on either action or inaction. ...................................................................................................................9

III. Kirschner cannot avoid SLUSA by manipulating the number of customers.....................10

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Armstrong v. McAlpin,*
   699 F.2d 79, 91 (2d Cir. 1983)..................................................................................................10

*Capital Management v. Bennett,*
   670 F.3d 194 (2012).............................................................................................................. *passim*

*Craigie v. Hadley,*
   54 Sickels 131 (N.Y. 1885)......................................................................................................4
   54 Sickels at 135 .....................................................................................................................6

*Klein v. Tabatchnick,*
   610 F.2d 1043, 1048 (2d Cir. 1979)........................................................................................5

*LaSala v. Lloyds TSB Bank, PLC,*
   514 F. Supp. 2d 447, 469-70 (S.D.N.Y. 2007) .....................................................................10

*Marriott v. Cnty. of Montgomery,*
   426 F. Supp. 2d 1, 8 n. 8 (N.D.N.Y. 2006).............................................................................7

*Myers v. Cnty. of Nassau,*
   -- F. Supp. --, 2011 WL 5838453, at *7 (E.D.N.Y. 2011) ......................................................5

*Scutti Enters., LLC v. Park Place Entm't Corp.,*
   322 F.3d 211, 217 (2d Cir. 2003)............................................................................................5

*SEC v. Aragon Cap. Advisors,*
   2011 WL 3278907, at *17-18 (S.D.N.Y. July 26, 2011)......................................................10

*U.S. Pipe & Foundry Co v. City of Hornell,*
   263 N.Y.S. 89, 93-97 (Sup. Ct. 1933).....................................................................................6

*United States v. Szur,*
   289 F.3d 200 (2d Cir. 2002)....................................................................................................4

*United States v. Wolfson,*
   642 F.3d 293, 294-96 (2d Cir. 2011) ......................................................................................5

*Wolff v. Cash 4 Titles,*
   351 F.3d 1348, 1350 n. 2 (11th Cir. 2003) .............................................................................8

**STATUTES AND RULES**

15 U.S.C. § 78bb(f)(5)(B) ...................................................................................................10

CPLR § 5001(a) ..................................................................................................................10

N.Y. Gen. Bus. Law § 339-d ................................................................................................3

N.Y. Gen. Bus. Law § 339-e .................................................................................................3

Federal Rule of Civil Procedure 12(b)(6) ............................................................................6

Federal Rule of Civil Procedure 26 ......................................................................................6

Federal Rule of Civil Procedure 30(b)(6) ........................................................................1, 7

**OTHER AUTHORITIES**

*Black's Law Dictionary* 1198 (8th ed. 2004) .......................................................................8

Kirschner's brief all but ignores *Capital Management v. Bennett*, 670 F.3d 194 (2012), the most critical precedent in this case. There, the Second Circuit held that RCM's customers were on notice of the risks of dealing with an unregulated broker, so they cannot sue for fraud. Indeed, the customers could not recover even against the Refco insiders who face jail time (and admittedly conspired to conceal the Refco fraud from Grant Thornton). *Id*. Against that backdrop, the customers here certainly cannot recover against Grant Thornton—an outsider with whom they had no relationship, to whom they paid no fees, and on whom they did not rely.

Kirschner does not and cannot distinguish that decision on its facts. To the contrary, he concedes that one of the theories the Court rejected—the theory that RCM assumed duties and made implied representations merely by accepting deposits—is "analogous" to his theory in this case. That is an understatement; the theory is identical. *Capital Management* involves the same facts and the same theory, and it was issued by the same Court that will review any decision here. On this basis alone, Grant Thornton is entitled to summary judgment.

Moreover, Kirschner's fraud theory has been disproven in discovery, and his brief does nothing to save it. The Court allowed this case to proceed past the pleading stage based on old banking cases that recognize a duty to disclose "hopeless insolvency" in limited circumstances. New York courts have applied these cases to find fraud when a bank accepted a deposit during a run on the bank. But that does not mean RCM committed fraud by accepting deposits **before** any run on the bank—particularly given Kirschner's own admission that the run on the bank could have been avoided and that RCM's condition was not "hopeless" after all. Kirschner claims he made these admissions in a different case and different "capacity," but he ignores the fact that he reaffirmed that testimony here. He also cannot avoid the admissions of his Rule 30(b)(6) designee, who testified that RCM always expected to be able to return its customers' funds.

