C3EAREFAps

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    In re REFCO INC.
      SECURITIES LITIGATION                  07 MD 1902 (JSR)
 4
      ------------------------------x
 5
      KENNETH M. KRYS, et al.,
 6
                   Plaintiffs,
 7
                   v.                        07 CV 3594 (JSR)
 8
      DEUTSCHE BANK SECURITIES INC.,
 9    et al.,

10                 Defendants.

11    ------------------------------x

12    KENNETH M. KRYS, et al.,

13                 Plaintiffs,

14                 v.                        11 CV 1486 (JSR)

15    SCHULTE ROTH & ZABEL LLP,

16                 Defendant.

17    ------------------------------x

18                                           New York, N.Y.
                                             March 14, 2012
19                                           2:55 p.m.

20    Before:

21                    HON. RONALD HEDGES

22                                           Special Master

23

24

25
```

C3EAREFAps

1                                APPEARANCES

2    BEUS GILBERT PLLC
          Attorneys for Plaintiffs
3    BY:  DENNIS K. BLACKHURST, ESQ.
          LEE MICHAEL ANDELIN, ESQ.
4
     BROWN RUDNICK LLP
5         Attorneys for Krys Plaintiffs
     BY:  ANDREW DASH, ESQ.
6         MASON C. SIMPSON, ESQ.

7    GIBSON, DUNN & CRUTCHER LLP
          Attorneys for Defendants Kavanaugh and Owens
8    BY:  MITCHELL A. KARLAN, ESQ.
          DIANA FEINSTEIN, ESQ.
9
     CHADBOURNE & PARKE LLP
10        Attorneys for Defendant
          Schulte Roth & Zabel LLP
11   BY:  SCOTT S. BALBER, ESQ.

12   LOWENSTEIN SANDLER PC
          Attorneys for Defendant
13        Robert Aaron
     BY:  ELLIOTT Z. STEIN, ESQ.
14
     DLA PIPER LLP (US)
15        Attorneys for the DPM Defendants
     BY:  KATIE A. GUMMER, ESQ.
16
     CARTER LEDYARD & MILBURN LLP
17        Attorneys for Defendants
          Aprendi and Aaronson
18   BY:  MATTHEW D. DUNN, ESQ.

19   WINSTON & STRAWN LLP
          Attorneys for Defendants
20        Grant Thornton LLP and
          Mark Ramler
21   BY:  CATHERINE W. JOYCE, ESQ.
          LUKE A. CONNELLY, ESQ.
22
     QUINN EMANUEL URQUHART & SULLIVAN LLP
23        Attorneys for Mark Kirschner,
          Trustee of Refco Private Actions Trust
24   BY:  NICHOLAS J. CALAMARI, ESQ.

25

C3EAREFAps

1   APPEARANCES, Cont'd

2   WILMER, CUTLER, HALE & DORR, L.L.P.
         Attorneys for Banc of America Securities, LLC
3   BY:  PHILIP D. ANKER, ESQ.

4   ROBERT NOONE, ESQ.
         Attorney for Defendant Farquharson

5
    GREGORY P. JOSEPH LAW OFFICES LLC
6        Attorneys for Non-Party
         Gibson Dunn & Crutcher LLP
7   BY:  PETER R. JERDEE, ESQ.

8

9

10            (In open court)

11            THE COURT:  Good afternoon, counsel.  We're here for

12   oral argument on various matters in the Refco litigation.  For

13   the record, I had an opportunity to speak before with regard to

14   an informal application to quash a notice of deposition on

15   James Palermo.  I had an opportunity to discuss that with

16   counsel.  It's been agreed that Mr. Castranova and Mizsak will

17   be deposed in the first instance.  Or is it Mr. Aaron who is

18   going to be deposed?

19            MR. BLACKHURST:  It was a day or two, I believe.

20            THE COURT:  Which ones?

21            MS. GUMMER:  I think it makes sense to have all the

22   others first.

23            THE COURT:  That's fine.  Have all the other

24   depositions of the former DPM employees or the like taken

25   first, and then we'll come back to Mr. Palermo's deposition.

C3EAREFAps

```
 1    And I understand, counsel.  When you work out dates for at

 2    least some of these depositions, let me know.  And I'm not

 3    telling you what to do or not to do, but I'm not quite

 4    convinced that the party who is noticing the deposition has an

 5    obligation to show me affirmatively that the people being

 6    deposed know more or know something unique other than

 7    Mr. Palermo.  So if there is going to be an application for a

 8    protective order, I'll let you decide what you want to put in

 9    it, Ms. Gummer.

10         MS. GUMMER:  OK.

11         THE COURT:  Counsel, you're going to work out a

12    stipulation and file it with the Court.  I don't need to sign

13    it.  All right?

14         MS. GUMMER:  Thank you, Judge.  Yes.

15         THE COURT:  All right.  Let's talk about the

16    deposition of Mr. Karlan and what's going to be seen or not

17    seen in that.  So can I have your appearances, please.

18         MR. BALBER:  Sure, your Honor.  Scott Balber from

19    Chadbourne & Parke on behalf of Schulte Roth & Zabel.

20         MR. KARLAN:  Good afternoon, your Honor.  Mitch Karlan

21    from Gibson Dunn & Crutcher.  With me here is my colleague

22    Diana Feinstein.  We are counsel for defendants Kavanaugh and

23    Owens.  And also in the courtroom is counsel for Gibson Dunn &

24    Crutcher, Peter Jerdee.

25         THE COURT:  I'm sorry, your last name?
```

C3EAREFAps

1          MR. JERDEE:  Jerdee, your Honor.

2          THE COURT:  Jerdee?

3          MR. JERDEE:  J-e-r-d-e-e.

4          THE COURT:  I suggest to counsel that before we begin,

5     it might be appropriate to defer any ruling with regard to the

6     scope of Mr. Karlan's testimony until we're into the deposition

7     and see what happens.  But I understand, from what your comment

8     was, you think you need some things before.

9          MR. BALBER:  Well, the focal point of our application,

10     your Honor, was documents, which have already been produced by

11     Owens and Kavanaugh to the plaintiffs and are the subject of a

12     December 2010 protective order issued by your Honor.  So we're

13     here about the documents.  And Mr. Karlan's deposition, while

14     relevant to the issue, is only secondary, because the documents

15     are going to dictate what we need to do or don't need to do.

16          THE COURT:  Well, Mr. Karlan does raise an argument

17     that this is an old order.  There have been several intervening

18     conferences.  You have been put on notice at least since you

19     were representing a party in this case that if discovery

20     matters are not brought to my attention at a conference they

21     were deemed waived.  And we're certainly beyond that point.  So

22     why should I even entertain this application?

23          MR. BALBER:  Well, your Honor, the order was entered

24     in December 2010.  Schulte was sued in March 2011.  It appeared

25     shortly thereafter.  And the protective order on its face

C3EAREFAps

```
 1    doesn't speak to what the documents were, what they relate to,
 2    what the subject matter might be.  The issue only became ripe
 3    for us to raise once we served a request on plaintiffs.
 4    Plaintiffs refused to turn over the documents, pointing to the
 5    protective order.  What Gibson is suggesting is that once we
 6    got named in the case and appeared, we had an obligation to
 7    review all existing orders and come to your Honor and say,
 8    Judge, we don't like this one and this one and this one, can
 9    you please reconsider them.  And while I don't want to purport
10    to read your mind, I think you would have said, Mr. Balber, why
11    don't you come back to me when you have a dispute that's ripe
12    for adjudication.  Here, the dispute became ripe for
13    adjudication only six weeks ago or so, when we sought the
14    documents and were told they were covered by this protective
15    order.
16         Even looking at Gibson Dunn's privilege log, rendered
17    on behalf of Kavanaugh and Owens, it's not on its face clear
18    which of those 500 pages of documents relate to the 500 or so
19    underlying documents that are at issue under this protective
20    order.
21         THE COURT:  Well, let me ask you a question.
22         MR. BALBER:  Sure.
23         THE COURT:  How many of the documents that were shared
24    are you interested in looking at?  All of them?
25         MR. BALBER:  Ah, the answer is, I don't know.  We
```

C3EAREFAps

1    served a request seeking what I believe to be a narrow category

2    of documents, your Honor.  Let me explain what it is.  One of

3    the primary allegations against Schulte by plaintiffs in this

4    case is that we committed malpractice by not providing

5    sufficient or any advice on bankruptcy preference issues in

6    connection with the PlusFunds decision to honor or not honor

7    redemptions.  Now, part of our defense among others is that at

8    the same time, they purport to have been seeking and waiting

9    for advice from us.  They were getting advice, actually getting

10   advice, by the law firms, including Gibson Dunn.  This all

11   happened in the second half of October 2005, and then whatever

12   additional documents may have been created the next couple of

13   months.

14           So all we're asking for, Judge, are the documents

15   relating to advice being rendered on these bankruptcy

16   preference redemption issues in basically a two- or three-month

17   time frame.

18           THE COURT:  By other law firms.

19           MR. BALBER:  In this case by Gibson Dunn.  We know

20   Walkers was rendering the same advice.  Seward & Kissel was

21   rendering the same advice.  We believe Sidley Austin was

22   rendering the same advice.  But Gibson was at the forefront of

23   it and Gibson has been identified by witnesses as PlusFunds'

24   bankruptcy counsel.

25           THE COURT:  All right.  Serve a document request, a

C3EAREFAps

```
1   specific request for documents during this period solely

2   relating to any type of legal advice being communicated.  Or

3   have you done that already?

4              MR. BALBER:  We have.  We have served that on

5   plaintiffs.  And what plaintiffs have done, your Honor --

6              THE COURT:  No, I don't want you to serve it on

7   plaintiffs.  I want you to serve it on Gibson Dunn.

