UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                         :
MARC S. KIRSCHNER, as Trustee of the Refco             :      07 Civ. 8165 (JSR)
Private Actions Trust,                                  :      07 MDL No. 1902 (JSR)
                                                         :
                    Plaintiff,                          :
                                                         :      REPORT AND
            -v-                                          :      RECOMMENDATION
                                                         :      OF THE SPECIAL
PHILIP R. BENNETT, SANTO C. MAGGIO,                    :      MASTER ON GRANT
ROBERT C. TROSTEN, MAYER BROWN, LLP, :               THORNTON'S MOTION FOR
MAYER BROWN INTERNATIONAL, LLP,                        :      SUMMARY JUDGMENT
And GRANT THORNTON, LLP,                               :
                                                         :
                    Defendants                          :
                                                         :
------------------------------------------------------------x

Daniel J. Capra, Special Master:


        This is a report and recommendation to Hon. Jed S. Rakoff concerning a motion brought by
the defendant Grant Thornton, LLP ("Grant Thornton") for summary judgment on the claim
remaining against it in the amended complaint ("Amended Complaint") filed by Marc S. Kirschner
as Trustee of the Refco Private Actions Trust ("Trustee").[1]

        For the reasons discussed below, Grant Thornton's motion for summary judgment should
be denied.

 **I. Background**

        The Trustee originally filed this action in New York State Supreme Court against all the
named defendants on behalf of Refco's foreign-exchange customers (the "FX customers"), asserting
claims under New York law for, *inter alia*, breach of fiduciary duty, fraud, and conversion. *See*

---

[1]        After Refco applied for bankruptcy, the United States Bankruptcy Court for the
Southern District of New York approved a Plan which provided for the establishment of a
"Private Actions Trust" ("PAT"),  to prosecute claims owned by Refco creditors or
shareholders that were independent of those held by the Refco debtors. Plaintiff Marc
Kirschner was appointed as the Trustee.

*Kirschner v. Bennett*, 2008 WL 1990669 (S.D.N.Y. May 7, 2008) (denying Trustee's motion to remand or abstain, on the ground that the case is "related" to Refco's Chapter 11 bankruptcy). In the original complaint the Trustee alleged that the FX customers collectively suffered losses totaling more than half a billion dollars when insiders at Refco[2] diverted assets from their FX accounts at Refco Capital Markets ("RCM") in order to bankroll the Refco fraud.[3]

On August 25, 2009, Judge Lynch granted the motions to dismiss the original complaint that were made by Grant Thornton and Mayer Brown, but gave the Trustee leave to replead. *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 528 (S.D.N.Y. 2009). The Trustee amended his complaint against those defendants. In a Report and Recommendation dated June 3, 2010 (the "PAT R and R") the Special Master reviewed the Amended Complaint and concluded that: 1) Judge Lynch's broad rulings precluded relief on claims for breach of fiduciary duty and conversion; 2) the Amended Complaint's allegations concerning fraudulent inducement were not precluded by Judge Lynch's rulings, but a fraudulent inducement claim could only lie as to FX customer deposits made after the date of Refco's leveraged buyout (LBO), as it was only after that date that Refco was — according to the Amended Complaint — hopelessly insolvent; 3) the Trustee did not sufficiently allege that Mayer Brown substantially assisted the fraudulent inducement; and 4) the Trustee had sufficiently alleged substantial assistance on Grant Thornton's part.

In sum, the Special Master recommended that all claims against Mayer Brown and Grant Thornton be dismissed, with one exception: the motion to dismiss the claim for aiding and abetting fraudulent inducement against Grant Thornton should be denied with respect to those FX customer deposits made after the date of the 2004 LBO.

In an order dated December 13, 2010, Judge Rakoff adopted the Special Master's Report and Recommendation in full. In particular, Judge Rakoff agreed that Judge Lynch's rulings should be adhered to as law of the case. Judge Rakoff observed that the "major grounds justifying reconsideration [of law of the case] are an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." December 13 Order at 3 (quoting *Virgin Atl. Airways, Ltd., v. Nat'l Mediation Bd.,* 846 F.2d 1245, 1255 (2nd Cir. 1992)). Judge Rakoff concluded that no such circumstances were presented in this case.

This Report and Recommendation considers Grant Thornton's motion for summary judgment on the remaining claim for aiding and abetting fraudulent inducement by RCM.

---

[2]    References to "Refco" include Refco Group Ltd. LLC and all of its affiliated entities, including Refco LLC and Refco Capital Markets ("RCM").

[3]    The Special Master has filed more than 30 R and Rs that describe the Refco Fraud in detail. Familiarity with those prior R and Rs is presumed. All abbreviated terms used in those prior R and Rs are incorporated herein by reference.

**II. Legal Standards for Summary Judgment.**

Summary judgment may be granted only if the submissions of the parties taken together show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Grant Thornton as the moving party bears the burden of demonstrating the absence of a material factual question, and as such, "always bears the initial responsibility of . . . identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on this summary judgment motion the court must view all facts in the light most favorable to the Trustee. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2nd Cir.2002).

If Grant Thornton has asserted facts showing that it is entitled to summary judgment, the Trustee must then set forth specific facts showing that there is a genuine issue for trial. He cannot rest on conclusory allegations or denials of Grant Thornton's submissions. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2nd Cir.2002). In reviewing a motion for summary judgment, a court "may rely only on admissible evidence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2nd Cir.2004). In sum, in considering whether to grant summary judgment, the court must (1) determine whether a genuine factual dispute exists based on the admissible evidence in the record; and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

**III. Grant Thornton's Arguments in Support of its Motion for Summary Judgment**

Grant Thornton moves for summary judgment on the entirety of the remaining claim by pressing four separate arguments:

1. Grant Thornton contends that the Second Circuit's decision in *Capital Management Select Fund Ltd. v. Bennett*, 670 F.3d 194 (2nd Cir. 2012) — handed down after the PAT R and R and its affirmance by Judge Rakoff — mandates dismissal. The *Capital Management* court found that RCM in its Customer Agreement represented that it was a Bermuda corporation. Id. at 210.[4] The court concluded that RCM had thereby clearly disclaimed any intent to comply with federal securities laws. Grant Thornton argues that under *Capital Management* RCM, by that same disclosure, clearly disclaimed any intent to comply with the common law principle applied in the PAT R and R — that

---

[4] The court quoted Section G.1 of the Customer Agreement, which stated that RCM "is a Bermuda Corporation." That same clause distinguished RSL as "a U.S. corporation and a broker-dealer registered with the U.S. Securities and Exchange Commission."

a broker, when it takes in customer money,  impliedly represents that it is not hopelessly insolvent. Put the other way, Grant Thornton argues that by stating that it was a Bermuda corporation, RCM was telling customers that they were assuming the risk that it was hopelessly insolvent at the time they made a deposit.

2. Grant Thornton contends that discovery has shown that the Trustee has failed to raise a question of fact as to whether, after the LBO, RCM was hopelessly insolvent.

3. Grant Thornton contends that discovery has shown that the Trustee has failed to raise a question of fact as to whether Grant Thornton substantially assisted RCM in any fraudulent inducement of FX customer deposits.[5]

4. Grant Thornton contends that the Trustee's remaining claim is barred by the Securities Litigation Uniform Standards Act of 1998, known as SLUSA. See 15 U.S.C. § 78bb(f). As will be discussed below, Judge Rakoff has already found that the remaining claim is *not* barred by SLUSA, but Grant Thornton argues that certain expert reports presented by the Trustee appear to be seeking recovery for misrepresentations made in the LBO, and therefore the remaining claim has been transformed into one barred by SLUSA.

