UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re REFCO, INC. SECURITIES LITIGATION :          07 MDL 1902 (JSR)
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
This document relates to:                           :
                                                    :          07 Civ. 8165 (JSR)
MARC S. KIRSCHNER,                                  :
As Trustee of the Refco Private Actions Trust,      :
                                                    :
                              Plaintiff,            :
                                                    :
                    -v-                             :
                                                    :
PHILLIP R. BENNETT, SANTO C. MAGGIO,                :
ROBERT C. TROSTEN, MAYER BROWN,                     :
LLP, MAYER BROWN INTERNATIONAL                      :
LLP, and GRANT THORNTON LLP,                        :
                                                    :
                              Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GRANT THORNTON LLP'S OBJECTION
## TO THE REPORT & RECOMMENDATION
## ON SUMMARY JUDGMENT


WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant Grant Thornton LLP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .......................................................................................................... 3

POINT ONE:         The R&R refuses to follow the Second Circuit's decision in
                   *Capital Management*, which held that RCM customers just
                   like these were not deceived at all. ................................................. 5

POINT TWO:         The R&R improperly recommends allowing Kirschner to
                   proceed on the theory that RCM had a common law duty to
                   disclose "hopeless insolvency," despite recognizing that the
                   proof does not support a finding of "hopeless insolvency"
                   under the New York cases. ......................................................... 11

POINT THREE:       The R&R improperly allows the aiding and abetting claim to
                   proceed despite the absence of evidence that anyone ever saw
                   Grant Thornton's audit opinions on RCM. .................................... 18

POINT FOUR:        The R&R improperly recommends denying dismissal under
                   SLUSA. ...................................................................................... 23

POINT FIVE:        Kirschner should not be allowed to proceed with claims for
                   the Rogers Funds, which have admitted they recovered more
                   than they lost. ............................................................................. 25

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

*Armstrong v. McAlpin*,
    699 F.2d 79, 91 (2d Cir. 1983)............................................................   22

*Aslandis v. U.S. Lines, Inc.*,
    7 F.3d 1067, 1072 (2d Cir. 1993).....................................................   20

*Bane v. Sigmundr Exploration Corp.*,
    848 F.2d 579, 581-82 (5th Cir. 1988) ...............................................   19

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
    -- F. Supp. --, 2012 WL 2026063, at *11 (S.D.N.Y. June 5, 2012)...................   15

*Byrd v. Ross*,
    58 F.2d 377, 378 (S.D. Fla. 1932) .....................................................   12

*Capital Mgmt. v. Bennett*,
    680 F.3d 214 (2d Cir. 2012).............................................................   *passim*

*Cartier, Div. of Richemont v. Bertone Group*,
    404 F. Supp. 2d 573, 574 (S.D.N.Y. 2005)..........................................   13

*Craigie v. Hadley*,
    54 Sickels 131 (1885) ...................................................................   11

    54 Sickels at 134-35 ......................................................................   12

*Demoulas v. Demoulas Super Mkts., Inc.*,
    1993 WL 818844, at *2-3 (Mass. Super. Ct. Nov. 29, 1993)...........................   19

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
    974 F.2d 270, 282-83 (2d Cir. 1992) ................................................   18

*Downriver Cmty. Fed. Credit Union v. Penn Square Bank*,
    879 F.2d 754, 762 (10th Cir. 1989) .................................................   16

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
    12 N.Y.3d 553, 562, 910 N.E.2d 976, 981 (2009)...................................   21

*Fidelity & Deposit Co. v. Kelso State Bank*,
    287 F. 828, 830 (9th Cir. 1923) ......................................................   17

    287 F. at 829 ...............................................................................   17

*Fidelity Sav. & Loan Ass'n v. Aetna Life & Cas. Co.*,
    647 F.2d 933, 936 (9th Cir. 1981) ...................................................   12

    647 F.2d at 936 ...........................................................................   16

*Fidelity Sav. & Loan Ass'n v. Aetna Life & Cas. Co.*,
    440 F. Supp. 862, 870-71 (N.D. Cal. 1977), *aff'd* 647 F.2d 933 (1981) ............   12

    440 F. Supp. at 871 ......................................................................   13

ii

*First Sec. Mortg. Co. v. Goldmark Plastics Compounds, Inc.*,
862 F. Supp. 918, 937 (E.D.N.Y. 1994) ............................................... 25

*Frame v. PricewaterhouseCoopers LLP*,
36 Cal. Rptr. 3d 209, 219 (Cal. App. 2005)............................................ 22

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
479 F. Supp. 2d 349, 370-72 (S.D.N.Y. 2007) ..................................... 19

*Global Minerals & Metals Corp. v. Holme*,
35 A.D.3d 93, 102, 824 N.Y.S.2d 210, 217 (App. Div. 2006) ........................... 18

*Independent Order of Foresters v. Donald, Lufkin & Jenrette*,
157 F.3d 933, 941 (2d Cir. 1998) ........................................ 10

*In re Heilig-Meyers Co.*,
319 B.R. 447, 471 (Bankr. E.D. Va. 2004)........................................ 17

*Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*,
36 N.Y.2d 121,126, 325 N.E.2d 137, 139 (1975).............................. 5

*Kaufman v. Cohen*,
760 N.Y.S.2d 157, 169 (App. Div. 2003) ................................... 17

*Kevin Kerveng Tung, P.C. v. JP Morgan Chase & Co.*,
2011 WL 6989895, at *4-5 (N.Y. Sup. Oct. 28, 2011)........................ 15

*Kolbeck v. LIT Am., Inc.*,
939 F. Supp. 240, 246-47 (S.D.N.Y. 1996) ................................ 21

*Krys v. Butt*,
2012 WL 2331485, at *3 (2d Cir. June 20, 2012) ........................... 18

*LaSala v. Bank of Cyprus Pub. Co. Ltd.*,
510 F. Supp. 2d 246, 268-69 (S.D.N.Y. 2007) ........................... 24

*Lehman Bros. v. Minmetals Int'l Non-Ferrous Met. Trading Co.*,
179 F. Supp. 2d 159, 164, 168 (S.D.N.Y. 2001)........................... 9

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273, 295 (2d Cir. 2006)....................................... 21

*Marriott v. Cnty. of Montgomery*,
426 F. Supp. 2d 1, 8 n.8 (N.D.N.Y. 2006) ............................ 13

*Mellon Bank, N.A. v. United Bank Corp.*,
31 F.3d 113, 116 (2d Cir. 1994)....................................... 10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
547 U.S. 71, 85 (2006)................................................. 23

*People ex Rel. Cuomo v. Coventry First LLC*,
13 N.Y.3d 108, 115, 915 N.E.2d 616, 620 (2009)........................... 18

*SEC v. Aragon Cap. Advisors*,
2011 WL 3278907, at *17-18 (S.D.N.Y. July 26, 2011)..................... 22

*SEC v. Zandford,*
    535 U.S. 813, 819 (2002)............................................................... 23

*Segal v. Fifth Third Bank, N.A.,*
    581 F.3d 305, 310 (6th Cir. 2009)................................................ 23

*Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.,*
    64 A.D.3d 472, 476, 883 N.Y.S.2d 486, 489-90 (App. Div. 2009)........ 21

*St. Louis & S.F. Ry. Co. v. Johnston,*
    113 U.S. 566 (1890) .................................................................... 11

