# In The Matter Of:

*IN RE: REFCO, INC. SECURITIES LITIGATION*

_____

*RAPHAEL THOMAS WALLANDER - Vol. 1  30(B)(6)*
*November 8, 2011*

_____

*( PAGE 214 Designated Confidential Pursuant to Protective Order)*

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

RAPHAEL THOMAS WALLANDER - 11/8/2011

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
In re REFCO, INC. SECURITIES
LITIGATION                    07-MD-1902
                                (JSR)

------------------------------------x
MARC S. KIRSCHNER, as Trustee of the
Refco Private Actions Trust,

            Plaintiff,

     -against-       Case No. 07-CV-8165
                              (JSR)
PHILLIP R. BENNET, et al.,

            Defendants.
------------------------------------x
GRANT THORNTON LLP,

     Defendant/Third-Party Plaintiff,

      -against-

THOMAS H. LEE PARTNERS, L.P., et al.,

            Third-party Defendants.
------------------------------------x
(Page 214 Designated Confidential Pursuant to
Protective Order)
            November 8, 2011
            9:39 a.m.


    Videotaped 30(b)(6) deposition of
WAYSATA INVESTMENT PARTNERS LLC, by RAPHAEL
THOMAS WALLANDER, at the offices of Winston &
Strawn LLP, 200 Park Avenue, New York, New
York, before MARK RICHMAN, a Certified
Shorthand Reporter, Registered Professional
Reporter and Notary Public within and for the
State of New York.

Page 22

 1         RAPHAEL THOMAS WALLANDER
 2   years.  What was your start date with
 3   Rider Bennett?
 4       A.   I started as a summer
 5   associate in I want to say May of 1998.
 6   I started as a lawyer roughly call it
 7   September 1 of 2000 -- or of 1999 and
 8   that date may be, you know, it may be a
 9   little off but roughly that time period.
10       Q.   And you make that distinction
11   because prior to that you hadn't finished
12   law school and been admitted to the bar?
13       A.   Yes.  I studied for the bar
14   exam.  And technically, I guess if we
15   really want to get technical, my bar
16   admission was October of 1999 and I don't
17   think the designation of representing
18   one's self as an attorney happens until
19   you get your bar admission.  But I went
20   back to work as an associate in the fall
21   of 1999.
22       Q.   That's a very fairly short
23   partnership track then?
24       A.   It was.
25       Q.   Was that accelerated at all or

Page 23

 1         RAPHAEL THOMAS WALLANDER
 2   was that the standard time frame at your
 3   firm?
 4       A.   You know, yes and no is the
 5   answer.  The partnership track changed
 6   while I was there.  And I, I don't know
 7   that I was terribly special and I don't
 8   know that I was necessarily the reason
 9   for some of the changes, but I put myself
10   at average.
11       Q.   How large was that law firm,
12   sir?
13       A.   At one point in time, it was
14   about 160 lawyers.  When I left, I would
15   put it at about a hundred lawyers, and
16   these are approximations.
17       Q.   Did it have offices outside
18   Minnesota?
19       A.   No.
20       Q.   So just Minnesota?
21       A.   Just Minneapolis.
22       Q.   What department did you work
23   in at Rider Bennett?
24       A.   I was in the, the bankruptcy
25   group.  I also did a fair amount of work

Page 24

 1         RAPHAEL THOMAS WALLANDER
 2   with the banking, some of the banking
 3   lawyers.  I also -- there wasn't really a
 4   department for it but an offshoot of my
 5   practice was that I did a fair amount of
 6   franchise and distribution work that kind
 7   of came naturally with some creditor work
 8   that I did.
 9       Q.   So would you consider yourself
10   during your tenure at Rider Bennett to
11   have done both litigation work and
12   corporate work?
13       A.   I was kind of a mutt.
14   Nominally the bankruptcy group was in the
15   litigation department, but it was never a
16   perfect fit and, and invariably
17   bankruptcy is inherently transactional at
18   times.
19       Q.   So you stayed with Rider
20   Bennett a little less than a decade, from
21   roughly May of '98 to some portion of
22   2007; is that correct?
23       A.   No.  Until Feb 1 of 2006 and
24   then I left and I went to a small firm
25   for about a year.

