# In The Matter Of:

*IN RE: REFCO, INC.  SECURITIES LITIGATION*

_____

## *WALTER THOMAS PRICE, III - Vol. 1*
*January 18, 2012*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
In Re REFCO, INC.              )
                               )   Case No.
SECURITIES LITIGATION          )   07-MD-1902 (JSR)
                               )
- - - - - - - - - - - - - - - -)
MARC S. KIRSCHNER, as Trustee  )
of the Refco Private Actions   )
Trust,                         )
                               )
           Plaintiff,          )
                               )   Case No.
      vs.                      )   07-CV-8165 (JSR)
                               )
PHILLIP R. BENNETT, et al.,    )
                               )
           Defendants.         )
```

          Videotaped 30(b)(6) deposition of ROGERS

FUNDS, by and through its representative WALTER THOMAS

PRICE, III, taken before NADINE J. WATTS, CSR, RPR, and

Notary Public, pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, at Suite 3700,

35 West Wacker Drive, in the City of Chicago, Cook

County, Illinois, at 9:25 o'clock a.m. on the 18th day

of January, A.D., 2012.

Page 26

30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2   A   It came after that.
3   Q   You've touched upon what some of these groups
4 are already, but just so I'm clear, I want an
5 understanding of what your role was in connection with
6 these companies and what your ownership interest was in
7 these companies.
8       So, first, Price Futures Group, that's your
9 commodities firm?
10  A   Are we talking prior to the ESOP?
11  Q   Right.  So I'm not talking about today.
12  A   Right.
13  Q   That's a good clarification.  I'm talking about
14 in the 2004, 2005 time period and I guess up until all
15 these entities were rolled into Price Holdings in 2010.
16  A   Correct.  The Price Futures Group owned a
17 hundred percent of it, the commodity trading, yes.
18 Price Asset Management owned a hundred percent of it.
19 Fund Dynamics, if it existed during that timeframe, I'm
20 not -- I don't really remember if it did, owned a
21 hundred percent of it.
22  Q   What did that company do, sir?
23  A   And it's actually an administrator for other
24 funds.
25  Q   Atrium Securities?

Page 27

30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2   A   Atrium Securities did exist, and I was a hundred
3 percent owner of Atrium.
4   Q   What did that company do?
5   A   It was simply a direct participation
6 broker/dealer.  It was really set up just to handle a
7 commodity fund.
8   Q   And then Uhlmann Price?
9   A   Uhlmann Price did exist, and I was, I'm going to
10 say, an 80 -- during that timeframe I was either an 81
11 percent owner or a 28 percent owner.  I'd have to go
12 back and check, because I made sure that the
13 ownership -- the people that ran the business had the
14 proper ownership after I bought Fred Uhlmann's majority
15 interest.
16  Q   How many other owners of Price Uhlmann were
17 there?
18  A   I believe four.
19  Q   That was a securities firm?
20  A   It is a securities firm.
21  Q   Did you also work in that timeframe with a
22 company called Beeland Management Company?
23  A   I did.
24  Q   What was your position or role at Beeland?
25  A   I was the CEO.  And my role was to make sure

Page 28

30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2 that all the necessary documents were prepared, filed
3 with the necessary regulatory bodies.
4   Q   During what timeframe, sir, did you work for
5 Beeland Management Company?
6   A   I want to say that it started in late 2002, and
7 I'm still -- still CEO of Beeland.
8   Q   Okay.  So as you sit here today, you're still
9 president and CEO of Beeland Management?
10  A   Correct.
11  Q   What is the business purpose of Beeland
12 Management Company, sir?
13  A   It's the -- it's the general partner of the
14 Rogers Raw Material Fund, private fund, Rogers
15 International Raw Material Fund, which is an offshore
16 fund, the Rogers International Materials Fund, which is
17 a public fund.
