# In The Matter Of:

*REFCO INC. SECURITIES LITIGATION/MARC S. KIRSCHNER, etc.*

*v.*

*PHILLIP R. BENNETT, et al.*

_____

*MAWDSLEY, CRAIG - Vol. 1*

*July 26, 2011*

_____

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

```
              STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
              -----------------------------------x
               In re REFCO, INC. SECURITIES
                  LITIGATION
                                            07-MDL-1902
              -----------------------------------x
                This Document Relates To:

              MARC S. KIRSCHNER,as Trustee of
              the Refco Private Actions Trust,

                            Plaintiff,
                   -vs-                   07 CIV 8165 (JSR)

              PHILLIP R. BENNETT, SANTO C. MAGGIO,
              ROBERT C. TROSTEN, MAYER BROWN LLP,
              MAYER BROWN INTERNATIONAL LLP, and
              GRANT THORNTON LLP,
                            Defendants.
              -----------------------------------x
              GRANT THORNTON LLP,
                   Defendant/Third Plaintiff,

                   -vs-

              THOMAS H. LEE PARTNERS, L.P.;
              THL EQUITY ADVISORS V, LLC;
              THL MANAGERS V, LLC;
              THOMAS H. LEE EQUITY FUND V, L.P.
              THOMAS H. LEE PARALLEL FUND V, L.P.,
              THOMAS H. LEE EQUITY (CAYMAN) FUND V,
              L.P., THOMAS H. LEE; DAVID V. HARKINS;
              SCOTT L. JAECKEL; and SCOTT A SCHOEN,

                   Third-party Defendants.

              -----------------------------------x
                                      July 26, 2011
                                      10:30 a.m.



              WITNESS: CRAIG MAWDSLEY
```

CRAIG MAWDSLEY - 7/26/2011

Page 34

                    CRAIG MAWDSLEY
11:07:20  2      Q.   Can you elaborate what do you
11:07:21  3   mean by structuring advice?
11:07:23  4      A.   Maple Securities had, from memory
11:07:26  5   four different trading desks.  They had a
11:07:28  6   credit derivatives trading desk.  They had an
11:07:33  7   equity arbitrage trading desk.  They had what
11:07:36  8   they called a special situations trading desk
11:07:38  9   and they had a commercial finance trading desk.
11:07:40 10           So the structuring advice, for
11:07:42 11   example, for the derivatives desk would be
11:07:45 12   structuring CDOs, for example, providing advice
11:07:49 13   on ISDA documentation.  And how to form a CDO,
11:07:55 14   I guess.
11:08:01 15      Q.   Who did you report to when you
11:08:02 16   worked at Maple Securities UK Limited?
11:08:05 17      A.   Hugo Watson Brown.
11:08:07 18      Q.   What was his position?
11:08:08 19      A.   I believe he was the Managing
11:08:12 20   Director.
11:08:13 21      Q.   Did you directly report to him
11:08:15 22   during the entire time you were there?
11:08:16 23      A.   Yes.
11:08:22 24      Q.   Did you have any direct reports?
11:08:24 25      A.   No.

Page 35

                    CRAIG MAWDSLEY
11:08:29  2      Q.   What caused you to leave Maple
11:08:32  3   Securities UK Limited and begin working for Mr.
11:08:33  4   McPike?
11:08:34  5           MR. PAULSEN:  Objection to form.
11:08:35  6      A.   An unsuccessful management
11:08:37  7   buy-out.
11:08:41  8      Q.   Can you elaborate a little bit on
11:08:43  9   that what you mean by that?
11:08:44 10      A.   The management team at Maple
11:08:46 11   Securities looked to purchase the corporate
11:08:48 12   finance business, commercial finance business
11:08:51 13   from the bank.  And they were unsuccessful.
11:08:55 14   And I was on the management side of the
11:08:58 15   management buy-out, and as is often customary
11:09:01 16   when those deals don't proceed, you seek
11:09:04 17   alternative employment.
11:09:09 18      Q.   When did you first meet Mr.
11:09:15 19   McPike?
11:09:16 20      A.   April 2005.
11:09:21 21      Q.   How did you meet him?
11:09:23 22      A.   In a job interview.
11:09:34 23      Q.   Where did that interview take
11:09:36 24   place?
11:09:37 25      A.   In the Bahamas.

