# In The Matter Of:

## MARC S. KIRSCHNER, ET AL.
## v.
## PHILLIP R. BENNET, ET AL.

_____

## NATHANAËL BENZAKEN 30(b)(6)  - Vol. 1
### October 21, 2011

_____

**MERRILL CORPORATION**
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
In re REFCO, INC. SECURITIES
LITIGATION                   07-MDL-1902
                                  (JSR)

----------------------------------------x
MARC S. KIRSCHNER, as Trustee of the
Refco Private Actions Trust,

             Plaintiff,

      -against-      Case No. 07-CV-8165
                                  (JSR)
PHILLIP R. BENNET, et al.,

             Defendants.
----------------------------------------x
GRANT THORNTON LLP,

     Defendant/Third-Party Plaintiff,

       -against-

THOMAS H. LEE PARTNERS, L.P., et al.,

             Third-party Defendants.
----------------------------------------x

                October 21, 2011

                9:36 a.m.


     Videotaped 30(b)(6) deposition of
LYXOR/BEACH DISCRETIONARY FUND LIMITED and
LYXOR/ESTLANDER & RONNLUND FUND LIMITED by
NATHANAËL BENZAKEN, at the offices of
Winston & Strawn LLP, 200 Park Avenue, New
York, New York, before Gail F. Schorr, a
Certified Shorthand Reporter, Certified
Realtime Reporter and Notary Public within
and for the State of New York.
```

Page 46

```
 1              NATHANAËL BENZAKEN
 2          In the case of Beach
 3   Discretionary, it's certainly more
 4   difficult for me to answer that question
 5   as I wasn't in charge of analyzing or
 6   supervising the fund in particular.
 7       Q.   Did you play any role in the
 8   decisionmaking with respect to which
 9   brokerage firms the funds would use for
10   their FX trading?
11       A.   For those two?
12       Q.   Yes.
13       A.   When I took over on Feb 1st
14   the two funds were already set up, so I
15   had no involvement in picking the
16   counterparty.
17       Q.   They were set up with Cargill?
18       A.   That's correct.
19       Q.   Specifically CIS Financial
20   Services; is that your understanding?
21       A.   The precise name of the entity
22   it sounds familiar.
23       Q.   Did you ever read audit
24   reports prepared by the outside auditors
25   of the brokerage firms with which the
```

Page 47

```
 1              NATHANAËL BENZAKEN
 2   Lyxor funds invested?
 3       A.   I didn't, sir. I didn't.
 4       Q.   You did not?
 5       A.   Did not.
 6       Q.   To your knowledge, did any of
 7   the fund managers, either internal or
 8   external at Lyxor, typically read audit
 9   reports that were prepared by the outside
10   auditors of the brokerage firms with
11   which they invested?
12       A.   Given the high standards of
13   the organization I work with, as well as
14   the managers we select, the professional
15   in charge of monitoring counterparty
16   risk, I cannot believe that he didn't
17   look at the audited financial statements
18   of all the counterparties.
19       Q.   Do you have any recollection
20   of any fund manager ever telling you that
21   he or she had reviewed an audit report
22   prepared by an outside auditor of the
23   brokerage firm with which they were
24   investing with FX?
25       A.   At what time?
```

Page 48

```
 1              NATHANAËL BENZAKEN
 2       Q.   At any time?
 3       A.   We had discussion in 2008
 4   where some managers told us they were
 5   concerned by Bear Stearns. On what
 6   basis, I can't say.
 7       Q.   That they were concerned by
 8   what, I'm sorry?
 9       A.   Bear Stearns.
10       Q.   Bear Stearns, okay. That was
11   in 2008?
12       A.   2008.
13       Q.   Prior to 2008, you can't
14   remember any discussion of audit reports?
15       A.   I can't remember.
16       Q.   Do you know whether the Lyxor
17   funds usually made spot trades or futures
18   trades when it comes to foreign currency
19   trading?
20       A.   In general, they can do both.
21   In those two cases specifically, I can't
22   say for sure. At this -- unless that
23   obviously they did trade some forwards
24   with Cargill, forward contracts.
25       Q.   You believe they used forward
```

Page 49

