ICLR: Equity Cases/Volume 18 /DUNNE v. ENGLISH. - (1874) L.R. 18 Eq. 524

(1874) L.R. 18 Eq. 524

**[EQUITY]**

# DUNNE v. ENGLISH.

[1872 D. 115.]

**1874 June 8; July 30.**

**SIR G. JESSEL, M.R.**

*Principal and Agent - Agent for Sale - Purchase by Agent - Disclosure of Material Facts - Burden of Proof - Practice - Evidence - Non-production of Witness for Cross-Examination - Payment into Court after Decree.*

An agent for sale who takes an interest in a purchase negotiated by himself is bound to disclose to his principal the exact nature of his interest; and it is not enough merely to disclose that he has an interest, or to make statements such as would put the principal on inquiry.

In such a case the burden of proving that a full disclosure was made lies on the agent, and is not discharged merely by the agent swearing that he did so, if his evidence is contradicted by the Plaintiff and not corroborated.

At the hearing of a cause on replication, the Plaintiff proposed to read the affidavit of a witness occupying an official position in the *United States*. Notice to cross-examine this witness had been given, and he had come over to this country for the purpose of being cross-examined, but had been obliged to return before the cause came on to be heard. The Plaintiff had given the Defendant only one day's notice before the witness left the country:-

*Held*, that the affidavit could not be read.

A Defendant whose affidavit filed on an inquiry discloses that he has money in his hands may be ordered to pay it into Court after decree and before further consideration.

> THE Plaintiff was, in and previously to May, 1871, interested to the extent of one-fourth in a company called the *Richmond Mining Company*, which owned certain mines and works in the State of *Nevada* alleged to be worth $100,000 (£20,000). In that month the Plaintiff obtained from the company a promise to sell the mines for $250,000 (£50,000); and it was arranged between the Plaintiff and Defendant (who were both then in *California*) that the Defendant should at once proceed to *London* and endeavour to negotiate a sale of the mines, on the joint account of the Plaintiff and Defendant, for such sum over £50,000 as could be obtained, and that they should share the expenses and profits of the sale equally. The Defendant accordingly proceeded to *London*, while the Plaintiff remained in *America* for the purpose of obtaining from the company a binding agreement of sale, and attending to other matters of business in connection with the mines.

An agreement in writing, dated the 23rd of June, 1871, was entered into between the *Richmond Mining Company* and the Plaintiff, whereby the company agreed to sell the mines and works to the Plaintiff at the price of $250,000, one half to be paid on the 1st of September, 1871, and the other half on the 1st of January, 1872; and it was provided that if the Plaintiff should not make a sale of the property on or before the 1st of September, 1871, or if he should not then have complied with the terms of the agreement by the payment of the said sum of money, the agreement should be void: and it was further provided that the vendors might at any time cancel the agreement, or, at their option, increase the amount for which the property was to be conveyed, by giving the Plaintiff notice by letter or telegram, subject, however, to this, that if on receipt of such advice or notice the property should have been sold, then the said notice should have no binding effect.

Having obtained this agreement, the Plaintiff forwarded it to the Defendant, who received it about the 19th of July. Immediately after so forwarding it, the Plaintiff himself started for *London*, where he arrived on the evening of the 23rd of July. On the same evening the Plaintiff and Defendant had a long and private conversation on the subject of the mines and works; and in the result they determined to sell the property for £60,000 to certain persons who were stated by the Defendant to be ready and willing to give that price for it, but whose names were not given. The Defendant promised to go and see the persons referred to next day, and endeavour to bring the matter to a close; and on the 25th of July, 1871, he told the Plaintiff that the parties to whom he had before referred had agreed to purchase the property for £60,000, and that a written agreement would be ready the next day. On the 26th of July the Plaintiff and Defendant met to discuss the terms of the agreement; and on the 28th of July a written agreement between the Plaintiff and Defendant was executed, whereby the Plaintiff agreed to sell the property to the Defendant at the price of £55,000. On the 3rd of August a limited company was registered in *England* for the purpose of purchasing and working the mines; and this company did shortly afterwards purchase the property sold by the Plaintiff for £200,000, of which £150,000 was paid in cash and £50,000 in shares. A

*(1874) L.R. 18 Eq. 524 Page 526*

settlement of accounts took place between the Plaintiff and Defendant in December, 1871, on the footing that there had been a sale at £60,000, and that the Plaintiff was to have half the £10,000 profit thus realised, less half the expenses; and the Plaintiff received from the Defendant a sum of £3725 4*s.*, being his share of profits on that footing, and gave a receipt in full for all moneys, claims, and demands payable or that might arise under the contract between him and the Defendant. The company had proved successful, and the shares thereof were valuable.

