Judgments

# Lindsay v O'Loughnane

*Deceit - Representation - Implicit representation - Defendant director of finance company - Claimant contracting with company to convert sterling into euros - Defendant representing that company solvent - Defendant representing delays in handling claimant's transactions due to third party error - Claimant depositing sums with company - Company in fact insolvent - Claimant suffering loss - Whether defendant liable to claimant in deceit - Statute of Frauds (Amendment) Act 1828*

[2010] EWHC 529 (QB), HC09X00691, (Transcript)

**QUEEN'S BENCH DIVISION**

**FLAUX J**

**23, 25, 26 FEBRUARY, 1, 2, 18 MARCH 2010**


**18 MARCH 2010**

A Maclean QC for the Claimant

C Keller for the Defendant

Mishcon de Reya; Bates Wells & Braithwaite


**FLAUX J:**

*INTRODUCTION AND OVERVIEW OF THE CASE*

**[1]**  The Claimant is a professional investment adviser with Credit Agricole Cheuvreux in London, in charge of the business dealing with Nordic shares. In 2004 he purchased in his private capacity some land in Corfu for development. In order to finance the development which was to be paid for in Euros, he needed to convert sterling into Euros and transfer substantial amounts of Euros to a bank account he set up with Alpha Bank in Corfu. In 2006, the Claimant also purchased a villa in Cape Verde for which he needed to convert sterling into Euros and then transfer the funds to a bank in Cape Verde.

**[2]**  Initially he carried out foreign exchange transactions through his bankers in London, Barclays Bank, with whom he held the current account from which the sterling to be converted into Euros was transferred. However in July 2005, he was introduced by Barclays to a company called FX Solutions Ltd on the basis that they offered a cheap and easy way to convert sterling into Euros at very competitive rates.

**[3]**  FX Solutions was incorporated in 2000. The Defendant was the managing director and held 50 of the 70 shares, that is all the voting shares. At the time with which this claim was concerned the only other director was Penny Compton, who is in fact Mrs O'Loughnane. She held ten shares and the remaining ten shares were held by a Kevin Gunning, who had left the company before the Claimant started dealing with it. The Defendant was also a director and the sole share

holder of another company Global FX, of which the only other director was his wife. That company was incorporated in 2000 but was dormant until early 2008, when it began to trade in circumstances to which I will turn in more detail later.

**[4]**  On 18 July 2005 the Claimant signed and returned to FX Solutions a copy of their Terms and Conditions of Business. In the period between July 2005 and September 2008 the Claimant engaged in some thirteen foreign exchange transactions with FX Solutions to transfer Euros abroad for the land development in Corfu and for the purchase of the villa in Cape Verde. In each case, he entered a spot contract, that is an agreement to buy a specified amount of Euros at the current market rate for settlement in a few days time, as opposed to a forward contract, that is an agreement to buy a specified amount of foreign currency at a pre-agreed rate of exchange on a specified future date, with the buyer providing a 10% margin or deposit in the meantime.

**[5]**  In the series of foreign exchange transactions conducted between July 2005 and October 2007, the Claimant dealt largely though not exclusively with Mr Paul O'Sullivan who was the senior manager and head of trading. It is clear that through Mr O'Sullivan FX Solutions provided a swift, efficient and economic service with which the Claimant was satisfied.

**[6]**  He had no need for any further foreign exchange transaction until June 2008, some eight months later. He then carried out a transaction on 5 June 2008 to convert £185,000 into Euros and two transactions on 8 August 2008 to convert £25,000 and £400,000 into Euros. In the case of the June 2008 transaction he dealt with the Defendant, Mr O'Sullivan having left since his last transaction in October 2007. All three transactions were confirmed by trade notes issued in the name of Global FX and payment of the sterling amounts for conversion was to be made not into an account of FX Solutions at Barclays as previously, but into an account of Global FX with HSBC. The Claimant assumed that Global FX was just another trading name for FX Solutions and nothing was said to disabuse him of that impression.

**[7]**  In the case of all three transactions, the Euros were received into his Corfu bank account late. The excuse for the late payment provided by the Defendant and others at FX Solutions/Global FX was that it was due to the inefficiency of HSBC. That was not true. The real reason was that by mid May 2008 at the very latest and in any event before the trades in June and August 2008, FX Solutions was hopelessly insolvent, unable to pay its debts as they fell due. This was known to the Defendant before those trades took place, as was accepted on his behalf by his counsel Mr Ciaran Keller in closing submissions.

**[8]**  As a consequence of the insolvency, the Claimant's sterling, once deposited in the HSBC account of Global FX, was not used to purchase the equivalent amount of Euros and then to transfer that Euro amount to his Corfu bank as contemplated by the Terms and Conditions. Nor was his money kept in the trading account of FX Solutions on trust for him pending the purchase of the relevant foreign exchange as required by the Terms and Conditions. Rather, unbeknownst to the Claimant his money was used to pay other creditors of FX Solutions or business and other expenses of FX Solutions and the Defendant in an illegitimate manner described in more detail below.

**[9]**  FX Solutions and Global FX appear to have purchased Euros *en bloc* rather than by reference to the particular transactions. It was only when sufficient Euros were received into Global FX's Euro business account with HSBC from other transactions that FX Solutions instructed HSBC to transfer the requisite amount of Euros to the Claimant's bank account in Corfu. Hence the June amount of Eur231,250 which should have arrived in that account by about 10 or 11 June did not arrive until 27 June having been paid out of the Global FX Euro account on 26 June. Similarly, the August amounts of Eur31,562.50 and Eur504,000 which should have arrived in the Corfu bank account on about 15 August 2008 did not arrive until 21 August and 26 August respectively. The reason for the delay in each case was that FX Solutions and Global FX had to wait for sufficient funds from other transactions to be in the HSBC Euro account and not, as the Claimant was told, inefficiency on the part of HSBC.

**[10]**  The Claimant entered two further foreign exchange transactions with FX Solutions in September 2008 and it is these which have given rise to the loss he has suffered. On 3 September 2008 he entered a transaction to convert £315,000 into Euros and on 9 September 2008 he entered a transaction to convert £250,000 into Euros, in each case to be transferred to his bank account in Corfu. In neither case was the conversion made or the transfer effected. On 18 Sep-

tember 2008 both FX Solutions and Global FX went into administration and Mr Andrew Tate of Abbott Fielding was appointed one of the administrators. In due course the companies went into liquidation and Mr Tate is the joint liquidator.

**[11]**   The Claimant is one of the major creditors of FX Solutions in the liquidation but according to Mr Tate, who gave evidence at the trial, on current information the dividend expected has gone down from what was originally anticipated, 27 pence in the pound to 18 pence in the pound. The current proceedings were issued by the Claimant on 20 February 2009. The Claimant makes two alternative claims against the Defendant. His primary claim is for damages for deceit. In the alternative the Claimant seeks to pierce the corporate veil and to hold the Defendant personally liable for the debts of FX Solutions and Global FX, including the liability to repay the sum of £565,000.

*THE WITNESSES*

**[12]**   Before dealing with the facts of the case in more detail and with each of the claims, I should say something about the witnesses. The Claimant was an impressive witness who gave his evidence in a careful, precise and measured way. He made no attempt to overstate his case and where ground had to be ceded, as it did in relation to some of the pleaded representations, he readily did so. I accept his evidence that had it not been for the representations which were made to him in relation to the June transaction in particular (but in addition the August and September transactions) he would not have parted with the sums of £315,000 and £250,000 as he did on 5 September and 10 September respectively. As to the representations made, by whom and whether they were fraudulent, I deal with those matters in detail below.

**[13]**   The Claimant also called Mr John Barnett who had worked for FX Solutions as part of the "back office" from 2004 and who was Head of Operations at the time that the companies went into administration in September 2008. It was he who ascertained and then subsequently investigated from December 2007 onwards, the "hole" in FX Solutions, that is the shortfall between the cash at bank and other debtors on the one hand and the creditors on the other, which meant that the company was in fact insolvent. Leaving aside some understandable reticence about certain matters, such as the fact that he had personally been paid on occasion towards the end of the business direct from the trading account or with monies transferred from the trading account (which he obviously appreciated should not have been permitted), I found Mr Barnett a straightforward witness. Where his evidence differed from that of the Defendant, such as over the extent to which the Defendant was in control of the business and the extent to which Mr Barnett explained the hole and the reasons for it to the Defendant and his wife, I preferred Mr Barnett's evidence.

**[14]**   The Claimant also called Mrs Carole Groombridge who was another client of FX Solutions who lost her money when the companies went into administration. She was clearly an honest and straightforward witness. Although her evidence could not directly support the Claimant's claim, I accept the submission of Mr Alan Maclean QC for the Claimant that it confirmed that a widespread pattern of deception was committed on the clients of FX Solutions, of which the Defendant was the architect.

**[15]**   It is not necessary to say anything much about Mr Andrew Tate, the joint liquidator who also gave evidence for the Claimant or about Mr John Frenkel, the forensic accounting expert called by the Claimant. They both gave their evidence in a straightforward manner and were not seriously challenged in cross-examination.

**[16]**   The contrast between the Claimant and the Defendant as witnesses could not be greater. The Defendant's demeanour in the witness box was arrogant and shameless, in the sense that he was prepared to lie and did lie about the essential issues in the case. He lied about the extent to which he was aware of the hole in FX's accounts and appreciated the company was insolvent, seeking to blame Mr Barnett for never having provided a clear explanation of the hole. The truth is that he was well aware of the hole having improperly used client monies from the trading account over some considerable period of time and permitted his friend Mr Leahy to do so, effectively using it as a personal bank account.

**[17]**   Equally, he lied about the extent to which he was involved in or at the very least aware of the trades with the Claimant. In particular, he lied about the fact that a critical email from his work email address had been sent by him on

30 June 2008, maintaining the absurd fiction that he had been working at home that day, where there was no remote access, notwithstanding that a number of emails sent from his work email address that day can only have come from him. Overall, I accept the submission of Mr Maclean that I should reject the Defendant's evidence, save to the extent that it is corroborated by other independent evidence.

