UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :
In re REFCO, INC. SECURITIES LITIGATION  :   07 MDL 1902 (JSR)
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :
This document relates to:                                           :
                                                                    :   07 Civ. 8165 (JSR)
MARC S. KIRSCHNER,                                                  :
As Trustee of the Refco Private Actions Trust,                      :
                                                                    :
                            Plaintiff,                              :
                                                                    :
                -v-                                                 :
                                                                    :
PHILLIP R. BENNETT, SANTO C. MAGGIO,                                :
ROBERT C. TROSTEN, MAYER BROWN,                                     :
LLP, MAYER BROWN INTERNATIONAL                                      :
LLP, and GRANT THORNTON LLP,                                        :
                                                                    :
                            Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GRANT THORNTON LLP'S SUBMISSION
## IN RESPONSE TO THE COURT'S TWO QUESTIONS

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant Grant Thornton LLP*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

POINT ONE:    Bermuda law does *not* recognize a duty similar to the New
              York common law duty to disclose "hopeless insolvency"
              that underlies Kirschner's remaining theory...................................................2

POINT TWO:    The customers cannot invoke New York law to show
              fraudulent inducement by RCM.......................................................................3

## TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE**

*Amusement Indus., Inc. v. Stern*,
    693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010) ...................................................... 5

*Bon Jour Group, Ltd. v. Elan-Polo, Inc.*,
    1997 WL 401814, at *4 (S.D.N.Y. July 16, 1997)............................................ 4

*Capital Mgmt. Select Fund Ltd. v. Bennett*,
    680 F.3d 214, 219, 230-33 (2012)................................................................... 1

    680 F.3d at 231 ............................................................................................... 3

    680 F.3d at 221, 232-33 ................................................................................. 7

    680 F.3d at 219, 225-26, 232 & nn. 21 & 22.................................................. 9

    680 F.3d at 230-31 ........................................................................................ 10

*Craigie v. Hadley*,
    54 Sickels 131 (N.Y. 1885) ........................................................................... 10

*Green v. Lines Overseas Mgmt. Ltd.*,
    Bda. L.R. 53 (2002)......................................................................................... 3

*Grund v. Delaware Charter Guar. & Trust Co.*,
    788 F. Supp. 2d 226, 244 (S.D.N.Y. 2011) ..................................................... 4

    788 F. Supp 2d at 244 ..................................................................................... 5

*In re Currency Conversion Fee Antitrust Litig.*,
    230 F.R.D. 303, 311 (S.D.N.Y. 2004)............................................................. 4

*Krock v. Lipsay*,
    97 F.3d 640, 645-46 (2d Cir. 1996)................................................................. 4

*Licci v. Lebanese Canadian Bank*,
    672 F.3d 155, 158 (2d Cir. 2012) ................................................................... 6

*Neumeier v. Kuehner*,
    31 N.Y.2d 121, 128, 286 N.E. 2d 454, 458 (1972) ........................................ 6

*Schultz v. Boy Scouts of Amer.*,
    65 N.Y.2d 189, 198, 480 N.E.2d 679, 684-85 (1985) .................................... 5

    65 N.Y.2d at 201 n.3 ....................................................................................... 5

    65 N.Y.2d at 201-02 ..................................................................................... 5-6

    65 N.Y.2d at 198, 201-02 ............................................................................... 7

*St. Louis & S.F. Railway v. Johnston*,
    133 U.S. 566, 577 (1890) ............................................................................. 10

*Tyco Int'l Ltd. v. Walsh*,
  2010 WL 3860390, at *2 (S.D.N.Y. Oct. 24, 2010) .......................................... 2

**OTHER AUTHORITIES** **PAGE**

Fed. R. Civ. P. 26 ................................................................................................ 2

Fed. R. Civ. P. 44.1 ............................................................................................. 2

**PRELIMINARY STATEMENT**

Kirschner's only remaining theory is that RCM—allegedly with Grant Thornton's assistance—deceived the FX customers about whether it was "a viable, solvent broker-dealer." Am. Compl. ¶¶ 13, 14. But these customers never relied on any false statement by anyone. So, Kirschner rests his case on the argument that under New York law, RCM had a duty to disclose "hopeless insolvency" before accepting a deposit. When it accepted deposits without any such disclosure, RCM supposedly implied that it was in compliance with that New York duty—and misled its customers into believing it had nothing to disclose.

