# Exhibit 5

1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2
 3    -------------------------------------x
      In re REFCO, INC. SECURITIES
 4    LITIGATION         07-MDL-1902
 5    -------------------------------------x
      This Document Relates To:
 6
      In re REFCO, INC. SECURITIES
 7    LITIGATION              05 Civ. 8626
                                    (GEL)
 8
      -------------------------------------x
 9
      And All Other Cases Subject to Deposition
10    Protocol Order
11    -------------------------------------x
12            VOLUME 1
13
              December 14, 2009
14            9:39 a.m.
15
16        Videotaped deposition of SANTO C. MAGGIO,
17    pursuant to notice, at the offices of White &
18    Case LLP, 1155 Avenue of the Americas, New York,
19    New York, before Eric J. Finz, a Shorthand
20    Reporter and Notary Public within and for the
21    State of New York.
22
23
24
25
```

2

```
 1
 2    A P P E A R A N C E S:
 3    BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
      Attorneys for Lead Plaintiffs RH CAPITAL
 4    ASSOCIATES LLC and PACIFIC INVESTMENT MANAGEMENT
      COMPANY LLC and CO-LEAD COUNSEL for the PUTATIVE
 5    CLASS
          1285 Avenue of the Americas
 6        New York, NY 10019
 7    BY:  JEREMY P. ROBINSON, ESQ.
 8
 9    GRANT & EISENHOFER P.A.
      Attorneys for Lead Plaintiffs RH CAPITAL
10    ASSOCIATES LLC and PACIFIC INVESTMENT MANAGEMENT
      COMPANY LLC and CO-LEAD COUNSEL for the PUTATIVE
11    CLASS
          Chase Manhattan Centre
12        1201 North Market Street
          Wilmington, DE 19801
13
      BY:  CHRISTINE MACKINTOSH, ESQ.
14
15
16    QUINN EMANUEL URQUHART OLIVER
      & HEDGES, LLP
17    Attorneys for REFCO ESTATE
          51 Madison Avenue, 22nd Floor
18        New York, NY 10010
19    BY:  SASCHA N. RAND, ESQ.
             -and-
20           NICHOLAS J. CALAMARI, ESQ.

21          -AND-

22    MILBANK TWEED HADLEY & McCLOY LLP
      Attorneys for REFCO ESTATE
23        One Chase Manhattan Plaza
          New York, New York 10005
24    BY:  SANDER BAK, ESQ.
25
```

3

```
 1
 2    A P P E A R A N C E S (Continued):
 3    WINSTON & STRAWN LLP
      Attorneys for Defendant GRANT THORNTON LLP
 4        200 Park Avenue
          New York, NY 10166
 5
      BY:  CALVIN K. KOO, ESQ.
 6          -and-
          DAVID MOLLON, ESQ.
 7
 8
      WILMER CUTLER PICKERING HALE and DORR LLP
 9    Attorneys for the UNDERWRITER Defendants and the
      WITNESS
10        399 Park Avenue
          New York, NY 10022
11
      BY:  ROSS E. FIRSENBAUM, ESQ.
12          -and-
          MARGAUX HALL, ESQ.
13
14
      LATHAM & WATKINS LLP
15    Attorneys for Defendant ERNST & YOUNG LLP
          53rd at Third
16        885 Third Avenue
          New York, NY 10022-4802
17
      BY:  CHRISTOPHER HARRIS, ESQ.
18
19
      SHAPIRO FORMAN ALLEN & SAVA LLP
20    Attorneys for Defendants JOSEPH J. MURPHY and
      GERALD M. SHERER
21        380 Madison Avenue
          New York, NY 10017
22
      BY:  MATTHEW J. SAVA, ESQ.
23
24
25
```

4

