UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :

In re REFCO, INC. SECURITIES LITIGATION : 07 MDL 1902 (JSR)
                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :

This document relates to:
                          : 07 Civ. 8165 (JSR)

MARC S. KIRSCHNER,
As Trustee of the Refco Private Actions Trust :
                          :

Plaintiff,
                          :

          -v-                :

PHILLIP R. BENNETT, SANTO C. MAGGIO, :
ROBERT C. TROSTEN, MAYER BROWN,
LLP, MAYER BROWN INTERNATIONAL :
LLP, and GRANT THORNTON LLP,
                          :

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GRANT THORNTON LLP'S COMBINED MOTIONS IN LIMINE

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant Grant Thornton LLP*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .....................................................................................................................1

    A.    The Underlying Facts ...........................................................................................1

    B.    The Work Performed By Grant Thornton ..............................................................2

    C.    The Sole Remaining Theory in this Case ...............................................................3

MOTIONS IN LIMINE .........................................................................................................4

I.    MOTION IN LIMINE TO PRECLUDE REFERENCES TO OTHER
    "SCANDALS"  OR TO PROBLEMS IN THE AUDITING PROFESSION ....................4

    ARGUMENT .........................................................................................................4

II.    MOTION IN LIMINE TO PRECLUDE USE OF THE TERM
    "PONZI SCHEME" ...............................................................................................7

    ARGUMENT .........................................................................................................8

III.    MOTION IN LIMINE TO EXCLUDE EVIDENCE ABOUT
    AND REFERENCES TO AUDITING STANDARDS .................................................11

    ARGUMENT .........................................................................................................13

IV.    MOTION IN LIMINE TO EXCLUDE GRANT THORNTON'S
    AUDIT MANUAL...................................................................................................18

    ARGUMENT .........................................................................................................19

V.    MOTION IN LIMINE TO EXCLUDE THE SEC ORDER RELATING
    TO MCA FINANCIAL CORPORATION ..................................................................21

    ARGUMENT .........................................................................................................21

VI.    MOTION IN LIMINE TO PRECLUDE A DEMAND FOR
    PUNITIVE DAMAGES .........................................................................................25

    ARGUMENT .........................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Agape Litig.*,
   773 F. Supp. 2d 298, 309 (E.D.N.Y. 2011) ........................................................14
   773 F. Supp. 2d at 309 .....................................................................................17

*In re Assisted Living Concepts Sec. Litig.*,
   No. 99-167-AA, 2001 U.S. Dist. LEXIS 12864, at * 3–4 (D. Or. Apr. 13, 2001) ................19

*Balaber-Strauss v. Lawrence*,
   264 B.R. 303, 305-06 (S.D.N.Y. 2001) .................................................................9

*Brueggemeyer v. American Broadcasting Companies, Inc.*,
   684 F. Supp. 452, 465-66 (N.D. Tex. 1988) ..........................................................17

*Capital Management Select Fund, Ltd. v. Bennett*,
   680 F.3d 214, 227-32 (2d Cir. 2012) .....................................................................1

   680 F.3d at 225-33 .........................................................................................10

*In re Cardinal Health Inc. Sec. Litig.*,
   426 F. Supp. 2d 688, 779 (S.D. Ohio 2006) ..........................................................22

*CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assocs.*,
   411 B.R. 591, 605–06 (N.D. Ill. 2009) ...................................................................5

*China Trust Bank of N. Y. v. Standard Chartered Bank, PLC*,
   981 F. Supp. 282, 289 (S.D.N.Y. 1997)............................................................ 26-28

*Command Cinema Corp. v. VCA Labs, Inc.*,
   464 F. Supp. 2d 191, 205 (S.D.N.Y. 2006)............................................................28

*In re Conticommodity Servs., Inc. Sec. Litig.*,
   MDL No. 644, 1988 WL 56172, at *1-2 (N.D. Ill. May 25, 1988) ........................... 19-20

*CPC Int'l v. Northbrook Excess & Surplus Inc.*,
   144 F.3d 35, 45 (1st Cir. 1998)............................................................................24

*Davis v. Coopers & Lybrand*,
   No. 90 C 7173, 1992 WL 159504, at * 1 (N.D. Ill. June 25, 1992).............................19

*Donell v. Kowell*,
   533 F.3d 762, 767 n.2 (9th Cir. 2008) ....................................................................9

*Ejchorszt v. Daigle*,
No. 3:02-cv-01350 (CFD), 2009 WL 1687930, at *1 (D. Conn. June 16, 2009)...................29

*Fidel v. Farley*,
392 F.3d 220, 233 (6th Cir. 2005) .......................................................................................22

*Filler v. Hanvit Bank*,
339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004)............................................................................15

*Fortnow v. Hughes Hubbard & Reed, LLP*,
10 Misc.3d 1064(A), 814 N.Y.S.2d 561, 2005 WL 3506955, at *5 (Sup. Ct. N.Y.
County Nov. 30, 2005)................................................................................................... 26-27

*Fraternity Fund v. Beacon Hill Asset Mgmt., LLC*,
479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007)...................................................................... 15-16

*Harris v. Pacific Floor Mach. Mfg.*,
856 F.2d 64, 67 n.2 (8th Cir. 1988) .....................................................................................22

*Harris v. Quadracci*,
856 F. Supp. 513, 519 (E.D. Wis. 1994)......................................................................... 15-16

*Hart v. Internet Wire, Inc.*,
145 F. Supp. 2d 360, 369–70 (S.D.N.Y. 2001)......................................................................18
145 F. Supp. 2d at 369–70 ....................................................................................................20

*Home Ins. Co. v. Am. Home Prods. Corp*
75 N.Y.2d 196, 203, 550 N.E.2d 930, 934 (1990) ...............................................................26

*JP Morgan Chase Bank v. Winnick*,
406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005)............................................................... 14-15

*Kelly v. Defoe Corp.*,
223 A.D.2d 529, 529, 636 N.Y.S.2d 123, 124 (2d Dep't 1996)...........................................26

*Kolbeck v. LIT Am., Inc.*,
939 F. Supp 240, 246 (S.D.N.Y. 1996)................................................................................13

*Krys v. Sugrue*,
No. 08-civ-3065, Dkt. No. 622 (July 30, 2012) (memorandum order)............................ 13-16

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887, 893 (2d Cir. 1976).........................................................................................23

*Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*,
No. 95 Civ 8450 (AGS) (THK), 1998 WL 422482, at *8 (S.D.N.Y. July 22, 1998).............26

*Marcoux v. Farm Serv. and Supplies, Inc.*,
   283 F. Supp. 2d 901, 907–08 (S.D.N.Y. 2003)......................................................26

*In re MTBE Prods. Liability Litig.*,
   517 F. Supp. 2d 662, 666-67 (S.D.N.Y. 2007) .....................................................25
   517 F. Supp. 2d at 672 ...........................................................................................28

*Novak v. Kasaks*,
   216 F.3d 300, 308 (2d Cir. 2000)...........................................................................16

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011)............................................................23

*Potenza v. City of N.Y., Dep't of Transp.*,
   Nos. 04-cv-2434, 03-cv-2430 (KAM) (RLM), 2009 WL 2156917, at * 3 (E.D.N.Y.
   July 15, 2009)..........................................................................................................13

*Procter & Gamble Co. v. Haugen*,
   No. 1:95-CV-94 TS, 2007 WL 701812, at *4 (D. Utah Mar. 2, 2007)...................11

*Sabratek Liquidating LLC v. KPMG LLP*,
   No. 01 C 9582, 2003 WL 22715820, at *6 (N.D. Ill. Nov. 18, 2003) ......................6

*Sanders v. Madison Sq. Garden, L.P.*,
   525 F. Supp. 2d 364, 370 (S.D.N.Y. 2007)............................................................25

*In re Safety-Kleen Bondholders Litig.*,
   No. 3:00-1145-17, 2005 WL 6075368, at *5 (D.S.C. Feb. 4, 2005) ........................6

*Smith v. Lightning Bolt Productions, Inc.*,
   861 F.2d 363, 373-74 (2d Cir. 1988) .....................................................................29

*Stoney v. Cingular Wireless LLC*,
   No. 06-cv-02003, 2009 WL 4250069, at *2 (D. Colo. Nov. 25, 2009)....................6

