**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE REFCO INC. SECURITIES LITIGATION | : | CASE NO. 07-MD-1902 (JSR) |

This document relates to:

| | | |
|---|---|---|
| KENNETH M. KRYS, *ET AL.,* | : | |
| Plaintiffs, | : | CASE NO. 08-CV-3065 (JSR) |
| -against- | : | CASE NO. 08-CV-3086 (JSR) |
| CHRISTOPHER SUGRUE, *ET AL.*, | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| KENNETH M. KRYS, *ET AL.,* | : | |
| Plaintiffs, | : | CASE NO. 10-cv-3594 (JSR) |
| -against- | : | |
| DEUTSCHE BANK SECURITIES INC., *ET AL.*, | : | |
| Defendants. | : | |

**MEMORANDUM IN SUPPORT OF THE UNDERSIGNED DEFENDANTS' MOTION
TO DISMISS OR FOR OTHER SANCTIONS FOR SPOLIATION OF EVIDENCE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ........................................................................................................................ 3

    A.    Background ........................................................................................... 3

    B.    Deposition of Mr. Rose and PlusFunds' Spoliation of Evidence .......... 5

I.    Plaintiffs Stand In The Shoes Of PlusFunds And SPhinX And Bear
Responsibility For Their Culpable Conduct In Connection With This
Litigation........................................................................................................ 10

II.    The Spoliation In This Case Warrants Dismissal Or, Alternatively, Other
Severe Sanctions. ........................................................................................... 11

    A.    The Notes' Destruction Breached an Ongoing Duty To Preserve
Relevant Evidence. ........................................................................... 12

        1.    PlusFunds and SPhinX had a duty to preserve evidence from
October 2005 onward.............................................................. 12

        2.    The destroyed documents were relevant and subject to the
preservation duty.................................................................... 15

        3.    The documents were destroyed at a time when the preservation
duty attached. ......................................................................... 16

    B.    The Spoliation Was Willful. .............................................................. 16

    C.    The Notes Likely Would Have Been Favorable to the Defense........... 17

    D.    Proposed Sanctions for Plaintiffs' Willful Spoliation .......................... 22

CONCLUSION........................................................................................................ 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alaimo v. Trans World Airlines, Inc.*, No. 00 CV 3906(GBD), 2005 WL 267558 (S.D.N.Y. Feb. 3, 2005) ..................................................................................7, 10

*Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409 (S.D.N.Y. 2009) ....................9, 17

*Byrnie v. Town of Cromwell Board of Education*, 243 F.3d 93 (2d Cir. 2001) .............................8

*Chan v. Triple 8 Palace, Inc.*, No. 03CIV6048(GEL)(JCF), 2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) .....................................................................................18

*Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012) .........................8

*Condit v. Dunne*, 225 F.R.D. 100 (S.D.N.Y. 2004) ........................................................15

*Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360 (N.D. Ga. 2008) ....................................10

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469 (E.D. Va. 2011) ..............................................................................17

*Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423 (2d Cir. 2001) .......................................8, 12

*Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284 (S.D.N.Y. 2009) ................................23

*Gutman v. Klein*, No. 03 CV 1570(BMC)(RML), 2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008) ...............................................................................22, 23

*In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006) ......................14

*In re WRT Energy Securities Litigation*, 246 F.R.D. 185 (S.D.N.Y. 2007) .................................23

*Kirschner v. KPMG LLP*, 626 F.3d 673 (2d Cir. 2010) .....................................................11

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) ...........................................9, 12, 14, 18

*Kyoei Fire & Marine Insurance Co. v. M/V Mar. Antalya*, 248 F.R.D. 126 (S.D.N.Y. 2007) .........................................................................22

*Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311 (Fed. Cir. 2011) ...........................................12

*Miller v. Time-Warner Communications, Inc.*, No. 97 Civ. 7286(JSM), 1999 WL 739528 (S.D.N.Y. Sept. 22, 1999) ......................................................................9

*O'Connell v. Arthur Andersen LLP (In re AlphaStar Insurance Group Ltd.)*, 383 B.R. 231 (Bankr. S.D.N.Y. 2008) .....................................................................11

*Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429 (S.D.N.Y. 2010) ...15, 17, 18

*Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010)................................................. passim

*Positran Manufacturing, Inc. v. Diebold, Inc.*, No. 02-466 GMS, 2003 WL 21104954 (D. Del. May 15, 2003) ..........................................................................................10, 22

*Reilly v. Natwest Markets Group. Inc.*, 181 F.3d 253 (2d Cir. 1999)............................................8

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002)......8, 12, 17

*Rotella v. Wood*, 528 U.S. 549 (2000) ......................................................................................9

*United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21 (D.D.C. 2004) ...........................23

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497 (D. Md. 2010)...........................10, 17

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (2d Cir. 1999)................................... passim

*Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000) ........................................................11

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ("*Zubulake IV*")...................16

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ("*Zubulake V*") ............. passim

## STATE CASES

*Bullmore v. Ernst & Young Cayman Islands*, 861 N.Y.S.2d 578 (Sup. Ct. N.Y. Cnty. 2008) ...............................................................................................................................11

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 26(b)(1) ....................................................................................15

Defendants Mayer Brown LLP, Edward S. Best, Joseph P. Collins, Paul Koury, Grant Thornton LLP, Mark Ramler, PricewaterhouseCoopers LLP, and Deutsche Bank Securities Inc. (the "Undersigned Defendants" or "Defendants") respectfully move this Court to dismiss this action with prejudice or to impose other appropriate sanctions against Plaintiffs for willful spoliation of evidence – binders full of handwritten notes authored by H. Christopher Rose, the Chief Operating Officer of PlusFunds Group, Inc. ("PlusFunds").

## PRELIMINARY STATEMENT

Christopher Rose is one of the most important witnesses in this case.  Mr. Rose has testified on behalf of PlusFunds and SPhinX on numerous occasions in the past, and he is certain to be a prominent witness for the Plaintiffs at trial.  As PlusFunds' Chief Operating Officer, Mr. Rose played a central role in connection with virtually every significant issue in this litigation, including the cash sweeps from Refco LLC to Refco Capital Markets ("RCM"); PlusFunds' assessment of the counterparty risk posed by the SPhinX Funds' exposure to Refco; and PlusFunds' and SPhinX's response to revelations of fraud at Refco in October 2005.  Mr. Rose remained employed by PlusFunds until July 2006, through the fallout from Refco's bankruptcy and the missteps by PlusFunds, SPhinX, and their outside advisers that contributed to Plaintiffs' injuries.

