```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
In re REFCO INC. SECURITIES        :        07 MDL 1902 (JSR)
LITIGATION                         :
----------------------------------------x
----------------------------------------x
MARC S. KIRSCHNER, as Trustee of the :
Refco Private Actions Trust,       :
                                   :
         Plaintiff,                :        07 Civ. 8165 (JSR)
                                   :
         -v-                       :        MEMORANDUM
                                   :
PHILLIP R. BENNETT et al.,         :
                                   :
         Defendants.               :
----------------------------------------x
JED S. RAKOFF, U.S.D.J.
```

On June 16, 2012, Special Master Daniel J. Capra issued

a Report and Recommendation (the "GT SJ R&R") recommending that

the Court deny the motion for summary judgment of defendant Grant

Thornton LLP. After receiving the parties' written objections,

oral arguments, and supplemental briefing on choice of law, the

Court considered the entire matter de novo, and, by "bottom-line"

Order dated July 27, 2012, denied defendant's motion for summary

judgment. This Memorandum sets forth the Court's reasons for that

ruling.

To start, the Court finds itself in agreement with

Special Master Capra's excellent Report and Recommendation in all

material respects and hereby adopts it in full as if incorporated

herein. Because, however, Grant Thornton, in objecting to the

Report and Recommendation, raised the issue of choice of law,

which was not presented to the Special Master, the Court writes

separately to address that issue.[1] The Court presumes full familiarity with the facts surrounding the Refco fraud and Grant Thornton's alleged involvement, see GT SJ R&R at 1-2, and recites here only those facts relevant to the issue of choice of law.

The Trustee brings this aiding and abetting fraud action against Grant Thornton as the assignee of the claims of customers of Refco Capital Markets ("RCM") who deposited funds in foreign exchange accounts at RCM, known in these multi-district proceedings as the "FX Customers." RCM held itself out as an offshore brokerage firm, incorporated and registered in Bermuda, which was not subject to U.S. federal or state securities laws and regulations. See Declaration of Catherine Joyce dated July 20, 2012 ("Joyce Decl.") Ex. F (certificate of incorporation); id. Ex. G (FX Customer agreement); Capital Management Select Fund Ltd. v. Bennett, 680 F.3d 214, 220, 231 (2d Cir. 2012). The FX Customers are scattered to the four winds -- but none is domiciled in New York. See Joyce Decl. Ex. B (list of FX Customer addresses).

Because Grant Thornton is here sued as aiding and abetting fraud, the Trustee must first show the existence of a

---

[1] As a matter of practice, the Court would normally have referred the newly presented issue to the Special Master for reconsideration. See, e.g., Supplemental Order, Krys v. Sugrue, 08 Civ. 3065, D.E. 598 (S.D.N.Y. Apr. 9, 2012). Since, however, trial in this case is firmly set to begin on September 4, 2012, the Court directed supplemental briefing after oral argument, so as to resolve the issue in advance of trial. See Order dated July 16, 2012.

primary violation by RCM, i.e., a fraud committed by RCM on the
FX Customers. See Kirschner v. Bennett, 648 F. Supp. 2d 525, 533
& n.11 (S.D.N.Y. 2009) (citing JP Morgan Chase Bank v. Winnick,
406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)). Relevant to that
primary violation, the Second Circuit has recently opined on the
relationship between RCM and its customers in the context of
securities customers who brought claims alleging that RCM
committed securities fraud by breaching their brokerage
agreements through rehypothecating[2] the securities in their
brokerage accounts. See Capital Management, 680 F.3d at 218–19.
In rejecting the securities customers' claims, the Second Circuit
held that RCM, by holding itself out as an unregulated offshore
broker-dealer, disclaimed any obligation to comply with U.S.
broker-dealer laws and regulations regarding rehypothecation. See
id. at 220–23, 228–29, 231–32, 233–34.

          This Court agrees with the Special Master that the
determination in Capital Management that RCM gave clear notice
that it was not bound by U.S. broker-dealer laws and regulations
regarding rehypothecation does not preclude the FX Customers from
asserting New York common law fraud claims for inducing the FX
Customers' deposits in the first place. See GT SJ R&R at 4–6. But

_____   _____

[2] Rehypothecation, in the general sense, refers to a broker using
or pledging the use of its customer's margin account securities
to obtain financing for its own transactions. Capital Management,
680 F.3d at 220 n.4.

