```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
In re REFCO INC. SECURITIES          :    07 MDL 1902 (JSR)
LITIGATION                           :
------------------------------------x
------------------------------------x
KENNETH M. KRYS, et al.,             :
                                     :
          Plaintiffs,                :    11 Civ. 1486 (JSR)
                                     :
          -v-                        :    MEMORANDUM ORDER
                                     :
SCHULTE ROTH & ZABEL LLP,            :
                                     :
          Defendant.                 :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

On February 14, 2011, plaintiffs sued defendant Schulte Roth & Zabel LLP ("Schulte Roth") in state court for malpractice. After the case was removed to federal court and a new complaint filed, Schulte Roth moved to dismiss. On April 9, 2012, Special Master Daniel J. Capra issued a Report and Recommendation, recommending that the motion to dismiss be granted in part and denied in part. On April 12, 2012, plaintiffs stipulated to the dismissal of the portion of the malpractice claim that the Special Master had recommended be dismissed. Plaintiffs and defendant then timely filed their objections to the remaining portion of the Report and Recommendation, and their responses thereto, and the Court heard oral argument on the parties' objections on May 30, 2012. After considering the entire matter de novo, the Court, by "bottom line" Order dated July 17, 2012, disagreed with the objected-to portion of the Special Master's Report and Recommendation and granted defendant Schulte Roth's

motion to dismiss the remainder of the malpractice claim. This Memorandum Order states the reasons for that conclusion and directs the entry of final judgment dismissing the complaint.

The Court here presumes full familiarity with the general background and factual allegations regarding the so-called "Refco fraud" and "SPhinX fraud." See generally Report and Recommendation of the Special Master on the Omnibus Issue of the Primary Violations by Refco dated March 1, 2010, Krys v. Sugrue, 08 Civ. 3065, D.E. 342. The more directly pertinent factual allegations, drawn from plaintiffs' Complaint, together with those "documents . . . incorporated in it by reference" and "matters of which judicial notice may be taken," Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted), are as follows:

Shortly after the disclosure of the Refco fraud on October 10, 2005, SPhinX and PlusFunds discovered that over $312 million of excess cash belonging to SPhinX Managed Futures Fund SPC ("SMFF") that had been deposited at Refco Capital Markets ("RCM") had not been maintained as promised in customer-segregated accounts, and therefore might be subject to claims arising from RCM's likely insolvency. Compl. ¶ 81. On the next day, October 11, 2005, SPhinX and PlusFunds withdrew all of

SMFF's excess cash from RCM, id. ¶ 8, and Refco filed for bankruptcy on October 17, 2005.

SPhinX and PlusFunds immediately sought legal advice as to whether the excess cash would be subject to claims by RCM's estate and whether SMFF faced exposure on claims of voidable preference. Id. ¶ 81. In addition, SPhinX and PlusFunds had to decide how to deal with redemption requests from their investors, a number of which were pending at the time of the Refco fraud disclosure on October 10, 2005, as well as additional redemption requests submitted in the following days and weeks. Id. ¶ 82.

Accordingly, SPhinX and PlusFunds retained two law firms to provide advice on these issues: the defendant here, Schulte Roth, and, separately, the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn").[1] Schulte Roth had been the "U.S.

---

[1] Plaintiffs separately brought suit against Gibson Dunn in the related action of Krys v. Sugrue, Nos. 08 Civ. 3065 (JSR); 08 Civ. 3086 (JSR) (S.D.N.Y.), which was dismissed in favor of arbitration. Plaintiffs agree that SPhinX and PlusFunds sought legal advice from Gibson Dunn on the same legal issues on which plaintiffs predicate their instant claims, but note that, based on the depositions of two Gibson Dunn attorneys, "Gibson Dunn takes the position that it was not counsel to the SPhinX funds in October 2005." SPhinX Plaintiffs' Response to the Objection of by Defendant Schulte Roth & Zabel, LLP to the Report and Recommendation of the Special Master on Motion to Dismiss dated May 18, 2012 ("Pl. Resp.") at 14 (citing Declaration of Mason C. Simpson dated May 18, 2012, Ex. A, Deposition of Mitchell Karlan dated Apr. 5, 2012, at 10-15; id. Ex. B, Deposition of Scott Kislin dated May 11, 2012, at 267-69). This is demonstrably incorrect, as shown by filings in the public record of which this court may take judicial notice. In particular, when Gibson Dunn moved to compel arbitration of plaintiffs' malpractice claims,

Fund Counsel" to both SPhinX and PlusFunds since 2002, and was specifically engaged on these issues on October 13, 2005, when PlusFunds sent Schulte Roth an email requesting advice regarding the potential treatment of customer funds held at RCM. Id. ¶¶ 21, 86. Gibson Dunn was separately retained by PlusFunds one day prior, on October 12, 2005, on behalf of both PlusFunds and SPhinX. Declaration of Scott S. Balber dated May 4, 2012 ("Balber Decl.") Ex. 4, Amended Complaint, Krys v. Sugrue, 08 Civ. 3065 ("Sugrue Compl.") ¶ 505.

