UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                       :

In re REFCO INC. SECURITIES LITIGATION    :   Case No. 07-MD-1902 (JSR)
                                       :

---------------------------------------------------------x

This Document Relates To:

---------------------------------------------------------x
KENNETH M. KRYS, *et al.*,                  :   Case No. 08-CV-3065 (JSR)
                                       :   Case No. 08-CV-3086 (JSR)

                   Plaintiffs,  :
                                       :

         -against-                  :
                                       :

CHRISTOPHER SUGRUE, *et al.*,           :
                                       :

                   Defendants.  :
---------------------------------------------------------x
KENNETH M. KRYS, *et al.*,                  :   Case No. 10-CV-3594 (JSR)
                                       :

                   Plaintiffs,  :
                                       :

         -against-                  :
                                       :

DEUTSCHE BANK SECURITIES., INC., *et al.*,  :
                                       :

                   Defendants.  :
---------------------------------------------------------x

**PLAINTIFFS' RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF THE PRIMARY VIOLATION OF FRAUD BY REFCO**

In accordance with Local Civil Rule 56.1, Plaintiffs respectfully submit the following statement of material facts as to which there is no genuine issue to be tried.

**A.** **All Parties have Admitted the Existence of the Refco Fraud.**

1.      On October 10, 2005, Refco[1] disclosed the existence of a $430 million related-party receivable. The receivable, which had been owed to Refco by Refco Group Holdings, Inc. ("RGHI") was at the center of a fraud that rendered Refco's published financial statements materially false and misleading. This announcement was followed by a series of events and subsequent disclosures that culminated in Refco filing for bankruptcy on October 17, 2005.

2.      Throughout this litigation, the parties and others have admitted the existence of the so-called "Refco fraud," a scheme to conceal massive losses from Refco's books and to enrich Refco insiders. The Refco fraud included the following elements: 1) Refco diverted assets from unprotected accounts at Refco Capital Markets Ltd. ("RCM"); a Bermuda affiliate, to fund Refco's fraudulent schemes and line the pockets of Refco insiders; 2) Refco conspired to hide the losses on the books by transferring losses and expenses to RGHI and creating a receivable owed from RGHI (the "RGHI receivable"); 3) Refco engaged in a series of round-trip loans ("RTLs"), which purported to be legitimate loan transactions but only served temporarily to reduce the balance of the RGHI receivable at the end of each reporting period and replace it with receivables from purportedly independent third parties; 4) Refco booked imaginary profits by charging excessive (and often usurious) interest on the RGHI receivable; 5) having maintained the illusion of solvency, Refco borrowed money to fund the August 2004 LBO, which enriched Refco's insiders; and 6) the LBO was followed up by an IPO that further

---

[1] As used herein, "Refco" refers to Refco, Inc., its direct and indirect subsidiaries, and their predecessors collectively. The definition of Refco herein excludes Refco Group Holdings, Inc.

enriched Refco's corrupt insiders.  The existence of a fraud has been admitted by nearly every party involved in the litigation, as shown below.

      **B.**      **Refco Insiders**

      3.      Robert Trosten, Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC (a predecessor of Refco, Inc.) between 2000 and 2004, pled guilty to securities fraud, bank fraud and wire fraud in connection with the Refco fraud.  He first found out about the fraud at Refco in 1998 and his salary significantly increased thereafter in part because he was prepared to continue with the ongoing fraud at Refco and was to be compensated for it.  In 2004, Mr. Trosten received in excess of $50 million dollars through the LBO.  *See* Deposition of Robert Trosten, dated Dec. 10, 2009, at 17:3-14, 28:20-22, 21:5-13 and 20:9-18 (attached as Ex. 1 to the Declaration of Mason C. Simpson in Support of Plaintiffs' Motion for Partial Summary Judgment on the Issue of the Primary Violation of Fraud by Refco, dated December 17, 2012 ("Simpson Decl.")).

