UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                   :
In re REFCO INC. SECURITIES LITIGATION    :  Case No. 07-MD-1902 (JSR)
                                                   :
------------------------------------------------------------x

                    This Document Relates To:

------------------------------------------------------------x
KENNETH M. KRYS, *et al.*,                         :  Case No. 08-CV-3065 (JSR)
                                                   :  Case No. 08-CV-3086 (JSR)
                           Plaintiffs, :

                 -against-                            :

CHRISTOPHER SUGRUE, *et al.*,              :

                          Defendants. :
------------------------------------------------------------x
KENNETH M. KRYS, *et al.*,                         :  Case No. 10-CV-3594 (JSR)
                                                   :
                         Plaintiffs, :

                 -against-                            :

DEUTSCHE BANK SECURITIES., INC., *et al.*, :

                          Defendants. :
------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE ISSUE OF THE PRIMARY VIOLATION OF
FRAUD BY REFCO**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

I.   PRELIMINARY STATEMENT. ...............................................................................1

II.  ARGUMENT ..............................................................................................................2

    A.   Summary Judgment Standard. ........................................................................2

    B.   The Workings of the Refco Fraud. .................................................................4

    C.   Several of Defendants' Experts Have Acknowledged and Admitted the Refco Fraud. ...........................................................................................6

    D.   Refco's Insiders Have Admitted the Existence of the Refco Fraud. ..............8

    E.   The Bankruptcy Examiner Concluded that There Had Been a Massive Fraud at Refco. ................................................................................11

    F.   Defendants have Based Several of their Arguments in Motions and Other Pleadings on the Existence of the Refco Fraud. .................................12

    A.   The Court has Consistently Acknowledged the Existence of the Refco Fraud Without Challenge From Defendants. .....................................13

III. CONCLUSION. ........................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................2

*Bethlehem Steel Corp. v. Tishman Realty & Constr. Co.*,
  72 F.R.D. 33 (S.D.N.Y. 1976) .................................................................................3

*Brager & Co. v. Leumi Sec. Corp.*,
  84 F.R.D. 220 (S.D.N.Y. 1979) ...............................................................................3

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................................2

*Pension Comm. of Univ. of Montreal Pension Plan v. Bank of America, Sec., LLC*,
  446 F. Supp. 2d 163 (S.D.N.Y. 2006) .....................................................................1

*Scott v. Harris*,
  550 U.S. 372 (2007) ................................................................................................2

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) .......................................................................................................2

Fed. R. Civ. P. 56(g) ......................................................................................................3

Fed. R. Civ. P. Rule 56(d) (2009) ..................................................................................3

Plaintiffs Kenneth M. Krys and Margot MacInnis, as Joint Official Liquidators of the SPhinX funds and assignees of claims of certain SPhinX funds investors, and The Harbour Trust Co. Ltd., as Trustee of the SPhinX Trust (collectively, "Plaintiffs"),[1] by and through their undersigned counsel, respectfully submit this memorandum of law in support of their Motion for Partial Summary Judgment on the Issue of the Primary Violation of Fraud by Refco.[2]

## I. PRELIMINARY STATEMENT.

More than seven years after its discovery, no one disputes that a massive fraud was perpetrated by Refco, Inc. (and related companies) through corrupt insiders, their agents and aiders and abettors. Indeed, the fact or existence of the Refco fraud is so notorious, well known and authoritatively attested to, that it cannot reasonably be doubted, potentially making it a proper candidate for judicial notice. While the Court may take judicial notice that the Refco fraud occurred, as evidenced, *inter alia*, by the guilty pleas and convictions of multiple Refco fraudsters, this Motion seeks summary judgment on the first element of Plaintiffs' claim for aiding and abetting fraud, namely, that the Refco fraud occurred.[3] To that end, Plaintiffs seek an

---

[1] As a result of various defense motions, SMFF is the only remaining Plaintiff with a claim for aiding and abetting fraud. Technically, however, the Court has not entered an order dismissing PlusFund's claim for aiding and abetting fraud. Whether the Court enters such an order should not affect the outcome of this motion.

