# **EXHIBIT 6**

# In The Matter Of:

*In re: REFCO, INC. SECURITIES LITIGATION*

_____

**SANTO C. MAGGIO**
*December 14, 2009*

_____

*MERRILL CORPORATION*
*25 West 45th Street - Suite 900*
*New York, NY 10036*
PH: 212-557-7400 / FAX: 212-692-9171

**MAGGIO, SANTO C. - Vol. 1**

```
                                                     Page 26
              1             SANTO C. MAGGIO
09:57:56      2     going to be -- swing more widely than it
09:58:00      3     would be a more consistent flow of
09:58:02      4     revenues, such as commission and interest
09:58:04      5     income business.
09:58:05      6         Q.   What other jobs did you hold
09:58:16      7     at Refco from 1985 up to 2005?
09:58:21      8         A.   Initially I was vice president
09:58:25      9     of Refco Securities.  And then I was
09:58:28     10     promoted to president of Refco Securities
09:58:30     11     in '91.  I was senior vice president of
09:58:33     12     Refco Group, and then became executive
09:58:36     13     vice president of Refco Group.  I was
09:58:38     14     director and vice president of Refco
09:58:42     15     Capital Markets and then became president
09:58:43     16     of Refco Capital Markets.  I was a
09:58:46     17     director of Refco Singapore, I was a
09:58:48     18     director of Refco -- Refco Paris.  I
09:58:55     19     think I was also on the board of
09:58:58     20     directors of Forstmann-Leff.
09:59:01     21         Q.   What was Refco Capital
09:59:03     22     Markets?
09:59:03     23         A.   Refco Capital Markets was an
09:59:07     24     offshore company based in Bermuda that
09:59:10     25     transacted in foreign exchange and
```

```
                                                     Page 27
              1             SANTO C. MAGGIO
09:59:14      2     securities business for clients.
09:59:17      3         Q.   Was it a regulated entity?
09:59:19      4         A.   No.
09:59:19      5         Q.   Did you hold any professional
09:59:32      6     licenses while you were at Refco?
09:59:33      7         A.   Yes.
09:59:34      8         Q.   Okay.  Could you list them for
09:59:36      9     me.
09:59:37     10         A.   If I can remember them.
09:59:39     11         Q.   As best you can recall.
09:59:41     12         A.   Series 3, Series 4, Series 7,
09:59:46     13     Series 8, Series 24, and 63.
09:59:52     14         Q.   Who issues those licenses?
09:59:54     15         A.   The NASD issues the licenses
09:59:57     16     for every one except for Series 3.  And I
10:00:02     17     believe the CFTC issues the license for
10:00:05     18     63 -- I mean for the Series 3 because
10:00:07     19     that's a, that allows you to conduct
10:00:10     20     business with an FCM.
10:00:12     21         Q.   What's the current status of
10:00:14     22     those licenses, Mr. Maggio?
10:00:15     23         A.   They've all been terminated.
10:00:18     24         Q.   When were they terminated?
10:00:20     25         A.   I don't know.  I do not know
```

```
                                                     Page 28
              1             SANTO C. MAGGIO
10:00:24      2     when Refco terminated them.
10:00:28      3         Q.   Mr. Maggio, was there a
10:00:30      4     massive fraud that occurred at Refco?
10:00:33      5         A.   Yes.
10:00:34      6         Q.   Did you participate in that
10:00:36      7     fraud?
10:00:37      8         A.   Yes.
10:00:37      9         Q.   And when that fraud was
10:00:41     10     revealed, Refco collapsed; is that true?
10:00:45     11         A.   Yes.
10:00:45     12         Q.   And that collapse occurred in
10:00:48     13     October of 2005?
10:00:50     14         A.   Yes.
10:00:51     15         Q.   Did that fraud involve a
10:00:56     16     manipulation of Refco's financial
10:00:58     17     statements?
10:00:58     18         A.   Yes.
10:00:59     19         Q.   Did you participate in
10:01:02     20     transactions that were designed to hide
10:01:03     21     the existence of monies owed to Refco by
10:01:06     22     an entity known as Refco Group Holdings,
10:01:09     23     Inc., or RGHI?
10:01:12     24         A.   Yes.
10:01:12     25         Q.   And were those transactions
```

```
                                                     Page 29
              1             SANTO C. MAGGIO
10:01:16      2     documented?
10:01:18      3         A.   Yes.
10:01:18      4         Q.   For what years were they
10:01:23      5     documented?
10:01:24      6         A.   2000 through 2005.
10:01:34      7         Q.   Did the fraud at Refco also
10:01:36      8     involve the misappropriation or misuse of
10:01:39      9     customer funds?
10:01:42     10             MR. TURNBULL:  Objection to
10:01:43     11         form.
10:01:46     12             MS. JACOBY:  Objection to
10:01:48     13         form.
10:01:48     14         A.   I don't understand the
10:01:49     15     question.
10:01:49     16         Q.   Let me rephrase it.  Did the
10:01:51     17     fraud at Refco involve the misuse or
10:01:54     18     misappropriation of customer funds?
10:01:57     19             MS. JACOBY:  Objection to
10:01:57     20         form.
10:01:58     21             MR. TURNBULL:  Objection to
10:01:59     22         form.
10:01:59     23         A.   Yes.
10:01:59     24         Q.   When did you leave Refco,
10:02:07     25     Mr. Maggio?
```

