**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------- X
                          :

In re REFCO INC. SECURITIES LITIGATION  :  Case No. 07-md-1902 (JSR)
                          :
--------------------------------------------------------- X

This Document Relates To:

--------------------------------------------------------- X
                          :

KENNETH M. KRYS, *et al.*,  :  Case No. 08-cv-7416 (JSR)
                          :

                  Plaintiffs,  :
                          :

           -against-  :

ROBERT AARON, *et al.*,  :
                          :

                 Defendants.  :
--------------------------------------------------------- X

**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS AND SUPPLEMENTAL**
**STATEMENT OF FACTS IN SUPPORT OF REPLY IN SUPPORT OF MOTION FOR**
**PARTIAL SUMMARY JUDGMENT RE BREACH OF THE SERVICE AGREEMENT**

**SPECIFIC RESPONSES**

**Defendants' Statement No. 1:**

      Plaintiffs have admitted that PlusFunds' management and risk committee understood that its foreign exchange accounts were held at RCM and that RCM was offshore and unregulated. Plaintiffs also admitted that they understood that there was no segregation for their foreign exchange funds held at RCM. Plaintiffs also claim that the data provided by DPM misrepresented the amount in the RCM accounts. (Am. Compl. 149) Plaintiffs' briefing in the *Sugrue* matter specifically stated:

> The Risk Committee's work on Refco concentrated on FX trading. Most of SMFF's portfolio managers engaged in foreign currency exchange ("FX") trading as a component of their trading strategies. Pl. SOF ¶ 6. FX trading takes place on unregulated exchanges and is not subject to the CFTC's customer-segregation requirements. Pl. SOF ¶ 6; Greenberger Report at 131.b. Accordingly, SMFF's

1

> 14 segregated portfolios established separate foreign exchange
> accounts at RCM for their FX trading. Pl. SOF ¶ 6. PlusFunds
> agents, including Bousbib, Rose, Aliprandi and others, were well
> aware of these trades and knew that the FX accounts at RCM were
> not segregated. Pl. SOF ¶ 6.

Krys v. Sugrue, 08-cv-03086; Docket #885 (Plaintiff's Brief in Opposition to Defendants' Joint

Motion for Summary Judgment, at pp. 10-11.)

**Response:**

Plaintiffs do not dispute that their Amended Complaint contains the above-cited excerpt

on its page 149. However, Plaintiffs dispute the assertion that their understanding that RCM FX

accounts were unsegregated provided knowledge that the excess cash in the RCM securities sub-

accounts was also unsegregated. Plaintiffs were aware that all funds deposited at Refco LLC

were segregated per CFTC Rules. The Refco LLC account opening documents state,

> All property carried for Customer by Refco shall be segregated as
> required by the Commodity Exchange Act and the rules of the
> Commodity Futures Trading Commission (CFTC). Customer will
> not be permitted to make or change an election concerning account
> type.

Andelin Dec. Ex. 7 at PLF-NYS01-04012375. Per CFTC rules including Rule 30.7 (17 C.F.R. §

30.7(c)(2)[1]), as a Futures Commission Merchant, Refco LLC was required to acquire a

depository acknowledgement letter from a RCM that the funds would continue to be segregated

within the depository wherever that depository was located and maintain a copy of that letter in

its files.

---

[1] 17 C.F.R. § 30.7(c)(2) states: "Each futures commission merchant must obtain and retain in its
files for the period provided in §1.31 of this chapter an acknowledgment from such depository
that it was informed that such money, securities or property are held for or on behalf of foreign
futures and foreign options customers and are being held in accordance with the provisions of
these regulations."

**Defendants' Statement No. 2:**

As stated above, DPM provided all of the RCM accounts numbers, separately listed, with accurate account balances for each account, as evidenced by the October 10, 2005 example, showing a balance of $312,046,266.20. Pendleton Decl. Ex. 33, (Excerpt of October 10, 2005 DPM feed). DPM listed every single one of the RCM accounts as FX, including the accounts holding the $312 million in excess cash. An excerpt of the October 10, 2005 DPM data is pasted below.

| FX-REFCO | USD | 12768712.78 | 10011575 | APFTX | BalanceSummary | Daily |
|----------|-----|-------------|----------|-------|----------------|-------|
| FX-REFCO | USD | 8840651.46 | 10011583 | BBFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 8418409.96 | 10011591 | DUFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 51505942.65 | 10011609 | CBFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 15956147.47 | 10011617 | WCFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 45188356.35 | 10011625 | CPFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 9856586.55 | 10011633 | DCFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 50564648.23 | 10011641 | GHFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 9686850.86 | 10011658 | HBFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 7196495.01 | 10011666 | MUFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 57040149.22 | 10011674 | RTFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 9675323.87 | 10011682 | WAFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 11539968.41 | 10011732 | ECFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 6808023.41 | 10011740 | HNFTX | BalanceSummary | Daily |
| FX-REFCO | USD | 7000000 | 10015865 | NEFTX | BalanceSummary | Daily |

**Response:**

Plaintiffs dispute the admissibility of Pendleton Decl. Ex. 33, which is described as "an example of a DPM data feed dated October 10, 2005, imported into Microsoft Excel and filtered for FX entries demonstrating balance in RCM accounts. (Produced in electronic format.)" Pendleton Decl. at 5, ¶ 33. Exhibit 33, contrary to Defendants' statement, has not been produced in electronic format for Plaintiffs' review, lacks a Bates label, has not been produced to date in this litigation, was created by Defendants as an "example," has not been authenticated by anyone, has not had a foundation properly laid, and has not been ever been viewed by Plaintiffs.

Plaintiffs respectfully request this Court to strike Defendants' Ex. 33 for the following reasons:

(1) FRE 901: Defendants have failed to authenticate Ex. 33 pursuant to FRE 901(b)(1), testimony of a witness with knowledge, or FRE 901(b)(9), evidence describing the

process or system by which Ex. 33 was generated and showing that it produces an accurate result.

(2) FRE 902: Defendants have failed to demonstrate that Ex. 33 should qualify as a self-authenticating document.

(3) FRE 1004: Defendants have failed to demonstrate how Ex. 33's "example" is not closely related to a controlling issue in order to qualify as an acceptable substitute for the original document from which it was derived.

(4) FRE 403: Defendants have failed to demonstrate how the purported relevance of Ex. 33's "example" is not outweighed by the unfair prejudice of allowing Defendants to recreate documents not part of the record for the purpose of drawing prejudicial inferences of data groupings that have never been proven to have been viewed or received by Plaintiffs in said manner or fashion. Defendants have also not demonstrated how Ex. 33's "example" does needlessly present cumulative evidence.

(5) FRE 106: Fairness requires consideration of the entire document of which Ex. 33 only represents a part or "example." Defendants have failed to demonstrate how FRE 106 does not mandate the production of Ex. 33 in "electronic format", whose production was represented in Defendants' Declaration but not produced.

(6) FRE 803: Defendants have failed to demonstrate that Ex. 33 should qualify for the "Record of a Regularly Conducted Activity" exception to hearsay pursuant to FRE 803(6). Defendants have failed to demonstrate or lay a foundation for how Ex. 33's "example" was: (A) "made at or near the time by—or from information transmitted by—someone with knowledge"; (B) "kept in the course of regularly conducted activity" of DPM; (C) "a regular practice" of the "DPM data feed" which was "imported into Microsoft Excel and filtered for FX entries"; (D) "shown by testimony of the custodian or another qualified witness"; and (E) one where "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness."

Plaintiffs also dispute that DPM listed all RCM accounts as "FX" Accounts.

**Defendants' Statement No. 3:**

The October 10, 2005 example of DPM data is typical of what was provided to PlusFunds and Lago on a daily basis for a period of years. Additional examples dated November 4, 2004, January 27, 2005 and May 11, 2005 are attached and the full set is available upon request. Pendleton Decl. Exs. 41, 42, 43. Hence, by Plaintiffs' own admission, the officers and others at PlusFunds knew that the excess cash held at RCM was not segregated. See ¶ 1 above.

**Response:**

Plaintiffs incorporate by reference their Response to Defendants' Statement No. 2 above

with respect to Ex. 33. Plaintiffs dispute the admissibility of Pendleton Decl. Exs. 41, 42, 43,

which are described as "an example of a DPM data feed" for November 4, 2004, January 27, 2005, and May 11, 2005, respectively, and "imported into Microsoft Excel and filtered for FX entries demonstrating balance in RCM accounts. (Produced in electronic format.)" Pendleton Decl. at 6, ¶¶ 41, 42, 43. Exhibits 41, 42, 43, contrary to Defendants' statement, have not been produced in electronic format for Plaintiffs' review, lack a Bates label, have not been produced to date in this Litigation, were created by Defendants as an "example", have not been authenticated by Defendants, have not had a foundation properly laid by Defendants, and have not ever been viewed by Plaintiffs.

