**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
                                                              :
In re REFCO INC. SECURITIES LITIGATION    :        Case No. 07-md-1902 (JSR)
                                                              :
--------------------------------------------------------------X

                    This Document Relates to:


--------------------------------------------------------------X
KENNETH M. KRYS, et al.,                          :        Case No. 08-cv-3065 (JSR)
                                                              :        Case No. 08-cv-3086 (JSR)
Plaintiffs,                                                   :
                                                              :        REPORT AND RECOMMENDATION
            -against-                                      :        OF THE SPECIAL MASTER ON
                                                              :        THE DEFENDANTS' MOTION FOR
                                                              :        SUMMARY JUDGMENT
CHRISTOPHER SUGRUE, et al.,                  :
                                                              :
Defendants.                                              :
--------------------------------------------------------------X

Daniel J. Capra, Special Master

        The remaining Defendants in this action are Grant Thornton LLP ("Grant Thornton") and
Mark Ramler (collectively "Grant Thornton" or the "Grant Thornton Defendants"); and Mayer
Brown LLP ("Mayer Brown") and two of its attorneys, Joseph P. Collins and Paul Koury
(collectively "Mayer Brown" or "the Mayer Brown Defendants").[1] All these Defendants move for
summary judgment.  The Plaintiffs oppose the motion.[2]

---

        [1] The Special Master has previously issued more than thirty R and R's in the Refco
matter. Some of these R and R's will be referred to herein. Abbreviations used in the prior R and
R's will be used herein. Familiarity with all of the R and R's — and with Judge Rakoff's Orders
reviewing them — is presumed.

        [2] As recounted in a number of prior opinions, the named Plaintiffs have been appointed
by the Cayman Islands Court to bring claims on behalf of SPhinX and PlusFunds. Prior rulings
by Judge Rakoff have narrowed the claims for damages to those incurred by SMFF. *See
generally* the Standing R and R dated  dated February 3, 2010 and affirmed by Judge Rakoff in
Orders dated March 31, 2010 and May 3, 2011; Order of Judge Rakoff dated December 26, 2012
(dismissing claims for damages allegedly suffered by PlusFunds).

The Defendants propound four separate reasons for summary judgment:

1) Plaintiffs cannot establish a genuine issue of fact with respect to reliance on Refco's misrepresentations;

2) There is no evidence that Refco intended to induce customers like SMFF to rely on any of Refco's misrepresentations;

3) Wrongdoing by insiders at PlusFunds establishes the affirmative defense of *in pari delicto*;

4) SMFF's loss was caused by SMFF's decision to settle the Preference Action, not by the Defendants.

***For the reasons discussed below, the Defendants' motion for summary judgment should be denied.***

## I. Background

At this point in this protracted litigation, the only claim against each of these Defendants is for aiding and abetting the Refco Fraud. Moreover, the only possible aiding and abetting that is actionable has been limited to actions taken before March 12, 2004, because on that date, SMFF's cash balance grew to $319.5 million — more than the $312 million on deposit at the time of Refco's collapse. *See* Kenneth Krys Report on Cash Balances and Transfers, June 29, 2012. After March 12, 2004, SMFF took out more cash from Refco than it put in. And the only compensable injuries are those suffered by SMFF in depositing monies at Refco. *See* Order of Judge Rakoff dated December 26, 2012.

So what we are down to are the following contentions by the Plaintiffs: 1) As of March 12, 2004, Refco made fraudulent misrepresentations to hide the RGHI Receivable and thereby paint a false financial picture at Refco; 2) Refco intended that customers such as SMFF would rely on these misrepresentations; 3) SMFF reasonably relied on the misrepresentations; 4) these Defendants knew about the misrepresentations; 5) these defendants assisted in the fraud in a way that proximately caused damages to SMFF.

Not all of the above contentions are at issue on this motion. For purposes of this motion the Defendants do not contest that Refco made fraudulent misrepresentations or that these Defendants

knew about the fraud.[3]  The Special Master will therefore assume arguendo that Refco did make fraudulent misrepresentations and these Defendants knew about the fraud. Nothing in this R and R should be construed as a finding or ruling on those matters.

In New York, for a claim of aiding and abetting fraud, the plaintiff must prove the following: (i) the  primary wrongdoer committed actionable fraud against the plaintiff; (ii) the defendant had knowledge of this primary violation; and (iii) the defendant substantially assisted in — proximately caused —  the primary wrong. *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983).

Judge Rakoff has stated the elements of an underlying fraud claim in New York as follows:

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001). In proving the elements of fraud, the proponent of the claim must put forth clear and convincing evidence, *Mix v. Neff*, 99 A.D.2d 180, 183, 473 N.Y.S.2d 31 (3d Dep't 1984), a standard which applies at the summary judgment stage as well as at trial, *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F.Supp.2d 206, 219 (S.D.N.Y. 2007).

*Laugh Factory, Inc. v. Basciano*, 608 F.Supp.2d 549, 558 (S.D.N.Y. 2009) (Rakoff, J.).

## II. Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment may be granted only if the submissions of the parties taken together show that "there is no genuine dispute as to any material fact and  the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Defendants as moving parties here bear the burden of demonstrating the absence of a material question of fact, and they have "the initial responsibility of . . . identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which . . . demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on the summary judgment motion the court must view all facts in the light most favorable to the Plaintiffs as nonmoving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[A]ll reasonable inferences must be drawn against the [moving] party," and summary judgment may not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "A dispute

---

[3] *See, e.g.,* Transcript of Oral Argument at 145, statement of Grant Thornton's Counsel ("The issue of knowledge is not before you today.").

regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002).

If the Defendants have presented facts showing that they are entitled to summary judgment, the Plaintiffs must then set forth specific facts showing that there is a genuine issue for trial. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir. 2002). But if the Defendants have not presented a sufficient showing of entitlement to summary judgment, then the Plaintiffs have no obligation to present anything at all. *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 617 (2d Cir. 1998) ("Where the movant has the burden, its own submissions in support of the motion must entitle it to judgment as a matter of law.").

### B. Requirement of Admissible Evidence

In reviewing a motion for summary judgment, a court "may rely only on admissible evidence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). Rule 56(c)(1) requires a party asserting that a fact is not genuinely disputed to support that assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(3) states that the court is only required to consider the materials cited pursuant to (c)(1), but it is permitted to go beyond the citations to consider other materials in the record. Finally, Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

### C. Local Rule 56.1

Judge Rakoff, writing for the Second Circuit in *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003), emphasizes that Local Rule 56.1 requires a party moving for summary judgment to provide a statement with citations to admissible evidence in order to establish its burden of showing the absence of triable facts — and that in the absence of such a showing, the non-moving party has no burden of going forward:

> Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact. *See* Local Rule 56.1(a), (d). If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted. *See* Local Rule 56.1(c). However, as we held in *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001), "[t]he local rule does not absolve the party seeking summary judgment

4

of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." * * * Where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented for the non-movant is not required to rebut an insufficient showing. (Some internal citations and quotations omitted).

### III. Reliance on Refco's Fraudulent Misrepresentations

The Defendants argue that the Plaintiffs cannot demonstrate an issue of fact with respect to reliance on Refco's fraudulent statements, and so summary judgment must be granted because without a primary fraud there can be no aiding and abetting fraud. The first issue to be decided is what is meant by reliance.

#### A. Reasonable Reliance

The Plaintiffs invoke deposition testimony of the innocents at PlusFunds; each testified that if they had known about the true financial position of Refco they would not have put SMMF money there. *See* Plaintiffs' Rule 56.1 Statement ¶¶26-28. But this evidence, while admissible, does not prove actual reliance — because the testimony is not about whether the innocents had access to any information. That testimony does, however, raise a question of fact on whether reliance, if it existed, would have been *reasonable*. The Defendants contest even this much by arguing that the deponents' testimony is "self-serving speculation." But at best the Defendants' argument goes to the credibility of these deponents, which is a jury question. Moreover, the testimony by these innocents is quite plausible — indeed obvious. As the Special Master stated in the R and R on Primary Violations at 25-26 (affirmed by Judge Rakoff):

> Plaintiffs must allege reasonable reliance. . . . The Plaintiffs allege, at various places, that if not for the false picture of financial health, SPhinX would not have placed and held its property in accounts at Refco. Defendants contend that these assertions are conclusory, but, really, what else is there to say? Any rational actor with millions in an account would seek to take protective measures if they were to discover that the funds are being held by a company that is under water. The run on Refco once the RGHI receivable was disclosed is testament to that.

Thus, the Plaintiffs have, with admissible evidence, raised a question of fact on whether, if there *was* reliance on the fraudulent misrepresentations, that reliance was reasonable.[4]

---

[4] It should be noted that the Defendants make no argument and present no evidence that PlusFunds or SMFF had other sources of information for determining whether there was a

### B. Indirect Reliance

On the question of whether there was in fact reliance, the Plaintiffs argue that "[i]t does not matter whether PlusFunds and SPhinX directly relied on any misrepresentation made by Refco." Plaintiffs' Brief at 6. In their view, reliance can be found if others in the market read the misrepresentations and directly relied. They contend that it is enough that if other members of the public had known about the RGHI Receivable, the market would have adjusted and SMFF would not have continued to do business with Refco. The Plaintiffs argue that it has already been established in the MDL that indirect reliance on public awareness is sufficient to establish reliance. And if the Plaintiffs are right about that, then it would be fair to state that they have raised a question of fact as to reliance, because it is more than plausible to conclude that if some members of the public had been made aware of Refco's true financial condition through a Refco statement, then they would act accordingly and  SPhinX would have relied on the public response.

But the Plaintiffs are wrong in their assessment that indirect reliance is sufficient to prove a claim of fraud. On this point the Plaintiffs confuse the primary wrong of fraud (the issue on this motion) with the tort of aiding and abetting. As the Special Master has stated in several R and R's, actual reliance is required for the former and not the latter. The Plaintiffs' quotation of passages of previous R and R's discussing indirect reliance is misguided because all of the cited passages are discussing substantial assistance, for which actual reliance is not required.