Kirscher's argument on substantial assistance fares no better. Unable to prove that a single customer relied on Grant Thornton's audit opinions, Kirschner changes the subject, arguing that the customers relied on "the absence of negative information." But then, unable to show that Grant Thornton had a duty to give the customers any such "information," Kirschner changes the subject back again, confirming that his case does, indeed, rest on Grant Thornton's audit opinions. In the context of aiding and abetting, New York law draws a sharp distinction between action and inaction; Kirschner cannot simply conflate the two. These customers cannot prove that they (or anyone else) relied on what Grant Thornton said, and they cannot establish that Grant Thornton owed them a duty to say something different. Thus, they have no claim.

Finally, Kirschner's argument against SLUSA preclusion flatly mischaracterizes the record. He claims that he now represents only 48 customers—just short of the 50 required to make this case a "covered class action." But his own complaints and supporting materials show that he is playing games. This case has always involved the claims of more than 50 customers, and Kirschner cannot avoid that fact by arbitrarily dropping one or two. Any one of these issues is enough to require judgment in Grant Thornton's favor.[1]

**I.   Kirschner's "hopeless insolvency" theory has been conclusively debunked, both by the Second Circuit and by the evidence developed in discovery.**

   **A.   The Second Circuit has rejected the theory that RCM assumed a duty or made implied representations merely by accepting customer deposits.**

Kirschner does not deny that the Second Circuit held—on the very same facts—that RCM's customers were not "misled." 670 F.3d at 198; *see* Consol. Am. Class Compl. in *In re RCM Brokerage Customer Sec. Litig.*, No. 06 Civ. 643, Dkt. No. 30, ¶¶ 5, 46, 57 (Sept. 5, 2006)

---

[1] Although Grant Thornton has not moved for summary judgment on scienter, it objects to any suggestion that it had knowledge of the Refco fraud. *See, e.g.,* Opp. 23-24 & n.17. The evidence at trial (if necessary) will show that Grant Thornton did not know about a fraud at Refco or RCM and, in fact, played a role in uncovering the Refco fraud and bringing it to light.

2

(setting out the basis for the claims rejected by the Second Circuit, including that RCM was a "ponzi scheme" saddled with huge, "uncollectible" loans to affiliates, having upstreamed the customers' assets to "insolvent" Refco entities that "lacked the financial ability and intention to repay"). Nor does Kirschner show that the decision was based on some unique aspect of the federal securities laws. Instead, Kirschner simply asserts (in a footnote) that his claim does not depend on RCM's practice of upstreaming assets without maintaining sufficient capital. *See* Opp. 5 n.3. But no matter how he characterizes it, that is ***exactly*** what his theory entails.[2]

The whole point of the SEC's regulations in this area is to protect against "the possibility that the brokerage, having rehypothecated its customers' securities, fails, making it unable to return customer [assets]." 670 F.3d at 200-01. The SEC's Net Capital Rule, for example, "requires brokers and dealers to maintain sufficient capital to protect their customers from the firm's potential insolvency." *Id*. at 208 n.17. State law imposes similar requirements, including restrictions on a broker's use of customer assets and limits on whether it can accept deposits while insolvent. *See* N.Y. Gen. Bus. Law §§ 339-d, 339-e; *accord* 670 F.3d at 212. But RCM's customer agreements "clearly represented" that it was "unregulated" and thus "undertook no obligation" to comply with these rules. 670 F.3d at 211-12. Under the circumstances, the customers "could be expected to understand the relevant benefits and risks." *Id*. at 210; *see id*. at 200-01 (including the risk that customers would not be protected from the broker's insolvency).

This is exactly why the customers in *Capital Management*—and the customers here— have no basis for a claim of fraud. Both sets of customers were unable to show that they relied

---

[2] *E.g.*, Opp. 10-11 (asserting hopeless insolvency based on upstreaming of assets and failure to retain sufficient funds to repay customers); Grant Thornton's Rule 56.1 Statement (cited herein as "¶___") ¶ 83 & Resp. (Kirschner's solvency expert opines that "RCM was inadequately capitalized") (undisputed); Kirschner's Counter-Statement ("Counter-Statement") ¶ 10 (asserting hopeless insolvency based on "routine siphoning" of assets and lack of profits on RCM's books).