8              MR. BALBER:  I'm happy to, your Honor, except the

9   documents have already been produced.  They are in the

10  possession of plaintiffs.  So my point is -- and I'll do

11  whatever you want you to, of course, your Honor -- they are in

12  the possession of plaintiffs.  Plaintiffs have an obligation to

13  produce them to us.  They are willing to produce them to us.

14  The only impediment is that Gibson is asserting on behalf of

15  Owens and Kavanaugh protections of this protective order.

16             THE COURT:  I understand the argument.

17             I don't see any reason why counsel can't see it.  I

18  appreciate the argument with regard to the protective order.

19  I'm not satisfied, though, that there has been any waiver of

20  rights to make an application for an information that really

21  arose within a short period of time.  I'll extend the order to

22  allow information to be made available to you.  Counsel sign

23  off on anything else you need to sign off on.  You're entitled

24  to get the information three days before the deposition

25  commences.
```

C3EAREFAps

1                When is the dep going to be taken?

2                MR. KARLAN:  Your Honor, we're going to have to ask

3     for a stay.  The issue here is the privilege of Mr. Kavanaugh

4     and Mr. Owens, and we're going to have to appeal this, your

5     Honor.  I'm sorry.

6                THE COURT:  What privilege?

7                MR. KARLAN:  Their attorney-client privilege, your

8     Honor, which you recognized and which Judge Rakoff recognized

9     in the same December 10th order.  The reason your Honor entered

10    the December 10th order, Judge, that there are documents -- the

11    documents in question, 627 documents, were written at a time

12    when Kavanaugh, Owens, Sugrue, and PlusFunds were co-clients of

13    Gibson Dunn & Crutcher.  Each of them has a right to have their

14    privileges protected.  The documents had to be produced by us

15    to the plaintiffs, as you recognized in your December 2010

16    order, because they are the successor in interest to one of our

17    former clients.  But as your Honor also recognized in the

18    order, no one else has any right to see those unless and until

19    all of the other clients waive their privileges, none of which

20    has happened.  So, respectfully, Judge, there's absolutely no

21    basis in law for your Honor to enter such an order even --

22                THE COURT:  No, there's no basis in law for me to do

23    it, but if they've got a defense and they want to see some of

24    the things, how are they going to be able to --

25                MR. KARLAN:  If I can just, Judge -- this is dicta for

C3EAREFAps

1   me at this point, right?

2          THE COURT:  Yes.  How are they going to be able to

3   prove their case?

4          MR. KARLAN:  It's not my concern, Judge.

5          THE COURT:  I know, but it's mine.

6          MR. KARLAN:  Privilege is.  Privileges exist to

7   prevent and frustrate litigants from getting information.  The

8   question your Honor is asking, if answered in its fullest,

9   means there are no more privileges.  By definition, valid

10  privileges prevent litigants from having access to information

11  that would otherwise be fun and interesting to have.

12         THE COURT:  Unless under Rule 502(d) I enter a quick

13  peep order and you produce it without there being a waiver of

14  any privilege.  Isn't that right?

15         MR. KARLAN:  No, Judge.

16         THE COURT:  No?

17         MR. KARLAN:  Respectfully, it is not right.

18  Respectfully, Judge, there is law in the Second Circuit about

19  when, if ever, a protective order that has been relied upon by

20  litigants, who have produced documents on the assumption that

21  the order was valid and would protect them in the future, may

22  be vacated.

23         THE COURT:  I understand that.  I'm suggesting --

24         MR. KARLAN:  No one cited that law --

25         THE COURT:  Hold on.

C3EAREFAps

1          MR. KARLAN:  -- including your Honor.

2          THE COURT:  Mr. Kaplan --

3          MR. KARLAN:  Karlan.

4          THE COURT:  Karlan, I'm sorry.   -- let me get a word

5    in, if you don't mind.

6          MR. KARLAN:  I just wanted, your Honor, the

7    opportunity to be heard before you finished ruling.

8          THE COURT:  I have not finished ruling on anything.

9          MR. KARLAN:  It sounded like you had.

10         THE COURT:  I raised something waiting for you to go

11   off the wall, Mr. Karlan.  Am I right?  Right?

12         MR. KARLAN:  No.

13         THE COURT:  No, I'm right that you went off the wall.

14   Nicely.  Nicely.

15         How do I deal with the privilege problem?

16         MR. BALBER:  This is really easy, Judge.  This is

17   really easy.  OK.  Mr. Karlan's argument is based on a

18   fundamentally false premise.  And let me explain what it is.

19         THE COURT:  That's consistent with the ruling I made

20   back in 2010.

21         MR. BALBER:  Completely consistent, Judge.

22         THE COURT:  OK.

23         MR. BALBER:  Let me explain why.  There is -- let me

24   start this way.  There are theoretically two buckets of

25   documents as to which Mr. Karlan's clients have asserted a

C3EAREFAps

1  privilege.

2          Bucket one are documents as to which there is this,

3  quote, joint privilege between PlusFunds and Kavanaugh and

4  Owens.  There is no such privilege.  The law is really clear.

5  There can be no joint privilege between a corporation and

6  corporate officers.  Period.  No privilege.

7          Bucket two, Judge.  Bucket two is, to the extent there

8  are communications between Owens and Kavanaugh on the one hand

9  and their counsel on the other hand, which is personal,

10  private, separate advice, OK, now, I don't think Mr. Karlan has

11  met that test.  But the point is, that privilege exists.

12          Now, here's the key.  To the extent documents have

13  been produced to plaintiffs, they must fit within the first

14  category, because if they didn't fit within the first category,

15  the privilege would have been waived.  And as to the first

16  category, there is no viable privilege.

17          So if what Mr. Karlan is seeking to protect are

18  communications between his law firm and Owens and Kavanaugh

19  about personal representation issues, under the *Bevill Bresler*

20  test, he can meet that standard or not.

21          THE COURT:  *Bevill Bresler* is the Third Circuit.

22          MR. BALBER:  It is.  Your Honor should know it well.

23          THE COURT:  I do know it well.

24          MR. BALBER:  Right.  So as to that category, he can

25  either fit within the test or not.  But whatever he has

C3EAREFAps

produced to the plaintiffs, whatever is covered by the

protective order is not covered by a viable privilege.  It

doesn't exist.  The case law is consistent and clear and

there's not a single case going the other way.  And we cite all

the cases in our brief, your Honor, and I will direct you to

the *MacKenzie-Childs* case, the *In re Grand Jury Subpoena* case,

etc.

THE COURT:  What do the plaintiffs say about this?

MR. BLACKHURST:  Actually, I have two points to make.

One is to the extent -- I think the dispute here is over the

advice that Gibson Dunn gave to the funds regarding receptions.

I do not understand how Kavanaugh and Owens, as directors of

the funds, have any interest, have any personal interest, in

advice to the funds about whether to honor redemption.  It's a

PlusFunds privilege.  It's a Sphinx interest.  That's point

one.

Point two is, with respect to the December order, as I

recall -- and I haven't looked at it in preparation for this --

I believe we had that order entered as a precaution.  I think

there's language there that says we don't think that there's a

joint interest privilege and it was a catchall.  I don't think

there's a substantive rule.  That's all I was going to say.  We

have no problem producing Mr. Dauber.

THE COURT:  Mr. Karlan, what about the distinction

that counsel makes between personal communications of your

C3EAREFAps

1   individuals, with you, as opposed to communications involving

2   the corporation?

3           MR. KARLAN:  Judge, there's an evidentiary record here

4   on this motion, in the form of Mr. Kurstein's affidavit, which

5   has a number of exhibits.  The facts are these, Judge.  Gibson

6   Dunn & Crutcher was counsel to Kavanaugh, Sugrue, Owens, and

7   several others before it was counsel to PlusFunds.  It

8   represented them in their capacity as owners of PlusFunds.  The

9   cases that are cited to you in the Schulte letter, reference to

10  which was just made by Mr. Balber, deal with a completely

11  different factual circumstance.  The cases that deal with the

12  circumstance that's relevant here are cited to you in our

13  letter of February 15th, 2012.  And it's clear there is a

14  privilege here and that it cannot be overcome simply because

15  one of the co-clients has waived.

16          THE COURT:  What if I decide on another matter today

17  that employees or officers of a corporation have no expectation

18  of privacy in any communications made in a business system or

19  information left in a business system?  What then?

20          MR. KARLAN:  Of the 627 documents that are at issue on

21  this application, I can't say that each and every one of them

22  falls outside that issue, but the vast majority of them does.

23          The facts are these, Judge:  Mr. Owens and

24  Mr. Kavanaugh did not have PlusFunds' domain e-mail addresses,

25  and none of Gibson Dunn's communications to them via e-mail

C3EAREFAps

1    were to a PlusFunds server.  Mr. Sugrue did use his PlusFunds

2    domain e-mail, and I don't know how many of these e-mails went

3    to him or from him at that address.  I can tell you that not

4    all of them did.

5            THE COURT:  I appreciate the argument, gentlemen.  I

6    decline to rule on this.  You'll begin Mr. Karlan's deposition.

7    Three days before the deposition, you -- well, with the

8    deposition, you bring with you the documents.  I want a set of

9    the documents delivered to me three days before the deposition.

10   And when we get into the deposition, I'll decide what I want to

11   do.  I'm not inclined to do it now.  And you can get me a

12   stipulation that says that.

13           So pick a date for your deposition, Mr. Karlan.  When

14   is it going to be?

15           MR. KARLAN:  Whenever anyone wishes.

16           THE COURT:  Next week.

17           MR. KARLAN:  I'm available.

18           MR. BALBER:  Just mechanics, your Honor, for purpose

19   of the order.  The documents will be given to you three days

20   before.  And then what about the documents vis-a-vis the

21   deposition?

22           THE COURT:  Bring a set with you in case I decide that

23   they can be turned over.  I'll have you give it to Mr. Karlan.

24           And Mr. Karlan then can make an application to stay

25   the deposition so he can go to Judge Rakoff.

C3EAREFAps

| | |
|---|---|
| 1 |     MR. BALBER:  You mean him bring a set to give them to |
| 2 | me. |
| 3 |     THE COURT:  Yes.  I'm sorry.  I had it the wrong way. |
| 4 | Yes.  Have him bring a set to bring to you.  If I decide |
| 5 | they're going to be turned over, Mr. Karlan can make an |
| 6 | application, which I may or may not grant.  And we'll go from |
| 7 | there. |
| 8 |     MR. BALBER:  OK.  Thank you, Judge. |
| 9 |     THE COURT:  So agree on a date for the deposition. |
| 10 | Tell me when it is. |
| 11 |     MR. KARLAN:  Whenever anyone wishes. |
| 12 |     THE COURT:  OK.  A week from today.  No, today, that's |
| 13 | that -- 21st? |
| 14 |     MR. BLACKHURST:  I need to check with Mr. Beus, who |
| 15 | couldn't be here today.  He's planning on taking this |
| 16 | deposition.  We're happy to work out dates. |
| 17 |     THE COURT:  OK.  Let's get the dates worked out, but |
| 18 | have it done before the end of the month. |
| 19 |     And where is it going to be?  At your office? |
| 20 |     MR. KARLAN:  Wherever everyone wishes it to be. |
| 21 |     MR. BALBER:  One mechanical issue with that, Judge. |
| 22 | I'm just anticipating this so we don't have to bother you right |
| 23 | out of the box.  Plaintiffs have the documents, Judge.  I |
| 24 | assume, although I don't know for sure, that plaintiffs will |
| 25 | use the documents with Mr. Karlan, like from the get-go. |

C3EAREFAps

| | |
|---|---|
| 1 | THE COURT:  Why don't we wait and see what happens. |
| 2 | MR. BALBER:  Sure, Judge. |
| 3 | THE COURT:  I assume Mr. Beus is going to be leading |
| 4 | the direct. |
| 5 | MR. BLACKHURST:  Correct. |
| 6 | THE COURT:  Let's wait and see what happens.  I'm not |
| 7 | inclined to get into this until I have to. |
| 8 | MR. BALBER:  OK.  Judge, thank you. |
| 9 | THE COURT:  All right.  Work out a date.  Get me a |
| 10 | stipulation.  The stipulation should have the date.  It's going |
| 11 | to be one day, I assume, no more than seven hours. |
| 12 | MR. KARLAN:  I think folks are going to be |
| 13 | disappointed with my deposition, Judge.  I'd be surprised if it |
| 14 | went a half day. |
| 15 | THE COURT:  Oh, Mr. Karlan, I'll be so amazed.  I may |
| 16 | come over and listen just because it's going to be so much fun. |
| 17 | MR. KARLAN:  It's going to be the Sergeant Schultz of |
| 18 | depositions. |
| 19 | THE COURT:  All right.  Let's get a stipulation.  The |
| 20 | stipulation is going to provide, number one, you're going to |
| 21 | put in one date for deposition.  Presumptively it's going to be |
| 22 | seven hours, as the rules require, or state.  Also, the |
| 23 | plaintiffs will bring a set of the documents with them to the |
| 24 | deposition.  Have delivered to me three business days before a |
| 25 | set of the -- how many documents are we talking about? |

C3EAREFAps

| | |
|---|---|
| 1 | MR. KARLAN:  627, Judge. |
| 2 | THE COURT:  I don't want 627.  I thought you told me |
| 3 | there were 40-something before.  Didn't you say that? |
| 4 | MR. KARLAN:  I did not, Judge. |
| 5 | MR. BLACKHURST:  He said, yes, he said 600. |
| 6 | THE COURT:  All right.  I must have been thinking I |
| 7 | had another number there.  OK.  627, binders, all the documents |
| 8 | in them. |
| 9 | MR. BALBER:  Do you want another three days, Judge? |
| 10 | THE COURT:  No, just fine.  I'm not going to look at |
| 11 | them until it comes up at a dep.  And we'll see what Mr. Karlan |
| 12 | has to say.  Mr. Karlan has no personal recollection. |
| 13 | I think I'll come for the deposition.  Let's figure |
| 14 | out where it's going to be.  Tell me where it's going to be and |
| 15 | I'll show up.  But I still want the documents before.  And you |
| 16 | can have another set -- that set that you may turn over, leave |
| 17 | it there at the deposition.  I'll be able to use that.  I'm not |
| 18 | going to truck 600-odd documents in and out.  OK?  So work that |
| 19 | out.  Get a stip file.  I don't need to see the stip.  Talk to |
| 20 | me before or just confirm with me when I'm available for the |
| 21 | deposition.  All right? |
| 22 | MR. BALBER:  Thank you, Judge. |
| 23 | THE COURT:  OK.  We had some correspondence before |
| 24 | about the funding issue for Ms. Farquharson's deposition. |
| 25 | Let's do that.  Do we have people here for that?  Is |

C3EAREFAps

1    Ms. Farquharson's counsel here?

2            MR. KARLAN:  Your Honor, in fairness to those who are

3    not here, I think what your Honor did was schedule the omnibus

4    conference for 4 o'clock.

5            THE COURT:  Yes, and this for 3.

6            MR. KARLAN:  And this for 3.  But I think the only

7    people who were supposed to be here for 3 were the Karlan folks

8    and one other.  Everybody else was coming at 4.

9            THE COURT:  All right.  This will take a minute to get

10   rid of.  It's not going to be --

11           Actually, who's here representing one side of the

12   Farquharson issue?

13           MR. KARLAN:  I am.

14           THE COURT:  Well, when their attorney comes in, I

15   think you should have a discussion with them and ask them to

16   suggest to me where in the Federal Rules of Civil Procedure I

17   get to shift costs, unless it's under Rule 45, because the

18   deposition will be impressive and there's no record I see

19   telling me $30,000 is impressive.

20           Now, with that, I don't want any comment on it.  You

21   have a discussion with them.  Maybe we can shift the costs

22   after.  Maybe you'll share the costs.  That's another

23   possibility.  But we'll do it at 4.

24           MR. KARLAN:  I had an application to have the

25   plaintiffs share it, pursuant to a --

C3EAREFAps