Finally, Grant Thornton,  even if the above arguments are rejected, contends that the claims of one set of  FX customers seeking relief — the Rogers Funds — should be dismissed because discovery has shown that it has not suffered any monetary damage.

Each of these arguments will be taken in turn.

## IV. *Capital Management* **and the Duty to Disclose Hopeless Insolvency**

Judge Rakoff, in affirming the PAT R and R, held that if a broker is hopelessly insolvent it has a duty to disclose that financial condition at the time that it takes in a deposit. That holding was based on an application of the Second Circuit's decision in *United States v. Szur,* 289 F.3d 200 (2nd Cir. 2002), in which the court held that a non-discretionary broker (like RCM) has an obligation to disclose "information [that] is clearly significant" to the customer, despite the "absence of any general fiduciary duty resulting from discretionary authority." Id. at 211-12. Under this standard of "significance" the *Szur* court "easily" concluded that a non-discretionary broker was obligated to inform the customers about a 45% or 50% commission on the customers' sale of stocks. The court in *Szur* also noted that some information falls into a "grey area of possible insignificance and possible significance" (Id.) in which case there would  be a jury question on whether the broker had a duty to disclose such information.

---

[5]     This argument of course assumes arguendo that there are questions of fact as to whether  1) RCM  disclaimed its implied obligation to disclose hopeless insolvency, and 2) RCM was hopelessly insolvent after the LBO.

4

Using this *Szur* standard of "significance" the Special Master (and Judge Rakoff) concluded as follows:

> Up to this point, the Second Circuit has not articulated whether hopeless insolvency is the type of "information [that] is clearly significant and must be disclosed accurately." *Szur*, 289 F.3d at 211-12 (quoting *Press*, 166 F.3d at 536). At the very least, it appears to be the type of information "fall[ing] into a grey area of possible insignificance and possible significance." *Id.* Given that ambiguity, it cannot be said as a matter of law that RCM did not have a duty to disclose its financial condition to potential customers as of the date of the LBO. Therefore, as to FX accounts opened after the date of the LBO, there remains a factual question as to fraudulent inducement that is not appropriately decided on a motion to dismiss.

PAT R and R at 14.

On this motion Grant Thornton does not contest the proposition that a non-discretionary broker has a duty to disclose a condition of hopeless insolvency to prospective customers. *See* Transcript of Oral Argument at 13 ("We don't disagree, for purposes of this argument, that there is an implied duty under New York law to disclose hopeless insolvency."). But according to Grant Thornton, the court's analysis in *Capital Management* requires a finding that RCM, by its disclosure in the Customer Agreement, *clearly disclaimed* any duty to inform its customers of hopeless insolvency. Id. at 18 ("I say there was a — to the extent there was an implied duty to disclose hopeless insolvency, no customer who invested with RCM could have expected that RCM was going to keep a certain amount of capital on its books to protect customers from insolvency.").

In *Capital Management* the court found that the Customer Agreement, by its disclosure that RCM was a Bermuda corporation — together with its disclosure in the same clause that RSL was a U.S. corporation registered with the SEC — had "clearly represented" that RCM was not obligated to comply with federal securities laws. 670 F.3d at 211. The specific regulations on which the customers relied were SEC Rules 15c3-1 and 15c3-3. Rule 15c3-1 requires brokers to maintain sufficient capital to protect their customers from the firm's potential insolvency, while Rule 15c3-3 prohibits a broker from rehypothecating a customer's margin account securities in excess of 140 percent of the customer's outstanding margin debt. *Capital Management*, 670 F.3d at 209, n. 17.[6]

---

[6] The court also held that RCM was not obligated to comply with New York General Business Law Section 339-e, "which, in general, restricts a broker's rehypothecation rights with respect to fully-paid or excess margin securities." Id. at 212. The specific holding regarding the New York law was that Section H of the Customer Agreement did not, as the Trustee argued, affirmatively obligate RCM to comply with the New York General Business Law — rather that Section operated only as a choice of law provision that governed the Customer Agreement itself.

But *Capital Management* cannot mean that by saying "RCM is not subject to securities regulations" RCM was also clearly saying "we are not regulated by any American law." Nor, more specifically, does it follow that by declaring "we are not bound by any SEC requirement regarding capitalization" it is also clearly declaring that "whether we are hopelessly insolvent is for us to know and you to find out, and thanks for your deposit." *Capital Management* holds that RCM, by its disclaimer, was stating that it did not have to adhere to capitalization requirements imposed by the SEC, but that is a far cry from stating "not only might we be undercapitalized at some point in time, but right now we are hopelessly insolvent." The bottom line is that the "Bermuda corporation" statement might have "clearly represented" that RCM undertook no obligation to comply with the securities regulations, but it is at least ambiguous as to whether it represented the more radical point that RCM had no obligation to comply with *any* capitalization standards — and it is even more doubtful that by that statement RCM represented that it had no obligation to inform a customer of hopeless insolvency *at the time of deposit*. In the end Grant Thornton reads far too much into *Capital Management* — a case which did not so much as cite *Szur*.

*Szur* held that a nondiscretionary broker had a duty to disclose "significant" matters to the customer, and that failure to disclose such matters constitutes fraud. That determination is grounded in New York common law. *See Press v. Chemical Investment Services Corp.*, 166 F.3d 529 (2nd 1999), on which *Szur* relied, which specifically grounds the duty to disclose significant information in New York common law. RCM's statement that it is a Bermuda corporation says nothing obvious or clear about whether it is disclaiming any obligation to comply with New York common law.[7] In sum, applying *Capital Management* to this matter at most renders the language in the RCM Customer Agreement ambiguous as to whether RCM was disclaiming its obligation under New York common law to disclose a state of hopeless insolvency. And ambiguity in contractual provisions raises a classic question of fact. *See Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63 (2nd Cir. 2008)(summary judgment inappropriate where contract terms are ambiguous).

Accordingly, Grant Thornton's argument for summary judgment on the basis of *Capital Management* should be rejected.

## V. Is There a Question of Fact on Whether RCM Was Hopelessly Insolvent at the Time of the LBO?

---

[7]  It bears noting that the *Capital Management* court relied on the fact that  RCM's disclosure of its Bermuda status was a clear disclaimer in part because it was made in the same paragraph with a representation that RSL was "registered with the U.S. Securities and Exchange Commission." 670 F.3d at 210-211. Thus it was clear that RSL would be complying with United States security regulations and RCM was not intending to do so. It is not at all obvious that the same inference can be "clearly" derived with regard to adherence to New York common law.

6

Grant Thornton contends that discovery has shown that the Trustee has failed to raise a question of fact as to whether, after the LBO, RCM was hopelessly insolvent under the relevant case law. Grant Thornton's basic argument is that "hopeless insolvency" requires a showing that RCM was "unable to pay its debts as they came due in the ordinary course and management has no 'hope' that it will stay in business and improve its position." Opening Brief at 10.

### A. The "Ancient" Banking Cases

Grant Thornton argues that the Trustee's claim for RCM's failure to disclose "hopeless insolvency" is completely dependent on 19th Century cases involving banks that took deposits just as they were shuttering their doors. *See Craigie v. Hadley,* 54 Sickels 131, 1 N.E. 537 (N.Y. 1885); *St. Louis & S.F. Ry. Co. v. Johnston,* 133 U.S. 566 (1890). Grant Thornton contends that the Special Master "relied" on these "ancient cases" and so, apparently, is somehow bound by whatever interpretation of "hopeless insolvency" they may have provided.  But a fair reading of the PAT R and R is that these cases were used only to provide "some support to the notion that insolvency is the type of information relevant to the affairs entrusted to RCM that is sufficiently significant to require disclosure." PAT R and R at 13. It did not adopt a *standard* of hopeless insolvency from those cases. The crux of the analysis of the PAT R and R lies in *Szur* — that even a nondiscretionary broker has the duty to disclose "significant" information to the customer. The "ancient" cases are illustrative that hopeless insolvency of the broker is the kind of information that a customer would find significant. But really, those cases are not necessary for what was in fact a common-sense conclusion in light of *Szur* — that hopeless insolvency "is certainly the kind of information on which a reasonable person would rely in deciding whether to place funds with a broker." Id.