    113 U.S. at 576-78 ...................................................................... 12

*U.S. Pipe & Foundry v. City of Hornell,*
    263 N.Y.S. 89 (Sup. Ct. 1933)..................................................... 12

    263 N.Y.S. at 93-97 ..................................................................... 13

    263 N.Y.S. at 93-97 ..................................................................... 16

*U.S. v. Santoro,*
    302 F.3d 76, 80-81 (2d Cir. 2002) ............................................... 10

*U.S. v. Szur,*
    289 F.3d 200, 211 (2d Cir. 2002)................................................. 6

    289 F.3d at 207 ............................................................................ 10

    289 F.3d at 211-12 ....................................................................... 10

*U.S. v. Wolfson,*
    642 F.3d 293, 294-95 (2d Cir. 2011) ........................................... 10

*Werner v. Crippen,*
    245 A.D. 363, 367, 282 N.Y.S. 722, 727 (App. Div. 1935) .............. 12

*Witzman v. Lehrman, Lehrman & Flom,*
    601 N.W.2d 179, 188-89 (Minn. 1999) ......................................... 19

**STATUTES AND RULES**

17 C.F.R. § 240.15c3-1 ...................................................................... 17

15 U.S.C. § 77p(b)............................................................................. 23

15 U.S.C. § 78bb(f)............................................................................ 23

CPLR § 5001...................................................................................... 25

New York Business Corporation Law § 102(a)(8)................................. 12

New York General Business Law § 339-d ............................................ 6, 9

New York General Business Law § 339-e.............................................. 8, 9

## PRELIMINARY STATEMENT

On every point, accepting the Special Master's June 16, 2012 Report & Recommendation would require rejecting or ignoring the governing law. The R&R recommends a trial on the customers' claims for aiding and abetting fraud, despite the Second Circuit's conclusion that customers exactly like these were never defrauded and cannot state a claim. *See Capital Mgmt. v. Bennett*, 680 F.3d 214 (2d Cir. 2012) (as amended). The R&R endorses the theory that offshore broker RCM had a duty under New York law to disclose "hopeless insolvency," despite acknowledging that this case is nothing like the New York "hopeless insolvency" cases. The R&R would allow the customers to recover from Grant Thornton without proving that they were even aware of its audit opinions, despite the absence of any New York case holding an auditor liable under such circumstances. The R&R would allow this case to survive SLUSA under an argument that this Court itself rejected just a month ago. And for those customers who have already recovered more money than they lost, the R&R would allow the jury to find injury based on prejudgment interest, even though New York law authorizes prejudgment interest only ***after*** the plaintiff shows an injury. As discussed below, every one of these recommendations appears to reflect the Special Master's theory about what the law ***should*** be, not an application of the law as it is. All these recommendations should be rejected.

Marc Kirschner is suing here as the assignee of dozens of individual customers of RCM (or Refco Capital Markets, Ltd.), Refco's unregulated offshore brokerage subsidiary. Each of these customers made deposits at RCM in order to trade in the unregulated foreign exchange ("FX") markets. Only one theory survived the pleading stage—that Grant Thornton aided and abetted RCM's fraudulent inducement of its customers' deposits. As this Court has recognized, this theory requires proof that RCM was "hopelessly insolvent"; that RCM defrauded its customers by silently accepting their deposits without disclosing this information; that Grant

Thornton knowingly aided the tort against each customer by issuing audit opinions on RCM's private, stand-alone financial statements; and that each customer was injured as a result. *See* R&R on Mot. to Dismiss at 10-14, 33, 36-39 (June 3, 2010), *adopted* Dec. 13, 2010 ("MTD R&R"). Kirschner has the burden of proving every step of this theory for each customer that assigned its claims to the trust.

Since the pleading stage, however, there have been two critical developments that now foreclose Kirschner's claims as a matter of law. First, as noted above, the Second Circuit issued a decision in another RCM customer case that refutes Kirschner's entire theory of liability. And second, the deposition testimony of Kirschner's own witnesses has produced admission after admission disproving his claims. As demonstrated further below, Kirschner cannot prove the elements of his claims for *any* of the customers he represents.

In the end, the current R&R shows how far this case has strayed from New York law. The customers in this case are all unsecured creditors of RCM, and they are suing to recover what they lost when RCM went bankrupt. Long ago, Grant Thornton moved to dismiss their claims as derivative of RCM's own injury. This Court rejected that argument at the time, on the theory that these customers alleged they were defrauded directly, in a manner "not equally applicable to all creditors." *See* R&R on Mot. to Dismiss for Lack of Standing at 6 (Feb. 14, 2011), *adopted* May 16, 2011; *see id.* (claims are direct if they are "personal to the [claimant]" and do not "affect[] all creditors equally").

Under the R&R now before the Court, however, the customers can proceed without showing any deception or harm that is "personal" to them, pursuing a theory that plainly is "equally applicable to all creditors." According to the Special Master, Kirschner can recover damages on behalf of these customers without proving any of the following:

- that these customers personally relied on any false statement by RCM or anyone else (SJ R&R at 14);

- that these customers were owed a duty to disclose that was distinct from a duty RCM owed to all its other creditors (*see id.* at 7 ("***no*** person in business should be taking on obligations when they know they are hopelessly insolvent"));

- that these customers personally knew or relied on the fact that Grant Thornton had audited RCM (*see id.* at 16-17 (finding it sufficient that "other members of the public had access to the information")); and

- that these customers personally lost more money at RCM than they were able to recover through the bankruptcy (*see id.* at 23-24 (finding it sufficient for a customer to show an entitlement to "prejudgment interest" or "nominal damages")).

These conclusions cannot be squared with either the governing law or the ruling on standing.  If the customers' claims are truly "direct," then Kirchner must prove that the customers were directly defrauded and harmed with the assistance of Grant Thornton, in a way that distinguishes them from every other creditor.  As a matter of law, Kirschner cannot carry that burden.

## BACKGROUND

*The Underlying Facts.*  This case arises out of the collapse of Refco, which was once the world's largest broker for exchange-related derivatives.  Among other things, Refco offered its customers the opportunity to trade using RCM, its offshore subsidiary.  RCM held itself out as a Bermuda corporation exempt from regulation in the United States.  *See generally Capital Mgmt.*, 680 F.3d at 219-23 (describing risks and benefits of using an unregulated broker).

RCM conducted trading both in securities derivatives and in the unregulated FX markets. It held all of its customers' deposits in unsegregated accounts.  *Id.* at 220.  It also engaged in the common practice of hypothecation, which involved using and "upstreaming" customer deposits as a source of financing for Refco's own business activities.  *Id.* at 220-21.  This practice was fully disclosed in RCM's customer agreements, which provided that RCM would have the right to "use or dispose of" everything in the customers' accounts "free from any claim or right."  *Id.*

at 227-29.  As a matter of contract, RCM's only obligation with respect to customer assets (aside from conducting trades at the customers' direction) was to honor requests for withdrawal by paying an amount of cash equivalent to the value of the assets the customer had on deposit.  *Id.*

In October 2005, Refco issued a press release disclosing a $430 million related-party receivable that should have been disclosed earlier.  (This receivable was owed by RGHI, an entity owned and controlled by Refco CEO Phil Bennett, who paid it down prior to the press release.)  Shortly thereafter, Bennett was arrested on charges of fraud.  He and other Refco executives are now facing years in prison for crimes that include a scheme to hide the truth from Refco's outside auditor, Grant Thornton.