Page 25

 1         RAPHAEL THOMAS WALLANDER
 2       Q.   Oh, and then you joined
 3   Waysata?
 4       A.   Waysata.
 5       Q.   In '07?
 6       A.   Yes.
 7       Q.   Got it.
 8       A.   And the name of that firm,
 9   I'll answer your next question, is
10   Morhman, M-O-H-R-M-A-N and Kaardal,
11   K-A-A-R-D-A-L, and that I had the same
12   practice and the same clients at that
13   firm.  It didn't really change at all.
14       Q.   And if you could give me a
15   little bit more of an understanding as to
16   what precipitated you leaving Rider
17   Bennett and joining Morhman?
18       A.   Sure.  Firm was in financial
19   trouble.  I kind of saw the full books
20   for the first time when I made partner.
21   And, you know, I'm a restructuring
22   lawyer, I kind of have some ability to
23   see what direction the train was going in
24   and I thought it was going steadily in
25   the wrong direction, and just got

Page 90

```
 1         RAPHAEL THOMAS WALLANDER
 2   Adams, the former general counsel fairly
 3   closely on a lot of things and she, I
 4   believe, worked with him to some extent
 5   on this.  And I frankly just wanted to
 6   pick her brain to kind of see if she
 7   remembered anything maybe anybody else
 8   maybe didn't to try to get, to get the
 9   institutional memory to the greatest
10   extent I could.
11       Q.   Do you know whose email
12   accounts, if any, were searched at
13   Waysata in connection with the Wayland
14   funds document production?
15       A.   Email accounts searched?
16       Q.   Yes.
17       A.   We, we produced documents that
18   we had.  We didn't go back to '04 and
19   '05.  I don't know that we actually still
20   have the capability of searching back
21   that far.
22       Q.   So when you say you produced
23   documents, where were these documents
24   located?
25       A.   Our operations staff had
```

Page 91

```
 1         RAPHAEL THOMAS WALLANDER
 2   copies of them.  I, I can't tell you
 3   exactly physically within the building
 4   where they were, but somebody had folders
 5   and things of that nature.
 6       Q.   So these were all hard copies?
 7       A.   I don't know if we had any
 8   scanned in.  I know that I -- ultimately
 9   there were PDF's made of them.  I suspect
10   that somebody might have had some stored
11   electronically but I don't know.
12       Q.   Is that how you ultimately saw
13   the documents, only in PDF forms?
14       A.   No, I had printed copies.  I'm
15   old fashioned.  I sat down and read them.
16       Q.   But somebody sent you PDF's
17   and then you printed them out and read
18   through them?
19       A.   No, I think somebody actually
20   handed me copies of them and I said let's
21   make PDF's and let's get them on to, to
22   Sascha.
23       Q.   As you sit here today, Mr.
24   Wallander, do you know for a fact whether
25   or not any email accounts or electronic
```

Page 92

```
 1         RAPHAEL THOMAS WALLANDER
 2   files were searched and produced to the
 3   PAT for production in this case?
 4       A.   I, I don't.  All I know is
 5   that we produced some documents that I
 6   thought were responsive to that.  And
 7   I'll say that this wasn't a document
 8   subpoena that we received so the normal
 9   protocols for that type of thing, you
10   know, we asked people what do you know,
11   what do you have.  But that's sort of
12   subpoena duces tecum type approach was
13   not, it's not the same approach for a
14   subpoena of this nature.
15       Q.   Did you personally make any
16   physical search for documents or did you
17   simply review documents that had been
18   provided to you by the operations team at
19   Waysata?
20       A.   I reviewed things of the
21   operations team.  I didn't have -- I
22   wasn't at the firm, so I reviewed what
23   was given to me.
24       Q.   And who provided you with
25   those documents, sir?
```