18  Q   In your position as the president and CEO of
19 Beeland, to whom do you report, if anyone, sir?
20  A   I'm pretty well -- To the regulators.
21  Q   Do any employees or officers within the company
22 report directly to you?
23  A   Yes.
24  Q   How many?
25  A   Two.

Page 29

30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2   Q   What are their names?
3   A   We have Allen Goodman.  Allen Goodman and Lori
4 Sampson.  Lori Sampson.
5       MR. McGURK:  Can you spell that?
6       THE WITNESS:  S-A-M-P-S-O-N.
7 BY MR. DOYLE:
8   Q   Mr. Goodman was there in 2004, 2005, correct?
9   A   Correct.
10  Q   Was Ms. Sampson?
11  A   I don't believe so.
12  Q   What are their responsibilities at Beeland?
13  A   Lori is comptroller and looks at the -- looks
14 after the filings.  And Allen is a financial officer and
15 computes pursuant to the rule book the rolls for the --
16 for the Rogers Funds.
17  Q   And, sir, back in 2004, 2005 were you also the
18 president of these other -- these other entities that
19 you've mentioned; namely, Price Futures Group, Price
20 Asset Management, Atrium Securities, Uhlmann Price and
21 Fund Dynamics?
22  A   No, I was not -- I was not president.  Well, I
23 may well have been.  I may well have been of Uhlmann
24 Price.  I think that Uhlmann Price -- So I tried to move
25 that -- When I made earlier mention of an 81 percent

Page 78

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2    A  Prior to?
3    Q  2005.
4    A  No.
5    Q  In the year 2005 did Beeland or the Rogers Funds
6  have discussions with Refco about entering into a
7  potential business relationship with it?
8    A  Beeland did, yes.
9    Q  When is the first time that you heard anything
10 about the possibility of Refco and Beeland exploring
11 some type of business relationship with one another?
12   A  I think it was in the -- maybe the spring of
13 2005.
14   Q  Can you pinpoint a month to the best of your
15 recollection?
16   A  No, but, you know, I recall that it was either
17 the spring or the beginning of the summer that -- when I
18 first became aware that there were talks going on.
19   Q  How did you first become aware of those talks?
20   A  I became aware of them because -- It was in my
21 prior testimony.  I've done this for roughly 10 years.
22 Somewhere around 2005, my earlier testimony was, that I
23 came in to try to right the ship, and I think I got that
24 done.  And then I said to Jim Rogers that, you know, I'd
25 like to spend more time on my own stuff and that they

Page 79

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  needed to get a full-time CEO in there because it was a
3  full-time job.  And he sent a fellow in to see me by the
4  name of Robert Mercorella, and I think this could be a
5  good guiding point.
6      And I think I made myself very clear with
7  Robert that -- He came from Refco.  And obviously we had
8  invested time and money to get everything turned around
9  within the Price Group, Price Futures Group, and Uhlmann
10 Price, and I wanted to make sure that we protected that
11 interest to the degree we could.  And I wanted to also
12 make sure that Robert Mercorella was not -- And I asked
13 him pointblank, are you a Trojan horse?  And he said
14 absolutely not.
15   Q  What did you mean by that term, sir?
16   A  I think everybody knows what a Trojan horse is.
17 It's someone sent in under the cover of night somewhat
18 to do -- to do a job that maybe is not what it proposes
19 to be.
20      It was somewhere in that area that I began to
21 learn that maybe talks had been held as early -- and
22 it's only hearsay on my part -- as early as maybe the
23 FAI convention in the early part of that year maybe with
24 Joe Murphy, president of Refco.  But really nothing had
25 been done.

Page 80

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2      When I began to talk to Robert, I had a fairly
3  lengthy contract drawn up for him, which tied down a lot
4  of things that would have said if you are a Trojan
5  horse, you're going to be in trouble.  Beeland just
6  didn't feel comfortable with a guy that's all of sudden
7  shown up from Refco, because he -- And immediately
8  thereafter they began to have meetings with Refco, and
9  Refco expressed an interest in acquiring Jim's interest
10 in Beeland.