Page 36

                    CRAIG MAWDSLEY
11:09:37  2      Q.   How did you learn about the
11:09:39  3   availability of a position with Mr. McPike?
11:09:41  4      A.   Marcus Traill informed me that
11:09:49  5   there was a vacant position.
11:09:53  6      Q.   How did you know Mr. Traill at
11:09:55  7   the time?
11:09:55  8      A.   We attended University together.
11:09:59  9      Q.   In New Zealand?
11:10:00 10      A.   Yes.
11:10:05 11      Q.   What was his position at the
11:10:07 12   time?
11:10:07 13      A.   Who is "his" in your question?
11:10:11 14      Q.   I'm sorry?
11:10:12 15      A.   Who is the "his" in your
11:10:14 16   question?
11:10:14 17      Q.   Marcus Traill.
11:10:15 18      A.   He was the day trader.  He may
11:10:23 19   have actually been head of trading at that
11:10:28 20   point.
11:10:38 21      Q.   Did you interview with anyone
11:10:39 22   else besides Mr. McPike for the job?
11:10:42 23      A.   Jim Cone.
11:10:45 24      Q.   Do you remember what his position
11:10:54 25   was at the time?

Page 37

                    CRAIG MAWDSLEY
11:10:54  2      A.   No.
11:10:56  3      Q.   When did you officially begin
11:10:59  4   working for Mr. McPike? Do you know the start
11:11:02  5   date?
11:11:03  6      A.   I don't know the date.  It was in
11:11:05  7   the month of May 2005.
11:11:12  8      Q.   What was your position or title
11:11:13  9   when you started working for Mr. McPike in May
11:11:16 10   2005?
11:11:25 11      A.   We don't have job titles per se.
11:11:30 12   If I did I would have been the night trader.
11:11:37 13      Q.   Did you have business cards?
11:11:38 14      A.   No.
11:11:38 15      Q.   No business card at all?
11:11:40 16      A.   No.
11:11:40 17      Q.   Or stationery or letterhead that
11:11:41 18   will identify any kind of position or title you
11:11:44 19   may have held?
11:11:45 20      A.   No.
11:11:45 21      Q.   What were your duties and
11:12:02 22   responsibilities when you first joined the
11:12:03 23   company as a night trader?
11:12:04 24      A.   Execution of trading signals.
11:12:15 25      Q.   When you say trading signals, I'm

10 (Pages 34 to 37)

Page 38

1                CRAIG MAWDSLEY
2   not familiar with that term, what does that
3   mean?
4       A.   It's a decision to buy or sell a
5   security.
6       Q.   What types of trading did you do,
7   sir, back in May of 2005?
8       A.   What do you mean?
9       Q.   Well, securities, did you do
10  foreign exchange trading? I am trying to get a
11  sense of the various types of trading that you
12  did as a night trader.
13      A.   Do you wish to know the asset
14  classes we traded in?
15      Q.   Yes, please.
16      A.   We traded futures and foreign
17  exchange.
18      Q.   Any other asset classes?
19      A.   Yes, metals.
20      Q.   Did you trade all three of these
21  types of asset classes, futures, foreign
22  exchange and metals back in May of 2005?
23      A.   No.
24      Q.   Can you tell me during what time
25  frame you did each? In other words, break it up

Page 39

1                CRAIG MAWDSLEY
2   for me.  Were you doing futures trading back in
3   May of 2005?
4       A.   Yes.
5       Q.   Were you doing foreign exchange
6   trading back in 2005?
7       A.   It depends what you mean by
8   foreign exchange trading.  If you mean cash
9   foreign exchange, no.  If you mean exchange
10  traded foreign exchange, yes.
11      Q.   What about metals?
12      A.   No.
13      Q.   When did you begin doing that?
14      A.   When I moved to the day desk, day
15  trading.
16      Q.   When was that?
17      A.   Approximately a year after I
18  started.
19      Q.   I want to have you take me
20  through the evolution of your work for Mr.
21  McPike if you could.  You started as a night
22  trader in 2005.
23      A.   Uh-huh.
24      Q.   It sounds like he wasn't big on
25  titles or positions. So I don't know if you

Page 40

1                CRAIG MAWDSLEY
2   experienced any formal title changes, but if
3   you can kind of walk me through how your duties
4   and responsibilities shifted and how you got to
5   the point today when I asked you what your
6   position was, you said you were the General
7   Counsel.
8            MR. PAULSEN:  Objection to form.
9       A.   Okay. So we had a small office.
10  And it is an informal office, hence, no titles.
11  We as an employee you tend to do whatever is
12  required of you, whatever you are best suited
13  for.
14           I was employed by Mr. McPike as a
15  night trader.  After a period of working nights
16  I moved on to days, became the day trader.
17           And after a period of trading
18  days I moved off the desk all together.  And
19  started to provide just general advisory work
20  for Mr. McPike.  Usually I would deal with any
21  legal issues that affected our business because
22  I have a legal background.  But it could be
23  anything and everything.
24      Q.   Are you involved in negotiating
25  contracts?