```
 1              NATHANAËL BENZAKEN
 2   contracts in addition to spot trading?
 3       A.   It's highly likely.
 4       Q.   Can you explain the different
 5   types of FX trading to the ladies and
 6   gentlemen of the jury? I don't think
 7   I've had you do that yet. What is a spot
 8   trade versus a forward contract, versus
 9   futures trading, if you could?
10       A.   As a disclaimer, I'm not an FX
11   trader. I never traded FX, as I told
12   you. And futures on FX is a -- is an
13   instrument trading, traded on an
14   organized exchange.
15            Forward is a -- is an unlisted
16   forward traded OTC, over the counter, so
17   on the basis of an ISDA contract, which
18   is a derivative agreement between the
19   counterparties and the fund.
20            And spot trading is buying and
21   selling the currency on the spot.
22            MR. DOYLE: Would you mark
23       this as Exhibit 3227.
24            (Deposition Exhibit 3227 for
25       identification, document titled
```

13 (Pages 46 to 49)

Page 98

```
 1            NATHANAËL BENZAKEN
 2   have been the only company that the Lyxor
 3   funds were doing FX trading with?
 4       A.   It's highly likely that it was
 5   the sole company.
 6       Q.   You're certainly not aware of
 7   any other companies?
 8       A.   Besides the fact that we ended
 9   up with Refco afterwards, but that's it.
10       Q.   Do you have any understanding,
11   sir, of the factors that contributed to
12   the decision to open accounts with
13   Cargill?  I know it predated your
14   employment with Lyxor, but have you ever
15   discussed with anybody or through any
16   other source have you ever gleaned any
17   understanding of why they decided to use
18   Cargill?
19       A.   I have no idea, sir.
20       Q.   Aside from RCM, sir, have any
21   of Lyxor's brokerage firms experienced
22   financial difficulties, to your
23   knowledge?
24       A.   Would you mind repeating the
25   question.
```

Page 99

```
 1            NATHANAËL BENZAKEN
 2       Q.   You're aware of the financial
 3   difficulties of Refco that came to light
 4   in October 2005, correct?
 5       A.   Correct.
 6       Q.   To your knowledge, have any of
 7   the other brokerage firms that Lyxor has
 8   used over the years experienced financial
 9   difficulties?
10            MR. GOTTLIEB:  Objection to
11       the form of that.  If we're talking
12       about the two Lyxor companies I
13       think he only knew of Cargill or
14       CIS and perhaps Refco.  So are you
15       asking him about Cargill and Refco?
16       Q.   No, I was really -- I didn't
17   limit my question I don't believe to the
18   Lyxor funds.  I was looking more broadly
19   at the various Lyxor funds beyond just
20   the two at issue in this case.
21       A.   And during a specific period
22   of time or until now?
23       Q.   Since you've been there?
24       A.   Obviously we went through
25   interesting times during 2008 with Lehman
```

Page 100

```
 1            NATHANAËL BENZAKEN
 2   Brothers.
 3       Q.   Before the transfer of the
 4   Lyxor funds' FX trading accounts from
 5   Cargill to RCM, had Lyxor ever had any
 6   type of business relationship with Refco
 7   or one of its subsidiaries?
 8       A.   We had in the past one
 9   relationship if I recall correctly.  One
10   managed account run by, called Lonestar
11   utilizing Refco as a broker.
12       Q.   For what types of trading?
13       A.   To be precise, certainly
14   around the futures trading as well as
15   currency trading, but I can't say for
16   certain.
17       Q.   Can you put any time frame on
18   that?  Do you know the date range during
19   which the Lonestar fund was utilizing the
20   services of Refco?
21       A.   I think the Lonestar managed
22   account started sometime around 2003 and
23   if I recall correctly, my predecessor
24   closed it around 2005 -- 2004, 2004.
25       Q.   Do you have an understanding
```

Page 101