The original bill in this suit was filed in June, 1872, and was afterwards amended; and, as amended, it contained allegations to the following effect. As regards the conversation which took place between the Plaintiff and Defendant on the 23rd of July, the Plaintiff averred that the Defendant, in alluding to the persons who he said were ready and willing to give £60,000 for the mines, so expressed himself as to make the Plaintiff understand that there were several of them, and that they would purchase the mines out and out for their own benefit; and that nothing passed which could lead the Plaintiff to suspect, and he did not suspect, that the Defendant was to retain any interest in the mines or to derive any profit from the sale other than that which he would derive as a member of the partnership, consisting of the Plaintiff and himself. As regards the meeting on the 26th of July, the Plaintiff averred that the Defendant then requested that the agreement which they had met to discuss should take the form of a sale to himself, giving as a reason for the request that the parties with whom he had been dealing did not know the Plaintiff, and they would prefer to deal with the Defendant as the person who had conducted the negotiations up to that time, and that by having the property in his own name he could arrange matters more satisfactorily. The Defendant (according to the Plaintiff) also proposed on that occasion that, as the purchase-money was £60,000, giving a profit of £10,000, the agreement might be framed as one for a sale for £55,000, being £60,000 less the Defendant's agreed share of the profits, which could be provided for in his arrangements with the persons who were purchasing the mines, and whom he referred to as the syndicate; and he stated that, as the syndicate knew that he was to make a profit of

*(1874) L.R. 18 Eq. 524 Page 527*

£5000 out of the transaction, there would be nothing improper in so framing the agreement. The amended bill also alleged that shortly after the date of the agreement the Plaintiff noticed that the Defendant was taking a great interest in the formation of a company which was intended to work the mines: that he was told by the Defendant that the syndicate was forming this company, and on inquiring who composed the syndicate was told by the Defendant that the names were not to be disclosed; but that the Defendant admitted that the syndicate had allowed him to have an interest in it: that the Plaintiff then asked that he also might have the privilege of taking a share in the syndicate, and offered to subscribe to the extent of £10,000: that the Defendant said he did not know whether the syndicate would allow the Plaintiff to subscribe, but promised to inquire, and he subsequently told the Plaintiff that the syndicate declined to allow him to have a share on the ground that it was all taken up. It also alleged that there was no sale of the mines to a syndicate at all, and that, though the Defendant at the time alleged the sale to be merely nominal and a matter of form, the Defendant in truth intended the agreement of the 28th of July, 1871, to effect a purchase of the mines from the Plaintiff for his own benefit: and that the Defendant in fact sold the mines to the company, a Mr. *Fisher* rendering some assistance in the matter, and receiving some portion of the profits: and that the Plaintiff had given his receipt on the occasion of the settlement in utter ignorance that he had been otherwise than fairly treated by the Defendant. The bill prayed for a declaration that the agreement of the 28th of July, 1871, was inoperative to determine the partnership then existing between the Plaintiff and Defendant, and that the Plaintiff was entitled to share equally with the Defendant in the profits made on the sale of the mines and works by the Defendant under the title conferred by that agreement, and that the Defendant was bound to make over to the Plaintiff one half of the profits realised by such sale, the Plaintiff offering to contribute one half of the expenses incurred in and about such sale, and to bring into account the amount paid to him on the settlement of account; and for an account on the footing of the declaration.