**[18]**  Finally the Defendant called Mr Alfie Stevens, who was one of the traders employed by FX Solutions and evidently a friend of the Defendant. His evidence was of little significance. Although the Defendant appeared to be suggesting at one point in his evidence about 30 June emails that an email to his wife from his email address about US visas had come from Mr Stevens, Mr Stevens was clearly not prepared to support this, saying only in rather vague terms that he had wanted to move to the United States. His evidence also sought to support the Defendant's evidence about traders using each other's computers. I did not find this evidence very convincing. I deal in more detail with the position in practice below.

*THE FACTS*

*THE CLAIMANT'S TRADING PRIOR TO JUNE 2008*

**[19]**  As already stated, the Claimant's trading relationship with FX Solutions began in July 2005, when he telephoned and spoke to Mr O'Sullivan who set up an account for him and sent him FX's Terms and Conditions. He signed these and sent them back on 18 July 2005. Accordingly, they governed the trading relationship thereafter.

**[20]**  The particular provisions which are of relevance for present purposes are as follows:

"Clause 2. Definitions

2.1 'Trading Account' - means the bank account in the name of FXS, details of which will be supplied by FXS to the Customer from time to time in which FXS will hold the Customer's money on trust for the Customer until such time as the money is to be paid out by FXS in accordance with the FX Contract.

'FX Contract' - means a contract entered into with FXS subject to these Terms under which [FX] agrees to sell and/or purchase Currency and deliver Currency to the Customer and the Customer agrees to sell and/or purchase Currency and take delivery of Currency on the Delivery Date . . . .

Clause 4. FX Contract

4.1 The Customer will give FXS an oral or written order for Currency such order to constitute an offer to enter into an FX Contract with FXS.

4.2 On acceptance of the Customer's offer by FXS, the Customer will be deemed to have entered into a binding FX Contract incorporating these Terms.

4.6 FXS will enter into an FX Contract solely for the purpose of the sale and/or purchase and delivery of Currency to the Customer . . . ."

**[21]**  It is not necessary for the purposes of this judgment to go into the detail of the trades which the Claimant conducted with FX Solutions in the period 2005 to 2007. A summary will suffice. The Claimant would telephone when he wanted to purchase Euros. He usually but not invariably spoke to Mr O'Sullivan. The Claimant would either give FX Solutions a limit in terms of rate or would accept the rate they quoted.

[22]  Within FX Solutions' trading room there were TV screens on the wall showing exchange rates, but as Mr Barnett said, those rates could not be achieved. A handful of people on the trading floor including the Defendant and Mr O'Sullivan were "bookers" as well as traders and only they had access within the Globsys computer system to the actual rates which were obtained by FX Solutions, until January 2008 from Barclays pursuant to a trading platform or facility. If the trader who was dealing on the phone with the customer was not also a booker, he would ask for a rate from a booker and the rate would be provided almost simultaneously, being shouted across the trading floor. The rate quoted to the customer would be slightly less favourable than the rate which the company could obtain from Barclays or another foreign exchange provider. It was on that difference or margin that the company made its gross profit. The gross profit in a particular month would be transferred to the company's business account at the end of the month.

[23]  Once a deal had been concluded on the telephone, the practice was that someone, usually the person who had booked the trade, would send the Claimant written confirmation in the form of a Trade Note. This was sent as a pdf attachment to an email automatically generated by the computer. The Trade Note stated "This trade has now been executed in accordance with your verbal instruction which is legally binding in accordance with cl 4 of our terms and conditions duly signed by you."

[24]  The Trade Note set out details of the trade: the trade date, the maturity date (ie the date by which the Claimant had to pay the relevant sterling amount into the bank account of FX Solutions, which on spot trades such as the Claimant conducted was a few days after the trade date), the amount of sterling being traded, the exchange rate agreed and the equivalent amount in Euros. It also provided details of the FX Solutions bank account at Barclays into which the Claimant was to instruct his bank to pay the sterling.

[25]  Upon receipt of the Trade Note the Claimant would usually sign it and send it back, giving details of the bank account into which the foreign exchange was to be paid. By the maturity date and usually before it, the Claimant would transfer the sterling amount into FX Solutions' bank account. So far as the Claimant was aware, FX Solutions would complete the purchase of the Euros and instruct its bank to remit those funds to the foreign bank nominated by the Claimant. This would be achieved within a few days of the maturity date.

*THE FINANCIAL CONDITION OF FX SOLUTIONS BY EARLY JUNE 2008*

[26]  Before dealing in more detail with the trades conducted in the period June to September 2008, it is necessary to set out the financial position of FX Solutions and the Defendant's knowledge of it, all of which is critical to the question whether the Defendant committed the tort of deceit.

[27]  In late 2007, Mr Barnett discovered that there was a deficit or hole in FX Solutions, a shortfall between debtors and creditors of about £1.2 million, of which he informed the Defendant and Mrs O'Loughnane. Given that, as the Defendant accepted, the liabilities of the company to its clients closely matched the cash they had deposited plus the 10% margin on forward contracts, this deficit should not have been there. Although Mrs O'Loughnane at least expressed some surprise in her emails to Mr Barnett in the period from January 2008 onwards as to the size and continued existence of the hole, it is clear from her email to him of 15 January 2008 that she and the Defendant were well aware that the business owed money to the client or trading account and that the two of them also owed money to the business.

[28]  Although one of the themes of the Defendant in his evidence was that he was always trying to get Mr Barnett to explain the size and nature of the hole and Mr Barnett never did so, necessitating the Defendant calling in a forensic accountant, I reject that evidence. The reality is that at all stages Mr Barnett explained very clearly both the amount of the deficit and what was causing it. It was he who wanted to call in an accountant, in large part because of his frustration that he did not seem to be able to convince Mrs O'Loughnane at least about the size of the hole, even after the O'Loughnanes had put monies into the client account in March 2008 (a matter to which I return below). This may have been because she had been out of the business for some three years and was unaware of the extent to which her husband had been using the trading account, in effect, as a personal bank account.

**[29]**  The Defendant however clearly knew the extent of the deficit, despite his protestations to the contrary in the witness box, not least because he was the principal cause of it. Of course the monies in the trading account were not the monies of the business let alone of the Defendant, but were client monies held on trust for the clients pending the carrying out of their foreign exchange transactions, as was stated clearly by the Terms and Conditions. In a particularly unedifying part of his evidence, the Defendant purported not to understand what the concept of a trust meant, but it is clear from the documents he created in March and July 2008 in relation to so-called capital injections that he did understand what a trust was, since in those documents he sought to impress his own money with a trust so as to ring-fence it from other monies.

**[30]**  Despite being aware of what it meant that the monies in the trading account were held on trust for the clients of the company, the Defendant had no compunction, over an extended period of time, in using the substantial cash flow which passed though the trading account in an illegitimate manner. The most striking example of this is the substantial sums paid out of the trading account (albeit there were sometimes corresponding credits paid in) over the period from November 2005 to March 2008, to the Defendant's friend Richard Leahy, evidently with a view to disguising from Mr Leahy's wife, from whom he was in the process of getting divorced, the extent of his personal wealth. Although the Defendant sought to suggest these payments had been arranged by Mr Stripling, the financial controller of the companies, somehow without the Defendant's knowledge, he was transparently lying. Only he could have authorised these payments and he clearly knew they were improper and should not have been made, despite his refusal to acknowledge this in evidence.

**[31]**  During his investigations and attempts to reconcile the company's books, Mr Barnett identified a number of what he described in an email to Mrs O'Loughnane of 31 January 2008 as "extracurricular payments and receipts". He explained in evidence that he meant, by this phrase, transactions which had nothing to do with actual FX trades, which is why in a subsequent email he had referred to the trading account and business accounts being treated as personal bank accounts by the Defendant. These extracurricular payments did not stop at the Leahy payments. Another example is that monies from the trading account financed home improvements for the Defendant. Equally the credit card bills of the Defendant and his wife and the lease payments on their Range Rover and Aston Martin were paid from the business account.

**[32]**  It would appear that the deficit or hole only became visible as the business of the company declined, which it clearly did in the second half of 2007. In November and December 2007 alone, the expenses of the company (before any drawings by the Defendant and his wife) exceeded its gross profit by nearly £100,000. Nevertheless, the deficit had been continuous for some considerable time. Although Mr Barnett's initial investigations into the amount of the hole were conducted by reference to the transactions recorded on Globsys, which had only been in place since early 2005, he thought the deficit dated back to before Globsys started and even before he joined the company in 2004.

**[33]**  In fact in the accounts for the 18 months to 31 July 2004 which were the last audited accounts and which were filed in October 2005, there was a shortfall between the creditors falling due within one year and the cash at the bank of over £1 million. The other current assets of the company were debtors and the notes to the accounts showed that of the total of £1.025 million only some £225,000 were trade debtors, the balance of some £800,000 being other debtors. Of that figure, the vast preponderance, £715,162, comprised an interest free loan to the Defendant. The notes to the accounts recorded that since the end of the accounting period £490,000 of this loan had been repaid. They also recorded that such loans were in breach of the Companies Acts.

**[34]**  In fact, after the accounting period to 31 July 2004, the accounts were not audited, but unaudited accounts were produced by new accountants, Mack Business Services Ltd. The Defendant maintained that this was because he was advised that the gross profits of the company were sufficiently small that it was exempt from the requirement of an audit. This is no doubt correct, although it is clear that the Defendant had a strong motivation not to have auditors examining the books and records of the company, having previously been warned that his director's loan was in breach of the Companies Acts. This would also have had serious adverse tax consequences. Indeed, it is apparent that Her Majesty's Revenue and Customs did commence proceedings against the company in respect of the directors' loans.

[35]  The accounts to 31 July 2005 which were signed by the Defendant on 26 February 2007, showed the "other debtors" as having come down from £800,000 to £35,000, thus purporting to show the repayment of the director's loans. In his evidence, the Defendant was at pains to demonstrate that the whole of this loan had indeed been paid back. However, in draft accounts for the period to 31 July 2005 which Mr Tate found among the accountants' working papers and which he provided to Mr Frenkel, a directors' loan of £691,316 is shown. This is described on a draft balance sheet for that period as "directors current accounts".