Recent Second Circuit authority requires rejecting that theory. *See Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 230-33 (2012). The Second Circuit squarely held that "RCM's affirmative representations" that it was a Bermuda company "trump any implied representation" relating to its compliance with either the letter or the spirit of domestic law. *Id*. Thus, RCM's customers could not have been "misled" about that compliance. *Id*. at 219. Under that reasoning, Kirschner's sole remaining theory in this case fails as a matter of law.

The answers to this Court's two questions underscore that result. As discussed below,

1. Bermuda law does *not* recognize "a duty similar to the New York common law duty to disclose 'hopeless insolvency' or the like" (July 16, 2012 Order); and

2. New York law does *not* "govern[] the relationship between the plaintiff FX customers and RCM, a Bermuda entity" (*id*.). Under New York's "interests" approach to choice of law, Bermuda law governs that relationship instead.

These FX customers hail from all over the world. ***Not one*** is from New York. They chose to do business with RCM, which this Court (along with Kirschner himself) has recognized was "a Bermuda entity." *Id*. To hold that New York law "governs the relationship" between these non-New-York customers and their non-New-York broker would be contrary to a governmental interests analysis and would flout the parties' reasonable expectations. Thus,

Kirschner cannot use New York law to establish a primary violation to underlie his claim of aiding and abetting against Grant Thornton LLP. That leaves him with no claim at all.

## POINT ONE

### Bermuda law does *not* recognize a duty similar to the New York common law duty to disclose "hopeless insolvency" that underlies Kirschner's remaining theory.

This Court has asked the parties to address "[w]hether Bermuda law recognizes a duty similar to the New York common law duty to disclose 'hopeless insolvency' or the like." The answer is *no*. Assuming that New York law does impose such a duty, Bermuda law does not. The relevant Bermuda authorities are discussed below and in two declarations from Bermuda law experts, submitted together with this supplemental brief. *See* Decls. of Kehinde Abinbola Lucille George and Mark Guy Chudleigh (both filed today); *see also* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source . . . ."); *Tyco Int'l Ltd. v. Walsh*, 2010 WL 3860390, at *2 (S.D.N.Y. Oct. 24, 2010) (court may consider expert declarations on foreign law without regard to disclosure requirements of Rule 26).[1]

Over the years, Bermuda has maintained a "low-tax and light regulatory environment." Ex. A to Decl. of Catherine W. Joyce (filed today) at ¶ 22 (Dec. 12, 2006 Order of Bermuda court, relating to RCM bankruptcy). This environment is reflected both in the absence of regulatory bodies like the SEC and in the development of statutory and common law.

---

[1] A similar declaration was submitted in this MDL by Jan Woloniecki, a law partner of Ms. George, on behalf of the TH Lee defendants in *Krys v. Sugrue*. *See* Decl. of Jan Woloniecki, MDL Docket No. 217 (Nov. 25, 2008). The declaration was filed in support of a motion to dismiss a claim that those defendants (as directors or shareholders of RCM) owed customers a fiduciary duty. It concerns the duties a director or shareholder owes a Bermudian company. In the process, however, it also states that a Bermudian broker does not owe a duty to disclose its insolvency either to customers (¶¶ 30-34) or to creditors generally (¶ 45). No responsive declaration was filed. The Special Master commented favorably on the Declaration and relied on it, stating that Mr. Woloniecki "appears to be qualified" and had presented what "appears to be a cogent statement of Bermuda law." R&R on Primary Violations in *Krys v. Sugrue* at 35-36, MDL Docket No. 579 (March 1, 2010). This Court adopted that R&R on May 3, 2011.