```
 1
 2    A P P E A R A N C E S (Continued):
 3    PAUL, WEISS, RIFKIND, WHARTON &
      GARRISON LLP
 4    Attorneys for the THL Parties and the Audit
      Committee Defendants
 5        1285 Avenue of the Americas
          New York, NY 10019
 6
      BY:  WALTER RIEMAN, ESQ.
 7          -and-
          PHILANDER HUYNH, ESQ.
 8
 9
      MARINO, TORTORELLA & BOYLE, P.C.
10    Attorneys for LIBERTY CORNER CAPITAL STRATEGIES
      and WILLIAM PIGOTT
11        437 Southern Boulevard
          Chatham, New Jersey 07928-1488
12
      BY:  JOHN D. TORTORELLA, ESQ.
13
14
      GIBSON DUNN & CRUTCHER LLP
15    Attorneys for MARK CAVANAUGH and BRIAN OWENS
          200 Park Avenue
16        New York, New York 10166
17    BY:  DAVID J. KERSTEIN, ESQ.
             -and-
18        KENNETH JUAN FIGUEROA, ESQ. (p.m. only)
19
20    FRIEDMAN & WITTENSTEIN
      Attorneys for Defendant WILLIAM M. SEXTON
21        600 Lexington Avenue
          New York, NY 10022
22
      BY:  IVAN KLINE, ESQ.
23
24
25
```

45

```
1              SANTO C. MAGGIO
2         MS. RENDON:  Objection to
3    form.
4         A.    I mentioned with the FCM that
5    we took $25 million out of the segregated
6    accounts and sent it to Refco Capital
7    Corp.
8         Q.    Did you take that money
9    directly out of the segregated account or
10   did you have to transfer it somewhere
11   first before you could use it?
12        A.    We transferred it to Refco
13   Capital.
14        Q.    Refco Capital Corporation or
15   Refco Capital Markets?
16        A.    Actually Refco Capital Corp.
17        Q.    And what was Refco Capital
18   Corporation?
19        A.    It was a nonregulated entity
20   in Refco that handled the treasury and
21   financing and banking arms or cash
22   management arms -- cash management for
23   Refco Group in the entire '90s and early
24   2000s.
25        Q.    Did Refco Capital Corp. serve
```

46

```
1              SANTO C. MAGGIO
2    as the bank of Refco?
3         A.    Yes.
4         Q.    And could you describe for me
5    a little bit about what that means?
6         A.    Refco had a number of
7    subsidiaries.  Most of those subsidiaries
8    were operating companies that transacted
9    businesses with clients, as well as banks
10   and broker/dealers.  So on every day
11   there was what we had a settlement.  So
12   because each company was working very
13   thin as it relates to its own cash
14   reserves, each company was instructed to,
15   if they had any extra money to send it to
16   RCC, Refco Capital Corp.
17        So at the end of the day each
18   company had needs and also had extra
19   money.  And so they informed RCC what
20   their needs would be for daily settlement
21   or if they were going to send them any
22   extra money that they may have from its
23   settlement.
24        Q.    What was the primary source of
25   funding for Refco Capital Corp.?
```

47

```
1              SANTO C. MAGGIO
2         A.    Excuse me?
3         Q.    Let me re-ask the question.
4    I'll ask a different question.
5         What was the primary source of
6    funding for Refco Capital Corp.?
7         A.    The largest, the largest
8    lender or largest funder for Refco
9    Capital Corp. was Refco Capital Markets.
10        Q.    And I think you mentioned
11   earlier that was the Bermuda entity;
12   right?
13        A.    Yes.
14        Q.    And it was unregulated; right?
15        A.    Yes.
16        Q.    Did Refco Capital Markets or
17   RCM, have employees in Bermuda?
18        A.    For a period of time.
19        Q.    For what period of time?
20        A.    From 1995 through 2001 or
21   2002.
22        Q.    And during that period of
23   time, 1995 through 2001 or 2002, did
24   Refco Capital Markets have operations in
25   Bermuda?
```

48