*Taylor v. Canadian Nat'l Ry. Co.*,
   301 F.2d 1, 2 (2d Cir. 1962)......................................................................................6

*T.D.W. v. Riverside County*,
   No. EDCV 08-232 CAS (JWJ), 2009 WL 2252072, at *9 (C.D. Cal. July 27, 2009) ............29

*In re Tenet Healthcare Corp. Sec. Litig.*,
   No. CV 02-8462-RSWL (RZ), 2007 WL 5673884, at *1-2 (C.D. Cal. Dec. 5, 2007)............23
   2007 WL 5673884, at *2 ..........................................................................................24

*Thomas v. Clay*,
   No. 08 CV 4456, 2010 WL 2136663, at *9 (N.D. Ill. May 25, 2010)....................15

*Tonnemacher v. Sasak*,
   155 F.R.D. 193, 195 (D. Ariz. 1994) ..................................................................19

*Tyson v. N.Y.C. Hous. Auth.*,
   369 F. Supp. 513, 518–19 (S.D.N.Y. 1974) ...........................................................7

*United States v. Awadallah*,
   436 F.3d 125, 133–35 (2d Cir. 2006) ..................................................................13
   436 F.3d at 133–35 ............................................................................................16

*United States v. Bari*,
   750 F.2d 1169, 1179 (2d Cir. 1984) ....................................................................17

*United States v. Bouye*,
   688 F.2d 471, 476 (7th Cir. 1982) ......................................................................17

*United States v. Catano–Alzate*,
   62 F.3d 41, 43 (2d Cir. 1995) .............................................................................14

*United States v. Curley*,
   639 F.3d 50, 57 (2d Cir. 2011) ...........................................................................21

*United States v. Cushing*,
   No. S3 00 CR 1098 (WHP), 2002 WL 1339101, at *3 (S.D.N.Y. June 18, 2002) ........... 21-22

*United States v. Edwards*,
   631 F.2d 1049, 1051 (2d Cir. 1980) ....................................................................13

*United States v. Ferrarini*,
   219 F.3d 145, 154 (2d Cir. 2000) ........................................................................13

*United States v. Hartstein*,
   500 F.3d 790, 798 (8th Cir. 2007) ........................................................................8

*United States v. Hatfield*,
   685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) ..........................................................22

*United States v. Hill*,
   322 F.3d 301, 306 (4th Cir. 2003) ......................................................................24

*United States v. Pierre*,
   285 Fed. App'x 828, 830 (2d Cir. 2008) .......................................................... 13-14

*United States v. Shelton*,
   No. 05-4342-CR, 2006 WL 3406840, at *2 (2d Cir. Nov. 22, 2006) ......................14

*United States v. Shoreline Motors*,
   413 Fed. App'x 322, 326 (2d Cir. 2011) ..............................................................14

v

*United States v. Wassner*,
141 F.R.D. 399, 404–05 (S.D.N.Y. 1992) ..............................................................7

*Verdekel v. County of Los Angeles*,
No. CV06-01518-RT, 2009 WL 4058592, at *2 (C.D. Cal. May 7, 2009) ............................29

*West v. Goodyear Tire & Rubber Co.*,
973 F. Supp. 385, 387–89 (S.D.N.Y. 1997)..............................................................26

*Wolff v. Cash 4 Titles*,
351 F.3d 1348, 1350 n.2 (11th Cir. 2003) ..............................................................9

*In re Worlds of Wonder Sec. Litig.*,
147 F.R.D. 214, 216 (N.D. Cal. 1992)..............................................................19
147 F.R.D. at 217 ..............................................................20

*Zucker v. Sasaki*,
963 F. Supp. 301, 308 (S.D.N.Y. 1997)..............................................................28

## OTHER AUTHORITIES

Fed. R. Evid. 401 ..............................................................5

Fed. R. Evid. 402 .............................................................. passim

Fed. R. Evid. 403 .............................................................. passim

Fed. R. Evid. 404(b)..............................................................21, 22

Fed. R. Evid. 407 ..............................................................23

Fed. R. Evid. 408 ..............................................................21, 23, 24

*Black's Law Dictionary* 1198 (8th ed. 2004)..............................................................8-9

WRIGHT & MILLER, FED. PRAC. & PROC. § 5216 nn.30, 36..............................................................16-17

## PRELIMINARY STATEMENT

In accordance with this Court's individual practices, Grant Thornton LLP ("Grant Thornton") hereby makes six motions in limine to exclude evidence and arguments from the September 4 trial.  The memoranda supporting these motions are presented here, in a single combined document, for the Court's convenience.  These motions seek the following relief: (i) to preclude references to other "scandals" or to problems in the auditing profession; (ii) to preclude use of the term "Ponzi scheme"; (iii) to exclude evidence about and references to auditing standards—and Grant Thornton's alleged noncompliance with those standards—as irrelevant, time-consuming, and likely to confuse the issues; (iv) to exclude Grant Thornton's internal audit manual; (v) to exclude an SEC settlement order that relates to Grant Thornton's audits for a different audit client during a different time period; and (vi) to preclude any demand for punitive damages.  The arguments and authorities supporting each motion are set forth in turn below, after a short discussion providing the appropriate background for the case.

## BACKGROUND

### A.    The Underlying Facts

This case arises out of the collapse of Refco, which was once the world's largest broker for exchange-related derivatives and a major provider of brokerage services in the fixed income and foreign exchange ("FX") markets.  Refco subsidiary Refco Capital Markets Ltd. ("RCM") was and represented itself to be an unregulated offshore broker-dealer.  RCM held customer assets in unsegregated accounts, and it engaged in the common practice of hypothecation, which involves using customer assets for financing the broker's own business activities.  As the Second Circuit has held, RCM's practice of hypothecation—including "upstreaming" customer assets to other Refco entities—was lawful and consistent with the terms of RCM's customer agreements. *See Capital Mgmt. Select Fund, Ltd. v. Bennett*, 680 F.3d 214, 227-32 (2d Cir. 2012).

1

In October 2005, Refco issued a press release disclosing a $430 million related-party receivable that should have been disclosed in Refco's prior consolidated financial statements. The receivable was owed by RGHI, an entity owned and controlled by Refco CEO Phil Bennett. Although the receivable had since been paid down, the discovery meant that Refco's prior consolidated financial statements should no longer be relied upon.

Shortly thereafter, Bennett was arrested on charges of fraud. He and other Refco executives are now facing years in prison for crimes that include a scheme to deceive Refco's outside auditor, Grant Thornton.

After Bennett's arrest, and after receiving little reassurance from management, some customers began approaching RCM and demanding withdrawal of their assets. A classic "run on the bank" ensued, and within a few days, Refco announced a moratorium on withdrawals from RCM. Both Refco and RCM (along with other subsidiaries) were soon forced to file for bankruptcy protection. Plaintiff Marc Kirschner was ultimately appointed as trustee of the trusts created in Refco's bankruptcy, including the Private Actions Trust.

**B.     The Work Performed By Grant Thornton**

Grant Thornton served as Refco's outside auditor for the fiscal years 2003-2005. It issued unqualified audit opinions on Refco's consolidated financial statements, which were filed with the SEC in connection with Refco's issuance of securities in its leveraged buy-out in August 2004 ("LBO") and its initial public offering in August 2005 ("IPO"). These consolidated financial statements necessarily represented the financial condition of Refco as a whole—treating all of its subsidiaries as part of the same, undivided organization, without regard to the movement of money from one subsidiary to another. Accordingly, these financial statements did not (and did not need to) reflect the intercompany loans between RCM and other Refco entities.

Grant Thornton also audited the financial statements of RCM as a stand-alone entity. But because RCM was neither a public company nor regulated by the SEC, its own financial statements (and Grant Thornton's audit opinion thereon) were never filed publicly or provided to any regulator.  In fact, there was no requirement that RCM have audited financial statements at all.  Grant Thornton provided its opinion on those financial statements privately, to Refco's and RCM's management.  After extensive discovery, including depositions of customers who have claims at issue, there is no evidence that these customers—or anyone else outside Refco and RCM—reviewed and relied on either the opinions or the RCM financial statements themselves.