So significant and widespread was Mr. Rose's involvement with the issues in this case that his was one of very few depositions that required three days to complete.  During those three days, Mr. Rose was questioned on many issues about which he had – or should have had – firsthand knowledge.  On many points, however, Mr. Rose's memory was poor, or else it was not corroborated by the contemporaneous documents.  Yet Mr. Rose – who has been cooperating with Plaintiffs for several years under the still-pending threat of a tolling agreement – sought to spin his answers to match what he understood to be Plaintiffs' view of the case.  In short, Mr.

Rose's credibility is very much in question, and contemporaneous documents bearing on his conduct are at a premium.

Given Mr. Rose's critical role in this case, prior to his deposition, Defendants searched Plaintiffs' document production for handwritten notes.  Not a single handwritten note attributable to Mr. Rose was found.  While disappointing, there could have been innocent explanations for this – until Defendants had the opportunity to depose Mr. Rose and learn the true explanation.

At his deposition, Mr. Rose testified that, throughout his employment with PlusFunds, he made a practice of continuously writing notes in loose-leaf binders, including notes he took during the in-person and telephonic meetings he attended.  Ex. 1, at 829:12–830:2, 831:20–832:5.  He testified that he had such handwritten notes in his possession in October 2005, and that he continued authoring them until he left PlusFunds in July 2006.  *Id.* at 830:18–23, 831:3–7, 832:5–10.  However, Mr. Rose made a habit of regularly throwing out his notes, and admits that he continued to do so even after he knew there was a threat of impending litigation arising from the events at Refco.  *Id.* at 830:3–10, 830:24–831:7.  Indeed, Mr. Rose is unaware of whether any of his notes were preserved and produced in connection with this or any other litigation.  *Id.* at 831:13–15, 832:11–23.

Like everyone at PlusFunds and SPhinX, Mr. Rose was well aware of the potential for litigation once the disclosures about Refco surfaced in October 2005.  In fact, PlusFunds and SPhinX were in constant consultation with counsel about the events at Refco and the potential for claims arising from the $312 million that SMFF deposited with Refco – the basis for Plaintiffs' alleged damages in this case.  At the end of November 2005 – much later than it should have – PlusFunds implemented a formal written litigation hold, which was circulated to all PlusFunds staff, including Mr. Rose, and which clearly demanded the preservation of his

handwritten notes. ***Before and after this formal hold, Mr. Rose continued taking handwritten notes – and destroying them.***

In short, PlusFunds, through its Chief Operating Officer, willfully destroyed documents relevant to this case while under a clear duty to preserve them.  Plaintiffs, who now stand in the shoes of PlusFunds and SPhinX, should not benefit from this misconduct.  Given Mr. Rose's critical importance as a witness in this case, as well as the deliberate disregard shown for not only the document-preservation obligation but also the integrity of the judicial process, the harshest sanctions are justified, and Defendants request that the Court dismiss Plaintiffs' case.  If dismissal is not granted, Defendants alternatively request preclusion of Plaintiffs' evidence on matters contained within the destroyed notes, as well as an instruction permitting the jury to draw an adverse inference based upon the spoliation.  Defendants further request any additional relief the Court deems proper.[1]

## FACTS

### A.      Background

This case arises from the October 2005 bankruptcy of Refco Group Ltd. and its affiliates (collectively, "Refco").  On October 10, 2005, Refco publicly disclosed that it had discovered a $430-million receivable owed to it by Refco Group Holdings, Inc., an entity owned by Refco's

---

[1]      This motion does not address another episode of spoliation, which is alleged in Plaintiffs' complaint in this case.  Plaintiffs allege that defendant Christopher Sugrue willfully destroyed substantial evidence and thus "is liable for spoliation."  Am. Compl. ¶ 368.  Specifically, Plaintiffs allege that Sugrue – "[a]fter disclosure of the Refco fraud and the facts underlying the Suffolk loans," after expressing his intent to assert a Fifth Amendment privilege if subpoenaed, and before "fle[eing] the United States" –"caused his e-mail files to be erased from PlusFunds' servers and removed the laptop he used at PlusFunds."  *Id*.   Mr. Sugrue was the Chairman and a senior executive of PlusFunds, and Defendants believe his conduct is also attributable to Plaintiffs.  Defendants intend to raise this separate spoliation issue, if necessary, under separate cover at or before trial.

Chief Executive Officer, Phillip Bennett.  Am. Compl. ¶ 11.  A week later, on October 17, Refco

filed for Chapter 11 bankruptcy in the Southern District of New York.  *Id.*

Plaintiffs are the liquidators of the SPhinX Managed Futures Fund ("SMFF"), a Cayman

Islands hedge fund, and the assignees of the claims of the bankruptcy trustee of the estate of

SMFF's investment adviser, PlusFunds.  Plaintiffs allege that, prior to Refco's collapse, SMFF's

excess cash was improperly transferred from SMFF's regulated, segregated accounts at Refco

LLC to RCM, an offshore, unregulated entity, where the cash became subject to the claims of

Refco's creditors.  *Id.* ¶ 6.

Immediately after Refco's hidden receivable was disclosed, at the request of PlusFunds'

Chairman, RCM "returned" $312 million from SMFF's non-segregated accounts at RCM to

SMFF's segregated accounts at Refco LLC, and PlusFunds subsequently caused the funds to be

transferred out of Refco altogether.  But, because the funds had been in unsegregated accounts at

RCM until shortly before Refco's bankruptcy, RCM, in December 2005, sued SMFF to recover

the $312 million as a preferential transfer.  SPhinX ultimately settled the preference action and

returned $263 million of the $312 million to Refco's bankruptcy estate.  *Id.* ¶¶ 12, 14.  The

preference action, Plaintiffs claim, triggered a "flood" of redemption requests by SPhinX

investors, leading to a dramatic decrease in PlusFunds' revenues and ultimately to PlusFunds'

own bankruptcy filing in March 2006.  *Id.* ¶¶ 12–13.