3

that does not address the first-order question: does New York
tort law even apply to the FX Customers' claims?

   At oral argument held before the Court on July 13,
2012, Grant Thornton argued that that RCM -- a Bermuda entity
dealing with far-flung FX Customers around the world, who
expressed no indication that they knew they were dealing with a
New York brokerage -- should not be subject to a New York common
law duty to disclose its "hopeless insolvency." Transcript of
Oral Argument dated July 13, 2012 ("Tr.") at 17-25. Neither party
at oral argument, however, knew whether Bermuda law imposed a
similar duty to disclose. Accordingly, the Court ordered
supplemental briefing on (1) whether Bermuda imposed a similar
duty to disclose, thereby obviating any conflict; and (2) if not,
whether the Court should apply New York law or Bermuda law to the
FX Customers' claims. See Order dated July 16, 2012. Having
reviewed the parties' supplemental briefing, the Court answers
the questions posed thusly: (1) Bermuda law does not impose a
duty to disclose hopeless insolvency or the like. (2)
Nonetheless, under choice of law principles, New York is the
locus of the fraud alleged and New York law applies to the
primary violation allegedly committed by RCM.

   A federal court sitting in diversity applies the choice
of law rules of the forum state, here, New York. See Thomas H.
Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F.
Supp. 2d 267, 283 (S.D.N.Y. 2009) (citing Klaxon v. Stentor Elec.

Mfg., 313 U.S. 487, 496-97 (1947)). Under New York choice of law
rules, the Court must first determine whether there is any actual
conflict between New York and Bermuda law. See Curley v. AMR
Corp., 153 F.3d 5, 12 (2d Cir. 1998).

Here, the procedural history of this case has left the
FX Customers with one primary violation allegedly committed by
RCM: that RCM failed to disclose it was "hopelessly insolvent"
before accepting the FX Customers' deposits, in violation of a
New York common law duty to disclose. See GT SJ R&R at 6-12
(citing Craigie v. Hadley, 1 N.E. 537 (N.Y. 1885); St. Louis &
S.F. Ry. Co. v. Johnston, 133 U.S. 566 (1890)). Based on the
parties' submissions to the Court, however, it appears that
Bermuda does not recognize the duty to disclose hopeless
insolvency or the like.

The Trustee puts forth two Bermuda law principles as
analogous to the New York duty to disclose hopeless insolvency:
implied agency and affirmative misrepresentation. See Plaintiff's
Supplemental Memorandum of Law on Choice of Law dated July 20,
2012 ("Pl. Supp. Br.") at 5-6. As Grant Thornton correctly
argues, however, both of these theories have already been
rejected as creating liability in this case even as a matter of
New York law, see PAT R&R at 15-16; Kirschner, 648 F. Supp. 2d at
535-37, and neither gets to the place that the hopeless
insolvency duty occupies: whether a nondiscretionary broker who
is not a fiduciary and has not made an affirmative

misrepresentation nevertheless has a common law duty to disclose
hopeless insolvency before accepting customer money. See GT SJ
R&R at 6-7 (citing PAT R&R at 13; United States v. Szur, 289 F.3d
200, 211-12 (2d Cir. 2002)). To the contrary, Grant Thornton
submits persuasive authority from its Bermuda law experts
suggesting that Bermuda treats the relationship between a broker
and its customers as simply a matter of contract. See Declaration
of Mark Guy Chudleigh dated July 20, 2012 ("Chudleigh Decl.") ¶¶
4-5; Declaration of Kehinde Abinbola Lucille George dated July
20, 2012 ("George Decl.") ¶¶ 10-12; Green v. Lines Overseas Mgmt.
Ltd., Bda. L.R. 53 (2002) (imposing customary contractual terms,
and not fiduciary or common-law duties, in broker case without
written contract).

        In particular, Szur imposes a duty on a broker to
affirmatively disclose certain significant information, whereas
Bermuda courts have generally refused to expand the obligations
of a broker to his customers beyond contractual obligations.
Chudleigh Decl. ¶ 4; White v. Conyers Dill & Pearman, Civil
Appeal No. 31 of 1993 at 5 (Court of Appeal for Bermuda), cited
with approval in Phoenix Global Fund Ltd & Anor v Citi Group Fund
Servs. (Bermuda) Ltd & Anor (Civil Jurisdiction 2006: No. 20) at
263 (Supreme Court of Bermuda). Accordingly, in the absence of a
case on point showing that Bermuda recognizes a duty to disclose
hopeless insolvency or the like, the Court concludes that Bermuda

6

law and New York law differ on this issue. See Fed. R. Civ. P. 44.1.