Plaintiffs allege that SPhinX and PlusFunds "consulted closely" with both firms in the days that followed, "specifically seeking advice regarding how SPhinX should respond to redemption

---

Gibson Dunn expressly and repeatedly took the position that it had represented both PlusFunds and SPhinX in October 2005. In this regard, Gibson Dunn cited, inter alia, to the engagement letter in which PlusFunds had retained Gibson Dunn on behalf of both PlusFunds and its affiliates, including SPhinX -- a letter that both the Special Master and this Court subsequently referenced in dismissing the case in favor of arbitration. See, e.g., Memorandum of Law in Support of Motion of Defendants Gibson, Dunn & Crutcher LLP, Mitchell A. Karlan and Scott A. Kislin to Compel Arbitration of All Claims or, in the Alternative, to Stay All Remaining Claims dated Nov. 13, 2008, Krys v. Sugrue, 08 Civ. 3065, D.E. 130; Report and Recommendation on Motion to Dismiss of Defendants Gibson, Dunn & Crutcher LLP, et al., to Compel Arbitration dated Nov. 20, 2009, Krys v. Sugrue, 08 Civ. 3065, D.E. 288, at 15-16 (adopting Gibson Dunn's proposed findings of fact and conclusions of law, including that "PlusFunds retained Gibson Dunn to represent SPhinX pursuant to the October 2005 Engagement Letter"); Memorandum Order dated Jan. 21, 2010, Krys v. Sugrue, 08 Civ. 3065, D.E. 316, at 2 (adopting report and recommendation and noting that "it is undisputed that . . . SPhinX received benefits - i.e., Gibson Dunn's legal services - pursuant to PlusFunds' engagement of Gibson Dunn").

requests in light of potential preference claims that might be asserted by Refco's estate." Compl. ¶ 87; Sugrue Compl. ¶¶ 506-09. During the next two weeks or so, Schulte Roth researched and billed SPhinX for work relating to preference issues and redemption requests. Compl. ¶¶ 87-89. Ultimately, however, Schulte Roth resigned from representing both SPhinX and PlusFunds on these matters, without offering an opinion on the issues it had been retained to research. Id. ¶ 90. Specifically, on October 31, 2005, Schulte Roth sent PlusFunds a letter stating that Schulte Roth had previously told PlusFunds on October 25, 2005 of its intent to withdraw from representing PlusFunds and SPhinX in connection with the Refco bankruptcy, and confirming that withdrawal. Balber Decl. Ex. 5.[2]

Subsequently, beginning on November 2, 2005, SPhinX honored investor redemption requests at full Net Asset Value ("NAV"). Compl. ¶¶ 93-95. On December 15, 2005, RCM's unsecured creditors committee filed suit against SMFF seeking to recover as

---

[2] Plaintiffs allege that Schulte Roth terminated the relationship on October 31, 2005, and make no reference to the October 25 discussion mentioned in the October 31 letter sent by Schulte Roth, or even the letter itself. Compl. ¶ 90. Nevertheless, "[w]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may . . . take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." Holowecki v. Fed. Express Corp., 440 F.3d 558, 565-66 (2d Cir. 2006). In any event, the difference in date of termination is immaterial to this Court's ruling.

a preferential transfer the $312 million SMFF had withdrawn from RCM. Id. ¶ 96. SPhinX was advised by its new counsel, Pillsbury Winthrop Shaw Pittman LLP, that SMFF would likely lose the preference action. Id. ¶¶ 97-101. Moreover, plaintiffs allege that Pillsbury correctly advised SPhinX that because SMFF could not pay back the full $312 million it had received (plus interest), therefore, under section 502(d) of the Bankruptcy Code, any claims SMFF had filed in the RCM bankruptcy proceeding would be disallowed. Id. ¶ 100, 102; 11 U.S.C. § 502(d) (requiring court to "disallow any claim by an entity from which property is recoverable" as a preferential transfer, "unless such entity or transferee has paid the amount . . . for which such entity or transferee is liable"). In light of this information, SPhinX settled the RCM preference claim by agreeing to return $263 million and waiving its claims against certain Refco entities. Compl. ¶ 103. As a result of this loss, however, SPhinX and PlusFunds collapsed -- SPhinX was forced into liquidation and PlusFunds into bankruptcy. Id. ¶ 107.