      4.      Mr. Trosten admitted that, as an officer of Refco, he participated in a fraudulent scheme to give the appearance that Refco was financially healthy.  The fraud included the hiding of the amount of the RGHI receivable that was due to Refco.  Other components of the fraud included the inflation of revenues through interest rate manipulations and the shifting of expenses from the books of Refco to RGHI.  *See* Trosten Dep., Dec. 10, 2009, at 23:2-7; 23:13-24:7; 24:8-25:14 and 26:4-13 (attached as Ex. 1 to Simpson Decl.).

      5.      Santo Maggio was a former Executive Vice President of Refco and the CEO of RCM.  Mr. Maggio pled guilty to two counts of security fraud, one count of wire fraud and one count of conspiracy to commit fraud in connection with his participation in the Refco fraud.  Mr. Maggio testified that the fraud involved a "manipulation of Refco's financial statements" and included "transactions that were designed to hide the existence of monies owed to Refco [by

RGHI]." Maggio Depo., Dec. 14, 2009, at 28:15-24. The fraud also involved the misuse and misappropriation of customer funds and the manipulation of revenues, inflation of revenues, phony transactions to inflate revenues and reclassification of certain types of revenues to inflate Refco's apparent revenues. Refco wrongfully "tapped into" customer segregated funds for its own purposes. *See* Deposition of Santo Maggio, dated Dec. 14, 2009, at 28:3-11; 28:15-24; 29:16-23; 30:20-31:19; 41:11-20; 42:11-18 (attached as Ex. 2 to Simpson Decl.).

6.     Mr. Maggio admitted that, as an officer of Refco, he participated in Refco's numerous, fraudulent round-trip loan transactions, the "sole purpose" of which was to hide the RGHI receivable. Refco also provided false information in its public filings in connection with the LBO and IPO and created false accounts, listed fake collateral and transferred obligations from and among various entities within the Refco Group to hide the false accounts and fake collateral. Refco was a "lie," portraying itself as a valuable enterprise when it in fact was "worthless or close to worthless." Maggio Depo., Dec. 14, 2009, at 109:2-18:25; 114:4-15:5; 406:7-11; 418:9-19:22; and Dec. 15, 2009, 518:11-19:4; 539:11-40:12; 541:12-25; 596:2-13 (attached as Ex. 2 to Simpson Decl.).

**C.     The Workings of the Refco Fraud.**

7.     In his expert report in support of Plaintiff's claims, former SEC Chairman Richard C. Breeden discusses the Refco fraud at length. Mr. Breeden first recounts the losses Refco incurred as a result of the 1997 "Asian Crisis" wherein a group of customers to whom Refco had extended credit incurred massive losses when a debt crisis in Asia resulted in a sudden and sharp decline in prices for Asian bonds. As a result, many Refco customers were unable to meet their margin calls and Refco was forced to satisfy its customers' obligations on their behalf. Refco booked receivables from its customers for these losses, but the bulk of these receivables were not collected. *See* Maggio Depo., Dec. 14, 2009, at pp. 85-87 (attached as Ex. 2 to

Simpson Decl.); Expert Report of Richard C. Breeden Report at p. 11 (attached as Ex. 3 to Simpson Decl.).

8.      Instead of recording its losses, Refco began a program of lying to cover up the customer losses and its pending insolvency.  Thus, the first step in the Refco fraud was to hide (rather than publicly acknowledge) the worthless customer receivables.  This was done by pushing them onto RGHI's books, and replacing them on Refco's books with a receivable at full face value from RGHI.  Another element of the fraud was to transfer large amounts of operating costs and additional extraordinary losses into the RGHI Receivable to make Refco's profits appear significantly larger than they really were.  *See* Maggio Depo., Dec. 14, 2009, at pp. 100-104 (attached as Ex. 2 to Simpson Decl.); Breeden Report at 13-14 (attached as Ex. 3 to Simpson Decl.).