[2] As used herein, "Refco" refers to Refco, Inc., its direct and indirect subsidiaries, and their predecessors collectively. The definition of "Refco" herein excludes Refco Group Holdings, Inc.

[3] *See Pension Comm. of Univ. of Montreal Pension Plan v. Bank of America, Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006) (observing the elements of a fraud claim are: 1) the existence of a fraud; 2) defendants' knowledge of the fraud; 3) that the defendant provided substantial assistance to advance the fraud's commission, and 4) damages).

Order specifying that the existence of the Refco fraud may be deemed to be established without substantial controversy.[4]

## II. ARGUMENT

### A. Summary Judgment Standard.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the burden of identifying matters that it believes demonstrate the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and all reasonable inferences are drawn in favor of the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 378 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Rule 56, Fed. R. Civ. P., was amended in 2010 and now provides at subsection (a) that "[a] party may move for summary judgment identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Rule 56(a), Fed. R. Civ. P. Regardless of this recent amendment, Rule 56 has long provided that a court is empowered to grant partial summary judgment as to a part of a claim or to issue an order that specifies facts

---

[4] Plaintiffs' aiding and abetting fraud claim has been asserted against Defendants Bank of America Securities, LLC, Credit Suisse Securities (USA), LLC, Deutsche Bank Securities, Inc., Mark Ramler, Pricewaterhouse Coopers LLP, Grant Thornton LLP, Mayer Brown LLP, Joseph Collins, Paul Koury, Robert Trosten, Tone Grant, Liberty Corner Capital Strategies, LLC, William Pigott, Ingram Micro Inc., CIM Ventures, Inc., Beckenham Trading Co., Inc., and Andrew Krieger.

2

deemed to be admitted without substantial controversy. *See* prior Rule 56(d), Fed. R. Civ. P. (2009). Current Rule 56(g) provides that the court may enter "an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." The purpose of the Rule, of course, is to streamline and narrow the scope of the trial by specifying those facts that cannot reasonably be controverted. *See, e.g.*, *Brager & Co. v. Leumi Sec. Corp.*, 84 F.R.D. 220, 222 (S.D.N.Y. 1979); *Bethlehem Steel Corp. v. Tishman Realty & Constr. Co.*, 72 F.R.D. 33, 40 (S.D.N.Y. 1976).

Here, the existence of the Refco fraud has been admitted by nearly every party involved in the litigation, including, among others, the Refco fraudsters themselves (*e.g.*, Messrs. Trosten and Maggio); Defendants (in prior pleadings); Defendants' experts (whose opinions essentially state that the Refco fraud was so well conceived and hidden that Defendants should be excused for failing to have discovered it); and, of course, it has been abundantly and painstakingly detailed throughout Plaintiff's pleadings.

The undisputed facts overwhelmingly show the existence of a fraud by Refco to misrepresent its financial condition to its customers, investors, creditors and the investing public at large.[5] Indeed, every pleading, motion, report and recommendation, order and judgment in this case has presumed the existence of the Refco fraud, and for good reason—it actually occurred to the enormous and disastrous detriment of many innocent victims, including the SPhinX family of hedge funds and their investors. Moreover, no party has made a serious effort to contest the fact of the Refco fraud. Indeed, there is no evidence that even suggests the fraud

---

[5] Throughout the litigation, the Special Master has referred to both the "SPhinX Fraud" (i.e., the diversion of SPhinX monies from segregated accounts at Refco to unsegregated accounts at RCM) and the "Refco Fraud" (the misrepresentation of Refco's financial health). This Motion pertains only to what has been deemed the "Refco Fraud."