8 (Pages 26 to 29)

Page 38

SANTO C. MAGGIO

2  States versus Joseph Collins?
3      A.   Yes.
4      Q.   Did you testify truthfully at
5  the trial of United States versus Joseph
6  Collins?
7      A.   Yes.
8      Q.   Mr. Maggio, at some point
9  after you started working at Refco, did
10 you become aware that Refco was
11 experiencing cash flow problems?
12     A.   Yes.
13     Q.   When did that first come to
14 your attention?
15     A.   Very late '80s, early '90s.
16     Q.   Was it prior to 1997 that you
17 realized that Refco was experiencing cash
18 flow problems?
19     A.   Yes.
20     Q.   And could you describe the
21 nature of those problems?
22     A.   I'm sorry, you have to be more
23 specific.
24     Q.   What specifically made you
25 aware that Refco was experiencing cash

Page 39

SANTO C. MAGGIO

2  flow problems.
3      A.   The first instance was
4  sometime in the late '80s, when I was
5  asking the firm to do a dividend
6  retransaction, where I needed a
7  short-term borrowing of several million
8  dollars, I forget exactly how much.  And
9  Bill Karsh told me that Refco lost its
10 cattle feeding operations, I didn't quite
11 understand what that meant.  But what he
12 told me was that it lost use of the
13 customer funds in its cattle feeding
14 operation, and lost use of the inventory
15 that it was pledging for its cattle
16 feeding operations.  And so that Refco
17 did not have the cash and was scrounging
18 around for cash to supplement the funds
19 it was using to fund its operations.
20     Q.   Did you ever come to an
21 understanding as to what the cattle
22 feeding operations were?
23     A.   No.  I've heard jokes about
24 it, but I didn't quite understand it.
25     Q.   Were there other incidents

Page 40

SANTO C. MAGGIO

2  prior to 1997 that led you to believe
3  that Refco was experiencing cash flow
4  problems?
5      A.   Yes.
6      Q.   Could you just generally
7  describe those for me.  You don't have to
8  get into great detail.
9      A.   In 1991, '92, the firm, Phil
10 Bennett asked me if I could make --
11 arrange with Refco, Inc., which was
12 affiliate to Refco Securities, a
13 transaction where we can utilize some of
14 Refco, Inc.'s customer funds, seg funds,
15 to the tune of $25 million.  Myself and
16 Ray Lacy arranged a situation where we
17 siphoned off $25 million of the customer
18 seg funds, and I moved that money up to a
19 fund called Refco Capital, which at that
20 time was the treasury and banking arm of
21 Refco Group.
22     Q.   What are customer seg funds?
23     A.   Broker/dealers and FCMs are
24 required by SEC and CFTC rules to lock up
25 a certain portion, if not all of the