Plaintiffs respectfully request this Court to strike Defendants' Exs. 41, 42, 43 for the following reasons:

(1) FRE 901: Defendants have failed to authenticate Exs. 41, 42, 43 pursuant to FRE 901(b)(1), testimony of a witness with knowledge, or FRE 901(b)(9), evidence describing the process or system by which Exs. 41, 42, 43 was generated and showing that it produces an accurate result.

(2) FRE 902: Defendants have failed to demonstrate that Exs. 41, 42, 43 should qualify as a self-authenticating document.

(3) FRE 1004: Defendants have failed to demonstrate how Exs. 41, 42, 43 "example" is not closely related to a controlling issue in order to qualify as an acceptable substitute for the original document from which it was derived.

(4) FRE 403: Defendants have failed to demonstrate how the purported relevance of Exs. 41, 42, 43 "example" is not outweighed by the unfair prejudice of allowing Defendants to recreate documents not part of the record for the purpose of drawing prejudicial inferences of data groupings that have never been proven to have been viewed or received by Plaintiffs in said manner or fashion. Defendants have also not demonstrated how Exs. 41, 42, 43 "example" does needlessly present cumulative evidence.

(5) FRE 106: Fairness requires consideration of the entire document of which Exs. 41, 42, 43 only represents a part or "example." Defendants have failed to demonstrate how FRE 106 does not mandate the production of Exs. 41, 42, 43 in "electronic format", whose production was represented in Defendants' Declaration but not produced.

(6) FRE 803: Defendants have failed to demonstrate that Exs. 41, 42, 43 should qualify for the "Record of a Regularly Conducted Activity" exception to hearsay pursuant to FRE 803(6). Defendants have failed to demonstrate how Exs. 41, 42, 43 "example" was:

(A) "made at or near the time by—or from information transmitted by—someone with knowledge"; (B) "kept in the course of regularly conducted activity" of DPM; (C) "a regular practice" of the "DPM data feed" which was "imported into Microsoft Excel and filtered for FX entries"; (D) "shown by testimony of the custodian or another qualified witness"; and (E) one where "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness."

Additionally, Plaintiffs dispute Defendants' claim that Exs. 33, 41, 42, 43 show "the officers and others at PlusFunds knew that the excess cash held at RCM was not segregated." Even if Plaintiffs had seen any of the information created by Defendants in Exs. 33, 41, 42, 43, they would have noticed that all of the account numbers contained therein were RCM securities sub-account numbers described by Defendants in their "example" as "Money swept from Futures account into this account weekly by Refco", designated as eight-digit account numbers beginning with the prefix digit "1"—as opposed to RCM FX account numbers described by Defendants in their "example" as "Margin calls into this account or excess margin out of this account to be requested by PlusFunds", designated as four-digit account numbers beginning with the prefix digit "4." *See* Pendleton Decl. (5 Mar 13) Ex. 28 at PLF-TU-0089248. These RCM account designations differed from Refco LLC futures account numbers described by Defendants in their "example" as "Segregated" where "Allocations made into this account twice monthly", designated as five-digit account numbers beginning with the prefix digit "4." *Id*. at PLF-TU-0089247.

Knowing that the account numbers referenced in Defendants' Exs. 33, 41, 42, 43 related to RCM securities sub-accounts as opposed to RCM FX accounts is significant. The account opening documents for RCM FX accounts represent that such accounts were used to conduct "FX Transactions," defined as:

> [A]ny transaction between the Parties for the purchase by one Party of an agreed amount of one Currency against the sale by it to the other of an agreed amount in another currency…

Pendleton Decl. (31 Dec 12) Ex. 39 at PF-059-0002479. The Margin Annex to the RCM FX account opening documents states that,

> Party A may, in its discretion, without prior notice to Party B, apply or transfer any cash, securities or other property interchangeably between any of Party B's accounts at Party A or any affiliate of Party A as may be deemed necessary for margin or to satisfy or reduce any deficit or debit balance in any such account.

*Id.* at PF-059-0002498. What is more, RCM FX account Customer Statements contained a disclosure in Note 4 stating,

> Refco does not segregate any collateral or other property deposited with it. Refco's transactions with are executed in the interbank foreign exchange market and these transactions are not subject to the U.S. Commodity Exchange Act. Accordingly, the segregation requirements of that Act are inapplicable, even with respect to funds or property transferred from Refco, Inc.

Pendleton Decl. (31 Dec 12) Ex. 129 at RA 0017818.

Conversely, the RCM securities sub-accounts, where excess cash was swept, accounts were titled "Segregated Portfolio" and conducted zero trading activity—let alone any "FX Transactions"—and the (incomplete) account-opening documents did not contain any of the language present in the RCM FX Margin Annex to alert Plaintiffs that funds there held would not be subject to segregation. *See* Andelin Decl. Ex. 54, at 1-360-RA_0012532. Furthermore, RCM securities sub-account customer statements did not contain the language found in Note 4 of the RCM FX account customer statements and confirm zero trading activity. *See* Andelin Decl. Ex. 158 at PLF-BME-0129692.

**Defendants' Statement No. 4:**

SPhinX was structured as an exempted Segregated Portfolio Company ("SPC") by PlusFunds and Refco under the laws of the Cayman Islands. Andelin Decl. Ex. 1 at PLF-CA-0224678; Pendleton Decl. Ex. 3 (Locke Tr. at 124:5-125:11); *id.*, Ex. 48 (Gerstein Tr. at 42:24-43:21; 48:5-49:2; 197:2-12). An exempted SPC structure has the advantage of "portfolio segregation" or "ring-fencing" the assets of one Portfolio Fund Series from the liabilities of

another Portfolio Funds Series that operate under the umbrella of a single fund. Pendleton Decl. Ex. 14 at PLF-CR04-0718023 to 24, ¶5.

**Response:**

Plaintiffs do not dispute the factual assertions in Statement No. 4.

**Defendants' Statement No. 5:**

Of the fourteen Portfolio Fund Series under SMFF, portfolio segregation ensured cross-liability protection where assets of each Portfolio Fund were segregated and could not be used by the creditors of another Fund in the SPhinX Family. By example, portfolio segregation protected any assets and liabilities of the "Rotella" segregated portfolio from the assets and liabilities of the "Chesapeake" Capital segregated portfolio. Pendleton Decl. Ex. 14 (Deposition Exhibit 4104, an e-mail and Walkers memo defining "SPC", dated October 15, 2002, at PLF CR04-0718024, ¶¶ 3, 5 and PLF-CR04-0718026, ¶¶ 2-5).

**Response:**

Plaintiffs do not dispute the factual assertions in Statement No. 5.

**Defendants' Statement No. 6:**

In 2002, an SPC was a new type of business structure, and the extent to which portfolio segregation would actually guarantee cross-liability protection was unknown in the industry. Pendleton Decl. Ex. 1 (Drake Tr. at 76:10-15); *id.*, Ex. 3 (Locke Tr. at 62:12-18); *id.*, Ex. 14 at PLF-CR04-0718024, ¶ 1, PLF-CR04-0718028, ¶ 3. The advantage of portfolio segregation under an SPC structure was an abstract concept. Pendleton Decl. Ex. 14 (Deposition Exhibit 4104, an e-mail regarding the Walkers memo defining "SPC", dated October 15, 2002, at PLF-CR04-0718024 and PLF-CR04-0718028).

**Response:**

Plaintiffs dispute that in 2002 there was no guarantee that ring-fencing would guarantee cross-liability protection for the funds of an SPC. Rather, the deposition transcripts of Drake and Locke relied upon by Defendants merely raise the point that it was unknown in 2002 if New York courts would recognize the SPC structure in an identical fashion to Cayman Islands Courts. Pendleton Decl. Ex. 1 (Drake Tr. at 76:10-15); *id.*, Ex. 3 (Locke Tr. at 62:12-18). Furthermore, Defendants' labeling the SPC's ring-fencing advantage as "abstract" is without foundation, vague, ambiguous and irrelevant.