For example, the Plaintiffs rely on the  R and R on Grant Thornton's motion for Summary Judgment in the PAT case at 12-13, in which the Special Master stated that "the FX customers could rely on public awareness as opposed to direct reliance." But that quote is taken out of context and the Plaintiffs fail to recognize the distinction the Special Master made between the primary wrong and the substantial assistance required for aiding and abetting. The R and R so heavily relied upon by the Plaintiffs makes that distinction in several places and makes clear that while actual reliance is not required to show substantial assistance, it *is* required to prove the primary wrong. As the Special Master stated in that R and R:

> It goes without saying that a fraud claim will not lie unless the plaintiff has reasonably relied on the fraudulent misstatement or concealment of the *primary wrongdoer*. It is not the case, however, that substantial assistance of a fraud can only be found if the plaintiff has relied on the *third party's* wrongful act. The question for aiding and abetting is

---

hidden receivable; so there is no dispute on the reasonableness of relying on the financial information as opposed to some other source. *See* R and R on THLee's Motion for Summary Judgment in THL v. Grant Thornton at 18. ("Reasonable reliance will not be found where the plaintiff 'has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means.' *Arfa v. Zamir,* 76 A.D.3d 56, 905 N.Y.S.2d 77, 79 (1st Dept. 2010)."). Thus, if the Plaintiffs have raised a jury question as to reliance, the question of the reasonableness of that reliance should be for the jury as well.

whether "the defendant's substantial assistance in the primary violation *proximately caused* the harm on which the primary liability is predicated." *Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*, 479 F.Supp.2d 349, 370-71 (S.D.N.Y. 2007) (emphasis added). Grant Thornton's equation of proximate cause and direct reliance is not correct — while there is certainly overlap, proximate cause is a broader concept and is not limited to reliance. As the courts have noted, substantial assistance "can take many forms."*Primavera Familienstiftung v. Askin*, 130 F.Supp.2d 450, 511 (S.D.N.Y. 2001), and there is no rule of law requiring that an aider and abetter's substantial assistance must be something directly relied upon by the plaintiff. *See, e.g., Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 180 (1994) (aiding and abetting liability can be found even though the plaintiff does not directly rely on the aider and abettor's wrongdoing). Indeed substantial assistance of a fraud can be found even if the third-party makes no statements at all that could be relied upon. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) ("[S]ubstantial assistance might include ... executing transactions or investing proceeds, or perhaps ... financing transactions."); DPM R and R at 37 (engineering unauthorized transfers into unprotected accounts can constitute substantial assistance because "if the Defendants had not acted as they did, the assets would never have been transferred to unprotected accounts"). *See also Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 94 F.Supp.2d 491, 512 (S.D.N.Y. 2000) (applying New York law and finding that the plaintiffs had sufficiently pled that the defendant substantially assisted a fraudulent transaction even where the defendant made no affirmative representation; the defendant's mere participation in the proposed project provided credibility for prospective investors).

Id. at 12. (Footnotes omitted; emphases in the original).

The passages cited in the Plaintiffs' brief clearly indicate that the discussion of lack of actual reliance is tied to substantial assistance and not to the primary wrong. *See* Id. at 14 (the law "does not at all required that the FX customer had to read or directly rely on the audit opinion to support a claim of substantial assistance."); Id. at 13 ("there is no rule of law requiring that an aider and abettor's substantial assistance must be something directly relied upon by the plaintiff"); Id. at 17 ("under the analysis of substantial assistance above, [the FX customers'] lack of specific reliance is not dispositive; substantial assistance can be found by the fact that other members of the public had access to the information and, if the public were informed of RCM's true financial condition, the FX customers would have been made aware of it and would not have done business with RCM").

Thus, the Plaintiffs are wrong in their assertion that it is the law of the case that they do not need to show actual reliance on Refco's misrepresentations in order to establish their claims here. The law of the case is precisely to the contrary. As the Special Master stated in the Primary Wrongs R and R at 21:

> To prove fraudulent misrepresentation under New York law, a plaintiff must show that: (1) the defendant made a material false statement, (2) the defendant intended to defraud

the defendant thereby, (3) the plaintiff *reasonably relied upon the representation*, and (4) the plaintiff suffered damage as a result of such reliance. *Blank v. Baronowski,* 959 F.Supp.172, 177 (S.D.N.Y.1997) (emphasis added).

The requirement of actual reliance on fraudulent misrepresentations is not only the law of the case. It is the law. The Plaintiffs are essentially arguing for a fraud-on-the-market theory of reliance for the underlying fraud. But that theory has been rejected time and again by courts evaluating fraud claims under New York law. As the court explained in *Int'l Fund Mgmt S.A. v. Citigroup, Inc.,* 822 F.Supp.2d 368, 386-87 (S.D.N.Y. 2011):

> Plaintiffs assert claims of fraud under New York common law. "The elements of common-law fraud are a representation of a material fact, falsity, scienter, reliance, and injury." *Kline v. Taukpoint Realty Corp*., 302 A.D.2d 433, 433, 754 N.Y.S.2d 899 (2d Dep't 2003). The requisite reliance is actual reliance, not the presumed reliance of a Section 10(b) action. *See Secs. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000). Plaintiffs concede this point with respect to misleading affirmative statements, but argue that they are entitled to a presumption of reliance for misleading omissions. Such a presumption exists in the context of a Section 10(b) action. *See Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Courts in this district, however, have repeatedly refused to import this presumption into New York common law. *See, e.g., Feinberg v. Katz,* No. 01 Civ. 2739, 2007 WL 4562930, at *5–*6 (S.D.N.Y. Dec. 21, 2007); *Waksman v. Cohen*, No. 00 Civ. 9005, 2002 WL 31466417, at *5 (S.D.N.Y. Nov. 4, 2002); *Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank,* 850 F.Supp. 1199, 1221–22 (S.D.N.Y.1994); *Turtur v. Rothschild Registry Int'l, Inc*., No. 92 Civ. 8710, 1993 WL 338205, at *7 (S.D.N.Y. Aug. 27, 1993). The Section 10(b) presumptions serve the specific prophylactic purposes of the federal securities laws, but are not appropriate in the common law context. *See Secs. Investor Prot. Corp., 222 F.3d at 73; Banque Arabe*, 850 F.Supp. at 1221–22; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 244 n. 22, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Actions under Rule 10b–5 are distinct from common-law deceit and misrepresentation claims and are in part designed to add to the protections provided investors by the common law."). *Plaintiffs must therefore show actual reliance for misrepresentations and omissions.* (Emphases added).[5]

Thus it is clear beyond dispute that to prevail here, it is not enough for the Plaintiffs to show indirect reliance on Refco's fraudulent statements or concealments. The Special Master now turns

---

[5] The Plaintiffs seek to distinguish *Int'l Fund* because while the case holds that direct reliance is required for a fraud claim, "that is not the question here; the issue is whether direct reliance is required in an aiding and abetting fraud case." Brief at 6. But that misses the elementary point that in order to prevail here, the Plaintiffs must first show that there *was an underlying fraud.* They can't collect for aiding and abetting fraud if there is no fraud perpetrated on SMFF to begin with. And to prove fraud, they must show direct reliance on the fraudulent misrepresentations of the primary wrongdoer.

to the question of whether there is an issue of fact as to SPhinX/PlusFunds' actual reliance on Refco's fraudulent conduct.

### C. Actual Reliance

The Defendants claim that discovery has shown that the allegations in the Amended Complaint about actual reliance are completely unsupported by admissible evidence. Opening Brief at 6-16. The Plaintiffs respond that there is "ample evidence that PlusFunds/SPhinX relied on Refco's misrepresentations." The Plaintiffs rely on seven asserted facts to support their reliance argument. Each will be discussed in turn. It must be remembered in this discussion that the Plaintiffs' cause of action has been limited to acts of fraud and aiding and abetting that occurred before March 12, 2004. It follows that acts of reliance during the LBO and IPO are not relevant to prove that SPhinX/PlusFunds relied on information before that time.

#### 1. Plus/Funds/SPhinX relied on Refco's household name and public perception as the largest FCM in the world.

The Plaintiffs cite deposition testimony from PlusFunds/SPhinX witnesses that they thought that Refco was in solid financial condition because of its household name and public perception. *See* Plaintiffs' Rule 56.1 Statement ¶¶ 26-27.[6] The testimony relied on by the Plaintiffs, however, does not indicate that anyone actually relied on fraudulent statements made by Refco about the RGHI Receivable. The Plaintiffs seem to be rearguing indirect reliance here — that if the public was aware of the truth, Refco would not have had a good name to rely upon. But as stated above, the reliance element for the primary fraud claim requires actual reliance.

Another way to think about the Plaintiffs' argument is that they are relying on fraud *by omission*. But it is far too late to change the theory of the case to encompass such a theory. The Plaintiffs have always argued that the Defendants are on the hook here because they assisted in affirmative misrepresentations and concealments — Refco's public statements, and the Round Trip Loans, that actively concealed the hidden receivable. That is, the underlying fraud was the affirmative misrepresentation and active concealment of Refco's financial situation. *See* First

---

[6] The Plaintiffs also emphasize that these witnesses relied on a misrepresentation that the SMFF money was in segregated accounts. But even if there was a misrepresentation on segregation that was relied upon, that fact would be insufficient to establish that those witnesses also relied on a misrepresentation regarding Refco's financial condition. That is, even if they relied on assurances of segregation, it doesn't mean they relied on fraudulent misrepresentations by Refco as to the hidden RGHI receivable. In fact it might be the opposite — if they relied on segregation then they were less likely to care about Refco's financial condition.

Amended Complaint ¶¶1256, 1259, 1263; Grant Thornton MTD R and R at 4 ("the Plaintiffs' claim is basically that GT/Ramler aided and abetted the Refco Fraud by issuing 'unqualified, clean audit opinions on Refco's fraudulent financial statements with knowledge of the Refco fraud.' FAC ¶ 211. The Plaintiffs allege that SPhinX and PlusFunds 'reasonably relied on the misstatements of Refco's financial condition.'").

It has already been determined in this MDL that the Plaintiffs have not specifically alleged fraud by omission. In the R and R on Standing in *Kirschner v. Bennett*, Grant Thornton sought to equate the PAT claims with the Plaintiffs' claims herein for purposes of standing. The Special Master (affirmed by Judge Rakoff), rebuffed this argument by noting a crucial difference between the allegations in the two actions:

> One critical difference in this case is that the amended complaint in *Krys v. Sugrue* never specifically alleged fraudulent inducement, i.e., that a deposit was made at Refco at a time when Refco was hopelessly insolvent. Indeed concerns about Refco's insolvency would not have been as critical to SPhinX because, according to the *Krys v. Sugrue* complaint, the innocent insiders thought that the funds were segregated and thus protected from any Refco insolvency. That is why SMFF had standing to challenge the allegedly unauthorized transfers from Refco LLC to RCM — it was at the point of unauthorized transfer that specific representations made to SPhinX were violated.

Standing R and R in *Kirschner v. Bennett*, 2/14/2011, at 9.[7]

For all these reasons, the Plaintiffs' actual reliance argument is not supported by the testimony that the innocents simply thought that Refco was in good financial shape because of its household name and public perception.

### 2. Risk Committee reliance on Fitch rating.

There is no dispute that PlusFunds had a Risk Committee that met regularly to review exposures and amounts at risk in SPhinX accounts. *See* Opening Brief at 8. The First Amended Complaint contains allegations that the Risk Committee reviewed Refco's financial statements and public filings and generated a "shadow rating" for Refco. FAC ¶¶ 189-91. Those allegations were relied upon by the Special Master in finding that the Plaintiffs had plausibly alleged actual reliance on Refco's misrepresentations. *See, e.g.,* Mayer Brown R and R at 10. As the Defendants correctly state, however, discovery has shown that there is no evidence supporting the Plaintiffs' assertion in their Amended Complaint regarding the Risk Committee's shadow rating and systematic review of

---

[7] Another important difference between the two actions is that the Trustee's claim in the PAT case hinged upon the fact that it was the LBO that had rendered Refco hopelessly insolvent, and it was after that point Refco was fraudulently inducing deposits. But that argument cannot apply here as the actionable time period ends before the date of the LBO.

Refco financial statements. The deposition testimony indicates that the Risk Committee did not create a shadow rating for Refco and did not review Refco's public statements. *See* Defendants' Rule 56.1 Statement at ¶¶36-46.