3

on any explicit misstatement by RCM, so their claims depend on the theory that RCM committed fraud by silently accepting their deposits. In the federal cases, this idea was presented under the "shingle theory," which holds that "a broker makes certain implied representations and assumes certain duties merely by 'hanging out its professional shingle'" and accepting customer deposits. 670 F.3d at 209. Here, this idea is presented through *Craigie v. Hadley*, 54 Sickels 131 (N.Y. 1885), which Kirschner cites for the proposition that a broker accepting a deposit assumes a duty to disclose hopeless insolvency. Indeed, he concedes that the implied duties under the shingle theory are "analogous to the New York common-law duty invoked in the instant case." Opp. 5.[3]

According to the Second Circuit, however, RCM's express representations about its unregulated status "trump" any such "implied" duties. 670 F.3d at 210. That necessarily includes any duty to disclose that RCM's upstreaming would leave its customers unprotected in the event of the enterprise's collapse. *Id*. at 209-212 (RCM's "Customer Agreement clearly represented that RCM undertook no obligation to comply with" federal net capital and customer protection rules, or with New York state restrictions on broker-dealers). To be sure, the Court left the shingle theory "intact," in response to concerns by the SEC. *See* Opp. 4-5 & n.4. But it just as clearly held that the theory ***did not apply to RCM***. As a result, Kirschner's suggestion that the theory in this case is "not impacted" by the Second Circuit's decision (Opp. 5) is flatly incorrect.

Kirschner also cannot avoid *Capital Management* by suggesting that its reasoning, taken at face value, would "impermissibly overrule" *United States v. Szur*, 289 F.3d 200 (2d Cir. 2002); *see* Opp. 6. The broker in *Szur* lacked the very characteristic that *Capital Management*

---

[3] The similarity between these theories is no surprise. The only difference between these customers and the customers in the federal cases is the nature of the "stuff" they were trading in their RCM accounts. *Cf*. 670 F.3d at 208-09. Kirschner himself is behind the scenes in both cases; he is the named plaintiff here, and he was assigned the proceeds of the claims in the federal cases. His lawyers at Milbank Tweed represented the customers in the Second Circuit.

4

found dispositive: it did not hold itself out as "unregulated," with the concomitant benefits and risks. *Accord United States v. Wolfson*, 642 F.3d 293, 294-96 (2d Cir. 2011), *cited at* Opp. 6.

In short, the Second Circuit's decision squarely rejects any attempt to charge RCM with an implied duty based merely on its acceptance of customer deposits. On this basis alone, Grant Thornton is entitled to judgment as a matter of law.[4]

### B.    On this record, Kirschner cannot invoke the extraordinary duty identified in the *Craigie* cases and in the Court's pleading-stage decision.

Further, Kirschner's own admissions demonstrate that there is no disputed issue of fact for trial. Kirschner must prove that RCM was in the same "hopeless" condition as the bank in *Craigie*—that is, that its management accepted deposits without any reasonable expectation that it could continue in business with sufficient capital to honor the customer's requests for withdrawal in the ordinary course. *See* GT Br. 10-12.[5] He cannot carry this burden.

Kirschner's response on this point involves a rhetorical sleight-of-hand. He accuses Grant Thornton of trying to "manufacture . . . ***exceptions*** to the legal definition of hopeless insolvency." Opp. 9 (emphasis added). But these features are not "exceptions"; they define the legal concept of "hopeless insolvency" in the first place. *Craigie* does not impose a duty based on simple balance-sheet "insolvency." Opp. 9 (citing *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (ordinary insolvency)). Instead, it describes a duty that arises only under specific

---

[4] Contrary to Kirschner's suggestion, the doctrine of "law of the case" does not empower the Special Master or the Court to ignore intervening authority. Moreover, this Court has never held "that a hopelessly insolvent broker-dealer—***including an unregulated broker-dealer like RCM***—has a duty to disclose that insolvency to its customers." Opp. 1 (emphasis added). The R&R adopted by the Court held only that the pleadings raised sufficient "ambiguity" about the facts to survive a motion to dismiss. R&R 14, 16-17. It did not address the impact of RCM's unregulated status.