```
 1              THE COURT:  Then why are you taking a position on
 2    this?
 3              MR. KARLAN:  I'm the one who asked for the documents,
 4    then.
 5              THE COURT:  That's not the issue, then.  You go talk
 6    to Ms. Farquharson's attorney about sharing costs, when her
 7    attorney shows up.
 8              MR. BLACKHURST:  I'm happy to talk to her.
 9              THE COURT:  I take it you'll know what the answer is
10    going to be very quickly.  All right.  We'll do that at 4
11    o'clock.
12              OK.  Let's do this Krys v. Aaron dispute with regard
13    to Aprendi and Aaronson.
14              Who's missing?
15              MR. DUNN:  Matthew Dunn for Mr. Aprendi and
16    Mr. Aaronson from Carter Ledyard.
17              THE COURT:  I guess they didn't know they were
18    supposed to be here at 3 o'clock.
19              MS. GUMMER:  They did.  Your Honor told them.
20
21              MR. DUNN:  Counsel for -- I'm counsel for Aprendi and
22    Aaronson.
23              THE COURT:  Good.  Come on up and let's argue it.  I
24    thought you said some other people were going to be here.  I'm
25    sorry.  I thought you just said you were waiting for some other
```

C3EAREFAps

1    people.  No?

2              MR. DUNN:  No, your Honor.

3              THE COURT:  Good.  Your appearances, please.

4              MS. GUMMER:  Katie Gummer on behalf of the Lee

5    defendants.

6              MR. DUNN:  Matthew Dunn from Carter Ledyard & Milburn

7    for non-parties Christopher Aprendi and Paul Aaronson.

8              THE COURT:  So I understand the issue is that when

9    your clients left the employment of the funds, they took some

10   things with them.  Is that right?

11             MR. DUNN:  That's right, your Honor.

12             THE COURT:  And they asserted privilege as to a number

13   of the things that they took with him.

14             MR. DUNN:  Very few, but correspondence with their own

15   individual counsel, yes, your Honor.

16             THE COURT:  And all this e-mail went through a

17   corporate system?

18             MR. DUNN:  Most of it, your Honor.

19             THE COURT:  Well, the e-mail that didn't go through a

20   corporate system is a different question.

21             MR. DUNN:  Correct.

22             THE COURT:  And that's not an issue, is it?

23             MS. GUMMER:  No, your Honor.

24             THE COURT:  OK.  Do you know what other systems these

25   communications went through?  And have you gotten all the

C3EAREFAps

1   documents?

2          MS. GUMMER:  Your Honor, we don't.

3          MR. DUNN:  I mean, I can clarify, your Honor.  If you

4   look at the privilege log, there are a few e-mails from 2007.

5   These people left at the end of December '05, so those are

6   obviously from a personal e-mail account.

7          THE COURT:  All right.  So we're only talking about

8   documents before the date of their termination or separation.

9          MR. DUNN:  Right.  And all the e-mails, your Honor,

10  are from either -- I think they're all December '05.  But in

11  any event, if there may be some in November '05, it was all in

12  the context of the SEC investigation and their separation from

13  PlusFunds.

14         THE COURT:  Well, you agree a waiver is a waiver,

15  right?  You can't selectively waive for one thing and then keep

16  it for another, correct?  That's not an issue, though.

17         MR. DUNN:  Correct.  The issue is that, you know, our

18  client's position is that they didn't waive.

19         THE COURT:  Well, let me ask you a question.  We have

20  an e-mail from general counsel or someone else in the

21  corporation, I believe in March of 2005, saying, anything that

22  goes through a corporate system you have no expectation of

23  privacy in or the like, it belongs to the company.  We have a

24  written corporate policy, I believe, from later that year,

25  which, Ms. Gummer, led me to the question at first, this is the

C3EAREFAps

written corporate policy sometime in 2005.  What was the policy

before?  And the e-mail that I saw in March seems to

demonstrate that there was a corporate policy that preexisted

the written one.  Is that right?

        MS. GUMMER:  I think that's right, your Honor.

        MR. DUNN:  We don't dispute the existence of the

policy, your Honor.  The question is whether the existence of

such a policy results in a waiver of privilege automatically as

a bright line rule.  And it certainly does not.  The cases are

very fact-specific.  Even the case that Ms. Gummer sent to you

today says --

        THE COURT:  The one I didn't read?

        MR. DUNN:  It says right in it that it's a

fact-specific inquiry --

        THE COURT:  I agree with you.

        MR. DUNN:  -- that it depends on the circumstances.

And there are cases, including the case I cited when she

e-mailed you last week, *Curto*, in which, you know, perhaps not

exactly on point, but in the face of such a policy, e-mails

sent over the company system were held not to result in a

waiver and the privilege was respected.

        THE COURT:  Why was that?  Why wasn't it a waiver?

        MR. DUNN:  There are factors that are examined under

the *Asia Global Crossing* case, one of which is whether the

company actually enforces and monitors -- your Honor, I'm just

C3EAREFAps

1    telling you what the Court said.

2           THE COURT:  No, I understand.  But I have --

3           MR. DUNN:  Whether you agree or disagree.

4           THE COURT:  Excuse me.  I have a problem with the

5    concept that if a corporation says information is its property

6    and it reserves the right to monitor, whether it monitors or

7    not seems to be irrelevant.  Don't you think?  Or do you want

8    Ms. Gummer to depose your clients exactly on what their

9    understanding was on all these things?  I think I have enough

10   facts on this record to make it pretty clear that there was no

11   privilege.

12          MR. DUNN:  Your Honor, can I just add a few -- getting

13   to these circumstances and the facts that need to be looked at

14   in this situation, this is a situation where the company is in

15   crisis mode, for one.  There is an SEC investigation.  There's

16   a lot of lack of information at this point and the desire to

17   obtain the big picture regarding the Refco collapse, the

18   implications, the preference claim, etc.

19          In late October '05, after Refco collapsed, the

20   PlusFunds' board signs off on a resolution fully indemnifying

21   the officers and agreeing to pay their legal fees.  Now, right

22   there, from then on, there's an expectation that these

23   individuals are retaining outside counsel, that they need

24   individual counsel.

25          THE COURT:  I don't disagree with you, counsel.  The

C3EAREFAps

1    question is how they communicate with those counsel.  Why

2    didn't they just start using some other communications means,

3    instead of using the corporate system?

4              MR. DUNN:  I mean, your Honor, I mean, I wasn't there,

5    I don't know the answer to that.  All I can say is time

6    constraints.  The pace at which things were happening was

7    pretty extreme.

8              THE COURT:  Well, I understand the pace at which

9    things were happening was extreme.  But the question is what's

10   in their mind or what should be in their mind, and it seems to

11   me, in June at the latest of 2005 and even earlier than that,

12   there is a policy within the corporation that says if you use a

13   corporate system, you have no expectation of privacy, which

14   means you can't have a privilege.  And I understand it's a very

15   fact-intensive inquiry.  But the only fact that seems to go

16   your way possibly is your surmise that there was never any kind

17   of monitoring.  And I don't know that from the record, such as

18   there is, do I?

19             MR. DUNN:  Right.  I mean, that's one fact and that's

20   what we've been told.

21             THE COURT:  You're assuming --

22             MR. DUNN:  I don't have any evidence of monitoring,

23   let's put it that way.

24             THE COURT:  You're assuming I should apply the

25   standards of the *Asia* case.

C3EAREFAps

1              MR. DUNN:  Well, I'm assuming, first of all, that --

2       our clients are non-parties, to begin with.  And they have

3       cooperated through this whole process.  Mr. Aaronson produced

4       his privilege log in November 2010.  A year and a half later,

5       this issue is raised.

6              THE COURT:  Why isn't this waived, Ms. Gummer?  You

7       had an opportunity to bring this to my attention long before

8       now, then.

9              MS. GUMMER:  Your Honor, for him to say that they

10      cooperated is a bit of an exaggerated, given the number of

11      times people appeared before your Honor to obtain their

12      cooperation.

13              THE COURT:  I understand.

14              MS. GUMMER:  And my recollection is they represented

15      that there was no such corporate policy.  We learned that there

16      was a written corporate document and we saw the e-mail from the

17      general counsel saying there was a written corporate policy and

18      reminding all of the employees of the corporate policy, to

19      which Mr. Aprendi responded, nicely worded, within the last

20      month, based on a submission from defendant's counsel.

21              THE COURT:  Do you both agree that ABA formal opinions

22      are things that a court should look at, under New York law, to

23      decide the existence of a privilege or a lawyer's duties?

24              MR. DUNN:  Perhaps it's persuasive authority, not

25      binding authority, your Honor.

C3EAREFAps

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | THE COURT:  Have you read opinions 11459 and 11460                 |
| 2  | that came out last August?  Both of which suggest that             |
| 3  | attorneys should realize that if they communicate with their       |
| 4  | clients over corporate systems, there may be problems with         |
| 5  | confidentiality, and that a corporate attorney has no              |
| 6  | obligation to advise someone representing an individual that        |
| 7  | that attorney has seen e-mails going to that attorney over a        |
| 8  | corporate e-mail system, subject to other law, which is the New     |
| 9  | Jersey *Stengard* opinion.  And that came out because there was      |
| 10 | an ambiguity in the policy.  There's no ambiguity in this           |
| 11 | policy, is there?                                                   |
| 12 | MR. DUNN:  Well, each policy is different, which is                |
| 13 | why it's a fact-intensive investigation.                           |
| 14 | THE COURT:  I don't disagree with you.                            |
| 15 | MR. DUNN:  For example --                                          |
| 16 | THE COURT:  Excuse me.  I don't disagree with you.                |