 It bears noting that the obligation to disclose hopeless insolvency is not in fact grounded in or dependent on banking. As the Court noted in *St. Louis & S.F. Ry. Co. v. Johnston*, supra, 133 U.S. at 576 – 77, the duty to disclose hopeless insolvency is based on the concept that *no* person in business should be taking on obligations when they know they are hopelessly insolvent:

> [N]o case can be found in the books holding that a trader who was hopelessly insolvent, knew that he could not pay his debts, and that he must fail in business, and thus disappoint his creditors, could honestly take advantage of a credit induced by his apparent prosperity, and thus obtain property which he had every reason to believe he could never pay for. In such a case, he does an act the necessary result of which will be to cheat and defraud another, and the intention to cheat will be inferred.

Grant Thornton argues that RCM could not have been hopelessly insolvent at the time of the LBO because the "ancient" banking cases involved banks that had essentially closed up shop while taking on more deposits. That is a fair reading of the facts in those banking cases. But nothing in those cases purports to establish a definition of "hopeless insolvency" or to hold that an entity's condition must be exactly the same as those banks for the entity to be hopelessly insolvent.  For example, in *Craigie, supra,* it was assumed that the bank was hopelessly insolvent — thus the court did not purport to establish a definition of hopeless insolvency. *See Werner v. Crippin,* 246 A.D.

363, 366 (4th Dept. 1935), *aff'd* 270 N.Y. 535, 200 N.E. 305 (1936) (discussing *Craigie*).[8] Moreover, to the extent there is any working definition of hopeless insolvency in *Craigie,* it does not require that the entity have essentially given up doing business at the time it takes on customers. In describing the bank's condition in *Craigie,* the court stated : "The bank was *not only* irretrievably insolvent, but it had apparently given up the struggle to maintain its credit before the deposit was made."  54 Sickels at 135 (emphasis added).

### B. Hopeless Insolvency and the Run on the Bank

Grant Thornton argues that the Trustee improperly defines hopeless insolvency by what would occur once the Refco Fraud was disclosed and a run on the bank occurred. According to Grant Thornton, every entity would be hopelessly insolvent if the test were whether it could withstand a run on the bank. But Grant Thornton's arguments on this score do not justify summary judgment for at least two reasons.

First, the Trustee has presented enough evidence to create a jury question on whether RCM was hopelessly insolvent after the LBO *without regard to any run on the bank after discovery of the fraud*. The Trustee has presented evidence that by the time of the LBO,  RCM had upstreamed almost all of its customers' deposits — more than $1.5 billion. (Counterstatement Nos.10-13, 17-18, 23-24, 54-56). The LBO  created $1.4 billion in debt for the Refco group, but only approximately $0.4 billion went to Refco. (Expert Report of Lisa Collura, §8.B.).    The Trustee's expert has calculated that the Refco entities were *never* in a position after the LBO — without regard to disclosure of the Refco Fraud —  to repay the amounts upstreamed from RCM. (Counterstatement No. 14).  RCM's own earnings could not at any point come close to satisfying its obligations to its customers. The Trustee has presented evidence from which a jury could find that RCM's true EBITDA after the LBO was negative. (Counterstatement Nos. 54-55).  *See also* Report of Expert Douglas Carmichael at 56 ("RCM had an obligation to return the fair value of customers' securities pledged in repo transactions of $1 billion [as of 2004]. This obligation could not be met without collecting the $1.1 billion owed by related parties and those funds were needed by those entities to remain liquid.").  A jury could find that this is not a picture of a faintly troubled company, or a company that was merely in the zone of insolvency. A jury could find that because RCM's liabilities exceeded its assets by more than $1 billion, without any likelihood that those assets would be replenished, RCM was hopelessly insolvent after the LBO — i.e., insolvent with no likelihood that it would ever become solvent. *See  U.S. Pipe & Foundry Co. v. City of Hornell*, 146 Misc. 812, 263 N.Y.S. 89, 96 (Sup.Ct. 1933) ("The definition of a solvent debtor in the ordinary accepted meaning

---

[8]         Other cases cited by Grant Thornton do not in fact establish or apply any definition of hopeless insolvency. *See, e.g., Downriver Cmty. Fed. Credit Union v. Penn Square Bank ex rel FDIC,* 879 F.2d 754, 764 (10th Cir. 1989), in which the court simply stated the principle that a bank commits fraud when taking deposits knowing it is hopelessly insolvent; insolvency was not in dispute and the question for the court was how to distribute assets to creditors.

of the term is a person who has sufficient property to pay all his debts."). And that finding could be made without regard to what would occur once the fraud was discovered.

Second and alternatively, Grant Thornton's view of hopeless insolvency — as ignoring the existence of fraud within the corporation —  is myopic. Defining a company's condition by ignoring the existence of a fraud that could bring it down would mean that only companies without a fraud at the core would be subject to the requirement of disclosing hopeless insolvency. A Potemkin Village of a broker would be "solvent" up until the minute when someone looked behind the facade — the company would have no obligation under *Szur* to inform a prospective customer that it was nothing but a shell. It makes no sense that a  failing-in-good-faith company would be liable for not disclosing its condition, while a fraudulent house of cards that will last only until the fraud is discovered has no obligation to disclose its condition. Under *Szur* there is at the very least a jury question as to whether a customer would consider it "significant" that the broker is so rife with fraud that it will not be able to pay the customer back if the fraud is exposed. In the end, the significance of "hopeless insolvency" is the same whether it is based on an existing financial condition or a fraud that will lead to an irretrievable financial condition when disclosed. In either case, the customer would undoubtedly find it significant that, as events are likely to unfold,  he is not ever going to get his money back. So, whether hopeless insolvency is determined by RCM's liabilities and assets at the time, or whether it is assessed in light of disclosure of the fraud, the Trustee has presented enough evidence to raise a question of fact on hopeless insolvency.

Grant Thornton argues that between the time of the LBO and the disclosure of the fraud, RCM "honored all obligations as they came due in the ordinary course." But that fact was already assumed to be the case — and  found irrelevant — by the Special Master, on the ground that keeping enough cash around  to prop up the fraud cannot possibly be dispositive of the true financial condition of the company. See Calamari Ex. 63 (Transcript of Oral Argument on Motion to Dismiss). *See also  U.S. Pipe & Foundry Co. v. City of Hornell*, 146 Misc. 812, 263 N.Y.S. 89, 96-97 (Sup.Ct. 1933) ("A bank may pay all of the obligations presented to it on a certain day and still be hopelessly insolvent.") The PAT R and R determined that a jury question existed as to hopeless insolvency even though it was uncontested at that point that RCM had met its day-to-day obligations. Accordingly,  Grant Thornton cannot now reargue the relevance of RCM's payment of its day-to-day obligations. *See Nobel Ins. Co. v. City of New York,* 2006 WL 2848121, at *4 (S.D.N.Y.) (prior rulings from a motion to dismiss should not be reconsidered on summary judgment where the court made rulings that "are not in any way altered by discovery, or by subsequent developments in the law").[9]

### C. Hopefulness

---
[9]

Grant Thornton argues that discovery *has* shown that one customer was able to withdraw almost $100 million from RCM during a two-week period. Rule 56.1 Statement No. 56. But these withdrawals were made shortly after the time Cargill accounts came into RCM, and so the fact that RCM was momentarily flush with assets that it would soon upstream does not indicate as a matter of law that RCM was not hopelessly insolvent at the time.