After Bennett's arrest, and after receiving little reassurance from management, some customers began approaching RCM and demanding withdrawal of their assets.  A classic "run on the bank" ensued.  Within a few days, Refco announced a moratorium on withdrawals.  Both Refco and RCM (and other subsidiaries) were soon forced to file for bankruptcy protection.

***Grant Thornton's Audits.***  Grant Thornton served as Refco's outside auditor for the fiscal years 2003-2005.  It issued unqualified audit opinions on Refco's consolidated financial statements, which were filed with the SEC in connection with Refco's issuance of securities in its leveraged buy-out in August 2004 ("LBO") and its initial public offering in August 2005 ("IPO").  These consolidated financial statements necessarily represented the financial condition of Refco as a whole—treating all of its subsidiaries as part of the same, undivided organization.

Grant Thornton also audited the financial statements of RCM as a stand-alone entity. But because RCM was neither a public company nor regulated by the SEC, its own financial statements (and Grant Thornton's audit opinions thereon) were never filed publicly or provided to any regulator.  In fact, there was no legal or contractual requirement for RCM to have audited

4

financial statements at all.  Grant Thornton provided its opinions on those stand-alone financial statements privately, to Refco and RCM, and there is no evidence that any of these customers—or anyone else outside Refco—ever reviewed or relied on them.

***This Lawsuit and the Private Actions Trust.***  Plaintiff Marc Kirschner served as bankruptcy trustee of RCM and was later appointed as trustee of the trusts created in Refco's bankruptcy—including the Private Actions Trust, which was designed to pool and pursue the claims of Refco creditors.  This lawsuit currently encompasses the assigned claims of 49 customers who used RCM as their broker for trading in the FX markets.  Each of these customers made deposits at RCM between the LBO in August 2004 and the bankruptcy in October 2005.  Kirschner's Fifth Claim for Relief—the only count remaining against Grant Thornton—asserts that Grant Thornton should be held liable for aiding and abetting a fraud by RCM that induced the customer's deposits.  As assignee, Kirschner has the burden of proving each element of this theory for each customer with a claim in this case.  *Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121,126, 325 N.E.2d 137, 139 (1975) ("It is elementary ancient law that an assignee never stands in any better position than his assignor.  He is subject to all the equities and burdens which attach to the property assigned . . . .").

Under the previous orders by Special Master Hedges, the upcoming trial—if it proceeds—will concern all the elements of liability.  The case will move on to a damages phase only with respect to those customers (if any) for whom liability is established at the first trial.

## POINT ONE

### The R&R refuses to follow the Second Circuit's decision in *Capital Management*, which held that RCM customers just like these were not deceived at all.

The customers in this case have never been able to identify any fraudulent statement by RCM, so they have resorted to a theory of fraud-by-implication.  They claim that RCM was

"hopelessly insolvent," that it owed them a duty to disclose this fact, and thus that it committed fraud by silently accepting their deposits.  MTD R&R at 11.  Although a non-discretionary broker does not owe its customers a general duty to disclose, it may owe a limited duty "'with respect to those matters that have been entrusted to the broker.'"  *Id*. at 11-12 (quoting *U.S. v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002)).  Against that backdrop, the Court concluded at the pleading stage that Kirschner had alleged sufficient facts to implicate a duty to disclose described in two old New York banking cases, which hold that "it is fraudulent for a bank to silently accept a customer's deposit when it is hopelessly insolvent."  MTD R&R at 13.  The Court found further support for this idea in state and federal brokerage regulations, which it concluded would impose sanctions on a broker that accepts a deposit without disclosing its insolvency.  *Id*. (citing Section 10(b) of the Securities Exchange Act and N.Y. Gen. Bus. Law § 339-d).

    Whatever the merits of this theory at the pleading stage, the Second Circuit has since issued a decision that requires rejecting it as a matter of law.  *Capital Management* was a putative class action brought by customers who used RCM as their broker for trading in securities—customers who are indistinguishable from the FX customers here in all material respects.[1]  The class customers (like those here) could not show that they had relied on any affirmative misstatement by RCM or Refco.  At the same time, the customers (like those here) contended that at the time of their deposits, RCM was actually a "ponzi scheme" saddled with huge, "uncollectible" loans to affiliates, having upstreamed the customers' assets to "insolvent" Refco entities that "lacked the financial ability and intention to repay."  *Compare* Consol. Am. Class Compl. in *In re RCM Brokerage Customer Sec. Litig*., Dkt. No. 30, ¶¶ 5, 46, 57 (Sept. 5,

---

[1]  In the class action, the customers pursued claims against Refco insiders (including Phil Bennett) as "control persons" behind the company's fraud.  Here, the customers sued the same individuals and also asserted aiding and abetting claims against Mayer Brown and Grant Thornton.  In both cases, the first step is to show a primary violation by Refco (or RCM).

2006), *with* Opp. to SJ Mot. at 1, 10-11.  So, the customers invoked the "shingle theory," which provides that a broker "assumes certain duties" and "makes certain implied representations" relating to its compliance with applicable law "merely by 'hanging out its professional shingle'" and accepting deposits.  680 F.3d at 230 (citations omitted).  Kirschner has conceded that this theory is "analogous" to the theory the customers are asserting in this case.  Opp. to SJ Mot. at 5.

According to the Second Circuit, however, RCM's customers were never deceived about whether it would comply with the laws that govern brokers in the United States.  As *Capital Management* explains, RCM's customer agreements "unambiguously warned" its customers that it was operating as a Bermuda entity, exempt from regulation in the United States.  680 F.3d at 227-30 (interpreting customer agreements).  Thus, its customers were on notice that RCM could and would use their assets without regard to the limits imposed by both state and federal rules.  *Id.*  That means that the customers were on notice that RCM would not comply with the rules that require a broker to take precautions to protect customers from the risk of its own insolvency—for example, by limiting its use or "hypothecation" of customer assets or by maintaining a particular amount of capital on the broker's stand-alone books.  *Id.* at 229 & n.18.

Concluding that RCM affirmatively represented itself to be exempt from U.S. law, the Second Circuit held that RCM's customers cannot claim fraud based on any implied representation or expectation that RCM would comply with it.   The Court concluded, "[s]urely, RCM's affirmative representations that it was ***not*** a U.S.-regulated company trump any implied representation" about RCM's compliance with applicable law.  *Id.* at 230.  That same reasoning requires rejecting the FX customers' theory here—that by accepting their deposits, RCM assumed solvency-related duties under New York law and implied it was complying with them.

Kirschner tried to avoid *Capital Management* by denying that his theory depends on RCM's practice of hypothecating assets while failing to maintain sufficient capital. *See* Opp. to SJ Mot. at 5 n.3. The Special Master did not accept that argument, and properly so. Obviously, any argument about a broker's insolvency necessarily focuses on inadequate capitalization, and Kirschner's argument is no exception.[2] The whole point of net capital requirements—and, indeed, all state and federal regulation in this area—is to "protect . . . customers from the firm's potential insolvency" 680 F.3d at 229 n.18; *see also id.* at 221. As the Second Circuit has recognized, RCM's customer agreements "clearly represented" that it "undertook no obligation" to comply with these rules. *Id.* at 232. "These disclosures were made in conjunction with a bargained-for agreement between sophisticated counter-parties that could be expected to understand the relevant benefits and risks" of this type of arrangement. *Id.* at 231.