Page 93

```
 1         RAPHAEL THOMAS WALLANDER
 2       A.   The people I listed, Sue
 3   Peterson, Tracey Calderon, Linda Gans,
 4   it's a group effort, Mary.  You know,
 5   there's no, no magic to it.  I can't tell
 6   you each specific document, who actually
 7   had it, but we came up with the best we
 8   could for something that's six years old.
 9           (Deposition Exhibit 3181,
10       previously marked and shown to
11       witness.)
12       Q.   Okay.  Sir, let me show you
13   what's been marked at a previous
14   deposition as exhibit 3181.  Have you
15   seen this before, sir?
16       A.   This looks like one of the
17   notices that we've referenced.
18       Q.   So you believe exhibit 3181 is
19   one of the document notices that you
20   believe you became aware of in the last
21   one or two weeks; is that correct?
22       A.   Correct.
23       Q.   So you believe that Waysata
24   had received this very document from the
25   Private Actions Trust?
```

```
                                                     Page 98
 1            RAPHAEL THOMAS WALLANDER
 2      ultimately recovered by the PAT and
 3      disbursed to FX customers, Waysata or the
 4      Wayland funds are not going to be a
 5      recipient, an ultimate recipient of any
 6      of that recovery, correct?
 7           A.   Correct.
 8           Q.   Could you turn to the next
 9      page in exhibit 3181 please.  On the back
10      side there's a list of nine types of
11      documents that the Wayland funds were
12      requested to produce in this case.  Do
13      you see those nine bullet points?
14           A.   Correct.  I see them.
15           Q.   Could you please take a moment
16      to read this list to yourself and let me
17      know when you're finished.
18           A.   Okay.
19           Q.   Sir, do you believe as you sit
20      here today that the Wayland funds have
21      produced all responsive documents in
22      their possession, custody and control
23      from these nine categories?
24           A.   Again, noting that some of
25      these funds no longer exist and we can't
```

```
                                                     Page 99
 1            RAPHAEL THOMAS WALLANDER
 2      really produce on behalf of them even,
 3      you know, just ticking through the list,
 4      the customer agreements, the customer
 5      statements, I asked about these entities
 6      and we kind of gave what we have, or
 7      about these documents, we gave what we
 8      could find on them.
 9           Q.   I want to ask you in
10      particular about number 5, the fifth
11      bullet point.  That asks for the
12      production of "Audit materials related to
13      Refco including all documents related to
14      Grant Thornton LLP's audits of Refco or
15      RCM."  Do you see that?
16           A.   Yes.
17           Q.   I haven't seen any documents
18      in this category from the Wayland funds
19      production.  Do you know whether the
20      Wayland funds have any documents relating
21      to Grant Thornton's audits of Refco or
22      RCM?
23           A.   We didn't see any.  That's not
24      to say we didn't have them.  There's a
25      little bit of a history to this that is
```

```
                                                    Page 100
 1            RAPHAEL THOMAS WALLANDER
 2      worth noting.
 3           When Wayland was inside, when
 4      Waysata before it became Waysata was
 5      inside Cargill, many of these accounts as
 6      I understand it, as has been told to me
 7      by our operations staff, were set up with
 8      CIS, the sort of proprietary currency
 9      trading operation at Cargill.
10           Those accounts were sold to
11      Refco.  So when these accounts were
12      actually set up, the counterparty to the
13      agreement would have been a Cargill
14      entity, and at the time Wayland was a
15      counter -- was a Cargill entity itself,
16      and generally doing diligence on another
17      entity within your own organization is
18      not customary.  So I'm not shocked that
19      we don't have anything like that.  And
20      it's a little bit of an odd-ball for an
21      account to get transferred like this,
22      that's the one thing I would note.
23           But I did ask and nobody had
24      anything of that nature.
25           Q.   And we will get into all those
```

```
                                                    Page 101
 1            RAPHAEL THOMAS WALLANDER
 2      details in a minute.
 3           A.   Sure.
 4           Q.   Because I want to discuss that
 5      issue with you.
 6           A.   Sure.
 7           Q.   I just want to make sure that
 8      you didn't have any documents that relate
 9      to Grant Thornton's audits of Refco or
10      RCM?
11           A.   No, none that anybody was
12      aware of or that we could find.
13           Q.   Do -- does Waysata or the
14      Wayland funds have any type of written
15      retention document policy?
16           A.   Boy, what is our -- we retain
17      things generally for tax purposes for a
18      fairly long period of time.  One other
19      hiccup with this is this is when we were
20      at Cargill so there may very well be
21      documents not in the our possession that
22      would relate to this and if -- and I
23      guess when I think about it the Refco
24      transaction happened afterwards.
25           Yeah, you know we, we have a
```