11     In fact, I think they expressed interest in
12 acquiring all of Beeland.  And, of course, in doing so,
13 Refco would have requested that they execute all the
14 trades, they get all the execution business.  And that
15 also would have taken it away from Price, and I think
16 that they wanted all of the sales to go to Refco
17 Securities, which would have taken it away from Uhlmann
18 Price.
19     Now, if you've got a bunch of men that have
20 earned their living and they've got clients out there,
21 you want to make sure that everything is as transitional
22 as smooth as you can.  I considered it a little bit of a
23 slap in the face to us because we took a company that
24 really did have some problems, righted the ship, and I
25 think got it to where it was.  But I had to look at it

Page 81

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  for what it was.  If a majority owner wants to sell his
3  interest, in the world that I live in, you can do that.
4      And so that's when the talks got in earnest.
5  And I hope I'm not confusing you with this, but
6  hopefully I'm giving you a little bit of a time line as
7  to what happened.  Robert Mercorella is in, he's with
8  us.  We're at a White Sox game.  He decided he's going
9  back to Refco.  He never comes back again.  We don't
10 know what happened, and we begin to say, well, this is
11 going to be -- And it was a Trojan horse.
12   Q  Okay.
13   A  To this day I believe it was a Trojan horse.
14   Q  I do appreciate all that information.  It
15 doesn't confuse me.  It's helpful.  But let me back up
16 and try to take this a little slower through some
17 stages.
18      When you first caught wind of a proposed
19 business arrangement between Beeland and Refco in the
20 spring or maybe even a little earlier of 2005, what did
21 you understand was being discussed at that point?
22   A  What I understood was that Jim Rogers was --
23 Actually, let me change that.  What I understood was
24 that Refco was telling me that they were going to try to
25 make the deal with Jim to make Beeland and the Refco --

21 (Pages 78 to 81)

Page 82

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  I mean the Rogers Funds a flagship account for the
3  Rogers -- for the Refco Alternatives Services.  I
4  believe that's the name of it.
5      And they had laid out a very nice proposal as
6  far as glossy prints and logos and things that we had
7  not done.  We had basically just been foot soldiers
8  doing our job.  And that's when we began to talk to -- I
9  called Jim when I was talking -- hearing this from some
10 of the Refco people, and I said what's going on and what
11 does this mean for Price and Uhlmann Price?  He said,
12 well, there's really not much to it, something may
13 develop, et cetera.  But I think in retrospect and going
14 back and reading old depositions four and five years
15 ago, I think that I was probably three or four months
16 behind the curve.
17    Q  In terms of being in the know about what the --
18    A  Right.
19    Q  -- true nature of the business relationship that
20 was being proposed was?
21    A  I think so, yes.
22    Q  And I would just caution you, Mr. Price, we're
23 falling into a trip every now and again where we speak
24 over one another.  And so I'll remind you, as I did at
25 the beginning of the deposition, to try to wait for my

Page 83

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  entire question, and I'll try not to -- do my best not
3  to interrupt you as well.  But all that information is
4  helpful.  I appreciate it.
5      Did the -- As you understand it, did the
6  discussion about this proposed business deal between
7  Beeland and Refco progress so that it was initially
8  Refco taking over some of the functions that had been
9  historically performed by some of your entities and then
10 later a discussion of a complete buy-out of Jim Rogers'
11 interest in Beeland?
12    A  Correct.
13    Q  That's generally the progression?
14    A  That's generally the progression.
15    Q  Okay.  Let me show you a few documents that
16 might help all of us piece some of this together.
17        Could you mark this as the next exhibit please.
18        (Document marked as Deposition
19        Exhibit 3292 for identification.)
20    Q  Mr. Price, I've had placed before you what's
21 just been marked as Exhibit 3292.  And, for the record,
22 it's a multipage document bearing Bates Nos.