Page 41

1                CRAIG MAWDSLEY
2       A.   Yes.
3       Q.   Including contracts relating to
4   foreign exchange trading?
5       A.   Yes.
6       Q.   Let's back up to May of 2005.
7   Did you physically move from London to the
8   Bahamas when you started working for Mr.
9   McPike?
10      A.   Yes.
11      Q.   And you've remained there since?
12      A.   Yes.
13      Q.   How many employees did Mr. McPike
14  have back in May of 2005?
15      A.   I don't know with certainty.  I
16  would guess 15.
17      Q.   How many does he have today?
18      A.   15 or 20.
19      Q.   Sticking with the 2005 time
20  period, just as a point of reference, can you
21  explain to me what those roughly 15 different
22  employees did, what type of different hats did
23  they wear?
24      A.   So broadly speaking we had in May
25  2005, two traders.  One, I guess office

Page 66

```
                    CRAIG MAWDSLEY
11:55:52  2       A.   Price data.
11:55:55  3       Q.   How do you as a trader ensure the
11:55:58  4   integrity of that data?
11:56:02  5            MR. PAULSEN:  Objection to form.
11:56:05  6       A.   It's based on, we have a computer
11:56:08  7   program, so when we make a decision we take
11:56:13  8   input data, like price data.  And based on that
11:56:19  9   price data we make a decision as to what to buy
11:56:21 10   or sell in the market.
11:56:22 11            So if we put bad price data into
11:56:24 12   the model, we'll get an inaccurate signal.  So
11:56:29 13   the check, that particular verification
11:56:32 14   exercise is to make sure that the latest price
11:56:37 15   that we are sending to the decision-making
11:56:40 16   model is reasonable.
11:56:41 17            And so, here, for example, a data
11:56:45 18   provider may be reporting a bad price for an
11:56:48 19   instrument.  It is nothing more than that.
11:56:53 20       Q.   Then you indicated you need to
11:56:55 21   work the order on the market and attempt to do
11:57:00 22   so with minimal slippage, is that what you
11:57:02 23   said?
11:57:02 24       A.   Yes.
11:57:03 25       Q.   What do you mean by minimal
```

Page 67

```
                    CRAIG MAWDSLEY
11:57:05  2   slippage?
11:57:05  3       A.   Slippage is a term that refers to
11:57:08  4   market impact.  So when we make a decision to
11:57:16  5   buy or sell an instrument it is based on a
11:57:18  6   price assumption.  It's not a theoretical
11:57:21  7   price, it is the price the market is trading at
11:57:24  8   that time.  But it is not necessarily the price
11:57:25  9   that you can put your position on it.
11:57:30 10            And the difference between those
11:57:31 11   two prices is your impact, is the market impact
11:57:34 12   of taking your decision and implementing it
11:57:37 13   into the real world.
11:57:38 14       Q.   So you're talking essentially
11:57:39 15   about trying to do it quickly so that the
11:57:47 16   pricing data is as close as possible to what
11:57:51 17   the computer is reporting?
11:57:52 18       A.   Right.  So, you might describe it
11:57:55 19   as being your fill prices close to your signal
11:57:59 20   price.
11:58:00 21       Q.   That makes sense.  How many, back
11:58:08 22   in the 2005 time frame -- I asked you to kind
11:58:11 23   of give me a sense of your routine.  You
11:58:13 24   outlined your primary responsibilities, which I
11:58:16 25   appreciate, but can you just take me through a
```

Page 68

```
                    CRAIG MAWDSLEY
11:58:19  2   day in the life.  In other words, when did you
11:58:21  3   show up at work, how many trades did you place
11:58:25  4   in a typical day?  Things of that nature.
11:58:28  5            If you can just give me a little
11:58:29  6   bit more background as to how you did your job?
11:58:31  7       A.   In 2005 I would come into work at
11:58:34  8   one o'clock in the afternoon and I would
11:58:38  9   download the most recent day's historical data,
11:58:44 10   open, high, low, close data for all the markets
11:58:47 11   we trade.  And clean the data to make sure a
11:58:52 12   data provider is not reporting a bad price.
11:58:54 13            I would then, you know, interact
11:58:55 14   with the other members of the trading team as
11:58:58 15   to any new issue that might be relevant to the
11:59:01 16   desk, such as a new market we might be trading,
11:59:05 17   a new transaction cost model we might have, a
11:59:07 18   new system we might be trading.
11:59:08 19            I would typically leave the
11:59:10 20   office again around two o'clock or three
11:59:12 21   o'clock in the afternoon.  Come back to the
11:59:14 22   office around seven o'clock or eight o'clock at
11:59:19 23   night, again, collect more data, clean the
11:59:24 24   data.  Then at our first decision time for the
11:59:26 25   first market we trade I would trade in the
```