```
 1            NATHANAËL BENZAKEN
 2   as to why that account was closed?
 3       A.   Exactly the answer is no.  We
 4   were not necessarily very happy with the
 5   performance most probably.
 6       Q.   What is your understanding
 7   today of exactly when the Lyxor funds' FX
 8   trading accounts were transferred to RCM?
 9       A.   Can you be specific with your
10   question?
11       Q.   This question relates solely
12   to the two Lyxor funds that are at issue
13   in this case, and the question is what is
14   your understanding today?
15       A.   Today.
16       Q.   As to exactly when those
17   accounts transferred from Cargill to RCM?
18       A.   If I recall correctly, the
19   deal closed end of August and I tend to
20   believe that the transfer or legal
21   transfer happened by then by virtue of
22   this negative consent letter that we --
23   that I never saw, that the firm maybe
24   received.
25       Q.   To your knowledge, sir, when
```

Page 102

1      NATHANAËL BENZAKEN
2  is the first time that anyone at Lyxor
3  realized that the Lyxor funds' FX trading
4  accounts had been transferred to RCM?
5      A.   This is impossible for me to
6  tell you.  I don't know.  It's a large
7  organization.  This was brought to my
8  attention obviously when this situation
9  happened.
10         MR. GOTTLIEB:  I'm not sure --
11     what situation?
12     A.   I mean the bankruptcy and
13  certainly the moratorium that was put in
14  place.
15         MR. GOTTLIEB:  Thank you.
16     Q.   So if I understand your
17  testimony, the public revelations in
18  October of 2005 that led to the Refco
19  bankruptcy were the first that you became
20  aware that these two Lyxor funds' FX
21  trading accounts had been transferred
22  from Cargill to RCM; is that correct?
23     A.   That's correct.
24         MR. DOYLE:  Can you please
25     mark this as whatever the next

Page 103

1      NATHANAËL BENZAKEN
2  numbered exhibit is.
3         (Deposition Exhibit 3228 for
4     identification, Bates stamped
5     REFCO-S-0788872 through 74.)
6     Q.   Mr. Benzaken, I'm showing you
7  what's just been marked as Exhibit 3228.
8         MR. DOYLE:  For the record, it
9     is a three-page document bearing
10    Bates numbers REFCO-S-0788872
11    through 74, and it actually
12    contains two different letters
13    dated August 15th, 2005 and then
14    some type of airborne shipments
15    record.
16    Q.   Have you seen these documents
17 before, sir?
18    A.   I think I saw them yesterday.
19         MR. GOTTLIEB:  Other than
20    that.
21    A.   I may have seen them when we
22 had to evaluate the situation, when the
23 problem were revealed to the market at
24 Refco, but I can't say for certain.
25    Q.   Are these two letters that are

Page 104

1      NATHANAËL BENZAKEN
2  contained in the first two pages of this
3  exhibit in fact the negative consent
4  letters that you've referred to at
5  various times during your testimony so
6  far today?
7     A.   Can I -- can I go through it
8  again, do you mind?
9     Q.   Sure.
10    A.   Yes, it's certainly the
11 negative consent letter that I referred
12 to earlier.
13    Q.   Just to be clear, let me read
14 a little bit of this into the record, and
15 the first letter relates to account
16 number 93350 which is an account of the
17 Lyxor/Estlander & Ronnlund Fund, correct?
18    A.   It reads that way.
19    Q.   And the second letter, just
20 for the record, relates to account number
21 93352, which is an account of the
22 Lyxor/Beach Discretionary Fund, correct?
23    A.   This is what's written.
24    Q.   And the text of the letters is
25 identical, right?

Page 105

1      NATHANAËL BENZAKEN
2     A.   Well, unless I can compare
3  word by word, it looks like that.
4     Q.   Let me just read from the
5  letter for the Lyxor/E&R fund.  It
6  states, "Dear customer:  We wish to
7  advise you that CIS Financial Services,
8  Inc. has agreed to sell certain of its
9  assets to Refco Group Ltd., LLC, the
10 parent company of Refco Capital Markets
11 Ltd., effective as of the close of