The Defendant, by his answer to the original bill, admitted that

*(1874) L.R. 18 Eq. 524 Page 528*

on the 23rd of July he told the Plaintiff that he thought he might be able to negotiate a sale outright for £60,000; but he denied that he said he knew some persons who were ready and willing to give £60,000 for the mines and works, or that there was any ground for imputing to him that he intended to mislead or conceal anything from the Plaintiff. He alleged that on the evening of the 24th of July he informed the Plaintiff that if a sale were made he himself would have to become one of the purchasers: that it was on that occasion determined that the mines and works should be sold for £60,000; and he admitted that he thereupon promised to go and see the parties who he thought would be most likely to join him in the purchase. He stated that he thereupon communicated with Mr. *Morton Coates Fisher*, and asked him to go into the speculation with the Defendant, and join him in buying the property: that *Fisher* did agree to do so, provided the Defendant would examine thoroughly the property and deposit a sum of £2000 to cover certain costs: that *Fisher* and the Defendant agreed, subject to such condition (which was subsequently performed), to enter into a partnership, and as to the property, to share equally profit and loss: but that this agreement was made subject to the stipulation that if *Fisher* could get other persons to join in the purchase and advance money he should do so; and that it was further agreed between them that as it was uncertain who else he might induce to join them, the written agreement for the sale should take the form of an agreement between the Plaintiff and Defendant. The Defendant admitted that, under these circumstances he did, on the 25th of July, tell the Plaintiff that the parties to whom he had referred (and by whom he meant, and he verily believed that the Plaintiff understood him to mean, the parties who he had thought would join him in the purchase,) had agreed to purchase the mine and works for £60,000, and that a written agreement would be ready the next day: and admitted that the persons who agreed to purchase the mine and works were *Fisher* and himself: and that in the events which happened no other persons became purchasers. He insisted that he always told the Plaintiff that he was to be one of the purchasers.

By his answer to the amended bill the Defendant admitted that he spoke of "persons" or "parties" in the plural number, because

*(1874) L.R. 18 Eq. 524 Page 529*

he considered that *Fisher* would endeavour to procure, and that there was a probability of his procuring, other persons to join in the purchase.

The Defendant admitted that after the date of the agreement the Plaintiff inquired who composed the syndicate, and that he told him that he would not disclose their names.

The cause now came on to be heard on replication. The Plaintiff and Defendant respectively made affidavits verifying the statements in the amended bill and answers; and they were cross-examined in Court. The result of the cross-examination will be found in the judgment. It appeared from the evidence that the purchase-money of £60,000 was to be provided by *Fisher*.

The Plaintiff, in support of his case, had filed an affidavit by a gentleman occupying an official position in the *United States*. The Defendant gave notice to cross-examine this witness, and he came over to this country for that purpose, but was obliged to return before the cause came on to be heard. The Plaintiff gave notice to the Defendant that the witness was about to leave in order that the cross-examination might be taken before a special examiner, but it appeared that only one day's notice was given.

Upon the Plaintiff's counsel proposing to read the affidavit the Defendant's counsel objected.

SIR G. JESSEL, M.R.:-

The evidence must be rejected. The witness ought to have been here for cross-examination. It is not enough that he was here at one time; if he could not remain, the Plaintiff ought to have taken the evidence by commission and postponed the hearing.

Mr. **Southgate, Q.C.**, Mr. **Fry, Q.C.**, and Mr. **Kekewich**, for the Plaintiff, submitted that the Defendant had not made a full disclosure of his interest as purchaser under the agreement of the 28th of July, 1871, and must account for all the profits he had made.

Mr. **Field, Q.C.**, Mr. **Chitty, Q.C.**, and Mr. **Graham Hastings**, for the Defendant, contended that on the Plaintiff's own shewing

*(1874) L.R. 18 Eq. 524 Page 530*

the Defendant had told the Plaintiff shortly after the date of the agreement, and long before the settlement of accounts, that the syndicate had allowed him an interest in the purchase. The Plaintiff had sufficient knowledge to put him, at all events, on inquiry, and he could not now complain.

**SIR G. JESSEL, M.R. :-**

In this case it is admitted that the Defendant stood in a fiduciary relation towards the Plaintiff. The Plaintiff and Defendant were partners for the purpose of selling a mine, called the *Richmond Mine*, situate in one of the new States of *America*, with certain smelting works belonging to it. It is asserted by the witnesses, apparently with confidence, that the mine and smelting and other works were worth, in June, 1871, 100,000 gold dollars. It belonged to a company which is styled the *Richmond Company*. The Plaintiff, Mr. *Dunne*, was a shareholder or part owner of that mine to the extent of one-fourth. He obtained from the company an agreement or option that within a limited time he might be allowed to purchase the mine for $250,000, or £50,000 sterling. Now, of course, if the mine and works were only worth £20,000, that was an option that could only be exercised on the assumption that he sold the mine for a larger sum before he bought it of the company. He associated with himself as a partner in this adventure (namely, a sale of the mine to English people and shareholders in *England*, at an advance on this optional price) Mr. *English*, who is, like the Plaintiff, a

subject of the United *States*. They two together were to contrive to induce the English public to give some larger sum for the mine than the optional sum. Mr. *English* first proceeded to *England*. Mr. *Dunne* followed him at a subsequent date. Mr. *Dunne* had not got all the documents which were considered necessary with a view to selling the concern to English individuals or English companies to be formed for the purpose of buying it, and therefore Mr. *English* was not in a position to make what may be called any final or concluded arrangement before he got those documents, but he did negotiate. Mr. *English* received the documents about the 19th of July, 1871, and then he was in a position to negotiate seriously,