[36]  By the time of his supplementary report (which was served in part in response to the Defendant's assertion in a supplementary witness statement that the director's loan had been repaid) Mr Frenkel had seen a full set of the nominal ledger accounts for the years to 31 July 2005 and 31 July 2006. Account Code 594 "Other Debtors" for the year ended 31 July 2005 showed a debit balance in the 2005 accounts of £691,316. There were then three credit adjustments to this account shown, totalling £645,616 described as "Trf [transfer] JOL [the Defendant] a/c 558,788" "trf FXP a/c 78,626" and "trf Global FX a/c £8,202" respectively. The corresponding entry to this credit adjustment is a debit adjustment to Account Code 737 "Trade Creditors" of £645,616 described as "Trf Global FX a/c."

[37]  As Mr Frenkel pointed out in his supplementary report, at the date of these accounts Global FX was a dormant company, as the Defendant accepted in cross-examination. When it was then put to the Defendant that the entries were fictitious, he maintained: "I never drafted the papers, so I wouldn't say so", although he accepted that it was he who instructed Mr Grant of Mack Business Services to do the accounts. Despite the Defendant's evident unwillingness to provide any explanation for all this, it is quite clear that these were fictitious entries created by the Defendant or at least at his behest, to disguise the continued existence of so-called directors' loans of almost £700,000.

[38]  Mr Frenkel said in his supplementary report:

> "By the creation of this journal entry, referencing it to a company that was dormant, the Defendant effectively solved two problems at one stroke. The overdrawn directors' loan account which was both illegal and carried significant adverse tax consequences was eliminated and secondly the disparity between the trade creditors and bank balances effectively disappeared . . . . No-one outside of the Companies would be able to identify that there was anything amiss given the way that the information was presented in the reported accounts as at 31 July 2005."

[39]  I accept that analysis, about which Mr Frenkel was not cross-examined. In his supplementary witness statement, the Defendant sought to rely on the letter from Mr Grant of Mack Business Services Ltd to Her Majesty's Revenue and Customs of 28 August 2007 which stated: "The accounts to 31 July 2005 recently submitted indicate that all Directors loans existing the previous year had been repaid". Although the Defendant refused to accept in cross-examination that Mr Grant must have checked the contents of the letter with him before it was sent out, it seems to me it was a critical letter and it is inconceivable that the Defendant was not consulted. The letter is very carefully worded and does not say in terms that the directors' loans *had been* repaid. In my judgment, the true position is that as at 31 July 2005 there remained nearly £700,000 of directors' loans to the Defendant outstanding and this sum had not been repaid by the time that Mr Barnett discovered the hole.

[40]  At the end of January 2008, after Mr Barnett had told the Defendant and his wife that the hole was £1.2 million, the foreign exchange trading facility which FX Solutions had with Barclays came up for renewal. As a condition of continuing to provide the facility, Barclays asked to see audited accounts of the company. The Defendant was not prepared to provide audited accounts and the facility lapsed. This all made no commercial sense, as the absence of a trading facility caused disruption to the company which then had to find another foreign exchange provider. Initially this was Axia, but they too withdrew their facility when the company was late paying fees. The Defendant maintained in evidence that he had not provided audited accounts to Barclays because he had been advised they were unnecessary. However, it is fairly clear that the real explanation for the reluctance to produce audited accounts, when the consequence was loss of the Barclays trading facility, was that the Defendant did not want auditors examining the books, finding the hole and almost certainly also finding that it was due to improper payments to the Defendant or others at his behest.

[41]  Confronted with the hole, it is clear that the Defendant and his wife recognised that they would have to find significant funds to fill the hole if the company was to survive. Thus, in an email to Mr Barnett of 5 February 2008, Mrs

O'Loughnane refers to "a serious amount of cash we are having to find to ensure the company stays afloat". The serious amount of cash consisted of two US dollar sums of $451,700.68 and $1,045,895.91 which were the proceeds of sale of two apartments owned by the Defendant in Dubai. However, the Defendant was careful not to make a capital investment into the company. Instead he created an Agreement dated 1 March 2008 between himself and FX Solutions under which the sums would be held by the company in trust for him for a period of no more than a year. In evidence he sought to suggest that this agreement was somehow necessary to ensure that, if and when he took his money out of the company, it would come out in dollars. That was clearly a complete nonsense and the real reason for the agreement was an attempt to ring-fence his own monies from other creditors in the event that the company failed.

[42]  Mr Barnett had continued his investigations into the hole and conducted a more detailed reconciliation of creditors and debtors from the bank records, not just from Globsys. What this revealed was that before the injection of funds from Dubai, the deficit was some £2.4 million, so that even after the injection, it remained close to £1.3 million. Mr Barnett explained in an email to the O'Loughnanes of 20 March 2008 that after taking all account balances and adding or removing holdings and margins the deficit was £1,282,969.80. Mrs O'Loughnane seems to have had some difficulty in understanding how this could be and Mr Barnett explained in clear terms in an email on 25 March 2008 what the exercise was that he had undertaken:

> "The working out is relatively simple. All I am doing is taking the current Barclays balances and deducting all holdings on a/c, deducting all funds that clients have paid early and adding on margin plus the funds that Jared has paid from his Dubai a/cs. What you are left with is the deficit."

[43]  In another email the following day he set out a quick list he had "knocked up" of outgoings against profit since August 2005. As he said:

> "This totals £626,843.11. If you add this figure to the 600k approx directors loan account, the figure comes to £1,226,843.11, which is very close to my figure of £1,282,969.80 approx. the 60k difference could conceivably be in the exchange rates."

Of course if one takes the loan account as nearer £700,000 than £600,000 as it was then the two sets of figures are even closer.

[44]  Whatever difficulty Mrs O'Loughnane may have had in understanding the extent of the deficit, it is clear that the Defendant understood the position perfectly well. I reject his suggestion in his evidence that he was still waiting for a proper explanation of the hole from Mr Barnett. Indeed when it was put to him in cross-examination that what Mr Barnett was telling them in the "knocked up quick list" email was that if, contrary to his wife's understanding the directors' loan had not been repaid, it was very simple to see how the deficit was in the order of £1.2 million, he was constrained to accept that.

[45]  By this stage in March 2008, FX Solutions was in a parlous financial state. In an email to Mrs O'Loughnane on 15 January 2008, Mr Barnett had stated that the debit balance on the company's business account was £177,849. It appears that thereafter and specifically, from March 2008 onwards, the state of the business account was such that the company could not pay expenses, including the salaries, from the profit transfers for the particular month. Accordingly the practice was adopted of making so called "profit transfers" in respect of future profits for the next month.

[46]  By way of example, on 28 March 2008, a transfer of £30,000 was made from the trading account to the business account described in Mr Stripling's monthly report to the Defendant as "Profit Transfer 1 (23/3 to 22/4)". Given that most of that period was in the future, this is a somewhat euphemistic description. In reality, this is another example of dipping into client monies in the trading account in an impermissible manner. That sum was then used in large measure to pay the salaries the same day. On the summary for that month also provided to the Defendant, this is expressly described as "£30,000 profit from the period 23/3 to 22/4 to cover salaries". In evidence, the Defendant sought to suggest that this was nothing to do with him and that Mr Stripling was responsible for all payments. This was unconvincing, as it is inconceivable that this practice of dipping into the trading account would have been adopted without the knowledge and consent of the Defendant.

**[47]**  The financial position of the company did not improve. On 12 May 2008, Mr Barnett told the Defendant that the current account deficit across all accounts was £1.47 million although he later reduced that to £1,186,680, having taken account of some dirham trades which had settled outside the business. In cross-examination, the Defendant accepted that if Mr Barnett's figures were correct, the company was not in a position to meet its liabilities as they fell due. I find that in broad terms his figures were correct and that the Defendant knew by 12 May 2008 that the company was insolvent. In reality the company was almost certainly insolvent for some months prior to that, as the Defendant well knew, but it is not necessary to make any specific finding about that since it is accepted on behalf of the Defendant that, as at 12 May 2008, he knew the company was insolvent.

**[48]**  It was at around this time that the Defendant decided to "revive" Global FX and to trade through that company. The banking relationship with Barclays came to an end and new accounts were opened with HSBC in the name of Global FX in May 2008. New customers would become customers of Global FX but existing customers remained with FX Solutions. Global FX in effect allowed FX Solutions to use its bank accounts. The Defendant explained his reasons for this scheme in the interview he had with the administrators in November 2008:

> "Now the hole in the accounts was always within FX Solutions. When we formed bank accounts in the name of Global FX there had never been any banking in the name of Global FX beforehand so when I put the money into Global FX it was essentially a fresh, brand new company without any holes in it so it would have been solvent.

> . . .

> I mean, I don't mind saying this for the record . . . Global FX, because it was a healthy company, was never supposed to go into administration. It was only FX Solutions that was only ever going into administration because Global FX doesn't have a hole in it.

> . . .

> . . . every Global FX customer, when they phoned up, we booked their trade, their money comes in and their money goes out. FX Solutions customers, because it got to the stage we were so far behind, we wasn't booking the deals."

**[49]**  It was because he was intending Global FX to be the lifeline for his business and was proposing to let FX Solutions go into administration that when, in July 2008, the question arose of a further injection of monies by the Defendant emanating from property sales in Dubai, the further Trust Agreement dated 1 July 2008 was between the Defendant and Global FX not FX Solutions. The money, which totalled some US$850,000, was paid into the HSBC account and seems to have been used at least in part to provide collateral for a trading facility extended to Global FX by HSBC. This only came into effect in early September 2008, shortly before the companies went into administration.

**[50]**  The Defendant was quite frank in the interview with the administrators as to why he put the money into Global FX rather than FX Solutions:

> ". . . we wanted to take the company forward in the name of Global FX. It was Global FX that didn't have a hole in it and I personally put money into it. So I am going to put money into a company that is a company that doesn't have a hole in it. Because if I had put money into FX Solutions they could have been - you know, would I ever [be] likely to get that back?"

**[51]**  None of this was ever disclosed to any of the FX customers including the Claimant. They carried on trading with FX Solutions unaware that it was insolvent and without being given the opportunity to trade with Global FX.

**[52]**  At around the same time as Global FX was being revived, the Defendant appears to have had a plan to move his centre of operations to the United States of America. He set up a company there which was somewhat ironically called Transparent Trading Inc and he and his wife applied to the US authorities for the appropriate visas and work permits.