2

Consistent with that approach, neither the Bermudian courts nor the Bermudian legislature recognizes any duty on the part of a broker to disclose its financial condition to a customer—no matter how grave that financial condition is. *See* George Decl. ¶¶ 8-9, 12, 14; Chudleigh Decl. ¶¶ 5-8. To the contrary, under Bermuda law, the relationship between a broker and its customer is simply a matter of contract. *See id.* ¶ 4; George Decl. ¶¶ 10-12; *Green v. Lines Overseas Mgmt. Ltd.*, Bda. L.R. 53 (2002). The *Green* case, for example, dealt with a broker and customer who had no written contract. The Bermudian court did not impose any fiduciary or common-law duty; it focused entirely on the contractual terms that would be found under ordinary custom and practice. *See* Chudleigh Decl. ¶ 5. Indeed, Bermuda has adopted a restrictive approach toward the expansion of duties beyond the terms of a contract. *Id.* ¶ 4.

RCM and its customers were all "sophisticated" parties who entered into a "bargained-for agreement." *Capital Mgmt.*, 680 F.3d at 231. The FX customers in particular are all investment funds that chose to do business with a Bermuda-based broker—undoubtedly because they believed this choice would be advantageous. *Id.* at 221-23 (costs and benefits of using an offshore broker). Consistent with Bermuda law, these customers were free to bargain for representations or warranties about RCM's financial condition—or even for a duty to disclose hopeless insolvency. *See* George Decl. ¶ 12. But Bermuda law does not impose one.

## POINT TWO

### The customers cannot invoke New York law to show fraudulent inducement by RCM.

On the facts of this case, Kirschner cannot use New York law to establish a primary violation between RCM and the FX customers. That is so whether the question is analyzed in terms of choice-of-law rules (as discussed below) or in terms of whether the customers were misled (as the Second Circuit reasoned in *Capital Management*).

3

In tort cases, New York choice-of-law rules look to the jurisdiction with the "'greatest interest'" in the matter. *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (citation omitted). "As New York law makes clear," the contacts between the parties and the various jurisdictions "'obtain significance only to the extent that they relate to the policies and purposes sought to be vindicated by the conflicting laws.'" *Id*. (quoting *Miller v. Miller*, 22 N.Y.2d 12, 237 N.E.2d 877, 880 (1968)). In a tort case, then, "'the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'" *Krock*, 97 F.3d at 646 (citation omitted).

In general, where the wrongful conduct and the injury occurred in different jurisdictions, "the locus of the tort tends to be where the alleged victims resided, as that is the locus of their economic loss." *Grund v. Delaware Charter Guar. & Trust Co.*, 788 F. Supp. 2d 226, 244 (S.D.N.Y. 2011) (citing *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004)); *see also Krock*, 97 F.3d at 646 (citing cases); *Bon Jour Group, Ltd. v. Elan-Polo, Inc.*, 1997 WL 401814, at *4 (S.D.N.Y. July 16, 1997). Courts have applied this rule in cases of fraud by omission, as well as in cases involving multiple plaintiffs (and, hence, multiple states' laws). In the *Currency Conversion Fee Antitrust Litigation*, for example, the court applied New York choice-of-law rules to determine which state's law would apply to common law claims in a putative class action, including a claim of "fraud-by-omission." 230 F.R.D. at 311. The court concluded that "[t]he torts arose . . . where the individual cardholders were solicited as cardholders, signed their cardholder agreements and received their monthly statements." *Id*. As a result, "the laws of all fifty states and the District of Columbia must be applied." *Id*. The court refused to alter this analysis simply because it would present "logistical difficulties" for the case. *Id*. (denying class certification on this basis).

Focusing on the customers' domiciles strongly indicates that New York law would not apply here.  ***None*** of the remaining FX customers is located in New York.  *See* Ex. B to Joyce Decl. (Trustee's list of FX Customer Addresses).  Instead, they hail from Abu Dhabi, the Cayman Islands, Luxembourg, Monaco, the Channel Islands, and a variety of other jurisdictions in the United States and abroad.  *See id.*  Those jurisdictions represent the site of the FX customers' reliance (if any), as well as "the locus of the harm."  *Grund*, 788 F. Supp 2d at 244. [2]