```
1              SANTO C. MAGGIO
2         A.    Yes.
3         Q.    And what were those
4    operations?
5         A.    You know, primarily the
6    operations were FX, foreign exchange,
7    where we had a group of traders and we
8    also had the back office.  And then we
9    also had a small securities group there
10   where the traders were there but the back
11   office operations were handled in New
12   York, except for the margin department,
13   which was in Bermuda.
14        Q.    Did the operations in --
15   strike that.
16        Did RCM's operations in
17   Bermuda cease in 2001 or 2002?
18        A.    Yes.
19        Q.    And how did that come about?
20        A.    I became president of Refco
21   Capital Markets in 2002.  Or 2000.  And
22   decided that I was going to close the
23   operations.  And move -- well, there are
24   two things.  One, as I closed the
25   securities operations sooner than that,
```

49

```
 1              SANTO C. MAGGIO
 2   it was '97 or '98.  And the FX operations
 3   or the FX trading group, there was no
 4   reason for them to be there, and I just
 5   moved them out in that year.
 6        Q.   Why was there no reason for
 7   them to be there?
 8        A.   Well, originally our largest
 9   client was in Bermuda.  Both for foreign
10   exchange and also for securities.  And it
11   was good business to stay close to them.
12   However, those clients left the business.
13   And now it was just nothing but a party
14   for everyone there, so I decided to shut
15   them down.
16        Q.   So in other words, there was
17   nothing for the employees to do in
18   Bermuda anymore?
19        A.   Except to go to the beach and
20   go fishing and ride their mopeds.
21        Q.   Was there at that point any
22   discussion at Refco about repatriating
23   RCM to the United States?
24             MR. RIEMAN:  Objection to
25        form.
```

50

```
 1              SANTO C. MAGGIO
 2        A.   Repatriating, excuse me, what
 3   do you mean by repatriating?
 4        Q.   Did RCM remain a Bermuda
 5   entity up until the time you left?
 6             MR. RIEMAN:  Objection to
 7        form.
 8        A.   Yes.
 9        Q.   Was there any discussion about
10   making it a United States entity at that
11   point in time?
12        A.   Yes.
13        Q.   And what were those
14   discussions?
15        A.   When we closed the securities
16   operations, not the foreign exchange, the
17   securities operations in the '90s, I was
18   very concerned that we would lose the
19   status of being an offshore
20   broker/dealer.  And if we lost that
21   status, we may have to regulate -- we
22   would have to make it an onshore
23   broker/dealer.  In which case we would
24   have to be regulated.  And then we would
25   lose the customer funds that we needed to
```

51

```
 1              SANTO C. MAGGIO
 2   run Refco Group's businesses, as well as
 3   may have to put up additional capital to
 4   support the business.
 5        Q.   Was there anyone within Refco
 6   who suggested that they should make RCM
 7   an onshore broker/dealer?
 8        A.   In the mid-'90s?
 9        Q.   Um-hum.
10        A.   I'm trying to think when I
11   shut down that operations.  I know there
12   was concern in our Miami office from the
13   people there.
14        Q.   What was the concern raised by
15   the people in the Miami office?
16        A.   That because the business was
17   being conducted out of Miami and New
18   York, that it had to be a regulated
19   broker/dealer.
20        Q.   Who was raising those
21   concerns?
22        A.   Just people in my office.  I
23   don't recall who in the Miami office.
24        Q.   Do you recall the names of
25   anyone who raised the concern?
```

52

```
 1              SANTO C. MAGGIO
 2        A.   It could have been Victor
 3   Henriquez, Sixto Campano.
 4        Q.   Who were they?
 5        A.   At that time Sixto was the
 6   second in charge of Miami, it was Hencorp
 7   Becstone/Miami office.  And Victor
 8   Henriquez I think was CEO.
 9        Q.   And were these two individuals
10   who thought that RCM should be made a
11   United States entity?
12        A.   Or that we should conduct the
13   business out of Refco Securities, which
14   was the U.S. broker/dealer.
15        Q.   Anybody else at Refco other
16   than those two individuals at any time
17   who suggested that RCM should be made an
18   onshore broker/dealer?
19        A.   Yes.
20        Q.   And who was that?
21        A.   Well, in the early 2000s, we
22   had an incident with, there was an
23   investigation regarding a stock called,
24   trading in a stock called Sedona.  And at
25   that time I think Mr. Klejna was
```