### C.    The Sole Remaining Theory in this Case

Kirschner's Fifth Claim for Relief in this case—the only count remaining against Grant Thornton—encompasses the assigned claims of roughly 48 FX customers, each of whom made deposits into RCM accounts at some point between the LBO (August 2004) and the bankruptcy (October 2005).  Kirschner asserted these claims against Refco's outside auditor Grant Thornton, Refco's outside counsel Mayer Brown, and various Refco insiders, including Phil Bennett.  At present, only Grant Thornton remains an active defendant.

Because these customers made their deposits with RCM, Kirschner has focused his lawsuit on RCM as a stand-alone entity.  He claims that RCM fraudulently induced the customers to make deposits at RCM by silently accepting the deposits at a time when it was "hopelessly insolvent," and that Grant Thornton aided and abetted that fraudulent inducement by issuing unqualified audit opinions on RCM's privately issued, stand-alone financial statements. R&R on Grant Thornton's Motion for Summary Judgment at 12 (Jun. 18, 2012) ("SJ R&R"). Under the Court's orders, Kirschner's claim requires proof that RCM was "hopelessly insolvent" and had a duty to disclose such condition under the common law; that it committed fraud by accepting deposits without disclosing this information; that Grant Thornton knew or consciously

3

avoided knowing that RCM was "hopelessly insolvent" and was breaching a duty to disclose; that each customer was injured; and that Grant Thornton substantially assisted or "caused" each customer's harm. *See* R&R on Motions to Dismiss at 10-14, 33, 36-39 (June 3, 2010) ("MTD R&R"), *adopted* Dec. 13, 2010.

## MOTIONS IN LIMINE

### I.   MOTION IN LIMINE TO PRECLUDE REFERENCES TO OTHER "SCANDALS"  OR TO PROBLEMS IN THE AUDITING PROFESSION

Kirschner and his witnesses should also be precluded from presenting evidence about, or referring to, other alleged accounting or corporate "scandals"—such as those involving Enron and Arthur Andersen, MF Global, Bernie Madoff, and Peregrine—and/or from suggesting to the jury that it use its verdict to send a message to the auditing profession more broadly. Unfortunately, tactics like these have become commonplace in lawsuits against auditors.  In this case, the danger is not merely hypothetical; Kirschner's experts have already referenced events like these in their written reports—even though these events have no conceivable relevance to the events at Refco and, in many instances, came to light long after the events relevant here. Such references are irrelevant and highly prejudicial.  Under Rules 402 and 403, they should be excluded from trial.

### ARGUMENT

In recent years, a number of corporate accounting "scandals" have received significant coverage in the media.  Kirschner's accounting expert Douglas Carmichael notes, for example, that Arthur Andersen LLP "effectively disbanded in the aftermath of accounting scandals and recent undetected fraudulent financial reporting at several clients including Enron and

Worldcom, and a history of similar scandals, such as Waste Management." Ex. A[1] at 13

(excerpts from Updated Expert Report of Douglas R. Carmichael (Dec. 2, 2011)).  The case of

MF Global has received particular notoriety in recent months, as the former governor of New

Jersey was called to testify before Congress.  These events were widely covered in the popular

press and may be familiar even to the most non-business-oriented juror.

Evidence of other corporate and accounting scandals is irrelevant, prejudicial, and

inadmissible.  Such evidence does not tend to prove or disprove a material fact.  *See* Fed. R.

Evid. 401, 402.  For this case, the only material facts are those that relate to RCM's alleged

failure to disclose its hopeless insolvency, Grant Thornton's alleged knowledge or conscious

avoidance of RCM's alleged breach of a duty to disclose, why these customers chose RCM, and

whether Grant Thornton's audit opinions on RCM played any role at all in the alleged fraudulent

inducement.  References to other frauds would be utterly irrelevant and inappropriate.  And even

if these references were somehow relevant, they would unfairly and irreparably prejudice Grant

Thornton.  Fed. R. Evid. 403 (even relevant evidence may be excluded "if its probative value is

substantially outweighed by a danger of . . . unfair prejudice" or "confusing the issues").  Grant

Thornton's ability to obtain a fair trial would be greatly prejudiced if Kirschner or his witnesses

were to refer to such scandals, to imply some connection between such scandals and Grant

Thornton's auditors, or to suggest (explicitly or not) that the jury send some broader message to

the auditing profession through its verdict.

Courts around the nation have excluded such "other scandals" evidence on precisely this

basis.  *See, e.g.*, *CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assocs.*, 411

B.R. 591, 605–06 (N.D. Ill. 2009) (finding that "the introduction of evidence of other corporate

---

[1]   All exhibits supporting these motions are attached to the Declaration of Linda T. Coberly that accompanies this combined brief.  The exhibits are cited herein as "Ex ___."

scandals or infamous suits [such as Enron and Worldcom] is not relevant and, even if relevant, highly prejudicial"); *In re Safety-Kleen Bondholders Litig.*, No. 3:00-1145-17, 2005 WL 6075368, at *5 (D.S.C. Feb. 4, 2005) (granting motion in limine to exclude "evidence about widely-publicized accounting scandals [because they] are not relevant to this matter, and even if they were, that introduction of such evidence would be unduly prejudicial"); *Sabratek Liquidating LLC v. KPMG LLP*, No. 01 C 9582, 2003 WL 22715820, at *6 (N.D. Ill. Nov. 18, 2003) ("[T]he improper conduct of other firms . . . has little, if any relevance to KPMG's conduct at issue . . . [and] [t]he probative value of references to the accounting scandals of the past few years is substantially outweighed by the risk of unfair prejudice that could be given to such evidence by the jury.").

Any suggestion that the jury should redress problems in the auditing profession generally or "send a message" with its verdict would be equally improper. *See Taylor v. Canadian Nat'l Ry. Co.*, 301 F.2d 1, 2 (2d Cir. 1962) ("A verdict based on appeals to passion and prejudice cannot stand.") (internal citation omitted); *Stoney v. Cingular Wireless LLC*, No. 06-cv-02003, 2009 WL 4250069, at *2 (D. Colo. Nov. 25, 2009) (precluding plaintiff from requesting "that the jury 'send a message' to Defendant"). The verdict in this case must be based on the conduct of Grant Thornton and RCM, not some third party not before the court.

This case requires a heightened vigilance against such improper remarks, as the particular circumstances here are bound to tempt Kirschner. Mark Ramler was formerly employed at Arthur Andersen. But there is no legitimate reason to reference the "history of scandals" that befell Ramler's old firm. Ex. A at 13 (Carmichael report). Nor is it appropriate to reference how that firm "blew up" or "imploded." Ex. B at 169:17-170:11; 185:18-186:2 (excerpts from deposition of Robert Trosten, designated for trial by Kirschner (over Grant Thornton's

6

objection)).  Neither Ramler nor the Refco engagement had any role in Andersen's demise.  Any attempt by Carmichael or Trosten to imply a connection between Ramler and these events would be a perfect example of the kind of mischief that Rule 403 is designed to prevent.  *See United States v. Wassner*, 141 F.R.D. 399, 404–05 (S.D.N.Y. 1992) ("Guilt by association is just what Fed. R. Evid. 403 was intended to exclude."); *Tyson v. N.Y.C. Hous. Auth.*, 369 F. Supp. 513, 518–19 (S.D.N.Y. 1974) ("[G]uilt by association is antithetical to the concepts of personal guilt and individual responsibility which are touchstones of the Anglo-American system of law.").

For all these reasons, Kirschner may also be tempted to reference the troubles at MF Global, a brokerage firm that acquired certain aspects of Refco's operations after its bankruptcy.  But events at MF Global in 2011 have no bearing whatsoever on how RCM conducted its business or whether it was hopelessly insolvent in 2004 and 2005, when the FX customers made their deposits.  Accordingly, evidence or allegations concerning MF Global has no place in this case.

For all these reasons, Kirschner should be barred from making any reference to any other corporate or accounting "scandals," including those befalling Arthur Andersen and MF Global, and from making any suggestion to the jury that this case implicates a broader problem in the auditing profession—or that it should use its verdict in this case to "send a message" to the profession at large.  Nor should Kirschner be allowed to reference the demise or "implosion" of Arthur Andersen.  All of these tactics would be fundamentally unfair and highly prejudicial and are barred under Rules 402 and 403.