On November 30, 2005, well over a month after learning of Refco's insolvency,

PlusFunds implemented a document-preservation litigation hold.  PlusFunds' General Counsel,

Patrick McMahon, circulated by e-mail a written notice of the litigation hold to all PlusFunds

staff – including to Christopher Rose, the company's longtime Chief Operating Officer.  *See* Ex.

2 (Christopher Rose custodian).  The notice broadly stated that, "[b]ecause of the recent

developments arising in relation to the REFCO bankruptcy, PlusFunds should take appropriate steps to preserve and maintain all documents relating to REFCO." *Id.* In turn, it demanded that no one "alter, destroy or erase any hard copy, electronic or other form of documents relating to REFCO." The hold was to "remain in force until further written notice [was] issued from the office of [PlusFunds'] General Counsel." *Id.*

### B.   Deposition of Mr. Rose and PlusFunds' Spoliation of Evidence

Christopher Rose was deposed over the course of three days in May and June 2012. His deposition confirmed that he is a witness of paramount importance in this case. As PlusFunds' Chief Operating Officer from 2002 onward, Mr. Rose was responsible for many of the pre-October 10, 2005 decisions regarding PlusFunds' and SPhinX's operations that are at issue here. For instance, Mr. Rose managed the SPhinX Funds' platform's day-to-day operations, including account openings, liquidity and risk monitoring, and client reporting. May 31 Tr. at 64:21–67:4, 96:21–97:7. He sat on PlusFunds' Risk Committee, which allegedly monitored SMFF's exposure to risk. *Id.* at 70:24–71:2. Mr. Rose and his staff also oversaw the cash transfers from Refco LLC to RCM. In fact, Mr. Rose knew of the movement of excess cash from Refco LLC to RCM by no later than December 2002, *id.* at 252:8–260:15, and evidence suggests (though Mr. Rose denies it) that he knew RCM was an unregulated entity by no later than June 2005, *see* Dep. Ex. 6173, at 11 n.8 (stating that Luis Porras informed the Securities and Exchange Commission's staff that, as early as June 2005, he was told by PlusFunds' Risk Committee – which included Mr. Rose – that RCM was unregulated).

Mr. Rose also remained an important figure at PlusFunds in the time period after Refco's bankruptcy. For example, on October 25, 2005, Mr. Rose drafted an e-mail memorandum to PlusFunds' Chief Executive Officer, Paul Aaronson, as well as to Mark Kavanagh and Brian Owens, members of PlusFunds' Board of Directors (and defendants in this case), in which Mr.

Rose distilled his "initial thoughts on some of the structural changes required [to PlusFunds] based on what [PlusFunds] learnt from the Refco situation."  Dep. Ex. 6271.  In his memorandum, Mr. Rose highlighted the failures of the PlusFunds Risk Committee, on which he sat, to identify the risk posed to SMFF cash from a potential Refco insolvency.  *Id.*  According to Mr. Kavanagh, Mr. Rose also shared these same sentiments with him in a personal meeting, which also occurred in October 2005.  May 17 Tr. at 510:2–516:14.  Then, on November 30, 2005, Mr. Rose attended a meeting of PlusFunds' Board of Directors, at which Mr. Aaronson, Chris Aliprandi (Chief Financial Officer), and Pat McMahon (General Counsel) announced their intent to resign from PlusFunds, allegedly because of wrongdoing by Messrs. Sugrue, Kavanagh and Owens.  June 1 Tr. at 674:16–20.  In December 2005 and January 2006, Mr. Rose met with SPhinX's bankruptcy counsel to discuss issues related to the then-ongoing preference action that Refco had filed.  *Id.* at 690:6–9; June 21 Tr. at 798:23–799:17.

At his deposition, Mr. Rose was asked whether, during his tenure with PlusFunds, he made "a practice of taking handwritten notes at any point in time."  Ex. 1, at 829:12–15.  He answered affirmatively, stating that, in fact, the entire time he worked for PlusFunds (and even still today) he would "continuously" write notes in loose-leaf binders, *id.* at 829:18–22, usually taking a "few weeks" to fill each binder, *id.* at 830:15–17.  He explained that the notes he took within these binders included notes transcribed during any in-person or telephonic meetings he attended.  *Id.* at 831:20–23.  Mr. Rose stated that he had such notes in his possession at the time of Refco's collapse, *id.* at 830:18–21, and that he continued to record them until he left PlusFunds, *id.* at 832:5–10.

Despite these notes' obvious relevance, not a single one appears to have been produced in this or any other case.  According to Mr. Rose, he "typically [would] fill up one [binder], [then]

go on to the next one.  And if [he] didn't have to go back to the prior one for . . . things [he] had taken notes on within a week, [he'd] dispose of it."  *Id.* at 830:6–10.  He stated that he continued to throw out his notes in this way following Refco's collapse; in fact, he admitted that, "[e]ven after the events at Refco unfolded and there was impending litigation, [he] would have thrown out notes."  *Id.* at 831:3–7.  Mr. Rose said that he is not aware that any of his notes were preserved and produced in any form in connection with any litigation.  *Id.* at 832:19–23.

In light of this testimony, on July 2, 2012, counsel for Defendants wrote Plaintiffs' Counsel to inquire whether Plaintiffs knew of any additional facts bearing on PlusFunds' spoliation or that would undermine the accuracy of Mr. Rose's testimony that his notes were destroyed.  *See* Ex. 3.  The July 2 letter highlighted that "Rose is one of the most significant witnesses in this case," *id.*, and specifically requested that Plaintiffs either agree or disagree that Mr. Rose's notes were not produced in this litigation.  *Id.*

Plaintiffs' Counsel responded on July 12, 2012.  *See* Ex. 4.  Plaintiffs' Counsel declared that neither they nor Plaintiffs know of the whereabouts of Mr. Rose's notes and that they have no additional information that would contradict Mr. Rose's testimony that all notes in his possession on and after October 10, 2005 were destroyed.  *Id.*  In an apparent effort to distinguish Plaintiffs from the entity in whose shoes they stand for purposes of their claims, the July 12 letter added that the joint liquidators (as opposed to PlusFunds) did not have custody of PlusFunds' documents until March 2009.  *Id.*

## ARGUMENT

"Spoliation of evidence occurs when a party or an agent of such party [culpably] destroys or significantly alters evidence, or fails to properly preserve it for another's use as evidence in a pending or reasonabl[y] foreseeable litigation."  *Alaimo v. Trans World Airlines, Inc.*, No. 00 CV 3906(GBD), 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) (citing *West v. Goodyear Tire &*

*Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).  Spoliation can occur regardless of whether the

destruction of evidence was willful or merely the result of inadvertence or negligence.  *See*

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) ("[T]he

'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed

'knowingly, even if without intent to [breach a duty to preserve it], or *negligently.*'" (second

alteration in original) (quoting *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107–12

(2d Cir. 2001))).