Having identified a conflict between Bermuda and New York law, the Court must now decide which law applies to the claims brought by the Trustee on behalf of the FX Customers. In a tort law case, New York uses an "interests analysis" to determine which law governs, applying the "law of the jurisdiction with the most significant interest in, or relationship to, the dispute." White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006) (citation and internal quotation marks omitted); Padula v. Lilarn Props. Corp., 84 N.Y.2d 519, 521 (1994). In weighing the interests in a tort case, New York distinguishes between "conduct regulating" and "loss allocating" rules. Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir. 1999). Conduct regulating rules are those "governing conduct to prevent injuries from occurring"; loss allocating rules "are those which prohibit, assign, or limit liability after the tort occurs." Padula, 84 N.Y.2d at 521; see also Cooney v. Osgood Mach., 81 N.Y.2d 66, 72 (1993).

Here, the question of whether a broker has a duty to disclose that it is hopelessly insolvent before accepting a customer's funds is clearly a conduct regulating rule designed to prevent brokers from fraudulently inducing deposits that customers will never get back. Cf. Thomas H. Lee Equity Fund V, 612 F. Supp. 2d at 284 (holding that negligent misrepresentation

7

and fraud claims against Mayer Brown for misrepresenting Refco's financial condition in connection with LBO involved conduct regulating rules). It would, after all, be difficult to allocate loss between the parties when one of the parties is insolvent. When the conflict involves rules that regulate conduct, the site of the tort governs. Padula, 84 N.Y.2d at 521; accord Sheldon v. PHH Corp., 135 F.3d 848, 853 (2d Cir. 1998).

Grant Thornton argues that the locus of the tort is Bermuda, focusing primarily on the reasonable expectations of the parties. See Schultz v. Boy Scouts of Am., 65 N.Y.2d 189, 201 n.3 (1985) (considering parties' expectations in loss allocating rule case). Grant Thornton argues that RCM held itself out as a Bermuda entity, that it maintained Bermuda incorporation, Bermuda directors and meetings, and Bermuda counsel, and that the customers who chose to deal with RCM knew they were dealing with an offshore entity, not a New York entity, and not an entity subject to U.S. broker-dealer laws and regulations. See Capital Management, 680 F.3d 214. Indeed, Grant Thornton argues that no FX Customer was domiciled in New York, see Joyce Decl. Ex. B, and that at least one customer believed, for example, that RCM was a London entity, Tr. at 21. Therefore, Grant Thornton argues, New York has no interest in regulating RCM's relationship with the FX Customers.

The Court disagrees. Although RCM is the specific Refco entity that the Trustee alleges defrauded the FX Customers, the

8

alleged "hopeless insolvency" that gave rise to the fraud in the first place goes well beyond this offshore brokerage subsidiary, and encompassed Refco as a whole. The Refco umbrella of companies included three primary operating subsidiaries, of which RCM was one. Capital Management, 680 F.3d at 219. RCM was used as a piggy bank to fund the Refco fraud -- Refco insiders used client money deposited at RCM to disguise its financial condition, see id. at 223; Kirschner, 648 F. Supp. 2d at 528-32 -- but the alleged "hopeless insolvency" created by the Refco fraud that gave rise to RCM's duty to disclose was a result of tortious (and indeed, criminal) conduct carried out in New York. See Thomas H. Lee Equity Fund V, 612 F. Supp. 2d at 284 (applying New York law in choice of law dispute because, inter alia, New York "is the jurisdiction where the Refco fraud originated and where substantial activities in furtherance of the fraud . . . were committed" and the "overwhelming bulk of events surrounding . . . the underlying fraud occurred in New York where Refco was headquartered").

Moreover, even RCM itself was based in significant part in New York. While RCM operated as a Bermuda company in order to avoid U.S. securities laws and regulations, in 2001, two and a half years before the commission of the deposits at issue here, RCM "repatriated" its operations from Bermuda to the United States and closed its Bermuda office in January 2002. See Kirschner, 648 F. Supp. 2d at 530 n.8; Declaration of Nicholas J.