Plaintiffs allege that Schulte Roth committed malpractice by failing to give adequate advice regarding investor redemptions after the Refco fraud was disclosed. Specifically, plaintiffs allege that Schulte Roth failed to advise SPhinX that, if SPhinX honored its investors redemption requests in full, it

6

would be subject to a voidable preference claim and unable to participate in the RCM bankruptcy pursuant to section 502(d) of the Bankruptcy Code.[3] Schulte Roth has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In order to state a claim for legal malpractice under New York law (which governs this claim), a plaintiff must allege "that an attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession" and that "the attorney's breach of this professional duty caused the plaintiff's actual damages." McCoy v. Feinman, 99 N.Y.2d 295, 302 (2002) (internal citations and quotations omitted).

Here, Schulte Roth, having been retained (along with Gibson Dunn) to opine on the questions here in issue, shortly

---

[3] As noted, plaintiffs also previously alleged that Schulte Roth committed malpractice in its preparation of the offering documents for the SPhinX funds. The parties, however, jointly dismissed, with prejudice, this portion of the claim on April 17, 2012, which the Court so ordered. Accordingly, the Court does not address this portion of the Special Master's Report and Recommendation.

7

thereafter resigned without rendering an opinion. However, when a lawyer chooses to withdraw from a representation, he must "protect the welfare of the client by giving due notice of the withdrawal, suggesting employment of other counsel, . . . cooperating with counsel subsequently employed, and otherwise endeavoring to minimize the possibility of harm." N.Y. Code of Prof'l Resp. E.C. 2-41.[4] More generally, the lawyer must take "reasonable steps to avoid foreseeable prejudice to the rights of the client." Hanlin v. Mitchelson, 794 F.3d 834, 842 (2d Cir. 1986) (quoting N.Y. Code of Prof'l Resp. D.R. 2-110(A)(2)).

Special Master Capra concluded that there exists a question of fact as to whether Schulte Roth took reasonable steps to avoid foreseeable prejudice to SPhinX. Report and Recommendation of the Special Master on Motion to Dismiss dated Apr. 9, 2010 ("SRZ R&R") at 12. The Court disagrees. Even accepting plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Complaint fails to plausibly allege that Schulte Roth failed to fulfill its duty to take reasonable steps to protect its client from foreseeable harm.

---

[4] Although New York has since repealed the Code of Professional Responsibility and replaced it with the Rules of Professional Conduct, the Code was still in force in 2005 at the time of the events here relevant. See Gabayzadeh v. Taylor, 639 F. Supp. 2d 298, 303 (E.D.N.Y. 2009) (noting Rules became effective on Apr. 1, 2009).

8

Schulte Roth may have informed SPhinX it was withdrawing as early as October 25, 2012, but it undisputedly confirmed it in writing on October 31, 2012. Although Schulte Roth had offered no advice on which SPhinX could rely, that writing identified for SPhinX that it should seek advice on the pitfalls associated with a potential "clawback" action.[5]

Although, given that caveat and the circumstances generally, Schulte Roth would have had ordinarily to ensure that SPhinX could obtain new counsel within sufficient time to protect SPhinX's rights, see Golden v. Cascione, Chechanover & Purcigliotti, 286 A.D.2d 281, 281-82 (1st Dep't 2001); Katz v. Herzfeld & Rubin, P.C., 48 A.D.3d 640, 641 (2d Dep't 2008), here SPhinX already had alternate counsel in place, Gibson Dunn, which had been working on the same issues since October 12, 2005, the

---

[5] The letter states, in relevant part:

> As [PlusFunds] requested, I can confirm to you that we have not advised either PFG or the Funds regarding the actions, if any, that are required to be taken by PFG or the Funds as a result of matters relating to Refco's bankruptcy. However, to the extent that we have served as counsel to the Funds, I note that we have advised PFG of our view that the boards of directors of the Funds should be made aware of, and consider, all relevant matters relating to the Refco situation (including the question of whether monies received from Refco are subject to potential claims as a consequence of the bankruptcy proceeding) insofar as they may have a bearing on the pricing of shares of the Funds and the disclosure obligations of the Funds.