9.      The next part of the fraud was to increase its reported revenues far beyond what they were in reality, thereby inflating profits.  This was done by accruing interest charges on the receivable which inflated Refco's reported profits and net worth.   *See* Peter James Depo., Dec. 14, 2009, at 62-67 (attached as Ex. 4 to Simpson Decl.); Breeden Report at 14 (attached as Ex. 3 to Simpson Decl.).

10.      Refco then devised a scheme to hide the receivable owed to Refco by RGHI.  This was accomplished through a repeated course of "round-trip loans" which "lacked any economic substance and were simply a smoke screen to conceal the enormous and growing hole in Refco's balance sheet.  See Maggio Depo., Dec. 14, 2009, at pp. 109-111; Maggio Depo., Jan. 6, 2010, at 1403-11 (attached as Ex. 2 to Simpson Decl.); Breeden Report at pp. 17-18 (attached as Ex. 3 to Simpson Decl.).

11.    Mr. Breeden also discusses Refco's practice of diverting customer cash out of segregated accounts and into Refco's treasury operations, where it was commingled and used by Refco to meet obligations.  The siphoned cash was what literally enabled Refco to meet its daily obligations and thereby to keep the fraud running without discovery.  Mr. Breeden cited to the testimony of Santo Maggio, a director and later CEO of RCM who testified that "[h]undreds and hundreds of millions of dollars were on deposit at RCM….  And yet Refco was using almost every dollar of it to fund its operations.  If we had to take the assets and put it in safekeeping, take the cash the customers have and lock it up, we would cease to exist." *See* Maggio Depo., Dec. 14, 2009, at 55:2-13 (Ex. 2 to Simpson Decl.).

   **D.    Defendants' Experts.**

12.    Several of Defendants' experts have also acknowledged the existence of the Refco fraud and discussed it at some length, mostly in arguing that the fraud was so sophisticated that the Defendants really had no chance of discovering it.  *See* Rudley Report at 7, 109-10 (Ex. 5 to Simpson Decl.); Holder Report at 48 (Ex. 6 to Simpson Decl.); Ellingsen Depo., Sep. 28, 2012, at 138:5-11 (Ex. 7 to Simpson Decl.).  By way of example, Mr. Rudley stated, "Refco Management actively deceived and concealed material facts from the 144(a) banks."  Rudley Report at 7.  He further acknowledged the "presence of accounting fraud at Refco…."  *Id.* at 109-10.

13.    As described by Defendants' experts, the Refco fraud involved the disguised practice of Refco "selling" its uncollectible customer receivables to a related party, RGHI, and then hiding the majority of the receivable balance at the end of financial periods through the round-trip loans.  The fraud began in the late 1990s and involved many members of Refco's senior management, several of whom pled guilty or were convicted for their roles in the fraud. Refco management enlisted third parties to help conceal the RGHI receivables through the

round-trip loans and Refco insiders hid the fraud by lying about key components of Refco's business, including its corporate structure, financial condition and risk management procedures. *See* Daines Report at pp. 3-6 (Ex. 8 to Simpson Decl.); Holder Report at 5, 47-48 (Ex. 6 to Simpson Decl.); Ellingsen Depo., Sep. 28, 2012, at 82:5-83:4, 125-28:11, 137:24-38:11, 146:18-47:12 (Ex. 7 to Simpson Decl.); Ellingsen Report at 17-18 (Ex. 9 to Simpson Decl.).   More specifically, Mr. Daines noted that the fraud

> [a]t Refco appears to have involved the disguised practice of Refco "selling" its uncollectible customer receivables to a related party, Refco Group Holdings, Inc. ("RGHI"), and then hiding the majority of this receivable balance at the end of financial periods through transactions referred to in this action as "round-trip loans." This fraud appears to have begun in the late 1990s.