3

did not occur.[6] The Refco fraud was aptly characterized by the Special Master in his Report and Recommendation on the Omnibus Issue of Primary Violations by Refco as including the concealment of losses and expenses in the RGHI receivable; the inflation of Refco's revenues and financial position; the round-trip loans that concealed the RGHI receivable; the concealed diversion of customer assets to finance Refco's operations and the looting of Refco customer assets to enrich insiders in the LBO and IPO. *See* Plaintiffs' Rule 56.1 Statement in Support of Motion for Partial Summary Judgment Against the Refco Fraud Defendants ("Pls' SOF") ¶¶ 17-18; Report and Recommendation of the Special Master on the Omnibus Issue of Primary Violations by Refco (the "Primary Violations R&R"), MDL Docket No. 579 dated March 1, 2010, at 25.

    **B.**     <u>The Workings of the Refco Fraud.</u>

In his expert report in support of Plaintiff's claims, former SEC Chairman Richard C. Breeden culls together facts of the Refco fraud and discusses it at length. Mr. Breeden first recounts the losses Refco incurred as a result of the 1997 "Asian Crisis" wherein a group of customers to whom Refco had extended credit incurred massive losses when a debt crisis in Asia resulted in a sudden and sharp decline in prices for Asian bonds. As a result, many Refco customers were unable to meet their margin calls. *See* Pls' SOF ¶ 7; Maggio Depo., Dec. 14, 2009, at pp. 85-87 (attached as Ex. 2 to the Declaration of Mason C. Simpson in Support of Plaintiffs' Motion for Partial Summary Judgment on the Issue of the Primary Violation of Fraud

---

[6] Indeed, this Court can take judicial notice of the fact that several individuals (Messrs. Bennett, Grant, Trosten and Collins) are now sitting in federal prison or awaiting sentencing, having been criminally convicted for their participation in the Refco fraud. Mr. Maggio avoided prison only because of his untimely death.

4

by Refco, dated December 17, 2012 (the "Simpson Decl.")); Expert Report of Richard C. Breeden Report at p. 11 (attached as Ex. 3 to Simpson Decl.). No one disputes these facts.

Instead of recording its losses, Refco began a program of lying to cover up the customer losses and its pending insolvency. Thus, the first step in the Refco fraud was to hide (rather than publicly acknowledge) the worthless customer receivables. This was done by pushing them onto RGHI's books, and replacing them on Refco's books with a receivable at full face value from RGHI. *See* Pls' SOF ¶ 8; Maggio Depo., Dec. 14, 2009, at pp. 100-104 (attached as Ex. 2 to Simpson Decl.); Breeden Report at 13-14 (attached as Ex. 3 to Simpson Decl.). Another element of the fraud was to transfer large amounts of operating costs and additional extraordinary losses into the RGHI Receivable to make Refco's profits appear significantly larger than they really were. *See* Pls' SOF ¶ 8; Maggio Depo., Dec. 14, 2009, at pp. 100-104 (attached as Ex. 2 to Simpson Decl.); Breeden Report at 13-14 (attached as Ex. 3 to Simpson Decl.). Again, no one disputes these facts.

The next step in the Refco fraud was to increase Refco's reported revenues far beyond what they were in reality, thereby inflating profits. This was done by accruing interest charges on the RGHI receivable which inflated Refco's reported profits and net worth. *See* Pls' SOF ¶ 9; Peter James Depo., Dec. 14, 2009, at 62-67 (attached as Ex. 4 to Simpson Decl.); Breeden Report at 14 (attached as Ex. 3 to Simpson Decl.). Refco then devised a scheme to hide the receivable owed to Refco by RGHI. This was accomplished through a repeated course of "round-trip loans" which "lacked any economic substance and were simply a smoke screen to conceal the enormous and growing hole in Refco's balance sheet." Pls' SOF ¶ 10; Maggio Depo., Dec. 14, 2009, at pp. 109-111; Maggio Depo., Jan. 6, 2010, at 1403-11 (attached as Ex. 2

to Simpson Decl.); Breeden Report at pp. 17-18 (attached as Ex. 3 to Simpson Decl.). No one disputes these facts as aspects of the Refco fraud.