Page 41

SANTO C. MAGGIO

2  funds that customers put on deposit.  In
3  a bank that is basically labelled
4  customer seg funds, for the sole use of
5  Refco, Inc.'s or Refco Securities'
6  customers.  The bottom line is that the
7  broker/dealer or FCM is not allowed to
8  touch those monies or is not allowed to
9  commingle those monies with its own
10 capital.
11     Q.   So it was wrong for Refco to
12 siphon off the $25 million of customer
13 seg funds to use for its own purposes?
14     A.   Yes.
15     Q.   Did that happen on more than
16 one occasion, where Refco would tap into
17 customer segregated funds?
18     A.   Yes.
19     Q.   For its own purposes?
20     A.   Yes.
21     Q.   And there were times even
22 prior to 1997 that Refco did not generate
23 sufficient fees from its brokerage
24 activities or its proprietary trading to
25 cover its day-to-day operations?

11 (Pages 38 to 41)

Page 42

```
                    1              SANTO C. MAGGIO
10:16:35   2       A.   I'm sorry, you have to repeat
10:16:37   3  that, I apologize.
10:16:39   4       Q.   Sure.  There were times that
10:16:40   5  Refco did not generate sufficient fees
10:16:42   6  from its own brokerage business and its
10:16:46   7  own proprietary trading to cover its
10:16:50   8  day-to-day operations?
10:16:51   9       A.   I don't quite understand the
10:16:55  10  question.
10:16:55  11       Q.   Okay.  Did Refco frequently
10:16:58  12  have to tap into customer funds in order
10:17:01  13  to fund its day-to-day operations?
10:17:03  14       A.   Yes.
10:17:03  15       Q.   And over what period of time
10:17:06  16  did that occur?
10:17:08  17       A.   For as long as I can remember
10:17:14  18  at Refco.
10:17:15  19       Q.   Since you started there in
10:17:16  20  1985; right?
10:17:17  21       A.   Since I -- I stand corrected.
10:17:22  22  Since I became a director of Refco
10:17:26  23  Capital Markets.
10:17:26  24       Q.   Which was when?
10:17:28  25       A.   '93, '94.
```

Page 43

```
                    1              SANTO C. MAGGIO
10:17:34   2       Q.   So from at least 1993 or '94,
10:17:37   3  you were aware that Refco was having to
10:17:38   4  tap into its customers' assets in order
10:17:42   5  to fund Refco's day-to-day operations;
10:17:45   6  right?
10:17:46   7       A.   Yes.  I stand corrected.
10:17:47   8  Obviously I knew about it in '91 and '92,
10:17:51   9  when we tapped into the $25 million of
10:17:52  10  the regulated entities' funds.  And I was
10:17:55  11  aware that we were, we were utilizing
10:17:59  12  customer assets in Refco Capital Markets
10:18:02  13  from '93 going forward.
10:18:04  14       Q.   So it's fair to say that from
10:18:06  15  1991 or 1992, you were aware that Refco
10:18:09  16  was having to tap into its customers'
10:18:13  17  assets in order to fund Refco's
10:18:16  18  day-to-day operations; correct?
10:18:21  19       A.   Yes.  However, I just want to.
10:18:29  20  I was aware earlier than that too,
10:18:31  21  because we had an over-the-counter
10:18:34  22  option, we were trading over-the-counter
10:18:36  23  options for clients.  And those monies
10:18:39  24  were deposited at Refco Capital Corp.,
10:18:42  25  and those clients, which were basically,
```