**Defendants' Statement No. 7:**

It was also unknown whether portfolio segregation would be enforced outside the Cayman Islands. *Id*., Ex. 1 (Drake Tr. at 76:10-15); *id*., Ex. 3 (Locke Tr. at 62:12-18); *id*., Ex. 14 at PLF-CR04-0718024, ¶ 1, PLF-CR04-0718028, ¶ 3. By contrast, "customer segregation" or "horizontal segregation" protects the assets of a Portfolio Fund Series against the insolvency of a prime broker. Pendleton Decl. Ex. 13 (Aliprandi Tr. at 137:3-139:18); *see also id*., Ex. 51 (Dew Tr. at 283:15-285:7).

**Response:**

Plaintiffs incorporate by reference their previous Response to Statement No. 6. Additionally, Plaintiffs dispute Defendants' equating "customer segregation" with "horizontal segregation." Plaintiffs agree that "customer segregation" differs from "ring-fencing." Plaintiffs dispute DPM's statement regarding customer-segregation; "customer segregation" is defined by CFTC rules, including 17 C.F.R. 30, Appendix B(1):

CFTC rules, including Rule 30.7, require FCMs who accept money, securities or property from foreign futures and foreign options customers to maintain in a separate account or accounts such money, securities and property in an amount at least sufficient to cover or satisfy all of its current obligations to those customers. This amount is denominated as the "foreign futures or foreign options secured amount" and that term is defined in Rule 1.3(rr). The separate accounts must be maintained under an account name that clearly identifies the funds as belonging to foreign futures and foreign options customers at a depository that meets the requirements of CFTC rules, including Rule 30.7(c). Further, each FCM must obtain and retain in its files for the period provided in Rule 1.31 an acknowledgment from the depository that the depository was informed that such money, securities or property are held for or on behalf of foreign futures and foreign options customers and are being held in accordance with the provisions of these regulations.

**Defendants' Statement No. 8:**

SPhinX only offered portfolio segregation to its investors, rather than customer segregation, because of its SPC structure. *See id.*, Ex. 5 (2/10/06 Rose Tr. at 127:14-17; 128:21-129:25; 130:20-133:22; 210:5-19; 210:23-212:10; 214:15-216:16); *id.*, Ex. 1 (Drake Tr. at 174:5-16); *id.*, Ex. 52 (Grennell Tr. at 103:22-104:3); *id.*, Ex. 64 (Feder Tr. at 52:2 -53:18; 56:21-57:13; 57:14-58:14).

**Response:**

Plaintiffs dispute Defendants' Statement No. 8. Defendants have not and cannot demonstrate that SPhinX did not offer its investors "customer segregation" as defined by the CFTC rules, including 17 C.F.R. 30, Appendix B(1). SPhinX's offering memorandum clearly promised that customer assets would be held in customer accounts, separate from the assets of the broker or custodian, and would receive priority treatment in the event of the broker's insolvency. *See* Andelin Decl. Ex. 1, at 26-27, 42-43.

**Defendants' Statement No. 9:**

In drafting SPhinX marketing materials, PlusFunds' only concern on the issue of segregation for the SPhinX Fund was ensuring portfolio segregation, not customer segregation. *See id.*, Ex. 55 (PlusFunds Firm Overview, at PLF-CS04-0132400, ¶ 2 (third bullet point).

**Response:**

Plaintiffs dispute Statement No. 9. Defendants' assertion that PlusFunds' "only concern" regarding SPhinX was "ring-fencing" lacks foundation, is purely speculative, and irrelevant. Plaintiffs incorporate their Response to Statement No. 8 above.

**Defendants' Statement No. 10:**

PlusFunds was advised to reinforce the portfolio segregation language for the SPhinX Fund. *See id.*, Ex. 53 (Ex. 4276). PlusFunds, having been given a second chance to revisit the scope of segregation, again only focused on portfolio segregation. *See id.*, Ex. 54 (Exhibit 4601).

**Response:**

Plaintiffs dispute Statement No 10. Defendants' assertion that PlusFunds' purported revisit to the segregation of SPhinX assets was "only focused" on "ring-fencing" lacks

foundation, is purely speculative, and irrelevant.  The SPhinX Offering Memorandum makes

clear promises of "customer segregation" as a key feature, showing that this was one of

PlusFunds' primary concerns.  Plaintiffs incorporate their Response to Statement No. 8 above.

**Defendants' Statement No. 11:**

The SPhinX Ltd. Offering Memorandum dated July 12, 2002, as prepared by PlusFunds[2], includes the portfolio segregation language that was of primary concern. *Id.*, Ex. 55 (PlusFunds Firm Overview, at PLF-CS04-0132400, ¶ 2 (third bullet point); *id.*, Ex. 56 (SPhinX Offering Memorandum, May 2004, at p. 27).

**Response:**

Plaintiffs dispute Statement No. 10.  Defendants cite Ex. 24 (Bousbib Depo. 361:9-16) to

assert that PlusFunds prepared the SPhinX Offering Memorandum.  However, the exact

deposition testimony that Defendants cite in no way supports this assertion.  Below is the exact

language from the Bousbib deposition cited by Defendants:

> 00361
>
> 09  letterhead that's signed by Mr. Aaron at the
> 10  bottom, did you see that document while you
> 11  were employed as the CEO at PlusFunds?  To
> 12  your knowledge?
> 13  A.  This document is—is not the
> 14  continuation of the prior page, right?  Just
> 15  to be clear.
> 16  Q.   No.  I am sorry.  I am actually

Therefore, Defendants' statement lacks foundation.  Contrary to Defendants' assertion, just prior

to the deposition excerpt offered by Defendants, Bousbib indicates that PlusFunds was not

concerned that the SPhinX Offering Memorandum had made inadequate promises of "ring-

fencing":

---

[2] *See id.*, Ex. 24 (Bousbib Tr. at 361:9-16) (stating that he "would probably review, suggest format changes, make edits [and] make comments on the context" of the SPhinX marketing materials).

Q.   Do you remember at any point in time when you were at PlusFunds it being brought to your attention that the documentation between the SPhinX funds and Refco needed to be modified to make clearer the ringfencing protection that applied to the SPCs?

A.   I don't recall.

(Bousbib Tr. at 357:13-20).

**Defendants' Statement No. 12:**

The amounts to be transferred were determined by Refco, and the sweep procedure was initiated each time by Refco. *See id.*, Ex. 22 (Phillips Tr. at 233:24-234:23). This cash sweep procedure was established from the outset of SMFF being launched in December 2002. *See id.*, Ex. 57 (December 6, 2002 account opening data); *id.*, Ex. 58 (Jouas Tr. at 111:22-112:5). PlusFunds ratified this procedure in 2004 by continuing to authorize transfers of assets to unsegregated accounts. *See id.*, Ex. 4 (Urban Tr. at 440:5-21); *id.*, Ex. 28, May 12, 2005 email from Urban re: Managed Futures Process.

**Response:**

Plaintiffs dispute Statement No. 12.  SMFF was launched in July 2002 and had in excess of $30 million at the end of November 2002.  Plaintiffs admit that Refco agents sought approval from DPM before transferring moneys from SMFF's Refco LLC accounts to the RCM accounts. These transfers were approved by DPM.  *See, e.g.*, Andelin Decl. Ex. 18, DPM's SMFF Excess Cash Transfer Authorization, 19 Dec 02 (DPM058 0964) ("OK to transfer"); Ex. 23, DPM's SMFF Excess Cash Transfer Authorization, 16 Dec 03, Ex. 5619 (DPM078-2002) ("Approved"); Ex. 24, DPM's SMFF Excess Cash Transfer Authorization, 22 Jan 04, Ex. 5618 (DPM078-1991) ("approval"); Ex. 149, DPM's SMFF Excess Cash Transfer Authorization, 28 Jul 03 (DPM058-0920) ("Approved"); Ex. 150, DPM's SMFF Excess Cash Transfer Authorization, 2 Jun 03 (DPM058-0924) ("Approved"); 151, DPM's SMFF Cash Transfer Authorization letter, 30 Sep 05 (DPM235 1065) ("Please accept this letter as authorization to wire transfer $18,245,864.91"). Not one of DPM's voluminous e-mails, letters, or communications purporting to "approve" the Refco cash sweep included any PlusFunds or SPhinX directors, agents, or employees as

recipients. *See id.* Plaintiffs dispute the Statement that PlusFunds ratified the transfer of assets

to unsegregated accounts. DPM has not identified a single document demonstrating the any

PlusFunds agent knew SMFF's cash at RCM was not segregated, and all of the PlusFunds

witnesses denied having any such knowledge.