In their Brief in Opposition, the Plaintiffs abandon the assertions in their Amended Complaint regarding the Risk Committee's shadow rating and regular review of Refco's financial statements. *See* Brief in Opposition at 11 ("PlusFunds elected not to conduct the shadow rating . . ."). But the Plaintiffs now argue actual reliance, through the Risk Committee, in another way. The Plaintiffs contend — and the Defendants do not dispute — that in August 2003 PlusFunds contacted Refco to obtain information about Refco's credit rating. A letter from Hackl to Sugrue, dated August 7, 2003, responded that Refco did not mainting a continuous credit rating and that it only sought credit ratings in anticipation of private debt financings. Ex. 56 to Andelin Dec. That letter enclosed a Fitch report that was issued in connection with a debt financing that was completed in October 2002. Id. The Plaintiffs explain that on the basis of the Fitch report, "the Risk Committee discussed Refco's credit rating and made an exception to its credit policy and allowed limited FX exposure to Refco." Rule 56.1 Counterstatement ¶7.[8]

So the question of actual reliance by the PlusFunds Risk Committee comes down to the Fitch Report, which provided ratings of Refco senior debt and trust preferred securities, and also discussed Refco's capital levels. *See* Connelly Ex. 56. On this motion, it is assumed that Refco made fraudulent misstatements; and the Plaintiffs raise an issue of fact that if Fitch had been informed about the hidden RGHI receivable on an accurate balance sheet, the Fitch Report on Refco would have been materially different. *See* Diego Lago Dep. 30 Mar. 2012 at 226 (PlusFunds risk analyst testifies that a ratings agency would be expected to look at a company's balance sheet before issuing a credit rating); Andelin Dec. Ex. 56 (Fitch represents on its webpage that its services include review of balance sheet integrity).

The Plaintiffs argue that it was "entirely proper for PlusFunds to rely on the Fitch credit rating as a proxy analysis of Refco's financial condition." Brief in Opposition at 12. Thus, the argument is that PlusFunds/SPhinX actually relied on Refco's affirmative misrepresentations regarding the RGHI receivable, albeit derivatively by way of the Fitch Report.

The Defendants seek to counter the reliance argument with respect to the Fitch Report in a number of ways. They first argue that "the Fitch rating is a statement by Fitch, not by Refco." Defendants' Brief at 11. But the Defendants cite no law which provides that a fraud claim must be based on reliance on statements coming from the defendant's mouth. Nor could that be the case; if it were, a defendant could escape liability for fraud by simply allowing — even paying — others to spread a lie. The Defendants also argue that there is no claim that they aided and abetted a statement by Fitch. But the question here — posed by the Defendants themselves — is not about aiding and

---

[8] The assertions regarding PlusFunds' obtaining and use of the Fitch Report are supported by admissible evidence, specifically the depositions of Bousbib, Lowe, Rose, cited in the Plaintiffs' Rule 56.1 Counterstatement ¶7.

11

abetting but rather about the primary fraud and actual reliance on *Refco's* misrepresentations. There is at least a question of fact as to whether the Fitch rating is a product of misrepresentations by Refco in its financial statements and balance sheets, and the Plaintiffs *do* allege that the Defendants aided and abetted the making of those statements — allegations that are not disputed for purposes of this motion. The Fitch Report itself indicates that it is relying on, and essentially a conduit for, statements of Refco regarding its financial condition.  *See* Ex. 56 to Andelin Declaration (Fitch Report) ("Ratings assigned by Fitch are based on the documents and information provided to us by the issuer and its experts and agents . . . . Fitch does not verify the truth or accuracy of such information.").

Under New York law, a fraud claim may lie even if the misrepresentation is not made directly from the defendant to the plaintiff, so long as: (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to him. *See Rosen v. Spanierman*, 894 F.2d 28, 33–34 (2d Cir. 1990); *Peerless Mills, Inc. v. American Tel & Tel. Co*, 527 F.2d 445, 450 (2d Cir. 1975).  Here, the first prong is established on this motion by the Fitch Report itself — which indicates that it is relying on information from Refco — and by the evidence discussed above raising the inference that Fitch would have reviewed the Refco financial statements before issuing the report. The second prong — intent to convey — is established by the letter from Hackl to PlusFunds, indicating an intent that PlusFunds rely on the Fitch Report in assessing Refco's credit-worthiness.

As to the Fitch rating, the Defendants finally argue that the Plaintiffs' claim for reliance has been "disproven in discovery" because there is no evidence that the PlusFunds Risk Committee took that rating into account in setting exposure limits or deciding whether to place SMFF's excess cash at Refco. The Defendants note that when PlusFunds was made aware of a BB- rating on Refco — below the minimum permitted by the Risk Committee's policy — the Risk Committee simply changed its policy, lowering the risk threshold to allow the trading to continue. *See* Defendants' Rule 56.1 Statement at ¶¶83-88 (citing to admissible evidence). But the Plaintiffs cite deposition testimony that the Risk Committee did in fact obtain the Fitch report in order to set exposure limits. Plaintiffs' Counterstatement ¶7. The Plaintiffs also provide a plausible explanation, through testimony by Aliprandi, for the Risk Committee to have lowered the risk after the BB- rating — as the focus was on FX trading and not cash, and there were millions of dollars of total assets on deposit with Refco. Id. at  ¶10. In any case, without regard to the BB- rating, the point for reliance is that PlusFunds asked for and reviewed the Fitch report, and if the Fitch rating *had* been based on truthful information, PlusFunds/SPhinX would have ceased doing business with Refco. The fact that the Risk Committee lowered the risk and continued to do business with Refco after reading the Fitch Report does not conclusively mean that the Committee would have lowered the risk to the point required to do business with a Refco *that had disclosed a giant receivable* in that Report. Thus, the lowering of the risk threshold is a red herring on the question of reliance.

It should be noted that the Fitch rating was based on Refco's financials as of October 2002. Grant Thornton notes that those financials preceded the activity  that is the gravamen of the aiding and abetting claim against them. Grant Thornton is on the hook here for its audits of Refco's financial statements from 2003 through 2005, and its reaudit of  Refco's 2002 financial statements.

12

*See* FAC ¶ 46. But the fact that Grant Thornton's alleged aiding and abetting activity preceded SPhinX/PlusFunds' act of direct reliance on the Fitch Report does not justify granting summary judgment in Grant Thornton's favor — and the same goes for Mayer Brown. To prevail on an aiding and abetting fraud claim, as discussed above, the Plaintiffs must prove actual reliance on misrepresentations of the primary wrongdoer; but they need not prove direct reliance on any act of the aider and abetter. That distinction — which the Defendants recognize and indeed emphasize in their Reply Brief at 4 — is critical here.  It is therefore enough to defeat the motion as to reliance if the Plaintiffs plausibly show that PlusFunds/SPhinX directly relied on the Fitch Report, and the Defendants aided and abetted the Refco Fraud even if at a later time.[9] So it does not matter for the purposes of this motion that Grant Thornton's activity postdated the information in the Fitch Report on which  SPhinX/PlusFunds relied.

Drawing the necessary inferences in favor of the non-moving parties, the Special Master concludes that PlusFunds' obtaining of the Fitch Report, and its consideration by the PlusFunds Risk Committee, raises a question of fact on actual reliance on the misrepresentations of Refco.

### 3. Rose's internet search

The Plaintiffs contend that Chris Rose, the Chief Operating Officer of PlusFunds, testified that  in 2003 he searched online resources to estimate Refco's likelihood of default on its obligations. (Andelin Dec. Ex 87, Rose Dep. at 503-17). But even drawing inferences in the Plaintiffs' favor, Rose's testimony about his online research does not help to raise a question of fact about actual reliance on misstatements by Refco. Rose testified that he did an online search on the "general problem" of associating a rating agency credit rating with the likelihood of default. Id. at 505. He  specifically stated that in conducting his internet search he was "leaving aside Refco" and focusing on a more general concern about whether PlusFunds' credit policy of setting exposure limits based upon credit ratings was "really working." Id. Rose did not testify that in his internet search he found any representations either directly or indirectly made by Refco as to its financial condition. To the contrary, he testified that he never saw any public representation by Refco about its finances. Connelly Ex. 25 (Rose Dep.) at 461.

Accordingly, the Rose internet search does not assist the Plaintiffs in establishing a question of fact as to SPhinX/PlusFunds' actual reliance on the misstatements of Refco.

### 4. Tia Lowe's obtaining and referring Refco's audited financial statements

The Plaintiffs rely on the deposition testimony of Tia Lowe, PlusFunds' director of operations, that she remembered requesting copies of Refco's audited financial statements from Refco. Her specific remembrance is that 1) a potential SPhinX investor requested additional

---

[9] Of course, each Defendant is only responsible for damages occurring after the date of their aiding and abetting. See Net Deposits R and R, dated Oct. 17, 2012,  at 12-13.

information regarding Refco; 2) she contacted Refco for financial statements; 3) her interest was piqued when Refco did not readily comply with the request; and 4) when she received the information, she reviewed Refco's balance sheet and statement of income to see if anything appeared unusual, then forwarded it on to the potential investor. Andelin Decl., Ex. 79 (Lowe Deposition at 459-63). Lowe also testified that while she was not a member of PlusFunds' Risk Committee she attended the meetings. Id. at 53-54, 239-44.

One major problem with Lowe's testimony is that she cannot recall when the event happened. If it happened on or after March 12, 2004, it would be irrelevant to reliance because the Plaintiffs' claims have been narrowed to conduct that occurred before that date, i.e., the date on which SMFF's cash balance at Refco grew to $319.5 million — more than the $312 million on deposit at the time of Refco's collapse. Reliance after March 12, 2004 says nothing about actual reliance before that time. *See Romero v. City of New York*, 839 F. Supp.2d 588, 616, n.19 (E.D.N.Y. 2012) (where timing of an event is critical, testimony that is indefinite as to time is insufficient to create a material question of fact as to when the event occurred).

Moreover, Lowe did not testify that she reviewed the Refco materials for the purpose of relying on them. Rather the testimony was that she reviewed the materials out of curiosity and to make sure that they were in order to send to the prospective investor. See Lowe Dep. at 243 ("I believe I received them and passed them on to prospects. I did not do a detailed review of them. No."). And she did not testify that she shared the materials, or reported any impression about them, to anyone making investment decisions at PlusFunds. Under the circumstances presented by Lowe, even if the materials *had* disclosed the true amount of the RGHI Receivable, there is nothing to indicate that she would have discovered that fact and disclosed it to any relevant actor at PlusFunds. See Id. ("It wasn't my responsibility to look at the audited financial statements of Refco, no."); Id. at 211 ("I didn't have a role" in assessing counterparty risk.).

In sum, even drawing inferences in favor of the Plaintiffs, Lowe's testimony is too vague and off-point to raise any inference of actual reliance on Refco's misrepresentations.

### 5. *Plus Funds received and reviewed Refco's Confidential Offering Circular*

The Plaintiffs state that Bousbib — PlusFunds' CEO — testified that in the summer of 2004, Sugrue showed him a copy of Refco's Confidential Offering Circular that was issued in connection with the LBO, and that he "browsed" the Circular. Andelin Decl. Ex. 69 (Bousbib Dep. at 935, 938-39).  Bousbib further testified that he discussed the LBO with CFO Chris Aliprandi and possibly with Rose. Id. at 939.

Bousbib's testimony is potentially stronger on the reliance question than that of Lowe because he was in a management position and it was more likely that his purpose for reviewing the offering circular was for purposes of reliance. Also, unlike Lowe, he testified that he discussed at least some aspect of Refco's financial situation with others at PlusFunds. But in the end all that is irrelevant, because Bousbib's reported act of reliance came too late — it was during the LBO , thus

14

after March 12, 2004, which is the cutoff date for this action. Accordingly, Bousbib's review of the Confidential Offering Circular does nothing to raise an issue of fact on actual reliance.