[5] The fact that this theory was allowed to survive a motion to dismiss does not relieve Kirschner of his obligation to show, based on the evidence, that a reasonable jury could find in his favor. *See Myers v. Cnty. of Nassau*, -- F. Supp. --, 2011 WL 5838453, at *7 (E.D.N.Y. 2011); *accord Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 217 (2d Cir. 2003).

5

circumstances—where the bank's default is imminent and its condition is "irretrievabl[e]." 54 Sickels at 135; *see* GT Br. 11-12.  In *Craigie*, this duty arose within hours of the bank's closure, when it had already "given up the struggle."  54 Sickels at 135.  In *U.S. Pipe & Foundry Co. v. City of Hornell*, 263 N.Y.S. 89, 93-97 (Sup. Ct. 1933), *cited at* Opp. 13, it arose because "a run of considerable proportion upon the bank" was already underway.

The admissions by Kirschner and his agents prove that at the time of the LBO—well before any run on the bank—RCM's condition was not "irretreivabl[e]" after all.  Kirschner himself testified that with better management, the Refco enterprise could have been restructured and "continued as a going concern."  *See* ¶ 49 & Resp. (undisputed).  He cannot impeach his own testimony as "speculative" (Opp. 9), nor can he dismiss it as having been offered in a different "capacity" (Resp. to ¶ 50).  Kirschner personally took an oath in the Litigation Trust's case against TH Lee, and he repeated the same oath and reaffirmed the same testimony in his deposition here.  ¶ 50; *see also* Grant Thornton's 56.1 Reply pp. 24-26 (also submitted today).

The testimony of expert Robert Manzo also shows that the run on the bank could have been avoided[6] and the entire enterprise (including RCM) could have been saved.  ¶¶ 51-53.  Manzo was no ordinary third-party witness; he was an expert proffered by Kirschner under Rule 26, and his testimony binds Kirschner as an admission.  56.1 Reply pp. 26-27.  Based in part on testimony by Manzo, Kirschner was able to secure a hefty settlement from TH Lee, half of which went to the Private Actions Trust.  *See* Kirschner Decl. in Support of Mot. for Preliminary Approval ¶ 4, in No. 06 Div. 643, Dkt. No. 284 (Mar. 2, 2011).  Kirschner cannot now simply disclaim this testimony, which precludes any finding that RCM was "hopelessly insolvent."

---

[6]  This Court has never held that the run on the bank was inevitable. *See* Opp. 12 n.8.  The rulings under Rule 12(b)(6) reflect only the ***allegations*** on this point by Kirschner and the other plaintiffs.  In discovery, Kirschner has admitted that the opposite is true.  *See*  ¶¶ 50, 53.

Nor could a jury find that RCM's management did not really believe that Refco could survive and repay the customers' deposits. Steven Dispenza—RCM's former Chief Operating Officer—testified that at all relevant times, he "fully expected and believed all [RCM] customer deposits could be returned to them on demand." ¶ 44. The Trustee cannot distance himself from this testimony; Dispenza was testifying on Kirschner's behalf as his designee under Rule 30(b)(6) about the FX customers' relationship with RCM. *See* ¶ 41. Kirschner does not dispute that Dispenza gave this testimony; instead, he suggests that Dispenza's belief does not represent the belief of RCM, because Dispenza did not know about the Refco fraud. Opp. 16; Resp. to ¶ 44-45. But when a party designates a witness under Rule 30(b)(6), it agrees to be bound by that witness's testimony as a matter of law. Having designated Dispenza to testify on this critical topic, Kirschner cannot avoid summary judgment by trying to discredit that testimony. *Marriott v. Cnty. of Montgomery*, 426 F. Supp. 2d 1, 8 n.8 (N.D.N.Y. 2006). And in any case, Kirschner cannot seriously deny that Dispenza had access to all relevant information—far more access, in fact, than Grant Thornton ever had.[7]

Unable to prove that RCM meets the test in the old banking cases, Kirschner proclaims RCM a "Ponzi scheme," as if that characterization were enough by itself to support a claim. It is not; the concept of a "Ponzi scheme" has nothing do to with this case. Kirschner defines that term based on *Black's Law Dictionary*, but he omits the critical language, emphasized here:

> ***A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments***. Money from the new investors is used

---

[7] Two other insiders who indisputably knew every detail of the Refco fraud—Robert Trosten and the late Santo Maggio—testified that the fraud was designed to "buy time" so Refco could attract new investment, so that it could pay off the RGHI receivable, eliminate the fraud, and continue as a going concern. ¶¶ 47-48 & Reply to Resp. Maggio believed that once the RGHI receivable was paid down, "there would be enough liquidity in the company to pay off . . . all the [RCM] customers." ¶ 47. Kirschner does not deny that Maggio gave this testimony.