| 17 | Every policy is different.  I have the policy in front of me.      |
| 18 | The only thing you're pointing to is the possibility that          |
| 19 | monitoring is something I should take into account.  There is       |
| 20 | one decision that suggests monitoring is a factor.  There are       |
| 21 | other decisions around the country that suggest the opposite,       |
| 22 | that there is no waiver of your rights by not monitoring            |
| 23 | something when you've got a right to monitor it.                   |
| 24 | I'll tell you what.  Take your depositions.  You have             |
| 25 | an hour each for each of them.  Inquire into what their             |

C3EAREFAps

1   understandings were.

2          MR. DUNN:  Your Honor --

3          THE COURT:  Either that or I rule today, counsel.

4   What do you want me to do?

5          MR. DUNN:  Your Honor, all our clients are already

6   having their depositions taken.

7          THE COURT:  So what?

8          MR. DUNN:  And they have agreed to two-day

9   depositions, so...

10         THE COURT:  That's got nothing to do with this.  I'm

11  giving you a chance to have them deposed, to build that record

12  if you want to.  Either that or bring them here, produce them,

13  and they can be examined under oath here.  What do want?  Your

14  choice, you know.  Deposition or I rule.

15         MR. DUNN:  Your Honor, as non-parties, it strikes us

16  that Ms. Gummer should have to bring a motion to compel here.

17         THE COURT:  Oh.  You want her to do that?

18         MR. DUNN:  Yes, your Honor.

19         MS. GUMMER:  I thought we did that.  I thought that's

20  why we're here.

21         THE COURT:  We did it because I said you didn't have

22  to do it formally.  But since counsel is complaining there's

23  not a formal motion, let's do a motion.  If I rule in your

24  favor, I may consider the imposition of costs under 1927

25  against counsel --

C3EAREFAps

| | |
|---|---|
| 1 | MS. GUMMER:  Thank you, your Honor. |
| 2 | THE COURT:  -- for making that necessary.  Counsel, |
| 3 | you're free to do what you want.  You know what the record is. |
| 4 | MR. DUNN:  Your Honor -- |
| 5 | THE COURT:  Excuse me, excuse me.  I've had enough. |
| 6 | You want to make a record, I'm giving you an opportunity to |
| 7 | make a record.  You're telling me that they didn't know what |
| 8 | the policy is or the policy is a multifactor.  You can tell me |
| 9 | the policy is ambiguous.  But I read it.  It's not.  And now |
| 10 | you're telling me and you've told me in your submission that |
| 11 | maybe there has to be monitoring.  I don't think I agree with |
| 12 | you, but I'll give you a chance to make a fuller record. |
| 13 | MR. DUNN:  Your Honor, and I'm not saying that they |
| 14 | didn't, you know, know about the policy or they have had their |
| 15 | head in the sand.  That's not what I'm saying, your Honor. |
| 16 | THE COURT:  Well then, tell me what you're saying. |
| 17 | MR. DUNN:  I just feel like this matter, there should |
| 18 | be a fuller record, even a fuller briefing. |
| 19 | THE COURT:  Fine. |
| 20 | MR. DUNN:  Perhaps a few pages from each party due by |
| 21 | a certain date. |
| 22 | THE COURT:  Counsel, I'm giving you an opportunity. |
| 23 | Make Ms. Gummer make her motion.  I've told you what the |
| 24 | consequence of it may be. |
| 25 | OK.  When do you want to file it? |

C3EAREFAps

1              MS. GUMMER:  A week from --

2              THE COURT:  A week from today?

3              MS. GUMMER:  Yes, your Honor.

4              THE COURT:  A week from today, file a motion.  Two

5       weeks from today, opposition comes in.  I'll give you a date

6       for argument, Ms. Gummer.  Write up a stipulation that says

7       that.  Once I see all the papers, I'll give you a date to

8       argue.

9              MR. DUNN:  And if between now and Friday we determine

10      that -- what's our alternative, your Honor?

11             THE COURT:  Work something out with her.  Or I'll just

12      order them to be produced without a formal motion, counsel.

13      There's no ambiguity in this policy.  The only thing you have

14      going for you in this argument, as far as I can see, is that

15      there's no monitoring, the cases are split around the country

16      as to whether there's a need for monitoring.  There are

17      decisions from the ABA that you tell me are persuasive if

18      nothing else that undermine your argument, frankly, on the face

19      of a nonambiguous policy.  I don't see an ambiguity in the

20      policy.  There is one sentence in here that I could see, if you

21      strain, might create an ambiguity.  And I'll let you guys

22      decide to write about that when you write a brief.

23             OK.  That's what I want done.  Thank you.

24             MS. GUMMER:  Thank you, Judge.

25             THE COURT:  All right.  Anybody else ready for any

C3EAREFAps

1    argument on anything?

2              I suggest you work this out.

3              We're off the record.

4              (Discussion held off the record)

5              THE COURT:  Your appearance, first, please.

6              MR. NOONE:  Robert Noone for attorney defendant

7    Patrina Farquharson.

8              THE COURT:  I understand you want some costs shared.

9              By the way, I will tell you, you would be in a lot

10   stronger position if you were representing a non-party other

11   than a party.  So let's leave that aside.  Because the language

12   in Rule 45 doesn't appear in any other rules.  Right?

13             MR. NOONE:  For what it's worth, the notice was issued

14   originally in a case that Ms. Farquharson was not a party to.

15   But it was also issued in a case where she is a party.  So I

16   think that distinction is not going to get very far here.

17             THE COURT:  No.

18             MR. NOONE:  The issue here, Judge, is that

19   Ms. Farquharson has produced her documents on a number of

20   occasions.  She produced them to the joint liquidators at the

21   time that they took over.  She has given documents to -- wound

22   up in the possession of Mr. Ginsberg during the course of the

23   events that led us here today.  And all of those documents have

24   been turned over to everyone.  In addition, most recently, she

25   produced all the hard-copy documents she had in her possession.

C3EAREFAps

1          THE COURT:  But this is about the cost of producing

2     electronically stored information that's going to cost about

3     $30,000 to do, correct?

4          MR. NOONE:  Correct.

5          THE COURT:  Has that information been produced before

6     to anybody?

7          MR. NOONE:  We are not able to, with certainty, say

8     that there is no piece of electronic information that she

9     hadn't previously printed out and produced.  We cannot make

10    that representation.  But nor can the people seeking the

11    information provide a basis to infer that something was not

12    previously produced.  We're both in the situation -- well, I

13    haven't heard any suggestion as to why there's a suspicion --

14         THE COURT:  Who has the burden of proof to make what

15    is the equivalent of a protective order?  You.  So you have to

16    be able to demonstrate -- and I understand the quandary.  You

17    have to be able to demonstrate that all the ESI that your

18    client is going to be asked to get now has already been

19    produced, I assume in electronic form, or is it in paper?  And

20    that's another question, because you can do more things with

21    electronic information, assuming it's searchable, than you can

22    with a piece of paper.

23         MR. NOONE:  To be sure.  And all paper production up

24    to now.  And the issue, from my perspective, the issue here is,

25    we've got a former director who's being asked to lay out an

C3EAREFAps

expense equivalent to 40 percent of her annual salary in a case

involving hundreds of millions of dollars, in a case involving

liquidators who only recently announced that they would not

advance this cost to their former director, who they have also

described as innocent.  And we've got parties --

THE COURT:  Who said that?

MR. NOONE:  Mr. Beus.

THE COURT:  Is that right, she's innocent?

MR. BLACKHURST:  We believe she's innocent.

THE COURT:  "We believe."  Does anyone believe she's

not?

There are the hands up.  OK.  Never mind.

Why don't you advance these cost?

MR. BLACKHURST:  Our position is that we're not the

requesting party.  We believe she is producing it.  It's not

our obligation to pay for it.  To the extent someone should

bear the cost, it's the party that requested the production.

THE COURT:  Can you tell me where in the Federal Rules

of Civil Procedure I can do that?

MR. BLACKHURST:  We're in a better position if she is

a non-party, which is what you said a few minutes ago.

THE COURT:  That's exactly right, because I don't have

the language in Rule 26 that I have in another rule.  And the

only rule you could rely on, counsel, frankly, would be

26(d)(2)(C), which is the proportionality rule.  And there's a

C3EAREFAps

1    debate there whether that rule authorizes cost-shifting or

2    whether it simply allows restrictions on discovery.

3              Where does she live?

4              MR. NOONE:  In the Bahamas.

5              THE COURT:  And what's the value of her property?

6              MR. NOONE:  That I cannot tell you at this time.

7              THE COURT:  Don't you think I need to know more than,

8    this would cost her X percent of her salary?  If she's sitting

9    on properties worth several million dollars or whatever -- and

10   I don't know whether she is or she didn't -- my sympathies go

11   downhill faster.

12             Who noticed her deposition?

13             Ah, Mr. Karlan.  Your name pops up everywhere here

14   today.

15             MR. KARLAN:  Bad penny, Judge.

16             THE COURT:  You don't want to -- you did too?

17             MS. GUMMER:  Well, we served the subpoena for -- we

18   served another as well.

19             THE COURT:  Well, I don't think that's relevant

20   anymore because we have a party deposition being taken now.

21   Correct?  Mr. Karlan, I assume, doesn't want to share the cost,

22   right, Mr. Karlan?

23             MR. KARLAN:  That's correct.

24             THE COURT:  Why not?  Your clients live in some nice

25   place, don't they?  Where do they live?

C3EAREFAps

1          MR. KARLAN:  Dublin.  Dublin, the new third world.

2          THE COURT:  I don't know about Dublin being a third

3     world.  Maybe Greece.  But I don't know if it's got that far

4     yet.  But in any event...

5          MR. KARLAN:  Judge, just to fill out the fact record

6     here, the plaintiffs --

7          THE COURT:  That's the problem we're having with

8     everything, Mr. Karlan.  People are supposing things and they

9     don't know it for a fact.

10         MR. KARLAN:  No, just, you asked a question and I

11    don't think you got a complete answer.