Grant Thornton contends that RCM could not have been *hopelessly* insolvent because a number of personnel at Refco have testified that they hoped for the best — that all customer deposits would be returned on demand, that the RGHI receivable would be fixed, and that Refco would ultimately come through in the end. See Rule 56.1 Statement No. 44 (testimony of COO Steven Dispenza), No. 48 (testimony of Robert Trosten), No. 47 (testimony of Santo Maggio). But all this testimony does not come close to establishing as a matter of law that RCM was not hopelessly insolvent. It is no surprise that Maggio and Trosten "hoped" that everything would come out fine — fraudsters usually do hope for the best. But "hope" must have a rational — and legal — basis, otherwise officials in a corporation rife with fraud would *never* be running a hopelessly insolvent company. *See Illinois Cent. R. Co. v. Rawlings*, 66 F.2d 146, 150 (5th Cir. 1933) ("It has therefore been held that while officers were making *earnest* endeavors to and expected to secure assistance, believing that the assistance would be forthcoming before withdrawals necessitated their closing, there is no fraud.") (emphasis added). *See also Werner v Crippen*, 245 A.D. 363, 366, 282 N.Y.S. 722 (4th Dept. 1935) (" A situation could never become so serious that men would not hope against hope that something would happen to afford relief.").

### D. The Trustee's Expert in Kirschner v. THL

Finally, Grant Thornton notes that the Trustee presented an expert in his action against THL, Mr. Manzo, who opined that even after the Refco Fraud was disclosed, the demise of Refco was not a foregone conclusion. Manzo thus challenged the idea that a run on the bank was inevitable. Grant Thornton argues that the Trustee is bound by this expert opinion and therefore as a matter of law RCM's situation was not "hopeless." The parties argue as to whether Manzo's opinion in the THL case would be admissible against the Trustee in this case. The Trustee argues that the expert opinion in the THL case is hearsay and it cannot bind the Trustee here because in the THL case the Trustee was taking on a different role — he was Trustee for the Refco Estate.

The Special Master notes that there is some dispute as to whether an expert opinion proffered by a party in one case can be admitted against that party in a different case over a hearsay objection. The only possible hearsay exception for such testimony is Fed. R. Evid. 801(d), exempting a statement by a party-opponent from the rule against hearsay. Courts are in dispute on whether the expert can be considered an agent of the party-opponent for purposes of that hearsay exemption. *See, e.g.*, *Kirk v. Raymark Indus.*, 61 F.3d 147, 163-64 (3rd Cir. 1995) (an expert is supposed to be independent of the party and therefore the expert's testimony may not be admitted under Fed.R.Evid. 801(d)(2)(D) as a statement of a party's agent); *Collins v. Wayne Corp.*, 621 F.2d 777, 782 (5th Cir. 1980) (holding expert's statement to be admissible as a statement of an agent of a party-opponent). Moreover, there is a fair question of whether the party-opponent doctrine is even applicable here. As the Trustee points out, he was a different party in the THL case because he represented the Refco Estate, not the FX customers.

But in the end it makes no difference whether the expert opinion in *Kirschner v. THL* is admissible against the Trustee in this case. Even if that opinion is admissible against the Trustee, it does not come close to showing that RCM had no duty to disclose its financial condition after the

LBO . Put another way, this testimony does nothing to alter the conclusion in the PAT that a jury question exists as to whether RCM's financial condition after the LBO was "significant" information that had to be disclosed to customers under *Szur*. That is, whatever the endgame, there is at the very least a fact question on whether RCM's dire financial condition was such that it would be "significant" to a customer. To understand this point, it is critical to note that Manzo did *not* testify that Refco's survival would have been a piece of cake. He testified to a possible series of hypothetical and  dramatic moves that *might* have saved the company: massive equity infusion, ouster of corrupt management, forgiveness by customers, lenders and others of the obligations owed to them, and better management of the story of the fraud. He recognized that his scenario was fraught with uncertainty.[10]  See Rule 56.1 Statement and Trustee's Responses, Nos. 51-54.

So take a hypothetical customer deciding whether to deposit funds at RCM. Under the Trustee's scenario in this case, the customer would be informed as follows: "We are hopelessly insolvent and if you give us your money, you won't get it back." That is significant information. But even under Grant Thornton's scenario, embracing Manzo's view,  the customer would be told something like this: "We are in dire financial condition but there may be a way to save the company, it would just require a hypothetical massive equity infusion, ouster of corrupt management, and forgiveness by customers, lenders and others of the obligations owed to them, and better management of the story of the fraud as well." It can't be argued that the possibility of "saving" the company under these hypothetical and dramatic conditions would be something that would persuade the customer to make a deposit at RCM. Put another way, *either* scenario is one of de facto hopeless insolvency, and either scenario is the type that at least creates a jury question as to whether the condition is significant enough under *Szur* to mandate disclosure.[11]

---

Whether an entity is insolvent is ordinarily a question for the fact finder. *See, e.g., Klein v. Tabatchnick* 610 F.2d 1043, 1048 (2nd Cir. 1979) (denying summary judgment in a case alleging fraudulent transfers and preferences while an entity was allegedly insolvent: "Insolvency is also a factual question."). Moreover, "a finding on the issue of insolvency often depends upon the factual inferences and conclusions of expert witnesses which, when controverted, do not lend themselves

---

[10]

The Special Master became quite familiar with Manzo's testimony in the THL case, as the Special Master heard oral argument on a motion to exclude Manzo's testimony under *Daubert*. That case was settled before the Special Master submitted an R and R on the subject.

[11]

For the reasons expressed in text, the Trustee's reliance on statements of hopefulness made by Kirschner himself in the THL case are insufficient to justify summary judgment on the question of hopeless insolvency.

readily to summary judgment resolution." Id.[12]

Grant Thornton has certainly raised questions about whether RCM's financial condition was one of hopeless insolvency. But because the Trustee has also presented evidence that RCM's financial situation was hopeless after the LBO — both with and without consideration of the fraud — the dispute on these questions is for the fact finder. Therefore Grant Thornton's argument for summary judgment on the ground that the Trustee has not raised a fact question on RCM's hopeless insolvency should be rejected.

## VI. Substantial Assistance and Reliance

### A. Is Direct Reliance on the Third-Party's Statements Required?

Grant Thornton provided unqualified audit opinions of RCM from 2003-5. The PAT R and R stated that the Trustee had presented a question of fact as to whether these audit opinions substantially assisted RCM's fraudulent inducement of customer deposits after the LBO. Grant Thornton argues that discovery has shown that as a matter of law the RCM audit opinions did not substantially assist the fraudulent inducement.[13] Grant Thornton's argument is straightforward: the RCM audit opinions were not made public and none of the customers whose claims remain in this case saw or directly relied on those opinions.[14] Grant Thornton contends that it cannot be found to

---

[12]

The parties in this case of course are presenting competing experts on whether RCM was hopelessly insolvent after the LBO. Grant Thornton attacks the opinion of the Trustee's expert, Dr. Shaked, but Grant Thornton has not at this point moved to exclude Dr. Shaked's opinions under *Daubert*, and therefore Grant Thornton raises no more than fact issues regarding competing experts.