Still, the Special Master refuses to accept that *Capital Management* means what it says. He recommends that this Court allow the customers' claims to proceed notwithstanding that decision, reasoning that "*Capital Management* cannot mean that by saying 'RCM is not subject to securities regulations' RCM was also clearly saying 'we are not regulated by ***any*** American law [or] ***any*** capitalization standards.'" SJ R&R at 6 (first emphasis added).

But that is ***exactly*** what *Capital Management* means. In fact, it says so explicitly. The Second Circuit concluded that RCM had not misled its customers about its noncompliance with ***any*** rules that would apply to a domestic broker—whether they arise under federal or state law. *See id.* at 229-33 (discussion under the heading "Consistency with Federal and State Law"). The Court recognized specifically that RCM was not bound by state laws like New York General

---

[2]  *See, e.g.*, Grant Thornton's Rule 56.1 Statement (cited herein as "¶___") ¶ 83 & Resp. (Kirschner's solvency expert opines that "RCM was inadequately capitalized") (undisputed); Plaintiff's Counterstatement of Material Facts ("CS") ¶ 10 (asserting hopeless insolvency based on upstreaming to other entities and lack of profits on RCM's own books).

Business Law § 339-e, which restricts the operations of brokers in New York.  *See* 680 F.3d at

232.  For the same reason, RCM's mere acceptance of deposits could not have deceived anyone

about whether it would comply with state laws such as New York General Business Law § 339-

d, which was cited in the pleading-stage R&R as support for the proposition that a broker has a

duty to disclose insolvency before accepting a deposit.

In a footnote, the R&R tries to minimizes the Second Circuit's conclusion relating to

New York General Business Law § 339-e, describing the "specific holding" as merely that

Section H of the RCM agreements did not bind RCM to comply with New York brokerage laws.

SJ R&R at 5 n.6.  That misses the point of this discussion.  Section H was important because it

was the only possible basis for claiming that RCM held itself out as complying with New York

law.  Without Section H, the customers had no reason to expect that RCM—a Bermuda

company—would follow New York law in connection with its brokerage operations.[3]

Nor was the theory in *Capital Management* merely about implied compliance with

"capitalization requirements imposed by the SEC," as the R&R suggests.  SJ R&R at 6.  The

customers argued that by accepting deposits, RCM falsely implied it would "'deal fairly with the

public in accordance with the standards of the profession.'"  680 F.3d at 230 (quoting Rule 28(j)

letter).  That is not materially different from the theory here—that by accepting deposits, RCM

falsely implied it had disclosed all "'significant'" information, including any solvency-related

information it was required to disclose under New York law.  *See* SJ R&R at 6 (quoting *Szur*).

Apparently, the Special Master was persuaded by the fact that *Capital Management* "did

not so much as cite *Szur*" (*id.*)—but there was never any reason for it to do so.  *Szur* was a

---

[3]  Notably, **no** foreign exchange broker—not even a domestic one—would be governed by these
statutes unless it was also trading in securities.  *Lehman Bros. v. Minmetals Int'l Non-Ferrous
Met. Trading Co.*, 179 F. Supp. 2d 159, 164, 168 (S.D.N.Y. 2001) (FX transactions do not
involve securities for purposes of Section 10(b) and New York's Martin Act).

federal criminal case involving a regulated broker.  The defendants were charged with devising and executing a scheme to defraud customers by selling them stock "without disclosing that up to fifty percent of the sale price of the stock went toward brokerage commissions." 289 F.3d at 207.  In the course of affirming a conviction for wire fraud, the Court recognized that even a nondiscretionary broker may have a duty of trust and confidence that requires it to use reasonable efforts to give its customers information "significan[t]" to the affairs with which it had been entrusted.  *Id.* at 211-12.  This was not a particularly noteworthy holding; it followed a line of cases recognizing that an agent may have "certain limited duties" to its principal even without a fiduciary relationship.  *Id.* (citing, *e.g.*, *Indep. Order of Foresters v. Donald, Lufkin & Jenrette*, 157 F.3d 933, 941 (2d Cir. 1998)).  The Second Circuit has never cited *Szur*'s duty holding outside the context of excessive commissions.  *See U.S. v. Wolfson*, 642 F.3d 293, 294-95 (2d Cir. 2011) (excessive commissions case); *U.S. v. Santoro*, 302 F.3d 76, 80-81 (2d Cir. 2002) (same).  Nor did *Szur* involve a situation—as in *Capital Management* (and here)—where a broker held itself out as an offshore entity, exempt from laws that govern brokers in the United States.   Thus, the fact that the Second Circuit did not cite *Szur* cannot possibly justify refusing to apply *Capital Management* in this case, on identical facts.

The R&R's ultimate conclusion with respect to *Capital Management* is mystifying.  It recommends denying summary judgment on the ground that RCM's customer agreements are "ambiguous" and present a "classic question of fact."  *See* SJ R&R at 6.  But Kirschner has never argued that the agreements are ambiguous; in fact, his counsel admitted that the issue raised under *Capital Management* is a "pure legal argument."  SJ Hearing Tr. at 86:19 (May 25, 2012).  And in any case, ambiguity precludes summary judgment only if the nonmoving party presents "relevant extrinsic evidence of the parties' actual intent."  *Mellon Bank, N.A. v. United Bank*

*Corp.*, 31 F.3d 113, 116 (2d Cir. 1994).  Kirschner has never identified any such extrinsic

evidence, so there is no "question of fact" that the jury could conceivably be asked to resolve.

The possibility of "ambiguities" did not prevent the Second Circuit from interpreting the RCM

customer agreements (680 F.3d at 229), and it should not prevent this Court from doing so either.

Obviously, *Capital Management* cannot be distinguished on its facts.  As legal precedents

go, it is difficult to imagine a precedent more compelling than this one—a decision rendered by

the same court that will review any decision in this case, dismissing claims by identically

situated customers under identical facts and an admittedly "analogous" theory.   This Court

should reject the Special Master's proposal to ignore *Capital Management* and enter judgment in

Grant Thornton's favor, as that decision requires.

### POINT TWO

**The R&R improperly recommends allowing Kirschner to proceed on the theory that RCM
had a common law duty to disclose "hopeless insolvency," despite recognizing that the
proof does not support a finding of "hopeless insolvency" under the New York cases.**

As discussed above, this case proceeded beyond the pleading stage because of allegations

that RCM was "hopelessly insolvent" at all times after Refco's August 2004 LBO.  *See* MTD

R&R at 13.  The legal theory underlying this claim was based on two New York common law

cases holding that "it is fraudulent for a bank to silently accept a customer's deposit when it is

hopelessly insolvent."  *Id*. (citing *Craigie v. Hadley*, 54 Sickels 131 (1885); *St. Louis & S.F. Ry.

Co. v. Johnston*, 133 U.S. 566 (1890)).  The Special Master acknowledged that these cases were

"ancient" and arose in the banking context.   MTD R&R at 13.  But both he and the Court were

willing to entertain the possibility that a non-discretionary broker might have the same duty to

disclose, if the evidence showed that RCM was, in fact, "hopelessly insolvent."  *See id*. at 11-13.