26 (Pages 98 to 101)

Page 106

1       RAPHAEL THOMAS WALLANDER
2  accounts with RCM, correct?
3       A.  Yes, some of which no -- or
4  entities no longer exist.
5           MR. RAND:  I'm going to
6       object, I'm going to object to
7       form.  Go ahead.
8       Q.  Do you know how many FX
9  trading accounts each of the Wayland
10 funds had with RCM?
11      A.  How many specific individual
12 accounts?
13      Q.  Right.
14      A.  You know, without documents in
15 front of me it's difficult to say.  I
16 know that there were I think multiple
17 trades and I don't know if each trade got
18 a different account number or if it was
19 in a different account or not.  Without
20 looking at documents it would be tough to
21 say the precise number of accounts.  It
22 might be more than 8.  But I know that
23 each of these eight funds generally had
24 some type of trading activity and thus an
25 account with.

Page 107

1       RAPHAEL THOMAS WALLANDER
2       Q.  And some of them may have had
3  multiple accounts with RCM?
4       A.  I don't know.  Without looking
5  at, without looking at documents it's
6  tough to know.  I know that these had
7  these trades on.
8       Q.  You indicated that prior to
9  transferring their accounts to RCM, all
10 of the Wayland funds had FX trading
11 accounts with CIS Financial Services,
12 correct?
13      A.  Yes.
14      Q.  That's a subsidiary of
15 Cargill?
16      A.  Correct.
17      Q.  And then in 2005 all of these
18 accounts were transferred from CIS
19 Financial Services to RCM, right?
20      A.  Yes.
21      Q.  Do you know who at Waysata or
22 the Wayland funds was involved in the
23 decision to transfer these accounts to
24 RCM?
25      A.  I think saying that there was

Page 108

1       RAPHAEL THOMAS WALLANDER
2  a decision to transfer might be perhaps a
3  mischaracterization is the right word but
4  maybe an overstatement.
5           CIS, and it is okay if I call
6  it the Cargill entity CIS?
7       Q.  Sure.
8       A.  CIS effectively sold these
9  accounts to Refco and Waysata received
10 notices that this transfer was happening
11 and it was sort of a speak now or forever
12 hold your piece transfer.
13          And I believe it was a
14 relatively short window of time in which
15 to effectuate that transfer.  Or I'm
16 sorry, to object to that transfer.
17      Q.  Are you aware of any
18 individuals that were involved in the
19 decision as to whether or not to object
20 to that transfer?
21      A.  Am I aware of individuals,
22 yes.
23      Q.  Who would have been involved
24 in that decision?
25      A.  A lot of the same people I've