23 REFCO-HC-0526629 through 6656.
24        And if at any point in time you believe that in
25 order to answer my question you need to read more of the

Page 84

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  document than I'm directing you to, Mr. Price, just let
3  me know and I'll let you go ahead and do that, but my
4  motus operandi generally is going to be to plunge right
5  in and direct you to certain portions of documents.
6      Again, if you need to take a step back and read
7  a sentence in context or read an entire page or passage
8  of a document in order to be in a position to fairly
9  answer my questions, you'll let me know that, right?
10    A  Sure.
11    Q  Okay, great.  My first question is, have you
12 seen this letter before, Mr. Price?
13    A  No.
14    Q  So when you talked earlier about coming in with
15 glossy presentations and things of that nature, this was
16 not a document that you were referring to; is that true?
17    A  No.
18        MR. RAND:  Objection to form.
19 BY MR. DOYLE:
20    Q  This is a lengthy letter from Refco's CEO Phil
21 Bennett to two other individuals dated May 6th, 2005; is
22 that correct?
23        MR. McGURK:  I believe it appears to be --
24        MR. RAND:  Objection to form.
25        MR. McGURK:  -- three individuals, the cover

Page 85

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  letter.
3        THE WITNESS:  No, there's two, Lionel and
4  Stephan.
5  BY MR. DOYLE:
6    Q  I thought I said to Jim Rogers and then two
7  other people.
8    A  Yes, that's correct.
9    Q  All right.  Is that correct, Mr. Price?
10    A  That's correct.
11    Q  Okay.  Who are the two other individuals that
12 are addressees on this letter?
13    A  Lionel Motiere and Stephan Wroble.  They are
14 principals of Diepason.  I don't know their titles, but
15 they're part of the ownership of Diepason.
16    Q  Have you interacted with them in the past?
17    A  I've met Lionel once in our office.  I've never
18 met Stephan.  I do sit on Jim Rogers' Index Committee.
19 Diepason sits on that same committee.
20    Q  I want to direct you to the very first paragraph
21 of this letter.  It states that Refco Group Limited, LLC
22 is pleased to provide Beeland Management Company,
23 LLC/Diepason Commodities Management the following
24 proposal to provide FX and futures execution and
25 clearing services, fund distribution, fund

22 (Pages 82 to 85)

Page 110

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  he was going to be in charge of the Rogers Funds.  And
3  so, effectively, they would have been, you know, moving
4  it back to -- Assuming -- assuming that -- There's been
5  some assumptions in here.
6       There's an assumption that Refco bought Beeland
7  and the minorities out, which never really occurred, but
8  everybody at Refco thought it was going to occur,
9  including Robert.  And so really it was, if you want to
10 say, the cart before the horse.  They were running
11 before they were walking on this deal.
12    Q   So if I understand your testimony, there was so
13 much momentum for a business deal pursuant to which
14 Refco would purchase Beeland Management and, therefore,
15 take over management of the Refco funds that
16 Mr. Mercorella felt comfortable just leaving Beeland and
17 going back to Refco, which he believed to be very soon
18 the operator of the Rogers Funds going forward?
19       MR. RAND:  Objection to form.
20       THE WITNESS:  You have a much better way of
21 words than I do.
22       MR. DOYLE:  Mr. Rand doesn't think so, so
23 I'll take it -- so I'll take the compliment.
24    Q   Sir, I take it there was never any agreement
25 executed that would have allowed Refco to purchase any

Page 111

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  ownership interest in Beeland, correct?
3     A   None to my knowledge.
4     Q   And so that deal fell through at some point?
5     A   I believe so.
6     Q   Okay.  When did it fall through?
7     A   I think there was still an ongoing, in progress.
8  When -- It's not when did that fall through.  I think
9  it's when Refco fell through.
10    Q   So obviously the events that precipitated the
11 Refco bankruptcy had something to do with this
12 transaction not being consummated; is that fair to say?