Page 69

```
                    CRAIG MAWDSLEY
11:59:30  2   manner we just described.
11:59:31  3            That would continue until about
11:59:36  4   three or four o'clock the following morning, at
11:59:39  5   which point I would go home.
11:59:41  6       Q.   When would the first relevant
11:59:42  7   market open for your purposes?
11:59:44  8       A.   It would be the Australian
11:59:49  9   markets and depending on daylight savings time,
11:59:51 10   somewhere between eight o'clock or ten o'clock.
12:00:00 11       Q.   In a given day or night, as it
12:00:03 12   may be when you were a night trader, how many
12:00:07 13   orders would you place?
12:00:08 14       A.   We traded approximately 20 or 25
12:00:10 15   markets as part of our night shift and we would
12:00:13 16   make one decision per day.  And the decision
12:00:15 17   may be to initiate a position, liquidate a
12:00:18 18   position or take no action.
12:00:20 19       Q.   Was that a hard and fast rule,
12:00:23 20   you would only do one per day?
12:00:24 21       A.   Yes.
12:00:24 22       Q.   Why?
12:00:25 23       A.   To match trading to research.
12:00:29 24       Q.   So you'd take the very best
12:00:31 25   opportunity that your research told you to
```

18 (Pages 66 to 69)

CRAIG MAWDSLEY - 7/26/2011

Page 70

```
                      1         CRAIG MAWDSLEY
12:00:32    2   take, and only one opportunity a day?
12:00:35    3         A.   Trading times is drifting into
12:00:40    4   proprietary information.
12:00:41    5         Q.   I am really not trying to pry
12:01:08    6   into anything proprietary.  I really am trying
12:01:10    7   to figure out the bases for your trading
12:01:13    8   decisions.
12:01:14    9              As I understand it, based on what
12:01:16   10   you've described, it is largely dictated by the
12:01:22   11   results of a computer analysis of data?
12:01:24   12         A.   Yes.
12:01:29   13         Q.   But I would assume that there
12:01:30   14   were times when the computer is providing you
12:01:34   15   with data that suggests that more than one
12:01:38   16   trade or opportunity would be advantageous on
12:01:43   17   any given day; is that correct?
12:01:45   18              MR. PAULSEN:  Objection to form.
12:01:45   19         A.   It is a research question I can't
12:01:49   20   answer.
12:01:57   21         Q.   But I am correct that your
12:02:00   22   trading decisions were dictated by the outcome
12:02:06   23   of a computer analysis of data?
12:02:10   24         A.   Yes.
12:02:13   25         Q.   Did you, as a matter of course,
```

Page 71

```
                      1         CRAIG MAWDSLEY
12:02:17    2   consult Mr. McPike on any of your trading
12:02:21    3   decisions?
12:02:22    4         A.   No.
12:02:23    5         Q.   You operated independently of him
12:02:26    6   on a day-to-day basis?
12:02:27    7         A.   Depends what you mean
12:02:30    8   independently.  And going to your previous
12:02:34    9   question about whether I consulted Mr. McPike
12:02:36   10   on my trading decisions, I didn't make any
12:02:39   11   trading decisions such as decision to buy or
12:02:43   12   sell an instrument.  It was generated by the
12:02:46   13   model.
12:02:47   14              We were independently of Mr.
12:02:50   15   McPike, to the extent we have a functional
12:02:52   16   split between research and trading, but we are
12:02:55   17   part of the same business.
12:02:58   18         Q.   So, would it be correct to say he
12:03:01   19   was more involved in the research and inputting
12:03:05   20   in the data, you performed a check on the data,
12:03:09   21   but you were more involved in the execution of
12:03:11   22   the trades?
12:03:11   23         A.   Yes.
12:03:13   24         Q.   Do you consider Mr. McPike to be
12:03:22   25   a sophisticated investor?
```