12 business on August 31st, 2005.  As a
13 result of this transaction, we propose to
14 transfer your account to RCM.
15         "Your account documentation
16 will be assigned to RCM on August 31st,
17 2005, unless you notify CISFS not to
18 effect such assignment and we actually
19 receive such notice at the CISFS address
20 listed below prior to 5 p.m. on August
21 26th, 2005."
22         Have I read that correctly?
23    A.   You did.
24    Q.   If you look at the last page
25 of this document, it would appear that

27 (Pages 102 to 105)

Page 106

1        NATHANAËL BENZAKEN
2   these letters were sent overnight to the
3   Lyxor funds on August 16th, 2005.  Do you
4   see that?
5       A.   I can see it.
6            (Witness and counsel confer.)
7       Q.   So Cargill was attempting to
8   give the Lyxor funds approximately 10
9   days to object in writing to the transfer
10  of their accounts to RCM, is that your
11  understanding based on these letters?
12      A.   I'm sorry, would you mind
13  repeating the question.
14      Q.   Yes.  These letters which I
15  just read from were sent to Lyxor on
16  August 16th, 2005, correct?  According to
17  the shipment date?
18      A.   This is the date, this is the
19  date that's on this letter.
20      Q.   Lyxor's being told to respond
21  by August 26th, 2005 or this transfer is
22  going to occur, correct?
23      A.   This is how it reads.
24      Q.   So you're basically being
25  given 10 days to respond in writing if

Page 107

1        NATHANAËL BENZAKEN
2   you don't want your accounts transferred
3   from Cargill to RCM, right?
4       A.   This is the process as written
5   here.
6       Q.   Right.  And my question, sir,
7   is do you believe that anybody at Lyxor
8   saw these letters in August 2005, anybody
9   who was still there?
10      A.   The thing is this letter was
11  sent to Raphael Faure, who wasn't with
12  the firm anymore at the time, so I can't
13  say for sure that this letter was
14  received by anyone.  I haven't seen it
15  before October when the bankruptcy and
16  the moratorium started.  That's the only
17  thing really I can tell you.
18      Q.   Who is Raphael Faure?
19      A.   I don't know.
20      Q.   So he's not -- do you know
21  when he left Lyxor?
22      A.   I don't know.  He wasn't there
23  when I was there.
24      Q.   So he was not somebody that
25  you had worked with at the company?

Page 108

1        NATHANAËL BENZAKEN
2       A.   Never worked with him.
3       Q.   And you can see that both of
4   these letters are in fact addressed to
5   him; is that correct?
6       A.   This is what's written on the
7   letters.
8       Q.   Do you see a fax track at the
9   top of the letters?
10      A.   I do.
11      Q.   And do you see the date of
12  that fax track?
13      A.   October 20th, 2005.
14      Q.   So it would appear based on
15  the document that somebody from Cargill
16  fax'd these letters to somebody at Lyxor
17  on October 20th, 2005; is that correct?
18           MR. RAND:  Objection; form.
19      A.   Certainly.
20      Q.   Do you have any independent
21  knowledge of that?
22      A.   Of the fact being receiving a
23  fax?
24      Q.   Yes.
25      A.   I can't recall for certain.

Page 109

1        NATHANAËL BENZAKEN
2   What I can say is that we -- when we find
3   out that the transfer happened without
4   our knowledge, we wanted to understand
5   and investigate what happened, and we
6   certainly asked for evidence of what
7   happened.
8       Q.   Do you know the identity of
9   the person at Cargill who faxed these
10  letters on October 20th, 2005?
11      A.   I don't.
12      Q.   Were you the person who
13  received this fax?
14      A.   I didn't.
15      Q.   Do you know who received this
16  fax?
17           MR. RAND:  Same objection.  I
18      have a continuing objection
19      actually.
20      A.   I don't remember.
21           MR. RAND:  Go ahead.
22      Q.   I'm sorry, can you restate
23  your answer?  Do you know who received
24  this fax?
25      A.   I don't.

Page 114