*(1874) L.R. 18 Eq. 524 Page 531*

and he went to a Mr. *Fisher*, and there seems to have been, not a final arrangement, but a discussion and conversation, in which £60,000 was named as the price. The exact day on which this conversation occurred is perhaps not strictly proved. It was a day or two after the 19th of July and before the 23rd of July, 1871. On the 23rd of July, 1871, which was a Sunday, the Plaintiff arrived in *England*. The Defendant, his partner, meets him at *Euston Station*; they go together to Mr. *English's* house; and the Plaintiff resides with Mr. *English* at his house in *London* until the 5th of August, when he goes back to the *United States*. The momentous events which determine this case occurred between those dates. On the night of Sunday, or rather early in the morning of Monday, they had a long conversation together. Mr. *Dunne* asserts that Mr. *English* did not tell him that he, Mr. *Dunne*, should have to sell the mine to Mr. *English* as one of the purchasers; Mr. *English* says he did tell him so, or used words to that effect. Now Mr. *Dunne's* position and Mr. *English's* position as partners - for they were partners - was subject to this risk, that the option which they had obtained from the *Richmond Company* only extended over sixty days from the 1st of July, and reckoning certain times to be occupied in journeys to and fro there was something like about fifteen days for negotiation when Mr. *Dunne* arrived in *England*. The exact number of days does not much matter, but both parties knew there was a risk of losing this option, which both of them considered a valuable option, whatever the real value of the mine might be, for they both anticipated they could get much more, and certainly there was a ground for that anticipation, because there had been a negotiation in which £60,000 had been mentioned by Mr. *Fisher* as the sum to be given. Therefore they were both anxious the option should not be lost, and the Defendant knew that the Plaintiff was anxious not to lose the expenditure - for there was some expenditure, though not to a very large amount, incurred by him - or to lose the chance of profit. The Defendant states that the Plaintiff wished to sell out and out for £60,000. There was a reason for his so selling. The time was short, and he was anxious to sell and have done with it. The Defendant asserts that he told the Plaintiff that he (the Defendant) would be one of the purchasers. Now we must

*(1874) L.R. 18 Eq. 524 Page 532*

recollect what the position of the parties was. The Defendant was not only in law the agent of the partnership to sell (being himself a partner, and every partner being an agent of the partnership), but he was in fact the agent who had been engaged in negotiating the sale. He was not merely a theoretical and legal agent, but he was the active agent for carrying on this sale, and being such agent he was bound, as I understand the law, if he intended to purchase himself or to take a share in the purchase, to tell the Plaintiff so, and, as I think, to tell him more than that, to tell him what share in the purchase he intended to take.

Now the first question I have to decide is, did he tell him so? According to the rule which I consider established, the *onus probandi* (that is, the obligation of proving that he told him so) lies on the Defendant. Can he prove it by simply saying that he told him so, the Plaintiff positively denying the statement? Is there any corroboration? I do not think there is anything worthy to be called corroboration, but I have seen the Plaintiff and the Defendant in the box, and I am asked to believe the one and disbelieve the other. I cannot say that either of them made a very satisfactory witness. The Plaintiff was cross-examined as to certain statements he made as to his having been in difficulties at particular times, and I must say the answers he first gave were not altogether reconcilable with the answers he was compelled to give when certain documents were put into his hands. I must also say it does appear that he is a man not extremely scrupulous about the obligations of veracity, for he certainly suggested to his partner that, in reference to another transaction, he might conveniently make a false statement, with a view of inducing the public to buy certain shares in a company which might otherwise be depreciated if it were known the manager of the company was selling the shares. On the other hand, the Defendant is compelled to admit in his answer that what he did say to the Plaintiff was not true. In his answer to the amended bill he is obliged to admit that he told the Plaintiff there were several persons willing to purchase; speaking of persons in the plural, there being, in fact, only one person, namely, Mr. *Fisher*. The statement in the first answer is this: "Under these circumstances I did, on the 25th of July, 1871, tell the Plaintiff that the parties to whom I referred