This is of some relevance in the context of the email to the Claimant of 30 June 2008 to which I will turn in the next section of this judgment.

*THE CLAIMANT'S TRADES IN THE PERIOD JUNE TO SEPTEMBER 2008*

[53]  On 5 June 2008 the Claimant telephoned FX Solutions with a view to converting £185,000 into Euros to transfer to Alpha Bank in Corfu. He expected to speak to Mr O'Sullivan, but it transpired that he had left the company and so the Claimant spoke to the Defendant. In evidence the Defendant purported to have no recollection of ever having spoken to the Claimant. However, the Claimant was quite clear in his evidence that it was the Defendant that he spoke to. Quite apart from anything else, in a later email on 30 June 2008 the Claimant refers to the Defendant having taken the order. In closing submissions, Mr Keller accepted on behalf of the Defendant that it was the Defendant to whom the Claimant spoke on 5 June.

[54]  During the telephone conversation the terms of the deal, with a rate of 1.25 and a maturity date of 10 June 2008, were agreed. This was confirmed in the Trade Note sent under cover of an email the same day, 5 June 2008, from the Defendant's email address and bearing his electronic signature. That email asked the recipient to note that banking details had changed to HSBC and the Trade Note identified the account to which monies were to be sent as a Global FX account. The Claimant, along with other FX Solutions customers, was not told that Global FX was a separate company and he thought that this was just re-branding and that FX Solutions and Global FX were the same company.

[55]  This is probably a convenient point to deal with the Defendant's assertion (bolstered to an extent by Mr Stevens) that around this time there were problems with the computers at FX and that merely because an email was sent from his email address it did not mean that he, rather than another trader, would have sent it, as other traders would have had access to his computer and could send emails from it if their own computers were on the blink. He asserted that it was distinctly possible that he was not even in the office when emails were sent from his email address.

[56]  That evidence was contradicted by Mr Barnett, who thought that this would have happened rarely, although it is fair to say that he was not usually on the trading floor, since he worked in the back office, which until towards the end of the business was on a separate floor. It can certainly be said in favour of the Defendant's assertion that there had been a previous trade with the Claimant in 2006 when an email was sent from the Defendant's email address, so that that is who the Claimant thought he was dealing with, whereas the Defendant was on holiday in Mauritius at the time.

[57]  However, of some significance in this context was the Defendant's own evidence that, if someone else used his computer and had to log in, that person would then enter his own password and gain access to his own email account not the Defendant's. It would only be if the Defendant's computer was already on and he was not at his desk for some reason, that another trader would be able to use his computer and his email address. I consider that this is unlikely to have happened often, not least because towards the end of the business (the Defendant said for the last two or three weeks before the administration but I find for longer, probably from May or June 2008 onwards) the Defendant was in the office 10-12 hours a day.

[58]  Furthermore, if some other trader were using the Defendant's computer and email address, I consider it would be sensible and likely that, to avoid confusion that trader would make it clear in the email that although coming from the Defendant's email address, it was being sent by someone else. This does not seem to have happened in the case of any of the relevant emails from and to the Defendant's work email address in the period June to September 2008. For reasons that I will elaborate as necessary below, I find that these were sent and received by the Defendant, not someone else.

[59]  Upon receipt of the Trade Note the Claimant signed and dated it and completed the section giving details of the account at Alpha Bank in Corfu to which the money was to be transferred. He then returned the Trade Note by email to the Defendant the same day, 5 June 2008. He followed that up with another email to the Defendant a few minutes later which said: "Hi Jared, I will transfer the money into the HSBC account from my Barclays tomorrow. Can you forward

the Euros to my Alpha Bank account in Corfu when you can, best rgds Sean". The Defendant then forwarded that email to an email account within his organisation called "Desk" which was accessible to all the staff. This was no doubt to ensure that everyone was aware of the transaction.

[60]  The £185,000 from the Claimant was transferred to HSBC on 6 June 2008. Given a maturity date of 10 June 2008, he expected the Euro equivalent to be with his Corfu bank within two days thereafter. When the money had not arrived, he emailed the Defendant on 12 June 2008 asking if the money had been sent. Within five minutes an email came back from the Defendant saying "all done sent on the 10th". Despite his protestations to the contrary in evidence, I find this was sent by the Defendant. What he said was a lie, as the money had not been sent on 10 June.

[61]  What in fact happened to the Claimant's money is analysed by Mr Frenkel in his report. At the time the trade was concluded on 5 June 2008, FX Solutions did not enter into a specific corresponding trade with a foreign exchange provider. Neither FX Solutions nor Global FX had a trading facility at this stage, so it appears that they bought foreign currency in bulk. After the Claimant's £185,000 was paid in to the trading account on 10 June 2008, it appears to have been used with other monies to purchase £500,000 of Euros the same day. The Euro equivalent, Eur629,250 was received in the Global FX Euro account also on the same day.

[62]  However, the Eur231,250 representing the Euros corresponding to the Claimant's £185,000 was not transferred to the Claimant's bank in Corfu as it should have been and as the Defendant said it had been. Instead thirty seven payments of some Eur640,000 were made to various other clients on 10 June 2008, leaving the Euro account overdrawn. The account remained overdrawn and was overdrawn by Eur359,000 on 23 June 2008. On that day there were two further Euro credits to the account of some Eur619,000. On 24 June 2008, fifty two payments were made to various clients of some Eur266,000, leaving the account overdrawn again. On 26 June 2008 Eur218,000 was paid into the Euro account by another client and it was only when those monies were received that the Eur231,250 was transferred to the Claimant's Corfu bank account.

[63]  In other words, the clear picture which emerges is that FX Solutions was insolvent, unable to honour its obligations as they fell due. This is borne out by a graphic email from Mrs O'Loughnane to the Defendant of 16 June 2008:

"Jared you look terrible and come home depressed every night. This is not living, it's an existence and a worrying one.

I care and I cannot tell you how concerned I am about this. Where is it going to end? We have to face reality in that if this doesn't happen [a reference to obtaining a favourable Dun & Bradstreet reference for Transparent Trading Inc] we are in an untenable position with nowhere to hide.

I also need to deal with the complaint re Barclays before they come knocking on our door. It's all getting out of hand.

You having currency positions hanging round your neck, no means to pay the clients as you cannot book the currency and things, in my opinion, are going from bad to worse.

We both know that without these f*cking account numbers you cannot settle anywhere. [again apparently a reference to Dun & Bradstreet] There are not words to describe how debilitating this all is.

We are falling apart here."

[64]  Of course the Claimant was unaware of any of this. When the money still did not arrive in his Corfu bank account, the Claimant emailed the Defendant again on 18 June 2008 saying Alpha Bank had still not received the funds and asking him to follow it up and ensure the funds had been sent. In fact over the period 10 to 30 June 2008, the Claimant sent seven emails and made ten phone calls from his mobile let alone calls from his office phone to the Defendant and others at FX Solutions about this trade.

**[65]**  The Defendant's response in an email of 19 June 2008 from his work email address with his electronic signature was: "just to confirm a trace has been put on your funds with our bankers due to non delivery." I find that that email was sent by the Defendant. This was the first of a number of emails designed to mislead the Claimant into thinking that the reason for the delay in the money arriving was fault or incompetence on the part of HSBC. That was of course a lie. There was no trace, nor any question of non-delivery. FX Solutions simply did not have the funds in Euros to transfer, having paid other clients first.

**[66]**  On 23 June 2008 the Claimant sent another email addressed to the Defendant. He referred to the fact that, on 19 June 2008, he had spoken to Mr Robert Hill another trader who had said that he would call HSBC and ask them to track the funds, but that it might take ten days to get an answer from HSBC. The Claimant was concerned that his money could be under threat of fraudulent activity. He asked for a status update that day or the following morning and said he would need a daily report. He said he would decide whether to log a complaint with the UK authorities the following day.

**[67]**  On 24 June 2008 the Claimant forwarded that email to Mr Hill having telephoned him and asked him to ask the Defendant why no-one had called him that morning as he had requested. He then heard nothing further and on 30 June 2008 (being at that stage unaware that the money had arrived at Alpha Bank on 27 June) sent a further email addressed to the Defendant, Mr O'Sullivan (although he had left) and Mr Hill:

> "Can you (HSBC) confirm that the money has arrived at my Alpha Bank account in Corfu? It is now 24 days since I made my chaps transfer into the HSBC account that you nominated. Clearly this is unacceptable. I would like a written explanation as to how this incompetence has occurred & following the receipt of that letter will consider what action to take.
>
> ps Jared, I find it quite odd that given that you took the order on 6 June, you haven't called me once with an apology, if nothing else?"

**[68]**  Notwithstanding that postscript the Defendant sent a somewhat abrupt response the same day, 30 June 2008:

> "Sean
>
> We cannot tell you when the funds have hit your account.
>
> We can only send the funds to the account details you give us, and you will be informed when the funds have hit your account.
>
> Will you let us know if the funds have hit your account yet as we have made a duplicate payment to the account details you have provided."

**[69]**  That of course was another lie. Since there had never been a payment in the first place, there could hardly have been a duplicate payment. However the email was designed to give the impression (and did give the Claimant the impression) that the original payment which the Defendant had said had been made on 10 June had gone astray through the incompetence of HSBC and that, to maintain good customer relations, FX Solutions had made a further payment.

**[70]**  Notwithstanding that the email came from his work email address (albeit that it did not have his electronic signature) the Defendant maintained, throughout his evidence, that it was not sent by him, as he had been working at home that day recuperating from an ear operation the previous week. He maintained that position notwithstanding being shown emails to others sent that day from his work email address which could only have been sent by him. In particular emails were sent to and from China Link and there was an email exchange with Mr Quaife of MF Global about a trading platform with them which can only have come from the Defendant, as he was the only person authorised to deal with MF Global.

[71]  Perhaps the most significant exchange of emails on 30 June was between the Defendant and his wife in the context of their applications for American visas. She had copied his work email in on an email the previous day to someone called Adrian Casemore about problems with another email account. On 30 June the Defendant responded to this from his work email: "can I please get Dubai bank account details regards and love". She replied at 0950 hours "is this for Jodie? If so, she already has them". About twenty minutes later at 10.12 hours she sent an email to someone called Nora Muhari, presumably at the US embassy, saying that their cheque for the US Customs and Immigration Service had not yet cleared and asking how long it took to start an application as they had had it for a month. That email was copied to the Defendant's work email address and provoked the almost immediate response from him: "can you call this twat pls" to which she replied at 10.16 hours: "Best coming from you as I have just given up."