On these unique facts, however, applying the laws of those many jurisdictions—or the laws of New York, for that matter—would be inconsistent with the "interests" analysis and the reasonable expectations of the parties.  Those considerations require that the relationship between the FX customers and their Bermudian broker be governed by Bermuda law.  New York choice-of-law rules "'attempt[] to protect the 'reasonable expectations of the parties' who relied on the jurisdiction's law to govern their conduct" and seek to protect that jurisdiction's governmental interest in furthering "'the admonitory effect that applying its law will have on similar conduct in the future.'"  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010) (quoting *Schultz v. Boy Scouts of Amer.*, 65 N.Y.2d 189, 198, 480 N.E.2d 679, 684-85 (1985)).  Although the parties' expectations are not dispositive (*Schultz*, 65 N.Y.2d at 201 n.3), they may play a role where the parties hail from separate, non-New-York jurisdictions.  In such a case, ignoring the expectations of the parties could create "'great uncertainty for

---

[2]  When Grant Thornton briefed its motions to dismiss and then answered the complaint, the Trustee had not yet provided the most critical information for any choice-of-law analysis:  a complete list of the remaining customers and their domiciles.  Thus, Grant Thornton did not yet know that all of the remaining customers were domiciled outside New York.  The Trustee did not provide that information until April 8, 2011, after Grant Thornton had requested it in a interrogatory and was forced to obtain an order from Special Master Hedges compelling a response.  *See* Ex. C to Joyce Decl. (Apr. 1, 2011 Order, compelling response to Jan. 12, 2011 interrogatory).  Months later, the Trustee identified two additional customers—the Rogers Funds—who had never surfaced in the case before.  Their domicile is in Illinois.  *See* Ex. D to Joyce Decl. at 52:7-9 (Price Dep.).

5

litigants.'" *Id.* at 201-02 (quoting *Neumeier v. Kuehner*, 31 N.Y.2d 121, 128, 286 N.E.2d 454, 458 (1972)); *see also, e.g.*, *Licci v. Lebanese Canadian Bank*, 672 F.3d 155, 158 (2d Cir. 2012) (where overseas plaintiff chose to deal with New York-based bank, applying New York law in order to serve New York's interest in regulating a New-York-based bank and to protect "'the reasonable expectations of the parties'") (quoting *Schultz*).

Here, the only "reasonable expectation[]" for the customers and RCM was that Bermuda law would apply—and, indeed, Bermuda has the greatest interest in regulating their relationship. During the bankruptcy proceedings, Kirschner admitted that RCM was "a Bermuda-registered company with a globe-spanning customer base" and that its operations were not "'regulated' in the United States." Ex. E to Joyce Decl. at 9-10 (bankruptcy filing). RCM was incorporated in Bermuda. *See* Ex. F (cert. of incorp.). At all relevant times, it held itself out as "a corporation organized under the laws of Bermuda." Ex. G (FX customer agreement); *see also* Ex. H at 10 (Refco Form 10K filed in 2005) (Refco entities had "material operations in Bermuda"). Refco also represented that the various Refco entities were "required to comply with the laws and regulations of foreign governmental and regulatory authorities of each country in which [they] conduct business"—and that RCM in particular was "offshore." Ex. I at 22, F-7 (LBO filing). Throughout its existence—up to and including the bankruptcy—RCM was characterized as a "Bermuda entit[y]" and was represented by counsel in Bermuda. Ex. J ¶¶ 5-6 & n.2 & attached decl. ¶ 3 (bankruptcy-related filing). And as for the customers themselves, their interactions were with representatives located in offices around the world—and generally ***not*** in New York.[3]

---

[3] The IDS Funds worked with a Refco employee in Chicago. Ex. K at 71:19-72:4, 104:11-14 (McCarthy Dep.); Ex. L (email, dep. ex. 3267). Stilton worked with individuals in London and Chicago. Ex. M at 118:15-119:9, 129:9-132:3 (Mawdsley Dep.); Ex. N (letters, dep. exs. 3188 and 3197). The Wayland Funds apparently worked with a contact person in Chicago. Ex. O (email chain, dep. ex. 3249). And as discussed below, Carlos Sevilleja's contact was in London.