## II.    MOTION IN LIMINE TO PRECLUDE USE OF THE TERM "PONZI SCHEME"

If his briefs in this case are any indication, Kirschner intends to mislead the jury by attaching an inflammatory, inaccurate label to RCM's conduct:  "Ponzi scheme."  In his summary judgment brief, for instance, Kirschner used this label 15 times—13 times in text, plus once in a quote and once in a heading.  His deposition designations show that he plans to

continue to press this misnomer at trial—including through the testimony of the late Santo Maggio, who used the term at his deposition based on a misleading definition provided by Kirschner's counsel.

This tactic cannot be allowed.  Kirschner must prove his claims based on admissible evidence regarding what actually happened at RCM and Refco—not based on shortcuts and inflammatory labels.  The critical question underlying the primary violation in this case is whether RCM was hopelessly insolvent; disputes about whether RCM does or does not meet the definition of a Ponzi scheme will be nothing more than a distraction.  Any reference to Ponzi schemes would risk inflaming the jury by linking RCM and Grant Thornton to some of most well-known frauds in recent history, none of which has anything to do with this case.  And in any event, RCM was ***not*** a Ponzi scheme;  it was a real business with real operations, paying real returns on customers' investments.  Under Rules 402 and 403, the term "Ponzi scheme" should be excluded from trial as irrelevant and highly prejudicial.

## ARGUMENT

The term "Ponzi scheme" has been used and misused so often that it no longer has any useful meaning.  *United States v. Hartstein*, 500 F.3d 790, 798 (8th Cir. 2007) ("Ponzi scheme" label "is in such wide use in such diverse settings as to be of little practical assistance").  The authorities that provide a definition say that a Ponzi scheme is characterized by a promise of "artificially high" profits, generally without any real operations or revenue-producing activity at all.  *Black's Law Dictionary*, for example, defines a Ponzi scheme as follows:

> A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments.  Money from the new investors is used directly to repay or pay interest to earlier investors, usu. without any operation or revenue-producing activity other than the continual raising of new funds. . . .

*Black's Law Dictionary* 1198 (8th ed. 2004); *accord Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1350

n.2 (11th Cir. 2003) (Charles Ponzi's fraud was to promise high returns when he "never invested

the funds at all").  These artificial profits in turn "cultivat[e] an illusion that a legitimate profit-

making business opportunity exists and induc[e] further investment" based on the supposed

"opportunity" to earn similar (artificially) high profits.  *Donell v. Kowell*, 533 F.3d 762, 767 n.2

(9th Cir. 2008) (internal quotation marks and citation omitted) (emphasis added); *see also*

*Balaber-Strauss v. Lawrence*, 264 B.R. 303, 305-06 (S.D.N.Y. 2001) ("A Ponzi scheme is an

investment scheme which is not supported by a legitimate underlying business venture.").

As a factual matter, of course, RCM was ***not*** a Ponzi scheme under this definition.  RCM

conducted a real business with real operations—a vibrant, industry-leading trading business that

went well beyond "the continual raising of new funds."  *Black's, supra*.  It did not merely

purport to be a broker-dealer; it ***was*** a broker-dealer.  And its returns were not "artificially high."

*Id.*  Kirschner himself has admitted that "[t]here was nothing unique about the foreign exchange

services or trading that RCM provided to its FX customers that another broker-dealer could not

have offered."  Kirschner's Counterstatement of Material Facts ¶ 77 ("CSMF"), MDL Dkt. No.

1466 (filed Apr. 16, 2012).

Although Santo Maggio testified that RCM ***was*** a Ponzi scheme, any reference to this

testimony at trial would be utterly misleading.  The concept was introduced at the deposition by

Kirschner's counsel, who asked whether, in Maggio's view, it was "fair to describe RCM as

Ponzi Scheme."  *See* Ex. C at 286:3-5 (excerpts from deposition of the late Santo Maggio).

Maggio responded by saying "You have to define what a Ponzi Scheme is."  *Id.* at 286:8-9.

Kirschner's counsel then provided a definition significantly different from the one set forth

above, stating that a Ponzi scheme is where "clients or customers are made to believe that the

9

entity is solvent and deposits money with the entity, and all the entity is doing is running around giving customer A what customer B just put in, or a little bit of it, and giving customer C what customer B put into it a little bit, and basically upstreaming all the money for whatever use they want to put it to." *Id.* at 286:10-21 (statement by counsel, followed by defense objection).  Of course, that definition would apply to many modern financial institutions—and particularly those (like RCM) for which the practice of unlimited "upstreaming" is both lawful and fully disclosed. *Capital Mgmt.*, 680 F.3d at 225-33.  Maggio was told nothing about artificially high returns or the absence of real operations—each a key component of a true Ponzi scheme.  Maggio's adoption of the term thus simply parrots counsel's misleading definition; it does not show that RCM was, in fact, a Ponzi scheme—or even that Maggio believed it was at the time.

In any case, whether RCM was or was not a "Ponzi scheme" is irrelevant.  Kirschner's theory is that RCM committed fraud by failing to disclose "hopeless insolvency."  The merits of that theory will depend on the real facts at RCM—not on whether RCM's business was or was not like the fake postage stamp investment scheme run by Charles Ponzi.  Indeed, it is telling that Kirschner's insolvency expert never found it necessary or appropriate to refer to RCM as a Ponzi scheme.  Nor did the Special Master—even though his 24-page single-spaced R&R accepted many of the arguments in Kirschner's summary judgment brief, which used the term repeatedly.

Any reference to Ponzi schemes in this case would run afoul of Rule 403, which provides for the exclusion of evidence where the "probative value is substantially outweighed by a danger of . . . unfair prejudice . . . [or] wasting time."  Fed. R. Evid. 403.  To allow Kirschner and his witnesses to suggest that RCM is a Ponzi scheme would compel a distracting mini-trial on the merits of that characterization and would take the jury far afield from the central issues in the case.  If Grant Thornton were forced to contest whether RCM offered artificially high returns or

10

conducted legitimate business activity, that dispute would consume valuable time and resources without bringing the jury closer to resolving the key issue of RCM's financial condition. And references to a "Ponzi scheme" would link RCM—and by extension Grant Thornton—to the likes of Charles Ponzi and Bernie Madoff. The obvious effect would be guilt by association.

Kirscher must prove a primary violation here by introducing admissible evidence about what actually happened at RCM—not by throwing around baseless and inflammatory labels. Given the risk of confusion and prejudice, this label should be barred from the upcoming trial. *See Procter & Gamble Co. v. Haugen*, No. 1:95-CV-94 TS, 2007 WL 701812, at *4 (D. Utah Mar. 2, 2007) (precluding plaintiffs from introducing testimony concerning Ponzi schemes).

For the foregoing reasons, Grant Thornton respectfully requests that this Court enter an order precluding Kirschner and his witnesses from using the term "Ponzi scheme," including by introducing the recorded deposition testimony on that subject by Maggio.

### III.   MOTION IN LIMINE TO EXCLUDE EVIDENCE ABOUT AND REFERENCES TO AUDITING STANDARDS

The only claim left in this case is a claim of aiding and abetting, which requires a showing that Grant Thornton *knew* about the primary wrong. Courts in this Circuit disagree about whether this standard can be met with a showing of "conscious avoidance," as opposed to "actual knowledge." But under either formulation, the test is a *subjective* one, focused on what the defendant actually knew or was "conscious[ly]" aware had a high likelihood of being true. So, the evidence at trial on this issue—whether direct or circumstantial—must focus on what Grant Thornton's auditors subjectively believed.

Kirschner apparently has something different in mind. He plans to try this case to an *objective*, "should have known" standard, as if the case involved claims of negligence or constructive knowledge. He apparently intends to offer into evidence 64 trial exhibits that

11

consist of generally accepted auditing standards ("GAAS") or guidance developed by the American Institute of Certified Public Accountants ("AICPA"), plus 14 additional trial exhibits made up of chapters from Grant Thornton's internal, firm-wide auditing manual.  Ex. D (exhibit list).[2]  He also plans to call expert Douglas Carmichael, who will opine (among other things) that Grant Thornton's audits of Refco and RCM "substantially deviated from applicable professional standards" and that Grant Thornton "would have known" the truth if its audits had complied with GAAS.  *See* Ex. A at 39-44 (Carmichael report).