The authority to sanction for spoliation derives from the Court's inherent authority to

control the litigation, and the Court has broad discretion in shaping an appropriate sanction

depending on the facts.  *West*, 167 F.3d at 779; *see also Fujitsu Ltd. v. Fed. Express Corp.*, 247

F.3d 423, 436 (2d Cir. 2001) ("The determination of an appropriate sanction for spoliation, if

any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case

basis." (citation omitted)); *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)

("Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit

from their wrongdoing – a remedial purpose that is best adjusted according to the facts and

evidentiary posture of each case.").  In fashioning sanctions, the Court should aim to provide

redress for conduct that "abuses the judicial process."  *Pension Comm. of the Univ. of Montreal*

*Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010), *abrogated on*

*other grounds*, *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135 (2d Cir. 2012) (rejecting *Pension*

*Committee*'s view that failure to implement a litigation hold in a timely manner constituted per

se gross negligence).  An appropriate sanction is one that is designed to: "(1) deter the  parties

from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who

wrongfully created the risk; and (3) restore 'the prejudiced party to the same position [he] would

have been in absent the wrongful destruction of evidence by the opposing party.'" *Id.* at 469

(quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), *overruled on other*

*grounds by Rotella v. Wood*, 528 U.S. 549 (2000)); *see also West*, 167 F.3d at 779 (explaining

that "the [appropriate] sanction should be molded to serve the prophylactic, punitive, and

remedial rationales underlying the spoliation doctrine").

      The Court has a broad range of sanctions available to it.  *See, e.g.*, *Pension Comm.*, 685

F. Supp. 2d at 469 (listing available spoliation sanctions).  Here, the sanction should account for

Mr. Rose's importance as a witness and executive of PlusFunds, the likely significance of his

handwritten notes to Defendants' case, and the utter disregard for the judicial process shown by

the notes' destruction.  Especially in light of the deliberate nature of the spoliation at issue and

the likely significant prejudice Defendants will suffer from the unavailability of Mr. Rose's

notes, Defendants submit that the most severe sanction – dismissal of Plaintiffs' case – is

warranted.  *See id.* at 469–70 ("[A] terminating sanction is justified in . . . the most egregious

cases, such as where a party has engaged in . . . intentionally destroying evidence . . . ." (footnote

omitted)); *Miller v. Time-Warner Commc'ns, Inc.*, No. 97 Civ. 7286(JSM), 1999 WL 739528, at

*2 (S.D.N.Y. Sept. 22, 1999) (noting that dismissal would have been proper for the plaintiff's

willful erasure of relevant handwritten notes had not enough "traces of the writing remained to

permit the defendants to determine the substance of the erased writing").

      If the Court elects not to dismiss this case, the spoliation attributable to Plaintiffs, at a

minimum, calls for other severe sanctions, including precluding Plaintiffs from offering evidence

at trial on matters contained within the destroyed evidence, and an adverse inference instruction

against Plaintiffs.  *See, e.g.*, *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 443

(S.D.N.Y. 2009) (precluding defendant from challenging any statistical evidence presented by

plaintiff with regard to use of internet site for infringing purposes when defendant had willfully failed to preserve data for site); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 436 (S.D.N.Y. 2004) ("*Zubulake V*") (adverse-inference jury instruction against corporate defendants with respect to e-mails willfully destroyed by employees); *see also Positran Mfg., Inc. v. Diebold, Inc.*, No. 02-466 GMS, 2003 WL 21104954, at *4 (D. Del. May 15, 2003) (granting "'spoliation inference'" against corporate party based on officer's destruction of handwritten notes reflecting contemporaneous account of relevant meeting).

I.    **Plaintiffs Stand In The Shoes Of PlusFunds And SPhinX And Bear Responsibility For Their Culpable Conduct In Connection With This Litigation.**

In response to Defendants' letter regarding the spoliation, Plaintiffs disputed none of the relevant facts.  Their only assertion was that Plaintiffs are not responsible for any spoliation that occurred prior to their appointment as Joint Official Liquidators ("JOLs") and trustee for the estates of SPhinX and PlusFunds, respectively.  That assertion is incorrect as a matter of law because Plaintiffs stand in the shoes of PlusFunds and SMFF, to whom the notes' spoliation is attributable.

Mr. Rose was the Chief Operating Officer of PlusFunds at all relevant times.  Under ordinary agency principles, a corporate party is responsible for spoliation committed by its employees or other agents.  *See Alaimo*, 2005 WL 267558, at *3 (citing *West*, 167 F.3d at 779) (recognizing that agent's spoliation of evidence is attributable to principal).  Indeed, "agency law is directly applicable to a spoliation motion, and the level of culpability of the agent can be imputed to the master."  *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 515 n.23, 521 (D. Md. 2010) (citing *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360 (N.D. Ga. 2008)); *see, e.g., Zubulake V*, 229 F.R.D. at 436 (attributing employees' willful destruction of e-mails to employer and imposing spoliation sanctions against employer).  The destruction of the notes is

thus attributable to PlusFunds.  It is also attributable to SPhinX because PlusFunds managed all

of the operations of SPhinX – which had no employees – and served as SPhinX's investment

adviser and agent in connection with the SMFF cash held at Refco.

Plaintiffs, as the court-appointed representatives of the respective estates, now stand in

the shoes of PlusFunds and SPhinX, asserting claims on the companies' behalf.  *See, e.g.*,

*O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*, 383 B.R. 231, 275 (Bankr.

S.D.N.Y. 2008) ("The liquidator (or trustee), stands in the shoes of the debtor corporation . . . .");

*see also Bullmore v. Ernst & Young Cayman Islands*, 861 N.Y.S.2d 578, 582 n.3 & 586 (Sup. Ct.