Calamari dated July 20, 2012 ("Calamari Decl.") Ex. 1 ("Dispenza Dep.") at 35-36; see also Calamari Decl. Ex. 5 ("Maggio Dep.") at 48.[3] The Refco insiders sued as individual defendants in this action worked in New York. Even RCM's communications to its customers were mailed from a New York mailing address. Dispenza Dep. at 256; Calamari Decl. Exs. 2-3.

        While Grant Thornton argues that the New York mailing address was simply "RCM c/o Refco Securities LLC," Calamari Decl. Exs. 2-3; see also Joyce Decl. Ex. E at 9-10 (Trustee describing RCM as "Bermuda-registered company" that was not "regulated" in the United States), this just proves the Court's point. Refco Securities LLC was Refco's on-shore, regulated brokerage subsidiary. In effect, Refco gave its customers a menu of options. Choose RCM, and choose an offshore brokerage unconstrained by U.S. securities laws and regulations. Or choose Refco Securities LLC, and choose an on-shore brokerage. Thus, while the subsidiaries functioned as a form of regulatory arbitrage, Refco effectively operated as one entity. In particular, Refco operations were controlled centrally from New York, and Refco employees operated both Refco Securities LLC and RCM. See Kraker Dep. at 21 (noting RCM's principal place of

---

[3] Grant Thornton notes that this repatriation involved relocating RCM's back office operations to New Jersey, Am. Compl. ¶ 264, and its trading operations to Vienna, Joyce Decl. Ex. P at 677-79. But this does not change the fact that after December 2001 RCM had no significant ties to Bermuda, whereas RCM's principal place of business in 2004 and 2005 was New York. Calamari Decl. Ex. 4 ("Kraker Dep.") at 21.

business was New York). Indeed, even Capital Management, on which

Grant Thornton heavily relies, noted that:

> Although RCM was organized under the laws of Bermuda and
> represented itself as a Bermuda corporation, it operated
> from New York at all relevant times. These operations were
> under the leadership of, and through a sales force of
> account officers and brokers employed by, its affiliated
> corporation, Refco Securities, LLC, ("RSL"), a wholly-owned
> subsidiary of Refco that operated as a U.S.-based broker-
> dealer registered with the SEC

Capital Management, 680 F.3d at 220.

The contractual choice to avoid U.S. regulations was

one the customers made, and the Second Circuit has upheld the

Court's prior ruling that the customers' choice to invest money

in an offshore brokerage firm was one they made knowingly and

voluntarily, and one they cannot now complain about as a

misrepresentation. Capital Management, 680 F.3d at 230 ("Here,

more than simply remaining silent as to whether it was complying

with U.S. law, RCM represented that it was not a U.S.-regulated

company."). But this is wholly distinct from determining the

locus of any claim that is actionable. Here, when Refco crossed

the line into illegality, Refco insiders siphoned off money from

one Refco entity to another in a complicated scheme of heroic

proportions to disguise Refco's financial condition. Kirschner,

648 F. Supp. 2d at 528-32. The efforts to disguise Refco's

financial condition -- and as a consequence, RCM's financial

condition -- and the subsequent failure to disclose that alleged

hopeless insolvency to the FX customers, were centered in New

York.

The difference between Capital Management and this case
may thus be described as the difference between the law governing
the going-forward relationship between the brokerage customers
and RCM, and the position of RCM vis-à-vis customers at the time
the customers made the decision to deposit their funds at RCM. At
that time, it is undisputed that RCM said nothing to the FX
Customers regarding its alleged hopeless insolvency. The question
of whether RCM was hopelessly insolvent, giving rise to a duty to
disclose, relates entirely to the Refco fraud, which was centered
in New York.

Therefore, applying New York choice of law principles
to this case, the Court concludes that New York has greater
interests in this action than Bermuda, and thus that New York law
applies to the Trustee's claims. Accordingly, the Court,
reaffirming its "bottom line" Order of July 27, 2012, hereby
denies defendant's motion for summary judgment. As previously
indicated, trial will begin on September 4, 2012, at 9 A.M.

JED S. RAKOFF, U.S.D.J.

Dated:     New York, New York
           August 29, 2012