Balber Decl. Ex. 5 at 1.

day before PlusFunds contacted Schulte Roth about the instant matter. Sugrue Compl. ¶¶ 504-10. Indeed, in their separate action against Gibson Dunn, plaintiffs alleged that Gibson Dunn gave SPhinX advice on redemptions, on which plaintiffs, to their detriment, relied. Sugrue Compl. ¶ 505-09; SRZ R&R at 12. Accordingly, there is no plausible inference to draw that Gibson Dunn did not have sufficient time to advise SPhinX. See, e.g., Park v. Reizes, No. 5:06-CV-0843, 2009 WL 4893142, at *5-6 (N.D.N.Y. Dec. 15, 2009) (granting summary judgment for defendant on malpractice claim where defendant was forced to withdraw twenty days before trial to avoid breach of professional duty and holding successor counsel had adequate time to prepare). The fact that Gibson Dunn allegedly failed to advise SPhinX of the effect of section 502(d) does not render Schulte Roth's efforts to ensure SPhinX's rights were protected unreasonable.

The Special Master also concluded that Schulte Roth and Gibson Dunn were "joint tortfeasors," and therefore the fact that Gibson Dunn continued its representation when Schulte Roth withdrew did not immunize Schulte Roth from malpractice liability. SRZ R&R at 14 (citing Ravo ex. rel. Ravo v. Rogatnick, 70 N.Y.2d 305, 309 (1987)).

The Court disagrees. Under the Special Master's joint tortfeasor theory of liability, there would be no way for a

10

lawyer in a multi-lawyer representation to withdraw from the representation without exposing himself to malpractice liability. Even if the lawyer soon learned after undertaking a representation that he had an unwaivable conflict and withdrew immediately, his withdrawal with ostensibly adequate counsel already in place would not relieve him of his joint and several liability if, unbeknownst to him, the other counsel then committed malpractice. Indeed, this is particularly a concern in the instant action, where plaintiffs themselves allege that Schulte Roth was in fact operating under a conflict, which "on and information and belief," led directly to its withdrawal. See Compl. ¶ 91. Under the Special Master's theory, withdrawing counsel, even though forced to withdraw immediately because of the conflict, would be left at the mercy of continuing counsel.

Ravo is not to the contrary. In Ravo the New York Court of Appeals affirmed a jury verdict holding two physicians jointly and severally liable for the "single indivisible injury" of brain damage caused by one doctor's malpractice before childbirth and another's malpractice soon after the plaintiff was born. Ravo, 70 N.Y.2d at 307. While the Court affirmed the commonplace rule that "[u]nder successive and independent liability . . . the initial tort-feasor may well be liable to the plaintiff for the entire damage proximately resulting from his own wrongful acts," id. at

11

310, it also included the obvious proviso that "where multiple tort-feasors neither act in concert nor contribute concurrently to the same wrong, they are not joint tort-feasors." Id. (internal quotation marks omitted). Unlike Ravo, in the instant case there is no plausible claim that Schulte Roth and Gibson Dunn are concurrent tort-feasors causing an "indivisible wrong." Rather, as described above, it is obvious where the representation of Schulte Roth ended and of other counsel began, and it is equally obvious that they were not working together at any time. Thus, there is no alleged injury that "because of [its] nature, [is] incapable of any reasonable or practicable division or allocation among multiple tort-feasors." Id.

The question is not, as the Special Master cast it, whether the allegations that Gibson Dunn also failed to advise SPhinX on section 502(d) implicates Schulte Roth in this malpractice action. SRZ R&R at 14. The question is whether, at the time Schulte Roth withdrew, it had taken reasonable steps to avoid foreseeable prejudice to SPhinX. The Court concludes that, even drawing all inferences in plaintiffs' favor, Schulte Roth had.

Accordingly, there is no plausible claim that Schulte Roth committed malpractice in withdrawing from representing SPhinX and not advising SPhinX of the implications of section

12

502(d) of the Bankruptcy Code. The Court therefore reaffirms its bottom line Order of July 18, 2012 granting defendant's motion to dismiss, and hereby directs the Clerk of the Court to enter final judgment dismissing the case with prejudice.

    SO ORDERED.

                                          JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
            November 13, 2012

13