Daines' Report at 3-4 (attached as Ex. 8 to Simpson Decl.).  Mr. Daines also acknowledged that the fraud involved "many members of Refco's senior management, including Refco's former Chief Executive Officer ('CEO') Phillip Bennett, former Chief Financial Officer ('CFO') Robert Trosten, former Executive Vice President Santo Maggio, and former CEO Tone Grant.  All four former executives either plead guilty or were convicted for their roles in the fraud."  Daines' Report at 4.  Mr. Ellingsen stated that the fraud was "specifically designed to hide information from the auditors…."  Ellingsen Depo., Sep. 28, 2012, at 138:5-11 (Ex. 7 to Simpson Decl.).

### E.   The Bankruptcy Examiner.

14.   Joshua R. Hochberg of McKenna Long & Aldridge, LLP, was appointed as Bankruptcy Examiner for the bankruptcy cases of Refco, Inc. and its affiliated debtors.  Mr. Hochberg concluded that there was a "massive fraudulent scheme designed to manipulate the financial statements of various Refco companies that were publicly reported and supplied to lending institutions and to regulators."  The "roots of the scheme that was used to conceal losses and money owed to Refco by RGHI began in at least 1997 or 1998" when "Refco suffered

millions of dollars in losses and certain of its customers could not make good on their own trading losses." Refco "sold" or transferred the bad debts to its unconsolidated parent company, RGHI, which "sale" price was treated as a receivable due from RGHI on the books of Refco. Refco then utilized the "round-trip loans" to hide the RGHI receivable by manipulating its books through a series of transactions which made it appear that the RGHI receivable was due from unrelated third parties rather than from RGHI. The round-trip loans were "sham transactions with no economic substance which were entered into solely to dress up Refco's consolidated financial statements." *See* Bankruptcy Examiner Report, at 3-4; 22-59 (Ex. 10 to Simpson Decl.).

        **F.**    **Defendants.**

        15.    Defendants have previously argued that the "Refco fraud," including the round-trip loans, the RGHI receivable and the LBO and IPO, could not form the basis of any claims by Plaintiffs because such actions were by Refco insiders and harmed only Refco itself. In connection with that argument, Defendants articulated a "three part fraudulent scheme" devised by Refco insiders in which they would prop up "the value of Refco and eventually cash out their interest in Refco for more than they were really worth." Memorandum of Law in Support of Investment Banks' Motion to Dismiss Claims 15, 34, 35, 36, 43, and 44 of the *Kirschner* Complaint, MDL Docket No. 51, dated May 21, 2008, at 4-5. The first part of the alleged scheme involved hundreds of millions of dollars in Refco trading losses and operating expenses by booking them as receivables owed to Refco by RGHI. The second part of the scheme consisted of concealing the nature and magnitude of the receivables through the use of the round-trip loans. Third, in 2004, the Refco insiders arranged for a leveraged buyout and in 2005 an initial public offering in order to cash out their positions. *See id.*

16.    In connection with its Motion for Summary Judgment dated April 23, 2010, Defendant Grant Thornton stated that:

> [w]itness after witness has testified that the Refco insiders deliberately lied to Grant Thornton and went to extraordinary lengths to keep it in the dark.  As the insiders have admitted, the very purpose of their elaborate financial machinations was to prevent Grant Thornton from discovering the truth.  The central figures in the fraud have plead guilty to or have been convicted of criminal conduct, including crimes predicated on lies to Grant Thornton, and they now face years in prison as a result.

Memorandum of Law in Support of Grant Thornton's LLP's Motion for Summary dated April 23, 2010 (MDL Docket No. 683), at 1; *see also id.* at 2-6.  Grant Thornton further explained that Refco's fraud began in the late 1990s, when it "lost hundreds of millions of dollars as a result of large trading losses in foreign currency transactions sustained by one of its customers" and that, rather than disclosing those losses, "Refco's most senior managers conspired to conceal them by transferring them off Refco's books and converting them into a receivable owed by Refco Group Holdings, Inc. ("RGHI")."  *Id.* at 4.