Refco's practice of diverting customer cash into Refco's treasury operations, where it was commingled and used by Refco to meet obligations, is similarly undisputed. *See* Pls' SOF ¶ 11; Maggio Depo., Dec. 14, 2009, at 55:2-13 (Ex. 2 to Simpson Decl.). The siphoned cash enabled Refco to meet its daily obligations and thereby keep the fraud running without discovery, again, an undisputed fact. *See* Pls' SOF ¶ 11; Maggio Depo., Dec. 14, 2009, at 55:2-13 (Ex. 2 to Simpson Decl.). Santo Maggio, a director and later CEO of Refco Capital Markets Ltd. ("RCM"), testified that "[h]undreds and hundreds of millions of dollars were on deposit at RCM…. And yet Refco was using almost every dollar of it to fund its operations. If we had to take the assets and put it in safekeeping, take the cash the customers have and lock it up, we would cease to exist." Pls' SOF ¶ 11, Maggio Depo., Dec. 14, 2009, at 55:2-13 (attached as Ex. 2 to Simpson Decl.).

### C. Several of Defendants' Experts Have Acknowledged and Admitted the Refco Fraud.

Bank Defendants' experts Douglas K. Rudley and Robert M. Daines discuss the Refco fraud at some length, mostly in connection with their argument that the fraud was so sophisticated that the investment banks really had no chance of discovering it. For example, Mr. Rudley opines that to "have any chance to uncover the accounting fraud perpetrated at Refco, the 144(a) banks would have had to undertake a forensic audit that ranged far beyond the level of investigation that underwriters are trained to perform as a matter of custom and practice." Pls' SOF ¶ 12; Rudley Report at 7 (attached as Ex. 5 to Simpson Decl.). He also states that "Refco management actively deceived and concealed material facts from the 144(a) banks." Pls' SOF ¶ 12; Rudley Report at p. 7. Mr. Rudley concludes that the "mere presence of accounting fraud at

6

Refco does not indicate that the 144(a) banks' financial due diligence was not thorough or reasonable or that the 144(a) banks should have (let alone did) discovered the fraud." Pls' SOF ¶ 12; Rudley Report at 109-10.

Mr. Daines goes into somewhat more detail in describing the fraud in his Report, noting that the fraud

> [a]t Refco appears to have involved the disguised practice of Refco "selling" its uncollectible customer receivables to a related party, Refco Group Holdings, Inc. ("RGHI"), and then hiding the majority of this receivable balance at the end of financial periods through transactions referred to in this action as "round-trip loans." This fraud appears to have begun in the late 1990s.

*See* Pls' SOF ¶13; Daines' Report at 3-4 (attached as Ex. 8 to Simpson Decl.). Daines acknowledges that the fraud involved "many members of Refco's senior management, including Refco's former Chief Executive Officer ("CEO") Phillip Bennett, former Chief Financial Officer ("CFO") Robert Trosten, former Executive Vice President Santo Maggio, and former CEO Tone Grant. All four former executives either plead guilty or were convicted for their roles in the fraud." Pls' SOF ¶ 13; Daines' Report at 4. Mr. Daines goes on to observe that Refco management enlisted third parties to help conceal the RGHI receivable through the round-trip loans and that the Refco insiders were careful to hide their fraud to prevent the truth from being known by lying about "many key components of Refco's business, including its corporate structure, financial condition, and risk management procedures." Pls' SOF ¶ 13; Daines' Report at 4-5. Mr. Daines also believes that "the fraud went undiscovered for approximately eight years." Pls' SOF ¶ 13; Daines' Report at 6. A major thrust of Mr. Rudley's and Mr. Daines' Reports is that the Refco fraud, while extensive and long lasting, was so pervasive and sophisticated that the Banks could not have known about it. Plaintiffs, of course, allege that the

banks did know about and substantially assist the fraud. However, the existence of the fraud is uncontroverted.