Page 44

```
                    1              SANTO C. MAGGIO
10:18:47   2  you know, pension funds and cities, were
10:18:50   3  depositing monies at RCC, which was
10:18:53   4  utilized, which the company was utilizing
10:18:55   5  to fund its operations.  So that was
10:18:57   6  happening very late '80s.
10:19:01   7       Q.   It was not unusual for Refco
10:19:03   8  to siphon off or tap into customer assets
10:19:10   9  in order to fund its operations?
10:19:14  10            MR. RIEMAN:  Objection to
10:19:16  11       form.
10:19:16  12       A.   Define unusual, please.
10:19:18  13       Q.   How frequently did that occur?
10:19:20  14       A.   All the time.
10:19:29  15       Q.   Did Refco ever arrange to
10:19:33  16  transfer customer funds that were in
10:19:35  17  segregation into nonsegregated accounts
10:19:39  18  so that it could use them for its own
10:19:42  19  purposes?
10:19:43  20       A.   I don't quite understand that
10:19:46  21  question, sir.
10:19:47  22       Q.   Did Refco ever take money
10:19:49  23  directly out of segregated funds,
10:19:52  24  customer segregated funds, in order to
10:19:55  25  use for its own purposes?
```

Page 45

```
                    1              SANTO C. MAGGIO
10:19:58   2            MS. RENDON:  Objection to
10:19:59   3       form.
10:20:06   4       A.   I mentioned with the FCM that
10:20:16   5  we took $25 million out of the segregated
10:20:19   6  accounts and sent it to Refco Capital
10:20:23   7  Corp.
10:20:23   8       Q.   Did you take that money
10:20:24   9  directly out of the segregated account or
10:20:27  10  did you have to transfer it somewhere
10:20:29  11  first before you could use it?
10:20:30  12       A.   We transferred it to Refco
10:20:33  13  Capital.
10:20:33  14       Q.   Refco Capital Corporation or
10:20:35  15  Refco Capital Markets?
10:20:36  16       A.   Actually Refco Capital Corp.
10:20:41  17       Q.   And what was Refco Capital
10:20:44  18  Corporation?
10:20:44  19       A.   It was a nonregulated entity
10:20:47  20  in Refco that handled the treasury and
10:20:52  21  financing and banking arms or cash
10:20:54  22  management arms -- cash management for
10:20:58  23  Refco Group in the entire '90s and early
10:21:06  24  2000s.
10:21:07  25       Q.   Did Refco Capital Corp. serve
```

12 (Pages 42 to 45)

Page 58

```
                    SANTO C. MAGGIO
10:34:45  2    contacted Mr. Collins again.  Basically
10:34:47  3    told him that we needed to be able to
10:34:49  4    have use to the customer funds.  And then
10:34:51  5    Mr. Collins came back to me and said
10:34:54  6    listen, you know, there are certain
10:34:56  7    things that we can and cannot do.  And we
10:34:59  8    went over all his issues.
10:35:01  9        And one of them was some of
10:35:03 10    the businesses that I really didn't care
10:35:05 11    about, which was, you know, the equity
10:35:08 12    business, the options on equities, which
10:35:11 13    I couldn't care less whether we moved
10:35:14 14    that into RSL, because there were no
10:35:16 15    customer funds or very little customer
10:35:18 16    funds on deposit that were associated
10:35:20 17    with it.  But the bulk of business, like
10:35:23 18    the emerging market debt, and some of the
10:35:25 19    other businesses, you know, he agreed
10:35:28 20    that because, you know, of what he
10:35:32 21    perceived as procedures, that we would be
10:35:33 22    able to keep that offshore.
10:35:37 23        Q.   So Mr. Collins agreed with you
10:35:39 24    that you could keep RCM offshore?
10:35:43 25        A.   Most of the businesses or a
```

Page 59

```
                    SANTO C. MAGGIO
10:35:46  2    good portion of the business is offshore,
10:35:49  3    yes.
10:35:49  4        Q.   Is that in fact what happened?
10:35:50  5        A.   That's in fact what's
10:35:52  6    happened.
10:35:57  7        Q.   Was anyone else at Refco
10:36:00  8    involved in those discussions?
10:36:02  9        A.   What discussions?
10:36:04 10        Q.   With Mr. Collins about keeping
10:36:08 11    RCM's operations offshore.
10:36:10 12        A.   Mr. Klejna.
10:36:18 13        Q.   While these discussions were
10:36:20 14    occurring, was it in fact true that RCM's
10:36:24 15    operations were occurring in the U.S.;
10:36:26 16    right?
10:36:26 17        A.   Yes.
10:36:26 18        Q.   It was not actually conducting
10:36:29 19    offshore operations during this period of
10:36:32 20    time; right?
10:36:33 21            MR. RIEMAN:  Objection to
10:36:33 22    form.
10:36:37 23        Q.   Go ahead.
10:36:38 24        A.   I'm sorry.  I'm sorry, repeat
10:36:41 25    that question.
```