**Defendants' Statement No. 13:**

SPhinX and DPM entered into five service agreements starting in July 9, 2002, May 1, 2003, February 27, 2004, June 30, 2004, and February 28, 2006. Each of the Service Agreements contained a Liquidated Damages Clause as the exclusive remedy for a breach of the Service Agreements. The Liquidated Damages Clause in the 2002-04 Service Agreements provides as follows:

> Subject to the limitations provided in Section 25 [sic] hereof, in the event of a material breach of contract including but not limited to any breach in the service levels (pursuant to Section 2 of this Agreement), which has not been remedied within three (3) business days of [SPhinX's] notification of breach to DPM or DPM Ltd; [SPhinX] shall receive $1,000 a day as liquidated damages, which amount is intended to compensate [SPhinX] for the cost of injuries to its operations resulting from the material breach, for a period of up to 30 days or until such time as the material breach is corrected, which ever calculation results in the lesser amount.

Andelin Decl. Exs. 9,11, § 25 (7/9/02 and 5/1/03 Agreements); Pendleton Decl. Ex 9, § 25

(2/27/04 Agreement); Andelin Decl. Ex. 12, § 25 (6/30/04 Agreement). Furthermore, the

Liquidated Damages Clause in the 2006 Service Agreement provides as follows:

> Subject to the limitations provided herein, in the event of a material breach of the terms of this Agreement by DPM Ltd. or DPM LLC that has not been remedied within three (3) business days of a Company's notification of such breach to DPM Ltd. or DPM LLC, the Company shall receive $1,000 per day in liquidated damages for a period of up to 30 days or until such time as the material breach is corrected, whichever occurs first.

Andelin Decl. Ex. 14, § 26 (2/28/06 Agreement).

**Response:**

Plaintiffs dispute Statement No. 13. Plaintiffs admit that SPhinX entered into four, not five, service agreements with DPM dated July 9, 2002, May 1, 2003, February 27, 2004, and June 30, 2004. The purported February 2006 amendment to the Service Agreement was not properly authorized and is irrelevant to Plaintiffs' claims other than as evidence of DPM's knowledge and intent, as evidenced by DPM's attempt to change the relevant parts of the Service Agreement after Refco's collapse. Although Robert Aaron attempted to single-handedly amend the validly renewed and applicable June 30, 2004 Service Agreement on February 28, 2006, Aaron's inherent conflicts of interest as a director of SPhinX and owner of DPM rendered the amendment invalid and resulted in his removal from the SPhinX Board on March 3, 2006. Pendleton Decl., Ex. 156 (Email to Andrew Feighery from Peter Ginsberg, 2 Mar 06, [PKF0253232]); Pendleton Decl., Ex. 157 (Resolution of the Directors, 3 Mar 06). Furthermore, Defendants' reference to the purported February 28, 2006 amendment to the Service Agreement lacks foundation and is irrelevant as Plaintiffs' claims and damages arise from their contractual relationship with Defendants prior to 2006. Plaintiffs also dispute Defendants' rendition of the liquidated damages clause in the 2002-04 versions of the Service Agreement. Instead, it reads:

> Subject to the limitations provided in Section 25 hereof, in the event of a material breach of contract including but not limited to any breach in service levels (pursuant to Section 2 of this Agreement), which has not been remedied within three (3) business days of Companies' notification of breach to DPM or DPM Ltd; the Companies shall receive $1,000 a day as liquidated damages, which amount is intended to compensate the Companies for the cost of injuries to its operations resulting from the material breach, for a period of up to 30 days or until such time as the material breach is corrected, which ever calculation results in the lesser amount

Andelin Decl. Exs. 9, 11, § 25 (July 9, 2002 and May 1, 2003 agreements); Pendleton Decl. Ex 9, § 25 (Feb. 27, 2004 agreement); Andelin Decl. Ex. 12, § 25 (June 30, 2004 agreement).

Finally, the liquidated damages clause is not the "exclusive" remedy for breaches of the Service Agreement. The liquidated damages clause applies only to the narrow category of "injury to [SPhinX's] operations. Recognizing the narrow scope of the clause, DPM attempted unilaterally to remove the "injury to [SPhinX's] operations" language from the purported 2006 Service Agreement.

Breaches of the Service Agreement are covered by ¶18, the Indemnification Clause, which permits SPhinX to recover "any and all … losses and attorneys' fees arising out of or in connection with any failure of [DPM] to perform their obligations under this Agreement."

**Defendants' Statement No. 14:**

In addition, the Warranties and Damages Clause disclaims any liability for extra-contractual damages arising under the Service Agreements or in connection with DPM's services. This clause works in conjunction with the Liquidated Damage Clause and bars Plaintiffs from attempting to recover damages in excess of $30,000.

**Response:**

Plaintiffs dispute Statement No. 14. Paragraph 27 does not limit claims for breach under Paragraph 18 by its own terms. Since Paragraph 25 applies only to "injury to [SPhinX's] operations," Paragraphs 25 and 27 do not work together to limit SPhinX's damage claim under Paragraph 18 to $30,000.00.

**Defendants' Statement No. 15:**

The Warranties and Damages Clause provides as follows:

> NEITHER PARTY SHALL BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA OR LOSS OF PROFITS OR ANTICIPATED PROFITS OR BENEFITS FROM THE USE OF THE SERVICES, REGARDLESS OF HAVING BEEN APPRISED OF THE POSSIBILITY THEREOF. THESE LIMITATIONS SHALL APPLY TO ALL CLAIMS OR CAUSES OF ACTIONS BY THE COMPANIES AGAINST DPM UNDER OR IN CONNECTION WITH THE SERVICES OF THIS AGREEMENT. THIS

SECTION SHALL NOT APPLY TO THE INDEMNIFICATION
OR CONFIDENTIAL OBLIGATIONS OF THE PARTIES.

Andelin Decl. Ex. 9, § 26 (7/9/02 Agreement); id., Ex. 11, § 27 (5/1/03 Agreement); Pendleton

Decl. Ex 9, § 27 (2/27/04 Agreement); Andelin Decl. Ex. 12, § 27 (6/30/04 Agreement); id.,

Ex. 14, § 28 (2/28/06 Agreement).

**Response:**

Plaintiffs dispute Statement No. 15. Defendants misrepresent the nature and substance of

the Warranties and Damages Clause as agreed to by the Parties and memorialized in the 2002-04

versions of the Service Agreement. The language of the valid Warranties and Damages Clause

from those agreements states:

> WARRANTIES AND DAMAGES. … NEITHER PARTY
> SHALL BE LIABLE FOR ANY SPECIAL, INDIRECT,
> INCIDENTAL OR CONSEQUENTIAL DAMAGES,
> INCLUDING, WITHOUT LIMITATION, DAMAGES FOR
> LOSS OF DATA OR LOSS OF PROFITS … FROM THE USE
> OF THE SERVICES…. THESE LIMITATIONS SHALL APPLY
> TO ALL CLAIMS OR CAUSES OF ACTION BY THE
> COMPANIES AGAINST DPM UNDER OR IN CONNECTION
> WITH THE SERVICES OR THIS AGREEMENT. UNDER ANY
> CIRCUMSTANCES, IF DPM IS UNABLE TO CORRECT ANY
> PROBLEM WITHIN A REASONABLE TIME, THE
> COMPANIES' MAXIMUM LIABILITY UNDER THIS
> AGREEMENT SHALL BE LIMITED TO AMOUNTS PAID
> UNDER THIS AGREEMENT IN THE YEAR IN WHICH SUCH
> LOSS IS DETERMINED. THIS SECTION SHALL NOT APPLY
> TO THE INDEMNIFICATION OR CONFIDENTIALITY
> OBLIGATIONS OF THE PARTIES.

Andelin Decl. Ex. 9, § 26 (July 9, 2002 agreement); Ex. 11, § 27 (May 1, 2003 agreement);

Pendleton Decl. Ex 9, § 27 (Feb. 27, 2004 agreement); Andelin Decl. Ex. 12, § 27 (June 30, 2004

agreement). Instead, Defendants' Statement No. 15 above asserts that the Warranties and

Damages Clause language from the invalid 2006 amendment to the Service Agreement is found

in the 2002-04 Service Agreements. There is however, one key difference between this Clause

in the latter Agreements versus the purported 2006 Amendment that Robert Aaron attempted

unilaterally to execute—it removes the following language:

> UNDER ANY CIRCUMSTANCES, IF DPM IS UNABLE TO
> CORRECT ANY PROBLEM WITHIN A REASONABLE TIME,
> THE COMPANIES' MAXIMUM LIABILITY UNDER THIS
> AGREEMENT SHALL BE LIMITED TO AMOUNTS PAID
> UNDER THIS AGREEMENT IN THE YEAR IN WHICH SUCH
> LOSS IS DETERMINED.