### 6. PlusFunds obtained and reviewed Refco's S-1

PlusFunds director Diego Winegardner testified that he reviewed Refco's S-1 filed in connection with the IPO, obtaining it online. Andelin Decl. Ex. 91 (Winegardner Dep. at 607-8). Again, however, this purported act of reliance is irrelevant to the present motion, as the case has been narrowed to conduct occurring before March 12, 2004. That is well before the release of the S-1.

### 7. SPhinX and PlusFunds relied on the false picture of Refco's financial condition.

The Plaintiffs' closing volley on reliance is to cite the report of their expert, Breeden, to the effect that SPhinX and PlusFunds could rely on the offering circular and on the fact that THLee invested in Refco as an indication that Refco was in good financial condition. There are several problems with this concluding assessment. First — as stated in the R and R on the Plaintiffs' Motion for Summary Judgment on the Primary Violation by Refco at 11-12 — the Breeden Report is not admissible evidence that can be considered on a motion for summary judgment. Second, none of the factors that Breeden cited as sources of reliance arose before March 12, 2004. Finally, the argument that SPhinX/PlusFunds could rely on *THLee's* investment is the kind of indirect, fraud - on-the-market reliance that is insufficient to establish a claim of fraud under New York law. *See* the discussion under Point 1, *supra*.

### D. Conclusion on Reliance

In order to prevail in this action, the Plaintiffs must show that SPhinX/PlusFunds actually relied on a misrepresentation by Refco — not on reliance by others, the public, etc. The Plaintiffs have cited to admissible evidence that does raise a question of fact as to actual reliance, specifically the transmission of the Fitch Rating from Refco to PlusFunds in 2003 and its consideration by the PlusFunds Risk Committee. Accordingly, the Defendants' motion for summary judgment should be denied insofar as it is based on the argument that the Plaintiffs have failed to raise a question of fact as to reliance.

## IV. Intent

The Defendants contend that the Plaintiffs have no evidence that Refco intended to induce SMFF to rely on Refco's concealment of the RGHI receivable. As stated above, a plaintiff claiming fraud must show that the primary wrongdoer made a misrepresentation "with the intention of

inducing reliance." *Laugh Factory, Inc. v. Basciano*, 608 F.Supp.2d 549, 558 (S.D.N.Y. 2009) (Rakoff, J.). The Defendants do not of course assert that the Plaintiffs must show that Refco had the intent to target and deceive SMFF specifically. Rather, they acknowledge that the appropriate test of intent is whether SMFF reasonably falls within a class or category of persons or entities that Refco intended to defraud. *See* Opening Brief at 16. *Berkowitz v. Baron*, 428 F.Supp. 1190, 1196 (S.D.N.Y.1977) ("in order for [defendant] to be liable to these plaintiffs, they must be within the class of persons that [defendant] should reasonably have expected to rely on the [discredited financial] statements"). In this case, that would mean that Refco must have had the intent to defraud its *customers* by hiding the RGHI Receivable. The Defendants contend that all of the misstatements of Refco that are raised by the Plaintiffs — the financial statements, the offering circular, the S-1, etc. — were documents prepared for Refco *investors.* Id. at 18.

It is undisputed that Refco sent financial statements to PlusFunds (representing SPhinX, a customer of Refco) at Tia Lowe's request, and the Plaintiffs understandably rely on that transmission as an indication of Refco's intent to defraud SMFF. The Defendants seek to dismiss this fact by arguing that Refco's intent to deceive would not have been directed toward SPhinX and PlusFunds but rather toward the SPhinX investor, on whose behalf Lowe requested the information. But that argument is weak, because a SPhinX investor, though one step removed, falls into the class of customers of Refco — Refco has no SPhinX as a customer if SPhinX has no investors. It makes no sense to conclude that Refco had an intent to deceive a SPhinX investor but not SPhinX — that is cutting the intent requirement way too fine. Finally, Plaintiffs are correct in stating that an inference of intent to deceive can be drawn by the fact that Refco sent the financial information in response to a request for it. Why else send it?

It could be argued that because the Lowe testimony is indefinite as to *when* Refco sent the financial information, then this evidence cannot show that Refco had an intent to defraud customers during the time period relevant to this action, i.e., before March 12, 2004. But even if the information was sent after that date, it would be relevant to Refco's intent to deceive customers at an earlier time — or at least a reasonable inference in favor of the Plaintiffs could so be drawn. *See, e.g., United States v. Ramirez,* 894 F.2d 565 (2d Cir. 1990) (similar acts after the crime charged found probative of intent to commit the crime charged); *United States v. Latney,* 108 F.3d 1446 (D.C. Cir. 1997) (same); *United States v. Rutkoske,* 506 F.3d 170 (2d Cir. 2007) (defendants understanding of a subsequent transaction is probative of his understanding of a prior one).

But even if Refco's transmission of financial information to Lowe is insufficient to raise a question of fact on intent, the Plaintiffs have more, indeed stronger evidence of intent. That is the sending of the Fitch Report in 2003. As discussed above, that report was sent directly to PlusFunds after a PlusFunds request for information about Refco's credit rating. There was no reason to send that report except to induce reliance — the letter from Hackl to Sugrue referring the Fitch Report essentially *invites* PlusFunds to rely on it. The Defendants argue that the Fitch rating dated back to October 2002 and that this fact "undermines any suggestion that Refco intended PlusFunds to rely on that rating in August 2003." Reply Brief at 12. But that argument is nonsensical. It would mean that wrongdoers would be liable for fraud only if they gave up-to-the-minute financial information at the precise time they seek reliance. Certainly a fraudster sending a year-old misrepresentation

could well anticipate that the victim would rely on it to draw an inference about the fraudster's current financial condition. Thus, the sending of the Fitch Report — especially as bolstered by the sending of the financial information to Lowe — raises a question of fact as to whether Refco intended to deceive its customers.

Finally, the operation of the Refco Fraud itself raises a plausible inference that Refco intended to defraud customers by misrepresenting its financial condition. Customers were necessary so that Refco could continue to operate. The Defendants are not on this motion contesting the assertions that Refco used RCM as a cash cow to fund its operations. Whether that upstreaming was permissible or not, it is certainly plausible to draw an inference that there would be no cash cow if customers were informed of the hidden RGHI Receivable at Refco. To say that Refco's misstatements were solely directed to investors looks at the Refco Fraud far too narrowly.

### *Conclusion on Intent*

The Defendants' motion for summary judgment should be denied insofar as it is based on the assertion that the Plaintiffs have failed to present evidence that Refco intended to defraud customers like SMFF.[10]

## V. *In pari delicto*

The defendants interpose the affirmative defense of *in pari delicto*. *See* R and R on the Motion to Dismiss on the Omnibus Issue of *in pari delicto* dated December 6, 2010 (the "*in pari delicto* R and R") at 9 (relying on New York case law indicating that *in pari delicto* is an affirmative defense). As seen below, the Defendants' argument is that SMFF cannot recover because of the wrongdoing of insiders at PlusFunds in engineering the allegedly improper transfers of SMFF excess cash into unsegregated accounts at RCM.

### A. The *in pari delicto* R and R

The *in pari delicto* issues raised on this motion have already been reviewed extensively in the *in pari delicto* R and R. That R and R identified the following wrongdoers whose acts were imputed to the Plaintiffs, as they were set forth in the order stated in the Amended Complaint:

---

[10] In the R and R on the Plaintiffs' Motion for Partial Summary Judgment on the Primary Fraud by Refco, the Special Master found that the Plaintiffs were not entitled to relief because, among other things, they did not present *indisputable evidence* that Refco intended to defraud customers. But of course that finding is not inconsistent with the finding herein that the Plaintiffs have raised a *question of fact* on intent to defraud customers sufficient to defeat the Defendants' motion for summary judgment.

1) Robert Aaron, a director of SPhinX and CEO of DPM, SPhinX's administrator. FAC ¶ 344.

2) Christopher Sugrue, a co-founder of and director of PlusFunds and founder of SPhinX. FAC ¶ 356.

3) Mark Kavanagh, a member of the PlusFunds board. FAC ¶ 376.

4) Brian Owens, a member of the boards of both PlusFunds and SPhinX. FAC ¶ 390.

With respect to these wrongdoers and imputation, the Special Master made the following recommendations that are pertinent to this motion:

● "[T]he defendants being sued on the Refco Fraud may still invoke *in pari delicto/Wagoner* even if those defendants are alleged to have engaged in misconduct that is separate and independent from the misconduct of the insiders at SPhinX and PlusFunds." *in pari delicto* R and R at 19. That recommendation rejected the Plaintiffs' argument that *in pari delicto* could not apply to Refco Fraud claims because the wrongdoing of the SPhinX/PlusFunds insiders was limited to the unauthorized transfers to RCM, i.e., the SPhinX Fraud.

● The fact that the wrongdoing insiders were acting without authorization — i.e., "acting for themselves" in engaging in transactions involving PlusFunds — was clearly not enough to prevent imputation under *in pari delicto*. Id. at 20.

● The "adverse interest exception" to *in pari delicto* applies only when the wrongdoing of the insiders provides no benefit to the corporation. Under New York law, the adverse interest exception must be applied under the following principles: 1. It is the "narrowest" of exceptions; 2. It does not apply if the corporation received *any* short-term benefit from the insiders' misconduct; and 3. The insiders' intent to act for their own personal benefit is irrelevant to the application of the exception. Id. at 22 (quoting and relying on *Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 469, 912 N.Y.S.2d 508 (2011)).

● The Plaintiffs' allegation that the wrongdoing of the insiders did not benefit SPhinX or PlusFunds in any way was "belied by the allegations of the Sugrue Amended Complaint." Id. at 23. The Special Master found that the Amended Complaint itself alleged a number of benefits from the insiders' wrongdoing. In reaching this finding, the Special Master rejected the Plaintiffs' argument that to count as a benefit it had to be related to participation in the fraud. The alleged benefits relied on then by the Special Master are the same as the Defendants rely on in this motion for summary judgment.

1. RCM paid interest on the SMFF cash at Refco.

2.  Refco provided SPhinX $70 million in investment capital to "seed" the Managed Futures Index.   FAC ¶ 140. That money remained invested in SPhinX for years. FAC ¶ 304.

3. In April 2005 Refco extended a $25 million credit facility to PlusFunds to provide SPhinX investors interim secondary market liquidity. FAC ¶ 304.

4. Refco worked to obtain investors for the SPhinX funds (FAC ¶ 144) and agreed to market investments in SPhinX and SMFF. (FAC ¶ 159). Refco established investment vehicle funds that incorporated the SPhinX mark in order to promote investment in SPhinX. (FAC ¶ 146). Refco Alternative Investments ("RAI") created, marketed and managed these investment vehicle funds. (FAC ¶¶ 158, 1034). As of October 2005 at least $100 million of the assets in the SPhinX funds had been invested through RAI-managed funds. FAC ¶1042.