7

> directly to repay or pay interest to earlier investors, ***usu. without any operation or revenue-producing activity other than the continual raising of new funds***. . . .

*Black's Law Dictionary* 1198 (8th ed. 2004); *compare* Opp. 15.[8]  As the omitted language shows, a Ponzi scheme is characterized by "artificially high . . . returns" and usually lacks any real business "operation."  *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1350 n.2 (11th Cir. 2003) (Charles Ponzi's fraud was to promise high returns when he "never invested the funds at all").[9]

Kirschner cannot possibly contend that RCM had those critical characteristics.  In fact, he has admitted that it did not.  His Rule 56.1 submission concedes that "[t]here was nothing unique about the foreign exchange services or trading that RCM provided to its FX customers that another broker-dealer could not have offered."  Counter-Statement ¶ 77.  Thus, RCM did ***not*** attract its customers by paying "artificially high . . . returns" on trading.  Further, as noted above, Kirschner admits that Refco (and RCM) could have been restructured as a going concern.  This too shows that RCM was not a Ponzi scheme—a "mere 'house of cards.'"  Opp. 14-15.[10]

In the end, Kirschner's evidence boils down to the idea that RCM could not have repaid all its customers at once—or, in other words, that it could not survive a run on the bank.  Opp. 9.  But that is true of ***every*** bank and broker.  It does not prove that RCM's default was imminent at all times in the preceding 14 months, and it does not establish any duty to disclose under *Craigie*.

---

[8]  Maggio's testimony that "RCM was a Ponzi scheme" is also based on Kirschner's misleading and incomplete definition, supplied by counsel at the deposition. Reply 56.1 p. 88-89. As the rest of Maggio's rather colorful testimony makes clear, his point was that Refco was unprofitable. *Id*. He does not say—nor could he—that the industry's largest broker had no real operations.

[9]  It is simply not true that under Grant Thornton's view of the law, "an unregulated broker-dealer operating a Ponzi scheme cannot defraud the victims." Opp. 1. A Ponzi scheme commits fraud against its victims through false promises, fake operations, and "artificially high" returns. None of that was present here.

[10]  Kirschner's oblique references to "failing" are highly misleading. *E.g.*, Opp. 11. There is no evidence that RCM ever "fail[ed]" to repay any customer's assets on demand. Maggio was referring to something else—a specific timing issue in the closing of a certain trades—and he admits that this practice stopped before the period relevant here. Reply 56.1 p. 94.

**II.     Kirschner cannot prove "substantial assistance" based on either action or inaction.**

Kirschner does not cite a single case under New York law finding an auditor liable to someone other than its own client based on audit opinions that the plaintiff never saw. To the contrary, to show substantial assistance based on an audit opinion, New York law requires proof that the plaintiff relied on it, or at least that it was provided to regulators and issued to the public. GT Br. 20-21; *see* Opp. 20 (citing R&Rs). Here, there is no evidence that the customers ever saw the RCM audit opinions, nor were they ever issued to a regulator or publicly disseminated.

Kirschner cannot avoid this problem by insisting that the opinions were "scrutinized and relied on" by "others." Opp. 19. He does not identify ***anyone*** who relied for any purpose on the RCM audit opinions.[11] In fact, he admits that "'nobody reads them or cares about them.'" Counter-Statement ¶ 95. And it is not true that "RCM's financial statements were a critical part of RGL's financial statements." Resp. to ¶ 95(a); *see* Reply 56.1 p. 53. While the consolidation included portions of RCM's financial information, it properly eliminated the loans RCM made to other consolidated entities—the very heart of Kirschner's theory. *Id*.