12         THE COURT:  OK.

13         MR. KARLAN:  You asked, I think, whether there was

14    reason to believe that she has an electronic database to

15    produce.  I wanted to remind you that there was a message

16    issued during her repeated Ginsberg conferences that

17    Mr. Ginsberg had received from his former client,

18    Ms. Farquharson, many of her e-mails, but that he had never

19    received the attachments.  And they have also not been produced

20    by the plaintiffs.

21         THE COURT:  Does your client have all the e-mail with

22    attachments to it?

23         MR. NOONE:  We don't know yet, your Honor, because we

24    haven't incurred the expense of loading up the electronic data

25    and starting the searching process.

C3EAREFAps

1          THE COURT:  You don't have an index?

2          MR. NOONE:  No.

3          THE COURT:  Your client can bear the expense, at least

4    in the first instance, of loading this information so we can

5    see what it is.  If it turns out that all the attachments are

6    stripped, I doubt I'll make you produce it.  But we've got to

7    at least know what's there.  If Mr. Ginsberg is representing

8    that the e-mails have no attachments, I don't know what the

9    attachments are.  I'm willing to entertain cost-shifting if I

10   get an affidavit from you, or someone, telling me what it's

11   going to cost to go through with all this, number one, and,

12   number two, what your client's entire assets are.

13          So I'm willing to talk about cost-shifting or

14   cost-sharing.  I think Rule 26(b)(2)(C) authorizes it, although

15   that other judge does not agree with me, but, you know, he's in

16   Washington and I'm sitting here.

17          MR. KARLAN:  Judge, when the affidavit on her assets

18   comes in, one of her assets, perhaps her most valuable asset

19   given her situation in this lawsuit, is the rights to

20   indemnification she enjoys vis-a-vis the plaintiffs.  That's

21   the nature of Mr. Macinnis's application.

22          THE COURT:  Where does that get me?

23          MR. KARLAN:  To an order directing the plaintiffs to

24   bear this cost, since they should have produced these documents

25   six years ago when this case commenced, and ought to have

C3EAREFAps

1    sanctions imposed upon them for not having done so.

2              THE COURT:  OK.  Sure.  Say something.

3              MR. BLACKHURST:  Can I respond to that?

4              THE COURT:  Why not.

5              MR. BLACKHURST:  We produced everything we've got.

6              THE COURT:  Well, I suppose the question is, if you

7    produced everything you have and Ms. Farquharson was a

8    director, why didn't, six or seven years ago, you go to her and

9    say, where is all the information that I have to have?

10             MR. BLACKHURST:  We went through much of the same

11   rigmarole that you did with Mr. Ginsberg as her counsel.  We

12   got everything we could get out of him.  We got to the point

13   where we don't think that we could get anything more out of

14   him.  And that was the end of the road.  We produced everything

15   we got.

16             THE COURT:  Enough.  Your client is to at least get

17   this information into an index so we know what's on it.

18             MR. NOONE:  In addition, you mentioned specifically

19   the issue about e-mail attachments.  Is there anything else we

20   should focus specifically on?

21             THE COURT:  Well, no, when it's indexed we should be

22   able to know what the attachments are.  But tell her to make

23   sure she talks with a consultant, whatever is done, so we're

24   able to know whether we've got just naked e-mail, hate to say

25   it, or e-mail with attachments.  And I don't want to hear about

C3EAREFAps

this until you've had a discussion with Mr. Karlan, who I take

it is going to be leading the deposition of her, to see if you

can agree on what she's got and what you're going to produce.

And I'm willing to discuss costs after.  But certainly,

Mr. Karlan, I appreciate the invitation for sanctions.  I don't

see a basis for that under Rule 37 or inherent authority or

statute.  So if you want to pursue that, if some of you want to

pursue sanctions some day, be so kind as to cite the source

you're relying on, which is either 28 U.S.C. 1927, probably, or

Rule 37 of the federal rules, and then you have to show an

order under 37(a) before you ask for sanctions under 37(b).

And then you can also come back to the court's inherent power.

OK?

          Have a discussion with Mr. Karlan.  I don't want to

see her incur more costs than she needs to.  You are the lead

person on this, Mr. Karlan.  So you have conversations with

counsel about how we deal with this.  OK?

          MR. KARLAN:  Yes, sir.

          THE COURT:  And if someone else wants something more,

they can pay for it.  I can do that now.  OK?  So people should

make sure they talk to you if they're interested in something.

I don't want to hear an agreement has been reached and someone

jumps in and says, I want more.  So keep people advised about

what's going on.  All right?

          MR. KARLAN:  Yes, sir.

C3EAREFAps

1          THE COURT:  All right.  Now, before we had a reporter

2  here, we were having a brief conversation about where we are in

3  the case.  I understand that there are three reports and

4  recommendations that remain before Professor Capra.  One of

5  them was argued last June or May?

6          MR. BALBER:  Last June, your Honor.

7          THE COURT:  One was argued last June.  There were two

8  other motions returnable before him or argued before him on

9  March 29.  Correct?

10          MR. BLACKHURST:  Correct.

11          THE COURT:  We have one summary judgment motion that's

12  been made on behalf of who?

13          MS. JOYCE:  On behalf of Grant Thornton, your Honor,

14  in the PAT action.

15          THE COURT:  OK.  On behalf of Grant Thornton in the

16  one action, that's been referred to Professor Capra, and I

17  assume until the opposition paper comes in, nothing is going to

18  him, correct?

19          MS. JOYCE:  Correct, your Honor.  The briefing is on

20  April 30, 2012.

21          THE COURT:  Who's your adversary on that?

22          MS. JOYCE:  Private Actions.

23          THE COURT:  I know.  Come on.  You don't have to hide

24  in back.

25          MR. CALAMARI:  I'm Nick Calamari on behalf of the

C3EAREFAps

1   Retro Five action.

2           THE COURT:  Have a seat Mr. Calamari.  Your briefs are

3   due when?

4           MR. CALAMARI:  April 13, your Honor.

5           THE COURT:  And the reply?

6           MS. JOYCE:  April 30.

7           THE COURT:  So by April 30, that's going to be going

8   to Professor Capra.  Mr. Anker, would you put that in what

9   you're going to be getting for me?

10          MR. ANKER:  Yes, sir.

11          THE COURT:  All I need to say is there are three R&Rs

12  that remain before Professor Capra.  Two of them remain to be

13  argued.  One is going to be argued.  We have a motion by Grant

14  Thornton.  Then the motions are supposed to be closed by April

15  30th.  Correct?

16          MS. JOYCE:  Yes.

17          THE COURT:  I also asked off the record whether anyone

18  was contemplating motion practice.  As Mr. Anker said, there is

19  a procedure for that to be done.  If a motion is being made

20  before all discovery is done and before expert reports are

21  coming in, so if any of you want to make a motion before

22  discovery is completed, you have to write Professor Capra and

23  have whatever discussions you're going to have about that.  OK?

24          There are a number of depositions that remain to be

25  taken.  We know yours, Mr. Karlan.  We know we're going to be

C3EAREFAps

1  taking your clients.  We know Ms. Farquharson is going to be

2  deposed.  Correct?

3        OK.  Who else has to be deposed in this to get fact

4  discovery done?  And I know you've got a period of time to do

5  testimony.  I just want to get a handle on how many are being

6  done.

7        MR. ANKER:  Your Honor, Philip Anker.  The sides have

8  taken, I don't know, on the order of 25 depositions already.  I

9  think we actually have this in a letter.  The defendants have

10  noticed 32 fact depositions.  15 of them have been taken.

11  Plaintiff has noticed 23 and seven have been taken.  There's a

12  large number scheduled to be taken in the remainder of this

13  month and into April.  A number of the witnesses simply were

14  not available.

15        THE COURT:  My recollection is it was going to be done

16  by the end of April or so.  Is that right or wrong?

17        MR. ANKER:  That is not right, your Honor.  Fact

18  discovery closes in this case on July 31.  And we will be

19  noticing additional depositions.

20        But I think it fair to say -- and I think this is

21  probably an issue on which the plaintiffs and defendants are in

22  agreement -- the parties are making substantial progress and I

23  think we're working quite hard and working well with the third

24  parties to arrangement the depositions.

25        THE COURT:  Any problems with regard to location of

C3EAREFAps

1   depositions or the like, and protective orders?

2           MR. ANKER:  Your Honor, there is one issue, I think,

3   that I don't want to touch on that deals with Mr. Karlan's

4   witnesses.  But I did want to focus you on one thing in your

5   letter, and just an FYI.

6           THE COURT:  Hold on one second.  Are we going to go to

7   Ireland for your deposition?

8           MR. KARLAN:  You don't have to come.  You're invited.

9           THE COURT:  OK.  I think between all of us going there

10  and two people coming here, I think we have got to let them

11  come here.

12          MR. KARLAN:  Judge do you want to do anything about

13  that or shall I wait?

14          THE COURT:  I don't think there's much to speak about.

15          MR. KARLAN:  Will I have an opportunity to be heard,

16  Judge?

17          THE COURT:  Yes, right now.  Go ahead.  Tell me.  Why

18  should I make all these lawyers troop to England or Ireland,

19  when two bodies can come here?

20          MR. KARLAN:  May we go off the record, Judge.

21          THE COURT:  Yes.  Go ahead.

22          (Discussion held off the record)

23          THE COURT:  Mr. Anker, is there anything else we need

24  to talk about today?  I understand the one issue involving

25  Mr. Karlan's point.

C3EAREFAps

MR. ANKER:  Yes.  I was simply going to say to you,
your Honor, I don't think it's an issue we need to discuss
today, but we may be coming to you shortly with simply an
application for your assistance to obtain an order from the
local court so we can take Ms. Ann Rister's deposition.  She is
located -- we addressed this, your Honor, at page 5 of the
letter at the bottom.  Her prior counsel had -- in fact there
was extensive e-mail throughout saying she would show up in New
York.  She apparently then retained different counsel from