[13]

It is important to note that for purposes of this motion, Grant Thornton does not contest that an issue of fact is presented as to its knowledge of the fraud. The Special Master has found that there are questions of fact as to Grant Thornton's scienter on three prior occasions. See PAT R and R; Report and Recommendation on Grant Thornton's Motion for Summary Judgment in *THL v. Grant Thornton*; Report and Recommendation on Grant Thornton's Motion to Dismiss in *Krys v. Sugrue*. These R and Rs were affirmed and adopted by Judge Rakoff.

[14]

Grant Thornton recognizes that an official of the Rogers Funds claims to have seen Grant Thornton's audit opinion on Refco's consolidated financial statements. Opening Brief at 19, n.1. The relevance of the Rogers Funds' claims will be discussed below. The Trustee does not meaningfully contest Grant Thornton's assertion that none of the customers here reviewed or directly relied on the RCM audit opinions.

have substantially assisted in the fraudulent inducement unless the customer directly relied on the RCM audit opinions.

It goes without saying that a fraud claim will not lie unless the plaintiff has reasonably relied on the fraudulent misstatement or concealment of the *primary wrongdoer*.[15] It is not the case, however, that substantial assistance of a fraud can only be found if the plaintiff has relied on the *third party's* wrongful act. The question for aiding and abetting is whether "the defendant's substantial assistance in the primary violation *proximately caused* the harm on which the primary liability is predicated." *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F.Supp.2d 349, 370-71 (S.D.N.Y. 2007). (emphasis added). Grant Thornton's equation of proximate cause and direct reliance is not correct — while there is certainly overlap, proximate cause is a broader concept and is not limited to reliance.[16] As the courts have noted, substantial assistance "can take many forms." *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 511 (S.D.N.Y.2001), and there is no rule of law requiring that an aider and abetter's substantial assistance must be something directly relied upon by the plaintiff. *See, e.g., Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 180 (1994) (aiding and abetting liability can be found even though the plaintiff does not directly rely on the aider and abetter's wrongdoing).[17] Indeed substantial assistance of a fraud can be found even if the third-party makes no statements at all that could be relied upon. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38,  48 (2nd Cir. 1978) ("[S]ubstantial assistance might include ... executing transactions or investing proceeds, or perhaps ... financing transactions."); DPM R and R at 37 (engineering unauthorized transfers into unprotected accounts can constitute substantial assistance because "if the Defendants had not acted as they did, the assets would never have been transferred to unprotected accounts"). *See also Gabriel Capital, L.P. v. NatWest Finance,*

---

[15]

See the extensive discussion of reasonable reliance in the R and R on Grant Thornton's Motion for Summary Judgment in *THL v. Grant Thornton* at 16-20, dated March 28, 2011 (affirmed by Judge Rakoff).

[16]

Grant Thornton tries to make something of the fact that Special Master Hedges, in ruling on a bifurcation motion, stated that the Trustee has the burden of proving reliance at trial. Nov. 11 Transcript at 38. Certainly that is so, but it does not at all follow that Judge Hedges was holding, without the benefit of briefing or argument, that the Trustee must show that the customers read and directly relied *upon the RCM audit opinions*.  Judge Hedges did say at the hearing that Grant Thornton had a "decent [argument] on reliance . . ."Id. at 43, but hopefully Grant Thornton is not treating that as a decision on the merits.

[17]

The cases cited by Grant Thornton that purport to require the plaintiff to have directly relied on statements by the third-party in fact establish no more than the unremarkable proposition that the third-party must have done *something* that proximately caused the plaintiff's harm. They do not *require* direct reliance. *See, e.g.,  Fraternity Fund Ltd. v. Beacon Hill Asst Mgmt., LLC,* 449 F.Supp.2d 349, 370-72 (S.D.N.Y.. 2007) (only one misrepresentation was at issue and the defendants did nothing to promote that statement).

*Inc.*, 94 F.Supp.2d 491, 512 (S.D.N.Y. 2000) (applying New York law and finding that the plaintiffs had sufficiently pled that the defendant substantially assisted a fraudulent transaction even where the defendant made no affirmative representation; the defendant's mere participation in the proposed project provided credibility for prospective investors).

So, given the fact that the customers did not directly rely upon the RCM audit opinions, has the Trustee nonetheless presented a question of fact that Grant Thornton's opinions proximately caused the fraudulent inducement? The Trustee argues primarily that if Grant Thornton had acted properly, RCM's impossible financial condition would have been disclosed to the public at large, and so the customers would have been made aware of it and would not have done business with RCM.

It is important to note that the Trustee's theory of substantial assistance — that the FX customers could rely on public awareness as opposed to direct reliance — is consistent with the law of the case. In assessing the Trustee's claim on the motion to dismiss in this action, the Special Master stated, in the PAT R and R at 39:

> Questions of proximate cause are generally left to the jury. *See, e.g., In re Sept. 11 Prop. Damage & Bus. Loss Litig.* 468 F.Supp.2d 508, 531 (S.D.N.Y. 2006 ) ("the issue of proximate cause is fact-laden and inappropriate for a motion to dismiss"); *Am. Tissue v. Donaldson, Lufkin & Genrette Secs. Corp.* 351 F.Supp.2d 79, 91 (S.D.N.Y. 2004) ("proximate causation generally remains an issue of fact for the jury"). The scenario posed by the Trustee --- that an FX customer *would be made aware* of the customer scheme through a proper audit --- is sufficiently plausible (assuming the allegations about the audit itself are true) to raise a jury question as to whether Grant Thornton's audit opinions substantially assisted/proximately caused a primary wrong by the Refco Insiders. (emphasis added).

This passage, adopted by Judge Rakoff, does not at all require that the FX customer had to read or directly rely on the audit opinions to support a claim of substantial assistance. It requires only that the FX customer be "made aware" of the hopeless insolvency through a proper disclosure. That awareness could certainly come from reports in the financial industry, media reports, etc. — the same way that the FX customers actually did become aware of the Refco Fraud in October 2005. *See also Deutsche Bank* R and R dated November 1, 2011, at 40 (substantial assistance found where the disclosure that DBSI failed to make would have gone to the "public at large") (affirmed and adopted by Judge Rakoff).

Certainly the Trustee has sufficiently established for purposes of this motion that if RCM's financial condition had been properly disclosed to the public, the customers here would not have placed deposits at RCM. The Trustee has presented expert testimony from Barbara Lucas that an alteration or qualification to RCM's financial statements would have become known to the financial community and the press. Trustee's Counterstatement at Nos. 109-114. The FX customers testified that when information about RCM's condition did surface, they became immediately aware of it. Id. at Nos. 89-115. And every one of the customers who has been deposed — as well as Cargill —

testified that they would not have used RCM if its audit opinions properly stated RCM's true financial condition. Id. at Nos. 78-80. Finally, the Trustee's expert testified to the rather common-sense conclusion that no rational customer would use a broker that was hopelessly insolvent. Id. at Nos. 84-86.

### B. Absence of Action

Grant Thornton argues, however, that the Trustee's theory is dependent on a *lack* of action on Grant Thornton's part — Grant Thorton should have refused to give an opinion, Grant Thornton should have altered or qualified RCM's financial statements, etc. Grant Thornton contends that if the theory of proximate causation is based on a lack of action, then it cannot be held liable for aiding and abetting — because a failure to act supports aiding and abetting liability only if the third party owed a duty directly to the plaintiffs. *See, e.g., In re Sharp Intern. Corp.*, 403 F.3d 43, 49 (2nd Cir. 2005) ("The mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.") (citation omitted). And there is no contention that Grant Thornton owed a fiduciary duty directly to the FX customers.