The discovery record in this case proves that RCM was ***not*** hopelessly insolvent.  Grant

Thornton has shown—and the Special Master apparently agrees—that the facts of this case are

markedly different from those in the New York banking cases.  *See* SJ R&R at 7.  As the Special

Master acknowledges, a "fair reading" of those cases is that they "involved banks that had

essentially closed up shop while taking on more deposits."  *Id.*   That is simply not true for RCM,

and Kirschner has never argued otherwise.

 *Craigie* concerned an obligation accepted by a bank "between 2 and 3 o'clock in the

afternoon" on its very last day of operation.  54 Sickels at 134-35.   The bank had already

allowed its drafts to "go[] to protest," and "it was manifest that a condition of open insolvency

must immediately ensue."  *Id.* at 135.   Similarly, in the *Railway* case, the bank accepted a deposit

and closed its doors forever the following morning.  133 U.S. at 577-78 (applying *Craigie*).

Despite the proximity of the deposit and the closure, the Court noted that there would still have

been no fraud if, at the time of the deposit, "there had been ground for the supposition that the

bank might continue in business," even on credit.  *Id.* at 578, 576; *accord Byrd v. Ross*, 58 F.2d

377, 378 (S.D. Fla. 1932) (no fraud if "there was a present genuine and reasonably founded

hope, expectation, and intention on the part of the bank's officers to carry on the business").

 The cases that have followed *Craigie* and the *Railway* case have similarly limited the

concept of "hopeless insolvency," applying it only when a bank is "unable to meet its obligations

as they mature" in the ordinary course of business.  *Fidelity Sav. & Loan Ass'n v. Aetna Life &*

*Cas. Co.*, 647 F.2d 933, 936 (9th Cir. 1981); *Fidelity Sav. & Loan Ass'n v. Aetna Life & Cas.*

*Co.,* 440 F. Supp. 862, 870-71 (N.D. Cal. 1977), *aff'd* 647 F.2d 933 (1981).[4]  In *U.S. Pipe &*

*Foundry v. City of Hornell*, 263 N.Y.S. 89 (Sup. Ct. 1933), for example, the court found a bank

---

[4] *Cf. Werner v. Crippen*, 245 A.D. 363, 367, 282 N.Y.S. 722, 727 (App. Div. 1935) (refusing to
set aside a verdict;  reasonable jury could have found that the bank was already leveraged to the
hilt and could no longer "meet the demands that were likely to be made upon it in the usual and
ordinary course of banking business"); N.Y. Bus. Corp. Law § 102(a)(8) ("'Insolvent' means
being unable to pay debts as they become due in the usual course of the debtor's business.").

liable when it had accepted a deposit while "a run of considerable proportion upon the bank" was already underway. *See id.* at 93-97, *cited in* Opp. to SJ Mot. at 13.

On the discovery record here, this theory fails as a matter of law. As discussed above, RCM was an unregulated offshore broker, not a bank. And moreover, Kirschner's claims concern deposits made as long as **14 months** before any "run on the bank." *Contrast Fidelity Savings & Loan Assoc.*, 440 F. Supp. at 871 (no fraud when bank was able "'to receive deposits, pay checks, and to do general banking business'" for three days following a deposit (citation omitted)). Throughout the period of the deposits, RCM's management honored—and expected to honor—all customer withdrawals in the ordinary course of business. Kirschner's own Rule 30(b)(6) witness admitted as much: former RCM Chief Operating Officer Steven Dispenza[5] testified that he always "fully expected and believed all [RCM] customer deposits could be returned to them on demand." ¶ 44; *see also* ¶ 47 (testimony of fraudster Santo Maggio).

Notwithstanding this binding admission, the Special Master recommends denying summary judgment. He now asserts that the New York banking cases were not the basis for the "hopeless insolvency" theory after all. SJ R&R at 7. According to the Special Master, these cases merely provided "some support" for the pleading-stage ruling; they were "not necessary" to that ruling, and they do not "establish a definition of 'hopeless insolvency.'" *Id.* But if the New York cases do not define "hopeless insolvency" for purposes of New York law, what does?

The Special Master has not attempted to define what hopeless insolvency is; he focuses only on what it is not. He asserts that hopeless insolvency is not "grounded in or dependent on

---

[5] Dispenza's deposition testimony is admissible and binding on the Trust. *See Cartier, Div. of Richemont v. Bertone Group*, 404 F. Supp. 2d 573, 574 (S.D.N.Y. 2005) (Rakoff, J.). Before the Special Master, Kirschner attempted to discredit Dispenza's testimony by saying that he did not have all the facts. But having designated him under Rule 30(b)(6) (*see* ¶ 41), Kirschner cannot avoid summary judgment by arguing that Dispenza was insufficiently knowledgeable. *Marriott v. Cnty. of Montgomery*, 426 F. Supp. 2d 1, 8 n.8 (N.D.N.Y. 2006).

banking" (*id.*), even though that is the only context in which New York courts have recognized or applied it.  He asserts that it does not turn on whether RCM was able to "honor[] all obligations as they came due in the ordinary course" (*id.* at 9)—even though that is precisely how the *Craigie* line of cases has interpreted it.

In fact, according to the Special Master, "hopeless insolvency" does not turn on whether RCM's condition was "hopeless" at all.  *See id.* at 9-12.  Kirschner has testified under oath that "prior to the IPO, and as long back as the LBO, [Refco], if properly handled, could have been saved from bankruptcy."  ¶ 49.  And in another Refco case, Kirchner presented an expert who opined that if Refco had been better managed, it could have prevented the run on the bank, retaining "all but 10% to 15%" of RCM's customers even after the fraud's disclosure.  ¶ 53; *see* ¶¶ 51-54 (opinions of restructuring expert Robert Manzo).[6]  Yet according to the Special Master, these admissions of "hopefulness" are "insufficient to justify summary judgment on the question of hopeless insolvency."  SJ R&R at 10-11 & n.11.

In essence, the R&R takes "hopeless insolvency" and makes it about something else entirely.  The Special Master would apparently permit the jury to find "hopeless insolvency" simply because management's plan to keep RCM in operation included continuing to hide the Refco fraud until the RGHI receivable was paid down.  *Id.* at 9-10.  But that is a different theory, having nothing to do with RCM's ability to honor its ordinary-course obligations to customers at the time of the deposits.  Accepting that theory would make this case about the failure to disclose the Refco fraud itself.  In fact, the Special Master says so explicitly.  *See id.* at 9 (suggesting that

---

[6]  Based in part on this testimony by Manzo, Kirschner was able to secure a significant settlement from defendant T.H. Lee, half of which went to the Private Actions Trust.  *See* Kirschner Decl. in Support of Mot. for Preliminary Approval ¶ 4, in No. 06 Civ. 643, Dkt. No. 284 (Mar. 2, 2011).  Under the circumstances, Kirschner cannot now disclaim this expert opinion simply because he offered it in a different capacity—as trustee for the Litigation Trust.

there is "at the very least a jury question" as to whether a broker has a duty to disclose that it is engaged in fraud and could face a run on the bank if the fraud were disclosed).