Page 109

1       RAPHAEL THOMAS WALLANDER
2  mentioned before, Pat Halloran, Mary
3  Burns, Sue Peterson, Linda Gans, maybe
4  Tracey, probably Steve Adams might have
5  had, I'm assuming would have had some
6  input, though at that point not much.
7       Q.  You weren't at the company at
8  the time?
9       A.  I was not there.  But I did
10 ask the question internally about what
11 happened.  And everybody's recollection
12 was that CIS made this transfer and
13 frankly it would have been more work to
14 try to unwind the trades and perhaps
15 uneconomic to do so.
16      Q.  Between the time that the
17 Wayland fund accounts opened and the time
18 that they were transferred to RCM, did
19 the Wayland funds use any other
20 counterparties besides CIS for FX
21 trading?
22      A.  None that anybody remembered.
23 I, I actually inquired and nobody
24 recalled there being any other
25 counterparty.  And the suspicion that

Page 122

1      RAPHAEL THOMAS WALLANDER
2  paragraph 3A gives CIS the right and
3  ability to use funds deposited by FX
4  customers as it sees fit?
5      A.   You're asking me to make a
6  snap decision about what this provision
7  means in the context of a very small font
8  several page agreement.  I'm not -- I'm
9  not going to go past saying the language
10 says what it says.  I don't think it's
11 appropriate for me to make an
12 interpretation, and I don't think that
13 it's within the scope of what I've been
14 subpoenaed today.
15     Q.   Do you have any understanding,
16 sir, as somebody who is one of the few
17 in-house lawyers at Waysata, as to
18 whether or not FX trading accounts are
19 typically segregated or nonsegregated?
20     A.   My guess is after, after
21 Refco, these agreements all got a
22 makeover.  I don't, I don't have an
23 opinion on that one way or another.
24     Q.   So you don't --
25     A.   I think it would probably

Page 123

1      RAPHAEL THOMAS WALLANDER
2  depend on who the counterparty is.  If
3  the counterparty is a JPMorgan or a
4  Credit Suisse or a very, very, very
5  liquid deep investment grade institution,
6  my guess is provisions like this are
7  probably not unheard of, though that may
8  have changed in recent years.
9         If the, if the institutions
10 are not investment grade or of shakier
11 credit, I speculate, I don't know, that
12 these provisions would probably be more
13 heavily negotiated in these -- in this
14 current era.
15     Q.   I take it you don't have any
16 familiarity, though, with that issue?
17     A.   I haven't, I haven't addressed
18 it before.
19     Q.   Is it fair to say, sir, that
20 in the 2004-2005 time frame, the Wayland
21 funds did not object to this language in
22 any way?
23     A.   Well I mean the document
24 speaks for itself.  The Wayland funds
25 executed these documents and nowhere in

Page 124

1      RAPHAEL THOMAS WALLANDER
2  there is there an I object stated next to
3  it.  So they executed these documents and
4  they speak for themselves.
5      Q.   Are you aware of any
6  discussions that went on at the Wayland
7  funds or at Waysata about whether the
8  funds in their FX trading accounts would
9  be segregated?
10     A.   I'm not aware of any
11 discussions of that nature.
12     Q.   Do you recall that being
13 raised as a concern on the part of
14 anybody at Waysata or the, the Wayland
15 funds?
16     A.   I wasn't there at the time and
17 no one noted to me that this issue was
18 raised prior to the problems that arose
19 with Refco.
20     Q.   Do you know, sir, exactly when
21 the Wayland funds's FX trading accounts
22 at Cargill were transferred to RCM?
23     A.   I have a general sense of the
24 time frame that it was roughly August of
25 2005.  And if we can turn to the front

Page 125

1      RAPHAEL THOMAS WALLANDER
2  page of this letter, this actually
3  verifies what my colleagues told me was
4  the general time line.
5      Q.   We're going to look at that
6  letter in a second.  But before the
7  account transfer, sir, had the Wayland
8  funds ever had any type of business
9  relationship with RCM?
10     A.   I believe the answer is no.  I
11 think this was, this relationship was
12 fully inherited through this transfer.
13     Q.   Before the transfer of the
14 Wayland funds FX trading accounts to RCM,
15 had the Wayland funds ever done business
16 with any Refco entity?
17     A.   I, I garnered information much
18 more narrowly than that for this
19 deposition so it's a supposition for me
20 to give an emphatic no to that, but I
21 believe that is correct.  Based on what I
22 have been told, I believe that is the
23 case.
24     Q.   You're not aware of any
25 relationship between any of the Wayland