13    A   Absolutely.
14    Q   Okay.  Let me show you one more document, sir,
15 that relates to this -- the discussions between Refco
16 and Beeland about a proposed business transaction.
17       I'd ask the court reporter to mark this as
18 Exhibit 3295.
19       (Document marked as Deposition
20       Exhibit 3295 for identification.)
21       MR. McGURK:  Is yours double-sided?
22       THE WITNESS:  (Nodding head.)
23 BY MR. DOYLE:
24    Q   Sir, I've had placed before you Exhibit 3295,
25 which, for the record, is a multipage document bearing

Page 112

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  Bates Nos. REFCO-0008-151344 through 47.
3       Have you seen this document before, sir?
4     A   No, I have not.
5     Q   Okay.  This document contains two e-mails that
6  were authored by David Henritze dated August 25th and
7  August 24th respectively, correct?
8     A   August 25th and, correct, August 24th.
9     Q   Okay.  I just have a few quick questions about
10 this.  If you look at the second e-mail, which is
11 actually the one that came first in time, from
12 Mr. Henritze to Joe Murphy on August 24th, 2005 --
13    A   Right.
14    Q   -- the subject is purchase of Jim Rogers'
15 ownership.  Do you see that?
16    A   I do.
17    Q   And in the very first sentence it says, Joe, as
18 you know, Jim Rogers has agreed to sell his 69 percent
19 ownership in Beeland Management Company, LLC and his 58
20 percent ownership in Diepason Commodities Management SA
21 for $8 million.  Do you see that?
22    A   I do.
23    Q   Do you ever remember $8 million being the price
24 that Mr. Rogers would be compensated for his ownership
25 interest in those two companies?

Page 113

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2     A   No, I was never privy to any of that -- those
3  conversations.
4     Q   The first e-mail, if you turn to the front page,
5  from Mr. Henritze to Phil Bennett, which copies Joe
6  Murphy, states in paragraph 3 that under the current
7  proposal, quote, Refco/RAI will own 100 percent of
8  Beeland Management Company, LLC versus 35 percent as
9  proposed in the original NEWCO structure.  Do you see
10 that language?
11    A   I do.
12    Q   Do you have an understanding of what this
13 reference to the original NEWCO structure is?
14    A   If you'll give me a moment and let me read it.
15       Okay.  I see it, but I'm not clear on what
16 the -- The Refco/RAI will own a hundred percent, I
17 understand that, of Beeland Management versus 35 percent
18 as proposed in the original NEWCO structure.  I never
19 saw the original NEWCO structure.
20    Q   So it's fair to say you were not involved in any
21 of these discussions or negotiations, correct?
22    A   Embarrassingly, no.
23    Q   And why do you say embarrassingly?
24    A   Well, it's embarrassing to sit here in front of
25 you guys and do this and tell you that stuff that went

29 (Pages 110 to 113)

Page 114

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2  on in a company that I was head of, I didn't seem to
3  know what was going on.
4      Q  Looking back on it now, you would have
5  appreciated being looked in on some of these
6  discussions; is that fair to say?
7      A  In a round about way, no, but, yes, I think I
8  should have been.
9      Q  My last question about this document, sir, is
10 there's a reference to a switch in the proposal from a
11 35 percent buy-out by Refco of Beeland to a hundred
12 percent buy-out.  Do you have any specific recollections
13 of when that shift occurred?
14         MR. RAND:  Objection to form.
15         THE WITNESS:  Since I'm not familiar with the
16 35 percent, I have no idea where the hundred percent
17 would come from.  I mean, it was always my understanding
18 that they would want to acquire a hundred percent.
19         MR. DOYLE:  Let's take our lunch break.
20         THE VIDEOGRAPHER:  We are going off the
21 record at 12:29.
22         (Lunch recess was taken.)
23         THE VIDEOGRAPHER:  We are going back on the
24 record at 1:10.