Page 72

```
                      1         CRAIG MAWDSLEY
12:03:24    2         A.   Yes.
12:03:24    3         Q.   What is your basis for that?  Why
12:03:30    4   would you characterize him as a sophisticated
12:03:32    5   investor?
12:03:34    6              MR. PAULSEN:  Objection, form.
12:03:35    7         A.   Due to his track record and
12:03:39    8   length of time trading.
12:03:40    9         Q.   How long has he been trading?
12:03:42   10         A.   Approximately 20 years.
12:03:53   11         Q.   You talked a little bit earlier
12:03:55   12   about the data that you would use to trade.  I
12:03:57   13   want to make sure I have a full understanding
12:03:59   14   of it.  So if I can just ask you the open-ended
12:04:02   15   question, what specific sources of data did
12:04:07   16   Stilton use to inform its trading?
12:04:09   17         A.   We collected data from a number
12:04:15   18   of data providers, such as Bloomberg, Reuters,
12:04:21   19   CQG.  There may have been an a couple of
12:04:27   20   others, like I think Knight-Ridder,
12:04:31   21   Knight-Rider that I have not used.
12:04:33   22         Q.   In what form did this data take?
12:04:36   23   In other words, is this stuff that is flashing
12:04:38   24   across a computer screen, are you reading any
12:04:39   25   of it in print?  What is the format of this
```

Page 73

```
                      1         CRAIG MAWDSLEY
12:04:46    2   data?
12:04:46    3         A.   Data providers effectively
12:04:52    4   provided two products for us, one is a terminal
12:04:55    5   with an interface which we use to read the
12:04:57    6   news, for example.
12:04:58    7         Q.   Okay.
12:04:59    8         A.   The other is an API or an
12:05:02    9   electronic link to their database where you can
12:05:05   10   make discrete requests for information which
12:05:08   11   they would return.
12:05:11   12         Q.   Did the traders at Stilton read
12:05:13   13   any industry periodicals or publications on a
12:05:16   14   regular basis?
12:05:16   15         A.   Yes.
12:05:17   16         Q.   Which ones?
12:05:18   17         A.   Lots.  Bloomberg has a magazine
12:05:21   18   that we read.  There is a Journal of
12:05:26   19   Quantitative Finance we read.  Any number of
12:05:28   20   periodicals.
12:05:34   21         Q.   Did you also watch any news
12:05:35   22   programs on a regular basis?
12:05:41   23         A.   We don't have a TV in our trading
12:05:43   24   room.  But we're interested people, so we watch
12:05:47   25   news when we're home and are interested in
```

19 (Pages 70 to 73)

Page 110

1            CRAIG MAWDSLEY
12:48:28  2      Q.   If you look at the next page on
12:48:35  3   this client fact sheet which is page 9 of the
12:48:38  4   document, sir, there is actually a reference to
12:48:48  5   different accounts that are managed at CIS.  Do
12:48:50  6   you see that?
12:48:50  7      A.   Yes.
12:48:51  8      Q.   There are two account numbers
12:48:53  9   listed there, one is 5050 P.  The other is 5001
12:48:58 10   P.
12:48:58 11      A.   Yes.
12:48:59 12      Q.   Do you know what accounts those
12:49:03 13   refer to?
12:49:03 14      A.   It is my belief that 5050 P is an
12:49:09 15   account with a company called Alcott Finance.
12:49:14 16   And I think the 5001 P account is Stilton's
12:49:18 17   account.
12:49:22 18      Q.   For FX trading; correct?
12:49:24 19      A.   The 5001 P certainly.  For
12:49:28 20   5050 P, I don't know.  I don't know the nature
12:49:32 21   of that trading with CIS.
12:49:34 22      Q.   At the bottom of this same page
12:49:36 23   there is a reference to a "Total risk capital."
12:49:42 24          Do you see that?
12:49:43 25      A.   Yes.

Page 111

1            CRAIG MAWDSLEY
12:49:43  2      Q.   Do you have an understanding of
12:49:44  3   what that means, sir?
12:49:45  4      A.   No.
12:49:51  5          MR. DOYLE:   This would be a good
12:49:53  6      time for a break.
12:49:53  7          VIDEOGRAPHER:   The time is now 12:49
12:49:55  8      p.m. This is end of tape number 1.  Off
         9      the record.
        10          (Luncheon Recess: 12:49 p.m.)
        11
        12      A F T E R N O O N   S E S S I O N
        13               1:30 p.m.
        14
        15          CRAIG MAWDSLEY,
        16      resumed, having been previously duly
        17      sworn, was examined and testified further
13:35:01 18      as follows:
13:35:01 19          VIDEOGRAPHER:   The time is now 1:34
13:35:06 20      p.m. this is beginning of tape number 2.
13:35:07 21      Back on the record.
13:35:08 22      CONTINUED EXAMINATION BY MR. DOYLE:
13:35:08 23      Q.   Mr. Mawdsley, before we took our
13:35:13 24   break you testified that Stilton's FX trading
13:35:17 25   account was transferred from Cargill to RCM?