```
 1            NATHANAËL BENZAKEN
 2   organization is a large organization.  I
 3   had no reason to believe that the mail
 4   has been sent got lost, but I can't say
 5   for certain.
 6       Q.   What do you recall occurring
 7   with respect to any communications with
 8   Cargill once it came to your attention in
 9   October of 2005 after the problems at
10   Refco came to light that these accounts
11   had in fact been transferred to RCM?
12           MR. GOTTLIEB:  Would you
13       repeat that question.
14       A.   Please.
15       Q.   I just want to know, if I
16   understand your testimony, you didn't
17   know that these accounts had transferred
18   to RCM until October of 2005?
19       A.   That's correct.
20       Q.   When the financial problems at
21   Refco came to light?
22       A.   That's correct.
23       Q.   And what I'm trying to figure
24   out, to the extent you recall, is what
25   you did about it?  Did you have
```

Page 115

```
 1            NATHANAËL BENZAKEN
 2   communications with Cargill subsequently
 3   about the fact that these accounts were
 4   transferred to RCM unbeknownst to you?
 5       A.   I don't understand the last
 6   words of your question.
 7       Q.   Without you knowing about it.
 8   In other words, did you have conversations
 9   with anybody at Cargill about the fact
10   that the Lyxor funds' FX accounts were
11   transferred from Cargill to RCM without
12   you knowing anything about it?
13           MR. RAND:  I just want to
14       object.  I want to make sure
15       because of the nature of the
16       deposition, when you say you, so
17       the witness isn't confused, you're
18       talking about him personally?
19           MR. DOYLE:  I was talking
20       about him personally.
21           MR. RAND:  I just wanted to
22       make certain.
23       A.   I'm sorry, I'm going to ask
24   you to repeat the question again.
25       Q.   Sure.  What did you do, if
```

Page 116

```
 1            NATHANAËL BENZAKEN
 2   anything, upon learning in October of
 3   2005 that the FX trading accounts of
 4   these two Lyxor funds had been
 5   transferred from Cargill to RCM without
 6   your knowledge?
 7       A.   When I found out that we had
 8   assets with Refco without knowing it,
 9   without having signed any contract with
10   Refco, my, one of my colleagues,
11   Alexandre Labbe, tried to -- contacted
12   our contact there at CIS to ask the money
13   back because it wasn't supposed to be
14   with Refco, it was supposed to be with
15   CIS.  And given the fact that no answer,
16   no answer came back, it was escalated to
17   me and I sent an email to our contact
18   there to basically get an explanation and
19   certainly get our money back.
20       Q.   And do you recall what you
21   were told by your colleague at Cargill?
22       A.   I'm sorry?
23       Q.   Did you say you sent an email
24   to someone at Cargill?
25       A.   To our contact who was
```

Page 117

```
 1            NATHANAËL BENZAKEN
 2   supposed to be our contact.
 3       Q.   And do you remember what that
 4   person said in response to your email?
 5       A.   The exact content?  No, I
 6   don't remember.
 7       Q.   Generally what was the
 8   response?
 9       A.   I -- I have an understanding
10   of what was the situation.  I don't know
11   whether he -- what he actually replied to
12   me in specifically beside the fact that
13   obviously the money is with RCM and
14   cannot be wired back to us.
15       Q.   So is it correct to state, Mr.
16   Benzaken, that you were informed by
17   Cargill about the negative consent
18   letters, about the fact that the accounts
19   had transferred to RCM, and about the
20   fact that there was a trading moratorium
21   so that you were unable at that time to
22   access those funds?
23           MR. FRIEDMAN:  Objection to
24       form.
25       A.   By October?
```

Page 154

```
 1              NATHANAËL BENZAKEN
 2    typically the type of agreement that we
 3    expect to have signed with any of the
 4    authorized counterparties the fund could
 5    have dealt with.
 6        Q.   This particular agreement is
 7    between CIS Financial Services on the one
 8    hand, a Trustee of the Lyxor Master Fund
 9    by the name of SG Hambros Trust Company
10    (Jersey) Limited and then Lyxor Asset
11    Management, which is the company you work
12    for, correct?
13        A.   Correct.
14        Q.   If you could turn to page 11
15    of this agreement and specifically at the
16    top of the page paragraph 7.  Do you have
17    that in front of you?
18        A.   I do.
19        Q.   I'm not going to read this
20    word for word, but in relevant part this
21    paragraph 7 provides, "Neither this
22    agreement nor any interest or obligation
23    in or under this agreement may be
24    transferred, whether by way of security
25    or otherwise, by either party without the
```

Page 155

```
 1              NATHANAËL BENZAKEN
 2    prior written consent of the other
 3    party."
 4             Do you see that?
 5        A.   I can see that.
 6        Q.   Do you believe that this
 7    language led Lyxor to believe that its
 8    accounts could not be transferred to RCM
 9    or anyone else without Lyxor's prior
10    written approval?
11             MR. RAND:  Objection to form.
12        A.   Can you repeat the question,
13    please.
14        Q.   Yes.  Do you believe that this
15    language that talks about obligations not
16    being transferred without the prior
17    written consent of the parties led Lyxor
18    to believe that its FX trading accounts
19    could not be transferred without Lyxor's
20    prior written approval?
21             MR. GOTTLIEB:  Objection.  Are
22        you assuming that he was looking at
23        this document, or Lyxor was looking
24        at this document at the time?  Or
25        are you asking about what he thinks
```

Page 156