*(1874) L.R. 18 Eq. 524 Page 533*

(and by whom I meant, and verily believe the Plaintiff understood me to mean, the parties who I had thought would join me in the purchase) had agreed to purchase the mine and works for £60,000." In his second answer he is obliged to say: "I spoke of 'persons' or 'parties' in the plural" (that not being true), "because I considered that the said *Morton Coates Fisher* would endeavour to procure, and that there was a probability of his procuring, other persons to join him and myself in the purchase. I had no other reason for speaking of persons or parties in the plural, and certainly I did not intend to mislead the Plaintiff by any such expression." Nothing could be easier than to say, "Mr. *Fisher* has agreed to purchase with me;" but he represents to the Plaintiff that there were several persons when there was only one. He states as a positive fact that there is only one, and when he is interrogated a second time he can only suggest that there were other persons coming in. Both as regards the Plaintiff and the Defendant, I am sorry to say that, having seen both of them in the witness box, their mode of answering questions is not such as is satisfactory to my mind. The hesitation and the long delays of the Defendant were remarkable; and, not only prevarication, but something like mis-statement, was extracted from the Plaintiff in his cross-examination. I cannot say, therefore, that I am at liberty to credit one or discredit the other. I must hold an even hand between them, and set off the assertion of one against the assertion of the other. That being so, I am of opinion that the assertion of the Defendant, that he told the Plaintiff he was to be one of the purchasers, is not proved, and having decided that the *onus probandi* is on him, that alone would dispose of the case, because nothing is better settled than that an agent, purchasing for himself, must tell his principal he is the purchaser, or one of the purchasers.

But even assuming the Defendant's version is correct, I think I must arrive at the same legal conclusion. It is not enough for an agent to tell the principal that he is going to have an interest in the purchase, or to have a part in the purchase. He must tell him all the material facts. He must make a full disclosure. Now, if I may say so, with great respect, I do not know that I could put the case better, or state the law more clearly, than is done by Lord

*(1874) L.R. 18 Eq. 524 Page 534*

*St. Leonards* in the case of *Murphy v. O'Shea* (1). The marginal note, which is a very fair representation of the judgment, is this: 'If, in a transaction between principal and agent, it appears that there has been any underhand dealing by the agent, *ex. gr.*, that he has purchased the estate of the principal in the name of another person, instead of his own, however fair the transaction may be in other respects, it has no validity in a Court of Equity." Lord *St. Leonards* says (2): "One thing admits of no dispute: the moment it appears in a transaction between principal and agent that there has been any underhand dealing by the agent - that he has made use of another person's name as a purchaser, instead of his own - however fair the transaction may be in other respects, from that moment it has no validity in this Court." Again (3), he states thus the other rule about full disclosure: "This, therefore is a case, not merely of an agent who had his principal in his power, but one in which the agent had full knowledge of the rule of the Court; which, however, does not prevent an agent from purchasing from his principal, but only requires that he should deal with him at arm's length, and after a full disclosure of all that he knows with respect to the property." It must be a full disclosure of all he knows; that, of course, means everything material which he knows. The point came before the same Lord Chancellor in another case of *Molony v. Kernan* (4). He says: "As to the merits, it is not denied that an agent may take a lease from his principal." Purchasing or taking a lease in this Court is the same thing. "The great case of *Lord Selsey v. Rhoades* (5), before Sir *John Leach*, which afterwards went to the House of Lords (6), established this; but it must always be difficult to sustain such a lease in this Court. It must be proved that full information has been imparted, and that the agreement has been entered into with perfect faith." That is, the agent must prove those things - good faith and full information. I will only read a few words from another well-known case, *Lowther v. Lowther* (7), in which Lord *Erskine*, then Lord Chancellor, states the doctrine as

(1)   2 J. & Lat. 422.

(2)   Ibid. 429.

 (3) Ibid. 425.

 (4) 2 D. & War. 31.

 (5) 2 S. & S. 41.

 (6) 1 Bli. 1.

 (7) 13 Ves. 95, 102.