[72]  None of this exchange would have been necessary if they had been in the house together and it is quite clear that this exchange took place with him whilst he was at the office. He sought in cross-examination to suggest that the emails might have come from someone else in the office who also wanted to go to the States, but in a telling moment did not actually identify that person as Mr Stevens, whilst leaving the court with the distinct impression that is who he meant. In his evidence however, Mr Stevens did not or would not support this subterfuge.

[73]  Overall, the Defendant's steadfast refusal to acknowledge that he had been in the office on 30 June 2008 and had sent the email to the Claimant would have been farcical had it not amounted to such blatant dishonesty. The Defendant clearly appreciates the seriousness of the lie he told in that email and would go to any lengths to deny being the author of it. However, as I find, he was the author of it.

[74]  The Claimant entered two further trades on 8 August 2008 to convert £25,000 and £400,000 into Euros. On the first he spoke to Mr Hill and on the second to another trader, Mr Bradley Mortimer. They booked the trades and sent the Trade Notes for their respective trades to the Claimant. In each case the maturity date was 12 August 2008. He signed and returned the Trade Notes, filling in instructions for payment to Alpha Bank in Corfu. He transferred the funds to the HSBC account of Global FX on 11 August 2008.

[75]  When the Euros had not arrived at Alpha Bank by 20 August 2008, the Claimant emailed Mr Mortimer and Mr Hill asking if they had received the transfers the previous week. He asked them to call HSBC and ask them why they hadn't delivered the money. He went on: "the last trade took 30 days to settle & we cannot have a repeat performance again", an indication of the extent to which he had been taken in by the deception that HSBC had been responsible for the delay on the previous trade.

[76]  Mr Mortimer replied the same day as follows:

> "2 transfers of Eur31,562.50 and Eur504,000 were executed on the afternoon of 12/08. Our accounts department have contacted HSBC regarding the delay in the receipt of funds at Alpha Bank and are awaiting their reply. They are aware of the urgency of the payments and have told us they will get back to us ASAP. As soon as I hear from them, I will get back to you."

[77]  In response, the Claimant asked Mr Mortimer to chase HSBC and to push them to deliver on time, although they were already late. On 26 August 2008, the Claimant was told by Alpha Bank that the smaller amount had arrived on 21 August but the Eur504,000 had still not arrived. He emailed Mr Mortimer, Mr Stripling and the Defendant asking them to contact HSBC about the delay and provide a verbal and written update as soon as possible. The Claimant was evidently told by Mr Mortimer that a trace had been put on the monies as he thanked him for that in an email the following day.

[78]  In fact the statements made by Mr Mortimer that the transfers had been executed on 12 August and that a trace had been put on the funds were lies. The true picture appears from Mr Frenkel's report. But for the payment into the HSBC trading account of the Claimant's £425,000, the account would have been overdrawn as the balance on the account at the end of 11 August 2008 was some £308,000. A payment out to another client of some £216,000 was made which could only have been made with the benefit of the £425,000 received. The £425,000 was thus not transferred on 12 August nor was it used to purchase foreign exchange on behalf of the Claimant. It was not until 26 August 2008 that some

£334,000 left the trading account and was converted into Euros, being returned to the Euro account as Eur418,000 odd the same day. Those funds together with Eur147,000 from another client were used to pay out the Eur504,000 to the Claimant's bank in Corfu.

**[79]** Again the picture is of FX Solutions being unable to honour its obligations as they fell due, but of the deception being practised on the Claimant that the delay was all the fault of HSBC. Whilst it is true that on this occasion the lies were told by Mr Mortimer, I consider that it is inconceivable that the Defendant was not well aware what was going on. The funds from the Claimant were very substantial and enabled the company to pay other clients and this all happened just over a month before the companies went into administration, when the Defendant must have been in the office a great deal. I find that the deception of the Claimant was clearly orchestrated by the Defendant.

**[80]** The Claimant then finally agreed the September trades which have given rise to the claim on 3 and 9 September 2008. On 3 September 2008, he telephoned to conduct a trade to exchange £315,000 into Euros. According to the screenshot for the trade from Globsys, the trader he spoke to was Mr Hill and it was Mr Mortimer who booked the trade. Mr Mortimer sent him the Trade Note by email the same day. The maturity date was 9 September 2008. The Claimant sent an email back to Mr Mortimer on 3 September 2008 saying he would transfer the funds into the HSBC account on 5 September 2008. He went on to say:

> "Given the utterly unacceptable performance of HSBC in delivering my money on time into my Alpha Bank account (it has taken between 20 - 30 days for the money to arrive on the past three transactions) I need you to put a trace on this money from Friday 5th Sept and track it."

This bears out the Claimant's very clear evidence that he entered the September trades in the mistaken belief that the delays on the previous two sets of trades had been the fault of HSBC.

**[81]** Mr Mortimer forwarded the Claimant's email to the Defendant later in the afternoon of 3 September 2008. Accordingly, before the Claimant transferred any funds on 5 September 2008, the Defendant was aware that the Claimant had made the trade and was going to transfer the monies two days later. The Defendant also knew that the deception he had practised or orchestrated on the June and August trades, that delays in transfer of funds to the Corfu bank account were all the fault of HSBC, continued to be effective. Furthermore, by this stage the Defendant had had a meeting with Mr Brett of ADS Accountants who are insolvency experts on 2 September 2008.

**[82]** The Claimant's bank transferred £315,000 into the Global FX account at HSBC on Friday 5 September 2008. On the Monday morning 8 September 2008, the Claimant sent an email to Mr Mortimer telling him the funds had arrived in the HSBC account on the Friday and asking him to instruct HSBC to deliver the Euros into the Claimant's Alpha Bank account within five working days.

**[83]** The following day, 9 September 2008, the Claimant rang up to conduct another trade to exchange £250,000 into Euros. He could not remember in evidence who he spoke to but the Globsys screenshot shows the trader as Mr Stevens and the Defendant as the booker of the trade. It was the Defendant who sent him the Trade Note by email. The maturity date was 11 September 2008. Upon receipt of the Trade Note the Claimant sent an email to the Defendant saying:

> "Please can you ensure, via asking HSBC to put a trace on the money from the outset, that the money arrives in my Alpha Bank account by Wednesday 24 September. This will allow them to take nine working days to deliver the money which should be more than enough time for a credible bank like HSBC to deliver the funds? (they have taken between 20-30 days in the past few trades = unacceptable)"

**[84]** This was further confirmation for the Defendant that the deception he had practised or orchestrated on the June and August trades remained effective. The Defendant did nothing to disabuse the Claimant of the false impression which he had. The Claimant's bank duly transferred the monies to the HSBC account on 11 September 2008.

[85]  So far as what happened to the Claimant's monies once they were transferred to the trading account is concerned, in each case, but for the receipt of those monies, the account would have been overdrawn. It follows that the Claimant's monies were used to make payments to other clients. The Claimant did not receive his Euros on either of these transactions. On 16 September 2008 the Defendant had a meeting with Mr Tate. According to the Defendant, Mr Tate advised him not to make any payment to the Claimant, as that could be preferring one creditor over others. Notwithstanding the clear advice about not preferring one creditor over another, on 17 September 2008 (the day before the companies went into administration) payments of £7,000 and £3,000 respectively were made to the Defendant and his wife and of £17,625 to ADS Accountants. On the same day, the Defendant made a wholly improper payment of some £357,000 from the companies' accounts to a business associate called Mr Adrian Faiers. The companies then went into administration on 18 September 2008. The Defendant told Mr Tate subsequently that he intended the sum of £357,000 to be returned to him as it was money advanced to Global FX held on trust for the Defendant. That sum was in due course recovered from Mr Faiers by the administrators' solicitors.

*DECEIT: THE LAW*

[86]  The elements of the tort of deceit are not in issue between the parties and can be summarised as follows:

>    (1) The Defendant must have made a representation which can be clearly identified, which must be a representation of fact.

>    (2) The representation must be false.

>    (3) It must have been made dishonestly.

>    (4) The statement must have been intended to be relied upon and in fact relied upon.

[87]  Taking those elements in turn, whilst the relevant representation must be one of fact and must be clearly identified, it is well established that a representation, including a fraudulent misrepresentation may in an appropriate case be implied from words or conduct. A recent example of the application of that principle is a case to which I will return in relation to the defence raised under s 6 of the Statute of Frauds Amendment Act 1828: the decision of the Court of Appeal in *Contex Drouzhba Ltd v Wiseman* [2007] EWCA Civ 1201, [2008] 1 BCLC 631, [2007] NLJR 1695. Whether or not the court will imply a representation will depend upon all the circumstances and context is everything, as Rix LJ observed in *AIC Ltd v ITS Testing Services (UK) Ltd ("The Kriti Palm")* [2006] EWCA Civ 1601, [2007] 1 All ER (Comm) 667 at para 252, [2007] 1 Lloyd's Rep 555.

[88]  The second and third elements can be dealt with together. The representation must be not only false but dishonestly made. As to the meaning of dishonesty, the classic direction for any court remains that of Lord Herschell in *Derry v Peek* (1889) 14 App Cas 337 at 374, 54 JP 148, 58 LJ Ch 864:

> "First, in order to sustain an action in deceit, there must be proof of fraud and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, (2) without belief in its truth, or (3) recklessly, careless whether it be true or false."

[89]  It is trite law that fraud must be distinctly pleaded and proved, to the heightened burden of proof as discussed in *Hornal v Neuberger Products Ltd* [1957] 1 QB 247, [1956] 3 All ER 970, [1956] 3 WLR 1034 and *Re H (Minors)* [1996] AC 563, [1996] 1 All ER 1, [1996] 1 FCR 509. This was emphasised by Rix LJ in *The Kriti Palm*, at paras 256 - 259, a case which provides a salutary reminder to any judge of the importance of being satisfied to the necessary heightened standard of proof that what is involved is dishonesty.