6

Under these circumstances, to impose the law of any jurisdiction other than Bermuda would be contrary to the customers' "reasonable expectations." *Schultz*, 65 N.Y.2d at 198, 201-02. The customers chose to do business with a Bermuda entity that had assumed no obligation to comply with New York law. *See Capital Mgmt.*, 680 F.3d at 232-33. They are sophisticated parties "that could be expected to understand the relevant benefits and risks" of that choice. *Id.* at 231. One such benefit, of course, is the prospect of trading without any limitations on hypothecation and margin financing—practices that give customers "the ability to invest on a leveraged basis and thereby earn amplified returns on their investment capital." *Id.* at 221. As one Bermuda court explained (in the Bermudian bankruptcy proceedings of RCM):

> It is somewhat ironical that investors in Bermuda-based companies are keen to take advantage of the enhanced profitmaking opportunities which this low-tax and light regulatory environment is believed to offer. Yet when insolvency intervenes, the same investors on occasion seem to wish that Bermuda companies could be restructured . . . as if they were not incorporated here. Short of re-domiciling the Companies to the US, a somewhat improbably regulatory option, ***the reality of their Bermudian place of incorporation cannot be wished away.***

Ex. A ¶ 22 (emphasis added).

RCM's alleged "repatriation" does not change this analysis. According to Kirschner, RCM "shut down" its Bermuda operations in 2001—and it did so covertly, so that it could "falsely" maintain its offshore status. Am. Compl. ¶¶ 35, 170. But the whole point of this allegation is that ***the customers knew nothing about it***. As late as July 2005, the consolidated Refco entity still represented that it had "material operations in Bermuda." Ex. H at 10. So, the customers' only reasonable expectation was that RCM was still a Bermuda entity.

RCM's own expectations point to Bermuda law as well. RCM could not reasonably have expected that it would have to conduct its business and relationships in compliance with the duties and regulations imposed in the home countries of all of its many customers. Nor did it expect that New York law would apply. RCM's management specifically chose to maintain

7

RCM's corporate status in Bermuda so that it could benefit from that jurisdiction's more lenient brokerage laws. Ex. P at 50:4-55:16 (Maggio Dep.) (discussing importance of maintaining RCM as "an offshore broker/dealer"). At all times, RCM had Bermudian directors and conducted meetings of its Board of Directors in Bermuda. *E.g.*, Ex. Q (board minutes and resolutions). Given the importance of RCM's exemption from U.S. law, RCM consulted with outside counsel concerning "ways to structure its business so as to attempt to avoid being treated as a regulated broker-dealer" subject to U.S. law. Am Compl. ¶ 167; Ex. P at 56:16-59:6 (Maggio Dep.).

The Trustee now contends that this was all unsuccessful; he plans to argue that after 2001, RCM was no longer entitled to claim the SEC's safe harbor for offshore entities. But even if that were so, it would not show that RCM expected to be governed by the laws of New York. The alleged "repatriation" did not involve changing RCM's place of incorporation from Bermuda—much less moving it to New York. Instead, it involved moving RCM's "back-office operations" to New Jersey (Am. Compl. ¶ 264) and its "trading operations" to the offices of the Austrian bank BAWAG in Vienna (Ex. P at 677:21-679:20) (Maggio Dep.). *See also* Ex. R at 35:16-36:19 (Dispenza Dep.) (some operations also went to Chicago); Ex. E at 9-10 (bankruptcy-related filing by Kirschner, admitting that RCM's operations were not "confined to a single state within the United States"). Therefore, even from RCM's perspective, the only reasonable expectation was still that Bermuda law would apply.

Ultimately, it is Bermuda—not New York or any other jurisdiction—that maintains the greatest governmental interest in determining what duties a self-proclaimed Bermuda broker-dealer does and does not assume. As noted above, Bermuda has chosen to create a "low-tax and light regulatory environment" (Ex. A ¶ 22)—undoubtedly as part of a particular strategy to promote commerce within that nation's borders. Bermuda thus has a strong interest in ensuring

8

that brokers and other financial institutions that incorporate in Bermuda and hold themselves out as Bermuda entities are subject to uniform legal requirements consistent with Bermuda's regulatory and economic priorities.