This evidence is all beside the point and threatens to confuse the jury and waste a tremendous amount of time.  Evidence about what Grant Thornton's auditors should have done and should have discovered is not probative of what the auditors ***actually*** did and ***actually*** discovered (or did not discover) during the course of their audits.  Further, to the extent that the professional standards have any probative value here at all, that value is substantially outweighed by the danger of unfair prejudice, confusion, and waste of time.  If this evidence were admitted, the trial would necessarily devolve into a dispute about whether the audits were, in fact, sub-standard in various specific respects.  And Carmichael's testimony (if credited) would leave the jury with the unmistakable impression that a substantial deviation from GAAS warrants a finding of liability, whether the Court's instructions on the law support that view or not.  Kirschner cannot be permitted to confuse the issues in this manner.  To avoid this distraction, Kirschner and his witnesses should be barred under Rules 402 and 403 from referring to auditing standards or offering such standards into evidence at trial.

---

[2]  The GAAS and AICPA exhibits include those marked as PTXs 793-838, 856, 870, 872-77, 880, 883, 1622, 1633, 1635, 1641, 1661, 1664, 1672, and 1673.  The audit manual exhibits are PTXs 517, 1296, 1297, 1298, 1634, 1636, 1639, 1640, 1665, 2007, 2008, 2009, 2010, and 2011.

## ARGUMENT

"[T]he court's determination of what constitutes 'relevant evidence' is guided by the nature of the claims and defenses in the cause of action." *Potenza v. City of N.Y., Dep't of Transp.*, Nos. 04-cv-2434, 03-cv-2430 (KAM) (RLM), 2009 WL 2156917, at * 3 (E.D.N.Y. July 15, 2009).  District courts have "broad discretion" to exclude evidence that is irrelevant under Rule 402. *United States v. Edwards*, 631 F.2d 1049, 1051 (2d Cir. 1980).  And of course, evidence that is otherwise admissible may still be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Fed. R. Evid. 403; *United States v. Awadallah*, 436 F.3d 125, 133–35 (2d Cir. 2006) (court has "broad discretion" to exclude evidence under Rule 403).

The first step, then, is to examine "nature of the claim[]."  There is only one claim left here:  a claim of aiding and abetting fraud.  As this Court recently held, "an aiding and abetting fraud claim requires showing that the defendant had knowledge of the underlying wrongful conduct."  Mem. Order at 3, *Krys v. Sugrue*, No. 08-civ-3065, Dkt. No. 622 (July 30, 2012) ("Mem. Order") (citing *Kolbeck v. LIT Am., Inc*., 939 F. Supp 240, 246 (S.D.N.Y. 1996)).  Courts in this Circuit disagree about whether this standard requires proof of "actual knowledge" or, rather, whether "conscious avoidance" is enough.  *Id.* (citing cases).  But any difference between the two standards "is a 'narrow one.'"  *Id.* (quoting Special Master's R&Rs).

Both "actual knowledge" and "conscious avoidance" are subjective, turning on what the defendant really believed.  The theory of "conscious avoidance," for example, permits a jury to infer a defendant's culpable knowledge where he was ***actually aware*** of the high probability that a fact existed and "***intentionally*** avoided confirming the fact."  *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (emphasis added).  The underlying principle is that "one can know a fact without being absolutely certain of it, as long as one is aware of a high probability of its

existence and does not actually believe it does not exist." *United States v. Pierre*, 285 Fed.

App'x 828, 830 (2d Cir. 2008); *see In re Agape Litig.*, 773 F. Supp. 2d 298, 309 (E.D.N.Y. 2011)

(focusing on whether defendant was consciously aware of certain facts and then made decisions

"specifically to avoid attributable knowledge"), *cited in* Mem. Order at 3.

   Although the evidence in a conscious avoidance case can obviously be circumstantial, it

must nevertheless be focused on the defendant's real, subjective belief.  Thus, for example,

conscious avoidance was established in one case where the evidence showed that the defendant

tore up a document relevant to the fraud and said, "I guess I never saw that"; left the room when

the fraud came up in a conversation and changed the subject when he returned; and declined to

inquire further when, in his presence, a colleague asked others whether there were "other

smoking guns" to be aware of and was presented with a list of smoking guns.  *United States v.*

*Shelton*, No. 05-4342-CR, 2006 WL 3406840, at *2 (2d Cir. Nov. 22, 2006); *see also, e.g.*,

*United States v. Shoreline Motors*, 413 Fed. App'x 322, 326 (2d Cir. 2011) (in conviction for a

fraudulent financing scheme, proof of conscious avoidance included testimony that defendant

was present at meetings in which others openly discussed the scheme and that defendant

instructed others to record false income information for purposes of securing credit).  Further, as

long as the defendant **actually believed** there was no fraud, the plaintiff cannot prove conscious

avoidance "however irrational that belief may have been."  *United States v. Catano–Alzate,* 62

F.3d 41, 43 (2d Cir. 1995) (per curiam) ("[T]he doctrine of conscious avoidance does not permit

a finding of guilty knowledge if the defendant actually did not believe that he or she was

involved in the transportation of drugs . . . .").

   As this Court has recognized, a finding of liability for aiding and abetting cannot be

based on recklessness or constructive knowledge.  *See* Mem. Order at 3-4 (citing, *e.g.*, *JP*

*Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005); *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004)). In fact, these standards involve looking at the wrong set of facts entirely. "Conscious avoidance . . . involves a culpable state of mind, whereas constructive knowledge *imputes* a state of mind" based on "[k]nowledge that one using reasonable care or diligence *should* have." *Fraternity Fund v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (emphasis added), *cited in* Mem. Order at 3. Even if the defendant's departures from professional standards were "gross" or extreme, that still does not translate into conscious avoidance "absent a culpable state of mind." *Thomas v. Clay*, No. 08 CV 4456, 2010 WL 2136663, at *9 (N.D. Ill. May 25, 2010).

Kirschner obviously intends to give the jury irrelevant evidence that will distort and confuse these issues. He plans to offer into evidence a variety of internal and external auditing standards (*see* exhibits listed *supra* at n.2), along with expert testimony that Grant Thornton's audits involved "gross departures" from those standards. *See, e.g.*, Ex. A at 74 (Carmichael Report; heading); *see also id.* at 43-44 (purporting to show lead audit partner's "serious failures as the auditor with final responsibility for GT's services"); *see generally id.* at Parts VI & VII and headings (purporting to show "gross" departures and "disregard" of professional standards). But under the cases discussed above, this is not the right test. Even a "gross" deviation from objective standards cannot establish liability for aiding and abetting. *Thomas*, 2010 WL 2136663, at *9 (in case involving subjective inquiry into "deliberate indifference," expert affidavit on standards of care was "unhelpful"); *cf. Harris v. Quadracci*, 856 F. Supp. 513, 519 (E.D. Wis. 1994) ("expert opinion testimony generally is not helpful when determining actual malice against a subjective standard"). And a showing that Grant Thornton's audits were "highly unreasonable" (Ex. A at 40)—even if such a showing could be made in this case—would

prove nothing more than recklessness.  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (recklessness requires a showing of audit work that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care") (internal quotation and citation omitted).

Nor can Kirschner help his case on aiding and abetting by trying to prove what Grant Thornton would have discovered if it had performed different audit procedures—procedures that Carmichael says were required by GAAS.  *See, e.g.*, Ex. A at 40 (opining that "[h]ad GT performed such procedures, GT would have recognized the round trip loans were being used to reduce the full amount of the RGHI receivable."); *id.* at 42 (opining that "[h]ad GT performed an audit that a competent auditor . . . would have performed, and applied even some of the audit procedures described above, . . . GT would have known the full amount of the RGHI receivable").  At most, that is constructive knowledge, focused on what Grant Thornton would or should have known.  But as a matter of law, "should have known" cannot support liability for aiding and abetting.  Mem. Order at 3-4; *Fraternity Fund*, 479 F. Supp. 2d at 368 (aiding and abetting liability cannot be based on a showing of "[k]nowledge that one using reasonable care or diligence should have").  The question is what these auditors actually believed, based on the audit procedures they actually performed.  Anything else is a distraction.