N.Y. Cnty. 2008) (concluding that Cayman JOLs are analogous to bankruptcy trustees "to the

extent that they are court-appointed professionals, that have standing to institute any suit that the

Fund itself could have brought had it not instituted winding-up proceedings").  Plaintiffs have no

more of a right to benefit from the notes' destruction than the entities in whose shoes they stand.

*See AlphaStar*, 383 B.R. at 275 (noting that by standing in the debtor corporation's shoes, the

liquidator or trustee "can bring the same claims as the debtor, but subject to the same defenses");

*cf. Kirschner v. KPMG LLP*, 626 F.3d 673, 678 (2d Cir. 2010) (acts of Refco's corporate insiders

are imputed to Refco and therefore to Refco litigation trustee, who was subject to the same *in*

*pari delicto* defense that could have been asserted against Refco); *Wight v. BankAmerica Corp.*,

219 F.3d 79, 87 (2d Cir. 2000) ("Because management's misconduct is imputed to the

corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a

trustee from suing to recover for a wrong that he himself essentially took part in.").

## II.    The Spoliation In This Case Warrants Dismissal Or, Alternatively, Other Severe Sanctions.

Depending on the circumstances of the case, spoliation may merit any of a range of

remedies.  For "more severe sanctions," such as dismissal, preclusion of evidence or an adverse

inference, *see Pension Comm.*, 685 F. Supp. 2d at 467, courts in this Circuit require proof of three elements, all of which are satisfied here: (1) the party having control over the relevant evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed or lost with a culpable state of mind; and (3) the destroyed or lost evidence likely would have been of "assistive relevance" to the movant's claim or defense, such that a reasonable trier of fact could find that it likely would have supported the claim or defense had the evidence not been destroyed or lost. *Id.* (citing *Residential Funding*, 306 F.3d at 107).

A. **The Notes' Destruction Breached an Ongoing Duty To Preserve Relevant Evidence.**

1. **PlusFunds and SPhinX had a duty to preserve evidence from October 2005 onward.**

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party *should have known that the evidence may be relevant to future litigation*." *Fujitsu*, 247 F.3d at 436 (emphasis added) (citing *Kronisch*, 150 F.3d at 126 ). Whether a party should have known of the evidence's potential relevance is "a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (citing *Fujitsu*, 247 F.3d at 436).

Immediately after Refco's collapse, in October 2005, PlusFunds and SPhinX were well aware of the potential ramifications for their business and that the circumstances might well lead to litigation.  In the short period between Refco's public announcement on October 10, 2005, and October 17, 2005, when RCM and other Refco entities filed for bankruptcy, PlusFunds' directors and officers rushed to transfer the $312 million in SMFF's accounts at RCM to SMFF's accounts at LLC, and from there to SMFF's accounts at Lehman Brothers, while simultaneously soliciting and receiving advice from attorneys regarding the preference risk of that transfer.  *See, e.g.*, Dep.

Ex. 6337 (Gibson Dunn advising CEO Aaronson and certain PlusFunds directors, on October 14, 2005, that PlusFunds "will of course continue to have preference risk" from SMFF's October 12, 2005 fund transfer).  When the Refco entities' Chapter 11 filing followed mere days later, PlusFunds and SPhinX indisputably were aware that litigation likely would result regarding the $312 million that they had just withdrawn.  As of that time, if not sooner, PlusFunds and SPhinX had a clear duty to take immediate steps to preserve documents.  *See Zubulake V*, 229 F.R.D. at 431 (establishing that once the party's duty to preserve has attached, in most cases, the party must impose a litigation hold and "suspend its routine document retention/destruction policy . . . to ensure the preservation of relevant documents" as soon as the "party reasonably anticipates litigation" (internal quotation marks omitted)).  Yet they apparently took no steps to preserve documents for well over a month – when PlusFunds finally issued a written litigation hold to its personnel.

In *Pension Committee*, a group of "sophisticated investors" brought an action to recover $550 million in losses suffered from the bankruptcy and liquidation of two British Virgin Islands-based hedge funds in which the plaintiffs held shares.  There, in determining the trigger date on which the duty to preserve attached to all plaintiffs, Judge Scheindlin focused on the time at which the plaintiffs should have known of the first fund's insolvency.  *See* 685 F. Supp. 2d at 475 (finding duty to preserve attached in April 2003, the month of fund's insolvency, because it was "unreasonable to assume that [plaintiffs who had not retained counsel or brought suit] – all sophisticated investors – were unaware of the [fund's] impending collapse while other investors were filing suit and retaining counsel").  Unlike the *Pension Committee* plaintiffs, PlusFunds, by no later than October 17, 2005, <u>actually knew</u> that Refco had become insolvent, and thus certainly were on notice of a probable threat that documents in its possession could "be relevant

to future litigation." *Kronisch*, 150 F.3d at 126.  The month-and-half delay in taking steps to preserve those documents was unreasonable, and the destruction of Mr. Rose's notes during that time was a clear breach of PlusFunds' preservation obligation.

By November 30, 2005, PlusFunds took formal steps to preserve documents, circulating its written litigation hold to all PlusFunds staff – including Christopher Rose.  Through that hold, entitled "Direction to Preserve Electronic and Hard Copy Records," PlusFunds acknowledged potential litigation arising from "recent developments . . . in relation to the REFCO bankruptcy," and broadly called for the need "to preserve and maintain all documents relating to REFCO." Ex. 2.  Employees were advised not to "alter, destroy or erase any hard copy, electronic or other form of documents relating to REFCO."  The hold was to "remain in force until further written notice [was] issued from the office of [PlusFunds'] General Counsel." *Id.*

PlusFunds' duty to preserve those documents has never ended since Refco's collapse. Ever since then, PlusFunds and SPhinX have been actively engaged in, or actively contemplating, litigation regarding the funds they deposited at Refco – the same funds for which they seek to recover damages today.  On April 19, 2006, the SPhinX Board of Directors met to discuss and approve a proposed settlement of the preference action; by May 2006, SPhinX was embroiled in fending off objections to that proposed settlement; and on June 9, 2006, the SPhinX Funds filed affirmative civil claims against Messrs. Sugrue, Kavanagh, and Owens, their first in a series of complaints that now comprise this consolidated litigation.  Dep. Exs. 5049, 5051 & 6082. *Cf. In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (finding, in copyright-infringement lawsuit against investment firm, that defendant had continuing duty to preserve all relevant documents related to Napster, Inc., even after dismissal of one lawsuit based on same facts); *see also Pension Comm.*, 685 F. Supp. 2d at 466 (because a

plaintiff controls the timing of litigation, its duty to impose a litigation hold is often triggered well before any litigation commences).