**G.    The Special Master and Judges Lynch and Rakoff.**

17.    The Court has previously ruled that Plaintiffs adequately alleged the existence of the Refco fraud.  *See* Report and Recommendation of the Special Master on the Omnibus Issue of Primary Violations by Refco, MDL Docket No. 579, dated March 1, 2010, at 26.  In that Report, Special Master Capra stated that the Refco fraud constituted

> a scheme to conceal massive losses from Refco's books and to enrich insiders.  A central part of the Refco fraud was to divert assets from unprotected accounts at RCM to fund Refco's fraudulent schemes and line the pockets of the insiders…. Another part of the Refco fraud was to hide the losses on the books by engaging in a series of roundtrip loans ("RTLs").  The RTLs purported to be legitimate loan transactions, but only served temporarily to pay down the massive losses that were parked at RGHI ….  A further part of the Refco fraud was to conduct a fraudulent LBO and IPO, allowing insiders to cash out, and thereby leaving Refco (and specifically RCM) insolvent.

*Id.* at 6.

18.     Special Master Capra and Judges Lynch and Rakoff have considered numerous motions and related matters arising out of the Refco fraud and have recounted the facts constituting the Refco fraud on several occasions.  For example, in the R&R of the Special Master on Grant Thornton's Motion for Summary Judgment in the *Thomas H. Lee vs. Grant Thornton* matter (07 CIV 8663 (JSR)), Special Master Capra stated that the "fraud surrounding Refco ha[d] already been chronicled in a number of R&R's entered by the Special Master, including those in *Krys vs. Sugrue and Kirschner v. Bennett.*"  R&R dated March 28, 2011, at 2. In that R&R, Special Master Capra discussed in particular the RGHI receivable:

> Beginning in the 1990s, Refco took on millions of dollars in uncollectable receivables that were parked at Refco Group Holdings, Inc. ("RGHI"), a company controlled by Bennett that was not consolidated with other Refco entities.  Refco covered up these receivables – collectively the "RGHI receivable" – by engaging in roundtrip loan transactions (RTL's) with unrelated entities….  Through the RTL's, Refco executives were able to disguise Refco's true financial condition with the aim of eventually cashing out their interests in Refco….

*Id.*  The Refco insiders effectuated the LBO in August 2004 and the IPO in August 2005, which allowed the Refco insiders to cash out their holdings in Refco.  *See* Report of the Special Master dated March 1, 2010, at 6, 25-26; Report of the Special Master on Grant Thornton's Motion for Summary Judgment, filed in *Thomas H. Lee Equity Fund V., L.P. v. Grant Thornton LLP*, Case No. 07 Civ. 8663, MDL Docket No. 1105, dated March 28, 2011, at 2; Opinion and Order, filed in *In re Refco, Inc. Sec. Litig.*, 05 Civ. 8626, Docket No. 362, dated April 30, 2007 by Judge Lynch, at 3; Report of the Special Master, filed in *Kirschner v. Bennett*, MDL Docket No. 742, dated June 3, 2010, at 2-3.

Dated: New York, New York
        December 17, 2012

                                        **BROWN RUDNICK LLP**

                                        By:   /s David J. Molton
                                                David J. Molton
                                                Andrew Dash
                                                Mason Simpson

                                        Seven Times Square
                                        New York, New York 10036
                                        Tel: (212) 209-4800
                                        Fax: (212) 209-4801
                                        dmolton@brownrudnick.com
                                        adash@brownrudnick.com
                                        msimpson@brownrudnick.com

                                                - and -

                                        Leo R. Beus (admitted *pro hac vice*)
                                        Dennis K. Blackhurst (admitted *pro hac vice*)
                                        BEUS GILBERT PLLC
                                        701 N. 44th Street
                                        Phoenix, Arizona  85008
                                        Telephone: (480) 429-3000
                                        Facsimile: (480) 429-3100
                                        lbeus@beusgilbert.com
                                        dblackhurst@beusgilbert.com

                                        *Attorneys for Plaintiffs*