Other defense experts have also acknowledged the Refco fraud. For example, defense expert William W. Holder discussed the RGHI receivable and the fraudulent round-trip loans, but opines that Defendant PwC was "not in a position" to discover the fraud because the analyses necessary to have discovered it were "not contemplated within the scope of its work ...." Pls' SOF ¶¶ 12-13; Holder Report at 47-48 (attached as Ex. 6 to Simpson Decl.). John E. Ellingsen also discussed the Refco fraud in his report (at pages 17-18) and in his deposition. *See* Pls' SOF ¶¶ 12-13. In his deposition, Mr. Ellingsen focuses on the RGHI receivable, the undisclosed guarantees and the round-trip loans. *See* Pls' SOF ¶ 13; Ellingsen Depo., Sep. 28, 2012, at pp. 82:5-83:4, 125-28:11, 137:24-38:11, 146:18-47:12 (attached as Ex. 7 to Simpson Decl.). He opines that the Grant Thornton defendants should not have been expected to have discovered the fraud because it was "specifically designed to hide information from the auditors …." *See* Ellingsen Depo., Sep. 28, 2012, at pp. 138:5-11.

### D.     Refco's Insiders Have Admitted the Existence of the Refco Fraud.

Robert Trosten, Refco's Executive Vice President and Chief Financial Officer between 2000 and 2005, readily admitted the existence of the fraud and his role in it. Indeed, Mr. Trosten pled guilty to securities fraud, bank fraud and wire fraud in connection with the Refco fraud. *See* Pls' SOF ¶¶ 3-4; Trosten Depo., Dec. 10, 2009, at 17:3-14 (attached as Ex. 1 to Simpson Decl.). Mr. Trosten admitted that he first found out about the fraud at Refco in 1998, *see* Trosten Depo., Dec. 10, 2009, at 28:20-22, and that his salary significantly increased thereafter in part because he was "prepared to continue with the ongoing fraud at Refco and was to be compensated for it." *Id.* at 21:5-13. In 2004, Mr. Trosten was paid in excess of $50 million dollars through Refco's LBO. *See id.* at 20:9-18. No one disputes these material facts.

Mr. Trosten admitted that the Refco fraud was a scheme to make Refco appear financially healthy when it was not. *See id.* at 23:2-7; 24:8-25:14. He also testified that other components of the fraud included the hiding of the amount of the receivable that RGHI had with Refco. *See id.* at 23:13 – 25:14. Mr. Trosten explained that other components of the fraud included the inflation of revenues through interest rate manipulations and the shifting of expenses from the books of Refco to RGHI. *See id.* at 26:4-13. Again, no one disputes these material facts.

Santo Maggio, a former Executive Vice President of Refco and the CEO of RCM, Refco's Bermuda subsidiary, was indicted and pled guilty in connection with his role in the fraud. Mr. Maggio has since passed away. Prior to his death, however, he testified extensively as to the existence of the fraud that occurred at Refco. For example, he testified as follows:

> Q. Mr. Maggio, was there a massive fraud that occurred at Refco?
>
> A. Yes.
>
> Q. Did you participate in that fraud?
>
> A. Yes.
>
> Q. And when that fraud was revealed, Refco collapsed; is that true?
>
> A. Yes.

Pls' SOF ¶¶ 5-6; Maggio Depo. Dec.14, 2009, at p. 28:3-11 (attached as Ex. 2 to Simpson Decl.).

Mr. Maggio testified that the fraud involved "a manipulation of Refco's financial statements" and included "transactions that were designed to hide the existence of monies owed to Refco by [RGHI]." Maggio Depo. Dec.14, 2009, at 28:15-24. Mr. Maggio also testified that the fraud at Refco involved the misuse or misappropriation of customer funds, *see id.* at 29:16-23, and the manipulation of revenues, inflation of revenues, phony transactions to inflate

9

revenues and the reclassification of certain types of revenues such as interest income to inflate Refco's apparent revenues. *See id.* at 30:20 – 31:19. No one disputes these material facts.