Page 60

```
                    SANTO C. MAGGIO
10:36:42  2        Q.   The question was, RCM was not
10:36:45  3    actually conducting offshore operations?
10:36:48  4        A.   In 2002?
10:36:49  5        Q.   Correct.
10:36:50  6            MR. RIEMAN:  Objection to
10:36:51  7    form.
10:36:51  8        A.   Correct.
10:37:05  9        Q.   Did RCM commingle all of its
10:37:10 10    customers' assets?
10:37:13 11            MR. TURNBULL:  Objection as to
10:37:14 12    form.
10:37:15 13        A.   Yes.
10:37:15 14        Q.   In other words, RCM did not
10:37:17 15    segregate customer assets?
10:37:19 16        A.   Correct.
10:37:19 17        Q.   And did RCM have assets of its
10:37:23 18    own separate and apart from customer
10:37:26 19    deposits?
10:37:28 20        A.   Define assets.
10:37:32 21        Q.   Did RCM have assets separate
10:37:34 22    and apart from the customer deposits?
10:37:39 23        A.   Segregated away from the
10:37:42 24    customer deposits or did it have its own
10:37:44 25    assets?
```

Page 61

```
                    SANTO C. MAGGIO
10:37:44  2        Q.   Did it have its own assets?
10:37:48  3        A.   I can't answer that question.
10:37:55  4    Because sometimes Refco Capital Markets
10:37:57  5    would invest in securities for its own
10:38:00  6    account.  So I guess that would be an
10:38:01  7    asset.
10:38:02  8        Q.   Is it fair to say that the
10:38:04  9    vast majority of the assets at Refco
10:38:08 10    Capital Markets consisted of customer
10:38:09 11    deposits?
10:38:10 12        A.   Yes.
10:38:11 13        Q.   And those were all commingled;
10:38:17 14    right?
10:38:18 15        A.   Yes.
10:38:19 16        Q.   In a single account, a single
10:38:23 17    bank account at Chase; right?
10:38:27 18        A.   Yes.
10:38:37 19        Q.   And that was the money --
10:38:41 20    strike that.
10:38:42 21            Those were the assets that
10:38:44 22    were transferred to Refco Capital
10:38:48 23    Corporation in order to fund the
10:38:49 24    operations of Refco?
10:38:50 25        A.   Yes.
```

16 (Pages 58 to 61)

# In The Matter Of:

*In re: REFCO, INC. SECURITIES LITIGATION*

_____

**SANTO C. MAGGIO**
*December 15, 2009*

_____

# *MERRILL CORPORATION*

*25 West 45th Street - Suite 900*

*New York, NY 10036*

PH: 212-557-7400 / FAX: 212-692-9171

**MAGGIO, SANTO C. - Vol. 2**

Page 688

```
                 SANTO C. MAGGIO
15:16:14  2  bringing in fresh blood and new blood and
15:16:17  3  better, you know, better ideas would help
15:16:20  4  increase the business that we do.
15:16:22  5       Because BAWAG was getting a
15:16:24  6  percentage of the business, not only
15:16:26  7  rent, but they were getting a percentage
15:16:28  8  of the business that we were doing
15:16:29  9  through that desk.  And the more business
15:16:31 10  we did, the more money they would make.
15:16:39 11       Q.  Did Mr. Hackl ask you any
15:16:41 12  questions about Mr. Fetner's departure?
15:16:43 13       A.  Yes.
15:16:43 14       Q.  What did he ask you?
15:16:45 15       A.  Why he left.
15:16:46 16       Q.  And what did you tell him?
15:16:47 17       A.  Just told him there was, you
15:16:49 18  know, it was a decision made, you know,
15:16:51 19  by both Barry and Phil.
15:16:53 20       Q.  Did you give him any other
15:16:54 21  information about that?
15:16:55 22       A.  No.
15:16:55 23       Q.  And do you know why Mr. Fetner
15:16:59 24  left?
15:17:00 25       A.  Yes.
```