*Id*. Regarding the purported 2006 Amendment to the Service Agreement, generally, Plaintiffs

respectfully refer to their Response to Statement No. 13.

**Defendants' Statement No. 16:**

Each of the Service Agreements contains an Indemnification Clause that the Court has
deemed applicable only to third-party claims. See Dkt. #: 332 (5/29/12 R&R on Plaintiffs'
Motion to Dismiss DPM's Indemnity Counterclaim (the "Indemnification R&R")), adopted Dkt.
#: 356 (8/17/12 Order). The Indemnification Clause in the 2002-04 Service Agreements provides
in relevant part that DPM will indemnify SPhinX:

> employees and their respective successors and permitted assigns
> from a and against any and all liabilities, claims, costs, fines,
> damages, expenses, losses and attorneys' fees arising out of our
> [sic] in connection with any failure of DPM and DPM Ltd. to
> perform their obligations hereunder. . . . Nothing contained herein
> shall require either party to indemnify the other for acts of the
> others, which constitute gross negligence, malfeasance or willful
> misconduct.

Andelin Decl. Exs. 9, 11, § 18 (7/9/02 and 5/1/03 Agreements); Pendleton Decl. Ex 9, § 18

(2/27/04 Agreement); Andelin Decl. Ex. 12, § 18 (6/30/04 Agreement). Furthermore, the

Indemnification Clause in the 2006 Service Agreement provides in relevant part that DPM will

indemnify SPhinX:

> employees and their respective successors and permitted assigns
> from a and against any and all liabilities, claims, costs, fines,
> damages, expenses, losses and attorneys' fees arising out of our
> [sic] in connection with any material failure of either DPM Ltd. or
> DPM LLC to perform their obligations hereunder. . . . Nothing
> contained herein shall require either party to indemnify the other

> for acts of the others, which constitute gross negligence,
> malfeasance or willful misconduct.

(emphasis and strikethrough added where the 2006 provision is different from the 2002-04

provisions) Andelin Decl. Ex. 14, § 18 (2/28/06 Agreement).

**Response:**

Plaintiffs dispute Statement No. 16. This Court has limited the indemnity clause in the

2002-04 versions of the Service Agreement as only applicable to third-party claims with regard

to SPhinX's potential liability to third-parties—it does not, however, disclaim DPM's liability to

SPhinX arising from performance of the Service Agreements. *See* Indemnification R&R, May

29, 2012, Dkt. No. 332, at 23, *adopted* Aug. 17, 2012, Dkt. No. 356.[3] Plaintiffs' obligation to

indemnify DPM is limited to third-party claims since that obligation arises only "in

consequence" of DPM's performance of the Service Agreement. In contrast, DPM's obligation

to indemnify SPhinX arises from claims "in connection with any failure of DPM and DPM Ltd.

to perform their obligations."

Plaintiffs do not dispute that the 2002-04 versions of the Service Agreement state what

Defendants here claim. Regarding the purported 2006 Service Agreement, Plaintiffs respectfully

refer to their Response to Statement No. 13.

**Defendants' Statement No. 17:**

On December 16, 2005, the Official Committee of Unsecured Creditors of Refco Inc., et

al., on behalf of Refco Capital Markets, Ltd ("RCM") filed a Complaint in the United States

---

[3] The Special Master noted, and Judge Rakoff affirmed, that:

> [T]he indemnification in SMFF's favor specifically calls for
> payment of attorney fees and the indemnification in DPM's favor
> does not. That does at all not mean that DPM's claim for attorney
> fees expended with respect to claims of a third party in an
> independent lawsuit would be dismissed on the pleadings—
> because the indemnity provision is at least ambiguous on whether
> it covers DPM's attorney fees in third-party suits.

Bankruptcy Court for the Southern District of New York to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547 and 550 (the "Preference Action"). Pendleton Decl. Ex. 49. (Preference Complaint filed in Case No. 05-60006(RDD)). The Preference Complaint makes no reference to DPM or its failure to perform under Sections 2 and/or 3 of the Service Agreements. Instead, the complaint refers to excess cash invested at RCM "[a]t PlusFunds' direction," $312 million of which was withdrawn from RCM to Refco LLC based on the demands of Christopher Sugrue, and then out of Refco LLC to an unrelated bank, again at PlusFunds' direction. Id., Ex. 49 at ¶¶ 22-26, 29.

**Response:**

Plaintiffs do not dispute the factual assertions in Defendants' Statement No. 17. However, Plaintiffs note that the Preference Complaint was drafted by a third party who was authorized by the Bankruptcy Court to pursue the recovery of assets from Refco's customers for the benefit of the Refco's estate. Plaintiffs further note the Preference Complaint was drafted for the purpose of initiating an adversarial proceeding against SMFF prior to discovery being performed and as such the factual information contained therein is severely limited. The plaintiff in the preference litigation did not have full access to SPhinX's books and records, as maintained by DPM, nor were they privy to the details of the relationship among PlusFunds, SPhinX, and DPM, specifically those covered by the Service Agreement between SMFF and DPM. Therefore, there is little, if any, probative value to the Preference Complaint.

<u>SUPPLEMENTAL STATEMENT OF FACTS</u>

I.    **DPM must indemnify SPhinX because DPM breached the Service Agreement, and SPhinX suffered damages.**

1.    The Service Agreement contains a clear provision requiring DPM to indemnify the Companies ("SPhinX") and the Portfolio Fund Series for all damages arising from DPM's failure to perform. *See* Pendleton Decl. Exs. 47-50, ¶ 18.

2.    Beginning with the 1 May 03 version of the Service Agreement, "Companies" is defined in the Service Agreement to mean "the Feeder Funds, Portfolio Funds and Strategy Master Funds." In the July 9, 2002 version of the Service Agreement, there was only one

"Company." *Id.* at 1. "Portfolio Funds" are listed on Schedule A to the Service Agreement, and

Strategy Master Funds are listed on Schedule B to the Service Agreement. *See* Pendleton Decl.

Exs. 47-50, Schedule A.

3.    "Portfolio Fund Series" is defined as follows:

> The Portfolio Funds will in turn allocate their assets in accordance
> with their respective investment strategies to segregated portfolio
> series (each, a "Portfolio Fund Series"), each of which to be
> managed by a different hedge fund manager (each, a "Portfolio
> Manager.")

At most relevant times, there were 14 such portfolios within SMFF. *See* Andelin Decl. Ex. 1

(Exhibit 4245, SPhinX, Ltd. Offering Memorandum, 12 Jul 2002 at 15. (PLF-CA-0224692.))

4.    The indemnification section of the Service Agreements states:

> DPM and DPM, Ltd. agree to indemnify and hold harmless the
> Companies and the Portfolio Fund Series and their officers and
> employees and their respective successors and permitted assigns
> from and against *any and all liabilities, claims, costs, fines,
> damages, expenses, losses and attorneys' fees arising out of or in
> connection with any failure of DPM and DPM Ltd. to perform
> their obligations hereunder.*

Pendleton Decl. Exs. 47-50, ¶ 18. (emphasis added).

5.    In contrast, SPhinX (and only SPhinX) agreed to indemnify

> DPM and DPM Ltd.and their respective officers and employees
> and their respective successors and permitted assigns from and
> against any and all liabilities, claims, costs, fines, damages,
> expenses or losses incurred by DPM or DPM Ltd. in consequence
> of the performance of their obligations under this Agreement.

*Id.*

6.    The Special Master has already noted the differences between the two clauses,

stating in a previous Report and Recommendation ("R and R") that the indemnity DPM owes to

SPhinX is "[t]ied to breach of the Agreement," while the indemnity owed by SPhinX to DPM "is

not." *See* R&R on Plaintiffs' Motion to Dismiss Indemnity Counterclaim, 29 May 12 (MDL Docket entry 1498) at 11.