The Special Master concluded that "the adverse interest exception to in *pari delicto/Wagoner* is not applicable to these actions, because SPhinX/PlusFunds received benefits from the misconduct of the wrongdoing insiders — including interest payments on the cash transferred to RCM and significant financial benefits from Refco's control over SMFF cash." *in pari delicto* R and R at 25.[11]

### B. Judge Rakoff's Opinion and Order reviewing the *in pari delicto* R and R.

In his Opinion and Order dated April 25, 2011, Judge Rakoff concluded that "contrary to the Special Master's interpretation, plaintiffs have adequately pleaded the adverse interest exception." Id. at 9. But Judge Rakoff "in all other respects adopts the findings and conclusions of the December 6, 2010 Report and Recommendation to the extent they are not inconsistent with the Court's determination regarding the adverse interest exception." Id.

In deciding this motion, it is important to analyze Judge Rakoff's reasons for rejecting the Special Master's conclusion that the Plaintiffs had not sufficiently pled the adverse interest exception to *in pari delicto*. Judge Rakoff reasoned as follows:

1. The interest payments at RCM were not a benefit because the Plaintiffs alleged that no interest at all was received for a year, and thereafter the rate of interest was less than what would have been received from treasury bills or at Refco LLC. So while interest received at RCM might have been a benefit from a groundpoint of zero, the relevant point was that the interest received was less after the transfer than it would have been before. Thus the transfer "was no different from taking money out of the SMFF customers' pockets and putting it into the pockets of Bennett and his accomplices." Id.  at 6.

_____

[11] The Special Master also found that if the Plaintiffs *had* properly invoked the adverse interest exception, then the "sole actor" exception to *that* exception had not been properly invoked by the Defendants. That recommendation was affirmed by Judge Rakoff. The inapplicability of the "sole actor" exception is not an issue on this motion.

Consequently, in assessing on this motion whether summary judgment should be granted on *in pari delicto* grounds, the Special Master must assess whether admissible evidence establishes beyond factual dispute that the SMFF cash was better off at RCM than it was at Refco LLC.

2. As to the other "supposed benefits" — the seed money, the Standby Credit Facility, and Refco's help in obtaining investors for the SPhinX funds — Judge Rakoff stated that according to the Plaintiffs' Amended Complaint they "grew out of the general relationship between Refco and SPhinX/PlusFunds and had nothing to do with the corruptly-procured transfers that are the gravamen of the instant claims." Id. at 8. Judge Rakoff noted the Defendants' argument that there was a causal connection between the cash transfers and asserted benefits, but responded that the Amended Complaint, when read most favorably to the Plaintiffs, at most suggested "that the connection, if any, between these benefits and the customers' funds was with the placement of these funds in the customer-segregated accounts at Refco, and not in the subsequent diversion of these funds into the unsegregated accounts at RCM." Id.

Consequently, in assessing on this motion whether summary judgment should be granted on *in pari delicto* grounds due to benefits received from the seed money, the credit facility, or the efforts to obtain investors, the Special Master must assess whether admissible evidence establishes beyond factual dispute that 1) there was a benefit to SMFF provided by Refco; and 2) the benefit was conditioned on placing SMFF excess cash in unprotected accounts at RCM.[12]

The Defendants argue that discovery has shown that 1) the SMFF cash *was* better off at RCM than it would have been at Refco LLC; 2) the seed money was given on the condition that SMFF cash would be swept to unprotected accounts at RCM; 3) the Standby Credit Facility was conditioned on Refco's continued control over SPhinX funds; and 4) the efforts to obtain investors were also tied to the wrongful transfers. Each of these arguments will be evaluated in light of the admissible evidence presented and Judge Rakoff's guidelines for applying the adverse interest exception.

But before reaching the question of benefits from the wrongdoing insiders, the Special Master must address what the wrongful conduct actually *was*, to determine whether it was actually beneficial. On that question, the Plaintiffs argue that the Defendants have not sufficiently identified the wrongful acts of insiders at SPhinX and PlusFunds that they seek to attribute to the Plaintiffs. On this question, the extensive allegations in the Amended Complaint regarding the wrongdoing of Sugrue, Owens, Kavanagh and Aaron are dispositive. Those allegations, among other things, charge Sugrue with engineering the transfers to RCM, and the others with aiding and abetting either the transfers themselves or the active concealment of those transfers. The Plaintiffs have used those

---

[12] It should be noted that the Defendants do not have to show that all three of these asserted benefits meet this test. Any one is sufficient. See *in pari delicto* R and R at 22 (adverse interest exception "does not apply if the corporation received *any* short-term benefit from the insiders' misconduct"); *Kirschner v KPMG LLP*, 15 N.Y.3d 446, 472, 912 N.Y.S.2d 508 (2010) (insiders' action must be completely adverse for adverse interest exception to apply).

allegations to obtain a default judgment against Sugrue and to defeat motions to dismiss certain claims brought against Owens, Kavanagh and Aaron. The Defendants argue correctly that the assertions in the Amended Complaint about the wrongdoing of Sugrue, Owens, Kavanagh and Aaron are judicial admissions that bind the Plaintiffs on this motion. "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985). *See also American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.,* 351 F.Supp.2d 79 (S.D.N.Y. 2004) (judicial admission "binds the party that makes it in the action in which it is made"). Thus there is no dispute of fact on the wrongdoing of Sugrue, Owens, Kavanagh, and Aaron as it is alleged in the Amended Complaint. *See Banks v. Yokemick,* 214 F.Supp.2d 401**,** 405 (S.D.N.Y. 2002) (judicial admissions obviate the need for discovery).[13]

The Plaintiffs argue that the Defendants have actively contested the Plaintiffs' assertions about the wrongdoing insiders and so cannot now be heard to rely on the Plaintiffs' allegations for purposes of the *in pari delicto* affirmative defense. Essentially they are arguing that the Defendants have made judicial admissions that the Plaintiffs' judicial admissions are untrue. But the Defendants have never denied that Sugrue et. al. are wrongdoers. They simply put the Plaintiffs to their proof on those questions; that is not the same as attesting that Sugrue et. al. were innocents.

Accordingly summary judgment should not be denied on the ground that the Defendants have failed to identify the wrongdoing that they seek to attribute to the Plaintiffs. The wrongdoing that is the focus of the analysis below (as directed by Judge Rakoff's Order) is the transfers of SMFF excess cash from Refco LLC to unsegregated accounts at RCM.

### C. Plaintiffs' argument that SPhinX fraud wrongdoing cannot bar a Refco Fraud claim

The Plaintiffs make an argument that is not related to the adverse interest questions left after Judge Rakoff's order. The Plaintiffs claim that *in pari delicto* cannot apply to their Refco Fraud claims because the wrongdoing of the insiders was related only to the SPhinX fraud. The Special Master already extensively analyzed — and rejected — this argument in the *in pari delicto* R and R at 14-19. The Special Master set forth three independent reasons for rejecting the Plaintiffs' argument and then concluded: "Thus, the defendants being sued on the Refco Fraud may still invoke *in pari delicto/Wagoner* even if those defendants are alleged to have engaged in misconduct that is

---

[13] The Plaintiffs contend that their assertions of wrongfulness are legal conclusions and that judicial admissions only go to factual assertions. But the Amended Complaint is replete with assertions of facts, specifically that Sugrue and the others engineered and/or concealed the sweeps to RCM. If those acts are not wrongful, it is hard to figure out what we have all been doing here for so long. Even now in their Brief, the Plaintiffs allege among other things that "Sugrue was a crook." Brief at 24. That, together with the acts attributed to Sugrue in the Amended Complaint, is certainly enough to establish at least that the Plaintiffs have admitted that Sugrue acted wrongfully in engineering the transfers to RCM.

separate and independent from the misconduct of the insiders at SPhinX and PlusFunds." Id. at 19. That finding was affirmed and adopted by Judge Rakoff. *See* Order dated April 25, 2011 at 9 (adopting all the findings and conclusions of the Special Master except those related to the adverse interest exception). Thus the Plaintiffs' attempt to separate the SPhinX Fraud wrongdoing from *in pari delicto* on the Refco Fraud must be rejected once again.

The Special Master now turns to whether SMFF received a corporate benefit tied to the transfer of the excess cash to unsegregated accounts at RCM.

### D. Defendants' arguments and evidence on benefits linked to wrongdoing that would bar the adverse interest exception to *in pari delicto*.

As a preliminary matter: in analyzing the benefits from the insiders' wrongful conduct that are pressed by the Defendants, the focus must be on benefits to *SMFF*. The claims for PlusFunds' damages have been dismissed with prejudice. *See* Order of Judge Rakoff dated December 26, 2012. Thus any benefits derived uniquely by PlusFunds are irrelevant to determining whether the adverse interest exception to the *in pari delicto* doctrine is applicable to this motion.

### 1. Interest payments on the excess cash at RCM

Both parties admit to difficulty in determining whether the excess cash yielded more interest at RCM than it did at Refco LLC. This is because accounts at Refco LLC contained assets other than excess cash — such as margin equity and open trade equity — and the Refco LLC monthly account statements do not break out the extent to which the interest recorded related to the excess cash in the account. *See* Defendants' Rule 56.1 Statement ¶¶ 199-200. The Defendants' expert, Professor Lehn, considered averages in the Refco LLC accounts and applied a methodology that attempted to separate out the interest allocations to the excess cash, but Lehn himself states that he was "unable to estimate with precision the interest rates that SMFF earned on unencumbered cash balances held at LLC." Plaintiffs' Rule 56.1 Statement ¶ 122.[14] Moreover, Lehn never attempted to calculate what the daily excess cash balances at Refco LLC actually were; and he acknowledged that "you would prefer to use the daily balances in computing the interest rate." Lehn Dep. at 87.

Besides the dispute of fact over what the interest rate for the cash at Refco LLC even was,

---

[14] The Defendants argue that the Plaintiffs' expert — Krys himself — applied the same methodology to the Refco LLC accounts. But Krys noted the same difficulty of trying to figure out how interest was specifically allocated, and ultimately concluded that the methodology was unreliable. *See* Plaintiffs' Rule 56.1 Statement ¶135 (citing and quoting the Krys Report). The fact that experts from both sides acknowledge problems in the methodology in determining the exact interest allocation makes the methodology less credible, not more. At a minimum it raises a question of fact as to the amount of interest paid on the cash while it was at Refco LLC.

there are other reasons to conclude that the Defendants have not shown that SMFF benefited from the interest payments it obtained from the cash at RCM. For one thing, the parties agree that RCM paid no interest at all until December 2003 — that is, there is no dispute about the factual allegation that Judge Rakoff found critical in his Order. *See* Opening Brief at 34 ("RCM started paying SMFF interest on its excess cash beginning in December 2003."). The Defendants argue that the zero interest payment is of no moment because "there is no evidence" that Refco LLC paid interest from 2002 until December 2003. Id. But that argument fails for at least three reasons. First, under the terms of Judge Rakoff's Order, the Defendants must show that the transfer to RCM was *beneficial*, not neutral. Second, the argument that "there is no evidence" of interest payments at Refco LLC shifts the burden to the Plaintiffs to prove that interest payments were made, and that is an inappropriate move given that *in pari delicto* is an affirmative defense. Third, the purported reason that there is "no evidence" of interest payments at Refco LLC is that, as stated above, there were assets other than excess cash in the LLC accounts and it is impossible to break out the allocation — but that does not stop the Defendants from arguing later on that they can do the allocation for account balances after December 2003 through the methodology employed by Lehn.