Nor can Kirschner carry his burden by shifting between what followed from Grant Thornton's issuance of unqualified audit opinions and what would have followed if Grant Thornton had acted differently. *E.g.,* Opp. 19, 21-22 & n.16. As the Special Master has observed, "it is important to ensure that the Plaintiffs do not jump back and forth from one to another theory in defending against" a dispositive motion. R&R in *Krys v. Sugrue* at 3, 8, MDL Dkt No. 1902 (Feb. 3, 2010), *adopted* March 31, 2010. If the alleged assistance was an ***act*** (issuing an opinion), Kirschner's case fails because there is no evidence that the customers relied

---

[11] At most, Kirschner identifies emails in which Refco employees say they sent RCM financial statements to specific third parties (not including the customers here). Counter-Statement ¶ 100. But these documents are inadmissible hearsay and do not prove that the third parties received the financial statements, much less that they "scrutinized and relied" on them. *See* Reply 56.1 pp. 132-33.

on it.  If the assistance was a *failure to act* (failing to disclose negative information), Kirschner's case fails because Grant Thornton did not owe these customers a duty.  GT Br. 21-23.  His authorities are not to the contrary[12]; his two New York federal cases both turned on the fact that the aidor/abettor received ill-gotten gains directly from the fraud.  *See SEC v. Aragon Cap. Advisors*, 2011 WL 3278907, at *17-18 (S.D.N.Y. July 26, 2011) (trading profits); *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (commissions).  There is no such evidence here.

### III. Kirschner cannot avoid SLUSA by manipulating the number of customers.

Finally, Kirschner has not even attempted to address Grant Thornton's argument that this case—as it has evolved since the pleading stage—is, after all, "in connection with" the issuance of covered securities.  GT Br. 23-25.  Instead, he simply recounts the earlier ruling and insists he is now suing on behalf of only 48 customers—2 less than the statutory threshold.  Opp. 25.

This is pure manipulation.  The operative complaint asserts the claims of 67 customers (Am. Compl. ¶ 18), which by itself requires dismissal under SLUSA.  Moreover, though some claims have since been dismissed based on the timing of the deposits, that it not enough to bring the number below 50.  Kirschner's own damages chart reveals that he is pursuing the claims of *49* customers, and it inexplicably omits at least 3 more whose claims survived the motion to dismiss. Reply 56.1 pp. 118-19. More broadly, Kirschner cannot deny that "damages are sought" here on behalf of *all* Trust beneficiaries, who number well over 50.  15 U.S.C. § 78bb(f)(5)(B); *see LaSala v. Lloyds TSB Bank, PLC*, 514 F. Supp. 2d 447, 469-70 (S.D.N.Y. 2007).  In short, Kirschner has not provided any legitimate reason to deny dismissal under SLUSA.[13]

---

[12]  Tellingly, none of the cases Kirschner cites on this point (at 19, 24) applies New York law.

[13]  In a footnote, Kirschner argues that Grant Thornton's argument about the Rogers Funds is "premature."  Not so.  The bifurcation order does not purport to prevent Grant Thornton from seeking summary judgment based on a customer's inability to prove injury.  And no injury means no prejudgment interest.  McKinney's CPLR § 5001(a) (interest on "sum awarded").

| | |
|---|---|
| Dated:  April 30, 2012<br>          Chicago, Illinois | Respectfully submitted,<br><br>WINSTON & STRAWN LLP<br><br> /s/                                                      <br>By:  Linda T. Coberly |
| *Of Counsel:*<br><br>Kenneth Cunningham<br>Tracy W. Berry<br>GRANT THORNTON LLP<br>175 West Jackson, 20th Floor<br>Chicago, Illinois 60604<br>Ph: 312-856-0001<br>Fax: 312-565-3473 | Bruce R. Braun (bbraun@winston.com)<br>Catherine W. Joyce (cjoyce@winston.com)<br>Linda T. Coberly (lcoberly@winston.com)<br>WINSTON & STRAWN LLP<br>35 W. Wacker Drive<br>Chicago, Illinois 60601<br>Ph: 312-558-5600<br>Fax: 312-558-5700<br><br>Calvin K. Koo (ckoo@winston.com)<br>WINSTON & STRAWN LLP<br>200 Park Avenue<br>New York, NY 10166<br>Ph: 212-294-6700<br>Fax: 212-294-4700<br><br>*Attorneys for Grant Thornton LLP* |