Mr. Ginsberg, and current's counsel's position is, we need to
go to the Bahamas, I think, to do that -- although I'm not
licensed in the Bahamas.  We may need an order of a court
there.  I think the process is your Honor issues an order
asking for aid, and we then bring that back down to the Bahamas
and get it domesticated.

THE COURT:  And when that happens, does that mean
she's deposed there or here?

MR. ANKER:  Deposed there, your Honor.  This is a
third party.

THE COURT:  Why don't you just get an order to me now.

MR. ANKER:  I think we will, your Honor.

THE COURT:  Just send it to me.

MR. ANKER:  We will do that, your Honor.

THE COURT:  Is anyone else going to be deposed in the
Bahamas, that we know of today?

C3EAREFAps

1          MR. BLACKHURST:  Not that we're aware of.

2          MR. KARLAN:  Judge, the answer is, not that we know of

3    today, but just so your Honor has all the back group, we've

4    been trying to get a deposition of Walkers, the law firm from

5    Cayman.  They have declined to cooperate in that regard.  We

6    served a Southern District deposition subpoena on a partner of

7    Walkers who was visiting our fair city.  I don't know whether

8    they intend to obey that subpoena or not.  But that issue is

9    floating around.

10          THE COURT:  Off the record.

11          (Discussion held off the record)

12          THE COURT:  I have a conference scheduled with you on

13    August 1.

14          MR. ANKER:  I believe that to be right.

15          THE COURT:  Right.  And that was when discovery

16    closes.  So we're going to keep that going the way it is.

17          The only issues I see now, other than we have to deal

18    possibly with Mr. Karlan's problems, when he is deposed.  It

19    would be interesting, Mr. Karlan.  What happens if I order you

20    to turn the documents over?  I guess you're going to have to

21    call Judge Rakoff from the deposition and ask for a stay?

22          MR. KARLAN:  And bring my toothbrush.

23          THE COURT:  Hm?

24          MR. KARLAN:  And bring my toothbrush, I guess.

25          THE COURT:  No.  I don't have contempt power.  Judge

C3EAREFAps

1    Rakoff does.  But we'll lave that for you to deal with some day

2    if you need to.

3            I used to tell people that, though.  It was a common

4    thing to say.  Go to your deposition and when you come,

5    depending on what happens, bring a toothbrush because I may

6    keep you.

7            MR. KARLAN:  Those of us who have been in matrimonial

8    cases, Judge, never go to court without a toothbrush.

9            THE COURT:  All right.  So we have the Karlan issue to

10   deal with, maybe.  We're going to possibly deal with the issue

11   of the deposition of Mr. Aaronson -- no, wrong person.

12   Ms. Gummer, who's the person at your company who you want to

13   avoid being deposed forever?

14           MS. GUMMER:  Palermo.

15           THE COURT:  Palermo.

16           MS. GUMMER:  There are probably others.  But he's

17   already been served.

18           THE COURT:  Palermo.  We may have an issue,

19   Mr. Karlan, with your clients.

20           Anyone else?

21           MR. BALBER:  We have a small issue, Judge.  Scott

22   Balber again on behalf of Schulte.  Plaintiffs owe us some

23   documents that we've been pushing back and forth on.  As

24   recently as today, they told us they're going to produce them

25   by the end of the month.  That's not the issue, Judge.  The

C3EAREFAps

issue is that Mr. Krys's continuation of his deposition is

supposed to be on Monday of next week.  We obviously need the

documents before we continue his deposition.  We have asked for

a third day once the documents are produced.  I believe

plaintiffs have suggested that his second day be adjourned till

April.  We're OK with that.  I just don't want an issue to be

not raised and therefore waived.  So I want to make sure I'm

aware of that issue.

          THE COURT:  Why don't we just carry the second day and

get the documents produced.  Is there a problem with that?

          MR. BLACKHURST:  Yes.  And we proposed, for everyone

in the room, we would propose April 10 or April 13 for Kenneth

Krys's second day.

          THE COURT:  Put it off.

          MR. BALBER:  We're fine with that, Judge.  I just

didn't want it to be --

          THE COURT:  Just send an e-mail around to everybody,

counsel.

          MR. BLACKHURST:  Yes.

          THE COURT:  Send an e-mail around to everyone with the

dates.  Or actually, you know, I'm going to let my scrivener

put that in the stip of the order -- is that the second day of

Mr. Krys's deposition?

          MR. BALBER:  That's correct, Judge.

          THE COURT:  Is what?

C3EAREFAps

1           MR. BLACKHURST:  We're proposing April 10 or April 13.

2           THE COURT:  It will be either April 10 or April 13

3    subject to further discussions between counsel.  OK?

4           All right.  Any other issues?

5           MR. BALBER:  Thanks, Judge.

6           MR. ANKER:  Your Honor --

7           THE COURT:  And I don't consider that an issue, by the

8    way.  I think it's just been resolved.

9           MR. ANKER:  Two things.  We got from Mr. Blackhurst

10   yesterday as he indicated, actually today, a response about a

11   series of documents that we requested at the Krys deposition.

12   The letter -- we've gotten, actually, production today through

13   a file.  We haven't had a chance to look at it.  I simply want

14   to flag it again.  We obviously need to look at those

15   documents.  I recognize your rules about raising or waiving,

16   and so we obviously need to look at them before we can

17   determine whether we're satisfied.

18          The only other issue I wanted to raise is the first in

19   our letter.  And that is the interrogatories.  At this point,

20   one of the things I want to try to do is narrow and get to the

21   essence of what we care about.  It seems to me that's helpful

22   to everyone.  At this point we're looking for one thing and one

23   thing only, which is for plaintiffs to tell us in a written,

24   sworn response, so it's binding, and so there's no surprises at

25   trial with surprise witnesses, here are the witnesses we claim

C3EAREFAps

1   who were PlusFunds' employees or Sphinx directors who read the

2   Refco S1 S4.

3            To put this in context, your Honor, the entirety of

4   the claim against my clients and other clients in this room,

5   other entities in this room represented by other counsel, is

6   the allegation that the plaintiffs read and relied on the

7   securities offering materials which allegedly contained false

8   statements, which allegedly we aided and abetted the falsity of

9   it.  So finding those witnesses who are going to testify, I

10  read this, I relied on it, is important.

11           THE COURT:  I don't have a problem with that,

12  Mr. Anker.

13           MR. ANKER:  That's all I'm asking.  Just identify the

14  witness so I can then depose him or her.

15           THE COURT:  The question is, do they know everyone,

16  and I assume the answer is yes.  Can you identify --

17           MR. ANKER:  Your Honor, they can certainly --

18  obviously, every interrogatory answer is answered to the best

19  knowledge of the person who responds.

20           THE COURT:  One could also take the position in that

21  that's a contention interrogatory and they need to wait.  But I

22  don't think that's --

23           MR. ANKER:  It's not.  And Rule 33 of the local rules

24  allows you to ask interrogatories to identify witnesses with

25  knowledge.  That's what we're asking.  If later they determine,

C3EAREFAps

1    if they tell me, it's persons one, two, and three, and two

2    months from now, in good faith they discover it includes person

3    four, they supplement their interrogatory response and then I

4    take the deposition of person four.

5         THE COURT:  Why don't we have the interrogatory

6    answered by the end of the month.  Any reason that can't be

7    done?

8         MR. BLACKHURST:  First of all, we think it goes beyond

9    Local Rule 33.

10        THE COURT:  What is Local Rule 33, sir?

11        MR. BLACKHURST:  It says you can request the identity

12   of witnesses, you can request the identity of documents.  We

13   have already identified all of the PlusFunds people that we

14   contend were innocent, that worked at Sphinx and PlusFunds.

15   They have noticed all these folks for deposition.

16        THE COURT:  Hey guys, the only person who gets to

17   interrupt anybody here is me.  OK.  So let's make that clear.

18        Now, does the Local Rule say that's truly all the

19   time, or can it be varied by a judicial officer?

20        Sit down, Mr. Anker.  Sit down, you're winning,

21   Mr. Anker, so far.

22        MR. BLACKHURST:  I can only assume that it can be

23   altered by --

24        THE COURT:  Me too.  We're getting near the close of

25   fact discovery.  They need to know the people they're going to

C3EAREFAps

1    be deposing.  Those individuals are central to the case, aren't

2    they?  So I think that deserves an answer.  Answer that

3    interrogatory by the last business day of the month, with the

4    understanding the rules allow that you can supplement if you

5    identify more people.

6         MR. ANKER:  Thank you, your Honor.

7         THE COURT:  Better that than have discovery close and

8    all of a sudden we find out there are other people out there

9    and I have to deal with this in July.  All right?

10        MR. BLACKHURST:  Very well, your Honor.

11        THE COURT:  If you need an extra week or two, I'm sure

12   Mr. Anker will give you an extra week or two.  Decide when you

13   go out so when Mr. Anker sends a stip in as to what happened

14   today, we have a date in there for certain, right?

15        MR. ANKER:  That's fine, your Honor.  I'm happy to do

16   that.

17        THE COURT:  OK.  So we have the three R&Rs.  We have

18   got one dispositive motion.  We don't know if there are going

19   to be any other dispositive motions now.  I've dealt with a

20   couple other discovery issues today.  I've put a few off.  And

21   with that, is everybody on track for their experts?

22        MR. BLACKHURST:  Plaintiffs have disclosed their

23   experts.  We're working toward the expert discovery date.

24        THE COURT:  After July 31.

25        MR. BLACKHURST:  Correct.  Or June 15th, I think, is

C3EAREFAps

1    the initial opinion date.

2              MR. ANKER:  Yes, Mr. Blackhurst is right.  The current

3    scheduling order provides for plaintiffs to disclose on June 15

4    and for defendants to disclose or provide their expert reports

5    on July 31, so it's a staggered production.

6              THE COURT:  All right.

7              Any other problems anyone anticipates now?

8              MR. KARLAN:  Judge, plaintiffs and we have been having

9    some conversations about some requests for admissions that we