It is true that knowingly watching a fraud go by, and remaining silent about it, will not constitute substantial assistance in the absence of a fiduciary duty to disclose. But Grant Thornton did not just watch a fraud go by. Grant Thornton submitted unqualified audit opinions of RCM that, for purposes of this motion, were knowingly false and materially misrepresented RCM's true financial condition. Thus Grant Thornton *did* affirmatively act. The Trustee argues — with support from his expert, Dr. Carmichael — that Grant Thornton should have refused to issue an audit opinion at all, or alternatively should have issued a properly qualified opinion. Once Grant Thornton starts down the road of making a false statement, it cannot dismiss these alternatives as an absence of action. If that were true, any fraudster could escape liability by arguing "I know that, instead of making a misrepresentation, I could have said nothing, but I had no duty to do that because that is an absence of action." Thus, Grant Thornton's attempt to rely on pure inaction is not availing if it affirmatively committed wrongful conduct.

Importantly, Grant Thornton's cited cases on inaction all involve alleged aiders and abetters who took no otherwise-wrongful action at all toward the plaintiffs. They are not cases in which the alleged aider and abetter made a misstatement and failed to take alternative actions that would have prevented the statement from being misleading or from being made at all. *See, e.g, Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 562, 883 N.Y.S.2d 147 (2009) (attorney had no duty to limited partners and therefore the attorney's failure to disclose a fraud was not actionable substantial assistance); *Stanfield Offshore Leveraged Assets, Ltd. v. Metro Life Ins. Co.,* 64 A.D.3d 472, 476-77 (1st Dept. 2009) (bank's failure to disclose a firm's insolvency to investors was not aiding and abetting as the bank was silent on the subject and owed the investors no fiduciary duty); *Kolbeck v. LIT Am., Inc.,* 939 F.Supp. 240, 249 (S.D.N.Y. 1996) (no aiding and abetting for failing to investigate whether a trader was registered by CFTC); Butt R and R at 13-14 (" The only affirmative act even alleged is the purported 'authorizing' of the transfers. But the Complaint itself belies any affirmative act of authorization.").

15

In contrast, where an auditor has made affirmative misstatements, there is authority for finding substantial assistance when the auditor fails to correct the misstatements. *See Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1044 (11th Cir.1986) ("Standing by while knowing one's good name is being used to perpetrate a fraud is inherently misleading. An investor might reasonably assume that an accounting firm would not permit inclusion of an audit report it prepared in a placement memo for an offering the firm knew to be fraudulent, and that such a firm would let it be known if it discovered to be fraudulent an offering with which it was associated."); *In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F.Supp. 1424, 1442-43 (D.Ariz. 1992)("If an auditor is aware that an ongoing fraud is a real possibility, he or she may not act as an advocate for its wrongdoing client. . . . Nondisclosure under these circumstances may constitute substantial assistance because regulators and the public are entitled to assume that an independent public accountant would take steps — either through frank discussions with regulators, the issuance of a preliminary cautionary report, or withdrawal from the account — if the auditor is aware that its client is perpetrating an ongoing fraud.").

### C. Private Documents?

Grant Thornton argues that the RCM audit opinions could not have substantially assisted the fraud because they were not public documents. They were like the tree in the forest that falls when nobody is around, so they couldn't have caused the FX customers to deposit funds at RCM..

Grant Thornton's argument misses the mark for at least three reasons:

1) The fact that there was no public disclosure of any qualification to the false report — or any refusal to report — is *itself* public information. *See* Expert Report of Barbara Lucas, Koo Ex. 31 at 2-3 (noting that market participants "rely on other publicly available information and/or the absence of negative public information concerning their counterparties"). Lucas provides what seems to be an unremarkable proposition: even if the RCM audit opinions were private, the fact that nothing negative is reported by an auditor creates an inference that RCM is financially healthy. Thus there is at least a jury question as to whether the unqualified audit opinions of RCM did substantially assist the fraud because they effectively operated to conceal RCM's financial situation by creating an inference that there was no problem for an accountant to find. *See JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 256 (S.D.N.Y.2005) (substantial assistance found if the defendant "affirmatively assists, *helps conceal*, or by virtue of failing to act when required to do so enables the fraud to proceed.") (emphasis added; internal quotation marks omitted). *See also, Frame v. PricewaterhouseCoopers LLP*, 36 Cal.Rptr.3d 209, 219 (Cal.App. 1st Dist.2005), *petition for appeal granted,* 41 Cal. Rptr. 872, 132 P.2d 210 (Cal. 2006), *appeal dismissed,* 49 Cal. Rptr.3d 656, 143 P.3d 657 (2006) ("The absence of a written audit report . . .assisted Peregrine/Hillman and PinnFund in their purported fraudulent scheme by postponing public detection of the fraud and giving them time to solicit and obtain additional investments.").

2) There is a question of fact as to how "private" those RCM audit opinions actually

were. The Trustee presents evidence that a) RCM ordered more that 150 copies of its audited financials from Grant Thornton (Counterstatement No. 99); b) RCM's financial statements were available to customers and counterparties who requested them (Response to Rule 56.1 Statement No. 97); and c) the financial statements were distributed by Refco to various counterparties (Counterstatement No.100).[17]   It is true that there is nothing in the record to indicate that the FX customers in this action requested or received the RCM statements. But under the analysis of substantial assistance above, their lack of specific reliance is not dispositive; substantial assistance can be found by the fact that other members of the public had access to the information and, if the public were informed of RCM's true financial condition, the FX customers would have been made aware of it and would not have done business with RCM.

3) The RCM audit opinion information was factored into RGL's consolidated financial statements, which were unquestionably disseminated to the public. Counterstatement at No. 102.[18]  Grant Thornton's counsel  argued at oral argument that the public disclosure of the consolidated financial statements makes no difference because those statements "take information from each of the subsidiaries, but the whole point is that they treat the Refco enterprise as if it's all one. . . . So the very thing that Kirschner is complaining about at RCM would not be reflected in the consolidated financial statements, because the money was all there. It was just in different pockets." Transcript of Oral Argument at 59. The problem with that argument is that Grant Thornton admits, for purposes

---

[17]

Grant Thornton asserts that there is no conclusive evidence that any RCM audit opinion was actually sent to a particular person. *See* Response to Trustee's Counterstatement No. 100.  But Grant Thornton admits that at least some of the evidence in the record indicates that various Refco officials stated an intent to send the RCM financial statements to someone outside Refco. Id.  Certainly the Trustee does not, at this stage  have to prove indisputably that some individual outside Refco actually received the RCM Report. The fact that a Refco official intended to send such a report is relevant evidence that it was sent. *See Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285 (1982). Grant Thornton also argues that the documentation by the Refco officials is hearsay; but the Refco officials' statements of intent to send out the RCM report are admissible under Fed. R.Evid. 803(3), the state of mind exception. *See generally* Saltzburg, Martin and Capra, *Federal Rules of Evidence Manual* at § 803.02[4][b] (10th ed. 2012). Moreover, records indicating that members of the public had requested the statements be sent to them could probably be admitted at trial as business records. Id. at § 803.02[7].

[18]

As stated above, the Rogers Funds representative testified to having reviewed the RGL consolidated financial statements. Rule 56.1 Statement No. 99.  So assuming arguendo that direct reliance is required, the Rogers Funds have satisfied that requirement for the purposes of this motion. For other contentions made by Grant Thornton regarding the Rogers Funds, see Section VIII, below.

of this motion, that it knew that the money was not actually "all there" because the RGHI receivable was being hidden by round-trip loans and RCM assets were being upstreamed with no real possibility of those intercompany debts being paid. The intercompany accounts were not a "wash" because Grant Thornton (for purposes of this motion) knew they were not a wash. Grant Thornton is arguing in essence that a public report with knowing misstatements cannot substantially assist a fraud because there would have been no way for an outsider to figure out the fraud. But that ignores the duty to report the information accurately in the first place. Given the public dissemination of the RGL consolidated financials, there is at the very least a jury question as to whether, if Grant Thornton disclosed what it (for purposes of this motion) knew about RCM's financial situation, the effect on the consolidated financials would have been significant enough to alert the public that RCM was hopelessly insolvent. *See* Report of Expert Douglas Carmichael at 73 ("Without the ability to use RCM's customers' assets, RGL would be bankrupt and cease to exist. . . . RGL was required by GAAP to disclose its deficits resulting from writeoff of the RGHI receivable, lack of sufficient profitability, and use of RCM's customers' assets to maintain liquidity and to disclose further that these factors caused substantial doubt about RGL's ability to continue as a going concern.").