It is too late for that.  This case has never been about a failure to disclose the RGHI receivable or the Refco fraud.  In fact, the previous rulings in this case have repeatedly refused to conflate that fraud—the "so-called 'receivables scheme' that involved the round-trip loans"— with the "so-called [RCM] 'customer scheme'" at issue in this case.  MTD R&R at 30 (quoting *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 545 (S.D.N.Y. 2009) (ruling on prior motion to dismiss)).  The only theory Kirschner was allowed to pursue in this case was that RCM committed fraud by accepting deposits while it was hopelessly insolvent—and that Grant Thornton aided and abetted that fraud by issuing an unqualified audit opinion on RCM's financial statements.  MTD R&R at 13, 36.  But that theory has been disproven in discovery.

To be clear, Grant Thornton has never contended that New York law on hopeless insolvency requires "ignoring the existence of fraud within the corporation."  SJ R&R at 9 (mischaracterizing Grant Thornton's argument and calling it "myopic").  But at the same time, the fact that there was a hidden fraud is not sufficient to create a duty to disclose.  *See, e.g.*, *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, -- F. Supp. --, 2012 WL 2026063, at *11 (S.D.N.Y. June 5, 2012) (N.Y. law) (broker had no duty to disclose that it had knowingly sold notes issued by a fraudfeasor that lacked the funds to repay them); *Kevin Kerveng Tung, P.C. v. JP Morgan Chase & Co.*, 2011 WL 6989895, at *4-5 (N.Y. Sup. Oct. 28, 2011) (bank had no duty to disclose multiple instances of forged or counterfeit instruments).  As noted above, Kirschner himself has admitted—both under oath in this case and through his expert in another Refco matter—that the mere existence of the Refco fraud did not make the collapse either imminent or inevitable.  *See supra* at 14.  So, the Refco fraud is significant here only to the extent that it

15

impaired RCM's ability to honor its obligations to customers in the present tense.  That requires looking at RCM's condition at the time of the deposits—*before* the run on the bank.  *Contrast U.S. Pipe*, 263 N.Y.S. at 93-97 (finding liability when bank accepted deposits while "a run of considerable proportion upon the bank" was already underway).

There is no evidence that at the time of the deposits here, the RGHI receivable fraud (or anything else) was adversely impacting RCM's ability to honor ordinary course withdrawals.  It was not until October 2005—when the news broke and was mismanaged into a public scandal— that RCM experienced a run on the bank and became unable to honor its obligations.  Only then did RCM become "hopelessly insolvent."[7]

The Special Master suggests that there is "a jury question on whether RCM was hopelessly insolvent after the LBO *without regard to any run on the bank after discovery of the fraud*"—relying on proposed expert Israel Shaked's opinion about the true state of RCM's balance sheet.  SJ R&R at 8 (citing, *e.g.*, CS ¶ 14).[8]  That is not sufficient.  As a matter of law, "the condition of [the institution's] balance sheet is not dispositive."  *Fidelity*, 647 F.2d at 936; *Downriver Cmty. Fed. Credit Union v. Penn Square Bank*, 879 F.2d 754, 762 (10th Cir. 1989) (it is not enough to show "simple insolvency") (quotation marks and citation omitted).   Under the

---

[7]   Kirchner's brief insisted that RCM was a "Ponzi scheme," but the Special Master apparently did not agree, as the R&R does not use that term.  And for good reason:  there is no evidence that RCM induced investments by showing artificially high returns that were not based on real operations—the defining characteristics of a Ponzi scheme.  SJ Reply at 7-8 (citing authorities).

[8]   Shaked also performs a "capital adequacy" analysis, examining RCM's "ability to pay its debts as they become due."  ¶ 88.  But that analysis assumes that the run on the bank had already occurred (when it clearly had not).  ¶ 90 (report assumes that "'upon disclosure of the full extent of the fraud and RCM's true financial condition, RCM's customers would have demanded the return of their deposits and funds'").  This is circular.  Obviously, one cannot determine "RCM's true financial condition" and ability to meet obligations in the ordinary course by assuming that the *disclosure* of "RCM's true financial condition" would cause a *departure* from the ordinary course.  (This problem is independent of—and in addition to—the grounds for excluding Shaked's opinions altogether, described in Grant Thornton's pending *Daubert* motion.)

16

*Craigie* line of cases, as long as the bank continues to "receive deposits, pay checks, and to do general banking business," it may accept additional deposits without making any special disclosures, even if its balance sheet is in the red. *Fidelity & Deposit Co. v. Kelso State Bank*, 287 F. 828, 830 (9th Cir. 1923); *see id.* at 829 (following the *Railway* case).

Moreover, by looking at RCM's "true" balance sheet on a stand-alone basis, Kirschner ignores the fact that RCM was part of the Refco group of companies and had loaned out its cash only within that organization. Yes, one of Kirschner's experts says the other Refco companies "needed" that cash "to remain liquid." SJ R&R at 8 (quoting Carmichael report). But a liquidity problem is not enough to make an enterprise insolvent, much less "hopelessly" insolvent. *See In re Heilig-Meyers Co.*, 319 B.R. 447, 471 (Bankr. E.D. Va. 2004) ("[T]he impact of poor liquidity is a matter of degree, and . . . must not overly influence the requisite solvency analysis.").

While RCM always had "an obligation to return the fair value of customers' securities" (SJ R&R at 8 (quoting Carmichael report)), it had no legal or contractual obligation to maintain enough liquidity to repay all its customers at once. Even a U.S.-regulated entity does not need to maintain that much cash. *See, e.g.*, 17 C.F.R. § 240.15c3-1 (SEC's Net Capital Rule). The only circumstance under which RCM would have faced the prospect of having to come up with all the funds at once would be during a run on the bank. Obviously, ***no*** modern bank or brokerage maintains sufficient liquidity to survive a run on the bank. Yet that does not mean that every bank and broker is committing a fraud merely by accepting a deposit.

In the end, the uncertain nature of the duty described by the R&R is itself a reason to dismiss Kirschner's claims. This is an aiding and abetting case. Aiding and abetting requires proof that the defendant actually ***knew*** that the wrongdoer owed and was breaching a duty to the plaintiff. *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003) (aiding and abetting

requires "that the defendant knowingly induced or participated in the breach"). As the New York Court of Appeals has explained, a claim for aiding and abetting "necessarily fails if . . . defendants did not know of the duty." *People ex Rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108, 115, 915 N.E.2d 616, 620 (2009).[9]

According to the R&R, it is still unclear today whether RCM had a duty to disclose at all. In fact, there will be no way to know whether RCM owed the customers a duty until a federal jury examines what information was or was not "significant" from the customers' perspective. SJ R&R at 11 (quoting *Szur*). No matter how the jury comes out on that issue, there is no conceivable way Grant Thornton could have known back in 2004 and 2005 that RCM had—and was breaching—such a duty. For all these reasons, the Special Master's recommendation should be rejected, and the Court should enter judgment in Grant Thornton's favor as a matter of law.

## POINT THREE

**The R&R improperly allows the aiding and abetting claim to proceed despite the absence of evidence that anyone ever saw Grant Thornton's audit opinions on RCM.**

Even if Kirschner could prove a fraud by RCM, he still cannot prove that Grant Thornton substantially assisted RCM in inducing customer deposits. His theory focuses on Grant Thornton's audit opinion on RCM's stand-alone financial statements. MTD R&R at 36.[10] But

---

[9] *See also Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 282-83 (2d Cir. 1992) (abrogated on other grounds) ("The relevant 'knowledge' for liability to attach for knowingly participating in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty."); *Global Minerals & Metals Corp. v. Holme*, 35 A.D.3d 93, 102, 824 N.Y.S.2d 210, 217 (App. Div. 2006) (rejecting claim on this basis). The Second Circuit recently applied this principle in another Refco-related case, rejecting a claim for aiding and abetting breach of fiduciary duty because the plaintiffs had not alleged that the defendant knew the conduct "violated anyone's fiduciary duty." *Krys v. Butt*, 2012 WL 2331485, at *3 (2d Cir. June 20, 2012) (summary order).