32 (Pages 122 to 125)

Page 130

1        RAPHAEL THOMAS WALLANDER
2    recent announcement concerning a
3    provisional agreement to sell the entire
4    global business of Cargill Investor
5    Services to Refco, correct?
6        A.   That's what the letter says
7    what it says. I think when you ask me to
8    sort of describe contents of a letter
9    you've just handed to me, I would just
10   referring to the letter itself and say,
11   you know, it says what it says.
12       Q.   Okay. The first sentence
13   reads as follows: "Dear Ms. Burns,
14   Further to our recent announcement I
15   wanted to put in writing more detail
16   regarding the provisional agreement to
17   sell the entire global business of
18   Cargill Investor Services to Refco."
19   Correct?
20       A.   That's what it says.
21       Q.   I've read that correctly?
22       A.   That's what it says.
23       Q.   Prior to the transfer of the
24   Wayland funds FX trading accounts to RCM,
25   what if any discussions took place

Page 131

1        RAPHAEL THOMAS WALLANDER
2    between Waysata and Cargill about that
3    agreement?
4        A.   Nobody remembered anything
5    specific. Just knowing that there's
6    enough folks at Waysata that know folks
7    at Cargill, I wouldn't be shocked if in
8    an informal conversation or even an email
9    there might have been. I haven't seen
10   anything specific. So what I would say
11   is there might have been some
12   communications. It wouldn't be
13   surprising to me. But nobody has
14   enunciated to me anything specific.
15       Q.   To your knowledge did any
16   representatives from Cargill make any
17   representations to Waysata about the
18   quality or the level of service that RCM
19   would provide?
20       A.   Gosh, I mean this letter sort
21   of purports -- it's more like puffery
22   than an actual firm rep and warrant. But
23   outside of this there's nothing to my
24   knowledge.
25       Q.   To your knowledge, were the

Page 132

1        RAPHAEL THOMAS WALLANDER
2    Wayland funds required or obligated in
3    any way to transfer their FX trading
4    accounts to RCM?
5        A.   No.
6        Q.   Could they have chosen to take
7    their business elsewhere?
8        A.   They certainly could have.
9        Q.   Could you turn back to exhibit
10   3244 please.
11       A.   Sure.
12       Q.   The very first page of this
13   exhibit is a letter from Steve Assimos of
14   Cargill Financial Services to Susan
15   Peterson of Waysata, correct?
16       A.   That's what it is.
17       Q.   Dated August 15th, 2005?
18       A.   That appears to be the date.
19       Q.   And this is the letter that
20   you've been referring to at various
21   points during the deposition as a
22   negative consent letter, right?
23       A.   Yep.
24       Q.   Do you know who Mr. Assimos
25   is?

Page 133

1        RAPHAEL THOMAS WALLANDER
2        A.   No.
3        Q.   You never spoken or
4    communicated with the man?
5        A.   No.
6        Q.   This letter informs Waysata
7    that unless someone objects, I think you
8    used the word squawks, on behalf of the
9    Wayland funds, the funds' accounts will
10   be transferred to RCM?
11       A.   Hence my characterization of
12   it as a negative consent, it's -- it
13   requires you to affirmatively do
14   something in order to take that step.
15       Q.   Are you aware of any response
16   that any of the Wayland funds made to
17   this letter?
18       A.   Based on my review, and I
19   wasn't around at the time, I don't think
20   we responded. I think we just elected to
21   allow the accounts to get transferred.
22       Q.   During this time period, do
23   you know whether Waysata or any of the
24   Wayland funds discussed the possibility
25   of using somebody other than RCM for FX

34 (Pages 130 to 133)