25 BY MR. DOYLE:

Page 115

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2      Q  Good afternoon, Mr. Price.  We're back from
3  lunch.  You understand that you're still under oath,
4  correct?
5      A  I do.
6      Q  Sir, do you recall that in early October 2005
7  Refco and Beeland exchanged drafts of a standstill
8  agreement that contemplated pushing back the
9  consummation of any business arrangement between the
10 parties to at least December of that year?
11     A  Refco and Beeland?
12     Q  Yes.
13     A  Yes, I recall a standstill agreement.
14     Q  Were you involved in any way in negotiating that
15 agreement?
16     A  No.
17     Q  What is your understanding of why the parties
18 were negotiating a standstill agreement in October 2005?
19     A  And I'd like to take a look at the standstill
20 agreement.  I mean, my recollection is I remember a
21 standstill agreement, but.  And I might be of more help
22 to you.
23         MR. DOYLE:  Let's go ahead and mark this as
24 the next exhibit.
25         (Document marked as Deposition

Page 116

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2         Exhibit 3296 for identification.)
3  BY MR. DOYLE:
4      Q  Mr. Price, only because you asked for it, I'm
5  showing you a copy of what I've just had marked as
6  Exhibit 3296, which, for the record, bears Bates Nos.
7  REFCO-E-028184221 through 226.
8         And you can see that this document on the first
9  page has an e-mail, it's dated October 4th, 2005, and
10 then the remaining pages are the draft of what's labeled
11 a standstill agreement.  Correct?
12     A  Correct.
13     Q  Okay.  Take as much time as you need to review
14 it since you wanted to see this document to refresh your
15 recollection, and then let me know when you've had an
16 opportunity to read it.  I only have a few questions
17 regarding it.
18     A  Okay.  I vaguely remember that there was a
19 standstill agreement.
20     Q  Okay.  And having reviewed Exhibit 3296, sir,
21 does that refresh your recollection as to the reason
22 that the parties were negotiating a standstill agreement
23 in early October 2005?
24     A  It -- it really doesn't.  May I ask a question?
25     Q  Sure.

Page 117

1  30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
2      A  Was this signed by myself or was it signed by
3  Robert Mercorella?
4      Q  That was going to be one of my questions, as to
5  whether or not this was ever executed.  Do you know as
6  you sit here today?
7      A  I don't recall executing this agreement.
8      Q  Okay.  Do you know whether this standstill
9  agreement arose from a desire by one of the parties,
10 meaning either Refco or Beeland, to delay the execution
11 of -- or consummation of some type of business
12 arrangement between the parties?
13     A  As I said, I recall that there was a standstill
14 agreement.  I don't recall specifically what it was for.
15 And looking at the date, the date of that, I really just
16 don't know.
17     Q  You don't recall as you sit here today?
18     A  That's correct.
19     Q  Okay.  Do you recall, sir, whether or not this
20 standstill agreement -- Well, let me strike that
21 question.
22        In October of 2005, later in this month, was
23 the time when Refco's financial problems came to light
24 and then the company subsequently filed for bankruptcy,
25 correct?

Page 126

```
 1   30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
 2   Rogers Funds review any other audit reports or audited
 3   financial statements of any Refco entity in 2005?
 4       A   You know, I can't tell you that because I don't
 5   know what all Mr. Goodman may have looked at at the same
 6   time.  But had there been something that would have been
 7   negative, I'm sure he would have brought it to my
 8   attention.
 9       Q   Okay.  And I'm not asking you to speculate about
10   what might have been done by Mr. Goodman.  What I'm
11   asking you is, as the designee of the Rogers Fund at
12   this deposition, to the best of your knowledge, did
13   anyone else either on behalf of Beeland or the Rogers
14   Fund at any point in time in the year 2005 review any
15   audit reports or audited financial statements of any
16   Refco entity, aside from the report contained in the IPO
17   offering that you've already testified about here today?