Page 112

1            CRAIG MAWDSLEY
13:35:20  2      A.   Yes.
13:35:21  3      Q.   I believe you stated that
13:35:23  4   happened just a few months after you started
13:35:24  5   working for Mr. McPike?
13:35:27  6      A.   Yes.
13:35:28  7      Q.   Were you involved in the
13:35:30  8   transition of Stilton's FX trading account from
13:35:32  9   Cargill to RCM?
13:35:33 10      A.   What do you mean by transition?
13:35:35 11      Q.   Well the account transitioned
13:35:36 12   from Cargill to RCM; right?
13:35:38 13      A.   Yes.
13:35:38 14          MR. PAULSEN:   Objection to form.
13:35:39 15      Q.   Were you involved in that in any
13:35:41 16   way?
13:35:42 17      A.   In a trading capacity, yes,
13:35:46 18   because I'm trading with that entity.  And in
13:35:49 19   any other capacity, no.
13:35:51 20      Q.   So aside from your capacity as a
13:35:55 21   trader, you didn't have any involvement in the
13:36:03 22   transaction that resulted in Stilton's FX
13:36:05 23   trading account moving from Cargill to RCM; is
13:36:09 24   that correct?
13:36:09 25          MR. RAND:   Objection to form.

Page 113

1            CRAIG MAWDSLEY
13:36:10  2          MR. PAULSEN:   Objection to form.
13:36:10  3      A.   That's correct.
13:36:15  4      Q.   To your knowledge was Stilton
13:36:17  5   required in any way to transfer its FX trading
13:36:20  6   account from Cargill to RCM?
13:36:22  7          MR. PAULSEN:   Objection to form.
13:36:26  8      A.   What do you mean by required?
13:36:28  9      Q.   Was there any obligation upon it,
13:36:30 10   did it have options to use other brokerage
13:36:32 11   firms if it wanted to? Was there anything that
13:36:34 12   legally required, to your knowledge, Stilton to
13:36:38 13   transfer its FX trading account from Cargill to
13:36:43 14   RCM?
13:36:43 15          MR. PAULSEN:   Objection to form.
13:36:44 16      A.   I guess there was no legal
13:36:46 17   requirement for us to transact business with
13:36:48 18   RCM.  It was an operational requirement which
13:36:51 19   is we had no other accounts opened so if we
13:36:53 20   wanted to continue trading, we had to transfer.
13:37:00 21      Q.   That's what I'm trying to figure
13:37:02 22   out.  Did Stilton in your mind have the option
13:37:04 23   of using a different brokerage firm besides RCM
13:37:08 24   for its FX trading?
13:37:09 25      A.   It always had an option of

CRAIG MAWDSLEY - 7/26/2011

Page 138

```
                  CRAIG MAWDSLEY
14:21:02   2    Q.   You're not aware of any company
14:21:03   3  with the acronym RIS?
14:21:05   4    A.   No.
14:21:16   5         MR. DOYLE:  Could you mark
14:21:18   6  this, please.
14:21:18   7            (Mawdsley Deposition
14:21:18   8         Exhibit 3188 for identification, Letter
14:21:46   9         dated 8/15/05, production numbers
14:21:48  10         REFCO-S-0787981.)
14:21:36  11    Q.   Mr. Mawdsley, I just had placed
14:21:38  12  before you a document that's been marked
14:21:39  13  Exhibit 3188.  For the record it is a one-page
14:21:42  14  document bearing two sets of Bates numbers.
14:21:46  15  One of which is REFCO-S-0787981.  Do you
14:21:55  16  recognize this document, sir?
14:21:57  17    A.   Yes.
14:21:57  18    Q.   Have you seen it before today?
14:21:59  19    A.   Yes.
14:22:01  20    Q.   When did you first see it?
14:22:02  21    A.   2005.
14:22:03  22    Q.   And you remember seeing it back
14:22:05  23  then?
14:22:05  24    A.   Yes.
14:22:10  25    Q.   What is this exhibit?
```