```
 1              NATHANAËL BENZAKEN
 2    today about the document?
 3             MR. DOYLE:  I'm asking him
 4        what the belief would have been at
 5        the time within the company as a
 6        30(b)(6) witness based on this
 7        language.
 8             MR. GOTTLIEB:  That's a
 9        hypothetical, okay.  I object.
10        A.   As a principle, the company
11    expects to always have a contract
12    negotiated and executed with any of the
13    counterparties, as a principle.
14        Q.   And as a principle, does the
15    company also expect that as opposed to
16    the negative consent letters that were
17    used in this case, that it will have an
18    opportunity to and in fact must consent
19    in writing to the transfer of its
20    accounts to another party?
21             MR. GOTTLIEB:  You're asking
22        about today or then?
23             MR. DOYLE:  At the time.  I
24        don't know that the answer would be
25        any different.
```

Page 157

```
 1              NATHANAËL BENZAKEN
 2             MR. GOTTLIEB:  Neither do I,
 3        that's why I asked when you were
 4        asking.
 5        A.   Can you ask the question
 6    again, please.
 7             MR. DOYLE:  Could you reread
 8        my question.
 9             (Record read as requested.)
10        A.   This is a principle that I
11    think did apply and still applies.
12        Q.   Lyxor obviously did not
13    provide any written consent for its FX
14    trading accounts to be transferred to RCM
15    in this case, correct?
16        A.   I didn't.  I don't know if
17    anyone did.
18        Q.   To your knowledge, Mr.
19    Benzaken, did the Lyxor funds ever make a
20    conscious decision to have their FX
21    trading accounts transferred to RCM?
22             MR. GOTTLIEB:  Objection to
23        form.
24        A.   I didn't make that conscious
25    decision.  I don't know if anyone else
```

40 (Pages 154 to 157)

Page 158

```
 1            NATHANAËL BENZAKEN
 2   made that decision during the time it
 3   happened.
 4        Q.   You're not aware of anybody at
 5   Lyxor having made an affirmative decision
 6   to have the accounts transferred to RCM,
 7   correct?
 8        A.   I'm not aware of such a fact,
 9   that's correct.
10        Q.   At any time prior to October
11   14, 2005, sir, did Lyxor or the Lyxor
12   funds do anything to investigate the
13   financial condition of either Refco or
14   RCM?
15        A.   It was, the question is
16   preannouncement of the problems at Refco
17   or --
18        Q.   Right.
19        A.   Pre.  I didn't personally.
20   I'm not aware of anybody else did that.
21        Q.   At any time prior to October
22   14, 2005, did Lyxor or the Lyxor funds do
23   anything to investigate or analyze the
24   solvency or insolvency of Refco or RCM?
25        A.   When, I'm sorry?
```

Page 159

```
 1            NATHANAËL BENZAKEN
 2        Q.   Any time prior to October 14,
 3   2005?
 4        A.   You're asking the question of
 5   Lyxor or as a group?
 6        Q.   Did Lyxor, and I'm
 7   particularly interested in the Lyxor
 8   funds, do anything to analyze the
 9   solvency or insolvency of Refco or RCM?
10        A.   To be precise, the funds
11   cannot do anything of that.  We were
12   acting as a sub-manager so it was
13   delegated to us as a function.  That's
14   point number 1. .
15             Point number 2, we have a --
16   we relied on Societe Generale
17   counterparty risk management to validate
18   the counterparty we deal with, and
19   therefore, as a consequence, their being
20   in charge of monitoring counterparties,
21   it was their responsibility to come to us
22   and say if something, anything could have
23   been wrong with any counterparty,
24   including Refco.
25        Q.   But in this case, sir, you
```

Page 160

```
 1            NATHANAËL BENZAKEN
 2   didn't even know that RCM was a
 3   counterparty prior to October 2005,
 4   correct?
 5             MR. RAND:  Objection; form.
 6        A.   That's correct.
 7        Q.   So based on that, do you have
 8   an understanding as to whether or not
 9   anybody within Lyxor would have done
10   anything to analyze or investigate or
11   research the solvency of Refco or RCM
12   prior to mid-October 2005?
13        A.   Why we would have done that?
14   We had -- we were not aware of being
15   exposed to Refco.  Why would we have done
16   that particular research, unless there
17   was something in the press that could let
18   us see something was happening there and
19   as a matter of information we were always
20   want to check whether we have direct or
21   indirect exposure to any problems
22   happening in the market.
23        Q.   You're not aware of any
24   problems or potential problems happening
25   in the market with respect to Refco until
```

Page 161