*(1874) L.R. 18 Eq. 524 Page 535*

Lord *Eldon* had laid it down: "Considering the Defendant *Bryan* as an agent, the principle upon which a Court of Equity acts in cases of this kind is very properly admitted; having been settled in many instances, particularly in the time of Lord *Eldon*; resting upon grounds connected with the clearest principles of equity and the general security of contracts, viz., that an agent to sell shall not convert himself into a purchaser, unless he can make it perfectly clear that he furnished his employer with all the knowledge which he himself possessed." So that the older authorities and the modern authorities agree.

Now, what is the meaning of "knowledge which he himself possessed" - "full disclosure of all that he knows?" Is it sufficient to say that he has an interest? Is it sufficient to put a principal on inquiry? Clearly not. Upon that point I have before me the case of *Imperial Mercantile Credit Association v. Coleman* (1). There is a passage in the argument of the counsel for the Appellants which, I think, very fairly and properly states the law: "It is not enough to say that the directors were sufficiently informed to be put upon inquiry. They ought in such a case to have the fullest information given to them, and ought not to be driven to inquiry;" for which two cases are cited: *Fawcett v. Whitehouse* (2) and *Hichens v. Congreve*(3). I take it that is a correct statement of the law. In that case the Defendant *Coleman* was a director of the company. He brought a purchase to the company in which he was interested as broker, and took a large commission. He told the other directors that he had an interest, and they were aware that his business was that of a stockbroker, and that he had a commission, so that they knew the nature of his interest though they did not know the amount. He had a large commission. Lord *Chelmsford*, in addressing the House of Lords, says this (4): "It was, however, contended that Messrs. *Knight* and *Coleman* were known to be stockbrokers, and that, therefore, declaring that they had an interest in the transaction conveyed all the requisite information that they were interested in that character. It was answered, however, that the commission of brokers upon placing shares and debentures varied considerably

 (1) Law Rep. 6 H. L. 189, 194.

 (2) 1 Russ. & My. 132.

 (3) 1 Russ. & My. 150, n.

 (4) Law Rep. 6 H. L. 201.

*(1874) L.R. 18 Eq. 524 Page 536*

according to the varying character of each transaction; and therefore the knowledge that Messrs. *Knight* and *Coleman* were acting as stockbrokers afforded very scanty information as to the nature of their interest." The directors knew Messrs. *Knight* and *Coleman* had an interest, and they knew it was an interest by way of commission; but because they did not know the amount of commission and did not ask, it was held that *Coleman* was liable to make over to the company the whole profit he obtained from the transaction. Lord *Chelmsford* goes on afterwards (1): "There was, therefore, the more reason for disclosing the real nature of the transaction; and as it is almost admitted that without the protection of the article, the principle applicable to his fiduciary position would have prevented his making a profit to himself out of the funds of the association, so his non-compliance with the conditions of that article leaves him exposed to the application of the principle, and liable to refund the profit which he must be considered to have received in trust for the association." That shews that even a statement which would in other cases be constructive notice sufficient to put the party on inquiry will not be sufficient in the case of principal and agent - that for reasons of policy he must not only put the principal on inquiry, but must give him full information and make full disclosure.

Now, assuming Mr. *English* told the Plaintiff he was interested in the purchase, what else did he tell him? All he told him is this: "I did, on the 25th of July, 1871, tell the Plaintiff that the parties to whom I had referred (and by whom I meant, and verily believe the Plaintiff understood me to mean, the parties who I had thought would join me in the purchase) had agreed to purchase the mine and works for £60,000, and that a written agreement would be ready the next day." Therefore all he told him was a sale outright for £60,000 to several parties. I ought to have mentioned on the question of credibility, that a very material point of the contract, viz., that Mr. *Fisher* was to furnish the money, does not appear even in the answer, but comes out in Mr. *Fisher's* evidence. Mr. *Fisher*, who is a witness for the Defendant, and was not cross-examined, tells us what the contract really was. He says: "The Defendant told me that the total price

---

(1)   Law Rep. 6 H. L. 202.