[90]  It is also well established that, if a representation is made as to an existing state of things and there is an interval of time between it being made and it being acted upon, it is deemed to be repeated throughout the interval until it is acted upon. There will be deceit if, to the representor's knowledge, it is false at the date it is acted upon. Accordingly, if be-

tween the time of making a representation and the Claimant acting upon it, the Defendant discovers that the representation is untrue, he will be liable in deceit: see Clerk & Lindsell on Torts 19th edition para 18-16 and the decision of the House of Lords in *Briess v Woolley* [1954] AC 333, [1954] 1 All ER 909.

**[91]**  The fourth element is that of inducement. The Court of Appeal in *Dadourian v Simms and others* [2009] EWCA Civ 169, [2009] 1 Lloyd's Rep 601 (at paras 99 and 101) recently confirmed the correct legal test of inducement, approving the approach of the trial judge Warren J:

"As to that, the judge directed himself in law, at J(1) 543 - 546, as follows:

(1) it is a question of fact whether a representee has been induced to enter into a transaction by a material misrepresentation intended by the representor to be relied upon by the representee;

(2) if the misrepresentation is of such a nature that it would be likely to play a part in the decision of a reasonable person to enter into a transaction it will be presumed that it did so unless the representor satisfies the court to the contrary (see Morritt LJ in *Barton v County NatWest Ltd* [1999] Lloyd's Rep Banking 408 at 421, paragraph 58);

(3) the misrepresentation does not have to be the sole inducement for the representee to be able to rely on it: it is enough if the misrepresentation plays a real and substantial part, albeit not a decisive part, in inducing the representee to act;

(4) the presumption of inducement is rebutted by the representor showing that the misrepresentation did not play a real and substantial part in the representee's decision to enter into the transaction; the representor does not have to go so far as to show that the misrepresentation played no part at all; and

(5) the issue is to be decided by the court on a balance of probabilities on the whole of the evidence before it . . . ."

**[92]**  In relation to a number of the fraudulent misrepresentations alleged against the Defendant, Mr Keller relies upon a defence under s 6 of the Statute of Frauds (Amendment) Act 1828 (Lord Tenterden's Act). That section provides as follows:

"Action not maintainable on representations of character etc, unless they be in writing signed by the Party chargeable.

No action shall be brought whereby to charge any person upon or by reason of any representation or assurance made or given concerning or relating to the character, conduct, credit, ability, trade, or dealings of any other person to the intent or purpose that such other person may obtain credit, money, or goods upon, unless such representation or assurance be made in writing, signed by the Party to be charged therewith."

**[93]**  The mischief which that section was designed to address was that, at the time the Act was passed, potential Claimants were seeking to bring actions for misrepresentation against Defendants who had made casual statements about other people's financial standing or probity in conversation or otherwise orally, whether in City coffee houses or elsewhere. This purpose of the section was explained by Gurney B in his judgment in *Lyde v Barnard* (1836) 5 LJ Ex 117, 1 Gale 388, 1 M & W 101 at 103:

"But a series of cases, commencing with the case of *Pasley v Freeman* (3 TR 51), had occurred, in which Defendants were charged, not strictly and specifically as guarantees for the solvency of others, but on alleged representations and assurances respecting them and their credit or ability, averred to be false and fraudulent.

There is no doubt that there have been many cases in which false and fraudulent representations of the ability of others have been made, in order to obtain credit for them, by which honest men have suffered. On the other hand, there has been but too much reason to fear that innocent persons have been the victims, not merely of intentionally false, but of unintentionally exaggerated statements of conversations.

> If inquiry were made and information given respecting the credit or ability of the person whom the inquirer was called upon to trust either with money or with goods, the inquiry would be private, the communication would be private, and, if the inquirer was a competent witness, on his evidence alone, without the possibility of contradiction or explanation, the case must rest.
>
> It has been a subject of complaint that these cases had trenched upon the security intended to be afforded by the Statute of Frauds, and it was considered by the legislature that a person so circumstanced was entitled to the same protection as the Statute of Frauds had given to the person whom a Plaintiff sought to charge for the debt or miscarriage of another. To afford this protection, among other purposes, the statute of 9 Geo 4, c 14 was passed.
>
> That act is intituled, 'An Act for rendering written Instrument necessary to the Validity of certain Promises and Engagements.'"

**[94]**  All of this may seem a million miles from a case like the present, but the section remains the law, so that where it is applicable, it must be applied, even if that might seem an injustice in a modern context. However, as *Context v Wiseman*, the most recent case in which the section has been considered, demonstrates, the purpose and limits of the section should be clearly understood. As Waller LJ explained at para 16 of his judgment the section is concerned with proving by evidence the existence of a representation and not with excusing fraudulent behaviour.

**[95]**  In a modern context, the section will clearly be satisfied if the representation is contained in an email, provided that the email includes a written indication of who is sending the email. It seems that it is not enough that the email comes from a person's email address without his having "signed" it in the sense of either including an electronic signature or concluding words such as "regards" accompanied by the typed name of the sender of the email: see the decision of HHJ Pelling QC (sitting as a High Court Judge) in *Pereira Fernandes v Mehta* [2006] EWHC 813 (Ch), [2006] 2 All ER 891, [2006] 1 WLR 1543.

*DECEIT: THE ALLEGED MISREPRESENTATIONS*

**[96]**  The Particulars of Claim enumerate no fewer than 26 alleged fraudulent misrepresentations by the Defendant. In some respects the pleading is formulaic and repetitive. Mr Keller was able to demonstrate by skilful cross-examination of the Claimant that some of the alleged misrepresentations were in fact true and that others were somewhat wide of the mark or the Claimant had not relied upon them. However, as will be apparent from this section of the judgment, I formed the very firm view after hearing all the evidence, that there was what might be described as an irreducible minimum of fraudulent misrepresentation by the Defendant, principally in 30 June 2008 email and in his failure, before the Claimant parted with his money on the September trades, to correct the misleading impression that the delay was all the fault of HSBC, whereas the truth was that the delay was caused by the fact that, as the Defendant had known before any of these trades took place, FX Solutions was hopelessly insolvent.

**[97]**  In this section of the judgment I propose dealing in detail with those of the pleaded representations which, by the end of the trial, arguably remained fraudulent misrepresentations by the Defendant relied upon by the Claimant. This is because, in relation to the other representations pleaded, I accept Mr Keller's submissions that they were not representations made by the Defendant at all, or if made were true.

**[98]**  Thus, in relation to the representations alleged in paras 9.1 and 10.1 of the Particulars of Claim in relation to the June trade (essentially repeated later in the pleading in relation to the August and September trades), that the Defendant intended to place the order for currency and that the Claimant's order had been placed, there must be some question as to whether in that context the Defendant could be said to be representing that he, as opposed to someone from the company, would do anything. Furthermore, in his evidence, the Claimant fairly accepted that FX Solutions had not been obliged to place a currency contract with anyone else and that what he was interested in and assumed would happen is that FX Solutions would deliver the foreign currency to him on the agreed date.

**[99]**  Similarly, the alleged representation in para 10.3 of the Particulars of Claim (again repeated in relation to the August and September trades) that Global FX was properly authorised to receive deposits on behalf of the client was wide

of the mark because neither company needed to be authorised to conduct the foreign exchange trades and, in any event, Global FX did have FSA authorisation.

[100]  In relation to the June trades, by the end of the trial the pleaded representations which were arguably fraudulent misrepresentations relied upon by the Claimant are as follows:

> (1) An implied representation by the Defendant in accepting the Claimant's order on 5 June 2008 that the Defendant's currency exchange business was trading properly and legitimately (para 9.2 of the Particulars of Claim).

> (2) An implied representation by the Defendant in sending the Trade Note and covering email that Global FX was a related company to FX Solutions which was trading properly and legitimately (para 10.2 of the Particulars of Claim).

> (3) An implied representation by the Defendant in sending the Trade Note and covering email that he intended to apply the Claimant's monies properly to pay for the currency ordered in accordance with the trust under the Terms and Conditions (para 10.4 of the Particulars of Claim).

[101]  The thrust of Mr Keller's submissions that none of the representations in the previous paragraph had been made by the Defendant was that representations of that kind should not be implied merely from the Defendant, as a director and agent of FX Solutions, entering into a contract on behalf of FX Solutions with the Claimant. If such representations were implied whenever contracts were made with a company when it had become insolvent, directors and employees would find themselves personally liable to the other contracting party where the appropriate remedy was against the insolvent company.

[102]  I can see the force of that argument where a director or employee of a company which is in fact insolvent makes a contract on its behalf in ignorance of its insolvent condition. That may well be the position in the majority of cases. However, in the present case, the Defendant accepted the Claimant's June order knowing that FX Solutions was already insolvent in the sense that it could not pay its obligations as they fell due. I find that the Defendant knew full well that, because of the parlous financial state of FX Solutions by early June 2008, the substantial sum of £185,000 which the Claimant was proposing to trade would not be held in trust for the Claimant until the equivalent Euros were purchased but would be used in an illegitimate manner to pay other clients, which is, of course, what happened.

[103]  Against that background it seems to me that, in accepting the order and in sending the email attaching the Trade Note, the Defendant, who was in control of both companies, was representing by implication that the currency business conducted by those companies was trading properly and legitimately, in the sense that the business was not insolvent and that funds paid by the Claimant would be held on trust in accordance with the Terms and Conditions until paid out to purchase foreign exchange on behalf of the Claimant.

[104]  It does not seem to me that it is any answer to the conclusion that the Defendant made those representations by implication that, at that time in June 2008, the Claimant did not know the Defendant's position in the company. On the basis of the decision of the House of Lords in *Standard Chartered Bank v Pakistan National Shipping Corp* [2002] UKHL 43, [2003] 1 AC 959, [2002] 2 All ER (Comm) 931, where any agent of a company commits a fraud, as the Defendant did here, he will be personally liable in deceit. It follows that it is irrelevant that the victim of the fraud was unaware of the position in the company of the person who made the fraudulent misrepresentation.