In contrast, New York's interest in the relationship between the customers and RCM is minimal at best. Consider, for example, the funds affiliated with Carlos Sevilleja—which account for more than 1/3 of the amount Kirschner seeks for all the customers in this case. Like the other customers, Sevilleja is not a New York resident. He is a Spanish national who conducts his business from a tower in Dubai. Ex. S at 10:22-23, 13:24-14:2 (Sevilleja Dep.). On behalf of his funds, he executed agreements that held RCM out to be "organized under the laws of Bermuda." *See, e.g.*, *id*. at 164:25-165:18 (referencing agreement). He conducted trades through an agent located in London. *Id*. at 83:6-84:2, 188:15-189:11. His funds traded hundreds of millions of dollars with RCM entirely for his own personal benefit (*id*. at 78:24-79:7), so when they lost money, he suffered that loss at his domicile in Dubai. The State of New York would have no expectation—and little (if any) governmental interest—in determining what this Bermuda broker was or was not required to disclose to Mr. Sevilleja in Dubai. On the facts of this case, then, Kirschner cannot use New York law to establish any primary violation by RCM.

To be clear, the result should be the same even if this Court does not apply choice-of-law rules at all. The class in *Capital Management* asserted claims under the federal securities laws, and the Second Circuit applied the federal securities laws to evaluate them. 680 F.3d at 225-26; *see also id*. at 232 & nn. 21 & 22 (finding it unnecessary to determine whether RCM was truly exempt from SEC regulation). Rather than applying a choice-of-law analysis, the Court simply concluded that the customers ***were not "misled."*** *Id*. at 219 (emphasis added). Both *Capital Management* and the instant case involve claims for fraud. But because RCM made "affirmative

9

representations that it was not a U.S.-regulated company," the customers were, in fact, not defrauded. Through its affirmative representations, RCM provided an adequate explicit disclosure that "trump[ed]" implied duties or representations. *Id*. at 230-31. As a result, the customers could not claim fraud through the "shingle theory," which provides that "a broker makes certain implied representations and assumes certain duties merely by 'hanging out its professional shingle.'" *Id*. at 230 (citation omitted). There, the alleged implied representation was that RCM would "deal fairly with the public in accordance with the standards of the profession." *Id*. Here, the alleged implied representation is that RCM was in compliance with a New York duty to disclose hopeless insolvency—and, thus, that it was "viable" and "solvent." Am. Compl. ¶¶ 13, 14. Kirschner has conceded that the theory here is "analogous" to the shingle theory (Opp. to SJ Mot. at 5), and the SEC would apparently agree; in an amicus brief in *Capital Management*, the SEC itself cited the New York hopeless insolvency case law to support its view of the shingle theory.[4] But because of RCM's affirmative representations, its customers were not misled and cannot possibly prove a primary violation.

In sum, under the reasoning in *Capital Management*, the various representations that RCM was a Bermuda entity **prevented these customers from being misled**. Under choice-of-law principles, the various representations that RCM was a Bermuda entity—coupled with its incorporation and the customers' domiciles outside New York—***prevent these customers from invoking New York law to govern their relationship with RCM.*** Under either analysis, Kirschner cannot show a primary violation by reference to any New York common law duty to disclose. His remaining claim fails as a matter of law.

---

[4] Brief of the Securities & Exchange Comm'n, Amicus Curiae, in No. 08-6166-cv(L), at 23 & n.11 (June 2009) (quoting *St. Louis & S.F. Railway v. Johnston*, 133 U.S. 566, 577 (1890), which in turn applies New York law and cites *Craigie v. Hadley*, 54 Sickels 131 (N.Y. 1885)).

Dated: July 20, 2012
       Chicago, Illinois

*Of Counsel:*

Kenneth Cunningham
Tracy W. Berry
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
Ph: 312-856-0001
Fax: 312-565-3473

Respectfully submitted,

WINSTON & STRAWN LLP

      /s/
By:  Linda T. Coberly

Bruce R. Braun (bbraun@winston.com)
Catherine W. Joyce (cjoyce@winston.com)
Linda T. Coberly (lcoberly@winston.com)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Ph: 312-558-5600
Fax: 312-558-5700

Luke Connelly (lconnell@winston.com)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Ph: 212-294-6700
Fax: 212-294-4700

*Attorneys for Grant Thornton LLP*