Even if this evidence were somehow probative of actual knowledge, that probative value would still be substantially outweighed by the danger that the evidence will cause unfair prejudice and confuse or mislead the jury.  Fed. R. Evid. 403;  *Awadallah*, 436 F.3d at 133–35 (court has "broad discretion" to exclude evidence under Rule 403).  Rule 403 allows a judge to exclude evidence where, among other things, "the proposed inferences" from the evidence in question "tend[] to suggest an illegitimate basis of decision, particularly one that is so similar to the true rule of the case that the jurors may have difficulty in discriminating between them."  *See*

WRIGHT & MILLER, FED. PRAC. & PROC. § 5216 nn.30, 36 (and cases cited); *e.g.*, *Brueggemeyer v. American Broadcasting Companies, Inc.*, 684 F. Supp. 452, 465-66 (N.D. Tex. 1988) (in actual malice case, expert testimony that defendant showed "reckless disregard" for professional standards was inadmissible because it had limited probative value and was likely to confuse the issues and mislead the jury).

Evidence about auditing standards and Grant Thornton's alleged lack of compliance with them should be excluded for precisely this reason. Grant Thornton cannot be held liable in this case unless the jury concludes that its auditors learned about the fraud—or became aware of a high probability that it existed and then specifically avoided obtaining any "attributable" knowledge. *Agape*, 773 F. Supp. 2d at 309. As a matter of law, then, the jury must not enter a finding of liability on the basis of supposedly "gross" or "highly unreasonable" departures from auditing standards. But Kirschner's evidence about auditing standards invites the jury to do just that. Allowing Kirschner to present evidence about these standards (and to argue Grant Thornton's supposed non-compliance with them) will create a substantial risk that the jury will become confused whether and how it is to evaluate those standards and may prompt it to reach a verdict on an impermissible basis.

This concern is particularly acute here, where the evidence about compliance and non-compliance with auditing standards would undoubtedly dominate the trial. *See United States v. Bouye*, 688 F.2d 471, 476 (7th Cir. 1982) (where evidence would open the door to a rebuttal that would waste time and confuse the issues, trial court properly excluded it under Rule 403); *e.g., United States v. Bari*, 750 F.2d 1169, 1179 (2d Cir. 1984) (district court properly excluded relevant evidence about a major witness's mental condition when it would have resulted in a confusing, time-wasting battle of expert opinions). Kirscher has identified 64 different trial

exhibits that constitute auditing standards (either internal or based on GAAS), and Carmichael's

discussion of Grant Thornton's supposed non-compliance with auditing standards spans more

than 100 pages in his written report.  If Kirschner is allowed to present this evidence, Grant

Thornton will have no choice but to challenge it, presenting its own, very substantial expert and

documentary evidence that its audits **did** comply with professional standards.  The result would

be more than just a "mini-trial"; it would become the whole trial, dominating any other evidence

presented by either side.  In a malpractice case, this sort of painstaking proof is inavoidable.  But

here, as a matter of law, a deviation from professional standards cannot be the basis for the

verdict in the first place.  To avoid the inevitable confusion of the issues and waste of time, this

Court can and should exclude all evidence about auditing standards under Rule 403.

For all these reasons, Grant Thornton respectfully requests that the Court enter an order

excluding any evidence about auditing standards and precluding Kirschner and his witnesses

from referring to such standards at trial.

## IV.    MOTION IN LIMINE TO EXCLUDE GRANT THORNTON'S AUDIT MANUAL

Many courts have expressed concern about admitting an audit firm's internal manuals

and auditing guidance as evidence against the firm in litigation.  Such evidence creates a

significant risk of confusing the jury, wasting time, and distracting from the issues in the case.

And just as importantly, it would be "unfair to use professionals' self-imposed standards, which

may exceed industry standards, against them to prove fraud."  *Hart v. Internet Wire, Inc.*, 145 F.

Supp. 2d 360, 369–70 (S.D.N.Y. 2001) (internal quotations and citation omitted).

In this case, these problems are present in spades.  Kirschner's exhibit list contains 14

different trial exhibits that consist of excerpts from Grant Thornton's internal auditing manual.[3]

---

[3] These exhibits are marked as PTXs 517, 1296, 1297, 1298, 1634, 1636, 1639, 1640, 1665, 2007, 2008, 2009, 2010, and 2011.

The audit manual is also discussed in the expert report of Douglas Carmichael.  *See* Ex. A at 37-38, 76-79, 84, 108, 122, 130, 173, App. F (Carmichael report).  For the reasons discussed in Part II above, Carmichael's references to Grant Thornton's internal auditing standards—and, indeed, *all* of Kirschner's evidence about auditing standards—should be excluded as irrelevant and prejudicial.  But even if professional standards were otherwise relevant here, Grant Thornton's internal audit manual does not constitute GAAS, and Grant Thornton's alleged departure from its internal guidelines is not relevant to any issue in this case.  Under Rules 402 and 403, Grant Thornton's audit manual (and all references thereto) should be excluded from evidence.

## ARGUMENT

Kirschner must prove that Grant Thornton actually knew about the alleged wrongdoing by RCM, and he apparently plans to make that showing in part through expert testimony purporting to show that Grant Thornton did not comply with professional auditing standards. Presumably, Kirschner believes that deviations from GAAS would be relevant to show actual knowledge of RCM's true financial condition and alleged breach of a duty to disclose.  As discussed above, this is wrong as a matter of law.

Even if a violation of GAAS were relevant here, however, Grant Thornton's internal standards *do not constitute GAAS*.  *See In re Worlds of Wonder Sec. Litig.*, 147 F.R.D. 214, 216 (N.D. Cal. 1992) (auditing standards are set by GAAS, not private firm manuals); *In re Assisted Living Concepts Sec. Litig.*, No. 99-167-AA, 2001 U.S. Dist. LEXIS 12864, at * 3–4 (D. Or. Apr. 13, 2001) (same); *Tonnemacher v. Sasak*, 155 F.R.D. 193, 195 (D. Ariz. 1994) (same). Courts have excluded internal audit manuals from litigation on precisely this basis.  *See, e.g.*, *Davis v. Coopers & Lybrand*, No. 90 C 7173, 1992 WL 159504, at * 1 (N.D. Ill. June 25, 1992) (affirming denial of the production of auditor's internal audit manual because such internal manuals were irrelevant to the fraud claims against the auditor); *In re Conticommodity Servs.,*

*Inc. Sec. Litig.*, MDL No. 644, 1988 WL 56172, at * 1–2 (N.D. Ill. May 25, 1988) (holding that the determination of audit negligence requires an examination of prevailing professional standards, not an examination of standards imposed by the accounting firm's own internal manuals, and thus, such manuals did not have to be produced in discovery).

Moreover, admission of Grant Thornton's internal audit procedures would be unfairly prejudicial, in that it would mislead and confuse the jury.  Although Carmichael suggests that the audit manual is nothing more than Grant Thornton's "explanation of what GAAS requires," he does nothing to support this assertion.  Ex. A at 37.  And to the extent the internal audit procedures are more stringent than GAAS, the jury may be confused about which one controls in the event of a conflict.  In other words, it may be tempted to censure Grant Thornton for departing from its internal procedures, even if the underlying conduct was perfectly appropriate under GAAS and does not show knowledge of any wrongdoing at Refco.

This is no small matter.  If courts regularly allowed internal audit procedures to be introduced into evidence and to serve as the standard against which an audit is judged, accounting firms would be deterred from developing standards that exceed those required by the industry, out of fear that the failure to abide by such internal standards could result in liability. *Cf. Hart*, 145 F. Supp. 2d at  369–70 ("'It is also unfair to use professionals' self-imposed standards, which may exceed industry standards, against them to try to prove fraud.'") (quoting *In re Worlds of Wonder Sec. Litig*, 147 F.R.D. at 217).

Further, there is great potential for distraction here.  To counteract any potential prejudice and confusion, Grant Thornton would have to introduce documentary evidence, testimony, and arguments explaining that its internal auditing standards and procedures ***are not*** GAAS and that deviations from those internal procedures cannot be equated with a departure from GAAS.  But

what is relevant in this case is what Grant Thornton's auditors **knew about Refco and RCM**, not what its internal audit manual said. A "mini-trial" on the significance of Grant Thornton's audit manual (and whether the Refco and RCM audits complied with it) would be confusing to the jury and a sheer waste of time.