### 2. The destroyed documents were relevant and subject to the preservation duty.

Once a preservation obligation attaches, the party must retain all documents in existence that might be "discovery-relevant" if litigation materializes. *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436. 441 (S.D.N.Y. 2010).  Discovery relevance, which is defined under Federal Rule of Civil Procedure 26(b)(1), "is 'an extremely broad concept,'" *Orbit One*, 271 F.R.D. at 436–37 (quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)), and includes all information that "'appears reasonably calculated to lead to the discovery of admissible evidence,'" *id.* at 437 (quoting Fed. R. Civ. P. 26(b)(1)).

The notes of Christopher Rose – PlusFunds' Chief Operating Officer – easily meet this liberal standard.  Although Defendants will never know the precise contents of the notes because they were destroyed, Mr. Rose's testimony makes clear that if preserved, the notes would have been relevant – indeed, highly significant – in discovery, and at trial.  Mr. Rose testified that he wrote notes "continuously" while at work, including at all meetings he attended.  As discussed in greater detail below, *see infra* Part II.C, other evidence shows that, during a time period in which PlusFunds was under a duty to preserve evidence, Mr. Rose attended numerous meetings related to Refco that bear on the principal issues in this case and that are critical to the Defendants' defenses.  Mr. Rose's notes from these meetings, and any other Refco-related notes, were unquestionably "reasonably likely" to result in discovery of admissible evidence.

### 3. The documents were destroyed at a time when the preservation duty attached.

As discussed above, Plaintiffs had a duty to preserve documents beginning in early October 2005.  Yet, from the outset, Plaintiffs breached that duty, failing ever to preserve Mr. Rose's relevant handwritten notes.  *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*") (duty to preserve discovery relevant documents extends to all of the organization's employees who are likely to have relevant information, that is, "the 'key players' in the case").

Mr. Rose testified that he took notes "continuously" until the end of his tenure with PlusFunds in July 2006, and that at all times he continued his practice of discarding binders full of his notes when he no longer needed them for ongoing work.  None of Mr. Rose's notes survived to be produced in this case; they are gone forever.  In other words, PlusFunds destroyed binders full of Mr. Rose's notes well after Mr. Rose and others at PlusFunds were aware of the threat of litigation, and even for seven months after they received the litigation hold in November 2005.  This is simply inexcusable.  "A party's discovery obligations do not end with the implementation of a 'litigation hold' – to the contrary, that's only the beginning.  Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." *Zubulake V*, 229 F.R.D. at 432.

### B. The Spoliation Was Willful.

Any degree of fault – bad faith, willfulness, gross negligence, or negligence – supports the culpability element necessary to find spoliation.  *Residential Funding*, 306 F.3d at 108.[2]

---

[2]     As long as any fault is shown, its quantum is not relevant in deciding whether spoliation has occurred; rather, the degree of fault is considered in determining the appropriate sanction for the spoliation.  *See, e.g.*, *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 434 (S.D.N.Y. 2009); *accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 498 (E.D. Va. 2011) ("'[T]he nuanced, fact-specific differences among these states of mind

Here, matters of degree are of little significance because the destruction of evidence was willful. Indeed, Mr. Rose expressly admits that he destroyed his notes without regard to the threat of litigation related to Refco.

In *Zubulake V*, UBS's in-house counsel issued a litigation hold, but "for unknown reasons," 229 F.R.D. at 436, "certain employees unquestionably deleted [potentially relevant] e-mails," some of which were lost forever, *id.* at 435. This conduct denied the plaintiff access to e-mails to which she was entitled. *Id.* at 436. Because "UBS deleted the e-mails in defiance of explicit instructions [from counsel] not to," this Court ruled that UBS had "acted [willfully] in destroying potentially relevant information, which resulted . . . in the absence of such information." *Id.* The facts here are at least as grave: PlusFunds, through Mr. Rose, flouted its litigation hold and destroyed significant evidence to which Defendants would have otherwise been entitled.

### C.   The Notes Likely Would Have Been Favorable to the Defense.

The final element is proof that the spoliated evidence likely would have been of "assistive relevance" to the movant, meaning that the evidence likely would have been favorable to the movant's claim or defense.[3] *Orbit One*, 271 F.R.D. at 438–39; *see also Pension Comm.*, 685 F. Supp. 2d at 467 (establishing that innocent party, in seeking "more severe sanctions" must show that the missing evidence likely was "relevant to the innocent party's claim or defense"); *Zubulake V*, 229 F.R.D. at 431 (explaining that "the concept of 'relevance' encompasses not only

---

become significant in determining what sanctions are appropriate . . . .'" (quoting *Victor Stanley*, 269 F.R.D. at 529 (alteration in original))).

[3]      Where lesser sanctions (such as fines or cost-shifting) are at issue, it may be sufficient that the culpably lost or destroyed evidence was pertinent to the claims, not that the evidence would have been favorable. *Chan v. Triple 8 Palace, Inc.*, No. 03CIV6048(GEL)(JCF), 2005 WL 1925579, at *7 n.2 (S.D.N.Y. Aug. 11, 2005).

the ordinary meaning of the term but also that the destroyed evidence would have been favorable to the movant" (footnote omitted)).

Here, Mr. Rose's notes' assistive relevance is <u>presumed</u> because their spoliation in defiance of PlusFunds' preservation obligation was willful. *See Zubulake V*, 229 F.R.D. at 436, 436 n.96 ("'It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" (quoting *Kronisch*, 150 F.3d at 126)).  In the event of willful spoliation, courts will presume assistive relevance in order not to reward the spoliating party for its misconduct.  "When evidence is destroyed in bad faith [or willfully], that fact alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions: that it would have been of assistive relevance." *Orbit One*, 271 F.R.D. at 438–39 (noting that the same inference arises in some cases where the culpable conduct constitutes gross negligence if the conduct is deemed "egregious").