Mr. Maggio plead guilty in federal court to four criminal counts – two for securities fraud, one for wire fraud and one for conspiracy to commit fraud in connection with his participation in the Refco fraud. Mr. Maggio testified that Refco wrongfully "tapped into" customer funds for its own purposes. *See, e.g., id.* at 41:11-20. Mr. Maggio further testified as follows:

> Q. Okay. Did Refco frequently have to tap into customer funds in order to fund its day-to-day operations?
>
> A. Yes.
>
> Q. And over what period of time did that occur?
>
> A. For as long as I can remember at Refco.

*Id.* at 42:11-18.

Mr. Maggio also testified in great detail about the "round-trip loan" transactions which had the "sole purpose of … hid[ing] the [RGHI] receivable." *Id.* at 110:23 - 11:6. This material fact is not disputed.

Later on in his deposition, Mr. Maggio testified that the Refco fraud also included providing false information in Refco's public filings in connection with the LBO and IPO. *See* Pls' SOF ¶ 6; Maggio Depo., Dec. 15, 2009, at 539:11-40:12; 541:12-25 (attached as Ex. 2 to Simpson Decl.). Mr. Maggio further testified that Refco created false accounts, listed fake collateral and transferred obligations from and among various entities within the Refco Group to hide the false accounts and fake collateral. *See* Pls' SOF ¶ 6; Maggio Depo., Dec. 15, 2009, at 596:2-13. He also testified that Refco's representations about not engaging in proprietary trading were false. *See* Pls' SOF ¶ 6; Maggio Depo., Dec. 14, 2009, at 406:7-11; 418:9-19:22. Indeed,

Mr. Maggio concluded that Refco "was a lie." Pls' SOF ¶ 6; Maggio Depo., Dec. 15, 2009, at 518:17, and that Refco portrayed itself as a valuable firm when it was in fact "worthless or close to worthless." Pls' SOF ¶ 6; Maggio Depo., Dec. 15, 2009, at 518:24-19:4.

### E. The Bankruptcy Examiner Concluded that There Had Been a Massive Fraud at Refco.

The United States Bankruptcy Court for the Southern District of New York appointed Joshua R. Hochberg of McKenna Long & Aldridge, LLP, as the Bankruptcy Examiner for the bankruptcy cases of Refco, Inc. and its affiliated debtors. Mr. Hochberg conducted an extensive investigation into Refco's history and the events that precipitated its bankruptcy. He also offered opinions regarding certain professionals' potential liability with respect to their respective work with Refco. The Examiner concluded that there was a "massive fraudulent scheme designed to manipulate the financial statements of various Refco companies that were publicly reported and supplied to lending institutions and to regulators." *See* Pls' SOF ¶ 14; Bankruptcy Examiner Report at 3 (attached as Ex. 10 to Simpson Decl.). Mr. Hochberg further concluded that the "roots of the scheme that was used to conceal losses and money owed to Refco by RGHI began in at least 1997 or 1998" when "Refco suffered millions of dollars in losses as certain of its customers could not make good on their own trading losses." ." *See* Pls' SOF ¶ 14; Bankruptcy Examiner Report at 3. The Examiner explained in detail how Refco "sold" or transferred the bad debts to the unconsolidated parent company, RGHI, which "sale" price was treated as a receivable, due from RGHI on the books of Refco. ." *See* Pls' SOF ¶ 14; Bankruptcy Examiner Report at 3. Mr. Hochberg also discussed how Refco utilized "round-trip loans" to hide the RGHI receivable by manipulating their books through a series of transactions which made it appear that the RGHI receivable was due from unrelated third parties rather than from RGHI. *See* Pls' SOF ¶ 14; Bankruptcy Examiner Report at 4. He concluded that the round-trip loans

11

were "sham transactions with no economic substance which were entered into solely to dress up Refco's consolidated financial statements." *See* Pls' SOF ¶ 14; Bankruptcy Examiner Report at 4. The Examiner's report described the round-trip loans and explained their impact on the RGHI receivable in great detail. *See* Pls' SOF ¶ 14; Bankruptcy Examiner Report at 22-59.