Page 689

```
                 SANTO C. MAGGIO
15:17:00  2       Q.  And what's the reason for
15:17:02  3  that?
15:17:02  4       A.  Mr. Fetner discovered that we
15:17:06  5  were failing on clients in FX, and he
15:17:12  6  contacted Phil Bennett, it did not happen
15:17:19  7  once, but it happened twice.  And Phil --
15:17:23  8  and Barry decided to leave the company.
15:17:25  9  And Phil ended up writing the separation
15:17:29 10  agreement.  And Barry left the company.
15:17:35 11       Q.  When you say that Mr. Fetner
15:17:37 12  discovered that we were failing on
15:17:39 13  clients in FX, can you explain what you
15:17:42 14  mean by that?
15:17:51 15       A.  On a daily basis we have
15:17:53 16  contractual obligations with a number of
15:17:55 17  banks for foreign exchange trades.  And
15:17:58 18  we would pick one bank and not pay them.
15:18:00 19  And we would utilize that money to fund
15:18:02 20  the operations of Refco.
15:18:04 21       Q.  Okay.  And you didn't tell
15:18:07 22  Mr. Hackl that that was the real reason
15:18:09 23  why Mr. Fetner left; right?
15:18:11 24       A.  That's correct.
15:18:12 25       Q.  Did you tell anyone else at
```

Page 690

```
                 SANTO C. MAGGIO
15:18:14  2  BAWAG that that was the real reason
15:18:18  3  Mr. Fetner left?
15:18:18  4       A.  No.
15:18:19  5       Q.  Do you know if anyone else at
15:18:20  6  Refco communicated with anyone at BAWAG
15:18:22  7  as to the real reason why Mr. Fetner
15:18:25  8  left?
15:18:25  9       A.  I don't know.
15:18:27 10       Q.  Now, you testified that when
15:18:43 11  customers of Refco put money on deposit
15:18:47 12  at Refco Capital Markets, Refco Capital
15:18:48 13  Markets could do whatever it wanted with
15:18:50 14  those funds; right?
15:18:51 15       A.  That's what I testified to,
15:18:52 16  yes.
15:18:53 17       Q.  And why was that, that RCM
15:18:55 18  could do whatever it wanted with the
15:18:57 19  funds?
15:18:57 20       A.  Because it was in the customer
15:18:58 21  agreement.
15:19:03 22       Q.  What do you mean by the
15:19:04 23  customer agreement?
15:19:04 24       A.  Clients signed an agreement
15:19:09 25  with RCM.  And in that agreement it
```

Page 691

```
                 SANTO C. MAGGIO
15:19:11  2  states that the firm has a right to
15:19:13  3  commingle, hypothecate, do anything with
15:19:17  4  the assets the customer is depositing at
15:19:20  5  RCM.
15:19:20  6       Q.  And so because RCM was an
15:19:24  7  unregulated entity, and because the
15:19:27  8  client signed an agreement with RCM, you
15:19:31  9  believed that it was okay for RCM to take
15:19:33 10  customer funds and use them as it needed
15:19:35 11  to fund Refco operations; is that right?
15:19:37 12       A.  I didn't say it was okay, I
15:19:39 13  said that we had a right to do it.
15:19:41 14       Q.  Meaning that you had a legal
15:19:42 15  right to do it?
15:19:42 16       A.  Yes.
15:19:43 17       Q.  Okay.  But you didn't believe
15:19:44 18  that was okay to do?
15:19:45 19       A.  I think in hindsight that was
15:19:47 20  not okay.
15:19:48 21       Q.  In hindsight you think it was
15:19:49 22  improper?
15:19:50 23       A.  Right.
15:19:51 24       Q.  And why do you think it was
15:19:52 25  improper?
```