7.     The Special Master noted that the indemnity DPM owes to SPhinX "covers only claims arising from *the breach of the Service Agreement,*" while the indemnity SPhinX owes DPM arises "in consequence of the performance of DPM's obligations under this Agreement." *Id.*

8.     The Special Master further stated:

> A comparison of the two different indemnity provisions in ¶ 18 of the Service Agreement raises an inference that SPhinX agreed to indemnify DPM for third party claims – and therefore that the indemnification provision is presumed to cover such claims and not intended to override the American Rule in suits between the contracting parties.  The provision on SPhinX indemnifying DPM states that it covers damages, etc. suffered by DPM, "in consequence of the performance of [DPM's] obligations under this Agreement."   In contrast, the provision on DPM indemnifying SPhinX covers damages, etc. suffered by SPhinX "arising out of or in connection with any *failure* of [DPM] to perform their obligations hereunder. (Emphasis added).  The latter clause covers only claims arising from *breach of the Service Agreement* while the former provision (the one at issue here) does not mention the breach of the Service Agreement but rather refers to claims resulting from any performance by DPM of any obligations under the Agreement.  If DPM properly performed its obligations under the Service Agreement, there would be no question of indemnifying SPhinX (as opposed to a third party) because SPhinX would have no claims against it. …  The first indemnity provision indicates that the parties knew how to cover suits between the parties [] if they wanted to do so.

*Id.* at 11-12.

## II.     Even if SPhinX were required to show a third-party claim, such a claim exists.

9.     As Judge Drain explained in the Refco bankruptcy proceedings:

> [I]f in fact the SPhinX accounts should have been segregated, or held in trust, there would not have been a preference, because the SPhinX Funds would have been entitled to a 100-cent payment from Refco. That is, the transfers they received from RCM

> wouldn't have been preferential because the SPhinX Funds would
> have been entitled to all of the money in Refco's subsequent
> bankruptcy. See 11 U.S.C. § 547(b)(5).

Andelin Decl. Ex. 113 (Ex. A to Order Granting the Plan Administrators' Motions for Summary

Judgment on Proofs of Claim of PlusFunds Group, Inc., 20 Jul 07, at 10).

10.    DPM regularly and repeatedly "approved" and "authorized" transfers of hundreds

of millions of dollars of excess cash from SMFF's accounts at Refco LLC to its accounts at

RCM.  *See* Andelin Decl. Exs. 149-151 and 153-157.

11.    That PlusFunds and SPhinX were focused on DPM's data to evaluate and act on

credit risk to counterparties is shown by the daily Collateral Review report, which includes both

Credit Risk and Cash Balance Reports, prepared from DPM-provided data and then monitored

by PlusFunds' management.  *See* Andelin Decl. Ex. 161 (Collateral Review report, 16 Aug 04).

**III.    SMFF is not guilty of gross negligence that would defeat its indemnity claim.**

12.    The Service Agreement excuses DPM's obligation to indemnify SMFF and the

Portfolio Fund Series "for acts … which constitute gross negligence, malfeasance or willful

misconduct." *See* Pendleton Decl. Exs. 47-50, ¶ 18.

13.    DPM provides no evidence that keeping cash at RCM was part of PlusFunds'

negotiations for the Sentinel investment, and RCM is not mentioned anywhere in the contract

with Sentinel. *See* Pl. CSOF ¶¶ 18-21, 23-24.

14.    In fact, the subscription documents for Sentinel inform Sentinel that it "should

read the Offering Memorandum," which states explicitly that monies would be kept segregated,

no matter which entity held the money.  *See* Pendleton Decl. Ex. 109 at 1 (PLF-CR04-0442473).

15.    Statements made in December 2002 concurrent with opening accounts at Refco

cannot logically have any causal connection because the investment agreement with Sentinel was

finalized and signed on October 7, 2002—two months earlier. *See* CSOF ¶ 20; Pl. Resp. SOF ¶¶ 14-22.

16.     The seed capital for SMFF came from an entity known as XL Capital. There was no agreement with XL Capital to transfer money to unregulated accounts at RCM in exchange for the seed capital. As did the Sentinel subscription agreement, the XL Capital agreement incorporates by reference the SPhinX Ltd. offering memorandum, which promised segregation of assets at Refco. *See* Andelin Decl. Ex. 164 at PF-089-0000844 and PF-089-0000847-49.

17.     The Sentinel monies were actually deposited at another fund besides SMFF and that fund then invested the Sentinel money in SMFF. *See* Pendleton Decl. Ex. 70 at PLF-NYS01-03208928.

18.     SPhinX did not settle the preference claim because of any alleged collateral wrongdoing by Farquharson or Feighery. The settlement was based on consideration of many factors stemming from the fact that SMFF's excess cash had lost its right to priority in bankruptcy when *DPM* transferred it into non-segregated accounts. Pl. Resp. SOF ¶ 305.

19.     Defendants' suggestion that Farquharson and Feighery expelled Aaron from the SPhinX Board so that they could deal with the preference litigation without his input (Defendants' Brief at 21) is demonstrably false. Aaron was removed from the SPhinX Board in the wake of his unilateral attempt to amend DPM's service agreement with SPhinX to omit reference to DPM's responsibility for the investment of SPhinX's excess cash. Pl. Resp. SOF ¶¶ 331-36. This was an obvious and belated attempt to distance DPM from its transfers of hundreds of millions of dollars of excess cash into non-segregated accounts, which DPM had authorized for years. Pl. Resp. SOF ¶ 213-25. Moreover, Aaron was removed from the SPhinX Board on 3 March 2006. Pl. Resp. SOF ¶ 333. This was long before equitable subordination or

the possibility of settling the Preference Action were first raised and discussed by the Board in

April 2006. Pl. Resp. SOF ¶ 306.

**IV. The "Warranties and Damages" clause of the Service Agreement does not limit SMFF's indemnification rights.**

20. The Warranties and Damages clause states:

> THIS SECTION SHALL NOT APPLY TO THE INDEMNIFICATION OR CONFIDENTIALITY OBLIGATIONS OF THE PARTIES.

Pendleton Decl. Ex. 47, ¶ 26; Pendleton Decl. Exs. 48-50, ¶ 27.

**V. The "Penalties" clause of the Service Agreement does not limit SMFF's indemnity damages to $30,000.00.**

**A. The "Penalties" clause deals with the narrow category of injuries to SPhinX's operations.**

21. The "Penalties" clause of the Service Agreement states:

> [I]n the event of a material breach of contract … the Company [Companies] shall receive $1,000 a day as liquidated damages, which amount is intended to compensate the Company [Companies] for the cost of injuries to its operations resulting from the material breach, for a period of up to 30 days….

Pendleton Decl. Ex. 47, ¶ 25; Pendleton Decl. Exs. 48-50, ¶ 25 ["Companies"].

22. The Penalties clause of the purported 2006 amendment of the Service Agreement

states:

> Subject to the limitations provided herein, in the event of a material breach of the terms of this Agreement by DPM Ltd. or DPM LLC that has not been remedied within three (3) business days of a Company's notification of such breach to DPM Ltd. or DPM LLC, the Company shall receive $1,000 per day in liquidated damages for a period of up to 30 days or until such time as the material breach is corrected, whichever comes first.

Andelin Decl. Ex. 132, ¶ 26 (MDL Exhibit 4879).

**B.** **DPM's breaches did damage SMFF's operations.**

23.     In Section 2 of the Service Agreement, DPM agreed to perform activities such as "reconciliations," calculations of "NAVs" and certain financial accounting activities. *See* Pendleton Decl. Exs. 47-50, ¶ 2.

24.     DPM repeatedly failed to properly perform such activities, which did cause operational damage to SMFF. For example, PlusFunds CFO Chris Aliprandi noted in a 1 Jun 05 email that:

> I believe it is important for everyone to understand the potential consequences of DPM's continuing SLA breaches:
>
> 1.      We have missed a reporting target date to all of our investors which was described in the offering memorandum… This will cause investor ill will.  In fact, I have gotten 4-5 queries relayed to me from sales and plusfunds operations from investors in the past week asking about the status of financials.
>
> 2.      We missed a reporting deadline to XL, our seed capital investor and are therefore in breach of our commitment agreement.
>
> 3.      Audited financials were not available to file with the CFTC last Friday and we were instead required to submit unaudited financials unexpectedly….

Andelin Decl. Ex. 165 at DPM00074630.

25.     On 2 June 2005, in an email from PlusFunds' Christopher Aliprandi to DPM's Guy Castronova, Aliprandi wrote:

> [W]e have had many target dates for clearing 'as many items as possible' or 'most of the items' announced to us over the past few months, starting with mike w's suggestion in early march that they would all be cleared by 3/18.  I'm sure you can understand that I am skeptical of any announced target dates anymore.  The consequences of missing this date are catastrophic—basically a restart of the position-vetting part of the audit.
>
> Rest assured that I am placing similar pressure on ryan/adam/pwc to make sure that the statements with notes and audit opinions are good-to-go before the 29th. If we miss that date it will not be because of the statement drafting, confirmation replies or anything else.  It will be solely due to the sla breaches.