As if more were necessary, there is another reason for rejecting interest payments at RCM as a benefit: there is admissible evidence that the only reason RCM began crediting any interest on the excess cash was because Bousbib negotiated with Refco personnel and demanded it. *See* Andelin Dec. Ex. 69 (Bousbib Dep. June 11, 2012 at 916). So the asserted benefit of a higher interest payment at RCM is not at all tied to wrongdoing insiders. The Defendants do not even allege, much less prove, that Bousbib was a wrongdoer. The critical wrongdoer for this motion is Sugrue and when he arranged for the sweeps to RCM, no interest at all was received on the cash. It would be perverse to find that an insider's wrongdoing was not completely adverse when the asserted benefit is due to the act of an innocent insider.

In sum, the Defendants have, at the very most, raised a question of fact as to whether the interest payments credited by RCM were a sufficient benefit to preclude application of the adverse interest exception. Accordingly, the motion for summary judgment should be denied insofar as it is based on the interest credited on the excess cash at RCM.

### 2. Seed money

There is no dispute that on October 18, 2002, Sentinel Bank agreed to purchase SPhinX shares and that pursuant to that agreement, in December 2002, Refco (through Sentinel) provided $70 million in in capital to SMFF. Judge Rakoff did not hold that this cash infusion was somehow not a corporate benefit that could bar the application of the adverse interest exception; $70 million in seed capital was beneficial to SMFF within the meaning of the adverse interest exception.[15]

---

[15] The Plaintiffs argue that SMFF was already "off the ground" at the time of the Sentinel transaction. But that assertion is belied by the deposition testimony and emails indicating that the money was necessary to seed the managed futures index. See Connelly Ex. 75 (Dec. 5-9 emails

Rather Judge Rakoff held that the Amended Complaint could not be read to concede the fact that the seed money was conditioned on the wrongful transfers from Refco LLC to RCM. The Plaintiffs present arguments that there remains a question of fact on whether the Sentinel transaction was conditioned on the transfers to unsegregated accounts at RCM. The Special Master proceeds to address those arguments.

### a. Whose wrongdoing counts?

The Plaintiffs' first argument is that the relevant wrongdoing insiders are limited to those at SMFF, because the SMFF claims are the only remaining claims in this action. The only relevant wrongdoer, under the Plaintiffs' theory, would be Aaron, who was a SPhinX director at the time of the Sentinel transaction. And the Plaintiffs are correct that there is nothing in the Amended Complaint, nor any admissible evidence presented by the Defendants, to indicate that Aaron was involved in the Sentinel transaction or had any awareness that it was tied to any wrongdoing.[16]

The Defendants argue that the *in pari delicto* doctrine is not so limited, and that the wrongdoing of Sugrue — who was indisputably involved in the Sentinel transaction and in the cash sweeps to unsegregated accounts — can be imputed to SMFF. The Defendants are correct. The Amended Complaint states that Sugrue was the "founder and agent" of the SPhinX funds. FAC ¶ 38. *See also* Id. at ¶356 (Sugrue "is considered the founder of the SPhinX Funds and was at all times involved in SPhinX's management as a director of PlusFunds."). And even if he was not technically an "insider," the doctrine of *in pari delicto* extends the rule of imputation to any corporate agent engaging in wrongdoing. As the New York Court of Appeals stated in *Kirschner,* 15 N.Y.3d at 465: "Traditional agency principles play an important role in an *in pari delicto* analysis." The *Kirschner*

---

indicating that the managed futures index was launched when the seed money was obtained); Lowe Dep. at 113 (December 10, 2002 was the launch date). It is also belied by the Plaintiffs' own assertions that the Sentinel investment was seed capital. *See* FAC ¶¶ 140-41. And even if the Plaintiffs are correct that SMFF was off the ground, an infusion of $70 million is beneficial whenever it is made. Whether it is "seed" money or not, it is still money.

The Plaintiffs further argue, on page 37 of their Brief, that SMFF did not benefit from the Sentinel investment because it was not a profit-making entity – it existed solely as a vehicle for investors and not to make money for itself. But this would mean that an entity like SPhinX could never benefit from anything. That premise is inconsistent with *Kirschner,* which states that the adverse interest exception applies where the insider's misconduct "enables the business to survive" by, for example, "attract[ing] investors." 15 N.Y.3d at 477. A substantial capital infusion fits comfortably within that broad definition of "benefit."

[16] Owens was on the SPhinX board, but only as of October 2003, and so could not have had any role in the Sentinel transaction or with any tie between the seed money and the wrongful transfers. See Owens and Kavanagh R and R at 4.

court further stated that imputation applies "even where the *agent* acts less than admirably, exhibits poor business judgment, or commits fraud." Id.   (Emphasis added). *See also* Id. at 466 ("where conduct falls within the scope of the *agents'* authority, everything they know or do is imputed to their principals."). (Emphasis added). The basic principle relied upon by the New York Court of Appeals was that in deciding how to allocate a loss from corporate wrongdoing — whether to the corporation or a third-party aider and abetter — it should be allocated to the corporation because the corporation had the authority to hire and control the wrongdoer. *See* Id. at 476-77 (noting that the proposal to allocate the loss to the third-party "would allow the creditors and shareholders of the company that employs miscreant agents to enjoy the benefit of their misconduct without suffering the harm"). That analysis is as applicable to agents as it is to insiders. As the Court of Appeals stated,  imputation is based on the "presumption that agents communicate information to their principals" and "imputation fosters an incentive for a principal to select honest agents and delegate duties with care." Id. at 466

It is important to note that Judge Rakoff in his Order recognized that the wrongdoing of PlusFunds insiders could be attributed to SMFF. As he put it, because Sugrue was a director of PlusFunds at the time of the alleged misconduct, his misconduct "would ordinarily be imputed, as a matter of agency law, to PlusFunds *and to its principal, SPhinX*" and that this attribution would bar SMFF's claim— but for the adverse interest exception. April 25, 2011 Order at 4. (Emphasis added).

Accordingly, the Plaintiffs' argument that no wrongdoing by Sugrue can be imputed to SMFF must be rejected. Sugrue's conduct is imputed to SMFF under the doctrine of *in pari delicto*.[17]  The next question is whether Sugrue's conduct in obtaining the benefit of the seed money from Refco was linked to the wrongful scheme of transferring SMFF's excess cash to unsegregated accounts at RCM.

### b. Link to wrongdoing — the terms of the Sentinel Agreement

The Plaintiffs argue that the terms of the Sentinel Agreement itself indicate that there was no requirement that the seed money be swept into unsegregated accounts at RCM. As the Plaintiffs note, the Sentinel Investment Agreement references the SPhinX Offering Memorandum, which states that customer assets are to be placed in customer-segregated accounts.  Sentinel Agreement at ¶1.1, Andelin Ex. 39; Plaintiffs' Rule 56.1 Statement ¶53. And it is not just a reference. The Sentinel Agreement provided that one "Event of Termination" was "any amendment to the SPhinX

---

[17] The Plaintiffs argue, at page 36 of their Brief,  that there remains a dispute about whether Sugrue had "bad knowledge" about the Sentinel investment. This is just another way of arguing that Sugrue did not intend a relationship between the Sentinel investment and the wrongful transfers — a matter now to be taken up in text. The foregoing section simply answered the question of whether Sugrue's work to transfer excess cash to unsegregated accounts at RCM could be imputed to SMFF. The answer to that question is yes.

offering documents" not approved by Sentinel. Sentinel Agreement at ¶1.1. It is true that this "Event of Termination" covers only changes that would be adverse to Sentinel and the Agreement does not specifically reference segregation. But it is at least plausible to read the Sentinel Agreement as not contemplating, and even inconsistent with, transfers of SMFF cash to unsegregated accounts. That reading is supported by the terms of the Sentinel subscription document, pursuant to which Sentinel actually invested the money. Sentinel agreed to purchase shares of SPhinX upon the terms and conditions set forth in the Offering Memorandum. Connelly Ex. 62. All this evidence tends to indicate that, as Judge Rakoff put it, efforts "to steer customers to SPhinX were in the context of assurances given by SPhinX/PlusFunds that the customers' monies would be kept in protected, customer-segregated accounts." April 25, 2011 Order at 8.

The Defendants point out that another contracted-for "Event of Termination" in the Sentinel Agreement was SMFF's use of unapproved prime brokers or other service providers. Id. But while this provision contemplates that SMFF accounts would remain at *Refco*, there is nothing in it to indicate that it was tied to improper transfers to unsegregated accounts. As Judge Rakoff instructed, the Defendants must show that the benefit received by SMFF must be conditioned on wrongful conduct, not merely establishment and continuation of a business relationship with Refco. *See* April 25, 2011 Order at 8.

Thus, in order to prevail in their argument that the seed money was a benefit that bars the adverse interest exception, the Defendants must show that the seed money was conditioned on the transfers to RCM despite the fact that the contract not only did not provide the condition but can be fairly read to preclude it.

### c. Link to wrongdoing — emails and documents around the time the money was wired

The parties agree that the Sentinel investment — $60 million — was wired into SMFF's portfolio accounts on Monday December 9, 2002, and that on that same day the first excess cash from SMFF, totaling $59.8 million, was swept into RCM. *See* Defendants' Rule 56.1 Statement ¶ 118 (undisputed). But the parties of course disagree on whether the admissible evidence proves that the deal was dependent on transfers into unsegregated accounts at RCM. The Defendants rely on a series of emails sent between Friday December 6, 2002 and Tuesday December 10 — some with attached documents. The critical emails for the Defendants are among Sugrue, Bousbib, Rose, Lowe and others. They involve setting up accounts at RCM to receive the excess cash from Refco LLC; and an inference can be derived from the emails that it was critical for those accounts to be set up as part of the arrangement for the seed capital. See Connelly Exhibits 18, 63, 64, 66, 67, 75.

But it does not necessarily follow that there was an understanding that the quid pro quo for the seed money was the transfer of SMFF cash into unsegregated accounts at Refco. Bousbib testified that there was no quid pro quo and that the arrangement for sending the funds to RCM was done at Refco's request for "operational reasons." Bousbib Dep. at 138. Bousbib also testified that he believed the funds would be segregated at RCM. Id. at 140. Rose and Lowe testified that the email exchanges were to work through operational concerns on PlusFunds' side about obtaining

26

reports from RCM and LLC so that the numbers for daily NAV reports could be accurately combined — the problem at the time being that there was no operation in place for aggregating the numbers. They denied that there was a quid pro quo. Rose Dep. at 253; Lowe Dep. at 114.

The email on which the Defendants most heavily rely is one by Sugrue to Bousbib, Rose and Lowe,  stating that it was "not possible to leave the money in LLC" and that he would "be forced to send back the money if we cannot follow the procedures as laid out by Refco on Friday." Connelly Ex. 75. That certainly raises an inference that the seed money was ineluctably tied to transfers to unsegregated accounts at RCM. But on the other hand, there is testimony from Rose that he didn't take Sugrue's threat seriously, and that all the hubbub was about operational questions that could be worked out. Rose Dep. at 261 ("Where he says I am going to send the money back, to me that's you know, him being very argumentative and being very stubborn, and I am trying to stand my ground and make sure we don't break our product."). Moreover, the email to Sugrue that led him to threaten to send the money back — from Rose — tends to support Rose's account that the only controversy was about operational issues on the PlusFunds side,  and there was nothing in the deal that tied the seed money to transfers of SMFF cash to unsegregated accounts. See Connelly Ex. 75, Rose email to Sugrue dated 12/8/02 (noting the operational problem that "Refco cannot do the daily transfers without compromising our controls" and "we still have to resolve getting data from Refco consistently for the 4 managers for whom we need daily data for S&P every day"; also suggesting that "if there is any chance of not getting good data for the existing managers because of a flawed process, we should leave the money in the LLC account for them until the problem is resolved.").