10   have served.

11             THE COURT:  Requests for admissions are not discovery

12   requests.

13             MR. KARLAN:  I understand.  We put it in a letter to

14   you, Judge.  But with your permission we would like, I would

15   like to defer raising that with you in the hope that --

16             THE COURT:  What's the issue?  Just tell me again.

17             MR. KARLAN:  The issue is whether, in responding to

18   requests for admissions, the plaintiffs were required not

19   simply to search the knowledge of the liquidator himself but to

20   search the knowledge of the many, many agents and employees of

21   Sphinx and PlusFunds with whom they are now in a contractual

22   relationship.  They have signed settlement agreements with a

23   lot of people pursuant to which those people are supposed to

24   cooperate with them in the prosecution of these cases.  We're

25   having a disagreement about what the rule requires them to do

C3EAREFAps

1    on that issue.

2            THE COURT:  How many people have they signed

3    agreements with?

4            MR. BLACKHURST:  I believe we have, give me one second

5    to think.

6            THE COURT:  I don't need an exact number.

7            MR. BLACKHURST:  Five at the most.  I'm thinking of

8    three or four off the top of my head.

9            THE COURT:  If there are only three, four, or five, I

10   suggest you inquire of them.  If there were 40 or 50 that would

11   be a little different.

12           MR. KARLAN:  To be clear, Judge, there are four -- I

13   don't know what the number is.  Whatever the number is that

14   Mr. Blackhurst said there is are people with whom they have

15   reached settlement agreements with cooperation.  There is then

16   an additional group of people who plaintiffs have --

17           THE COURT:  Talking to.

18           MR. KARLAN:  Threatening and having tolling agreements

19   with, and by reason of the leverage of these tolling

20   agreements, they have induced such witnesses to spend four and

21   five hours with them at a time to educate them about the case.

22   And apparently plaintiff's position is that during those

23   five-hour prep sessions they were never required to go over an

24   R&R phase with them.  We're not sure it's right.

25           THE COURT:  I'm not sure it's wrong.  They're not

C3EAREFAps

1    employees anymore.  They don't have control over these -- well,

2    in theory I suppose you could say you have control over them in

3    the sense of threatening them with some bad outcome if they

4    don't cooperate with you.  If there is an agreement reduced to

5    writing that requires cooperation, I don't have a problem with

6    the plaintiff asking of those people what they need to ask --

7    respond to a letter, to a request.  I have a problem with the

8    idea that they're holding something over someone's head and

9    talking to them.  That somehow gives them control that they

10   have to go to those people since they're not current employees.

11        You can have the discussions you want, but I think

12   I've just about told you what's going to happen.  All right?

13        MR. KARLAN:  Thank you, your Honor.

14        THE COURT:  All right.  That dealt with motions.

15   We're taking care of experts.  We know we're going to see

16   everybody in August.  Anything anyone else anticipates

17   happening?

18        OK.  So off you all go to take depositions.  Tell me

19   when you go to Ireland or the Caymans or whatever.  Maybe I'll

20   have to go.  So we'll see.

21        MR. BLACKHURST:  There's one last issue.  We raised in

22   our letter, there is a question as to privilege on some

23   documents that were produced to us.  We just don't want to

24   wait.  And we're working, we've talked to them about it.  We'll

25   follow up with them.

C3EAREFAps

1          THE COURT:  When do you think we're going to get some

2     resolution of all these questions?

3          Ms. Gummer is going to be making her motion, right,

4     next week?  Assuming you can't work something out.

5          MS. GUMMER:  Yes, your Honor.

6          THE COURT:  Which, again, I'll suggest should be

7     worked out.  And Mr. Karlan, I'm waiting to deal with you until

8     your deposition begins.  Right?

9          MR. KARLAN:  Yes, sir.

10          THE COURT:  Have whatever discussions you need to have

11     about these privilege issues.  But I want to get these things

12     resolved sooner rather than later.  So let's see what you come

13     up with.  OK?

14          MR. BLACKHURST:  Yes.

15          THE COURT:  All right.  Barring some issues where I

16     bring individuals in for arguments, which is in your case,

17     Ms. Gummer, I'm scheduled to see you on Wednesday, August 1st

18     at 4 p.m.  Now, is that enough time?  You're closing the

19     discovery on the 31st.  Your expert reports are going to be in.

20     Is that going to be enough time to have whatever discussions

21     you want to have about everything, to be in a stage where you

22     can either make dispositive motions and we give you schedules

23     or you get ready to try the case?  Or you want the month of

24     August to try to work everything out, considering it's August.

25     It's up to you, folks.  You're not under any deadlines from

C3EAREFAps

1   Judge Rakoff.

2           MR. BALBER:  Judge Rakoff's one deadline, your Honor,

3   is the close of both fact and expert discovery by September 30.

4   And I think the contemplation is that we will spend August and

5   September on expert discovery.  I do think, frankly, it would

6   be better to see you in September.

7           THE COURT:  I do too.

8           MR. ANKER:  Perhaps toward the end, given vacations

9   and other things in August.

10          THE COURT:  I do too.  How about September 12.  Is

11  that enough time?  Or do you need a little more time,

12  Mr. Anker?

13          MR. ANKER:  I think a little more time would be

14  helpful.  The other thing, your Honor, I don't know when the

15  Jewish holidays may be.

16          THE COURT:  Rosh Hashanah, according to my calendar,

17  is the 17th of September.  So could we do a conference on the

18  18th?  Because I've got to be at training judges the rest of

19  that week.  Is the 18th all right?

20          MR. DASH:  Your Honor, there are some Jews who observe

21  the second day of Rosh Hashanah.  That may be a problem for

22  some.

23          THE COURT:  Fine.  Let's do it the next day.

24          MR. ANKER:  May perhaps the week after?

25          THE COURT:  I'd love to, unless you're all going to

C3EAREFAps

1   come to Chicago.  Let's do it October 2.  Is that all right for

2   everybody?  That's a Tuesday.  What time shall we do it?

3   Morning or afternoon?  What's better?  Morning or afternoon?

4   October 2nd in the afternoon, 3 o'clock, to get you out by 5?

5           MR. ANKER:  That sounds great, your Honor.

6           THE COURT:  So let's put that in the stip of the order

7   you're going to do, Mr. Anker.  And what I want to talk about

8   then is schedules for dispositives, number one, confirm that

9   everything is done except expert deps.  Right?  They should be

10  done by then.

11          MR. BLACKHURST:  They should be done by then.

12          MR. ANKER:  They should be done.

13          THE COURT:  Number one, I want to confirm that all the

14  discovery is done.  Number two, schedule set for dispositive

15  motions.  What's your practice or preference with regard to

16  pretrial orders?  I don't know what Judge Rakoff's is really.

17  Would he rather have motions done first and put in pretrial or

18  pretrial orders done first?  There's a big split everywhere

19  about that.  Does anyone know what his practice is?

20          MS. JOYCE:  Your Honor, we have had trials before him

21  before.  He wants rulings and also summary judgment done prior

22  to the trial date.

23          THE COURT:  But that's different.  No, the trial date

24  is different than doing a pretrial.

25          MS. JOYCE:  He has a standing order on pretrial

C3EAREFAps

1   motions.

2          THE COURT:  Which says what?

3          MS. JOYCE:  The final pretrial order is due one week

4   before the trial is scheduled to begin.

5          THE COURT:  That solves our problem, because I can't

6   give you trial dates until I get everything else done.

7          MR. BALBER:  I'm sorry, Judge.  I just remembered I

8   have a trial starting in Milwaukee on October 1.

9          THE COURT:  Wouldn't you rather be here?

10          MR. BALBER:  I would much rather here, but

11   unfortunately I will be otherwise engaged.  If we could do a

12   conference with your Honor the week before, that would be

13   great.

14          MR. ANKER:  Your Honor, my only -- Mr. Balber, I don't

15   know how long your trial is.  My only concern about the week

16   before is, it's the last week before the close of expert

17   discovery and this case is, like every other case, I suspect

18   there will be a lot of depositions going on that week.

19          THE COURT:  Let's leave it for 3 p.m.  You know, I

20   have no idea what's going to happen between now and October.

21          MR. ANKER:  Your Honor, may I say one other thing on

22   scheduling in that regard which may be consistent with

23   Mr. Balber's request.  I wonder whether, if we're talking about

24   a schedule for dispositive motions, if it also makes sense for

25   Professor Capra to be here since those motions will, as I

C3EAREFAps

1      understand, Judge Rakoff's order here will be directed to him.

2                  THE COURT:  Oh, I agree.

3                  MR. ANKER:  I don't know what his schedule, obviously,

4      is.

5                  THE COURT:  I'll e-mail Dan and see what he says.  So

6      let's keep an eye.  If something else develops, you may have to

7      have someone come in your place.

8                  MR. BALBER:  OK, Judge.

9                  THE COURT:  All right.  So tentatively 3 p.m. on

10     October 2.  We're going to set up summary judgment motions and

11     make sure all the discovery is done.

12                 And I think it's fair to say that every defendant, no

13     matter where they are in the pecking order, is going to be

14     making a summary judgment motion.  Is that about right?

15                 MR. KARLAN:  Yes.

16                 THE COURT:  So Judge Capra has something to do for the

17     next two years, right?

18                 MR. ANKER:  I would imagine that's right, your Honor.

19                 THE COURT:  Any motions, any dispositive motions?

20                 MR. BLACKHURST:  We're considering some.

21                 THE COURT:  Well, think about it.  If you're going to

22     have them, they're going to get rolled into the schedule, so

23     you'll just be making cross motions.  You're going to move for

24     summary judgment on liability?

25                 MR. BLACKHURST:  It will probably be discrete issues.

C3EAREFAps