––––––––––––––––––––––––

For all these reasons, Grant Thornton's motion for Summary Judgment on the ground that substantial assistance cannot be shown as a matter of law should be rejected.

## VII. SLUSA

This is Grant Thornton's third attempt to have the Trustee's case dismissed under the Securities Litigation Uniform Standards Act of 1998, known as SLUSA. See 15 U.S.C. § 78bb(f).[19] In the first attempt, Judge Lynch held that SLUSA did not bar the Trustee's action because at that

––––––––––––––––––––––––

[19]     SLUSA's preclusion provision states, in pertinent part:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging ... a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security....

15 U.S.C. § 78bb(f)(1)(A).

SLUSA is often referred to as "preempting" state claims but in fact it operates as a means of precluding state claims when brought as part of a covered action. *Romano v. Kazacos*, 609 F.3d 512, 520, n. 10 (2nd Cir. 2010).

time the Trustee's complaint was for money stolen from the FX customer's accounts — and Judge Lynch concluded that it was "a simple claim" that did not plausibly "coincide" with the purchase or sale of a covered security. *Kirschner v. Bennett,* 648 F.Supp.2d 525, 533, n.5 (S.D.N.Y. (2009). After the Trustee amended the Complaint, Grant Thornton once again moved to dismiss under SLUSA, this time arguing that the Trustee was alleging that the LBO rendered RCM hopelessly insolvent and therefore the fraudulent inducement claim was "in connection with" the purchase or sale of a covered security.   The Special Master (and thereafter Judge Rakoff) rejected Grant Thornton's SLUSA argument, on the ground that the LBO was only a fact to be proved as part of RCM's condition of hopeless insolvency,  and the fraudulent inducement claim was not dependent on a purchase or sale of any security in the LBO. PAT R and R at 40-41.

Grant Thornton wants to revisit the law of the case because "it has become clear that Kirschner's case *does* rest in significant part on the LBO, and particularly on Grant Thornton's work relating to that transaction." Opening Brief at 23 (emphasis in original). Grant Thornton notes that Kirschner's experts Lisa Collura and Douglas Carmichael focus on the LBO as part of the Refco fraudulent scheme, and that Carmichael opines that the disclosures in the S-4 Registration statement were inadequate and that Grant Thornton was at fault for inaction at the time of the LBO.

But the Trustee's theory of the case is the same as it was when evaluated in the PAT R and R.[20] The Trustee alleges that after the LBO, RCM was hopelessly insolvent, Grant Thornton knew about that, and Grant Thornton nonetheless issued clean audit opinions. Of course, at trial the Trustee will have to prove that RCM was hopelessly insolvent, and certainly the effect of the LBO on RCM's financial condition is a critical fact on the question of hopeless insolvency. But Judge Rakoff  ruled that proving the LBO as a fact is not barred by SLUSA. It would be impossible  to try to prove hopeless insolvency without even mentioning the LBO. It is clear that the PAT R and R, as adopted by Judge Rakoff, did not intend to  give the Trustee the false opportunity of continuing with the action so long as he didn't try to prove a fact critical to the action.

It is true, as it was at the time of the PAT R and R, that any attempt to recover damages for Grant Thornton's *role* in the LBO would run afoul of SLUSA. But the mere fact that the Trustee has obtained an expert opinion that is arguably on that subject is no reason to preempt the entire action under SLUSA, especially after the prior rulings in this case. If the Trustee does seek damages for the LBO, as opposed to simply proving the LBO and its effect on RCM's financial condition, then the court can at that time take appropriate action by precluding such a claim, rather than dismissing the entire action. As the Special Master noted in the SLUSA R and R  (*Krys v. Sugrue),* dated September 5, 2011, at 5-6:

Under Second Circuit law, SLUSA is applied claim-by-claim. Thus, even if this action is a covered class action,  it may be that certain claims are not precluded because they do not

---

[20]    Grant Thornton argues that Kirschner's theory "requires" reliance on Grant Thornton's conduct in the LBO. Opening Brief at 24.  But that is just an argument that the Special Master and Judge Rakoff were wrong in rejecting the SLUSA claim the last time around.

raise a claim "in connection with the purchase or sale of a covered security" or do not allege "misrepresentation or omission of a material fact."  See *In re Kingate Mgmt. Ltd. Litig.,* 2011 WL 1362106, at *6 ("The law of the Second Circuit requires a claim-by-claim analysis as to SLUSA [preclusion].").

Accordingly, there is no justification at this point for rejecting the law of the case and holding that the remaining claim in this case is now  about a misrepresentation or omission of a material fact "in connection with the purchase or sale of a covered security."

Besides their disagreement over the "in connection with" requirement,  the parties dispute whether the action is now a "covered action" within the meaning of SLUSA preemption.[21] Grant Thornton points out that the Special Master in the PAT R and R stated in a footnote that "[t]he SLUSA numerosity requirement — more than 50 — is clearly met." PAT R and R at 41, n. 35. And that was certainly true at the time, as there were more than 50 FX customers whose claims the

---

[21]

SLUSA defines a "covered class action" as:

(i) any single lawsuit in which—

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members, or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(b).

20

Trustee was pursuing.[22]  But Judge Rakoff's order affirming the PAT R and R meant that the claims of a number of FX customers had to be dropped because they were based on deposits made before the LBO. The parties agree that the number of FX customers remaining in the case is just below 50, but Grant Thornton makes two arguments for why the numerosity requirement is still met.

The first argument, made in the Reply Brief, is that the Trustee has dropped claims strategically — including a few claims that survived the motion to dismiss — in order to get under 50. The Special Master finds that there is no evidence that the Trustee or counsel has acted strategically in engineering the number of claimants to get below 50. But even if there was strategic activity, Grant Thornton cites no authority for why it is forbidden under SLUSA to drop claims to get under the 50-person limit.[23]  Indeed the case law is to the contrary. *See Contreras v. Host America Corp.*, 453 F.Supp.2d 416, 419  (D.Conn.2006) ("a calculated strategy to avoid SLUSA preemption" by bringing claims for less than 50 claimants "will not, by itself, permit a finding of preemption.") (quoting *In re WorldCom Inc. Sec. Litig.*, 308 F.Supp.2d 236, 245 (S.D.N.Y.2004)).

At oral argument Grant Thornton's counsel stated without authority  that "you look at the complaint as it was filed" in determining the number of claimants. But the SLUSA cases cited by the Special Master in the SLUSA R and R evaluated the number at the time of review. *See, e.g.,  In re WorldCom, Inc.,* 308 F.Supp.2d 236 (S.D.N.Y. 2004); *Newby v. Enron Corp. Sec. Derivative & ERISA Litig.,* 535 F.3d 325, 339-40 (5th Cir. 2008). Moreover, Grant Thornton's argument that the SLUSA question is evaluated at the time of filing is completely inconsistent with its argument that this action was not barred by SLUSA as filed, but is now precluded because it has somehow morphed into an action about misrepresentations in connection with a sale of a covered

---

[22]

The Trustee concedes that the Private Action Trust is not entitled to entity treatment under the SLUSA counting provision, because the Trust was formed solely for litigation purposes. *See Lee v. Marsh & McLennan Cos.,* 2007 WL 704033, at *4 (S.D.N.Y.) (noting in dictum that a trust created to pursue litigation is not entitled to entity treatment under SLUSA).