[10] Although Grant Thornton issued opinions on RCM's standalone financial statements for 2003, 2004, and 2005, only the 2005 audit opinion (for the year ending February 28, 2005) relates to financial statements for a period after the LBO. So, that is the only RCM audit opinion that even arguably relates to the concealment of RCM's post-LBO financial condition.

18

that audit opinion was issued privately to Refco's management; neither the opinion nor the underlying financial statements were ever filed with the SEC or any other public agency. Moreover, every customer to testify here has admitted ***that it never saw that opinion***, and there is no evidence that they saw RCM's audited financial statements either.  ¶¶ 95, 97.   In short, no action by Grant Thornton proximately caused these customers to choose RCM as their broker.

We are not aware of a single case under New York law where an auditor was held liable for aiding and abetting fraud based on the issuance of audit opinions that were never filed with a regulator or otherwise provided to the plaintiff.  To the contrary, to establish substantial assistance based on something an outside professional said or did, the plaintiff must prove he was aware of it.  *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 370-72 (S.D.N.Y. 2007) (allowing aiding and abetting claims by plaintiffs who relied, and dismissing claims by plaintiffs who did not); *accord Demoulas v. Demoulas Super Mkts., Inc.*, 1993 WL 818844, at *2-3 (Mass. Super. Ct. Nov. 29, 1993) ("Documentation which has never been viewed or otherwise relied upon could not possibly have served as a substantial factor in bringing about any loss.").

This is no surprise; courts have long held that ordinary work by an outside professional behind the scenes cannot constitute substantial assistance.  *See, e.g.*, *Bane v. Sigmundr Exploration Corp.*, 848 F.2d 579, 581-82 (5th Cir. 1988) (no substantial assistance based on bank's extension and solicitation of loans); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188-89 (Minn. 1999) (no substantial assistance based on ordinary auditing and accounting services).  As one court observed, "[i]f we were to recognize that such routine services constitute substantial assistance, then it would be the rare accountant indeed who would not be subject to automatic liability merely because his client happened to be a tortfeasor."  *Id.* at 189.

19

The Special Master suggests that the RCM financial statements were not kept entirely private, noting that RCM ordered more than 150 copies. *See* SJ R&R at 17. It is unclear how that could make a difference; showing that some unidentified third party reviewed RCM's financial statements could not possibly support these customers' claims. But in any event, Kirschner has not come forward with admissible evidence showing that ***anyone*** outside Refco reviewed RCM's stand-alone financial statements. The only evidence he cites is a set of email strings—apparently from Refco's email system—that discuss the transmittal of RCM's financial statements to a handful of third parties over the years. *Id.* at 16-17 (citing CS ¶ 100). Only one of those email strings relates to the financial statements relevant here—the statements describing RCM's financial condition after the August 2004 LBO. *See* Calamari Ex. 20 (cited in CS ¶ 100) (July 2005 email regarding transmittal of RCM financial statements to Banco Brazil). Kirscher's witness list does not include anyone from Banco Brazil to say whether the financial statements were actually reviewed (and for what purpose). Nor has he listed anyone who could possibly lay a foundation for the emails as "business records." SJ R&R at 17 n.17 (suggesting the possibility).

The R&R incorrectly states that "the Trustee does not, at this stage[,] have to prove indisputably that some individual outside Refco actually received the RCM report." SJ R&R at 17 n.17. Not so. To raise an issue of fact about "public awareness" of RCM's financial statements (*id.* at 14), Kirschner was required to come forward with his evidence now. *See Aslandis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) ("Once [the moving party's] burden is met, the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists."). Clearly, he has not done so.

With no proof of causation based on what Grant Thornton ***did***, the Special Master would allow Kirschner to proceed based on arguments about what Grant Thornton ***failed*** to do.

Kirschner's case for substantial assistance depends on an expert opinion from securities lawyer Barbara Lucas, who examines "The Effect of Grant Thornton's Failure to Withdraw or Qualify its Audit Opinions" (¶ 102); *see also* SJ R&R at 17-18 (discussing possibility that Refco's consolidated financials would have been affected by a qualification on RCM).  Lucas opines that "an alteration or qualification to RCM's financial statements would have become known to the financial community and the press."  *Id.* at 14.  Further, she opines that the news of that alteration or qualification would have made it impossible for RCM to continue, because "no rational customer would use a broker that was hopelessly insolvent."  *Id.* at 15.  According to the R&R, Lucas's opinions alone are sufficient to support a jury's finding that Grant Thornton proximately caused or substantially assisted RCM's inducement of the customers' deposits.  *Id.*[11]

Grant Thornton cannot be held liable on this basis.  As a matter of New York law, a failure to act cannot constitute "substantial assistance" where, as here, the defendant (Grant Thornton) did not owe any duty to the plaintiff (the customers).  *Eurycleia Partners, LP v. Seward & Kissel, LLP*,  12 N.Y.3d 553, 562, 910 N.E.2d 976, 981 (2009) (hedge fund's lawyers did not owe a duty to its investors, so their aiding and abetting claims could not be based on lawyers' failure to disclose); *Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476, 883 N.Y.S.2d 486, 489-90 (App. Div. 2009) (absent a duty to the plaintiff, aiding and abetting claims against arrangers of company's refinancing could not be based on arrangers' failure to disclose company's insolvency).[12]

---

[11] Grant Thornton has moved to exclude Ms. Lucas's expert report and testimony as improper under *Daubert* and Rule 702.  Obviously, if Ms. Lucas is barred from testifying, Kirschner's entire case for substantial assistance would collapse.

[12]  *Accord Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996); *see also* R&R in *Krys v. Butt* at 14, MDL Dkt. No. 832 (Aug. 4, 2010), *adopted* Mar. 9, 2011, *aff'd* 2012 WL 2331485 (2d Cir. June 20, 2012). The R&R cites a California case on this point, but that case too turned on whether the alleged

The R&R incorrectly holds that these cases can be distinguished because they involve aiders and abetters "who took no otherwise-wrongful action at all toward the plaintiffs." SJ R&R at 15.[13]   The same is true of Grant Thornton.  There is no evidence that Grant Thornton took any action at all toward these customers.  Nor were they aware of any "misstatement" that Grant Thornton therefore had a duty to correct or "prevent[] from being misleading." *Id.* at 15; *see id.* at 16 (citing cases addressing prior misstatements that had been publicly filed or distributed).  Although Grant Thornton did give unqualified audit opinions for RCM, there is no evidence that these customers ever knew about them—or knew that RCM's stand-alone financial statements had been audited in the first place.[14]   For all practical purposes, then, Grant Thornton too "took no otherwise-wrongful action at all toward the plaintiffs." *Id.* at 15.