18       A   To the best of my knowledge, there was more than
19   just the opinion, but, on the same token, I can't be
20   specific with you right now and put a point on that.  I
21   think -- I wish I could help you more.  I can't.
22       Q   To your knowledge, Mr. Price, during the period
23   of time when a potential business deal was being
24   discussed between Beeland and Refco, did anyone from
25   Beeland or the Rogers Funds ever view the stand-alone
```

Page 127

```
 1   30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
 2   audit reports on RCM?
 3       A   I don't recall.
 4       Q   Okay.  Sir, let's turn now to the Rogers Funds
 5   accounts at RCM.  The Rogers Funds opened a number of
 6   accounts with Refco Capital Markets in September 2005,
 7   correct?
 8       A   Correct.
 9       Q   How many accounts in total did RCM -- Strike the
10   question.
11           How many accounts in total did the Rogers Funds
12   open at RCM?
13       A   My guess would have been two, possibly three.
14       Q   When you say two, possibly three, do you mean
15   for each fund?
16       A   Yes.
17       Q   Can you explain to me the purpose for opening
18   these multiple accounts at RCM?
19       A   Sure.  At this point in time it was pretty clear
20   that the business was being moved to Diepason to execute
21   for Refco.  It had been made very clear.  And in trying
22   to be facilitory, being the general partner, I knew that
23   sometimes Diepason used FX.
24           So they -- Refco asked me to -- if I wouldn't
25   mind getting those done all at the same time, in the
```

Page 128

```
 1   30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
 2   same conference room, on the same day, and I was more
 3   than happy to facilitate that to make the move easier.
 4           So we facilitated it by -- I believe we opened
 5   one probably for the Rogers Raw Material Fund and one
 6   for the Rogers International Raw Material Fund.  I could
 7   be mistaken if there's a third one, but certainly I know
 8   that we were bound to have opened two.
 9       Q   Okay.  Let me try to drill down a little bit on
10   that and just make sure I understand it.  The Rogers
11   Funds themselves were only going to be trading in
12   commodities futures, correct?
13       A   We had only traded in commodity futures.
14       Q   Okay.  And when you say that Diepason sometimes
15   used FX, can you explain that a little bit more?
16       A   Well, Diepason was in Switzerland.  The majority
17   of the commodities they dealt with were dollar based.
18   Most of their clients were euro based.  The dollar had
19   strength.  The euro had weakness.
20           So they hedged a great deal of their -- the
21   currency risk, but we were looking at the small number
22   of contracts that we had in Japan, Canada, the UK, and,
23   of course, the LME can be denominated the other way.
24           So if the dollar's going up, we felt that if we
25   needed to hedge, we could do whatever we needed to do by
```

Page 129

```
 1   30(B)(6) ROGERS FUNDS - WALTER T. PRICE, III - 1-18-12
 2   doing it with a Chicago Mercantile contract.  I was
 3   aware that Diepason in the past had used FX.  So if they
 4   were going to be executing a trade, we looked at it and
 5   said, fine, we'll be happy to try to make this
 6   transition -- transition until such time as I'm no
 7   longer the general partner, which could have been any
 8   given day.  We will get those accounts opened over here
 9   for you in case you need to put a trade on.
10           In fact, there was a delay of one month as I
11   recall.
12       Q   A delay -- What's the delay you're referring to?
13   Between the time you attempted to open the account and
14   the time it opened or what?
15       A   I was trying to think if that had even anything
16   to do with the standstill, and I don't think it did.  I
17   think it was just the paperwork and people trying to get
18   their ducks in line.
19           Diepason really was going to do the roll a
20   month earlier, and they weren't prepared to do it, or we
21   weren't prepared to allow them to do it, and we did it
22   ultimately.
23       Q   At the time that the Rogers Funds' FX accounts
24   were opened at RCM, had any contracts or agreements been
25   signed with Diepason?
```

33 (Pages 126 to 129)