Page 139

```
                  CRAIG MAWDSLEY
14:22:11   2    A.   It is a letter from Cargill
14:22:15   3  Investor Services Financial Services, Inc. to
14:22:18   4  Stilton International Holdings regarding the
14:22:20   5  transfer of its trading account from CIS
14:22:23   6  Financial Services.
14:22:23   7    Q.   The date of it is August 15,
14:22:25   8  2005; correct?
14:22:26   9    A.   Yes.
14:22:30  10    Q.   The person who wrote it is Steve
14:22:32  11  Assimos, Vice President of CIS Financial
14:22:35  12  Services; correct?
14:22:35  13    A.   Yes.
14:22:36  14    Q.   Do you know Mr. Assimos?
14:22:38  15    A.   No.
14:22:43  16    Q.   This letter states that "Refco's
14:22:46  17  acquisition of CIS Financial Services will
14:22:50  18  occur effective August 31, 2005."
14:22:52  19         Do you see that?
14:22:53  20    A.   Yes.
14:22:53  21    Q.   Is it your recollection that the
14:22:54  22  transfer of Stilton's FX account occurred on
14:22:57  23  that date?
14:23:00  24    A.   Yes.
14:23:01  25    Q.   Do you know whose handwriting
```

Page 140

```
                  CRAIG MAWDSLEY
14:23:02   2  appears on this letter?
14:23:03   3    A.   Yes.
14:23:06   4    Q.   Whose?
14:23:06   5    A.   Jim Cone's.
14:23:07   6    Q.   Is all of it his or do you see
14:23:11   7  two different sets of handwriting here?
14:23:13   8    A.   I see two different sets of
14:23:15   9  handwriting.
14:23:16  10    Q.   When you say some of it is Jim
14:23:17  11  Cone's, what handwriting are you referring to
14:23:19  12  on the document?
14:23:22  13    A.   Everything except the signature
14:23:23  14  of the letter, which I assume to be Steve
14:23:26  15  Assimos' handwriting.
14:23:28  16    Q.   Some of his comments are in
14:23:30  17  cursive, some look to be in print form, but you
14:23:33  18  recognize both those types of writings as
14:23:36  19  coming from Mr. Cone?
14:23:38  20    A.   I don't understand the question.
14:23:42  21    Q.   I am noting that some of the
14:23:43  22  writings in hand on this document are cursive.
14:23:47  23    A.   What does cursive mean?
14:23:49  24    Q.   I don't know how to describe it.
14:23:52  25         MR. PAULSEN:  Script.
```

Page 141

```
                  CRAIG MAWDSLEY
14:23:53   2    Q.   In script.  And some of it is
14:23:54   3  printed.
14:23:55   4    A.   Okay.
14:23:56   5    Q.   I just wanted to make sure you
14:23:59   6  recognize both his script or cursive writing
14:24:02   7  and his print writing and think that all of the
14:24:07   8  handwriting aside from the signature is Mr.
14:24:09   9  Cone's?
14:24:10  10    A.   Yes.
14:24:10  11    Q.   You believe that to be the case?
14:24:12  12    A.   Yes.
14:24:17  13    Q.   I notice the letter at least was
14:24:19  14  addressed to a Julian McPike, do you see that?
14:24:21  15    A.   Yes.
14:24:21  16    Q.   Someone has written it should be
14:24:23  17  changed to Harold McPike; correct?
14:24:25  18    A.   Yes.
14:24:27  19    Q.   You believe that was Mr. Cone who
14:24:29  20  did that?
14:24:29  21    A.   Yes.
14:24:30  22    Q.   Was there ever a Julian McPike
14:24:32  23  who was associated with Stilton?
14:24:33  24    A.   Yes.
14:24:34  25    Q.   Who is Julian McPike?
```

36 (Pages 138 to 141)

CRAIG MAWDSLEY - 7/26/2011

Page 142

```
              1          CRAIG MAWDSLEY
14:24:35      2      A.   He is Harold McPike's
14:24:39      3   brother-in-law.
14:24:40      4      Q.   Does he still do any work for
14:24:42      5   Stilton?
14:24:42      6      A.   No.
14:24:42      7      Q.   Does he do any work for Mr.
14:24:45      8   McPike?
14:24:49      9      A.   Yes.
14:24:50     10      Q.   What type of work does he do,
14:24:52     11   sir?
14:24:52     12           MR. RAND:   Beyond the scope.
14:24:54     13      A.   It is beyond the scope.  Property
14:24:56     14   management work in New Zealand.
14:25:01     15      Q.   This letter states that Stilton's
14:25:03     16   account will be assigned to RCM on August 31,
14:25:08     17   2005 unless Stilton notified Cargill before
14:25:11     18   close of business on August 26th not to effect
14:25:14     19   the assignment; correct?
14:25:19     20      A.   Yes.
14:25:19     21      Q.   Do you recall any discussions at
14:25:22     22   Stilton about whether to allow the transfer of
14:25:24     23   this account to RCM?
14:25:24     24      A.   No.
14:25:26     25      Q.   This letter also states no new
```