```
 1            NATHANAËL BENZAKEN
 2   October 2005, correct?
 3        A.   I'm not aware of any problem
 4   and if we were, we would have certainly
 5   been made aware, but without knowing that
 6   we had exposure.
 7        Q.   When the FX trading accounts
 8   were transferred to RCM did the Lyxor
 9   funds know that Grant Thornton was RCM's
10   outside auditor?
11        A.   I didn't know.
12        Q.   Do you have any reason to
13   believe that anybody else within Lyxor
14   knew at the time of the transfer of the
15   accounts to RCM that Grant Thornton was
16   RCM's outside auditor?
17        A.   You're asking the question
18   when it happened supposedly contractually
19   by virtue of the negative consent?
20        Q.   Right.  Which would have been
21   as we looked at some documents, August
22   31st, 2005 approximately?
23        A.   So the answer is likely that
24   we didn't know because we didn't even
25   know we had exposure to Refco at the
```

Page 170

```
 1            NATHANAËL BENZAKEN
 2   were publicly available in 2005?
 3       A.   Say it again.
 4       Q.   Do you know whether Grant
 5   Thornton's audit reports concerning RCM
 6   were publicly available in 2005?
 7       A.   For which year, 2004?  The, in
 8   the auditor's letters?
 9       Q.   In the year 2005, right.
10       A.   I'm assuming that they issue a
11   letter every year, so it was probably
12   available, but I don't know for sure.
13       Q.   Are you aware that RCM was a
14   private company?
15       A.   I don't know what the
16   implication are, but it was a company to
17   me.
18       Q.   Do you know the difference
19   between a public and a private company in
20   terms of the reporting obligations that
21   need to be made?
22       A.   I know that the vague
23   distinction, but certainly not the
24   reporting obligation that makes them
25   different.
```

Page 171

```
 1            NATHANAËL BENZAKEN
 2       Q.   In response to some of my
 3   earlier questions you talked about the
 4   possibility that certain people at SG,
 5   Societe Generale had reviewed audit
 6   reports of Refco or RCM.
 7            Do you even know whether the
 8   audit reports of Refco or RCM prior to
 9   mid-October 2005 were publicly available
10   to be reviewed by people in that
11   position?
12       A.   I don't know exactly.  What I
13   think I told -- what I think I said is
14   that part of the best practice to
15   evaluate the counterparty risk associated
16   to a certain counterparty to the extent
17   audited financial statements are
18   available, this is certainly on the to be
19   reviewed list.  I think this is what I
20   said, at least what I meant.
21       Q.   I'm glad you just said that
22   because I think maybe we were a little
23   confused or I was a little confused.
24   Because there's a difference between you
25   telling me what the best practice is in
```

Page 172

```
 1            NATHANAËL BENZAKEN
 2   theory versus telling me what you know
 3   occurred.
 4       A.   Absolutely.  That's why I am
 5   -- this is what I meant saying.
 6       Q.   I appreciate that.  So what I
 7   want to make sure is I understand to the
 8   extent you know personally and speaking
 9   on behalf of the Lyxor funds, to the
10   extent you're able to do so today as
11   their designee, do you know sitting here
12   today whether anybody making investment
13   decisions for the Lyxor funds had access
14   to and reviewed any Grant Thornton audit
15   report of RCM or Refco prior to
16   mid-October 2005?
17       A.   I don't know for certain that
18   this happened.  I know that they did a
19   review, SG counterparty risk management,
20   to the extent -- I'm sorry, I'm confused.
21   So I know for a fact that they did a
22   review.  What they did to the review,
23   it's their job.  As I said, I know what
24   best practices are.  I can't say more
25   than that.
```

Page 173