*(1874) L.R. 18 Eq. 524 Page 537*

payable to the American company for the mine was £50,000; after giving some further consideration, I agreed to join the Defendant in buying the property. The agreement which we then came to was that the property should be purchased for £60,000; that I should provide that sum" (that is a fact not communicated to the Plaintiff, and in fact it is a fact kept out of the answer in which the Defendant was bound to state on oath all the material points of the contract), "but that the Defendant should at his cost and risk make a thorough examination of the property, and satisfy me as to its value, and that it was a *bon, fide* affair, and should deposit £2000" (which he in fact subsequently did; that was not told to the Plaintiff, and that is rather against the bargain; it does, however, appear in the answer) "to cover the expense of such examination and also of the promoting any company which I might be able to organise for the purpose of buying and working the said property, and that the Defendant and myself should enter upon the adventure upon these terms, and should share equally any profit or loss in the transaction." That was not told to the Plaintiff, and the Defendant does not pretend he did tell him anything of the kind. He only told him he was to be one of the purchasers. Now, let us look what the bargain really was. Mr. *Fisher* was to find the purchase-money, £60,000, of which the Defendant would get his share, and the Plaintiff would get his share. But over and above that, subject to the Defendant giving some further information and making a deposit of £2000, the Defendant was to have half the further profits of floating the company; so that in fact, though his duty towards the Plaintiff was to make the best bargain he, the Defendant, could for the partnership, he deprived the Plaintiff of his share of the subsequent profits, and, oddly enough, they were the largest part of the transaction, for the agreement having been signed on the 28th of July, the company was registered on the 3rd of August; and on the 2nd of August an arrangement was made for the sale of this mine for £200,000, £150,000 in cash and £50,000 in shares. It is said, and probably with some truth, that if the company had not floated they never would have got the money. But I am afraid if the company had not floated the same observation might have been made as to the £60,000. It is by no means proved to my satisfaction that if *Fisher*

*(1874) L.R. 18 Eq. 524 Page 538*

or his friends had not come forward the money would have been forthcoming. However, I am not at liberty, nor do I intend, to speculate on that transaction. The bulk of the profits was the difference between £60,000 and £200,000. That that must have been in the Defendant's contemplation at the time is certain, because Mr. *Fisher* and he were to share equally in the profit of selling to a company. Whether the exact figures had been arranged between him and Mr. *Fisher* does not matter. As I have said before, the contract between the Plaintiff and Defendant was signed on the 28th of July, and this contract followed in a few days, namely, on the 2nd of August. Therefore it was a very close transaction. But the plain and clear duty of the Defendant, as agent of the partnership, was to secure the whole of the profits for the partnership; and many of the observations made in *Hichens v. Congreve* (1) apply to this case. It was the clearest and plainest breach of duty on the part of the Defendant that, when he was acting for the partnership, as he ought to have been, he should endeavour to obtain a private advantage for himself and conceal that from the Plaintiff as he did. I think I might leave the case there, but I must go a little further.

I do not think that the Defendant is liable merely on the abstract doctrine of equity under which Mr. *Coleman* was made liable in a very honest and *bon, fide* transaction - I think the Defendant must have been perfectly well aware that he was taking an unfair advantage of the Plaintiff, that he intended to take that advantage, and that he, probably with a view to his own profit, kept the Plaintiff in the dark as to the real nature of the transaction. [His Honour then referred to the defence of acquiescence on the part of the Plaintiff, and continued:-] It appears to me, first of all, that any notion of acquiescence or release of right, that is, of gift by the Plaintiff to the Defendant of half the profits over and above the £10,000, is quite out of the question; that the Plaintiff never had any knowledge of his rights until after the filing of the will; and that, even if he had any knowledge or something to put him on inquiry, he has done no act, and the Defendant has done no act with his knowledge or sanction, which alters the relations of the parties. Therefore I think there is no defence on this ground.

(1)   1 Russ. & My. 150, n.

*(1874) L.R. 18 Eq. 524 Page 539*

Under those circumstances I intend to make a decree substantially in accordance with the first and second paragraphs of the prayer of the bill.

> July 30. Upon the account directed by the decree being proceeded with, the Defendant filed an affidavit which shewed that a considerable sum was coming to the Plaintiff.

Mr. **Southgate, Q.C.** (Mr. **Kekewich** with him), now moved that the Defendant might be ordered to pay the sum into Court.

Mr. **Chitty, Q.C.** (Mr. **Graham Hastings** with him), submitted that it was not in accordance with the practice of the Court to make such an order after decree and before the further consideration of the cause, citing *Binns v. Parr* (1).

*The MASTER OF THE ROLLS , however, made the order.*

———

*The decree was appealed from, but terms of compromise were agreed to before the appeal was heard.*

Solicitors: Messrs. *Waller & Handson*; Messrs. *Newman, Dale, & Stretton*.

(1)   7 Hare, 288.