[105]  Mr Keller also relied in relation to the representation alleged in para 9.2 of the Particulars of Claim upon s 6 of Lord Tenterden's Act, on the basis that any representation made was as to "the character, conduct, credit, ability, trade, or dealings of any other person to the intent or purpose that such other person may obtain credit, money, or goods upon". The short answer to that submission is that the relevant implied representation as to the business of FX Solutions being conducted properly and legitimately was repeated in the sending of the email attaching the Trade Note. Mr Keller sought to argue that that implied representation was not pleaded because para 10.2 of the Particulars of Claim related

only to the business of Global FX being conducted properly and legitimately. He reminded me that the court must be astute to ensure that allegations of fraudulent misrepresentation are only considered in relation to the pleaded misrepresentation, citing in that context Buxton LJ at para 404 of *The Kriti Palm*. Of course that must be the correct approach, particularly where fraud is alleged.

[106]  However, although para 10 of the Particulars of Claim is not as aptly pleaded as it might be it seems to me that the plea that the Defendant represented by implication that the business of FX Solutions was being carried out properly and legitimately is encompassed within the allegation in para 10.4 of the Particulars of Claim.

[107]  The fact that the relevant representation is to be implied from a written document which otherwise complies with s 6 of Lord Tenterden's Act (as the email enclosing the Trade Note does, because it includes the Defendant's electronic signature) does not mean that it is unenforceable pursuant to that section. This is made clear by paras 10 and 11 of Waller LJ's judgment in *Contex v Wiseman*:

> "10 I then pose the question as to whether if such a letter by its terms made only an implied representation to the same effect, would that make any difference? Once again, without regard to Lord Tenterden's Act, the position would be the same, and it would be strange indeed if Lord Tenterden's Act was construed so as to make such a fraudulent implied representation unenforceable. One can just about understand an argument that, on a strict construction of the section, the section applies to express representations but not implied ones. This seems to have been the argument in the authority much relied on by Mr Bartlett on this appeal *John Hudson & Co Ltd v Oaten* Transcript 19 June 1980. But the object of such an argument was to persuade the court that the Act did not apply to implied representations ie there was no need for a written document signed by the maker to enforce an implied representation. That would hardly meet the mischief at which the Act was aimed, ie to require writing as proof of representations as to credit or solvency. The argument was unsurprisingly rejected; see Sir David Cairns 10H and following.
>
> 11 Thus the fact that a representation can only be implied from the terms of a written document rather than being an express term could not assist an argument that in some way the section provided a defence."

[108]  Accordingly I find that, in sending the email of 5 June 2008 attaching the Trade Note, the Defendant did impliedly represent (i) that the business of FX Solutions was being carried out properly and legitimately, in other words that the company was not insolvent and (ii) that the Claimant's monies would be held on trust until used to buy foreign exchange for the Claimant. On any view those representations were false to the knowledge of the Defendant and were accordingly fraudulent, since by the time they were made on 5 June 2008, the Defendant knew that FX Solutions was insolvent and that the monies paid by the Claimant would not be held on trust but would be used to pay other creditors with a view to keeping the company afloat as long as possible by "robbing Peter to pay Paul".

[109]  Furthermore, since the implied representations made on 5 June 2008 were never corrected, they continued as misrepresentations of the position (because the Defendant never sought to tell the Claimant what the true position was) throughout the period during which the Claimant continued to trade with FX Solutions, being repeated whenever the Claimant relied upon them in entering the subsequent trades, which he clearly did: see *Briess v Woolley*; Spencer Bower, Turner and Handley: Actionable Misrepresentation (4th edition) para 75.

[110]  The next pleaded misrepresentation is that relating to the email which, as I have found, was sent by the Defendant on 30 June 2008. It is pleaded that in that email the Defendant expressly represented that the delay in payment of the Euros under the June trade was due to banking errors and that a duplicate payment had been made and impliedly represented that the earlier representations made on 5 June 2008 were true.

[111]  Mr Keller points out, quite correctly, that there is no express statement that the delay was the fault of HSBC, but there is undoubtedly an express statement that a duplicate payment had been made, the clear implication from which is that FX Solutions had already made one payment and had now had to make another. Given that, as Mr Keller reminded me, context is everything, in the light of the emails sent by the Defendant on 12 and 19 June giving the false impression that FX Solutions had given instructions to HSBC for the transfer of the funds on 10 June and that they had subsequently put a trace on the funds because of non-delivery, the clear implication from the Defendant's statement that a duplicate payment had been made, is that the original payment that FX Solutions had made on 10 June (as represented in the

email of 12 June) had gone astray through the fault of HSBC and that, for the sake of good customer relations, FX Solutions was making the duplicate payment in circumstances where HSBC had failed to comply with its obligations.

[112]  That is exactly how the Claimant saw the statement about the duplicate payment: as he explained it in his evidence, the offer to make a duplicate payment endeared FX Solutions to him as an entity prepared to honour its obligations even though the other contracting party was in default. The reality is that, whether one focuses on the statement about the duplicate payment or on the implied representation that the delay was all attributable to HSBC, it was all a lie and the Defendant and, it would appear, his immediate colleagues knew that. There had been no default or delay by HSBC and the reason for the delay was that FX Solutions could not honour the transaction with the Claimant until it had enough funds in the Euro account from other sources. The fraudulent misrepresentation in 30 June email was also a continuing misrepresentation which was never corrected by the Defendant and which was repeated and continued to be relied upon by the Claimant in entering the September trades.

[113]  Mr Keller submitted that any misrepresentation in 30 June email was not actionable by reason of s 6 of Lord Tenterden's Act. The representation by the Defendant was that the delay was the bank's fault and not FX Solutions' fault and that, Mr Keller submitted, was a representation as to the character or conduct of FX Solutions within the meaning of the section. However the email did not contain any electronic or typed signature of the Defendant so the representation was not enforceable. It seems to me that the short answer to that point is the one Mr Maclean gave. The email is representing two things. First the key message is that the delay is all the fault of HSBC and second it is saying: "look how wonderful we are, we've sent the money again". None of that is caught by s 6 of Lord Tenterden's Act.

[114]  The next set of pleaded misrepresentations are those said to have been made by the Defendant on 8 August 2008 in accepting the August orders and sending out the Trade Notes on those transactions. If the Defendant had accepted the orders and sent out the Trade Notes on 8 August then I would have no difficulty in concluding that, as in the case of the June trade he thereby represented by implication that the currency business conducted by those companies was trading properly and legitimately, in the sense that the business was not insolvent and that funds paid by the Claimant would be held on trust. However, the problem for this part of the Claimant's case is that it was not the Defendant who accepted the orders or who sent out the Trade Notes, but Mr Hill and Mr Mortimer.

[115]  Mr Maclean sought to overcome that difficulty by contending that the Defendant was in overall control of the business, was the architect of the deception of the Claimant and other customers of FX Solutions and must have been aware of the Claimant's August trades, given the amount of money involved, £425,000. He submitted that against that background, the Defendant would be liable for the representations made by others because they were made with his authority or he ratified them. Mr Maclean cited a passage from Clerk & Lindsell on Torts 19th edition para 6-75 dealing with vicarious liability for fraud.

[116]  As I see it, that passage is dealing with a somewhat different situation, where an agent or employee commits a fraudulent misrepresentation with the authority of his principal or employer. For that principle to have any application here would require reaching the conclusion that when Mr Hill and Mr Mortimer made the trades and sent the Trade Notes they were acting fraudulently in the same way as the Defendant had in the case of the June trade. That case is not pleaded, nor are those individuals parties to these proceedings and I am not prepared to make serious findings of that kind against them.

[117]  In any event, the fraudulent misrepresentations which I have found the Defendant made on 5 June and 30 June were continuing misrepresentations which continued to have effect at the time of the August trades.

[118]  The final pleaded misrepresentations are those specific to the September trades where the Claimant actually lost his money. In relation to each of the trades on 3 September and 9 September 2008 it is alleged that by the acceptance of the Claimant's orders and the sending of the Trade Notes the Defendant represented by implication that the currency business conducted by those companies was trading properly and legitimately in the sense that the business was not insolvent and that funds paid by the Claimant would be held on trust.

[119]  So far as 9 September trade is concerned, it was the Defendant who was the booker of the trade and who sent out the Trade Note. I consider that in doing so, the Defendant clearly did make that implied representation (as with the previous misrepresentation he made in relation to 5 June trade) and that that representation was a fraudulent misrepresentation for the same reason as I have given in relation to 5 June misrepresentation.

[120]  The alleged misrepresentation made in accepting the Claimant's order and sending him the Trade Note for 3 September trade faces the same problem as the misrepresentations alleged in relation to the August trades, that it was Mr Hill and Mr Mortimer with whom the Claimant dealt not the Defendant. For the same reasons as I have given in relation to the August trades, I would not be prepared to conclude that any misrepresentation in accepting the Claimant's order and sending the Trade Note was a fraudulent misrepresentation by Mr Hill or Mr Mortimer for which the Defendant was responsible.

[121]  However, in relation to the September trades, in my judgment it does not matter that it may not have been the Defendant with whom the Claimant dealt. For the reasons I have already given, the Defendant had made fraudulent misrepresentations on 5 June and 30 June 2008. Those were continuing misrepresentations and, whenever the Claimant acted upon them (as he clearly did in entering each of the September trades) and the Defendant failed to correct them, the Defendant repeated them by his conduct: see *Briess v Woolley* [1954] AC 333, [1954] 1 All ER 909 per Lord Reid at 349 and Lord Tucker at 354.

[122]  The appropriateness of applying that principle in the present case is demonstrated by the facts. Mr Mortimer forwarded the Claimant's email of 3 September 2008 to the Defendant later that afternoon. Accordingly, before the Claimant transferred any funds on 5 September 2008, the Defendant was aware that the Claimant had made the trade and was going to transfer the monies two days later. The Defendant also knew that the deception he had practised or orchestrated on the June and August trades continued to be effective.

[123]  Clearly, in those circumstances, it was incumbent on the Defendant to correct the misleading and false impression which he knew the Claimant had been given and, by failing to do so, he impliedly repeated by his conduct the earlier fraudulent misrepresentations. Mr Keller contended that somehow it should make a difference that the Defendant was not aware of 3 September trade until after it had been concluded, because the Claimant was contractually bound once the trade was agreed. Even assuming in the Defendant's favour that he was not aware of the trade until later that day, this is a false point.