For all these reasons, Grant Thornton respectfully requests that this Court preclude Kirschner and his witnesses from introducing or referring to its internal audit manual at trial.

## V.    MOTION IN LIMINE TO EXCLUDE THE SEC ORDER RELATING TO MCA FINANCIAL CORPORATION

Kirschner's exhibit list includes classic "other acts" evidence—an order of the Securities & Exchange Commission ("SEC") relating to Grant Thornton's audits of MCA Financial Corporation ("MCA"). The audits addressed in that order have absolutely nothing to do with this case. They were performed by different Grant Thornton auditors, in a different Grant Thornton office, for a different audit client, in a different industry, and at a different time. *See* Ex. E (PTX-1818). Moreover, under Rule 408, the MCA Order is not admissible even to show a deficiency in the MCA audits themselves. Admitting this evidence would be highly prejudicial to Grant Thornton in this case, and it would also chill future settlements—an outcome courts must guard against. Under Rules 402, 403, 404(b), 407, and 408, the MCA Order should be excluded from trial, and Kirschner's witnesses should be prohibited from referring to it.

### ARGUMENT

Evidence of other acts can be admitted at trial only if it serves a purpose other than "to show the defendant's propensity to commit the offense." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011). Courts in the Second Circuit routinely refuse to admit evidence at trial when it is clear that its only purpose is to suggest the defendant's propensity to commit the alleged act or wrong. *See, e.g., United States v. Cushing*, No. S3 00 CR 1098 (WHP), 2002 WL 1339101, at

21

*3 (S.D.N.Y. June 18, 2002) (whether the defendant previously lied "makes it no more likely that he knew he made an untruthful statement to the SEC"); *see also, e.g.*, *United States v. Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010).

Here, Kirschner's only possible basis for offering this evidence would be to suggest that Grant Thornton has a propensity for performing inadequate audit procedures with respect to related-party transactions—a use at the heart of Rule 404(b).  The MCA Order is not relevant to any other issue and, thus, it is not admissible for any other purpose.  MCA Financial Corporation has no connection with Refco, and Grant Thornton's audits of the two companies were entirely unrelated.  The auditors did not overlap; indeed, the audits of MCA were performed between 1994 and 1999—well before Grant Thornton was retained to audit Refco in the first place. Evidence that a different group of auditors faced an inquiry in connection with audits performed years earlier for a different audit client has no legitimate role in this case.  *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 779 (S.D. Ohio 2006) (evidence of other fraud claims brought against the same auditor "do not amount to a showing that [the auditor] knowingly or recklessly prepared a fraudulent auditor report for [the company in this case]"); *Fidel v. Farley*, 392 F.3d 220, 233 (6th Cir. 2005), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (auditor's involvement in other lawsuits was not probative of whether it acted knowingly or recklessly in preparing its audit report for a different company in the present case); *Harris v. Pacific Floor Mach. Mfg.*, 856 F.2d 64, 67 n.2 (8th Cir. 1988) (affirming an order excluding evidence "of other lawsuits" arising from similar accidents).

Further, the MCA Order shows nothing about Grant Thornton's training programs, either at the time of the MCA audits (in the 1990s), at the time of the MCA Order (August 2004), or

during the audits of Refco (2003-2005).  In the MCA Order, Grant Thornton agreed to require its professionals to undergo special fraud detection training conducted by the Association of Certified Fraud Examiners, to be completed within 24 months.  Ex. E at 21.  These subsequent remedial measures—which are found in many administrative settlements—are not admissible to show any deficiency in the training in place at Grant Thornton at that time.  *See* Fed. R. Evid. 407.  And they do not shed any light on subsequent events either; for example, they do not help Kirschner argue that under new training protocols, Grant Thornton would have been more or less likely to discover the Refco fraud.  At the time the Refco fraud became public, the MCA Order's mandated deadline for additional training remained almost a year into the future.  Whether the training had or had not yet occurred reveals nothing.

Indeed, the MCA settlement would not be admissible even to show problems in the MCA audits themselves.  Evidence of settlements is not admissible "to prove or disprove the validity or amount of a disputed claim."  Fed. R. Evid. 408.  In other words, a settlement is not competent evidence of the alleged conduct underlying the settlement.   In *Lipsky v. Commonwealth United Corp.*, for example, the Second Circuit applied Rule 408 to "a consent judgment between a federal agency and a private corporation," holding that it "cannot be used as evidence in subsequent litigation between that corporation and another party."  551 F.2d 887, 893 (2d Cir. 1976).  Similarly, a court in this district recently barred a plaintiff from relying on a settlement between the defendant and the Commodities Futures Trading Commission ("CFTC") to plead the settlement order's factual findings.  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011); *see also In re Tenet Healthcare Corp. Sec. Litig.*, No. CV 02-8462-RSWL (RZ), 2007 WL 5673884, at *1-2 (C.D. Cal. Dec. 5, 2007) (granting defendant auditing firm's motion to exclude settlements with SEC and Department of Justice).

Accounting expert Douglas Carmichael purports to use the Order in precisely the matter prohibited by Rule 408. His report describes Grant Thornton's alleged failures in the MCA audits in 1994-1999 and purports to draw an analogy between those audits and the Refco audits in 2003-2005, discussing which similarities he finds "most significant." Ex. A at 164. Under Rule 408, however, the MCA settlement cannot be used to show that there were any deficiencies in the MCA audit in the first place—so Carmichael's analogy lacks any proper foundation or evidentiary basis.

Even if the MCA Order *were* relevant and admissible for some permissible purpose, that relevance would be substantially outweighed by the danger of unfair prejudice and the risk that the evidence would mislead and confuse the jury. *See* Fed. R. Evid. 403. First, the admission of the MCA Order would result in a mini-trial with regard to the audits of MCA Financial Corporation, which would cause delay and distract the jury from the facts at issue—namely, the facts concerning Refco and RCM. *See, e.g.*, *United States v. Hill*, 322 F.3d 301, 306 (4th Cir. 2003) (affirming the exclusion of evidence of another transaction and another lawsuit, which "would have necessitated an exhaustive case within a case"); *CPC Int'l v. Northbrook Excess & Surplus Inc.*, 144 F.3d 35, 45 (1st Cir. 1998) (affirming the exclusion of judicial decisions from other cases where "perfecting the analogy" of the circumstances in those cases to "the ones at issue in this trial" would have led to a "'replay of the litigation of those other two cases'" and "certainly would have caused delay") (internal citations omitted). And second, "a settlement is not a reliable indicator of misconduct, and the fact-finder may be unduly swayed by the fact that [Grant Thornton] entered into the SEC Consent Order[]." *Tenet Healthcare Corp.*, 2007 WL 5673884, at *2. Either of these considerations provides more than adequate reason to exclude the MCA Order from trial.

Finally, even if settlement evidence is offered for a purpose other than to prove the underlying allegations, courts must "weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Sanders v. Madison Sq. Garden, L.P.*, 525 F. Supp. 2d 364, 370 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). Allowing litigants to use settlements like this one—in the manner Kirschner hopes to use it—would chill settlements in the future. Such an outcome is particularly unjustified here, given that the settlement will add nothing of consequence to the case. Thus, the MCA Order should be excluded outright.

For the foregoing reasons, Grant Thornton respectfully requests that this Court enter an order precluding Kirschner and his witnesses from introducing or referring to the MCA Order.

## VI.    MOTION IN LIMINE TO PRECLUDE A DEMAND FOR PUNITIVE DAMAGES

Whatever the merits of Kirschner's remaining claim against Grant Thornton, there is ***no*** evidence that it acted with "evil and reprehensible motives" or "criminal indifference," as would be required for punitive damages. The Special Master reached this very conclusion in his most recent report and recommendation, finding that Kirschner does not have the evidence to take a punitive damages claim to the jury. *See* SJ R&R at 23 n.26 (observing that "there is no indication in the allegations of the Amended Complaint, nor in the proof elicited, that Grant Thornton's conduct would support a recovery of punitive damages"). Kirschner did not object to that recommendation, nor did he have any basis for doing so. As a matter of law, any demand for, evidence regarding, or argument about punitive damages should be excluded from the upcoming trial. *See In re MTBE Prods. Liability Litig.*, 517 F. Supp. 2d 662, 666-67 (S.D.N.Y. 2007) (holding that such relief is appropriately sought through a motion in limine before trial).