Even without this presumption, the missing notes likely would have been favorable to Defendants.  The evidence shows that, during a time period when PlusFunds was under a duty to preserve evidence, Mr. Rose attended meetings relating to Refco that are critical to Defendants' defenses in this case.  For example, a few weeks before Refco collapsed, Mr. Rose met with Tamischa Ambrister and others regarding a cash management platform being proposed by Ms. Ambrister's company.  Subsequently, in late September and early October 2005, Ms. Ambrister authored a series of memoranda in which she described having learned from her meetings with PlusFunds staff – including meetings with Mr. Rose – that PlusFunds' existing cash management processes included routinely transferring excess cash from "segregated accounts" to "general

accounts." *See* June 1 Tr. 593:13–609:17; *see also* Dep. Ex. 5515, at 2.  Mr. Rose's missing

notes from his meetings with Ms. Ambrister, from which he recalls very little, may have shown

not only which PlusFunds personnel knew of the excess cash transfers but also confirmed that

Mr. Rose and others knew that excess cash held in RCM accounts was not segregated – a central

issue in this case.

Similarly, three days before Refco's October 10, 2005 public announcement, PlusFunds'

Director of Operations, Tia Urban, reported she had met with Mr. Rose and received his approval

to authorize one of the SMFF managers to sweep excess cash into an Irish hedge fund.  (Such a

sweep would have freed the excess cash from the CFTC's segregation requirements and exposed

it to significant market risk and other risks of loss.)  Mr. Rose now denies having been aware that

the sweep vehicle was an Irish hedge fund.  *See* June 1 Tr. 550:23–561:25.  Mr. Rose's notes

from the meeting with Ms. Urban could have contradicted his and PlusFunds' asserted devotion

to protecting customer cash, while also serving as impeachment evidence.

After Refco's public disclosure of its hidden receivable on October 10, 2005, Mr. Rose

participated in numerous meetings on critical topics.  These topics included:  deciding whether to

transfer SMFF's funds out of RCM, analyzing whether doing so would invite a preference claim,

investigating who at PlusFunds and SPhinX historically was involved in authorizing the cash

sweeps from LLC to RCM, and many more.  All of these topics were the subject of extensive

deposition testimony by Mr. Rose in the preference action and again in this case, and all are

topics for which Mr. Rose either claims not to have a recollection or for which his claimed

recollection is dubious.

As one example, Mr. Rose testified on February 10, 2006, in connection with the

preference action between PlusFunds and the Refco Creditors Committee, that he had no specific

understanding of why certain other senior PlusFunds managers had resigned approximately two months earlier, nor could he recall having been present for any occasion where those managers' motivations were discussed with specificity.  *See* Dep. Ex. 5273 at 37–40 (Aaronson), 47–51 (Aliprandi), 53–54 (McMahon).  In preparation for Mr. Rose's deposition in connection with this case, Defendants located documents showing that Mr. Rose participated in multiple meetings over the course of several days in late-November and early-December 2005 for the specific purpose of discussing those managers' planned resignations – and Mr. Rose even briefly was included among the group of managers who were jointly resigning, although he ultimately rescinded his resignation a few days later.  *See* June 1 Tr. at 674:12–683:03.  Once again, Mr. Rose's notes, had they survived, could have provided invaluable information about these – and the many other – meetings Mr. Rose attended where the now-existing documentary record is murkier; they also could have impeached Mr. Rose's recollection of these meetings, or lack thereof.

Indeed, Mr. Rose's destruction of potential impeachment materials is especially prejudicial because Mr. Rose's credibility is – and has long been – in question.  For example, Mr. Rose testified at his deposition that he was unaware that Sentinel Bank, which provided seed capital to launch SMFF, was connected to Refco.  *See* May 31 Tr. 244:25–268:6.  Plaintiffs' Complaint prominently alleges that the Sentinel-Refco affiliation was hidden from "innocents" at PlusFunds and SMFF, of whom Mr. Rose allegedly was one.  Compl. ¶¶ 140–141.  But contemporaneous e-mails suggest that Mr. Rose was well aware that Sentinel and Refco were connected.  *See* Dep. Exs. 4383, 4385, 5080 & 5081.  In fact, Mr. Rose and other PlusFunds executives participated in an intensive series of meetings and discussions with Refco in December 2002 regarding the need to hold the incoming cash from Sentinel at RCM rather than

at Refco LLC as a condition to seeding and launching SMFF.  *Id.*  Clearly, Mr. Rose was

actively resisting making factual admissions that he knew would hurt Plaintiffs' claims.  His

notes from such important meetings could impeach Mr. Rose's attempts to distort the facts.

In the course of trying to defend the preference action, PlusFunds' lawyers, the Pillsbury

law firm, met multiple times with Mr. Rose and, reluctantly, built their case on his declarations

and testimony as a Rule 30(b)(6) witness.  Internally, the Pillsbury lawyers expressed concern

that Mr. Rose's "story changes daily" and that they could not defend the case without knowing

the "true story."  Dep. Ex. 5039; *see also* Dep. Ex. 5040 ("[W]e had another interesting day

prepping Rose – another story about his setting up of the accounts.").  The lead Pillsbury

attorney, David Crichlow, testified in this case that he became suspicious of Mr. Rose because

"every time I would hear about a fact that couldn't be substantiated with any – by either another

witness or by documents, if we discussed it subsequently there would be more facts added on to

make the scenario seem more plausible."  Crichlow Dep. Tr. at 143:06–149:12.  Mr. Rose's

notes from meetings he attended, had they survived, likely would have provided the concrete

evidence needed to flatly contradict his suspicious recollection on a number of important issues

in this case.