  **F.**  **Defendants have Based Several of their Arguments in Motions and Other Pleadings on the Existence of the Refco Fraud.**

  Multiple defendants involved in the various Refco litigations have admitted or acknowledged that the Refco fraud occurred. Indeed, early in the case, defendants repeatedly asserted that any claims related to the Refco fraud would be barred by *in pari delicto* and/or the *Wagoner* doctrine, based upon imputation of the wrongdoing of Refco insiders. Defendants argued that such claims belonged to Refco and RCM and that Plaintiffs' "Refco fraud" claims were derivative of such claims. For example, the Memorandum of Law in Support of Investment Banks' Motion to Dismiss Claims 15, 34, 35, 36, 43, and 44 of the *Kirschner* Complaint, MDL Docket No. 51, dated May 21, 2008, expressly recounts a "three-part fraudulent scheme" by Refco insiders which involved: 1) "hiding hundred of millions of dollars in Refco trading losses and operating expenses by booking them as receivables owed to Refco by RGHI"; 2) concealing the nature and magnitude of the receivables through the use of the round-trip loans; and 3) raising money to use in connection with a leveraged buyout and through an initial public offering. *Id.* at 4-5; Pls' SOF ¶ 15. Thus, the occurrence of the Refco fraud was admitted by Defendants.

  In connection with its Motion for Summary Judgment dated April 23, 2010, Defendant Grant Thornton also discussed the Refco Fraud, stating that:

> [w]itness after witness has testified that the Refco insiders deliberately lied to Grant Thornton and went to extraordinary lengths to keep it in the dark. As the insiders have admitted, the very purpose of their elaborate financial machinations was to

12

> prevent Grant Thornton from discovering the truth. The central figures in the fraud have plead guilty to or have been convicted of criminal conduct, including crimes predicated on lies to Grant Thornton, and they now face years in prison as a result.

Pls' SOF ¶ 16; Memorandum of Law in Support of Grant Thornton's LLP's Motion for Summary dated April 23, 2010, at 1. Grant Thornton goes on to explain that Refco's fraud began in the late 1990s, when it "lost hundreds of millions of dollars as a result of large trading losses in foreign currency transactions sustained by one of its customers" and that, rather than disclosing those losses, "Refco's most senior managers conspired to conceal them by transferring them off Refco's books and converting them into a receivable owed by Refco Group Holdings, Inc. ("RGHI")." *Id.* at 4. Grant Thornton then argues that the round-trip loan transactions were intended to conceal the RGHI receivable from parties including Grant Thornton. *Id*. There are many more examples of Defendants acknowledging that the Refco fraud occurred and none challenging the existence of the Refco fraud.

### A. The Court has Consistently Acknowledged the Existence of the Refco Fraud Without Challenge From Defendants.

As an initial matter, the Court has ruled that Plaintiffs adequately alleged the existence of the Refco fraud. *See* Report and Recommendation of Special Master on the Omnibus Issue of Primary Violations by Refco dated March 1, 2010, at 26. In that Report, Special Master Capra stated that the Refco fraud constituted

> a scheme to conceal massive losses from Refco's books and to enrich insiders. A central part of the Refco fraud was to divert assets from unprotected accounts at RCM to fund Refco's fraudulent schemes and line the pockets of the insiders.... Another part of the Refco fraud was to hide the losses on the books by engaging in a series of roundtrip loans ("RTLs"). The RTLs purported to be legitimate loan transactions, but only served temporarily to pay down the massive losses that were parked at RGHI .... A further part of the Refco fraud was to conduct a fraudulent LBO and IPO, allowing insiders to cash out, and thereby leaving Refco (and specifically RCM) insolvent.