Andelin Decl. Ex. 167 at PLF-CA-0221496.

26.    Aliprandi testified in his deposition:

> Q:    You made sure that things were right before the financial statements were released, right?
>
> A:    I did.  What that meant is I had to spend a significant amount of time at the administrator [DPM] and that distracted me from my other duties, and eventually I had to hire two other CPAs to sit at DPM and effectively act as their middle management to remedy the problem there.
>
> Q:    What other weaknesses did you mean when you testified about weaknesses of DPM?
>
> A:    If I had the Pricewaterhouse material weakness letter here with me, I could go through all of them, but from sitting here right not, I can't remember others.

Andelin Decl. Ex. 37, C. Aliprandi Dep., 29 Feb. 12, 508:6-21.

27.    The PWC material weakness letter discusses the following shortfalls in DPM's performance:

- "Use of cash as a suspense account";

- Improper "[p]erformance of monthly reconciliations";

- "Reporting of positions not held at the prime brokers";

- Failure to perform "reconciliation of intercompany accounts";

- Improper "[p]rocessing of valuation adjustments";

- "[T]he open equity on a swap position did not correctly account for the premium paid."

- "At end of period, all sales were treated as short positions … rather than a sell down of a long position."

- "Unrealized gains and losses on foreign cash balances were treated as realized losses and combined in a 'cost of money' profit and loss account on the general ledger."

- "DPM only records coupon interest. Generally accepted accounting principles require that discounts be accreted and premiums be amortized on the effective yield basis."

- "There currently is no policy and no established practice to ensure that interest accruals are stopped on instruments when the receipt of such interest is determined to be unlikely…"

- "[W]e noted that DPM accounts for interest on bank debt on a cash basis and does not therefore accrue or independently calculate interest receivable on such holdings."

- "DPM does not periodically obtain a listing of subscriptions held with the portfolio managers and the related open cash items, and therefore has no effective procedures for the periodic reconciliation of the bank debt positions held."

- DPM needed procedures to ensure "[c]omplete and accurate recording of investment information."

  - "DPM records certain investment positions (e.g. bank debt) based on trade blotters provided by the portfolio managers. Such information may be incomplete or inaccurate."

  - "Other information appeared to be inaccurate, including issuer names and other security identifiers."

  - "The tax characteristics of certain securities were not properly designated."

- "There is no complete listing of all brokerage accounts for the Funds…"

- "The investment positions of each PFS are valued by the portfolio managers. On a monthly basis DPM is required to evaluate the managers' prices against prices obtained from independent external sources. We noted for certain investment positions it was not possible:

  - to verify the pricing source, and/or

  - obtain contact information in order to confirm the pricing source, and/or

  - obtain documentation verifying that, when the manager's price was used, such price had been compared to an appropriate corroborating source and disposition of differences noted )e.g. swap pricing on Vega).

- "Certain important records of the funds (e.g. brokerage statements, bank debt agreements, etc.) could be located only after an extended search of several months."

- "Cost rollforwards are an important control that helps provide assurance that the ledgers that are used to substantiate cost in total and on a lot-by-lot basis, that calculate realized and unrealized gain and loss, and that are used to prepare the amounts required to be presented by generally accepted accounting principles are accurate. They can detect incorrect entries to the cost accounts/investments accounts posted directly to the general ledger."

- "The offering memoranda of SPhinX, Ltd. list investment restrictions which proscribe:

  1) investing more than 20% of the gross assets of a feeder class in the securities of any one issue;

  2) allocating more than 40% of the gross assets of any feeder class to any other fund or investment manager;

  3) investing more than 20% of the gross assets of a feeder class to another fund of funds; and other limitations.

  Currently no formal process of monitor compliance with these restrictions is being performed."

- DPM was not "[p]rocessing [] capital activity in accordance with the Funds' governing documents," necessitating "numerous post-closing entries" to be "processed to ensure compliance with the governing documents." The auditors noted:

  Failure to comply with the requirements of the governing documents could result in breach of contract and financial loss.

- There were "errors in the shareholder registry maintained by DPM and [] such registry was not reconciled to the supporting records."

- There was "[n]o detail regarding the interest of a share class or series at the fund-of-fund level"; therefore, "the books and records associated with each legal entity do not provide sufficient detail" to "support financial reporting in accordance with GAAP."

- "Currently, personnel at PlusFundsGroup, Inc. perform the allocation of the results of operations of the PFS to the various fund-of-funds…. DPM is charged with maintaining the primary books and records of the fund-of-funds and the PFS

and should at least be performing a secondary check….″  [maybe remove – look at 22]

- "During the course of the audit, we were not able to readily obtain certain investment related information from the portfolio accounting system, nor the general ledger, for example:

    - Income and dividend ledger (history of income received, by security, for a specified period)

    - Interest and dividends receivable reports, including past-due amounts

    - Brokerage commission allocation reports and principal trades reports (can be required for reporting of related party transactions)

    - Pending purchases and pending sales reports (these aid in the reconciliation process)

    - Failed trade reports, to promptly identify transactions requiring additional analysis

    - Price variance reports to identify significant movements in daily price, stale prices, zero prices, and prices that have been manually input.

- "Many of the important accounting functions normally handled by similar entities through automated general ledgers and subsidiary ledgers are maintained by DPM on a series of excel spreadsheets, in particular the NAVINC schedules which are used to calculate NAV and track interests in the funds." Such spreadsheets are problematic because, for among other reasons, the "[a]re prone to error, "[d]o not provide for easy analysis, and "[a]re extremely inefficient."

- "The existing accounting staff at DPM experienced difficulty in responding to document requests and requests for certain analyses on a timely basis. … [W]e believe that there are insufficient accounting staff to carry out the dy-to-day operations and respond to any additional demands…"

Andelin Decl. Ex. 53 (PwC Material Weakness letter, MDL Exhibit 4887).

28.     According to PlusFunds CFO Chris Aliprandi, the issues raised in the 2004 material weakness letter (regarding the 2003 audit) cited in the previous paragraph did not improve for the 2004 audit.  He testified:

Q.      What contact did you have with DPM after the release of the 2004 financial statement?

A.      So this would have been after June 30 of '05. In the summer of '05 Pricewaterhouse gave us a draft of a second material weakness letter. We had gotten one from Pricewaterhouse in summer '04 as a result of the '03 engagement, and for the intervening year DPM had been supposedly working on remediating the problems, but the material weakness letter we got in the summer of '05 was almost as bad.

So DPM made almost no progress at fixing the problems that had been on the record for at least a year.

Andelin Decl. Ex. 37, C. Aliprandi Dep., 29 Feb. 12, 540:6-20.

29.     In 2005, PlusFunds President Paul Aaronson sent an email to Robert Aaron and Guy Castronova to provide context to a forthcoming meeting with DPM personnel to discuss numerous issues with DPM, including the following:

Experience with DPM over multiple audits has been uniformly negative:

- 2002 Audit by Deloitte and Touche struggled to completion with negative comments from Deloitte about reconciliation process.

- 2003 12/31 audit by PricewaterhouseCoopers NY team ran over budget and attracted a 27 item material weakness letter which has in some instances been a marketing burden to the fund. This led to a meeting between PWC, DPM and PlusFunds on 4/26/04 in which DPM gave assurances that issues would be addressed.

- 2004 6/30 Balance Sheet audit needed for ISE listing of the EQ share class of SphinX Strategy Fund Ltd. was narrowly completed by deadline and was followed by oral commentary by PWC that many of the issues noted in their 12/31/04 audit remained present.

- Refco experienced problems with DPM that lead to their appointment of another administrator for their funds.

- 2004 12/31 audit appears to have gone worse than the 2003 audit in many respects, with most financial reports unissued as of today, June 21, 2005. We've been advised that this audit will also run over budget and that there will be a significant internal control weakness letter.

- Rydex audit, conducted by PWC Philadelphia as of 3#105 produced simile comments about inadequacy of reconciliation controls.

Andelin Decl. Ex. 166, (Email from P. Aaronson to R. Aaron and G. Castronova, 20 June 05).

**C.     DPM's proposed interpretation is contrary to the intent of the parties and leads to absurd results.**

30.     The warranties and damages paragraph applies to "all claims or causes of action" other than indemnification claims against DPM "under or in connection with the services under this agreement" and limits damages to "amounts paid under this Agreement in the year in which such loss is determined."