In sum, drawing all inferences in favor of the Plaintiffs as non-moving parties, there is a jury question on whether the seed money was sufficiently tied to transfers of cash into unsegregated accounts so as to constitute a benefit that bars the adverse interest exception. The Plaintiffs have presented sufficient admissible evidence to support another interpretation: 1) *after* the Investment Agreement was executed on October 18, 2002, Refco informed PlusFunds that excess cash would be maintained in RCM accounts for operational reasons; 2) there is no direct evidence that anybody at Refco or Sentinel demanded transfers into an unsegregated account as a condition for the seed money; 3) the evidence of the efforts on the PlusFunds side to accommodate Refco's request were not part of a quid pro quo but rather were motivated by the need to implement a procedure for PlusFunds to keep track of the money in order to provide timely NAV reports; and 4) Sugrue's threat to send the money back was related to operational issues and in any event was not a serious threat. Because this is a plausible interpretation of the admissible evidence, the motion for summary judgment should  be denied insofar as it is based on a benefit obtained by SMFF from the seed money.[18]

------

[18] The Defendants rely on the deposition testimony of Santo Maggio — a deponent whose testimony they have attacked as unreliable throughout these proceedings, and a deponent whose testimony has been found too vague and opinionated to support an order for summary judgment. *See* R and R on Partial Summary Judgment on the Question of Primary Fraud by Refco at 10.  But assuming that Maggio's testimony is useful on the seed money, it only supports the fact that it was not a benefit to SMFF. Maggio testified that Refco didn't have the money to

### 3. Standby Credit Facility

As stated above, in April 2005 Refco extended a $25 million credit facility to PlusFunds to provide SPhinX investors interim secondary market liquidity. FAC ¶ 304. The Defendants claim that discovery has shown that the Standby Credit Facility was linked to the transfers of SMFF cash to unsegregated accounts at RCM. The parties engage in extensive arguments over whether the Standby Credit Facility was a benefit at all, and whether it was tied to the cash sweeps as required by Judge Rakoff's Order.

#### a. Was the Credit Facility a benefit?

The Plaintiffs plausibly argue that the Credit Facility was not a benefit because SMFF had hundreds of millions of dollars of cash and did not need credit protection.[19] The Defendants respond that PlusFunds needed the Credit Facility to ameliorate the risk of "liquidity mismatch" because PlusFunds was offering investors better liquidity terms than it was getting from the SPhinX portfolio managers. Defendants' Rule 56.1 Statement ¶¶ 131-33. But there is no clear indication in the admissible evidence that PlusFunds wanted or needed the Credit Facility to cover any risk regarding the *excess cash at SMFF*. The Credit Facility might have benefited PlusFunds or other SPhinX portfolios, but there is at least a question of fact on whether it provided any benefit to the only entity whose claims are still viable in this action — SMFF.[20] Moreover, the Plaintiffs cite admissible evidence indicating that at the time of the Standby Credit Facility the liquidity gap was narrowing, and PlusFunds was managing the gap. Andelin Dec. Ex. 67 (Aliprandi Dep. at 235, 248); Andelin Dec. Ex. 69 (Bousbib Dep. 331, 335, 350).

---

seed the funds and so the arrangement was made that "monies would come right back to Refco." Maggio Dep. 12/15/09 at 8. That would mean that the net result of the transaction was zero, which would or course not be a benefit that would bar the application of the adverse interest exception.

[19] The Plaintiffs note that PlusFunds never accessed the credit provided by the Credit Facility but that is irrelevant to whether it was a benefit. If SMFF could face a risk of a liquidity problem that could be remedied by drawing down on the Credit Facility, then the Credit Facility was a corporate benefit to SMFF within the meaning of the adverse interest exception — similar to an insurance policy.

[20] The Defendants cite admissible evidence that there was some expressed concern that a liquidity mismatch might lead to the loss of the S&P license, which would have had an effect on SMFF. *See* Defendants' Rule 56.1 Statement ¶ 136. That evidence, read in the light most favorable to the Plaintiffs, indicates that some members of the board of PlusFunds were concerned with and discussing disaster scenarios, not that a Standby Credit Facility was necessary to protect SMFF cash. It does not establish indisputably that the Credit Facility was obtained as a benefit to SMFF.

28

The Plaintiffs have also raised a question of fact as to whether the Credit Facility could even solve the problem of liquidity that the Defendants say it was designed to address. This is because it was PlusFunds, and not SPhinX, that signed the agreement; and it is reasonable to infer that PlusFunds was not authorized to use the Credit Facility in a way that would solve any liquidity issues arising at SPhinX. PlusFunds was an investment advisor, and borrowing from a lender to purchase investor assets could raise a conflict of interest, even assuming that PlusFunds had the mechanisms in place to handle stock trading of SPhinX shares. *See* Statement of Patrick McMahon, chief legal officer of PlusFunds, Andelin Dec. Ex.83 ("Upon reading the first couple of pages of the Standby Credit Facility, I became concerned that it could not be drawn upon. In my mind, the proper party to the agreement should have been the SPhinX entity that would need the liquidity to honor redemptions if there was a liquidity issue.").

Thus there is a question of fact on whether the Credit Facility was a benefit to SMFF. But even if it was a corporate benefit to SMFF, there remains a question of fact on whether that benefit was sufficiently linked to the insiders' wrongdoing as to bar the adverse interest exception to *in pari delicto*. That point is discussed immediately below.

### b. Link to wrongdoing

On the linkage question, the Defendants' sole argument is that the Standby Credit Facility contained a "vendor covenant" that required SMFF "to keep its cash at Refco." Reply Brief at 18. But that is different from saying that the Credit Facility was conditioned on keeping the SMFF cash in unsegregated accounts at RCM. It is critical to note that the Credit Facility was between PlusFunds and *Refco LLC*. *See* Standby Credit Facility, Connelly Ex. 127 at 1, 32. RCM is not mentioned anywhere in the document. There is *no* indication in the document that RCM is even involved, much less that the agreement is conditioned on transferring the excess cash into unsegregated accounts at RCM.

It should be noted that the Defendants raise nothing on the point of relatedness that was not already before Judge Rakoff when he ruled that there was a question of fact on whether the Credit Facility was connected to the wrongful transfers. The Defendants cite only the Amended Complaint and the terms of the Standby Credit Facility. Thus, contrary to the Defendants' assertion, discovery has not shown anything new about a connection between the Credit Facility and the cash transfers. Indeed it would be fair to state that Judge Rakoff's ruling that a question of fact exists on whether the Standby Credit Facility was linked to the wrongful transfers is the law of the case, as the Defendants raise nothing at all that is relevant to changing that determination. Thus, the Defendants have failed to provide undisputed evidence that the Standby Credit Facility was conditioned on the wrongful transfers of excess cash.

### c. Timing

Finally, even if the Credit Facility provided a corporate benefit that was tied to the wrongful transfers, that benefit arose well after the time period that now controls this case. As stated above,

the Plaintiffs can only recover damages for cash placed at Refco before March 12, 2004. The Standby Credit Facility was entered into on April 13, 2005. The Defendants cite no authority to indicate that a benefit received more than a year after the last actionable wrongdoing can qualify to prevent a corporation from invoking the adverse interest exception. It should be remembered that the actionable wrong here is not *maintaining* the assets at RCM, but rather *depositing* the assets at Refco. *See, e.g.,* Grant Thornton R and R at 17 ("Thus, the Special Master's analysis finding a lack of proximate cause regarding claims of fraudulent *retention* of assets at Refco — in four separate R and R's (two affirmed and adopted by Judge Rakoff) —  bars the Plaintiffs from suing GT and Ramler for such damages here."). The actionable deposits end on March 12, 2004. Any action taken to require SMFF to retain those deposits at Refco in 2005 does not even constitute an actionable wrong, and is by definition not linked to the actionable wrongdoing in this case.

For all these reasons, the motion for summary judgment should be denied insofar as it is based on any benefit to SMFF derived from the Standby Credit Facility.

### 4. Refco's responsibility for increased assets under management.

The parties spend relatively little effort on whether SMFF benefited from Refco's efforts to solicit investors to the SPhinX funds. It is undisputed that as part of the agreement that gave Refco exclusive brokerage rights for SMFF, Refco agreed to provide alternative investment vehicles for individuals to invest with SMFF. *See* Defendants' Rule 56.1 Statement ¶¶ 201-02 (undisputed). The Plaintiffs concede that "RAI-sponsored funds constituted a substantial source of investments into SMFF." Response to Rule 56.1 Statement No. 203. So there is no question of fact on whether the Refco efforts provided a corporate benefit to SMFF.[21] Also, unlike the Standby Credit Facility discussed *supra,* the benefits derived from the investments secured by Refco were obtained at the same time that the actionable wrongful transfers were occurring.

So the question is whether the Defendants have shown that Refco's efforts on SMFF's behalf were dependent on the transfers of excess cash into RCM. Judge Rakoff has already found that, at the motion to dismiss stage, the Plaintiffs had sufficiently alleged that "the efforts made by Refco to steer customers to SPhinX were in the context of the assurances given by SPhinX/PlusFunds that the customers' monies would be kept in protected, customer-segregated accounts." April 25, 2011 at 8. Contrary to the Defendants' assertions, there is nothing in discovery that changes Judge Rakoff's determination. The Defendants argue that discovery has shown that "a substantial portion — at times, a majority — of SMFF's deposits at RCM came from the investors secured by Refco." Reply Brief at 20. But whatever the evidence of *volume* is, it does not at all undermine the Plaintiffs' assertion that the money came in pursuant to assurances of segregation. The Defendants assert  that once the deposits came in, they were upstreamed to fund Refco's operations. Id.  But the citation for

---

[21] The Plaintiffs again contend that SMFF could never receive a benefit because it did not profit from additional assets. The Special Master rejected this argument as applied to the seed money. See Note 15, *supra*. The argument is no better here.

that assertion comes from the Amended Complaint, not to anything relevant that was produced in discovery. Thus, there is nothing found in discovery that at all affects Judge Rakoff's ruling that the Plaintiffs have at least raised a jury question on whether there is a connection between Refco's efforts to obtain investors and the wrongful transfers to unsegregated accounts.

In essence, the Defendants are arguing that because the investor money was eventually swept to RCM unsegregated accounts, the efforts to sign up investors was connected to the wrongful transfers. But this is *post hoc ergo propter hoc* thinking. That same thinking was applicable at the motion to dismiss stage, and Judge Rakoff rejected it then. It follows that the Defendants have not indisputably established a linkage between Refco's efforts to solicit investors and the transfers of excess cash to unsegregated accounts.

Drawing all reasonable inferences in favor of the Plaintiffs, the motion for summary judgment should be denied insofar as it is based on a corporate benefit resulting from increased assets under management.