```
 1              THE COURT:  OK.  That's fine.

 2              Anyone contemplating now -- I know it's far ahead --

 3     any kind of in limine motions anyone may be making?  It's going

 4     to happen, guys.

 5              MR. ANKER:  If this case is like any others, I suspect

 6     the answer is there will be motions in limine.  But I think the

 7     honest answer --

 8              THE COURT:  Too early.

 9              MR. ANKER:  It's way too early for anyone to know the

10     answer to that.

11              THE COURT:  OK.  So, Mr. Anker, if you get me just a

12     stip, I don't care what you call it, send me an order.  Send me

13     an order.

14              MR. ANKER:  We will, your Honor.

15              THE COURT:  Whenever you're ready.  No rush.  And I'll

16     let Professor Capra know about the date on October 2.  And I'm

17     just going to drop him an e-mail and say as far as we know

18     there are also three R&Rs pending.  And when I hear back from

19     him, if we need to move the date around, I'll tell you, and you

20     can communicate it to everybody.  All right?

21              MR. ANKER:  Very well, your Honor.  Thank you.

22              THE COURT:  Anything else anyone need or want, other

23     than to get out of the case?

24              How much money do you want, by the way, just out of

25     curiosity, to settle this?
```

C3EAREFAps

1          MR. BLACKHURST:  We'll take a billion.

2          THE COURT:  A billion.

3          MR. BLACKHURST:  Sure.

4          THE COURT:  All right.  Well, you know, I know Judge

5     Rakoff is probably going to want to appoint someone else as a

6     mediator, and it's kind of a nonstarter even as a number, don't

7     you think?

8          MR. BLACKHURST:  It's a large number.

9          THE COURT:  I'm sorry?

10         MR. BLACKHURST:  It was a large number.

11         THE COURT:  Well, I know, but that doesn't help us,

12    whoever is going to mediate, when you start at 1 billion.

13         MR. BLACKHURST:  I honestly have no idea what the

14    client would consider for settlement.

15         THE COURT:  I think you better give some thought to

16    it, because if there are not discussions about it yet, when I

17    see you in October, there's going to be some reference probably

18    to some type of ADR.  All right.  I have to talk to Judge

19    Rakoff about that, but we'll do that.

20         OK.  Thank you, folks.

21         COUNSEL:  Thank you, your Honor.

22                              o0o

23

24

25