[23]

As discussed in the SLUSA R and R, SLUSA contains a "grouping provision" that counts the claimants in separate but related litigation toward the 50-person limit. See the SLUSA R and R at 8. If the dropped claimants were to bring individual claims, then it is possible that they might be grouped and counted with the FX customers remaining here, thus preventing strategic activity. But that has not occurred and SLUSA contains no provision — other than the grouping provision — that would prevent any strategic action to avoid the 50-person limit.

It should also be noted that this action cannot be "grouped" with *Krys v. Sugrue* for SLUSA counting purposes. See Judge Rakoff's Memorandum Order dated May 9, 2012 at 14. (the PAT action and the *Krys* action "do not present common questions of fact or law sufficient to be grouped").

security.[24]

Grant Thornton's second argument on the number-counting question is that under the terms of the Private Action Trust, any damages received in this action will be distributed not only to the FX customers, but also to class members of the securities class action and unsecured creditors and customers of the Refco Estate. See Settlement R and R in *In re Capital Markets, Ltd. Brokerage Customer Sec. Litig.,* at 4. So if all those beneficiaries are counted, the number goes over 50. But those beneficiaries are indirect recipients. As Judge Rakoff stated in his Memorandum Order on the SLUSA issue in Krys v. Sugrue, counting the ultimate beneficiaries of every recovery would "rewrite the text of the statute." Memorandum Order dated May 9, 2012, at 5. Judge Rakoff reasoned that if ultimate beneficiaries were counted, "the Court would be required to count the 'ultimate' beneficiaries of any recovery, i.e., the corporation's numerous shareholders." Id. at 5-6. Thus, the relevant parties for counting purposes are the FX customers whose claims are being brought in this case.

Accordingly, Grant Thornton's argument that this is a covered action under SLUSA should be rejected.

## VIII. The Rogers Funds

Grant Thornton contends that discovery has shown that one set of FX customers — the Rogers Funds — has been fully compensate for its damages, and so at least the Rogers Funds claims must be dismissed as a matter of law. At the time of RCM's bankruptcy, the Rogers Funds held about $8.6 million in FX accounts, and almost $363 million in RCM securities accounts. Rule 56.1 Statement at Nos. 116-17. With respect to the securities accounts, the Rogers Funds have already received amounts that exceed their losses, in an amount that cannot now be assessed specifically but is greater than $10 million. Id. at No.118. That means the Rogers Funds received approximately $1.4 million more than it had in FX accounts at RCM.

The Trustee argues that if the Trustee prevails at trial, the Rogers Funds will be entitled to prejudgment interest of about $3.6 million. Counterstatement at Nos. 126-129.[25] If you add the $3.6

------

[24]

      It should also be noted that the SLUSA R and R in *Krys v. Sugrue*, in a part affirmed and adopted by Judge Rakoff, evaluated the claims in the case at the time of review, not at the time of filing. See SLUSA R and R at 9 (rejecting the grouping of this PAT action with *Krys v. Sugrue*, because the two actions "simply do not have the kind of overlap that Congress sought to regulate in the grouping of lawsuits provision, *especially as they have been shaped by the various rulings in this MDL.*") (emphasis added).

[25]    CPLR 5001 provides for prejudgment interest:

        Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with

million to the $8.6 million lost from the FX accounts, that amount at least creates a jury question as to whether it exceeds the amount of recovery that the Rogers Funds already received.[26] Grant Thornton responds that the Rogers Funds will not be entitled to *any* prejudgment interest because such interest is to be calculated on the "sum awarded" by the court under CPLR 5001(a), and the Rogers Funds would not be entitled to any such award because of the recovery already obtained. But if Grant Thornton is right about that, then the Rogers Funds would be worse off for having recovered on the securities claims, because the Funds would have lost the right to prejudgment interest on the FX claims, at least to the extent the interest together with the underlying recovery would be greater than the excess amount of recovery already received on the securities side.   Grant Thornton's position ignores the fact that prejudgment interest is designed to make the plaintiff whole by compensating the plaintiff for the lost opportunity cost from the time of the harm to the time of the judgment. *See Kaiser v. Fishman*, 187 A.D.2d 623, 590 N.Y.S.2d 230, 234 (2nd Dept. 1992) ("The award of interest is founded on the theory that there has been a deprivation of use of money or its equivalent and that the sole function of interest is to make whole the party aggrieved."). Consequently, the Rogers Funds would at least be entitled to prejudgment interest if the amount of FX loss, plus the prejudgment interest rate, exceeds the amount of overcompensation on the securities side.   And as seen above, there is at least a fact question as to whether the amount of FX loss plus 9% in prejudgment interest is greater than the amount that the Rogers Funds have been overcompensated on the securities side.

---

title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

The interest rate for an award of prejudgment interest is 9%, measured from the date of the accrual of the cause of action. CPLR 5001(b); CPLR 5004.

"In this diversity case, issues bearing on prejudgment interest are governed by New York law." *Baker v. Dorfman*, 239 F.3d 415, 425 (2nd Cir. 2000).

[26]

The Trustee also argues in his Counterstatement, No. 129, that the FX Customers may be entitled to punitive damages. But there is no indication in the allegations of the Amended Complaint, nor in the proof elicited, that Grant Thornton's conduct would support a recovery of punitive damages. Punitive damages in fraud cases are only recoverable where the defendant acted "with evil and reprehensible motives." *China Trust Bank of New York v. Standard Chartered Bank, PLC,* 981 F.Supp. 282, 289 (S.D.N.Y. 1997) (internal quotation omitted). Punitive damages are not available in the ordinary fraud and deceit case. *Kelly v. Defoe Corp.,* 223 A.D.2d 529, 636 N.Y.S.2d 123, 124 (2nd Dept. 1996) ("It is well settled that punitive damages may not be awarded to redress a private wrong, and, accordingly, that such damages are not available in the ordinary fraud and deceit case.") (internal citation and quotation omitted). Accordingly, the possibility of a punitive damage recovery will not be considered in determining whether the Rogers Funds have any damage claim at stake in this action.

23

But even if Grant Thornton were correct in its assessment that there can be no award of prejudgment interest, dismissal of the Rogers Funds would still be unjustified. That is because if liability is determined in the Trustee's favor, the Rogers Funds would have the right to an award of nominal damages under New York law. *See, e.g., Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 470, 453 N.Y.S.2d 750 (2nd Dept. 1982) ("Notwithstanding its failure to establish damages, Manorville is still entitled to nominal damages to vindicate its rights deriving from the fraud and breach of warranty practiced upon it (see, generally, Dobbs, Law of Remedies, § 3.8, p. 191). The transaction having been fraudulently induced, Clearview and DeLillo are liable to pay nominal damages without a showing of actual damages.") (string citations omitted). See also AmJur Damages §13 ("Liability for nominal damages is sufficient to sustain a cause of action, and the possibility of an award precludes the grant of a motion to dismiss, summary judgment, or a directed verdict in favor of the defendant.").

Accordingly, there remains at the very least a question of fact as to whether the Rogers Funds may be awarded damages in this case should liability be found. Therefore the motion to grant summary judgment on the claims of the Rogers Funds should be denied.

## IX. Conclusion and Recommendation

Grant Thornton's motion for summary judgment should be denied.

Daniel J. Capra
Special Master

Dated: June 16, 2012
New York, New York

24