Adopting the Special Master's view of the law on this issue would create nearly unlimited aiding and abetting liability.  Under the Special Master's approach, RCM committed fraud by its silence (*see* SJ R&R at 7), and Grant Thornton substantially assisted the fraud by remaining silent too (*id.* at 16 ("nothing negative [was] reported")), even though none of these customers even knew RCM's financial statements had been audited.  If that is enough to show substantial assistance, then there is no limit to the types of professional advisors who could be held liable on the same basis.  The underwriters were instrumental in Refco's public filings in the LBO and IPO;  they did not report anything negative.  PricewaterhouseCoopers provided

---

aider/abettor was required to disclose information to the plaintiffs. *Frame v. Pricewaterhouse Coopers LLP*, 36 Cal. Rptr. 3d 209, 219 (Cal. App. 2005), *cited in* SJ R&R at 16.

[13] Kirschner has never contended that Grant Thornton received ill-gotten gains directly from the fraud, as was the case in the two Second Circuit authorities he relied on in his opposition brief. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (commissions); *SEC v. Aragon Cap. Advisors*, 2011 WL 3278907, at *17-18 (S.D.N.Y. July 26, 2011) (trading profits).

[14] For the same reason, "the fact that nothing negative [was] reported" by Grant Thornton in respect to RCM would not have "creat[ed] an inference" in the customers' minds "that there was no problem for an accountant to find."  SJ R&R at 16.

consulting services to Refco; it did not report anything negative.  Mayer Brown gave advice to

RCM and served as its outside counsel;  it did not report anything negative (and, indeed, was

dismissed from this action).  Yet under the Special Master's approach, there is no material

difference between Grant Thornton's role and the role played by all these other behind-the-

scenes advisors.  It is precisely for that reason that New York law does not recognize inaction as

"substantial assistance."  Again, Grant Thornton is entitled to summary judgment.

### POINT FOUR

The R&R improperly recommends denying dismissal under SLUSA.

Since the pleading stage, it has become increasingly clear that Kirschner's claim depends

on the LBO—and thus it is "in connection with the purchase or sale of a covered security."  15

U.S.C. § 77p(b); *see id.* § 78bb(f).  Courts have construed this requirement "'flexibly,' not

'technically and restrictively.'"  *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir.

2009) (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).  "[I]t is enough that the fraud

alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else."

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006).

Kirschner's remaining claim meets that standard, and his expert reports prove it.

Accounting expert Douglas Carmichael gives an entire series of opinions concerning "GT's

Involvement in Refco's Form S-4 Registration Statement"—the filing related to the issuance of

"new registered notes" as part of the LBO.  ¶ 113.  He takes issue with the adequacy of the

disclosures in the S-4 itself, as well as with Grant Thornton's interim review of certain quarterly

financial statements for Refco Group—a review that he describes as "[i]n connection with the

LBO transaction."  ¶ 114.  And this is all part of Kirschner's Fifth Claim for Relief;  it is not a

separate claim that can be analyzed or excised on a claim-by-claim basis.  SJ R&R at 19.

Indeed, while the R&R concludes that the "in connection with" requirement is not met here (*id.* at 19-20), other aspects of the R&R actually strengthen the connection between Kirschner's claim and the issuance of covered securities. This Court previously denied a motion to dismiss under SLUSA, holding that the LBO was merely a background fact. MTD R&R at 40. But now, the R&R suggests that Grant Thornton could have substantially assisted RCM's fraud by issuing an opinion that was "factored into" the SEC filings of Refco Group Limited. SJ R&R at 17. To the extent Kirschner is now trying to hold Grant Thornton liable for its "role" in Refco's SEC filings (*id.* at 19)—including in those relating to the LBO and IPO (¶ 113 (citing Carmichael on "GT's Involvement"))—that claim is even more clearly barred by SLUSA.

Alternatively, the R&R recommends finding that SLUSA does not apply on the ground that Kirschner is not seeking damages "'on behalf of more than 50 persons.'" SJ R&R at 20 n.21 (quoting SLUSA). Citing this Court's recent SLUSA ruling, the R&R concludes that SLUSA requires counting the number of claimants, rather than the "ultimate beneficiaries." SJ R&R at 22. Since the motion to dismiss, the number of claimants here has conveniently dropped to 49.

This recommendation has the Court's SLUSA ruling exactly backwards. In *Krys*, this Court concluded that SLUSA requires looking through a trust and counting its direct beneficiaries, not only the number of claims asserted. Mem. Order in *Krys v. Sugrue*, MDL Dkt. No. 1491, at 5 (May 9, 2012). The Court relied expressly on the case of *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 268-69 (S.D.N.Y. 2007), for the proposition that SLUSA requires "looking to 'trust beneficiaries' as named in Trust Agreement to determine if litigation trust sought damages on behalf of more than 50 persons." Mem. Order at 5 (quoting *LaSala*). In *Krys*, the litigating trust has only two direct beneficiaries, and the Court was unwilling to look through those two to see who would receive the money "ultimate[ly]." *Id.*

Here, however, counting all the trust's beneficiaries brings the total well over 50.  For this reason too, the R&R should be rejected, and the Court should dismiss Kirschner's remaining claim.

## POINT FIVE

### Kirschner should not be allowed to proceed with claims for the Rogers Funds, which have admitted they recovered more than they lost.

One set of customers in this case—the Rogers Funds—admitted in discovery that it has already recovered *more money* than what it had on deposit when RCM filed for bankruptcy. ¶ 119 (Rule 30(b)(6) witness for Rogers Funds); *see also* ¶¶ 116-18.  Still, the R&R finds that Kirschner has raised a "jury question" on the Rogers Funds' damages, on the theory that the jury might decide to take prejudgment interest into account.  SJ R&R at 23.  This is incorrect as a matter of law.  Under the pertinent New York statute, prejudgment interest is imposed only on the "sum awarded."  CPLR § 5001(a).  That "sum" includes only whatever remains *after* applying any offsets.  *See., e.g.*, *First Sec. Mortg. Co. v. Goldmark Plastics Compounds, Inc.*, 862 F. Supp. 918, 937 (E.D.N.Y. 1994).  And in any event, it is up to the Court—not the jury— to award prejudgment interest.  CPLR § 5001.

As for the suggestion that Kirschner would still be able to pursue the Rogers Funds' claims for $1 in "nominal damages" (SJ R&R at 24)—a suggestion that Kirschner never made and that the Special Master raised on his own— that is hardly a reason to take up any time at all for the Court, the jury, and the parties at the upcoming trial.  If Kirschner refuses to withdraw the claims of the Rogers Funds, Grant Thornton is prepared to pay $1 to resolve them.

## CONCLUSION

For all these reasons, Kirschner has failed to raise a genuine issue of material fact for trial.  The Court should reject the R&R and enter judgment in Grant Thornton's favor.

Dated: June 28, 2012
      Chicago, Illinois

*Of Counsel:*

Kenneth Cunningham
Tracy W. Berry
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
Ph: 312-856-0001
Fax: 312-565-3473

Respectfully submitted,

WINSTON & STRAWN LLP


_____/s/_____
By:  Linda T. Coberly

Bruce R. Braun (bbraun@winston.com)
Catherine W. Joyce (cjoyce@winston.com)
Linda T. Coberly (lcoberly@winston.com)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Ph: 312-558-5600
Fax: 312-558-5700

Luke Connelly (lconnell@winston.com)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Ph: 212-294-6700
Fax: 212-294-4700

*Attorneys for Grant Thornton LLP*