Page 143

```
              1          CRAIG MAWDSLEY
14:25:30      2   account documentation will be required to
14:25:33      3   effect the transfer.  Do you see that?
14:25:38      4      A.   Yes.
14:25:38      5      Q.   Do you recall whether Stilton
14:25:40      6   signed any new documents or agreements in
14:25:41      7   connection with the transfer of its FX trading
14:25:44      8   account to RCM?
14:25:47      9      A.   Yes.
14:25:47     10      Q.   What do you know about that, sir?
14:25:49     11      A.   That we did not sign any new
14:25:51     12   agreements.
14:25:51     13      Q.   You did not?
14:25:52     14      A.   Yes.
14:25:56     15      Q.   So it is your understanding the
14:25:57     16   terms of the foreign exchange account
14:26:01     17   agreements that we looked at earlier that were
14:26:03     18   entered into between Cargill and Stilton would
14:26:07     19   govern the trading under those accounts with
14:26:11     20   RCM?
14:26:12     21      A.   Yes.
14:26:17     22      Q.   At the bottom of this letter Mr.
14:26:21     23   Cone expresses an indication that Stilton
14:26:29     24   agrees with the transfer, do you see that?
14:26:30     25      A.   Yes.
```

Page 144

```
              1          CRAIG MAWDSLEY
14:26:33      2      Q.   Do you know why he did that, sir?
14:26:35      3      A.   Yes.
14:26:35      4      Q.   Why?
14:26:36      5      A.   I believe Jim was contacted by
14:26:40      6   Mike Cartier on the 30th of August or about the
14:26:44      7   30th of August and informed unless we responded
14:26:47      8   to this letter that we would not be able to
14:26:49      9   trade post transfer with RCM.
14:26:55     10      Q.   So Mr Cartier wanted something in
14:26:58     11   writing that expressed an agreement to the
14:27:00     12   transfer?
14:27:01     13      A.   I don't know what Mr. Cartier
14:27:02     14   wanted, but he did ask that we initial this
14:27:06     15   document and return it.
14:27:12     16      Q.   So you believe what Mr. Cone has
14:27:14     17   written on the bottom half of this exhibit was
14:27:16     18   one at the request of Mr. Cartier?
14:27:19     19      A.   I believe so.
14:27:27     20      Q.   Do you have any understanding or
14:27:28     21   ability to explain any of the handwritten
14:27:31     22   notations in the upper right-hand corner of
14:27:34     23   this document?
14:27:39     24      A.   No.
14:27:39     25      Q.   Do you see the reference in these
```

Page 145

```
              1          CRAIG MAWDSLEY
14:27:49      2   handwritten notations to, I think it just say
14:27:56      3   "public very quickly."  Do you see that
14:27:58      4   language or those words?
14:27:59      5      A.   Yes.
14:27:59      6      Q.   Do you have any understanding of
14:28:00      7   what that refers to?
14:28:01      8      A.   No.
14:28:07      9      Q.   Do you know whether Mr. Cone sent
14:28:12     10   this letter with his signature to anybody at
14:28:15     11   Cargill or Refco?
14:28:17     12      A.   I believe so.
14:28:19     13      Q.   Do you know to whom he sent it?
14:28:21     14      A.   I believe he sent it to Mike
14:28:23     15   Cartier.
14:28:23     16           (Mawdsley Deposition
14:28:23     17       Exhibit 3189 for identification, Novation
14:29:05     18       Agreement, production numbers
14:29:08     19       REFCO-S-0787985 through 87.)
14:28:55     20      Q.   Mr. Mawdsley, I just had placed
14:28:57     21   before you what's been marked as Exhibit 3189.
14:29:01     22   For the record it is a three-page document
14:29:03     23   bearing two sets of Bates numbers.  One of
14:29:05     24   which is REFCO-S-0787985 through 87.
14:29:16     25       I'll give you a chance to look at
```

37 (Pages 142 to 145)