```
 1            NATHANAËL BENZAKEN
 2       Q.   But you don't know what
 3   materials they had access to?
 4       A.   I have no idea.
 5       Q.   So if I understand your
 6   testimony, you're unable to testify under
 7   oath here today that somebody within
 8   Lyxor or the Lyxor funds, or even within
 9   Societe Generale actually reviewed any
10   Grant Thornton audit report of Refco or
11   RCM; is that correct?
12       A.   I expect them to have done it
13   to the extent they are available, but I
14   can't say for certain it happened.
15       Q.   And you don't know to what
16   extent they were available, right?
17       A.   I don't know.
18       Q.   Do you know, sir, whether
19   anything Grant Thornton did ever
20   influenced the Lyxor funds' investment
21   decisions with respect to FX trading back
22   in the 2005 time period?
23       A.   Well, I think we were not
24   aware of being exposed to RCM, so as a
25   matter of fact, we couldn't have made any
```

44 (Pages 170 to 173)

Page 174

                NATHANAËL BENZAKEN
 2   conscious decision based on any
 3   statement.  If we knew, though, that
 4   there were some problems we would
 5   certainly, didn't have exposure, we would
 6   have moved our assets quickly.
 7       Q.   Just so I make sure I have an
 8   answer to my question, you don't believe,
 9   do you, sir, that anything Grant Thornton
10   did back in 2005 influenced any of the
11   Lyxor funds' investment decisions,
12   correct?
13           MR. GOTTLIEB:  Could you
14       phrase that positively because
15       you're going to have a problem with
16       the word don't.
17           MR. DOYLE:  I'll take that as
18       an objection to form and I'll try
19       to reput my question to you.
20       Q.   To the best of your knowledge,
21   Mr. Benzaken, did Grant Thornton do
22   anything back in the 2004/2005 time frame
23   that influenced the investment
24   decisionmaking of the Lyxor funds with
25   respect to FX trading?

Page 175

                NATHANAËL BENZAKEN
 2           MR. GOTTLIEB:  Objection to
 3       the form.
 4       A.   The answer is no.  We were not
 5   supposed to have exposure to RCM, so why
 6   would we care?
 7       Q.   To the best of your knowledge,
 8   in making their investment decisions back
 9   in 2005 did the Lyxor funds ever rely in
10   any way on the content or information
11   contained in Grant Thornton's audit
12   reports of RCM?
13       A.   Can you be specific in your
14   question, please.  Or repeat it, please.
15       Q.   I don't know that I can be any
16   more specific.  I'm going to ask the
17   court reporter to read it back to you if
18   that's okay.
19           (Record read as requested.)
20       A.   We didn't make any conscious
21   decision to invest with RCM.
22       Q.   I'm not trying to be tricky
23   with the question.  I know -- I'm not
24   trying to confuse you.  I think the
25   answer is no?

Page 176

                NATHANAËL BENZAKEN
 2       A.   The answer is no, we didn't
 3   have any exposure to, I mean we're not
 4   supposed to have exposure to RCM.
 5       Q.   And would your answer be the
 6   same with respect to Refco?  In other
 7   words, back in 2005, did the Lyxor funds
 8   ever rely in any way on the content or
 9   information contained in Grant Thornton's
10   audit reports of Refco?
11           MR. RAND:  Objection to form.
12       A.   The answer is no, we -- the
13   answer is no.
14       Q.   During that same year, 2005,
15   did the Lyxor funds ever rely on Grant
16   Thornton to keep them informed about the
17   financial condition of RCM?
18       A.   Say that again.
19       Q.   Yes.  Back in --
20           MR. GOTTLIEB:  You're not
21       trying to be tricky, are you, by
22       asking the same question over and
23       over and over again?
24       Q.   During that same year, 2005,
25   did the Lyxor funds ever rely on Grant

Page 177

                NATHANAËL BENZAKEN
 2   Thornton to keep them informed about the
 3   financial condition of RCM?
 4           MR. RAND:  Objection to form.
 5           MR. GOTTLIEB:  Objection.
 6       A.   At what time, exactly?
 7       Q.   In 2005, at any time.  In
 8   other words, the Lyxor fund was making FX
 9   trades.  Was it looking at any point in
10   time to Grant Thornton to keep them
11   apprised or informed about the financial
12   condition of RCM in the context of making
13   those trades?
14       A.   So to my knowledge, we have no
15   exposure to Refco, that's point number 1.
16           Point number 2, this happened
17   by virtue of this negative consent letter
18   only on August 31st, 2005.  So we had no
19   exposure beforehand, conscious exposure.
20   Why would we rely on any auditor's report
21   for a counterparty we have no exposure
22   to?
23       Q.   Do you know anyone from Grant
24   Thornton?
25       A.   I know no one.

45 (Pages 174 to 177)