[124]  The critical act on the Claimant's part was parting with his money on 5 September. Before then, the Defendant could and should have corrected the false impression previously given. It is quite clear that if the Claimant had known the true position he would not have parted with his money. The suggestion which Mr Keller made that somehow FX Solutions could have insisted on the contract being performed, in circumstances where the Claimant was being defrauded and would, if he had known the true position have ceased trading before 3 September, is unsustainable.

[125]  Furthermore, the Defendant was aware of the Claimant's continued reliance on his fraudulent misrepresentations at the time 9 September trade was made and repeated those misrepresentations by his conduct in failing to correct the misleading impression he had given. For good measure, as I have held, in sending out 9 September Trade Note, the Defendant made the implied fraudulent misrepresentations again that (i) that the business of FX Solutions was being carried out properly and legitimately, in other words that the company was not insolvent and (ii) that the Claimant's monies would be held on trust.

[126]  In relation to inducement, Mr Keller made an ingenious attempt in cross-examination to get the Claimant to accept that, at the time he entered the September trades, what was operating on his mind was the statements made about delay being the responsibility of HSBC, made in the context of the August transactions, in other words misrepresentations made by Mr Mortimer rather than any representation made by the Defendant in relation to 5 June trade or in 30 June email.

[127]  The Claimant's response was that the misrepresentations in relation to the August trades had not taken over in his mind from earlier misrepresentations. He had a collective impression from what he described as "multiple interfaces", meaning everything he had been told, that FX Solutions had not been responsible for the delay in previous trades. From that evidence, which I accept, it is clear that the misrepresentations made by the Defendant in June, which were of course continuing representations, continued to operate on his mind when he entered the September trades. That much is clear anyway from the emails he sent at the time where he referred to the delay in the previous transactions being the fault of HSBC, demonstrating that the deception in 30 June email continued to operate on his mind.

[128]  If there were any doubt about this, that was laid to rest by his evidence in re-examination when he said that if he had been told on 30 June that the reason for the delay in payment was the financial difficulties of FX Solutions, he would not have traded in August or September. Ultimately, in closing submissions, Mr Keller accepted fairly and realistically that if the alleged misrepresentation on 30 June had been made by the Defendant, the Claimant had been induced by it.

[129]  I have no doubt that in relation to all the fraudulent misrepresentations which I found that the Defendant made, the Claimant was induced by those misrepresentations to enter into the September trades in circumstances where, had he known the truth, he would not have entered the transactions and certainly would not have handed £565,000 over to FX Solutions or Global FX. It follows that the claim in deceit succeeds.

*PIERCING THE CORPORATE VEIL*

[130]  Given that I have found that the claim in deceit succeeds, it is not strictly necessary to decide whether this is an appropriate case in which to pierce the corporate veil and permit a claim which should otherwise be pursued against the company to be pursued against the Defendant. Indeed, in *Dadourian Group International Inc v Simms* [2006] EWHC 2973 (Ch), at paras 684 and 685, Warren J held that where a claim in deceit succeeded against the person controlling the company, it would be inappropriate to permit the veil to be lifted to enable the Claimant to pursue a contractual claim against that person. As he put it the Claimant "recovers all his loss arising as a result of the misrepresentation by his tortious claim in deceit" (para 685). This point was not addressed in the Court of Appeal.

[131]  I can deal relatively briefly with the question whether I would have permitted the corporate veil to be lifted if the claim in deceit had not succeeded. Clearly if the claim in deceit had failed because I had concluded that there had been no fraudulent misrepresentations made, there being no other impropriety pleaded, there would be no basis for piercing the corporate veil.

[132]  The position would have been more difficult if I had concluded that fraudulent misrepresentations had been made, but that they were unenforceable by virtue of s 6 of the Statute of Frauds (Amendment) Act 1828. In that case there would have been impropriety by the Defendant. In support of his submission that, even in that case, it would not be appropriate to pierce the corporate veil, Mr Keller relied upon the decision of Munby J (as he then was) in *Ben Hashem v Ali Shayif* [2008] EWHC 2380 (Fam), [2009] 1 FLR 115, [2008] Fam Law 1179.

[133]  After a comprehensive review of all the authorities, the learned judge said at para 199:

> "The common theme running through all the cases in which the court has been willing to pierce the veil is that the company was being used by its controller in an attempt to immunise himself from liability for some wrongdoing which existed entirely *dehors* the company. It is therefore necessary to identify the relevant wrongdoing - in *Gilford* and *Jones v Lipman* it was a breach of contract which, itself, had nothing to do with the company, in *Gencor* and *Trustor* it was a misappropriation of someone else's money which again, in itself, had nothing to do with the company - before proceeding to demonstrate the wrongful misuse or involvement of the corporate structure. But in the present case there is no anterior or independent wrongdoing. All that the husband is doing, in the circumstances with which he is now faced - the wife's claim for ancillary relief - is to take advantage, in my judgment legitimately to take advantage, of the existing corporate structure and, if one chooses to put it this way, to take advantage of the principle in *Salomon*."

**[134]**  Mr Keller submits that in the present case, any wrongdoing by the Defendant was not entirely *dehors* the company. On the contrary the wrongdoing alleged was taking place within the context of the company's business. Mr Maclean refuted the suggestion that it was a pre-condition of piercing the corporate veil that the wrongdoing was entirely *dehors* the company. He accepted that it was necessary to show that the impropriety was linked to the use of the company structure to avoid or conceal liability for the impropriety, but submitted that this was such a case since the Defendant controlled the company, knew that it was insolvent but permitted it to continue trading for collateral reasons and thereby used the faÁade of company to disguise what he was in fact doing, which was to set up an alternative business to rise like a phoenix from the ashes.

**[135]**  Mr Maclean relied on para 163 of Munby J's judgment where, in setting out the principles to be derived from the authorities, he had cited the judgment of Sir Andrew Morritt V-C in *Trustor AB v Smallbone (No 2)* [2001] 3 All ER 987, [2001] 2 BCLC 436, [2001] 1 WLR 1177:

> "Fifthly, it follows from all this that if the court is to pierce the veil it is necessary to show *both* control of the company by the wrongdoer(s) *and* impropriety, that is, (mis)use of the company by them as a device or faÁade to conceal their wrongdoing. As the Vice Chancellor said in *Trustor* at para 23:

> 'the court is entitled to 'pierce the corporate veil' and recognise the receipt of the company as that of the individual(s) in control of it if the company was used as a device or facade to conceal the true facts thereby avoiding or concealing any liability of those individual(s).'

> And in this connection, as the Court of Appeal pointed out in *Cape* at page 542, the motive of the wrongdoer may be highly relevant."

**[136]**  Furthermore, submitted Mr Maclean, it is no answer to say that FX Solutions and Global FX had been properly incorporated at the outset. The question is whether the companies were being used as a device or faÁade by the Defendant at the time of the relevant transactions in September 2008. This timing point was expressly recognised by Munby J at para 164 of his judgment.

**[137]**  This is not an easy point, but on reflection I consider that Mr Keller is right in his submission that the cases where it is appropriate to pierce the corporate veil are all concerned with the Defendant who controlled the relevant company using the corporate structure to disguise his wrongdoing, which had nothing to do with the company. As Munby J put it, the wrongdoing was "entirely *dehors* the company".

**[138]**  The pleaded case here is that the Defendant used Global FX and/or FX Solutions as a faÁade for his fraudulent trading. The relevant fraudulent trading is defined in para 7 of the Particulars of Claim as, inter alia, accepting payments from customers pursuant to currency exchange contracts and then using the money for other purposes including the payment of the company's expenses, payments to himself and associates and paying money to other customers to give the appearance of legitimate trading. That is not wrongdoing which has nothing to do with the company or companies. It is wrongdoing at the heart of the actual business of the company.

**[139]**  Of course that wrongdoing (irrespective of the tort of deceit) may in due course give rise to a liability on the part of the Defendant under ss 213 and 214 of the Insolvency Act 1986 for fraudulent trading or wrongful trading on the application of the liquidator on behalf of the creditors of the companies as a whole. I accept Mr Maclean's submission that the possibility of such proceedings should not be relevant to the question whether or not the case is an appropriate one to pierce the corporate veil, but equally, that the Defendant was responsible for such trading does not seem to me without more to indicate that the companies were being used by the Defendant as a facade to disguise his wrongdoing.

**[140]**  In my judgment, this would not be an appropriate case in which to pierce the corporate veil. However, the point is academic since the Claimant's claim in deceit succeeds.

*QUANTUM*

**[141]**  As regards the quantum of damages Mr Maclean accepted on behalf of the Claimant that the damages should be the sterling amounts paid over less any dividend recovered in the liquidation. Given that the exact recovery that will be made in the liquidation is uncertain, the correct course is to give judgment for damages to be assessed, together with interest from 5 September 2008 on £315,000 and from 10 September 2008 on the balance. I order that an interim payment on account of those damages is to be paid pursuant to CPR 25.7.1(b) in an amount representing £565,000 plus interest less 18% of the £565,000. I accept Mr Maclean's submission that on the evidence of Mr Tate, 18% remains the most likely dividend the Claimant will receive in the liquidation.

**[142]**  As regards the rate of interest, Mr Maclean relied upon the judgment of Jackson J (as he then was) in *Claymore v Nautilus Properties Ltd* [2007] EWHC 805 (TCC), [2007] BLR 452 for the proposition that, in order to reflect the principle that interest should reflect the status of the successful party and the rate at which they would be able to borrow commercially, I should consider awarding a higher rate of interest than 1% over Bank of England base rate, which is the rate regularly applied in the Commercial Court. Of course this case is not in the Commercial Court (although in many ways it would have been a suitable case for that court) and in any event as Mr Maclean rightly points out 1% over base rate is only a presumption, which can be displaced in an appropriate case.

**[143]**  Although there is no specific evidence as to the rate of interest which the Claimant would have had to pay to borrow the money (and indeed was no such evidence in *Claymore*) I accept the general proposition that the rate at which individuals can borrow money has been rather higher than base plus 1% in the last few years. In the absence of specific evidence I am not prepared to go as high as 4% over base which was Mr Maclean's upper limit, being the rate imposed by FX on its customers for late payment under cl 5.8 of the Terms and Conditions. However, I will award interest at 2% over base rate.

*Judgment accordingly.*