## ARGUMENT

Under New York law, a claim for punitive damages may be presented to the jury only where the evidence shows that the defendant acted "with evil and reprehensible motives." *China Trust Bank of N. Y. v. Standard Chartered Bank, PLC*, 981 F. Supp. 282, 289 (S.D.N.Y. 1997). Evidence of intentional or knowing misconduct is not enough. *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95 Civ. 8450 (AGS) (THK), 1998 WL 422482, at *8 (S.D.N.Y. July 22, 1998) (it is "well-settled in New York that punitive damages are not available in the ordinary fraud and deceit case") (citing *Kelly v. Defoe Corp.*, 223 A.D.2d  529, 529, 636 N.Y.S.2d 123, 124 (2d Dep't 1996)).  The plaintiff must prove a great deal more—a level of culpability tantamount to criminal misconduct. *Fortnow v. Hughes Hubbard & Reed, LLP,* 10 Misc.3d 1064(A), 814 N.Y.S.2d 561, 2005 WL 3506955, at *5 (Sup. Ct. N.Y. County Nov. 30, 2005) (plaintiff must show defendant acted with spite, malice, an evil motive, or such a conscious disregard of the interests of others that its conduct implies a "criminal indifference to civil obligations") (internal citation omitted); *Home Ins. Co. v. Am. Home Prods. Corp.,* 75 N.Y.2d 196, 203, 550 N.E.2d 930, 934 (1990) (punitive damages "are intended as punishment for gross misbehavior . . . and have been referred to as a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine") (internal citation omitted).  The standard for establishing punitive damages is "demanding," *Marcoux v. Farm Serv. and Supplies, Inc.*, 283 F. Supp. 2d 901, 907–08 (S.D.N.Y. 2003), and requires "clear, unequivocal, and convincing evidence," *West v. Goodyear Tire & Rubber Co.*, 973 F. Supp. 385, 387–89 (S.D.N.Y. 1997).

Kirschner cannot possibly carry this heavy burden.  Although the complaint included a demand for punitive damages (Am. Compl. p. 90), Special Master Capra concluded on summary judgment that there is no basis for such a remedy in this case.  As he observed, "there is no indication . . . that Grant Thornton's conduct would support a recovery of punitive damages,"

26

which "are only recoverable where the defendant acted 'with evil and reprehensible motives.'" SJ R&R at 23 n.26 (quoting *China Trust Bank*, 981 F. Supp. at 289). Kirschner did not object to that conclusion, nor did he attempt to reargue the point in the papers he filed with the Court before the July 13 hearing.

The Special Master's recommendation on this issue is clearly correct. There is no evidence—none—that Grant Thornton played any role in perpetrating the Refco fraud. In fact, there is no evidence that Grant Thornton's auditors actually knew about the Refco fraud at any time before late September 2005, when they played a role in bringing it to light. That is why the evidence of scienter in the various Refco cases against Grant Thornton has always focused on some combination of "would have known" and "should have known." And if Grant Thornton never actually knew about the fraud, it could not possibly have acted "in criminal disregard of its civil obligations."

Indeed, unlike the other defendants in this case, neither Grant Thornton nor any of its partners has ever been implicated in anything "criminal" in respect to Refco. *Fortnow*, 10 Misc.3d 1064(A), 814 N.Y.S.2d 561, 2005 WL 3506955, at *5. Phil Bennett, Santo Maggio, and Robert Trosten masterminded the Refco fraud and have been convicted of crimes on that basis; Mayer Brown partner Joe Collins was indicted for his role in the Refco fraud and will soon be retried. *See* CSMF ¶¶ 1-5 (Refco insiders have been criminally prosecuted). But none of those indictments implicated Grant Thornton in the insiders' wrongdoing; to the contrary, they identified Grant Thornton as the fraud's principal target. Bennett, Maggio, and Trosten all pleaded guilty to criminal charges that were predicated on, *inter alia*, concealing the truth from Grant Thornton. *See* Ex. F (judgments of conviction and allocutions). Both Trosten and Maggio—the only insiders who gave depositions in the Refco civil litigation—admitted that the

27

insiders lied to Grant Thornton repeatedly, not only by falsifying documents and schedules but also face-to-face.  Ex. C at 576:6-8 (Maggio dep.) (admitting that he "lied to Refco's auditors"); Ex. B at 531:11-19 (Trosten dep.) (acknowledging that Bennett lied to auditors).  These facts make it impossible for Kirschner to show that Grant Thornton shared in the insiders' "criminal" culpability.

The record in this case is also devoid of any evidence that Grant Thornton acted "with evil and reprehensible motives." *China Trust Bank*, 981 F. Supp. at 289.  According to Kirschner, the Refco insiders benefitted handsomely from their criminal scheme, motivated by a desire to "line their own pockets by cashing-out their interests in Refco for more than those interests were worth."   Am. Compl. ¶ 1.  Grant Thornton, on the other hand, received nothing more than ordinary professional fees—no kickbacks, bribes, gifts, "cashing-out" benefits, or other unusual compensation.  An auditor's receipt of fees in the ordinary course is not enough even for an inference of scienter.  *See, e.g.*, *Zucker v. Sasaki*, 963 F. Supp. 301, 308 (S.D.N.Y. 1997) ("[M]ere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter.") (citations omitted).  By the same token, the desire to retain a client and earn ordinary professional fees cannot possibly constitute the "evil and reprehensible motive" required for punitive damages—or else punitive damages would be available in every case.

Given the inadequacy of Kirschner's punitive damages demand, this Court can and should bar him at the outset from even raising the issue—and exclude any related evidence as irrelevant under Rule 402.  *See MTBE Prods.*, 517 F. Supp. 2d at 672 (granting motion in limine to preclude request for punitive damages); *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 205 (S.D.N.Y. 2006) (same).  It makes no difference that the liability phase of this

trial has been bifurcated from the damages phase. Courts generally address entitlement to punitive damages in the first phrase of a bifurcated trial, saving the amount to be determined later. As the Second Circuit has stated, "the preferred method of accommodating the various interests is to delay trial as to the amount of an award of punitive damages until the usual issues of liability and compensatory damages have been tried, along with the matter of whether the defendant's conduct warrants any award of punitive damages at all." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 373-74 (2d Cir. 1988); *see also T.D.W. v. Riverside County*, No. EDCV 08-232 CAS (JWJ), 2009 WL 2252072, at *9 (C.D. Cal. July 27, 2009) (holding that "whether punitive damages are warranted should be tried in the first phase" of bifurcated trial); *Ejchorszt v. Daigle*, No. 3:02-cv-01350 (CFD), 2009 WL 1687930, at *1 (D. Conn. June 16, 2009) (bifurcating trial, but requiring "the jury first find[] that punitive damages are appropriate"); *Verdekel v. County of Los Angeles*, No. CV06-01518-RT, 2009 WL 4058592, at *2 (C.D. Cal. May 7, 2009) (noting that "if the jury finds liability for punitive damages in Phase 1," it may go on to determine the amount in a subsequent phase). If Kirschner cannot now bring forth sufficient evidence to support punitive damages, he will never be able to do so. And to wait until the jury renders its verdict on liability would allow Kirschner to use his meritless demand as a bargaining chip.

For all these reasons, Grant Thornton respectfully requests that the Court exclude from trial any demand for or evidence concerning punitive damages and any argument that Grant Thornton's conduct warrants finding Kirschner entitled to receive such damages.

Dated:  August 3, 2012
New York, New York

Respectfully submitted,

WINSTON & STRAWN LLP

            /s/ Linda T. Coberly            

*Of Counsel:*

Kenneth Cunningham
Tracy W. Berry
GRANT THORNTON LLP
175 West Jackson, 20th Floor
Chicago, Illinois 60604
Ph: 312-856-0001
Fax: 312-565-3473

Bruce R. Braun (bbraun@winston.com)
Catherine W. Joyce (cjoyce@winston.com)
Linda T. Coberly (lcoberly@winston.com)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Ph: 312-558-5600
Fax: 312-558-5700

Luke Connelly
(lconnelly@winston.com)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Ph: 212-294-6700
Fax: 212-294-4700

*Attorneys for Grant Thornton LLP*