It bears repeating – and emphasizing – that many of the most vigorously contested

allegations in Plaintiffs' Complaint concern facts that SPhinX and PlusFunds allegedly did <u>not</u>

know, including that RCM was an offshore, unregulated entity; that Refco was the lender for the

Suffolk Loan transactions; that SMFF's cash was not protected from RCM's insolvency risk

while held at RCM; that certain account documents signed by SPhinX Director Robert Aaron

even existed; and many more.  Mr. Rose's job responsibilities and activities – such as his role

overseeing Operations, or sitting on the Risk Committee, or in tendering his stock in the May

2005 tender offer – meant that he had substantial opportunity to learn these facts that were

allegedly unknown to SPhinX and PlusFunds.  Yet Mr. Rose has disclaimed knowledge at every

turn.  From the voluminous sets of handwritten notes that Mr. Rose willfully destroyed, even one

stray note – perhaps from a meeting that, absent the notes, is not even known to have occurred –

could discredit Mr. Rose or defeat Plaintiffs' claims.  *See, e.g.*, *Positran*, 2003 WL 21104954, at

*4 (finding prejudice "not insignificant" based on destruction of handwritten notes from a

relevant meeting because there was "no means of determining what [the] contemporaneous notes

described" and thus the notes' destruction deprived movant of opportunity to use them in cross-

examination).

### D.        Proposed Sanctions for Plaintiffs' Willful Spoliation

Because all of the necessary elements are satisfied, and particularly given the willfulness

of the spoliation at issue and the likely substantial – and unjustified – prejudice Defendants will

suffer from the complete destruction of Mr. Rose's notes, dismissal of Plaintiffs' case is

warranted.  *See, e.g.*, *West*, 167 F.3d at 779 ("Dismissal is appropriate [as a sanction for

spoliation] if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned

party.").  Although this "ultimate sanction" is "'not to be imposed lightly,'" *Gutman v. Klein*,

No. 03 CV 1570(BMC)(RML), 2008 WL 4682208, at *12 (E.D.N.Y. Oct. 15, 2008) (quoting

*Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 145 (S.D.N.Y. 2007)), it is

justified when lesser sanctions would not restore the prejudiced party to the same position it

would have been in absent the evidence's wrongful destruction.  *See Gutman*, 2008 WL

4682208, at *12.  Consequently, less severe "sanctions such as adverse inferences are ill-suited

to a case like this, where the spoliator has, in bad faith, irretrievably [destroyed documents] that

likely contained important discovery information."  *Id.*

If dismissal is not granted, however, Defendants request that the Court preclude Plaintiffs from offering evidence on matters contained within the destroyed evidence, and that it charge the jury that it may draw an adverse inference against Plaintiffs from the spoliation of Mr. Rose's notes.  Defendants will propose specific evidence to be precluded and specific language for an adverse-inference jury instruction at an appropriate time, after Plaintiffs have disclosed their trial witnesses and exhibits, or on whatever other schedule the Court may direct.

In addition to a severe sanction, the Court should award monetary sanctions, including attorney fees and the costs associated with bringing this motion.  Monetary sanctions are "appropriate 'to punish the offending party for its actions [and] to deter the litigant's conduct, sending the message that egregious conduct will not be tolerated.'"  *Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 292 (S.D.N.Y. 2009) (alteration in original) (quoting *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 201 (S.D.N.Y. 2007)).  They are also used to "serve[] the remedial purpose of compensating [the movant] for the reasonable costs it incurred in bringing [a motion for sanctions]."  *Pension Comm.*, 685 F. Supp. 2d at 471 (second and third alterations in original) (quoting *Green*, 262 F.R.D. at 291) (imposing sanction on thirteen spoliating plaintiffs, even on those whose conduct was merely negligent).  In deciding whether to impose these monetary sanctions, courts "focus[] more on the conduct of the spoliating party than on . . . whether th[e] documents were relevant and [their destruction] resulted in prejudice to the innocent party."  *Id.* at 467; *see also United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 26 (D.D.C. 2004) (imposing nearly $3-million fine because the court "ha[d] no way of knowing what, if any, value th[e] destroyed [evidence] had to [movant's] case").  In light of the willfulness of the spoliation at issue here, monetary sanctions should be granted.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion To Dismiss or for Other Sanctions for Spoliation of Evidence be granted.

Respectfully submitted,

Dated:  Washington, DC
        August 21, 2012

WILLIAMS & CONNOLLY LLP

By: /s/ Craig D. Singer
    John K. Villa
    George A. Borden
    Craig D. Singer
    (csinger@wc.com)
    725 Twelfth Street, N.W.
    Washington, DC 20005
    Tel.: (202) 434-5000

*Attorneys for Defendants Mayer Brown LLP and Edward S. Best*

Dated:  New York, New York
        August 21, 2012

WINSTON & STRAWN LLP

By:  /s/ Linda T. Coberly
    Linda T. Coberly
    Bruce R. Braun
    Catherine W. Joyce
    David J. Doyle
    35 W. Wacker Drive
    Chicago, Illinois 60601
    Tel: (312) 558-5600
    Fax: (312) 558-5700

    Luke A. Connelly
    200 Park Avenue
    New York, New York 10166
    Ph: (212) 294-6700
    Fax: (212) 294-4700

*Attorneys for Defendants Grant Thornton LLP and Mark Ramler*

LINKLATERS LLP

By: /s/ James R. Warnot, Jr.
    James R. Warnot, Jr.
    Ruth E. Harlow
    Robert H. Bell
    1345 Avenue of the Americas
    New York, New York 10105
    Tel: (212) 903-9000

    *Attorneys for Defendant Deutsche Bank*
    *Securities Inc.*


KING & SPALDING LLP

By: /s/ James J. Capra, Jr.
    James J. Capra, Jr.
    James P. Cusick
    1185 Avenue of the Americas
    New York, New York 10036
    Tel: (212) 556-2100

    *Attorneys for Defendant*
    *PricewaterhouseCoopers LLP*


COOLEY LLP

By: /s/ William J. Schwartz
    William J. Schwartz
    Jonathan P. Bach
    Reed A. Smith
    1114 Avenue of the Americas
    New York, NY 10036-7798
    Tel: (212) 479-6000

    *Attorneys for Defendant Joseph P.*
    *Collins*

CLAYMAN & ROSENBERG

By: /s/ Charles E. Clayman
    Charles E. Clayman
    305 Madison Avenue, Suite 1301
    New York, NY 10165
    Tel: (212) 922-1080

    *Attorneys for Defendant Paul Koury*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 21st day of August 2012, a copy of the foregoing

Memorandum in Support of the Undersigned Defendants' Motion To Dismiss or for Other

Sanctions for Spoliation of Evidence was filed with the Court through the CM/ECF system.  The

foregoing was served on counsel of record via the Court's CM/ECF system.


<u>/s/ John Williams</u>
John Williams