*Id.* at 6; Pls' SOF ¶¶ 17-18.

Special Master Capra and Judges Lynch and Rakoff have considered numerous other motions in this and related matters arising out of the Refco fraud and have consistently recounted the facts constituting the Refco fraud on several occasions.[7] See Pls' SOF ¶¶ 17-18. Although the descriptions of the fraud stated by the Special Master and Judges Lynch and Rakoff were by and large distillations of allegations contained in the various complaints in these actions—allegations that, for the most part, were taken as true for purposes of deciding various motions—there has been no serious dispute that the Refco fraud as described above is accurate. All of the parties have proceeded in this case accepting and acknowledging the truth of those facts and the Court's recitation of them has been consistent.

---

[7] For example, in the R&R of the Special Master on Grant Thornton's Motion for Summary Judgment in the *Thomas H. Lee vs. Grant Thornton* matter (07 CIV 8663 (JSR)), Special Master Capra stated that the "fraud surrounding Refco ha[d] already been chronicled in a number of R&R's entered by the Special Master, including those in *Krys vs. Sugrue and Kirschner v. Bennett*." R&R dated March 28, 2011, at 2. In that R&R, Special Master Capra discussed in particular the RGHI receivable:

> Beginning in the 1990s, Refco took on millions of dollars in uncollectable receivables that were parked at Refco Group Holdings, Inc. ("RGHI"), a company controlled by Bennett that was not consolidated with other Refco entities. Refco covered up these receivables – collectively the "RGHI receivable" – by engaging in roundtrip loan transactions (RTL's) with unrelated entities…. Through the RTL's, Refco executives were able to disguise Refco's true financial condition with the aim of eventually cashing out their interests in Refco….

*Id.* The Special Master's description of the Refco fraud relied heavily on facts set forth by Judge Lynch in a prior proceeding. *Id.*; *see also* Opinion Order dated April 30, 2007 at 3 (Judge Lynch describing the Refco fraud and noting certain of Refco's risky loans began to backfire in 1997 and 1998, when several "global financial crises caused Refco and a number of its largest customers to suffer massive trading losses …."); Report and Recommendation dated June 3, 2010 at 2 (Special Master Capra noting that "goal of the receivables scheme was to allow Refco to continue operations until the insiders could cash out."). Special Master Capra further articulated the components of the Refco fraud in his Report & Recommendation of the Special Master on the Omnibus Issue of Standing dated February 3, 2010, at 3 n.4.

14

III.  **CONCLUSION.**

For all the reasons set forth herein (and based upon the undisputed material facts in the accompanying Rule 56.1 Statement and Declaration in Support) Plaintiffs respectfully request that this Court grant partial summary judgment in its favor under Rule 56 of the Federal Rules of Civil Procedure and find that the existence of the Refco fraud may be deemed to be admitted without substantial controversy and, therefore, that the first element of a claim for aiding and abetting fraud under New York law – the existence of a fraud – is deemed established.

Dated: New York, New York
December 17, 2012

**BROWN RUDNICK LLP**

By: /s David J. Molton
David J. Molton
Andrew Dash
Mason Simpson

Seven Times Square
New York, New York 10036
Tel: (212) 209-4800
Fax: (212) 209-4801
dmolton@brownrudnick.com
adash@brownrudnick.com
msimpson@brownrudnick.com

- and -

Leo R. Beus (admitted *pro hac vice*)
Dennis K. Blackhurst (admitted *pro hac vice*)
BEUS GILBERT PLLC
701 N. 44th Street
Phoenix, Arizona  85008
Telephone: (480) 429-3000
Facsimile: (480) 429-3100
lbeus@beusgilbert.com
dblackhurst@beusgilbert.com

*Attorneys for Plaintiffs*

60938633 v2

15