31.     Even in 2002, when the DPM/SPhinX relationship first commenced, SPhinX had sufficient assets under management that DPM's fees for that year would be greater than $30,000.00.  *See* Andelin Decl. Ex. 60 at 1.

32.     The 2006 Agreement, after discovery of the Refco fraud, removed the damages limitation to one year's fees from the Warranties and Damages section of the proposed 2006 Service Agreement.  *See* Andelin Decl. Ex. 132 at ¶ 28 (MDL Exhibit 4879).

**VI.     DPM fully understood CFTC segregation requirements because it was a registered Commodity Pool Operator under CFTC regulations.**

33.     DPM was a registered commodity pool operator under CFTC regulations:

> [DPM] is a Commodity Pool Operator, and is therefore regulated by the CFTC and the NFA.  [DPM] acts as a CPO for one client, Deutsche Bank with twenty-six funds, as a service to the client.  As a CPO, [DPM] assumes a number of compliance responsibilities and risks including employing and supervising approved persons, complying with regulatory rules and oversight, maintaining proper records, providing information to investors, and know your client requirements.

Andelin Decl. Ex. 158, Project Traffic Due Diligence Report, 23 Jul 04, at 4 (DPM000581708).

As such, DPM necessarily knew that "no commodity pool operator may commingle the property

of any pool that it operates or that it intends to operate with the property of any other person."

17 C.F.R. § 4.20(c) (Apr. 1, 2003).

34.     DPM's John Mizsak testified that hedge fund administrators were responsible for

keeping all of the books and records for hedge funds:

> Q.     So the administrator is responsible for keeping all of the
>        books and records for [a] hedge fund?
>
> A.     Correct.  Yes.
>
> Q.     Is there anything else that an administrator does?
>
> A.     That's pretty broad, keeping the books and records.  So,
>        you know, those are the responsibilities.

*See* Andelin Decl. Ex. 8, J. Mizsak Dep., 24 Jul 12, 14:6-18.

35.     He further testified that DPM's accounting department prepared the general

ledger that DPM used to maintain the books and records for the SPhinX Funds:

> Q.     Did DPM have an accounting department?
>
> A.     Yes.
>
> Q.     Do you know what they were responsible for?
>
> A.     Well they were -- I know we did our daily recs, she did the
>        month end recs. Then accounting did something.  Because
>        you had the general ledger and all that stuff.

Andelin Decl. Ex. 159, J. Mizsak Dep., 24 Jul 12, 120:19-122:22.

36.     Aaron testified that as a SPhinX board member, he was aware that PlusFunds was

relying upon the information DPM provided to evaluate the SPhinX Funds' exposure to risk.  He

also testified it was in fact reasonable for PlusFunds to rely upon the accuracy of the information

it received from DPM with regard to the SPhinX Funds' "insolvency exposure":

> Q.     And the *risk report that was provided to the risk committee*
>        of PlusFunds was an analysis on at least a weekly basis or

maybe even more often of what that risk was by prime broker?

A.    I believe so, *yes.*

* * *

Q.    You expected them to actually look at the information knowing there could be some risk, but monitoring that risk so it would not get out of hand?

A.    We relied on PlusFunds to look at the report and make credit decisions as specifically part of their responsibility in their investment manager contract.

Q.    And as a SPhinX board member, *you knew that the information that PlusFunds was looking at to determine whether the risk was or was not acceptable was the information that DPM was providing in those reports; right?*

A.    *Yes.*

* * *

Q.    But you would think that the – at least the independent directors of PlusFunds or any independent management of *PlusFunds would be able to reasonably rely on what the insolvency exposure is for the numbers put on the reports provided by DPM;* correct?

A.    *They should be able to rely on that.*

Andelin Decl. Ex. 120, R. Aaron Dep., 27 Feb 08, 197:7-199:24 (emphasis added).

37.    Guy Castranova testified that the non-payment of interest on SPhinX Funds' cash was something DPM "could probably" bring to the attention of PlusFunds and/or the SPhinX Funds.  *See* Andelin Decl. 160, G. Castranova Dep., 9 May 12, 142:4-9.

38.    In an email string dated September 3, 2003, Chris Aliprandi wrote to Robert Aaron about the possibility of hiring an accounting firm to prepare the SPhinX Funds' 2003 financial statements because DPM was refusing to prepare them as contractually agreed.  In his email, Aliprandi reminded Aaron that "last year, DPM prepared the financial statements for the

funds in GAAP format with full footnotes." Aaron not only did not object to this statement, but his response was "I like it." *See* Andelin Decl. Ex. 162, email string between Robert Aaron to Chris Aliprandi dated 3 Sep 03.

39. The financial statements DPM prepared for the SPhinX Managed Futures Fund SPC for the period ending December 31, 2012 defined "Cash and cash equivalents" as "financial instruments with maturities of three months or less." *See* Andelin Decl. Ex. 56, SPhinX Managed Futures Fund SPC financial statements for the period ending 31 Dec 02.

40. For SMFF's 2003 and 2004 financial statements, the definition of "Cash and cash equivalents" that was used in SMFF's 2002 footnote was carried over and revised to also include "cash held in margin accounts at brokers." *See* Andelin Decl. Ex. 5 and Andelin Ex. 6.

41. According to a 2004 Audit Project Plan, DPM was assigned several financial statement-related tasks to perform, including "Finalize trial balances include all GAAP reclasses," "Provision of audit binders (trial balances plus support)," and reviewing the first draft of the SPhinX Funds' financial statements. *See* Andelin Decl. Ex. 163, 2004 Audit Project Plan, pp. 2, 4-5.

42. DPM necessarily had to read and understand the terms and conditions of the SPhinX Funds offering memoranda in order to perform its contractual obligations per the Service Agreements. For instance, paragraph 1 of the Service Agreements between DPM and SPhinX states that the "[c]apitalized terms used herein and not otherwise defined herein have the same meanings as in the offering memorandum of SPhinX Ltd…." Also, ¶ 12(h) states "DPM shall, at a minimum, review the Companies subscription documents," which include the offering memoranda. *See* Pendleton Decl. Exs. 47-50; Andelin Decl. Ex. 164 at PF-089-0000844 and PF-089-0000847-49 ("Prospective investors should read the Offering Memorandum for SPhinX

Ltd."; "The undersigned wishes to become a shareholder in SPhinX, Ltd. … upon the terms and conditions set forth herein, in the Memorandum of the Company (the 'Memorandum')…"; and "[t]he Investor has received, carefully read and understands the Memorandum outlining, among other things, the organization and investment objectives and policies of, and the risks and expenses of an investment in the Company.")

43.     The Service Agreements provided that DPM's performance of its duties under the Service Agreement would not "violate any applicable laws, rules or regulations." *See* Pendleton Decl. Exs. 47-50, ¶ 12(d).

44.     The Service Agreements further provided that DPM "will immediately notify the Companies if any of the foregoing representations cease to be true." *See* Pendleton Decl. Exs. 47-50, ¶ 12(l).

45.     The Refco LLC and RCM account statements for Graham Capital Management for the month Feb 05 clearly shows a total of $3.2 million dollars of SMFF's excess cash was transferred between the two accounts via three separate wire transfers in the amounts of $1.9 million, $600,000, and $700,000. *See* Andelin Decl. Ex. 168 at GTP0058386; Andelin Decl. Ex. 169 at GTP 0106044 and GTP 0106046, and GTP 0106048.

46.     In a series of emails dated 6 Mar 03, Diego Lago and Sara Dillon discussed the procedures used to extract the data used to create the Credit Risk reports from the information provided by DPM. *See* Andelin Decl. Ex. 170.

Dated: March 25, 2013
    Phoenix, Arizona

**BEUS GILBERT PLLC**


By   *s/ Lee M. Andelin*
        Leo R. Beus
        Dennis K. Blackhurst
        Lee M. Andelin
        701 North 44th Street
        Phoenix, Arizona  85008-6504
        Tel: (480) 429-3000
        Fax: (480) 429-3100
        lbeus@beusgilbert.com
        dblackhurst@beusgilbert.com
        landelin@beusgilbert.com

            - and -

        David J. Molton
        Andrew Dash
        Mason Simpson
        Brown Rudnick LLP
        Seven Times Square
        New York, New York 10036
        Tel: (212) 209-4800
        Fax: (212) 209-4801
        dmolton@brownrudnick.com
        adash@brownrudnick.com
        msimpson@brownrudnick.com


        *Attorneys for Plaintiffs*