### Conclusion on in pari delicto

The motion for summary judgment should be denied insofar as it is based on the affirmative defense of *in pari delicto.*

# VI. Proximate Cause

The Defendants contend that summary judgment must be granted because the Plaintiffs cannot prove that anything the Defendants did proximately caused SMFF's damages. It is undisputed that in October 2005, Sugrue obtained from Refco the entirety of SMFF's excess cash that was then at RCM — all $312 million. *See* Defendants' Rule 56.1 Statement ¶208-09 (undisputed). Subsequently PlusFunds/SPhinX returned $263 million to the RCM unsecured creditors' committee in settlement of the Preference Action that was brought against SMFF by that committee. Id. at ¶226 (undisputed). It is that returned money (plus interest) that represents SMFF's claim for damages.

The Defendants argue that it was PlusFunds/SPhinX that settled the Preference Action and gave the money back in what their own counsel has called "the dumbest settlement ever." Connelly Ex. 198. They note that the Plaintiffs themselves attacked the Settlement — unsuccessfully — in the Second Circuit. Connelly Ex. 197. So the Defendants conclude that it was PlusFunds/SPhinX's own bad decisionmaking that was the proximate cause of the loss of the $263 million.

The Special Master has already considered whether the Preference Settlement indisputably breaks the chain of causation from third-party aiding and abetting. Owens and Kavanagh made the same argument in moving to dismiss the Plaintiffs' claims against them. The Special Master responded as follows:

The Defendants argue that had the SPhinX Board not entered into the settlement, "SPhinX may very well have prevailed in its defense of the Preference Action" and therefore it is the SPhinX Board's "own unlawful and unauthorized conduct in entering into the Preference Action settlement agreement that directly caused SPhinX's loss." Memorandum in Support of Motion to Dismiss at 39. This is an interesting argument, because it is based on an alleged intervening wrong by one of the claimants in the action. But it is ultimately not a sufficient basis upon which to grant a motion to dismiss. This is so for a number of reasons:

> 1) The Preference Action settlement was never determined to be "unlawful and unauthorized" — it was attacked as such by Investors but those arguments were not considered for lack of standing.  Thus the wrongful nature of the settlement as a basis for cutting the chain of causation is at best a question of fact.

> 2) More importantly, it is highly disputable that SPhinX would ultimately have been successful in defending the Preference Action. The Defendants' only contention on this score is that a court might have ruled that RCM held the cash in trust for SMFF, and therefore that the cash was not property of the Refco Estate (citing *Begier v. IRS,* 496 U.S. 53, 59 (1990)). But at the very least the question of whether the cash was held in trust is and would have been a disputed question of fact. In this very action, the Court has upheld the Special Master's determination that the excess cash *was* property of the Refco Estate — that is the basis for the ruling in the Standing R and R regarding the Refco Fraud. Thus, the Defendants' argument that the Preference Action settlement broke the chain of causation is speculative. There is at minimum a jury question as to whether SPhinX would have prevailed in the Preference Action.

Owens and Kavanagh R and R at 22.[22]

The Defendants do not mention the analysis in the Owens and Kavanagh R and R; but they raise a few points that at least need to be addressed to determine whether the Special Master's previous analysis is somehow inapplicable on this motion. Ultimately, nothing propounded by the Defendants changes the analysis in the Owens and Kavanagh R and R: that the Preference Settlement does not indisputably constitute a superseding act that precludes the Plaintiffs from proving proximate cause.

### The Plaintiffs' Continued-Segregation Theory

The Defendants argue that the Plaintiffs, since filing their Amended Complaint,  have propounded a theory that the excess cash remained segregated when transferred to RCM —  so

---

[22] The Special Master's analysis in the Owens and Kavanagh R and R was affirmed and adopted in full by Judge Rakoff in an Order dated December 6, 2011.

under their own theory the cash was never part of the RCM Estate, and so the transfer back to Sugrue could not have been a voidable preference. But this argument changes nothing for at least three reasons:

1) To the extent the Plaintiffs are accountable because the theory was propounded by the Plaintiffs' expert, Greenberger — as the Defendants argue — that is no longer relevant because Greenberger's expert opinion has been struck in its entirety by Judge Rakoff, in an Order dated February 5, 2013.

2) To the extent the Plaintiffs are accountable because they proposed their continued-segregation theory in a letter brief to the Special Master dated November 9, 2009 — as the Defendants argue — that theory does not bind them as a judicial admission. It's a theory, not an expression of fact, and judicial admissions only apply to statements of fact. *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985). This is as it should be, because parties are and should be free to propound alternative theories in the course of a litigation. *See* Fed. R. Civ.P. 8(e)(3) ("A party may state as many claims or defenses as it has, regardless of consistency."); *United States v. Matthews*, 485 U.S. 58 (1988) (rejecting the government's argument that pleading inconsistent defenses is inappropriate). Thus the Plaintiffs are free to argue that the cash remained segregated when at RCM and, if not, the transfers to RCM were improper. That alternative argument does not prejudice the Defendants here at any rate, because they are not charged with aiding and abetting improper transfers to RCM.

3) Whether the Plaintiffs have propounded a theory of continued-segregation is in the end a red herring because the question is not what the Plaintiffs think but whether the theory had validity such that it would have been an indisputably dispositive defense to the Preference Action. That just brings us back to the Owens and Kavanagh R and R, in which the Special Master evaluated the argument that the cash was not property of the Refco Estate and concluded that the viability of that argument was at best a question of fact. That ruling, grounded in concepts of proximate cause, is consistent with case law holding that the plaintiff's settlement of a lawsuit brought as a foreseeable consequence of a tort does not cut the chain of causation. *See National Enterprises Corp. v. Dechert Price & Rhoads*, 246 A.D.2d 481, 667 N.Y.S.2d 745, 747 (1st Dept. 1998) (in a malpractice action that led to the plaintiffs being sued for fraud, the plaintiffs' settlement of the fraud action was not a superseding cause of their loss as a matter of law, because there was a triable issue as to whether the settlement was compelled by the malpractice.). *See also Whitman & Ransom v. Revson*, 220 A.D.2d 321, 632 N.Y.S.2d 567, 568 (1st Dept. 1995) (plaintiff "should not be precluded from advancing a claim based upon her assent to a settlement allegedly compelled by plaintiff's malpractice"). In this case it was foreseeable that once the RGHI receivable was disclosed, SMFF would be involved in litigation to try to get the money back. The fact that SPhinX settled that litigation does not indisputably cut the chain of causation.

Thus nothing about the Plaintiffs' continued-segregation argument affects the reasoning of the Owens and Kavanagh R and R — that the effect of the Preference Settlement on the issue of proximate cause is a question of fact.

### Rogers Funds recovery

The Defendants argue that the wrongheadedness of the Preference Settlement is demonstrated by the fact that the Rogers Funds got all its money back from Refco by making the argument — in an adversary proceeding in the RCM bankruptcy —  that the Rogers Funds assets on deposit at RCM were entitled to segregation and so were not property of the RCM Estate. Connelly Ex. 193, Rogers Funds Complaint. The Rogers Funds also brought an action against Refco LLC for any losses caused by the transfer of assets to unsegregated accounts at RCM. Connelly Ex. 194. The Rogers Funds settled their claims against RCM and Refco LLC, and, according to the Defendants, "ended up recovering more than 100% of the assets that had been on deposit at RCM at the time of its bankruptcy." Defendants' Rule 56.1 Statement ¶222.[23]

The success of the Rogers Funds is relevant evidence that SPhinX *might* have prevailed in the Preference Action had it not been settled. But at best it raises a question of fact as to whether the Preference Settlement broke the chain of causation from the Defendants' actions. As the Plaintiffs point out, there are a number of differences between the Rogers Funds claims and those of SMFF. For one thing, the Rogers Funds plausibly alleged that none of their agents knew anything about the cash transfers, while SMFF obviously could not make that claim — thus the case on unauthorized transfer was stronger for the Rogers Funds. The cases were also in a different procedural posture: SMFF was being charged with being party to a voidable preference, whereas the Rogers Funds was seeking to get its money from the Estate. There is at least a question of fact as to whether these different procedural postures might have an effect on litigation outcome.

Finally and most importantly, the Rogers  Funds outcome was not preordained from the outset. At the time the decision was made to settle the Preference Action, there was no indication that the Rogers Funds would be as successful as it was. The Defendants make their causation assertion with the benefit of hindsight.[24] At the time, however, respected counsel for SPhinX advised that the Preference Action should be settled because the chances of a bankruptcy court finding a constructive trust was unlikely, as such a finding would disadvantage the other creditors. *See*

---

[23] The Plaintiffs argue that the Special Master, affirmed by Judge Rakoff, has already determined that there is a question of fact as to whether the Rogers Fund recovered 100% of its damages. *See* R and R on Grant Thornton's Motion for Summary Judgment in the PAT case, June 18, 2012, at 22-24. But while that is an accurate statement, the Special Master in that R and R was working at the margin — it was clear that the Rogers Funds recovered the lion's share of their losses, and the only question was whether it was 100% and so their action for damages would have to be dismissed. For purposes of the discussion here, it is appropriate to assume that the Rogers Funds substantial recovery at least approximated 100%.

[24] In fact we don't know *why* the Rogers Funds was so successful in getting the money back. There was never an adjudication that the Rogers Funds money remained segregated and so was never part of the RCM Estate. The case settled and certainly reasonable minds can differ over whether it settled because of the strength of the segregation argument.

Andelin Ex. 95.[25]

Thus nothing about the Rogers Funds changes the reasoning of the Owens and Kavanagh R and R, i.e., that the effect of the Preference Settlement on the issue of proximate cause is a question of fact.

### *Farquharson's conduct*

The Defendants note that one of the SMFF directors who approved the Preference Settlement — Patrina Farquharson — acknowledged that her close ties to BAWAG were a factor in her decision to approve the Preference Settlement. Connelly Ex. 44 (Farquharson Dep. at 496). The Defendants don't make much of this point, and at best it raises a question of fact as to how Farquharson's activities and motivations might have affected the decision to settle the Preference Action. Drawing inferences in favor of the Plaintiffs, there remains a jury question on whether SPhinX would have or should have settled the Preference Action regardless of Farquharson's situation. After all, the Special Master and the Court found SMFF's constructive trust argument to be sufficiently questionable on its own — thus plausibly justifying the Preference Settlement — without considering Farquharson's situation. *See* Owens and Kavanagh R and R at 22, quoted above.

——

For all these reasons, the Defendants' motion for summary judgment should be denied insofar as it is based on the Preference Settlement as constituting a superseding cause for SMFF's

---

[25] If counsel's recommendation to settle was bad advice — which is in any case a question of fact — it would not break the chain of causation. It would just constitute a case of multiple wrongdoers each causing the same damages. As the Special Master stated in the Owens and Kavanagh R and R at 22:

> New York law provides that proximate causation is present where it was "reasonably foreseeable" that the damage incurred would follow from the wrongful act. *Id. See also In re Parmalat Sec. Litig.,* 501 F.Supp.2d 560, 580 (S.D.N.Y. 2007) ("It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm."). Indeed, if another wrongdoer's conduct was sufficient in all cases to cut the chain of causation by other actors, there would never be a concept of aiding and abetting liability — that liability, as discussed below, has been held to require a finding of proximate cause, but there could be no proximate cause under the Defendants' theory because of the existence of a primary wrongdoer.

damages.

## VII. Conclusion and Recommendation

*The Defendants' motion for summary judgment should be denied.*

Daniel J. Capra
Special Master

Dated: April 21, 2013
New York, New York